```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK



HAGER DA SILVA,                 *  Case No. 17-CV-4550 (FB)
                                *
                                *
             Plaintiff,         *  Brooklyn, New York
                                *  March 28, 2018
      v.                        *
                                *
NEW YORK CITY TRANSIT           *
  AUTHORITY, et al.,            *
                                *
             Defendants.        *
                                *
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

            TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
                 BEFORE THE HONORABLE VERA M. SCANLON
                   UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:              DAVID ALAN ROTH, ESQ.
                                ELLIOT DOLBY-SHIELDS, ESQ.
                                Roth & Roth, LLP
                                192 Lexington Avenue, Suite 802
                                New York, NY 10016


For the Defendants:             MARK S. YAGERMAN, ESQ.
                                MARCIA K. RAICUS
                                Smith Mazure Director Wilkin's
                                  Young and Yagerman
                                111 John Street, 20th Floor
                                New York, NY 10038

                                DENISE FURIANO ROZZA, ESQ.
                                New York City Transit Authority
                                130 Livingston Street, 11th FL
                                Brooklyn, NY 11201


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1          (Proceedings commenced at 4:25 p.m.)

2              THE COURT:  Harger Da Silva versus New York City

3      Transit Authority, et al., 17-CV-4550.  So for the plaintiff?

4              MR. ROTH:  David Roth, from Roth and Roth, Your

5      Honor, and my associate Elliot Shields, also from Roth and

6      Roth.

7              THE COURT:  Mr. Shields, did you file a notice of

8      appearance?

9              MR. SHIELDS:  I have not yet, Your Honor.

10             THE COURT:  Okay.  You should do that.

11             MR. SHIELDS:  Yes, I will.

12             THE COURT:  All right.  For defendants, yes.

13             MR. YAGERMAN:  Good afternoon, Your Honor.

14         Mark Yagerman, Smith Mazure Director Wilkins Young

15     and Yagerman, for New York City Transit Authority and my

16     associate, Marcia Raicus.  We both filed appearances.  We just

17     came into the case some time early of last month.  And Denise

18     Rozza is in house with New York City Transit Authority.  She

19     previously was handling the case.

20             THE COURT:  All right.  How do you spell your name,

21     your last name?

22             MS. FURIANO ROZZA:  Furiano Rozza, F-U-R-I-A-N-O and

23     Rozza, R-O-Z-Z-A.

24             THE COURT:  Okay.  This is one of my law school

25     interns, law students and interns in the courthouse.  All

3

1      right.

2              So for my benefit, for his benefit, for my deputy's

3      benefit, I know you went through some of this before with

4      regard to my colleague, but the case was transferred to me.

5              So before we dive deep -- you're standing up, you

6      can have a seat -- before we dive deeply into your discovery

7      issues, do you want to just orient me with regard to your

8      respective positions, so --

9              MR. ROTH:  Do you want me to stand, Your Honor?

10             THE COURT:  No, it's fine.  You can stay seated.

11     Just use the microphone.

12             MR. ROTH:  So this is a case where my client, Ms.

13     Harger Da Silva, is a 19 year old architectural student from

14     Brazil visiting her boyfriend in America.

15             And she's -- it's the Summer of 2016, she's waiting

16     at the platform and she faints and slides into the subway

17     tracks at Barkley subway station.

18             The train comes in, amputates her arm and her leg

19     above the knee, above the elbow.  I've been litigating against

20     the transit authority for many, many, many years and one of

21     the things that happens is --

22             THE COURT:  Your colleague is shaking he head over

23     there.

24             MR. ROTH:  So anyway -- so one of the things that

25     has caught our attention is the statistics that the transit

4

1    authority keeps and the way in which they decided to design

2    and maintain their subway system.

3         So our claims here are, one, which we don't have, we

4    just got information, is did the train operator have the

5    opportunity to stop and was he negligent in failing to stop in

6    time.

7         The train operator, from the documents that they've

8    given us, has not given a statement, but he says he sees her

9    faint and didn't have time to stop and he threw it in as soon

10   as possible.

11        The other -- we actually have two other claims, but

12   the main claim is that the Transit Authority has chosen not to

13   put up platformage doors or some kind of edge protection to

14   stop people from falling into the subway system, into the

15   tracks.

16        What happens is that over the years in other cases

17   which I've had experience, that the Transit Authority has

18   asserted immunity defenses and in state court they asserted

19   immunity defenses after verdict and then the appellate

20   division will throw a case out all the way after trial because

21   of --

22        THE COURT:  And this is all in general about

23   immunity --

24        MR. ROTH:  Yes.

25        THE COURT:  -- or just about this barrier issue?

5

1         MR. ROTH:  Well this is not the -- no, this is not -

2  - the cases that I'm talking about actually, the gap cases

3  which they no longer get immunity for because we found that

4  the study that they did was no study at all.

5         So -- but for years and years and years until we

6  fought, fought, fought to get the actual document that they

7  relied on for their policy, they allowed all of a sudden

8  having dismissed, dismissed, dismissed cases all of a sudden

9  after I was able to obtain a document that said, I think six

10  inches is a good idea with no measurement, no study, they

11  starting losing that.

12         So the immunity discovery is extremely important to

13  say, what's your basis for not putting them up, and you know -

14  -

15         THE COURT:  But what about a different question

16  which is why is it that this is the standard of care that you

17  think is industry appropriate, New York City appropriate,

18  where does this come from?

19         MR. ROTH:  Well, where it comes from is that in many

20  other stations across the world that they have these edge

21  doors, okay --

22         THE COURT:  Less then a 100 year old system, since

23  what I could gather from this --

24         MR. ROTH:  Okay.  And what I'll say is that there's

25  a -- the various immunity statutes all say that you're allowed

6

1   to have a design, and you can make your decision, and you can

2   do whatever you want, but once you begin to realize and once

3   people start to die and once people start to get hurt, say you

4   know what, you can't just say, hey, we have a safe design.

5         So if you're going to rely on -- and they said, you

6   know, in their letter to you, they wrote that it's been 100

7   years old and if you can say, okay, we're not supposed to make

8   any safety improvements in 100 years, and --

9         THE COURT:  I mean, but it's obvious what they're

10  saying.  They're saying retrofitting 400 plus stations with

11  guides given the size, shape, distance, et cetera, this is

12  completely impractical.  They can barely manage to keep up

13  with the maintenance of the system, let alone do the kind of

14  retrofit that you're talking about.

15        MR. ROTH:  So there's a choice -- there's choices

16  that they have and I'm -- if this was a motion for summary

17  judgment on the immunity and I would have all of the

18  information, I'd be able to show you that the choices that

19  they made and that I have some --

20        THE COURT:  I know, but where do you get the

21  industry standard?  I mean, there's going to be the basics

22  that are, you know, necessary.  So lighting, I mean, maybe no-

23  slip surfaces, et cetera and then there's going to be above

24  and beyond.  So where does it come from that this is the

25  standard for negligence?

1           MR. ROTH:  So there's many other stations across the

2    world and in the United States of America that do have the

3    platform edge doors, okay.

4           THE COURT:  Well, what about retro --

5           MR. ROTH:  Well, all that's again, so when you say

6    retrofit, okay, when you say retro --

7           THE COURT:  I mean is there a better word?

8           MR. ROTH:  No, no, no, no.  So what I'm saying is

9    right this second, they're installing platform edge doors in

10   the L train.  They have known about this and according to

11   their own documents, for years and years and years.  They

12   built -- hold on -- okay, sorry.

13          THE COURT:  Yeah, but this, so where do you -- no,

14   you hold on.  Where does the standard come from because there

15   is a different between negligence and what one might like if

16   you could have everything you wanted in a system.

17          MR. ROTH:  So the difference between a lot of the

18   other immunities that cases what they have where there's a

19   standard, not standard, if you have a design and there's a fix

20   that could be -- and you choose not to do that fix, as Mr.

21   Yagerman said in the last conference, he says there's

22   executive decision making, there's costs, there's all this

23   other stuff, and if they're entitled to their immunity, they

24   will get their -- they will win.

25          THE COURT:  So what are they -- what --

8

1          MR. ROTH:  And what I'm saying is that once you know

2     that to a moral certainty that if you install a safety device,

3     nobody will -- that there will be no more amputations, there -

4     -

5          THE COURT:  Well, what you don't know is whether

6     there would be other problems.

7          I mean you'd have to design it for each -- I'm going

8     out on a limb here, but you have to design it for each

9     station.

10          So you wouldn't be able to change the length of the

11    cars, you wouldn't be able to use different cars on a

12    particular line, you might have overcrowd -- you know, et

13    cetera, et cetera, et cetera.

14          Plus, I can't even imagine how many zeros are on the

15    end of the -- adding these barriers to the stations.  I mean,

16    you probably could just take the L line, if you're saying

17    they're putting it in there and multiply that by however many

18    stations there are.

19          MR. ROTH:  So at the monorail in Disney World

20    there's a four foot high chain link fence that runs the length

21    of it.  They had to shuttle in -- I don't know if you get the

22    shuttle at Times Square -- they have a red railing that runs

23    along there.  The fact that they --

24          THE COURT:  Yeah, that's extremely crowded and -- I

25    don't -- I wonder if that's the best way.

9

1           MR. ROTH:  Well, all I'm saying is that --

2           THE COURT:  But anyway, that's personal experience.

3    I'm not the witness.

