UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


HARGER DA SILVA,              *  Case No. 17-CV-4550(FB)
                             *
                             *
              Plaintiff,     *  Brooklyn, New York
                             *  June 4, 2018
     v.                      *
                             *
NEW YORK CITY TRANSIT        *
  AUTHORITY, et al.,         *
                             *
              Defendants.    *
                             *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          DAVID ALAN ROTH, ESQ.
                            ELLIOT DOLBY-SHIELDS, ESQ.
                            Roth & Roth, LLP
                            192 Lexington Avenue, Suite 802
                            New York, NY 10016


For the Defendants:         MARK S. YAGERMAN, ESQ.
                            MARCIA K. RAICUS, ESQ.
                            Smith Mazure Director Wilkins
                             Young and Yagerman
                            111 John Street, 20th Floor
                            New York, NY 10038

                            DENISE FURIANO ROZZA, ESQ.
                            New York City Transit Authority
                            130 Livingston Street, 11th FL
                            Brooklyn, NY 11201

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1            (Proceedings commenced at 11:59 a.m.)

2            THE COURT:   Harger Da Silva versus New York City

3    Transit Authority, 17-CV-4550.  Let's start with plaintiff's

4    counsel's appearance.

5            MR. ROTH:  David Roth, of Roth and Roth, on behalf

6    of plaintiff, and Elliot Shields, my associate, is here as

7    well.

8            MR. SHIELDS:  Good morning, Your Honor.

9            THE COURT:  Good morning.

10           And for the defendants.

11           MR. YAGERMAN:  Mark Yagerman, Smith Mazure Director

12   Wilkins Young and Yagerman, for the Transit.  Marcia Raicus

13   from my office and Denise Rozza from Lawrence Heisler's

14   office, New York City Transit.

15           THE COURT:  Okay.  All right.  Well, let me ask.  Any

16   settlement possibilities?

17           MR. YAGERMAN:  No, Judge, none.

18           THE COURT:  Okay.  Not on this one.

19           MR. YAGERMAN:  Not on this one, no.

20           THE COURT:  Okay.  So maybe just addressing things

21   in order.  At 41, you had the proposed stipulation of

22   confidentiality that the defendants signed.  And then we have

23   at 45, plaintiff's letter.  Have you worked this one out at

24   all?

25           MR. YAGERMAN:  Could I address that?

1          THE COURT: Yeah.

2          MR. YAGERMAN: Yeah. So we asked for a conference.

3    I spoke with Mr. Roth. Three-fold -- number one. We wanted a

4    confidentiality agreement on documents that are sensitive for

5    security for the Authority. It's the procedure of the

6    Authority. It was document 41 that we submitted.

7          I called Mr. Roth. He indicated to me like about

8    May 8th he'll get me something. I got something this weekend.

9    I went through it briefly and I have a number of concerns with

10   it, but I haven't really vetted that document.

11         The issue is we've provided a great number of

12   documents, Your Honor, just to comply with our practice and to

13   move things along, including track plans, station plans,

14   signal plans, stopping distance charts, all security-sensitive

15   documents.

16         Mr. Roth has been involved in state court involving

17   certain security issues involving documentation and has

18   actually signed the stipulation that's modeled similar to the

19   one that we've presented to him in this case in New York

20   County, after a hearing with New York City Transit Authority's

21   Chief of Security, Higgins.

22         So, you know, in good faith we provided a great

23   number of documents. But we have -- I wanted a proposal in

24   place for that document, those documents, as well as going

25   forward. We have a good number of documents that we're going

4

1     to be providing as soon as they're vetted, which should be --

2     I don't know -- sometime this week.

3              MS. ROZZA:  Hopefully, yeah.

4              MR. YAGERMAN:  This week sometime -- which deal

5     with, you know, some -- which deal with the track intrusive

6     devices and platform doors.  And that was the (indiscernible)

7     first time. So we wanted a confidentiality agreement.

8              MR. ROTH:  Your Honor.

9              MR. YAGERMAN:  The sec -- could I just --

10             MR. ROTH:  Yeah, but --

11             THE COURT:  Please don't interrupt.

12             MR. ROTH:  Okay.

13             THE COURT:  Go ahead.

14             MR. YAGERMAN:  So the second item that we have,

15    Judge, is that we wanted to advise the Court that we are

16    working on getting documents concerning the platform doors and

17    track intrusion devices, which I said are being vetted right

18    now through I believe it's Chief Higgins and Mr. Levine from

19    New York City Transit Authority.

20             And I didn't want the Court to think that we weren't

21    -- that we haven't discussed this with certain decision

22    makers.  And I wanted an extension on that just to advise the

23    Court that we're in the process of getting that taken care of.

24             THE COURT:  So just looking at what I have --

25             MR. YAGERMAN:  We've identified people, Judge, as

5

1    decision makers --

2              THE COURT:  All right.

3              MR. YAGERMAN:  -- as part of discovery which the

4    Court wanted us to do, but I wanted to go further and get more

5    -- get documents on that.

6              THE COURT:  So are you -- I have at 43, just so I'm

7    following along, your letter or your -- I guess --

8              MR. YAGERMAN:  44 I believe is our letter, Judge.

9              THE COURT:  Ms. Raicus' letter --

10             MR. YAGERMAN:  Yes, that's correct.

11             THE COURT:  -- is at 43.  All right.

12             MR. YAGERMAN:  Oh, okay.

13             THE COURT:  Are you looking for -- I mean, this

14   seems to be your dispute.  And then at 44, we have the timing,

15   the letter about the timing.

