UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
LUISA JANSSEN HARGER DA SILVA,          :
                                        :
                Plaintiff,              :
                                        :        **MEMORANDUM AND ORDER**
        -against-                       :
                                        :        1:17 Civ. 04550 (FB) (VMS)
NEW YORK CITY TRANSIT AUTHORITY,        :
METROPOLITAN TRANSPORTATION             :
AUTHORITY and RAQIA SHABAZZ,            :
                                        :
                Defendants.             :
                                        :
---------------------------------------------------------- X

**Vera M. Scanlon, United States Magistrate Judge:**

Defendants New York City Transit Authority ("NYCTA"), Metropolitan Transit Authority ("MTA"), and Raqia Shabazz (collectively, "Defendants") move for Plaintiff's Counsel, David A. Roth ("Mr. Roth"), to be disqualified as counsel herein, sanctioned, or in the alternative, directed to cease and desist from contacting any representatives of the MTA or NYCTA "regarding facts pertaining to platform screen doors and any other salient issues involved in [this case]." ECF No. 59 at 1 ("Sept. 21 Letter"). For the reasons stated herein, this Court denies Defendants' motion in its entirety. As to Plaintiff's motion to sanction Defendants' counsel (ECF No. 62 at 34), it is denied without prejudice as not being made properly under Fed. R. Civ. P. 11(b) and as without complete briefing. The Parties are directed to discuss a resolution to Plaintiff's sanctions request. If they do not come to an agreement, a briefing schedule will be set at the next conference.

I.    **Background**

Plaintiff (also referred to as "Ms. Da Silva") alleges that on August 2, 2016, she was struck by a northbound "B" train after she fainted and fell onto the tracks at the Atlantic Avenue-

Barclays Center subway station ("Atlantic Terminal station").  Compl., ECF No. 1 ¶ 24.  On August 2, 2017, Ms. Da Silva filed her Complaint in this matter contending that her injuries resulted from negligence:  (1) in the train's operation; (2) in the ownership, maintenance, and design of the platform edge; (3) insofar as there was a failure to communicate with the train operator; and, (4) in the maintenance of the train and platform.  See id. ¶¶ 62-142, generally.

On August 21, 2018, the MTA hosted a "Fast Forward" Town Hall meeting at the Milton G. Bassin Performing Arts Center at York College, Queens, New York (hereinafter the "Meeting") at which members of the public asked questions of MTA NYCT President, Andrew Byford.  ECF No. 59 at 1; id. at Ex. "A," generally.  Mr. Roth attended this Meeting as a private citizen.  Id., Ex. A at 4.  During the Meeting, Mr. Roth and Mr. Byford had a brief exchange of approximately 90 seconds:

> Mr. David Roth: Thank you for hearing me today.  So my mom is blind and I think that to be truly accessible, the subway needs to be safe.  According to your signage, 50 people a year are getting hit and killed by subways, 170 I think, well, whatever the sign that I saw in the subway today, in 2015, were hit by subways, causing major amputations. I was very, I felt compelled to come here today because in your plan to modernize, you're not taking it (sic) to a platform edge safety into your plan. There's no, there is a method to prevent, I think since 2013 there's been about, until today, if it's 50 a year, that's 500 deaths, excuse me, 750 deaths. And if this plan is going to go forward ten more years without platform edge doors, there's going to be another 500 deaths, and you can stop it because at the AirTrain, as you know, there's zero, nobody's been hit by a car, nobody's been amputated, nobody's been killed.  And I can't let my mom go on the subway.  And even if you get escalators and you get elevators, she's not going down there, because as you know, in London, they put them in.  In Tokyo, in Toronto, I think there's just an add that they're going to put them in when one person died.  What's your plan to protect them? Because modernization includes safety.

