UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


HARGER DA SILVA,          \*    Case No. 17-CV-4550(FB)
                          \*
                          \*
            Plaintiff,   \*    Brooklyn, New York
                          \*    October 29, 2020
     v.                 \*
                          \*
NEW YORK CITY TRANSIT     \*
AUTHORITY, et al.,        \*
                          \*
           Defendants.  \*
                          \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          ROBERT GENIS, ESQ.
                          Sonin & Genis, Esq.
                          One Fordham Plaza
                          Suite 907
                          Bronx, NY   10458

                          DAVID A. ROTH, ESQ.
                          ELLIOT DOLBY-SHIELDS, ESQ.
                          Roth & Roth LLP
                          192 Lexington Avenue 802
                          New York, NY  11548

For the Defendants:         ANDREW P. KEAVENEY, ESQ.
                          TIMOTHY COLLAZZI, ESQ.
                          120 Broadway, 27th Floor
                          New York, NY  10271


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 2:34 p.m.)

2          THE COURT:  Okay.  So, this case is *Harger Da Silva*

3     *v. New York City Transit Authority*.  It's 17-CV-4550.

4          So let's start first with counsels' appearances for

5     the plaintiffs.

6          MR. GENIS:  Sure.  Bob Genis for the plaintiff,

7     among others.

8          MR. ROTH:  David Roth for the plaintiff.

9          MR. SHIELDS:  And Elliott Shields for the plaintiff.

10          MR. GENIS:  That's our team on this call.

11          THE COURT:  All right.  And for the defendants?

12          MR. KEAVENEY:  Andrew Keaveney for defendants.

13          MR. COLLAZZI:  Timothy Collazzi for the defendants.

14          THE COURT:  Anybody else?  All right.  Okay.  All

15     right.

16          So we have your status letters.  I have the one at

17     132.  It's a somewhat general description of a couple of

18     issues.  And then we have 133, which is the outstanding

19     discovery issues, and particularly talking about a couple of

20     ESI points.

21          So, first, any progress on any of those issues

22     before we dive into them, in the last two days?

23          MR. GENIS:  I think this is where we're at, Judge.

24          THE COURT:  All right.  So it seems that you have a

25     couple of -- the two main issues seem to be what should happen

1       when it's ESI, and you have a question about how the searches

2       are going to happen, and then what should happen with meta

3       data and the other -- are a couple of issues with depositions,

4       including some overlap in your planning with ESI.

5               So I think that's on the plaintiff's side.  I guess

6       I have a couple of questions.  You know, I mean, your thoughts

7       about what you really, really need, because from the -- unless

8       you disagree with the defendants that the amount of data that

9       would be produced is huge, and two, -- well, two and three.

10      What do you really need the metadata for, and why should -- it

11      seems -- maybe I'm not understanding, but some of this will be

12      a reproduction with the metadata and why is that justified?

13              And then, if there's anything you think you should

14      highlight, you know, feel free.

15              MR. ROTH:  Your Honor, is what -- for the ESI

16      purposes.  I will address the ESI purpose -- ESI discussion.

17              We have agreed to, you know -- we're in the process

18      of finalizing search terms that's, you know, that we agreed to

19      a tiered process where they can start rolling this stuff out.

20              THE COURT:  Uh-huh.

21              MR. ROTH:  You know, so that we can -- you know, so

22      that we can get going.  And you know, we both agree to it, and

23      one of the -- I wouldn't -- I mean, we're in a complete

24      disagreement about searching the share files, the file

25      folders, and the hard drives.  And the basis of the request is

4

1     that their witness, Rick Ryan, said, hey, if I knew where to

2     look.

3              If you knew where to look, there would be other

4     similar documents that would be similar.  And I've said this

5     every single call that we've been on and that they -- and the

6     fact they identify in some places that there were share

7     folders and file paths, and what happens is if, for instance -

8     - I don't know if you remember, but the very very first

9     document that stimulated this entire line was that the

10    customer contact with train report, which said, hey, this is

11    how many people died every single year from 2002 to 2013, and

12    this is how many people were struck by trains and killed, et

13    cetera, et cetera.  And we -- okay, well, who's the author of

14    that?  We don't know.  What team put that together?  We don't

15    know; we can't tell you that.

16             Well, it's a PowerPoint.  Obviously it's an -- it

17    started out in electronic format.  It would have an author.

18    It would have modifications.  It would have a whole bunch of

19    different information.

20             So specifically, for the PowerPoints, that clearly

21    they're -- you know, there's raw data behind that.  There's

22    data that relied on who knew it, when did they know it, what -

23    - you know, who got it -- you know, a lot of that information

24    should -- you know, is on there, and that's why we've asked

25    for that reproduction because they're saying -- if we say,

5

1    hey, you know, you know what -- you know, were did this come

2    from?

3              Where is this -- hey, there's a PowerPoint in 2003

4    that says, hey, we knew about that platform edge doors would

5    make it safer and, et cetera, et cetera.

6              So those things, it's -- they must be created

7    electronically because they're PowerPoints, and somebody had

8    to have produced them because they gave them to us.  So --

9              THE COURT:  All right.  But are you looking -- when

10   I read this letter, and I'm looking at 133 --

11             MR. ROTH:  Yeah.

12             THE COURT:  -- particularly at page 2 and --

13             MR. ROTH:  Yeah.

14             THE COURT:  -- item 36, document production with

15   metadata.  You know, if you're talking about something like

16   what you just said, you know, we -- we have found -- this is

17   just an example, but you know, a line of these reports about

18   deaths and what happened, and you know, there's X number of

19   them and they're all PowerPoints, and that's what we need the

20   metadata for, that's one thing.

21             But what's described here is you want all of the

22   production.  Sounds like what's already been produced.  I

23   don't know how much there is of that, but going forward, done

24   with the metadata.

25             I mean, you have to -- you know, I mean, I don't

6

1    know what this translates into but when defendants say the

2    words, two terabytes of data and 18 million emails, you know,

3    this is not, you know, the exhaustive history of the MTA in

4    this project.

5           This is -- you have enough information to make out

6    your claim that they knew the risk, had the means to deal with

7    the risk, and deliberately chose not to deal with the risk in

8    a period relevant to your client.  I mean, so --

9           MR. ROTH:  Hold on, Your Honor.

10          THE COURT:  -- you know, to go back to where we

11   started this conference, this is a 2017 case.  And I

12   understand you feel like you have been, you know, pursuing

13   this, but you know, I -- my question every conference is, what

14   do you need?  So, what do you need?  I get it that there might

15   be some examples where the metadata is relevant, but --

16          MR. ROTH:  Your Honor, let me -- let me just say

17   this.  The emails and that two -- and the two terabytes of

18   data and that stuff, they're not complaining about that.

