```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
LUISA JANSSEN HARGER DA SILVA,

                Plaintiff,

        - against -

NEW YORK CITY TRANSIT AUTHORITY,
METROPOLITAN TRANSPORTATION
AUTHORITY, and RAQIA SHABAZZ,

                Defendants.
----------------------------------------------------X
```

**DECLARATION IN SUPPORT MOTION FOR SUMMARY JUDGMENT**

17-cv-04550(FB)(VMS)

ANDREW P. KEAVENEY declares pursuant to 28 U.S.C. § 1746:

1. I am a member of the bar of the Eastern District of New York and a member of the law firm Landman Corsi Ballaine & Ford P.C., attorneys for defendants New York City Transit Authority (NYCTA), Metropolitan Transportation Authority (MTA), and Raqia Shabazz and as such, and from a review of our files, I am fully familiar with the matters herein.

2. I submit this Declaration in support of Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. Rule 56.

3. True and complete copies of all exhibits relied on in Defendants' motion are attached hereto and are listed in the appendix to this motion.

4. Plaintiff Luisa Janssen Harger Da Silva (Harger) commenced this action to recover monetary damages for personal injuries she sustained after she fainted and fell from a station platform in front of an oncoming train on August 2, 2016. (Ex. A.)

5. Plaintiff's complaint alleges four causes of action. Count 1 alleges the train operator failed to prevent the train from striking plaintiff by either operating the train outside the posted speed restriction, failing to observe plaintiff on the track, or failing to apply the emergency brake in a timely manner. Count 2 alleges defendants were negligent in failing to install platform edge barriers to prevent customers from

failing onto the track. Count 3 alleges the defendants failed to install "intrusion technology" that would have warned the train operator that plaintiff was on the tracks prior to striking her. Finally, Count 4 alleges deficiencies with the station and train's lighting and the train's brakes. Plaintiff's claim can be narrowed down to two categories: (a) failure to study and install platform screen doors (PSDs) and other platform safety devices, such as track intrusion detection technology (TIDs); and (b) negligent operation of the train. (*Id.*)

6. Defendants, in their answer, asserted affirmative defenses, including immunity (6th Affirmative Defense) and the application of the emergency doctrine (5th Affirmative Defense). (Ex. B.)

7. The five years of discovery that included 15 depositions and the exchange of over 60,000 documents, demonstrates that defendants exercised its governmental policy making function by consistently, appropriately, and repetitively studying and considering all available platform safety options and implementing those that are within its capital resources and infrastructure capabilities that will not cause greater safety risks to the public, and therefore, defendants are entitled to immunity. Additionally, the years of studying and considering PSDs and TIDs were performed despite there being no requirement to have these new technologies.

8. The admissible evidence also demonstrates that plaintiff suddenly and without warning fell from the platform before the oncoming train, leaving train operator (TO) Shabazz insufficient time to stop the train before contacting plaintiff.

### **Jurisdiction**

9. The District Court has original jurisdiction of this civil action based on the amount in controversy and diversity of citizenship of the parties. 28 U.S.C. § 1332. Plaintiff is a Brazilian foreign national and Defendants are residents of the State of New York. Plaintiff's seeks damages in excess of $75,000. (Ex. A.)

## Parties

A. **Plaintiff Harger**

10. At the time of the accident, plaintiff Harger was a foreign tourist visiting NY (Ex. "A").

B. **Defendants' Subway**

11. The history of City-wide subway transit is complex. Although the first subways New York in 1904 were *operated and maintained* by private companies the Interborough Rapid Transit Company (IRT) and later the Brooklyn-Manhattan Transit Corp. (BMT) via long-term leases with the City, all railroad structures of the companies remained vested with the City (Ex. "PP" at 9).[1]

12. Despite the leases to private companies, the "initiation, development, and execution for all plans for construction and operation of transit facilities in the City of New York had been under the direction of State officials, appointed by the Governor" via the Rapid Transit Act (*Id*. at 4). The Unification Law of 1921 directed the Transit Commission (again, under the Rapid Transit Act) to prepare a plan for effectuating unification of rapid transit facilities in the City under public ownership and control. (*Id*. at 6.)

