# Exhibit UU

 INSIGHT
ASSOCIATE
CONSULTING

REPORT
IN THE MATTER OF:

Luisa Janssen Harger Da Silva
Vs
New York City Transit Authority
Metropolitan Transportation Authority
and Raqia Shabazz

Prepared for:

David Roth
Roth & Roth, LLP
192 Lexington Avenue
New York, NY 10016

*Orlando A Jimenez Jr.*
*INSIGHT ASSOCIATE CONSULTING*
*124 NEPTUNE AVENUE*
*MASTIC, NY 11950*

*March 12, 2023*

David Roth
Roth & Roth, LLP
192 Lexington Avenue
New York, NY 10016

Re: Luisa Janssen Harger Da Silva
United States District Court
Eastern District of New York
Civil Action No. 1:17-CV-04550-FB-VMS

Dear Mr. Roth,

You have asked me to render an opinion as to the cause[s] of an incident where your client, Luisa Janssen Harger Da Silva[1] ("plaintiff"), while lying on the subway tracks, was run over by a subway train traveling northbound on

---

[1] Plaintiff was married and changed her name from "Da Silva" to "Brown", since she is named Da Silva in all the records, I will refer to her with her full maiden name, or as plaintiff.

A-4 track of the BMT division at the Atlantic Avenue – Barclay Center Station in Kings County, Brooklyn NY. The incident took place at approximately 1909 hours on August 2, 2016.

My assignment in this matter includes the operation of subway trains in general, the model train in question, the track and approach to the incident station, whether or not there is an industry standard for the safe operation of subway/rail cars operated by a Transportation Authority and whether or not these standards were met in the abovementioned matter. If called, at the time of trial I will also opine and testify about accident investigation procedures for train operators, about any debriefings, or lack thereof, after incidents where customers and employees were struck by trains, about what information is recorded regarding identifying the passenger and train locations within the station and the train in incident and where customers were after being struck by subway trains from 1980 until when I left in 2009. If called I will also offer opinions about lines of site in general as well as in this station in particular, what can be seen on the approach to stations and track layouts based upon my experience. In addition, I will opine and testify about the testing of trains for braking, the general maintenance of trains, the expected performance when putting trains into emergency, the difference between different types of braking, the comparison of the actual application of putting a train into emergency compared with full service braking. I will testify to any relevant records exchanged by defendants in this matter. In addition, I will testify to the below consists of my opinion in this matter.

The plaintiff is compensating me at a rate of $350 per hour for all work on this case

I have no publications in the last ten years.

## Testimony

| | | | |
|---|---|---|---|
| 11/20/2019 | Carbuccia vs NYCTA | Testimony | NYS Supreme Court, New York County |
| 10/19/2020 | Guerrero vs NJT | Deposition | Superior Court of NJ, Bergen County |
| 07/27/2022 | Gaddy vs CTA | Deposition | Circuit Court Cook County, Ill |

## Experience

My Curriculum Vitae is attached hereto as Ref. 1. It identifies the experience I possess which is germane to this assignment; the majority of which comes from my history of working for the Metropolitan Transportation Authority (MTA) - New York City Transit Authority (NYCTA), Transport Workers Union (TWU), as well as my experience in consulting on various transportation cases. I have been qualified to give testimony as an expert before the Supreme Court of the State of New York.

More specifically from 1980 to 2009 my duties and responsibilities included the safe movement of various types of trains (passenger, work trains, inter-divisional new car transfers, continuous welded rail train operation with track delivery and freight) throughout the NYC Transit System. I was a trainer for MTA/NYCTA of New Motorman/Train Operators during in-service operations for over 20 years. During my service I was required to have a masterly understanding of NYCTA Rules and Regulations, Bulletins, Safety Bulletins as well as annual training regarding Safety enhancements, OSHA (Occupational Safety and Health Administration) Chemical right to know courses – workplace safety training and NYCTA training center annual recertification for operational proficiency. Additionally, during this period I was also engaged as a Union Representative for TWU Local 100 – Motorman's/Train Operators Division in various titles beginning with a shop steward and ending as an Organizer/Staff representative. The duties of these positions included representation of Union Members in various levels of Human Resources hearings that addressed disciplinary charges, as well as, operational and administrative

charges against members of the union. I draw against this experience and knowledge in addition to other relevant knowledge to address the specific issues in this matter.

