# Exhibit VV

Carl Berkowitz, Ph.D. PE

**Expert Report**
**Harger v. New York City Transit Authority (NYCTA)**



**Figure 1: Location of incident**

**Prepared by: Carl Berkowitz, Ph.D., PE**
**March 13, 2023**

I

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## Table of Contents

I. Introduction ........................................................................................................... 4

II.    Summary of Opinions ...................................................................................... 5

A.    The TA never conducted a proper hazard analysis or safety study. ............................ 5

B.    The TA never studied how to eliminate or reduce CWIs. ......................................... 10

C.    Additional Failures in maintaining a safe subway system and protecting customers from being struck by trains. ........................................................................................ 11

D.    Accident Analysis ................................................................................................... 11

E.    Opinion ................................................................................................................... 11

III.    ANALYSIS ...................................................................................................... 12

A.    Summary of the incident ........................................................................................ 12

B.    Detailed Findings and Opinions. ............................................................................ 13

    1.    History of NYCTA People being stuck by subways (CWIs) ............................... 13

    2.    The data shows that the root cause of CWIs is open access from the subway platforms to the track. ................................................................................................ 15

    3.    Good and accepted system safety and transportation practices and procedures require a proper Hazard Analysis, applying the Department of Defense Standard Practice System Safety, MIL-STD-882E ............................................................... 18

C.    Application of MIL-STD-882E requires an analysis of the hierarchy of safety solutions. ...................................................................................................................... 23

    i.    Hazard Elimination ........................................................................................... 24

    ii.    Engineering Controls ....................................................................................... 24

    iii.    Administrative Controls .................................................................................. 24

    D.    Platform Screen Doors (PSDs), Platform Edge Doors (PEDs), and Automatic Platform Gates ............................................................................................................. 25

    E.    Failure to take corrective action. ......................................................................... 26

F.    Overcrowding is not a cause of CWIs ..................................................................... 29

G.    Use of Platform Edge Doors / Barriers Globally .................................................... 30

    *i.    TA's Trip to Korea Report for the Evaluation of Platform Screen Doors in the Seoul Metropolitan Rapid Transit (SMRT) System (January 23 - January 28, 2010)* ...................................................................................................................... 31

H.    Feasibility Study published February 2020 ............................................................ 33

    At some point prior to 2020, the TA converted a contract with STV to conduct a pilot PSD program into a Feasibility Survey which was misnamed a Feasibility Study which was actually infeasibility survey. ................................................................... 33

I.    Failings of the Feasibility Study ............................................................................ 35

    iii.    *Structural Issues*: ............................................................................................ 38

J.    The TA did not conduct proper engineering or transportation studies. ................. 42

K.    TA violations of the standards of care. ................................................................... 43

    1.    Standard: Safety and hazard analysis ................................................................ 43

    2.    Standard: Training ............................................................................................ 44

    3.    Standard: Defensive operations programs to reduce the potential for incidents. ... 44

    4.    Standard: Policy and procedures to protect passengers on the track ................. 45

    5.    Standard: Safe Zone ......................................................................................... 45

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

6.    Standard: OSHA General Duty Clause ...............................................46
7.    Standard: Common Carrier laws .......................................................46
IV.    Accident Analysis .................................................................................48
Accounts of the incident events: ..........................................................48
Additional details ................................................................................49
Figure 2: Chronology of Key Events ....................................................49
Perception Reaction Time ....................................................................50
The Train Operator's Situation Awareness ...........................................51
B.    Braking Distance Analysis .............................................................52
1.    Visibility: ....................................................................................52
2.    Assumptions: ...............................................................................53
Figure 4: Accident location diagram ....................................................54
C.    The train operator had time to stop and was not paying attention.........65
D.    Train Operator Violations of Standards of Care .............................65
Rules & Regulations Governing Employees Engaged in the Operation of the MTA
New York City Transit System (April 2000) .........................................66
V.    Analysis of reduction of speed that trains enter the stations ...................67
VI.    Conclusion ..........................................................................................72
VII.    Appendices ........................................................................................74
1.    Photographs of the Incident Location .............................................74
2.    R68A ...........................................................................................77
3.    NYCT emergency brake stopping distance data .................................78
7.    Emergency Braking Data ...............................................................79
8.    Examples of Platform Doors Around the World ................................84
APTA Safety Study Format ..................................................................93
Track Incident Data ............................................................................96
Supporting Documentation ..................................................................98
Memo on the Platform Edge Safety Program Proposal (November 30, 2001) ..............103
Charles Yengue memo (May 11, 1999) .........................................................104

3

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## I.  Introduction

The plaintiff, Luisa Janssen Harger Da Silva Brown,[1] hired me to serve as an expert and provide an opinion in this case regarding the New York City Transit Authority ("NYCTA") and Metropolitan Transportation Authority's[2] ("MTA") (collectively referred to hereinafter as "TA") regarding the August 2, 2016 incident where she fainted, fell onto the subway tracks at the Manhattan bound B/Q subway platform at the Atlantic-Avenue Barclays Center Subway Station (the "subject station"), and was run over by the train. As a result of the incident Ms. Harger severed her left arm above the elbow and left leg above the knee. This report will address various deviations of the TA from good and accepted transportation systems practices and procedures, in the engineering, design, hazard analysis and operations of the subway system that contributed to the incident herein. Additionally, it will address the actions of the train operator and an accident reconstruction which shows based upon the credible evidence that had the train operator been paying attention she would have been able to stop the train prior to striking Ms. Harger.

As fully laid out in my attached CV, I have extensive experience working in the transportation industry, including the government, private and academic sectors. I have comprehensive multi modal experience in transportation planning, design, engineering, safety, security, construction, maintenance, operations and management. In addition to my work experience, I have conducted research, consulted, and given presentations on transportation safety, including specifically rail passenger safety. I have worked as a transportation engineer for over fifty-five years, including four years as the highest ranking civil-service engineer in the New York City Transportation Department. I have multiple degrees, including a Ph.D. in Transportation Planning and Engineering from the Polytechnic Institute of New York (NYU-Tandon), have held numerous teaching positions, have published academic and news articles, and I am a member of various industry and professional associations, including the American Public Transportation Association (APTA), Department of Homeland Security Surface Transportation Security Advisory Committee (STSAC), American Railway Engineering and Maintenance-of-Way Association (AREMA) and the International Association of Public Transport (UITP).

I am familiar with professional standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety and design.

I have reviewed voluminous records and deposition testimony in this case [see appendices at the end of this report, and Exhibit "A", appendix of ESI records reviewed],

---

[1] Ms. Harger was married since the incident and her name changed from Da Silva to Brown for consistency she will be referred to as Ms. Harger
[2] The MTA and the NYCTA will be referred to collectively and interchangeably as the TA.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

and based upon consideration of this information, and my knowledge, education, training, experience, familiarity with professional standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety and design, give my opinions with respect to whether the MTA/NYCTA complied with said standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety, design and operation.

The plaintiff is compensating me at a rate of $475 per hour for all work performed in this case.

In the past four years, I have testified as an expert on many occasions at depositions and trials. A list of my testimony since 2018 is annexed hereto as Exhibit "B".

In the past ten years, I have published several articles, which are included in my CV (CV attached hereto as Exhibit "C"), and copied below:

*Rail Passenger Terminal Safety Audit*, Website Proceedings, International Seminar and Exposition, Rail Safety, 2014, Orlando, FL, April 2014, Joint Author.

*Pedestrian Safety in a Terminal Environment*, Website Proceedings, Institute of Transportation Engineers, Northeastern District, Long Branch, NJ, May 2014, Joint Author.

*Passenger Safety: Subway and Bus*, Proceedings, Subway Series 2014: Get on Track, New York State Trial Lawyers Institute, New York, NY, May 2014.

*Passenger Railroad Facility Safety Audit as Revenue Protection*, Joint Rail Conference, San Jose, CA, March 2015, Joint Author.

## II.    Summary of Opinions

Based on my consideration and review of the voluminous documents and deposition testimony in this case, it is my opinion that the design, operation and safety practices and procedures for the TA regarding people who access the tracks and are stuck by trains deviated from good and accepted transportation engineering practices and safety standards.

### A.  The TA never conducted a proper hazard analysis or safety study.

Since the NYC subway system was opened in 1904, people have accessed the track area and have been stuck by trains, causing thousands of fatalities and catastrophic injuries. The TA's data shows that from 1987 and 2021, at least 1,808 people have been

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

killed and more than 5,694 people have been seriously injured as a result of being struck by trains. Internally, the MTA refers to these incidents as "12-9s", "man under" or "CWIs" (Contact with Individual). Recently, CWI incidents have increased to approximately 200 per year.

This trend is due the TA's failure to take corrective actions as required by their own System Safety Program Plan (SSPP) as well as standard Military Hazard Analysis MIL 882A-E[3], Federal Transportation Authority ("FTA") rules and guidelines and good and accepted transportation engineering practices, safety standards and hazard analysis for mass transit systems. As detailed below, in violation of best practices, the TA failed to do any valid scientific studies, failed to do a proper hazard analysis, failed to take proper and effective corrective actions, even though they have collected data detailing the frequent catastrophic events of people being struck by trains for more than 30 years.

The TA was and is aware of various effective solutions, such as platform barriers that prevent people from accessing the track area. There are various types of platform barriers utilized by subway systems worldwide, including Platform Screen Doors ("PSDs"), which are full height, floor to ceiling doors; Automatic Platform Gates ("APGs"), which are half height doors that are typically four to six feet high; and Rope Platform Screen Doors ("RPSDs"), which operate vertically when letting passengers through, and work with multiple train types with different length and train door configurations and Fixed Railings.

PSDs are the gold standard and have been implemented by transit systems worldwide to reduce and/or eliminate passengers from accessing the track area and being struck by trains. Despite being aware of PSDs and other effective solutions, the TA has chosen not to implement PSDs or any other safety technologies in the NYC subway system. The TA lacked a reasonable basis for this decision.

In discovery, the TA admitted that prior to plaintiff's incident on August 2, 2016, the TA never conducted a study to support its decision not to implement PSDs or any other safety devices or technologies. (Rule 30(b)(6) witness transcript p. 181-82). Moreover, the TA lacked a safety plan to stop or prevent people from accessing the track area and being struck by trains, both for the subject station and systemwide.

The TA's failure to implement a safety plan is due, in part, to its failure to conduct a proper hazard analysis. The first step in a hazard analysis requires identification of the hazard. Here, the known and undisputed hazard is the fact there are 100 – 200 CWI incidents every year because customers have open access to the track area. In 2020, the number of CWIs escalated to 200.

---

[3] Mil 882 has had 5 versions, the earliest version available online is 1993 which has the same hazard analysis and the same hazard risk assessment matrix, which is in effect in 882E (2012). Even in the 882C version it notes that a 1A risk assessment index, people being stuck by subways in is an unacceptable risk.

6

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

The second step in a hazard analysis is conducting a "root cause" analysis. A successful root cause analysis identifies all root causes—there are often more than one. Here, the primary root cause is the open access to the track area from the platform edge. A second root cause is the lack of an adequate warning system to the train or its operator when a person is present on the subway tracks.

The third step in the hazard analysis is to assess and document risks, which requires an assessment of the probability of occurrence and the severity of the injuries if the occurrence happens. The industry standard for conducting this second step is known as "MIL-STD-882", which was developed by the United States Department of Defense and is the standard systems engineering approach to eliminating hazards. Notably, the NYCTA claims that it has adopted the MIL-STD-882 standard, but a review of the documents demonstrates that it was never properly applied.

By following this well-established standard procedure, one can objectively evaluate and compare the frequency and severity of injuries from the system "as is" (with no changes), to the frequency and severity of injuries that would exist if each of the proposed corrective actions were implemented. Then, an objective comparative analysis reveals which method results in the fewest number of catastrophic injuries.

Once the best corrective action or combination of corrective actions is identified, the agency must implement an adequate System Safety Plan ("SSP") or System Safety Program Plan ("SSPP"), which must be periodically reviewed by analyzing the safety performance indicators and revised accordingly. This process must be repeated, and corrective action(s) must be taken, until the hazard is removed or reduced to an acceptable level.  If a hazard is frequent or probable and can result in catastrophic injuries, it must be corrected.  Notably, a comparison may require exchanging a possible or even probable minor injury for a catastrophic injury that is frequent or probable.

It is this final step that the TA has failed to conduct. The TA has never conducted a proper safety study to objectively evaluate and compare the frequency and severity of injuries from the subway system "as is" (without PSDs or other safety measures), to the frequency and severity of injuries that would exist if PSDs or other safety devices / measures were implemented. Thus, the TA is in violation of good and accepted practices, and their own policies, which require application of the system safety hazard analysis MIL-STD-882.

This step of the analysis of MIL-STD-882 required the TA to assess and document the risk associated with people having open access to the track area. To determine the appropriate severity category, the TA was required to identify the potential for death or injury if a person accesses the tracks. Second, the TA was required to assess the probability of people falling onto the tracks and being struck by trains in the absence of PSDs or other technologies.

7

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Third, the risks are assessed by evaluating the Risk Assessment Code, which is a combination of the severity code and the probability level. This is done by looking at the Risk Assessment Matrix in MIL-STD-882.

Here, fatalities and severe injuries are categorized as "catastrophic." Moreover, 50 deaths from CWIs per year, and a total of 100-200 CWIs per year, is categorized as "frequent."[4]  This hazard is therefore categorized as a "High" on the Risk Assessment Matrix. Good and accepted system safety and transportation practices state that "high" hazards are unacceptable and require development and implementation of a system safety plan.

MIL-STD-882 then requires identification and documentation of risk mitigation factors, including the expected risk reductions of each. The goal should be to eliminate the hazard if possible. If completely eliminating the risk is impossible, then the hazard must be reduced to the lowest acceptable level. The system safety design order of precedence identifies alternative mitigation approaches and lists them in order of decreasing effectiveness.

Here, application of the appropriate MIL-STD-882 analysis required installation of PSDs at stations where feasible, and installation of other safety devices at stations where PSDs were not feasible. That is because in subway systems where PSDs have been installed, they have nearly eliminated CWIs. Moreover, where PSDs were not possible, alternative safety measures are required, because it is unacceptable to permit the hazardous condition to continue unabated.

An adequate safety plan requires a proper hazard analysis and also would have required the development of a corrective action safety plan for each station. In other words, each station would be required to implement a plan to prevent people from being exposed to the open track way, accessing the tracks and being struck and killed on the platform or the tracks. Because each station is unique, a "one size fits all plan" is infeasible. A solution that works for one station, like PSDs, might not work for other stations. However, a proper hazard analysis requires a safety plan for each station, independent of what might work or not work at other stations.

Instead of conducting a proper a hazard analysis and coming up with corrective action plans and monitoring them for effectiveness and developing safety plans for each

---

[4] Throughout the production, the TA continues to cite the number of injuries per million when reporting to the oversight agencies and making presentations to Committees, politicians or the media as if they are performing well. In fact, the TA has been permitting and facilitating an unacceptable hazard to exist in their subway system. The TA prior to August 2, 2016 did not articulate that 2-4 people a week were getting catastrophically injured and killed when naming presentations to the oversight agencies or committees, nor did they ever urgently correct the unacceptable risk as required by MIL 882E.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

station, over the years, the TA has repeatedly rejected proposals to install PSDs or other safety measures at some stations, because they wanted a "one-size-fits-all" solution for the entire system. This decision lacks any rational basis and violates MIL-STD-882, which requires the unacceptable hazard to be eliminated, and if that is not possible, to be reduced to the maximum extent possible.

In 2022, the TA issued a Trespass Task Force Report, which is informative in the the way the TA has handled the frequent and deadly occurrence of CWI incidents. In the report, the TA deflects its responsibility for ensuring passenger safety by claiming that mitigating or eliminating this hazard is impossible.

The Trespass Task Force Report defines the problem as follows: "Track trespassing, also known as track intrusion, refers to any unauthorized entry onto the tracks, whether intentional or accidental."

Thus, according to the TA's definition, Ms. Harger "trespassed" on the tracks, even though she was only there because she experienced a medical emergency when she fainted and fell onto the tracks. By placing the blame on innocent victims like Ms. Harger in how the TA defines "track trespassers", the TA demonstrates a blatant disregard for their safety obligations and a culture of attempting to avoid responsibility for its failure to remedy this known problem.

Notably, in this case, the TA admitted through its Rule 30(b)(6) witness that it is aware that the root cause of people being killed and catastrophically injured by CWIs was the open access to the subway tracks from the platform. Similarly, in his deposition, Andrew Bata, former Chief Strategic Improvements and Best Practices, Office of Strategic Innovation and Technology, MTA agreed that the root cause of CWIs was the open access to the tracks from the platform.

The Transit Authority, though its Rule 30(b)(6) witness, confirmed that none of the purported safety measures undertaken in the past 20- 30 years have been effective:

> Q. In fact, if you look at the data, the numbers really don't change all that much for the number of people getting hit and either catastrophically injured or killed over these decades, true?
>
> A. I would say true.
>
> Q. Since the numbers of people being killed or catastrophically injured have not changed significantly over these decades, can we agree that whatever measures were taken by the Transit Authority, they now have had decades of data to analyze and study if they wanted to, true?
>
> A. True.

9

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

(Jones transcript at page 162)

The Rule 30(b)(6) witness also admitted that once a hazard is identified, corrective action is required. (Id. at 163-164). Here, the TA was aware of the hazard of people being struck and killed by trains at the rate of at least 50 per year, and that open access to the subway platform to the track was the root cause of the hazard.

Nevertheless, the TA never implemented any effective corrective action plan to stop and/or prevent people on the subway platform from accessing the track area and being killed or struck by trains.

It is my opinion, based on the materials I reviewed and considered, that the TA never conducted an adequate study, a hazard analysis or a proper safety plan. Moreover, it is my opinion that the TA's failure to conduct a proper hazard analysis or safety study, and the failure to implement a corrective action plan, constitutes a violation of MIL-STD-882 and professional standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety, design, and operations.

**B. The TA never studied how to eliminate or reduce CWIs.**

The TA never studied how to eliminate or reduce the CWIs, despite knowing that more than 50 customers were killed every year, and many more survived but were catastrophically injured, such as Ms. Harger.

The TA only examined specific safety technologies, but never devised a proper safety plan or a corrective action plan to stop people from accessing the track area and being struck by trains. Notably, however, the TA admitted through its Rule 30(b)(6) witness that no PSD feasibility study was ever conducted prior to Ms. Harger's accident in August 2016. (See Jones transcript at pp. 181-82).

I reviewed the documents that the TA identified in their discovery responses as "studies" or "plans." None of these records constituted a safety "study" or "plan," particularly none of the records that were created prior to August 2, 2016. None of these purported studies had any reasonable basis for the conclusion to not install PSDs or other safety devices including operational fixes such as slowing down the trains. None of the records that were purported to be studies or plans were based on any scientific, hazard or engineering analysis. The records that were identified as studies and plans are more accurately characterized as "surveys" and collections of data, which purport to offer opinions based upon conjecture and speculation, and not the application of any scientific method. Any analysis that was done was not a comparative analysis as will be detailed herein, comparing the system without safety measure vs adding the safety measure or plan.

10

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Importantly, none of these records even purported to be a "safety study," and none contained a proper hazard analysis to ascertain how to eliminate or reduce hazards in order to protect people from being struck by trains. Each and every suggestion for a safety measure was rejected without a hazard analysis comparing what the hazard would be of implementing the safety measuring or leaving the system and the station as is.

### C. Additional Failures in maintaining a safe subway system and protecting customers from being struck by trains.

Internationally, many other transit systems have eliminated CWIs by installing PSDs and other safety devices. In these other systems, every variation of system design challenges have been overcome to ensure that customer safety is the top priority.

In NYC, these engineering challenges could also be overcome. However, because the culture within the TA does not prioritize customer safety, the TA has chosen not to implement any safety plans to reduce CWIs, despite the wide availability of various different safety technology.

Notably, the TA's own engineers advocated for implementation of PSDs and other safety technology. The engineers were rebuffed. When it was requested to at least have a standard for new stations which is the standard all over the world, without rational basis and in violation of good an accepted safety engineering practices the TA rejected that plan as well. It is a violation of good and accepted transit practices and procedures for a mass transit system to refuse to implement safety changes at the recommendation of its own engineers that are known to be effective worldwide without conducting a hazard analysis or at a minimum a pilot.

### D. Accident Analysis

Based on our accident reconstruction, detailed below, which was done using the credible evidence in this matter, the train operator had sufficient time and sight distance of the station tracks to be able to observe Ms. Harger on the tracks, activate the emergency braking, and prevent the train from striking Ms. Harger. Since the train inspection indicates the train was operating as designed, the failure of the train operator to stop the train in time indicates that the train operator was negligent and was likely not paying attention at the time of the incident. The credible evidence in this matter establishes the plaintiff had fallen onto the tracks prior to the train entering the station.

### E. Opinion

Based my review and consideration of the voluminous documents in this case, it is my opinion, with a reasonable degree of transportation engineering certainty, that the TA violated applicable standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety, design, hazard

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

analysis and operation, and that said violations were a proximate cause of the catastrophic injuries sustained by Ms. Harger.

A non-exhaustive list of Failures include:

- Failure to conduct adequate and proper safety studies regarding CWIs;
- Failure to have adequate, proper and rational safety plans both system wide and for the subject station regarding reduction and / or elimination of CWIs.
- Failure to use proper methodology in examining the risk of CWIs, and options for reducing and /or eliminating CWIs;
- Failure to use proper hazard analysis and risk matrix for comparative analysis;
- Failure to perform pilot project studies for any type of platform edge barriers;
- Failure to consider the opinions of their own engineers, the successful implementation of PSDs in transit systems around the world; published data on the effectiveness of PSDs and other safety measures; international benchmarks and best practices, and their own SPI and data.
- Failure to take effective corrective action to remedy a known recurring hazard that causes catastrophic injuries with frequency.
- Failure to warn plaintiff of the dangers of the different areas on the platform that certain areas are safer than others
- Failure to slow down the trains for a speed for people in the stations on the platforms or who fall onto the tracks
- Failure to change operations in reasonable way to protect people from being struck by trains

## III.    ANALYSIS

### A.  Summary of the incident[5]

On August 2, 2016, at approximately 7:07 p.m., Ms. Harger fainted while standing on the platform of the Manhattan bound B/Q train at the Atlantic Avenue Barclays Center Station, fell onto the tracks, and was run over by a subway train, severing her left arm above the elbow and left leg above the knee.[6]

There was a 911 caller who informed the police the plaintiff had fallen on the tracks and that the train was not yet in the station. Notably all eyewitnesses and the police officer other than the train operator stated that the train was not yet in the station at the time Ms. Harger fell on the tracks, including the police officer who testified that the train

---

[5] Memorandum from Maureen McCarthy, Superintendent Zone 33 on August 2, 2016; Memorandum from Ernest Cherry, III, Line Superintendent, "B/FS" Lines, District #3 on August 2, 2016; NYCTA Car Equipment Department, Train Trouble Control – 066, Request for Assistance Report;

[6] The incident will be covered in the accident analysis portion of the report.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

operator told him that the person was already on the tracks when train operator entered the station.

### B. Detailed Findings and Opinions.

The findings and opinions in this safety report are based on information provided through discovery, depositions, and technical references.

