UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LUISA JANSSEN HARGER DASILVA,

          Plaintiff,

-against-

NEW YORK CITY TRANSIT AUTHORITY;
METROPOLITAN TRANSPORTATION
AUTHORITY, and RAQUIA SHABAZZ,

          Defendants.
----------------------------------------------------------X

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1(a)**

1:17-cv-04550 (FB) (VMS)

    In accordance with Local Civil Rule 56.1(a), defendants New York City Transit Authority (NYCT), Metropolitan Transportation Authority (MTA) and Raquia Shabazz (Shabazz), by their attorneys Landman Corsi Ballaine & Ford P.C., respectfully submit the following Statement of Undisputed Material Facts in support of their motion for summary judgment.

    1.    On August 2, 2017, plaintiff Luisa Janssen Harger DaSilva, by her counsel Roth and Roth LLC, filed a summons and a 142 paragraph complaint that sought to recover monetary damages for personal injuries she sustained after she fainted and fell from a train platform at the Atlantic Avenue-Barclays Center station in front of an oncoming train on August 2, 2016 (*see* Declaration of Andrew P. Keaveney, dated November 2, 2023 ["Keaveney Dec."] at Exhibit A).

    2.    Plaintiff's complaint alleges four causes of action. Count 1 alleges the train operator failed to prevent the train from striking plaintiff by either operating the train outside the posted speed restriction, failing to observe plaintiff on the track, or failing to apply the emergency brake in a timely manner. Count 2 alleges defendants were negligent in failing to install platform edge barriers to prevent customers from failing onto the track. Count 3 alleges the defendants failed to install "intrusion technology" that would have warned the train operator that plaintiff was on

the tracks prior to striking her. Finally, Count 4 alleges deficiencies with the station and train's lighting and the train's brakes. (*Id.*)

3. Defendants, in their answer dated December 11, 2017, asserted affirmative defenses, including immunity (6th Affirmative Defense) and the application of the emergency doctrine (5th Affirmative Defense). (Keaveney Dec. at Ex. B.)

4. The District Court has original jurisdiction of this civil action based on the amount in controversy and diversity of citizenship of the parties (28 U.S.C. § 1332), specifically, plaintiff is a Brazilian foreign national, Defendants are residents of the State of New York, and plaintiff seeks damages in excess of $75,000. (Keaveney Dec. at ¶ 9.)

5. The New York City subway system began operating over 100 years ago. (Keaveney Dec. at ¶ 11).

6. Defendant MTA is "a body corporate and politic constituting a public benefit corporation" whose purposes "shall be the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district, including but not limited to such transportation by railroad" which is "in all respects for the benefit of the people of the state of New York" and "shall be regarded as . . . an essential governmental function." (Keaveney Dec. at Ex. ¶ 17; New York Public Authority Law (NYPAL) §§ 1263 and 1264).

7. Defendant NYCT is "a body corporate and politic constituting a public benefit corporation" whose purpose is "to construct, reconstruct, improve, maintain and operate any transit facility, whether now existing, or constructed, acquired or provided in the future" which is "in all respects for the benefit of the people of the state of New York" and "shall be regarded as . . . an

2

essential governmental function." (Keaveney Dec. at Ex. ¶¶ 14 and 18; NYPAL §§ 1202(2) and 1204(8).)

8. There is no heavy rail rapid transit system in the United States that is operated by a private entity (Keaveney Dec. at ¶ 16).

9. Defendant and train operator (TO) Shabazz is an employee of NYCTA. (Keaveney Dec. at Ex. ¶ 20).

10. The over five years of discovery in this action included 15 depositions, and the exchange by Defendants of over 60,000 documents (Keaveney Dec. at ¶ 7).

11. Platform screen doors are relatively new technology (Abdallah Dec. at ¶ 30) and the New York City subway system was not constructed for their use. (Keaveney Dec. at ¶ 34; Ex. YY).

12. Defendants have been studying platform screen doors since the late 1990's, along with other platform safety initiatives to the present day. (Keaveney Dec. at ¶ 25; Abdallah Dec. at ¶¶ 15 and 88.)

13. The installation and use of platform screen doors requires coordination and consideration of various conditions and systems, such as station design, platform integrity, electrical power, signals, car equipment, air circulation, train operation, emergency situations, operating rules, accessibility, installation, maintenance and, of course, funding. (Abdallah Dec. at ¶ 11.)

