UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LUISA JANSSEN HARGER DASILVA,

                    Plaintiff,

                                                    Civ. No.: 1:17-cv-04550 (FB) (VMS)

        -against-

NEW YORK CITY TRANSIT AUTHORITY;
METROPOLITAN TRANSPORTATION
AUTHORITY, and RAQUIA SHABAZZ,

                    Defendants.

----------------------------------------------------------X

---

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

                    LANDMAN CORSI BALLAINE & FORD, P.C.
                    Attorneys for Defendants
                    120 Broadway, 13th Floor
                    New York, New York 10271
                    (212) 238-4800

i

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................. 1

STANDARD OF REVIEW ........................................................................................................ 2

LEGAL ARGUMENT ............................................................................................................... 3

POINT I

DEFENDANTS ARE ENTITLED TO IMMUNITY FROM
PLAINTIFF'S SUIT REGARDING COUNTS 2 AND 3 ............................................................3

    A.  MTA and NYCTA, as public corporations, exercise a governmental function when
they make systemwide policy decisions on prioritizing limited capital funding,
balancing different classes of public safety by need and probability, and weighing
possible advances in technology against its installation feasibility and the
technology's creation of new threats to public safety. ....................................................5

    B.  Even if the decision was proprietary, defendants MTA and NYCTA are entitled to
qualified immunity because they extensively studied the risk and the possible
solutions and mitigation methods, and came to a reasoned decision ...........................9

POINT II

PLAINTIFF FAILS TO MAKE A PRIMA FACIE CASE THAT
DEFENDANTS ARE NEGLIGENT IN VIOLATING AN INDUSTRY
STANDARD, THEREFORE COUNTS 2 AND 3 SHOULD BE DISMISSED ........................14

POINT III

NEGLIGENCE AS TO TRAIN OPERATION SHOULD BE DISMISSED ...........................18

    A.  The evidence demonstrates that the train operator (TO) was attentive but was
confronted with the sudden fainting of the plaintiff in front the oncoming train
with mere seconds to respond and insufficient time to stop the train. ........................18

    B.  The baseless speculations that plaintiff uses to support a claim of
negligent train operation fails to support a viable cause of action. ............................20

        1.  Plaintiff's expert – Carl Berkowitz ......................................................................21

        2.  Plaintiff's Expert – Orlando Jimenez, Jr. ...........................................................22

i

POINT IV

PLAINTIFF CAN'T PROVE NEGLIGENCE AS TO THE MAINTENANCE
OF THE CAR EQUIPMENT OR PLATFORM ........................................................................24

CONCLUSION ........................................................................................................................24

4858-8666-5870v.2

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v Cuomo*, 100 F.3d 253 [2d Cir. 1996] ................................................................. 3

*Amorgianos v National R.R. Passenger Corp.,* 303 F.3d 256 [2d Cir. 2002] ............................ 23

*Anderson v Liberty Lobby, Inc.*, 477 U.S. 242 [1986] ..................................................... 3

*Blount v Swiderski*, 2006 WL 3314635 [EDNY] ........................................................... 24

*Bourjaily v U.S.*, 483 U.S. 171 [1987] ....................................................................... 20

*Briceno v. Beau Maison Corp.*, 190 AD3d 813 [2 Dept 2021] ............................................ 21

*Cacciola v Selco Balers, Inc.*, 127 F. Supp. 2d 175 [EDNY 2001] ...................................... 21

*Canel v New York City Tr. Auth.*, 201 AD3d 862 [2 Dept 2022] ........................................ 19

*Chase v New York City Tr. Auth.*, 288 AD2d 422 [2 Dept 2001] ........................................ 10

*Chunhye Kang-Kim v City of New York*, 29 AD3d 57 [1 Dept 2006] ................................... 12

*Clinger v New York City Tr. Auth.*, 85 NY2d 957 [NY 1995] ............................................. 7

*Coleman v New York City Tr. Auth.*, 48 AD3d 764 [2 Dept 2008] ...................................... 18

*Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 [1993] .................................. 20

*DeLeon v New York City Tr. Auth.*, 305 AD2d 227 [2 Dept 2003] ............................... 14, 23

*Deringer v City of New York*, 260 AD2d 305 [1999] ........................................................ 9

*Diaz v N.Y. Downtown Hosp.*, 99 NY2d 542 [NY 2022] ............................................. 17, 20

*Dibble v New York City Tr. Auth.*, 76 AD3d 272 [2 Dept 2010] ........................................ 23

*Enker v County of Sullivan*, 162 AD3d 1366 [3 Dept 2018] .............................................. 10

*Erie Railroad Co. v Tompkins*, 304 U.S. 64 [1938] ......................................................... 3

*Ernest v Red Creek Cent. School Dist.*, 93 NY2d 664 [NY 1999] ....................................... 9

*Ferreira v City of Binghamton*, 38 NY3d 298 [NY 2022] .................................................. 4

*Friedman v State of New York*, 67 NY2d 271 [NY 1986] ....................................................... 12, 13

*Garcia v San Antonio Metro. Transit Auth.*, 469 U.S. 528 [1985] ................................. 6

*Haddock v City of New York*, 75 NY2d 478 [NY 1990]........................................................ 6

*Heins v Vanbourgondien*, 180 AD3d 1019 [2 Dept 2020] ...................................... 9

*Hilaire v DeWalt Inds. Tool Co.*, 54 F.Supp.3d 223 [EDNY 2014].......................... 20

*Iacone v Passanisi*, 133 AD3d 717 [2 Dept 2015] ....................................................... 10

*In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 [2d Cir. 2016] ............................................ 23

*Jeffreys v City of New York*, 426 F.3d 549 [2d Cir. 2005] ............................................ 3

*Kumho Tire Co. v Carmichael*, 526 U.S. 137 [1999] ................................................. 20

*Langer v Xenias*, 134 AD3d 906 [2 Dept 2015] ......................................................... 10

*Lynch v C & S Wholesale Grocers, Inc.*, 157 AD3d 471 [1 Dept 2018] ..................................... 17

*Major League Baseball Properties, Inc. v Salvino, Inc.*, 542 F.3d 290 [2d Cir. 2008]............... 23

*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428 [NY 2011] ...................................... 12

*McCord v City of New York*, 298 AD2d 438 [2 Dept 2002]........................................... 10

*McKechnie v N.Y. City Tr. Police Dept.*, 130 AD2d 466 [2 Dept 1987] ................................. 7, 11

