UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------X

LUISA JANSSEN HARGER DA SILVA,

    Plaintiff,

              Docket No.

  - against -       1:17-cv-04550

NEW YORK CITY TRANSIT AUTHORITY,

METROPOLITAN TRANSIT AUTHORITY,

and RAQIA SHABAZZ,

    Defendants.

-------------------------------------------X

    Video Conference


    February 7, 2023

    10:00 a.m.


  DEPOSITION of NEW YORK CITY TRANSIT AUTHORITY, Defendant, by ERIC JONES, taken by Plaintiff, pursuant to Federal Rules of Civil Procedure, and Order, held at the above-noted time and place, before Joanne Maggiore, a Stenotype Reporter and Notary Public within and for the State of New York.

2

```
 1   A P P E A R A N C E S:

 2

 3      ROTH & ROTH, LLP
           Attorneys for Plaintiff
 4         192 Lexington Avenue, Suite 802
           New York, New York  10016

 5

        BY:DAVID ROTH, ESQ.

 6

 7

        SONIN & GENIS ATTORNEYS AT LAW, LLC
 8         Attorneys for Plaintiff
           1 Fordham Plaza, Suite 907
 9         Bronx, New York  10458

10      BY: ROBERT GENIS, ESQ.

11

12      LANDMAN CORSI BALLAINE & FORD P.C.
           Attorneys for Defendants
13         120 Broadway, 13th Floor
           New York, New York  10271

14

        BY: ANDREW P. KEAVENEY, ESQ.

15

16

        A L S O   P R E S E N T:

17

           CHARLES GERSHBAUM, ESQ.

18

19

20

21

22

23

24

25
```

3

1    F E D E R A L    S T I P U L A T I O N S

2

3        IT IS HEREBY STIPULATED AND AGREED by and between the

4    attorneys for the respective parties herein, that the

5    sealing, filing and certification of the within

6    deposition be waived;

7        IT IS FURTHER STIPULATED AND AGREED that all

8    objections, except as to form, are reserved to the time

9    of trial;

10       IT IS FURTHER STIPULATED AND AGREED that the

11   transcript of this deposition may be signed before any

12   Notary Public, with the same force and effect as if

13   signed before a clerk or Judge of the Court;

14       IT IS FURTHER STIPULATED AND AGREED that all rights

15   provided to all parties by the F.R.C.P. cannot be deemed

16   waived, and the appropriate sections of the F.R.C.P.

17   shall be controlling with respect thereto.

18

19                            oo0oo

20

21

22

23

24

25

4

1

2    E R I C   J O N E S,

3        Witness, having first been duly sworn by the

4        Notary Public, was examined and testified as

5        follows:

6

7    EXAMINATION BY

8    MR. GENIS:

9        Q.    Please state your name for the

10   record.

11       A.    Eric Jones.

12       Q.    Where do you reside?

13       A.    2 Broadway, New York, New York

14   10004.

15       Q.    Good morning, Mr. Jones.  My name is

16   Bob Genis.  I represent a young lady who lost her

17   arm and her leg.

18            I'll ask you some questions today.

19   If there is anything I ask that you don't

20   understand, please say so; I'll rephrase the

21   question.  Otherwise, if you answer the question,

22   we are going to assume you understood it.

23            Do you understand everything I've

24   said so far?

25       A.    Yes.

5

1                        E. JONES

2          Q.    Okay.  And I'm going to give some

3     additional instructions, sir, to take up less of

4     your time.

5              If I ask a yes or no question, or a

6     true or false question, would you please just

7     answer with a yes or no, or a true or false, and if

8     you're unable to do so, just say I'm unable to do

9     so?  Would you agree to do that, sir?

10         A.    Yes.

11         Q.    If you need to take a break for the

12    bathroom or anything, just say so; we will gladly

13    take a break.  Just, if there's a pending question,

14    answer it first, please.

15         A.    Okay.

16         Q.    Do you understand all of these

17    terms?

18         A.    Yes.

19         Q.    Do you agree to them?

20         A.    Yes.

21         Q.    They're fair?

22         A.    Yes.

23         Q.    Have you ever testified before?

24         A.    Yes.

25         Q.    How many times have you testified

6

                              E. JONES

1

2  before?

3          A.    Once.

4          Q.    And when you testified before, was

5  it at a deposition like this; was it a trial, or

6  something else?

7          A.    A trial.

8          Q.    And when you testified at the trial,

9  were you testifying on behalf of the New York City

10 Transit Authority?

11         A.    Yes.

12         Q.    And when you were testifying before

13 at a trial on behalf of the Defendant, New York

14 City Transit Authority, was it a claim where

15 somebody said that they were injured because of the

16 negligence of the New York City Transit Authority?

17         A.    No, it wasn't injury.

18         Q.    It was what, a contract or something

19 other than a person being injured?

20         A.    It was a case about the

21  depreciation of property value.

22         Q.    Okay.  Got it.  I am going to go

23 through your background now.  I'm trying to tell

24 you in advance where I'm going; we will go a little

25  quicker that way.

7

1              E. JONES

2              First, can you give me your

3    educational background, please?

4         A.    Starting -- well, I have a

5    bachelor's degree in Natural Sciences.  I have a

6    master's degree in Environmental Science.  I

7    have another master's degree in Public

8    Administration.  And I'm also a certified

9    construction manager.

10        Q.    Do you hold any other licenses,

11   certificates, or certifications, or anything else

12   of that nature?

13        A.    No, other than the CCM I just

14   mentioned, certified construction manager.

15        Q.    Whom are you employed by?

16        A.    MTA Construction and Development

17   currently.  It was New York City Transit

18   Authority, but we're now a part of the new MTA

19   Construction and Development Division.

20        Q.    When did you first start working for

21   the New York City Transit Authority?

22        A.    1994.

23        Q.    What was your title or position

24   then?

25        A.    Environmental protection

8

E. JONES

1
2    specialist.

3         Q.    What were your duties?

4         A.    I worked then in the Office of

5    System Safety.  Basically, doing audits of our

6    facilities or processes to ensure compliance

7    with state and federal environmental

8    regulations.

9         Q.    From 1994 to when did you do that?

10        A.    To '99.

11        Q.    In 1999, what did your title or

12   position become?

13        A.    I moved from the Office of System

14   Safety to the Capital Program Management

15   division of New York City Transit, where I

16   became a project administrator.

17        Q.    What were your duties as a project

18   administrator for -- I'll use the initials CPM.

19        A.    I was overseeing the New York City

20   Transit Authority's efforts, capital efforts, to

21   comply with a New York State Department of

22   Environmental Conservation Consent Order, which

23   involved overseeing consultants and contractors

24   who were doing underground storage tank, soil,

25   etc., remediation work.

9

                              E. JONES

1

2       Q.    And what is the job of CPM, Capital

3   Project Management?

4       A.    Capital Project Management, as it

5   existed on the New York City Transit,

6   responsible for the design and construction of

7   capital projects that are part of the New York

8   City Transit Five-Year Capital Program.

9       Q.    From 1999 until when were you a

10  project administrator for the Capital Program

11  Management of the New York City Transit Authority?

12      A.    My next title, but my

13  responsibilities remained the same, but I was

14  promoted to construction administrator.  Perhaps

15  two years later, I think.

16      Q.    So about 2001?

17      A.    Yes, around then.  If I recall

18  correctly.

19      Q.    And your duties remained the same?

20      A.    Pretty much.  A little more,

21  because as a project administrator, I was

22  reporting to a construction manager who

23  departed, so I took his responsibilities.  So it

24  was a high level of responsibility, but still

25  covering the Remediation Program.

10

E. JONES

1

2      Q.    So from 2001 until when were you a

3   construction administrator?

4      A.    I believe that would have been

5   until 2007 about, where I became a construction

6   manager.  I was promoted to construction

7   manager.

8      Q.    What were your duties as

9   construction manager?

10      A.    It was still the same.  Same.  I

11   was still managing the same capital program.

12      Q.    And from 2007 until when were you a

13   construction manager or CPM at the New York City

14   Transit Authority?

15      A.    A construction manager from 2010 to

16   2015.

17      Q.    Wait.  What happened between 2007

18   and 2010?

19      A.    As I answered previously, I was

20   managing the Remediation Program.

21      Q.    I'm sorry.  That was 2007 to 2010.

22   My apologies.  You didn't give an end date of that

23   before.

24      A.    2009, sorry.  2009 I was still

25   managing the Remediation Program.  Then in 2009,

11

E. JONES

1

2    I went to the Stations division of Capital

3    Program Management and managed station

4    rehabilitation projects until 2015.

5        Q.    So from 2009 until 2015, you were

6    still a construction manager at CPM, but in charge

7    of the Station division.  Did I get that correct?

8        A.    Not in charge of the Station

9    division.  Let me correct that.

10            From 2009 to 2013, I was a

11    construction manager, managing capital projects

12    that was under the station's program area of

13    Capital Program Management.

14        Q.    So what did that involve?

15        A.    They were rehabilitation projects

16    for stations, primarily the Rockaway Peninsula.

17    It was structural rehabilitation of, you know,

18    reconstruction of the platforms, the mezzanine

19    areas of the stations.  New fire alarm systems,

20    a new staircases (sic).  You name it.  Full

21    rehabilitation, bringing them to a state of good

22    repair.

23        Q.    In 2013, what was your next title or

24    position?

25        A.    In 2013, still as a construction

12

1                              E. JONES

2       manager, I moved to the Security program.  The

3       Systems and Security Program of Capital Program

4       Management, managing security, primarily

5       electronic security projects.  Electronic

6       security projects, yes.

7              Q.    And what did that involve,

8       electronic security projects?

9              A.    Electronic security projects

10      involved the deployment of the CCTV cameras,

11      access to control systems, you know, intercom

12      systems, intrusion detection systems.  So you

13      can have a mix of all of that or just one

14      element of that in an electronic security

15      project.

16             Q.    And from 2013 until when were you in

17      the Systems Security program?

18             A.    So from 2013 to 2015, I was a

19      construction manager.  In 2015, when the

20      departure or retirement of the program manager

21      to whom I reported, I was promoted to that

22      position of program manager, overseeing not only

23      -- you know, all the security projects.  Not

24      only projects that were assigned to me as a

25      construction manager, but now all security

13

E. JONES

1

2    projects, security capital projects.

3        Q.    So from 2015 until when were you the

4    program manager for all security projects and

5    capital projects for the New York City Transit

6    Authority?

7        A.    So, as program manager, in 2015 I

8    also had the responsibility of overseeing all

9    platform safety, platform safety initiatives, as

10   well as I then had the environmental remediation

11   that I used to manage as a project

12   administrator, construction administrator,

13   construction manager.  That also came back under

14   my responsibility.

15       Q.    From 2015 until when did you do all

16   of the things that you told us you were doing;

17   program management involving all security for the

18   entire system, overseeing it, and the platform

19   safety initiative?  From 2015 to when did you do

20   that?

21       A.    Until 2018.  Well, I'm still doing

22   that today, but I have added responsibilities

23   and new titles.  So until 2018, I was a program

24   manager.  In 2018, I became a program officer,

25   and then my responsibilities increased.  I now

14

                                    E. JONES

1

2    had not only remediation, capital safety

3    initiatives to do with platform screen doors,

4    etc., I had systems projects.  You know, fire

5    alarm projects, communication projects,

6    communication network projects.

7            Q.    So, from 2018 until when you were a

8    program officer continuing to work on remediation

9    and rehabilitation of stations, communications

10   network, the capital safety program, platform

11   safety initiative, and platform screen doors, from

12   2018 until when were you doing all that for the New

13   York City Transit Authority?

14            MR. KEAVENEY:  Note my objection.

15            A.    I have been doing that until today.

16   But in September of last year, I was elevated to

17   the position of vice president for the Systems

18   business unit within MTA's CCD, MTA Capital

19   Construction Development.

20            Q.    What does that involve, sir?

21            A.    It pretty much involves overseeing

22   a larger number of projects.  It involves

23   deputizing for the senior vice president of this

24   business unit on all matters.  It's HR-related

25   matters or the whole gambit of everything we

15

1                          E.  JONES

2      have to handle as a business unit.  Safety,

3      quality, staffing, planning.

4              Q.    So, in the different jobs you've had

5      at the Transit Authority -- withdrawn.

6                   Have you told us about all the

7      titles and positions you've held at the Transit

8      Authority?

9              A.    Yes.

10             Q.    And are there any other titles or

11     positions you've held with MTA?

12             A.    Not to my recollection, no.

13             Q.    Have you served on different

14     committees or task forces for the Transit Authority

15     or MTA?

16             A.    Yes.

17             Q.    I'll ask one favor, please.  Just so

18     the reporter can get everything we both are saying,

19     if you let me finish my question before you give

20     the answer, otherwise, it's difficult for her to

21     get what each of us are saying.  We want to make

22     sure she gets all of your words as well as mine.

23                  Okay?

24             A.    Not a problem.

25             Q.    Thank you.  So I think you were

16

1                         E. JONES

2    about to tell us that you were on various

3    committees and task forces for the Transit

4    Authority and MTA?

5           A.    Yes.  My response was yes, I have

6     been on.

7           Q.    What are the committees and tasks

8    forces, if you can give me years as well, please?

9           A.    I'm not sure I am going to remember

10    all the years, but the first was the Underground

11    Storage Tank Steering Committee, which I was a

12    part of pretty much shortly after I joined New

13    York City Transit Authority in 1994.  That

14    committee, I guess, was active until perhaps

15    early 2000's.  I can't recall when that was.

16           Q.    What else?

17           A.    Oh, back to the question, if I have

18    any -- I have chaired the Construction

19    Management Forum, which is a professional group

20    of construction managers here at -- well, back

21    then, when it was Capital Program Management on

22    the New York City Transit.  I was the deputy

23    chair for that forum for one year, and then I

24    was the chair for that forum for the following

25    year.

17

E. JONES

1

2      Q.    What did it do?  What did the

3   Construction Management Forum do?

4          A.    It was basically coming together,

5   all of the construction managers.  Looking at

6   best practices, sharing best practices, trying

7   to resolve construction management issues as a

8   collective.  You know, proposing improvements in

9   the way construction management was done.  It

10  was an information-sharing kind of a forum.

11         Q.    And best practices, what are best

12  practices?

13              MR. KEAVENEY:  Note my objection.

14         A.    That's pretty wide, but in a

15  general sense, it's -- if you have a successful

16  project, what were some of the things you did to

17  achieve that success.  Right.  And so each

18  manager would have a different approach,

19  perhaps, to some degree.  We do have standard

20  rules we follow and, you know, if there was a

21  challenge that somebody was able to overcome

22  using, you know, following some kind of a

23  creative method, then, you know, it would be

24  shared.  And if it was thought by the collective

25  that this actually is something we should

18

E.  JONES

1

2      implement, then it becomes a best practice.

3            Q.    So, in other words, there are

4      certain professional standards of care that the

5      Transit Authority is supposed to follow and comply

6      with, true?

7            A.    Right, correct.

8            Q.    And these standard practices and

9      rules that the Transit Authority is supposed to

10     follow are also known as best practices, correct?

11                 MR. KEAVENEY:  Objection.

12           A.    No.

13           Q.    Okay.

14           A.    The rules are the rules.  But

15     beyond the rules, there are ways you can, you

16     know, implement something.  Yes, you are

17     supposed to follow the procedure and the rules,

18     right.  We had program management procedures,

19     program management guidelines.  But, you know,

20     exactly -- the best practices, yes, over time,

21     something that was thought to be a better way of

22     doing things can become incorporated, and the

23     procedure and guidelines can be updated.

24           Q.    In other words, you look to see

25     other transit systems and organizations to see what

19

1                              E. JONES

2      are these other systems doing, what is effective,

3      and then you can incorporate that to become part of

4      your standard procedures, guidelines, rules and

5      practices you follow, yes?

6                   MR. KEAVENEY:  Objection.

7            A.    That's a possibility.

8            Q.    Well, is it more than a possibility?

9      Was that an accurate statement?

10                  MR. KEAVENEY:  Objection.

11           A.    Yes, we do update our guidelines

12        periodically and our procedures.  It's usually

13        based on, perhaps, changing industrial

14        standards.  You know, some kind of a

15        benchmarking where we get information from

16        somewhere else, we believe this is a better

17        approach, and collectively, a decision is made

18        to update the procedures, the guidelines.  It's

19        not a static document that never gets updated.

20           Q.    You mentioned industry standards and

21      benchmarks.  You would look at international

22      standards and benchmarks and best practices,

23      correct?

24                  MR. KEAVENEY:  Objection.

25           A.    I don't know about international,

20

1                        E. JONES

2    but definitely national.

3            Q.    Are you familiar with COMET,

4    C-O-M-E-T?

5            A.    Yes.

6            Q.    And that's an international

7    organization?

8            A.    Yes.

9            Q.    That's an organization that the

10   Transit Authority has belonged to, and belongs to,

11   true?

12           A.    That's correct.

13           Q.    And they set forth best practices,

14   industry standards, and benchmarks, correct?

15                 MR. KEAVENEY:  Objection.

16           A.    I am not aware that they set -- I

17     know it's an organization that provides sheer

18     information across all the community of metros.

19     It does not dictate how each metro agency

20     operates and what standards they follow.  They

21     basically -- it's an information-sharing

22     platform.  That's my understanding.

23           Q.    Okay.  So, in other words, COMET, so

24   Transit is not only a member of COMET, but it

25   cooperates with them, true?

                              E. JONES

1

2          A.    Yes.

3          Q.    Transit Authority provides data, as

4    do other transit systems, to COMET, true?

5          A.    Yes.

6          Q.    And COMET publishes the data and the

7    findings and the analysis of the data and findings,

8    true?

9          A.    Yes.

10         Q.    So they analyze the different data;

11   they see what works, what is effective, and what

12   does not, correct?

13         A.    Yes.

14         Q.    Then they publish these findings,

15   correct?

16         A.    Yes.

17         Q.    And they promulgate their best

18   practices and their benchmarks, correct?

19              MR. KEAVENEY:  Objection.

20         A.    I don't know if they promulgate.  I

21     know they share the information and it would,

22     you know, basically say, you know, these are

23     some of the things being done by these various

24     transit agencies, these are the data, etc.  But

25     I don't know if they promulgate.

22

1                          E. JONES

2          Q.    Well, let me -- maybe I have a

3    better -- I apologize if English seems to be my

4    fifth language at times.

5                COMET publishes its findings and

6    analyses, correct?

7          A.    Yes.

8          Q.    And COMET publishes its benchmarks

9    and best practices, correct?

10               MR. KEAVENEY:  Objection.

11         A.    I don't know that COMET has

12    benchmarks or best practices.  I know that they

13    share information that they gather from all the

14    metros with all, you know, the community of

15    metros, and they provide that information.

16         Q.    And you've read the different

17    publications of COMET and its findings and

18    analyses, true?

19               MR. KEAVENEY:  Objection.

20         A.    I have read maybe one or two

21    reports, if I recall.

22         Q.    The one or two reports that you read

23    from COMET, what were the subject matters of those

24    reports, or their titles?

25         A.    I think they had to do with

23

1                    E. JONES

2    platform safety initiatives.

3         Q.    What were the dates of those

4    publications from COMET that you read on platform

5    safety initiatives?

6         A.    The last one I recall, which I

7    actually read yesterday, I may have read it in

8    the past, but I did a refresh yesterday.

9         Q.    Okay.

10        A.    It was I think 2011 or 2016.  I

11   can't recall the date exactly of the -- it was

12   actually a PowerPoint presentation.

13        Q.    Now, you were giving us the

14   different committees you have been a member of.  So

15   what other committees or task forces have you been

16   a member of at the New York City Transit Authority?

17        A.    The latest would be the Track

18   Trespass Task Force.

19        Q.    What is the Track Trespass Task

20   Force?

21        A.    It was established in -- toward the

22   end of 2021, in response to a series of

23   intrusion incidents that occurred.  And so there

24   was a lot of press about incidents that occurred

25   where individuals had fallen onto the tracks, in

24

1                          E. JONES

2    some cases, injuring or had fatalities.

3              Q.    So when you talk about intrusion or

4    track intrusion, you're talking about when people

5    or customers somehow, one way or another, wind up

6    on the track or track bed, correct?

7              A.    Correct.

8              Q.    You are still on this Track Trespass

9    Task Force that started in 2021?

10             A.    Well, the task force culminated.

11   The efforts of the task force culminated the

12   issuance of a report in, I think May of 2022,

13   that outlaid, you know, gave a lot of background

14   information, a lot of data, and basically

15   proposed a plan forward as to what the MTA in

16   general and New York City Transit specifically

17   would be doing.  You know, measurements that

18   will be implemented in an effort to reduce the

19   incidents of track intrusions.

20             Q.    So if I understand you correctly, in

21   2021 is when the Track Trespass Task Force was

22   formed, correct?

23             A.    Correct.

24             Q.    And its job was to plan forward and

25   to reduce the number of incidents of people winding

25

                                   E. JONES

1

2    up on tracks and track beds, correct?

3           A.    Correct.

4           Q.    And was that the first time that the

5    Transit Authority started such a committee or task

6    force or something to that effect?

7           A.    No.  In terms of a formal task

8    force, I cannot recall a prior occasion where a

9    group came together as a committee and was

10   called a task force for this specific reason.

11          But I have read reports going back

12   all the way to, I believe 2013, 2010, I can't

13   recall all the dates, that were reports about

14   similar.  You know, basically reacting similarly

15   to prior spikes in intrusions, and basically

16   laying out what had -- you know, what the

17   Transit Authority was doing and what they plan

18   to do going forward.

19          So there had been initiatives

20   before based on reports I've read wherein the

21   Transit Authority recognized a need to, you

22   know, either reinforce what they had in terms of

23   mitigation efforts and plan for additional

24   mitigation efforts.

25          Q.    The reports that you read that were

1                                E. JONES

2    dated either 2013, 2010, or both, were these

3    reports published by the Transit Authority or some

4    other entity?

5            A.    Transit Authority.

6            Q.    And in addition to the Construction

7    Management Forum, the Track Trespass Task Force,

8    have you belonged to any other committees or task

9    forces at the Transit Authority or the MTA?

10           A.    As I mentioned, the first was

11    underground storage --

12           Q.    And that as well.  I don't mean to

13    interrupt you.  I apologize.  And the underground

14    storage.  Other than those, have you belonged to

15    any other committees or task forces?

16           A.    I can't recall at this moment.

17           Q.    Were you ever a member of a platform

18    safety committee?

19           A.    I don't recall there being a

20    platform safety committee.  No, not --

21           Q.    Do you remember, was there some sort

22    of committee for platforms?

23           A.    No, not that I can recall.

24           Q.    All right.  And when you said that

25    the Track Trespass Task Force started in 2021 to

27

1                           E. JONES

2    plan forward to reduce the incidents of people

3    winding up on tracks, was this the first formal

4    task force ever done by the Transit Authority to

5    reduce the number of people winding up on the

6    tracks?

7                    MR. KEAVENEY:  Objection.

8          A.    I can't say if that was the very

9       first time, but that's the first one I was

10      involved with.

11          Q.    Okay.  And were you familiar with a

12   Platform Screen Door Task Force?

13          A.    No.  I'm not familiar with the task

14      force of that particular name.

15          Q.    Or Platform Screen Door Committee.

16   Were you involved with a Platform Screen Committee

17   of some sort?

18          A.    No.

19          Q.    Now, to back up for a second.

20                Would it be fair to say that the

21   Transit Authority, since the subway system first

22   started in the City of New York, has had incidents

23   of people winding up on the track?

24                    MR. KEAVENEY:  Note my objection.

25          A.    There is recorded history of people

28

1                              E. JONES

2      ending up on the tracks, yes.

3              Q.    And this has been a known, recurring

4      problem for the Transit Authority since its

5      inception, correct?

6                    MR. KEAVENEY:  Objection.

7              A.    I can only speak to my tenure here

8       at the New York City Transit Authority.

9              Q.    Okay.

10             A.    As long as I've been here, I know

11      it has been a concern.

12             Q.    So, in other words, you started in

13      1994 with the Transit, and would it be fair to say

14      that each and every year since 1994 to the present

15      time, many people each and every year wind up on

16      the track beds and on the tracks?

17             A.    Yes.

18             Q.    And would it be fair to say that

19      when you -- withdrawn.

20                   You discussed this Track Trespass

21      Task Force.  Do we agree that track-trespassing is

22      what you also called track intrusion?

23             A.    Yes.

24             Q.    And according to the Transit

25      Authority, that means any person, whether

29

                              E.  JONES

1

2    intentional or accidental, that winds up on the

3    tracks, correct?

4            A.    Yes.

5            Q.    So, in other words, if a person

6    falls, is sick, trips due to an unsafe condition on

7    the platform, or is pushed or commits suicide,

8    however they fall, whether it's accidental or

9    otherwise, that's considered trespassing, true?

10                  MR. KEAVENEY:  Objection.

11           A.    It's considered an intrusion.

12           Q.    And you told us an intrusion is

13   considered track-trespassing, correct?

14           A.    I think there is a difference

15    between trespassing and -- trespassing and

16    intrusion has kind of a different --  my

17    interpretation.

18           Q.    Well, let's back up, sir.

19                  You told us that in 2022, you were a

20   member of the Track Trespassing Task Force

21   Committee and it published its report, correct?

22           A.    Yes.

23           Q.    And in the report, they define the

24   problem, true?

25           A.    Yes.

30

E. JONES

1

2      Q.    And they define track-trespassing as

3  track intrusion, and refers to any entry onto the

4  tracks, whether accidental or intentional, true or

5  false?

6      A.    True.

7      Q.    So the Transit Authority considers

8  and views anybody, even if they accidentally wind

9  up on the track, as a trespasser, true?

10             MR. KEAVENEY:  Objection.

11      A.    In the context of how the report

12   was written, then yes.

13      Q.    We are going to come back to that in

14  a little bit.  But right now, I want to ask you

15  some other questions, if I may.

16             Have you told us now everything

17  about your work and involvement with the Transit

18  Authority, MTA?

19      A.    I have given you, you know, my

20   titles and the years I had those titles, and my

21   responsibilities during those tenures, yes.

22      Q.    By the way, do you have what's

23  called a resume or CV?

24      A.    Yes.  Not --

25      Q.    Would you --

31

                                E. JONES

1

2          A.    It wouldn't be up to date.  It

3    would not have my current title on there.

4          Q.    Okay.  Whatever you have, would you

5    kindly give a copy to the attorney for the Transit

6    Authority, the gentleman seated next to you?  He

7    can then give us a copy of that.  Okay?

8          A.    Sure.

9          MR. KEAVENEY:  We will take your

10         request under advisement.

11         MR. GENIS:  I appreciate that, sir.

12         Q.    Now, sir, what, if anything did you

13   review to prepare for today's deposition?

14         A.    I reviewed the summary or Platform

15   Feasibility Study.  I reviewed that Track

16   Intrusion Task Force Report.  I reviewed some

17   specific feasibility reports for specific

18   stations.  I reviewed a couple of COMET reports,

19   ones I referred to earlier.  I can't recall

20   everything I reviewed.

21         Q.    Can you please tell me by Bates

22   number what documents you reviewed to prepare for

23   your deposition today?

24         A.    By what number, sir?

25         Q.    What's called a Bates number.

32

                                    E. JONES

1       Sometimes the pages have little numbers on the

3       bottom of it.

4               A.   I'd have to pull the documents up

5          to tell you what numbers were on the documents.

6               Q.   How did you get the documents you

7       reviewed to prepare for today's deposition?

8               A.   Most of the documents are documents

9          that I had, and some were provided to me by

10         attorney, my attorney.

11              Q.   When you say your attorney --

12              A.   New York City Transit Authority.

13         Yes, the New York City Transit attorney.

14              Q.   And you are referring to the

15      attorney sitting next to you?

16              A.   Yes, and a colleague.

17              Q.   Another lawyer at his firm?

18              A.   Yes.

19              Q.   So what was specifically provided to

20      you by the attorney to review to prepare for

21      today's deposition?

22              A.   There was a Contact With Train

23         Report, I think that goes back 2010, 2013.

24         There was a deposition from one of my colleagues

25         here at the MTA.

33

                            E. JONES

1

2          Q.    Which one?

3          A.    Mike Sullivan.

4          Q.    What else?

5          A.    A couple other things.  I'm trying

6     to remember.

7          Q.    Go ahead.

8          A.    There was one about train speeds.

9          Q.    What about train speeds did you

10    review?

11         A.    It had to do with the response by

12    the Authority to propose legislation to stop the

13    trains prior to entering into a station, and

14    then traverse the station at five miles per

15    hour.  So it was a response to that proposal

16    legislation.

17         Q.    What else did the lawyer give you to

18    review to prepare for today's, today's deposition?

19         A.    I think there were two reports that

20    had to do with train speeds, in addition to the

21    others I mentioned.  There may be one or two

22    other documents; I can't recall specifically.

23    I'd have to go -- I read so many documents over

24    the last two weeks.  I -- it's...

25         Q.    So the documents you read on train

34

1                           E. JONES

2    speeds, one was a response to a proposed bill or

3    proposed law to reduce the train speed for trains

4    entering the station, and what were the others?

5          A.    I think one was a more

6    comprehensive -- one was a comprehensive report

7    and one was a series of e-mails, I believe, that

8    basically provided a summary response, and there

9    was a small detailed report.  That more detailed

10   report, I did not read it in its entirety.

11         Q.    So was it one report or more than

12   one report that you reviewed on train speeds?

13         A.    There was -- in the sense of a

14   report, there was one document that seemed, you

15   know, that you would perhaps entitle a report.

16   The other document I reviewed was basically a

17   series of e-mails, which culminated with a

18   summary response.  And it also alluded to hiring

19   a consultant to use software to basically, you

20   know, come up with more definitive numbers in

21   terms of, you know, increase running time,

22   throughput, etc.

23         Q.    So I just want to make sure we are

24   using the right word.  You used the word "report,"

25   then you said it was a "response to a proposed

```
1                        E. JONES
2   bill" and you used another term.  Are all three of
3   these things the same exact document you are
4   referring to?
5            A.    No.  As I said, there was one
6      document that I would call a report because it
7      was --
8            Q.    Okay.
9            A.    -- multiple pages.  It was a
10     cohesive document with I guess a table of
11     contents, etc.  The other document was just a
12     series of e-mails that culminated with a summary
13     of the Transit Authority's response to that
14     legislation, proposed legislation.
15           Q.    The one report that had the table of
16  contents, how long was that document,
17  approximately?
18           A.    In all honesty, I did not read the
19     entire thing.  But it was -- I don't know how
20     many pages was in there.
21           Q.    Who authored that report?
22           A.    I can't recall.  I am assuming it
23     was probably a consultant, but I can't recall.
24           Q.    And you mentioned there was also a
25  summary along with some e-mails, correct?
```

36

                              E. JONES

1

2          A.     Yes.

3          Q.     The summary, who authored that?

4          A.     The last e-mail that culminated

5    that e-mail train was Glenn Lunden.

6          Q.     So did Glenn Lunden, however it's

7    pronounced, I don't know how it's pronounced; is

8    that correct?

9          A.     Yes.

10         Q.     So did Mr. Glenn Lunden author the

11   summary, or did he author the report, or both,

12   something else?

13         A.     The only thing I recall his name

14   attached to was that culminating summary of that

15   e-mail chain.

16         Q.     Your understanding is the document

17   authored by Mr. Glenn Lunden was merely a summary

18   of the e-mails?

19         A.     I think it's more of his response,

20   offering a summary response based on requests in

21   the e-mail chain below.

22         Q.     What report with the table of

23   contents that I believe you thought a consultant

24   authored, what was the title of that report?

25         A.     I can't recall that.  It had to do

37

1                              E.  JONES

2      with train speeds.

3              Q.    And did that report, did it analyze

4      the number of people that are hit or run over by

5      trains and either killed or seriously injured?  Did

6      it do anything like that?

7              A.    I don't -- again, I did not read

8         that report in its entirety.  I just basically

9         glanced through it.  I can't recall if it

10        specifically had that to it.

11             Q.    Well, did the report say, well,

12     here's how many people get hit now, but if we lower

13     the speed, whether it be by one mile or slow it

14     down to ten miles an hour or five miles an hour or

15     some other speed, any speed whatsoever at all, if

16     we have a certain speed as to the entry speed of

17     trains as they enter the train station, we will

18     have X number of people getting hit or run over by

19     trains and killed or maimed?

20             MR. KEAVENEY:  Objection.

21             A.    Again, I did not read that report

22        in its entirety.  I cannot recall if it did

23        that.

24             Q.    Well, did the report have any

25     conclusions or findings or opinions?

38

1                          E. JONES

2          A.    I think it may have culminated with

3    a conclusion or conclusion section, but I'm

4    going to repeat what I just said; I did not read

5    that report in its entirety, so I can't

6    specifically say what it had or didn't have.

7          Q.    Did the report say anything about

8    that -- well, if the trains do go slower as they

9    enter the station, fewer people will be killed or

10   maimed?

11              MR. KEAVENEY:  Objection.

12         A.    My answer is the same.  I honestly

13   did not read that report in its entirety to be

14   able to say what it had or what it doesn't.

15         Q.    I understand maybe you didn't read

16   it in its entirety.  Did you read the final

17   conclusion or opinion of the report?

18         A.    If I did, I can't recall what it

19   said.  I know I recall Mr. Lunden's e-mail

20   because it was short and concise, relatively

21   short, and I think I read that twice.

22         Q.    Glenn Lunden, did he indicate

23   anywhere in his summary or in his e-mails the

24   number of peoples' lives that would be saved if the

25   trains were to slow down at all when they entered

39

1                              E.  JONES

2    stations?

3              A.    No, I don't --

4              MR. KEAVENEY:  Objection.

5              A.    No, I do not recall that.

6              Q.    Did Mr. Lunden's summary analyze how

7    many serious injuries would be prevented or

8    reduced, loss of limbs, things of that nature, if

9    the trains slowed down their speed at the stations?

10             MR. KEAVENEY:  Objection.

11             A.    I do not recall that included.

12             Q.    Was there any kind of comparative

13   analysis with the number of people that would get

14   hit by trains and either killed or seriously

15   injured versus the number of people that are killed

16   or injured by the trains if the train's speed is

17   not lowered?

18             MR. KEAVENEY:  Objection.

19             A.    I do not recall that included.

20             Q.    Have you ever read anything anywhere

21   that indicates that if the trains entered the

22   station at a lower speed, that lives can be saved?

23             MR. KEAVENEY:  Objection.

24             A.    I think there were references to

25    the proposed legislation, and at the root of

40

1                           E. JONES

2      that was -- I think there was even a draft of

3      the proposed bill, which was I think attached to

4      that e-mail, and it eluded to that fact.  That

5      was the premise behind the bill.

6           Q.    So you understand and agree that if

7    trains have a slower entry speed into stations, the

8    train takes less distance to stop, so it can stop

9    sooner and fewer people would get hit by trains,

10   correct?

11                MR. KEAVENEY:  Objection.

12           A.    What I know is that the slower the

13      train go, it's the short of the stopping

14      distance.  But as to whether or not it -- how

15      many lives it would prevent, I cannot say.  If

16      somebody wanted to commit suicide, for example,

17      they would wait until the train is right next to

18      them before they jump.  That would be my

19      assumption.

20                So I can't say exactly how many

21      lives it would save.  All I can say is that the

22      stopping distance of the train will be less if

23      they're going slow.

24           Q.    So let's back up to what you just

25      said.  First, you are assuming or guessing about

41

1                              E. JONES

2    the suicides, correct?

3              A.    I'm not assuming or guessing.  I

4       have looked at data and I know there are

5       intrusions that are attributed to suicides.

6              Q.    Well, let's back up a second.

7                    First, we are in agreement that if

8    the train enters the station at a slower speed,

9    there is a shorter stopping distance, true?

10             A.    Yes.

11             Q.    And that means a train could stop

12   sooner if they see a person on a track or near the

13   track, correct?

14                   MR. KEAVENEY:  Objection.

15             A.    Yes.

16             Q.    And that means if they stop sooner,

17   they could not run over somebody or hit them,

18   correct?

19                   MR. KEAVENEY:  Objection.

20             A.    Depends on where that individual

21      is.  Again, it's all about the stopping

22      distance.  So a train operator could see

23      somebody, but the person is not distant enough

24      from the train, that if the operator was to

25      apply the brakes, they could still potentially

42

1                              E. JONES

2       hit that person.

3            Q.    In fact, the Transit Authority has

4       published stopping distance charts, correct?

5            A.    I believe so.

6            Q.    And it indicates at what speed, what

7       distance is required to stop the train, correct?

8            A.    I have not looked at those charts

9        specifically, so I don't want to say what it has

10       or what it doesn't.  But I would believe they do

11       have it.

12            Q.    Did the Transit Authority ever

13       perform a study to see what would the effects of

14       reduction of entry speed of a train into the

15       station be to prevent or reduce the number of

16       people getting hit or run over by trains and killed

17       or seriously injured?

18                 MR. KEAVENEY:  Objection.

19            A.    Not to my knowledge.

20            Q.    Do we agree that, understood that if

21       the train is coming into the station and a person a

22       split second before the train enters a foot away

23       from the train, that train can't stop in time; we

24       are in agreement about that, right?

25            A.    Yes.

43

1                            E. JONES

2          Q.    But, for example, if the person

3    falls or gets pushed onto the tracks farther away

4    from the entry of the train into the station, if

5    the train is going slower, the train could stop and

6    avoid running them over or hitting them and killing

7    and injuring them, true?

8                    MR. KEAVENEY:  Objection.

9          A.    It would be agreed, a possibility

10    that the train could stop ahead if there's

11    sufficient braking difference between them and

12    the intrusion that occurred, or the person.

13          Q.    So do we agree that if there was

14    slower entry speed for trains entering the

15    stations, at least some lives would be saved every

16    year?

17                    MR. KEAVENEY:  Objection.

18          A.    That's possible.  But I do not have

19    data to support that.

20          Q.    Do you have data to contradict that

21    or rebut that?

22          A.    No, I don't.

23          Q.    Your common sense would tell you if

24    the trains could stop in less distance, fewer

25    people would get hit every year, true?

44

                              E. JONES

1                     MR. KEAVENEY:  Objection.

2          A.     That would be an assumption.

3          Q.     Would that be a logical conclusion?

4                     MR. KEAVENEY:  Objection.

5          A.     It would be a logical assumption.

6          Q.     Okay.  All right.  So slowing the

7    trains down as they enter the station would help

8    somewhat to prevent or reduce the number of people

9    killed or maimed by contact with trains, true?

10                    MR. KEAVENEY:  Objection.

11         A.     Could you repeat the question?

12         Q.     Sure.

13                    MR. GENIS:  Kindly, would you read

14                 it back?  Sometimes it is not English.

15                 (The requested portion of the

16                 record was read by the Court Reporter.)

17         A.     I do not have data to support that,

18      but it sounds like a logical assumption.

19         Q.     And the only way you would know for

20    sure is if there's a proper study done on this,

21    correct?

22         A.     Correct.

23         Q.     Okay.  Now, you mentioned other

24    parts of your jobs and tasks with the Transit

45

                              E. JONES

1

2    Authority and MTA over the years.

3              Have you ever done any litigation

4    support to help the Transit defending cases where

5    people are suing, like here, that there's a claim

6    that there was negligence and a young lady lost her

7    arm and leg because of it?  Have you assisted the

8    Transit in defending these cases?

9         A.   No.  It's the first time I have

10    been asked to give a deposition on something of

11    this sort.

12              MR. KEAVENEY:  Note my objection to

13         the question.

14         Q.   I'm putting aside depositions now.

15              I am asking, was it ever part of

16    your job, your duties, to assist litigation support

17    for the Transit Authority?  It could be behind the

18    scenes, it could be paperwork, it could be

19    conversations of any type.

20         A.   The only thing that we do get here

21    in that -- we used to get in Capital Management

22    Program Division and we still get here in MTA

23    Construction Development, our Freedom of

24    Information of Law requests, which is pretty

25    much -- so I don't know if you call that

46

1              E. JONES

2     litigation support.  I am not aware of any

3     specifically that had to do with an intrusion or

4     injury due to an intrusion.  But we do provide

5     material requested through Freedom of

6     Information Law.

7          Q.    So other than providing materials

8     that any one of the public can request under the

9     Freedom of Information Law, has it ever been part

10    of your job to assist or support the Transit

11    Authority with respect to litigation against it?

12               MR. KEAVENEY:  Objection.

13          A.    No.

14          Q.    Thank you.

15          A.    I did mention before that I was --

16    I appeared in court on behalf of the Transit

17    Authority, you know, in a different matter.

18          Q.    Right.  That was, I think you said

19    it was involving a property case of some sort.

20          A.    Correct, right.  Property

21    depreciation.

22          Q.    We will go on to other topics now.

23          A.    Could you pause one second, please?

24          Q.    Do you need a bathroom break or

25    phone call?

47

```
 1                          E. JONES
 2          A.    Yeah, I have been just inundated
 3     and a phone call --
 4          Q.    Not a problem.
 5               MR. GENIS:  We'll take a break.
 6          It's 11:21.  We will take a five-minute
 7          break, in case anyone has to use the
 8          bathroom.
 9               Is five minutes enough time?
10               THE WITNESS:  Yes, that's more than
11          enough.  Thank you very much.
12               MR. GENIS:  It's 11:21.
13               (Recess was taken.)
14               MR. GENIS:  It is 11:26.  We just
15          had a brief off-the-record discussion
16          where I asked Defense Counsel if they will
17          produce all of the items reviewed by the
18          witness to prepare for today's deposition.
19          Counsel indicated he will take it under
20          advisement.
21               I respectfully submit, I am
22          absolutely entitled to everything that
23          this gentleman reviewed to prepare for
24          today's deposition as a 30(b)6 witness.
25               MR. KEAVENEY:  You certainly asked
```

48

1                              E. JONES

2          him what he reviewed, then you have them

3          there already.

4                  MR. GENIS:  He was not able to

5          identify by Bates numbers or even absolute

6          titles.  He was vague on the different

7          documents and even the numbers of things

8          he reviewed.  He did actually add a number

9          of things you gave him that he did not

10         initially say that he did review until

11         after I asked the question of what you

12         gave him.

13                 I'm not going to waste more of my

14         time arguing with you.  I'm entitled to

15         everything you sent him and every single

16         thing you reviewed.  You know what you

17         sent him and you clearly know what he

18         reviewed and I am entitled to it.  I am

19         moving on.

20         Q.    Sir, let's get to some other topics

21    now.

22                 So, you have learned that -- how

23    many track intrusions are there on average per year

24    in the Transit Authority?

25                 MR. KEAVENEY:  Note my objection.

49

                                E. JONES

1

2        A.    I have not -- I don't have that

3    number ready to say, what the average has been.

4        Q.    Sir, you were a member of that Track

5    Trespassing Task Force, correct?

6        A.    Correct.

7        Q.    Who is the chairman of that task

8    force?

9        A.    It was Jamie Torres Springer, the

10    president of MTA Construction and Development.

11        Q.    By the way, has the Transit

12    Authority always maintained data, information

13    regarding people and track intrusion?

14        A.    Yes.  As far as I know, yes.

15        Q.    And how far back does that data go?

16    In the 1960's, 70's, 80's, earlier, later,

17    something else?

18        A.    I can't say exactly when it

19    started.  I know it would have been a very long

20    time ago.

21        Q.    So for many decades, correct?

22        A.    Possibly, yes.

23        Q.    And, in fact, in your task force,

24    when you reviewed track intrusion incidents by

25    year, you saw that there were over a thousand such

50

1                              E. JONES

2    incidents per year, correct?

3                    MR. KEAVENEY:  Objection.

4         A.    I believe thousands plus was for

5     the entire MTA, if I recall correctly.

6         Q.    When you say the "entire MTA," are

7    you referring to the Transit Authority or are you

8    referring to other things?

9         A.    Transit Authority, Long Island Rail

10    Road, and Metro North.

11        Q.    Sir, how many people per year for

12   the Transit Authority had track intrusions?

13                    MR. KEAVENEY:  Objection.

14        A.    I think it was in the hundred plus.

15        Q.    Okay.

16        A.    Again, the report focused on 2019,

17    2020, and 2021.

18        Q.    Okay.  So for 2019, there were 1062

19   track intrusions.  In 2020, there was 1094 track

20   intrusions.  And 2021, there were 1267 people that

21   the Transit Authority viewed as track trespassers,

22   correct?

23        A.    Correct.  That sounds like the

24    correct numbers, from what I recall, yes.

25        Q.    What percentage of those were people

51

1                          E. JONES

2    from the New York City Transit Authority?

3              A.    I think those were the Transit

4    Authority numbers.

5              Q.    And is there a shared drive where

6    all of this information is stored and kept at the

7    Transit Authority?

8              A.    The data for intrusions is usually

9    managed and stored and kept by the Office of

10   System Safety.  You know, not kept.  Not MTA

11   Construction Development nor CPM of the past

12   would do that.  That is something done by the

13   Office of System Safety and perhaps the

14   Operation Division, the Department of Subways.

15             Q.    And they would have kept all of this

16   data for decades, as you said, correct?

17                   MR. KEAVENEY:  Objection.

18             A.    That's my assumption.

19             Q.    That's your understanding, based on

20   your work, your experience, and training, correct?

21             A.    That's my assumption, yes.

22             Q.    Now, the Track Trespass Task Force,

23   does it have a shared drive or storage or group

24   e-mail or something else?

25                   MR. KEAVENEY:  Objection.

52

1                              E. JONES

2          A.    We knew who the members were, and

3     then there would be communication among the

4     members.  Most of that had to do with

5     preparation of the report that was issued in May

6     of 2022.

7          Q.    And as of now, does that task force

8     have a shared drive of some sort?

9          A.    No, not to my knowledge.  I recall

10    -- yeah, there was -- the initial draft of the

11    report would have been on a shared location

12    where people, you know, where the members would

13    comment, and so the comments would be recorded.

14         Q.    Is the task force still active or is

15    it terminated?

16         A.    We have not convened since the

17    report was issued, but the chairman of that,

18    which is Jamie Torres, and also the head of MTA

19    Safety and Security, are both tracking the

20    implication of all those recommendations that

21    came out of the report.

22         Q.    We are going to get to that in a few

23    minutes.

24               So let me ask you:  Is the job of

25    the task force over now that it has issued the

53

E. JONES

1

2  report?

3          A.    I know we have not had a meeting of

4     all the members, but I can't say the job of the

5     task force is over.  The implication of the

6     recommendations, as I stated, is being monitored

7     by the chairman of the task force as well as the

8     MTA chief of Security and Safety.

9          Q.    What was your role on that task

10  force?

11         A.    A lot of coordination among the

12     members and particularly working on the capital

13     initiatives.  The capital -- the recommendations

14     that required capital investment.

15         Q.    Now, we went over those numbers that

16  you told us from 2019 through 2021 that were just

17  for the New York City Transit Authority.  You saw

18  that there was an increase literally by 20 percent

19  of these incidents in 2019 to 2021, correct?

20         A.    Correct.

21         Q.    And that was even as ridership fell

22  dramatically, correct?

23         A.    Correct.

24         Q.    So, of the 1,267 reported incidents

25  in the subway, there were 200 resulting in

54

1                          E. JONES

2    collisions with trains, correct?

3              A.    I believe that's the number that's

4      in the report, yes.

5              Q.    There were 68 fatalities, correct?

6              A.    Yes, if that's the number of the

7      report.

8              Q.    In other words, even though

9    ridership was at an all-time low, we had an

10   all-time high of track intrusions and trains

11   hitting and running over people and either killing

12   them or seriously injuring them, true?

13                   MR. KEAVENEY:  Objection.

14             A.    True.

15             Q.    Were you one of the leaders of this

16   committee?

17             A.    I would say yes.  Again, I reported

18     to the president and I did a lot of the

19     coordination.  So from the point of coordinating

20     and, you know, all the stakeholders, and trying

21     to get their recommendations and to put them all

22     into some kind of a cohesive document, at least

23     a draft document, yes.

24             Q.    So did the Transit Authority conduct

25   an analysis of its data with regards to safety and

55

1                              E. JONES

2    preventing people from having track intrusions or

3    collisions with the train and getting killed or

4    seriously injured?

5                    MR. KEAVENEY:  Objection.

6         A.    I'm not sure what you mean by

7     "analysis."

8         Q.    Well, looking at the data and

9    analyzing it.

10        A.    So what came out, as shown in the

11    task force report, there was an effort to have

12    somewhat more of a granularity, or somewhat more

13    of a distinction between different categories of

14    reasons for intrusions, and a different approach

15    to data gathering that would give a little more

16    in-depth and insight into the numbers.  So that

17    was one of the recommendations that were

18    implemented as a result of the task force.

19        Q.    The task force, I will back up a

20    second.  You were at these meetings, correct?

21        A.    Not all, but most.  Most, yes.

22        Q.    Okay.  Was there any tension, so to

23    speak, between the stakeholders with some people

24    who wanted the system safer and other people wanted

25    them faster, you know, speed versus safety?

56

                              E. JONES

1

2          A.    No, I do not recall that.

3          Q.    Now, was there a recommendation for

4    an immediate fix as opposed to long-term action?

5          A.    Yes, there were recommendations for

6     short-term, medium-term, long-term remedial

7     action, yes.

8          Q.    In terms of the capital improvements

9    and long-term steps, that included having platform

10   screen doors, true?

11         A.    Correct.  That's one of the capital

12    recommendations, to pilot platform screen doors

13    at a few stations.

14         Q.    And to have cameras on the front of

15   the trains, correct?

16         A.    Correct.  That was a proof of

17    concept, yes.

18         Q.    And closed circuit TV deployment,

19   correct?

20         A.    Utilizing existing CCTV that

21    existed, and using AI to try and detect behavior

22    on platforms that could lead to intrusions.

23         Q.    And also track intrusion detection

24   systems, correct?

25         A.    Correct.

57

1                        E. JONES

2          Q.    In fact, the task force concluded

3    that platform screen doors had proven highly

4    effective at preventing track intrusions around the

5    world, true?

6          A.    Yes.

7          Q.    Was the Office of System Safety a

8    member of the task force?

9          A.    Yes.

10         Q.    Now, one of the things that the task

11   force did was, it reviewed what the Transit

12   Authority had done in the past, correct?

13         A.    Yes.

14         Q.    And the point was to see how to make

15   steps that were actually more effective at reducing

16   or preventing track intrusions and resulting in

17   death and serious injury, true?

18              MR. KEAVENEY:  Objection.

19         A.    Yes.  The intent was to look at

20     what was being done and how that could be

21     improved.

22         Q.    So in other words -- we will come

23   back to this document in a second.

24              Would it be fair to say that while

25   the subway system was built between, around 1900,

58

1                          E. JONES

2    1904, and most of it went up between 1900 and 1950,

3    there have been relatively few changes to the

4    infrastructure since that time?

5                   MR. KEAVENEY:  Objection.

6          A.    Very few changes.  What degree of

7       changes are you referring to?

8          Q.    Well, let's talk about the

9    infrastructure itself.  You tell me.  From 1950 to

10   the present time, have there been any changes to

11   the infrastructure of the system?

12         A.    They're always capital projects

13      that, you know, doing rehabilitation, you know,

14      state of good repair.  So there are always

15      projects that are aimed at keeping the system in

16      a state of good repair.  But if you're talking

17      about major construction, meaning addition or

18      demolition of existence structure, that's what I

19      mean.  I need a sense of what you mean by "major

20      changes."

21         Q.    Not a problem.

22                You're familiar what with is called

23   a ConOps document from the Transit Authority,

24   correct?

25         A.    Yes.

59

                         E. JONES

1

2        Q.    What is a ConOps document?

3        A.    It's short for Concept of

4    Operations.  It's basically, usually prepared

5    when you're introducing a new system and you

6    need to define who all the stakeholders are,

7    what their responsibilities are, how would you

8    go about designing the system to function within

9    this environment.

10       Q.    These are reports prepared by MTA,

11   New York City Transit Authority, correct?

12       A.    And/or with the help of consultants

13   at times, yes.

14       Q.    These documents typically have

15   executive summaries in them, correct?

16       A.    Yes.

17       Q.    And if an executive summary of a New

18   York City Transit Authority ConOps with respect to

19   platform screen doors stated, for the most part,

20   the New York City Transit Authority subway system

21   was built in between 1900 and 1950, and there have

22   been relatively few changes of the infrastructure

23   since that time, would you agree or disagree with

24   that statement?

25       A.    I would agree with that in terms of

60

1                          E. JONES

2      expanding the system, adding new stations.  You

3      know, in that regard, yes.  There is always

4      rehabilitation work going on.

5            Q.    When there is rehabilitation work,

6      does that include changing the design of the

7      stations to make them safer for the public?

8                  MR. KEAVENEY:  Objection.

9            A.    There is an element related to the

10     American Disability Act.  So if you are talking

11     about safety, that is one thing that would pop

12     out, where we have installed tactile warning

13     strips at the edge of the stations; elevators

14     had been installed in some stations to make them

15     ADA-accessible.  Any rehabilitation work would

16     have addressed any safety issue, you know,

17     that's intrinsic to the work being performed.

18           Q.    I want to see if I understand you.

19                 Since you are at the Transit

20     Authority, have there been any rehabilitations of

21     any stations for the safety of people to either

22     prevent or reduce the number of people being hit by

23     trains and killed or suffering catastrophic or

24     serious injuries?

25                 MR. KEAVENEY:  Objection.

61

                              E. JONES

1

2        A.    There are efforts that have been

3    undertaken such as, as I said, going back to the

4    tactile warning strips.  It is viewed as one of

5    the mechanisms of ensuring that people stay or

6    give them sufficient warning, so they understand

7    that they should not be standing this close to

8    the platform edge.  It's detected; if you walk

9    on it, you would feel the difference.  If you

10   are a wheelchair passenger, you would probably

11   realize that you are on an uneven surface and be

12   more cautious.  So yes, if you were to say --

13            The other thing that's been

14   installed are help points in all the stations,

15   so if there's an emergency, anybody within the

16   station environment could, you know, press an

17   emergency button, perhaps notify the command

18   center there is somebody on the rail bed.  You

19   know, the control center would perhaps stop the

20   train from running or etc.  There have been

21   efforts made to.

22        Q.    Let's back up.

23            Tactile warning strips, you

24   mentioned that's required by the Americans with

25   Disabilities Act, true?

1                      E. JONES

2          A.    Yes.

3          Q.    The tactile warning strips is a

4    requirement because of blind people and visually

5    impaired people, true?

6          A.    Yes.

7          Q.    So that's what its purpose is,

8    correct?

9               MR. KEAVENEY:  Objection.

10         A.    That, plus what I've just stated

11    before.

12         Q.    Okay.

13         A.    It is a warning to anybody.  It is

14    -- prior to the tactile warning strips

15    installed, it was always a painted area showing

16    where customers should not stand or wait on

17    trains.

18         Q.    So when you told us the task force

19    was reviewing everything, did they review to see

20    how effective, if at all, the tactile warning

21    strips or the painting and the help points were at

22    preventing or reducing the number of people getting

23    killed or seriously injured by trains every year?

24               MR. KEAVENEY:  Objection.

25         A.    I don't believe there was any

63

1                          E. JONES

2      empirical data available to be reviewed in that

3      regard.

4           Q.    Well, when you say there was no

5      empirical data, there is what is called a safety

6      performance indicator that the Transit Authority

7      keeps, true?

8           A.    Yes.

9           Q.    And, in fact, the Transit Authority

10     reports its safety performance to COMET and other

11     organizations as well, true?

12          A.    I believe so.

13          Q.    And when the task force reviewed the

14     data, they saw over the years, since basically the

15     inception of the Transit Authority, people have

16     been getting hit and run over by trains each and

17     every year, correct?

18          A.    As I said before, the data that the

19     task force mainly focused on was the last three

20     years, 2019, 2020, 2021.

21          Q.    In those years, I think we already

22     went over approximately, at least the last year,

23     200 people getting hit by trains and 68 killed, and

24     the balance of them seriously injured or

25     catastrophically injured, correct?

64

1                        E. JONES

2            MR. KEAVENEY:  Objection.

3        A.    The numbers are stated in the

4    report, yes.  To the extent you're restating the

5    numbers stated in the report and that's

6    accurate.

7        Q.    These numbers, even though it was

8    lower ridership, are those numbers the same, lower,

9    higher than they have been for the past few

10   decades?

11       A.    I have not -- I can't say what the

12   overall trend has been.  I can't recall exactly

13   what the data has been for decades.  I haven't

14   reviewed that data recently.

15       Q.    Well, did anybody ever look to see

16   from the Transit Authority if the warning strips

17   and the help points and any other steps that they

18   may have taken were actually effective at reducing

19   or preventing people from being killed or

20   catastrophically injured by trains?

21            MR. KEAVENEY:  Objection.

22       A.    I have not seen where that data has

23   been recorded and analyzed.  But I believe,

24   anecdotally, it is believed that they have

25   played a part in reducing intrusions.

E. JONES

1

2      Q.    Are you familiar with another

3  Concept of Operations report by the Transit

4  Authority called Integrated Platform Safety with

5  Track Intrusions Detective System Concept of

6  Operations?

7      A.    Yes.

8      Q.    And, in fact, you signed off on that

9  report, correct?

10      A.    Signed off, I'm not sure if my

11  signature was needed, but I was -- I am very

12  familiar with that, yes.

13      Q.    You, in fact, signed this document;

14  true or false?

15      A.    Okay.  I don't have the document in

16  front of me, but I know I was intimately

17  involved, and it would not be surprising to me

18  if I signed that document.

19      Q.    Okay.  In fact, this document was

20  produced by MTA New York City Transit Authority CPM

21  Systems Engineering, correct?

22      A.    Systems Program, yes.

23      Q.    And you're from CPM, correct?

24      A.    Was from CPM, yes.  CPM is no

25  longer in existence.  We are now part of MTA

1                          E. JONES

2      Construction Development.

3              Q.    At the time when this report was

4      issued in April 2019, you were from Systems and

5      Security Program and you were a program officer,

6      correct?

7              A.    Correct, yes.

8              Q.    And you and the other members of

9      this -- what do you call this, a committee, task

10     force?  What do you call them?

11             A.    I knew that what we had was a -- we

12        had a consultant to prepare this Concept of

13        Operation or Track Intrusion Detection Systems.

14        And part of that process, which was led by a

15        gentleman from our Systems Engineering Division,

16        was to engage in meetings with all the

17        stakeholders, get their input, etc.

18             Q.    And then, when you signed off on it,

19     that's an assurance review signoff indicating that

20     you have contributed, that the reviewers

21     contributed, and it's accurately reflected and

22     agrees the reviewers reached the contents that have

23     been reviewed, correct?

24             A.    Correct.

25             Q.    In reviewing everything, they

1                          E. JONES

2   specifically looked at whether or not these call

3   boxes have been effective, true?

4           A.    You mean the help points?

5           Q.    Yes.

6           A.    I believe so.  Again, I have not

7       read that concept, that ConOps recently.  I did

8       not read it in preparation for this deposition

9       either, but I believe so.

10          Q.    Those help points, the intercoms,

11  this ConOps report notes that they have numerous

12  deficiencies, including a high volume of prank

13  calls and shortage of staff to handle RCC emergency

14  red button calls, true?

15          A.    Again, as I stated, I have not read

16      that ConOps in recent -- at least for the last

17      couple of years I perhaps have not looked at it.

18      If you say that's what is in there, then I'm not

19      going to dispute it.

20          Q.    In fact, it's that same report noted

21  on page 23, by the way, that there's the lack of

22  knowledge within the organization to understand the

23  degree to its safety devices are being utilized by

24  customers in the event of track intrusions.

25                Would you agree with that statement

68

1                              E. JONES

2     also?

3               A.    If you are reading that in the

4      report as stated, I would say yes.  That's what

5      -- if that's what is in the report, we believed

6      that at the time the report was issued.

7               Q.    If the report also indicates that

8     New York City Transit Authority's response time to

9     answer information calls is faster than the

10    response time for answering emergency calls, would

11    you agree with that?

12              A.    If that was what is stated in the

13     report, then at the time, that would have been

14     the general belief and understanding.

15              Q.    Okay.  So does this tell you that

16    those help points have not been effective at

17    reducing or preventing people from being hit, run

18    over by trains, killed, or catastrophically

19    injured?

20              MR. KEAVENEY:  Objection.

21              A.    I do not believe the report stated

22     that help points do not help to mitigate with

23     those incidents, as you just stated.

24              Q.    Well, tell me, please, what analysis

25    or study, if any, has ever been done by the Transit

69

1                              E. JONES

2    Authority to see whether or not those help points

3    have been effective in reducing or preventing

4    people from being killed or catastrophically

5    injured by contact with trains?

6              A.    I am not aware of any empirical

7       study that has been done.

8              Q.    We will go to the next thing.

9                    Let's talk about messaging to the

10   customers, the people that ride the trains.

11                   Do you agree that the report noted

12   customers are overloaded with communications and

13   consumed in their own world, causing message

14   fatigue and attention on the platform?

15             A.    Sorry.  What am I to respond to?

16             Q.    Do you agree with that statement?

17             A.    If that's what is stated in the

18      report, at the time, that was the common belief

19      at the time.  Yes.

20             Q.    So in other words, when the Transit

21   Authority studied this or looked at this, they saw

22   that the messages were causing message fatigue and

23   was not effective, true?

24                   MR. KEAVENEY:  Objection.

25             A.    That is -- that was the summary

70

1                    E. JONES

2      that's in the report.  That's what is in the

3      report; that was the common belief at the time.

4          Q.    And do you agree with that?

5              MR. KEAVENEY:  Objection.

6          A.    I believe the professionals who we

7      hired to produce the Concept of Operation did a

8      thorough research, and this was part of their

9      conclusion.  And based on the fact that I signed

10     that report, it means I did not object to that

11     finding.

12         Q.    So yes, you agreed that there was

13   message fatigue and the messaging was not effective

14   at reducing or preventing people from being killed

15   or catastrophically injured by contact with a

16   train?

17             MR. KEAVENEY:  Objection.

18         A.    Again, I believe we hired

19     professionals to make -- to produce this

20     document.  They did what I hoped would have been

21     a thorough review, and this was their

22     conclusion.  Then I respect their conclusion.

23         Q.    So is that a yes or no, you agree or

24   disagree with it?  Which is it?

25             MR. KEAVENEY:  Objection.

71

E. JONES

1

2          A.     I would repeat exactly what I just

3     said.

4          Q.     So you're not going to answer my

5     question?  So you won't answer my question?

6               MR. KEAVENEY:  Objection.

7          Q.     Do you remember you gave me your

8     word to say yes or no or true or false, and if you

9     are unable to do so, just merely say you --

10          A.     I'll say I'm unable to answer that

11     question.

12          Q.     Okay.  I can accept that.

13               Sir, did the report also note that

14     the announcements made did not comply with ADA;

15     limited customer information signs along the

16     platform were also there, and it was inaccuracy of

17     counting clock information, causing people to look

18     out on the tracks to see when the trains were

19     coming?

20          A.     You are asking if the report said

21     that?

22          Q.     Sure.

23          A.     Yeah.  If you are reading that from

24     the report, that sounds like something that, you

25     know, I wouldn't disagree with that.

72

1                              E. JONES

2          Q.    Since you've already noted that

3    during the pandemic, with ridership at an all-time

4    low, and we had an all-time high of people being

5    hit and killed or catastrophically injured by

6    trains, crowding has nothing to do with people

7    being hit by trains?

8                     MR. KEAVENEY:  Objection.

9          A.    No, I would disagree with that.

10    Crowding, in my opinion, has a lot to do with

11     potential intrusions onto the right of way.

12          Q.    Okay.  Let's back up.

13                Do you agree, according to the

14    research by the Transit Authority, when they looked

15    at the data, most injuries, a higher amount of

16    injuries occurred between 9:00 p.m. and 1:00 a.m.,

17    where the train platforms were less crowded?

18                Do you agree with that fact?

19          A.    If that is stated there, I would

20     not dispute that fact.  Yes.

21          Q.    In fact, fatalities were more

22    prevalent during non-rush hour times and during the

23    same evening period as injuries 9:00 p.m. to 1:00

24    a.m.; do you agree with that?

25          A.    If that's what's stated in report,

73

                            E. JONES

1

2    I would not object.

3         Q.    In other words, more people are

4    getting hit by trains when it's not rush hour at

5    nights or on weekends; true?

6         A.    Based on what you just read, and if

7     that's the correct data, then yes.

8         Q.    And more people have been injured by

9    trains, being hit by trains with ridership at an

10   all-time low when it was no crowding at the

11   platforms, true?

12                MR. KEAVENEY:  Objection.

13        A.    True based on the data.

14        Q.    So based on the facts, on the data,

15   you have to agree that crowding of the platforms

16   does not cause people to get hit by trains?

17                MR. KEAVENEY:  Objection.

18        A.    No.  Crowding of the platforms, in

19    my opinion, can definitely contribute to track

20    intrusions.

21        Q.    When you say your opinion, is there

22   any factual data that supports the opinion you just

23   gave?

24        A.    I cannot recall any.  Any database

25    that I've seen that has some kind of empirical

74

                            E. JONES

1    measure of, you know, 90 percent crowding of a

2    platform leads to X percent increase in track

3    intrusions.  I am not aware of any such

4    analysis.

5         Q.    So in other words, are you aware of

6    a single study by the Transit Authority that

7    supports your opinion that crowding has anything to

8    do with the number of people getting hit or run

9    over by trains and killed or seriously injured or

10   catastrophically injured?

11                MR. KEAVENEY:  Objection.

12        A.    I am not aware of a specific report

13   that I read that said that, no.

14        Q.    Are you aware of any studies that

15   address it?

16        A.    I know, if I recall correctly, one

17   of the COMET reports that I read, one of the

18   causing factors of intrusions, they did identify

19   as crowding, overcrowded platforms.

20        Q.    That COMET report that you just

21   referred to, is that for the New York City Transit

22   Authority or for other entities?

23        A.    I think it was -- I'm trying to

24   recall.  It gave all the reasons, if I recall

                              E. JONES

1

2    correctly, what they found to be the reasons for

3    track intrusion.

4              MR. GENIS:  Move to strike.

5         Q.    Could you please answer my question.

6              The COMET study that the report that

7    you just said you read, that you claim supports

8    your opinion, was that for data for the New York

9    City Transit Authority or elsewhere?

10        A.    I am trying to recall if it was

11    only gathered at the New York City Transit

12    Authority, because the community of metros, the

13    reports are usually gathered at, you know --

14    it's usually documents with contributions from

15    all the metros that are involved.  I can't

16    recall if that one was only for the New York

17    City Transit Authority.

18        Q.    So you're speculating as to what

19    that report actually said, correct?

20              MR. KEAVENEY:  Objection.

21        A.    I am not speculating to the fact

22    that it did identify overcrowding as one of the

23    possible causes or contributing causes to track

24    intrusions.

25        Q.    What report was this?

76

E. JONES

1

2      A.    I think it was dated 2011 or

3   something of that nature.  I can't recall, you

4   know, the exact title of the report.  But I knew

5   I read that COMET report recently.

6      Q.    Since you read it recently, and

7   preparing for this deposition as the representative

8   of the Transit Authority, did you make note of this

9   important report that you claim supports your

10  opinion?

11     A.    I made a mental note.

12     Q.    Okay.

13     A.    But not --

14     Q.    Since you made a mental --

15     A.    Not a photographic note that I

16  could say.

17     Q.    Did you prepare any written notes,

18  typed or handwritten, for today's deposition?

19     A.    No, no.  I do not have any written

20  notes.

21     Q.    Now, sir, speaking of COMET, when

22  you mentioned COMET reports that you reviewed, do

23  we agree that according to COMET, New York City

24  Transit Authority was number one with the highest

25  number and proportion of accidental track

1                          E. JONES

2    intrusions in 2012 through 2016 --

3                  MR. KEAVENEY:  Objection.

4         Q.    - in the world?

5         A.    Highest number of -- could you

6      repeat that?

7         Q.    Sure.  The Transit Authority is

8    number one for accidents in the entire world for

9    track intrusions, accidental track intrusions,

10   according to the COMET study from 2012 through

11   2016?

12                 MR. KEAVENEY:  What's the question?

13        Q.    Not a problem.  I'll try to again.

14                 Sir, you read COMET studies and

15   reports you told us; true or false?

16        A.    Correct.

17        Q.    And COMET --

18        A.    True.

19        Q.    And COMET is the leading

20   international organization for Transit safety,

21   correct?

22                 MR. KEAVENEY:  Objection.

23        A.    COMET is a community of metros

24     that, as far as I know, they share information

25     and all aspects of concern common among all the

78

```
 1                              E. JONES
 2      transit agencies that are members.
 3              Q.    So that is the leading premiere
 4      international organization for Transit entities
 5      throughout the world; true or not?
 6              A.    I don't know that to be true or
 7      false.
 8              Q.    Transit Authority gives data to
 9      COMET; true or false?
10              A.    True.
11              Q.    And the Transit Authority routinely
12      relies on COMET; true or false?
13                   MR. KEAVENEY:  Objection.
14              A.    I do not know if they routinely
15      rely on COMET.  Again, I know that from where I
16      sit in the MTA Construction Development area, we
17      do not.  As to whether the New York City Transit
18      authority does, I can't speak to that.  I know
19      they share information; I do not know the extent
20      to which they rely on COMET's information to
21      implement policy or otherwise.
22                   MR. GENIS:  Move to strike.
23              Q.    Let's see if I understand you.
24                   We agree that COMET is an
25      international organization that the Transit
```

79

1                          E. JONES

2    Authority belongs to and gives data to and utilizes

3    the best practices and benchmarking and

4    publications of COMET; true or false?

5                  MR. KEAVENEY:  Objection.

6           A.    Again, I belong to the MTA

7    Construction Development Group.

8           Q.    Can you answer my question?

9           A.    Prior to that --

10          Q.    Please answer my question.

11          A.    Could you repeat the question?

12                MR. GENIS:  Read it back, please.

13                (The requested portion of the

14          record was read by the Court Reporter.)

15                MR. KEAVENEY:  Objection.

16          A.    You said if I -- it's either true,

17   false, or I can't answer the question.  I can't

18   answer the question.

19          Q.    Not a problem, sir.  Let's be

20   crystal clear.  The Transit Authority and MTA has

21   designated you to testify on their behalf regarding

22   any of the matters of examination of the 30(b)6

23   notice for deposition and its rider for today,

24   true?

25                A.    That's my understanding, yes.

80

                    E. JONES

1

2        Q.    And you have a full authority to

3    speak on behalf of the Transit Authority and MTA,

4    true?

5        A.    I have full authority to speak to

6    what I know.

7        Q.    Well, sir, let's back up then.  You

8    understand that your answers to my questions are

9    binding on the Transit Authority/MTA, true?

10           MR. KEAVENEY:  Objection.

11       A.    I understand that my answers are

12   being used in this litigation.

13       Q.    Do you understand that your

14   testimony today must represent all information

15   known or recently available to the Transit

16   Authority and MTA regarding the matters of

17   examination listed in the 30(b)6 deposition notice

18   marked today for identification as Plaintiff's

19   Exhibit 1?

20       A.    I can only speak to my personal

21   knowledge; I cannot speak to what I do not know.

22       Q.    Well, what was done to prepare you

23   to fully and un-evasively answer questions about

24   the designated subject matters in the deposition

25   notice?

81

E. JONES

1

2          A.    Counsel, my attorneys, the

3      attorneys for the Transit Authority provided

4      various documents.  We had a couple sessions

5      where they asked questions.  I personally went

6      and looked through my files and read some

7      documents particularly related to the capital

8      aspects or track intrusion mitigation

9      initiatives.

10          Q.    Have you ever seen the 30(b)6 notice

11      and its rider for today's deposition that brings

12      you here?

13          A.    No.

14          Q.    Has anybody ever showed it to you?

15          A.    No.

16          Q.    Has anybody ever told you the topics

17      that are on the 30(b)6 rider you will be questioned

18      on today?

19              MR. KEAVENEY:  Note my objection.

20              Don't answer that; it calls for

21          attorney/client communication.

22              MR. GENIS:  I am asking about

23          preparation.

24              MR. KEAVENEY:  You are asking what

25          he was told.  That infringes on

82

1                              E. JONES

2            attorney/client communication.  So move

3            on.

4            Q.    Sir, did you talk to anybody from

5    the Transit Authority at all, so that you would be

6    here today as a knowledgeable witness on behalf of

7    the Transit Authority?

8            A.    No.  I didn't have discussions that

9     were aimed at providing me a brith (phonetic) of

10     knowledge beyond my area of expertise outside of

11     what the discussions I had with all attorneys

12     and the documents they provided.

13            Q.    So the basis of your testimony

14    today, it includes what the attorney said to you

15    and showed to you?

16                 MR. KEAVENEY:  Objection.

17                 Don't answer that.

18                 MR. GENIS:  Let's mark for

19            identification Plaintiff's Exhibit 1.  The

20            30(b)6 notice with its rider, please.

21                 (Whereupon, the aforementioned

22            30(B)6 Notice & Rider was marked as

23            Plaintiff's Exhibit 1 for identification as

24            of this date by the reporter.)

25                 (Whereupon, Plaintiff's Exhibit 1

83

```
 1                         E. JONES

 2          was presented in Screen Share.)

 3              Q.    Do you see what is deemed marked

 4      Plaintiff's Exhibit 1 of today's date, the Notice

 5      for Deposition Pursuant to Rule 30(b)6?  Do you see

 6      the first page on the screen, sir?

 7              A.    Yes.

 8              MR. GENIS:  Dave, please scroll.

 9              Q.    Do you see there are definitions on

10      the second page of the 30(b)6 notice?

11              A.    Yes.

12              MR. GENIS:  Dave, continue to the

13              rider, please.

14              Q.    Do you see Schedule A for the

15      different topics that you were to be giving

16      testimony on today?

17              A.    On this screen, yes.

18              Q.    Right now, this is the very first

19      time you've ever seen this document, true?

20              A.    Yes.

21              Q.    We will scroll down, so you can see

22      what is on there.

23              A.    (Viewing).

24              Q.    Have you finished looking at the

25      first page before we go to the second?
```

84

E. JONES

1

2          A.    I am finished glancing at it.  I

3     didn't read it in its entirety.

4          Q.    Read it.  If you need a break to do

5     so, we will take a break.

6               MR. KEAVENEY:  Don't take a break.

7          Q.    Would you like to take a break to do

8     it?

9               MR. KEAVENEY:  There is no breaks

10              here.  Read it to yourself.

11              MR. GENIS:  He needs time.  I'll

12              respect his wishes.  I'll stop the clock.

13              MR. KEAVENEY:  We are not stopping

14              the clock.  If you want him to read the

15              document, give him time to read the

16              document on your time.  If not --

17              MR. GENIS:  Wrong.

18              MR. KEAVENEY:  You should have

19              provided the document ahead of time.

20              MR. GENIS:  He was provided with

21              the document ahead of time.  Your office

22              was served it.  And the fact that you

23              failed to comply with your obligations

24              under the federal rules does not excuse

25              any of the conduct you are engaging in

85

1                              E. JONES

2          today or of the witness's.  I think it's

3          reprehensible you failed to properly

4          produce this witness in violation of

5          Federal Rule 30(b)6.  This will not be the

6          end of this conversation.

7                    We will get back to the deposition.

8          Q.    Sir, you read the first page of the

9     rider; yes or no?

10         A.    I have not read the entirety of it.

11         Q.    Good.  We will take a break, so you

12    can read it.

13                    MR. GENIS:  We are now taking a

14          break.  It's 12:16.

15                    (Recess was taken.)

16                    MR. GENIS:  It is now 12:21.

17         Q.    Sir, have you now reviewed the

18    Schedule A to the 30(b)6 Notice for Deposition for

19    your deposition today?

20         A.    Yes, I just read what was produced

21      on the screen, yes.

22         Q.    Now that you've read it, are there

23    any of the topics that you saw listed here in bold

24    face that you have no knowledge about as you sit

25    here today?  If you need us to scroll down, we will

86

1                           E. JONES

2    gladly scroll down.

3          A.    I have to go through -- I'll have

4    to go through one at a time.

5          Q.    Sure.

6          A.    There are some I have some

7    knowledge of, but not full, extensive knowledge.

8    There are some I am very knowledgeable of; I

9    would say perhaps 100 percent, but I don't have

10   absolute knowledge of every single thing here

11   100 percent.

12         Q.    I'll make it easier.  I will read

13   out loud the bold face items.

14               First one is Immunity Defenses.  Do

15   you have knowledge of the Transit Authority

16   Defenses of Immunity and the basis of it?

17         A.    No.

18               MR. KEAVENEY:  Note my objection.

19               MR. GENIS:  You got his answer, or

20         no?

21               MS. REPORTER:  Yes.

22         Q.    Next.  You have "Knowledge as to:

23   Platform screen doors, TIDs, signage programs,

24   announcements, and other safety measures to reduce

25   12-9s."  Do you have knowledge on that?

87

1                          E. JONES

2           A.    I have full knowledge of PSDs and

3      TIDs.  I have some knowledge on signage

4      announcements and other safety measures, as I

5      was a part of the Track Intrusion Task Force.

6           Q.    Do you have knowledge on the

7      Platform Edge Door Task Force?

8           A.    Yes.

9           Q.    Do you have knowledge of these items

10     before the year of 2016?

11          A.    My first involvement with track

12     safety initiatives started in 2015.  Anything I

13     know prior to that would have been from reading

14     documents that were dated prior to 2015.

15               MR. GENIS:  Dave, scroll down to

16          see the next topic.

17          Q.    I'll stop just for a second.

18               Do you see this number about RFI's

19     and responses to RFI's and offers and proposals to

20     install, place platform screen doors, TIDs, by

21     private entities and build, operate, and transfer

22     agreements for same?  Do you have any knowledge

23     about that?

24          A.    I read a document recently that

25     spoke about that previous offer by Casey

88

1                          E. JONES

2      Manufacturers to install PSDs, platform screen

3      doors.

4              Q.    So you saw how 13 original equipment

5      manufacturers responded to the Transit Authority's

6      RFI to install platform screen doors at little or

7      no cost to the Transit Authority in exchange for

8      advertising revenue?

9              A.    In the document I read, yes.

10             Q.    Then you saw how the Transit

11     Authority narrowed that list down to five equipment

12     manufacturers to have further discussions with --

13             A.    Yes.

14             Q.    -- to do so?

15             A.    Yes.

16             Q.    What happened after that?

17             A.    I'm trying to recall.  I think

18     there was something about competitive

19     procurement that they had to -- they chose to go

20     through and, you know, do this via a competitive

21     procurement.

22             Q.    So in other words, if I understand

23     you correctly, there was to be a competitive

24     bidding process to decide which of the

25     manufacturers the Transit Authority wanted to award

1                          E. JONES

2    the contracts to install platform screen doors at

3    little or no cost by the New York City Transit

4    Authority in exchange for advertising revenue?

5              MR. KEAVENEY:  Objection.

6         A.    My understanding is, in what I

7    read, if I read correctly, that going the route

8    that they were going was contrary to correct

9    procurement, public procurement policy.  And so,

10   if they were to choose to implement platform

11   screen doors, they would have to do it through a

12   competitive procurement process.

13        Q.    Okay.  So I am trying to understand

14   what you just said.  So yes, there was supposed to

15   be a competitive bidding process for companies,

16   manufacturers to install platform screen doors at

17   little or no cost to the New York City Transit

18   Authority in exchange for advertising revenue, or

19   no, it was not to have a competitive bidding?

20             MR. KEAVENEY:  Objection.

21        A.    I think, if I recall correctly, it

22   terminated by saying that in order for them to

23   move forward, this approach could not be pursued

24   because it would not comply with public

25   procurement requirements, and therefore, I don't

90

E. JONES

1

2    recall that anything happened after that.

3        Q.    Can you please tell me what public

4    procurement policy you are referring to?

5        A.    For publicly advertised or public

6    procurement, if you're spending government

7    money, in layman's terms, then you have to offer

8    to the bidding community a local competition, as

9    opposed to just going to negotiate with one or

10   two individuals, and then make a selection from

11   that pool of individuals, as opposed to giving

12   the broader community an opportunity to bid on

13   this public work.

14       Q.    So did the Transit do that; did they

15   say we have to open up this to competitive bidding

16   and that's what we were going to do?  Did the

17   Transit do so?

18       A.    From what I read that's in a

19   document, I did not see anything.  I stopped.  I

20   did not see any follow-up on that that said they

21   pursued a public procurement, you know, process.

22       Q.    So let's see if I get this straight.

23   The Transit Authority issued and published a

24   request for information asking the manufacturers

25   throughout the world to see if they could put in

91

                              E. JONES

1

2    platform screen doors, so the New York City Transit

3    Authority, at little or no cost to the Transit, in

4    exchange for those companies getting the

5    advertising revenue, true?

6                MR. KEAVENEY:  Objection.

7         A.    That is what I read in the

8    document, yes.

9         Q.    And 13 major corporations, original

10   equipment manufacturers, responded to that RFI,

11   correct?

12        A.    That's what I read in the document,

13    yes.

14        Q.    The Transit Authority decided that

15   we have to now open this up to competitive bidding,

16   so we comply with public procurement policies,

17   true?

18        A.    True.

19        Q.    Did the Transit Authority ever do

20   so?

21        A.    Not at that -- I mean, what I know

22    since I have been here in 2015 is the only

23    knowledge I have of a public procurement was

24    around 2017, 2018, when an attempt was made to

25    install platform screen doors at Third Avenue on

92

1                          E. JONES

2     the L Line.  That's the first public

3     solicitation following the public procurement

4     rules that I'm aware of.

5          Q.    So let's back up.

6                You just mentioned the Third Avenue

7     L Line.  Was an original equipment manufacturer

8     hired by the Transit Authority to install platform

9     screen doors at little or no cost in exchange for

10    advertising revenue?

11         A.    I am not aware of that.

12         Q.    So the Transit Authority asked the

13    world to see if anybody could do platform screen

14    doors for the Transit Authority at little or no

15    cost in exchange to get the advertising revenue;

16    you told us that repeatedly, true?

17                MR. KEAVENEY:  Objection.

18         A.    That's what the document stated.

19         Q.    Why did the Transit Authority not

20    pursue this to get at little or no cost to itself

21    manufacturers to install platform screen doors at

22    little or no cost to the Transit Authority?

23         A.    As I stated previously, and as

24     stated in the document, going the route of

25     selecting an equipment manufacturer outside of

93

1                          E. JONES

2      the proper public procurement process was the

3      reason why they chose not to go ahead.

4           Q.    Okay.  So all they had to do, all

5    the Transit Authority had to do was say, okay, we

6    will put these out for competitive bidding to do

7    the very same thing that it had previously put in

8    its RFI and then 13 original equipment

9    manufacturers had responded to in the affirmative,

10   true?

11          A.    I am not aware of the reasons why

12     they never proceeded.  I know that the first

13     attempt at publicly procuring a PSDs

14     manufacturer occurred in 2017, 2018 for Third

15     Avenue.

16               MR. GENIS:  Move to strike.

17          Q.    That's not my question.  I am asking

18   you right now, all the Transit Authority had to do

19   in order to get at least one manufacturer to, at

20   little or no cost to the Transit Authority, install

21   platform screen doors, all they had to do was put

22   it out there to the public for competitive bidding,

23   true?

24               MR. KEAVENEY:  Objection.

25          A.    I do not know if that is all they

94

1                              E.  JONES

2      had to do.  What I know is, the reason they gave

3      was that they would have to do this through

4      public procurement.

5            Q.    Okay.  And did the Transit Authority

6  ever attempt to get companies to install platform

7  screen doors at little or no cost to the Transit

8  Authority through public procurement; yes or no?

9            A.    I am not aware of any attempt.

10           Q.    Okay.  Why did they not attempt to

11  get companies to do it for free?  In other words,

12  why did the Transit Authority not do anything now

13  to get companies, at little or no cost to the

14  Transit Authority, to install platform screen doors

15  in the Transit Authority system?

16                 MR. KEAVENEY:  Objection.

17           A.    I can't answer that question.

18           Q.    Who would know the answer to that

19  question?

20           A.    I'm not sure any single individual

21      would know.  But individuals that were involved

22      at the time the decision was made to not pursue

23      our RFI response any further and that they would

24      have to go through public procurement, they

25      would know the reasons as to why they did not.

95

                              E. JONES

1

2    I do not.

3          Q.    Who are those people?  Who are those

4    people?

5          A.    Whoever was involved at the time.

6    As I said, that was -- created my involvement

7    with the knowledge I have of that approach, or

8    that attempt, is from what I recently read in

9    the document provided.

10         Q.    So when you looked at the documents,

11   did you see why or who, if anyone, at the Transit

12   Authority said we're going to abandon the idea of

13   getting, at little or no cost, platform screen

14   doors proven effective at preventing or reducing

15   people from getting killed by trains or

16   catastrophically injured, at little or no cost to

17   the Transit Authority, we are going to abandon

18   doing so?

19              MR. KEAVENEY:  Objection.

20         A.    I would have to go back and look at

21   the document, if there were names, and I imagine

22   you would have those same documents.

23         Q.    But who would you ask why did they

24   turn down getting it for free, or at little cost,

25   an effective, proven system device to prevent or

96

1                              E. JONES

2    reduce the number of people getting killed or

3    catastrophically injured by trains?

4          A.    I would imagine that would be

5     senior leadership.  Perhaps the president.

6                    MR. KEAVENEY:  Objection.

7          Q.    So you're familiar with Faiveley and

8    some of the other original equipment manufacturers

9    that you saw that responded to the RFI, true?

10         A.    I'm familiar with them since I

11    became involved with the platform screen door

12    initiatives in 2015, yeah.

13         Q.    You know who Lawrence Reuter was,

14   true?

15         A.    Yes.

16         Q.    And he was the president of the

17   Transit Authority, correct?

18         A.    Yes.

19         Q.    Did you think he was a knowledgeable

20   person with respect to safety of the Transit

21   Authority?

22                    MR. KEAVENEY:  Objection.

23         A.    I can't speak to his personal

24    knowledge; I'm not intimately familiar with him.

25    But as the head of the Transit Authority, I

97

1                          E. JONES

2      would imagine that safety would be one of his

3      top concerns.

4           Q.    Okay.  Are you aware that Mr. Reuter

5      testified recently that he could not for the life

6      of him figure out in sum and substance why the

7      Transit Authority did not follow through with this,

8      to get it at little or no cost, platform screen

9      doors installed in the Transit Authority system?

10               MR. KEAVENEY:  Objection.

11          A.    I am not aware of that.

12          Q.    Would you agree with him, if that

13     was his testimony?

14          A.    If his testimony was he had no idea

15      of why the Transit Authority did not pursue

16      this, I can't answer that question.

17          Q.    Let me ask you:  Since you are here

18     as the witness today, if you had the ability or

19     opportunity to have original equipment

20     manufacturers install platform edge doors, platform

21     screen doors, in the New York City subway system at

22     little or no cost in exchange for advertising

23     revenue, would you do that?

24               MR. KEAVENEY:  Objection.

25          A.    From where I sit today, and knowing

98

1                          E. JONES

2       that platform screen doors is not feasible at

3       all the stations through the Transit, that would

4       play a factor in such a decision as to, you

5       know, where do they want to go to install the

6       platform screen doors?  Are they available to go

7       anywhere that the Transit would dictate they go?

8       Are they looking to go to locations that are not

9       feasible?  Without a lot of questions answered,

10      I could not make a decision.

11              Q.    Let's see if I can help you then,

12      sir.  I am here to help.

13                    When you were on your task force,

14      did they look at platform screen doors that were

15      placed in Seoul, Korea and other parts of the

16      world?

17              A.    If the task force looked at it in

18      what sense?

19              Q.    In any sense at all, sir.  Just

20      answer my question.

21              A.    Sure.  Looked at data, you know,

22      reports, etc., that says where has it been

23      installed, where has it been successful.  Sure.

24              Q.    Okay.  And you learned that, in

25      fact, Seoul, Korea had platform screen doors

99

1                           E.  JONES

2    installed, as well as Paris, France and London,

3    England, and a number of other places, correct?

4                    MR. KEAVENEY:  Objection.

5           A.    Yes.

6           Q.    You learned in Seoul, Korea, the

7    platform screen doors were installed by a company

8    in exchange for getting the advertising revenues;

9    it did not cost the Korean government a penny?

10                   MR. KEAVENEY:  Objection.

11          A.    I don't recall specifically what

12    you just stated.

13          Q.    Well, do you recall in sum and

14    substance that you learned that in Korea, platform

15    edge doors were put in in exchange for advertising

16    revenue?

17                   MR. KEAVENEY:  Objection.

18          A.    I do not recall that specifically.

19    I recall they do have platform screen doors, but

20    not specifically that they were done at no cost

21    based on advertising revenue.

22          Q.    Well, was cost an issue to you when

23    you would look at things in this task force?

24          A.    Cost of each recommended initiative

25    to reduce track intrusions, yes.

100

1                          E. JONES

2          Q.    Again, you agree that your task

3    force noted that the platform screen doors are

4    highly effective at preventing track intrusions,

5    correct?

6          A.    Sure, yes.

7          Q.    In fact, in Seoul, Korea, they went

8    from 22 to zero, correct, people being killed?

9          A.     If that's what it stated.  Exact

10     number, I don't recall in my head.  But if

11     that's what you read in the report, then I would

12     stand by it.

13         Q.    In terms of cost, did your task

14   force look at getting any entities to perform work

15   in exchange for advertising revenue?

16         A.    No.

17         Q.    Have there been other reports issued

18   by or to the Transit Authority discussing about

19   getting the work done at little or no cost?

20         A.    I'm not aware of any.

21         Q.    Sir, you keep telling us what you

22   recall, and I'm just going to remind you, you are

23   here as the representative of the Transit

24   Authority.  You are here as a witness with all of

25   its knowledge of what it knew or reasonably could

101

1                           E. JONES

2    have known.  You do understand that, right?

3            A.    I understand what you stated, but I

4      cannot say more than I honestly know.  So if I'm

5      asked a question, I am going to answer it to the

6      best of my ability.

7            Q.    Okay.  So you're saying that the

8    Transit Authority did not properly prepare you for

9    this deposition by educating you on all of the

10   subject matter of the 30(b)6 notice, correct?

11              MR. KEAVENEY:  Objection.

12              Don't answer that.

13              MR. GENIS:  What were the grounds

14         of that objection resulting in you

15         directing him not to answer?

16              MR. KEAVENEY:  Just improper.  You

17         are asking him attorney/client

18         communications.

19              MR. GENIS:  No, I did not say a

20         word about attorney.  Nowhere in that

21         question did I say attorney.

22              Please do not make improper

23         objections.  Please do not direct the

24         witness not to answer, which is improper.

25         Q.    Please answer the question, sir.

102

                              E. JONES

1

2       A.    Can you repeat the question?

3       Q.    Surely.

4             MR. GENIS:  Read it back, please.

5             (The requested portion of the

6       record was read by the Court Reporter.)

7             MR. KEAVENEY:  Don't answer that.

8       Q.    You can answer it, sir.

9             MR. KEAVENEY:  No, he can't.  Move

10      on.

11            MR. GENIS:  We will mark it and we

12      are going to be making an application to

13      the judge.  You're not asserting

14      privilege.  Let's keep moving.

15      Q.    Sir, do you agree that your task

16  force, the only studies your task force looked at

17  were things between 2017 and 2019, correct?

18      A.    The only things the task -- in

19   terms of the track intrusion data?

20      Q.    Sure.

21      A.    Yeah, the track intrusion data that

22   was looked at was primarily 2019 to 2021.

23      Q.    And in terms of the data including

24  platform screen doors, the data you looked at was

25  generated between 2017 and 2019, true?

103

E. JONES

1

2      A.    The feasibility studies were done

3      between 2017 and 2019.  The platform screen door

4      feasibility studies of all 472 stations was

5      performed between 2017 and 2019.

6              MR. GENIS:  We will take a brief

7              restroom break now.  It is 12:44.

8              (Recess was taken.)

9              MR. GENIS:  It is now 12:54.

10      Q.    Sir, your task force concluded that

11   it needed to conduct outreach to experts and

12   authorities to make sure that the Transit Authority

13   was up to date on current best practices in

14   international precedence regarding track intrusion

15   prevention, true?

16      A.    If that's what is stated there,

17   yes.

18      Q.    And the task force outreach included

19   benchmarking organizations such as the community of

20   metros, COMET, true?

21      A.    True.

22      Q.    And the task force research, the

23   investigation, they learned that there are

24   different types of track intrusions, correct?

25      A.    Yes.

104

1                          E. JONES

2          Q.    But they all have one common

3    denominator or one root-cause, true?

4          A.    One --

5                MR. KEAVENEY:  Objection.

6          A.    There are many causes for track

7     intrusions.  I think it's provided in that task

8     force report, what they were.

9          Q.    So let me see if I can help you

10   then.

11               Do we agree, the common denominator,

12   whether somebody trips, whether they fall, whether

13   they try to get their phone, whether they get

14   pushed, whether they jump, is that they have access

15   to the track bed?

16         A.    Correct.

17         Q.    Okay.  So if we remove access to the

18   track and track bed, we remove the ability for the

19   train to hit the people, true?

20         A.    True.

21         Q.    So the root-cause of the people

22   getting killed or catastrophically injured by

23   contact with the trains is that there is access to

24   the track, true?

25         A.    True.

105

E. JONES

1

2       Q.    Okay.  And we agree that they

3  reached the conclusion that platform doors are the

4  best way to enhance platform safety by reducing the

5  risk to negligible levels?

6       A.    Platform doors create a barrier and

7    would achieve the objective of preventing egress

8    onto the roadbed.

9       Q.    Once you prevent egress onto the

10 roadbed, you prevent the contact between the train

11 and people, true?

12      A.    True.

13      Q.    And the Transit Authority has known

14 this, certainly since the 1980's, correct?

15           MR. GENIS:  Objection.

16      A.    I can't speak to what they know

17   before I was even working at the Transit

18   Authority.

19      Q.    You're there since 1994?

20      A.    Correct.

21      Q.    So since 1994, the Transit Authority

22 has known about the root-cause of people being hit

23 and killed or catastrophically injured by contact

24 with trains, correct?

25           MR. KEAVENEY:  Objection.

106

1                          E.  JONES

2          A.    My involvement with track safety

3     and track safety initiatives started in 2015.

4          Q.    And you looked at part of the

5     historical data along with the Trespass Task Force

6     Committee, correct?

7          A.    Yes.

8          Q.    And you were on the Platform Screen

9     Door Committee as well, true?

10         A.    I am not aware of the Platform

11     Screen Door Committee.

12         Q.    Let me look at my notes, so I can do

13     it accurately.  We want to be specific here.

14               So you're telling us you had no

15     involvement whatsoever at all with any committee or

16     task force involved with platform screen doors,

17     whatever name it may have been called.

18               Is that what you're telling us?

19         A.    My involvement with platform screen

20      doors and platform screen door initiatives

21      started in 2015.  I was a program manager and an

22      initiative to one, hired a consultant to do an

23      international benchmarking study, find out what

24      the state of the industry was, as well as plan

25      for a pilot project.  So that's where my

107

                              E. JONES

1

2    involvement started.  I have not been involved

3    with all the initiatives since then.

4          Q.    The correct name is the Platform

5    Screen Door Task Force.  You are saying you had no

6    knowledge or involvement with them, correct?

7          A.    No.  The Track Intrusion Task

8    Force, yes.

9          Q.    Let me ask you:  You told us your

10   involvement with platform screen doors started in

11   2015, correct?

12         A.    Correct.

13         Q.    So did you know anything about

14   platform screen doors and people getting killed or

15   catastrophically injured by contact with trains

16   before 2015?

17         A.    Anecdotally, yes.  But not as part

18   of my job responsibilities.  So, I would perhaps

19   have heard things by the way, or anything I've

20   read in preparation for this, or since my

21   involvement started in 2015, whatever documents

22   have come my way that predated my involvement I

23   would have read.  That's the level of my

24   knowledge of anything prior to 2015.

25         Q.    I am trying to figure out what is it

108

1                          E. JONES

2      that you read, whether as part of your job or in

3      preparation for this deposition today.

4                      What did you read that predated 2015

5      involving platform screen doors and prevention or

6      reduction of people getting hit and killed or

7      catastrophically injured by trains?

8              A.    I read some of the documents you

9        eluded to earlier about the whole offer that was

10       made by PSD manufacturers to install PSDs for

11       free, you know, providing they could utilize the

12       PSDs for advertising.  Those documents I think

13       predated 2015.  I think the train speed study,

14       you know, predated 2015.  There may be a couple

15       of other documents that I'm not recalling

16       exactly right now.

17             Q.    When you say the "speed study," you

18     are referring to the summary by Glenn Lunden,

19     correct?

20             A.    Correct.

21             Q.    And that's subtotal of knowledge on

22     speed, correct?

23             A.    Yes.

24             Q.    And speed and prevention or reducing

25     people getting hit or killed or catastrophically

109

1                          E.  JONES

2   injured by trains, correct?

3                    MR.  KEAVENEY:   Objection.

4          A.     Yes.

5          Q.     And you told us earlier, you were

6   familiar with the ConOps on platform screen doors

7   from -- withdrawn.

8                    Were you familiar with the ConOps

9   Platform Screen Doors Report of 2011?

10         A.     Yes, yes.

11         Q.     Okay.  And in that report, do we

12  agree it noted by the Transit Authority that the

13  use of platform screen doors had been successful

14  and is becoming common in many European and Asian

15  subway systems, as well as the people movers within

16  the USA?

17         A.     Yes.

18         Q.     And that you learned that Paris and

19  London, among other places with comparable transit

20  systems to New York City, that they had been doing

21  retrofit of platform screen doors, correct?

22         A.     Yes.

23         Q.     And you saw in that ConOps that the

24  use of advertising incorporated into the platform

25  screen door system maybe looked at as a positive

110

1                          E.  JONES

2    funding source to help lower the cost of installing

3    and maintaining the platform screen doors, true?

4            A.    Yes.

5            Q.    And you also learned that the Office

6    of System Safety, that you used to work at,

7    performs hazard assessment and risk analysis,

8    correct?

9            A.    Yes.

10           Q.    And you learned that there are

11   requirements and standards that the Transit

12   Authority is to use when performing hazard analysis

13   and risk assessment, true?

14           A.    Yes.

15           Q.    And you learned that the Transit

16   Authority has incorporated a US military standard

17   882 as part of its required procedures in

18   performing hazard analysis and risk assessment,

19   true?

20           A.    Yes.

21           Q.    By the way, you learned that the MTA

22   Real Estate Department works closely with private

23   sectors to get new ways and new locations for

24   advertising, correct?

25           A.    Yes.

111

1                            E. JONES

2          Q.    And the Transit Authority, in its

3    ConOps report that we have been discussing,

4    discussed the need for platform screen doors,

5    correct?

6                  MR. KEAVENEY:  Objection.

7          A.    I do not recall if it says that

8       they're needed.  I know the ConOps document was,

9       you know, you would have to have a concept of

10      operation before you were to introduce platform

11      screen doors.  So it was more like leading the

12      way and most likely -- more part of a plan in

13      process.  If you're going to introduce this new

14      technology, this new system, we need a concept

15      of operations.  And so I believe that was a

16      premise of the ConOps.

17         Q.    So when we discussed the ConOps and

18   there's a heading that says, "Need for Platform

19   Doors."  It then states, "The goal of the platform

20   door system is to improve customer safety by

21   eliminating the occurrence of customers accidently

22   falling or being pushed onto the track way."

23              Would you agree or disagree with

24   that statement?

25         A.    Agree.

112

1                              E. JONES

2            Q.    Another goal of the platform door

3    system to improve customer safety is by deterring

4    customers from jumping onto the track way, true?

5            A.    True.

6            Q.    Another goal of the platform door

7    system to improve customer safety is by deterring

8    unauthorized individuals and would-be criminals

9    from accessing the track way, true?

10           A.    True.

11           Q.    Another means of improving customer

12   safety by the platform door system is mitigating

13   the occurrence of objects falling onto the track

14   way and customers trying to retrieve them, true?

15           A.    True.

16           Q.    It also mitigates the occurrence of

17   customers leaning over the track way to see train

18   arrivals, true?

19           A.    True.

20           Q.    Another means of improving customer

21   safety with platform doors is to deter customers

22   from surfing on cars, true?

23           A.    True.

24           Q.    Another means of improving customer

25   safety is by deterring customers from boarding and

113

1                          E. JONES

2   alighting between cars, correct?

3           A.    True.

4           Q.    Other goals of the platform door

5   system reduces trash accumulating on the track way,

6   true?

7           A.    Could you -- I didn't hear part of

8     your question.

9           Q.    Sure.  I'll do that one again.

10          Another category under the heading

11  of Need for Platform Doors and the goal of the

12  platform screen door system is to reduce trash

13  accumulating in the track way, true?

14          A.    True.

15          Q.    And to reduce track fires due to

16  trash and debris from platforms, true?

17          A.    True.

18          Q.    And it improves safety of employees

19  working on platforms while reducing requirements

20  for flagging protection, true?

21          A.    True.

22          Q.    We are going to start addressing

23  challenges for a moment.  There are certain

24  challenges to putting in platform screen doors,

25  true?

114

1                        E. JONES

2          A.    Yes.

3          Q.    And one of the things you saw from

4     the response by the 13 original equipment

5     manufacturers of the Transit Authority's RFI is

6     that these major corporations felt they could meet

7     the challenges inherent in the New York City

8     Transit Authority system, true?

9                   MR. KEAVENEY:  Objection.

10         A.    I do not recall that they

11     specifically stated that, from what I read, that

12     we could meet all the challenges faced by the

13     New York City Transit Authority to install.

14         Q.    Well, did you read any of their

15     responses, any of the 13 -- withdrawn.  Let's back

16     up a second.

17                   Did you read any of the submissions

18     of these 13 original equipment manufacturers that

19     were made to the Transit Authority?  Did you read

20     any of their submissions?

21         A.    No, I have not.

22         Q.    Did you read them in preparation for

23     your deposition?

24         A.    No.

25         Q.    Well, did any of these original

115

1                        E. JONES

2     equipment manufacturers say they can't do it

3     because they can't meet the challenges of the New

4     York City Transit Authority system or did they say,

5     "Yeah, we can do it"?

6          A.    Again, as I stated, those RFI's,

7          the responses from those 13 manufacturers were

8          not provided to me.  That predated my

9          involvement and I have not seen those documents,

10         so I can't speak to what they said or did not

11         say.

12         Q.    Okay.  Well, let's see.

13               In fact, in a ConOps for the Transit

14    Authority, they specifically noted how there were

15    possible solutions to these different challenges

16    and problems, true?

17         A.    What I know at the time the ConOps

18         was done in 2011, they may have identified some

19         of the challenges, but I don't think they would

20         have known of all of the potential challenges

21         had we not done this comprehensive feasibility

22         study to actually identify what all those

23         challenges are.  I do believe they would have

24         known anecdotally or empirically of some of the

25         challenges at the time the ConOps was written.

116

1                          E. JONES

2          Q.    So you're saying as of 2011, there

3    had been no comprehensive study?

4          A.    True.  Not to my knowledge there

5     was not.

6          Q.    Certainly there was no feasibility

7    study on the platform screen doors done before, I

8    think you said 2017 to 2019?

9                MR. KEAVENEY:  Objection.

10          A.    Yeah.  The first time I'm aware of

11     a comprehensive feasibility study of all

12     stations within the New York City Transit

13     environment was that 2017 to 2019 study.

14          Q.    Let's move on to some other things.

15                Did the study that you just referred

16    to, did that study or analyze how to meet the

17    challenges?

18          A.    No.  The study was primarily an

19     engineering technical feasibility study to

20     basically determine was it engineeringly, you

21     know, from an engineering perspective, was it

22     possible to install these doors on any given

23     station.

24          Q.    And we agree it's possible to

25    install platform screen doors on any given station;

117

1                        E. JONES

2     there may be challenges encountered in how to do

3     so, true?

4                        MR. KEAVENEY:  Objection.

5             A.      There are some challenges

6        considered insurmountable, and for challenges

7        that were considered surmountable, those did not

8        engage a station or deem a station not feasible.

9        There are examples, if you'd like me to give

10       you.

11            Q.      Let's see if I can help.

12                    Some stations, for example, you

13    could not easily have a full-height platform screen

14    door, but you could have a three-quarter or a

15    half-height screen door, true?

16            A.      Correct.  There are some stations

17       where a full-height door was not feasible, but a

18       half-height door was.  Those would be deemed

19       feasible if there were no other reason for them

20       being deemed infeasible.

21            Q.      Even a half-height door is about

22    five, six-feet high?

23            A.      Roughly.  Anywhere, it can start

24       from four-and-a-half-feet to like six-feet.

25            Q.      Now, let's talk about, one of the

118

                              E. JONES

1
2    main reasons given for alleged infeasibility is the
3    ADA Act, true?
4              A.    True.
5              Q.    Of the 472 train stations of the
6    Transit Authority, how many of them are 100-percent
7    fully ADA-compliant?
8                   MR. KEAVENEY:  Note my objection.
9              A.    I have no idea.
10             Q.    Would it be fair to say --
11             A.    I would imagine -- I would imagine
12       stations, the new stations that were recently
13       built.  If I had to make a guess, all those
14       would be 100 percent ADA compliant.  Meaning,
15       you know, the three Second Avenue stations as
16       well as Hudson Yards; I think Cortland Street as
17       well.  So anything built from scratch I imagine
18       would be -- would have been built to meet -- to
19       be 100 percent ADA-compliant.
20             Q.    Other than those less than handful
21    of stations, the balance of the entire subway
22    system is not ADA-compliant, true?
23                   MR. KEAVENEY:  Objection.
24             A.    I do not have empirical data to
25       tell you exactly how many are 100 percent

119

1                            E. JONES

2        ADA-compliant and how many are not.

3                Q.    And when you said that the newer

4        stations were 100 percent ADA-compliant, you agree

5        that they were required to be 100 percent

6        ADA-compliant?

7                A.    Because they are being built from

8         scratch, yes.

9                Q.    We agree that for the new stations

10       being built from scratch, there is absolutely no

11       excuse on this earth not to be 100 percent

12       ADA-compliant, true?

13               A.    True.  I would agree with that.

14               Q.    And with respect to the other

15       stations, we agree that it's irrational to attempt

16       to have a one-size-fits-all approach for the

17       different stations, true?

18                    MR. KEAVENEY:  Objection.

19               A.    One size fits all in regards to

20        what?

21               Q.    Platform screen doors or some other

22       kind of safety device to prevent people from being

23       hit by trains.

24               A.    There are options implemented for

25        some kind of a track safety measure.  There's

120

1                              E. JONES

2     platform screen doors.  Sometimes a full-height

3     and a half-height, neither are feasible for

4     other reasons.  And that's where perhaps you

5     would want to try other technologies.

6           Q.    Agreed.  So then what you see for

7     whatever reason at a given station or at a given

8     platform, if you can't do a platform edge door,

9     whether it be full-height, three-quarter-height,

10    half-height, there are other technologies and

11    devices that can be used, true?

12                MR. KEAVENEY:  Objection.

13          A.    There are other particular track

14    intrusion detection systems that have been used

15    in other facilities.  We have piloted them

16    ourselves.  At the time they were piloted, they

17    were -- the technology was still lacking what

18    was considered optimal.  So yes, there were

19    other technologies.  If you're thinking of

20    mitigation technologies, such as track intrusion

21    detection systems, which were being used at some

22    locations in Europe that we're aware of, yes.

23          Q.    So the answer to my yes or no

24    question is yes?

25          A.    Yes.

121

                              E. JONES

1

2          Q.    All right.  Let's talk about other

3    devices.

4                Are you familiar with fixed rails?

5          A.    Yes.

6          Q.    Fixed rails is old technology,

7    correct?

8          A.    Sure, yes.

9          Q.    I mean, we have fixed rails going

10   back over 100 years in the Transit Authority

11   system, true?

12         A.    Where specifically are you

13    referring to?

14         Q.    In different stations.  It could be

15   Grand Central, Time Square Shuttle.  Could be the

16   South Ferry.  We can go on.

17         A.    I am aware that fixed rails were

18    used at very few locations.

19         Q.    Is that a yes to my question, sir?

20   Yes, are you aware of fixed rails?

21         A.    Yes.

22         Q.    And you --

23         A.    At a few locations.

24         Q.    And you are aware that fixed rails

25   have been used for over 100 years?

122

1                          E. JONES

2          A.    Yes.  For one particular --

3          Q.    Is that a yes to my question, sir?

4          A.    Yes, yes.

5          Q.    Thank you.  Okay.  I can take up

6    much less of your time if you keep your word and

7    answer the questions yes or no.

8                So there are also other types of

9    technical barriers as well.  For example, are you

10   -- withdrawn.

11               The Transit Authority is aware of

12   other types of technological barriers as well,

13   true?

14         A.    Other barriers other than platform

15     screen doors?

16         Q.    Yes.

17         A.    And rails?

18         Q.    Yes.

19         A.    The only other barrier that we were

20     aware of that was being tested and no longer

21     being used in most of the other transit agencies

22     was a rope roll-up/roll-down kind of a barrier,

23     and that we found out was discontinued at the

24     locations where they were piloted in Asia.

25               MR. GENIS:  Move to strike.  We

123

1                         E. JONES

2           will try to get an actual answer to my

3           question.

4           Q.    Sir, the question was, yes, the

5    Transit was familiar with other types of

6    technological barriers; yes or no?

7           A.    No, not other barriers other than

8     platform screen doors.  Those are the only

9     barriers.  Track intrusion detection systems are

10    not barriers.

11          Q.    Understood.  Again, I can take less

12    of your time if you just answer my question.  So

13    let's answer my questions.

14                So yes, are you familiar with

15    vertical barriers?

16          A.    Vertical barriers?

17          Q.    Yes, sir.

18          A.    I recall reading about a vertical

19     barrier that was being piloted at some location

20     in Asia but was not in service.

21          Q.    So let's see if I can get back to an

22    actual answer to my question, sir.

23                So yes, you're familiar with

24    vertical barriers, correct?

25          A.    Yes.

124

1                          E. JONES

2          Q.    Okay.  And vertical barriers, in

3    fact -- how did you first become aware of vertical

4    barriers as being an effective safety device to

5    help people from getting hit and killed or

6    catastrophically injured by contact with the train?

7                MR. KEAVENEY:  Objection.

8          A.    Just through research.  I must have

9      come across it doing some research and found out

10     that they had this new technology that they were

11     piloting.  I researched further and found out it

12     was just a pilot; it was not deployed and in

13     service anywhere.  Subsequent to that research,

14     I have not gotten any new information about it.

15         Q.    When did you do this research?

16         A.    It would have been a few years ago.

17     Perhaps the time of the feasibility study.

18         Q.    So you're saying in 2019, 2017, or

19   something else?

20         A.    Yeah, it would be a few years ago.

21     Probably close to 2019, 2020.  Somewhere around

22     there.

23         Q.    Okay.  So to get a cohesive answer

24   to my question, you first learned, according to

25   you, about vertical barriers in 2019, 2020, true?

125

1                          E. JONES

2          A.    Again, that's my -- I am figuring

3     that would be the time period.  If you know

4     specifically --

5          Q.    Is that yes?  Is that yes to my

6     question?  True?  Yes?

7          A.    I can't answer as to the specific

8     year that I was --

9          Q.    2019 to 2020 is what you said,

10    corrects?

11         A.    It's a rough estimation, yes.

12         Q.    When you said you did research, what

13    research did you do on vertical barriers?

14         A.    Pretty much online.  Just, you

15    know, I came across it online or somebody may

16    have mentioned it to me, and I went to the

17    website that the manufacturer of this vertical

18    screen door had information on their website.  I

19    read it, saw what state they were in.  I

20    realized it was actually not deployed in a

21    station; it was just a pilot that they were

22    piloting.

23         Q.    So let's back up a little bit.

24               You said you read something from the

25    manufacturer of the vertical barrier.  What

126

1                          E. JONES

2    manufacturer was that?

3            A.    I can't recall the name.

4            Q.    Okay.

5            A.    I can't remember.

6            Q.    Okay.  And I want to make sure I

7    understand your sworn testimony today.

8                  Is it your sworn testimony today,

9    under oath, on behalf of the Transit Authority as

10   their corporate representative, that nowhere in the

11   world are there vertical barriers that work and are

12   effective?

13           A.    I'm not -- again, I can't speak of

14      today, because subsequent to that research I

15      did, there was that vertical barrier that was

16      being piloted.  There was the rope barriers,

17      which are these roll-up/roll-down, which were

18      piloted and discontinued by the agencies who had

19      piloted them.

20                  Subsequent to that, I had not done

21      research to find out have any of these

22      technologies been put into use and have been

23      deployed as other transit facilities.

24           Q.    So making sure I understand you.

25                  You're testifying under oath, on

127

1                          E. JONES

2      behalf of the Transit Authority, that as of 2019,

3      2020, nowhere in the world were vertical barriers

4      being utilized effectively, true?

5              A.    No.

6              Q.    I want to make sure I understand

7      you.

8              A.    No, I did not say that.

9              Q.    So is it your testimony that as of

10     2019 or 2020, there were no places in the world

11     that were using vertical barriers and using them

12     effectively to prevent people from getting killed

13     or catastrophically injured by contact with trains?

14                  MR. KEAVENEY:   Objection.

15             A.    No, I'm not agreeing to that.

16             Q.    Okay.  So is it your sworn testimony

17     today, on behalf of the Transit Authority, that as

18     of 2019 or 2020, the only thing that had ever been

19     done anywhere in the world was a pilot project that

20     was then cancelled?  Is that your sworn testimony?

21             A.    I am speaking as to my personal

22        research at the approximate time I conducted it.

23        On a website for a manufacturer, I saw that they

24        were piloting a vertical-type door separate,

25        different from the rope-type barrier I mentioned

128

1                          E. JONES

2    previously, which the last time I read about it,

3    it was -- that pilot project in Asia somewhere,

4    one of the agencies they had discontinued its

5    use.

6                That's to what I can attest.  I

7    cannot attest that nowhere else in the world,

8    since the time I did my personal online

9    research, has implemented vertical barriers.

10   That is outside; I cannot attest to that.

11        Q.    I want to be crystal clear then.

12                Is it your sworn testimony under

13   oath today, on behalf of the Transit Authority, as

14   a designated representative, that nowhere in the

15   world before 2019 had vertical barriers been in

16   place, working and effective at reducing or

17   preventing people from getting killed or

18   catastrophically injured by contact with trains?

19                Is that your testimony?

20                MR. KEAVENEY:  Objection.

21        A.    Before 2019?

22        Q.    Yes, sir.

23        A.    Before 2019, there were agencies

24   that used the vertical or roll-up type barriers,

25   and what I found from my research was that they

129

1                              E. JONES

2      had discontinued them at some point.  Right.

3              Q.    So it is your sworn testimony -- I

4      don't want to interrupt you.  Go ahead.

5              A.    No.  Go ahead.

6              Q.    So now what you're telling us is

7      that before 2019, the only vertical barriers in the

8      world was a pilot project and it was ineffective

9      and they withdrew it; took it out of the station

10     and cancelled it?  Is that your sworn testimony on

11     behalf of the Transit Authority as their corporate

12     representative?

13             A.    That is my recollection.

14             Q.    And for that recollection, was it

15     your understanding that in Barcelona, let me see if

16     I can refresh your memory, as a stopgap, they used

17     vertical barriers before they put in larger

18     platform edge barriers to protect people, to

19     prevent them getting hit by trains and getting

20     catastrophically injured?  Or Japan, I should say.

21             A.    I recall Asia; I do not recall this

22      being done in Barcelona.

23             Q.    Japan.  My apologies.

24             A.    Somewhere in Asia.  I can't recall

25      the country.  I know it was in Asia.

130

1                            E. JONES

2            Q.    In other words, as a stopgap, they

3     used -- let's back up.

4                  In Japan, as a stopgap, vertical

5     barriers were used until they put in larger

6     platform edge door barriers; true or false?

7                  MR. KEAVENEY:  Objection.

8            A.    Again, my recollection is that they

9       used rope-type barriers and it was a temporary

10      phenomenon.  It was discontinued after a certain

11      time.  It was because they were using it as a

12      stopgap.  I can't recall specifically if that

13      was the reason or they were piloting to see

14      whether it was something they could roll out at

15      all of their stations.

16           Q.    Let's go to the other possibility I

17    asked in the question that you did not answer.

18                 In Japan, the vertical barriers were

19    used until they could be replaced by larger

20    platform edge door barriers; true or false?

21           A.    I do not know that to be true or

22      false.  I can't answer.

23           Q.    In Barcelona, they had and still

24    have vertical barriers in the subway system; true

25    or false?

131

1                          E. JONES

2           A.    I cannot answer that question.

3           Q.    So when you did your research, was

4    it thorough research?

5           A.    Again, we relied partially --

6           Q.    Was it thorough; yes or no?

7                 MR. KEAVENEY:  Objection to your

8           tone.

9           A.    As thorough as I needed to be as

10     the reason I was doing the research.

11          Q.    So you were doing the research for

12   what reason, to help people be safe?

13          A.    To look into what possibilities

14     there were in the platform screen door

15     technology realm.

16          Q.    Were you doing this on behalf of the

17   Transit Authority?

18          A.    Sure.

19          Q.    And do you expect the Transit

20   Authority to be thorough in its research on safety

21   and devices to protect people from getting hit and

22   killed or catastrophically injured by trains?

23          A.    Yes, and that's why we hired a

24     consultant to produce --

25          Q.    So the answer is yes to my question,

132

                              E.  JONES

1

2   sir?

3          A.    Yes.

4          Q.    Excellent.  Again, I can take far

5   less of your time if you just answer my question.

6   Do you remember when you gave me your word that you

7   would do that?  Do you remember that, sir?

8          A.    I remember that.

9          Q.    Good.

10         A.    There are times it is not a

11   straightforward yes or no.

12         Q.    Can you please keep your word to me,

13   sir?

14         A.    I will.

15         Q.    Excellent.  Do you remember giving

16   your word that if you can't answer with a yes or no

17   or true or false, all you have to do is say you

18   cannot answer with a yes or no or true false,

19   understood?

20         A.    Understood.

21         Q.    You agreed to that before as well,

22   true?

23         A.    Correct.

24         Q.    And you understand that by not

25   directly answering questions, it's possible you

133

                              E. JONES

1
2    would be perceived as being evasive?  Do you
3    understand that?
4              MR. KEAVENEY:  Objection.
5         Q.    You may answer that, sir.
6         A.    I am not trying to be evasive.  If
7      someone perceives that, it is not my intent.
8         Q.    The best way to keep people from
9    thinking you are evasive is to directly answer the
10   questions, true?
11             MR. KEAVENEY:  Objection.
12        A.    I cannot answer that.
13        Q.    Are you here to help the Transit
14   Authority today?
15             MR. KEAVENEY:  Objection.
16        A.    I am here to answer to the best of
17     my knowledge and recollection any question you
18     ask of me.
19        Q.    Sir, you would not try to answer
20   questions in a manner that would benefit the
21   Transit Authority; would you do that?
22             MR. KEAVENEY:  Objection.
23        A.    I am answering questions to the
24     best of my recollection and ability.
25        Q.    I understand that, sir.

134

1                        E. JONES

2          A.    That is how I answer the questions.

3          Q.    When you answer questions, are you

4    trying to say anything to benefit your employer,

5    the Transit Authority?

6          A.    No.

7                MR. KEAVENEY:  Objection.

8                MR. GENIS:  I wanted to make sure

9          we are clear on that.  Let me ask the

10         reporter.

11               Are you okay?  We will break now.

12         We will go all day.  It's 1:34.

13               (Recess was taken.)

14               MR. GENIS:  It is now 2:25.

15         Q.    Sir, can we agree that the Transit

16   Authority should prevent preventable harm?

17         A.    Yes.

18         Q.    Do we agree that the New York City

19   Transit Authority, part of its job is to prevent

20   foreseeable harm?

21         A.    Yes.

22         Q.    Do we agree that every year a

23   certain number of people get either hit or run over

24   by trains causing them to die or have catastrophic

25   injuries?

135

1                              E. JONES

2           A.    Yes.

3           Q.    Do we agree that the Transit

4    Authority is aware of this recurring problem every

5    year of people being killed and catastrophically

6    injured by trains?

7           A.    Yes.

8           Q.    Do we agree that because the Transit

9    Authority was aware of this recurring problem of

10   people being killed or catastrophically injured by

11   trains, that they had a duty to do something about

12   preventing this from occurring?

13                MR. KEAVENEY:   Objection.

14          A.    To the extent they can, yes.

15          Q.    I'll rephrase that question because

16   there is an objection.

17                Do we agree it is the job of the

18   Transit Authority, since it's aware of this

19   recurring problem of people being killed or

20   catastrophically injured by trains, it's part of

21   their job to do something about preventing this

22   from occurring?

23          A.    Yes.

24          Q.    And we agree that there are

25   different devices, equipment, or technologies that

136

1                              E. JONES

2      have been available for years and decades to

3      prevent people from being hit and killed and run

4      over catastrophically by trains?

5              A.    Yes.

6              Q.    Do we agree in the 1980's and 1990's

7      the Transit Authority was aware of safety devices

8      such as platform edge doors to prevent people from

9      getting hit or run over by trains and being killed

10     or seriously injured?

11             A.    Yes.

12             Q.    Do we agree that it's easier to have

13     platform edge doors installed where there's new

14     construction?  For example, a new station?

15             A.    Yes.

16             Q.    In fact, even in New York City at

17     JFK Airport, they have platform edge doors, true?

18             A.    True.  However, it's a different

19       kind of rail system.

20             Q.    Thank you.

21             MR. GENIS:  Move to strike what is

22             nonresponsive.

23             Q.    Have you ever heard of a single

24     person being hit and killed by a train at JFK after

25     they installed the safety devices, platform edge

137

1                         E. JONES

2    doors?

3              A.    I have not personally heard, no.

4              Q.    Have you heard of a single person

5    being seriously or catastrophically injured at JFK

6    after they installed the safety devices, the

7    platform edge doors?

8              A.    I am not aware.

9              Q.    The Second Avenue subway was a new

10   subway line, correct?

11             A.    Correct.

12             Q.    Brand new stations, correct?

13             A.    Correct.

14             Q.    Did the Transit Authority ever

15   request any kind of funding from the city, state,

16   or federal government, or anyone else in the world

17   for platform edge doors safety technology to

18   minimize harm for that Second Avenue subway?

19             A.    I am not aware.  I don't know.  I

20     can't answer that question.

21             Q.    Who at the Transit Authority could

22   answer that question?

23             A.    It would be at the time -- that

24     project was being managed by at the time -- the

25     division of the MTA was called MTA Capital

138

1                          E. JONES

2    Construction.  I was not working for MTA CC at

3    the time.  So I imagine the leaders of the MTA

4    CC at that time who were in charge of that

5    project should be able to.  And at that time,

6    Mysore Nagaraja was the president, I believe, at

7    that time at MTA CC.

8          Q.    Mysore Nagaraja was an advocate and

9    component of platform edge doors in the subway

10   system for New York City, true?

11         A.    I am not aware.  I cannot say yes

12   or no.

13         Q.    The Transit Authority, for decades

14   and decades, orders new train cars, correct?

15         A.    Yes.

16         Q.    The Transit Authority can order,

17   design whatever specifications they want; they can

18   have whatever kind of train with what specs they

19   want made, true?

20         A.    True.  Within the limits of the

21   manufacturer.

22         Q.    If the Transit Authority wants to

23   have a homogeneous fleet, where they are all the

24   same design, they can do that, true?

25         A.    Yes.

139

E. JONES

1

2      Q.    And when the trains are homogeneous,

3  it makes it easier to manage the system, true?

4      A.    I would guess, yes.  I'm not on the

5   operation's side, but I would imagine it is.

6      Q.    You told us before you have

7  familiarity with rehabilitation of train stations,

8  true?

9      A.    Yes.

10      Q.    Do we agree that when a substation

11  is rehabilitated, it's supposed to be modernized

12  and brought up to current standards, true?

13      A.    When you say, "brought up to

14   current standards, modernized and brought up to

15   current standards," I can speak to the extent of

16   what I know they do as part of rehabilitation.

17           Some of the work involved is

18   esthetics; some of it goes to replacement of the

19   topping surfaces of the platforms.  Repainting

20   the station, replacing the platform edge,

21   installing warning strips, tactile warning

22   strips, upgrading staircases, adding staircases

23   in some cases.

24           You know, when you said, "brought

25   up to current standards," I don't think to every

140

                              E. JONES

1

2    single standard they are brought up.

3         Q.    How does the Transit decide what

4    standards to comply with and what standards to

5    violate?

6         A.    The state code is what they follow.

7    And as far as I know, only certain degrees of

8    rehabilitation triggers certain levels of

9    compliance.  So basically, if you were going to

10   paint the station, for example, you probably

11   have to do nothing else.  Painting a station is,

12   in fact, a capital project in cases.  So it

13   depends what you are doing.  Depends on the

14   extent of the rehabilitation.

15        Q.    Have there been rehabilitations

16   where new tracks are placed?

17        A.    New tracks?

18        Q.    Yes, sir.

19        A.    Yes, yes.

20        Q.    Have there been rehabilitations

21   where new track beds are installed?

22        A.    Yes.

23        Q.    Have there been rehabilitations

24   where new platforms are installed?

25        A.    Yes.  New platform edges.

141

1                              E.  JONES

2          Q.    Okay.  Have there been

3  rehabilitations where platforms have been shored or

4  reshored?

5          A.    It's usually -- when you deal with

6     platforms, it is usually a replacement of the

7     concrete slab or the edge that overhangs the

8     tracks.

9          Q.    So there's been stations that had

10  new concrete for their platforms, new tracks, new

11  track beds, and other parts of the station, whether

12  it be the roof, the columns, the staircase, all of

13  those things have been rehabilitated, true?

14          A.    Right.  Column rehabilitation is

15     usually augmentation of the steel.  If they are

16     rusted parts, then you would, you know, fix the

17     rusted parts.  Replacing columns entirely, I

18     have not seen that.

19          Q.    You've seen stairwells get installed

20  as part of the rehabilitation?

21          A.    Yes, yes.

22          Q.    Elevators get installed sometimes as

23  part of the rehabilitation?

24          A.    Yes.

25          Q.    Let's see.  For decades, there have

142

1                          E. JONES

2    been platform edge doors used in other parts of the

3    world, correct?

4            A.    Yes.

5            Q.    There's platform edge doors in

6    Copenhagen, Denmark, correct?

7            A.    I believe so.

8            Q.    And Shanghai?

9            A.    Yes.

10           Q.    And Delhi, India?

11           A.    Yes.

12           Q.    We've gone through the safety

13   benefits of the platform edge doors to prevent

14   people from getting killed or catastrophically

15   injured.  It also makes it easier for air

16   conditioning to keep the stations cooler, true?

17           A.    It can.

18           Q.    Now, I think you told us earlier

19   that the Transit Authority cannot realistically

20   have a one-size-fits-all approach for each of the

21   472 stations, true?

22                 MR. KEAVENEY:  Objection.

23           A.    True.

24           Q.    So each station has to have its own

25   unique safety plan, true?

143

1                          E. JONES

2              MR. KEAVENEY:  Objection.

3         A.    You may have a similar safety plan

4    that applied to more than one station.

5         Q.    Okay.  In other words, you might

6    have some stations that are comparable or similar,

7    so you can have a safety plan that might be

8    applicable to those few stations that are similar

9    and comparable, correct?

10        A.    Yes.

11        Q.    Otherwise, each unique station needs

12   its own unique safety plan, true?

13        A.    True.

14        Q.    And each station has to have its own

15   unique feasibility plan, true?

16        A.    True.

17        Q.    And the best way to make a station

18   safe or safest is by doing a separate safety plan

19   for each station, correct?

20        A.    True.

21        Q.    Now, there were recommendations from

22   the MTA CC to install platform edge doors in the

23   Second Avenue subway, true?

24        A.    I recall reading a report that was

25    done by a consultant for the Second Avenue

144

1                           E. JONES

2      looking into the feasibility, the cost, the

3      impact of schedule, etc.  I can't recall reading

4      something that said the MTA CC deliberately said

5      we must install platform screen doors.

6                 MR. GENIS:  Move to strike what is

7            nonresponsive.

8                 Q.    All I asked you was if there were

9      recommendations of the MTA CC to install platform

10     edge doors in the Second Avenue subway in phase

11     one, true?

12                A.    I am not aware of the particular

13     recommendation, no.

14                Q.    If there was a recommendation to

15     have platform edge doors installed, that

16     recommendation would remain primarily for safety,

17     to prevent people from getting killed or

18     catastrophically injured, true?

19                A.    True.

20                MR. KEAVENEY:  Objection.

21                Q.    And if the Transit Authority does

22     not ask for funds, it doesn't get them, true?

23                MR. KEAVENEY:  Objection.

24                A.    I would say true.

25                Q.    Did the Transit Authority ever ask

145

1                            E. JONES

2    for funds from anyone; city, state, federal

3    government, private entity, for safety devices such

4    as platform edge doors?

5            A.    I am not aware.

6            Q.    Safety requires adherence to safe

7    design, maintenance, performance principles, true?

8            A.    True.

9            Q.    Safety requires safety audits,

10   interventions, and training programs, true?

11           A.    True.

12           Q.    Safety requires programs and

13   accident investigation reporting, correct?

14           A.    True.

15           Q.    There has to be safety analysis,

16   true?

17           A.    True.

18           Q.    And there has to be root-cause

19   analysis, true?

20           A.    True.

21           Q.    Did the Transit Authority ever

22   perform any study -- withdrawn.  I am going to --

23   let me go to a different topic for a second before

24   I get to that.

25                 Do we agree that in doing a safety

146

1                          E. JONES

2    analysis and a hazard analysis, there are different

3    categories of injuries that are used to determine

4    the severity of injury, true?

5              A.    Sounds correct.

6              Q.    For example, one of the categories

7    is catastrophic injury, true?

8              A.    True.

9              Q.    And a catastrophic injury is one

10   that can result in either death or a permanent

11   total disability or a significant environmental

12   impact or monetary loss equal to or exceeding ten

13   million dollars, true?

14             A.    Sounds correct.

15             MR. GENIS:  Dave, put up the

16             pictures, please, that we have.  We will

17             make that Plaintiff's Exhibit 2.

18             (Whereupon, the aforementioned

19        Photographs were marked as Plaintiff's

20        Exhibit 2 for identification as of this date

21        by the reporter.)

22             (Whereupon, Plaintiff's Exhibit 2

23        was presented in Screen Share.)

24             Q.    There is a number of photographs; we

25   will mark them collectively as Number 2.  We will

147

E. JONES

1    scroll on the screen for you to look at them.

2             Stop at this one for a second, so

3    that you can take this in.

4             Do you see this young lady?

5    A.    Yes.

6    Q.    You see she's missing an arm and a

7    leg?

8    A.    Yes.

9             MR. GENIS:  You can keep going,

10            Dave.  Is that all of them, Dave?

11            He's still going.  I think we have

12            gotten to the end.

13   Q.    Have you seen all those photographs

14   as Plaintiff's Exhibit 2?

15   A.    Yes.

16   Q.    Do we agree that those photographs

17   of Ms. Da Silva represent catastrophic injury?

18   A.    Yes.

19            MR. KEAVENEY:  Objection.

20   Q.    Another category of injury is

21   critical, true?

22   A.    Yes.

23   Q.    Critical is either a permanent

24   partial disability or injuries or occupational

148

1                            E. JONES

2    illness that may result in hospitalization of at

3    least three personnel, or significant environmental

4    impact or monetary loss equal or exceeding one

5    million dollars, but less than ten million dollars,

6    true?

7            A.    I think you need to repeat that

8      question.

9            Q.    Sure.  A critical injury is one that

10   can result in one or more of the following:  A

11   permanent partial disability or injuries or

12   occupational illness that may result in

13   hospitalization of at least three personnel, or

14   reversible significant environmental impact, or

15   monetary loss equal or exceeding one million

16   dollars, but less than ten million dollars, true?

17           A.    I am not aware of the exact legal

18     definition, so I can't answer that true or

19     false.

20           Q.    I'm not getting into legal

21   definitions whatsoever at all.  I'm utilizing what

22   you already told us are the standards used by the

23   Transit Authority.  That's what I'm going by.

24           A.    So if that is what the Transit

25     Authority states to be their definition of

149

E. JONES

1    critical injury, then I would.  You know, if

2    that's what they state, then I would not be -- I

3    would agree.

4    would agree.

5         Q.    Okay.  Now let's get to some other

6    things here.

7              And do we agree that the Transit

8    Authority was required, in their system safety

9    program plan, to not only have identification of

10   hazards, but plans for the mitigation or

11   elimination of them and the resulting risks?

12        A.    Yes.

13        Q.    The Transit Authority is required to

14   have a safety philosophy and a safety culture?

15        A.    Yes.

16        Q.    The Transit Authority was required

17   to evaluate -- withdrawn.  Let's back up.

18              When the Transit Authority has the

19   system safety program, it's required to be fully

20   implemented within 36 months of the Federal Rail

21   Road Administration's approval of the plan, true?

22        A.    I believe that's correct.

23        Q.    And then the Transit Authority is

24   supposed to collect its data, collect, maintain,

25   analyze, distribute safety data, true?

150

E. JONES

1

2          A.     I believe that's correct.

3          Q.     And the Transit Authority is

4     supposed to use proper procedures for the hazard

5     analysis, so that they can come up with a plan to

6     eliminate or reduce the hazard, true?

7          A.     I believe that's correct.

8          Q.     And the Transit Authority

9     acknowledged that one of the main hazards and the

10    main cause of death and catastrophic injury in its

11    system are contact of individuals with trains,

12    true?

13         A.     True.

14         Q.     That's when people get hit by a

15    train or run over by a train, correct?

16         A.     True.

17         Q.     And you've told us before, in terms

18    of frequency, that there's approximately 1000 to

19    over 1200 track intrusions per year, true?

20              MR. KEAVENEY:  Objection.

21         A.     No, what I eluded to was that the

22    number was -- what you quoted was a summery for

23    the entire MTA.  I think the annual for 2019,

24    2020, and 2021 were provided in the report,

25    which numbered maximum 160-something I think

151

                              E. JONES

1
2    each year.

3            Q.    Oh, let's do that then.  Because in

4    your track Trespass or Track Intrusion report, it's

5    specifically noted, we went through this before,

6    year by year, how each year it started at least

7    over 1000, and by the last year of the report, it

8    had over 1200.  Do you recall that?  You were a

9    member of that task force.

10           A.    Can you run the numbers by me

11   again?

12           Q.    That would be my pleasure to do,

13   sir.

14           A.    I look at numbers every day.

15           Q.    I'm happy to do so.  Let me get it

16   for you.

17           A.    I'm not objecting to what's in the

18   report at all.

19           Q.    Okay.  Track Intrusion incidents by

20   year for the New York City Transit Authority.

21           A.    Yes.

22           Q.    2019, 1062; 2020, 1094; 2021, 1267.

23           A.    Yes.

24           Q.    In 2021, 200 of these track

25   intrusions resulted in collisions with train and

152

1                          E.  JONES

2   catastrophic injury, true?

3              A.    True.

4              MR. KEAVENEY:  Objection.

5         Q.    And 68 fatalities, correct?

6         A.    True.  If that's what is in the

7   report, I agree with it.

8         Q.    If we have 1000 to approximately

9   1200 track intrusions a year, that's an average of

10  how many a day?

11             A.    Divide that by 365.  Four.

12        Q.    And would you consider four track

13  intrusions a day to be frequent?

14             A.    Based on what scale?

15        Q.    Based on occurrences.  Do you

16  recognize four track intrusions a day to be a

17  frequent occurrence?

18             A.    Yes.

19        Q.    Do we agree that 150 to 200 people,

20  let's make it 100 to 200 a year getting hit by

21  trains and being catastrophically injured or killed

22  is a frequent occurrence?

23             A.    Yes.

24        Q.    So we agree that the Transit

25  Authority has a hazard management process, true?

153

1                          E. JONES

2          A.    Yes.

3          Q.    And it has the severity of

4    categories of injuries that we talked about;

5    catastrophic, critical, things of that nature,

6    true?

7          A.    True.

8          Q.    And it has probability levels,

9    correct?

10         A.    I assume so.  I'm not -- I haven't

11    -- I'm not sure what probability levels you are

12    referring to.

13         Q.    Well, let's see.  One probability

14   level is frequent; that's a Level A.  That's

15   defined as "likely to occur often in the life of an

16   item."  Okay?

17         A.    Okay.

18         Q.    So based on that definition, we

19   continue to agree that the number of incidents with

20   trains either hitting or running over people is a

21   frequent probability level, true?

22         A.    True.

23         Q.    And the definition of probable,

24   Category Level B, is "will occur several times in

25   the life of an item."  Do you agree with that too?

154

1                         E. JONES

2          A.    Acknowledge.

3          Q.    Okay.  So was that a yes?

4          A.    Yes.

5          Q.    I didn't hear you.  Okay.

6                So then we use that risk assessment

7    matrix that the Transit Authority uses.  It has

8    across the top, the severity of the injury:

9    "Catastrophic, Critical, Marginable, Negligible."

10               Correct so far?

11         A.    Yes.

12         Q.    Across the side, top to bottom, is

13   the probability.  In other words, "Frequent,

14   Probable, Occasional, Remote, Improbable, Or

15   Eliminated," correct?

16         A.    I acknowledge if that's what it

17    states, then I'm not opposed.

18         Q.    So for this risk assessment matrix

19   used by the Transit Authority for severity, you

20   have Categories 1, 2, 3, 4; Catastrophic being 1,

21   Critical being 2, Marginal being 3, Negligible

22   being 4, true?

23         A.    Okay.  Acknowledge.

24         Q.    And then for probability, in the

25   risk assessment matrix you have Frequent as A,

155

1                              E. JONES

2    Probable is B, Occasional is C, Remote is D,

3    Improbable is E, Eliminated is F, correct?

4            A.    I'm not looking at the document.

5      I'm hearing what you're reading as being the

6      Transit Authority's approach to managing risks

7      and categorizing risks.

8            Q.    So by categorizing the hazards in

9    this matter, it allows hazards to be prioritized

10   for corrective action, correct?

11           A.    That would be the implication, yes.

12           Q.    Where you have something on this

13   risk matrix with a catastrophic or critical injury,

14   and a frequent or probable occurrence, that's

15   considered high risk, true?

16           A.    Sounds like that, yes.

17           Q.    And where there is something in this

18   matrix that is a high risk or a high hazard, do we

19   agree that is unacceptable, according to applicable

20   standards, policies, procedures, and rules?

21                 MR. KEAVENEY:  Objection.

22           A.    I would agree that if you have a

23     high risk, you should try to mitigate the risk.

24           Q.    Let's first answer my question.

25                 Do we agree that according to the

156

```
 1                          E. JONES
 2   Transit Authority itself, high hazards are
 3   unacceptable?
 4            A.    I would think that would be a
 5      correct approach, yes.
 6            Q.    Do we agree that high hazards or
 7   high risk of hazards require immediate corrective
 8   action?
 9            A.    Yes.
10            Q.    How many deaths are acceptable to
11   the Transit Authority when people get hit by trains
12   or run over by trains?
13            A.    I do not think any death is
14      acceptable.
15            Q.    How many catastrophic injuries are
16   acceptable to the Transit Authority in any given
17   year?
18            A.    I do not think any are acceptable.
19            Q.    How many, let's use the right word,
20   "critical injuries" caused by contact with a train,
21   in other words, a train hits or runs over a person;
22   how many critical injuries are acceptable for the
23   Transit Authority per year?
24            A.    I don't think any are acceptable.
25            Q.    So where there is an identified high
```

157

1                         E. JONES
2    risk -- let's back up.
3                    So we agree that catastrophic and
4    critical injuries occur in the Transit system with
5    frequency, true?
6          A.    True.
7          Q.    So that is the highest risk
8    category, true?
9                    MR. KEAVENEY:  Objection.
10         A.    Sounds correct.
11         Q.    That's what must be corrected
12   immediately, correct?
13                   MR. KEAVENEY:  Objection.
14         A.    I would say yes.
15         Q.    Okay.  And the Transit Authority
16   knows about this happening for approximately 100
17   years, true?
18                   MR. KEAVENEY:  Objection.
19         A.    I would imagine that the Authority
20     knows about all events, all catastrophic and
21     critical injuries, that occurred in the system
22     through its history, throughout its history.
23         Q.    So when for the first time did the
24   Transit Authority take any kind of alleged
25   corrective action to prevent or reduce the number

158

E. JONES

1

2  of people killed or catastrophically injured by

3  being hit or run over by a train?

4          A.    Again, as I said, my involvement

5    with track safety initiatives started in 2015.

6    Anything I've read, any knowledge I have prior

7    to my involvement would be from literature I

8    read.

9                What I know is that one of their

10    primary initiatives was their messaging campaign

11    through posters, print media, broadcast media,

12    social media, etc.  That was one of their

13    primary and perhaps initial approaches to try to

14    mitigate track safety incidents, track intrusion

15    incidents.

16          Q.    When did they first do that?

17          A.    I can't recall exactly when.

18          Q.    Approximately?

19          A.    Honestly, I don't know.

20          Q.    Can you tell me if --

21          A.    I would imagine it goes back many

22    decades.  I can't imagine -- I can only speak to

23    what I know.  I joined the Authority in 1994,

24    and I got involved in track safety initiatives

25    on the capital side primarily in 2015.

159

1                           E. JONES

2          Q.    When you first got there in 1994, as

3    of 1994, what, if anything, did the Transit

4    Authority do to prevent or reduce the number of

5    incidents of people getting killed or

6    catastrophically injured by getting hit or run over

7    by a train?

8          A.    From my personal recollection, it

9      has been their messaging campaign primarily.

10         Q.    So you're saying in 1994, they were

11   already doing messaging, yes?

12         A.    From my recollection, yes.

13         Q.    Okay.  And when did they next do

14   anything else in an attempt to prevent or reduce

15   the number of people being killed or

16   catastrophically injured by being hit by or run

17   over by trains?

18         A.    I imagine their initiatives and

19     starting to research into platform screen doors

20     and other track intrusions mitigation

21     technology, which I imagine started -- again,

22     before I got involved, I think it goes back to

23     -- when was it?  Early 2000's maybe.  I think.

24         Q.    So if I understand you correctly, in

25   the early 2000's is the first time the Transit

160

1                          E. JONES

2    Authority did anything other than messaging to

3    attempt to prevent or reduce the number of people

4    being killed or catastrophically injured as a

5    result of contact with trains, true?

6                    MR. KEAVENEY:  Objection.

7           A.    I wouldn't say exclusively.  They

8       were, as pointed out in the task force report,

9       whether someone agreed with it or not, the

10      initiatives involved the platform edge doors,

11      warning strip, the help points.  Those were all

12      the initiatives that the Transit Authority

13      thought were effective means of helping to

14      address the issue.

15                   MR. GENIS:  Move to strike what is

16         nonresponsive.

17          Q.    When for the first time was it in

18   the 2000's that the Transit Authority did these

19   other so-called initiatives?

20          A.    To my knowledge, initiatives with

21      platform screen doors and track intrusion

22      detection systems started in the 2000's, yes.

23          Q.    In terms of the help points, the

24   messaging, and any kind of markings on the

25   platform, when did that start?

161

1                        E. JONES

2          A.    That goes back quite a bit.  I know

3     the upgrading of the platform edges and

4     installing the tactile warning strips, that is

5     something that goes back probably to the early

6     90's maybe.  Help points would be in the 2000's.

7          Q.    Every year the Transit Authority has

8     its data, statistics, number of people getting hit

9     and killed or catastrophically injured by contact

10    with trains, true?

11         A.    True.

12         Q.    And the Transit Authority, these are

13    safety performance indicators when you see the

14    number of people hit and either killed or

15    catastrophically injured when they're hit by a

16    train, true?

17         A.    True.

18         Q.    So utilizing the safety performance

19    indicators, can you tell us, was there ever a

20    study, an analysis, to see if whatever these

21    measures taken by the Transit Authority were,

22    whether it's messaging, announcements, those help

23    points, the call points, marketing on the platform,

24    was there any kind of study or analysis to see

25    whether or not they were effective?

162

1                          E. JONES

2           A.    I'm not aware of any specific

3    empirical study.  No, I am not aware of it.

4           Q.    In fact, if you look at the data,

5    the numbers really don't change all that much for

6    the number of people getting hit and either

7    catastrophically injured or killed over these

8    decades, true?

9           A.    I would say true.

10          Q.    Since the numbers of people being

11   killed or catastrophically injured have not changed

12   significantly over these decades, can we agree that

13   whatever measures were taken by the Transit

14   Authority, they now have had decades of data to

15   analyze and study if they wanted to, true?

16          A.    True.

17          Q.    If they wanted to do such an

18   analysis, they would have seen whatever measures

19   they have taken has not been effective in reducing

20   the number of people being killed or

21   catastrophically injured by being hit or run over

22   by trains, true?

23               MR. KEAVENEY:  Objection.

24          A.    I have seen an analysis where they

25    looked at ridership, because ridership over the

163

                           E. JONES

1

2    years obviously has increased, and so would

3    train miles traveled, and so our passenger miles

4    traveled.  So they have done that to try and

5    look at, you know, normalize it based on the

6    amount of increase in passenger ridership over

7    the decades and the amount of trips passengers

8    take, etc.

9              MR. GENIS:  Move to strike what is

10        nonresponsive.

11        Q.    That's not what my question is, sir.

12             MR. GENIS:  Can you read back the

13        question?

14             (The requested portion of the

15        record was read by the Court Reporter.)

16        A.    I'll ask you again to read that for

17   me, please.  Again, please.

18             MR. GENIS:  Read it for a third

19        time, please.

20             (The requested portion of the

21        record was read by the Court Reporter.)

22             MR. KEAVENEY:  Objection.

23        A.    I can't answer that question.

24        Q.    Okay.  In terms of that hazard

25   analysis, it requires the corrective action.  It's

164

1              E. JONES

2    not your opinion; it's not an option.  That's what

3    the standards require; true or false?

4              MR. KEAVENEY:  Objection.

5        A.    Corrective action is required,

6     identified by hazard, yes.

7        Q.    Before 2016, what studies, if any,

8    did the Transit Authority do to see what could be

9    done to prevent or reduce people from being killed

10   or catastrophically injured when they got hit or

11   run over by trains?

12       A.    I know that, as we discussed

13    before, they have been involved with COMET, and

14    have been looking at what other Transit agencies

15    have been doing in this regard.  So I believe

16    they have been looking at what the possible

17    solutions are, including and leading up to their

18    foray.  Platform screen doors, track intrusion

19    detection systems, and all the technologies that

20    could be brought to there, and whether or not

21    they are feasible within the Transit Authority.

22       Q.    So let's back up.

23             What you're telling us is that the

24   Transit Authority saw, decades ago, through

25   publications and COMET and other organizations

165

1                              E. JONES

2    throughout the world, that people, for decades,

3    have been using platform edge doors or screen doors

4    and other technologies to prevent or reduce the

5    number of people being killed or catastrophically

6    injured by contact with trains, true?

7            A.    True.

8            MR. KEAVENEY:  Objection.

9            Q.    But my question is:  Did the Transit

10   Authority, before 2016, ever do its own study to

11   figure out how to prevent or greatly reduce the

12   number of people being killed or catastrophically

13   injured every year by contact with trains?

14           A.    At this moment, I can't recall a

15      specific study that I've read.  I recall there

16      was a Contact with Train Report.  I can't recall

17      the date of it, but there was a report, Contact

18      with Train.  I'm not sure if it was dated 2011

19      or 2010.

20           Q.    Sir, I'm not asking your

21   recollection; I am asking did it happen?

22           A.    Well, I can only state based on my

23      recollection, right.  I can't state definitely

24      whether or not it did or did not happen.  I can

25      only state to what I recall.

166

1                          E. JONES

2          Q.    So who would know, if you don't

3    know?

4          A.    I would imagine the Office of

5    System Safety.

6          Q.    Because your memory and knowledge

7    ends at 2015, correct, going backwards?

8          A.    Apart from --

9          MR. KEAVENEY:  Objection.

10         A.    Apart from anything I've read, any

11    documents I've read subsequent to that.  But I

12    would not have been involved or been reading up

13    on this or investigating or trying to research

14    this topic prior to 2015.

15         Q.    So from an engineering standpoint,

16    whatever plan the Transit Authority had, because

17    the numbers didn't really change much year to year

18    over the decades in terms of the number of people

19    hit, catastrophically injured, or killed by trains,

20    whatever they did was not adequate or effective,

21    true?

22         MR. KEAVENEY:  Objection.

23         A.    I can't say if what they did was

24    not adequate or effective.  I have not seen any

25    empirical data trying to match their efforts

167

```
                              E. JONES
 1
 2     against results.
 3              Q.    You already told us, according to
 4     the results, the numbers don't really change year
 5     to year over the decades, true?
 6              A.    I have said before that I have --
 7              Q.    Can you answer my question, please?
 8              A.    I can't answer that.
 9              Q.    Okay.  That's fine.  Let's get
10     through different types of studies now.
11                   Did the Transit Authority ever
12     perform any kind of study to compare the number of
13     either deaths or injuries from what was currently
14     going on with it, in other words, with whatever it
15     was doing or not doing, has X number of people
16     getting injured and killed, as opposed to if they
17     took certain other actions?  Have they ever done
18     such an analysis?
19              A.    I am not aware of that.
20                   MR. KEAVENEY:  Note my objection.
21              Q.    I'll be more specific because that
22     was general.
23                   So, for example, did the Transit
24     Authority ever do an analysis saying, okay, here's
25     the number of people that get killed or
```

168

1                          E. JONES

2     catastrophically injured that had contact with

3     trains, if we had platform edge doors, here's what

4     we think it will be?  Have they done that kind of

5     analysis?

6             A.     I am not aware of any.

7             Q.     Have they ever done any analysis to

8     say, okay, here's the number of people being

9     catastrophically injured or killed per year by

10    either doing nothing, or whatever it is they are

11    doing, versus if we have closed circuit TV to help

12    monitor?

13            A.     I'm not aware of any.

14            Q.     Okay.  Have they done any analysis

15    or studies to compare the number of either

16    catastrophic injuries or deaths that occurred from

17    train contact, the way the system was already

18    proceeding with whatever they were doing, and if

19    they had front cameras on the train cars, so that

20    the drivers could see in advance through the closed

21    circuit TV and the camera, what, if anything, was

22    on the track or at the edge of the platform?

23            A.     I am not aware of any.

24            Q.     Did the Transit Authority ever do

25    any kind of study or analysis comparing the number

169

1                          E. JONES

2    of people killed or catastrophically injured with

3    how they were already doing things, as opposed to

4    if there was some sort of track intrusion device,

5    whether it be a TID/track intrusion device, or a

6    LID/laser intrusion device?

7          A.    I am not aware of any specific

8      study.

9          Q.    Did the Transit Authority ever do

10   any kind of study comparing the number of people

11   being killed or maimed by contact with trains the

12   way the system was already, as opposed to if they

13   were fixed rails installed?

14         A.    I'm not aware of any.

15         Q.    Did the Transit Authority ever

16   perform any study or analysis to compare the number

17   of people killed or catastrophically injured with

18   the system as it was, as opposed to if they slowed

19   down the trains when they entered the stations?

20         A.    I am not aware of any specific

21     study.

22         Q.    Did the Transit Authority ever

23   request any funding from the city, state, federal

24   government, or any private entity to have fixed

25   rails placed?

170

1                              E. JONES

2          A.    I am not aware of any.

3          Q.    Now, the federal government makes

4    money available for closed circuit TV and front-end

5    cameras from Homeland Security after 9/11, true?

6          A.    True.

7               MR. KEAVENEY:  Objection.

8          Q.    So if the Transit Authority wanted

9    money for that, that could be obtained, true?

10         A.    For CC TV cameras, yes.

11         Q.    Similarly, because the LIDs, the

12   laser intrusion devices, and the track intrusion

13   devices can also get funding from Homeland Security

14   because that helps prevent terrorists from going

15   into tunnels, correct?

16         A.    Correct.

17         Q.    Has the Transit Authority tried to

18   get money for that from Homeland Security?

19         A.    Yes.

20         Q.    Okay.  When did they first do so?

21         A.    Again, I started with the security

22   program in 2013.  I believe 2008 was their first

23   grant, if I recall correctly.

24         Q.    And that grant was for what?

25         A.    For closed circuit TV.

171

1                            E. JONES

2          Q.    In 2008, was the first application

3    of a grant from a federal government for closed

4    circuit TV, front cameras, LIDs, TIDs, or something

5    else?

6          A.    My recollection, from looking back

7     at the records, is it was for comprehensive

8     electronic security systems at particular

9     high-risk locations.

10          Q.    When you say, "electronic," please

11    tell me what devices you're referring to.

12          A.    It would include cameras, intrusion

13     detection systems such as LIDs that act as

14     control systems primarily.

15          Q.    Did the federal government give

16    money for these purposes?

17          A.    Yes.

18          Q.    Did the Transit Authority spend that

19    money for those purposes for closed circuit TV,

20    front-end cameras, LIDs, and TIDs starting in 2007,

21    2008, whenever you said they first applied?

22          A.    Not TIDs.  TIDs was not never

23     included in any of those applications.  It was

24     strictly what they considered security,

25     mitigating security risks.  So yes, the Transit

172

E. JONES

1

2     Authority has deployed those systems that were

3     funded by those grants.

4          Q.    Let's see if I'm crystal clear.

5               So did the Transit Authority get

6     laser intrusion devices/LIDs; did they spend money

7     given by the federal government for that purpose of

8     getting LID devices?

9          A.    Yes.

10         Q.    When for the first time did they do

11    so?

12         A.    I believe the first facility was --

13    the first deployment of intrusion detection

14    systems that predated LIDs, older technology,

15    was at the major hubs, like Penn Station, Grand

16    Central, Times Square, and I believe that was

17    started actually in 2004, 2005.  I'm not sure if

18    those projects were federally funded or not, but

19    that's the first time I'm aware that they

20    started to deploy intrusion protection systems.

21              The first LIDs I believe would have

22    been at the Chamber Street Station complex,

23    followed by Rock Center, followed by Herald

24    Square.  Those were some of the early ones.

25         Q.    But let's back up.  You told me that

173

1                          E. JONES

2      the Transit Authority did not request funds from

3      Homeland Security for the TIDs, the track intrusion

4      devices.  Do you recall saying that a moment ago?

5            A.    Yes.

6            Q.    So I am questioning you about money

7      requested of the federal government and then spent

8      by the Transit Authority for the purpose of LIDs.

9                  When was that first done?

10           A.    LIDs specifically would have been

11     in that I believe around the 2008 grant.  And

12     the first facilities that would have been

13     equipped with LIDs would have been, I believe

14     the Chamber Street Station complex followed by

15     Rock Center, Herald Square, Roosevelt, 74th,

16     Lexington and 53rd.  Those are some of the early

17     stations with LIDs.

18           Q.    And that was LIDs.  When were they

19     installed in those stations?

20           A.    It would have been between 2008,

21     2009, all the way up to 2012 maybe.

22           Q.    And were these laser intrusive

23     devices, the LIDs, were any of them deployed in a

24     manner to detect a person on the platform coming

25     into the space of the track?

174

                              E. JONES

1

2          A.    They were deployed at the end of

3    the platforms to detect anybody going into the

4    underground tunnel.  So that would be exiting

5    the station platform, going into the tunnel.

6          Q.    So we agree that at no time did the

7    Transit Authority ever use LIDs to protect people

8    from either contact from the edge of the platform

9    with the train or falling into the track bed

10   itself, true?

11         A.    True.

12         Q.    By the way, when we were discussing

13   comparative analysis, did the Transit Authority

14   ever analyze or study to see the number of people

15   killed or catastrophically injured with the system

16   as it was, or if they had utilized the vertical

17   barriers or the rope barriers?

18         A.    I am not aware of any such study.

19         Q.    If there were any studies that

20   indicated that whatever measures the Transit

21   Authority took were effective, certainly you would

22   have learned about that and your task force would

23   have known about that report, correct?

24         A.    I believe that would be correct.

25         Q.    And your task force report did not

175

1                          E. JONES

2    say how any of these other measures have been

3    effective at preventing and reducing the number of

4    people getting killed or catastrophically injured

5    by contact with trains, true?

6              A.    There was no quantitative measures,

7      no; it was more qualitative.

8              Q.    If the Transit Authority ever did

9    any of these kinds of studies that we just talked

10   about, doing a comparative analysis about the

11   effectiveness of different types of measures to

12   prevent or reduce the number of people being killed

13   or catastrophically injured by contact with trains,

14   certainly such studies would have been given to

15   your task force or any other outside contractors,

16   true?

17             MR. KEAVENEY:  Objection.

18             A.    I believe so.  Yes.

19             Q.    Did the Transit Authority ever

20   perform any kind of safety study about the

21   prevention or reduction of the number of people

22   getting killed or catastrophically injured as a

23   result of contact with trains at the Atlantic

24   Avenue-Barclays Station?

25             A.    Could you repeat the question,

176

1                          E. JONES

2      please?

3                    MR. GENIS:  Read that back, please.

4                    (The requested portion of the

5              record was read by the Court Reporter.)

6              A.    I am not personally aware of it.

7              Q.    Did the Transit Authority ever do a

8      study to see the actual cost of people being killed

9      or catastrophically injured from contact with

10     trains?

11             A.    I'm not personally aware of any.

12             Q.    I want to talk about related costs.

13     For example, we agree there is different costs due

14     to death or injury, true?

15             A.    True.

16             Q.    For example, if a person is not

17     killed, but is catastrophically injured, there's

18     the cost of medical care to them.  That's one such

19     cost, correct?

20             A.    True.

21             Q.    And if they have to go on Medicare

22     or Medicaid, that's a cost to the public, true?

23             A.    True.

24             Q.    And there's also a cost of people

25     who were working and paying taxes, but no longer

177

```
 1                         E. JONES
 2   able to work and pay taxes, true?
 3                    MR. KEAVENEY:  Objection.
 4             A.    True.
 5             Q.    There is a cost of people being on
 6   public assistance or welfare or food stamps because
 7   of their injuries, true?
 8                    MR. KEAVENEY:  Objection.
 9             A.    That's a possibility.
10             Q.    The Transit Authority is aware that
11   after a train hits or runs over a person and either
12   kills or catastrophic injures them, that the train
13   operators have suffered post-traumatic stress
14   disorder as a result of that?
15             A.    True.
16                    MR. KEAVENEY:  Objection.
17             Q.    And many of these people had to go
18   out on either permanent or certainly long or
19   short-term disability because of that, true?
20             A.    True.
21             Q.    That's another cost, correct?
22                    MR. KEAVENEY:  Objection.
23             A.    True.
24             Q.    And when people get run over or hit
25   by trains and are killed or catastrophically
```

178

1                              E. JONES

2    injured, that causes a disruption of service, true?

3              A.     True.

4              Q.     And that's another cost to the

5    Transit Authority as well, correct?

6              A.     True.

7              Q.     So has anybody ever looked at the

8    total cost involved if there are people getting

9    killed or catastrophically injured by contact with

10   trains, as opposed to what the cost is from

11   preventing it from occurring?

12             A.     I'm not personally aware of any.

13             Q.     Did anyone from the Transit

14   Authority ever do any review of litigation costs

15   when people are either killed or catastrophically

16   injured as a result of being hit or run over by a

17   train?

18             A.     I am not personally aware of any.

19             Q.     I am not asking about your personal

20   awareness, sir; I am asking if the Transit

21   Authority ever did any review.  That's what I'm

22   trying to find out.  You are here as their

23   representative.

24                    Did the Transit Authority ever look

25   at or do an analysis or study of what the costs are

179

                              E. JONES

1

2   of litigation for people who were either killed or

3   catastrophically injured as a result of contact

4   with the train?

5          A.    I don't know.

6          Q.    We will come back to that soon.

7                How many times, if ever, did a call

8   point get utilized when somebody, however they fell

9   or tripped or whatever, got pushed onto a track,

10  how many times has the call point been used and

11  actually prevented the person on the tracks from

12  getting killed or catastrophically injured?

13                MR. KEAVENEY:  Objection.

14         A.    I don't know.

15         Q.    Has the Transit Authority ever done

16  a study or analysis of that?

17         A.    I'm not aware of any.

18         Q.    We agree that if a study is made,

19  it's got to follow proper methodology to be a valid

20  study, correct?

21         A.    Correct.

22         Q.    So in other words, if the study is

23  not complete, it's not valid, true?

24         A.    If a study is not complete, it's

25   not valid, I can't say that.

180

1                         E. JONES

2        Q.    Okay.  How about if a study is not

3   complete, do we agree it's less than valid?

4        A.    Yes.

5        Q.    If a study is not thorough, it's

6   less than valid?

7        A.    Yes.

8        Q.    If a study is not accurate, it is

9   less than valid?

10       A.    Yes.

11       Q.    If the study does not look at the

12   right questions, it is less than valid?

13       A.    Yes.

14             MR. KEAVENEY:  Objection.

15       Q.    If there was a study that identifies

16   challenges, but fails to address how those

17   challenges could be met or overcome, can we agree

18   such a study is less than valid?

19       A.    Not necessarily.

20       Q.    Okay.  So sometimes yes, sometimes

21   no?

22       A.    It depends on what the objective of

23    the study was.

24       Q.    Okay.  So let me ask you this --

25       A.    Or the perimeters and constraints.

181

                              E. JONES

1

2          Q.     So a feasibility study, the purpose

3    of that is to see if something can be done, is it

4    feasible, can it be done, true?

5          A.     Correct.

6          Q.     So a proper and valid feasibility

7    study is one that looks to see how can we

8    accomplish the goal, true?

9          A.     Correct.

10         Q.     So in other words, if you wanted to

11   do a proper and valid feasibility study about

12   platform edge doors, the study would look at how

13   can we make it work, how can we make it effective,

14   true?

15         A.     True.

16         Q.     Has the Transit Authority ever done

17   a study to see how can they make platform edge

18   doors work; how can they make it effective here?

19         A.     Yes.

20         Q.     When was that for done for the first

21   time?

22         A.     The 2017 to 2019 feasibility study

23    that was comprehensively -- comprehensively

24    looked at all 472 stations.

25         Q.     Is it your sworn testimony as the

182

1                          E. JONES

2  representative of the New York City Transit

3  Authority, here on their behalf, that that study

4  looked at how to solve the problem, how to meet the

5  challenges, how to make platform edge doors work,

6  and be effective in New York City?

7              A.    Yes, within certain constraints.

8              Q.    Did the study look to say, maybe we

9  should have a mix and match approach because we

10  have so many unique stations, each station needs a

11  different device or type of device?

12             A.    Yes, each station study involved

13   looking at whether or not full-height platform

14   screen doors were feasible and/or half-height

15   doors were feasible.

16             Q.    In other words, for a particular

17  station, you could do a full-height door, but for

18  another station, you could only do a half-height

19  door or three-quarter-height door, correct?

20             A.    Yes.  In some stations, you can do

21   both.

22             Q.    Some stations need vertical

23  barriers, correct?

24             A.    Vertical barriers, if you are

25   referring to the roll-up rope barriers, those

183

1                          E. JONES

2    were not considered -- those were initially

3    reviewed and/or a consultant provided a white

4    paper summary and recommendation, and the

5    recommendation, for various reasons, I can't

6    recall them all, was not to use -- not to

7    implement or consider that as an option.

8              Q.    So let's see if I understand you

9    correctly.

10              Is it your sworn testimony on behalf

11   of the Transit Authority that a valid, complete,

12   and thorough study and analysis was done to see

13   whether or not, first of all, vertical barriers or

14   rope barriers are effective?  Did they study that?

15              A.    Yes.  The consultant did, yes.

16              Q.    Did they learn from the COMET and

17   other parts around the world that those vertical

18   barriers are, in fact, effective in preventing or

19   reducing the number of people having contact with

20   trains, and thereby being killed or

21   catastrophically injured?

22              MR. KEAVENEY:  Objection.

23              A.    As I said earlier, they issued a

24   white paper on that.

25              Q.    Just answer my question, please.

184

1                          E. JONES

2    Just answer my question, please.

3              A.     Repeat the question.

4                   MR. GENIS:  Read that back.

5                   (The requested portion of the

6              record was read by the Court Reporter.)

7                   MR. KEAVENEY:  Objection.

8              A.     I do not recall an analysis looking

9    at how many people it saved from injury versus,

10   you know, the absence of it.  There was no -- I

11   don't recall a comparative analysis of that.

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

185

1                          E. JONES

2          Q.    Was there any study or analysis to

3    see the effectiveness of these vertical barriers in

4    the cities that had deployed them to say, "Yes, we

5    have prevented or reduced the number of people

6    being killed or catastrophically injured by contact

7    with trains" or "No, we did not"?

8                  Did anybody look at that?

9          A.    Not to my knowledge.

10                 MR. GENIS:  Off the record.  It is

11          3:30.  We will stop the camera.

12                 Mr. Johnson, thank you.

13          (Time noted:  3:30 p.m.)

14

15                          _____

16                          ERIC JOHNSON

17

18    Subscribed and sworn to before me

19    this _____ day of _____, 2023.

20

21    _____

22          NOTARY PUBLIC

23

24

25

186

1

2                            INDEX

3

4      WITNESS                 EXAMINATION BY         PAGE

5      ERIC JOHNSON        MR. GENIS            4-185

6

7         INFORMATION AND/OR DOCUMENTS REQUESTED

8      INFORMATION AND/OR DOCUMENTS            PAGE

9      RESUME/CV                               31

10     ALL ITEMS REVIEWED BY WITNESS TO PREPARE    47
       FOR DEPOSITION

11

12

                             EXHIBITS

13

       PLAINTIFF'S

14     EXHIBIT              DESCRIPTION           PAGE

15     EXHIBIT 1          30(B)6 NOTICE & RIDER    82

16     EXHIBIT 2          PHOTOGRAPHS            146

17

18

19     QUESTIONS MARKED FOR RULINGS

20     PAGE          LINE

21     101           7

22

23

24

25

187

1

2                          CERTIFICATION

3

4

       STATE OF NEW YORK  )

5                          )  ss

       COUNTY OF SUFFOLK  )

6

7

8          I, JOANNE MAGGIORE, a Shorthand Reporter

9    and Notary Public within and for the State of New

10   York, do hereby certify:

11         THAT the foregoing transcript is a true and

12   accurate transcript of my original stenographic notes.

13         I further certify that I am not related, either

14   by blood or marriage, to any of the parties to the

15   action; and THAT I am in no way interested in the

16   outcome of this matter.

17         IN WITNESS WHEREOF, I have hereunto set my hand

18   this 7th day of February 2023.

19

20

21         JOANNE MAGGIORE

22

23

24

25

188

UNITED STATES DISTRICT COURT          VOLUME II
EASTERN DISTRICT OF NEW YORK     PAGES 188-374
--------------------------------------------x
LUISA JANSSEN HARGER DA SILVA,

                Plaintiff,

                                    Case No.
   - against -                      17-cv-04550


NEW YORK CITY TRANSIT AUTHORITY,
METROPOLITAN TRANSPORTATION AUTHORITY,
and RAQIA SHABAZZ,

                Defendants.
--------------------------------------------x


                Via Zoom Videoconference


                February 13, 2023
                11:04 a.m.


        CONTINUED EXAMINATION BEFORE TRIAL of
NEW YORK CITY TRANSIT AUTHORITY, Defendant,
by ERIC JONES, pursuant to the Federal Rules
of Civil Procedure and Order, held at the
above-noted time and place, before Michelle
Conero, a Stenotype Reporter and Notary
Public within and for the State of New York.

189

```
 1
 2     A P P E A R A N C E S:
 3
 4       ROTH & ROTH, LLP
              Attorneys for Plaintiff
 5              192 Lexington Avenue, Suite 802
              New York, New York 10016
 6              Phone:  212-425-1020
              E-mail:  droth@rothandroth.com
 7       BY: DAVID ROTH, ESQ.
 8
 9
10       SONIN & GENIS, ESQS.
              Attorneys for Plaintiff
11              One Fordham Plaza, Suite 907
              Bronx, New York 10458
12              Phone:  718-561-4444
              E-mail:  rgenis@soningenis.com
13       BY: ROBERT GENIS, ESQ.
14
15
16       LANDMAN CORSI BALLAINE & FORD, PC
              Attorneys for Defendants
17              120 Broadway, 13th Floor
              New York, New York 10271
18              Phone:  212-238-4800
              E-mail:  akeaveney@lcbf.com
19     BY:  ANDREW KEAVENEY, ESQ.
20
21
22       ALSO PRESENT:
23              CHARLES GERSZBAUM, ESQ.
                  Gerszbaum & Weisz
24
25
```

190

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5         IT IS HEREBY STIPULATED AND AGREED by

6     and between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an unsigned

14    copy of the deposition may be used with the

15    same force and effect as if signed by the

16    witness, 30 days after service of the

17    original & 1 copy of same upon counsel for

18    the witness.

19

20        IT IS FURTHER STIPULATED AND AGREED

21    that all objections except as to form, are

22    reserved to the time of trial.

23

24                    *     *     *     *

25

191

1

2    E R I C    J O N E S,

3          Witness, having first been duly sworn

4          by the Notary Public, was examined and

5          testified as follows:

6    EXAMINATION BY

7    MR. GENIS:

8          Q      Please state your name for the

9    record.

10         A      Eric Jones.

11                MR. GENIS:  It is now a start time

12         of 11:04.

13         Q      Good morning, Mr. Jones.  Can you

14   please tell me what, if anything, have you

15   reviewed that was in any way related to the

16   subject matter listed in the Rule Federal

17   30(b)(6), notice for deposition and rider,

18   since we paused our last deposition?

19         A      The only thing I looked at this

20   morning briefly was the Track Intrusion --

21   Track Trespassing Task Force report that was

22   issued in 2022.

23         Q      Okay.  Since we last paused our

24   deposition, have you attempted to learn

25   anything that in any way related to the subject

192

1

2    matter listed in our Federal Rule 30(b)(6),

3    notice for deposition and rider?

4         A     No.

5         Q     Have you talked to anyone about

6    anything that was in any way related to the

7    subject matter of that notice and rider?

8         A     No.

9         Q     Has anyone shown you anything about

10   that?

11        A     No.

12        Q     Did you read anything on that?

13        A     No.

14        Q     Did you look up or research

15   anything on that?

16        A     No.

17        Q     Okay.  Now, you told us before that

18   you were educating yourself at the last

19   deposition.  Can you please tell me, where is

20   the location of the records you reviewed, share

21   drive, share points, things of that nature?

22        A     All the records I reviewed -- I

23   referred to some that were provided to me by

24   counsel.  The remaining documents, most of them

25   are documents that I had on a -- on a drive --

193

1

2    a work drive here at the office.

3         Q    Okay.  And what work drive are you

4    referring to?

5              MR. KEAVENEY:  Note my objection.

6         A    We have an H drive that pretty much

7    we would, you know, save our documents to as

8    opposed to saving it on the local C drive on

9    your desktop computer.

10        Q    And who had access to this H drive?

11        A    Well, this -- this is a personal

12   folder for each individual, so nobody would

13   have access to my folders unless I decide to

14   store documents on a share drive.  So there is

15   a share drive that you can have, you know,

16   authorized access for other individuals to have

17   access to a particular folder that you want to

18   set up there for purposes of sharing.

19        Q    Okay.  So were there different

20   share drives at the Transit Authority related

21   to platform edge safety?

22        A    Different share drives.  I can't

23   speak for what other individuals may create.  I

24   know that documents that I have, I have them,

25   you know, primarily on -- in my H drive folder,

194

1

2  documents that have been shared with me,

3  et cetera, but I can't speak for every single

4  individual who has been involved in this

5  initiative as to whether or not they have

6  created extra drives or folders, et cetera.

7        Q     So is there one main share drive

8  that anybody involved in platform edge safety

9  had access to so that they could look at

10  documents or whatever happened to be stored

11  there?

12        A     Well, I know for the task force

13  there was a share point set up where

14  individuals could review a draft of the task

15  force report and make comments.

16        Q     Okay.  And that share point, was

17  that given a name or designation?  How was it

18  accessed?

19        A     I can't recall the name, but all

20  share point sites, the creator has to provide

21  access to -- read/write access to individuals

22  who they may choose to give permission to

23  access that share point site or file.

24        Q     So were all members of the task

25  force given access to that share point and that

195

1

2    H drive?

3         A     I believe so.  I believe so.

4         Q     Okay.  Now, you mentioned now and

5    then last time the different documents you

6    reviewed.  Do you have the exact names and

7    Bates numbers of the documents that you

8    reviewed to prepare for your deposition last

9    time?

10        A     No.  I have not committed that to

11   memory.

12        Q     No.  Have you noted it anywhere?

13   It doesn't have to be to memory.

14        A     I don't -- I did not make notes to

15   come to today's deposition listing every single

16   document and any related number of those

17   documents.  No, I did not.

18        Q     Okay.  Because you recall last time

19   we asked you for a list by name and Bates

20   number of all documents you reviewed to prepare

21   for your deposition and you had about a week to

22   be able to identify them.  Have you done so?

23        A     I was not --

24              MR. KEAVENEY:  Objection.

25        A     I was not informed that I need to

196

1

2    go -- subsequent to or the end of our last

3    deposition, to go back and produce that.  If I

4    knew or was given direction to do that, then I

5    would have made an effort to do that, but I was

6    not.

7         Q    Well, I asked you to do that last

8    time.  Don't you recall?

9              MR. KEAVENEY:  Note my objection.

10        Q    Do you remember me telling you to

11   please do that, or asking you to please do

12   that?

13        A    I do not recall you telling me at

14   the end of that deposition.  When we broke the

15   deposition, because some individuals had to

16   leave, I cannot recall you specifically saying

17   now we're going to be splitting the deposition

18   in two parts.  Mr. Jones, please go get a list

19   of all the documents and numbers.  I -- I don't

20   recall that, sir.

21        Q    It was at the beginning of your

22   deposition when I first started to question

23   you, sir, and I asked you to provide a list of

24   everything you reviewed.  That was at the

25   beginning of the deposition.  Did you do so,

197

1

2   yes or no?

3            MR. KEAVENEY:  Note my objection.

4       A    I did not at the time for the

5   reasons I stated.  I did not make a separate

6   list of -- of -- of -- of documents with

7   related numbers that I had looked at.

8       Q    Okay.  What's the document --

9   please give us a list by name or Bates numbers

10  the documents that were sent to you from the

11  lawyer that e-mailed them to you?

12      A    I -- I cannot tell you the name and

13  exact Bates number.  I have not committed every

14  single document to memory by name and number.

15      Q    Did you save them all to a specific

16  folder that you were using for this deposition?

17      A    Yes.

18      Q    Okay.  So you have -- you still

19  have all those e-mails with whatever

20  attachments were sent to you.  Correct?

21      A    Yes.

22      Q    And if we went off the record now,

23  could you find those e-mails and tell us what

24  was attached to them?

25      A    Sure.

198

1

2          Q     Okay.  And did you review any

3     records that your lawyer did not give you?

4          A     Yes.

5          Q     Okay.  And -- and those would also

6     be in that same folder?

7          A     No.  They would be on my H drive.

8          Q     So how do you determine what

9     records that you reviewed were provided to you

10    by the attorney and which you already had?

11         A     I created a folder that -- that

12    identified the documents that the attorney sent

13    to me.

14         Q     Okay.  And do you know if all the

15    records were provided to the Plaintiff in this

16    case?

17         A     If I know if all the records -- no,

18    I would not know that.

19         Q     How would you determine what

20    records you reviewed that were provided to the

21    Plaintiff and those that were not?

22         A     I have no idea, sir.

23               MR. GENIS:  Okay.  We're going to

24         take a break now off the record.  It's

25         11:13.

199

1

2          Q     So you could -- now you told us if

3     we went off the record, you could give us a

4     list.  We're going to do that now so we can get

5     that list.

6                MR. KEAVENEY:  Continue your

7          questions.

8                MR. GENIS:  Well, I'd like to know

9          what he looked at, so we're going to go

10         off the record, Counsel.  It's 11:13.

11         We're going to take that break so that he

12         can do so.

13               (Whereupon, a recess was taken from

14         11:13 a.m. until 11:20 a.m.)

15               MR. GENIS:  It's now 11:20.  We've

16         had an off-the-record discussion.  Let me

17         ask a couple questions and then I'll

18         place a statement on the record.

19         Q     Sir, was it one share point or more

20    than one share point that people, including

21    yourself, would upload documents to related to

22    platform edge safety, platform screen door

23    technology and things related to that?

24         A     The only share point site that

25    I'm -- that I can recall that was established

200

1

2    was one for the Track Intrusion Task Force, and

3    primarily it was being used for review of the

4    report and commenting on the report.  I'm not

5    aware of any other share point site that was

6    specifically set up for that.

7         Q     Were there any other share points

8    for the Platform Edge Task Force?

9         A     No.  That's the only one I'm aware

10   of.  I can't -- you know, I don't know if other

11   individuals created other share point

12   locations, but that's the only one that I

13   personally can recall.

14        Q     And that's the one on the H drive.

15   Correct?

16        A     No.  No.

17        Q     Okay.  That's a separate share

18   point?

19        A     Share point is a separate means of

20   sharing documents versus having a central, you

21   know, computer for an agency in which you have

22   multiple drives set up for different reasons.

23        Q     And people could upload documents

24   to either of these share points, whether it be

25   the Track Intrusion Task Force or the Platform

201

1

2   Edge Safety Task Force.  Correct?

3        A    As far as I can recall, that share

4   point drive that was set up for the Track

5   Trespassing Task Force, yes.  Individuals would

6   have read/write capability to add documents,

7   et cetera.

8        Q    And similarly for the Platform Edge

9   Task Force, for its share point people could

10  upload documents and have access?

11       A    The Platform Edge Task Force which

12  you're referring to, I was never involved in a

13  Platform Edge Task Force.  That probably

14  predated my -- my involvement, which was in --

15  which started in 2015.  But I cannot recall

16  being a member of a task force called Platform

17  Edge Task Force.

18       Q    And the share point that you

19  mentioned and that H drive that you mentioned

20  that you have records, those are still in

21  existence and still searchable.  Correct?

22       A    Yes.  The H drive is basically my

23  personal documents, anything that I create or

24  choose to save outside of my C drive on my

25  local computer so that, you know, if, for

202

1

2    example, my C drive crashed, there would be a

3    backup of those documents on another server.

4         Q    Okay.  And before the task force,

5    the Trespass Task Force was even created, you

6    got e-mails about uploading documents to other

7    share points.  True?

8              MR. KEAVENEY:  Objection.

9         A    Not to -- not anything doing --

10   dealing with -- with the Track Trespassing Task

11   Force.

12        Q    Okay.  But before the Trespass Task

13   Force was created, you got e-mails about

14   uploading documents to other share points

15   related to platform edge safety.  True or

16   false?

17             MR. KEAVENEY:  Objection.

18        A    Other share points?  Possibly for

19   the feasibility reports that were done for

20   PSDs, and those are all public documents that

21   have been shared with the public.  Yeah,

22   that -- it would be maybe for the feasibility

23   studies.

24        Q    So is that --

25        A    For access to the feasibility

203

1

2    studies.

3         Q     Okay.  So -- so is that a yes to my

4    question?

5              MR. KEAVENEY:  Objection.

6         A     To the best of my recollection, I

7    would say yes, --

8         Q     Thank you.

9         A     -- there would have to be a point

10   to share those reports.

11        Q     Thank you so much.  So the bottom

12   line is yes, before the Trespass Task Force was

13   committed, you got e-mails about uploading

14   documents to other share points that were

15   related to platform edge safety.  True or

16   false?

17             MR. KEAVENEY:  Objection.

18        A     I can't answer true or false to

19   that.

20        Q     Okay.  You can't answer it.  You

21   can't answer it.  That's okay.

22        A     Okay.

23        Q     I don't need -- like I told you

24   last time, I don't need long answers.  If it's

25   a yes, no or true, false question, please

204

1

2    answer with a yes or no or true or false so I

3    can take up less of your time.  And if you're

4    unable to do so, just say you're unable to do

5    so.  Understood again?

6        A    Understood.

7        Q    Okay.  And I have your word again

8    that you'll do so?

9            MR. KEAVENEY:  Objection.

10       A    I'll do my best.

11       Q    You'll -- you'll -- you'll -- okay.

12   And --

13       A    Mr. -- Mr. Roberts -- or Mr. Genis,

14   there are questions that make it difficult --

15   it's not -- it just doesn't sound like a yes or

16   a no answer, and so it's difficult for me to

17   say yes or no.

18       Q    There's no question posed to you

19   right now.  You're just making a speech which

20   is improper, so --

21           MR. GENIS:  I move to strike.

22       Q    And as I said, if I ask you a yes

23   or no question or true or false question and

24   you're unable to do so, all you have to do is

25   say you're unable to do so.  That's it.  You

205

1

2    don't need a speech.  Understood?

3         A     Okay.

4         Q     Thank you.  And remember you gave

5    me your word that you'll do so?

6               MR. KEAVENEY:  Objection.

7         A     Yes.

8         Q     All right.  I'd like to show you a

9    document marked -- Bates stamped 371223.  Do

10   you see this document?

11              MR. GENIS:  And we'll deem it

12        marked Plaintiff's whatever number we're

13        up to now for Mr. Jones.

14              (Whereupon, Plaintiff's Exhibit 1

15        Jones Day 2 was marked for identification

16        as of this date.)

17        Q     Do you see this e-mail, sir?

18        A     Yup.

19        Q     And it's to you.  Correct?

20        A     Yes.

21        Q     And it talks about certain

22   documents are too big to e-mail so it was

23   uploaded to the office share.  Do you see that?

24        A     Yes.

25        Q     Does that refresh your memory about

206

1

2    share points and people uploading documents to

3    them?

4          A    Yes.

5          Q    Okay.  So yes, in fact, that there

6    were other share points that people uploaded

7    documents to that in some way related to

8    platform edge safety.  True?

9          A    True.

10          MR. KEAVENEY:  Objection.

11          Q    Okay.  Thank you.  And these can be

12    searched even now.  Correct?  They're all still

13    in existence?

14          MR. KEAVENEY:  Objection.

15          A    I -- I would assume.  Unless I went

16    and checked.  I can't say it's absolutely there

17    in that particular -- particular location.  I --

18          Q    Well, did the Transit Authority

19    purge and delete these share points and

20    documents that were uploaded regarding platform

21    edge safety?

22          A    Not to my knowledge.

23          Q    Okay.  So they would be kept on a

24    memory somewhere.  True?

25          MR. KEAVENEY:  Objection.

207

1

2          A      Again, sometimes the path for

3    locations can change.  Sometimes you may go and

4    click on a link and it doesn't, you know,

5    always lead to the same location.  But I would

6    assume that that particular location, you know,

7    unless I know otherwise, I would say okay, yes,

8    if you want to locate something there, click on

9    that link and see where it takes you.

10         Q      Okay.  So in other words, that's --

11   to move along, sir, so true or false that since

12   you are not aware of anything being deleted or

13   purged from the system, it's still there,

14   accessible and searchable.  True?

15               MR. KEAVENEY:  Objection.

16         A      True.

17         Q      Okay.  Can you look at --

18               MR. GENIS:  Dave, please put up

19          document 416027 Bates.

20               MR. KEAVENEY:  The last document,

21          was that Exhibit 3?  Plaintiff's

22          Exhibit 3?

23               MR. GENIS:  I'm not sure what

24          number we're up to because I think Dave

25          was keeping track of it last time.  Not

208

1

2          me.

3               MR. ROTH:  What we're going to do

4          is we're going to mark them just for

5          day 2 just Exhibit 1 so the witness --  I

6          don't want to wait and there's no

7          confusion.  Okay?  We'll just do

8          Exhibit 1 day 2.  All right?

9               MR. GENIS:  Okay.  So now we're

10         going to have Exhibit 2 of day 2 which I

11         just put the Bates on the record.

12              (Whereupon, Plaintiff's Exhibit 2

13         Jones Day 2 was marked for identification

14         as of this date.)

15         Q    So please take a look at this

16    e-mail.  Do you see how it talks about other

17    share drives involving benchmarking and

18    platform screen doors.  True?

19         A    Yes.

20              MR. GENIS:  Okay.  And just we

21         wanted to note on the record, during our

22         last break off the record, counsel, and

23         you can correct me if I say anything

24         wrong, noted that -- that he was -- he

25         did not know whether or not the witness

209

1

2          had reviewed documents that had not been

3          exchanged in discovery, and that's one of

4          our issues why we need to know everything

5          that the witness reviewed to prepare.  If

6          there were documents not exchanged in

7          discovery, we're entitled to them, and I

8          will move on from there.

9      Q      And you use share points and share

10  drives at times to save documents that are too

11  large to e-mail.  Correct?

12     A      Correct.

13     Q      And this way anybody can access the

14  share point that is supposed to have access to

15  the share point.  Correct?

16     A      Correct.

17     Q      So videos, presentations, contracts

18  are put into the share point instead of

19  e-mails.  Correct?

20          MR. KEAVENEY:  Objection.

21     A      Correct.

22     Q      Did the Transit Authority do

23  anything to help educate you on the topics and

24  the 30(b)(6) notice and the different share

25  points?

210

1

2          A     Did the Transit Authority?

3          Q     Yes.

4          A     No.  The only people that I've

5     spoken to in regards to this is counsel sitting

6     behind me.

7          Q     Okay.  Sir, let's talk about

8     another topic now.  You've told us before there

9     are different effective safety devices and

10    technology and means of eliminating or reducing

11    death or catastrophic injury caused by contact

12    between trains and people or trains running

13    over the people.  Do you recall that?

14               MR. KEAVENEY:  Objection.

15         A     I recall you -- yes, yes, yes.

16         Q     Okay.  And these included platform

17    edge doors or platform screen doors, APGs,

18    different height doors, horizontal moving

19    doors, and you told us that they were known to

20    be effective means of preventing or reducing

21    the number of people killed or catastrophically

22    injured because they were hit or run over by a

23    train.  Do you recall that?

24               MR. KEAVENEY:  Objection.

25         A     Yes.

211

1

2          Q      Okay.  And then we mentioned in

3   passing about road platform screen doors, a

4   type of vertical barrier.  Do you recall that?

5          A      Yes.

6          Q      And we talked about in passing

7   fixed rail as well.  Do you recall that?

8          A      Yes.

9          Q      We talked briefly in passing about

10  closed circuit TV.  Do you recall that?

11         A      Yes.

12         Q      And we talked briefly in passing

13  about cameras in the front of the train cars?

14         A      Yes.

15         Q      We talked briefly about TIDs and

16  LIDs?

17         A      Yes.

18         Q      Track intrusion type devices.

19  Right?

20         A      Yes.

21         Q      And we talked briefly about slowing

22  down trains as they entered the stations as

23  another means of reducing the number of people

24  killed or catastrophically injured as a result

25  of getting hit or run over by a train.  True?

212

1

2          A     Yes.

3                MR. KEAVENEY:  Objection.

4          Q     And you told us the many benefits

5    of these different safety devices, technologies

6    and means and methods of doing so.  True?

7                MR. KEAVENEY:  Objection.

8          A     I think so.

9          Q     Yes.  And you told us because

10   there's so many different types of stations,

11   the Transit Authority cannot have a one size

12   fits all approach.  Correct?

13               MR. KEAVENEY:  Objection.

14         A     Yes.

15         Q     Okay.  And you told us how you need

16   to study each and every station to come up with

17   an individual safety plan for each station.  Do

18   you recall that, sir?

19               MR. KEAVENEY:  Objection.

20         A     I recall agreeing to that, yes.

21         Q     Okay.  And you might possibly have

22   different safety devices or different heights

23   or different means of corrective action for

24   each station.  True?

25         A     Yes.

213

1

2          Q      Okay.  And we talked about how

3     first we have to identify the problem, the root

4     cause, that common denominator, and we agreed

5     that that was open access to the track.  Do you

6     recall that?

7                 MR. KEAVENEY:  Objection.

8          A      I recall -- I think so.

9          Q      Okay.  And then we discussed why

10    platform edge doors or screen doors are the

11    most effective at preventing access to the

12    track and thereby preventing people from being

13    killed or catastrophically injured as a result

14    of contact with the train or being run over by

15    the train.  Correct?

16                MR. KEAVENEY:  Objection.

17         A      I believe so.

18         Q      And we talked about the other

19    options that we just mentioned a moment ago.

20    Correct?

21                MR. KEAVENEY:  Objection.

22         A      What other option?

23         Q      Like we said not only different

24    height of platform screen doors and the APGs,

25    but the RPSDs, the rope barriers, vertical --

214

1

2    the CC TV, the front camera, the track

3    intrusion device, laser intrusion devices,

4    fixed rail and slowing down trains.  Correct?

5         A     Yes.

6         Q     Okay.  And can we agree that each

7    of these other options is better than doing

8    nothing?

9              MR. KEAVENEY:  Objection.

10        A     I would believe so.

11        Q     Okay.  And each or any of these

12   options as a means of eliminating, reducing the

13   number of people killed or catastrophically

14   injured by contact with trains is better than

15   doing nothing.  Correct?

16             MR. KEAVENEY:  Objection.

17        A     I would believe so.

18        Q     Okay.  And each or any of these

19   options we discussed as a means of eliminating

20   or reducing the number of people killed or

21   catastrophically injured by contact with trains

22   is better than what the record has been for the

23   past twenty years.  True?

24             MR. KEAVENEY:  Objection.

25        A     I cannot speak to what the record

215

1

2  has been for the last twenty years.

3          Q     Well, sir, you're aware, as we went

4  through last time, how each and every year you

5  told us at a minimum, as I recall, over 1,000

6  people have track intrusions, and we know -- we

7  went over how it went up to 200 people being

8  hit by trains in the past year, and I believe

9  it was either 60 or 80, or something to that

10 effect, being killed.  Do you recall going

11 through all that last time?

12         A     Yes.

13         Q     Okay.  So we went through the

14 numbers, and the Transit Authority has been

15 keeping these numbers for many, many decades.

16 Correct?

17         A     Correct.

18         Q     So we agree that if any one of

19 these options for eliminating or reducing

20 people having contact with trains would give us

21 less people getting catastrophically injured or

22 killed as a result of contact with trains or

23 being run over by trains than not having these

24 options.  True?

25                 MR. KEAVENEY:  Objection.

216

1

2          A       I believe so.

3          Q       Okay.  And we discussed a little

4   bit last time about a risk hazard analysis.  Do

5   you recall that?

6          A       Yes.

7          Q       And we went through -- let me just

8   be crystal clear now.  Can we agree that the

9   number one cause of death in the subway system

10  is contact with the train?

11         A       I believe that's correct.

12         Q       And the number one cause of

13  catastrophic injury is contact with the train?

14         A       I believe that's correct.

15         Q       The number one cause of serious

16  injury is contact with the train by people.

17  Correct?

18         A       I believe that's correct.

19         Q       And we went through how there was

20  frequent incidents of people being killed or

21  catastrophically injured as a result of contact

22  with the train or being run over by a train.

23  True?

24                 MR. KEAVENEY:  Objection.

25         A       True.  That was discussed.

217

1

2        Q    Okay.  And we went through how

3    according to the standards used by the Transit

4    Authority, including Military Standard 882,

5    that where one sees that they have a frequent

6    occurrence of death or catastrophic injury,

7    they're required to take corrective action.

8    True?

9               MR. KEAVENEY:  Objection.

10       A    I don't recall -- I don't recall

11   saying that they had to take corrective action.

12       Q    Okay.  Well, let's back up.

13   When -- in that case let's be crystal clear.

14   Do we agree that when the Transit Authority --

15   let's back up.  The Transit Authority has --

16   has adopted U.S. Military Standard 882 for its

17   hazard analysis and identification process and

18   procedure.  True?

19       A    True.

20       Q    Okay.  And part of the risk hazard

21   analysis is a risk assessment.  True?

22       A    It's a risk assessment when

23   you're -- as I understand it, when you're

24   introducing a new system into the subway

25   environment.

218

1

2          Q     So let's back up.  The steps to be

3     followed is first you identify the problem.

4     That's been done here.  True?

5                MR. KEAVENEY:  Objection.

6          A     True.

7          Q     Okay.  Second, you come up with a

8     plan of corrective action.  True?

9                MR. KEAVENEY:  Objection.

10         A     Can I expound?

11         Q     Can you just answer yes or no?

12    Once there's a hazard analysis done and you see

13    that you have frequent occurrence of death or

14    catastrophic injury, according to the standards

15    used by the Transit Authority, you're supposed

16    to now come up with a plan, a safety plan of

17    corrective action.  True or false?

18                MR. KEAVENEY:  Objection.

19         A     I can't answer that question.

20         Q     Okay.  And then you told -- and you

21    told us -- I think we went through last time

22    how after a corrective action plan is

23    implemented, you have to see whether or not

24    it's effective.  True?

25         A     True.

219

1

2        Q    Okay.  And so let me ask you, would

3   you like to look at the system safety program

4   plan to see if it requires corrective action

5   once you have the matrix -- risk assessment

6   hazard matrix done?

7               MR. KEAVENEY:  Objection.

8        A    You would like me to look at it?

9        Q    I'm asking if you'd like to.  You

10  tell me.  If you want to look at it to make

11  sure that we're crystal clear that after you've

12  done the hazard analysis, you meaning the

13  Transit Authority -- you know what?  I'll move

14  on.

15              And do we agree that according to

16  the applicable standards and procedures, after

17  the corrective action is taken, you have to

18  give it time to see whether or not it's

19  effective.  Correct?

20       A    I would believe so.

21       Q    Okay.  So for example, in

22  approximately 2001 is when the president of the

23  Transit Authority, Lawrence Reuter, R-E-U-T-E-R,

24  implemented certain changes in the system, for

25  example to have announcements and signs and --

220

1

2    and things of that nature, in an attempt to

3    lessen the number of people hit by trains and

4    run over by trains.  True?

5                MR. KEAVENEY:  Objection.

6        A    I know that has been done in the

7    past, yes.

8        Q    Was it done before 2001, in the

9    1980s, 1990s, or was it in 2001 or something

10   else?

11       A    I cannot answer that question.  I

12   was not here prior -- I was not involved in

13   track intrusion initiatives prior to 2015.  I

14   know anecdotally that since I have been with

15   the Transit Authority since 1994, I have come

16   across various announcements of different types

17   relating to platform edge safety.

18       Q    Okay.  So you don't really know

19   anything prior to 2015 about platform edge

20   safety.  All your knowledge is after 2015.

21   Fair -- true?

22                MR. KEAVENEY:  Objection.

23       A    No.

24       Q    Okay.  So you do know about

25   platform edge safety before 2015?

221

1

2        A     Anecdotally, yes, but it was not my

3    area of responsibility.  I have read some

4    documents over the -- over time, and

5    anecdotally, having been here since 1994, I

6    would have heard, seen things, using the subway

7    to traverse back and forth from work.  So I

8    would have been exposed to some of that

9    information, yes.

10       Q     Okay.  So you were exposed to some

11   information anecdotally, but not as part of

12   your job.  Correct?

13       A     Prior to 2015, no.  That was not a

14   part of my job.

15       Q     And no one from the Transit

16   Authority prepared you or educated you so that

17   you would be knowledgeable on all of this

18   before 2015.  True?

19            MR. KEAVENEY:  Objection.

20       A     I did not have a sit down

21   specifically for this deposition to be educated

22   by other members of the Transit Authority on

23   everything that transpired prior to 2015.

24       Q     I'm not asking you about a formal

25   sit down.  I'm asking was anything done

222

1

2    whatsoever at all by the Transit Authority to

3    educate you or prepare you on the -- on the

4    subject matters of platform edge safety for

5    anything that took place before 2015?

6              MR. KEAVENEY:  Objection.

7        A     Only what I received from counsel.

8        Q     Okay.  But since 1994 to the

9    present you've seen -- you've heard

10   announcements and seen signs that were in the

11   subway.  Yes?

12       A     Correct.  Yes.

13       Q     Okay.  And when did this first take

14   place?  Was it in the 1990s, 1980s, 2000, 2001?

15   You tell me.

16       A     I do not have the specific dates

17   when different messaging campaigns occurred.

18   As I said, anecdotally I -- I do recall prior

19   to 2015 when I became involved in track safety

20   initiatives, capital track safety initiatives

21   in particular, that I recall seeing signs,

22   hearing messages, you know, over those years.

23   But specific dates, I -- I would not have that.

24       Q     I'm not asking you for a date.  I'm

25   asking you for a decade.  So was it in the

223

1

2    1980s, 1990s or around 2000, 2001?

3         A    I can only speak to the decade that

4    I was here, which was in the '90s.

5         Q    Okay.  And so since the -- in the

6    '90s, is that when they started with signs and

7    messaging to -- to try to reduce the number of

8    people getting hit by trains?

9         A    I can't say if that's when they

10    started.  Again, I -- I migrated to the United

11    States in 1989 and I started working here at

12    the Transit Authority in 1994, and I became

13    involved in track safety -- capital track

14    safety initiatives in 2015.

15         Q    No.  I understand that.

16         MR. GENIS:  I move to strike.

17         Q    I've heard that about thirty times.

18    My question, sir, is can you tell us right now

19    what decade the Transit Authority started to do

20    the messaging?  Was it in the 1990s or 2000 or

21    something later?

22         A    I cannot answer that question.

23         Q    Okay.  Can we agree whatever was

24    done along those lines, messaging,

25    announcements, help points, was done long ago,

224

1

2   decades ago?

3          A      Could you repeat the question?

4                 MR. GENIS:  Read it back, please.

5                 (Whereupon, the referred to

6          question was read back by the Reporter.)

7          A      Help points I believe was first --

8    I've read was first pioneered in 2011 or

9    something of that nature.  So, you know, I

10   think definitely help points would be the

11   2010s, 20 teens.  But other initiatives prior

12   to help points, you know, my assumption would

13   be that it would perhaps have gone back

14   decades.

15         Q      Okay.

16         A      Again, my -- you know, my knowledge

17   is limited.

18         Q      Okay.  So for the announcements and

19   the signage that was done decades ago, they had

20   certainly ample time to see whether or not that

21   was effective at reducing the number of people

22   getting killed or catastrophically injured by

23   contact with trains.  True?

24                MR. KEAVENEY:  Objection.

25         A      I would believe so.

225

1

2          Q      Okay.  And according to the

3     applicable standards, you're supposed to look

4     back after thirty-six months or about three

5     years to see whether or not any corrective

6     action taken has been effective.  True?

7                    MR. KEAVENEY:  Objection.

8          A      If that's what the standard reads,

9     then I'm not -- I have no objection.

10         Q      So did the Transit Authority,

11    within thirty-six months of implementing a plan

12    of corrective action by means of messaging,

13    announcements, signage, things of that nature,

14    implementing that plan of corrective action,

15    did they look to see whether or not it was

16    effective?

17         A      I can't answer that question.

18         Q      Well, can we agree that according

19    to the numbers of people being hit and

20    seriously injured, catastrophically injured or

21    killed by contact with trains, since the

22    numbers did not change, that it was not

23    effective?

24                    MR. KEAVENEY:  Objection.

25         A      I can't answer that question.

226

1

2        Q    Okay.  Well, they instituted the

3    help points you told us 2010, 2011 or in the

4    teens for a reason.  True?

5              MR. KEAVENEY:  Objection.

6        A    They -- they installed them for a

7    reason, yes.

8        Q    Okay.  And that reason would have

9    been the prior steps taken by the Transit were

10   not effective so they tried something else.

11   Correct?

12             MR. KEAVENEY:  Objection.

13       A    Not correct.

14       Q    Okay.  So why were the help points

15   done if everything else was effective?

16       A    The help points have two reasons.

17   They have an emergency call button and they

18   have an information button.  So the point --

19   the purpose of the help point is -- as far as I

20   know, was not specifically for mitigating track

21   intrusions.  It served multiple purposes.  So

22   any -- any customer who had an emergency

23   situation or observed what would be considered

24   somewhat of an emergency on the platform could

25   communicate with the real control center and

227

1

2    the booth within the station, or if they were

3    looking for travel information, they could

4    press the green button and get information.

5        Q    Okay.  And we went through last

6    time, if you recall, how the help points were

7    not effective in reducing the number of people

8    getting killed or catastrophically injured by

9    being hit or run over by trains.  Do you recall

10   that, sir?

11           MR. KEAVENEY:  Objection.

12       A    No, I don't recall saying that they

13   were not effective.

14       Q    Okay.  Okay.  So according to the

15   data of people getting catastrophically injured

16   or killed as a result of contact with trains,

17   the help points were put in over a decade ago.

18   Have they been effective or not?

19           MR. KEAVENEY:  Objection.

20       A    I can't answer that question.

21       Q    Do you agree now that the help

22   points have been ineffective at reducing the

23   number of people being killed or

24   catastrophically injured by contact with

25   trains?

228

1

2            MR. KEAVENEY:  Objection.

3      A     I can't answer that question.

4      Q     Who can answer the questions about

5  the effectiveness -- from the Transit Authority

6  that is.  Who can testify from the Transit

7  Authority -- withdrawn.  Let me ask a brand new

8  question.  Who from the Transit Authority can

9  answer these questions about whether or not any

10  of the actions taken in the past have been

11  effective at reducing the number of people

12  being catastrophically injured or killed as a

13  result of contact with trains?

14      A     I don't know specifically, but I

15  imagine that would lie with the Office of

16  System Safety.

17      Q     Anyone in particular there that

18  would have knowledge of this?

19      A     Well, I think if you go to the vice

20  president of system -- Office of System Safety,

21  they would be able to -- if they -- if that --

22  if the vice president personally cannot provide

23  that information, they would have members on

24  their staff, I assume, who would be able to

25  provide that information.  Specifically how

229

1

2  they track that data, I -- I do not know.

3       Q    Okay.  And since you've seen the

4  data has gone up, you told us even from 2019

5  through 2022 we've had the highest number of

6  people ever being killed and catastrophically

7  injured by contact with trains, that whether it

8  be the help point, the announcements, the

9  messages, the signage, that the numbers have

10 gone up so they have not been effective, the

11 measures taken.  True or false?

12            MR. KEAVENEY:  Objection.

13      A    I cannot answer that question.

14      Q    Who could?

15      A    I don't know.

16      Q    So as of 2021, have the help

17 points, the announcements, the signage, the

18 messaging been effective at reducing the number

19 of people catastrophically injured or killed as

20 a result of contact with trains?

21            MR. KEAVENEY:  Objection.

22      A    I do not have any empirical

23 evidence of either, meaning help or not help.

24      Q    And do you recall --

25      A    That data I have not looked at.

230

1

2          Q      And you recall last time we talked
3     about safety performance indicators.  Do you
4     recall all that?
5          A      I believe so.
6          Q      Okay.  So does the Transit
7     Authority have any evidence to contradict the
8     statement that the measures taken so far have
9     been ineffective in significantly reducing the
10    number of people catastrophically injured or
11    killed as a result of contact with trains?
12         A      I personally don't, but I -- I
13    cannot speak for the entire Authority as to
14    whether or not any of that information exists.
15    The first place I would -- I would ask would be
16    the Office of System Safety.
17         Q      And you do understand that you are
18    here to be the representative of the Transit
19    Authority with all of its corporate knowledge
20    as a designated 30(b)(6) witness.  True?
21         A      I've been told that, but I can only
22    answer what I know.
23         Q      Okay.  Now, we went through last
24    time how the Transit Authority had offers from
25    twelve of the largest manufacturers of platform

231

1

2    screen doors, equipment manufacturers and

3    engineering consultants to install at little or

4    no cost to the Transit Authority platform

5    screen doors in exchange for ad revenue as per

6    the Transit Authority RFI solicitation.  So we

7    agreed that this was doable.  True?

8                MR. KEAVENEY:  Objection.

9        A    I agree that I read documents that

10   this was done, yes.

11       Q    Okay.

12       A    This was proposed.

13       Q    Okay.  And you saw the documents we

14   looked at last time that, in fact, not only did

15   twelve of the largest manufacturers say that

16   they were able to install platform edge doors

17   in the New York City Transit Authority system

18   at little or no cost to the Transit in exchange

19   for advertising revenue, that the Transit

20   Authority then narrowed it down to five

21   different manufacturers.  True?

22                MR. KEAVENEY:  Objection.

23       A    I recall reading that.

24       Q    Okay.  So you also -- we reviewed

25   briefly that there were offers of funding for

232

1

2    the number 7 extension to install platform edge

3    doors.  Do you recall that?

4            MR. KEAVENEY:  Objection.

5        A    I can't specifically recall that.

6        Q    Okay.  Well, let me ask you.  Do we

7    agree that there were offers of funding for

8    platform edge doors for the number 7 extension?

9        A    I -- I -- I can't recall.

10        Q    We showed you an e-mail a moment

11    ago that was marked for identification today

12    from Lisa Schreibman.  Do you recall who she

13    is?

14        A    I know who she is, yes.

15        Q    Okay.  And is Lisa -- and who is

16    Lisa -- who is or was Lisa Schreibman?

17        A    Currently she is a vice president

18    in the Department of Subways in charge of

19    capital programs, and previous -- prior to that

20    I believe she worked in the Operations Planning

21    group of New York City Transit.

22        Q    And if Lisa Schreibman sent e-mails

23    to the Transit Authority stating that there

24    could be funding for platform edge doors on the

25    number 7 extension line, you'd -- would you

233

1

2    have any reason to doubt her?

3        A    No.

4        Q    Okay.  And we agree that the

5    Transit Authority has never applied for any

6    kind of monies, grants or aids from the City of

7    New York, the State of New York, the United

8    States Government or any entity to get money

9    for platform edge doors to be installed in the

10   Transit Authority system.  True?

11       A    I am not aware of it.

12       Q    Okay.  So you're not aware of the

13   Transit ever applying for money to get grants

14   to install these devices, safety devices.

15   True?

16       A    Not to my knowledge.

17       Q    Okay.  And we agree that last year

18   the United States, President Biden passed the

19   largest infrastructure bill since FDR and the

20   depression.  True?

21            MR. KEAVENEY:  Objection.

22       A    I believe that's what I've heard in

23   the press.

24       Q    Has the Transit Authority applied

25   for any money from that infrastructure program

234

1

2    for improved safety of the New York City

3    Transit Authority system to prevent people or

4    reduce people from getting killed or

5    catastrophically injured by contact with

6    trains?

7                MR. KEAVENEY:  Objection.

8        A     I can't answer that.  I have not

9    looked at all the applications they have made

10   for funding.

11       Q     And after 9/11, Homeland Security

12   made monies available to the Transit Authority

13   for closed circuit TV.  True?

14       A     After 9/11, yes.  Homeland Security

15   has provided grants, yes.

16       Q     They've given money for wifi

17   throughout the subway system, true, for

18   communications?

19                MR. KEAVENEY:  Objection.

20       A     I'm not aware of for wifi.  I know

21   for electronic security projects, yes.

22       Q     Okay.  And part of electronic

23   security projects includes communications.

24   True?

25       A     Yes.  Fiber communication is what

235

1

2   we rely on for security communication, that we

3   get transmittal, et cetera.

4        Q    Okay.  And then closed circuit TV

5   was something Homeland Security gave funding

6   for.  Correct?

7        A    Correct.

8        Q    And track intrusion devices and

9   laser intrusion devices got -- can get funding

10  as well.  True?

11       A    Yes.  LIDs got funded, yes.

12       Q    And front cameras on trains can

13  also get funding from the Federal Government.

14  True?

15            MR. KEAVENEY:  Objection.

16       A    I -- I don't know.  We have never

17  applied for -- as far as I know, we have never

18  applied for a grant for cameras on the front of

19  a train for purposes of intrusion detection.

20       Q    Okay.  So between companies

21  offering to install platform edge doors at

22  little or no cost in exchange for advertising

23  revenue, and offers to give funding for

24  platform edge doors for the number 7 extension,

25  and infrastructure bills, and the Transit not

236

1

2   asking for money for platform edge doors, can

3   we agree that money is not the real reason

4   platform edge doors have not been installed?

5              MR. KEAVENEY:  Objection.

6        A     No, I can't answer that.

7        Q     Okay.  Does the Transit Authority

8   require strict adherence to the Americans for

9   Disability Act at all times for all subway

10  stations?

11       A     As far as I know, if you're doing

12  any renovation to the stations, there's certain

13  AD requirements that are triggered depending on

14  the activity you plan on performing within the

15  station, the dollar threshold of the investment

16  you're making in perhaps rehabilitating a

17  station, et cetera.

18       Q     Okay.  So if I understand you

19  correctly, sir, what you're saying is where a

20  station is renovated, it must have compliance

21  and strict adherence to the Americans with

22  Disabilities Act.  Yes?

23             MR. KEAVENEY:  Objection.

24       A     Depending on the dollar value of

25  your investment.

237

1

2          Q      So does that mean that the Transit

3     Authority requires strict adherence to the

4     Americans for Disability Act at all times for

5     all subway stations, yes or no?

6                 MR. KEAVENEY:  Objection.

7          A      I can't answer that question.

8          Q      Okay.  Out of the 472 subway

9     stations, how many of these stations are one

10    hundred percent ADA compliant?

11                MR. KEAVENEY:  Objection.

12         A      I would imagine all the new

13    stations that were recently built.  The Second

14    Avenue extension, Hudson Yards, I would believe

15    those would be built to meet all applicable

16    current standards.

17         Q      Okay.  So other than Second Avenue

18    and the extension to Hudson Yards, those are

19    the only train stations that are one hundred

20    percent ADA compliant.  True?

21                MR. KEAVENEY:  Objection.

22         A      I can't answer that question.

23         Q      Okay.  Well, what percentage of the

24    stations -- other than the brand new ones at

25    Second Avenue and Hudson Yards, what percentage

238

1

2      of the New York City Transit Authority stations

3      are one hundred percent ADA compliant?

4           A     I do not have that data.

5           Q     Okay.  When you say you don't have

6      this information, who does?

7           A     I'm trying to think where the best

8      source of this would be.  We do have an ADA

9      Compliance Group within the Construction &

10     Development Division of the MTA.  As to whether

11     or not they have that information readily

12     available, I -- I can't say.

13          Q     Well, has the Transit Authority

14     ever sought waivers or variances so that they

15     do not have to comply one hundred percent with

16     the ADA for its stations?

17                MR. KEAVENEY:  Objection.

18          A     I believe the source of that would

19     be, again, the Code Compliance group.  If there

20     is a project being developed and there is any

21     thought of a waiver from the building codes, it

22     would go through our Code Compliance group, and

23     they would then channel that to the state.

24          Q     So would it be fair to -- so

25     let's -- I understand you don't know the exact

239

1

2      number, but would it be fair to say that once

3      we remove the new subway stations like on the

4      Second Avenue line and the extension of the

5      number 7 to Hudson Yards, other than those new

6      stations, very few of the 472 train stations

7      are actually one hundred percent ADA compliant.

8      True?

9                    MR. KEAVENEY:  Objection.

10         A     I can't answer that question.

11         Q     Can you tell me, are five percent

12     of the stations one hundred percent ADA

13     compliant?

14         A     I can't answer that question.

15         Q     One percent?

16         A     I -- if -- if the three stations on

17     Second Avenue and Hudson Yards adds up to one

18     percent, then yes.

19         Q     Okay.  So other than the stations

20     on Second Avenue and Hudson Yards, would it be

21     fair to say that none of the other train

22     stations, subway stations in the Transit

23     Authority system are one hundred percent ADA

24     compliant?

25         A     I can't answer that question.

240

1

2          Q      Okay.  Of the stations -- putting

3     aside Second Avenue and Hudson Yards, how many

4     of the stations have elevators for people in

5     wheelchairs to get either up to an elevated

6     train platform or down to a subway platform?

7          A      We had a target, I believe, of a

8     hundred key stations.  I believe those are

9     mostly complete.  And then in this current

10    capital program, I believe there's another

11    fifty stations that will be made ADA compliant

12    with elevators.

13         Q      Okay.  So let's -- let's break it

14    down.  As of August 1st of 2016, how many

15    subway stations had elevators?

16         A      I can't recall that number right

17    now.  I --

18         Q      Was it less than one percent?

19         A      Less than --

20                MR. KEAVENEY:  Note my objection.

21    You can answer.

22         A      Less than one percent in 2016?

23         Q      Yes, sir.

24         A      I don't think that's correct.

25         Q      Okay.  Was it less than five

241

1

2    percent?

3         A     I do not have the numbers, but I

4    think that's readily available.  That --

5    that's -- that should be easily ascertained,

6    exactly how many stations were elevator

7    equipped in 2016.

8         Q     Okay.  Because we agree if there's

9    no wheel -- if there's no elevator for a

10   wheelchair to be able to get to a platform,

11   everything else is irrelevant in terms of ADA

12   compliance because the people can't get on the

13   trains.  Correct?

14              MR. KEAVENEY:  Objection.

15        A     No, I don't think that's correct.

16        Q     Okay.  So let me ask you, if

17   there's no elevator, how does a person in a

18   wheelchair get onto a platform to board a train

19   in a subway station that's below ground or

20   above ground?

21        A     Because I don't think the only

22   person that's deemed in that class of disabled

23   persons are folks sitting in wheelchairs.

24        Q     I understand.  That's not my

25   question.

242

1

2          A      There are blind people -- okay.

3          Q      That's not my question, sir.  My

4     question is a nice, simple one.  If you have

5     somebody who is in a wheelchair, okay, how do

6     they possibly use that subway, get onto the

7     subway platform if there's no elevator?

8          A      I -- I imagine somebody would have

9     to physically take them down the stairs.

10         Q      Okay.  So can we agree then that

11    once -- okay.  And we agree that when we talk

12    about ADA compliant, the code says it's got to

13    be compliant for wheelchairs.  True?

14         A      True.

15         Q      Okay.  So if it's not compliant for

16    wheelchairs and wheelchair clearance, the

17    station is not ADA compliant.  True or false?

18         A      I believe that's correct.

19         Q      Okay.  So if the -- so can we agree

20    that if we remove all the stations that do not

21    have elevators as of 2016, how many stations

22    would be left?

23         A      I don't have that number.

24         Q      Okay.  Well, let's assume that the

25    wheelchair can get to a platform.  Can we agree

243

1

2    then they have to be able to get on and off the

3    train from the platform to be able to be ADA

4    compliant?

5         A    Yes.

6         Q    And in order to do that -- let's

7    back up.  There is a gap between the edge of

8    the platform and the doorsill of the subway

9    car.  True?

10        A    Correct.

11        Q    Okay.  And if that gap distance,

12   whether it's in the horizontal or vertical or

13   both, is excessive, they cannot get their

14   wheelchair on or off the train.  True?

15        A    Correct.

16        Q    So if there's an excessive gap

17   distance, that is in violation of the Americans

18   for Disabilities Act.  True?

19             MR. KEAVENEY:  Objection.

20        A    That's a noncompliance.

21        Q    Because the Americans for

22   Disabilities Act has requirements for

23   acceptable or tolerable gap distances.  True?

24             MR. KEAVENEY:  Objection.

25        A    I believe that's true.

244

1

2          Q      Okay.  How many of the stations, as

3    of right now even -- withdrawn.  Putting aside

4    Second Avenue and Hudson Yards, are there any

5    other stations in the entire subway system that

6    are one hundred percent ADA compliant with

7    respect to gap distances?  In other words,

8    every single door on every single car of every

9    single train has an ADA compliant gap distance.

10         A      I don't have that information.  I

11   don't know.

12         Q      Can we agree that it is under five

13   percent?

14                MR. KEAVENEY:  Objection.

15         A      I -- I don't have the numbers so I

16   can't agree to that.

17         Q      Is it less than one percent?

18                MR. KEAVENEY:  Objection.

19         A      I can't agree to that.  I -- I

20   don't know.

21         Q      Well, let's look at some of this

22   information here.  Who would have that

23   information?

24         A      It's possible that MOW, Maintenance

25   Of Way, Track Engineering may have that

245

1    information.

2    information.

3        Q    Okay.  Well, do we agree that the
4    Transit Authority has issued its own guidelines
5    for gap distances that are in violation of the
6    Americans for Disabilities Act?

7                MR. KEAVENEY:  Objection.

8        A    I can't recall recently looking at
9    both documents so I could make that definitive
10   determination.

11       Q    Okay.  Well, has the Transit
12   Authority issued memorandums of understanding
13   involving car and line equipment clearances
14   where the Transit Authority has allowed gap
15   distances in the horizontal of well more than
16   double what the ADA requires?

17               MR. KEAVENEY:  Objection.

18       A    What I know is that yes, they
19   are -- they are -- they do issue MOUs that
20   govern the vertical and horizontal gaps so that
21   projects that are planned for construction they
22   know what the Transit Authority standard is.

23       Q    Well, let's take a look, okay,
24   because you keep talking about new stations and
25   I keep -- and I want to talk about existing

246

1

2    stations, because we've already agreed that new

3    stations are required to be ADA compliant.

4    True?

5         A    True.

6         Q    Okay.  So let's talk about existing

7    stations, not new ones.  Are you familiar with

8    the Gunn memo, David Gunn?

9         A    No.

10        Q    Are you familiar that the Transit

11   Authority has represented that there is a memo

12   by David Gunn that permits, according to the

13   Transit Authority, six-inch vertical and

14   horizontal platform gaps?

15        A    No, I'm not familiar with that.

16        Q    Such a policy would clearly be in

17   violation of the Americans for Disabilities

18   Act.  True?

19             MR. KEAVENEY:  Objection.

20        A    I believe so.

21        Q    Okay.  So such a policy would be

22   invalid.  True?

23             MR. KEAVENEY:  Objection.

24        A    Again, I'm not -- if I'm forced to

25   answer yes or -- true or -- yes or no, then I

247

1

2    will have to answer I -- I don't know.

3         Q     Well, if we have a retrofitted

4    existing station, is the gap in the horizontal,

5    according to the Americans for Disabilities

6    Act, to be no more than three or four inches

7    wide and two inches high?

8         A     Honestly, I have not been involved

9    in platform edge work for awhile, so I can't --

10   I don't recall what the distances are.  If you

11   have the latest MOU, then I imagine that they

12   would be reflected there.

13        Q     Has the Transit Authority ever

14   stated that it's difficult, if not impossible,

15   to achieve full ADA compliance with tracks for

16   the gap distance?

17        A     I can't recall personally seeing

18   that anywhere or reading that.  As -- as I said

19   earlier, I know they do have an MOU that

20   establishes, you know, what is the Transit

21   Authority standard.

22        Q     And has the Transit Authority ever

23   stated that as much as possible, in other words

24   not always, not a hundred percent, ADA

25   compliant platforms should only be built along

248

1

2    tangent or straight tracks?

3        A    I -- I can't recall exactly what

4    the MOU says or said.

5        Q    Well, according to the ADA, do we

6    agree that the maximum horizontal gap should be

7    four inches and the maximum vertical gap should

8    be two inches?

9            MR. KEAVENEY:  Objection.

10       A    I can't answer that question.

11       Q    And if there's new construction,

12   then the maximum horizontal gap is three inches

13   and the maximum vertical gap is one and-a-half

14   inches.  True?

15           MR. KEAVENEY:  Objection.

16       A    True, if that's what the ADA

17   requirement calls for.

18           MR. GENIS:  I'll tell you what.

19           Dave, can you please put up -- I'm going

20           to look at appendix number 1, Bates 6107.

21           If it's easier for you, I can give you

22           the first page of the MOU.  The first

23           page is Bates 6084.

24           MR. ROTH:  Can you tell if that's

25           an NYCTA Bates number or a --

249

1

2              MR. GENIS:  Yes.  NYCTA2.  And as I

3      say, I --

4              MR. ROTH:  Okay.  Fine.  Yes.  Just

5      give me the number.

6              MR. GENIS:  The front page is 6084,

7      then there are certain pages that I want

8      to address.

9              MR. ROTH:  So this is Exhibit 3,

10     Jones Day 2.

11             (Whereupon, Plaintiff's Exhibit 3

12     Jones Day 2 was marked for identification

13     as of this date.)

14             MR. GENIS:  When you get it up, let

15     me know, then we can let him look at the

16     cover and then we'll go to particular

17     pages.

18             MR. ROTH:  Two seconds.

19      Q    Okay.  We're showing you now, I

20     think it's Plaintiff's number 3 of today's

21     date, Bates stamped 61 -- I'm sorry.  That's

22     the wrong page.  The front page is 6084 Bates

23     number.  It's memorandum of understanding for

24     car and line equipment clearances.  Do you see

25     this, sir?

250

1

2          A       Yes.

3          Q       Okay.

4                  MR. GENIS:  Dave, could you please

5          go to page 15 which is Bates 6107,

6          appendix 1?  Okay.  Go to the top so we

7          can see the page.

8          Q       Okay.  Do you see how this is

9   appendix 1?

10         A       Yes.

11         Q       And it talks about platform gauge

12  and height standards to meet ADA regulations?

13         A       Yes.

14         Q       Okay.  And you see how they talk

15  about for construction of new platforms and

16  they give the exact citation for the Americans

17  with Disabilities Act, there should be a

18  maximum horizontal gap of three inches?  Do you

19  see that, sir?

20         A       Yes.

21         Q       And a maximum vertical gap of one

22  and-a-half inches --

23         A       Yes.

24         Q       -- between the car and the

25  platform.  True?

251

1

2          A      Yes.

3          Q      Okay.  And then for rehabilitation

4    of existing stations, also known as key

5    stations which have an exception under the ADA,

6    there should be a maximum horizontal gap of

7    four inches.  True?

8          A      Correct.

9          Q      And a maximum vertical gap of two

10   inches.  True?

11         A      Yes.

12                MR. GENIS:  Okay.  Dave, can you

13         now go to page 5 of the same report,

14         Bates 6088?

15         Q      Okay.  And do you see how it goes

16   to the A and B divisions?

17         A      Yes.

18         Q      The IRT and the BMT and IND lines?

19         A      Yes.

20         Q      Okay.  Do you see how they allow,

21   on the A division, a horizontal of as much as

22   seven and-a-half inches?  Do you see that, sir?

23         A      Yes.

24         Q      And -- and in the B division as

25   much as ten and-a-quarter inches.  True?

252

1

2          A     This is the gauge of new rail.  Are

3   we looking at the same thing?

4          Q     Yes.  Do you see where it says on

5   the right column under the B division it goes

6   to a high of ten and-a-quarter inches for the

7   horizontal.  True or false?

8          A     True.

9          Q     Okay.

10         A     For new rail to temporary edge.

11         Q     Okay.  So we agree that that's way

12  beyond what the ADA requires.  True?

13                MR. KEAVENEY:  Objection.

14         A     If you scroll back up and let me

15  see what the distance they were measuring.

16  This is -- this is between gauge of new rail to

17  structural edge, temporary edge.  It is using

18  the gauge of the new rail as the reference

19  point.

20         Q     This is involving a tangent track.

21  True?

22         A     Yes.

23         Q     And that's a straight track.

24  Correct?

25         A     Yes.

253

1

2          Q      And where there's a curved track

3    it's even more difficult for the Transit

4    Authority to comply with the ADA.  Correct?

5                 MR. KEAVENEY:  Objection.

6          A      On a curved track there are

7    remedies that they use to reduce the gap space,

8    such as gap fillers, et cetera.  So it depends.

9          Q      So you're saying -- let me ask you,

10   so are you telling us on a curved track the

11   Transit Authority is supposed to comply with

12   the ADA requirements for the amount of the gap?

13                MR. KEAVENEY:  Objection.

14         A      I believe for new -- new

15   construction, yes.  New stations.

16         Q      I understand that.  But you keep

17   talking about new.  Let's talk about existing

18   stations.  Are you telling us it's the position

19   of the Transit Authority with respect to

20   existing stations, that where there's a curved

21   track they are still supposed to comply with

22   the ADA requirements for gap distance?

23         A      I can't answer that.

24         Q      Well, does the Transit Authority

25   comply with ADA requirements on all of its

254

1

2    tangent or straight tracks for all of its

3    platforms?

4         A     I can't answer that.

5         Q     Does the Transit Authority comply

6    with ADA requirements for all curved tracks?

7         A     I can't answer that.

8              MR. GENIS:  Dave, can you please

9         go, on the same document, it's page 6,

10        Bates 6089?  Go to the bottom of the

11        page, please, paragraph 2.6.1.2.

12        Q     Do you see where it states

13   compliance with ADA requirements for newly

14   built, fully ADA accessible platforms and

15   curved tracks will be very difficult, if not

16   impossible, to achieve.  Do you see that, sir?

17        A     Yes.

18              MR. GENIS:  Okay.  Go to the next

19        page, Dave.  Page 7, Bates 6090.  We'll

20        look at the first bullet point about

21        halfway down.  Actually, we'll go

22        slightly above the first bullet point

23        first.  Next page, Dave.  Next

24        page, please.  Okay.  Stop, please.

25        Q     Do you see where it says

255

1

2    construction variations and lack of strict

3    quality control during the construction of the

4    platforms will also negatively impact the

5    compliance with ADA requirements regarding

6    horizontal gaps.  Do you see that, sir?

7         A    Yes.

8         Q    And then they talk about the

9    following guidelines must be adhered to.  Do

10   you see that?

11        A    Yes.

12        Q    And do you see the first bullet

13   point, as much as possible, fully compliant ADA

14   platforms should only be built along tangent

15   tracks.  Do you see that, sir?

16        A    Yes.

17        Q    Does as much as possible mean the

18   same as always?

19        A    No.

20        Q    Okay.  And then do you see on the

21   next bullet point where they are talking about

22   curved tracks and if this requirement is not

23   possible to be met, then the station platform

24   will not be able to meet the ADA horizontal gap

25   requirements unless retractable gap filling

256

1

2     devices are used?

3         A    Yes.

4         Q    Other than 14th Street, can you

5     name more than three stations that have

6     retractable gap filling devices?

7         A    Not off the top of my head.

8              MR. GENIS:  And in fact, Dave, can

9         you go to -- it's actually an STV

10        document so there's no Bates number, but

11        it's NYC platform screen door pilot

12        project, contract C32514, page 14.  If

13        you can't get it, you can't get it.

14        Q    But if your -- STV was a

15     consultant --

16             MR. ROTH:  You're asking for the

17        actual contract?

18             MR. GENIS:  No.  It's -- it's a

19        report on feasibility platform edge

20        barriers.  It's for the Canarsie line.

21             MR. ROTH:  So do you have -- do you

22        have the Bates number?

23             MR. GENIS:  There is no Bates

24        number on it.  This was from STV.

25             MR. ROTH:  Okay.

257

1

2          MR. GENIS:  It's dated July 24,

3     2017, page 14 of 42.

4          MR. ROTH:  By counsel, whatever

5     I -- I gave you the Dropbox link to

6     whatever STV exchanged to us via

7     subpoena.  Do you recall that?

8          MR. KEAVENEY:  I recall that.  I

9     want to know if this was included in

10    that.

11         MR. ROTH:  Yes, because he didn't

12    give us anything else, so that's the only

13    place it would be.  But in any event --

14         MR. GENIS:  If you can't find it,

15    that's okay.  I'll just keep moving.  I

16    don't want to waste time.

17         MR. ROTH:  I'll look for it while

18    you're doing your thing.

19         MR. GENIS:  No problem.  So I'll

20    keep talking while -- I'll keep asking

21    questions while you're looking.

22    Q    Okay.  The Transit Authority, you

23    told us, hired STV because STV was a reputable

24    and reliable, experienced consultant for

25    transit matters, particularly involving

258

1

2  platform edge safety.  True?

3              MR. KEAVENEY:  Objection.

4      A     I know that they were hired through

5  a competitive process where they turned out to

6  be the consultant that was selected by a -- a

7  committee.

8      Q     Okay.  So did the Transit Authority

9  hire them because they were disreputable --

10     A     No.

11     Q     -- and not credible?

12     A     No.

13     Q     Okay.  So the Transit Authority

14  found STV to be credible and reliable.  True?

15     A     Correct.

16             MR. KEAVENEY:  Objection.

17     Q     Experienced and skilled.  True?

18     A     I'm sorry?  Repeat that.

19     Q     Experienced and skilled.  True?

20     A     Yes.

21     Q     Knowledgeable.  True?

22     A     Yes.

23     Q     Okay.  And if STV wrote in a report

24  to the Transit Authority, pursuant to a

25  contract that the Transit Authority paid them

259

1

2    money for, that -- that the Transit Authority

3    has a gap at least double the recommended gap,

4    would you agree or disagree with that?

5         A    Would I agree if they wrote it?

6         Q    Yeah.  Would you agree with that

7    statement?

8         A    I would believe they would have

9    done their research and I would -- I would

10   agree, yes.

11        Q    Okay.

12            MR. ROTH:  Are you -- is the

13        document that you're requesting the

14        engineering design drawing and

15        specifications for platform screen door

16        pilot?

17            MR. GENIS:  It's the tier 2-3

18        report of feasibility of platform edge

19        barriers for L Canarsie line stations in

20        Manhattan.

21            MR. ROTH:  All right.  Just keep

22        going.

23            MR. GENIS:  All right.  I will.

24        Q    So -- okay.  So in other words,

25   even if the station has an elevator, if there's

260

1

2    an excessive gap, a person in a wheelchair

3    cannot get on or off the train safely.

4    Correct?

5                 MR. KEAVENEY:  Objection.

6         A     I would agree with that.

7         Q     Okay.  And where there's an

8    excessive gap, then the station itself is not

9    ADA compliant.  True?

10                MR. KEAVENEY:  Objection.

11        A     But there are boarding areas that

12   are used specifically by -- for wheelchairs.

13   You know, if there is -- if elevators are added

14   to a station, then they would have to make sure

15   that there's a special boarding area where the

16   gaps are addressed.

17        Q     Okay.  So let me see if I

18   understand you correctly.  Are you telling us

19   now that the Transit Authority does not have to

20   have every door of every car of every train ADA

21   compliant with respect to the gap distance?

22                MR. KEAVENEY:  Objection.

23        A     For a renovated station I believe

24   that's correct.

25        Q     Okay.

261

1

2          MR. ROTH:  Bob, let's take a break
3     right here.
4          MR. GENIS:  Yeah.  I need to go to
5     the bathroom, anyhow.  So it is now
6     12:27.
7          MR. ROTH:  Come back at 12:40.
8          MR. GENIS:  Okay.
9          MR. ROTH:  Thirteen minutes,
10    please.
11         MR. GENIS:  Sure.  All right.  So
12    turn off the camera.  It's 12:27 and
13    we're going to take -- I could use that
14    bathroom break, anyhow.
15         (Whereupon, a recess was taken from
16    12:27 p.m. until 12:40 p.m.)
17         MR. GENIS:  It is now 12:40.
18    Q    All right.  So sir, a moment ago
19  you were talking about a boarding area, so --
20  and we were discussing the gap distances
21  between platform and the train cars.  So was it
22  the policy of the Transit Authority, as long as
23  there was one boarding area, in other words at
24  least one door for one car, that the gap was
25  not excessive, that the station was ADA

262

1

2    compliant?

3              MR. KEAVENEY:  Note my objection.

4       A    I don't think it's one door for one

5    car.  I don't recall the length of it, but it's

6    definitely not the entire length of the

7    platform nor more than a car length.

8       Q    Okay.  So the boarding area that

9    you referred to would be for one car length of

10   one car of a train?

11      A    I can't recall the exact distance

12   of the boarding area, the exact width of it,

13   but I know it would not expand beyond a car

14   length.

15      Q    Okay.  So that boarding area could

16   be as little as one door of one car of the

17   entire train and as large as one car length.

18   Correct?

19             MR. KEAVENEY:  Objection.

20      A    Again, I don't recall the exact

21   dimensions, the exact width of the boarding

22   area, so I can't answer that question.

23      Q    Okay.  So -- well, let's back up to

24   make sure I understand you correctly then.

25   With respect to the gap distances and

263

1

2    wheelchair accessibility to get on and off the

3    trains from the platform, you're saying

4    according to the Transit policy, all that was

5    required to be ADA compliant was one boarding

6    area with gap distances that were ADA

7    compliant.  Is that what you're telling us?

8            MR. KEAVENEY:  Objection.

9        A    That's my understanding.

10       Q    Okay.  And to the extent you said

11   you weren't sure if it was just one door or --

12   or just one car, who would be knowledgeable

13   about that?

14       A    Definitely our -- our Compliance

15   Group.  Our Code and ADA Compliance Group.

16       Q    Who is in charge of that?

17       A    The name of the gentleman right

18   now, I would have to get back to you on that,

19   the exact name of the person that leads the ADA

20   and Code Compliance Group at the moment.

21       Q    All right.  So in other words,

22   let's -- let's talk about gap distances in the

23   stations.  So where there's a platform and it

24   has two sides to the platform, you know, let's

25   say for example an uptown and a downtown side,

264

1

2  if one side is ADA compliant but the other side

3  is not, do you consider that to be an ADA

4  compliant station with respect to the gap for

5  wheelchair accessibility?

6       A    No, because you would need a

7  boarding area if there is -- if there are

8  wheelchair passengers boarding and alighting

9  from either -- either edges of the platform,

10 then yes, you need a boarding area on either

11 side, on both sides.

12      Q    Okay.  So if -- so if it's not both

13 sides, it's a noncompliant station.  Correct?

14           MR. KEAVENEY:  Objection.

15      A    Again, if you have renovated that

16 station, you should have added the ADA boarding

17 elements to that platform if you had renovated

18 that platform, yes.

19      Q    And when you say the boarding

20 elements, you mean that one boarding area that

21 allows either one car door minimum or maximum

22 of one car to have an ADA compliant gap

23 distance between the platform and the -- and

24 the doors of the train.  True?

25      A    That's my understanding.

265

1

2          Q      Okay.  So once you have that one

3     boarding area on each side of the platform,

4     that station is now ADA compliant.  True?

5                  MR. KEAVENEY:  Objection.

6          A      For a renovated station, that would

7     be my understanding.

8          Q      Okay.  And how about for a station

9     that's not renovated?

10         A      Like a new station?

11         Q      So let's back up.  How many types

12    of stations are there?  I understand there's

13    new.  So for the old one it's either renovated

14    or not renovated.  Correct?

15                 MR. KEAVENEY:  Objection.

16         A      Right, but it depends.  There are

17    different levels of renovation.  So there's --

18    there's stations where you would simply go in

19    there, for example, at the lowest level and

20    repaint the station, or you may replace a

21    staircase, or you may, you know, repair some

22    columns, or you may redo the platform edges.

23    So there are projects that are strictly aimed,

24    for example, at replacing the platform edges

25    and ensuring that there are ADA compliant

266

1

2    boarding areas.

3         Q    So -- and if there's no renovation

4    of that nature, what do you call that station?

5         A    An unrenovated station.

6         Q    Okay.  As of 2016, August of 2016,

7    how many unrenovated stations were there?

8         A    I don't have that number.

9         Q    As of now, how many unrenovated

10   stations are there?

11        A    I don't have that number.

12        Q    Who would know that?

13        A    Our Planning Group would because

14   they have long range planning data.  So for

15   example, in putting together a five-year and

16   twenty-year capital program, there are projects

17   that are based on what's done, what needs to be

18   done.  So within our Planning Group I would

19   imagine they would have that data.

20        Q    So who in the Planning Group would

21   have this knowledge?

22        A    I would -- I would say you go to

23   the top and then they would be able to direct

24   you in the right direction, and the person that

25   leads our Planning division at the moment is

267

1

2    Fredericka Cuenca.

3         Q     Spell that, please?

4         A     Construction and Development

5    Planning.

6         Q     Spell her name, please?

7         A     Let me give you the exact spelling.

8    One second.  F-R-E-D-E-R-I-C-K-A.  Cuenca,

9    C-U-E-N-C-A.

10        Q     Thank you.  Okay.  So in a

11   renovated station, and you told us there's

12   different degrees of renovation, as long as

13   there is one boarding area on each side of the

14   platform, that station is ADA compliant.  True?

15                MR. KEAVENEY:  Objection.

16        A     True for purposes of a renovated

17   station.

18        Q     Okay.  And that's the Transit

19   Authority policy, is that they have to comply

20   one hundred percent with the ADA.  Correct?

21                MR. KEAVENEY:  Objection.

22        A     I believe that's what they do for

23   renovated stations, yes.

24        Q     Okay.  Now, if there's a bigger

25   station, for example, that has a local and an

268

1

2    express train, so now there's two platforms

3    with four sides, okay, in order for that train

4    station to be deemed ADA compliant with respect

5    to the gaps, do you require all four sides to

6    each have at least one boarding area where the

7    gap distance complies with the ADA

8    requirements?

9          A     I believe that's correct for any

10   renovated station and for each platform edge.

11         Q     And does the Transit Authority ever

12   get waivers or variances with respect to ADA

13   violations of gap distances for its stations?

14               MR. KEAVENEY:   Objection.

15         A     I can't answer that question.

16         Q     Who could?

17         A     It would be our ADA Code Compliance

18   Group.

19         Q     And who is the head of that?

20         A     I -- I can -- if you allow me, I

21   can --

22         Q     Sure.  Do you have that answer yet,

23   sir?

24         A     Can I -- can I -- can I look for

25   that and get back to you after the break?

269

1

2      Q     Sure.  Of course.  Sure.  That's

3    fine.  Okay.  Has the Transit Authority ever

4    claimed substantial compliance with respect to

5    its ADA compliance?  In other words, that it's

6    not a hundred percent, but it's substantially

7    good and that's good enough?

8                MR. KEAVENEY:  Objection.

9      A     I'm sorry.  Could you repeat that?

10     Q     Sure.

11                MR. GENIS:  Read it back.  Let's

12          see if it's English.

13                (Whereupon, the referred to

14          question was read back by the Reporter.)

15     A     I can't answer that question.

16     Q     Okay.  Well, would it be fair to

17    say that the Transit Authority does not have a

18    policy of exceeding ADA requirements?

19                MR. KEAVENEY:  Objection.

20     A     I can't answer that question.

21     Q     Okay.  I mean it might be wonderful

22    or laudable to exceed ADA requirements, but

23    it's not mandatory by the Transit Authority

24    that they do so.  True?

25     A     I would believe so.

270

1

2          Q    Okay.  In fact, as we've noted with

3    these gap distances, it might be onerous, if

4    not impossible, to require standards exceeding

5    ADA requirements.  True?

6                MR. KEAVENEY:  Objection.

7          A    That sounds fair.

8          Q    Okay.  In fact, we noted it may, in

9    fact, be impossible to comply with standards

10   that even meet the ADA, let alone exceed it.

11   True?

12               MR. KEAVENEY:  Objection.

13         A    I can't answer that question.

14         Q    Okay.  Well, the ADA is what the

15   law requires.  True?

16         A    True.

17         Q    Okay.  So we can't expect the

18   Transit Authority to do more than the law

19   requires.  True?

20         A    True.

21         Q    That would be unfair and

22   unreasonable to have the Transit Authority do

23   more than the law requires.  Correct?

24               MR. KEAVENEY:  Note my objection.

25         A    I can't answer that question.

271

1

2        Q    Okay.  So it's proper to require

3  one hundred percent ADA compliance for new

4  stations or if there's a total rehabilitation.

5  True?

6        A    For new stations I know absolutely,

7  yes.

8        Q    Okay.  Even for a new station, can

9  we agree the Transit Authority does not require

10  ADA standards to be exceeded, just met?

11        A    I would believe so.

12        Q    Okay.  And it's not proper to

13  require exceeding ADA standards for existing

14  stations where there's renovation or

15  rehabilitation.  True?

16        A    I would believe so.

17        Q    Okay.  And do we agree that the ADA

18  only requires that one door in the whole train

19  have proper wheelchair access, ingress, egress?

20        A    I can't answer that question.

21            MR. GENIS:  Dave, can you please

22        put the ADA on the screen?

23            MR. ROTH:  Can you be more

24        specific?

25            MR. GENIS:  Okay.  Let's see.  I

272

```
1
2        know we had a document that had a copy of
3        it, but let's see if I can find it
4        quickly.  Where did I have that?  Son of
5        a gun.  Okay.  I'm going to -- I think
6        I've got it right here.  Yes, I do.
7        Dave, can you please put Bates 364308?
8        If you need the first page of that, I can
9        tell you the first page, but --
10              MR. ROTH:  That's okay.
11       Q    What are you looking at now on your
12  screen, sir?
13       A    I was continuing to search for the
14  name of the gentleman that you asked for.
15       Q    Thank you.
16              MR. ROTH:  Is this Exhibit 4 or 5?
17              MR. GENIS:  I think we already did
18       5.  I'm asking you to keep track because
19       I haven't been making notes of it.
20              MR. ROTH:  I think this is 4.
21              MR. GENIS:  Okay.  Whatever.
22              MR. ROTH:  Exhibit 4, Jones Day 2.
23              (Whereupon, Plaintiff's Exhibit 4
24       Jones Day 2 was marked for identification
25       as of this date.)
```

273

1

2          MR. GENIS:  Go to 364308, please.

3      Okay.  That's it.  Let me see the top.

4      It says appendix A at the top.

5          MR. KEAVENEY:  What's the name of

6      this document?

7          MR. GENIS:  This is actually the

8      ADA code itself.  It's annexed to

9      meetings Transit Authority Bates 364306,

10     PSD, ADA and code compliance discussion,

11     May 10, 2017.  The attendees include

12     Mr. Jones.

13     Q     Do you see that, sir?

14     A     Yes.

15     Q     Okay.  So there was a meeting held

16  about ADA and code compliance for platform

17  screen doors.  True?

18     A     Yes.

19     Q     And you were at that meeting.

20  True?

21     A     Yes.

22     Q     And Mr. David Foell was there.

23  True?

24     A     Yes.

25     Q     Okay.  And there was a discussion

274

1

2  of what the ADA required.  True?

3       A    Yes.

4       Q    Okay.  So let's look at what the

5  ADA requires.  At the top of the page it

6  states,

7            MR. GENIS:  Dave, move up, please.

8       Dave, move up, please --

9       Q    -- "Per the ADA code there must be

10 an accessible path of travel from one door of

11 each train to the elevator."  Okay.  "(Or ramp

12 which serves as the exit path).  An accessible

13 path involves achieving proper gaps between the

14 train and the platform."  I'm going to stop

15 reading there.  Did I read that accurately?

16      A    Yes.

17      Q    Okay.  And then if you go down, it

18 talks about subpart C, section 1192.51 general

19 and then there's B.  Do you see that?

20      A    Yes.

21      Q    And then there's C.  And on C it

22 says, "Existing vehicles which are retrofitted

23 to comply with the one car per train rule," and

24 it gives the different sections of the Federal

25 requirements.  Do you see that?

275

1

2          A      Yes.

3          Q      And in key stations have at least

4    one door complying.  Do you see that?

5          A      Yes.

6          Q      Okay.  So do we agree that what the

7    ADA requires is that only one car door per

8    train is all that's required to have wheelchair

9    accessibility to comply with the Americans with

10   Disabilities Act.  True?

11         A      Yes.

12         Q      Okay.  And that's consistent with

13   what you told us earlier about at boarding

14   areas.  Correct?

15         A      Correct.

16         Q      So that the Transit Authority, it

17   would be improper for it to require anyone,

18   including itself, to exceed those ADA

19   requirements.  True?

20                MR. KEAVENEY:  Objection.

21         A      I would agree with that.

22         Q      Okay.  And there can be waivers of

23   the code for safety.  Correct?

24                MR. KEAVENEY:  Objection.

25         A      I would believe so.

276

1

2        Q      Okay.  In fact, that was discussed

3    at that meeting you were at.  True?

4        A      You'd have to refresh my memory.

5        Q      Sure.

6              MR. GENIS:  Dave, go to page

7        364306, the first page of this document,

8        and then we're going to look at paragraph

9        number 4.

10        Q      "A code waiver may be accepted by

11   stating that even though the pinch point gets

12   tighter, New York City Transit is increasing

13   safety by installing platform screen doors."

14   Do you see that?

15        A      Yes.

16        Q      Does that refresh your memory?

17        A      Yes.

18        Q      And then number 5, "The feasibility

19   study will include justifications for code

20   waivers and variances."  True?

21        A      True.

22        Q      Okay.  So --

23              MR. GENIS:  You can take it down

24        now, Dave.

25        Q      Okay.  And the Transit Authority

277

1

2    should be consistent in its approach to ADA

3    compliance.  Correct?

4         A    True.

5         Q    Okay.  So for example, the

6    requirements for the gap distances of only one

7    door per entire train is what's also applicable

8    for ADA compliance and requirements with

9    platform screen doors.  Correct?

10                 MR. KEAVENEY:  Objection.

11        A    I'd have to think about that some

12   more.

13        Q    Well, let me ask you some questions

14   while you're thinking.  You've already agreed

15   that the ADA does not require every car and

16   every door of its train to give sufficient

17   access for wheelchair, it only requires one

18   door per train.  True?

19        A    True.

20        Q    Okay.  And if anyone ever said that

21   the ADA requires every car to have all doors

22   wheelchair accessible, that's simply not true.

23   Correct?

24        A    Correct.

25        Q    And the ADA does not require every

278

1

2    inch of the platform -- of the edge of the

3    platform to be wheelchair accessible, just

4    enough to comply with that one door per train

5    rule.  True?

6           A     True.

7           Q     Okay.  And if someone said that the

8    ADA required more than one door per train, that

9    would be untrue.  Correct?

10          A     True.

11          Q     That would be misleading, in fact.

12   Correct?

13          A     I would believe so, yes.

14          Q     And if there was a study based on a

15   criteria that stated that the ADA supposedly

16   required more than one door per train to be

17   wheelchair accessible, that would be an invalid

18   study.  Correct?

19               MR. KEAVENEY:  Note my objection.

20          A     There are multiple ADA requirements

21   other than providing for a point of boarding.

22          Q     I understand, but that's not what

23   I'm asking you about right now, sir.

24               MR. GENIS:  Move to strike as

25          nonresponsive.

279

1

2          Q     If we're discussing point of

3     boarding, getting on and off the train, if

4     there was a study that said there's a criteria

5     that required exceeding ADA requirements, that

6     would be an invalid study.  Correct?

7                MR. KEAVENEY:  Objection.

8          A     I can't answer that question.

9          Q     Well, the Transit Authority would

10     never tell one of its contractors or

11     consultants that they had to exceed ADA

12     requirements.  True?

13          A     True.

14                MR. KEAVENEY:  Objection.

15          Q     Okay.  That would be hypocritical

16     to do that.  Correct?

17                MR. KEAVENEY:  Objection.

18          A     I guess so.

19          Q     Okay.  Now, one of the main reasons

20     that the Transit Authority has not installed

21     platform edge doors is because of ADA

22     compliance or noncompliance.  Correct?

23          A     No.

24          Q     Okay.  Well, let me ask you.  How

25     much of a consideration by the Transit

280

1

2    Authority is it that there be compliance or --

3    withdrawn.  Let me ask that in better English.

4    Okay.  Has the Transit Authority ever stated

5    that one of the reasons it will not install

6    platform screen doors is because stations are

7    not ADA compliant if they install the platform

8    screen doors?

9              MR. KEAVENEY:  Objection.

10        A    I can't answer the question the way

11   it's phrased.

12        Q    All right.  Let me try this another

13   way.  Okay.  We used the expression pinch

14   points before.  Do you recall that?

15        A    Yes.

16        Q    Okay.  So in other words, we have

17   stations and sometimes there are columns or

18   stairways, structures or elevators that are --

19   are somewhat close to the edge of the platform.

20   True?

21        A    True.

22        Q    Okay.  And where we have that,

23   where there's a column, a stairway, a

24   structure, an elevator that's too close to the

25   edge of the platform, then that platform in

281

1

2      that particular location is not ADA compliant

3      because there's not enough room for the

4      wheelchair to get off the train and have that

5      turning radius.  Correct?

6            A      Correct.

7            Q      Okay.  But all that's required for

8      the station to be ADA compliant is to provide

9      that one boarding area with that one door that

10     does have the access and no pinch point and a

11     proper turning radius.  Correct?

12           A      Correct for the --

13           Q      Okay.  So in other words, if there

14     are parts of any given station with the pinch

15     point where there's already a violation of the

16     ADA because at that particular spot the edge of

17     the platform has a column, a stairway, a

18     structure or an elevator too close to the edge,

19     then it already -- it's a pinch point so

20     there's not enough room for a wheelchair,

21     already that station in that spot is not ADA

22     compliant.  Correct?

23           A      Correct.

24                  MR. KEAVENEY:  Objection.

25           Q      And adding a platform screen door

282

1

2    in that one spot does not change its ADA

3    status.  Correct?

4          A     I can't answer the question the way

5    it's phrased.

6          Q     Well, if it's already -- that one

7    spot -- in other words, that one door is not

8    ADA compliant because of a pinch point, because

9    there is a column or a stairway or a structure,

10   an elevator too close to the edge, that

11   particular door is already noncompliant with

12   the ADA.  Correct?

13               MR. KEAVENEY:  Objection.

14         A     I want to expound, but I can't.  I

15   still can't answer the question the way it's

16   phrased.

17         Q     Okay.  So in other words, according

18   to the ADA you need a certain number of inches,

19   30, 36 inches, something to that effect, for a

20   person in a wheelchair to be able to get off of

21   the train and then be able to turn their

22   wheelchair left or right or to -- you know,

23   whatever.  Correct?

24         A     Correct.  And travel the length

25   of -- and travel.  They need a clear path of

283

1

2    travel without those pinch points --

3         Q    Okay.

4         A    -- that don't exceed the pinch

5    point width.

6         Q    Okay.  So where you already have

7    less than enough space for that, it's

8    already -- in that particular location it's

9    already not wheelchair accessible.  Correct?

10        A    Right, but you can't exacerbate the

11   problem by --

12        Q    Now, when you say you can't

13   exacerbate -- let's back up.  Can we agree one

14   cannot become more pregnant?  Either you're

15   pregnant or you're not.

16             MR. KEAVENEY:  Objection.

17        Q    True?

18        A    True.

19        Q    Okay.  And if there's already not

20   enough space, okay, between the edge of the

21   platform and a column, or a stairway, or a

22   structure, or an elevator for the wheelchair to

23   get out, it's already inadequate ingress,

24   egress for the wheelchair.  Correct?

25             MR. KEAVENEY:  Objection.

284

1

2          A      Correct.

3          Q      There's already not enough room for

4    it.  Correct?

5          A      Correct.

6          Q      It's already in violation of the

7    ADA.  Correct?

8                 MR. KEAVENEY:  Objection.

9          A      If it was a brand newly constructed

10   station, yes.

11         Q      And if it's an existing station

12   that's been renovated or rehabilitated, it's

13   still now in violation of the ADA, correct, --

14                MR. KEAVENEY:  Objection.

15         Q      -- in that spot?

16         A      It depends on the scope of the

17   renovation.  Yes.

18                MR. KEAVENEY:  We're hearing some

19         background noises from Mr. Roth.

20                MR. GENIS:  I'm sorry.  I didn't

21         hear it.  Okay.  Okay.  Dave.  Dave.

22                MR. KEAVENEY:  We're hearing

23         Mr. Roth's questions to Mr. Genis.

24                MR. GENIS:  Sorry.  Okay.

25         Q      Okay.  Let's talk about existing

285

1

2    stations.  Okay.  Just existing stations.  So

3    where there is a column or a structure, whether

4    it's a stairway or an elevator, in an existing

5    station and there is insufficient space for

6    that wheelchair to get out of the train car

7    from that door, that's already in violation of

8    the requirements for the ADA for that

9    particular door.  True or false?

10             MR. KEAVENEY:  Objection.

11        A    Again, I would still say depending

12   on whether or not the station has undergone

13   renovation and is required a certain degree of

14   renovation or it's new and it -- and it's

15   required to comply with those ADA requirements.

16        Q    Okay.  So if there hasn't been the

17   renovation or rehabilitation, then you're

18   saying it doesn't have to comply with the ADA,

19   anyhow.  Correct?

20        A    I believe the ADA law has certain

21   time limits, et cetera, has certain allowances

22   for preexisting -- you know, I'd have to like

23   read the ADA act again.

24        Q    So in other words, you're saying

25   there's like a grandfather clause?  If it's old

286

1

2      enough, you don't have to comply with the ADA.

3      Correct?

4           A     I believe there's some of that

5      there, --

6           Q     Okay.

7           A     -- if my memory serves correct.

8           Q     Okay.  So now there's a couple

9      options.  Either A, you do not have to comply

10     with the ADA to begin with.  Correct?  That's

11     one option?

12          A     Okay.

13          Q     Or two, you do have to comply with

14     the ADA.  Correct?

15          A     Correct.

16          Q     Okay.  And if you do not have to

17     comply with the ADA, then it doesn't matter if

18     you put in a platform screen door on the edge

19     of that platform and there's now, any given

20     door, not enough wheelchair access room because

21     the station does not have to be ADA compliant

22     to begin with.  True?

23                MR. KEAVENEY:  Objection.

24          A     That -- that would make sense.

25          Q     Okay.  And if the station does have

287

1

2    to be ADA compliant, if you already have a door

3    that's not ADA compliant, putting in a platform

4    screen door again makes no difference because

5    that particular door is already not compliant.

6    True?

7                MR. KEAVENEY:  Objection.

8         A     The logic makes sense.

9         Q     Okay.  And -- and even putting all

10   this aside, there are some alternative devices

11   and means that we're going to get into later

12   that don't violate the ADA regardless.  True?

13               MR. KEAVENEY:  Objection.

14        A     I can't speak to what you're going

15   to speak about.  I -- I can't answer to what

16   you're referring.

17        Q     That's fair enough.  So let me fill

18   in the question.  For example, we touched on,

19   and we're going to later on get into greater

20   detail, about rope platform screen doors.

21   Correct?

22               MR. KEAVENEY:  Objection.

23        A     You're saying you're going to get

24   into speaking about rope platform screen doors.

25   I hear you.

288

1

2          Q      Let me ask it -- you're not

3     understanding the question, so let me rephrase.

4     Okay.  We mentioned that there is a safety

5     device known as a rope platform screen door.

6     True?

7          A      Yes.

8          Q      And because that is in the

9     vertical, when it is open, that is not an issue

10    for ADA compliance one way or the other.

11    Correct?

12                MR. KEAVENEY:  Objection.

13         A      If it's open, I would imagine there

14    should be no issue.

15         Q      Okay.  If we lowered the entry

16    speed of a station -- of a train entering the

17    station, that has no affect on ADA compliance.

18    True?

19         A      The speed.  Not to my knowledge.

20    That should not.

21         Q      If you have closed circuit TV, that

22    does not affect ADA compliance.  Correct?

23         A      No.

24         Q      Front cameras do not affect ADA

25    compliance.  True?

289

1

2          A      No.

3          Q      Okay.  And if you do fixed rail but

4    not where there is a doorway to the train, then

5    there's also not an issue of ADA compliance.

6    True?

7                 MR. KEAVENEY:  Objection.

8          A      Not of ADA, but there are other

9    concerns with that.

10         Q      Understood.  But right now we're

11   focusing on ADA.  Okay.  So -- now, do we agree

12   that the Transit Authority instructed its

13   consultant not to use actual ADA requirements

14   and standards when investigating a station for

15   possible installation of platform screen doors?

16         A      I am not aware of that.

17         Q      Did the Transit Authority instruct

18   its consultant to require every door of every

19   car to be ADA compliant?

20         A      I believe that was a collective

21   decision reached based on the pros and cons,

22   et cetera.  And it would not be -- I believe

23   there were some reasons behind that decision,

24   that if you are going to impact -- reconstruct

25   a platform for platform screen doors, most

290

1

2      platform screen doors would require a

3      reconstruction of the edge to provide

4      structural stability to -- to -- to bear the

5      load of the platform screen doors, and if you

6      were going to do that, then you might as well

7      just make the entire platform ADA compliant.

8                    MR. GENIS:  Move to strike as not

9             responsive.

10          Q     That's not my question, sir.  All

11     I'm asking you, sir, yes or no, did the Transit

12     Authority instruct its consultant to require

13     for feasibility study every door of every car

14     of every train to be ADA compliant?

15          A     I can't recall specifically that

16     being a direction.

17          Q     Did the Transit ever tell its

18     consultant that the ADA required every door of

19     every car of every train to have wheelchair

20     accessibility?

21          A     Not to my knowledge.

22          Q     Did the Transit Authority ever tell

23     its consultant that if every door of every car

24     of every train does not have wheelchair

25     accessible, that they should say it is not ADA

291

1

2  compliant?

3      A    Not to my knowledge.

4      Q    If the Transit Authority ever did

5  that, that would be an untrue statement.

6  Correct?

7           MR. KEAVENEY:  Objection.

8      A    That's a hypothetical.

9      Q    Yeah.  So answer my hypothetical.

10     A    I can't answer that question.

11     Q    Well, if the Transit Authority ever

12 told its consultant that if -- if -- if every

13 single door of every car does not have

14 wheelchair accessibility, it's not ADA

15 compliant, that would be something misleading

16 and false.  True?

17          MR. KEAVENEY:  Objection.

18     A    I can't answer that question.

19     Q    Okay.  Let's start looking at some

20 things.

21          MR. GENIS:  Okay.  Dave, can you

22      please put up Bates 1265?

23          MR. ROTH:  Is that an NYCTA2 or an

24      NYCTA code?

25          MR. GENIS:  2.

292

1

2          MR. ROTH:  Is that the feasibility

3     study?

4          MR. GENIS:  No.

5          MR. ROTH:  Okay.

6          MR. GENIS:  It's an e-mail.

7          MR. ROTH:  Give me a second.

8          MR. GENIS:  1265.

9          MR. ROTH:  I'm sorry.  That's just

10    inside a bunch of -- a bigger document,

11    so just give me a second so I can

12    extract.

13    Q    You told us that you're familiar

14  with James Hemmerly.  Correct?

15    A    James Hemmerly.  Yes.

16    Q    And he was at STV, the TA's

17  consultant.  Correct?

18    A    He was a -- yes.  He was working at

19  STV at the time the feasibility study was done.

20  Yes.

21    Q    And are you familiar with a

22  Gricelda Cespedes?

23    A    Yes.

24          MR. GENIS:  And I'm going to spell

25    the name for the reporter.

293

1

2          G-R-I-C-E-L-D-A for the first name.  Last

3          name, C-E-S-P-E-D-E-S.

4          A     Yes.

5          Q     Who is she?

6          A     She's now retired, but at the time

7    I believe she was the head of Code Compliance

8    and ADA.

9          Q     And she was an engineer.  Correct?

10         A     Yes.

11         Q     And did Mr. Hemmerly ever ask --

12   include you on any e-mails about if according

13   to the Transit, do you need every door from an

14   arriving train to have ADA path on the platform

15   should a wheelchair bound passenger exit onto

16   the platform from any door?

17              MR. KEAVENEY:  Objection.

18         A     I couldn't recall at the time.  If

19   you have the document and you want to refresh

20   my memory, that's --

21              MR. ROTH:  I'm ready.

22              MR. GENIS:  Put it up.  Okay.

23         Scroll down a little, please.  First

24         let's see the page so he can see the

25         Bates number at the bottom.

294

1

2              (Whereupon, Plaintiff's Exhibit 5

3         Jones Day 2 was marked for identification

4         as of this date.)

5         Q     Do you see it's 1265?

6         A     Yup.

7         Q     Okay.  And at the bottom there's an

8    e-mail involving you, Mr. Jones, to Eric Jones

9    from James Hemmerly.  Correct?

10        A     Yes.

11             MR. GENIS:  Then go up the page,

12        please, Dave.

13        Q     Then there's an e-mail --

14             MR. GENIS:  Let's keep going.

15        Okay.  Hold on.

16        Q     Do you see Mr. Hemmerly wrote an

17   e-mail.  He has a question for Gricelda, and it

18   states, "If I understand correctly, you need

19   every door from an arriving train to have an

20   ADA path on the platform should a wheelchair

21   bound passenger exit onto the platform from any

22   door.  Please confirm."  Do you see that

23   e-mail?

24        A     Yes.

25             MR. GENIS:  Dave, can you scroll to

295

1

2          the top for the response?

3          Q     And the response from Gricelda

4   Cespedes to James Hemmerly with a cc to you

5   states, "Yes.  Every door."

6          A     Yes, I see that.

7          Q     Okay.  So does that refresh your

8   memory that the Transit Authority told its

9   consultant that every single door of every car

10  of every train had to have that wheelchair

11  bound accessible path --

12         A     Yes.

13         Q     -- in order to comply with the ADA?

14         A     Yes.

15               MR. KEAVENEY:  Objection.

16         Q     Okay.  And in fact -- and by the

17  way, these e-mails -- we've shown you last time

18  and today different e-mails.  These were all

19  created, kept and maintained by the Transit

20  Authority in the regular course of its

21  business.  Correct?

22               MR. KEAVENEY:  Objection.

23         A     I would imagine so, yes.

24         Q     And all of the documents that you

25  reviewed and you've seen so far in this case

296

1

2    are documents that were kept and maintained by

3    the Transit Authority in the regular course of

4    its business.  True?

5            MR. KEAVENEY:  Objection.

6        A    I -- from what I recall, yes.

7            MR. GENIS:  Okay.  Now -- okay.

8        Let's go to -- here we go.  Let's do it

9        in order.  Let's go -- Dave, can you

10        please put up Bates -- I'm sorry.  Did

11        the reporter say something?

12            THE REPORTER:  No.

13            MR. GENIS:  I thought you did.  My

14        apologies.  Dave, please go to Bates

15        387807.

16            MR. ROTH:  That's 387807?

17            MR. GENIS:  Correct.  That's

18        NYCTA2.  Before you put it up -- never

19        mind.  You already -- you already covered

20        that.  I already asked you about that.

21            (Whereupon, Plaintiff's Exhibit 6

22        Jones Day 2 was marked for identification

23        as of this date.)

24        Q    Okay.  And you see how it's 387807

25    on the bottom.  Correct?

297

1

2          A     Yes.

3          Q     And you see there's an e-mail from

4    David Foell to you.  True?  Yes?

5          A     Yes.  I'm just reading it.

6          Q     Okay.  And then he's writing, he

7    says, "Eric, per your earlier direction,

8    stations where one side of an island platform

9    are infeasible will automatically result in a

10   finding of infeasibility for the opposite

11   side."  Correct?

12         A     Yes.

13         Q     And I'm going to skip down here

14   where they're talking about Atlantic Avenue

15   IRT.  "We have an island platform serving the 4

16   and 5 train surrounded by two side platforms

17   serving the 2, 3 trains."  Am I reading it

18   accurately so far?

19         A     Yes.

20         Q     "The island platform is infeasible

21   for several reasons.  Most notably the columns

22   near the platform edge whereas the side

23   platforms are feasible."  Did I read that

24   accurately?

25         A     Yes.

298

1

2          Q      "How shall we apply your ruling

3    regarding consistency of approach in this

4    situation."  Do you see that?

5          A      Yes.

6          Q      And your answer --

7                 MR. GENIS:  Above that, please.

8          Q      And your answer was "Yes.  If the

9    train cannot open its doors."  Correct?

10         A      Yes.

11                MR. GENIS:  And Dave, can you just

12         go to the next page?  There's a picture

13         of what they're discussing.

14         Q      And do you see -- you see the Bates

15    number that's 387808.  Correct?

16         A      Yes.

17         Q      And you see that's a picture.

18    Correct?

19         A      Yes.

20         Q      And you see here in this picture it

21    says Atlantic Avenue?  You can see that on the

22    columns.  Correct?

23         A      Yes.

24         Q      And you see that there are columns.

25    True?

299

1

2          A     True.

3          Q     And the columns already encroach

4    upon the tactile yellow strip.  True?

5          A     True.

6          Q     So where those columns are, that

7    platform is already not ADA compliant because

8    there's not sufficient access for a wheelchair.

9    Correct?

10              MR. KEAVENEY:  Objection.

11         A     Between the -- between the column

12   and the rails of the stairs, I don't know what

13   that distance is.

14         Q     But can you answer --

15              MR. GENIS:  Move to strike as not

16         responsive.

17         Q     My question is where the column is,

18   each of those columns, if the door to the train

19   opens where that column is, can we agree that

20   is not ADA compliant because it's not

21   wheelchair accessible?

22              MR. KEAVENEY:  Objection.

23         A     Again, that goes back to the whole

24   issue of --

25         Q     Just answer my question, please.

300

1

2          A      I can't answer that question.

3          Q      Okay.  So you're telling us that

4     that column is taking up how much of that

5     yellow tactile strip?  Twenty-five percent?

6     Half?  You tell me.

7          A      It looks like between a third and a

8     half.

9          Q      Okay.  And the tactile strip is how

10    wide?

11         A      30.  30 inches.

12         Q      Okay.  So clearly at that point, if

13    the door opens where that column is, a

14    wheelchair cannot exit the train.  Correct?

15         A      Correct.

16         Q      Okay.  So -- but if you see,

17    looking at the photo to the left of that

18    column, there's like that diamond kind of

19    picture.  Do you see that on the ground?

20         A      Yes.

21         Q      Okay.  At that point it is ADA

22    compliant if a door opens there.  Correct?

23                MR. KEAVENEY:  Objection.

24         A      ADA -- ADA compliant for what?

25         Q      In other words, where there is no

301

1

2    column, there is no rail for a stairway, there

3    is no elevator or structure close to the edge

4    of the platform, if the train door opens there,

5    assuming it's not an excessive gap distance,

6    then a wheelchair can get on and off the train.

7    Correct?

8         A    Yes.  Yes.

9         Q    So, therefore, that platform is ADA

10   compliant because at least one car door is ADA

11   compliant for wheelchair accessibility.

12   Correct?

13              MR. KEAVENEY:  Objection.

14        Q    Meets your clearance?

15        A    Yes.

16        Q    Yes?

17        A    Yes.

18        Q    Okay.  And where the column

19   encroaches upon the tactile strip, if there's a

20   platform screen door there, it would not affect

21   it because it's already noncompliant where the

22   column is.  Correct?

23              MR. KEAVENEY:  Objection.

24        A    I can't answer that question.

25        Q    Well, if it's already not compliant

302

1

2   because there's not enough clearance for the

3   wheelchair, then it doesn't matter if there's a

4   platform screen door where that column is.

5   True or false?

6           MR. KEAVENEY:  Objection.

7       A     I can't answer that question.  I

8   would have to expound.

9       Q     And if there's plenty of wheelchair

10  clearance access, if there is a platform screen

11  door that opens in that area where that diamond

12  is, then it is ADA compliant.  Correct?

13          MR. KEAVENEY:  Objection.

14      A     For turning radius, yes.

15      Q     Okay.  So that Atlantic Avenue

16  station is ADA compliant then.  Correct?

17          MR. KEAVENEY:  Objection.

18      Q     And could accommodate a platform

19  screen door.  True?

20          MR. KEAVENEY:  Objection.

21      A     I can't answer that question.

22      Q     Well, you told us if there's just

23  one door, that's all the ADA requires that has

24  wheelchair clearance, and you told us in this

25  picture you could see that there's enough space

303

1

2    for wheelchair clearance.  Then that station

3    would be ADA compliant if it had a platform

4    screen door that opened where there was

5    clearance for the wheelchair.  True?

6                MR. KEAVENEY:  Objection.

7        A    There are other reasons why a

8    platform screen door can and cannot be

9    installed.

10       Q    That's a separate issue.  Right now

11   we're talking about ADA.

12               MR. GENIS:  Move to strike.

13       Q    Just answer my question, please.

14       A    I can't answer that question.

15       Q    Assume that area with the diamond

16   is where somebody can now head to an elevator.

17   Can we now agree that that Atlantic Avenue

18   station is ADA compliant?

19               MR. KEAVENEY:  Objection.

20       A    For purposes of turning radius,

21   yes.

22       Q    Okay.  And let's go to some others.

23               MR. GENIS:  Dave, can you put on

24       Bates 319919, please?

25               MR. ROTH:  I'm doing it.

304

1

2           MR. GENIS:  Okay.  And actually,

3      we'll start at the bottom of it, it's

4      three pages long, once you get to it.

5      Let's go to the bottom of it.

6           MR. ROTH:  It's just on the first

7      page because the other one is a

8      continuation.  I'm sorry.

9           MR. GENIS:  Okay.

10          MR. ROTH:  This has what you need.

11          MR. GENIS:  Okay, fine.

12          (Whereupon, Plaintiff's Exhibit 7

13      Jones Day 2 was marked for identification

14      as of this date.)

15      Q    So this is an e-mail to you from

16  David Foell.  Correct?

17      A    Yes.

18      Q    And this is another one created,

19  kept and maintained in the regular course of

20  business by the Transit Authority.  Correct?

21          MR. KEAVENEY:  Objection.

22      A    Correct.

23      Q    Yes?

24      A    Yes.

25      Q    Okay.

305

1

2              MR. ROTH:  And this is Exhibit 7.

3         Q    And it says, "Eric, we have another

4    situation similar to our discussion below.  On

5    Central Park West the IND stations of the B and

6    C trains are stacked:  Northbound on top,

7    southbound on bottom.  Two of these stations

8    are feasible at one level, but not the other.

9    Please give your recommendations regarding

10   feasibility at these stations."

11             MR. GENIS:  And then go up to see

12        your response.

13        Q    And it says, "Eric" -- I'm sorry.

14   This is from Foell again.  My apologies.  I'm

15   sorry.  I skipped in the middle.  In the middle

16   is your response.  "My statement is highlighted

17   below and will also apply."  Correct?

18        A    Yes.

19        Q    And then above that, "Eric, similar

20   to the situations described below, at 34th

21   Street Eighth Avenue we find that the A train

22   platform, the island platform is infeasible.

23   However, we already declared the E train

24   platform (side platform) to be feasible."  Did

25   I read that accurately?

306

1

2          A      Yes.

3          Q      "We will, therefore, revise the E

4     train report to show infeasibility with an

5     explanation."  True?

6          A      Yes.

7                 MR. ROTH:  Just for continuity

8          since we're on video, here is the

9          highlighted portion from the other e-mail

10         on page --

11                MR. GENIS:  It should be 31992.

12                MR. ROTH:  Yes.  It highlighted

13         what he was talking about.

14                MR. GENIS:  That's exactly what I

15         wanted to get to.

16         Q      Okay.  We see these other e-mails,

17    and now it has the highlight from you.  And do

18    you see that e-mail from Eric Jones to David

19    Foell?

20         A      Yes.

21         Q      Do you see it?

22         A      Yes.

23         Q      And you wrote, "If one of two

24    platform edges is infeasible, then we will

25    determine that the station is infeasible."

307

1

2    True?

3         A      Yes.

4         Q      Okay.  And what you told --

5              MR. GENIS:  Let's see.  Let's now

6         go to Bates 387829, please.

7              MR. ROTH:  I'm sorry.  Can you give

8         me that Bates number again, please?

9              MR. GENIS:  Sure.  387829.

10             MR. ROTH:  It's also three pages.

11        This will be Exhibit 8.

12             (Whereupon, Plaintiff's Exhibit 8

13        Jones Day 2 was marked for identification

14        as of this date.)

15             MR. ROTH:  It's up.

16        Q      Okay.  Now, you see that this is an

17   e-mail that you were cc'd on.  Correct?

18        A      Yes.

19        Q      All right.  And I'm going to read.

20   "Here is another location similar to the one I

21   wrote about for Atlantic Barclays station.  We

22   need to know if it is feasible to make a slight

23   relocation of the train stop at stations like

24   this to give room for platform screen doors."

25   Do you see that?

308

1

2          A      Yes.

3          Q      And then below that again, "Eric,

4    Don, here is another location where a slight

5    relocation of train stops will bring compliance

6    as we have space at the rear end of the train.

7    Please comment."  Do you see that?

8          A      Yes.

9          MR. GENIS:  Now let's go to the

10         next page, Dave, Bates 387830, with a

11         picture.

12         Q      Do you see the picture?

13         A      Yes.

14         Q      So in other words, an end car has

15   the end door, and where the door opens now may

16   or may not have sufficient wheelchair

17   clearance.  Correct?

18         A      Correct.

19         Q      But if the train is relocated just

20   a little bit, then there would be adequate

21   wheelchair clearance for that door.  Correct?

22         A      Correct.

23         Q      And then the entire train would

24   certainly be ADA compliant.  Correct?

25         MR. KEAVENEY:  Objection.

309

1

2          A      For wheelchair turning radius, yes.

3          Q      Thank you.  And if the other -- so

4     that would be coded as feasible then, correct,

5     for platform screen doors?

6          A      For this specific purpose you're --

7     you're talking about, yes.

8          Q      Okay.

9          A      But not for everything.

10         Q      Okay.  We're going to get to

11    everything in a minute.  And -- and even this

12    station, there's no mention that there's any

13    other problems at any of the other doors on

14    this train of not having sufficient wheelchair

15    clearance.  True?

16         A      I would have to review the report.

17         Q      Okay.  Well, what you originally

18    told the Transit is they just have to be ADA

19    compliant and wanted to know if the platform

20    screen doors will interfere with making a

21    station ADA compliant.  True?

22         A      Could you repeat that?

23         Q      Sure.

24              MR. GENIS:  Read it back.

25              And Dave, while she's doing that,

310

1

2          please pull up 364306.

3                  (Whereupon, the referred to

4          question was read back by the Reporter.)

5          Q    I'm going to withdraw the question.

6    That's another one.  What the Transit told its

7    consultant, they wanted to know if installing

8    platform screen doors interfere with making a

9    station ADA compliant.  Correct?

10         A    Sure.  Yes.

11         Q    Okay.

12                 MR. GENIS:  Dave, can you just put

13         up 364306, please?  You had it up before.

14                 MR. ROTH:  I'm sorry.  I had so

15         many things up.  You're saying it's -- do

16         you know what exhibit that was?

17                 MR. GENIS:  364306.  This is draft

18         meeting minutes May 10, 2017, ADA code

19         compliance discussion.  This is the one

20         that had a copy of the --

21                 MR. ROTH:  I understand that, but

22         unfortunately these documents have

23         multiple Bates numbers of the same thing,

24         so that's why yours doesn't match mine.

25         But it's coming up.

311

1

2          Q       Okay.   This we had up on the screen

3    before.   Do you see meeting minutes, issue

4    action description, number one, will installing

5    PSD interfere with making a station ADA

6    compliant.   A, installing PSD can prevent a

7    station from becoming ADA compliant and/or make

8    an existing ADA compliant not compliant.

9    Correct?

10         A       Yes.

11         Q       Okay.   So -- so that's the

12   question, is -- either the station is already

13   compliant or it's not.   Correct?   Yes?

14         A       I'm just reading it to digest it

15   again.

16         Q       I understand, but can you answer my

17   question, please?

18         A       I can't answer that question.

19         Q       Okay.   Well, the -- they wanted to

20   know if you put in a PS door, platform screen

21   door, would that prevent a station from

22   becoming ADA compliant.   Right?   That's one

23   question, will it do that.   Correct?

24         A       Yes.

25         Q       Or will it make an existing ADA

312

1

2    compliant station not compliant.  Correct?

3        A    Yes.

4        Q    Okay.  So as we said, as long as

5    there's that one door in the entire train that

6    gives wheelchair clearance and accessibility,

7    then you're ADA compliant.  Correct?

8              MR. KEAVENEY:  Objection.

9        Q    That's what you told us repeatedly

10   today.  Correct?

11       A    Correct.

12       Q    Okay.  And as long as the platform

13   screen door allows that clearance for that door

14   for wheelchair and access to the elevator, that

15   station is ADA compliant.  Correct?

16             MR. KEAVENEY:  Objection.

17       A    I think so.

18             MR. GENIS:  Okay.  Now, Dave, can

19        you please go to Bates 133853?

20             MR. ROTH:  What's the number again?

21             MR. GENIS:  133853.  It's three

22        pages.  It's another minutes of meeting

23        for the platform screen door or pilot

24        feasibility review for the Canarsie line

25        station.

313

1

2          Q      Okay.  Do you see the date on it,

3     June 2, 2017?

4          A      Yes.

5                 MR. GENIS:  And Dave, can you go to

6          the last page so we can see who the

7          attendees are?

8          Q      All right.  Do you see your name

9     there?

10         A      Yes.

11         Q      Okay.  David Foell is also there,

12    Jim Hemmerly is also there.  True?

13         A      Yes.

14         Q      Gricelda Cespedes is there as well.

15    Correct?

16         A      Yes.

17         Q      Okay.

18                MR. GENIS:  Now go back to the

19         first page.  Okay.  And let's go to

20         item 5, please.

21         Q      Do you see where it says ADA access

22    at train doors?

23         A      Mm'hm'.  Yes.

24         Q      Do you see where it says New York

25    City Transit policy exceeds the requirements of

314

1

2     the ADA one door per vehicle?

3          A     Yes.

4          Q     Do you see that?  Okay.  Didn't you

5     tell us earlier that that's not true and that

6     that's not valid and that's not proper, --

7                MR. KEAVENEY:  Objection.

8          Q     -- and that you would never tell a

9     contractor to do that, or a consultant?  Do you

10    recall giving all that testimony under oath

11    today, sir?

12               MR. KEAVENEY:  Objection.

13         A     Not the way you worded it.

14         Q     Okay.  You told us it would be

15    misleading to do that.  Correct?

16               MR. KEAVENEY:  Objection.

17         Q     We're going to get back to this

18    document later, but do you see on number 1,

19    fixed barriers, the last line, "Per Eric Jones,

20    this solution should be deleted from all

21    further consideration."  True?

22         A     The screen is currently being

23    blocked by Mr. Roth's --

24         Q     He highlighted it.

25         A     One second.  Oh, it's my -- my --

315

1

2   my -- my screen being blocked.  Okay.

3          Q     Do you see that, sir?

4          A     Right.  I said the solution was

5   already reviewed by NYCT senior management and

6   rejected per the -- yes.

7          Q     So in other words, fixed barriers

8   were one of the four suggested solutions, and

9   fixed barriers are essentially guardrails with

10  no moving parts mounted with openings to

11  coincide with train door openings.  True?

12         A     True.

13         Q     Okay.  So in terms of ADA

14  compliance, as long as the fixed rail has

15  sufficient opening for wheelchair clearance and

16  access to the elevator, it's ADA compliant.

17  Correct?

18         A     And providing it's not affecting

19  the path of travel.  Yes.

20               MR. GENIS:  Okay.  By the way, can

21         you go to item 7, please?

22         Q     Barrier wall advertising.  Who is

23  L. Tonn, T-O-N-N?

24         A     Linda Tonn.

25         Q     And then it says, "The reference to

316

1

2    advertising under pros should be deleted."  Do

3    you see that?

4         A    Yes.

5         Q    Do you remember how we discussed

6    one of the pros or the benefits of using -- of

7    having advertising on these platform screen

8    doors is it raises revenue?  Do you recall

9    that?

10              MR. KEAVENEY:  Objection.

11        A    I recall that discussion, yes.

12        Q    Okay.  And can you tell me, when is

13   getting advertising revenue for the Transit

14   Authority not a pro?

15        A    I couldn't answer that.

16        Q    Okay.  When is it bad to earn

17   revenue?

18              MR. KEAVENEY:  Objection.

19        A    I can't answer that.

20        Q    Does the Transit have a policy we

21   don't want revenue?  We don't want ad revenue,

22   we don't want money?  Do they have that policy?

23        A    Not that I'm aware of.

24        Q    Was there ever a policy that it

25   is -- it's no longer a positive or a pro to get

317

1

2    revenue?

3         A    Not that I'm aware of.

4         Q    Why was this reference to

5    advertising under a pro deleted?

6         A    I'm sure Ms. Tonn had a reason for

7    it.  I can't recall at this moment.

8         Q    Okay.  Why did the Transit

9    Authority walk away from a no cost or low cost

10   platform edge door program by original

11   equipment manufacturers?

12              MR. KEAVENEY:  Objection.

13        A    I can't speak to that.  I don't

14   know.

15        Q    Well, you are aware that that's

16   exactly what happened.  Correct?

17              MR. KEAVENEY:  Objection.

18        A    I'm aware that they had a -- that

19   they did not move forward with that.

20        Q    Okay.  Why?

21        A    I can't say.

22        Q    Who would have the answer to that

23   question?

24        A    I imagine senior -- the senior

25   executives who would have played a part at the

318

1

2    time that decision was or was not made.

3        Q     Well --

4        A     It predates my involvement.

5        Q     Okay.  Was a decision ever made?

6    You said made or not made.  Was a decision ever

7    made to say yes, there were these companies

8    that responded to our RFI, and you saw who

9    those companies were, you were familiar with

10   those companies and those companies said that

11   they could do it and they could install the

12   platform screen doors at little or no cost to

13   the Transit in exchange for the advertising

14   revenue.  Do you recall all that?

15       A     I recall that.

16       Q     Okay.  Is that a positive or a

17   benefit to the Transit Authority?

18       A     It sounds like that would be a

19   benefit.

20       Q     That's a pro.  Correct?  There's

21   pros and cons.  That's a pro?

22       A     It sounds that way.

23       Q     Okay.  So you work in Capital

24   Program Management.  Anytime you can get the

25   Transit Authority money, it's a good thing,

319

1

2  right, or save them money.  True?

3        A     I guess I would see -- have to see

4  what the circumstances are.  I wouldn't make

5  that blanket statement, yes.

6        Q     So as a blanket statement, you

7  don't want to save the Transit Authority money.

8  Am I correct?

9              MR. KEAVENEY:  Objection.

10       Q     That's what you're saying?

11       A     No, that's not what I'm saying.

12       Q     Okay.  So we agree it's always a

13  good thing to save the Transit Authority money.

14  True?

15       A     Not at the cost of perhaps other

16  mitigating factors that you have to consider.

17       Q     Okay.  So let's look at other

18  factors.  You told us that the platform screen

19  doors are the most effective means of

20  preventing people from being killed or

21  catastrophically injured as a result of being

22  hit or run over by a train.  Do you recall

23  that?

24              MR. KEAVENEY:  Objection.

25       A     To my knowledge, yes.  That's the

320

1

2    most -- the best way to prevent those incidents

3    from occurring.

4        Q    And we went through last time the

5    many other benefits of platform screen doors

6    being installed.  Do you recall that?

7        A    Yes.

8        Q    Okay.  So when you get the benefit

9    of saving life, preventing people from being

10    maimed, plus other benefits, and all at little

11    or no cost, when is that not a good idea?

12        A    There are possible occasions when

13    that still probably is not a good idea, but --

14        Q    Tell me.

15        A    If you explore all the potential

16    options, you look at the pros, the cons, the

17    ramifications and then you come to an educated

18    decision, that's -- that's how you should go

19    about it.

20        Q    Okay.

21            MR. GENIS:  So move to strike as

22        not responsive.

23        Q    Can you give me -- tell me why

24    right here when they -- when the Transit

25    Authority spent thousands of hours and work and

321

1

2    money on all of this, and had offers from

3    twelve or thirteen original equipment

4    manufacturers, and then they narrowed it down

5    to five who would install platform screen doors

6    to save life and limb and have other benefits

7    for the Transit at little or no cost to the

8    Transit, why didn't the Transit do it?

9              MR. KEAVENEY:  Objection.

10       A     I do not know.

11       Q     Okay.  Would that have been a good

12   thing or a bad thing to have gotten platform

13   screen doors installed at little or no cost to

14   the Transit Authority to save life and limb and

15   all the other benefits associated with it?

16             MR. KEAVENEY:  Objection.

17       A     I can't answer that question.

18       Q     Who could?

19       A     The individuals who made the

20   decision at the time and would have known what

21   was the premise for their decision.

22       Q     And who were those people?

23       A     As I said previously, it would be

24   the executives of the organization.

25       Q     Who?

322

1

2          A      I wasn't around at the time and I

3     can't recall the exact years.  I'd have to go

4     back, look who was the -- the -- the chairman,

5     who was the president, who was the vice -- the

6     senior vice president of the Department of

7     Subways, because I would imagine that they were

8     all involved in that decision.

9          Q      So who was involved in the decision

10    to delete the reference to advertising as being

11    a pro?

12         A      Again, I would have to ask Ms. Tonn

13    or you may have to ask her as to exactly what

14    was the reason behind that.  I'm sure it was

15    probably discussed at this meeting, but I can't

16    recall what was the premise behind that.

17         Q      You told us the number one job of

18    the Transit is to have a safe system.  True?

19         A      Yes.  That's a very important

20    responsibility.

21         Q      What's more important than saving

22    life and limb?

23         A      I don't think there is anything

24    more important.

25         Q      Okay.  So since the number one goal

323

1

2    is to save life and limb and you had -- and the

3    Transit had an opportunity to save life and

4    limb by getting, at little or no cost, the

5    installation of these effective safety devices

6    that have other benefits as well, can you tell

7    me why it wasn't done?

8         A     No, I can't.

9               MR. KEAVENEY:  Objection.

10        Q     Okay.  So the Transit Authority is,

11   at the present time, still no better off than

12   it was two decades ago.  True?

13              MR. KEAVENEY:  Objection.

14        A     I can't answer that question.

15        Q     No better off than it was a decade

16   ago in terms of safety and preventing people

17   from getting run over and/or hit by trains and

18   dying, being catastrophically injured.  True?

19              MR. KEAVENEY:  Objection.

20        A     I can't answer that question.

21        Q     Well, the numbers have gone up.

22   Correct?

23        A     Be more specific.

24        Q     We went through last time how the

25   numbers of people getting hit or run over by

324

1

2    trains and killed or catastrophically injured

3    have increased over the years.  True?

4         A    I believe it has increased and

5    decreased at times, but for 2019 to '21 --

6    there was a definite increase from between 2019

7    and 2021.

8         Q    And that's despite the lowest

9    ridership ever because of the pandemic.

10   Correct?

11        A    Correct.

12        Q    Okay.

13             MR. GENIS:  All right.  Dave, can

14        you please put up Bates 3266?

15             MR. ROTH:  3266?

16             MR. GENIS:  Yes, sir.  While you're

17        doing that, I'll ask some more questions.

18        Q    Let me ask you, sir, we were

19   talking before about as long as you have that

20   safe boarding area, you have ADA clearance

21   and -- and the station complies with the ADA.

22   Do you recall that?

23        A    Yes.

24        Q    And since nothing is more important

25   than safety, if it's feasible to have a

325

1

2      platform screen door -- edge door on one side

3      of the platform, even if you think it's not

4      feasible on the other side, can we agree that

5      even putting it up on one side can help prevent

6      people from being killed or catastrophically

7      injured?

8           A    On the side it is, I would imagine

9      that would help.

10          Q    And even if you couldn't do one

11     hundred percent of the edge of the platform, if

12     you could do ninety-five percent or ninety

13     percent, that would still be a good thing to

14     help save lives and prevent people from

15     catastrophic injuries.  True?

16          A    True depending on the type of

17     intrusion we're talking about.

18          Q    And -- and as we said earlier, if

19     you can't use a -- there's different height

20     platform screen doors.  True?

21          A    True.

22          Q    And there's different types of

23     platform screen doors.  True?

24          A    True.

25          Q    And some can be mounted from the

326

1

2    top, some are from the bottom.  Correct?

3         A     True.

4         Q     And then there's the other safety

5    devices we've been talking about as well.

6    Correct?

7         A     What specific safety --

8         Q     I'll get into that later.

9         A     Okay.

10        Q     Now --

11             MR. GENIS:  Dave, that's not the

12        document I actually asked for.  Dave,

13        that's not the document I asked for.

14             MR. ROTH:  You didn't say 3266?

15        I'm sorry.

16             MR. GENIS:  I did.  I did.  I said

17        3266.

18             MR. ROTH:  That's 3266.  Is it

19        maybe 3266 --

20             MR. GENIS:  And 3267.

21             MR. ROTH:  Is it 3266 NYCT, not

22        NYCT2?  Is that possible?

23             MR. GENIS:  Mine doesn't have an

24        NYCT on it, so I don't know.

25             MR. ROTH:  Okay.  Hold on.  Just

327

1

2          give me a second.

3                   MR. GENIS:  I'll ask some other

4          questions while he's doing that.

5                   MR. ROTH:  Is 32 -- is 3266 the --

6          is 3266 the Atlantic terminal?

7                   MR. GENIS:  Yes.

8                   MR. ROTH:  Okay.  It's coming up

9          right now.  I'm sorry.  That was NYCTA1.

10         I apologize.

11                  (Whereupon, Plaintiff's Exhibit 9

12         Jones Day 2 was marked for identification

13         as of this date.)

14         Q     And do we agree doing something is

15   better than doing nothing to save lives?

16         A     Yes.

17         Q     Okay.  Now we're looking at a

18   portion of a report on feasibility on platform

19   edge barriers, the Atlantic Avenue station at

20   Barclay Center.  Do you see that?

21         A     Yes.

22         Q     Okay.  And do you see why it says

23   it's not feasible, because it would result in

24   noncompliant ADA conditions?

25         A     Yes.

328

1

2          Q     Correct?  And it says specifically

3     that the minimum width of 32 inches would not

4     be met at multiple locations and there would be

5     a bottleneck.  Do you see that?

6          A     Yes.

7                MR. GENIS:  Okay.  And let's go --

8          Dave, two pages down there's a diagram.

9          Okay.  There we go.

10         Q     Do you see this diagram?

11         A     Yes.

12         Q     Okay.  And you see how on the right

13    where the column and the stairway is, if

14    there's -- it's already not compliant with the

15    ADA.  True?  If there's a door right there?

16         A     Correct.  For path of travel.

17         Q     Okay.  However, if the door is over

18    a little bit, then there is adequate access,

19    correct, and clearance for a wheelchair?  True?

20         A     I don't know about a little bit.

21    I'd have to -- you know, we'd have to see the

22    dimensions.

23         Q     Well, you see right there it shows

24    43 inches and you see a man standing there.

25    You can see there's an opening because that's

329

1

2    where the stairway comes down.  True or false?

3         A    There's 43 inches between the train

4    and the staircase, yes.

5         Q    Okay.  And then where the staircase

6    ends, like where that man is standing in the

7    photo, there's even more an impeded access and

8    clearance for a wheelchair to travel to an

9    elevator.  True?

10        A    Where the man is standing?

11        Q    Yes, sir.

12        A    Yes.  There's more clearance where

13   he is.

14        Q    Okay.  And then look on the picture

15   on the left.  And you see again that where that

16   column is there's sufficient space on the

17   bottom for a platform screen door.  Correct?

18             MR. KEAVENEY:  Objection.

19        A    Enough space on the bottom?

20        Q    Do you see on the picture on the

21   left --

22        A    The 44 inches.

23        Q    -- there's 44 inches.  Correct?

24        A    Yes.

25        Q    So that means there is adequate

330

1

2    space.  Correct?

3          A      For the --

4          Q      For wheelchair clearance.

5          A      Well, there's the 16 inch radius as

6    well as the path of travel and pinch points.

7          Q      So let's go --

8          A      It has to be --

9          Q      So let's go point by point.

10         A      Okay.

11         Q      First of all, you told us earlier

12   it has to be 32 inches for wheelchair clearance

13   or a maximum of 36 inches, correct, for that

14   turning radius?

15         A      The -- no.  The turning radius is a

16   60 inch diameter.

17         Q      So the pinch point is 32 inches.

18   Correct?

19         A      Correct.

20         Q      Okay.  And we see here from the

21   edge to the column on the picture on the left

22   is 44 inches.  Correct?

23         A      Yes.

24         Q      Okay.  And you see the elevator

25   right there.  Correct?

331

1

2          A      Yes.

3          Q      So where -- and you see the picture

4    on the left there's a man standing there with

5    the door -- when the train door opens, it's

6    unimpeded access and clear access to the

7    elevator.  True?

8                 MR. KEAVENEY:  Objection.

9          A      Where the man is I can't see -- I

10   don't know if it's connected to the picture to

11   the -- to the left.

12         Q      We're talking about the picture on

13   the left, sir.  Let's try this again.  When you

14   look at the picture on the left, do you see a

15   man standing by the elevator?

16         A      Yes.

17         Q      Okay.  And do you see how there's

18   clear, unimpeded access for a wheelchair with

19   clearance if that's --

20         A      Yes.

21         Q      -- where the door was to the train

22   to get to the elevator.  Correct?

23         A      Yes.  Yes.

24         Q      Okay.

25                MR. KEAVENEY:  Objection.

332

1

2          Q      All right.  So that would mean that

3    this station is ADA compliant.  Correct?

4                 MR. KEAVENEY:  Objection.

5          A      For all three aspects, path of

6    travel, turning radius and pinch points, is

7    that what you're asking?

8          Q      Yes.  If the door is right there

9    where we discussed for the train, at that one

10   point, even if nowhere else, that point makes

11   it ADA compliant.  True?

12                MR. KEAVENEY:  Objection.

13         A      True.  If the person is traveling

14   from that train door to that elevator, yes.

15         Q      Okay.  Okay.  So for the

16   feasibility studies that you had conducted, did

17   you ever tell the consultant that as long as

18   there's one door with an accessible path of

19   travel, that would meet the strict reading of

20   the ADA code?  Did the Transit Authority ever

21   say that to its consultant --

22         A      Not to my recollection.

23         Q      -- for the feasibility study?

24         A      Not to my recollection.

25         Q      So let me ask you, how many

333

1

2   stations -- one second.  Let me back up a

3   second.  I asked you before --

4          MR. GENIS:  You can take it down

5      now, Dave.

6      Q     I asked you before how many

7   stations have platforms with gaps that are ADA

8   compliant other than the new ones on Second

9   Avenue and Hudson Yards.  Do you recall that?

10     A     Yes.

11     Q     And how many stations with a gap

12  were ADA compliant one hundred percent?

13     A     I told -- I believe -- I recall

14  saying I do not have those numbers.

15     Q     How about the percentage?

16     A     I don't have that, either.

17         MR. GENIS:  Okay.  All right.  You

18     know what?  I need to have a quick

19     bathroom break.  We're going to stop the

20     camera now.  It's 2:06.  We're going to

21     take a short break.

22         (Whereupon, a recess was taken from

23     2:06 p.m. until 2:29 p.m.)

24         MR. GENIS:  I have 2:29.

25     Q     Okay.  Sir, yes or no, did the

334

1

2    Transit Authority ever do a hazard analysis to

3    compare the number of deaths and catastrophic

4    injuries from contact with trains in a run over

5    if there's platform screen doors or as the

6    system is right now, yes or no?

7         A    Not to my knowledge.

8         Q    Did they ever do such a hazard

9    analysis comparing use of fixed rail as opposed

10   to how it is now?

11        A    Not to my knowledge.

12        Q    Did they ever do a similar hazard

13   analysis for rope platform screen door barriers

14   or vertical barriers?

15        A    Can I go back to a question before

16   where I --

17        Q    Just answer this question, sir, --

18        A    Okay.  Go ahead.

19        Q    -- yes or no.  Did the Transit

20   Authority ever do a hazard analysis to compare

21   the number of people killed or catastrophically

22   injured as a result of contact with trains,

23   whether hit or run over, if they have fixed

24   rail or as the system is right now?  Did they

25   do that, yes or no?

335

1

2          A      Not to my knowledge.

3          Q      Did they do such a hazard analysis

4    with respect to rope platform screen door

5    barriers, vertical barriers?

6          A      Not to my knowledge.

7          Q      Did they do such a program for

8    closed circuit TV and front cameras?

9          A      Not to my knowledge.

10          Q      Did the Transit Authority ever do

11    any kind of study to -- withdrawn.  Did the

12    Transit Authority ever have a safety plan for

13    the Atlantic Avenue Barclays station terminal

14    to prevent or reduce people being killed or

15    seriously injured as a result of contact with

16    trains, yes or no?

17          A      I can't answer that question.

18          Q      At any time before August 2nd of

19    2016 did the Transit Authority ever perform any

20    kind of study to see how to prevent or reduce

21    people from getting killed or injured at that

22    Atlantic Avenue Barclay station, yes or no?

23          A      I am not aware of any.

24          Q      Before August 2nd of 2016, did the

25    Transit Authority ever have a safety plan for

336

1

2      that station to prevent or reduce the number of

3      people getting killed or seriously injured by

4      contact with trains, yes or no?

5           A     I don't know.

6           Q     Before August 2, 2016, did the

7      Transit Authority ever do a study to see how to

8      best protect and prevent people from being

9      killed or seriously injured or reduce these

10     amounts as a result of people being hit or run

11     over by trains, yes or no?

12          A     I don't know.

13          Q     Okay.  Did the Transit Authority

14     ever do a study to see if there was actual

15     compliance with the ADA for wheelchair

16     clearance at the stations it claimed were not

17     feasible due to an alleged ADA violation where

18     they used excessive standards?

19               MR. KEAVENEY:  Objection.

20          A     I don't know.

21          Q     So in other words, we already

22     discussed how the Transit told its consultant

23     to use criteria that was not the ADA and

24     exceeded the ADA and based on that said that

25     stations were not feasible.  How many stations,

337

1

2    if they used actual ADA criteria, were in fact

3    feasible?

4         A    I can't answer that question.

5         Q    Did they ever do a hazard analysis

6    to determine whether or not crowding of

7    platforms in terms of hazard analysis played a

8    role?

9         A    I don't know.

10        Q    Okay.  All right.  When the Transit

11   Authority has contracts, they have a legal

12   procurement process they're supposed to go

13   through.  True?

14        A    True.

15        Q    And they have to do bids.  Correct?

16        A    Bids are --

17        Q    Yes or no?  Yes or no?

18        A    No.  Not only bids.

19        Q    Okay.  And when the Transit does

20   this, these monies are earmarked for specific

21   purposes.  True?  Yes or no?

22        A    True.

23        Q    And the monies cannot just be used

24   for some other purpose willy-nilly.  True?

25   True or false?

338

1

2          A       I can't answer the way it's

3    phrased.

4          Q       Well, if money is allocated for a

5    particular purpose, can it be used for another

6    purpose that's unrelated to that?  Yes or no?

7          A       I have seen that happen.

8          Q       I didn't ask if you've seen it

9    happen.  Is it supposed to happen or is that

10   improper?

11         A       I can't answer that question.

12         Q       Okay.  So let me ask you, this is

13   public monies.  If money had been allocated for

14   purpose A, is it proper for the Transit

15   Authority to now use it for purpose B?

16              MR. KEAVENEY:  Objection.

17         Q       Yes or no?

18         A       I can't answer that question.

19         Q       If monies are allocated for a scope

20   of work for studies and for furthering safety

21   of the system, is it an acceptable means -- is

22   it proper to use that money for legal purposes

23   for helping the Transit Authority defend

24   lawsuits?

25              MR. KEAVENEY:  Objection.

339

1

2          A      I can't answer that question.

3          Q      Is a consultant supposed to be --

4     withdrawn.

5               MR. GENIS:  I need a break again

6          for a second.  We are stopping the clock

7          at 2:33.

8               (Whereupon, a recess was taken from

9          2:33 p.m. until 2:39 p.m.)

10              MR. GENIS:  It's 2:39.

11         Q      Okay.  Sir, was there ever -- did

12    the Transit Authority ever do a hazard analysis

13    to compare reduction of speed, entry speed of

14    trains as they enter stations as opposed to how

15    it is now with respect to the number of

16    preventable deaths and catastrophic injuries

17    due to contact between trains and people?

18         A      I don't know.

19              MR. KEAVENEY:  Objection.

20         Q      Was that ever done before

21    August 2nd of 2016, a hazard analysis to see

22    about speed and reduction of entry speed of

23    trains into stations with respect to as it is

24    currently or as it was at the time with no

25    reductions of speed?

340

1

2          A      I don't know.

3                 MR. KEAVENEY:   Objection.

4          Q      Okay.  Who would know if there was

5    ever a hazard analysis to see the effect of

6    speed, entry speed of trains at the stations

7    with respect to prevention or reduction of

8    injury or catastrophic injury caused by contact

9    with trains?

10         A      I would imagine the Office of

11   System Safety.

12         Q      Okay.  Sir, you traveled to Europe

13   for the purposes of looking personally at

14   platform screen door systems installed in

15   comparable subway systems.  True?

16         A      Yes.

17         Q      Okay.  And when you went there, you

18   saw that they were successful.  Correct?

19         A      I saw that platform screen doors

20   were successfully installed at some locations,

21   yes.

22         Q      And when you saw in Europe under

23   comparable systems in London and Paris, you saw

24   that they, in fact, had eliminated deaths

25   caused by contact with trains.  True?

341

1

2              MR. KEAVENEY:  Objection.

3        A     I do not recall what the exact data

4   showed in terms of pre and post platform doors.

5        Q     Do you recall that you learned that

6   there was certainly a huge reduction in

7   injuries, if not deaths, from contact with

8   trains where there were platform screen doors

9   installed in Europe.  True?

10       A     Yes.

11       Q     Not only were these programs

12  successful in that they had dramatic reduction

13  in death and serious injury caused by contact

14  with trains, they had expanded their platform

15  screen door programs.  True?

16             MR. KEAVENEY:  Objection.

17       A     I am not aware of the nature of the

18  expansion in Paris and in London.  I am aware

19  that the only new -- the only place they had

20  installed platform screen doors is on the new

21  cross rail.

22       Q     Can you answer my question, yes or

23  no, sir.  Did any of them -- did you learn that

24  these other cities were planning on expanding

25  their platform screen door programs, yes or no?

342

1

2          A      Yes, at the time.

3          Q      Okay.  Have you learned that any of

4     these cities, London, Paris or any other

5     comparable cities, have removed platform screen

6     doors because they were ineffective or unsafe

7     or caused more hazards?

8          A      Not to my knowledge.

9          Q      Okay.  Sir, there have been various

10    pilot projects, tests on platform screen doors

11    in New York City.  True or false?

12         A      Various pilot projects.  There are

13    two pilot projects that I'm aware of.  True.

14         Q      Okay.  And these projects, a lot of

15    man hours went into it from the Transit

16    Authority.  Thousands of hours.  True?

17         A      A lot of time went into it.  True.

18         Q      Transit Authority spent millions of

19    dollars on consultants and -- and engineers for

20    these pilot projects for platform screen doors.

21    True?

22         A      True.

23         Q      Okay.  The platform screen door

24    pilots were canceled.  True?

25         A      I'm aware of one pilot that was

343

1

2   canceled.

3        Q      Has a single pilot been held for

4   platform screen doors in the City of New York?

5        A      None that went all the way through

6   to construction so far.

7        Q      And the pilot -- they kept

8   switching the locations for where the pilots

9   would be.  Correct?

10        A      There were a number of changes,

11   yes.

12        Q      And then there were changes to what

13   the pilot program would be testing for.  True?

14        A      Not what it was testing for fully,

15   no.

16        Q      So things were changed.  Correct?

17        A      Locations were changed.  Correct.

18        Q      And one of the -- okay.  And what

19   is the purpose of performing a pilot?

20        A      It's basically to demonstrate how

21   that technology would function within a given

22   environment.  Given our New York City Transit

23   subway system, the purpose of the pilot would

24   have been to see how well it performs in this

25   environment from an engineering perspective,

344

1

2   from an operational perspective, et cetera.

3          Q       Okay.  And in fact, in London in

4   1999 they had already installed platform screen

5   doors in one of their train lines.  True?

6          A       I know when I went there in 2016

7   there was one line with platform screen doors.

8          Q       That's not what I'm asking.

9                  MR. GENIS:  Move to strike.

10         Q       In London they did it in 1999.

11  True or false?

12         A       I can't recall the exact year.

13         Q       Well, was -- in London did they

14  complete the platform screen door more than a

15  decade before you went there?

16         A       I can't recall the year.

17         Q       Paris did it well before you went

18  there as well.  True?

19         A       Before I went there, yes.

20         Q       Is there a reason that New York

21  City Transit has never done a pilot project for

22  platform screen doors since they've been

23  talking about it since the 1980s?

24         A       I can only speak for the -- my

25  tenure and my involvement.

345

1

2          MR. GENIS:  Move to strike as not

3      responsive.

4      Q      Just ask -- answer my question.

5   Yes, there's a reason.  No, there is not.

6   Please answer the question.

7      A      I can't answer the question.

8      Q      Okay.  Does anybody know why the

9   City of New York Transit Authority has never

10   completed a pilot project to test platform

11   screen doors?

12      A      I can't answer that question.

13          MR. GENIS:  Let me break for a

14      second.  I'm sorry.  I have to stop so I

15      can look at my notes.  2:45.  We're

16      stopping it at 2:45.

17          (Whereupon, a recess was taken from

18      2:45 p.m. until 2:59 p.m.)

19          MR. GENIS:  I have 2:59.

20      Q      All righty.  Sir, I believe you

21   told us that stations need to be rehabilitated

22   because everything has a certain life

23   expectancy.  True?

24      A      True.

25      Q      So you have to rehabilitate and

346

1

2    renovate platforms.  Correct?

3          A      True.

4          Q      Tracks, track beds, all of that.

5    Correct?

6          A      True.

7          Q      So in fact, the life expectancy of

8    precast affects how long it lasts for.

9    Correct?

10              MR. KEAVENEY:  Objection.

11         Q      Precast concrete I'm talking about

12   for platforms.  True?

13         A      True.

14         Q      So you have to replace them in any

15   event.  True?

16              MR. KEAVENEY:  Objection.

17         A      I don't know the frequency, but --

18         Q      Okay.  Okay.

19              MR. GENIS:  Well, Dave, can you

20         please put up 533539?

21              MR. ROTH:  Say that again.

22              MR. GENIS:  533539.

23              MR. ROTH:  Okay.  I believe that's

24         Exhibit 10.

25              MR. GENIS:  Okay.

347

1

2                    (Whereupon, Plaintiff's Exhibit 10

3          Jones Day 2 was marked for identification

4          as of this date by the Reporter.)

5          Q     We're looking at an e-mail and it

6    talks about -- do you see how it says, "Many

7    precast platforms have reached the end of their

8    useful life and require replacement in the next

9    five years.  So as a criteria for feasibility

10   of PSDs, platform screen doors, I'm not sure

11   that precast should be an eliminating factor."

12   Did I read that accurately so far?

13         A     Yes.

14         Q     It then says that "Our precast

15   panels having a useful life of ten to fifteen

16   years so properly coordinated for a replacement

17   program may actually be an advantage to

18   platform screen door installation."  True?

19         A     That's what's written there by that

20   gentleman.

21         Q     And do you agree with that?

22         A     Not necessarily.

23         Q     Okay.  Not necessarily means a

24   hundred percent of the time.  What part of that

25   do you disagree with and why?

348

1

2          A      Using precast platforms, there's a

3    whole structural study done by the consultant,

4    and it's not only about replacing the precast

5    platforms, it's that you now have to use a

6    different kind of slab to -- to support the

7    load that would be added by the platform screen

8    doors.  So it's not simply just replacing the

9    precast platforms, but it's -- instead of

10   precast you would probably have to have poured-

11   in-place platforms, structural platforms to

12   withstand the weight of the platform doors.

13         Q      Okay.  Let's -- let me back up a

14   little bit.  First of all, Kevin Caston went to

15   Europe with you.  Correct?

16         A      Yes.

17         Q      And he's knowledgeable.  Correct?

18         A      He's -- I don't know the extent of

19   his knowledge, but he is, obviously, a

20   knowledgeable gentleman in various aspects.

21         Q      Is he more knowledgeable than you

22   when it comes to concrete?

23         A      I don't know.

24         Q      Okay.  Well, since he's the one

25   writing the e-mail -- what's his title?

349

1

2          A      At the time he wrote this e-mail I

3    think he was -- I know he worked in Maintenance

4    of Way Engineering.  He would have been a

5    manager or a director.

6          Q      By the way, when you -- when you

7    make comments about the concrete not being able

8    to sustain the weight of platform screen doors,

9    you are aware that in Paris they shored up

10   their platforms and had no problem with the

11   platform screen doors.  True?

12               MR. KEAVENEY:  Objection.

13         A      I can't answer the question the way

14   it's worded.

15         Q      Let me rephrase it then.  You saw

16   in Paris an older system that's comparable to

17   New York City.  True or false?

18         A      Yes.

19         Q      And in Paris they shored up their

20   platforms.  True or false?

21         A      Platforms that were underground

22   stations, not aboveground stations.

23         Q      Okay.  So yes that they shored up

24   platforms for underground stations so that they

25   could properly hold the weight of platform

350

1

2    screen doors.  Yes?

3         A    Correct.  For underground stations,

4    yes.

5         Q    Thank you.  Okay.  And other cities

6    have also done retrofit and they've been able

7    to -- to address this challenge.  Correct?

8              MR. KEAVENEY:  Objection.

9         A    Be specific.

10        Q    Sure.  Shanghai, they also did it.

11   Correct?  Cost efficiently.  True?

12        A    I -- I -- I -- I can't recall what

13   Shanghai did in terms of retrofit.

14        Q    Okay.  By the way, when you say

15   here in New York some of our stations cannot do

16   it -- by the way, you have an international

17   report.  Correct?

18        A    Yes.

19        Q    And if your international report

20   stated that Shanghai replaced the concrete and

21   did it efficiently to -- to hold platform

22   screen doors, that would be accurate.  True?

23        A    Underground or -- or -- or --

24        Q    If your report stated that in

25   Shanghai they were able to replace the concrete

351

1

2    on the platform to be able to hold the weight

3    of platform screen doors and did it efficiently

4    and shored it up, would that be a true or false

5    statement?

6            A       The report would be correct.

7            Q       Okay.  Thank you.  By the way, when

8    you say that -- that some of the platforms

9    cannot hold the weight, what testing has been

10   done on platforms to see whether or not they

11   can hold the weight?

12           A       We have a structural analysis that

13   was done by STV and it addressed all of that.

14   It's a document that you may have access to or

15   you may request.  And it basically went into a

16   full explanation as to why these elevated

17   platforms with precast concrete were not -- it

18   provided calculations, it provided all the

19   reasoning, the engineering, the reasoning

20   behind why these -- these precast slabs were

21   not capable of withstanding the -- the load

22   that would be added by platform screen doors.

23           Q       Okay.  So first of all, if those

24   platforms are shored up, then they could --

25   then they could withstand the weight.  True or

352

1

2    false?

3              MR. KEAVENEY:   Objection.

4        A      False.

5        Q      Okay.   So did you ever look at the

6    cost of shoring up platforms instead of just

7    replacing them?

8        A      For underground stations, yes.

9        Q      Okay.   And when you said false, you

10   saw in other cities like Paris and Shanghai

11   they shored up the platforms to be able to

12   successfully hold the weight of the platform

13   screen doors.   True or false?

14             MR. KEAVENEY:   Objection.

15       A      I can't answer the question the way

16   it's worded.

17       Q      Okay.   And if you're going to

18   replace the platforms anyhow because of the end

19   of the useful life, then you might as well do

20   it the right way to uphold the weight.   True or

21   false?

22             MR. KEAVENEY:   Objection.

23       A      I can't answer the question the way

24   it's worded.

25       Q      When the testing was done, did they

353

1

2      do boring in the concrete to properly analyze

3      its -- what its weightbearing capacity was?

4           A      Not to my knowledge.

5           Q      Were they permitted to do

6      destructive testing to see what its

7      weightbearing capacity was?

8           A      Not to my knowledge.

9           Q      Did they examine about fixed rail

10     or rope because they're lighter and can be put

11     on precast cement.  True?

12          A      Not to my knowledge.

13          Q      Okay.  So nobody examined to see

14     about using the rope platform screen doors

15     which does not put the same weight on the

16     platform.  True or false?

17          A      I can't answer the question the way

18     it's worded.

19          Q      So nobody studied the rope

20     barriers.  Correct?  The rope platform screen

21     doors.  True or false?

22                 MR. KEAVENEY:  Objection.

23          A      False.

24          Q      Okay.  When did you study it?

25     You're the one that ordered it not be studied.

354

1

2    True?

3         A    There was -- there was a white

4    paper that was done by STV, I think I testified

5    to that earlier, which they looked into the

6    pros and cons and the feasibility of using rope

7    -- the rolled up rope type platform screen

8    barriers and issued their recommendation, which

9    was not to use them.

10        Q    Sir, you've seen that the rope

11   barriers have been effectively used in other

12   parts of the world.  True or false?

13        A    I can't answer that question.

14        Q    Did you ever go in person to look

15   with your own two eyes about the rope platform

16   screen door barriers anywhere?

17        A    No.

18        Q    Okay.  Did anyone from the Transit

19   do so?

20        A    Not to my knowledge.  I can't -- I

21   don't know.

22        Q    And fixed rail barriers also weigh

23   less than platform screen doors.  True?

24        A    That would be true.

25        Q    Okay.  And platform screen doors

355

1

2    for underground stations can also be mounted to

3    the roof.   True?

4         A      Not --

5                MR. KEAVENEY:   Note my objection.

6         Q      True or false?

7         A      They are part -- they can be

8    partially supported by the roof, but,

9    obviously, they have to also be attached to the

10   surface of the platform.

11        Q      So that would mean less

12   weightbearing for the platform.   True or false?

13        A      That would -- that's possible.

14        Q      Okay.   And in fact, the FTA has

15   asked the Transit to look into rope platform

16   screen door barriers after that white paper was

17   written that you just referred to by STV.   True

18   or false?

19        A      I can't recall that.

20               MR. GENIS:   Let me take another

21          break to look through my notes.   I'm

22          going to take a break.   It is 3:09.

23               (Whereupon, a recess was taken from

24          3:09 p.m. until 3:13 p.m.)

25               MR. GENIS:   It's 3:13.

356

1

2          Q      Did the Transit Authority ever do
3    any hazard analysis regarding changing limited
4    line of clearance with respect to accidents and
5    injuries caused by the amount that they had?
6          A      I don't know.
7          Q      STV made certain recommendations
8    and requested the Transit Authority to change
9    its operations.  Did the Transit Authority
10   accept or reject these recommendations?
11                MR. KEAVENEY:  Objection.
12         A      You'd have to be more specific.
13         Q      Did Transit Authority ever change
14   its operations with respect to the
15   recommendations made by STV?
16                MR. KEAVENEY:  Objection.
17         A      I would need to know what
18   recommendations specifically you're referring
19   to.
20         Q      All right.  I'll talk specifically
21   about clearance.  STV recommended that they
22   change the limited line of clearance.  Did the
23   Transit Authority do so or not?
24                MR. KEAVENEY:  Objection.
25         A      No.

357

1

2          Q      Okay.   So the Transit Authority

3   rejected the recommendation of its retained

4   engineering consultant, STV, in that regard.

5   True?

6                 MR. KEAVENEY:   Objection.

7          A      True.

8          Q      Okay.   When the Transit Authority

9   retained STV, the Transit Authority gave all

10  relevant and pertinent studies and reports and

11  findings and records to STV so that they could

12  properly do their study and evaluation.   True?

13         A      I can't answer the question the way

14  it's worded.

15         Q      Well, did the Transit Authority

16  hold anything back from STV?

17         A      No.

18         Q      Okay.   So the Transit Authority

19  gave everything they had to STV so that STV

20  could do a proper job.   True?

21         A      I can't answer the question the way

22  it's worded.

23         Q      Sure.   The Transit Authority gave

24  every -- all the records it had so that STV

25  could do as Transit Authority wanted it to do.

358

1

2    True?

3              MR. KEAVENEY:  Objection.

4        A    I can't answer the question the way

5    it's worded.

6        Q    Has Transit Authority done anything

7    to change their operations of trains within

8    stations for the safety of passengers to

9    prevent them or reduce the chances of them

10   being hit or run over by trains?

11       A    I don't know.

12       Q    Okay.  What are the costs of

13   litigation payouts and litigation costs for --

14   for claims related to people being hit by

15   trains?

16       A    I don't know.

17       Q    Did the Transit ever do analysis to

18   see if it's cheaper to litigate these cases

19   than to actually effectuate the repairs to

20   prevent these incidents from occurring?

21       A    I don't know.

22       Q    Is it, in fact, cheaper for the

23   Transit Authority to litigate these cases than

24   install platform screen doors and make other

25   changes to make it safer for the public?

359

1

2              MR. KEAVENEY:  Objection.

3         A     I don't know.

4         Q     When you say you don't know this,

5    who would know all these things?

6         A     Perhaps our -- our Legal

7    Department.

8         Q     Okay.  How much was the total cost

9    of the Second Avenue subway when it was

10   finalized and completed?

11        A     I can't recall the exact amount.

12        Q     What was the total cost when it was

13   finalized for Hudson Yards?

14        A     I can't recall the exact amount.

15        Q     What was the final cost of the

16   Fulton Center?

17        A     I can't recall the exact amount.

18        Q     Would you recommend to the Transit

19   Authority that they not make changes to make it

20   safer for the public if it was cheaper to

21   litigate the cases than to actually make the

22   changes to make it safer?

23        A     No.

24              MR. KEAVENEY:  Objection.

25        Q     Do you think that would be

360

1

2    unethical to do so?

3                MR. KEAVENEY:  Objection.

4         A    I would believe so.

5         Q    Okay.  In fact, that would

6    violate -- the Transit Authority, as a public

7    entity, has a duty and a job to protect the

8    public.  Correct?

9                MR. KEAVENEY:  Objection.

10        A    The riding public, yes.

11        Q    So if the Transit Authority made a

12   conscious decision and used any of its

13   resources to fund litigation defenses instead

14   of funding corrective action, that would be a

15   violation of its job.  True?

16                MR. KEAVENEY:  Objection.

17        A    I can't answer that question.

18        Q    Okay.  Did the Transit Authority

19   spend billions of dollars on the Second Avenue

20   subway?

21        A    True.

22        Q    Has the Transit Authority done

23   anything to protect people from committing

24   suicide by jumping in front of trains?

25        A    I know that there's a -- a constant

361

1

2      outreach through messaging and partnering with

3      suicide prevention organizations, and I

4      believe --

5           Q     Has that been effective at all?

6                 MR. KEAVENEY:  Objection.

7           A     I do not have the empirical

8      evidence to say yes or no.

9           Q     Can we agree if there's platform

10     screen doors, that would eliminate or certainly

11     dramatically reduce the number of suicide

12     deaths in the Transit system?

13                MR. KEAVENEY:  Objection.

14          A     Only at the station where it was --

15     where it would be installed.

16          Q     Okay.  So at all stations that had

17     platform screen doors it would eliminate

18     suicide deaths.  True?

19                MR. KEAVENEY:  Objection.

20          A      It would eliminate suicide deaths

21     of people entering the right-of-way from the

22     platform.

23          Q     Okay.  And is that something that

24     the Transit would -- should do, try to protect

25     people from being killed by trains?

362

1

2              MR. KEAVENEY:  Objection.

3       A     Yes.  The Transit Authority should

4    protect people from being killed by trains.

5       Q     And every time somebody is hit by a

6    train, there's an interruption in service and

7    delays and cost overruns.  True?

8              MR. KEAVENEY:  Objection.

9       A     True.

10      Q     Has anybody done an analysis of

11   what the costs are to the Transit Authority

12   attributable to people getting hit by trains in

13   terms of its own operations, its own costs,

14   putting aside lawsuits?

15      A     Not -- I don't know.

16      Q     There would be significant savings

17   and improvement in service if you didn't have

18   all the interruptions of people getting hit by

19   trains.  True?

20             MR. KEAVENEY:  Objection.

21      A     I believe so.

22             MR. GENIS:  I can breathe now.

23             Let's see.  It's 3:20.  I have to breathe

24             for a second.  Let me calculate how much

25             time I have left.

363

1

2          So we're going off the record now

3     at 3:20.

4          (Whereupon, a recess was taken from

5     3:20 p.m. until 3:27 p.m.)

6          MR. GENIS:  It's 3:27.

7     Q    Okay.  Sir, you told us already

8  that we agree that platform screen doors are

9  doable, are feasible in the New York City

10 subway system.  True?

11         MR. KEAVENEY:  Objection.

12    A    In a certain portion of the system.

13    Q    Okay.  And then there's other types

14 of safety devices that could be used in other

15 portions.  Correct?

16    A    Correct.

17    Q    So if anybody ever said that it was

18 impossible to install platform screen doors in

19 the New York City subway system, that would be

20 a -- a false statement.  True?

21    A    True.

22         MR. KEAVENEY:  Objection.

23    Q    Okay.  Did anybody from the Transit

24 Authority -- withdrawn.  Did anyone at Transit

25 ever say, in sum and substance, that because

364

1

2     the Transit Authority is never going to install

3     platform screen doors, it's a waste of time and

4     money to investigate and study doing so?

5          A     I never heard that.

6          Q     Okay.  And what would you say to

7     somebody if they said -- if you learned about

8     that statement?

9                MR. KEAVENEY:  Objection.

10         A     If somebody was to say it's a waste

11    of time to study whether or not platform screen

12    doors are feasible, I would -- I would disagree

13    with that.

14         Q     Okay.  And so if somebody said just

15    it's never going to happen so why waste time,

16    would that be a true or false statement?

17               MR. KEAVENEY:  Objection.

18         A     I can't answer that question.  I

19    never heard that being said.

20         Q     Okay.  But we do know for a fact

21    there has not yet been a platform screen door

22    pilot and they have not installed any platform

23    screen doors anywhere in the -- in the subway

24    system.  True?

25         A     True.

365

1

2      Q     Okay.  And the platform screen door

3    pilots have all been canceled.  True?

4      A     No.

5      Q     Has one been held yet?

6      A     There is a current platform screen

7    door pilot that we are in the procurement

8    process of.

9      Q     Okay.  And there's been procurement

10   in the past and they've been canceled every

11   time.  True?

12     A     I'm aware of one procurement that

13   was canceled for Third Avenue.

14     Q     Okay.  And sir -- let's see.  And

15   there are delays to the trains that cause

16   slowdowns.  Correct?

17              MR. KEAVENEY:  Objection.

18     A     Could you rephrase that?

19     Q     Sure.  Sometimes, for example,

20   there's track work or other things that cause

21   delays in the system or slowdown of the trains.

22   Correct?

23     A     Yes.

24     Q     Okay.  And has anybody ever done a

25   hazard analysis for the Transit Authority to

366

1

2     see what, if any, effect slowdowns of the

3     trains have on safety?  In other words, people

4     getting hit by trains and killed or

5     catastrophically injured.

6          A     I don't know.

7          Q     Okay.  Let's see.

8                MR. KEAVENEY:  Are you wrapping it

9          up?

10         Q     Currently --

11               MR. GENIS:  Yeah.  I'm almost done.

12         Q     Is there currently a contract out

13    for one of the pilots that you claim you're

14    doing for platform screen doors?

15         A     We have an RFQ and we are -- we are

16    planning to release an RFB this month or next

17    month.

18         Q     So no contract yet.  True?

19         A     No contract yet.

20         Q     Thank you.  Were there any signs

21    placed in the Atlantic Avenue Barclay station

22    on and before August 2nd of 2016 to stay away

23    from the edge of the platform?

24         A     I don't know specifically.

25         Q     Okay.  Did STV do any work on any

367

1

2      document that's going to be released?

3           A      Be more specific.

4           Q      Okay.  You said that there's --

5      you're about to get soon to the contract stage

6      for procurement.  Who did work on that?

7           A      STV.

8           Q      Okay.  And have any companies

9      submitted bids to do the pilot?

10          A      The bids have not been received --

11     have not been requested yet.  They've submitted

12     statements of qualification.

13                 MR. GENIS:  Okay.  Let me see what

14          time it is.  It's 3:30.  I have three

15          minutes left.  Okay.

16          Q      You're familiar with Don Willemann?

17          A      Yes.

18          Q      And if Don Willemann stated that

19     it's a waste to spend time on the platform

20     screen doors because it's never going to

21     happen, is he a knowledgeable person?

22                 MR. KEAVENEY:  Objection.

23          A      Could you rephrase the question?

24          Q      Sure.  What's Don Willemann's

25     title?

368

1

2          A     He's retired, but at the time he

3    was a design manager.

4          Q     Okay.  Who submitted statements of

5    qualifications, what companies, for the -- what

6    you call the upcoming, although there's still

7    no contract of procurement yet for the pilot

8    project, for platform screen doors?

9          A     I believe there were five or --

10          Q     Which ones?

11          A     Skanska, Judlau, Railroad

12    Construction Company.  Again, they're --

13    they're -- they're design build teams so it's a

14    general contractor aligned with an -- with an

15    architectural engineering firm that makes up

16    the proposal.  I don't recall the combinations

17    of all of them, but I know Skanska, Judlau,

18    Railroad -- Railroad Construction Company.  I

19    can't recall the rest off -- off -- off the top

20    of my head.

21          Q     Okay.  Do you agree that -- that

22    the installation is not only feasible, but just

23    might require some modifications or resources

24    to make installation of the different platform

25    safety devices feasible.  Correct?

369

1

2              MR. KEAVENEY:  Objection.

3       A     I can't answer the question the way

4  it's phrased.

5       Q     When Don Willemann stated just

6  because we can't think of a solution to a

7  problem does not mean that there isn't an

8  engineering solution out there, did you agree

9  with him?

10             MR. KEAVENEY:  Objection.

11      A     I would have to understand the

12  context in which he was saying that.

13      Q     Okay.  Any context.  Do you agree

14  that just because you can't think of a solution

15  to a problem doesn't mean that there's not a

16  solution out there?

17      A     Sure.  There -- there -- there's

18  that potential.

19      Q     Okay.  And lots of things are

20  feasible if you just make some modifications.

21  Correct?

22             MR. KEAVENEY:  Objection.

23      A     Yes.  You can make things feasible

24  depending on the extent of modification that

25  you determine is doable.

370

1

2          Q      Okay.  And by the way, did -- did

3     Willemann directly report under you or to you?

4          A      Yes.

5          Q      Okay.

6                 MR. KEAVENEY:  Bob, your time is

7          up.

8                 MR. GENIS:  I'm sorry?  I didn't

9          hear you, Andrew.

10                MR. KEAVENEY:  Your time is up.

11         Are you done?

12                MR. GENIS:  It's 3:34.  I thought I

13         had one more minute.  Let me look at my

14         clock.  Because we started again at 3:27

15         and I thought I had -- I thought I had

16         another four -- you know what?  3:27.

17         Okay.  All right.

18                MR. KEAVENEY:  You had less time,

19         but I was being nice and giving you a few

20         extra minutes.

21                MR. GENIS:  Okay.  I appreciate

22         that.  So let me ask one more question.

23         Q      When you talk about the companies

24    for -- for whatever, if they ever do this

25    upcoming platform screen door pilot, were any

371

1

2  of them Faglie, Jurgan, Parsons Brinckerhoff?

3        A        Faglie -- no.  Faglie -- Faglie was

4  not a -- one of the design build entities that

5  submitted an SOQ, but I -- but potentially one

6  of the design build firms may have identified

7  them as their PSD manufacturer that they would

8  use on the project.  One or more may have

9  identified actually a number of firms that they

10  would potentially use on the project.

11        Q        Okay.  Let me ask you, do you

12  consent to spending more time answering more

13  questions, sir?

14              MR. KEAVENEY:  Time is up.  You did

15        your seven hours, Bob.

16              MR. GENIS:  Okay.  I wanted to know

17        if he consented.  So I take it you're

18        objecting.  Right?

19              MR. KEAVENEY:  Yes.

20              MR. GENIS:  All right.  Well, my

21        time is up, so even though I have other

22        questions -- and I just would note on the

23        record that since I'm not being allowed

24        to ask any more questions, that there

25        were a number of issues that this

372

1

2          gentleman said he did not know about,

3          others did.  I respectfully submit that

4          other witnesses are necessary to fulfill

5          the Transit's obligations under Rule

6          30(b)(6).

7                    I guess that's it then.

8

9                    (Time noted:  3:36 p.m.)

10

11

12

13

14                    _____

15                         ERIC JONES

16

17

18    Subscribed and sworn to

19    before me this ____ day

20    of _____, 20____

21    _____

22        Notary Public

23

24

25

373

1
2                        I N D E X
3
4    TESTIMONY
5    WITNESS            EXAMINATION BY              PAGE
6    Eric Jones      Mr. Genis                    191
7
8
9    EXHIBITS
10   JONES DAY 2
     EXHIBIT NO.    DESCRIPTION                   PAGE
11
        1          Bates 371223, e-mail          205
12
        2          Bates 416027, e-mail          208
13
        3          Bates 6084, memorandum of     249
14                 understanding for car and
                   line equipment clearances
15
        4          Bates 364308, ADA code        272
16
        5          Bates 1265, e-mail            294
17
        6          Bates 387807, e-mail          296
18
        7          Bates 319919, e-mail          304
19
        8          Bates 387829, e-mail          307
20
        9          Bates 3266, report re         327
21                 feasibility of platform
                   edge barriers
22
        10         Bates 533539, e-mail          347
23
24
25

374

1

2                        CERTIFICATION

3

4    STATE OF NEW YORK   )
                         )  ss
5    COUNTY OF ORANGE    )

6

7         I, Michelle Conero, a stenotype

8    reporter and Notary Public within and for the

9    State of New York, do hereby certify;

10              That the witness whose Examination

11   Before Trial is hereinbefore set forth was duly

12   sworn by me;

13              That such Examination Before Trial

14   is a true and accurate record of the testimony

15   given by said witness.

16              I further certify that I am not

17   related to any of the parties to this action by

18   blood or marriage, and that I am in no way

19   interested in the outcome of this matter.

20        IN WITNESS WHEREOF, I have hereunto set

21   my hand this 19th day of February 2023.

22

23   _____

24        Michelle Conero

25