1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------x
LUISA JANSSEN HARGER DA SILVA,

                Plaintiff,

                               Index No.

     - against -        17-cv-04550(FB)(VMS)
NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN
TRANSPORTATION AUTHORITY, and RAQIA SHABAZZ,


                Defendants.


--------------------------------------------x


                        Video Conference

                        March 3, 2022
                        10:03 a.m.


      EXAMINATION BEFORE TRIAL of
JOSE GREGORY SANCHEZ, Nonparty Witness, taken
by All Parties, pursuant to Federal Rules of
Civil Procedure, and Subpoena, held at the
above-noted time and place, before Kristen
McAlevey, a Stenotype Reporter and Notary
Public within and for the State of New York.

2

 1
 2    A P P E A R A N C E S:
 3
 4        ROTH & ROTH, LLP
              Attorneys for Plaintiff
 5            192 Lexington Avenue, Suite 802
              New York, New York 10016
 6
          BY: DAVID A. ROTH, ESQ.
 7
 8        SONIN & GENIS
              Attorneys for Plaintiff
 9            One Fordham Plaza, Suite 907
              Bronx, New York 10458
10
          BY: ROBERT GENIS, ESQ.
11
12        LANDMAN, CORSI, BALLAINE & FORD, P.C.
              Attorneys for Defendants
13            120 Broadway, 13th Floor
              New York, New York 10271
14
          BY: ANDREW P. KEAVENEY, ESQ.
15
16
17
18
19
20
21
22
23
24
25

3

1

2          F E D E R A L   S T I P U L A T I O N S

3

4      IT IS HEREBY STIPULATED AND AGREED by and

5   between the attorneys for the respective

6   parties herein, that the sealing, filing and

7   certification of the within deposition be

8   waived;

9      IT IS FURTHER STIPULATED AND AGREED that all

10   objections, except as to form, are reserved to

11   the time of trial;

12      IT IS FURTHER STIPULATED AND AGREED that the

13   transcript of this deposition may be signed

14   before any Notary Public, with the same force

15   and effect as if signed before a clerk or

16   Judge of the Court;

17      IT IS FURTHER STIPULATED AND AGREED that all

18   rights provided to all parties by the F.R.C.P.

19   cannot be deemed waived, and the appropriate

20   sections of the F.R.C.P. shall be controlling

21   with respect thereto.

22

23                    oo0oo

24

25

4

1

2                    P R O C E E D I N G S

3              THE REPORTER:  The attorneys

4       participating in this deposition

5       acknowledge that I am not physically

6       present in the deposition room and that

7       I will be reporting this deposition

8       remotely.

9              They further acknowledge that, in

10      lieu of an oath administered in person,

11      I will administer the oath remotely.

12             The parties and their counsel

13      consent to this arrangement and waive

14      any objections to this manner of

15      reporting.  Please indicate your

16      agreement by stating your name and your

17      agreement on the record.

18             MR. GENIS:  Bob Genis, so

19      stipulated.

20             MR. KEAVENEY:  Andrew Keaveney,

21      for the defendants, so stipulated.

22             MR. ROTH:  David Roth, so

23      stipulated.

24

25

5

1

2    J O S E    G R E G O R Y    S A N C H E Z,

3              Nonparty Witness, having first been

4    duly sworn by the Notary Public, in and of the

5    State of New York, was examined and testified

6    as follows:

7              THE COURT REPORTER:  Please state

8         your name for the record.

9              THE WITNESS:  Jose Gregory

10        Sanchez.

11             THE COURT REPORTER:  Where do you

12        reside?

13             THE WITNESS:  8810 Tennyson

14        Drive, Plainsboro, New Jersey 08536.

15   EXAMINATION BY

16   MR. GENIS:

17        Q.    Good morning, Mr. Sanchez.  My

18   name is Bob Genis, I represent a young woman

19   who lost her arm and her leg.  I'm going to be

20   asking you some questions today.  If there is

21   anything I ask of you that you do not

22   understand, please say so, and I will gladly

23   rephrase the question.  Otherwise, if you

24   answer the question, we're going to assume you

25   understood it.

6

```
 1                        J. SANCHEZ
 2              Do you understand everything I've
 3   said so far?
 4        A.     I understand.
 5        Q.     Do you agree to these terms, sir?
 6        A.     That's correct, yes, that's fine.
 7        Q.     They're fair?
 8        A.     They're fair.
 9        Q.     Have you ever testified before,
10   sir?
11        A.     Actually, no.
12        Q.     Okay, so I'm going to ask
13   questions, sometimes I have to think in the
14   middle of a question, so just because I pause
15   or breathe, it might not mean that the
16   question is over.  So just give me a chance to
17   finish before you answer the question, because
18   otherwise you might be answering a question
19   that I'm not even asking, if any of that made
20   sense.
21        A.     That's okay.
22        Q.     Also, the reporter has to take
23   down everything we're saying, and sometimes
24   humans talk pretty fast, I know I do, so we've
25   got to give her a chance to get it all down,
```

7

J. SANCHEZ

1          all right?

2              A.      No problem.

3              Q.      In a normal conversation, people

4          tend to talk over one another, but because the

5          reporter has to get down all of our words, if

6          you can just please pause a second before you

7          answer so she gets it all.  Okay?

8              A.      Okay, understood.

9              Q.      Thank you.  First I'd like to

10         tell you where I'm going, so it's a little

11         easier for you.  I'm going to ask a bunch of

12         background questions first to learn about your

13         background, okay?

14             A.      That's okay.

15             Q.      Can you please tell us your

16         educational background, sir?

17             A.      I am a mechanical engineer by

18         trade, okay, I have worked in the industry of

19         mass transit systems for thirty-something

20         years.  I've worked with consultants, like

21         Parsons Brinckerhoff, back when it was called

22         Parsons Brinckerhoff.  I've worked in metros,

23         like New York City Transit, Washington Metro,

24         Hong Kong MPR, Singapore-MIT, London

8

1              J. SANCHEZ

2    Underground, Turkey Metro, in Italy, in

3    Germany.  So I've been heavily in the mass

4    transit industry, where we have designed

5    systems for fire-life safety, and that

6    involves ventilation, safety issues with smoke

7    purge, and all kinds of safety following NFPA

8    101 guidelines and NFPA 130 and 502.

9         Q.    I'm going to back up second,

10   okay, because I want to get even more basic

11   information about you.  And you also mentioned

12   some initials before, which we're going to

13   come back to, because I don't know what they

14   mean.

15               But first; did you go to college?

16        A.    Of course.

17        Q.    Where did you go to college?

18        A.    Brooklyn Polytechnic in New York.

19        Q.    That's part of NYU, correct?

20        A.    Now it's part of NYU, correct.

21        Q.    What did you study in college?

22        A.    Mechanical engineering.

23        Q.    What is mechanical engineering?

24        A.    Mechanical engineering involves a

25   lot of aspects dealing with mechanisms that

9

1                       J. SANCHEZ

2    provide energy.  That means, for example, a

3    bicycle could be a byproduct of mechanical

4    engineering because, by cranking the pedals,

5    you produce energy to propel the bicycle.  A

6    motor vehicle, by virtue of combustion

7    engines, you create energy; you burn something

8    to provide energy for another.  You have the

9    wheels that transmit energy to the ground and

10   that moves it along, you know, a path.  And

11   other aspects internal dynamics, by

12   differential temperatures, you provide

13   pressure and that drives the flow.

14   Airplanes -- the airplanes are driven by

15   different kinds of pressure over the air

16   force.  We look at ventilation, you have a

17   system where you have pressure in the dock, it

18   is in the system so that you are able to push

19   against that pressure to provide the intended

20   ventilation that we need to move the air from

21   one point to another.

22              And so, that is mechanical

23   engineering.  It's anything that has to do

24   with converting the energy from some static

25   status to some dynamic function.

10

1                    J. SANCHEZ

2         Q.      Thank you.

3                  When you went to Polytechnic

4    School of Engineering at New York University,

5    did you get a degree --

6         A.      Yes.

7         Q.      -- in mechanical engineering?

8         A.      Yes, I have a master's and a

9    bachelor's.

10        Q.      I'm going to go in order; so

11   first you got a bachelor of science degree,

12   sir?

13        A.      That's correct.

14        Q.      And then you got a graduate

15   degree of some sort?

16        A.      That's correct.

17        Q.      And, that was a master's degree?

18        A.      That's correct.  In mechanical

19   engineering.

20        Q.      Where did you get your master's

21   degree in mechanical engineering?

22        A.      At Polytechnic as well.

23        Q.      In addition to getting your

24   bachelor's degree and your master's degree in

25   mechanical engineering, do you have any

11

1                           J. SANCHEZ

2    postgraduate education in engineering?

3          A.      As far as through an institution,

4    no.  As far as personal research, a lot.  I

5    have studied a lot of people, I have written a

6    lot of papers, I consider myself to be an

7    expert in the field where I have to decipher

8    many things that the industry needs

9    correction.  I go to conferences, I present to

10   people ideas and we discuss, we debate, so I

11   have a lot of experience in that.  I've done a

12   lot of dissertations and spent time with

13   helping them.  So I am an expert in the field,

14   I consider myself an expert in the field.

15         Q.      I'm going to get to you being an

16   expert in the field in a minute, I'm going to

17   go through now, I just want to -- I'm a simple

18   guy, so I try to go basic, and I have a

19   feeling you're way smarter than I am, and I'm

20   just going to go a little step-by-step, okay?

21         A.      No problem.

22         Q.      Thank you.  We're going to get to

23   presentations you've made and publications of

24   yours in a minute.  First, I'm going to your

25   education.

12

1                    J. SANCHEZ

2              Have you attended, whether it be

3     seminars, programs, conferences, things of

4     that nature in your field of mechanical

5     engineering?

6         A.    Yes.

7         Q.    Out of curiosity, do you belong

8     to any professional associations or societies?

9         A.    ASHRAE, right now.

10        Q.    What does that stand for, sir?

11        A.    American Society of Heating,

12    Refrigeration and Air-Conditioning Engineers.

13        Q.    Did you work in the field of

14    engineering before you graduated from college

15    and got your bachelor's in mechanical

16    engineering?

17        A.    No.

18        Q.    Did you work in the field of

19    engineering before you got your master's in

20    mechanical engineering?

21        A.    Yes.

22        Q.    What work did you do at that

23    point?

24        A.    Between bachelor's and master's,

25    you mean?

13

1                           J. SANCHEZ

2          Q.      Sure.

3          A.      I worked in -- my first job was

4    really when I was in my undergrad school where

5    they got to do modern buoys, so we were

6    looking at operation analysis --

7          Q.      Can you say that again?  I didn't

8    catch those words, sir.

9          A.      I worked in a research project in

10   my undergrad, the professor, Mr. William

11   Lesser, we analyze the operation of buoys, the

12   flotation devices in the ocean.

13         Q.      Got it.

14         A.      We would look at the dynamics and

15   backlash dynamics and that is what kicked me

16   off into the field of numerical analysis.  So

17   throughout my experience, I have done

18   analysis, competition through dynamics or any

19   other, create my own numerical codes, where we

20   analyze the dispersion of physics throughout,

21   you know whether it is chemical pile

22   dispersion, which is one of the projects I had

23   worked on, whether it is in fire, smoke

24   dispersion, things like that.  So a lot to do

25   with numerical analysis.  I did fear analysis

14

J. SANCHEZ

1
2    in my first job, where we looked at war

3    horses.  We looked at queueing analysis,

4    queueing theory, where you follow-up -- the

5    famous example is the banker problem, where

6    people queue into lanes, and you analyze how

7    many tellers you need, so we tried to identify

8    where the optimum is.

9            My application was on peer

10   operations where you have cargoes coming into

11   a bay and then you have so many machines, and

12   the machines have limits on the different

13   capacities.  And cars come on different sizes,

14   so we have to optimize the operation as to how

15   to -- you know, the sequence of which way is

16   the best way to schedule the debarking of the

17   merchandise and the loading, things like that.

18   And I also did some traffic analysis on the

19   Suez Canal, so I did some structure analysis

20   on the peer structure.

21           And then I went to work at

22   Parsons Brinckerhoff on tunnel ventilation,

23   where I began work into how to control smoke

24   and pollutants, like carbon monoxide, you

25   know, oxygen dioxide and things like that that

15

1               J. SANCHEZ

2    are a harm to people's environment when you

3    are developing a public safety system.

4         Q.    Tell us about your next job -- by

5    the way, that company you just mentioned you

6    worked for, is that considered a small

7    company, a large company or something else?

8         A.    Parsons Brinckerhoff is a large

9    company, it was one of the pioneers in tunnel

10   ventilation, very heavy.  Right now, they are

11   under the name of WSP, they were bought out by

12   somebody else.  But at that time, it was a

13   real legendary company.  I can say that; it

14   was a very legendary company.

15        Q.    Tell us about the next job you

16   had in the field of engineering?

17        A.    The next one was, I went from

18   working with Parsons Brinckerhoff, to ICF

19   Kaiser Engineers, at that time I was part of

20   A. Kong.  For that, I went to Hong Kong to be

21   there for about nine months in Hong Kong,

22   doing, for example, the Hong Kong Metro is

23   where I got involved with doing a lot of

24   analysis that, you know, it's a construction

25   job and we designed the first extension line,

16

1                         J. SANCHEZ

2    and that first extension happened to be with

3    platform screen doors, and there were some

4    issues that the design team didn't understand.

5                         And it was magical when one time

6    I was having dinner, and I was having a

7    dispute with them, I didn't understand the

8    piston effect.  So I'm in the back of the --

9    Hong Kong is very tight, the tunnels are very

10   tight.  And I'm in the back of the station

11   waiting for the train to go to my hotel, and I

12   feel the piston effect.  And I said, this is

13   the problem.  And I went the next day to the

14   meeting I said, guys, go to the Causeway Bay,

15   stand in this location, wait for the train to

16   come and then you're going to feel exactly

17   what I'm explaining to you.  And so that

18   opened a lot of opportunities for me, because

19   I was beginning to -- people were beginning to

20   really reason that, you know, I indeed had a

21   knack.  And that -- so that opened a lot of

22   doors for me.  After that, I went to work for

23   --

24        Q.    I'm going to stop you for one

25   second, sir, I apologize for interrupting you.

17

1          J. SANCHEZ

2          What year was that that you were

3    working on that Chinese metro subway line with

4    platform screen doors?

5          A.    1998.

6          Q.    What is a platform screen door?

7          A.    A platform screen door is -- put

8    it this way, it's a partition wall that

9    separates the platform walking area from the

10   station traffic area where the trains travel.

11         Q.    So it's a divider between the

12   platform and the track bed and the train?

13         A.    That is correct, yes.  And the

14   purpose of those, you know, for instance in

15   1994 when I was working with Parsons

16   Brinckerhoff, I worked in platform screen

17   doors for the London Underground Jubilee Line,

18   so it's two different purposes.  In London

19   Underground Jubilee Line, the idea was to --

20   because it was an air-conditioned station,

21   they needed a piston effect to move through

22   the station.  So you have to make it somewhat

23   a person's height, so that it will allow the

24   train system to do its function of pushing the

25   air through the station.

18

J. SANCHEZ

1

2        But in Hong Kong, it was

3  different because Hong Kong is a very hot,

4  humid environment.  The system was designed to

5  be open originally, and so there was a lot of

6  air-conditioning load being lost into the

7  tunnels.  So this systems were designed to be

8  fully height to totally isolate the track heat

9  into the station, and to control or reduce the

10  air-conditioning load from the station into

11  the tunnel.  So different dynamics, different

12  forms of purposes, but different -- you know,

13  that's the main feature.

14        Q.    So, in 1994 you were already

15  working with subways in London?

16        A.    That's correct, yes.

17        Q.    Did that London subway in 1994

18  have anything to do with platform screen

19  doors?

20        A.    Yes, it does.

21        Q.    So your earliest work in platform

22  screen doors would be 1994 or earlier?

23        A.    1994.

24        Q.    All right, so you did London,

25  then you're in China; what's your next job in

19

1                            J. SANCHEZ

2    the field of engineering?

3          A.      When I was -- after I left, ICF,

4    I went to work for New York City Transit.  I

5    worked there, and then during my tenure in New

6    York City Transit for nineteen years, I was

7    allowed to also do consulting overseas.  So I

8    -- I was associated with a company in Hong

9    Kong that was not related to any business in

10   the U.S., that's the disclosure of that.  So I

11   was working with a lot of overseas, not so

12   much U.S.-based.  So I worked with a

13   Hong Kong-based company, and I did consulting

14   for them for, like, ten years, something like

15   that.  Ten, eleven years.

16               So we are -- through them, we did

17   retrofit of the Hong Kong MTR to convert the

18   demand a lot of stations, because the first

19   line with platform screen door was the one I

20   just designed, the purple line -- actually

21   they call it the North Point station line.

22   And then, MTR liked that and then they

23   contracted us to retrofit a lot of existing

24   stations.  So we worked in retrofitting some

25   of the other stations in the system.  So that

20

1                          J. SANCHEZ

2    when I was, you know, that was post-1998, I

3    can't remember the year exactly, but say in

4    the 2000s, early 2000s.

5          Q.     So, Hong Kong, you've designed

6    subway lines and platform screen doors?

7          A.     Yes.

8          Q.     Hong Kong, is that considered

9    mainland China or is that not mainland China?

10         A.     No, at that time, it was --

11   actually, they were part of mainland China,

12   but China has not taken them yet.  There was a

13   point, I can't remember exactly when, that

14   they were waiting for something and -- but it

15   was just about the transition when they were

16   becoming only one.

17               MR. ROTH:  I'd like to interrupt

18         for a second.  Off the record.

19               (Discussion held off the record.)

20               (Video recording started.)

21               MR. GENIS:  This deposition was

22         supposed to be recorded from the outset,

23         we just realized about twenty or so

24         minutes into it that it was not being

25         recorded, so we're going to start the

21

J. SANCHEZ

1

2      recording now.  It was noted to be

3      recorded on the subpoena, so it's going

4      to be missing the first twenty minutes,

5      but the balance will be recorded.

6            MR. KEAVENEY:  I don't recall it

7      was ever on the subpoena, to the extent

8      it is, that's fine.  To the extent that

9      it's not, I'm going to object to the

10     recording.

11           Q.    So, you were hired by the New

12  York City Transit Authority to do what?

13           A.    I was hired to lead the tunnel

14  ventilation aspect of it, because of my

15  expertise.  At the time in April 1999, New

16  York City Transit was doing a lot of fire-life

17  rehabilitation to address the fire-life safety

18  of the system.  Prior, when I was working with

19  Parsons Brinckerhoff, I was one of the leading

20  teams who led one-third of the analysis, that

21  was a study evaluating the tunnels to

22  determine what was the severity, what was the

23  risk and everything, what is the requirement

24  that we needed to meet NFPA 130 which is

25  basically is a fire-life safety requirement,

22

1                         J. SANCHEZ

2    where people's lives, you know, in the event

3    of a fire are protected.  So there was a whole

4    program on that.  So I was hired to work on

5    that with my experience, my background.  So

6    you know, that aspect, I was hired as a

7    project administrator and then I became a

8    project -- a principal.

9         Q.    From when to when did you work

10   for the New York City Transit Authority?

11        A.    From April 5, 1999 to February 2,

12   2018.

13        Q.    For the first ten years, they

14   permitted you to work for an outside

15   consultant for a company that was outside of

16   the United States, correct?

17        A.    For the whole tenure.

18        Q.    For the whole tenure?

19        A.    Yes.

20        Q.    So for the entire time you were

21   there?

22        A.    Yes.

23        Q.    Then in 2018, you stopped working

24   for the New York City Transit Authority?

25        A.    That's correct.

23

1                          J. SANCHEZ

2          Q.      Where did you go to then?

3          A.      I went to work for STV, I was

4     assigned to go to Los Angeles Metro in

5     California.  I was there for two years.

6          Q.      Who is STV?

7          A.      STV is a consulting firm.  They

8     do a lot of transportation-related matters,

9     and some buildings as well.  Some commercial.

10         Q.      Tell us about your work

11    experience at STV.

12         A.      I was a lead -- the chief

13    mechanical, I went to lead the tunnel

14    ventilation aspects of it, because they had

15    the design built for the Purple Line 2

16    Extension.  And when I was there, we also got

17    word of the Purple Line 3, so I was a little

18    mechanical.  The same as this time, I was

19    leading the -- the team on how to design the

20    ventilation systems, you know, with the other

21    teams that -- architecture, structural, you

22    name it everybody together, electrical.  So I

23    was the lead person, mechanical, you know,

24    guiding them and developing what we needed to

25    do for that system.

24

1                       J. SANCHEZ

2          Q.       What was your next job after

3     that?

4          A.       I worked for New Jersey Transit

5     for about fourteen months, I was the director

6     of mechanical engineering and electrical and

7     plumbing.  So under that, I was in charge -- I

8     was the designer of record for the New Jersey

9     Transit, and I was responsible for all the

10    electrical design, all the electrical

11    mechanical plumbing designs, so we would have

12    to also provide construction.  So I was the

13    one who was going to approve the design, go to

14    the field, consult with the contractor and,

15    you know, undergo next phases.  So I was the

16    -- the one dominated -- you know, I wouldn't

17    say dominated, I would say the one responsible

18    for all MEP aspects.

19         Q.       Okay.

20                  After you worked for New Jersey

21    Transit as the director and the design

22    director, where did you go next?

23         A.       I am currently employed by T.Y.

24    Lin, I am a lead mechanical commission

25    engineer.  Under that, I am leading mechanical

25

1                       J. SANCHEZ

2    design, and I am also in charge of the

3    commission process, which is some quality tool

4    to allow owners to verify that indeed the

5    system is designed and functioning as

6    intended.

7          Q.     Now, you mentioned earlier that

8    you also have made present --

9                 MR. ROTH:   Can I get your current

10   position and company?

11                THE WITNESS:   T-Y, L-I-N,

12        International.

13         Q.     Now, in addition to working in

14   the field of mechanical engineering and mass

15   transit and subways involving platform screen

16   doors, have you also made professional

17   presentations?

18         A.     Yes.

19         Q.     Tell us about the professional

20   presentations you've made.

21         A.     Well, I have done a lot of

22   presentations throughout the world.  I've done

23   presentations on -- a lot of dealing with

24   tunnels and mass transit systems, well, the

25   one of them for instance is fire models where

26

1                          J. SANCHEZ

2    people have been assuming the wrong things, so

3    I develop a new view where, you know, the

4    oxygen consumption method, so I challenged

5    that because a lot of people assume that to be

6    constant, I say it's not constant, it's

7    variable.  I did a mechanical analysis, I

8    presented it, so I went around talking about

9    that, talking about dispersion of smoke in the

10   tunnels.  One of the tasks that I also worked

11   with our international labs was the dispersion

12   of chemical biological substances in subways,

13   so they did a lot of study with the Washington

14   Metro, so I worked with that.

15                  I went to Australia in two

16   thousand -- October 2000 to make a

17   presentation on that subject about the work we

18   were doing.  So it was a lot of groundbreaking

19   certain things, you know, so I've done a lot

20   of presentations -- I -- you know, I've been

21   around talking, and wherever I go, I express

22   points that people I think might be, you know,

23   feel it and they understand it.

24        Q.    So in other words, if I

25   understand this correctly, you have taught and

27

1                           J. SANCHEZ

2    made presentations to other professional

3    engineers all over the world on the subject

4    matter of mass transit and trains, including

5    platform screen doors?

6           A.      Yes.

7           Q.      Have you ever been published in

8    your field?

9           A.      Yes, in conferences.

10          Q.      How many times have you made

11   these professional presentations to your

12   peers, fellow engineers around the world, and

13   made publications of these conferences and

14   engineering meetings?

15          A.      Pardon me, again?

16          Q.      About how many times have you

17   made, as an engineer, these professional

18   presentations to your fellow engineers around

19   the world and throughout the U.S. and had

20   written papers and things of that nature?

21          A.      I have about fifty papers that I

22   published around, my presentations made.

23          Q.      And that's five-zero, correct;

24   fifty?

25          A.      Five-zero, yeah.

28

1                    J. SANCHEZ

2      Q.    Is there anything I have skipped

3  in your background of relevance to you being

4  an engineer and familiar with mass transit and

5  platform screen doors?

6      A.    No, I think we covered, you know.

7      Q.    Okay, great, thank you.

8            By the way, when you went to work

9  at the New York City Transit Authority, did

10 they give you training as well?

11     A.    What do you call training?

12     Q.    Anything at all about, you know,

13 how they do things, giving you manuals,

14 memorandums of understanding, bulletins, any

15 kind of training at all?

16     A.    Oh, yes.  Yeah, of course.

17 Company trains everyone on ethics, trains us

18 on safety, you know, all these required

19 trainings.  You know, right from wrong, all

20 these trainings.

21     Q.    Would it be fair to say that you

22 were taught that the New York City Transit

23 Authority operates one of the largest public

24 transportation agencies in North America and

25 one of the largest in the world?

29

1                        J. SANCHEZ

2          A.      Yes, that's a statement.

3          Q.      Based on your education, your

4   training, your experience, your knowledge,

5   your personal research, would it be fair to

6   say that you were familiar with good and

7   accepted engineering practices and principals?

8          A.      Yes.

9          Q.      Would it be fair to say that you

10  are familiar with professional standards of

11  care in your field?

12         A.      Yes.

13         Q.      And then you're familiar with

14  good and accepted practices and procedures and

15  standards of the New York City Transit

16  Authority?

17         A.      That's correct.

18         Q.      I'm going to ask you first some

19  just kind of general questions, and then we're

20  going to get more specific, okay?

21         A.      Okay.

22         Q.      Can we agree that a public

23  transportation company, like the New York City

24  Transit Authority, must have the knowledge to

25  do their job safely and properly?

30

1                          J. SANCHEZ

2          A.      Well, I'm -- I'm not in a

3   position to make such statements.  The reason

4   why I'm saying this is organizations have

5   their own code and practice, put it that way.

6   Meaning, you find companies that are their own

7   agency basically, others rely on hiring

8   consultants.  So that's why I cannot make that

9   statement.

10         Q.      Okay, fair enough.

11                 Can we agree that it's a good and

12  accepted practice for a transit agency, like

13  the New York City Transit Authority, to see

14  and learn what is being done throughout the

15  world?

16         A.      As far as I know, yes.  I mean,

17  it's a good practice, and as far as I know, I

18  mean all agencies do.

19         Q.      Is it part of the job of the New

20  York City Transit Authority to make the New

21  York City subway system as safe as possible?

22                 MR. KEAVENEY:  Note my objection.

23         A.      Yes, I mean that is -- how can I

24  put it, one of the means; obviously, we have

25  to provide safety first.  We always say safety

31

1                          J. SANCHEZ

2    first and construction, whatever we do.  So,

3    yeah, and they do work on that.

4          Q.    By the way, does the Transit

5    Authority employ other engineers, not just

6    you?

7          A.    Yes.

8          Q.    Does the Transit Authority belong

9    to various professional trade groups for

10   society?

11         A.    Yes, they -- they're involved

12   with different groups, locally and you know,

13   nationally.

14         Q.    Is it part of the job of the

15   Transit Authority to operate its system in the

16   safest manner possible?

17         A.    Yes, that's one of the main

18   missions.

19         Q.    So, everything the Transit does

20   should be guided by what makes it safest and

21   promotes safety for the public?

22         A.    That's correct, yes.

23         Q.    And the customers have a right to

24   expect that the City Transit Authority system

25   will be as safe as possible?

32

1                    J. SANCHEZ

2        A.      Yes, they do.

3        Q.      Do the customers of the Transit

4   Authority have a right to expect that the New

5   York City Transit system will use its

6   knowledge, technology, what information is out

7   there in the world to make the subway systems

8   the safest in the world?

9        A.      Well, I don't know about safest

10  in the world.  But, yes, you know we -- I'm a

11  professional engineer, you know, my job

12  requires me to be a professional engineer.  So

13  under the professional engineering law, we

14  have to provide safety to the people.  And I

15  don't know, I don't want to make a statement

16  that, you know, it's the safest in the world,

17  because that's a competing statement, so, but

18  I can say that when I was working there, my

19  role and my responsibility as a professional

20  engineer is to do what I can do to make sure

21  things were safe, they were not falling apart

22  and that the public is safe.

23       Q.      So, can we agree that a transit

24  company, like the Transit Authority, should

25  prevent preventable harm, according to good

33

1                           J. SANCHEZ

2    and accepted practices and procedures?

3            A.      Say again; prevent prevent what?

4            Q.      Prevent preventable harm?

5            A.      Oh, prevent preventable harm.

6    Well, that is the goal, every system.  But as

7    you know, even as an engineer, we cannot

8    control unforeseeable events, okay.  So there

9    are certain statistical responsibilities we

10   can meet, where it's accidental things we can

11   try to mitigate, but then there is random,

12   terrorism attacks that we just have no

13   control, no matter what we do, we cannot

14   control.

15           Q.      Sure.

16                   So let's use the word

17   foreseeable; can we agree that according to

18   good and accepted practices and procedures,

19   the Transit Authority should prevent

20   foreseeable harm where possible?

21           A.      Yes.  But at the same topic, I

22   would like to qualify the term foreseeable.

23   Meaning, there are degrees of foreseeability.

24   You know, as an engineer, I can see that

25   sometimes we may design for the 99th

34

1                          J. SANCHEZ

2    percentile, let's say, but that doesn't become

3    cost effective.  So we try to look into what

4    is cost effective.  And sometimes in the

5    engineering practice, that's all across the

6    world, we're driven by statistics of what is

7    the risk that we may take.  And that is the

8    risk that we may take.

9          Q.    Got it.

10               Speaking of risk and safety and

11   foreseeable harm and preventible harm, when

12   you worked at the Transit Authority, did you

13   learn that there's incidents that they called

14   12-9s?

15         A.    I don't know that term.

16         Q.    Okay, that's fine.  All right,

17   when you were at the Transit Authority -- let

18   me back up.

19               You were talking about platform

20   screen doors, let's talk a little about the

21   history of platform screen doors, if we can.

22         A.    Uh-huh.

23         Q.    Can we agree that the idea for

24   platform edge doors started as early as 1908?

25         A.    I can't remember the date, but

35

1                          J. SANCHEZ

2     they go way back, I know, yes.

3          Q.     In fact, there was a man, Charles

4     Shute, S-H-U-T-E, of Boston and he got a

5     patent for safety fence and gates for railway

6     platforms, correct?

7          A.     That, I don't know.  I -- you

8     know, how far do I go back in the history.

9          Q.     So, I'll skip some of the history

10    then.  Are you aware then, for example, in

11    1917, Carl Albert West got a patent for gates

12    for subrails and the like?

13         A.     No, no.  I try -- I try not to go

14    too far out, because those are moments of

15    birth and, you know, sometimes the

16    circumstances upon birth is different from

17    where I'm actually practicing today.  And not

18    -- related to that, we have new innovations,

19    so it doesn't do me any good.

20         Q.     Understood, no problem.  And I'm

21    a history buff, so, okay.

22                Let's talk about platform screen

23    doors; are you familiar with when subway

24    stations first did it throughout the world;

25    for example, I think in Saint Petersburg they

36

1                          J. SANCHEZ

2    had platform screen doors somewhere between

3    1961 and 1972?

4         A.     I don't know exactly when, but

5    you know, I'm very familiar with platform

6    screen doors.  They're everywhere, they're at

7    the airports, so I mean, I've seen them at the

8    airports.  And honestly, when I worked in my

9    first job in the London Underground, it was no

10   impact for me because I had been at airports

11   that had them, so I didn't have the shock.  So

12   that's why I am not so much into which was the

13   first system, you know.

14        Q.     Okay.

15               So, you know, for example,

16   Singapore Mass Rapid Transit, you know --

17        A.     Yes, yes, Singapore I worked in

18   the MRT line, which actually we implemented

19   that.  Yes, we -- I know those systems.

20        Q.     So, that was even back in 1987,

21   Singapore had the a heavy metro system with

22   platform screen doors, correct?

23        A.     Yeah, well, I don't remember

24   exactly when, but when I was in Singapore in

25   the 90's, yes, they had them in there.

37

1                    J. SANCHEZ

2          Q.      So it's not a new development

3    about platform screen doors; they've been

4    around for many, many decades, correct?

5          A.      Oh, yes.  Oh, yes, they've been

6    around.

7          Q.      And they've been used throughout

8    the world for decades, correct?

9          A.      Correct, yes.

10          Q.      When we're talking more about the

11    Transit; in terms of volume, is it like the

12    fifth to the seventh largest in the world?

13    You tell me.

14          A.      You mean ridership, you mean?

15          Q.      You tell me, whether it's

16    ridership, length, whatever.

17          A.      The New York City subway?

18          Q.      Yes.

19          A.      I don't know what the rank is,

20    but it certainly is one of the largest by

21    distance, by rails, you know, number of lines

22    and the number of feet and so forth, certainly

23    one of the largest.  And in terms of

24    ridership, it's not quite the largest, because

25    New York City, even though it's a big city,

38

1                        J. SANCHEZ

2    it's not the most populated one.  You've got

3    other systems, like in Bai Jing and even

4    Moscow and things like that, that they have a

5    lot of population and they use more of the

6    system.  But certainly it is one of prime top

7    rankings in a lot of the categories.  And, you

8    know, a lot of people look after what New York

9    City does.

10        Q.    So would it be fair to say that

11   the Transit should, when looking at what else

12   is done in the world, could compare similar

13   systems by size or things of that nature,

14   correct?

15        A.    Yes, you could say that.

16        Q.    Now, okay, and is a platform

17   screen door a safety device?

18        A.    It is many things.

19        Q.    Okay.

20        A.    Okay.  It is -- I can explain.

21   It is a way to, yes, keep the people away from

22   the -- call it the track side, it is a way to

23   control the temperature and reduce the loads.

24   So there are, again, by being a partition at

25   the edge, it keeps one side from the other,

39

1                        J. SANCHEZ

2    whatever that side is; whether it's air,

3    people, trains, whatever it is.

4         Q.    So there is certain benefits to

5    platform screen doors, correct?

6         A.    There are benefits, but there are

7    requirements.  By that I say, it is not carte

8    blanche; in other words, for example in

9    Guangzhou, China, they wanted to put platform

10   screen doors as well, but they could not do as

11   we did in Hong Kong.  So they had to

12   accommodate some half-height barrier, okay.

13   So there is not one form that fits all, but

14   every system has to look at how or what is it

15   that they could do or not to do it.

16        Q.    When you were at the New York

17   City Transit Authority, did you become aware

18   of people, customers, getting hit by trains or

19   run over by trains and being killed or

20   injured?

21        A.    Well, other than what is in the

22   news, because as you know, these statistics

23   are not open to everybody, and I was not part

24   of the system safety crew.  So I'm sure system

25   safety may have known and keep all those

40

1                          J. SANCHEZ

2      records.  Me, as an engineer, I was more on

3      the physics side.  But other than you hear in

4      the news, events that happened, that was the

5      extent of my knowledge.

6              Q.     Well, let's see, I want to talk

7      about, part of your job as an engineer is to

8      problem solve, correct?

9              A.     Correct.

10             Q.     So, first one identifies a

11     problem, correct?

12             A.     Correct.

13             Q.     And then you figure out the way

14     to solve the problem, correct?

15             A.     Correct.

16             Q.     And that's the proper methodology

17     that's supposed to be followed, correct?

18             A.     That is one of them.

19             Q.     For example, did you ever learn

20     that the Transit Authority was aware of a

21     problem -- I'm not getting into numbers now --

22     of people being killed or seriously harmed by

23     being run over or hit by trains on the subway

24     system?

25             A.     Well, I mean again, like I said,

41

1                        J. SANCHEZ

2    yes, you hear that in the news that those

3    events happen.

4         Q.     The Transit Authority has, and

5    for many years has had, a website, correct?

6         A.     Oh, yes.

7         Q.     And on their website, they even

8    publish how many people per year are hit and

9    run over by trains and how many people are

10   killed by trains every year, correct?

