1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------------x

LUISA JANSSEN HARGER DA SILVA,

                    Plaintiff,

          -against-

NEW YORK CITY TRANSIT AUTHORITY,

METROPOLITAN TRANSPORTATION AUTHORITY,

and RAQIA SHABAZZ,

                    Defendants.

Civil Action No.: 17-cv-04550

--------------------------------------x

                    Via Video Conference

                    August 24, 2022

                    10:13 a.m.


          Video-recorded Deposition of a

Non-Party Witness, CHERYL KENNEDY, pursuant

to Subpoena, before Christine DeRosa, a Notary

Public of the State of New York.

2

1

2    A P P E A R A N C E S:

3    ROTH & ROTH, LLP

4    Attorneys for Plaintiff

5         192 Lexington Avenue, Suite 802

6         New York, New York 10016

7    BY:   DAVID ROTH, ESQ.

8

9    SONIN & GENIS

10   Attorneys for Plaintiff

11        One Fordham Plaza, Suite 907

12        Bronx, New York 10458

13   BY:   ROBERT GENIS, ESQ.

14

15   LANDMAN CORSI BALLAINE & FORD P.C.

16   Attorneys for Defendants

17        120 Broadway, 13th Floor

18        New York, New York 10271

19   BY:   ANDREW P. KEAVENEY, ESQ.

20

21

22

23

24

25

3

1

2              F E D E R A L   S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED by

5    and between the attorneys for the respective

6    parties herein, that the sealing, filing and

7    certification of the within deposition be

8    waived;

9          IT IS FURTHER STIPULATED AND AGREED that

10   all objections, except as to form, are

11   reserved to the time of trial;

12         IT IS FURTHER STIPULATED AND AGREED that

13   the transcript of this deposition may be

14   signed before any Notary Public, with the same

15   force and effect as if signed before a clerk

16   or Judge of the Court;

17         IT IS FURTHER STIPULATED AND AGREED that

18   all rights provided to all parties by the

19   F.R.C.P. cannot be deemed waived, and the

20   appropriate sections of the F.R.C.P. shall be

21   controlling with respect thereto.

22

23                      oo0oo

24

25

4

1

2                THE REPORTER:  The attorneys

3        participating in this deposition

4        acknowledge that I am not physically

5        present in the deposition room and that

6        I will be reporting this deposition

7        remotely.

8                They further acknowledge that, in

9        lieu of an oath administered in person,

10       I will administer the oath remotely.

11               The parties and their counsel

12       consent to this arrangement and waive

13       any objections to this manner of

14       reporting.

15

16

17

18

19

20

21

22

23

24

25

5

1

2    C H E R Y L     K E N N E D Y,     called as a

3            witness, having been duly sworn by a

4            Notary Public, was examined and

5            testified as follows:

6                    THE COURT REPORTER:  Please state

7            your full name for the record.

8                    THE WITNESS:  Cheryl Kennedy.

9                    THE COURT REPORTER:  What is your

10           address?

11                   THE WITNESS:  140 Summit Woods

12           Drive, Morgantown, West Virginia 26508.

13   EXAMINATION BY

14   MR. GENIS:

15           Q.    Good morning, Ms. Kennedy.  My

16   name is Bob Genis.  I represent a young woman

17   who lost her arm and leg.  I'm going to be

18   asking you some questions today.  If there's

19   anything that I ask you that you do not

20   understand, please say so, and I will gladly

21   rephrase the question.  Otherwise, if you

22   answer the question, we're going to assume

23   that you understood it.

24                   Do you understand everything I've

25   said so far?

6

```
1                    Cheryl Kennedy
2         A.      Yes.
3         Q.      Agree to these terms?
4         A.      Yes.
5         Q.      They're fair?
6         A.      Fair.
7         Q.      What, if anything, did you review
8    to prepare for today's deposition?
9         A.      Not -- I don't have any documents
10   because I'm retired.
11        Q.      What, if anything, did you review
12   to refresh your memory?
13        A.      I just sat down and thought about
14   things that I could remember.  I really have
15   no documents.  You know, I have -- I didn't
16   bring anything with me when I retired.
17        Q.      Okay.  Who, if anyone, have you
18   spoken with about this case and your
19   deposition?
20        A.      Andrew.
21        Q.      Okay.  Other than speaking with
22   the attorney for the Transit Authority, have
23   you discussed this with anyone else?
24        A.      No.
25        Q.      How much time have you spent
```

7

1                     Cheryl Kennedy

2    discussing this matter with defense counsel

3    for the Transit?

4          A.     A couple of hours.

5          Q.     And was this over one session, a

6    number of sessions or something else?

7          A.     Two.

8          Q.     Was each session a few hours?

9          A.     The first one was a couple of

10   hours.  The second one was shorter.

11         Q.     In addition to these sessions for

12   a few hours with the defense counsel for the

13   Transit, did you also have other

14   communications, whether it be e-mails, text

15   messages, regular mail, things of that nature?

16         A.     No.

17         Q.     Any other communications --

18         A.     Oh, a text message just saying

19   when we would meet.  Is that what you're

20   talking about?

21         Q.     Okay.  Just of any kind, but --

22         A.     Okay.

23         Q.     So that was just a text message

24   about when you're going to meet?

25         A.     Yes.

8

                        Cheryl Kennedy

1

2          Q.      Okay.  Have you ever testified

3    before?

4          A.      Maybe once.

5          Q.      When you testified before, was it

6    in a deposition like this, was it at trial or

7    something else?

8          A.      I guess it was twice.  One was a

9    deposition and once was a trial.

10         Q.      And the two other times you've

11   testified at both the deposition and trial,

12   did they involve claims of negligence against

13   the Transit Authority, that they negligently

14   caused injury to somebody?

15         A.      No.

16         Q.      Okay.  Did they involve safety at

17   all?

18         A.      Employee-related issues.

19         Q.      Got it.  Employee-related issues

20   for safety or something else?

21         A.      Something else.

22         Q.      Got it.  Okay.  I'm going to now

23   ask you questions about your background.

24                 First, what's your educational

25   background?

9

1                         Cheryl Kennedy

2          A.      I have a master of science in

3    safety management from West Virginia

4    University.

5          Q.      I'm going to back up.  Before you

6    got your master's, did you have --

7          A.      I had an undergrad master's of

8    science in education.

9          Q.      And did you have an undergraduate

10   degree?

11         A.      Yes.  I said master's of science

12   in education.

13         Q.      I mean --

14         A.      Oh, I'm sorry, bachelor's of

15   science.  I'm sorry.  Bachelor's in education.

16   And then I had a master of science in safety

17   management.

18         Q.      Okay.  And when you got your

19   bachelor of science undergraduate, was that in

20   education, was it in phys ed or something

21   else?

22         A.      It was physical education.

23         Q.      Okay.  And then you got your

24   master's degree in safety of some sort?

25         A.      Safety management.

10

1                       Cheryl Kennedy

2          Q.      What is safety management?

3          A.      It's the -- you're talking about

4     my degree?  Basically, overall management of

5     safety issues, both, you know, environmental,

6     occupational, engineering-related, emergency

7     preparedness, all aspects of safety.  It could

8     be in an organization.  So that would be my

9     degree area.

10         Q.      Did you take any classes in

11    engineering?

12         A.      No.

13         Q.      What is your work history?

14         A.      I've worked --

15         Q.      Go ahead, I'm sorry.

16         A.      I've -- after I graduated, I went

17    directly to work for New York City Transit and

18    I worked in safety my entire career there.  I

19    started in 1982.

20         Q.      Okay.  So you started at the

21    Transit Authority in 1982, correct?

22         A.      Yes.

23         Q.      And you started with the office

24    of system safety?

25         A.      Yeah, I started with the office

11

1                        Cheryl Kennedy

2    of system safety.  That office just dealt with

3    subway-related issues.  There were two safety

4    offices at that time, and I was employed by

5    the office that dealt with subway, mostly

6    customer areas.  The other safety office dealt

7    with buses as well as employee safety, and it

8    wasn't until, I think, 1985 where they merged.

9        Q.    Okay.  When you first started

10   working for the office of system safety, did

11   you have a title or position?

12       A.    Yeah, I was a transit analyst,

13   and I think I worked there from '82 to '85.

14   And then I went and became a manager.  I was

15   manager of hazard analysis from '86 to about

16   '89.  Then I was director of hazard assessment

17   from '89 to '99.  And then I was the vice

18   president of system safety from 2000 until I

19   retired, March 1st of 2018.

20       Q.    So I just want to make sure I'm

21   accurate here.  You started working in 1982

22   for the New York City Transit Authority in the

23   office of system safety; you were involved

24   with subway-related issues.  They merged in

25   1985.  So you worked there from '82 to '85 as

12

1                       Cheryl Kennedy

2     a transit analyst.  Then you became a manager

3     for the hazard -- hazardous assessment?

4             A.      Hazard -- hazard assessment, yes.

5             Q.      Okay.  And that was '86 to '89,

6     correct?

7             A.      Yes.

8             Q.      And then you became the director

9     of hazard assessment or hazardous assessment

10    from '89 to '96, correct?

11            A.      Uh-hum.  Yes.

12            Q.      Okay.  And then you became the

13    director of --

14            A.      '99, is that what you said?

15            Q.      I said '96, but if it was '99 --

16            A.      '99, yeah.

17            Q.      My apologies.

18            A.      No problem.

19            Q.      And then so from 1999 to 2018,

20    you were the director of the office of system

21    safety, correct?

22            A.      Yeah, the year 2000 until the end

23    of 2017, really --

24            Q.      Okay.

25            A.      -- yeah, March 1, 2018.

13

1                    Cheryl Kennedy

2        Q.      What is the office of system

3    safety, what is its purpose?

4        A.      It, basically, was to develop

5    policies and procedures to make sure there was

6    a comprehensive overall safety management of

7    New York City Transit, so it was to the

8    development of policies, procedures, and

9    oversight of that -- those issues in order to

10   ensure a comprehensive safety program for all

11   of New York City Transit on both bus and rail,

12   customer and employees.

13       Q.      Can we agree that the job of the

14   office of system safety was to ensure that

15   safety was integrated into all operations of

16   the Transit Authority?

17       A.      Yes.

18       Q.      And that would include accident

19   investigation, hazard analysis, safety audit

20   programs and performance indicators for

21   customer and employees statistics,

22   occupational safety, environmental safety and

23   fire safety?

24               MR. KEAVENEY:  Objection.

25       A.      Yes.

14

                        Cheryl Kennedy

1

2              THE WITNESS:  What?

3              MR. KEAVENEY:  Don't worry, just

4        if I object, just wait for the objection

5        and --

6              THE WITNESS:  Oh, I'm sorry.

7        Q.     And by the way, do you get a

8   pension from the Transit Authority?

9        A.     Yes.

10       Q.     Okay.  And was it your job to

11  oversee the daily safety of all customers and

12  employees in the subway system?

13       A.     No, not on that level.  You know,

14  every customer -- I wasn't overseeing every

15  customer's safety, if that's what you're

16  saying.  It was, basically, we were -- we were

17  at the top of the chain at New York City

18  Transit.  I reported directly to the president

19  and we developed policies and procedures and

20  it covered, you know, all those areas that you

21  discussed, and we also audited all those areas

22  to make sure that the various departments were

23  following those policies and procedures and

24  all of the different, like, subways and buses

25  both also had safety departments within them

15

1                    Cheryl Kennedy

2    that we coordinated with, and we coordinated

3    with many people within both bus and rail to

4    ensure that safety was paramount at New York

5    City Transit and everyone was responsible for

6    safety down to the lowest level employee at

7    the organization.

8         Q.    Well, I'm going to back up a

9    second.  When I asked you a question earlier

10   about was it your job to oversee the daily

11   safety of all customers and employees, I don't

12   mean for each individual person that you had

13   to make sure that Mary Smith was safe on her

14   way to work.  I'm talking --

15        A.    Okay.

16        Q.    -- generally.

17        A.    In general, yes.

18        Q.    So you do agree with that

19   statement then?

20        A.    Yeah, in general overall.  As I

21   stated again, we set the policies and

22   procedures, made sure that we had enough --

23   the proper policies and procedures in all

24   those areas that you mentioned to make sure

25   that we also were following all the

16

1                    Cheryl Kennedy

2    regulations that were in place that covered

3    safety, such as the Department of Labor, which

4    enforced OSHA regulations, or any

5    environmental regulations that were in place,

6    policies for accident investigation, policies

7    for many things to make sure that we covered

8    all the regulations that we had to.

9         Q.    Thank you.  By the way, since we

10   have a limited amount of time, there are times

11   I will ask you yes-no questions or true-false

12   questions.  When I do so, could you please

13   just answer with a yes or no or a true or

14   false, and if you're unable to do so, just

15   tell me I can't answer that with a yes or no;

16   fair enough?

17        A.    Fair enough.

18        Q.    And you agree to this?

19        A.    Yeah, as much --

20        Q.    I have your word on that?

21        A.    As much as I can.

22        Q.    Okay.  And if I ask just a direct

23   question of some sort, just please give an

24   answer that is responsive to that actual

25   question.  I, by and large, don't really care

17

1                          Cheryl Kennedy

2    what it is that you say, I just want it to be

3    responsive to the question.  So, in other

4    words, if I ask you about apples, I don't want

5    to hear about oranges or your opinions or

6    editorializing about apples.  Just answer the

7    fact; understood?

8              A.     Understood.

9              Q.     Okay.  Now, was it also part of

10   your job to be the local safety contact with

11   both the federal, state and local governments

12   charged with oversight of the organization and

13   its unions for safety?

14             A.     Yes.

15             Q.     And was it part of your job to

16   make sure that safety was integrated into all

17   operations?

18             A.     Yes.

19             Q.     And I believe you told us you

20   reported directly to the president of the

21   Transit Authority, correct?

22             A.     Correct.

23             Q.     And you agree that the president

24   of the Transit Authority relied upon you and

25   your office for safety recommendations and

18

1                    Cheryl Kennedy

2    advice?

3                    MR. KEAVENEY:  Objection.

4         A.    Yes.

5         Q.    Okay.  And the presidents of the

6    Transit Authority relied upon you and your

7    office for advice on how to make the system

8    safer; true?

9                    MR. KEAVENEY:  Objection.

10                   Go ahead and answer.

11        A.    That's true, along with, you

12   know, many other department's input.

13        Q.    Okay.  And you knew that the

14   presidents of the Transit Authority relied

15   upon the recommendations of yourself and your

16   office with respect to hazard assessment and

17   how to mitigate these hazards; true?

18        A.    True.

19        Q.    Okay.  And we agree that

20   performing adequate, reasonable and proper

21   hazard assessments and making proper adequate,

22   reasonable safety plans to mitigate these

23   hazards was an extremely important job of

24   yours in your department?

25        A.    True.

19

1                    Cheryl Kennedy

2        Q.    Okay.  And among the hazards that

3   you assessed was contact between trains and

4   people; true?

5        A.    That was an issue that we did

6   look at, yes.

7        Q.    And among the hazards you

8   assessed was people coming onto the track or

9   track bed; true?

10              MR. KEAVENEY:  Objection.

11        A.    As I stated, they -- they were --

12   we were not looking at -- you're calling that

13   a hazard.  We looked at the issue of contact

14   with individuals, you know, persons getting

15   struck by trains --

16        Q.    And --

17        A.    -- and the causes of those type

18   of incidents.

19        Q.    Okay.  And a purpose of

20   performing safety audit programs is to see

21   whether whatever steps actually taken or any

22   safety plans made are actually effective;

23   true?

24              MR. KEAVENEY:  Objection.

25        A.    State that again.

20

1          Cheryl Kennedy

2               MR. GENIS:  Sure.  Read it back,

3          please.  See if it's English; sometimes

4          it's not.

5               (Record read.)

6          A.    That's not the only thing that an

7   audit does.  An audit is to make sure that the

8   various areas are following what they should

9   be following.  That's what the purpose of an

10  audit is.  So as part of oversight, which my

11  department was responsible for, we did many

12  audits, and the audits were to make sure the

13  departments were following the proper

14  procedures and processes that were in place.

15         Q.    Okay.  So --

16         A.    That's what an audit is for.

17         Q.    Okay.  Well, let me ask you this:

18  Can an audit be used -- a safety audit program

19  be used to see whether or not steps taken or

20  safety plans made are actually effective?

21         A.    I wouldn't call that an audit.

22         Q.    Okay.  What would you call that?

23         A.    Just a review to see whether or

24  not your -- your accidents have gone down or

25  up or if they're following the procedures.

21

1                    Cheryl Kennedy

2          Q.     So in order to do a proper,

3    adequate and reasonable review and analysis,

4    you have to use standard performance

5    indicators; true?

6          A.     True.

7          Q.     Okay.  You have to base any

8    opinions you have on hard fact and data; true?

9          A.     True.

10         Q.     You have to base your opinion on

11   safety performance or lack thereof; true?

12         A.     I -- true.  I -- yeah.

13         Q.     Okay.  Can we agree based on your

14   education background, experience and training,

15   you were familiar with good and accepted

16   practices and procedures of safely operating a

17   mass transit subway system as it existed when

18   you were working for the New York City

19   Transit?

20         A.     State that again.

21         Q.     Okay.  Based on your education,

22   your background, your experience and your

23   training, were you familiar with good and

24   accepted practices and procedures of safely

25   operating a mass transit subway system when

22

1                    Cheryl Kennedy

2    you were working for the New York City Transit

3    Authority?

4              A.    Yes.

5                    MR. KEAVENEY:  Objection.

6              Q.    And do you agree based on your

7    education, background, experience and

8    training, you were familiar with benchmarks

9    for safely operating a mass transit subway

10   system as it existed when you were working for

11   the New York City subway system?

12                   MR. KEAVENEY:  Objection.

13             A.    Certain benchmarks.

14             Q.    Okay.  Based on your education,

15   background, experience and training, were you

16   familiar with best practices and procedures of

17   safely operating a mass transit subway

18   system --

19                   MR. KEAVENEY:  Objection.

20             Q.    -- when you worked for the

21   Transit Authority?

22             A.    For various issues, procedures,

23   equipment, yes.

24             Q.    Okay.  And based on your

25   education, experience and training, were you

23

1                    Cheryl Kennedy

2    familiar with professional standards of care

3    for safely operating a mass transit subway

4    system from 1982 through 2018?

5                    MR. KEAVENEY:  Objection.

6         A.     That's a very general question.

7    What standards of care are you talking about?

8         Q.     We're going to get to specifics

9    later on.  I go from general to --

10        A.     Well, then I can't answer that.

11   I can't answer that one.

12        Q.     Okay.  Well, do we agree that

13   there were professional standards of care

14   for --

15        A.     There are many -- there were

16   many --

17        Q.     Can I finish my question, please?

18        A.     Sure.

19        Q.     Thank you.  Can we agree that

20   there were professional standards of care for

21   safely operating a mass transit subway system,

22   1982 through 2018?

23        A.     There were many different

24   standards.

25        Q.     Okay.  And were you familiar with

24

1                    Cheryl Kennedy

2    these professional standards of care for

3    safely operating a mass transit subway system

4    from 1982 through 2018?

5                    MR. KEAVENEY:  Objection.

6         A.     That's too general of a question.

7    I mean, if I say yes to that, you can -- that

8    could be anything.  If you're specific, I can

9    tell you if I am familiar with it or not.

10        Q.     Sure.  No problem.

11               Do we agree that according to the

12   good and accepted practices of safely

13   operating a mass transit system as it existed

14   when you were working for the Transit, the

15   Transit Authority was never allowed to

16   unnecessarily expose the public to harm?

17                    MR. KEAVENEY:  Note my objection.

18        A.     We shouldn't expose people to

19   harm; I agree with that.

20        Q.     And do we agree that according to

21   the benchmarks for safely operating a mass

22   transit subway system, from 1982 through 2018,

23   the Transit Authority was never allowed to

24   unnecessarily expose people to harm?

25                    MR. KEAVENEY:  Objection.

25

1                    Cheryl Kennedy

2        A.      What -- what benchmarks are you

3    talking about?

4        Q.      Any benchmarks at all that you're

5    familiar with.

6        A.      It's too general of a question to

7    answer.

8        Q.      Okay.  Well, do we agree that

9    according to the best practices and procedures

10   of safely operating a mass transit subway

11   system, was the Transit Authority ever allowed

12   to unnecessarily expose people to harm?

13                MR. KEAVENEY:  Objection.

14       A.      We would not unnecessarily expose

15   them to harm.

16       Q.      That would be violation of best

17   practices and procedures; true?

18                MR. KEAVENEY:  Objection.

19       A.      Give me specifics on what best

20   practices you're talking about.  There are so

21   many best practices.

22       Q.      Okay.  So you tell me which best

23   practice allows the Transit Authority to

24   unnecessarily --

25       A.      I just -- there aren't -- I

26

Cheryl Kennedy

1

2    didn't see there was, okay.

3          Q.    Okay.  Good.  So that we agree

4    then, according to the best practices and

5    procedures of safely operating a mass transit

6    subway system, from 1982 to 2018, the Transit

7    Authority was never allowed to unnecessarily

8    expose people to harm; true?

9          A.    Correct.

10          Q.    Okay.  And according to

11    professional standards of care of safely

12    operating a mass transit subway system from

13    1982 to 2018, the Transit Authority was never

14    allowed to unnecessarily expose the public to

15    harm?

16          MR. KEAVENEY:  Objection.

17          A.    We would not want to

18    unnecessarily expose customers to harm.

19          Q.    I'm not asking what you would

20    want to do.  I'm asking --

21          A.    We would --

22          Q.    My question is nice and simple.

23    According to professional standards of care,

24    was the Transit Authority ever allowed to

25    unnecessarily expose people to harm?

27

1          Cheryl Kennedy

2              MR. KEAVENEY:  Objection.

3      A.    We would not expose people to

4  harm.

5  MO        MR. GENIS:  Okay.  Move to strike.

6      That's not my question.

7      Q.    Okay.  Are you familiar with any

8  professional standard of care that allowed the

9  New York City Transit to unnecessarily expose

10 people to harm?

11     A.    No.

12     Q.    Okay.  So can we agree, according

13 to professional standards of care, the Transit

14 Authority was never allowed to unnecessarily

15 expose people to harm?

16     A.    I answered that already.

17     Q.    So can we get answer, yes or no,

18 please?

19     A.    I'm not answering yes or no

20 because you're not telling me what standard of

21 care you're talking about.  I don't know -- I

22 don't know of any, but you're saying, like --

23 the thing is so broad.

24     Q.    Okay.  Well, you told us a moment

25 ago that there was not a single professional

28

1                    Cheryl Kennedy

2    standard of care --

3          A.     That I know.

4          Q.     -- that allowed a Transit

5    Authority to unnecessarily expose the public

6    to harm; true?

7          A.     (No response.)

8          Q.     Yes; didn't you just say that a

9    moment ago?

10         A.     You said of the ones that I know

11   of, and that is correct.

12         Q.     Okay.  Good.  Now, let's discuss

13   hazard analysis.  Have you performed hazard

14   analysis for the Transit Authority?

15         A.     Yes.

16         Q.     Okay.  And do we agree that there

17   are good and accepted procedures that are to

18   be followed in performing hazard analysis?

19         A.     Yes.

20         Q.     Do we agree that there are

21   certain professional standards of care that

22   are supposed to be complied with when

23   performing a hazard analysis?

24                MR. KEAVENEY:  Objection.

25         A.     There are standards and

29

1                  Cheryl Kennedy

2    guidelines that you can use to perform hazard

3    analyses.

4         Q.     In other words, you are supposed

5    to perform a proper methodology in performing

6    a hazard analysis, correct?

7         A.     Yes.

8         Q.     Okay.  And, in other words, when

9    performing a hazard analysis, it must be

10   adequate, reasonable and proper; true?

11        A.     True.

12        Q.     Okay.  And the way that one has

13   an adequate, reasonable and proper hazard

14   analysis is by following good and accepted

15   practices and procedures in performing the

16   hazard analysis, correct?

17        A.     Correct.

18        Q.     The way one performs an adequate,

19   reasonable and proper hazard analysis is by

20   complying with professional standards of care;

21   true?

22             MR. KEAVENEY:  Objection.

23        A.     There are guidelines and

24   procedures that we follow to do a hazard

25   analysis.

30

1                          Cheryl Kennedy

2          Q.      And one must follow the proper

3    methodology in order to perform an adequate,

4    reasonable and proper hazard analysis; true?

5          A.      Yes.

6          Q.      Okay.  Because if one does not

7    follow the proper methodology in performing

8    the hazard analysis, that would result in an

9    inadequate, unreasonable and improper hazard

10   analysis; true?

11                 MR. KEAVENEY:  Objection.

12         A.      True, if you're not going to

13   follow the -- the -- true.  Okay.

14         Q.      And the same is true if one does

15   not follow good and accepted practices and

16   procedures, then the hazard analysis would be

17   inadequate, unreasonable and improper; true?

18                 MR. KEAVENEY:  Objection.

19         A.      There are many ways to perform

20   hazard analyses.

21   MO          MR. GENIS:  That's not my

22          question.  Move to strike.

23         Q.      Can you answer my question,

24   please?

25         A.      Ask it again.

31

1                    Cheryl Kennedy

2              MR. GENIS:  Sure.  Read it back,

3       please.

4              (Record read.)

5       A.    True.

6       Q.    And if one does not comply with

7  professional standards of care in performing

8  hazard analysis, the result would be an

9  inadequate, unreasonable and improper hazard

10  analysis, correct?

11             MR. KEAVENEY:  Objection.

12      A.    What are your standards of care?

13      Q.    So you can't answer that

14  question?

15      A.    Correct, because you're not

16  telling me --

17      Q.    That's fine.

18      A.    -- the standards of care.

19      Q.    Do we agree that an adequate,

20  reasonable, and proper hazard analysis has

21  certain hallmarks?

22      A.    Certain what?

23      Q.    Hallmarks.

24      A.    Correct.

25      Q.    Okay.  For example, the hazard

32

1                        Cheryl Kennedy

2    analysis, in order to be adequate, reasonable,

3    and proper, must be complete; true?

4            A.     True.

5            Q.     The hazard analysis must be

6    accurate in order to be adequate, reasonable,

7    and proper; true?

8            A.     True.

9            Q.     The hazard analysis must be

10   thorough in order to be adequate, reasonable,

11   and proper; true?

12           A.     True.

13           Q.     The hazard analysis must be

14   honest in order to be adequate, reasonable,

15   and proper; true?

16           A.     True.

17           Q.     The hazard analysis must be

18   objective in order to be adequate, reasonable,

19   and proper; true?

20           A.     True.

21           Q.     And the hazard analysis must be

22   based on objective data in order to be

23   adequate, reasonable, and proper; true?

24           A.     True.

25           Q.     Now, do we agree that the New

33

1                      Cheryl Kennedy

2    York City Transit adopted, incorporated, used

3    and followed the practices, procedures, and

4    methodology for performing a hazard analysis

5    as set forth in the United States of America

6    Military Standards?

7            A.     Yes.  True.

8            Q.     In fact, you utilized standard

9    882E in your analysis, correct?

10           A.     When I first started, it was C,

11   then D, now E.

12           Q.     And not only did the Transit

13   adopt, incorporate, use, and follow the

14   practices, procedures, and methodology for

15   properly performing a hazard analysis as set

16   forth in USA Military Standards, you did as

17   well; true?

18           A.     True.

19           Q.     Okay.  And you used the military

20   standards because it is an authoritative

21   source; true?

22           A.     True.

23           Q.     And there are other authoritative

24   sources as well; true?  In other words, that's

25   not the only authority of the military?

34

1                        Cheryl Kennedy

2          A.       Right.  True.

3          Q.       For example, you are familiar

4     with the American Society for Civil Engineers,

5     ASCE; true?

6          A.       ASTE?

7          Q.       CE.

8          A.       Excuse me?

9          Q.       ASCE, American Society for Civil

10    Engineers?

11         A.       No.

12         Q.       Are you familiar with ANSI,

13    American National Standards Institute?

14         A.       Yes.

15         Q.       And ANSI also publishes

16    authoritative standards and guidelines; true?

17         A.       True.

18         Q.       And you're familiar with RAMS in

19    Railway Systems; true?

20         A.       No.

21         Q.       No, okay.  You've never heard

22    that expression, R-A-M-S?

23         A.       No.

24         Q.       Okay.  Let's see.

25         A.       Not offhand.

35

1                       Cheryl Kennedy

2           Q.      Let's see if I can help you --

3     I'll get to that later.  Okay.

4                   Now, do we agree that a system

5     safety standard practice uses systems

6     engineering approach to eliminating hazards

7     where possible and minimizing risks where

8     those hazards cannot be eliminated?

9           A.      Yes.  Engineering practices is

10    one way of doing it, yes.

11          Q.      I'm going to go through certain

12    definitions now so that we -- so if we use

13    words, we're on the same page, okay; fair

14    enough?

15          A.      Okay.

16          Q.      Okay.  First, acceptable risk.

17    Can we agree that risk that is -- that the

18    appropriate accepted authority is willing to

19    accept without additional mitigation?

20          A.      True.

21          Q.      Causal factor, one or several

22    mechanisms that trigger the hazard that may

23    result about a mishap; agree?

24          A.      Causes, yes.

25          Q.      Okay.  Hazard, a real or

36

1                     Cheryl Kennedy

2    potential condition that could lead to an

3    unplanned event or series of events, i.e.,

4    mishap, resulting in death, injury or

5    occupational illness; true?

6         A.    True.

7         Q.    Initial risk is the first

8    assessment of the potential risk of an

9    identified hazard; true?

10        A.    State that again, I'm sorry.

11        Q.    Initial risk is the first

12   assessment of the potential risk of an

13   identified hazard; true?

14        A.    I'm not -- I don't know the

15   answer to that one.

16        Q.    Well, initial risk establishes a

17   fixed baseline for the hazard; true?

18             MR. KEAVENEY:  Note my objection.

19        A.    I -- I can't answer that.

20        Q.    Mishap, do we agree that the

21   definition of that is an event or series of

22   events resulting in unintentional death,

23   injury or occupational illness?

24        A.    True.

25        Q.    Mitigation measure, an action

37

1                    Cheryl Kennedy

2    required to eliminate the hazard or when a

3    hazard cannot be eliminated reduce the

4    associated risk by lessening the severity of

5    the resulting mishap or lowering the

6    likelihood that a mishap will occur?

7         A.    True.

8         Q.    Okay.  Monetary loss, the

9    summation of the estimated costs for equipment

10   repair replacement, facility repair or

11   replacement, environmental cleanup, personal

12   injury or illness, environmental liabilities

13   or related costs?

14        A.    That's true, but we didn't use

15   costs in our assessment.

16        Q.    Probability, an expression of the

17   likelihood of occurrence of a mishap; true?

18        A.    True.

19        Q.    Okay.  Program manager is the

20   designated governmental individual with

21   responsibility for and authority to accomplish

22   program objectives for development, production

23   and sustainment of the system, products or

24   equipment to meet the user's operational

25   needs?

38

Cheryl Kennedy

1

2      A.      True.

3      Q.      Risk, a combination of the
4   severity of the mishap and the probability
5   that the mishap will occur; true?

6      A.      True.

7      Q.      Risk level is a characterization
8   of risk as either high, serious, medium or
9   low; true?

10     A.      True.

11     Q.      Safety means the freedom from
12  conditions that can cause death, injury,
13  occupational injury or illness; true?

14     A.      True.

15     Q.      Safety critical is a term applied
16  to a condition, event, operation, process or
17  term whose mishap's severity consequence is
18  either catastrophic or critical; true?

19     A.      I don't have that in front of me,
20  so, I'm --

21     Q.      Do you agree with what I said?

22     A.      I don't have it in front of me.
23  I mean, so I don't know if that's exactly how
24  it's worded.

25     Q.      Well, do you disagree with that?

39

                        Cheryl Kennedy

1

2        A.      No.

3        Q.      Okay.  Safety critical function

4   is a function whose failure to operate or

5   incorrect operation will directly result in a

6   mishap of either catastrophic or critical

7   severity; true?

8        A.      State that again.

9        Q.      Safety critical function is a

10  function whose failure to operate or incorrect

11  operation will directly result in a mishap of

12  either catastrophic or critical severity;

13  true?

14       A.      I'm not -- I don't know.  I'm not

15  answering that one because you're reading it

16  from something, so I don't have that in front

17  of me if you're reading it from the military

18  standard.  Whatever is in the military

19  standard is what we followed and the verbiage

20  that's in the military standard is what we

21  follow --

22       Q.      Okay.

23       A.      -- and there's verbiage in there

24  for severity and there's verbiage in there for

25  likelihood or probability.

40

                    Cheryl Kennedy

1

2       Q.      I'm going to get into all of that

3    in a minute.

4       A.      That's the verbiage that we used,

5    so --

6       Q.      Okay.

7       A.      And I don't have it in front of

8    me to see if you're reading that exactly.

9       Q.      That's okay.  So an example of a

10   safety critical function would be where an

11   employee fails to properly perform their job

12   such as a train operator preceding that can

13   result in harm to someone; true?

14      A.      True.

15      Q.      Okay.  Safety-related is a term

16   applied to a condition, event, operation,

17   process or item that is identified as whether

18   safety critical or safety-related; true?

19              MR. KEAVENEY:  Objection.

20      A.      I -- I -- I just finished telling

21   you, I don't know what you're reading this

22   stuff from, so I'm --

23      Q.      Okay.

24      A.      You're reading it from -- I'm

25   telling you, we followed Military Standard,

41

1                    Cheryl Kennedy

2    882C, D, and E now, and the verbiage, if

3    you're reading it from there, that is what we

4    followed, if you're reading many more things

5    than that.

6          Q.    Severity, the magnitude of

7    potential consequences of a mishap to include

8    death, injury, occupational illness, damage to

9    or loss of equipment or property, damage to

10   the environment or monetary loss; true?

