1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
LUISA JANSSEN HARGER DA SILVA,

                              Plaintiff,

                              Index No.
            - against -       17-cv-04550(FB)(VMS)
NEW YORK CITY TRANSIT AUTHORITY,
METROPOLITAN
TRANSPORTATION AUTHORITY,
and RAQIA SHABAZZ,

                              Defendants.
-------------------------------------X

                         August 8, 2022
                         10:11 a.m.


    DEPOSITION of LAWRENCE GEORGE REUTER, a
Non-Party witness herein, taken by the Defendant,
pursuant to the Federal Rules of Civil Procedure
and Order, held at the above-mentioned time and
place before Megan Sheridan, a Notary Public of
the State of New York.

2

```
 1   A P P E A R A N C E S
 2

         ROTH & ROTH, LLP
 3           Attorneys for Plaintiff
             192 Lexington Avenue, Suite 802
 4           New York, New York 10016
 5       BY: DAVID A. ROTH, ESQ.
             (Via Zoom Videoconferencing)
 6
 7       SONIN & GENIS, ESQ.
             Attorneys for Plaintiff
 8           One Fordham Plaza, Suite 907
             Bronx, New York 10458
 9
         BY: ROBERT GENIS, ESQ.
10           (Via Zoom Videoconferencing)
11
         LANDMAN, CORSI, BALLAINE & FORD, P.C.
12       Attorneys for Defendants
         120 Broadway, 13th Floor
13       New York, New York 10271
14       BY: ANDREW P. KEAVENEY, ESQ.
             (Via Zoom Videoconferencing)
15
16
17
18
19
20
21
22
23
24
25
```

3

1                    S T I P U L A T I O N S

2

3            IT IS HEREBY STIPULATED AND AGREED by and

4    among counsel for the respective parties hereto,

5    that the filing, sealing and certification of the

6    within deposition shall be and the same are hereby

7    waived;

8            IT IS FURTHER STIPULATED AND AGREED that

9    all objections, except to the form of the

10   question, shall be reserved to the time of the

11   trial;

12           IT IS FURTHER STIPULATED AND AGREED that

13   the within deposition may be signed before any

14   Notary Public with the same force and effect as if

15   signed and sworn to by the Court.

16           IT IS FURTHER STIPULATED AND AGREED that

17   all rights provided to all parties by the FRCP

18   cannot be deemed waived and the appropriate

19   sections of the FRCP shall be controlling with

20   respect thereto.

21

22

23

24

25

4

PROCEEDINGS

1

2          THE REPORTER:  The attorneys

3    participating in this deposition

4    acknowledge that I am not physically

5    present in the deposition room and that I

6    will be reporting this deposition remotely.

7          They further acknowledge that, in

8    lieu of an oath administered in person, I

9    will administer the oath remotely.

10          The parties and their counsel consent

11    to this arrangement and waive any

12    objections to this manner of reporting.

13    Please indicate your agreement by stating

14    your name and your agreement on the record.

15          MR. ROTH:  David Roth, agreed.

16          MR. GENIS:  Robert Genis, agreed.

17          MR. KEAVENEY:  Andrew Keaveney,

18    agreed.

19

20

21

22

23

24

25

1    L A W R E N C E   G E O R G E   R E U T E R ,

2    Non-Party witness, called as a witness, having

3    been first duly sworn by a Notary Public

4    of the State of New York, was examined

5    and testified as follows:

6        THE REPORTER:  Please state your name

7    for the record.

8        THE WITNESS:  Lawrence George Reuter.

9        THE REPORTER:  Please state your

10    address for the record.

11        THE WITNESS:  2436 Nobleton Lane,

12    The Villages, Florida 32162.

13    EXAMINATION BY

14    MR. GENIS:

15    Q  Good morning.  My name is Bob Genis.  I

16    represent the young woman who lost her arm and her

17    leg.  I'm going to be asking you some questions

18    today.  If there's anything I ask you that you do

19    not understand, please say so, and I will gladly

20    rephrase the question --

21    A  Okay.

22    Q  -- otherwise, if you answer the question,

23    we're going to assume you understood it --

24    A  All right.

25    Q  -- do you understand everything I've said

6

1              Lawrence George Reuter

2   so far, sir?

3       A   I do.

4       Q   Okay.  And because we have a stenographer

5   who's writing down what we say, and because we're

6   doing this through remote technology, there tends

7   to be a little bit of a time lag.  So if you could

8   just please wait until I definitely finish my

9   question before you give an answer.  Otherwise, if

10  you speak over me, it cuts out and reporter can't

11  get everything that we're each saying, okay?

12      A   I'll try -- I'll try to do that.

13      Q   Thank you.  I know, it's kind of weird and

14  awkward.  It's not normal human conversation, but

15  we both have to slow it down --

16      A   Okay.

17      Q   -- thank you.  And what I'm going to do,

18  sometimes, I may ask you a question that's like a

19  "yes" or a "no," or a "true" or a "false"

20  question.  If you would please just answer with a

21  "yes" or "no," or "true" or "false," and if you're

22  able to do so, just say, "I can't do that."  And

23  this way I can move along somewhat quicker,

24  understood?

25      A   Understood.

7

1                    Lawrence George Reuter

2       Q   Agreed too?

3       A   Yup.

4       Q   Okay.  And if I ask a question, just please

5    be responsive to the question.  Sometimes I ask a

6    question, and people are talking about something

7    related to the question, but not exactly

8    responsive to the question.  So I can go much

9    quicker if you actually just respond to question

10   posed, agreed?

11      A   Go it, understood.

12      Q   Thank you.  Okay.  I'm going to first ask

13   you questions about your background.  I like to

14   tell you where I'm going in advance, make it go a

15   little quicker.  Can you please give me your

16   educational background?

17      A   Uh, Bachelor of Science Engineering, and

18   then Advanced Studies in further engineering, and

19   then in -- and in business.  But just a Bachelor's

20   of Science in Engineering.

21      Q   Okay.  Is your engineering degree civil,

22   mechanical, or something else?

23      A   Civil.

24      Q   Are you a licensed engineer, sir?

25      A   Uh, no.

8

Lawrence George Reuter

1

2    Q   Were you ever a licensed engineer?

3    A   No.

4    Q   Did you get a graduate degree in

5    engineering, or something else?

6    A   No.  I just did extensive graduate work,

7    but didn't get the degree.

8    Q   Okay.  And where did you go to college,

9    sir?

10    A   Uh, I went to college at what was called

11    Florida Technological University.  It's now called

12    the University of Central Florida.

13    Q   Okay.  And, sir, can you give us your work

14    experience in this field?

15    A   Uh, well, I started work like 1971, as I

16    recall, for a company called Auto Trade

17    Corporation.  Uh, it's now actually operated by

18    Amtrak.  It's where you put your car on the train

19    from Lorton, Virginia to Florida.  Uh, I worked

20    there until I moved to New York City.  Okay.  And

21    started working, uh, with the Transit Authority

22    in, I believe it was '81 or '82.  Okay.  And I

23    worked there for -- until 1990, when I went to

24    California, and was the, um, general manager of

25    the Santa Clara County Transportation Agency.

9

1          Lawrence George Reuter

2          Uh, then in '94, I went to Washington D.C.

3     where I was the general manager of the WMATA,

4     which is the Washington bus and subway system.

5          And then in '96, I came back to New York

6     City for my second tour of duty, as I like to call

7     it, as the president of the Transit Authority,

8     where I stayed until 2007.  Uh, when I -- when I

9     left, resigned from there.  I then went to work

10    for Parsons Brinckerhoff as Senior Vice President

11    for them, until I retired in, I believe it was

12    2017, 2018, was when I finally decided I couldn't

13    take anymore travel.  So...

14    Q    Okay, all right.  And so you worked at the

15    Transit Authority from 1981 or '82, through about

16    1990, and then again from 1996 through 2007,

17    correct?

18    A    That is correct.

19    Q    Okay --

20    A    I had multiple positions from -- in '82 to

21    '90, uh, where I started as the assistant to the

22    vice president of Rapid Transit, went over and ran

23    the SIRTOA of as general superintendent of the

24    Staten Island Rapid Transit.  Came back, was the

25    vice president of Service Transit, which was the

10

1              Lawrence George Reuter

2   buses, then vice president of Rapid Transit, which

3   is the subways.  And then I was senior vice

4   president of Operations (inaudible), which is all

5   of the operations, both buses and subways.

6      Q  Okay.  So that covers everything from '81

7   through '90 for the positions you had at the

8   Transit?

9      A  That's correct.

10     Q  And when you were president of the Transit,

11  were you president of the New York City Transit

12  Authority, of the MTA, both, or something else?

13     A  Uh, it was the New York City Transit

14  Authority.  It was -- at that time, it was called

15  MTA New York City Transit.  So -- but I was the

16  president of the New York City Transit.

17     Q  Got it.  And when you went to work for

18  Parsons Brinckerhoff, what did they do, who are

19  they?

20     A  Parsons Brinckerhoff is a, uh, consulting

21  engineering firm.  Uh, they do a lot of design

22  work, both of highways, bridges, subway systems.

23  I worked for them in the, uh, basically the subway

24  side where they were designing systems.  I worked

25  in, uh, Phoenix, Arizona, I worked in the

11

1           Lawrence George Reuter

2  Dulles Corridor in Washington D.C., and I worked

3  on the 2nd Avenue, uh, subway, in New York City,

4  where they were the design engineers.

5     Q  So Parsons worked on the 2nd Avenue subway

6  line?

7     A  That's correct, yes.

8     Q  Did they also work on the number 7 line

9  extension?

10    A  Yes.  I -- I didn't work on them, but they

11  did, I believe.  Yes.

12    Q  Okay.  And Parsons, just me give an idea,

13  like are they a big company, a small company?

14    A  Uh, they're a fairly big company.  They're

15  now owned by a company in Canada, which for the

16  life of me, I can't remember because of

17  Alzheimer's setting in right now.  But they've --

18  they've been acquired by them 'cause it used to be

19  an employee owned company, and I remember when

20  they sold off, I got my -- my stock paid for when

21  they sold the company.  But, uh, they're --

22  they're owned by a company in Canada as far as I

23  know.

24    Q  Okay.  And did Parsons, were they familiar

25  with the standards and best practices, of good and

12

1          Lawrence George Reuter

2     accepted practices, of engineering and subway

3     systems?

4               MR. KEAVENEY:  Objection.

5        A  Yes.  Yes, absolutely.

6        Q  By the way, since you're in the field, I'm

7     going to just name some other companies.  Can you

8     tell me if you're familiar with them or not?

9        A  Sure, mm-hmm.

10       Q  Are you familiar with Crown Infrastructure

11    Solutions?

12       A  Say that again?

13       Q  Crown, like a king wears a crown, Crown

14    Infrastructure Solutions?

15       A  No, I'm not familiar --

16       Q  Okay.  Are you familiar with

17    Faively Transport?

18       A  No, I'm not familiar with them.

19       Q  Are you familiar with GE Transportation?

20       A  Yes.  Yes, I am.  I'm familiar with them.

21       Q  Are you familiar with Kaba, K-A-B-A,

22    Gilgen, or Gilgen Door Systems AG?

23       A  No --

24       Q  Okay.

25       A  -- I'm not.

13

1                    Lawrence George Reuter

2        Q   Okay.  Are you familiar with Kawasaki Real

3    Car, Incorporated --

4        A   Oh, yes.  Yes, I am.

5        Q   Are you familiar with Knorr, that's

6    K-N-O-R-R Bremse, B-R-E-M-S-E, Rail Systems?

7        A   Yeah.  Brake manufacturer, yes.

8        Q   Okay.  Are you familiar with KPMG?

9        A   KPMG, did you say?

10       Q   Yes, sir.

11       A   Yes.

12       Q   Okay.  Are you familiar Samsung SDS?

13       A   Yes, I am.

14       Q   Are you familiar with Sojitz, S-O-J-I-T-Z,

15   Corp.?

16       A   No, I can't say I am.

17       Q   Okay.  It's also known as Sojitz Corp. of

18   America, that's Shenzhen, S-C-H-E-N-Z-H-E-N [sic],

19   Fangda, F-A-N-G-D-A, Automatic System?  Also known

20   as Schenzhen Fangda?

21       A   No, I'm not familiar with them.

22       Q   Are you familiar with STANLEY Access

23   Technologies?

24       A   Say that again?

25       Q   STANLEY?

14

1                  Lawrence George Reuter

2       A  No.

3       Q  Okay.  Are you familiar with SYSTRA,

4    S-Y-S-T-R-A, Engineering?

5       A  Yes.

6       Q  And are you familiar with TIS Partners

7    Incorporated?  It's an association with the Seoul

8    Metropolitan Rapid Transit Corp., Elmore

9    Transportation Systems, and Parsons.

10      A  No, I can't say that I'm familiar with

11   them.

12      Q  By the way, did Parsons get bought out by

13   WSP, like Walter, Sam, Peter?

14      A  That's it.  That's who -- that's who bought

15   them.  You're correct.

16      Q  Thank you.  Okay.  I just listed a bunch of

17   companies.  Of the ones that you were familiar

18   with, can you tell me how is it that you're

19   familiar with these companies?

20      A  Well, Kawasaki Real Car builds a lot of

21   rail cars for New York City Transit Authority.  So

22   I was familiar with dealing with them, obviously

23   on the -- the purchase of rail cars that they

24   provided to us.  Uh, I'm tying to think.  KPMG, I

25   was more familiar with them, really in their

15

1                    Lawrence George Reuter

2    function as an auditing, you know, company.  Uh,

3    they do a lot of auditing.  Um, which other

4    company did you name that I'm familiar with?

5        Q  I named a couple of them, and just are you

6    familiar with any of them as, for example,

7    manufacturers, or OEMs, operator, equipment

8    manufacture --

9        A  Kawasaki --Kawasaki truly is an OEM and a

10   manufacturer.  They built the -- they built a lot

11   of rail cars for us and other companies in -- in

12   this country, as well as Japan.

13       Q  Okay.  Now, I want to go back to the

14   Transit, and the different jobs you had, and you

15   actually told us the different jobs.  When you

16   said you were head of operations, you said briefly

17   what that's about.  What is operations for the

18   Transit Authority?

19       A  So operations of the Transit Authority is

20   the side of the business that runs -- responsible

21   for running all of the buses and the subway

22   system.  They do all of the -- the operations, all

23   the bus operators, train operators, all the

24   maintenance personnel, and all of the, uh -- in

25   the -- in the Transit Authority, the bus side and

16

1                    Lawrence George Reuter

2    the car equipment side, the rail car side, had

3    their own engineering departments with -- inside

4    the -- those departments.  The engineering

5    department of the Transit Authority was really

6    more for construction in facilities.  So I ran all

7    of those operations.

8        Q  And by the way, until the time you retired

9    in approximately 2017 or 2018, did you belong to

10   any professional associations or societies?

11       A  No --

12       Q  Okay.

13       A  -- no, I did not.

14       Q  All right.  No trade groups, things like

15   that?

16       A  Well, I was always a part of like APTA,

17   which is the American Public Transit Association.

18   Uh, but you're really part of that because of your

19   position in the industry, so...

20       Q  How about, for example, COMET, C-O-M-E-T?

21       A  No.

22       Q  Okay.  Did you do anything to keep abreast

23   in your field of development, studies, surveys,

24   reports, just new things that go on in your field?

25       A  When I was in the business, I did.  You

17

1                    Lawrence George Reuter

2     know, I've been out of the transit business now

3     for 15 years, so...

4         Q   Okay, all right.  So would you have kept up

5     with literature in your field through

6     approximately 2018 when you retired?

7         A   No.  I retired from Transit Authority in

8     2007.

9         Q   Okay.

10        A   Okay.  I then spent ten years with Parsons,

11    which took me to 2017.  But when I left the

12    Transit Authority in 2007, I kind of did not keep

13    up on much of the transit technology or, you know,

14    business at that time.

15        Q   Okay.  So did Parsons belong to any of

16    these different trade groups?  For example, you

17    were at Parsons from 2007 through approximately

18    2018.  Did Parsons belong to these different

19    associations or groups?

20                    MR. KEAVENEY:  Objection.

21        A   I couldn't say for sure, but I suspect they

22    probably belonged to some.  I don't know.

23        Q   Because Parsons did transit work and that

24    type of work, so they would have naturally kept

25    abreast in the developments in their field?

18

1                  Lawrence George Reuter

2                  MR. KEAVENEY:  Objection.

3      A  They did lots of transit work, yes.

4      Q  Okay.  So Parsons would have kept abreast

5    of professional standards of care, good and

6    accepted practices, best practices, things of that

7    nature?

8                  MR. KEAVENEY:  Objection.

9      A  Yes.  Mostly in their line of work.

10     Q  Sure.  They would have been familiar with

11   studies, or surveys, or research publications,

12   things of that nature, correct?

13                 MR. KEAVENEY:  Objection.

14     A  Yes.

15     Q  Okay.  Let's see.  When you were the

16   president of the New York City Transit Authority,

17   what were your duties?

18     A  Well, I was responsible for the overall

19   management of the organization.  You know, setting

20   fair policy, uh, making sure that the -- the

21   operations in both buses, subways, you know, were

22   operating, uh -- trying to -- to operate

23   efficiently, on schedule, on time.  And, uh, and

24   then obviously managing all of the budget

25   responsibilities.  And any of the -- the issues

19

1              Lawrence George Reuter

2    that came up in the day-to-day operations in the

3    Transit.

4       Q   Would it be fair to say that you were the

5    ultimate decision maker at the Transit Authority

6    as its president?

7       A   In the Transit Authority, I was, but

8    obviously we were under the umbrella of the MTA.

9    So the MTA, you know, controlled the, you know,

10   certain decisions that -- that were being made.

11      Q   Explain --

12      A   They ultimately controlled the ultimate

13   budget, you know.  Which, you know, and those type

14   of items.

15      Q   Okay.  Explain to me the relationship

16   between the New York City Transit Authority and

17   the MTA while you were the president of the

18   Transit?

19      A   Originally, as you may recall, the Transit

20   Authority was an independent agency on its own.

21   And then when the MTA came about, New York City

22   Transit Authority, Long Island Rail Road, the MTA,

23   Metro-North, all came under the umbrella of the

24   MTA.

25              And the -- the MTA really, I would have to

20

1                    Lawrence George Reuter

2    say, transitioned, over the years as to what its

3    role was.  Initially, it was more dealing with the

4    budget, the capital program, you know, and what I

5    would call the -- the ultimate policies of

6    politics, you know, that get involved in, uh, any

7    type of state agency, uh, like that.

8          The -- the operating agencies truly were

9    responsible for, you know, procuring their --

10   their buses, their rail cars, and the -- and all

11   of the -- the -- all of the business necessary to

12   operate.  We had our own law department, our own

13   accounting department, you know, all of those type

14   of issues.  But I think now, it's different.  I

15   mean, I'm not familiar with it, but I've heard

16   that its changed quite a bit since.

17   Q   Okay.  So for example, if you wanted

18   something done in the New York City subway system

19   when you were the president, would you have the

20   ability or authority to get it done, or did you

21   have to get approval from the MTA, or something

22   else?

23   A   Well, I think it really depended on what

24   the issue was.  I mean, if it was, you know,

25   within, you know, our budget limits, and spending

21

1                    Lawrence George Reuter

2    limits, and our ability, we -- I could make those

3    decisions.  But if ultimately we needed to move

4    money around within the capital program or request

5    additional funding, we had to go to the MTA to

6    request that.  But we generally kept the MTA

7    pretty much informed of all of those issues.

8        Q  And if you, for example, felt strongly

9    about one issue or another, for or against it, and

10   you gave your opinions and recommendations to the

11   MTA, would they generally go along with your

12   opinions?

13       A  Generally, they would go along.  There

14   would be times that wouldn't happen, but the -- it

15   was more rare than -- than -- than what would -- I

16   consider normal routine.

17       Q  Okay.  So for the day-to-day operations of

18   the Transit Authority, were you where the buck

19   stops, as they say?

20       A  Yeah, I was the one who got blamed when --

21   when anything went wrong.

22       Q  Okay.

23       A  They were the ones who got the credit when

24   everything went right.  You know, that's the

25   world -- the political world.

22

1          Lawrence George Reuter

2     Q   Okay, all righty.  Is it also part of your

3  job as the president of the Transit Authority to

4  go do public relations, to be a spokesperson for

5  them?

6     A   Oh, yes.  I was constantly out dealing with

7  the press and doing, you know, PR work or -- or

8  whatever it's called.  You know, mostly

9  information when it related to transit.  I wasn't

10  a salesman, I was the guy really going out and

11  explaining the issues to the -- to the public and

12  the press.

13     Q   And would it be fair to say based on

14  working for the Transit Authority from 1981 to

15  about 1990, and then again as its president from

16  1996 to 2007, you were familiar with the duties

17  and responsibilities of the Transit Authority?

18     A   Yes, I was.

19     Q   Okay.  You were familiar with its job,

20  correct?

21     A   Yes.

22     Q   Could we agree that it was part of the job

23  of the New York City Transit Authority to provide

24  a safe mass transportation service to the people

25  in the City of New York?

23

1                    Lawrence George Reuter

2       A   That's correct.

3       Q   And could we agree that the Transit

4    Authority had a duty and a responsibility to

5    provide safe mass transportation service to the

6    people, in the City of New York?

7       A   Yes.  That was our -- that was our goal to

8    do that, yes.

9       Q   Okay.  And was this duty of the Transit

10   Authority to provide safe mass transportation

11   service for the people of the City of New York, is

12   that what we call a nondelegable duty?

13                    MR. KEAVENEY:  Objection.

14      Q   You may answer.

15      A   I didn't hear your question.  It was, what?

16      Q   Was that what we call a nondelegable duty?

17                    MR. KEAVENEY:  Objection.

18      Q   In other words, it was the job of the

19   Transit, not somebody else?

20                    MR. KEAVENEY:  Objection.

21      Q   You can't pass it off to somebody else.

22                    MR. KEAVENEY:  Objection.

23      A   Well, I'm not -- I'm not sure what that

24   means.  I mean, uh --

25      Q   Okay.

24

1          Lawrence George Reuter

2      A  -- if we -- if we found issues, you know,

3   with the design, we obviously would pass it off to

4   the designer or manufacturer, or, you know.  I'm

5   not sure what -- what the question's asking.

6      Q  Let me try a different way then.  So it was

7   the sole duty of the New York City Transit

8   Authority to provide a safe mass transportation

9   service for the people, true?

10     A  I'm not sure it was sole.  I mean,

11  obviously the other agencies, like the MTA, played

12  a part in that.  Whenever we would have, you know,

13  issues that we considered significant, we would

14  have to call the MTA, uh, in that -- if we

15  requested -- if we needed to request additional

16  funding to deal with any type of issues like that.

17     Q  Okay.  But the day-to-day operation and the

18  design and the maintenance and the management of

19  the subway system, that was solely the job of the

20  Transit Authority?

21     A  Generally that's true, yes.

22     Q  Okay.  And was the safety of the people

23  using the subway system important to the

24  Transit Authority?

25     A  Oh, very important, yes.

25

1            Lawrence George Reuter

2      Q   Okay.  Was there anything more important to

3   the Transit Authority than the safety of people

4   using the subway system?

5      A   No, absolutely not.

6      Q   And was safety of the public the main

7   consideration to you when you were making

8   decisions as the president of the Transit, for the

9   Transit?

10     A   Yes, it was.

11     Q   And you'd agree that all decisions made for

12  the Transit should be guided by what promotes and

13  furthers safety of the public best?

14           MR. KEAVENEY:  Objection.

15     A   Yes, absolutely.

16     Q   You were there in the 1980s, and then again

17  in the '90s, and when you became president, you

18  also became familiar with the conditions of the

19  subway system, correct?

20     A   Oh, yes.  Sure.

21     Q   Okay.  And you learned the institutional

22  history of the Transit Authority?

23     A   Fairly much, yeah, that's true.

24     Q   So the subway started in about 1904,

25  correct?

26

                    Lawrence George Reuter

1

2     A   That's correct, yes.

3     Q   And originally it was different private

4   companies starting different subway lines,

5   correct?

6     A   Yes, yeah.

7     Q   And then because of that, many different

8   stations had different configurations, and some of

9   the subway lines had different styles or types of

10  train cars, correct?

11    A   There -- there were different styles,

12  types, and different sizes, lengths.  I mean,

13  there were quite -- it was a -- a hodgepodge of

14  equipment that was assimilated into the transit

15  world, yes.

16    Q   And at some point, the New York City

17  Transit Authority was created to take this over,

18  to manage, maintain, own, and operate the subway

19  system, correct?

20    A   That's correct.

21    Q   Okay.  And when did that occur?  When did

22  the Transit Authority take over?

23    A   You know, I can't recall exactly anymore.

24  I used to know the history, but it seems like it

25  was in the '30s, I think.

27

1             Lawrence George Reuter

2     Q   And so for example, while you were the

3  president of the Transit Authority, there were

4  approximately 472 subway stations?

5     A   Uh, that's correct.  I think it was 469,

6  and then they added a few more.  It was 469 for

7  quite a few years, yes.

8     Q   Got it, okay.  And during the time you were

9  the president, you had these different train

10  stations with different configurations, different

11  widths of platform, some below ground, some above

12  ground, with different lines and different kinds

13  of trains, correct?

14     A   Some of that cut out.  Could you -- could

15  you --

16     Q   Sure.

17     A   -- repeat that?

18     Q   Sure, I'm sorry.  I know the problem with

19  the remote is sometimes --

20     A   Yeah.

21     Q   -- we cut in and out.

22     A   Yup.

23     Q   What I was saying is, because there were so

24  many difficult subway stations, as you said, 469

25  originally, with different configurations,

28

1                    Lawrence George Reuter

2    different widths of platforms, some stations above

3    ground, some stations below ground, different

4    lines, different types of train cars.  That was

5    kind of how you found it, right?

6        A  That is how I found it.

7        Q  Okay.

8        A  I think it's pretty much the same today.

9        Q  Okay.  So that wasn't your fault, that was

10   how you found it, correct?

11       A  That's it, that's the way it was.

12       Q  Okay.  And because we have all these

13   differences, different stations and

14   configurations, and above ground and below ground,

15   and different widths of the platforms and

16   different kind of trains, you cannot have a

17   one-size-fits-all approach, correct?

18       A  No, absolutely you cannot.  You cannot.

19       Q  Okay.  It's unreasonable to have a

20   one-size-fits-all approach to the New York City

21   subway system, correct?

22       A  It is unreasonable.

23       Q  You need different solutions for common

24   problems at the different stations and the

25   different lines, correct?

29

1                    Lawrence George Reuter

2       A   That's true --

3       Q   Okay.

4       A   -- yes.

5       Q   And you learned in the 1980s, if not, even

6    earlier, the Transit Authority was looking at and

7    considering modernizing its subway system,

8    correct?

9       A   Oh, yes, absolutely.

10      Q   Okay.  And over the years, before you were

11   at the Transit -- while you were at the Transit,

12   they would order new train cars, for example,

13   correct?

14      A   That's correct.

15      Q   Okay.  Like for example, you mentioned

16   Kawasaki would make some of your train cars,

17   correct?

18      A   Yeah.  Kawasaki, Lombardia, (inaudible),

19   yes.

20      Q   Okay.  So over the years, and over the

21   decades, the Transit Authority orders new train

22   cars, correct?

23      A   That is true, that is true.

24      Q   Before you got there in 1981, when was the

25   last time they had like, ordered new train cars,

30

1               Lawrence George Reuter

2    new models or whatever?

3        A  You know, I can't recall exactly, but it

4    seems like it was early '70s.  Uh, there may have

5    been some -- an order of cars like the R -- I

6    think it was the R44s and 46s, but I'm not -- I'm

7    not a hundred percent sure about it.

8        Q  That's okay.  And we're not going to hold

9    you to it.

10       A  Okay.

11       Q  And then in the 1980s and '90s, did they

12   also order new cars?

13       A  Yes.  In the early '80s, you know, after

14   the -- the system almost collapsed in the late

15   '70s, the MTA first developed the first of the

16   five year capital programs, which you're probably

17   familiar with living in -- in New York.  And

18   that's when we started to really modernize the

19   system, and we were able to start ordering some

20   new equipment, new buses, new subway cars...

21       Q  And when you would order these new train

22   cars, the Transit could write the specifications

23   for what they wanted, and then the manufacturers

24   would make what you wanted, correct?

25       A  Basically that's true, yes.

31

1              Lawrence George Reuter

2     Q  So over the years, there were different

3  models and makes of trains that were designed and

4  ordered and purchased by the New York City Transit

5  Authority, correct?

6     A  Correct.

7     Q  Okay.  And it was up to the

8  Transit Authority to decide what it wanted for its

9  design specifications for its train cars, correct?

10     A  It was up to the Transit Authority within

11  reason of the manufacturer who built them.  I

12  mean --

13     Q  Okay.

14     A  -- just as an example, we would want the

15  manufacturer to build a car with, uh, you know,

16  the ability to go a hundred thousand miles without

17  doing any maintenance.  They couldn't do that.

18     Q  Okay.

19     A  There are certain things that they just

20  physically couldn't do.

21     Q  Okay.  But you would make whatever design

22  specifications you had, and to the best of the

23  state of the art at the time, that's what would be

24  done, correct?

25     A  That's correct.  That is correct.

32

1                    Lawrence George Reuter

2        Q    And would it be fair to say that even in

3    the 1970s and the 1980s, the Transit Authority was

4    looking at homogenizing its fleet of subway

5    trains, correct?

6        A    Tried to homogenize them as best you could

7    with -- with the different platform widths and

8    lengths --

9        Q    Okay.

10       A    -- (inaudible) with different fleets, yes.

11       Q    And so when did the Transit first start to

12   decide that they needed to homogenize the train

13   cars; was it in the '70s, the '80s?  You tell me

14   when.

15       A    I would think it really came about more in

16   the '80s.  It started in the '70s, but in the

17   '80s, it -- it really was an effort -- a lot of

18   effort went into looking to see if we could

19   actually come up with a single car design.  That

20   just didn't -- just wasn't possible because of the

21   physical constraints of the stations.

22       Q    Well, let's discuss this for a moment.

23   What are the benefits of a homogenized fleet of

24   just one kind of car --

25       A    Well, obviously you get a car -- you have

33

1                        Lawrence George Reuter

2       one type of car, that one makes your maintenance a

3       lot easier, uh, it also eliminates the -- the

4       extensiveness of spare part requirements in

5       multiple fleets where you can buy, you know, the

6       standard type of replacement parts of the car.

7       And it's easier to train the mechanics, obviously,

8       to maintain.  One type of car could make the,

9       uh -- mechanics transportable all over the system

10      that way.  So there's more than two benefits to

11      getting that car, if you could do it.

12         Q  So a homogenized fleet addresses many of

13      the problems you have in the day-to-day operations

14      of a subway system?

15         A  That's correct, yes.

16         Q  Okay.  And a homogenized fleet also

17      addresses some of the problems you have with

18      respect to station configurations, and platforms,

19      and things of that nature, correct?

20                    MR. KEAVENEY:  Objection.

21         A  Well, yeah it -- it'd accommodate it...

22         Q  Okay.  And over the years, as you mentioned

23      even in the '70s and '80s, the Transit Authority

24      has overhauled, or rehabilitated, upgraded,

25      modernized, whatever words you want to use, its

34

1                     Lawrence George Reuter

2   different stations, platforms, tracks, and track

3   pads, correct?

4       A   That's correct.

5       Q   Okay.  And they've had, the Transit's had,

6   capital projects to upgrade its station's

7   platforms, tracks, and track pads over the years,

8   correct?

9       A   Correct.

10      Q   And did that start really in the 1970s, or

11  was that in the '80s?

12      A   '80s.

13      Q   Okay.

14      A   It really came about when Dick Ravitch was

15  the chairman of the MTA.  He was the first one

16  that successfully negotiated with the State of

17  New York for first of the five year MTA capital

18  program.  Up until that time, it was pretty, uh,

19  probably -- I would -- I would probably say

20  haphazard...

21      Q   Okay, all right.  So in the '80s, they came

22  to the conclusion that they cannot stay mired in

23  the past.  They've got to advance, so to speak,

24  and modernize and bring its system up to date,

25  correct?

35

1          Lawrence George Reuter

2              MR. KEAVENEY:  Objection.

3      A  Yes.

4      Q  Okay.  And they had to meet the needs of

5  its customers, and use technology to do so,

6  correct?

7              MR. KEAVENEY:  Objection.

8      A  Well, we wanted to update the technology,

9  yes.

10     Q  Okay.  Now, an issue in operating a subway

11  system is sometimes the funding, correct?

12     A  Sometimes, yeah.  Of course, you know, the

13  system's 469 stations, 6,000 rail cars, 4,000

14  buses.  And obviously, uh, is one that takes a lot

15  of the prioritization to deal with the more

16  serious issues.  Or some -- sometimes you

17  literally had stations falling down.  You know, so

18  it was -- you had to deal with the issues on a

19  priority basis.

20     Q  Okay.  By the way, I'm just going to back

21  up for one second.  When you have the different

22  subway lines, can you have the same types of train

23  cars on the different line; how does that work?

24     A  No.  You -- some of the cars, because of

25  their lengths and their widths, could only operate

36

1                    Lawrence George Reuter
2    on certain lines.  You cannot operate what were
3    considered IMD cars on IRT, on the number lines
4    because they were just too long, too wide for
5    those -- those stations.  So you were -- you were
6    limited to where you could use the -- the --
7    specifically limit cars to stations they could
8    operate in.
9        Q   Okay.  So you could make whatever train
10   cars were for the IRT and for the IMD the same if
11   they were homogenized, correct?
12       A   Well, you could try to make them the same,
13   but you cannot make them the same car because the
14   lengths and widths would -- just would not work --
15       Q   Okay.
16       A   -- within the two systems.
17       Q   Okay.
18       A   You would try to standardize.  You would
19   like to -- to have similar brake systems, you
20   would like to have similar type of air
21   conditioning systems.  Because remember, the
22   original subways weren't air conditioned --
23       Q   Okay.
24       A   -- so the big issue was modernizing to get
25   air conditioning systems.

37

1              Lawrence George Reuter

2     Q   Okay.  So you would have, for example, one

3   type of train car for the IRT lines, and another

4   type of train car for the IMD lines, correct?

5     A   Basically that's true, yes.

6     Q   Okay.  So you could standardize each line,

7   so to speak?

8     A   Yes.

9     Q   Okay.  I want to get back to funding for a

10   second.

11    A   Mm-hmm.

12    Q   There's different sources of funding,

13   correct?

14    A   Yeah.  You obviously have, you know,

15   federal funding that comes, you know, from the

16   federal government, you have state funding.  You

17   know, and then you have local funding, which -- a

18   few different sources.  But mostly the MTA was

19   responsible for that...

20    Q   Okay.  And I'm sorry, I forgot to use one

21   word.  So when we talked earlier about

22   standardizing, for example, trains for the

23   different lines, so there would be homogenized

24   trains for the different lines, correct?

25    A   That's right, correct.

38

1              Lawrence George Reuter

2      Q   Thank you.  Sorry about that.  Okay.  So

3   there's different sources of revenue.  There's the

4   City can give money, the State can give money, and

5   the federal government can give money, correct?

6      A   That's correct.

7      Q   And plus, you've got the revenue from the

8   paying customers, correct?

9      A   We have fair-bought trip, yes.

10     Q   Okay.  And do they ever have bonds or, you

11  know, float bonds to raise money as well?

12     A   Yeah.  Well, the MTA capital programs

13  really started as a bond financing program.  And I

14  think they've sold bonds ever since, as far as I

15  know.

16     Q   Okay.  Have they ever looked to get grants;

17  whether it be City, State, or federal, or from a

18  private, or semiprivate entity?

19     A   Oh, yes, yeah.  A lot -- a lot of the, uh,

20  money from the federal government and the State

21  emits grants.

22     Q   Okay.  And there are, as I said, private or

23  public entities that you would go to for grants,

24  correct?

25     A   That's -- yes.

39

1           Lawrence George Reuter

2      Q   Okay.  So if you needed money for a

3   particular project, or whatever it is you wanted,

4   you could ask for the monies to come from the MTA,

5   correct?

6      A   That's basically correct.

7      Q   All right.  So was the MTA the entity that

8   was in charge of fundraising, so to speak, or were

9   you responsible for your own fundraising, or a

10  combination?

11     A   The MTA was responsible for all of the

12  funding.

13     Q   Okay.  And there are times that you have to

14  be creative and innovative to get funding,

15  correct?

16             MR. KEAVENEY:  Objection.

17     A   Oh, yeah.  Yeah.

18     Q   Okay.  Now, by the way, to get grants or

19  certain funds, whether it be from the City, State,

20  federal government, or private entities, you have

21  to first ask for it and apply for it, correct?

22     A   Uh, you know, that's really not my

23  bailiwick, so I couldn't really tell you that.

24     Q   Okay.  So well, probably just guessing,

25  that people don't give away the money, you've got

40

1               Lawrence George Reuter

2    to ask for it to get it?

3        A  Oh, I know they ask for it, but I don't

4    know how the process --

5        Q  Okay.

6        A  -- who's responsible for that, yes.

7        Q  Fair enough, okay.  So sometime the

8    Transit Authority would do things to raise its own

9    money, and I don't know if it's Transit or through

10   the MTA.  For example, advertising revenue,

11   correct?

12       A  Oh, yes.  But that was run -- but that was

13   run by the MTA also.  That, I believe was -- I

14   think the word would be "homogenous," among all of

15   the MTA agencies, Metro-North, Long Island Rail

16   Road, and the Transit Authority.  So the MTA ran

17   the advertisements, they were the ones who handled

18   that.

19       Q  Okay.  So for example, let's talk subways

20   for a second.  You've got, at the stations, on the

21   platforms, on the mezzanines, by the station

22   booth, the stairways, the hallways, there's

23   different ads that they get money for letting

24   advertising go there, right?

25       A  That's correct.

41

1          Lawrence George Reuter

2     Q   Okay.  And on the train car itself, there's

3  ads in the train cars, correct?

4     A   That's correct.

5     Q   And that's, again, to raise money, correct?

6     A   Correct.

7     Q   And for example, there are buses, you told

8  us, and buses have ads on them as well, correct?

9     A   That's correct.

10    Q   And buses have bus shelters, correct?

11    A   Correct.

12    Q   And there's also, I think it's called a BOT

13 Agreement, Build-operate-transfer Agreements, for

14 the bus shelters, correct?

15             MR. KEAVENEY:  Objection.

16    A   I'm not familiar with that, but there

17 probably is.

18    Q   Okay.  So for example, it's my

19 understanding, correct me if I say anything wrong,

20 that private companies took over the bus shelters,

21 and they would build the shelters in exchange for

22 getting the ad revenue on the shelters; is that

23 correct?

24             MR. KEAVENEY:  Objection.

25    A   I believe that's correct.  Yeah, I believe

42

1                    Lawrence George Reuter

2    that's correct.

3      Q   Okay.  And when they do this, the MTA and

4    Transit gets to save money because they don't have

5    to spend the money for the bus shelters, some

6    private company will do so, correct?

7                    MR. KEAVENEY:  Objection.

8      A   That's correct.

9      Q   So it's a money savings to the MTA and the

10   Transit Authority, so it's a win-win, correct?

11                   MR. KEAVENEY:  Objection.

12     A   Oh, it is a win-win.  That's right.

13     Q   All right.  And there's no real downside

14   because the vender that's putting up the shelters

15   for the ad revenue, they're assuming the risk and

16   the ones spending the money, correct?

17                   MR. KEAVENEY:  Objection.

18     A   Yeah.  There -- there is a downside we had,

19   and that has always been getting the -- the

20   vendors to maintain those shelters to the

21   standards that we would like them maintained.

22     Q   Okay.  So are there mechanisms to make sure

23   that the vendors maintain the shelters to the

24   standard that you want them --

25     A   Well, there were requirements of their

43

1                    Lawrence George Reuter

2    contract.  But it's obviously like, uh, you know,

3    any enforcement issue, you have to deal with the

4    contractual issues.  You know, try to enforce the

5    contracts.

6        Q  Okay.

7        A  And that does not always go exactly as

8    words on paper, so sometimes there's arguments.

9        Q  Okay.  So was it in the 1980s that the

10   Transit Authority started to consider what's known

11   as platform edge doors?

12       A  Well, it -- we definitely were considering

13   in the '80s.  I don't know whether it was

14   considered in the early --

15       Q  Okay.

16       A  Yes.

17       Q  All right.  So it's possible before the

18   '80s the Transit Authority was looking at platform

19   edge doors, but definitely in the '80s, they were

20   looking at them, correct?

21       A  Yes, correct.

22       Q  Okay.  And they were still looking at

23   platform edge doors in the 1990s as well, correct?

24       A  Yes, that's correct.

25       Q  And then in the 2000s, they were still

44

1                    Lawrence George Reuter

2     looking and discussing platform edge doors,

3     correct?

4        A   Well, at least until when I left there.   I

5     don't know what happened after that.

6        Q   Okay.   So through 2007?

7        A   Yes.

8        Q   Okay.   And when the Transit Authority in

9     the 1980's was looking at platform edge doors, why

10    were they looking at platform edge doors?

11       A   Well, there -- there were several reasons.

12    One was to look at, to try, and stop the

13    passengers from encroaching upon a train pulling

14    in the station, or falling on roadbed.   Uh, it was

15    also looking at it, the idea of eventually,

16    possibly air conditioning the stations.   It'd be a

17    way to help keep the, uh, controlled heat, you

18    know, from the rail cars from getting into the

19    stations.   It was, you know, multiple issues...

20       Q   Okay.   And by the way, in the 1980s, did we

21    have the same essential challenges that you had

22    through 2007 with respect to whether or not you'd

23    be about to utilize platform edge doors?

24             MR. KEAVENEY:   Objection.

25       A   Yeah, I -- I would say they're the same

45

1                    Lawrence George Reuter

2    issues.

3       Q   Okay.  So is a function of a platform edge

4    door, that it is literally a barrier that prevents

5    a customer from winding up onto the track or track

6    bed?

7       A   That's -- that's one of the benefits.  It

8    at least -- at least hinders that.  I mean, people

9    could obviously still try to hold the doors open,

10   you know, not abide by the door closing.

11      Q   Okay.  And so can we agree that the best

12   benefit to platform edge doors is safety?

13      A   That -- that is a benefit, absolutely.

14      Q   Okay.  And when we say "safety" -- let's

15   back up a second.

16          Can we agree that since the time New York

17   City started having a subway system, there have

18   been people that have wound up on the subway

19   tracks and track beds?

20      A   Yes.

21      Q   Okay.

22      A   Absolutely.

23      Q   And does the Transit Authority consider

24   people that wind up on the track or track bed to

25   be trespassers?

46

1                    Lawrence George Reuter

2      A   Uh, not always.  I mean, they're not

3   considered always to be trespassers.  Sometimes,

4   you know, people are pushed, you know, onto the

5   roadbed, and sometimes they just accidentally

6   fall.  I wouldn't say we call them trespassers.  I

7   don't remember even using that - that terminology

8   at all.

9      Q   Okay.  So since basically the inception of

10  the subway system, people have been hit, or run

11  over by trains, correct?

12     A   Oh, yeah.  I -- I can only attest to when I

13  was there, but from what I understand, yes.  It's

14  been a long history of those problems.

15     Q   And when the train makes contact with a

16  living human being, those individuals, those

17  humans can me killed or seriously harmed, correct?

18     A   Well, my terminology used to be the train

19  almost always wins.

20     Q   All right.  And every year, certainly since

21  you were at there Transit Authority, people are

22  hit or run over by trains, correct?

23     A   Yes.  We had -- we had several most years,

24  yes.

25     Q   And did the Transit Authority keep records,

47

1                    Lawrence George Reuter

2    keep track, of the number of incidents where

3    people got hit, and whether they where killed or

4    seriously injured by trains?

5        A   Yeah, I believe we did.  I -- you know, I

6    don't have those records now, but I believe we

7    did.

8        Q   Okay.  And why did they do that, why did

9    the Transit Authority keep track of records or

10   people being either killed or seriously injured by

11   contact with trains?

12                    MR. KEAVENEY:  Objection.

13       A   Well, the Transit Authority kept records

14   pretty much on everything.  So, I mean, uh, it

15   would be one of those issue that, uh, you knew

16   would come up, uh, to deal with.  And they were

17   also trying to figure out ways to prevent, you

18   know, those incidents from happening, so we would

19   track it.

20                    MR. GENIS:  And we have some charts.

21            I'm going to ask Dave to put up on the

22            screen, some charts.  I'm going go -- let's

23            see.  I think we've got a chart starting at

24            1987.  Dave, if you could put that up on

25            the screen?  If you've already marked it

48

1              Lawrence George Reuter

2       for, ID, let me know, and if we haven't,

3       we'll mark it now.

4              Off the record for a second so Dave

5       can do that.  It's 10:56, just keeping

6       track.

7              (A discussion was held off the

8       record.)

9              MR. GENIS:  It's now 10:59.  All

10      right.  We're going to show you what we've

11      marked today for identification as

12      Plaintiff's Exhibit number 1.

13             (Plaintiff's Exhibit 1, Chart, was

14      marked for identification.)

15   Q  If you look on the left column, it has

16   years starting in 1987, going literally up to

17   2021.  And the next column in the middle, to the

18   right of that, of the year, by number of

19   incidents, these are what's knows as 12-9

20   incidents.  We'll talk about that in a second.

21   And then number of fatalities; do you see that

22   (indicating)?

23   A  (Viewing.)  Yes, I see that.

24   Q  Okay.

25             MR. KEAVENEY:  Just note my objection

49

1           Lawrence George Reuter

2       to use of this document.  It wasn't

3       exchanged in discovery, and my

4       understanding is it's a document produced

5       and generated by Plaintiff's counsel for

6       the purpose of (inaudible), so --

7           MR. GENIS:  As we noted, it was

8       annexed to a motion already submitted to

9       the court, and it is based on the data and

10      records that you have furnished to us in

11      discovery.  Moving along.

12  Q   So let's see.  You worked for the

13  Transit Authority in the 1980s.  If we were to

14  say -- withdrawn.  Let's back up.

15      Did the Transit Authority have a code, or a

16  note, a name, for when people were hit or run over

17  by trains?

18  A   Well, we -- we had -- we had terms that we

19  would call, you know, persons under.  You know,

20  I'm not sure what terminology you're looking for,

21  but yeah.

22  Q   Okay.  For example, was there a code known

23  as a 12-9 for a person under?  In other words, a

24  person hit by a train, man under?

25  A   You know, there was a code.  I can't

50

1            Lawrence George Reuter

2   remember if it was the 12-9 anymore, but yeah,

3   there was a code.

4      Q   Okay.  And so the Transit Authority would

5   keep records for these man under, 12-9 incidents,

6   correct?

7            MR. KEAVENEY:  Objection.

8      A   Yes.

9      Q   And if we said that in 1987, there were

10   approximately 195 man under, 12-9 incidents, would

11   that sound about right to you?

12            MR. KEAVENEY:  Objection.

13      A   I -- I really couldn't say.  I don't know.

14      Q   Okay.  You know, or customer contact with a

15   train, another way of putting it?

16      A   Well, you know, there's so many of these --

17   these incidents.  I mean, they could be homeless

18   people on the track, it could be people jumping in

19   front of the train, pushed, it could be people,

20   you know, caught in the doors, they may have got

21   dragged down to the -- the system.  So I -- I

22   mean, I just -- I couldn't really answer that

23   effectively.

24      Q   All right.  Are they also known as CWI

25   reports?

51

1                    Lawrence George Reuter

2      A   CWI?   I'm not familiar -- right now, I

3   can't recall that.

4      Q   Okay.   Would it be part of your job as the

5   president of the Transit Authority at the time, to

6   be aware of how many people were run over by

7   trains, or hit by trains, each year?

8      A   Uh, you know, I would be informed of any of

9   the incidents that -- that occurred by that, but I

10  wasn't, uh, you know, always just keeping a tally

11  like -- like you've got on the sheet here.   Uh,

12  generally, the, uh -- our System Safety Department

13  would have keep those records, you know, and we

14  looked at them.   They would have been the ones

15  that brought them to my attention too.

16     Q   And so to Transit Authority has an Office

17  of System Safety, correct?

18     A   Or had.   I guess it still does, but had.

19     Q   Okay.   Had, sorry.   And what was the job of

20  the Office of System Safety?

21     A   They -- they were to basically investigate

22  any type of safety incident, no matter what type.

23  You know, whether it was a slip, tripped, and

24  fall, or whether it was a serious employee injury,

25  or these type of fatalities, they would also be --

52

1                    Lawrence George Reuter

2    keep them and make recommendations, you know, on

3    what could be done to try to lessen the impact of

4    these types of incidents.

5        Q  So in other words, they would do a hazard

6    analysis?

7        A  That's correct.

8        Q  And the Office of System Safety was

9    supposed to do a root cause analysis?

10                   MR. KEAVENEY:  Objection.

11       A  Generally, they would try to do that, yes.

12       Q  Okay.  And so would it be fair to say that

13   the Transit Authority would publish each year, the

14   number of these 12-9 incidents, the CWIs?

15                   MR. KEAVENEY:  Objection.

16       A  I'm -- I'm pretty sure we did, but I -- I

17   can't -- you know, we published so much

18   information, I can't recall just those incidents.

19   But I think we did.

20       Q  Okay.  So in 1988, there were approximately

21   227 12-9 incidents, with 57 fatalities; does that

22   sound about right to you?

23       A  I -- I couldn't say, but, you know, I just

24   don't know whether that's the right number or not.

25                   MR. GENIS:  All right.  Well, I'll

53

1          Lawrence George Reuter

2      tell you what, what we're going to do,

3      because the Transit Authority has objected

4      to this document.  So we're going to use a

5      different document that the Transit

6      Authority gave us --

7          THE WITNESS:  Okay.

8          MR. GENIS:  -- starting at 2001.  And

9      this way they can have no objections.

10      That'd be Plaintiff's number 2, with

11      today's date.

12          (Plaintiff's Exhibit 2, Transit

13      Authority document, was marked for

14      identification.)

15          MR. GENIS:  Okay.  And we have

16      Plaintiff's number 2 for identification on

17      the screen now.

18   Q  Do you see that, that it starts in 2001

19 (indicating)?

20   A  (Viewing.)  I see that.

21   Q  Okay.  So according to the Transit, in

22 2001, there were 110 people struck by trains, and

23 31 of them died, correct?

24   A  That's what this says, yes.

25   Q  2002, 136 people hit by trains, 46 died,

54

1                    Lawrence George Reuter

2    correct?

3        A   That's what it says, correct.

4        Q   2003, 188 people hit by trains, and 37 of

5    them died, correct?

6        A   That's what it says, yes.

7        Q   2004, 158 people hit by trains, and 35 of

8    them were killed, correct?

9        A   That's correct, on the sheet.

10       Q   2005, 151 people hit by trains, and 44 of

11   them were killed, correct?

12       A   That's looks correct, yes.

13       Q   Then in 2006, 109 people were hit by

14   trains, and 38 were killed, correct?

15       A   Wait a minute, it just moved around on me.

16   Yes, that looks correct.

17       Q   Okay.  And then 2007, 110 people hit by

18   trains, 55 of them killed, correct?

19       A   That's what it says, yes, correct.

20            MR. GENIS:  Okay.  And by the way,

21        just for the record, and, Andrew, for your

22        edification, it's dates 29044 [sic].

23       Q   And I'm going to stop in 2007, because

24   that's when you left, okay?

25       A   Yeah, that's correct.

55

1              Lawrence George Reuter

2     Q   All right.  So would it be fair so say that

3   in the 80's when you worked for the Transit, and

4   again when you became its president in the 1990s,

5   you were aware that ever year, many people were

6   hit by trains, correct?

7     A   Basically that's correct, yes.

8     Q   And you were aware that every year, in the

9   1980s, 1990s, through 2007, people were also being

10  killed and seriously injured by trains, correct?

11    A   That's generally correct, yes.

12    Q   So this was like a known and longstanding

13  problem for the Transit Authority, correct?

14              MR. KEAVENEY:  Objection.

15    A   There were many reasons why these...

16    Q   Well, we're going to get into the reasons

17  in a minute.  Can we just agree that this was a

18  known and longstanding problem to the

19  Transit Authority people, being hit and either

20  killed or seriously injured by trains?

21              MR. KEAVENEY:  Objection.

22    A   Yeah.  The numbers are the numbers, yeah.

23    Q   Okay.  When did the Transit Authority start

24  keeping track of these statistics, the numbers of

25  people being hit and being injured or killed by

56

1                    Lawrence George Reuter

2    trains?

3        A   Uh, I couldn't tell ya, I don't recall.

4        Q   Is there a single year that you're aware

5    of, that a year went by without a single person

6    being killed by a train?

7        A   I really can't recall.

8        Q   Is there a single year that somebody wasn't

9    hit by a train and injured?

10       A   I can't recall.

11       Q   Has there ever been a month without

12   somebody being killed by a train?

13       A   Again, I just can't recall.

14       Q   Has there been a month without somebody

15   being injured by a train?

16       A   Has, what?

17       Q   Has there ever been a month without

18   somebody being hit and seriously injured by a

19   train?

20       A   I can't recall.

21       Q   Has there ever been a week without somebody

22   trespassing on the track or track bed?

23       A   I couldn't answer that.  Trespassing is

24   just not a word that I necessarily use, so...

25       Q   Okay.  So you think it's inappropriate to

57

1          Lawrence George Reuter
2   call somebody on the track or track bed a
3   trespasser, correct?
4     A   No.  There are -- there are occasions where
5   there are trespassers, but it was just not a
6   common terminology.  That was one more the -- I
7   would think that the, uh -- the police department
8   or others used.
9     Q   Okay.  So I just want to back up.  So in
10  other words, if a person -- I'm just trying to go
11  by what you said earlier, is for example, a
12  homeless person and they go on the track because
13  maybe somewhere in the tunnel, they have an
14  encampment, that would be a trespasser.  But if
15  it's a person that fell, or tripped, or fainted,
16  or was pushed onto the track, they would not be a
17  trespasser, is --
18    A   That's generally true.
19    Q   Okay.
20    A   That's generally true, yes.
21    Q   Okay.  So somebody who falls, or faints, or
22  gets pushed onto the track, is not a trespasser,
23  correct?
24    A   No.  I would not consider them a
25  trespasser.

58

1          Lawrence George Reuter

2     Q   Okay, thank you.  Now, during the time you

3   were at the Transit Authority, was it acceptable

4   to the Transit Authority to have this many people

5   being hit and either injured or killed by trains

6   every year?

7          MR. KEAVENEY:  Objection.

8     A   No.

9     Q   Okay.  And basically there's only a few

10  ways that these incidents can occur.  For example,

11  there can be a defective or unsafe platform

12  condition that can cause somebody to trip or slip,

13  and fall onto the track, correct?

14    A   That's one way, yes.  That's one way.

15    Q   They could just fall because they fell for

16  whatever reason onto the track, correct?

17    A   That's correct.

18    Q   A person can get sick or have a medical

19  condition that causes them to fall onto the

20  tracks, correct?

21    A   That's correct.

22    Q   A person can get pushed onto the tracks,

23  correct?

24    A   Correct.

25    Q   And a person could jump onto the tracks

59

1              Lawrence George Reuter

2  intentionally, correct?

3      A   Uh, that's correct also.

4      Q   Now, did the Transit Authority have a

5  category for suicide?  You know, people

6  intentionally, allegedly jumping onto the tracks

7  to get hit by trains?

8      A   You know, I believe we did, I just can't

9  recall what it is now.  But yes, I think we did.

10  I know they were categorized by suicide.

11      Q   Okay.  And so all of these are different

12  categories or possibilities of how people can wind

13  up on the track that we just went through a moment

14  ago, correct?

15      A   Yes.

16      Q   And did the Transit Authority keep track of

17  that, so they'd know, for example, X number of

18  people tripped and wound up on it, Y number of

19  people got sick and fell onto the track, Z number

20  went to retrieve something and wound up on the

21  track, you know, or some other number jumped onto

22  the track, things of that nature?  Did they keep

23  track of it by categories?

24      A   Yeah, I believe we did, but I can't say for

25  certain.

60

1                    Lawrence George Reuter

2      Q   Okay.   And sometimes people could even get

3   hit by a train just because they're too close to

4   the edge of the platform, correct?

5      A   That could be, or they could have their --

6   their clothing caught in the doors that close, or

7   like a purse, like your coat could get caught in

8   the doors.

9      Q   All right.   Now, when the Transit Authority

10  would categorize something as a suicide, what

11  would be the basis or criterial of them making

12  that opinion?

13                   MR. KEAVENEY:   Objection.

14     A   You know, I -- I don't know for sure.

15  You'd have to talk to the people that did the

16  classifications.

17     Q   Was there a written criteria, or basis, for

18  opining that a person was trying to commit suicide

19  when they get hit by a train?

20                   MR. KEAVENEY:   Objection.

21     A   Not that I'm familiar with, that I don't

22  know.

23     Q   Okay.   When you were with the Transit, did

24  the Transit Authority want to prevent these

25  suicides from occurring?

61

1                Lawrence George Reuter

2      A  Well, we wanted to prevent all accidents,

3  yes.

4      Q  Okay.  And the did the Transit Authority

5  ever learn to see if any other similar entities

6  were doing things to present people from

7  committing suicide on subways?

8                MR. KEAVENEY:  Objection.

9      A  Well, I don't know about just suicides.  We

10  have people that were going around, studying

11  different ways to try to prevent people from

12  ending up on the tracks from whatever reason.

13     Q  Okay.  So for example, I'm going make some

14  analogies for a moment.  There are times with the

15  Transit Authority, they have bridges or

16  overpasses, correct?

17     A  Correct.

18     Q  And do they have fences of some sort to

19  prevent people from falling or jumping onto the

20  tracks below?

21     A  Generally that's true, yes.

22     Q  Okay.  And is that one of the purposes and

23  function of that fencing or barrier, to prevent

24  people from falling or jumping onto the tracks

25  below?

62

1                     Lawrence George Reuter

2        A   Well, I would -- I would probably say to

3    deter.  It doesn't always prevent, but deters.

4        Q   Okay.  And so for example, you know, we see

5    bridges.  The George Washington Bridge has

6    barriers or fences to prevent people, or deter

7    people, from jumping off the bridge, correct?

8        A   Yeah, it does, but somehow they seem to

9    keep doing that there too.

10       Q   Okay.  And would we agree that every life

11   that's saved, or any death that's prevented, is a

12   good thing?

13       A   It is a good thing, absolutely.

14       Q   Okay.  And by the way, does the

15   Transit Authority give training to its employees,

16   including train operators?

17       A   Yes.

18                  MR. KEAVENEY:  Objection.

19       Q   And by the way, so every life that's saved

20   is precious, correct?

21                  MR. KEAVENEY:  Objection.

22       A   Oh, absolutely.

23       Q   And even if it's not a hundred percent

24   effective, every little bit helps, correct?

25                  MR. KEAVENEY:  Objection.

63

1            Lawrence George Reuter

2       A   Well, that's kind of a general statement.

3   I don't -- I don't feel comfortable just saying

4   that --

5       Q   Okay.  Well, is it better to prevent a

6   death, or not prevent a death?

7       A   Well, you know, you could always say it's

8   easier just to prevent people getting in the

9   subway system, that would prevent deaths.  But,

10  you know, you still have to -- people have to get

11  to work and do their business, so, you know, it's

12  within limits.  You've got to do what you can do

13  reasonably to prevent it.

14      Q   Agreed.  So the Transit Authority should do

15  whatever's reasonable to prevent these 12-9s from

16  occurring, correct?

17      A   Correct.

18      Q   The Transit Authority should do whatever's

19  reasonable to prevent people from having contact

20  with trains, correct?

21      A   As best they can, that's right, yeah.

22      Q   Now, we were discussing training a moment

23  ago.  Did the Transit Authority train its

24  operators of its subways to look out for people

25  near the edge of the platform?

64

1              Lawrence George Reuter

2       A  Yes, yes they did.

3       Q  Okay.  And why did they do that?

4       A  Well, they were trying to prevent people

5  from getting injured or hit by the train.  And

6  the -- you know, constantly, when a train

7  operator's pulling into the station, you know,

8  they look for people to -- to see what they can do

9  and prevent it.

10      Q  Okay.  So the Transit Authority would train

11  its operators to look out and see people that even

12  might come into contact with the train, so that

13  they can take steps to avoid hitting or running

14  over them, correct?

15      A  Well, they try to have them beep the horn

16  to get the people to move, you know, or

17  potentially stop the train if there's enough

18  room -- enough time to do that.

19      Q  Okay.  And so the Transit Authority teaches

20  its operators based on the number of people every

21  year that are hit or run over by trains, that it

22  is foreseeable that people wind up on the tracks,

23  correct?

24              MR. KEAVENEY:  Objection.

25      A  I'm not sure I understood that one --

65

1                    Lawrence George Reuter

2      Q   Let me rephrase it.

3      A   Okay.

4      Q   We agree it's a recurring problem each and

5   every year that people wind up on the tracks and

6   are either hit or run over by trains, correct?

7                    MR. KEAVENEY:  Objection.

8      A   There -- there -- that does happen.  People

9   do end up on the tracks.

10     Q   Okay.  And that is a recurring problem,

11  correct?

12                   MR. KEAVENEY:  Objection.

13     A   Yes, it is a recurring problem.

14     Q   Okay.  So the Transit is aware that this

15  will happen, and since it happens so many times in

16  the past, it is foreseeable that it will happen

17  again, right?

18                   MR. KEAVENEY:  Objection.

19     A   Yeah.  Like there are car accidents, yes,

20  they happen.

21     Q   So the Transit Authority trains, or

22  teaches, its train operators that it's foreseeable

23  that people will wind up on tracks, correct?

24                   MR. KEAVENEY:  Objection.

25     A   Yeah.  We -- that's one of the things

66

                    Lawrence George Reuter

1

2    they're trained for, yes.

3        Q   Okay.  And one of the purposes of the

4    training is to help them have a quicker reaction

5    time and quicker response to avoid, if possible,

6    running over or hitting someone, correct?

7                    MR. KEAVENEY:  Objection.

8        A   Try to make them aware to do that, yes.

9        Q   Okay.  By the way, are station agents

10   members of a union?

11       A   Oh, yeah.  All -- all Transit employees

12   basically, other than management...

13       Q   And let me ask you a question, when you

14   were president of the Transit Authority, if

15   funding was not an issue, what would you have done

16   to prevent or reduce the number of --

17                   MR. KEAVENEY:  Objection.

18       A   The number of what?

19       Q   12-9s, of these man under cases?

20       A   Well, we didn't necessarily have the

21   solution to eliminate or -- or significantly

22   reduce them.  You know, we were doing everything

23   we thought we could possibly do to do that.

24       Q   So you're saying funding was not an issue

25   about preventing people from getting hit by trains

67

1                    Lawrence George Reuter

2    when you were president?

3        A   Uh, we -- if we had found a -- a solution

4    that we thought was going to be effective to do

5    that, we would have fought pretty hard to get any

6    funding necessary.  I dare say we would probably

7    have been successful if we would have found a

8    solution.

9        Q   Okay.

10       A   Now, understand, 469 stations, 6,000 rail

11   cars, it still takes a long time to -- to accept

12   that change throughout the system, so...

13       Q   Okay.  So is there anything that you would

14   have liked to have done when you were president,

15   that you didn't do, to help prevent or reduce the

16   number of people getting hit by trains?

17       A   No, I can't think of anything that I --

18   that I don't -- that I think we didn't try to do.

19       Q   Okay.  I'm going to come back to that topic

20   in a few minutes.  I want to do a different topic

21   for a little --

22       A   Okay.

23       Q   -- and I like to tell you where I'm

24   going --

25       A   Okay.

68

1                    Lawrence George Reuter

2     Q  -- I think it's fairer that way.

3     A  Okay.

4     Q  Okay.  Do we agree that the

5  Transit Authority had to be familiar with good and

6  accepted practices and procedures in the mass

7  transportation industry?

8     A  Generally that's true, yes.

9             MR. KEAVENEY:  Objection.

10    Q  Including engineering standards, correct?

11    A  Yes, yes that's true.

12    Q  And the Transit Authority had to be

13  familiar with these professional standards of care

14  of engineering in the mass transit industry?

15            MR. KEAVENEY:  Objection.

16    A  Yeah, that's true.

17    Q  Okay.  And did you have to be familiar with

18  these professional standards of care as well?

19    A  Not -- not in detail, no.

20    Q  Because you had people that were below you

21  to do those jobs, correct?

22            MR. KEAVENEY:  Objection.

23    A  There were 45,000 people, so yes.

24    Q  And they could give you their advice and

25  their recommendations based on their familiarity

69

1              Lawrence George Reuter

2    with professional standards of care, correct?

3        A   That's correct.

4        Q   Okay.  So the Transit had to be familiar

5    with customs and practices, and thus practices, in

6    the mass transportation industry, correct?

7                  MR. KEAVENEY:  Objection.

8        A   That's generally correct, yes.

9        Q   Okay.  And the Transit Authority was

10   supposed to follow and comply with and adhere to

11   the best practices in the mass transit industry,

12   correct?

13                 MR. KEAVENEY:  Objection.

14       A   Well, as best as we could, yes.

15       Q   Okay.  And the Transit was supposed to be

16   familiar with mass transportation industry

17   benchmarks, correct?

18                 MR. KEAVENEY:  Objection.

19       A   General, yes.

20       Q   Okay.  And the Transit Authority was

21   supposed to follow, comply, and adhere to these

22   benchmarks of the mass transit industry, correct?

23                 MR. KEAVENEY:  Objection.

24       A   Well, not necessarily comply with them,

25   but, uh, be aware of them and, you know, try to

70

1               Lawrence George Reuter

2   achieve the best we could to get near those

3   benchmarks.

4     Q   Okay.  And was the Transit Authority

5   supposed to comply with and adhere to professional

6   standards of care in the mass transportation

7   industry?

8     A   I'm not -- I'm not sure exactly what that

9   means.

10    Q   Okay.  Well, was the Transit Authority

11  supposed to comply with engineering professional

12  standards of care, applicable to the mass

13  transportation industry?

14              MR. KEAVENEY:  Objection.

15    A   I'm not -- I'm not sure the -- that -- that

16  seems kind of vague to me.  I'm not sure that

17  would be true...

18    Q   Okay.  Should the Transit Authority adhere

19  to the good and accepted practices and procedures

20  in the mass transportation industry?

21              MR. KEAVENEY:  Objection.

22    A   Generally we try to, but obviously, uh, you

23  know, we had different -- different laws in the

24  State of New York and the City of New York, that

25  we were also compliant with, but maybe in conflict

71

1                    Lawrence George Reuter

2     with them.

3        Q   Well, according to good and accepted

4     practices involving mass transit, talking about a

5     subway system, is a mass transit system ever

6     allowed to unnecessarily expose the public to

7     harm?

8                    MR. KEAVENEY:   Objection.

9        A   No, I can't imagine that being the -- the

10    case, no.

11       Q   And according to professional standards of

12    care, is a mass transit agency ever allowed to

13    unnecessarily expose the public to harm?

14                   MR. KEAVENEY:   Objection.

15       A   Again, that seems vague.  But generally, I

16    would say no.

17       Q   And according to professional standards for

18    care and engineering mass transportation, were

19    they ever allowed to unnecessarily expose the

20    public to harm?

21                   MR. KEAVENEY:   Objection.

22       A   Again, vague, but I would say, uh,

23    generally no.

24       Q   And at times you have to use your judgement

25    and discretion, correct?

72

1                 Lawrence George Reuter

2      A   Oh, you have to deal with, uh, an existing

3   system, that was built -- been there for over a

4   hundred years now.

5      Q   Okay.  When, if ever, according to

6   professional standards of care, you're allowed to

7   use your judgement and discretion in a manner that

8   would unnecessarily expose the public to harm?

9                 MR. KEAVENEY:  Objection.

10     A   I couldn't answer that, I don't know.

11     Q   Okay.  Can you think of a single instance

12  when you're allowed to use judgement and

13  discretion in a manner that unnecessarily exposes

14  the public to harm?

15     A   Well, I don't -- again, I think part of

16  that -- you have to be specific, what that means.

17  I mean, you know, there are people in the subway

18  system that come in with guns and knives.  That

19  exposes people to harm, but there's just so much

20  you can do about that.  So I don't know.  Just --

21     Q   I mean --

22     A   -- got to be pretty specific.

23     Q   Okay.  Look, there's things you can

24  control, and there's things you cannot control,

25  correct?

73

1                    Lawrence George Reuter

2        A   That's correct.

3        Q   Okay.  Well, did the Transit have a policy

4    of zero tolerance for unnecessary exposure of harm

5    to the public?

6                    MR. KEAVENEY:   Objection.

7        A   Uh, I think only within reason that we

8    could control 'cause obviously we can't control

9    peoples actions.

10       Q   Okay, fair enough.  Do you agree part of

11   the job of the Transit Authority is to prevent

12   preventable harm?

13       A   Try our best to prevent as many accidents

14   as we can.

15       Q   Okay.  Part of the job of the Transit is to

16   anticipate problems and anticipate how people can

17   be harmed, correct?

18       A   As best as we possibly can, yes.

19       Q   Okay.  So it's part of the job of the

20   Transit to take reasonable care to prevent

21   foreseeable harm, correct?

22                    MR. KEAVENEY:   Objection.

23       A   Again, as best as you can.  But that's

24   still vague in general, so I don't know.

25       Q   Okay.  Well, should the Transit Authority

74

1                    Lawrence George Reuter

2      be prudent in safeguarding the public using its

3      system?

4                    MR. KEAVENEY:  Objection.

5         A  I think we -- I think the Transit Authority

6      was, yes.

7         Q  So that's what they're supposed to do,

8      correct?

9         A  Yes.

10        Q  Okay.  And is the Transit Authority

11     supposed to be diligent in safeguarding the

12     public?

13                    MR. KEAVENEY:  Objection.

14        A  Basically as best they can, yes.

15        Q  Okay.  And part of the job of the Transit

16     is identifying the potential safety hazards,

17     correct?

18        A  Say that again, I missed that.

19        Q  Sure.  Part of the job of the

20     Transit Authority includes identifying potential

21     safety hazards, correct?

22        A  That's correct, yes.

23        Q  Okay.  So first, you have to identify the

24     problem, correct?

25        A  Correct.

75

1          Lawrence George Reuter

2     Q   And then, you could work on eliminating or

3   reducing these potential safety hazards, correct?

4     A   That's correct.

5     Q   Okay.  So part of the job of the Transit

6   Authority is to problem solve, correct?

7     A   Oh, that is one of the jobs, that's

8   correct.

9     Q   Okay.  And the best way to solve a problem

10  is to first determine what the root cause of the

11  problem is, that root cause analysis we mentioned

12  earlier, correct?

13    A   (Inaudible) the ways do it, correct.

14    Q   Okay.  So when you're doing the root cause

15  analysis, you're trying to look for the common

16  denominator, correct?

17          MR. KEAVENEY:  Objection.

18    A   Yes.  That is one of the -- that's one of

19  the -- yes.

20    Q   Okay.  So for example, when we have people

21  having contact with trains, that is the common

22  denominator.  Whether they fell, whether they got

23  pushed, whether they jumped, whatever.  The common

24  denominator is contact between the person and the

25  train, correct?

76

1          Lawrence George Reuter

2          MR. KEAVENEY:  Objection.

3     A  Well, that is a common denominator, but I

4  don't know that's necessarily the whole issue, but

5  yes.

6     Q  Okay.  So the means of either preventing or

7  reducing people having contact with the trains, is

8  affecting their access to the track, the track

9  bed, or the train itself, correct?

10    A  Well, that's one way.

11    Q  Okay.

12    A  That -- that is one way.

13    Q  So if you restrict access to the track bed

14  or the train, that is one way of preventing or

15  reducing the number of people having injury or

16  death caused by contact with a train, correct?

17         MR. KEAVENEY:  Objection.

18    A  That is one way.

19    Q  And in fact, people can also get hurt just

20  falling off of the platform, even if they're not

21  hit by a train, just hitting a track below,

22  correct?

23    A  Correct.

24    Q  Okay.  So if you prevent access to the

25  train or the track, you can present contact with

77

1              Lawrence George Reuter

2    the train, correct?

3                  MR. KEAVENEY:  Objection.

4        A  I wouldn't say prevent, but you could

5    probably reduce it.

6        Q  Okay.  Greatly reduce?

7        A  I would say greatly reduce or reduce.  You

8    will never eliminate it.

9        Q  Okay.  I mean, nothing in this world is a

10   hundred percent, correct?

11       A  No, absolutely.

12       Q  Okay.

13       A  Well, death and taxes, I would say.

14       Q  Okay, all right.  Other than those two

15   things...

16       A  Yup.

17       Q  You know, for example, the

18   Transit Authority deals with problems every single

19   day.  What percentage does the Transit Authority

20   consider a good success rate?  Whatever the issue

21   or problem maybe.

22                  MR. KEAVENEY:  Objection.

23       A  Well, I think it depends on what the

24   issue -- you know, what -- what the specific issue

25   is, what we consider good.  I mean, you know, for

78

1                    Lawrence George Reuter

2    on-time performance, we would like on-time

3    performance to be in the upper 90's on the -- on

4    the system.  Uh, for maintenance, we would like

5    all our maintenance schedules to be at or near a

6    hundred percent.  So it just depends on the

7    issue --

8       Q  Okay.

9       A  -- you know, what we would consider to be a

10   success.

11      Q  How about prevention of death or serious

12   injury?  What's considered a good success rate for

13   that?

14      A  For what?  For serious injury?

15      Q  To prevent or reduce death or serious

16   injury, what's a good success rate for that?

17      A  Again, because there's so many issues that

18   can cause it, I don't think we have -- we have a

19   percentage that I would put on it.

20      Q  And when you say "on-time performance,"

21   what does that mean for a subway, when you say

22   "on-time performance?"

23      A  Well, that's how often the trains get to

24   the stations within a certain period, you know, of

25   their scheduled time.

79

1              Lawrence George Reuter

2      Q   So when you were the president, what

3   percentage of the time did the trains keep to

4   their scheduled time?

5      A   Uh, you know, it's been so long ago, I

6   can't remember.  It was in the 90s, that I know.

7   I don't remember.

8      Q   Okay.  When there are scheduled times, are

9   the times built in with -- let me try and do this

10   again, sorry.

11        Sometimes there are delays in the system

12   that are inherit, correct?

13      A   That's correct.

14      Q   So are these delays built into the

15   scheduled times?

16      A   Uh, not a delay.  There are times built in

17   for dwell times at stations, for how long the

18   train should be sitting at a station, but not for

19   a delay.  A delay causes -- potentially causes

20   a...

21      Q   And getting back to things you could

22   control or not control, you can't prevent somebody

23   from slipping, or tripping, or falling, correct?

24              MR. KEAVENEY:  Objection.

25      A   That -- generally, that's true.  There are

80

1                    Lawrence George Reuter

2      things you could do to mitigate...

3          Q   Okay.   So yes, you want to make sure the

4      platform is safe so that there's no tripping or

5      slipping conditions, correct?

6          A   Right, yes.

7          Q   You can't prevent one passenger from

8      pushing another onto the track, correct?

9          A   No, we cannot do that.

10         Q   You can't prevent somebody from jumping

11     onto the track, correct?

12         A   No, we could not.

13         Q   What you can control is access to the track

14     though, correct?

15         A   No, we could not.

16         Q   Well, you're saying it's impossible to

17     control access to the track?

18         A   Uh, in the New York City subway system, any

19     time in my lifetime or your lifetime, the answer

20     is, yes, it's impossible to control access to the

21     tracks.

22         Q   When you told us a few moments ago how in

23     the 1980's, if not earlier, the Transit Authority

24     was considering platform edge doors, could we

25     agree that a function of a platform edge door is

81

1              Lawrence George Reuter

2     to prevent access to either the track or the train

3     from the public?

4       A   Again, I would use the words deter access.

5     We'll never prevent, but we'll definitely deter

6     access.

7       Q   Could platform edge doors certainly reduce

8     the number of times people can have access to the

9     track?

10             MR. KEAVENEY:  Objection.

11      A   Yes, I would say that would be true.

12      Q   Okay.  You know, I'll give an analogy.  I

13    don't know if it's good or bad, but it popped into

14    my head.  You can't control the weather, but you

15    can take preventative measures to reduce or

16    mitigate the damages caused by flooding, correct?

17      A   That's correct.

18      Q   So in other words, root cause, whether it's

19    electrical wiring or some other component of your

20    system, if it's damaged by water, it doesn't

21    really matter if it's a hurricane, a storm, or

22    just a lot of rain, the common denominator is

23    water getting into the system.  So the issue is,

24    how to either prevent or reduce the water from

25    coming in, or protect the equipment, correct?

82

1              Lawrence George Reuter

2              MR. KEAVENEY:  Objection.

3    A  Yeah, that's correct.

4    Q  Okay.  So one of the means to try to

5    prevent a reoccurrence of people being hit or run

6    over by trains, would be platform screen doors,

7    correct?

8              MR. KEAVENEY:  Objection.

9    A  That would deter their -- the falling on

10   the tracks...

11   Q  And there's other methods or technologies

12   to try to accomplish that as well, correct?

13   A  Yes.

14   Q  Okay.  And so for example, are you familiar

15   with what's known as track intrusion devices,

16   TIDs?

17   A  I'm not sure what you're referring to.

18   Q  Okay.  I'm going to make an analogy in a

19   moment, and then come back to this, okay?

20   A  Mm-hmm, okay.

21   Q  So for example, you could ride an elevator,

22   and they can have sensors, whether it's laser,

23   thermal, or whatever, to see if somebody is

24   standing in the doorway, so that the elevator

25   knows not to close on the person because it senses

83

1                    Lawrence George Reuter

2     their presence, correct?

3         A  Yeah, yeah.  That I understand, correct.

4         Q  Okay.  So there could be similar devices

5     installed at subway stations where if a person

6     fell, or wound up somehow getting onto the track,

7     their body would make contact or break through

8     that laser or light, or thermal, whatever it is,

9     so that that would now break the signal and it

10    could then relay that information, if there's a

11    person on the track, correct?

12                   MR. KEAVENEY:  Objection.

13        A  Well, my answer would be theoretically that

14    maybe possible.  I think practically, that would

15    be very hard to do.

16        Q  Well, you've heard of these TID devices,

17    correct?

18        A  I've heard of them, yeah.  I haven't heard

19    them called TIDs, but yeah, I've heard of them.

20        Q  What have you heard them called?

21        A  Well, I've just heard them, you know,

22    called, you know, detectors for tracks.  You know,

23    to -- to try to determine some foreign object, you

24    know, that gets there, but --

25        Q  Okay.

84

1                    Lawrence George Reuter

2      A  -- on a subway platform, it's pretty

3   complicated.

4      Q  All right.  So there's different types of

5   these detection devices.  For example, you can

6   have like a laser or light beams that we

7   mentioned, like with elevators.  That's one means

8   of having a track intrusion device, correct?

9      A  Yeah, but I'm not sure what it would do.  I

10  mean, in an elevator, it stops the door from, you

11  know, potentially closing.  On the subway, it

12  can't stop the train.

13     Q  Well, it's funny that you mention that.

14  Let's talk about that then?

15     A  Yeah.

16     Q  When you have electronic devices --

17     A  Mm-hmm.

18     Q  -- okay.  So let's get back to the

19  elevator, and then we're going to come back to the

20  train.

21     A  Yes.

22     Q  So the elevator has some sort of

23  controller --

24     A  Correct.

25     Q  -- so that when the light beam gets broken,

85

1           Lawrence George Reuter

2   it relays that information to the controller, and

3   now there's a safety device that makes the

4   elevator stop.  And --

5           MR. KEAVENEY:  Objection.

6   A  I believe that's correct --

7   Q  -- okay?

8   A  Yeah.

9   Q  Okay.  And a similar kind of thing can be

10  used in a subway, where if the person falls onto

11  the track and breaks that light beam connection,

12  that that could relay information, whether it be

13  to the train itself, whether it be to a railroad's

14  clerk station, or something else, that can be

15  connected, true?

16          MR. KEAVENEY:  Objection.

17  A  Uh, it'd be very hard to -- to do that

18  effectively if you're gonna be at the railroad

19  clerk or operations center because the time delay

20  would be pretty considerable.  And to do it to the

21  train, you'd have to have some wireless

22  connection, which doesn't exist, that didn't exit,

23  and does still not exist.

24  Q  So let's back up a little bit.

25  A  Yeah.

86

1              Lawrence George Reuter

2      Q   Okay.  And here's where we started getting

3   into where I would appreciate if you just answer

4   my question, and not give additional information.

5   Because I'm going to have to back up a little bit

6   now.

7      A   Okay.

8      Q   First of all, so yes, there is technology

9   for track intrusion devices, correct?

10              MR. KEAVENEY:  Objection.

11     A   There are certain track intrusion devices

12   available.

13     Q   And these track intrusion devices have been

14   available for many decades, correct?

15              MR. KEAVENEY:  Objection.

16     A   I'm not aware of that, I don't know.

17     Q   When did you first learn of track intrusion

18   devices; was it in the 1980s, 90's, or some other

19   time?

20     A   Uh, probably in the 90's.

21     Q   Okay.  And in addition to those types of

22   track intrusion devices, there's also what's

23   called pressure mats, correct?

24     A   I'm not familiar with that.

25     Q   Okay.  And it's just something you could

87

1                          Lawrence George Reuter

2      put on the track bed, that if it feels the weight,

3      over a certain amount of weight, same concept, it

4      now let's them know, oh, there's a body here, and

5      alert that information, correct?

6                          MR. KEAVENEY:  Objection.

7          A   Well, I assume it let's them know there's

8      some weight there.  It doesn't know what the

9      weight is, but I'm assuming that.  I don't know.

10         Q   Okay.  Well, has Parsons installed track

11     intrusion devices?

12                          MR. KEAVENEY:  Objection.

13         A   I couldn't -- I couldn't tell you.  Parsons

14     does a lot of work.

15         Q   Okay, all right.  And so whether one has a

16     track intrusion decide of a laser, or a thermal

17     device, or a pressure mat, it's electronic

18     information.  Which, if the system is wired

19     properly, can be immediately relayed to a

20     controller of some sort, correct?

21                          MR. KEAVENEY:  Objection.

22         A   (No verbal response.)

23         Q   Yes?

24         A   Theoretically.

25         Q   Okay.  And that communication, depending

88

1             Lawrence George Reuter

2    how it is wired, can also be relayed to the train

3    car, true?

4             MR. KEAVENEY:  Objection.

5     A  Again, theoretically, but not as the subway

6    system exists now.

7     Q  Okay.  Well, can we agree that throughout

8    the world, there have been other track intrusion

9    devices in subway systems that have been

10   effective?

11            MR. KEAVENEY:  Objection.

12    A  I couldn't -- I don't know, I couldn't

13   answer that.

14    Q  Okay.  Throughout the world, there have

15   been platform edge doors, or platform screen door,

16   that have been installed, correct?

17    A  There are some systems that have that,

18   that's correct.

19    Q  Okay.  And again, you were familiar with

20   that in the 1980s and '90s, and certainly through

21   2007, correct?

22            MR. KEAVENEY:  Objection.

23    A  Correct.

24    Q  London and Paris have subway systems older

25   than New York, correct?

89

Lawrence George Reuter

1

2    A   I'm not sure of their exact age, but

3    they're old systems, yes.

4    Q   Okay.  And London had retrofitting on some

5    of its subway line, correct?

6              MR. KEAVENEY:  Objection.

7    A   I'm not familiar with that.  I couldn't

8    answer that.

9    Q   Okay.  Paris had platform screen doors also

10   placed on some of its subway lines, correct?

11             MR. KEAVENEY:  Objection.

12   A   I couldn't answer that either.

13   Q   Okay.  In the year 2000, the

14   Transit Authority sent staff to London to see what

15   was going on within platform screen doors,

16   platform edge doors, on the Jubilee line, true?

17             MR. KEAVENEY:  Objection.

18   A   I don't remember that specifically, but we

19   sent people all around the world, looking at all

20   kinds of technology changes.  That could be, but I

21   don't know that for a fact.

22   Q   Why did the Transit Authority send people

23   all over the world to look at other subways

24   systems that had platform edge doors or other

25   technologies to prevent person from getting hit by

90

1              Lawrence George Reuter

2    trains?

3              MR. KEAVENEY:  Objection.

4    A  Just to try to evaluate it, to see whether

5    there was any -- any reason that it could be

6    beneficial for the Transit Authority.

7    Q  Okay.  And where there publications and

8    studies performed in these other cities that got

9    platform edge doors installed in their subway

10   system, to see how effective they were?

11   A  Couldn't answer that, I don't know.

12   Q  Okay.  Well, did you ever send anyone

13   abroad to see how these other systems were

14   working?

15   A  I sent people abroad quite a bit, but I

16   don't remember specifically just for platform edge

17   doors, no.

18   Q  Well, when you sent people abroad, was it

19   for system safety to prevent or reduce incidents

20   of people getting hit or run over by trains?

21   A  Again, I don't recall specifically for that

22   purpose, but we could have done that.  That would

23   have been one of the things that we looked at.

24   Q  Okay.  And you were mentioning there were

25   other benefits to platform edge doors.  Whether it

91

1                    Lawrence George Reuter

2    be for air-condition, is one of them, correct?

3        A   That is one of the benefits.

4        Q   There could be other energy cost savings

5    from platform edge doors, correct?

6        A   Correct.

7        Q   They could also reduce track fires and

8    debris winding up on the track beds, correct?

9        A   Well, potentially.

10       Q   Okay.  And you can have faster entry and

11   exit speed of the train where there are platform

12   edge doors, correct?

13                   MR. KEAVENEY:  Objection.

14       A   Uh, I'm not sure we could of necessarily

15   had faster entrances or exits with our trains.

16   They were -- they're limited with the braking

17   distance how fast you can come into a station.

18       Q   Well, put it this way, if there is platform

19   edge door, the operator does not have to be

20   concerned about slowing down to avoid running over

21   a person because the person can't be on the track

22   to begin with, correct?

23                   MR. KEAVENEY:  Objection.

24       A   Yeah, but he has to be concerned with

25   stopping the train within the platform limits.

92

1           Lawrence George Reuter

2     Q   Yes.  But you could have a faster entry

3   speed where there's a platform edge door, than

4   when there's no platform edge door, correct?

5               MR. KEAVENEY:  Objection.

6     A   Only potentially.  I'm not sure that would

7   be true on all cases.

8     Q   Okay.  So the most important part of the

9   platform edge door is then that it saves lives,

10   and prevents people from being seriously injured,

11   correct?

12               MR. KEAVENEY:  Objection.

13     A   That's one of the potential benefits of

14   platform edge doors.

15     Q   Would that be the main benefit of platform

16   edge doors, is that they save lives and limbs?

17     A   That would probably be the main benefit you

18   would consider installing them.

19     Q   Okay.  In addition to platform edge doors

20   and track intrusion devices, are you familiar with

21   closed-circuit TV?

22     A   Yes.

23     Q   Okay.  And there were cameras on different

24   platforms, correct?

25     A   Correct.

93

1                    Lawrence George Reuter

2       Q   And those cameras are part of a

3   closed-circuit TV system, correct?

4       A   That's right, that's correct.

5       Q   Okay.  And what is possible is to have a

6   monitor inside the train, so that operator could

7   actually see what the cameras show at the station

8   before the operator even enters the station,

9   correct?

10                  MR. KEAVENEY:  Objection.

11      A   Technically possible, correct.

12      Q   Okay.  And this way, if somebody falls on

13  the track before the train even gets there, the

14  operator would see it and know, and could take

15  measures to avoid hitting the person, correct?

16                  MR. KEAVENEY:  Objection.

17      A   Could possibly see it, yes.

18      Q   Another means is putting cameras on the

19  front of the train so that also visualizes before

20  the train, and that the operator can have a

21  monitor to look at, correct?

22      A   That's possible, but the train cars get

23  broken up quite a bit.  So the front car's not

24  always the front car of the train.  That would be

25  a technical challenge.

94

1              Lawrence George Reuter

2      Q   So that's just putting a camera on every

3   train car then, correct?

4      A   Well, not every, but close to every, yeah.

5      Q   Okay.  And camera systems are used in other

6   train systems throughout the world as well,

7   correct?

8              MR. KEAVENEY:  Objection.

9      A   That's correct.

10     Q   Okay.  And they also help save lives in

11  other countries as well, correct?

12             MR. KEAVENEY:  Objection.

13     A   I'm not familiar what the statistics are.

14     Q   Okay.  There's also what's known as fixed

15  rail, correct?

16     A   Fixed rail?

17     Q   Yes.

18     A   Explain what you're talking about.

19     Q   Sure.  Let's see.  When you were the

20  president, were you familiar with the number one

21  train by Bowling Green, the south ferry?

22     A   Yes.

23     Q   Okay.  And that was an old station,

24  correct?

25     A   That was an old station, correct.

95

1                    Lawrence George Reuter

2      Q   And that had fixed rails to prevent people

3   from falling onto the tracks, correct?

4                    MR. KEAVENEY:  Objection.

5      A   It had -- it had some fixed rails at the

6   station, yes.

7      Q   Okay.  And that was one of the purposes of

8   those fixed rails at the station, was to prevent

9   people from going on the tracks, correct?

10                   MR. KEAVENEY:  Objection.

11     A   You know, I'm not sure when it was put

12  there what the reason was.

13     Q   Well, what's your understanding of why

14  certain stations had fixed rails in them?

15     A   Part of it was different people that were

16  designing the stations had an architectural, you

17  know, issues in mind of trying to be able to

18  control the passengers.  But, um, I don't

19  specifically know for that -- those stations.

20     Q   So controlling the passengers, means

21  controlling the flow of passengers, to prevent

22  passengers for falling onto the tracks and being

23  hit by trains, correct?

24                   MR. KEAVENEY:  Objection.

25     A   Well, that's a -- that could be a potential

96

1                    Lawrence George Reuter

2   problem, but also to make sure the passengers went

3   to the proper spot on platform to get on the

4   train.

5      Q  Okay.  So if other countries, or other

6   cities, had utilized different means of preventing

7   or reducing man under, 12-9 incidents from

8   occurring, in other words, people getting hit or

9   run over by trains, would that be a useful and

10  important fact to know?

11     A  That would be worth exploring, you know,

12  and investigating further, yes.

13     Q  Okay.  And you could look at their

14  statistics to determine whether or not, whether it

15  be a platform edge door, a track intrusion device,

16  or some other device, was effective or not,

17  correct?

18     A  Well, you would look at that, and then also

19  look at their system physical constraints to see

20  whether that would still be applicable in the

21  Transit Authority.

22     Q  Okay --

23     A  Because our system's quite a bit different

24  than other systems.

25     Q  I understand.  But again, now we're going

97

1              Lawrence George Reuter

2    into not answering the question and being a little

3    nonresponsive.  So if you could just stay focused

4    on the question, sir.

5         So do we agree that if the country has

6    statistics, before and after, before we did the

7    device, here's the number of people hit by trains,

8    after we did the device, here's what that number

9    is, right?  That's fact, correct?

10                   MR. KEAVENEY:  Objection.

11    A  That would be interesting to explore

12    further.

13    Q  Okay.  And then that would be hard, cold

14    fact statistics of effective, or lack thereof, of

15    different devices or approaches, correct?

16                   MR. KEAVENEY:  Objection.

17    A  Well, it would be on that system you were

18    looking at, yes.

19    Q  Okay.  So you would see, for example, if in

20    Seoul Korea, if they had X number of incidents

21    before, they put in platform edge doors, now it's

22    zero, that would tell you if it's effective or

23    not, correct?

24                   MR. KEAVENEY:  Objection.

25    A  Well, that would be one of the things you

98

1              Lawrence George Reuter

2    would look at, to determine if it's effective,

3    yes.

4        Q   Okay.  And this way, you can see whether or

5    not you will consider using such a device because

6    you've already seen whether or not it's effect

7    based on their statistics and their use, correct?

8              MR. KEAVENEY:  Objection.

9        A   You would only use that to consider if you

10   want to evaluate further, how it would apply to

11   your system.

12       Q   Well, when you say, "apply to your system,"

13   whether a person is in Korea, in New York City,

14   Rio De Janeiro, London, or Paris, if a person

15   falls onto a track, they fall onto a track,

16   correct?

17       A   That is true, but there maybe other reasons

18   and causes.

19       Q   I understand.  But again, whether somebody

20   falls, gets pushed, or jumps, there's only so many

21   finite ways somebody can wind up on a track,

22   correct?

23       A   That's true.

24       Q   Okay.  And so whether or not somebody

25   faints, falls, is drunk, gets pushed, or jumps,

99

1                   Lawrence George Reuter

2     those are among the finite ways somebody can wind

3     up on a track, correct?

4         A   Those are -- those are some of the ways

5     they do it, that's right.

6         Q   Okay.  And it wouldn't matter if somebody

7     was Korean, American, English, French, or

8     something else, it's the same thing, correct?

9         A   Yup, yup, that wouldn't matter at all.

10        Q   Okay.  So another means of preventing or

11    trying to reduce the number of contact between

12    people and trains would be to slow down the train

13    as it enters the station, true?

14                  MR. KEAVENEY:  Objection.

15        A   That could potentially help, yes.

16        Q   Okay.  Because in other words, the slower

17    the train is going, the less distance it takes for

18    it to stop, correct?

19        A   That is true, that's true.

20        Q   Okay.  The faster it's going, the more

21    distance it needs to stop, correct?

22        A   Correct.

23        Q   And are you familiar with a Mr. Samuelson?

24        A   A -- I couldn't hear you.

25        Q   Samuelson, do you remember that name?

100

1                    Lawrence George Reuter

2      A   Was he the TWU representative?

3      Q   Yes, sir.  President of the Union --

4      A   That's -- I remember that name, yes.

5      Q   Okay.  And did Mr. Samuelson ever write the

6   Transit Authority and request that they reduce the

7   entry speed of trains into stations to prevent or

8   reduce the number of incidents where trains run

9   over people?

10     A   I don't recall.  I -- just, you know --

11  it's been a long time.  Not that I recall.

12             MR. GENIS:  All right.  Dave, could

13         you please put that document up?  I think

14         it may have been previously marked.

15             MR. ROTH:  One second.

16             MR. GENIS:  Okay.

17             MR. ROTH:  While he's doing that, I'll

18         ask you another question.

19     Q   So how many people per year was it

20  acceptable to the Transit Authority to get run

21  over and either seriously injured or killed?

22             MR. KEAVENEY:  Objection.

23     A   There was no number that was acceptable.

24             MR. ROTH:  (Shares document.)

25             MR. GENIE:  All right, okay.  This

101

1              Lawrence George Reuter

2          letter is actually after your tenure, but

3          can you see this letter, I'm trying to see,

4          what was previously marked for

5          identification...

6                MR. ROTH:  It's Exhibit 3 for this

7          deposition.

8                MR. GENIS:  Okay, thank you.

9                (Plaintiff's Exhibit 3, Letter from

10         the Transport Workers Union, was marked for

11         identification.)

12     Q  Exhibit 3 of today's deposition.  It's a

13  letter from the Transport Workers Union, to

14  Mr. Prendergast, president of the

15  Transit Authority, he was a successor to you,

16  correct?

17     A  Yeah.  Yeah, I worked with Tom for a long

18  time.  I know him well.

19     Q  Okay.  And I'm directing your attention to

20  this paragraph that's highlighted, and --

21                MR. GENIS:  Could you scroll down a

22          little bit?

23                MR. ROTH:  (Scrolling.)

24     Q  Okay.  And this is to the president, "The

25  TA's effort to reduce 12-9 by posting signs,

102

1              Lawrence George Reuter

2   encouraging riders to stand back from the edge of

3   the platform, has not had a measurable effect on

4   subway deaths.  The two widely covered pushing

5   incidents, and the New Year's Day suicide, has

6   focused intense public scrutiny, on an issue that

7   has been an all too common occurrence in our

8   system."  Did I read that accurately, sir

9   (indicating)?

10     A  (Viewing.)  I see it.

11     Q  Okay.  And I understand that this letter

12   came in after you left the Transit, but do you

13   agree with that statement?

14     A  Uh, I -- I'm not familiar with the

15   statistics of it.  They were probably posting

16   signs, but you were having announcements made at

17   all the stations to stand back, uh, from the edge

18   of the platform.  Uh, I think it did have an

19   affect --

20     Q  We're going to get to that in a minute.

21   Okay.  So let's see.  You mentioned earlier how

22   the Transit Authority was a member of COMET and

23   other associations.  So the Transit Authority

24   would be aware of these studies, and surveys, and

25   findings, and publications, about what if any

1          Lawrence George Reuter

2    affect on safety certain devices such as platform

3    edge doors, or track intrusion devices, or CCTV,

4    etcetera, would have on safety, correct?

5          MR. KEAVENEY:  Objection.

6    A  Uh, I wasn't familiar with COMET, so I -- I

7    couldn't answer that.

8    Q  But as I said, you would have people that

9    worked under you, that were familiar, and they

10   could then be familiar with these things, and

11   advise you accordingly, correct?

12         MR. KEAVENEY:  Objection.

13   A  I could only assume they did.  I don't know

14   that for a fact.

15   Q  Okay.  Well, did you ever learn that around

16   the world, other mass transit systems have

17   installed and retrofitted their system to get

18   platform edge doors?

19   A  I was aware that some -- some systems had

20   installed them.  I'm not sure about retrofitting

21   though --

22   Q  Okay.

23   A  -- I can't recall that specifically.

24   Q  And in the systems that you're aware of

25   that installed platform edge doors, did you learn

104

1                Lawrence George Reuter

2    that these platform edge doors were effective at

3    reducing or preventing people from being hit or

4    run over by trains?

5       A   I never saw any statistics on it, that I

6    recall.

7       Q   If you saw statistics, what if any effect

8    would that have had on you?

9       A   Again, it depends on what the statistics

10   showed and what -- what the investigation showed

11   on each of the incidents.  They're all different,

12   so...

13      Q   Well, did you consider looking at the

14   statistics to see the effectiveness of the safety

15   devices, such as platform edge doors, track

16   intrusion devices, CCTV, things of that nature?

17               MR. KEAVENEY:  Objection.

18      A   Well, I wasn't aware of the statistics, so

19   I wouldn't, you know, have done it.  But we did --

20   we did investigate into looking at platform edge

21   doors.  It -- it's a tremendous problem to put

22   them in a system --

23      Q   Okay.

24      A   -- with -- with the different size

25   platforms that you have.

105

1          Lawrence George Reuter

2     Q  Again, we're going to get to those things,

3  but again, if you would just be responsive to the

4  question, I'd appreciate that.

5     A  I'm trying to.

6     Q  Thank you.  So let me ask you, when you

7  were the president of the Transit Authority, did

8  you investigate to see what if any safety devices

9  other comparable subway systems were utilizing to

10  prevent or reduce people from getting killed or

11  maimed by contact with trains?

12     A  We -- we had people within the Transit

13  Authority do that.  I didn't specially, but...

14     Q  Okay.  And you have these people do that

15  for a reason, correct?

16     A  Oh, sure.

17     Q  And who did you have perform this

18  investigation or analysis?

19     A  That I couldn't tell you now, it's been so

20  long ago.

21     Q  And so who do you recall?

22     A  Uh, I would recall that potentially

23  Gene Sanson, who was in the new car engineering,

24  new car equipment.  Uh, Tom Prendergast actually

25  probably looked at it.  He was the head of safety

106

1          Lawrence George Reuter

2    at one time at the Transit Authority.  So I would

3    have thought he would have looked at it, but I

4    can't say that specifically he did.  And I can't

5    say Gene Sanson himself would have done it, but it

6    would have been people that worked for them.

7              MR. GENIS:  I'm just going to do

8         another couple of questions, and maybe

9         we'll take a break.  This reporter's been

10        working hard.

11             THE WITNESS:  Okay.

12    Q  All right.  For example, do you recall

13    someone by the name of -- withdrawn.

14        Do you recall Cheryl Kennedy?

15    A  What's that?

16    Q  Cheryl Kennedy?

17    A  Cheryl Kennedy was the head of System

18    Safety also.

19    Q  Okay.  Would she have been somebody that

20    you would have investigate, to see what the safety

21    devices were out there, and how effective they

22    were?

23    A  Well, her department would -- would do

24    that.  Not -- not specifically her, but yes.

25    Q  Okay.  How about Ken Brown?

107

1                    Lawrence George Reuter

2      A   Who?

3      Q   Ken Brown?

4      A   Spell that name?

5      Q   Ken, K-E-N, Brown, B-R-O-W-N.

6      A   You know, the name's familiar, but I

7   can't -- I couldn't answer that.

8      Q   Well, is one of the best ways to see if a

9   safety device is effective, is by looking at the

10  statistics?

11              MR. KEAVENEY:  Objection.

12     A   You've got to not only look at the

13  statistics, you've got to look at the applications

14  itself.  Statistics only give you numbers.

15     Q   Okay.  Well, numbers are important, numbers

16  give you if it's effective or not, correct?

17     A   Numbers give you --

18              MR. KEAVENEY:  Objection.

19     A   -- an indication to drill down deeper, to

20  see what's behind the numbers and what makes it

21  work.

22     Q   Well, for example, if there were 22 deaths

23  and then they put in a platform edge door, and

24  then it went to zero, that would show a hundred

25  percent effectiveness, correct?

108

1             Lawrence George Reuter

2     A   That would show a high -- high degree of

3   effectiveness, that's for sure.

4     Q   And you could go into other -- whatever the

5   numbers are, if there were multiple incidents of

6   either death or serious injury with contact with

7   trains, and then the safety devices installed, and

8   then it goes down to zero or a very low number,

9   that would be very significant, true?

10    A   That would be significant.

11    Q   That would indicate to you that the safety

12  device was effective, correct?

13    A   That would indicate to me that we need to

14  explore that safety device further, to see if it

15  would work in our system.

16    Q   That's not my question, sir.  Move to

17  strike.  I'm asking you, very simply, when

18  somebody puts in a safety device, and you have a

19  before and after statistics, and you see that

20  there is a big difference between the number of

21  people getting injured or killed before the safety

22  device, and the numbers after, that would tell you

23  whether or not the safety device was effective at

24  preventing or reducing the number of deaths or

25  injuries caused by contact with trains; true or

109

1                    Lawrence George Reuter

2     false?

3                    MR. KEAVENEY:  Objection.

4        Q  In that system?

5        A  I think my answer that I said still stands.

6     I know you don't like it, but...

7        Q  Well, but with all due respect, it's not

8     responsive.  I just want to know, the word is

9     "effective."  Statistics show whether or not a

10    safety device is effective, correct?

11       A  Yeah, that does show that.

12                   MR. KEAVENEY:  Objection.

13       Q  Thank you.  By the way, are you familiar

14    with Glen London (phonetic)?

15       A  Glen London?

16       Q  Yes.

17       A  Uh, familiar yeah.  Yes.

18       Q  Okay.  Did he have knowledge, to your

19    understanding and memory, of safety devices and

20    prevention and reduction of 12-9 incidents, people

21    getting hit or run over by trains?

22       A  I -- I couldn't recall.

23                   MR. GENIS:  Okay.  Why don't we take a

24            break because it's now, my watch has

25            12:05 --  actually, 12:04, I'm sorry.

110

1              Lawrence George Reuter

2         12:04.  So we're going to take a break for

3         lunch now.  I don't know how much time do

4         people need, or the reporter needs?  We can

5         go off the record now, you can turn off the

6         camera.

7              (A recess was taken from 12:04 p.m.

8         until 12:16 p.m.)

9              MR. GENIS:  And I have it's now 12:16,

10        okay.

11   Q   All right.  So, sir, I want to ask you some

12   follow up questions to which you were just telling

13   us.

14        So I'm not sure I understand you.  So when

15   you were at the Transit Authority, when you were

16   president of the Transit Authority, what if

17   anything did you do to see if there were effective

18   means throughout the world that could be used to

19   either prevent or reduce the number of incidents

20   of people getting hit or run over by trains?

21   A   Well, we did -- we did things like make --

22   continually make announcements at the platform

23   telling people to stand back from the edge,

24   putting signs up, trying to make sure that the

25   edges were well marked --

111

1                 Lawrence George Reuter

2    Q   I don't mean to interrupt you, because now,

3    you're telling me things you did to allegedly

4    prevent it here.  That's not what I'm asking you.

5    A   Mm-hmm.

6    Q   My question is asking you, we could read it

7    back if you'd like, I'm trying to find out --

8              MR. GENIS:  Let's read back the

9         question so we can get an actual answer to

10        the question.

11             THE WITNESS:  Okay.

12             MR. GENIS:  And I'm just moving to

13        strike as nonresponsive, with no disrespect

14        intended.

15             THE WITNESS:  Could I please have the

16        question again?

17             MR. GENIS:  Please read it back?

18             THE REPORTER:  I'm trying to get to

19        it, it's frozen.  I'm frozen.  I apologize,

20        I'm sorry.

21             MR. GENIS:  Did you unfreeze or not?

22             THE REPORTER:  No, not yet.  It's

23        still frozen.

24             MR. GENIS:  Okay.  Tell me when

25        because I would like an answer to that

112

1          Lawrence George Reuter

2      question.

3              THE REPORTER:  Hold on one second,

4      give me one second.  I apologize.

5              MR. GENIS:  No worries.

6              (Pause in proceedings.)

7              THE REPORTER:  Okay.

8              (The requested portion of the record

9      was read by the court reporter.)

10   A  You know, it's been so long, I don't

11   specifically remember anything other than probably

12   asking System Safety and the car equipment

13   department to investigate, to see what options

14   they could see that were available.  But I don't

15   specifically remember...

16   Q  Did you ask anybody from the Transit,

17   whether it be System Safety or another department,

18   to issue a report, or a memo, or a recommendation

19   to you, an e-mail, anything?

20   A  I don't remember that, no.

21   Q  Okay.  Did you instruct people how they

22   should investigate?  In other words, see what

23   they've done in other countries, look at the

24   statistics, look at the publications, things of

25   that nature?

1              Lawrence George Reuter

2       A  No, I didn't.  I wouldn't -- wouldn't tell

3    them specifically how to do it.

4       Q  And did anybody report back to you that,

5    oh, okay, we looked at whether this city or that

6    city, and these were the number of incidents

7    before, these were the number if incidents

8    afterwards?  You know, yes, they were effective,

9    no, they were not, they kept the devices in, they

10   tore the devices out; things of that nature?

11      A  No.  I don't remember any of that, no.

12      Q  Did you ever here of any city where they

13   used a device, whether it be a platform edge door,

14   or a track intrusion device, or CCTV, or anything

15   else, where they removed it, they took it out

16   because it didn't work or it was not effective?

17      A  No, I don't -- I don't recall that.

18      Q  Okay, all right.  So as of the time you

19   left office in 2007, as of that point, you were or

20   were not familiar with other cities experiences

21   with safety devices to prevent these incidents

22   from occurring; you were or were not?

23      A  I was not really.  Not -- not effective --

24   I was not familiar in depth with that.  It was

25   just general knowledge.

114

1                    Lawrence George Reuter

2        Q   Okay.  And I'm not saying in depth.  I'm

3    saying, so as of the time you left the Transit in

4    2007, were you somewhat familiar with the

5    experiences of any other cities that installed

6    safety devices, such as platform edge doors, or

7    track intrusion devices, or CCTV, or some other

8    device, to see whether or not they were effective

9    at preventing or reducing the incidents of people

10   being killed or injured by contact with trains?

11       A   No, I was just aware that some properties

12   were trying.  That's -- that's it.

13       Q   Okay, thank you.  Well, were you aware that

14   internationally, it complied with best practices

15   to have platform edge doors installed?

16                    MR. KEAVENEY:  Objection.

17       A   No, I was not.

18       Q   Okay.  Were you aware that it complied with

19   good and accepted practices and procedures to have

20   platform edge doors installed in a subway to

21   prevent people from getting killed or injured by

22   contact with trains?

23                    MR. KEAVENEY:  Objection.

24       A   No, no.

25       Q   Let me ask you this, did it comply with

115

1              Lawrence George Reuter

2    good and accepted practices to have platform edge

3    doors installed to prevent people from being

4    killed or injured by contact with trains?

5              MR. KEAVENEY:  Objection.

6      A  I don't -- I'm not sure I can answer that.

7      Q  Okay.  Did it comply with professional

8    standards of care in engineering to have platform

9    edge doors installed to prevent or reduce the

10   number of incidents of people being kill or harmed

11   by contact with trains?

12             MR. KEAVENEY:  Objection.

13     A  Again, I -- I couldn't answer that.

14     Q  Okay.  You did learn that during your time

15   at the Transit, that it was feasible for other

16   cities to have platform edge doors installed in

17   their subway systems, correct?

18             MR. KEAVENEY:  Objection.

19     A  Again, I knew others -- other properties

20   were trying, yeah.  I didn't know the details.

21     Q  Okay.  And by the way, are you also

22   familiar with what's known as vertical ropes?

23     A  Say that again?

24     Q  Are you familiar with what's known as

25   vertical ropes?

116

1                    Lawrence George Reuter

2       A  Not -- not under that terminology, no.

3       Q  Okay.  Almost like curtain that comes down

4    from top, instead of coming up from the bottom?

5       A  Okay.  That's what you're calling a

6    vertical...

7       Q  If you called it something else, tell me

8    what you call it?

9       A  No, I would call that a curtain.

10      Q  Okay.  Are you familiar with that type of

11   safety device, rope barriers?

12      A  I -- you know, I've heard people talk about

13   it.  I'm not familiar with it at all.

14      Q  Okay, all right.  So let's talk about

15   before you were president of the

16   Transit Authority.  What if anything, did the

17   Transit Authority do to prevent or reduce people

18   from being killed or harmed by contact with

19   trains?

20                    MR. KEAVENEY:  Objection.

21      A  Before I was president?

22      Q  Yes, sir.

23      A  I'm not sure that I can answer that.

24      Q  Okay.  Well, let's break it down.  You

25   worked there from 1981 to 1990.  During that time

1          Lawrence George Reuter

2    period, what if anything did the Transit Authority

3    do, that you're aware of, to prevent or reduce the

4    number of incidents of people being killed or

5    seriously injured by contact with trains?

6       A  Well, we required people to make

7    announcements when the train was coming into the

8    station, stand clear of the platform, stand clear

9    of the closing doors, try to stay back from the

10   platform edge, trying to make sure the platform

11   edge was well painted and marked so that people

12   could see the edge.  Uh, those type of things, we

13   did.

14      Q  Okay.  Did they do anything else from 1981

15   to 1990, other than make announcements of the type

16   you just said, and make sure that the edge was

17   painted properly of the platform?  Was anything

18   else done at that time period to prevent or reduce

19   people from being hit or run over by trains?

20              MR. KEAVENEY:  Objection.

21      A  I couldn't -- I couldn't -- there probably

22   was, but I couldn't tell you.

23      Q  Okay.  When you became president of the

24   Transit in 1996, did you ever look back to see

25   whether or not the steps taken in the 1980s, the

118

1           Lawrence George Reuter

2  announcements, the painting of the edge, whether

3  or not they were effective in preventing or

4  reducing the number of incidents of people being

5  hit and killed or seriously injured by trains?

6      A  I can't specifically recall it now.

7      Q  Well, after you became president, so from

8  1996 to 2007, what if anything did you do to

9  prevent or reduce the number of incidents of

10 people being killed or seriously injured as a

11 result of contact with trains?

12     A  Well, continued those same efforts about

13 painting of the edges and making announcements,

14 you know, try to encourage people to stand back

15 from the -- from the edge.  Uh, we were working

16 on, you know, items on the train itself to stop

17 people from getting clothing, or purses, from

18 getting closed.  Uh, but those are the items that

19 I'm not sure (inaudible)...

20     Q  Anything else that you can think of?

21     A  No, not that I can think of right now.

22     Q  Okay.

23     A  It was 15 years ago.

24     Q  And did you ever look to see whether or not

25 those same methods that were done in the 80s were

119

1                    Lawrence George Reuter

2    effective in the 1990s through 2007 in preventing

3    or reducing the number of people being killed or

4    seriously injured by contact with trains, or being

5    struck by trains?

6        A  Can't recall.

7        Q  Okay.  Well, when we go through the data,

8    and if you'd like we can pull up either of these

9    two charts, the one that starts with 2001, or the

10   one that starts in 1987, and you can tell me if

11   there was any effectiveness to any of these

12   things.  Would that be of assistance to you, sir?

13       A  That -- that wouldn't really be of -- be of

14   any assistance because you really have to look at

15   what the passenger -- passenger (inaudible) was

16   during each of those years to -- to figure out,

17   you know, whether the numbers were just, you know,

18   a statistical anomaly, or whether it was because

19   it was a lot more ridership and crowding on the

20   subway platforms.  So I -- I couldn't tell you.

21       Q  Well, okay.  If in any given year the

22   lowest number of incident of people being hit by

23   trains, and I'm looking from 1987 to 2021, the

24   lowest number I see for any year was in 2006, and

25   was a 109 incidents with 38 deaths.  So if that's

120

1              Lawrence George Reuter

2    the low, would you consider that this program of

3    announcements and painting was effective at

4    redoing the numbers or not?

5              MR. KEAVENEY:  Objection.

6     A  Again, you need to know what's in those

7    numbers before you can even try to hazard a yes --

8    I don't know how many were suicides, or homeless

9    people, so you can't answer just based on the

10   numbers.

11    Q  Well, when you say you can't answer based

12   on the numbers, is the most effective means of

13   seeing -- withdrawn.

14         Is the best means of seeing whether or not

15   a program is effective, is to look at the facts,

16   look at the statistics, the hard data?

17              MR. KEAVENEY:  Objection.

18    Q  Can we agree on that?

19    A  It's an effective indicator.  Once you look

20   at it, you've got to drill down to see what's

21   behind the numbers.

22    Q  Okay.  So let's look.  We have again, up on

23   the screen, the exhibit that starts in 2001.  And

24   do you see those numbers (indicating)?

25    A  (Viewing.)  I see them.

121

1          Lawrence George Reuter

2     Q   Okay.  And as I say, we've gone through the

3   lowest any given year is 109 incidents with 38

4   deaths.  And the range, let's just do it from 2001

5   through 2007, when you were there.  And the high

6   is 188.  So you tell me, was the announcements and

7   the painting effective at reducing and preventing

8   people from being hit by trains, or not?

9              MR. KEAVENEY:  Objection.

10    A   Again, you can't tell just by those

11  numbers.  It appears that it had an effect, you

12  know, but I don't know.  I don't know what's in

13  those numbers.

14    Q   Okay.  Well, these are the numbers that the

15  Transit Authority has published.

16    A   Yeah.

17    Q   So what would you need to know to see

18  whether or not the announcements and the

19  paintings, whatever other measures you're saying

20  were taken, were actually effective?

21    A   Well, you want to know what -- what caused

22  these people getting hit by the train.  Was it,

23  again, suicides, was it homeless, you know, was it

24  people jumping or being pushed.  So without

25  looking at those, it's hard to say whether the

122

1              Lawrence George Reuter

2    making the announcements or those had an effect on

3    people that were obeying the system rules.  So I

4    couldn't -- couldn't really tell you.

5        Q  Okay.  I'm a little confused right now.  So

6    every year, you've told us since the subway

7    started, people have been hit by trains.  And

8    we've gone over the finite number of causes of how

9    somebody winds up on the track.  So the issue is

10   whether or not you're doing something that

11   effectively prevents that from occurring; true or

12   false?

13       A  Oh, that's true.

14       Q  Okay.  And the best means to see if

15   whatever it is you're doing is actually effective

16   at preventing or reducing the number of people

17   being killed or seriously injured by contact with

18   trains, is to look at the actual numbers; true or

19   false?

20              MR. KEAVENEY:  Objection.

21       A  Might give you good indication, yes.

22       Q  Okay.  So looking at the numbers, if for

23   example, if in any one here, the numbers went to

24   zero or single digits, then you would say, ah-hah,

25   the program was effective, true?

123

1              Lawrence George Reuter

2         MR. KEAVENEY:  Objection.

3    A  Unless there was nobody using the system

4    during that period of time.

5    Q  Well, did you ever have a year where nobody

6    used the subway system?

7    A  Well, we had periods of times.  You know,

8    the lines got shut down and...

9    Q  Not my question, sir.  Move to strike.  Can

10   you tell me what year did nobody use the subway

11   system?

12   A  Uh, I can't recall of any year at all.

13   Q  Okay.  What month did nobody use the subway

14   system?

15   A  Uh, I can't think of any month they didn't

16   use the entire system.

17   Q  Okay.

18   A  After 9/11, there was a lot of lines shut

19   down.

20   Q  Okay.  9/11 was in 2011 [sic].  Let's get

21   back to when you were at the Transit.  When you

22   were at the Transit, when, if at all --

23   A  No, I was at the Transit -- I was at the

24   Transit in 9/11.  It was 2001.

25   Q  I'm sorry, you're correct.  My apologies --

124

1                    Lawrence George Reuter

2       A  I was there.

3       Q  -- it was 2001.  You're right --

4       A  I was down at the World Trade Center, I

5    know.

6       Q  My apologies, okay.  Time flies, okay.  So

7    let me ask you this, well, was there any real

8    change or difference between the number of people

9    being hit, whether seriously injured or killed by

10   trains, at any time you were with the Transit?

11      A  Was it -- ask that again.

12      Q  Yes, let me do it with better English,

13   sorry.  Okay.  Did the Transit Authority ever do a

14   study to see whether or not the measures it had

15   taken, the announcements, the painting on the

16   edge, were effective in actually preventing or

17   reducing any incidents occurring of people being

18   killed or injured when hit by trains?

19      A  I don't recall, no.

20      Q  Are you aware of a single study or an

21   analysis to show that whatever the Transit did,

22   whether it be the announcements or the painting,

23   whatever else it did, that in any way, shape, or

24   manner, it was actually effective at reducing or

25   preventing the number of people injured or killed

125

1                 Lawrence George Reuter

2    as a result of contact with trains?

3        A   I just can't recall, I don't know.

4        Q   That would be an important study if it was

5    done, true?

6                 MR. KEAVENEY:   Objection.

7        A   (No verbal response.)

8        Q   Yes?

9                 THE REPORTER:   Was there an answer?

10       Q   Sir, we're waiting for an answer.

11       A   I said, that would be interesting.

12       Q   Okay.   And not only would that be

13   interesting, that would be an important

14   significant fact, true?

15                MR. KEAVENEY:   Objection.

16       A   Well, I -- I would say interesting, yeah.

17       Q   Well, if in fact whatever was done was

18   actually effective at reducing or preventing the

19   number of 12-9s from occurring, who's

20   responsibility would it be to bring that to your

21   attention?

22       A   Uh, it would be -- well, anybody within the

23   organization involved in the existing safety or

24   car equipment, would bring the issue up, you know,

25   if they had a specific recommendation to make.

126

1          Lawrence George Reuter

2     Q   Well, if what was done was effective, that

3  would be the type of thing you would issue a press

4  release over or make a statement about to the

5  press, correct?

6          MR. KEAVENEY:  Objection.

7     A   Well, not necessarily.  I mean, it's -- you

8  may or may not.  I mean, this is not a -- not a

9  subject where you, uh, can take a lot of kudos,

10  even if the number's drop by half.

11    Q   Well, let me ask you, did the numbers ever

12  drop by half --

13    A   Not that I'm aware --

14    Q   All right.  Just so we have a coherent

15  question and answer, at any time, did the number

16  of people getting killed or injured as a result of

17  contact with trains ever drop by half?

18    A   I -- I can't recall.

19    Q   And certainly, if the Transit Authority did

20  something that was that dramatic an improvement in

21  safety, of reducing or preventing a significant

22  number of people from being killed or injured by

23  contact with train, that's certainly something

24  that the Transit would want to publicize, true?

25    A   That would be something we would mention.

127

1              Lawrence George Reuter

2    I'm not sure we would have a press conference or

3    release over it.  But yeah, we would mention it.

4      Q  And why would you mention it?

5      A  Well, it'd just be an important piece of

6    information that people would be interested in.

7      Q  And you would want to know, I mean, let's

8    back up.  If the Transit Authority took action of

9    some sort, can we agree they want to know whether

10   or not the action they took is effective or not,

11   correct?

12     A  Oh, they would like to know, yes.

13     Q  Because if it's not effective, then you

14   have to try something else, correct?

15     A  Well, you would continue to explore other

16   options, sure.

17     Q  Well, let's back up.  When you say,

18   "continue to explore other options," let's be

19   crystal clear.  Over the decades, how many people

20   have been run over or hit by a train and are

21   either killed or seriously injured?

22              MR. KEAVENEY:  Objection.

23     A  I have no idea.  I -- I don't have those

24   numbers at my hands.

25     Q  Well, let's see.  If we go from 1987 to

128

1              Lawrence George Reuter

2    2021, it would be 5,332 people hit by trains and

3    injured, and had 1,684 people killed from contact

4    by a train.  Would that be a significant number to

5    you?

6              MR. KEAVENEY:  Objection.

7      A  Uh, I'm not sure -- again, I'm not sure why

8    they were hit or killed.  So it's -- it's a

9    significant number, but I'm not sure what it

10   means.

11     Q  Well, it means that nothing prevented them

12   from having contact with a train, correct?

13             MR. KEAVENEY:  Objection.

14     A  I'll not sure something could have been

15   done to do that.

16     Q  That's a separate issue.  Could you answer

17   my question?  So based on the Transit Authority

18   documents, if you see those numbers, doesn't that

19   mean to you that this method was not effective?

20             MR. KEAVENEY:  Objection.

21     A  No.

22     Q  Okay.  Well, let me ask you, let's be

23   crystal clear.  As we sit here today, would the

24   announcements, the painting of the edge, the

25   different things done, do you feel it was

129

1                    Lawrence George Reuter
2    effective at preventing and reducing the number of
3    people either seriously injured or killed by
4    contact with trains?
5        A  Yeah, I do believe it's effective.
6        Q  Okay.
7        A  It hasn't eliminated it, but it is
8    effective.
9        Q  Okay.  And what's your basis for saying it
10   was effective?
11       A  I think the -- the numbers, even the
12   ridership have increased, have grown by a
13   tremendous -- tremendous numbers.  So I think it's
14   effective.
15       Q  So wait.  When you say it's effective, if
16   in 2001 it's a 110 people, and in 2007 it's still
17   110 people getting hit by a train, are you telling
18   us that that was an improvement?
19       A  Yeah, because ridership was going up.  At
20   that same time, more people where using the
21   system.
22       Q  All right.  So it doesn't matter to you how
23   many people were actually killed or injured, it's
24   how many people were actually riding the train?
25       A  No, it matters to me.

130

1              Lawrence George Reuter

2      Q   Okay.

3      A   It matters, but it's what you could do to

4   effectively reduce it.

5      Q   Okay.  And that's the keyword is

6   "effectively."  And so the best way to see whether

7   or not something is effective, is to see how many

8   people are still getting hit and kill or injured

9   by trains; true or false?

10             MR. KEAVENEY:  Objection.

11     A   Well, yeah.  That's an -- that's an

12  indication, yes.

13     Q   Okay.  By the way, in 2021, because of the

14  pandemic, ridership was at an all time low, yet

15  they had the greatest number of these types of

16  incidents.  How do you explain that?

17             MR. KEAVENEY:  Objection.

18     A   Well, I wasn't there.  I don't know, but

19  I'd be interested to see how many of them may have

20  been suicides because of the pandemic.  I don't

21  know.

22     Q   Okay.  Well, how do you know, what's the

23  basis of determining whether people are committing

24  suicide?

25             MR. KEAVENEY:  Objection.

131

1                    Lawrence George Reuter

2      A   I couldn't hear you.

3      Q   I said, what's the basis of the

4  Transit Authority deciding people committing

5  suicide, or why they were committing suicide?

6                 MR. KEAVENEY:  Objection.

7      A   I don't know if we know, but the -- that

8  was going on in a lot of places during the

9  pandemic time.  At least down here in our places,

10  so I assume it was potentially going on up there.

11     Q   Okay.  So you're just guessing, you don't

12  have any actual basis --

13     A   No.

14     Q   -- for stating this?

15     A   Just guessing, just guessing.

16     Q   All right.  So we're going to move to

17  strike as guessing.  So what my question to you

18  is, when you were the president, did you ever want

19  to know if this program was effective at getting

20  people to -- withdrawn.

21         When you were president, did you ever want

22  to know whether or not this program of

23  announcements and painting the edge yellow of the

24  platform edge were effective at preventing or

25  reducing the number of people seriously injured or

132

1                    Lawrence George Reuter

2    killed by contact with trains?

3      A  I don't specifically remember asking

4    that -- that question, no.

5      Q  Well, did anybody look that up?

6      A  I couldn't tell you, I don't know.

7      Q  Okay.  And if that program was not

8    effective at significantly reducing the numbers of

9    people being seriously injured or killed by

10   contact with trains, can we agree then that

11   something else had to be done?

12                   MR. KEAVENEY:  Objection.

13     A  You still -- you would still want to

14   explore other options for sure.

15     Q  Okay.  So I understand you say "explore,"

16   but let's back up.  You told us earlier that not

17   even one unnecessary death, that that one is too

18   many, correct?

19     A  Yeah, that's true.  That's a lofty goal to

20   achieve, yes.

21     Q  Okay.  So and if you have every year,

22   anywhere from a 109 people, to getting close to

23   200 people getting hit by trains, over decades,

24   that's a lot of people, correct?

25     A  That's a lot of people.

133

1                Lawrence George Reuter

2      Q   Okay.  And would you consider that an

3  urgent situation?

4      A   Again, without knowing what the options are

5  to correct it, I -- I can't say --

6      Q   That's not my question.  Move to strike.

7  All I'm asking you, is that many people every year

8  being seriously injured or killed every single

9  year, do you consider that to be an urgent

10 condition?

11     A   I would consider that to be a significant

12 issue, not urgent.

13     Q   Okay.  And do you consider that to be an

14 emergency, that that many people are being either

15 killed or seriously injured every year by contact

16 with trains?

17     A   No, I wouldn't consider it an emergency.

18     Q   Okay.  Did you consider that that many

19 people being killed or injured by contact with

20 trains every year, is something that must be

21 corrected?

22     A   Something that you would like to be able to

23 correct, if you could.

24     Q   Well, I understand that you'd like to.  But

25 I'm saying, do you think it should be corrected?

134

1              Lawrence George Reuter

2      A  If there's a way to do it.

3      Q  Okay.

4      A  I don't know if that --

5      Q  So let me ask you, when you say it's not

6   urgent or emergent when that many people are being

7   injured, seriously injured or killed by contact

8   with trains, why do you say it's not urgent or

9   emergent?

10     A  Because I don't know any way to effectively

11  deal with it to get it down to zero.

12     Q  Okay.  Well, how about if there's a way

13  just to dramatically reduce it; would that be

14  significant?

15     A  Well, that'd something, again, to explore

16  to see what it would take to do that.

17     Q  Okay.  And so I want to back up.  So can we

18  agree that a hundred people being hit by trains a

19  year is not a tolerable number?

20     A  It's not -- it's not a number you would

21  like to see.  It may be one you have to tolerate,

22  it's not what you'd like to see.

23     Q  Okay.  Well, did the Transit Authority ever

24  study to see what is the best way to prevent or

25  reduce contact between people and trains?

135

1              Lawrence George Reuter

2              MR. KEAVENEY:  Objection.

3      A  I'm not familiar with it.

4      Q  Okay.  So for example, we've mentioned

5  different possible ways, platform screen doors,

6  trac intrusion devices, CCTV, fixed rail, reduce

7  speed, and things of that nature, pressure mats.

8  Has anybody from the Transit ever studied to see

9  what is the safest most effective means of

10  preventing or reducing the number of people being

11  injured or killed by contact with trains?

12              MR. KEAVENEY:  Objection.

13      A  I don't remember anything in that kind of

14  terminology that was done, no.

15      Q  Okay.  Well, when you say, "that

16  terminology," in sum and substance, did anybody

17  from the Transit ever look to see what is the best

18  way and most effective way to keep people safe and

19  prevent or reduce dramatically the number of

20  people being killed or seriously injured by

21  contact with trains?

22              MR. KEAVENEY:  Objection.

23      A  I -- I don't remember any reports or

24  information that's -- stating that, no.

25      Q  Okay.  Did anyone ever do comprehensive

136

1             Lawrence George Reuter

2   analysis using a rail network simulator to see

3   what would be the most effective means of

4   preventing or reducing contact between trains and

5   people?

6             MR. KEAVENEY:  Objection.

7     A  I don't recall.

8     Q  Okay.  Now, let's talk about entry speed.

9   You mentioned earlier that if we slowed the trains

10  down when they entered the stations, it is easier

11  to prevent people from being hit by trains; do you

12  recall saying that?

13    A  Yeah, the trains can stop quicker.

14    Q  Okay.  Has anyone ever, at the

15  Transit Authority, done a comprehensive analysis

16  to see the effect on safety by reducing train

17  entry speed as it enters the station?  Anybody

18  ever do any kind of comprehensive analysis for

19  that?

20            MR. KEAVENEY:  Objection.

21    A  I'm not familiar, I don't know.

22    Q  Okay.  Did anybody use a rail network

23  simulator to see the effect of reduction of entry

24  speed of a train into a station, to see the effect

25  of that on preventing or reducing people from

137

1          Lawrence George Reuter

2   being run over or hit by trains?

3                MR. KEAVENEY:  Objection.

4     A  I'm not familiar with it.

5     Q  Has anyone from the Transit Authority ever

6   done a study to see the actually cost of reducing

7   entry speed of a train into a station by even

8   one mile per hour?

9     A  I'm not familiar.

10    Q  Well, I want to back up.  I've asked you a

11   series of questions now, and you've said you're

12   not familiar.  I'm going to back up, to redo those

13   questions for only when you were at the

14   Transit Authority, okay?  So we're going to limit

15   it.

16         So when you were at the Transit Authority,

17   did anyone ever study, "yes" or "no," what the

18   safest means, what the best means, of preventing

19   or reducing contact between trains and people are?

20                MR. KEAVENEY:  Objection.

21    A  I don't know.

22    Q  Okay.  When you were at the

23   Transit Authority, did anyone ever study the

24   effect of reducing entry speed of a train as it

25   enters a station on safety?  In other words,

138

1           Lawrence George Reuter

2    reduction or prevention of people being hit or run

3    over by trains?

4           MR. KEAVENEY:  Objection.

5    A  I don't know.

6    Q  When you were at the Transit Authority, did

7    anyone ever do a study to see the actual cost of

8    reducing train entry speed into a station by even

9    one mile per hour?

10          MR. KEAVENEY:  Objection.

11   A  I don't know.

12   Q  Did anyone ever do a study of the Transit

13   while you were there, to see the actual cost of

14   reducing entry speed down to ten miles per hour

15   when they enter a station?

16   A  I don't know.

17   Q  When you were at the Transit, did anyone

18   ever do a study to see the actual cost of reducing

19   the speed to five miles per hour when they entered

20   the station?

21          MR. KEAVENEY:  Objection.

22   A  I don't know.

23   Q  Did you ever consider slowing down the

24   train to reduce the number of man under cases?

25   A  I don't recall.

139

                    Lawrence George Reuter

1

2    Q  Why not?

3    A  I just don't recall.  I've been gone for 15

4    years.

5    Q  All right.  But I'm saying -- okay.  If you

6    would have ordered such a study -- withdrawn.

7    Let's break it up.

8        If you would have directed a study to be

9    undertaken, first to see what's the best way to

10   prevent or reduce the number of man under cases,

11   that would be in writing, correct?

12   A  That would be, what?

13   Q  In writing?

14   A  Uh...

15   Q  There would be a record of that, correct?

16            MR. KEAVENEY:  Objection.

17   A  Possibly, not necessarily.  So possibly,

18   yeah.

19   Q  Okay.  Well, if you told somebody at the

20   Transit you wanted a study to see what's the best

21   way to reduce or prevent people from being run

22   over by trains, or hit by trains, if there was a

23   response, certainly that would have been written

24   somewhere in some fashion, correct?  There would

25   be a record of it?

140

1            Lawrence George Reuter

2            MR. KEAVENEY:  Objection.

3    A  Oh, I think there should be, but I don't --
4    I don't recall.

5    Q  Okay.  And if you ever directed that there
6    be a study to see on the effect of reducing entry
7    speed of a train into a station, to see what
8    effect that had on safety.  In other words,
9    reducing or preventing people from being run over
10   by trains, that would be written somewhere, true?

11           MR. KEAVENEY:  Objection.

12   A  Same answer, I would say, yeah.

13   Q  Okay.  And then the answer, or the result
14   of that study, would also be in writing, correct?

15           MR. KEAVENEY:  Objection.

16   A  I would think, but I can't tell you that.

17   Q  And what kind of record would it be; would
18   it be an e-mail, would it be a memo, a report, a
19   study, like what kind of record would it be?

20   A  (No verbal response.)

21   Q  A white paper, you tell me?

22   A  If -- again, I don't recall doing that
23   'cause my memory doesn't recall, but it would no
24   doubt have generated a report, I would think.

25   Q  All right.  And where would that report get

141

1          Lawrence George Reuter

2  distributed to, who would it be distributed to?

3     A  Um, could be any of the department heads of

4  the Transit Authority, but I couldn't tell you.

5     Q  And if there was such a report, in other

6  words, if there was a study, and then there was a

7  report, what if anything was supposed to be done

8  with that report to show what would be the safest

9  way, the best way, to reduce or prevent people

10 from being hit or run over by trains?

11          MR. KEAVENEY:  Objection.

12    A  That's all -- I don't know.  I don't know

13 what the report would have said.  I mean, I would

14 have to see what the -- what the recommendation...

15    Q  And what would have been the purpose of

16 having a study to see if reduction of entry speed

17 of a train as it enters a station reduces or

18 prevents the number of people getting run over by

19 a train, what would be the purpose of doing that?

20    A  Well, I -- I -- again, I don't remember

21 that.  But I would assume you would be looking at

22 the -- what you call the effect of lowering the

23 speed would be on the number of people that were

24 injured, and then what effect it had on the

25 system, you know, that would have as well.

142

Lawrence George Reuter

1    Q   And so that's what a proper and adequate
2
3    study would do, correct?
4              MR. KEAVENEY:   Objection.
5    A   Uh, that's not all.   That would be most
6    of --
7    Q   Okay.   So in other words, a proper and
8    adequate study would look at the right issue?   In
9    other words, if the issue is what's the best way
10   to prevent or reduce the number of people getting
11   killed or seriously injured by contact with
12   trains, that's what the study should be studying,
13   correct?
14             MR. KEAVENEY:   Objection.
15   A   I'm not sure that you would -- we would ask
16   somebody for the best way.   We would ask people to
17   study what the options were to make options, but
18   I'm not really familiar with that, quite frankly.
19   Q   Okay.   And again, if there were options, A
20   through E, whatever they may be, one through ten,
21   you'd still want to know which are the best
22   options, which are the most effective options,
23   correct?
24   A   You would know -- want to know what are --
25   what would be considered the most effective, but

143

1                   Lawrence George Reuter

2   then what do you actually practically do to the

3   system --

4      Q   Okay.  So "yes" or "no," a proper and

5   adequate study would analyze based on fact and

6   data, what method is the most effective at

7   preventing or reducing 12-9s from occurring; true

8   or false?

9               MR. KEAVENEY:  Objection.

10     A   True, but that's not whole question, so...

11     Q   And an adequate and proper study to see

12  what the effect is of reduction of train entry

13  speed into a station in reducing or preventing

14  people from being killed or injured by 12-9s,

15  contact with trains, would have to again, look at

16  the hard facts and the data, correct?

17              MR. KEAVENEY:  Objection.

18     A   You would look at the facts and the

19  implications of those facts.

20     Q   Okay.  And if the study failed to look at

21  the facts, and look at the data, then it would be

22  an inadequate study, correct?

23     A   Again, it depends on what the person's been

24  tasked to study.  Could be --

25     Q   Well, if the purpose of the study is say,

144

1                Lawrence George Reuter

2    we want to know whether or not reducing train

3    entry speed effects safety.  In other words,

4    reduces the number of people run over by trains or

5    hit by trains, right?  That would be a purpose of

6    the study, correct?

7        A  Yeah, that would be one of the purposes.

8    Yes.

9        Q  Okay.  Because as you said, you're supposed

10   to be guided by what's safest for the public,

11   correct?

12       A  Well, obviously the safest system is to not

13   run trains.

14       Q  Okay.  Did I ask you that, sir?

15       A  What's that?

16       Q  Did I ask you that question, sir?

17       A  No, you didn't, but that's --

18       Q  Okay.  Remember you promised me that you're

19   not going to be nonresponsive and volunteer

20   things; do you remember that?

21                MR. KEAVENEY:  Objection.

22       Q  Can I keep you to your word, sir?

23       A  Well, depends how you ask the --

24       Q  Can I keep you to your word, sir?

25       A  As best I can.

145

1                    Lawrence George Reuter

2       Q   Thank you.  All right.  So --

3       A   The only two things that are certain in

4   life are death and taxes, so --

5       Q   Okay.  Well, I'm going to try to keep you

6   to your promise, even though it's not death or

7   taxes.  Okay.  So let's get back to it.

8       A   Mm-hmm.

9       Q   If safety of the public is the most

10  important thing to the Transit, and everything

11  they do must be guided on what promotes safety,

12  can we agree that it would be a good and accepted

13  practice for the Transit Authority to do an

14  adequate and proper study to see what's the best

15  way, most bang for the buck, for preventing or

16  reducing people from getting killed or injured by

17  contact with trains; true or false?

18                  MR. KEAVENEY:  Objection.

19      A   I just can't answer that because it's not a

20  true/false question.

21      Q   Okay.  Well, can we agree that if the

22  Transit Authority -- okay.  Let's back up.  You

23  told us earlier there's different stations,

24  different configurations, and trains, and lines,

25  all that kind of stuff, correct?

146

1                     Lawrence George Reuter

2       A  Correct.

3       Q  But there's one thing that can be used

4   universally, and that's entry speed of a train

5   into a station, true?

6       A  Well, it could be used, yes.

7       Q  Okay.  And that's something the

8   Transit Authority can control, is the entry speed

9   of a train into a station, true?

10      A  Well, within reason.  Obviously, train

11  operators have to abide by rules, yes.

12      Q  So yes, that's something the

13  Transit Authority can control is the entry speed

14  of a train into a station; "yes" or "no?"

15      A  We can control the regulation, we couldn't

16  control the speed.

17      Q  Well, you can control what you tell the

18  operator to do, correct?

19      A  Exactly.  That we could do.

20      Q  Okay.  But whether or not the operator

21  complies with instructions is a separate issue,

22  correct?

23      A  That is correct, yes.

24      Q  Okay.  And since that is something that

25  does not require any changes in infrastructure,

147

1                    Lawrence George Reuter

2    effecting speed, correct?

3       A  Well, it could require changes to the

4    signal system to effect the speed of the train

5    because the signal system does govern the speed of

6    the train to come into a station.  So that's

7    infrastructure --

8       Q  Okay.  So that's just telling the signal

9    system, instead of a yellow light, give a red

10   light, instead of, you know, 20 miles an hour, do

11   five miles an hour, something to that effect,

12   correct?

13                    MR. KEAVENEY:  Objection.

14      A  Well, it's a little more complicated than

15   that, but that's the gist of it.  You may

16   physically have to relocate all of those signals,

17   sensors...

18      Q  Okay.  But that is certainly easier and

19   less expensive than, for example, installing

20   platform edge doors, correct?

21      A  Well, it definitely would be cheaper than

22   installing platform edge doors.

23      Q  And just lowering the entry speed would be

24   easier and cheaper than installing track intrusion

25   devices, correct?

148

1                    Lawrence George Reuter

2        A   Correct.

3        Q   And it would be less expensive and less

4    work to lower entry speed of a train, instead of

5    installing closed-circuit TV, correct?

6        A   Again, I don't know for a fact that would

7    be true, but I would think that would be.

8        Q   Okay.  So you have to look at both parts,

9    not just the effect on the system, but the effect

10   on the number of people actually getting struck by

11   trains, correct?

12       A   Yeah, that -- we would look at that.  Can

13   ask I ask you one question though?

14       Q   Go ahead.

15       A   How much longer is this going to be?  My

16   wife just came in and said her aunt just died.

17       Q   Oh, I'm so sorry.

18       A   She was 93 years old, so...

19       Q   Oh, my goodness.  I'm sorry so sorry.

20

21              (Continued on next page to accommodate

22          the jurat.)

23

24

25

149

1          Lawrence George Reuter

2          MR. GENIS:  Why don't we go off the

3     record for a second.  It's 1:05.

4          (A discussion was held off the

5     record.)

6          MR. GENIS:  We've had an off the

7     record discussion.  Because the witnesses'

8     aunt has passed away, his wife's aunt, I

9     should say, a Pauline Madden, has died, we

10    had to suspend the deposition.  We're going

11    to try to reconvene at a mutually

12    convenient time after funeral and wake and

13    whatever other proceedings they're doing.

14    I don't know, Shiva, I don't know what

15    they're doing.

16          And then also, we did note his wife

17    had knee replacement surgery, so her

18    physical therapy schedule is also effecting

19    him, but we're going to try to reschedule a

20    mutually convenient time.

21          We've added up the time used so far.

22    We've used 156 minutes, and we have another

23    264 minutes remaining in the deposition of

24    Mr. Reuter.

25          MR. KEAVENEY:  I just don't agree

150

1          Lawrence George Reuter

2       that, Plaintiff's counsel fumbled for

3       exhibits, should be deducted from the time.

4       You know --

5          MR. ROTH:  Did you keep track of how

6       much the fumbling cost?  Because I think --

7          MR. KEAVENEY:  I don't know, it

8       doesn't matter.  You know --

9          MR. GENIS:  I tried to --

10          MR. KEAVENEY:  Why don't you just go

11       down to the seconds at this point.  I mean,

12       it's ridiculous.  It's like three hours...

13          MR. ROTH:  All right.

14          MR. GENIS:  Thank you very much.

15

16       (Time noted:  1:12 p.m.)

17

18                    _____

                      LAWRENCE GEORGE REUTER

19

20   Signed and subscribed to before me this

21       day of         , 2022.

22

23

24   Notary Public, State of New York

25

151

1

2                     INDEX TO TESTIMONY

3    NAME                EXAMINATION BY              PAGE

4    Lawrence George Reuter   Mr. Genis              5

5

6                          EXHIBITS

7    PLAINTIFF'S              DESCRIPTION        PAGE

8         1        A chart                      48

9         2        Transit Authority document   53

10        3        Letter from the Transit      101

                   Workers Union

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

152

1                C E R T I F I C A T I O N

2

3          I, MEGAN SHERIDAN, a Stenotype Reporter

4     and Notary Public within and for the State of New

5     York, do hereby certify:

6          THAT the witness(es) whose testimony is

7     hereinbefore set forth, was duly sworn by me; and

8          THAT the within transcript is a true

9     record of the testimony given by said witness(es).

10          I further certify that I am not related,

11    either by blood or marriage, to any of the parties

12    in this action; and

13          THAT I am in no way interested in the

14    outcome of this matter.

15          IN WITNESS WHEREOF, I have hereunto set my

16    hand this   8th   day of      August

17

18

19

                        MEGAN SHERIDAN

20

21

22

23

24

25

153

UNITED STATES DISTRICT COURT          VOLUME II
EASTERN DISTRICT OF NEW YORK     PAGES 153-367
---------------------------------------------x
LUISA JANSSEN HARGER DA SILVA,

            Plaintiff,

                              Case No.

  - against -                 17-cv-04550


NEW YORK CITY TRANSIT AUTHORITY,
METROPOLITAN TRANSPORTATION AUTHORITY,
and RAQIA SHABAZZ,

            Defendants.
---------------------------------------------x


            Via Zoom Videoconference


            January 27, 2023
            10:02 a.m.


      CONTINUED EXAMINATION BEFORE TRIAL of
LAWRENCE GEORGE REUTER, a Non-Party Witness,
pursuant to the Federal Rules of Civil
Procedure and Order, held at the above-noted
time and place, before Michelle Conero, a
Stenotype Reporter and Notary Public within
and for the State of New York.

154

1
2    A P P E A R A N C E S:
3
4    ROTH & ROTH, LLP
          Attorneys for Plaintiff
5          192 Lexington Avenue, Suite 802
          New York, New York 10016
6          Phone:  212-425-1020
          E-mail:  droth@rothandroth.com
7    BY: DAVID ROTH, ESQ.
8
9
10    SONIN & GENIS, ESQS.
          Attorneys for Plaintiff
11          One Fordham Plaza, Suite 907
          Bronx, New York 10458
12          Phone:  718-561-4444
          E-mail:  rgenis@soningenis.com
13    BY: ROBERT GENIS, ESQ.
14
15
16    LANDMAN CORSI BALLAINE & FORD, PC
          Attorneys for Defendants
17          120 Broadway, 13th Floor
          New York, New York 10271
18          Phone:  212-238-4800
          E-mail:  tcollazzi@lcbf.com
19    BY:  TIMOTHY COLLAZZI, ESQ.
20
21
22    ALSO PRESENT:
23          ANDREW KEAVENEY, ESQ.
              Landman Corsi Ballaine & Ford, PC
24              (Present from 10:58 a.m. until 2:31 p.m.)
25

155

1

2       F E D E R A L   S T I P U L A T I O N S

3

4

5          IT IS HEREBY STIPULATED AND AGREED by

6    and between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an unsigned

14   copy of the deposition may be used with the

15   same force and effect as if signed by the

16   witness, 30 days after service of the

17   original & 1 copy of same upon counsel for

18   the witness.

19

20          IT IS FURTHER STIPULATED AND AGREED

21   that all objections except as to form, are

22   reserved to the time of trial.

23

24                    *    *    *    *

25

156

1

2    L A W R E N C E    G E O R G E    R E U T E R

3          a Non-Party Witness to the Within

4          Action, having first been duly sworn by

5          the Notary Public, was examined and

6          testified as follows:

7    EXAMINATION BY

8    MR. GENIS:

9          Q      Please state your name for the

10   record.

11         A      Lawrence George Reuter.

12         Q      Good morning.  Have you spoken to

13   anyone whatsoever at all about this case or

14   either of your depositions?

15         A      No.

16         Q      Okay.  Did you review anything to

17   prepare or refresh your memory?

18         A      No.

19         Q      Are you familiar with the PTSB, the

20   Public Transportation Safety Board?

21         A      Yes.

22         Q      Do you agree that the PTSB

23   published requirements for a System Safety

24   Program Plan applicable to the New York City

25   Transit Authority?

157

1

2           MR. COLLAZZI:  Objection, form.

3      Q     You can answer.

4      A     They did when I was there.  I have

5 no idea.  It's sixteen years, so --

6      Q     Okay.  When you were with the

7 Transit Authority, do we agree that the PTSB

8 had published requirements for a System Safety

9 Program Plan applicable to the New York City

10 Transit Authority?

11     A     Yes.

12          MR. COLLAZZI:  Objection to form.

13     Q     Do you agree that the PTSB got the

14 requirements for a System Safety Program Plan

15 from a Federal regulation, specifically 49 CFR

16 Section 270.103 --

17          MR. ROTH:  Objection to form.

18     Q     -- System Safety Program Plan?

19     A     I'm not sure about the numbers, but

20 I know the Federal Government requires them to

21 do it.

22     Q     Okay.  And do we agree that the

23 Transit Authority was required to comply with

24 the requirements of that Federal regulation or

25 rule?

158

1

2              MR. COLLAZZI:  Objection to form.

3        A     Basically, yes.

4        Q     Okay.  And do we agree that the

5   Transit Authority was required to comply with

6   the PTSB guidelines?

7              MR. COLLAZZI:  Objection to form.

8        A     We try to follow them as best we

9   can.

10       Q     Okay.  Well, do we agree that the

11  transit should comply with the PTSB guidelines?

12             MR. COLLAZZI:  Same objection.

13       A     Where possible, yes.

14       Q     Do you agree that according to

15  professional standards of care, it requires

16  compliance with the Federal rules?

17             MR. COLLAZZI:  Objection, form.

18       A     Could you repeat that?

19       Q     Sure.

20             MR. GENIS:  Read it back, please.

21       Let's see if it's English.

22             (Whereupon, the referred to

23       question was read back by the Reporter.)

24       A     Basically correct, yes.

25       Q     Okay.  And according to good and

159

1

2    accepted practices and procedures for a mass

3    transit agency like the Transit Authority, they

4    should comply with the Federal rules?

5             MR. COLLAZZI:  Objection, form.

6       A    Again, basically the same, yes.

7       Q    Okay.  I'm going to discuss the

8    requirements of a System Safety Program Plan.

9    Do we agree that every passenger L operation

10   shall adopt and fully implement a System Safety

11   Program through a written System Safety Program

12   Plan?

13            MR. COLLAZZI:  Objection, form.

14      A    Yes.

15      Q    And at a minimum, that plan must

16   contain the elements noted in the Federal rule.

17   True?

18            MR. COLLAZZI:  Objection.

19      A    Generally correct, yes.

20      Q    Okay.  And the System Safety

21   Program Plan, the SSPP, should define the

22   agent -- withdrawn.  The System Safety Program

23   Plan should describe the safety philosophy of

24   the safety culture of the passenger L

25   operations of the transit system.  True?

160

1

2              MR. COLLAZZI:  Objection.

3        A     Well, that's a general statement,

4   but basically true.

5        Q     Okay.  And the System Safety

6   Program Plan should list its goals for the

7   plan.  True?

8              MR. COLLAZZI:  Objection, form.

9        A     Again, basically true.

10       Q     Okay.  And all of my questions are

11  for the time period that you were at the

12  Transit Authority.  Fair enough?

13       A     That's correct, because I have no

14  idea what's happened since then.

15       Q     Understood.  That's why all my

16  questions, in case I don't say it each and

17  every time, I'm only asking about when you were

18  at the Transit.  We covered when you were at

19  the Transit at your last session.  I'm not

20  going to waste more time on that.  Understood?

21       A     Okay, great.

22       Q     Thank you.  And do we agree that,

23  according to the System Safety Program Plan, at

24  minimum the goals should be long term?

25       A     Yes.

161

1

2              MR. COLLAZZI:  Objection.

3       Q     Meaningful?

4              MR. COLLAZZI:  Objection.

5       A     Yes.

6       Q     Measurable?

7              MR. COLLAZZI:  Objection.

8       A     Basically, yes.

9       Q     And lastly, focused on the

10   identification of hazards and the mitigation or

11   elimination of the resulting risks.  True?

12             MR. COLLAZZI:  Objection.

13      A     That's true.

14      Q     Okay.  And the System Safety

15   Program Plan shall be fully implemented within

16   36 months of the Federal Rail Administration's

17   approval of the System Safety Plan.  True?

18             MR. COLLAZZI:  Objection.

19      A     I don't recall that.

20      Q     Okay.  When you're saying you don't

21   recall it, are you saying you just don't

22   remember one way or the other or are you saying

23   that that's not correct?

24      A     I don't recall one way or the

25   other.  It's been too long, so --

162

1

2        Q     Okay.  Fair enough.  With respect

3   to the System Safety Program Plan, it shall

4   include a statement that describes the process

5   that the rail uses to receive notification of

6   accidents, incidents, investigating, reporting

7   these accidents and incidents.  True?

8                MR. COLLAZZI:  Objection, form.

9        A     To the best of my recollection.  I

10  can't recall it exactly.

11       Q     And the System Safety Program Plan

12  with respect to accident or incident reporting,

13  investigation shall develop, implement and

14  track any corrective actions found necessary to

15  address an investigation's findings.  True?

16               MR. COLLAZZI:  Objection, form.

17       A     Again, I can't recall exactly what

18  it said.

19       Q     Well, does that sound familiar to

20  you?

21       A     It sounds familiar, but I can't say

22  it's s hundred percent true.

23       Q     All right.  It sounds about right

24  to you, though?  More likely than not?

25       A     More likely.

163

1

2          Q     Okay.  And as part of the System

3     Safety Program Plan, there's supposed to be

4     safety data acquisition.  True?

5                MR. COLLAZZI:  Objection, form.

6          A     I missed that one.  Safety what?

7          Q     Safety data, D-A-T-A, acquisition.

8     True?

9                MR. COLLAZZI:  The same objection.

10         A     I can't recall that.

11         Q     Well, does that sound about right

12    to you, though?

13         A     It sounds familiar, but I just

14    can't recall it.

15         Q     Okay.  And the System Safety

16    Program Plan shall establish and set forth a

17    statement in the plan that describes the

18    processes it uses to collect, maintain, analyze

19    and distribute safety data in support of the

20    System Safety Program.  True?

21                MR. COLLAZZI:  Objection.

22         A     Again, I -- basically that would be

23    my understanding, but I can't swear to it.

24         Q     Okay.  More likely than not that

25    sounds about right?

164

1

2          A      More likely.

3          Q      Okay.  Let's talk about another

4    part of the System Safety Program Plan.  There

5    should be a Risk-Based Hazard Management

6    Program.  True?

7                 MR. COLLAZZI:  Objection.

8          A      I believe -- I believe that's true.

9          Q      Okay.  And the TA shall establish a

10   Risk-Based Hazard Management Program as part of

11   the System Safety Program.  Correct?

12                MR. COLLAZZI:  Objection.

13         A      I can't recall.

14         Q      Does it sound right?

15         A      What's that?

16         Q      Does it sound right, more likely

17   than not?

18         A      It sounds more likely, but I just

19   can't recall.

20         Q      Okay.  And the Risk-Based Hazard

21   Management Program shall be fully described in

22   the System Safety Program Plan.  Correct?

23                MR. COLLAZZI:  Objection.

24         A      Again, I think that sounds correct,

25   but I couldn't swear.

165

1

2          Q     Okay.  All right.  And the

3    Risk-Based Hazard Management Program shall

4    establish, one, the processes or procedures

5    used in the Risk-Based Hazard Analysis to

6    identify hazards on the rail system.  Correct?

7                MR. COLLAZZI:  Objection.

8          A     I would say basically true, but I

9    would not be the best person to be asking this

10   to.

11         Q     Okay.  And the processes or

12   procedures used in the Risk-Based Hazard

13   Analysis to analyze, identify hazards and

14   support the Risk-Based Hazard Management

15   Program.  True?

16                MR. COLLAZZI:  Objection.

17         A     I would say the same answer.  It

18   sounds basically correct, but --

19         Q     Okay.

20         A     -- I can't attest to it.

21         Q     All right.  And do we agree that

22   this Risk-Based Hazard Management Program, when

23   I'm discussing it, the methods used in the

24   Risk-Based Hazard Analysis are to determine the

25   severity and frequency of hazards and to

166

1

2    determine the corresponding risk.  True?

3                MR. COLLAZZI:  Objection.

4        A    I would say the same answer.  It

5    sounds basically correct, but I couldn't swear.

6        Q    All right.  And the methods used in

7    the Risk-Based Hazard Analysis are to be -- are

8    to identify actions that mitigate or eliminate

9    hazards and corresponding risks.  True?

10               MR. COLLAZZI:  Objection.

11       A    Again, the same answer.  It sounds

12   basically correct.

13       Q    And the process for setting goals

14   for the Risk-Based Hazard Management Program

15   and how it performs against the goals will be

16   reported, shall be established as well.  True?

17               MR. COLLAZZI:  Objection.

18       A    The same answer.  It sounds

19   basically correct, but I don't know.

20       Q    Okay.  And the process to make

21   decisions that affect the safety of the rail

22   system relative to the Risk-Based Hazard

23   Management Program shall be documented.  True?

24               MR. COLLAZZI:  Objection.

25       A    It basically sounds correct.  But

167

1

2  again, the same answer.

3          Q     Okay.  And the methods used in the

4  Risk-Based Hazard Management Program to support

5  continuous safety improvement throughout the

6  life of the rail system shall be done.  True?

7                MR. COLLAZZI:  Objection.

8          A     Again, I couldn't -- I don't -- I

9  don't recall that.

10         Q     Does that sound familiar, more

11  likely than not?

12         A     It sounds more likely, but I just

13  don't recall.

14         Q     Okay.  And the methods used to

15  maintain records of identified hazards and

16  risks and the mitigation or elimination of the

17  identified hazards and risks throughout the

18  life of the rail system shall also be

19  documented in the plan.  True?

20               MR. COLLAZZI:  Objection.

21         A     It sounds correct, but I'm --

22  basically the same answer.  I can't -- I can't

23  swear to it.

24         Q     Okay.  The System Safety Program

25  Plan's description of the Risk-Based Hazard

168

1

2    Management Program shall include, one, the

3    position and title of the individuals

4    responsible for administering the Risk-Based

5    Hazard Management Program.  True?

6                MR. COLLAZZI:  Objection.

7        A     The same answer.  It sounds -- it

8    sounds like that would be the case, but I can't

9    swear to it.

10       Q     Okay.  It shall also include the

11   identities of stakeholders who will participate

12   in the Risk-Based Hazard Management Program.

13   Correct?

14                MR. COLLAZZI:  Objection.

15       A     The same answer.  It sounds

16   reasonable, but I don't know.

17       Q     Okay.  And the position and title

18   of the participants and structure of any hazard

19   management teams or safety committees that may

20   be established to support the Risk-Based Hazard

21   Management Program.  True?

22                MR. COLLAZZI:  Objection.

23       A     The same answer.

24       Q     Okay.  And let's talk about

25   Risk-Based Hazard Analysis according to the

169

1

2   Federal rule now.  Once the FRA approves a rail

3   operations System Safety Plan, the Risk-Based

4   Hazard Analysis methodology shall be applied to

5   identify and analyze hazards on the rail system

6   and to determine the resulting risks.  True?

7                 MR. COLLAZZI:  Objection.

8        A     The same answer.  I don't -- I

9   don't recall.

10       Q     Well, more likely than not that

11  sounds right?

12       A     More likely, but --

13       Q     Okay.  And the Risk-Based Hazard

14  Analysis shall identify specific actions that

15  shall be implemented using the methods

16  described in this section that will mitigate or

17  eliminate the hazards and resulting risks

18  identified in the section of the Federal rule.

19  True?

20                 MR. COLLAZZI:  Objection.

21       A     The same answer.

22       Q     So the same answer meaning more

23  likely than not that's correct?

24       A     More likely, but I just don't know.

25       Q     Okay.  And if you were to look at a

170

1

2   copy of the Federal rules, that would tell you

3   exactly what they say.  Correct?

4        A     If you read them, I'll take your

5   word for it.  Okay.

6        Q     Yup.  Okay.  Let's continue now.

7   Technology Analysis and Implementation Plan.

8   We'll discuss that now according to the Federal

9   rule.  Do we agree that the rail shall develop

10   and periodically update as necessary a

11   Technology Analysis and Implementation Plan.

12   True?

13               MR. COLLAZZI:  Objection.

14        A     It sounds correct, but I can't

15   swear to it.

16        Q     Okay.  And this shall -- and the

17   System Safety Program Plan shall include this

18   Technology Analysis and Implementation Plan.

19   Correct?

20               MR. COLLAZZI:  Objection.

21        A     Again, the same answer.

22        Q     Okay.  More likely true than --

23   true.  Correct?

24        A     More likely.

25        Q     Okay.  And the rail's Technology

171

1

2   Analysis and Implementation Plan shall describe

3   the process used to identify and analyze

4   current, new or novel technologies that will

5   mitigate or eliminate the hazards and resulting

6   risks identified by the Risk-Based Hazard

7   Analysis.  True?

8               MR. COLLAZZI:  Objection.

9        A     The same answer.  More likely, but

10   I don't know.

11        Q     Okay.  And it shall analyze the

12   safety impact, feasibility and cost and

13   benefits of implementing the technologies

14   identified by the processes that will mitigate

15   or eliminate hazards and the resulting risks.

16   True?

17               MR. COLLAZZI:  Objection.

18        A     The same answer.

19        Q     So more likely true than false.

20   Correct?

21        A     More likely.

22        Q     Okay.  And once the FRA approves

23   the passenger rail System Safety Program Plan,

24   including the Technology Analysis and

25   Implementation Plan, the TA shall apply, one,

172

1

2    the processes described in the section to

3    identify and analyze technologies that will

4    mitigate or eliminate the hazards and resulting

5    risks identified by the Risk-Based Hazard

6    Analysis.  True?

7                    MR. COLLAZZI:  Objection.

8        A      The same answer.

9        Q      So more likely true.  Correct?

10       A      More likely.

11       Q      Okay.  At a minimum, the

12   technologies a passenger rail operation shall

13   consider as part of its Technology Analysis are

14   processor-based technologies, positive train

15   control systems, electronically controlled

16   pneumatic brakes, rail integrity inspection

17   systems, rail integrity warning systems, switch

18   position monitors and indicators, trespass or

19   prevention technology, and highway rail grade

20   crossing warning and protection technology.

21   True?

22                    MR. COLLAZZI:  Objection.

23       A      It sounds reasonable, but again,

24   the same answer.

25       Q      Okay.  So more likely true.

173

1

2    Correct?

3         A       More likely.

4         Q       Okay.  And the plan -- the System

5    Safety Program Plan with the Technology

6    Analysis and Implementation Plan shall describe

7    how it will develop, adopt, implement, maintain

8    and use the identified technologies.  True?

9               MR. COLLAZZI:  Objection.

10        A       The same answer, but it sounds

11   reasonable.

12        Q       Okay.  And shall set forth and

13   prioritize an implementation schedule for the

14   development, adoption, implementation and

15   maintenance of those technologies over a

16   ten-year period.  True?

17              MR. COLLAZZI:  Objection.

18        A       Same answer.

19        Q       And safety certifications.  Do we

20   agree that the TA shall establish and set forth

21   the statement in its System Safety Program Plan

22   that describes the certification process used

23   to help ensure that safety concerns and hazards

24   are adequately addressed before the initiation

25   of operations for major projects to extend,

174

1

2    rehabilitate or modify an existing system or

3    replace equipment?

4            MR. COLLAZZI:  Objection.

5        A    I don't -- I don't know if I can

6    answer that one.

7        Q    Okay.  If -- do we agree that if

8    that's what's contained in the Federal rule,

9    specifically 49 CFR Section 270.103 for the

10   System Safety Program Plan, you'd agree with

11   that?

12           MR. COLLAZZI:  Objection.

13       A    If that's what it says, I'd agree

14   with that, yes.

15       Q    Okay.  And lastly, the System

16   Safety Program Plan shall contain a statement

17   that describes how the rail operation measures

18   the success of its safety culture.  True?

19           MR. COLLAZZI:  Objection.

20       A    The same answer.  It sounds

21   reasonable, but I don't know.

22       Q    Okay.  And according to the New

23   York State PTSB, there's a requirement that the

24   System Safety Program Plan details the internal

25   operating procedures for conducting business in

175

1

2    a safe and efficient manner.  True?

3              MR. COLLAZZI:  Objection.

4        A    The same answer.

5        Q    More likely true than false?

6        A    More likely.

7        Q    Okay.  And the PTSB guidelines

8    identify all the elements that should be

9    considered in the systemwide approach to

10   safety.  True?

11             MR. COLLAZZI:  Objection.

12       A    The same answer.

13       Q    More likely true?

14       A    More likely.

15       Q    They stress operational safety

16   rather than industrial safety.  True?

17             MR. COLLAZZI:  Objection.

18       A    I -- I just don't know.  I couldn't

19   answer that at all.

20       Q    Okay.  Operational safety implies a

21   broader perspective in providing a safety

22   service to the fare paying public since the

23   bulk of the accidents occur in the operational

24   aspect of the transportation system.  True or

25   false?

176

1

2              MR. COLLAZZI:  Objection.

3       A     I'm not sure that's true.

4       Q     Okay.  If the PTSB wrote that and

5  published it in its System Safety Program Plan

6  guidelines, would you agree with it or disagree

7  with it?

8              MR. COLLAZZI:  Objection.

9       A     If that's what it says, I'd have to

10  agree that's what the words say.

11      Q     And you're familiar with the

12  American Public Transit Association for the

13  Urban Mass Transportation Administration.

14  True?

15      A     Yes, I was.

16      Q     And -- and the System Safety

17  Program Plan guidelines of the New York State

18  PTSB were developed by the American Public

19  Transit Association for the Urban Mass

20  Transportation Administration.  True?

21              MR. COLLAZZI:  Objection.

22      A     That I don't know.

23      Q     Okay.  Can we agree that according

24  to the PTSB, the System Safety Program Plan

25  should give evidence of a positive and active

177

1

2    approach towards safety?

3              MR. COLLAZZI:  Objection.

4         A    I -- I assume you're reading it, so

5    it's the same answer.  I don't know.

6         Q    Okay.  And according to the New

7    York State PTSB guidelines for System Safety

8    Program Plans, it enables the transit system to

9    display to its best advantage its safety

10   policies, programs and goals.  Correct?

11             MR. COLLAZZI:  Objection.

12        A    The same answer.

13        Q    More likely true?

14        A    More likely.  It sounds like

15   government-ese.  Yes.

16        Q    It gives the transportation

17   operator a professional approach to safety.

18   True?

19             MR. COLLAZZI:  Objection.

20        A    Same answer.

21        Q    It enables management to see its

22   entire safety effort coordinated into a

23   systemwide approach.  Correct?

24             MR. COLLAZZI:  Objection.

25        A    The same answer.

178

1

2         Q      Well, let's back up a second.   When

3    you were at the Transit Authority -- president

4    of the Transit Authority, you had to make sure

5    that they had System Safety Program Plans every

6    year.   True?

7         A      Yes.

8         Q      Okay.   And when you were at the

9    Transit Authority, did you make sure that the

10   System Safety Program Plan complied with the

11   Federal rule and regulation requirements?

12        A      Yes.   As best I could, yes.

13        Q      Okay.   And did you make sure, when

14   you were at the Transit, that the Transit

15   Authority complied with the New York State PTSB

16   guidelines for System Safety Program Plans?

17        A      Yeah.   We submitted it and it was

18   approved, as I recall.

19        Q      Okay.   So let's continue.   And the

20   System Safety Program Plan assures management

21   that all safety responsibilities and tasks are

22   documented in a logical and organized manner.

23   True?

24               MR. COLLAZZI:  Objection.

25        A      Sounds correct.

179

1

2          Q     And the System Safety Program Plan

3     develops a program where safety is part of all

4     decision making processes.  Correct?

5                MR. COLLAZZI:  Objection.

6          A     Again, it sounds correct, but --

7          Q     Okay.  And when we're talking about

8     safety, that includes safety of the passengers.

9     True?

10         A     That's correct.

11         Q     Okay.  And when we're discussing

12    the scope of operation, this, in fact, is

13    operating maintenance rules and procedures

14    involving people hit by trains.  Correct?

15               MR. COLLAZZI:  Objection.

16         A     Well, that would be one of the

17    issues, as I recall, yes.

18         Q     And with respect to the hazard

19    identification policy, can we agree that hazard

20    identification is an analysis performed to

21    identify hazardous conditions for the purpose

22    of their elimination or control?

23               MR. COLLAZZI:  Objection.

24         A     Sounds correct.

25         Q     This is a systematic approach to

180

1

2    identify hazards that start with basic systems

3    and subsystems and identifies the possible

4    hazards or failures that could occur.  True?

5              MR. COLLAZZI:  Objection.

6         A    Again the same answer.  Sounds

7    reasonable.  Sounds like something that would

8    be required.

9         Q    Once hazards are identified, they

10   should be assessed to determine their impact on

11   the total system to determine whether to accept

12   the hazard or the extent of corrective measures

13   to eliminate the hazard or reduce its severity.

14   True?

15             MR. COLLAZZI:  Objection.

16        A    The same answer.  Sounds

17   reasonable, but I can't swear to it.

18        Q    Okay.  And the hazard

19   identification procedure and process shall

20   define internal safety data sources for hazard

21   identification.  True?

22             MR. COLLAZZI:  Objection.

23        A    Same answer.

24        Q    So true more likely?

25        A    More likely, but --

181

1

2          Q      Okay.

3          A      -- I can't swear to it.

4          Q      And data sources should include but

5   are not limited to unusual occurrence reports

6   that are used as data sources for hazard

7   identification.  True?

8                 MR. COLLAZZI:  Objection.

9          A      Again, it sounds -- it sounds

10  reasonable, but I can't swear to it.

11         Q      And it shall also include accident

12  or incident reports used as data sources for

13  hazard identification.  True?

14                MR. COLLAZZI:  Objection.

15         A      The same answer.

16         Q      And then the -- let's discuss

17  hazard assessment analysis and resolution.

18  Okay?

19         A      Okay.

20         Q      The purpose of this task is to

21  identify, on a priority basis, resolutions or

22  controls to prevent potential hazards from

23  becoming incidents or accidents.  True?

24                MR. COLLAZZI:  Objection.

25         A      Sounds reasonable.

182

1

2          Q      And those hazards that have been

3     identified and assessed as to severity and

4     likelihood of occurrence should be prioritized

5     for resolution.   True?

6                  MR. COLLAZZI:  Objection.

7          A      Again, it sounds reasonable, but I

8     can't swear to it.

9          Q      Okay.  And for risk assessment,

10    hazard severity categories are identified for

11    hazard analysis and risk assessment.   Correct?

12                 MR. COLLAZZI:  Objection.

13         A      Same answer.

14         Q      So priority of hazards is based on

15    hazard severity, probability of occurrence and

16    cost of corrective action.   True?

17                 MR. COLLAZZI:  Objection.

18         A      The same answer.

19         Q      More likely true?

20         A      More likely, but --

21         Q      Okay.  And corrective actions to be

22    identified hazards are monitored for

23    effectiveness.   Correct?

24                 MR. COLLAZZI:  Objection.

25         A      Again, it sounds -- it sounds

183

1

2    reasonable, but I can't swear to it.

3         Q    And the choice of corrective action

4    follows system safety precedents and includes

5    design, safety and warning devices, training

6    and personal protection equipment.  True?

7              MR. COLLAZZI:  Objection.

8         A    Same answer.

9         Q    Okay.  And where -- and there

10   should be documentation of rational and proper

11   signoff for retention of acceptable risk on

12   file.  Correct?

13             MR. COLLAZZI:  Objection.

14        A    Sounds reasonable, but I can't

15   swear to it.

16        Q    And these are all things that when

17   you were president of the Transit Authority you

18   made sure of.  Correct?  You made sure that

19   these things were done?

20             MR. COLLAZZI:  Objection.

21        A    I missed your question.

22        Q    When you were at the Transit

23   Authority and president of the Transit

24   Authority, did you make sure these different

25   things we discussed now about hazard

184

1

2    identification analysis and elimination were

3    complied with?

4            MR. COLLAZZI:  Objection.

5        A    Well, I had people that worked for

6    me that were responsible for doing that.

7        Q    Okay.  And that's what the people

8    working under you were supposed to do.

9    Correct?

10           MR. COLLAZZI:  Objection.

11       A    That's correct.

12       Q    And do we agree that the New York

13   City Transit Authority in its System Safety

14   Program Plan had a section on hazard management

15   process.  True?

16           MR. COLLAZZI:  Objection.

17       A    I can't remember.

18       Q    Okay.  Well, the hazard -- do you

19   agree that the hazard management process is the

20   primary tool utilized to ensure the safety of

21   New York City Transit activities, passengers,

22   employees, vehicles and facilities?

23           MR. COLLAZZI:  Objection.

24       A    Again, sounds reasonable, but I

25   can't swear to it.

185

1

2          Q      It is a process whereby hazards are

3     identified, assessed for potential impacts and

4     resolved in a manner acceptable to management.

5     Correct?

6                 MR. COLLAZZI:  Objection.

7          A      Same answer.

8          Q      Okay.  So hazard identification is

9     the initial step of the hazard management

10    process according to the New York City Transit

11    Authority System Safety Program Plan.  True?

12                MR. COLLAZZI:  Objection.

13         A      I can't recall.

14         Q      Does that sound right to you?

15         A      It sounds reasonable, but --

16         Q      Okay.

17         A      -- it's been over sixteen years.  I

18    don't know.

19         Q      Okay.  And within the Office of

20    System Safety, hazard identification is

21    achieved through the conduct of safety

22    inspections, safety reviews, accident

23    investigations and other things.  True?

24                MR. COLLAZZI:  Objection.

25         A      Again, that sounds correct.

186

1

2          Q     Trend analyses are conducted as

3     well, focusing on employee and customer

4     accidents, near miss incidents, other types of

5     incidents and common deficiencies found.

6     Correct?

7                MR. COLLAZZI:  Objection.

8          A     Sounds reasonable.

9          Q     And according to the Office of

10    System Safety and the New York City --

11    withdrawn.  According to the New York City

12    Transit Authority's Office of System Safety and

13    the Transit itself, hazard assessments shall be

14    conducted in accordance with Military Standard

15    882, and then there's letters, depending on the

16    year, A through E or F.  Correct?

17                MR. COLLAZZI:  Objection.

18         A     I can't swear to it, but it sounds

19    correct.

20         Q     Well, you recall the Military

21    Standard 882.  True?

22         A     No.  Not really.

23         Q     Okay.  If there's been testimony by

24    Cheryl Kennedy and Tom Pendergast that the

25    Transit Authority utilized Military Standard

187

1

2   882, would you agree or disagree with that?

3               MR. COLLAZZI:  Objection.

4       A     If Tom and Cheryl said that, I

5   would probably agree with it, yes.

6       Q     Okay.  And when you don't remember

7   things, because I understand it's been a period

8   of time, these are things that you would expect

9   your department to do and comply with.

10  Correct?

11              MR. COLLAZZI:  Objection.

12      A     Basically that's correct.

13      Q     Okay.  And when discussing hazard

14  analyses, they are supposed to comply with the

15  safety principles outlined in that Military

16  Standard 882.  Correct?

17              MR. COLLAZZI:  Objection.

18      A     I think that's correct, but I can't

19  swear to it.

20      Q     And the analysis is conducted to

21  identify the hazards, assess the hazards

22  relative to their severity and probability of

23  occurrence and identify correction actions --

24  corrective actions, I'm sorry, to bring the

25  hazard to an acceptable level.  Correct?

188

1

2              MR. COLLAZZI:  Objection.

3       A      The same answer.

4       Q      And then trend analysis is

5   necessary.  Correct?

6       A      Basically that's correct.

7       Q      So common types of hazards are

8   identified through the performance of the trend

9   analysis.  Correct?

10      A      Sounds correct.

11      Q      And even regardless of what that

12  Military Standard 882 manual says, you agree

13  with the things we've been discussing so far

14  today?

15             MR. COLLAZZI:  Objection.

16      A      Well, I think basically, but I

17  can't -- that's a pretty broad question.

18      Q      Okay.  Let's talk about hazard

19  classifications.  There are severity

20  categories.  True?

21      A      Yes.

22      Q      One of the categories is

23  catastrophic for severity.  Correct?

24      A      That's correct.

25      Q      And catastrophic includes death or

189

1

2   permanent total disability, irreversible

3   significant environmental impact or monetary

4   loss equal to or exceeding $10,000,000.

5   Correct?

6              MR. COLLAZZI:  Objection.

7        A     Sounds correct.

8        Q     Critical is a severity category

9   that could result in permanent partial

10  disability or injuries or occupational

11  illnesses that may result in hospitalization of

12  at least three personnel or reversible

13  significant environmental impact or monetary

14  loss equal to or exceeding 1,000,000 but less

15  than 10,000,000.  Correct?

16             MR. COLLAZZI:  Objection.

17       A     Again, it sounds correct, but I

18  couldn't swear to it.

19       Q     Okay.  And then you would also look

20  at the probability levels.  Correct?

21             MR. COLLAZZI:  Objection.

22       A     Again, sounds reasonable.

23       Q     Okay.  And in the probability

24  levels one of the categories is frequent.

25  Correct?

190

1

2      A      Sounds -- sounds reasonable.  I
3    don't know exactly.
4      Q      Well -- and frequent, the
5    definition of frequent for this risk assessment
6    matrix is likely to occur often in the life of
7    an item.
8              MR. COLLAZZI:  Objection.
9      A      I couldn't tell you that's the
10   definition, but it sounds reasonable.
11     Q      Okay.  You're familiar with the
12   risk matrix.  Correct?  Risk assessment matrix?
13     A      Well, vaguely anymore.
14     Q      Okay.  And you would agree that
15   something that happens on a weekly basis is
16   frequent.  True?
17             MR. COLLAZZI:  Objection.
18     A      I would say that sounds pretty
19   reasonable.
20     Q      Okay.  So in other words, here's
21   this like kind of risk assessment matrix with a
22   box and you have one column going down and
23   another -- and rows going across.  Correct?
24     A      To the best of my recollection,
25   that's correct, yes.

191

1

2      Q     Okay.  So you want to see the

3   severity, so going across from catastrophic to

4   critical to marginal to negligible.  Correct?

5              MR. COLLAZZI:  Objection.

6      A     I think that's correct.

7      Q     And then going down you have

8   probability of frequent, probable, occasional,

9   remote, et cetera.  Correct?

10              MR. COLLAZZI:  Objection.

11      A     Again, I think that's correct.

12      Q     All the way down to eliminated.

13   Correct?

14      A     I think that's correct.

15      Q     Okay.  So this way, the way you

16   categorize the hazards is you'd use this table

17   and that's how you prioritize them for

18   corrective action.  Correct?

19              MR. COLLAZZI:  Objection.

20      A     Again, sounds -- sounds somewhat

21   reasonable, yes.

22      Q     Okay.  So for example, if something

23   in this risk assessment matrix had a

24   catastrophic possible outcome, right, death or

25   that kind of serious injury, and had a

192

1

2      probability of frequent, that would be the

3      highest category for risk assessment.  Correct?

4              MR. COLLAZZI:  Objection.

5      A      Sounds like it could be right up

6      there at the highest.

7      Q      Okay.  And if something had a

8      negligible injury and was improbable, that

9      would have a low prioritization.  Correct?

10     A      Again, that sounds reasonable, yes.

11     Q      And where something, according to

12     the hazard assessment matrix, has a high

13     hazard, that's unacceptable.  Correct?

14             MR. COLLAZZI:  Objection.

15     A      I don't recall that.

16     Q      Well, serious hazards are

17     undesirable.  Correct?

18             MR. COLLAZZI:  Objection.

19     A      I can't recall.

20     Q      Well, do we agree that according to

21     the Transit Authority's own System Safety

22     Program Plan, high hazards may require

23     immediate corrective action.  True?

24             MR. COLLAZZI:  Objection.

25     A      I don't recall that.

193

1

2          Q     Does that sound right to you?

3          A     Sounds like it could be, but I

4    couldn't swear to it.

5          Q     Well, that's what you had people

6    for, to make sure that this was done.  Correct?

7                MR. COLLAZZI:  Objection.

8          A     That's correct.

9          Q     And it was their jobs to make sure

10   that all of this was done properly and

11   correctly.  True?

12               MR. COLLAZZI:  Objection.

13         A     It was their job to implement the

14   System Safety Plan.

15         Q     Okay.  And it's their job to make

16   sure that they use that risk assessment matrix

17   properly.  True?

18               MR. COLLAZZI:  Objection.

19         A     I believe that's correct.

20         Q     Okay.  Now, part of the System

21   Safety Program Plan includes having a proper

22   and adequate study.  True?

23               MR. COLLAZZI:  Objection.

24         A     Again, I think that sounds

25   reasonable, but I don't know.

194

1

2          Q      Okay.  So in other words, you at

3    times have to do comparative analyses.

4    Correct?

5                 MR. COLLAZZI:  Objection.

6          A      Sounds reasonable.

7          Q      You want to know -- there are

8    different possible solutions to the hazards

9    identified, so you want to see first what's

10   going to be the most effective at eliminating

11   or reducing the hazard.  True?

12                MR. COLLAZZI:  Objection.

13         A      Sounds reasonable.

14         Q      And you also want to see what's

15   most practical to eliminate or reduce the

16   hazard.  Correct?

17                MR. COLLAZZI:  Objection.

18         A      Sounds reasonable.

19         Q      And then whenever -- and let's

20   assume that there's been proper and adequate

21   study and there is then corrective action.

22   Correct?

23                MR. COLLAZZI:  Objection.

24         A      Yes.

25         Q      And then you have to measure and

195

1

2    analyze the effectiveness of the corrective

3    action.  Correct?

4              MR. COLLAZZI:  Objection.

5        A    Basically that's true.

6        Q    Okay.  And by the way, when we

7    discuss -- one second.  One second.  Okay.

8    What I'm going to do is just assist in

9    refreshing your memory.

10             MR. GENIS:  Dave, can you please

11        put up, it's Bates -- the first page is

12        557599, and then we'll jump to

13        particular pages.

14       Q    I want you to see what it is we're

15   talking about first.

16       A    Okay.

17             MR. GENIS:  I'm not sure what

18        exhibit number we're up to, but we'll

19        have it deemed marked whatever exhibit

20        we're up to.

21             MR. COLLAZZI:  I think it might be

22        4.  I'm not sure.

23             MR. GENIS:  I'm good with that,

24        Tim.  So we'll say Plaintiff's Exhibit 4.

25             MR. COLLAZZI:  I think David would

196

1

2          know better than me, though.  I don't

3          want to have a duplicate -- a duplicate

4          exhibit number on my conscience.

5                MR. GENIS:  Okay.  So Dave, if it's

6          4, please deem it marked 4, and if it's a

7          different number, we'll deem it marked

8          that as well.

9                (Whereupon, Plaintiff's Exhibit 4

10         for identification as of this date.)

11         Q     Okay.  And I'm showing you, at the

12    top it's a memo on New York City Transit

13    letterhead dated December 22nd of 2003.  Do you

14    see it's to Michael Lombardi, senior vice

15    president, Department of Subways; and Cheryl

16    Kennedy, vice president of Office of System

17    Safety at the time?

18         A     Yes, I see that.

19                MR. GENIS:  Okay.  I'm now going to

20         ask, Dave, if you could jump to Bates --

21         where is it?  What did I just say?

22         557603.  That's it.

23         Q     And do you see the heading of

24    hazard assessment?

25         A     Yes, I see that.

197

1

2          Q      And by the way, at the time of this

3    memo in 2003 you were president of the Transit

4    Authority.  Correct?

5          A      That's correct.

6          Q      Okay.  And when it talks about

7    hazard assessment, it says in an effort to

8    evaluate the hazards the severity and

9    probably -- probability, I'm sorry, were

10   identified in accordance with standard severity

11   and probability categories outlined in Military

12   Standard, at this point it's 882-C.  Correct?

13         A      Yes.

14         Q      All right.  And in fact, in here

15   they're talking about what's known as a drag.

16   Correct?

17                MR. COLLAZZI:  Objection.

18         A      Yes.

19         Q      And it says the severity of the

20   hazard associated with a customer that is

21   caught between the closed train doors, in the

22   event it is not detected and the train moves

23   (drag) has been categorized as catastrophic and

24   has potential to result in a passenger

25   fatality.  Correct?

198

1

2          A      Yes.

3          Q      Okay.  And if something occurs --

4                 MR. GENIS:  Dave, can you just go

5          to the next page, please?  Okay.  Stop

6          right there.

7          Q      On this top paragraph, I'm going to

8    go to the third line from the bottom where they

9    talk about the frequency.  And if it occurs

10   once every three and-a-half years, that would

11   be considered occasional.  True?

12                MR. COLLAZZI:  Objection.

13         A      I read that in there, yes.

14         Q      Okay.  Now, it's -- and then the

15   next paragraph, the severity of the hazard

16   associated with a passenger falling between the

17   car body and the platform edge, in the event it

18   is not detected and the train moves (space

19   case) has been categorized as catastrophic as

20   it has the potential to result in a passenger

21   fatality.  Correct?

22         A      That's correct.  That's what it

23   says.

24         Q      Okay.  I think that's it for that

25   document.  Let me just see if there's anything

199

1

2      else that I wanted to use with this.  One

3      second.  I think that's it for this document.

4      Okay.

5               MR. GENIS:  Dave, you can take the

6          document down?  Thank you.

7      Q      So we've just seen in that document

8      that Military Standard that was accepted and

9      used by the Transit Authority.  Correct?

10     A      Correct.

11     Q      Okay.  And you agree that that

12     standard was professionally reliable?

13               MR. COLLAZZI:  Objection.

14     A      That was what?

15     Q      Professionally reliable.

16     A      I couldn't catch your last word.

17     Q      Not a problem.  The Military

18     Standard that was used and accepted by the

19     Transit Authority was professionally reliable.

20     True?

21               MR. COLLAZZI:  Objection.

22     A      Sounds correct, but it's a pretty

23     broad statement again.

24     Q      Well, would you use -- would the

25     Transit Authority use something that was not

200

1

2    professionally reliable?

3        A     I just don't know what that means

4    when you say it that way.

5        Q     Okay.  Well, did you conduct

6    yourself as a professional when running the

7    Transit Authority?

8        A     Yes.

9        Q     Did the Transit Authority run

10   itself in a professional manner?

11       A     Yes.

12       Q     It was supposed to.  Correct?

13       A     That's correct.

14             MR. COLLAZZI:  Objection.

15       Q     And the Transit was supposed to

16   comply and follow professional standards of

17   care.  True?

18             MR. COLLAZZI:  Objection.

19       A     Basically correct.

20       Q     Okay.  All right.  Now, you relied

21   on Cheryl Kennedy at times.  Correct?

22       A     Yes, --

23             MR. COLLAZZI:  Objection.

24       A     -- that's correct.

25       Q     And you relied on her department.

201

1

2    Correct?

3              MR. COLLAZZI:  Objection.

4       A      Correct.

5       Q      You relied on other departments,

6    not just the Office of System Safety.  Correct?

7       A      Oh, yes.  Absolutely.

8       Q      And you assumed that Cheryl Kennedy

9    and the Office of System Safety and other

10   Transit departments followed and complied with

11   professional standards of care.  Correct?

12             MR. COLLAZZI:  Objection.

13      A      Basically correct.

14      Q      And you assumed that Kennedy, the

15   Office of System Safety and other Transit

16   departments followed and complied with good and

17   accepted practices and procedures.  True?

18             MR. COLLAZZI:  Objection.

19      A      Again, basically correct.

20      Q      Okay.  You assumed that they

21   complied with best practices in the field.

22   Correct?

23             MR. COLLAZZI:  Objection.

24      A      Where they could, yes.

25      Q      Okay.  And you assumed that they

202

1

2    complied with and followed that Standard 882.

3    Correct?

4              MR. COLLAZZI:  Objection.

5        A    I believe that's correct.

6        Q    Okay.  And have you ever heard the

7    expression GIGO, G-I-G-O, that acronym?

8        A    No, I can't say that I have.  I

9    don't recall it.

10       Q    Garbage in, garbage out?

11       A    Oh, that I've heard of.

12       Q    Okay.  All right.

13       A    Yup.

14       Q    In other words, your decisions

15   could only be as good as what you're getting

16   from the people below you that you're relying

17   on.  Correct?

18             MR. COLLAZZI:  Objection.

19       A    That's correct.

20       Q    So in other words, you're assuming

21   that these people are doing good, proper,

22   adequate studies and analyses.  Correct?

23             MR. COLLAZZI:  Objection.

24       A    I was assuming it, but they also

25   were monitored by the FRA and the PTSB.  So I

203

1

2  assume that what they were doing was correct.

3       Q    Okay.  And when you say they were

4  monitored, let's say by the PTSB, they would

5  have to at times speak to the Transit

6  Authority, attend hearings or give testimony or

7  make written statements to the PTSB and the

8  FRA.  Correct?

9            MR. COLLAZZI:  Objection.

10      A    Yeah.  That among other things,

11 yes.

12      Q    Okay.  And you expected them to do

13 so in an honest and forthright manner.

14 Correct?

15            MR. COLLAZZI:  Objection.

16      A    Yes.

17      Q    And you expected them to be

18 complete, thorough and accurate and objective.

19 True?

20            MR. COLLAZZI:  Objection.

21      A    Yes.

22      Q    To the extent that the

23 representations made by representatives of the

24 Transit Authority to these oversight agencies

25 was less than honest, or less than complete, or

204

1

2    less than thorough, or less than accurate, it

3    would be less than reliable and valid.  True?

4              MR. COLLAZZI:  Objection.

5        A    I never -- I never really thought

6    of it.  I always thought they were always

7    truthful and honest, and still do.

8        Q    That's what you would expect them

9    to be.  Correct?

10       A    Exactly.

11       Q    Okay.  And if any representations

12   made to the PTSB were less than a hundred

13   percent accurate and honest, it would be less

14   than reliable.  True?

15             MR. COLLAZZI:  Objection.

16       A    If it was knowingly done, yes.

17       Q    And to the extent that any

18   representations made to the oversight agencies

19   were less than complete and accurate, it would

20   be less than reliable.  True?

21             MR. COLLAZZI:  Objection.

22       A    By definition I think that's true.

23       Q    Okay.  Now, when the Transit

24   Authority implemented its System Safety Program

25   Plan, it was supposed to track the impact of

205

1

2    the program over time.  Correct?

3              MR. COLLAZZI:  Objection.

4        A    To the best of my recollection,

5    yes.

6        Q    Okay.  And a key part of that is

7    what's called safety performance indicators.

8    True?

9        A    That's correct.

10       Q    Okay.  And in other words, you

11   would use these indicators and compare the

12   before and after, if corrective action is

13   taken, to see whether or not the corrective

14   action was effective.  True?

15             MR. COLLAZZI:  Objection.

16       A    Basically correct.

17       Q    Okay.  I mean what's the purpose of

18   a safety performance indicator then?

19       A    Say that again.

20       Q    What is the purpose of a safety

21   performance indicator?

22       A    Well, just to give you an idea of

23   how you're performing.

24       Q    Okay.  So -- okay.  And in fact,

25   you want to be able -- when you're trying to

206

1

2    analyze safety performance indicators, you want

3    it to be easily tracked.  True?

4              MR. COLLAZZI:  Objection.

5    A       Basically that's true, yes.

6    Q       Okay.  And what is a pilot program?

7    A       Say what?

8    Q       A pilot, P-I-L-O-T, pilot program?

9    A       It's basically a -- basically it's

10   a test program where you're trying to implement

11   something to see how it works.

12   Q       Okay.  So the purpose of it or why

13   you do it is what?

14   A       Well, to see, number one, you know,

15   how effective it is, what is its cost, what are

16   the implications, are there problems or issues

17   with what you're trying to do.

18   Q       So is a pilot project or program an

19   integral and vital part of a proper, adequate

20   and complete study?

21             MR. COLLAZZI:  Objection.

22   A       No.  Not always.

23   Q       Okay.  So in -- let's back up.

24   When you say not always, when would you want to

25   do a pilot project, when would you not?

207

1

2          A      I don't think there is a -- a

3    cookie cutter answer for that.  I would have to

4    evaluate on a case-by-case basis.

5          Q      Okay.  So in other words --

6          A      What are going to be the

7    implications to operations, what are -- what's

8    it going to take to do it, you know.  All kinds

9    of questions that come to mind.

10         Q      Okay.  So in other words, if you

11   know something based on research or studies or

12   published data is going to be effective, you

13   don't necessarily need to do a pilot project.

14   Correct?

15                MR. COLLAZZI:  Objection.

16         A      No.  Sometimes you still need to do

17   a pilot project.  It doesn't always work in

18   your environment, but it works somewhere else.

19         Q      So that's why to do an adequate,

20   proper, reasonable study for certain corrective

21   actions, you need to do the pilot project.

22   Correct?

23                MR. COLLAZZI:  Objection.

24         A      In some cases you need to do a

25   pilot project, some you don't.

208

1

2          Q     Okay.  Let's now discuss -- well,

3     if you don't do the pilot project, you don't

4     know the real world performance.  Correct?

5                MR. COLLAZZI:  Objection.

6          A     I'm not sure that that's a hundred

7     percent true answer.

8          Q     Okay.  Well, what percentage true

9     is that?

10         A     Well, you've got to look -- some

11    pilot projects you could say you can do it, but

12    if you look at your environment, you couldn't

13    even figure out how to do a pilot project.

14    They're just different environments you've got

15    to deal with.

16         Q     Okay.  Well, if you don't do a

17    pilot project, do you risk that you're just

18    guessing or speculating?

19                MR. COLLAZZI:  Objection.

20         A     I don't think so.

21         Q     Okay.  So there are times the

22    Transit Authority does pilot projects because

23    it deems it necessary to do so.  Correct?

24                MR. COLLAZZI:  Objection.

25         A     If it deems it's necessary and it's

209

1

2    one that you can figure out how to do and

3    manage it effectively.

4                (Whereupon, Andrew Keaveney entered

5          the Zoom Videoconference.)

6          Q    Okay.  So for example --

7                MR. GENIS:  Dave, can you please

8          put up Bates 7526?

9                MR. ROTH:  I'm sorry, Bob.  That

10         was 7526?

11               MR. GENIS:  7526.  Before he does

12         that -- actually, before you do that,

13         Dave, do you mind if we take a short

14         bathroom break?  I apologize.

15               THE WITNESS:  I'm ready to do that,

16         too.

17               MR. GENIS:  Okay.  It's 10:59.  All

18         right.

19               (Whereupon, a recess was taken from

20         10:59 a.m. until 11:04 a.m.)

21         Q    I'm just going to back up.  If you

22    knew from published data that something was

23    effective in promoting safety and preventing or

24    reducing death or serious injury, would you do

25    a pilot?

210

1

2         A     Well, you can't just broadly say
3    that, but generally, yes.
4         Q     Okay.  So when would you not do a
5    pilot?
6         A     Well, when you evaluate that it
7    would not be something that would work in your
8    system or be too complicated to install.  I
9    mean you could do that even before a pilot
10   sometimes.
11        Q     Well, how would you know if you
12   didn't try?
13        A     Well, you know, again, you're
14   asking a very broad, general statement to
15   apply, but there are times that whatever you
16   would evaluate just wouldn't fit in your
17   system.  Your system was designed -- the New
18   York City Transit Authority was 100 years old,
19   so it's not designed like systems are that were
20   built 34 years ago, and sometimes there just
21   wasn't the proper infrastructure or space to
22   allow you to install pilots.
23        Q     And to make that decision, first
24   you'd have to have an adequate and proper
25   study.  Correct?

211

1

2          A      Yeah.  Sometimes it doesn't take

3     that long to take a look at what you could do.

4          Q      I didn't say how much time was

5     spent, but I'm saying that -- that in order to

6     make the decision that a pilot project is not

7     necessary or should not be done, you'd first

8     have to have adequate -- an adequate and proper

9     study to reach that conclusion.  True?

10               MR. COLLAZZI:  Objection.

11         A      Well, no.  I did.  It just depends

12    on whether you even want to undertake such an

13    undertaking.

14         Q      Okay.  So if you're not even

15    interested in undertaking some sort of remedial

16    action, then you don't even bother doing the

17    study and there's no need for the pilot.

18    Correct?

19               MR. COLLAZZI:  Objection.

20         A      Broadly that's correct.

21         Q      Okay.  And when you mentioned a

22    moment ago that, you know, when you're dealing

23    with, for example, a 100 year old system,

24    that's different than something that's only 30

25    or 40 years old.  Correct?

212

1

2          A       That's correct.

3          Q       Okay.  And I'm going to talk about

4     this later on, but just it happened to come up

5     now, that there was a Second Avenue subway

6     project line that you were familiar with.

7     Correct?

8          A       Correct.

9          Q       And that was from scratch, brand

10    new.  Correct?

11         A       Correct.

12         Q       There was also a number 7 line

13    extension and that was also brand new.  True?

14         A       True.

15         Q       Okay.  So those would be

16    opportunities where something is brand new from

17    scratch, so you're not having your hands tied,

18    so to speak, by older systems that have poor

19    configuration that might be difficult to

20    implement change in.  True?

21         A       That's correct.

22         Q       Or challenging?

23         A       True.

24                 MR. GENIS:  All right.  Okay.  Now

25         let's go to Bates 7526.  And this is --

213

1

2          I'm going to show it from the top first,

3          if we can, please.

4          Q    So you see it's a memo on New York

5    City Transit letterhead dated November 30, 2001

6    to you as president from Cheryl Kennedy as vice

7    president of the Office of System Safety.

8    True?

9          A    Yes.  I see that.

10         Q    Okay.  And this is involving a

11   Platform Edge Safety Program proposal.

12   Correct?

13         A    It appears to be, yes.

14         Q    Okay.  And it says that there's a

15   Platform Safety Group's recommendation to

16   follow up on the recently concluded pilot

17   project.  Correct?

18         A    Yes.  I read that.

19         Q    Okay.  So this was a project to

20   see -- let's back up.  I just want to add a

21   couple things.  So by the way, Cheryl Kennedy

22   is vice president of the Office of System

23   Safety.  Was that the highest position in the

24   system of System Safety?

25         A    Yes, it was.

214

1

2          Q     Okay.  And so there was some sort

3    of Platform Edge Safety Group within the

4    Transit Authority?

5          A     Yeah.  That's the safety group -- I

6    think that was not a permanent group.  It was a

7    temporary group doing a study.

8          Q     Okay.  And if they did a study,

9    were they supposed to do an adequate and proper

10   study?

11         A     Yes.

12         Q     Okay.  And that's what you expected

13   them to do.  Correct?

14         A     Correct.

15         Q     And that's reasonable to expect

16   them to do an adequate and proper study.

17   Correct?

18         A     That is correct.

19         Q     And as we discussed earlier, the

20   most important part of an adequate and proper

21   study is that it followed the proper

22   methodology.  Correct?

23         A     Basically that's correct.

24         Q     Okay.  Because if a study doesn't

25   utilize proper methodology, it's an invalid or

215

1

2    unreliable study.  Correct?

3              MR. COLLAZZI:  Objection.

4    A     Basically that's correct.

5    Q     Okay.  And the methodology to be

6    utilized is what's set forth in the System

7    Safety Program Plan.  Correct?

8              MR. COLLAZZI:  Objection.

9    A     Again, the same answer as before.

10   I think that's correct.

11   Q     Okay.  And the methodologies that's

12   supposed to be utilized is in part of the

13   military standards we discussed a moment ago.

14   Correct?

15   A     Correct.

16   Q     And to comply and to utilize the

17   methodology of the Federal regulations and

18   PTSB.  Correct?

19   A     Basically correct.

20   Q     Okay.  And to follow good and

21   accepted engineering practices and procedures.

22   Correct?

23   A     Correct.

24   Q     To comply with engineering

25   professional standards of care.  True?

216

1

2              MR. COLLAZZI:  Objection.

3       A      Basically correct.

4       Q      And to comply with engineering best

5  practices and mass transit best practices.

6  Correct?

7       A      Again, basically correct.

8       Q      Okay.  And -- and when performing

9  an adequate and proper study, that would

10 include evaluating safety technologies.

11 Correct?

12             MR. COLLAZZI:  Objection.

13      A      Basically correct.

14      Q      Okay.  And those technologies would

15 be technologies that are available all over the

16 world.  Correct?

17             MR. COLLAZZI:  Objection.

18      A      Basically correct.

19      Q      And the studies would include

20 gathering information from other transit

21 agencies.  Correct?

22             MR. COLLAZZI:  Objection.

23      A      Yeah.  Where applicable.

24      Q      Sure.  Like you're familiar with

25 Comet.  Correct?  C-O-M-E-T.

217

1

2          A       No.  Not really.

3          Q       Okay.  The Transit Authority

4    belonged to Comet.  Correct?

5          A       I'm not -- I don't recall anymore.

6          Q       Okay.  And that's just because it's

7    been a long time so you're not really sure if

8    you remember it or not?

9          A       Yeah.  I just don't remember.  It's

10   been a long time.

11         Q       Okay.  Understood.  Understood.

12   But the Transit Authority, when you were there

13   and president, belonged to different various

14   transit associations around the world.

15   Correct?

16         A       Oh, correct.  Yes.

17         Q       Okay.  So you might not remember

18   the names of them in particular, but you

19   remember that they belonged to these groups.

20   Correct?

21         A       We belonged to lots of different

22   groups.

23         Q       Okay.  And you would get the

24   information from these different groups to

25   utilize in your studies.  Correct?

218

1

2          A      The Transit Authority would, yes.

3    Not necessarily me.

4          Q      Of course.  Of course.  And part of

5    studying any safety technologies for the

6    Transit Authority is the Transit Authority

7    would reach out to these other international

8    bodies as well.  Correct?

9          A      Correct.

10         Q      Okay.  Okay.  I want to get back to

11   this document.  So that there was this Platform

12   Edge Safety Group.  And who belonged to this

13   group?

14         A      I can't recall.

15         Q      Even if you don't remember the

16   names, I'm saying would this be the Office of

17   System Safety, would it be other departments as

18   well, would it be interdisciplinary or

19   something else?

20         A      It would definitely be -- the

21   System Safety would be taking the lead.  It

22   would no doubt include the Department of

23   Subways and a bunch of their different

24   departments, like RTO, Track Maintenance.  You

25   know, all the different groups.  Car

219

1

2    Maintenance.  All the different groups in

3    Subways as well.

4        Q    Okay.  And so these people would

5    have -- would perform -- let's back up.  So the

6    Platform Edge Safety Group is supposed to

7    perform adequate and proper study and analysis

8    and then make recommendations.  Correct?

9            MR. COLLAZZI:  Objection.

10       A    Basically correct, yes.

11       Q    Okay.  And -- and for example, in

12   this case they concluded a pilot project.

13   Correct?

14       A    Yes.

15       Q    Okay.  And in this one is when you

16   look for platform edge safety.  They did things

17   about the platform edge material and signs and

18   voice message systems.  Correct?

19       A    Yes.  That's what I'm reading, yes.

20       Q    Okay.  So when they -- so how is

21   the pilot performed here?  How is the pilot

22   project performed here?

23       A    I -- I -- I don't recall.

24       Q    Okay.  Is there a difference

25   between a sampling and a pilot project?

220

1

2          A      I don't know if I could correctly

3     answer that, but -- I don't -- I don't know

4     what sampling really means.

5          Q     Okay.  Well, for example, it says

6     they looked at 120 stations.  Correct?

7          A      Yes.  I'm reading that now.  Yes.

8          Q     Okay.  So looking at this document,

9     does it look like they actually analyzed 120

10    stations or did they just look at them and

11    determine what they would do?  What was done

12    here?

13         A      I don't know.  You'd have to ask

14    them what that meant.  I don't know.

15         Q     Okay.  Well, is a survey the same

16    thing as an adequate and proper study?

17         A      Generally, no.  A survey is more a

18    tertiary review to see if it meets certain

19    criteria.

20              MR. GENIS:  Okay.  And Dave, can

21         you just go to Bates, on this document,

22         7528?  I think it's the third page.  Go

23         up a little bit more, Dave, please.

24         Q     Okay.  So from this pilot --

25    withdrawn.  So for this Platform Edge Safety

221

1

2    Program recommendations, they made

3    recommendations using capital funds or other

4    sources of money to -- to make these changes.

5    Correct?

6          A      Yes.

7          Q      Okay.  And it was going to cost

8    millions of dollars to do so in just a number

9    of stations.  Correct?

10         A      That's what it says here, yes.

11         Q      So this was not for the complete

12   transit system for all the subway stations.

13   This is just some stations.  Correct?

14         A      Yes.

15         Q      Okay.  So this document that we're

16   looking at, we'll deem it Plaintiff's number 5

17   of today's date, is a recommendation.  Correct?

18         A      That is correct.

19                (Whereupon, Plaintiff's Exhibit 5

20         was marked for identification as of this

21         date.)

22         Q      Okay.  So a recommendation is

23   something looking forward.  Correct?

24         A      Right.

25         Q      And an evaluation is looking

222

1

2    backwards.  Correct?

3         A     Correct.

4         Q     And a pilot is an evaluation

5    looking backwards?  In other words, you've done

6    the pilot, you now see what it showed, you're

7    looking backwards.  Correct?

8         A     Correct.

9         Q     Okay.  Now, when they talked about

10   in this document, Plaintiff's 5, that edge

11   material, that's referring to those yellow

12   tactile strips.  Correct?

13        A     Yeah.

14             MR. COLLAZZI:  Objection.

15        A     Well, I use the term bumpy dots.

16        Q     Okay.  Bumpy dots.  And those bumpy

17   dots, that's -- that's something that was

18   required under the Americans with Disabilities

19   Act for blind people or visually impaired

20   people.  Correct?

21        A     That is correct.

22        Q     Okay.  And the reason they're bumpy

23   dots is because they can't see but they can

24   feel that -- those bumpy dots.  Correct?

25        A     With their cane.  Absolutely, yes.

223

1

2        Q    Okay.  Now let's see.  Let's get to

3   something else.  Can we agree that typically

4   the Transit Authority, when you were there

5   certainly, would hold back on about 150 to 200

6   train cars from service on a regular basis?

7        A    That would what?  I didn't hear

8   you.

9        Q    Sure.  Let's try that again.  Do

10  you agree that back when you were with the

11  Transit Authority, typically there would be

12  about 150 to 200 train cars either held back,

13  unreserved so to speak, on a regular basis?

14       A    Probably at least that, yes.

15       Q    Okay.  And when you say at least

16  that, how many cars, train cars would they hold

17  back from -- from -- on a regular basis from

18  service?

19       A    Well, you always had cars going in

20  for different maintenance reasons.  You know,

21  scheduled maintenance or, you know, some sort

22  of breakdown maintenance.  You would have at

23  least that many cars out of service.

24       Q    Okay.  Putting aside train cars

25  that are out of service for maintenance

224

1

2    purposes, did the Transit Authority ever have

3    other train cars at the ready, so to speak,

4    should they need them, you know, in an

5    emergency?

6         A    Yeah, they did.  That varied.  The

7    number varied all the time.

8         Q    Okay.  And cars that could be put

9    into service that were held back on a regular

10   basis would be about 150 to 200 train cars?

11        A    I don't recall the number, but that

12   could be reasonable.

13        Q    Okay.  All right.  And do we agree

14   that -- we touched upon briefly last time about

15   how if a train entering a station slows down as

16   it enters the station, you told us that that

17   could help it stop faster or at a shorter

18   distance and avoid running over people.  True?

19        A    True.

20        Q    Okay.  And do we agree that if you

21   slow down the entry speed of trains as they

22   enter the station, if you run more trains on

23   each line keeping the headways or the spacing

24   between the trains the same, that would not

25   impact the daily commuting schedule.  Correct?

225

1

2              MR. COLLAZZI:  Objection.

3       A      Say that again.

4       Q      Sure.  If -- if the trains entering

5    stations -- as they enter stations are slowed

6    down but you run more trains on each line

7    keeping the headways, the spacing between the

8    trains the same, that would not impact the

9    daily commute.  True?

10      A      Well, sometimes you can't do that.

11   With a train entering the station, you've got

12   to keep the other train behind it at a safe

13   distance.  So if you're slowing down the lead

14   train, you've got to slow down what follows.

15      Q      Okay.  But if you run enough

16   trains, then you're still able to move the

17   people and keep to the commute.  Correct?

18      A      If -- if physically you can run

19   enough trains, that's true.  I mean the math

20   works out, but sometimes the timing doesn't

21   work out.

22      Q      Okay.  Now, do we agree that the

23   Transit Authority had train simulators used to

24   train its operators?

25      A      Correct.

226

1

2          Q     Okay.  And -- and you told us

3     before -- and we talked about CWI, contact with

4     an individual.  You know, in other words, train

5     versus person.  Do you recall mentioning that

6     last time?

7                MR. COLLAZZI:  Objection.

8          A     Mentioning what?

9          Q     Let me try that again in English.

10    I'm sorry.

11         A     Yeah.

12         Q     We discussed before -- I believe

13    you said that when a train meets a person, the

14    train always wins.  Correct?

15               MR. COLLAZZI:  Objection.

16         A     Generally that's true.

17         Q     Okay.  And when there's contact

18    between a train and an individual, that's

19    called a CWI incident.  Correct?

20               MR. COLLAZZI:  Objection.

21         A     I don't remember the acronym

22    anymore.

23         Q     Okay.  Well, you told us that

24    you're aware -- that the Transit Authority has

25    known since essentially its inception that

227

1

2    there's a recurring problem for decades about

3    people getting hit by trains.  Correct?

4              MR. COLLAZZI:  Objection.

5         A    There has been problems for a long

6    time.

7         Q    Okay.  And when the trains run over

8    people, that's called -- you call that a man

9    under or a 12-9 incident.  Correct?

10        A    Correct.

11        Q    Okay.  And so do we agree since

12   this is a known recurring problem for decades,

13   would it comply with professional standards of

14   care to teach or train the train operators on

15   simulators on how to look out for and respond

16   to 12-9s?  In other words, seeing somebody on

17   the track or near the edge of the platform?

18        A    Generally that's correct.  But, you

19   know, there's always people on the platform, so

20   it's crowded.

21        Q    Okay.  So that's -- part of proper

22   training would be using the simulators to teach

23   them how to do this -- how to have a quicker

24   and better reaction time.  True?

25             MR. COLLAZZI:  Objection.

228

1

2          A       True.

3          Q       Okay.  Because you want them to be

4    able to react as fast as possible.  Correct?

5          A       Correct.

6          Q       And that would be one of the

7    purposes of training them on the simulators,

8    for people on the edge of the platform or on

9    the tracks.  Correct?

10         A       Yes.  As best you could, yes.

11         Q       Okay.  Did the TA train its

12   operators on simulators on how to look out for

13   and respond to 12-9s?

14              MR. COLLAZZI:  Objection.

15         A       You know, I don't recall anymore.

16         Q       Okay.  Did the Transit Authority

17   train its operators on simulators how to look

18   out for people on the edge of the platform to

19   avoid running them over or hitting them?

20         A       I don't recall specific training.

21   You would have to talk to the trainers.

22         Q       Okay.  Now, you're also familiar

23   with an entity called DMJM Harris.  Correct?

24         A       DMJM Harris?

25         Q       Yes.

229

1

2          A      Yes.

3          Q      Okay.  And who are they?

4          A      They were a consulting engineering

5    company.

6          Q      Okay.  And -- one second.  Okay.

7    And the Transit Authority, when you were

8    president, hired them to look at platform edge

9    doors.  Correct?

10         A      I don't recall that specifically.

11                MR. GENIS:  Okay.  Dave, can you

12         please put up Bates 3286?  We'll deem

13         that number 6.

14                (Whereupon, Plaintiff's Exhibit 6

15         was marked for identification as of this

16         date.)

17         Q      And while he's doing that, when you

18    said you were familiar with DMJM Harris, they

19    were a good and reliable company.  Correct?

20         A      Yes.

21                MR. COLLAZZI:  Objection.

22         A      Yes.

23         Q      I mean that's why the Transit

24    Authority hired them.  Correct?

25         A      Exactly.

230

1

2          Q      Okay.  You wouldn't have hired them

3    if they weren't professionally reliable.

4    Correct?

5          A      No, we would not.

6          Q      Okay.

7                 MR. ROTH:  For the record, this is

8                 Exhibit 6, 3286.  And the prior two

9                 exhibits were -- Exhibit 4 was 57599 and

10                Exhibit 5 was 7526, for the record on the

11                transcript.

12                MR. GENIS:  Thank you.  Okay.  And

13                Dave, if you would just scroll down a

14                little so we can actually see the

15                document.  Okay.

16         Q      Do you see it's on platform edge

17    doors, and you see it's February of 2003?

18         A      I can't read that because the box

19    is there, but I'll take your word.  All the

20    video boxes are over my date.

21         Q      Oh, that's weird.

22         A      There you go.

23         Q      Now you see it?

24         A      Now I see it.

25         Q      So you see it's February 2003?

231

1

2          A      Yes.

3          Q      And that's when you were president

4     of the --

5          A      Yes.

6          Q      -- Transit Authority.  Correct?

7     Okay.  And -- and so the whole thing was about

8     platform edge doors for this -- this -- this

9     paper.  Correct?

10               MR. COLLAZZI:  Objection.

11         A      That's what it says, yes.

12               MR. GENIS:  All right.  Let's jump

13          to page 6 which is Bates 3291.  Okay.

14          That's it.

15         Q      And you see the heading is safety.

16    Correct?

17         A      I see that.

18         Q      So -- and this is discussing the

19    safety benefits to platform edge doors.

20    Correct?

21         A      I think it is, yes.

22         Q      Okay.  So the first thing is that

23    when there's a platform edge door, there's a

24    lower risk of people falling or getting pushed

25    onto the tracks.  True?

232

1

2          A     That's what it says, yes.

3          Q     Okay.  And that would help prevent

4     or reduce the number of serious injury or death

5     caused by contact between a train and a person.

6     Correct?

7          A     Yeah.  I think it would reduce,

8     yes.

9          Q     Okay.  And that would reduce that

10    catastrophic injury that we discussed on that

11    risk matrix.  Correct?

12         A     Correct.

13         Q     Okay.  And it also -- the platform

14    edge doors would reduce the risk of draggings.

15    Correct?

16         A     Yes, it should.

17         Q     And then there would be fewer

18    accidents due to people or objects falling onto

19    the tracks.  Correct?

20         A     It should do that, yes.

21         Q     There would be improved air quality

22    from the platform edge doors.  Correct?

23         A     I'm not sure about that, but okay.

24         Q     Well, you see that's what they

25    wrote.  Correct?

233

1

2          A      I see that's what they wrote.

3          Q      Okay.  And it would have clarity of

4    public announcements.  Correct?

5          A      Correct.

6          Q      And reduce risk of tunnel fire.

7    Correct?

8          A      That -- see, that I don't

9    understand, but yeah.

10         Q      Okay.  Well, let's see if I can

11    help you then.  Because if you have a full

12    length platform edge door, it's harder to get

13    debris onto the tracks.  That would help reduce

14    the number of track fires.  Correct?

15         A      I wouldn't overrate that.

16         Q      Okay.  You have engineers that work

17    for you.  Correct?

18         A      Correct.

19         Q      And if those engineers told you

20    that platform edge doors can reduce the risk of

21    tunnel fires and fires on track beds, would you

22    agree to them and defer to them?

23         A      I'd probably ask for a little more

24    study than just that one bullet.

25         Q      Okay.  And do we agree that the

234

1

2   greatest safety benefit to the platform edge

3   doors is that it can help prevent or reduce

4   death or serious injury, catastrophic injury.

5   Correct?

6        A     Yeah.  The real idea behind the

7   platform doors is to reduce the number of

8   people that can get on the track bed.

9        Q     Okay.  And by doing that you reduce

10  the number of people that are either seriously

11  injured or killed.  Correct?

12       A     Correct.

13             MR. GENIS:  All right.  Dave, if we

14       can jump to page 10 which is Bates 3295,

15       please.

16       Q     And you see a bullet under the

17  heading of cost, there's reduced energy

18  consumption when this platform edge door is

19  used.  Correct?

20       A     I see that.

21       Q     And it's more effective ECS.

22  Correct?

23       A     What are they defining ECS as?

24       Q     That's what I was just going to ask

25  you.  What's ECS?

235

1

2          A      I don't know.

3          Q      Okay.

4          A      I don't know.

5          Q      Well, smaller ECS equipment,

6     whatever that is.  Right?

7          A      Whatever it is, yes.

8          Q      Okay.  And cleaner stations and

9     tunnels.  Correct?

10         A      Yes.

11                MR. GENIS:  Okay.  And let's go to

12         page -- can we go to page 26 which is

13         Bates 3311, please?

14         Q      Okay.  And for operations, do you

15    see they documented less chance of interruption

16    from objects or passengers.  Correct?

17         A      Correct.

18         Q      Train entry and exit speeds can be

19    optimized.  Correct?

20         A      Yes, I see that.

21         Q      Increased operational efficiency

22    and flexibility.  Correct?

23         A      I see that.

24         Q      Improve passenger supervision.

25    Correct?

236

1

2          A      Yes.

3          Q      Supports OPTO?

4          A      Yup.

5          Q      What's OPTO?

6          A      One person train operation.  That

7    one I remember.

8          Q      Okay.  I'm sorry.  What was OPTO?

9          A      One person train operation.

10         Q      Got it.  Improved recovery time?

11         A      I'm reading that, yes.

12         Q      Okay.  And do you agree with all

13   this?

14         A      What's that?

15         Q      Do you agree with all these things?

16         A      I'm not sure I agree with all of

17   them, no.

18         Q      Okay.  And so when less people get

19   hit by trains -- let's back up a second.  When

20   people get hit by trains, do we agree that that

21   causes a disruption and an interruption in

22   service?

23         A      Oh, absolutely.

24                MR. GENIS:  Okay.  And let me --

25         here we go.  Dave, can you please put up

237

1

2          Bates number 6925 for a second?  We'll

3          make that Plaintiff's Exhibit 7.

4                  (Whereupon, Plaintiff's Exhibit 7

5          was marked for identification as of this

6          date.)

7          Q      And while he's doing that, I'll ask

8   more questions.  So when we say that less

9   people getting hit by trains, that means less

10  delays.  Correct?

11         A      Correct.

12         Q      And that would be beneficial to the

13  operation of the transit system.  Correct?

14         A      Correct.

15         Q      And there are significant delays

16  caused by these incidents where trains hit

17  people.  True?

18         A      Yes.

19                MR. COLLAZZI:  Objection.

20         A      Absolutely.

21         Q      All right.  And we now have what we

22  deemed marked for identification Plaintiff's

23  Exhibit 7, Bates 6925.

24                MR. GENIS:  And can you just scroll

25          down so we can see the whole document,

238

1

2          Dave?  Okay.  And just go -- there we go.

3          Q     And so you see this is a chart of

4     people having, by year, number of incidents of

5     contact with trains and then number of delayed

6     trains.  Correct?

7          A     Correct.

8          Q     Okay.  And this was a document

9     provided to us by the Transit Authority.  And

10    it states on the bottom delayed trains based on

11    methodology as reported in monthly New York

12    City Transit committee books.  Do you have any

13    reason to doubt the authenticity of this?

14         A     No, I have no reason to doubt it.

15         Q     Any reason to doubt the accuracy of

16    this?

17         A     Say that again.

18         Q     Any reason to doubt the accuracy of

19    this document?

20         A     No.

21         Q     Okay.  And when you were at the

22    Transit, you had similar documents to this.

23    Correct?

24         A     Correct.

25         Q     Okay.  And it shows year by year

239

1

2    thousands and thousands of delayed trains

3    because of these incidents where people are hit

4    by trains.  Correct?

5         A    Correct.

6         Q    Okay.  So those are disruptions and

7    delays that would not occur if there -- if you

8    didn't have those contacts with individuals,

9    correct, by the trains?

10        A    Yeah.  If you could eliminate all

11   those, yes.

12        Q    Okay.  So that would help the

13   Transit be more efficient moving the people.

14   Correct?

15             MR. COLLAZZI:  Objection.

16        A    Correct.

17        Q    That would improve operations.

18   Correct?

19             MR. COLLAZZI:  Objection.

20        A    Correct.

21        Q    Okay.  Let's keep going.

22             MR. GENIS:  Dave, can you please

23        jump to page 32 of this document, which

24        is Bates 3317?  So we're back on

25        Plaintiff's 6.  I'm sorry.  Okay.  And

240

1

2          can you go to page 32, please, Dave,

3          which is Bates 3317?  Okay.

4          Q     And this professionally reliable

5    DMJM Harris that the Transit Authority hired

6    gave, in summary, the review of platform edge

7    doors for this study and report that they did

8    for you in 2003.  Correct?

9          A     Say that again.

10               MR. GENIS:  Just read it back.

11         Let's see if it's English.

12               (Whereupon, the referred to

13         question was read back by the Reporter.)

14         A     That appears correct, yes.

15         Q     Okay.  And for the benefits they

16   listed lower initial cost.  Correct?

17         A     I see that.

18         Q     Lower recurring costs.  True?

19         A     I see that.

20         Q     Increased safety and security.

21   Correct?

22         A     I see that.

23         Q     And safety, meaning that the

24   benefit is saving lives and limbs.  Correct?

25         A     I'm assuming that, yes.

241

1

2          Q     Okay.  And you told us last time

3     that safety for the people is the most

4     important thing to the Transit Authority.

5     Correct?

6          A     That's correct.

7          Q     And certainly when you were at the

8     Transit, saving lives and limbs and preventing

9     serious injury was the number one concern and

10    of paramount importance to the TA.  True?

11         A     Correct.

12               MR. COLLAZZI:  Objection.

13         Q     Okay.  So the most important

14    benefit of the platform edge doors is that it

15    helps either prevent or reduce the number of

16    deaths and serious injuries caused by contact

17    with trains.  Correct?

18               MR. COLLAZZI:  Objection.

19         A     That's the primary benefit, yes.

20         Q     Okay.  We'll continue going through

21    the other benefits.  That in addition to

22    increased safety and security, there's

23    increased comfort.  Correct?

24         A     Yes.

25         Q     Will help satisfy EO-111.  Correct?

242

1

2          A      I'm not sure what that is anymore.

3          Q      Okay.  And then it gives drawbacks

4     as well.  Correct?

5          A      Yes.  These are pretty general --

6     these are pretty general statements.

7          Q      Okay.

8          A      Lower initial costs than what?

9          MR. GENIS:  Okay.  Well, let's go

10          to the very next page now of this

11          document, which is page 33, Bates 3318.

12          Okay.

13          Q      And you see that your contractor

14     gave to you, correct, when they gave

15     recommendations?

16          A      I see that.

17          Q      And this is what the company that

18     you hired gave you.  Correct?

19          A      Well, when you say you, I didn't

20     hire them, but the Transit Authority hired

21     them.

22          Q      I'm sorry.  Okay.  So these are the

23     recommendations that -- the Transit Authority

24     hired a professionally reliable company and

25     this professionally reliable company issued

243

1

2    written recommendations to the Transit

3    Authority.  Correct?

4          A      It appears so, yes.

5          Q      Okay.  And then they requested to

6    conduct a platform edge door feasibility study.

7    Correct?

8          A      Yes, I see that.

9          Q      Okay.  Did you follow their

10   recommendation?

11         A      I don't remember seeing any of this

12   before.  So no, I couldn't tell you that.

13         Q      Okay.  Well, when you were at the

14   Transit Authority, did you order a feasibility

15   study for platform edge doors?

16         A      I can't recall anymore.

17         Q      Did anyone at the Transit Authority

18   while you were there perform a feasibility

19   study for platform edge doors?

20                MR. COLLAZZI:  Objection.

21         A      I can't recall anymore.

22         Q      Well, were you ever aware of an

23   alleged feasibility study for platform edge

24   doors conducted by or on behalf of the Transit

25   Authority while you were at the Transit

244

1

2    Authority?

3        A    I just don't remember.  It's been

4    so long.

5        Q    Well, that would be something

6    important if there was a feasibility study.

7    Correct?

8        A    Well, it would be important, but

9    there were a lot of important things going on,

10   and it's been sixteen years ago --

11       Q    Okay.

12       A    -- or longer.  This was twenty

13   years ago.

14       Q    Okay.

15       A    I have a good memory, but it's not

16   that good.

17       Q    That's okay.  Well, let me ask you,

18   at any time before you left the Transit

19   Authority in 2007 did they perform a proper and

20   adequate study that complied with the

21   professional standards of care about how to

22   best prevent or reduce contact with trains?  In

23   other words, trains versus individuals, 12-9,

24   man under, whatever you want to call it?

25            MR. COLLAZZI:  Objection.

245

1

2          A      I can't recall.

3          Q      Okay.  Well, did the Transit

4   Authority ever, while you were there, perform a

5   proper and adequate study that complied with

6   good and accepted practices and procedures

7   about the most effective way to prevent or

8   reduce death or injury caused by contact

9   between people and trains?

10              MR. COLLAZZI:  Objection.

11         A      I just can't recall.

12         Q      Did the Transit Authority ever

13  perform a proper and adequate study that

14  complied with that Military Standard 882 at any

15  time before you left in 2007?

16              MR. COLLAZZI:  Objection.

17         A      I can't recall.

18              MR. GENIS:  Now let's go to -- yes

19         -- no.  I want a different one first.

20         Okay.  Dave, can you please put up Bates

21         6671?  That will be number 8.

22              (Whereupon, Plaintiff's Exhibit 8

23         was marked for identification as of this

24         date.)

25         Q      And while he's doing that, DMJM

246

1

2    Harris, that wasn't the first job that the

3    Transit Authority hired them for.  Correct?

4              MR. COLLAZZI:  Objection.

5        A    No.  I'm sure DMJM -- DMJM Harris

6    has probably been hired for lots of jobs over

7    the years.  Yes.

8        Q    Okay.

9              MR. ROTH:  Can you state the Bates

10         number again, please?

11             MR. GENIS:  6671.

12        Q    And after that earlier DMJM Harris

13    report in 2003 that we looked at, they were

14    hired again by the Transit Authority.  Correct?

15        A    I don't know.

16        Q    Okay.  Well, let's take a look at

17    this one.

18             MR. GENIS:  That's not it.  Let's

19         see.  All right.  We're going to see --

20         let's go to the top so we can see what

21         this is.  Okay.

22        Q    Do you see this is from DMJM

23    Harris.  Correct?

24             MR. ROTH:  Hold on.  This is

25         Exhibit 8, 6671?

247

1

2            MR. GENIS:  Correct.

3      Q      All right.  So you're looking at

4  Plaintiff's Exhibit 8, 6671 Bates.  Do you see

5  it's from DMJM Harris?

6      A      I see that.

7      Q      Now, I understand it's December 11,

8  2007.  Do you see that?

9      A      Yes.

10      Q      Who was Anil, A-N-I-L, Parikh,

11  P-A-R-I-K-H?

12      A      Anil Parikh.  He was a program

13  manager inside the capital construction at the

14  TA.  Actually, the MTA capital company at that

15  time.  They had separated them into a separate

16  company.

17      Q      Okay.  And it says PE.  That means

18  he's a licensed professional engineer?

19      A      Yes.  He is a professional

20  engineer.

21      Q      And it's -- and it's from a

22  Christopher Bennett, also a licensed

23  professional engineer?

24      A      Well, that's what it says.  I don't

25  know Christopher Bennett.

248

1

2          MR. GENIS:  Okay.  Let's just go to

3      the very next page, which is Bates 6672,

4      for a second so we see what this is.

5      Q     Do you see this is a report on the

6  engineering services for the Second Avenue

7  subway in Manhattan involving feasibility of

8  installing platform edge doors at certain

9  stations?  Do you see that?

10     A     Can you shrink it?  I can't read

11  it.

12          MR. GENIS:  Make it smaller,

13      please, Dave.

14     A     There you go.  Yup.  I see that.

15  Okay.

16          MR. GENIS:  Okay.  And Dave, if we

17      can just jump to, it's Bates 6693 which

18      is page 15 of the report.  When we get

19      there, we're going to look at paragraph

20      6.2, costs.  Okay.  Can you make that

21      bigger so we can just see costs, Dave?

22      Okay.

23     Q     Now, do you see where it talks

24  about cost and it says, "The actual cost of the

25  platform edge doors themselves is not a

249

1

2    significant amount in the overall station

3    budget and it would be mitigated by the savings

4    in reducing mechanical and electrical

5    equipment"?  Did I read that accurately, sir?

6         A    I'm trying to read it right now.

7         Q    Okay.

8         A    Okay.  I see it.  I see the cost

9    estimate for the delay to do this here.

10         Q    Okay.  So do you agree with that

11    statement, that the actual cost of the platform

12    edge doors themselves is not a significant

13    amount in the overall station budget and would

14    be mitigated by the savings in reduced

15    mechanical electrical equipment?  Do you agree

16    with that?

17         A    I'm not sure I would agree that

18    it's not significant, but I see what it says.

19         Q    Okay.  And this again is the

20    feasibility report of -- and study by the

21    engineers that the Transit Authority hired and

22    found reliable.  Correct?

23         A    Yes.  That's from their report, as

24    I recall.

25         Q    Okay.  Let's see.  Now let's get to

250

1

2    the Second Avenue subway for a minute.  That's

3    something you were familiar with.  Correct?

4         A     Yeah.  Vaguely.  Sure.

5         Q     Okay.

6         A     I mean I kind of left before the

7    construction started.

8         Q     Okay.  But way before construction

9    starts, it had to be planned and approved and

10   all that kind of stuff.  Right?

11        A     Yes.  Absolutely.

12             MR. GENIS:  Okay.  And if we could

13        put up Bates 3358.  That will be

14        Plaintiff's Exhibit number 9.  3358.

15             (Whereupon, Plaintiff's Exhibit 9

16        was marked for identification as of this

17        date.)

18        Q     By the way, while we're waiting for

19   that, what was the total cost of the Second

20   Avenue subway project?

21        A     Oh, God.  I -- I -- I can't

22   remember now.  It was quite a bit of money.

23        Q     Like what's your best ballpark?

24             MR. COLLAZZI:  Objection.

25        A     You know, I hate to hazard a guess.

251

1

2   My memory is just not that current on those

3   numbers.  But it was, I'm sure, hundreds of

4   millions of dollars.

5          Q     Okay.  Well, was it billions of

6   dollars?

7                MR. COLLAZZI:  Objection.

8          A     Probably, but I can't -- I couldn't

9   swear to that.

10         Q     Okay.  That's fair enough.  Do you

11   think more than $6,000,000,000 for the Second

12   Avenue subway project?

13         A     I know the numbers kept going up,

14   you know.  But again, I left and I never -- I

15   don't remember, so --

16         Q     Okay.  All righty.  Well, we're

17   going to show you now portions of a Transit

18   Authority document, Plaintiff's Exhibit 9.  It

19   starts Bates 3358.  Do you see that it's about

20   the Second Avenue subway and platform edge

21   doors?

22         A     I see that.

23         Q     And it's dated June 18th of 2007.

24   Correct?

25         A     Yup.

252

1

2              MR. GENIS:  All right.  And now I'm

3         going to jump to -- let's see -- Bates

4         3366, page 9.

5         Q     While he's looking for that, when

6    did you leave in 2007 the Transit Authority?

7         A     My recollection, it was March of

8    2007.

9         Q     Okay.  So certainly before this

10   document was -- was published you were -- you

11   were aware of this document being prepared.

12   Correct?

13             MR. COLLAZZI:  Objection.

14        A     I can't -- I don't recall this at

15   all.

16        Q     Okay.  This is the type of thing

17   that the Transit Authority was supposed to

18   produce in the regular course of its business.

19   Correct?

20             MR. COLLAZZI:  Objection.

21        A     I think there was some type of

22   report, yes.

23        Q     Okay.  And you were certainly aware

24   of the project for Second Avenue.  Correct?

25        A     Oh, yes.

253

1

2      Q    And -- and while you might not

3  remember this report now, at the time this is

4  something that you would have been aware of,

5  correct, that this study was being done?

6            MR. COLLAZZI:  Objection.

7      A    You know, I don't specifically

8  remember this study.

9      Q    Okay.  And -- and you see on the

10  bottom of this page of 3366, page 9, it has the

11  logo for New York City Transit MTA and that

12  DMJM Harris.  Correct?

13      A    Right.

14            MR. GENIS:  And Dave, can you just

15        scroll up a little bit so we can see the

16        top of the page?  Okay.

17      Q    This is about the feasibility for

18  the installation of platform edge doors.

19  Correct?

20      A    Yes.

21      Q    Okay.  And there's a lot of work

22  going into this that would have been started

23  before you left the Transit Authority.

24  Correct?

25            MR. COLLAZZI:  Objection.

254

1

2          A      Oh, yes.  Yeah.  A lot of design

3   work had been going on, yes.

4          Q      Okay.  And for feasibility for

5   installation, it says the doors themselves can

6   be readily accommodated, but require

7   significant design changes to ventilation and

8   finishes.  Correct?

9          A      Yeah.  I -- I read that, yes.

10         Q      Okay.  And -- and you're aware that

11   there's been -- withdrawn.  And you have

12   engineers at the Transit that looked at these

13   issues for ventilation and finishes.  Correct?

14                MR. COLLAZZI:  Objection.

15         A      Correct.

16         Q      And you're aware that these

17   engineers felt that this was easily

18   addressed --

19                MR. COLLAZZI:  Objection.

20         Q      -- and dealt with.  Correct?

21         A      That -- that they what?

22         Q      That it was -- it was not difficult

23   to address the design changes for ventilation

24   and finishes.  Correct?

25                MR. COLLAZZI:  Objection.

255

1

2          A      Yeah.  It's a brand new station so

3    it would be a lot easier.  Yeah.

4                 MR. GENIS:  Okay.  And let's go to

5          the very next page, please, of this

6          Plaintiff's 9, Bates 337 -- I'm sorry,

7          3367, page 10.

8          Q      And the advantages, again, of the

9    platform edge doors is, first, enhanced public

10   safety.  Correct?

11         A      Yes.

12         Q      And -- and that -- and again,

13   enhanced public safety means either preventing

14   or reducing people from getting hit or run over

15   by trains.  Correct?

16         A      Right.

17                MR. COLLAZZI:  Objection.

18         Q      And it doesn't say that, but that's

19   what you understand it to mean when it talks

20   about enhanced public safety?

21         A      Yeah.

22                MR. COLLAZZI:  Objection.

23         A      It would reduce the number of

24   people that could get on the track.

25         Q      Okay.  So it would reduce the

256

1

2    number of deaths and people getting maimed.

3    Correct?

4            A     Correct.

5                  MR. COLLAZZI:  Objection.

6            Q     And then again another advantage,

7    after helping prevent or reduce catastrophic

8    injuries, is to reduce station energy

9    consumption.  Correct?

10                 MR. COLLAZZI:  Objection.

11           A     Yeah, because these stations were

12   going to be ventilated with air conditioning,

13   so it would help reduce energy consumption.

14           Q     And it would be a reduction in the

15   volume of trash on the tracks?

16           A     Again, I see that, but I'm not a

17   hundred percent convinced of that.

18           Q     Okay.  And platform maintenance

19   would be simplified as well.  Correct?

20           A     I don't quite understand that one

21   either, but okay, yes.

22           Q     Okay.  And the Transit Authority

23   was aware of these benefits back in 2003 from

24   that other report when you were president, as

25   well as in 2007 in this presentation.  Correct?

257

1

2        A      There were people inside the

3  Authority that had access to these.  I did not.

4  But people had access.  I didn't.

5        Q      Well, as president, you had access

6  to anything you wanted.  Right?

7        A      Well, I only had access to what I

8  wanted if I knew it existed.

9        Q      Okay.  And -- and back when you

10  were there, is this the type of document that

11  would have been hidden from you?

12        A      Say that again.

13        Q      When you were president of the

14  Transit Authority, is this document,

15  Plaintiff's Exhibit 9, is this the type of

16  document that somebody would have hidden from

17  you?

18        A      No.  I don't know that they would

19  have hidden it from me.

20        Q      All right.  Since the Second Avenue

21  subway project was a major project when you

22  were president, somebody would have brought

23  this to your attention, the reports and

24  findings of both the Transit and its

25  consultant, DMJM Harris, on this very subject.

258

1

2    True?

3              MR. COLLAZZI:  Objection.

4         A    Well, at the time it should surface

5    up to the top when they thought it was

6    appropriate, yes.

7              MR. GENIS:  Okay.  And when we go

8         to page 22, the last page of this report,

9         Bates 3379 --

10        Q    And by the way, while we're

11   flipping, this is part of the whole project,

12   and the consideration of these presentations

13   are something you should have known about.

14   Correct?

15             MR. COLLAZZI:  Objection.

16        A    I wouldn't know about this one

17   because I was gone.

18        Q    Okay.  Well, before this was

19   actually published, it was in its works?  It

20   took time to get this.  Correct?

21             MR. COLLAZZI:  Objection.

22        A    I couldn't answer that.

23        Q    Okay.  And you see that --

24             MR. GENIS:  Dave, can you just

25        scroll so we can see the top, please?

259

1

2          Q     Implementation recommendations.

3    And -- and there's options 1 and 2 are to

4    install -- option 1 is install the platform

5    edge doors in phase 1.  Do you see that?

6          A     I see that.

7          Q     Okay.  And option 2 is install the

8    platform edge doors in a later phase.  Correct?

9          A     Yes.

10         Q     Okay.  And by the way, when you're

11   saying you don't remember things, we've covered

12   a few times now that this is a long, long time

13   ago and that's why maybe you don't remember.

14   Correct?

15         A     Yeah.  It's a long time ago.

16         Q     Yes.  So it's not that at the time

17   you were not made aware of these things.  You

18   just don't remember at this point.  Correct?

19         A     I don't remember.

20         Q     Okay.  That's fair.  All right.  So

21   when they again were recommending the

22   implemen --

23              MR. GENIS:  You can take it down

24         now, Dave.

25         Q     When -- when there were

260

1

2   recommendations to install the platform edge

3   doors at this Second Avenue subway, you saw

4   those recommendations certainly.  Right?

5        A    No.  I wasn't there then.

6        Q    Okay.  Well, somebody at the

7   Transit Authority was certainly aware of these

8   recommendations.  Correct?

9        A    Well, I'm sure they were, yeah.

10       Q    Okay.

11       A    I don't know who at the time, but

12  yes.

13       Q    Okay.  And -- and -- and did -- did

14  the Transit Authority comply with these

15  recommendations?

16            MR. COLLAZZI:  Objection.

17       A    I'm sure they -- they accepted

18  or -- I don't know what they did, though.

19       Q    Okay.  Well, sir, to your

20  knowledge, did they ever put platform edge

21  doors in the Second Avenue subway?

22       A    No, I do not believe that they did.

23       Q    Okay.  All right.  I was about to

24  have Dave put up some documents, but I think he

25  had to step away for a second, so let's go to

261

1

2      some other questions while I'm waiting on this.

3      We already covered that.

4                Okay.  Let me ask you this.  Did

5      you have any say in whether or not there would

6      be platform edge doors anywhere in the New York

7      City Transit Authority?

8           A      I just can't recall.

9           Q      Okay.  By the way, are you familiar

10     with the person named Kachee, that's

11     K-A-C-H-E-E, Cheung, C-H-E-U-N-G?

12          A      Say that again.

13          Q      Are you familiar with, I'm going to

14     mispronounce the name, Kachee Cheung, first

15     name K-A-C-H-E-E, last name C-H-E-U-N-G?

16          A      Not -- it's not ringing a bell

17     right now, no.

18          Q      Okay.

19                MR. ROTH:  I'm back.

20                MR. GENIS:  Thanks, Dave.  All

21          righty.  Let's see.  Can we put up Bates

22          5664, and that will be number 10.  I

23          believe it's a two-page document.

24                (Whereupon, Plaintiff's Exhibit 10

25          was marked for identification as of this

262

1

2          date.)

3          Q     Actually, we'll start on the second

4    page because it's -- that's chronological order

5    is the second page.  So we're starting on Bates

6    5665 of Plaintiff's number 10.  And you're

7    familiar with Ken Brown and Robert Montfort.

8    Correct?

9          A     Vaguely, yes.

10         Q     Okay.  And let's -- do you see

11   there's an e-mail first from Ken Brown to

12   Robert Montfort on March 11, 2009 on platform

13   edge doors?  Do you see that?

14         A     I see that, yes.

15         Q     Okay.  And then above it there's a

16   response?

17              MR. GENIS:  Dave, can you just

18         scroll up a little so we can see it

19         better, please?

20         Q     Okay.  And then there's a response

21   by Robert Montfort to Ken Brown on March 12,

22   2009, and it says Ken, and it's regarding the

23   subject of platform edge doors, "This subject

24   is so political that I do not know who, if

25   anyone, will talk to other properties."  Did I

263

1

2    read that accurately so far?

3            A       Yeah, I see that.

4            Q       "There are many people totally in

5    favor of them and we have done considerable

6    study of them under Second Ave and 7 West with

7    our consultants, Don and I are totally for

8    their use, but there is no champion for their

9    use within the operating department."  Did I

10   read that accurately so far?

11           A       I'm reading it.

12           Q       Okay.  And then it says, "I think

13   every new subway around the world uses them

14   except New York City Transit."  Did I read that

15   accurately so far?

16           A       Yes.

17           Q       And that Don they're referring to

18   is Don Iannuzzi.  Correct?

19           A       I think that's who he is talking

20   about.

21               MR. GENIS:  Okay.  All right.  And

22           let's scroll up a little more, please.

23           You might have to go to the page before

24           while we're scrolling.  Keep going.  Keep

25           going.  Okay.

264

1

2          Q      And we now see another e-mail from

3    a Paul Sciara, S-C-I-A-R-A, to Don Iannuzzi.

4          A      I see that.

5          Q      And you see it cc's Ken Brown and

6    Cheryl Kennedy and Kachee Cheung, Robert

7    Montfort, Anthony DiFiore.  Do you see all

8    that?

9          A      Yes, I do.

10         Q      By the way, who was Don Iannuzzi?

11         A      You know, I don't remember his

12   title at the time, but I think he was, you

13   know, inside the Capital Program Management

14   Group.

15         Q      Okay.  And -- all right.  Could we

16   just -- and they're talking about that

17   feasibility study that was for Second Avenue.

18   That's one of those earlier studies that we

19   looked at in 2003.  Correct?

20               MR. COLLAZZI:  Objection.

21         A      I think that's what they're

22   referring to, yes.

23               MR. GENIS:  Okay.  Can you now,

24         Dave, scroll up higher?  Let's see.

25         Okay.

265

1

2          Q      Now there's an e-mail from -- hold

3      on.  Where did it go?  Okay.

4               MR. GENIS:  Can you go a little

5          higher, Dave, so we can -- there we go.

6          Q      Do you see this e-mail on Bates

7      5664 from Kachee Cheung to Paul Sciara and a cc

8      to Anil Parikh?  I can't --

9          A      Parikh.  Anil Parikh.

10         Q      Thank you.  And there's a March 13,

11     2009 on the platform edge doors.  Correct?  Do

12     you see that?

13         A      I see that.

14         Q      Okay.  And it states, "I will help

15     you as much as I can on this topic.  But I

16     suspect you may already have everything (the

17     feasibility report) that we have."  Did I read

18     that accurately so far?

19         A      Yes.

20         Q      Then it states, "Our conceptual" --

21     "our conceptual design scope of work did

22     include a study for the PEDs, the platform edge

23     doors."  Did I read that accurately so far?

24         A      Yes.

25         Q      "We did a study, recommended it to

266

1

2    the president (Mr. Reuter at the time), he

3    killed it (no way, no how).  That was the end

4    of it."  Did I read that accurately?

5          A    You read it accurately.  That's

6    what it said.

7          Q    Okay.  I'm going to scoot down to

8    the next paragraph.  "The agency asking you for

9    the platform edge doors information is probably

10   knocking at the wrong door.  It is like asking

11   the government of Ecuador how they deal with

12   snow removal in winter."  Did I read all that

13   accurately?

14         A    Yeah.  It's a pretty interesting

15   e-mail.

16         Q    Okay.  So let me ask you, is

17   killing platform edge doors something that you

18   had the power to do as president of the Transit

19   Authority?

20         A    Yes, I probably did.

21         Q    Okay.  Did you kill the platform

22   edge door program?

23              MR. COLLAZZI:  Objection.

24         A    You know, I can't remember.  I

25   don't even remember what this referred to.

267

1

2    This is written in 2009.

3        Q    Right.  So back when you were at

4    the Transit Authority and were president, did

5    you kill the platform edge door program?

6            MR. COLLAZZI:  Objection.

7        A    I don't remember killing them.  I

8    asked lots of questions at the time about how

9    they could be implemented in the system.  I

10   don't remember killing them, no.

11           MR. GENIS:  Okay.  Let's go to

12           Bates 4396, please.  And that's going

13           to -- 4396.  That's going to be

14           number 11.

15           (Whereupon, Plaintiff's Exhibit 11

16           was marked for identification as of this

17           date.)

18       Q    By the way, do you know who Lisa

19   Schreibman was?

20       A    Who?

21       Q    Lisa Schreibman, S-C-H-R-E-I-B-M-A-N.

22       A    No.  The name is familiar, but I

23   can't place it.

24       Q    How about John Gaul, G-A-U-L?

25       A    John Gaul I know, yes.

268

1

2          Q      Okay.  Who is he?  Who is John

3     Gaul?

4          A      John Gaul was inside RTO.  So was

5     Tony and Don.

6          Q      Okay.  And Peter Cafiero?

7          A      Yup.

8          Q      Okay.  Now I'm --

9          A      I remember Peter, but I can't

10    remember where he worked at the time.

11         Q      By the way, what's RTO?

12         A      Rapid transit operations.

13         Q      And we're looking at this e-mail,

14    and again it's Bates 4396, and it's Plaintiff's

15    Exhibit 11 today, and it's in September of 2011

16    from Lisa Schreibman to John Gaul, John Gaito,

17    G-A-I-T-O, --

18         A      Gaito.

19         Q      -- Peter Cafiero and Marva Brown.

20         A      Right.

21         Q      And it's regarding platform screen

22    door meeting.

23         A      Right.

24         Q      Do you see that?

25         A      I see that.

269

1

2          Q      I'm going to jump to the third

3     paragraph.

4          A      Okay.

5          Q      Do you see where it says, "Given

6     the surrounding politics, I want to bring you

7     all up to date on the issue as I can.  PSDs, as

8     you all know, are used in many other systems

9     around the world."  Did I read it accurately so

10    far?

11         A      Yes.

12         Q      Next sentence, "Under President

13    Reuter, PSDs were disallowed."  Did I read that

14    accurately?

15         A      Yes, you're reading it right.

16         Q      Okay.  "When he left NYC, New York

17    City Transit, PSDs were proposed for the number

18    7 line extension project and a preliminary

19    design was developed."  Did I read that

20    accurately?

21         A      Yes.

22         Q      "And then, however, by sometime in

23    2008 a decision to include them in the project

24    was needed."  Correct?

25         A      I see that.

270

1

2          Q     Okay.  Do you see at the bottom of

3     the page it states, "MTACC  wants to pitch a

4     way to install PSDs at the new number 7 line

5     station without running a pilot on an abandoned

6     station"?  Do you see that?

7          A     Where?  I see that.

8          Q     Okay.  All right.  So now we see

9     some more saying that you disallowed the PSDs,

10    the platform screen doors.  Correct?

11         A     Yeah.  I'm a very powerful person.

12              MR. GENIS:  And Dave, can you

13         please put up Bates number 1, actually?

14         This will be Plaintiff's Exhibit number

15    12.

16              (Whereupon, Plaintiff's Exhibit 12

17         was marked for identification as of this

18         date.)

19              MR. COLLAZZI:  Bob, that last

20         e-mail, what was the year on it?  Just

21         the year?

22              MR. GENIS:  Let me get it back up.

23    The year on that was 2011.

24              MR. COLLAZZI:  Thank you.

25              MR. GENIS:  You're welcome.

271

1

2          MR. ROTH:  The date on Exhibit 10

3      is 2009.

4          MR. GENIS:  Right.  So that -- we

5      did 10 and 11.  Well, we've done all of

6      that section.  Okay.

7          MR. ROTH:  Just for clarification,

8      Bob, you actually said 2011, so --

9          MR. GENIS:  Oh, I'm sorry.

10         MR. ROTH:  Exhibit 10, 5664, is an

11     e-mail from 2009.  Exhibit 1 is going to

12     be -- excuse me.  Exhibit 12, which is

13     Bates literally number 1, is from 2009.

14         MR. GENIS:  Okay.

15         MR. COLLAZZI:  I was asking about

16     11.  Bob was correct I think.

17         MR. ROTH:  Yeah.  The Bates 4396

18     was 2011.

19         MR. COLLAZZI:  Thank you.

20         MR. ROTH:  You're welcome.

21     Q    Okay.  So now we have on -- on the

22 screen Plaintiff's Exhibit 12, Bates number 1,

23 and you see it's an e-mail to Ken Brown from

24 Mr. Anil Parikh, how ever it's pronounced --

25     A    Parikh.

272

1

2          Q      -- Parikh, sorry -- regarding the

3     Second Avenue subway platform edge screen.

4     Okay.  And you see how it says, "Ken, as of

5     now, SAS is not installing platform screen

6     doors."  Did I read that sentence accurately?

7          A      You did.

8          Q      And this is in March of 2009.

9     Correct?

10         A      Yes.

11         Q      Okay.  What was SAS?

12         A      Second Avenue subway.

13         Q      Okay.  All right.  And by the way,

14    when we look to the e-mail below it, it talks

15    about an e-mail from Ken Brown to Mr. Parikh --

16    I just can't say that name, P-A-R-I-K-H.

17         A      Just call him Anil.

18         Q      Okay.  Anil.  That "Do you have

19    someone who is knowledgeable on platform edge

20    screens?  Received a call from another transit

21    property asking about this and specifically

22    about a possible pilot on the Second Avenue

23    line."  Do you see that?

24         A      I see that.

25         Q      Okay.  And now let's look at that

273

1

2     responsive e-mail where it says, "Second

3     Avenue.  As of now, Second Avenue subway is not

4     installing platform screen doors."  Correct?

5          A     I see that.

6          Q     And it says, "We've studied in 2002

7     and were told by New York City Transit

8     president not to install."  Do you see that?

9          A     I see that.

10         Q     Okay.  And you were the president

11    back then.  Correct?

12         A     I was.

13         Q     Okay.  And does that refresh your

14    memory now if you killed the project to have

15    platform screen doors?

16         A     Not really.

17         Q     Okay.  And does that indicate that

18    you did not want a pilot for platform screen

19    doors on the Second Avenue line?

20               MR. COLLAZZI:  Objection.

21         A     I just can't recall.

22         Q     Okay.

23               MR. GENIS:  Dave, can you go to

24         Bates 4400, please?  That would be number

25         13.

274

1

2          (Whereupon, Plaintiff's Exhibit 13

3      was marked for identification as of this

4      date.)

5          MR. GENIS:  Okay.  And I think we

6      have to start at the bottom again on this

7      one.  Going to the second page.  Let's

8      see.  Okay.  All right.  Now -- okay.

9      Let's see.  All right.  Let's start --

10     okay.  And Dave, if you could just go to

11     -- we can go to 4401, the next page,

12     please, and then we're going to work our

13     way up.  There we go.  Okay.

14         MR. ROTH:  Hold on a second.  Not

15     to interrupt, but this e-mail begins on

16     the first page.  That's why I have it up.

17         MR. GENIS:  Oh, I'm -- oh, my

18     apologies.  Okay.

19         MR. ROTH:  To look at it properly

20     you have to go here and then go down, and

21     then we'll go up after you cover --

22         MR. GENIS:  All right.  I stand

23     corrected.

24     Q    So we're looking at the e-mail that

25  starts on Bates 4400 and then continues on to

275

1

2    4401, and it's an e-mail from Lisa Schreibman

3    on September 15, 2011 to John Gaul, John Gaito,

4    Peter Cafiero and Marva Brown regarding a

5    platform screen door meeting.  Do you see that?

6          A    I see that.

7          Q    Okay.  And this is a similar, if

8    not the same, e-mail that we just looked at a

9    minute ago, correct, about how -- wanted to

10   bring people up to date on how the platform

11   screen doors all over the world, but was

12   disallowed under you.  Correct?

13              MR. COLLAZZI:  Objection.

14         A    It's -- it's jumping around a lot,

15   but okay, yup.

16              MR. GENIS:  Okay.  And can you just

17         go up -- let's see.  Okay.  All right.

18         Nothing -- can you just go back down

19         again, please, Dave?  I'm sorry.  You

20         know what.  I don't even need it.

21         Q    So let me ask you this.  You've now

22   seen a number of these different e-mails from

23   people at the Transit Authority.  These were

24   fairly high level people at the Transit.

25   Correct?

276

1

2          A      Yes.  Some of them were.

3          Q      And these people, were they

4    reliable people?

5          A      Yeah, they were reliable.

6          Q      Okay.  And do you have any reason

7    to disbelieve or doubt what they were saying?

8          A      I don't -- I -- I don't have any

9    reason to doubt, but I don't know where they

10   got all that information.

11         Q      Okay.

12         A      I mean I saw there where it said

13   the City of New York wants -- wanted to fund

14   it.  I don't even remember that.

15         Q      Okay.  And I'll gladly, if you'd

16   like, show you e-mails how there could have

17   been funding if you put in platform screen

18   doors.  Would that surprise you?

19         A      I couldn't hear you.  What?

20         Q      Would you be surprised if there

21   were documents that showed there could have

22   been funding for the number 7 extension if

23   platform screen doors were installed?

24         A      I -- I wouldn't be surprised about

25   anything.

277

1

2        Q    Okay.  So sir, I'm not asking you

3    whether you remember back then, but -- but do

4    you have any reason to doubt the truth of what

5    these people were saying in the e-mails, that

6    you killed platform screen doors?

7                MR. COLLAZZI:  Objection.

8        A    Well, you know, these -- these

9    memos that you're showing me were written two

10   to three years after I left.  All they had to

11   do was bring it up with the new president and

12   ask him and see if they would get a different

13   decision, if in fact I made that decision.

14               MR. GENIS:  Okay.  I just move to

15          strike those portions that are not

16          responsive.

17       Q    I'm not asking about the new

18   president.  I'm asking about you.  So would it

19   be fair to say that you, whether you want to

20   use the word killed, disallowed or vetoed, but

21   got rid of platform screen doors for any

22   Transit property while you were there?

23       A    The only thing that I really

24   remember telling in detail the Capital Program

25   Group is I wanted a -- a more thorough analysis

278

1

2      of what it would take to install systemwide if

3      we started to install platform edge doors,

4      because once you start to go down this road,

5      you need to be able to finish it.

6              Q      Okay.

7              A      That's the only -- and if that's

8      called killing the project, that may just be

9      somebody's terminology for asking for a better

10     analysis.

11             Q      Okay.  So you felt that the

12     analysis done up to that point was not adequate

13     and proper.  Correct?

14             A      That's correct.

15             Q      And while you were there at the

16     Transit, did anybody ever do an adequate and

17     proper analysis on the subject of platform edge

18     doors and preventing and eliminating -- let

19     me -- that's too many questions.  I'll break it

20     down.  While you were at the Transit, did

21     anyone ever do a proper and adequate study on

22     the topic of platform edge doors?

23             A      I'm not familiar with it.

24             Q      Okay.  And while you were at the

25     Transit Authority, did anyone ever do a proper

279

1

2    and adequate study on how to best prevent or

3    reduce 12-9 incidents from occurring?

4         A    Well, there were analyses done on

5    how to reduce them.  I don't know, you know,

6    whether it was totally thorough, you know, to

7    prevent them.  But yes, there were studies on

8    them.

9         Q    And from your -- withdrawn.  And

10   the studies all showed that the most effective

11   way of preventing or reducing 12-9s from

12   occurring is platform edge doors.  Correct?

13        A    I believe that's correct.

14        Q    And at the time you were given

15   information about how platform edge doors had

16   been installed in cities all over the world.

17   Correct?

18        A    I had seen them.  Yes.

19        Q    Okay.  And at the time --

20        A    I don't know if it's all over the

21   world, but a lot of systems have it, yes.

22        Q    Okay.  And you learned that -- when

23   you were at the Transit Authority, that the

24   platform edge doors were extremely effective at

25   preventing or reducing 12-9s from occurring?

280

1

2          A      Yes.  They were -- they were more

3     effective than a non, you know, covered

4     (interruption in the proceedings.)  A lot of

5     systems --

6                 THE REPORTER:  I'm sorry.  That

7           last answer cut out.  There is some

8           background noise.  I don't know if

9           anybody else is hearing it.

10                MR. GENIS:  I am hearing it, too.

11          Yeah.

12                MR. ROTH:  Can we go off the record

13          for a second?

14                MR. GENIS:  Yeah.  Let's stop the

15          clock at -- what time is it?  It's 12:19.

16                (Whereupon, a recess was taken from

17          12:19 p.m. until 12:25 p.m.)

18          Q      So Mr. Reuter, can you just

19     continue your answer?  We read back the portion

20     that the Reporter had before there was some

21     interference.

22          A      Yes.  Just the end of it was that

23     they -- they would be more effective than a

24     noncovered platform edge.

25          Q      Thank you.  Okay.  Let's talk about

281

1

2    money for a second.  There would be annual

3    budgets that you would have to do as the

4    president of the Transit Authority.  Correct?

5        A    Correct.

6        Q    Okay.  And -- oh, I forgot to ask a

7    couple questions.  By the way, we were talking

8    about some studies.  Had there been any

9    adequate -- withdrawn.  While you were at the

10   Transit, did anybody recommend to you that it

11   was feasible, at least in certain stations or

12   some places, to install platform edge doors?

13       A    Yes.  I believe they did, yes.

14       Q    Okay.  And so people -- you had

15   engineers recommending the installation of

16   platform edge doors.  Correct?

17       A    Yes.  Yes.

18       Q    And you had determinations of

19   feasibility from your engineers to install

20   platform edge doors.  Correct?

21       A    Some, yes.

22       Q    Okay.  And you could have requested

23   the money to get them installed if you wanted

24   to.  True?

25       A    Well, I could have requested, yes.

282

1

2          Q     Okay.  And had you requested the

3     money for installation of platform edge doors

4     to prevent or reduce the number of people

5     getting seriously injured or killed by contact

6     with trains, you would have gotten the funds.

7     True?

8                MR. COLLAZZI:  Objection.

9          A     I'm not sure.  I probably would

10    have had the same questions asked of me that I

11    was asking of them.

12         Q     Okay.  So let me ask you, were you

13    familiar with what's called BOT agreements,

14    B-O-T, build, operate, transfer?

15         A     It doesn't make -- no.  It doesn't

16    make an impact with me now.

17         Q     All right.  Well, let me ask you

18    if you would have been able to have a

19    program -- well, let's back up first.  If --

20    if -- if you wanted to get the funding to

21    install platform edge doors to prevent people

22    or reduce people from being killed or maimed by

23    contact with trains, you would have at least

24    tried to do so.  Correct?

25         A     Yes.

283

1

2          MR. COLLAZZI:  Objection.

3     Q     Okay.  And if there was -- if

4  anybody had proposed, in other words a

5  manufacturer of these platform edge doors, an

6  OEM that said you know what, we will do it at

7  little or no cost to the Transit in exchange

8  for advertising revenue on these platform edge

9  doors, is that something you would have

10  approved and agreed to?

11     A     I'm not sure.  I'd have to -- I'd

12  have to learn all the details of it.

13     Q     Okay.  Well, if -- if -- if

14  companies would say we can do this -- major

15  companies, the ones that manufacture and put

16  them in throughout the world, said we can do

17  this at little or no cost to the Transit in

18  exchange for the advertising revenue, just like

19  on bus shelters, would you have said hey, this

20  is a good idea?

21          MR. COLLAZZI:  Objection.

22     A     Well, if they could do it for the

23  whole system, then sure.

24     Q     Okay.  That's a win/win?

25     A     Yeah.

284

1

2          Q     Right.  Because then you're getting

3   safety for the public and at little or no cost

4   to the Transit.  Correct?

5          A     Yeah.  Mm'hm'.

6          Q     Okay.  All right.  And when you

7   would do annual budgets, there would be

8   categories in the budgets.  Correct?

9          A     Yes.

10         Q     And would one of the categories be

11  safety?

12         A     Yes.

13         Q     Okay.  And in terms of safety, how

14  much money, if any, was allocated for

15  prevention or reduction of 12-9s from occurring

16  when you were at the Transit in any given year?

17              MR. COLLAZZI:  Objection.

18         A     Well, I -- I couldn't recall that.

19         Q     Was it -- was it significant or

20  not?

21              MR. COLLAZZI:  Objection.

22         A     I can't recall.

23         Q     Okay.  By the way, I just want to

24  make sure, because before when I was asking you

25  a question, you might have said mm'hm' or

285

1

2  uh-uh, which is not the same thing as a yes,

3  and I think you intended to say yes.  When we

4  were on the subject if you would have gotten

5  large manufacturers, you know, Parsons,

6  Favorly, other companies, to install platform

7  edge doors at little or no cost to the Transit

8  in exchange for advertising -- in exchange for

9  advertising revenue, you would have said yes to

10  that.  Correct?

11         MR. COLLAZZI:  Objection.

12     A     Well, I would have definitely

13  wanted to have further discussions about

14  potentially proceeding forward.

15     Q     Okay.  That would make a lot of

16  sense.  Correct?

17     A     It could, but you've got to figure

18  out how you're going to do it systemwide, what

19  are the impacts and can it be done at all

20  stations.  There are just a lot of questions --

21     Q     Sure.

22     A     -- that you would want to have

23  answered.

24     Q     Okay.  And one of the things that

25  could have been done is different types of

286

1

2    safety devices at different stations.  Correct?

3         A     Correct.

4         Q     In other words, at one station you

5    might want one type of a protective barrier and

6    at another station another type of protective

7    barrier.  Correct?

8         A     That's possible, yes.

9         Q     Okay.  Or at one station, you know,

10   you might need to slow down the entry speed of

11   a train coming in or something else to help

12   prevent or reduce the incidents of these 12-9s.

13   Correct?

14              MR. COLLAZZI:  Objection.

15        A     Those are possibilities.

16        Q     Okay.  So what made the most sense,

17   the most rational thing to do was have a mix

18   and match approach.  Whatever is -- would be

19   the best solution for any given station is what

20   should be done for that station to help prevent

21   or reduce the number of 12-9s.  True?

22              MR. COLLAZZI:  Objection.

23        A     Well, it's hard to answer that

24   accurately, but generally, yes.

25        Q     Okay.  Because it made no sense to

287

1

2    ever take an all or nothing approach.  Correct?

3         A    Yes.

4              MR. COLLAZZI:  Objection.

5         Q    Okay.  And do you recall ever

6    being -- ever stating -- withdrawn.  Do you

7    recall ever stating that it had to be all or

8    nothing?  The same -- same devices throughout

9    the entire system or nothing?

10        A    I don't recall that.

11        Q    Does it sound like something you

12   might have said?

13        A    It could be a possibility, but I

14   just don't recall it.

15        Q    Okay.  So in other words, it does

16   not comply with good and accepted practices and

17   procedures to have a one-size-fits-all approach

18   for safety in the transit system due to its

19   very nature.  Correct?

20             MR. COLLAZZI:  Objection.

21        A    I -- I didn't understand your

22   question.

23        Q    Sure.  Let me try that again.  Do

24   we agree that according to good and accepted

25   practices and procedures and engineering

288

1

2    standards, a one-size-fits-all approach does

3    not make sense and does not comply with those

4    standards.  True?

5              MR. COLLAZZI:  Objection.

6        A    Well, a one size fits all would be

7    ideal because then it would make the training

8    so much simpler.  I'm not sure what you're

9    trying to get to.

10       Q    Sure.  But if you can't do a one

11   size fits all, then your choice is either --

12   well, let me ask -- no.  Too much coffee now.

13   So if -- if you're having a one-size-fits-all

14   approach, so it's all or nothing.  Correct?

15       A    Yes.

16       Q    And so if you can't do it all the

17   same way, that means it's nothing.  Correct?

18       A    Well, you'd want to evaluate what

19   the alternatives were, yes.

20       Q    Okay.  But if you don't do the

21   alternatives, if it's all or nothing, then

22   it's -- the answer is nothing.  Correct?

23             MR. COLLAZZI:  Objection.

24       A    Yeah.  I'm not sure that's the

25   answer, but you're right, if that's the answer,

289

1

2   yes.

3          Q     Okay.  That's why each -- because

4   of the different configurations of each

5   station, each station really needs its own

6   System Safety Plan.  True?

7                MR. COLLAZZI:  Objection.

8          A     Yes.

9          Q     Okay.

10         A     For the most part that's true.  You

11  could probably cookie cutter some.  Some would

12  be independent.

13         Q     Right.  So -- and that would be the

14  only thing that is rational and makes sense is

15  to have individual System Safety Program Plans

16  for each station for the ones that were not

17  uniform to others.  Correct?

18         A     Correct.

19         Q     And that's what would have been

20  required by professional standards of care.

21  True?

22                MR. COLLAZZI:  Objection.

23         A     Well, I'm not sure that is true,

24  but it would be what would be normally accepted

25  standards, yes.

290

1

2         Q     Okay.  That would certainly comply

3    with professional standards of care, to have

4    individual System Safety Program Plans for each

5    station.  Correct?

6         A     It could, yes.

7              MR. COLLAZZI:  Objection.

8         Q     Okay.  So when you were president

9    of the -- when you were at the Transit

10   Authority -- withdrawn.  When you were at the

11   Transit Authority, how much money was budgeted

12   annually in the terms of safety for prevention

13   or -- or reduction of 12-9s from occurring?

14             MR. COLLAZZI:  Objection.

15        A     I couldn't tell you that because

16   there's not just a separate category for that.

17   It's built into a bunch of different

18   departmental budgets, so I don't know.

19        Q     Now, when you're doing a budget,

20   you also have to look at all items.  Correct?

21        A     Correct.

22        Q     So did you also look at what the

23   cost of litigation were for the Transit

24   Authority?

25        A     Yeah.  We always -- we always

291

1

2    looked at that, sure.

3          Q     Okay.  And when you would look at

4    litigation costs, look -- withdrawn.  Part of

5    your job, as the head of a large entity --

6                MR. GENIS:  I'm getting a lot of

7          echo.  Are you guys hearing echo?

8                MR. ROTH:  Andrew has got to mute.

9                MR. GENIS:  I think he is muted.

10         You know what, it's --

11               MR. ROTH:  No.  He just muted and

12         now it's all better.

13               MR. GENIS:  Okay.  All right.

14         Q     Okay.  So let's get back.  Okay.

15   Part of your job of being the head of a large

16   entity is making the budget and seeing what the

17   costs and the benefits are.  Correct?

18         A     Correct.

19         Q     Fiscal responsibility.  Correct?

20         A     Correct.

21         Q     And you have to have anticipated

22   budgets for budget meetings.  Correct?

23         A     Have to have what?

24         Q     You would have anticipated -- you

25   would have your budgets and you would have

292

1

2    anticipated revenue and anticipated expenses.

3    Correct?

4            A    Correct.

5            Q    All right.  And -- because you have

6    to look at all of the costs of the transit

7    system.  Correct?

8            A    Correct.

9            Q    And part of your job is to explain

10   why you need money.  Correct?

11           A    Correct.

12           Q    And why you need money in different

13   categories.  Correct?

14           A    Correct.

15           Q    And you would make presentations.

16   Correct?

17           A    Make what?

18           Q    Presentations.

19           A    Yes.

20           Q    Okay.  And one of the things you

21   would look at is, for example, litigation

22   costs.  Correct?

23           A    Yes.  We would look at that, yes.

24           Q    Okay.  And that would be all kinds

25   of costs.  That would be lawyers, experts,

293

1

2    payouts, all kinds of things like that.  Right?

3                MR. COLLAZZI:  Objection.

4        A    That's correct.

5        Q    Okay.  You might also have things

6    like disability lawsuits, eminent domain,

7    environmental impact lawsuits.  Things of that

8    nature as well.  Correct?

9        A    Correct.

10       Q    And as president, you would

11   sometimes make decisions about short-term costs

12   over long-term.  Correct?

13       A    Correct.

14       Q    Okay.  And one of the things you

15   might look at is okay -- and then -- withdrawn.

16   I'm sorry.  And all monies for the Transit

17   Authority have to be accounted for.  Correct?

18       A    All the what?

19       Q    Monies for the Transit Authority.

20   All your expenses have to be accounted for.

21   Correct?

22       A    That's correct.

23       Q    You need to know here's what we're

24   spending on lawyers, here's what we're spending

25   on experts, here's what we're spending on

294

1

2    litigation, here's what we're spending on,

3    whether it be settlements or verdicts or

4    judgments.  Correct?

5                    MR. COLLAZZI:  Objection.

6         A      Correct.

7         Q      Okay.  And you would also then

8    look, okay, sometimes, for example -- sometimes

9    you would have to look at a cost benefit

10   analysis.  Correct?

11                   MR. COLLAZZI:  Objection.

12        A      Yeah, sometimes we would.  Yes.

13        Q      Okay.  So for example, you knew,

14   when you were head of the Transit Authority,

15   how many people every year were getting hit by

16   trains.  True?

17        A      Yeah.  Based on that report like

18   you showed earlier.

19        Q      You knew how many were killed, how

20   many were seriously injured.  Correct?

21        A      Correct.

22        Q      And you knew what it was costing

23   the Transit Authority to litigate these cases

24   where people sued over either death or serious

25   injury due to these 12-9s.  Correct?

295

1

2              MR. COLLAZZI:  Objection.

3        A     I don't remember ever seeing that

4    rolled up, you know, every year into just that

5    category, no.

6        Q     So how would it be rolled up?

7        A     Well, it would be in the whole

8    Legal Department's budget.  They would present,

9    you know, what -- what they -- what they

10   expended last year and what they were

11   requesting this year.  If there was a big

12   increase or whatnot, we'd want to know, you

13   know, what the changes were.

14       Q     Okay.

15       A     It was a more broader rollup than

16   what you're discussing.

17       Q     So you would see what the -- what

18   the total numbers were.  Correct?

19       A     I would see the total numbers.  The

20   budget people would go through the details.

21       Q     Okay.  And so litigation payouts

22   were part of the Legal Department budget.

23   Correct?

24              MR. COLLAZZI:  Objection.

25       A     I'm missing -- I have a little

296

1
2    feedback.  What was that?
3            MR. GENIS:  Andrew, it helps if you
4        mute, please.  It's causing the feedback.
5        Q    So litigation payouts were part of
6    the Legal Department budget.  Correct?
7        A    Yes.
8        Q    Okay.
9            MR. COLLAZZI:  Objection.
10       Q    And would those be line items in
11   the budget or something else?
12       A    No.  They would -- not in the
13   budget that would get presented to me.  They
14   would be rolled up into a lot broader category
15   for just Legal Department.
16       Q    Okay.
17       A    We had a Department of OMB, Office
18   Management Budget.  They would go through all
19   of the details by category, not me.
20       Q    Okay.  So then OMB -- so the Legal
21   Department would have to have their budget to
22   show the details to OMB.  Correct?
23       A    Yes.  Correct.
24       Q    Okay.  And if somebody, for
25   example, got hit by a train and the Transit had

297

1

2   to pay $10,000,000, $20,000,000 or something

3   like that, that would show up in your budget.

4   Correct?

5        A     It would show up in the budget.  I

6   don't know if it would be that type of debt,

7   but yes.

8        Q     Okay.  So if we wanted to find out

9   the amount of payouts for all the different

10  types of accidents that there were, we could go

11  to the Legal Department and ask for that

12  information.  Correct?

13             MR. COLLAZZI:  Objection.

14       A     That's where I would go, yes.

15       Q     Okay.  Who would have it more, the

16  Legal Department or OMB?

17       A     Well, both of them probably have

18  it, but I couldn't tell you now.

19       Q     Okay.  And you also knew what the

20  estimated costs were, assuming you didn't get

21  it for free or at little cost, to have safety

22  devices like platform edge doors installed.

23  Correct?

24       A     Well, I had some estimates for, you

25  know, what they had given us.  Not detailed.

298

1

2          Q       And was it your understanding
3      that -- that it would cost a lot more to
4      install platform edge doors throughout the
5      system than the Legal Department was spending
6      to defend these lawsuits where people were
7      suing over getting hit by trains?
8                       MR. COLLAZZI:  Objection.
9          A       I don't remember.  I don't remember
10     seeing that veto, but I suspect that is an
11     absolute true answer.
12         Q       So from a business perspective it
13     made more sense to just fight the lawsuits and
14     pay the cost of litigation than to pay the cost
15     of installing platform edge doors throughout
16     the system.  Correct?
17                      MR. COLLAZZI:  Objection.
18         A       I don't know if I would put it that
19     way.  I hear what you're saying.
20         Q       Well, do you agree with --
21         A       You also have to view what the --
22     the impact to the system with trying to do such
23     a project consisting of 470 stations.  It's --
24     it's a massive undertaking.
25         Q       I understand.  But is that

299

1

2    generally accurate what I said, that when you

3    would look at the budget, you'd say well, geez,

4    it would cost way more money to install

5    platform edge doors throughout the entire

6    system than we're spending on these lawsuits

7    and payouts.  Correct?

8                MR. COLLAZZI:  Objection.

9       A    I don't remember having those

10   discussions, you know --

11      Q    But it's accurate, what I'm saying.

12   Correct?

13      A    It could be.  I'm sure there were

14   discussions like that had somewhere.  I don't

15   remember having them, but yes.

16      Q    Okay.  And people would talk to you

17   about that, maybe, and tell you that hey, geez,

18   it just financially makes more sense for us to

19   just litigate these cases than it does to

20   install the platform edge doors, correct,

21   throughout the whole system?

22               MR. COLLAZZI:  Objection.

23      A    I don't remember having that

24   discussion with anybody.

25               MR. GENIS:  Okay.  All right.  Can

300

1

2          we just take a short break for a minute?

3          I'm sorry.  It's 12:45.  A short break.

4          Thank you.

5                 (Whereupon, a recess was taken from

6          12:45 p.m. until 12:56 p.m.)

7          Q     Let me ask you a question.  When --

8    do we agree that crowding or overcrowding of a

9    platform does not play any significant role in

10   12-9s occurring?

11                MR. COLLAZZI:  Objection.

12         A     Say that again.

13         Q     Do we agree that crowding or

14   overcrowding on a platform does not play any

15   significant role in the number of 12-9s

16   occurring?

17         A     No, I don't agree with that.

18                MR. GENIS:  Okay.  Well, in that

19         case, let's take a look at Bates 498135,

20         please.  That will be 14.

21                (Whereupon, Plaintiff's Exhibit 14

22         was marked for identification as of this

23         date.)

24         Q     And while he's doing that, I guess

25   I'll just ask some more questions.  So for

301

1

2    example, when there are 12-9s, in other words

3    people getting hit or run over by trains, there

4    are investigations and reports, detailed

5    reports prepared and created by the Transit

6    Authority.  True?

7          A     True.

8          Q     Okay.  And one of the things that

9    gets noted is, for example, the time of the

10   occurrence, the day of the week, things like

11   that?

12         A     Correct.

13         Q     Okay.  And so you could see, for

14   example, are certain stations more prone to

15   12-9s occurring than other stations?

16              MR. COLLAZZI:  Objection.

17         A     Correct.

18              MR. GENIS:  Okay.  By the way,

19         Dave, in case you didn't hear it, the

20         Bates was 498135.  That's 498135.

21         Q     So you'd be able to see, by what

22   station it was, the time of day, the day of the

23   week and, from the accident reports and

24   investigation, whether or not the station was

25   crowded, the platform was crowded at the time.

302

1

2    True?

3         A    Well generally, but not a hundred

4    percent.  Yes.

5         Q    Okay.  And that's something that

6    would be investigated to see is a cause of the

7    12-9, you know, overcrowding?

8         A    That's one of the things you would

9    look at, sure.

10        Q    Sure.  Okay.  So right off the bat

11   when -- when the TA did --

12             MR. ROTH:  Hold on one second.

13        Just so you know, I'm having some kind of

14        problem, some technical problem.  I

15        don't -- I'm not seeing the document, so

16        just give me one second.

17        Q    And did anybody ever show you any

18   report or study based on an analysis of the

19   actual hard data of the facts that showed that

20   overcrowding or alleged overcrowding of a

21   platform contributed to more 12-9s occurring?

22        A    I can't say as I recall seeing one.

23        Q    Was there ever such an adequate and

24   proper study prepared by the Transit Authority

25   that looked at the facts, the hard data that

303

1

2    said that overcrowding contributed to more

3    12-9s occurring?

4              MR. COLLAZZI:  Objection.

5        A    I don't recall.

6              MR. GENIS:  All right.  We're going

7         to -- we now have I think up on the

8         screen Plaintiff's Exhibit 14.  It's

9         Bates 498135.  And let's just -- we can

10        scroll from the top down to the bottom.

11        Dave, can you just scroll down, please?

12        Q    Okay.  All right.  We've scrolled

13   through this.  And do you see how that

14   according to these e-mails -- let's back up.

15   You remember who Glen London is.  Right?

16        A    Not really.  I remember the name,

17   but that's all.

18        Q    I remember you mentioned him last

19   time, that Glen London was fairly high up at

20   the Transit Authority.  Correct?

21        A    You know, I can't remember now.  I

22   just can't.

23        Q    Okay.  And how about Judith

24   McClain?  Who is she?

25        A    Who?

304

1

2          Q      Judith McClain.

3          A      I can't remember.

4          Q      Alison Becktel?

5          A      I can't remember.

6          Q      Jay Krantz?

7          A      I can't remember.

8          Q      Kevin Gurley?

9          A      I can't remember.

10         Q      David Greenberger?

11         A      I remember the name, but I can't

12    remember.

13         Q      Nathan Diaz?

14         A      Again, I remember the name, but I

15    can't remember.

16         Q      Well, when you see these e-mails,

17    do you see how people are noting that there is

18    a lack of linkage between crowding and

19    passengers struck by trains?

20         A      Well, I see that many of them are

21    arguing that (technical interruption in the

22    proceedings).

23              THE REPORTER:  I'm sorry.  I missed

24         your answer.  Mr. Reuter, if you could,

25         just repeat your answer.  I'm sorry.  I

305

1

2          didn't hear it.

3          A     I -- I see that many of them are

4    arguing that they believe that it didn't affect

5    the number of people struck by trains, but they

6    just said they were making their own argument.

7          Q     Okay.  So let's look at the hard

8    data and the facts.  Okay.  So for example,

9    what we --

10              MR. GENIS:  Let's put back up the

11         charts, because we have to be fair.

12         Dave, can you please go to the chart --

13         well, let's just hold on before we even

14         go to the charts.

15         Q     Do you see on here that even though

16   daily ridership plummeted by more than 75

17   percent due to the COVID pandemic, they had

18   more deaths and 12-9 incidents than they ever

19   did when ridership was higher?

20         A     Yeah, I see them saying that.  Were

21   these people shoved on the track?  I don't know

22   what the data -- what's in that data.

23         Q     Okay.  Well, whether somebody

24   falls, jumps or gets pushed, either way it's a

25   12-9 incident.  Correct?

306

1

2          A     Correct.

3          Q     And whether somebody falls, jumps

4   or gets pushed, that's the type of event that a

5   platform edge door prevents, correct, or

6   reduces.  True?

7          A     It could help.  It's not going to

8   necessarily stop somebody from pushing somebody

9   on the track.

10         Q     Well, if -- if there is literally a

11  door, a barrier between the -- the -- the edge

12  of the platform and the track, somebody gets

13  pushed, they get pushed into that door, they

14  don't get pushed onto the track.  Correct?

15               MR. COLLAZZI:  Objection.

16         A     As long as the door hasn't been

17  jammed open, yes.

18         Q     Right.  Okay.  So assuming the door

19  is closed as it's supposed to be, then the

20  doors would prevent people from getting pushed

21  onto the tracks.  Correct?

22               MR. COLLAZZI:  Objection.

23         A     It should -- it should prevent

24  that, yes.

25         Q     Okay.  And in fact, you're aware of

307

1

2    the platform edge doors at JFK.  Correct?

3                    MR. COLLAZZI:  Objection.

4        A     Only vaguely.  It's been so long

5    since I've been in JFK.

6        Q     Okay.  Well, let me ask you, have

7    you ever heard of a single person being pushed

8    into a train at JFK where they have those

9    platform edge doors, or the air train at

10   Jamaica station?

11       A     I -- I haven't followed it at all,

12   so I can't recall any.

13       Q     Okay.  Have you ever heard of a

14   single death or serious injury at either JFK or

15   the Jamaica station air train where there are

16   platform edge doors?  A single person getting

17   injured or killed at either of those places due

18   to the 12-9?

19       A     No, but I don't follow it so it

20   wouldn't be -- it wouldn't be something I'd

21   expect to know.

22       Q     Okay.  And when you told us you

23   sent people to Korea, you learned that they

24   went down to zero incidents of 12-9s in Korea

25   after they installed platform edge doors.

308

1

2    Correct?

3        A    I don't recall the numbers exactly.

4        Q    Okay.  And if there were other

5    records at the Transit Authority indicating

6    that most 12-9s occur at night or on weekends

7    when the stations are less crowded, that would

8    be indicative to you that crowding is -- is not

9    a -- a contributing factor in 12-9s?

10            MR. COLLAZZI:  Objection.

11       A    Well, that would be -- that would

12   be an indication of that, yes.

13       Q    Okay.  And if the 12-9s occurred at

14   stations that were less crowded, that would be

15   another indication to you that crowding of

16   platform -- withdrawn.  Bad English -- not

17   English.

18       A    It sounds reasonable.

19       Q    What?

20       A    It sounds reasonable.

21       Q    Okay.  And so in other words, you'd

22   expect that the busiest stations with the most

23   crowding, Grand Central and some of these

24   others, they would have the most number of

25   12-9s if crowding was the cause.  Correct?

309

1

2          MR. COLLAZZI:  Objection.

3      A     Well, you would think they would

4  have a high number, yes.

5      Q     Okay.  But that's not what the data

6  shows.  Correct?

7          MR. COLLAZZI:  Objection.

8      A     I don't know.  I don't recall the

9  data.

10     Q     And when you were there at the

11 Transit, did you -- were most of the 12-9s

12 during rush hour, when they're crowded, or not?

13     A     You know, I just can't remember.  I

14 don't know.

15     Q     Were the 12-9s at the busy stations

16 like Grand Central or more of them elsewhere,

17 more isolated stations with fewer people?

18     A     I don't remember.  They were all

19 over.  I just don't remember.

20     Q     Okay.  And when we looked --

21          MR. GENIS:  Dave, can you please

22      put up the chart that -- so we can just

23      see the ridership and the number of

24      incidents, let's say, from 2014 through

25      2021?

310

1

2          Okay.  Well, let's see.  Okay.

3     Well, you know, we've already covered

4     this topic and we already have the

5     records.  I'm going to move on.  Okay.

6     You know what?  I'm sorry.  I'm going to

7     have to take --

8          Off the record.

9          (Whereupon, an off-the-record

10    discussion was held.)

11         MR. GENIS:  It is 1:07.  We'll see

12    everybody in maybe twenty minutes, if

13    people don't mind.

14         THE WITNESS:  1:30?

15         MR. GENIS:  Sure, 1:30.  That

16    works.  Okay.  Thank you.  We'll see you

17    at 1:30.  Thank you.

18         (Whereupon, a recess was taken from

19    1:07 p.m. until 1:36 p.m.)

20    Q     All right.  When you were at the

21    Transit Authority, were all New York City

22    subway stations a hundred percent ADA

23    compliant?

24    A     No.

25    Q     How many of the subway stations

311

1

2    were a hundred percent ADA compliant when you

3    were there?

4         A    I can't remember.  I don't know.

5    Very few.

6         Q    Okay.  And is the Transit Authority

7    allowed to be noncompliant with the ADA?

8              MR. COLLAZZI:  Objection.

9         A    In the older system you have to

10   come into compliance as you renovate and modify

11   and build new systems.  Older stations would

12   stay noncompliant until you were able to

13   renovate them.

14        Q    And has the Transit Authority ever

15   applied for what's called waivers for the ADA?

16             MR. COLLAZZI:  Objection.

17        A    I can't recall.

18        Q    Okay.  That's something the Transit

19   Authority has the ability to do, is seek

20   waivers if they are noncompliant for a reason.

21   Correct?

22        A    Sure.  Yes.  Absolutely.

23        Q    Now, we mentioned briefly those

24   yellow tactile strips, those bumpy things that

25   you talked about before.  Do you remember that?

312

1

2          A       Bumpy dots.

3          Q       Bumpy dots.  That's it.  And

4  they're what, about 24 inches wide and supposed

5  to go from the edge of the platform 24 inches

6  into the platform?

7          A       Yes.

8          Q       Okay.  And do we agree that nobody

9  is supposed to actually stand on it, they're

10  only supposed to cross it to enter or exit the

11  train.  Correct?

12         A       Yeah.  You're really supposed to

13  stand clear of the tactile strip.

14         Q       And to be ADA compliant, you have

15  to have a certain amount of space from the edge

16  of the platform.  Correct?

17                 MR. COLLAZZI:  Objection.

18         A       To the door -- to the train, yes.

19         Q       Okay.  And does that amount of

20  space include the tactile strip or is it in

21  addition to the tactile strip or something

22  else?

23         A       It's in addition.  The tactile

24  strip doesn't always go to the edge of the

25  platform because you have a rubbing board on

313

1

2    the edge, so --

3        Q    So for the ADA compliance, is that

4    supposed to be 36 inches, more, less or

5    something else?

6        A    I don't remember the dimensions.

7        Q    The Transit Authority has many,

8    many stations with columns or pillars that are

9    closer to the edge of the platform so that they

10   are not ADA compliant.  Correct?

11              MR. COLLAZZI:  Objection.

12       A    That's correct.

13       Q    And then the Transit Authority has

14   stations with stairs and stairwells that are

15   within that distance from the edge of the

16   platform so they're not ADA compliant.

17   Correct?

18              MR. COLLAZZI:  Objection.

19       A    Some are very close to the edge of

20   the platform, yes.

21       Q    Similarly, there are stations with

22   elevators that are too close to the edge of the

23   platform so it's not ADA compliant.  True?

24              MR. COLLAZZI:  Objection.

25       A    The ones that have elevators, some

314

1

2    are pretty close.

3        Q    Okay.  So when the Transit

4    Authority has a station that's not ADA

5    compliant, what do they do in those

6    circumstances, or at least when you were there?

7        A    Well, if it's not ADA compliant,

8    you just try to do it with information and

9    signage to let people know, and then

10   ultimately, as that station undergoes a

11   renovation or upgrade, you try to accommodate

12   as best you can.  But many there's just not the

13   space.  You can't widen the station.

14       Q    Okay.  In other words, if there's a

15   column, can it be moved, sometimes yes,

16   sometimes no or never?  You tell me.

17       A    Sometimes yes, sometimes no, but

18   more no than yes.

19       Q    Okay.  Similarly, if there's a

20   stairway or an elevator, can they be moved?

21       A    Sometimes, but not -- not -- not

22   often.

23       Q    Okay.  So for example, where you

24   have a station that's already not ADA compliant

25   because, let's say, a column or a stairway or

315

1

2    something is too close to the edge, that's how

3    it is and you might not be able to do anything

4    about it.  Correct?

5         A     You may not ever be able to do

6    anything about it.  That's why you make station

7    announcements to stay clear of the platform

8    edge, and you try to do it with signage and

9    announcements.

10        Q     Okay.  So if a platform edge door

11   is installed and it uses a portion of that

12   yellow tactile strip, that does not change the

13   ADA status of the station.  True?

14             MR. COLLAZZI:  Objection.

15        A     Well, I think if you -- and I can't

16   state this as a fact, but I think you'd have to

17   get a waiver, you know, that the door is going

18   to impinge upon that tactile strip.

19        Q     Okay.  But like let's assume for

20   the sake of our discussion you have a station

21   where there's a column or a stairway or an

22   elevator that's already not ADA compliant

23   because it's too close to the edge.  If you

24   added or inserted a platform edge door, well,

25   it was already not compliant, it's still not

316

1

2    compliant, there's been no real change in its

3    ADA status.  True?

4              MR. COLLAZZI:  Objection.

5        A     Well, you'd -- you'd now have to

6    get approval or a waiver to do that because

7    you're making a modification at the station, --

8        Q     Okay.

9        A     -- you know, since ADA has been

10   passed.

11       Q     Okay.  So in other words -- so in

12   other -- you know, I'll make a silly example.

13   You can't get more pregnant.  Either you're

14   pregnant or you're not.  So --

15       A     Right.

16       Q     -- if you're already not compliant

17   on that ADA because the column or the

18   stairway --

19       A     You just froze.

20       Q     Oh, I'm sorry.

21       A     You just froze for a minute.  I

22   missed that.  Now you're back on.

23       Q     Okay.  So -- so let me back up,

24   because I'm not sure what you heard or didn't

25   hear.  What I was saying is I gave an analogy

317

1

2    that you can't get more pregnant.  Either

3    you're pregnant or you're not.  So either

4    you're ADA --

5          A     Correct.

6          Q     Right?

7          A     That's what I've learned in my

8    life.  Yes.

9          Q     Okay.  Same here.  So either you're

10   ADA compliant or you're not.  Correct?

11         A     Yes.  That's right.

12         Q     So in other words, if already that

13   column or that stairway or that elevator is too

14   close to the edge so that it's not ADA

15   compliant, by putting in that platform edge

16   door you're not changing the status.  You were

17   not ADA compliant and you're still not ADA

18   compliant.  True?

19               MR. COLLAZZI:  Objection.

20         A     That's true, but you still have to

21   get approval to do it.

22         Q     Okay.  How do you do that?

23         A     Well, you'd have to apply to the

24   FRA for a waiver and explain what you're doing,

25   why you're doing it, and why you can't meet the

318

1

2    ADA and try to get their approval to allow you

3    to install.

4        Q    Okay.  And probably if it was

5    already non ADA compliant to begin with, you're

6    not really changing anything substantively, not

7    taking away ADA compliance, so that the waiver

8    would get approved.  Correct?

9                MR. COLLAZZI:  Objection.

10       A    Well, you know, you can never

11   predict what the Federal Government is going to

12   do.  But I do think reasonably that would be

13   true.

14       Q    Okay.  I mean at -- when you were

15   at the TA, did you ever apply for ADA waivers?

16       A    Did I what?

17       Q    When you were at the Transit

18   Authority, did the Transit ever apply for ADA

19   waivers?

20       A    I -- I don't recall.  I just don't

21   recall.  Probably, but I don't know.

22       Q    Were any of them rejected?

23       A    I don't know.

24       Q    Okay.  So if -- if making a change

25   that makes the station safer for the public,

319

1

2    would that be a good grounds for applying for

3    an ADA waiver?

4              MR. COLLAZZI:  Objection.

5        A    Well, I would think that would be a

6    decent ground.

7        Q    Okay.  So if you thought you could

8    stop or reduce the number of people being

9    killed or harmed by 12-9s, that would be a

10   worthwhile thing to apply for that ADA waiver

11   of installing the platform edge door.  Correct?

12             MR. COLLAZZI:  Objection.

13       A    Well, possibly, yes.

14       Q    Okay.  Let's see.  We talked

15   briefly last time about root cause analysis and

16   we agreed that part of a hazard analysis is

17   performing a root cause analysis.  Correct?

18             MR. COLLAZZI:  Objection.

19       A    Correct.

20       Q    Okay.  And we went over the

21   different types of whether somebody falls or

22   gets pushed or jumps and how that common

23   denominator, the root cause, was always access

24   to the tracks from the platform.  Correct?

25       A    Yes.

320

1

2          Q     Okay.  All right.  Let's see.  When

3    you were at the Transit, did they ever look at

4    the costs of 12-9s?  You know, people getting

5    hit or killed by trains?

6               MR. COLLAZZI:  Objection.

7          A     I can't -- I don't recall that

8    specific.  I don't know.

9          Q     I'm going to go through different

10   types of costs.  One cost is due to the delays

11   and disruption of the system.  That's a cost.

12   Correct?

13         A     Correct.

14         Q     There is a cost of overtime to

15   employees.  Correct?

16         A     Correct.

17         Q     Some of the employees go out on

18   disability because of these 12-9s, they get

19   PTSD.  True?

20         A     Correct.

21         Q     There's employees that lose work

22   and you have to pay for treatment and things of

23   that nature.  Correct?

24         A     Correct.

25         Q     Okay.  Then there's the cost of the

321

1

2    lawsuits as well.  Correct?

3         A    Correct.

4         Q    And then you have people, if

5    they're injured or they die, there's a loss of

6    tax revenue because they're not working

7    anymore.  Correct?

8              MR. COLLAZZI:  Objection.

9         A    Well, that wouldn't be a loss to

10   us.

11        Q    Okay.  Well -- and if there's -- if

12   there's -- if the person is disabled and now

13   gets Medicaid or Medicare, Social Security

14   Disability, that's a cost to the Government.

15   Correct?

16        A    That would be correct.

17        Q    So did the Transit ever look at all

18   of these costs associated to people getting hit

19   by trains?

20        A    I can't recall.

21        Q    Okay.  Is that the type of thing

22   that should have been done by the Transit

23   Authority?

24              MR. COLLAZZI:  Objection.

25        A    Well, I don't -- I don't know.  I

322

1

2    mean I know parts of it were looked at, but I

3    -- I -- it may have been looked at.  I just

4    don't know.

5         Q    Okay.  Do we agree that part of the

6    job of the Transit Authority is to prevent

7    preventable harm?

8         A    What?  I missed that.

9         Q    Do we agree that part of the job of

10   the Transit Authority is to prevent preventable

11   harm?

12             MR. COLLAZZI:  Objection.

13        A    As best as possible.  Correct.

14        Q    Okay.  And do we agree it complies

15   with good and accepted practices and procedures

16   and professional standards of care to prevent

17   preventable harm?

18             MR. COLLAZZI:  Objection.

19        A    Basically that's true.

20        Q    And is it part of the job of the

21   Transit Authority to prevent foreseeable harm?

22        A    Basically, yeah, that's true.

23        Q    Okay.  Let's talk for a minute

24   about funding and budgets.  Let's do funding

25   first.  For example, how did the Second Avenue

323

1

2    subway get funding?

3          A      Well, Second Avenue subway gets

4    funded through Federal grants, State and --

5    part of the State MTA Capital Program.  So it's

6    a combination of, you know, different funding

7    sources.

8          Q      Okay.  And grants are something

9    that the Transit has to apply for to get the

10   money.  Right?

11         A      That's correct.

12         Q      So if you don't ask, you don't get.

13   Correct?

14         A      Exactly.  Yup.

15         Q      Okay.  And how long does that

16   process take when you apply for a grant,

17   whether it's the Federal Government, the State

18   or the City?  How long does it take from the

19   time you apply until the time they say yes or

20   no?

21         A      You know, I don't recall anymore

22   the time, but it was a rather lengthy process.

23         Q      Like years?

24         A      Usually, but it depended on the

25   size and the complexity.  Usually years.

324

1

2    You've got to get into their funding cycle, get

3    in their budgets.  It's a complicated process.

4        Q    So how do you go about doing it?

5    Like do you have to find out what are possible

6    grants or do you -- like tell me the process.

7        A    Well, the best person to tell you

8    that would be the MTA because they really

9    handle the -- the getting of the grants of the

10   Federal Government.  The TA didn't.  We

11   supplied information, but the MTA really was

12   the one who applied for the grants and did the

13   negotiations.

14       Q    When you were at the Transit, did

15   anybody ever apply for a grant from the Federal

16   Government for platform edge doors, barriers of

17   that type?

18       A    I don't recall that, no.

19       Q    Did anybody ever apply for a grant

20   for track intrusion devices?

21       A    For what?

22       Q    Track intrusion devices.

23       A    I just don't recall.

24            MR. GENIS:  Okay.  Dave, could you

25       kindly put up Bates number 5869392?

325

1

2          MR. ROTH:  Yes.  I'm doing that
3      now.  I'm missing -- this is Exhibit 15?
4      Is that what this is?
5          MR. GENIS:  Correct.  Yes.  It's
6      going to be 15.
7          MR. ROTH:  I apologize.  For some
8      reason I am missing exhibit -- I'm not
9      sure what Exhibit 12 is and what
10     Exhibit 14 is.
11         MR. GENIS:  I have the Bates
12     stamped numbers for them.  12 is number
13     1.
14         MR. ROTH:  Oh, 12 is number 1?
15         MR. GENIS:  Yes.  And 14 was
16     498135.
17         MR. ROTH:  Okay.  I'll fix that.
18     I'm sorry about that.
19         MR. GENIS:  No worries.
20         MR. COLLAZZI:  Well, what's the
21     current Bates number for 15?
22         MR. GENIS:  15 should be 5869392.
23         (Whereupon, Plaintiff's Exhibit 15
24     was marked for identification as of this
25     date.)

326

1

2          Q      While he's doing that, I'll ask

3    some other questions.

4          A      Okay.

5          Q      Let's see.  When you rehabilitate a

6    station, you should modernize it and bring it

7    up to current standards.  True?

8          A      That's basically correct, yes.

9          Q      Okay.

10               MR. ROTH:  It's up.

11               MR. GENIS:  Okay, great.

12         Q      Let's go to this.  All righty.  And

13   we're now showing you Plaintiff's 15, Bates

14   5869392.  And do you see how this is a 2008

15   grant for over $48,000,000?  Do you see that?

16         A      Yes.  I'm looking at it right now.

17         Q      Okay.  And it involves installation

18   of closed circuit TV, intrusion detection and

19   other matters.  Correct?

20         A      Yes.  That's what it says.

21         Q      Okay.  And in fact, after 911, the

22   Federal Government made a lot of grant money

23   available for closed circuit TV for security

24   purposes.  True?

25               MR. COLLAZZI:  Objection.

327

1

2          A      Well, you know, I wasn't there

3   after -- well, they did make -- they did make a

4   lot of money available for closed circuit TVs

5   and different detection programs, yes.

6          Q      And -- and, you know, these closed

7   circuit TVs could be dual purpose?  It could be

8   used for security, you know, so you don't have

9   to worry about terrorists, but it could also be

10  used for safety purposes as well.  Correct?

11              MR. COLLAZZI:  Objection.

12         A      Absolutely.

13         Q      So just like somebody applied for

14  grants for track intrusion detection devices,

15  grants could have been made to apply for money

16  for platform edge devices, barriers and things

17  like that.  Correct?

18              MR. COLLAZZI:  Objection.

19         A      Yes, it could have.

20         Q      Okay.  And did the Transit ever try

21  and get money for platform edge doors?

22         A      I don't -- I just don't recall.

23         Q      Okay.  Let's see.  Let's see.  We

24  were talking earlier about the budget and you

25  were telling us that each department would have

328

1

2    a detailed budget.  Correct?

3         A    Correct.

4         Q    And so for example, the Subway

5    Department would have details, let's say, for

6    overtime for each different position of

7    employee within its department.  Correct?

8         A    Correct.

9         Q    Similarly, Legal would have a --

10   a -- a detailed breakdown of its payouts and

11   things of that nature.  Correct?

12              MR. COLLAZZI:  Objection.

13        A    They had -- they had detailed

14   budgets.  I didn't necessarily see those

15   details.  But yes.

16        Q    So for example, one of the things

17   that a fiscally responsible head would do would

18   say okay, for example, are we paying out a lot

19   of money for -- for trip and fall cases because

20   of unsafe stairs, are we paying out a lot of

21   money because of excessive gap space between

22   the edge of the platform and the train car

23   door, are we paying out a lot of money on these

24   12-9s.  Things of that nature.  Correct?

25              MR. COLLAZZI:  Objection.

329

1

2          A      Well, similar -- similar type of

3     questions were asked, yes.

4          Q      Okay.  And this way you can

5     prioritize, you know, how to allocate your

6     budget to correct these things.  Correct?

7                 MR. COLLAZZI:  Objection.

8          A      Correct.

9          Q      So for example, if you see you're

10    spending a lot of money on excessive gaps, you

11    can make sure, okay, let's get the rubbing

12    boards in there to -- to minimize that gap

13    distance to prevent or reduce the number of

14    these incidents from occurring.  True?

15                MR. COLLAZZI:  Objection.

16         A      Correct.  You do that.

17         Q      You know, if the steps are broken

18    or the platform is broken, let's -- let's spend

19    some money to fix it so we don't have to pay

20    out all this money in injury claims.  Correct?

21                MR. COLLAZZI:  Objection.

22         A      Basically correct.

23         Q      And the same kind of thing is for

24    the 12-9s.  They could see what are they

25    spending on 12-9s to see how important that is

330

1

2    to remedy that situation.  Right?

3              MR. COLLAZZI:  Objection.

4        A    Again, I don't remember seeing that

5    kind of detail, though.

6        Q    Okay.  Well, it might not come up

7    to your level, but it would be in their

8    individual department budgets.  Correct?

9              MR. COLLAZZI:  Objection.

10       A    I would think so, yes.

11       Q    Okay.  Because they have to track

12   it and look for trends.  Correct?

13             MR. COLLAZZI:  Objection.

14       A    Say that again.

15       Q    You would -- you would want to --

16   when I say you, the Transit Authority would

17   want to keep track of it and look for trends?

18             MR. COLLAZZI:  Objection.

19       A    Yes.

20       Q    So for example, yup, we put in all

21   these rubbing boards, we have fewer gap

22   incidents, or we fixed all the stairs, we have

23   fewer trip and falls.  That kind of thing.

24   Right?

25             MR. COLLAZZI:  Objection.

331

1

2        A      We did that, yes.

3        Q      Okay.  And then you'd look at the

4    safety performance indicators for how many

5    people are getting hurt, more, less?  In other

6    words, are the improvements working?

7                MR. COLLAZZI:  Objection.

8        A      Generally that's correct.

9        Q      Okay.  And these are the things

10   that the Transit Authority would do, whether

11   it's Legal, OMB, to track all of these things.

12   Correct?

13               MR. COLLAZZI:  Objection.

14       A      Generally correct.

15       Q      Okay.  And then they can make that

16   business decision that, you know, we're

17   spending less on these 12-9 incidents than it

18   would cost actually corrected so let's just

19   keep the status quo.  That might be a business

20   decision you make.  True?

21               MR. COLLAZZI:  Objection.

22       A      Maybe.  I don't ever recall that

23   coming up, but it could be.

24               MR. GENIS:  Okay.  All righty.

25       Let's go to Bates 96046.  And if you need

332

1

2          time, Dave, I'll ask other questions so I

3          don't waste time.  I'll ask questions

4          while we're doing that.

5                  MR. ROTH:  It's coming up.

6                  MR. GENIS:  Oh, it's coming up.

7          Then I'm not going to.  Okay.  There we

8          go.

9                  MR. ROTH:  That's Exhibit 16?

10                 MR. GENIS:  Correct.  So let's put

11         16, and I'm going to write my Bates

12         number next to it, 96046.  Okay.  That's

13         Plaintiff's 16.

14                 (Whereupon, Plaintiff's Exhibit 16

15         was marked for identification as of this

16         date.)

17         Q      And this is a spreadsheet the

18   Transit Authority gave to us.  This is

19   involving man under incidents by year and with

20   specific details on a spreadsheet.  Do you see

21   this?

22         A      I see that.

23         Q      So this is something that the

24   Transit keeps close track of.  Correct?

25         A      Yes.

333

1

2        Q    And by having this kind of detailed

3    information, you could see what, if any,

4    stations you're having more 12-9 incidents at.

5    Correct?

6        A    You could, yes.

7        Q    You could see what, if any, times

8    of day 12-9s are occurring.  True?  It might

9    not be in this very same spreadsheet, but that

10    would be in the investigation of the accident

11    reports.  Correct?

12        A    Yeah.  You could go to the details

13    and find that information out.

14        Q    Right.  Okay.  And this way you

15    could even prioritize where you need to take

16    corrective action.  Correct?

17        A    Yes.

18        Q    Because you'd want to hit the hot

19    spots first, so to speak?  In other words, if

20    there's known locations with lots of 12-9s

21    occurring, you might want to try to fix that

22    before you tried to fix a station where nobody

23    ever got hurt.  Right?

24             MR. COLLAZZI:  Objection.

25        A    You'd like to try to figure out a

334

 1
 2    way to lower that number, yes.
 3         Q    Okay.  And did you ever try to do
 4    something like that when you were at the
 5    Transit?
 6         A    For -- for -- for which one?
 7         Q    For 12-9s.  To say, okay, you know,
 8    let's try to address 12 -- all right.  You know
 9    what?  I'm going to withdraw that.  Okay.  Let
10    me move on.  Let's see.  Okay.  Okay.  Now,
11    there were different challenges to installing
12    the platform edge doors.  Correct?
13              MR. COLLAZZI:  Objection.
14         A    Oh, yes.  Yup.
15         Q    And the engineers, that's part of
16    their jobs to figure out how to meet and
17    address those challenges.  Correct?
18         A    That is part of their job, yes.
19         Q    Okay.  And when you were at the
20    Transit, did they ever do a study to see how to
21    meet those challenges, how to best utilize
22    platform edge doors to protect the public?
23         A    I don't recall.
24         Q    Was there ever a study to say how
25    do we -- you know, what's the most effective

335

1

2    way we can do this?  Withdrawn.  That's a bad

3    question.  Did the Transit ever do a study to

4    say okay, here's how we're going to meet the

5    challenge so that we can successfully implement

6    it, put in these platform edge doors?

7                    MR. COLLAZZI:  Objection.

8         A     I don't recall that.

9         Q     Should something like that have

10   been done?

11        A     I'm not -- I'm not necessarily

12   sure.

13        Q     Okay.  Well, if you don't know how

14   to meet the challenges, how do you make a

15   decision whether or not to utilize something

16   that you know to be effective at preventing or

17   reducing 12-9s from occurring?

18                    MR. COLLAZZI:  Objection.

19        A     You have lots of challenges in

20   operating the New York City subway system, so

21   you had to deal with them, you know, on what

22   was the priority of the moment and deal with

23   them within the budget constraints.  So it's

24   not just -- it's not just a black or white

25   answer I'm afraid.

336

1

2          MR. GENIS:  Okay.  Just -- I'm

3     going to move to strike, with all due --

4     due respect.

5          Can you please read back the

6     question?

7          (Whereupon, the referred to

8     question was read back by the Reporter.)

9     Q     Would you kindly answer that

10  question, sir?

11     A     It's the same one.  There are lots

12  of challenges in the system.  One is just

13  running and operating the system efficiently.

14  You have to deal within the constraints of the

15  budgets and what's the pressing issues of the

16  day.

17     Q     Well, is -- is preventing people

18  from getting killed or maimed an important

19  issue of the day?

20     A     It is an important issue.  It's not

21  the only one, but it is an important issue.

22     Q     And that's a high priority.

23  Correct?

24     A     It's a priority, yes.

25     Q     Okay.  And if you see -- for

337

1

2    example, if you actually did an adequate,

3    proper study to see what the challenges were in

4    implementing platform edge doors, and you see

5    that for whatever reason it can't be done, then

6    you can go to the next best choice.  Correct?

7                MR. COLLAZZI:  Objection.

8        A      Theoretically you could do that.

9        Q      So if device A is too difficult to

10   use in a particular station, then you go to

11   device B.  If device B is not good for that

12   station, device C, et cetera.  Correct?

13               MR. COLLAZZI:  Objection.

14       A      That's a possibility, yes.

15       Q      Okay.  And that makes sense.

16   Correct?

17       A      Well, it makes sense, but again,

18   there's lots of pressing issues, so --

19       Q      Okay.  And -- and doing this, this

20   kind of hierarchy of meeting the safety needs,

21   complies with good and accepted practices and

22   procedures.  True?

23               MR. COLLAZZI:  Objection.

24       A      Basically that's true.

25       Q      And -- and this hierarchy of safety

338

1

2    and to meet the needs, that also complies with

3    professional standards of care.  True?

4         A    Again, basically true.

5         Q    Okay.  Do you know -- who is Myser

6    Negarashi?  I may be pronouncing --

7         A    Negarashi.

8         Q    That's him.

9         A    Myser Negarashi.

10        Q    Okay.

11        A    He was the -- well, he was the

12   senior vice president of Program Capital

13   Management, and he became the president of the

14   MTA capital company when they spun the capital

15   company off.

16        Q    Okay.  So you knew him.  Correct?

17        A    Oh, I knew him well.  I appointed

18   him to his job.

19        Q    Okay.  And you did so because he

20   was smart.  Correct?

21        A    Very smart.

22        Q    Knowledgeable?

23        A    Very good.

24        Q    Okay.  And in fact, Mr. -- Myser

25   Negarashi was a big proponent of installation

339

1

2  of platform edge doors.  True?

3          MR. COLLAZZI:  Objection.

4      A    I believe -- I can't say that for a

5  fact, but I believe he was.

6      Q    Okay.  And he was an engineer that

7  you respected.  Correct?

8      A    Oh, yes.  Mm'hm'.  Yes.

9      Q    And by the way, even if one can't

10  do high tech things or low tech, whatever you

11  want to call it -- withdrawn.  Bad question.

12  You're familiar with fixed rails as well.

13  True?

14      A    With what?

15      Q    Fixed rails.  I think we briefly

16  touched upon this last time.  Like at the south

17  ferry before they changed the station.  Right?

18      A    Yes.

19      Q    You know there's fixed rails at the

20  Times Square shuttle and other stations as

21  well.  Correct?

22          MR. COLLAZZI:  Objection.

23      A    Correct.

24      Q    Okay.  And fixed rails you know is

25  also an option to help reduce the number of

340

1

2   12-9s.  Correct?

3            MR. COLLAZZI:  Objection.

4        A     It helps, yes.

5        Q     Okay.  And -- and while fixed rails

6   maybe will not prevent 12-9s from occurring,

7   they can be effective in reducing the number of

8   12-9s occurring.  True?

9            MR. COLLAZZI:  Objection.

10       A     Very possible, yes.

11       Q     Okay.  And did the Transit ever try

12  to install more fixed rails at stations to

13  reduce the number of 12-9s?

14       A     I don't recall.

15       Q     Did you ever recommend that or

16  suggest it?

17       A     I don't recall.

18       Q     If Myser Negarashi said that it

19  would be good to put in fixed rails at stations

20  to help reduce the number or 12-9s, would you

21  agree with him?

22       A     Well, I would want to listen to him

23  and have him explain what his concept was.

24       Q     Okay.  And as a -- as a smart,

25  knowledgeable, reliable professional engineer,

341

1

2      would you defer to his judgment?

3            A      Well, for the -- for engineering

4      answers I would, yes.  But he's not operations

5      so I'd have to have multiple inputs, not just

6      his.

7            Q      All right.  Can you name a person

8      or an entity that did a study, an adequate and

9      proper study, to see how the challenges can be

10     met of installing some sort of device, whether

11     it be a platform edge door, a track intrusion

12     device, fixed rail, closed circuit TV, anything

13     to help prevent or reduce the number of 12-9s

14     from occurring?

15                  MR. COLLAZZI:  Objection.

16           A      I remember, you know, there were

17     certain recommendations made, but I don't

18     remember any big report like you're talking

19     about.

20           Q      Did anyone ever do a comparative

21     analysis to say well, if we do either a

22     platform edge door, this type of platform edge

23     door, that type, a gate, you know, all the

24     different types of safety devices that could be

25     utilized to help either prevent or reduce

342

1

2    12-9s?  Did anybody ever do that kind of

3    comparative analysis to see the relative

4    effectiveness of the different devices?

5              MR. COLLAZZI:  Objection.

6        A    I'm not aware of one.  I don't

7    know.  I just don't know.

8        Q    Was there ever some analysis that,

9    okay, here's the number of incidents that occur

10   when we have nothing and here's what it would

11   be if we had any or all of these devices?

12             MR. COLLAZZI:  Objection.

13       A    I'm not familiar with that, no.

14       Q    Okay.  Should such -- you know, the

15   studies I've just been talking about the past

16   two questions that you didn't remember or were

17   not aware of, do you agree that those type of

18   studies should have been done, you know,

19   comparative analysis, effectiveness analysis?

20       A    You know, that's a pretty broad

21   statement.  Again, there's just lots of

22   pressing issues.  I don't know that I could

23   just specifically call that one item out and

24   say yes.

25       Q    Well, but -- but if these items,

343

1

2      these kinds of studies can make it safer so

3      that people don't get killed or maimed, that

4      would be important.  True?

5                  MR. COLLAZZI:  Objection.

6         A    It would be important, but there

7      are other ways to try to mitigate it.  That's

8      what we were doing.

9         Q    Okay.  And -- okay.  And then

10     that's why you have to -- and by the way,

11     because things change over time, you have to

12     continually update your -- your studies.

13     Correct?

14                 MR. COLLAZZI:  Objection.

15        A    Well, if you have studies, you do

16     have to update them.

17        Q    Okay.  And that's what's required

18     by professional standards of care, is updating

19     the studies.  True?

20                 MR. COLLAZZI:  Objection.

21        A    Basically that is required.

22        Q    And that complies with good and

23     accepted practices and procedures as well.

24     True?

25                 MR. COLLAZZI:  Objection.

344

1

2          A      Yes.

3          Q      Okay.  And that's -- like we said

4    earlier, you have to do that analysis to see,

5    well, is whatever we did, is it effective, is

6    it actually preventing or reducing the number

7    of these incidents from occurring.  True?

8                 MR. COLLAZZI:  Objection.

9          A      That would be one of the things you

10   would do, yes.

11         Q      And that's -- that's what -- that

12   complies with professional standards of care.

13   True?

14                MR. COLLAZZI:  Objection.

15         A      That's true.

16         Q      In fact, that's required under

17   professional standards of care.  True?

18                MR. COLLAZZI:  Objection.

19         A      I believe it is, yes.

20                MR. ROTH:  Mr. Reuter, can you push

21         your laptop back a little bit?  Only half

22         of your head is showing.  Yeah.  Okay.

23                THE WITNESS:  That was the best

24         half.

25         Q      And if a study is done but it's not

345

1

2   an adequate and proper study, then it has to

3   be redone or done until it's done properly.

4   Correct?

5        A    That would be true.

6        Q    And from an engineering standpoint,

7   if every year the numbers don't change all that

8   much for how many people are hit by trains,

9   killed by trains, maimed by trains, from an

10  engineering standpoint do we agree that

11  whatever plan that had been implemented, it's

12  not adequate, not effective if the numbers are

13  not significantly changing?

14            MR. COLLAZZI:  Objection.

15       A    I'm not sure that's a fair

16  statement, but I understand what you're saying.

17       Q    Well, why isn't that a fair

18  statement?

19       A    Well, just like every year there's

20  so many people killed in automobile accidents.

21  There's just -- it's a business -- business

22  operation.  That's the way it works.  I mean

23  you can take a look at it.

24       Q    Okay.  So when you say automobile

25  accidents, do we agree that every year the

346

1

2    manufacturers try to make the cars safer and

3    they redesign them, they reengineer them?

4            MR. COLLAZZI:  Objection.

5        A    I don't know about every year, but

6    I think they do constantly try to upgrade their

7    safety features, yes.

8        Q    Okay.  And municipalities try to

9    make roads safer, better lighting, better

10   channelization, better markings, things --

11   better signage.  Correct?

12           MR. COLLAZZI:  Objection.

13       A    Right.

14       Q    Just like we mentioned last time,

15   if people are jumping off the George W Bridge,

16   they try to put a better, safer -- better

17   fences to prevent that from occurring.  True?

18           MR. COLLAZZI:  Objection.

19       A    They try that, yes.

20       Q    Okay.  So do we agree that -- that

21   it's part of the job of the Office of System

22   Safety to figure out what needs to be done,

23   what type of adequate, proper study needs to be

24   done to prevent or mitigate a known problem?

25           MR. COLLAZZI:  Objection.

347

1

2          Q      A known recurring problem like

3     12-9s?

4          A      Well, that would be their job, but

5     I don't know if it would be any known problem.

6     They would have to prioritize.

7          Q      Okay.  And do we agree it's the

8     responsibility of every transportation system

9     every year to try to increase safety and reduce

10    the number of people injured or killed in the

11    system.  True?

12         A      Yes.

13         Q      Okay.  Let's see.  And in terms of

14    decision makers, you were where the buck

15    stopped for the Transit Authority when you were

16    president.  Correct?

17                MR. COLLAZZI:  Objection.

18         A      Well, basically, but I had to

19    answer to the MTA and the MTA board, so --

20         Q      Okay.  And you know -- are you

21    familiar with what's known as an RFI?

22         A      You said what?  RFI?

23         Q      Yes.

24         A      Yes.

25         Q      Okay.  And --

348

1

2          A       Vaguely.

3          Q       Thank you.

4                  MR. GENIS:  Dave, could you please

5          put up, we'll make it number 17, the RFI

6          in this case.  And I'm sorry, I don't

7          have the Bates number.

8                  MR. ROTH:  I'm doing it now.

9                  MR. GENIS:  Okay.

10                 MR. ROTH:  This is going to be

11         Exhibit 17?

12                 MR. GENIS:  Correct.  And just put

13         the Bates number on it, please, also.

14                 MR. ROTH:  It's already on it.

15                 MR. GENIS:  Okay.

16                 (Whereupon, Plaintiff's Exhibit 17

17         was marked for identification as of this

18         date.)

19         Q       While he's doing that, would the

20     MTA generally defer to your opinions and

21     recommendations?

22                 MR. COLLAZZI:  Objection.

23         Q       Sir?

24         A       Okay.  I see it.

25         Q       Could you answer my question I just

349

1

2    asked, please?

3         A    I missed your question.

4         Q    No problem.

5              MR. GENIS:  Michelle, would you

6         kindly read it back?

7              (Whereupon, the referred to

8         question was read back by the Reporter.)

9         A    Generally.

10             MR. GENIS:  Okay.  And Dave, could

11        you just scroll down until we see the

12        Bates number on this document, please?

13        I'm sorry.  I see it on the top.  It

14        is --

15             MR. ROTH:  It's 1284.

16             MR. GENIS:  Right.  1284.  Okay.

17             MR. ROTH:  Just make a note this is

18        an NYCTA Bates number, not an NYCTA2

19        Bates number.

20             MR. GENIS:  Okay.  You got that,

21        Andrew?

22             MR. COLLAZZI:  Yes.

23             MR. GENIS:  Okay.

24        Q    And this is an RFI.  And you can

25   take a peek at it, sir.  It talks about how the

350

1

2    Transit wants to get information, firms

3    experienced in design, furnishing, installing

4    platform screen door -- edge door and things of

5    that nature for passenger safety.

6             MR. GENIS:  Dave, can you scroll

7         down a little bit where they talk about

8         the cost portion of it?  Let's see.

9         Let's see.  Here we -- wait.  There we

10        go.

11        Q    The financing.  Do you see where it

12   says project financing, sir?

13        A    Yes, I do.

14        Q    And it says, "New York City Transit

15   is considering cost sharing financing options

16   for a potential PSG/PED/PEG retrofit project

17   including design, build, operate, transfer and

18   advertising revenue sharing agreements.  New

19   York City Transit is particularly interested in

20   financing options involving little or no

21   upfront construction costs to New York City

22   Transit."  Do you see all that?

23        A    I do.

24        Q    And that's -- that makes sense.

25   Correct?

351

1

2          A      Well, that's a good starting point,

3      yes.

4          Q      Okay.

5              MR. GENIS:  Dave, can you now put

6          up, we'll make it number 18, the

7          committee response to all this?

8              (Whereupon, Plaintiff's Exhibit 18

9          was marked for identification as of this

10         date.)

11         Q      That was a great idea, that RFI.

12     That helps everybody.  Win/win.  Correct?

13             MR. COLLAZZI:  Objection.

14         A      What happened to it?

15         Q      He took it down.  But -- but the

16     idea of having private companies --

17             MR. ROTH:  Hold on a second.  Is

18         the question what happened to it meaning

19         what happened to the idea or what

20         happened to the document?

21             THE WITNESS:  What happened to --

22         to the RFI?  Did they get --

23         Q      That's what we're getting to, the

24     next document now.

25         A      Okay.

352

1

2          Q    Okay.  I know you're on the edge of

3    your seat right now, so --

4          A    I'm waiting.

5          Q    So we agree that kind of idea to

6    have private companies pay for everything at

7    little or no cost to the Transit in exchange

8    for ad revenue, that's a great idea that helps

9    everybody.  Correct?

10              MR. COLLAZZI:  Objection.

11         A    Well, it is a great idea.

12              MR. ROTH:  This is Exhibit 18,

13         NYCTA2 618.

14         Q    All right.  And this is the

15   Platform Screen Door Task Force.

16         A    Okay.

17         Q    And this is the evaluation summary

18   of responses received in response to that RFI.

19         A    Okay.

20         Q    And they received twelve responses

21   from companies.

22              MR. GENIS:  Dave, can you scroll

23         down so we can see it all, please?

24         Q    From some of the biggest companies

25   in the world.  Correct?

353

1

2          A      Yes.

3                 MR. GENIS:  Okay.  And let's keep

4          going, Dave, so that he can see the rest

5          of this, please.  Dave, can you scroll

6          down, please?

7          Q      Okay.  And these companies, you're

8    familiar with these companies?  These are

9    large, well-known, big companies.  Correct?

10                MR. COLLAZZI:  Objection.

11         A      Most of them.  Not all of them.

12         Q      Okay.  Okay.  And you see they

13   wanted to make sure that they were an original

14   equipment manufacturer or a subsidiary of one

15   or -- and they give the different things that

16   they are looking for.  Correct?

17         A      Yes.

18                MR. GENIS:  All right.  Can you

19         keep going, Dave?  Let's get to the

20         bottom line here.

21         Q      By the way, why is it important

22   to -- to be an original equipment manufacturer?

23         A      Well, you really want to make sure

24   that the people that you're hiring know the

25   system inside and out so that they are not

354

1

2   going to be ultimately blaming somebody else

3   for any problems when they install it.

4        Q    Okay.  And -- and when these big

5   companies, you know, said that they can do it,

6   and in fact, after looking at the thing, this

7   committee for the Platform Screen Door Task

8   Force unanimously agreed that at least four of

9   the companies responding gave acceptable

10  responses and recommended that they get

11  involved, correct, included?

12       A    I see that.  They did recommend it,

13  yes.

14       Q    Okay.  And when we have these --

15  some of the biggest companies in the world,

16  there's no reason to think that they couldn't

17  do what they say they could do.  Correct?

18            MR. COLLAZZI:  Objection.

19       A    Well, don't -- don't take them at

20  their word just because they're the biggest

21  companies.  We had some of the biggest

22  companies have lots of problems in New York.

23       Q    Okay.  And that's why, for example,

24  the Transit sent people all over the world,

25  into Korea and to other places?  And in Seoul

355

1

2    Korea in fact, that's exactly what was done,

3    was one of these companies did it at no cost to

4    the Koreans in exchange for the ad revenue.

5    Correct?

6                MR. COLLAZZI:  Objection.

7         A    Right.  That -- that gives it a

8    very positive evaluation to start with, yes.

9         Q    Okay.  So Transit was able to see

10   this has been done before successfully.

11   Correct?

12        A    Yeah.  In other systems, yes, it

13   has.

14               MR. GENIS:  Okay.  All right.  You

15            know what, if I can just have a minute or

16            two to go through my notes, because I may

17            be either done or towards the end.  So if

18            I can just have -- we're going to go off

19            the record for a minute.  It's 2:21.

20            I'll come back in a couple minutes.

21               (Whereupon, a recess was taken from

22            2:21 p.m. until 2:24 p.m.)

23        Q    Do we agree that the Transit

24   Authority should conduct studies, adequate and

25   proper ones, to see how to reduce or best

356

1

2    reduce 12-9s from occurring?

3        A    Yeah.  I think that would be a

4    worthy project for them to do.

5        Q    Okay.  And they should look at

6    what's the most effective means of reducing

7    12-9s.  Correct?

8        A    They should look at that, yes.

9        Q    And they should do proper and

10   adequate studies for how to effectuate and best

11   effectuate any corrective actions that need to

12   be done to reduce 12-9s?

13       A    Ask that again.  I'm not sure I

14   understood it.

15       Q    It might not have been English.

16   Let me try it again.

17       A    Okay.

18       Q    So do we agree that the Transit

19   Authority should conduct adequate and proper

20   studies to see the best way to effectuate the

21   change, the corrective action to try to reduce

22   12-9s from occurring?

23       A    Well, I think they should look at

24   the best and all ways to reduce the 12-9s.

25       Q    And they should study how to best

357

1

2    implement corrective action and address the

3    challenges of implementing corrective action to

4    reduce 12-9s from occurring.   True?

5        A    Yes, they should.

6        Q    And they should do that comparative

7    analysis to see how many people get hurt or

8    killed from plan A, plan B, C, et cetera or do

9    nothing.   Correct?

10           MR. COLLAZZI:   Objection.

11       A    Well, they should look at that and

12   make an evaluation, yes.

13       Q    And then they should look at the

14   trends and the history and see what's worked,

15   what hasn't, what has been effective, what

16   hasn't been effective.   Correct?

17           MR. COLLAZZI:   Objection.

18       A    Can I ask you a question?

19       Q    Sure.

20       A    You showed that RFI and the four

21   companies.   What did they do with that?

22       Q    Nothing.

23       A    Nothing.   Okay.   Did they give a

24   reason?   Did they give a reason?

25       Q    Not that I've seen.

358

1

2                    MR. COLLAZZI:  Note my objection.

3          Q     I've been in search of.

4          A     Okay.

5          Q     Can you think of any reason that

6     they didn't do it?

7          A     I -- I -- I don't know.  If

8     somebody is willing to come in and try to give

9     you a proposal which should answer a lot of the

10    questions that you're asking, and do it for

11    free, if that's true, I'm not sure what the

12    answer is.

13         Q     Okay.  And you would learn about

14    the effectiveness of each of the different

15    types of safety devices and look at the safety

16    performance indicators to basically see how

17    many people were getting hit and killed or hurt

18    after the implementation.  True?

19                    MR. COLLAZZI:  Objection.

20         A     Well, you would look at that, yes.

21                    MR. GENIS:  I think I'm going to

22              say thank you very much and it was really

23              nice meeting you.

24                    I don't know, Andrew, if you have

25              any questions or not.

359

1

2            MR. COLLAZZI:  Yeah.  I just have a

3      couple of follow-ups.

4            MR. GENIS:  Okay.

5   EXAMINATION BY

6   MR. COLLAZZI:

7      Q    Mr. Reuter, you were talking about

8   the budget earlier and litigation costs.  What

9   litigation costs would you look at when you

10  were looking at the budget?

11     A    What I would look at.  I would look

12  at the rollup for all litigation costs.  You

13  know, I wouldn't look at the specific details.

14     Q    Okay.  Would you look at buses

15  compared to subways, or would that be --

16     A    Yeah.  They would be separate, but

17  it would really be just bus litigations and

18  subway litigations.

19     Q    How would that be put into your

20  budget that you looked at?

21     A    What?

22     Q    Tell me what exactly you looked at?

23     A    I -- I missed that again.

24     Q    Tell me what exactly was in the

25  budget that you looked at through your years as

360

1

2      president?

3           A      What mine would be is a very high

4      rollup of all departments including the Legal

5      Department.  You would be comparing the new

6      budget requests compared to last year, and then

7      you would -- if you saw some major differences,

8      you want to drill down to find out what was

9      driving the cost up or down.

10          Q      And did you ever specifically do

11     that?

12          A      Not on these costs, no.

13          Q      At your first deposition you

14     testified that you worked for Parsons

15     Brinkerhoff.  Is that correct?

16          A      I missed your question again.

17          Q      At your first deposition you

18     testified that you worked for Parsons

19     Brinkerhoff.  Is that correct?

20          A      Yes.  After I left the Transit

21     Authority.

22          Q      And you worked on the Dulles

23     corridor to Washington Metro?

24          A      Yes.

25          Q      Does -- the Dulles corridor, that's

361

1

2   new construction.  Isn't it?

3       A     It is new construction.

4       Q     Does that have platform screen

5   doors?

6       A     Not that I -- not that I know of.

7   Not when I was there.  Neither did Washington

8   Metro.  I ran Washington Metro.  It doesn't

9   have platform doors, either.

10      Q     Is Washington Metro a newer system

11  than New York City Transit?

12      A     A lot newer.  Yes, absolutely.

13      Q     And the Dulles corridor extension

14  to Dulles Airport, that was just recently

15  completed.  Is that correct?

16      A     Yeah.  It was I think within the

17  last five, eight years.  Something like that,

18  yes.

19      Q     And that doesn't have platform

20  screen doors.  Correct?

21      A     No, it does not.

22      Q     And that's the same type of heavy

23  rail system used in New York City Transit.  Is

24  that correct?

25      A     It's what?

362

1

2          Q     That's the same type of heavy rail

3     system that is used in New York City Transit.

4     Is that correct?

5          A     That's correct.

6                MR. COLLAZZI:  Okay.  Thank you.

7                THE WITNESS:  Okay.

8                MR. GENIS:  A couple quick

9          follow-ups for me.

10    FURTHER EXAMINATION

11    BY MR. GENIS:

12         Q     Do two wrongs make a right?

13         A     What's that?

14         Q     Do two wrongs make a right?

15               MR. COLLAZZI:  Objection.

16         A     Who?

17         Q     Two wrongs make a right?

18         A     Oh, beauty is in the eye of the

19    beholder, okay.

20         Q     Okay.  So I don't know about you,

21    but when I was a kid, my mom used to tell me I

22    don't care if all the other kids jump off the

23    Brooklyn Bridge, you can't do it.  Did you ever

24    hear something like that?

25         A     I understand what you're saying.

363

1

2    But I think those systems were brand new so

3    it's a lot easier to do than New York City

4    Transit.  I mean it's a very old, complicated

5    system.

6              MR. GENIS:  Okay.  Just move to

7         strike as nonresponsive.

8         Q    But anyhow, let me get back to the

9    budget for a second.  Within each -- you're

10   looking at the general big budget, but within

11   each individual department you'd expect them to

12   have a lot of detail within their budget.

13   Correct?

14        A    Oh, absolutely.  Yes.  Yes.

15        Q    And then -- and then from each

16   section they'd have to give very granular

17   details and then it gets rolled up into a more

18   general one.  Correct?

19             MR. COLLAZZI:  Objection.

20        A    Yes.  That would all be gone

21   through with management and budget before it

22   would be forwarded up to me.

23             MR. GENIS:  Okay.  Thanks again.

24        It was really a pleasure meeting you,

25        sir.

364

1

2              THE WITNESS:  Thank you.  Nice

3         talking to you guys.  We're done now?

4              MR. GENIS:  We're done.  You have a

5         great day and a great weekend.

6              THE WITNESS:  Thank you.  You, too.

7              MR. GENIS:  Thank you.

8

9              (Time noted:  2:31 p.m.)

10

11

12              _____

13              LAWRENCE GEORGE REUTER

14

15

16

17    Subscribed and sworn to

18    before me this ____ day

19    of _____, 20____

20    _____

21         Notary Public

22

23

24

25

365

```
 1
 2                    I N D E X
 3
 4   TESTIMONY
 5   WITNESS              EXAMINATION BY      PAGE
 6   Lawrence George    Mr. Genis            156
     Reuter             Mr. Collazzi         359
 7                      Mr. Genis            362
 8
 9   EXHIBITS
10   PLAINTIFF
     EXHIBIT NO.   DESCRIPTION               PAGE
11
         4         Bates 57599, letter from   196
12                 NYC Transit Authority
                   dated 12/22/03 and attachments
13
         5         Bates 7526, memorandum dated  221
14                 11/30/01
15       6         Bates 3286, platform edge   229
                   doors document dated 2/03
16
         7         Bates 6925, chart           237
17
         8         Bates 6671, DMJM Harris     245
18                 report dated 12/11/07
19       9         Bates 3358, NYC Transit     250
                   Authority document re
20                 Second Avenue subway dated
                   6/18/07
21
        10         Bates 5664, e-mail chain    261
22
        11         Bates 4396, e-mail chain    267
23
        12         Bates 1, e-mail chain       270
24
        13         Bates 4400, e-mail chain    274
25
```

Enright Court Reporting    (631) 589-7788

366

```
 1
 2    PLAINTIFF EXHIBITS (CONTINUED):
 3    EXHIBIT NO.    DESCRIPTION              PAGE
 4      14         Bates 498135, chart         300
 5      15         Bates 5869392, 2008 grant   325
 6      16         Bates 96046, spreadsheet    332
 7      17         Bates 1284, RFI             348
 8      18         Bates NYCTA2 618, evaluation 351
                   summary
 9
10
11

      INSERTS
12
      DESCRIPTION                              PAGE
13    (None)
14
15
16    REQUESTS
17    DESCRIPTION                              PAGE
      (None)
18
19
20
      MARKED FOR RULING
21
      DESCRIPTION                              PAGE
22    (None)
23
24
25
```

367

1

2                      CERTIFICATION

3

4    STATE OF NEW YORK   )
                          )  ss
5    COUNTY OF ORANGE    )

6

7         I, Michelle Conero, a stenotype

8    reporter and Notary Public within and for the

9    State of New York, do hereby certify;

10             That the witness whose Examination

11   Before Trial is hereinbefore set forth was duly

12   sworn by me;

13             That such Examination Before Trial

14   is a true and accurate record of the testimony

15   given by said witness.

16             I further certify that I am not

17   related to any of the parties to this action by

18   blood or marriage, and that I am in no way

19   interested in the outcome of this matter.

20        IN WITNESS WHEREOF, I have hereunto set

21   my hand this 8th day of February 2023.

22

23   _____

24             Michelle Conero

25