4           MR. ROTH:  Right, right.  So what I'm saying is that

5    there's many options and I think that, you know, depending on

6    what they say because, you know, they have their own customer

7    contact with train report, they have --

8           THE COURT:  But is it called customer --

9           MR. ROTH:  Yes.  It says customer contact with train

10   --

11          THE COURT:  Oh, meaning customers who have -- who

12   are hit by the train.

13          MR. ROTH:  Right.  And you can -- and actually I

14   gave this to the defendants so that they could kind of see it.

15          They say that in the last -- it's in my letter,

16   there's I think 522 deaths, 1,600 amputations, there was

17   serious injuries that they have recorded and what I'm saying

18   is, is that -- so the theory that they're espousing is we're

19   too big to be safe.  Okay.

20          And that they say that there's budgetary concerns

21   and there's all this other stuff.  If they're entitled to

22   those immunities, and I said to them at the last conference

23   and even beforehand, I said, you know, that if you're going to

24   declare these immunities, you have the burden of proof on the

25   immunities and that's going to be a big burden and if it comes

1       out that after all of the discovery comes out in the immunity

2       that you're entitled, then you win.

3              And if you're not entitled to it and say, wait a

4       minute, you know, wow, based on the case law if you know that

5       all these people are hurt and there's some options that are

6       available and you just chose not to do it, you chose not to

7       make it safer, then maybe you don't get the immunity and maybe

8       it goes to a jury, then the rest of the pressure of the

9       discovery on the case would be, you know, would be changed.

10      So all --

11             THE COURT:  But are you arguing that there should be

12      -- so that -- there is -- I'm trying to think of the last

13      airport I was in that had this --

14             MR. ROTH:  Yes.

15             THE COURT:  -- in -- I don't know where it was, I'm

16      trying to think where I went -- one of the air trains --

17             MR. ROTH:  JFK.

18             THE COURT:  -- but yeah, that they -- you're saying

19      they should have that or they should have those red bars that

20      they have at the shuttle?

21             MR. ROTH:  I'm saying is that there's a whole bunch

22      of options available to them.  I don't know what they studied,

23      I don't know what cost analysis they made, I --

24             THE COURT:  All right.  So then you're saying every

25      single safe -- and I don't understand what their relationship

1    is between the city -- where you're saying the city needs to

2    or the transit needs to consider a particular safety

3    improvement.  How are you fitting that standard, right?

4             And presumably around the world there have been

5    safety improvements in how one builds a subway system and you

6    could keep saying that that's the standard, but you know,

7    which they should -- the Transit should meet.

8             It doesn't really seem that likely or practical, so

9    you know, how is the -- how does one figure out what the

10   standard of care is here for your negligence claim?

11            MR. ROTH:  So what I'm saying is that when they're

12   aware of the people getting injured in certain situations and

13   that they're depending -- that for them to get immunity or the

14   different types -- there will be different types of immunity

15   they're asserting, for them to get immunity they have to do a

16   study to say that this is -- and then they have to rely on

17   that study and it has to be an adequate study --

18            THE COURT:  That -- I think it's a different -- I'm

19   asking you what's the standard of care?

20            This would be your case, you would have to show -- I

21   mean, I know you had this discussion about immunity, but you

22   have to show there's a breach of a standard of care.  So where

23   does the standard of care come from?

24            MR. ROTH:  The standard of care comes from that you

25   want to keep people safe and you're a common carrier.  You

1      have a non-delegable duty to keep your premises safe.

2             If you know to a moral certainty that hundreds, if

3      not thousands -- I don't know how long they've kept records --

4      thousands of people are dying and you're making different

5      choices of how to, you know, how to spend your money --

6             THE COURT:  Yeah, but I mean -- okay.  Now to get a

7      little bit in the weeds, thousands of people are dying.  Well,

8      from what I can tell from my informal contacts with people who

9      work in the police, it's pretty much a person a day jumps in

10     front of a subway car.

11            Well that person went onto the tracks and I'm not

12     sure if they could have done all that much about that, but

13     your client apparently fainted and fell on the tracks.

14            So you know, you're talking about a report that

15     talks about -- I think you're talking about a report that says

16     all contacts with the subway, right?  So how did this get

17     separated out so that you could tell what risk would be dealt

18     with?

19            Now maybe if you close off the ends of the platform,

20     you can stop the jumpers, I don't know.  But, you know, again,

21     what number here, you know, because it's dramatic to say

22     thousands of people are dying and they've known this for years

23     and then you say, well what's really going on here and again,

24     who -- where does this standard of care come from?  Like

25     apples and oranges, what are we really talking about here?

13

1          MR. ROTH:  So you're saying is -- so is your

2     question to me, why are they -- like let's assume there's no

3     immunity, just generally why are they negligent?

4          THE COURT:  Yeah, just what's this case about,

5     what's your theory of negligence here?

6          MR. ROTH:  I'm saying if they were not entitled to

7     immunity, I think that I could go to the jury and say that the

8     Transit Authority was aware that they had a system and that

9     they made choices and that they chose not to have a safe

10    subway system.

11          That maybe that the Transit Authority because of the

12    way it's constructed, maybe certain stations are very crowded,

13    maybe that there's a lot of different things that they're

14    doing which -- and they've done studies now, how come they're

15    starting to put the doors in the L train?  I don't know.

16    Maybe they've had other proposals, I don't know.

17          So all I can say is that that discovery -- and I

18    don't think if you think I'm coming before you and saying, oh,

19    I think this is the easiest case in the world, I am certainly

20    not by any means.

21          THE COURT:  No.  And what I would do if -- and I

22    don't think this should be an examination of a capital

23    investment decisions made by the Transit Authority across the

24    board.

25          So I'm trying to figure out what exactly your theory

14

1    is, how you see what the immunity issue is and then talk about

2    discovery.  Because from the letters that I've read, you have

3    some seemingly intense dispute about what should be turned

4    over with initial disclosures.  But it would be helpful for me

5    to understand the case.  All right.  So --

6            MR. ROTH:  Oh, Your Honor, there's no -- we're not

7    disputing it.  I mean, I don't think that we're disputing it,

8    I said whatever documents you're going to rely on for your

9    immunity and all I said was, at the initial conference was,

10   listen, it's going to take you a long time and if you -- you

11   know, and that we should focus on that and whatever you need

12   to get that because otherwise you'll blow every deadline that

13   we have.

14           THE COURT:  I don't see how they're going to -- that

15   part, that's what I don't understand here, but --

16           MR. ROTH:  Well, they had initial disclosures that

17   they say they want to give us discovery and they can't make

18   it.

19           THE COURT:  Yeah, but so my understanding, and I'll

20   hear from defendant's counsel, is that initial disclosures are

21   at the time when you evaluate the case, well who do you know

22   would be witnesses and what kinds of documents do you have.

23           You don't need to produce all the documents, I mean

24   you may want to tee this up for an early motion, et cetera, et

25   cetera, so I'll hear for one second, but I don't see given

1     even the production, which did not need to be filed, the

2     docket seems to be off to a good start.

3              But anyway, what's the defendant's view of what's

4     going on here and how you think this issue of immunities or

5     other issues should be brought to the fore of the case?

6              MR. YAGERMAN:  Thank you, Judge.  And I did -- I

7     provided our complete investigative file --

8              THE COURT:  For the incident itself?

9              MR. YAGERMAN:  -- but -- for the incident itself.

10             THE COURT:  I get it.  Maybe I should go back to the

11    plaintiff.  What's the theory that the operator was negligent?

12             MR. ROTH:  Did he have time to stop before --

13             MR. YAGERMAN:  She, it was a she.

14             MR. ROTH:  Did she have the --

15             THE COURT:  She -- how is that negligent --

16             MR. ROTH:  If you're on the track and you can see it

17    and then you're not paying attention, that's why there's an

18    operator and you can run somebody over.  There's many, many

19    cases where somebody if they have the opportunity to stop and

20    they don't stop, but then they're negligent.

21             That's why there's an operator.  It's a

22    straightforward -- it's called a 12-9 case, they have tons of

23    them.  Many they win, many they lose.

24             THE COURT:  And there's some evidence in this case

25    that there was time to stop from when she fainted onto the

16

1    track?

2              MR. YAGERMAN:  I don't believe so, but -- I don't

3    believe so.

4              THE COURT:  Okay.  All right, so let's --

5              MR. YAGERMAN:  I think there was an emergency that

6    existed and the train operator brought the train to the stop

7    as quick as she could have and couldn't avoid the accident.

8              Basically that's -- but regarding Mr. Roth's, you

9    know, proposition, I have found not one case, reported case,

10   establishing a duty of care to provide, you know, barrier

11   guards or intrusive devices on platforms. There's none.  In

12   fact --

13             THE COURT:  None, none in New York, none around the

14   country, none --

15             MR. YAGERMAN:  None in New York --

16             THE COURT:  Okay.

17             MR. YAGERMAN:  -- at the very least.  In the

18   country, there are no subway systems --

19             THE COURT:  As old --

20             MR. YAGERMAN:  -- that has --

21             THE COURT:  -- or as big.

22             MR. YAGERMAN:  -- barrier guards in this country --

23             THE COURT:  Is there other --

24             MR. YAGERMAN:  -- other than, you know, the limited,

25   you know, trolley systems --