16             MR. YAGERMAN:  Right.

17             THE COURT:  So are you asking -- I mean, are --

18   where are you with regard to working out the issues that are

19   in 43?

20             MR. YAGERMAN:  Well, I was just presented with a --

21   Mr. Roth's version of a security agreement.  I believe it was

22   Saturday morning he emailed it to me.

23             THE COURT:  Wait a minute.  There's others --

24   there's -- just so we're clear, what I have is 41 is the

25   proposed stipulation of confidentiality, which defendant

6

1    signed, and it's opposed by the plaintiff at 45 I believe.

2    Right?

3              MR. YAGERMAN:  Correct.

4              THE COURT:  Then there's what seems to be a letter

5    between counsel, but it's filed with the Court, the 43 letter.

6    Is that right?  That the right letter?  Yeah.  The discovery

7    disputes.  And then I have 44, the request for an extension of

8    time which --

9              MR. YAGERMAN:  Right.

10             THE COURT:  -- some of what you said touched on

11   that.

12             MR. YAGERMAN:  Right.

13             THE COURT:  So I understand you have the -- it seems

14   like where you are with the back and forth on the

15   confidentiality is you have your draft and you just got

16   something from plaintiff.

17             MR. YAGERMAN:  Correct.

18             THE COURT:  And you're suggesting that in the state

19   court an order had come out in a similar situation that

20   happened after there had been a hearing.  So the

21   confidentiality issue is one?

22             MR. YAGERMAN:  Right.

23             THE COURT:  The second -- I'm asking are you looking

24   for relief with regard to the document that's filed at 43,

25   which just seems to be a counsel letter?  Have you resolved it

1    or is this what you're working on?

2              MR. YAGERMAN:  We have a dispute as to demands for

3    discovery, which are, I feel -- some of them and many of them

4    -- blunderbuss and disproportionate to the relative --

5              THE COURT:  All right.  So these are the issues that

6    you --

7              MR. YAGERMAN:  -- discovery issues in this case.

8              THE COURT:  -- the issues you raise at 44, right?

9              MR. YAGERMAN:  So.  I mean, the --

10             THE COURT:  All right.  Stop with the dramatic

11   sighing.  You know, I understand you disagree.

12             But let me just hear from defendant's counsel and

13   then I'll hear from the plaintiff's counsel.

14             All right.  So --

15             MR. ROTH:  Sorry, Judge.

16             THE COURT:  Do you want me -- are you asking for a

17   particular resolution to any of the issues that are in the

18   letter at 43 or are you saying, as you seem to outline in 44,

19   you need more time, but it may be fruitful for you to continue

20   your discussions with plaintiff's counsel?

21             MR. YAGERMAN:  I think it would be -- I would hope

22   it could be fruitful to continue with plaintiff's counsel.  I

23   just got Saturday morning the confidentiality agreement.  I've

24   gotten some letter -- I think it was on Saturday morning as

25   well emailed to me -- on his claims of deficiency of discovery

8

1    responses.

2            You know, we did this three weeks ago.  I thought

3    maybe I would have some sort of productive discussion.  I

4    called him twice on it.  Yet I got on a Saturday morning, when

5    I'm playing with my grandson, that.

6            THE COURT:  Okay.

7            MR. YAGERMAN:  In any event, I don't know how

8    productive we would be in discussing line by line some of the

9    discovery demands, Judge.  It's possible that you may want us

10   to outline it in a motion and provide a brief.

11           I've given them a -- it's just that it's very

12   disconcerting.  I've given them every ascertained document

13   concerning the happening or the occurrence, and ascertained

14   documents that somehow relate to any and all demands, but I

15   can't decipher in my own brain what he's after, and I don't

16   want to be accused of not following through afterwards.

17           THE COURT:  Okay.

18           MR. YAGERMAN:  I mean, when I get a document demand

19   that asks for produce documents including, but not limited to,

20   complaints, answers, discovery responses, deposition

21   transcript, motion papers, any and all supporting documents

22   supported in connection with motions and trial transcripts

23   from any federal or state lawsuit, or administrative action

24   filed against the defendants by or on behalf of people who

25   were struck by subway trains and cause for the entire period

9

1    of time for which such records are kept and stored in

2    electronic format, I really don't know how to respond to that.

3              THE COURT:  It seems that --

4              MR. YAGERMAN:  Truthfully --

5              THE COURT:  I mean, your objection's probably less

6    about you don't know what it is and more about it's incredibly

7    burdensome.

8              MR. YAGERMAN:  Yes.  And you know what, I sleep --

9              THE COURT:  I'm sure you can figure it out, but --

10             MR. YAGERMAN:  I don't sleep at night when I get

11   stuff like this so that's why I raise it.

12             THE COURT:  All right.  So it seems to me that so

13   far what we should be discussing is how to resolve this

14   confidentiality issue unless you think you are having a

15   conversation about whatever was presented on Saturday would be

16   helpful.

17             And then we're going to take a break and you can

18   meet.  We'll give you a room and you can talk about what your

19   outstanding discovery issues are.  And then we'll have a

20   second call.

21             All right.  For the plaintiff, what's up with this

22   situation with the confidentiality?