> Mr. Byford: So I agree with you, with that statement, I entirely concur.  And I say that as a former safety director on what was British Rail.  So safety is in my psyche, it's in my DNA.  I'm very familiar with platform screen doors.  There are certain real, genuine challenges about retrofitting an existing metro system, one that was built in the early 1900s. So when you mentioned London, the oldest network in the world, the only platform screen doors on the London Underground are on the Jubilee line extension from Westminster around to Stratford because they were

brand new stations that were built with dead straight platforms and platforms that can support the weight of platform screen doors.

So I'm not ruling them out. I would certainly say that they are easier to specify and my view would be we should specify them for extensions and modern stations going forward. To retrofit them where literally the platforms will not support the weight and where there are very, very tight curves, and where you don't have automatic train control, so you'd have to have very accurate train stopping to line the trains up with the doors is – I'm not saying its insurmountable, but I think it will probably double the cost of the Fast Forward Plan.

So in the short term, that's why that's not in the plan. I would love to have platform screen doors. They don't just preclude suicides. They preclude garbage blowing onto the tracks, they stop people dropping things and then going down to pick them up. So I get it. But it is, trust me, way more complex than you might think. The only subway that I can think of that has retrofitted an existing system is Hong Kong, which is a system built in 1976, with straight platforms. So its on my wish list, but realistically there are huge challenges.

Mr. Roth: Thank you for your response and it was before your time, but the Second Avenue subway doesn't have them.

Mr. Byford: And they could have. I'm well aware of that. Thank you.

ECF No. 59-1, pp. 81-84. Defendants note that the transcript contains an error, and that the colloquy between Mr. Roth and Mr. Byford was:

Mr. Roth: Thank you for your response and it was before your time, but the Second Avenue subway doesn't have them. And they could have.

Mr. Byford: I'm well aware of that. Thank you.

ECF No. 59 at 1, n. 1.[1]

By Letter Motion ("Letter"), Defendants seek to disqualify Mr. Roth from representing his client in this matter and request that he be sanctioned. ECF No. 59 at 1. In the alternative, Defendants seek an order directing Mr. Roth to "cease and desist from contacting any representatives of the [MTA] and [NYCTA] regarding facts pertaining to platform screen doors

---

[1] For purposes of the instant motion practice, this distinction is immaterial.

and any other salient issues involved [in the instant matter]." Id.  In response to Defendants'

Motion, and in light of the gravity of the accusations therein, Mr. Roth retained ethics defense

counsel, Pery D. Krinsky ("Mr. Krinsky").  ECF Nos. 61, 62.  Mr. Krinsky filed an opposition to

Defendants' motion on Mr. Roth's behalf, and he requested that the Court sanction Defense

Counsel by ordering them to pay reasonable attorney's fees and costs.  ECF No. 62 at 34.

Defendants filed reply papers thereafter, and the Court heard oral argument.  ECF Nos. 66, 68.

## II.    DISCUSSION

Defendants allege that by and through Mr. Roth's attendance at the Meeting and his

interaction with Mr. Byford, he violated certain New York Rules of Professional Conduct

("RPC"), specifically Rules 4.2, 4.1, and, 8.4-c.

### A.  Mr. Roth Did Not Violate RPC 4.2

Rule 4.2 provides that "[i]n representing a client, a lawyer shall not communicate or

cause another to communicate about the subject of the representation with a party the lawyer

knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent

of the other lawyer or is authorized to do so by law."  RPC 4.2(a) (emphasis added).  Comment

Five to Rule 4.2 clarifies that "[c]ommunications authorized by law may include

communications by a lawyer on behalf of a client who is exercising a constitutional or other legal

right to communicate with the government."  Id.  The Rule is intended to protect represented

parties from "possible over-reaching by other lawyers . . . in the matter, interference . . . with the

attorney-client relationship, and un-counseled disclosure of information relating to the

representation."  RPC 4.2, [1].