19   That's a separate issue.  That issue goes to that -- they're

20   saying, hey, this is what we're doing.  They're doing that.

21   They're going to collect it and they're saying it -- and we're

22   working with them to streamline down that particular issue.

23   So that, we're not fighting about, actually.  That's not --

24   that's not (indiscernible).

25          THE COURT:  So you're not asking for the metadata

1      that goes with those emails?

2                MR. ROTH:  No.

3                THE COURT:  Because that's the way --

4                MR. ROTH:  That's going to be -- no, because that's

5      going to be produced.  They haven't produced any of that yet.

6      It's going to be -- it's going -- they've agreed to produce

7      those emails in the, you know, electronic format with --

8      they'll have the metadata.

9                And what they're hoping for, and what -- and one of

10     the -- and what, you know, what they're hoping for is that

11     they'll -- these documents that we're all referencing will be

12     attached, and they'll be attached in the electronic format and

13     we'll see the metadata.  So they'll be saying is like, let's

14     see what happens, you know.

15               And what we're saying is, hey, listen, you know,

16     that's one issue.

17               And by the way, Judge, that the two terabytes of

18     data, and that's -- we're not fighting about that, actually.

19               THE COURT:  Okay.

20               MR. ROTH:  We're working together.  That's -- that's

21     -- and what we came up with, actually -- you know, I spoke

22     with Bob and I spoke with Andrew earlier today, in fact, is

23     that the documents that were -- some of the specific documents

24     that we're really seeking the metadata for, we're going to put

25     the names of those documents in the search terms and maybe,

8

1    hopefully, they'll be attached to some of the emails and, you

2    know, maybe they'll get around it that way.  You know, and

3    we'll get -- you know, and both parties will be able to

4    produce it.

5           And until -- until that happens, you know, at -- you

6    know, I'm willing to try it their way, but I still think that

7    that's extremely inefficient.  But the two terabytes of data,

8    the 2 million emails, that we're not fighting about, actually.

9    That, we're working together to streamline them and, you know,

10   it's the reproduction, we're saying.

11          And, Judge, we can certainly highlight, you know,

12   certain specific documents to ask them to produce the

13   metadata.  Like, specifically like the PowerPoints, like you

14   said.  Like that's understandable.  We can go through and do -

15   - and identify --

16          THE COURT:  Well, what's the scale of what you're

17   asking to be reproduced, then?

18          MR. ROTH:  It was --

19          THE COURT:  If it's not a subset of --

20          MR. ROTH:  Your Honor, it was, you know, it was

21   maybe -- probably like 3 or 400 documents that they produced

22   that we had asked them to -- you know, that we put in our

23   definitions, certainly in the fourth set, and even in the

24   earlier sets that, you know, you're supposed to produce them

25   in the manner that they're kept, and they're kept on -- they

1    have to be kept on computer.  They're not in millions of

2    filing cabinets all over the transit authority.

3         And so, you know -- and like, you know, and we even

4    deposed somebody about blueprints and said, hey, we have it

5    scanned in going back to 1910.  You know, the drawings, et

6    cetera, et cetera.  And we identified that person for them so

7    they could go ask that person, hey, where do you look for

8    these things, and I even, you know -- anyway.

9         So like I said, so the reproduction, if Your Honor

10   wants us to pinpoint stuff that has already been produced to

11   get the -- to have that produced to metadata, we're certainly

12   open to that, you know, to work on that.  That's, you know,

13   that's not -- that's not out of the ballpark of what, you

14   know, we would, you know, we would do if -- because based on

15   what Rick Ryan said, is he said, if you knew where this was,

16   there would be other similar documents to this document in --

17   located in that folder.

18        THE COURT:  And where are these -- the documents

19   that you're asking to be produced, when were they -- when were

20   they originally produced?

21        MR. ROTH:  A year ago, two years ago, and some of

22   them last month.  Within the last 30 days, there was two small

23   productions made as well, and I think the rest of the

24   production came, I want to say last year sometime, but with

25   COVID I can't remember if it's this year or the year before to

10

1    be honest with you.

2              MR. GENIS:  So I think we're allaying your concerns,

3    Judge, that we're going to limit what we need the metadata

4    for.  We don't need the metadata for every single thing, and

5    you know, so that's -- that was your initial question and

6    we're going to work with the defense to limit what we actually

7    need the metadata for.

8              THE COURT:  I suppose the question is, why is the --

9    at least some of the information that you're talking about not

10   included in the text of the document itself?  And you're

11   talking about who is responsible for these documents.  I mean,

12   is there no attribution in these PowerPoints or designation

13   that this comes under, you know, whomever's work product it

14   is?

15             MR. ROTH:  Nope.  It just says customer contact with

16   train report, and it's just the PowerPoint, and all of the

17   PowerPoints are similar.  They just say, platform edge doors,

18   PowerPoint, or you know, you know, safety, PowerPoint, and

19   doesn't -- it doesn't -- there's no way to tell, you know

20   where -- you know, who authored the document, who shared in

21   the document, et cetera, et cetera.

22             And based upon our -- like I said, based upon our

23   conversation earlier, I mean, I called Ms. Keaveney and said,

24   are you open to using the names of these documents -- search

25   terms so that maybe they'll be attached to a PowerPoint

1      someplace, and then that will, you know, generate, you know,

2      production from the email.  And he indicated to me, yes, he

3      would -- that he was open to that, so you know, that

4      development -- those developments, like I said, I do this all

5      the time.  It's highly unusual but we're willing to give it a

6      shot.

7              THE COURT:  Well, all right.  What's the defendant's

8      position on this production metadata issue?

9              MR. KEAVENEY:  Well, I think like I've been saying

10     the past few times is that the email e-discovery, will provide

11     that information.

12             THE COURT:  Uh-huh.

13             MR. KEAVENEY:  Just a couple things to point out,

14     Rick Ryan deposition.  He was just making assumptions as to

15     whether things might be kept in the same files.  So I

16     (indiscernible) definitively, so just to base any claim off

17     that testimony is kind of a stretch.

18             Even if metadata is provided, for example, in a

19     PowerPoint, Rick Ryan didn't know how the metadata would be

20     kept for any particular document.  It could be very limited

21     amount of metadata.

22             It could be very limited amount of metadata, it

23     could be a lot.  Generally, a metadata would only record the

24     last person that edits a document.  That could be a secretary,

25     a paralegal.  You know, someone that's inputting data into a

1    PowerPoint.

2            THE COURT:  Uh-huh.

3            MR. KEAVENEY:  So that doesn't really get you

4    anywhere.  Doesn't give you the author of it.  It just gives

5    you someone that might have edited it at the last moment, or

6    someone that downloaded it, or someone that touched it.  It

7    doesn't -- you know, searching how to -- the documents are

8    maintained doesn't get you the information that you need.