13. The Board of Transportation of the City of New York, whose members were appointed by the mayor, was created in 1924 and assumed responsibility for administering laws affecting transit development. (*Id*. at 6). The Board of Transportation planned, constructed, and equipped a new rapid transit system (the Independent Subway System or IND) as a wholly municipal financial enterprise, funded by the issuance of City bonds. (*Id*. at 6)

---

[1] The Fulton Avenue station (now Atlantic Ave – Barclays Center) was part of the initial Brooklyn line of the BMT division. (*Id*. at 13).

4877-3274-9454v.1

14. In 1940, the City did not renew its operational leases to the private companies and took complete control of the BMT and (the then bankrupt) IRT (*Id*. at 8). In the 1950s, the New York City Transit Authority (NYCT) was created to operate the BMT, IRT, and IND as a single system. (*See* Tony Abdallah's Declaration at ¶ 7). NYCT is "a body corporate and politic constituting a public benefit corporation" (New York Public Authority Law (NYPAL) § 1201), and an affiliate of the MTA.

15. The MTA "is North America's largest transportation network, serving a population of 15.3 million people across a 5,000-square-mile travel area surrounding New York City, Long Island, southeastern New York State, and Connecticut. The MTA network comprises the nation's largest bus fleet and more subway and commuter rail cars than all other U.S. transit systems combined."[2]

16. There is no heavy rail rapid transit system in the United States that is operated by a private entity.[3]

17. MTA is "a body corporate and politic constituting a public benefit corporation" (NYPAL § 1263). "The purposes of the authority shall be the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district, including but not limited to such transportation by railroad . . . " (NYPAL § 1264). Its "purposes are in all respects for the benefit of the people of

---

[2] Https://new.mta.info/about, accessed 2023-10-20.

[3] U.S. public heavy rail rapid transit system consist of the Bay Area (San Francisco) Rapid Transit District, Los Angeles County Metropolitan Transportation Authority, Miami-Dade Transit Authority, Metropolitan Atlanta Rapid Transit Authority, Honolulu Authority for Rapid Transportation, Chicago Transit Authority, Maryland (Baltimore) Transit Administration, Massachusetts Bay (Boston) Transportation Authority, Port Authority (PATH) Transit Corporation; Metropolitan Transportation Authority, Greater Cleveland Regional Transit Authority, Southeastern Pennsylvania (Philadelphia) Transit Authority, and Washington Metropolitan Area Transit Authority. *U.S. Department of Transportation, Federal Transit Administration, Rail Safety Data Report*, September 2021 - Appendix A – State Oversight Program Community, https://www.transit.dot.gov/sites/fta.dot.gov/files/2021-09/Rail-Safety-Data-Report-2007-2018-09-23-2021.pdf, accessed 2023-10-17.

the state of New York and the authority shall be regarded as performing an essential governmental function in carrying out its purposes and in exercising [its] powers" (*Id.*).

18. NYCT's purposes are also "in all respects for the benefit of the people of the state of New York and the authority shall be regarded as performing a governmental function in carrying out its corporate purpose . . . (NYPAL § 1202(2)). Its purpose is "to construct, reconstruct, improve, maintain and operate any transit facility, whether now existing, or constructed, acquired or provided in the future, . . ." (NYPAL § 1204(8)).

19. A "transit facility" is defined as a rapid transit railroad in the City of New York "together with the devices and appurtenances, facilities and equipment thereof and power plants and other instrumentalities used or useful therefore or in connection therewith. (NYPAL § 1200(15)). "Devices and appurtenances" include:

> Devices and appurtenances deemed necessary by the authority, to secure the greatest efficiency, public convenience and safety, including the number, location, description and plans and specifications for the stations, suitable supports, turnouts, switches, sidings, connections, landing places, garages, repair shops, buildings, structures, platforms, stairways, elevators, telephone, telegraph and signal devices, facilities for access to the surface, and other suitable appliance incidental and requisite to what such authority may approve as the best and most efficient system of rapid transit in view of the public needs and requirements, including in its discretion, operation of a transit facility or some portion thereof by any device or means . . .