My experience also includes more than one hundred occasions of train operation on the exact same route of the subway line in which injured plaintiff was traveling on: the Manhattan bound B/Q subway line. My experience and knowledge allows me to know the manner and operation of trains and application of standards for safe train operation and whether or not the operator's performance in the instant matter fell below those standards.

Records Reviewed

The following shall constitute my report and shall summarize my conclusions and opinions in this matter. While preparing this report, I reviewed the following depositions and the relevant exhibits, various documents exchanged by the defendants, and additionally the below specific documents:

1. N.Y.C.T.A. – 0008-0066 Accident Reports and Photos.
2. N.Y.C.T.A. 4504 – 4533 Police Reports
3. 911 Audio call Jody
4. Police Sprint Report
5. N.Y.C.T.A. – 126 – 192 History of Car 5145
6. N.Y.C.T.A. – 193 – 262 History of Car 5065
7. N.Y.C.T.A - 4520 DD5 No 4
8. N.Y.C.T.A 4504 – Memo to the Chief
9. Deposition Godfrey Gaskin
10. Raqia Shabazz 1 - Memo From Broderick to Cherry
11. Shabazz 2 - Timeline with Shabazz Statement
12. Shabazz 3 – Request For Assistance Report
13. Deposition Andrew Bata 23173 -
14. Deposition Raqia Shabazz 19636
15. Deposition Donald Moeller
16. Deposition Gabrielle Smith
17. Deposition George Brown
18. Deposition Michael Sullivan

Overview

1) On 8/2/2016, at approximately 1909 hours, NYCTA T/O Raqia Shabazz while operating the 1848 B Brighton Beach/145, entered Atlantic Ave – Barclay Center NB A-4 track and ran over plaintiff Luisa Janssen Harger Da Silva.

2) Witness Gabrielle Smith was standing on the platform just a few feet from plaintiff Luisa Janssen Harger Da Silva.

3) Witness Gabrielle Smith further stated that she observed plaintiff Luisa Janssen Harger Da Silva suddenly faint and fall to the tracks.

4) Witness Gabrielle Smith further stated that she observed that there was no train in the station immediately after plaintiff Luisa Janssen Harger Da Silva fainted and fell to the track.

5) Witness Gabrielle Smith Further stated that plaintiff Luisa Janssen Harger Da Silva was lying on the tracks between seven and ten seconds before the train operated by T/O Raqia Shabazz ran over her.

6) Witness Gabrielle Smith further stated that the train should have been able to stop before coming into contact with plaintiff Luisa Janssen Harger Da Silva.

7) 911 audio call exchanged obtained by defendants and provided to plaintiff, transcription:
Somebody is on the train tracks. By the B and the Q, someone is in the tracks. The train hasn't come yet they're trying to talk him into getting up but he's still down there. Everyone was screaming and talking to him… I had to get service to call 911.[2]

8) Witness George Brown, on 8/2/2016 was standing next to Plaintiff Luisa Janssen Harger Da Silva on the Atlantic Avenue – Barclay Center NYCTA train station at approximately 1909 hours.

9) Witness George Brown stated Da Silva suddenly fainted and fell to the tracks.

10) Witness George Brown further stated that it was approximately twenty to forty seconds before the train operated by T/O Raqia Shabazz ran over his then fiancée Luisa Janssen Harger DaSilva after she fell to the track.

11) New York City Police Detective Donald Moeller arrived at the incident scene at 1935 hours.

12) New York City Police Detective Donald Moeller conducted an interview with T/O Raqia Shabazz regarding the incident 12-9/1054 at Atlantic Avenue – Barclay Center.

13) New York City Police Detective Donald Moeller recorded on his DD5 that "T/O Raqia Shabazz stated that she was operating the 1848 "B" train out of Brighton Beach at the time of the incident".

14) New York City Police Detective Donald Moeller further recorded on his DD5 that "She continued that as she was entering the Atlantic Ave station she observed a person lay on the tracks".  He clarified in his testimony that Luisa Janssen Harger Da Silva was on the tracks before T/O Shabazz entered the station.

15) New York City Police Detective Donald Moeller further recorded on his DD5 that "She continued that she immediately activated the "Brakes in Emergency" in an effort to stop the train at which time the train did make contact with the person on the tracks".