Proper methodology and analysis first require the identification of a known hazard, and a root cause analysis to determine what the root cause of the hazard is, perform a proper hazard analysis and a proper comparative hazard analysis using the the Department of Defense Standard Practice System Safety, MIL-STD-882E and the MTA's System Safety Program Plan. Studies require using scientific methods and looking at the effectiveness of any safety measure taken.

### 1. History of NYCTA People being stuck by subways (CWIs)

Here, the known and recurring hazard is that well over 100 – 200 people every year get struck or run-over by subway trains, and catastrophically injured or killed. These are referred to by the TA by code as "12-9s" or "man under" or CWI (Contact with Individual). In 2020, the number of CWIs escalated to 200. According to the TA (Trespass Taskforce report 2019-2021), in addition to these CWIs, there are over 1,000 "track intrusions" by people per year, and numerous "near misses" of trains missing contact with people.. The historical data for intrusions was not provided but there is no evidence to indicate that it would not be the same over the 34 years for which CWI data was provided. While there are different mechanisms of injury, i.e., did the person slip/trip and fall onto the tracks or did they have a medical condition, or were they trying to retrieve a lost object from the tracks, or were they pushed or did they jump onto the tracks; they all share one common denominator and root cause: open access from the train platform to the train tracks/track bed.

The rail/subway industry has been aware of such incidents since trains first became available and widely used; some of the oldest subway stations in NYC had "fixed rails" at the platform edge, a barrier separating people from the tracks, in some stations in a rudimentary attempt to reduce the number of catastrophic injuries and death caused by such contact.

The TA tracks the number of customers hit and injured or killed by trains. The below chart is from their 2013 Customer Contact with Trains Presentation showing statistics from 2001 – 2012:

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



The number of incidents and fatalities of people being struck by trains is consistently high over the period from 2001 to 2012, varying between 107 to 188 incidents annually and 31 to 55 deaths annually.

These statistics—total people stuck and how many died—are known as Safety Performance Indicators (SPI), the TA shares these with international metro associations such as the Community of Metros ("CoMET"). When asked the Transit Authority as a member of CoMET provided data and safety performance indicators based on documents received as far back as 1994. Notably all witnesses testified, to the extent that they we asked, there was no significant change in the number of CWIs during the history of their employment with the TA. President Prendergast described the numbers as basically flat.

CoMET[7] collects this data and shares it with other This information if used properly informs a mass transit system if its safety measures, corrective actions plans are effective.

---

[7] The Community of Metros (CoMET) benchmarks worldwide urban railway performance
It consists of 44 large and medium sized metro systems from 40 cities around the world. The TA is a member and has participated in sharing data and information and received information as well.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

These statistics, despite contradictory testimony from TA witnesses (Prendergast and Kennedy) are SPI and help inform transit systems if their safety measures and plans are effective. Track Intrusion statistics including people struck and killed or catastrophically injured based on data published in the MTA Trespass Taskforce Report (2019 -2021) [8] show that the safety plan and measures have not been effective.

MTA "track trespassing"[9] incidents increased 20% from 2019 to 2021, even as ridership fell dramatically. During the period 2019 to 2021, there were 561 collisions resulting from these intrusions, causing 372 injuries and 189 fatalities. There were 1,267 reported incidents in the subway in 2021, with 200 resulting in collisions with trains and 68 in fatalities. This trend continued into 2022. There were 3,423 total track intrusions reported during the three-year period of 2019 to 2021. What this shows is that ridership and crowding have no relation to the frequency with which people in the New York City Subway System are being struck by trains.

## 2. The data shows that the root cause of CWIs is open access from the subway platforms to the track.

The transportation agencies for mass transit and subway systems have formed international organizations, and they have collected and analyzed data, including Safety Performance Indicators ("SPI") for these incidents, and have published their findings, along with historical data, engineering solutions, and best practices and benchmarks to eliminate or reduce such events from occurring, and the results of changes in the design and operations for urban railways, subways and mass transit.

For decades, comparable subway systems have designed, installed and retrofitted their systems with various safety devices and technologies and changes in operations, by leading manufacturers and consultant engineering companies, and it is undisputed that worldwide, these safety measures and plans have been effective at reducing or preventing these CWIs from occurring.

Proper and adequate study of the problem makes clear that the root cause of these CWIs, is the hazard of open access to the train tracks from the platform edge, and secondarily, from lack of adequate warning to the train or its operator. A purported study that fails to analyze the data and the SPIs and reach the conclusion that the root cause, the fault tree, the common denominator for all such incidents is open access – nothing

---

[8] MTA Addressing Track Trespassing: Actions for Rider Safety & System Reliability A Report of the Track Trespassing Task Force - Chartered by Janno Lieber, Chair & CEO- May 2022 (https://new.mta.info/document/87881)

[9] According to the MTA\NYCTA Track trespassing, also known as track intrusion, refers to any unauthorized entry onto the tracks, whether intentional or accidental.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

preventing or limiting the movement of people from the platform onto the track, is fundamentally flawed, and is using improper methodology. In the TA's case they continually refer to the reason someone falls, which is not the reason they are hit by trains. This analysis has led to them implementing no safety measures that are effective or creating corrective action plans as their conclusion as to the root cause, is never open access to the trackway.

Prior to August 2, 20216 the ineffective Safety Measures to prevent people being struck and catastrophically injured were unchanged for at least the last 30 years. The testimony and records all indicate despite the history of extreme, catastrophic frequent injures caused to customers 2-4 times per week by being contracted with trains the only alleged safety measures were: announcements, signs and allegedly the tactile strips. The TA has also claimed that the Help Point stations are a safety measure meant to reduce CWIs, but the TA witnesses were not consistent regarding that issue.

Mike Sullivan from office of system safety testified as follows:

Q And so what has the Transit Authority done to prevent 12-9's?

A Well, there's signage, there's warning signs, there's announcements that are made. In this picture that you're looking here of an unknown location, that yellow tactile strip, people are constantly reminded to stay behind the yellow lines, stay clear of it. There are announcements that are made on top of, that are made on the trains when you're on them. People are told through the announcements to avoid the platform edges.
They're told to, if they drop something on the tracks, leave it there, call for assistance.

Q Anything else, sir?
A Not that I can recall now, no.

Q Basically three things, signs, Announcements and the tactile strip, correct?
A Yes.

In the Task Force report, the TA claims the Help points are also safety measures for being struck by 12-9s but there is no evidence, engineering study or common sense to report same. It was a violation of good and accepted engineering safety practices to fail to have the help points communicate with the train operator. As a result Ms. Harger was struck by the train herein.

Additionally, the only actions undertaken by the NYCTA/MTA in the past 30 years with regard to CWIs, according to their Trespasser Task Force report, has been:

16

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

- **Messaging Campaigns and Safety Announcements**: The Task Force report claims (although this was not present in the station in question) are for safety but have proven to be ineffective based upon the SPI.

- **In-Station Help Points**: The Task Force claims Help points stop track intrusions, but there is no data to support this claim and from a safety engineering point is unsupported by data or common sense. Notably Help Points do not connect to the incoming train operator to warn the train operator of a person on the tracks. This was an opportunity for safety which the TA rejected without doing a hazard analysis and could have helped to alert the train operator in this matter to stop hitting Ms. Harger.

- **Platform Edge Warning Strips**: The TA has also claimed in this report and in testimony that the tactile platform edge warning strips help stop CWIs. These were actually installed for blind people and are claimed to be a safety measure but are completely inadequate for the claimed purposes- they do not state stand back from the tactile platform edge warning strips. There is nothing on the platform to indicate people should stand back from the strips on the platform, the signs are sporadic and not in the station in question. They were able put decals or paint tiles that say "stand here" for covid, and they certainly could have painted or put decals to stand back from the edge or do not stand in the yellow tactile strips. The TA alleges in their most recent Trespass report that "Tactile platform edge warning strips serve to deter many types of track intrusions, including those stemming from medical conditions as well as those stemming from slips and falls, whether as the result of intoxication, platform crowding, or simply distraction. These strips are now present in nearly all MTA stations." There is no data or study that was done to support these claims. These claims are made and published without any factual support that was provided by Defendants in this matter.

- The Track Intrusion report also mentions other technologies:

- The report claims Laser Intrusion Detection Systems (LIDS) are being used for CWI safety but they are only used in the tunnels and again the Trespass report erroneously represents these are in use in the platforms to protect people from being hit by trains which is not true.

- The report also mentions Closed-Circuit TV (CCTV) Security Cameras: The Trespass report states: "The MTA's CCTV system has been expanded dramatically in recent years to provide far greater security coverage of the subway system." This again is a misrepresentation as the CCTV are not used to monitor the platforms to

- According to the SPI and data, these measures have not been effective or successful at preventing or significantly reducing the number of CWIs, yet no other meaningful corrective actions have been taken.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

- *Notably what is missing from the Task Force report is that in 2019, 2020 the CWIs were at their recent highest levels where when the Transit had the most safety measures in place. This shows the complete ineffectiveness of the same technologies that they have basically been in place for the last 25 years.*

The Trespass Taskforce claims it was impossible to install platform edge doors and that's simply not true, it is the criteria that the TA decided upon that supports, albeit inadequately, the alleged claim of impossibility to install PSDs in the current system. The TA knows it is possible and the report as well as numerous communications going back 15 years shows the dishonesty of the TA in its communications and representations to the public and its oversight agencies. The below blurb is from the Trespass Taskforce report:

| Platform Screen Doors: | Platform screen doors provide an additional barrier at the edge of the platform and have proven highly effective at preventing track intrusion in newer subway systems around the world. While the structure of MTA platforms and trains makes it impossible to install platform screen doors at most MTA stations under current conditions, the MTA will pilot platform screen doors at 3 stations where it is possible to install them: the **7** at Times Square, the **L** at 3 Avenue, and the **E** at Sutphin Boulevard–Archer Avenue–JFK. |

Yet the TA's Rule 30(b)(6) witness, Eric Jones, who was a member of the Trespass Taskforce, testified at the Rule 30(b)(6) deposition that:

> Q So if anybody ever said that it was impossible to install platform screen doors in the New York City subway system, that would be a -- a false statement. True?
>
> A True.

3. **Good and accepted system safety and transportation practices and procedures require a proper Hazard Analysis, applying the Department of Defense Standard Practice System Safety, MIL-STD-882E**

Since the New York City Subway system opened people have been stuck, maimed and killed by subway trains[10]. Once a hazard is identified, proper hazard and safety analysis requires the assessment to learn the probability of occurrence, and the severity of the injuries sustained by the hazard. A Risk Assessment Matrix is used for the necessary comparative analysis, a required step in perform of a proper hazard analysis. Proper methodology requires that any ameliorative or corrective action that may be used undergo this same comparative analysis.

---

[10] Bata Lines 205 3-9, Reuter

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

By following this well-established standardized procedure, one can objectively evaluate and compare the frequency and severity injuries from the system "as is" (with no changes), with the frequency and severity of injuries determined to exist for each of the proposed corrective actions. Then the corrective action needs to be reviewed and an objective comparative analysis must be conducted to reveal if the corrective action was effective, by seeing if the frequency or severity of the injuries sustained due to the hazard were mitigated. The agency then must take proper corrective actions and formulate safety plans using a proper and adequate System Safety Plan ("SSP") or System Safety Program Plan ("SSPP"), which must be periodically reviewed by reviewing the SPI data for effectiveness of the plan, and possibly revised. Corrective action must be taken until the hazard is removed or reduced to an acceptable level. If a hazard is frequent or probable and can result in a catastrophic or serious/critical injury, it must be corrected. A comparison may require trading a less frequent risk of injury or a less severe injury for a catastrophic injury.

Good and accepted transportation standards requires the TA to perform a proper hazard analysis and take corrective action to eliminate or reduce unacceptable hazards. . The national standard of care for hazard analysis, which has also been adopted by TA, is the Military Standard 882E or whatever version was previously in affect over the last 30 years.  This analysis requires NYCTA to classify hazards by assessing the severity (effects) of the hazard and the probability (likelihood) of hazard occurrence.  The hazard resolution for each risk level is determined in a Hazard Assessment Matrix. For example, a fatality or amputation caused by customer contact with a train (CWI) from access to the open track way is an event categorized as a catastrophic severity which occurs frequently based on NYCTA data and all testimony by current and former employees of the defendants in this matter. The data shows since 1987, approximately 3-4 times a week a customer is contacted by a subway.  This hazard is therefore a RAC 1A Frequent Catastrophic "high hazard" which is unacceptable and requires immediate corrective action. It also requires urgency to correct a "high Hazard" or reduce it to a lesser index. No such efforts by the TA were made in fact the TA used the potential of remote or improbable probability events as excuses not to implement corrective actions that would eliminate frequent catastrophic incidents, such rejecting certain barriers that would stop people being maimed 3 times a week because, once a conductor stuck his head out and hit his head on a column 5 years prior. MIL 882E is exactly the process that should the been applied to weigh the risk index and implement the plan that will result in the least probable risk or injury or both.

19

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



| Year | Incidents | Fatalities |
|------|-----------|------------|
| 1987 | 195 | 62 |
| 1988 | 227 | 57 |
| 1989 | 226 | 64 |
| 1990 | 193 | 64 |
| 1991 | 193 | 68 |
| 1992 | 160 | 61 |
| 1993 | 216 | 59 |
| 1994 | 199 | 60 |
| 1995 | 173 | 57 |
| 1996 | 165 | 52 |
| 1997 | 135 | 45 |
| 1998 | 150 | 25 |
| 1999 | 140 | 41 |
| 2000 | 121 | 43 |
| 2001 | 139 | 31 |
| 2002 | 136 | 46 |
| 2003 | 188 | 37 |
| 2004 | 158 | 35 |
| 2005 | 151 | 44 |
| 2006 | 109 | 38 |
| 2007 | 110 | 55 |
| 2008 | 120 | 34 |
| 2009 | 136 | 49 |
| 2010 | 127 | 51 |
| 2011 | 146 | 47 |
| 2012 | 141 | 56 |
| 2013 | 152 | 55 |
| 2014 | 152 | 55 |
| 2015 | 145 | 58 |
| 2016 | 172 | 50 |
| 2017 | 168 | 49 |
| 2018 | 189 | 68 |
| 2019 | 192 | 62 |
| 2020 | 170 | 62 |
| 2021 | 200 | 68 |
|  | 5694 | 1808 |

Miliary Hazard Analysis as contained the in the SSPP has the following provisions:

20

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## 6.2    Hazard Classification

As previously mentioned one of the methods utilized by OSS to identify hazards is the performance of a hazard analysis in accordance with Military Standard 882E. This methodology incorporates hazard classification by assessing the severity (effects) of the hazard and the probability (likelihood) of hazard occurrence.

To determine the appropriate severity category as defined in Table 6-1 for a given hazard at a given point in time, identify the potential for death or injury, environmental impact, or monetary loss. A given hazard may have the potential to affect one or all of these three areas.

Table 6-1 Severity Categories

| SEVERITY CATEGORIES | | |
|---|---|---|
| Description | Severity Category | Mishap Result Criteria |
| Catastrophic | 1 | Could result in one or more of the following: death, permanent total disability, irreversible significant environmental impact or monetary loss equal to or exceeding $10M. |
| Critical | 2 | Could result in one or more of the following: permanent partial disability, injuries or occupational illness that may result in hospitalization of at least three personnel, reversible significant environmental impact, or monetary loss equal to or exceeding $1M but less than $10M. |
| Marginal | 3 | Could result in one or more of the following: injury or occupational illness resulting in one or more lost work day(s), reversible moderate environmental impact, or monetary loss equal to or exceeding $100K but less than $1M. |
| Negligible | 4 | Could result in one or more of the following: injury or occupational illness not resulting in a lost work day, minimal environmental impact, or monetary loss less than $100K. |

To determine the appropriate probability level as defined in Table 6-2 for a given hazard at a given point in time, assess the likelihood of occurrence of a mishap. Probability level F is used to document cases where the hazard is no longer present.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Table 6-2 Probability levels

| PROBABLITY LEVELS | | | |
|---|---|---|---|
| Description | Level | Individual Item | Fleet or Inventory* |
| Frequent | A | Likely to occur often in the life of an item. | Continuously experienced. |
| Probable | B | Will occur several times in the life of an item. | Will occur frequently. |
| Occasional | C | Likely to occur sometime in the life of an item. | Will occur several times. |
| Remote | D | Unlikely, but possible to occur in the life of an item. | Unlikely but can reasonably be expected to occur. |
| Improbable | E | So unlikely, it can be assumed occurrences may not be experienced in the life of an item. | Unlikely to occur, but possible. |
| Eliminated | F | Incapable of occurrence within the life of an item. This level is used when potential hazards are identified and later eliminated. | |

*The size of the fleet or inventory should be defined.

Assessed risks are expressed as a Risk Assessment Code (RAC) which is a combination of one severity category and one probability level. For example, a RAC of 1A is the combination of a Catastrophic severity category and a Frequent probability level. Table 6-3 assigns a risk level of High, Serious, Medium, or Low for each RAC.

Table 6-3 Risk Assessment Matrix

| RISK ASSESSMENT MATRIX | | | | |
|---|---|---|---|---|
| SEVERITY ⟍ PROBABILITY | Catastrophic (1) | Critical (2) | Marginal (3) | Negligible (4) |
| Frequent (A) | High | High | Serious | Medium |
| Probable (B) | High | High | Serious | Medium |
| Occasional (C) | High | Serious | Medium | Low |
| Remote (D) | Serious | Medium | Medium | Low |
| Improbable (E) | Medium | Medium | Medium | Low |
| Eliminated (F) | Eliminated | | | |

Categorizing the hazards as depicted in the table allows for the hazards to be prioritized for corrective action. Categorization may be based on severity since not all hazards are of equal magnitude or criticality as the anticipated consequences of hazardous events may be minimal, while in others it could be catastrophic. Hazard categorization also involves the determination of the likelihood of a hazardous event actually occurring. The likelihood of occurrence can be assigned in non-numeric (qualitative) or numeric (quantitative) terms.

Page 6-4

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

6.3    **Hazard Resolution**

The hazard resolution for each risk level as determined in the Hazard Assessment Matrix is as follows: high hazards are unacceptable, serious hazards are undesirable and require a management decision to reduce the hazard, medium hazards are acceptable with review by management and low hazards are acceptable without review by management.

Therefore, the high hazards may require immediate corrective action, the serious hazards would require a management decision, while the medium hazards requiring management review would have a lower priority.

In addition to recommendations that result from the conduct of hazard analysis, OSS makes recommendations to resolve hazards identified as a result of inspections, surveys, investigations, reviews, trend analysis etc. The recommendations are submitted to the Department of Subways for corrective action and tracked by OSS until closure. Each section within OSS has developed a recommendation tracking database whereby recommendations are logged into the database and tracked until corrective actions are implemented and the hazard is resolved and tracked to closure.

**C.  Application of MIL-STD-882E requires an analysis of the hierarchy of safety solutions.**

Good and accepted transportation standards requires the application of the hierarchy of control to immediately correct the hazardous conditions. The hierarchy of control is a step-by-step approach to eliminating or reducing risks and it ranks risk controls from the highest level of protection and reliability through to the lowest and least reliable protection.



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

i. **Hazard Elimination**

Step one is elimination of the hazard if possible. Elimination removes the hazard at the source, in this case, with barriers to prevent or limit access from platform to the track bed. Examples include:

- Platform Edge Door ("PED") aka Platform Screen Door ("PSD"), which can be of various types and sizes, i.e., full height, ¾ and ½ height, ceiling mount or platform mount, and Automatic Platform Gates ("APG")s, which move horizontally, much like an elevator door, and
- Rope Platform Screen Doors ("RPSD") that move vertically, much like used by storefronts;
- Fixed Rail, a stationary guardrail (for those people who want to make use of an area of safety).

ii. **Engineering Controls**

If the hazard cannot be eliminated then engineering controls should be implemented to reduce or prevent hazards from coming into contact with passengers, such as with warnings to train or its operator that a person is on the tracks or at the edge of the platform.

- Track Intrusion Devices ("TIDs"), Laser Intrusion Devices ("LIDs"), pressure mats on track bed – to detect the presence of a person on or near the track-bed or edge of the platform, so that the train may stop or slow down before it even enters the station or as it does so, or
- Closed Circuit TeleVision ("CCTV") – cameras in station that view platform and tracks with live remote feed to operator or train so that they see a person on the tracks or near the platform edge before the train enters the station so that the train may stop or slow down before it even enters the station or as it does so, or
- Front Facing Cameras on front of train car with live feed to train operator before or as the train enters the station so that the train may stop or slow down before it even enters the station or as it does so.

iii. **Administrative Controls**

If engineering controls cannot reduce or prevent the hazards, then administrative controls should be established to reduce the duration, frequency, or intensity of exposure to the hazards. Examples of administrative controls include operation changes to the train such as reducing the train speed entering the station (so that it takes less distance to stop the train), outreach programs which highlight improper behavior (proven to be ineffective in NYC Subway System) and educate the public on proper and safe station behavior (proven to be ineffective in NYC Subway System), and connect help points directly to the train operator.

Below is a summary of the safety measures categorized within the hierarchy of controls.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| Elimination | Sub-stitution | Engineering Controls | Administrative Controls |
|---|---|---|---|
| Platform Edge Doors full height | | Track intrusion devices | Reduced Train Speed |
| Platform Edge Doors ¾ height | | Sight Distance Improvements | Monitor the station with staff on the platform and using CCTV |
| Platform Edge Doors Half height (APG) also automatic platform gates | | Better Illumination | Outreach educational programs |
| Rope Barriers | | Warning signs and announcements | Help points which connect to the train operator |
| Fixed Rail Barrier | | Unique warning messages | |

### D. Platform Screen Doors (PSDs), Platform Edge Doors (PEDs), and Automatic Platform Gates

Platform Screen Doors (PSDs), Platform Edge Doors (PEDs), and Automatic Platform Gates are platform barriers that that open or close simultaneously with the doors of the passenger train. PSDs and PEDs are generally floor to ceiling, and APGs are generally half height.

The primary reasons for using platform edge doors or gates is to save lives and prevent catastrophic, life altering injuries that occur multiple times a week in the NYC Subway System due to subways contacting individuals. Their use has prevented frequent catastrophic injuries, suicides, people on the platform edge being struck causing severe traumatic brain injuries, and generally protecting customers from entering onto the track or ROW.[11]  Platform edge barriers of any type have been effective globally in preventing passenger incidents on the tracks.

The doors, gates, barriers are effective in:

- Prevent catastrophic injuries due to accidental falls from the platform onto the lower track area, suicide attempts, and pushings of passengers onto the tracks or into the train.

---

[11] ROW or the "right of way" has been misused by the Transit Authority to portray anyone who enters the "right of way" to be an unauthorized person on the tracks or to be a trespasser, thereby shifting the responsibility of the safety of the subway system to the victim who is being catastrophically injured or killed.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

- Deterring passengers from jumping from the platform onto the tracks.

- Preventing passengers from being injured when leaning over and looking into the tunnel for an oncoming train.

- Improves station security and limits access to the track area.

- Platform Edge barriers are automatically controlled and provide a barrier to the tracks, allowing access only when a train arrives and stops at the station platform.