14. The installation of platform screen doors has benefits including: (a) improving customer safety; (b) reducing trash from accumulating on the track; (c) reducing track fires due to trash and debris; (d) deterring unauthorized individuals and would be criminals from accessing tracks. (Abdallah Dec. at ¶ 53.)

3

15. The installation and use of platform screen doors carries its own hazards, such as a customer getting caught between the train and the platform, the doors preventing emergency egress in certain situations, and a customer being caught in the platform door.   (Keaveney Dec. at ¶ 35; Ex. EE).

16. No heavy rail system in the United States has installed platform screen doors or platform barriers.  (Keaveney Dec. at ¶ 40; Ex. WW at ¶ 15.)

17. One common denominator for contact with trains is customers standing too close to the platform edge. (Keaveney Dec. at ¶ 27; Ex. ZZ at 137:16-18.)

18. The chance of a customer having contact with a New York City subway train in 2016 is less than .00004% (Keaveney Dec. at ¶ 33).

19. There is no federal, statute, rule, or ordinance that requires that installation and use of platform screen doors or barriers on any heavy rail system in the United States.  (Keaveney Dec. at ¶ 40; Ex. WW at ¶ 15.)

20. There is no federal, state, or local statute, rule, or ordinance that requires that installation and use of platform screen doors or barriers on New York City subways.  (Ex. WW at ¶ 15.)

21. Defendants have determined that only 27% (128 out of 472) of its stations are feasible for the installation of platform screen doors (Keaveney Dec. at ¶ 36; Abdallah Dec. at ¶ 82.; Ex. II).

22. NYCT stations were deemed infeasible for installation and use of platform screen doors due to different car classes, ADA clearance issues, platform integrity, structural issues, and mechanical equipment space requirements. (Abdallah Dec. at ¶¶ 86 and 87.)

23. The total cost to install platform barriers at only the 128 feasible NYCT stations would be approximately $7 billion ($7,000,000,000) with an additional annual maintenance cost of $119 million ($119,000,000). (Abdallah Dec. at ¶ 82.; Ex. II.)

24. Defendants have determined that it is not feasible to install platform screen doors at the stations where the accident occurred (Atlantic Avenue- Barclays Center). (Keaveney Dec. at ¶ 36; Abdallah Dec. at ¶ 85.; Ex. JJ).

25. Defendants have to prioritize capital program needs along with maintenance and maintaining the system in a state of good repair. (Abdallah Dec. at ¶¶ 65.)

26. Defendants, following various and reasonable studies, research, investigations, reports, and analyses conducted by consultants and professionals, have passed on installing platform screen doors for various reasons (Abdallah Dec. at ¶¶ 11, 15, 17, 18, 24, 36, 38, 40, 41, 42, 45, 48, 53, 57, 58, 59, 64-78, 80-86).

27. Defendants have implemented campaigns to warn customers from standing too close to the platform edge, via signage, countdown clocks, announcements, displays, and posters. (Keaveney Dec. at ¶ 28; Abdallah Dec. at ¶¶ 61, 64, and 89.)

28. Defendants have studied and tested track intrusion devices. (Abdallah Dec. at ¶¶ 91-96.)

29. There is no U.S. heavy rail rapid transit agency that utilizes intrusion detection system wide. (Ex. YY, ¶ 13.)

30. There is no standard, rule, procedure, or generally accepted practice that requires the use of track intrusion devices in the U.S. (Ex. YY, ¶ 14.)

31. On the day of the accident, the subject train entered the station at a speed between 20 to 25 mph (Keaveney Dec. at ¶ 42; Ex. TT, at 196, 203-204).

5

32. For Manhattan bound trains entering the subject station, the station layout is preceded by a downgrade curve with a posted speed limit of 25 mph (Keaveney Dec. at ¶ 42; Ex. TT at 177-178, 203-204).

33. Plaintiff was at the middle of the station platform before she fell to the track (Keaveney Dec. at ¶ 42; Ex. TT at 214, 216).

34. Prior to and after the accident, there were no defects with the train. (Ex. QQ and RR.)

35. Prior to and after the accident, there were no defects with the station platform. (Ex. SS).

Dated: November 6, 2023
New York, NY

Respectfully submitted,

LANDMAN CORSI BALLAINE & FORD P.C.

By: _____
Andrew P. Keaveney
Attorneys for Defendants
120 Broadway 13th Floor
New York, New York 10271
(212) 238-4800

4860-7127-7965v.1