*Miller v State of New York*, 62 NY2d 506, 512 [NY 1994]......................................... 4, 5

*Mirjah v New York City Trans. Auth.*, 48 AD3d 764 [2 Dept 2008] ............................... 22

*Moore Charitable Found. v PJT Partners, Inc.*, 40 NY3d 150 [NY 2023]................................. 14

*Nebraska v Wyoming*, 507 U.S. 584 [1993]................................................................ 2

*Neenan v Quinton*, 110 AD3d 967 [2 Dept 2013] ....................................................... 19

*Pabon v Long Is. R.R. Co.*, 189 AD3d 860 [2 Dept 2020] ...................................... 18

*Painchault v Target Corp.*, 2011 WL 4344150 [EDNY]. ........................................... 2

*Ramirez v State of New York*, 143 AD3d 880 [2 Dept 2016] ....................................... 9

iv

*Rivera v New York City Tr. Auth.*, 184 AD2d 417 [1 Dept 1992] .................................................. 4

*Searcy v New York City Tr. Auth.*, 169 AD3d 1076 [2 Dept 2019] ............................................. 18

*Stevens v New York City Tr. Auth.*, 288 AD2d 460 [2 Dept 2001] ............................................ 9

*Suero v Villa Maria Academy*, 178 AD3d 460, 461 [1 Dept 2019] ........................................... 17

*Taylor Precision Prod., Inc. v Larimer Grp., Inc.*, 2018 WL 4278286 [SDNY] ...................... 21

*Tomassi v Town of Union*, 46 NY2d 91 [NY 1978] ................................................................... 12

*Trimarco v Klein,* 56 NY2d 98 [NY 1982] ................................................................................. 14

*Turturro v City of New York*, 28 NY3d 469 [NY 2016] .............................................................. 4

*Velocci v Stop & Shop*, 188 AD3d 436 [1 Dept 2020] ............................................................... 17

*Weimar v Metro. Transp. Auth.*, 147 AD3d 1111 [2 Dept 2017] ......................................... 21, 23

*Weiner v Metro. Transp. Auth.*, 55 NY2d 175 [NY 1982] .......................................................... 4

*Weiss v Fote*, 7 NY2d 579 [1960] ..................................................................................... passim

*Zambrana v New York City Tr. Auth.*, 14 AD3d 23 [1 Dept 2004] ........................................... 10

**Statutes**

Federal Rules of Civil Procedures Rule 56[c] ............................................................................ 2

Federal Rule of Evidence Rule 104(a) ....................................................................................... 20

Federal Rule of Evidence Rule 702 ...................................................................................... 20, 21

New York Public Authority Law § 1202 ..................................................................................... 4

New Your Public Authority Law § 1264 ...................................................................................... 4

## PRELIMINARY STATEMENT

Defendants New York City Transit Authority (NYCTA), Metropolitan Transportation Authority (MTA) and Raquia Shabazz (Shabazz) respectfully submit this memorandum of law in support of its motion for summary judgment, pursuant to Rule 56, Fed. R. Civ. P., to dismiss the claims and complaint of plaintiff Luissa Janssen Harger DaSilva (Harger).

This diversity jurisdiction action seeks to recover monetary damages for personal injuries following an accident that occurred on August 2, 2016. At that time, plaintiff Harger was waiting for a northbound "B" subway train at the Atlantic Ave. - Barclays Center station when she fainted and fell backwards onto the tracks in front of an oncoming train. Train Operator (TO) Shabazz saw the plaintiff falling and immediately put the train in brakes in emergency but was unable to stop before contacting plaintiff. As a result, plaintiff sustained partial amputations of her left arm and left leg.

Plaintiff's complaint alleges four causes of action. Count 1 alleges the train operator failed to prevent the train from striking plaintiff by either operating the train outside the posted speed restriction, failing to observe plaintiff on the track, or failing to apply the emergency brake in a timely manner. Count 2 alleges defendants were negligent in failing to install platform edge barriers to prevent customers from failing onto the track. Count 3 alleges the defendants failed to install "intrusion technology" that would have warned the train operator that plaintiff was on the tracks prior to striking her. Finally, Count 4 alleges deficiencies with the station and train's lighting and the train's brakes. Defendants, in their answer, asserted affirmative defenses, including immunity and the application of the emergency doctrine.

Discovery in this action has lasted five years. During that time, defendants have produced over 60,000 documents and Plaintiff has taken 15 depositions, which have primarily focused on whether NYCT considered platform screen doors (PSDs) and other track intrusion devices (TIDs)

1

to prevent customer contact with trains.  Discovery on the operation of the train was also conducted.

Years of litigation has lead us to this point - the unavoidable conclusion that: (1) the agency defendants are public authorities exercising a governmental function when it makes systemwide policy decisions about public safety and the prioritizing of limited public funding, and therefore they are entitled to government function immunity; (2) even if not deemed a governmental function, the agency defendants considered and passed on the specific risk alleged, and therefore they are entitled to qualified immunity; (3) defendants did not breach a duty owed as the industry standard for rapid transit systems do not require the use of PSDs or TIDs, thus the agency defendants are not negligent for simply following the existing industry standard; and (4) plaintiff cannot demonstrate that defendants negligently operated or maintained its train and the claims in this regard should be dismissed.

The Court is respectfully referred to Defendants' Rule 56.1 Statement of Material facts.

## <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P.56[c].

Generally, "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions" (*Painchault v Target Corp.*, 2011 WL 4344150, at *3 [EDNY]).   Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case" (*Nebraska v Wyoming*, 507 U.S. 584, 590 [1993][internal citation, quotation marks, and brackets omitted]).   As such, "[a] defendant

2

moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case" (*Allen v Cuomo*, 100 F.3d 253, 258 [2d Cir. 1996]).  To survive summary judgment, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor" (*Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)]) and "may not rely on conclusory allegations or unsubstantiated speculation" (*Jeffreys v City of New York*, 426 F.3d 549, 554 [2d Cir. 2005][citation omitted]).

In diversity cases, the Court applies substantive state law and federal procedural law (*see Erie Railroad Co. v Tompkins*, 304 U.S. 64 [1938]) and whether a governmental entity is entitled to immunity is an issue for the Courts to decide.

As will be shown, there are no genuine issues of material fact that require a trial in this action and, therefore, Defendants are entitled to judgment as a matter of law.