11        A.     To be honest, I never looked at

12   the website for that reason.

13        Q.     All right, that's okay.

14               Can we agree that it's important

15   to use engineering to promote safety to

16   protect people?

17        A.     Well, safety is inherent in the

18   design process.  So, all engineering systems

19   that we do; a car, for instance, is tested

20   over and over to make sure that the drivers

21   don't have an accident.  If they get in an

22   accident, they don't have a fatality, or

23   there's some way that we can design it -- you

24   know, the airplanes are also designed in that

25   way so all engineering principals account for

42

1                           J. SANCHEZ

2    that.

3         Q.     Is there what's known as a

4    hierarchy of safety?

5         A.     Repeat again?

6         Q.     Is there what's known as a

7    hierarchy of safety?

8         A.     I wouldn't call it hierarchy, I

9    would say whenever we do a design, there is a

10   lot to consider, maybe that's what you call

11   hierarchy.  And we have a sequence of events

12   and we go through them, and we analyze them,

13   and we check what is past, what is not past.

14        Q.     When did the Transit Authority,

15   to your knowledge, first become aware of

16   platform barriers in subways to enhance

17   safety?

18        A.     Since I joined, we all knew about

19   platform screen doors.  I joined in 1999, like

20   I said, we -- I knew about them in 1994 and

21   nineteen-ninety -- I forgot, '93 or so, events

22   that were done.  So I'm quite sure the New

23   York City Transit knew about it.

24             MR. GENIS:  Dave, could you put

25        up -- I'm going to give you some BATES

43

1                          J. SANCHEZ

2           numbers -- it's BATES 389118, it's an

3           MTA letter dated April 19, 2002.  This

4           will be Plaintiff's Exhibit 1 of today's

5           date.

6                   (Email BATES stamped 389118, was

7           marked as Plaintiff's Exhibit 1, for

8           identification, as of this date.)

9                   (Mr. Roth screen sharing.)

10          Q.      Sir, I'm showing you what we have

11   marked today for identification as Plaintiff's

12   Exhibit Number 1, it's a letter dated April

13   19, 2002 and it's written to somebody, they're

14   acknowledging his letter of March 25, 2002, to

15   the chairmen of the Metropolitan Transit

16   Authority.  And I'm going to look at the next

17   second full paragraph, where the sentence

18   reads, "Numerous proposals to install some

19   type of platform barrier to enhance safety in

20   the subways has been received from a variety

21   of sources over the past fifteen to

22   twenty years."

23                   I'm going to stop right there.

24   Would that be a fair statement; would you

25   agree with that, sir?

44

J. SANCHEZ

1

2      A.      I'm not sure about -- what does

3  it say, proposals to install?

4      Q.      I'm just talking about that one

5  sentence that I just read; do you agree with

6  that?

7      A.      Understand.  So what I'm going to

8  say is that I am aware that they talked about

9  it, but I don't know exactly to what extent,

10  whether there have been proposals or it's just

11  internal talk.

12      Q.      Okay.

13          Have you ever been involved in

14  anything at the Transit Authority involving

15  platform screen doors?

16      A.      No.

17      Q.      When you say no --

18          MR. GENIS:  Dave, I think this is

19      BATES 586343, and it's some emails we're

20      going to take a peak at.

21          (Emails BATES 586343 was marked

22      as Plaintiff's Exhibit 2, for

23      identification, as of this date.)

24      Q.      This an email dated September 26,

25  2007 at 10:00 a.m., from a Minh, M-I-N-H, last

45

1                        J. SANCHEZ

2    name Luong, L-U-O-N-G.

3            A.      Yeah, I see my name there.

4            Q.      Sir, we're putting on the screen

5    what we've marked for identification as

6    Plaintiff's Number 2 and it's some emails and

7    as I said it's dated September 26, 2007, and

8    do you see, you're one of recipients of this

9    email?

10           A.      Right, I see that.

11           Q.      And the subject is, involving the

12   number seven extension project, platform

13   screen door product presentations; do you see

14   that, sir?

15           A.      I see that.  But, you know what,

16   I don't remember --

17           Q.      Okay.

18           A.      -- this meeting.

19           Q.      That's okay, I'm helping you,

20   sir.

21           A.      Yeah.

22           Q.      So, was it part of your job when

23   you worked for the Transit; to receive and

24   send emails from time to time?

25           A.      Oh, yes, of course.

46

1                              J. SANCHEZ

2          Q.      I understand this was a long time

3     ago and you may not remember it, but was this

4     an email that you would have received in the

5     regular course of business while you worked

6     for the Transit Authority?

7          A.      Yes.

8          Q.      And it was sent from somebody

9     from the Transit Authority, correct?

10         A.      Correct, and I was working on

11    that project.

12         Q.      Okay.

13                 And this particular email, 2007

14    September, is talking about presentations by

15    manufacturers of the platform screen door

16    products, and it lists vendors like Faiveley,

17    F-A-I-V-E-L-E-Y?

18         A.      Right, correct.

19         Q.      Curtis, and then Westinghouse,

20    Knorr; K-N-O-R-R, Bremse; B-R-E-M-S-E.  Do you

21    see that, sir?

22         A.      Yes, I see that.

23         Q.      And it talks about the location

24    at 2 Broadway; do you see that, sir?

25         A.      Yes, I see that.

47

```
 1                    J. SANCHEZ
 2        Q.      These were for presentations in
 3   September and October of 2007?
 4        A.      I see that, yes.
 5        Q.      Two Broadway is where the office
 6   of system safety was located for the Transit
 7   Authority, correct?
 8        A.      That's correct, yes.
 9        Q.      And it talks about what the
10   presentation should cover, correct?
11        A.      Correct.
12        Q.      One of the items listed, for
13   example, is safety, among other things,
14   correct?
15        A.      That's correct, yes.
16             MR. GENIS:  And, let's see.  And
17        then there was in fact, Dave, I think
18        it's BATES 586408 -- but then we're
19        going to come back to this page again --
20        which is another email of September 26,
21        2007 from the same person.
22             MR. ROTH:  So the previous
23        exhibit was Exhibit 2, by the way.  And
24        this 586343 was Exhibit 2, and this
25        586408 is going to be Exhibit 3.
```

48

1              J. SANCHEZ

2              (Email BATES 586408 was marked as

3        Plaintiff's Exhibit 3, for

4        identification, as of this date.)

5              MR. GENIS:  Just scroll so we can

6        see his name on there.

7              MR. ROTH:  (Scrolling.)

8              THE WITNESS:  Yeah, I'm there.

9        Q.    We're showing you Plaintiff's 3

10   for identification now, and this is another

11   email of September 26, 2007, and the time

12   would be 13:59, so like almost two o'clock in

13   the afternoon.

14              Do you see that you received this

15   as well?

16        A.    Yes.

17        Q.    And this would be another email

18   that you received in the regular course of

19   your business on behalf of the Transit

20   Authority?

21        A.    That's correct.

22        Q.    It's about that same presentation

23   for the platform screen door products,

24   correct?

25        A.    That's correct, yes.

49

1              J. SANCHEZ

2              MR. GENIS:  Now let's go back to

3         Plaintiff's 2, to the top of the page,

4         and that would be an email of October 2,

5         2007.

6         Q.    Sir, you told us you got some of

7    these emails involving platform screen doors;

8    when were you first involved at the Transit

9    Authority with platform screen doors?

10         A.    I was not involved directly in

11   the decisionmaking, I was providing some

12   information on some of the requirements for my

13   boss, Don Iannuzzi.  But I, again like I said,

14   I don't recall being at these meetings.

15   Perhaps it was sent to me maybe because of the

16   size of the group, I was -- at some point they

17   tell me don't come, that may be why I don't

18   recall.

19         Q.    I'm not asking about the meetings

20   right now, I'm just asking when was the first

21   time in any way, shape or matter you were

22   somehow involved at the Transit Authority with

23   platform screen doors?

24         A.    On the Seven West project, on

25   this project.

50

1                        J. SANCHEZ

2        Q.        We looked, and we're back on

3    Plaintiff's Number 2, and this email that

4    you're CC'd on on October 2, 2007, do you see

5    that it says, "Please be advised that the

6    Westinghouse presentation for platform screen

7    doors scheduled for October 4, 2007, has been

8    cancelled."

9        A.        I see that, yes.

10        Q.        So that means that while the

11    presentation for Westinghouse was cancelled,

12    there were presentations on the other two

13    dates by the other two vendors, correct?

14        A.        Quite possibly, yes.

15        Q.        Do you know why the Westinghouse

16    presentation for platform screen doors was

17    cancelled?

18        A.        I don't know.

19        Q.        Were you at any of the meetings

20    for platform screen doors in September and

21    October of 2007?

22        A.        That I recall, no.

23        Q.        What is the number seven line

24    extension?

25        A.        That is the -- the station that

51

1                          J. SANCHEZ

2    was built in -- on the west side across from

3    Jacob Javits Center.  That was connecting that

4    section to the Times Square, so it was an

5    extension to the Number 7 train.

6          Q.    So that's an extension of the

7    Number 7 train line, correct?

8          A.    Correct, which terminated before

9    at the Port Authority right there on 42nd

10   Street, so it was prolonged to connect to

11   Jacob Javits for services of the events at the

12   Javits Center.

13         Q.    Are you familiar with these three

14   vendors identified in these exhibits;

15   Faiveley, Curtis and Westinghouse?

16         A.    Westinghouse, yes.  The other

17   ones, I'm not.

18         Q.    Westinghouse, is that a fairly

19   large company?

20         A.    Oh, yes.  Very reputable too.

21              MR. GENIS:  Let's go to the next

22         one, that would be Number 4 now, and

23         this is BATES 389761.

24              (Email BATES 389761 was marked as

25         Plaintiff's Exhibit 4, for

52

1                         J. SANCHEZ

2          identification, as of this date.)

3          Q.      We're showing you Plaintiff's

4    Number 4, BATES 389761; do you see this was

5    another email that you were sent when you

6    worked for the Transit Authority, by the

7    Transit Authority, in the regular course of

8    your business?

9          A.      Yes, I see that.

10         Q.      This was also on that number

11   seven extension project, platform screen door

12   study?

13         A.      Yes.

14         Q.      And on this one it shows there

15   was even attachments, some kind of horizontal

16   signal study?

17         A.      Yes.

18         Q.      Does this refresh your memory

19   about any work you were doing back then in

20   2007 on the platform screen doors?

21         A.      Okay, what I need to -- when I

22   was involved with this project, when I was

23   involved, as I can see this here, one of the

24   issues was is the traffic of the trains, how

25   it would pile up the ventilation in the

53

1                       J. SANCHEZ

2    tunnel.  So I remember looking at traffic,

3    because that's the signal condition, we had to

4    see how many trains we could stack up and the

5    delay on the doors and so forth.  So, yes, I

6    remember looking at this from that point of

7    view.

8            Q.    Okay.

9                  By the way, is this project also

10   known as the Hudson Yards?

11           A.    Correct, yes.

12           Q.    So were you being informed, but

13   not being asked about your opinion, or

14   something else, you tell me?

15           A.    I was being informed, and asked

16   opinions to what I thought and, you know, but

17   I don't think -- I was not in the presence of

18   the vendors and stuff.

19           Q.    Okay.

20                 Are you familiar with Robert

21   Montfort?

22           A.    Yes.

23           Q.    Who is he?

24           A.    He was my supervisor.  He was my

25   first boss at the New York City Transit, he

54

1                        J. SANCHEZ

2    was a principal engineer, mechanical engineer.

3    So I joined with him being my supervisor, and

4    then as I was promoted to principal, then Don

5    Iannuzzi became my supervisor.

6          Q.    So designs have to make sense,

7    correct?

8          A.    Correct.

9          Q.    And you have to, in other words,

10   get out of the nineteenth century to have

11   proper designs, correct?

12         A.    That is correct, yes.  Some

13   require changes, yes.

14              MR. GENIS:  You know Dave, could

15         you put up BATES 389765.  While you're

16         doing that, I'll ask some other

17         questions.

18         Q.    Where is Robert Montfort now,

19   sir?

20         A.    He is retired.

21         Q.    Do you know where he lives; I

22   mean, is he in New York, Florida?

23         A.    Last I knew, he lived in New

24   Jersey, but I don't know where he is.  I

25   haven't kept track with it.

55

1                          J. SANCHEZ

2          Q.      How about Don Iannuzzi, your

3    boss?

4          A.      He also retired.  I knew he lived

5    in New York somewhere, like Yonkers, someplace

6    up there.  At the end of one of the green

7    lines, somewhere up there.

8          Q.      Okay, thank you.

9                  MR. GENIS:  I'm going to look at

10   an email of October 9, 2007 at 15:21.

11                 MR. ROTH:  That's Exhibit 5.

12                 (Email BATES 38965, was marked as

13         Plaintiff's Exhibit 5, for

14         identification, as of this date.)

15         Q.      We're showing you now Plaintiff's

16   Number 5, BATES stamped 389765, an email from

17   Robert Montfort on October 9, 2007.  And I'm

18   going to read it and tell me if I'm reading it

19   accurately, sir.

20                 "This design makes no sense, all

21   we are doing is designing for failure to make

22   something to work.  The doors are too far from

23   the edge, the mezzanine needs to be raised to

24   make room for the signal heads or redesign the

25   heads to fit (get out of the nineteenth

56

1                    J. SANCHEZ

2    century)."

3                    Am I reading that accurately so

4    far?

5         A.    Yes.

6         Q.    Then it continues, "We will look

7    like fools to the world.  The doors should be

8    very close to the rub board to minimize space

9    behind the doors-safety issue."

10                   Did I read that accurately so

11   far?

12        A.    Yes.

13        Q.    And then he talks about other

14   issues of the design that need to be fixed,

15   "Otherwise everybody is going to wonder who

16   designed this mess."

17                   Correct?

18        A.    That's correct, yes.

19        Q.    Are you aware of any feasibility

20   studies done in December of 2007 about

21   installing platform edge doors on the Second

22   Avenue subway?

23        A.    Not on the Second Avenue subway,

24   on the seven extension, yes.

25        Q.    The Second Avenue subway was

57

1                          J. SANCHEZ

2    going to be a new subway line, correct?

3         A.     That's correct.

4         Q.     As was that number seven

5    extension to the Hudson Yards, correct?

6         A.     That's correct.

7         Q.     When you're building a new line,

8    the new stations, can we agree that the actual

9    cost of these platform screen doors themselves

10   is not a significant amount in the overall

11   station budget?

12        A.     No, that the steel works is very

13   heavy.  The steel works is the majority of the

14   budget.  That means, you know, structural,

15   concrete, things like that.

16        Q.     So we agree that the actual cost

17   of the platform screen doors themselves is not

18   a significant amount in the overall station

19   budget and would be mitigated by the savings

20   in reduced mechanical and electrical

21   equipment, true?

22        A.     I wouldn't go that far.  What I

23   mean is, every system has to be looked upon.

24   And there's some -- how can I put it, there

25   are some tradeoffs that you have to do to make

58

1                    J. SANCHEZ

2    things happen, so -- I mean, I don't know the

3    numbers, what are the tradeoffs, but if the

4    intent is to reduce the air-conditioning, the

5    reduction of the air-conditioning would be

6    somewhat to reduce in the rules, okay.  So the

7    trade off and everybody, it depends on the

8    location you have to look at that, you know.

9         Q.     Now, when you were at the Transit

10   Authority, were you ever asked your opinion if

11   you were in favor of these platform edge doors

12   or platform screen doors?

13        A.     Well, not quite in favor, but

14   they did ask me what I thought of, you know,

15   what are the pluses and minuses, what we would

16   have to do.

17              MR. GENIS:  Dave, can you put up

18        I think it's BATES 5582, if I'm reading

19        that correctly.  It's an email dated

20        March 12, 2009 at 12:16 it's to Ken

21        Brown from Robert Montfort.

22              MR. ROTH:  That would be

23        Exhibit 6.

24              (Email BATES 5582 was marked as

25        Plaintiff's Exhibit 6, for

59

J. SANCHEZ

1

2        identification, as of this date.)

3        Q.      Sir, we're showing you from

4    Plaintiff's Exhibit Number 6, BATES stamped

5    5582, an email from Ken Brown to Robert

6    Montfort, subject, platform edge doors.

7        A.      Yes.

8        Q.      It says "Bob, we were contacted

9    by another transit property who wants to ask

10   us about platform edge screens.  Who would be

11   knowledgeably (sic) about this subject,

12   specifically it as it relates to either second

13   Avenue or the Seven West extension?  Thanks,

14   Ken."

15              Do you see that, sir?

16       A.      I see that.

17       Q.      Now we're going to go to the top

18   of the page, what appears to be a responsive

19   email to Ken Brown from Robert Montfort on

20   October 12, 2009, same subject, platform edge

21   doors.  Do you see this, sir?

22       A.      I see that.

23       Q.      "Ken, the subject is so political

24   that I do not know who, if anyone, will talk

25   to other properties.  There are many people

60

1                          J. SANCHEZ

2    totally in favor of them, and we have done

3    considerable study of them under Second Avenue

4    and Seven West with our consultants, Don and I

5    are totally with their use, but there is no

6    champion for the use within the operating

7    department.  I think every new subway around

8    the world uses them except, NYCT.  I think the

9    best thing to do is contact Connie or having

10   your boss talk to the President to see if NYCT

11   wants to discuss this problem."

12                   Did I read this accurately, sir?

13        A.     Yes.

14        Q.     By the way, who is Ken Brown?

15        A.     Ken Brown is the director of

16   system safety.

17        Q.     Do you agree with what's written

18   in this?

19        A.     Well, I could -- if I agree, I

20   don't want to quite say I agree.  But I do

21   know that, yes, we discussed the subject

22   several times.  We were in agreement that we

23   -- it was time to use them, especially on the

24   Second Avenue subway and Seven West.  The

25   reason is because they were going to be

61

1                         J. SANCHEZ

2    air-conditioned stations, so it became an

3    energy savings incentive that we were looking

4    for.

5         Q.      Was Don Iannuzzi, your boss, was

6    he knowledgeable on the subject of platform

7    edge doors?

8         A.      He was, and I was his best kept

9    secret.

10        Q.      What do you mean by that?

11        A.      I mean, this is what I'm trying

12   to tell you that, you know, we discuss a lot

13   of things.  We basically have a giant office,

14   it was Don's office, one office and then the

15   next, my office.  And they used to say I

16   should have a sign up there that says

17   continuing education unit, because we always

18   were on my board talking about things,

19   drawing, so I was always imparting knowledge

20   to them.  So I was an educational tool to

21   them.  So yes, he knew, he learned from all of

22   us, and I think he even took some tours to

23   visit other systems.  I think even he went to

24   Singapore, I'm not quite sure.

25        Q.      We're going to get to that in a

62

1                        J. SANCHEZ

2     minute.

3                   By the way, was Robert Montfort

4     also knowledgeable about platform edge doors?

5          A.      Yes, he was a member of the

6     NFPA 130 who was also trying to provide, as an

7     alternative for design, the use of platform

8     screen doors.

9                   MR. GENIS:  Let's go to the next

10              exhibit, which I think is BATES 5664, if

11              I'm reading it correct.  That's dated

12              March 13, 2009.

13                   (Email BATES 5664, was marked as

14              Plaintiff's Exhibit 7, for

15              identification, as of this date.)

16         Q.      All these emails I'm showing you,

17    these are all emails created, kept and

18    maintained by the Transit Authority in the

19    regular course of business, correct?

20         A.      That's correct, yes.

21                   MR. GENIS:  Dave, you tell me

22              when you're ready.

23                   THE COURT REPORTER:  Can we take

24              a quick break?

25                   (Video recording stopped.)

63

1              J. SANCHEZ

2              (A brief recess was held from

3        11:23 a.m. to 11:30 a.m.)

4              (Video recording started.)

5        Q.    Sir, we're looking at Plaintiff's

6  Number 7, BATES stamped 5664, we're going to

7  look at the bottom and go up so that we could

8  see the whole chain.  Let's go to the email,

9  March 12, 2009 at 11:40 a.m.

10             MR. ROTH:  (Indicating).

11        Q.    Mr. Sanchez, I'm showing you

12  Plaintiff's Number 7, it's a chain of emails

13  and I'm going to start talking with one on

14  March 12, 2009 at 11:44 in the morning, and

15  it's from Paul Skiora, to Don Iannuzzi, your

16  boss, and it also CCs Kenneth Brown, Michelle

17  Kennedy, Robert Montfort, among other people.

18  And the subject is platform edge doors; do you

19  see that?

20        A.    I see that, yes.

21        Q.    It's to Don Iannuzzi, and it says

22  "Don, OSS was contacted by another transit

23  property inquiring about the use of platform

24  edge doors/guards.  The attached email

25  contains a feasibility study that was done for

64

1                       J. SANCHEZ

2    Second Avenue.  Can you please provide the

3    contact name that we can refer the other

4    property to so that they can discuss NYCT's

5    findings on this subject."

6                Do you see that, sir?

7         A.    I see that, yes.

8         Q.    OSS is Office of System Safety,

9    correct?

10        A.    That's correct, yes.

11        Q.    And then the next email above

12   that seems to be responsive from that Paul

13   Sykora on March 12, 2009 at 2:54 p.m. to

14   somebody saying, "Don informed me I should

15   contact you as MTACC was handling this issue."

16                Do you see that, sir?

17        A.    I see that, yes.

18        Q.    What is MTACC?

19        A.    What it was, when I join New York

20   City Transit in 1999, New York City Transit

21   had a department called capital program

22   management.  Under that we handle all capital

23   projects, then when Second Avenue and Seven

24   West extension became about, they wanted to

25   kind of like separated two accounts, because

65

1                          J. SANCHEZ

2    there was like the old system, which is, what

3    do you call it -- not traditional, I forgot

4    what it -- I forget the term they used, but it

5    means that, you know, it's like a -- has a

6    historical side and then there's the new

7    system that involves the new set of rules.  So

8    then the MTACC took on the Second Avenue and

9    the Seven West project, which were like

10   following totally new construction and the new

11   standard we would apply a lot more than we

12   apply for the old system.  So they created the

13   MTACC and that was taking care of this.

14        Q.    Now I'm going to go to the next

15   email above that on the same page of March 13,

16   2009 at 8:20 in the morning.  And it's again

17   to Paul Sykora on platform edge doors, and it

18   says, "I will help you as much as I can on

19   this topic.  But I suspect you may already

20   have everything (the feasibility report) that

21   we have.  Our conceptual design scope of work

22   did include a study for the PEDs.  We did in

23   this study, recommended it to the president,

24   Mr. Roider at the time.  He killed it (no way,

25   no how).  That was the end of it.  We never

66

```
 1                     J. SANCHEZ
 2   went beyond conceptual."
 3                Did I read that accurately so
 4   far, sir?
 5        A.    Yes.
 6        Q.    In other words, there was a study
 7   done, a feasibility study, and after the
 8   study, it was recommended to the president of
 9   the Transit Authority that they utilize the
10   platform edge doors, correct?
11                MR. KEAVENEY:  Objection.
12        A.    That's what I understand what it
13   says.
14        Q.    And that the president of the
15   Transit killed it, just no way, no how,
16   correct?
17        A.    That's what the statement says,
18   yes.
19        Q.    And then it continues, "The
20   agency asking you for the PED, platform edge
21   doors, information is probably knocking at the
22   wrong door, it is like asking the government
23   of Ecuador how they deal with snow removal in
24   winter."
25                Did I read that accurately?
```

67

                          J. SANCHEZ

1

2        A.      Yes.

3        Q.      So, when you saw the prior email

4   about politics playing a role and now you see

5   this email, does that indicate to you that the

6   people with the knowledge and that did the

7   study were recommending that the platform edge

8   doors be used, and then for a political reason

9   the project was killed?

10              MR. KEAVENEY:  Objection.  Go

11         ahead, Mr. Sanchez.

12       A.      Okay, so that unfortunately is

13  sometimes the -- our tragedy, or what you call

14  it, as an engineer, we can foresee an

15  approach.  But then -- I don't want to call it

16  politics, I want to call it management --

17  comes into the picture, which looks at the

18  many other angles, and they make a

19  determination whether we go forward or not.

20              MR. GENIS:  Let's look at BATES

21         406270, and that's an email of March 25,

22         2010.

23       Q.      All the emails we've been

24  reviewing so far are emails created, kept and

25  maintained by the New York City Transit

68

```
1                    J. SANCHEZ
2    Authority in the regular course of their
3    business, correct?
4         A.     Correct.
5                MR. ROTH:  Give me that number
6         again, please?
7                MR. GENIS:  406270.  And then
8         right after that, Dave, we're going to
9         do 40269.  I'm just trying to keep it in
10        order.  Throughout the same page, it
11        doesn't matter, however you have it.
12               MR. ROTH:  This will be
13        Exhibit 8.
14               (Email BATES 406270, was marked
15        as Plaintiff's Exhibit 8, for
16        identification as of this date.)
17        Q.     We're showing you now Plaintiff's
18   Exhibit 8, BATES stamped 406270, it's an email
19   from Thomas Millbury to Don Iannuzzi on
20   March 25, 2010, and the subject is platform
21   edge doors; do you see that?
22        A.     I see that, yes.
23        Q.     And it says, "Don, a major
24   initiative is underway to implement platform
25   sliding doors at the edges of platforms in
```

69

1                        J. SANCHEZ

2    existing stations."

3                   Did I read that correctly?

4         A.       Yes.

5         Q.       And then I'm just going to read

6    the next sentence; "At the present time, the

7    L line stations are being considered as the

8    first locations for the platform doors."

9                   Did I read that accurately?

10        A.       Yes.

11        Q.       Then they talk about issues

12   involving ventilation, something you told us

13   you're an expert in and then, "This is in

14   action of the train, et cetera."  You see all

15   that, sir?

16        A.       I see that, yes.

17        Q.       And I'm going to go to the second

18   to last paragraph, and do you see the sentence

19   five lines in, where it starts, "openings can

20   be introduced"?

21        A.       I see that, yes.

22        Q.       It says, "Openings can be

23   introduced in the platform door system by

24   converting solid glass panels to a louvered or

25   screened arrangement."

70

1                    J. SANCHEZ

2          A.      Yes.

3          Q.      So in other words, can you

4    explain to us what was the problem identified

5    and what was the solution to the problem?

6          A.      Okay, so as I explained before,

7    every system will have its own needs to

8    implement different technology.  In New York

9    City Transit, the heating index is

10   inconsistent being that it has very low

11   ceiling, so it presents challenges.  You heard

12   stories of the summers, you know, the heat

13   being one of the problems.  So putting up a

14   door will certainly create harm to the public

15   by blocking the -- limiting the ventilation,

16   and removing the heat.  So this is what is

17   referring to that, if you put a door, that's

18   going to be, what do you call it drastic, you

19   put a full height door, you in turn keep the

20   air from the tunnel in the tunnel and you keep

21   the air in the station in the station.  But

22   then there is no displacement.  So what this

23   is trying to say is look, we know that there

24   is a problem, so we were going to use a

25   mechanism where there is leakage through the

71

1                          J. SANCHEZ

2   door, so that it will limit, but it will not

3   prevent the exchange of air from the tunnel to

4   the station and the station to the tunnel, may

5   be our target.

6          Q.    So that's a simple fix to the

7   problem, correct?

8          A.    I wouldn't call it simple, but

9   it's a concept.

10                MR. GENIS:  Let's now go 406279.

11                (Email BATES 406279 was marked as

12         Plaintiff's Exhibit 9, for

13         identification, as of this date.)

14         Q.    Who is Thomas Millbury?

15         A.    I don't know exactly who he is.

16  I heard his name, but I never met him.

17         Q.    Okay.

18                So we're showing you what we've

19  now marked for identification as Plaintiff's

20  Exhibit Number 9, BATES stamped 406279, and

21  this is an email dated March 29, 2010; do you

22  see that, sir?

23         A.    I see that, yes.

24         Q.    Do you see that this was also

25  sent to you?

72

1                          J. SANCHEZ

2          A.     I see that, yes.

3          Q.     And it was sent from your boss,

4    Don Iannuzzi?

5          A.     Yes.

6          Q.     And the subject is platform edge

7    doors?

8          A.     Yes.

9          Q.     Okay.  And it states, "We are

10   well aware of the pros and cons of platform

11   edge doors and have been advocating their use

12   on the Second Avenue and Seven West extension

13   projects from their initial scopes of works."

14                Did I read that accurately?

15         A.     That's correct, yes.

16         Q.     This is the chief mechanical

17   engineer for the capital program management

18   division saying that we, meaning I guess his

19   unit, department, division and the people with

20   expertise in this area have been advocating

21   the use of the platform edge doors, correct?

22         A.     That's correct, yes.

23         Q.     "And of course CPM, capital

24   program management, has the technical ability

25   to perform the analysis."

73

1                           J. SANCHEZ

2                 Did I read that accurately?

3        A.      That's correct, yes.

4        Q.      And then he said, "This analysis

5    is no different than the analysis that was

6    performed for the Hillside Avenue flood

7    mitigation project, correct?

8        A.      Correct.

9        Q.      "The aboveground platforms don't

10   require analysis, but will probably require

11   canopy-mounted fans to provide ventilation in

12   warm weather."

13                Did I read that accurately?

14       A.      That's correct, yes.

15       Q.      "The fifteen underground

16   stations, whether they have center or side

17   platforms, will require analysis to ensure

18   that the stations are not overly heated during

19   the warm weather or that the station's ability

20   to control smoke during a fire is not

21   diminished."

22                Did I read that accurately?

23       A.      That's correct, yes.

24       Q.      And do you agree, by the way, I'm

25   going to back up, that first sentence I read,

74

1                          J. SANCHEZ

2    that we are well aware of the pros and cons of

3    platform edge doors and have been advocating

4    their use on the Second Avenue and Seven West

5    extension project from their initial scope of

6    work; do you agree with that statement?

7           A.    Yes.

8           Q.    And is he correct, when Don

9    Iannuzzi said those things?

10          A.    Yeah, he's correct.  We discussed

11   many times, pros and cons.  And like I said,

12   we identified every station will have to have

13   different situations on it, so, yes.

14          Q.    And then he says this is the

15   first time he's hearing of this major

16   initiative, we're going to scoot down a little

17   bit, "We estimate that it will take one year

18   to perform the ventilation and smoke control

19   analysis for all fifteen underground stations.

20   This time can be shortened if computer time is

21   purchased from Fleunt, F-L-E-U-N-T."

22          A.    That's correct.

23          Q.    So in other words, in 2010 --

24   March 2010, they can do all this analysis, can

25   be done in a year, and if they purchase the

75

                        J. SANCHEZ

1

2   computer time from some other company, they

3   can do it even faster, correct?

4        A.    Correct.

5        Q.    You agree with all that too,

6   correct?

7        A.    That's correct.  I was the

8   instrumental end of it, not technical end of

9   it.

10       Q.    Again this email was created,

11  kept and maintained by Transit Authority in

12  the regular course of its business, correct?

13       A.    Correct.

14             MR. GENIS:  I'd like to now go to

15       BATES 406272, this an email March 30,

16       2010 at 3:25 p.m.  Plaintiff's 10.

17       Q.    While he's looking, when we had

18  mentioned that earlier document and we've

19  talked about the -- we, you know, that was

20  written by Don Iannuzzi, that included

21  yourself as well, correct?

22       A.    That's correct, yes.

23             MR. GENIS:  Tell me whenever

24       you're ready to put that one up.

25             MR. ROTH:  406272?

76

1                    J. SANCHEZ

2              MR. GENIS:  That's what I have.

3              MR. ROTH:  I have 292.

4              MR. GENIS:  I don't know, that's

5         what my handwritten note is but

6         3/3/2010, 3:25 p.m.  You know what I

7         also have it on another page as 406288.

8              MR. ROTH:  Yes, that's what I

9         have.

10             (Email BATES 406288 was marked as

11        Plaintiff's Exhibit 10, for

12        identification, as of this date.)

13        Q.    We're showing you plaintiff's

14   Exhibit Number 10, BATES stamped 406288, dated

15   March 30th of 2010 at 3:25 p.m.; do you see

16   that this was also sent to you, sir?

17        A.    Yes, I see that, yes.

18        Q.    Who is Thomas Lamb that was

19   sending this?

20        A.    Thomas Lamb was hired to be

21   innovation technology leader, I don't quite

22   remember the full title, but his mission was

23   to investigate potential innovation and new

24   technology that may emerge in the industry and

25   see how he could recommend and see what we

77

1                        J. SANCHEZ

2    could perceive as reasonable to use in the

3    system or not.

4         Q.     Now let's go back to the top

5    page, please.

6                Now, it starts at the beginning,

7    "Tom, I must apologize, but after seeing these

8    emails, I feel compelled to raise a question

9    or two concerning platform edge doors, what

10   appears to be a developing work effort to

11   create another initiative to reconsider the

12   subject of platform edge doors."

13               Did I read that accurately, sir?

14        A.     Yes.

15        Q.     My first question is, when was

16   the platform edge doors first considered by

17   the Transit?

18        A.     You mean considered or became

19   aware of?

20        Q.     Well, both.

21        A.     Okay, what happens is, as I

22   mentioned, we were involved with NFPA 130,

23   that's the National Fire Protection

24   Association 130, which deals with safety in

25   the systems.  Since the 80s, the standard has

78

1                    J. SANCHEZ

2    been advocating as a potential solutions the

3    use of platform screen doors, so we were

4    coming -- me, from Hong Kong and Singapore and

5    London, we were aware of the platform screen

6    doors, and most of the members of the

7    committee.  So he was certainly in the stream

8    of the information, so this concept is not a

9    revelation, it's just that, as we were looking

10   at projects like Second Avenue and Seven West,

11   it became an opportunity to investigate,

12   officially, as part of the New York City

13   Transit.

14        Q.    So when did the Transit Authority

15   first start to consider the subject of these

16   platform edge doors?

17        A.    I would say when the Seven West

18   started was the first incident.

19        Q.    When was that?

20        A.    Oh, early 2000s.  I can't

21   remember the date.

22        Q.    Okay, because this is talking

23   about reconsidering it, so how many times, as

24   of March 30, 2010, did the Transit consider

25   platform edge doors?

79

J. SANCHEZ

1

2      A.      Well, I think of it this way;

3    Second Avenue subway started in the year of

4    2001, I believe, whereabouts the Seven West

5    extension also started.  So I would say at

6    least in the early 2000s.

7      Q.      So, what we saw from some of the

8    other emails is, it was considered at one

9    point, but then it was killed by Roider, as

10    the email said, for political reasons, and

11    then after that, it's now being reconsidered,

12    correct?

13      A.      Correct.

14      MR. KEAVENEY:  Objection.

15      Q.      And was Roider still the head in

16    2010?

17      A.      I don't remember when he left.

18      Q.      And I'm going to scoot down

19    towards the bottom of the page where it says

20    beginning in early March, that's it.  Do you

21    see where it says "Beginning in early March,

22    the innovation and technology group has been

23    actively been working on ideas to mitigate

24    subway vehicle contact with humans in the

25    station platform area leading to injury or

80

1                           J. SANCHEZ

2    death."

3                   Did I read that accurately?

4          A.      Yes, you do.

5          Q.      "This need to consider new ideas

6    was articulated by NYCT OSS."  That's New York

7    City Transit Office of System Safety, correct?

8          A.      Correct.

9          Q.      And, the New York State Public

10   Transportation Safety Board, correct?

11         A.      Correct.

12         Q.      So in other words, they've

13   identified a need, correct?

14         A.      Correct.

15         Q.      And the need was to mitigate

16   subway vehicle contact with humans in station

17   platform areas leading to injury or death,

18   correct?

19         A.      Correct.

20         Q.      So once this need is identified,

21   the only question is how do you fix it,

22   correct; how do you solve the problem?

23         A.      Correct.

24         Q.      Okay, then it says, "Platform

25   edge doors is just one idea being considered

81

1                          J. SANCHEZ

2    along with some other significantly lower-cost

3    approaches, which could potentially be

4    implemented subway system wide to address the

5    need expressed by office of system safety,

6    that of diminishing train and human contact in

7    the station areas."