11         A.    True.

12         Q.    System safety engineering, an

13   engineering discipline that employs

14   specialized knowledge and skills in applying

15   scientific and engineering principles,

16   criteria, and techniques to identify hazards

17   and then to eliminate the hazards or reduce

18   the associated risks when the hazards cannot

19   be eliminated; true?

20         A.    True.

21         Q.    System safety management, all

22   plans and actions taken to identify hazards,

23   assess and mitigate associated risks, and

24   track, control, accept - that's A-C-C-E-P-T -

25   and document risks encountered in the design,

42

1                    Cheryl Kennedy

2    development, test, acquisition, use and

3    disposal of systems, subsystems, equipment and

4    infrastructure; true?

5         A.     True.

6         Q.     Target risk, the projected risk

7    level the project manager plans to achieve by

8    implementing the mitigation measures

9    consistent with the design order of

10   precedence; true?

11        A.     True.

12        Q.     All right.  Let's discuss general

13   requirements now.  System safety requirements,

14   when properly applied, these requirements

15   should enable the identification and

16   management of hazards and their associated

17   risks during system development and sustaining

18   engineering activities; true?

19        A.     True.

20        Q.     Let's talk about the system

21   safety process.  Can we agree that there are

22   eight elements to this?

23        A.     No --

24        Q.     Okay.

25        A.     -- because I don't have it in

43

1                    Cheryl Kennedy

2    front of me.

3         Q.    Okay.  Let me start going through

4    them then.

5                    The first thing is to document

6    the system safety approach; true?

7         A.    True.

8         Q.    Okay.  So the project manager

9    shall document the system safety approach from

10   managing hazards as an integral part of SE

11   process; true, safety engineering process?

12        A.    Right.

13        Q.    Okay.  And the minimum

14   requirements of the approach include, I'm

15   about to give a list now, one, documenting the

16   risk management effort and how the program has

17   integrated risk management into the SE

18   process, the integrated product and process

19   development process, and the overall program

20   management structure; true?

21        A.    True.

22        Q.    Okay.  In terms of documenting

23   the system safety approach, they must document

24   hazards with a closed loop hazard tracking

25   system, also known as an HTS; true?

44

1              Cheryl Kennedy

2              MR. KEAVENEY:  Just note my

3      objection.

4      A.      I don't know if that must be done

5      that way.

6      Q.      Okay.  Well, are you familiar

7      with documenting hazards with --

8      A.      I know -- you document hazards.

9      You assess those hazards, their severity and

10     probability of occurrence.  You make

11     recommendations to mitigate the hazards, and

12     you track your recommendations through

13     completion.

14     Q.      Thank you.  I'm going to get to

15     all of that in a minute, but first talking

16     about documenting hazards with a hazard

17     tracking system, do we agree that's a good and

18     accepted methodology practice and procedure?

19             MR. KEAVENEY:  Objection.

20     A.      I just said you do document the

21     hazards and you document them and ensure that

22     you have dealt with all of the recommendations

23     that you made.

24     Q.      Well, let's back up.  What is --

25     A.      I'm not saying that you would put

45

1                       Cheryl Kennedy
2    all hazards in the Transit Authority into a
3    system like that.  So I don't know if that's
4    what you're trying to get at.
5         Q.     Okay.  Let's try it this way:
6    Have you ever heard of a hazard tracking
7    system?
8         A.     Yes.
9         Q.     Okay.  And do we agree that a
10   hazard tracking system would include, at a
11   minimum, the following data elements:  One,
12   identify hazards; two, associated mishaps;
13   three, risk assessment including initial
14   target and events; next, identify risk
15   mitigation measures; next, selected mitigation
16   measures, next hazard status; next
17   verification of risk reductions and risk
18   acceptances; true?
19                MR. KEAVENEY:  Objection.
20        A.     True.
21        Q.     Okay.  Now let's discuss
22   identifying and documenting hazard.  Do we
23   agree that hazards are identified through a
24   systematic analysis process?
25                MR. KEAVENEY:  Objection.

46

Cheryl Kennedy

1    A.    Hazards can be identified that
2 way.  You can identify hazards in many
3 different ways, but if you're talking about
4 doing it as in accordance with the military
5 standard, yes.
6
7    Q.    And you told us the military
8 standards are what the Transit is supposed to
9 comply with, correct?
10            MR. KEAVENEY:  Objection.
11    A.    For certain things, yes.  But
12 certain things, not for everything.  I mean,
13 you're not going to use that for everything
14 that's done in the Transit Authority, okay.
15 There are many ways of identifying hazards.
16 There are many different procedures and
17 processes and -- that you can use in order to
18 identify and address hazards.  They don't all
19 have to be done in accordance with Military
20 Standard 882.
21    Q.    Okay.  So when you were working
22 at the office of system safety, other than the
23 Military Standard 882, what, if any, standards
24 did you use and rely upon?
25    A.    We could perform a job safety

47

1              Cheryl Kennedy

2    analysis --

3         Q.    I understand that.  That's not my

4    question.  My question is, other than --

5         A.    Hold on.  That is your question.

6    There are many different ways to identify

7    hazards; that's what I'm telling you, okay.

8         Q.    That's not my question.  My

9    question is, other than using the prescribed

10   methodology and practices and procedures

11   detailed and outlined in the military

12   standards, what, if any, other written

13   standards did you use to identify and document

14   hazards?

15        A.    We used -- there are many

16   different procedures that can be used.  I'm

17   not saying they are written down as a

18   standard, but there's a job hazard analysis,

19   there's job safety analysis, you know, where

20   you go out and take a look at someone

21   performing a job task.  This is -- this known

22   methods of doing -- identifying hazards that's

23   different from -- from the military standard,

24   so there are -- what I'm saying is there are

25   other methods.  You can take a look at

48

                        Cheryl Kennedy

1

2    statistics that you have and you can go from

3    there.  Every single thing in the Authority is

4    not -- you do not perform a hazard analysis

5    such that you're saying, okay.

6                We performed hazard analysis in

7    accordance with Military Standard 882 for new

8    equipment, for changes to equipment, for new

9    procedures, for changes to current procedures,

10   okay.  Every single thing in the Authority

11   that you're looking at, you're not going to do

12   a hazard assessment as you're reading.

13        Q.    Are you finished?

14        A.    Yes.

15        Q.    Thank you.

16   MO          MR. GENIS:  I just move to strike

17        those portions are nonresponsive.

18        Q.    All my question is asking you is

19   nice and simple, other than the military --

20   written military standards, were there any

21   other written standards or guidelines that you

22   used in identifying and documenting hazards

23   when you did hazard analysis for the Transit

24   Authority?

25        A.    I just answered you.

49

1                        Cheryl Kennedy

2          Q.       You have not.

3          A.       Yes, I did.

4          Q.       If you could please name, if

5     there are any, any other written standards or

6     guidelines?  I don't care who published it,

7     who promulgated it, that's what I'm trying to

8     find out.

9          A.       There are ANSI standards.  There

10    are many -- there are many different standards

11    available.  There are many different best

12    practices available, okay, that you can use in

13    order to identify hazards; and that's --

14    that's what I'm saying.

15         Q.       Okay.  So ANSI standards are

16    authoritative --

17         A.       There are --

18         Q.       Please let me finish my question;

19    please?

20         A.       Okay.

21         Q.       So ANSI standards, which you've

22    told us are authoritative, are also proper to

23    use for identifying and documenting hazards,

24    yes or no?

25         A.       You can utilize those.  You can

50

1                    Cheryl Kennedy

2    also utilize OSHA standards to see the areas

3    in which you're going to look.

4         Q.    Okay.  Military --

5         A.    I'm not going to answer that

6    question.

7         Q.    Ma'am, you're giving very lengthy

8    nonresponsive answers that are --

9         A.    They're good answers.

10        Q.    I'm not here to argue with you or

11   debate with you.  I'm trying to get answers

12   that are actually responsive to my question.

13              So my simple question to you now

14   is, other than the Military Standards 882,

15   other than ANSI standards, what, if any, other

16   -- and you mentioned best practices, what

17   other written either standards, guidelines or

18   best practices do you consider authoritative

19   that would comply with proper identification

20   and documentation of hazards and hazard

21   analysis?

22              MR. KEAVENEY:  Objection.

23        A.    I'm not answering that any more

24   than I've already answered.

25        Q.    But you haven't.

51

1                     Cheryl Kennedy

2          A.      Yes, I did.

3          Q.      I'm just trying to find out any

4    other sources, ma'am, yes or no?

5          A.      There are many sources that --

6          Q.      Okay.

7          A.      If you're going to go do a job

8    safety analysis, you can look that up and see

9    the procedures that are used, okay.  I'm not

10   telling you that there's a specific standard

11   like an OSHA standard or the military

12   standard, but there are procedures in which

13   you can do that, okay --

14         Q.      All I'm trying to --

15         A.      All I'm saying --

16         Q.      You're still not being

17   responsive.  All I'm saying is, could you

18   please list them?  That's all I want you to

19   know.  Just --

20         A.      I'm not listing them --

21         Q.      Please let me finish my question,

22   please.  You keep interrupting me.  The

23   reporter cannot write us both down at the same

24   time.  You must let me finish the question

25   before you give an answer; is that understood?

52

1                    Cheryl Kennedy

2          A.     Yes.

3          Q.     Thank you.

4                 So my question is, you've told us

5    about the Military Standards 882, you've told

6    us about ANSI standards.  So what written best

7    practices are you referring to that are proper

8    to use to identify and document hazards?

9          A.     I don't have them in front of me.

10         Q.     I didn't ask if you have them in

11   front of you.  What are they, for example --

12         A.     I don't know at this point.

13         Q.     Okay.

14         A.     I'm not going -- I don't know

15   have them in front of me and I don't have a

16   list of them, so -- but I am telling you

17   they're not only military standard --

18         Q.     Okay.

19         A.     -- that you can use to identify

20   hazards.

21         Q.     All right.  Do you recall, as we

22   sit here today, any other written standards or

23   guidelines for proper identification and

24   documentation of hazards?  That's all I'm

25   trying to find out.

53

                        Cheryl Kennedy

1

2        A.      I just answered that.  I'm not --

3   I just answered that.  There are many

4   different --

5        Q.      No, you can't think of any other

6   names; is that the answer?  Tell me.

7                MR. KEAVENEY:  Objection.

8        A.      I said there was one job safety

9   analysis, that is not part -- that is not

10  military standard, okay.  I utilized

11  statistics, that -- that is not a military

12  standard.  There are many ways to identify a

13  hazard.  You're trying to put words in my

14  mouth.

15       Q.      No, I'm not.

16  MO           MR. GENIS:  Move to strike as

17           nonresponsive.

18       Q.      You are -- with all due respect,

19  ma'am, you are conflating different methods

20  and procedures with what I'm actually asking

21  you.

22       A.      Okay.

23       Q.      All I am asking you is, nice and

24  simple, the sources that you consider

25  authoritative that one can look at for

54

1                    Cheryl Kennedy

2    documentation and identification of hazards.

3    You mentioned military standards.  You

4    mentioned ANSI standards.  I'm just trying to

5    find out what other written place, if you

6    wanted to look them up, could we do so?

7         A.    OSHA standards.  I mentioned OSHA

8    standards.

9         Q.    Yes, you did.

10        A.    Okay.  I don't have the list of

11   them and I'm not going to say that the

12   military standard is the only way to identify

13   hazards, and that's what you're trying to tell

14   me.

15        Q.    Actually, that's not at all

16   correct.

17   MO          MR. GENIS:  And I move to strike.

18        A.    Okay.

19        Q.    All I was trying to do -- and I

20   will say it again to you.  All I was trying to

21   find out is what are the written standards or

22   guidelines for proper identification and

23   hazard and assessment.  That's all I'm trying

24   to do, okay?  Either you remember the names of

25   these other sources or guidelines and

55

1                     Cheryl Kennedy

2    standards or you do not.  If you do not --

3         A.      Okay.

4         Q.      -- all you had to do was say I

5    don't remember any other names.  I don't need

6    a speech.

7         A.      I don't remember the other names

8    other than the ones I said to you.

9         Q.      See, that was simple.

10        A.      Okay.

11        Q.      That's all you have to do.  Let's

12   keep going now.

13                Do we agree that in identifying

14   and documenting hazards, you should use mishap

15   data; true?

16        A.      True.

17        Q.      You should use relevant

18   environmental and occupational health data;

19   true?

20        A.      True.

21        Q.      You should use user physical

22   characteristics; true?

23        A.      True.

24        Q.      User knowledge; true, skills and

25   abilities?

56

1                    Cheryl Kennedy

2          A.      True.

3          Q.      Lessons learned from legacy and

4    similar systems; true?

5          A.      True.

6          Q.      The hazard identification process

7    shall consider the entire life cycle and

8    potential impacts to personnel,

9    infrastructure, the public and the

10   environment; true?

11         A.      True.

12         Q.      And identifying hazards shall be

13   documented in the hazard -- at the HTS, the

14   hazard tracking system, correct?

15         A.      In some cases, it would.  You can

16   have your own way of tracking hazards.

17         Q.      Okay.  Let's now discuss

18   assessing and documenting risks, okay?  Are we

19   ready?

20         A.      I'm ready.

21         Q.      Can we agree the severity

22   category and probability level of the

23   potential mishaps for each hazard across all

24   system modes are assessed; true?

25         A.      True.

57

Cheryl Kennedy

1

2      Q.      Okay.  And in that military

3  standard, they have definitions in tables;

4  true?

5      A.      True.

6              MR. KEAVENEY:  Objection.

7      Q.      And those tables list how to do

8  this proper analysis, correct?

9              MR. KEAVENEY:  Objection.

10     A.      If you're referring to hazard

11  severity and probability of occurrence and the

12  items listed there, there is verbiage that

13  describes each one.

14     Q.      Thank you.  So you use - you

15  anticipated my next question - severity

16  categories and probability level tables,

17  correct?

18     A.      Yes.

19     Q.      And then you use a risk

20  assessment matrix table, correct?

21     A.      Correct.

22     Q.      And all of these three tables are

23  listed in the Military Standard 882, correct?

24     A.      Correct.

25     Q.      Okay.  Next thing, identify and

58

1                       Cheryl Kennedy

2     document risk mitigation measures; true,

3     that's supposed to be done?

4           A.     Yes.

5           Q.     Okay.  So you're supposed to look

6     at the potential risk mitigations and they

7     shall be identified and the expected risk

8     reductions of the alteratives shall be

9     estimated and documented in the hazard

10    tracking system; true?

11          A.     No.

12          Q.     Okay.  What part of that is not

13    true?

14          A.     You identify the hazard and you

15    have recommendations to mitigate those hazards

16    and we track them to completion.

17          Q.     So --

18          A.     Okay.

19          Q.     So first you would have to

20    identify a potential risk mitigation; yes?

21          A.     Yes.

22          Q.     And then you'd have to identify

23    the expected risk reductions; true?

24          A.     No.

25          Q.     Okay.  So, in other words, when

59

1                          Cheryl Kennedy

2     you have a risk mitigation plan, do you have

3     expected risk reductions?

4          A.     You have -- we utilized that to

5     do assessments on various things, okay, for

6     example, an operation, and you wanted to

7     address all the hazards relative to the change

8     in an operation, and you would come up with

9     recommendations.  Say, you came up with 10.

10    Those 10 recommendations we would track to

11    completion.  We're not stating that one

12    particular one is going to reduce the risk by

13    more than another, okay.  That's how we went

14    about doing that.

15         Q.     Well, I'm going to back up a

16    second.  First of all, when you have a

17    potential risk mitigation plan, part of it is

18    based on the study you've done before then;

19    true, your analysis, yes?

20         A.     Yes.

21         Q.     Okay.

22         A.     We used --

23         Q.     So you've already come to the

24    opinion then that doing A, whatever A may be,

25    is supposed to reduce risk; true?

60

1                       Cheryl Kennedy

2          A.      True, but you don't know how much

3     because they all go together, okay.  You make

4     10 recommendations --

5          Q.      Again -- ma'am -- ma'am, I get.

6     Ma'am, when you give the long nonresponsive

7     answers --

8          A.      But they're not nonresponsive.

9          Q.      Okay.  Ma'am, I'm not trying to

10    argue with you.

11         A.      But yes or no to everything is

12    not right.

13    MO           MR. GENIS:  Move to strike as

14           nonresponsive.

15         Q.      I'm not here to argue with you.

16    I'm not here to debate --

17         A.      I'm not arguing either.

18         Q.      I'm trying to get -- to move it

19    along.  I'm asking simple questions.

20         A.      You're asking me whether --

21         Q.      Stop.  There's no question before

22    you right now.  Please stop.

23                 MR. KEAVENEY:  Bob, let's take a

24           quick break.

25                 MR. GENIS:  Sure.

61

1              Cheryl Kennedy

2              MR. KEAVENEY:  My computer is on

3      the fritz and I want to fix it.

4              MR. GENIS:  Not a problem.  So

5      it's 11:09.

6              MR. KEAVENEY:  Let's come back in

7      five minutes.

8              MR. GENIS:  Okay.

9              (Recess taken from 11:09 a.m. to

10     11:17 a.m.)

11  BY MR. GENIS:

12     Q.     Okay.  And, Ms. Kennedy, just

13  when I ask a question, I think this maybe this

14  can help us a little bit, if you don't know

15  the answer or if you don't remember, you can

16  say so.  You know, if I ask you, as I say, a

17  yes-or-no question, if you're not able to

18  answer with a yes or no, just say you're

19  unable to do so.

20     A.     Okay.

21     Q.     If I ask you another kind of

22  question and you say, look, I don't know, I

23  don't remember, I'm fine with that --

24     A.     Okay.

25     Q.     -- all right?

62

                    Cheryl Kennedy

1

2          A.      All right.

3          Q.      And I think we can get rid of a

4    lot of the back and forth and

5    unresponsiveness; fair enough?

6          A.      Fair enough.

7          Q.      Okay.  We were talking about risk

8    mitigation measures.  So what my next question

9    is, when you have a -- let's say, a plan to

10   mitigate risk, do you have an expected risk

11   reduction?

12         A.      Yes.

13         Q.      Okay.  So, in other words, before

14   you do the plan, you've already figured if we

15   do A, we will be able to prevent or reduce by

16   X degrees or X percentage or X number, certain

17   types of incidents from occurring?

18         A.      No.

19         Q.      I know I'm being general, but --

20         A.      No.

21         Q.      No, okay.  So would your plan --

22   would you expect that your plan, safety plan,

23   would indicate what risks would be reduced by

24   the plan?

25         A.      Since I can't talk, I mean, I

63

1                    Cheryl Kennedy

2    can't answer yes or no.

3         Q.    Okay.  So you're saying when you

4    do a risk mitigation plan, you don't know

5    or have a -- withdrawn.  Let's do it another

6    way.

7         A.    Okay.

8         Q.    When you do a risk mitigation

9    plan, do you have a hypothesis of what amount

10   of risk reduction should occur?

11        A.    No.

12        Q.    Okay.  Now, when you do plans,

13   safety plans, do you do expected risk

14   reductions of alternatives to the risk

15   mitigation at hand?

16        A.    I can't answer these with a yes

17   or no.  I need to explain the way to do it,

18   okay, so --

19        Q.    If you can't -- no, if you can't,

20   that's okay.

21        A.    Okay.

22        Q.    So I'm going to give a sentence

23   and you can agree or disagree or some other

24   answer --

25        A.    Okay.

64

1                    Cheryl Kennedy

2          Q.      -- like -- you know, because I'm

3    going to ask yes-no questions.

4                  So yes or no, in identifying and

5    documenting risk mitigation measures, do we

6    agree that potential risk mitigations shall be

7    identified and the expected risk reductions of

8    the alternatives shall be estimated and

9    documented in the hazard tracking system?

10         A.      No.

11         Q.      Okay.  Should the goal always be

12   to eliminate the hazard if possible?

13         A.      If possible.

14         Q.      When a hazard cannot be

15   eliminated, the associated risk should be

16   reduced to the lowest acceptable level by

17   applying the system safety design order of

18   precedence; true?

19         A.      True.

20         Q.      The system safety design order of

21   precedence identifies alternative mitigation

22   approaches and lists them in order of

23   decreasing effectiveness; true?

24         A.      True.

25         Q.      And eliminate hazards through

65

1                    Cheryl Kennedy

2    design selection; true?

3        A.    That's one method.

4        Q.    Ideally, if the hazard should be

5    eliminated by selecting a design or material

6    alternative that removes the hazard

7    altogether; true?

8        A.    That's one method.

9        Q.    Another method is reduce risk

10   through design alteration; true?

11       A.    True.

12       Q.    So if adopting a design change or

13   material to eliminate the hazard is not

14   feasible, then you should consider design

15   changes that reduce the severity and/or

16   probability of the mishap potential caused by

17   the hazard; true?

18       A.    True, that's one way.

19       Q.    Okay.  And then incorporate

20   engineered features or devices; true, is

21   another method?

22       A.    That is another method.

23       Q.    So if -- if -- and another method

24   is operational changes as well to mitigate

25   risk; true?

66

1                    Cheryl Kennedy

2          A.      Yes.

3          Q.      Okay.  So if mitigation of the
4    risk through design alteration is not
5    feasible, reduce the severity or the
6    probability of the mishap potential caused by
7    the hazard using engineered features or
8    devices; true?

9          A.      That's one method, yeah.  You
10   went over that one.

11         Q.      Okay.  And, in general,
12   engineered features actively interrupt the
13   mishap in sequence and devices reduce the risk
14   of mishap; true?

15         A.      In general.

16         Q.      Okay.  Another thing is providing
17   warning devices, so if engineered features and
18   devices are not feasible or do not adequately
19   lower the severity or probability of the
20   mishap potential caused by the hazard include
21   detection and warning systems to alert
22   personnel to the presence of a hazardous
23   condition or occurrence of a hazardous event?

24         A.      True, that's another method.

25         Q.      Okay.  And an example of such a

67

1                    Cheryl Kennedy

2    device would be, for example, a track

3    intrusion device; true?

4         A.      True.

5         Q.      Or a closed-circuit TV to feed

6    the train; true?

7         A.      True.

8         Q.      Okay.  Let's discuss reducing

9    risk.  Do we agree that mitigation measures

10   are selected and implemented to achieve an

11   acceptable risk level?

12        A.      True, they -- they all go

13   together, though.

14        Q.      Okay.  So you present the current

15   hazards, their associated severity and

16   probability assessments and the status of risk

17   reduction efforts in technical reviews,

18   correct?

19        A.      Yes, in some type of assessments.

20        Q.      Okay.  And then after that's

21   done, the next step is to verify, validate and

22   document risk reduction; true?

23        A.      Can't answer it yes or no.

24        Q.      Okay.  Well, let's discuss --

25   well, can we first agree that you're supposed

68

1                    Cheryl Kennedy

2    to verify the implementation and validate the

3    effectiveness of all selected risk mitigation

4    measures through appropriate analysis,

5    testing, demonstration or inspection?

6           A.     In some assessments.

7           Q.     Okay.  Well, when would you not

8    want to verify and validate --

9           A.     You --

10          Q.     -- the effectiveness of a

11   selected risk mitigation measure through

12   appropriate analysis, testing and

13   demonstration or inspection?

14          A.     Okay.  You make sure that you've

15   implemented the measures or your

16   recommendations, your mitigation --

17          Q.     Right.

18          A.     -- but they're not all separate.

19   So all of the assessments that we have done,

20   you have many recommendations or many

21   mitigation things put in place, and all of

22   them together address the hazards, okay.  So

23   I'm not going to say that one -- we didn't

24   give an effectiveness of one of them separate.

25   It would be all together as one entire

69

1                    Cheryl Kennedy

2    assessment, for a particular item or a design

3    change or procedural change, like specific

4    type of operation, a specific type of job.

5         Q.    Okay.  So all I'm trying to find

6    out is, according to proper procedures, when

7    you implement a safety plan for the purposes

8    of risk reduction, you first have to verify

9    the implementation of the plan; true?

10                    MR. KEAVENEY:  Objection.

11        A.    True.

12        Q.    Okay.  Then after its

13   implemented, you have to verify and validate

14   the effectiveness of the selected risk

15   mitigation measures through appropriate

16   analysis, testing, demonstration or inspection

17   to see if it works, correct?

18        A.    Yes.  As a whole, yes.

19        Q.    Okay.  So then you would document

20   the verification and validation of the risk

21   mitigation measure in the hazard tracking

22   system, correct?

23        A.    In some cases.  In some type of

24   assessments.

25        Q.    Right, because, as we said, we

70

1                          Cheryl Kennedy

2    want to know, does it work or not, and then

3    you want to document how well does it work,

4    correct?

5          A.    If you're using military standard

6    on that particular issue, yes.

7          Q.    Okay.  And before exposing

8    people, equipment or the environment to known

9    system-related hazards, the risks shall be

10   accepted by the appropriate authority,

11   correct?

12               MR. KEAVENEY:  Objection.

13         A.    I can't answer yes or no to that

14   one.

15         Q.    Well, you've done a risk

16   assessment, so either there's something that

17   you've concluded can be done to prevent or

18   reduce that risk or you've concluded there's

19   nothing that can be done, correct?

20         A.    Correct.

21         Q.    And when you've concluded that

22   there's nothing that can be done, you've

23   basically accepted the risk, correct?

24               MR. KEAVENEY:  Objection.

25         A.    No, if nothing -- if nothing can

71

1                         Cheryl Kennedy

2   be done, then maybe the procedure that we were

3   looking at wouldn't be implemented, okay.  If

4   nothing could be done, if I -- if we could not

5   identify any means of reducing the risk, then

6   what we were assessing, if it were, giving an

7   example, a procedure, then it wouldn't be

8   implemented.

9          Q.    But I'm saying -- let's back up.

10         A.    Okay.

11         Q.    What we said a moment ago is, all

12  right, you come up with this plan, a safety

13  plan, to reduce or mitigate risk --

14         A.    Yeah, it's an assessment, not

15  necessarily a plan, okay.

16         Q.    Okay.  And then we discussed how

17  you implement, right, that plan, correct?

18         A.    Correct.

19         Q.    And then you said you looked to

20  see if the plan is effective or not, does it

21  work?

22         A.    Right.

23         Q.    Okay.  So either it works or it

24  doesn't, correct?

25         A.    Right, parts of it might work and

72

1                    Cheryl Kennedy

2    parts not, right.

3         Q.      And if plan A doesn't work, we

4    talked about that other hierarchy or

5    precedence of things, then you can go to B, C

6    or D, correct?

7         A.      Correct.

8         Q.      But if none of them will work,

9    right, if there's nothing that can be done,

10   there's the hazard and there's just nothing

11   you can do to mitigate that hazard, then

12   either you accept the risk or you just shut

13   down the system, correct?

14                MR. KEAVENEY:  Objection.

15        A.      Correct -- well...

16        Q.      Okay.  So let's discuss data item

17   descriptions, also known as DIDs.  Are you

18   familiar with that?

19        A.      No.

20        Q.      All right.  Let me get to that in

21   a second.  Okay.  So let's talk about certain

22   data item descriptions.  For example, you're

23   familiar with a safety engineering analysis

24   report, yes, no?

25        A.      Not necessarily, no.

73

1                      Cheryl Kennedy

2          Q.      Okay.  Are you familiar with

3    failure mode, M-O-D-E, effects - that's with

4    an "E," and criticality analysis report?

5          A.      Yes.

6                   And can I mention something?

7    When you asked whether we follow Military

8    Standard 882, okay, we do with respect to the

9    type of analysis that we normally performed

10   and we performed the preliminary hazard

11   analysis type of analysis in systems safety.

12   Any other type of hazard such as failure mode

13   effect analysis and so on would have been

14   performed by consultants in relationship,

15   maybe, to capital program management, but my

16   office followed the preliminary hazard

17   analysis method in there, and that was the

18   only one, really.

19   MO          MR. GENIS:  Move to strike.

20         There's no question about that, but

21         that's fine.

22         A.      But I just want -- you were

23   asking a lot of other questions about military

24   standard.  I want to make sure you know that's

25   the part of the standard that we really

74

1                    Cheryl Kennedy
2    followed.
3         Q.     Okay.
4         A.     Okay.
5         Q.     Are you familiar with the system
6    safety hazard analysis report?
7         A.     Not in those terms, no.
8         Q.     Are you familiar with the safety
9    assessment report, SAR?
10        A.     No.
11        Q.     Are you familiar with engineering
12   change proposal system safety report?
13        A.     No, not all these reports that
14   you're mentioning.
15        Q.     Are you familiar with waiver or
16   deviation system safety report?
17        A.     All those things that you're
18   talking about are, I believe, part of an
19   analysis that would be done with a consultant.
20   We did not do all of these things that you're
21   talking about in my office.
22        Q.     And when you worked with a
23   consultant --
24        A.     They were not under me, okay.
25        Q.     Okay.  Let me just try to be

75

1                    Cheryl Kennedy

2    clear.

3         A.     Like I'm talking about --

4         Q.     I'm trying to get a question in

5    here and then get an answer because if we

6    don't have a coherent question and answer, the

7    whole transcript is worthless because it's

8    just babbling by both of us; that's no good.

9         A.     Okay.

10        Q.     So question, all right, there are

11   times that the Transit Authority hires

12   consultants; true?

13        A.     Correct.

14        Q.     And you have to work with these

15   consultants; true?

16        A.     Correct.

17        Q.     And then you give data to the

18   consultants; true?

19        A.     Yes.  The Authority gives facts,

20   yes.

21        Q.     Okay.  And when you say "the

22   Authority," you mean the Transit Authority,

23   correct?

24        A.     Correct.

25        Q.     Okay.  And then the consultant

76

1                         Cheryl Kennedy

2      reviews the data given by the Transit

3      Authority, correct?

4              A.      Correct.

5              Q.      And they write up their report,

6      correct?

7              A.      Correct.

8              Q.      And then you review and analyze

9      the report, correct?

10             A.      Correct.

11             Q.      Okay.  So you're familiar with

12     the reports and their methodologies, correct?

13                     MR. KEAVENEY:  Objection.

14             A.      Correct.

15             Q.      Okay.  Are you familiar with a

16     system safety program progress report?

17             A.      Not in those terms, no.

18             Q.      Okay.  Are you familiar with the

19     safety studies report?

20             A.      No.

21             Q.      Are you familiar with the safety

22     studies plan?

23             A.      No.

24             Q.      Are you familiar with the mishap

25     risk assessment plan?

77

1                        Cheryl Kennedy

2          A.      No.

3          Q.      Okay.  I'm going to now go

4    through certain methodology for system safe

5    methodology.  Let's see.  Let me get to

6    something else first.  Okay.

7                  Do you we agree that with hazard

8    identification in mitigation effort using

9    system safety methodology is the goal should

10   always be to eliminate the hazard if possible,

11   and when a hazard cannot be eliminated, the

12   associated risk should be reduced to the

13   lowest acceptable level within the constraints

14   of cost, schedule and performance by applying

15   the system safety design order of precedence;

16   true.

17         A.      True --

18         Q.      Okay.

19         A.      -- not necess -- we didn't really

20   take cost into consideration in my office, but

21   overall, you would.

22         Q.      So where there is a study for

23   this, at a minimum, they have to report first

24   the hazards and the associated risks, correct?

25         A.      Correct.

78

Cheryl Kennedy

1          Q.      The functions, items and
2   materials associated with the hazard; true?
3          A.      I don't know what you're
4   referring to there.  You're looking at, like,
5   a design-type assessment or --
6          Q.      Right, a report on the assessment
7   and status of hazards, that's what I'm talking
8   about, okay?
9          A.      I can't answer yes or no.
10         Q.      Okay.  Do we agree it's supposed
11  to, the third thing, recommend requirements
12  for operation, maintenance, sustainment and
13  disposal?
14         A.      Correct.
15         Q.      And it's supposed to have
16  recommended mitigation measures, correct?
17         A.      Correct.
18         Q.      Okay.  And now let's talk about
19  the system safety program plan and its -- what
20  that's supposed to do.
21         A.      Okay.
22         Q.      That should be an integral part
23  of the system engineering management plan,
24  correct?

79

1                    Cheryl Kennedy

2         A.    The system safety program plan is

3    the overarching plan that manages safety at

4    the -- at New York City Transit or all transit

5    properties.

6         Q.    So, in other words, you have the

7    overall system engineering process and then --

8         A.    We have -- go ahead.

9         Q.    And then you have the system

10   safety program plan, which is an integral part

11   of the system engineering management plan --

12        A.    No.

13        Q.    -- correct?  No?

14        A.    No.

15        Q.    Okay.  Well, do you agree that

16   the system safety program plan shall detail

17   the tasks and activities that are required to

18   implement a systematic approach of hazard

19   analysis, risk assessment and risk management?

20        A.    Yes.

21        Q.    And that the goal of the system

22   safety program plan should always be to

23   eliminate the hazard if possible, correct?

24        A.    No, the --

25        Q.    Okay.  The goal of the system

80

1                     Cheryl Kennedy

2   safety program plan be that when the hazard

3   cannot be eliminated, the associated risk

4   should be reduced to the lowest acceptable

5   level?

6        A.    Yes, that's part of that system

7   safety program plan, pieces of it, yes.

8        Q.    Okay.  And when we do the hazard

9   analysis, the system safety program plan shall

10  describe the processes for hazard

11  identification, risk assessment, risk

12  mitigation, risk communication, and support to

13  risk acceptance; true?

14       A.    The system safety program plan

15  does outline how you go about identifying and

16  resolving hazards, your -- the techniques you

17  use.

18       Q.    So you agree with what I said,

19  correct?

20       A.    I don't know.  Say that again

21  because --

22       Q.    Okay.

23       A.    I'm sorry.

24       Q.    That's okay.  At a minimum, with

25  respect to hazard analysis, the system safety

81

1                    Cheryl Kennedy

2    program plan shall describe the processes for

3    hazard identification, risk assessment, risk

4    mitigation, risk communication, and support to

5    risk acceptance; true?