```
 1                 THE COURT:  Disney.

 2                 MR. YAGERMAN:  -- like at JFK or whatever.

 3                 THE COURT:  Okay.

 4                 MR. YAGERMAN:  In fact foreign countries, Paris, I

 5      think there were --

 6                 THE COURT:  Paris.  I feel like -- I'm trying to

 7      remember, I know there was somewhere --

 8                 MR. YAGERMAN:  There's only like three lines that

 9      have barrier guards on the Paris line out of many, many lines

10      that they have.  And in Britain, I think in London, they have

11      only two or three as well out of the many lines that they

12      have.  Shanghai as well and South Korea, the whole system is

13      not covered by barrier guards.

14                 THE COURT:  All right.  So your point would be

15      they're going to lose on this idea, the duty of care because

16      the both domestic and international standard for --

17                 MR. YAGERMAN:  Exactly.

18                 THE COURT:  -- for subway stations does not include

19      a barrier guard.  All right.

20                 MR. YAGERMAN:  Exactly.

21                 THE COURT:  What about the -- how do you look at the

22      immunity issue?

23                 MR. YAGERMAN:  Well the way I look at it, Your

24      Honor, is that, you know, the Transit Authority is always

25      trying to explore different ways to improve service and safety
```

1    on the system.

2            And, you know, the Transit Authority, you know, back

3    probably in 2013, you know, came out with a paper that said,

4    you know, we're going to warn passengers not to stand by the

5    edge --

6            THE COURT:  Right, stand away from --

7            MR. YAGERMAN:  -- to get -- stand away --

8            THE COURT:  -- stand away, behind the yellow line,

9    behind the --

10           MR. YAGERMAN:  Exactly.

11           THE COURT:  -- the bumps for the --

12           MR. YAGERMAN:  You know, a whole education campaign

13   with placards and announcements and personnel wearing buttons

14   and, you know, when you buy your token -- not your token, your

15   metro card --

16           THE COURT:  If you --

17           MR. YAGERMAN:  I'm dating myself, Judge.  And I

18   started at the TA in 1979, so I remember tokens.

19           THE COURT:  The little token with a Y.

20           MR. YAGERMAN:  But -- and in the interim while we're

21   warning, we're making plans to see what kind of prototypes we

22   can have on different stations like the Canarsie line.

23   They've picked out three lines on the Canarsie line while the

24   station is closed because --

25           THE COURT:  Three stations on the Canarsie line?

19

1      MR. YAGERMAN:  -- while the line is closed, the

2      construction is being done like 2019, 2020, to see what kind

3      of prototypes we can do on some type of barrier system at

4      Canarsie on the yellow line.  They picked out three stations

5      that they're trying to figure out compatibility.

6              There are -- you kind of hit it on the head, Your

7      Honor.  There are so many limitations and challenges to

8      putting barrier guards or intrusive devices, detection devices

9      on a hundred year old system.

10             Each station out of the 472 stations, and 665 miles

11     of track, covering each of the counties and the city,

12     including Staten Island (indiscernible), has limitation.

13             Just look at, you know, down here at Court Street,

14     you know, there are columns that support the roof of the

15     underground, you know.

16             The devices that he is talking about to retrofit,

17     you'd have to take away all those columns.  I mean the

18     electricity, the -- each station is unique.  The curvature

19     that runs with particular streets --

20             THE COURT:  Okay.  So you're talking about whether

21     and how it can be done.  One question that plaintiff is

22     raising, I think, is you could have the fancy kind that you

23     have at the airport, or you could have what is at 42nd Street

24     for the shuttle at Times Square, those red bars and everybody

25     has to stand around and wait until everybody gets off and then

20

1    you get on and so --

2            MR. YAGERMAN:  Again, that has limitations as well.

3    There has to be, you know, safety considerations, whether it

4    could mesh with -- let's take this particular station, the

5    Atlantic Avenue Station.

6            Can he tell us that that could do it in the Atlantic

7    Avenue -- no one, no.  We don't know if it's feasible or not.

8    I mean, whether there's, you know, safety considerations for

9    that particular station.

10           THE COURT:  All right.  So, just so I understand --

11           MR. YAGERMAN:  And whether it's safety or

12   compliance.

13           THE COURT:  So you have the issue of you believe the

14   domestic and international standard of care does not require

15   this kind of installation.

16           MR. YAGERMAN:  Correct.

17           THE COURT:  How does the question about the

18   executive branch being allowed to, in a responsible way, have

19   priorities as to spending?  I mean, we're all here.

20           MR. YAGERMAN:  Absolutely.

21           THE COURT:  I have to say, I sometimes, you know,

22   sometimes ride the subway -- the *New York Times* did its whole

23   report and it would seem like terrorism and signal failures

24   are going to be pretty high on your list of things that you

25   need to deal with.

1         And while, obviously, what happens here and whatever

2    the number turns out to be, people were hurt by contact with

3    the train, seeing your position Is we can decide which are the

4    most serious and most widespread problems that need to be

5    dealt with in order to keep the system running.

6              MR. YAGERMAN:  Exactly.

7              THE COURT:  So how does that --

8              MR. YAGERMAN:  -- It doesn't have to be the best --

9              THE COURT:  -- idea fit in --

10             MR. YAGERMAN:  -- decision, Your Honor, it has to be

11   a rational decision.

12             THE COURT:  Right.  So how does that idea fit in

13   with this case and arguments that you're going to raise?

14             MR. YAGERMAN:  Well, it fits within the argument

15   that as an executive body making decisions about where money

16   is spent and whether you have money to spend, there are

17   priorities.  And whether --

18             THE COURT:  And you're saying give -- you have the

19   right to make those decisions?

20             MR. YAGERMAN:  Exactly, 100 percent.

21             THE COURT:  All right.  So in terms of the process,

22   I mean, it seems like, just again looking at your letters

23   here, you're talking about exchanging a lot of information,

24   but I'm not sure where you were going with procedurally how

25   this would be resolved.

22

1          Because on the one hand, plaintiff, you're making

2    the point, while you ultimately thwarted one effort of

3    claiming immunity, what you don't want to have is litigate

4    this whole case and then find out at the end that there's an

5    immunity and it's a waste of everybody's time and your

6    client's hopes and your money, et cetera, et cetera.

7          MR. ROTH:  That's correct.

8          THE COURT:  On the other hand, at least the letter

9    that's on the docket at 30, you know, it talks about the

10   plaintiff and all of the plaintiff's issues, including her

11   health care in Brazil.

12         So that suggests you're talking about doing most of

13   the discovery. I mean, unless you're talking about settling,