23             MR. ROTH:  So, Your Honor, this is -- what happened

24   was, we had signed a confidentiality agreement before we had

25   this hearing with Mr. Higgins who was the head of the MTA

1   Security.  And the issue in that case was that they were

2   saying that certain documents -- they had designated we're in

3   agreement.  They said okay.  We're going to have a hearing and

4   see what should be almost restricted access.

5           And when we had this hearing, I will tell you that I

6   point blank said to Mr. Higgins I said I'm glad you're

7   watching out for us, and I'm not looking to disseminate

8   records that could hurt anybody.

9           And after we had this hearing, I said -- and

10  actually it was very interesting, and I don't want to go on

11  the record about what was a sealed hearing -- everybody was

12  sworn to not disclose what the contents of the hearing was --

13  but other than to say is that it was somewhat eye opening as

14  to what could be security sensitive and what wasn't.  And then

15  after that I went back.

16          And during the hearing, I was very uncomfortable

17  with the documents that had been previously released by the

18  Transit Authority to plaintiffs and to contractors.  I didn't

19  feel comfortable with that.  After speaking to him, I said,

20  you know, I'm in possession of stuff that really now that

21  you've, you know, articulated that that, you know, that should

22  be secure.

23          And I told Mr. Yagerman that we are going to be

24  drafting a document that is not a confidentiality -- because

25  there is no -- there's no trade secrets, there is no

1     confidentiality.  This is security-sensitive documents.  And

2     so what we did was -- and it took me some time -- I contacted

3     some of my friends who had some cases against NYPD.  And, you

4     know, like in Rikers for instance there's cameras and they

5     kind of want to keep those disclosed and I said what language

6     did they use for security-sensitive stuff.

7                So what I came up with was -- and I'm expecting that

8     this will be used just like (indiscernible) -- although he got

9     the title wrong, he wasn't part of that case

10    -- that confidentiality was prior to the hearing.

11               So what we did was we drafted -- and I can hand it

12    up to you, Your Honor --

13               THE COURT:  Is this what you sent over on Saturday?

14               MR. ROTH:  Yes.  Yes.

15               THE COURT:  Uh-huh.

16               MR. ROTH:  And is it okay for me --

17               THE COURT:  No.  Well, not yet.

18               MR. ROTH:  Okay.  So anyways.  So we entitled this

19    stipulation and order concerning security-sensitive litigation

20    documents.  And that is a far different thing than

21    confidentiality.  Because technically public records, they

22    can't be confidential.

23               THE COURT:  Well, that's not true.  I mean --

24               MR. ROTH:  Well, they could be held -- there's no

25    trade secret between -- technically, under FOIL, everything,

1    unless it's security sensitive would be available, like

2    contracts, et cetera.

3         So we drafted -- we drafted with that in mind. And

4    I made the restrictions against the plaintiffs -- and I would

5    expect more restrictive than what they had in there -- that

6    the plaintiffs had certain obligations.

7         But additionally we put in there that if you're

8    going to designate these as security sensitive, then you

9    better be keeping them because I don't want to get them and

10   then be said that oh, you did something wrong.

11        Like they should be having -- they have to make the

12   representation that they're keeping these confidential as

13   well. Because if they're just sending them out to contractors

14   and so, you know, without the same types of agreements, then

15   these documents are out there anyway. And then the security-

16   sensitive litigation documents makes no sense.

17        I mean, if anybody could just get them, it would be

18   like having it up on the internet.

19        So what we put in here is that, hey, listen, we are

20   going to make special steps, even within our own office,

21   within our own server, you know, to protect the records. And

22   the Transit Authority has got to make the same representation.

23   But if they're just giving it out to everybody, then we

24   shouldn't --

25        THE COURT: What is giving it out to everybody?

13

1          MR. ROTH:  In other words, they --

2          THE COURT:  I mean, the contractors, presumably

3   those doing work on the physical plant, are going to have to

4   know certain information to do their jobs properly.

5          MR. ROTH:  Sure.  And they should be signing

6   something as well.  Because all I'm saying is if they get it,

7   so what makes it --

8          THE COURT:  But then they're in a commercial

9   relationship that --

10         MR. ROTH:  -- what makes them less dangerous than

11  me?  I mean, you know, I'm saying is I'm signing it.

12         THE COURT:  I don't understand this reasoning.

13  Because the -- I mean, once the contractor -- depending on the

14  topic and how the issue, whatever the subject matter of the

15  work, I mean, they then become in a contractual relationship

16  in which they have contractual obligations both, you know,

17  explicit and good faith in their dealings with the Transit

18  Authority.

19         So, you know, depending on how materials are

20  provided to someone doing work for you, they don't become your

21  material so they're not -- you're not free to send them out.

22  I mean, there's a lot of --

23         MR. ROTH:  But this is terrorism issues, not -- this

24  was all regarding terrorism.

25         THE COURT:  Right.

1          MR. ROTH:  This is not, you know, that.  So all I

2     said was --

3          THE COURT:  Well, I'm responding to your example --

4          MR. ROTH:  Okay.

5          THE COURT:  -- that the suggestion that because

6     materials are being disseminated to third parties, and non-

7     parties in this action, that that suggests that there should

8     -- you know, there necessarily is some sort of parallel

9     document on the Transit Authority, you know, on the city's

10    side.