Defendants argue that the instant matter "involv[es] allegations concerning the lack of

platform safety devices" and that Mr. Roth "question[ed] [Mr.] Byford on that very issue as it

relates to individuals contacted by subway trains allegedly because of the absence of those devices." ECF No. 59 at 2 (emphasis added). Defendants' broad interpretation of "the subject of the representation" is neither shared by this Court, nor – in this instance at least – tenable under the First Amendment, which permitted Mr. Roth, as a concerned private citizen, to inquire as he did at the Meeting.

Rather, the Court agrees with Plaintiff that Mr. Roth did not communicate "about the subject of [Ms. Da Silva's] representation." ECF No. 62 at 20. Ms. Da Silva's claims concern allegations of negligence in the maintenance and design of the Atlantic Terminal station, the operation of the train she contends struck her, or some combination thereof, in August 2016. Compl. ¶¶ 62-142, generally. Mr. Roth inquired about potential and prospective safety measures, specifically the possibility of adding platform screen doors as part of the Fast Forward initiative and throughout the subway system. Id. At its most specific, Mr. Roth and Mr. Byford discussed the feasibility of these measures with regards to the Second Avenue subway line, of which the Atlantic Terminal station is not a part. Id.[2] The Atlantic Terminal station was not discussed or alluded to at any time. Id. Neither Plaintiff nor her claims were discussed. Id. Although Mr. Byford discussed some of the general logistical challenges surrounding installation of retrofitted platform screen doors, again, he did so broadly and without opining as to how those challenges might relate to the Atlantic Terminal station. Id. The only overlap between the matters discussed at the Meeting and the instant matter was at a broad policy level – equally applicable to nearly any litigation involving platform safety at any subway station in New York City. Thus, the brief exchange between Mr. Roth and Mr. Byford touched exclusively and broadly on matters of public interest and policy, rather than "the subject of [Plaintiff]'s

---

[2] See also, e.g., http://web.mta.info/capital/phase2_about_sas.html, last accessed May 21, 2019.

representation."  <u>See</u> Restatement of the Law (Third) Governing Lawyers (Ali, 2000) § 101(2)

("In negotiation or litigation by a lawyer of a specific claim of a client against a governmental

agency or against a governmental officer in the officer's official capacity, the [anti-contact rule]

applies, except that the lawyer may contact any officer of the government . . . with respect to an

issue of general policy.").

Regardless of any attenuated overlap concerning these broader matters of public policy,

the Court agrees that Mr. Roth's conduct was permitted under Rule 4.2(a).  "The rights to

complain to public officials and to seek administrative and judicial relief from their actions are

protected by the First Amendment."  <u>Dougherty v. Town of N. Hempstead Bd. of Zoning

Appeals</u>, 282 F.3d 83, 91 (2d Cir. 2002).  Although "not all speech is of equal First Amendment

importance," <u>Dun & Bradstreet v. Greenmoss Builders</u>, 472 U.S. 749, 758, 105 S. Ct. 2939, 2944

(1985), "speech on matters of public concern . . . is at the heart of the First Amendment's

protection."  <u>Snyder v. Phelps</u>, 562 U.S. 443, 451-52, 131 S. Ct. 1207, 1215 (2011) (internal

quotation marks & citations omitted) (quoting <u>Dun</u>, 472 U.S. 749, 758-759, 105 S. Ct. 2939

(1985)); <u>see</u> <u>Ragbir v. Homan</u>, No. 18-1597, 2019 U.S. App. LEXIS 12348, at *30 (2d Cir. Apr.

25, 2019) (speech on matters of public concern "implicates the apex of protection under the First

Amendment").  "Speech deals with matters of public concern when it can be fairly considered as

relating to any matter of political, social, or other concern to the community, or when it is a

subject of legitimate news interest; that is, a subject of general interest and of value and concern

to the public[.]"  <u>Snyder</u>, 562 U.S. at 453 (citations & internal quotation marks omitted).