9            I really -- I'm just trying to find out why this is

10   relevant, especially since all these PowerPoints, it's not as

11   if you look at the PowerPoint, you look at the author, and you

12   can pinpoint it to one document where all the PowerPoint was

13   created from.  I would imagine PowerPoint presentations, such

14   as the one that Mr. Roth was explaining, comes from hundreds

15   of sources.

16           So the best way would probably be email

17   communications back and forth to the extent that that is

18   transmitted somehow, which I would imagine it was at some

19   point, transmitted, because you don't create a document and

20   then just leave it on a hard drive somewhere.  It gets sent.

21   That's the purpose of making documents such as PowerPoints, is

22   to send it out to get comments back.

23           And all that stuff should be on the emails.  I don't

24   want to go back.  I don't want to strain already very strained

25   transit resources in these times, especially when people still

1    are not fully back to work, to have them go redo searches

2    again.  When this issue also came up, my contact did go back

3    to certain custodians and ask if, you know, there was

4    additional documents.  And the response was no, this is

5    everything that we have.  I don't know what else can be done

6    to do that for a third time to produce these documents.

7            My process that --

8            THE COURT:  Sure.  But then how does the -- how does

9    the production happen, right?  If you say PowerPoint A, don't

10   you know from the searches that that came from, you know,

11   person -- custodian number 1's email account and don't you --

12   and usually what happens is, the account is downloaded and

13   you're operating off -- you know, not directly off their

14   account anymore, so --

15           MR. KEAVENEY:  Right.  My understanding, Judge, is

16   that some of the materials that were produced that was not

17   downloaded from a computer, it was in a paper format that was

18   printed out somewhere along the line, and that paper copy was

19   reproduced and sent to plaintiff.  So again, whether it was

20   kept on a computer or kept in a file on a floor in somebody's

21   office, you know, I was told that it was a little bit of both.

22           That -- to say that this document was on a hard

23   drive somewhere, it's possible it was, but that may not be how

24   we found it.

25           THE COURT:  And do you not have the ability to

1      fairly easily trace back where the production came from?

2              MR. KEAVENEY:  That would include -- that would

3      require me to really go back and reproduce 5,000 pages of

4      documents, when I'm already agreeing to produce what will

5      likely be several hundred thousand emails.

6              THE COURT:  Okay.

7              MR. KEAVENEY:  With attachments, which -- with

8      metadata.

9              And one other thing is that plaintiff's first and

10     second request for documents did not request metadata.  The

11     third and fourth did, but their first and second did not

12     request metadata.

13             THE COURT:  And the production that we're talking

14     about is your response to number 1 and number 2, or --

15             MR. KEAVENEY:  Is a combination of them all.  At

16     least --

17             THE COURT:  All right.

18             MR. KEAVENEY:  -- the way that number 36 on the

19     letter is done.

20             THE COURT:  All right.

21             MR. KEAVENEY:  I don't want to waste a lot of time,

22     Judge, in really going back and doing this, especially when

23     transit is probably going to spend, you know, in terms of

24     legal cost and fees, possibly up to a half million dollars in

25     doing e-discovery.  And we're getting close to, you know,

1    whether or not it's disproportionate to the claim.

2              THE COURT:  Right.

3              MR. KEAVENEY:  I mean, talking about that much

4    money.

5              THE COURT:  Yep.  All right.  I'm not going to --

6    you're not going to go back and redo the production with the

7    exception, if there are some exceptionally relevant documents,

8    which you know, is not a technical legal term, but I think you

9    could describe it as something that would be highly

10   prioritized as evidence on your summary judgment motion, for

11   example, a fairly recent report about the installation of

12   barriers at stations. You know, something akin to that.

13             So, a few of those documents is reasonable for the

14   plaintiffs to ask the defendants to try just to determine, was

15   it in e-discovery format and then see if there is any way to

16   get that kind of a copy.

17             But otherwise, it is disproportionate to go back

18   now, especially on the older part of the production, and try

19   to recreate where this material came from, particularly in the

20   context of this exceptionally large production happening,

21   which you know, we don't know what it's going to include, but

22   the searches are going to look for material that's relevant to

23   the same topics as the production that was already made is

24   about.

25             So it seems like there should be the ability, if

1     these events actually happened, meaning that there were

2     discussions about the topics that are of interest to the

3     plaintiff, like the possible installation of some safety

4     mechanisms and the various studies that have been referenced

5     and the offer of having a system installed and, you know,

6     whatever.  The couple of topics that you all have mentioned

7     over the years.

8             But I think that doing the ESI search now in the

9     organized way it's going to happen that's going to get you the

10    metadata, is enough, and to spend the time reproducing the

11    past, recreating the past in order to be able to produce the

12    metadata, unless there's something that's exceptionally

13    worthwhile in undertaking that effort.

14            So that's that.  But to go to this big search that's

15    supposed to happen, it's unclear to me exactly what you're

16    talking about where, plaintiffs, you're saying -- I don't

17    know.  You're disagreeing with the defendant's ability to

18    search, it seems like.  And then, so where -- where are you on

19    the technology being used to do this search and the systems

20    that you're searching that this is such a problem?

21            MR. ROTH:  They're able to -- Your Honor, they're

22    able to search the emails, and they actually could -- I've

23    been saying this from day one, is that if you knew where to

24    look, you could look.  And if you're telling them that --

25    right now, what their carte blanch -- our 30(b)(6) notice

1    listed like a whole bunch of stuff and said, hey, you need to

2    know when you come for deposition, Mr. Ryan, you've got to

3    tell us where these documents were located.  And there's like

4    -- it's like Exhibit A to the -- it's probably like 26 copy --

5    26 different documents that we said, hey, these were really

6    important, or something to that effect.  I don't know exactly

7    how many.  And said, hey, these are really important.  Where

8    are they located?

9          And he says, I don't know, that wasn't my job.  So

10   they didn't educate him and they didn't prepare him for the

11   30(b)(6) to answer those specific questions.  He says, my job

12   is to talk about generally, you know, you know, how big the

13   system is.  And we're like, we don't dispute that, and just is

14   -- but these documents, they came from someplace and, you

15   know, that was the issue.

16         But we're not -- there's no dispute -- there's no

17   dispute going forward about the searching of the emails.  We

18   don't -- we're in a dispute.  We're working together to

19   streamline the productions and to make them as -- you know, to

20   yield the documents that we're looking for.