NYPAL § 1200(8).

20. Defendant and train operator (TO) Shabazz is an employee of NYCT.

**Pleadings**

21. Plaintiff commenced this action on July 16, 2018 by filing a summons and complaint. (Ex. A.) Plaintiff's 142 paragraph complaint alleges countless acts of negligence reduced to four causes of action. Count 1 alleges the train operator failed to prevent the train from striking plaintiff by either operating the train outside the posted speed restriction, failing to observe

5

plaintiff on the track, or failing to apply the emergency brake in a timely manner. Count 2 alleges defendants were negligent in failing to install platform edge barriers to prevent customers from failing onto the track. Count 3 alleges the defendants failed to install "intrusion technology" that would have warned the train operator that plaintiff was on the tracks prior to striking her. Finally, Count 4 alleges deficiencies with the station and train's lighting and the train's brakes.

22. Defendants, in their answer, denied plaintiff's claims and asserted affirmative defenses of governmental and qualified immunity and the application of the emergency doctrine. (Ex. "B".)

## Discovery

23. Discovery in this personal injury action lasted over five years. Plaintiff's counsel has served a First, Second, Third, Fourth and Fifth Request for Production of Documents, a First and Second Request for Interrogatories, a First and Second Request to Admit and Related Request for Production of Documents, non-party deposition and document subpoenas (that has generated tens of thousands of additional documents from Defendants' contractor STV, Inc.), conducted 15 depositions, and conducted ESI discovery from 23 Defendant custodians that required to review of 3 million documents and production of over 60,000 documents.

24. In addition, Defendants have produced over 300 documents in additional to ESI, served their Rule 26 disclosures, including their Second Supplemental Rule 26 Disclosure that identified Tony Abdallah[4] as an individual likely to have discoverable information (Ex. "C"), and served expert reports of Mark Marpet (Ex. XX) and Kenneth Korach (Ex YY) in rebuttal to the expert reports of Orlando Jimenez (Ex. UU), Carl Berkowitz (Ex. VV) and Peter Glismann (Ex. WW).

---

[4] Tony Abdallah was one of the 23 custodians that plaintiff's counsel picked for an ESI search and production of documents.

## PSDs and Other Safety Plans

25. The discovery confirms that Defendants have been studying PSDs since the late 1990s, along with platform safety initiatives to the present day. (*See* Declaration of Tony Abdallah ["Abdallah Dec."] at ¶¶ 15 and 88.)

26. Defendants' investigation into platform safety has involved a collaboration of employees, professionals, fire and police personnel, political leaders at State and City levels, and manufacturers to identify issues and potential solutions (*see* Abdallah Dec., *passim*).

27. One common denominator for contact with trains has emerged – customers standing too close to the platform edge. (*see* Exhibit ZZ (Cheryl Kennedy Deposition) at 137:16-18).

28. To address this issue, defendants have implemented campaigns to warn customers from standing too close to the platform edge, via signage, announcements, displays, countdown clocks, and posters. (*See* Abdallah Dec. at ¶¶ 61, 64, and 89.)

29. Defendants have also identified suicides as a cause of contact with trains and have installed Help Points for customers to advise defendants of unusual behavior, cameras to identify platform issues, and blue lights in stations to create a calming effect. (*See* Abdallah Dec. at ¶ 97.)

30. Defendants have studied and tested track intrusion devices with the goal of alerting train operators of potential track hazards. (*See* Abdallah Dec. at ¶¶ 91-96.)