16) T/O Shabazz submitted a G2 claiming that as she approached Atlantic Avenue, she observed a female customer as she fainted from the platform and fell on the roadbed.

17) T/O Shabazz testified that she was 1.5 to 2 car lengths from Luisa Janssen Harger Da Silva when she saw her faint and fall to the tracks.

18) T/O Shabazz testified that when she fell is when she first noticed her.

19) T/O Shabazz testified that she was operating the train at 20 -24 mph when she entered the station.


ANALYSIS

The 8-car consist was the responsibility of NYCTA and that responsibility was entrusted to Operator Shabazz. She was charged with operating in a safe, efficient, reasonable and prudent manner.

Contrary to all other evidence in this matter Operator Shabazz alleged that she observed Plaintiff Luisa Janssen Harger Da Silva "faint" resulting in her fall from the platform to the tracks as T/O Shabazz was entering Atlantic

---

[2] The call refers to a man but cross checking police sprint report it's the same incident and at the exact time and place of the incident herein.

Avenue station.[3] T/O Shabazz also stated that she had "come into the station about 1.5 to 2 car lengths"[4] when she observed Luisa Janssen Harger Da Silva fall to the track. T/O stated that she was going 20 mph – 24 mph at the time she entered the station. T/O Shabazz claims that she noticed plaintiff when she was 180 feet away and that when the plaintiff was falling was the same time that she first saw her.[5] T\O Shabazz claimed that she cannot see into the station when she is looking from the dark tunnel into the lit station. That there is a curve in the station and until she is at the entrance, she could not see into the Atlantic Barclays station at all.

The train operator's claim that she observed plaintiff fall from the platform contradicts the credible evidence in this matter. The credible evidence is that the plaintiff had already fallen and was on the tracks before the train entered the station.

According to the contemporaneous 911 call recording, the caller stated in part:
> "Somebody is on the train tracks. By the B and the Q, someone is in the tracks. The train hasn't come yet they're trying to talk him into getting up but he's still down there… Everyone was screaming and talking to him… I had to get service to call 911."

T/O Shabazz at the scene gave statement that was memorialized in a report[6] to Detective Donald Moeller and his partner that Luisa Janssen Harger Da Silva was already on the tracks before she entered the station.

This statement was recorded in the police reports and testified to by Detective Donald Moeller.

This statement is consistent with the only other non-interested witness, Gabrielle Smith who also stated that the train was not yet in the station when the Plaintiff was on the tracks.

The fact that Luisa Janssen Harger Da Silva was already on the tracks before T/O Shabazz entered the station is also consistent with both the testimony of George Brown, plaintiff's now husband and the plaintiff's testimony.

Therefore the credible evidence considered in this report and the findings and opinion made herein, are based upon the 911 call recording, police reports, police officer's testimony that T/O Shabazz told him that the Plaintiff was on the tracks before the train pulled into the station and independent eyewitness testimony, that clearly Luisa Janssen Harger Da Silva was already on the tracks before T/O Shabazz entered the station. No train operator for the NYCTA would fail to tell the police if someone "fell" off the platform, compared with being on the track before the train entered the station.

A train operator entering that station, that was paying attention, should have seen the plaintiff on the tracks, even before she was in the station and should have stopped her train prior to striking plaintiff.

T/O Shabazz also offered other incredible testimony that you can't see into the station when approaching a station going from inside the tunnel being dark looking into the illuminated station. This is in fact the opposite of the way it works. A NYCTA train operator can clearly see from the dark or darker tunnels on the approach to the illuminated stations before the entrance of the station. This is not just for train operation but it just the way it works, at the same time what a train operator cannot see, is from a lit area into a dark area. T/O Shabazz's testimony on this was "What I would like to say is that on every single station that's underground, you go from a transition, from a level of darkness to a level of illumination, which changes based on entering the station which is, you know, "*universal*"[7] for underground. So I'm in darkness. And Then, once I hit the station is when I'm able to see into Atlantic."[8] This is a