It is conceded by the TA that according to international best practices, benchmarks, and in compliance with professional standards of care and good and accepted practices and procedures, that PED/PSDs, barriers of any type are extremely effective at preventing or significantly reducing the number of catastrophic injuries and deaths caused by CWIs, and that each of the above measures has demonstrated effectiveness at reducing the number of these CWIs. Other systems have used these safety devices and have documented data and SPI that have been published and disseminated worldwide. The published data demonstrates the comparative reduction in the frequency and severity of injuries caused by CWIs, what, if any, new hazards actually existed or were created by the introduction of these corrective actions, and what the comparative frequency and severity of injuries caused by these corrective actions.

The TA, a member of some of various national and international metro organizations, has sent teams of its engineers and executives on international trips to personally observe PED and other safety devices in action, and to question their counterparts in those systems and question the manufacturers that installed the systems. The TA reported how the PEDs and Platform Barriers were effective at preventing catastrophic injuries caused by CWIs and the engineers there advocated their use.

Significantly, not only is there published data worldwide for these similar systems, in both Paris, France and London, England, the subway systems are older than that in NYC, are comparable systems, in London, over 23 years ago, they opened a subway line with PED, and Paris did soon thereafter, and both cities have done retrofits with great success. The TA was also well aware of the 10 subway stations comprising the "train to the plane" to JFK, all of which successfully and effectively installed full height Platform Screen Doors and in almost 20 years no one has been struck by a train at any of those 10 stations. The trips that the TA took and all documentation discussed.

**E. Failure to take corrective action.**

Using the proper Hazard Analysis methodology, following professional standards of care, and good and accepted practices and procedures, the foregoing required the NYCTA/MTA to have taken corrective action decades ago.

26

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

It is undisputed that the TA is aware of the carnage caused by CWIs for many decades, and that they have considered installing safety devices, like PEDs since the 1980s (Singapore installed a PEDs in their subway system 1987). In 2011, after the TA's Platform Door Task Force visited Seoul, Korea in January of 2010 and saw that the PEDs installed effectively prevented CWIs and that the PED system was installed at virtually no cost via an agreement to allow advertising revenue go to the manufacturers of the PEDs, and after some private companies offered such services to the NYCTA, the NYCTA published an RFI to the world to see if any Original Equipment Manufacturers ("OEMs") would be interested in installing PEDs in the NYC subway system at little or no cost to the NYCTA in exchange for the advertising revenue.

TA put out an RFI (request for information) and to do an installation of the PEDs in the NYC Subway System at little or no cost. Thirteen OEMs, some of the largest companies in the world offered to do so. The TA narrowed the list down to five. And then did nothing with regard to following this successful and established business model, a Build Operate and Transfer (BOT) agreement, similar to what is done for bus shelters. The TA similarly spurned funding for PEDs when building the # 7 Line extension to Hudson Yards, because they did not want to make it a standard for new construction to have PEDs or any types of barriers. No rational reason was offered as to the MTA abandoned this plan. It has not tried to get funding from the City, State or Federal government for Platform Barriers of any type.

The TA has failed to implement even the most basic corrective action of reducing the speed of trains entering the station. As requested, years ago by the President of the Transit Workers Union, who noted simply lowering the entry speed of trains as they enter stations would enable the trains to stop in less distance, and avoid running over at least some people, and save some lives and limbs. ==SPEED ADDRESS HERE== -

The TA argues that lowering the speed will causes delays and overcrowding due to not enough trains on the line. The TA also argues that they had a speed policy, but whatever plan they had was based on no study for the safety of people on the platform or that might fall onto the tracks. They did no hazard analysis as to the effects on safety for slowing down the trains entering the station and how many lives and catastrophic injuries they would save. They did not do an adequate study or evolve a plan with a reasonable basis for the speed of trains entering the stations. They gave many excuses that had no merit as to the risk assessment index.  More trains can be placed on the line to address any service-related concerns. The TA's claim that slowing the speed at which trains enter the station would increase crowding on the platforms and increase run times dramatically is simply untrue. (*See infra*, Point V).  In addition, while the TA designed posters and developed announcements to remind passengers of the dangers of falling on the subway tracks, these have not been effective. Additionally, at the Atlantic Avenue-Barclays Center station, none of these signs were present at the time of our most recent site visit. Presumably if these signs were truly safety measures then even if they were changed, damaged over the years they would have been replaced. If there were announcements they would have kept them.

27

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Another excuse given for not implementing Platform Barriers of some type are that the TA lack sufficient funds. The documents exchanged reveal this to be a continuing excuse. One such example is that a March 19, 2010 letter from the MTA to the PTSB stating "Given operational considerations and limited capital resources, MTA agencies are not able to "harden" the system in a way that would absolutely keep customers and trespassers from entering the tracks." This representation to the PTSB is problematic[12] for numerous reasons, but this claim is representative of the numerous claims over the years as cost being an impediment to making the system safer.

The excuse of cost rings hollow. As noted above, they could have used BOT agreements and had such safety devices installed at little or no cost, but they chose to forgo this reasonable plan. Similar to their refusal to seek funding for the #7 line extension, which would have required them to agree that the standard for new stations would include platform barriers, This plan was rejected in part because the TA would have a negative appearance and poor public image showing they don't consider passenger safety a priority look bad if they made a new standard, but didn't put the platform doors in the second avenue. This is a continuous theme of the TA executives being more concerned with how the TA looks instead of the safety of their subway system. The testimony is that they failed to seek funding from various sources for the installation of safety devices or measures. Moreover, NYCTA have spent millions of dollars hiring consultants not to perform an actual and proper feasibility study, but instead to perform "infeasibility studies designed to delay actual changes to remediate a known and recurring hazard, and disregarding the advice offered by some of these consultants, changing the scope of work, cancelling projects.

Not only did they reject the BOT agreements, adopting a new standard for new systems that all other systems in the world have and although they told the PTSB it would be too costly, President Reuter testified much differently: 68:24 - 67:8

> Q So you're saying funding was not an issue about preventing people from getting hit by trains when you were president?

> A Uh, we -- if we had found a -- a solution that we thought was going to be effective to do that, we would have fought pretty hard to get any

---

[12] This is a clear violation of MIL 882E and its prior versions to reject a corrective action plan or safety measure that does not "absolutely keep customers and trespassers from entering the tracks would", if that plan would reduce a frequent risk of hazard to a less frequent hazard. It is clear that the TA improper hazard analysis, if any, that was done by the TA in 2010 when they informed their oversight committee that unless they "eliminate the possibility of a customer entering the track", which an F level frequency on the MIL 882 index, which is considered incapable of occurrence and per se an improper analysis until after the corrective action plan is reviewed for effectiveness

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

funding necessary. I dare say we would probably have been successful if we would have found a solution.

The funding could have been requested in the early 2000s which would have saved thousands of catastrophic injuries. The emails show absolutely no sense of urgency in violation of all good and accepted transportation practices. There are documents as far back as 1999 and 2002 where the TA claims all of the challenges have been known for many years had they at that time implemented corrective action plans instituted safety measures they would have been in place by August 2, 2016 and Ms. Harger would still have all of her arms and legs.

F.  Overcrowding is not a cause of CWIs

Another false excuse used by the TA to avoid implanting safety measures is that platforms can become too crowded and that crowding is a cause of CWIs and injuries. The TA uses this as an excuse to avoid slowing down trains for safety and that the possibility the safety measures such as PES will cause delays, creating crowding. These claims were purely speculative as to CWIs or any injuries being caused by crowding. The data that the TA ignored which was accessible to them based on the thousands of cases they have investigated over the last 25 years contain the time and location of each and every CWI which they collected but failed to study.[13] The TA while refusing to slow down trains due to the dangers of crowding, was at the same time reporting to CoMET that most CWIs were on weekends and at night not during rush hour. The TA never did a study or a hazard analysis for this erroneous proposition.

In an email dated December 29, 2020, Glenn Lunden, who was the Acting Deputy Chief of Rail Planning at the time, seemed to admit that crowding has nothing to do with CWIs:

> "One of the issues that as debated when we debated platfom doors was how crowding in the subway affected the likelihood of riders being stuck by a train … This article from The Daily News appears to reinforce the lack of a linkage between crowding and passengers struck by trains … Mind you, the article doesn't discuss platform doors. And maybe some of the stats are wrong (the 75% drop in ridership is an old number) — but it struck me that, if these 12-9 numbers are right, this is strong indication of the lack of correlation between crowding and 12-9's. NYCTA"

Similarly, at his deposition Mike Sullivan testified

---

[13] The records reveal that the NYCTA\MTA continuously refers to surveys and the collection of data as "studies". Surveys and collecting data and presenting data is not engineering study, not a valid and proper hazard analysis under 882a-e or nor can a plan have a reasonable basis if it relies only on surveys and collections of data rather than full studies to formulate corrective action plans.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Q So, if the ridership is down and the platforms in the stations are less
crowded, but the 12-9's stay constant and consistent, can we
agree that crowding is not the cause of the 12-9's?
A Yes.

Sullivan 276 line 5

Q What if any role does crowding or
overhead crowding have on 12-9's?
A I'm not aware of any.

Lines, 8-10:
Q Does the transit authority know the
exact time and location of every 12-9?
A Yes.

According to testimony in this matter there is no correlation between the CWIs -
high hazard of being struck by a train and crowding on platforms. The crowding excuse
has been debunked; most such incidents occur when the platforms are not crowded.
Along with testimony the data shows that when ridership was at an all-time low during
pandemic, CWIs were at an all-time high over the last 25 years. Moreover, when CWIs
occur, there is a disruption in service, resulting in more crowding, yet no there is no
corresponding data showing an increase of CWIs occurring.

## G.  Use of Platform Edge Doors / Barriers Globally

Platform edge doors (PEDs) are used in transit systems in a number of countries
around the world. (see appendix for pictures) Wikipedia article which was circulated
among  TA executives shows more than 75 Countries have some type of Platform
barriers.  Some examples include:

- Singapore: The Mass Rapid Transit (MRT) system in Singapore has been using PEDs
  since its inception in 1987.
- Japan: PEDs are widely used in Japan's urban transit systems, including the Tokyo
  Metro and the Osaka Metro.
- South Korea: The Seoul Metro began using PEDs in 2009.
- China: PEDs are increasingly being adopted in China's rapidly expanding transit
  systems, including the Beijing Subway and the Shanghai Metro.
- United Kingdom: PEDs have been installed in several stations on the London
  Underground's Jubilee and Central lines.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

> *i.  TA's Trip to Korea Report for the Evaluation of Platform Screen Doors in the Seoul Metropolitan Rapid Transit (SMRT) System (January 23 - January 28, 2010)*

The TA issued a report following their trip to Korea. The report stated that the SMRT (Seoul Metropolitan Rapid Transit Corp.) has been using platform screen doors (PSD), as well as platform edge doors (PED), and platform edge gates (PEG) for approximately 15 years. Platform screen doors extend from platform to the ceiling above and provide a complete separation between track and platform. Platform edge doors do not extend all the way to the ceiling and are typically installed in Seoul stations where there is a very high ceiling. Platform edge gates are a half-height version of the platform edge doors. The primary reason platform screen doors were installed in Seoul was to prevent suicides on the system. <u>This goal has been met and there have been no suicides on the system since installation</u>. However, it is also an indication of the effectiveness of platform doors to prevent anyone from getting to the tracks whether it is as a result of accidental fall, intentional pushing, criminal intent, vandalism, security compromise, or homeless refuge. The PSDs in Seoul also provide the benefit of reduced noise, reduced migration of steel dust to the platform, and energy savings for the HVAC system.

The TA trip to Seoul, South Korea for the evaluation of platform screen doors in use on the SMRT system provided a very detailed look at the doors in actual operation in the Seoul subway system as well as a thorough review of the platform screen door products at two manufacturers. <u>The preparation on the part of the SMRT system and the manufacturers was extensive in every respect and the doors were demonstrated to be a reliable, effective method for providing a separation between passengers and the right-of-way.</u> Particular issues in the NY subway system that differ from Seoul were discussed. These issues include: impact on piston-action airflow in stations, structural attachment, train stopping position, door monitoring, control and communications, mounting of equipment in the cab and wayside, train operations, and emergency service personnel. There is sufficient merit in the platform door system to warrant a more thorough review by other stakeholders. It is recommended that TA procure two modules of the platform edge door system, rather than the platform screen doors, for the purposes of testing, evaluation and demonstration in the TA subway system.

The records show again that the TA ignored its own recommendation to" procure two modules of the platform edge door system, rather than the platform screen doors, for the purposes of testing, evaluation and demonstration in the TA subway system." This is not simply a choice since the goal is to correct and unacceptable hazard, not obtaining these modules and testing them for a proper study is a violation of good and accepted transportation practices and procedures.

> *ii.  Trip to London and Paris June 2016.*

According to the TA records, six and a half years after the Korea trip Five (5) New York City Transit senior managers and several individuals from their consultant,

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

STV, traveled as a collective team to London, England and Paris, France to research PSDs installed in their metros, as they were considered the most comparable to the NYC subway system.

The report says "the purpose for this trip was to provide the NYCT senior-managerial team with a broader understanding of metro based PSD systems, as well as a better understanding of the challenges encountered by the installation of PSD systems in heavily used metro networks." The records go on to state, "As part of the investigatory process, the NYCT team interviewed various agency and manufacturer subject matter experts and documented its observations at locations where site visits occurred."

Specifically, the team met with the following PSD manufacturers:

• Faiveley Transport
• Gilgen Door Systems AG
• Westinghouse PSD (headquartered in London)
• ClearSy System Engineering

and interviewed representatives from the following agencies:

• Regie Autonome des Transports Parisians (RATP) Paris
• Transport for London (TfL) — London.

These interviews. along with the site visits, allowed TA's team to be educated on PSD manufacturers, products, technologies, controls, safety systems, operations. the implications of retrofit stations, the interfaces with car borne systems, and the user experience.

The sum and substance of the trip was that all the other agencies were very successful with Platform Edge Barriers of all types, and retrofitting same, which the MTA already knew from their prior trip and their membership in various transportation agencies. All of the agencies that installed the Platform Barriers reported success and the project narrative states:

STV consultant drafted a report entitled "Platform Screen Doors International research Report" dated December 2016. Outtakes from this report state:

In 2012, 141 people were struck by trains in the NYC Transit system. 55 were killed and there were 33 suicides / attempted suicides. These occurrences have occurred through the pushing of customers, leaning over the platform edge, medical conditions, trips and falls, or intentionally entering the track.

In other cities, similar types and numbers of accidents and fatalities were reported by the metro agencies. These incidents, resulting from open track ways, have been nearly

32

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

eliminated through the installation of platform screen doors (PSDs) and automatic platform gates (APGs) on the platform edges where they have been installed.

There is also an introduction including the same challenges to installing Platform Edge Barriers that have existed since the system was built and that they have otherwise known they needed to address for over 25 years.

### H. Feasibility Study published February 2020

At some point prior to 2020, the TA converted a contract with STV to conduct a pilot PSD program into a Feasibility Survey which was misnamed a Feasibility Study[14] which was actually infeasibility survey.

According to the documents exchanged, NYCTA contracted with STV to do a system wide survey which began in 2017 and was completed in 2019 and then published in February of 2020[15] to ascertain which stations were feasible for the installing, operating, and maintaining a platform barrier system in the New York Subway system based upon the criteria that the TA provided to STV. The language in the published report as to prior evaluations of the system were not based upon valid transportation engineering studies nor were the conclusions.

Allegedly the types of barrier systems assessed included:

1. Platform Screen Doors (PSD): full height
2. Automatic Platform Gates (APG): half height
3. Rope Platform Screen Doors (RPSD): vertically opening gate system

Notably originally Fixed Rail was included and then was eliminated without any study, analysis or reasonable basis.

Feasibility Study Scope and Schedule: The report claims that in March 2017 STV began the study of all 472 subway stations to determine the feasibility of installing fixed railings, PSDs, APGs, and/or RPSDs at each station (nominally 472 stations) and every platform (more than 1200 platform edges). The report additionally alleges that NYCT worked together with STV to assess the feasibility of installing the various barrier technologies via the development of screening criteria that defined 'fatal flaws' and/or critical cost factors. The report identifies but does not come up with solutions for any of the challenges that they identify from establishment of minimum space requirements for PSD control rooms or minimum clear space for APG/PSD components at the platform edge. Most egregiously while the TA claims that it used the ADA code to determine if

---

[14] For consistency we will continue to refer to it as a Feasibility Study
[15] Prior to 2010 multiple companies approached the TA to do the installation of PSDs for little or no cost.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

the Platforms were feasible for ADA compliance, in fact the TA used its own criteria and not the ADA code to determine compliant egress widths. This allowing for more infeasible stations supporting the predetermined outcome that very few stations would be feasible. The report claims that STV developed the screening criteria with TA project leadership, but the testimony states otherwise and that STV did what they were told and used only the criteria that the TA directed STV to use.

The report notes that Fixed railings were eliminated early in the study due to expressed concerns by NYCT OSS and MOW regarding the potential injury they could cause to customers due to door dragging incidents. The TA in fact made this determination in violation of good and accepted mass transit safety engineering and hazard analysis practices and procedures as no study was done. This rejection of the fixed rail was in direct violation of MIL 882E hazard analysis as draggings are remote and CWIs are frequent.

The RPSDs were assessed in a survey which was in no way a study and they also were rejected in violation of good and accepted transportation practices and procedures without doing a proper hazard analysis, and without any site visit. The TA removed RPSDs from consideration, based in part on alleged hazards which were never analyzed and were not supported but their own investigation contained in STVs Rope barrier report. There is nothing in the rope barrier report that indicates that the Rope Barriers were more hazardous than leaving the system "as is". The Rope Barriers also solved many of the TA's alleged "challenges" including fleet door alignment. It should be noted that in the report as well as in the Feasibility Study that Rope Barriers are not identified as saving lives or preventing people from getting struck by trains, which is their most important and effective function.

Feasibility Results: The STV report and survey states as of the date of the report the NYCT Subway system features cars with three different door alignment profiles on the A Division and three on the B Division. The car types in each division are mixed among Subway Lines within their respective Divisions. The different spacing of doors on these cars makes installation of platform doors infeasible at most stations today. However, NYCT plans to complete the procurement of new rolling stock, per division, with nearly identical car geometries/door spacing, by 2033.

This claim is simply not accurate nor is it impossible to run the same trains on the same lines if the TA chose to do it. If it were true that the TA needed 13 years to homogenize its fleet, it was on notice in the 1980s that they needed to do so and the and had they started that plan then by the 2000s this challenge would been eliminated. Instead, the TA violated good accepted safety transportation practices and procedures and MIL 882E and its prior versions by accepting an unacceptable Hazard that the TA knew needed correction and could have been corrected long before Ms. Harger's incident.

The report goes on to state:

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

"Accordingly, STV's assessment assumes homogenized car classes, per division, by the year 2033. PSD were deemed feasible at as few as 3% and as many as 75% of stations on a given Line. Overall systemwide feasibility is 27%, or 128 of the 472 stations studied. The report alleges that due to door misalignments, PSDs could only be implemented at 41 of the 128 stations, with implementation for the remainder being possible as car types (geometries/door spacings) in each Division/Line get progressively compatible by year 2033. Despite getting this information as the survey progressed the TA did nothing to look to see how to adjust criteria, design, operations to enable a more immediate corrective actions to address this unacceptable hazard."

The summary causes of the claimed reasons for infeasibility of stations are broken down in the table below:

| REASONS FOR INFEASIBILITY | | |
|---|---|---|
| Causative Factors | Number of Infeasible Stations* | Percentage of Infeasible Stations |
| ADA Clearance | 154 | 43% |
| Structural integrity of elevated Pre-cast Platforms | 100 | 28% |
| Fleet Misalignment** | 31 | 9% |
| Columns too close to edge | 30 | 8% |
| No Space for PSD Equipment Room | 21 | 6% |
| Gap Fillers | 1 | <1% |

Above figures are for the year 2033 assuming procurement of new rolling stock occurs as currently scheduled.

*Some of the stations serving multiple Subway Lines may be feasible for one or more Lines but not all (on one or more platforms), therefore aggregating station counts for feasible and infeasible will exceed 472

**Car class compatibility will not be achieved on certain lines regardless of rolling stock changes due to dimensional differences between 8-car (M & G trains) and 10-car trains

## I.  Failings of the Feasibility Study

35

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

The document that is alleged to be a feasibility study is actually a survey to identify which stations could have full height or half height platform edge doors based upon criteria that the TA gave to STV. It was not a scientific study because the TA failed to apply a rigorous scientific approach to the hazard of passengers being struck by trains either on the platform or after falling on the tracks. The Hazard Management Process, Military Standard 882E and any prior applicable version that were in effect in the past, have been adopted as the standard at TA, but was not applied to any assessment of the hazard or feasibility of solutions. The study is actually an infeasibility survey. The study is focused on the challenges of each safety measure rather than finding a safety solution and corrective action plan that was effective. Other transit systems in the US, Europe and Asia have successfully implemented platform edge barriers of all types to eliminate the hazardous conditions cause by open access to the track. In many of these cases the transit system also faced unique challenges that required the platform to be retrofitted.

Examples include the Paris and London transit systems[16]. The TA has chosen not to implement any effective initiatives to eliminate or reduce accidents due to passengers getting struck by trains on the tracks in violation of good and accepted transportation system standards, practices and procedures.

Below are the additional failings of this survey alleged to be a study:

i. ***Hazard Analysis Standard***:

According to the Hazard Management Process (Military Standard 882E ), a fatality or other injuries such as amputations, traumatic brain injuries and other life altering catastrophic injuries from customers being struck by trains due to the open track way occurs frequently based on NYCTA data and testimony, is categorized as "catastrophic severity". This hazard is therefore a high hazard which is unacceptable and requires immediate corrective action. The "Feasibility Study" failed in numerous ways to use the MIL Hazard Analysis to accept or reject proposed changes to the criteria or look for other ways to eliminate or reduce a "High Hazard". This survey allows for no corrective action until 2033 which is unacceptable.

ii. ***ADA Clearance***:

The reason given by the TA for infeasibility of the within station was ADA clearance. The ADA clearance compliance should not be a reason to identify 154 stations as infeasible, or the station in question or to use as an excuse for not implementing PEDs or other platform barriers. At the time of the report most of the NYC transit system stations were not ADA compliant. The ADA code for wheelchair accessibility clearance requirements for existing stations, is that there should be wheelchair access to one door of every train (not every car) to have a clear path to an elevator.

---

[16] President Prendergast said that these systems were closest in comparision to the NYC subway system.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

     As not every station has an elevator, those stations without elevators are already in violation of the ADA, and since customers in wheelchairs cannot access the platform, this is a disingenuous claim for such station because installation of PEDs or barriers will not change their ADA status. Additionally, waivers/variances may be obtained if not already unnecessary because said stations are "grandfathered" in for "acceptable" non-compliance with the ADA.