## LEGAL ARGUMENT

## POINT I

## DEFENDANTS ARE ENTITLED TO IMMUNITY FROM PLAINTIFF'S SUIT REGARDING COUNTS 2 AND 3

Although the City's subway system was initially built by private companies via government leases and funds, the government has always directed the development, and execution for all plans for construction and operation of transit facilities (Declaration of Andrew P. Keaveney ("Keaveney Dec."] at ¶ 13).  NYCTA has operated NYC subways as a unified City public rapid transit system since the 1950's (*see* Keaveney Dec. at ¶ 14; Declaration of Tony Abdallah ("Abdallah Dec.") at ¶ 7) and receives most of its operating revenue from taxes and governmental subsidies[1].  Defendants' statutory purpose is "for the benefit of the people of the New York" and

---

[1] *MTA Operating Budget Basics*, https://new.mta.info/budget/MTA-operating-budget-basics, accessed 2023-10-17.

3

they "shall be regarded as performing an essential governmental function in carrying out its purposes and in exercising [its] powers" (NYPAL §§1202, 1264).  As such, the governance, management, and planning of the City's subways is an essential governmental function.

Thus, MTA and NYCTA are, indisputably, governmental agencies that may exercise governmental functions (*see Rivera v New York City Tr. Auth.*, 184 AD2d 417 [1 Dept 1992] *citing Weiner v Metro. Transp. Auth.*, 55 NY2d 175 [NY 1982]).

When assessing a defendant's entitlement to immunity, Courts have initially looked at whether a governmental agency performs a governmental or proprietary function.  (*Miller v State of New York*, 62 NY2d 506, 512 [NY 1994] [internal citations and quotations omitted]).  This is not always a black or white/yes or no determination.  Rather,

> A governmental entity's conduct may fall along a continuum of responsibility . . . . *The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions* . . . .  Consequently, any issue relating to the safety or security of an individual claimant must be carefully scrutinized to determine the point along the continuum that the . . . alleged negligent action falls into, either a proprietary or governmental category.  (*Id*. [emphasis added].)

"The relevant inquiry in determining whether a governmental agency is acting within a governmental or proprietary capacity is to examine the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred" (*Turturro v City of New York*, 28 NY3d 469 [NY 2016][internal quotation omitted]; *see also Ferreira v City of Binghamton*, 38 NY3d 298 [NY 2022] ["A municipality's varied functions may be interspersed with both governmental and proprietary elements and, therefore, the determination of the primary capacity under which a governmental agency was acting turns solely on the acts or

---

4

omissions claimed to have caused the injury" [internal quotations and citations omitted]).

A.    **MTA and NYCTA, as public corporations, exercise a governmental function when they make systemwide policy decisions on prioritizing limited capital funding, balancing different classes of public safety by need and probability, and weighing possible advances in technology against its installation feasibility and the technology's creation of new threats to public safety.**

Plaintiff claims, in counts 2 and 3, that she was injured because Defendants failed to install billions of dollars of new technology into its century old legacy system that would have prevented her from failing on the tracks at the subject station and preventing her contact with the train.

Defendants do not contend that every aspect and decision by the MTA/NYCTA is governmental in nature.  Indeed, Defendants do not argue that the everyday individual acts or omissions of its staff employees in the operation of the mass transportation system – driving trains and buses, opening and closing train and bus doors, cleaning of debris or spills - are governmental functions. Nor do Defendants contend that their maintenance of subway wall tiles, water pipes and staircases are governmental functions. However, the allegations in count 2 and 3 go far beyond the day-to-day operational actions and decisions.  Counts 2 and 3 go to the heart of governance in public transportation and the running of the City – getting funding for capital improvements; prioritizing the allocation of funds; balancing systemwide safety across different populations; the judgment of high level politicians at the State and City levels; considerations and decisions by executive level heads in the MTA and NYCT; and analytical decisions by numerous department heads and experts - all of which have significant impact on public safety, transportation and the City as a whole.

Plaintiffs sought after remedy goes "to more complex measures of safety and security for a greater area and populace" (*Miller*, 62 NY2d at 512) and involves the overall funding, planning and management of New York's 100+ year old mass transit system, which is a traditional

5

governmental function (*see Garcia v San Antonio Metro. Transit Auth.*, 469 U.S. 528 [1985]). "Governmental immunity under the decisional law of [New York] does not attach to every act, but when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial, a municipal defendant generally is not answerable in damages for the injurious consequences of that action" (*Haddock v City of New York*, 75 NY2d 478, 484 [NY 1990]). As such, when the claims involve the alleged failure to integrate billions of dollars of new and untested safety equipment into the subway system, "the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability" (*Id.*).

Indeed, the systemwide installation of new technology such as PSDs and TIDs is not a proprietary determination of whether the station platform was properly cleaned or maintained to be free of cracks, debris or spills, or that the train operator was not trained properly and failed to act timely or adequately. It is a decision that goes to the heart of the Public Authorities' planning as it relates to obtaining government funding for the new technologies, which legislators have opposed (Ex. Q); their prioritizing of the limited funding obtained based on the greatest needs of the City (*i.e.*, mass transportation, urban development, demographic equity, environmental impact, etc.) (Abdallah Dec. at ¶ 65); their determination of public safety and whether greater harm to a larger portion of the public will result from the implementation of this new technology (*i.e.*, the approximate 1 million New Yorkers with disabilities that rely on ADA compliance and accessibility upgrades to the system versus the 0.000000095629755 chance of a person coming in contact with a subway train in a year) (*see* Keaveney Dec. at ¶¶ 33 and 34, FN 7); and their determination of public safety and whether the new technology actually carries with it risks of

6

harm that did not previously exist (*i.e.*, PSD installation would severely diminish air flow to the stations which are currently reliant on air pressure changes caused by the suction effect of train entry and departures (Abdallah Dec. at ¶ 38), that misalignment of the car doors and PSDs can trap passengers on the train (Ex. EE)[2], that miscommunication between PSDs and train doors can lead to passengers being wedged between resulting in fatal injuries (Ex. EE)).

Further, the public safety considerations on whether to install PSDs and TIDs is not limited to a single station but expands across the entire system. This is not a simple change of a single floor tile, stairwell step, or train door at a particular location (*see e.g.*, Abdallah Dec. at ¶ 11), but a system wide capital expenditure that involves public safety and crime prevention considerations (*see* Abdallah Dec. at ¶ 53) similar to NYCT's determination of systemwide lighting (*see Rivera , supra* at 418 ["numerous courts have declined to hold that lapses of proper maintenance, including inadequate lighting, involve a municipality's proprietary function…"]) or its determination on whether to close a station connection tunnel and where to store construction materials in its system (*see Clinger v New York City Tr. Auth.*, 85 NY2d 957 [NY 1995]).