8              Correct?

9         A.    Correct.

10        Q.    And, do you agree with these

11   statements that there was a need to mitigate

12   subway vehicle contact with humans leading to

13   injury or death?

14        A.    Well, certainly the -- there is a

15   problem, but I mean, one of the options is

16   platform screen doors, but I won't call it the

17   only solution.

18        Q.    I understand.  I didn't imply

19   that on the question, I just asked that --

20        A.    Yeah.

21              MR. GENIS:  I now am going to

22        look at, I have it as BATES 406292.

23              (Email BATES 406292 was marked as

24        Plaintiff's Exhibit 11, for

25        identification, as of this date.)

82

1                          J. SANCHEZ

2          Q.     Sir, on Plaintiff's 11, first you

3    see this email from Thomas Millbury dated

4    March 31, 2010 at 10:52 a.m.?

5          A.     Yes.

6          Q.     It's involving platform edge

7    doors?

8          A.     Yes.

9          Q.     And its says, "Greg, a team of

10   four NYCT employees, of which I was one, that

11   visited Seoul, South Korea recently to review

12   the installation of platform doors on the

13   Seoul Metropolitan Rapid Transit System."

14                Did I read that accurately?

15         A.     Yes.

16         Q.     "We came away with a positive

17   opinion."

18                Did I read that accurately?

19         A.     Yes.

20         Q.     And, that was from a whole team

21   of people that went there, correct?

22         A.     That's correct.

23         Q.     And that was the conclusion of

24   the team; that it was a positive opinion to

25   use platform screen doors, correct?

83

1                      J. SANCHEZ

2        A.      Correct.

3        Q.      And then they say, "A copy of a

4    team trip report is attached."  Correct?

5        A.      Correct.

6        Q.      And then, above it is another

7    email on that chain, and you're CCd on it,

8    correct?

9        A.      Yes.

10       Q.      And that's again March 31, 2010,

11   and it's by Tom Lamb to Tom Millbury, "Thanks

12   for providing a copy of the trip report, I

13   will be certain to read it through."

14               Okay, did I read that accurately,

15   sir?

16       A.      Yes.

17       Q.      All of these emails are created,

18   kept and maintained by the New York City

19   Transit Authority in the regular course of

20   their business, correct?

21       A.      Correct.

22               MR. GENIS:  And, can we look now

23         at that trip report that was just

24         referred to, and I think it's BATES

25         1399, and then I'll flip to a particular

84

1                    J. SANCHEZ

2       page once we're there, and maybe we can

3       deem it 11A.  That's a fourteen-page

4       document.

5                    (Trip report BATES 1399, was

6       marked as Plaintiff's Exhibit 11A, for

7       identification, as of this date.)

8                    MR. GENIS:  Jump to page -- well

9       I wanted to look at the first page so he

10      sees what I'm reading from.

11      Q.    We're showing you what we've

12   marked for identification as Plaintiff's

13   Exhibit 11A that starts on BATES stamp 1399

14   and it's fourteen pages long.

15                   MR. ROTH:  I have twenty-seven

16      pages, that's what I'm concerned about,

17      just hold on one second.

18                   MR. GENIS:  You might have

19      attachments to it, I'm just looking at

20      the report itself.

21                   MR. ROTH:  So this document, just

22      for the record, it starts at 1399, and

23      it's twenty-seven pages, which include

24      the attachments.

25                   MR. GENIS:  Fine, that's fair

85

1                      J. SANCHEZ

2         enough, okay.

3         Q.    Do you see, Mr. Sanchez, 11A, how

4    it says platform edge screen door systems,

5    trip report South Korea?

6         A.    Yes.

7         Q.    Okay.

8         A.    Yes.

9         Q.    Now what we're going to do is,

10   let's go to the second page of it, where it

11   says history, that would be the next page.

12   And it says SMRT runs the longest network

13   subway system in Korea, one hundred

14   forty-eight stations, over ninety-four miles,

15   carrying three million passengers daily; do

16   you see that, sir?

17        A.    I see that, yes.

18        Q.    They successfully completed the

19   installation of platform screen doors at all

20   148 operating stations, correct?

21        A.    Correct.

22        Q.    And the primary reason for the

23   installation of the PSDs, platform screen

24   doors, was for the safety of the customers;

25   did I read that accurately?

86

1                          J. SANCHEZ

2          A.      Yes.

3          Q.      And it states, "there have been a

4    number of suicides in the system from people

5    struck by trains, so after the original PSDs

6    (approximately twenty-four stations) were

7    installed, the mayor of Seoul committed to

8    installing PSDs in all subway stations in the

9    SMRT (5 to 8 lines) and Seoul transit (1 to 4

10   lines), systems by the end of 2010."

11                 Did I read that accurately?

12         A.      Yes.

13         Q.      And the project was in fact

14   completed by the end of 2009, correct?

15         A.      That's what it says.

16         Q.      "Other benefits of the PSDs were

17   environmental improvements, including a

18   reported 7.9% reduction in platform noise, a

19   reported 35.3%  improvement in air quality and

20   a reported 33.5% improvement in the efficiency

21   of the heating and air-conditioning systems."

22                 Is that accurate?

23         A.      That's correct, that's the other

24   benefits that come with that.

25         Q.      "Prior to the installation of the

87

1                          J. SANCHEZ
2    PSDs, they experienced twenty-two customers
3    struck by trains with thirteen deaths and nine
4    serious injuries."
5                    Did I read that accurately?
6         A.    Yes.
7         Q.    "Following the installation of
8    the PSDs, they have not had any customers
9    struck by trains."
10                   Did I read that accurately?
11        A.    Yes, you did.
12        Q.    And then they talk about how the
13   installation took months to complete and they
14   joined with manufacture, et cetera, correct?
15        A.    Correct.
16        Q.    I'm going to scoot over to the
17   report, do you see a heading, general safety
18   on Plaintiff's 11?
19        A.    Yes.
20        Q.    And there's bullet points, the
21   first one is, "Installation of PSDs, platform
22   screen doors, will reduce, if not eliminate,
23   incidents of customers struck by trains, as
24   well as customers walking into the side of
25   trains."

88

1                          J. SANCHEZ

2               Do you see that?

3       A.      I see that, yes.

4       Q.      Do you agree with that?

5       A.      Yes, I do.

6       Q.      Next; "SMRT also saw reduction in

7    customer drag incidents insomuch as the

8    obstruction sensing detectors prevents a train

9    from leaving the station if an obstruction is

10   detected."

11              Do you see that?

12      A.      I see that, yes.

13      Q.      Do you agree with that?

14      A.      I do.

15      Q.      Next bullet point.

16              "The use of full height platform

17   screen doors will improve the air quality and

18   reduce noise on the platform by isolating the

19   track (steel dust) and train from the

20   platform.  SMRT reported a 35.3% improvement

21   in the air quality and a 7.9% decrease in

22   noise."

23              Do you agree with that?

24      A.      I agree with that, yes.

25      Q.      Next bullet point, "Platform

89

J. SANCHEZ

1
2   screen doors should help reduce the amount of
3   combustible debris that enters the track way
4   by isolating the platform from the track."
5                   Did I read that accurately?
6        A.     Yes.
7        Q.     "This would have an impact on
8   reducing the number of track fires by
9   eliminating some of the materials that can
10  burn."
11                  Did I read that accurately?
12       A.     Yes.
13       Q.     Would you agree with those
14  statements as well?
15       A.     Yes.
16       Q.     These are additional benefits to
17  having the platform screen doors in addition
18  to preventing, eliminating people getting
19  killed or injured, true?
20       A.     That's correct, yes.
21       Q.     Did those benefits that we just
22  talked about, the safety of the track fires,
23  the noise, the air quality, would that all
24  apply to New York City Transit Authority as
25  well if they're done?

90

                        J. SANCHEZ

1

2       A.      Yes.

3       Q.      Now let's go, as I say to page

4   12, operational advantages; do you see that

5   heading, sir?

6       A.      Yes.

7       Q.      "The installation of the PSD,

8   platform screen door system, at NYCT, New York

9   City Transit, would provide various advantages

10  to existing problems in stations:  Reduction

11  in customers struck by trains, 12-9

12  suicides/attempts, improved air quality from

13  decreased steel dust exposure, reduction of

14  track debris/fires, reduction of platform

15  noise and station HVAC implementation."

16              Did I read that accurately?

17      A.      Yes.

18      Q.      Do you agree with all of that?

19      A.      Yes.

20      Q.      You remember when I mentioned

21  12-9s before?

22      A.      Yeah.

23      Q.      Do you see it there now?

24      A.      I think I know.

25      Q.      And then additionally, the heat

91

1                    J. SANCHEZ

2   generated by subway train motors would be

3   isolated from the platform, this would be

4   especially helpful during summer months.

5             Did I read that accurately?

6        A.      Yes, you read that accurately.

7        Q.      Do you agree with all of that?

8        A.      Well, I agree with the principal,

9   but I would like to caution you that it is not

10  magical.  This is what I was explaining

11  earlier, that for all of this bad things to

12  happen, it means that you have to make changes

13  to the system or configure the system to make

14  this happen.

15       Q.      Okay, understood.  Then -- by the

16  way, have you been to Korea to see this

17  system?

18       A.      Actually, not to Korea.

19       Q.      Going to the next paragraph.

20             "There were 121 customer jumpers

21  or 12-9s in 2009.  These incidents caused over

22  four thousand six hundred train delays that

23  cannot be calculated in dollar amounts, but

24  have inconvenienced hundreds of thousands of

25  customers, not to mention the cost of lost

92

1                        J. SANCHEZ

2    time for train crews suffering from trauma

3    related to the incident."

4                Did I read that accurately?

5        A.      Yes.

6        Q.      Do you agree with that?

7        A.      Yes.

8        Q.      "The PSD system should at least

9    impede and may likely eliminate customers from

10   being struck by trains, jumping in front of an

11   incoming train and accessing the tracks."

12               Did I read that accurately?

13       A.      Yeah.

14       Q.      Would you agree with that too?

15       A.      I do.

16       Q.      And then it goes on, "If an HVAC

17   system is installed, the floor to ceiling

18   modular PSD system should improve the air

19   quality in stations by decreasing steel dust

20   levels on platforms and mezzanine areas and

21   isolating the platforms from the heat from the

22   trains."

23               Do you agree with that?

24       A.      I agree with that, yes.

25       Q.      "It is also expected that the

93

1                          J. SANCHEZ

2    platform screen doors will prevent debris and

3    garbage from getting on the tracks which

4    should reduce track fires, minimize the

5    blockage of switch mechanisms and help reduce

6    clogged drains."

7                    Do you agree with that?

8         A.      I agree with that.

9         Q.      "The full height PSD may insulate

10   and reduce the noise level."

11                   Do you agree with that?

12        A.      Yes.

13        Q.      And then it talks about, "SMRT

14   has boasted about it's 35% HVAC efficiency

15   increase at its stations.  Combined with the

16   solutions for the piston effect, the HVAC

17   solutions of NYCT stations can be addressed."

18                   Do you agree with that?

19        A.      Let me -- repeat again?

20        Q.      Sure, just take a look at it.

21        A.      Well, I agree with that it can be

22   addressed.  Like I said, it's not a clearcut

23   solution, but it can be addressed.

24        Q.      Great, let's go to the very next

25   page, page 13 on 11A which is BATES 1411, the

94

1                    J. SANCHEZ

2    heading is economic considerations.  I'm going

3    to start with the second sentence, "It was the

4    understanding of the travelers, meaning the

5    New York City Transit Authority people, that

6    the PSD system would be installed at a

7    predetermined number of locations in exchange

8    for advertising revenue generated from the PSD

9    displays."

10                   Did I read that accurately?

11        A.      Yes, you did.

12        Q.      And then I'm going to scoot down

13   a little; "These costs would include, but not

14   be limited to, engineering design review

15   costs, physical location inspection,

16   development of specialized work equipment for

17   PSD -- platform screen door -- deployment,

18   providing space for platform screen door

19   control equipment at stations, interfaces to

20   rail command center, modifications to New York

21   City Transit rail car door and train operator

22   control systems, deliverables, such as

23   platform screen door drawings and manuals

24   required for maintenance, and New York City

25   Transit personnel training."

95

J. SANCHEZ

1

2          Did I read all that accurately?

3     A.     Yes.

4     Q.     And do we agree that if a vendor

5  would pay for the cost of the platform screen

6  doors in exchange for getting the ad revenues

7  placed on them, this could virtually be for

8  free or minimal cost to the New York City

9  Transit Authority, true?

10          MR. KEAVENEY:  Note my objection.

11     A.     It could be, yes.

12     Q.     Would that be a benefit to the

13  Transit Authority if they can get these

14  platform screen doors done at no or limited

15  cost?

16     A.     Personally, I wouldn't want it.

17  I wouldn't want it that way.

18     Q.     Why?

19     A.     Because it's like a mob, I don't

20  want to be tied to the mob.  I would rather

21  pay for it out of my own pocket.  So I

22  separate business, you know, because this is

23  kind of like a conflict of interest, in my

24  opinion.  Nobody does a favor for free.

25     Q.     Right, they're saying we will pay

96

J. SANCHEZ

1

2    for it all, but we want the advertising

3    revenue for ads that we can put, correct?

4         A.    Correct.  But again, personally,

5    I wouldn't do it that way because I don't like

6    to deal with the mob.

7         Q.    Let's back up, I just want to

8    make sure, are you calling these manufacturers

9    and consultants and entities that would be

10   installing and doing these platforms screen

11   doors, are you calling them the mob?

12        A.    I don't believe anybody give you

13   a free lunch, and that's the problem.

14        Q.    I understand, but can you answer

15   my question please; are you calling them the

16   mob?  Are they the Mafia?

17        A.    Well, as an expression.  But

18   that -- what I mean is that, you're making a

19   business deal that I don't -- they don't have

20   control over, that's what I mean.

21        Q.    Well, let's back up a little bit.

22              First of all, can we agree safety

23   is the most important thing?

24        A.    Correct.

25        Q.    And so, the platform screen

97

1                          J. SANCHEZ

2     doors, if they get installed and this program

3     is implemented, A, it protects lives; true?

4          A.     Yes.

5          Q.     And B, there's other benefits

6     that we've discussed as well, correct?

7          A.     Correct.

8          Q.     So one of the things you

9     mentioned earlier from an engineering

10    perspective is you have to look at the cost,

11    correct?

12         A.     Correct.

13         Q.     Now, you've seen in New York City

14    in the subway cars, withdrawn.

15                Have you ridden subway cars in

16    New York City?

17         A.     Of course.

18         Q.     Have you seen ads in those subway

19    cars?

20         A.     Yes.

21         Q.     And the Transit Authority gets

22    money from those ads, correct?

23         A.     How much, yes.

24         Q.     Have you ever seen bus stops in

25    the City of New York?

98

1                    J. SANCHEZ

2        A.     Oh, yes.

3        Q.     Have you ever seen ads on those

4    bus stops?

5        A.     Yes.

6        Q.     That's what's known as BOT

7    agreements; build, operate, transfer

8    agreements, correct?

9        A.     I'm not sure about that term.

10       Q.     So, are you aware that for the

11   bus stops, companies pay for those bus stops

12   at no cost to the Transit in exchange for

13   getting the ad revenue of the bus stops?

14       A.     Again, it might be a business

15   model, but I'm not -- I wasn't involved with

16   that, I don't know.

17       Q.     So in other words, if the

18   platform screen doors were there, that's like

19   blank space that ads could be placed on for

20   whatever companies want to buy ads in the

21   subway system, correct?

22       A.     That's correct.

23              MR. KEAVENEY:  Note my objection.

24       Q.     And revenue could be raised by

25   the ads, correct?

99

1              J. SANCHEZ

2              MR. KEAVENEY:  Objection, you can

3         answer.

4         A.    Okay, yes.  Yes, I mean that's

5    how this system operates; they advertise and

6    they also look for extra revenue to help the

7    system.

8         Q.    This is just another means of

9    getting revenue to help the system?

10        A.    Correct, it could be.

11        Q.    Great.  If a company like Parsons

12   Brinckerhoff said that they could do this, put

13   in the platform screen doors, and that they

14   would do it for the ad revenue, at no cost in

15   other words, to the Transit Authority, do you

16   think they could do it well?

17        A.    They -- I mean, sometimes they

18   could do it and they will -- I'm sure they

19   will have done some type of analysis for it

20   where they determine where the breaking point

21   and you know so on and so forth to make money.

22   So I think, can they do it, of course they

23   could do it.  I think -- I think the system

24   should be smart enough to do the counter

25   analysis to determine, you know, is it better

100

1                        J. SANCHEZ

2    for me to pay it out and get all the sales or

3    you know, what is the -- what am I losing,

4    what is it that --

5        Q.    So in other words, either way,

6    the Transit can get this done for free; either

7    by somebody paying for it directly or the

8    Transit does the initial outlay for it, but

9    they make the money at the back end with the

10   ad revenue, correct?

11              MR. KEAVENEY:  Objection.

12       A.    Well, what I would say is that

13   there are many alternatives as to how this

14   plan ends, okay, and it's up to the powers

15   that be to decide which is -- or what they

16   foresee to be in the best interest.  But there

17   are many alternatives.

18       Q.    Okay, let's talk about other

19   alternatives.  There are grants or funds that

20   could be obtained from, let's say from the

21   federal government or other entities, true?

22       A.    That's correct, yes.

23       Q.    So, it would make sense for the

24   Transit Authority to look at how they can get

25   the money, whether it's getting a grant or

101

1                        J. SANCHEZ

2    fund from the federal government or from the

3    State, right, those are certain options,

4    correct?

5        A.    Yes, yes.

6        Q.    It would be a smart, reasonable

7    and practical thing to do to make applications

8    for those grants and funds, correct?

9              MR. KEAVENEY:  Objection.

10       A.    That is correct.

11       Q.    It would be a smart and practical

12   thing to do their own internal calculations to

13   see how much money they could make by renting

14   out the ad space on those platform screen

15   doors, correct?

16       A.    Yes, they could do that analysis.

17       Q.    For example, even when you go in

18   subway stations, on the walls leading to the

19   platforms, you see ads on the walls, correct?

20       A.    That's correct.

21       Q.    So, the Transit Authority is not

22   against ads in its subway system, correct?

23       A.    No.

24       Q.    So it's just, which way they make

25   the greatest amount of money, correct?

102

1                    J. SANCHEZ

2              MR. KEAVENEY:  Objection.

3         A.    No.  Well, no, I mean how I look

4    at it is, I will be careful on that regard

5    because what are the terms and conditions.

6         Q.    Okay.

7              Right, so again, they could

8    either say you know what, that would be, just

9    looking at the numbers, which way would the

10   Transit come out the best, correct?

11        A.    Yes, that's right.

12        Q.    If they come out ahead

13   financially by getting grants and funds, then

14   that's what they do?

15              MR. KEAVENEY:  Objection.

16        A.    This is not true, sir.

17        Q.    If they come out ahead by selling

18   themselves the ad space and ad revenue for the

19   platform screen doors, then that's what they

20   would do, correct?

21              MR. KEAVENEY:  Objection.

22        A.    Yes.

23        Q.    And if they would rather just not

24   have to come up with the money initially to do

25   this, they could let these other companies do

103

1                        J. SANCHEZ

2    it at no cost in exchange for these companies

3    getting the ad revenue from these BOT

4    agreements, correct?

5                    MR. KEAVENEY:  Objection.

6        A.      Well again, depends on the terms

7    and conditions, I wouldn't want to make a

8    statement.  That's for the Transit to say.

9        Q.      Okay, so the first thought is how

10   do you make it as safe as possible and as soon

11   as possible, correct?

12       A.      Yes.

13       Q.      Because the sooner you could make

14   it safe, the sooner you should do so, correct?

15       A.      Yes.

16       Q.      Because the Transit Authority

17   should do everything possible to save lives

18   and limbs, correct?

19       A.      Well, I would say they should do

20   what is possible to maintain the minimum

21   safety that is intended.

22       Q.      Is the intent to have a hundred

23   and twenty, a hundred and fifty, a hundred and

24   seventy people hit by trains and killed or

25   maimed, or is the intent to reduce or

104

1                          J. SANCHEZ

2    eliminate that from happening?

3           A.     Well --

4                  MR. KEAVENEY:  Objection.

5           A.     -- see as an engineer, you've got

6    to understand we have certain guidelines to

7    follow, and I think that is what sometimes

8    drives how we see -- we see the world.

9    Certainly platform screen doors would be the

10   benefit, but if that -- you know, if that

11   really is the ultimate solution that we want,

12   there could be other alternatives.

13                 MR. GENIS:  Well, let's talk

14          about that for a second.  Let's go to

15          BATES 406271, we'll make that

16          Plaintiff's 12.

17                 (Email BATES 406271 was marked as

18          Plaintiff's Exhibit 12, for

19          identification, as of this date.)

20          Q.     While he's getting that, I'll ask

21   another question.

22                 If one mechanism or system can

23   save lives and prevent people from being hit

24   or killed by trains by putting in platform

25   edge doors, should the Transit Authority try

105

1                      J. SANCHEZ

2    to do it?

3          A.     I would say they should consider

4    it as a potential concept to investigate.  But

5    as everything, finances are problematic and,

6    you know.

7          Q.     Finances -- I'm sorry, the

8    finances are problematic, we've already

9    discussed multiple alternatives to get it for

10   free or at minimal cost or to make the money

11   back, correct?

12         A.     That's correct, yes.

13                MR. GENIS:  So, Dave do you have

14         that up yet or not yet?

15                MR. ROTH:  One more second.  This

16         is Exhibit 12, I have this as a

17         five-page document, so there is multiple

18         emails attached to this document.

19                MR. GENIS:  I'm going to start

20         first with this one though, hold on.

21         Mine looks different, but okay.  I just

22         have the email from Mr. Sanchez, you

23         have others on yours?

24                MR. ROTH:  I think this is a

25         chain that you've already seen.

106

1                           J. SANCHEZ

2               MR. GENIS:  Okay, got it.

3               MR. ROTH:  If you want, for

4        purposes of this deposition, if you want

5        me to leave those right now, I can do

6        that.

7               MR. GENIS:  Why don't we just do

8        this one as a standalone.  So this would

9        be --

10              MR. ROTH:  Now it's one page.

11              MR. GENIS:  -- Plaintiff's 12.

12        Q.     This is an email from you,

13   correct?

14        A.     Correct, yes.

15        Q.     And it's on March 31st of 2010,

16   correct?

17        A.     Correct.

18        Q.     And this was sent to various

19   people at the Transit Authority, correct?

20        A.     Correct.

21        Q.     This was created, kept and

22   maintained by the Transit in the regular

23   course of its business, correct?

24        A.     Correct.

25        Q.     And it's on the subject of

107

                          J. SANCHEZ

1

2    platform edge doors, correct?

3         A.    Correct.

4         Q.    It states, "Platform edge doors

5    (or platform screen doors) are not an

6    innovation or new technology in 2010."

7                Did I read that accurately?

8         A.    Yes, you did.

9         Q.    And you wrote this or you agree

10   with that statement, I assume?

11        A.    That's correct, yes.

12        Q.    "In the mass transit industry,

13   they have existed for over fifteen years."

14                Is that a truthful statement?

15        A.    Yes.

16        Q.    "I designed the Jubilee Line

17   extension in London with partial height doors

18   (stations are not air-conditioned), to address

19   the issue New York City Transit has today --

20   safety."

21                Did I read that accurately?

22        A.    Yes.

23        Q.    Do you agree with that statement?

24        A.    Yes.

25        Q.    And that's the issue, is safety,

108

1                          J. SANCHEZ

2    correct?

3            A.      Correct.

4            Q.      "I designed Hong Kong and

5    Singapore metro systems with full height doors

6    (stations are air-conditioned), to address

7    energy conservation."

8                    Is that an accurate statement?

9            A.      Yes.

10           Q.      And you agree with that?

11           A.      Yes.

12           Q.      "As Donald Iannuzzi also pointed

13   out, we were considering them for the Second

14   Avenue subway and Seven West extension line.

15   This technology you will also find at the

16   airports with little trains interconnecting

17   the various terminals."

18                   Did I read all of that

19   accurately?

20           A.      Yes, you did.

21           Q.      You agree with all of that,

22   correct?

23           A.      Yes.

24           Q.      "Therefore, we are not talking

25   about an innovation or new technology, what we

109

1                          J. SANCHEZ

2    are talking about is a design process."

3               Correct?

4    A.        Correct.

5    Q.        "This is no different from when

6    we are going to build a new fan plant when

7    there was none before.  The technology already

8    exists (the fan), it is a design that needs to

9    be implemented considering the different

10   scenarios to identify the requirements for

11   equipment performance and operation."

12              Do you agree with all of that?

13   A.        Yes.

14   Q.        That's all accurate?

15   A.        Correct.

16   Q.        That's all the truth?

17   A.        Yes.

18   Q.        "So we need to look at the

19   tunnels and stations.  Furthermore, what we

20   are talking about is a design exercise.  We

21   need to analyze the different conditions in

22   order to decide what concise considerations

23   are required in order to collect what type of

24   platform edge door may be installed and what

25   is the impact on the stations and tunnels."

110

1                          J. SANCHEZ

2              Did I read that accurately?

3      A.      Yes.

4      Q.      Do you agree with it?

5      A.      Yes.

6      Q.      Is it a truthful statement?

7      A.      Yes.

8      Q.      Okay.  "I just wanted to clarify

9  that we should be taken (sic) this as a design

10  process, like when we design a fan plant.  We

11  will start with some CFD analysis to identify

12  the impact on ventilation and fire-life

13  safety, which would then dictate which type of

14  doors (full height, partial height, none) is

15  recommended for each station and why."

16              Did I read that accurately?

17      A.      Yes.

18      Q.      Was that an accurate statement?

19      A.      Yes.

20      Q.      Is that a truthful statement?

21      A.      Correct.

22      Q.      "After that, we will need to

23  consider our RTO requirements," and on and on,

24  correct?

25      A.      Correct.

111

1                          J. SANCHEZ

2       Q.      What are RTO requirements?

3       A.      Rail trail operations.

4       Q.      "I am working with Donald on the

5   estimate to perform the CFD analysis for

6   station ventilation and fire-life safety on

7   the basis that the technology is available and

8   proven in many other systems."

9               Did I read that accurately?

10      A.      Yes.

11      Q.      Is that an accurate and truthful

12  statement?

13      A.      Yes.

14      Q.      "I am looking at our system

15  applying this technology."

16              Correct?

17      A.      Correct.

18      Q.      Okay, so in other words, what you

19  wrote, this is nothing new, all you have to do

20  is do some design analysis to see for each

21  station what the right solution is, how do you

22  make the platform screen doors work in any

23  given station, correct?

24      A.      Correct.

25              MR. KEAVENEY:  Objection.

112

                        J. SANCHEZ

1

2      Q.      So, in other words, if it's a

3  station with air-conditioning, you would have

4  a full height one, if it's a station without

5  air-conditioning, you could do a less than

6  full-height platform screen door, correct?

7      A.      Correct.

8              MR. KEAVENEY:  Objection.

9      Q.      So in other words, you can't have

10  a one-size-fits-all approach, true?

11     A.      True.

12     Q.      So, each station has to be

13  studied and each station has to have the

14  proper safety plan, correct?

15     A.      Yes.

16     Q.      When each station is studied and

17  each station has a proper safety plan, then

18  you know how to implement the plan, correct?

19     A.      Repeat again?

20             MR. GENIS:  Let's just read it

21         back, make sure she's getting it.

22             (The requested portion of the

23         record was read back by the reporter.)

24     A.      Yes.

25     Q.      So, without doing a proper safety

113

1                           J. SANCHEZ

2    study for each station, if you don't do that,

3    you're not doing a proper plan, correct?

4          A.      Right.  Let me qualify.  The

5    reason why, overseas, say -- I haven't seen in

6    Korea, but say in, like, Hong Kong where I

7    worked, the reason why that was easier to do

8    is because the stations were identical, very

9    close to each other, okay.  So almost like one

10   would platform has to conform all of them.  In

11   New York City, even with the legacy that would

12   exist, every station is developed different,

13   and so that's why there is no one solution

14   and, you know -- okay?

15         Q.      In fact, it would be irrational

16   to have a one-size-fits-all plan, because all

17   the stations are different, correct?

18         A.      That's correct.

19         Q.      And that's why you need a

20   separate solution for each station, correct?

21         A.      Yes.

22         Q.      So, there is no adequate study or

23   no adequate feasibility study if you don't do

24   a safety study for each station, correct?

25         A.      That's correct, that's why if you

114

1                       J. SANCHEZ

2    look at my statement, I said the technology is

3    there, you need to look at the design process

4    of each one.

5           Q.    Because each station needs a

6    separate solution?

7           A.    That's correct.

8           Q.    Now, after you sent this email

9    and spoke to people, how did they react to it

10   at the Transit Authority?

11          A.    I don't recall any reaction,

12   really.

13               MR. GENIS:  Let's look at BATES

14          406286, it's a response to Mr. Sanchez's

15          email.  While you're looking, I'll ask

16          him another question.

17          Q.    Mr. Sanchez, did the Transit

18   Authority ever do that separate

19   station-by-station feasibility safety study to

20   see what the proper solution is for each

21   station?

22          A.    That I know, no.  Could they have

23   done it without my knowledge?  Possibly.  But

24   I don't know.

25               MR. ROTH:  Could you give me the

115

1                        J. SANCHEZ

2          numbers again?  I'm sorry.

3                    MR. GENIS:  I have 406286.  And

4          it's dated 3/31/2010.

5                    MR. ROTH:  Got it.

6                    MR. GENIS:  This should be

7          Exhibit 13.

8                    (Email BATES 406286 was marked as

9          Plaintiff's Exhibit 13, for

10         identification, as of this date.)

11         Q.    The only proper way to do a

12    proper, adequate feasibility or safety study

13    would be to look at each station and design

14    for that station how to make it safe to

15    prevent people from getting hit by these

16    trains, correct?

17         A.    Yeah, that's correct.  You've got

18    to look at this; the ridership patterns, there

19    is a ride operations patterns, there is

20    physical dimensions, you know, it's historic.

21         Q.    Now, let's take a look at

22    Plaintiff's 13, BATES stamp 406286, and we see

23    at the top, it's to you, correct, from Thomas

24    Lamb?

25         A.    Yes -- no -- oh, yes, yeah.

116

1                        J. SANCHEZ

2          Q.    And this is on March 31, 2010

3    involving the platform edge doors, correct?

4          A.    Yes.

5          Q.    Again, he is the chief innovation

6    technology person, correct?

7          A.    Correct.

8          Q.    This is an email also created,

9    kept and maintained by the Transit Authority

10   in the regular course of its business,

11   correct?

12         A.    Correct.

13         Q.    It says, "Greg, you are correct."

14   In the response to the email we just read,

15   Number 12, correct?

16         A.    Yeah.

17         Q.    "I doubt if anyone considers

18   platform edge doors as an innovative concept.

19   As you stated, they have been around for

20   years.  I believe they were initially designed

21   in, but are now designed out, of the Second

22   Avenue and Seven West extension projects."

23               Did I read that accurately?

24         A.    Yes.

25         Q.    So in other words, they were

117

1                          J. SANCHEZ

2    supposed to be -- platform screen doors were

3    supposed to be designed in both of those new

4    subway lines; the Second Avenue and the Seven

5    West extension projects, correct?

6                MR. KEAVENEY:  Objection.

7          A.     I know we talked about it, but I

8    do not know if they were supposed to be in or

9    out.  There may have been a study where, you

10   know, like any other project, you know, you

11   look at options and then you make a --

12   management makes a decision, go or no go.  But

13   I -- I don't know if they were initially in

14   and then they were taken out, I don't know.

15         Q.     Let me ask you, would Mr. Lamb,

16   the chief of innovation and technology at the

17   capital program management of the Transit

18   Authority, would he be knowledgeable about

19   whether or not platform edge doors were

20   designed in a particular project?

21               MR. KEAVENEY:  Objection.

22         A.     He could, but I'm not privileged

23   to that.

24         Q.     I understand, so I guess you

25   don't know, but Mr. Lamb, the chief of

118

1                         J. SANCHEZ

2    innovation and technology, he's in a position

3    to be aware of what was designed in a

4    particular project, correct?

5                   MR. KEAVENEY:  Objection.

6         Q.    I didn't hear the answer.

7         A.    It could.

8         Q.    Yes.

9                And he wrote that these platform

10   edge doors were initially designed in both the

11   Second Avenue and Seven West extension

12   projects, correct?

13        A.    That's what he says, yes.

14        Q.    For example, if for whatever

15   reason you decide after doing -- if a proper

16   study was done, you know for each station, and

17   for any given station based on the study, you

18   said okay, this particular station, we can't

19   do a platform screen door, whether it's full

20   height, partial height, or just period, we

21   can't do it, then you need to take an

22   alternative means to protect people to keep

23   them safe, correct?

24        A.    That's correct.

25        Q.    Okay, so, you can't just ignore

119

1                    J. SANCHEZ

2    the danger, correct?

3         A.    That, I cannot answer that

4    question, you know.

5         Q.    Well, would it be a violation of

6    good and accepted and professional engineering

7    practices to ignore danger?

8         A.    Yes, as an engineer, we should

9    take care of that.  We always look at what is

10   the intent of the use of the facility.

11        Q.    And the use of the subway system

12   are people, passengers, riding the trains,

13   correct?

14        A.    Yes.

15        Q.    And the Transit is supposed to

16   keep them safe, correct?

17        A.    That's right.

18        Q.    And you told us earlier the

19   Transit is supposed to prevent preventable

20   harm where possible, correct?

21        A.    Correct.

22        Q.    And they're supposed to prevent

23   foreseeable harm where possible, correct?

24        A.    Yes, but --

25        Q.    And according to good and

120

1                          J. SANCHEZ

2    accepted engineering practices and procedures

3    and standards of care, that's what's supposed

4    to be done; preventible harm is supposed to be

5    prevented, and foreseeable is supposed to be

6    prevented where possible, correct?

7           A.     That's correct.

8                  MR. KEAVENEY:  Objection.

9           A.     What I would like to add is this;

10   as engineers, we are controlled by codes,

11   informal codes.  So a lot of what you are

12   trying to bring to the picture, underneath are

13   these codes, which is how systems are

14   designed, you know what I mean?

15          Q.     So when you talk about codes,

16   there are, like for example, published written

17   standards and codes that are required to be

18   followed, correct?

19          A.     That's correct.

20          Q.     For example, you referred before

21   to that National Fire -- NFPTA, something like

22   that?

23          A.     NFPA, National Fire Protection

24   Association.

25          Q.     So they have codes that are

121

1                           J. SANCHEZ

2    supposed to be complied with, correct?

3           A.      They have standards that systems

4    adopt to use and place in certain portions of

5    the code, correct.

6           Q.      For example, American Society of

7    Civil Engineers, they have published

8    standards, correct?

9           A.      Correct, correct.

10          Q.      And there's published standards

11   by mechanical engineers, correct?

12          A.      Yes.

13          Q.      Standards by ANSI, the American

14   National Standard Institute, correct?

15          A.      Correct.

16               MR. GENIS:  I want to get into

17          this document, but people might be

18          getting hungry, does anybody want to

19          take a lunch break on this now before I

20          go further?

21               THE WITNESS:  I'm okay.

22               MR. GENIS:  Is the reporter okay?

23          You have rights too.

24               COURT REPORTER:  I'm okay to go

25          on a little bit.

Enright Court Reporting    (631) 589-7788

122

J. SANCHEZ

1

2          THE WITNESS:  I have to leave by

3          2:00.

4          MR. GENIS:  I didn't know that.

5          Okay, we're going to be a while still so

6          if you need to leave, we'll have to

7          continue another day.  So let me not

8          take a break and keep going then.

9          Q.     So, getting back to Plaintiff's

10   13, let's look at the third paragraph and

11   where they say, "My questions seek to better

12   identify a capital stakeholders needs (against

13   which a "best" fit solution may be measured),

14   like platform edge doors are other possible

15   solutions."