6            A.    True.

7            Q.    Okay.  And for risk assessment,

8    the system safety program plan shall list the

9    severity of categories, probability levels and

10   risk assessment codes that shall be followed;

11   true?

12           A.    It can either list them in the

13   plan or refer to them in the plan.

14           Q.    Now, let's discuss supporting

15   data.  At a minimum, the system safety program

16   plan shall describe the approach for

17   collecting and processing pertinent hazard,

18   mishap, and lessons learned data; true?

19           A.    True.

20           Q.    And this should include both

21   historical data from similar or legacy systems

22   used to assist in hazard identification and

23   associated risk assessment and current system

24   data such as the hazard tracking system; true?

25           A.    That's all not going to be

82

1                       Cheryl Kennedy
2    outlined in the plan in that detail.
3            Q.    Okay.  So let's --
4            A.    So I say no --
5            Q.    Okay.
6            A.    -- if you're saying system safety
7    program plan.
8            Q.    Okay.  So I want to make sure I
9    get --
10           A.    Can I --
11           Q.    -- what you're agreeing with and
12   not, so let me break it down.
13           A.    Okay.
14           Q.    So in terms of the system safety
15   program plan and supporting data, at a
16   minimum, should plan describe the approach for
17   collecting and processing pertinent hazard,
18   mishap and lessons learned data; I believe you
19   agreed with that already?
20           A.    Right.  It's the way that we go
21   about doing it in New York City Transit, so
22   our plan would outline how New York City
23   Transit does it.
24           Q.    Okay.  And do we agree that a
25   system safety program plan, at a minimum,

83

1                   Cheryl Kennedy

2   should include both historical data from

3   similar or legacy systems used to assist in

4   hazard identification and associated risk

5   assessment of the current system data?

6        A.    No, it would not be in the system

7   safety program plan.

8        Q.    Okay.  Let's discuss verification

9   and validation.  Do we agree the system safety

10  program plan, at a minimum, shall document how

11  the safety risk management effort will verify,

12  validate and document the effectiveness of

13  mitigation measures in reducing risks through

14  tests analysis, inspection, et cetera?

15       A.    If you're looking at the entire

16  plan, yes, it's not going to be all in one

17  place, though.

18       Q.    Do we agree that, at a minimum,

19  the system safety program plan shall verify,

20  validate and document that hardware, software

21  and procedures comply with identified hazard

22  management requirements?

23       A.    In general.

24       Q.    And let's discuss briefly the

25  hazard management plan, okay?  Do we agree

84

1                        Cheryl Kennedy

2    that they're supposed to develop a hazard

3    management plan that documents a standard

4    generic system safety methodology for the

5    identification, classification and mitigation

6    of hazards as part of the overall system

7    engineering process?

8            A.      I can't answer that yes or no.

9            Q.      Okay.  The hazard management plan

10   should be an integral part of the system

11   engineering management plan; true?

12           A.      Are we moving from system safety

13   program plan to something else?

14           Q.      We're discussing hazard

15   management plans.

16           A.      Okay.  That --

17           Q.      Do you need me to repeat any of

18   the questions I just asked --

19           A.      I'm sorry, I can't answer them

20   yes or no.

21           Q.      Okay.  Did you need me to go over

22   some of the questions I just asked because I

23   was asking about hazard management and you may

24   have been thinking about something else?

25           A.      You were asking --

85

                        Cheryl Kennedy

1

2      Q.      Do you need me to ask them again?

3   You tell me.

4      A.      I don't know.  You were asking me

5   many questions on the system safety program

6   plan, and within the system safety program

7   plan, yes, there is a section in there that

8   describes how you identify and assess hazards,

9   and the entire plan deals with the whole

10  operation of New York City Transit, being

11  maintenance and everything, operation.  So I

12  don't know.  I mean, I'm not sure how -- what

13  you're just asking me goes in there.

14     Q.      Okay.  Well, do we agree that the

15  hazard management plan shall detail the tasks

16  and activities that are required to implement

17  a systematic approach of hazard analysis, risk

18  assessment, and risk management?

19     A.      If I can answer more than yes or

20  no; otherwise, no, I'm not -- I can't

21  answer -- I can't answer.

22     Q.      Okay.  The goal shall always be

23  to eliminate the hazard if possible, when

24  hazard cannot be eliminated, the associated

25  risk should be reduced to the lowest

86

1                    Cheryl Kennedy
2    acceptable level; true?
3         A.    True.
4         Q.    Okay.  So then we get into
5    probability levels, and again, there is a
6    chart for that in the military standards,
7    correct, or table?
8         A.    Correct.
9         Q.    So, for example, we have
10    different probability levels.  There's
11    frequent, is one category, and that's a level
12    A, correct?
13         A.    Correct.
14         Q.    And that -- and for that is --
15    and then there's probable is level B, correct?
16         A.    Correct.
17         Q.    Occasional is level C, correct?
18         A.    Correct.
19         Q.    Remote is level D, correct?
20         A.    Correct.
21         Q.    Improbable is level E, correct?
22         A.    Yes.
23         Q.    And then eliminated is level F,
24    correct?
25         A.    Correct.

87

1                     Cheryl Kennedy

2          Q.      So when we discuss a frequent

3   probability level, that just means it is

4   likely to occur often in the life of an item,

5   correct?

6          A.      Yeah, that's one of the

7   definitions.

8          Q.      Okay.  So probability -- if we

9   want to make it quantitative, probability of

10  an occurrence greater than or equal to 10,

11  correct?

12         A.      Correct.

13         Q.      So, in other words, if 10 bad

14  things occur, mishaps, in a year, that gives

15  it a probability level of frequent, correct?

16         A.      No.

17         Q.      Okay.  So when we say a level of

18  10, do we -- is that by a period of time or

19  something else?

20         A.      It could be many other things.

21  It could be the -- the number of customers you

22  carry a year.  It could be -- it depends on

23  what you're looking at.  You know, I don't

24  know.  You can't just generalize how it's

25  done.

88

1                    Cheryl Kennedy

2         Q.     Well, let's say we're discussing

3    probability levels of different types of harm,

4    whether it be a catastrophic or something

5    else.  We're going to get into those levels in

6    a moment, but if you were going to look at the

7    probability levels of a catastrophic event and

8    it was frequent --

9         A.     You would look --

10        Q.     -- define frequent.

11        A.     You would look how many times it

12   occurred.  You could also look at, in order to

13   calculate that 10, how many people you carry a

14   year or in -- in that given example.  We

15   carried 1.7 billion people a year, so you

16   would take that into consideration too when

17   you're calculating that.

18        Q.     Okay, but let's get back to my

19   question, please.  When looking at probability

20   and frequency and, let's say, we're looking at

21   frequency of a catastrophic injury, okay?

22        A.     Okay, yup.

23        Q.     You're looking at the

24   quantitative of how many times it occurs over

25   a finite period of time; true?

89

1                      Cheryl Kennedy

2          A.     No.

3          Q.     Okay.

4          A.     It's not the only thing you're

5    looking at.

6          Q.     I didn't say it was the only

7    thing.  I just asked --

8          A.     Oh, okay.  Yes, if that's not the

9    only thing, but yes, that's one thing you look

10   at.  Yes.

11         Q.     So -- okay.  So a probable level

12   will occur less than 10, correct?

13                MR. KEAVENEY:  Just note my

14         objection.

15         A.     I don't have it in front of me,

16   so I can't --

17         Q.     Okay.

18         A.     You know, if I had the chart

19   then -- if you're reading from the chart out

20   of military standard, that would, you know, be

21   accurate, whatever the chart says.

22         Q.     Okay.  And let me --

23         A.     There's a chart for probability

24   and there's one for severity.

25         Q.     Right.  I was going to start --

90

1                    Cheryl Kennedy

2    let's get into some of that right now.  Okay.

3                  So the chart for severity

4    categories, let's go through those.

5         A.    Okay.

6         Q.    There's severity category number

7    one is catastrophic, correct?

8         A.    Correct.

9         Q.    And catastrophic means could

10   result in one or more of the following, death,

11   permanent total disability, irreversible

12   significant environmental impact, or monetary

13   loss equal to or exceeding $10 million.  Do

14   you agree with that?

15        A.    Yes, but we didn't use the cost

16   part.

17        Q.    Okay.  So --

18        A.    If that's what the military

19   standards says.

20        Q.    Okay.  So, again, we're

21   discussing severity categories and the mishap

22   result criteria for giving it that category,

23   correct?

24        A.    Okay.  In the military standard,

25   yes.

91

1                        Cheryl Kennedy

2          Q.      Okay.  So then after

3    catastrophic, we have severity level number

4    two, which is critical, correct?

5          A.      Correct.

6          Q.      And that could result in one or

7    more of the following, permanent partial

8    disability, injuries or occupational illness

9    that may result in hospitalization of at least

10   three personnel, reversible significant

11   environmental impact, or monetary loss equal

12   to or exceeding 1 million but less than $10

13   million?

14         A.      Correct, but, once again, we

15   didn't use that -- the cost part in the

16   assessments that we did.

17         Q.      Okay.  Severity category number

18   three, marginal, that means could result in

19   one or more of the following, injury or

20   occupational illness resulting in one or more

21   lost workdays, reversible moderate

22   environmental impact, or monetary loss equal

23   to or exceeding $100,000 but less than

24   $1 million, correct?

25         A.      Correct.

92

Cheryl Kennedy

1      Q.     Okay.  And for severity category

2   number four, negligible, is could result in

3   one or more of the following, injury or

4   occupational illness not resulting in a lost

5   workday, minimal environmental impact or

6   monetary loss less than $100,000, correct?

7      A.     If that's what the military

8   standard says, yes.

9      Q.     Okay.  So then when we had

10  discussed the probability levels, we have

11  frequent level A, and that's likely to occur

12  often in the life of an item, correct, or

13  system?

14     A.     True.

15     Q.     Level B, probable, will occur

16  several times in the life of an item or a

17  system, correct?

18     A.     True.

19     Q.     Probability level C --

20     A.     This is a -- oh, yeah, because

21  there's more than one -- there's more than one

22  column, from what I remember, that chart, life

23  of an item or -- or a fleet or inventory.

24     Q.     Correct.

93

1                    Cheryl Kennedy

2          A.      Okay.

3          Q.      Okay.  So probability level C is

4    occasional, which is likely to occur sometime

5    in the life of an item or a system; true?

6          A.      True, there's also quantitative

7    information as well, right.

8          Q.      Okay.  And we have probability

9    level D, for remote, unlikely but possible to

10   occur in the life of an item or a system;

11   true?

12         A.      True.

13         Q.      Then we have probability level E,

14   improbable, so unlikely it could be assumed

15   occurrence may not be experienced in a life of

16   an item or a system; true?

17         A.      True.  And they all have

18   quantitative information in there too, I

19   believe.

20         Q.      And then level F, eliminated

21   means incapable of occurrence, this level is

22   used when potential hazards identified and

23   later eliminated, correct?

24         A.      Correct.

25         Q.      Okay.  And then we have this

94

1                          Cheryl Kennedy

2    other table, we mentioned it briefly, we're

3    going to go into a little more detail now, is

4    the risk assessment matrix, correct?

5          A.      Correct.

6          Q.      And that charts out, across one

7    plain, the catastrophic, critical, marginal or

8    negligible in terms of the injury, correct?

9          A.      Correct.

10         Q.      And down a column goes through

11   the probability.  So we have the severity

12   across the top and the probability down the

13   left, correct?

14         A.      Correct.

15         Q.      And then you see where they

16   mix --

17         A.      Correct.

18         Q.      -- correct?

19         A.      Yep.

20         Q.      So, for example, you can have a

21   catastrophic severity with a high frequency,

22   okay, or something else, correct?

23         A.      Correct.

24         Q.      So when we have the risk

25   assessment matrix, it goes -- it has high,

95

1                    Cheryl Kennedy

2    serious, medium and low, correct?

3         A.    I can't recall exact verbiage

4    because it's not in front of me, but --

5              MR. KEAVENEY:  Why don't you show

6         her the document?

7         A.    -- I believe you do merge the two

8    and there's terms in the chart.

9         Q.    Okay.  So, for example, 1A would

10   be the worst, that would be a catastrophic

11   injury with a frequent probability, correct?

12        A.    Correct.

13        Q.    And also of high risk level would

14   be a critical injury with a frequent level of

15   occurrence, correct?

16        A.    Correct.

17        Q.    A catastrophic injury with a

18   probable level of occurrence is also ranked as

19   a high risk assessment matrix, correct?

20        A.    I believe so, but I don't have

21   this in front of me, so I can't, you know --

22   you're reading it off the military standard

23   and I don't have it here, but --

24        Q.    Okay.

25        A.    -- whatever it says in there, I

96

1                     Cheryl Kennedy

2    agree with what it says in the military

3    standards.

4         Q.    Okay.  Just to move it along, I'm

5    going to ask Dave if he can put it on the

6    screen and this way we can look at it.  I

7    understand you've already agreed with it --

8         A.    Okay.  That's good.  Thank you.

9         Q.    Okay?

10        A.    Yup.

11             MR. GENIS:  This is going to be,

12        I guess, Plaintiff's Number 1 of today's

13        date.  We're going to deem this.  I

14        see -- the page number that we have up

15        is 4608, so that we can identify where

16        we got this document from.

17             (Plaintiff's Exhibit 1 deemed

18        marked for identification.)

19        Q.    Do you see these two tables on

20   this document?

21        A.    Yes.

22        Q.    Okay.  And do you see on the top

23   one is probability levels that we've already

24   gone over?

25        A.    Yes.

97

1                    Cheryl Kennedy

2        Q.      And then the bottom one is that

3    risk assessment matrix that we've been

4    discussing, correct?

5        A.      Yes.

6        Q.      So --

7        A.      The top one would also -- you

8    could also have qualitative, like you were

9    discussing before.

10       Q.      Yes.

11       A.      Okay.

12       Q.      So let's go back to the risk

13   assessment matrix.

14       A.      Sure.

15       Q.      Okay.  So for that, even where

16   you have a marginal injury, but with

17   probability of it being frequent, that's a

18   serious categorization, correct?

19       A.      Correct.

20       Q.      And even where you have a

21   marginal injury with a probable level of

22   occurring, it's also serious, correct?

23       A.      Correct.

24       Q.      And where you have a catastrophic

25   severity level that is probable, that's high

98

1                    Cheryl Kennedy

2    on the risk assessment matrix, correct?

3         A.    Correct.

4         Q.    And where it's critical severity

5    with a probable level of occurrence, that's

6    also high on the risk assessment; yes?

7         A.    Correct.

8         Q.    And where you have a marginal

9    injury but with a probable occurrence, that's

10   also serious, correct?

11        A.    Correct.

12        Q.    Catastrophic with an occasional

13   occurrence is still a high on the risk

14   assessment matrix, correct?

15        A.    Correct.

16        Q.    Critical severity that occurs

17   occasionally is also serious, correct?

18        A.    Correct.  Serious, yes.

19        Q.    And, in fact, a catastrophic

20   injury that is remote in probability is still

21   serious, correct?

22        A.    Correct.

23        Q.    Okay.  All right.  Now, let's

24   discuss here, do we agree that the greatest

25   number of fatalities and catastrophic injuries

99

1                    Cheryl Kennedy

2    in the New York City subway system are caused

3    by contact between a train and a human being?

4         A.    The greatest number of

5    catastrophic -- I don't have the, you know,

6    stats here, but it is high.

7         Q.    So fatalities and catastrophic

8    injuries, right, the greatest number would be

9    caused by contact between a train and a

10   person; true?

11        A.    It's high, but I don't know if

12   that's the highest.  I can't answer that

13   because I don't -- I don't have the data in

14   front of me.

15        Q.    Okay.  Well, when you worked for

16   the Transit Authority, on a yearly basis, you

17   would look at the data, correct?

18        A.    Correct.

19        Q.    And year by year, did you see

20   that the greatest number of fatalities and

21   catastrophic injuries occurred when there was

22   contact between a train and a human being?

23        A.    Yes.  Correct.

24        Q.    Now, there's different

25   terminology the Transit uses, and I just want

100

1                          Cheryl Kennedy

2      to make sure that we're all on the same page

3      here.  Are you familiar with the initials CWI?

4              A.      Yes, contact with individual.

5              Q.      Okay.  And are you familiar with

6      the initials P, like Peter, TI, Peter, Thomas,

7      indigo?

8              A.      No, not necessarily.  I can't

9      recall it, but say what it is and --

10             Q.      I think it's like a -- I can't

11     remember if it's either platform train

12     intersecting, so to speak, or if it's a --

13     passenger train interface.  My apologies,

14     passenger train interface?

15             A.      I'm not familiar with that

16     acronym.

17             Q.      Okay.  And are you familiar with

18     12-9s, code 12-9s?

19             A.      Yes.

20             Q.      And 12-9 is also contact between

21     a train and a person, correct?

22             A.      Correct.  And it could be on the

23     rail bed or on the platform -- station

24     platform, I'm sorry.

25             Q.      So do you distinguish between CWI

101

1              Cheryl Kennedy

2    and the 12-9 or are they interchange?

3         A.     They're interchangable.

4         Q.     Okay.  So since the greatest

5    number of fatalities and catastrophic injuries

6    in the subway system are caused by these CWI

7    or 12-9s, could we agree that probably the

8    first thing that the Transit would want to

9    alleviate or reduce would be these incidents?

10                MR. KEAVENEY:  Objection.

11        A.     We would want to reduce them, but

12   I wouldn't say that's, you know, the first

13   thing or only thing we would be working on.

14        Q.     Okay.  So in terms of ranking it,

15   what priority do the Transit Authority give to

16   reducing or alleviating these 12-9, CWIs from

17   occurring?

18                MR. KEAVENEY:  Objection.

19        A.     It gave it a, you know, high

20   priority.  We didn't want anyone to get

21   harmed.

22        Q.     Okay.  So I'm just asking in

23   terms of priority, I asked if it was the top

24   priority or the first thing you would --

25        A.     It's not the top -- you know,

102

1                    Cheryl Kennedy

2    there's many, many things that are high

3    priority at the Transit Authority and that was

4    one of them.

5          Q.    Okay.  So in terms of ranking --

6          A.    I can't.

7          Q.    -- what number would you give it

8    when you were the head of office of system

9    safety --

10         A.    I can't answer.

11         Q.    Just let me finish the question,

12   please.

13         A.    Okay.

14         Q.    Because when you interrupt --

15         A.    I'm sorry.  I'm sorry.

16         Q.    It's okay.  So getting back to my

17   question.

18               When you were the head of the

19   office of system safety, did you want to get

20   rid of, either alleviate or reduce, the 12-9s

21   from occurring?

22         A.    I did.

23         Q.    Okay.  And was that your top

24   priority or not?

25         A.    No.

103

1                     Cheryl Kennedy

2        Q.      Okay.  In terms of ranking

3   priority, was alleviating or reducing 12-9s

4   from occurring, two, three, four, or something

5   else?

6                MR. KEAVENEY:  Objection.

7        A.      I didn't prioritize them in that

8   way, so I can't answer that.

9        Q.      Okay.  Did the Transit Authority

10  prioritize the importance of alleviating or

11  reducing 12-9s from occurring?

12       A.      They wanted to reduce them, but

13  to give them a priority level, I can't tell

14  you.  I can't answer that.

15       Q.      Okay.  Well, do we agree that the

16  Transit Authority should have an adequate and

17  proper system safety plan to prevent or reduce

18  the number of these incidents from occurring?

19       A.      No, you wouldn't call that a

20  system safety plan.

21       Q.      Okay.  And we can call it

22  something else if you would like, but do we

23  agree that the Transit Authority should have

24  had, when you were there, an adequate and

25  proper plan that was reasonable to prevent or

104

1                    Cheryl Kennedy

2    reduce the number of these 12-9s from

3    occurring?

4         A.      They should have had methods to

5    reduce that from occurring.

6         Q.      And can we agree that the Transit

7    Authority should have had an adequate,

8    reasonable and proper plan to reduce the

9    severity of 12-9 injuries from occurring;

10   true?

11        A.      You would reduce the overall

12   issue, okay.  I guess yes, there were some --

13   some things that you could do that could

14   reduce the severity, I guess you could say.

15        Q.      All right.  When you worked for

16   the Transit Authority, what was the acceptable

17   or tolerable number of fatalities caused by

18   12-9s?

19        A.      There was none, no acceptable

20   level.

21        Q.      And what was the acceptable or

22   tolerable number of fatalities according to

23   the Transit Authority, because I think you

24   gave me for your opinion, but for --

25        A.      There's not.

105

1                    Cheryl Kennedy

2         Q.      -- the Transit Authority?

3         A.      There's not.

4         Q.      Go ahead.

5         A.      There wouldn't be a tolerable

6    limit, like you wouldn't say, oh, we can have

7    ten and we can five.  You know, there wasn't

8    any -- anything written like that.

9         Q.      So no acceptable number of

10   fatalities or catastrophic injuries; true?

11        A.      Yeah, you wouldn't -- we tried to

12   eliminate or reduce any of them.  I'm not --

13   you know, if you're trying to say that.

14        Q.      All I'm trying to find out is,

15   for example, at any time when you worked for

16   the Transit Authority, whether it be you or

17   somebody else at the Transit Authority did

18   anyone ever say, okay, we can accept or

19   tolerate X number of fatalities per year due

20   to 12-9s?

21        A.      No.

22        Q.      Did anybody, whether you or

23   somebody else at the Transit Authority, while

24   you worked for them, ever say we can accept or

25   tolerate X number of either catastrophic or

106

1                    Cheryl Kennedy

2    serious or major injuries attributable to

3    12-9s?

4            A.      No.

5            Q.      Okay.  Do we agree that it has

6    been -- a known and recurrent problem to you

7    and to the Transit Authority for many, many

8    decades is contact between train and person,

9    12-9 incidents?

10           A.      Yes, many, many years.

11           Q.      Okay.  And that it is a known and

12   recurring problem to both you and the Transit

13   Authority for many, many decades is contact

14   between train and people known as these 12-9s,

15   correct?

16           A.      Many, many years, yes.

17           Q.      And the Transit Authority

18   investigates each and every one of these 12-9

19   incidents; true?

20           A.      Correct.

21           Q.      And the Transit Authority

22   documents each and every one of these 12-9

23   incidents, correct?

24           A.      Correct.

25           Q.      And these investigations reveal

107

1                    Cheryl Kennedy

2    important and significant information; true?

3         A.    Correct.

4         Q.    Okay.  For example, as a result

5    of the investigations for each 12-9 incident

6    that occurs, the Transit Authority can learn

7    in each station by, for example, markers where

8    the incident occurred; true?

9         A.    True.  Yeah, you would find out

10   where the incident occurred in the

11   investigation, yes.

12        Q.    Okay.  And so, for example, you

13   might learn, well, it happens at any -- for

14   any given case, at the beginning of the

15   station, in the middle of the station, at the

16   end of the platform, you know --

17        A.    Correct.

18        Q.    Okay.  And the Transit Authority

19   records all of this information, they document

20   all of this information; true?

21        A.    Correct.

22        Q.    So they collect and document all

23   the information because they use that data,

24   correct?

25        A.    Correct.

108

1                      Cheryl Kennedy

2        Q.      And as a result of collecting and

3   documenting -- withdrawn.

4                Can we agree, in fact, there are

5   requirements to investigate, collect, document

6   and analyze the data; true?

7                MR. KEAVENEY:  Objection.

8        A.      Yeah, you collect -- yes.  Yes.

9        Q.      Okay.  There's federal and state

10  requirements that you do so; true?

11       A.      Correct.  We have to notify the

12  New York State Public Transportation Safety

13  Board, the NTSB, and the FTA, with different

14  information, so yes, with those types of

15  incidents.

16       Q.      Okay.  And as a result of the

17  gathering and documenting these incidents from

18  the investigation, you can learn if there's a

19  particular part of stations with a greater

20  number of 12-9s; true?

21                MR. KEAVENEY:  Objection.

22       A.      Correct.

23       Q.      Okay.  And you can also, from

24  analyzing the data, learn which stations have

25  the greatest number of 12-9s occurring,

109

1                      Cheryl Kennedy

2    correct?

3           A.      Correct.

4           Q.      In other words, you can rank the

5    stations, so to speak; true?

6           A.      You could if it turned out that

7    one was higher than others.

8           Q.      Sure.  So -- and you would also

9    from reviewing the data that you're required

10   to collect and record and document, the time

11   of day and day of week, the time that each of

12   these incidents occur; true?

13          A.      True.

14          Q.      And oftentimes, there are videos

15   that actually depict and show the 12-9

16   occurring; true?

17          A.      True.

18          Q.      So in addition to the regular

19   investigation, you can watch the videos,

20   correct?

21          A.      Yes.

22          Q.      And as a result of the

23   investigation and/or the videos, you would

24   learn whether or not, for example, the

25   platform was crowded at the time the 12-9

110

1                    Cheryl Kennedy

2    occurred or not crowded; true?

3          A.      If there were videos.  There's

4    not always videos.  You know, sometimes there

5    were.

6          Q.      And even if there are no videos

7    as a result of the investigation that is

8    performed, you would know whether or not the

9    12-9 occurred at a crowded platform or an

10   uncrowded platform; true?

11         A.      If they -- yeah, if they gathered

12   that information.

13         Q.      Okay.  And this is the type of

14   information that you would want gathered and

15   collected and recorded; true?

16         A.      True.

17         Q.      Okay.  Because this is all

18   important and significant information; true?

19         A.      True.

20         Q.      Okay.  And that's why the Transit

21   Authority keeps these records and keeps track

22   of all these different 12-9s; true?

23         A.      True.

24         Q.      And how long has the Transit

25   Authority kept track of these 12-9s or CWIs,

111

1                    Cheryl Kennedy

2    how many decades?

3         A.    That, I can't answer.

4         Q.    Okay.  Well, for example, when

5    you first got to the Transit in 1982, they

6    already had been keeping track of these 12-9

7    for years; true?

8         A.    I don't know.

9         Q.    Well, you were in the office of

10   system safety and working specifically with

11   the subway-related issues in 1982, correct?

12        A.    Correct.

13        Q.    Okay.  And, in 1982, that was

14   already a known recurring issue and problem of

15   12-9s occurring resulting in fatalities and

16   catastrophic injuries; true?

17        A.    I don't recall.  That wasn't

18   something that I worked on way back then, so I

19   don't know.

20        Q.    Okay.  So when did you first

21   learn as part of your job involving safety in

22   the subways that the main cause of

23   catastrophic injury or fatality are 12-9

24   incidents?

25        A.    I can't recall that either.

112

                        Cheryl Kennedy

1

2        Q.      All right.  I'm going to try to

3   refresh your memory.

4        A.      That was a long time ago, okay.

5        Q.      Okay.  I'm going to see if we can

6   refresh your memory.

7        A.      Okay.

8        Q.      Okay, but let's just give a

9   second.  So -- okay.  In 1985, you were still

10  working at the Transit Authority on safety,

11  correct?

12       A.      Correct.

13       Q.      And you were doing hazard

14  assessment starting in '86, correct?

15       A.      Correct.

16       Q.      Okay.  So before 1986, were you

17  aware of the number one cause of fatality or

18  catastrophic injuries in the subway system

19  were 12-9 incidents?

20       A.      No.

21       Q.      Okay.  Starting in 1986, did you

22  become aware that the number one cause of

23  fatalities or catastrophic injury in the

24  subway system were 12-9 incidents?

25       A.      I can't recall.

113

1                    Cheryl Kennedy

2          Q.    So when did you first learn that;

3    was that in the 1980s --

4          A.    I can't --

5          Q.    -- 1990s or some other time?

6          A.    I don't know exactly when it was.

7          Q.    I understand you don't know

8    exactly, but can you tell me approximately

9    when you became --

10         A.    No.

11         Q.    -- aware of this?

12         A.    No.

13               MR. GENIS:  Well, let's see,

14         Dave, can you put up the chart?  I think

15         we have one going back to 1987 for 12-9s

16         based on Transit Authority data?  Okay.

17         And we're going to deem this Plaintiff's

18         Number 2 of today's date.  The Bates

19         number looks like it's 743, if I'm

20         reading that accurately.

21               (Plaintiff's Exhibit 2 deemed

22         marked for identification.)

23         Q.    And are you able to see that?  Do

24    we need to make it bigger?

25         A.    Oh, I can see.  It's good.

114

1              Cheryl Kennedy

2          Q.    Okay.  And it starts in 1987 and

3     it goes through 2021.

4          A.    Yeah, you can make it smaller

5     like it was.  Yeah, okay.  Yeah, I see.

6          Q.    So, for example -- and we have on

7     this chart the number of 12-9 incidents and

8     the number of fatalities for any given year as

9     reported by the Transit Authority.  Do you see

10    that?

11         A.    Yes, uh-hum.

12         Q.    So, for example, in 1987, there

13    were 195 12-9 incidents with 62 fatalities;

14    true?

15         A.    True.

16         Q.    Okay.  And if we go to 2021,

17    there were 200 12-9 incidents and about 68

18    fatalities, correct?

19         A.    True.

20         Q.    And when we go through the

21    numbers, we see for many decades, at minimum,

22    there are over 100 incidents per year and as

23    many as 200 12-9s occurring; true?

24         A.    Yes, there's -- yes.  Uh-hum.

25    Yes.

115

Cheryl Kennedy

1

2    Q.    And these numbers have been

3   fairly constant and consistent over the many

4   decades of 12-9s occurring; true?

5           MR. KEAVENEY:  Objection.

6    A.    They vary some, you know,

7   throughout the years.

8    Q.    I understand that there's some

9   variants, but can we agree it's not a

10   significant variant year to year for the

11   number of incidents and fatalities caused by

12   12-9s?

13           MR. KEAVENEY:  Objection.

14    A.    Well, you can see in 2021, there

15   were 200, and in 2007, there was 110, so

16   that's a big difference, but, in general, you

17   -- I mean, you can look at the data, you see

18   it was high, then it went down lower, now it's

19   back up high.  Look at the way the trend is

20   going on the chart.

21    Q.    Okay.  Well, if Thomas --

22   withdrawn.

23    A.    I'm sorry.

24    Q.    Are you familiar with Thomas

25   Prendergast?

116

1                        Cheryl Kennedy

2          A.      Yes.

3          Q.      And he was the president of the

4     Transit Authority at one point, correct?

5          A.      Correct.

6          Q.      And you worked under him,

7     correct?

8          A.      Correct.

9          Q.      And if Mr. Prendergast testified

10    the rate of 12-9s and fatalities have been

11    basically flat over the course of of time for

12    anything significant, would you agree or

13    disagree with that statement?

14                 MR. KEAVENEY:  Objection.

15         A.      Yeah, I'm just saying what I see.

16    Generally, it's very similar, but I'm just

17    saying it goes from, you know, a high of 227

18    to a low of like 109.  It's not --

19         Q.      Okay.  And it never dips below,

20    let's say, 100 or 109 --

21         A.      That's correct.

22         Q.      -- in terms of number of

23    incidents, correct?

24         A.      That's correct.

25         Q.      Okay.  And the lowest number of

117

1                    Cheryl Kennedy

2    fatalities in any year for these recorded ones

3    is a low of -- is it 30?

4          A.    Looks like 25.

5          Q.    25, what year is that?

6          A.    1998.

7          Q.    Yes, a low of 25 with 150

8    incidents, correct?

9          A.    Correct.

10         Q.    Okay.  Can we agree that the risk

11   of death or catastrophic injury caused by

12   these 12-9s, CWI, whatever you want to call

13   it, is essentially the same from when you

14   first came to the Transit Authority until the

15   time you left?

16         A.    Yes, it's very similar.

17         Q.    Okay.  Now, you've reviewed data

18   from before you got there, when you first

19   started to work on hazard analysis, correct?

20               MR. KEAVENEY:  Objection.

21         A.    I reviewed a lot of data, not

22   necessarily, you know, for one thing.

23         Q.    Okay.  We're going to get into

24   what data you reviewed in a minute, but is --

25   the risk of death or catastrophic injury

118

1                    Cheryl Kennedy

2    caused by CWI or 12-9, is the risk the same

3    now as it was when the Transit Authority first

4    started keeping these records?

5          A.      Similar, yes.

6          Q.      Okay.  And is the risk of death

7    or catastrophic injury caused by 12-9s or CWIs

8    the same from when the Transit Authority

9    started keeping these records until the time

10   you left?

11         A.      Similar, yes.

12         Q.      And, if anything, the numbers

13   seem to have trended upwards over the past

14   number of years; true?  In other words, you

15   noted, for example, from 2007 to 2021, the

16   numbers have trended upwards throughout that

17   time period; true?

18         A.      From two thousand what?  I'm

19   sorry, what did you say, two thousand when?

20         Q.      2007 --

21         A.      2007 --

22         Q.      -- to 2021, the numbers have

23   trended upwards for 12-9s, correct?

24         A.      Correct.

25         Q.      Okay.  And do we agree that this

119

1                      Cheryl Kennedy

2      known and recurrent problem to both you and

3      the Transit Authority for many, many decades

4      of contact between trains and persons has

5      resulted in hundreds, if not thousands, of

6      fatalities; true?

7            A.      That's what it says, 1,684.

8            Q.      Okay.  And that this known and

9      recurrent problem to both you and the Transit

10     Authority for many, many decades about contact

11     between trains and persons has resulted in

12     hundreds, if not thousands, of catastrophic or

13     major injuries; true?

14                  MR. KEAVENEY:  Objection.

15           A.      True.

16           Q.      I didn't hear you.  Did you

17     answer?

18           A.      Yes, true, according to what you

19     are showing us here.

20           Q.      Okay.  Thank you.

21           A.      Uh-hum.

22           Q.      So there are literally thousands

23     of people that have suffered brain injuries or

24     amputations as a result of these 12-9s, these

25     contact between trains and people; true?