14   it seems like plaintiff's situation is really the second part

15   -- maybe the third part of this, immunity, liability, damages.

16   So --

17         MR. YAGERMAN:  Well, there is an issue with getting

18   records from Brazil and being able to defend the case on that

19   score, and whether we've received proper authorizations to

20   release those records.

21         THE COURT:  Well, what -- I'm sorry, I have question

22   sort of prior to that.  Are you trying to do all the

23   discoveries so that there's one global motion or -- and this

24   is really trying to me catch up with what's --

25         MR. YAGERMAN:  What I would have like to do, Judge -

1    --

2              THE COURT:  -- going on with Judge Pollak.

3              MR. YAGERMAN:  What I'd like to do is try and do the

4    initial fact discovery first and get to the immunity issue at

5    some point after we've done the fact discovery.

6              THE COURT:  What's the theory being, you might

7    settle or --

8              MR. YAGERMAN:  Well, I think --

9              THE COURT:  -- I guess I'm unclear, why do you care

10   about the plaintiff's damages if --

11             MR. YAGERMAN:  Because there's immunity issue -- the

12   issue relating to the barrier guards and technology can be

13   dealt with on a motion, and I feel that at some point in time,

14   the court would schedule a time to --

15             THE COURT:  Correct.  So maybe I'm asking it

16   unclear, but it seems to me you want to raise an immunity

17   question, you want -- and generally try to deal with

18   immunities early, so you're trying to have this -- varying

19   descriptions of your letters, but limited discovery, although

20   it's about, it's only limited in the sense about the topic,

21   not limited in the sense that there's a lot of paper it seems

22   like it.  But there's the immunity issue and there's the

23   event, I mean --

24             MR. ROTH:  The event, that's a --

25             MR. YAGERMAN:  The event -- the events I have I --

24

1    you know, is something that we can deal with kind of readily.

2              THE COURT:  Okay.

3              MR. YAGERMAN:  The immunity issue is accumulating

4    the decision-makers, so to speak, so I can get them to the

5    court in a very clean manner.

6              THE COURT:  But my question is, do you want to have

7    --

8              MR. YAGERMAN:  It takes time for me.

9              THE COURT:  -- do you -- are you trying to have a

10   global summary judgment motion that's -- puts all three of

11   these issues before the court or at least the two, one is the

12   immunity and the second is the alleged negligence and I guess

13   there's some overlap to the extent that even plaintiff's

14   proposal that could have saved the plaintiff from these

15   injuries.

16             I don't know -- hypothetically maybe those big glass

17   doors that you're talking about from the airport would, but

18   the, you know, the red, I don't know, whatever they are --

19             MR. ROTH:  Railing?

20             THE COURT:  -- steel poles, railings, that are --

21             MR. ROTH:  Well, there's, I'm just saying there's

22   choices, I wasn't saying those specific --

23             THE COURT:  -- I mean, but the choices -- well but

24   the point is given what happened to her, would it have made a

25   difference?

1          MR. ROTH:  The red pole would have.

2          MR. YAGERMAN:  No.

3          THE COURT:  They probably wouldn't have caught her.

4          MR. ROTH:  Excuse me, Your Honor, I mean my son just

5    went to Japan.  He knows -- he's 17 years old. He knows what

6    we talk about is this, and he took like ten pictures of a four

7    foot high barrier in Japan in every single subway system.  So

8    I mean, there's all different variations and it only came up

9    four feet high --

10         THE COURT:  Yeah, but my only --

11         MR. YAGERMAN:  She could have fell right over that.

12         THE COURT:  Okay.

13         MR. ROTH:  No, she fainted, why are you saying that?

14         THE COURT:  My point is only it may be -- there's

15   one view in which the immunity -- the pure question of whether

16   any determinations about capital expenditures of the scope

17   that the plaintiff is talking about are subject to immunity

18   that would  -- may need to be free standing, and the subject

19   of a motion.

20         Another view is, you need to hone what exactly the

21   plaintiff is looking for and in order to focus on that, you

22   need to know what exactly happened to the plaintiff because

23   maybe the barrier idea really makes no sense if -- considering

24   how she fell, et cetera.  I don't know.

25         And then the third question is, do you need to do

1   the damages discovery before you resolve part one and two, but

2   if, for example, you're going to depose the plaintiff, then

3   maybe you might as well do it all at once, even if you

4   essentially reserve the damages issue until later.  Trying to

5   get a handle here on what -- how you see this being brought to

6   a head

7           MR. ROTH:  Yes, Your Honor.  I have -- this is what

8   my initial proposal was and I still think it fits in with

9   everything you're saying.  The plaintiff and her boyfriend

10  were on the tracks.  They should be deposed, preserve their

11  memories so that, you know, we're ready to produce them, you

12  know, as --

13          THE COURT:  Is he still in New York or he's in

14  Brazil?

15          MR. ROTH:  No she's in Brazil.

16          THE COURT:  She's in Brazil, what about him?

17          MR. ROTH:  She's in Brazil.

18          THE COURT:  Where's the boyfriend?

19          MR. ROTH:  The boyfriend, I believe, is in New York,

20  I believe.  I -- okay.

21          THE COURT:  He was a student as well?

22          MR. ROTH:  Yeah.  I don't think so.

23          THE COURT:  All right, but he's in New York.

24          MR. ROTH:  Right.  He's in New York and they just

25  gave us a whole bunch of fact discovery and the -- there's a

27

1    train operator, there's a conductor who might be there and

2    then their records identify two eye witnesses, I believe, that

3    were on the platform.

4              That discovery, I think, should -- and I don't think

5    there's anything stopping it, there's no -- there's nothing --

6    there's no reason to stop that from going forward.

7              My client is going to -- she's a double amputee, she

8    has -- I think she just graduated from architectural school,

9    so her damages, whatever they are as far as physically, are

10   going to be developing, you know.

11             We're doing some research into -- they have a

12   robotic arm which you can control from your brain that they're

13   working on and she might be a candidate to participate in

14   that.  But that's going to be down the road.

15             I think that what I also did, was I immediately --

16   and before at the last conference, I said listen, I don't need

17   demands, I can get you every possible thing that she has and I

18   gave authorizations for the school records and I got her to

19   get her own school records, whatever she could get, and I

20   forwarded that to them.

21             I got whatever medical records, just a couple pages,

22   I'm sure there's more in Brazil, but really, I mean, she's --

23             MR. YAGERMAN:  In Portugese.

24             MR. ROTH:  Well, I can only do what I can do.

25             THE COURT:  Do you need to have them translated?

 1           MR. ROTH:  I mean, well that would be for --