11         MR. ROTH:  I guess maybe --

12         THE COURT:  The Transit Authority side.

13         MR. ROTH:  -- maybe the way they get it, like for

14    instance, if you can just download it the station plan and

15    anybody could do it, but I don't know that information.

16         THE COURT:  All right.  I mean, that's different

17    than a contractor.

18         MR. ROTH:  Yeah.

19         THE COURT:  Okay.  Go ahead.

20         MR. ROTH:  Well, you know --

21         THE COURT:  All right.  So your suggestion is that

22    you've drafted an appropriate security-sensitive

23    confidentiality agreement that you would like the defendant's

24    counsel to consider, but you only sent that on Saturday?

25         MR. ROTH:  But it's exactly the same except for the

1    points that I made.  Like we looked at it.  We compared it.

2    So the points are --

3              THE COURT:  So what --

4              MR. ROTH:  -- that it's more stringent against

5    plaintiff.  And also it takes out this stuff about lecturing

6    to the bar.  It says you're not allowed to give to anybody --

7              THE COURT:  Yeah.  I thought that was a little bit

8    strange.  I don't know what that's about.

9              MR. ROTH:  Yeah.  Well, it's directed against me

10   because I lectured.  So, you know.

11             THE COURT:  I know.  I mean, I figured that out.

12             MR. ROTH:  But what I'm hoping --

13             THE COURT:  I don't know why you thought it was okay

14   to put it in there.

15             MR. ROTH:  Your Honor, what I would say is I

16   suggested it to Mr. Yagerman.

17             And I even suggested it, you know, that I'm hoping

18   that we craft something that can be used universally

19   throughout all of these, you know, all cases where that they

20   were -- where if there's -- if they're designating something

21   security sensitive that they'll be protected.  That's all.

22             THE COURT:  All right.

23             MR. ROTH:  And like I said, it was more -- this is

24   actually more restrictive against me than the other ones.

25             And the only thing -- and the other issue is that to

1       the extent that I have other litigation against the Transit

2       Authority, I should not be precluded from using these

3       documents because they're security sensitive.  They know it.

4       I know it.

5                   And if I have them, why should I be stopped from

6       using them because they're -- technically the only basis for

7       the confidentiality is the security issue?

8                   THE COURT:  You know, that begs a different --

9       that's a different -- I understand your point that the

10      security issue would have been expanded to include you, but

11      there's -- in all these -- in all litigation with repeat

12      players, there's a concern about information from one case

13      being used in another if it's not public information.

14                  All right.  So my take -- so far what I hear is that

15      you all have not had a direct conversation about this proposed

16      model?

17                  MR. YAGERMAN:  Correct, Judge.  Correct, Your Honor.

18                  THE COURT:  Okay.

19                  MR. YAGERMAN:  Unfortunately.

20                  THE COURT:  And then let me get back to plaintiff in

21      terms of the outstanding discovery issues.  Some or all that

22      were described in the Smith Mazure letter of May 8th, and then

23      referred to in the subsequent letter --

24                  MR. ROTH:  Your Honor, I didn't have the --

25                  THE COURT:  -- your general position?

17

1            MR. ROTH:  My general position is that the -- and

2     the only reason I objected to anything was that we're supposed

3     to meet and confer before we make a motion whether to let a

4     motion -- and I was not given the opportunity to meet and

5     confer on it.

6            So what I -- so right this second, there's their

7     response has -- and many, many, many different objections for

8     the same exact document.

9            Now it may be that the only issue is a security

10    agreement, which we're going to -- I assume we're going to

11    work it out in the next couple of days -- and that once they

12    get that, then they're going to be sending me certain

13    documentation.

14            I don't agree that a whole bunch of these things

15    that they're saying are security sensitive are.  But what's

16    the difference if we're going to sign the document anyway?

17    They're just going to give it to us.

18            And then if I want to fight about it, there's a

19    provision that, hey, I can fight.  I'm not going to waste my

20    time saying that this is not security sensitive, you know.

21            So my thought process, what would make the most

22    sense is, before I object or say anything, I think that we

23    should work out the security agreement, have it executed, have

24    them produce by Bates stamp what-- you know, if there's a

25    response that these Bates stamp ranges go with the responses,

1    and then we can have -- we could sit down and have a meet and

2    confer, which is what I would normally do, over the discovery

3    issues.

4                 What I would say to you is that what the delay was

5    is I had sent a letter.  And we had agreed that all responses

6    wouldn't be Bates stamped.  This document that was not Bates

7    stamped --

8                 THE COURT:  Would not be Bates stamped?

9                 MR. ROTH:  It was not Bates stamped.  Okay.  So what

10   document it was --

11                THE COURT:  All right.  I'm sorry.  You had agreed

12   that all documents would --

13                MR. ROTH:  Yes.  In front of Judge Pollak, we said

14   that all documentation --

15                THE COURT:  Oh, the old conference.

16                THE COURT:  -- be Bates stamped.  Ours -- they have

17   now started Bates stamping theirs.

18                But what happened was on May 8th they sent us a

19   letter.  So here it says request No. 3, request No. 5, request

20   No. 10.

21                THE COURT:  Right.

22                MR. ROTH:  With no Bates ranges, I couldn't figure

23   out -- I couldn't figure out what's what.  So I said -- you

24   know, I'm like, hey, you've got to give me the Bates range.