Mr. Roth's inquiry of Mr. Byford was made on matters of public concern, <u>i.e.</u>, safety in

the public subways, at a public forum – the Milton G. Bassin Performing Arts Center at York

College.[3]  Mr. Roth's First Amendment rights were therefore at their zenith during the Meeting and his exchange with Mr. Byford.

In addition, under Comment Five of Rule 4.2, Mr. Roth could have complained to Mr. Byford in the same manner but on behalf of Ms. Da Silva at the Meeting without violating Rule 4.2.  See J.P. Foley & Co. v. Vanderbilt, 523 F.2d 1357, 1359-60 (2d Cir. 1975) (Gurfein, J., concurring) (matters of policy can inform a court's interpretation of a disciplinary rule).  Thus, it follows that Mr. Roth's inquiry of, and/or complaint to, Mr. Byford in regards to matters of broad public policy – and not on behalf of Ms. Da Silva – was within the protective ambit of communications authorized by the First Amendment.

## B.  Mr. Roth Did Not Violate RPC 4.1, 8.4-c

Defendants contend that in addition to violating Rule 4.2(a), Mr. Roth also violated Rules 4.1 and 8.4-c of the New York Rules of Professional Conduct by and through his conduct at the Meeting.  ECF No. 59 at 3.  Rule 4.1 provides that "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person."  RPC 4.1. (emphasis added).  Rule 8.4-c provides that "[a] lawyer or law firm shall not . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."  Defendants contend that Mr. Roth violated these rules by "failing to disclose who he is and who he represents."  ECF No. 59 at 3.  As set forth above however, Mr. Roth was not representing Ms. Da Silva – or any of his other clients – at the Meeting.  Rule 4.1 therefore does not apply to Mr. Roth's conduct therein.

---

[3] The Court need not determine whether the Town Hall meeting constituted a traditional, designated, or a limited public forum, as none would permit viewpoint-based discrimination. See Johnson v. Perry, 859 F.3d 156, 172 (2d Cir. 2017) (discussing the types of forums and requirements for any content restrictions); see also Frey v. Dep't Health & Servs., 106 F.R.D. 32, 37 (E.D.N.Y. 1985) ("[U]nlike a corporate party, the government has a duty to advance the public's interest in achieving justice, an ultimate obligation that outweighs its narrower interest in prevailing in a lawsuit.")

The record does not show that Mr. Roth engaged in any dishonesty, fraud, deceit, or misrepresentation, or that he made any false statements of fact or law at the Meeting. ECF Nos. 59, 66, generally.

In sum, the Court finds that Mr. Roth's conduct did not violate the Rules of Professional Conduct as argued by Defendants.

### C. Defendants' Motion For Mr. Roth's Disqualification Is Not Warranted By Existing Law

The Defendants' motion for disqualification or sanctions on the basis of these purported ethical violations is without merit. See Guan v. Long Island Bus. Inst., Inc., No. 15 Civ. 2215 (CBA) (VMS), 2017 U.S. Dist. LEXIS 10490, at *23-32 (E.D.N.Y. Jan. 24, 2017). Although Rule 37 does not include disqualification as a possible sanction, federal courts have the inherent power to disqualify attorneys in order to "preserve the integrity of the adversar[ial] process." Hempstead Video, Inc. v. Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005) (citation omitted). "Motions to disqualify are generally not favored. They are often tactically motivated; they cause delay and add expense; they disrupt attorney-client relationships sometimes of long standing; in short, they tend to derail the efficient progress of litigation." Felix v. Balkin, 49 F. Supp. 2d 260, 267 (S.D.N.Y. 1999) (internal citation omitted). Disqualification is appropriate only if the attorney's misconduct "tends to 'taint the underlying trial' by affecting his or her presentation of the case." Tradewinds Airlines, Inc. v. Soros, No. 08 Civ. 5901 (JFK), 2009 WL 1321695, at *4 (S.D.N.Y. May 12, 2009) (quoting Bd. of Ed. of City of N.Y. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)). In addition, the Court of Appeals has demanded "a high standard of proof on the part of the party seeking to disqualify an opposing party's counsel." Secured Worldwide, LLC v. Kinner, No. 15 Civ. 1761 (CM), 2015 WL 4111325, at *3 (S.D.N.Y. June 24, 2015).