21         So that's, you know -- when you say I dispute, yes,

22   I do dispute that hey, if you knew what folder it was, just

23   like -- it would almost be like, Your Honor, you have the

24   Harger file in your computer, and instead of searching the

25   Harger file in your computer, you go into the entire federal

18

1    website and say, okay, I'm going to run a search.  You know,

2    obviously if you know where to look then you can -- then you

3    can find it, and that's what Ryan testified to.  He said, if

4    you knew -- if somebody told me where to look -- and I'm like,

5    hey, you guys ask the person who produced these, and they

6    don't want to do that.  You know.  I said, if you ask the

7    person who -- you know, you know, where did this come from,

8    then it would be an easy thing to take a peek in there.

9              But right this second, Your Honor, you're saying is

10   that you want us to try to see if they get it through their

11   email production and we're willing to work on doing that.

12             THE COURT:  Well, no.  I'm not -- I don't think I'm

13   talking about the same issue.  I'm looking at, again, letter

14   133 and what I wanted to know about was, what's the

15   significance of this point.  Defendants have raised concerns

16   regarding the ability to search certain files, folders, and

17   drives for specific documents.

18             MR. ROTH:  That's the same thing we're --

19             THE COURT:  So --

20             MR. ROTH:  -- talking about, Judge.

21             THE COURT:  But, I don't understand.  You're --

22   there is the retrospective part of this, which we've already

23   dealt with.  And now there's the going forward and you're

24   going to search these 22 individual email accounts, and you're

25   going to use, hopefully, a moderate search program.  So what

1    is it that can't happen now?

2         MR. KEAVENEY:  Judge, I think that's a reference to

3    the hard drives, which in the transit, the 312 terabytes of

4    documents or materials, that would be impossible to -- or

5    really disproportionate to search.  A lot of those documents

6    aren't readable.  You'd have to try to get -- export them all

7    to a vendor to OCR them to determine what's inside those

8    documents.  It would just be a really extraordinary task, and

9    that's really what that comment is in reference to.

10        THE COURT:  So --

11        MR. KEAVENEY:  And this (indiscernible) --

12        THE COURT:  Wait a minute.  So just so I'm clear,

13   this -- even though this is one paragraph, you're making a

14   distinction between the email accounts and the -- whether it's

15   a hard drive or an assigned drive?  Is that what we're --

16   that's the difference here?

17        MR. KEAVENEY:  That's the difference, because 36 was

18   -- referred to all the documents that have been previously

19   produced, and there was some discussion about going back to

20   share drives and searching those.  So again, that's what that

21   is reference to.  And we have discussed that in the past, and

22   I think the parties have, at least for now, agreed that the

23   emails is the best approach at this time.

24        THE COURT:  And the plaintiff's position?

25        MR. ROTH:  The plaintiff's position is that -- like,

1    for instance, let's say there's 22 people.  Let's just say

2    there's 22 people for the emails, okay?

3              THE COURT:  Uh-huh.

4              MR. ROTH:  So those, you know, let's say Tony

5    Abdalla (ph), he's the head of track or something like that,

6    right, and he was on the platform edge door task force, he

7    went to -- I believe he went to Korea and all over the world

8    looking at stuff.  If you said, hey, Tony, where do you keep

9    your records about this -- about this -- you know, what's the

10   hard drive that keeps the records?

11             Can you go look in there and produce whatever's --

12   you know, you know what -- you know what files you use, you

13   know what folders you use, you know what share drives you use,

14   can you go look through there, eyeball it, and pull out all of

15   the stuff that we're seeking, not just the stuff that they

16   want to produce, but the data behind it, and you know, and the

17   draft notes and the reports and all that other stuff.

18             If you ask them that, then he could -- you could

19   probably make a production based on -- you know, he could pull

20   out the documents himself and it doesn't -- it's not this high

21   level, 14 billion things, like look at this -- the 22

22   custodians that each -- every single custodian of those, atop

23   of whatever drives they use within the system, they all have a

24   drive assigned to themselves.

25             And to say, hey, you know, they probably saved stuff

1    to that drive and you ask them, say, can you -- you know, I'm

2    saying is, if that's the source of ESI that you guys -- that's

3    not in an email that you guys should be searching, and it

4    doesn't require an outside vendor or anybody.

5           It just says, hey, did you speak to the guy whose

6    files -- just like if you said to me, David, where do you keep

7    your Harger folder in discovery, and I'd point you to it and

8    I'd look through and pull out the document.  That's all I'm

9    saying.

10          THE COURT:  All right.  And we've spent a huge

11   amount of time trying that approach, and it may be that that

12   approach is the one that comes out in the depositions of these

13   individuals.  But I guess I'm missing the point about, if

14   everyone has a hard drive assigned to them, why is searching

15   the hard drive something difficult?

16          And I -- you know, maybe (indiscernible) hard

17   drives.

18          MR. KEAVENEY:  Those inquiries were made to those

19   custodians.

20          THE COURT:  Those what?

21          MR. KEAVENEY:  This is -- those inquiries were made

22   to those custodians; those relevant --

23          THE COURT:  Uh-huh.

24          MR. KEAVENEY:  -- (indiscernible) those were the

25   documents that were provided to us, which we produced to

1    plaintiff.  And that's what I was saying earlier.

2    (Indiscernible) --

3              THE COURT:  Okay.  So what's -- so what is the -- so

4    I mean, I'm just missing the disconnect here.  You're saying

5    that there's emails.  You're going to search the emails, and

6    then the plaintiffs are saying there are drives, suggesting

7    that they have not been searched and then it could be searched

8    on a person-by-person communication.  But this is all in the

9    context of ESI.

10             So to the extent that the plaintiffs are saying -- I

11   think the plaintiffs, you're suggesting that, what, that

12   everything has not been produced.

13             And so I'm asking, you know -- we spent probably two

14   years on this question about doing it based on the personal

15   knowledge of the individual custodians of their own hard

16   drives, and you know, there may be other communal hard drives.

17   But putting that aside, so what -- to the extent there's an

18   issue that the drives have not been searched, why is it such a

19   project?  And I just don't under -- I don't understand what it

20   is.

21             MR. KEAVENEY:  I think you're right, that it's

22   not --

23             THE COURT:  And this is -- I'm basing this based --

24             MR. KEAVENEY:  -- a big project.

25             THE COURT:  -- on --

1          MR. KEAVENEY:  Yeah.

2          THE COURT:  I'm basing this on your paragraph under

3     plaintiff's fourth set of demands, and you know, you have this

4     agreement about the email, and then this paragraph that's sort

5     of saying that you're each taking a different position with

6     regard to the drives.