31. Defendants have investigated platform screen doors as part of their safety initiatives, despite the fact that there is no known use of platform screen doors (PSDs) by any rail carriers in the United States (Abdallah Dec. at ¶ 12; Ex. YY at ¶ 15),[5] no requirement for its use

---

[5] Https://trespasstoolkit.fra.dot.gov/eLib/Details/L00028 (accessed 2023-10-31).

by any federal, state, or local authority (Abdallah Dec. at ¶ 12; Ex. YY at ¶¶ 14, 32 and 33), and a very small chance of customer being struck by a train (*see infra* at ¶¶ 37-38; Ex. YY at ¶¶ 28).

32. For example, in 2016, the year of plaintiff's accident, there were 168 "collision with individual" (CWI) incidents throughout the subway system. This number includes: 3 people who fell while walking between the cars of a moving train, 12 people who made contact with a moving train within system tunnels and outside of any subway station limits, 29 people who appear to have committed suicide, 22 people who appear to have been attempting suicide, 31 people who contacted moving trains while on the tracks within station confines, and 71 people who contacted a moving train while on a station platform and not in on the tracks. (Ex. AAA at 28.)

33. That same year, 2016, there were 1.757 billion (1,756,775,380) paid NYC subway rides (Ex. AAA at 2), making the probability of being struck by a train in 2016 as follows:

$$168 \div 1{,}756{,}775{,}380 = 0.000000095629755$$

and the probability of being struck by a train while on a station platform as:

$$71 \div 1{,}756{,}775{,}380 = 0.000000040414956$$

and the probability of being killed by a subway train as:

$$48 \div 1{,}756{,}775{,}380 = 0.000000027322787.^6$$

34. Regardless, one of the problems facing New York's subway system is that PSDs are relatively new technology that is not implemented in across any other rapid transit system throughout the U.S., and the 100+ year old subway was not constructed for their use. (Ex. YY at ¶ 15.) Existing station builds and layouts that include curved platforms, structural column

---

[6] Compare to the 2021 lifetime odds of death by: heart disease (1 in 6); cancer (1 in 7); gun (1 in 89); motor vehicle crash (1 in 93); drowning (1 in 1,006); choking on food (1 in 2,659); bicyclist (1 in 3,546); sunstroke (1 in 4,655); dog attack (1 in 53,843); railway passenger (too few deaths in 2021 to calculate odds). Https://injuryfacts.nsc.org/all-injuries/preventable-death-overview/odds-of-dying/ (accessed 2023-10-31).

4877-3274-9454v.1

placement near platform edges, air flow issues, emergency egress concerns, platform integrity, power capabilities, and ADA limitations,[7] make PSD installation infeasible in most stations (Ex. YY, *passim*; Abdallah Dec., *passim*). Car equipment and signal issues also provide challenges and preclude installation of PSDs on certain lines. (*Id*.)

35. PSDs come with their own safety hazards, the most significant being caught between the PSD array and train (*see* Ex. EE).

36. Nevertheless, NYCT via its contractor, STV, conducted a study of all 472 stations and found that only 128 (27%) were feasible (once car fleet homogeny occurs) for PSDs at an installation cost of approximately $7 billion and a yearly maintenance cost of almost $120 million. (Abdallah Dec. at ¶ 82.)

37. Significantly, the STV study showed that the subject station where plaintiff's accident occurred was not feasible for PSDs. (Abdallah Dec. at ¶ 85.)

38. MTA/NYCT has other projects that require capital resources. For example, in the 2016/17 year, the following projects (in additional to general maintenance and state of good repair measures) were planned/ongoing: upgrading signals and implementing communication-based train control (CBTC), countdown clocks, wireless service in underground stations, Help Points, track cleaning, ADA accessibility, elevators/escalators installation/replacement, new train cars, lead paint abatement, new ventilation plant, Superstorm Sandy repair and resiliency projects, and station enhancements. (Ex. AAA.)