---

[3] Deposition Raqia Shabazz, pg. 264 Lines 7-11
[4] Deposition Raqia Shabazz, pg. 212 lines 16-19
[5] Deposition Raqia Shabazz pg. 214 Lines 15-23 and 217 lines 3-7
[6] NYCTA-04520 General Investigation, UF61 Summary of Investigation
[7] My emphasis
[8] Deposition Raqia Shabazz, pg. 206 lines 18-25, pg. 207 lines 2-4

self-serving twist on the way it works. Additionally, she claimed that there is a curve before entering the station which is true, but the curve she refers to between Seventh Avenue and Atlantic Barclays B\Q is approximately 130 - 150 feet from the station and based on the slight downgrade entering the station once into and around the curve you can see far into the station.[9]

T/O Shabazz was negligent in operating the train, based upon the credible evidence that Luisa Janssen Harger Da Silva was on the tracks before T/O Shabazz entered the station, because T/O Shabazz should have seen the plaintiff not only as her train entered the station but from another 150 feet back inside the tunnel. T/O Shabazz testified that she did not see anything that was an issue before entering the station[10]. T/O Shabazz should have seen the plaintiff when she was on the tracks when she more than approximately 350 – 400 feet away and still in the tunnel. T/O Shabazz had more than enough time to stop the train before hitting the plaintiff. She had approximately 2- 3 times the necessary stopping distance, from the time she should have observed plaintiff, to stop before running over the plaintiff.

In T/O Shabazz's deposition, she was asked "Was your training that there's a schedule, and you're supposed to meet the schedule, barring some incident?[11] T/O Shabazz's Response was " My training was to operate safely and efficiently throughout my tour, and responsible – we're told, repeatedly, that a train operator is responsible for the safe operation of the train. It says nothing about meeting – keeping to a timetable".[12] She also testified the train simulator was broken when she was training, and she never got that training that was scheduled.[13]

T/O Shabazz demonstrated in her deposition testimony a convoluted and inconsistent understanding of her job and position as a NYCTA Train Operator. Her situational awareness was lacking. She could not describe details of the incident with clarity and a clear remembrance of what she actually saw, what actions she took and when she took those actions. Her knowledge of the rules and how to apply them cries out for reinstruction and additional training.

Situational awareness and observation are key factors during the operation of a train. When specific incidents occur, those facts are indelible and remain in ones memory for long periods of time if not forever. In the short term, reconstructing an incident during investigations is crucial to establishing facts and comparing those facts with others who observed the incident. These others are not the professionals with training as T/O Shabazz is "*supposed*"[14] to be. In my 29.5 years of experience operating trains, I was always able to observe the station as soon as it was visible from within the tunnel. My ability to observe from inside the tunnel was enhanced by bringing my observation to a focus on a specific area in front of me; the station and roadway. Her assessment of "universal for underground" is not accurate. From where plaintiff Luisa Janssen Harger Da Silva was located, is visible for approximately 350 - 400 feet away while the train was still in the tunnel outside of the Atlantic Ave – Barclay Center station. In addition, T/O Shabazz completely disregards Rule 2.39 (f) and (g) and states that her training says, "nothing about meeting – keeping to a timetable." As a trainer of T/O's this is a red flag for failure to understand rules and operate safely and efficiently.

Another example of incredible testimony is that T/O Shabazz stated that she saw the plaintiff "faint" and fall in her G2 and her testimony. Aside from the 911 caller, the statement to the police officer and eyewitness testimony, plaintiff was behind a large white column before she fell. It is unbelievable that T/O

---

[9] 150 feet is an approximation from my experience as a train operator.
[10] Deposition Raqia Shabazz pg. 210 Lines 21-25
[11] Deposition Raqia Shabazz, Pg. 54 lines 21-24
[12] Deposition Raqia Shabazz, pg. 55 lines 3-9
[13] Deposition Raqia Shabazz, pg. 63 lines 13 - 16
[14] My emphasis

Shabazz would be able to tell the manner in which plaintiff fell, because as the train operator comes into the station all the columns along the edge block the view of the platform. When going 20 - 24 mph while entering the station, these columns almost form a wall to the train operator's vision. If the incident happened as T/O Shabazz claims, she would have only had a split second to see plaintiff fall. In that split second whether it was a fall, a push, a trip or a medical condition, there would not be time to determine what the reason was that she was falling. In T/O Shabazz's testimony she back tracked, she was unsure if someone told her before she wrote her G2 that the plaintiff had fainted.

The deposition was video recorded and T/O Shabazz demonstrated how she operates the master controller to put the train into emergency and if her hand was where she said it was, then it takes less than a second to throw the train into emergency.