- Assuming a station has an elevator to accommodate a customer in a wheelchair, the TA policy allows for gap distances[17] between the platform edge and the doorsill of the cars that is excessive and in violation of the ADA; the gap is often too large for a wheelchair on the platform to access to the train car and visa versa. Some of this is because defendants have an excessive Limited Line of clearance (LLC) that is not necessary[18]. If a wheelchair cannot get on or off a train car, the station is in violation of the ADA, and installation of PED will not change this either; if in violation already, installation of PED will not alter this status. TA has claimed that while it is acceptable for them to violate the ADA with respect to elevators and gap distances, they have instructed their consultants not to comply with the ADA requirements in performing their surveys, but to exceed those requirements of the ADA to justify rejecting installation of PEDs. If STV would have used the actual be ADA code more stations would have been designated as feasible. The testimony was clear that no survey was done to see what stations were compliant with the actual ADA code and not the TA's criteria that every door in every car has to be wheelchair accessible, which it isn't now.

- The claim of 154 Stations being "infeasible" due to wheelchair clearance codes is erroneous and not based on good and accepted transportation practices and procedures. It should be noted that they are claiming that wheelchair clearance is valid at stations but traversing the yellow tactile strips is required, which is in violation of the alleged safety plan of the TA that no one should be on the yellow tactile strips when the train is not in the station. They are actually putting the disabled people in as close proximity as possible to the edge of the platform to support their

---

[17] The TA policy for tangent tracks such as the track at the within station is 6 inches horizontal and 6 inches vertical. Pursuant to the 1987 Gunn Memo, routinely exchanged by the TA in gap cases where they are trying to claim that a gap is within their tolerance limits.  ADA gap tolerance for existing stations is 4 inches horizonal and 2 inches vertical so that wheelchairs can access subway cars. At the station in question there are numerous vertical gaps exceeding the ADA code.
[18] STV asked the TA to reduce the conservative Limited Line Clearance to enable more train stations to be feasible and the TA refused.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

claim of wheelchair clearance, which is unsafe from a transportation ADA perspective.

- The Feasibility report also states that the station platforms in the entire system are defined as "existing". That is accurate and would come and installing PSDs or other barriers would be termed "retrofitting". The next thing report goes on to say which is that "the application of the law is often left to interpretation of the code official when it comes to incremental capital improvements to a non-compliant facility". There is no facility for an official to change the code. The facility ether meets the ADA code or it does not. If the TA wants to have a stricter narrower requirement, that does not change the code. What the TA did here was use the Code as cover for its own standard which far exceeds the ADA, yet claim to the public and force its consultant to claim, that its standard is the ADA code when it is not.  The report goes on to say: "In meetings with NYCT ADA code officials, our team came to understand the following specific application of ADA law to the NYCT system". This is also incorrect. STV is hiding the fact that the TA told them to use their own standard and ignore the code when it comes to PSDs. There is no special application of the ADA law to the NYC System that has been provided in this case.

- The simply  no requirement to make the gap at the 30 doors compliant with the ADA and this is not a code,  it is a subjective directive that was not subject to, study, analysis for compliance with the SSPP  or any hazard analysis,  if this report were to be followed   now future customers at 154 stations will be exposed to an unacceptable hazard.

- Regarding movement along the platform (parallel to platform edge), the platform edge barrier cannot preclude ADA movement where it currently exists. This is applicable even if a second parallel route exists on the other side of the platform. (An existing 32" point of constraint between the edge of platform and a column is considered a compliant passageway, even if it is less than optimal.)

The TA is requiring wheelchair access to include travel along the  yellow tactile strips which is unsafe and violates good and accepted mass transit practices and procedures and the TA's own alleged safety plan.

The above information is related to the ADA but most of the requirements above, exceed the ADA and are designed to force 154 stations to be classified as Infeasible due to the need for ADA Clearance in order for the TA to accomplish their self fulfilling prophecy that there will never be platform edge doors in the New York City Subway System.

     iii.  *Structural Issues*:

Electricity issues - Additional power lines can be added and wired to existing stations. <u>Concrete issue</u> - Bereft of any actual testing, boring samples etc., NYCTA have opined that some platforms could not support the weight of full height PSDs. NYCTA

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

has failed to note that this is a fixable problem. Supports can be built. There are different types of concrete. In Paris, this challenge was met successfully. The platform all have a "life span" and need to be re-done approximately every 10-15 years, and can be re-done in a manner that meets the challenges. TA engineers requested that the replacing of platforms not be used as a reason to designate platforms "infeasible", again that request was denied. NYCTA has failed to consider "work arounds" to make their stations as safe as possible and ADA compliant, such as constructing PSDs of alloys that are lightweight, thinner and place less of a load on the platform structure and occupy less space than claimed; ordering homogenous fleets of train cars; reducing the LLC; using different types of barriers (such a RPSDs, dynamic PSDs), fixed rail or PSDs only where there is sufficient space for them, using the other devices or methods noted above.  Some of the largest companies in the world, OEMs, have carefully studied the issues and their engineers believe that all challenges can be met. In Shanghai they also found a cost-effective way to shore up the platforms.

At no point was any consideration given to partial coverage of the length of the platforms to afford some safe zones if they could not do the .

The below from is an appendix from the Feasibility Study

39

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

---

Appendix A – Tier 2-3 Technology Assessment (Summary of Sections 2.0 through 5.0)

| Assessment of Platform Screen Door Technologies | | | | | |
|---|---|---|---|---|---|
| **Assessment Factors** | | | | | |
| **General Factors** | **Specific Subfactors** | PSDs | APGs | RPSDs | **Grading system** |
| **1. Safety** - What are the relative benefits of this technology to public safety? | | | | | 0 - 5 (with 5 highest benefit) |
| | Protection to the public | 5 | 4 | 1 | higher the number the better |
| **2. Capital Cost** - What is the anticipated relative installation cost of this technology? | | | | | 0 - 5 (with 5 lowest cost) |
| | Cost of technology itself | 2 | 3 | 3 | higher the number the better |
| | Cost of impact to existing station systems | 2 | 3 | 2 | *RPSD's have not been priced |
| **3. O&M Cost** - What is the likely relative operations and maintecnce cost of this technology? | | | | | 0 - 5 (with 5 lowest cost) |
| | Number of motors/elements requiring service | 3 | 2 | 4 | higher the number the better |
| | Ease of cleaning glass | 1 | 2 | 5 | |
| | Ease/number of sensors requiring maintenance/cleaning | 3 | 3 | 3 | |
| **4. Operations** - What is the impact of the technology on current operations protocols? | | | | | 0 - 5 (with 5 lowest impact) |
| | Extent of changes in protocol for train operations | 1 | 4 | 1 | higher the number the better |
| | Extent of changes to maintenance protocols | 1 | 1 | 1 | |
| **5. Risks** - What are the foreseeable risks in safety and operations of this technology? | | | | | 0 - 5 (with 5 lowest risk) |
| | Risks to conductors | 1 | 5 | 1 | higher the number the better |
| | Risks of entrapment | 3 | 3 | 1 | |
| | | | | | |
| **Raw Score** | | 22.00 | 30.00 | 22.00 | |
| **Weighting of the Factor No.** | **Weight of Each Factor** | | | | |
| 1. | 25.0% | | | | |
| 2. | 20.0% | | | | |
| 3. | 20.0% | | | | |
| 4. | 20.0% | | | | |
| 5. | 15.0% | | | | |
| **Weighted Score** | | 4.30 | 5.05 | 4.20 | **Highest value is best** |

| Technology | Comments |
|---|---|
| Platform Screen Doors (PSDs) ( > 8' in height) | Recommended for new underground stations; benefits air tempering and smoke control systems; not recommended for existing stations as impact to existing systems, particularly station ventilation, are too high |
| Automated Platform Gates (APGs) ( < 6' in height) | Recommended for existing underground, open cut, and elevated stations where feasible; provides most of the benefits of PSDs with marginally lower cost and fewer impacts to existing systems and existing operating procudures |
| Roped Platform Screen Doors (RPSDs) (full height vertical lift rope screens) | Guillotine operation is not intuitive; risk of head injury during closing or pinching of fingers & hands; vertical lift requires additional height (10"-0" min.); technology has very limited use worldwide; horizontal cables encourage climbing |

*Figure 1 - Platform door technologies; comparative analysis. Note: RPSD costs are "order of magnitude" based on costs of similar systems.*

There is no data or scientific, engineering analysis, that is identified in the "Feasibility Study" to support the above conclusions and ratings in this Appendix. These are simply the speculations from the TA. STV testified that the TA did the risk assessments and there is no evidence that a proper hazard analysis or risk assessment was done using any scientific methods or the MIL 882E for any part of the report. Fixed Rail was removed from this chart. The Rope Barrier rating of least effective is used to support the rejecting of a very safe alternative compared to doing nothing. The Rope Barriers

40

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

would solve the fleet alignment challenge and are lighter than the PEDs and thinner so
many more stations could have been feasible using this technology that was never
properly studied before it was rejected.

The TA's Rule 30(b)(6) witness, Eric Jones, testified that no hazard analysis or
even a site visit was made for the Rope Barriers prior to rejecting them.

If a proper and adequate feasibility study was to have been performed, the
purpose and goal of this study would be to see how to best implement a System Safety
Plan (SSP) that requires corrective action by installing PEDs or similar safety devices—
in other words, *which* safety device works best *for each different station,* or what
modifications, if any, were needed to accommodate these differently configured stations.
To perform a proper feasibility study, a pilot project may be necessary, as a test run and
for comparative analysis. None was done for any of the safety measures that could have
helped prevent the plaintiff's accident herein. There was a TIDS pilot and there was no
records of them causing additional hazards and the pilots should have been done years
prior to plaintiff's incident so that by the time she was in danger the TIDs could have
helped save her from the injuries she sustained.

STV requested small changes in operations that were all rejected such as changes
to clearance, allow slower trains in the station, even slight changes such as stopping the
train just a few feet different in a station where only one door was implicated at the very
rear of the train. Even this request was refused which shows the true goal of the study to
make an appearance that it is impossible to put in the platform edge doors so that this
"will blow over" as President Prendergast said. It shows the dishonesty of the Feasibility
Study

Here, the TA's goal in publishing the Feasibility Study was clearly to provide an excuse
for why the TA had not implemented any corrective measures, despite knowing that
PSDs and other safety devices were available for decades that could have stopped and /or
prevented the catastrophic hazard of people being struck by trains.

For example, in an email dated April 20, 2019 there was an exchange between
STV and the TA that shows the utter disregard for safety and demonstrates that the goal
of the Feasibility Study was to demonstrate that PSDs were not feasible. (NYCTA 2
00319919).

> "We have another situation — similar to our discussion
> below On Central Park West, the IND stations of the B and
> C trains are stacked, northbound on top, southbound on
> bottom. Two of these stations are feasible at one level but
> not the other.
>
> Please give your recommendation regarding feasibility at
> the stations."

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

(NYCTA_2_00319919)

The response was by Eric Jones, the TA's Rule 30(b)(6) witness in this case, the person in charge of the feasibility study or the contact liaison for STD. was that that if one side of the platform is infeasible then the whole station should be declared infeasible. The response from David Foell, the Rule 30(b)(6) witness produced by STV, was that at 34th Street, they had previously found that the E-train platform (which is not an island platform) was feasible, and so he would change that finding to declaring that the E train platform was infeasible (based on the email from Mr. Jones). In other email exchanges they reference doing this at other stations and even stacked stations where a station one level is feasible and on another it's not, the response from TA was make it all infeasible. Presumably this study will be used, and the TA is now subjecting all the future customers that could have been protected exposure to an unacceptable hazard, without a study, or slightest consideration of the safety of the future passengers that could have been protected but now will not be.

This email demonstrates that the TA was never concerned about maximizing customer safety, because the decision to declare that the E train platform at 34th Street and 8th Avenue was "infeasible" for PSDs was simply untrue.

## J.  The TA did not conduct proper engineering or transportation studies.

The voluminous documents and emails that were exchanged by the TA in this matter all refer back to "studies" of CWIs. However, based on my review of the voluminous documents in this case, the TA never conducted a proper or scientific "study" in this case regarding CWIs or installation of PSDs.

The TA did conducted "investigations", but none followed the proper protocols to be considered a safety "study".

The requirements for an appropriate feasibility study for the transit system that has an engineering basis that can be rationally relied upon require the proper application of engineering analysis principles. These principles require the use of the scientific method, identifying the problems to be studied and the principals to be examined, collecting data, taking measurements, establish valid sampling procedures, collecting and applying statistical analysis, and applying engineering principles and safety considerations to the entire subway system. Examining one line, which is not typical of the subway system and utilizing this information to form an opinion (suggestion) without any objective analysis to support it is simply inadequate.

A study has specific scientific meaning, it is not just simply the collection of relevant information, but the analyzing of data and how the information reflects upon the conditions being studied.  A suggestion based upon assumptions, presumptions, guesses and public opinions have no place in science and do not constitute an

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

engineering study. A proper and adequate study would examine and analyze the entire problem or at least a statistically valid sample. Then ascertain the root cause of the problem, formulate a corrective action and study the effectiveness of the corrective action. IN transportation systems routinely the different metro systems see what technologies the others are using and that informs them of whether the technology is safe or not. The TA learned that various technologies were safe but refused to implement them and then set up a sham feasibility study to support that decision.

The TA has known of the dangers and hazards of the subway system for people being struck by trains, has collected the information, and done absolutely nothing with the date to formulate a plan had to reduce the "carnage" as President of the TWU referred to it.

### K. TA violations of the standards of care.

#### 1. Standard: Safety and hazard analysis

<u>Compliance</u>: There is no evidence that TA performed a proper analysis of the hazards of open access from their subway platforms onto the adjacent track/track bed, and specifically the hazardous conditions of the Atlantic Avenue-Barclays Center station. Further, NYCTA failed to properly review and evaluate to see whether the measures taken were effective; they were not. As a result, there has been no reduction in CWIs since the institution of these measure long ago. Additionally, people get "message fatigue", signs are not posted and announcements not made, and the "help points" have not saved a single life.

In performing this analysis, TA should consider performing the following:
- proper and adequate comparative hazard analysis and risk matrix
- proper and adequate safety studies
- safety study or plan for the subject station
- conduct a pilot project for PEDs or similar safety devices (cancelled such pilots)
- implement corrective actions based on the analysis and pilots

Additional actions:
- safety management systems (SMS) for incident reporting and trend analysis
- reporting mechanism for hazards (e.g., from signal issues to visibility issues) through the safety risk management program
- near-miss reporting and analysis
- state safety oversight agency requirements
- accident/incident investigation (incorporate defensive rail operations program into investigation process to learn if operator was operating defensively, what hazards and distractions existed, and what corrective actions can be taken)
- degrees of awareness/degrees of difficulty in operation and whether/how this should be taught (e.g., a grade crossing with a higher-than-average rate of events)
- job hazard analysis

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

### 2.   Standard: Training

Compliance: There is no evidence that TA properly trained the train operator and other TA staff. Training is a critical part of the proper execution of the duties of the operating personnel, and this also applies to the effective response in situations of a passenger in danger, which when not properly followed through can result in the very highest risk to the passenger. It is a common practice at most railroads to explicitly require train crews to observe conditions at the platform and tracks when arriving at a station.

Background: Standards of Care for Training

a) APTA RT-S-OP-013-03, Authorized September 28, 2003, Operating Practices, 13. Standard for Training of Rail Operations and Station Operations Personnel
This Standard outlines the basic elements required for a comprehensive rail and station operations employee training and retraining program. This Standard is intended to provide the training requirements for rail and station operations employees. The rail system should also have a system to track performance to measure the effectiveness of training.

The purpose of a comprehensive training program is to ensure the consistent and complete training of all appropriate rail and station operations employees covered by this Standard. Such a program requires employees to have a base knowledge that is consistent with their particular job. The program also ensures that the rail system provides initial certification and refresher training.

b) APTA RT-S-OP-011-04, July 26, 2004, Volume 4 - Operating Practices, 11- Standards for Rule Compliance and Implementation. This standard provides minimum rule compliance requirements for rail systems to ensure their approved operating rules are implemented and followed according to the standard stated within their rules and guidelines. Operating rules are created to promote safe, efficient, timely, and customer-oriented operations.

### 3.   Standard: Defensive operations programs to reduce the potential for incidents.

Compliance: There is no evidence that NYTCA developed the following defensive operation programs that could have prevented incidents such as the incident with Ms. Harger.
- Consider the relationship between the administration of the defensive operations program and their safety management system
- Evaluate techniques for train operators to use that promote defensive operation
- Integrate defensive rail operations guidance into existing train operator training curricula

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

- Consider impacts of hours of service and scheduling on a train operator's ability to operate defensively
- Pointing and calling, which is a method in occupational safety for avoiding mistakes by pointing at important indicators and calling out the status. Making large gestures and speaking out the status helps with focus and attention. It requires co-action and co-reaction among the operator's brain, eyes, hands, mouth and ears.
- Defensive driving techniques such as regularly scan the horizon, read every sign, and take other actions that promote awareness and attention to the changing environment.
- Visual scanning of immediate and distant viewpoints.
- The art of focusing as related to the provisions of this recommended practice.
- The concept of seeing the environment for the first time every time (e.g., do not assume the signal will always be red, or always expect to react in case the designed elements are not functioning correctly).

### 4. Standard: Policy and procedures to protect passengers on the track

Compliance: There is no evidence that TA developed the proper policy and procedures to protect passengers on the tracks. The policy and procedures should establish defensive operation instructions, measurements, and guidance for train operators. The policy and procedures should provide an overview of what defensive operation for a train operator entails and explain how to communicate expectations for defensive operations and measure train operator performance. There should be policy and procedures for measuring the results of the defensive operation program and taking action based on those results.

### 5. Standard: Safe Zone

Compliance: There is no evidence that TA incorporated the concept of the safe zone into its defensive rail operations program and the training for this program.

The "safe zone" is a dynamic space that remains with the train while it is stopped or in motion and changes depending on the location and operating dynamics of the train. The safe zone will differ by mode and vehicle type and other environmental factors. The safe zone may also include the presence of other hazards that may affect safe train operation, such as a fallen tree or debris encroaching on the right-of-way.

The safe zone is a visualization the train operator should have that consists of the area where passengers, pedestrians or trespassers may stand or walk without risk of making contact with a train in motion. It is the zone in which motor vehicle movements also pose a similar risk. The safe zone includes both immediate risks and potential risks that can occur. The safe zone is not the same as the dynamic envelope of the train. The safe zone is the clearance around the rail vehicle or train that should be maintained to prevent collisions, accidents and/or contact with people and objects.

TA should determine what constitutes a "safe zone" around a train. Train operators would envision the space around a train in which a hazard has the potential of

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

entering and violating the dynamic envelope of the train, which might result in contact with the train, thereby creating the potential for an unsafe event.

Train operator situational awareness of the safe zone involves monitoring the areas visible from the cab, as well as via mirrors and/or cameras to determine if any person or object is within the safe zone and could potentially be at risk of moving into the train or into the path of the train. The safe zone can extend beyond the dynamic envelope, since it factors in considerations of potential hazards beyond the envelope that are related to train movements.

### 6. Standard: OSHA General Duty Clause

Compliance: The employer, TA, has the responsibility to identify and correct any hazards that may harm employees **or others**. TA should have provided signs warning the customers and train operators about the hazardous conditions present at the station. A hazardous condition was created by TA by failing to install safety countermeasures despite the history of track intrusion incidents on their subway transit system. These incidents caused mental health issues and trauma to their employees, especially the train operators.

Background: According to the General Duty Clause of the United States Occupational Safety and Health Act, 29 U.S.C. § 654, 5(a)1, the Employer has the following requirements:

Each employer shall furnish to each of his employees' employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.

It is incumbent upon the employer to actively examine the workplace and workplace practices to determine possible hazards and/or practices that can cause harm to their employees or others. That is, the responsibility is upon the employer to initiate the search for and correction of all hazards that are found in the workplace in order to provide for the safety of all personnel.

This regulation must be followed by the employer to ensure the safety of their employees and all individuals who enter that workplace.

### 7. Standard: Common Carrier laws

Compliance: TA failed to comply with their Common Carrier duties by failing to correct the hazardous situation that resulted from not providing a safe station and platform for customers. A hazardous condition was created by TA failing to install safety countermeasures despite the history of track intrusion incidents on their subway transit system. TA has a duty to their passengers to ensure their safety.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

<u>Background</u>: Public transportation is an essential part of many peoples' lives. Passengers essentially put their lives into the hands of those transporting them to a destination; and it is their belief that they will arrive safely because safe railroad systems are taken for granted. However, life-threatening incidents do happen and, unfortunately, they happen too often.

Pursuant to the United States Code, a common carrier is liable for damages during transit. Liability arises not only because a person was injured, but was injured due to the carrier's negligence. Similarly, the States have developed laws, which hold common carriers to a standard of care for their passengers. The special duties of the passenger carrier are said to arise from the fact that passengers have entrusted their safety to the custody and safekeeping of the carrier. Under the law, public transportation providers are referred to as "common carriers."

Public policy recognizes that people should be able to trust the passenger railroad they hire to transport them in a safe manner. In order to further this concept, common carriers are strictly regulated by federal and state agencies and laws to make sure that they are compliant with safety regulations. When a passenger sustains an injury while using public transportation, the provider may be held legally responsible for the passenger's injuries.

The railroad must use care and diligence for passenger safety and must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill.

As part of this standard of care, common carriers owe many duties to their passengers, including:

- Safely transport passengers to their destinations;
- Provide a safe place (platforms and stations) for passengers to enter and exit the train;
- Take reasonable steps to protect passengers from harm, including harm by other passengers and or employees;
- Provide safe railcars and maintain the safety of this equipment; and
- Hire qualified employees and properly educates and trains those employees.

The duties' common carriers owe to their passengers begins before the passenger steps foot on the train. So long as the carrier has accepted a person as a passenger and has placed himself or herself in the carrier's care, then the carrier has a duty to take every reasonable step to ensure the safety of the passenger. Furthermore, the carrier's duties do not automatically end once a passenger enters or leaves the vehicle. The common carrier must take the passenger to his or her intended destination, but must also leave the passenger in a safe place.

When a common carrier fails to uphold its duties, and the passenger is hurt as a result, the carrier is clearly responsible for these injuries. Most accidents relate to failure

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

to follow rules and regulations to the letter, operational negligence and poor training. Common carrier incidents may happen for many different reasons, including:

- Poor crew training;
- Inadequate discipline of operating crews;
- Crew and platform personnel fatigue;
- Improperly maintained infrastructure; and
- Negligent operations and control of the train's service.

Common carriers are responsible for the actions of their employees. Under the law, employees are agents of the carrier, and the Railroad is liable for the negligence of its agents. Common carriers are required to train their employees and supervise their work. This includes properly disciplining personnel that do not perform their work responsibly.

## IV.    Accident Analysis

**Accounts of the incident events:**

- Ms. Harger was already on the tracks before the train entered the station according to the Police Reports and testimony of NYPD Detective Moeller page 128 lines 7-14, who stated

  Q. You clearly said in your report that Ms. Shabazz told you as she was entering the station, she observed the person laying on the tracks, she was already laying before Ms. Shabazz entered the station, correct?

  A Yes, sir.

- According to the declaration and testimony of the witness Gabrielle Smith, "At the time [Ms. Harger] fell onto the train tracks, the train was not yet in the train station. She was on the tracks 7-10 seconds before the train ran over her."