The purpose of governmental immunity is to defer to the expertise of the entity's professionals, "a task the courts are not suited to perform" in a negligence lawsuit (*see McKechnie v N.Y. City Tr. Police Dept.*, 130 AD2d 466, 468 [2 Dept 1987]). Defendants' evaluation of the use of PSDs and TIDs, which has been ongoing since the late 1990's, is not a ministerial act. It is an elaborate assessment that has involved high level MTA and NYCT executives and professionals, governors, mayors, councilmen/women, multiple vendors/contractors, independent consultants, various studies, international investigation trips, task forces, and working groups.

---

[2] All referenced exhibits are attached to the Declaration of Andrew P. Keaveney.

Even if by some miracle sufficient funding is obtained, the planning, installation and synchronization of the new technologies would require the coordination of every department that makes up the subway division (*i.e.*, platforms, signals, car equipment, train operation, schedules, and labor relations). It would also require the closure of stations for numerous years to implement necessary station upgrades, which would necessitate alternative means of providing mass transportation to the millions of people that rely on the subway system each and every day, as well as, contending against the City and local politicians, lobbyists and community and business groups that will undoubtedly move to halt the work due to the environmental impacts or other complaints.[3]

As the determination of whether to utilize the new technologies of PSDs and TIDs involves systemwide policy decisions on prioritizing limited capital funding from governmental bodies, balancing different classes of public safety by need and probability, and weighing possible advances in technology against its installation feasibility and the technology's creation of new threats to public safety, the agency defendants were, and are, exercising a governmental function and are entitled to governmental immunity against Counts 2 and 3 of the complaint.

---

[3] *See e.g.*, *No. 7 Extension Won't Include 10th Ave. Station*, New York Times, Sept. 19, 2008, https://archive.nytimes.com/cityroom.blogs.nytimes.com/2008/09/19/no-7-extension-wont-include-10th-ave-station/, accessed 2023-11-01 ["Transit advocates and some public officials have been critical of plans to build the extension without the extra station, saying that it would bypass a growing area in need of subway service." "Failure to build a full 7 train extension is a huge missed opportunity to promptly realize the complete potential of the Far West Side," Senator Charles E. Schumer said in a statement."]; *Victory for Disabled – L train's 6th Avenue station to become ADA compliant*, Chekpeds, June 22, 2018, https://chekpeds.com/victory-for-disabled-l-trains-6th-avenue-station-to-become-ada-compliant, accessed 2023-10-21 ["As the result of a lawsuit filed by the 14th Street Coalition and disabled groups, the MTA committed to install elevators at the 14th Street and 6th Avenue Station, while the repairs to the Canarsie Tunnel are underway."]; *New York Gov. Cuomo axes plan to shut down the L train, saves Brooklynites from commuting hell*, Insider, Jan. 3, 2019, https://www.businessinsider.com/l-train-subway-shutdown-governor-cuomo-cancels-closure-2019-1, accessed 2023-10-31; *Fort Lee mayor sues [FHA and MTA] over congestion pricing, claims program will cause more asthma in NJ*, Gothamist, Nov. 1, 2023, https://gothamist.com/news/fort-lee-mayor-sues-over-congestion-pricing-claims-program-will-cause-more-asthma-in-nj, accessed 2023-11-02 ["The mayor of Fort Lee, New Jersey filed a federal lawsuit on Wednesday that aims to stop the MTA's congestion pricing program, claiming the tolls planned for Manhattan would increase air pollution in the Garden State."].

**B.**     **Even if the decision was proprietary, defendants MTA and NYCTA are entitled to qualified immunity because they extensively studied the risk and the possible solutions and mitigation methods, and came to a reasoned decision**

Should this Court find that MTA/NYCT's consideration on whether to install PSDs and TIDs falls short of the governmental function continuum of responsibility, Defendants are still entitled to immunity - qualified immunity, as their decisions regarding platform safety evolved following adequate studies and had a reasonable basis (*see Weiss v Fote*, 7 NY2d 579 [1960]).

The doctrine of qualified immunity serves to preclude second-guessing relating to the considered planning decisions of governmental bodies (*Weiss*, *supra*; *Deringer v City of New York*, 260 AD2d 305 [1999]).

> The rule is well settled that where power is conferred on public officers or a municipal corporation to make improvements, such as streets, sewers, etc., and keep them in repair, the duty to make them is quasi-judicial or discretionary, involving a determination as to their necessity, requisite capacity, location, etc., and for a failure to exercise this power or an erroneous estimate of the public needs, no civil action can be maintained.

*Weiss*, 7 NY2d at 584.

Under *Weiss*, *supra*, a public corporation escapes liability "…absent some indication that due care was not exercised in the preparation of the design or that no reasonable official could have adopted it." (*Weiss*, 7 NY2d at 586). Moreover, "…courts should not be permitted to review determinations of governmental planning bodies under the guise of allowing them to be challenged in negligence suits…" (*Id.*)

"To establish its entitlement to qualified immunity, the governmental body must demonstrate 'that the relevant discretionary determination by the governmental body was the result of a deliberate decision-making process'" (*Ramirez v State of New York*, 143 AD3d 880 [2 Dept 2016][citations omitted]; *see also Heins v Vanbourgondien*, 180 AD3d 1019 [2 Dept 2020]["The relevant discretionary determination resulted from a "deliberate decision-making process"]); *see*

9

*also Ernest v Red Creek Cent. School Dist.*, 93 NY2d 664, 673 [NY 1999]; *Stevens v New York City Tr. Auth.*, 288 AD2d 460 [2 Dept 2001]; and *Chase v New York City Tr. Auth.*, 288 AD2d 422 [2 Dept 2001]).

In *McCord v City of New York* (298 AD2d 438, 439 [2 Dept 2002]), the court held that NYCT was entitled to qualified immunity based on its decision to lock the doors on its longer subway cars because it was reasonably based on passenger safety since the longer cars pose a greater risk to passengers moving from car to car. *See also Zambrana v New York City Tr. Auth.*, 14 AD3d 23 [1 Dept 2004]["a conscious decision on the part of TA to keep car doors unlocked and to afford a ready means of escape is a valid governmental policy choice concerning the dangers posed to riders who might become trapped below ground as the result of a mishap, as opposed to the danger that a passenger might be injured as a result of voluntarily moving between cars . . . [and therefore the] TA's decision is protected by the doctrine of governmental qualified immunity"]).