16          Correct?

17          A.     Yes.

18          Q.     So in other words, as we said

19   earlier, the standards require that where we

20   have known, not innovative, concepts that can

21   prevent people from being killed or seriously

22   harmed, they should be employed, it's just a

23   question of figuring out which is the right

24   one for each station, correct?

25          A.     Well, the standards don't quite

123

1                        J. SANCHEZ

2    talk about people falling on tracks, the fire

3    protection procedures talk about how to

4    control fires, okay.  So that, I think is one

5    of the little discrepancies on what we're

6    trying to discuss here, where we look at

7    platform screen doors as a potential tool to

8    prevent people accidents, falling onto the

9    track for instance, NFPA for instance will

10   require this, so that we can do energy

11   conservation we can do better smoke control

12   and so forth.

13         Q.    In other words, the National Fire

14   Standard says we're concerned about harm being

15   caused by fire, correct?

16         A.    Correct, correct.

17         Q.    So they're looking at how to put

18   safety first, only in relationship to fires,

19   correct?

20         A.    That's correct.

21         Q.    And there's other engineering

22   standards and practices and procedures and

23   protocols that are supposed to be followed as

24   well, correct?

25         A.    That's correct.

124

1                    J. SANCHEZ

2        Q.    All of these standards put safety

3    first, correct?

4        A.    That's correct.

5              MR. GENIS:  The next document is

6        an email dated May 25th of 2010 at

7        fifteen hours and nine minutes.

8              MR. ROTH:  I have that as a

9        three-page document.

10             MR. GENIS:  I just need that one

11       email.

12             MR. ROTH:  This is going to be

13       Plaintiff's Exhibit 14, BATES 390438,

14       and I have this as a May 25, 2010 email.

15             (Email BATES 390438 was marked as

16       Plaintiff's Exhibit 14, for

17       identification, as of this date.)

18       Q.    Sir, do you see Plaintiff's 14,

19   BATES stamped 390438, an email from Glen

20   Lunden on May 25, 2010 involving platform

21   screen doors?

22       A.    Yes.

23       Q.    By the way, do you see it talks

24   about this Comet, C-O-M-E-T, forum?

25       A.    No idea.

125

J. SANCHEZ

1

2      Q.      It's in the subject line, sir?

3      A.      Yeah, I see that, yes.  I believe

4   that is, like, a Korean conference in the

5   metropolitan area.

6      Q.      Okay.

7              I'm going to scoot down to the

8   second photograph, and they're talking about

9   that Korean trip, I'll start with the third

10  line where it says the first.

11             "The first two emails in the

12  attachments above are related to a more recent

13  proposal from a South Korean firm to install

14  plat edge doors at no cost the NYCT, New York

15  City Transit, in return for the right to sell

16  advertising on the doors/screens."

17             Did I read that accurately?

18     A.      Yes.

19     Q.      "And there was a flurry of

20  activity in December and January and then,

21  nothing.  I don't know what the status is of

22  this effort."

23             Do you see that?

24     A.      I see that, yes.

25     Q.      Mr. Lunden, he is a senior

126

```
1                    J. SANCHEZ
2    director of subway operations improvement,
3    correct?
4         A.    I don't know who he is.
5         Q.    Can you scroll down a little
6    Dave, so we can see his title?
7         A.    Yeah, I see that, but I don't
8    know him.
9         Q.    Okay, that's fine.
10              So the transit was to get the
11   platform screen doors at no cost to
12   themselves, correct?
13        A.    So it seems.
14        Q.    Are you aware of anybody ever
15   saying yes or no to these offers?
16        A.    I am not even aware of some of
17   these offers.
18              MR. GENIS:  The next one that I
19         would like to get to, Dave -- by the way
20         I just want to ask quickly I can't
21         remember if I asked you this.
22        Q.    Are you familiar with Faiveley
23   Transport, F-A-I-V-E-L-E-Y?
24        A.    No.
25        Q.    Are you familiar with GE
```

127

1                      J. SANCHEZ

2      Transportation or Singapore Technologies

3      Electronics?

4            A.      Yes, I heard of that.

5            Q.      And they're a substantial

6      company, correct?

7            A.      Correct.

8            Q.      Have you heard of Kaba; K-A-B-A,

9      Gilgen; G-I-L-G-E-N door systems AG?

10           A.      No.

11           Q.      Have you heard of Knorr;

12     K-N-O-R-R, Bremse; B-R-E-M-S-E rail systems

13     UK?

14           A.      No.

15           Q.      Have you heard of TIS Partners

16     Incorporated?

17           A.      No.

18                   MR. GENIS:  Can we now go to

19           BATES 12725?

20                   MR. ROTH:  This is Exhibit 15.

21                   (Email BATES 12725 was marked as

22           Plaintiff's Exhibit 15, for

23           identification, as of this date.)

24           Q.      So we're showing you what's been

25     marked for identification as Plaintiff's

128

1                    J. SANCHEZ

2    Exhibit 15, and it's BATES 12725; do you see

3    this email from Lisa Triban on November 7,

4    2011 at 9:42 in the morning?

5          A.     Yes.

6          Q.     By the way, are you familiar with

7    Andrew Bata?

8          A.     Yes.

9          Q.     And who is the?

10          A.      I don't know exactly who he was,

11   I know he was some high profile, maybe like a

12   public relations fellow, but I -- I never

13   dealt with him.

14          Q.      If I said he was the chief of

15   strategic improvements and best practices,

16   office of strategic innovation and technology,

17   would that sound right?

18          A.      That, no.

19          Q.      Okay.

20                  Let's keep going then.  We're

21   looking at this email, from Lisa Triban,

22   director of the number seven line extension.

23   "I just had the discussion with MTACC staff,

24   they said that in order for them to go back to

25   HYDC (the founding partner in the number seven

129

1                          J. SANCHEZ

2      line extension), that NYCT would need to

3      declare platform doors a new standard."

4                  Did I read that accurately?

5          A.      Yes.

6          Q.      Okay, and do you agree with that

7      statement?

8          A.      I'm not sure what that statement

9      is about.

10         Q.      Do you agree that platform doors

11     should have been declared as a standard years

12     ago?

13         A.      Not necessarily.  Again, it all

14     depends how the system is designed, okay.

15         Q.      So in other words, if the system

16     can accommodate the platform screen doors,

17     then the standard would be to install platform

18     screen doors, correct?

19         A.      Yes.

20         Q.      What Ms. Triban is talking about

21     then, let's go to the next paragraph, "I think

22     it would be highly problematic if NYCT

23     declared platform doors a new standard for all

24     stations or even all underground stations or

25     even all underground stations with CBTC."

130

1                         J. SANCHEZ

2                   Did I read that accurately?

3          A.      Yes.

4          Q.      What is CBTC?

5          A.      CBTC is a train operation signal,

6      it's control-based train controlled -- no,

7      computer-based train control.  What that is

8      is, technology that allows -- see, the system

9      is designed as a block system, that means

10     every so often, there is a signal and the

11     train shall not pass that signal, if there is

12     no passage right to go.  Under the CBTC -- and

13     that used to keep maybe like a half a mile

14     long between trains, something like that.

15     With the CBTC, you will always know the

16     position of the train, and it will allow them

17     to go very close to each other so that they

18     can mediate the congestion.  So it will allow

19     trains to get closer.  That's what CBTC

20     allows.

21         Q.      By the way, have you ever heard

22     of Halmar Company?

23         A.      Who?

24         Q.      H-A-L-M-A-R?

25         A.      No.

131

1                    J. SANCHEZ

2        Q.    First name Halmar, I'm sorry.

3        A.    No.

4        Q.    Let me keep reading, I'm going

5    back to Plaintiff's 15.

6              "However, we could probably

7    create a new standard for new stations without

8    much problem."

9              Do you agree with that statement?

10       A.    Yes.

11       Q.    Because now you're making -- it's

12   brand new, so you can design it that way,

13   correct?

14       A.    That's correct.

15       Q.    That's why that should be the

16   standard for all new stations, correct?

17       A.    That's correct.

18             MR. GENIS:  And then, let's go to

19             the next document, which is 12722 BATES,

20             that would be Exhibit Number 16, 10:24

21             in the morning.  And then the next one

22             should be from Andrew Bata to Don

23             Iannuzzi on the same date, at 15:44, so

24             in the afternoon.

25             MR. ROTH:  That's just all on

132

```
                          J. SANCHEZ
 1
 2        12722, so that will be Exhibit 16.
 3                MR. GENIS:  Yes.
 4                (Email BATES 12722 was marked as
 5        Plaintiff's Exhibit 16, for
 6        identification, as of this date.)
 7        Q.      We're now going to show you
 8   what's been marked for identification as
 9   Plaintiff's Number 16, it's BATES stamped
10   12722, and we're going to start at the bottom
11   because that's chronologically the next one on
12   November 7, 2011 at 10:24 in the morning, from
13   Donald Iannuzzi, chief mechanical engineer,
14   your boss.
15        A.      Right.
16        Q.      Do you see that email?
17        A.      Yes.
18        Q.      And do you see where it says,
19   "Platform doors should have been a standard
20   for new stations ten years ago."
21                Do you see that?
22        A.      I see that, yes.
23        Q.      Do you agree with that statement?
24        A.      Yes.
25        Q.      It's an accurate and truthful
```

133

1                          J. SANCHEZ

2    statement?

3              A.      Yes.

4              Q.      Above that -- and you see, by the

5    way, one of the people on the CC is Andrew

6    Bata?

7              A.      Yes.

8              Q.      Look at the email above it now,

9    on the same document from Andrew Bata, do you

10   see his title is chief strategic improvements

11   and best practices for office of strategic

12   innovation and technology, MTA New York City

13   Transit?

14             A.      I see that, yes.

15             Q.      And his response to Iannuzzi is

16   absolutely, with four exclamation points,

17   correct?

18             A.      Yes.

19             Q.      Do you agree with Mr. Bata as

20   well?

21             A.      Well, yes, I think so.

22                     MR. GENIS:  I'm going to jump

23             ahead to BATES email dated January 25,

24             2013 at 12:47, it's from Andy Layman,

25             and it's a string of two emails.  While

134

1                         J. SANCHEZ

2          you're looking, I'll ask some other

3          questions.

4          Q.      So you see that certain people at

5     the Transit Authority were advocates for

6     installing platform edge doors or platform

7     screen doors in the subway system, correct?

8          A.      Yes.

9          Q.      Who were the people at the

10    Transit Authority that were the biggest

11    proponents or advocates of installing this

12    safety device of the platform screen doors?

13         A.      The way I can quantify the best

14    is -- the engineers we, you know, like in my

15    situation, we were designing systems so we

16    were seeing the trend of how, you know, things

17    are evolving; the benefits and so forth.  So I

18    would say a lot of engineers would see the

19    benefit of it if we, as Don pointed out, could

20    develop it into a new standard.

21         Q.      Was it in any particular

22    department or division within the Transit

23    Authority that the engineers wanted a standard

24    of requiring platform edge doors?

25         A.      What I would say is that the

135

                              J. SANCHEZ

1

2      engineer side of the capital -- of the city --

3      capital program management, yes.

4          Q.      And the engineers are the people

5      with the technical knowledge of the

6      feasibility of these platform edge doors,

7      correct?

8          A.      Correct.

9          Q.      Okay.

10                 So the people with the greatest

11     knowledge about feasibility and safety of

12     platform edge doors all wanted to have

13     platform edge doors installed and make that

14     the standard in the Transit Authority,

15     correct?

16         A.      Correct, we would like that.

17         Q.      When did people have that

18     consensus of these engineers that platform

19     edge doors were feasible and should be the new

20     standard where necessary to protect lives?

21         A.      Well, I don't know about being

22     feasible, but as far as would you consider

23     that, since I joined the transit, you know

24     because like I've expressed, I've been in

25     technology for a long time, so when I joined

136

1                          J. SANCHEZ

2    the New York City Transit, that was certainly

3    some of the topics from a fire safety point of

4    view, that's how we were looking at it.

5          Q.    When we go back to feasibility,

6    you know, is it practical to do it, that's

7    what feasibility really means; is it feasible,

8    is it practical to do it?

9                MR. KEAVENEY:  Objection.

10         A.    Well, the feasibility aspect

11   comes into the existing stations, you know,

12   what is it that you have to do to fit in the

13   existing station.  And if you would have

14   accounted for it in a new design, then you

15   could have taken that from the beginning, you

16   account for that.  And then the feasibility is

17   not necessarily needed, it's just an

18   incorporation of the design department.

19         Q.    Okay.

20               So, feasible means is it doable,

21   correct?

22               MR. KEAVENEY:  Objection.

23         A.    Yes.  Or what you need to do?

24               MR. ROTH:  Bob, hold on one

25               second, can you just give me some more

137

1                          J. SANCHEZ

2          detail on that email?

3                    MR GENIS:  It's two emails, as I

4          say, from Andy Layman, L-A-Y-M-A-N.

5          Q.    So, if you can design it, it's

6     feasible, correct?

7                    MR. KEAVENEY:  Objection.

8          Q.    You can answer.

9          A.    No, I'm just thinking.  If you

10    can design it -- if you can design it, you are

11    past the feasibility.

12         Q.    So, by definition, if one can

13    design it, a platform edge door, it's

14    feasible, correct?

15                   MR. KEAVENEY:  Objection.

16         A.    Let me see how I can put it

17    better.  At the point you come to the design

18    phase, that means you have already done the

19    feasibility and determined that it's doable.

20         Q.    Okay.

21         A.    Okay, so in other words

22    feasibility is the question, can I go forward

23    or not, so if I'm already there, I already

24    left the feasibility behind.

25         Q.    Got it.

138

J. SANCHEZ

1

2          So then it's just a question of

3   how do you best accomplish it, you know, what

4   needs to be done to make it happen, so to

5   speak, to make it work?

6          A.    Right.

7          MR. GENIS:  I can keep asking

8          questions if you're not ready yet Dave,

9          you tell me.

10         MR. ROTH:  Just hold on one

11         second.  I'm at that spot, I just have

12         to get the times, so can you tell me the

13         subject line?

14         MR. GENIS:  Sure, the subject

15         line was let me find it again now, by

16         the way the importance is high on that

17         one.  The subject line is PSDs.

18         MR. ROTH:  I got it, that's a

19         two-page email.  That's going to be

20         Exhibit 17, BATES 198105.

21         (Email BATES 198105 was marked as

22         Plaintiff's Exhibit 17, for

23         identification, as of this date.)

24         Q.    I'm really just going to start

25   with the first one, the January 18, 2013 at

139

1                      J. SANCHEZ

2  9:41 in the morning.

3              So this is an email to Tom

4  Pendergast on January 8th of 2013 at 9:41 in

5  the morning, correct?

6        A.    Yes.

7        Q.    Pendergast was the President of

8  the Transit Authority, correct?

9        A.    At one time, yes.

10       Q.    I am going to skip down to some

11  of it, let's look at -- they're talking about

12  the platform screen doors, correct, on that

13  second paragraph?

14       A.    Yes.

15       Q.    And it talks about how this

16  person met Mr. Prendergast in June of 2011 at

17  the Green consortium?

18       A.    Yes.

19       Q.    They had some engineers from

20  Helmar and Parsons, correct?

21       A.    Yes.

22       Q.    You're familiar with Parsons,

23  correct?

24       A.    Parsons is not Parsons

25  Brinckerhoff, Parsons is Ralph M. Parsons,

140

1                          J. SANCHEZ

2     another consulting firm.  It used to be based

3     in Pasadena, now it is in Houston, Texas.

4          Q.    I'm going to skip down, and it

5     talks about some of the other projects that

6     Parsons and Helmar has constructed or

7     renovated involving Times Square, Stillwell

8     and Southbury stations, which are among the

9     most iconic stations in New York City Transit

10    system, do you see that?

11         A.    Yup.

12         Q.    And they talk about other

13    projects they've done and it says we are one

14    of the few contractors that understand your

15    complete system, do you see that?

16         A.    Yes.

17         Q.    "It's our opinion that the

18    construction costs drive the financing of a

19    PSD, platform screen door system, and that's

20    advertisers alone, such as CBS outdoor, can't

21    finance the system because of their lack of

22    technical capability.  We believe a

23    comprehensive team can deliver a design/build/

24    operate/maintain PSD, platform screen door

25    solution to New York City Transit at no cost."

141

1                          J. SANCHEZ

2              Correct?

3         A.      Yes.

4              MR. GENIS:  Let's go to BATES

5         203790.  That will be Exhibit 18.

6              (Email BATES 203790 was marked as

7         Plaintiff's Exhibit 18, for

8         identification, as of this date.)

9         Q.      While he's looking, you saw that

10   there were responses by Prendergast and other

11   MTA people to that email by Helmar, correct?

12        A.      Correct.

13        Q.      And all these emails were

14   created, kept and maintained by the Transit

15   Authority in the regular course of their

16   business, correct?

17        A.      Correct.

18              MR. GENIS:  Just go to the top so

19         we can see, that's it.

20              MR. ROTH:  Just for the record, I

21         belive that where that says Don, I think

22         that's from an email above when I

23         merged, I don't think it's from this

24         page.

25        Q.      Okay, who is Don Willowman?

142

1                          J. SANCHEZ

2          A.      Don Willowman was a design

3    manager.

4          Q.      Do you know who Randane

5    Benferhat --

6          A.      No.

7          Q.      And do you know Kenneth

8    Prosmushkin is, P-R-O-S-M-U-S-H-K-I-N?

9          A.      No.

10         Q.      About Keven Cassimire?

11         A.      No.

12         Q.      And they're talking about the

13   number seven IRT line, do you see that?

14         A.      Yes.

15         Q.      I'm going to scoot down, "It

16   would appear that we should be concentrating

17   on lines that run the newer car classes as it

18   would be the least technically feasible to

19   integrate a PSD, platform screen door, into

20   the oncar electronic systems of these cars."

21                 Did I read that accurately?

22         A.      Yes.

23         Q.      Did you agree with that

24   statement?

25         A.      Yes.

143

1                    J. SANCHEZ

2              MR. GENIS:  Let me jump to some

3        other things now.

4        Q.    We've discussed some of the

5   benefits of having platform screen doors,

6   let's talk about some other issues.  We talked

7   before about alternatives if you can't do the

8   platform screen door, correct?

9        A.    Correct.

10       Q.    Or with the platform screen

11  doors, if you're going to do it, you know,

12  full or three quarter or half, et cetera?

13       A.    Right.

14       Q.    Let's talk about it.

15              So, the first thing is, how do

16  you make the platforms safe for the people,

17  correct?

18       A.    Correct.

19       Q.    In different means, one is in

20  terms of what's safest, we're going to go,

21  let's say, from beginning to the end, you

22  could do signage and make announcements,

23  right?

24       A.    Right.

25       Q.    You can have a yellow strip at

144

1                          J. SANCHEZ

2    the edge of the platform, correct?

3          A.    Right.

4          Q.    You were in London, you could

5    have a thirty-six inch yellow strip to keep

6    people even further back, correct?

7          A.    Yes.

8          Q.    By the way, was that effective in

9    London when they had that thirty-six inch

10   yellow strip?

11         A.    My personal opinion is that

12   culture is a difference.  You see the culture

13   of the cities, for instance, London doesn't

14   have garbage cans, yet you don't see garbage

15   on the platforms.  So a lot of that has to do

16   with the culture of the city whether they are

17   effective, so I think that's why London is a

18   little different from here.

19         Q.    Okay.

20               So signage and announcement, a

21   yellow strip or even a bigger yellow strip,

22   not as effective as you would hope, correct?

23         A.    Uh-huh.

24         Q.    Yes?  We need a word.

25         A.    Oh, yes, yes.

145

J. SANCHEZ

1

2      Q.      And then let's talk about the

3  next step up, and that's called a fixed rail,

4  correct?

5      A.      Yes.

6      Q.      And fixed rail exist, for example

7  at Shanghai, Delhi in India and parts of the

8  New York City Transit system, correct?

9      A.      Yes.

10     Q.      And where there have been fixed

11 rails, how effective is that at preventing

12 people from getting hit by trains and run over

13 by trains?

14     A.      That was one of the main

15 objectives is to protect, for example the old

16 Salisbury turn, I don't know if you remember

17 that, the Number 1 train, it was on a curve.

18 We had rails there, the idea is to prevent

19 people from pouring onto the train so that --

20 and they were lined up with those wires, so

21 that effected it.

22     Q.      Then you would do half height

23 platform screen doors, correct?

24     A.      Yes.

25     Q.      You could do three quarter height

146

1                          J. SANCHEZ

2    platform screen doors, correct?

3          A.      Right.

4          Q.      Then you could do floor to

5    ceiling platform screen doors, correct?

6          A.      Yes.

7          Q.      And the full floor to ceiling

8    would be the most effective to prevent people

9    from being hit or run over by trains, correct?

10         A.      No, I wouldn't say that.  I mean,

11   even with the partial height, it could be

12   effective.  Or even with the rail, it could be

13   effective.

14         Q.      Okay.

15                 Have you ever heard of, goes back

16   to probably the 1800s trains, those cow

17   catchers?

18         A.      No.

19         Q.      People catchers, no?  Okay.

20                 Are you familiar with what's

21   known as TIDS; track intrusion devices?

22         A.      Yes.

23         Q.      And there's different types of

24   track intrusion devices, correct?

25         A.      Correct.

147

                              J. SANCHEZ

1

2        Q.      And they could be laser or

3    infrared or other types, correct?

4        A.      Correct.

5        Q.      And it's a sensing device, in

6    essence, correct?

7        A.      That's correct.

8        Q.      So if a person falls, gets pushed

9    or somehow lands from the platform onto the

10   track, the train now knows it, correct?

11       A.      Correct.

12       Q.      And the train could then be

13   stopped instantaneously, correct?

14       A.      Yes.

15       Q.      And that's a fail safe mechanism,

16   correct?

17       A.      Yes.

18       Q.      Are the track intrusion devices,

19   are they effective?

20       A.      Yes, they could be effective.

21       Q.      There's also what's known as

22   closed circuit TV, correct?

23       A.      Yes, that's right.

24       Q.      What that is, is you could have

25   cameras at the stations, and the closed

148

1                        J. SANCHEZ

2    circuit TV could be the train, so the train

3    operator, before they ever get to the station,

4    sees who is on the platform and if anyone is

5    on the track, correct?

6         A.    I'm not sure about that

7    technology.  The reason is because there's too

8    much interference in the communication line.

9         Q.    Okay.

10        A.    So I'm not quite sure how that

11   would work.

12        Q.    Okay.  And there is also a low

13   tech thing of just lowering the speed of the

14   train before they enter the station so that

15   they could stop in time to avoid running

16   somebody over, correct?

17        A.    Which they do.

18        Q.    And that's an effective means as

19   well, correct?

20        A.    Yes.

21        Q.    And --

22        A.    Well, when acted upon timely.

23        Q.    Correct, yes, that's right.

24   That's the key.

25             So, it complies with good and

149

1                         J. SANCHEZ

2     accepted engineering practices and standards

3     and procedures to have a lower speed limit for

4     trains before they enter the station itself,

5     correct?

6                 MR. KEAVENEY:  Objection.

7          A.    Yes, that's been established.

8          Q.    This way, if the train, just like

9     if you're driving a car, if you're going

10    slower, you could stop to avoid hitting the

11    child that darts out; if the train is going

12    slower when it comes to the station, it can

13    stop in time to avoid running over the person,

14    correct?

15                MR. KEAVENEY:  Objection.

16         A.    Yes.  You've got to understand

17    something, the systems are designed to

18    maintain certain traffic flow, that's how

19    they're designed.  So they're considering all

20    these things into account.

21         Q.    Okay.

22                So let's now discuss, let's say

23    problems or issues with, you know, or cons to

24    platform edge barrier systems, okay?

25         A.    All right.

150

J. SANCHEZ

1

2      Q.     Let's see, what are, to you, the

3  cons of a platform screen door system?

4      A.     Okay, you have to qualify the

5  question; meaning, are you talking about -- -

6      Q.     Let me ask a better word, you

7  make a valid point.

8             What are the challenges, more

9  accurately put, to having a platform screen

10  door system?

11      A.     You have to coordinate the rail

12  operations with the mechanical operation of

13  the doors, okay, you have to sense when

14  they're coming in, when they open up.  You

15  have, in certain systems, the pressure is a

16  factor, and you know how well in the closed

17  the system, the piston effect may be a big

18  factor, so they may have to make the doors

19  thicker, because the material has to be

20  thicker.  You've got issues with fires, there

21  has to be a system with fires.  You have to

22  have abrasion resistant because people may

23  come and scratch on it and try to destroy it,

24  so there is a whole ramifications of issues

25  that you have to consider when implementing

151

1                     J. SANCHEZ

2    something.

3        Q.    Okay, so these are things that

4    engineers can study and figure out how to

5    solve those problems, correct?

6        A.    Correct.

7        Q.    And so, are you aware of anybody

8    from the Transit Authority studying these

9    challenges, how to solve those problems, that

10   you just identified?

11       A.    No, no.

12       Q.    All right, let's talk about other

13   challenges that you haven't even mentioned

14   yet.  And let me back up even further.  When

15   you see these platform screen doors installed

16   around the world, for any of the challenges

17   that we've talked about with platform screen

18   doors, have you ever seen them have to rip

19   them out and take them out because of these

20   issues or challenges?

21       A.    No.

22       Q.    They've remained the same the

23   entire time, correct?

24       A.    That's correct, yes.

25       Q.    Now, let's talk about some other

152

1                      J. SANCHEZ

2    challenges.  For example, the Transit

3    Authority has to comply with the Americans for

4    Disabilities Act, correct?

5          A.     Yes, I don't know the actual

6    litigation of it, but yes, they would have to

7    consider it.

8          Q.     And by the way -- I'm just going

9    to back up a second.  The reason, to your

10   understanding and knowledge and experience and

11   familiarity, that platform screen doors have

12   not been removed or torn out wherever they've

13   been installed is because they work; they're

14   effective, and they're able to meet the

15   challenges, correct?

16              MR. KEAVENEY:  Objection.

17         A.     That's correct.  Correct, as an

18   example.

19         Q.     They are the safest options,

20   correct?

21              MR. KEAVENEY:  Objection.

22         A.     I'm not sure if it's the safest;

23   it's one of the features.

24         Q.     In terms of preventing people

25   from getting run over or hit by trains, the

153

1                          J. SANCHEZ

2    platform screen doors, whatever their heights,

3    are the safest, correct?

4                    MR. KEAVENEY:  Objection.

5          Q.     To your knowledge.

6          A.     I wouldn't call it the safest

7    because, as I tell you, they cause big

8    problems with the doors.

9          Q.     We're going to get to the

10   challenges in a minute.

11         A.     Okay, but it is -- could be an

12   option.

13         Q.     Okay.

14                Are platform screen doors the

15   safest option in terms of eliminating or

16   reducing people getting run over or hit by

17   trains?

18         A.     Yeah, they could be.

19         Q.     Are you aware of any safer

20   option, other than platform screen doors, to

21   prevent people from getting run over or hit?

22         A.     Well, the other option is, like,

23   handrails.  Because the reason why people fall

24   on the tracks is because they cannot hold onto

25   anything, there is no support along the

154

1                          J. SANCHEZ

2    platform.  So that's why I don't want to be

3    biased to just one option, because there could

4    be other options that --

5         Q.    So the fixed rail would also be a

6    safe option?

7         A.    Yes, sir.

8         Q.    And the fixed rail costs a lot

9    less money than the platform screen doors,

10   correct?

11        A.    Oh, yes.

12        Q.    Okay, so now, the transit system

13   in New York, withdrawn.

14              So the fixed rails are lighter,

15   are easily installed, cost less money and

16   prevent these 12-9 incidents of people getting

17   hit and run over by trains and are easily

18   installed, correct?

19              MR. KEAVENEY:  Objection.

20        A.    They can.

21        Q.    And they are feasible, correct?

22        A.    Yes.

23        Q.    Now, because the transit system

24   is old and the Americans for Disability Act is

25   fairly new, can we agree that the Transit has

155

1                          J. SANCHEZ

2    many, many stations that do not comply with

3    the Americans with Disabilities Act?

4         A.    I don't know the quantity, but

5    certainly they're working on that.

6         Q.    So what the Transit does when it

7    does not comply with the ADA is they obtain

8    waivers, correct?

9         A.    Yes.  I don't know exactly the

10   logistics of how much time they have, but yes,

11   they have to allow for certain waiver.

12        Q.    So, let's talk about design

13   issues; one of the issues might be how wide,

14   the thickness of the platform screen door and

15   what houses it, correct?

16        A.    Yes.

17        Q.    What is the thinnest platform

18   screen door and housing mechanism that you're

19   familiar with?

20        A.    I'm going by memory, my guess is

21   about six inches.

22        Q.    Okay.

23        A.    Something like that.

24        Q.    All right, okay.

25              And when was that six-inch wide

156

1                            J. SANCHEZ

2    or thick platform screen door and housing

3    unit, when was that installed; for example,

4    was that ten years old, twenty years old,

5    thirty years old or something else?

6          A.    Oh, no, there are new ones, you

7    find them around.  The exact date, I don't

8    know, but it's current.

9          Q.    So a platform edge barrier does

10   not need to be wider than six inches, correct,

11   or thicker than six inches, correct?

12         A.    It depends on the support, I mean

13   see when you have full height platform screen

14   doors, the support comes from the top, so you

15   can integrate under the structure.  But when

16   it is not, it has to be supported someplace,

17   so there is no one answer for this, because it

18   depends on the -- the strength of the floor

19   where you are.  It depends on how you're

20   supporting and how long it is.

21         Q.    So in other words, what should be

22   done is, there could be the walls themselves

23   can be thin, it could be like the thickness of

24   a one-inch piece of glass, correct?

25         A.    Yes.  But then you have to --

157

                        J. SANCHEZ

1

2    that's right, you have to allow that the door

3    has to slide in between, it depends on how

4    it's designed, it's designed to slide out of

5    the wall or in between the door -- you know

6    the wall, so.  And they also have to, you

7    know, you have to allow for the rollers to go

8    into place, so all of those factors come in

9    and, you know.

10        Q.    Got it.

11             When we're talking about the

12   weight, there is also materials can be

13   lightweight as well, correct?

14        A.    Typically, some kind of glass,

15   because of fire.  All right, you put plastic

16   there is a combustible, that's why it's

17   tricky.

18        Q.    Got it, okay.

19             In other words, let me ask you

20   this; have you ever heard of a platform

21   collapsing due to the weight of the platform

22   screen doors?

23        A.    No, because the design accounts

24   for that.

25        Q.    And in New York City right now,

158

1                         J. SANCHEZ

2    without any platform screen doors, have you

3    ever heard of the platform collapsing due to

4    the weight of it being a really crowded

5    platform with people crammed like sardines on

6    the edge of the platform where that platform

7    screen door would go?

8         A.     No.

9         Q.     So, how does one figure out how

10   much weight the platform can support?

11        A.     Typically, by the thickness of

12   the concrete and the span of the support that

13   it can deliver, you can develop engineering

14   calculations to see what is the most that a

15   weight will do and then you can determine what

16   is the limit of that weight, all right.

17        Q.     So, for example you have to look

18   at the load factor, correct?

19        A.     Correct.

20        Q.     Are you aware of any studies or

21   analysis of the New York City Transit to see

22   what the load factor is, you know, the weight

23   tolerance of the platforms?

24        A.     No.

25        Q.     Has any structural analysis ever

159

1                          J. SANCHEZ

2    been done, to your knowledge, for the New York

3    City Transit to see if the platforms could or

4    could not sustain the weight of a platform

5    screen door?

6            A.      That, I don't know.

7            Q.      Has anybody ever told you that

8    they ever did any kind of study or testing or

9    analysis to see whether or not these platforms

10   can hold the weight of the platform screen

11   doors?

12           A.      No, nobody has discussed that

13   with me.

14           Q.      When we talked about people being

15   on the edge of the platform, people can be

16   pretty heavy sometimes, correct?

17           A.      Of course.

18           Q.      Now, you might assume what, an

19   average weight of 250 pounds for a person?

20           A.      No, typically it's about 180 --

21           Q.      Okay.

22           A.      -- is the rule of thumb design.

23           Q.      And you have an obesity crisis in

24   America, correct?

25           A.      Yeah.

160

1                    J. SANCHEZ

2          Q.    So you can have very heavy people

3    on the edge of those platforms, correct?

4          A.    Yes.

5          Q.    And despite New York having a

6    crowded like sardines subway system, with

7    people, and heavy people, on the edge, you've

8    never heard of the platform ever collapsing,

9    correct?

10         A.    No.

11         Q.    So, is the weight of this

12   platform screen door the same, more or less,

13   than if you had all those heavy people

14   standing like sardines on the edge of the

15   platform?

16         A.    I don't -- they would be less,

17   actually.

18         Q.    So the platform screen doors

19   weigh less than the people that would be on

20   the platform, correct?

21         A.    Right.

22         Q.    So if the platform is strong

23   enough to support the weight of the people,

24   the platform is strong enough to support the

25   weight of the platform screen door, correct?

161

1                    J. SANCHEZ

2         A.     That's correct.

3         Q.     And if for some odd reason you

4    were concerned that it wasn't strong enough,

5    things could be done to help support it,

6    correct?

7         A.     That's correct.

8         Q.     For example, underneath the

9    platform, you could have support beams,

10   correct?

11        A.     That's correct.

12        Q.     And, where there is a ceiling,

13   you could have things hanging from ceilings as

14   well, correct?

15        A.     That's correct, yes.

16        Q.     So, let's talk at some other

17   challenges.  By the way, can we agree that

18   precast concrete is stronger that non-precast

19   concrete?

20        A.     I don't know.  Personally, I

21   don't know.  But what I do know is that what

22   makes strong concrete is not the concrete, but

23   it is the rebars.

24        Q.     Okay.  Let's see, so right now we

25   have subway stations where there are columns

162

1                         J. SANCHEZ

2   and stairways and elevators and things like

3   that in the platforms, correct?

4           A.      Correct.

5           Q.      And sometimes these columns or

6   stairways or elevators are fairly close to the

7   edge of the platform, correct?

8           A.      That's correct.

9           Q.      That already can violate the

10  Americans for Disability Act, correct?

11          A.      That's correct.

12          Q.      So, they already do that,

13  correct?

14          A.      Yes.

15          Q.      So, it would be no different if,

16  in a location that already is in violation of

17  the American Disability Act because it's not

18  enough from the edge of the platform to the

19  column, if you put in a platform screen door,

20  it wouldn't make it any worse, correct?

21                  MR. KEAVENEY:  Objection.

22          A.      That's correct.

23          Q.      If there is a column or a

24  stairway that was installed, that could be

25  uninstalled or moved, correct?

163

1                          J. SANCHEZ

2          A.      Repeat again?

3          Q.      Where there is a stairway that

4    gets installed or a column that gets

5    installed, or an elevator that gets installed,

6    they could be moved, correct?

7          A.      Well, a stairway might be

8    modified.  But columns, not quite, because

9    columns are structure support, you cannot

10   touch it.

11         Q.      Can you tell me what other

12   challenges are there to having platform screen

13   doors that you could think of that you haven't

14   already mentioned?

15         A.      Again, I think the biggest

16   challenge is present in the fact that the

17   infrastructure cannot be modified to

18   accommodate anything beyond what is already

19   there.

20         Q.      By the way, in the Times Square

21   shuttle, they moved columns, correct?

22         A.      Repeat again?

23         Q.      In the Times Square shuttle, they

24   moved columns, correct?

25         A.      Yes, they adopted something, but

164

1                          J. SANCHEZ

2    I am sure they treated the system to

3    accommodate that.  But again, you have to do

4    structural analysis, okay.

5              Q.     So in other words, if they don't

6    do that structural analysis, they're not doing

7    a proper feasibility or safety study, correct?

8              A.     Correct.

9              Q.     So, in other words, if you don't

10   look at what the problem is and how to solve

11   it, you're not doing a proper study, period,

12   end of story, correct?