120

1              Cheryl Kennedy

2              MR. KEAVENEY:  Objection.

3         A.    I can't answer that.

4         Q.    Okay.  Has the Transit Authority

5    ever looked at how many limbs have been lost

6    as a result of these 12-9s?

7         A.    No, not -- not to my knowledge,

8    anyway.

9         Q.    Did you ever keep track of how

10   many limbs were lost as a result of these

11   12-9s?

12        A.    No.

13        Q.    Now, do we agree because of these

14   thousands of people being either killed or

15   catastrophically injured as a result of 12-9

16   incidents, that this is carnage?

17             MR. KEAVENEY:  Objection.

18        A.    I'm not going to answer that.

19   What do you mean?  I -- it's significant.

20   It's -- you can see 1,684 fatalities.

21        Q.    Well, if Mr. Prendergast

22   described it as carnage, would you agree or

23   disagree with that statement?

24        A.    I don't know what he said, but

25   I'm saying that it is significant if he has

121

1                    Cheryl Kennedy

2    1,684 fatalities.

3          Q.    Okay if Prendergast described

4    that as insane, would you agree or disagree

5    with that?

6          A.    I don't know what he said.  I'm

7    just telling you what I see, that it is

8    significant.

9          Q.    Okay.  And do you know who John

10   Samuelsen is or was?

11         A.    Yes.

12         Q.    He was president of the Transit

13   Workers Union?

14         A.    Yes.

15         Q.    And Mr. Samuelsen described this

16   as carnage, correct?

17               MR. KEAVENEY:  Objection.

18         A.    I don't know.

19         Q.    Well, did you ever receive an

20   e-mail with a letter by Mr. Samuelsen about

21   these 12-9 incidents?

22         A.    I can't recall.  Maybe.  You

23   know, I can't recall.

24         Q.    Well, did you ever work on a

25   response to that letter by Mr. Samuelsen?

122

1                    Cheryl Kennedy

2        A.     I can't recall.

3               MR. KEAVENEY:  Objection.

4        Q.     All right.  Let's keep going.

5               Do we agree that the Transit

6    Authority has the highest numbers in the world

7    of numbers of fatalities and catastrophic or

8    major injuries due to contact between trains

9    and people?

10              MR. KEAVENEY:  Objection.

11       A.     I can't recall.

12       Q.     Okay.  Well, can you tell us what

13   city in the world has a higher number of

14   fatalities or catastrophic or major injuries

15   due to contact between trains and people?

16              MR. KEAVENEY:  Objection.

17       A.     No, I can't answer that.

18       Q.     All right.  And even if you can't

19   remember if New York is number one, do you

20   agree it's one of the tops in the world for

21   any major agency for the number of fatalities

22   or catastrophic injuries due to contact

23   between trains and people?

24              MR. KEAVENEY:  Objection.

25       A.     I can't -- you know, I don't have

123

1                    Cheryl Kennedy

2    that information in front of me.  I don't

3    know.

4         Q.     Okay.  Well, was that of interest

5    to you when you worked through -- worked for

6    the Transit Authority?

7                    MR. KEAVENEY:  Objection.

8         A.     Would be, yeah, but I don't have,

9    you know -- I don't remember all of it, so I

10   can't recall.

11        Q.     Well, you know, something like

12   being -- leading the world in number of

13   fatalities or catastrophic injuries as a

14   result of 12-9s, is that the kind of thing

15   that would be memorable?

16                   MR. KEAVENEY:  Objection.

17        A.     You know, if you have that

18   information, you know, I - I don't have -- I

19   don't have that information.  I know we

20   reported this information to the National

21   Transit Database, but you could not pull out

22   what different properties, what the causes

23   were.  It would list fatalities, but you

24   couldn't identify the causes, but maybe they

25   made changes to that, but I don't know.

124

1                    Cheryl Kennedy

2    MO    Q.    Well, we're going to get to that

3    in a moment.  Right now -- and I move to

4    strike.  We're discussing right now solely the

5    number of incidents that occur, okay, just the

6    number of 12-9s and the number of fatalities.

7    So --

8              A.    It's a high number.

9                    MR. GENIS:  Dave, can you please

10          put on the screen, it was, I believe,

11          Plaintiff's Number 2 at

12          Mr. Prendergast's deposition?  It's

13          Bates 9548.

14              Q.    This is a two-page document.  I'm

15    going to -- he's going to scroll down.  Tell

16    us if he's going too fast or if you need to

17    see anything again.

18              A.    Yeah, if you can go back to the

19    top.  Okay.

20              Q.    All right.  So you see now what

21    we previously marked for identification --

22              A.    Hold on.

23              Q.    Go ahead.

24              A.    Let me look at it.

25              Q.    That's okay.  I thought you were

125

1                    Cheryl Kennedy

2    done, my apologies.

3          A.    Okay.

4          Q.    Okay.  So you've looked now --

5          A.    Yeah.

6               MR. GENIS:  Just to make life

7          simple, we're going to make it

8          Plaintiff's Exhibit Number 3 of today's

9          date, okay.  So we're now deeming this

10          marked Plaintiff's Exhibit 3 of today's

11          date, and again, it's Bates 9548, two

12          pages.

13               (Plaintiff's Exhibit 3 deemed

14          marked for identification.)

15          Q.    Now, it's entitled Hazard

16    Mitigation Form, correct?

17          A.    Yes.

18          Q.    And this is a preprinted form

19    from the New York City Transit Authority,

20    correct?

21          A.    Right.  It's for the Flushing

22    CBTC Project.

23          Q.    Okay.  And -- but this is a form

24    that is not only for particular project, it

25    may have been used in this particular case for

126

1                    Cheryl Kennedy

2     this project; true?

3         A.    True, it's used for projects like

4     that.

5         Q.    Okay.  And -- let's just back up.

6               This is a form created, kept and

7     maintained by the Transit Authority in the

8     regular course of its business; true or false?

9         A.    True, for specific projects.

10        Q.    Okay.  And -- by the way, does it

11    indicate anywhere on this document that this

12    form should only be used for specific

13    projects?

14        A.    No.

15        Q.    Thank you.  Now, this form asks

16    for information that then gets filled in,

17    correct?

18        A.    Correct.

19        Q.    Okay.  So, for example, on the

20    upper right in the preprinted form, bold face,

21    is general hazard, and then they write in the

22    answer for that, correct?

23        A.    Yes.

24        Q.    And they wrote in, undetected

25    obstruction on track, correct?

127

1                    Cheryl Kennedy

2         A.      Right.

3         Q.      And then it lists IEE 1474.1,

4    hazard type, correct?  Do you see that on the

5    left?

6         A.      I'm sorry, point -- Oh, okay.

7    Yes.  Okay.

8         Q.      Okay.  And that IEE is referring

9    to some international standard; true?

10        A.      Yes.

11        Q.      And is that an international

12   standard that you recognize as authoritative

13   as well?

14        A.      Yes.

15        Q.      Okay.  And that's a standard that

16   the Transit Authority incorporates, uses, and

17   adopts, correct?

18        A.      Correct.  This is for projects

19   such as that CBTC, they -- this hazard

20   mitigation form, so that we made sure when we

21   were implementing a new project that all the

22   hazards are taken care of.

23   MO             MR. GENIS:  I just move to

24        strike --

25        A.      Identify and address --

128

1              Cheryl Kennedy

2    MO         MR. GENIS:  I just move to strike

3         all those portions that are

4         nonresponsive, which was pretty much

5         everything after you said yes, that you

6         acknowledge this as being authoritative.

7         Q.    Now, when we look at the hazard

8    type on Plaintiff's Exhibit 3, on that one,

9    they checked off the box for G, correct?

10        A.    Correct.

11        Q.    And that says, hazards associated

12   with collisions with objects on the track,

13   correct?

14        A.    Correct.

15        Q.    And then they say specific

16   description of hazard on the preprinted form,

17   correct?

18        A.    Correct.

19        Q.    By the way, do you know what the

20   IEE stands for?

21        A.    Not off the top of my head right

22   now.

23        Q.    Okay.  And getting back to the

24   specific description of hazard.  It states,

25   insufficient protection for person on

129

1                      Cheryl Kennedy

2    platform, correct?

3            A.     Correct.

4            Q.     Okay.  Then it has following

5    action has been identified to mitigate hazard;

6    that's on the preprinted form, correct?

7            A.     Yes.

8            Q.     And then they write in the

9    answer --

10           A.     Uh-hum.

11           Q.     -- and they say, HL Control

12   Measure EXP014, then there's a number 1.  Do

13   you see that?

14           A.     Yes.

15           Q.     It says, Railway authority shall

16   have the responsibility to have protection

17   measures in place to prevent persons from

18   approaching the platform edge when there is no

19   train aligned (e.g. clear indication of

20   platform edge, warning signs, et cetera).  Did

21   I read that accurately?

22           A.     Yes.

23           Q.     And then for the second thing, it

24   says, HL Control Measure EXP014, and number 2,

25   correct?

130

1                    Cheryl Kennedy

2          A.      Correct.

3          Q.      Operating procedures shall

4    specify the requirements to limit train

5    movement into a platform where a person has

6    fallen onto the tracks, correct?

7          A.      Correct.

8          Q.      What does HL Control Measure with

9    the EXP014 stand for?

10         A.      I don't recall.

11         Q.      Okay.

12         A.      It's a numbering system for

13   the --

14         Q.      Okay.  And then it states, action

15   required, on the preprinted form, correct?

16         A.      Correct.

17         Q.      And what's written in is

18   Reference measures to prevent persons from

19   approach platform edge and accidentally

20   falling onto tracks; true?

21         A.      True.

22         Q.      So the Transit Authority

23   identified as a known hazard type where there

24   are no protective measures in place to prevent

25   persons from approaching the platform edge

131

1                    Cheryl Kennedy

2    when there is no train aligned, correct?

3         A.    Correct.

4         Q.    Okay.  Now, do we agree that

5    hazard analysis is important?

6         A.    Yes.

7         Q.    It's very important for safety,

8    correct?

9         A.    Correct.

10        Q.    And do we agree that part of

11   hazard analysis is performing a root cause

12   analysis?

13        A.    Root cause is usually done as

14   part of, you know, an accident investigation.

15   There are usually many causes associated with

16   a hazard.

17        Q.    Okay.  Well, let's discuss

18   further.  Do we agree in order to conduct a

19   proper root cause analysis, you have to see

20   what the common denominator is for the root

21   cause; true?

22        A.    I can't answer that yes or no.

23        Q.    All right.  Well, let's see if I

24   can help you this way.  There are a number of

25   different types of 12-9 incidents, correct?

132

1                    Cheryl Kennedy

2         A.      Correct.

3         Q.      So, for example, a person can

4    fall, okay, onto the tracks because of an

5    unsafe condition of the platform; true?

6         A.      True.

7         Q.      Okay.  And a person can become

8    ill, have a medical condition and faint and

9    fall onto the tracks, correct?

10        A.      True.

11        Q.      A person can get pushed onto the

12   tracks, correct?

13        A.      True.

14        Q.      A person can jump onto the

15   tracks, correct?

16        A.      Correct.

17        Q.      And so whether somebody falls, is

18   sick, gets pushed or jumps, the common

19   denominator is that their body had contact

20   with a train, correct?

21        A.      Okay.  Correct.

22        Q.      And they can even be -- whether

23   they fall off of the platform onto the tracks

24   or even stand on the edge of the platform,

25   either way, there can be contact between their

133

1                    Cheryl Kennedy

2    body and the train; true?

3         A.    True.  The common denominator is

4    they're too close to the platform edge.

5    MO            MR. GENIS:  Well, just move to

6            strike as nonresponsive.  That wasn't my

7            question.

8         Q.    But can we agree that the common

9    denominator is that there is nothing

10   preventing them from landing or falling onto

11   the track bed, for one; true?

12                MR. KEAVENEY:  Objection.

13        Q.    Yes?

14        A.    That's one thing, but --

15        Q.    Thank you.  Thank you.  And

16   another thing is there's nothing preventing

17   them, even when they're on the edge of the

18   platform, from having contact with the train;

19   true?  True or false?

20        A.    True.

21        Q.    Okay.  So -- so access to the

22   tracks is the common denominator that allows

23   the person to have contact with the train,

24   correct?

25                MR. KEAVENEY:  Objection.

134

Cheryl Kennedy

1    A.    They're too close to the platform

2    edge as well.  If they weren't close --

3    Q.    So there could be more than one

4    cause, I get that.  So --

5    A.    Okay.  If they weren't that close

6    to the platform edge, they wouldn't be on the

7    track.

8    Q.    Okay.  So let's back up, okay,

9    because we can have circular logic here, which

10   I don't think --

11   A.    Okay.

12   Q.    -- is productive, so let's back

13   up.

14   A.    Okay.

15   Q.    If there is no barrier to prevent

16   a person from having contact with the train,

17   that person can have contact with the train;

18   true or false?

19   A.    True.

20   Q.    Okay.  So we have different

21   causes for people falling onto the tracks or

22   having contact with the train, correct?

23   A.    Correct.

24   Q.    But the common denominator or

135

1                       Cheryl Kennedy

2    root cause for all of these different causes

3    of 12-9s is that there is no barrier

4    preventing them from having contact with the

5    train; true or false?

6                 MR. KEAVENEY:  Objection.

7         A.     False.

8         Q.     Okay.  So when you look at that

9    Plaintiff's Exhibit 3 today, the hazard

10   mitigation form --

11        A.     Can you move the form up a little

12   on my thing?  Thank you.

13        Q.     Okay.

14        A.     Uh-hum.

15        Q.     So when it's stated that

16   insufficient protection for person on platform

17   and the railway authority shall have the

18   responsibility to have protection measures in

19   place to prevent persons from approaching the

20   platform edge when there is no train aligned,

21   and it talks about action required, reference

22   measures to prevent persons from approach

23   platform edge and accidentally falling onto

24   the tracks, did you agree or disagree with

25   those statements?

136

1                         Cheryl Kennedy

2                    MR. KEAVENEY:  Objection.

3           A.     There's too many things in there.

4    I mean, they list right there what the

5    mitigations are; look at it.

6           Q.     I understand, ma'am.

7    MO              MR. GENIS: Just move to strike.

8           Q.     Can you please answer my

9    question?

10          A.     Say it again.

11          Q.     Do you agree or disagree with

12   those statements made by the Transit Authority

13   in Plaintiff's Number 3 that I just read to

14   you?

15          A.     I can't answer that yes or no.

16          Q.     Okay.  Well, did anybody make

17   false statements in this document --

18                 MR. KEAVENEY:  Objection.

19          Q.     -- to your knowledge?

20          A.     Not to my knowledge.

21          Q.     Okay.  Do we agree that a common

22   denominator does not mean it's the only common

23   denominator or the only denominator; true?

24          A.     True.

25          Q.     Like you've seen those Venn

137

1                     Cheryl Kennedy

2    diagrams; true?

3         A.     True.

4         Q.     And that's where you have the

5    different circles and you see where they all

6    intersect, correct?

7         A.     Correct.

8         Q.     And you see what's in the middle,

9    that's what's common to all of them, correct?

10        A.     Okay.

11        Q.     So the one common fact in every

12   12-9 is that there is no barrier preventing

13   contact between the person and the train; true

14   or false?

15             MR. KEAVENEY:  Objection.

16        A.     That's false.  That's not the

17   only common fact.  Every single one of them,

18   they're too close to the platform edge.

19        Q.     Well, let me ask you --

20        A.     Most of them get dragged --

21   dragged from one end of the platform to the,

22   you know, from pushed on the tracks from far

23   away, that's the only one.

24        Q.     So people can get pushed away

25   from far away from the tracks and have contact

138

1                    Cheryl Kennedy

2    with the train; true?

3           A.     That's true.

4           Q.     Okay.  So getting back to it now,

5    since you've conceded that fact.  Do we agree

6    that if there is a barrier so that people

7    cannot have contact with the train, that would

8    prevent 12-9s from occurring?

9           A.     No, I don't agree.

10          Q.     All right.  Now, let's discuss

11   other things since you don't agree with that.

12                 Do we agree that these 12-9s,

13   these contact with individual from a train, is

14   a known safety hazard in the industry of mass

15   transit for over 100 years?

16          A.     I don't know how many years.

17          Q.     Okay.  How long do you think?

18          A.     I don't know.

19          Q.     Okay.  Well, the transit subway

20   system got built in what, 1904?

21          A.     Yes, that's ours, but you said

22   all over, so I don't know.

23          Q.     All right.  Well, how much

24   earlier in either Paris or London have subway

25   systems?

139

1                    Cheryl Kennedy

2        A.    I don't know what their systems

3   have, so, you know, I don't -- I can't answer

4   that question that you asked.

5        Q.    That's fine.  By the way, are you

6   familiar with the train to the plane to JFK?

7        A.    Yes.

8        Q.    And they have barriers there to

9   prevent people from having contact with the

10  train or the tracks, correct?

11       A.    Right --

12             MR. KEAVENEY:  Objection.

13       A.    -- that was built that way.

14       Q.    Okay.  Thank you.  So the answer

15  was yes to my question, though, right?

16       A.    Yes.

17       Q.    Okay.  Remember you promised me

18  you're going to give yes or no to yes-or-no

19  questions?

20       A.    I did.

21       Q.    Thank you.  Thank you.  Now, so

22  how many 12-9s have occurred at JFK at that

23  train where they have those barriers

24  installed?

25       A.    I don't know.

140

1                    Cheryl Kennedy

2          Q.     Have you heard of a single one?

3          A.     I don't know.

4          Q.     Okay.  Well, you've studied this.

5    Have you learned of a single, in your studies,

6    of a single 12-9 occurring at JFK?

7          A.     I can't recall.

8          Q.     Okay.  It certainly would be

9    memorable if you ever learned of one, correct?

10                 MR. KEAVENEY:  Objection.

11         A.     I just can't recall.

12         Q.     All right.  Now, there are

13   international professional trade industry

14   groups or associations; true?

15         A.     True.

16         Q.     Okay.  And there are

17   international professional trade industry

18   associations groups for mass transit like New

19   York City subway system, correct?

20         A.     True.

21         Q.     Okay.  And the Transit Authority

22   belongs to some of these international

23   professional trade industry groups or

24   associations; true?

25         A.     True.

141

1                          Cheryl Kennedy

2          Q.     Have you ever been a member of

3    any of these international professional trade

4    industry groups?

5          A.     As part of the Transit Authority,

6    yes.

7          Q.     Okay.  Is one of these

8    international professional trade industry

9    groups or associations known as COMET,

10   C-O-M-E-T?

11         Q.     What are the other ones that you

12   can think of?

13         A.     APTA.

14         Q.     That's for America, correct?

15         A.     Correct.

16         Q.     Okay.  So what other -- other

17   than COMET, the Community of Metros, what are

18   the other international professional trade

19   industry groups?

20         A.     I don't recall any.

21         Q.     Have you ever heard of UITP?

22         A.     Yes.

23         Q.     Okay.  And that's an

24   international professional trade group; true?

25         A.     Yes.

142

1                      Cheryl Kennedy

2          Q.      Okay.  And have you heard of

3    NOVA?

4          A.      No, I can't say I have heard

5    that.

6          Q.      Okay.  All right.  Can we agree

7    that -- and, by the way, the Transit Authority

8    belonged to both COMET and UITP, correct?

9          A.      Correct.

10         Q.      And did you also belong, through

11   the Transit Authority, to COMET and UITP?

12         A.      As part of the Transit Authority.

13         Q.      Okay.  And can we agree that

14   COMET is the premier international

15   professional trade industry group for mass

16   transit that includes subways?

17         A.      Yes, that's a good one.

18         Q.      Okay.  And is UITP another

19   premier international professional trade

20   industry group?

21         A.      Yes.

22         Q.      And do you agree that the Transit

23   Authority gives data to COMET, correct?

24         A.      Correct.

25         Q.      And do you agree with respect to

143

1           Cheryl Kennedy

2   industry standards and practices in the field

3   of mass transit for subway stations, COMET is

4   an authority?

5               MR. KEAVENEY:  Objection.

6       A.      An authority, what do you mean by

7   authority?

8       Q.      Okay.  I'm glad you asked me that

9   question.  Let's find my definitions here.

10      A.      They know about all different

11  transit properties, so they're a very good

12  source of information.

13      Q.      Okay.  I'm just trying to find my

14  notes.  Do we agree that according to

15  Dictionary.com, there are definitions of the

16  word authoritative and authority?

17      A.      Yes.

18      Q.      Let's talk about authoritative,

19  okay?  First of all, to make life simple, do

20  you acknowledge the publications of COMET as

21  being authoritative?

22      A.      Yes, they're authority.  They're

23  authority on other properties all over the

24  world.

25      Q.      Okay.  Thank you.  You just saved

144

1                    Cheryl Kennedy

2    me some time.

3            A.    Okay.  See.

4            Q.    Okay.  And COMET being an

5    authority and publishing authoritative

6    documents, do we agree that one of their goals

7    or missions is to help cities have safer and

8    better mass transit subway systems?

9            A.    Agree.

10           Q.    And do you agree that COMET

11   performs studies and does research and

12   publishes its findings?

13           A.    Yes.

14           Q.    And UITP also performs studies

15   and does research and publishes its findings,

16   correct?

17           A.    Correct.

18           Q.    And UITP is also an authority in

19   this field, correct?

20           A.    Correct.

21           Q.    And they also publish their

22   studies and research and findings, correct?

23           A.    Correct.

24           Q.    And the publications of UITP are

25   also authoritative, correct?

145

1                    Cheryl Kennedy

2        A.      Correct.

3        Q.      And COMET has studied and

4   researched the challenges to prevent or

5   mitigate to reduce number of these CWI or 12-9

6   incidents; true?

7        A.      I don't recall the document, but

8   it could have.  Go ahead.

9        Q.      All right.  And UITP has also

10  studied and researched the challenges to

11  prevent and reduce these incidents and has

12  published them, correct?

13       A.      I don't recall.

14       Q.      Okay.  Do you have any reason to

15  doubt the accuracy of the information that

16  COMET provides?

17       A.      No.

18       Q.      Do you have any reason to doubt

19  the accuracy of information provided by UITP?

20       A.      No.

21              MR. GENIS:  All right.  Why don't

22         we take a break for lunch now.  It's

23         12:47.  We've been going for a while

24         now, and we will take a lunch break.

25         How long would people like for lunch?

146

1                    Cheryl Kennedy

2          And you can stop the recording.

3                    (Luncheon recess taken from

4          12:47 p.m. to 1:21 p.m.)

5     BY MR. GENIS:

6          Q.    We were discussing COMET and UITP

7     and how they perform studies and do research

8     and publish their findings.  Do we agree that

9     COMET has studied and researched the

10    challenges to prevent or mitigate and reduce

11    the number of CWI or 12-9 incidents?

12         A.    I don't recall.

13         Q.    Okay.  Well, has COMET studied,

14    researched and published the various ways of

15    preventing or mitigating, reducing the number

16    of 12-9 or CWI incidents?

17         A.    I don't recall.

18         Q.    COMET has studied, researched and

19    published what methods are the most effective

20    at preventing or mitigating, reducing the

21    12-9s, CWI incidents; true?

22         A.    I don't recall.

23         Q.    Well, you do recall that COMET

24    published certain international standards and

25    best practices and good and accepted practices

147

1                        Cheryl Kennedy

2      and procedures; true?

3              A.      For this topic or for any?  They

4      do, yes, true.

5              Q.      All right.  Now -- by the way,

6      what is benchmarking?

7              A.      Seeing what other properties do

8      and comparing yourself with others.

9              Q.      What's the performance of

10     benchmarking?

11             A.      To see if you have an area that

12     is a significant area that another property

13     might not have or might have addressed.  You

14     know, you can benchmark against properties for

15     specific things if you want to.

16             Q.      So, in other words, if you want

17     to see what the benchmarks are for safety and

18     how to prevent certain types of catastrophic

19     or serious injuries, you can do so; true?

20             A.      Yes.

21             Q.      Okay.  And it's a good and

22     accepted practice and procedure to do so;

23     true?

24             A.      True.

25             Q.      It complies with professional

148

1                    Cheryl Kennedy

2    standards of care to do so; true?

3                    MR. KEAVENEY:  Objection.

4         A.    I don't know what -- I can't

5    answer yes or no on that.

6         Q.    Okay.  So do you think it would

7    violate professional standards of care to look

8    at benchmarks for safety for other systems?

9                    MR. KEAVENEY:  Objection.

10        A.    Violate standards to look at it?

11        Q.    Yes.

12        A.    I wouldn't think so.

13        Q.    Okay.  So if it does not violate

14   standards to look at published international

15   benchmarks, can we agree it would comply with

16   professional standards of care to do so and to

17   look at these?

18                   MR. KEAVENEY:  Objection.

19        A.    I don't know what standards of

20   care you're talking about, so I can't answer

21   that question.

22        Q.    Okay.  Well, let's look at it

23   this way, see if I can help you.  When you

24   were at the Transit Authority, did you tell

25   anyone whatever you do, do not look at

149

1                       Cheryl Kennedy

2    international benchmarks?

3         A.    No.

4         Q.    When you were at the Transit

5    Authority, did anyone at the Transit Authority

6    say to you, whatever you do, don't look at

7    best practices or international benchmarks?

8         A.    No.

9         Q.    Were you encouraged to see

10   internationally what other subway systems were

11   doing and what their benchmarks and best

12   practices were?

13        A.    Yes.

14        Q.    In fact, the Transit Authority

15   sent people all over the world to see what

16   other countries were doing; true?

17        A.    Correct.

18        Q.    The Transit Authority sent people

19   to Seoul, Korea; true?

20        A.    True.

21        Q.    Sao Paulo in Brazil, correct?

22        A.    I don't recall that one, but --

23        Q.    Okay.

24        A.    Okay.

25        Q.    To Paris and London and other

150

1                        Cheryl Kennedy

2    cities; true?

3           A.      Yes.

4           Q.      Okay.  And an important thing to

5    look at are key performance indicators, KPI,

6    correct?

7           A.      Yes.

8           Q.      And another thing to look at are

9    safety performance indicators, SPI, correct?

10          A.      Correct.

11          Q.      Okay.  And while you were at the

12   Transit, you would be asked to collect data,

13   evaluate that data and study that data,

14   correct?

15          A.      Correct.

16          Q.      And you would evaluate risks and

17   hazards and give that information to the

18   president and other decision-makers at Transit

19   about safety issues; true?

20          A.      True.

21          Q.      And that information would be

22   documented by your office and other agencies

23   within the Transit Authority about what was

24   causing injuries, the frequency of the

25   injuries, the probabilities of the injuries,

151

1                    Cheryl Kennedy

2    the severity of the injuries so that you could

3    figure out the cause and how to mitigate the

4    frequency and severity of the injuries in the

5    future; true?

6                    MR. KEAVENEY:  Objection.

7         A.      Yes, for various things.

8         Q.      Okay.  And you told us how COMET

9    would ask for safety performance indicators

10   and you would provide that information to

11   them; true?

12                   MR. KEAVENEY:  Objection.

13        A.      I don't know what they asked for.

14   I don't recall what they asked for.

15        Q.      Well, COMET would send out

16   questionnaires to different transit agencies,

17   and the New York City Transit would routinely

18   fill them out and then give them to COMET and

19   then receive the results of the COMET studies,

20   correct?

21        A.      True.  Yes.

22        Q.      So you would participate so that

23   COMET could conduct an adequate study of the

24   various metro systems and give feedback on

25   best practices, what safety issues each system

152

1                    Cheryl Kennedy

2      was having and why, correct?

3                    MR. KEAVENEY:  Objection.

4           A.       Correct.

5           Q.       Okay.  And do we agree that COMET

6      found that platform screen doors are effective

7      at preventing 12-9s?

8           A.       I don't recall.  I'd have to look

9      at the document.

10          Q.       Okay.  So -- well, let's back up

11     before we start getting into documents.

12                   If there was a device that could

13     prevent thousands of people from being killed

14     or having catastrophic injuries, would it

15     comply with good and accepted practices and

16     procedures for the Transit Authority to obtain

17     and utilize such a device?

18                   MR. KEAVENEY:  Objection.

19          A.       You'd have to study that --

20     systematically study that device and see

21     whether or not it could be used.

22          Q.       Okay.  Now, when you say study

23     that device and see if it could be used, let's

24     back up a second.  You told us earlier how

25     COMET studies these things, correct?

153

1              Cheryl Kennedy

2              MR. KEAVENEY:  Objection.

3      A.      You did.

4      Q.      Okay.

5      A.      Yes.

6      Q.      And you agreed with me?

7      A.      And I said yes, okay.  Yes.

8      Q.      So since COMET -- and let's back

9   up.  That the -- that there have been studies

10  done -- withdrawn.  I'm sorry.  Let's be

11  coherent.

12              There have been platform screen

13  doors in use for different systems for decades

14  now, correct?

15      A.      Correct.

16      Q.      Okay.  And there have been

17  studies about the effectiveness of these

18  platform screen doors, correct?

19              MR. KEAVENEY:  Objection.

20      A.      I'd have to look at the studies

21  to see what ones are what --

22      Q.      I'm not asking you what any given

23  study actually said, but I'm asking you if

24  you're aware that there have been such

25  studies?

154

                    Cheryl Kennedy

1

2        A.      There's studies -- I -- I don't
3   recall.

4        Q.      So now -- let's back up because
5   now you're confusing me.  Can we agree when
6   you were in the office of system safety, you
7   told us one of the biggest concerns you had
8   was trying to prevent or reduce 12-9s from
9   occurring; true?

10       A.      I said that was one of my
11  concerns.

12       Q.      Okay.  And was it one of your top
13  concerns?

14       A.      It was one of my concerns.  There
15  were many top concerns.

16       Q.      Okay.  Was it one of your top
17  three concerns, preventing people from being
18  killed and catastrophically injured from
19  12-9s?

20              MR. KEAVENEY:  Objection.

21       A.      It's one of my concerns.  I've
22  answered that numerous times.

23       Q.      Well, actually, we talked before
24  about the Transit.  I didn't ask about you,
25  but now we're asking about you --

155

1                         Cheryl Kennedy

2          A.      Okay.

3          Q.      -- so let's get --

4          A.      That was one --

5          Q.      Let me ask the question.

6          A.      Okay.

7          Q.      So yes, was preventing or
8   reducing, mitigating 12-9s from occurring,
9   either in frequency or severity of injury one
10  of your top three concerns when you were in
11  Transit?

12         A.      I wouldn't say it was one of my
13  top three concerns.  There were so many
14  concerns that rated very high and it was a
15  high one.  You know, I can say that --

16         Q.      Okay.

17         A.      -- but there were many concerns
18  that were high.

19         Q.      Okay.  So was preventing or
20  mitigating 12-9s from occurring in your top 10
21  of priorities?

22         A.      Yes.

23         Q.      So was preventing and reducing
24  12-9s from occurring somewhere between 5 and
25  10?

156

1                    Cheryl Kennedy

2        A.     I don't know.  I mean, I'm not

3    ranking them.  I'm just saying that I had many

4    concerns and there were a lot of things going

5    on at New York City Transit.  There were a lot

6    of safety-related issues that were -- needed

7    to be dealt with and that was one.

8        Q.     Well, when we looked at that risk

9    matrix, we saw 1A, right, was people getting

10   hit by trains --

11       A.     Right.

12       Q.     -- with frequency and severity?

13       A.     And you want to make sure that --

14       Q.     Can I finish my question, please?

15   Thank you.  I appreciate that courtesy.

16             So wouldn't that be the top of

17   your list of things that are of high priority?

18       A.     It was a high priority along with

19   many other things.

20       Q.     Okay.  Well, what's more

21   important than saving lives and limb; what's

22   more important than that?

23       A.     Well, there were many other

24   things that we were saving lives and limbs

25   doing.

157

Cheryl Kennedy

1

2      Q.      Okay.  So other than people

3  getting hit by trains, what was the next

4  leading cause of fatality and catastrophic

5  injury?

6      A.      You're -- you're trying -- I'm

7  not answering yes or no whatever.  There were

8  many, many --

9      Q.      I'm asking you to fill in the

10  blank.  Just tell me, what was the next

11  highest cause of fatalities and catastrophic

12  injury after 12-9s incidents?

13      A.      There were many.

14      Q.      Like what?

15      A.      We were concerned with

16  derailments, with collisions, with bus

17  accidents --

18      Q.      Okay.  Right now we're talking

19  about subway.

20      A.      -- accidents regarding on the bus

21  side.

22      Q.      But, again, you're back to buses.

23  We're only talking about subways today.

24      A.      It doesn't matter.  They were all

25  under my scope, so there were many things, but

158

                        Cheryl Kennedy

1

2   any big track-related conditions that could

3   result in a derailment or signal conditions

4   that could result in a collision between --

5          Q.      Understand.

6          A.      Those are very high.

7          Q.      Okay.

8          A.      Okay.  And this -- what you're

9   talking about is high as well.  That's all I'm

10  saying.

11         Q.      Okay.  Good.  So --

12         A.      Okay.

13         Q.      -- I'm appreciable of the answer

14  you gave me because it gives me a lot of

15  follow-up now.

16                 So how often were there

17  derailments while you were at the Transit

18  Authority?

19         A.      At the end, it was very few.

20         Q.      Okay.  So during the whole time,

21  how many derailments were there?

22         A.      In the '80s, there was probably

23  like 20 or more, and by the time that I left,

24  there might be one, and there might be less

25  than that over the years.  So there was many

159

                          Cheryl Kennedy

1

2    things that were done in order to reduce

3    those.

4    MO    Q.    Excellent.  So let's get back

5    to -- even though actually wasn't any part of

6    my question, but that's okay, I'm just going

7    to move to strike again.

8              A.    Okay.

9              Q.    As I said, when you volunteer

10   information, just -- I want to give you

11   another instruction.  When you are

12   nonresponsive to a question and volunteer

13   information that I didn't ask for, you do

14   understand that a jury might view you as being

15   evasive, right; you do get that?