 2           THE COURT:  Well no, it's your case, your --

 3           MR. ROTH:  No, no, but if they want -- they didn't

 4      ask me to translate it, so I mean --

 5           THE COURT:  All right.  I think you're responsible

 6      for translations. It's your client's proof of damages, but

 7      that's, you know, it still seems down the line.

 8           MR. ROTH:  Well at this point, I'm saying is I gave

 9      them everything I possibly could at this moment.

10           There's nothing else left for the plaintiff to give

11      and the only -- and so what I was -- did not want to go

12      forward with was extra discovery, recreating the train

13      situation, you know, doing all of these other things regarding

14      the event that would not need to be done, necessarily, if

15      after you hear about their immunity, maybe they're entitled,

16      maybe they're not.  And that's the part that I wanted to push

17      back.

18           THE COURT:  So I'm back with the same question

19      though, which is what's the motion practice?

20           Is it a straight, pure immunity that doesn't really

21      require much information about the event and if these

22      executive level documents and testimony that you're talking --

23      I'm sorry, defendant's counsel you're talking appearing, or is

24      it you need the record of the event, so the investigation, the

25      statements, the deposition testimony of at least the five

1    people who seem to know about it --

2              MR. ROTH:  Right.

3              THE COURT:  -- the victim, plaintiff here, the

4    boyfriend, the two eye witnesses and the driver and plus, I

5    don't know who else, but that would be, I mean do you need

6    that?  I don't know.  So --

7              MR. YAGERMAN:  I think that might be a good idea to

8    go with the fact discovery first, schedule another conference

9    at some point.  We haven't served interrogatories yet and we

10   should get dates, you know, for --

11             THE COURT:  Okay.  I'm not sure I'm asking this

12   question correctly. If you step away from this, you have a

13   meta claim of immunity which is what they are saying is

14   necessary, is major capital improvements and you're -- okay.

15   And you're saying --

16             MR. YAGERMAN:  Right, but they -- yes, I --

17             THE COURT:  -- at an executive level, we're entitled

18   to prioritize these things and we do and here's the evidence

19   that we do and barriers didn't make it to the top of the list

20   given all the demands and the scope of the system and the

21   expense.

22             There's another view, which is your particular

23   choice with regard to barriers, needs to have a bit of

24   information about what the plaintiff is claiming happened and

25   whether a particular kind of barrier makes a different.

1          If potentially the railings which might be, you

2     know, a relatively inexpensive fix are not practical and

3     really could never have stopped her from sliding down given

4     how she fainted.  So then you need to know about what was

5     going on with the plaintiff.

6          There's another ground on which you, I think,

7     conceivably could move for summary judgment, although now

8     we're talking about this expert question, which as you say,

9     nowhere in the world, literally, is this the standard of care

10    or if it is, maybe in Japan where counsel's son was, that's a

11    completely minority view for whatever reason they prioritize

12    their system in this way, they made these choices.

13          MR. YAGERMAN:  Correct.

14          THE COURT:  But that might involve the expert

15    testimony.  One could see this being staggered or you could

16    see doing a global summary judgment motion.  And then there is

17    a question of her damages which may also require some expert,

18    seems to come at the end.

19          She has to get past all of these hurdles and be

20    going to trial, but if you're going to depose her anyway,

21    maybe you should be asking her damage.  If you're going to be

22    deposing her boyfriend, ask her about damage.  You know, what

23    is it motion practice wise that you see yourselves wanting to

24    do in order to have this, you know, be as efficient and

25    effective as it can be?

31

1          MR. YAGERMAN:  I see exactly as you said, Your

2     Honor.  You really articulated it perfectly.  A motion, three-

3     pronged, that --

4          THE COURT:  Okay.

5          MR. YAGERMAN:  -- there's no duty of care, there's

6     an immunity defense, and that the barriers, whatever they

7     expose would not espouse --

8          THE COURT:  Wouldn't have made a difference here.

9          MR. YAGERMAN:  -- wouldn't have made a difference.

10         THE COURT:  All right.  So then you are talking

11    about doing all of the discovery --

12         MR. YAGERMAN:  That's in the alternative --

13         THE COURT:  -- in this case --

14         MR. YAGERMAN:  -- because there's no duty of care to

15    have barriers, right.

16         THE COURT:  Okay.  All right.

17         So then it seems like you're talking about doing a

18    lot of discovery except -- and I don't usually advocate for

19    this, but given the international aspect of this case, it

20    might make sense to push this off, the damages piece of this,

21    not that you couldn't ask her about it in her deposition, but

22    I don't know for, you know, therapy post -- you know, post the

23    initial report of her, you know, physical harm, if you need to

24    get that together now before the motion practice.  This is

25    really your choice.

32

1          MR. ROTH:  Your Honor, the -- I mean my client is a

2     double amputee, it doesn't, you know, I mean, her mother comes

3     to school to open a water bottle for her. I mean, I don't

4     think that there's like there's not a complicated trying to

5     figure out what her damages are.  I also think that --

6          THE COURT:  Well, I mean, look in the --

7          MR. ROTH:  -- as she's getting older, things are

8     going to change.  So unless the defendant -- I have no

9     objection defending -- we'll bring her in, we'll bring her in

10    the summer, they can ask her anything they want.  I'm not -- I

11    would not stop --

12         THE COURT:  Well, I'm talking about the damages,

13    right, because you're presumably going to have to put on at a

14    minimum a -- you know, what; the docket says your demand is 20

15    million, so in order to get to 20 million you'd have to show

16    relative loss of enjoyment of life, her need for support, you

17    know, if she needs someone to help her dress or whatever it is

18    or you're suggesting there's advanced prosthetics that could

19    help her, you know, et cetera.

20         And I don't know if she's facing direct economic

21    loss. If you said she graduated from school, I don't know if

22    that means there's not going to be that much economic loss or

23    she's not able to get the highest level job in her profession

24    because her current situation, I don't know.

25         MR. ROTH:  Your Honor, I would say that that should,

33

1  based on the posture of this case, that there's going to be

2  some event, that there's going to be all this immunity stuff.

3          I would say that that information is way, way down

4  the road and I don't -- unless the defendants are going to say

5  they're going to use something for it, I think we could wait -

6  -

7          THE COURT:  Well that's the thing I'm trying to

8  figure out what --

9          MR. ROTH:  -- Right.  Well as far as we're concerned

10  --