25                But in any event, the issues that I'm having right

1  now are that I'm not sure what's responsive to what.  Okay?

2          THE COURT:  Mm-hmm.

3          MR. ROTH:  So what I would respectfully request is

4  that for the purposes of this litigation, when there's a

5  response that the Transit Authority says this request number,

6  if they're going to say this document's responsive, just give

7  me the Bates range so we can have an intelligent conversation.

8  I shouldn't have to try to figure it out.

9          The other issue is -- and this is relating to -- I'm

10 sure that the defendants have given me the documents that they

11 say are related to it, but in request No. 23, it says -- on

12 May 8th it says additional photographs.  There are no

13 additional photographs in this package.  So I am --

14         THE COURT:  Okay.

15         MR. ROTH:  So that would be related to the incident.

16 And I have contacted -- they served a notice of my client's

17 deposition.  They served a notice of the non-party witness,

18 her boyfriend's deposition.  We can -- you know, we can get

19 together and get ready to produce them.

20         I don't think that there's any more documentation

21 that they're going to have that would affect that other than

22 these photographs, if there are additional photographs, I

23 don't know.

24         So my suggestion would be is that, you know, I would

25 like to work together with defendants to figure out what our

1     disputes actually are.

2           And then -- so if we do this confidentiality or

3     security agreement, then they're going to --

4           You're going to produce documents once that's

5     signed, right?  You're ready to produce some documents?

6           MR. YAGERMAN:  We produced over 200 --

7           THE COURT:  All right.  Like I said, I get it.

8     Basically, you all need to talk.

9           MR. ROTH:  Right.  But I need --

10          THE COURT:  So my question is, what does this --

11    what does this do to your time line?

12          MR. ROTH:  Well, the only thing I would say is that

13    once -- from my time line, as far as the immunity stuff goes,

14    I was supposed to serve interrogatories.  They had asked for

15    an extension.

16          I'm going to serve my interrogatories after I get

17    their immunity Rule 26 disclosure.  So I only need an

18    extension for that.

19          If they would have called me and said, listen, would

20    consent to an extension for us to get the immunity documents,

21    I would have said yes.  Why wouldn't I?

22          And I said that to them initially.  I thought this

23    was going to be -- you know, if they're going to stick with

24    their immunity defenses, that there's going to be a heavy

25    discovery burden to support those defenses.

21

1              And that I understood that and I would be

2      cooperative in giving in extensions.  But, you know, nobody

3      ever said to me would you consent?  I would consent.

4              THE COURT:  Okay.  So from the -- two things.

5              One, you need to talk about the confidentiality

6      issue and you need to talk about these outstanding discovery

7      issues.  And your option is to do it here or to set a time

8      where you're going to meet and confer in person about these

9      issues in the next couple of days.

10             And then I guess this really goes to the defendants,

11     what time line are you proposing for the extension, given that

12     you need to have this -- these conversations?

13             MR. YAGERMAN:  I'd say two weeks, Judge.

14             THE COURT:  All right.  So it's two weeks extending

15     what your dates to respond, is that what it is?

16             MR. YAGERMAN:  For the immunity documents?

17             THE COURT:  Mm-hmm.

18             MR. YAGERMAN:  Yes, Judge.  I would --

19             THE COURT:  Okay.  All right.  So do you want to

20     have your own conversation off the record here or do you want

21     to set a time where you're going to meet, say sometime later

22     this week?  It's up to you.

23             MR. ROTH:  As far as the security document goes?

24             THE COURT:  Mm-hmm.

25             MR. ROTH:  I don't know if you do --

1           MR. YAGERMAN:  I have to have it voted.

2           MR. ROTH:  That's what -- yeah, that's what -- yeah,

3     that's what that.  I think --

4           THE COURT:  All right.

5           MR. ROTH:  -- quite frankly, even though I'd be

6     willing to do it, I know that they've got to talk upstairs.  I

7     mean, I know that's the way it goes.

8           But the other thing I would say, Your Honor, is that

9     as far as the document responses to our discovery requests,

10    once we sign the document and then they respond to whatever it

11    is, then we would be able to have a meet and confer.

12          Because they may be -- I may be thinking that

13    they're holding back documents on one privilege and they're

14    just waiting to give it to me because it was -- they

15    cooperated.

16          So that's why I'm saying is that the ones I see what

17    they give me, then I could have a meaningful meet and confer

18    on whatever's outstanding or I believe is outstanding.

19          And just to let you know, for the actual question

20    that he gave to you, I responded in my letter, which I told

21    him I did not expect him to respond to by today because it was

22    done over the weekend.

23          But then I said, well, if you're tracking these

24    cases by like man under cases, could you at least give me a

25    list.  That was it.

23

1              MR. YAGERMAN:  What's the -- respectfully, Judge, I

2       don't see the particular relevance or the proportionality.

3       The Transit Authority is not claiming that --

4              MR. ROTH:  That's a different story.

5              MR. YAGERMAN:  Please, counsel.

6              We're not claiming that people don't come in contact

7       with subway trains.  If it's a notice issue, I don't

8       understand the demand for us -- and I think your initial

9       reaction was correct -- it's going back through the history of

10      time on person hit by train cases.

11             What's the particular relevance of that and its

12      proportionality to this particular litigation?