The Second Circuit has held that disqualification is justified in two instances. <u>See</u> <u>Nyquist</u>, 590 F.2d at 1246. First, disqualification is merited if an attorney's concurrent representation of two clients undermines the court's confidence in the attorney's loyalty to his clients. <u>See id.</u>; <u>All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund</u>, No. 08 Civ. 1816 (LDW) (AKT), 2010 WL 2243351, at *2 (E.D.N.Y. June 1, 2010); <u>Med. Diagnostic Imaging,</u> <u>PLLC v. CareCore Nat., LLC</u>, 542 F. Supp. 2d 296, 306 (S.D.N.Y. 2008). Second, disqualification may be necessary if the attorney is actually or potentially in a position to use privileged information gained from a former client to the advantage of a current client. <u>See id.</u>; <u>Tradewinds Airlines</u>, 2009 WL 1321695, at *4; <u>Med. Diagnostic Imaging</u>, 542 F. Supp. 2d at 306. Neither of these two situations is even arguably present in the instant matter, nor have Defendants argued otherwise. ECF Nos. 59, 66, <u>generally</u>.

Outside of these two situations, courts "have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct." <u>Tradewinds Airlines</u>, 2009 WL 1321695, at *4 (quoting <u>Nyquist</u>, 590 F.2d at 1246). The Second Circuit has cautioned that the "appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases." <u>Nyquist</u>, 590 F.2d at 1247. In order for the appearance of impropriety to be sufficient to support disqualification, a "violation of either the duty to preserve client confidences or the duty to exercise independent judgment on the client's behalf is generally also required." <u>Blue Cross & Blue Shield of N.J. v. Philip Morris</u>, 53 F. Supp. 2d 338, 345 (E.D.N.Y. 1999). In all cases, courts are hesitant to disqualify an attorney from representing his client in litigation, and the key to justifying disqualification is demonstrating a conflict of interest or a potential breach in attorney-client confidentiality. <u>See Nyquist</u>, 590 F.2d at 1246.

Again, Defendants have not alleged – let alone established – that any conflict of interest or breach in confidentiality occurred herein.  ECF Nos. 59, 66, <u>generally</u>.

Defendants have not met the "high standard of proof [required] on the part of the party seeking to disqualify opposing counsel."  <u>Secured Worldwide</u>, 2015 WL 4111325, at *3; <u>Guan</u>, 2017 U.S. Dist. LEXIS 10490, at *23-32.  Defendants' motion to disqualify was not warranted.  <u>See</u> Fed. R. Civ. P. 11(b)(2).

III.    **CONCLUSION**

Accordingly, the Court DENIES Defendants' Motion at [59].  Mr. Roth's request for costs and fees within his Opposition (ECF No. 62 at 34) is denied without prejudice to renew in a separate, properly briefed application.  See Fed. R. Civ. P. 11(C)(2); see also Jefferson v. Webber et al., No. 17-1043-cv, 2019 U.S. App. LEXIS 18182, at *11 (2d Cir. June 18, 2019) ("Due process requires that a litigant 'must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges.'") (quoting Sakon v. Andreo, 119 F.3d 109, 114 (2d Cir. 1997).  Counsel are encouraged to discuss an agreed-upon resolution to Plaintiff's request for sanctions.  The briefing schedule for any motion by Mr. Roth for costs and fees will be discussed at the next status conference.

Dated:  Brooklyn, New York
        June 21, 2019

_Vera M. Scanlon_
VERA M. SCANLON
United States Magistrate Judge

11