7          And I'm just trying to understand, you know, is it

8     that -- you know, like, if we were to rewind this whole thing,

9     there were discussions by previous counsel that when we talk

10    about somebody's hard drive, that would mean we would need to

11    go into that person's office, make sure we have the machine,

12    they had it the right period of time, which might be in their

13    office or might be in some, you know, storage closet, who

14    knows where it is, and go through the effort of backing that

15    up and then searching it.  That's one possibility.

16         But another version -- just giving you an example of

17    what the Court has -- most of us have virtual drives, and it's

18    no big deal.  You would just -- I mean, it may be a big deal

19    to run the searches, but it's not a big deal to collect the

20    information.  You are really just going into the, you know,

21    the unified system that has, whatever.  You know, Scanlon and

22    Kuo, and Pollack, and just would pull all of those up.

23         So I don't understand what the technical problem is

24    for whether the defendants can or cannot readily search the

25    assigned drives, what plaintiffs in this paragraph under the

24

1   header, plaintiff's fourth set of demands, is describing.

2          MR. KEAVENEY:  Well, the problem is, search what?  I

3   mean, if you're going to look for --

4          THE COURT:  No, I'm asking you.

5          MR. KEAVENEY:  Well, I'm trying to give an example

6   here.  If, for example, if you're looking for a document,

7   collision with trains, and you look under one person's drive

8   for collision with trains, you are taking the assumption that

9   that document is actually named that to the extent that you

10  can only see the title of the documents during your searches.

11         THE COURT:  Right.

12         MR. KEAVENEY:  If that document wasn't created in a

13  virtual format, you'd have to send it out to somebody or

14  convert all the documents on that drive so they are readable.

15  And that's one person's drive.

16         So that's the issue I want to make clear is that

17  there is no standard in transit that certain documents have to

18  be kept in certain locations.  So we don't find it on

19  custodian's A drive, so where do you go next?  You go to the

20  next drive.  You go to another shared drive.  You go to the

21  thousands of employees at the transit authority on all their

22  drives to find this one document.  That's just one document.

23  Then what do you next?

24         THE COURT:  Okay.  But the other -- the other --

25  and this really, again, for the umpteenth time, we're asking

1    how things are organized, and that's -- and so you're saying,

2    okay, we would have a hard time finding -- let's take the

3    example, you know, a PowerPoint about the Atlantic Avenue

4    station in 2010.  We don't -- we don't know where that is,

5    because we don't know if it was called, you know, Atlantic

6    Avenue, or was called Pacific Atlantic Avenue, we don't -- or,

7    you know, whatever it was called.

8            So that's -- that's the hard part in the search.

9    But I think we're at the stage of asking the question just

10   before that, which is where I'm having a hard time

11   understanding is, is that you don't know which -- because the

12   problem you're identifying is a search term problem, not a

13   question of where are the hard drives.  And I don't -- are

14   they -- are they --

15           MR. KEAVENEY:  Well, Judge, one has to --

16           THE COURT:  You know, I don't know.

17           MR. KEAVENEY:  Going back again, when collections

18   were made for relevant documents, custodians were asked, where

19   do you get them?  Get them to us.  And they did their own

20   searches and provided us the documents.  So again, these

21   searches were conducted by the custodians as to where they

22   thought or where they placed certain material.

23           THE COURT:  Uh-huh.

24           MR. KEAVENEY:  I just don't -- there was further

25   inquiry that the additional searches would be made, or should

26

1    be made, excuse me, and again, that is what the comment there

2    in the document 133 is referring to --

3                THE COURT:  Uh-huh.

4                MR. KEAVENEY:  -- that to go back and, you know, now

5    put in all these search terms to search for all the potential

6    documents that may be related, assuming they're titled the

7    correct way, and assuming they're on certain drives that the

8    police have got -- I think it was 1,200 drives within the

9    transit authority, that would just be impossible

10   (indiscernible) --

11               THE COURT:  So has it ever -- has the collection of

12   the drive -- okay.  You've got 22 individual email accounts.

13   Has there ever been a parallel collection of the hard drives

14   that -- and I'm calling them hard drives.  You know, that

15   could be very broad.  It may not be a physical hard drive.  It

16   might be something virtual.  I don't know how you all run

17   this, but has there ever been a parallel collection of the

18   drives of computers of those individuals?

19               MR. KEAVENEY:  There hasn't been, to my knowledge.

20   It's just been --

21               THE COURT:  Okay.

22               MR. KEAVENEY:  -- custodians have been requested to

23   search their -- where they keep their documents related to

24   this matter.

25               THE COURT:  Okay.

1          MR. KEAVENEY:  Again, I just -- I -- to that,

2     especially when Rick Ryan testified that there is no specific

3     location where documents are required to be kept, nor is there

4     a requirement as to how documents are to be titled, you could

5     search someone's personal drive for the documents related to

6     this matter and find zero because that person may have kept it

7     on another shared drive.  So you'd be chasing your tail trying

8     to find documents that you couldn't find, you know, just

9     pulling from one's personal drive.

10          MR. ROTH:  But you would ask them.  That's the

11     point.

12          MR. KEAVENEY:  But we did, David.

13          MR. ROTH:  That's a little bit (indiscernible).

14          MR. KEAVENEY:  That's the whole problem.  That's the

15     whole point.  We've done that already, and that's why we're

16     saying to do these more involved searches, is just impossible.

17          So again, which is why we've agreed to do the email

18     searches; which is why the transit --

19          THE COURT:  All right.

20          MR. KEAVENEY:  -- has agreed to --

21          MR. ROTH:  Andrew --

22          MR. KEAVENEY:  -- pay thousands -- hundreds of

23     thousands of dollars to do the email searches.

24          THE COURT:  All right.  This is what we're going to

25     do.  You're going to go ahead with this email project, you're

1    going to back burner the question about whether any particular

2    individual's hard drive needs to be searched, again using the

3    term hard drive broadly because you're again telling me --

4                    MR. KEAVENEY:  Well, I (indiscernible) Your Honor --

5                    THE COURT:  -- that you have no unified system of

6    having either the physical hardware on how materials are

7    stored, or the -- even standardized virtual systems, and then

8    you have no nomenclature that cuts across the files.

9                    And so, you're suggesting that the broad use of

10   search terms is not likely to yield a productive -- the

11   production is not likely to be sufficient to justify the

12   effort, but you know, I think that the backup for that, or the

13   substitute for that is this email effort.  If the email

14   doesn't yield anything, then I think you end up revisiting

15   this question.