39. Plaintiff's expert Carl Berkowitz (Ex. VV) claims that Defendants violated Federal Transportation Authority rules and guidelines and good and accepted transportation engineering

---

[7] There are almost 1 million (985,824) disabled New Yorkers. Https://www.nyc.gov/site/mopd/resources/resources.page#:~:text=Did%20you%20know%20that%20there,race%2C%20employment%20status%20and%20more (accessed 2023-10-31).

practices and safety standards. (*Id*. at p. 6). Similarly, plaintiff's expert Peter Glismann (Ex. WW), claims that Defendants violated professional standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety, design, and operations. (*Id*. at p. 24.) Neither expert provides a basis for these opinions.

40. There is no heavy rail rapid transit agency in the U.S. that utilizes PSDs (Ex. WW at ¶ 15) or system wide TIDs (*Id*. at ¶ 13) and there is no rule, regulation, industry or operational practice in the U.S. to utilize PEBs and intrusion devices, nor does the absence of such technologies makes transit systems unsafe. (*Id*. at ¶ 14.)

### The Claims of Negligence in Train Operation

41. In Count 1 of her Complaint Plaintiff alleges that train operator (TO) Shabazz negligently failed to see what was there to be seen…" (Ex. A at ¶ 99). Plaintiff also alleges that Shabazz operated the subway "without due care for persons occupying the platform," failed "to keep a proper lookout," and failed "to observe what was available to be observed," and operated "the train while distracted." (Ex A at ¶ 99). However, the admissible evidence in the record does not support plaintiff's claim.

42. Rather, TO Shabazz testified at her September 4, 2019 deposition that she entered the station at a speed between 20 to 25 mph (Ex. TT, at 196, 203-204). The station layout is preceded by a downgrade curve with a posted speed limit of 25 mph (*Id* at 177-178, 203-204). When the train was already 1 ½ to 2 cars into the station, TO Shabazz watched as plaintiff fall from the edge of the platform (*Id* at 211). At that moment, plaintiff was falling from the middle of the station platform, the train was traveling at 20-24 mph and the train was about 180 feet away from plaintiff (*Id*. at 214, 216). TO Shabazz immediately applied the emergency brakes (*Id* at 219) but contact with plaintiff still occurred.

43. As such, TO Shabazz, who was faced with an emergency situation when plaintiff fainted in front of the oncoming train did not have enough time to stop and the accident was unavoidable.

44. In support of this claim, plaintiff relies on the report of Carl Berkowitz, Ph.D. However, his conclusions are based on made up assumptions and faulty calculations (Ex. "VV").

**A. Berkowitz Perception Reaction Time Analysis is Speculative**

45. Berkowitz initially cites the estimated perception reaction time ("PRT") for a train operator ranges from 1.6 to 1.9 seconds. He then argues that if the train operator was trained in situational awareness, her perception time would be reduced from a maximum of 1.9 seconds to approximately 0.6 seconds. Berkowitz suggests that the Users' Guide to Human Factors and Ergonomics Methods, by Mica R. Endsley, Human Factors and Ergonomics Society, 2021, is the basis for this reduction. However, that study does not support Berkowitz's conclusion and is mere speculation. (*See* Ex. "BBB"). Moreover, there is no claim that the lack of situational awareness training was negligent. Nevertheless, Berkowitz adopts that figure as the basis for his PRT calculations. This invalid assumption (*e.g.*, if only, then), makes the rest of his calculations faulty.

46. Next Berkowitz misquotes the record to suggest plaintiff was on the tracks prior to the train entering the station and calls TO Shabazz' testimony incredible. However, a review of TO Shabazz testimony and the accident reports demonstrates that is not the case.

**B. Berkowitz Emergency Braking Distance Analysis is Speculative**

47. Berkowitz uses a 3.2 mph/sec deceleration rate (obtained from a Wikipedia entry), and calculates an 109 feet stopping distance at 20 mph and 153 stopping distance at 24 mph, which provides for a longer stopping distance than NYCT's empirically based emergency brake stopping

11

distance chart of 121 feet at 20 mph and 167 feet at 24 mph.  (*Compare* Ex. VV at 53 *with* Ex. XX at 8).