### APPLICABLE RULES AND JOB DUTIES

While operating a train in revenue/passenger service, the most imperative aspect of a Train Operator's duties is the safety of persons and property. The ability to understand and decipher what an operator is seeing requires complete attention to the operation of the train, focused attention to detail and unimpaired concentration. Reasonable care is required at all times during the operation of a train. Attention to every detail and preparedness both mentally and physically to respond to anything out of the ordinary requires a discipline of preparedness, attention and observational readiness to react under the most extreme and dire circumstances. Ability to recognize and respond instantaneously are skills that are mandated to be practiced each and every time an operator sits in the seat behind the controls and accepts the responsibility of moving multi-ton equipment over a rail system.

Prior to moving a train, railcar or any equipment on a rail system, the NYCTA, governed by the Federal Transit Administration (FTA)[15] and The U.S Department of Transportation (DOT), has guidelines for any employee involved with the safe movement of any train, railcar or equipment. That employee must be qualified through intensive training to move any train, railcar or equipment.

Rule 2.39a of the MTA, NYCT, MABSTOA and SBR in effect at that time states:

> A Train Operator is prohibited from engaging in any conduct that results in a collision of the train he or she is operating, with any person, car, bumper block or any other object on the trackway.[16]

Rule 9.02b further states that:

> THEY MUST TAKE EVERY PRECAUTION FOR THE SAFETY OF THEIR TRAINS AND CUSTOMERS. WHEN A TRAIN IS IN MOTION THE RESPONSIBILITY FOR SAFE RUNNING RESTS ENTIRELY UPON THE TRAIN OPERATOR.[17]

KNOWLEDGE OF AND COMPLIANCE WITH RULES

Rule 2

2(a) These rules, which govern the operation of the New York City Transit System, are applicable to and must be obeyed by all employees.

2(d) Employees must be conversant with and obey the rules that govern their particular duties and all special instructions issued by their superiors.

---

[15] Chapter 53 of title 49 of the US code §5329.
[16] MTA, NYCT Rules and Regulations effective 2003
[17] MTA, NYCT Rules and Regulations effective 2003 (Rule is capitalized in rulebook)

It is my opinion based on my knowledge, many years of experience operating trains, training others in their operation and experience in operating a train along the route where the plaintiff was injured, that T/O Shabazz was not performing her duties as per her training and job description.

A train Operator is trained to observe and operate according to the conditions he/she is operating in. There is no default speed for operation and, indeed, in approaching a station where the potential for civilian contact can be much greater than within a tunnel, being prepared to significantly lower speed and stop is reasonable and prudent.

In 1999, Rapid Transit Operations produced and required all employees involved in operations to obtain and abide by the "MANUAL OF STANDARD OPERATING PROCEDURES", which on page 11 of section III, Train Operations, addresses "DISTRACTIONS". The SOP quotes rule 98.b, which became rule 9.02(b) in the 2003 rules and regulations, and additionally states:

> Proper train operation requires the operator's undivided attention to fixed signals and the roadway while the train is in motion in order to provide safe, efficient transportation, to protect the well being of customers and employees, and to safeguard Transit property.

Train Operators are reminded that if they become distracted or must perform a task that requires their attention to be directed off the roadway or away from fixed signals, they must bring their train to an immediate stop."

Additionally Rule 4 of the MTA, NYCT, MABSTOA and SBR Rules and Regulations incorporates this SOP into the rulebook which reads,

### GENERAL DUTIES AND OBLIGATIONS OF EMPLOYEES

4(b) Employees while on duty are under the authority of and must obey the orders of supervision.

They must, within their qualifications, perform such duties, in addition to those set forth herein, as the superiors to whom they report may direct. Safety rules, manuals of instructions, policy instructions, special instructions, etc., in force prior to, or promulgated by department or division heads subsequent to, the adoption of these rules, shall have the same force and effect as though set forth in full in this Rule Book.

MTA, NYCT, MABSTOA and SBR Rules and Regulations clearly state:

### KNOWLEDGE OF RUNNING TIME AND SCHEDULE

2.39(f) Employees whose duties are affected in any way by the Timetable/Schedule must know the running time and schedule of their run. In addition, when issued, Train Operators and Conductors must have a preprinted schedule card in their possession at all times.