- According to Mr. George Brown, Ms. Harger's boyfriend, Ms. Harger was waiting for train about 4 to 5 feet from the platform edge before she fell onto the tracks. After Ms. Harger fell on the tracks, Mr. Brown looked and did not see a train. From this statement we can conclude that the train was not yet in the station for a period of time that Ms. Harger was on the tracks.

- According to the Plaintiff immediately prior the incident she was talking to her then boyfriend, facing the entrance of the station. The Train was not yet in the station. She had shopping bags with her that were still on the ground. When she began to feel faint the train was still not in the station. If the train had been in the station or even approaching she could have seen the lights in the tunnel and said she would have picked up bags to board the rain had it been in the station before she fainted and fell.

48

Carl Berkowitz, Ph.D. PE

- According to the train operator,[19] Raqia Shabazz, she observed Ms. Harger falling backward onto the tracks as she was pulling into the station. Ms. Shabazz immediately activated the emergency braking but was unable to stop the train before hitting Ms. Harger. This testimony was contradicted by her now husband who was an eyewitness, Gabrielle Smith and independent witness, the Detective that interviewed her as well as her statement recorded in Police reports as well as the Plaintiff. Shabazz had other highly incredible testimony that makes her rendition of the incident suspect.
- According to the 911 caller, Ms. Harger was on the tracks before the train entered the station. She said, "Somebody is on the train tracks. By the B and the Q, someone is in the tracks. The train hasn't come yet they're trying to talk him into getting up but he's still down there. Everyone was screaming and talking to him… I had to get service to call 911."

**Additional details**
- <u>Weather</u>: At the time of the incident the weather was clear and dry. [20]
- <u>Train consists</u>: 5148, 5147, 5145, 5146, 5068, 5067, 5065, 5066[21]
- <u>Incident</u>:
  - The lead car, #5148 came into contact with Ms. Harger[22]
  - Customer came to rest under the second car, #5147 under door panels 9 & 10 at 10 feet south of survey marker #A4 336+50. [23]
  - Lead car #5148 came to rest 15 feet north of survey marker A4- 336+50. Four cars were in the station. [24]
- <u>Inspection</u>: Train cars were last inspected 8/3/2016, before the incident. Based on the inspection after the incident, #1 snow block on car # 5148 was intact without strike marks on the trip device. Furthermore, no exterior damage to the train. The headlight, windshield wiper and horn worked as designed. The train operator's vision glass was clean and free of obstruction. [25]
- <u>Witnesses</u>: There were 2 independent witnesses: Gabrielle Smith and Eliot Ramos[26]

### A. Incident Timeline

**Figure 2: Chronology of Key Events**

---

[19] Correspondence sheet and interviews
[20] NYCT CTA Cleaning Report
[21] NYCTA Car Equipment Department Train Trouble Control – 066, Request for Assistance report
[22] ibid.
[23] ibid.
[24] ibid.
[25] ibid.
[26] ibid.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | Time | Ms. Harger | Train operator (Ms. Shabazz) |
|---|---|---|---|
| 1 | | Ms. Harger and Mr. Brown waiting 1 to 2 feet away from the solid yellow line. | |
| 2 | | Ms. Harger falls onto the tracks. | |
| 3 | | Ms. Harger laid on her side on the tracks (for 7 to 10 seconds). | Train approaches the station. |
| 4 | | | Train enters the station. |
| 5 | | | Train operator activates the emergency brakes. |
| 6 | | Train strikes Ms. Harger. | |
| 7 | | | Train stops. |

**Perception Reaction Time**

Figure below shows the estimated Perception-Reaction Time for a train operator. The approximate 2 second perception-reaction time is the approximate maximum time from a study by U.S. Department of Transportation Federal Railroad Administration and the Massachusetts Institute of Technology.

**Figure 3: Elements of Train Operator's: Perception-Reaction Time**
(Presents the various key elements that result in an operator's perception-reaction time.)

| | Steps to Avoid Passenger Incident | Emergency Braking to Avoid Passenger | Perception -Reaction Steps | | Time Interval |
|---|---|---|---|---|---|
| 1 | Passenger Could be Seen | Passenger in Path Becomes Visible | Detection | Perception | |
| 2 | Passenger is Seen | Operator Sees Passenger in Path | Detection | Perception | Approximately 1.6 to 1.9 Second*[27] |
| 3 | Passenger is Understood | Operator Recognizes Probable Incident | Recognition | Perception | |

---

[27] Preview Information in Cab Displays for High-Speed Locomotives, Human Factors in Railroad Operations, U.S. Department of Transportation Federal Railroad Administration and Massachusetts
Institute of Technology, July 2005 (DOT/FRA/ORD-04/12), p28.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | Steps to Avoid Passenger Incident | Emergency Braking to Avoid Passenger | Perception -Reaction Steps | | Time Interval |
|---|---|---|---|---|---|
| 4 | Action is Taken | Operator Moves Master Controller | Decision | Reaction | |
| 5 | Action is Completed | Operator Initiates Emergency Braking | Action | Reaction | |
| *Unexpected Event, Alert Operator, No Distraction, Good Lighting, Single Decision | | | | | |

**The Train Operator's Situation Awareness**

Training in situation awareness[28] would have allowed the train operator to react and take action more quickly than the unexpected event perception-reaction time. If the train operator was trained in situation awareness, the operator would have taken the following three steps to prevent this incident:

1. Sound the horn
2. Begin to slow down the train
3. Prepare to emergency stop by placing her hand on the emergency brake.

By preparing to stop, the train operator has reduced the perception reaction time from a maximum of 1.9 seconds (based on the study by U.S. Department of Transportation/ Federal Railroad Administration/ Massachusetts Institute of Technology[29]) to approximately 0.6 seconds.

Situation awareness has been recognized as a critical input for successful decision-making across a broad range of situations. Insufficient situation awareness has been identified as one of the primary factors in accidents attributed to human error.

Situation Awareness is being aware of what is going on around you. For a train operator good situation awareness is not just being able to observe around you but also being able to interpret what is happening with the many gauges and systems inside the train operator's cab. This can lead to data overload for the train operator. There is a lot of data to observe and people have a limited ability to absorb, process and understand this data and use it to make real-time rapid decision making.

---

[28] See background on situation awareness below.
[29] Preview Information in Cab Displays for High-Speed Locomotives, Human Factors in Railroad Operations, U.S. Department of Transportation Federal Railroad Administration and Massachusetts
Institute of Technology, July 2005 (DOT/FRA/ORD-04/12), p28.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Endsley's model[30]: The theoretical framework of SA was developed by Dr. Mica Endsley. Endsley's model has three SA ascending levels: perception, comprehension, and projection.

**Level 1 SA—Perception**
People first need to see, hear, smell, or otherwise acquire the needed information from the environment, tests and reports, system displays, or other people. As an example, for the driver of an automobile this includes the speed and trajectory of the vehicle, where other automobiles and pedestrians are along with their trajectories, relevant traffic signage and markings, and the route to the desired destination.

**Level 2 SA—Comprehension**
Level 2 SA involves putting together all the Level 1 information to understand its meaning or significance in relation to the person's goals. This means that the automobile driver must know whether or not they are exceeding the speed limit, if they are on the intended route, fuel sufficiency, distance to other vehicles and pedestrians, and the impact of weather and road conditions on vehicle safety.

**Level 3 SA—Projection**
Finally, people with good SA are able to think beyond the current situation to project likely or possible future events. This enables them to be proactive rather than just reactive decision makers. Drivers with the very highest level of SA are able to project such potential future events as areas where pedestrians or animals crossing the roadway are likely to be encountered, projected weather conditions, and the projected safety or efficiency of different routes. They also are making real-time assessments of many dynamic factors, such as projected vehicle trajectories and collision or miss distances, projected effectiveness of braking and maneuvering, projected time and distance to destinations, and projected distance available on the remaining fuel.

## B. Braking Distance Analysis

There was more than sufficient distance and time for the train operator to stop the train and prevent the incident. Based on the analysis in this report, the train operator had sight distance of 246.50 feet of Ms. Harger upon the train entering the station plus an additional 147 feet of sight distance from inside the tunnel. At a speed of 24 mph and reaction time of 0.6 seconds, the train operator only required 153 feet to stop the train. Failure to activate the emergency brakes was likely due to the train operator not paying attention or being distracted.

### 1. Visibility:

---

[30] Users' Guides to Human Factors and Ergonomics Methods, by Mica R. Endsley, Human Factors and Ergonomics Society, 2021

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

On the date of the incident, no obstructions were reported as the train approached Atlantic Avenue Barclays Center Station. Based on the schematic of the station, the track inside the station appears to be straight. According to the NYCTA Car Equipment Department[31], the headlight, windshield wiper and horn worked as designed; and the train operator vision glass was clean and free of obstruction. According to NYCTA, the weather was clear and dry.

2. **Assumptions:**

- Based on the consist numbers of the train (5148, 5147, 5145, 5146, 5068, 5067, 5065, 5066), the train is an R68A manufactured by Kawasaki between 1988-89.  The train cars are 75 feet in length and 10 feet wide.[32] The R68A deceleration is 3.0 mph/s with full-service braking and 3.2 mph/s in emergency braking.[33]
- According to the witness statement from Gabrielle Smith, at the time Ms. Harger fell onto the train tracks, the train was not yet in the train station. She was on the train tracks 7-10 seconds before the train ran over her.
- According to the deposition of the train operator (Shabazz), the train was traveling between 20-24 mph upon entering the station.

---

[31] NYCTA Car Equipment Department, Train Trouble Control – 007, Request for Assistance report
[32] https://en.wikipedia.org/wiki/New_York_City_Subway_rolling_stock
[33] https://en.wikipedia.org/wiki/R46_(New_York_City_Subway_car)

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**Figure 4: Accident location diagram**



**Notes:** Y Distance to Accident, X Platform Length

### 3. Measurements:

According to the schematic of Atlantic Avenue Station (source: NYCTA General Signal Arrangement Station 320+50 to 355+50, Contract S32301-R, Brighton Line, 11/16/1993)

- Survey marker at beginning of station is A4-339
- Survey marker at end of station is A4-333
- Length of station platform is 600 feet (x)
- Distance from beginning of station to body, based on the inspection on March 4, 2023 measured 246.50 feet (y)
- The approaching sight distance to the entire platform measures approximately 300 feet.

54

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**Schematic of Atlantic Avenue-Barclays Center Station.**



**Zoomed in on station survey markers**



**Calculations:**

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

    **4. Calculations: Distance from beginning of station (south portal) to location of body = 246.50 feet**

Based on an inspection of the station and field measurements, Ms. Harger was found 246.50 feet into the station (from the south station portal).

The sight distance from inside the tunnel = 147 feet.

Since one is not permitted to inspect the inside the tunnel, the sight distance had to be estimated from the video of the train entering the station from the tunnel. Below are screenshots of the train entering Atlantic Avenue-Barclays Center Station from the Inspection on March 4, 2023. Based on the timestamp, from when the train is first observed until it enters the station takes approximately 4.0 seconds. The train is traveling in the tunnel at a speed of 25 mph (36.7 ft/s). Therefore, the train operator has full view of the station tracks and platform for approximately 146.7 feet (at 25 mph) while still in the tunnel.

Note according to the station schematic the length of straight track prior to entry into the tunnel is greater than 147 feet (approximately X feet).

    **5. Analysis:**

At a speed of 24mph, the train operator would require 153 feet to stop the train after activating the emergency braking. At 153 feet, the train operator has situation awareness and requires a reaction time of 0.6 seconds.

The body of Ms. Harger was found on the track 246.50 feet north of the station entrance (south portal) and was visible to the train operator upon entering the station, and even 147 feet before even entering the station. At a speed of 24 mph, the train operator would require 153 feet to stop the train after activating the emergency braking. ***The train operator had more than sufficient distance and time to stop the train and prevent the incident.***

Below is the time required for the train operator to stop the train when activating the emergency brakes at varying speeds.

**Figure 5: Speed vs. Emergency Brake Stopping Distance for R-68A Train**

| Speed (mph) | Emergency Braking Stopping Distance (ft)* | Emergency Braking Stopping Time (sec)* |
|---|---|---|
| 20 | 109 | 6.8 |
| 24 | 153 | 8.1 |

Sources: Emergency braking data for NYCT (Reaction time = 0.6 seconds) – see calculations below

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

*Based on theoretical braking data

**Supporting Calculations**
**A.  Total stopping distance at speed of 24 mph**

Initial velocity = 24mph (35.2 ft/sec)
Final velocity = 0
Emergency braking deceleration = -3.2 mph/sec (-4.6944 ft/sec^2)
Braking time = (final velocity – initial velocity)/ acceleration
Braking time = (-35.2 ft/sec)/ (-4.6944 ft^2) = 7.5 sec
Reaction time = 0.6 sec
Total Time = braking time + reaction time = 7.5 sec + 0.6 sec = 8.1 sec

Braking distance = initial velocity * braking time + 0.5*(deceleration * braking time^2)
Braking distance = 35.2 ft/sec * 7.5 sec + 0.5*(-4.6944 ft/sec^2 * 7.5 sec^2) = 132 feet

Reaction time distance = initial speed * time
Reaction time distance = 35.2 ft/sec * 0.6 sec = 21.12 ft

Total stopping distance = braking distance + reaction time distance = 132 ft + 21.12 ft = 153 ft

**Total stopping distance = 153 ft**

**B.  Total stopping distance at speed of 20 mph**

Initial velocity = 20mph (29.33 ft/sec)
Final velocity = 0
Emergency braking deceleration = -3.2 mph/sec (-4.6944 ft/sec^2)
Braking time = (final velocity – initial velocity)/ acceleration
Braking time = (-29.33 ft/sec)/ (-4.6944 ft^2) = 6.2 sec
Reaction time = 0.6 sec
Total Time = braking time + reaction time = 6.2 sec + 0.6 sec = 6.8 sec

Braking distance = initial velocity * braking time + 0.5*(deceleration * braking time^2)
Braking distance = 29.33 ft/sec * 6.2 sec + 0.5*(-4.6944 ft/sec^2 * 6.2 sec^2) = 91.65 ft
Reaction time distance = initial speed * time
Reaction time distance = 29.33 ft/sec * 0.6 sec = 17.60 ft

Total stopping distance = braking distance + reaction time distance = 91.65 ft + 17.6 ft = 109.25 ft

**Total stopping distance = 109 ft**

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



61

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**C.  The train operator had time to stop and was not paying attention**

Had the train operator kept a proper lookout she would have spotted Ms. Harger on the track bed and would have been able to avoid this incident. The train operator did not exercise extreme caution while approaching and entering the Station.  Assuming the train operator was paying attention to the tracks and platform, then the operator would have had sufficient time to stop the train and avoid the incident. Given how late the train operator applied the emergency brake, it can be reasonably concluded that she was not paying attention to the track ahead.

Not observing for potential hazards on the track is a clear violation of the national standard of care.  According to the national standard of care as indicated by standards set by transit systems in a number of major US cities: "The train operator must exercise diligence in the observation of potential hazards in and around track, signals, and switches. An employee must also use all available resources (i.e., headlights) to optimize observation techniques.  Also, the operator must personally operate his/her own train and facing forward, keep a sharp-lookout ahead for signals, obstructions and persons on or near the right-of-way."[34]

Figure below highlights the seven major proximate causes of railroad accidents caused by train operator errors.

**Figure 6: Human Errors that Cause Railroad Accidents by Train Operators**

| Item | Proximal Cause | Description |
|------|----------------|-------------|
| 1 | Attention | Lack of attention leading to a mental lapse |
| 2 | Perception | Inability to see or hear specific features |
| 3 | Knowledge | Inadequate or incorrect knowledge for task |
| 4 | Rule Violation | Deliberate breach of rules or procedures |
| 5 | Procedural Error | Use of wrong procedure in a given situation |
| 6 | Slip or Lapse | An unintended action |
| 7 | Fatigue | Tiredness and or fatigue influencing behavior |

**D.  Train Operator Violations of Standards of Care**

By not paying attention to the track ahead, the train operator violated the following standards:

**Standard**: TA – although these standards are listed in the MTA rules and regulations these are good and accepted practice and procedures for all mass transit systems in the United States.

---

[34] Example from MTA in Boston

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**MTA Rules and Regulations Governing Employees of MTA New York City Transit, Manhattan and Bronx Surface Transit Operating Authority and South Brooklyn Railway (Revised November 2003):**

- Rule 2.39 (a) A train operator is prohibited from engaging in any conduct that results in a collision of the train he or she is operating, with any person, car, bumper block or any other object on the trackway.
- Rule 2.40 (z) A Train Operator must be vigilant at all times. When the Train Operator sees any person on or around the tracks, they must immediately reduce the speed of the train and sound the train horn or whistle. The Train Operator must stop the train if the person does not appear to be in the clear or has not given a proper signal to the Train Operator. The Train Operator may proceed only when he/she has determined that the person is in a safe area.
- Rule 9.02 (b) They must take every precaution for the safety of their trains and customers. When a train is in motion the responsibility for safe running rests entirely upon the train operator.

**Rules & Regulations Governing Employees Engaged in the Operation of the MTA New York City Transit System (April 2000)**

Rule 4. General duties and obligations of employees
4(a) Employees are required at all times to perform their duties in accordance with these rules, Policy Instructions and their division's instructions. They must not, whether on or off duty, engage in activities which will interfere with the proper performance of their duties.
4(b) Employees while on duty are under the authority of and must obey the orders of supervision. They must, within their qualifications, perform such duties, in addition to those set forth herein, as the superiors to whom they report may direct. Safety rules, manuals of instructions, policy instructions, special instructions, etc., in force prior to, or promulgated by department or division heads subsequent to, the adoption of these rules, shall have the same force and effect as though set forth in full in this Rule Book.

Rule 39. Train Movement; Speed Limits; Possible Loss of Job
(a) A Train Operator is prohibited from engaging in any conduct that results in a collision of the train he or she is operating with any person, car, bumping block or any other object on the trackway.

Rule 98. Train Operator
(b) They must take every precaution for the safety of their trains and passengers. when a train is in motion the responsibility for safe running rests entirely upon the train operator.
g) At any time when passing a fixed signal indicating proceed, prepare to stop at the next signal, Train Operators must govern the speed of their trains so that there is no possibility of their running past the next signal, should that signal indicate STOP. They must reduce speed to conform with Speed Limit Signs and other instructions before reaching curves

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

and continue at the prescribed speed until the entire train has rounded the curve. Train Operators must approach all STOP signals, trains ahead, junction and terminals with their trains under full control.

## V.    Analysis of reduction of speed that trains enter the stations

In document bates no. NYCTA_2_00013615, the TA claims that "[t]he implementation of slow speeds entering stations would have a major destructive impact on the quality and quantity of service provided to customers and the economics of providing service. Operating and capital costs would increase, including fleet size, service would be less frequent and much slower and cars and platforms would be overloaded."

The following chart illustrates the extent of service deterioration if a slower speed limit for entering stations was implemented systemwide:

| Posted Speed Limit | Potential Increase in Running time per Station | Potential Average Increase in Round Trip Running Time | Potential % Increase in Running Time |
|---|---|---|---|
| 20 mph | 8 to 12 Seconds | 8.7 to 13.0 Minutes | 6.3% to 9.5% |
| 15 mph | 15 to 23 Seconds | 16.2 to 24.9 Minutes | 11.8% to 18% |
| 10 mph | 30 to 50 Seconds | 32.5 to 54.2 Minutes | 24% to 39% |

This increase in running time results in some combination of a decrease in the throughput provided and added operating and capital costs."

**Response:**
Assuming a service brake deceleration of 3 mph/sec. and zero perception-reaction time, below are the expected braking times.

**Figure: Summary of Emergency Braking Distance and Time (P-R = 0 seconds)**

| Speed (mph) | Braking Stopping Time (sec)* | Change in Stopping Time (sec)* | Braking Stopping Distance (ft)* |
|---|---|---|---|
| 15 | 3.3 | | 55 |
| 20 | 6.7 | 3.4 | 98 |
| 25 | 8.3 | 5 | 153 |
| 30 | 10.0 | 6.7 | 220 |
| 35 | 11.7 | 8.4 | 299 |

Sources: Emergency braking data for NYCT (P-R = 0 seconds) – see Appendix
*Based on theoretical braking data

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**Figure: Posted speed limit of 15 mph**



**Assumptions**
The speed of the train in the tunnel is 25 mph (36.7 ft./sec.) and slows to 15 mph (22ft./sec.) at the beginning of the station.

**Calculations**
Braking distance from 15mph to zero is 55 feet. Time to brake is 3.3 seconds.
Distance of station is 600 feet.  Train starts braking at 545 feet into the station.
s= v*t: 545 ft= 22 ft./sec. * t [t= 24.8 sec.]
t= (vf-vi)/a: -10mph/-3mph/sec. = 3.33 sec.
s=vi*t = 0.5*at^2: 36.7*3.33 +0.5*(-4.4)*(3.3)^2=98.3 feet
Total time = 3.3 sec. + 24.8 sec. + 3.3 sec. = **31.4 sec.**

**Figure: Posted speed limit of 25 mph**



**Assumptions**

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

The speed of the train in the tunnel is 25 mph (36.7 ft./sec.) and does not slow at the beginning of the station.

**Calculations**
Braking distance from 25 mph to zero is 153 feet. Time to brake is 8.3 seconds.
Distance of station is 600 feet.  Train starts braking at 447 feet into the station.
s= v*t: 447 ft= 36.7 ft/s * t [t= 12.4 sec.]
s= v*t: 98.3 ft= 36.7 ft/s * t [t= 2.7 sec.]
Total time = 2.7 sec. + 12.4 sec. + 8.3 sec. = 23.4 sec.

**Conclusion**
According to the above calculations, the increase in running time per station with a tunnel speed of 25 mph and a posted speed at the tunnel entry of 15 mph is (31.4 seconds minus 23.4 seconds) **8 seconds**

According to the NYCT study, the potential increase in running time per station is 15 to 23 seconds.  This is significantly higher than this calculation of 8 seconds and it is concluded that 15-23 seconds is a gross overestimation and not based on an empirical study.

The B line has 35 stations, therefore at an increase of 8 seconds per station, the total potential in round trip running time is (35*2*8 seconds) 560 seconds (**9.3 minutes**). According to the NYCT study the potential increase in round trip running time is 16.2 to 24.9 minutes.  This is significantly higher than our calculation of 9.3 minutes and we believe is a gross overestimate.

Consequently the NYCTA estimates in this study of reduced service and added costs are also incorrect.

**Figure: Estimate of delays**

| Source | Potential increase in running time per station | Potential average increase in round trip running time |
|---|---|---|
| NYCTA study | 15 to 23 seconds | 16.2 to 24.9 minutes |
| Empirical Calculations | 8 seconds | 9.3 minutes * |

Note: * for B line
Note: Calculations do not take into account that at lower posted speeds there will be less accidents and less delays from accidents

**A.  NYCTA_2_00394674**
Email from NYCTA

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

From: Lunden, Glenn
Sent: Thursday, February 10, 2011 2:55 PM
To: Cafiero, Peter
Subject: FW: Assemblyman Crespo Introduces Legislation
NYCT has undertaken a high-level evaluation of the impact of the proposed legislation to
require that subway trains stop before each station stop and then proceed at no more than
5 mph while entering the station. This has been a joint effort of Operations Planning,
MOW Engineering, and CPM Signals and Systems.