Similarly to here, MTA/NYCT's policy decisions concerning PSDs and TIDs are reasonably based on passenger safety, feasibility and funding, following extensive study into the new technologies and other means and methods to mitigate the risk. NYCT's efforts regarding PSD have not been simple. The implementation of PSDs is not akin to the cost and work involved in installing a stop sign (*Langer v Xenias*, 134 AD3d 906 [2 Dept 2015]) or a traffic light (*Enker v County of Sullivan*, 162 AD3d 1366 [3 Dept 2018]) or trimming a hedge that is blocking the view of traffic (*Iacone v Passanisi*, 133 AD3d 717 [2 Dept 2015]). Moreover, unlike a stop sign or traffic light that can be installed with little or no involvement to adjacent infrastructure, PSDs cannot be placed on a station platform and be expected to work upon a flick of a switch. It is a communication technology that requires in sync train interaction and system wide coordination

10

across all subway departments.  The research, planning, and developmental stages for rapid transit projects can take years and even decades to perform.[4]

The Declaration of Tony Abdallah sets forth a summary of NYCT's extensive efforts regarding its consideration of the new technology (PSDs and TIDs) which spans over decades and included: multiple international trips to assess working PSDs systems; employing outside engineering firms to assess PSDs in new and existing stations; assessing hazards associated with PSDs; participating in industry studies to assess PSDs; analyzing unsolicited proposals regarding PSDs; forming internal task forces and working groups to assess the potential for PSDs integration into the subway system; meeting with PSDs vendors and stakeholders; analyzing different forms of PSDs; planning pilot studies; conducting a 2½ year feasibility study regarding the installation of PSD in each subway station that deemed only 27% of stations feasible at a cost of several billion dollars; studying TIDs technologies to mitigate passenger contact with trains; international trips to study the use of various different kinds of TIDs available in the global market; implementing other system-wide tools and mitigation efforts such as campaigns, station announcements, timeclocks, tactile strips, posters, and warnings.

The existence of such investigations, studies, and planning is a clear indication of the Defendants' reasonable efforts to ascertain the safety of its platforms and to assist in making meaningful decisions in light of operational experience and structural difficulties caused by a century old system and the complex history of the City's non-uniform subway system (*see* Keaveney Dec. at ¶¶ 11-14).

NYCT's decision to consider, forgo, reconsider, and delay PSDs was not arbitrary or unreasonable.  It was based on valid concerns such as limited funding for capital improvements,

---

The first proposal for the Second Avenue Subway, which opened in 2017, was 88 years earlier in 1929 (*see Second Avenue Subway, phase 1*, https://new.mta.info/project/second-avnue-subway-phase-1, accessed 2023-10-23).

prioritizing of capital improvements, demographic equity, ADA accessibility, the operational impacts on the system and the feasibility of implementation, newly created hazards caused by the new technologies and continuing maintenance costs (*see e.g., Tomassi v Town of Union*, 46 NY2d 91 [NY 1978][looking at fiscal practicality, inter alia, in assessing liability]; *see also McKechnie*, 130 AD2d at 468 [the TA "must establish priorities and allocate resources in order to perform its responsibilities, and such exercise of its judgment is generally not subject to judicial review"]).

Whether or not MTA/NYCT's decision to forego implementation of PSDs, etc. was the absolute correct policy decision is of no moment.  That is because "[g]overnmental entities cannot be expected to be absolute, infallible guarantors of public safety, but in order to encourage them to engage in the affirmative conduct of diligently investigating security vulnerabilities and implementing appropriate safeguards, they must be provided with the latitude to render those critical decisions without threat of legal repercussion" (*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428, 455 [NY 2011]).

"Strong policy considerations underpin the qualified immunity doctrine . . . in cases such as these where a governmental body has invoked the expertise of qualified employees, . . . [and to] examine the criteria that were considered by the [Defendant's] professional staff, emphasize factors allegedly overlooked, and, with the benefit of hindsight, rule that the studies were inadequate as a matter of law. . . would constitute the type of judgment substitution that *Weiss v Fote* prohibits."  *Friedman v State of New York*, 67 NY2d 271, 286 [NY 1986]).  "[S]omething more than a mere choice between conflicting opinions of experts is required before the State or one of its subdivisions may be charged with a failure to discharge its duty . . . . "  (*Chunhye Kang-Kim v City of New York*, 29 AD3d 57 [1 Dept 2006], *citing Weiss*, 7 NY2d at 588.  Indeed, "courts and juries are not to say [a municipal defendant] shall be punished in damages for not giving to

12

the public more complete protection; for . . . that would be to take the administration of municipal affairs out of the hands to which it has been entrusted by law." *Weiss*, 7 NY2d at 584.

The history outlined in the Abdallah Declaration confirms that Defendants have repeatedly investigated the use of PSDs and TIDs through extensive and time-consuming studies, assessments, analysis, planning, and testing, but passed on implementing certain devices over others for various thought out and reasoned judgment determinations.  Despite considering, passing, reconsidering, and again passing on PSDs, NYCT has initiated other projects aimed at platform safety such as train announcements, posters, and warnings on MetroCard (Abdallah Dec. at ¶ 89).  It has also installed HelpPoints so that customers can, among other things, advise personnel of platform issues or of passengers who may cause harm to themselves or others (*Id*.).  NYCT has also installed tactile warning strips and yellow painted rubbing boards that serve a dual purpose: alerting the visually impaired of the platform edge and advising other customers to stand back from the edge (*Id*.).  In addition, it has considered blue lights as a means of calming stressed or potentially suicidal customers (*Id*. at ¶ 97).

To deny the motion based on challenges to the appropriateness of Defendants' studies would essential allow a jury to decide "the reasonableness and safety of a plan of governmental service and prefer it over the judgment of the governmental body which originally considered and passed on the matter[.] [It] would be to obstruct governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts" (*Friedman*, 67 NY2d 283-4, *citing Weiss*, 7 NY2d at 585-586).

Such a finding would essentially allow a jury to decide how a governmental agency spends its limited resources, which would "constitute the type of judgment substitution that *Weiss v Fote* prohibits" (*Friedman*, 67 NY2d 285-6 ("[plaintiff] would have us examine the criteria that were

considered by [NYCT's] professional staff, emphasize factors allegedly overlooked, and, with the benefit of hindsight, rule that the studies were inadequate as a matter of law. We decline this invitation, . . . . ").