13             A.     Yes, you have to look at those

14   parameters, and then don't ignore any

15   verified --

16             Q.     Okay.

17                    And you can make accommodations

18   that can support a structure in one spot if

19   necessary, correct?

20             A.     Yes.

21             Q.     Let's talk about entrapment; can

22   we agree that there is a gap -- let me bring

23   it --

24                    If all you do is identify

25   possible problems, that's not collecting data

165

1                       J. SANCHEZ

2    and you're not really studying the problem,

3    correct?

4                  MR. KEAVENEY:  Objection.

5          A.     Yeah, I mean you collect data to

6    understand the behavior of the system, you

7    know.  And then if you identify a hazard, then

8    you have information to know what the hazard

9    is.

10         Q.     So, in other words, somebody can

11   say, well this could happen or that could

12   happen or something else could happen and

13   that's just speculation, correct?

14         A.     No, it could happen, the question

15   is where it could happen.

16         Q.     And the likelihood of it

17   happening, correct?

18         A.     That's right.

19         Q.     The number of instances, if any,

20   of that actually happening?

21         A.     That's right.

22         Q.     And then what could be done to

23   prevent that bad thing from happening,

24   correct?

25         A.     Yes, you could -- yeah, you could

166

1                        J. SANCHEZ

2    learn from lessons learned.

3           Q.     So in other words, just

4    identifying a problem is not a proper study,

5    period, end of story, correct?

6           A.     Correct.

7           Q.     And collecting data is not the

8    same thing as studding and analyzing the data,

9    correct?

10          A.     No.

11          Q.     So I'm correct when I say that?

12          A.     Yes.

13          Q.     And so, the only thing a proper

14   study does is how do you solve the problem,

15   what needs to be done to solve the problem,

16   correct?

17                 MR. KEAVENEY:  Objection.

18          A.     Correct.

19          Q.     Now, we were talking a second

20   ago, or almost talking about entrapment.  Now,

21   there is, right now in the subway system, gaps

22   between the edge of the platform and the train

23   itself; the car, correct?

24          A.     Yeah, in some areas, yes.

25          Q.     So, where there is an excessive

167

1                          J. SANCHEZ

2    gap that's unsafe irregardless or regardless

3    of a platform screen door, correct?

4                    MR. KEAVENEY:  Objection.

5          A.      Correct, there is a standard

6    every system has to comply with.

7          Q.      By the way, the standards for the

8    gap is two to three inches, correct?

9                    MR. KEAVENEY:  Objection.

10         A.      About.

11         Q.      If you have an excessive gap,

12   that's just dangerous no matter what, because

13   people can get injured in the gap, right?

14         A.      Yes, especially, like, a

15   wheelchair or whatever, it needs to have a way

16   to, you know, flow on through.

17         Q.      So the bigger, not only the more

18   dangerous it is, the bigger the gap, the

19   harder it is to have a platform screen door,

20   correct?

21         A.      No.

22         Q.      Okay.

23         A.      You can have a bigger gap, and

24   you can have a platform screen door, they have

25   no relation.  Two different features.

168

1                         J. SANCHEZ

2          Q.      Got it, okay.

3                  All right, and I just want to ask

4     you this; the bigger the gap, the more

5     dangerous it is, correct?

6          A.      Of course.

7          Q.      What is root cause analysis?

8          A.      That is an engineering tool that

9     allows you to identify statistical data, go

10    track what is the cause of a problem and then,

11    while you identify the statistical basis, you

12    can propose solutions.

13         Q.      So in other words, if we look at

14    these 12-9s, you know people getting hit or

15    run over by trains?

16         A.      Right.

17         Q.      So the cause is basically one of

18    three causes; a person falls, a person is

19    pushed or a person jumps, correct?

20         A.      Uh-huh.

21         Q.      Yes?

22         A.      Yes.

23         Q.      So now the only thing is, how,

24    for that root cause, you have to look and see

25    what can we do to prevent that from recurring

169

1                        J. SANCHEZ

2    where you see it's a recurring problem,

3    correct?

4         A.    I would be careful with that, in

5    the sense that as you know, just because an

6    accident happens in one location, that doesn't

7    mean it's going to happen throughout the

8    system or it's going to happen in the same

9    place again, you know.

10        Q.    Okay.

11        A.    So, as engineers we need to be

12   careful and smart as to how we can innovate a

13   global solution, not necessarily an alarm, you

14   know what I mean.

15        Q.    So has the transit studies each

16   location, in other words, when every year

17   people get run over or hit by trains, has the

18   Transit ever studied to say, ah, it's

19   happening more at location A than location B;

20   whether it's a different station or a

21   different part of the station or a different

22   time?  Has the Transit ever studied that?

23             MR. KEAVENEY:  Objection.

24        A.    That I don't know.

25        Q.    So in other words, you have to

170

J. SANCHEZ

1          look at each location and analyze how to

2          prevent, at that location, that occurrence

3          from happening again, correct?

4                    MR. KEAVENEY:  Objection.

5          A.       Correct, that's --

6          Q.       Because its's either a problem at

7          that particular station or it's global

8          problem, correct?

9          A.       Correct.

10         Q.       Either way, you've identified the

11         cause, so you just have to come up with the

12         solution?

13         A.       That's correct.

14         Q.       That's the whole reason you do

15         cause analysis is how you solve problem --

16         A.       Right.

17                   MR. KEAVENEY:  Objection.

18         Q.       -- and prevent it from happening

19         again, correct?

20                   Because if you're not doing good

21         at that, you're not complying with good and

22         accepted engineering practices standards and

23         procedures, correct?

24                   MR. KEAVENEY:  Objection.

171

1                           J. SANCHEZ

2           A.      It depends on what you call

3      procedures.  Because, as engineers, we have

4      several documents and guidelines and goals and

5      we design it for that.  And systems change,

6      civilization changes, and there are things

7      that we may not have foreseen at the moment of

8      design, just because we don't foresee at the

9      moment of design.  And if an event happens,

10     that doesn't mean I'm at fault, it didn't

11     mean, you know -- it's just things can happen.

12          Q.      Understood.  But here, let's

13     bring it back to the New York City Transit

14     Authority, we know for a fact for over a

15     hundred years, every year, a certain number of

16     people get hit and run over by trains and

17     either killed or seriously injured, correct?

18          A.      Right.

19          Q.      That's fact, correct?

20          A.      Yes.

21          Q.      So, that is a known recurring

22     problem with a known root cause, correct?

23          A.      Correct.

24          Q.      So the only thing that, according

25     to good and accepted engineering standards

172

1                          J. SANCHEZ

2     practices and procedures is, to figure out how

3     to solve the problem and prevent it from

4     recurring, true?

5          A.     Yes, sir.

6          Q.     And that's what are the

7     requirements of good and accepted engineering

8     practices, procedures and standards, correct?

9                 MR. KEAVENEY:  Objection.

10         A.     Correct.

11         Q.     And, when the engineers make the

12    recommendations and the engineers have to make

13    that recommendation based on these good and

14    accepted practices and procedures and

15    standards, correct?

16         A.     Correct.

17                MR. KEAVENEY:  Objection.

18         Q.     If a manager, for whatever

19    reason, doesn't want to follow those

20    engineering recommendations, well, then that

21    doesn't solve the problem, correct?

22         A.     Right.

23                MR. KEAVENEY:  Objection.

24         Q.     And then, whether it's politics

25    like you saw one of those emails, or something

173

1                          J. SANCHEZ

2    else, if they don't fix the problem, then it's

3    going to happen over and over and over again,

4    correct?

5                    MR. KEAVENEY:  Objection.

6         A.      It could.

7         Q.      In fact in New York it has,

8    correct, every year it's been happening?

9                    MR. KEAVENEY:  Objection.

10        A.      Yes, sir.  It's -- we call, it's

11   one of the conditions of the system, actually.

12        Q.      And that's not the engineers'

13   fault that people every year are getting

14   killed and run over by the trains, correct?

15        A.      No, we assume that the people

16   will behave.  We don't control the people.

17        Q.      Well, the engineers can only make

18   the recommendations to the Transit of how to

19   make it safer, correct?

20        A.      That's correct.

21        Q.      And so, the engineers could say,

22   for example as you did, it's nothing new, it's

23   nothing innovative.  Put in the platform

24   screen doors, it's effective throughout the

25   world, it's effective at JFK, it's effective

174

J. SANCHEZ

1

2    throughout the U.S., and you could prevent or

3    reduce people from getting hit and killed and

4    run over and maimed by trains, correct?

5         A.      Correct.

6              MR. KEAVENEY:  Objection.

7         Q.      And if somebody, for example,

8    lost an arm and a leg at a particular station,

9    let's say Atlantic Avenue Barclays station, so

10   the proper thing to do to comply with good and

11   accepted practices and procedures and

12   standards of care of an engineer is to see how

13   can we prevent that from happening again,

14   correct?

15        A.      Yes.

16        Q.      And, I'm sorry, Atlantic Terminal

17   I think it's called.

18              So, and if there would have been

19   a prior or previous incident of somebody

20   getting hit, run over or killed by a train at

21   that Atlantic Terminal station, now they know

22   it's happened and they should, according to

23   good and accepted practices and procedures and

24   standards of care, take action to prevent it

25   from recurring and happening again, correct?

175

```
 1                    J. SANCHEZ

 2        A.      Yes.

 3                MR. KEAVENEY:  Objection.

 4                THE WITNESS:  I have about ten

 5        minutes.

 6        Q.      Can we agree to do nothing, to

 7   not do fixed rail, to not do platform screen

 8   doors, to not do track intrusion devices, to

 9   lower the speed limit, to not do anything is

10   it a violation of good and accepted practices

11   and procedures and standards of care?

12                MR. KEAVENEY:  Objection.

13        A.      Let me qualify this statement;

14   what I would say is, we, as an organization,

15   have to always look at the performance and be

16   conscientious of the goal, and if something is

17   not going towards that goal, we have to be

18   changing something to make us go on track.

19        Q.      So, to do nothing is not

20   reasonable, correct?

21        A.      Yes.

22        Q.      So, when you have a recurring

23   problem, people being killed or maimed by

24   being run over by trains, to fail to implement

25   some reasonable procedure or step to prevent
```

176

1                        J. SANCHEZ

2    these things from happening, is a violation of

3    an engineering professionals standards of

4    care, good and accepted practices and

5    procedures, true?

6                  MR. KEAVENEY:  Objection.

7         A.      Well, I wouldn't call it a

8    violation of good and accepted practices and

9    procedures.  We continue facility operations,

10   we design facilities.  It is the operation

11   that has to take over, do you understand what

12   I mean?

13        Q.      So it's a failure of management

14   to put safety first and listen to their

15   skilled trained engineers who are giving the

16   recommendations on how to prevent unnecessary

17   death and injury?

18                  MR. KEAVENEY:  Objection.

19        A.      I would say it is a management

20   decision what to do and not to do and we

21   follow.

22        Q.      And again, the whole point of

23   having specialized engineers with specialized

24   education and training is to defer to them on

25   issues of engineering safety, correct?

177

1                    J. SANCHEZ

2        A.     It should be that way.

3        Q.     Because the Transit is supposed

4    to put safety first, correct?

5        A.     Yes.

6        Q.     And if the engineers are giving

7    them, saying here's what you have to do to put

8    safety first, that's what should be done,

9    correct?

10       A.     Correct.

11              MR. KEAVENEY:  Objection.

12       Q.     That's what reasonable, correct?

13       A.     Yes.

14              MR. KEAVENEY:  Objection.

15       Q.     That's what's fair and right,

16   correct?

17              MR. KEAVENEY:  Objection.

18       A.     I don't know about fair and

19   right.

20       Q.     That's what should have been

21   done.

22              Let me just ask you, what's more

23   important; saving lives and limbs or the train

24   being on time?

25              MR. KEAVENEY:  Objection.

178

1                          J. SANCHEZ

2          A.      Say it again?

3          Q.      What is more important; saving

4     lives and limbs or being on time, the train?

5          A.      Saving lives.

6                  MR. GENIS:  We're going to have

7          to -- I know you have to go, sir, and I

8          truly appreciate your time, I really do,

9          and you're a bona fide expert.  And I

10         understand your time is valuable and

11         precious, but we do have some more

12         things to cover, is it possible that we

13         can reconvene at a time that is

14         convenient to you, sir?

15                 THE WITNESS:  Well --

16                 MR. GENIS:  It will only be

17         another hour or two max, because I

18         really covered a lot of ground today.

19         And we will gladly accommodate your

20         schedule as much as humanly possible.

21                 THE WITNESS:  Well, tomorrow

22         morning is that too soon or?

23                 MR. GENIS:  I think we have

24         another witness scheduled for tomorrow

25         morning, but if it's okay with you, can

179

1                     J. SANCHEZ

2          we be in touch, we can email and we can

3          look at our schedule, you can look at

4          your schedule --

5                     THE WITNESS:  Yes, give me

6          options and I will pick from there.

7                     MR. GENIS:  I appreciate that,

8          and we can continue this another time.

9          Because I -- I truly appreciate your

10         time and I certainly won't be as long as

11         I was today, we covered a lot of ground

12         today.

13                    (Time noted:  1:54 p.m.)

14

15

16              Jose Gregory Sanchez

17

18    Subscribed and sworn to

19    before me this       day

20    of                , 20__

21

22         Notary Public

23

24

25

180

```
 1                        J. SANCHEZ
 2                          INDEX
 3
 4   WITNESS            EXAMINATION BY              PAGE
     Jose Gregory      Mr. Genis                    5
 5   Sanchez
 6                        EXHIBITS
 7   NUMBER             DESCRIPTION                 PAGE
     1                  Email BATES 389118          43
 8   2                  Email BATES 586343          44
     3                  Email BATES 586408          48
 9   4                  Email BATES 389761          51
     5                  Email BATES 38965           55
10   6                  Email BATES 5582            58
     7                  Email BATES 5664            62
11   8                  Email BATES 406270          68
     10                 Email BATES 106288          76
12   11                 Email BATES 406292          81
     11A                Email BATES 1399            84
13   12                 Email BATES 406271          104
     13                 Email BATES 406286          115
14   14                 Email BATES 390438          124
     15                 Email BATES 12725           127
15   16                 Email BATES 12722           132
     17                 Email BATES 198105          138
16   18                 Email BATES 203790          141
17
18
19
20
21
22
23
24
25
```

181

1                        J. SANCHEZ

2                        CERTIFICATION

3

4    STATE OF NEW YORK  )

                         )   ss

5    COUNTY OF SUFFOLK  )

6

7         I, KRISTEN MCALEVEY, a Shorthand

8    Reporter and Notary Public within and for the

9    State of New York, do hereby certify:

10        THAT the foregoing transcript is a true

11   and accurate transcript of my original

12   stenographic notes.

13        IN WITNESS WHEREOF, I have hereunto set

14   my hand this 3rd day of March, 2022.

15

16

17

18                        KRISTEN MCALEVEY

19

20

21

22

23

24

25

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X
LUISA JANSSEN HARGER DASILVA,

        Plaintiff,

                           Docket No.

   - against -           17-cv-04550

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN
TRANSPORTATION AUTHORITY, and RAQIA SHABAZZ,

        Defendants.

--------------------------------------------X

           Video Conference

           March 11, 2022
           10:30 a.m.


     DEPOSITION of GREGORY SANCHEZ, Nonparty Witness,
taken by Plaintiff, pursuant to Federal Rules of Civil
Procedure, and Order, held at the above-noted time and
place, before Joanne Maggiore, a Stenotype Reporter and
Notary Public within and for the State of New York.



2

```
 1    A P P E A R A N C E S:
 2
 3    ROTH & ROTH, LLP
              Attorneys for Plaintiff
 4            192 Lexington Avenue, Suite 802
              New York, New York  10016
 5
         BY:DAVID ROTH, ESQ.
 6
 7
         SONIN & GENIS
 8            Attorneys for Plaintiff
              One Fordham Plaza, Suite 907
 9            Bronx, New York  10458
10       BY: ROBERT GENIS, ESQ.
11
12    LANDMAN CORSI BALLAINE & FORD, PC
              Attorneys for Defendants
13            120 Broadway, 13th Floor
              New York, New York  10271
14
         BY: ANDREW P. KEAVENEY, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

3

1    F E D E R A L    S T I P U L A T I O N S

2

3         IT IS HEREBY STIPULATED AND AGREED by and between the

4    attorneys for the respective parties herein, that the

5    sealing, filing and certification of the within

6    deposition be waived;

7         IT IS FURTHER STIPULATED AND AGREED that all

8    objections, except as to form, are reserved to the time

9    of trial;

10        IT IS FURTHER STIPULATED AND AGREED that the

11   transcript of this deposition may be signed before any

12   Notary Public, with the same force and effect as if

13   signed before a clerk or Judge of the Court;

14        IT IS FURTHER STIPULATED AND AGREED that all rights

15   provided to all parties by the F.R.C.P. cannot be deemed

16   waived, and the appropriate sections of the F.R.C.P.

17   shall be controlling with respect thereto.

18

19                         oo0oo

20

21

22

23

24

25

4