16              MR. KEAVENEY:  Objection.

17              A.    No, I'm answering your questions.

18              Q.    Okay, but when you're not

19   answering the questions directly, like you

20   just did now, you do understand that a jury

21   might view you as evasive; true?

22              MR. KEAVENEY:  Objection.

23              A.    No, I don't understand that.

24              Q.    Okay.  You do understand that

25   when you're not responsive to a question, that

160

                    Cheryl Kennedy

1

2    might cast doubt about your credibility and

3    reliability.  Do you understand that?

4                    MR. KEAVENEY:  Objection.

5         A.     I'm answering -- no, I'm

6    answering you to the best of my ability and

7    you are not answering -- not allowing me to

8    say other things, so that's okay.  I'm

9    answering yes or no.  I'm not being evasive.

10        Q.     So you promise me you're only

11   going to answer yes or no, it won't be evasive

12   again?

13                   MR. KEAVENEY:  Objection.

14        A.     I'll try.

15        Q.     Okay.  So I have your word that

16   you're going --

17        A.     I'm trying.

18        Q.     Great.  Thank you.

19        A.     Ask me another question.

20        Q.     My pleasure.  I'm happy to ask

21   you another question.

22                   So what happened more often when

23   you were at the Transit Authority, derailments

24   or 12-9s?

25        A.     Well, 12-9s.

161

1                      Cheryl Kennedy

2          Q.     Okay.  So, for example -- let's

3    do from 19 -- let's do from the year 2000,

4    okay, we'll do from 2000 to 2018, when you

5    left.  We already that know there were

6    thousands of 12-9 incidents.  How many

7    derailments were there?

8          A.     I don't recall.

9          Q.     Okay.  How many people -- from

10   the year 2000 to the year 2018, how many

11   people died in derails compared to how many

12   people died from 12-9s?

13         A.     I don't recall.  There's a few.

14         Q.     Okay.  How many people had

15   catastrophic injuries in derailments from

16   2000 --

17         A.     I don't have that --

18         Q.     Can I please finish my question?

19   Thank you.

20         A.     Okay.

21         Q.     About how many people had

22   catastrophic injuries as a result of

23   derailments and how many people had

24   catastrophic injuries as a result of 12-9s

25   from 2000 to 2018?

162

1                    Cheryl Kennedy

2        A.     Well, I saw the chart for contact

3    with individuals or 12-9s, but I don't have

4    the other information in front of me.  I don't

5    recall.

6        Q.     Well, was it that frequent and

7    were that many people killed in --

8        A.     No.

9        Q.     -- derailments?

10       A.     No, but there's --

11       Q.     Is it even close?

12       A.     No.

13       Q.     Okay.  So we can't speak over one

14   another.  So you're answering questions

15   finally, which is nice, so let me get to

16   another question.

17              So can we agree that there were

18   far more people being killed or having

19   catastrophic injuries from 12-9s than as a

20   result of derailments in the year 2000 to

21   2018; true?

22       A.     True.

23       Q.     Okay.  Can we agree in terms of

24   not just the number of people killed or having

25   catastrophic injuries, that the number of such

163

1                    Cheryl Kennedy

2    incidents themselves were far greater for

3    12-9s than it was for derailments from 2000 to

4    2018, correct?

5          A.     True.

6          Q.     Okay.  So on that risk matrix, 1A

7    is that highest level of severe injury and

8    higher probability, correct?

9          A.     Correct.

10         Q.     So does that mean that

11   derailments are lower on the matrix than 12-9s

12   are?

13         A.     No.

14         Q.     Okay.  So --

15         A.     If you look at how many customers

16   we carry per year, 1.7 billion customers,

17   about that, 8 million a day.

18   MO             MR. GENIS:  Move to strike as

19         nonresponsive.

20         Q.     Not what I'm asking you at all?

21         A.     Okay.

22         Q.     So I'm going to try to have you

23   keep your word and answer my question.

24                So the question is, when we have

25   the matrix, right, and it goes by one category

164

1                        Cheryl Kennedy

2      we saw, severity of injury, the other category

3      is frequency of occurrence, so when you plug

4      those things on the matrix, based on frequency

5      of actual injury and what the injury is, the

6      highest level for the Transit Authority are

7      12-9s; true or false?

8              A.      I can't answer that.

9              Q.      Okay.  Well --

10             A.      I can't answer that yes or no.

11             Q.      Where on the matrix are

12     derailments?

13             A.      High.

14             Q.      Okay.  How high, what category,

15     where is it, 1A, 1B, 1C, 2, 3, 4; you tell me?

16             A.      They are high.  They're --

17     they're -- obviously, they're catastrophic.

18     They -- they wouldn't be frequent.  You know,

19     I would have to calculate it out to see

20     whether or not they're -- they're occasional,

21     but the number of people that could be injured

22     as a result of derailment is very high, but

23     I'm not -- I'm not saying that the contact

24     with individuals is not, you know, important

25     to us.

165

1                     Cheryl Kennedy

2          Q.     Okay.  Good.

3    MO              MR. GENIS:  So I just move to

4          strike, again, those portions which are

5          nonresponsive.

6          Q.     Now, let me ask you this:  Do you

7    remember a guy named Ken Brown; did he work

8    for you?

9          A.     Yes.

10         Q.     He was in your division; true?

11         A.     Yes.

12         Q.     And he went to Korea and gave you

13   a copy of his trip report; true?

14         A.     Correct.

15         Q.     Do you recall on his trip report

16   he said once platform doors were installed --

17   platform screen doors were installed, it

18   brought down the number of 12-9 incidents to

19   zero?

20         A.     Correct.

21         Q.     Okay.  So was it your

22   understanding, based on international

23   experience, that platform screen doors were

24   highly effective at preventing or reducing the

25   number of 12-9 incidents?

166

1                    Cheryl Kennedy

2        A.      Correct.

3        Q.      Okay.  And -- okay.  And by the

4   way, you and the Transit Authority gave data

5   to COMET showing that most 12-9s occurred at

6   nights and on the weekends when platforms were

7   less crowded; true?

8        A.      I don't recall.

9        Q.      Well, would you have given that

10  data if it wasn't true?

11       A.      No.

12               MR. KEAVENEY:  Objection.

13       Q.      Okay.  And do we agree, during

14  the pandemic, ridership was down dramatically?

15       A.      I'm sure it was, but I wasn't

16  there.

17       Q.      Okay.  And we showed you the data

18  how the 12-9s were actually up during the

19  pandemic, correct?

20       A.      Correct.

21       Q.      Okay.  So we agree that when

22  ridership is down, there was never a complaint

23  of crowding on the platform stations -- on the

24  station platforms, I should say, during the

25  pandemic; true?

167

1                    Cheryl Kennedy

2              MR. KEAVENEY:  Objection.

3         A.    I don't know.  I wasn't there.

4    I don't know if they had any --

5         Q.    Okay.

6         A.    -- complaints.

7         Q.    Well, do you agree that the data

8    shows that crowding of a platform does not

9    play a significant role in causing 12-9s?

10             MR. KEAVENEY:  Objection.

11        A.    Yes, the -- it's a random-type

12   thing.

13        Q.    Okay.  All right.  Now, there are

14   various alternative means of preventing 12-9s;

15   true?

16        A.    True.

17        Q.    Okay.  So, for example, we're

18   mentioning platform screen doors and platform

19   screen doors can have different heights,

20   correct?

21        A.    Correct.

22        Q.    You can have a full height,

23   three-quarter, half, et cetera; true?

24        A.    True.

25        Q.    There's also platform edge doors

168

1                     Cheryl Kennedy

2    and APGs, gates, correct, platform gates,

3    correct?

4             A.     Gates, okay.  Yes.

5             Q.     There's also -- and those are

6    other types of devices to prevent people --

7    creating a barrier to prevent people having

8    contact with the train, correct?

9             A.     Correct.

10            Q.     Okay.  And then there's also

11   what's known as rope barriers that are

12   vertical, that descend, correct?

13            A.     I don't know those.

14            Q.     You're not familiar with that?

15            A.     No.

16            Q.     Okay.  Let me ask you, if there

17   was a device or a technology that was

18   effective at preventing or dramatically

19   reducing 12-9s from occurring, was it part of

20   your job to know of such devices?

21            A.     I would know about them --

22            Q.     Okay.

23            A.     -- but I don't recall anything

24   regarding ropes.

25            Q.     Okay.  Well, I might be using the

Enright Court Reporting    (631) 589-7788

169

1                    Cheryl Kennedy

2    wrong words.  Let's try another word then.

3    Because it would have been part of your job to

4    keep current with literature and publications

5    to keep abreast of developments in your field;

6    true?

7         A.    True.

8         Q.    Okay.  So they may be also known

9    as cables or some other fashion, but they come

10   down vertically?  Do you understand what I'm

11   saying by come down vertically?

12        A.    I don't recall that.

13        Q.    Okay.  Well -- okay.  And

14   you're -- are you familiar with track

15   intrusion devices, known as TIDs?

16        A.    Yes.

17        Q.    Okay.  And those are devices to

18   say whether or not a body is on a track bed,

19   correct?

20        A.    Correct.

21              MR. KEAVENEY:  Objection.

22        Q.    And this way, if there's an

23   electronic notification through the TIDs

24   system, that could be relayed to a train

25   operator, so they stop the train before they

170

1                    Cheryl Kennedy

2    run over somebody; true?

3         A.     True.

4         Q.     Or before they hit somebody;

5    true?

6         A.     Correct.

7         Q.     Okay.  We mentioned briefly

8    closed-circuit TV, how they have the cameras

9    in the stations by the platforms and you can

10   have a live video feed to the train so if the

11   train operator actually sees before he or she

12   enters the station if anybody is on the track

13   or on the edge of the platform; true?

14             MR. KEAVENEY:  Objection.

15        A.     That's one of the detection

16   devices, yes.

17        Q.     And, in fact, after 9/11

18   occurred, the federal government was giving

19   out grant money and funding to subway stations

20   like the Transit Authority to place those

21   cameras for security purposes as well,

22   correct?

23        A.     True.

24        Q.     Okay.  There's also what's known

25   as fixed rail; true?

171

1                    Cheryl Kennedy

2          A.      True.

3          Q.      And fixed rail was in existence

4    for over 100 years in the City of New York,

5    correct?

6          A.      Okay.  Correct.

7          Q.      And a purpose of a fixed rail is

8    also to create a barrier to prevent 12-9s from

9    occurring; true?

10         A.      You mean like a gate?

11         Q.      Yes.

12         A.      Is that what you're talking

13   about?

14         Q.      Sure, a gate, a rail, sure.

15         A.      It could be, yes.

16         Q.      Okay.  And it's to give some

17   areas of safety on the platform, correct?

18         A.      It's not a yes-or-no answer.

19         Q.      Okay.  Well, does a fixed rail

20   provide some areas of safety for customers on

21   a platform?

22         A.      I can't give you a yes or no.

23         Q.      Okay.  Now, another alternative

24   is to lower the entry speed of a train into a

25   station; true?

172

1                    Cheryl Kennedy

2              MR. KEAVENEY:  Objection.

3         A.     True.

4         Q.     Because if a train is going

5   slower, it takes less time and less distance

6   to stop the train; true?

7         A.     True.

8         Q.     So, for example, if a train is

9   going 10 miles an hour, according to the

10  Transit's stopping chart distances, they

11  should be able to stop in 24 feet; true?

12        A.     I don't have that in front of

13  me --

14        Q.     Okay.

15        A.     -- the exact number, but yes, it

16  would take less time to stop.

17        Q.     Okay.  And the Transit Authority

18  has published stopping distance charts,

19  correct?

20        A.     Correct.

21        Q.     Okay.  Now -- all right.  So you

22  and the Transit Authority are aware of actual

23  studies and instances of other subway systems

24  installing platform screen doors, correct?

25        A.     Correct.

173

1                    Cheryl Kennedy

2         Q.     Okay.  And you and the Transit

3    Authority are aware of the results of those

4    studies of other subway systems installing

5    platform screen doors; true?

6         A.     I don't recall them at this

7    point.

8         Q.     Well, when you say you don't

9    recall it, are you saying --

10        A.     I'm sure there were, but I

11   retired and I'm, you know -- I don't know.

12        Q.     Okay.  Certainly at the time you

13   were working at the Transit in charge of

14   safety for the system --

15        A.     If they were there, I would know,

16   yes.

17        Q.     Okay.  That would have been part

18   of your job to be aware of these things,

19   correct?

20        A.     Right.  Correct.

21        Q.     At the time you were there, you

22   and the Transit would have been aware of

23   platform screen doors had been proven to be

24   effective at dramatically reducing the number

25   of 12-9s; true?

174

1                    Cheryl Kennedy

2        A.        At some properties, yes, the ones

3    that would have them, okay.

4        Q.        Okay.  So could we agree that if

5    something has already been studied and a fact

6    already established, there's no need to study

7    it again or reinvent the wheel; true?

8              MR. KEAVENEY:  Objection.

9        A.        False.

10       Q.        Okay.  So let me ask you, if

11   there had been other studies and other

12   research over a period of time about the

13   effectiveness of platform screen doors in

14   other cities and it established that they were

15   effective at dramatically reducing or

16   preventing 12-9s from occurring, why would you

17   need to study it again?

18       A.        Because you would have to study

19   it for institution into your own property and

20   the challenges that you might have in your

21   property and to see whether or not they could

22   be placed in our property --

23       Q.        Okay.

24       A.        -- safely.

25       Q.        So, in other words -- I want to

175

1                    Cheryl Kennedy

2    make sure we're understanding each other --

3          A.    Those other properties you're

4    talking about, most of them were built that

5    way.

6          Q.    I understand.

7    MO          MR. GENIS:  Just move to strike

8          the last part of that.

9          Q.    But all I'm asking you now is,

10   okay, could we agree that there is a

11   difference between studying effectiveness of a

12   safety device as opposed to studying how to

13   adopt and use that device here?

14         A.    Yes.

15         Q.    Okay.  So, in other words, the

16   Transit Authority and yourself were aware that

17   platform screen doors were effective, so that

18   was -- it was not necessary to study that;

19   true?

20         A.    True.

21         Q.    Okay.  So the only kind of study

22   that would make sense to do is to do a study

23   to see how do we best adopt platform screen

24   doors or some other safety device to our

25   system; true?

176

1                    Cheryl Kennedy

2         A.     True.

3         Q.     Okay.  Because there's no need to

4    study what's already been studied and

5    established, correct?

6                MR. KEAVENEY:  Objection.

7         A.     If it was studied, yes.

8         Q.     Okay.  So when performing a

9    study, you have to study the pertinent issue,

10   correct?

11        A.     Correct.

12        Q.     Okay.  And if you don't study the

13   pertinent issue, it's an inadequate study;

14   true?

15        A.     I can't answer that.

16        Q.     Well, if you don't study the

17   pertinent issue, can we agree that the study,

18   by definition, would be improper, unreasonable

19   and inadequate?

20        A.     Yes, if that's how you're

21   phrasing it.

22        Q.     Okay.  It's like if you don't ask

23   the right question, you're not going to get

24   the correct answers, correct?

25        A.     Correct.

177

Cheryl Kennedy

1

2          Q.      So if there's a study, but it's

3   not asking the right questions, that's an

4   inaccurate, inadequate and unreasonable study;

5   true?

6                  MR. KEAVENEY:  Objection.

7          A.      If it's not asking the right

8   questions, depending on what the study is.

9          Q.      Okay.  And in doing a study, if

10  you don't collect and analyze the pertinent

11  data, the study is inadequate, unreasonable

12  and improper; true?

13         A.      True.

14         Q.      Okay.  And methodology requires a

15  fact-based analysis of data, correct?

16         A.      Yes, you use facts.

17         Q.      Okay.  You're not supposed to

18  guess or speculate; true?

19         A.      True.

20         Q.      Okay.

21         A.      You...

22         Q.      And where somebody guesses or

23  speculates, that is never a substitute for

24  fact- and data-based analysis; true?

25         A.      True.

178

1                    Cheryl Kennedy

2        Q.      If somebody is guessing or

3   speculating or even hypothesizing, that would

4   be an inadequate, improper and unreasonable

5   study; true?

6        A.      I -- I can't can't answer that.

7   Sometimes you predict things, so I don't know,

8   like -- you're looking at things that could

9   happen, but you don't necessarily have all the

10  data that shows it exactly, but you could

11  predict that, so I don't know.  I don't know

12  how to answer that one.

13  MO   Q.     Okay.  If you don't know how to

14  answer that, we're just going to move to

15  strike as nonresponsive --

16       Q.      -- and that's your answer, you

17  don't know how to answer it.

18       A.      Okay.

19       Q.      But if an analysis is not done

20  properly, can we agree that the study is

21  inadequate, improper, and unreasonable?

22               MR. KEAVENEY:  Objection.

23       A.      Yes.

24               MR. GENIS:  And just, Reporter,

25          you got the answer?

179

1                    Cheryl Kennedy

2                    THE WITNESS:  Yes.

3                    THE COURT REPORTER:  Yes.

4                    MR. GENIS:  Okay, just wanted to

5            make sure.  Okay, good.  Because

6            sometimes when people talk over, it

7            makes the sound cut out; that's why I

8            was asking.

9            Q.    So if there is pertinent data,

10   you have to look at it, correct?

11           A.    Correct.

12           Q.    Okay.  And then in order to

13   conduct a proper study, you have to compare

14   equivalences, in other words, apples to

15   apples, not apples to oranges, correct?

16                   MR. KEAVENEY:  Objection.

17           A.    I -- like, theoretical questions,

18   I don't know how to answer that one.

19           Q.    Okay.  Let's see.  Well, based on

20   the studies and the facts -- hold on one

21   second.  Let's back up.  When you we talk

22   comparables -- let me do it this way.

23                   I'd like you to assume

24   Mr. Prendergast testified recently that you

25   cannot compare New York City, for example, to

180

1                    Cheryl Kennedy

2    the Washington Metro, but you have to compare

3    it to a larger older system like that of Paris

4    and London.  Would you agree or disagree with

5    that statement?

6            A.    Agree.

7            Q.    Okay.  So, in other words, you

8    have to compare apples to apples, a system of

9    similar volume, size, things of that nature?

10           A.    Yes, I agree.

11           Q.    Okay.  Now, we mentioned earlier,

12   and you agreed, how there have been various

13   studies done by both COMET and UITP about

14   platform screen doors from the cities that

15   have utilized them based on their experience;

16   true?

17           A.    I don't recall them, but...

18           Q.    Okay.  Well, let's try this

19   again, okay.  There have -- I understand you

20   don't recall them at this moment, but while

21   you worked for the Transit, you would have

22   read these studies and --

23           A.    Yes.

24           Q.    -- were familiar with them?

25           A.    Yes, I would have probably read

181

1                          Cheryl Kennedy

2    them, yes.

3         Q.    And it was part of your job to

4    obtain these studies to read them and be

5    familiar with them, correct?

6         A.    If they were sent to me, yes.

7         Q.    Okay, by the way, when you say if

8    they were sent to you, was it anybody's job at

9    the Transit Authority that worked under you to

10   do research, collect and gather studies,

11   research, pertinent literature to keep you

12   abreast of safety developments?

13        A.    Yeah, depending on the topic.

14        Q.    Okay.  So did you do the research

15   yourself or you assigned it to somebody to do

16   research on prevention and mitigation of

17   12-9s?

18             MR. KEAVENEY:  Objection.

19        A.    I wouldn't have done it myself,

20   but we would have done it collectively, not

21   just with my department.  It would have

22   involved other departments as well.

23        Q.    Okay.  So who, if anyone, in your

24   department was responsible for keeping abreast

25   of the literature, looking for gathering,

                                                                    182

1                     Cheryl Kennedy

2     collecting literature with respect to safety,

3     subways, and prevention and mitigation of

4     12-9s?

5              A.     There would have been, you know,

6     a few different people --

7              Q.     Who?

8              A.     -- and we would have coordinated

9     with the contact with COMET --

10             Q.     Okay.

11             A.     -- which would be Andy Bata.

12             Q.     Okay.

13             A.     But there --

14             Q.     Okay.

15             A.     There were numerous people, so,

16    you know...

17             Q.     Was there a global benchmarking

18    department, so to speak, in the Transit

19    Authority?

20             A.     Andy Bata benchmarked a lot of

21    things and you could go to him to -- to ask

22    questions of COMET.

23             Q.     Okay.  And you spoke to Andy Bata

24    when you worked for the Transit; true?

25             A.     True.

183

1                   Cheryl Kennedy

2         Q.      And you discussed platform screen

3    doors with Andy Bata; true?

4                   MR. KEAVENEY:  Objection.

5         A.      I don't recall.  I probably did.

6    I don't recall at this point.

7         Q.      And Andy Bata was in favor of

8    having platform screen doors installed in the

9    New York City subway system; true?

10        A.      I don't recall that.

11        Q.      Andy Bata was in favor of having

12   standards requiring platform screen doors to

13   be used for all new construction and new

14   installation, new stations; true?

15        A.      I don't recall that.

16        Q.      Are you denying those things or

17   you're just saying you don't --

18        A.      No, I'm saying I don't recall it.

19        Q.      Okay.  I just want to be clear

20   that that's what you mean when you say you

21   don't recall?

22        A.      Yeah, I'm not denying it.  I just

23   don't remember.

24        Q.      Okay.  That's fair enough.

25                   MR. KEAVENEY:  (Inaudible) I

184

                    Cheryl Kennedy

1

2        don't recall.

3        Q.    Okay.

4              THE WITNESS:  Huh?  Excuse me?

5        Okay.

6        Q.    All right.  Let me ask you this:

7    At the time when you were familiar with the

8    literature and the research and the studies

9    and the publications by COMET, UITP,

10   et cetera, did you learn that platform screen

11   doors were safe?

12             MR. KEAVENEY:  Note my objection.

13       A.    I can't answer that yes or no.

14       Q.    Okay.  Well, did you read any

15   publications that indicated that platform

16   screen doors were not safe?

17       A.    I don't recall.

18       Q.    Did you read any publications

19   that indicated platform screen doors were

20   hazardous or could be hazardous?

21       A.    I didn't -- don't recall reading

22   that, no.

23       Q.    Did you read anything anywhere in

24   any kind of literature, public, anywhere at

25   all in the world that platform screen doors

185

1                    Cheryl Kennedy

2    caused or created hazards to the public?

3         A.    I don't recall.

4         Q.    Okay.  Now, we agree that there

5    are certain challenges in installing safety

6    devices to prevent 12-9s in the City of New

7    York, correct?

8         A.    Correct.

9         Q.    All right.  Now, some of the

10    challenges can be addressed, correct?

11         A.    Correct.

12         Q.    Okay.  In fact, all of the

13    challenges can be addressed one way or

14    another, correct?

15         A.    I don't know if they all can be

16    addressed.

17         Q.    Okay.  Let me ask you this:  You

18    are aware that -- withdrawn.

19              While you were head of the office

20    of system safety for the New York City Transit

21    Authority, you were aware that the Transit

22    Authority published and issued an RFI, request

23    for information, seeking manufacturers of

24    platform screen doors to submit proposals to

25    install them in the City of New York in our

186

1                    Cheryl Kennedy

2    subway system in exchange -- at little or no

3    cost to the subway system in exchange for

4    getting ad revenue, advertising revenue?

5         A.      I remember that, yes.

6         Q.      Okay.  And, approximately, 12

7    major corporations, multi national

8    corporations, responded to that RFI; true?

9                 MR. KEAVENEY:  Objection.

10        A.      I don't recall.

11        Q.      Well, you recall a number of

12   manufacturers responding to the Transit

13   Authority's RFI?

14        A.      Correct, a number.

15        Q.      All right.  And these were very

16   large corporations, substantial entities;

17   true?

18                MR. KEAVENEY:  Objection.

19        A.      I don't recall.

20        Q.      Well, it wasn't like a

21   mom-and-pop store, these were big companies?

22        A.      I don't recall.

23                MR. KEAVENEY:  Objection.

24        Q.      Well -- and then the Transit

25   Authority narrowed down the list from 12 to 5

187

1                    Cheryl Kennedy

2    that they wanted to discuss this RFI with;

3    true?

4          A.    I don't recall.

5          Q.    Okay.  Well, did you ever talk to

6    any manufacturer of any platform screen door

7    company to see if they could install platform

8    screen doors in the New York City subway

9    system at little or no cost to the Transit

10   Authority?

11         A.    I don't recall.

12         Q.    Okay.  Would that have been of

13   interest -- withdrawn.

14               Would that have been part of your

15   job to discuss the safety and efficacy of

16   platform screen doors in the New York City

17   subway system with the manufacturers of the

18   platform screen doors?

19         A.    We would have worked through

20   capital program management.

21         Q.    So when you say you would work

22   through capital program management, that means

23   you, that division and other pertinent

24   divisions would discuss this jointly, correct?

25         A.    Correct, mostly capital program

188

1                   Cheryl Kennedy

2    management.

3            Q.    Okay.  And capital program

4    management or project management actually

5    e-mailed that there was an offer -- withdrawn.

6                   You're familiar with the Number 7

7    Line extension; true?

8            A.    True.

9            Q.    And you were aware that there was

10   an offer to get funding for installation of

11   platform screen doors if the Transit Authority

12   established a standard for new construction,

13   new stations, to have platform screen doors;

14   true?

15                 MR. KEAVENEY:  Objection.

16           A.    I don't recall.

17           Q.    Okay.  Would that be significant

18   to you?

19           A.    It would be good; sure.

20                 MR. GENIS:  Dave, can you please

21           put up the -- I forget the Bates number,

22           but I think we have some e-mail on this?

23           Hopefully, he's listening.  There he

24           goes.  Okay.

25                 And we're going to deem this

189

                        Cheryl Kennedy

1

2          Plaintiff's Number 4.  I think this was

3          previously marked for ID at a

4          deposition, and it looks like it's

5          Bates, I see at the bottom, 12722, and

6          there's some e-mails.

7                    (Plaintiff's Exhibit 4 deemed

8          marked for identification.)

9          Q.     I'm going to let Dave scroll from

10   the bottom up because it's in reverse

11   chronological, so this way you can start at

12   the bottom of 12722 and work your way up --

13         A.     Okay.

14         Q.     -- and tell me when you've done

15   so.

16         A.     Okay, you can move it up a

17   little.  Okay.  So on new construction, he's

18   saying.

19         Q.     Yes.

20         A.     Okay.  Good.

21         Q.     So you saw how in terms of having

22   the standards to have -- require platform

23   screen doors that Andrew Bata was in favor of

24   that, correct?

25         A.     Yes, on new --

190

1                    Cheryl Kennedy

2          Q.     Yes.

3          A.     -- designs, yes, uh-hum.  On new

4    lines or...

5          Q.     Okay.  And, in fact, Mr. Bata

6    thought that that should have been the

7    standard 10 years earlier, correct?

8          A.     Yeah, go back down.  Yes, he did,

9    uh-hum.

10         Q.     Okay.  All right.  And what was

11   your position on that?

12         A.     If it was new construction and it

13   could be designed into it safely, that would

14   be -- that would be good.

15         Q.     Okay.  In fact, you learned that

16   with London and Paris, comparable subway

17   systems, they had done retrofits to some of

18   their subway systems, correct?

19         A.     Correct.

20                MR. KEAVENEY:  Objection.

21         Q.     Okay.  And you learned that the

22   platform screen doors in London and Paris were

23   also effective at preventing or reducing 12-9s

24   from occurring; true?

25         A.     Correct.

191

1                     Cheryl Kennedy

2          Q.     And you learned that there were

3    no hazards associated with the platform screen

4    doors in London and Paris; true?

5          A.     Well, to them, yeah.

6          Q.     Okay.  Now, let's see.  Can we

7    agree that -- hold on one second.

8                 If you were concerned about

9    people getting trapped, let's say, by a subway

10   door, in other words, they're coming from the

11   platform, they're going to enter the train car

12   and you're concerned that they're somehow

13   going to get trapped with the platform door or

14   the subway car door, can we agree if the doors

15   have sensors to retract, that would help

16   ameliorate that concern?

17         A.     It would help --

18         Q.     Okay.

19         A.     -- but it may not prevent it.

20         Q.     Okay.  Well, in other words, if

21   the door closes on somebody, if it has a

22   sensor and worked properly and retracts and

23   opens up again, then they're no longer trapped

24   by the door, correct?

25                MR. KEAVENEY:  Objection.

192

1                    Cheryl Kennedy

2        A.      Depending on the design.

3        Q.      Okay.  And there also can be some

4    sort of filler, if necessary, to be placed

5    between the platform screen doors and what

6    would be the train car; true?

7        A.      What kind of filler?

8        Q.      It could be anything if you think

9    that's -- that is necessary to keep -- if

10   you're worried about people being trapped in

11   between so that they can't --

12       A.      I don't know what you mean by

13   filler, so --

14       Q.      Okay.  Any kind of substance that

15   prevents somebody being stuck in between.

16       A.      I mean, we had incidents where

17   people that would get their clothes caught in

18   the door of the train and the train could

19   move, so you would have to look at the design

20   to see whether or not you could do that, and

21   if you could, that -- that's good.

22       Q.      Okay.

23       A.      That would solve the problem if

24   you could do it and it would be done, you

25   know, safely.

193

1                    Cheryl Kennedy

2        Q.     Okay.  So when you were at the

3    Transit Authority, were there instances of

4    people getting dragged by the trains?

5        A.     Yes.

6        Q.     Okay.  And that could happen

7    because their clothing got stuck, as you said,

8    or they were trapped in the door or something

9    to that effect, correct?

10       A.     It was down to pretty much the

11    clothing could get caught in the door where

12    the door sensors wouldn't identify that, and

13    if the train operator wasn't doing his job by

14    looking or couldn't see before he moved the

15    train, you could have a drag.

16       Q.     So how often did that happen,

17    that there were drags?

18       A.     I don't recall the number right

19    now, but --

20       Q.     Did the Transit Authority keep

21    statistics or data on the number of drags that

22    occurred each year?

23       A.     Yes.

24       Q.     Okay.  And where was that data

25    kept?

194

1                    Cheryl Kennedy

2          A.      You could get that from system

3   safety.

4          Q.      Okay.  And what was that called?

5          A.      Drag incidents.

6          Q.      Okay.  And there would be -- do

7   you recall the share drive number for that?

8          A.      No.  You know, the department of

9   subways would also have it.

10         Q.      Okay.  Who would that have now,

11  do you know?

12         A.      No.

13         Q.      Okay.  So if a concern of drags

14  is that somebody's clothing could get stuck on

15  the subway car, in the train, or their body

16  could get stuck in the train door, and that's

17  how they get dragged, if there's a platform

18  screen door barrier, that prevents their

19  clothing from getting stuck on the subway

20  train or their body being stuck inside the

21  door of the subway train car, correct?

22         A.      No --

23         Q.      Okay.

24         A.      -- that would not prevent that.

25         Q.      Well, if you can't get to the

195

1                    Cheryl Kennedy

2    car --

3          A.      You have to get in -- okay.

4    Listen -- if I can talk.  You have to -- a

5    passenger boards or alights, okay, and gets

6    there, the -- the platform door has to be open

7    as well as the train door has to be open,

8    okay.  And you could have the door close on

9    the train door, not the same as the platform

10   door, the person could get their clothes

11   caught, the train still could move because the

12   train operator at the point can't see, and he

13   could get dragged into the platform edge door,

14   so they have to be synchronized very well and

15   there has to be a way that the train operator

16   can tell that everything is closed and no one

17   is caught in there.

18         Q.      Okay.  So the fixes to that

19   problem are A, the doors are synchronized,

20   both the platform screen doors and the train

21   car door; true?

22         A.      True.

23         Q.      That's fix number one?

24         A.      Right.

25         Q.      Fix number two is to have the

196

1                    Cheryl Kennedy

2    sensors with the retraction devices on the

3    doors as well; true?

4          A.     True, that's one.  That could --

5          Q.     And number three is the train

6    operator does their job properly, observes and

7    sees when it is or is not safe to have the

8    train start moving; true?

9          A.     Correct.  True.

10               MR. KEAVENEY:  Objection.

11         Q.     Okay.  Now, by the way, who tells

12   the train to move, the conductor, the train

13   operator, the motorman or somebody else?

14         A.     Well, the conductor in most

15   incidents is the one that checks the side of

16   the train car and notifies the train operator,

17   except when there's one-person train operation

18   with short trains, the train operator does

19   that task with the use of CC-TV.

20         Q.     Got it.  Okay.  Now, what was

21   more frequent when you were at the Transit

22   Authority, 12-9 incidents or drags?

23         A.     12-9s.

24         Q.     Okay.  And was it even close, the

25   number of 12-9s to draggings?

197

1                    Cheryl Kennedy

2        A.      No.

3        Q.      Okay.  So like, for example, we

4    already went through the data of how many

5    12-9s there were per year, okay, so I'm not

6    going to go through that again.

7    Approximately, I understand you may not recall

8    the exact number --

9        A.      I don't recall.  I don't want to

10    say the number because I don't recall.

11        Q.      Can you give me a ballpark

12    number --

13        A.      No.

14        Q.      Let me just get a question out

15    before you answer, please.

16        A.      Okay.

17        Q.      You keep interrupting and then it

18    becomes a problem

19        A.      All right.

20        Q.      Okay.  So can you give me an

21    approximate number per year of drags?

22        A.      I'm sorry, I can't.

23        Q.      Okay.  And if you saw data that

24    said it was in the single digits, would that

25    make sense to you for drags?

198

1                    Cheryl Kennedy

2          A.     It should be, yes.

3          Q.     Okay.  So there were

4     exponentially more 12-9s than there were

5     dragging incidents, correct?

6                    MR. KEAVENEY:  Objection.

7          A.     I don't have the numbers in front

8     of me, so, I mean, you --

9          Q.     Well, on the matrix, the dragging

10    would be much lower because it's a far less

11    frequency; true?