11          THE COURT:  -- you're doing here.

12          MR. ROTH:  -- we have no issue waiting on that

13  because -- and the truth of the matter is she's young and I

14  would have to get a life care planner and do all this other

15  assessment --

16          THE COURT:  Right.

17          MR. ROTH:  -- but it's premature --

18          THE COURT:  In Brazil though, right, I mean --

19          MR. ROTH:  -- well, maybe she's going to move to New

20  York, I don't know.  I mean that's what I'm saying is, I think

21  that that is one of the things that I'm saying that it should

22  be even bifurcated out at this point --

23          THE COURT:  Well, I'm asking, is that what you want

24  to do?

25          MR. ROTH:  Yes, I think that would be the smartest

1    thing.

2            And I don't think -- if they think they're going to

3    want a summary judgment, why would they want to waste money

4    spending all this time evaluating her and doing all this other

5    stuff and I will tell you right now, I will reproduce her

6    after we make all of this stuff, afterwards --

7            THE COURT:  All right.

8            MR. ROTH:  -- when she has all these claims, I will

9    reproduce her for damages if it's necessary because that's

10   only fair.  So I mean --

11           THE COURT:  So from the defendant's perspective, are

12   you willing to -- for discovery purposes anyway, are you

13   interested in or willing to bifurcate the plaintiff's --

14   certainly the expert discovery related to plaintiff's damages

15   and possibly the fact discovery, although I think the

16   deposition it wouldn't, you know, you could at least do some

17   of the -- I mean, all of that makes sense if you're not going

18   to have serious settlement discussions until this motion

19   practice is resolved.

20           I don't know what your position is.  Obviously

21   plaintiff's number is a high number, maybe not high relative

22   to, you know, her long term difficulties, but -- so what do

23   you want to do?  Do you want to have all the discovery

24   completed before you go to motion to practice?

25           MR. YAGERMAN:  I would bifurcate the discovery, Your

1      Honor.

2              THE COURT:  Okay.  All right.  So in terms of -- I

3      think you just filed a letter saying you served some kind of

4      disks, is that right?  Am I mixing it up with something?

5      Anyway, you served a fair amount of discovery already, paper

6      discovery?

7              MR. YAGERMAN:  Yes, Your Honor, yes we did.

8              THE COURT:  All right.  How much more do you see, at

9      least for the first round, do you see yourselves producing?

10             MR. YAGERMAN:  I'm in the middle of --

11             THE COURT:  Right.  And then I'm --

12             MR. YAGERMAN:  -- exploration of that, Your Honor.

13             THE COURT:  All right.  What was on these disks that

14     you just sent, the audio records --

15             MR. YAGERMAN:  I just sent audio of --

16             THE COURT:  -- communications?

17             MR. YAGERMAN:  -- yeah.

18             THE COURT:  Is any of this confidential?  The

19     station plans?  I don't have a copy. I just see the list,

20     number 4.

21             MR. YAGERMAN:  I don't think so.  I'd say --

22             MR. ROTH:  It's public information.

23             THE COURT:  I don't know what it -- I don't know.

24             MR. YAGERMAN:  I think that's a public record.

25             THE COURT:  Okay.  All right.

1          MR. ROTH:  At this point, Your Honor, you know, I've

2    looked briefly through all of their initial reports and from

3    every single -- and I don't know if this is a policy of the

4    Transit Authority, but I've -- many, many, many cases, I have

5    never seen, and I can't imagine they don't exist, when they

6    come to do the investigation, taking pictures at the scene.

7          I have a hard time believing in this incident that

8    there was no pictures contemporaneous with the scene, although

9    they did give me pictures afterwards, but that's something I

10   just want to raise now because it's -- anybody --

11         MR. YAGERMAN:  I gave you what I have, counsel.

12         MR. ROTH:  I --

13         MR. YAGERMAN:  That's what was --

14         MR. ROTH:  -- that's what the Transit Authority gave

15   to you and if you want to -- I don't think the judge wants my

16   list of sordid Transit Authority stories at this point.

17         MR. YAGERMAN:  Let's deal with this case.

18         MR. ROTH:  Right.  Well let me just tell you

19   something, in this case do you believe that they came to the

20   scene and nobody took a picture of what happened, no blood, no

21   nothing?  You do?

22         MR. YAGERMAN:  I do.

23         MR. ROTH:  Then that would have to be an interesting

24   policy that they have.

25         MR. YAGERMAN:  It's not a policy.

1          MR. ROTH:  So you think that there was big accident

2     and somebody's arm and a leg are amputated --

3          THE COURT:  All right.  Stop the cross talk --

4          MR. ROTH:  -- and nobody took a picture --

5          THE COURT:  -- I mean really --

6          MR. ROTH:  Okay.  Sorry, Your Honor.

7          THE COURT:  -- who takes -- NYPD came to the scene,

8     right?

9          MR. YAGERMAN:  Yeah, that's correct.

10          THE COURT:  So maybe there's records from them.  I

11     don't know.  All right.  So when you with Judge Pollak, you

12     set a couple of interim dates.  So you're going to serve the

13     document request and interrogatories by April 6th and those

14     responses are due 5/11.

15          So in terms of depositions, at least witnesses to

16     the event, there's five that we know of plus maybe an NYPD

17     officer or an EMT or somebody.  What about the high level

18     decision makers, or at least the people who --

19          MR. YAGERMAN:  I have to round them --

20          THE COURT:  -- involved in these --

21          MR. YAGERMAN:  I have to ascertain that, Judge.

22          THE COURT:  How many do you think there are?

23          MR. YAGERMAN:  At this time, I don't know.

24          THE COURT:  Okay.

25          MR. YAGERMAN:  I really don't know.  I've gotten to

1    certain levels, but I haven't gotten to --

2              THE COURT:  All right.

3              MR. YAGERMAN:  -- I'm still -- I'm really --

4              THE COURT:  So after the document production, what

5    do you need to finish this, six months?  Does that seem

6    reasonable to do this discovery?

7              MR. YAGERMAN:  Which -- the document production?

8              THE COURT:  Everything -- no.

9              MR. YAGERMAN:  Oh.

10             THE COURT:  It seems like you're looking at five to

11   10 depositions, I mean I'm guessing, ten depositions, right?

12   The plaintiff, her boyfriend, the two witnesses, the driver,

13   and then your policy people, so ten depositions, maybe?

14             MR. YAGERMAN:  Well, the policy people, I probably -

15   - I mean I have to, I mean I need some time to pull -- I mean,

16   I need some time on that, Judge.

17             THE COURT:  So six months?  Middle of December?

18             MR. YAGERMAN:  That's fair.

19             THE COURT:  It's a little bit longer.  All right.

20   So let's just pick a date. December 14th fact discovery.

21             And then the expert discovery, so with -- all right.

22   I'm going to leave this as to be discussed and let's have a

23   conference over the summer and see where you are with regard

24   to figuring out what expert discovery you're going to do now.

25             MR. YAGERMAN:  That's fair.