13             THE COURT:  All right.  So you need to have a

14      conversation about this.  I want you to stagger it, given what

15      you've said, because it seems that you should have -- whether

16      you do it today or another day -- a meet and confer about

17      confidentiality.  And get that.  Then obviously get the

18      documents produced.

19             And then if you can't come to an immediate agreement

20      as to what else needs to be produced, you should meet in

21      person and talk about it.

22             My immediate understanding of this is this goes to

23      the breadth of the case and the exact terms of your defense.

24             Because plaintiff's theory --- which I have

25      questions, because of the enormous capital expense that seems

1    to be involved -- is, you know, much like what -- the Air

2    Trains around.  You know, there should be some sort of

3    barrier.  I mean, we've already had the conversation.

4            Are we talking about doors, are we talking about

5    some sort of fourfoot high bar, are we talking about something

6    like what's over at, you know, the shuttle at Times Square,

7    and to Grand Central?

8            You know, what is it that would be the bare minimum

9    that would satisfy the plaintiffs and think that there wasn't

10   available here.  Right.

11           That's their overall theory about, you know, that

12   it's not -- you know there's a risk and there should be some

13   sort of barrier or some way to stop people from going on the

14   tracks.

15           Then there's the point that you're raising.  I mean,

16   there's all kinds of ways people end up on the tracks.  People

17   jump on the tracks.  People go down to get their iPhones on

18   the tracks.  People fall on the tracks.

19           So, you know, would it really -- would the barrier

20   that might have prevented the injury here that plaintiff is

21   complaining of, you know, does that have anything to do with

22   all of the different kinds of cases that I'm sure you have in

23   your records?

24           And then there's the substantive procedural, less,

25   you know, practical question, not substantive, what's

1    involved?  If you have a, you know -- I think it was -- what

2    was it called man under --

3         MR. YAGERMAN:  Right.

4         THE COURT:  -- if you have, you know, a -- you hit a

5    button and summarize the files, well, then that's not

6    burdensome.

7         But if you have to go and pull, you know, documents

8    from archives for, you know, five to ten to 15 years, and

9    that's a massive project, and you are particularly looking to

10   hone in your immunity defenses, then maybe it doesn't need to

11   ever be done or doesn't need to be done now.

12        But I -- you know, there's too many moving parts

13   that are not clearly set forth before me for me to make any

14   determination about this.  So I think you all need to, you

15   know, go through this.

16        But you -- you know, from our last discussions, you

17   have a gaping divide as to the like working viability of the

18   theory.

19        But just, you know, to recap, the other issue was

20   what exactly is your immunity defense?  Because I think I

21   asked some questions -- and as plaintiff's counsel argued --

22   if yours rests on any analysis of reasonableness, then

23   plaintiff's view, I think, would be that all of this

24   information might be fair game.

25        You know, because it would be a fact -- I mean, from

1    plaintiff's view, it would be a factual determination for the

2    fact finder, presumably the jury.

3            So, you know, there were moving pieces. Last time

4    there was a -- this is not a criticism because it was the sort

5    of state of affairs -- but, you know, a lack of clarity as to

6    exactly what was going to be argued and then what exactly

7    needed to be turned over.  So it seems like that still needs

8    to be developed here.

9            So the way to do that seems to be that you would

10   figure out the confidentiality, see what it is that you

11   understand you should produce, have a discussion about what

12   exactly plaintiff is looking for, and what your exact defense

13   is, and for you all (indiscernible)  information about what

14   would be involved?

15           I mean, their -- you know, the suggestion or, you

16   know, comparison to security sensitive cases with the NYPD,

17   some of the NYPD's records are very easy to access.  They're

18   completely computerized and it's reasonable for them to be

19   produced.  And others require, you know, digging out boxes,

20   which, you know, given the scope of the issues raised, doesn't

21   make sense.

22           So I think you all need to have some more

23   conversation with each other about what this is about.

24           MR. YAGERMAN:  Quite frankly, I didn't understand

25   many of the demands made.  And I can't really -- I can't make

27

1    it out, Judge.

2            THE COURT:  Well, I'm here, but I shouldn't be the

3    first person who anyone's having this conversation with.  So

4    let's just set a time frame for doing this.

5            On the confidentiality, can you work it out in the

6    next two weeks?  Or at least come back to me with whatever the

7    outstanding issues are?

8            MR. YAGERMAN:  Okay.

9            THE COURT:  So today is the 4th.  Can you have

10   either the agreed upon document or a letter highlighting

11   whatever it is that you disagree with by the 18th?

12           MR. YAGERMAN:  Sure.

13           THE COURT:  All right.  A letter as to issues.

14           And then by when -- how long is it going to take you

15   to have a discussion about the discovery, and then review

16   whatever it is that the defendants are going to produce, and

17   then, you know, focus your issues?

18           I will point out I think we had on the calendar an

19   August 8th conference.  I think that's still on there.  So if

20   we were working backwards, and assuming that that was when we

21   would discuss the issues, when could you -- I would like some

22   time ahead of that.

23           So we had the 8th.  Yeah, it's on for 3 o'clock on

24   the 8th.  So by the 25th or the 27th of July, can you get a

25   handle on whatever your outstanding discovery issues are and

1    let me know in a joint letter?