16                   But you know, this whole case and the discovery, you

17   know, is structured to try to get the documents first, and at

18   some point this is going to be a question of doing the

19   depositions, and as the plaintiff's counsel keeps saying,

20   well, ask them.

21                   Well, then that's going to be your opportunity to

22   ask them, because we just cannot keep this going in this sort

23   of spinning around in the virtual -- or the -- you know,

24   whatever the data collection processes are for the -- data

25   preservation and collection processes are for the defendants

1    here.

2           So the issue is alluded to, but not particularly

3    clearly stated in the paragraph at the bottom of page 1 and

4    page 2.  It's going to be addressed by going ahead with the

5    email searches as you have seemingly agreed on, and the

6    question of looking at any individuals' -- or systems' other

7    files is put on hold until you see what comes out of the email

8    production effort.

9           And then, it is a balancing effort here.  You know,

10   how much does the plaintiff need to be able to establish, or

11   at least have a fair chance of raising and convincing the fact

12   finder of the alleged failure to meet the reasonable

13   precautions that should have been made?

14          But -- and then, obviously, on the defendant's side,

15   your public defenses that you're -- you have been raising

16   along the way.  Anyway, all right.  I mean, I think that's

17   where you can go here.

18          What's the -- for the time line, I mean, you said in

19   that one letter at 132 that you were not quite sure of the

20   long-term discovery schedule, and now -- and in this letter

21   you talk about finalizing the search terms within 10 days.  I

22   mean, is that happening?  What are we talking about?

23          MR. KEAVENEY:  (indiscernible) again.  I think we

24   could probably get those search terms ironed out within the

25   next week and a half, and the first tier of people to start

1    searching.

2          I think at the last conference you said you wanted

3    to have a little tighter reign on the discovery going forward,

4    and we're certainly amenable to having a little more oversight

5    by you, with either status reports or additional conferences

6    to see how we're doing, because I don't think we can set a

7    time table at this time before we actually have that initial

8    production of emails sent, because there will be time to --

9    we'll need time to review them, and then of course to assess

10   them and to (indiscernible) --

11         THE COURT:  What -- so what's the review --

12         MR. KEAVENEY:  -- people for depositions.

13         THE COURT:  -- what's the review going to be?

14         MR. KEAVENEY:  You know, it all depends upon how

15   many emails are responsive to the search terms.  You know, if

16   there's several hundred thousand emails that come back, it

17   could take a couple months to go -- to go through them all.

18         THE COURT:  And what's the point -- I don't

19   understand.  Like, so what's the point of the review, because

20   it seems like there would be relevance.  It doesn't matter if

21   you're producing -- are not relevant or you should be working

22   together to refine the search, once you know there's a

23   particular subset or one of these terms turns out to be -- I

24   don't know what the computer word is, but like a false term,

25   right, that it's picking up things that are totally unrelated

1  to this.

2          There's privilege.  I mean, you could have a

3  clawback agreement, and then you have the security issues and

4  it seems, you know, you could have an arrangement to deal with

5  that.  I mean, if you are going through the entire production

6  before they see it, and you are not using pretty sophisticated

7  technology, then this is going to take forever.  And so, I

8  mean, if -- uh-huh.

9          MR. KEAVENEY:  We have discussed a clawback, and I

10  think that we're probably both amenable to that, but we would

11  still have to review the emails on at least some type of

12  cursory review for privileged information and relevancy.  I

13  don't think we want to give, you know, 300,000 emails -- and

14  I'm sure plaintiff doesn't want 300,000 emails either, if half

15  of them are not relevant to -- to the issues.

16          THE COURT:  But isn't the point of you doing the --

17  of doing this using e-discovery to be able to use basically a

18  smart production process?

19          MR. KEAVENEY:  It will --

20          THE COURT:  I thought you were doing either a

21  (indiscernible).

22          MR. KEAVENEY:  I think the search terms will

23  certainly decrease the role of documents, but I still think

24  that it is where we have to stop.  I think, you know, we have

25  to do our due diligence to make sure that those things are

1    responsive to a certain extent, and that they're not

2    privileged in some way.

3            THE COURT:  What would be --  I mean, what's

4    privileged here?  I mean, you have your counsel's names.  You

5    -- what else -- so there's attorney work product,

6    attorney/client, I don't -- I mean, maybe there's a little bit

7    of a difficult issue here because you have an in-house

8    counsel, but you -- and whether that, you know, falls on the

9    line of privilege or that was just part of the work, I don't

10   know where that -- you know, that's an issue we don't need to

11   decide today, but what else is going to be privileged in all

12   of this?

13           MR. KEAVENEY:  That would probably be the bulk of

14   the material, I would imagine.  But I haven't seen any of

15   these documents, so I don't know.  As some of these documents

16   come in and maybe some of these issues come up, that's

17   certainly something that I can discuss with you.  But I just

18   don't know what else is in the --

19           THE COURT:  Depends.  I mean, you need a plan here,

20   that the -- this is going to move along.  You know, you've

21   been waiting.  Previous effort really didn't work particularly

22   well.  Now, you know, new counsel, you have a vendor, you have

23   search terms.

24           It should be not that hard to scan these documents

25   for counsel's name, and then, you know, whether that is

1    something that, you know, you shunt those aside and you focus

2    on getting out the door anything that is not a problem, you

3    know --

4              MR. KEAVENEY:  So, I don't know who's an attorney

5    and who's not, and who may not be in those emails.  So if

6    there's somebody (indiscernible) --

7              THE COURT:  But how can you ask -- the transit has

8    to know who its counsel office are.  I mean --

9              MR. KEAVENEY:  It does, but it doesn't mean that

10   every single attorney within an outside firm that might send

11   an email, you know, is known to everybody.  It's just, you

12   know, we have associates at our firm that are assigned to

13   cases and we might send an email to a client with confidential

14   information.

15             THE COURT:  But why would anyone expect that these

16   discussions are the kinds that your attorneys were involved

17   in, other than possibly contract negotiations?  And that is

18   the kind of thing that I would think is going to be close to

19   the line about whether it's actually privileged, or it's a

20   business decision that's just got, you know, the attorney's

21   input.

22             So just take for example, the issue that was raised

23   that I think there was an offer, right, of sample station

24   being done, or something like that along the way.  I don't

25   remember what exactly it was.  But what's privileged about all

1       this?  These are engineering and technical issues and

2       capitalist -- capital allocation questions that go on here.

3               I mean, maybe on the chart of the people who have

4       died, there might be -- and there's litigation about this, or,

5       you know, the risk analysis, again, that might be something

6       that actually is not privileged, it's just an in-house

7       business decision that requires knowing about the law, not --

8       the privilege -- you cannot spend months doing a privilege

9       review.  You need to have an expeditious way of getting to the

10      heart of any privilege concern.