        C.        **Berkowitz' Opinion Relies on Unverified Data**

48.     Berkowitz, in a most unscientific and speculative manner, calculates the train operator's alleged visibility distance inside the tunnel by standing *on the platform* at the accident location, noting when he first sees the headlights of a random train in the tunnel traveling at an unknown speed, and noting again, when the train enters the station and uses that as a basis for what the train operator could see.  (Ex. VV at p. 56.)

        D.        **Speculative Report of Orlando Jimenez, Jr.**

49.     Plaintiff also proffers Orlando Jimenez as an expert, who essentially opines that because the accident occurred, the train operator was negligent.  (Ex. UU.)  Such a conclusion is not supported by any facts and is based on speculative and unsupported assumptions.

### The Claim of Negligence as to Speed

50.     In Count 1 of her Complaint, Plaintiff alleges that train operator Shabazz "entered the station at a speed equal to or less than the posted speed restriction" (Ex "A" at ¶ 81), "entered the station at a speed greater that the posted speed restriction" (Ex. "A" at ¶ 82), and was negligent "in operating the train at an excessive and unreasonable rate of speed" (Ex. "A" at ¶ 99).

51.     Plaintiff's expert Carl Berkowitz does not allege or opine that the train was being operated slower or greater than the posted speed restriction or that the speed of the train was in violation of any of Defendants' rules.  (Ex. VV.)  Nor does he claim that the train operator's speed of between 21 to 24 mph was excessive or unreasonable.  Instead, Berkowitz attacks the Defendants' conclusion that a decrease in train speeds would have an effect on the train's running time (and, as such, the whole system).  (Ex. VV at 69.)

52. Similarly, plaintiff's expert Glismann merely claims that "common sense would dictate that slowing the speed at which trains enter the station would reduce the number of CWIs" (Ex. WW at 32) but provides no other basis for this conclusion.

### The Claim of Negligence as to Car Equipment

53. Finally, none of plaintiff's experts have provided any opinions regarding any alleged defect with the train or platform. That is because the documents produced in this action (*e.g.*, Train Trouble Report Ex. QQ, Post Incident Inspection Report Ex. RR, and CTA Cleaning Report Ex. SS) failed to identify any defect or condition that could have resulted in plaintiff's accident and injury.

54. The Court is respectfully referred to Defendants' Memorandum of Law in further support of its motion for summary judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 6, 2023
New York, NY