### OBEY TIMETABLE

2.39(g) Train Crews are responsible for operating their trains according to the timetable, except where conditions on the track interfere, or unless otherwise ordered by printed instructions or by a supervisor.[18]

---

[18] MTA, NYCT Rules and Regulations effective 2003

OPINION

I offer my opinion for everything previously stated above in my report and I will also testify about the manner of braking, how the master controller works, accident investigation by train operators, the failure to conduct any debriefings with train operators as to how avoid future 12-9s. I will testify about lines of sight of train operators and their positioning in the cab of the train.

I will also testify about the manner in which TA investigates accidents, that since 1980 the NYCTA has had their train operators and other investigating employees of train strike incidents accurately identify where the train comes to a stop within the station, how many cars are in or out of the station when the train comes to a stop after striking someone, and where the person is exactly on the tracks in relation to where the train and platform are. Additionally, the way information is collected and that there are no photos of customer accidents but photos of employee accidents shows how the same type of accidents are investigated differently. That trains enter into a station as fast as allowable and there is no caution or reduction of speed entering the station permitted. That all operators are directed to go as fast as allowable so long as they can stop at the designated marker at the end of the platform. That once within the station at some point the trains begin to slow down and that trains must go slower at the leaving end of the station compared with the speed at the entering end of the station. That a train operator has a better chance of stopping when there is someone on the tracks at the leaving end of the station because the train has a shorter stopping distance the slower it goes. That had plaintiff fallen in the same manner at the far leaving end of the platform, T/O Shabazz would have been able to stop before running over the plaintiff. That there are no warnings to customers that the trains have a shorter distance to stop at the leaving end of the platform as opposed to the entering end. That there are no debriefings with system safety for customer accidents with train operators to determine how to avoid this from happening again. Shabazz's testimony, and Gaskin's testimony as well as Sullivan's testimony that only employee accidents get boards of inquiry, corroborates the fact that the T/O involved in this 12-9 never spoke to anyone after the incident about how the accident happened and what could have been done differently to attempt to figure out how to stop it from happening again. I also will testify that there is a significant difference in the manner and the abruptness between stopping in emergency and stopping the train in full brake service.

There is a responsibility on the part of the MTA to not only protect the property and employees of the Authority, but also to reasonably ensure the protection of the passengers who use the Transportation Authority's system, especially those who are disabled, impaired, sick, minors, handicapped or intoxicated. It is reasonable, on the part of the passengers who pay to use the System to have some expectation of protection of life and limb even under the direst instance. Ultimately the Transportation Authority, assumes the responsibility for the reasonably safe transport of a passenger from one point to another while the passenger uses the system.

The NYCTA makes service a priority over safety. They have numerous documents with a motto "every second counts", but no motto that says every life counts. The New York City Transit Authority does not offer as part of its training how to avoid striking people that are on the tracks.

Conclusion:

The above is my opinion and what I will testify to as well as to rebut anything that may be in documents exchanged or testimony or depositions at or prior to trial. I will testify that Shabazz did not demonstrate the knowledge and skills required for the safe operation of trains within the NYC Transit System. T/O Shabazz based on the testimony and documents exhibited an insufficient understanding of what her duties and responsibilities were. Shabazz had a superficial understanding at best, of the gravity of the job and the responsibilities that one assumes

in that position. Her operation of the train that injured the plaintiff fell below the standards for reasonably careful and prudent operation. The tragic incident that occurred, the running over plaintiff Luisa Janssen Harger Da Silva was completely avoidable had she, T/O Shabazz, been operating her train properly.

*Insight Associate Consulting reserves the right to supplement or amend this report if additional case related information or documentation of any kind is received relating to this matter.*

Respectfully Submitted,

*[signature]*

Orlando A. Jimenez Jr.

<u>CV</u>

Orlando A. Jimenez Jr.