**Response**: This recommendation was dismissed out-of-hand without a study or an
alternate recommendation. If the NYCTA took the suggestion of reducing station speed
seriously they would have determined it was the best alternative short-term to save
passenger lives.

## B. NYCTA-03666

SPECIFICATIONS-CAR DESIGN PARAMETERs
3. Deceleration Rate. The full-service deceleration rate of 3.0 mph/sec.

Response: A braking deceleration rate of 3 mph/s was used in the calculations in section
A.

## C. NYCTA-06957

Crowding study at Atlantic Avenue Station after Nets basketball game.
October 26, 2006
"The projected LOS C conditions on the three IRT platforms are considered an
acceptable level of service, especially for a special event condition such as the post-game
peak hour after a Nets basketball game at the arena."

LOS C
7-I0 sf/person space for standing and restricted circulation through queuing
area by disturbing others.

## D. NYCTA 06978

MTA NYCT SUBWAY SPEED AND CAPACITY REVIEW
STV Final Report

**Response:** As shown below in Figure 2, NYCTA has a poor operational record of on-
time performance, which has been caused by signal failures and other operational factors.

As shown below in Figure 1, persons on the track-bed are a major cause of delays.
Therefore, adding safety measures such as platform edge barriers would reduce incidents
of persons on the track-bed and thereby eliminate one of the significant causes of train
delays.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**Figure 2: Customer Journey On-Time Performance Since January 2017**



71

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**Figure 1: Major Incidents Since January 2017**



## VI.    Conclusion

As noted above and as corroborated by the documents included herewith, both in the below Appendix, and the attached appendix, this accident was preventable. There were multiple proximate causes of the incident. The first was the failure of the TA to install PSDs or any other platform barriers, which would have prevented Ms. Harger from falling onto the trackbed.

The second was the failure of the TA to install track intrusion devices at the subject station, which would have immediately alerted the train operator, defendant Shabazz, that plaintiff was on the trackbed, and would have done so with sufficient time for her to stop the train before it ran over Ms. Harger.

The third was the negligence of the train operator, defendant Shabazz, in failing to pay attention and to immediately see Ms. Harger on the tracks as the train was pulling into the station, because if she had pulled the emergency break as she was pulling into the station, it would have stopped before she ran over Ms. Harger.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Additionally, each of the below violations was a proximate cause of the catastrophic injuries sustained by Ms. Harger:

1. The TA failed to have adequate and proper safety studies and analysis.
2. The TA failed to have adequate, proper, and rational safety plans both system wide, and for the Atlantic Avenue station.
3. The TA failed to use proper new technology development methodology.
4. The TA failed to use proper hazard analysis and risk matrix for comparative analysis as to the PSD's and other attempts to limit catastrophic injuries.
5. The TA failed to perform pilot project studies for PSDs.
6. The TA disregarded their own engineers, have disregarded what they have personally seen implemented world-wide, ignored published data, ignored international benchmarks and best practices, and they have ignored their own SPI and data.
7. The TA failed to take effective corrective action to remedy a known recurring hazard that causes catastrophic injuries with frequency.

Respectfully submitted,

/s

Carl Berkowitz

73

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## VII.    Appendices

### 1.  Photographs of the Incident Location





74

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE





Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Exhibit from George Brown





Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## 2. R68A

R68A Passenger Car[35]



| Contract # | Division | Year Built | Builder | Car Length[4] | Car Width | Photograph | Fleet numbers ↑Total | Number in | CBTC | Assigned Services | Yard assignment | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R68A | | 1988–1989 | Kawasaki | | | | 5001–5200 (200 total) | 200 | No | Ⓐ – 8 cars (1 train, p.m. rush, used in B service in the a.m. rush) Ⓑ – 152 cars (19 trains, a.m. rush) 144 cars (18 trains, p.m. rush) Ⓝ Ⓦ – 16 cars (2 trains)[21][22][23] Assignments as of December 19, 2021 | Coney Island | • Originally single cars, now in 4-car sets. |

R68A schematic



Source: https://www.nycsubway.org/wiki/R-68_(Westinghouse-Amrail)_--_R-68A_(Kawasaki)

---

[35] https://en.wikipedia.org/wiki/New_York_City_Subway_rolling_stock

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

### 3. NYCT emergency brake stopping distance data



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## 7. Emergency Braking Data

### Emergency Braking for NYCTransit R68A (3.2 mph/s)

**P-R time = 0 seconds**

| | | | | | | | | | | | | NYCTransit Data |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Theoretical data based on Manufacturer Specs | | | | | | | | |
| Vi | Vi | Aeb | Tpr | Xpr | Vf | Teb | TebTeb | Xeb | Xt | Tt | | Xeb |
| mi/hr | ft/sec | ft/sec/sec | sec | ft | ft/sec | sec | sec x sec | ft | ft | sec | | ft |
| 1 | 1.47 | -4.6944 | 0 | 0.00 | 0 | 0.31 | 0.10 | 0.23 | 0.23 | 0.31 | | |
| 2 | 2.93 | -4.6944 | 0 | 0.00 | 0 | 0.62 | 0.39 | 0.92 | 0.92 | 0.62 | | |
| 3 | 4.40 | -4.6944 | 0 | 0.00 | 0 | 0.94 | 0.88 | 2.06 | 2.06 | 0.94 | | |
| 4 | 5.87 | -4.6944 | 0 | 0.00 | 0 | 1.25 | 1.56 | 3.67 | 3.67 | 1.25 | | |
| 5 | 7.33 | -4.6944 | 0 | 0.00 | 0 | 1.56 | 2.44 | 5.73 | 5.73 | 1.56 | | 13 |
| 6 | 8.80 | -4.6944 | 0 | 0.00 | 0 | 1.87 | 3.51 | 8.25 | 8.25 | 1.87 | | 17 |
| 7 | 10.27 | -4.6944 | 0 | 0.00 | 0 | 2.19 | 4.78 | 11.23 | 11.23 | 2.19 | | 21 |
| 8 | 11.73 | -4.6944 | 0 | 0.00 | 0 | 2.50 | 6.25 | 14.66 | 14.66 | 2.50 | | 26 |
| 9 | 13.20 | -4.6944 | 0 | 0.00 | 0 | 2.81 | 7.91 | 18.56 | 18.56 | 2.81 | | 32 |
| 10 | 14.67 | -4.6944 | 0 | 0.00 | 0 | 3.12 | 9.76 | 22.91 | 22.91 | 3.12 | | 38 |
| 11 | 16.13 | -4.6944 | 0 | 0.00 | 0 | 3.44 | 11.81 | 27.72 | 27.72 | 3.44 | | 44 |
| 12 | 17.60 | -4.6944 | 0 | 0.00 | 0 | 3.75 | 14.06 | 32.99 | 32.99 | 3.75 | | 51 |
| 13 | 19.07 | -4.6944 | 0 | 0.00 | 0 | 4.06 | 16.50 | 38.72 | 38.72 | 4.06 | | 58 |
| 14 | 20.53 | -4.6944 | 0 | 0.00 | 0 | 4.37 | 19.13 | 44.91 | 44.91 | 4.37 | | 65 |
| 15 | 22.00 | -4.6944 | 0 | 0.00 | 0 | 4.69 | 21.96 | 51.55 | 51.55 | 4.69 | | 74 |
| 16 | 23.47 | -4.6944 | 0 | 0.00 | 0 | 5.00 | 24.99 | 58.65 | 58.65 | 5.00 | | 82 |
| 17 | 24.93 | -4.6944 | 0 | 0.00 | 0 | 5.31 | 28.21 | 66.21 | 66.21 | 5.31 | | 91 |
| 18 | 26.40 | -4.6944 | 0 | 0.00 | 0 | 5.62 | 31.63 | 74.23 | 74.23 | 5.62 | | 101 |
| 19 | 27.87 | -4.6944 | 0 | 0.00 | 0 | 5.94 | 35.24 | 82.71 | 82.71 | 5.94 | | 111 |
| 20 | 29.33 | -4.6944 | 0 | 0.00 | 0 | 6.25 | 39.04 | 91.65 | 91.65 | 6.25 | | 121 |
| 21 | 30.80 | -4.6944 | 0 | 0.00 | 0 | 6.56 | 43.05 | 101.04 | 101.04 | 6.56 | | 132 |
| 22 | 32.27 | -4.6944 | 0 | 0.00 | 0 | 6.87 | 47.24 | 110.89 | 110.89 | 6.87 | | 143 |
| 23 | 33.73 | -4.6944 | 0 | 0.00 | 0 | 7.19 | 51.64 | 121.20 | 121.20 | 7.19 | | 155 |
| 24 | 35.20 | -4.6944 | 0 | 0.00 | 0 | 7.50 | 56.22 | 131.97 | 131.97 | 7.50 | | 167 |
| 25 | 36.67 | -4.6944 | 0 | 0.00 | 0 | 7.81 | 61.01 | 143.20 | 143.20 | 7.81 | | 180 |
| 26 | 38.13 | -4.6944 | 0 | 0.00 | 0 | 8.12 | 65.99 | 154.88 | 154.88 | 8.12 | | 193 |
| 27 | 39.60 | -4.6944 | 0 | 0.00 | 0 | 8.44 | 71.16 | 167.02 | 167.02 | 8.44 | | 207 |
| 28 | 41.07 | -4.6944 | 0 | 0.00 | 0 | 8.75 | 76.53 | 179.63 | 179.63 | 8.75 | | 221 |
| 29 | 42.53 | -4.6944 | 0 | 0.00 | 0 | 9.06 | 82.09 | 192.69 | 192.69 | 9.06 | | 235 |
| 30 | 44.00 | -4.6944 | 0 | 0.00 | 0 | 9.37 | 87.85 | 206.20 | 206.20 | 9.37 | | 250 |
| 31 | 45.47 | -4.6944 | 0 | 0.00 | 0 | 9.69 | 93.81 | 220.18 | 220.18 | 9.69 | | 266 |
| 32 | 46.93 | -4.6944 | 0 | 0.00 | 0 | 10.00 | 99.95 | 234.61 | 234.61 | 10.00 | | 282 |
| 33 | 48.40 | -4.6944 | 0 | 0.00 | 0 | 10.31 | 106.30 | 249.51 | 249.51 | 10.31 | | 290 |
| 34 | 49.87 | -4.6944 | 0 | 0.00 | 0 | 10.62 | 112.84 | 264.86 | 264.86 | 10.62 | | 315 |
| 35 | 51.33 | -4.6944 | 0 | 0.00 | 0 | 10.94 | 119.57 | 280.67 | 280.67 | 10.94 | | 337 |
| 36 | 52.80 | -4.6944 | 0 | 0.00 | 0 | 11.25 | 126.51 | 296.93 | 296.93 | 11.25 | | 357 |
| 37 | 54.27 | -4.6944 | 0 | 0.00 | 0 | 11.56 | 133.63 | 313.66 | 313.66 | 11.56 | | 372 |
| 38 | 55.73 | -4.6944 | 0 | 0.00 | 0 | 11.87 | 140.95 | 330.84 | 330.84 | 11.87 | | 393 |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

### Emergency Braking for NYCTransit R-68A (3.2 mph/s)

#### P-R time = 0.5 seconds

| | | | | | | Theoretical data based on Manufacturer Specs | | | | | NYCTransit Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vi** | **Vi** | **Aeb** | **Tpr** | **Xpr** | **Vf** | **Teb** | **TebTeb** | **Xeb** | **Xt** | **Tt** | **Xeb** |
| *mi/hr* | *ft/sec* | *ft/sec/sec* | *sec* | *ft* | *ft/sec* | *sec* | *sec x sec* | *ft* | *ft* | *sec* | *ft* |
| 1 | 1.47 | -4.6944 | 0.5 | 0.73 | 0 | 0.31 | 0.10 | 0.23 | 0.96 | 0.81 | |
| 2 | 2.93 | -4.6944 | 0.5 | 1.47 | 0 | 0.62 | 0.39 | 0.92 | 2.38 | 1.12 | |
| 3 | 4.40 | -4.6944 | 0.5 | 2.20 | 0 | 0.94 | 0.88 | 2.06 | 4.26 | 1.44 | |
| 4 | 5.87 | -4.6944 | 0.5 | 2.93 | 0 | 1.25 | 1.56 | 3.67 | 6.60 | 1.75 | |
| 5 | 7.33 | -4.6944 | 0.5 | 3.67 | 0 | 1.56 | 2.44 | 5.73 | 9.39 | 2.06 | 13 |
| 6 | 8.80 | -4.6944 | 0.5 | 4.40 | 0 | 1.87 | 3.51 | 8.25 | 12.65 | 2.37 | 17 |
| 7 | 10.27 | -4.6944 | 0.5 | 5.13 | 0 | 2.19 | 4.78 | 11.23 | 16.36 | 2.69 | 21 |
| 8 | 11.73 | -4.6944 | 0.5 | 5.87 | 0 | 2.50 | 6.25 | 14.66 | 20.53 | 3.00 | 26 |
| 9 | 13.20 | -4.6944 | 0.5 | 6.60 | 0 | 2.81 | 7.91 | 18.56 | 25.16 | 3.31 | 32 |
| 10 | 14.67 | -4.6944 | 0.5 | 7.33 | 0 | 3.12 | 9.76 | 22.91 | 30.24 | 3.62 | 38 |
| 11 | 16.13 | -4.6944 | 0.5 | 8.07 | 0 | 3.44 | 11.81 | 27.72 | 35.79 | 3.94 | 44 |
| 12 | 17.60 | -4.6944 | 0.5 | 8.80 | 0 | 3.75 | 14.06 | 32.99 | 41.79 | 4.25 | 51 |
| 13 | 19.07 | -4.6944 | 0.5 | 9.53 | 0 | 4.06 | 16.50 | 38.72 | 48.25 | 4.56 | 58 |
| 14 | 20.53 | -4.6944 | 0.5 | 10.27 | 0 | 4.37 | 19.13 | 44.91 | 55.17 | 4.87 | 65 |
| 15 | 22.00 | -4.6944 | 0.5 | 11.00 | 0 | 4.69 | 21.96 | 51.55 | 62.55 | 5.19 | 74 |
| 16 | 23.47 | -4.6944 | 0.5 | 11.73 | 0 | 5.00 | 24.99 | 58.65 | 70.39 | 5.50 | 82 |
| 17 | 24.93 | -4.6944 | 0.5 | 12.47 | 0 | 5.31 | 28.21 | 66.21 | 78.68 | 5.81 | 91 |
| 18 | 26.40 | -4.6944 | 0.5 | 13.20 | 0 | 5.62 | 31.63 | 74.23 | 87.43 | 6.12 | 101 |
| 19 | 27.87 | -4.6944 | 0.5 | 13.93 | 0 | 5.94 | 35.24 | 82.71 | 96.64 | 6.44 | 111 |
| 20 | 29.33 | -4.6944 | 0.5 | 14.67 | 0 | 6.25 | 39.04 | 91.65 | 106.31 | 6.75 | 121 |
| 21 | 30.80 | -4.6944 | 0.5 | 15.40 | 0 | 6.56 | 43.05 | 101.04 | 116.44 | 7.06 | 132 |
| 22 | 32.27 | -4.6944 | 0.5 | 16.13 | 0 | 6.87 | 47.24 | 110.89 | 127.02 | 7.37 | 143 |
| 23 | 33.73 | -4.6944 | 0.5 | 16.87 | 0 | 7.19 | 51.64 | 121.20 | 138.07 | 7.69 | 155 |
| 24 | 35.20 | -4.6944 | 0.5 | 17.60 | 0 | 7.50 | 56.22 | 131.97 | 149.57 | 8.00 | 167 |
| 25 | 36.67 | -4.6944 | 0.5 | 18.33 | 0 | 7.81 | 61.01 | 143.20 | 161.53 | 8.31 | 180 |
| 26 | 38.13 | -4.6944 | 0.5 | 19.07 | 0 | 8.12 | 65.99 | 154.88 | 173.95 | 8.62 | 193 |
| 27 | 39.60 | -4.6944 | 0.5 | 19.80 | 0 | 8.44 | 71.16 | 167.02 | 186.82 | 8.94 | 207 |
| 28 | 41.07 | -4.6944 | 0.5 | 20.53 | 0 | 8.75 | 76.53 | 179.63 | 200.16 | 9.25 | 221 |
| 29 | 42.53 | -4.6944 | 0.5 | 21.27 | 0 | 9.06 | 82.09 | 192.69 | 213.95 | 9.56 | 235 |
| 30 | 44.00 | -4.6944 | 0.5 | 22.00 | 0 | 9.37 | 87.85 | 206.20 | 228.20 | 9.87 | 250 |
| 31 | 45.47 | -4.6944 | 0.5 | 22.73 | 0 | 9.69 | 93.81 | 220.18 | 242.91 | 10.19 | 266 |
| 32 | 46.93 | -4.6944 | 0.5 | 23.47 | 0 | 10.00 | 99.95 | 234.61 | 258.08 | 10.50 | 282 |
| 33 | 48.40 | -4.6944 | 0.5 | 24.20 | 0 | 10.31 | 106.30 | 249.51 | 273.71 | 10.81 | 290 |
| 34 | 49.87 | -4.6944 | 0.5 | 24.93 | 0 | 10.62 | 112.84 | 264.86 | 289.79 | 11.12 | 315 |
| 35 | 51.33 | -4.6944 | 0.5 | 25.67 | 0 | 10.94 | 119.57 | 280.67 | 306.33 | 11.44 | 337 |
| 36 | 52.80 | -4.6944 | 0.5 | 26.40 | 0 | 11.25 | 126.51 | 296.93 | 323.33 | 11.75 | 357 |
| 37 | 54.27 | -4.6944 | 0.5 | 27.13 | 0 | 11.56 | 133.63 | 313.66 | 340.79 | 12.06 | 372 |
| 38 | 55.73 | -4.6944 | 0.5 | 27.87 | 0 | 11.87 | 140.95 | 330.84 | 358.71 | 12.37 | 393 |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

### Emergency Braking for NYCTransit R-68A (3.2 mph/s)

**P-R time = 0.6 seconds**

| | | | | | Theoretical data based on Manufacturer Specs | | | | | | NYCTransit Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vi** | **Vi** | **Aeb** | **Tpr** | **Xpr** | **Vf** | **Teb** | **TebTeb** | **Xeb** | **Xt** | **Tt** | **Xeb** |
| *mi/hr* | *ft/sec* | *ft/sec/sec* | *sec* | *ft* | *ft/sec* | *sec* | *sec x sec* | *ft* | *ft* | *sec* | *ft* |
| 1 | 1.47 | -4.6944 | 0.6 | 0.88 | 0 | 0.31 | 0.10 | 0.23 | 1.11 | 0.91 | |
| 2 | 2.93 | -4.6944 | 0.6 | 1.76 | 0 | 0.62 | 0.39 | 0.92 | 2.68 | 1.22 | |
| 3 | 4.40 | -4.6944 | 0.6 | 2.64 | 0 | 0.94 | 0.88 | 2.06 | 4.70 | 1.54 | |
| 4 | 5.87 | -4.6944 | 0.6 | 3.52 | 0 | 1.25 | 1.56 | 3.67 | 7.19 | 1.85 | |
| 5 | 7.33 | -4.6944 | 0.6 | 4.40 | 0 | 1.56 | 2.44 | 5.73 | 10.13 | 2.16 | 13 |
| 6 | 8.80 | -4.6944 | 0.6 | 5.28 | 0 | 1.87 | 3.51 | 8.25 | 13.53 | 2.47 | 17 |
| 7 | 10.27 | -4.6944 | 0.6 | 6.16 | 0 | 2.19 | 4.78 | 11.23 | 17.39 | 2.79 | 21 |
| 8 | 11.73 | -4.6944 | 0.6 | 7.04 | 0 | 2.50 | 6.25 | 14.66 | 21.70 | 3.10 | 26 |
| 9 | 13.20 | -4.6944 | 0.6 | 7.92 | 0 | 2.81 | 7.91 | 18.56 | 26.48 | 3.41 | 32 |
| 10 | 14.67 | -4.6944 | 0.6 | 8.80 | 0 | 3.12 | 9.76 | 22.91 | 31.71 | 3.72 | 38 |
| 11 | 16.13 | -4.6944 | 0.6 | 9.68 | 0 | 3.44 | 11.81 | 27.72 | 37.40 | 4.04 | 44 |
| 12 | 17.60 | -4.6944 | 0.6 | 10.56 | 0 | 3.75 | 14.06 | 32.99 | 43.55 | 4.35 | 51 |
| 13 | 19.07 | -4.6944 | 0.6 | 11.44 | 0 | 4.06 | 16.50 | 38.72 | 50.16 | 4.66 | 58 |
| 14 | 20.53 | -4.6944 | 0.6 | 12.32 | 0 | 4.37 | 19.13 | 44.91 | 57.23 | 4.97 | 65 |
| 15 | 22.00 | -4.6944 | 0.6 | 13.20 | 0 | 4.69 | 21.96 | 51.55 | 64.75 | 5.29 | 74 |
| 16 | 23.47 | -4.6944 | 0.6 | 14.08 | 0 | 5.00 | 24.99 | 58.65 | 72.73 | 5.60 | 82 |
| 17 | 24.93 | -4.6944 | 0.6 | 14.96 | 0 | 5.31 | 28.21 | 66.21 | 81.17 | 5.91 | 91 |
| 18 | 26.40 | -4.6944 | 0.6 | 15.84 | 0 | 5.62 | 31.63 | 74.23 | 90.07 | 6.22 | 101 |
| 19 | 27.87 | -4.6944 | 0.6 | 16.72 | 0 | 5.94 | 35.24 | 82.71 | 99.43 | 6.54 | 111 |
| 20 | 29.33 | -4.6944 | 0.6 | 17.60 | 0 | 6.25 | 39.04 | 91.65 | 109.25 | 6.85 | 121 |
| 21 | 30.80 | -4.6944 | 0.6 | 18.48 | 0 | 6.56 | 43.05 | 101.04 | 119.52 | 7.16 | 132 |
| 22 | 32.27 | -4.6944 | 0.6 | 19.36 | 0 | 6.87 | 47.24 | 110.89 | 130.25 | 7.47 | 143 |
| 23 | 33.73 | -4.6944 | 0.6 | 20.24 | 0 | 7.19 | 51.64 | 121.20 | 141.44 | 7.79 | 155 |
| 24 | 35.20 | -4.6944 | 0.6 | 21.12 | 0 | 7.50 | 56.22 | 131.97 | 153.09 | 8.10 | 167 |
| 25 | 36.67 | -4.6944 | 0.6 | 22.00 | 0 | 7.81 | 61.01 | 143.20 | 165.20 | 8.41 | 180 |
| 26 | 38.13 | -4.6944 | 0.6 | 22.88 | 0 | 8.12 | 65.99 | 154.88 | 177.76 | 8.72 | 193 |
| 27 | 39.60 | -4.6944 | 0.6 | 23.76 | 0 | 8.44 | 71.16 | 167.02 | 190.78 | 9.04 | 207 |
| 28 | 41.07 | -4.6944 | 0.6 | 24.64 | 0 | 8.75 | 76.53 | 179.63 | 204.27 | 9.35 | 221 |
| 29 | 42.53 | -4.6944 | 0.6 | 25.52 | 0 | 9.06 | 82.09 | 192.69 | 218.21 | 9.66 | 235 |
| 30 | 44.00 | -4.6944 | 0.6 | 26.40 | 0 | 9.37 | 87.85 | 206.20 | 232.60 | 9.97 | 250 |
| 31 | 45.47 | -4.6944 | 0.6 | 27.28 | 0 | 9.69 | 93.81 | 220.18 | 247.46 | 10.29 | 266 |
| 32 | 46.93 | -4.6944 | 0.6 | 28.16 | 0 | 10.00 | 99.95 | 234.61 | 262.77 | 10.60 | 282 |
| 33 | 48.40 | -4.6944 | 0.6 | 29.04 | 0 | 10.31 | 106.30 | 249.51 | 278.55 | 10.91 | 290 |
| 34 | 49.87 | -4.6944 | 0.6 | 29.92 | 0 | 10.62 | 112.84 | 264.86 | 294.78 | 11.22 | 315 |
| 35 | 51.33 | -4.6944 | 0.6 | 30.80 | 0 | 10.94 | 119.57 | 280.67 | 311.47 | 11.54 | 337 |
| 36 | 52.80 | -4.6944 | 0.6 | 31.68 | 0 | 11.25 | 126.51 | 296.93 | 328.61 | 11.85 | 357 |
| 37 | 54.27 | -4.6944 | 0.6 | 32.56 | 0 | 11.56 | 133.63 | 313.66 | 346.22 | 12.16 | 372 |
| 38 | 55.73 | -4.6944 | 0.6 | 33.44 | 0 | 11.87 | 140.95 | 330.84 | 364.28 | 12.47 | 393 |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**Emergency Braking for NYCTransit R-68A (3.2 mph/s)**