As can be gleaned from the Declaration of Tony Abdallah and the numerous exhibits included with the Keaveney Declaration, MTA and NYCT have, and continue to, extensively study and consider PSDs and TIDs as alternative methods to reduce the risk of customer contact with trains at platforms stations, and came to a reasoned decision based on limited funding, the viability and feasibility of the new technologies in the existing system, and overall public safety. Therefore, inasmuch as NYCT has reviewed and passed on the very risk that plaintiff alleges caused her injury and has adopted a policy that has a reasonable basis in public safety and efficiency, its decision is protected by the doctrine of qualified immunity (*see DeLeon v New York City Tr. Auth.*, 305 AD2d 227, 228 [2 Dept 2003], *quoting Weiss*, 7 NY2d at 588, 589). Accordingly, plaintiff's claims in counts 2 and 3 must be dismissed.

## POINT II

### PLAINTIFF FAILS TO MAKE A PRIMA FACIE CASE THAT DEFENDANTS ARE NEGLIGENT IN VIOLATING AN INDUSTRY STANDARD, THEREFORE COUNTS 2 AND 3 SHOULD BE DISMISSED

Plaintiff contends that defendants are negligent for failing to install PSDs and TIDs. However, in order to make a case for negligence on those counts, plaintiff must establish that defendants owed a duty to install PSDs and TIDs and breached that duty (*see Moore Charitable Found. v PJT Partners, Inc.*, 40 NY3d 150, 157 [NY 2023]).

In order to establish that defendants owed the duty to install such new technologies into its system, plaintiff must establish that the rapid transit industry has made the installation of such new technologies a standard practice or custom (s*ee Trimarco v Klein,* 56 NY2d 98 [NY 1982])

It is "a well-recognized and pragmatic proposition that when 'certain dangers have been removed by a customary way of doing things safely, this custom may be proved to show

14

that the one charged with the dereliction has fallen below the required standard.' Such proof, of course, is not admitted in the abstract. It must bear on what is reasonable conduct under all the circumstances, the quintessential test of negligence."  *Id at* 105 (internal citations omitted)

"Put more conceptually, proof of a common practice aids in "[formulating] the general expectation of society as to how individuals will act in the course of their undertakings, and thus to guide the common sense or expert intuition of a jury or commission when called on to judge of particular conduct under particular circumstances."  *Id* at 106.

"The source of the probative power of proof of custom and usage is described differently by various authorities, but all agree on its potency. Chief among the rationales offered is, of course, the fact that it reflects the judgment and experience and conduct of many. Support for its relevancy and reliability comes too from the direct bearing it has on feasibility, for its focusing is on the practicality of a precaution in actual operation and the readiness with which it can be employed." *Id* (internal citations omitted).

On the other hand, "…when proof of an accepted practice is accompanied by evidence that the defendant conformed to it, this may establish due care …" *Id.*

In this case, Plaintiff exchanged Carl Berkowitz, Ph.D., P.E. as a purported expert in the transportation industry (Ex. VV).  However, nowhere in Berkowitz's report does he establish what the industry standard is for the installation of PSDs and TIDs in the U.S.  Instead, to deflect from this gaping hole in plaintiff's evidence, Berkowitz talks about "Use of Platform Edge Doors / Barriers Globally" (*Id* at 30).  That "Platform edge doors are used in transit systems . . . around the world" and lists the follow: Singapore, Japan, South Korea, China, and London (*Id*).

Nothing is said of the use of PSDs or TIDs in rapid transit systems within the 50 states, and there is a very good reason for this – there is none.

Indeed, there are no standards, regulations, or industry requirements which mandate the use of Intrusion Detection devices or PEBs (platform edge barriers) in heavy rail rapid transit systems (Ex. YY at ¶ 5).

No heavy rail rapid transit systems in the United States utilize platform edge barriers (*Id* at

5). There are currently 13 U.S. heavy rail rapid transit systems.[5]  Of these, five are defined as "legacy" systems, in that one or more lines were constructed beginning in the late 19th or early 20th century. The other 8 heavy rail systems (considered "modern") were constructed beginning in the late 1950's through the 1970's. (Ex. YY at ¶ 9). It is critical to note that none of the legacy or modern systems were designed or constructed with PEBs (platform edge barriers). In addition, none have been retrofitted with PEBs. (*Id*).

While some foreign systems have utilized PSDs at select lines within their rapid transit systems, their entire systems have not been completely retrofitted with TIDs or PSDs (Ex. YY at ¶ 5).  Retrofits have generally been part of much larger technological improvement projects, including full train automation, or were specifically designed, engineered and constructed with such PSDs or re-engineered as part of a major comprehensive upgrade as an integral feature of the systems (*Id*.).  This is because platform edge barriers cannot be viewed as "stand alone" devices or systems, which are just "bolted on" to existing heavy rail rapid transit high-level platforms (*Id.* at ¶ 6). They must be designed as an integrated component of the entire heavy rail rapid transit system, which includes civil engineering, platform and station design, ventilation systems, train and signal technology, electrical systems, and other components which must be viewed from a system engineering perspective and all of elements must be integrated together in order to function safely and effectively (*Id*. at ¶¶ 6-7).

Transport systems, such as the JFK AirTrain, which does have PSDs, are distinct from heavy rail rapid transit systems and are known as "Automated People Mover" systems (Ex. YY at ¶ 5).  Similar to other airport people mover systems, these systems are fully automated and do not have on-board drivers (*Id.*) and are not considered to be heavy rail rapid transit systems. (*Id.*)

---

[5] Boston, New York, PATH (NY and NJ), Philadelphia, PATCO (NJ and PA), Baltimore, Washington DC, Miami, Atlanta, Chicago, Cleveland, Los Angeles, and San Francisco. (Ex. YY at 8).

16

Regardless, they were engineered, designed, and constructed to have PEBs as an integral component of their operation (*Id*).

Similarly, like PSDs, there are no US heavy rail rapid transit agencies which utilize intrusion detection systems and no heavy rail lines elsewhere in the world that utilizes them system-wide (Ex. YY at ¶ 13). They must also be viewed as part of a larger overall system and not a "bolt on" technology which can stand alone from operational and safety systems. (*Id.*) They also have a very high capital and on-going operating cost, with very restricted effectiveness (*Id.*).