```
 1                              DEBBIE NYACK
 2      G R E G O R Y   S A N C H E Z,
 3          Nonparty Witness, having first been duly sworn
 4          by the Notary Public, was examined and
 5          testified as follows:
 6      EXAMINATION BY
 7      MR. GENIS:
 8          Q.    Please state your name for the
 9  record.
10          A.    Gregory Sanchez.
11          Q.    Where do you reside?
12          A.    88 Tennyson Drive, Plainsboro, New
13  York.
14          Q.    Good morning, Mr. Sanchez.  This is
15  a continuation of your deposition and you were here
16  pursuant to a subpoena on your own behalf and not
17  as a representative of the New York City Transit.
18                Is there anything you wish to add to
19  that comment?
20          A.    Yes, I would like to add that prior
21  part of the deposition I have been asked some
22  questions that really didn't belong for me to
23  answer, but to the authority.  I have no
24  authority to speak on behalf of the other people
25  or the authority and I would like to correct
```

5

GREGORY SANCHEZ

1

2     that.  I would like to see we can proceed with

3     statements that really belong to me as facts

4     that I can answer.

5          Q.    All right.  So you made the

6     statement you wanted to make, sir?

7          A.    Yes.

8          Q.    I'll get to my questions.  Since the

9     time of the last deposition, who, if anyone, have

10    you either spoken with or communicated with about

11    either this deposition or lawsuit?

12         A.    Nobody except my wife.

13         Q.    All right.  What I want to do first

14    is as you're an engineer I wanted to get into and

15    we have been discussing standards.  I want to be

16    clear what we are talking about and definitions of

17    words and things like that so we are on the same

18    page.

19              First, is there an expression in the

20    field of engineering, you're an engineer, called

21    Fail Safe, which means the characteristics of a

22    system or its elements whereby any failure or

23    malfunction effecting safety cause the system to

24    revert to a state that is known to be safe?

25         A.    Yes, that's a common term in

6

1                     GREGORY SANCHEZ

2      design.

3           Q.    I'll go through other engineering

4      terms.  Hazard, meaning existing or potential

5      condition that can result in an accident; is that

6      correct?

7           A.    That's correct.

8           Q.    Risk, the measure of the severity

9      and likelihood of an accident?

10          A.    Yes.

11          Q.    Safety critical is designation

12     placed on a system, subsystem, element, component,

13     device, or function denoting satisfactory operation

14     of such mandatory to mitigation of unacceptable and

15     undesirable hazards.

16          A.    Repeat the first part of the

17      question.

18          Q.    Sure.  Safety critical, designation

19     placed on a system, subsystem, element, component,

20     device, or function denoting that satisfactory

21     operation of such is mandatory to mitigation of

22     unacceptable and undesirable hazards.

23          A.    Yes.

24          Q.    Shall means it is a mandatory

25     requirement; correct?

7

1                           GREGORY SANCHEZ

2           A.     That's correct.

3           Q.     System dependability, overall serve

4    criteria used to measure the performance of an

5    operating system in terms of the liability,

6    maintain ability, and availability; true?

7           A.     Yes.

8           Q.     System safety, application of

9    engineering and management principles, criteria,

10   and techniques to optimize all aspects of safety

11   within the constraints of operational

12   effectiveness, time, and cost throughout all phases

13   of the system life cycle; is that accurate?

14          A.     That's correct, yes.

15          Q.     I'll go through some safety

16   requirements according to engineering standards.

17   Tell me if you agree or disagree to what I'm

18   saying.  Okay?

19          A.     Okay.

20          Q.     Safety requirements, a System Safety

21   Program shall be instituted during the system

22   planning and design phase and shall continue

23   throughout the system construction and operation.

24   Do you agree with that so far as engineering

25   standards?

8

1                       GREGORY SANCHEZ

2          A.     Yes.  That's done, yes.

3          Q.     Again, all the standards we're

4    discussing were for the time you were at the

5    Transit Authority; fair enough?

6          A.     Yes.

7          Q.     The system safety concept shall

8    emphasize the prevention of accidents by resolving

9    hazards may systematic matter in accordance with

10   hazard resolution process; true?

11         A.     That's true.

12         Q.     System Safety Program, a System

13   Safety Program shall be implemented to identify and

14   resolve hazards; is that correct?

15         A.     That's correct, yes.

16         Q.     These are all good and accepted

17   engineering practices, procedures, protocols, and

18   standards of care; true?

19         A.     Yes.

20         Q.     These would all be applicable to the

21   New York City Transit Authority subway system?

22         A.     Yes.

23         Q.     The Transit Authority shall provide

24   the development of a System Safety Program Plan,

25   also known as a SSPP, to assist in implementing and

9

1                          GREGORY SANCHEZ

2    documenting that program.  The SSPP, System Safety

3    Program Plan, shall identify the responsibilities

4    for all parties by implementing a System Safety

5    Program.  Do you agree with that?

6            A.    Yes, that's protocol.

7            Q.    The System Safety Program and System

8    Safety Program Plan shall, one, have safety for the

9    passengers, employees, the general public, and

10   equipment; agreed so far?

11           A.    Yes.

12           Q.    Two, identify the safety roles and

13   responsibilities of all organizational element and

14   require accountability; true?

15           A.    True.

16           Q.    Designate one individual to be

17   responsible for the safety of the system with a

18   clearly defined role and responsibilities

19   established or written policy; true?

20           A.    True.  Well, you know, we're

21    reading here is a standard.

22           Q.    Yes.

23           A.    So I mean I honestly feel this

24    document that you can present to the court

25    itself for them to read.  I don't think I need

10

GREGORY SANCHEZ

1
2    to be repeating this.
3         Q.    Sir, I might normally agree with
4    you.  We have rules of evidence.  I'm just not
5    allowed to pick up a document and read it in court.
6    Even though you might think I should be able to.
7    Since you are an engineer, and as you told us an
8    expert, I'm asking you questions to see if you
9    agree with the standards that I'm reading to you.
10         A.    Yes.  I'm going by faith that what
11    you're reading is in the document, you know.  I
12    know there are standards are there with a lot of
13    words and so forth that we follow.  That I'm
14    aware of.
15         Q.    So did we get an answer to the last
16    question?  I just don't remember.
17         A.    Yes.
18         Q.    So the answer is yes to the
19    question?
20         A.    Yes.
21         Q.    Okay.  And shall contain a hazard
22    resolution process that includes the procedures
23    necessary to identify and resolve hazards
24    throughout the system life cycle; correct?
25         A.    Correct.

1                    GREGORY SANCHEZ

2          Q.    And the System Safety Program Plan

3    shall be developed during the planning and design

4    phase of the project and shall be maintained

5    current through the system life cycle, correct so

6    far?

7          A.    That's correct, yes.

8          Q.    And the System Safety Program Plan

9    shall at a minimum identify the scope of the System

10   Safety Program activities; correct?

11         A.    Yes.

12         Q.    We will move along.  The hazards

13   shall be identified.  The techniques and methods

14   used to use to identify the hazards shall include

15   the following:  One, data from previous accidents

16   or operating experience.  Are we in agreement so

17   far?

18         A.    Yes.

19         Q.    Two, expert opinion and hazard

20   scenarios; agreed?

21         A.    Yes.

22         Q.    Three, checklist of potential

23   hazards; true?

24         A.    True.

25         Q.    Four, previous hazards analysis,

12

1                          GREGORY SANCHEZ

2     five, other analysis techniques as appropriate;

3     correct?

4              A.    Yes.

5              Q.    All identified hazards shall be

6     assessed in terms of the severity or the

7     consequence of the hazard and the probability of

8     occurrence; true?

9              A.    To some degree, yes.

10             Q.    Risk assessment estimates based on

11    meantime between hazardous events shall be used as

12    the basis in the decision making process to

13    determine whether individual system or subsystem

14    hazards shall be eliminated, mitigated, or

15    accepted; agree?

16             A.    Yes, that's one them.

17             Q.    Hazards shall be resolved to a

18    design process that emphasizes the elimination of

19    the hazard; correct?

20             A.    Correct, yes.

21             Q.    Resolution strategies or mitigations

22    to be used listed in order of the increased

23    preference shall be the following: One, eliminate

24    hazards; agreed so far?

25             A.    Yes.

13

1                         GREGORY SANCHEZ

2            Q.    Two, design to control hazards;

3    correct?

4            A.    Yes.

5            Q.    Three, use safety devices; true?

6            A.    Yes.

7            Q.    Use warning devices, yes?

8            A.    Yes.

9            Q.    Five, implement special procedures;

10   true?

11           A.    True.

12           Q.    Six, accept the hazard and seven,

13   eliminate the system subsystem or equipment;

14   correct?

15           A.    Yes.

16           Q.    This process shall include full

17   documentation of all identified hazards, risk

18   assessments, hazard resolution activities, and a

19   hazard tracking log; correct?

20           A.    Yes.

21           Q.    The effectiveness of the mitigations

22   shall be monitored to determine that no new hazards

23   are introduced; correct?

24           A.    Yes.

25           Q.    In addition, whenever substantive

14

1                           GREGORY SANCHEZ

2    changes are made to the system analysis shall be

3    conducted to identify and resolve any new hazards;

4    correct?

5            A.    Correct, yes.

6            Q.    Hazard analysis shall be used to

7    assist in the evaluation of potential hazards and

8    to document or make resolution; agreed?

9            A.    Yes.

10           Q.    As a minimum a Preliminary Hazard

11   Analysis, PHA, shall be conducted for each project.

12   Other detailed analysis including subsystem hazard

13   analysis, system hazard analysis, and operating and

14   support analysis shall also be conducted if

15   mandated by the System Safety Program Plan, agree

16   with me so far?

17           A.    That's correct.  I'd like to

18   qualify something here.

19           Q.    Sure.

20           A.    All you are reading is good for

21   construction design.  All right.  So what you

22   are reading if you look at any construction

23   project that we do, yeah, we follow these rules.

24   We follow OSHA, we follow all these regulations.

25   We have hazards if something collapse we fix it.

15

GREGORY SANCHEZ

1

2   Okay.  Now a lot of these methods are not a

3   hundred percent one to one for the operation of

4   a system and different guidelines that the

5   systems follow.  To that regard I think we

6   should call on people that run systems.  All the

7   guidelines that they follow because they have

8   other guidelines an operating system has to

9   follow.  So far what you have read, yes, it's a

10  lot of applicable.  When we design a system

11  we'll go to construction, we identify what the

12  potentially hazards, we try to secure the

13  facility so that no one gets injured and s

14  forth.  That's the risk analysis we do and so

15  forth.  So I wanted to clarify what you have

16  talked about is a hundred percent applicable to

17  design and construction.

18      Q.    Thank you.  Safety principles, we

19  agree safety principles shall be observed in the

20  system and defines unacceptable, undesirable

21  hazards.  One, when the system is operating

22  normally there shall be no unacceptable or

23  undesirable hazard conditions; agreed?

24      A.    There should be none intensional.

25  Hazard condition because accidents happen and

16

1                    GREGORY SANCHEZ

2    foreign things can occur.  So we design to none

3    terrorist conditions.  Okay.  That's why --

4          Q.    I understand.  I am not talking

5    about terrorism here.  I am going through from

6    engineering standards and guidelines and good and

7    accepted practices and procedures about what are

8    safety principles.  Safety principles shall be

9    observed and they define unacceptable and

10   undesirable hazards; correct?

11         A.    Yes.

12         Q.    One of the safety principles is when

13   the system is operating normally there shall be no

14   unaccepted or undesirable hazard conditions; true?

15         A.    True.

16         Q.    And the system design shall require

17   positive actions to be taken in a prescribed manner

18   to either begin system operation or continue system

19   operation; correct?

20         A.    Correct, yes.

21         Q.    Hopefully not much longer on this

22   stuff and I can get to other specific questions.

23   I'll flip through some things here.  I am skipping

24   stuff so we can move along.  We have limited time

25   with you.  System Safety Program requirements,

17

1                           GREGORY SANCHEZ

2    System Safety Plan purpose, the System Safety

3    Program Plan shall describe in detail tasks and

4    activities of system safety management, system

5    safety engineering and the safety certified process

6    required to identify, evaluate, and eliminate or

7    control hazards or reduce the associated risk to a

8    level acceptable to the authority having

9    jurisdiction throughout the system life cycle;

10   agreed?

11          A.    Okay.  That statement belongs to

12       the system safety to answer.  The reason I say

13       that is we -- when we do my line of work we look

14       at am I bringing something harmful to the system

15       like the wrong material, the wrong paint, not

16       appropriate consistency.  All these protocols is

17       what is really the guideline as the statement.

18       I don't know about that because I am not -- I

19       don't know about that because I am not heading

20       system safety.  I don't know all the regulations

21       they have to follow.

22          Q.    I'm just talking and I'll read in a

23   minute you will see about general engineering

24   standards and practices.  Do you agree with what I

25   just stated about what a System Safety Program Plan

18

1                     GREGORY SANCHEZ

2    is and its purpose?

3          A.    That's what I'm saying.  I never

4    developed a System Safety Program.  I cannot

5    answer that.

6          Q.    Let's look at this.  General system

7    safety requirements and criteria, the System Safety

8    Program Plan shall describe general engineering

9    requirements and design criteria for safety,

10   agreement so far?

11         A.    Well, again, we are going to a

12   territory where I have not been.  That's why I

13   cannot answer.

14         Q.    All right.

15         A.    I can tell you what we do for

16   safety, telling you how we are aware of hazards,

17   yes.  That's part of my design of my

18   construction and inspection.  I cannot answer to

19   that in specific.

20         Q.    So are you involved in hazard

21   analysis?

22         A.    Yes.  To what degree?  That's the

23   difference.  There's two many functions.  You

24   know, structure engineer looks at bending

25   moments as one of the hazards for the design.  I

19

1                               GREGORY SANCHEZ

2          look at small concentration and support as a

3          hazard.  So it's all depended on what aspect of

4          the practice because everybody practices

5          different areas.

6                    Q.    I'll get to some of the questions.

7     You would agree that in transportation engineering

8     good and accepted practices and procedures requires

9     you to analyze each problem individually; correct?

10                   A.    Yes.

11                   Q.    Each location within the

12    transportation systems will have its own different

13    designs and challenges even if they're mostly the

14    same?

15                   A.    Repeat again.

16                   Q.    Each location within the

17    transportation systems will have its own different

18    designs and challenges even if they are mostly the

19    same?

20                   A.    Yes, things can be different.

21         Demographic can be different.  We try to make

22         them as uniform as possible.  Sometimes the

23         standards don't cover that.

24                   Q.    The same thing for maintenance.  If

25    there's different stations within one

20

1                    GREGORY SANCHEZ

2    transportation system you have to maintain each one

3    of them for its particular location and design;

4    correct?

5            A.    That's correct, yes.

6            Q.    And I wave a silly example.  So for

7    instance for snow removal you might have a

8    different policy for Yankee Stadium above ground

9    compared to let's say the number one train at 191

10   Street, which is 173 feet below ground.

11           A.    I think the policy is the same.

12     It's the application that is differs by the

13     need.

14           Q.    Well, there could be design changes

15   that differ.  For example, let's say Yankee Stadium

16   station for the elevated platform you might have to

17   design for wind conditions or precipitation that

18   can affect the safety of the customers of the

19   trains and you would not have those considerations

20   you might need for underground stations; true?

21           A.    That's true.  Every design we

22     address the design scope.  That would be

23     identified in the design scope.

24           Q.    Can we agree that even two stations

25   they can have almost the exact same configuration,

21

GREGORY SANCHEZ

1   but mostly likely will never be exactly the same?

2   The one can have an air duct, one place or another

3   station does not have; correct?

4        A.    That's correct, yes.

5        Q.    So for all these differences you

6   would have to have a different design and a

7   different safety plan and different maintenance

8   plan; true?

9        A.    Well, different design, yes.  They

10  all follow the same plan because it's a plan for

11  everything.  It's just how you apply.  I think

12  how you apply the things of the need of the

13  design.

14       Q.    So for example in New York City the

15  subsystem there's about 472 unique subway stations;

16  yes?

17       A.    Yes.

18       Q.    And each and every one of these

19  stations has its own challenges in its own design

20  and configuration; correct?

21       A.    Yes.

22       Q.    So each subway station has to be

23  analyzed for maintenance and safety individually;

24  true?

22

1                          GREGORY SANCHEZ

2          A.     They have to be addressed, yes, as

3      they perform.

4          Q.     And some of the safety features you

5      completed for one station you might not be able to

6      put in another station; correct?

7          A.     That's possible, yes.

8          Q.     In fact, like some stations are

9      curved, so for example, the gap between the edge of

10     the platform and the step of the train car is going

11     to be bigger then at stations that have a straight

12     platform; true?

13         A.     True.

14         Q.     So some of the things that it's not

15     so easy to do is straighten a track; correct?

16         A.     I mean now you try to make the stop

17      on the straight track.

18         Q.     So in one station you might put up a

19     sign that says, "Watch the large gap," which you

20     might need, but you don't need that in another

21     station where there is virtually no gap; true?

22         A.     That's true.  It's local special

23      conditions.

24         Q.     So it's good and accepted

25     engineering practices and procedures and standards

23

GREGORY SANCHEZ

1

2  of care that require each station within the New

3  York City subway system to have its own safety

4  plan; true?

5          MR. KEAVENEY:  Note my objection.

6      A.    I wouldn't go that far.

7      Q.    Well, the good and accepted

8  transportation engineering standards require a

9  safety plan that accommodates unique designs and

10  challenges of each station?

11          MR. KEAVENEY:  Note my objection.

12      A.    Yes, that I cannot be general like

13    that.

14      Q.    Well, because of the differences and

15  the uniqueness of the different 472 different

16  stations according to good and accepted practices

17  and procedures you cannot have a one size fits all

18  safety plan; true?

19          MR. KEAVENEY:  Objection.

20      A.    I wouldn't want to answer that.

21      Q.    What do you mean by that?

22      A.    I mean the authority has to come up

23    with a policy that applies to the whole system,

24    okay, and it's up to what they put in the policy

25    that dictates what is done.

24

1          GREGORY SANCHEZ

2          Q.    So in other words, the policy might

3     be we have to keep things safe; correct?  I'm going

4     general to specific.  I'm just following up on what

5     you just said.

6          A.    Look, all I know is this, when we

7     do a design we follow the certain rules that

8     have been established by the authority, okay.  I

9     don't even put what authority is going to do or

10    not do.  That all comes from the plan they

11    follow.  They get together and they make the

12    decision.  I don't make the decision.  That's

13    why I don't want to answer about the plan.  I

14    can only follow once they have given me the

15    direction.  I can follow the direction.  I can

16    follow what the goal is, but how they are

17    reached, what they include, what they don't

18    include I don't want to comment on that.  I have

19    not been in this position first of all and

20    second it's not my responsibility to answer

21    that.

22         Q.    I get it you don't want to discuss

23    policy because you don't make policy; correct?

24         A.    Correct.

25         Q.    But you are an engineer and know

25

1                    GREGORY SANCHEZ

2   about engineering standards generally; correct?

3          A.    Yes.

4          Q.    You know about engineering standards

5   generally as they apply to the subway system for

6   New York City?

7          A.    Yes.

8          Q.    So according to good and accepted

9   engineering practices and standards where you have

10  different stations that have different

11  configurations, different locations, you would have

12  to look at each station individually to see how you

13  are going to adapt that general policy you don't

14  make, but have you take that policy to apply it to

15  each station?

16               MR. KEAVENEY:  Objection.

17         A.    No.  Yes, I don't want to call it

18      that way.  Like I said, when a project is

19      specified the goal, the scope, the requirements

20      are dictated and the design follows proceeding

21      that.  Whether they are similar, they are not

22      similar, whether different here, there that is

23      not common practice problem.  It's a design

24      scope problem.

25         Q.    I am not sure I understand that.

26

GREGORY SANCHEZ

1

2     Let's try something else.  Can we agree that

3     engineering standards require fact and not

4     speculation?

5          A.    Repeat again.

6          Q.    Engineering standards require

7     decisions being made on fact, not on speculation?

8          A.    Not really.

9          Q.    Okay.

10         A.    If you look at codes -- codes

11    sometimes ask you to do certain things.  Me as

12    an engineer object, but I am force to do.  No, I

13    don't agree with your statement.  It's not a

14    hundred percent there.  Sometimes it's

15    operating.

16         Q.    So I'm very confused by your last

17    answer, which I also respectfully submit is not

18    responsive to the question.  You now talk about

19    codes, which I was not asking about.  But since you

20    brought that topic up whether there are codes or

21    standards, can we agree that whether you like them

22    or not you have to apply them?

23         A.    Yes, we apply.

24         Q.    So --

25         A.    But, but, where I didn't answer

27

GREGORY SANCHEZ

1

2     your question before was you said the word

3     facts, is based on facts.  What I'm trying to

4     tell you a lot of these codes, these

5     requirements are not necessarily based on facts.

6     Okay.  Just decisions and they communicate and

7     make a decision.  You wonder who is the

8     committee, but it's not necessarily based on

9     facts.  That's what I'm trying to stress.

10          Q.    Let's back up a little further.  I

11    am not sure I am still understanding what you are

12    saying to me.  I am not interested in the politics

13    of the transit.  You are talking about a lot of the

14    politics of the New York City Transit.

15          A.    No, I'm talking about that you

16    saying that I am saying you are saying the

17    standards and procedures are based on facts.  I

18    said not all are based on facts.  I been

19    standard where if committee makes a decision,

20    communication the design, requirement, it is not

21    necessarily based on facts.

22          Q.    Okay.  So sometimes a committee at

23    the Transit Authority --

24          A.    No, no.  A committee of the

25    standard you were referring to.  You're saying

28

1          GREGORY SANCHEZ

2    there are standards and procedures we follow.

3    So when you look at those books, those codes,

4    sometimes those decisions are not based on

5    facts.  A lot of these requirements in this

6    handbooks and these codes or whatever are

7    commercially driven.  Meaning the vendors put

8    the interest in there and -- okay.

9          Q.    Let's back up.  I want to make sure

10   we are understanding one another.  As an engineer

11   involved in design you want to design things first

12   and foremost that comply with engineering

13   professional standards of care, good and accepted

14   practices and procedures and protocols; true?

15         A.    True.

16         Q.    One of the key principles of

17   engineering is that when there are designs that it

18   be designed safely and for safety; true?

19         A.    Follow the standards, yes.

20         Q.    So basically what a lot of

21   engineering is, just trying to get to the brass

22   tacks here, in engineering you first identify a

23   hazard or a problem and then using engineering

24   knowledge and principles you figure out how to

25   solve that problem; correct?

29

1                    GREGORY SANCHEZ

2          A.     Yes.

3          Q.     So somebody can say here is what we

4    need to do and you say okay this can solve that

5    problem, but there are certain challenges to the

6    implementation of that; correct?

7          A.     Yes.

8          Q.     The engineer says here's how we are

9    going to come up with solutions to these

10   challenges; right?

11         A.     Right.

12         Q.     So for example, you told us you

13   worked on the Jubilee line in London; correct?

14         A.     Correct.

15         Q.     And they installed platform edge

16   doors on that system; correct?

17         A.     Correct.

18         Q.     And there were challenges in that

19   system to do so; correct?

20         A.     Correct.

21         Q.     And one of the things that the

22   engineers doing that Jubilee line is they look how

23   from an engineering perspective can we solve or

24   overcome these challenges; correct?

25         A.     Yes.

30

1                     GREGORY SANCHEZ

2          Q.    In London they were able to do so;

3    correct?

4          A.    Let me qualify.  The system was

5    designed to include them in the design.  There

6    are parts of London underground that doesn't

7    have platform screen doors.  So while, yes, we

8    included them in the design and we worked it out

9    that was part of the design to include them, but

10   the other parts they are not part of the design

11   and they remain as they were.  So what I'm

12   trying to say is when the design is set forth

13   include them we tried to accommodate them and if

14   we cannot we recommend no, why not.  That

15   changes the design.

16         Q.    So now I'll see if I can get what

17   you're saying.  In London they found they could not

18   do a one size fits all approach; correct?

19         A.    No, that's not what I said.

20         Q.    Okay.  Well, I'm trying because you

21   told us in London that there were parts that they

22   were able to put in the platform edge doors and

23   stations that they could not do so; right?

24         A.    No, no.  What I'm saying is the

25   Jubilee line extension from the design

31

GREGORY SANCHEZ

1

2      construction was to include for ventilation

3      purposes and platform screen doors as they were

4      included in the design.  It's not that the

5      underground was going to include them

6      everywhere.  So that was a new project.  It was

7      okay to put them in there from the get go and

8      they did so.  We accommodate that.  We worked

9      with the design to look at the design throughout

10     the Jubilee line extension, but that did not

11     cover the rest of the system.  The rest of the

12     system remained without platform screen doors.

13     So when they did that --

14          Q.    I will ask you.  So part of the

15     London system, the subway system, had platform

16     screen doors and part did not; correct?

17          A.    Correct.

18          Q.    Okay.  And how long ago was all this

19     done?

20          A.    As far as I know only the Jubilee

21     line extension has platform screen doors.

22          Q.    That's not my question.  I am asking

23     when.  When was it done?

24          A.    I know.  I am going to that.

25          Q.    Okay.

32

1                          GREGORY SANCHEZ

2          A.    That design was in the 1992, 1994

3   or so when it was designed and the line was put

4   in service in the early 2000's.

5          Q.    So that was a long time ago;

6   correct?

7          A.    Yeah.

8          Q.    Okay.  They've had the ability over

9   this long period of time since then to see what the

10  data showed about its effectiveness; correct?

11         A.    Depends what the effectiveness is

12   trying to attract.  It has done its function,

13   which was to keep the heat from the tracks in

14   the tracks and continue with the ventilation of

15   the station.  That was the main purpose of that.

16         MR. GENIS:  Move to strike what is

17   nonresponsive.

18         Q.    I know you have a time limit today.

19  I can go much faster if you just answer my

20  questions and don't go off on a tangent.

21         A.    Okay.

22         Q.    What my question originally was,

23  nice and simple -- do you have notes in front of

24  you, sir?  You are looking down.

25         A.    No, my wife is making me a

33

1                      GREGORY SANCHEZ

2      sandwich.

3            Q.    So let's get back.  So the point was

4      you told us that long ago they had finished and

5      completed the installation of platform edge doors

6      in parts of the London subway system?

7            A.    That's correct, yes.

8            Q.    From that time to now we've had

9      quite a few years intervene; yes?

10           A.    Yes.

11           Q.    So if people wanted to have data,

12     hard fact over the passage of time they have the

13     ability to do so; correct?

14           A.    Yes.

15           Q.    Okay.  So for example, there's

16     different things that one might measure to see

17     whether or not that system was effective; correct?

18           A.    Again, there were effective is what

19       is tricky.  What are you trying to track?

20           Q.    You have to give me a chance, sir.

21     Okay.  We go from general to specific.  First we

22     know that over a period of time you now have the

23     ability to collect and analyze data; yes?

24           A.    Yes.

25           Q.    And you can look at the data, just

34

GREGORY SANCHEZ

1
2    step by step here, to see whether or not a
3    particular design or for example here platform edge
4    doors was effective or not; true?
5           A.    Qualify effective.  If you mean by
6        effective the doors open and close without
7        falling apart, yes, you can do that.  But any
8        other function I cannot answer for.
9           Q.    Let's talk about effectiveness.  We
10   discussed last time how a purpose of platform edge
11   doors is safety; true?
12          A.    Yes, but you have to qualify
13       safety.
14          Q.    Sir, sir, I know you want to leave
15   today.  So the best way I can help you if I ask you
16   a yes or no question if you just answer with a yes
17   or no and we can move on.  I can't do everything in
18   one question.  I have to go step by step.
19   Understand.
20          A.    When safety has so many
21       ramifications I have to be careful.  Safety is
22       air quality, which is one of the issues we
23       design for.  Safety is control, which is one of
24       the issues.  So I'm trying to make sure that my
25       answer tailors my expertise.  I don't want to go

35

1                          GREGORY SANCHEZ

2    off branch.  That's what I'm insisting to define

3    what I'm trying to answer.

4          Q.    Not a problem.  So let's just be at

5    a slow down.  Right now when I'm talking about

6    safety right now.  I'm going to be asking you about

7    people being hit or run over by trains.

8          A.    Okay.

9          Q.    Understood?

10         A.    Now I know what I'm talking about,

11    right.

12         Q.    Thank you.  Can we agree one of the

13    purposes for platform edge doors to be installed in

14    London and elsewhere was to prevent or reduce

15    people being run over and being hit by trains?

16               MR. KEAVENEY:  Note my objection.

17         A.    Yes, that I cannot attest to.

18         Q.    Well, sir, you've read the

19    literature and studies about these platform edge

20    doors in other places like London; correct?

21         A.    I cannot attest to why they were

22    implemented on that point.

23         Q.    Well, you are familiar with the data

24    involving the reduction or elimination of people

25    getting run over or hit by trains; correct?

36

GREGORY SANCHEZ

1

2          A.     That I'm not familiar with, no.

3                 MR. GENIS:  Well, can you give us

4          Plaintiff's Exhibit 1 from I believe it's

5          Botta's deposition.

6          Q.     While you are doing that, do you

7    know Andrew Botta?

8          A.     I don't know him.  I know him.

9          Q.     You know of him?

10         A.     Yes.

11         Q.     And you've had e-mails that you both

12   were on the same e-mail chain; correct?

13         A.     Yes, because of the team, but I

14     never dealt with him.

15         Q.     When you say the team, what team are

16   you referring?

17         A.     The New York Transit team.  You

18     know, any team people get correspondence and it

19     doesn't necessarily mean you know all the people

20     on the list.

21         Q.     I understand.  I'm not saying that.

22   When you refer to a team you are just talking about

23   the team of the New York City Transit Authority;

24   correct?

25         A.     Correct.

37

1                          GREGORY SANCHEZ

2          Q.    You worked there many years.  Have

3    you noticed the people at the transit make friends

4    with one another?

5          A.    Of course.  Everywhere, not just

6      Transit.

7          Q.    People that work there a period of

8    time have loyalty to the Transit Authority?

9          A.    Some do, some don't.

10              MR. KEAVENEY:  Objection.

11         Q.    Especially the people that have been

12   there for a long time they have loyalty to the

13   Transit?

14         A.    I can't answer that.

15         Q.    Do you have loyalty to the Transit

16   Authority?

17         A.    Not really.  Not -- I wouldn't call

18     it loyalty.

19         Q.    What do you call it?

20         A.    I'll call it it was a place where I

21     worked and, you know, it's part of my life.  I

22     don't think -- I don't have any honors for them,

23     yes.  I worked for them, but I don't have any --

24         Q.    You work for a company now that does

25   work for different transit agencies; correct?

38

1                           GREGORY SANCHEZ

2          A.     Yes.

3          Q.     You work for a company now that does

4    work for the Transit Authority; correct?

5          A.     That's correct, yes.

6          Q.     And the company that you work for

7    does work for the Transit Authority?  Does your

8    company get paid significant sums of money to work

9    for the Transit Authority?

10         A.     That I don't know.

11         Q.     These are big jobs, not small jobs;

12   correct?

13         A.     Yes.  Different jobs, yes.

14         Q.     Okay so let's look at Plaintiff's

15   Exhibit 1.  I see it's up.  I see that it goes

16   through --

17                MR. GENIS:  Dave, make it bigger so

18         we can see it, please.

19         Q.     This is a document that tracks

20   certainly from 2001 over the years the number of

21   people being run over or hit by trains and number

22   of people that were killed in these incidents.  Do

23   you see that, sir?

24         A.     I see that, yes.

25         Q.     And we see going through it the

39

1                          GREGORY SANCHEZ

2    smallest amount or the lowest number of people

3    being hit is 109.   The highest on this document is

4    189.   Correct?

5              A.    Yes.

6              Q.    We see that there are fatalities

7    that's also a range, but every year there is quite

8    a few fatalities as well; correct?

9              A.    Yes.

10             Q.    So you see that consistently year

11   after year anywhere from 109 to 188 people are run

12   over by trains; correct?

13             A.    Well, I have to be careful with

14    this.

15             Q.    Or hit by trains?

16             A.    I have to be careful with this.   I

17    don't know the source of the data.

18             Q.    This is the Transit Authority's to

19   answer your question.

20             A.    Hear me out.   I don't know what

21    these numbers and how they are collected or

22    anything like that.   I have never been involved

23    in collecting data of accident.   I don't know

24    the action number like I reported the last time.

25    Most of the time all of these incidents were

40

1                           GREGORY SANCHEZ

2       heard on the news, even internally.  They exist.

3       I don't know.  I would like to refrain from

4       answering any of these questions.  I would like

5       to refer this to the New York City Transit

6       safety that collects this information and are

7       aware of all these numbers.  For me to answer

8       these numbers I don't feel comfortable because I

9       don't know how they quantify them.  I don't know

10      anything about it.

11           Q.    Okay.  All right.  So what my

12      question was actually asking you, sir, was -- I

13      think it was just a yes or no if you see the data.

14           A.    I see the data.