12                   MR. KEAVENEY:  Objection.

13         A.     I guess it would be, yeah, true.

14         Q.     Okay.  Now, so proper actions by

15    whether it be a conductor, motorman or train

16    operator to look at and observe and make sure

17    it's safe before the train moves is another

18    effective means of preventing draggings or

19    injuries that could in some manner be related

20    to platform screen doors; true?

21         A.     True.

22         Q.     Okay.  Now, when doing your

23    analysis, did you ever compare whether -- for

24    another city the number of fatalities they had

25    from 12-9s when there were platform screen

199

1                    Cheryl Kennedy
2  doors and when there were not, in other words,
3  from before and after?
4          A.    I don't recall.
5          Q.    Would that have been a good and
6  accepted practice for you to have done that at
7  the time?
8          A.    Yes.
9          Q.    Okay.  Would thought have
10 complied with good and accepted practices and
11 procedures to compare the before and after
12 numbers on fatalities with respect to
13 installation of platform screen doors?
14         A.    Yes.
15         Q.    Okay.  Would that have yielded
16 significant and important data and
17 information?
18         A.    Yes.
19         Q.    And did you compare the number of
20 catastrophic injuries when there were platform
21 screen doors as opposed to when there were
22 not, in other words, before and after for
23 catastrophic injuries?
24         A.    I can't -- I don't recall.
25         Q.    Okay.  Would it have been good

200

1                    Cheryl Kennedy

2    and accepted practice and procedure to have

3    done so?

4         A.     Yes.

5         Q.     Okay.  Did it comply with proper

6    methodology to have done so?

7         A.     Yes.

8         Q.     Okay.  Would it have been good

9    and accepted practice to find out what, if

10   any, other type of injuries might occur from

11   use of platform screen doors?

12        A.     Yes.

13        Q.     Okay.  And did the Transit

14   Authority ever do that?

15        A.     I believe we did, but I can't

16   give you what was found.  I don't recall.

17        Q.     Did you ever do that?

18        A.     Not myself, no.

19        Q.     If -- in other systems, if you

20   learned or found that there were minimal other

21   types of injuries that might occur from use of

22   platform screen doors, would that be a

23   significant factor to you in whether or not

24   you would recommend installing platform screen

25   doors?

201

1                    Cheryl Kennedy

2          A.     Yes.  It was one factor, yes.

3          Q.     Okay.  And would that factor into

4    your hazard analysis?

5          A.     It would.

6          Q.     Okay.  And --

7          A.     It would help identify another

8    hazard.

9          Q.     Okay.  Well, did you ever study

10   to see which way are there fewer fatalities

11   and catastrophic injuries or major or serious

12   injuries, and I'm going to go through each

13   category in a second, with or without platform

14   screen doors regardless of whatever heights

15   they were?

16         A.     No.

17         Q.     Okay.  Did anyone from the

18   Transit Authority ever do a study to see which

19   way there were fewer fatalities or

20   catastrophic or major or serious injuries with

21   or without platform screen doors regardless of

22   their heights?

23         A.     I don't recall.

24         Q.     Okay.  Did you ever do a study to

25   see which way there were fewer fatalities,

202

1                    Cheryl Kennedy

2    catastrophic injuries or major or serious

3    injuries with or without platform edge doors

4    or gates, PEGs?

5            A.    No, not phrased in that fashion.

6            Q.    Did the Transit Authority ever do

7    so?

8            A.    I don't think so.  I don't --

9    I don't know.

10           Q.    Did you ever study which way

11   there were fewer fatalities, catastrophic

12   injuries or major, serious injuries with or

13   without track intrusion devices, TIDs?

14           A.    Not the way you're -- no.

15           Q.    Did the Transit Authority ever

16   study to see which way there were fewer

17   fatalities, catastrophic injuries or major or

18   serious injuries with or without TID devices?

19           A.    They were evaluating these

20   devices to see if they worked, so I don't -- I

21   don't know, you know --

22           Q.    Not my question.

23   MO           MR. GENIS:  Move to strike.

24           A.    I know, I can't answer the

25   question.

203

1                    Cheryl Kennedy

2        Q.      Okay.

3                MR. GENIS:  So I just forgot --

4        to the reporter, can you just read back

5        the last question so I don't ask it

6        again.

7                THE COURT REPORTER:  Sure.

8                (Record read.)

9                MR. GENIS:  Got it.  Okay.  Good.

10       Q.      Did you ever study to see which

11   way there were fewer fatalities, catastrophic

12   injuries, major, serious injuries with or

13   without track intrusion devices?

14       A.      I couldn't have because we didn't

15   have them.

16       Q.      Did you ever study to see which

17   way there were fewer fatalities, catastrophic

18   injuries, major, serious injuries with or

19   without the closed-circuit TV?

20       A.      In some cases.

21       Q.      And --

22               MR. GENIS:  I just want to hear

23       back the question again.  I know what

24       her answer is, I just want the question

25       read back, please.

204

1                    Cheryl Kennedy

2                    (Record read.)

3          A.     With respect to drags, yes.

4          Q.     Okay.  Other than with respect to

5     drags, did you study it?

6          A.     No.

7          Q.     Okay.  Now, by the way, when you

8     studied with respect to drags, which way --

9          A.     Not necessarily a -- go -- go

10    ahead.  Finish your question.

11         Q.     Okay.  When you said there were

12    some studies with respect to drags, were there

13    studies to see which way there were fewer

14    fatalities, catastrophic injuries or major or

15    serious injuries with or without the

16    closed-circuit TV?

17         A.     Not phrased that way, no.

18         Q.     Well, did the Transit Authority

19    ever study to see which way there were fewer

20    fatalities or catastrophic injuries or major,

21    serious injuries with or without the

22    closed-circuit TV?

23         A.     Not phrased like that, no.

24         Q.     Okay.  Well, that would be hard

25    fact, hard data, before and after, correct?

205

1                    Cheryl Kennedy

2        A.      You're asking me yes-and-no

3    questions.  I'm telling you, you can't answer

4    this with yes and no.

5        Q.      Okay.  Well, wouldn't the most

6    telling fact be if you see a number of

7    incidents when there is no such device and you

8    compare that with a number of incidents after

9    there is such a device and see if the numbers

10   are the same or different?

11               MR. KEAVENEY:  Objection.

12       A.      Not in this case.

13       Q.      Okay.

14       A.      You're not, you know -- you can't

15   answer yes or no to this.

16       Q.      All right.  That's fine.  Let's

17   talk about fixed rail for a second.  Did you

18   ever do a study to see which way there are

19   fewer fatalities or catastrophic injuries,

20   major, serious injuries with or without fixed

21   rails?

22       A.      No.

23       Q.      Okay.  Did the Transit Authority

24   ever do a study to see which way there were

25   fewer fatalities or catastrophic injuries or

206

Cheryl Kennedy

1

2    major or serious injuries with or without

3    fixed rail?

4          A.    Not that I recall.

5          Q.    Did you ever study to see which

6    way there were fewer fatalities or

7    catastrophic injuries or major or serious

8    injuries with or without a lower entry speed

9    of a train into the station?

10         A.    No.

11         Q.    Did the Transit Authority ever do

12   so?

13         A.    I don't recall.

14         Q.    Okay.  Now, when you mentioned a

15   few moments ago some studies involving drags

16   and CC-TV, please tell me what were those

17   studies and --

18         A.    Okay.  It's not necessarily a

19   study, and it was a long time ago, when they

20   were getting ready to implement a one-person

21   train operation and they were moving from long

22   trains to short, particularly on the L Line,

23   and the train operator was going to assume the

24   duties and responsibilities of the conductor,

25   so he would then have to see the sides of the

207

1                    Cheryl Kennedy

2    train, and certain stations were curved, you

3    had to make sure the CC-TVs were there, so

4    they had to be seen and they had to make sure

5    they saw the entire length of the train.

6              And, yes, it was tracked to see

7    whether or not we had drag incidents or any

8    incidents relative to the use of that CC-TV in

9    that setting of one-person train operation

10   because that was -- you had to look at that to

11   see whether or not you were going to implement

12   that, move that out into any other lines.

13        Q.    Okay.  And when you --

14        A.    You had --

15        Q.    -- did that -- go ahead.  I'm

16   sorry, I didn't mean to interrupt.

17        A.    You had to make sure the CC-TV

18   would work for the train operator to prevent

19   drags.

20        Q.    Okay.  By the way, are you

21   reading anything on your computer screen as

22   we're talking?

23        A.    Absolutely not.

24        Q.    Okay.  Just checking if you were

25   reading from something or not because I hear

208

1                    Cheryl Kennedy

2    all this typing.  I don't know if that's you

3    or --

4         A.    Oh, that's not me typing --

5         Q.    Okay.

6         A.    -- at all.

7         Q.    Okay.  No problem.  Let's keep

8    going now.

9              And so what did you learn from

10   what you just told us, were there more or less

11   drag incidents when CC-TV was used properly?

12        A.    We found that it worked.  It

13   wasn't really more or less.  I don't know

14   whether there were many on that line in the

15   first place, okay, but we had to make sure

16   that if you were removing the conductor and

17   his view and -- and task, that the train

18   operator could pick up that task safely, and

19   he was able to.

20        Q.    All right.  So as a result of

21   this study, you learned that the CC-TV could

22   be useful; true?

23        A.    True.

24        Q.    And you learned that the CC-TV

25   could be effective; true?

209

1                      Cheryl Kennedy

2         A.      True.

3         Q.      And you learned that from proper

4    use of CC-TV, you can help reduce the number

5    of drags or 12-9s from occurring; true?

6                 MR. KEAVENEY:  Objection.

7         A.      No, it had nothing to do with

8    12-9s.

9         Q.      Okay.  So let me rephrase the

10   question then.  So you learned from proper use

11   of CC-TV you could reduce the number of

12   dragging incidents; true?

13        A.      You could -- not necessarily

14   reduce them.  You would at least keep them to

15   a level that if you had a conductor doing that

16   task, now you're having somebody else do that

17   task.  He had to be able to see the side of

18   the train, okay.  He could still make the same

19   mistake as a conductor if he didn't do his due

20   diligence, but we did find the CC-TVs did work

21   and they worked as good as the conductor

22   checking the side of the train as the train

23   was moving out of the station.

24        Q.      In fact, when you did that study

25   on the G Line, I believe it was, you learned

210

1                      Cheryl Kennedy

2    that --

3              A.      There were a number of different

4    lines, uh-hum.  Every line, they put them in.

5              Q.      -- one of the things you learned

6    from that study was that one of the main

7    causes of dragging was the train operator

8    conductor not properly doing their job and not

9    being observant; true?

10                     MR. KEAVENEY:  Objection.

11             A.      That is one, sure.

12             Q.      And when you looked for what

13   other cities were doing, did you learn that

14   other cities were using the CC-TV to help

15   reduce the number of 12-9 incidents?

16             A.      I don't recall that.

17             Q.      So you're not denying that it

18   happened, you're just saying you don't

19   remember all these years later?

20             A.      I don't recall if it did or

21   didn't.

22             Q.      Okay.  So did you ever do any

23   analysis to see the number of lives that could

24   have been saved or the number of catastrophic

25   injuries that could have been prevented or

211

1                    Cheryl Kennedy

2    reduced if some sort of safety device was

3    utilized, whether it be a platform screen

4    door, a PED an APG, a TIDs, CC-TV, fixed rail

5    or lower entry speed into a station --

6                    MR. KEAVENEY:  Objection.

7         Q.      -- was that ever done by the

8    Transit Authority?

9         A.      All those items are -- were and

10   are being evaluated.

11        Q.      That's not my question.  My

12   question is -- let me try it again and I'll

13   break it up.  First I'll do it for you and

14   then I'll do it for the Transit.

15        A.      Okay.

16        Q.      Did you ever perform any analysis

17   to see the number of lives that could have

18   been saved or the number of catastrophic

19   injuries that could have been prevented or

20   reduced if an alternative safety device was

21   utilized such as the ones we've been

22   discussing today?

23                    MR. KEAVENEY:  Objection.

24        A.      Not the way that it's phrased.

25        Q.      Okay.  Well, did you ever do an

212

1                       Cheryl Kennedy

2     analysis for the hazards that could be

3     mitigated in the subway system by using one of

4     these other safety devices that we've just

5     been talking about?

6            A.     We did look at the hazards

7     that -- or the -- basically, the causes of

8     contact with individuals and platform screen

9     doors was one method of reducing them, train

10    track intrusion was another, public awareness

11    was another.  Another thing that was done was,

12    you know, we added countdown clocks, so you

13    don't have people stretching their neck out

14    looking for the train.  They could easily see

15    when the trains were arriving, so those

16    different things were being looked at, done or

17    whatever.

18           Q.     Okay.  So let me ask you a couple

19    of follow-up questions.  First of all, so I'm

20    still not clear on one thing, though, yes or

21    no, did you do an analysis to see the number

22    of lives that could have been saved or the

23    number of catastrophic injuries that could

24    have been prevented if one of these other

25    types of devices or operations had been

213

1                    Cheryl Kennedy

2    implemented?

3         A.    Not the way you're asking that,

4    no.

5         Q.    Okay.  By the way, are you -- did

6    the Transit Authority ever perform any such

7    analysis to see the number of lives that could

8    have been saved or the number of catastrophic

9    injuries that could have been presented if

10   they utilized one of these other either safety

11   devices or changes in operations?

12              MR. KEAVENEY:  Objection.

13        A.    Not -- I don't know.  I don't

14   recall.

15        Q.    Okay.  Are you aware of any city

16   in the world that has ripped out the platform

17   screen doors, removed them because of problems

18   with them?

19        A.    No.

20        Q.    Okay.  When you performed an

21   analysis, did you do it pursuant to 882E, the

22   military standards?

23        A.    It depends on which one -- what

24   you're asking me, if you're --

25        Q.    Okay.  Let's back up.

214

1                    Cheryl Kennedy

2          A.     Okay.

3          Q.     So did you do a study to see how

4    to best prevent or reduce 12-9s in New York

5    City?

6          A.     We took a look at the data.  I

7    can -- can I -- if I can't answer yes or no --

8    I can't answer yes or no.

9          Q.     Okay, so -- all right.  So let's

10   back up.  Did either you or the Transit

11   Authority ever do a study how to best prevent

12   or reduce the number of 12-9s in New York

13   City?

14         A.     I don't know if I recall a study.

15         Q.     Okay.  Did you or anybody from

16   the Transit Authority ever do a study to see

17   how to best reduce the number of 12-9s in the

18   Atlantic Avenue Barclays Center subway

19   station?

20         A.     No.

21         Q.     And -- okay.

22         A.     Not to my knowledge, anyway.

23         Q.     Okay.  Now, when we talk about

24   analysis, did you ever perform a hazard

25   analysis about the causes and prevention or

215

1                    Cheryl Kennedy

2     mitigation of 12-9s?

3           A.     We did perform an analysis of the

4     data and identify the causes or the reasons

5     that people fell onto the track and

6     categorized them to see how many of each type

7     there were and took a look at what resolution

8     or mitigation could be done, being that public

9     awareness and all the different ways that you

10    can reach the public, that would also be

11    looking into platform screen doors and how

12    they could could go about being implemented,

13    and looking into track intrusion, different

14    methods of track intrusion.

15          Q.     Okay.  Did anybody, whether it be

16    you or anyone from the Transit Authority, ever

17    study the difference, and I'm talking about

18    number of either fatalities or serious

19    injuries, between leaving the system as it was

20    versus adding safety devices like we've been

21    discussing today?

22          A.     No, but adding the safety

23    devices -- I'll just say no.

24                 MR. GENIS:  Okay.  Now -- all

25          right.  We're just going to take a short

216

1          Cheryl Kennedy

2      bathroom break right now.  If that's

3      okay with you.

4              THE WITNESS:  Sure.

5              MR. GENIS:  It is 2:35.  We've

6      been going for an hour. So you can turn

7      it off now, please.

8              (Recess taken at 2:35 p.m. to

9      2:42 p.m.)

10  BY MR. GENIS:

11      Q.    I just want to be crystal clear.

12  Did you ever perform -- you or the Transit

13  Authority ever perform a study pursuant or in

14  compliance with Military Standard 882E about

15  what would happen if you installed any of

16  these safety devices or changes in operation

17  that we've been discussing today?

18      A.    We did do an assessment in

19  accordance with 882 to see the hazards that

20  would be associated with installing platform

21  screen doors so that we could make sure that

22  we addressed everything if we were to -- you

23  know, if they were going to design one.

24      Q.    So I just want to make sure I'm

25  crystal clear with you.  So, yes, you or the

217

1                    Cheryl Kennedy

2     Transit Authority followed the methodology and

3     complied with the requirements of Military

4     Standard 882E in performing your hazard

5     analysis of 12-9s or, no, you did not?

6              MR. KEAVENEY:  Objection.

7         A.    Not of 12-9s.  We did an

8     analysis, but not in accordance with 882 --

9         Q.    Okay.

10        A.    -- which is okay.

11        Q.    Okay.  All right.  Well, did you

12    or the Transit do a study to see how to best

13    adapt platform screen doors to New York City?

14        A.    In my area, we did a -- an

15    assessment to identify the hazards that were

16    associated with installing screen doors so

17    that we would make sure we could address all

18    of those hazards in installation or in a

19    design.

20        Q.    That's not my question.

21  MO          MR. GENIS:  Move to strike.

22        A.    I think it was your question.

23        Q.    Okay.

24        A.    Unless I misunderstood it, I'm

25    sorry.

218

1                       Cheryl Kennedy

2        Q.       It's possible you misunderstood

3    it.  It's possible I asked a poor question.

4    Anything is possible.

5        A.       Okay.

6        Q.       So was there an assessment of the

7    hazards caused by the door compared to if they

8    just left everything the way it was; in other

9    words, did they do an assessment and say,

10   okay, we have X number of 12-9s occurring

11   right now and if we put on the doors,

12   recollect we're going have Y number of 12-9s,

13   something to that effect?

14       A.       No.

15       Q.       Okay.  Was there any kind of

16   assessment of the hazards of the actual

17   injuries, in other words, severity of

18   injuries, that there were to occur if there

19   were platform screen doors as opposed to no

20   platform screen doors?

21       A.       The severity would be the same if

22   you had an injury.

23       Q.       Okay.  So were there any kind of

24   assessment of the hazards of the frequency of

25   12-9s from occurring or from injuries

219

1                      Cheryl Kennedy

2    occurring if -- let me rephrase it.  Sorry.

3                      Was there any kind of analysis of

4    the frequency of injuries when there are

5    platform screen doors as opposed to no

6    platform screen doors?

7            A.     No.

8            Q.     Okay.  And was there any kind of

9    assessment of hazards where if there were

10   track intrusion devices and no track intrusion

11   devices?

12           A.     No, because we didn't even know

13   if they worked.  I mean, there wasn't any, so

14   you couldn't really do it.

15           Q.     And did you do an assessment of

16   hazards from when there was closed-circuit TV

17   as opposed to no closed-circuit TV?

18           A.     No.

19           Q.     Did you do a hazard assessment

20   about the frequency of injuries when there was

21   a lower entry speed of a station -- train into

22   a station?

23           A.     No.

24           Q.     Well, when you talked about

25   screen doors and that there was some sort of

220

1                    Cheryl Kennedy
2    study, was it for any height door or any kind
3    of barrier, was it a particular kind of
4    barrier, a fixed rail?  I just want to
5    understand exactly what it is you said you
6    studied.
7            A.    The platform screen doors could
8    be --
9            Q.    Let me withdraw that question
10   because you said it wasn't a study.  I don't
11   want to put words in your mouth.  Let me
12   correct myself.
13           A.    It was an assessment.
14           Q.    Right.  My apologies.
15           A.    It's okay.
16           Q.    So when you did an assessment,
17   did you assess the hazards for a different
18   height screen door?
19           A.    That went into it, okay.
20           Q.    When you did the assessment for
21   the dangers -- okay.  Let me just be clear.
22           A.    So maybe I can explain or you
23   want to keep --
24           Q.    Hold on a second.  Did you do an
25   assessment for the number of injuries that

221

1                          Cheryl Kennedy

2    would occur whether there was a barrier of any

3    kind, whether it be a platform screen door,

4    regardless of height, a fixed rail, a gate,

5    anything at all, compared to not having such a

6    device?

7           A.      No.

8           Q.      Okay.  Did you do an assessment

9    for the severity of injuries for when there is

10   such a barrier, regardless of the height of

11   the platform screen door or if it's a PED or

12   an APG --

13          A.      No.

14          Q.      Okay.  And did you do an

15   assessment of the number of injuries and the

16   severity of injuries if it's fixed rail or no

17   fixed rail?

18          A.      No.

19          Q.      Did you do an assessment of

20   injuries whether it be frequency or severity

21   of injuries if there are track intrusion

22   devices versus no track intrusion devices?

23          A.      No.

24          Q.      Did you do a hazard assessment to

25   see, whether it be the severity of injuries or

222

1                    Cheryl Kennedy

2    frequency of injuries, when there is lower

3    entry of speed into the station as opposed to

4    not?

5          A.     No.

6          Q.     Okay.  And when you did the

7    hazard assessment, was that done following the

8    methodology of Military Standard 882 and

9    complying with it or not?

10         A.     Which one are you talking about?

11         Q.     Well -- hold on.  Withdraw that

12   question.  Okay.

13                Was there ever an analysis done

14   to see which devices, if any, should be

15   installed at which stations?

16         A.     No.

17         Q.     Okay.  Now --

18         A.     They're still evaluating them.

19         Q.     Okay.  So how many years have

20   they -- has the Transit Authority been

21   evaluating all these things?

22         A.     I don't know.

23         Q.     Okay.

24         A.     With respect to track intrusion,

25   maybe 2016.

223

1                    Cheryl Kennedy

2        Q.      Okay.  So that's when they

3   started or that's when they stopped?

4        A.      I think that's when they

5   started --

6        Q.      Okay.

7        A.      -- but you can --

8        Q.      So you're telling us the Transit

9   has been studying the problems of 12-9s for

10  many decades, correct?

11               MR. KEAVENEY:  Objection.

12       A.      I don't know if they've been

13  studying -- I don't know.

14       Q.      Okay.  Well, has the Transit

15  Authority, from when you first got there until

16  the time you left, ever completed and

17  finalized study and analysis about the best

18  way to prevent or reduce 12-9s from occurring

19  or are they still studying it?

20       A.      They were looking at a number of

21  different issues and some of them were

22  implemented, okay, customer awareness

23  campaign, which was a huge campaign that had a

24  lot of different media.  You had the help

25  points that were installed to -- to assist

224

                        Cheryl Kennedy

1

2    passengers if they dropped something on the

3    track, they could call and get somebody to

4    come get it.  They installed countdown clocks

5    that would keep people from needing to go or

6    thinking they need to go to platform edge to

7    look to see if the train was coming.  This now

8    told them the train was coming.

9                    They were looking at something

10   new, which was the track intrusion devices, to

11   see if they could even work.  I believe they

12   looked at four, and then they were going to

13   look at another four when I left.  And they

14   were evaluating platform screen doors to see

15   whether or not they could be installed in our

16   system.

17   MO          MR. GENIS:  Okay.  So just move

18        to strike the portions which are

19        nonresponsive.

20        Q.    But to get to the question, so it

21   would be fair to say from the time you started

22   at the Transit until the time you left, the

23   Transit has not completed its studies for

24   safety and prevention of 12-9s; true?

25                    MR. KEAVENEY:  Objection.

225

1                      Cheryl Kennedy

2        Q.      They're still looking at it, so

3   it's still not complete yet, still studying

4   it; true?

5        A.      Well, they're looking at various

6   remedies or resolutions.  They have

7   implemented a number of other --

8        Q.      Well, we're going to talk about

9   that in a minute.  Right now I just want to be

10  clear on the question because you're going off

11  on tangents.

12       A.      Okay.

13       Q.      All I'm trying to find out now

14  is, yes or no, from the time you first got to

15  the Transit until the time you left in 2018,

16  did the Transit Authority complete its proper,

17  adequate, thorough, honest, objective study

18  and analysis and formulate a plan and

19  implement the plan to prevent or reduce 12-9s?

20       A.      They're still updating that,

21  okay, as I left.  It's always going to be

22  looked at.

23       Q.      So the answer is, it was not yet

24  finalized out of -- any study that was taking

25  place was not yet finalized at the time you

226

1               Cheryl Kennedy

2    left in 2018; true?

3               MR. KEAVENEY:  Objection.

4         A.    I can't answer that with a yes or

5    no.

6         Q.    Okay.  All right.  So would it be

7    fair to say that from the time you got to the

8    Transit until the time you left, the only

9    systemwide safety items that the Transit

10   Authority had implemented would be signs,

11   announcements, painting the tactile strips,

12   help points, and the other signs you mentioned

13   to prevent 12-9s from occurring; fair enough?

14        A.    There were other media associated

15   with the customer awareness, but, in general,

16   true.

17        Q.    All right.  Now -- all right.  So

18   let's talk about this.  When you first got to

19   the Transit Authority in 1982, had they

20   already implemented this program of

21   announcements and the signs and the media and

22   the help points and all those other things?

23        A.    I don't believe so.

24        Q.    Had they implemented any part of

25   that before you first got to --

227

1                    Cheryl Kennedy

2         A.     I don't recall way back then.

3    I don't know.

4         Q.     Okay.  Were any of these measures

5    implemented while you were at the Transit

6    Authority?

7         A.     Yes.

8         Q.     Okay.  When were these

9    implemented?

10        A.     I don't recall exactly when.

11        Q.     I understand you may not know the

12   exact --

13        A.     I don't know when they were

14   implemented.  I know the customer awareness

15   campaigns were around for a long time, but

16   they change over time to make them better or

17   the message changed a little bit, but over

18   time when I was there, they instituted the --

19   the tactile strip alongside of the -- the

20   yellow -- the yellow tactile strip along the

21   side of the platform.  They did awareness

22   campaigns over time.  They could have changed

23   or increased in -- in the number of media that

24   they put out because we had different

25   availability as time went on.  You had social

228

                        Cheryl Kennedy

1

2   media came into play.  You had TV came into

3   play.  You had MetroCards that you could put

4   messages in on the back of.  You had on-the-go

5   signs that you could put them on.

6              So the methods of doing it

7   increased over the years.  You know, there

8   were no help points back when we started with

9   this, and that was a big installation of all

10  of them.  There were no countdown clocks, and

11  over time, they instituted those, so

12  everything is over time, but when exactly that

13  customer awareness campaign came into play, I

14  can't answer that right now.

15       Q.    Okay.  I understand --

16  MO         MR. GENIS:  And just move to

17         strike those portions which are

18         nonresponsive.

19       Q.    I understand you don't recall the

20  exact date or year or month even, but can you

21  tell me, for example, what decade did they

22  start putting in the help points?

23       A.    The help points, in the 2000s.

24       Q.    Okay.  At what point did they put

25  in those message boards that, you know, the

229

1                    Cheryl Kennedy

2    train will be here in five minutes or

3    whatever?

4         A.    I think that was in the 2000s as

5    well.

6         Q.    Okay.  At what point did they put

7    in signage?

8         A.    Signage was over time.  They --

9    they -- I'm sure they had different things

10   back in old time, but the newer stuff came

11   into play in 2013.  They did a huge campaign

12   on it, but I'm -- I'm sure there were other

13   things in messages long before that.

14        Q.    Okay.  And when did they start

15   making announcements?

16        A.    I don't know.  I don't know when

17   that started.

18        Q.    Okay.  Now, when you say the

19   2000s, you're referring to the decade between

20   2000 and 2010, correct?

21        A.    Oh, could be 2000 now, right?

22        Q.    Well, I'm backing up now.  I

23   asked you about certain things, for example --

24        A.    I don't know when help points

25   were finished being installed, okay, or

230

1                    Cheryl Kennedy

2    started.  The late 2000s.  The -- I know that

3    the awareness campaign that was really

4    detailed and had all the different media in

5    place was around 2013.

6         Q.    Okay.

7         A.    2016, they started looking at

8    intrusion detection.  They did the pilot study

9    of that, but...

10         Q.    All right.  Let's back up now.

11    So -- okay.  What safety performance

12    indicators did you use to evaluate the

13    effectiveness of any of those items you just

14    listed; in other words, the measures you claim

15    that the Transit took in an attempt to prevent

16    or reduce 12-9s from occurring?

17         A.    You can't really look at them

18    individually.  You know, they were done all

19    together.  I don't know how you can really

20    look at -- you know, we put the tactile strips

21    in.  We did the announcements and all of that,

22    people still stand by the platform edge when

23    they shouldn't.  Help point, that was still

24    being installed when I left, but they can take

25    a look at how it's used, how many times it's

231

1                        Cheryl Kennedy

2    used to help a customer, how many times they

3    call for an emergency that is related to this

4    issue, but I don't know if they had done that.

5         Q.    Well, let me ask you this:  Let's

6    start with the help points.  How many 12-9

7    incidents were prevented because of use of a

8    help point?

9              MR. KEAVENEY:  Objection.

10        A.    I don't think you can determine

11   that.

12        Q.    Well, that's simple enough.  The

13   help point is a customer pushes that button

14   and talks at that station, correct?

15        A.    Right.

16        Q.    Okay.  Now, first of all, when

17   the customer uses the help point, are the help

18   points at the edge of the platform or

19   somewhere else?

20        A.    They're in various areas in the

21   platform and in mezzanine.

22        Q.    Okay.  So --

23        A.    So the only -- go ahead.

24        Q.    If a help point is in the

25   mezzanine, can we agree that that would have

232

1                     Cheryl Kennedy

2     little if no effect on preventing a 12-9 from

3     occurring?

4                     MR. KEAVENEY:  Objection.

5          A.     I don't know.

6          Q.     Okay.  Well, let's back up.  How

7     are the help points supposed to be used?

8          A.     You can use them to contact -- it

9     goes either to the station booth or the

10    control center and someone could call for --

11    for an emergency.  That would be maybe they

12    saw some activity on the station platform that

13    they needed to get to somebody right away.

14    Somebody could look like they were going to go

15    under the tracks or somebody might be on the

16    tracks and another customer could contact

17    them.  Then there's also another button that

18    you can push, the red one -- I'm sorry, a

19    green one, that you could get directions or

20    travel information.

21         Q.     Well, directions and travel

22    information will not prevent 12-9s from

23    occurring; true?

24         A.     True, but -- yeah, they're two

25    different aspects of it.

233

1                        Cheryl Kennedy

2          Q.      All right.  So let's stay focused

3    here now.  So first of all, if a customer uses

4    the help point station, does that directly

5    communicate with the train; yes or no?

6          A.      No.

7          Q.      So, in other words, if a customer

8    gets on the help point and says, somebody fell

9    on the tracks, stop the train, that will not

10   go directly to the train; will it?

11         A.      No.

12         Q.      Okay.  If a help point is on the

13   mezzanine, people that may wish to utilize it

14   can't even see what's happening on the

15   platform on the tracks; true?

16         A.      Well, they -- no, but they could

17   have ran to that one and used it.

18         Q.      So I'm saying if somebody is on a

19   platform and they see that another customer

20   fell onto the tracks --

21         A.      Well, no.

22         Q.      Can I finish my question, please;

23   please?

24         A.      Go ahead.

25         Q.      Thank you.  All right.  So a

234

1                    Cheryl Kennedy

2    customer is on a platform.  He sees another

3    customer.  Here, she sees another customer has

4    fallen onto the tracks.  First of all, you're

5    expecting them to run up the steps to the

6    mezzanine and find a help point and to know

7    there's a help point there, then they're going

8    to use the help point, and then somehow that's

9    going to get relayed in time to the train

10   operator or conductor to stop the train in

11   time; is that what you're telling us?

12        A.    Absolutely not what I said.

13        Q.    Okay.  Good.  So can we agree

14   that there is little, if any, value in the

15   help point in preventing a 12-9 on a

16   mezzanine; true?

17             MR. KEAVENEY:  Objection.

18        A.    That's true --

19        Q.    Okay.

20        A.    -- but it could --

21        Q.    Thank you.

22        A.    -- have some input in some cases.

23   MO         MR. GENIS:  Move to strike as

24        nonresponsive.

25        Q.    Okay.  So now let's get back to

235

1                        Cheryl Kennedy

2     help points on the platform.  How many help

3     points do they put on a platform?

4          A.     It depends on the platform, and I

5     don't know or I can't recall how many were on

6     each one.

7          Q.     Well, was more than one ever put

8     on a platform?

9          A.     Yes, of course.

10         Q.     Okay.  How many?

11         A.     I don't know.  I just said I

12    don't know how many are on the platform.  All

13    the platforms are different sizes, different

14    configurations.  They would have a different

15    number of them on there.

16         Q.     So, first of all, we have

17    stations that have no help points at all;

18    true?

19         A.     I don't believe that's true

20    anymore.  I believe they all do.

21         Q.     In --

22         A.     They were supposed to, when I

23    left, have them.  Every station was supposed

24    to have them.  Whether they do now or not, I

25    do not know.

236

1                    Cheryl Kennedy

2          Q.     So as of 2016, let's say, August

3    of 2016, not every station had help points;

4    true?

5          A.     Correct.

6          Q.     And were there ever times that

7    the help points did not function properly, did

8    not work properly?

9          A.     I don't recall.

10         Q.     Well, did anybody ever look into

11   that?

12         A.     I'm sure they did, but I don't

13   recall.

14         Q.     Okay.  And the help point might

15   be far from where somebody actually falls onto

16   the tracks; true?

17         A.     True.

18         Q.     Well, what, if any, safety

19   performance indicators do you have to evaluate

20   anything in the system according to what you

21   submitted to COMET about safety performance

22   indicators about how many people get injured

23   and how many people get hit by trains?

24         A.     I don't know how to answer that

25   question.

237

1                    Cheryl Kennedy

2        Q.    Okay.  Well, using Military

3    Standard 882E, when you're evaluating the

4    hazard in attempting to mitigate the risk, is

5    it fair to say using that methodology, as we

6    sit here today, you can't tell us what, if

7    any, effect these measures that you told us

8    were taken by the Transit had any effect on

9    the number of severity of 12-9s; true?