```
 1              THE COURT:  So how's August -- I don't know what
 2     anyone's summer vacation plans are, et cetera, August 15th?
 3     Does that look -- at 12 o'clock?
 4              MR. YAGERMAN:  August?
 5              THE COURT:  15th?
 6              MR. YAGERMAN:  I might be salmon fishing in Alaska,
 7     Judge.
 8              THE COURT:  All right.  When are you leaving?
 9              MR. YAGERMAN:  Yeah, I think the 15th is good.
10              MR. ROTH:  Could we -- could -- Your Honor would it
11     be possible, I don't know what I'm -- I'm right now in the
12     middle of waiting to hear what college my kid gets into, like
13     tonight at 7:00 we're going to find out --
14              THE COURT:  Knowing on the 15th --
15              MR. ROTH:  -- so I don't know what time I'll have to
16     drive him up, but --
17              THE COURT:  All right.  August 8th?
18              MR. ROTH:  Yeah, that's probably a better --
19              THE COURT:  I mean not to name out that early --
20              MR. ROTH:  -- yeah, that sounds like a better date
21     actually.
22              THE COURT:  All right.  You're waiting for the
23     college or you're waiting for your son?
24              MR. ROTH:  I'm waiting -- no, the -- 7 o'clock
25     tonight he's got to log in and find out about four colleges.
```

1    Tomorrow he logs in and then the college he really wants to go

2    to, he finds out on the 31st.

3              THE COURT:  That's brutal.

4              MR. ROTH:  It is brutal.

5              THE COURT:  He needs to get the thick envelope or

6    the thin envelope.

7              MR. ROTH:  Yeah -- that's it.

8              THE COURT:  And you know there is no --

9              MR. YAGERMAN:  That's right.  I got a lot of thin --

10             THE COURT:  -- is my internet connection working --

11             MR. YAGERMAN:  -- envelopes. But I've been there,

12   done that.

13             THE COURT:  All right.  Oh my gosh.

14             MR. YAGERMAN:  It's exciting though.

15             MR. ROTH:  Exciting and terrifying.

16             MR. YAGERMAN:  It's exciting.

17             THE COURT:  All right.  So we're going to have a

18   conference on August 8th at 3 o'clock.

19             MR. YAGERMAN:  Great.  Thank you, Judge.

20             MR. ROTH:  Your Honor, as far as the defendant asked

21   for 30 days to do their initial disclosures regarding their

22   immunity defenses and I understand they don't have to produce

23   the documents, but they're going to produce something.  What

24   are the --

25             THE COURT:  But it's all the stuff they've already

1    given you.

2           MR. ROTH:  No, no, it has nothing to do with

3    immunity.  They've given me zero regarding immunity, nothing.

4    Okay.

5           And that's what they had asked -- that's what their

6    letter was for could we have 30 days to produce to do our

7    initial disclosures for immunity which, like I said, no

8    surprises and I'm always willing to offer courtesy and

9    whatever, so that's what they wanted, that's what their letter

10   was for.

11          MR. YAGERMAN:  I'm still in the process, Your Honor,

12   of trying to figure out --

13          MR. ROTH:  There's no objection, Judge --

14          THE COURT:  Let me just understand.  When you say in

15   your letter that defendants provided -- they have 22 people

16   who are likely to possess discoverable information.  Is that

17   all about the event or --

18          MR. YAGERMAN:  The event,  Yes, Your Honor.

19          THE COURT:  So why don't you just deal with this in

20   the document requested interrogatories?

21          MR. ROTH:  The thing is that I would have already

22   used up, like three quarters of my interrogatories on the

23   event and they had gave me -- like all of the stuff that I

24   would have asked for, they already gave me.

25          So when they -- and they intend on doing this, so

42

1    all I'm saying is for the either A, let me just split my rogs

2    and I'll do -- once they do their disclosures then I can serve

3    my interrogatories after that for the --

4              THE COURT:  I mean, do you agree with, I don't --

5              MR. ROTH:  -- yeah, I mean I'm not, like I said,

6    because you know, until I see their disclosures regarding the

7    immunity, I don't know, I only have 25 rogs --

8              MR. YAGERMAN:  What I really want to do --

9              THE COURT:  What are you going to get --

10             MR. ROTH:  -- I have only 25 rogs.

11             THE COURT:  This is what you're going to get.  The

12   assistant commissioner, whatever the person's title in charge

13   of capital investment knows about this and then you're going

14   to get the engineer who worked on station redesign, that

15   person.

16             So you're going to get the names of however many,

17   three, four, five people and you're going to get a dull

18   description of documents and then you're going to issue -- I

19   mean, it just seems like not such a productive effort.

20             MR. ROTH:  And there's studies, whatever studies

21   they relied on to do whatever they're doing.  So all I'm

22   saying is that --

23             THE COURT:  But why don't you just issue a document

24   request that says, please provide studies about the -- I mean,

25   this is --

43

1          MR. ROTH:  Okay.

2          THE COURT:  -- there's some cases you have no idea

3    what the issue is and this case we got it, it's about

4    barriers.

5          MR. YAGERMAN:  I can safely say, Your Honor, that

6    there probably were no studies relating to this particular

7    station.

8          THE COURT:  What about the general question of

9    barriers?  I mean, there must have been something done for the

10   L station and the Canarsie Station about whether this was

11   something worth doing, helpful --

12         MR. YAGERMAN:  I think probably after the fact --

13         THE COURT:  So that's more recent?

14         MR. YAGERMAN:  Yeah, probably.

15         THE COURT:  What are you holding up there?

16         MR. ROTH:  This is platform edge doors right in

17   their document that they're considering, so I've seen --

18         MR. YAGERMAN:  (Indiscernible).

19         MR. ROTH:  In 2012.  So don't act like oh, this is

20   this impossible thing.  This is your document.  So I'm not

21   trying to be crazy, Judge, but --

22         MR. YAGERMAN:  it also talks about all the

23   limitations about --

24         MR. ROTH:  That's fine --

25         THE COURT:  All right.  Stop the cross talk.

1            MR. ROTH:  Okay.  Anyway --

2            THE COURT:  Look, this is ambitious case on the

3       plaintiffs side, so you know, you're going to have to --

4            MR. ROTH:  Try my hardest.

5            THE COURT:  -- try -- well, try your hardest, but

6       focus your requests.  This is not a general review of all of

7       the capital decisions of the MTA or the Transit.  So that in

8       an ideal world, we'd have a whole new subway system and it

9       would all be great like, you know, your models that you're

10      talking about, you know, Japan or Disney.  Right?

11           So I don't know. I mean, I don't see the initial

12      disclosures being all that helpful here, but if you want, I

13      mean, to do this exercise, then you can do it.

14           MR. ROTH:  Your Honor, all I'm saying is that if

15      they -- is that after they serve their initial disclosures,

16      that's when I would like to serve my rogs, that's all.

17           They said they were going to do 30 days -- 30 more

18      days for their initial disclosures and then I would serve my

19      rogs relating to those disclosures, that's all -- related to

20      immunity.  That's all I was asking for.

21           THE COURT:  All right.  When do you want to put

22      together -- I mean, with initial disclosures on the --

23           MR. YAGERMAN:  May 11th would be the time, Judge.

24           THE COURT:  Okay.  So then --

25           MR. YAGERMAN:  Is that enough time, Denise?

1           THE COURT:  Look, you can supplement them after the

2    fact, this is just --

3           MR. YAGERMAN:  We can supplement --

4           THE COURT:  -- to get an overview of who you think

5    you're dealing with.  And then -- all right.  So then for the

6    document request and interrogatories related to immunity then

7    you can serve those by the end of May.

8           MR. YAGERMAN:  The interrogatories on immunity, end

9    of May?