2              MR. YAGERMAN:  Sure.  July?

3              THE COURT:  Okay.  I'll say the 27th.

4              MR. ROTH:  The 27th?

5              THE COURT:  Mm-hmm.  July 27th, 2-7.

6              MR. ROTH:  For a joint letter to the Court?

7              THE COURT:  Yeah.  As to outstanding discovery.

8              Okay.  Other issues?

9              MR. ROTH:  Your Honor, I don't -- I think that

10   whatever other -- whatever discovery issues -- assuming we

11   come to an agreement on the confidentiality or we don't and

12   then you'll rule on it either way, would --

13             THE COURT:   Well, that -- that though, yeah, that's

14   going to be that earlier letter because --

15             MR. ROTH:  Right.  So -- right.

16             THE COURT:  -- we can't hang this whole thing up.

17             MR. ROTH:  So at that point, then the Transit's

18   going to produce certain documents that had been held back.

19             And just to let the Court know -- and I told this to

20   Mr. Yagerman -- even though there had been no confidentiality

21   on those records, I've been treating them as confidential.

22             THE COURT:  Okay.

23             MR. ROTH:  Especially after our hearing, I was very

24   careful about that.

25             THE COURT:  Okay.

1          MR. ROTH:  They're actually not even in my office.

2     So I'm taking that very seriously.  We have tons of plans.

3          THE COURT:  They're not even in your office --

4          MR. ROTH:  No.  They're in my house.

5          THE COURT:  -- but they're in a secure location?

6          MR. ROTH:  No.

7          THE COURT:  Okay.

8          MR. ROTH:  Nobody's going to my house, but anyway--

9     so what I was going to say is that once -- we're not going to

10    know exactly where we're at until they produce those records

11    that are being held back for the security issue and then we'll

12    know.

13         MR. YAGERMAN:  I might say, there has been no

14    documents held back regarding this accident, the facts of this

15    accident, plans, all of that plaintiff has.

16         I'm talking about the blunderbuss document demands

17    that he's made, email accounts, maintenance issues.  The woman

18    fainted.  He's asking for inspection of the station for three

19    years prior and -- I mean, there's stuff that --

20         THE COURT:  I mean, the other way to handle this --

21    and this really goes to you fine tuning what the arguments are

22    that are being made here -- is to come to an agreement.  I

23    don't think anyone disagrees that there was no barrier.

24         MR. YAGERMAN:  Right.

25         THE COURT:  And that seems to be the heart of your

30

1    claim, that she -- people faint, people fall, people get sick,

2    people get slip, they trip.  You shouldn't be able to fall on

3    the tracks.

4            And then the other side of it is in the industry,

5    this is, you know, standard design.  Obviously, plaintiff is

6    disagreeing with this.

7            But given all of your considerations that you want

8    to raise, mostly the enormous capital input that would be

9    required to retrofit these stations, that that is not the

10   industry or other whatever standard you're going to propose --

11           MR. YAGERMAN:  That's not --

12           THE COURT:  -- is the appropriate standard, you

13   know, standard, you know, standard of care in these

14   circumstances.

15           But I mean --

16           MR. ROTH:  Your Honor, can --

17           THE COURT:  I mean, I don't know if you need --

18           MR. YAGERMAN:  Which is also a --

19           THE COURT:  I don't know if you need, but you should

20   --

21           MR. YAGERMAN:  -- quasi-duty kind of immunity issue.

22           THE COURT:  Okay.  So that's fine.

23           You have to -- in order to make these exchanges

24   productive, I think you both need to state more clearly and

25   more finely-tuned your exact arguments.  But maybe you don't

31

1    need all of this because I don't know that you disagree about

2    some of these key issues.  There's no barrier there.

3                  MR. YAGERMAN:  Correct.

4                  THE COURT:  That's it.

5                  MR. YAGERMAN:  Correct.

6                  THE COURT:  So maintenance records for the last

7    three years, what's that going to tell you?

8                  MR. ROTH:  To the extent --

9                  THE COURT:  I don't know.  What could it possibly

10   tell you?

11                 MR. ROTH:  Your Honor, essentially I -- we could

12   work -- we can work those things out I think.

13                 THE COURT:  Yeah.  All right.

14                 MR. ROTH:  But what I was going to say is I just

15   would like to bring up one thing.  You keep talking about the

16   accountable and the budgetary issue.  One of their responses

17   was they don't have to provide that information.  And that's -

18   - I mean, if that's their defense --

19                 THE COURT:  But this is -- so like you really --

20                 MR. ROTH:  You know what I'm saying, it's what can

21   we do?

22                 THE COURT:  You really have to have the

23   conversation.

24                 MR. ROTH:  Right.

25                 THE COURT:  And this is why I keep saying it matters

1      what your defense is, you know. If you're --

2              MR. ROTH: Right. We'll talk. Your Honor, I

3      promise we'll talk. Let's leave it at that. Whether we agree

4      or not, we'll talk.

5              THE COURT: I'm introducing it based on, you know,

6      reading the *Times*, talking about how much work there is to be

7      done on the system, and, you know, their fancy diagram about,

8      you know, how slowing the trains down, you know, has a knock

9      on effect. You know. I don't know. I'm sure you all saw

10     that a week or two ago.

11             MR. ROTH: Yeah.

12             THE COURT: You know, that very clever design. Oh,

13     I get it. I don't know what is important to running the

14     trains except, you know, as somebody living in the city.

15             But for you, you have to decide what exactly the

16     issues are that you want to raise on this earlier motion about

17     the immunities and then go from there as to what discovery is

18     relevant.