11              And I don't understand, and maybe you just -- you

12      know, everybody needs to think about this more, but quickly,

13      what kinds of issues are going to be privileged and how you

14      could at least separate out your -- the documents that might

15      be causing you some concern, and then figure out a way to cut

16      through them.  And then to the extent there are disputed

17      issues of privilege, you know, raise that.

18              But, you know, anything that sounds like months of

19      review, that's a no go.  You're going to have to move this

20      production out because this is a 2017 case, it's been a long

21      time coming to get to this stage, and I'm not going to have

22      this get delayed because of at least the kinds of issues that

23      you're talking about now.

24              You all can figure out an expeditious way to deal

25      with it.  I'm pretty sure between your vendor, yourself, and

1    the information that your client has about legal issues that

2    came up in this area, it's not going to be that hard to do.

3    So we'll just, you know, put that as the -- an asterisk for

4    the to-do list and figure it out.

5           All right.  So, it comes back to the question about

6    time.  So you're talking about having a list of the terms

7    done.  You know, your letter said 10 days, so what does that

8    look like?  By, like, the week of the 9th, you're going to

9    start this process, or the week of the 16th, you're going to

10   start running -- having the vendor run these search terms?

11          MR. KEAVENEY:  Well, the vendor has to get the

12   emails first and we haven't agreed on the initial tier of

13   custodians.  So that's got to be transferred and uploaded to

14   the vendors.  See, that's -- that's just initial process.  It

15   will probably take a little time and my colleague Tim is on

16   the call.  He's got a little more experience in that if he can

17   give an estimate as to how long that would take?

18          MR. COLLAZZI:  Yeah.  Your Honor, this is Tim

19   Collazzi.  I think the initial -- once the initial custodians

20   are identified, they can be -- their email in boxes have to be

21   transferred to the vendor, who then has to process it before

22   the search terms can even be applied.

23          So depending on the custodians that are identified

24   as top tier, you know, it could take, you know, a week to two

25   weeks for the data to be processed.

1          THE COURT:  I thought you knew.  What's the point of

2     this 22 individual email accounts?

3          MR. KEAVENEY:  Well, because we were trying to

4     streamline a little bit and take the most relevant custodians

5     and do those first, and as those emails get produced, it's our

6     hope that we won't have to produce 22 custodians, and maybe

7     there will be some more -- all those custodians should not be

8     meeting, is the purpose of doing a tiered approach.

9          THE COURT:  How, at this point, three years into

10    this, do we not know who the most important players are?

11         MR. ROTH:  We do, and they -- and their --

12    (indiscernible).

13         THE COURT:  So who -- all right.  Who are the top

14    tier?  Mr. Roth, who are the top -- give me the top five --

15    give me the top five names that you would like their accounts

16    searched.

17         MR. ROTH:  Well, this is -- hold on, Your Honor.  We

18    -- what we agreed to was that to get this rolling, that we're

19    -- so this is what we -- this is what we did.  We took -- we

20    took -- we took the people and we said, okay, the issue is how

21    much they're ingesting in the -- like, right?  It's like if

22    you -- if I took half your box, half the email box, it would

23    be half the size, right?  So if they say that the email box is

24    100 gigs, and then I took half of it and it was -- now it's

25    only 50 gigs, right?

1          So what we said was, can you limit the -- can you

2    limit the ingestion by year?  This would be something that,

3    you know -- that that's something you probably could do, you

4    know, up front, and so you're not ingesting all that.  And we

5    already suggested a whole bunch of limitations by year, and

6    they need to analyze that to say, okay, how much will that cut

7    it down?  So that's -- so those people were -- that's why

8    we're doing the tiered approach.

9          I'm not doing a tiered approach.  Mr. -- if Mr.

10   Keaveney's idea is that, hey, are we going to walk away from

11   these 22 people?  No, it was to streamline down their emails

12   so that, you know, when they gave us the titles of the people

13   and the years that they worked, so that we could try to cut

14   out that and see how much smaller that would be.

15         But in the meantime, that the stuff that they're

16   saying we're already going to produce, you know, that we --

17   you know, that we've discussed it and we're going to come up

18   with the first five.  And then while that's going on, their

19   tech people are going to analyze how well we're streamlining.

20         You know, so like the person -- for one person we

21   said, hey listen, you know, for example, this guy, Kenneth

22   Mooney (ph), his box is 256 gigs.  So what we said is, hey

23   look, you know, let's take -- we're just going to take a micro

24   -- we're going to take a percentage, a piece of that, and say,

25   you know what?  We don't want attachments for all of those.

1     Let's just see where the emails go, because he's -- he's the

2     chief of engineering, so he's probably cacheing drawings and

3     blueprints and tons of stuff like that.

4              And then based upon the emails we could say, hey, go

5     back and like pull these.  You know, these ones seems like

6     they have valid attachments.

7              So that was -- that's just an example of how we

8     could maybe limit it from 246 gigs to 2 gigs.  You know?  I

9     mean, and so, we're working together on that.  But as far --

10             THE COURT:  All right.  So I withdraw my -- look, I

11    withdraw the question about five.  You need a working plan

12    that thinks this whole thing through by November 13th.  I

13    mean, that's two weeks out.  This has been going on forever,

14    and after that --

15             MR. ROTH:  Do you have our address?

16             THE COURT:  -- I mean, just, I want that plan.  This

17    is just way, way, way too slow.  So get that plan and then

18    your vendor should expect that you'll start working on that

19    plan and moving this along, and the production should start

20    rolling in December, if not sooner.  I mean, it's just -- it's

21    -- anyway.  It has to happen.

22             It has to happen expeditiously and you need to think

23    through the issues that are likely to come up, and that

24    includes in that plan, how to deal with the possibility of

25    privilege, because, you know, the idea that it's going to be a

1    search, and then we're going to spend time on this, and -- no.

2    you know, three years in, that's just -- that's just not a

3    reasonable way to do this.

4           So, you should be giving me your plan.  If you need

5    to do it under seal because somehow it has some sensitive

6    information, then you can file under seal, but file it by the

7    13th and get it going.  Just way, way, way too slow, and you

8    know, I understand this is -- you know, counsel, you were not

9    the ones who were on it, but you're stuck making up for the

10   lost time here.

11          All right.  What about the depositions here?  You're

12   going to do the -- this is the other issue in the letter at

13   133.  You have the police department depositions scheduled.

14   You're still working on this -- on Mr. Gaskin.  What's the

15   story there?

16          MR. ROTH:  Mr. Gaskin's deposition was left open and

17   we have to just schedule it.  We'll get -- I guess, Mr.