_____
Andrew P. Keaveney

4877-3274-9454v.1

## LIST OF EXHIBITS

| Exhibit | Title | ECF/Bates Nos. (if |
|---|---|---|
| A | Summons and Verified Complaint, dated Aug. 2, 2017 | ECF Doc. No. 1 |
| B | Answer, dated Dec. 11, 2017 | ECF Doc. 20 |
| C | Defendants' Second Supplemental Rule 26 Disclosure, dated and served on Sept. 7, 2018 | |
| D | 1999 Memo from Charles Yongue, then acting Director of Engineering & Fire Protection, System Safety, to John Gaul, the then-Acting Chief Transportation Officer, Sys. A | NYCTA_2_00005926 – NYCTA_2_00005927 |
| E | Letters from Roy Spence to others, from 1999 to 2012, regarding his barrier system | NYCTA_2_00379733 - NYCTA_2_00379758 |
| F | Letter from Cheryl Kennedy to Roy Spence, dated Jun. 16, 2000 | NYCTA_2_00379740 |
| G | Letter from Katherine Lapp to Roy Spence, dated April 19, 2002 | NYCTA_2_00379743- NYCTA_2_00379744 |
| H | Copy of Safety Rail Ladder Concept Design | NYCTA_2_00007639 – NYCTA_2_00007643. |
| I | DMJM+Harris' feasibility study, dated July 27, 2007 | NYCTA_2_00005627 - NYCTA_2_00005663. |
| J | Email enclosing the agenda for a Jun. 25, 2007 meeting between NYCT personnel and representatives from the Régie Autonome des Transports Parisiens | NYCTA_2_00389712 - NYCTA_2_00389714. |
| K | October 2009 Metropolitan Railways Committee of the International Association of Public Transport Final Report on Platform/Track Protection Systems | NYCTA_2_00007845 - NYCTA_2_00007883. |
| L | Unsolicited proposal from Boston Sovereign Bank and the Seoul Metropolitan Rapid Transit Corporation Authority | NYCTA 00465- NYCTA 00478 |
| M | Trip Report for the Evaluation of Platform Screen Doors in the Seoul Metropolitan Rapid Transit System, Jan. 23 – 28, 2010 | NYCTA 00436- NYCTA 00449 |
| N | Memorandum from Tony Abdullah to John H. Johnson, dated Feb. 12, 2010 | NYCTA_2_00002614 – NYCTA_2_00002630 |
| O | Email from Glenn Lunden with the subject "Plat Door Task Force Kick Off Meeting," dated Mar. 11, 2010 | NYCTA_2_00390893- NYCTA_2_00390895. |
| P | Request for Information 10RFIN44 | NYCTA - 01284 – NYCTA 01286 |
| Q | Letter from New York State Senator Diane J. Savino to Jay Walder, Chairman, MTA, dated Feb. 2, 2011 | NYCTA_2_00175446. |
| R | Memorandum from John H. Johnson, Chief Transportation Officer, Rapid Transit Operation, to Melanie Hazel, Chief Officer, Subway Operations Support and Administration, dated Feb. 16, 2011 | NYCTA_2_00415628 – NYCTA_2_00415630. |
| S | NYCT Concept of Operations for PSDs/PEDs/PEGs (without exhibits) | NYCTA-00529- NYCTA-00566 |

4867-6972-8140v.1

| Exhibit | Title | ECF/Bates Nos. (if |
|---|---|---|
| T | Platform Screen Door Task Force – Evaluation Summary of Responses Received to RFI #10RFIN44, dated Oct. 6, 2011 | NYCTA_2_00415628 – NYCTA_2_00415630 |
| U | Memorandum from Tom Prendergast, President of NYCT, to Dr. Michael Horodniceanu, President of MTA Capital Construction, with attached Platform Doors for #7 Line Extension Briefing Paper, dated Dec. 12, 2011 | NYCTA 00516-NYCTA 00517 and NYCTA_2_00405489 – NYCTA_2_00405500 |
| V | Email from Tom Prendergast to New York State Senator Tony Avella, dated July 26, 2012 | NYCTA_2_00541210-NYCTA_2__00541211 |
| W | Email from Tom Prendergast to Fernando Ferrer, dated Jan. 1, 2013 | NYCTA_2_00098326-NYCTA_2_00098327 |
| X | New York City Council Committee on Transportation agenda for Feb. 7, 2013 | |
| Y | Customer Contact with Train Incident Report, dated Jan. 2013 | NYCTA 00567-NYCTA 00612 |
| Z | System Wide Platform Screen Door Feasibility Study – Summary of Conclusions | NYCTA_2_00324423-NYCTA_2_00324426 |
| AA | NYCT Platform Screen Doors Pilot Project – Phase I, meeting minute, dated Aug. 17, 2015 | NYCTA_2_00451793-NYCTA_2_00451794 |
| BB | Platform Screen Doors International Research Report," dated Sept. 21, 2016 | NYCTA_2_00001202-NYCTA_2_00001250 |
| CC | Email from Ken Mooney to Kevin Coughlin, dated Jun. 7, 2016 | NYCTA_2_00411420 |
| DD | Email from Mark Bienstock to Eric Jones, dated Aug. 25, 2016 | NYCTA_2_00269747 |
| EE | Memorandum from Cheryl E. Kennedy, Vice-President, Office of System Safety, to Wynton Habersham, Sr. Vice President, Department of Subway, re: Hazard Analysis on PSDs, dated Aug. 14, 2017 | NYCTA-05537 |
| FF | Technology Assessment – Roped Platform Screen Doors & The NYCT Subway System, dated Apr. 30, 2018 | NYCTA_2_00297595 – NYCTA_2_00298016 |
| GG | Memorandum from Don Wilemann to Mayada Shikara re: Contract C-32518 Platform Screen Doors 3rd Ave. Station "L" Line Cost Estimate Concurrence, dated Apr. 5, 2018 | NYCTA_2_00295842 |
| HH | Email from Eric Jones to Peter Gillespie and others, re: Cancellation of PSD Pilot at 3rd Ave. Station, dated Jun. 4, 2018 | NYCTA_2_00187489 |
| II | "Total Approximate System Wide Costs," dated on or about Oct. 1, 2019 | NYCTA_2_00193123 |
| JJ | Report on Feasibility of Platform Edge Barriers For "B" Service Stations, Atlantic Avenue Barclay Center station, with appendices | NYCTA 09181-NYCTA 09187, NYCTA 09189, NYCTA 09247-NYCTA 09337 |