---

| | |
|---|---|
| Background | Provide accurate, insightful and expert advice about all aspects of train operation including commuter, and subway operations. Proficient in the operation of all facets of public rail transportation, SMEE equipment, diesel locomotives, air brake systems, electrical systems, undercarriage/body construction, wayside signal operation, right-of-way, tracks and switches, "Chemical Right to Know" and OSHA required safety regulations. Performed train operator performance analysis, time-speed studies, video analysis, accident reconstruction, safety standards, operating rules violations analysis and investigation. |

Experience  07/2009 to Present           Retired                Mastic, NY

Retiree

Active within Brookhaven Town and Mastic-Shirley Community. Town of Brookhaven Senior Bingo Inspector. Involved with School Budget reviews, Library Budget reviews, and various charitable organizations. Served as advisor to Legislator Kate Browning, 3rd Legislative District County of Suffolk on the Suffolk County Hispanic Advisory Board. Certified NYS Board of Elections, Election Inspector, past Treasurer and Past Grand Knight of James V. Kavanaugh Knights of Columbus Council 5293, Member in Charge (MIC) J.V. Kavanaugh KofC Saturday morning Bingo Game 2011-2013, Bookkeeper of Record J.V. Kavanaugh Columbiettes 2014-2018, Pro-Bono Bookkeeper of Record Akiva School 2017-2018, Assistant Membership Director NYS Council Knights of Columbus, Webmaster Suffolk Chapter and Suffolk Conference Knights of Columbus.

02/1980 to 07/2009   New York City Transit Authority   New York, NY

Motorman/Train Operator

- Served as a Motorman/Train Operator and as a Train Operator Trainer.
- Trained in operation of mechanical electrical train equipment, diesel Locomotives, New Technology Trains, proficient in all facets of SMEE equipment (self- lapping mechanical electrical equipment) including airbrake systems, electrical systems and knowledge of undercarriage & car body construct.
- Trained in wayside signal operation, right of way, tracks and switches.
- Trained in "Chemical Right to Know" and other OSHA required safety regulations.
- Trained New Motorman/Train Operator's during in-service operations for 25 years

01/1985 to 03/1998   Transport Workers Union – Local 100   New York, NY

<u>CV</u>

Orlando A. Jimenez Jr.

___

Various

Held elected and appointed positions for Transport Workers Union Local 100 from Shop Steward to Organizer/Staff representative. Worked within the Rapid Transit Operations (RTO) Department representing Train Operators, Conductors and Tower Operators (Block Operators)
Trained in all aspects of Rail Transit operations
Represented Local 100 members in various labor relations situations

Served as Labor Chairman for NYS Puerto Rican/Hispanic Legislative Task Force Conference (Somos el Futuro)
   Liaison between NYS Legislature and Organized Labor

08/1978 to 02/1980     New York City Transit Authority     New York, NY
Bus Operator
- Operation of buses over designated routes within the city of New York

07/1974 to 08/1978     New York City Police Department
New York, NY
Police Administrative Aide

- Worked as (Telephone Switchboard) TS operator/Police Dispatcher in 911 Communications section answering emergency calls and dispatching RMP's to 911 emergencies throughout NYC.

Education   1973 to 1974     Bernard M. Baruch College,     New York, NY
                              CUNY

            1972 to 1973     John Jay College of Criminal Justice, CUNY     New York, NY

Meritorious
- Labor Council for Latin American Advancement Special Recognition, March 29th, 1993
- Dr. Ramon Emeterio Betances NY Puerto Rican Day Parade Labor Award April 15th, 1995
- New York State Assembly Citation April 22nd, 1995
- New York State Puerto Rican Hispanic Task Force Labor Award March,1996
- Damaso Seda Labor Award March 11th, 1996
- New York City Transit Authority Meritorious Service Award (31 years of Exemplary Service) 08/2009
- Workshop Panelist at NYS Puerto Rican/Hispanic Legislative Task Force Conference 1993 through 1996

<u>CV</u>

Orlando A. Jimenez Jr.

- Invited Speaker, LCLAA Annual Dinner Dance, NY Hilton Hotel 1994, 1996, 1997
- Various speaking engagements at numerous Organized Labor related events as a representative of TWU Local 100, 1991 through 1998
- Representative for TWU International AFL - CIO organizing effort Puerto Rico 1990-1992
- Developed Shop steward program for Local 100 RTO and implemented new procedures and requirements for becoming a Shop Steward, 1987
- Assisted in development of TWU Local 100 Legislative Agenda 1992, 1993
- NTSB Rail Safety Training, 1992
- OSHA Training Program, 1993
- Labor Liaison, US Presidential Campaign 1994.
- Knights of Columbus Knight of the Year 2013
- Knights of Columbus Special Appreciation Award 2014
- Columbiettes Special Appreciation Award 2015

References are available upon request.