**P-R time = 1.5 seconds**

| Theoretical data based on Manufacturer Specs | | | | | | | | | | | NYCTransit Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vi** | **Vi** | **Aeb** | **Tpr** | **Xpr** | **Vf** | **Teb** | **TebTeb** | **Xeb** | **Xt** | **Tt** | **Xeb** |
| *mi/hr* | *ft/sec* | *ft/sec/sec* | *sec* | *ft* | *ft/sec* | *sec* | *sec x sec* | *ft* | *ft* | *sec* | *ft* |
| 1 | 1.47 | -4.6944 | 1.5 | 2.20 | 0 | 0.31 | 0.10 | 0.23 | 2.43 | 1.81 | |
| 2 | 2.93 | -4.6944 | 1.5 | 4.40 | 0 | 0.62 | 0.39 | 0.92 | 5.32 | 2.12 | |
| 3 | 4.40 | -4.6944 | 1.5 | 6.60 | 0 | 0.94 | 0.88 | 2.06 | 8.66 | 2.44 | |
| 4 | 5.87 | -4.6944 | 1.5 | 8.80 | 0 | 1.25 | 1.56 | 3.67 | 12.47 | 2.75 | |
| 5 | 7.33 | -4.6944 | 1.5 | 11.00 | 0 | 1.56 | 2.44 | 5.73 | 16.73 | 3.06 | 13 |
| 6 | 8.80 | -4.6944 | 1.5 | 13.20 | 0 | 1.87 | 3.51 | 8.25 | 21.45 | 3.37 | 17 |
| 7 | 10.27 | -4.6944 | 1.5 | 15.40 | 0 | 2.19 | 4.78 | 11.23 | 26.63 | 3.69 | 21 |
| 8 | 11.73 | -4.6944 | 1.5 | 17.60 | 0 | 2.50 | 6.25 | 14.66 | 32.26 | 4.00 | 26 |
| 9 | 13.20 | -4.6944 | 1.5 | 19.80 | 0 | 2.81 | 7.91 | 18.56 | 38.36 | 4.31 | 32 |
| 10 | 14.67 | -4.6944 | 1.5 | 22.00 | 0 | 3.12 | 9.76 | 22.91 | 44.91 | 4.62 | 38 |
| 11 | 16.13 | -4.6944 | 1.5 | 24.20 | 0 | 3.44 | 11.81 | 27.72 | 51.92 | 4.94 | 44 |
| 12 | 17.60 | -4.6944 | 1.5 | 26.40 | 0 | 3.75 | 14.06 | 32.99 | 59.39 | 5.25 | 51 |
| 13 | 19.07 | -4.6944 | 1.5 | 28.60 | 0 | 4.06 | 16.50 | 38.72 | 67.32 | 5.56 | 58 |
| 14 | 20.53 | -4.6944 | 1.5 | 30.80 | 0 | 4.37 | 19.13 | 44.91 | 75.71 | 5.87 | 65 |
| 15 | 22.00 | -4.6944 | 1.5 | 33.00 | 0 | 4.69 | 21.96 | 51.55 | 84.55 | 6.19 | 74 |
| 16 | 23.47 | -4.6944 | 1.5 | 35.20 | 0 | 5.00 | 24.99 | 58.65 | 93.85 | 6.50 | 82 |
| 17 | 24.93 | -4.6944 | 1.5 | 37.40 | 0 | 5.31 | 28.21 | 66.21 | 103.61 | 6.81 | 91 |
| 18 | 26.40 | -4.6944 | 1.5 | 39.60 | 0 | 5.62 | 31.63 | 74.23 | 113.83 | 7.12 | 101 |
| 19 | 27.87 | -4.6944 | 1.5 | 41.80 | 0 | 5.94 | 35.24 | 82.71 | 124.51 | 7.44 | 111 |
| 20 | 29.33 | -4.6944 | 1.5 | 44.00 | 0 | 6.25 | 39.04 | 91.65 | 135.65 | 7.75 | 121 |
| 21 | 30.80 | -4.6944 | 1.5 | 46.20 | 0 | 6.56 | 43.05 | 101.04 | 147.24 | 8.06 | 132 |
| 22 | 32.27 | -4.6944 | 1.5 | 48.40 | 0 | 6.87 | 47.24 | 110.89 | 159.29 | 8.37 | 143 |
| 23 | 33.73 | -4.6944 | 1.5 | 50.60 | 0 | 7.19 | 51.64 | 121.20 | 171.80 | 8.69 | 155 |
| 24 | 35.20 | -4.6944 | 1.5 | 52.80 | 0 | 7.50 | 56.22 | 131.97 | 184.77 | 9.00 | 167 |
| 25 | 36.67 | -4.6944 | 1.5 | 55.00 | 0 | 7.81 | 61.01 | 143.20 | 198.20 | 9.31 | 180 |
| 26 | 38.13 | -4.6944 | 1.5 | 57.20 | 0 | 8.12 | 65.99 | 154.88 | 212.08 | 9.62 | 193 |
| 27 | 39.60 | -4.6944 | 1.5 | 59.40 | 0 | 8.44 | 71.16 | 167.02 | 226.42 | 9.94 | 207 |
| 28 | 41.07 | -4.6944 | 1.5 | 61.60 | 0 | 8.75 | 76.53 | 179.63 | 241.23 | 10.25 | 221 |
| 29 | 42.53 | -4.6944 | 1.5 | 63.80 | 0 | 9.06 | 82.09 | 192.69 | 256.49 | 10.56 | 235 |
| 30 | 44.00 | -4.6944 | 1.5 | 66.00 | 0 | 9.37 | 87.85 | 206.20 | 272.20 | 10.87 | 250 |
| 31 | 45.47 | -4.6944 | 1.5 | 68.20 | 0 | 9.69 | 93.81 | 220.18 | 288.38 | 11.19 | 266 |
| 32 | 46.93 | -4.6944 | 1.5 | 70.40 | 0 | 10.00 | 99.95 | 234.61 | 305.01 | 11.50 | 282 |
| 33 | 48.40 | -4.6944 | 1.5 | 72.60 | 0 | 10.31 | 106.30 | 249.51 | 322.11 | 11.81 | 290 |
| 34 | 49.87 | -4.6944 | 1.5 | 74.80 | 0 | 10.62 | 112.84 | 264.86 | 339.66 | 12.12 | 315 |
| 35 | 51.33 | -4.6944 | 1.5 | 77.00 | 0 | 10.94 | 119.57 | 280.67 | 357.67 | 12.44 | 337 |
| 36 | 52.80 | -4.6944 | 1.5 | 79.20 | 0 | 11.25 | 126.51 | 296.93 | 376.13 | 12.75 | 357 |
| 37 | 54.27 | -4.6944 | 1.5 | 81.40 | 0 | 11.56 | 133.63 | 313.66 | 395.06 | 13.06 | 372 |
| 38 | 55.73 | -4.6944 | 1.5 | 83.60 | 0 | 11.87 | 140.95 | 330.84 | 414.44 | 13.37 | 393 |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**Emergency Braking for NYCTransit R-68A (3.2 mph/s)**

**P-R time = 2.0 seconds**

| Theoretical data based on Manufacturer Specs | | | | | | | | | | | NYCTransit Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vi** | **Vi** | **Aeb** | **Tpr** | **Xpr** | **Vf** | **Teb** | **TebTeb** | **Xeb** | **Xt** | **Tt** | **Xeb** |
| mi/hr | ft/sec | ft/sec/sec | sec | ft | ft/sec | sec | sec x sec | ft | ft | sec | ft |
| 1 | 1.47 | -4.6944 | 2 | 2.93 | 0 | 0.31 | 0.10 | 0.23 | 3.16 | 2.31 | |
| 2 | 2.93 | -4.6944 | 2 | 5.87 | 0 | 0.62 | 0.39 | 0.92 | 6.78 | 2.62 | |
| 3 | 4.40 | -4.6944 | 2 | 8.80 | 0 | 0.94 | 0.88 | 2.06 | 10.86 | 2.94 | |
| 4 | 5.87 | -4.6944 | 2 | 11.73 | 0 | 1.25 | 1.56 | 3.67 | 15.40 | 3.25 | |
| 5 | 7.33 | -4.6944 | 2 | 14.67 | 0 | 1.56 | 2.44 | 5.73 | 20.39 | 3.56 | 13 |
| 6 | 8.80 | -4.6944 | 2 | 17.60 | 0 | 1.87 | 3.51 | 8.25 | 25.85 | 3.87 | 17 |
| 7 | 10.27 | -4.6944 | 2 | 20.53 | 0 | 2.19 | 4.78 | 11.23 | 31.76 | 4.19 | 21 |
| 8 | 11.73 | -4.6944 | 2 | 23.47 | 0 | 2.50 | 6.25 | 14.66 | 38.13 | 4.50 | 26 |
| 9 | 13.20 | -4.6944 | 2 | 26.40 | 0 | 2.81 | 7.91 | 18.56 | 44.96 | 4.81 | 32 |
| 10 | 14.67 | -4.6944 | 2 | 29.33 | 0 | 3.12 | 9.76 | 22.91 | 52.24 | 5.12 | 38 |
| 11 | 16.13 | -4.6944 | 2 | 32.27 | 0 | 3.44 | 11.81 | 27.72 | 59.99 | 5.44 | 44 |
| 12 | 17.60 | -4.6944 | 2 | 35.20 | 0 | 3.75 | 14.06 | 32.99 | 68.19 | 5.75 | 51 |
| 13 | 19.07 | -4.6944 | 2 | 38.13 | 0 | 4.06 | 16.50 | 38.72 | 76.85 | 6.06 | 58 |
| 14 | 20.53 | -4.6944 | 2 | 41.07 | 0 | 4.37 | 19.13 | 44.91 | 85.97 | 6.37 | 65 |
| 15 | 22.00 | -4.6944 | 2 | 44.00 | 0 | 4.69 | 21.96 | 51.55 | 95.55 | 6.69 | 74 |
| 16 | 23.47 | -4.6944 | 2 | 46.93 | 0 | 5.00 | 24.99 | 58.65 | 105.59 | 7.00 | 82 |
| 17 | 24.93 | -4.6944 | 2 | 49.87 | 0 | 5.31 | 28.21 | 66.21 | 116.08 | 7.31 | 91 |
| 18 | 26.40 | -4.6944 | 2 | 52.80 | 0 | 5.62 | 31.63 | 74.23 | 127.03 | 7.62 | 101 |
| 19 | 27.87 | -4.6944 | 2 | 55.73 | 0 | 5.94 | 35.24 | 82.71 | 138.44 | 7.94 | 111 |
| 20 | 29.33 | -4.6944 | 2 | 58.67 | 0 | 6.25 | 39.04 | 91.65 | 150.31 | 8.25 | 121 |
| 21 | 30.80 | -4.6944 | 2 | 61.60 | 0 | 6.56 | 43.05 | 101.04 | 162.64 | 8.56 | 132 |
| 22 | 32.27 | -4.6944 | 2 | 64.53 | 0 | 6.87 | 47.24 | 110.89 | 175.42 | 8.87 | 143 |
| 23 | 33.73 | -4.6944 | 2 | 67.47 | 0 | 7.19 | 51.64 | 121.20 | 188.67 | 9.19 | 155 |
| 24 | 35.20 | -4.6944 | 2 | 70.40 | 0 | 7.50 | 56.22 | 131.97 | 202.37 | 9.50 | 167 |
| 25 | 36.67 | -4.6944 | 2 | 73.33 | 0 | 7.81 | 61.01 | 143.20 | 216.53 | 9.81 | 180 |
| 26 | 38.13 | -4.6944 | 2 | 76.27 | 0 | 8.12 | 65.99 | 154.88 | 231.15 | 10.12 | 193 |
| 27 | 39.60 | -4.6944 | 2 | 79.20 | 0 | 8.44 | 71.16 | 167.02 | 246.22 | 10.44 | 207 |
| 28 | 41.07 | -4.6944 | 2 | 82.13 | 0 | 8.75 | 76.53 | 179.63 | 261.76 | 10.75 | 221 |
| 29 | 42.53 | -4.6944 | 2 | 85.07 | 0 | 9.06 | 82.09 | 192.69 | 277.75 | 11.06 | 235 |
| 30 | 44.00 | -4.6944 | 2 | 88.00 | 0 | 9.37 | 87.85 | 206.20 | 294.20 | 11.37 | 250 |
| 31 | 45.47 | -4.6944 | 2 | 90.93 | 0 | 9.69 | 93.81 | 220.18 | 311.11 | 11.69 | 266 |
| 32 | 46.93 | -4.6944 | 2 | 93.87 | 0 | 10.00 | 99.95 | 234.61 | 328.48 | 12.00 | 282 |
| 33 | 48.40 | -4.6944 | 2 | 96.80 | 0 | 10.31 | 106.30 | 249.51 | 346.31 | 12.31 | 290 |
| 34 | 49.87 | -4.6944 | 2 | 99.73 | 0 | 10.62 | 112.84 | 264.86 | 364.59 | 12.62 | 315 |
| 35 | 51.33 | -4.6944 | 2 | 102.67 | 0 | 10.94 | 119.57 | 280.67 | 383.33 | 12.94 | 337 |
| 36 | 52.80 | -4.6944 | 2 | 105.60 | 0 | 11.25 | 126.51 | 296.93 | 402.53 | 13.25 | 357 |
| 37 | 54.27 | -4.6944 | 2 | 108.53 | 0 | 11.56 | 133.63 | 313.66 | 422.19 | 13.56 | 372 |
| 38 | 55.73 | -4.6944 | 2 | 111.47 | 0 | 11.87 | 140.95 | 330.84 | 442.31 | 13.87 | 393 |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

8.  **Examples of Platform Doors Around the World**

| Picture | Location |
|---|---|
|  | JFK Airport Airtrain |
|  | Newark Airport Airtrain |
|  | O'Hare Airport Inter-Terminal Train |
|  | Horizontal lift style doors at Lomonosovskaya Station on the Saint Petersburg Metro, the first type of screen doors in the world. |

84

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | |
|---|---|
|  | The Singapore MRT was the first in the world to be fitted with glass screen doors. These are the first-generation doors, seen here at Raffles Place Station. |
|  | Platform edge doors at Kwai Hing Station of Hong Kong MTR |
|  | Fully enclosed platform screen doors at Jiashan Road Station of Line 9 in Shanghai Metro |
|  | Fully enclosed doors at Ecological District Station of Kaohsiung MRT in Taiwan |
|  | Platform edge doors at Hills Showground Station on the Sydney Metro |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | |
|---|---|
|  | Half-height platform gates at Sunny Bay Station on the Disneyland Resort Line in Hong Kong |
|  | Rouse Hill Station on the Sydney Metro |
|  | Paulista Station on São Paulo Metro's Line 4 with platform screen doors |
|  | Line 6 of the Santiago Metro, inaugurated in November 2017, introduced the platform doors and converted it into one of the most modern in Latin America. |
| | Most stations at Line 2 of Shanghai Metro are facilitated with platform screen gates. The image describes the low-height screen doors at Songhong Road Station, with a train with Fate/Grand Order livery stopping. |

86

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | |
|---|---|
|  | Some high-speed railway stations, such as Futian Railway Station are facilitated with screen doors set back from the platform edge. |
|  | Platform screen doors at Forum Station. These type of doors are installed in all underground stations throughout the Copenhagen Metro. |
|  | Fully enclosed platform screen doors in Paris Métro |
|  | East Tsim Sha Tsui Station has the longest set of platform screen doors in the world, but a third have been out of service since the station began serving the West Rail Line's shorter trains in 2009. |
|  | Fully enclosed platform screen doors installed in Chennai Metro's underground stations |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | |
|---|---|
|  | Half-height automatic platform doors in Okhla Bird Sanctuary Station of the Delhi Metro's Magenta Line. |
|  | Platform screen doors at Bundaran HI MRT Station |
|  | Half-height doors at ASEAN MRT station |
|  | Half-height doors at TransJakarta Bundaran HI station |
|  | Platform screen doors at the Monte Compatri-Pantano station on Rome Metro's Line C |
|  | Full-height doors on Tokyo Metro Namboku Line and Toei Mita Line |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | |
|---|---|
|  | Low-height doors on the Tokyo Metro Marunouchi Line |
|  | Platform screen doors at KLCC |
|  | Half height platform screen doors at Semantan |
| | Platform screen doors at TRX station |
|  | Second-generation platform doors at Serangoon Station, opened in 2003. These doors have more glass than the first-generation doors pictured above. |
| | Half-height platform doors at Yio Chu Kang Station |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | |
|---|---|
|  | Full-height platform screen doors on Seoul Subway |
|  | Full-height platform screen doors in Barcelona Metro |
|  | Liseberg Station with doors one meter from the platform edge |
|  | Platform screen doors at Lausanne Métro's Délices Station. |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | |
|---|---|
|  | Taipei Main Station of the Taipei Metro is fitted with automatic platform gates |
|  | Sala Daeng sky train station, Silom, Bangkok |
|  | Full-height platform screen doors in Dubai Metro |
|  | Platform screen doors at Westminster |
|  | Full-height platform screen doors at AeroTrain Terminal at Washington Dulles International Airport |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| | |
|---|---|
|  | The Barcelona subway, vertical platform doors |
|  | Beijing outfitted with safety doors |
|  | From Tokyo Mango: "Newer train lines in Japan have suicide prevention platforms. 5-foot walls span the entire platform, with doors that only open when the train has safely stopped at the station. Jumping in front of a moving train is one of the most common suicide methods in Japan. |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**APTA Safety Study Format**

**APTA RT-RGC-RP-003-03, December, 2017 Rail Transit Grade Crossing Safety Assessment**

This *standard* provides an organized, structured approach for assessing the safety of highway-railroad grade crossings. This is accomplished by verifying that the highway-railroad grade crossing systems are operating safely and as designed through periodic assessment, thereby increasing safety, lowering risk and reducing the number of highway-railroad grade crossing collisions, deaths and injuries involving people who interact with the railroads operations (motorists, employees, passengers, pedestrians).

**1. Highway rail grade crossing safety assessment process**

The Rail Transit System (RTS) should assess each highway-rail grade crossing using a process that includes the activities presented in Sections 1.1 through 1.8 as a minimum.

**1.1 Diagnostic review team**

The RTS should assemble a diagnostic review team that is interdisciplinary in nature and represents all groups that share responsibility for safety at the grade crossings, such as rail and highway systems, law enforcement agencies and local municipalities.

The diagnostic team should have experience in the following:
- Rail and highway traffic operations
- Rail and highway traffic engineering
- Railroad and highway signals and their interconnection
- System safety
- Administration
- Applicable regulatory recommended practices

**1.2 Site visit and data collection**

The diagnostic team should study each proposed crossing by gathering all relevant data and engineering documents. The team should then conduct a group review of the data and a group inspection of the proposed/existing physical crossing location and its surrounding area. The objective is to determine the characteristics and factors at the proposed crossing that affect safety. This information should be kept in a database for easy reference and updating as conditions change.

**1.3 Evaluation/engineering analysis**

An evaluation of each crossing should be made using a documented methodology that takes into account factors such as those shown in Annex B. The methodology should identify potential hazards related to people (employees, passengers, pedestrians and members of the general public), trains, equipment, highway vehicles and other property that may exist at each crossing. Additionally, the grade crossing safety

93

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

evaluation should be tied to the rail transit system's overall system safety program plan.

## 1.4 Development of recommendations

Recommendations to eliminate or control hazards should be identified and documented. The following should be primary considerations:

- Closure or consolidation of existing crossings
- Grade separation of existing crossings
- Design recommendations

Examples of specific design-related recommendations for retained crossings include the following:

- Improved sight distance (e.g., removal of obstructions in the sight triangle)
- Raised median or divider
- Signage
- Pavement markings
- Curbs
- Roadway surface
- Highway realignment
- Improved cross-section (humped crossings)
- Illumination of the crossing (street lighting, etc.)
- Crossing surfaces

Installation of active traffic control and warning devices:
- Flashing warning lights
- Bells and other audible devices
- Gates (highway and pedestrian)
- Data recorders
- Health monitoring
- Interconnection with highway traffic signal systems

## 1.5 Implementation of recommendations

The design and construction of the system should address all recommendations so that they are implemented prior to operation. Recommendations should be included in the project safety certification process of the system safety program plan.

In addition to the recommendations developed in Section 1.4, the following areas should be made part of the highway rail grade crossing system safety program plan:
- Operating and maintenance procedures
- Training programs
- Safety education programs
- Law enforcement programs

94

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## 1.6 Grade crossing inventory
Each RTS  should maintain a highway-rail grade crossing inventory that includes all public, private and pedestrian highway rail grade crossings, both at grade and grade separated (underpasses and overpasses). Each crossing should be assigned an appropriate unique identifier.

## 1.7 Follow-up
There should be a procedure in place to ensure that the grade crossing recommendations have been implemented in accordance with Section 1.4. As soon as practicable after the start of revenue operation, each highway rail grade crossing should be reviewed to determine whether the initial assumptions are still valid. The database discussed in Section 1.2 and the inventory discussed in Section 1.6 should be updated if appropriate.

## 1.8 Periodic review
### 1.8.1 System-wide review
System-wide review of new and existing highway rail grade crossings should be done on a regular basis in accordance with the rail transit system's system safety program plan. This review should identify factors at crossings that may have changed or are emerging that may create the potential for new hazards not previously addressed. The inventory and the factors in Section 1.4 may be used in the system safety program plan if the RTS deems it appropriate.