Thus, it is understandable why Plaintiff's experts, Peter Gilsmann (Ex. WW) and Carl Berkowitz (Ex. VV), offer nothing but silence on the rapid transit system standard for use of PSDs and TIDs in the United States – there is none. Therefore, any opinion by plaintiff's expert that Defendants, MTA/NYCT were negligent for failing to install PSDs and/or TIDs (counts 2 and 3) must be disregarded (s*ee Diaz v N.Y. Downtown Hosp.*, 99 NY2d 542 [NY 2022] ["Where the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation, however, the opinion should be given no probative force and is insufficient to withstand summary judgment"]; *Velocci v Stop & Shop*, 188 AD3d 436 [1 Dept 2020][finding expert affidavit failed to raise a triable issue of fact when there was no evidence that cited standards are an adopted and implemented industry standard or a generally accepted safety practice]; *Lynch v C & S Wholesale Grocers, Inc.*, 157 AD3d 471, 472 [1 Dept 2018] [Discounting expert who, "…failed to identify any professional or industry standard to substantiate his assertions…"]; and *Suero v Villa Maria Academy*, 178 AD3d 460, 461 [1 Dept 2019]["expert failed to provide any engineering standard to support contention that such a minor height differential would create a dangerous condition…"].

Absent an industry standard or practice evidencing their use in the system, plaintiff cannot prove that Defendants breached a duty owed for not installing them, and thus, cannot prove a cause

17

of negligence on counts 2 and 3.  Accordingly, should this Court find that Defendants are not entitled to governmental function or qualified immunities, counts 2 and 3 of plaintiff's complaint should still be dismissed.

## POINT III

## NEGLIGENCE AS TO TRAIN OPERATION SHOULD BE DISMISSED

In Count 1 of her Complaint Plaintiff alleges that train operator Shabazz negligently failed to see what was there to be seen…" (Ex. A at ¶ 99). Plaintiff also alleges that Shabazz operated the subway "without due care for persons occupying the platform," failed "to keep a proper lookout," and failed "to observe what was available to be observed," and operated "the train while distracted." (Ex. A at ¶ 99). However, the admissible evidence in the record does not support Plaintiff's claim and plaintiff's speculative expert submissions fail to cure this deficiency.

**A.  The evidence demonstrates that the train operator (TO) was attentive but was confronted with the sudden fainting of the plaintiff in front the oncoming train with mere seconds to respond and insufficient time to stop the train**

Where the operator of a subway train sees a person lying on the tracks abutting a subway station platform, from such a distance and under such other circumstances as to permit him [or her], in the exercise of reasonable care, to stop before striking the person, the operator's failure to avoid the accident may be found to be negligent (*Searcy v New York City Tr. Auth.*, 169 AD3d 1076 [2 Dept 2019], *quoting Coleman v New York City Tr. Auth.*, 48 AD3d 764 [2 Dept 2008]). However, no such liability attaches where the accident was unavoidable under the circumstances (*Searcy* at 1077*); see also Pabon v Long Is. R.R. Co.*, 189 AD3d 860 [2 Dept 2020]).

In this case, TO Shabazz testified that she entered the station at a speed between 20 to 25 mph (Ex. TT, at 196, 203-204).  The station layout is preceded by a downgrade curve with a posted speed limit of 25 mph (Ex. TT at 177-178, 203-204).  When the train was already 1½ to 2 cars into the station, TO Shabazz watched as plaintiff fell from the edge of the platform (Ex. TT at 211).

18

At that moment, plaintiff was falling from the middle of the station platform, the train was traveling at 20-24 mph and the train was about 180 feet away from plaintiff (Ex. TT at 214, 216).   TO Shabazz immediately applied the emergency brakes (Ex. TT at 219) but contact with plaintiff still occurred.

Courts have consistently dismissed cases when the train accident was unavoidable.  Indeed, the only thing a train operator can do is try to stop the train in time.  Unfortunately, through no fault of the operator, this is not always possible.  For example, in *Canel v New York City Tr. Auth.* (201 AD3d 862 [2 Dept 2022]), the operator testified that the train was approximately 3½ cars into the train station when he 'slammed the brakes in emergency' upon seeing the plaintiff, whose knees were buckling, on the platform and about to go onto the tracks. The defendants also submitted the affidavit of the defendants' expert, in which he averred that the train operator could not have avoided the accident. The Court found defendants' submissions established that they were not negligent for the accident and were entitled to summary judgment.

In *Neenan v Quinton* (110 AD3d 967 [2 Dept 2013]), the train was moving at a lawful speed and was approximately one car length away when the train operator first observed the decedent on the tracks and immediately applied the emergency brakes but it was too late to avoid the collision.  Based on this evidence, which is similar to the case at bar, the Court found that the defendants established that they "were not negligent in the happening of the accident as a matter of law."

Based on the TO Shabazz' testimony, the plaintiff fainted in front of the oncoming train that was traveling at a permissible speed of 20-24 miles per hour and while the train operator acted immediately by applying the brakes, contact with the plaintiff was unavoidable under the circumstances.

19

**B.     The baseless speculations that plaintiff uses to support a claim of negligent train operation fails to support a viable cause of action**

It is well settled that the proponent of expert evidence must establish the admissibility of that evidence under Federal Rule of Evidence 104(a).  *Bourjaily v U.S.*, 483 U.S. 171, 175-76 [1987].  In *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 [1993], the Court defined the lower court's gatekeeping role as requiring a determination as to whether an expert's testimony satisfies the general requirements of the Rules of Evidence - the Court is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v Carmichael*, 526 U.S. 137, 152 [1999].

Based upon *Daubert*, Federal Rule of Evidence Rule 702 provides that: A witness who is qualified as an expert by knowledge, skill, experience, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and  (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of the expert's testimony bears the burden of proving by a preponderance of the evidence that the *Daubert* standard is met and the expert's opinions are admissible.  The Court, in assessing *Daubert*, must affirmatively answer "two questions: (1) is the proposed expert qualified to testify by virtue of his specialized "knowledge, skill, experience, training or education?" Fed. R. Ev. 702; and (2) if deemed qualified, is his testimony reliable and will it assist the fact finder in deciding the issue?" (*Hilaire v DeWalt Inds. Tool Co.*, 54 F.Supp.3d 223, 228 [EDNY 2014].)