15           Q.    Excellent, good.  There we go.  Sir,

16      now when you see the data and if there had been any

17      procedures implemented by the Transit Authority, do

18      you see they had been effective in reducing or

19      eliminating incidents of people getting hit or run

20      over by trains?

21           A.    I cannot answer that.

22           Q.    Well, if there had been a program or

23      steps taken by looking at the statistics and the

24      data, can you see whether or not such a program has

25      been effective or not for the number of people

41

GREGORY SANCHEZ

2  getting hit and killed by trains?

3          A.    Look, I cannot answer that.  The

4  reason is there is a program implemented.  I

5  know it's a program.  How it functions, it is

6  not for me to judge.  I would like to defer that

7  question specifically to the New York City

8  Transit.

9          Q.    Who at the Transit Authority should

10  I ask these questions of then?

11          A.    I don't know.  I suppose system

12  safety maybe.  I don't know.  Maybe the

13  president.  The president will tell you where

14  this -- who is the most appropriate person to

15  answer these questions.

16          Q.    We have to talk to the president of

17  the Transit Authority to get all of this

18  information?

19          A.    I'll say he's the primary source of

20  authority and therefore.

21          Q.    By the way, when you did these

22  different projecting in other parts of the world,

23  who were the contractors, manufacturers that

24  installed these?

25          A.    I don't remember.  There were so

42

1                         GREGORY SANCHEZ

2    many.  Some were Chinese, Germans.  I don't

3    remember all the names really.

4              Q.    For example, are you familiar with

5    Faiveley Transport?

6              A.    No.

7              Q.    GE Transport Singapore?

8              A.    Yes, that I'm familiar with.

9              Q.    Are you familiar with Norbremse rail

10   system in the UK?

11             A.    No.

12             Q.    Who did the project in London, the

13   Jubilee line?

14             A.    I can't remember.  It might have

15   been Austin.  I can't remember.

16             Q.    Who did the one in Paris that you're

17   familiar with?

18             A.    No, I don't remember.  Usually I

19   don't deal with the manufacture.  We deal with

20   the principals.  We deal with functions.  I will

21   make sure we understand the parameter.  But at

22   the time a project starts the time it ends

23   sometimes you switch manufacturer, which has

24   happened.  So that's why I don't keep track who

25   manufacturers it since that's not my

43

GREGORY SANCHEZ

1

2  responsibilities.

3       Q.    Who put in the doors in London,

4  Singapore, Hong Kong?

5       A.    I don't know.  I'll have to take a

6  look at the brand in there.  It is on the steps.

7  Usually they have the brand name at the bottom.

8  I don't remember.

9       Q.    From an engineering perspective, yes

10  or no, do you try to make decisions based on

11  factual data statistics, things of that nature,

12  likelihood of certain events occurring?

13       A.    When possible.

14       Q.    You see or identify the hazard or

15  the problem and here can we agree that there was an

16  identified hazard or problem of people getting hit

17  or run over by trains?

18       A.    If the data is true, yes.  It has

19  to be yes.

20       Q.    So then we go to the process.  First

21  question is, what devices or changes can be made

22  that will be effective in eliminating or reducing

23  this known risk; correct?

24       A.    You mentioned the word risk.  Let

25  me show you something.  Sometimes the higher

44

1                    GREGORY SANCHEZ

2    risk element are the ones with the problem.

3    Sometimes the design has no ability to count a

4    hundred percentile for all events.  That's where

5    it comes into play.  That's what is going to

6    make the project feasible and buildable.  If you

7    look at the very small person driving a lot of

8    these things you will never have it.  You can

9    never build anything.  So from an engineer point

10   of view risk is used to learn and to understand

11   what are the potential things that we are going

12   to take a risk on and move forward.  Sometimes

13   we have to exclude certain things.

14        Q.    Sir, if you go on for twenty minutes

15   for each question I cannot finish you by noon

16   today.  I know you don't want to come back again.

17   If we can just get short concise answers to my

18   questions I can move along.  Okay.  Thank you.  Now

19   all right.  I am trying to ask yes or no questions.

20   So I can get a yes or no or a true or false out of

21   you and I move on to the next question.

22        A.    All I have to say is I am not

23   allowed to explain.  It's when things are a very

24   gray area I'll say no.  We have to be clear.

25   This is my word here, guys.

45

1                          GREGORY SANCHEZ

2          Q.    I understand.  Of course.  Engineers

3     build bridges; correct?

4          A.    Yes.

5          Q.    And there's risks in building

6     bridges; correct?

7          A.    That's correct.

8          Q.    But they look at what the challenges

9     or problems are to the bridge or building the

10    bridge and then they figure out through engineering

11    how to overcome the challenge and solve the

12    problem; correct?

13         A.    Yes.

14         Q.    When one has a bridge one of the

15    hazards that has been identified are people jumping

16    off of bridges; correct?

17              MR. KEAVENEY:  Objection.

18         A.    Yes.

19         Q.    So one of the engineering solutions

20    to that has been saying place a fence or a rail,

21    some sort of barrier that prevents people from

22    jumping off the bridge; correct?

23         A.    I have not been in that decision

24     point.

25         Q.    But you heard of this; correct?

46

1                    GREGORY SANCHEZ

2          A.    Yes.

3          Q.    Okay.  So that's the whole point of

4    engineering how do you use the engineering to

5    overcome the challenge and give the solution;

6    right?

7                MR. KEAVENEY:  Objection.

8          A.    Not quite sure what the question

9      is.

10         Q.    Not a problem.  Okay.  There's

11   alternative means sometimes of addressing the same

12   problem; correct?

13         A.    Yes.

14         Q.    The first question is for any

15   particular location what is the most effective

16   means of eliminating the problem; correct?

17         A.    Yes.

18         Q.    And if that is not doable then you

19   go to the next best; correct?

20         A.    Potentially, yes.

21         Q.    And you go down the line; correct?

22         A.    To some degree.

23         Q.    To use a silly expression there is

24   more than one way to skin a cat; correct?

25         A.    Yes.

47

1                      GREGORY SANCHEZ

2          Q.    For example, if what wants to be

3    accomplished is reducing or preventing people from

4    getting run over by trains there's what is called a

5    root cause analysis in the field of engineering;

6    true?

7          A.    Correct.

8          Q.    Okay.  And when the root cause

9    analysis of people getting hit by trains comes down

10   to that the edges of platforms that are unprotected

11   that there's nothing to prevent people from having

12   contact with the trains; correct?

13         A.    Okay.  Let me give you an example.

14         Q.    Can you just answer my question,

15   please?  I am not interested in an example.  Answer

16   my question.

17         A.    The answer is no.

18         Q.    Okay.  So can we agree if there is a

19   barrier between the edge of a platform and the

20   train if it's a proper barrier there are no contact

21   between people and trains; true?

22         A.    Yes.

23         Q.    So then the next engineering

24   question is, how do we best accomplish that

25   barrier; correct?

48

GREGORY SANCHEZ

1

2      A.    It depends on the intent.

3      Q.    If the intent is to prevent people

4  from being killed or harmed by contact with trains.

5      A.    No, because I tried to tell you

6  Washington DC doesn't have platform screen

7  doors.

8      Q.    I didn't ask you about that.  Sir, I

9  didn't ask about Washington.  I am asking a nice

10  simple question.  Are you here to help the Transit

11  Authority today?

12      A.    I am not.  I am trying to --

13      Q.    Who spoke to you?

14      A.    No one.

15      MR. KEAVENEY:  Objection.

16      A.    No one has spoken to me.  Look, I

17  am here, like I said, I thought some of the

18  statements that were given in the beginning last

19  week and I felt that now they are asking me or

20  my expertise a lot of questions were on what I

21  thought the Transit was to do.  Look, I am

22  saying I am not going to answer questions that

23  belong to an authority.  I am not in the

24  management seat.  I am in technical seat.  I am

25  going to tell you how the things are going to

49

1                        GREGORY SANCHEZ

2       work, how the things have to be standard.

3       Things like that in nature.

4              Q.     That's what I'm asking you about.

5       That's what I would like answers to.  I appreciate

6       how things work and how they effect.  So platform

7       edge doors work to prevent contact between

8       customers and the trains; yes?

9              A.     Yes.

10             Q.     And in terms of airflow and

11      ventilation, one of your areas of expertise,

12      there's different means of addressing the concerns

13      of airflow; correct?

14             A.     Yes.

15             Q.     One of the means could be through

16      having openings or louvers in the platform edge

17      door?

18             A.     Correct.

19             Q.     Another means is adjusting the

20      height of the platform edge door; correct?

21             A.     Correct.

22             Q.     So that's an example of a challenge

23      or a problem that can be solved through

24      engineering; correct?

25             A.     To prevent through engineering.

50

1                    GREGORY SANCHEZ

2        Q.    That's what you do; correct?

3        A.    Correct.

4        Q.    Let's talk more about that.  For

5  example, you might see a particular station and

6  from an engineering perspective you might say

7  there's challenges to putting in a platform edge

8  doors there, for example, in Paris if they felt the

9  platforms were not strong enough to support the

10  edge doors they reenforce the concrete; correct?

11        A.    Yes.

12        Q.    Other means involving cantilevers on

13  the platform edge doors; correct?

14        A.    Correct.

15        Q.    Other means of addressing that are

16  suspending platform edge doors from the ceiling;

17  correct?

18        A.    Correct.

19        Q.    Other kind of means could be putting

20  supports underneath the platform where necessary;

21  correct?

22        A.    Correct.

23        Q.    Okay.

24        A.    Now you brought up Paris.  When I

25     talked to Washington you told me not to.  Just

51

GREGORY SANCHEZ

1

2     continue.

3          Q.    My pleasure, sir.  So one of the

4     other issues, for example, might be the width of

5     the door and the unit the frame that houses it;

6     correct?

7          A.    Yes.

8          Q.    So one can look for an engineering

9     design perspective how can the doors either be made

10    lighter or thinner; correct?

11         A.    Yes.

12         Q.    That's another way from engineering

13    you see a challenge and you solve the problem;

14    correct?

15         A.    Correct.

16         Q.    Another good and accepted practice

17    of engineering for whatever reason you see that

18    it's not possible to install a platform edge door

19    at a particular platform or station then you could

20    look for an alternative means of accomplishing the

21    same goal of reducing or preventing people from

22    getting hit by trains; correct?

23         A.    If that's the intent of the design,

24    yes.

25         Q.    So you would then look, for example,

52

1                    GREGORY SANCHEZ

2   if there are track intrusion devices; true?

3           A.    You could.

4           Q.    Okay.  And again, if that's an

5   effective means of reducing or preventing people

6   from getting run over and hit by trains and if the

7   platform edge doors are not doable then you can do

8   that; correct?

9           A.    You could do that.

10          Q.    If for whatever reason it was

11  impossible to install track intrusion devices well

12  then you can do fixed rails; correct?

13          A.    That's many options.

14          Q.    So what good engineering requires is

15  that you look at the different options and which

16  options are most effective in addressing the issue

17  at hand; correct?

18          A.    Just to remember one of the options

19   is nothing.  So nothing is one of the outcomes.

20   Some things are we do analysis the idea is go or

21   not go.  If it is not go, we of course not go.

22   If it is a go, what level of go we can go with.

23   I just wanted to make sure we covered the whole

24   spectrum of the engineering analysis.

25          Q.    Sure.  So then the issue is if

53

1                    GREGORY SANCHEZ

2    nothing is done then it's not addressing the

3    problem it sought to eliminate though; correct?

4         A.    No.  There should be other

5     alternatives that can work.

6         Q.    Back up.  Now you're confusing me.

7         A.    Okay.  If you are looking for --

8         Q.    Sir, I am trying to ask questions

9    here.  I am trying to ask questions to get answers.

10   Okay.  Let's back it up.  First, engineering, is

11   safety important?

12        A.    Yes.

13        Q.    Is safety the most important part of

14   engineering that has to be safe?

15        A.    It is one of the primary factors,

16    yes.

17        Q.    If we are looking at the system and

18   we're looking at hazard and risk analysis, one of

19   the things we are looking at is people getting

20   injured; correct?

21        A.    That's what you're looking at.

22        Q.    And by the way, from an engineering

23   perspective, are you ever allowed to ignore the

24   danger?

25        A.    No, we cannot.

54

GREGORY SANCHEZ

1

2     Q.     So here we know for fact that every

3 year many people are hit and seriously injured or

4 killed by trains in the New York City subway

5 system; correct?

6     A.     In a sense, yes.

7     Q.     So the question is, does the Transit

8 Authority have the duty to keep the system safety?

9          MR. KEAVENEY:  Objection.

10    A.     That duty part I don't know.

11    Q.     Okay.  That's fine.  I'd like you to

12 assume for the sake of the argument the Transit is

13 supposed to keep the subway system safe.  So if we

14 start with that premise the question then becomes,

15 A, identification of injury, yes?

16    A.     That's your go.

17    Q.     And here the Transit Authority has

18 collected data and identified a source and cause of

19 injury; correct?

20          MR. KEAVENEY:  Objection.

21    A.     If you are referring to what this

22   is showing just give the authorities.  That's

23   it.

24    Q.     Is that yes to my question, sir?

25    A.     I cannot answer that question.

55

1                          GREGORY SANCHEZ

2          Q.    You can't answer it.  So let's back

3    up a second.  Are you telling us as an engineer and

4    as someone who worked for the Transit Authority and

5    still works in the field with the company that

6    works for the Transit you are unaware of the safety

7    dangers of people getting hit by trains?

8          A.    I'm aware that people get hit by

9      trains, fall on the tracks if that's what you

10     are trying to lean to.  As to the causes, as to

11     what the transit does about it, that I don't

12     know anything about.

13         Q.    That's fine.  This chart is not my

14   representation.  This is the Transit Authority's

15   representation.  This is their data that we are

16   showing you that they have given us in this

17   lawsuit.  Okay.

18         A.    That's fine.  Leave it to TA to

19     answer the questions on this chart.  It's not my

20     chart.

21         Q.    So my question is, as an engineer,

22   when you see every year there's a recurring problem

23   from an engineering perspective you should design

24   something to help reduce or prevent these events

25   from recurring; true?

56

GREGORY SANCHEZ

1

2      A.      You should look at the function of
3   the system and see what could be functioning and
4   where it's not functioning.  What they do, I
5   don't.

6      Q.      You look to see whether or not they
7   have made a design and implemented that safety plan
8   to make the station safe to prevent or reduce the
9   number of people getting hit by trains; true?

10              MR. KEAVENEY:  Objection.

11      A.      Yeah, I don't want to answer that
12   question.

13      Q.      Okay.  Are good and accepted
14   engineering practices and procedures trying to
15   reduce injury in the data?

16      A.      Yes.

17              MR. GENIS:  We will take a quick
18         break.

19              (Recess was taken.)

20      Q.      We are back on the record, sir.  So
21   let me ask a question here.  Getting back to
22   general engineering practices and procedures.
23   Engineering is science; correct?

24      A.      It's part of it.

25      Q.      Okay.  It's science, it's math, it's

57

GREGORY SANCHEZ

1

2    physics; correct?

3          A.    Part of it, yes.

4          Q.    And engineering is based in part on

5    science and math and physics.  Is it driven by

6    factual data; correct?

7          A.    Some, yes.

8          Q.    And part of the basis for

9    engineering and looking at data is looking at

10   statistics; correct?

11         A.    So some agree.

12         Q.    Okay.  And when you are doing design

13   you're basing it on data so that you think the

14   design will be effective; correct?

15         A.    Yes.

16         Q.    The whole point of design is to make

17   something that will be effective; correct?

18         A.    Yes.

19         Q.    And then you utilize that design and

20   you measure to see whether or not it has actually

21   been effective; correct?

22         A.    Yes, you look at that.

23         Q.    For example, you look at the

24   statistics, what number or percentage of people did

25   A, B, C after you had this new design; correct?

58

1                    GREGORY SANCHEZ

2          A.     Yes.

3          Q.     And then you can gauge whether or

4    not the design has in fact been effective or not;

5    correct?

6          A.     I would like to qualify one caveat

7      to that.  You mention before root cause

8      analysis.  We have to look at also what is the

9      cause of the problem.  I cannot blindly -- I

10     mean I am an engineer and I cannot blindly if I

11     hear somebody hit the door I have to find out

12     why the fact that the door is being hit.

13         Q.     Agreed.  I'll follow up on what you

14   just said.  There's basically three ways that

15   somebody can wind up on the train track, they fall

16   and whether they fall because they are sick,

17   medication, heat, they trip on a condition,

18   whatever, but they fall and then they wind up on

19   the track, that's one way; correct?

20         A.     Yes.

21         Q.     A second way is they get pushed onto

22   the track; correct?

23         A.     Correct.

24         Q.     And a third way is that they jump

25   onto the track or go to retrieve an item that fell

59

1                          GREGORY SANCHEZ

2    onto the track; correct?

3              A.    Whatever the reason, yes.

4              Q.    Right.  And those are basically the

5    three ways that people can wind up on the track bed

6    and get run over or hit by a train; correct?

7              A.    Yeah.

8              Q.    So from an engineering design

9    perspective the cause of people getting run over,

10   because you are looking for the solvable cause, is

11   contact.  That's the common denominator.  There is

12   contact between people and the train on the track

13   bed; correct?

14             A.    Yes.

15             Q.    From an engineering perspective you

16   want to design something that can prevent that

17   contact from occurring; correct?  That is the means

18   of addressing the problem; correct?

19             A.    I would look at how to manage the

20    event.

21             Q.    In managing the event we are talking

22   about preventing the people from getting hit or run

23   over by trains; correct?

24             A.    Yes.

25             Q.    And so you can see what is most

60

1                      GREGORY SANCHEZ

2    effective, for example, you can say we're going to

3    make an announcement over the loud speaker, don't

4    go on the tracks, don't even go near the edge of

5    the platform; right?

6              A.    Yes, that's correct.

7              Q.    But then you would look at the data

8    if after you started that program so to speak to

9    see did the numbers change?  You look at the data

10   the statistics; correct?

11             A.    Yes.

12             Q.    So for example, I'm making things up

13   now, I am not saying this is accurate.

14             A.    Yeah.

15             Q.    If in the year 2010 if that's when

16   they start making announcements to watch out for

17   the track bed, stay away from the edge you would

18   look from 2010 and you can look to the data for the

19   ten years let's say before 2010, the ten years

20   after 2010, and you could look at the data to say

21   it used to be 200 people that got hit by trains and

22   after we made the announcements it is down to ten

23   people getting hit by trains; correct?

24             A.    Yes.

25             Q.    Then you say this plan has been

61

1                          GREGORY SANCHEZ

2    somewhat effective; correct?

3          A.    Correct.

4          Q.    Or you can see the number is

5    virtually unchanged by looking at the statistics

6    and data; correct?

7          A.    Yes.

8          Q.    And then you would know that plan

9    was not effective; correct?

10         A.    Correct.

11               MR. KEAVENEY:  Objection.

12         Q.    So the bottom line is engineering

13   and design is driven by fact, by data, and by

14   statistics; yes?

15         A.    Some of the factors.

16         Q.    All right.  I think I asked you

17   about all the questions I can ask of you at this

18   time.  So I'm going to stop.  I don't know if the

19   lawyer for the Transit Authority has anything he

20   wishes to ask you.  Otherwise for now I have

21   nothing else to ask you.  I appreciate your time.

22               MR. GENIS:  Do you have anything

23          you want to ask?

24               MR. KEAVENEY:  I want to clarify

25          some comments from the last deposition.

62

1                         GREGORY SANCHEZ

2          Not too many.

3                    MR. GENIS:  While you are thinking

4          I will ask another question.

5          Q.    If the problem and hazard identified

6    is people getting hit by trains, run over by

7    trains, and seriously injured or killed, can we

8    agree that if the answer to do nothing is the

9    approach taken that that will not effectively

10   reduce the number of people getting hit or run over

11   by trains; true?

12                   MR. KEAVENEY:  Note my objection.

13         A.    Yes, I cannot answer that.

14         Q.    Well, a moment ago you told us that

15   one of the options is to do nothing.

16         A.    That's correct.

17         Q.    Okay.  So can we agree if the

18   problem identified --

19         A.    Let me qualify something.

20         Q.    Can I finish my question, please?

21   If the problem identified is that people are being

22   hit and either seriously injured or killed by

23   trains and the solution proposed is to do nothing,

24   can we agree that does not solve the problem at

25   all?

63

1                    GREGORY SANCHEZ

2          A.    Look, sometimes nothing works.

3    Sometimes nothing doesn't work.  I'll give an

4    example.  If I know that I'm going to see a

5    train coming down the rail and I saw the guy

6    just before me tried to cross and got hit fear

7    goes through me.  I said I don't want that to

8    happen to me.  I am trying to be as objective as

9    I can in the answers.  I am trying to --

10         Q.    Sir, you are going off on a tangent

11   having nothing to do with the question.  You told

12   me you did not want to get into your personal

13   opinions and your personal things.  You wanted to

14   get into engineering design.  I am only discussing

15   engineering design and engineering practices.

16         A.    Correct.  When your question --

17         Q.    That's what we are doing.

18         A.    Your question doesn't cover all the

19   bases.  It leaves me up hanging.  I am trying to

20   make sure I cover all the bases.

21         Q.    I'm only using your words.

22         A.    I'm trying to clarify that what you

23   are trying to ask me have a more bigger spectrum

24   than you are trying to reach.

25         Q.    I don't understand what you are

64

GREGORY SANCHEZ

1
2    saying, sir.  All I am asking is if the problem
3    identified from an engineering perspective is that
4    people are being hit and killed by trains.  I
5    understand that there is a hierarchy of safety of
6    different approaches that can be done; correct?
7         A.    Yes.
8         Q.    And it can be from the most
9    effective to the least effective; correct?
10        A.    Yes.
11        Q.    And then you said in addition to
12   those choices the choice is to do nothing; correct?
13        A.    That's one of the options for
14     whatever reason we did we are --
15        Q.    Sir, sir, I didn't ask you about all
16   that.
17             MR. GENIS:  Move to strike what is
18             nonresponsive.
19        Q.    The only question was that one of
20   the options you told us is to do nothing.  True or
21   false, sir?
22        A.    That's true.
23        Q.    Thank you.  Can we agree if the
24   problem identified is people getting hit and killed
25   and maimed by trains and the goal it to prevent

65

1                    GREGORY SANCHEZ

2   that if the answer is do nothing can we agree it

3   will not accomplish that goal of reducing or

4   eliminating people from getting hit and injured or

5   killed by trains?  Can we agree with on that, yes

6   or no?

7          A.    Nothing means not implemented a

8     barrier.  Or what does the nothing mean.

9          Q.    Sir, okay.

10         A.    I am asking you clarification.

11         Q.    Not a problem.  I'm going back to

12  your statement.  You said one of the options is to

13  do nothing.  I assume when you use that expression

14  you meant those words.  Do nothing means do

15  nothing?

16         A.    I am talking about --

17         Q.    Sir, sir, we are trying to have

18  questions and answers.  When you speak over me and

19  make speeches we can't do this.  This is not how

20  this works.

21         A.    Then clarify your question.  If you

22    allow me to clarify my answer.

23         Q.    Sir, all I'm trying to do is ask

24  you.  I am not here to argue with you, sir.  I am

25  not here to debate with you.  All I'm trying to do

66

GREGORY SANCHEZ

1

2    is ask questions and get answers to my questions.

3    That's it.  That's all.  Remember how you told us

4    that was fair that we do that, right.  It's fair if

5    I ask yes or no questions that you give me a yes or

6    no or say you can't.  Is that fair?

7          A.    If the yes or no is proper

8      statement.

9          Q.    Sir, nice and simple, if the answer

10    is -- let's back up, sir.  When you go off on

11    tangents it makes it take so much longer.  When an

12    engineer comes up with a hierarchy of safety with

13    different alternatives all designed to solve the

14    problem, can we agree that they have already

15    determined that there is a need to solve the

16    problem?

17          A.    I don't understand the question.

18          Q.    Not a problem.  I'll rephrase.  Is

19    it a good thing or bad thing to save lives from an

20    engineering perspective?

21          A.    It's a good thing.

22          Q.    From an engineering perspective, is

23    it a good thing or bad thing to save limbs?

24          A.    Again, what does that mean to me to

25      a technical issue.

67

1                    GREGORY SANCHEZ

2          Q.    So an engineer that objectively

3    studies a problem -- let's even back up further.

4    Do you believe that STV is a reliable engineering

5    company?

6          A.    Yes.  A lot of companies are.

7          Q.    Has STV ever said that the root

8    cause of people getting people injured by contact

9    of trains is the absence of any safety device

10   preventing it from occurring such as a barrier,

11   would you agree or disagree with the statement?

12         A.    I have to look at the context.  I

13   have to see what they are evaluating.

14         Q.    You would not take STV just at their

15   word; correct?

16         A.    No.

17         Q.    And is it your testimony today that

18   looking at this chart Plaintiff's Exhibit 1 of all

19   the people getting injured and killed by contact

20   with trains that from an engineering perspective

21   where safety is foremost that doing nothing is an

22   acceptable choice?

23         A.    The term nothing in what regards?

24         Q.    Doing nothing to prevent these

25   incidents from occurring.

68

1                       GREGORY SANCHEZ

2           A.     Let me qualify the nothing.  If the

3       nothing means --

4           Q.     You asked me to qualify it.  I did.

5       Can you please answer my question, sir.

6           A.     Because the question is operation

7       is not my term.  We are here talking about

8       platform screen doors.  If your question is

9       about doing no platform screen doors I can't

10      answer that.  Is that what you are saying

11      nothing?

12          Q.     Sir, let's back up.  Now you are

13      mischaracterizing things.  We don't know want that

14      I know.  I know you don't like that.  So we

15      discussed a hierarchy of safety.  Do you recall

16      that?

17          A.     Yes.

18          Q.     We discussed different types of

19      devices or equipment that can be effective in

20      preventing or reducing incidents or a number of

21      incidents of people getting killed or maimed by

22      contact with trains; true?

23          A.     That's true.

24          Q.     Not just platform screen doors, we

25      discussed other things as well?

69

1                       GREGORY SANCHEZ

2          A.    That's correct.

3          Q.    Okay.  So can we agree when you say

4    the words doing nothing that means by definition

5    none of the items listed as alternatives in that

6    hierarchy of safety; true?

7          A.    When I talked about the nothing we

8     were talking about --

9          Q.    Just answer my question, sir.  Can

10   you just answer my question?

11         A.    I cannot answer the question.  Are

12    you allowing me to explain?

13         Q.    You can't answer if that was true or

14   false when you said that?  You can't tell me that?

15         A.    Look, are you allowing me to

16    explain?

17         Q.    Can you answer true or false?  Just

18   say either you can or can't answer if it is true or

19   false.

20         A.    I can't.

21         Q.    Not a problem.  If you can't answer

22   all you have to do is say you can't answer it.

23   Much easier and faster.  Just like you did before,

24   if the answer is --

25         A.    Because --

70

1                    GREGORY SANCHEZ

2          Q.    Why are you arguing?

3          A.    I am not arguing.

4          Q.    Why are you arguing?

5          A.    You are always objecting to my

6     explanation.  I am here listening to you very

7     well.  I am patient to listen to you, but you

8     want me to go and twist my words.  I don't want

9     my words to be twisted.  I'm trying to make sure

10    I'm clear on what I say.  I want to stand for

11    what I say.  Look, you are the --

12         Q.    Sir, tell me when you are finished,

13    sir.

14         A.    What I said before was --

15         Q.    Tell me when you are finished.

16         A.    When we do engineering analysis we

17    look at options.  For example, we are talking

18    about platform screen doors, I said yes.  One of

19    the options we have to consider is the ability

20    of not being able to do it.  If it is not able

21    to do we have to look at what we can do.  Some

22    option not building a platform screen door is

23    one of the options.  Can it be possible, of

24    course.  Can it be not be possible, it may be an

25    outcome.  That's the extent I was trying to

71

GREGORY SANCHEZ

1

2    explain to you before.  That when we look at the

3    analysis we look at can we do this option or

4    not, can we do that option or not.  So not

5    having that feature in there is also part of the

6    analysis.  I am trying to tell you in regard to

7    options we look.  We look at, yes, you mentioned

8    public announcements.  Yes, it works in London,

9    "Mind the gap," it works.  Does it work here, I

10   don't know.  Different options that are there.

11   That's what I'm trying to say.  When we do

12   engineering analysis we look at can this be

13   done, if it is not done, what can we do.  We go

14   on like that.  That's the extent of no as an

15   option.

16        Q.    Are you finished, sir?

17        A.    Yes.

18             MR. GENIS:  Move to strike what is

19        nonresponsive.  There wasn't even a

20        question posed.  It is a speech.  I am

21        moving to strike all of that.

22        Q.    Sir, all I'm trying to ask, yes or

23   no, you agree that from an engineering perspective

24   there are different options to try to see what will

25   be the most effective means of solving the problem?

72

                              GREGORY SANCHEZ

1

2    Yes or no or you can't answer it?

3            A.    I can answer it.

4            Q.    Fine.  And if nothing is done to

5    address a problem, can we agree then that the

6    problem will persist?  Yes or no or you can't

7    answer the question?

8            A.    I cannot answer.

9            MR. GENIS:  Andrew, if you have

10           questions.

11   EXAMINATION BY

12   MR. KEAVENEY:

13           Q.    Can you see the exhibit up now?

14           A.    Yes.

15           Q.    It's Exhibit 11A --

16           A.    Yes.

17           Q.    -- from your previous deposition.

18           A.    Yes.

19           Q.    Mr. Genis at the last deposition

20   read this to you.  He left out a couple of words.

21   So I want to read it to you again just to make sure

22   that we are on the same page.  It starts Economic

23   Considerations.  "Cost data was not obtained for

24   the PSD system during the visit to Korea.  It was

25   the understanding of the travelers that the PSD

73

GREGORY SANCHEZ

1
2   system would be installed at a predetermined number
3   of locations in exchange for advertising revenue
4   generated from the PSD displays.  It is unknown if
5   the costs to be covered by the vendor are limited
6   to the physical modules or extend to all costs
7   associated with PSD implementation."  Then the
8   paragraph goes on to say what those costs would
9   include.  Do you see that?
10          A.    Yes.
11          MR. GENIS:   Objection to form.  Go
12      ahead.
13      Q.    So there are a lot of costs
14  associated with installing PSD based on your
15  experience other than just the cost of the units
16  themselves; correct?
17          A.    That's correct.
18          Q.    Let's go on the same document to
19  page 11.  This is under the heading structural,
20  which is from the previous page.  Paragraph starts,
21  "The platform screen doors installed in Seoul are
22  typically installed on platform edges that have the
23  thickness of the door of 12 inches or more.  The
24  thickness provides sufficient strength for the
25  anchoring of the door modules.  In some cases,

74

1                    GREGORY SANCHEZ

2    columns were installed under the platform edges to

3    transfer the applied loads directly to the track

4    roadbed.  The platform edges in NYCT stations are

5    not as thick as platform edges in Seoul and are

6    themselves a cantilever form of construction

7    extending from the platforms.  As a result,

8    installation of platform doors will cause the

9    platform edges to receive a concentrated loading at

10   regular intervals along the platform.  In addition,

11   in order to level the sill of the platform doors

12   with the platform, it is necessary to remove a

13   depth of almost 4 inches of material from the width

14   of about 12 inches at the platform edge.  The

15   removal of this amount of material from the NYCT

16   platform edges is questionable."  Do you think

17   removing 4 inches from a 12 inch platform leaving 8

18   inches would be sufficient enough to withstand the

19   weight of the platform doors and motors and all the

20   other equipment necessary to install platform doors

21   without some type of reinforcement or

22   reconstruction of the platform edge?

23                    MR. GENIS:  Objection to form and

24             he previously testified that he is not

25             knowledgeable.  His area of expertise is

75

GREGORY SANCHEZ

1

2       ventilation and air and not concrete.  He

3       made a point of saying that repeatedly.

4       Those are my objections among others.

5       That's it.

6       A.      Answer?

7       Q.      Yes.

8       A.      It depends on the weight of the

9    platform screen doors.  So you have to see what

10   is the weight of them and then see if the

11   structure can support it.

12       Q.      You gave a history of your prior

13   experience.  You testified last week that you had

14   worked at the Los Angeles Metro; is that correct?

15       A.      That's correct.

16       Q.      Recently the Los Angeles Metro built

17   a new line; is that correct?

18       A.      Yes, the purple line.  It is under

19   construction.

20       Q.      Does that have platform screen

21   doors?

22       A.      No.

23       Q.      You also said that you worked for

24   the Washington DC Metro.

25       A.      I worked in the project on the

76

1                    GREGORY SANCHEZ

2        Washington DC Metro.

3            Q.      They are extending a line past Dolup

4    Airport; is that correct?

5            A.      Yes, that's correct.

6            Q.      Does that line contain platform

7    screen doors?

8            A.      No.

9            Q.      Both of those projects are new

10   construction; correct?

11           A.      That's correct.

12           Q.      Are you aware of any heavy duty

13   subway system within the United States that has

14   platform screen doors?

15           A.      No.

16           MR. KEAVENEY:    Thank you.

17   EXAMINATION BY

18   MR. GENIS:

19           Q.      Sir, do two wrongs make a right?

20   Can you answer that, please?

21           A.      I don't know what your point is.

22           Q.      It's a simple question.   Do two

23   wrongs make a right?

24           A.      What is it exactly what you are

25       looking at?

77

GREGORY SANCHEZ

1

2     Q.    It's a nice simple question.   Can

3     you answer that, sir?

4     A.    I don't understand your question.

5     Q.    Let me do it this way then.   I grew

6     up in New York and we used to have a saying if I

7     wanted to do something and my mother said no and I

8     said, "All the other kids are doing it," my mother

9     would say, "If all the other kids jump off the

10    Brooklyn Bridge, are you going to do that too?"

11    That is an example of two wrongs making a right.

12    Do you understand that now?

13    A.    That has nothing to do with me.

14    Q.    Okay.  So in other words, like you

15    said that it has nothing to do with you, does it

16    matter to you if other engineers or other subway