10       A.    You can't determine which one had

11   what effect, that's true.

12       Q.    Well, can you determine if --

13   globally, if all of these things all together,

14   all the measures put together, had any effect

15   on the 12-9s?

16       A.    I can tell you just by looking at

17   it, you still have the incidents and you still

18   have a high number of them.

19       Q.    Okay.  Well, for example, if

20   after there were changes made, in other words,

21   now we're doing tactile trims, now we're doing

22   announcements, now we're doing signs, now

23   we're doing this campaign public awareness,

24   now we're doing all these different things, if

25   -- if -- whether it be individually or all

238

1                        Cheryl Kennedy

2    together, if they were effective, you would

3    expect to see a dramatic decrease in the

4    number of 12-9 incidents; true?

5         A.      It should help decrease it.

6         Q.      Okay, but when you look at the

7    data, did you see any decrease in the number

8    of 12-9s after these measures were

9    implemented?

10        A.      No, not really.

11        Q.      Okay.  So would it be fair to say

12   that the measures taken by the Transit

13   Authority to reduce 12-9s have not been

14   effective?

15                MR. KEAVENEY:  Objection.

16        A.      You can't really tell completely.

17        Q.      Well, when you say "completely,"

18   we have the data, we don't see any - you just

19   told us - any significant decline or change in

20   the number of 12-9s from before and after the

21   measures taken by the Transit Authority were

22   implemented, so --

23        A.      Right.

24        Q.      -- would you agree since there's

25   been no real change that these measures have

239

1                    Cheryl Kennedy

2    been ineffective; true?

3                    MR. KEAVENEY:  Objection.

4        A.    But you're still carrying 1.7 or

5    more billion customers a year --

6        Q.    That's not my question.

7    MO          MR. GENIS:  Move to strike.

8        A.    -- most of them safely.

9    MO          MR. GENIS:  Move to strike?

10       A.    If you had -- okay.

11   MO          MR. GENIS:  Move to strike.

12       Q.    Please answer my question.  If

13   you need it read back, we'll read it back to

14   you.

15       A.    The trend did not really -- did

16   not decrease.

17       Q.    Okay.  Well, put it this way:  If

18   after you put a change in the announcements

19   and the steps taken and suddenly there was a

20   drop in 12-9s, you would correlate that as

21   being effective; true?

22       A.    You could.

23       Q.    Okay.  And in 2021, you have a

24   greatest amount or number of help points

25   installed in the whole system; true?

240

1                          Cheryl Kennedy

2          A.       True.

3          Q.       But in 2021, with the greatest

4    number of help points installed, they have the

5    greatest number of 12-9s in recent years;

6    true?

7          A.       According to your chart, yes.

8          Q.       Okay.  All right.  Now, so when

9    one has a system safety plan to prevent or

10   reduce the number of people killed or

11   catastrophically injured by 12-9s, you have to

12   look at the plan and see is it effective and

13   working or if it's not; true?

14         A.       You're talking about the system

15   safety program plan?

16         Q.       Any kind of system safety plan

17   that is written to help, prevent or reduce the

18   number of people being killed or

19   catastrophically injured by 12-9s, that's what

20   I'm asking you about.

21                  MR. KEAVENEY:  Objection.

22         Q.       If you had such a plan --

23         A.       I don't know what you're asking.

24         Q.       Okay.  Hold on.  If you don't

25   know, let's try that again then.

241

1                       Cheryl Kennedy

2          A.      Okay, let's try it.  Because

3     you're calling it a system safety program plan

4     and that is like the global plan of the whole

5     Authority.

6          Q.      Okay.  Can you articulate what

7     the safety plan was for the New York City

8     subway system to stop people from getting hit

9     by trains between 2006 and 2016?

10                      MR. KEAVENEY:  Objection.

11         A.      Okay.  You -- we look at the

12    data, okay, and all of the aspects of the data

13    to see --

14         Q.      I'm asking you what was the plan.

15    Can you please answer my question?

16    MO              MR. GENIS:  Move to strike as

17              nonresponsive.

18         A.      Statistical analysis.

19         Q.      Okay.  All right.  So yes, there

20    was a safety plan to prevent people from

21    getting hit by trains between 2006 to 2016, or

22    no, there was not?

23         A.      What you're calling a plan and

24    what I might call a plan -- I don't know what

25    you're calling a plan, so I can't answer that

242

                    Cheryl Kennedy

1    question.

2         Q.    Okay.  Well, if a measure is not

3    effective, then the proper thing to do is to

4    analyze the data and then go to the next plan,

5    change the plan; true?

6         A.    True.

7         Q.    All right.  Because plans can

8    evolve or change over time; true?

9         A.    True.

10        Q.    Okay.  So the first step is to

11   study the effectiveness of whatever measures

12   are taken to see whether or not they are

13   effective; true?

14        A.    True.

15        Q.    Okay.  And if you don't do

16   anything with the data or for the statistics,

17   then it's not valid for safety; true?

18        A.    True.

19        Q.    Okay.  And after the Transit

20   Authority took the measures you've told us,

21   the tactile strips, the signs, the

22   announcements, the help points, things of that

23   nature, did the severity of the injuries of

24   12-9s change significantly?

25

243

1                    Cheryl Kennedy

2          A.    No --

3          Q.    Okay.

4          A.    -- the severity is not going to

5     change.

6          Q.    Okay.  Now, when you were head of

7     OSS, what did you do to prevent or reduce the

8     number of 12-9s from occurring?

9          A.    Okay.  We took a look at the data

10    and analyzed it to see the different causes or

11    reasons for people getting hit by trains, some

12    of them being on the platform, some of them

13    being on the track in the station confines,

14    some of them being in between stations, some

15    of them being medical conditions, some of them

16    being suicides, some of them falling between

17    cars, and also took a look at to see if there

18    was any trend to see any particular station or

19    times of day or anything that you could pick

20    out as being a trend.

21         Q.    Okay.

22         A.    And took that information and

23    utilized that information to put it into the

24    customer awareness campaign as well as some of

25    the other measures that I went through, which

244

1                      Cheryl Kennedy

2    we don't want people going out onto the tracks

3    on purpose to pick up their items.  We want to

4    make sure that they're able to contact someone

5    from the Authority to assist them.  We want to

6    make sure it's very clear where they should

7    not be standing, which is the yellow tactile

8    strip, and also so many messages to tell

9    people to stand back from the platform edge.

10                      We went ahead and continued on

11   with, you know, going further in trying to

12   find new technology, and new technology being

13   intrusion detection, to see if that could

14   work.  We went further in trying to see

15   whether or not platform doors doors could be

16   safely constructed and designed and

17   implemented at New York City Transit, and they

18   are still doing that.

19                      And those things were done in a

20   systematic way.  You can't just decide that

21   you're going to put platform screen doors up

22   all over the system without really doing a

23   good -- your due diligence in looking at it to

24   see if it can be done, if it can be done

25   safely, and what do we have to do in order to

245

                        Cheryl Kennedy

1
2    do it safely.

3         Q.    But the last part is the most

4    important part, correct, because you're

5    already aware platform screen doors can be

6    installed, can be retrofitted and are

7    effective, so the only question is, how can we

8    best adopt them here, correct?

9         A.    Yes.

10        Q.    That's the only thing that really

11   should be studied; true?

12        A.    Right.

13             MR. KEAVENEY:  Objection.

14        Q.    Now -- okay.  All right.  Let's

15   move on.

16             THE WITNESS:  Can you hold on one

17        second?

18             MR. GENIS:  Sure, of course.

19             THE WITNESS:  I just have to

20        answer because someone is picking up my

21        granddaughter.

22             MR. GENIS:  No problem.  Do you

23        want to take a break?  It's 3:17.

24             THE WITNESS:  No.  No, it's okay.

25             MR. GENIS:  Okay.

246

1              Cheryl Kennedy

2              THE WITNESS:  Actually, yeah,

3         five minutes, can you do that?

4              MR. GENIS:  No problem.  Sure,

5         it's 3:17.  We'll take a break.

6              (Recess taken from 3:17 p.m. to

7         3:21 p.m.)

8    BY MR. GENIS:

9         Q.   Okay.  I'm almost done on this

10   particular topic, so I just want to finish

11   this up, so I can move to the next topic.

12              You mentioned earlier you did a

13   preliminary hazard analysis.  Did you ever do

14   a final hazard analysis?

15         A.   That's what the analyses are

16   called that we normally did.  If you look in

17   the military standard, the one that we used

18   all the time was called preliminary hazard

19   analysis, but that was really the only one my

20   office used.  It's not necessarily meaning

21   it's preliminary.  It's final when it's done,

22   but that's just the type of analysis that we

23   used.

24         Q.   Now, do we agree that when doing

25   an analysis, it has to be based on the fact

247

1                    Cheryl Kennedy

2    and the data and not on speculation, guesses

3    or hypothesis; true?

4         A.    True.

5         Q.    So to do a proper, adequate and

6    reasonable study, you have to compare the

7    probabilities of any hazard you've identified;

8    true?

9         A.    You have to look at the

10   probabilities, yes.

11        Q.    Okay.  And then -- so you have

12   to -- so we looked at that matrix, you have to

13   look at the frequency and you have to look at

14   the severity, correct?

15        A.    Correct.

16        Q.    And this is how you compare so

17   it's apples to apples instead of apples to

18   oranges, correct?

19        A.    Correct.

20        Q.    In other words, we can do a

21   platform screen door and on the matrix, here's

22   where that comes out or we can do some other

23   device and see where that comes out on the

24   matrix, so on and so forth; true?

25        A.    No.

248

                        Cheryl Kennedy

1

2       Q.      No.  So you're saying -- let's

3    make sure I understand you now.  When we're

4    discussing proper, adequate, and reasonable

5    studies, you have to have comparables that are

6    equivalent; true?

7       A.      I don't know if I agree with that

8    statement.

9       Q.      Okay.  That's okay.  You don't

10   have to agree with me.

11      A.      Okay.

12      Q.      So, for example, on the topic of

13   comparables, we discussed earlier how if

14   you're going to compare the New York City

15   subway system, you have to use a comparable or

16   an equivalent subway; true?

17      A.      True.

18      Q.      Okay.  That's why we said Paris

19   and London were comparables, but Washington,

20   D.C. was not, correct?

21      A.      Correct.

22      Q.      Okay.  So --

23      A.      So --

24      Q.      So what I'm saying is, if you're

25   trying to decide and do an adequate, proper,

249

                        Cheryl Kennedy

1

2    and fair study and analysis, you're looking at

3    the different possible options and you're

4    looking on that risk matrix to see, okay, if

5    we do option A, this is the type of hazards

6    and the frequency, and if we do B, this is the

7    type of hazard and frequency and so on,

8    correct?

9          A.    You identify all of your

10   resolutions, okay.  Every hazard that we would

11   identify, we would come up with resolutions

12   for it.  And it would be similar to what you

13   said before, where you would have technology,

14   you would have training, you would have those

15   type of things.

16         Q.    Okay.

17         A.    You would have warning devices or

18   operational changes, and they would affect the

19   overall -- each -- each hazard that we

20   identified --

21         Q.    Okay.

22         A.    -- but we would address all of

23   them --

24         Q.    Okay.

25         A.    -- regardless of what their --

250

1                    Cheryl Kennedy

2   what was on the matrix.

3          Q.    And that's what is required to be

4   done; true?

5          A.    True.

6          Q.    Okay.  And that's what's required

7   by good and accepted practices and procedures;

8   true?

9          A.    True.

10          Q.    Okay.  So if you fail to compare

11   that risk matrix analysis for the different

12   means of accomplishing something, you have not

13   done a proper, adequate and complete

14   reasonable study; true?

15          A.    No.

16          MR. KEAVENEY:  Objection.

17          Q.    Okay.  So you're telling me is,

18   okay, so what we have, A is a safety device,

19   and we already know on the matrix where that

20   is, on the risk matrix, and B we know where

21   that is, and C we know where that is, but

22   we're not going to compare them to see which

23   has the least amount of injury or least severe

24   injury and the least frequency because that's

25   the safest way to go; is that what you're

251

1                    Cheryl Kennedy

2    telling me?

3         A.    You come up with your

4    recommendations --

5         Q.    Can you answer my question?

6         A.    No, I can't answer it that way.

7         Q.    You can't answer that, okay.

8    So -- all right.  So, in other words, the

9    consequences of the various acts that can be

10   taken are irrelevant to you?

11              MR. KEAVENEY:  Objection.

12        A.    They're not irrelevant.

13        Q.    Okay.  So they have to be

14   weighted, that's why we have these tables that

15   evaluate them; true?

16        A.    I said we are addressing all of

17   the hazards.  What you're saying is not

18   completely true.

19        Q.    Okay.  All right.  So if you fail

20   to properly, fairly and adequately study and

21   evaluate all of the hazards, looking at the

22   severities and frequency of occurrence, if you

23   fail to do that, you have not done a proper,

24   complete and adequate, reasonable study; true?

25              MR. KEAVENEY:  Objection.

252

                    Cheryl Kennedy

1

2          A.       No, there are other ways of doing

3   analyses, not just following that military

4   standard, if that's what you're getting at.

5   You can do an analysis utilizing your

6   statistics, like I described.

7          Q.       Okay.  So -- we're going in

8   circles now.

9          A.       Yeah, because I don't understand

10  what you're --

11         Q.       Statistics are data and numbers;

12  true or false?

13         A.       True.

14         Q.       Okay.  So you have to look at the

15  data, the numbers and the statistics; true or

16  false?

17         A.       Yes.

18         Q.       And you have to look at the

19  comparatives and the comparables to see which

20  is the safest outcome; true or false?

21         A.       The safest outcome?

22         Q.       Yes.

23         A.       I don't know what you're saying.

24         Q.       You don't know what that means?

25         A.       I don't know what -- you're going

253

1                    Cheryl Kennedy

2    in circles to me, so I don't know what you're

3    saying.  I'm not -- I'm not trying to be

4    difficult.  I'm just --

5          Q.      Not a problem.  Okay.  Let's do

6    it a nice, simple way.

7          A.      Okay.

8          Q.      You have a known recognized

9    hazard; true?

10          A.      True.

11          Q.      All right.  So the question is,

12    what's the best way to rectify or mitigate

13    that hazard; true?

14          A.      True.

15          Q.      And a proper method and an

16    adequate method of assessing, analyzing and

17    studying it is to look at the different

18    consequences or outcomes by using the

19    different applicable possible methods; true?

20          A.      True.

21          Q.      And you could see that device A

22    is far more effective at preventing both in

23    terms of severity of injury and in terms of

24    frequency and occurrence than something

25    category B or C; true?

254

1                       Cheryl Kennedy

2          A.      True --

3          Q.      Okay.

4          A.      -- but you have --

5          Q.      And that's what a proper,

6    adequate, reasonable study does, is it looks

7    at the whole picture --

8          A.      Okay.

9          Q.      -- evaluates everything --

10         A.      Uh-hum.

11         Q.      -- and then comes to the logical,

12   rational conclusion based on the data and the

13   statistics; true?

14         A.      True, but there's more to it.

15         Q.      Okay.  I'll take it up to true.

16         A.      Okay.

17         Q.      So one of the things you have to

18   do to decide whether you're going to put in a

19   safety device or leave it alone; true?

20         A.      You have to see if a safety

21   device is available.  You have to --

22         Q.      Can you answer my question,

23   please?

24         A.      I am answering it.

25         Q.      No, you're not.

255

1                    Cheryl Kennedy

2          A.    I am.  All right, I can't answer

3    it.  I'm sorry.

4          Q.    Okay.  If you can't, you can't,

5    that's fine.  So, in other words -- okay.

6    You're deciding you're either going to put in

7    a safety device --

8          A.    The safety --

9          Q.    -- or you're not; true or false,

10   that's the ultimate decision?

11         A.    True.

12         Q.    Okay.  Thank you.  And when doing

13   this, you have to weigh the dangers and

14   consequences using that matrix of leaving it

15   as, not making the change, as opposed to what

16   happens if you put in the safety device; true

17   or false?

18              MR. KEAVENEY:  Objection.

19         A.    It's not that -- that simple.

20   You're --

21         Q.    It really is, but okay.

22         A.    No, you're not --

23         Q.    Okay.  Well, let me ask you,

24   right --

25         A.    Okay, well, let --

256

1                    Cheryl Kennedy

2          Q.      Let's put it this way --

3          A.      Okay.

4          Q.      -- was it -- before the Transit

5     decided to put in a tactile strips, do signs,

6     help points, announcements and things of that

7     nature, was it acceptable and tolerable for

8     the number of 12-9s taking place?

9          A.      No.

10         Q.      Okay.  So the Transit Authority

11    acknowledged that something had to be done to

12    prevent or dramatically reduce the number of

13    12-9s; true?

14         A.      True.

15         Q.      And so then the question is, what

16    is the most effective means of preventing

17    12-9s from occurring; true?

18                 MR. KEAVENEY:  Objection.

19         A.      It's true, but --

20         Q.      Thank you.

21         A.      -- you're not letting me explain.

22         Q.      Thank you.  I don't need an

23    explanation.  You answered my question.

24    MO                 MR. GENIS:  Move to strike after

25            true.  Thank you.

257

1                    Cheryl Kennedy

2           A.      Okay.

3           Q.      Okay.  Now, do we agree that when

4    you're using this risk matrix chart, sometimes

5    you may be looking at there's a hazard of

6    doing nothing, but there's a hazard of doing

7    something, correct?

8           A.      Yes.

9           Q.      So then you have to compare those

10   hazards, the severity of the hazards for each

11   and the probabilities of the hazard for each,

12   correct?

13          A.      Correct.  You...

14          Q.      All right.  So, in other words,

15   if you put in the platform screen doors and it

16   now prevents 99 percent of your 12-9s and

17   prevents all of those fatalities and

18   catastrophic injuries, but in exchange for

19   that, you will have a small number of people

20   that sustain minor injuries that would not

21   have occurred but for the installation of the

22   platform screen doors, can we agree that

23   that's a fair trade, you're getting rid of a

24   high frequency of serious outcomes of death or

25   catastrophic injuries in exchange for a low

258

1                    Cheryl Kennedy

2    number of minor injuries; true?

3                    MR. KEAVENEY:  Objection.

4         A.    It may not -- I can't answer that

5    question with a yes or no.

6         Q.    Okay.  Well, you would look to

7    see which way is -- which way is there a net

8    benefit, so to speak?

9         A.    There's more to it than that.

10        Q.    Okay.  All right.  So you can't

11   answer my question?

12        A.    No.

13        Q.    Okay.  That's all you have to do

14   is say that.

15        A.    Okay.

16        Q.    I keep telling you that.

17              Now you mentioned a few times

18   pilot project.  What is a pilot project?

19        A.    That is to identify, in this

20   case, some type of technology, this was an

21   intrusion detection, and you analyze it to

22   see -- put it in place somewhere in the system

23   and see if it works.  Okay.

24        Q.    Why does the Transit Authority do

25   pilot projects?

259

Cheryl Kennedy

1

2          A.      To see if they can be installed

3     or they can operate in our system from an

4     operational standpoint, from a maintenance

5     standpoint, from a safety standpoint, and to

6     see if they do what they're supposed to do

7     depending on what the technology is, and it

8     would give you time to evaluate whether or not

9     it's working.  With respect to the intrusion

10    detection, to see whether or not it was

11    identifying people actually soon enough as

12    they go onto the track, whether it was

13    identifying things that were not people, you

14    know, whether it was false notifications.  You

15    would have to see what technology worked the

16    best.  And some of those technology might work

17    better in some type of configurations of our

18    system than others, so that's why they

19    couldn't just pick one and put it out there

20    and think it's going to work when you don't

21    know.

22          Q.      Okay.  So what you're telling me,

23    if I'm understanding you correctly, is that it

24    is necessary, at times, to perform pilot

25    projects; true?

260

1                     Cheryl Kennedy

2          A.      True.

3          Q.      Okay.  And among the reasons that

4    you do the pilot project is to see whether or

5    not the proposed safety device is effective;

6    true?

7          A.      True.

8          Q.      So you do the pilot, which is a

9    test, so to speak?

10         A.      Yes.

11         Q.      And you see, does it pass the

12   test or fail the test, correct?

13         A.      True.  Yes.

14         Q.      Okay.  We took whatever measures

15   we took and we see the data, we see the

16   statistics, it's effective or it's not

17   effective; true?

18         A.      True.

19         Q.      Okay.  And then based on that,

20   you see that, okay, we can't do it with A,

21   we're going to go with B, correct?

22         A.      Correct.

23         Q.      Okay.  And you look at the safety

24   indicators, performance indicators to see

25   whether or not it is, in fact, effective and

261

1                    Cheryl Kennedy

2    working; true?

3         A.    More than just that.

4         Q.    Okay.  And, by the way, does the

5    urgency in which you do this relate to the

6    severity of risk and the injury?

7              MR. KEAVENEY:  Objection.

8         A.    Yes, if you see -- yes.

9         Q.    Okay.  So now, who decides

10   whether or not to perform a pilot project?

11        A.    The president.

12        Q.    Okay.  And the pilot project,

13   they cost money and it takes time to do it,

14   correct?

15        A.    Correct.

16        Q.    Because first you have to decide

17   to do one and you have to look at the type,

18   the when and where and how and pick locations,

19   right?

20        A.    Correct.

21        Q.    Okay.  So during the time you

22   were at the Transit Authority, did the Transit

23   Authority have any pilot projects planned for

24   platform screen doors?

25        A.    Yes.

262

                    Cheryl Kennedy

1

2        Q.     Okay.  How many pilot projects

3   did the Transit Authority have planned for

4   platform screen doors?

5        A.     I don't recall how many.  I just

6   remember the one on the L Line.

7        Q.     And were any of the pilot

8   projects for platform screen doors ever

9   implemented?

10       A.     No.

11       Q.     Do you know why the pilot

12   projects that were planned were not

13   implemented, and this is for the platform

14   screen doors?

15       A.     I don't know what happened with

16   the L Line because I left and it was supposed

17   to be done.  I don't know why.

18       Q.     Do we agree that since 2003,

19   there were supposed to be pilot projects

20   platform screen doors?

21       A.     I don't recall how many or where.

22   I don't recall the details.

23       Q.     Well, did you ever make

24   recommendations for any of these pilot

25   projects for platform screen doors?

263

1                        Cheryl Kennedy

2        A.       We would have been in the loop

3   that they were going to do them or where they

4   were going to do them.

5        Q.       Well, for example, did you make

6   recommendations for the locations of the

7   pilots?

8        A.       We would assist in that.

9        Q.       Okay.  And did you do so?

10       A.       I don't recall.

11       Q.       Okay.  Now, was there anything

12  ever -- let's back up.

13                At the Transit Authority, when

14  you were there, constantly there were e-mails

15  and memos being sent back and forth to

16  different people; true?

17       A.       True.

18       Q.       You were constantly receiving and

19  sending e-mails and receiving and sending

20  memos; true?

21       A.       True.

22       Q.       Okay.  And there were numerous

23  writings and memos and e-mails about these

24  pilot projects; true, for platform screen

25  doors?

264

                        Cheryl Kennedy

1

2       A.      I'm sure there were.

3       Q.      Okay.  And it went through a lot

4  of steps to finally have these pilot projects

5  approved, designed and planned, correct?

6       A.      Correct.

7       Q.      And then they were canceled after

8  all that was done, correct?

9       A.      Well, I remember the L Line one.

10  I'm not recalling the other ones.

11       Q.      Okay.  And did you -- was there

12  ever a memo or e-mail that you received that

13  said why the pilot project for the platform

14  screen doors was canceled?

15       A.      I don't recall.

16       Q.      Okay.  Now, did the -- when you

17  were at the Transit Authority, did they have

18  any pilot projects for the track intrusion

19  devices?

20       A.      Yes.

21       Q.      Okay.  Did they have any pilot

22  projects for the CC-TV?

23       A.      That was part of that, I think.

24  It was all intrusion, I think is what you're

25  asking about.  That could have been a piece of

265

1                    Cheryl Kennedy

2   -- that was one of the types of intrusion.

3        Q.    Okay.  Was there ever a pilot

4   project for fixed rail to see its efficacy in

5   preventing 12-9s?

6        A.    I don't recall that.

7        Q.    Okay.  And when we're talking

8   about the CC-TV, I want to be clear that

9   that's informing the train that somebody is on

10  the track before it gets into the station,

11  correct?

12       A.    Well, I don't know what those

13  four intrusion detection things were.  One was

14  laser, one was thermal imaging, and some of

15  them had CC-TVs associated with it.  So yes,

16  it would be -- you would want to be notifying

17  the train that someone was on the track for

18  all of those different devices.  And they were

19  -- they were piloting four -- they piloted

20  four and they were going to pilot four more

21  when I left.

22       Q.    In fact, you were aware and knew

23  about track intrusion devices and platform

24  screen doors in the early 2000s; true?

25       A.    True -- well, not intrusion

266

1                    Cheryl Kennedy

2  detection, per se.  I don't recall that, but

3  platform screen doors I would have known.

4        Q.    And in the early 2000s based on

5  the documents given to the Transit Authority

6  from COMET and its other organizations it

7  belonged to, you were aware that these other

8  devices, track intrusion devices, platform

9  screen doors, were being used successfully in

10  other countries; true?

11        A.    I don't recall.

12        Q.    And if there were e-mails that,

13  in 2009, you were aware of track intrusion

14  devices, would that refresh your memory?

15        A.    It might, yeah.

16        Q.    Okay.  Now -- well, did you ever

17  do a pilot project -- withdrawn.

18              By the way, are you aware of a

19  type of track intrusion device known as a

20  pressure mat, it's placed on the track floor,

21  that was even older than the laser devices?

22        A.    I don't -- I don't recall that.

23        Q.    Okay.  Now, was there ever a

24  pilot project about having a lower entry speed

25  of a train into a station to prevent or reduce

267

1                    Cheryl Kennedy

2    12-9s from occurring?

3          A.    I don't recall.

4          Q.    Was there ever a study done to

5    see if lowering the entry speed of a train

6    into a station would reduce the number of

7    12-9s?

8          A.    Not that I know of.

9          Q.    Okay.  Did you ever do a test or

10   try to lower the speed of trains entering the

11   stations to see if that reduced the number of

12   12-9s?

13         A.    Not to my knowledge.

14         Q.    Okay.  Now, if there was a pilot

15   or a study about reduction of entry speed of a

16   train into a station, that's something that

17   would be in writing; true?

18         A.    True.

19         Q.    That would be documented clearly,

20   correct?

21         A.    True.

22         Q.    And that would be something that

23   you would have been informed of as the head of

24   office of system safety, correct?

25         A.    Correct.

268

                        Cheryl Kennedy

1

2          Q.     And, as we sit here today, you

3    don't know how many pilot projects were

4    canceled for platform screen doors, correct?

5          A.     Correct.

6          Q.     And, as we sit here today, you

7    don't know why they were canceled, correct?

8          A.     Correct.

9          Q.     And do you know why then new

10   pilots were then ordered for platform screen

11   doors?

12         A.     The L Line was going to be

13   totally closed and changed and rehabbed, so

14   that would have been a good location that they

15   could have tried it because it would be, like,

16   bringing in a new -- a newer -- it was going

17   to be closed for a significant amount of time,

18   but I don't know, you know, what happened with

19   the construction of all that.

20         Q.     And if there was a pilot for the

21   platform screen doors, you would have wanted

22   to know the results to see if it was

23   effective; true?

24         A.     True.

25         Q.     Okay.  And the pilots for the

269

1                      Cheryl Kennedy

2    track intrusion devices, when you were there,

3    were successful; true?

4           A.      Some were.

5           Q.      Okay.  Now, for the Second Avenue

6    subway, that was new construction; true?

7           A.      True.

8           Q.      And the original designs for the

9    Second Avenue subway, platform screen doors

10   were supposed to be installed; true?

11          A.      I don't recall.

12          Q.      Okay.  So you're not denying

13   that, you just don't remember one way or the

14   other?

15          A.      Right.

16          Q.      Now, since the Second Avenue

17   subway was new construction, that would have

18   been the perfect opportunity to install

19   platform screen doors; true?

20          A.      It could have been.

21          Q.      And do you agree that there was a

22   recommendation for platform screen doors to be

23   installed in the Second Avenue subway?

24          A.      I don't recall offhand right now.

25          Q.      Do you know why platform screen

270

1                    Cheryl Kennedy

2    doors were not installed in the Second Avenue

3    subway?

4            A.      No.

5            Q.      Do you recall anybody being

6    against the installation of platform screen

7    doors of any type while you were there?

8            A.      No, we just had to look at

9    whether they could be installed and how they

10   would go about doing it.  I mean, I wouldn't

11   say they would be against it.

12           Q.      Okay.  Was there tension between

13   operations and safety to see if change in

14   operations was necessary to accommodate safety

15   features?

16           A.      No.

17           Q.      Okay.  You're familiar with the

18   Americans with Disabilities Act; true?

19           A.      True.

20           Q.      When you were at the Transit

21   Authority, were all New York City Transit

22   Authority subway stations 100 percent ADA

23   compliant?

24           A.      No.

25           Q.      How many of the subway stations,

271

1                    Cheryl Kennedy

2    when you were there, were 100 percent ADA

3    compliant, if any?

4             A.    I don't recall.

5             Q.    Is the Transit Authority allowed

6    to be noncompliant with the ADA?

7             A.    I believe they were moving to

8    follow all the regulations they had to follow.

9    You know, I don't recall.  I know they had

10   elevators and egress and things like that were

11   taken into consideration for ADA, and they had

12   a whole separate ADA group that was dealing

13   with it.

14            Q.    You know what, I'm going to

15   ask -- not ask you questions about ADA

16   compliance.  I'm going to save that for

17   another witness, okay?

18            A.    Good.

19            Q.    So I'm going to move off the

20   topic, all right?  And I'm sure that made you

21   happy too.  Let's go to these other notes.

22                 So while you were at the Transit,

23   would it be fair to say that 12-9s were a

24   weekly occurrence?

25            A.    No.

272

1               Cheryl Kennedy

2        Q.    Okay.  Well, how often did they

3   occur?  I mean, we went through the data

4   before and we saw anywhere from, let's say,

5   you know, 110 to 200 per year 12-9 incidents.

6        A.    I don't know, you know, how many

7   incidents occurred, how that was broken down

8   through the year.  I don't -- I don't know.

9        Q.    Okay.  Well, after each accident,

10  you told us there's an investigation, so --

11  true?

12       A.    True.

13       Q.    Okay.  So each time there's an

14  accident and an investigation, do they do a

15  root cause analysis to see how they could

16  prevent such an occurrence from happening

17  again?

18              MR. KEAVENEY:  Objection.

19       A.    No.  They would identify the

20  incident and what happened and it could be

21  done by the police or it might have been done

22  by the department of subways, and it would be

23  described -- the incident would be described.

24  MO           MR. GENIS:  Okay.  Move to strike

25       as nonresponsive.

273

1                    Cheryl Kennedy

2          Q.      That's not my question.

3          A.      I think I answered it.

4          Q.      Not really.  Well, let me ask

5    you, when an employee is injured and hit by a

6    train, do we agree that in those instances, a

7    root cause analysis is performed?

8          A.      In those incidents, a detailed

9    report and investigation is done by -- was

10   done by my office and you might not come up

11   with one cause.  You know, when you call it a

12   root cause, there could be a few causes and

13   normally there were more than one in those

14   incidents.

15         Q.      Okay.  I don't think I ever said

16   one cause.

17         A.      Well, a root -- when you're

18   saying root cause, there could be causes --

19         Q.      Uh-hum.

20         A.      -- okay, and they were identified

21   and all of them were addressed.

22         Q.      Okay.  And then -- so when you

23   have the employee that's injured in a 12-9,

24   you then come up with a recommendation to make

25   sure it doesn't happen again, correct?

274

1                    Cheryl Kennedy

2        A.     Correct --

3        Q.     Okay.

4        A.     -- recommendations.

5        Q.     Okay, recommendation is fine.

6        A.     Yeah.

7        Q.     Okay, but when a regular customer
8    was either killed or catastrophically injured
9    in a 12-9 incident, did the Transit Authority
10   also make recommendations to prevent such an
11   occurrence from happening again?

12       A.     Not in each incident, no.

13              MR. GENIS:  Okay.  Let's see --

14       okay.  Just going through my notes.  I

15       don't need to cover things I've already

16       asked you about.  Can we just take a

17       quick two-minute break and I can take up

18       less of your time.

19              THE WITNESS:  Sure.

20              MR. GENIS:  Let's take a

21       five-minute break.

22              THE WITNESS:  No problem.

23              MR. GENIS:  3:53.

24              THE WITNESS:  Okay.

25              MR. GENIS:  You can turn off the

275

1                    Cheryl Kennedy

2          camera.

3                    (Recess taken from 3:53 p.m. to

4          3:59 p.m.)

5    BY MR. GENIS:

6                    MR. GENIS:  Let's see, Dave, can

7          you please put on exhibit -- I forget

8          the Bates, but I think it's a marked

9          Crane complaint?

10                   We'll make this -- deem it

11         Plaintiff's Exhibit 5 of today's date,

12         and let's just get the Bates numbers on

13         there.  I can't see it, so, Dave, if you

14         can scroll down, so we can at least get

15         the Bates numbers -- we just lost it,

16         Dave.

17                   Okay.  I see the Bates is 419359,

18         I think for the first page, so we have

19         that on the record as Plaintiff's Number

20         5.

21                   (Plaintiff's Exhibit 5 deemed

22         marked for identification.)

23                   MR. GENIS:  And, Dave, if you can

24         just scroll so the witness can see it,

25         please.

276

1                    Cheryl Kennedy

2              THE WITNESS:  Okay.  I have to

3        read it, so --

4              MR. GENIS:  No problem.  Yeah,

5        slow it down, Dave.