10          MR. ROTH:  Yeah.  I'll serve my document requests

11   this week on the, you know --

12          MR. YAGERMAN:  (Indiscernible).

13          MR. ROTH:  -- yeah on the -- no, I'll serve the --

14   the document request is not the issue.  That I know what to

15   ask for.  Rogs is what's going to come afterwards.

16          THE COURT:  I'm going to give you on the immunity

17   until the end of May to serve your initial requests.  If you

18   want to serve it earlier, that's fine.

19          MR. ROTH:  Sure.  Okay.  Thank you, Your Honor.

20          THE COURT:  All right.  All that aside, given the

21   uphill battle that the plaintiff has and the extensive

22   discovery that the defendant has to undergo, do you want to

23   talk about settlement?  There's a lot of zeros.  I mean --

24          MR. YAGERMAN:  I have no authority right now, Judge.

25          THE COURT:  Is your demand anything other than the

1    20 million that's listed?

2              MR. ROTH:  Not at this time, Your Honor.

3              THE COURT:  All right.  If you think a phone

4    conference would be helpful, we could do it with me, Judge

5    Pohorelsky, court annexed mediation, obviously, private

6    mediators if you're interested in doing that.  I mean one

7    thought is, is your client is going to travel to New York for

8    these depositions and --

9              MR. ROTH:  Your Honor --

10             THE COURT:  I mean, can she travel?  I mean she

11   obviously traveled home, but --

12             MR. ROTH:  She -- I mean, I've got pictures of her

13   in her wheelchair if you want to see them.  She does -- she'll

14   make it.  She's got to do --

15             THE COURT:  I mean you all can talk about whether

16   she should do her deposition by video, if that makes sense,

17   but if she's coming, if there's any interest in having

18   settlement discussion, maybe you could coordinate those.

19             If she's here, we could get a preview of how good a

20   witness she is, et cetera, and see if this is, you know,

21   something that could be done.  All right.

22             MR. YAGERMAN:  So that I'm correct on the dates,

23   Judge --

24             THE COURT:  Yep.

25             MR. YAGERMAN:  -- we have a conference August 8th.

1              THE COURT:  Um-hmm, at 3 o'clock.

2              MR. YAGERMAN:  3 o'clock.  Fact discovery should be

3    done like December --

4              THE COURT:  Yep, December 14th.

5              MR. YAGERMAN:  All right.

6              THE COURT:  And we'll have a -- and at the August

7    8th conference, we'll have a discussion about what expert --

8              MR. YAGERMAN:  Discussion.

9              THE COURT:  -- discovery needs to be done.  And at

10   that point, hopefully, you've honed your respective theories

11   as to the immunities and standard of care, you know.  That may

12   be the same expert, it may be a different experts, what you

13   may need them for this dispositive motion, you may not need

14   it.

15             I could see this going different ways, it depends on

16   what the evidence is, right?  So I think it's premature to

17   make a decision about that.

18             But, at a minimum we would talk about what your time

19   line for disclosure would be and then, you know, I don't know

20   if you'll know who your experts are or not.  I mean, you may

21   have somebody who you're -- who are all the experts on train

22   barriers.  All right.

23             MR. YAGERMAN:  You pushed out the interrogatory

24   responses, Your Honor.  Did you do --

25             THE COURT:  So it's bifurcated much like the

48

1    damages.  Document requests and interrogatories can be served

2    by April 6th with responses due May 11th.

3            But for the document requests and interrogatories

4    related to immunity, they should be served by May 31st and

5    responses to follow.

6            Can I ask, this issue's been litigated in New York,

7    have there been other cases about the barrier at all?

8            MR. ROTH:  It's going to be a case of first

9    impression --

10           THE COURT:  First impression.

11           MR. ROTH:  -- this will be my second barrier case

12   against a municipality in New York where they claimed --

13           THE COURT:  What happened in the first --

14           MR. ROTH:  The first -- well, this I'll tell you, my

15   two experiences.  One they had a pier at Lutheran -- it's

16   called the -- they were defense on this case but here's what I

17   remember because it was a long time ago.  There's a Lutheran

18   Hospital has a pier, it's called a --

19           MR. YAGERMAN:  My office overlooked it.

20           MR. ROTH:  Yeah.

21           THE COURT:  What's it called?

22           MR. ROTH:  So anyway --

23           THE COURT:  The Lutheran has a pier --

24           MR. ROTH:  By Lutheran Hospital there's a parking

25   lot on a pier --

49

1           THE COURT:  Oh, yeah.

2           MR. ROTH:  -- it's two tenths of a mile long, 150

3    feet wide, it's called Bat Pier 4.  And that pier they said

4    that there was immunity and that they couldn't end up the

5    zoning laws it was not appropriate to put a barrier around the

6    edge of the pier.

7           And my client was 16 years old and she was learning

8    to drive on the pier because it was empty and she drove off

9    the pier.

10          And the case we went all the way to the jury and the

11   jury found that they were -- the City was responsible for not

12   putting barriers up around the pier.

13          And after my case went on, they did put Jersey

14   barriers -- a half mile of Jersey barriers around that pier

15   because there was a parking lot on the pier.

16          So if you're going to stop -- if you're going to

17   have people on a pier, and they put a little fence around it

18   to stop people falling in the water, you should put Jersey

19   barriers on a pier to stop -- parking lot to stop cars from

20   going into the water.

21          And then the other case which we had, which I told

22   you with the gap case, what happened was they said that all of

23   the courts were saying that the gap policy was six inches by

24   six inches.  It's called the gun memo.  And I started saying,

25   you know, that seems like a baby could fall through six inches

50

1     by six inches, that seems awfully big on a straight track.

2            And I started asking over and over where did you get

3     this policy from and finally it was based on this gout -- what

4     they called a study.  But what gout really was, was an

5     accident investigation and the engineer said, you know what, I

6     think six by six would be pretty good, otherwise it will be

7     too expensive for us to fix it.

8            And all of a sudden they started losing their

9     immunity because all the courts said, wait a minute, that's

10    not a real study.  You can't rely on that to say that that's

11    your policy.

12           THE COURT:  So how did you win; on the standard of

13    care?

14           MR. ROTH:  Well the standard of care was is it safe

15    or not and the jury gets to make that decision.  It wasn't --

16    there's no specific standard of care said you have a track,

17    you have a track, you have train, there's a gap, is that

18    negligent or not and now they get to go to the jury, they

19    don't get thrown out on immunity.

20           So that was my personal experience and I'm not

21    saying by any means that I have an easy road to hoe here, but

22    this girl lost her arm and her leg and I'm going to fight my

23    hardest to get her justice if I can.  That's all.

24           THE COURT:  All right.  Your thoughts?  Anything

25    else?

1          MR. YAGERMAN:  No, Your Honor.  I think you covered

2      a lot of ground.

3          THE COURT:  Okay.  All right.

4          MR. YAGERMAN:  And it was a pleasure meeting you,

5      introduce you with this interesting matter.

6          THE COURT:  All right.  So we can go off the record,

7      but I'm going to ask you to stay for one second.

8

9          (Proceedings concluded at 5:23 p.m.)

10          I, CHRISTINE FIORE, Certified Electronic Court

11      Reporter and Transcriber and court-approved transcriber,

12      certify that the foregoing is a correct transcript from the

13      official electronic sound recording of the proceedings in the

14      above-entitled matter.

15

16          *Christine Fiore*

17      _____          June 3, 2018

18          Christine Fiore, CERT

19

20

21

22