19             All right. So just for the record, 41 is denied.

20     This is the confidentiality. It was denied without prejudice.

21             And as discussed, you're going to try to work it

22     out. And if you can't, you'll raise it in the letter with

23     whatever your outstanding issues. And the extension is granted

24     as we discussed.

25             So this is all going to, you know, fall in together

1   once you get that confidentiality --

2             MR. ROTH:  Your Honor --

3             THE COURT:  -- and you have the other situations.

4   And we're going to meet again in August on the 8th at 3

5   o'clock.

6             Yeah.

7             MR. ROTH:  And just my -- the only other thing in

8   the order was that my time to serve interrogatories regarding

9   the immunity defense would be after they serve their initial

10  disclosures regarding immunity --

11            THE COURT:  Yeah.

12            MR. ROTH:  -- would be extended by two weeks, is

13  that all right?

14            THE COURT:  That's fine.  Is that --

15            MR. ROTH:  Is that okay?

16            MR. YAGERMAN:  Depending upon --

17            THE COURT:  I mean, that's it.  You have to.  You

18  have to stagger these things.

19            MR. YAGERMAN:  Yes.

20            MR. ROTH:  Right.

21            THE COURT:  Otherwise, how can they know?

22            MR. YAGERMAN:  Your Honor, so --

23            MR. ROTH:  Make it two weeks from -- make it two

24  weeks from when it's executed.  And this way, if we have a

25  dispute, then she'll decide the two weeks from then.

1          MR. YAGERMAN:  At least, yes.

2          THE COURT:  Well, you should be prepared to turn --

3    all right.  Why don't you see what the issues are.

4          But the expectation would be you're working towards

5    an agreement.  Then they're going to -- you're going to -- the

6    defendants are going to turn over documents quickly.

7          Then you're going to know.  And I had said, you

8    know, maybe before you leave you talk about what your -- what

9    you understand your respective arguments are.

10         I mean, I'm trying to summarize them from memory

11   from our previous discussions.  If I've missed something, you

12   know, maybe you should clarify it for each other.

13         All right.  This is the schedule.  But let me just

14   -- the deputy just drew something to my attention with regard

15   to the 8th.

16      (Pause.)

17         THE COURT:  So the 8th actually doesn't look like

18   it's going to work anymore.  So let me adjust these dates.

19   How does the 14th of August look for you all?

20         MR. YAGERMAN:  I'm sorry?

21         THE COURT:  We can go earlier if you want.

22         MS. ROZZA:  8/14 is not good for me, Your Honor.

23         THE COURT:  How does Friday, the 3rd, look?

24         MR. YAGERMAN:  Friday the 3rd of?

25         THE COURT:  August.  I'm sorry.  Yeah.  The 3rd.

35

```
1      Yeah.  Sorry.

2           (Pause.)

3               THE COURT:  How about July 25th?  But you're going

4      to have to get me your joint status letter earlier.

5               MR. YAGERMAN:  Okay.  So now I've got nine dates.

6      Which date, Judge, do we have?

7               THE COURT:  I'm just suggesting a couple of days.

8               July 25th, August 3rd, and then I was also

9      suggesting a week -- the week of the 13th, but then somebody

10     said they were on vacation.  So takers?  otherwise I'm picking

11     something.

12              MR. YAGERMAN:  July 25th is fine.

13              MS. ROZZA:  Yeah.

14              MR. ROTH:  Your Honor, can I make a quick phone

15     call?

16              THE COURT:  Sure.  Hang on, do you want the 24th?

17              MR. ROTH:  I don't know.  I don't know.

18              THE COURT:  Okay.

19              MR. ROTH:  My daughter's in -- I don't think --

20     somewhere I've got to -- it's like I'm supposed to do

21     something that weekend.  Let me just make a quick phone call.

22              THE COURT:  All right.  You can step out if you

23     want.  It's up to you.

24              MR. ROTH:  Okay.

25           (Pause.)
```

1             MR. ROTH:  The boss says the 25th's okay.

2             THE COURT:  All right.  The 25th.  All right.  All

3     right.  So then that joint letter, can you have it in by the

4     23rd?

5             MR. YAGERMAN:  By July 23rd?

6             THE COURT:  All right.  3 o'clock still okay?

7             MR. YAGERMAN:  Yes, Judge.

8             MS. ROZZA:  Yes.  Yes.  3 o'clock.

9             THE COURT:  Okay.  8/8 is off.

10            All right.  Is there anything else?

11            MR. ROTH:  Not from us.  Not from plaintiff, Your

12    Honor.

13            THE COURT:  Okay.

14            MR. YAGERMAN:  No, Judge.

15            THE COURT:  All right.  Thanks.

16            MR. ROTH:  Thank you, Judge.

17            MR. YAGERMAN:  If we could get got proper

18    authorizations for medical records.  Everything's gotten

19    bounced.

20            THE COURT:  All right.  Why don't you --

21            MR. ROTH:  When is that being --

22            THE COURT:  Why don't you talk about that before you

23    all leave.  That seems like something you could come to an

24    agreement about.

25            (Proceedings concluded at 12:44 p.m.)

37

1          I, CHRISTINE FIORE, Certified Electronic Court

2     Reporter and Transcriber and court-approved transcriber,

3     certify that the foregoing is a correct transcript from the

4     official electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7

8     _____          June 15, 2018

9          Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25