18   Keaveney is going to give us dates when he's available and

19   we'll schedule his deposition to find -- to finish it.

20          MR. KEAVENEY:  That's fine, Your Honor.

21          THE COURT:  Okay.  And then Brown --

22          MR. KEAVENEY:  We will do that.

23          THE COURT:  Brown, you do want to wait until after

24   some of this ESI is done, or just Brown's ESI, or what --

25   what's the person?

1          MR. KEAVENEY:  Well, Brown is going to be one of the

2     people they're collecting for as one of the top five anyway.

3     So --

4          THE COURT:  Uh-huh.

5          MR. ROTH:  You know, he -- like I said --

6          THE COURT:  Right.

7          MR. ROTH:  -- Brown is -- you know, we discussed

8     that so, that should be going soon, and when they produce

9     Brown and -- and hopefully the rest of it.

10          The only -- the only other thing is, Your Honor, to

11     the extent that, you know, what -- if you look at our letter,

12     they say that they're going to supplement their responses to

13     certain things that are outside of ESI, and we have --

14          THE COURT:  Right.

15          MR. ROTH:  -- and one of the things we've asked for

16     is just give a date certain when you're going to -- like if

17     there's stuff that you're agreeing to produce, okay, whatever

18     that you agree to produce, just give us a date certain of when

19     you're going to produce it by, not just leave -- we're going

20     to try.  That's not -- that's, you know, that's a problem for

21     us because --

22          THE COURT:  All right.  Look, this is --

23          MR. ROTH:  -- if I have a date certain I could --

24          THE COURT:  -- this is the deal.

25          MR. ROTH:  -- (indiscernible) Brown.

1           THE COURT:  This is the deal.  I want that ESI

2    agreement or your disagreement by the 13th, and I want the

3    discovery to start rolling in December, and then we are going

4    to have a discussion in the -- let's talk about December 17th.

5    Does that work; in the afternoon at 2:15?

6           And that's going to be -- the point of that is to

7    see what your initial ESI has shown, where you -- what you

8    think the time line is going to be, what the rate of

9    production is, and then project out what it's going to take to

10   do this discovery.  And then, following on that, what is going

11   to happen with regard to the depositions or any other follow-

12   up that needs to happen.

13          And so by that discussion on the 17th of December,

14   which gives you about six weeks -- five, six weeks -- what you

15   have agreed to produce the defendants, you should be producing

16   -- you should have produced it so that we go into that not

17   with any of these outstanding issues.

18          So I mean, the one dynamic issue is plaintiff

19   identifying if there are any incredibly important pieces of

20   the production for which you are going to ask the -- I'm

21   sorry, going to ask the defendant to go back and see if there

22   is any metadata associated with it.  But that should be no

23   more than a handful of documents.

24          You know, if somehow the email effort is a colossal

25   failure, which I don't think it's going to be, given the size

42

1        and the effort that's going into it, we'll revisit the

2        question of whether they need to track down any other

3        documents.  But, okay.

4                So basically, these depositions are basically on

5        hold and -- or depends on your scheduling.  But I think the --

6        the continuing 30(b)(6) deposition, I don't think it's -- I

7        think it's something which should be tabled again in light of

8        the email effort.

9                I mean, it's basically another iteration of the same

10       question I was trying to ask about the hard drives and what it

11       would take and is that necessary, et cetera, et cetera.  So

12       we're trying emails, you're trying to deal with this through

13       emails, and you'll see where that gets you.  If it's

14       successful and it obviates the need for this additional

15       discovery, that's great.  If it doesn't, it's done.

16               So, the schedule out of this is, I get an ESI

17       detailed schedule for this email analysis, you know, from the

18       terms, to the uploading, to the production, and how you're

19       going to deal with what the defendants consider to be the

20       review issues when including privilege.

21               And then a schedule for -- which you're going to

22       roll out the materials, including making some production in

23       December so that the plaintiffs can have some sense of what's

24       coming to them.

25               And then you're going to deal with the outstanding

1     production that are noted in the letter on page 2 at 133, and

2     we're going to talk on the 18th at 2:15, and the plan there

3     would be to have a projection for what it's going to take to

4     finish the email production and get whatever other discovery

5     you need done so that by sometime in the spring you're ready

6     to do the summary judgment motion globally on all of the

7     issues that have been floating out there, because you know, we

8     have no idea what's going to happen with that.  That could be

9     the end of -- that could be the end of this case.

10            I'm sorry, I think I might have said the 18th.  I

11    mean the 17th, sorry.

12            MR. ROTH:  The 17th.  Okay.  That's (indiscernible).

13            THE COURT:  My deputy just asked me.  Sorry.  That

14    will be the 17th in the afternoon.

15            You know, this case could go away depending on the

16    summary judgment, or it could be moving towards trial.  But

17    you know, once you get the decision on the summary judgment

18    motion, then if there's something left, you know, want to move

19    towards trial.

20            So if you don't start the summary judgment motion

21    process before the spring, it's not -- it will be well into

22    2022 by the time you're ready for a trial, if there is a

23    trial, and that will make this a five-year-old case, and that

24    is more than long enough, which is why you are now going to

25    have a more intense schedule than you've had before.

44

1           You don't need to talk about it in detail; there is

2      always the issue of, do you want to talk about settlement, and

3      I'm not asking you about that, I'm just putting that on the

4      radar for a conversation as this goes along, and you can

5      decide, you know, if you want to have the conversation, and if

6      you do want to have that conversation, do you want to use a

7      mediator.  But that's a conversation for you all to have.

8           All right.  I have the next conference on.  I think

9      you have the working deadlines, you know, and I understand

10     that this is a lot of work, and particularly a lot of work for

11     defendant's counsel, but from your clients' side, they've had

12     a lot of time to deal with this case.  And that's not you, but

13     you're in it now, so -- all right.  So we'll talk on the 17th

14     at 2:15.

15           All right.  Have a good Thanksgiving.

16           MR. KEAVENEY:  Thank you, Judge.  You too.

17           THE COURT:  Be safe.

18           MR. KEAVENEY:  Thanks.

19           THE COURT:  All right.  Thank you.

20           MR. ROTH:  Thank you, Your Honor.

21           THE COURT:  Bye.

22         (Proceedings concluded at 3:34 p.m.)

23

24

25

1          I, CHRISTINE FIORE, court-approved transcriber and

2     certified electronic reporter and transcriber, certify that

3     the foregoing is a correct transcript from the official

4     electronic sound recording of the proceedings in the above-

5     entitled matter.

6

7

8     _____          November 9, 2020

9          Christine Fiore, CERT

10          Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24