4867-6972-8140v.1

| Exhibit | Title | ECF/Bates Nos. (if |
|---|---|---|
| KK | Safety posters placed in Defendants' subway stations | NYCTA-00615-NYCTA 00625 |
| LL | Track Intrusion Detection/Platform Doors Trip Report – Sept. 30 – Oct. 8, 2013 | NYCTA_2_00021871 – NYCTA_2_00021884 |
| MM | Executive Summary of Track Intrusion Testing at Rector Street | NYCTA_2_00005054-NYCTA_2_00005056 |
| NN | Meeting Minutes – TIDS-2/Administration of Pilot at RCC Theatre, dated Feb. 2, 2018 | NYCTA_2_00220818-NYCTA_2_00220819 |
| OO | Conclusions of the Track Intrusion Detection Pilot Projects, dated Dec. 19, 2019 | NYCTA_2_00344457-NYCTA_2_00324460 |
| PP | Excerpts from the Board of Transportation of the City of New York – Report Including Analysis of Operations of the New York City Transit System for Five Years Ended June 30, 1945 | |
| QQ | NYCTA Car Equipment Dept., Train Trouble Control, Request for Assistance Report, dated Aug. 2, 2016 | NYCTA 0010-NYCTA 0014 |
| RR | Division of Car Equipment – Post Incident Inspection Report, dated Aug. 2, 2016 | NYCTA 0015 |
| SS | CTA Cleaning Report, dated Aug. 2, 2016 | NYCTA 0340 |
| TT | Train operator Raquia Shabazz's deposition transcript, dated September 4, 2019 | |
| UU | Plaintiff's Expert Report prepared by Orlando A. Jimenez Jr., exchanged by plaintiff's counsel and dated Mar. 12, 2023 | |
| VV | Plaintiff's Expert Report prepared by Carl Berkowitz, Ph.D., P.E., exchanged by plaintiff's counsel and dated Mar. 13, 2023 | |
| WW | Plaintiff's Expert Report prepared by Peter Glismann, C.S.P., M.S., P.E., exchanged by plaintiff's counsel and dated Mar. 13, 2023 | |
| XX | Defendants' rebuttal Expert Report prepared by Mark I. Marpet, Ph.D., P.E., dated Apr. 20, 2023 | |
| YY | Defendants' rebuttal Expert Report prepared by Kenneth Korach, dated Apr. 24, 2023 | |
| ZZ | Cheryl Kennedy's deposition transcript, dated Aug. 24, 2022 | |
| AAA | NYCTA Briefing Document, Aug. 16, 2017 | NYCTA_2_00580133-NYCTA_2_00580207 |
| BBB | Preview Information in Cab Displays for High-Speed Locomotives, Human Factors in Railroad Operations | |
| CCC | System Safety Program Plan – 2016 | NYCTA 04542-NYCTA 0491 |
| DDD | Addressing Track Trespassing; Actions for Rider Safety & System Reliability | |

3

4867-6972-8140v.1