### 1.8.2 Site-specific review
Additionally, site-specific review should be done as deemed necessary by management or when any of the following occur:

- changes in the safety factors considered in the grade crossing evaluation (Section 1.4).
- system expansion
- an accident (collision)
- a near miss (near hit)

### 1.8.3 Database and USDOT inventory update
The database and inventory should be updated as appropriate.

### 1.8.4 Diagnostic team/engineering study
During a system-wide or site-specific review, conditions may warrant a full diagnostic team/engineering studies.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## Track Incident Data

NYCT 'Struck By' or 'Collision w/ Individual' Incidents & Fatalities 2001-2019

6/16/2019

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | 5 | 8 | 12 | 10 | 11 | 4 | 5 | 7 | 7 | 12 | 15 | 14 | 110 | |
| (Fatalities) | 0 | 2 | 3 | 4 | 4 | 2 | 1 | 2 | 1 | 4 | 2 | 6 | 31 | 31 |
| 2002 | 10 | 10 | 10 | 8 | 8 | 8 | 13 | 6 | 16 | 11 | 23 | 13 | 136 | |
| (Fatalities) | 6 | 5 | 3 | 4 | 3 | 2 | 7 | 1 | 4 | 1 | 5 | 5 | 46 | 46 |
| 2003 | 9 | 16 | 9 | 13 | 20 | 8 | 23 | 20 | 22 | 11 | 16 | 21 | 188 | |
| (Fatalities) | 2 | 7 | 4 | 3 | 4 | 1 | 3 | 4 | 0 | 2 | 3 | 4 | 37 | 37 |
| 2004 | 6 | 17 | 19 | 12 | 17 | 28 | 17 | 5 | 5 | 8 | 11 | 13 | 158 | |
| (Fatalities) | 1 | 3 | 2 | 1 | 3 | 4 | 7 | 4 | 1 | 2 | 2 | 5 | 35 | 35 |
| 2005 | 15 | 20 | 27 | 9 | 8 | 9 | 12 | 7 | 9 | 5 | 17 | 13 | 151 | |
| (Fatalities) | 6 | 3 | 6 | 5 | 4 | 3 | 4 | 2 | 0 | 1 | 5 | 5 | 44 | 44 |
| 2006 | 6 | 5 | 16 | 12 | 10 | 7 | 12 | 12 | 5 | 9 | 9 | 6 | 109 | |
| (Fatalities) | 3 | 2 | 5 | 3 | 5 | 1 | 3 | 1 | 4 | 5 | 4 | 2 | 38 | 38 |
| 2007 | 10 | 8 | 10 | 12 | 5 | 6 | 8 | 15 | 10 | 9 | 5 | 12 | 110 | |
| (Fatalities) | 6 | 2 | 5 | 5 | 5 | 2 | 4 | 8 | 2 | 7 | 2 | 7 | 55 | 55 |
| 2008 | 10 | 12 | 12 | 9 | 8 | 11 | 7 | 5 | 6 | 15 | 5 | 7 | 107 | |
| (Fatalities) | 3 | 4 | 3 | 4 | 3 | 3 | 1 | 3 | 2 | 4 | 0 | 4 | 34 | 34 |
| 2009 | 10 | 13 | 20 | 10 | 12 | 12 | 9 | 16 | 7 | 5 | 8 | 13 | 135 | |
| (Fatalities) | 4 | 5 | 8 | 3 | 3 | 6 | 4 | 6 | 3 | 2 | 3 | 2 | 49 | 49 |
| 2010 | 7 | 14 | 12 | 8 | 12 | 13 | 10 | 8 | 11 | 14 | 6 | 12 | 127 | |
| (Fatalities) | 3 | 6 | 7 | 4 | 4 | 4 | 4 | 4 | 6 | 4 | 2 | 3 | 51 | 51 |
| 2011 | 17 | 13 | 10 | 13 | 7 | 9 | 10 | 14 | 13 | 11 | 12 | 17 | 146 | |
| (Fatalities) | 3 | 3 | 4 | 7 | 5 | 1 | 5 | 5 | 3 | 4 | 3 | 4 | 47 | 47 |
| 2012 | 9 | 13 | 19 | 11 | 11 | 12 | 8 | 6 | 14 | 12 | 9 | 17 | 141 | |
| (Fatalities) | 7 | 9 | 8 | 2 | 3 | 5 | 3 | 0 | 6 | 4 | 3 | 6 | 56 | 56 |
| 2013 | 17 | 14 | 16 | 13 | 13 | 8 | 11 | 8 | 16 | 12 | 12 | 12 | 152 | |
| (Fatalities) | 7 | 6 | 3 | 7 | 4 | 4 | 2 | 2 | 5 | 7 | 7 | 1 | 55 | 55 |
| 2014 | 10 | 17 | 18 | 8 | 10 | 12 | 11 | 11 | 12 | 10 | 17 | 9 | 145 | |
| (Fatalities) | 2 | 5 | 6 | 7 | 5 | 2 | 6 | 4 | 5 | 6 | 6 | 4 | 58 | 58 |
| 2015 | 19 | 9 | 22 | 8 | 16 | 20 | 12 | 12 | 12 | 14 | 11 | 17 | 172 | |
| (Fatalities) | 6 | 4 | 5 | 0 | 3 | 5 | 4 | 3 | 5 | 9 | 4 | 2 | 50 | 50 |
| 2016 | 12 | 17 | 14 | 23 | 12 | 12 | 13 | 10 | 10 | 12 | 19 | 14 | 168 | |
| (Fatalities) | 1 | 3 | 6 | 7 | 5 | 4 | 3 | 2 | 5 | 3 | 7 | 2 | 49 | 49 |
| 2017 | 21 | 13 | 19 | 15 | 17 | 16 | 10 | 15 | 23 | 8 | 9 | 15 | 181 | |
| (Fatalities) | 6 | 3 | 3 | 4 | 5 | 7 | 3 | 3 | 3 | 5 | 1 | 2 | 46 | 46 |
| 2018 | 19 | 14 | 17 | 11 | 11 | 14 | 16 | 14 | 16 | 18 | 16 | 23 | 189 | |
| (Fatalities) | 7 | 2 | 4 | 2 | 4 | 9 | 8 | 4 | 6 | 9 | 5 | 8 | 68 | 68 |
| 2019 | 13 | 13 | 12 | 24 | 21 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 88 | |
| (Fatalities) | 2 | 3 | 3 | 10 | 7 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 27 | 27 partial year |

**Notes:**
Fatalities are a subset of the total incident count. i.e. There were 189
total cases in 2018 where a person came in contact with a moving train, of which
68 resulted in a fatality.
Data is certified through March 2019; all other months are preliminary.

876

96

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

| Year | Incidents | Fatalities |
|------|-----------|------------|
| 1987 | 195 | 62 |
| 1988 | 227 | 57 |
| 1989 | 226 | 64 |
| 1990 | 193 | 64 |
| 1991 | 193 | 68 |
| 1992 | 160 | 61 |
| 1993 | 216 | 59 |
| 1994 | 199 | 60 |
| 1995 | 173 | 57 |
| 1996 | 165 | 52 |
| 1997 | 135 | 45 |
| 1998 | 150 | 25 |
| 1999 | 140 | 41 |
| 2000 | 121 | 43 |
| 2001 | 139 | 31 |
| 2002 | 136 | 46 |
| 2003 | 188 | 37 |
| 2004 | 158 | 35 |
| 2005 | 151 | 44 |
| 2006 | 109 | 38 |
| 2007 | 110 | 55 |
| 2008 | 120 | 34 |
| 2009 | 136 | 49 |
| 2010 | 127 | 51 |
| 2011 | 146 | 47 |
| 2012 | 141 | 56 |
| 2013 | 152 | 55 |
| 2014 | 152 | 55 |
| 2015 | 145 | 58 |
| 2016 | 172 | 50 |
| 2017 | 168 | 49 |
| 2018 | 189 | 68 |
| 2019 | 192 | 62 |
| 2020 | 170 | 62 |
| 2021 | 200 | 68 |
| | 5694 | 1808 |



Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## Supporting Documentation

### Key Depositions, interviews and witness statements

### Train Operator Shabazz



98

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

### Gabrielle Smith Witness Statement (Declaration)

"At the time [Ms. Harger] fell onto the train tracks, the train was not yet in the train station. She was on the train tracks 7-10 seconds before the train ran over her."

"I was standing in the middle of the train station. The station at the time was not really crowded. As I stood in the middle of the platform and about halfway back toward the back wall, I observed a young female in her 20's and male in his 20"s standing in front of me. They were about 1 - 2 feet away from the solid yellow line. We were standing there for about 5 minutes when all of sudden the female, fainted and fell onto the subway tracks. She fell on her side and appeared not to be totally unaware of surroundings. Another Hispanic male and I went to the edge of the platform where she fell and were saying to her over and over to roll over and lay flat, but she was not understanding or not comprehending what we were saying. At the time she fell onto the train tracks, the train was not yet in the train station. She was on the train tracks 7-10 seconds before the train ran over her. After the train ran her over she was under the second rail car. Before the train ran over her I did not hear any horns. This accident was the fault of the train operator as she should have seen female customer and been able to stop the train from going over her."

### George Brown (Deposition)
**George Brown Page 63:14-25**
Q. Now, at some point you said Luisa mentioned to you that she fell strike that. By the way, where Luisa was standing, to the edge of the platform, about how far was that?
A. I would say over a meter.
Q. Is three feet?
A. Four to five feet

**George Brown Page 73:2-10**
Q. She fell on to the platform?
A. Sorry, on to the tracks. She fell onto the tracks, I shouted at Luisa asking, you know, is she okay, can she move, after that I look up and I don't see a train.
I go back to shouting at Luisa, I look up again, the train is now entering the platform.

**George Brown Page 74:6-17**
Q. Did there come a time when she fell into the roadbed and you saw the train coming?
MR. ROTH: Again, asked and answered.
A. Between her hitting the floor and the train coming in?
Q. Yes.
A. I can give you a range, under a minute, more than five seconds.
Q. But you don't know?
A. But I don't know.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

## Division of Car Equipment: Post Incident Inspection report



**DIVISION OF CAR EQUIPMENT**
**POST INCIDENT INSPECTION REPORT**

RFA #: _066_          MAINT. FACILITY: _CIM_     DATE: _8/2/16_

CONSIST (N/M or S/M): _5148 47 45 46 5068 67 65 66_ _____

INSPECTOR: _O. TSE_       TITLE: _RCI_     PASS NO: _906008_
_H Foster_                  _RCI_          _287586_

*TYPE OF INCIDENT*

- ☒ **PERSON UNDER** (inspect items 1 - 10, 20)
- ☐ **PERSON FALLING BETWEEN CARS** (inspect items 1 -30)
- ☐ **PERSON BETWEEN CAR-BODY AND PLATFORM** (inspect items 1 - 21)
- ☐ **PERSON STRUCK BY TRAIN WHILE ON PLATFORM** (inspect items 1, 2, 4 – 7, 9 – 11, 14, 19, 20, 21 )

| No. | Item | Yes | No |
|---|---|---|---|
| 1. | Brakes tested (static test) electrically and pneumatically and found working as intended? | ☒ | ☐ |
| 2. | Motor control circuits tested and found working as intended? | ☒ | ☐ |
| 3. | Car body heights within limits? | ☒ | ☐ |
| 4. | T/O's vision glass clean and in good working condition? | ☒ | ☐ |
| 5. | Windshield wiper assembly in working condition? | ☒ | ☐ |
| 6. | Headlights in working condition? | ☒ | ☐ |
| 7. | Horn (T/O operating position) working as intended? | ☒ | ☐ |
| 8. | Trip Devices working as intended? | ☒ | ☐ |
| 9. | Evidence of person coming in contact with the train? If yes; note Car # and location | ☒ | ☐ |
| 10. | Pilot valve (T/O position) and emergency brake valves (T/O and C/R positions) working? | ☒ | ☐ |
| 11. | Cars with excess lateral motion? | ☐ | ☐ |
| 12. | Toe plates okay? Toe plates dry? | ☐ | ☐ |
| 13. | Safety chains/inter- car springs are in place and in good condition. | ☐ | ☐ |
| 14. | Pantograph gates/chains in place and not protruding out of car body line? | ☐ | ☐ |
| 15. | Storm doors (bulkhead) in good condition? Locks working? | ☐ | ☐ |
| 16. | Evidence (rub marks) of person falling between cars? | ☐ | ☐ |
| 17. | Car lighting (interior) working as intended? | ☐ | ☐ |
| 18. | Car floor in good condition at both ends of the car? | ☐ | ☐ |
| 19. | T/O and C/R communications (buzzer/PA) working as intended? | ☐ | ☐ |
| 20. | Event Recorder downloaded? (R142/142A/143/160 Contracts)   _N/A_ | ☐ | ☐ |
| 21. | Threshold plates are in place and no part is protruding out of car body line? | ☐ | ☐ |

Comments: _On Main Reservior and on #1 A/c Resistor_
_box at car 5148 - found human tissue on_
_car 5148_

_____ Signature of Inspector _____

- Fax to DCE – **EMERGENCY RESPONSE UNIT AT (212) 712 – 4754**
- Mail Original to: DCE –**EMERGENCY RESPONSE UNIT**
  **354 W54 Street, Rail Control Center, Room 2102A**

5/7/2010

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE



## PUBLIC TRANSPORTATION SAFETY BOARD
## RAIL ACCIDENT CLOSE-OUT FORM

| PTSB Case No. | Property Name | Accident Date |
|---|---|---|
| 13806 | MTA - New York City Transit | August 2, 2016 |

| Injuries | Fatalities | Accident Type | Accident Cause |
|---|---|---|---|
| 1 | 0 | Collision with Individual | Medical Emergency |

| Location | Borough, City, Village, Town |
|---|---|
| Atlantic Avenue Station | Brooklyn |

On Tuesday, August 2, 2016, at approximately 7:07 p.m., a northbound "B" train (interval 1848) struck an individual who fainted and fell in front of the train as it was entering the Atlantic Avenue Station. The Train Operator immediately activated the emergency brakes but was unable to stop the train prior to striking the individual. The Train Operator notified the Rail Control Center (RCC) of the incident. The Train Operator stated that as the train entered the station she observed an individual fall backwards from the platform in front of her train. The train came to a complete stop with four cars in the station. The individual was located alive under the second car (#5147) near survey marker A4 336+50. Two witnesses stated the individual fainted and fell backwards from the station platform onto the track. The individual was removed by EMS and transported to Bellevue Hospital for treatment of a severed arm and leg. There were no other reported injuries to any of the passengers or crew.

The Train Operator was escorted to the NYCT Medical Assessment Center for post incident drug and alcohol testing, which by FTA standards should be administered as soon as practicable following an incident. The following chart shows the Drug and Alcohol test administration times for each transit employee tested:

| Employee | Alcohol Breath Test | | Urinalysis Drug Test | |
|---|---|---|---|---|
| | Time | Within 2 Hours? | Time | Within 32 Hours? |
| Train Operator | 8:52 p.m. | Yes | 9:02 p.m. | Yes |
| Conductor | Not Tested | | Not Tested | |

The alcohol testing was administered to the Train Operator within the FTA two hour guide line. The Conductor was not incident tested because a NYCT supervisor determined that she was not a contributing factor to this incident. The results of the post incident drug and alcohol testing for the Train Operator, at the time of testing, did not meet concentrations equal to or greater than the cutoff requirement for a positive drug or alcohol test. The incident train was sent to the Coney Island Maintenance Facility for post incident inspection. The inspection revealed all equipment was working as intended at the time of the incident.

The Public Transportation Safety Board staff finds that the probable cause of this incident was the medical emergency experienced by the individual who fainted and fell to the roadbed and was struck by the train entering Atlantic Avenue Station. Based on the reported facts in this case, the Public Transportation Safety Board staff makes no recommendations regarding this incident.

| Investigated by | Approved by | Date of Board Approval |
|---|---|---|
| James Patterson | | |
| | Chief Investigator, PTSB | |

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

347 Madison Avenue
New York, NY 10017-3739
212 878-7000 Tel

 **Metropolitan Transportation Authority**
State of New York

March 17, 2010

Dr. Gary R. McVoy
Executive Director
Public Transportation Safety Board
State of New York
Department of Transportation
Albany, New York 12232

Re: System Safety Corrective Action Response to Individuals Struck by Train

Dear Dr. McVoy:

MTA shares the Public Transportation Safety Board's concern for individuals who are
struck by trains and have taken many steps to address this issue. Per your suggestion, I
recently met with the Safety Directors of Long Island Rail Road, Metro-North Railroad
and NYC Transit to share information on practices employed in the industry to reduce
these incidents.

Information provided to New York City Transit by six large transit agencies indicate
that none of these properties have any sort of intrusion alarms or physical barriers to
prevent customers from entering the track bed. While some have CCTV, none are
consistently monitored by staff. SEPTA has emergency buttons in some token booths
used to illuminate a light in the tunnel if it is reported to the station agent that someone
is on the tracks. The signal to train operations provided by this system, which relies
solely on human interaction, is similar to the current ability of NYCT station agents to
notify the train operator through the command center in the event that it is known that
someone is on the right-of-way.

The properties surveyed largely rely on the same approaches as are in use on the MTA
systems. The MTA and the other large transit systems surveyed use various
announcements, both on-board and in stations, to remind passengers to stand back from
the platform edge and we have all found the two-foot wide detectable warning strips on
platform edges to be an effective deterrent to people standing along the edge of the
platform.

The agencies of the MTA

MTA New York City Transit     MTA Long Island Bus     MTA Bridges and Tunnels     MTA Bus Company
MTA Long Island Rail Road     MTA Metro-North Railroad     MTA Capital Construction

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

Dr. Gary R. McVoy
March 17, 2010
Page 2

Public Address and Customer Information Screens (digital information signs which
alert customers of train arrival information) currently in use at some NYCT stations and
to be installed in all stations over the course of this and the next capital program, will
reduce the occurrences of customers leaning over the platform edge to look down the
tunnel for an approaching train.

Given operational considerations and limited capital resources, MTA agencies are not
able to "harden" the system in a way that would absolutely keep customers and
trespassers from entering the tracks.

The efforts described above are in line with those of other large transit agencies. MTA
will continue to monitor cases of individuals struck by trains and industry
developments that could further reduce the occurrence of these tragic events. I will be
pleased to advise the Board of any future developments in this area.

Sincerely,

Judith Walker
Acting Director Operations Support

FURTHER LIST OF MATERIALS REVIEWED AND CONSIDRED:

**Memo on the Platform Edge Safety Program Proposal (November 30, 2001)**
This memo provides further evidence that NYCTA was aware of the platform hazard.
Further, NYCTA planned to pilot recommended safety enhancements at the Euclid
Avenue Station and to track the effectiveness of the enhancements.
"The purpose of the pilot program, particularly at the Euclid Avenue Station, was to
install a package of items whose impact on platform edge safety could be easily tracked
over time."
The enhancements include a voice message system and variable message signs that
advise customers to stand back from the platform edge as trains enter and depart the
station. There is no evidence that NYCTA tracked or studied the effectiveness of these
enhancements. Further, based on the inspection of Atlantic Avenue -Barclays Center
station on March 8, 2023 neither of these safety measures were being utilized at the
station.

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

**Charles Yengue memo (May 11, 1999)**
Based on the internal memo on May 11, 1999 from Charles Yengue, in 1999 NYCTA
was already aware of safety challenges related to the platform edge and provides
comments on the use of platform edge guard rail (fixed rail). This memo identifies
challenges of a fixed rail systems related to emergency situations, platform crowding,
platform crowding and customer safety (dragging risk).  However, this memo discusses
only the infeasibility and risks of installing a fixed rail without providing any empirical
evidence or performing any scientific studies to support their conclusions.


Deposition transcripts and Exhibits
  a.  30(b)(6) Eric Jones
  b.  Mike Sullivan
  c.  Mysore Nagaraja
  d.  Thomas Prendergast
  e.  Lawrence Reuter
  f.  Cheryl Kennedy
  g.  Gregory Sanchez
  h.  Andrew Bata
  i.  Ulysse Wurtz
  j.  Gabrielle Smith
  k.  Donald Moeller
  l.  George Brown
  m.  Luisa Janssen Harger Da Silva
  n.  Godfrey Gaskin
  o.  David Foell- STV
  p.  Raqia Shabazz

Plaintiff's documents exchanged with defendants unrelated to medical issues.
Defense responses to Requests for documents, Requests for Admission,  Responses to
Interrogatories and all documents attached or identified therein. To the extent that the
responses identified the ESI production in this matter, there were hundreds of thousands
pages of documents that were placed on the Everlaw review platform and through
Everlaw using the search tools available a review of relevant records and emails was
conducted.

2018 7 13 - DEF Supp Response to PL 1st RFP w_ cd.pdf
2018 7 13 - DEF Supp ROGs responses.pdf
2018 7 13 - DEF Supp Rule 26(a)(1) Initial Disclosures- with cd-17662.pdf
2018 8 13 Def 2nd Supplemental Response to PL 1st RFPs.pdf
2018 9 7 Supplemental response to Rule 26 disclosure.pdf
2019 3 20 Harger Def Response to Rogs.pdf
2019 6 12 Resp to Pltf's 3rd Request for Docs (Doc#1181).pdf

Copyright © 2023 by Carl Berkowitz

Carl Berkowitz, Ph.D. PE

2020 08 07 - supp response to 3rd D and I - HARGER.docx
2020 10 22 - DEF Response to Fourth request for production of documents-21178 CG
NOTES.docx
2020 10 22 - DEF Response to Fourth request for production of documents-21178.pdf
2020 12 14 Supp Resp to Pltf 4th Req for Prod of Docs-21429.pdf
2020-08-07 - Further Supplemental Response to Plaintiff's Third Request for Production
of  Documents -
2022 06 24 - response to pltf's 5th Doc Req - HARGER.pdf
2022 06 24 - Supp Responses to Plaintiff's Second Requests for Admission
2022-06-08 - Responses to Plaintiff's Second Requests for Admission
2022-06-24 - ltr response to alleged deficiencies in response to req to admit
2022-06-30 - response to pltf's 2d req for interrogs FIN
2022-12-06 - Second Responses to Plaintiff's Second Requests for Admission -
HARGER.pdf
2022-12-06 - supp response to pltf's 2d req for interrogs - HARGER.pdf
NYCTA 6978 -7163 MTA NYCT Subway Speed and Capacity Review_Final Report
Bates.pdf
NYCTA-04541-004792 System Safety Plan.pdf
NYCTA-5597-6432 RFI responses.pdf
NYCTA_2_00593536 (2).pdf
 Pages from CHERYL KENNEDY,  8 24 2022  1.pdf
Pages from CHERYL KENNEDY,  8 24 2022 .pdf
Pages from PRENDERGAST.pdf
MTA Addressing Track Trespassing: Actions for Rider Safety & System Reliability
A Report of the Track Trespassing Task Force - Chartered by Janno Lieber, Chair &
CEO- May 2022 (https://new.mta.info/document/87881)

Subpoenaed records from STV
STV renderings

In addition to the documents referenced in the report, included above, and listed above,
see the attached Appendix listing the bates numbers of ESI documents that were
reviewed pursuant to word searches conducted of the docuemtns produced by defendants
in discovery in this matter.[36]

---

[36] There were so many documents there may be some overlap in between these lists.

Copyright © 2023 by Carl Berkowitz