Moreover, "speculative assertions in opposition to the motion insufficient to raise a triable issue of fact" (see *Weimar v Metro. Transp. Auth.*, 147 AD3d 1111 [2 Dept 2017]; *also see Briceno v. Beau Maison Corp.*, 190 AD3d 813 [2 Dept 2021][speculation that the train operator should have seen the decedent in time to stop the train, was insufficient to raise a triable issue of fact]).

 "[I]f a proffer of expert testimony in the form of an expert report is excluded as inadmissible under Rule 702, the summary judgment determination is made on a record that does not include that evidence." *Taylor Precision Prod., Inc. v Larimer Grp., Inc.*, 2018 WL 4278286, at *31 [SDNY], *citing Cacciola v Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 [EDNY 2001].

### 1.   Plaintiff's expert - Carl Berkowitz

In an attempt to make out a case of negligence in the operation of the train, plaintiff, once again, relies on Carl Berkowitz, Ph.D., P.E. as a purported expert (Ex. VV).  However, Berkowitz's opinions on this count are just as useless as they were previously.

Here, Berkowitz's methodology lacks reliability and is based on compounding speculations.  Berkowitz offers opinions on the stopping distance of the train.  The total stopping distance range is obtained by adding perception-reaction or response time (PRT) *(e.g.*, the amount of time it takes to: 1) observe a visual image; 2) analyze the image; 3) decide what to do; and 4) carry out the action) to the emergency breaking distance ("EBD") Ex. VV at p. 56).  The breaking distance is the total distance a train will travel after an emergency break is activated and is based on the speed of the train at the time the break is applied.

Berkowitz's methodology for both the PRT and EBD elements of his analysis contain fatal flaws that are not based on scientific values or generally accepted methods and should not be considered.

Berkowitz estimated PRT, which is a significant variable in his equation, is made up. Berkowitz initially relies on PRT range for a train operator from 1.6 to 1.9 seconds (Ex. VV at p.

50).  He then suggests that "training in situational awareness would have allowed the train operator to react more quickly (*Id*. at p. 51).  He then provides a supposedly "situational awareness" aided PRT of 0.6 seconds based on the *Preview Information in Cab Displays for High-Speed Locomotives, Human Factors in Railroad Operations* (Ex. VV at p. 52).  However, that publication does not provide for the reduced PRT he uses as his new standard (*see* Ex. BBB).  Nor does his citation to *Users' Guides to Human Factors and Ergonomics Methods* establish that "situational awareness" training is an industry standard or requirement in rapid transit operation (Ex. VV at p. 52).

Berkowitz uses 3.2 mph/sec deceleration rate obtained from Wikipedia, which gives a shorter stopping distance than NYCTA's empirically based emergency brake stopping distance chart, which provides a longer stopping distance at 20 to 24 mph (*Compare* Ex. VV at 53 *with* Ex. XX at 8).

Berkowitz, in a most unscientific manner, calculates the train operator's alleged visibility distance inside the tunnel by standing on the platform at the accident location, noting when he first sees the headlights of a random train in the tunnel traveling at an unknown speed, and noting again, when the train enters the station.  Such questionable and infantile methodology could hardly be called reliable and scientific. (*See Mirjah v New York City Tr. Auth.*, 48 AD3d 764 [2 Dept 2008][finding plaintiff's expert estimates of train speed, when the plaintiff was first visible to the train operator, and the use of a median PRT was speculative and insufficient].)   Accordingly, Berkowitz's report and speculative opinions cannot be used to support plaintiff's claim of negligent operation of the train.

### 2.     Plaintiff's expert - Orlando Jimenez, Jr.

Next, plaintiff exchanged a third expert, Orlando Jimenez, to support her claim of negligent operation of the train (Ex. UU).  However, if possible, Jimenez' opinions are even more unreliable

22

than Berkowitz's, which are completely unsupported by any facts or data and merely speculative statements that suggest that because the accident occurred the train operator was negligent.

Thus, Jimenez' report cannot be used to support plaintiff's claim of negligent operation of the train (*see DeLeon*, 305 AD2d at 228 ["assertions that an attentive train operator would have seen plaintiff in time to stop before hitting him is pure speculation unsupported by reference to any facts in the record or personal observations"]).

"[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 [2d Cir. 2016]; *see also Major League Baseball Properties, Inc. v Salvino, Inc.*, 542 F.3d 290, 311 [2d Cir. 2008]["An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment"]).

Expert opinions resting on "faulty assumptions" should be excluded (*see Amorgianos v National R.R. Passenger Corp.*, 303 F3d 256, 269 [2 Cir 2002]; *see also Dibble v New York City Tr. Auth.*, 76 AD3d 272, 277 [2 Dept 2010][reversing verdict due to jury's determination that the accident could have been avoided based on nothing more than a series of estimated stopping distances that incorporated purported average reaction time]; *Weimar, supra* ["plaintiff's speculative assertions in opposition to the motion were insufficient to raise a triable issue of fact"]).

Accordingly, count 1 of the complaint should be dismissed as the accident was unavoidable, the TO acted reasonably under the circumstances and plaintiff's unreliable and speculative experts' opinions are devoid of any evidentiary value.

## POINT IV

## PLAINTIFF CAN'T PROVE NEGLIGENCE AS TO THE MAINTENANCE OF THE CAR EQUIPMENT OR PLATFORM

In Count 4 of her Complaint, plaintiff alleges defendants were negligent in maintenance of the subway car and the platform.  However, plaintiff and her experts have not provided any proof or opinions regarding any defects with the train or maintenance of the platform that resulted in the accident.  *See Blount v Swiderski*, 2006 WL 3314635, at *12 [EDNY][plaintiff "need[ed] to adduce proof sufficient to create a genuine issue of material fact" and "mere allegations are insufficient" to defeat summary judgment].)

Rather, the documents produced in this action (*e.g.*, Train Trouble Report Ex. QQ, Post Incident Inspection Report Ex. RR, and CTA Cleaning Report Ex. SS) demonstrates that there were no defects with the train or platform on the day of the accident.

## CONCLUSION

For the reasons fully set forth above, it is respectfully requested that this Court grant Defendants' motion for summary judgment dismissing the complaint and all four counts in their entirety, and grant such other and further relief as this Court may deem just and proper.

Dated:  November 6, 2023
    New York, NY

Respectfully submitted,

LANDMAN CORSI BALLAINE & FORD P.C.

By: _____
    Andrew P. Keaveney
    Attorneys for Defendants
    120 Broadway 13th Floor
    New York, New York 10271
    (212) 238-4800

24

4858-8666-5870v.2