17    systems do things that are wrong?

18    A.    Look --

19    Q.    Just answer that question.

20    A.    What people do is their

21    prerogative.  If people make decisions --

22    Q.    So whether or not Washington, LA, or

23    anyone does what is right, does that change what is

24    right here?

25    A.    I don't have to define what right

78

GREGORY SANCHEZ

1

2    is.

3        Q.    If what other people do does not

4    promote safety, does that make it right here?

5        A.    Well, you see if you look at the

6    standards --

7        Q.    Yes or no?  Sir, it's a yes or no

8    question.  If you can't answer just say so.

9        A.    I cannot answer that.

10        Q.    That's fine.  That's all you have to

11    do.  See, so much easier.  So should we do what is

12    safe for us regardless of what other people do?

13    Yes or no?

14        A.    What is the question again?

15        Q.    Should we here in New York City do

16    what is safe regardless of what other people do?

17    Yes or no?

18            MR. KEAVENEY:  Note my objection.

19        A.    I really -- without explaining I

20    cannot answer the question.

21        Q.    Okay, you can't answer it.  That's

22    fine.  So if another city does things that are

23    unsafe should we follow that same model or should

24    we do what is safe?

25        A.    No, you could learn from lessons.

79

GREGORY SANCHEZ

1

2      Q.    So if other cities or other metro

3  systems do not follow Best Practices and do what is

4  safe what should we do here, should we do what is

5  safe or follow a bad example?

6      A.    Look --

7      Q.    Which is it?  Safe or follow a bad

8  example is the question.

9      A.    I'm looking through an engineer

10   here.

11     Q.    Just answer my question, please.

12     A.    I can't answer then.  You don't let

13   me explain.

14     Q.    If you can't answer it, you can't

15  answer it.  That's okay.  I'm fine with that.  I

16  mean either things are done in a safe manner to

17  protect the public properly or they are not;

18  correct?

19     A.    Which we do.

20     Q.    I didn't ask you about that.  By the

21  way you keep saying "we" and "we do things."

22     A.    Engineers, engineers.

23     Q.    Can I finish my question, sir?  When

24  you say "we do" and "we make the subway safe" are

25  you referring to the Transit Authority or are you

81

                              GREGORY SANCHEZ

1

2          A.     Yes, that's correct.

3          Q.     So engineers should be guided by

4    what promotes and keeps us safest; true?

5          A.     And those are the codes.

6                 MR. GENIS:  Excellent.  Nothing

7          else to ask you, sir.

8              (Time noted:  12:10 p.m.)

9

10                   _____

11                     GREGORY SANCHEZ

12

13    Subscribed and sworn to

14    before me this _____day

15    of_____, 2022

16    _____

17        Notary Public

18

19

20

21

22

23

24

25

82

1                                    INDEX

2

3       WITNESS                  EXAMINATION BY              PAGE

4       Gregory Sanchez          Mr. Genis                  5,76

5                                Mr. Keaveney               72

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

83

1                    CERTIFICATION

2

3    STATE OF NEW YORK    )

                         )   ss

4    COUNTY OF SUFFOLK    )

5

6        I, JOANNE MAGGIORE, a Shorthand Reporter and

7    Notary Public within and for the State of New York, do

8    hereby certify:

9        THAT the foregoing transcript is a true and

10   accurate transcript of my original stenographic notes.

11       I further certify that I am not related, either by

12   blood or marriage, to any of the parties to the action;

13   and THAT I am in no way interested in the outcome of

14   this matter.

15   IN WITNESS WHEREOF, I have hereunto set my hand this

16   11th day of March, 2022.

17

18

19

20                    JOANNE MAGGIORE

21

22

23

24

25

ERRATA SHEET FOR THE TRANSCRIPT OF:


DASILVA v. NYCTA
March 11, 2022
GREGORY SANCHEZ


CORRECTIONS:

Pg.  Ln.  Now Reads                Should Read                Reasons Therefore

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____

___  ___  _____            _____               _____


                                    _____
                                    Signature of GREGORY SANCHEZ

**A**

...m 1:11
ability 7:6 32:8
  33:13,23 44:3
  70:19
able 10:6 22:5 30:2
  30:22 70:20,20
above-noted 1:16
absence 67:9
accept 13:12
acceptable 17:8
  67:22
accepted 8:16
  12:15 16:7 19:8
  22:24 23:7,16
  25:8 28:13 51:16
  56:13
accident 6:5,9
  39:23
accidents 8:8 11:15
  15:25
accommodate
  30:13 31:8
..ccommodates
  23:9
accomplish 47:24
  65:3
accomplished 47:3
accomplishing
  51:20
accountability 9:14
accurate 7:13 60:13
  83:10
action 39:24 83:12
actions 16:17
activities 11:10
  13:18 17:4
adapt 25:13
add 4:18,20
addition 13:25
  64:11 74:10
address 20:22 72:5
addressed 22:2
addressing 46:11
  49:12 50:15 52:16
  53:2 59:18
..djusting 49:19
advertising 73:3

affect 20:18
agencies 37:25
ago 31:18 32:5 33:4
  62:14
agree 7:17,24 9:5
  10:3,9 12:15
  14:15 15:19 17:24
  19:7 20:24 26:2
  26:13,21 35:12
  43:15 47:18 57:11
  62:8,17,24 64:23
  65:2,5 66:14
  67:11 69:3 71:23
  72:5
agreed 3:3,7,10,14
  9:10 11:20 12:24
  14:8 15:23 17:10
  58:13
agreement 11:16
  18:10
ahead 73:12
air 21:3 34:22 75:2
airflow 49:10,13
Airport 76:4
allow 65:22
allowed 10:5 44:23
  53:23
allowing 69:12,15
alternative 46:11
  51:20
alternatives 53:5
  66:13 69:5
amount 39:2 74:15
analysis 11:25 12:2
  14:2,6,11,12,13
  14:13,14 15:14
  18:21 47:5,9
  52:20,24 53:18
  58:8 70:16 71:3,6
  71:12
analyze 19:9 33:23
analyzed 21:24
anchoring 73:25
Andrew 2:14 36:7
  72:9
Angeles 75:14,16
announcement
  60:3

announcements
  60:16,22 71:8
answer 4:23 5:4
  10:15,18 17:12
  18:5,13,18 23:20
  24:13,20 26:17,25
  32:19 34:8,16,25
  35:3 37:14 39:19
  40:7,21 41:3,15
  47:14,15,17 48:22
  54:25 55:2,19
  56:11 62:8,13
  65:2,22 66:9 68:5
  68:10 69:9,10,11
  69:13,17,18,21,22
  69:24 72:2,3,7,8
  75:6 76:20 77:3
  77:19 78:8,9,20
  78:21 79:11,12,14
  79:15
answering 40:4
answers 44:17 49:5
  53:9 63:9 65:18
  66:2
apart 34:7
applicable 8:20
  15:10,16
application 7:8
  20:12
applied 74:3
applies 23:23
apply 21:12,13 25:5
  25:14 26:22,23
appreciate 49:5
  61:21
approach 30:18
  62:9
approaches 64:6
appropriate 3:16
  12:2 17:16 41:14
area 44:24 74:25
areas 19:5 49:11
argue 65:24
arguing 70:2,3,4
argument 54:12
asked 4:21 61:16
  68:4
asking 10:8 26:19

31:22 35:6 40:12
  48:9,19 49:4 64:2
  65:10
aspect 19:3
aspects 7:10
assessed 12:6
assessment 12:10
assessments 13:18
assist 8:25 14:7
associated 17:7
  73:7,14
assume 54:12 65:13
attest 35:17,21
attorneys 2:3,8,12
  3:4
attract 32:12
Austin 42:15
authorities 54:22
authority 1:6,6
  4:23,24,25 8:5,21
  8:23 17:8 23:22
  24:8,9 27:23
  36:23 37:8,16
  38:4,7,9 40:17
  41:9,17,20 48:11
  48:23 54:8,17
  55:4 61:19 79:25
  80:8
Authority's 39:18
  55:14
availability 7:6
Avenue 2:4
aware 10:14 18:16
  40:7 55:8 76:12

**B**

B 57:25
back 27:10 28:9
  33:3 44:16 53:6
  53:10 55:2 56:20
  56:21 65:11 66:10
  67:3 68:12
bad 66:19,23 79:5,7
BALLAINE 2:12
barrier 45:21 47:19
  47:20,25 65:8
  67:10
based 12:10 27:3,5

27:8,17,18,21
  28:4 43:10 57:4
  73:14
bases 63:19,20
basically 28:20
  58:14 59:4
basing 57:13
basis 12:12 57:8
bed 59:5,13 60:17
beginning 48:18
behalf 4:16,24
believe 36:4 67:4
belong 4:22 5:3
  48:23
belongs 17:11
bending 18:24
best 34:15 46:19
  47:24 79:3
big 38:11
bigger 22:11 38:17
  63:23
blindly 58:9,10
blood 83:12
books 28:3
Botta 36:7
Botta's 36:5
bottom 43:7 61:12
branch 35:2
brand 43:6,7
brass 28:21
break 56:18
bridge 45:9,10,14
  45:22 77:10
bridges 45:3,6,16
bringing 17:14
Broadway 2:13
Bronx 2:9
Brooklyn 77:10
brought 26:20
  50:24
build 44:9 45:3
buildable 44:6
building 45:5,9
  70:22
built 75:16
BY:DAVID 2:5

**C**

Page 2

C 2:1 4:2 57:25
all 15:6 25:17
  37:17,19,20
called 5:20 47:4
cantilever 74:6
cantilevers 50:12
car 22:10
care 8:18 23:2
  28:13
careful 34:21 39:13
  39:16
cases 73:25
cat 46:24
cause 5:23 47:5,8
  54:18 58:7,9 59:9
  59:10 67:8 74:8
causes 55:10
caveat 58:6
ceiling 50:16
certain 24:7 26:11
  29:5 43:12 44:13
certainly 38:20
certification 3:5
  83:1
certified 17:5
certify 83:8,11
chain 36:12
challenge 45:11
  46:5 49:22 51:13
challenges 19:13,18
  21:20 23:10 29:5
  29:10,18,24 45:8
  50:7
chance 33:20
change 60:9 77:23
changes 14:2 20:14
  30:15 43:21
characteristics 5:21
chart 55:13,19,20
  67:18
checklist 11:22
Chinese 42:2
choice 64:12 67:22
choices 64:12
cities 79:2
city 1:6 4:17 8:21
  21:15 23:3 25:6
  27:14 36:23 40:5

41:7 54:4 78:15
  78:22 80:8,13
Civil 1:15
clarification 65:10
clarify 15:15 61:24
  63:22 65:21,22
clear 5:16 44:24
  70:10
clearly 9:18
clerk 3:13
close 34:6
code 80:4
codes 26:10,10,19
  26:20 27:4 28:3,6
  81:5
collapse 14:25
collect 33:23
collected 39:21
  54:18
collecting 39:23
collects 40:6
columns 74:2
come 23:22 29:9
  44:16
comes 24:10 44:5
  47:9 66:12
comfortable 40:8
coming 63:5
comment 4:19
  24:18
comments 61:25
commercially 28:7
committee 27:8,19
  27:22,24
common 5:25 25:23
  59:11
communicate 27:6
communicated
  5:10
communication
  27:20
companies 67:6
company 37:24
  38:3,6,8 55:5 67:5
compared 20:9
completed 22:5
  33:5
comply 28:12

component 6:12,19
concentrated 74:9
concentration 19:2
concept 8:7
concerns 49:12
concise 44:17
concrete 50:10 75:2
condition 6:5 15:25
  58:17
conditions 15:23
  16:3,14 20:17
  22:23
conducted 14:3,11
  14:14
Conference 1:9
configuration
  20:25 21:21
configurations
  25:11
confused 26:16
confusing 53:6
consequence 12:7
consider 70:19
considerations
  20:19 72:23
consistency 17:16
consistently 39:10
constraints 7:11
construction 7:23
  14:21,22 15:11,17
  18:18 31:2 74:6
  75:19 76:10
contact 47:12,20
  48:4 49:7 59:11
  59:12,17 67:8,19
  68:22
contain 10:21 76:6
context 67:12
continuation 4:15
continue 7:22 16:18
  32:14 51:2
Continued 80:17
contractors 41:23
control 13:2 17:7
  34:23
controlling 3:17
correct 4:25 6:6,7
  6:25 7:2,14 8:14

8:15 10:24,25
  11:5,7,10 12:3,19
  12:20 13:3,14,19
  13:23 14:4,5,17
  16:10,19,20 19:9
  20:4,5 21:4,5,21
  22:6,15 24:3,23
  24:24 25:2 28:25
  29:6,13,14,16,17
  29:19,20,24 30:3
  30:18 31:16,17
  32:6,10 33:7,13
  33:17 35:20,25
  36:12,24,25 37:25
  38:4,5,12 39:4,8
  39:12 43:23 45:3
  45:6,7,12,16,22
  45:25 46:12,16,19
  46:21,24 47:7,12
  47:25 49:13,18,20
  49:21,24 50:2,3
  50:10,13,14,17,18
  50:21,22 51:6,10
  51:14,15,22 52:8
  52:12,17 53:3,20
  54:5,19 56:23
  57:2,6,10,14,17
  57:21,25 58:5,19
  58:22,23 59:2,6
  59:13,17,18,23
  60:6,10,23 61:2,3
  61:6,9,10 62:16
  63:16 64:6,9,12
  67:15 69:2 73:16
  73:17 75:14,15,17
  76:4,5,10,11
  79:18 80:15,15
  81:2
correspondence
  36:18
CORSI 2:12
cost 7:12 72:23
  73:15
costs 73:5,6,8,13
count 44:3
COUNTY 83:4
couple 72:20
course 37:5 45:2

52:21 70:24
court 1:1 3:13 9:24
  10:5
cover 19:23 31:11
  63:18,20
covered 52:23 73:5
criteria 7:4,9 18:7,9
critical 6:11,18
cross 63:6
current 11:5
curved 22:9
customers 20:18
  49:8
cycle 7:13 10:24
  11:5 17:9

D

D 3:1
danger 53:24
dangers 55:7
DASILVA 1:3
data 11:15 32:10
  33:11,23,25 35:23
  39:17,23 40:13,14
  40:16,24 43:11,18
  54:18 55:15 56:15
  57:6,9,13 60:7,9
  60:18,20 61:6,13
  72:23
Dave 38:17
day 81:14 83:16
DC 48:6 75:24 76:2
deal 42:19,19,20
dealt 36:14
debate 65:25
DEBBIE 4:1
decision 12:12
  24:12,12 27:7,19
  45:23
decisions 26:7 27:6
  28:4 43:10 77:21
deemed 3:15
Defendants 1:7
  2:12
defer 41:6
define 16:9 35:2
  77:25
defined 9:18

defines 15:20
definition 69:4
definitions 5:16
degree 12:9 18:22
   46:22
Demographic
   19:21
denominator 59:11
denoting 6:13,20
dependability 7:3
depended 19:3
depends 32:11 48:2
   75:8
deposition 1:14 3:6
   3:11 4:15,21 5:9
   5:11 36:5 61:25
   72:17,19
depth 74:13
describe 17:3 18:8
design 6:2 7:22
   11:3 12:18 13:2
   14:21 15:10,17
   16:2,16 18:9,17
   18:25 20:3,14,17
   20:21,22,23 21:7
   21:10,14,20 24:7
   25:20,23 27:20
   28:11,11 30:5,8,9
   30:10,12,15,25
   31:4,9,9 32:2 34:3
   34:23 44:3 51:9
   51:23 55:23 56:7
   57:12,14,16,19,25
   58:4 59:8,16
   61:13 63:14,15
Designate 9:16
designation 6:11,18
designed 28:18
   30:5 32:3 66:13
designs 19:13,18
   23:9 28:17
detail 17:3
detailed 14:12
determine 12:13
   13:22
determined 66:15
developed 11:3
   18:4

development 8:24
device 6:13,20 67:9
devices 13:5,7
   43:21 52:2,11
   68:19
dictated 25:20
dictates 23:25
differ 20:15
difference 18:23
differences 21:6
   23:14
different 15:4 19:5
   19:12,17,20,21,25
   20:8 21:7,8,8,10
   23:15,15 25:10,10
   25:11,22 33:16
   37:25 38:13 41:22
   49:12 52:15 64:6
   66:13 68:18 71:10
   71:24
differs 20:12
direction 24:15,15
directly 74:3
disagree 7:17 67:11
discuss 24:22
discussed 34:10
   68:15,18,25
discussing 5:15 8:4
   63:14
displays 73:4
DISTRICT 1:1,1
doable 46:18 52:7
Docket 1:4
document 9:24
   10:5,11 14:8
   38:19 39:3 73:18
documentation
   13:17
documenting 9:2
doing 29:22 36:6
   57:12 63:17 67:21
   67:24 68:9 69:4
   77:8
Dolup 76:3
door 49:17,20 51:5
   51:18 58:11,12
   70:22 73:23,25
doors 29:16 30:7,22

31:3,12,16,21
   33:5 34:4,6,11
   35:13,20 43:3
   48:7 49:7 50:8,10
   50:13,16 51:9
   52:7 68:8,9,24
   70:18 73:21 74:8
   74:11,19,20 75:9
   75:21 76:7,14
Drive 4:12
driven 28:7 57:5
   61:13
driving 44:7
duct 21:3
duly 4:3
duty 54:8,10 76:12

E
E 2:1,1 3:1,1 4:2,2
e-mail 36:12
e-mails 36:11
early 32:4
easier 69:23 78:11
EASTERN 1:1
easy 22:15
Economic 72:22
edge 22:9 29:15
   30:22 33:5 34:3
   34:10 35:13,19
   47:19 49:7,16,20
   50:7,10,13,16
   51:18 52:7 60:4
   60:17 74:14,22
edges 47:10 73:22
   74:2,4,5,9,16
effect 3:12 49:6
effecting 5:23
effective 33:17,18
   34:4,5,6 40:18,25
   43:22 46:15 52:5
   52:16 57:14,17,21
   58:4 60:2 61:2,9
   64:9,9 68:19
   71:25
effectively 62:9
effectiveness 7:12
   13:21 32:10,11
   34:9

either 5:10,11
   16:18 51:9 62:22
   69:18 79:16 83:11
element 6:12,19
   9:13 44:2
elements 5:22
elevated 20:16
eliminate 12:23
   13:13 17:6 53:3
eliminated 12:14
eliminating 40:19
   43:22 46:16 65:4
elimination 12:18
   35:24
emphasize 8:8
emphasizes 12:18
employees 9:9
ends 42:22
engineer 5:14,20
   10:7 18:24 24:25
   26:12 28:10 29:8
   44:9 55:3,21
   58:10 66:12 67:2
   79:9 80:6
engineering 5:20
   6:3 7:9,16,24 8:17
   16:6 17:5,23 18:8
   19:7 22:25 23:8
   25:2,4,9 26:3,6
   28:12,17,21,22,23
   29:23 43:9 45:10
   45:19 46:4,4 47:5
   47:23 49:24,25
   50:6 51:8,12,17
   52:14,24 53:10,14
   53:22 55:23 56:14
   56:22,23 57:4,9
   59:8,15 61:12
   63:14,15,15 64:3
   66:20,22 67:4,20
   70:16 71:12,23
engineers 29:22
   45:2 77:16 79:22
   79:22 80:3,3,5,12
   80:14 81:3
equipment 9:10
   13:13 68:19 74:20
Especially 37:11

ESQ 2:5,10,14
established 9:19
   24:8
estimates 12:10
evaluate 17:6
evaluating 67:13
evaluation 14:7
event 59:20,21
events 12:11 43:12
   44:4 55:24
everybody 19:4
evidence 10:4
exact 20:25
exactly 21:2 76:24
EXAMINATION
   4:6 72:11 76:1
   82:3
examined 4:4
example 20:6,15
   21:15 22:9 29:12
   33:15 34:3 42:4
   47:2,13,15 49:22
   50:5,8 51:4,25
   57:23 60:2,12
   63:4 70:17 77:11
   79:5,8
Excellent 40:15
   81:6
exchange 73:3
exclude 44:13
exhibit 36:4 38:15
   67:18 72:13,15
exist 40:2
existing 6:4
experience 11:16
   73:15 75:13
expert 10:8 11:19
expertise 34:25
   48:20 49:11 74:25
explain 44:23 69:12
   69:16 71:2 79:13
explaining 78:19
explanation 70:6
expression 5:19
   46:23 65:13
extend 73:6
extending 74:7 76:3
extension 30:25

31:10,21
xtent 70:25 71:14

**F**

F 3:1
F.R.C.P 3:15,16
facility 15:13
fact 22:8 26:3,7
  33:12 54:2 58:4
  58:12 61:13
factors 53:15 61:15
facts 5:3 27:3,3,5,9
  27:17,18,21 28:5
factual 43:11 57:6
Fail 5:21
failure 5:22
fair 8:5 66:4,4,6
faith 10:10
Faiveley 42:5
fall 55:9 58:15,16
  58:18
falling 34:7
false 44:20 64:21
  69:14,17,19
familiar 35:23 36:2
  42:4,8,9,17
far 7:24 9:10 11:6
  11:17 12:24 14:16
  15:9 18:10 23:6
  31:20
faster 32:19 69:23
fatalities 39:6,8
fear 63:6
feasible 44:6
feature 71:5
features 22:4
Federal 1:15
feel 9:23 40:8
feet 20:10
fell 58:25
felt 48:19 50:8
fence 45:20
field 5:20 47:5 55:5
figure 28:24 45:10
filing 3:5
find 58:11
  ine 54:11 55:13,18
  72:4 78:10,22

79:15
finish 44:15 62:20
  79:23
finished 33:4 70:12
  70:15 71:16
first 4:3 5:13,19
  6:16 24:19 28:11
  28:22 33:21 43:20
  46:14 53:10
fits 23:17 30:18
five 12:2 13:9
fix 14:25
fixed 52:12
flip 16:23
Floor 2:13
follow 10:13 14:23
  14:24,24 15:5,7,9
  17:21 21:11 24:7
  24:11,14,15,16
  28:2,19 58:13
  78:23 79:3,5,7
  80:4
following 11:15
  12:23 24:4
follows 4:5 25:20
force 3:12 26:12
FORD 2:12
Fordham 2:8
foregoing 83:9
foreign 16:2
foremost 28:12
  67:21
form 3:8 73:11 74:6
  74:23
forth 10:13 15:14
  15:15 30:12
forward 44:12
found 30:17
Four 11:25
frame 51:5
friends 37:3
front 32:23
full 13:16
function 6:13,20
  32:12 34:8 56:2
  80:4
functioning 56:3,4
functions 18:23

41:5 42:20
further 3:7,10,14
  27:10 67:3 83:11

**G**

G 4:2,2
gap 22:9,19,21 71:9
gauge 58:3
GE 42:7
general 9:9 17:23
  18:6,8 23:12 24:4
  25:13 33:21 56:22
generally 25:2,5
generated 73:4
Genis 2:7,10 4:7
  32:16 36:3 38:17
  56:17 61:22 62:3
  64:17 71:18 72:9
  72:19 73:11 74:23
  76:18 81:6 82:4
Germans 42:2
getting 35:25 40:19
  41:2 43:16 47:4,9
  51:22 52:6 53:19
  55:7 56:9,21 59:9
  59:22 60:23 62:6
  62:10 64:24 65:4
  67:8,19 68:21
give 33:20 36:3
  46:5 47:13 54:22
  63:3 66:5
given 24:14 48:18
  55:16
go 6:3 7:15 15:11
  23:6 31:7 32:19
  32:20 33:21 34:18
  34:25 40:15 43:20
  44:14 46:19,21
  52:20,21,21,21,22
  52:22,22 54:16
  58:25 60:4,4
  66:10 70:8 71:13
  73:11,18
goal 24:16 25:19
  51:21 64:25 65:3
goes 38:15 63:7
  73:8
going 10:10 16:5

18:11 22:10 24:3
  24:9 25:13 29:9
  31:5,24 35:6
  38:25 44:5,11
  48:22,25,25 60:2
  61:18 63:4,10
  65:11 77:10
good 4:14 8:16
  14:20 16:6 19:8
  22:24 23:7,16
  25:8 28:13 40:15
  51:16 52:14 56:13
  66:19,21,23
governed 80:14
gray 44:24
Gregory 1:14 4:10
  5:1 6:1 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1,11
  82:4
grew 77:5
ground 20:8,10
guided 81:3
guideline 17:17
guidelines 15:4,7,8
  16:6

guy 63:5
guys 44:25

**H**

H 4:2
hand 52:17 83:15
handbooks 28:6
hanging 63:19
happen 15:25 63:8
happened 42:24
hard 33:12
HARGER 1:3
harmed 48:4
harmful 17:14
hazard 6:4 8:10
  10:21 11:19 12:7
  12:19 13:12,18,19
  14:6,10,12,13
  15:23,25 16:14
  18:20 19:3 28:23
  43:14,16 53:18
  62:5
hazardous 12:11
hazards 6:15,22 8:9
  8:14 10:23 11:12
  11:14,23,25 12:5
  12:14,17,24 13:2
  13:17,22 14:3,7
  14:25 15:12,21
  16:10 17:7 18:16
  18:25 45:15
heading 17:19
  73:19
hear 39:20 58:11
heard 40:2 45:25
heat 32:13 58:17
heavy 76:12
height 49:20
held 1:16
help 34:15 48:10
  55:24
hereunto 83:15
hierarchy 64:5
  66:12 68:15 69:6
higher 43:25
highest 39:3
history 75:12
hit 35:7,15,25 38:21

39:3,15 40:19
41:2 43:16 47:9
51:22 52:6 54:3
55:7,8 56:9 58:11
58:12 59:6,22
60:21,23 62:6,10
62:22 63:6 64:4
64:24 65:4
honestly 9:23
Hong 43:4
honors 37:22
Hopefully 16:21
houses 51:5
hundred 15:3,16
26:14 44:4

**I**

idea 52:20
identification 54:15
identified 11:13
12:5 13:17 20:23
43:16 45:15 54:18
62:5,18,21 64:3
64:24
identify 8:13 9:3,12
10:23 11:9,14
14:3 15:11 17:6
28:22 43:14
ignore 53:23
implement 13:9
implementation
29:6 73:7
implemented 8:13
35:22 40:17 41:4
56:7 65:7
implementing 8:25
9:4
important 53:11,13
impossible 52:11
inch 74:17
inches 73:23 74:13
74:14,17,18
incidents 38:22
39:25 40:19 67:25
68:20,21
include 11:14 13:16
24:17,18 30:5,9
30:13 31:2,5 73:9

included 30:8 31:4
includes 10:22
including 14:12
increased 12:22
INDEX 82:1
individual 9:16
12:13
individually 19:9
21:24 25:12
information 40:6
41:18
injured 15:13 53:20
54:3 62:7,22 65:4
67:8,19
injury 54:15,19
56:15
insisting 35:2
inspection 18:18
install 51:18 52:11
74:20
installation 33:5
74:8
installed 29:15
35:13 41:24 73:2
73:21,22 74:2
installing 73:14
instance 20:7
instituted 7:21
intensional 15:24
intent 48:2,3 51:23
interest 28:8
interested 27:12
47:15 83:13
internally 40:2
intervals 74:10
intervene 33:9
introduced 13:23
intrusion 52:2,11
involved 18:20
28:11 39:22
involving 35:24
50:12
issue 52:16,25
66:25
issues 34:22,24
51:4
item 58:25
items 69:5

**J**

JANSSEN 1:3
Joanne 1:17 83:6
83:20
jobs 38:11,11,13
Jubilee 29:13,22
30:25 31:10,20
42:13
judge 3:13 41:6
jump 58:24 77:9
jumping 45:15,22
jurisdiction 17:9

**K**

Keaveney 2:14 23:5
23:11,19 25:16
35:16 37:10 45:17
46:7 48:15 54:9
54:20 56:10 61:11
61:24 62:12 72:12
76:16 78:18 82:5
keep 24:3 32:13
42:24 54:8,13
79:21
keeps 81:4
key 28:16
kids 77:8,9
killed 38:22 41:2
48:4 54:4 62:7,22
64:4,24 65:5
67:19 68:21
kind 50:19
know 9:20 10:11,12
17:18,19,20 18:24
24:6,25 25:4
31:20,24 32:18
33:22 34:14 35:10
36:7,8,8,9,18,19
37:21 38:10 39:17
39:20,23 40:3,9,9
41:5,11,12 43:5
44:16 54:2,10
55:12 61:8,18
63:4 68:13,14,14
71:10 76:21
knowledge 28:24
knowledgeable
74:25

known 5:24 8:25
43:23
Kong 43:4
Korea 72:24

**L**

L 3:1,1
LA 77:22
LANDMAN 2:12
large 22:19
lawsuit 5:11 55:17
lawyer 61:19
lean 55:10
learn 44:10 78:25
leave 34:14 55:18
leaves 63:19
leaving 74:17
left 72:20
lessons 78:25
let's 18:6 20:9,15
26:2 27:10 28:9
33:3 34:9 35:4
38:14 50:4 53:10
55:2 60:19 66:10
67:3 68:12 73:18
level 17:8 52:22
74:11
Lexington 2:4
liability 7:5
life 7:13 10:24 11:5
17:9 37:21
lighter 51:10
likelihood 6:9
43:12
limbs 66:23
limit 32:18
limited 16:24 73:5
line 17:13 29:13,22
30:25 31:10,21
32:3 42:13 46:21
61:12 75:17,18
76:3,6
list 36:20
listed 12:22 69:5
listen 70:7
listening 70:6
literature 35:19
little 27:10

lives 66:19
LLP 2:3
loading 74:9
loads 74:3
local 22:22
location 19:11,16
20:3 46:15
locations 25:11
73:3
log 13:19
London 29:13 30:2
30:6,17,21 31:15
33:6 35:14,20
42:12 43:3 71:8
long 31:18 32:5,9
33:4 37:12
longer 16:21 66:11
look 14:22 17:13
18:6 19:2 24:6
25:12 26:10 28:3
29:22 31:9 33:25
38:14 41:3 43:6
44:7 45:8 48:16
48:21 51:8,20,25
52:15 56:2,6
57:22,23 58:8
59:19 60:7,9,18
60:18,20 63:2
67:12 69:15 70:11
70:17,21 71:2,3,7
71:7,12 77:18
78:5 79:6
looking 32:24
40:23 53:7,17,18
53:19,21 57:9,9
59:10 61:5 67:18
76:25 79:9
looks 18:24
Los 75:14,16
lot 10:12 15:2,10
27:4,13 28:5,20
44:7 48:20 67:6
73:13
loud 60:3
louvers 49:16
lowest 39:2
loyalty 37:8,12,15
37:18

LUISA 1:3

**M**

Maggiore 1:17 83:6
  83:20
maimed 64:25
  68:21
main 32:15
maintain 7:6 20:2
maintained 11:4
maintenance 19:24
  21:8,24
making 12:12
  32:25 60:12,16
  77:11
malfunction 5:23
manage 59:19
management 7:9
  17:4 48:24
managing 59:21
mandated 14:15
mandatory 6:14,21
  6:24
manner 16:17
  79:16
manufacture 42:19
manufacturer
  42:23
manufacturers
  41:23 42:25
March 1:11 83:16
marriage 83:12
material 17:15
  74:13,15
math 56:25 57:5
matter 8:9 77:16
  83:14
mean 9:23 22:16
  23:21,22 34:5
  36:19 58:10 65:8
  66:24 79:16
meaning 6:4 28:7
means 5:21 6:24
  46:11,16 49:12,15
  49:19 50:12,15,19
  51:20 52:5 59:17
  65:7,14 68:3 69:4
  71:25

meant 65:14
measure 6:8 7:4
  33:16 57:20
medication 58:17
mention 58:7
mentioned 43:24
  71:7
methods 11:13 15:2
metro 75:14,16,24
  76:2 79:2
METROPOLIT...
  1:6
Mind 71:9
minimum 11:9
  14:10
minute 17:23
minutes 44:14
mischaracterizing
  68:13
mitigated 12:14
mitigation 6:14,21
mitigations 12:21
  13:21
model 78:23
modules 73:6,25
moment 62:14
moments 18:25
money 38:8
monitored 13:22
morning 4:14
mother 77:7,8
motors 74:19
move 11:12 16:24
  32:16 34:17 44:12
  44:18,21 64:17
  71:18
moving 71:21

**N**

N 2:1 3:1 4:2
name 4:8 43:7
names 42:3
nature 43:11 49:3
near 60:4
necessarily 27:5,8
  27:21 36:19
necessary 10:23
  50:20 74:12,20

need 9:25 20:13,20
  21:13 22:20,20
  29:4 66:15
never 18:3 21:2
  36:14 39:22 44:8
  44:9
new 1:1,6,18 2:4,4
  2:9,13,13 4:12,17
  8:21 13:22 14:3
  21:15 23:2 25:6
  27:14 31:6 36:17
  36:23 40:5 41:7
  54:4 57:25 75:17
  76:9 77:6 78:15
  80:8,9,12 83:3,7
news 40:2
nice 32:23 48:9
  66:9 77:2
Nonparty 1:14 4:3
nonresponsive
  32:17 64:18 71:19
noon 44:15
Norbremse 42:9
normally 10:3
  15:22 16:13
Notary 1:18 3:12
  4:4 81:17 83:7
Note 23:5,11 35:16
  62:12 78:18
noted 81:8
notes 32:23 83:10
noticed 37:3
number 20:9 38:20
  38:21 39:2,24
  40:25 56:9 57:24
  61:4 62:10 68:20
  73:2
numbers 39:21
  40:7,8 60:9
NYACK 4:1
NYCT 74:4,15

**O**

O 3:1 4:2
object 26:12
objecting 70:5
objection 23:5,11
  23:19 25:16 35:16

37:10 45:17 46:7
  48:15 54:9,20
  56:10 61:11 62:12
  73:11 74:23 78:18
objections 3:8 75:4
objective 63:8
objectively 67:2
observed 15:19
  16:9
obtained 72:23
occur 16:2
occurrence 12:8
occurring 43:12
  59:17 67:10,25
okay 7:18,19 10:21
  15:2 16:3 17:11
  23:24 24:8 26:9
  27:6,22 28:8 29:4
  30:20 31:7,18,25
  32:8,21 33:15,21
  35:8 38:14 40:11
  44:18 46:3,10
  47:8,13,18 50:23
  52:4 53:7,10
  54:11 55:17 56:13
  56:25 57:12 62:17
  65:9 69:3 77:14
  78:21 79:15
once 24:14
ones 44:2
oo0oo 3:19
open 34:6
openings 49:16
operating 7:5 11:16
  14:13 15:8,21
  16:13 26:15
operation 6:13,21
  7:23 15:3 16:18
  16:19 68:6
operational 7:11
opinion 11:19
opinions 63:13
optimize 7:10
option 70:22 71:3,4
  71:15
options 52:13,15,16
  52:18 62:15 64:13
  64:20 65:12 70:17

70:19,23 71:7,10
  71:24
order 1:16 12:22
  74:11
organizational 9:13
original 83:10
originally 32:22
OSHA 14:24
outcome 70:25
  83:13
outcomes 52:19
overall 7:3
overcome 29:24
  45:11 46:5

**P**

P 2:1,1,14 3:1
p.m 81:8
page 5:18 72:22
  73:19,20 80:17
  82:3
paid 38:8
paint 17:15
paragraph 73:8,20
parameter 42:21
Paris 42:16 50:8,24
part 6:2 6:16
  18:17 30:9,10
  31:14,16 37:21
  53:13 54:10 56:24
  57:3,4,8 71:15
particular 20:3
  34:3 46:15 50:5
  51:19
parties 3:4,15 9:4
  83:12
parts 30:6,10,21
  33:6 41:22
passage 33:12
passengers 9:9
patient 70:7
PC 2:12
people 4:24 15:6
  33:11 35:7,15,24
  36:18,19 37:3,7
  37:11 38:21,22
  39:2,11 40:19,25
  43:16 45:15,21

47:3,9,11,21 48:3
51:21 52:5 53:19
54:3 55:7,8 56:9
57:24 59:5,9,12
59:22 60:21,23
62:6,10,21 64:4
64:24 65:4 67:8,8
67:19 68:21 77:20
77:21 78:3,12,16
**percent** 15:3,16
26:14
**percentage** 57:24
**percentile** 44:4
**perform** 22:3 80:4
**performance** 7:4
**period** 32:9 33:22
37:7
**persist** 72:6
**person** 41:14 44:7
**personal** 63:12,13
**perspective** 29:23
43:9 50:6 51:9
53:23 55:23 59:9
59:15 64:3 66:20
66:22 67:20 71:23
**PHA** 14:11
**phase** 7:22 11:4
**phases** 7:12
**physical** 73:6
**physics** 57:2,5
**pick** 10:5
**picture** 80:10,13
**place** 1:17 21:3
37:20 45:20
**placed** 6:12,19
**places** 35:20
**Plainsboro** 4:12
**Plaintiff** 1:4,15 2:3
2:8
**Plaintiff's** 36:4
38:14 67:18
**plan** 8:24 9:3,8
11:2,8 14:15 17:2
17:3,25 18:8 21:8
21:9,11,11 23:4,9
23:18 24:10,13
56:7 60:25 61:8
**planning** 7:22 11:3

**platform** 20:16
22:10,12 29:15
30:7,22 31:3,12
31:15,21 33:5
34:3,10 35:13,19
47:19 48:6 49:6
49:16,20 50:7,13
50:16,20 51:18,19
52:7 60:5 68:8,9
68:24 70:18,22
73:21,22 74:2,4,5
74:8,9,10,11,12
74:14,16,17,19,20
74:22 75:9,20
76:6,14
**platforms** 47:10
50:9 74:7
**play** 44:5
**Plaza** 2:8
**please** 4:8 38:18
47:15 62:20 68:5
76:20 79:11
**pleasure** 51:3
**point** 33:3 35:22
44:9 45:24 46:3
57:16 75:3 76:21
**policy** 9:19 20:8,11
23:23,24 24:2,23
24:23 25:13,14
**politics** 27:12,14
**posed** 71:20
**position** 24:19
**positive** 16:17
**possible** 19:22 22:7
43:13 51:18 70:23
70:24
**potential** 6:4 11:22
14:7 44:11
**potentially** 15:12
46:20
**practice** 19:4 25:23
51:16
**practices** 8:17 16:7
17:24 19:4,8
22:25 23:16 25:9
28:14 56:14,22
63:15 79:3
**precipitation** 20:17

**predetermined**
73:2
**preference** 12:23
**Preliminary** 14:10
**premise** 54:14
**prerogative** 77:21
**prescribed** 16:17
**present** 9:24
**president** 41:13,13
41:16
**prevent** 35:14
47:11 48:3 49:7
49:25 55:24 56:8
59:16 64:25 67:24
**preventing** 47:3
51:21 52:5 59:22
67:10 68:20
**prevention** 8:8
**prevents** 45:21
**previous** 11:15,25
72:17 73:20
**previously** 74:24
**primary** 41:19
53:15
**principals** 42:20
**principles** 7:9
15:18,19 16:8,8
16:12 28:16,24
**prior** 4:20 75:12
**probability** 12:7
**problem** 19:9 25:23
25:24 28:23,25
29:5 35:4 43:15
43:16 44:2 45:12
46:10,12,16 49:23
51:13 53:3 55:22
58:9 59:18 62:5
62:18,21,24 64:2
64:24 65:11 66:14
66:16,18 67:3
69:21 71:25 72:5
72:6
**problems** 45:9
**Procedure** 1:16
**procedures** 8:17
10:22 13:9 16:7
19:8 22:25 23:17
27:17 28:2,14

40:17 56:14,22
**proceed** 5:2
**proceeding** 25:20
**process** 8:10 10:22
12:12,18 13:16
17:5 43:20
**professional** 28:13
**program** 7:21 8:12
8:13,24 9:2,3,5,7
9:8 11:2,8,10
14:15 16:25 17:3
17:25 18:4,8
40:22,24 41:4,5
60:8
**project** 11:4 14:11
14:23 25:18 31:6
42:12,22 44:6
75:25
**projecting** 41:22
**projects** 76:9
**promote** 78:4
**promotes** 81:4
**proper** 47:20 66:7
**properly** 79:17
**proposed** 62:23
**protect** 79:17
**protocol** 9:6
**protocols** 8:17
17:16 28:14
**provide** 8:23
**provided** 3:15
**provides** 73:24
**PSD** 72:24,25 73:4
73:7,14
**public** 1:18 3:12
4:4 9:9 71:8 79:17
81:17 83:7
**purple** 75:18
**purpose** 17:2 18:2
32:15 34:10
**purposes** 31:3
35:13
**pursuant** 1:15 4:16
**pushed** 58:21
**put** 22:6,18 23:24
24:9 28:7 30:22
31:7 32:3 43:3
**putting** 50:7,19

**Q**
**qualify** 14:18 30:4
34:5,12 58:6
62:19 68:2,4
**quality** 34:22
**quantify** 40:9
**question** 6:17 10:16
10:19 26:18 27:2
31:22 32:22 34:16
34:18 39:19 40:12
41:7 43:21 44:15
44:21 46:8,14
47:14,16,24 48:10
54:7,14,24,25
55:21 56:12,21
62:4,20 63:11,16
63:18 64:19 65:21
66:17 68:5,6,8
69:9,10,11 71:20
72:7 76:22 77:2,4
77:19 78:8,14,20
79:8,11,23
**questionable** 74:16
**questions** 4:22 5:8
10:8 16:22 19:6
32:20 40:4 41:10
41:15 44:18,19
48:20,22 53:8,9
55:19 61:17 65:18
66:2,2,5 72:10
**quick** 56:17
**quite** 33:9 39:7
46:8

**R**
**R** 2:1 3:1 4:2,2
**rail** 42:9 45:20 63:5
**rails** 52:12
**ramifications** 34:21
**range** 39:7
**RAQIA** 1:6
**reach** 63:24
**reached** 24:17
**read** 9:25 10:5 15:9
17:22 35:18 72:20
72:21
**reading** 9:21 10:9
10:11 14:20,22

really 4:22 5:3
17:17 26:8 37:17
42:3 78:19
reason 17:12 41:4
51:17 52:10 59:3
64:14
recall 68:15
receive 74:9
Recess 56:19
recommend 30:14
reconstruction
74:22
record 4:9 56:20
recurring 55:22,25
reduce 17:7 35:14
55:24 56:8,15
62:10
reducing 40:18
43:22 47:3 51:21
52:5 65:3 68:20
reduction 35:24
reenforce 50:10
refer 36:22 40:5
referring 27:25
36:16 54:21 79:25
80:7
refrain 40:3
regard 15:5 71:6
regardless 78:12,16
regards 67:23
regular 74:10
regulations 14:24
17:20
reinforcement
74:21
related 83:11
reliable 67:4
remain 30:11
remained 31:12
remember 10:16
41:25 42:3,14,15
42:18 43:8 52:18
66:3
removal 20:7 74:15
remove 74:12
removing 74:17
Repeat 6:16 19:15
26:5

repeatedly 75:3
repeating 10:2
rephrase 66:18
reported 39:24
Reporter 1:17 83:6
representation
55:14,15
representative 4:17
require 9:14 16:16
23:2,8 26:3,6
required 17:6
requirement 6:25
27:20
requirements 7:16
7:20 16:25 18:7,9
25:19 27:5 28:5
requires 19:8 52:14
reserved 3:8
reside 4:11
resolution 8:10
10:22 12:21 13:18
14:8
resolve 8:14 10:23
14:3
resolved 12:17
resolving 8:8
respect 3:17
respectfully 26:17
respective 3:4
responsibilities 9:3
9:13,18 43:2
responsibility
24:20
responsible 9:17
responsive 26:18
rest 31:11,11
result 6:5 74:7
retrieve 58:25
revenue 73:3
revert 5:24
right 5:5,13 14:21
18:14 29:10,11
30:23 35:5,6,11
40:11 44:19 46:6
59:4 60:5 61:16
66:4 76:19,23
77:11,23,24,25
78:4

rights 3:14
risk 6:8 12:10
13:17 15:14 17:7
43:23,24 44:2,10
44:12 53:18
risks 45:5
roadbed 74:4
ROBERT 2:10
role 9:18
roles 9:12
root 47:5,8 58:7
67:7
ROTH 2:3,3,5
rules 1:15 10:4
14:23 24:7
run 15:6 35:7,15,25
38:21 39:11 40:19
43:17 47:4 52:6
59:6,9,22 62:6,10

S

s 2:1 3:1,1 4:2
15:13
safe 5:21,24 24:3
53:14 54:13 56:8
78:12,16,24 79:4
79:5,7,16,24
80:15
safely 28:18
safest 80:15 81:4
safety 5:23 6:11,18
7:8,10,15,20,20
8:7,12,13,24 9:2,4
9:7,8,8,12,17 11:2
11:8,10 13:5
14:15 15:18,19
16:8,8,12,25 17:2
17:2,4,5,5,12,20
17:25 18:4,7,7,9
18:16 20:18 21:8
21:24 22:4 23:3,9
23:18 28:18 34:11
34:13,20,21,23
35:6 40:6 41:12
53:11,13 54:8
55:6 56:7 64:5
66:12 67:9,21
68:15 69:6 78:4

sake 54:12
Sanchez 1:14 4:10
4:14 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1,11 82:4
sandwich 33:2
satisfactory 6:13,20
save 66:19,23
saw 63:5
saying 7:18 18:3
27:12,16,16,16,25
30:17,24 36:21
45:20 48:22 60:13
64:2 68:10 75:3
77:6 79:21
says 22:19 29:8
scenarios 11:20
science 56:23,25
57:5
scope 11:9 20:22,23
25:19,24
screen 30:7 31:3,12
31:16,21 48:6
68:8,9,24 70:18
70:22 73:21 75:9

75:20 76:7,14
sealing 3:5
seat 48:24,24
second 24:20 55:3
58:21
sections 3:16
secure 15:12
see 5:2 10:8 17:23
25:12 30:16 32:9
33:16 34:2 38:15
38:15,18,23,24,25
39:6,10 40:13,14
40:16,18,24 43:14
50:5 51:13,17
55:22 56:3,6
57:20 59:25 60:9
61:4 63:4 67:13
71:24 72:13 73:9
75:9,10 78:5,11
sense 54:6
Seoul 73:21 74:5
seriously 54:3 62:7
62:22
serve 7:3
service 32:4
set 30:12 83:15
seven 13:12
severity 6:8 12:6
SHABAZZ 1:6
short 44:17
Shorthand 83:6
show 43:25
showed 32:10
showing 54:22
55:16
sick 58:16
sign 22:19
signed 3:11,13
significant 38:8
sill 74:11
silly 20:6 46:23
similar 25:21,22
simple 32:23 48:10
66:9 76:22 77:2
Singapore 42:7
43:4
sir 5:6 10:3 32:24
33:20 34:14,14

35:18 38:23 40:12
40:15 44:14 48:8
51:3 53:8 54:24
56:20 63:10 64:2
64:15,15,21 65:9
65:17,17,23,24
66:9,10 68:5,12
69:9 70:12,13
71:16,22 76:19
77:3 78:7 79:23
81:7
**Six** 13:12
**size** 23:17 30:18
**skin** 46:24
**skipping** 16:23
**slow** 35:5
**small** 19:2 38:11
44:7
**smallest** 39:2
**snow** 20:7
**solution** 46:5 62:23
**solutions** 29:9
45:19
**solvable** 59:10
**solve** 28:25 29:4,23
45:11 51:13 62:24
66:13,15
**solved** 49:23
**solving** 71:25
**somebody** 29:3
58:11,15
**somewhat** 61:2
**SONIN** 2:7
**sort** 45:21
**sought** 53:3
**source** 39:17 41:19
54:18
**speak** 4:24 60:8
65:18
**speaker** 60:3
**special** 13:9 22:22
**specific** 16:22 18:19
24:4 33:21
**specifically** 41:7
**specified** 25:19
**spectrum** 52:24
63:23
**speculation** 26:4,7

**speech** 71:20
**speeches** 65:19
**spoke** 48:13
**spoken** 5:10 48:16
**ss** 83:3
**SSPP** 8:25 9:2
**Stadium** 20:8,15
**stand** 70:10
**standard** 9:21
27:19,25 49:2
**standards** 5:15
7:16,25 8:3,18
10:9,12 16:6
17:24 19:23 22:25
23:8 25:2,4,9 26:3
26:6,21 27:17
28:2,13,19 78:6
**start** 54:14 60:16
**started** 60:8
**starts** 42:22 72:22
73:20
**state** 1:18 4:8 5:24
83:3,7
**stated** 17:25
**statement** 5:6 17:11
17:17 26:13 65:12
66:8 67:11
**statements** 5:3
48:18
**States** 1:1 76:13
**station** 20:16 21:4
21:23 22:5,6,18
22:21 23:2,10
25:12,15 32:15
50:5 51:19 56:8
**stations** 19:25
20:20,24 21:16,20
22:8,11 23:16
25:10 30:23 74:4
**statistics** 40:23
43:11 57:10,24
60:10 61:5,14
**stay** 60:17
**stenographic** 83:10
**Stenotype** 1:17
**step** 22:10 34:2,2
34:18,18
**steps** 40:23 43:6

**STIPULATED** 3:3
3:7,10,14
**stop** 22:16 61:18
**straight** 22:11,17
**straighten** 22:15
**strategies** 12:21
**Street** 20:10
**strength** 73:24
**stress** 27:9
**strike** 32:16 64:17
71:18,21
**strong** 50:9
**structural** 73:19
**structure** 18:24
75:11
**studies** 35:19 67:3
**stuff** 16:22,24
**STV** 67:4,7,14
**submit** 26:17
**subpoena** 4:16
**Subscribed** 81:13
**substantive** 13:25
**subsystem** 6:12,19
12:13 13:13 14:12
21:16
**subway** 8:21 21:16
21:23 23:3 25:5
31:15 33:6 54:4
54:13 76:13 77:16
79:24
**sufficient** 73:24
74:18
**SUFFOLK** 83:4
**Suite** 2:4,8
**sums** 38:8
**support** 14:14 19:2
50:9 75:11
**supports** 50:20
**suppose** 41:11
**supposed** 54:13
**sure** 6:18 14:19
25:25 27:11 28:9
34:24 42:21 46:8
52:23,25 63:20
70:9 72:21
**suspending** 50:16
**switch** 42:23
**sworn** 4:3 81:13

**system** 5:22,23 6:12
6:19 7:3,5,8,13,20
7:21,23 8:7,12,12
8:21,24 9:2,4,7,7
9:17 10:24 11:2,5
11:8,9 12:13
13:13 14:2,13,15
15:4,8,10,20,21
16:13,16,18,18,25
17:2,2,4,4,9,12,14
17:20,25 18:4,6,7
20:2 23:3,23 25:5
29:16,19 30:4
31:11,12,15,15
33:6,17 41:11
42:10 53:17 54:5
54:8,13 56:3
72:24 73:2 76:13
**systematic** 8:9
**systems** 15:5,6
19:12,17 77:17
79:3

**T**

**T** 3:1,1
**TA** 55:18
**tacks** 28:22
**tailors** 34:25
**take** 25:14 43:5
44:12 56:17 66:11
67:14
**taken** 1:15 16:17
40:23 56:19 62:9
**talk** 26:18 34:9
41:16 50:4 80:11
**talked** 15:16 50:25
69:7
**talking** 5:16 16:4
17:22 27:13,15
35:5,10 36:22
59:21 65:16 68:7
69:8 70:17 80:6,7
**tangent** 32:20
63:10
**tangents** 66:11
**tasks** 17:3
**team** 36:13,15,15
36:17,18,22,23

**technical** 48:24
66:25
**techniques** 7:10
11:13 12:2
**tell** 7:17 18:15 27:4
41:13 48:5,25
69:14 70:12,15
71:6
**telling** 18:16 55:3
**ten** 60:19,19,22
**Tennyson** 4:12
**term** 5:25 67:23
68:7
**terms** 6:4 7:5 12:6
49:10
**territory** 18:12
**terrorism** 16:5
**terrorist** 16:3
**testified** 4:5 74:24
75:13
**testimony** 67:17
**Thank** 15:18 35:12
44:18 64:23 76:16
**thereto** 3:17
**thick** 74:5
**thickness** 73:23,24
**thing** 19:24 66:19
66:19,21,23,23
**things** 5:17 16:2,23
19:20 21:13 22:14
24:3 26:11 28:11
29:21 33:16 43:11
44:8,11,13,23
48:25 49:2,3,6
52:20 53:19 60:12
63:13 68:13,25
77:17 78:22 79:16
79:21
**think** 9:25 10:6
15:5 20:11 21:12
37:22 40:13 57:13
61:16 74:16
**thinking** 62:3
**thinner** 51:10
**third** 58:24
**thought** 48:17,21
**three** 11:22 13:5
58:14 59:5

time 1:16 3:8 5:9
  7:12 8:4 16:24
  32:5,9,18 33:8,12
  33:22 34:10 37:8
  37:12 39:24,25
  42:22,22 61:18,21
  81:8
today 32:18 34:15
  44:16 48:11 67:17
told 10:7 29:12
  30:21 33:4 50:25
  62:14 63:11 64:20
  66:3
topic 26:20
track 22:15,17
  33:19 42:24 52:2
  52:11 58:15,19,22
  58:25 59:2,5,12
  60:17 74:3
tracking 13:19
tracks 32:13,14
  38:19 55:9 60:4
train 20:9 22:10
  47:20 58:15 59:6
  59:12 63:5
trains 20:19 35:7
  35:15,25 38:21
  39:12,15 40:20
  41:2 43:17 47:4,9
  47:12,21 48:4
  49:8 51:22 52:6
  54:4 55:7,9 56:9
  59:23 60:21,23
  62:6,7,11,23 64:4
  64:25 65:5 67:9
  67:20 68:22
transcript 3:11
  83:9,10
transfer 74:3
transit 1:6 4:17 8:5
  8:21,23 27:13,14
  27:23 36:17,23
  37:3,6,8,13,15,25
  38:4,7,9 39:18
  40:5,17 41:8,9,17
  48:10,21 54:7,12
  54:17 55:4,6,11
  55:14 61:19 79:25

80:8,9,13
Transport 42:5,7
transportation 1:6
  19:7,12,17 20:2
  23:8
travelers 72:25
trial 3:9
tricky 33:19
tried 30:13 48:5
  63:6
trip 58:17
true 7:6 8:10,11,18
  9:14,15,19,20
  11:23,24 12:8
  13:5,10,11 16:14
  16:15 20:20,21
  21:9,25 22:12,13
  22:21,22 23:4,18
  28:14,15,18 34:4
  34:11 43:18 44:20
  47:6,21 52:2
  55:25 56:9 62:11
  64:20,22 68:22,23
  69:6,13,17,18
  81:4 83:9
try 15:12 19:21
  22:16 26:2 43:10
  71:24
trying 27:3,9 28:21
  30:12,20 32:12
  33:19 34:24 35:3
  44:19 48:12 53:8
  53:9 55:10 56:14
  63:8,9,19,22,23
  63:24 65:17,23,25
  70:9,25 71:6,11
  71:22
twenty 44:14
twist 70:8
twisted 70:9
two 9:12 11:19 13:2
  18:23 20:24 76:19
  76:22 77:11
type 74:21
types 68:18
typically 73:22

---
U
---

U 3:1
UK 42:10
unacceptable 6:14
  6:22 15:20,22
  16:9
unaccepted 16:14
unaware 55:6
unchanged 61:5
underground 20:20
  30:6 31:5
underneath 50:20
understand 16:4
  25:25 34:19 36:21
  42:21 44:10 45:2
  63:25 64:5 66:17
  77:4,12
understanding
  27:11 28:10 72:25
Understood 34:5
undesirable 6:15
  6:22 15:20,23
  16:10,14
uniform 19:22
unique 21:16 23:9
uniqueness 23:15
unit 51:5
United 1:1 76:13
units 73:15
unknown 73:4
unprotected 47:10
unsafe 78:23
use 11:14 13:5,7
  46:4,23 65:13
  80:13
Usually 42:18 43:7
utilize 57:19

---
V
---

vendor 73:5
vendors 28:7
ventilation 31:2
  32:14 49:11 75:2
Video 1:9
view 44:10
virtually 22:21 61:5
visit 72:24

---
W
---

waived 3:6,16
want 5:13,15 23:20
  24:13,18,22 25:17
  28:9,11 34:14,25
  44:16 56:11 59:16
  61:23,24 63:7,12
  68:13 70:8,8,10
  72:21
wanted 5:6,14
  15:15 33:11 52:23
  63:13 77:7
wants 47:2
warning 13:7
Washington 48:6,9
  50:25 75:24 76:2
  77:22
wasn't 71:19
watch 22:19 60:16
wave 20:6
way 25:18 34:15
  41:21 46:24 51:12
  53:22 58:19,21,24
  77:5 79:21 83:13
ways 58:14 59:5
we'll 15:11
we're 8:3 9:20
  53:18 60:2
we've 33:8
week 48:19 75:13
weight 74:19 75:8
  75:10
WHEREOF 83:15
width 51:4 74:13
wife 5:12 32:25
wind 20:17 58:15
  58:18 59:5
wish 4:18
wishes 61:20
withstand 74:18
Witness 1:14 4:3
  82:3 83:15
wonder 27:7
word 27:2 43:24
  44:25 67:15
words 5:17 10:13
  24:2 63:21 65:14
  69:4 70:8,9 72:20
  77:14 80:14

work 17:13 37:7,24
  37:25 38:3,4,6,7,8
  49:2,6,7 53:5 63:3
  71:9
worked 29:13 30:8
  31:8 37:2,21,23
  55:4 75:14,23,25
works 55:5,6 63:2
  65:20 71:8,9
world 41:22
wouldn't 23:6,20
  37:17
written 9:19
wrong 17:15,15
  77:17
wrongs 76:19,23
  77:11

---
X
---

X 1:2,8

---
Y
---

Y 4:2
Yankee 20:8,15
yeah 14:23 32:7
  56:11 59:7 60:14
year 39:7,10,11
  54:3 55:22 60:15
  38:20 60:19,19
York 1:1,6,18 2:4,4
  2:9,13,13 4:13,17
  8:21 21:15 23:3
  25:6 27:14 36:17
  36:23 40:5 41:7
  54:4 77:6 78:15
  80:8,9,13 83:3,7

---
Z
---

Z 4:2

---
0
---

---
1
---

1 36:4 38:15 67:18
10:30 1:11
10016 2:4
10271 2:13
10458 2:9

**109** 39:3,11
**11** 1:11 73:19
**11A** 72:15
**11th** 83:16
**12** 73:23 74:14,17
**12:10** 81:8
**120** 2:13
**13th** 2:13
**17-cv-04550** 1:5
**173** 20:10
**188** 39:11
**189** 39:4
**191** 20:9
**192** 2:4
**1992** 32:2
**1994** 32:2

---

**2**

**200** 60:21
**2000's** 32:4
**2001** 38:20
**2010** 60:15,18,19
   60:20
**2022** 1:11 81:15
   83:16

---

**3**

---

**4**

**4** 74:13,17
**472** 21:16 23:15

---

**5**

**5,76** 82:4

---

**6**

---

**7**

**72** 82:5

---

**8**

**8** 74:17
**802** 2:4
**88** 4:12

---

**9**

**907** 2:8

80

1                          GREGORY SANCHEZ

2    --

3          A.     Engineers, engineers.  When we

4    perform our function we follow the code.

5          Q.     And when you say, "we engineers,"

6    are you talking about any engineer or are you

7    referring when you say that "we" are you talking

8    about the New York City Transit Authority?

9          A.      No, the New York Transit is not in

10   the picture.

11         Q.     When you talk about what we

12   engineers do, having nothing to do with the New

13   York City Transit, not in the picture to use your

14   words, engineers should be governed by what is

15   safe; correct?  What is safest; correct?

16

17   (Continued on next page.)

18

19

20

21

22

23

24

25