6              THE WITNESS:  Okay.  You can move

7        it up a little bit.  Okay -- down a

8        little, I'm sorry.  Okay -- oh, wait.

9        I'm reading the dead man's curve, so you

10       can -- okay.  Okay.  Okay.  Okay.  Go

11       back a little.  Right there.  Okay.  You

12       can move it down or whatever -- okay.

13       Okay.  You can move it a little down a

14       little -- I'm sorry, back a little.

15       Okay.  Okay.  Okay.  You can move it a

16       little.  Okay.

17             MR. GENIS:  Is that the end of

18       it, Dave?

19             THE WITNESS:  Is there more?

20             MR. GENIS:  That's the end of it.

21             THE WITNESS:  Okay.

22             MR. GENIS:  If we can now go --

23       Dave, can you put up the Samuelsen

24       letter?  I forgot what exhibit that is.

25       And we'll deem it marked Plaintiff's 6,

277

1          Cheryl Kennedy

2      and we'll get the Bates number as soon

3      as you put it up.  Just waiting for you

4      to put it up, Dave.

5              MR. ROTH:  Just give me one more

6      second.

7              MR. GENIS:  Okay.

8              Okay.  And the Bates on this

9      was -- Dave, just go to the bottom for a

10     second, so I can see the Bates.  It is

11     13594, and that's deemed Plaintiff's

12     Number 6 for today.

13             (Plaintiff's Exhibit 6 deemed

14     marked for identification.)

15             MR. GENIS:  Let's just start at

16     the top, so she can read it, maybe the

17     very top, so she can see who it's from.

18             THE WITNESS:  Yeah, I -- I see

19     Samuelsen.

20             MR. GENIS:  Okay.

21             THE WITNESS:  Just go back a

22     little bit, I'm sorry.  Okay.

23     Q.     All right.  Have you read this

24  whole document, Plaintiff's Number 6?

25     A.     Yes.

278

1                    Cheryl Kennedy

2          Q.     Okay.  By the way, did you ever

3    become aware of either this letter by

4    Mr. Samuelsen, president of the Transit

5    Workers Union or Mr. Crane, the one on

6    Plaintiff's 5 we showed you right before that?

7          A.     Probably.  I mean...

8          Q.     Okay.  You had circulated these

9    letters, correct?

10         A.     Right.

11         Q.     Okay.  And after receiving these

12   two letters, at that time -- well, let me

13   break it down.

14                After the Crane letter in 2008,

15   at that time, did the Transit Authority do any

16   kind of testing or studies to see what would,

17   if anything, happen if they reduced the entry

18   speed of a train entering a train station?

19         A.     I don't recall.

20         Q.     And did you ever have any study

21   or analysis after the 2008 letter by Mr. Crane

22   about lowering or reducing the entry speed of

23   a train into a station and to see what, if

24   any, effect that would have on safety and the

25   reduction of 12-9s?

279

1                        Cheryl Kennedy

2            A.      I don't believe so.

3            Q.      Okay.  And after the Samuelsen

4    letter in 2013, at that time, did the Transit

5    Authority do any studies or perform any

6    testing to see what, if any, effect lowering

7    the speed of a train entering the station

8    would have on reduction of 12-9s?

9            A.      Yeah, I don't recall.

10           Q.      Did you do anything after getting

11   the Samuelsen letter?

12           A.      I don't recall that either.

13   Sorry.

14           Q.      And -- all right.

15                   MR. GENIS:  Dave, can you just

16           put up the Crespo bill, please.  We're

17           going to mark that -- or deem it marked

18           Number 7 today.

19                   And we'll just get the Bates

20           number.  Can you just make that a little

21           bigger, please, Dave, so I can see the

22           Bates number?  You've got to go to the

23           bottom so I can see --

24                   MR. ROTH:  I'm showing from the

25           bottom up.

280

                        Cheryl Kennedy

1

2              MR. GENIS:  But I'm not seeing

3         the bottom.  Okay.  Bates number --

4         where did it go?  It just disappeared on

5         me.  I see 391437.  It looks like it

6         might be for the second page of this.  I

7         can't tell if it's the first or the

8         second.

9              MR. ROTH:  This a five-page

10        document.  This is the bill and then the

11        e-mail about the bill is the one above

12        it.

13             MR. GENIS:  Okay.  First, I want

14        to look at the bill and then we can do

15        the e-mails.

16             THE WITNESS:  Wait.

17             MR. GENIS:  And that's 391436,

18        I see.

19             THE WITNESS:  Okay.

20    Q.        Tell me when you've read that.

21    A.        Okay.  I read it.

22    Q.        Okay.  Now, this was in 2011,

23    correct?

24    A.        That's what it says.

25    Q.        Okay.  Now, do you recall, were

281

1                     Cheryl Kennedy

2   you aware of this proposed bill to lower the

3   speed of trains entering stations?

4           A.      At the time, I must have been.

5           Q.      Okay.  And after seeing a

6   proposed bill -- and you see how there's an

7   e-mail that was sent to you?

8           A.      Yes, uh-huh.

9           Q.      So after you received this, did

10  you see, geez, maybe we should do a study or a

11  test to see if we lower the speed of a train

12  entering a station, if it can reduce the

13  number of 12-9 incidents; did you do anything

14  to that effect?

15          A.      We did not do a study.

16          Q.      Okay.  Did you do a test?

17          A.      I don't recall a test.

18          Q.      Did you do a pilot?

19          A.      No, I don't -- I don't recall,

20  actually, what happened.

21          Q.      Did you recommend that either a

22  test, a study, an analysis, a pilot project,

23  anything at all be done after getting all

24  three of these things --

25          A.      I don't recall.

282

Cheryl Kennedy

1          Q.      -- a letter from Mr. Crane, a

2    letter from the president of the Transit

3    Workers Union, a proposed bill by a state

4    assemblyman, to lower the speed of trains

5    entering subway stations to prevent 12-9s from

6    occurring?  After those three things occurred,

7    did you then say, as the head of the office of

8    system safety, maybe we should do a study or

9    an analysis or a test to see if reducing the

10   entry speed of a train can reduce 12-9s from

11   occurring?

12                 MR. KEAVENEY:  Objection.

13         A.      I don't recall.

14         Q.      Okay.  Now, if you did such a --

15   if you said that -- withdrawn.

16                 If you would have requested a

17   study, an analysis, a test, that would be

18   documented; true?

19         A.      It should be.

20         Q.      All right.  Okay.  Now, let's now

21   look at the e-mails above that, so we can see

22   some responses from the Transit Authority to

23   the proposed Crespo bill, and it's still

24   Exhibit 7, and we'll get to the Bates numbers

283

1                       Cheryl Kennedy

2    when they come up on the screen, but I see --

3    you know what --

4           A.     I can read it.

5           Q.     Yes.  And we're on Bates 391435.

6           A.     Well, that would be who would do

7    it.  It went to operations planning because

8    any change in the speed would have an effect

9    on platform crowding and, you know, boarding

10   and alighting of trains and everything, so it

11   would have gone to operations planning, Peter

12   Cafiero.

13          Q.     Okay.  So you see that on

14   February 8, 2011, right after the proposed

15   Crespo bill was publicized, Tom Prendergast,

16   the president of the Transit, sent an e-mail

17   to Carmen Bianco, yourself and a Charles

18   Seaton, with a CC to Ken Mooney and Peter

19   Cafiero, correct?

20          A.     Uh-hum.

21          Q.     Yes?

22          A.     Yes.

23          Q.     Who is Carmen Bianco?

24          A.     He was vice president of subways.

25          Q.     Who was Charles Seaton?

284

                        Cheryl Kennedy

1

2        A.      He was in charge of the press

3   office.

4        Q.      Who is Peter Cafiero?

5        A.      He was in operations planning.

6        Q.      Who was Ken Mooney?

7        A.      He was in maintenance of way --

8        Q.      Okay.

9        A.      -- the signal expert.

10       Q.      Okay.  Do we agree that a

11   quick-and-dirty analysis is not a proper,

12   adequate and thorough study?

13       A.      Yeah, I don't know what -- what

14   they did.  I can't recall what they did.

15       Q.      Can we agree that a

16   quick-and-dirty analysis does not comply with

17   Military Standard 882E?

18               MR. KEAVENEY:  Objection.

19       A.      Yeah, I don't know what kind of

20   analysis was done in this case.  So, you know,

21   calling it quick and dirty, I don't know.

22       Q.      Okay.  All right.  Well, did you

23   do an analysis or an assessment of reduction

24   of train speed entering stations to see what

25   effect, if any, it would have on reducing

285

1                    Cheryl Kennedy

2    12-9s from occurring?

3         A.     I don't recall doing it, no.

4         Q.     Okay.  When you see this e-mail

5    from Mr. Prendergast, does it say anything at

6    all about safety and preventing or reducing

7    12-9s from occurring?

8         A.     No.

9         Q.     Okay.  Do you see anything in

10   this e-mail from Mr. Prendergast expressing

11   concern for the safety of the public to

12   prevent their needless deaths or catastrophic

13   injuries?

14        A.     He has concerns on another level,

15   which would be the result of slowing down the

16   trains and what would happen to the station

17   crowding and the way that passengers could

18   move on the platform, egress, the trains, how

19   you could -- the effect of boarding and

20   alighting trains, the effect of bringing those

21   trains into the station and maybe having to

22   shut down certain stations because it's so

23   crowded.  So his -- he's looking at it from

24   the effect -- the safety effect on the rest of

25   the system.

286

1                    Cheryl Kennedy

2    MO              MR. GENIS:  Just move to strike as

3         nonresponsive.

4         Q.      Let's try that again, and if you

5    can just answer my actual question.

6         A.      Okay.

7         Q.      My question was, do you see

8    anything in this e-mail from the president of

9    the Transit Authority expressing concern for

10   the safety of the public; in other words, to

11   prevent them from being killed or

12   catastrophically injured unnecessarily in a

13   12-9 because the train is coming in too fast

14   into the station?  Do you see anything at all

15   in there; yes or no?

16        A.      No --

17        Q.      Okay.

18        A.      -- not about 12-9s.

19               MR. KEAVENEY:  Objection.

20        Q.      And -- okay.  Do you see anything

21   in that e-mail about some kind of hazard

22   analysis from a safety perspective, for

23   example, looking at a matrix to make this

24   decision?

25        A.      No.

287

1           Cheryl Kennedy

2               MR. GENIS:  Okay.  Let's go

3           further up, Dave, in the document.

4           Q.    So I'm showing you responses from

5     other people in the Transit Authority to this

6     proposed Crespo bill --

7           A.    Okay.

8           Q.    -- so you can see what other

9     people saying.

10          A.    I'm going to read it, okay?

11          Q.    Go right ahead.

12          A.    You can move it, so I can read

13    the next section.  Thank you.  Okay.  You can

14    move it up a little.  I'm going to start

15    reading where it says crowding.  Thank you.

16    Okay.  You can keep going.  Is there more to

17    read on that one?  Okay.

18          Q.    Now, this was -- you just read it

19    and this was an e-mail from Glenn Lunden,

20    senior director subway operations department;

21    true?

22          A.    True.

23              MR. GENIS:  And, Dave, just

24          scroll to the top, so we can see who it

25          was sent to.

288

1                        Cheryl Kennedy

2          Q.      And this was sent from Glenn

3    Lunden to Peter Cafiero, correct?

4          A.      Yes.

5          Q.      And then Mr. Cafiero forwarded

6    this to Mr. Prendergast, Charles Seaton, Ken

7    Mooney, Carmen Bianco, Lois Tendler, yourself,

8    Robert Bergen, and also Glenn Lunden, correct?

9          A.      Correct.

10         Q.      Okay.  Then above that, there

11   seems to be one more e-mail from

12   Mr. Prendergast?

13                 MR. GENIS:  Can you just scroll

14         up a little bit?

15         Q.      And this is from Mr. Prendergast.

16         A.      Okay, hold on.  Okay.

17         Q.      So you've read this document now,

18   correct, all the different e-mails?

19         A.      Yes.

20         Q.      Okay.  And -- so what was Glenn

21   Lunden's job, to your understanding?

22         A.      He was in operations planning,

23   who would help set the schedules and evaluate

24   what's required in terms of service to make

25   sure our customers were, you know -- they're

289

1                    Cheryl Kennedy

2    not having overcrowding conditions, proper

3    service.

4         Q.    Okay.  Now, when you looked at

5    Mr. Lunden's analysis, you saw how he

6    repeatedly noted that this was a very limited

7    analysis, correct?

8         A.    Correct.

9         Q.    Okay.  By the way, what was Glenn

10   Lunden's involvement with platforms and --

11   platform screen doors, track intrusion devices

12   and things of that nature?

13        A.    I don't recall.

14        Q.    Okay.  When you read his

15   analysis, did you see anything whatsoever at

16   all about prevention or reduction, mitigation

17   of 12-9s?

18        A.    No.

19        Q.    Did you see anything at all about

20   safety of the public in Glenn Lunden's

21   analysis of the proposed Crespo bill?

22        A.    Yes.

23        Q.    Okay.  Let's go to it and tell me

24   what you saw about how it would -- about the

25   analysis.

290

1              Cheryl Kennedy

2              MR. GENIS:  Dave, can you scroll

3      down, please?

4      A.     The effect would be -- the safety

5   effect would deal with the crowding.

6      Q.     Okay.  So where did it say --

7   please tell me, show me --

8      A.     Okay.

9      Q.     -- where did Glenn Lunden say

10   that if we do A or don't do A, it will have

11   whatever effect on 12-9s, it will cause more

12   12-9s, less 12-9s?

13      A.     It doesn't mention 12-9s.

14      Q.     Okay.  So does he mention

15   anything whatsoever at all in his e-mail -- in

16   Plaintiff's Number 7, this e-mail from Glenn

17   Lunden, does he say anything at all about

18   preventing unnecessary deaths?

19      A.     No, but he --

20      Q.     Does he say anything at all about

21   preventing or reducing catastrophic injuries?

22      A.     I can't answer that yes or no.

23      Q.     Okay.  Well, you read the whole

24   thing.  Either it says it or it doesn't,

25   right?

291

1                   Cheryl Kennedy

2          A.     Well, if he's talking about an

3    enormous increase in crowding, that is a huge

4    safety impact.

5          Q.     That's not what I'm asking about.

6    MO          MR. GENIS:  Move to strike as

7          nonresponsive.

8          A.     Okay.

9          Q.     My question is very, very,

10   simple.

11         A.     Okay.

12         Q.     Either Lunden, Glenn Lunden,

13   discusses preventing deaths and catastrophic

14   injuries from 12-9s or he does not?

15         A.     No, not from 12-9s.

16         Q.     Okay.  So does he mention

17   anything at all about the slowing trains as

18   they enter stations, what, if any, beneficial

19   effect it would have on safety of the public

20   in preventing 12-9s?

21         A.     No.

22         Q.     Okay.  And you are aware that the

23   purpose of this proposed bill was to prevent

24   or reduce 12-9s from occurring; true?

25         A.     True.

292

                    Cheryl Kennedy

1

2        Q.     And what hazard analysis has the

3    Transit Authority ever done regarding crowding

4    of platforms and 12-9s?

5        A.     Not the two together.

6        Q.     Okay.  Thank you.  Now, by the

7    way, and -- all right.

8               Now, when you have a 12-9, that

9    causes a significant disruption in service;

10   true?

11       A.     True.

12       Q.     Okay.  And when you have a

13   disruption in service, that causes crowding at

14   other stations, correct?

15       A.     True.

16       Q.     Have you ever seen 12-9s occur

17   because there was a disruption due to a 12-9

18   and that caused overcrowding, which caused

19   another 12-9 to occur?

20       A.     I can't recall that, but --

21       Q.     Okay.  So you've never heard or

22   seen anything about that; have you?

23       A.     No.

24       Q.     Okay.  Was there ever a study

25   that the Transit Authority -- about what the

293

1                       Cheryl Kennedy

2      effect of train delays has in causing

3      additional 12-9s?

4              A.     No.

5              Q.     Have you ever done such a study?

6              A.     No.

7              Q.     Okay.  Let's see.  I believe we

8      discussed earlier that most 12-9s occur on

9      weekends or at night, correct?

10             A.     That's what you said.

11             Q.     Okay.  And that's --

12             A.     I don't recall --

13             Q.     I said that, all right.

14             A.     Okay.

15             Q.     So, as we sit here today, is it

16     any safer now in terms of prevention and

17     reduction of 12-9s than it was when you first

18     started to work for the Transit Authority?

19             A.     There were many measures put in

20     place, but it hasn't affected the trend.

21                    MR. GENIS:  Okay.  I'm just going

22             to take a quick two-minute break to

23             review some of my notes, so I can take

24             up less of your time.  It's 4:33.  If we

25             can just stop it for a minute, please.

294

1          Cheryl Kennedy

2          (Recess taken from 4:33 p.m. to

3     4:37 p.m.)

4  BY MR. GENIS:

5          Q.    We were discussing about the

6  Americans with Disabilities Act before, the

7  ADA.  Is the Transit Authority allowed to be

8  noncompliant with the ADA?

9          A.    I'm not positive of what the

10  regulations are for that, whether they can be

11  for a time frame and then have to begin

12  compliance, but you'll have to ask them.

13          Q.    Okay.  What does the Transit

14  Authority do when it has a station that's

15  noncompliant with the ADA?

16          A.    I can't recall.

17          Q.    Does the Transit Authority

18  request waivers?

19          A.    Oh, probably.

20          Q.    Okay.  And a waiver allows them,

21  it gives them a pass, so to speak, on not

22  complying with the ADA, correct?

23          A.    You'd have to ask them to

24  describe their waiver process.

25          Q.    Okay.  And tactile strips, that

295

1                    Cheryl Kennedy

2    was first required to comply with the ADA, so

3    that blind or people visually impaired would

4    know that they're getting to the edge of the

5    platform; true?

6            A.    True.

7            Q.    Okay.  And it's 24-inch wide from

8    the edge of the platform into the platform,

9    correct?

10           A.    Correct.

11           Q.    And no one is supposed to stand

12   on it, you're only supposed to cross it to

13   enter or exit the train; true?

14           A.    True.

15           Q.    Okay.  And you do not want a

16   wheelchair rolling along the edge or, in other

17   words, go horizontal, correct?

18           A.    True.

19           Q.    And the tactile strips have

20   nothing to do with prevention of 12-9s; true?

21           A.    Well, they can help give a visual

22   for a customer to stand back from the platform

23   edge.

24           Q.    Okay.  And -- so in order to be

25   ADA compliant, how far from the edge of the

296

1                    Cheryl Kennedy

2    platform is supposed to be open space?

3         A.    I don't -- I don't recall.

4         Q.    Okay.  In other words, it's

5    supposed to be a larger amount of space that

6    is open in addition to that tactile strip,

7    correct?

8         A.    You'll have to ask them the --

9    the regulations.  I -- I can't recall that

10   right now.

11        Q.    Okay.  So, as I said, the yellow

12   tactile strip, nobody is supposed to cross

13   that or enter it when a train is not in the

14   station; true?

15        A.    Right.  We ask them to stand

16   back.

17        Q.    Okay.  Now, when we discussed a

18   moment ago that there's supposed to be area or

19   space beyond the tactile strip, in other

20   words, for a larger width, are there ever

21   stations that have columns or pillars or

22   stairwells, steps, elevators, things like

23   that, that are within that space?

24        A.    Yes, columns are, in many

25   stations, close to the platform edge.

297

1                    Cheryl Kennedy

2          Q.      Okay.  So when there are columns

3    close to the platform edge, that is a

4    violation of the ADA, correct?

5          A.      I don't know how they view that,

6    whether they view it as a violation or

7    something that's been like that they can't

8    correct because it is a column holding up a

9    station.

10          Q.      Okay.  So, in other words, if the

11    station is already not compliant and there's

12    already a column that means the exit or

13    entrance onto the subway is already not ADA

14    compliant, it would not make a bit of a

15    difference in terms of ADA compliance if there

16    was a platform screen door there, correct?

17          A.      You'd have to ask them how it

18    impacts it.

19          Q.      And, by the way, columns can get

20    moved; true?

21          A.      It can.

22          Q.      In fact, you had recommended for

23    the Time Square Shuttle that columns get moved

24    for safety; true?

25          A.      I believe so, if they -- when

298

1                    Cheryl Kennedy

2      they were doing a rehab.

3           Q.      Okay.  Has the Transit Authority

4      ever studied the actual costs of 12-9s?

5           A.      I don't recall.

6           Q.      Did the office of system safety

7      ever study the costs of 12-9s?

8           A.      No.

9           Q.      Did they ever look at the costs

10     of just disruptions to the system and delays

11     caused by 12-9s?

12          A.      No.

13          Q.      Did they ever look at the costs

14     of -- over time to employees because of 12-9s?

15          A.      No.

16          Q.      Did they look at the costs of the

17     employees who went on disability because of

18     being traumatized by the 12-9s?

19          A.      Well, they would -- let me go

20     back.  It would -- they would look at the lost

21     time accidents and stress-related incidents

22     with the train operator or a conductor or an

23     employee that might have seen it, but, you

24     know, I don't know the -- the total number,

25     you know, off the top of my head.

299

1                    Cheryl Kennedy

2         Q.    You are aware that there was a

3    Chaplain Program, correct?

4         A.    Yes.

5         Q.    And that was because so many of

6    the workers in the Transit were so traumatized

7    by the 12-9s that they needed counseling from

8    the Chaplain, correct?

9         A.    I can't answer yes or no.

10        Q.    Okay.  Tell me about the Chaplain

11   Program, how did it start, when did it come

12   about?

13        A.    I don't -- I don't know when it

14   started, but I do know what they did.  They

15   helped employees in a lot of different areas.

16   They would -- if we had a fatality, an

17   employee fatality, they would go to the

18   person's home and help the family.  They did

19   help employees that needed assistance that

20   would come to them with many different

21   stresses.  It could even be stresses at home,

22   so they were not just there for 12-9s, but

23   they helped with that.

24        Q.    Well, let's see, so -- okay.  In

25   other words, when -- train operators and

300

1                    Cheryl Kennedy

2    conductors, they've been traumatized by 12-9s,

3    correct?

4          A.     Correct.

5          Q.     And they miss work because of it;

6    true?

7          A.     Correct.

8          Q.     And they get Chaplain counseling;

9    true?

10         A.     True.

11         Q.     Some of them go out on

12   disability; true?

13         A.     True.

14         Q.     Some of them on permanent

15   disability, correct?

16         A.     Correct.

17         Q.     And witnesses, lay people, get

18   traumatized by seeing the 12-9s as well,

19   correct?

20         A.     Yes.  Other employees you're

21   talking about?  Yes.

22         Q.     Well -- okay.  In addition to the

23   employees, did you utilize -- did the Transit

24   Authority utilize the Chaplain Program to

25   console people that were just on a platform

301

1              Cheryl Kennedy

2   and saw a 12-9 and were equally traumatized?

3        A.    I don't recall them doing that.

4        Q.    Okay.  Well, did the Transit ever

5   use the Chaplain Program to console the people

6   that were hurt when they were hit by the

7   trains or their loved ones?

8        A.    I don't recall.

9        Q.    So the Transit didn't give any

10  counseling to the people that were actually

11  hurt by the 12-9s; true?

12       A.    I don't know.  You'd have to look

13  at the program detail.  I just told you what I

14  know.

15       Q.    Who ran the Chaplain Program?

16       A.    That was Rabbi Berkowitz at my

17  time.

18       Q.    Okay.  And what area of the

19  Transit Authority was in charge of that?

20       A.    Oh, I don't know whether it was

21  on the customer -- I don't know exactly where

22  they fell, I'm sorry.

23       Q.    Okay.  In addition to that, you

24  have workers, not only are we talking about

25  the lost salary and disability, but some of

302

1                    Cheryl Kennedy

2    them get treatment for being traumatized,

3    correct?

4          A.    Correct.

5          Q.    And there's a cost of that as

6    well, correct?

7          A.    Correct.

8          Q.    And then if there are lawsuits,

9    there's costs to the lawsuits, correct?

10         A.    Correct.

11         Q.    And for the injured people that

12   are unable to work afterwards or because

13   they're dead, there's a loss of tax revenue to

14   the city, state and federal government; true?

15         A.    I assume.

16         Q.    And -- right, I mean -- and if

17   people have catastrophic injuries and have to

18   go on Medicaid, Medicare or Social Security

19   Disability, that's another cost to the

20   taxpayers as well, correct?

21         A.    I never looked into that, but I

22   don't -- I don't want to answer that.

23         Q.    Okay.  Well, there's all kind of

24   costs associated with 12-9s, correct?

25         A.    Correct.

303

1                       Cheryl Kennedy

2          Q.     Now, you've communicated with the

3     PTSB, the Public Safety Transportation Board,

4     correct?

5          A.     Yes.

6          Q.     And it was your obligation to be

7     honest with them, correct?

8          A.     Correct.  Yes.

9          Q.     Did you freeze?

10         A.     Oh, you froze.  You guys all

11    froze.

12         Q.     I think you froze.  Oh, there you

13    are, okay.

14         A.     Okay.  Yes.

15         Q.     And you had to be not only honest

16    with the Public Transportation Safety Board,

17    but you had to be accurate; true?

18         A.     True.

19         Q.     Complete?

20         A.     True.

21         Q.     Thorough?

22         A.     True, to give them the

23    information they required.

24         Q.     Okay.  You had to be objective,

25    correct?

304

1                    Cheryl Kennedy

2          A.      Correct.

3          Q.      And when we say honest and

4  objective, you had to give them the good, the

5  bad and the ugly, correct?

6          A.      We gave them what was required of

7  us to give them, yes, and whatever information

8  we gave them, yes, it would be accurate.

9          Q.      Okay.  So you couldn't, for

10  example, withhold information from the PTSB?

11          A.      No.

12          Q.      You couldn't shade the testimony

13  with the PTSB, correct?

14          A.      No.

15          Q.      And you had gone to PTSB meetings

16  as well, correct?

17          A.      Correct.

18          Q.      And you heard what other people

19  from the Transit were saying to the PTSB,

20  correct?

21          A.      Correct.

22          Q.      And one of the issues about

23  having platform screen doors is the cost,

24  correct?

25          A.      Correct.

305

1                        Cheryl Kennedy

2          Q.      Well, did anyone from the Transit

3     Authority, any meeting you were at, any e-mail

4     or any conversation at all, ever tell the PTSB

5     that were there offers to install platform

6     screen doors at little or no cost to the

7     Transit Authority?

8          A.      I can't recall.

9          Q.      Did you ever tell anyone from the

10    PTSB that there were offers to install

11    platform screen doors to the transit system at

12    little or no cost to the Transit Authority?

13         A.      I can't recall.

14         Q.      That would be an important fact

15    to tell them; true?

16         A.      True.

17         Q.      Okay.  Would it be an important

18    fact to tell the PTSB that platform screen

19    doors are highly effective at preventing 12-9s

20    from occurring?

21         A.      I can't answer that yes or no.

22         Q.      Okay.  Well, if you were aware of

23    the fact that the Transit Authority could have

24    gotten platform screen doors at little or no

25    cost, is that the type of information you

306

1                        Cheryl Kennedy

2    would have been obligated to tell them about?

3          A.      Yes, if they -- if that was an

4    issue that they -- they tracked the data for

5    contact with individuals and we communicated

6    with them all the time, so --

7          Q.      And when I say -- I'm sorry, go

8    ahead.

9          A.      It would be more to it than the

10   fact that they'd be willing to do it at little

11   or no cost.  You'd have really look into it

12   from a systematic point of view whether it was

13   doable.

14         Q.      Okay.  And whether it be you or

15   some other person speaking to the PTSB on

16   behalf of the Transit, whoever it would be,

17   would have that obligation to tell them, to

18   tell the PTSB that there was -- there were

19   offers to have platform screen doors installed

20   at little or no cost to the Transit, correct?

21         A.      I don't know the answer to that

22   one.

23         Q.      So, in other words, you had to be

24   honest, but other TA employees did not have to

25   be honest?

307

Cheryl Kennedy

1

2      A.      Everybody had to be honest with

3   them --

4      Q.      Okay.  Thank you.

5      A.      -- yeah.

6      Q.      Okay.  And everyone had to be

7   forthright and forthcoming, correct?

8      A.      Right.

9      Q.      Okay.  And you told us earlier

10  it's an important and significant fact that

11  12-9s can be prevented or dramatically reduced

12  by platform screen doors, correct?

13      A.      They could be reduced, yes.

14      Q.      Okay.  And you told us earlier

15  that there were studies, in fact, you got a

16  report when you sent somebody to Korea that

17  they were 100 percent effective at preventing

18  12-9s, talking about platform screen doors;

19  true?

20      A.      Correct.

21      Q.      Okay.  And did you ever relay

22  this important significant fact to the PTSB

23  that platform screen doors could be 100

24  percent effective at reducing or preventing

25  12-9s?

308

```
                        Cheryl Kennedy
 1
 2         A.     I don't recall.
 3         Q.     Did anyone ever tell this to the
 4    PTSB?
 5         A.     I don't recall.
 6               MR. GENIS:  All right. I may be
 7         done.  Give me another two minutes,
 8         please.
 9               THE WITNESS:  Okay.
10               MR. GENIS:  I'm going to stop the
11         clock at 4:51.
12               (Recess taken from 4:51 p.m. to
13         4:53 p.m.)
14    BY MR. GENIS:
15         Q.     I apologize if I asked you this
16    earlier, I just forgot, but --
17         A.     Okay.
18         Q.     -- when we were talking about
19    proper, adequate, and reasonable studies and
20    you told us how they had to be complete,
21    thorough, accurate, honest, objective,
22    et cetera; do you recall all that?
23         A.     Yes.
24         Q.     And it had be based on fact, data
25    and statistics; true?
```

309

1                    Cheryl Kennedy

2        A.      Yes.

3        Q.      Okay.  To the extent that a study

4   or assessment is not complete, thorough,

5   accurate, objective, honest, and based on fact

6   and statistics and data, can we agree it would

7   be less than adequate, less than reasonable,

8   and less than proper?

9        A.      Can I -- can I add to that or --

10  I can't answer yes or no.

11       Q.      You can't answer that with a yes

12  or no?

13       A.      It's -- if there is stats,

14  statistics, available, then yes.

15       Q.      Okay.  All right.  So if there

16  are statistics --

17       A.      Yeah --

18       Q.      -- available --

19       A.      You'd have to have that.  If it

20  didn't have that, you would have to go about

21  it differently.

22       Q.      Okay.  So, otherwise -- just to

23  make sure we're -- we're understanding one

24  another.  To the extent a study or an

25  assessment is not complete, thorough,

310

1                   Cheryl Kennedy

2    accurate, objective, honest, and based on fact

3    and data, it would be less than adequate, less

4    than reasonable, and less than proper; true?

5         A.      True.

6                 MR. GENIS:  Okay.  I think I have

7         no further questions of this young lady

8         at this time.

9                 THE WITNESS:  Oh, boy.

10                MR. GENIS:  Yes.

11                So, Andrew, do you have any

12        questions you would like to ask?

13                THE WITNESS:  He's -- you're

14        muted.

15                MR. GENIS:  Okay.

16                THE WITNESS:  He's muted.

17                MR. GENIS:  That's to keep from

18        cursing at me.

19                THE WITNESS:  There he is.

20                MR. GENIS:  Do you have anything

21        you're going to ask, Andrew?

22                MR. KEAVENEY:  No.

23                MR. GENIS:  Okay.  So I think we

24        are done, and I hope I was not impolite

25        or unprofessional to you, and I wish you

311

1                    Cheryl Kennedy

2          to have a very nice day and --

3                    THE WITNESS:  Thank you.

4                    MR. GENIS:  -- thank you very

5          much.

6                    THE WITNESS:  You too.  Thank

7          you.

8                    MR. GENIS:  You're welcome.

9                    THE WITNESS:  Bye-bye.

10                   (Time noted:  4:55 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

312

1                      Cheryl Kennedy

2              A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK     )

                           :ss

5    COUNTY OF             )

6

7

8              I, CHERYL KENNEDY, hereby certify

9    that I have read the transcript of my

10   testimony taken under oath in my deposition of

11   August 24, 2022; that the transcript is a

12   true, complete and correct record of my

13   testimony, and that the answers on the record

14   as given by me are true and correct.

15

16

17                        _____

18                        CHERYL KENNEDY

19

20   Signed and subscribed to before

21   me, this_____ day

22   of _____, 2022.

23

     _____

24   Notary Public, State of New York

25

313

1

2  ------------------I N D E X--------------------

3  WITNESS              EXAMINATION BY              PAGE

4  CHERYL KENNEDY    MR. GENIS                      5

5

6  MOTIONS:  PAGE 27, 30, 48, 53, 54, 60, 73, 124,

7                128, 133, 159, 165, 178, 202,

8                224, 228, 234, 239, 241, 256,

9                272, 285, 291

10

11  ------------------EXHIBITS------------------

12          Plaintiff's Exhibits 1 through 7

13          deemed marked for identification.

14

15

16

17

18

19

20

21

22

23

24

25

314

```
 1
 2                   C E R T I F I C A T E
 3    STATE OF NEW YORK    )
 4                         ) ss.:
 5    COUNTY OF NASSAU     )
 6
 7              I, CHRISTINE DEROSA, a Notary
 8         Public within and for the State of New
 9         York, do hereby certify:
10              That CHERYL KENNEDY, the witness
11         whose deposition is hereinbefore set
12         forth, was duly sworn by me and that
13         such deposition is a true record of the
14         testimony given by such witness.
15              I further certify that I am not
16         related to any of the parties to this
17         action by blood or marriage; and that I am
18         in no way interested in the outcome of
19         this matter.
20              IN WITNESS WHEREOF, I have
21         hereunto set my hand this 6th day of
22         September, 2022.
23
24         _____
                    CHRISTINE DEROSA
25
```