1

UNITED STATES EASTERN DISTRICT
EASTERN DISTRICT NEW YORK
---------------------------------------x
LUISA JANSSEN HARGER DaSILVA,

                              Plaintiff,


        -against-


NEW YORK CITY METROPOLITAN TRANSIT
AUTHORITY, REQUIA SHABAZZ,

                              Defendants.
---------------------------------------x

                              Video Conference Call
                              Long Island, New York
                              March 8, 2022
                              10:07 a.m.



        EXAMINATION BEFORE TRIAL of ANDREW BATA,
    Defendant Representative of NEW YORK CITY
    TRANSIT AUTHORITY, taken by Plaintiff, pursuant
    to Article 31 of the Civil Practice Law and
    Rules of Testimony, and Order, held at the
    above-noted time and place, before Dorothy
    Maggiore, a Stenotype Reporter and Notary Public
    within and for the State of New York.

2

```
 1
 2        V I R T U A L   A P P E A R A N C E S:
 3
 4        ROTH & ROTH, ESQS.
                Attorneys for Plaintiff
 5              192 Lexington Avenue - Suite 802
                New York, New York  10016
 6        BY:  DAVID ROTH, ESQ.
 7
 8        SONIN & GENIS
                Attorneys for Plaintiff
 9              One Fordham Plaza - Suite 907
                Bronx, New York  10458
10        BY:  ROBERT GENIS, ESQ.
11
12        LANDMAN, CORSI, BALLAINE & FORD, P.C.
                Attorneys for Defendants Transit Authority
13              120 Broadway - 27th Floor
                New York, New York  10271
14        BY:  ANDREW P. KEAVENEY, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

3

1

2                        STIPULATIONS

3

4        IT IS HEREBY STIPULATED, by and between the

5    attorneys for the respective parties hereto, that:

6        All rights provided by the C.P.L.R., and Part 221

7    of the Uniform Rules for the Conduct of Depositions,

8    including the right to object to any question, except as

9    to form, or to move to strike any testimony at this

10   examination is reserved; and in addition, the failure to

11   object to any question or to move to strike any

12   testimony at this examination shall not be a bar or

13   waiver to make such motion at, and is reserved to, the

14   trial of this action.

15       This deposition may be sworn to by the witness

16   being examined before a Notary Public other than the

17   Notary Public before whom this examination was begun,

18   but the failure to do so or to return the original of

19   this deposition to counsel, shall not be deemed a waiver

20   of the rights provided by Rule 3116 of the C.P.L.R., and

21   shall be controlled thereby.  The filing of the original

22   of this deposition is waived.

23       IT IS FURTHER STIPULATED, that a copy of this

24   examination shall be furnished to the attorney for the

25   witness being examined without charge.

4

1

2      PROCEEDINGS

3      THE REPORTER:

4          The attorneys participating in this deposition

5      acknowledge that I am not physically present in the

6      deposition room and that I will be reporting this

7      deposition remotely.

8          They further acknowledge that, in lieu of an oath

9      administered in person, I will administer the oath

10     remotely.

11         The parties and their counsel consent to this

12     arrangement and waive any objections to this manner of

13     reporting.

14

15

16

17

18

19

20

21

22

23

24

25

5

1                          A. BATA

2    A N D R E W   B A T A, called as a witness, having been

3    first duly sworn by a Notary Public within and for the

4    State of New York, was examined and testified as

5    follows:

6    THE REPORTER:

7              Q.     Would you please state your full

8    name for the record.

9              A.     Andrew Bata.

10             Q.     What is your current address?

11             A.     1725 York Avenue, New York, New York

12    10128.

13    EXAMINATION BY

14    MR. GENIS:

15             Q.     Good morning, Mr. Bata.  My name is

16    Bob Genis and I represent the young woman who was

17    harmed.  She lost her arm and her leg.

18                    I am going to be asking you some

19    questions today.  If there is anything that I ask

20    of you that you do not understand, please say so

21    and I will gladly rephrase the question.

22    Otherwise, if you answer the question, we are

23    going to assume that you understood it.

24                    Do you understand everything I have

25    said so far?

6

1                          A. BATA

2          A.    That's correct, yes.

3          Q.    And you agree to these terms, sir?

4          A.    Yes.

5          Q.    These terms are fair?

6          A.    Yes.

7          Q.    Have you ever testified before,

8    sir?

9          A.    No.

10         Q.    You are here pursuant to a subpoena

11   today; correct?

12         A.    Yes.

13         Q.    After receiving the subpoena, what

14   did you do?

15               MR. KEAVENEY:  Other than speaking

16         to attorneys?

17               MR. GENIS:  I don't know what he

18         did.  I am asking him.

19         A.    I basically didn't understand at

20   first what it was about, and I called an attorney I

21   knew at the MTA.

22         Q.    So, in other words, you received a

23   subpoena with the notice of a deposition, and it

24   had a law firm name and phone number and e-mail

25   address and all of that stuff on it; correct?

7

1                      A. BATA

2          A.    Yes.

3          Q.    And you could have, for example,

4     called up that attorney or e-mailed the attorney

5     to ask what this is about; true?

6          A.    I could have.

7          Q.    Instead you chose to contact a

8     lawyer via the MTA?

9          A.    Yes.

10          Q.    And after you contacted an attorney

11     with the MTA, how many other people did you speak

12     with?

13                    MR. KEAVENEY:  Objection.  Calls

14              for attorney/client communication.

15                    MR. GENIS:  No, I didn't ask for

16              any communications between an attorney and

17              a client.  We haven't even established

18              there was a attorney and client

19              relationship.

20                    All I am asking is, and we could

21              read back the question, how many other

22              people -- who else did he speak to.

23                    MR. KEAVENEY:  He said he called an

24              attorney he knew at the MTA.

25                    MR. GENIS:  Right.  And I said,

8

1                    A. BATA

2         "After that, what did you do?"

3              I am not here to argue with you,

4         Mr. Keaveney, and you are arguing with me.

5         I am trying to question this gentleman.

6         Q.    Sir, getting back to the question,

7    all right, because I don't care for being

8    filibustered, how many people did you speak to

9    about this deposition?

10        A.    I spoke to my wife, and I think I

11   spoke to a gentleman I worked with at the MTA,

12   who -- Don Weliman.

13        Q.    Don Weliman is a very knowledgeable

14   gentleman at the MTA; correct?

15        A.    Yes, correct.

16        Q.    Other than that, who did you speak

17   with at the Transit Authority or MTA?

18        A.    I don't recall anybody else.

19        Q.    When you spoke with Don Weliman,

20   what did you discuss?

21        A.    I just asked him if he got a note

22   like me, because I know this subject was in his

23   area.

24        Q.    Is Mr. Weliman working for the

25   Transit still, is he retired, or something else?

9

1                         A. BATA

2            A.     He is retired.

3            Q.     When did you first retain an

4     attorney, sir?

5            A.     I did not retain an attorney.

6            Q.     Okay.  Did somebody tell you to

7     retain an attorney?

8            A.     No.

9            Q.     Did somebody tell you that you

10    should be represented by a lawyer for the Transit

11    Authority or MTA?

12           A.     The MTA, they told me that they will

13    represent me.

14           Q.     Did you ask for the representation

15    or did they just offer it, or both?

16           A.     No, they said they would.

17           Q.     Okay.  When they said that they

18    would, did they said that you had no choice in the

19    matter, you had to take the attorney, or that you

20    had a choice, or something else?

21           A.     I don't remember anything like that.

22           Q.     Okay.  All right.  What, if

23    anything, did you review to prepare for today's

24    deposition, sir?

25           A.     Just my memory.

10

1                        A. BATA

2          Q.    Did you look over any records or

3     documents or e-mails or anything?

4          A.    No, I have not.

5          Q.    So, I just want to back up for a

6     second.  When you first got the subpoena, did you

7     immediately speak to Don Weliman or did you

8     immediately speak to an attorney; who did you talk

9     to first?

10         A.    I first just talked to my wife,

11    because I was upset that the paper came in an

12    unopened envelope and I was embarrassed in my

13    building.  I thought it was very unprofessional.

14         Q.    So, it offended you that there was

15    an envelope with your name on it; correct?

16         A.    There was no envelope.  There was no

17    envelope.

18         Q.    Okay.  So, it was just a subpoena?

19         A.    Correct.

20         Q.    Well, if you were offended, we

21    apologize.  But since they refused to produce you,

22    we had no alternative.  They would not allow us to

23    interview you.  We had no choice but to subpoena

24    you, sir.

25                MR. KEAVENEY:  Note my objection.

11

1                    A. BATA

2          Q.    We asked if they would allow us to

3    formally interview you, they objected, and we

4    asked if they would produce you, and they

5    objected.  And we asked if they would accept a

6    subpoena on your behalf, and they declined and

7    they said -- this was the only alternative left.

8                    MR. KEAVENEY:  Note my objection.

9                    MR. GENIS:  It's all the truth,

10              Andrew.  Anyhow -- so, it is your fault

11              that we had to subpoena the guy.

12         Q.    But let's keep going, sir.  I am

13   going to go through your background now.  Can you

14   please tell me, what is your educational

15   background, sir?

16         A.    I have a bachelor's in geography,

17   urban planning, and I have a master's degree in

18   transportation.

19         Q.    Where did you get your bachelor's

20   degree, sir, in urban planning?

21         A.    At Hunter College, New York City.

22         Q.    And where did you get your master's

23   degree?

24         A.    Northwestern University.

25         Q.    Over in Evanston, Illinois?

12

1                        A. BATA

2          A.    Yes, correct.

3          Q.    Sir, can you please tell us your

4    work experience in the field that is related to

5    mass transit?

6          A.    I have a degree in transportation,

7    so all of my career I worked in

8    transportation-related companies.  I worked for a

9    consulting firm for ten years, and then I worked

10   for Metro-North for a couple of years, and then I

11   worked for the New York City Transit for 28 years.

12         Q.    So, I am just going to back up.

13   The consulting job that you had, from when to when

14   was that consulting job?  This is when you first

15   got out of school?

16         A.    That was approximately from 1974 to

17   1982, something like that.

18         Q.    And when you were in school, by the

19   way, did you work in the field, or no?

20         A.    I had an internship, between my two

21   graduate years, at the Port Authority.

22         Q.    So, you went to school, and while

23   in school, you interned at the Port Authority, and

24   when you graduated from school, you started

25   working for the consulting firm in 1974; is that

13

1                          A. BATA

2    accurate so far?

3              A.     That's correct, yes.

4              Q.     What consulting firm was that, sir?

5              A.     It was called Gibbs & Hill.  They

6    are no longer in existence.

7              Q.     What sort of work did they do?

8              A.     It was a large consulting firm with

9    power plants, electrification projects, transit

10   projects, freight railroads, infrastructure, et

11   cetera.

12             Q.     Okay.  And in approximately 1982,

13   what job did you then take?

14             A.     Then I went to Metro-North, and I

15   was the assistant director of planning.

16             Q.     What were your duties there?

17             A.     My main duties there was scheduling,

18   scheduling the trains.

19             Q.     Would that be approximately 1982

20   that you started that job?

21             A.     1982, 1983, yes.

22             Q.     When did you stop working at

23   Metro-North, sir?

24             A.     1987.

25             Q.     In 1987 is when you went to work

14

                              A. BATA

1
2      for MTA, New York City Transit Authority?

3              A.     Correct.

4              Q.     Did you work directly for MTA, for

5      the Transit Authority, or something else?

6              A.     It was for the Transit Authority.

7              Q.     What was your title when you first

8      started to work for the New York City Transit

9      Authority in 1986?

10             A.     It was manager of equipment and

11     facility planning.

12             Q.     What were your duties for that?

13             A.     It was basically to look at rolling

14     stock design, infrastructure design, station

15     design, customer service elements.

16             Q.     How long was that your title or

17     position, in 1987 until when?

18             A.     Until about 1990.

19             Q.     In 1990, what did your title

20     become?

21             A.     And then I became director of

22     service planning.

23             Q.     What were your duties as director

24     of service planning?

25             A.     Service planning was to look at the

15

A. BATA

1

2    overall service that the -- mostly on the rail

3    side, for the agency.  And a large piece of my

4    responsibility was managing a group that was

5    planning the service, doing diversions, doing

6    construction projects, how the trains get

7    re-routed.  That was a big element.

8          Q.    From 1990 to when was that your

9    job?

10          A.    And then I was in that job for

11    about -- I would say I became senior director of

12    service planning and I was there until about, I

13    would say, 2000.

14          Q.    So, in the 1990s, you were both

15    director and then senior director in the same job?

16          A.    Yes.

17          Q.    And in 2000, what did your title

18    become?

19          A.    Then I went to the information IT

20    department, where they had a technology group, and

21    I was there for a few years.

22          Q.    What were your duties there?

23          A.    There, the big project was getting

24    the agency to deploy the next train arrival signs,

25    you know, the countdown blocks.  The next train

16

                              A. BATA

1

2   coming in two minutes, three minutes, five minutes.

3   That was basically a significant amount of my

4   responsibility.

5            Q.    That was from 2000 until when?

6            A.    Until 2005 or 2006.

7            Q.    What did your title or job become

8   in 2005 or 2006?

9            A.    I think it was manager of technology

10  or something like that.  Honestly, I don't remember

11  exactly.

12           Q.    What were your duties as manager of

13  technology?

14           A.    As I am saying, it was basically to

15  look at technology of all kinds, mostly on a

16  customer information side.

17           Q.    So, you started that in

18  approximately 2005 or 2006?

19           A.    In 2006, I was moved to capital

20  program management, CPM.

21           Q.    What was your title at CPM?

22           A.    At CPM, I was one of the chiefs for

23  technology and international best practices, new

24  ideas, and things like that.  Actually, I was -- I

25  am sorry.  Actually, I was -- I think my title

17

1                          A. BATA

2    included strategic planning or something like that.

3    It has been seven years, so I am sorry.

4          Q.    What were your duties at CPM,

5    capital program management, where you were chief

6    of technology and international best practices and

7    strategic planning; what were your duties?

8          A.    CPM was structured along very strict

9    disciplines, mechanical, civil, industrial, etc.

10   So, my role was to be a bridge between all of these

11   disciplines, which I could be a mediator of

12   different opinions and, you know, contribute my IT

13   contents.

14         Q.    So, you were kind of -- I will give

15   two different analogies, and tell me if either of

16   them work.  You were either the quarterback or the

17   captain of the ship?

18         A.    I was basically almost like a coach

19   and judge.

20         Q.    Okay.  From 2006 to when did you

21   keep that position?

22         A.    Until 2010 or 2011, when I was put

23   in the president's office.  He created a new

24   position for strategic planning and best practices.

25         Q.    When you say you were in the

18

1                          A. BATA

2    president's office for strategic planning and best

3    practices, is that the president of the New York

4    City Transit Authority, of the MTA, or something

5    else?

6           A.    President of the New York City

7    Transit Authority.

8           Q.    Who was the president of the New

9    York City Transit Authority when you started to

10   work for that president directly?

11          A.    Tom Prendergast.

12          Q.    How long did you keep that post or

13   position at that time?

14          A.    Until I retired.

15          Q.    That was when, sir?

16          A.    2015.

17          Q.    So, you led units for service

18   planning, innovation, and new technology

19   deployment; correct?

20          A.    Correct.

21          Q.    You did station design, rolling

22   stock design; correct?

23          A.    Correct.

24          Q.    Have you ever been a member of the

25   Intelligent Transportation Society of New York?

19

1                         A. BATA

2              A.    Yes.

3              Q.    Were you the president of the

4    Intelligent Transportation Society of New York?

5              A.    That's correct.

6              Q.    Are you a board member of the

7    Intelligent Transportation Society of New York?

8              A.    Correct.

9              Q.    What is the Intelligent

10   Transportation Society of New York?

11             A.    It is a professional association,

12   mainly focused on intelligent transportation for

13   road traffic, road management, traffic avoidance,

14   surveyance, GPS, things like that.

15             Q.    Are you a professor of

16   transportation at Columbia and New York

17   University, both of those universities?

18             A.    I was.

19             Q.    What classes did you teach at

20   Columbia?

21             A.    It was a basic class on basic

22   transportation planning and history.  That's it.

23             Q.    Okay.  What did you teach at New

24   York University?

25             A.    The same, the same course.

20

1                         A. BATA

2          Q.    In addition to being the chief

3    strategic technology planner and director of

4    service planning, as well, did you chair the speed

5    policy committee?

6                MR. KEAVENEY:  Note my objection.

7          You can answer.

8          A.    Yes, I did.

9          Q.    What is the speed policy committee?

10         A.    The speed policy committee was an

11   interdepartmental committee that was supposed to

12   have an independent view of how the agency manages

13   signals, speeds, looking at rules, regulations,

14   composed of interdepartmental representatives,

15   smaller agencies.

16         Q.    Did the speed policy committee

17   issue a promulgate standards or guidelines or

18   things of that nature?

19               MR. KEAVENEY:  Note my objection.

20         A.    Generally, my recollection is no.

21         Q.    Were there speed limits in the New

22   York City Transit Authority during your tenure

23   there?

24         A.    Sure.  Yes.

25         Q.    Were there speed limits before

21

```
 1                      A. BATA
 2    entering train stations?
 3                      MR. KEAVENEY:  Note my objection.
 4          A.    I don't understand exactly what you
 5    mean.
 6          Q.    Sure.  For example, if you are
 7    going from Point A to Point B, while you are in
 8    between those two stations, you might go faster,
 9    but as you are approaching the station, you might
10    want to slow down so that you could safely enter
11    the station; is that a fair statement?
12          A.    The trains follow the signals.  If
13    it is red, it stops, if it is yellow, it slows, and
14    if it is green, it is go.  So, the trains always
15    follow the signals.
16          Q.    So, for example, were there any
17    speed limits that, when entering any given
18    station, the train should not go above x number of
19    miles per hour?
20                      MR. KEAVENEY:  Note my objection.
21                      The witness can answer the question.
22          A.    Not specifically to stations.
23          Q.    Okay.  Was there a speed limit
24    anywhere throughout the system of the Transit
25    Authority that trains should not go above a
```

22

1                          A. BATA

2       certain speed limits as they are about to enter a

3       station?

4                    MR. KEAVENEY:  Note my objection.

5            A.    Usually those speed limits were

6       because of grades or curves.

7            Q.    So, there were speed limits at

8       certain stations, before the train entered the

9       station?

10           A.    Not because of the train entering

11      the station, because of other factors in the

12      infrastructure of the path of the train, like a

13      grade or curve.

14           Q.    So, I am not asking you the reason

15      to have a speed limit.  I am just asking if there

16      were speed limits in the tunnels for trains

17      entering certain stations?

18                    MR. KEAVENEY:  Note my objection.

19           A.    I don't remember.  I don't remember

20      specifically if there is anything specifically

21      entering the station, no.

22           Q.    Okay.  By the way, are you

23      receiving a pension from the Transit Authority?

24           A.    Sure.

25           Q.    How many times have you spoken with

23

1                              A. BATA

2       or communicated with an attorney on behalf of the

3       Transit Authority for this case?

4                   MR. KEAVENEY:  Objection.  Don't

5              answer that.

6                   MR. GENIS:  I didn't ask him what

7              was said.  It is a proper question, how

8              many times.

9                   MR. KEAVENEY:  You could mark it.

10                  MR. GENIS:  Mark it, please.

11          Q.    How much time was spent

12      communicating with an attorney on behalf of the

13      Transit Authority for this case?

14                  MR. KEAVENEY:  Note my objection.

15             Don't answer that either.

16          Q.    Well, was it in person, your

17      meetings, was it on the phone, e-mails, or

18      something else?

19                  MR. KEAVENEY:  Objection.  Don't

20             answer that.

21                  MR. GENIS:  Dorothy, mark every

22             time he is saying don't answer.

23          Q.    By the way, who were the members of

24      that speed policy committee over the years that

25      you were on it?

24

                              A. BATA

1

2         A.    Well, there were members of

3    different departments.  There was signaling,

4    stations, track, safety, operations.  I think there

5    was somebody from CPM.  It was an interdepartmental

6    group.

7         Q.    So, when did you first get on the

8    speed policy committee and when did you stop being

9    on the speed policy committee?

10              MR. KEAVENEY:  Hold on.  I am going

11              to object to these questions.  I am going

12              to direct him not to answer.  Speed policy

13              is subject to a motion that we have.  I

14              will direct him not to answer any

15              additional questions on speed policy.

16              MR. GENIS:  You've made a motion

17              with respect to your violation of the

18              court's order directing you to give me the

19              guidelines of the speed policy and that is

20              documentary evidence.

21              I am asking this gentleman the

22              question.  It is germane, it is relevant,

23              and it is not privileged.  Are you still

24              directing him not to answer?

25              MR. KEAVENEY:  I am directing him

25

1                        A. BATA

2          not to answer subject of a motion that is

3          pending before the court.

4              MR. GENIS:  Mark it again.

5          Q.    Please give me the names of all of

6    the people, from the time you first got on the

7    speed policy committee, until the time you left,

8    the other members?

9              MR. KEAVENEY:  Objection.  Don't

10         answer that question.

11         Q.    After you left the Transit

12   Authority, when you retired in 2015, did you go to

13   work elsewhere?

14         A.    I worked part-time with a

15   international association.

16         Q.    Which international association was

17   that, sir?

18         A.    The International Association of

19   Public Transit.

20         Q.    What was your title or position

21   with them?

22         A.    I was basically a representative for

23   the North America region.

24         Q.    Was it part of your job at the

25   Transit Authority to have comprehensive

26

1                            A. BATA

2      assessments of technology needs and developing

3      practical solutions for deployment?

4            A.    In general, it was basically to see

5      what is going on around the world.

6            Q.    So, you were responsible for the

7      planning and conceptual design of advanced systems

8      that promote state-of-the-art passenger service

9      with an emphasis on integrated communication

10     systems and realtime passenger information;

11     correct?

12           A.    Yes.

13           Q.    And you developed recommendations

14     that followed the best practices for the New York

15     City Transit and the entire MTA family; correct?

16           A.    I gave opinions about certain

17     things, but not specific recommendations.

18           Q.    Okay.  Did you oversee the agency's

19     intelligent transportation systems projects?

20           A.    No.

21           Q.    Have you ever represented that you

22     have done so?

23           A.    I didn't hear your question.

24           Q.    Did you ever represent that you

25     have done so?

27

1                          A. BATA

2           A.    No.  But ITS is -- it doesn't have a

3      strong definition.  So, for example, signaling

4      could be ITS, okay.  Or customer information could

5      be ITS.  It doesn't have a specific definition.

6           Q.    Are you a member of the

7      transportation resource rewards committee on

8      emerging and innovative public transportation and

9      technology?

10          A.    I was.

11          Q.    Were you chair of the international

12     light rail transit development subcommittee?

13          A.    Yes, light rail.

14          Q.    Sir, when you worked for the

15     Transit Authority, did they also give you training

16     in addition to your own professional background,

17     knowledge, and experience?

18          A.    There was some safety training.

19     That's what I remember, things like that.

20          Q.    You have belonged to different

21     professional societies and associations over your

22     career; true?

23          A.    Yes.

24          Q.    While you were at the Transit

25     Authority, you belonged to these various

28

1                    A. BATA

2     professional societies and associations; true?

3          A.    Well, I really only belonged to the

4     transportation research board.

5          Q.    Okay.  The Transit Authority,

6     through its employees, belong to various

7     associations, as well; correct?

8          A.    Yes.

9          Q.    That international group you

10    mentioned before, that you went to work for after

11    you left the Transit, the Transit Authority is a

12    member of that, as well; correct?

13         A.    Yes.

14         Q.    And the Transit Authority is a

15    member of what is known as CoMET; correct?

16         A.    Yes.

17         Q.    Based upon your education,

18    training, experience -- by the way, I am sorry,

19    you already told us what is the international one,

20    and that's UITP; correct?

21         A.    Correct.

22         Q.    And what is CoMET, sir?

23         A.    CoMET is a benchmarking group that

24    compares statistics worldwide.

25         Q.    Would it be fair to say, throughout

29

1                                    A. BATA

2       your tenure at the Transit Authority, based on

3       your knowledge, experience, education, training,

4       that you were familiar with good and accepted

5       practices and procedures in your field of mass

6       transportation and rails?

7               A.     Yes.

8               Q.     And you were familiar, during this

9       period that you were at the Transit Authority,

10      with professional standards of care at such a

11      transit agency?

12              A.     In general, yes.

13              Q.     And then you learned and became

14      familiar with best practices, as well; correct?

15                     MR. KEAVENEY:  Note my objection.

16              You can answer.

17              A.     It is -- yes.  It depends on how you

18      define best practices, yes.

19              Q.     We are going to get into that, sir.

20      First, can we agree that one of the jobs of the

21      Transit Authority and MTA is safety for the public

22      and its employees?

23              A.     Correct.

24              Q.     Is safety the most important thing

25      at the Transit, or is something more important

30

1                              A. BATA

2      than safety?

3              A.     Safety is very important and

4      delivering service is also important.

5              Q.     The New York City Transit Authority

6      operates the largest public transportation agency

7      in North America; correct?

8              A.     Yes, correct.

9              Q.     Could we agree that a public

10     transportation company must have the knowledge

11     necessary to do its job safely?

12             A.     Yes.

13             Q.     The job of a public transportation

14     company includes keeping up with the latest

15     research and literature and developments, and

16     practices; correct?

17             A.     It is -- generally, yes.

18             Q.     And the job of the public

19     transportation agency includes keeping up with

20     published guidelines and standards?

21             A.     Yes.

22             Q.     One of the ways that the

23     transportation agency keeps up with its field is

24     through these professional associations,

25     societies, and training groups; correct?

31

1                          A. BATA

2          A.    Yes.

3          Q.    So, for example, you are familiar

4    with the American Society of Civil Engineers;

5    correct?

6          A.    Yes, I am.

7          Q.    You are familiar with the American

8    National Standards Institute; correct?

9          A.    Yes.

10         Q.    You are familiar with the

11   Transportation and Development Institute; correct?

12         A.    No.

13         Q.    I am sorry.  I couldn't hear you.

14         A.    I don't know them.

15         Q.    Are you familiar with -- you told

16   us you are familiar with CoMET, as well; correct?

17         A.    Yes.

18         Q.    How are these things used?

19         A.    You are talking about a specific

20   association?

21         Q.    Generally, how does the Transit

22   Authority, and you, in your job of best practices,

23   look at what is going on around the world; how do

24   you use that information, such as CoMET, et

25   cetera?

32

1                        A. BATA

2          A.    Well, I mean, it is usually an

3     information rich venue, and there -- you could get

4     some information that you may or may not use in

5     your work.

6          Q.    Let's back up a little more.  Can

7     we agree, the more knowledge a transportation

8     agency has about preventing a known cause of harm,

9     the better the chance they could use that

10    knowledge to prevent that harm?

11         A.    Yes, correct.

12         Q.    And a transportation company should

13    have the necessary knowledge to prevent

14    preventable harm; true?

15         A.    It depends what level of knowledge.

16    Of course they cannot possibly know everything.

17         Q.    Should the transportation company

18    have the knowledge necessary to prevent

19    foreseeable harm?

20         A.    They should have general knowledge

21    at hand, yes.

22         Q.    Is a lack of knowledge a danger to

23    the public by the Transit Authority, in other

24    words, a lack of knowledge by the transit agency

25    that is dangerous to the public?

33

1              A. BATA

2              MR. KEAVENEY:  Not my objection.

3         You can answer.

4         A.    What is lack of knowledge?

5         Q.    Not knowing what it should know.

6         A.    It is not definable.

7         Q.    Could we agree that the Transit

8    Authority was supposed to make the New York subway

9    system the safest in the world?

10             MR. KEAVENEY:  Note my objection.

11        You can answer.

12        A.    It is extremely safe.

13             MR. GENIS:  That's not my question,

14        sir.  Move to strike as not responsive.

15        Q.    My question is, was the New York

16   City Transit Authority and MTA supposed to make

17   the New York City subway system the safest in the

18   world, while you were there?

19             MR. KEAVENEY:  Note my objection.

20        You can answer.

21        A.    It is supposed to make it safe, but

22   there is no mandate to be the safest in the world.

23        Q.    Putting aside a mandate or a

24   requirement, did the Transit Authority have goals

25   or aspirations, a mission?

34

1                          A. BATA

2          A.      The Transit Authority's mission is

3    to be -- always be extremely safe considering what

4    it is.

5          Q.      So, is it part of the mission of

6    the Transit Authority, while you worked there, to

7    be the safest and have the safest subway system in

8    the world?

9          A.      You cannot say safest in the world.

10   It is extremely safe.

11                 MR. GENIS:  Just move to strike as

12            not responsive.

13         Q.      Can we agree that, in New York

14   City, we could learn from other systems throughout

15   the world, how to be safer?

16         A.      Correct.

17         Q.      So, the Transit Authority, through

18   people like you, look to see what is being done,

19   what the industry standards and customs and

20   practices are; correct?

21         A.      Correct.

22         Q.      Does the Transit Authority hold

23   itself out as being number one or the best in the

24   world?

25                 MR. KEAVENEY:  Objection.  You can

35

1                         A. BATA

2          answer.

3               A.    No.

4               Q.    Does the Transit Authority hold

5     itself out as number one in the field of public

6     transportation?

7               A.    No.

8               Q.    Does the Transit Authority hold

9     itself out that it is number one job is to safely

10    operate its mass transit system?

11              A.    It is one of the key goals.

12              Q.    And when we are talking about

13    safety, is second best acceptable to the Transit

14    Authority?

15              A.    I don't understand the question.

16              Q.    Okay.  Does the Transit Authority

17    ever expect a pass on safety?

18              A.    Of course not, no.

19              Q.    So, safety is the most important

20    thing a public transportation organization, like

21    the Transit Authority, should strive for?

22              A.    It is very important, for sure.

23              Q.    And safety is supposed to be the

24    highest priority; correct?

25              A.    It is one of the highest priorities.

36

1                          A. BATA

2          Q.    What is more important than safety?

3                MR. KEAVENEY:  Objection.  You can

4          answer.

5                THE WITNESS:  Answer or no?

6                MR. KEAVENEY:  Yes, please.

7                THE WITNESS:  Delivering the

8          service.

9          Q.    So, service is more important than

10    safety, according to the Transit Authority;

11    correct?

12          A.    I did not say that.

13          Q.    That's what I am asking you.  So,

14    you tell me --

15          A.    There are several objectives of

16    equal importance.

17          Q.    So, according to the Transit

18    Authority, service is just as important as safety;

19    correct?

20          A.    It is one of the key goals.

21          Q.    So, in other words, for lack of a

22    better expression, keeping the trains running on

23    time is more important than keeping the trains

24    running safely?

25                MR. KEAVENEY:  Objection.

37

1                           A. BATA

2          A.    The safest system is a system that

3    doesn't run.

4          Q.    What is more important to the

5    Transit Authority, having the trains run on time

6    or having the trains run safely?

7                     MR. KEAVENEY:  Objection.  Asked

8                and answered.  You can answer again.

9          A.    It is -- the question doesn't make

10   any sense.

11         Q.    The customers of the Transit

12   Authority have the right to expect that the New

13   York City subway system will be safe?

14         A.    Correct.

15         Q.    Does the public have the right to

16   expect that the New York City Transit subway

17   system would be the safest in the world?

18         A.    I don't think so.

19         Q.    Does the public have a right to

20   expect that the New York City Transit subway

21   system will be second to none?

22         A.    I don't think so.  It is old.

23         Q.    Does the public have a right to

24   expect that the Transit Authority, with its

25   technology, where it can reasonably do so, to make

38

1                          A. BATA

2    the subway system the safest in the world?

3          A.    They expect good effort in that,

4    yes.

5          Q.    Is it part of the job of the

6    transportation agency to anticipate how customers

7    may become harmed?

8          A.    Yes.

9          Q.    And it is the job of the Transit

10   Authority to keep the system as safe as possible;

11   correct?

12         A.    As safe as possible, yes.  Possible

13   is the key word.

14         Q.    So, it is part of the job of the

15   Transit Authority to keep the system absolutely as

16   safe as possible; correct?

17         A.    As safe as possible.

18         Q.    You mentioned benchmarking; why is

19   benchmarking important in the field of

20   transportation, and what is it?

21         A.    You need to know what your peers are

22   doing.

23         Q.    Is that what benchmarking is?

24         A.    Yes.

25         Q.    You have to keep your voice up a

39

1                              A. BATA

2    little bit.  Sometimes it is hard to hear you,

3    sir?

4              A.    Yes, it is.

5              Q.    So, the job of the Transit

6    Authority includes taking reasonable steps to

7    prevent preventable harm; correct?

8              A.    Yes.

9              Q.    And it is the job of the Transit

10   Authority to take all reasonable steps to prevent

11   foreseeable harm; correct?

12             A.    Yes.

13                   (Whereupon, a break was taken from

14                   10:49 a.m. to 11:07 a.m.)

15             Q.    Mr. Bata, where are you right now

16   for this deposition?

17             A.    I am in the office of the attorney.

18             Q.    The attorney for the Transit and

19   MTA; correct?  Yes?

20             A.    Yes, correct.

21             Q.    Thank you.  We can't write down

22   nods of the head and things like that.  That's why

23   I do that sometimes.

24             A.    I am sorry.

25             Q.    That's okay.  No worries.

40

1                          A. BATA

2               All right.  So, let's see.  Before

3      we took a break for your attorney, do we agree

4      that it is part of the job of the transit agency

5      to make its system as safe as possible and to

6      prevent preventable harm?

7               A.    That's correct.

8               Q.    And it is part of the job of the

9      Transit Authority to make its system as safe as

10     possible and prevent foreseeable harm; correct?

11              A.    Yes.

12              Q.    And that's what is required under

13     good and accepted practices and procedures; true?

14              A.    Yes.

15              Q.    And that is what is required under

16     the international standards of care; true?

17              A.    Yes.  I guess so, yes.

18              Q.    And that's what is required under

19     industry standards, customs, and practices;

20     correct?

21              A.    Yes.

22              Q.    When you were talking about

23     benchmarks and best practices, I just want to

24     understand something.  First of all, is it

25     important to have benchmarks, to use benchmarks?

41

1                          A. BATA

2            A.     It is not required, but it is good

3      to have.

4            Q.     Why do you use benchmarks?

5            A.     As I said, it is good to know what

6      is going on with your peers.

7            Q.     How do you use benchmarks?

8            A.     Yes.  The benchmark is the

9      information about what is going on, yes.

10            Q.     Okay.  So, in other words, you

11      should learn what the best practices are

12      internationally; correct?

13            A.     As possible for peer agencies, yes.

14            Q.     And best practices would be to use

15      benchmarks; true?

16            A.     No.

17            Q.     And when you say the Transit

18      Authority is supposed to be aware of best

19      practices internationally, do we agree that they

20      should comply with best practices?

21                  MR. KEAVENEY:  Note my objection.

22            You can answer.

23            A.     No.

24            Q.     All right.  By the way, is the

25      Transit Authority a founding member of CoMET?

42

1                    A. BATA

2          A.    I don't believe so.

3          Q.    Was it a founding member of the

4    UITP?

5          A.    No.

6          Q.    Okay.  Does the public have a right

7    to expect, with American knowledge and technology

8    and brainpower, that the Transit Authority would

9    lead or pave the way, set the standard for mass

10   transit and subways?

11              MR. KEAVENEY:  Objection.  You can

12         answer.

13         A.    Not necessarily.

14         Q.    Okay.  So, the public here should

15   expect third-world nations or other nations to

16   have a safer, better subway system than we have?

17              MR. KEAVENEY:  Objection.  Go ahead

18         and answer.

19         A.    No.

20         Q.    So, let's get back to my original

21   question then.  Does the public have the right to

22   expect the Transit Authority to set the standard,

23   to lead the way, to be the safest?

24         A.    No.

25         Q.    Okay.  Now, do we agree that a

43

1                          A. BATA

2    public transportation agency, like the Transit, is

3    never allowed to unnecessarily expose the public

4    to unnecessary harm?

5            A.    That's a vague question.  I can't

6    answer that.

7            Q.    Well, do we agree that -- by the

8    way, did anybody ever tell you that I might ask

9    that question or a question in that format?

10           A.    No.

11           Q.    When did you get to the office

12   today that you are in?

13           A.    This morning, about 9:45 a.m. --

14   8:45 a.m.  Sorry.

15           Q.    Since we didn't start until about

16   ten after ten, what did you do for that

17   hour-and-a-half before we started?

18           A.    I got here at 9:45.  I'm sorry,

19   9:45.  What did I do?  I had a cup of coffee.

20           Q.    So, you are telling us, according

21   to good and accepted practices and procedures, it

22   is okay for the Transit Authority to unnecessarily

23   expose the public to unnecessary harm?

24               MR. KEAVENEY:  Objection.  You can

25               answer, unless I say not to.

Enright Court Reporting    (631) 589-7788

44

1                        A. BATA

2              MR. GENIS:  I am going to withdraw

3         that question and ask another one.  Let me

4         ask a better question.

5              MR. KEAVENEY:  Answer the question

6         unless I say don't answer.  My objections

7         are for the record, but please answer

8         unless I say otherwise.  Thank you.

9         Q.    Okay.  So, let's talk about good

10   and accepted practices and procedures.  According

11   to good and accepted practices and procedures of a

12   mass transit agency, is the mass public

13   transportation company ever allowed to

14   unnecessarily expose the public to harm?

15         A.    I don't understand the question.

16   But with unnecessary, you can fall down the steps.

17   Is it unnecessary or irresponsibility?

18              MR. GENIS:  I don't understand what

19         you just said to me, but I am going to

20         move to strike as not responsive.

21              THE WITNESS:  A fall down the

22         stairs, okay, then it is an unnecessary

23         responsibility?

24         Q.    So, let me ask you, are stairs

25   supposed to be kept in a safe condition?

45

1                       A. BATA

2           A.    The safest thing would be no stairs.

3           Q.    But that's not my question, sir.  I

4    am not here to argue with you and go down rabbit

5    holes.  My question is very, very simple.  You

6    talked about stairs, even though I didn't ask

7    about it.  Are stairs allowed to be unsafe

8    according to the Transit Authority?

9           A.    Stairs, by definition, are unsafe.

10          Q.    So, you are telling me there are no

11   standards with respect to stairs?

12          A.    There are standards about how wide a

13   step should be and what the elevation is and what

14   should be the resting between landing, of course.

15   It's whatever, of course.

16          Q.    And those are safety standards for

17   stairs; correct?

18          A.    In terms of design, yes.

19          Q.    Okay.  And the Transit Authority is

20   supposed to comply with these safety standards;

21   correct?

22          A.    For specific design, yes.

23          Q.    And they are supposed to keep the

24   stairs in good maintenance and repair; correct?

25          A.    Correct.

46

1                           A. BATA

2              Q.     And they are supposed to keep them

3      safe; correct?

4              A.     Yes.

5              Q.     So, if the stairs were not properly

6      designed and not properly maintained and repaired,

7      then the stairs would be unsafe; correct?

8              A.     There are other circumstances, such

9      as ice.

10             MR. GENIS:  I understand.  But

11             right now, if you could just answer my

12             question, I would appreciate it.  I move

13             to strike as not responsive.

14             Q.     They have to properly design and

15     maintain the stairs so people don't get

16     unnecessarily hurt; true or false?

17             A.     That's true.

18             Q.     In other words, with stairs, using

19     your example, and then we will come back to what

20     this case is about, is that with stairs, the

21     Transit Authority is never allowed to

22     unnecessarily expose the public to unnecessary

23     harm; true?

24             A.     I have difficulty in understanding

25     what you meant, unnecessary.

47

A. BATA

1

2      Q.    Well, there are things that are

3   necessary and things that are unnecessary;

4   correct?

5      A.    I find it difficult to answer that

6   question with that unnecessary and necessary.  I am

7   sorry.

8      Q.    Not a problem.  I am here to help.

9   So, let's see how I can help you.  Let's look up

10  the word necessary in dictionary.com.

11              According to dictionary.com, the

12  definition of necessary, it is an adjective,

13  "Being essential, indispensable, or requisite,

14  acting or preceding with compulsion or necessity."

15              So, can we agree on the definition

16  of necessary?

17     A.    Necessary is totally correct.

18  Unnecessary is much more difficult to define, in my

19  opinion.

20     Q.    Not a problem.  Let's look up the

21  word unnecessary then, because, as I said, I'm

22  here to help you.

23              Okay.  According to dictionary.com,

24  the definition of unnecessary, also an adjective,

25  "Not necessary or essential, needless,

48

1                          A. BATA

2     unessential."

3                    Okay.  So, do you agree with that

4     definition, sir?

5              A.    It is highly subjective, though.

6              Q.    So, now we have the definitions of

7     the words.  So, let's get back to the question.

8     Is a public transportation agency, like the

9     defendant, Transit and MTA, are they ever allowed,

10    according to good and accepted practices and

11    procedures, to unnecessarily expose the public to

12    harm?

13             A.    There are many, many factors, and I

14    think there are many unnecessary events that could

15    happen in a situation like a transit agency.

16                  MR. GENIS:  Move to strike as

17                  non-responsive.  That's not my question,

18                  sir.

19                  THE WITNESS:  I would say no.

20             Q.    Okay.  According to professional

21    standards of care, is a public transportation

22    agency, like the Transit, ever allowed to

23    unnecessarily expose the public to harm?

24                  MR. KEAVENEY:  Note my objection.

25             A.    As I said, it is highly subjective

49

1                          A. BATA

2    what is unnecessary, and I have to say no, there is

3    no absolute necessary things, okay.  It is not a

4    black and white situation.

5           Q.    It is a simple question.  It is a

6    black and white question.  Either they are allowed

7    to unnecessarily expose people to harm or they are

8    not, according to professional standards of care.

9           A.    There are incidental circumstances

10   that can be explained.

11          Q.    Are you here to help the Transit

12   Authority today, sir, that you get a pension from

13   and you are sitting in their lawyer's office and

14   you contacted them after receiving a subpoena?

15                MR. KEAVENEY:  Objection.  The

16                witness is here subject to a subpoena.

17                Don't answer the question.

18                MR. GENIS:  You are directing him

19                not to answer.

20                MR. KEAVENEY:  Yes.

21          Q.    And you do understand that when you

22   are perceived as evasive by not answering a direct

23   simple question, a jury might view you as evasive?

24                MR. KEAVENEY:  Objection.  That's

25                an improper question.  Don't answer that.

50

1                         A. BATA

2          Q.    Sir, credibility is an issue of

3     every witness.  You understand that if you are

4     evasive to questions, you might be viewed as less

5     than credible by a jury by virtue of being

6     evasive?

7                    MR. KEAVENEY:  Objection.  That's

8              an improper question.  Don't answer that.

9          Q.    So, to the extent the Transit

10    Authority has the ability to prevent preventable

11    harm, they should do so; true?

12         A.    Yes.

13         Q.    To the extent that the Transit

14    Authority has the ability to prevent foreseeable

15    harm, they should do so; true?

16         A.    Yes.  Correct.

17         Q.    And when a transit agency sees that

18    there is a possible danger, is it a good and

19    accepted practice for them to make that danger

20    safe, to remove the danger?

21         A.    They should have effort to try to do

22    their best that they can, that's feasible and

23    possible.

24         Q.    And feasible means something that

25    -- let's get back to the definition again.  I

51

1                           A. BATA

2    would like to be accurate.  "Feasible, adjective,

3    capable of being done, effected, or accomplished."

4                Do you agree with that definition

5    from the dictionary, sir?

6         A.    I would add practical.

7         Q.    So, you disagree with the

8    dictionary definition?

9                MR. KEAVENEY:  Objection.

10        A.    The definition of feasible is

11   probably correct, you know.  It depends on how it

12   is interpreted.

13        Q.    Well, I am not asking for

14   interpretations.  I am asking for definitions.

15   So, we agree on that definition of feasible, sir?

16        A.    If that's what the dictionary says,

17   yes.

18        Q.    Okay.  Is a transportation agency

19   ever allowed to ignore signs of danger?

20        A.    Again, it is a vague question.  I am

21   sorry.  Not overtly, okay.

22                MR. GENIS:  Okay.  Let's see if we

23                can help you a little bit more, to get

24                focused here.

25                First, Dave, could you please put

52

1                       A. BATA

2           up Chart, I believe, the Bates No. 29044.

3           Q.    While he is pulling up a document,

4    I am going to continue asking you some questions,

5    sir.

6                 Sir, are you aware of the Radio

7    Code 12-9, 12-dash-9?

8           A.    What is it again?

9           Q.    Twelve-dash-nine, it is a code?

10          A.    No.

11          Q.    And if I represented that it is a

12   Transit Authority code for what is known

13   colloquially by the Transit as man under, would

14   you know what that means?

15          A.    Yes.

16          Q.    Would that refer to a train either

17   running over or having contact, hitting a

18   customer, a person?

19                MR. KEAVENEY:  Objection.  Are you

20                asking him if that's what it refers to

21                or --

22                MR. GENIS:  I am asking him the

23                question, yes, and he could agree or

24                disagree.

25          A.    I don't recollect a specific code

53

1                         A. BATA

2    number, but they have a lot of codes.  A 12-9 could

3    be that code.  I was not in operations.  So, that

4    could be the code, yes.

5            Q.    Okay.  We will skip using the code.

6    But you are familiar with the danger of people

7    being run over or hit by trains; true?

8            A.    Of course, yes.

9            MR. GENIS:  Okay.  Now, we have a

10               chart, and we will mark this Plaintiff's

11               Exhibit No. 1 of today's date.  And Dave,

12               I think you have to make that bigger so we

13               could see it.

14               (Whereupon, Plaintiff's Exhibit 1,

15               a chart, was marked for identification.)

16               MR. ROTH:  I see that, just for the

17               record, the numbers on the right-hand

18               side, this is off of an Excel spreadsheet,

19               those were added accidentally.  I can

20               remove them if Andrew wants, or I can --

21               not right at this moment, but for the

22               record, it is just pulling out all of the

23               fatalities on the extra column that is

24               green.

25               MR. GENIS:  They are already in

54

                         A. BATA

1

2       red, the fatalities.

3              MR. ROTH:  I understand that.  I am

4       just letting you know, the document was

5       slightly altered for math purposes.  I

6       just want to make the record clear.

7              MR. KEAVENEY:  Well, is that Bates

8       No. 29044?

9              MR. ROTH:  Yes.  There are three

10      sheets on 29044, and the original does not

11      have those --

12             MR. GENIS:  The green numbers in

13      the right column on the right side of the

14      chart?

15             MR. ROTH:  Yes, correct.  That's

16      all.

17             MR. KEAVENEY:  It's not reflective

18      of the actual Bates document?

19             MR. ROTH:  No, it is.  Do you see

20      where it says 27 of 2019, this right here

21      was an extra column that I didn't notice.

22      This is added.  So, it is up to -- you

23      know, that's all.  It is the same exact

24      document.

25             MR. KEAVENEY:  Was it added to the

55

1                        A. BATA

2         Bates document itself or was it added that

3         you reformulate it somehow?

4              MR. ROTH:  This was provided in

5         Excel format.

6              MR. KEAVENEY:  So, you changed it

7         over to a PDF format?

8              MR. ROTH:  Yes, for the purposes of

9         today, I changed it over.

10             MR. GENIS:  Just to make life

11        simple, Dave --

12             MR. KEAVENEY:  Why don't you just

13        make that statement that that's what it

14        was and then --

15             MR. ROTH:  It doesn't effect

16        anything.  I just want to make sure that,

17        for the record, that it was just an

18        accident, I left it on there, and I

19        apologize.

20             MR. GENIS:  If it is not on the

21        original for the document that gets marked

22        for identification, we will take it off

23        that, as well.

24             MR. ROTH:  Is that what you want to

25        do, Andrew?

56

1                          A. BATA

2                  MR. KEAVENEY:  No.  We will use it

3          as an exhibit and just make the statement

4          as to what it is.

5                  MR. ROTH:  Okay.  This is a PDF of

6          Excel 29044.  There are three sheets.

7          This is the first sheet, and the little

8          extra green numbers underneath 6/6/2019,

9          in that column, were just accidentally

10         pulled over from the total column.  But

11         there is no change.  Everything is the

12         same.  It was just added over; okay?

13                 MR. GENIS:  It is duplicative.

14                 MR. ROTH:  Yes, it is duplicative

15         of the red in each -- in the red total.

16         And there are two other sheets that go

17         along with that.

18         Q.    Okay.  So, Mr. Bata, do you see

19    Plaintiff's Exhibit 1 of today's date, this chart?

20         A.    I see the chart, yes.

21                 MR. KEAVENEY:  They are talking

22         about Plaintiff's Exhibit 1.

23                 THE WITNESS:  Yes.

24         Q.    So, for example, in the year of

25    2001, 110 people were struck by trains; correct?

57

1                        A. BATA

2           A.    Yes.  Does that include suicides?

3           Q.    Sir, if you just -- let me do a

4     preface here.  If I ask you, sir, a yes or no

5     question, or a true or false question, would you

6     please just answer with a yes or no, or a true or

7     false.  I can go along much quicker and take up

8     less of your time if you are responsive.

9           A.    It is a natural question from

10    knowing the business.

11          Q.    See, again, when you editorialize

12    or volunteer information, it just makes it take

13    longer.

14          A.    All right.

15          Q.    So, the question was, in 2001, is

16    it fair to say that the Transit Authority was

17    aware that 110 people were struck by trains; true?

18          A.    Yes.  It looks like it, yes.

19          Q.    And 31 of those people died;

20    correct?

21          A.    From the chart, it looks like, yes.

22          Q.    And in 2002, 136 people were struck

23    by trains or run over by trains; correct?

24          A.    Yes.

25          Q.    And 46 of them died; correct?

58

1                          A. BATA

2              A.    Yes.

3              Q.    In 2003, 188 people were struck by

4    trains; correct?

5              A.    Yes.

6              Q.    And 37 of these people died;

7    correct?

8              A.    Correct.

9              Q.    In 2004, 158 people were hit by

10   trains; correct?

11             A.    Yes.

12             Q.    And 35 of those people died;

13   correct?

14             A.    Yes.

15             Q.    And in 2005, 151 people were run

16   over or hit by trains; correct?

17             A.    Yes.  I am looking at the chart,

18   yes.

19             Q.    And 44 of those people died;

20   correct?

21             A.    Yes.

22             Q.    In 2006, 109 people were run over

23   or hit by trains; correct?

24             A.    Yes.

25             Q.    And 38 of these people died;

59

1                         A. BATA

2    correct?

3              A.    Right.

4              Q.    In 2007, 110 people were run over

5    or hit by trains; correct?

6              A.    Yes.

7              Q.    And 55 people died; correct?

8              A.    Yes.

9              Q.    In 2008, I think we are up to, 107

10   people were run over or hit by trains in the

11   Transit Authority; correct?

12             A.    Yes.

13             Q.    And 34 of them died; correct?

14             A.    Yes.

15             Q.    And in 2009, 136 people were run

16   over or hit by Transit Authority trains; correct?

17             A.    Yes.

18             Q.    And 49 of them died; correct?

19             A.    Correct.

20             Q.    In 2010, 127 people were run over

21   or hit by trains; correct?

22             A.    Yes.

23             Q.    And 51 of them died; correct?

24             A.    Correct.

25             Q.    In 2011, 146 people were run over

60

                              A. BATA

1

2     or hit by Transit Authority trains; correct?

3              A.    Yes.

4              Q.    And 47 of them died; correct?

5              A.    Right.

6              Q.    And in 2012, 141 people were run

7     over or hit by Transit Authority subway trains;

8     correct?

9              A.    Yes.

10             Q.    And 56 of them died; correct?

11             A.    Correct.

12             Q.    And in 2013, 152 people were run

13    over or hit by Transit Authority subway trains;

14    correct?

15             A.    Correct.

16             Q.    And 55 of them died; correct?

17             A.    Correct.

18             Q.    And in 2014, 145 people were run

19    over or hit by subway trains from the Transit

20    Authority; correct?

21             A.    Correct.

22             Q.    And 58 of them died; correct?

23             A.    Correct.

24             Q.    In 2015, 172 people were run over

25    or hit by Transit Authority trains; correct?

61

1                          A. BATA

2              A.    Correct.

3              Q.    And 50 of them died; correct?

4              A.    Correct.

5              Q.    And in 2016, 168 people were run

6     over or hit by Transit Authority trains; correct?

7              A.    Correct.

8              Q.    And 49 of them died; correct?

9              A.    Correct.

10             Q.    And in 2017, 181 people were run

11    over or hit by subway trains from the Transit

12    Authority; correct?

13             A.    Correct.

14             Q.    And 46 of them died; true?

15             A.    Correct.

16             Q.    And in 2018, 189 people were run

17    over or hit by subway trains from the subway

18    system of New York City; correct?

19             A.    Correct.

20             Q.    And 46 of them were killed;

21    correct?

22             A.    Correct.

23             Q.    Did I skip 2016, it was a 168 hit

24    and 49 killed, and 2017, 181 hit and 46 killed;

25    correct?

62

1                          A. BATA

2              A.      Correct.

3              Q.      And in 2018, 189 people were run

4      over or hit by Transit Authority trains from the

5      subway system; correct?

6              A.      Correct.

7              Q.      And 68 of them were killed;

8      correct?

9              A.      Correct.

10             Q.      And in 2019, a partial year, there

11     were 88 people run over or hit by trains, and 27

12     of them killed; correct?

13             A.      Yes, correct.

14             Q.      Okay.  So, if we add them up,

15     that's about 876 people dead; correct?

16             A.      I assume the addition is correct,

17     yes.

18             Q.      And you are aware that, since the

19     pandemic, ridership is down dramatically in the

20     train system; correct?

21             A.      Yes.

22             Q.      And you are aware that we have had

23     the highest rate of people being run over and hit

24     by trains and killed in history; correct?

25             A.      I don't know.

63

1                          A. BATA

2          Q.    Okay.  Do you keep track of

3    injuries and deaths of the Transit Authority --

4          A.    No.

5          Q.    -- people hit by trains?

6          A.    No.

7                MR. GENIS:  Let's talk about just

8          one of these incidents in 2016.

9                Dave, could you please put up what

10         was previously marked for identification

11         as Plaintiff's Exhibits 26 and 27, on

12         January 20th of the year 2022, this year?

13         Is that 26 or 27, Dave?

14               MR. ROTH:  That's 26.

15         Q.    That's Bates 178; do you see that

16   document, sir, that photograph?

17         A.    Yes, I do.

18               MR. GENIS:  Can you go to the other

19         one now, Plaintiff's Exhibit 27?

20         Q.    That's also Bates No. 184; do you

21   see that, sir?

22         A.    Yes, I do.

23         Q.    That's the young woman I represent

24   in this case.  Are her injuries somewhat typical

25   of these injuries we have been discussing when

64

1                          A. BATA

2    people get run over by trains in the subway system

3    in New York?

4                MR. KEAVENEY:  Objection.

5         A.    I don't know what is typical.

6         Q.    Sir, when you talk about benchmarks

7    and international best practices, do you try to

8    look at other comparable mass rapid transit cities

9    or systems?

10               MR. GENIS:  You could take that

11         down, I think.

12        A.    Yes.

13        Q.    And you looked at publications,

14   published papers, and studies from these other

15   cities and countries; correct?

16        A.    Sometimes, yes.

17        Q.    And you looked at published

18   engineering standards of care and engineering

19   guidance; correct?

20        A.    I am not involved in the engineering

21   specifics.  In general, I understand what is going

22   on.

23        Q.    Okay.  Would it be fair to say that

24   during the time that you worked for the Transit

25   Authority, they were aware of a problem, a

65

1                      A. BATA

2    recurring problem, of every year many people being

3    run over, hit by trains, and seriously injured or

4    killed; true?

5              MR. KEAVENEY:  Objection.

6         A.    Aware, because there were many

7    suicides, also, yes.

8         Q.    By the way, when you say there are

9    many suicides, how do you know that; what is your

10   basis of saying that?

11        A.    It is known.  System safety keeps a

12   record of annual suicides.

13        Q.    Well, how do they decide that?  How

14   do you know if that's a valid opinion?

15        A.    It is not my area of expertise.

16   System safety based on evidence, witnesses, or

17   whatever.  I don't know.

18        Q.    So, you don't know factually how

19   many, if any, of the people run over and injured

20   or killed every year are actual suicides; correct?

21        A.    I know from what is on the official

22   report.

23        Q.    Do you know how that is determined

24   or based; do you know if that's a valid number

25   from the official report?

66

1                          A. BATA

2           A.    I believe it is a valid number

3    because it is based on the investigation.

4           Q.    Okay.  So, in other words, because

5    the Transit Authority tells you it is valid, you

6    believe it is valid; correct?

7                 MR. KEAVENEY:  Objection.

8           A.    Yes.

9           Q.    Are you familiar with the

10   expression root cause?

11          A.    Yes.

12          Q.    And you are familiar with the

13   expression root cause analysis; true?

14          A.    Not a hundred percent.

15          Q.    Well, root cause is determining the

16   essential cause of something happening; correct?

17          A.    Okay.

18          Q.    And the analysis determining what

19   the cause is; right?

20          A.    Correct.

21          Q.    And there is one common denominator

22   to all of these incidents, these hundreds, if not

23   thousands of incidents of people getting hit or

24   injured or killed by the trains; correct?

25                MR. KEAVENEY:  Objection.

67

1                           A. BATA

2                   THE WITNESS:  Can you repeat that

3          question?

4                   MR. GENIS:  Let's read it back and

5          let's see if it is English.

6                   (Whereupon, the requested portion

7          of the transcript was read back by the

8          court reporter.)

9                   THE WITNESS:  What is the common

10         denominator?

11         Q.    I am glad you asked me that.

12   Contact between the person and the train.

13         A.    Okay.

14         Q.    All right?

15         A.    Yes.

16         Q.    And there are different meanings or

17   different ways that that may happen.  So, for

18   example, a person could trip and fall on the

19   platform due to a defective or unsafe surface of

20   the platform and fall onto a track bed; correct?

21         A.    Correct.

22         Q.    And person could get sick, be ill,

23   have a heart attack, faint, or anything, and wind

24   up on the track bed?

25         A.    Correct.

68

1                      A. BATA

2          Q.    People can get pushed onto the

3    track bed; correct?

4          A.    Correct.

5          Q.    All right.  So, all of these people

6    that get hit or injured or killed, it is because

7    there was an open track way from the platform;

8    correct?

9          A.    Yes.

10         Q.    So, you are familiar with the study

11   that concluded from, not only New York, but cities

12   around the world, similar type cities, is that the

13   cause of people being hit by trains results from

14   open track ways?

15              MR. KEAVENEY:  Objection.

16         A.    No.

17         Q.    You are not familiar with that

18   study?

19         A.    No.

20         Q.    Have you heard of STV?

21         A.    Yes, I have.

22         Q.    Who is STV?

23         A.    It is consulting firm in New York

24   City.

25         Q.    And if they did work for the

69

1                          A. BATA

2    Transit Authority and issued a report involving

3    platform safety, that is something that, as your

4    job, you are required to be familiar with; true?

5              A.    I know they were doing a study, yes.

6              Q.    And, in fact, they did a study and

7    the final publication date was September 21 of

8    2016; correct?

9              A.    Well, I was not there anymore.

10             Q.    Hold on.  You, I thought, told us

11   you left the Transit Authority -- let me get my

12   notes here -- in 2015.  You are correct.  Sorry

13   about that.  You were already gone?

14             A.    That's correct.

15             Q.    But you kept up in the field;

16   correct?

17             A.    As a general knowledge.

18             Q.    Okay.  So, were you interested in

19   knowing what a study done for the Transit

20   Authority concluded in 2016?

21             A.    I was not involved.

22             Q.    I didn't ask if you were involved.

23   I asked if you were interested.

24             A.    No.

25             Q.    Now, you also, you told us, as part

70

1                              A. BATA

2       of your job, are familiar with other types of

3       structures involving mass transit, you even

4       mentioned cars and driving and things like that;

5       right?

6              A.    Yes.

7              Q.    And you worked for the Port

8       Authority, you told us, as well; correct?

9              A.    Yes, for a few months.

10             Q.    And you are familiar with the

11      George Washington Bridge; correct?

12             A.    Correct.

13             Q.    And the George Washington Bridge,

14      to your knowledge, are there fences on it to

15      prevent people from committing suicide by jumping

16      off of the bridge?

17                   MR. KEAVENEY:  Objection.

18             A.    I am not aware.  I used to walk

19      across the bridge and there was no fence.

20             Q.    So, if there was sworn testimony

21      and photographs and documents of evidence of

22      fencing on that bridge to prevent suicides, would

23      that be true or false?

24                   MR. KEAVENEY:  Objection.  If there

25                   was, would it be true or false?

71

1                        A. BATA

2              MR. GENIS:  Well, we know there

3         were.  We know this for a fact.

4              MR. KEAVENEY:  It is a poor

5         question.  Don't answer it.

6              MR. GENIS:  You know what, I will

7         rephrase it.

8         Q.    If you saw a photo of fencing on

9    the GW Bridge, would that be an accurate photo or

10   would that be invented?

11             MR. KEAVENEY:  Objection.  Don't

12        answer that.

13             MR. GENIS:  Let's do this another

14        way.

15        Q.    In your work, have you ever heard

16   of overpasses, bridges, walkways that went over

17   train tracks?

18        A.    Yes, of course.

19        Q.    Okay.  Did these bridges, these

20   overpasses, these walkways, did they have any kind

21   of rail or fencing?

22        A.    Some do and some don't.

23        Q.    Can you please name one, involving

24   the New York City Transit Authority, that has no

25   rail, no fencing, for a bridge, a walkway or

72

1                         A. BATA

2    passageway that goes over train tracks of the

3    Transit Authority that lacks that railing or

4    fencing?

5           A.    Honestly, I don't know.  It is a

6    huge system.  I don't know.

7           Q.    In fact, even inside stations there

8    are frequently walkways to go from, let's say, the

9    northbound to the southbound side of the train;

10   correct?

11              MR. KEAVENEY:  Objection.  You may

12          answer.

13          A.    Yes.

14          Q.    Those walkways, do they have

15   railings or fencing of some sort?

16          A.    I said there are many.  I don't

17   know.  Some do and some don't, probably.

18          Q.    So, you are telling us, the Transit

19   Authority, they have walkways in an underground

20   station to go from one side to the other, and

21   above the train tracks there are no fences or

22   railings or anything?

23              MR. KEAVENEY:  Objection.  He said

24          he didn't know.

25              MR. GENIS:  That's what I am

73

1                       A. BATA

2           asking.  I am following up.

3                   MR. KEAVENEY:  You are asking him

4           the question again.

5                   MR. GENIS:  I am asking another

6           follow-up question.  Can I please get an

7           answer?

8           A.    Some probably do and some probably

9    don't.  I don't know.

10          Q.    Does that comply with good and

11   accepted practices and procedures to have these

12   walkways, passageways, or bridges over Transit

13   Authority train tracks, in Transit Authority

14   subway stations where there is no railing or

15   fencing to prevent people from falling onto the

16   tracks below?

17          A.    As I said, there are some locations

18   where there is some fencing and some location where

19   there is not.

20          Q.    I understand.  That is not my

21   question.  Can you please answer my question?

22          A.    Okay.  I am trying to answer your

23   question again.  Please ask me again.

24                  MR. GENIS:  Read it back please.

25                  (Whereupon, the requested portion

74

```
 1                        A. BATA
 2           of the transcript was read back by the
 3           court reporter.)
 4           A.    It is -- I think the agency is
 5    trying to do its best, where it is practical and
 6    feasible.  Again, I am sure there are locations
 7    where there is no fencing and I am sure there is
 8    locations with some fencing.
 9                MR. GENIS:  Again, move to strike.
10           You are not answering the question, sir.
11           That's not the question.
12                THE WITNESS:  I can only tell you
13           what I know.  I don't know.
14           Q.    What do you base that on; what do
15    you base your opinions on that they have
16    unprotected walkways, bridges, and overpasses --
17    passageways?
18           A.    Well, when I step on the sidewalk,
19    it is unprotected.
20           Q.    I didn't ask about a sidewalk.
21           A.    Okay.
22           Q.    Can you answer my question about
23    New York City Transit Authority subway stations?
24           A.    As I said, the agency does a pretty
25    good job --
```

75

1                          A. BATA

2          Q.    That is not what I asked you, sir.

3     Could you please answer the question?

4                MR. KEAVENEY:  Could you let him

5                respond to the question and then you could

6                put your objection on the record.

7                MR. GENIS:  I would like him to

8                actually be responsive.

9          Q.    Because, sir, you told us, you are

10    not here to protect the interest of the defendant

11    in this lawsuit, are you; are you here to do that,

12    sir?

13               MR. KEAVENEY:  Objection.

14         Q.    Are you here to do that, sir?

15         A.    I am trying to give you my best

16    knowledge.

17         Q.    I know.  But could you answer that

18    question I just put to you; are you here to

19    protect the interest of the Transit Authority who

20    pays you a pension and brought you to their

21    attorney, to their office, for this deposition

22    today?

23               MR. KEAVENEY:  Objection.  Don't

24               answer that question.

25         Q.    Are you here to protect the

76

1                              A. BATA

2       interest of the Transit Authority, sir?

3                    MR. KEAVENEY:  Don't answer that

4              question.  It is an improper question.

5                    MR. GENIS:  I am glad you could see

6              his credibility and bias is not even in

7              dispute at this point, based on what you

8              are saying.

9                    MR. KEAVENEY:  Are you the jury

10             now, also, in addition to the plaintiff's

11             attorney?

12                   MR. GENIS:  I am just following

13             your lead, Andrew.  If you think all of

14             these things are irrelevant, the only way

15             they could be irrelevant is if it is so

16             obvious, which it is to me at least.  But

17             that's neither here nor there.

18                   Let's proceed.  I would like to

19             have a meaningful deposition and stop this

20             nonsense with you.

21             Q.   So, sir, out of curiosity, since

22      you are familiar with best practices around the

23      world, did transportation agencies generally try

24      to protect the public from suicides, like putting

25      fencing or railings on bridges or overpasses or

77

A. BATA

1

2    structures so that they don't fall onto the train

3    tracks below?

4         A.    Yes.

5         Q.    The Long Island Rail Road does

6    that, as well, too, and Metro-North; correct?

7              MR. KEAVENEY:  Objection.

8         Q.    True?

9         A.    Yes, I think so.

10        Q.    Okay.  When all over the world

11   public transit agencies install railings or

12   fencing on overpasses and walkways and bridges

13   over train tracks, and they do so to prevent

14   people from falling or committing suicide by

15   plummeting to the track below, when they do that,

16   is that a good and accepted practice and

17   procedure?

18              MR. KEAVENEY:  Objection.  You can

19        answer.

20        A.    It is -- worldwide, there are some

21   locations where it is done there, and worldwide

22   there are some locations where it is not done

23   there.

24              MR. GENIS:  That's not what I asked

25        you, sir.  Move to strike.

78

1                         A. BATA

2           Q.    All I am asking is, when agencies

3   do these preventative safety measures, when they

4   do so, does that comply with good and accepted

5   practices and procedures?

6                 MR. KEAVENEY:  Objection.

7           A.    It doesn't comply.  It is basically

8   desire.

9           Q.    Okay.  So, when people do safety

10  steps, these public agencies, to put railings or

11  fences on overpasses and bridges and passageways

12  above train tracks to prevent people from falling

13  or jumping onto the tracks below, does that comply

14  with professional standards of care?

15          A.    I -- honestly, I don't know what the

16  rule is or comply means.  I think it is desire they

17  do it.  I don't know that there is a rule for that.

18  I do not know.

19          Q.    Well, do good and accepted

20  practices and procedures require transit agencies

21  to protect people from falling, being pushed, or

22  jumping to suicides on the train tracks below to

23  the extent possible?

24          A.    It is a desired goal.

25          Q.    Is that a yes to my question?

79

1                         A. BATA

2          A.     I would say yes.

3          Q.     Okay.  So, it complies with

4    professional standards of care to require a

5    transit agency to protect people from falling,

6    being pushed, or jumping and committing suicide

7    onto train tracks below to the extent possible;

8    true?

9                 MR. KEAVENEY:  Objection.

10         A.     I don't know to what level it is

11   required.  I do not know the regulations.

12         Q.     Well, let's see.  Let's talk about

13   pedestrian safety.  Are you familiar with

14   pedestrian safety in mass transit and trains?

15         A.     In general, yes.

16         Q.     Good.  Let's talk about different

17   types of pedestrian safety.  Are you familiar with

18   platform edge doors or platform screen doors?

19         A.     Yes, I am.

20         Q.     Okay.  Can we agree that platform

21   edge doors are found extensively in transit

22   systems in Europe and in Asia?

23                MR. KEAVENEY:  Objection.

24         A.     Yes, they are found -- yes.  I am

25   not sure about extensively, but they are found.

80

1                        A. BATA

2            Q.    Okay.  Well, have you ever read any

3      studies that were given to MTA and Transit

4      Authority, in 2007, by Capital Construction, from

5      a consultant it hired?

6            A.    I don't recollect 2007.

7            Q.    Do you remember there being studies

8      about the Second Avenue subway?

9                  MR. KEAVENEY:  Objection.

10           A.    Yes.

11           Q.    And you are familiar DMJM Harris;

12     correct?

13           A.    The consulting firm; right?

14           Q.    Yes.

15           A.    Yes.

16           Q.    And you reviewed their studies that

17     they gave to the Transit Authority in 2007, July

18     of 2007 to be specific?

19                 MR. KEAVENEY:  Objection.  You can

20                 answer.

21           A.    I don't recollect specifically.

22           Q.    Well, certainly at the time it

23     would have been part of your job to read any of

24     there studies about installing platform edge doors

25     at stations on the Second Avenue subway which had

81

1                        A. BATA

2    not even been built yet; correct?

3                    MR. KEAVENEY:  Objection.  You can

4            answer.

5            A.    Again, I was not an engineer.  It

6    was not my responsibility to review those studies.

7    I might have looked at it.  I don't recall.

8            Q.    Did you ever read that the

9    consultant hired by the MTA, and paid by the MTA,

10   wrote that platform edge doors are found

11   extensively in transit systems in Europe and Asia?

12           A.    I believe they said that, yeah.  I

13   think so.

14           Q.    Would you agree or disagree with

15   that statement?

16           A.    I would -- I would disagree with the

17   word extensively.  I would probably say in general,

18   yes.

19           Q.    Do you agree that these platform

20   edge doors have been used in St. Petersburg,

21   Russia since 1963?

22           A.    Again, that's -- in St. Petersburg,

23   that is not the platform door system architectural

24   design.

25           Q.    Let's be crystal clear.  So, if

82

1                          A. BATA

2     DMJM Harris put in writing, and was paid by the

3     MTA, and gave a final report that said that, would

4     that be a true or false statement?

5              A.    I am just commenting on the word

6     extensively, okay.  It depends on how you define

7     extensively.

8              Q.    Sir, I was no longer talking about

9     extensively.  I was asking about the barrier

10    protections for pedestrians in St. Petersburg,

11    Russia since 1963; true or false?

12             A.    I want to be truthful to you.  The

13    one in St. Petersburg is an architectural solution.

14    That's not a platform door.

15             Q.    There are barriers; correct?

16             A.    It is a door between columns,

17    architectural columns.  It is a beautiful station

18    with a beautiful design with oval structures over

19    the doors.  It is not a platform door design.

20             Q.    So, yes, there is a barrier to

21    prevent people from being run over by trains at

22    St. Petersburg since 1963?

23             A.    I don't know the date, but yes.

24             Q.    Okay.  Thank you.  Do we agree,

25    other heavy rail transit systems operating with

83

1                         A. BATA

2     platform edge doors include Beijing, Shanghai, and

3     Hong Kong in China, Copenhagen in Denmark, Paris,

4     Lille, Rennes, and Toulouse in France?

5              A.    There are, and many of those are

6     automated driverless systems.

7              Q.    Excellent.  Thank you.  So, yes is

8     the answer to my question?

9              A.    Yes.

10             Q.    And also, you are familiar with

11    platform edge doors in Shinkansen, JR, and various

12    private railways in Japan, in Seoul, Korea, in

13    Incheon, Korea, Busan, Daegu, and Daejeon in

14    Korea; do you agree with that, sir?

15             A.    Those are high-speed intercity

16    trains.

17             Q.    And yes, they have platform edge

18    doors; true or false?

19             A.    Some of them do and some of them

20    don't.

21             Q.    As of 2007, they had them; correct?

22             A.    Again, I don't know the date.  All I

23    know is that some of those are high-speed intercity

24    trains, some of them do have platform doors and

25    some of them don't.

84

1                          A. BATA

2          Q.    Kuala Lumpur in Malaysia, London in

3    the United Kingdom, Kaohsiung and Taipei in

4    Taiwan, and in Bangkok, Thailand, and in

5    Singapore; true or false?

6          A.    It is probably true that some of

7    those systems have it and some of them don't,

8    depending on the line, of course.  Some cities may

9    have it on certain lines and some don't, for

10   example, Paris, where they don't have most of the

11   stations.

12         Q.    Let's back up.  So, I just want to

13   be crystal clear.  I just gave a list of different

14   cities and countries throughout the world that

15   have platform edge doors; is it your sworn

16   testimony under oath that none of these places

17   have it or that all of them have it in one form or

18   another?

19         A.    I cannot say all.  I would probably

20   say that they probably have them on some of their

21   lines.  That's all I can tell you.  That's my

22   knowledge.

23         Q.    So, all of them have it on some of

24   their lines throughout the world; true or false?

25         A.    I do not know if they have.  I have

85

1                          A. BATA

2    not been to all of those places.  I have not

3    witnessed it.

4          Q.    As of 2007, pedestrian edge doors

5    are being designed and under construction in

6    Europe and in Asia and are used extensively in

7    people-mover systems in the United States,

8    particularly in airports and around the world;

9    true or false?

10          A.    Automatic systems, yes.

11          Q.    Okay.  Thank you.  And by the way,

12   the subway systems in London and Paris are older

13   than the one in New York City; true?

14          A.    The one in London is.

15          Q.    In fact, London has got the oldest

16   subway system in the world; correct?

17          A.    Correct.

18          Q.    And Paris' subway system is older

19   than the New York City Transit, as well; correct?

20          A.    Maybe by a year.

21          Q.    Let's talk about these platform

22   edge doors for a moment, okay.  Could we agree

23   there are various advantages, benefits, to having

24   platform edge doors; correct?

25          A.    Yes.

86

1                          A. BATA

2              Q.    So, for example, right off the bat,

3       can we agree that platform edge doors prevent

4       people from landing on the tracks and getting run

5       over by trains?

6              A.    Correct.

7              Q.    And that they can eliminate

8       incidents of people being run over and either hurt

9       or killed by trains?

10             A.    Correct.

11             Q.    In addition to having safety by

12      preventing people from being run over or hit by

13      trains, they create fire and safety barriers

14      between the track area and the platform?

15             A.    If there is excessive trash on the

16      tracks.

17             Q.    Well, I am going to go through a

18      list of things that I am sure you have reviewed

19      before, sir.  It was part of your job to be

20      familiar with the international best practices of

21      platform edge doors safety; correct?

22             A.    Correct.

23             Q.    So, you knew that platform edge

24      doors can prevent debris from going onto the track

25      bed below; true?

87

1                          A. BATA

2          A.      That's correct.

3          Q.      And if there is no debris on the

4    track bed, that could prevent fires from starting

5    on the track bed; correct?

6          A.      Mitigate it, for sure.

7          Q.      Where there is a fire, the platform

8    edge door creates a safety barrier between the

9    track area and the platform; true?

10         A.      True.

11         Q.      And where there are platform edge

12   doors, they could eliminate or reduce delays

13   caused by unauthorized persons on the track; true?

14         A.      In stations.

15         Q.      Yes.

16         A.      Not in the tunnel.

17         Q.      In stations we are talking about.

18         A.      In stations.

19         Q.      Okay.  Platform edge doors tell

20   passengers -- they give them a clear indication of

21   where to wait for train doors so that cueing,

22   boarding and alighting is more efficient; true?

23         A.      Not necessarily.

24         Q.      Well, when you say not necessarily,

25   necessarily means one hundred percent of the time;

88

1                    A. BATA

2    correct?

3         A.    If the doors are marked clearly,

4    yes.  If they are not marked clearly, not true.

5         Q.    So, let's back up.  So, where the

6    doors are marked clearly, passengers would have a

7    clear indication of where to wait for train doors

8    so that cueing, boarding, and alighting is more

9    efficient with platform edge doors; true or false?

10        A.    Generally, yes, true.

11        Q.    Passengers and staff working on

12   platforms would be protected from passing trains

13   if there are platform edge doors; correct?

14        A.    Correct.

15        Q.    Claims resulting from passengers

16   falling onto tracks will decrease; true or false?

17        A.    I guess it is true.

18             MR. KEAVENEY:  The witness needs a

19             break.

20             MR. GENIS:  Okay.  Let's make a

21             note of the time.  The time is now 12:06.

22             So, we are taking a break.

23             (Whereupon, a break was taken.)

24             MR. GENIS:  Dave, if you could put

25             on the screen -- let's start with, I think

89

 1              A. BATA

 2      it is 12722, and it was also marked as

 3      Plaintiff's Exhibit 16, I believe at

 4      Mr. Sanchez' deposition.

 5              MR. ROTH:  We are just going to

 6      mark it, just as if it is the first

 7      exhibit.  We are just going to mark it

 8      Exhibit --

 9              MR. GENIS:  It is actually not the

10      first.  The first one today was the chart

11      with the fatalities, et cetera.

12              MR. ROTH:  Right.  I will re-number

13      that.  So, this is Exhibit 2, and it is

14      Exhibit 2 Bata, 12722.  Do you want me to

15      start from the bottom up?

16              MR. GENIS:  Yes, please.  Okay.  We

17      will start from the bottom and -- hold on

18      a second.  Go further down.  Dave, that's

19      the wrong document.  I said 12722.  No,

20      that's the wrong document.  The document I

21      have only has two e-mails on it.  It

22      starts with Iannuzzi at the bottom and

23      Mr. Bata at the top.

24              Okay.  That's it.  That's the

25      document I want.  It is No. 2 for today's

90

1                          A. BATA

2              date.

3                   (Whereupon, Plaintiff's Exhibit 2,

4              a document, was marked for

5              identification.)

6              Q.    Sir, we are showing you Plaintiff's

7    Exhibit 2 of today's date, Bates stamped 12722.

8    And on the bottom part of the page, which is what

9    we are focusing on, is an e-mail from Donald

10   Iannuzzi, and you are one of the people that is

11   cc'd on this; correct?

12             A.    That's correct, yes.

13             Q.    And this is on November 7th of

14   2011, at 10:24 in the morning; correct?

15             A.    Yes.

16             Q.    The subject is platform door

17   recommendations; correct?

18             A.    Yes.

19             Q.    Who is Don Iannuzzi?

20             A.    He was an engineer in the capital

21   program management department.

22             Q.    Well, wasn't he the chief

23   mechanical engineer and a licensed professional

24   engineer?

25             A.    I mean, he had several titles, but I

91

1                    A. BATA

2    think at that time, yes.  It looks like it, yes.

3            Q.    And did he write, "Platform doors

4    should have been a standard for new stations ten

5    years ago"?

6            A.    That's what he wrote.

7            Q.    Do you agree with that statement?

8            A.    I agree that, not standard, but it

9    should be tried.

10            Q.    Okay.  So, you would not agree with

11    that statement, that one sentence in his one

12    sentence e-mail; correct?  You agree or disagree

13    with that statement?

14            A.    Object to the standard, right.

15            MR. GENIS:  So, Dave, could you

16            scroll to the top of the page now?

17            Q.    We are now looking at your

18    responsive e-mail to Mr. Iannuzzi on November 7th

19    of 2011, and the time is 15 hours and 44 minutes,

20    regarding the platform door recommendation; do you

21    see that?

22            A.    Yes.  Yes, I see it.

23            Q.    Signed by you, Andrew Bata, Chief

24    Strategic Improvements and Best Practices, Office

25    of Strategic Innovation and Technology, MTA New

92

```
 1                           A. BATA
 2      York City Transit; do you see that?
 3              A.    I do see it, yes.
 4              Q.    And your response to Mr. Iannuzzi's
 5      statement that platform doors should have been a
 6      standard for new stations ten years ago, was the
 7      word, "Absolutely," with four exclamation points;
 8      correct?
 9              A.    Correct.
10              Q.    So, can we agree, in 2011, you
11      agreed absolutely with Mr. Iannuzzi's statement
12      that platform doors should have been a standard
13      for new stations ten years ago?
14              A.    Well, apparently I was enthusiastic.
15              Q.    Is that a yes, that's what you did
16      back in 2011, you said absolutely to that
17      statement?
18              A.    In retrospect, the word standard,
19      probably --
20              Q.    Sir, I didn't ask you about
21      retrospect.
22              A.    I have to say yes.
23              Q.    Sir, was that the truth when you
24      wrote that then; when you wrote absolutely
25      platform doors should have been a standard for new
```

93

1                          A. BATA

2    stations ten years ago in the year of 2011, were

3    you being truthful?

4            A.    As a reaction, yes.

5            Q.    Were you being honest?

6            A.    Yes.

7            Q.    Were you being accurate?

8            A.    Probably not.

9            Q.    Were you being objective?

10           A.    Probably not in terms of standard.

11   I should be more careful.

12           Q.    Okay.  So, did you ever send out a

13   follow-up e-mail, "Geez, I should have never said

14   that.  I disagree with that.  That's wrong"?

15           A.    No, probably I did not.

16               MR. GENIS:  Okay.  Well, let's talk

17           a little more about that then.

18               Dave, can you please put on the --

19           it is Bates No. 414959.  Before we get to

20           that, I want to do just another couple.

21           Sorry.  My apologies, Dave.

22               Can you jump to Bates No. 385648?

23           I will start at the bottom and go towards

24           the top, and this will be Plaintiff's

25           Exhibit 3.  There are three e-mails on my

94

1                          A. BATA

2              page.  We will start at the bottom.

3                      (Whereupon, a discussion was held

4              off the record.)

5                      (Whereupon, Plaintiff's Exhibit 3,

6              a document, was marked for

7              identification.)

8              Q.    Sir, we are showing you what has

9    been marked for identification today as

10   Plaintiff's Exhibit 3, Bates stamped 385648.  And

11   we are looking at the bottom, an e-mail from Peter

12   Cafiero, on November 6, 2011, at 3:17 p.m.; do you

13   see that, sir?

14             A.    Yes, I do.

15             Q.    The subject is, "Report from Sao

16   Paulo"?

17             A.    Okay.

18             Q.    It states, "I recently attended the

19   annual meeting of the community of Metros (CoMET)

20   the international benchmarking group for Metros

21   (subways) that New York City Transit has been a

22   founding member of."

23                      Did I read that accurately?

24             A.    Yes, you did.

25             Q.    By the way, do you recall

95

1                          A. BATA

2        testifying under oath earlier today that you are

3        not familiar with CoMET?

4                A.    I did not say that.

5                Q.    So, you were familiar with it?

6                A.    Of course.

7                Q.    Do you remember I asked you if New

8        York City Transit was a founding member of it; do

9        you remember what your answer was?

10               A.    It was not a founding member, it was

11       a new member.

12               Q.    Do you see how this is written,

13       that transit is a founding member?

14               A.    Yes.

15               Q.    Is Mr. Cafiero wrong; is he lying?

16               A.    He was not there in 1980 when

17       that -- when it was established.

18               Q.    And you were?

19               A.    1987, I was there, yes.

20               MR. GENIS:  And let's just go,

21               Dave, to the next page for one second, to

22               Page 385649, and then we will come back to

23               this page again.

24               Q.    We are going to go to the first

25       full paragraph.  Do you see it says, "First some

96

1                        A. BATA

2     basic facts about Sao Paulo; it is the largest

3     city in the southern and the western hemispheres,

4     with a population of over 11 billion, and the

5     metropolitan area population is just a little less

6     than New York's, although it is more densely

7     packed."

8                   Did I read that accurately?

9          A.    Yes.

10                MR. GENIS:  Okay.  Let's go back

11              now to the first page, Bates 385648, Dave.

12         Q.    Do you see the e-mail from John

13    Gaul, on November 7, 2011, at 8:40 a.m., and you

14    were one of the people this is sent to, regarding

15    the report from Sao Paulo; correct?

16         A.    Yes, but your picture blocks some of

17    the text.

18                MR. GENIS:  Can you move it over to

19              the left, Dave, or shrink it somehow?

20                THE WITNESS:  Yes, I can see it

21              now.

22         Q.    All right.  Do you see how Mr. Gaul

23    said to you and others, "See Peter Cafiero's

24    report below on his recent inspection trip to Sao

25    Paulo.  I visited Sao Paulo in 1989 as part of New

97

                          A. BATA

1           York City Transit's control center modernization

2    management study, and considered the then much

3    smaller system to be on the cutting edge of heavy

4    rail rapid transit operations worldwide; do you

5    see that, sir?

6              A.    Yes, I do.

7              Q.    Now, let's go up to your responsive

8    e-mail.  Okay.  And this is from you to Mr. Gaul

9    and all of these other people, on November 7,

10   2011, at 15:16 hours; correct?

11             A.    Yes.

12             Q.    And you write, "John/All, I have

13   been back several times since John and I were

14   there in 1988, and the progress has been

15   incredible."

16             Did I read that accurately?

17             A.    That's correct.

18             Q.    "Their headway management is

19   incredibly efficient and they can maintain less

20   than two minutes continuously throughout the

21   rush."

22             Did I read that accurately?

23             A.    Right.

24             Q.    I am going to go to the last

98

1                          A. BATA

2      sentence in your e-mail, and it is boldfaced in

3      the original; correct?

4              A.    Yes.

5              Q.    And it states, by you, "When will

6      we listen to/follow proven international best

7      practice here?"

8                   Did I read that accurately?

9              A.    That's correct.

10             Q.    When you wrote that, was that a

11     truthful statement?

12             A.    Correct, yes.

13             Q.    Was it honest?

14             A.    Yes.

15             Q.    Was it accurate?

16             A.    Yes.

17             Q.    Was it objective?

18             A.    It was not objective.

19             Q.    Not objective, okay.  So, we will

20     have more fun with that later.  Let's go to

21     another thing now.  Let's go to Bates 414959,

22     please.

23                  By the way, did you ever tell

24     anybody at the Transit Authority that you were not

25     objective when doing your job?

99

1                      A. BATA

2              MR. KEAVENEY:  Objection.

3         A.    No, I did not.

4         Q.    Did you ever do a follow up e-mail

5    to say, you know, "Ignore the other e-mail I wrote

6    when I said when will we listen to/follow proven

7    international best practices here.  I was not

8    objective;" did you ever do that?

9         A.    Because I should have been --

10        Q.    Did you ever do that is my

11   question?

12        A.    I should explain more, my comments.

13             MR. GENIS:  Move to strike.

14        Q.    Just answer my nice, simple

15   question.  Did you ever send a follow-up e-mail,

16   to your e-mail of November 7, 2011, to the Transit

17   Authority, "When will we listen to/follow proven

18   international best practices here," boldfaced; did

19   you ever send a follow-up e-mail saying, "Geez,

20   don't listen to me.  I was not objective"?

21        A.    No, I did not.

22             MR. GENIS:  Now let's have the next

23             one.  This should be Plaintiff's 4, if I

24             am correct.  It is Bates 414959.

25             (Whereupon, Plaintiff's Exhibit 4,

100

1                              A. BATA

2              a document, was marked for

3              identification.)

4              Q.    Okay.  We are going to start at the

5     bottom, and there is an e-mail from a Ronald

6     Pezik, also on November 7, 2011, at 2:25 in the

7     afternoon; correct?

8              A.    Yes.

9              Q.    It is about a PSD/PED meeting held

10    on October 25, 2011; correct?

11             A.    In a memo, yes.

12             Q.    And PSD stands for platform screen

13    door; correct?

14             A.    Yes.

15             Q.    And PED is platform edge door?

16             A.    Yes.

17             Q.    And these terms are used

18    synonymously and interchangeably?

19             A.    In general, yes.

20             Q.    There is an e-mail -- by the way, I

21    just want to back up.  When we were discussing

22    some of your other e-mails, where you talked about

23    absolutely should have been the standard ten years

24    ago and when are we going to follow best practices

25    and comply with best practices internationally,

101

                        A. BATA

1

2    why are you sending it to all of those people at

3    the Transit Authority?

4         A.    Generally to inform them about what

5    is happening internationally.

6         Q.    That was part of your job; correct?

7         A.    Yes.

8         Q.    And the people you were sending it

9    to, who were these different people?  I mean, it

10   has their names on it.

11        A.    Well, I mean, they were people in my

12   -- my colleagues.

13        Q.    I mean, when you say they are

14   colleagues, was it just people that you happen to

15   know and work with, or were these people that were

16   intergritley involved with platform screen doors

17   and safety?

18        A.    They were people who probably had

19   something to do with them, correct.

20        Q.    I mean, if the subject is platform

21   door recommendations, you wouldn't be sending this

22   e-mail to people that had nothing to do with

23   platform doors; correct?

24        A.    Right.

25        Q.    So, now, this e-mail, who is Ronald

102

A. BATA

1

2    Pezik, by the way?

3         A.    I have no idea.  I don't recollect.

4    I don't know who he is.

5         Q.    Do you know who the other people

6    that are cc'd on this e-mail are?

7         A.    I know some of them.

8         Q.    Who?

9         A.    I know Lisa Schreibman.

10        Q.    Who is she?

11        A.    She was an operations designer.  And

12   I know Sean Kildare.

13        Q.    Who else?

14        A.    And that's it.

15        Q.    Who is Sean Kildare?

16        A.    He was in -- I believe, I recollect

17   now, he was in MTA construction, capital

18   construction.

19        Q.    And Lisa Schreibman was actually

20   the director of the No. 7 line extension capital

21   program department of subways; true?

22        A.    At that time, probably she was, yes.

23        Q.    What were the roles of these

24   different people?

25        A.    They were involved in the No. 7 line

103

1                        A. BATA

2    extension.

3              Q.    I mean, they were involved to just

4    take a look at it, to give comments, to do what?

5              A.    Again, as I mentioned, I don't

6    know -- I don't recollect this Ronald Pezik, but it

7    looks like they were part of the team that was

8    involved in the -- especially Lisa, that it was

9    involved in the No. 7 line extension.

10             Q.    And here, this e-mail from Ronald

11   Pezik to Lisa says, "The determination to be able

12   to move forward with this initiative hinges on

13   whether PSD/PED will be become a New York City

14   Transit standard."

15                   Did I read that accurately?

16             A.    Yes.

17             Q.    If that is not the case, and New

18   York City Transit is not in a position to fund

19   this initiative, I think that the technical

20   details are superfluous, as the initiative can't

21   move forward; true?

22             A.    True.

23             Q.    In other words, and we could go to

24   the other e-mails if you would like, that if this

25   became a standard, there be would funding separate

104

1                          A. BATA

2    and apart from the Transit Authority, another

3    entity would give funding for this project;

4    correct?

5              A.    I don't know.

6              Q.    You don't know, okay.  Let's see if

7    I could help you on that.  We will get back to

8    that in a minute.  I just want to stick on this

9    e-mail.

10             Let's go right above Pezik's 1.

11   Let's look at Schreibman's response on the same

12   document.  Do you see it, on November 7, 2011, at

13   2:30 p.m., five minutes later?

14             A.    Yes.

15             Q.    And she sent this to a number of

16   people, including you; correct?

17             A.    Yes.  I see my name, yes.

18             Q.    And she said, "FYI"; correct?

19             A.    Right.

20             Q.    And that was for your information;

21   correct?

22             A.    Yes.

23             Q.    Let's go higher to see your

24   response.  Do you see an e-mail by you, on

25   November 7, 2011; yes?

105

1                       A. BATA

2        A.    Yes, I do see it.

3        Q.    And you say, "Lisa, this needs to

4    be elevated to the highest levels"; did I read

5    that accurately?

6        A.    Yes.

7        Q.    "We'll be forever stuck in dinosaur

8    land"; did I read that accurately?

9        A.    You read it correctly.

10       Q.    So, she was talking about having a

11   standard for new stations to have platform edge

12   doors, the same one that you had previously said

13   absolutely, how it should have been the standard

14   ten years earlier, and then you said, "This needs

15   to be elevated to the highest levels"; correct?

16       A.    Correct.

17       Q.    And what did you mean by that, when

18   you said this needs to be elevated to the highest

19   levels?

20       A.    Well, it should be evaluated for

21   sure, absolutely, so it makes sense.

22       Q.    What does that mean?  When you said

23   this needs to be elevated, did you mean this meant

24   that they need to bring this to the attention of

25   the people at the top; correct?

106

1                          A. BATA

2          A.    To see if it makes sense, of course.

3          Q.    So, you wanted this to be brought

4    to the decision makers; correct?

5          A.    For evaluation and consideration,

6    absolutely.

7          Q.    Okay.  And who were the decision

8    makers?

9          A.    Well, top management, New York City

10   Transit.

11         Q.    Who?

12         A.    Well, the engineer who was involved

13   in the seven line extension, and some of the people

14   who ran capital construction, you know, and the New

15   York City Transit president, you know.

16         Q.    So, the president, at the time, was

17   Prendergast; correct?

18         A.    Correct.

19         Q.    Who were the other decision makers

20   at the highest level that you wanted this new

21   standard brought to the attention of?

22         A.    As I said, I object to the word

23   standard.  I recommended that this should be

24   evaluated to see if it makes sense.

25         Q.    Sir, I am going to go by your

1                        A. BATA

2    words, not what you are trying to backtrack to

3    now.  At the time you said, after somebody said

4    platform doors should have been a standard for new

5    stations ten years ago, you said, "Absolutely";

6    right?

7            A.    Correct.

8            Q.    And then you said, that same day,

9    "When will we listen to follow-up proven

10   international best practices here"; true or false?

11           A.    Correct.

12           Q.    Thank you.  And then, when

13   discussing this absolute new standard that should

14   have been in place ten years before, you said,

15   "This needs to be elevated to the highest levels";

16   true or false?

17           A.    For a decision.

18           Q.    Okay.  And other than the

19   president, who were the other decision makers that

20   at the highest levels that you wanted them to see

21   how this should be the new standard ten years ago

22   for new stations?

23           A.    I would just say the president, you

24   know.

25           Q.    Anyone else?

108

1                         A. BATA

2           A.    That's -- I mean, maybe the head of

3     capital construction.

4           Q.    The head of capital construction at

5     the time was Mysore Nagaraja; correct?

6           A.    At that time, I think so, yes.

7           Q.    And you are aware that Mysore

8     Nagaraja wanted platform edge doors, as well, and

9     he was a proponent of them being done; true?

10          A.    He was interested.

11          Q.    And, in fact, he wrote to

12    Mr. Prendergast asking that they put them in;

13    correct?

14          A.    I didn't see the memo, but I know

15    that he was interested, yes.

16          Q.    Are there other names of people who

17    you consider the decision makers at the highest

18    level on this, the names, not just the titles?

19          A.    Those two are the highest levels, in

20    my opinion.

21          Q.    And how about, are you familiar

22    with Horodnicinea?

23          A.    Yes, I am.

24          Q.    Who is that?

25          A.    I think he came -- he was the head

109

1                          A. BATA

2      of capital -- I think he came after Mysore, I

3      believe.  I don't recollect exactly, but I think he

4      was the successor to Mr. Nagaraja.

5              Q.    When you had said, on November 7th

6      of 2011, "We'll be forever stuck in dinosaur

7      land," what did that mean?

8              A.    That we need to look at these

9      things.

10             Q.    Were you saying we need to do more

11     than look, we need to make changes?

12             A.    That's what I meant, evaluate and

13     look and test.

14             Q.    In any of your e-mails, did you say

15     evaluate and test?

16             A.    Probably not.

17             Q.    You didn't say that?

18             A.    Not specifically, but it was part of

19     my job to be in that evaluation testing mode.

20             Q.    Sir, when you volunteer words

21     non-responsively to my questions, you are doing so

22     each and every time to assist the Transit

23     Authority; true?

24                  MR. KEAVENEY:  Objection.

25             Q.    You can answer.

110

1                        A. BATA

2          A.    It is not true at all.

3          Q.    Have you volunteered a single thing

4     yet, in response to any of my questions, that

5     would be of assistance to any of the victims who

6     were killed or maimed by being run over by these

7     trains that platform edge doors could have

8     prevented?

9               MR. KEARNEY:  Objection.  Don't

10              answer that question.

11         Q.    Have you volunteered anything that

12    would benefit them as opposed to just benefiting

13    the Transit Authority in this case?

14              MR. KEAVENEY:  Objection.  Don't

15              answer that question.  It is improper.

16              MR. GENIS:  Is it improper to show

17              bias, Andrew?

18              MR. KEAVENEY:  I am not being

19              deposed today.

20              MR. GENIS:  Thank you.  Just

21              checking.

22         Q.    So, sir, you wrote e-mails, and I

23    could go through all of them, sir, that you wanted

24    these standards to be changed, you wanted changes

25    in the system; true or false?

111

                    A. BATA

1

2          A.    I don't think I ever wrote that the

3     standards should be changed.

4          Q.    So, when you wrote "absolutely" in

5     response to platform doors should have been the

6     standard for new stations ten years ago,

7     "absolutely" with four exclamation points, you

8     didn't actually mean what you wrote; is that what

9     you are telling me right now under oath?

10         A.    What I meant is that we should look

11    at it to see if it is feasible and makes sense.

12         Q.    So, you are lying when you wrote

13    the word "absolutely"?

14              MR. KEAVENEY:  Objection.

15         A.    I object to that statement.

16         Q.    You have a lawyer objecting, sir.

17              So, sir, did you ever say to

18    anybody, "You know what, I was not being honest

19    and truthful when I said absolutely with four

20    exclamation points.  I was misleading.  It was not

21    an honest candid statement"; did you ever do that?

22              MR. KEAVENEY:  Objection.

23         A.    I am not going to answer the

24    question.  I find it objectionable.

25         Q.    Well, sir, I am not going to get

112

1                          A. BATA

2    into what I find objectionable.

3              A.    No.  I did not do that, no.  You

4    need to present that in the case.

5              Q.    Sir, I think your words speak for

6    themselves.

7                   So, sir, let me ask you, before I

8    started to question you under oath today for a

9    lawsuit, did you ever put in writing that when you

10   wrote "absolutely," how platform doors should have

11   been the standard for new stations ten years ago,

12   and we should listen to and follow proven

13   international best practices here, did you ever

14   change that at any time before today for this

15   lawsuit?

16             A.    I didn't change that memo, that

17   e-mail.

18             Q.    Like is today the first time you

19   are ever saying these things, that you were not

20   truthful and honest and accurate and objective in

21   your e-mail?

22             MR. KEAVENEY:  Objection.

23             A.    No, I did not say that.

24             Q.    So, you were being truthful,

25   accurate, and objective in these e-mails?

113

1                          A. BATA

2                  MR. KEAVENEY:  Objection.

3          A.     I think I was overly enthusiastic.

4          Q.     Sir, I didn't ask if you were

5   enthusiastic.  Answer my question, please.

6          A.     Truthful, I was truthful in what I

7   felt.

8          Q.     Okay.  So, you were being truthful,

9   honest, and objective in what you wrote in these

10  e-mail; yes or no?

11         A.     I guess I was.

12         Q.     Okay.  And what you wrote in those

13  e-mails, are they still the truth today?

14         A.     Based on international best

15  practices, it is obvious that it needs to be looked

16  at for specific case by case basis, yes.

17                 MR. GENIS:  Move to strike as not

18                 responsive.

19         Q.     All I am asking you is yes or no,

20  those three e-mails we have just read in the

21  record, what you wrote then and you said was the

22  truth then, is it still the truth today?

23         A.     It is true today, what I felt, yes.

24         Q.     Thank you.  And what you said was

25  honest and accurate in 2011, is it still honest

114

                            A. BATA

1

2    and accurate today in those e-mails?

3              A.    It was honest and should have been

4    more accurate.

5              Q.    Okay.  So, it was accurate, though?

6              A.    It should have been more accurate.

7              Q.    So, now you are changing your

8    testimony again.  So, let's back up.  Sir, I am

9    trying to -- it is just going to take me longer

10   the more you do this.  But okay.  That's all

11   right.

12             Sir, you told us a moment ago that

13   what you wrote in these e-mails was accurate, now

14   you are saying it is not accurate; which is it,

15   were they accurate or not accurate?

16             MR. KEAVENEY:  Objection.  He's

17             answered this line of questions numerous

18             times.

19             MR. GENIS:  Yeah, and then he keeps

20             giving conflicting and different answers,

21             and when he volunteers information that

22             flatly contradicts what he said a moment

23             ago, I have no choice but to follow up and

24             explore it.

25             Again, if he would only answer the

115

1                    A. BATA

2           questions, we wouldn't be having this

3           problem.  But since he likes to volunteer

4           information, this is the problem.

5           Q.    So, sir, answer my question.  We

6    could read it back if you would like.

7           A.    It was accurate how I felt at that

8    time.

9           Q.    Great.  What you wrote, is it

10   accurate today?

11          MR. KEAVENEY:  Objection.  Asked

12          and answered.

13          Q.    Yes or no, sir, is it accurate?

14          A.    In retrospect, I should have said --

15          Q.    Sir, I didn't ask you about in

16   retrospect what you should have said.  Can you

17   please just answer my simple yes or no questions?

18          MR. KEAVENEY:  Objection.  You are

19          asking what he meant today --

20          MR. GENIS:  That's not what I asked

21          him at all, Andrew.

22          MR. KEAVENEY:  Read the question

23          back.

24          (Whereupon, the requested portion

25          of the transcript was read back by the

116

1                          A. BATA

2          court reporter.)

3                     THE WITNESS:  It would not be

4          accurate today.

5          Q.    Okay.  When did it stop being

6     accurate?

7          A.    As I said, in retrospect --

8          Q.    I didn't ask you about that.  When

9     did it stop being accurate, what you wrote in

10    these three e-mails in 2011; when did it stop

11    being accurate?

12                     MR. KEAVENEY:  Objection.  Let him

13          answer the question.  Stop interrupting

14          him.

15         A.    I don't recall, but if I would have

16    looked at it again the next day, probably I would

17    have corrected it.

18         Q.    Did you correct it the next day;

19    yes or no?

20         A.    No, I did not.

21         Q.    Okay.  So, let's back up.  All of

22    these e-mails, to and from you, were created,

23    kept, and maintained by the Transit Authority in

24    the regular course of business; correct?

25         A.    Yes.

117

1                          A. BATA

2          Q.    It was part of your job to draft

3    these e-mails and respond to these e-mails; true?

4          A.    Yes.

5          Q.    And it was your job to be honest,

6    thorough, and accurate; true?

7          A.    Yes.

8          Q.    It was your job to be objective;

9    true?

10         A.    Yes.

11         Q.    Okay.  And did you perform your job

12   when you wrote these e-mails?

13         A.    Yes, I did.  I did.

14         Q.    Thank you.  The first time you have

15   ever cast any doubt at all on the clear words you

16   wrote is today; true or false?

17         A.    In my mind, I probably should have

18   been more careful what I said as an enthusiastic

19   person.

20              MR. GENIS:  Sir, I didn't ask you

21         any of that.  Move to strike.

22         Q.    Could you please answer my

23   question?

24         A.    Informally?

25         Q.    Yes, sir.

118

1                          A. BATA

2          A.     No, no.

3          Q.     So, today is the first time you are

4    ever formally changing your prior accurate,

5    objective, and truthful statements that you made

6    as part of your job to be accurate, truthful, and

7    objective 11 years ago; correct?

8          A.     For that particular sentence, yes,

9    correct.

10         Q.     Those three different e-mails; yes

11   or no?

12         A.     Yes, for those words only.

13         Q.     Thank you.

14         A.     Not opinions.

15         Q.     And dinosaur land, does that mean

16   that the Transit, as you noted in one of your

17   other e-mails, needs to follow proven

18   international best practices, and it was mired in

19   the past; is that what that meant when you said it

20   will be forever stuck in dinosaur land?

21         A.     What I meant was we should look at

22   what is out there.

23         Q.     I understand that, but could you

24   answer my question, please?

25                MR. KEAVENEY:  Objection.  He just

119

1                      A. BATA

2          did.

3          Q.    Okay.  I'm sorry, did you say we

4    should look what is out there or did you say this

5    needs to be elevated, not should be, may be, can

6    we, needs to be elevated to the highest levels;

7    true or false?

8          A.    For evaluation, of course.

9          Q.    By the way, did you say for

10   evaluation in that e-mail; yes or no?

11         A.    That's what I meant.

12         Q.    I didn't ask what you meant.  Did

13   you say it; yes or no?

14         A.    I did not say it.

15         Q.    Okay.  And then you said, "Will be

16   forever stuck in dinosaur land"; correct?

17                MR. KEAVENEY:  Objection.  Asked

18                and answered repeatedly.

19         Q.    Is dinosaur land a reference to

20   times long ago?

21         A.    It means old system.

22         Q.    Old, okay.  Archaic, antiquated; is

23   that what dinosaur land means?

24         A.    Correct.

25                MR. GENIS:  Let's take a look at

120

1                    A.  BATA

2          Bates No. 12725.

3          Q.    While he is doing that, so dinosaur

4    land means not only archaic and antiquated, it

5    means way in the past, when the rest of the world

6    had already moved on; correct?

7                A.    It has implications of that.

8                MR. GENIS:  Thank you.

9                MR. ROTH:  Is this Exhibit 5?

10               MR. GENIS:  I believe so.

11               MR. ROTH:  And that's a two-page

12         document?

13               MR. GENIS:  Mine is only one page.

14               MR. ROTH:  It looks like it goes

15         down to another.

16               MR. GENIS:  It does look like it

17         goes on to another page.

18               MR. ROTH:  I am just going to make

19         it two pages.

20               MR. GENIS:  That's fine.

21               (Whereupon, Plaintiff's Exhibit 5,

22         a document, was marked for

23         identification.)

24         Q.    So, we are looking at Plaintiff's

25    Exhibit 5, Bates stamped 12725 and 12726.  At the

121

1                          A. BATA

2      bottom of 25, going into 26, is an e-mail from

3      Lisa Schreibman; correct?

4              A.    You are asking me?

5              Q.    Yes, I'm asking you, sir.

6              A.    Yes, I see it.

7              Q.    And you are one of the people cc'd

8      on it, when you go on to the next page; correct?

9              A.    Yes.  It looks like it, yes.

10             Q.    And it was on platform doors

11     recommendations; correct?

12             A.    Yes.  From Lisa, yes.

13             Q.    And she, Lisa Schreibman, was

14     attaching a draft Powerpoint for Tuesday's

15     meeting; correct?

16             A.    Right.

17             MR. GENIS:  And can you go up,

18             please, Dave.  All right.

19             Q.    Now, on the same exhibit, there is

20     another e-mail from Lisa Schreibman, November 7,

21     2011, at 9:42 in the morning, and you are one of

22     the people cc'd on it; correct?

23             A.    Yes.

24             Q.    And the subject, again, is platform

25     door recommendations with a Powerpoint; correct?

122

1                              A. BATA

2          A.    Yes, correct.

3          Q.    And she writes how she just had a

4    discussion with MTA-CC staff; did I read that

5    accurately?

6          A.    Yes.

7          Q.    Who is MTA-CC?

8          A.    MTA Capital Construction.

9          Q.    "They said that in order for them

10   to go back to HYDC (the funding partner for the

11   number seven line extension) that NYCT would need

12   to declare platform doors a new standard."

13              Did I read that accurately?

14         A.    You read that accurately.  That's

15   correct.

16         Q.    And she writes, "I think it would

17   be highly problematic if NYCT declared platform

18   doors a new standard for all stations, or even all

19   underground stations, or even all underground

20   stations with CBTC."

21              Did I read that accurately?

22         A.    Yes, you did.

23         Q.    "However, we could probably create

24   a new standard for "new stations" without much

25   problem."

123

1                          A. BATA

2              Did I read that accurately?

3         A.    You did.

4         Q.    "Perhaps we would word it that new

5    stations with a single fleet?"  And it goes on.

6              Did I read that accurately?

7         A.    You did.

8         Q.    So, in other words, you are seeing

9    again that if this became the standard for new

10   stations, platform edge doors, the Transit

11   Authority could get funding by a separate entity;

12   correct?

13             MR. KEAVENEY:  Objection.  You can

14        answer.

15        A.    That's what they felt.  Not my

16   opinion.

17        Q.    Well, sir, it was in this whole

18   stream of e-mails, because that was written at

19   9:42, and we've already covered the e-mail from

20   Don Iannuzzi from 10:24, not even an hour later,

21   how platform doors should have been the standard

22   for new stations ten years ago, and then your

23   response e-mail saying absolutely; correct?

24        A.    It was my view, I guess,

25   enthusiastically speaking.

124

1                        A. BATA

2          Q.    Then were you so enthusiastic that

3    same day, you also said, "When will we listen to

4    follow proven international best practices here";

5    correct?

6                    MR. KEAVENEY:  Objection.  Asked

7               and answered.  Move on.

8                    MR. GENIS:  We are just getting

9               full context now, because he didn't know

10              about the funding earlier, so that's why

11              we have to go back to it.

12         Q.    Sir, could you answer the question?

13                   MR. GENIS:  Again, Andrew, if the

14              witness wants to keep going about him

15              being enthusiastic and being

16              non-responsive, this is what happens.  If

17              he just answers my question --

18                   THE WITNESS:  I am giving you

19              honest answers.

20         Q.    Sir, honest would be if you

21    answered yes or no to a yes or no question; true?

22                   MR. KEAVENEY:  Objection.

23         Q.    Remember you gave me your word

24    earlier, that if I asked you a yes or no, or a

25    true or false, you will do so and not add anything

125

1                          A. BATA

2    else; do you remember giving me your word on that?

3           A.    I think I answered the question

4    already.

5           Q.    Can you answer me now; do you

6    remember giving your word on that before?

7           A.    Yeah, I think so.

8           Q.    Good.  All right.  And you do

9    understand that if you just answer with yes or no

10   to a yes or no question, or true or false to a

11   true or false question, we could move on quicker;

12   correct?

13              MR. KEAVENEY:  Objection.

14          A.    I assume so.

15          Q.    Then you don't need to add the

16   extra words; correct?

17              MR. KEAVENEY:  Objection.

18          Q.    You don't need to volunteer the

19   extra words for the benefit of the Transit

20   Authority; correct?

21              MR. KEAVENEY:  Objection.

22          Q.    So, now we have the full context,

23   because we have gone from beginning to end of

24   these mails about the funding, and your position

25   at the time was, absolutely, the Transit should

126

1                    A. BATA

2    have made this, ten years ago, the standard for

3    all new stations, that we have to follow and

4    listen to international best practices and we have

5    to bring this to the highest levels, otherwise you

6    are going to be forever stuck in dinosaur land;

7    correct?

8                    MR. KEAVENEY:  Objection.  You can

9            answer.

10           A.    Correct.

11           Q.    Sir, because you were intimately

12   familiar with UITP, you, in fact, sent around a

13   copy of a final report by UITP, called Topic 28

14   platform/track protection systems, dated October

15   2009; correct?

16           A.    I don't recollect, but probably I

17   did, yes.

18           Q.    Do you recall, at the time, UITP,

19   in 2009, wrote how platform edge protection

20   ensures passenger safety and protection; true?

21           A.    True.

22           Q.    And they wrote, in 2009, UITP, how

23   a platform edge protection prevents intrusions

24   onto the track, limiting the number of suicides,

25   protecting against pollution, reducing fires in

127

1                          A. BATA

2     tunnels; correct?

3              A.    That's correct.

4              Q.    And how it improves traffic flow,

5     helping trains to enter stations at a higher

6     speed; correct?

7              A.    Yes.

8              Q.    And to exit at a higher speed;

9     correct?

10             A.    I don't remember the exit, but I

11    guess he said that's fine.

12             Q.    And improving quality of train

13    services; correct?

14             A.    That's what it says.  That's

15    correct.

16             Q.    And for better use of the available

17    platform areas; correct?

18             A.    Correct.

19             Q.    And that the platform edge doors

20    optimize the air conditioning system,

21    circumscribing air circulation, reducing energy

22    consumption; true?

23             A.    You are quoting the UITP report,

24    yes.

25             Q.    By the way, you have circulated

128

1                          A. BATA

2    this UITP report that noted that, "Platform screen

3    doors and APGs are the signal dominant system used

4    for PTP; correct?

5              A.    PTP?  I don't know.

6              Q.    Pedestrian protection.

7              A.    Okay.  Fine.

8              Q.    Okay.  And APGs, what are those?

9              A.    I think it is automatic passenger

10   systems -- I'm not sure.  I don't recall anymore.

11             Q.    It is a gate, it's a passenger

12   gate; would that help you?  Would that refresh

13   your memory?  Does that refresh your memory, sir?

14             A.    Yes.  You used the reference.

15             Q.    Okay.  And it is just kind of a

16   lower height, a lower technology gate; it is kind

17   of like a fixed rail almost gate?

18             A.    I understand, yes.

19             Q.    Okay.  So, it is a PSD, it is a

20   type of PSD, it is just at a lower height;

21   correct?

22             A.    That is correct.

23             Q.    Now, Singapore was the pioneer of

24   these PSDs and has the oldest installation dating

25   back to 1986; correct?

129

1                          A. BATA

2              A.    I think so.  I'm not sure.

3              Q.    When UITP made this study, they did

4      so with the Transit Authority; correct, they

5      participated in it?

6              A.    I do not know.  I honestly don't

7      remember.

8              Q.    Okay.  And there were various major

9      suppliers of PSD systems in the world; correct?

10             A.    That's correct.

11             Q.    And a number of them, at least

12     seven, were identified in this study; correct?

13             A.    That's correct.

14             Q.    The study did a comparison of

15     before and after retrofitting of platform screen

16     doors; correct?

17             A.    Again, I don't recall.  But if you

18     say so, it is in the study, yes.

19             Q.    And that's certainly something you

20     would have been looking at; correct?

21             A.    I probably -- yes.  I probably did,

22     yes.

23             Q.    Certainly, if you circulated this

24     report, you would have read it first?

25             A.    Yes, that's correct.

130

1                          A. BATA

2          Q.    And the before and after showed

3    zero fatal accidents, including suicides, after

4    PSDs were installed; correct?

5          A.    Correct.

6          Q.    Zero operational lost time per day

7    due to passenger intrusions after the PSDs were

8    retrofitted; correct?

9          A.    Correct.

10         Q.    Operational lost time per day due

11   to falls and different objects on the track went

12   down to zero; correct?

13         A.    Correct.

14         Q.    Number of driver sick days due to

15   psychological shock after hitting intruders went

16   down to zero, as well, after the retrofit, as

17   well; correct?

18         A.    Yes.  Again, I don't recollect the

19   exact report, but I will take your word for it

20   that's in there.

21         Q.    The report talks about

22   benchmarking; correct?

23         A.    Okay.

24         Q.    And different applications and

25   technologies; yes?

131

1                          A. BATA

2            A.      Yes.

3            Q.      And the different technologies used

4    throughout the railway industry throughout the

5    world, as of 2009, I am going to list, and tell me

6    if I am right or wrong; video system, active

7    infrared beam system, weight sensors, laser

8    scanner, active radar beam, and platform screen

9    door/automatic platform gate?

10           A.      Yes.

11           Q.      And the video system is based on a

12   commercial off-the-shelf technology, consists of

13   video cameras and motion detectors; true?

14           A.      Yes.

15           Q.      And as of 2009, both Paris and New

16   York networks were equipped with this technology

17   to contribute to the global safety of the

18   networks; correct?

19           A.      Yes.

20           Q.      By the way, when you were talking

21   before about suicides, Tokyo has a subway system

22   since the 1920s; correct?

23           A.      That's correct.

24           Q.      And Tokyo put in the platform doors

25   to prevent the suicides; correct?

132

1                           A. BATA

2           A.    Yes, yes.

3           Q.    Okay.  And it eliminated suicides

4    in Tokyo, from people being run over by trains;

5    correct?

6           A.    No.

7           Q.    No?

8           A.    No.

9           Q.    Okay.  What percentage of suicides

10   did it prevent in Tokyo, according to the

11   research?

12          A.    I don't know.

13          Q.    99.9 percent?

14          A.    I don't know.

15          Q.    99 percent?

16          A.    I do not know.

17          Q.    Okay.  How many suicides, after

18   Tokyo put in the platform screen doors, all

19   together have there been?

20          A.    I do not know, but I know it is not

21   a hundred percent prevented.

22          Q.    So, 99.9 percent?

23          A.    I do not know, sir.

24          Q.    By the way, even before 2009, the

25   Massachusetts Bay Transportation Authority had

133

1                          A. BATA

2    installed an IVS video system using object video

3    equipment to detect trespassers entering their

4    tunnels and trains tracks; correct?

5            A.    I am not aware of it.  Obviously, I

6    believe you, what you said.

7            Q.    Let's talk about active infrared

8    beam systems, that has been used at station

9    platforms; correct?

10           A.    I believe so, yes.

11           Q.    And, in fact, this was used in

12   Canada, in 2005; correct?

13           A.    I do not know.  I am not involved in

14   those systems.

15           Q.    But you reviewed these reports;

16   correct?

17           A.    I saw them mentioned, but I don't

18   know much details about them.

19           Q.    What is more important to the

20   Transit Authority, protecting people or protecting

21   its equipment?

22           A.    They are both very important, of

23   course.

24           Q.    Which is more important?

25           A.    To be truthful, probably people.

134

1                    A. BATA

2    But it is an unfair question.

3            Q.    Nothing unfair about it at all,

4    sir.  It is just priorities.  So, would the

5    Transit Authority have its priority the safety of

6    the customers or the safety of its equipment;

7    which is the higher priority?

8            A.    I just answered it.

9            Q.    And laser scanners, you are

10   familiar with, as well; correct, and active radar

11   beams?

12           A.    As I said, I am not familiar with

13   them.  I know about them.  I know they are testing

14   these things.  I am not familiar with them.  That's

15   not my area.

16           Q.    Now, for the platform screen doors,

17   that is your areas; correct?

18           A.    I know something about them, yes.

19           Q.    And platform screen doors are the

20   most widely-used system to prevent people from

21   being hit and run over by trains throughout the

22   world?

23                 MR. KEAVENEY:  Objection.

24           A.    Well, maybe yes, but I would also

25   say a good signal system is also helpful.

135

1                          A. BATA

2          Q.    According to the UITP report that

3    you circulated throughout the Transit Authority,

4    and the Transit Authority participated in, stated

5    that PSDs are certainly the most widely-used

6    systems; true or false?

7          A.    Yes, I think it is true.

8          Q.    They fulfill more needs than other

9    systems (PSDs prevent people from falling onto the

10   tracks, rather than detect them when they fall;

11   full-height PSDs also prevent heat exchange by

12   isolating the platforms from the tracks; they

13   allow an increase in the speed of the trains

14   entering a station, etc.)"

15          Do you agree with all of that?

16          A.    I do.

17          Q.    And they offer the highest level of

18   safety; correct?

19          A.    In that case, yes.

20          Q.    And Hong Kong had successfully

21   completed a retrofit project during 2002 to 2006;

22   correct?

23          A.    Yes.  I think so, yes.

24          Q.    And then there were retrofits in

25   Europe, as well; correct?

136

1                         A. BATA

2          A.     A few cases, yes.

3          Q.     And Tokyo, also, for the green

4    line, retrofitted; correct?

5          A.     I don't know.  It could have been an

6    automatic line, a driverless line.  I don't know.

7          Q.     And Paris did a retrofit, as well;

8    correct?

9          A.     Just two lines.

10          Q.     So, you are aware that there are

11    major train lines, subway lines, that have done

12    retrofits on older lines to install,

13    retroactively, platform screen doors for safety;

14    true or false?

15          A.     Where it is feasible.

16          Q.     You told us feasible means it can

17    be done; correct?

18                 MR. KEAVENEY:  Objection.

19          A.     If it is not feasible, it cannot be

20    done.

21          Q.     And if it is feasible, it can be

22    done; correct?

23          A.     If it is feasible and practical,

24    yes.

25          Q.     I am not going to get into the

137

1                        A. BATA

2      reports from 2007 and earlier.  Let's stick with

3      this 2009 report.  So, the Transit Authority was

4      aware of the findings and conclusions of this UITP

5      report in 2009; correct?

6              A.    I assume so.

7              Q.    What changes, if any, did the

8      Transit Authority make to prevent people from

9      getting hit or run over by a train, since 2009,

10     the entire time you were there?

11             A.    Well, certainly they increased the

12     communications, stay away from the platform edge,

13     standard announcements, and all kinds of testing of

14     systems, instructions to train operators, a

15     tremendous amount of things.

16             Q.    Let's me see if I get this

17     straight.  What year did you start with the

18     Transit again?

19             A.    1987.

20             Q.    Okay.  From 1987 to 2015, what if

21     any structural changes did the Transit Authority

22     make to prevent people from being hit and run over

23     by trains and harmed or killed?

24             A.    Well, I mean, first of all, they

25     installed those platform edge concave domes as the

138

1                          A. BATA

2     safety edge platform safety devices that is

3     mandated by the federal government.

4              Q.    Say that again.  What do they

5     install?

6              A.    Concave domes on the platform edge.

7              Q.    When you say a dome, what do you

8     mean by a dome?

9              A.    Protruding domes on the platform

10    edge telling people where the platform edge is.

11             Q.    The yellow tactile strip; is that

12    what you are referring to, that yellow strip?

13             A.    Correct.

14             Q.    And isn't the tactile yellow strip

15    merely to alert blind people, or visually impaired

16    people, that they are getting close to the edge,

17    and that's why it is tactile and raised?

18             A.    Absolutely not.  That's not true.

19             Q.    That wasn't put there as a

20    requirement of the Americans for Disabilities Act?

21             A.    Yes, but it is good for everybody.

22             Q.    Okay.  That's not what I asked you

23    sir.  So, let's get back to the question, since

24    you just changed an answer.

25                   So, the tactile dome raised bubbles

139

1                      A. BATA

2      on that yellow strip were placed pursuant to the

3      Americans for Disabilities Act, so that blind

4      people or visually impaired people would know that

5      they are getting close to the edge of the

6      platform; true or false?

7                A.    That was the origination of the

8      idea, yes.

9                Q.    By the way, where, if anywhere, on

10     the platform itself, does it say that people are

11     supposed to step back from the edge?

12               A.    I am not sure there are signs, but

13     the announcements coming instantly.

14               Q.    So, could we agree that throughout

15     the entire time period that you were there, there

16     were no markings on the platform or signs posted

17     to keep away from the edge of the platform; true

18     or false?

19               A.    The strips are markings.

20               Q.    Excuse me.  Answer my question.

21               A.    I said, the strips, the tactile

22     strips, are markings.

23               Q.    Let's try this again.  Could you

24     tell me, from the time you started with the

25     Transit Authority in 1985, to 2015, what signs,

140

1                          A. BATA

2       with words, what words were written, what

3       markings, words, were written on the platform to

4       tell people to stay away from the edge?

5              A.    Words, I don't recall.

6              Q.    So, would it be fair to say that at

7       no time did the Transit Authority ever place signs

8       or put words on the platform warning the customers

9       to stay away from the edge; true or false?

10                  MR. KEAVENEY:   Objection.

11             A.    I don't recall.  It is probably

12      true.  I don't recall, frankly.  There could be

13      signs, but I don't know.

14             Q.    And if a person is deaf or hearing

15      impaired, they might not hear the announcement, if

16      one was made, to stay away from the edge; correct?

17             A.    Wouldn't hear the announcement, yes.

18             Q.    So, let me ask you -- let's even

19      stick with the 2009 report.  So, since the time

20      the report was issued, 556 people died, 1,645

21      people were struck, according to the Transit

22      Authority records; other than putting on that

23      yellow strip and perhaps making announcements,

24      what, if anything, did the Transit Authority do to

25      prevent people from getting hit by trains and run

141

                           A. BATA

1

2   over by trains?

3          A.    Constant instructions to the train

4   operators and constant announcements, non-stop

5   announcements.  Every station, every time.

6          Q.    Other than the announcements and

7   telling its drivers to try not to run over people,

8   what did they do structurally to prevent it from

9   happening?

10         A.    Improve lighting systems in the

11  station.  Station upgrades.  Improve lighting.

12         Q.    When did they put in the improved

13  lighting, give us better training?

14         A.    As parts of the constant renewal of

15  stations.

16         Q.    When is what I am asking you?

17         A.    It is continuous.

18         Q.    So, let me ask you.  Are you aware

19  of a single study, memo, report, analysis that

20  said the announcements were effective, to any

21  degree whatsoever at all, in preventing people

22  from being hit and run over by trains?

23              MR. KEAVENEY:  Objection.  You can

24              answer.

25         A.    I don't know.

142

1                        A. BATA

2          Q.    Are you aware of any study, report,

3    analysis, or anything at all, that says that

4    yellow tactile strip for the blind people has been

5    effective in preventing anybody from getting hit

6    and run over by a train?

7          A.    I am not aware, but it is common

8    knowledge.

9          Q.    When you say it is common

10   knowledge, let's look at the statistics.  We went

11   through 2001 through 2019.  Do the statistics show

12   that there has been essentially no change in the

13   number of people getting hit and killed every

14   year?

15         A.    I do not know about statistics.  I

16   know that the rail is about steady year to year.

17         Q.    Not a problem.  We will put it back

18   on the screen to help you.

19              MR. GENIS:  So, Dave, do you have

20         that ready yet?

21              MR. ROTH:  I am sorry.  I missed

22         that.

23              MR. GENIS:  Can you please put

24         Plaintiff's Exhibit 1 up?

25              MR. ROTH:  Plaintiff's No. 1 from

143

A. BATA

1

2          today?

3                    MR. GENIS:  Today, the chart.

4                    (Whereupon, a discussion was held

5          off the record.)

6                    MR. GENIS:  I am going to ask some

7          other questions while you get that.

8          Q.    As a transportation professional,

9    you can look at numbers or statistics and you

10   could see whether there is a significant change or

11   not, to see whether or not there is a change or

12   whether or not whatever is being done is effective

13   or not; true or false?

14                   MR. KEAVENEY:  Objection.  You can

15         answer.

16         A.    In general, yes.

17         Q.    So, what year did they place those

18   yellow strips?

19         A.    I do not recall.  I don't know.

20         Q.    Approximately?

21         A.    I don't know.  Honestly, I don't

22   know.

23         Q.    What decade?

24         A.    '80s or '90s.

25         Q.    Now we are showing you Exhibit 1,

144

1                          A. BATA

2      which starts in 2001, okay.  When you went through

3      it, did you see if the numbers actually went up;

4      by 2003, it is 188 people, and then there are some

5      fluctuations where it goes down and up?

6              A.    That's the point.  It goes up and

7      down.

8              Q.    Have you ever seen, for a complete

9      year, a full year, any year where less than 110

10     people were hit by trains?

11             A.    On this chart, no.

12             Q.    And are there years where, on this

13     chart, you see it went up to 189 people hit by

14     trains?

15             A.    I'd like to see the chart from 1994.

16             MR. GENIS:  I would, too, and I'll

17             call for production of it.  I have been

18             asking for it for a while from the Transit

19             Authority.  I would like to get all of

20             their years of statistics.

21             THE WITNESS:  That would be good.

22             MR. GENIS:  So, I agree with you,

23             sir, and I join in your request.

24             THE WITNESS:  It fluctuates.

25             Q.    But it fluctuates within a certain

145

                          A. BATA

1

2    range; correct?

3         A.    I am not a statistician.  It is a

4    range.  It fluctuates.  That's what I see.  I am

5    looking at the numbers.  It goes up and down.

6         Q.    It never goes below 110; correct,

7    never below 110 people?

8         A.    That's correct.  That's correct.

9    And we don't know how many suicides.

10        Q.    Well, we know how much deaths;

11   correct?

12        A.    Correct.

13        Q.    Okay.  Sir, I would like to make a

14   representation that during the pandemic, last

15   year, 200 people got hit and 68 people died, when

16   we had the lowest percentage ridership ever; would

17   you agree with that?

18        A.    I don't know the exact numbers, but

19   there are other reasons, and you know that.

20        Q.    By the way, safety is the priority

21   for doing a platform screen door retrofit;

22   correct?

23        A.    It is one of the reasons.

24        Q.    Now, since you haven't seen

25   statistically, can you tell me, since it seems to

146

1                          A. BATA

2      be within a certain range, can we agree that

3      whatever steps the Transit Authority has taken

4      have been ineffective at preventing death and

5      serious injury from people being hit by trains?

6                     MR. KEAVENEY:  Objection.  You can

7               answer.

8              A.    All I can tell you, in general,

9      safety is a high priority and efforts are made to

10     make the system as safe as feasibly and practically

11     possible.  You cannot ever make it --

12                    MR. GENIS:  Move to strike.  That

13              is not my question.

14                    THE WITNESS:  You cannot make it a

15              hundred percent safe.

16                    MR. GENIS:  Move to strike as not

17              responsive.

18              Q.    Sir, in fact, didn't you review

19     reports and studies that said they eliminated

20     people being killed and hit, or injured and hit by

21     trains, platform screen doors; didn't you read a

22     study and didn't you testify to that earlier today

23     under oath?  Yes or no, sir?

24              A.    Of course, yes.

25              Q.    So, isn't the best reason to put in

147

                        A. BATA

1                        A. BATA

2    platform screen doors to keep it safe for the

3    people?

4          A.    It is one of the primary reasons,

5    yes, I agree with you.

6          Q.    And based on worldwide experience,

7    it is not a dispute that it is doable, feasible,

8    and can be accomplished; correct?

9                MR. KEAVENEY:  Objection.

10         A.    No.

11         Q.    No?

12         A.    It is case by case.

13         Q.    Let's back up.  So, you are telling

14   us, even though it has been done all over the

15   world, and even in New York City, at JFK, it is

16   not possible to install platform screen doors in

17   New York City subways; is that what you are

18   telling us?

19         A.    JFK is a brand new system and it is

20   automated.

21         Q.    That's not my question, sir.  My

22   question is very simple.  We can read it back if

23   you'd like.  It is a yes or no question.  And

24   let's keep our word, right, you are going to keep

25   your word and answer my yes or no question with a

148

A. BATA

1      yes or no.

2              Is it your sworn testimony, right

3      now, that it is impossible, cannot be done, we

4      cannot install platform screen doors in New York

5      City subways; is that your testimony, sir?

6          A.    Not at every station.

7              MR. GENIS:  Move to strike as not

8              responsive.

9          Q.    I didn't ask you that, sir; did I?

10     Remember you were going to keep your promise and

11     give me a yes or no?

12         A.    The question is vague.  It is an

13     incorrect question.  I can't answer the question

14     like that.

15         Q.    You can't answer the question like

16     that?

17         A.    Absolutely not.

18         Q.    So, you are agreeing that in some

19     stations, certainly, it is absolutely feasible,

20     practical, doable, and possible to install

21     platform screen doors; true?

22             MR. KEAVENEY:  Objection.

23         A.    In some stations it is feasible --

24         Q.    Thank you.

149

1                        A. BATA

2          A.     -- not practical.

3          Q.     Is it ever not practical to save a

4     life?

5                 MR. KEAVENEY:  Objection.

6          A.     I find the question objectionable.

7          Q.     That really doesn't matter, sir.  I

8     am using your words.

9                 By the way, in transportation

10    engineering, are feasible and practical the same,

11    synonymous?

12         A.     Not in my mind.

13         Q.     I didn't ask you your mind.  I

14    asked you about in the field of transportation

15    engineering.

16                MR. KEAVENEY:  Objection.  You can

17                answer.

18         A.     It is feasible to send a rocket to

19    the moon; is it practical to send everybody up?

20                MR. GENIS:  Sir, I didn't ask you

21                that.  Move to strike as not responsive.

22         Q.     When we want to talk about going to

23    the moon, we will get there.  But to follow up on

24    you, we can send people to the moon --

25         A.     There is a difference between

150

1                          A. BATA

2    feasible and practical.

3            Q.    Let me follow up based on what you

4    just volunteered on your own.  You are telling us

5    we could put people on the moon, but we can't keep

6    people safe on the New York City subway system; is

7    that your sworn testimony?

8            A.    It is a silly question, no.

9            Q.    So, we could put people on the

10   moon, but you are saying it is impossible to have

11   platform screen doors in the New York City subway

12   system; is that what you are telling me?

13           A.    I did not say that.  I said it is

14   feasible.

15           Q.    Excellent.  Thank you.  I am glad

16   you cleared that up.

17           A.    Not practical.

18           Q.    Is it practical to save lives?

19           A.    Sure.

20           Q.    And is it practical to prevent

21   people from losing their arms and legs?

22           A.    Yes.

23           Q.    Is it practical to prevent people,

24   where it is possible to do so --

25           A.    Where it is possible.  Good words.

151

1                    A. BATA

Using your words, yes.

2

3            Q.    Excellent.  I am glad.  Practical,

4    in the field of transportation engineering, means

5    that something can be done, it's feasible;

6    correct?

7            A.    Makes sense.

8            Q.    Okay.  Thank you.  Let's keep

9    going.  Let's back up a little bit.

10                 So, the technology for platform

11   screen doors has been in existence for many, many

12   decades; correct?

13           A.    Yes.

14           Q.    Okay.  And we already went through

15   how platform screen doors were installed in

16   certain stations throughout the world back in the

17   1980s and before; correct?

18           A.    Yes.

19           Q.    Okay.  So, it is not state of the

20   art, in the year of 2010 to 2016, to be able to

21   have a platform screen door, that's state of the

22   art was already decades before; correct?

23           A.    It is evolving.

24           Q.    I understand that things could be

25   made better, but the technology already existed

152

1                      A. BATA

2    decades before 2010; correct?

3          A.    Yes.  Yes, correct.

4          Q.    Thank you.  So, it is not

5    innovative to have platform screen doors, it is

6    just whether or not one does it; correct?

7                MR. KEAVENEY:  Objection.

8          A.    It is innovative.

9          Q.    Well, innovative -- let's look up

10   the word innovative.  Let's make sure we are using

11   that correctly.  Innovative means to introduce

12   something new or different; do you agree with that

13   definition?

14         A.    Correct.

15         Q.    Okay.  So, platform screen doors

16   have been around for many, many decades; correct?

17         A.    Correct.

18         Q.    They are not new, they are not

19   different in the world; correct?

20         A.    They are very different in many

21   stations.

22               MR. GENIS:  That's not my question,

23         sir.  Move to strike.

24               THE WITNESS:  They are different

25         worldwide.

153

1                        A. BATA

2              MR. GENIS:  Move to strike.  That's

3        not my question.

4        Q.    You are not here to help the

5   Transit; right?  I am just checking.

6        A.    I am giving the facts.

7              MR. KEAVENEY:  Objection.  Your

8        question was they are different; right?

9              MR. GENIS:  Okay.  That's fine.

10             MR. KEAVENEY:  Let's not disconnect

11        here.

12             MR. GENIS:  That's okay.  I will

13        deal with it.

14        Q.    So, could we agree that one of the

15   issues for the Transit Authority to install

16   platform edge doors to keep people safe would be

17   the cost of doing so; correct?

18        A.    It is one of the factors, yes.

19        Q.    What is the key factor in deciding

20   to install them or not, the funds or not?

21        A.    One of the factors.  It is not one

22   key factor.

23        Q.    Well, you can't do it if you don't

24   have the money; correct?

25        A.    It is a key factor, yes.

Enright Court Reporting    (631) 589-7788

154

1                          A. BATA

2          Q.    But can you answer my question?  If

3     there are no funds for the installation of

4     platform screen doors, well then they can't be

5     installed; correct?

6          A.    Correct.

7          Q.    Okay.  That would be practical;

8     right?  If you don't have money, it is not

9     practical to have it; correct?

10         A.    Then it is not even feasible.  Then

11    it is not feasible.

12         Q.    Okay.  Then the issue is money.

13    Can we agree that, according to UITP, and that

14    report you circulated at the Transit Authority,

15    the report of 2009, stated significant revenues

16    are generated for the illuminated track side

17    advertising panels?

18         A.    Yes.

19         Q.    And, in fact, there were offers to

20    have platform edge doors installed for free by

21    different companies; true?

22         A.    I think there was some talk about

23    that, yes.

24         Q.    In fact, in 2006, a company called

25    Crown Infrastructure Solutions offered to design

155

1                          A. BATA

2      and fund and do the installation of platform

3      screen doors for the New York City subway system

4      in June of 2006; true or false?

5              A.    I heard about that, yes.

6              Q.    And then after Crown made that

7      offer to install them at no cost to the Transit

8      Authority, did the Transit Authority ever issue

9      and RFI?

10             A.    I do not know.

11             Q.    What is an RFI?

12             A.    Request for information.

13             Q.    Did you ever suggest, to the

14     Transit Authority, that they issue an RFI to see

15     if any companies would be interested in installing

16     a platform screen door safety system for free to

17     the system, in other words at no cost to the

18     Transit Authority, or minimal cost?

19             A.    I don't remember.  I don't remember.

20     I remember there was talk about it, but for one

21     station or something like that.  I don't recall,

22     honestly, but I know there was talk about it, like

23     an advisement, but only one station, as a trial,

24     yeah.

25             Q.    Did the Transit Authority ever

156

1                        A. BATA

2    issue an RFI for platform screen doors to see if

3    companies could do it for free or at minimal cost?

4         A.    I don't know.  I don't think so for

5    free.  I don't recall.  I don't know.

6         Q.    That would be an important fact, if

7    they did that; correct?

8         A.    I don't know about the free ones.  I

9    do not know.

10        Q.    If the Transit Authority had asked

11   companies, solicited people, to respond to RFIs,

12   to see if they could do it for free, that would be

13   an important fact; correct?

14                 MR. KEAVENEY:  Objection.

15        A.    I guess so.

16        Q.    That would be a very significant

17   fact; correct?

18                 MR. KEAVENEY:  Objection.

19        Q.    Can you please answer?

20        A.    Yes, I guess so.

21        Q.    By the way, you are familiar with

22   MTA real estate; correct?

23        A.    Yes, I am.

24        Q.    And that is a portion of the MTA

25   New York City Transit Authority; correct?

157

1                              A. BATA

2          A.    I'm not sure if it is part of the

3    Transit Authority or the MTA.  I don't remember

4    now.  I don't know.  It could be the MTA.

5          Q.    And one of the things they do is,

6    they figure out ways of getting revenue for the

7    Transit Authority; correct?

8          A.    Correct.

9          Q.    So, for example, you are familiar

10   with the bus shelters in New York City; correct?

11         A.    Correct.

12         Q.    And you are familiar with BOT, BOT

13   agreements; correct?

14         A.    What is BOT?

15         Q.    If you are not familiar, you are

16   not familiar.  That's okay.

17               You are familiar with, you told us,

18   the bus stations; correct?

19         A.    Bus shelters, yes.

20         Q.    Bus shelters, yes.  And at one

21   point in time they got rid of all of the old bus

22   shelters and got brand new ones; correct?

23         A.    Correct.

24         Q.    And the new bus shelters all had a

25   form of advising on them; correct?

158

1                          A. BATA

2          A.    Correct.

3          Q.    The agreement the Transit Authority

4    made with a private company or companies, was that

5    the private companies would pay for the cost of

6    installing these brand new bus shelters in

7    exchange for getting ad revenue; correct?

8                MR. KEAVENEY:  Objection.  You may

9          answer.

10         A.    Yes.  But I think that was a New

11   York City DOT contract, not a New York City Transit

12   contract, I believe.

13         Q.    And then, in the subways

14   themselves, in the train cars, there are

15   advertisements; correct?

16         A.    Correct.

17         Q.    When you are at the stations, on

18   the platform, on the mezzanine, when you buy your

19   MetroCard, in the tunnels, they have billboards

20   and posters, as well; correct?

21         A.    That's correct.

22         Q.    These are all advertisements that

23   money gets paid to the Transit Authority; correct?

24         A.    Correct.

25         Q.    And one of the findings of the

159

1                      A. BATA

2       International UITP, that you are a member of,

3       noted how significant ad revenue to could be

4       raised by utilizing the space on the platform

5       screen doors for ads; correct?

6            A.    It depends on how you define

7       significant, yes.

8                 MR. GENIS:  Dave, do you have Bates

9            No. 1284 and 1285?  That's the RFI.

10                MR. ROTH:  Will that be Exhibit 6?

11                MR. GENIS:  Yes.  It might be

12           longer, but those are the two pages that I

13           am actually looking at.

14                (Whereupon, Plaintiff's Exhibit 6,

15           a document, was marked for

16           identification.)

17           Q.    We are showing you an RFI,

18      No. 10-RFI-N44, with a reply date of March 1,

19      2011; do you see that, sir?

20           A.    Yes, I do.

21           Q.    And it states, "New York City

22      Transit is seeking an expression of interest in

23      order to identify and obtain information from

24      firms experienced in designing, furnishing, and

25      installing a platform screen door, platform edge

160

1                         A. BATA

2    door, and/or platform edge gate (PSD/PED/PEG)

3    system to enhance passenger safety, comfort, and

4    overall station appearance."

5                    Did I read that accurately, sir?

6         A.    Yes.

7         Q.    And we could scroll down to the

8    next page.  On this page it gives different terms.

9    Now, when we look on the next page, No. 8 at the

10   top of the page, "Information display and

11   advertising options, space for posters and

12   integrated electronic/video displays for both

13   service information and advertising."

14                   Do you see that, sir?

15        A.    Yes, I do.

16        Q.    Okay.  By the way, for the

17   avoidance of doubt, it says, "New York City

18   Transit will only consider PSD/PED/PEG systems

19   that have been proven in large scale applications

20   involving the use of PSD/PED/PEG in a heavy rail

21   environment"; correct?

22        A.    Correct.

23        Q.    And again, they talk about the

24   qualifications, it is all for passenger safety;

25   correct?

161

1                      A. BATA

2              MR. KEAVENEY:  Objection.  You can

3       answer.

4       A.    Yes.

5       Q.    Okay.  So, we agree that the

6  Transit did issue an RFI for platform screen

7  doors, and specifically mentioned how there could

8  be revenue generated by information displays and

9  advertising options; correct?

10             MR. KEAVENEY:  Objection.

11      A.    Correct.  Yes.

12      Q.    And are you aware of the responses

13 received by a number of major manufacturers

14 offering to do just that, to install it and

15 maintain it for free?

16             MR. KEAVENEY:  Note my objection.

17      You may answer.

18      A.    I do not remember.  That was ten

19 years ago or more.  I don't remember the exact

20 response.

21      Q.    Well, one of the companies, for

22 example, noted in the UITP report -- remember when

23 we mentioned a number of different companies --

24 was a Faiveley company, F-A-I-V-E-L-E-Y; do you

25 recall that?

162

1                          A. BATA

2          A.     Faiveley is one of the companies

3      that makes doors, yes.

4                 MR. GENIS:  Dave, would you kindly

5                 put up Bates No. 5718?  And then we will

6                 jump to Page 5722 and 5726.

7                 MR. ROTH:  This is Exhibit 7, and

8                 this is a 48-page document.

9                 (Whereupon, Plaintiff's Exhibit 7,

10                a document, was marked for

11                identification.)

12         Q.     Do you see Plaintiff's Exhibit 7,

13     with the first page Bates stamped 5718, from

14     Faiveley, in response to the RFI that we just

15     identified from the Transit involving platform

16     screen doors?

17         A.     Yes.

18                MR. GENIS:  Okay.  Dave, can you

19                now flip --

20         Q.     And this was on March 1, 2011;

21     correct?  It might be on another page.

22                Let's go to Page 5722, please, and

23     it gives the executive summary.  All right.  And I

24     am going to start at the top.  "Our present

25     submission aims to demonstrate that Faiveley

163

1                        A. BATA

2    Transport is embracing with the keenest interest

3    this prestigious, exciting, and demanding project

4    which we had somehow been looking forward to for

5    years and not less indirectly preparing for."

6              Did I read that accurately?

7         A.    Yes, you did.

8         Q.    "We express our hope that our

9    presented technical data and numerous project

10   references provide the trust and evidence that

11   Faiveley Transport is indeed a serious, qualified,

12   and highly prepared contender for a retrofitting,

13   not simply platform doors, but retrofitting

14   platform doors in the New York City Transit

15   specific environment within the conditions of a

16   24-hours running operating railway."

17             Did I read that accurately?

18        A.    Yes, you did.

19             MR. GENIS:  And can you scoot down

20             to the first little paragraph after the

21             bullet points, Dave?

22        Q.    I am going to read.  "Indeed, with

23   regard to the project financing, Faiveley

24   Transport is financially capable and as a

25   corporation is prepared to offer a variety of

164

1                              A. BATA

2      project financing solutions ranging from very

3      classical solutions to elaborate, sophisticated

4      solutions, as mentioned, in case of adopting our

5      BOT scheme, Faiveley within a qualified project

6      consortium would provide for a turnkey solution,

7      technically, in terms of operation and maintenance

8      and most importantly with the financial solution

9      where New York City Transit would not be required

10     to spend one single dollar on the construction and

11     operation of the platform edge doors, let alone

12     any upfront payment, while enjoying from day one

13     of the going into service of the platform edge

14     doors, the absolute safety and convenience on the

15     platform for all passengers and staff and

16     collateral benefits of uninterrupted rail services

17     for New York City Transit."

18                    Did I read all of that accurately?

19          A.    Yes, you did.

20          Q.    Okay.  And sir, in addition to

21     Faiveley, a number of other companies offered to

22     do it for free; correct?

23          A.    Again, I don't recollect.  If that

24     is -- if there is evidence for that, yes.  I don't

25     know.  I do not know.

165

1                      A. BATA

2          Q.    Well, we mentioned earlier about

3    funding on a particular project for the Hudson

4    Yards, and now we have mentioned how the Transit

5    was soliciting these kinds of queries; correct?

6          A.    Okay.

7          Q.    By the way, do you have any reason

8    to believe -- by the way, BOT stands for

9    build-operate-transfer; does that assist you?

10         A.    Yes, I understand the term.

11         Q.    Were you on a team that reviewed

12   these RFI submissions by different companies?

13         A.    Honestly, I don't remember.  I think

14   I may have been in some meetings.  I don't know if

15   I was officially on a review committee.  I don't

16   remember.

17         Q.    Now, there were other companies,

18   Westinghouse, and some other large manufacturers;

19   correct?

20         A.    Yes.

21         Q.    And these are major companies that

22   do platform screen doors all over the world;

23   correct?

24         A.    Yes.

25         Q.    Okay.  These are prestigious,

166

1                        A. BATA

2    prominent, well-established, well-funded

3    companies; true?

4              MR. KEAVENEY:  Objection.

5         A.    Yes.

6              MR. KEAVENEY:  They are called OEM,

7         original equipment manufacturers.

8         Q.    I am sorry.  I will use that.  They

9    are known as OEM, original equipment

10   manufacturers; correct?

11        A.    Yes.

12        Q.    Do you have any reason to believe

13   that any one of these companies that offered to do

14   it for free, as requested by the Transit

15   Authority, that they were lying?

16        A.    It is part of a proposal without

17   realizing how difficult it is for our system as a

18   whole.  For one station it may be correct, but as a

19   system, no.

20        Q.    Let's back up.  Let's back up.  So,

21   these companies have done systems all over the

22   world; correct?  If you would like, I could flip

23   to the page right in this submission where it

24   talks about some of the other projects that were

25   done throughout the world; would you like to do

167

1                           A. BATA

2    that?

3            A.     Which old system there are

4    antiquated?

5            Q.     Do you want to know which ones they

6    have done?

7            A.     Old systems.

8            Q.     So, you are not interested in which

9    ones they have done; am I correct?

10           A.     I don't know.  I don't remember.

11   Which old system they --

12           Q.     So, let me ask you, what is the

13   difference, if they could do it for free, whether

14   it is new or old?

15           A.     The possibility of the physical

16   feasibility of stations we have.

17           Q.     Let me ask you a question.  When

18   the Transit Authority asked these other companies,

19   when they sent out the RFI to the world, did the

20   Transit think that it couldn't be done, when they

21   asked for this to be done?

22                  MR. KEAVENEY:  Objection.  You can

23           answer.

24           A.     I think that the Transit had a great

25   question mark about that.

168

1              A. BATA

2          Q.    That's not my question.  My

3    question is very simple, okay.  Let's do it this

4    way.  When the Transit Authority published to the

5    world a request for information to see if any OEM

6    manufacturer could do this job and do it at no

7    cost to the Transit, was the Transit Authority

8    lying?

9              MR. KEAVENEY:  Objection.

10         A.    It was -- they wanted to know what

11   the response is.

12         Q.    So, the Transit Authority, did they

13   think that this is impossible, cannot happen?

14         A.    They had serious doubts.

15         Q.    That's not what I asked you, sir.

16   When the Transit Authority issues this RFI, people

17   work on these RFIs; correct?

18         A.    Correct.

19         Q.    And it costs manpower, time, and

20   money to do the RFI; correct?

21         A.    Yes.  It definitely costs money, of

22   course.

23         Q.    And then you have to publish to the

24   world, so that all of the companies know about

25   this RFI; correct?

169

A. BATA

1

2          A.      Correct.

3          Q.      And by the way, was this RFI, in

4    2011, that was after people from the Transit

5    Authority went to Korea, to London, to Paris, and

6    other parts of the world to see what had been done

7    at other stations for platform screen doors?

8          A.      Yes.

9          Q.      So, in other words, they had

10   already checked it out, they had already gone all

11   over the world to other stations to see that

12   platform screen doors can be installed, can be

13   retrofitted, and they can be work and be

14   effective; true or false?

15         A.      In certain circumstances, yes,

16   correct.

17         Q.      And after seeing firsthand that it

18   worked, after reading the studies in 2009, and

19   2007, and before, so after reading everything,

20   seeing firsthand, they decided to expense and in

21   time publish a request for information about this?

22         A.      Yes.

23         Q.      In fact, when they went to Korea,

24   they learned that in Korea, the company that put

25   it in Korea offered to do it for free in the U.S.,

170

1                           A. BATA

2      as well; true?

3               A.    I don't know about the details, but

4      I know they went to Korea.

5                    MR. GENIS:  Dave, could you put up

6               Page 5760?

7                    (Whereupon, a break was taken from

8               2:00 p.m. to 2:36 p.m.)

9                    MR. GENIS:  All right.  On the

10              document we were just looking at, why

11              don't we just jump to Page 43 for a

12              moment.  Dave, could you please do that?

13              Q.    Okay.  Sir, we are still on

14      Plaintiff's Exhibit 7, which was Bates No. 5718,

15      and we are at point number 8.1, on this document,

16      "Faiveley retrofit experience.  Faiveley has

17      extensive retrofit experience on both platform

18      edge door and platform edge gate systems.  On all

19      of the projects highlighted," and they give

20      another section of their submissions, 2.3.2,

21      "installation has been conducted on an operating

22      railway by nighttime within a narrow window of

23      three to four hours with all installed units fully

24      operational by the next day."

25                    Does that assist you with retrofit

171

1                        A. BATA

2     experience, sir?

3              A.    Me?

4              Q.    Yes.  I want to know if they have

5     retrofit experience?

6              A.    Well, I mean, that's what it says,

7     you know.  I don't -- honestly, today, I wouldn't

8     believe them.

9              Q.    You wouldn't believe them?

10             A.    No.

11             Q.    When they made these submissions to

12    you, to the Transit Authority, did anybody say

13    they are lying?

14             A.    I think just -- I don't know, but I

15    am feeling they had a lot of question marks.

16                  MR. GENIS:  Can we, please, Dave,

17            put on the screen -- we will make it -- if

18            we don't have No. 8 already, it will be

19            No. 8.  It is a three-page document.  It

20            starts on Bates 503775.

21                  (Whereupon, a discussion was held

22            off the record.)

23                  MR. GENIS:  While you are working

24            on that, I am going to ask more questions.

25             Q.    Sir, the Transit Authority had a

172

1                          A. BATA

2    platform screen door task force; correct?

3              A.    I think so, yes.

4              Q.    Were you a member of the platform

5    screen door task force?

6              A.    You know, honestly, I don't know if

7    I was officially a member or not.  I have to be

8    honest in my answer.  I don't know.  I probably

9    was.  I don't know.  Do you have any evidence?  I

10   don't know.  I don't remember.

11             Q.    Do you consider one of the main

12   things that you tried to accomplish while you were

13   at the Transit was to get it to be a safer system?

14             A.    Yes.

15             Q.    And was it one of your

16   accomplishment, or attempted accomplishment, that

17   you tried to move the Transit forward to be

18   creative, to be innovative, to embrace new

19   technologies, and to be safer?

20             A.    Yes.

21             Q.    And one of your goals was to have

22   the Transit Authority comply with best practices

23   international?

24             A.    Comply?  It is to see what is going

25   around.  There is no comply.  It is basically to

173

                              A. BATA

1

2      understand and see what elements of those could be

3      used.

4                      (Whereupon, a discussion was held

5              off the record.)

6              Q.    Sir, what does the expression best

7      practices mean?

8              A.    It is basically to see what is done

9      elsewhere, how they're using it, and to what degree

10     can it be transported or implemented locally,

11     considering the local conditions.  That's what.

12             Q.    Is it a good thing or a bad thing

13     to comply with best practices?

14             A.    It is probably a good thing, but

15     comply is -- again, it is maybe the incorrect word.

16             Q.    Okay.  Is it a good thing or bad

17     thing to follow best practices?

18             A.    I was going to say follow is a

19     better word.

20                     (Whereupon, a discussion was held

21             off the record.)

22             Q.    Okay.  Would it be reasonable for

23     the customers of the Transit Authority to think

24     that the Transit Authority would follow best

25     practices?

174

1                        A. BATA

2            A.    Yes.

3            Q.    Would it be reasonable for the

4    Transit Authority to follow best practices?

5            A.    Yes, if they can.

6            Q.    Does it comply with good and

7    accepted practices and procedures, in the field of

8    mass transit, to follow and comply with best

9    practices?

10                 MR. KEAVENEY:  Note my objection.

11           A.    Yes, if practical.

12           Q.    Does it comply with professional

13   standards of care to follow and comply with best

14   practices?

15           A.    Yes.

16                 (Whereupon, Plaintiff's Exhibit 8,

17                 a document, was marked for

18                 identification.)

19           Q.    Sir, we are showing you what we

20   marked today as Plaintiff's Exhibit 8.  Apparently

21   it has different Bates numbers, but the one that

22   we are looking at now is No. 503775.  It is a

23   three-page document.  We are going to scroll

24   through, but do you see it to begin with?

25           A.    Yes, I do.

175

1                       A. BATA

2            Q.    This is a document created, kept,

3    or maintained by the Transit Authority in the

4    regular course of its business; correct?

5            A.    Correct, yes.

6            Q.    And let's just go to the top.  I am

7    going to read some of it.  Okay.  So, it states

8    that, "On October 24, 2011, the platform screen

9    door task force convened to discuss to establish

10   the necessary criteria to evaluate the responses

11   to the RFI," it gives the number for platform

12   screen doors, et cetera; correct?

13           A.    Yes, I see it.

14           Q.    It says, "Transit received 12

15   responses to the RFI on or about March 11, 2011;

16   correct?

17           A.    Yes.

18           Q.    It lists Crown Infrastructure

19   Solutions; right?

20           A.    Right.

21           Q.    Faiveley Transport, the one that we

22   just talked about?

23           A.    Right.

24           Q.    GE Transportation, for General

25   Electric; correct?

176

1                          A. BATA

2          A.    Yes.

3          Q.    Kawasaki Rail Car Incorporated;

4    correct?

5          A.    Yes.

6          Q.    By the way, Kawasaki makes some of

7    the train cars for the Transit; correct?

8          A.    That's correct.

9          Q.    And GE is one of the largest

10   companies in the world; correct?

11         A.    Yes.

12         Q.    And then Kaba/Gilgen Door Systems,

13   KG; correct?

14         A.    Yes.

15         Q.    Knorr-Bremse Rail Systems; correct?

16         A.    Yes.

17         Q.    And they own Westinghouse; correct?

18         A.    I don't know.  I guess so.  So many

19   mergers, I cannot keep them clear.

20         Q.    And Westinghouse is also a huge

21   international corporation; correct?

22         A.    Yes.

23         Q.    KPMG LLP; correct?

24         A.    That's an accounting firm, yes.

25         Q.    And is it possible, it is also a

177

A. BATA

1

2     firm by the same initials that does --

3     manufactures platform doors?

4             A.     That's on odd one for me, frankly.

5             Q.     All right.  Samsung SDS America,

6     they were on the list, as well, they submitted an

7     RFI?

8             A.     Uh-huh.

9             Q.     Yes?

10            A.     Yes.

11            Q.     Thank you.  And I only do it when

12    you say, "uh-huh," because she can't write down,

13    "uh-huh."

14            A.     I am reading what you are reading.

15            Q.     I understand.

16            A.     Yes.

17            Q.     And Samsung is a pretty big

18    company, too; correct?

19            A.     Correct.

20            Q.     And then Sojitz Corporation of

21    America, and it gives some other name after that?

22            A.     Okay.

23            Q.     And Stanley Access Technology?

24            A.     Yes.

25            Q.     And Systra Engineering?

178

1                          A. BATA

2          A.    Yes.

3          Q.    And then TIS Partners, in

4    conjunction with other entities, as well; correct?

5          A.    Right.

6          Q.    Okay.  That's the one that was in

7    Korea that offered to do it for free when the

8    Transit sent people to Korea to look at their

9    platform screen doors system?

10         A.    Yes.

11               MR. GENIS:  Let's keep going down.

12         Dave, could you scroll, please?

13         Q.    I am going to summarize instead of

14   going word for word.  They tried to evaluate the

15   different responses to the different companies;

16   correct?

17         A.    Yes.

18         Q.    And then they declined to evaluate

19   certain responses because they were from

20   consulting engineering firms as opposed to being a

21   manufacturer; correct?

22         A.    Yes.

23               MR. GENIS:  Okay.  Dave, go to the

24         next page.

25         Q.    And then they unanimously agreed to

179

1                         A. BATA

2    further evaluate certain responses, including from

3    Faiveley and some others; correct?

4             A.    Right.

5             Q.    And they decided those were major

6    OEMs with experience in transit applications and

7    PSDs arise; right?

8             A.    Yes.

9             Q.    So, these were manufacturers with

10   lots of experience in platform screen doors?

11            A.    Yes.

12            Q.    So, they had different meetings,

13   they discussed things.

14                 MR. GENIS:  We can scroll down.

15                 Keeping going, Dave.  Keep going.

16            Q.    Okay.  Now we are on the last page.

17   "After reviewing all 12 responses to the RFI, the

18   platform screen door task force unanimously agrees

19   that the following four respondents provided

20   acceptable responses and hereby recommend that

21   they be included in future discussions pertaining

22   to the platform screen door project."

23                 And it lists Faiveley, the one we

24   looked at before; correct?

25            A.    Right.

180

1                          A. BATA

2          Q.     It lists GE Transportation;

3     correct?

4          A.     Right.

5          Q.     It lists Kaba/Gilgen?

6          A.     Okay.

7          Q.     And then Knorr-Bremse Rail System,

8     which is Westinghouse, as we said; correct?

9          A.     Right.

10         Q.     Okay.  So, I know we kind of went

11    quickly, but we will gladly go through it slower.

12    Did you see anywhere in this document that they

13    thought any of these companies, including Faiveley

14    and the other ones that offered to do it for free,

15    were lying or exaggerating or making a

16    misrepresentation?

17         A.     No.

18         Q.     You could read through it if you

19    would like; was that said anywhere?

20         A.     No, but it is --

21         Q.     I am not interested in the no, but.

22    I am just interested in the no or the yes.  So,

23    the answer is no?

24         A.     No.  That's a no.

25         Q.     Thank you.  And when you read

181

1                          A. BATA

2    through the document, they decided why they didn't

3    want to consider certain of the 12 and why they

4    did consider the four that they did ultimately

5    consider.  So, did they say of the four, any of

6    these four, we think they are exaggerating it,

7    they are puffing it, there is no way they will do

8    what they say they will do; is that said anywhere?

9          A.    I don't think so.

10         Q.    So, here we've got meetings over a

11   period of many months, the first one being in

12   August, and the meeting again in September, and in

13   October, and after reviewing everything, this

14   whole panel of experts come to the conclusion that

15   these are the five companies -- I am sorry, not

16   four -- five companies that they want to take

17   seriously; right?

18         A.    Yes.

19               MR. KEAVENEY:  Objection.

20         Q.    Yes?

21               MR. KEAVENEY:  He said yes.

22         A.    You said five, but I see four.

23               MR. GENIS:  If I miscounted them --

24         there should be five.  It is missing TIS,

25         Dave.  Because on mine it says TIS

182

1                    A. BATA

2          Partners, at the bottom, after

3          Knorr-Bremse.

4               MR. ROTH:  This is a problem with

5          e-mail.

6               MR. GENIS:  Interesting.  Dave,

7          there is a difference.  In my copy, it

8          says there are five respondents and it

9          lists five.

10              MR. ROTH:  You are right.  I will

11         put up a different exhibit.  I am sorry.

12         I am going to change this to Exhibit 8A.

13         This is why we objected to having things

14         attached to e-mails, because you can't

15         tell what is the final copy.

16              So, this is Exhibit 8A, and I will

17         put that up now.  I apologize about that.

18         Apparently, on the first page also, they

19         were missing.

20              (Whereupon, Defendant's Exhibit 8A,

21         a document, was marked for

22         identification.)

23              MR. ROTH:  So, now, Exhibit 8A is

24         going to be No. 589606, which we thought

25         was actually a duplicate copy, but it is

183

```
 1                      A. BATA

 2           actually different than another almost

 3           exactly similar document that was

 4           exchanged.

 5           Q.    Sir, we are looking at Exhibit 8A

 6      now, where it says five respondents, and it lists

 7      the five of them; correct?

 8           A.    Yes.

 9           Q.    By the way, I may have asked you

10      this before, were you on the RFI committee?

11           A.    I don't think so.

12           Q.    And were you on the trip to Korea

13      in January of 2010?

14           A.    No.

15                 MR. GENIS:  Dave, do you have the

16                 document -- I am sorry.  I apologize about

17                 Korea, but do you have the document for

18                 the RFI review committee, please?

19                 MR. ROTH:  This will be Exhibit 9?

20                 MR. GENIS:  Sure.

21                 MR. ROTH:  And it is No. 414766.

22                 (Whereupon, Plaintiff's Exhibit 9,

23                 a document, was marked for

24                 identification.)

25           Q.    Okay.  Sir, we are showing you an
```

184

1                          A. BATA

2      e-mail from you, on September 1, 2011, to Lisa

3      Schreibman, and let's skip to the fifth paragraph,

4      "Also, and I mentioned this at the meeting, MTA-CC

5      should have a rep on the PSD RFI evaluation

6      committee that I am a part of."

7              A.    Okay.

8              Q.    Do you see that?

9              A.    I see it.

10             Q.    And it says, "This way all the dots

11     would be connected.  This committee had done a

12     tremendous amount of work in vetting, evaluating

13     the various responses to the PSD RFI."

14             A.    Okay.

15             Q.    And you also recommended talking to

16     sister, another company, as they are also

17     connected to RAPP, and they sent in an offer to

18     help with PSDs here as part of the RFI inquiry;

19     correct?

20             A.    That's what I am reading, yes.

21             Q.    So, you were, in fact, on the RFI

22     evaluation committee; correct?

23             A.    I mean, apparently I was, but

24     honestly, I don't remember it.

25             Q.    You would have been one of the

185

1                          A. BATA

2    people that did that tremendous amount of work

3    vetting and evaluating the various responses of

4    the 12 companies to the RFI that was published by

5    the New York City Transit Authority; correct?

6          A.    I don't know.  It is 11 years ago.

7    I don't remember specifically.  And frankly, I

8    don't even remember some of those other companies

9    on the list.

10          Q.    So, you are saying, when you see

11   your own e-mail that you put in writing in the

12   regular course of business that said you are on

13   the committee, that you are a part of, and that

14   they have done a tremendous amount of work in

15   vetting and evaluating the various responses, that

16   doesn't refresh your memory at all?

17              MR. KEAVENEY:  Objection.

18          A.    I don't remember specifically.  I

19   told you, I was involved in the discussion.  If I

20   was on the committee, if I said that, then I was,

21   okay.  I mean, I am not going to dispute what I

22   said, but I don't remember it.

23          Q.    So, in other words, when you do

24   these e-mails, and you have done many, many

25   e-mails for the Transit Authority; correct, as

186

1                         A. BATA

2    part of your job?

3               A.    Right.

4               Q.    And your e-mails, whether they are

5    from you or to you, they are in the regular course

6    of business for the Transit Authority; correct?

7               A.    Correct.

8               Q.    When you write these e-mails, that

9    is at the time, when your memory is fresh and the

10   events are fresh; correct?

11              A.    Correct.

12              Q.    Now, I understand it is years later

13   and you may not remember things.  I understand

14   that; fair enough?

15              A.    Fair enough.

16              Q.    Okay.  These e-mails that you wrote

17   at the time, they were all accurate, complete,

18   thorough, honest, and objective; true?

19              A.    As far as I could tell, yes.

20              Q.    And you would look through the

21   e-mails before, you know, you would hit send, to

22   make sure you said everything you needed and

23   wanted to say; correct?

24              A.    Yes.  Sometimes I was overly

25   enthusiastic.

187

                        A. BATA

1

2          Q.    That's okay.  It is good to be

3     passionate about what you do.  I can relate to

4     that.

5               So, when you would do these

6     e-mails, you would review them to make sure,

7     before you hit send, that they were complete,

8     thorough, accurate, honest, and objective, for

9     your work; true?

10              MR. KEAVENEY:  Objection.

11         A.    Yes.

12         Q.    So, since it was a tremendous

13    amount of work evaluating and vetting the

14    responses to the Transit Authority's RFI, you

15    would have been one of those people doing that

16    tremendous amount of work; correct?

17              MR. KEAVENEY:  Objection.

18         A.    The responses were engineering

19    responses.  And if I had any role in a unit of a

20    very cursory review overall but not the specific

21    engineering, that was done by the engineering

22    department.  That's my best recollection.

23              MR. GENIS:  Okay.  But I don't

24         think it is responsive to the question.

25         Can I have the question read, please?

188

1            A. BATA

2            (Whereupon, the requested portion

3       of the transcript was read back by the

4       court reporter.)

5            MR. KEAVENEY:  Same objection.  The

6       answer speaks for itself.

7       Q.    Yes, you were one of them, or no,

8  you were not?

9       A.    I don't think I was part of the

10  detailed evaluation team, no.  I think I was part

11  of maybe a general team, but not the specific

12  engineering evaluation.  I don't remember it.

13       Q.    Well, money has nothing to do with

14  engineering; correct?

15       A.    Yes, it does.  But let's not debate

16  that.

17       Q.    By the way, that would be a

18  significant fact, as you told us earlier, if

19  companies agreed to do this for free, with no cost

20  to the Transit Authority; correct?

21       A.    Well, it was -- it is a statement

22  they made, yes.

23       Q.    So, when you had these meetings,

24  did you bring it to anybody's attention that,

25  "Hey, I am not an engineer, but I see people are

189

1                    A. BATA

2      willing to do it for free or no cost to the

3      Transit"; did you do that?

4                    MR. KEAVENEY:  Objection to form.

5           A.    I might have said the opposite.  I

6      don't remember.

7           Q.    Well, when you say you might have

8      said the opposite, are you guessing now that you

9      would have said the opposite, or you might have

10     said the opposite?

11                   MR. KEAVENEY:  Objection.

12          A.    All I am saying is that I don't

13     remember.  But I might have said that I don't

14     believe that, or I might have said that, "Wow.

15     Great."  I don't remember.

16          Q.    Well, there is a world of a

17     difference between, "Wow.  Great," and "I don't

18     believe them"; right?  I mean, they are polar

19     opposites.

20          A.    Exactly.

21                   MR. KEAVENEY:  You can answer.

22                   THE WITNESS:  I gave you an answer.

23          Q.    Did you ever write anything to say,

24     "I don't believe it"; did you write that in an

25     e-mail?

190

1                          A. BATA

2            A.    I don't think so.  I didn't write

3     it.

4            Q.    And Faiveley is one of the

5     companies that you, and all of these other people

6     that did all of this tremendous amount of work of

7     vetting and evaluating, approved of; correct?

8                  MR. KEAVENEY:  Objection.

9            A.    As I said, I was -- I don't

10    recall -- I don't remember that I was involved in

11    the detailed evaluation of the specific responses.

12    I have been in some meetings, but they were very

13    thick documents and they were engineering answers.

14           Q.    Is at no cost or the concept of

15    free an engineering concept or something else?

16           A.    It is connected to engineering.

17    Because when it is free, obviously you have to do

18    something; right?  I mean, of course it is

19    connected.

20           Q.    Okay.  So, to me, and I am not an

21    engineer either, but I get the idea of free and at

22    no cost.  So, did you understand that, as well, as

23    a non-engineer?

24           A.    Yes.

25           Q.    And since you already told us free

191

1                         A. BATA

2    is an important significant fact, did you bring it

3    to anybody's attention that it was for free?

4          A.    I didn't bring it to anybody's

5    attention, no.  I don't think so.

6          Q.    You used to report to the president

7    himself; correct?

8          A.    I must have, yes.

9          Q.    Did you ever tell the president,

10   Mr. Prendergast, that we have offers to put in

11   platform screen doors at no cost to the Transit,

12   for free; did you ever say that to him?

13         A.    I don't remember.  I might have.

14   But he probably saw the report that it said that.

15         Q.    Okay.  And one of the things that

16   you do is that you look for creative solutions;

17   correct?

18         A.    Yes.

19         Q.    One of the things that you do is

20   you look for creative ways to get funding;

21   correct?

22         A.    Not really.  Not my job.

23         Q.    Sir, were you ever part of a panel,

24   in 2017, that said it is the job of a transit

25   company to find creative ways to find and fund

192

1                        A. BATA

2    projects?

3              A.    2017?

4              Q.    Yes, sir.

5              A.    I might have said that.

6              Q.    And if you said that, would it have

7    been the truth?

8              A.    I guess.  If I said it, it is

9    probably how I felt.

10             Q.    Okay.  And when you said it, you

11   were saying it based on your many years, your 27

12   or 28 years of experience with the Transit

13   Authority; correct?

14                  MR. KEAVENEY:  Objection.

15             A.    No.  I just said it as a general

16   idea for transit companies to do that.  Common

17   sense.

18             Q.    Right, common sense that a transit

19   company should try to get funding where possible

20   or services in a creative manner, for free if

21   possible?

22                  MR. KEAVENEY:  Objection.

23             A.    Yes.

24             Q.    What is the downside to the Transit

25   Authority of having a company do something for

193

1                          A. BATA

2     free?

3             A.    Ethics, legal problems,

4     complications, lawsuits.

5             Q.    Okay.  So, let's take ethics first.

6     When the Transit Authority allows companies to do

7     ads inside of the train cars, is that unethical?

8                    MR. KEAVENEY:  Objection.

9             A.    No.  But certain ads are banned;

10    right?

11            Q.    So, you tell me, sir.  I am just

12    asking if they -- the Transit Authority, when they

13    make money from ads in the subway cars, are they

14    being unethical?

15            A.    In the general sense, no.

16            Q.    When the Transit Authority has ads

17    on the platforms that they get money for, is that

18    unethical?

19            A.    Again, ads are vetted.  So, what is

20    out there, it is not unethical.

21            Q.    I am not asking about the contents

22    of the ads.  I am giving the fact that ads are

23    placed and the Transit gets money for it; is that

24    ethical or unethical?

25            A.    In principle, no.

194

                          A. BATA

1

2          Q.    So, it is not unethical, is what

3    you are saying?

4          A.    Yes.  Correct.

5          Q.    When the Transit Authority has ads

6    in the tunnels of the subway and on the mezzanines

7    and where the token booths are, is that ethical or

8    unethical?

9          A.    It is ethical if the contract is

10   well written.

11         Q.    Is it ethical when they have ads on

12   their buses?

13         A.    Again, subject -- depending on what

14   the ad is.  Some ads are removed.

15         Q.    Sir, I didn't ask you about that.

16   I asked you, that they got money for ads, is that

17   ethical or unethical?

18              MR. KEAVENEY:  Objection.  You can

19              answer.

20         A.    Ethical, if it is done correctly.

21         Q.    And when the Transit Authority has

22   bus stops with those ads on it and they get money

23   from that, is that ethical or unethical?

24         A.    I think the bus shelters are owned

25   by the City.

195

1                              A. BATA

2          Q.    Is it ethical or unethical?

3          A.    It is the City's problem.

4          Q.    Is it ethical or unethical?

5          A.    I don't know, you know.

6          Q.    Do ethics change if it is the City

7    or the Transit Authority?

8          A.    I think it is the City.  I think.  I

9    don't want to answer for the City.

10         Q.    Did that change ethics?  I mean,

11   you used the word ethics.  That was your word.

12   So, either it is ethical or it is unethical to do

13   this; correct?

14              MR. KEAVENEY:  Stop badgering the

15              witness.

16              MR. GENIS:  I am not badgering.

17         A.    It is not a black and white

18   question.

19         Q.    Yes, sir, it is.  You can't be a

20   little pregnant.  Either you are ethical or you

21   are not; correct?

22         A.    Ethical is a concept.

23         Q.    Okay.  So, when the Transit, on its

24   own, solicited to the world for companies to see

25   if they could do it at no cost to the Transit

196

1                          A. BATA

2    Authority, was the Transit Authority being ethical

3    or unethical?

4                    MR. KEAVENEY:  Objection.

5            A.     I guess they were ethical.

6            Q.     Okay.  So, if a company responded

7    to the ethical request for information from the

8    Transit Authority, to see if they could do it for

9    free, is the company being ethical when it

10   responds to the ethical question of the Transit

11   Authority?

12           A.     Again, on the surface it seems okay,

13   but you never know.

14           Q.     Okay.  Again, you can't be a little

15   pregnant.  Either they are being ethical or they

16   are not; correct?  Yes?

17           A.     Okay, I said.

18           Q.     And naturally, when this committee

19   that you were a member of did a tremendous amount

20   of work in vetting and evaluating the various

21   responses, if any of the members of the committee

22   thought there was anything unethical, unseemly,

23   inappropriate, just didn't look right, smell

24   right, didn't they, any one of those people, have

25   an obligation to be point that out and say so in

197

1                         A. BATA

2    writing?

3              A.    Probably in writing, no.  Verbally,

4    probably yes.

5              Q.    So, why would it be wrong to say it

6    in writing if you think somebody is being

7    unethical?

8              A.    It is a touchy subject.

9              Q.    What is touchy about it, either you

10   are ethical or you are not?

11             A.    As I said, it is not black and

12   white.

13             Q.    So, in other words, if you turn a

14   blind eye to somebody's unethical behavior, are

15   you being ethical?

16                  MR. KEAVENEY:  Objection.

17             A.    As I said, there is nothing written

18   about it.  So, obviously, there was no written

19   response, but verbally there probably was a lot of

20   questions.

21             Q.    Well, let me ask you this.  They

22   have a whole law department.  Did anybody from the

23   law department say, "Hey, you can't have people do

24   this.  It is unethical"?

25                  MR. KEAVENEY:  Objection.

198

1                          A. BATA

2          Q.    Did anybody do that?

3          A.    I do not know.  I do not know.

4          Q.    The law department were

5     stakeholders; correct?

6          A.    I don't know exactly what was their

7     role.  They have to be involved, of course.

8          Q.    So, before that RFI gets sent out,

9     it was reviewed by the law department; correct?

10               MR. KEAVENEY:  Objection.

11         A.    I assume so.

12         Q.    Okay.  And the law department

13    vetted it, or private lawyers vetted it, and the

14    RFI got sent out; correct?

15               MR. KEAVENEY:  Objection.

16         A.    Yes.

17         Q.    So, the Transit didn't think it was

18    unethical to ask people to do it for free, the

19    people reviewing the RFI didn't think it was

20    unethical to send it for free, and it was sent,

21    and you told us it was not unethical to send it;

22    is that an accurate summary?

23               MR. KEAVENEY:  Objection.  You can

24               answer.

25         A.    In your view, probably.  In your

199

 1                    A. BATA

 2    definition, probably, yes.

 3           Q.    How about on the planet earth, in

 4    reality, factually, was that an accurate summary?

 5           A.    I am not going to get into debate of

 6    ethics.  It is not black and white.

 7           Q.    By the way, since we are on the

 8    topic of ethics, would it be ethical for a witness

 9    to shave their testimony to favor one litigant

10    over another; would that be ethical?

11                 MR. KEAVENEY:  Objection.  Don't

12                 answer that.

13           Q.    Would it be ethical --

14                 MR. KEAVENEY:  That's an improper

15                 question.  Don't answer that.

16           Q.    Would it be ethical for a witness

17    to pretend that they lack memory to assist a

18    defendant in a lawsuit; would that be ethical?

19                 MR. KEAVENEY:  That's an improper

20                 question.  Don't answer that.

21           Q.    Sir, if there is a reason not to do

22    it for free, because it is unethical, that would

23    truly be your position; correct?

24                 MR. KEAVENEY:  Objection.

25           A.    I didn't say that.

200

1                        A. BATA

2            Q.    So, is it okay to have ads that

3     defer or mitigate costs, minimize costs; is that

4     okay?

5            A.    It is okay, yes.

6            Q.    So, that's ethical?

7            A.    It is a business plan.

8            Q.    Okay.  So, it is a business plan to

9     be able to get other people -- it is a barter

10    thing.  They build something for you at no cost to

11    you, but then they get the ad revenue, and that's

12    what they get out of it, and that's a business

13    arrangement; true?

14           A.    Yes.

15           Q.    People buy and sell things every

16    day, and it has nothing to do with ethics; true?

17           A.    That's not true.

18           Q.    Not true?

19           A.    Absolutely not.

20           Q.    Did you buy your suit that you are

21    wearing today?

22           A.    You are talking in general.

23           Q.    You bought your suit; is that

24    unethical?  I am not going to waste time on this.

25           A.    You go to Canarsie to buy a

201

1                        A. BATA

2    pocketbook, is it ethical?

3            Q.    Sir, I am not here to argue with

4    you.

5            A.    Give me a break.

6            Q.    I will gladly give you a break.

7    Can you show me anywhere on this planet, on this

8    entire planet, that anyone from the Transit

9    Authority ever put in writing that when a company

10   responded to the Transit's RFI to do something at

11   no cost, and they responded that that was

12   unethical; who in the Transit Authority ever said

13   that at any time on this planet in writing?

14           A.    I am not aware of it in writing.

15           Q.    Thank you so much.

16                 By the way, did the president of

17   the Transit Authority tell you, "Oh, that's

18   unethical.  We can't do this"?

19           A.    No, he didn't.

20           Q.    So, you have actually spoken in

21   public a number of times since leaving the Transit

22   Authority; correct?

23           A.    Yes.

24           Q.    You have appeared on podcasts and

25   spoken at programs and seminars; correct?

202

1                        A. BATA

2           A.     No podcasts.

3           Q.     You have been on Transit Talk;

4     correct?

5           A.     Yes.

6           Q.     And what is Transit Talk?

7           A.     I think it was like an initiative by

8     somebody who interviews people about

9     transportation.

10          Q.     Okay.  And Transit Unplugged;

11    right?

12          A.     Yes.  Yes, that's correct.

13          Q.     And when you get interviewed on

14    these transit issues, are you honest?

15          A.     Yes, of course.

16          Q.     Are you accurate?

17          A.     As much as I can.

18          Q.     Okay.  So, if, in fact, if you were

19    not honest and accurate when you spoke in these

20    interviews, that would be unethical; correct?

21                 MR. KEAVENEY:  Objection.

22          A.     I am not going to answer that

23    question.  No, I don't -- I have no thoughts about

24    ethics.

25          Q.     If you wrote an e-mail that was not

203

1                          A. BATA

2    honest and truthful and accurate, would that be

3    unethical?

4                    MR. KEAVENEY:  Objection.  You can

5            answer.

6            A.    Of course it was unethical.

7            Q.    Okay.  Let me move on.

8                  So, sir, did anybody ever say no,

9    at the Transit Authority, to having a company do

10   this at no cost to the Transit, for free?

11           A.    I don't remember.  They might have.

12   There were a lot of people opposed to innovation

13   and new things.  There might have been, absolutely.

14           Q.    When you say there are a lot of

15   people opposed to innovation and new things, in

16   fact, you have stated that it was very difficult

17   at times for you to come up with creative,

18   innovative solutions at the Transit Authority;

19   correct?

20           A.    Correct.

21           Q.    One of the reasons that you have

22   given, that it was very difficult for you to get

23   the Transit Authority to be innovative or

24   creative, is because they are very conservative;

25   true?

204

1                          A. BATA

2          A.      That's correct.

3          Q.      When you say they are very

4    conservative, that means they are resistant to

5    change, to doing things differently; correct?

6          A.      Very cautious.

7          Q.      Well, when you say cautious, what

8    do you mean by that?

9          A.      They have to evaluate pros and cons

10   in every aspect.

11         Q.      So, opposed to innovation, means

12   opposed to getting new safety devices?

13         A.      No.

14         Q.      So, conservative and opposed to

15   innovation, does not mean opposed to safety

16   devices that can save life and limb; correct?

17         A.      Absolutely.

18         Q.      Now, you told us earlier how safety

19   was a high priority and that means saving life and

20   limb; correct?

21         A.      Yes.

22         Q.      And when you see every year one to

23   two hundred people are hit by trains and either

24   maimed or killed, that's an urgent situation;

25   true?

205

1                          A. BATA

2            A.      True.

3            Q.      I mean, when you have that many

4    people getting hit by trains and either killed or

5    injured, like in the charts we looked at that the

6    TA used, that would tell them the urgency of the

7    problem; correct?

8            A.      It has been a problem since the

9    subway was opened.

10           Q.      When you have an urgent problem

11   since the subway has opened, we agree that's when

12   people should be listening to your creative

13   innovative approaches?

14           A.      Yes.

15           Q.      One of your creative and innovative

16   approaches, was you were a proponent of platform

17   edge doors; correct?

18           A.      To see if they would be feasible.

19           Q.      When you say to see if they would

20   be feasible, you had maintained at various

21   meetings and in e-mails and at other places and

22   times that you already knew, from worldwide

23   experience, that they were feasible and that they

24   were effective in eliminating injury and death,

25   and the only question was how it could be adopted

206

1                        A. BATA

2      to the New York City system; true?

3                    MR. KEAVENEY:  Objection.  You can

4            answer.

5            A.    Yes.  The second half was the

6      correct word, right.

7            Q.    The only study that at any time was

8      necessary then, was to see how you could best

9      adopt these best practices throughout the world of

10     protecting people from being hit by trains of

11     getting it done, correct?

12                   MR. KEAVENEY:  Objection.

13           A.    Yes, it was -- I was in favor of a

14     trial, of course.

15           Q.    For example, certain lines should

16     be used over other lines for the tests; correct?

17           A.    No, certain stations.

18           Q.    Certain stations, okay.  For

19     example, if there was new construction, that is

20     the ideal perfect place to institute platform edge

21     doors and platform screen doors; true?

22           A.    To try.  To try.

23           Q.    And you were a proponent of having

24     platform screen doors at the Second Avenue subway;

25     correct?

207

1                          A. BATA

2          A.    Yes.

3          Q.    You were a proponent of having

4    platform screen doors on the No. 7 line extension;

5    correct?

6          A.    Yes.  I was eager to see how it

7    worked.

8          Q.    So, in order to use the creative

9    innovative approach that you were proposing with

10   platform screen doors, that means they would have

11   to have a change in operations; correct?

12         A.    Major change.

13         Q.    At the time that you were at the

14   Transit Authority, did they ever make that change

15   in operations?

16         A.    Part of the reason was not feasible.

17               MR. GENIS:  Move to strike.

18         Q.    Answer my question.  Did they ever

19   change the operations?

20         A.    We didn't install them, so they did

21   not change operations.

22         Q.    Okay.  In order to change

23   operations, you have to be willing to change

24   operations, to innovate; right?

25               MR. KEAVENEY:  Objection.  You can

208

1                          A. BATA

2              answer.

3              A.    I don't know what to say to that,

4        you know.  I mean, if it is warranted to be

5        feasible, they would change operations.

6              Q.    So, is it warranted to change

7        operations to save one to two hundred people a

8        year from getting run over by trains and maimed or

9        killed?

10             A.    It is like saying would you have a

11       hundred policemen in a station, is it warranted.

12                  MR. GENIS:  Move to strike.

13             Q.    Sir, when the trial is over, I will

14       gladly debate with you on any topic you want.  But

15       right now we are in a deposition.  Could you

16       please answer my question?

17             A.    No.

18             Q.    So, the answer is no; right?

19       That's the answer to the question, was no?

20             A.    A few changes for -- unless it is

21       fully vetted.

22                  MR. GENIS:  Let's back up.  Move to

23                  strike as not responsive.

24             Q.    I asked a really simple question.

25       We could read back the question, because I would

209

1                     A. BATA

2     really appreciate getting an actual answer to my

3     yes or no question.

4          A.    I gave you my best honest answer.

5          Q.    Sir, we've already gone through

6     that before.  I want a responsive answer to a yes

7     or no question, meaning a yes or no.

8               MR. GENIS:  Please read back the

9               question.  And I'm expecting you to keep

10              your word, because you gave me your word.

11              (Whereupon, the requested portion

12              of the transcript was read back by the

13              court reporter.)

14         A.    I cannot give you a yes or no

15    answer.  It depends on the circumstances, no.

16         Q.    Okay.  So, how many lives is it

17    acceptable to the Transit Authority to lose every

18    year not to change operations?

19              MR. KEAVENEY:  Objection.

20         A.    I am not going to answer the

21    question.

22         Q.    Sir, I mean, that's what they do.

23    When making a decision, the decision is either (a)

24    you do something to protect people's lives and

25    make it safe, or you do not.  That's the choice;

210

1                      A. BATA

2    correct?

3           A.     That's incorrect.

4           Q.     Okay.  So, structurally, what was

5    done different at the Transit Authority to prevent

6    people from getting run over by trains, other than

7    the tactile yellow strip and possible

8    announcements; what else was structurally done?

9           A.     Have you seen the help points at the

10   station?

11          Q.     Answer my question.  Structurally,

12   what was done structurally at the stations to

13   prevent people from getting run over by trains?

14          A.     I just told you, help points at the

15   stations.  Help points, every station.

16          Q.     So, let me ask you, a help point is

17   what, something written somewhere?

18          A.     Structural installation in stations,

19   almost at every station.

20          Q.     A help point, are you talking about

21   those little blue lights you could hit if somebody

22   is trying to rob you or something?

23          A.     They are not little.  They are

24   large.  There is an emergency button and an

25   information button.

211

1                          A. BATA

2          Q.    So, let me ask you, have you seen

3    any data, any facts whatsoever at all, that showed

4    that those help points that you just talked about

5    prevented a single person from getting killed by a

6    train?

7          A.    I haven't seen any.

8          Q.    I am not interested in your

9    speculation.  You haven't seen it answers the

10   question.

11               MR. KEAVENEY:  The question calls

12         for speculation.

13         Q.    Can you please tell me a single

14   limb that was saved because of one of those help

15   points?

16               MR. KEAVENEY:  Objection.

17         A.    Again, I am not there.  I don't see

18   the reports.  I don't know.

19         Q.    Could we agree decisions get made

20   on facts, on statistics, data?

21         A.    No, not all decisions.  Absolutely

22   not.

23         Q.    All right.  I am just trying to see

24   if there is a consistent approach here.  Are

25   decisions made on facts and data and statistics,

212

1                         A. BATA

2    or on speculation?

3                    MR. KEAVENEY:  Objection.

4           A.    It is -- statistics is a part of the

5    decision.  There are many, many other factors.

6           Q.    So, it is based on fact, for

7    transportation systems, not speculation; correct?

8                    MR. KEAVENEY:  Objection.

9           A.    Statistics is part of the equation.

10          Q.    In order to make a decision, you

11   want to know factually what the cause or effect is

12   on any decision; correct?

13          A.    It is part of it.

14          Q.    Okay.  And you want to look at data

15   to help you decide; correct?

16          A.    Absolutely.  Of course.

17          Q.    So, for example, if no one in the

18   City of New York was ever hit by a train, nobody

19   killed, nobody injured, then there would be no

20   need for platform screen doors; correct?

21                    MR. KEAVENEY:  Objection.

22          A.    You might need it for air

23   conditioning.

24          Q.    So, it would be helpful for air

25   conditioning.  I am glad you mentioned that,

213

1                          A. BATA

2    because we never finished going through the list

3    before about the other advantages.  So, I have to

4    finish going through that.  I am glad you reminded

5    me.

6              Station AVAC air conditioning can

7    operate more efficiently resulting in a smaller,

8    more efficient mechanical system, more compact

9    ancillary facilities, and a more sustainable

10   station design; true?

11             A.    It is true, especially in newer

12   systems.

13             Q.    Okay.  And again, other advantages

14   of these platform screen doors or platform edge

15   doors is the need for lighting and finishes on the

16   walls and ceilings of the track area could be

17   reduced or eliminated assuming aesthetically and

18   functionally acceptable alternatives are

19   developed; true?

20             A.    Probably true, with a cost.

21             Q.    Another advantage is stations are

22   protected from smoke or flames generated by a fire

23   on the track and in the tunnels; correct?

24             A.    That's correct.

25             Q.    Another advantage is improvement in

214

1                      A. BATA

2    tunnel ventilation system in response to a train

3    fire in the tunnel; correct?

4           A.    I don't know.  There is some debate

5    about that.

6           Q.    Well, platform edge doors, another

7    advantage is tunnel ventilation would be more

8    effective due to the greater effectiveness of the

9    blast shafts; true?

10          A.    Debatable.  I don't know.  It is an

11   ongoing debate.

12          Q.    Another advantage, most of the heat

13   generated by train operation would be prevented

14   from entering stations; true?

15          A.    True.

16          Q.    Air surges through stationarys due

17   to the train piston action would be largely

18   eliminated; true?

19          A.    Debatable.

20          Q.    Reduced noise levels and better

21   acoustics on the platform would improve public

22   address and telephone communications?

23          A.    Largely improve, and also part of it

24   is debatable.

25          Q.    Trash and other objects would be

215

1                        A. BATA

2      prevented from falling or being thrown from the

3      platform to the track; true?

4              A.    Absolutely.

5              Q.    And also, the air quality is

6      improved, as well; true?

7              A.    Could be a negative effect in the

8      train, because it is an enclosed shaft.  So, it is

9      debatable.

10             Q.    Now, by the way, are you aware of

11     the study, in 2007, commissioned by the Transit

12     Authority, that said the actual cost of platform

13     edge doors themselves is not a significant amount

14     in the overall station budget and it would be

15     mitigated by the savings of reduced mechanical and

16     electrical equipment?

17             A.    I am not aware of that statement.

18             Q.    Do you agree with that statement or

19     disagree with that statement?

20             A.    I disagree with that statement.

21             Q.    Okay.  Can you tell me, you are

22     familiar with platform edge devices, screen doors

23     and gates and barriers and track intrusion safety

24     devices all over the world; correct?

25             A.    Reasonably.

216

1                        A. BATA

2            Q.    And all over the world they are

3    putting in more and more of these devices;

4    correct?

5            A.    New systems, yes.

6            Q.    Can you tell me, have they been

7    ripped out or pulled out of any stations so far,

8    any system?

9            A.    I am not aware.

10           Q.    Okay.  So, is there a single place

11   in the world that platform edge doors, screen

12   doors, track intrusion devices, gate barriers,

13   have been ripped out or pulled out because they

14   are not effective?

15           A.    No, because they put them in with a

16   tremendous amount of careful analysis.

17           Q.    Thank you.  So, the answer was no;

18   correct?

19           A.    Because they were careful putting

20   them in.

21              MR. GENIS:  Thank you so much.  I

22           appreciate that, that you just answered

23           the no, like you kept your word.

24              By the way, can we look now for a

25           second -- I want to get back to money.

217

1                          A. BATA

2              Dave, can you please put up 390438.  I

3              think it was marked Plaintiff's Exhibit 14

4              at a deposition before.

5                     MR. ROTH:  This is Sanchez 14?

6                     MR. GENIS:  Yes.

7                     MR. KEAVENEY:  Are we going to mark

8              it?

9                     MR. GENIS:  We can.  You tell me.

10                     MR. ROTH:  Since I can easily find

11              it, no.

12              Q.    We are showing you what has been

13        marked for identification, at the Sanchez

14        deposition, Plaintiff's No. 14, Bates No. 390438.

15        It is an e-mail within the Transit Authority.  Do

16        you recognize the names of any of these people

17        this is to or from?

18              A.    Yeah.  I remember some people, yeah.

19              Q.    And this is -- the subject is

20        platform screen doors, the COMET forum; correct?

21              A.    Right.  I see it.

22              Q.    This is May 25, 2010; correct?

23              A.    It looks like it, yes.

24              Q.    And there were multiple attachments

25        to this e-mail, all involving platform screen

218

1                          A. BATA

2    doors?

3            A.    Yes.

4            Q.    These abilities, studies, all kinds

5    of things; right?

6            A.    Yes.

7            Q.    Yes?

8            A.    Yes.

9            Q.    And it was decided, for example, on

10   that No. 7 extension and the Second Avenue subway,

11   it was, in fact, feasible to install platform

12   screen doors there; correct?

13           A.    It says feasible to the study.

14           Q.    I understand reviewing it.  That's

15   not what I am asking you.

16           A.    What was the question?

17           Q.    The question was, it was determined

18   it was, in fact, feasible to put in platform

19   screen doors on the Second Avenue, as well as the

20   No. 7 line extension; true?

21           A.    Where does it say that?

22           Q.    Sir, just answer my question.

23           MR. KEAVENEY:  Counsel, your first

24           question was did the document say that,

25           and now you are changing --

219

1                         A. BATA

2                MR. GENIS:  No, that's not what I

3          said.  Mischaracterization.

4                MR. KEAVENEY:  I don't know what

5          you are saying.  Why don't you ask the

6          question again?  I heard two things, and

7          so did the witness, obviously.

8          Q.    Sir, yes or no, did you recommend,

9    because it was feasible and it was safe, to have

10   platform screen doors for that Second Avenue

11   subway; yes or no, sir?

12               MR. KEAVENEY:  Objection.  You can

13         answer.

14         A.    I recommended a trial to see if it

15   is feasible.

16         Q.    Okay.  Well, feasible means that

17   you are capable of putting it in and installing

18   it, designing it and installing it; correct?

19         A.    Exactly.

20         Q.    So, the pilot is to see how well it

21   works; correct?

22         A.    Or if it can be done.

23         Q.    Well, you know it can be done.  The

24   only question is if it works or needs to be

25   changed or modified; correct?

220

1                          A. BATA

2          A.    No, sir.  If there is not enough

3     power, it cannot be done.

4          Q.    So, you are telling us you

5     recommended that they install platform edge doors

6     on the Second Avenue subway and you didn't even

7     know if there was enough power there?

8          A.    It was part of this thing to find

9     out, what power requirements you need, structural

10    improvements, et cetera.

11         Q.    Sir, are you aware that the study

12    said that it could be done, it was, in fact,

13    feasible to have platform screen doors at the

14    Second Avenue subway; are you aware of that?

15         A.    Well, if the engineer said it was

16    feasible, then it was.

17         Q.    Okay.  So, I am glad that we got

18    that one agreed to.  And the same thing for the

19    No. 7 line extension, that was also in the study

20    to say it was feasible?

21         A.    It is true, yes.

22         Q.    So, now let's get back to this

23    e-mail I am questioning you on.  We have all of

24    these different attachments to it, and then we are

25    going to get through the actual body of it.

221

1                          A. BATA

2               In the first full paragraph, the

3      third line down starts at the end, "The first two

4      e-mails on the attachments above are related to a

5      more recent proposal from a South Korean firm to

6      install plat edge doors at no cost to NYCT, New

7      York City Transit, in return for the right to sell

8      advertising on the doors/screens."

9               Did I read that accurately?

10          A.    That's what it says.

11          Q.    Okay.  And do you see anywhere on

12     this e-mail that anybody thinks "Can't be done,

13     sleazy, unethical," or anything to that effect?

14          A.    No, I do not.

15          Q.    Okay.  Now, let's go to the last

16     paragraph.  "Judy, I am copying you on this,

17     because after the rump rail staff meeting

18     yesterday, Peter joined us and said that Tom (as

19     in Prendergast) was interested in plat edge doors

20     and had asked CPM to draft a white paper on the

21     topic."

22               Did I read that accurately so far?

23          A.    Yes.

24          Q.    And that was Judith McLane was

25     Judy; correct?

222

1                          A. BATA

2          A.     Yes.

3          Q.     Who is Judith McLane?

4          A.     Judith was a senior manager in

5     operations planning.

6          Q.     CPM has assigned Andy (as in Bata)

7     to handle, and Andy asked Peter for assistance."

8                 Did I read that accurately; yes or

9     no?

10         A.     I see it there.  It is right there.

11         Q.     Okay.  So, you were aware of all of

12    this; correct?

13         A.     I was definitely aware of the

14    discussion of platform screen doors.

15         Q.     Were you aware that Prendergast,

16    the president, was interested in platform edge

17    doors; correct?

18         A.     Yes, he was.

19         Q.     And he was aware that it could be

20    done at no cost to the Transit Authority; correct?

21                MR. KEAVENEY:  Objection.

22         A.     I assume he saw that proposal.  I

23    cannot speak for him.

24                MR. GENIS:  Dave, can you put up

25          Bates No. 489770.  It's a multi-page

223

                              A. BATA

1

2        document.

3        Q.    Why were you a proponent of

4    installing platform screen doors and making that

5    the new standard in New York City?

6        A.    I didn't say standard.  I was always

7    interested in new technology and this was worth

8    investigating.

9        Q.    When you say you didn't say

10   standard, we already went through the e-mail where

11   you said absolutely that should have been the

12   standard.

13       A.    As I said, it was an enthusiastic

14   response.

15             MR. KEAVENEY:  Note my objection.

16       Q.    By the way, today are you giving us

17   enthusiastic responses when you are adding to --

18   editorializing to the yes/no questions?

19       A.    No, I am trying to give you some

20   education.

21       Q.    Thank you.  I appreciate that.

22             By the way, before that, were you

23   ever under pressure in New York to begin to think

24   about platform edge doors?

25       A.    No.

224

1              A. BATA

2              (Whereupon, Plaintiff's Exhibit 10,

3         a document, was marked for

4         identification.)

5         Q.    Sir, I am showing you Plaintiff's

6    Exhibit 10.  It is dated August 29, 2012, the

7    Metropolitan Transportation Authority; do you see

8    that, sir?

9         A.    Yes.

10        Q.    The subject is platform screen

11   doors; correct?

12        A.    Wait a minute, this is -- this is

13   not MTA.  What is it?  That's not us.

14        Q.    When you said you would look at

15   best practices and look internationally, did that

16   include looking into the U.S., as well?

17        A.    The U.S. doesn't have any.

18             MR. GENIS:  Sir, that's not my

19        question.  Move to strike.

20        Q.    You told us part of your job was to

21   look for best practices internationally; did that

22   include looking at reports in the United States of

23   America?

24        A.    I don't recall looking at U.S.

25   reports, no.

225

1                          A. BATA

2          Q.    If we go to Page 2, the very top,

3   do you see how the attached summary report, quote,

4   platform/track protection system report, end

5   quote, was issued in October of 2009, by the

6   International Association of Public Transport,

7   UITP; do you see that, sir?

8          A.    Yes.

9          Q.    And look at the bottom.  It notes

10  it as an attachment; correct?

11         A.    Okay.

12         Q.    And this was given to us by the New

13  York City Transit Authority; did they ever hide

14  this from you?

15         A.    Never saw it.

16             MR. GENIS:  Okay.  So, let's go to

17             some e-mails now.  Dave, could you just

18             put up -- it is 198106.  Actually, the

19             first page is 198105.  So, it is 198105

20             and 198106, two pages.  And this was

21             previously marked Plaintiff's Exhibit 17.

22             MR. ROTH:  In the future, you could

23             tell me that, so that I can get to the

24             right spot.

25                 (Whereupon, a discussion was held

226

1                        A. BATA

2            off the record.)

3                 MR. ROTH:  Just for identification

4            purposes, that's Sanchez Plaintiff's

5            Exhibit 17.

6                 MR. KEAVENEY:  Are we marking it?

7                 MR. ROTH:  No.  It has a good

8            marking on it, so we will leave it.

9                 MR. GENIS:  So, let's go to Page 2,

10           because then it goes in order.  Okay.  Go

11           to the top of that page, please.

12           Q.    This is an e-mail on January 8,

13    2013, at 9:41, to Tom Prendergast involving PSDs,

14    platform screen doors; correct?

15           A.    It looks like it, yeah.

16           Q.    And if you look at the bottom, it

17    is somebody from Halmar Corporation; correct?

18           A.    Okay.

19           Q.    And I am going to look at that big

20    paragraph in the middle, the very last sentence.

21    Actually, the last two sentences.  "It is our

22    opinion that the construction costs drive the

23    financing of a PSD system and that is why

24    advertisers alone, such as CBS Outdoor, can't

25    finance the system because of their lack of

227

1                      A. BATA

2      technical capability.  We believe a comprehensive

3      team can deliver a design/build/operate/maintain

4      PSD, platform screen door, solution to NYCT, New

5      York City Transit, at no cost."

6                 Do you see that?

7           A.    I see it.

8           Q.    Okay.  And let's go to the first

9      page, before that, the response.  Do you see on

10     January 25, 2013, 7:37 in the morning, Tom

11     Prendergast is doing a responsive e-mail; do you

12     see that?

13          A.    Yes, I see it.

14          Q.    Okay.  And his response is to the

15     guy, Chris Larson, from Halmar; correct?

16          A.    Okay.

17          Q.    And not only is the subject PSD,

18     the importance is high; correct?

19          A.    Okay.

20          Q.    And when it says, "Thanks for your

21     offer of assistance," et cetera, and we go through

22     the e-mail; do you see the whole e-mail?

23          A.    I see it.

24          Q.    Anywhere, does Mr. Prendergast say,

25     the president, "This is unethical"?

228

1                        A. BATA

2        A.    No, it doesn't say that.

3        Q.    Anywhere, does Mr. Prendergast, the

4   president of the Transit Authority, say, "This is

5   impossible.  You can't do it"?

6        A.    No, it doesn't say that.

7        Q.    Does he say anything at all that

8   makes it seem that the offer to do it for free was

9   fishy, suspect, smelled, anything at all?

10       A.    No.  If you read the previous memo,

11  it said that the original thing is not feasible and

12  they are looking for a team to do it.

13            MR. GENIS:  Move to strike.

14       Q.    I don't know what you are even

15  talking about, sir, but could you answer my

16  question?  Remember you gave me your word that you

17  are going to answer my yes or no questions with a

18  yes or no, and you are not here to help the

19  Transit Authority?  So, could you answer my

20  question, please?

21            MR. KEAVENEY:  Just note my

22            objection to the statement as opposed to a

23            question.

24            MR. GENIS:  That's okay.  I have an

25            objection to his non-responsiveness, so we

229

1                    A. BATA

2          are even.

3          Q.    Sir, can you answer my question?

4          A.    What is the question?

5          Q.    Do you see anywhere on this e-mail,

6    from the president of the Transit Authority, that

7    in any way, shape, or manner, the president of the

8    Transit Authority thought that the offer of a

9    company to design, build, operate and maintain

10   platform screen door solution to the New York City

11   Transit Authority at no cost was unethical,

12   unseemly, improper, impossible, smelled, anything

13   at all?

14         A.    No.

15         Q.    Thank you.

16               Now, you also sent an e-mail about

17   that UITP report; correct?

18         A.    Which one?  Oh, okay.  That report,

19   okay.

20         Q.    Yes?

21         A.    Yes.

22               MR. GENIS:  Could we look at, Dave,

23         Bates No. 249276?

24               (Whereupon, Defendant's Exhibit 11,

25         a document, was marked for

230

1                          A. BATA

2              identification.)

3              Q.    I am showing you what has been

4    marked for identification as Exhibit 11 today,

5    Bates 249276.  This is and e-mail you sent on

6    October 30, 2013; correct?

7              A.    Yes.  Right.

8              Q.    And you sent it to Mark Bienstock;

9    correct?

10             A.    Yes.

11             Q.    Who is Mark Bienstock?

12             A.    He was one of the chiefs in CPM.

13             Q.    Who is Carmen Bianco?

14             A.    He was the president.

15             Q.    Carmen Bianco was president?

16             A.    At this date, he may have just come

17   in.  I am not sure.  He was definitely up there,

18   yeah.

19             Q.    Who is Fred Smith?

20             A.    He was the head of CPM at that time.

21             Q.    Who is John Gaul?

22             A.    He was the head of service delivery.

23             Q.    Who was Joe Leder?

24             A.    He was also in subway.  He was the

25   head of subways then.

231

1                       A. BATA

2          Q.    So, you sent this e-mail saying,

3    "UITP issued this valuable report on track

4    intrusion systems"; correct?

5          A.    Right.

6          Q.    "This is a result of our inquiry,

7    on New York City Transit's behalf, to see what is

8    out there"; correct?

9          A.    Yes.

10         Q.    "I think this will be a great

11   supplement to your recent investigative trip

12   regarding this subject"; correct?

13         A.    Right.  Yes.

14              MR. GENIS:  Dave, if you can put

15              up -- I have two different Bates numbers

16              on it.  I am not sure what is easier for

17              you.  What I have is 4580, and the other

18              one I have is 201274.  I don't know which

19              is easier for you, Dave.

20              MR. ROTH:  Does the document have a

21              name?

22              MR. GENIS:  It is an e-mail.  The

23              e-mail is from Bata, May 15, 2013.  The

24              one right before, that he received.

25                   (Whereupon, a discussion was held

Enright Court Reporting    (631) 589-7788

232

1                          A. BATA

2            off the record.)

3                  (Whereupon, Defendant's Exhibit 12,

4            a document, was marked for

5            identification.)

6            Q.    Do you see this e-mail to you, from

7    Lindsey Mancini, May 15, 2013?

8            A.    Right.

9            Q.    And it is saying, "Hi, Andy.  Here

10   is a slightly older study from 2009, which again

11   focuses on PSDs, but does provide more of a

12   technical description of other intrusion detection

13   systems."

14                 Do you see that?

15           A.    Yes.  I see it, yes.

16           Q.    And you reviewed this; correct?

17           A.    I looked at it, yeah.  I think it

18   was about other intrusion systems.

19           Q.    And then, in fact, that same day of

20   May 15, 2013, at 10:30 in the morning, 25 minutes

21   later, you forwarded this report to other people;

22   correct?

23           A.    Yes.

24           Q.    You sent it to Craig Stewart;

25   correct?

233

1                        A. BATA

2          A.    Yes.

3          Q.    Who is Craig Stewart?

4          A.    Craig Stewart was my boss.

5          Q.    And then Mark Bienstock; correct?

6          A.    Yes.

7          Q.    And Don Weliman; correct?

8          A.    Right.

9          Q.    By the way, why did you call Don

10   Weliman, since he was retired, when you got the

11   subpoena?

12         A.    I called him because I know Don

13   Weliman was doing the study on the feasibility of

14   the platform doors.  So, I just asked him, I said,

15   "Did you get called?"  And he said yes.  That's

16   all.

17         Q.    Okay.  And then you are also

18   sending it to John Gaul; correct?

19         A.    Yes.

20         Q.    And then to Tony Abdullah; correct?

21         A.    Correct.

22         Q.    Who is Tony Abdullah?

23         A.    Tony was in the control center, I

24   believe.

25         Q.    And then it just said, "Considering

234

1                     A. BATA

2    this is an ongoing issue for us, I am sending you

3    this very excellent report, although a bit dated,

4    by UITP"; correct?

5          A.    Yes.

6          Q.    You were keeping up on these

7    things; correct?

8          A.    Yes.

9          Q.    And you were trying to promote

10   them; correct?

11         A.    Notice it says automatic metro

12   observatory, so it is a key thing for automated

13   driverless metros.

14         Q.    So, you thought this was worthless

15   and that's why you sent it to people above you?

16         A.    No, I just said that because there

17   are many automated metros in the world, they use

18   platform screen doors.

19         Q.    Let's get back to my actual

20   question.  You said, "Because this is an ongoing

21   issue, I am sending you this very excellent

22   report, though a bit vague"; correct?

23         A.    That's the report.

24         Q.    Now, you told us before -- by the

25   way, Don Weliman was in favor of having the

235

1                    A. BATA

2    platform doors on Second Avenue and seven west

3    extension; correct?

4                    MR. KEAVENEY:  Objection.  You can

5           answer.

6           A.    I don't know what his personal view

7    was.  I know he was involved in the feasibility

8    study.

9           Q.    He found it was feasible; correct?

10                   MR. KEAVENEY:  Objection.

11          A.    I have no evidence of it, but I know

12   he was doing the study.

13          Q.    You just spoke to him; what did he

14   say when you said you had talked to him about the

15   study?

16          A.    We didn't talk about in favor or

17   not.  I said, "You were involved in the feasibility

18   study," and I asked the question, "Were you

19   subpoenaed like me?"  And he said yes, and that's

20   it.

21                   MR. GENIS:  Dave, can you put up

22          413682?  That's not going to be the first

23          page.  So, the first page of it is 413680,

24          and it is a multi-page document.

25                   MR. ROTH:  This is going to be

236

1                    A. BATA

2          Exhibit 13.  Where do you want to start

3          it?

4                 MR. GENIS:  We will start at the

5          back, at the end of it.  Actually, the

6          second to last page is where his e-mail

7          starts.

8                 MR. ROTH:  Starting on the last

9          page?

10                 MR. GENIS:  On the second to last

11          page is where we should start, at the

12          bottom.

13                 (Whereupon, Plaintiff's Exhibit 13,

14          a document, was marked for

15          identification.)

16          Q.    So, we are looking at Plaintiff's

17    Exhibit 13, and the page we are on is 413682.  Do

18    you see this e-mail from you to other people?

19          A.    I see it.

20          Q.    And this is January 7, 2013;

21    correct?

22          A.    Correct.

23          Q.    And you are saying, "Dear John,

24    Serge and Sammy"; correct?

25          A.    Right.

237

1                        A. BATA

2          Q.    And these are people in England;

3    correct?

4          A.    No.

5          Q.    And you say, "We are under pressure

6    here in New York to begin to think about platform

7    edge doors."

8                Did I read that sentence

9    accurately?

10         A.    That's correct.

11         Q.    Who was pressuring you to begin to

12   think about platform edge doors?

13               MR. KEAVENEY:  Objection.  You can

14         answer.

15               THE WITNESS:  I can answer?

16               MR. KEAVENEY:  Yes.

17         A.    It was in the press, you know,

18   media.

19         Q.    Okay.  So, in other words, just

20   like recently, sometimes when people get killed by

21   trains, it gets a lot of publicity; correct?

22         A.    Incidents in the subway get a lot of

23   publicity.

24         Q.    Not all incidents get a lot of

25   publicity; correct?

238

1                        A. BATA

2                MR. KEAVENEY:  Objection.

3          A.    Generally all.

4          Q.    In fact, when you have spoken on

5    some of these interviews, you have talked about

6    the evil three Ps; correct?

7          A.    I didn't say evil.

8          Q.    Do you remember speaking about the

9    three Ps?

10         A.    I did.

11         Q.    And tell me what the three Ps were,

12   to your memory?

13         A.    I just said significant to people,

14   politicians, and the press, and the public don't

15   understand our system and they have false

16   impressions about, you know, what the whole thing

17   is about.  That was it.

18         Q.    In fact, you said that the three Ps

19   are the enemies of the Transit Authority; correct?

20         A.    I said it in context that they are

21   sometimes misinformed.

22         Q.    So, yes, you said that they were

23   enemies of the Transit Authority, the three Ps?

24         A.    Maybe I used that word, but I meant

25   that it was -- misinformation is not a good thing

239

1                       A. BATA

2      for the Transit Authority.

3              Q.    The three Ps stood for the public,

4      the press, and the politicians; correct?

5              A.    That's what I said.

6              Q.    So, the public is an enemy of the

7      Transit Authority?

8              A.    I just said it is misinformed

9      sometimes the complexity of the system.

10             Q.    The press is an enemy of the

11     Transit Authority?

12             A.    Misinformed.

13             Q.    And the politicians are an enemy of

14     the Transit Authority?

15             A.    It is -- you know, they use --

16     sometimes they use it negatively and sometimes they

17     are in favor and sometimes they are not, of course.

18             Q.    So, does the Transit Authority have

19     an obligation or a duty to be honest and

20     transparent and accurate?

21             A.    Absolutely.

22             Q.    So, if the Transit Authority -- for

23     example, there are times the Transit Authority

24     makes presentations or answers questions to public

25     entities; true?

240

1                        A. BATA

2          A.    Right.

3          Q.    Have you ever spoken to the PTSB?

4          A.    No.

5          Q.    Have you ever spoken to the city

6    council?

7          A.    No.

8          Q.    Have you ever spoken to any public

9    or governmental entities?

10         A.    No.

11         Q.    Have you ever spoken to any

12   reporters?

13         A.    I might have spoken to some

14   reporters while I was working there.

15         Q.    Okay.  And have you spoken to any

16   politicians?

17         A.    No.

18         Q.    When anyone from the Transit is

19   making a presentation or answering questions to,

20   let's say the PTSB or city counsel or any

21   governmental entity, do they have an obligation to

22   be factual?

23         A.    They are trying to be factual and

24   informative.

25         Q.    So, they are required to be

241

1                        A. BATA

2    factual, honest, and accurate; true?

3            A.    Yes.  To the best of their ability,

4    yes.

5            Q.    And they are required to be

6    complete and thorough; correct?

7            A.    As much as possible, of course.

8            Q.    Because, you know, a half truth is

9    essentially half a lie; correct?

10           A.    I don't know how much is correct.

11           Q.    So, when people from the Transit

12   speak to the PTSB or the city counsel, are they

13   supposed to give the whole truth or a half truth?

14           A.    They try to do the best -- the best

15   job they could do.

16           Q.    I understand, but you are not

17   answering my question.  Can you please answer my

18   question?

19           A.    Of course.

20           Q.    Of course what?

21           A.    Of course they have to be truthful.

22           Q.    And they have to give the whole

23   truth; correct?

24           A.    As defined by the whole truth,

25   right.

242

1                    A. BATA

2        Q.    By the way, who in the Transit

3   Authority told the press and the public and the

4   politicians, the three Ps, that companies were

5   willing to do platform screen doors for free?

6        A.    I have no idea.

7        Q.    Did anyone ever, from the Transit

8   Authority, ever tell the press that companies were

9   willing to install and maintain, design, et

10   cetera, platform screen doors?

11        A.    I have no idea.  I have no idea what

12   the communications for those things were.  I don't

13   know.  I do not know.

14        Q.    Did you ever help prepare the

15   president of the Transit for speaking?

16        A.    No.

17        Q.    So, the pressure you were referring

18   to in this e-mail was from the press, about people

19   being killed or maimed by trains; correct?

20        A.    Media, on TV, right.

21        Q.    So, the fact that 100 to 200 people

22   were getting maimed every year, and about 55 or so

23   were getting killed every year, did not matter;

24   what mattered was that the press was pressuring

25   you; true?

243

1                          A. BATA

2              MR. KEAVENEY:  Objection.

3         A.    The press saw this was something new

4    and, in fact, it was true since the subway opened

5    in 1904.

6         Q.    But now you are responding and you

7    are doing things because of the pressure; correct?

8              MR. KEAVENEY:  Objection.

9         A.    There is no pressure.  It was in the

10   media.

11        Q.    So, when you say there is no

12   pressure, so were you lying when you put, "We are

13   under pressure here in New York"?

14        A.    Pressure meant that it is in the

15   discussion, and the agency, we are looking into it.

16        Q.    Well, sir, you are an educated and

17   intelligent man with a master's degree; correct?

18   I mean, you taught at Columbia and NYU; correct?

19        A.    Yes.

20        Q.    You are capable of formulating

21   sentences that say what you mean and intend;

22   correct?

23        A.    Right.

24        Q.    Okay.  When you formulated this

25   sentence in this e-mail, were you complete,

244

1                          A. BATA

2    honest, accurate, and thorough?

3                    MR. KEAVENEY:  Objection.

4            A.    It was my opinion.

5            Q.    That's not my question.  My

6    question is, when you wrote this e-mail,

7    Plaintiff's Exhibit No. 13, on January 7th of

8    2013, when you wrote that, were you being honest

9    and accurate?

10                   MR. KEAVENEY:  Objection.

11           A.    I certainly was.

12           Q.    Were you being complete and

13   thorough?

14           A.    Just one sentence.

15           Q.    Is that a yes to my question?

16           A.    I was not completely thorough.  I

17   just gave my opinion.

18                   MR. GENIS:  Move to strike.

19           Q.    Sir, I didn't ask you about

20   opinions.  I am asking you point blank, when you

21   wrote this e-mail in the regular course of your

22   business on behalf of the Transit Authority, were

23   you complete and accurate?

24                   MR. KEAVENEY:  Objection.  You can

25           answer.

245

                              A. BATA

1

2        A.    Yes.

3        Q.    Now, since you are saying people

4   have been getting killed and maimed since 1904,

5   wasn't that pressure enough to fix the problem?

6              MR. KEAVENEY:  Objection.

7        A.    It is an ongoing issue in all the

8   subway systems since 1904.

9        Q.    Sir, did you ever say, "This has to

10  stop"?

11       A.    I don't think I said that.  I think

12  we should look at things to mitigate it.

13       Q.    Did anybody from the Transit ever

14  say, "We have to do something to stop hundreds of

15  people from being maimed and killed"?

16             MR. KEAVENEY:  Objection.

17       A.    Obviously, the Transit Authority is

18  a very safety oriented and we did many things to

19  improve safety, like I mentioned earlier, all the

20  time.

21       Q.    Okay.  Well, let me ask you this.

22  And let's scroll up a little bit to the response

23  to your e-mail.  It is on that same page.  It is

24  right there, actually.

25             Do you see, in bold face, it says,

246

1                          A. BATA

2     "In summary, our experience is that PEDs, platform

3     edge doors, don't make things worse but improve

4     matters; do you see that?

5                A.    Yes.

6                Q.    And at the top of the page --

7                     MR. GENIS:   Can you just go to the

8           top of the page, Dave.

9                Q.    "They do an exceptionally good job

10    of separating customers from train movement.

11    There have been no genuine struck by train

12    incident at the PED platforms."

13                     Did I read that accurately?

14                A.    You did.

15                Q.    By the way, does the Transit

16    Authority consider a person on the tracks, whether

17    they fell, got sick, were pushed, whatever, to be

18    unauthorized persons on the track?

19                A.    Yes.

20                Q.    Okay.  By the way, does the Transit

21    Authority have a relatively large number of

22    incidents of falls on tracks for passengers

23    compared to other metros?

24                A.    I do not know what the statistics

25    are.

247

1                          A. BATA

2          Q.    Tony Abdullah, who is that?

3          A.    I told you, he was in the control

4     center.

5                MR. GENIS:  Dave, can you please

6          put up 24530?

7          Q.    By the way, sir, while he is

8     looking for the document, did you consider the

9     topic or subject of platform edge doors to be

10    political?

11         A.    No.

12         Q.    Did anybody at the Transit

13    Authority consider the subject of platform edge

14    doors to be political?

15               MR. KEAVENEY:  Objection.

16         A.    No.

17         Q.    Have you ever heard or seen of

18    anybody characterizing the topic of platform edge

19    doors as political?

20         A.    I don't think so.

21               (Whereupon, Plaintiff's Exhibit 14,

22          a document, was marked for

23          identification.)

24         Q.    Okay.  All right.  Do you see

25    Plaintiff's Exhibit 14, an e-mail to Eric Turner

248

1                           A. BATA

2      from Tony Abdullah; correct?

3              A.     Yes.

4              Q.     Who is Eric Turner again?

5              A.     I don't know him.

6              Q.     Okay.  And you see the importance

7      is high; correct?

8              A.     Yes.

9              Q.     And the subject is CoMET, track

10     intrusion incident questions; correct?

11             A.     Yes.

12             Q.     And he says, "Eric, I apologize.  I

13     see that I did not send your response to your

14     inquiry below.  I hope it is not too late.  Tony

15     A."  And then he gives the response.

16                    "The question is, New York City has

17     a relatively large number of incidents or falls on

18     tracks per passenger (compared to other metros),

19     do you also consider 24/7 service to be a main

20     contributor to this?"

21                    The answer by Mr. Abdullah, "No."

22                    Do you see that?

23             A.     Yes.

24             Q.     And then he goes into other causes

25     for so many people falling or being pushed or

249

1                    A. BATA

2    accidentally losing balance or things like that;

3    correct?

4              MR. GENIS:  You can scoot down a

5              little more so he can see that paragraph,

6              Dave.

7         Q.    Do you see all of that?

8         A.    Yes.

9              MR. GENIS:  Now, Dave, can you go

10             to Bates No. 5664, and I think it was

11             previously Plaintiff's Exhibit No. 7.

12        Q.    Did you ever work with Mr. Reuter?

13        A.    Yes.  He was a former president.

14        Q.    And did you discuss platform edge

15   doors with him?

16        A.    He was in the meeting.  He was part

17   of the committee at one time, so he used to

18   participate, yes.

19        Q.    And was Reuter in favor of platform

20   edge doors or against them?

21        A.    He was in favor of the idea, but

22   then he was -- just like in paragraph you showed

23   before, he said you create a false sense of

24   security if you do it one station and not another

25   station.  Then he was against it.  He said it is

250

1                          A. BATA

2    very unsafe, having a false sense of security by

3    having intermittent stations with platform doors,

4    and he was right.

5           Q.    In other words, a station that has

6    a platform edge door that prevents people from

7    getting hit by trains is unsafe?

8           A.    You are misrepresenting what I said.

9    Read the paragraph that I said before.

10          Q.    Answer my question.  Is that what

11   you are saying to me, sir?

12          A.    That station may be safe, but the

13   next station may not be.

14          Q.    So, in other words, the station

15   that has the platform edge doors is safe, but the

16   station that does not have the platform edge doors

17   is not safe; correct?

18          A.    The passenger may think it is safe.

19          Q.    Okay.  But it is not; correct?

20          A.    Less safe.

21          MR. GENIS:  Okay.  So, now let's

22          take a look -- can you make it a little

23          bit larger now, Dave?

24          Q.    By the way, is there any factual

25   basis for you to say that the customers will

251

1                          A. BATA

2    somehow be less safe because of their

3    expectation -- let me back up.

4                    Tell me again why you are claiming

5    it is less safe to have some stations with

6    platform edge doors -- so some of them have it and

7    some of them don't; why is that less safe for the

8    whole system as a whole?

9                    MR. KEAVENEY:  Objection.  Asked

10              and answered.  You can answer again.

11         A.    Inconsistency is unsafe in general.

12         Q.    How is it unsafe?

13         A.    You want me to give an example?

14         Q.    No.  Let me be very clear.  You

15    have told us before that around the world there

16    are other cities where some of the lines have

17    platform edge doors and some of the lines do not;

18    correct?

19         A.    That's correct.

20         Q.    Okay.  So, in these other cities,

21    have they torn out the platform edge doors to say,

22    "Geez, this is not safe, because some of them have

23    them and some don't, so we have to make sure that

24    nobody has it"; have you heard of that happening?

25         A.    No such thing as aligned with some

252

1                          A. BATA

2     station have and some don't.  No such experience

3     anywhere.

4              Q.    So, is there any proof, not your

5     speculation, not your assumptions, not your

6     guesses, but any documented proof that if you put

7     platform edge doors at some stations, but not all

8     stations, that the system as a whole will be less

9     safe?

10                   MR. KEAVENEY:  Objection.  You can

11             answer.

12             A.    Probably there is proof that

13    inconsistency is very unsafe.

14             Q.    You said probably there is proof.

15    That's not my question.  I am not asking for your

16    assumptions, your guesses, or your speculation.

17             A.    I am not a psychologist.  I don't

18    know.

19             Q.    Are you aware of a single study,

20    proof, documented proof, where there are PSDs at

21    some stations but not others, the whole system as

22    a whole is less safe?

23                   MR. KEAVENEY:  Over objection.

24             A.    I don't -- I don't have anything I

25    recall there is a document, but of course it is

253

```
1                        A. BATA

2   common knowledge.

3          Q.    Well, I don't know what common

4   knowledge you are referring to, sir.  I am asking

5   about facts, okay.  So, can you tell me, anywhere

6   in the world have you heard about documented

7   facts, not your guess, okay, that the whole system

8   is less safe because they have either platform

9   screen doors or gates or some kind of protective

10  device, that it is less safe when they have it at

11  some stations but not all?

12         A.    Evidence is that there is no such

13  thing in the world.  That's speaks for itself.

14         Q.    So, it is common knowledge that

15  when you put the platform screen doors in, it is

16  effective at eliminating, preventing, and reducing

17  death and injury due to contact with trains; true

18  or false?

19         A.    At that station.

20         Q.    So, is it a good thing or a bad

21  thing, at any given station, to prevent somebody

22  from getting run over by a train?

23         A.    At one particular station, if you

24  don't look at the system, yes.

25         Q.    So, let me ask you, if ten percent
```

254

1                              A. BATA

2    of the stations had some sort of platform edge

3    door protective device, would you expect to see a

4    ten percent reduction in injury and fatality, or

5    would you expect to see a greater number of injury

6    and fatality?

7            A.    I do not know.  I do not know.

8            Q.    Okay.  If half of the stations had

9    platform screen doors or some other kind of safety

10   device, would you expect to see half the number of

11   people killed and injured or more than half of the

12   number of people killed and injured?

13           A.    Could be more, because now you have

14   a tremendous inconsistency.

15           Q.    Could be.  So, is there any proof

16   that you would expect to see more?

17           A.    Just supposition.

18           Q.    So, that's a guess.  So, let me ask

19   you, if half of the stations had some sort of

20   safety device to prevent it, prevent people from

21   getting hit by trains, do you think overall,

22   overall, the system would show more people getting

23   hit, injured, and killed, or less people overall

24   getting injured or killed?

25                 MR. KEAVENEY:  Objection.  Now you

255

                              A. BATA

1
2          are asking him to guess.

3          A.    I do not know.

4          Q.    Okay.  So, is inconsistency the

5    reason Reuter gave to you of why he killed the

6    PSD?

7          A.    Yes, a big reason for it.

8          Q.    He wanted an all or nothing

9    approach; correct?

10         A.    He said, to be practical, it has to

11   be all or nothing.

12         Q.    So, let me ask you this.  Have you

13   seen in the news that they are doing a pilot in

14   three different stations?

15         A.    Yes.

16         Q.    Well, won't that make the system

17   more dangerous?

18         A.    It is a test.

19         Q.    Won't that make the system,

20   according to you, more dangerous?

21         A.    It is part of the test.

22         Q.    But that's not what I am asking

23   you.  Let me see if I get this.  So, you want to

24   do a test to see if more people get killed or

25   injured if you put in platform screen doors at

256

1                          A. BATA

2      three stations; is that what you are telling me?

3                      MR. KEAVENEY:  Objection.

4          A.     Absolutely not.  I am not telling

5      you that.

6          Q.     I mean, if the Transit Authority

7      thought, if we have three stations, right,

8      inconsistent approach, not all or nothing, that

9      more people would wind up getting killed or

10     injured; is that what you are telling me they are

11     doing?

12         A.     I am saying it is part of the

13     evaluation.

14         Q.     So, it is a test to prove your

15     unproven hypothesis about an inconsistency in your

16     mind?

17                    MR. KEAVENEY:  Objection.

18         A.     One of the many factors.

19                    MR. GENIS:  Let's look at this.

20                 Dave, can you make this document larger

21                 please?  Larger, so we could read it.

22                    (Whereupon, a discussion was held

23                 off the record.)

24         Q.     This is Plaintiff's 7 from Sanchez,

25     Bates 5564.  Do you see the e-mail in the middle,

257

1                          A. BATA

2      it has some highlighting on it, from Cachee

3      Cheung?

4              A.    Yes.

5              Q.    Who is she, or he?

6              A.    I don't know who she is.

7              Q.    Who is Paul Sciara?

8              A.    I don't know.

9              Q.    Who is Aanil Parikh?

10             A.    He was a project manager for the

11     Second Avenue subway.

12             Q.    And the e-mail says, "I will help

13     you as much as I can on this topic, but I suspect

14     you may already have everything (the feasibility

15     report) that we have.  Our conceptual design scope

16     of work did include a study for the platform edge

17     doors, PEDS.  We did a study, recommended it to

18     the president (Mr. Reuter at the time), he killed

19     it, (no way, no how)."

20                  Did I read that accurately?

21             A.    You read it accurately.

22             Q.    Okay.  And so, there was a

23     recommendation that these platform edge doors be

24     put in for Second Avenue; correct?

25             A.    Yeah.

258

                          A. BATA

1

2        Q.    And Reuter went against the advice

3    and recommendation of the engineers; correct?

4        A.    Yes.

5        Q.    He just killed the project;

6    correct?

7        A.    He's the president.

8        Q.    Okay.  And the reason he went

9    against the engineers is his unproven guess that

10   if you do it in some and not all, that somehow it

11   will make the system less safe; correct?

12               MR. KEAVENEY:  Objection.

13       A.    No, it's part of the reason.  That

14   was not the reason.

15       Q.    Didn't you tell us a moment ago

16   that the reason was that it was because all or

17   nothing, and if you can't do it for all, you have

18   to do none of them?

19               MR. KEAVENEY:  Objection.

20       Q.    Sir, can you answer me?

21       A.    What is the question?

22       Q.    Okay.  Not a problem.  I am here to

23   help.  I got all day.

24               So, you told us earlier, under

25   oath, that the main reason that Reuter killed the

259

1                          A. BATA

2    program, was -- you know what, it is already under

3    oath.  You already said it under oath.  You want

4    to contradict, I am fine with that.

5                    Then it says, "The agency asking

6    you for the PEDs information is probably knocking

7    at the wrong door.  It is like asking the

8    government of Ecuador how they deal with snow

9    removal in winter."

10                    Did I read that accurately?

11         A.    Yes.

12                    MR. GENIS:  Dave, could you go to

13              the next page?  I want is the e-mail from

14              Robert Montfort, March 12th; do you see

15              that one?  That's it.

16         Q.    Do you see this, Bates 5665, sir?

17         A.    Yes.

18         Q.    Who is Robert Montfort?

19         A.    He was an engineer in CPM, I think.

20         Q.    Who is Ken Brown?

21         A.    I don't know.

22         Q.    And you see this e-mail regarding

23    platform edge doors?

24         A.    The bottom?

25         Q.    The one that is right in front of

260

1                    A. BATA

2    you.

3          A.    Yes.  There are two.

4          Q.    The one from Robert Montfort that

5    we have been discussing.

6          A.    On top.  Okay.

7          Q.    "This subject is so political that

8    I do not know who, if anyone, will talk to other

9    properties."

10                Did I read that accurately?

11         A.    You read it accurately.

12         Q.    "There are many people totally in

13   favor of them and we have done considerable study

14   of them under Second Avenue and Seven West with

15   our consultants, Don and I are totally for their

16   use, but there is no champion for the use within

17   the operating department.  I think every new

18   subway around the world uses them except for New

19   York City Transit Authority."

20                Did I read all that accurately?

21         A.    You read it accurately.

22                MR. GENIS:  Okay.  Dave, could you

23                put up, please, Bates No. 103488?

24         Q.    By the way, would the L line also

25   be considered a location for platform doors?

261

1                          A. BATA

2          A.    There was one station considered for

3    trial.

4          Q.    Sir, by the way, when they were

5    talking about issues with airflow and temperature,

6    was it noted that openings could be made in the

7    platform door system by converting solid glass

8    panels to a lurid or screened arrangement?

9          A.    I honestly don't remember that.

10         Q.    Well, that would solve that

11   problem; correct?

12               MR. KEAVENEY:    Objection.

13         A.    I don't know.

14         Q.    We just went through that e-mail

15   with Montfort and Ken Brown with platform screen

16   doors; do you know what their involvement was?

17         A.    Ken Brown, I don't recall him.

18   Frankly, I don't know.

19               (Whereupon, Plaintiff's Exhibit 15,

20               a document, was marked for

21               identification.)

22         Q.    We are looking at another document

23   now that we have marked as Plaintiff's Exhibit 15

24   for identification, and it is Bates No. 103488.

25   Do you see this e-mail to Tom Prendergast from

262

```
 1                        A. BATA

 2    Stanley Grill?

 3             A.    Yes.

 4             Q.    And cc'd to Robert Bergen?

 5             A.    Yes.

 6             Q.    Who is Robert Bergen?

 7             A.    He was the executive vice president.

 8             Q.    And who is Stanley Grill?

 9             A.    He was head of procurement.

10             Q.    And the subject is platform edge

11    doors; correct?

12             A.    Yes.

13             Q.    March 2nd of 2010; correct?

14             A.    Yes.

15             Q.    And it says, "Tom, just a reminder

16    that this project is still a promising

17    possibility, but I am afraid that, once I leave,

18    it will die."

19                   Did I read that accurately?

20             A.    You read it accurately.

21             Q.    "We sent a team to Seoul to

22    investigate the installations there, and while

23    trip reports haven't been finalized, there were no

24    technical obstacles identified."

25                   Did I read that accurately?
```

263

1                          A. BATA

2          A.    Yes, you read it correctly.

3          Q.    "We still need to proceed by having

4    us and the group from Seoul identify some possible

5    pilot stations and to coordinate this through MTA

6    real estate."

7                Did I read that accurately?

8          A.    Yes.

9          Q.    And the MTA real estate was getting

10   involved again because of the advertising revenue

11   in these agreements; correct?

12         A.    I guess that's why they were

13   involved.

14         Q.    There is no other reason for them

15   to be involved; correct?

16         A.    Unless they found that they had to

17   move some -- some tenants in the station or

18   something.  I don't know.

19         Q.    Well, for platform screen doors you

20   don't have to move a tenant in a station?

21         A.    I assume that's correct.

22         Q.    And I am going to continue reading.

23   "It has moved forward relatively quickly because I

24   have been pushing it, but unless a project leader

25   from DOS, Department of Subways, is identified who

264

1                           A. BATA

2      has the responsibility for pursuing this further,

3      it will just stall."

4                   Did I read that accurately?

5           A.     You read this correctly.

6           Q.     Could we agree that the project

7      stalled for decades?

8                   MR. KEAVENEY:  Objection.

9           A.     I would say because it was

10     complications, it was go, no go.  It was always

11     fought with a lot of complications and costs.

12          Q.     Well, cost, we have already gone

13     through how they could have gotten it for free.

14     Let's take cost off of the table.

15                  Basically, from the time people

16     first discussed putting in platform screen doors

17     in New York City subways, until the time you left

18     the Transit Authority in 2015, was there a single

19     pilot project that got implemented?

20          A.     Implemented, no.

21          Q.     So, there were a number of designs

22     and plans for pilot projects; correct?

23          A.     Yes.

24          Q.     While there were plans to put in

25     the platform screen doors in some of these

265

1                            A. BATA

2     stations and lines, they were never implemented,

3     the plans to do so were never implemented; true?

4          A.    Right.

5          Q.    So, it stalled; correct?

6          A.    It was stopped because of the

7     reasons for stopping it.

8          Q.    Now, let's discuss hierarchy of

9     safety at this point.  Let's look at some of my

10    notes.

11              (Whereupon, a break was taken from

12              4:33 p.m. to 4:44 p.m.)

13         Q.    So, would it be fair to say that it

14    was part of your job to research to see how these

15    12/9, people getting run over by trains and killed

16    or maimed can be prevented?

17              MR. KEAVENEY:  Objection.  You can

18              answer.

19         A.    My job was not a safety officer.  It

20    is not part of my job.

21         Q.    So, was it part of your job to find

22    creative and innovative means of keeping people

23    safe by preventing or reducing incidents of people

24    getting run over by trains and killed or maimed?

25         A.    Among the many things I was doing,

266

1                        A. BATA

2    yes.

3            Q.    When you did your research and you

4    looked at the best practices worldwide, what did

5    you learn?

6                    MR. KEAVENEY:  Objection.  You can

7            answer.

8            A.    Because the number one factor is, or

9    a big factor is people leaning over the platform

10   endangering themselves because they don't know when

11   the trains are coming.  We spent a lot of money and

12   installed the NextGen arrival signs, which was

13   very, very successful and a tremendous improvement

14   in people not leaning over anymore because they see

15   when a train is coming.

16           Q.    So, when you saw very successful,

17   can you tell me, what is the factual data or

18   statistics that show fewer incidents of people

19   getting hit by trains since you have done that?

20           A.    It is -- just ask anybody.

21           Q.    I am asking you.  Do you have any

22   factual data to support the opinion you just

23   expressed?

24           A.    I don't have any factual data,

25   because I am not there anymore, but I know the

267

1                    A. BATA

2    project has been very successful.

3          Q.    Great.  When you say successful, I

4    am not sure what that means.  I am interested in

5    results.  So, for example, we had the chart up

6    that showed year by year.  What year did you make

7    this very successful change to prevent people from

8    getting hit by trains; what year?

9          A.    It was ongoing.  Installations

10   started like in the late 1990s.

11         Q.    Okay.  The late 1990s, and when was

12   it completed?

13         A.    I think there is still a few

14   stations that don't have them.  I think it is

15   almost complete.  It is almost done.

16         Q.    So, can you show me, whether it is

17   through the chart you have in front of you,

18   Plaintiff's Exhibit No. 1, or any other facts, any

19   other hard data, any other statistics to show that

20   any injury or death was prevented by that program

21   that you just referred to?

22         A.    No.  I cannot show you any data on

23   it, no.

24         Q.    All right.  So, you learned when

25   you tried to see what the best practices were --

268

A. BATA

1
2     let's get back to my original question.  Because,
3     with all do respect, you didn't answer it.
4             When you did your research for best
5     practices for prevention of people getting hit and
6     run over by trains and killed or maimed, did you
7     learn that there were various effective safety
8     devices?
9             A.    Well, I mean, yes.  I mean, I knew
10    there were platform doors, I knew there were
11    inclusion systems, announcements, help points,
12    NextGen arrival signs, platform edge markings,
13    station lighting, media messages, advertising.
14    Absolutely.  There was a big, long list of measures
15    that prevent accidents, absolutely.
16            Q.    Let's see if I get this straight.
17    Can we agree that these platform doors and other
18    devices to prevent people from getting hit
19    complied with best practices?
20            MR. KEAVENEY:  Just note my
21            objection.
22            A.    Best practices, as you define
23    looking for solutions, yes.
24            Q.    So, yes is the answer to my
25    question?

269

1                    A. BATA

2          A.    Yes.

3          Q.    Thank you.  And these best

4    practices that were used throughout the world to

5    prevent people from getting hit and killed or

6    maimed by trains, were they done in some

7    third-world nations?

8          A.    Some yes, some no.

9          Q.    So, did you ever say that, "Geez,

10   third-world nations are doing best practices, but

11   we here in the United States, in New York, a

12   leader, have best practices, as well"; did you say

13   that?

14         A.    I just said that there is a whole

15   world out there and there are best practices around

16   the world that are worth looking at.  New York is

17   the best practice in the world for graffiti.

18   People are looking at us.  So, they say best

19   practice here for anti-graffiti.

20         Q.    I'm not interested in graffiti.  I

21   am interested in saving lives and limbs.  When we

22   want to talk about graffiti, we will talk about

23   graffiti.  Right now we are talking about safety.

24   I know that you don't want to talk about safety.

25   I am here to talk about safety, okay.  So, let's

270

1                         A. BATA

2      stay focused on what we are here for today.

3              A.    You asked about best practice.

4              Q.    Sir, and the best practice -- yes.

5      Sir, I am happy to question you.  Very happy to.

6                    So, sir, where are you from, by the

7      way?

8              A.    I was born in Hungary.

9              Q.    And by the way, did you ever --

10     let's get back.  So, is part of best practices

11     putting safety first?

12             A.    It is part of best practices, yes,

13     of course.

14             Q.    All right.  And did you ever do a

15     write up about platform screen doors?

16             A.    I probably sent memos, of course.

17     You saw it.

18             Q.    And by the way, when we say safety

19     first, that means before everything else; correct?

20             A.    It is a key pillar of operating a

21     transit system.

22             Q.    But can you answer my question,

23     please?  Does safety first mean safety before

24     everything else?

25             A.    Generally, that's the accepted model

271

1                              A. BATA

2     for all transit operators, yes, safety first, of

3     course, just like the airlines.

4              Q.   So, I am just asking you in

5     general, a simple yes or no question, does the New

6     York City Transit Authority put safety first?

7     That's the question.

8              A.   Generally, they are very, very

9     safety oriented.

10             Q.   My question was, do they put safety

11    first?  It is a yes or no question.

12             A.   I cannot give you a yes or no, but

13    in general --

14             Q.   If you can't, you can't.  If it is

15    too complicated for you, I understand that, sir.

16    You know, yes or no questions can be hard.  I get

17    it.

18                  So, sir, let's see if I get all of

19    this.  Okay.  So, you told us you did do some

20    write ups about platform screen doors; yes?

21             A.   Memos.

22                  MR. GENIS:  Dave, could you please

23             put one on the screen?

24                  (Whereupon, a discussion was held

25             off the record.)

272

1                          A. BATA

2                  (Whereupon, Plaintiff's Exhibit 16,

3          a document, was marked for

4          identification.)

5          Q.    Okay.  Sir, I am directing your

6   attention to an e-mail from you, April 5, 2011, at

7   9:41 in the morning, to Ramdane Benferhat and Tony

8   Abdullah; do you see that?

9          A.    I do.

10         Q.    Who is Ramdane Benferhat?

11         A.    He was also working in the control

12   center, I believe.

13         Q.    And the subject is PSD, platform

14   screen doors; correct?

15         A.    Correct.

16         Q.    You say, "Ben, so the next step is

17   you are collecting comments on the document you

18   sent"; right?

19         A.    Right.

20         Q.    And by the way, what was Ramdane

21   Benferhat's role; what did he do with all of this?

22         A.    I honestly don't know.  I think he

23   was working for Tony.  He was not a high level

24   person.  He was an engineer, I believe.

25         Q.    So, what was Tony's role, Tony

273

1                          A. BATA

2      Abdullah?

3              A.    Tony, I think, was -- he ran the

4      control center, I believe.

5              Q.    What does the control center do?

6              A.    It manages how trains move and

7      manages incidents, you know, gives passenger

8      information, responds to the help point inquiries,

9      basically managing the operation of the subways and

10     stuff.

11             Q.    What was his role with this project

12     involving platform screen doors?

13             A.    I don't know specifically at this

14     point.  I don't know.  I don't know.

15             Q.    What was Ramdane Benferhat's role

16     with platform screen doors?

17             A.    I don't know.

18             Q.    Well, did either of them have any

19     role in any of the platform screen door projects

20     or pilots?

21             A.    Tony might have been in some

22     meetings because, obviously, he is a senior person

23     in operations.  So, I think he was probably in some

24     meetings, yes.  He was copied on things.  He is an

25     important person.

274

1                          A. BATA

2          Q.    And did he take trips to Europe and

3    Asia for the platform screen doors?

4          A.    I'm not sure if he went to Korea.  I

5    don't remember.  He might have been on the team to

6    go to Korea.  I'm not sure.

7          Q.    When you say you are not really

8    sure what their roles were, who would know what

9    the roles of Mr. Benferhat and Mr. Abdullah were?

10         A.    At this point, I mean, I think they

11   both retired.

12         Q.    I am not asking if they are

13   retired.  That's not my question, sir.  Who, in

14   relation to these projects for platform screen

15   doors, would know what their roles were?

16         A.    What their roles were?

17         Q.    Yes.

18         A.    Maybe Don Weliman.  I don't know.

19         Q.    Now, did you then send any comments

20   after you asked about if they are collecting

21   comments?

22         A.    Actually, I am not sure what

23   comments you are talking about here right now.

24   This is 11 years ago.

25               MR. GENIS:  So, Dave, do you have

275

1                          A. BATA

2              the other documents?

3                    MR. ROTH:  This is Plaintiff's

4              Exhibit 17, which was attached to the

5              prior e-mail from Mr. Bata.  That was

6              4270, and this is 4272.

7                    (Whereupon, Plaintiff's Exhibit 17,

8              a document, was marked for

9              identification.)

10             Q.    Okay.  Do you see this document

11     that you sent on platform screen doors?

12             A.    Yes.

13             Q.    Did you prepare and compile this

14     document?

15             A.    I think I had one of my staff

16     compile it, I believe, yes.

17             Q.    And did you review it to make sure

18     it was complete, thorough, and accurate, and

19     honest, and objective?

20             A.    I think.  As much as possible, yes.

21             Q.    So, you reviewed the benefits and

22     the uses of platform screen doors; correct?

23             A.    This was to compare different

24     heights.

25             Q.    Okay.  So sir.  You give the

276

1                        A. BATA

2    benefits and uses of the different height platform

3    screen doors; correct?

4            A.    That's correct.

5            Q.    And you noted, for example, how a

6    full height door, as well as a three-quarter

7    height door can prevent suicides; correct?

8            A.    Yes.

9            Q.    You noted that whether it was a

10   full-height door, a three-quarter height, or even

11   half-height door, they all would prevent

12   accidental falls to the track; correct?

13                MR. KEAVENEY:  Objection.

14           A.    Yes.

15           Q.    And they all would prevent edge

16   issues related to crowding; correct?

17           A.    It helps.

18           Q.    And they all would improve train

19   operations throughput increase; yes?

20           A.    Yes.

21           Q.    And they all were positive for

22   dwell management?

23           A.    Yes, but later there was some study

24   on that, that debated that.

25           Q.    So, did you ever send an e-mail to

277

1                         A. BATA

2      people saying, "Guys, I was wrong about something

3      here"?

4              A.    No.

5              Q.    Okay.  Did you ever supplement and

6      say, "New facts have come to light"?

7              A.    No.

8              Q.    Do you have something in writing

9      that said anything you wrote was incorrect?

10             A.    No.

11             Q.    Now, were you ever told by anybody

12     there was a push against these doors or that

13     people were against them for some odd reason?

14             A.    There are always people who are

15     against any kind of change or new technology, of

16     course.  There may be resistance because it is a

17     very conservative agency, I told you.

18             Q.    Okay.  So, in other words, it

19     really has nothing to do with safety and benefit

20     and use, it is just there are people at the

21     Transit that are resistant to change and

22     innovation period; correct?

23             A.    No, incorrect.  They had their

24     reasons for it.

25             Q.    Well, people can have all kinds of

278

                              A. BATA

1

2    reasons.  The question is whether or not they are

3    factually correct or not; true?

4         A.    That is probably true.

5         Q.    Okay.  Let's get to some other

6    things.  You were not -- by the way, when you

7    prepared this document, you did so in the regular

8    course of your business on behalf of the New York

9    City Transit Authority; correct?

10        A.    Yes, yes.

11        Q.    Why were you sending people this

12   document?

13        A.    I think there was a question mark

14   about -- many people within the agency just didn't

15   understand the difference between heights.  It was

16   just to delineate the different aspects of the

17   height.

18        Q.    And like we were saying before, New

19   York has difference stations; correct?  So, for

20   example, at one station a full-height platform

21   screen door might be appropriate, another one a

22   three-quarter or even a half; correct?

23        A.    Yes.  Possibly, yes.

24             MR. GENIS:  And we are going to get

25             to that in a second.

279

1                          A. BATA

2                    (Whereupon, a discussion was held

3              off the record.)

4                    (Whereupon, a break was taken from

5              5:00 p.m. to 5:07 p.m.)

6              Q.    So, when you studied this, you saw

7    that around the world there were different height

8    platform screen doors that we just discussed; yes?

9              A.    Yes.

10             Q.    And you learned about the gates,

11   the APGs; correct?

12             A.    Yes.

13             Q.    You learned about railing, just

14   like fixed rail; correct?

15             A.    Yes.

16             Q.    Okay.  And you learned about track

17   intrusion devices, like we talked about some of

18   those different types before; correct?

19             A.    Not in detail, but I was aware of

20   them, yes.

21             Q.    Well, we talked before about laser,

22   infrared and different --

23             A.    Yes, yes.

24             Q.    Okay.  And you also learned about

25   closed-circuit TV, CCTV; correct?

280

1                          A. BATA

2           A.     Correct.

3           Q.     And that's where you got cameras at

4    the station that show both the platform and the

5    track, and there is a monitor in the train where

6    the operator can see if anybody is on the edge of

7    the platform or on the track itself; correct?

8                  MR. KEAVENEY:  Note my objection.

9           You can answer.

10          A.     That's usually used when the train

11   it leaving.

12          Q.     That's not my question, sir.  Could

13   you answer my question, please?

14          A.     It is a tool, yeah.  Yeah.

15          Q.     And this way, if you are operating

16   the train and you see, before you are even into

17   the station, that, "Oh, my God, there is somebody

18   on the track," or "There is somebody on the edge.

19   I better slow down or stop"; correct?

20                 MR. KEAVENEY:  Just note my

21          objection.

22          A.     Well, assuming that there is a

23   screen in the train --

24          Q.     Yes.

25          A.     -- which they don't.

281

1                        A. BATA

2          Q.    If you would just answer my

3    question, I really could go so much faster.  The

4    question was, initially, you learned about best

5    practices and different means of accomplishing

6    best practices and promoting safety; true or

7    false?

8          A.    Yes.

9          Q.    Okay.  And one of the things you

10   learned about was CCTV, like they have in Korea;

11   true or false?

12         A.    CCTV in Korea?  I don't recollect

13   knowing anything about that technology.  I know

14   that CCTV can be used to look at things in the

15   stations and possibly on the track way.  I don't

16   know anything specific about it.  But yes,

17   possibly.

18         Q.    So, it took you a long time to say

19   yes, but okay, we got there.  So, yes, if there

20   are cameras on the station platform or that showed

21   the track, and there is a monitor on the train,

22   the operator could see if there is somebody on the

23   track or near the track and stop or slow down the

24   train to avoid hitting it; true or false?

25                MR. KEAVENEY:  Objection.  You can

282

```
1                      A. BATA

2         answer.

3         A.    You can -- you need cameras.

4         Q.    That's what we just said, sir.  Can

5    you answer my question?

6         A.    Yes.  Multiple, yes.

7         Q.    And, sir, you even learned that,

8    for example, in London, they have markings on the

9    platform itself, much further back from the edge,

10   with words for where people should stand behind;

11   correct?

12        A.    I don't know about London, but

13   possibly, yes.  I don't recall in London

14   specifically a marking like that.  I just know that

15   they have sayings, "Beware of the platform edge."

16        Q.    And you saw that there were studies

17   in London, specifically having a much greater

18   distance, wider than that yellow tactile strip,

19   with the words to keep away from the edge, that

20   distance; correct?

21             MR. KEAVENEY:  Objection.

22        A.    I am trying to jog my memory.  I

23   have seen that.  There may be things like that.  I,

24   frankly -- I have been to London many times.  I

25   don't recall that, but it is possible that they
```

283

1                        A. BATA

2    have that.

3            Q.    And these are all different means

4    of trying to reduce or prevent people from getting

5    run over or getting hit by trains; correct?

6            A.    Correct.

7            Q.    Let's talk about something else.

8    If the train is going at a slower speed when

9    entering the station, it can also stop in time and

10   avoid hitting somebody or running them over; true?

11                   MR. KEAVENEY:  Just note my

12           objection.

13           A.    Not true.

14           Q.    Okay.  So, let me ask you.  You

15   drive a car; correct?

16           A.    Correct.

17           Q.    Okay.  And if you are driving and a

18   child darts out in front of you, if you are going

19   at a certain speed, you cannot possibly stop in

20   time; true?

21                   MR. KEAVENEY:  Objection.

22           A.    It depends, yes.

23           Q.    But if you are going at a certain

24   lower speed, you can stop in time to avoid running

25   over the child; true?

284

1                          A. BATA

2                MR. GENIS:  Objection.  Give your

3          opinion.

4          A.    In the street, I expect somebody to

5     be on the right of way.

6          Q.    Sir, can you just answer my

7     question.

8                MR. KEAVENEY:  Give your opinion to

9          his opinion question.

10         Q.    Can you answer my question?  It is

11    a simple question, sir.

12         A.    The faster you drive a car, the more

13    likely you hit that child, yes.

14         Q.    And if you are slower, you could

15    stop and avoid hitting the child; true?

16               MR. KEAVENEY:  Objection.

17         A.    Not necessarily.

18         Q.    So, you are telling me that nobody

19    can ever -- aren't there signs on buses, from the

20    Transit Authority, that show posters, here is what

21    happens if you are going 40 miles an hour, you

22    kill the child, and here is what happens if you

23    are going 20 miles an hour, the child -- there is

24    no contact; have you ever seen those signs on

25    buses?

285

1                           A. BATA

2           A.    No.

3           Q.    Are you aware of those signs on

4     buses?

5           A.    I have never seen a sign like that

6     on a bus.

7           Q.    So, is that part of your creative,

8     innovation approach, to keep track of safety

9     devices?

10          A.    I don't know what you are talking

11    about on the bus.  I have never seen that sign on a

12    bus.

13          Q.    A train has a stopping distance;

14    true?

15          A.    Yes.

16          Q.    And it is based on speed; true?

17          A.    That's correct.

18          Q.    And, in fact, the train is even

19    simpler than a car, because a car you could see to

20    the left or right, an on a train there is no

21    steering, you are moving or you are stopped;

22    correct?

23          A.    That's correct.

24          Q.    So, the slower the train is going,

25    the shorter the stopping distance; true?

286

1                          A. BATA

2              MR. KEAVENEY:  Note my objection to

3         this line of questioning.  This is subject

4         to a motion for the court.  You can

5         answer.

6         A.    True.

7         Q.    Okay.  So, we have this hierarchy

8    of safety, from one end to the other.  So, the one

9    that costs no money at all is just slowing down

10   the trains before they enter the station; correct?

11        A.    Correct.

12        Q.    And so --

13        A.    Incorrect.

14        Q.    You just told us a moment ago, the

15   slower the speed, the shorter the stopping

16   distance?

17        A.    You said cost.  Tremendous cost

18   involved slowing the train down, tremendous.  You

19   are talking about millions.

20        Q.    So, to slow down a train, it costs

21   money; is what you are telling me?

22        A.    A tremendous amount.

23        Q.    How much money does it cost to slow

24   down a train?

25        A.    A tremendous amount of money.

287

1                    A. BATA

2        Q.     How much?  Tell me.

3        A.     You know math?

4        Q.     I could figure a little bit.  I

5   want to know exactly if -- let's make it make

6   sense.  Let's do it so we have numbers and it all

7   makes sense.  Right now --

8        A.     I will give you numbers.

9        Q.     Sir, let me do a question and then

10  you answer my question.  You wanted this.  We are

11  going to do it.

12              At the Atlantic Avenue Barclays

13  Station in Brooklyn, what was the speed limit for

14  trains entering that station in 2016?

15       A.     I don't know exactly.

16       Q.     What is the speed limit for any

17  train, the highest speed limit that you are aware

18  of, to enter any station in the City of New York?

19       A.     I don't know.  I think they are

20  coming in at, I don't know, 15 miles an hour or 20

21  miles per hour or 35 miles an hour.  I don't know.

22  They follow the signals.

23       Q.     What is the lowest speed limit for

24  any station in the City of New York for entering a

25  station?

288

1                        A. BATA

2            A.    Zero.

3            Q.    So, I am going to assume -- first

4    off, five mile an hour difference and a ten mile

5    an hour difference.  So, if the train had

6    originally a 25 mile an hour speed limit and it

7    drops to 20 miles an hour, how much money does

8    that cost?

9            A.    Let me give you a mathematical --

10           Q.    Answer my question.

11           A.    A lot of money.

12           Q.    How much?

13           A.    Millions and millions and millions.

14           Q.    How many millions to go five miles

15    an hour slower?

16           A.    Hundreds of millions.

17           Q.    To go ten miles an hour slower, how

18    much does that cost?

19           A.    Even if you slow that train down a

20    few seconds, it will cost the agency tens of

21    millions of dollars.

22           Q.    So, let me -- first I want to back

23    up.  In 2016 or before, did the Transit Authority

24    have speed limits for the trains entering

25    stations; yes or no?

289

1                          A. BATA

2                    MR. KEAVENEY:  Objection.  Asked

3              and answered.

4              A.    Yeah, they just have speed limits

5       following the signals.

6              Q.    Okay.  And the signals are set for

7       a certain speed limit, miles per hour; correct?

8              A.    Yes.  It doesn't have a specific

9       speed limit.  Green is you go the maximum speed you

10      could go.

11             Q.    Okay.  So, sir, you are telling us

12      there is no speed limit, there is just lights,

13      green, yellow, red; correct?

14                   MR. KEAVENEY:  Objection.

15             A.    There are speed limits, of course.

16      It depends on the curve.

17             Q.    This is what I am trying to find

18      out from you, sir.  I have been asking over and

19      over again, and I can't get an answer out of you.

20      What are the speed limits?

21             A.    There are a variety of speed limits.

22             Q.    What are they?

23             A.    The speed limits could be ranging

24      from five miles an hour to thirty miles an hour.

25             Q.    Okay.  What stations are thirty

290

1                        A. BATA

2    miles an hour and what station are five miles an

3    hour?

4          A.    Okay.  We have 471 stations, okay.

5    There could be a grade, there could be a curve,

6    there could be an obstruction.

7          Q.    So, where is it written what the

8    speed limits are for each station?

9          A.    It is not written specifically, you

10   know.  It is basically part of the train operator's

11   instructions.

12         Q.    Well, how do you know what the

13   speed limits are for any given station if it is

14   not written somewhere?

15         A.    I am not an operating person and I

16   don't feel qualified to answer on exact speeds.

17   All I know is that the signal system is extremely

18   safe and --

19         Q.    Sir, I didn't ask you about that.

20   Again, you are not here to help the Transit, are

21   you, by volunteering information that you feel

22   would be beneficial to the Transit, which is not

23   responsive to my question?

24         A.    I don't know.

25               MR. KEAVENEY:  Note my objection.

291

1                          A. BATA

2          It is an improper question.

3          Q.   I can tell, you wouldn't do that.

4               Sir, are there posted signs

5    anywhere for the trains, before they enter the

6    stations, for what the speed limit is?

7               MR. KEAVENEY:  I am going to stop

8               the witness from answering these

9               questions, because this matter is in a

10              pending motion before the court.  I am

11              going to instruct him not to answer.

12              Move on.

13              MR. GENIS:  There was already

14              testimony, by Shabazz, the operator, about

15              all of these different things.  There has

16              other testimony about it.  I think that,

17              you know, the door was opened a while ago,

18              and he's already said he was the speed

19              committee.  Yeah, no.

20              And the judge already ordered you

21              to give me things that were not

22              ESI-related to speed policy.  So, you are

23              wrong, wrong, wrong.  Let's get an answer.

24              MR. KEAVENEY:  He just said he

25              wasn't an operator.  You just said you got

292

```
1                    A. BATA
2         the operator's testimony.  So, why are you
3         asking him?
4              MR. GENIS:  I am glad you agree
5         that we opened the door and it is a proper
6         subject.  Thank you, Andrew.  I appreciate
7         that.  Let's get back.
8              MR. KEAVENEY:  I never said it is a
9         proper subject.
10             MR. GENIS:  Andrew, are you
11        interrupting my deposition, repeatedly
12        now, because you believe the speed that
13        the train had to the station is not part
14        of this case; is that what you are saying
15        now, Andrew?  I want to understand the
16        nature of your objection.
17             MR. KEAVENEY:  Yes.
18             MR. GENIS:  So, you are saying we
19        don't have the right to find out how fast
20        the train was going, or should have been
21        going, before it entered the station and
22        ran over a woman, and ran over two of her
23        legs; is that what you are saying now on
24        the record?
25             MR. KEAVENEY:  Yes.  It is
```

293

1                          A. BATA

2          irrelevant.

3                  MR. GENIS:  Okay.  Good.  So, it is

4          either relevant or it's not, Andrew.

5                  MR. KEAVENEY:  You have the

6          testimony today.

7                  MR. GENIS:  Great.  So, since we

8          have testimony and its relevant, let's

9          proceed.  Thank you so much.  I appreciate

10         it.

11         Q.    Sir, getting back to the question,

12   are there posted signs of speed limits for trains

13   as they enter stations; yes or no?

14                 MR. KEAVENEY:  Objection.  Asked

15         and answered.

16         Q.    Can I get an answer, please?

17                 MR. KEAVENEY:  Objection.  Asked

18         and answered.

19         Q.    Can I have an answer, please?  He

20   is not directing you not to answer.  Answer the

21   question, sir.

22         A.    I am not an operator, so I am not in

23   the tunnel, so I don't know.

24         Q.    Okay.  So, when you were looking

25   for safety, did you even consider what the speed

294

1                          A. BATA

2     of the trains were when you were looking for

3     safety solutions?

4              A.    Worldwide best practice --

5              Q.    Can you just answer my question,

6     sir?

7                    MR. KEAVENEY:  He was answering

8              your question.

9                    MR. GENIS:  He did not answer the

10             question.  He did not.  No.  We are here

11             so long because he babbles without

12             answering the question.  He goes on, and

13             on, and on, and on.

14                   THE WITNESS:  Okay.  I will stop.

15             Q.    Let's try it one more time.  And

16    again, I could have been done hours go if you just

17    answered my questions.

18             A.    I have 45 minutes left, by the way,

19    for you.

20             Q.    Well, you may be back again another

21    day, sir, because you have refused to answer the

22    questions.  You have been playing beat the clock

23    all day long.  You are trying to run the clock by

24    being non-responsive.  It is not appreciated, and

25    I don't like it, and let's keep going.

295

1                           A. BATA

2                So, what is the speed policy limit

3     based on?

4           A.    I am sorry, I missed your question.

5     I apologize.

6           Q.    What is the speed limit policy

7     based on; is it based on safety?

8                MR. KEAVENEY:  Objection.  He

9                answered that question already.

10                MR. GENIS:  He did not.  He never

11                answered that question.

12                MR. KEAVENEY:  Yes, he did.

13          Q.    Can I have an answer, please?

14                MR. GENIS:  Andrew, you are beating

15                the clock, too, wasting my time.

16          Q.    Sir, answer the question.  Answer

17     the question, sir.  Answer the question.

18          A.    What the speed policy does.

19                MR. KEAVENEY:  No.  What is the

20                speed policy based on?

21          Q.    Is it based on safety or not?

22          A.    The speed policy is based on what is

23     the best speed for the operation of the system.

24          Q.    Okay.  So, does that mean it is not

25     based on what is safest --

296

1                        A. BATA

2          A.      Safe operation.

3          Q.      Okay.  So, the speed policy must be

4     based on what is safe; correct, yes or no?

5          A.      Of course.

6          Q.      And it has to be safe for the

7     passengers on the platform; true or false?

8                  MR. KEAVENEY:  Objection.

9          A.      On the platform.  On the platform.

10         Q.      Okay.  And the speed policy has to

11    be safe in the event one of these 100 to 200

12    people per year fall onto the train tracks that

13    the train could stop in time to avoid running them

14    over; true or false?

15                 MR. KEAVENEY:  Objection.  You may

16                 answer.

17         A.      They are unauthorized persons on the

18    track, not expected.

19         Q.      I didn't ask you that.  When you

20    say not expected, are you telling me that people

21    have been getting hit by trains since 1904, to use

22    your words, every year, to use your words,

23    hundreds of people every year, to use your words,

24    that it is now suddenly unexpected; is that what

25    you are telling me now?

297

1                    A. BATA

2                MR. KEAVENEY:  Counsel, can you

3        stop yelling?

4                MR. GENIS:  I am not yelling.

5        A.    As I said, the safest system is a

6    train that doesn't run, zero speed.

7                MR. GENIS:  How about move to

8        strike and answer my question.

9        Q.    Is it your sworn testimony today

10   that it is unexpected to have people on the tracks

11   after every year, since 1904, you told us hundreds

12   of people get run over by trains; is that your

13   testimony, sir?

14       A.    It is a dedicated right of way.

15               MR. GENIS:  Move to strike.

16       Q.    Answer my question, sir.  It is a

17   simple yes or no question.

18               MR. KEAVENEY:  Answer the question

19       as best you can.

20       A.    Pedestrians are unexpected on the

21   right of way.

22       Q.    So, let me ask you this.  You told

23   us before that it was foreseeable that people

24   would be on the tracks; true or false?

25               MR. KEAVENEY:  Objection.

298

```
 1                        A. BATA
 2         A.    What do you mean, foreseeable?
 3         Q.    You don't know what the word -- I
 4    will look that up for you, too, since you asked,
 5    if you don't know what the world foreseeable
 6    means.  I am here to help.  Not a problem.
 7              "Foreseeable, able to be known or
 8    seen in advance."
 9              Foreseeable, okay.  Do you agree
10    with that definition?
11         A.    Yes.  Not expected.
12         Q.    So, how many people does the
13    Transit Authority have to run over and kill or
14    maim before it might be foreseeable for them that
15    people could be on the train tracks?
16              MR. KEAVENEY:  Objection.  Don't
17              answer that question.  That's improper.
18              MR. GENIS:  It is absolutely
19              proper.  He just said it is not
20              foreseeable.  He just said that it is
21              unexpected.  That is exactly what he said
22              under oath.  Under penalty of perjury,
23              that's what he just said.
24              So, I am enjoying this, because I
25              want to see what else he will say now.
```

299

1                          A. BATA

2          Q.    So, sir, are you saying, despite

3    all of the evidence, your speed policies are based

4    on the premiss that nobody ever, no person will

5    ever be on the track bed?

6          A.    No, I did not say that.

7          Q.    Okay.  So, you do expect people to

8    be, from time to time, on the track bed; true or

9    false?

10         A.    It happens.

11         Q.    Okay.  And since it happens, it is

12   foreseeable; true?

13         A.    It happens, but it is not expected.

14         Q.    Okay.  So, how many times does it

15   have to occur to be expected?  Tell me.

16         A.    I don't know what you mean.

17         Q.    Well, if it happens once or twice,

18   is it now something that you could expect might

19   occur?

20         A.    You would have to calculate how many

21   times a train, in the past 120 years, entered a

22   station, and calculate how many people were

23   illegally on the platform or the roadway.  It is

24   just numbers.

25         Q.    Yes, it is numbers.  I understand

300

1                          A. BATA

2    to you it is just numbers.  So, you understand

3    that, to me, it is actually a person's life and

4    their legs.  I may view it differently than you,

5    sir.

6              MR. KEAVENEY:  You can stop with

7         the sickness -- but go ahead, ask your

8         question.

9         Q.    Let me see if I get this straight.

10   If a person faints or has a heart attack or a

11   medical emergency and they wind up collapsing onto

12   the tracks, is that illegal?

13        A.    It is not illegal, but it is

14   unexpected.

15        Q.    So, when you say it is unexpected,

16   are you aware of the literature and the e-mails

17   and the notes from the Transit Authority itself,

18   how people faint, have medical conditions, and

19   wind up on the tracks?

20        A.    I don't know the statistics.  I

21   don't know.

22        Q.    I didn't ask you for the

23   statistics, but are you aware that people have

24   said that from the Transit Authority?

25        A.    I am sure it happens.

301

1                    A. BATA

2           Q.    And since you are sure it happens,

3    of course, right, there are different ways, people

4    could fall there by accident, you told us earlier

5    they could trip on an unsafe platform, they could

6    have a medical condition, somebody could push

7    them.  You told us before there are many different

8    ways people could wind up on the train tracks;

9    correct?

10          A.    They could also fall down a

11   stairway.

12          Q.    I know.  We talked about stairways

13   before, but that's not what this case is about.

14   Can you answer my question and get back to the

15   train tracks and people getting killed and maimed?

16   Answer my question, please.

17          A.    What was the question?

18          Q.    See, this is the problem.  If you

19   actually answered the question instead of making a

20   speech, you would know what the question is.

21               MR. GENIS:  Why don't we read back

22          the question.  Read back the question.  I

23          am here to help you, sir.  At trial, I am

24          going to help you as much as I possibly

25          can, believe me.  I can be really helpful

302

1                          A. BATA

2          at trial.  I live for that.

3                    (Whereupon, the requested portion

4          of the transcript was read back by the

5          court reporter.)

6          Q.    I will make a simple.  So, sir, you

7    have testified today under oath that there are a

8    number of different ways that people, since 1904,

9    have wound up on the train tracks and been hit and

10   run over by trains, and there have been hundreds,

11   if not thousands of people since then hit and run

12   over by trains; true?

13         A.    I don't think I have said that.

14         Q.    Do you agree with that statement,

15   sir?

16         A.    I never said thousands.

17         Q.    Do the math.  If one to two hundred

18   people are hit every year, and it is since 1904,

19   how long do you think it takes to get to thousands

20   of people, sir?

21              MR. KEAVENEY:  Objection.

22         A.    Yes, true.

23         Q.    Okay.  So, since thousands of

24   people have been hit by trains, on the train

25   tracks, and you have seen the documents, could we

303

1                       A. BATA

2    agree that it is a known foreseeable event and

3    occurrence that people wind up on the tracks; yes

4    or no?

5                   MR. KEAVENEY:  Objection.

6           A.    Statistically insignificant.

7           Q.    When you say statistically

8    insignificant, let's look at the average.  About

9    150, but we have years where it is 200 or close to

10   200.  Let's say 150 a year for ease of math.

11   That's almost every other day somebody getting hit

12   by a train; correct?

13          A.    Are you counting the suicides?

14          Q.    Sir, I am just talking about how

15   many people get hit by trains.  Can we agree it is

16   almost every other day somebody gets hit by a

17   train?

18          A.    I am just asking a question.  Are

19   you including suicides?

20          Q.    Sir, let's try it again.  All I

21   want is a nice, simple answer to a nice, simple

22   question.

23          A.    Okay.

24          Q.    You have a master's degree.  I

25   would imagine you would be able to answer a yes or

304

```
 1                        A. BATA
 2      no question with a yes or no.
 3                    MR. KEAVENEY:  Objection.  Stop
 4            badgering the witness.
 5                    MR. GENIS:  I am just waiting for
 6            him to become responsive.
 7                    MR. KEAVENEY:  You are badgering.
 8            Q.    How much are you being paid to be
 9      here by the Transit Authority?
10                    MR. KEAVENEY:  Objection.
11            Q.    How much are they paying you?
12            A.    You want to me to answer?  Zero.
13            Q.    How much are you being promised?
14            A.    Zero.
15            Q.    What have you been promised?
16            A.    Zero.
17            Q.    For loyalty and your pension that
18      you are doing this?
19            A.    Coffee.
20            Q.    Loyalty and pension is why you are
21      trying to help the Transit?
22                    MR. KEAVENEY:  Objection.  Don't
23            answer that question.
24            Q.    Sir, let's get back to when you say
25      something is statistically insignificant.  We
```

305

1                              A. BATA

2      agree if there is, on average, 150 people per year

3      getting hit by trains, that means roughly every

4      other day somebody is hit by a train; true or

5      false?

6              A.     Probably true.

7              Q.     And do you think it is significant

8      to that person or their family getting run over by

9      the train?

10             A.     Obviously.  It is traumatic.  Of

11     course it is terrible.

12             Q.     Now, sir, let's get back to -- and,

13     in fact, not only does the Transit Authority know

14     that this happens with regularity and it is

15     foreseeable to them, that's the whole reason you

16     were studying platform safety, and platform edge

17     doors was a means of preventing this from

18     happening; true?

19             A.     Platform safety doors were studied

20     to improve safety, yes.

21             Q.     So, yes is the answer to my

22     question; correct?

23             A.     Yes.

24             Q.     Thank you.  Now, the speed policies

25     should be based in part on the fact that it is

Enright Court Reporting    (631) 589-7788

306

1                         A. BATA

2    expected that, like you just told us, that people

3    may wind up on the train tracks; true or false?

4                    MR. KEAVENEY:  Objection.

5         A.    They are not expected.

6         Q.    So, you are telling us now that the

7    speed policies are based on the fact that,

8    according to you, it is absolutely unexpected and

9    unforeseeable that a person ever winds up on the

10   train tracks, they are trespassers, they are there

11   illegally, and that the speed policy should be

12   based on the assumption that no one will ever be

13   on the train tracks?

14        A.    No, I didn't say that.

15        Q.    Okay.  I thought you did.  So,

16   let's be clear then.  So, are you saying, yes,

17   speed policies taken into consideration that

18   somebody may wind up on the train tracks, or no,

19   they do not take that into consideration?

20        A.    The speed policy basically considers

21   the best reasonable speed considering the operating

22   needs of the agency.

23                    MR. GENIS:  Non-responsive.

24        Q.    Can you please answer my question,

25   please?

307

1                        A. BATA

2          A.     I did.

3          Q.     No, you didn't.  I want to know,

4    yes or no, okay?  Yes, the speed policy has taken

5    into consideration the possible occurrence of

6    somebody being on the train tracks, or no, they do

7    not; which is it?

8                    MR. KEAVENEY:  Objection.  He

9               answered the question.

10                    MR. GENIS:  No, he has not.  I

11               would love an answer to the question.  It

12               is a yes or no question.

13          A.     It is -- the speed policy considers

14   the best -- the best and reasonable speeds

15   considering all the factors of the agency,

16   operating speeds, passenger convenience, thing

17   could happen on the tracks, the stations, the

18   environment, the whole thing.  It is a complete

19   picture.

20          Q.     Okay.  So, are you saying yes, the

21   speed policies are supposed to take into

22   consideration the event of a person being on the

23   tracks; yes, that's what they are supposed to do?

24          A.     I can't answer the question, because

25   there could be a person in the middle of a tunnel

308

1                         A. BATA

2     on the track.

3              Q.    I'm not asking about in a tunnel.

4     I am asking about a station.  We have only been

5     talking about entering a station.  So, answer my

6     question, sir.  It's been such a simple question.

7     I am trying really hard to get a simple answer

8     from you.

9              MR. KEARNEY:  What is the question

10             again?  Now you changed the question.

11             MR. GENIS:  No problem.  I will

12             gladly ask him another one.  We are going

13             to waste more time, because I don't think

14             he's yet today ever answered a yes or no

15             question with a yes or a no.

16             He has made speeches, he has

17             pontificated, he is being evasive.  He has

18             yet to answer simple questions.  That's

19             why it is so long and we are going to need

20             more time because of his

21             non-responsiveness and evasion.

22             Q.    Let's get back to the question.

23    So, should the speed policies take into

24    consideration the fact that a person may be on the

25    track before the train enters the station, or as

309

1                          A. BATA

2    they enter the station?

3             A.    Human life is always very important

4    for speed policy consideration, yes.

5             Q.    So, the speed policies, you just

6    told us, must take into account the fact that a

7    person may wind up on the track bed and the train

8    should be able to stop in time to avoid hitting

9    them, if possible; true?

10                  MR. KEAVENEY:  Objection.

11            A.    As I said, there are a tremendous

12   amount of factors being considered for the speed

13   policy.

14                  MR. GENIS:  Move to strike as

15           non-responsive.

16            Q.    Is what I just said true?

17            A.    I just said that --

18            Q.    True or false, sir?  Can you answer

19   my true or false question with a true or false?

20                  MR. KEAVENEY:  He cannot answer it.

21           He gave you his answer.

22                  MR. GENIS:  Then it is

23           non-responsive.  I could ask him his name

24           and he could say he likes apples.  That's

25           not answering the question.

310

1                    A. BATA

2         Q.    Answer my question, please.

3              MR. KEAVENEY:  That's not true.  He

4         answered the question.

5         Q.    True or false, sir?  Just answer

6    the question.

7         A.    That's to the best of my ability.

8         Q.    Sir, true or false?  Just answer

9    it.

10             MR. KEAVENEY:  He answered the

11        question already.

12             MR. GENIS:  I haven't heard it.

13        Q.    True or false?

14        A.    Could we read it back again?

15             MR. GENIS:  Read it back, Dorothy.

16             (Whereupon, the requested portion

17        of the transcript was read back by the

18        court reporter.)

19             MR. GENIS:  That's not the answer

20        to my question.  Move to strike.

21             THE WITNESS:  That's the answer.

22        Q.    It's a true or false question.

23    Answer it true or false.  We just had it read

24    back.

25             MR. KEAVENEY:  The witness answered

311

1              A. BATA

2          the question the best he could.

3              MR. GENIS:  No, he didn't answer

4          it.  It is not responsive.  Even you are

5          conceding he is not being responsive.

6              MR. KEAVENEY:  Call for a ruling.

7      Q.    True or false --

8              MR. KEAVENEY:  He answered the

9          question.  Move on.

10     Q.    Sir, you can't answer that question

11 with a true or false; is that what you are telling

12 us?

13             MR. KEAVENEY:  Objection.  He

14         answered it already.

15     Q.    Are you able to answer it with a

16 true or false, sir?

17             MR. KEAVENEY:  Objection.  He

18         answered it.

19     Q.    Are you able to?  That's the

20 question.  I have asked it three times in a row.

21 Answer it, please.

22     A.    I answered the question.

23     Q.    No.  Answer this question right

24 now.  Can you answer the earlier question with a

25 true or false?  Either you are able to or you are

312

```
1                        A. BATA

2    not.

3                MR. KEAVENEY:  Now you are badging

4           the witness.

5           Q.    Are you physically able to answer

6    that true or false question with a true or false?

7                MR. KEAVENEY:  He gave you his

8           answer.

9                MR. GENIS:  Your interjections and

10          interruptions, which have gone on

11          throughout today, have also eaten our

12          time, as well.  More over, it is

13          encouraging the witness to be

14          non-responsive and evasive.  So, your

15          assistance has been less than helpful in

16          getting this deposition to proceed.

17          Q.    So, my question is real simple.

18   Can we agree -- I will ask a brand new one, since

19   he had so much difficulty with the last one -- can

20   we agree that the speed policies are not based

21   upon what you consider the unexpected event of

22   somebody who will be on the tracks; yes or no,

23   sir?

24          A.    Generally, the speed policy is

25   trying to consider all of the factors, including
```

313

```
 1                    A. BATA
 2    human life, and considers all the factors and tries
 3    to make a practical and effective decision for the
 4    agency as a whole and its passengers.  It is five
 5    million passengers.  Including the five million
 6    passengers, it is a huge factor.
 7          Q.    Sir, does any part of this long,
 8    non-responsive meandering answer have anything to
 9    do with my yes or no question?
10          A.    I gave an answer.
11          Q.    Is the reason you can't answer with
12    a yes or no because you are here to help the
13    Transit, sir?
14               MR. KEAVENEY:  Objection.  Improper
15               question.  Don't answer that.
16          Q.    Sir, do the speed policies take
17    into account the event that somebody may be on the
18    tracks so that the train can stop in time, if
19    possible, to avoid running over the person?
20               MR. KEAVENEY:  Objection.  You are
21               not going to get a different response by
22               asking it a different way.
23               MR. GENIS:  It is a different
24               question.  Before I asked what they should
25               do, and now I am asking what they do do.
```

314

1                    A. BATA

2          Q.     Answer the question.

3                  MR. KEAVENEY:  It is the same

4          question.

5          Q.     It is a different question.  Please

6    answer it.

7          A.     Same question.  Multiple factors and

8    trying to make the best decision that is good for

9    the agency and its passenger.

10         Q.     So, before you told us if a train

11   slowed up even a little bit, it would cost

12   hundreds of million of dollars to do so; do you

13   remember that?

14         A.     That's correct.

15         Q.     Okay.  Do you have any statistics,

16   facts, data, proof of that statement you just

17   made?

18         A.     It is mathematics.

19         Q.     Sir, that's not my question.  My

20   question is really simple.  Do you have any proof,

21   facts, data, statistics that support that

22   statement you just made?

23         A.     Well, math is facts; right?

24         Q.     Sir, what study can you point me

25   to, or name, list, hand me, that says it will cost

315

1                              A. BATA

2      hundreds of millions of dollars if we slow down

3      the train even one mile per hour to avoid running

4      over somebody?

5              A.    I could give you the math if you

6      would like it.

7              Q.    Sir, I am just asking you to point

8      something to me.  I want to see a piece of paper

9      that says that.  I want to know about a study that

10     says it.  I want to know a fact or a statistic

11     that says it, just not your verbiage.  Can you do

12     that; yes or no?

13             A.    Yes, I can tell you right now.

14             Q.    Great.  What document says that,

15     sir?  What study, what data?  Tell me.

16             A.    No data.  I can tell you the math.

17             Q.    No data, okay.  What study supports

18     your claim that the slowdown of trains one mile

19     per hour to save a life will cost the Transit

20     hundreds of millions of dollars?

21             A.    I can give you the math, which is

22     fact.

23             Q.    Answer my question.  What study

24     says this?

25             A.    The study of mathematics.

316

A. BATA

1

2       Q.    Sir, what statistic have you seen

3   that supports your claim?

4       A.    It's not a claim.  It is a fact.

5       Q.    Okay.  You are telling us it is a

6   fact; where is this fact allegedly written?

7       A.    It is written in the laws of

8   mathematics.

9       Q.    Okay.  Who wrote this alleged fact

10  that it would cost hundreds of millions of dollars

11  to slow a train down by one mile an hour to avoid

12  running over somebody and killing them or severing

13  their limbs?

14      A.    It is very simple math.  I can go

15  through it.

16      Q.    Answer my question.  Who?

17      A.    The Greeks started with the

18  mathematics.

19      Q.    I am not asking you about the

20  Greeks and math.  I am asking you nice, simple

21  questions.  You are testifying under oath, under

22  penalty of perjury, that every time a train slows

23  down, even one mile per hour to save a life, it

24  will cost the Transit Authority hundreds of

25  millions of dollars, and you have testified

317

1                           A. BATA

2   further that that is fact.  I am trying to find

3   out what person will corroborate or support this

4   allegation of fact; who?

5           A.    A chief operating officer.  Almost

6   anybody at Transit --

7           Q.    Who.  What chief operating officer?

8           A.    You could ask anybody who runs the

9   trains --

10          Q.    Which operating officer?  Give me a

11  name, any.  Anyone.

12          A.    I don't know who is there now.

13          Q.    Name one that was there.

14          A.    I don't know.

15          Q.    So, you are unable to name a single

16  person in the world that supports what you claim

17  to be fact; true?

18              MR. KEAVENEY:  You are not letting

19          him answer the question.

20              MR. GENIS:  I would love an answer

21          to the question.  Nothing would make my

22          happier, Andrew.

23          A.    There are 10 -- maybe 100 people who

24  can give you the same math.

25          Q.    Name one.

318

1                          A. BATA

2          A.      Name one person?

3          Q.      Yes.

4          A.      Oakland operating guy.

5          Q.      Name.  I want a name.  Give me one

6   name of one person that you claim is going to

7   support your statement that it would cost hundreds

8   of millions of dollars for a train to slow down

9   even one mile an hour to save a life or a limb.

10  Name one person that is going to say that.

11                 MR. KEAVENEY:  Objection.  You are

12          not letting him explain his answer.

13                 MR. GENIS:  I don't need an

14          explanation.  I want a name.  It couldn't

15          be simpler.

16                 MR. KEAVENEY:  He told you people

17          that --

18                 MR. GENIS:  Name, not one person.

19          Name a person.

20                 MR. KEAVENEY:  He told you --

21                 MR. GENIS:  Andrew, I am not

22          interested in your speeches, your

23          filibustering, and your colloquy.  I am

24          interested in him answering a nice, simple

25          question, what are the names.

319

                        A. BATA

1

2       Q.    You have had a few minutes now to

3   think about this.  Give me a name.

4              MR. KEAVENEY:  Shop shouting.

5              MR. GENIS:  This is how I talk.  I

6         am sorry, Andrew.  I am Jewish.  This is

7         how I talk.

8       Q.    Can you give me a name, sir?

9       A.    I am not going to give you a

10  specific name, but you could talk to anybody --

11      Q.    So, if you can't give me a name,

12  can you give me a single publication, a single

13  statistic, a single e-mail, a single study, a

14  single report, a single conclusion by a

15  consultant, anything in writing to support what

16  you claim is that if a train slows down by one

17  mile an hour to avoid killing somebody, it will

18  cost hundreds of millions of dollars?

19      A.    I did not say one mile an hour.  You

20  said that.

21      Q.    Sir, can you name any publication

22  that says that, any e-mail --

23      A.    I didn't say one mile an hour.

24      Q.    Sir, can you give me one single

25  written document that supports your testimony in

320

1                          A. BATA

2      this regard?

3              A.    Simple mathematics, if you will let

4      me.

5              Q.    Sir, one document, can you name it,

6      sir?

7                    MR. KEAVENEY:  Objection.  He said

8              he could provide you with the statistics.

9              Q.    Sir, I want to know a really simple

10     question.  Name a single document.  I have asked

11     you about 20 times now.  I can't get an answer out

12     of you.  Can you name a document that corroborates

13     what you are saying?

14             A.    It doesn't need a document.

15             Q.    How do we know, with no disrespect

16     intended, you are being truthful, accurate, and

17     honest?

18             A.    Let me explain and then you would.

19             Q.    I don't need your explanation.  I

20     just want an answer to my question.

21             A.    Then, in that case, we are done.

22             Q.    So, you don't want to answer

23     questions.  I get it.  You just want to give

24     explanations.

25             A.    You said you don't need explanation.

321

                              A. BATA

1    I was trying to explain, you refused.

2            Q.    Sir, I understand this.  Do you

3    remember, you promised --

4            A.    Any judge, simple mathematics.

5            Q.    Sir, does your word mean anything

6    to you?

7                  MR. KEAVENEY:  Objection.

8            A.    Absolutely.

9            Q.    So, when you have given me your

10   word, repeatedly, that you will answer a yes or no

11   question or a true or false question with a yes or

12   no or true or false, were you lying or telling the

13   truth?

14                 MR. KEAVENEY:  Objection.  Do you

15                 understand the question; yes or no?

16           A.    I am a truthful person and I am

17   trying to explain, but you don't listen.

18           Q.    Anytime somebody tells me how

19   truthful they are, I know what that means.

20                 So, to get to my question, okay.

21   Can you please point to a single document, I don't

22   care if it is an e-mail, a study, a report, an

23   analysis, a consultant, anything on this planet

24   that supports the testimony you have given today

322

```
 1                          A. BATA

 2    how it will cost hundreds of millions of dollars

 3    if they slowed down to avoid running over a person

 4    and killing them or severing their limbs; can you

 5    do that, sir, yes or no?

 6                   MR. KEAVENEY:  Objection.

 7         A.    I gave you my answer.

 8         Q.    So, you can't point to a single

 9    document; true?

10         A.    Like I said, math 101.

11         Q.    So, you can't answer my question.

12    I get it.

13         A.    Your document, mathematics, textbook

14    101.  It is a document.  I can prove it to you.

15         Q.    Okay.

16         A.    First grade, by the way.  Maybe

17    second grade.

18         Q.    So, there is no document that

19    supports your testimony; true?

20         A.    I told you, I can bring a textbook

21    and show it to you.

22         Q.    So, what textbook says it costs

23    hundreds of millions of dollars if a train slows

24    down to avoid running somebody over?

25                   MR. KEAVENEY:  Objection.  That's
```

323

```
1                          A. BATA
2          not what he said.
3              MR. GENIS:  He said a textbook, he
4          could prove it to me.
5     Q.    What textbook says that, sir?
6              MR. KEAVENEY:  It is in the math,
7          is what he meant.
8              MR. GENIS:  Andrew, I don't need
9          your speeches, again.  I don't need your
10         constant interjections, your constant
11         interruptions, and your constant coaching.
12         And you are actually encouraging him to be
13         evasive.  And you are laughing and smiling
14         because you know it is true, and I know
15         you are enjoying this.
16             MR. KEAVENEY:  You are laughing,
17         and you are being animated on the screen,
18         I think it is improper.
19    Q.    Sir, I know it is easy to be calm
20   when you don't answer a question.  Answer my
21   question.  It is not hard.  You could do it.  Yes
22   or no, is there a single document --
23             MR. KEAVENEY:  Stop badgering the
24         witness.
25    Q.    -- in the world that answers that?
```

324

1                        A. BATA

2    Just say there is none, if there is none.  If

3    there is, tell me what it is.  It is not hard; is

4    it?  Just do it.

5             A.    It's very simple.

6             Q.    Good.  Very simple.  What document

7    says it is hundreds of millions of dollars every

8    time a person slows down to avoid running over a

9    pedestrian on the track?

10            A.    I gave you my answer and that's all

11   I am going to do.

12            Q.    Well, I would like an answer to the

13   question.  What document, sir?  What document says

14   this?  Sir, let's talk about -- since you can't

15   seem to answer that, let's go to something else.

16               Sir, when a train runs over a

17   person, can we agree that that causes a disruption

18   in service?

19            A.    Yes.

20            Q.    And can we agree, when there is a

21   disruption of service -- I would like you to

22   assume that there has been testimony that on

23   average it causes at least a two-hour disruption

24   of service.

25            A.    Okay.

325

1                      A. BATA

2              MR. KEAVENEY:  Objection.

3         Q.    And you agree with that assessment,

4    about two hours, minimum?

5         A.    I don't know.  It ranges.  I don't

6    know.  It could be likely, yes.

7         Q.    Does that cost the Transit

8    Authority money, when there is a disruption in

9    service because they ran over a person?

10        A.    Absolutely.

11        Q.    Does that cost hundreds of millions

12   of dollars when they run over somebody and there

13   is a disruption of service?

14        A.    Not as much as slowing the train

15   down.

16        Q.    So, let's see.  If the train is

17   stopped for two hours, you are saying that costs

18   more money to the Transit than if the train just

19   slows down a little bit as it enters the station;

20   is that your sworn testimony, sir?

21             MR. KEAVENEY:  Objection.

22        A.    I didn't say that.  I said just the

23   opposite.

24        Q.    So, can we agree it costs the

25   Transit Authority less money to slow down the

326

1                         A. BATA

2    trains than to run over a person and have a

3    disruption of service?

4              A.    It is the opposite.

5              Q.    Well, you keep giving me the

6    opposite.

7              A.    It is the opposite.  I just told

8    you, it is just the opposite.

9              Q.    Sir, which way does it cost the

10   Transit Authority more money, when service is

11   disrupted for a few hours because a person has

12   been killed or had limbs severed, or if the train

13   just slows down slightly as it enters the station

14   to avoid running over the person?

15             A.    Number two costs more money,

16   hundreds of millions more.

17             Q.    When a train slows down, how much

18   delay is there, if it just slows down five miles

19   an hour, ten miles an hour, when you enter?

20             A.    A few seconds.  It could be half a

21   minute.

22             Q.    A half a minute, 30 seconds?

23             A.    It could be seconds, you know.

24   Let's say ten seconds.

25             Q.    Ten seconds extra if it just slows

327

A. BATA

1                                    A. BATA

2       down?

3              A.      You know math?

4              Q.      Sir, just answer my question.

5              A.      It is math.

6              Q.      You know what, I am going to go

7       with your ten seconds, sir, just to make you

8       happy.  So, you are telling us that a ten-second

9       slowdown of a train costs the Transit Authority

10      way more money than when there is a two-hour

11      disruption because they ran over a person and

12      killed them or severed their limbs?

13             A.      Now you are getting there.

14             Q.      When you looked at the cost --

15      let's talk about disruption of service.  Is there

16      a cost that employees go out on disability because

17      they had to see severed body parts and corpses?

18             A.      Right.

19             Q.      And is there a cost of equipment

20      that has to be taken out of service?

21             A.      Of course.

22             Q.      Is there a cost to workers now

23      having to work overtime because of the disruption

24      of service?

25             A.      Sure, sometimes.

328

1                      A. BATA

2          Q.    Let me ask you this.  Which do you

3     care more about; do you care more that people are

4     not killed and maimed, or do you care more that

5     the trains run on time?

6          A.    Of course I care about the people.

7     Don't be silly.

8          Q.    So, since you care about the

9     people, did you say to anybody at the Transit, "We

10    have 150 to 200 people getting run over every

11    year.  This is an urgent emergency condition.  We

12    must immediately do something to stop this from

13    happening"; did you ever do that, since you care?

14         A.    It is definitely a concern, of

15    course.

16         Q.    When you said this is an urgent

17    emergent condition, that immediate action is

18    required to prevent this from happening --

19         A.    I said --

20         Q.    -- what did the Transit Authority

21    do; did they immediately take action to prevent

22    this from happening, or not?

23         A.    They are constantly changing, since

24    we opened.  It is not an easy situation.  Since

25    October 29, 1904, it has been a constant situation.

329

1                         A. BATA

2          Q.    So, according to the Transit

3     Authority, that's tolerable and acceptable?

4                 MR. KEAVENEY:   Objection.

5          A.    No, of course not.   But it is an

6     operating system.

7          Q.    So, looking at the hierarchy of

8     safety, okay, you are saying it costs more money

9     to lower the speed limit when a train enters a

10    station than to have platform screen doors;

11    correct?

12         A.    I haven't made that study.   I don't

13    know.

14         Q.    What costs more money, the platform

15    screen doors or just a train slowing down before

16    it enters the station?

17         A.    I haven't made a calculation about

18    that.   They are both a tremendous amount of money.

19    Tremendous, both.

20         Q.    Well, which one did the Transit get

21    offers to do it for free, to slow down the trains

22    or to install platform screen doors?

23         A.    I said the offer was for platform

24    screen doors.

25         Q.    By the way, did the Transit

330

1                              A. BATA

2      Authority ever apply for any federal grants for

3      safety devices, like platform screen doors,

4      railings, track intrusion devices, or anything of

5      that nature?

6              A.    I don't know.  I really don't know.

7              Q.    Did the Transit Authority get money

8      from Homeland Security for the closed circuit TV?

9              A.    It might have for security.  They

10     might have, you know, after 9/11.

11             Q.    So, did the Transit say, "Hey,

12     federal government, Homeland Security, give us

13     money for the closed-circuit TV post-9/11, so the

14     conductors can see if there is anything on the

15     track or suspicious on the platform?

16                  MR. KEAVENEY:  Objection.

17             A.    It is -- one is security and one is

18     safety.  Many people don't understand the

19     difference.  Homeland Security is security, okay.

20             Q.    Could you answer my question,

21     please?

22             A.    What was the question again?

23                  MR. GENIS:  Read it back, please.

24                  (Whereupon, the requested portion

25                  of the transcript was read back by the

331

1                         A. BATA

2          court reporter.)

3                  THE WITNESS:  I don't know if it

4          went to the track.  I just know that

5          cameras were installed for, in general,

6          security of the system after 9/11.  There

7          was an effort -- I don't know if they

8          showed that money, but I know that was a

9          concern.  Things like that.

10         Q.    Did anybody from the Transit ask

11  the federal government, Homeland Security, FTA,

12  anyone from the federal government, for money for

13  the closed-circuit TV so that the operator of the

14  train can see if there is anything or anyone on

15  the track or on the edge of the platform?

16                  MR. KEAVENEY:  Objection.

17         A.    I do not know.

18         Q.    Sir, can we agree that there are

19  different available ways to achieve the same level

20  of benefit?

21         A.    As a general principle, yes, of

22  course.

23         Q.    Where there is more than one

24  available way to achieve exactly the same level of

25  benefit, is the public transportation agency

Enright Court Reporting    (631) 589-7788

332

```
 1                    A. BATA
 2    allowed to select a way that carries more danger
 3    than the alternatives?
 4         A.    I don't fully understand the
 5    question.  I mean, the agency generally wants to
 6    avoid danger as much as possible when it is
 7    practical and feasible, of course.
 8         Q.    Let's get back to good and accepted
 9    practices and procedures.  According to good and
10    accepted practices and procedures, the transit
11    agency must select -- all things being equal, the
12    same level of benefit, whatever way exposes the
13    public to the least amount of harm; true?
14                    MR. GENIS:  Objection.
15         A.    It is trying to mitigate incidents
16    as much as possible, as feasible and practical, of
17    course.
18         Q.    So, the transit agency should
19    select the safest way of doing things; correct?
20         A.    As safe as practical and feasible.
21    As I told you, the safest means different things.
22         Q.    Is it ever prudent not to choose
23    the safest possible way to protect people?
24         A.    Safest is subjective.  I told you,
25    the safest is no trains, okay.
```

333

A. BATA

1

2      Q.    Sir, where we do have trains --

3 because I think we are assuming that there are

4 trains.  So, where we do have trains --

5      A.    There could be no trains.

6      Q.    I understand, sir.  But I am trying

7 to get you to answer one of my questions, because

8 you keep going off on tangents, which takes up a

9 lot of time.

10      A.    I gave you the answer.

11      Q.    Sir, you keep arguing with me and

12 you won't let me ask questions.  I am tying to ask

13 questions and I'm trying to get answers.  So,

14 let's get back to it.

15            So, sir, there is a risk benefit

16 analysis; correct?

17      A.    Yes.

18      Q.    So, you look for the benefit of the

19 different alternative means; correct?

20      A.    In general, yeah.

21      Q.    You look at the different risks to

22 the different alternatives; correct?

23      A.    Correct.

24      Q.    And the only prudent thing to do is

25 to choose the means that exposes the public to the

334

                              A. BATA

1
2    least amount of harm and has the same level of

3    benefit; correct?

4         A.    But you are forgetting practicality

5    and feasibility.

6         Q.    Could you just answer my question,

7    please.

8         A.    I told you, it is not a black and

9    white answer.

10         Q.    Can you just answer my question,

11    please?

12         A.    I answered the question.

13         Q.    You haven't.

14         A.    Yes, I did.

15         Q.    Sir, I don't want to argue with

16    you.  You like to argue.

17         A.    Me neither.

18         Q.    So, let's back up.  There is either

19    benefit or no benefit to different alternative

20    procedures; correct?

21         A.    A different level of benefits and a

22    different level of danger, okay, and there are

23    different levels of practicality, different levels

24    of cost, different feasibility, public expectance,

25    funding, press, media, everything.  It is a

335

1                              A. BATA

2     complicated thing, okay.  Everything is taken into

3     an intelligent decision considering all of the

4     factors, and safety is a huge factor, all being

5     considered, but not blindly.

6            Q.    Can you tell me, when you finish

7     the non-responsive answer to my simple yes or no

8     question -- are you finished, sir, because I would

9     like to move to strike and go back to the actual

10    question?

11           A.    Finished.

12           Q.    Do we agree that, the higher the

13    level of danger, the higher the level of care

14    would be required?

15           A.    The higher level of danger, in

16    general principle, correct.

17           Q.    Okay.  And can we agree that in

18    terms of hierarchy of danger, death and

19    dismemberment are as bad as you could get, that is

20    the worse dangers that there are; correct?

21           A.    Yes.  It is on top, yes.

22           Q.    So, things that can prevent death

23    and dismemberment would be good safety devices and

24    features; true?

25           A.    Yes, of course.

336

                              A. BATA

1

2          Q.    So, a prudent transit agency would

3    look to say how can we prevent these events from

4    occurring; true?

5          A.    Yes, true.

6          Q.    Okay.  And the Transit Authority is

7    aware that the greatest amount of benefit, in

8    other words preventing death and dismemberment,

9    come from platform screen doors; true?

10         A.    Not necessarily.

11         Q.    What physical structures can the

12   Transit Authority install that is more effective

13   at preventing people from being run over by trains

14   and killed or maimed?

15         A.    Well, you could have less trains.

16              MR. GENIS:  That's not what I asked

17         you.  Move to strike.

18         Q.    So, you told us there are different

19   alternatives.  I am going to try it a different

20   way with you, sir.  Maybe I will get an answer one

21   of these days.

22              There are platform screen doors?

23         A.    Right.

24         Q.    There is the APG gates, there is

25   fixed railing, there is track intrusion devices,

337

1                         A. BATA
2       there is closed-circuit TV, there is markings on a
3       platform and signs and announcements, and then
4       there is lowering speed limits.  Those are the
5       different possible means of preventing people from
6       getting run over by trains; true?
7                A.    I told you the other things.
8                Q.    Can you just answer my question?
9       Those are means --
10               A.    You left out some key things.
11               Q.    Sir --
12               A.    Because you left out some things,
13      information, hot points, NextGen signs,
14      advertising, getting the message out about how
15      unsafe things are.  So, it is not true.  The whole
16      picture is what --
17               Q.    Sir, I already said announcements
18      and markings and signs, which is what you just
19      babbled on about.  So, please stop saying I
20      mischaracterized you when I didn't, please stop
21      saying I was not true, not accurate, when I was,
22      and please stop being non-responsive and evasive
23      to very simple questions; okay?
24               A.    Of an incomplete picture.
25                     MR. KEAVENEY:  Stop badgering the

338

```
 1                      A. BATA
 2         witness.
 3                 MR. GENIS:  I think I am the one
 4         getting badgered.
 5         A.    No, you're not.
 6         Q.    So, sir, you tell me, you studied
 7    it, this is what you do.  What is more effective
 8    at preventing people from being run over by trains
 9    where they are killed or maimed than platform
10    screen doors; what equipment, what device is more
11    effective?
12         A.    Physical device?
13         Q.    Yes, sir.
14         A.    Probably the doors are the most
15    effective.
16         Q.    Okay.  So, what is the second most
17    effective physical device to prevent somebody from
18    getting hit or run over by a train?
19         A.    You cannot say number two, three,
20    four, five.  There is a whole bunch of a variety of
21    things, combinations.  All right.  You could have a
22    track intrusion device with a sign saying you have
23    a track intrusion device, okay, or without a sign,
24    okay.  That could be number one, okay.
25                 You could have a media campaign,
```

339

1                          A. BATA

2    okay.  That could be number two, okay.  Or you

3    could have some other things.  It is not like -- it

4    is not like mathematics.  This is not mathematics.

5                    MR. GENIS:  Move to strike as not

6              responsive.

7                    THE WITNESS:  I am explaining to

8              you, there is no number two, three, four.

9         Q.    Sir, I am trying to ask a question

10   here without you going on and on.

11        A.    I answered.

12        Q.    Sir, I understand you are used to

13   lecturing people, but here you are answering

14   questions, okay.  So, let's get back to answering

15   the questions.

16                    Is media as effective as track

17   intrusion devices or platform screen doors in

18   preventing people from being run over by trains?

19        A.    Not in mathematical form, you know,

20   of course it is effective, a combination.

21                    MR. GENIS:  That's not my question.

22              Sir, listen to my question.  Move to

23              strike as not responsive.

24        Q.    Does media eliminate as many people

25   as platform screen doors does from getting hit by

340

1                          A. BATA

2       trains?

3                   MR. KEAVENEY:  Note my objection.

4           A.    I do not know.

5                   MR. KEAVENEY:  Okay.  Your time is

6           up, seven hours.

7                   MR. GENIS:  It is now 6:09 and the

8           defendant is terminating the deposition.

9           I note that the witness was incredibly

10          non-responsive, incredibly evasive, talked

11          over me repeatedly, would not even allow

12          me to ask questions at times, would not

13          answer questions.

14                  Defense counsel directed him

15          improperly not to answer questions,

16          interjected repeatedly, was obstructive,

17          coached him, and encouraged the witness

18          not to be responsive to the question.

19                  These are the reasons, among

20          others, that we have not yet completed

21          this deposition.  I do not consider this

22          deposition completed, and that's why we

23          couldn't finish in seven hours, because of

24          no respect, counsel, you and the witness.

25          More the witness than you on this one,

341

1                          A. BATA

2          though.  I do not consider this deposition

3          over.

4              MR. KEAVENEY:  Anything else?

5              MR. GENIS:  In fact, I may request

6          supervision of the deposition when we

7          bring him back, so that we can get

8          responsive answers to the questions.  And

9          I am going to ask that the Transit

10         Authority have to pay for the supervision

11         so that we can get a ruling -- when you

12         improperly direct him not to answer a

13         question, we can get a ruling for you not

14         to coach and we could get a ruling for the

15         witness to be responsive and not evasive.

16             MR. KEAVENEY:  Go ahead, make your

17         application, if that's what you want to

18         do.

19             MR. GENIS:  I am not done, but he

20         is closing the record.

21             MR. KEAVENEY:  Pursuant to federal

22         rules procedure Rule 30, plaintiff had

23         seven hours for the deposition of this

24         witness, and the seven hours has exceeded.

25         So, he is over his time pursuant to the

342

1                    A. BATA

2          rules.

3                    MR. GENIS:  And we will note that

4          we also previously made an application

5          seeking more time.  We tried to meet and

6          confirm with you well before this

7          deposition, and that was for the first

8          time when you said you did not agree to

9          extend the seven hours.

10                   MR. KEAVENEY:  You have also

11         exceeded now your ten witnesses, so you

12         should tread lightly if you want to

13         continue.

14                   MR. GENIS:  We also noted that we,

15         in the past, we made an application to

16         have more than ten witness noted, that you

17         only recently for the first time objected

18         to doing more than ten witnesses.  And, in

19         fact, passively agreed to more than ten

20         prior to your recent objection.

21                   MR. KEAVENEY:  I never did.  I

22         never agreed.  Okay.  I have a family.

23         So, we can talk another time.

24                   MR. GENIS:  I look forward to

25         seeing you again, Mr. Witness.  Looking

343

1                          A. BATA

2           forward to that.

3                    THE WITNESS:  Nice to meet you,

4           sir.

5                    (Time noted:  6:12 p.m.)

6

7                    _____

8                         ANDREW BATA

9

10   Subscribed and sworn to before me

11   this _____ day of _____, 2022.

12

13   _____

14                    NOTARY PUBLIC

15

16

17

18

19

20

21

22

23

24

25

344

```
 1                          A. BATA

 2      ---------------- I N D E X -----------------

 3     WITNESS              EXAMINATION BY        PAGE

 4     ANDREW BATA        MR. GENIS                5

 5

 6      ------------- DOCUMENT REQUEST -------------

 7     PAGE 144    STATISTICS CHART

 8

 9      ---------------- EXHIBITS ----------------

10     PLAINTIFF'S    DESCRIPTION            PAGE

11     Exhibit 1,     CHART                  53

12     Exhibit 2,     E-MAILS                90

13     Exhibit 3,     E-MAILS                94

14     Exhibit 4,     E-MAILS                100

15     Exhibit 5,     E-MAILS                120

16     Exhibit 6,     RFI                    159

17     Exhibit 7,     FAIVELEY RESPONSE      162

18     Exhibit 8,     RESPONSE REVIEW        174

19     Exhibit 8A,    RESPONSE REVIEW        182

20     Exhibit 9,     E-MAIL                 183

21     Exhibit 10,    8/29/12 MTA            224

22     Exhibit 11,    10/30/13 E-MAIL        229

23     Exhibit 12,    5/15/13 E-MAIL         232

24     Exhibit 13,    1/7/13 E-MAIL          236

25     Exhibit 14,    E-MAIL                 247
```

345

1                          A. BATA

2    Exhibit 15,    3/2/10 E-MAIL          251

3    Exhibit 16,    4/15/11 E-MAIL         272

4    Exhibit 17,    HEIGHT DOCUMENT        275

5

6                       RULINGS

7    PAGE           LINE

8    22             25

9    23             11

10   23             16

11   24             7

12   25             5

13

14                          oOo

15

16

17

18

19

20

21

22

23

24

25

346

1                              A. BATA

2                         CERTIFICATION

3    STATE OF NEW YORK   )

                          )  ss.:

4    COUNTY OF NASSAU     )

5

6                    I, Dorothy Maggiore, a Notary Public

7    within and for the State of New York, do hereby certify:

8                    That ANDREW BATA the witness(es)

9    whose deposition(s) is(are) hereinbefore set forth,

10   was(were) duly sworn by me and that such deposition(s)

11   is(are) a true and accurate record of the testimony

12   given by such witness(es).

13                   I further certify that I am not

14   related to any of the parties to the action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17                   IN WITNESS WHEREOF, I have hereunto

18   set my hand this MARCH 8th of 2022.

19

20   _____

21                   DOROTHY MAGGIORE

22

23

24

25

UNITED STATES EASTERN DISTRICT

EASTERN DISTRICT NEW YORK

------------------------------------------------X

LUISA JANSSEN HARGER DaSILVA,

                                    PLAINTIFF,

                    -against-

NEW YORK CITY METROPOLITAN TRANSIT AUTHORITY,

REQUIA SHABAZZ,

                                    DEFENDANTS.

------------------------------------------------X

                    DATE: July 1, 2022

                    TIME: 10:09 A.M.


          CONTINUED EXAMINATION BEFORE TRIAL of

the Defendant, by a Witness, ANDREW BATA, taken by

the Plaintiff, pursuant to a Court Order, held

remotely via video conference, before Christos

Liopyros, a Notary Public of the State of New

York.

```
 1
 2    A P P E A R A N C E S:
 3
 4    ROTH & ROTH, LLP
             Attorneys for the Plaintiff
 5           192 Lexington Avenue - Suite 802
             New York, New York 10016
 6           BY: DAVID ROTH, ESQ.
 7
 8
 9    SONIN & GENIS, ESQS.
             Attorneys for the Plaintiff
10           One Fordham Plaza - Suite 907
             Bronx, New York 10458
11           BY: ROBERT GENIS, ESQ.
12
13
14    LANDMAN, CORSI, BALLAINE & FORD, P.C.
             Attorneys for the Defendants
15           120 Broadway - Suite 1301
             New York, New York 10271
16           BY: ANDREW P. KEAVENEY, ESQ.
17
18
                    *              *              *
19
20
21
22
23
24
25
```

```
 1
 2                    S T I P U L A T I O N S
 3
     IT IS HEREBY STIPULATED AND AGREED by and between
 4   counsel for all parties present that this
     deposition is being conducted by Videoconference,
 5   that the Court Reporter, all counsel, and the
     witness are all in separate remote locations and
 6   participating via Videoconference
     (LegalView/Zoom/WebEx) meeting under the control
 7   of Lexitas Court Reporting Service, that the
     officer administering the oath to the witness need
 8   witness shall be sworn in remotely by the Court
     Reporter after confirming the witness's identity,
 9   that this Videoconference will not be recorded in
     any manner, and that any recording without the
10   express written consent of all parties shall be
     considered unauthorized, in violation of law, and
11   shall not be used for any purpose in this
     litigation or otherwise.
12
     IT IS FURTHER STIPULATED that exhibits may be
13   marked by the attorney presenting the exhibit to
     the witness, and that a copy of any exhibit
14   presented to a witness shall be emailed to or
     otherwise in possession of all counsel prior to
15   any questioning of a witness regarding the exhibit
     in question. All parties shall bear their own
16   costs in the conduct of this deposition by
     Videoconference, not withstanding by a copy of the
17   transcript to the deposed party by the taking
     party in Civil Litigation matters.
18
19
20
21
22
23
24
25
```

```
 1                        A. BATA
 2    A N D R E W   B A T A, called as a witness, having
 3    been first duly sworn by a Notary Public of the
 4    State of New York, was examined and testified as
 5    follows:
 6                    THE COURT REPORTER:  What is
 7             your name, please?
 8                    THE WITNESS:  Andrew Bata.
 9                    THE COURT REPORTER:  What is
10             your address, please?
11                    THE WITNESS:  1725 York Avenue,
12             Apartment 5-D, New York, New York
13             10128.
14    EXAMINATION BY
15    MR. GENIS:
16        Q.      Good morning, Mr. Bata.  What did you
17    review to prepare for today's deposition?
18        A.      I didn't review anything specific
19    except my memory.
20        Q.      Okay.  What did you review to refresh
21    your memory?
22        A.      Nothing specific.
23        Q.      Did you offer any guidance to the
24    Transit Authority about documents that would be
25    relevant to the speed committee about the speed
```

```
 1                        A. BATA
 2   policy of the Transit Authority?
 3        A.      You mean now?
 4        Q.      Yes.
 5        A.      No.
 6        Q.      Okay.  At any time?
 7        A.      No.
 8        Q.      Okay.  So we're clear, at any time,
 9   did you ever offer guidance to the Transit
10   Authority about documents that would be relevant
11   to the speed committee about the speed policies of
12   the Transit Authority?
13                     MR. KEAVENEY:  Note my
14                     objection.
15        A.      I -- I'm not sure what you mean.  You
16   mean like after I left, or?
17        Q.      No.  I said at any time.
18        A.      No.
19        Q.      Okay.  Who, if anyone, did you talk
20   to about this case or the topics involving this
21   case?
22        A.      You mean now?  In this case?
23        Q.      Yes.
24        A.      Um, I mentioned to my, um, my wife
25   that I'm in this case, and, um, I have mentioned
```

```
 1                     A. BATA
 2    to, um, a colleague that I'm -- that this case is
 3    on.  That's it.
 4         Q.     When you say a colleague, somebody
 5    that either works or worked for the Transit
 6    Authority?
 7         A.     Yes.
 8         Q.     Who?
 9         A.     Paul Gogansky (phonetic).
10         Q.     I'm sorry, I couldn't hear that.
11         A.     He's -- I'm going to repeat it.  The
12    name is Paul Gogansky.  He's a retired --
13                     THE COURT REPORTER:  Sir, sir,
14                say it louder and clearer, please, I
15                apologize.  I didn't hear what you
16                said.
17         A.     Paul Gogansky, he's a retired MTA
18    employee and we had dinner and I mentioned that
19    this case is on.  That's all.
20                     THE COURT REPORTER:  He's a
21                retired, what kind of employee?  You
22                said something, sir.
23         A.     Was retired Transit planner.
24                     THE COURT REPORTER:  Transit
25                planner.
```

```
 1                    A. BATA
 2      A.      He was --
 3                   THE COURT REPORTER:  Thank you,
 4              sir.
 5      A.      -- a bus person.
 6      Q.      Have you had any communications with
 7   anyone at or from the Transit Authority or MTA,
 8   including present or former employees, since the
 9   last deposition other than that one thing you told
10   us about?
11      A.      No.
12      Q.      Okay.  What communications have you
13   had with any attorney representing the Transit
14   Authority or the MTA?
15                   MR. KEAVENEY:  Objection.  Calls
16              for attorney/client communication.
17                   MR. GENIS:  Judge already ruled
18              on this.  That's another minute of
19              time for the objection.
20                   MR. KEAVENEY:  No, you said what
21              discussions did you have.
22                   MR. GENIS:  Nope.  I said what
23              communication have you had with any
24              attorney representing the Transit
25              Authority and MTA.
```

```
 1                    A. BATA
 2               Another minute from your time,
 3          Andrew.
 4     Q.    Please answer the question.
 5               MR. KEAVENEY:  It's asking --
 6               MR. GENIS:  I am not having an
 7          argument with you.  The judge ruled
 8          on this.  Another minute of my time
 9          you're wasting.  We're not playing
10          beat the clock today, Andrew.  Not
11          happening.  Okay?  We're keeping
12          track of every minute, every second
13          you're wasting of my time.
14               Judge ruled on all of this.
15     Q.    Answer it, please.
16               MR. KEAVENEY:  Objection.  It
17          asks for a --
18               MR. GENIS:  Andrew, I'm about to
19          have a call to the phone to the court
20          and look to hold you in contempt.
21          Enough is enough.  Judge ruled on
22          this.  Let's move on.
23     Q.    Answer the question.
24               MR. KEAVENEY:  (Inaudible.)
25     Q.    Answer the question.
```

1               A. BATA
2               MR. GENIS:  Nope.
3    Q.        Answer my question.
4               MR. GENIS:  That's another
5          minute of time wasted.
6               MR. KEAVENEY:  Repeat the
7          question.
8               (Whereupon, the referred to
9          portion was read back by the
10         Reporter.)
11              MR. GENIS:  You did not read
12         back the pending the question.
13              THE COURT REPORTER:  Let me read
14         it back right now.
15              MR. GENIS:  And, and it's, it's
16         now 10:14.
17              (Whereupon, the referred to
18         portion was read back by the
19         Reporter.)
20    A.        Andrew told me to -- that, that this
21  is a follow-up deposition, and I'm to come in, and
22  he told me to come in today at 10:00 a.m.
23    Q.        Okay.  How many communications have
24  you had with any attorneys or law firms
25  representing the Transit Authority or MTA in this

```
 1                    A. BATA
 2  case?
 3       A.      Just with Andrew.
 4       Q.      I didn't ask you that, sir.
 5               How many?  That's a number.  How many
 6  communications have you had?
 7       A.      One or two.  To set up this meeting.
 8       Q.      Have the communications you had with
 9  your lawyers been on telephone, computer, Zoom,
10  e-mail, text, anything else?
11       A.      I think it was telephone.  Or -- I
12  think it was telephone.  I think so.
13       Q.      And you can't look at the lawyer for
14  an answer.  You have to just give your own
15  answers.
16       A.      I tried to refresh my memory.
17       Q.      Okay.  How much time have you spent
18  all together talking with lawyers for the --
19  withdrawn.
20               How much time have you spent all
21  together before the last deposition, after, before
22  today?  That's what I want to know.
23       A.      Between the last time and now?
24       Q.      No, that's not what I said.  I'll do
25  it again.
```

```
 1                       A. BATA
 2             How many times -- withdrawn.
 3             How much time have you spent all
 4    together communicating with attorneys for the
 5    Transit or MTA, and I'm asking you about before
 6    the last deposition, after the last deposition,
 7    and during the last deposition, right through
 8    'till right now.
 9        A.      Maybe an hour.
10        Q.      Okay.  I'm gonna ask you questions
11    that primarily call for a yes, no, or a true or
12    false.  Please only answer with a yes, no, or a
13    true or false unless you are unable to do so.  In
14    which case just say you are unable to do so.
15                Understood?
16        A.      Yes.
17        Q.      Agreed?
18        A.      Yes.
19        Q.      I have your word on that?
20        A.      (No verbal response.)
21        Q.      Yes?
22        A.      Yes.  I said yes.
23        Q.      Okay.  We couldn't hear you.
24                Okay.  We will be discussing safety
25    today.
```

1              **A. BATA**

2         **According to dictionary.com, they**

3    **define safety as a noun, the state of being safe,**

4    **freedom from the occurrence or risk of injury,**

5    **danger or a loss.**

6         **Do you agree with this definition?**

7    **A.       If it's in the dictionary, yes.**

8    Q.       Okay.  When I am asking you about

9    safety during this deposition, unless I say

10   otherwise, I am generally referring to freedom

11   from the occurrence or risk of injury to human

12   beings caused by contact between any part of their

13   body with the New York City subway train.

14        Do you understand?

15   **A.       Yes.**

16   Q.       Okay.  You told us you were the chair

17   of the New York City Transit Authority's speed

18   policy committee.  True?

19   **A.       Correct.**

20   Q.       When did you first get on the speed

21   policy committee?  And when did you stop being on

22   it?

23   **A.       I have to refresh my memory.  I**

24   **think -- again, this was 30 years ago, um, I**

25   **believe I started in 1991, something like that,**

1                      **A. BATA**

2      **and I think I was on it for -- until 1999,**

3      **something like that.**

4          Q.      Were you on the speed policy from

5      the -- from 1991 until the time you left the

6      Transit Authority?

7          **A.      No.**

8          Q.      I'm sorry, your answer was?

9          **A.      No.**

10         Q.      Okay.  Who else was on the speed

11     policy committee while you were on it?

12         **A.      It, it was a rotating thing.  It was**

13     **a community, so there were many people who signed**

14     **in, signed out.  It was not liked a set bodies.**

15     **It was a community of people who come in,**

16     **depending on, on the subject.**

17         Q.      Was Glenn Lunden on it?

18         **A.      Glenn might have come to some**

19     **meetings.**

20         Q.      Okay.  I'm not asking you if

21     Mr. Lunden ever attended meetings of the speed

22     policy committee of the Transit Authority.  I'm

23     asking if he was a member of it.

24         **A.      My recollection, there was no set**

25     **membership list.**

1                        **A. BATA**

2      Q.      So there's a committee without

3  members?

4      **A.      It's, it's a community.  It's -- it**

5  **represents different departments.  So it was not**

6  **like you are a, a, a designated person.  It's**

7  **basically you're -- whoever the department sent to**

8  **represent the department depending on the**

9  **discussion.**

10     Q.      Were there set meetings or scheduled

11  meetings of this committee?

12     **A.      Yes.**

13     Q.      How often were they held?

14     **A.      Again, I -- it's 30 years.  I think**

15  **it was monthly.**

16     Q.      Okay.  And in addition to yourself

17  attending these meetings -- withdrawn.

18              You were the chair of the committee,

19  correct?

20     **A.      I was the main -- I was the center**

21  **figure for coordinating the meeting, yes.**

22     Q.      Okay.

23              **MR. GENIS:  Move to strike as**

24              **not responsive.**

25     Q.      You testified under oath at your last

1                         A. BATA

2    deposition that you were the chair of the Transit

3    Authority speed policy committee.

4         A.      That's, that's (inaudible), yes.

5         Q.      And you had routine, you had routine

6    monthly meetings of the speed policy committee,

7    true?

8         A.      Yes.  Not necessarily every month.

9    As -- I -- as I recollect, again, it's 30 years, I

10   think it was monthly.

11        Q.      Okay.  And people were allowed to

12   attend these speed policy committee meetings even

13   if they were not members of the committee, true?

14                    MR. KEAVENEY:  Objection.

15        A.      (Inaudible.)

16                    THE COURT REPORTER:  Mr. Bata,

17                    say that again.  Whatever word you

18                    just said.  You said one word, I

19                    didn't hear it.

20        A.      I'm not sure if I could answer.

21                    MR. KEAVENEY:  Go ahead.

22        A.      There were no set members.  So people

23   would come when it was a subject of interest to

24   them or relevance.

25        Q.      After 1999, did you still attend

```
 1                    A. BATA
 2    speed policy committee meetings?
 3        A.      I don't remember, but I might have
 4    come occasionally.
 5        Q.      When you -- did you ever consult or
 6    did they ever consult with you, the speed policy,
 7    after 1999?
 8        A.      I don't remember.
 9        Q.      Were you the chair of the speed
10    policy committee the entire time you were a member
11    from 1991 through 1999?
12                    MR. KEAVENEY:  Note my
13                    objection.
14                    You can answer.
15        A.      Yeah, I think so.  Yes.
16        Q.      Okay.  So you continued attending
17    meetings of the speed policy committee until the
18    time you left the Transit Authority?
19        A.      No.
20        Q.      No?
21        A.      I said no.
22        Q.      Okay.  So what year was the last time
23    you went to a speed policy committee meeting?
24        A.      As I said, I don't remember because I
25    might have gone to some meetings after I stopped
```

```
 1                    A. BATA
 2    being (inaudible) to the speed policy.  I might
 3    have gone to a meeting here and there after I
 4    received to be chair.
 5         Q.    I understand.
 6                    MR. GENIS:  Move to strike as
 7                not responsive.
 8         Q.    My question is very simple.
 9                In what year was the last time you
10    attended a meeting of the Transit Authority speed
11    policy committee?
12         A.    I don't remember.
13                    THE COURT REPORTER:  Sir, say
14                that again.
15         A.    I don't remember.
16                    THE COURT REPORTER:  Thank you.
17                Louder.  Thank you, sir.
18                    THE WITNESS:  Sure.
19         Q.    Was it in 2015?
20         A.    I do not remember.
21         Q.    2016?
22         A.    I don't know.
23         Q.    2014?
24         A.    I, I do not remember, I said.
25         Q.    2013?
```

1                        **A. BATA**

2       **A.      I don't remember.**

3       Q.      2010?

4       **A.      I don't remember a specific years.**

5       Q.      Okay.  Well, what decade was it?  Was

6    it after the year 2000, after the year 2010?

7       **A.      As I said, I attended very, very**

8    **rarely.  I don't remember.**

9       Q.      Okay.  So you said this is an

10   informal committee with no regular members, true?

11      **A.      Generally there's no label, anybody's**

12   **a specific member.**

13      Q.      So this is an informal committee or

14   is it a formal committee?

15      **A.      I can't answer if it's informal,**

16   **formal.  It is -- it was a group of -- it's a**

17   **community of people who are -- who gather to**

18   **discuss subject at hand.**

19      Q.      So there are floating members, so to

20   speak?  Whoever shows up shows up?  'Cause there's

21   no regular members?  True?

22                        **MR. KEAVENEY:  Objection.**

23      **A.      Some people come more regularly, some**

24   **people have not.**

25      Q.      Okay.  So there's no requirement that

```
 1                        A. BATA

 2     there be formal members, and that they attend

 3     meetings, true?

 4                    MR. KEAVENEY:  Objection.

 5         A.        There's no formal requirement.

 6     There's a desire to meet.

 7         Q.        Okay.  So does the speed policy

 8     committee actually make decisions of any kind?

 9         A.        They do, yes.

10         Q.        Okay.  Are the decisions it make, are

11     they formal or informal?

12         A.        I don't know, I cannot decide -- I

13     cannot tell you what -- how formal it is.  You

14     know.  (Inaudible) formal.  They makes a decisions

15     and it's in minutes.

16         Q.        Okay.  So there was a secretary of

17     the committee that would take minutes?

18         A.        Generally there was somebody who took

19     minutes, yes.

20         Q.        Okay.  Was it an assigned person or

21     not?

22         A.        I think it was on a voluntary basis.

23         Q.        Okay.  And they would -- who would

24     the minutes be distributed to after each of these

25     meetings?
```

```
 1                    A. BATA

 2        A.        Generally the people who signed in,

 3    they was who signed into the, into the meeting,

 4    and then they may have sent it to their

 5    departments, other people in their departments.

 6        Q.        Okay.  Where were the minutes kept?

 7        A.        In files.

 8        Q.        Okay.  What files?  Where were they

 9    located?

10        A.        Everybody -- I don't know how people

11    kept their own files.  You know.  I had a file.

12    And other people had files.  Some people didn't

13    have files.

14        Q.        Okay.  So, in other words, somebody

15    would type up on a computer the minutes, and they

16    would e-mail them around, correct?

17        A.        Yes, although the early days e-mail

18    was not -- this is before e-mail times.

19        Q.        So you're saying --

20        A.        Again, 30 years ago.

21        Q.        So you're saying, from 1991 to 1999,

22    none of the minutes were e-mailed to any of the

23    members or any other personnel from the Transit

24    Authority?

25        A.        I didn't say that.  I said --
```

```
 1                        A. BATA

 2        Q.        Okay.

 3        A.        -- some, some -- I didn't say that.

 4        Q.        So, yes, the minutes of the meetings

 5   were e-mailed to members and those that were

 6   interested?  Or not?

 7        A.        As I said, in the early days it very

 8   possible that the e-mails were typed up and then

 9   copied and then people had a physical copy without

10   e-mailing them.  Later on, when e-mails became

11   more common practice, then, of course, it was

12   e-mailed.  Of course.

13        Q.        Okay.  So when did you start

14   e-mailing the minutes of the --

15        A.        (Inaudible) --

16        Q.        -- speed policy committee meetings?

17        A.        It was the 1990s.  I don't remember

18   the transition period.  The technology was moving.

19   I don't remember specifically, no.  I know it was

20   evolving.

21        Q.        Well, what was the job of the speed

22   policy committee?  What did it do?

23        A.        It's a discussion group of, um,

24   interested parties who were brought together to

25   discuss different views by different departments
```

1              A. BATA

2    about a particular subject.

3        Q.      Other than discussing views about

4    different people on different topics, what, if

5    anything, did it do?

6        A.      As I said, we discussed the topic,

7    and then it was put in the minutes, and then

8    different opinions were expressed about a

9    particular topic.

10       Q.      Well, did the speed policy committee

11   have a goal or a mission?

12       A.      Its only mission was to be

13   practical -- a practical interdepartmental view of

14   the matter.  They have a lot of different

15   opinions, and the mission is basically to have a

16   community of different departments in one room,

17   expressing their thoughts, and discussing pros and

18   cons and, and analyzing the subject at hand.

19       Q.      Did the speed policy committee review

20   or promulgate speed rules, policies, guidelines,

21   things of that nature?

22       A.      Yes.

23       Q.      Did the speed policy committee review

24   or promulgate signal changes, speed restrictions

25   at certain locations?

```
 1                    A. BATA

 2       A.        When there was a specific case it

 3   did.

 4       Q.        Did the speed policy committee review

 5   and promulgate rules or policies with respect to

 6   signage?

 7       A.        Yes.

 8       Q.        Okay.  Did the speed policy committee

 9   review or promulgate -- withdrawn.

10                 Did the speed policy committee review

11   the policies that were in place when you first got

12   on it?

13       A.        Can you repeat that again, please?

14   I'm sorry.

15       Q.        Sure.

16                     MR. GENIS:  Can you just read it

17                 back so I can make sure I'm speaking

18                 English, please.

19                     (Whereupon, the referred to

20                 portion was read back by the

21                 Reporter.)

22       A.        I don't remember, actually.

23       Q.        Did the speed policy committee, from

24   the time you were on it, change any of the prior

25   policies, standards, guidelines or rules that had
```

```
 1                    A. BATA
 2  been previously promulgated?
 3      A.      I, I don't remember doing that
 4  specifically.
 5      Q.      Okay.  After you stopped being chair,
 6  but would periodically or sporadically attend
 7  meetings of the speed policy committee, did they
 8  ever review and change any of the preexisting
 9  speed policies?
10      A.      I, I don't know.
11      Q.      Did the speed policy committee issue
12  or draft bulletins?
13      A.      I don't know.
14      Q.      Now, for the different speed rules or
15  policies and the things we just talked about,
16  signal changes, speed restrictions at certain
17  locations, signage, where were these records kept?
18  For example, on a shared drive, on your computer,
19  a filing cabinet?  You tell me.
20      A.      Generally at, at that time when I was
21  on it people just had files.
22      Q.      Okay.  So in hard copy file cabinet?
23  Is that what you're saying?
24      A.      At that time, yes.  That was the
25  main, that was the main way of doing it, right.
```

1                        A. BATA

2   File cabinets.

3        Q.      What was your role on the speed

4   policy committee?

5        A.      I was a mutual host.  That's all I

6   can tell you.  A mutual host.  I'm not involved in

7   the track, or signaling, or any of the engineering

8   things.  I'm not an engineer.  I was a mutual host

9   because the -- I was in operations planning, and

10  that was considered to be intermediate person to,

11  to sort of make peace among these people in a, in

12  a, in a very, in a -- an executive manner to run

13  the meeting smoothly.

14       Q.      Who were the chairs of the speed

15  policy committee after you left?  After you left

16  the committee.

17       A.      I don't, I don't remember.

18       Q.      Can you name a single chair of the

19  speed policy committee after you ceased to be the

20  chair until the time you left the Transit

21  Authority?

22       A.      I don't remember who was the chair.

23  I know there were some people who remained on it,

24  but I don't know exactly there was another chair

25  that -- I don't remember.

```
1                      A. BATA
2      Q.      When did the Transit Authority first
3  establish or form the speed policy committee?
4      A.      I think that was in 1988.
5      Q.      Do you know why it was started?
6      A.      Yes.
7      Q.      Why?
8      A.      The president wanted to know why some
9  trains are going extremely slow.
10     Q.      When, if ever, did the Transit
11 Authority first issue a speed policy?
12                 MR. KEAVENEY:  Note my
13                 objection.
14     A.      There was no such thing, the speed
15 policy.
16     Q.      When, if ever, did the speed policy
17 committee issue its first speed policy?
18                 MR. KEAVENEY:  Note my
19                 objection.
20     A.      I don't remember such a thing as
21 speed policy.
22     Q.      Okay.  So I just want to be clear.
23             At any time that you worked for the
24 Transit Authority, did the speed policy committee
25 ever issue or promulgate a written speed policy?
```

```
 1                    A. BATA

 2      A.        My memory is that we issued

 3   resolutions of a problem.  But I don't remember a

 4   blanket speed policy.  I don't remember that.

 5      Q.        Okay.  Did the Transit Authority, for

 6   the entire time you worked for it, ever issue a

 7   written speed policy standard?

 8      A.        I don't, I don't remember.

 9      Q.        Did the Transit Authority ever

10   promulgate -- withdrawn.

11            Did the speed policy committee ever

12   issue or promulgate speed policy rules,

13   guidelines?

14      A.        I think -- oh, you're finished.

15   Okay.

16            Um, certainly there were some -- if

17   there was -- there's an issue at hand, it issued a

18   recommendation of some -- of problem to be

19   resolved, yes.

20      Q.        So was there ever a speed policy

21   issued by the speed policy committee about the

22   speed for trains entering stations?

23      A.        The topic was discussed, but I don't

24   remember a specific document on that.  I know that

25   the subject was discussed.
```

```
 1                    A. BATA
 2     Q.      Well, did the Transit Authority ever
 3  issue or promulgate a written speed policy for the
 4  speed of trains entering stations?
 5     A.      I don't remember.
 6     Q.      You mentioned something about
 7  resolutions involving speed policy.
 8             Were these written resolutions?
 9     A.      They were in the minutes.
10     Q.      So just the contents of the minutes?
11     A.      Yes.
12     Q.      So if we wanted to know what the
13  resolutions of the speed policy committee were, we
14  would have to look at the minutes, true?
15     A.      The minutes if not the, the
16  discussions of the meeting.
17                 MR. GENIS:  I'm sorry, could,
18             could the reporter just read back his
19             answer.
20                 (Whereupon, the referred to
21             portion was read back by the
22             Reporter.)
23     Q.      I don't understand what you just
24  said, sir.
25             So you --
```

```
 1                  A. BATA

 2      A.      The minutes reflected the discussions

 3  at the meeting.

 4      Q.      Okay.  But I'm not asking you about

 5  that.  I am ask -- withdrawn.

 6              You told us that the speed policy

 7  committee of the Transit Authority issued

 8  resolutions about the speed of trains entering

 9  stations, true?

10      A.      I don't necessarily say the

11  solutions.  I would say it reflected the

12  discussions about speeds.

13      Q.      I'm not asking you about discussions

14  right now.  I'm asking you about written

15  resolutions.

16              You told us a moment ago, under oath,

17  is that the speed policy committee of the Transit

18  Authority issued resolutions about the speed of

19  trains entering stations, true or false?

20      A.      I don't think, I don't think I said

21  that.

22      Q.      Okay.  So just to be crystal clear,

23  did the speed policy committee issue resolutions

24  about the speed of trains entering stations?

25      A.      I don't remember specific resolution.
```

1                          **A. BATA**

2     **I remember the committee members, or the members**

3     **at the meeting expressing opinions about that.  I**

4     **don't remember a specific resolution or directive.**

5     **I don't remember it.**

6          Q.      All right.  Are there differences

7     between speed policies and speed standards?

8          **A.      (No verbal response.)**

9          Q.      Or are they one and the same?

10         **A.      It's, it's, it's a matter of**

11    **interpretation.  I don't, I don't know how to**

12    **separate it.**

13         Q.      Okay.  So to you is a speed policy

14    and a speed standard the same thing, just by

15    another name?

16         **A.      Not necessarily, no.**

17         Q.      Well, when you're saying not

18    necessarily, we got into that last time, if you

19    recall.  We looked up the dictionary definition of

20    necessarily and of unnecessarily.

21              So my question to you is; yes or no,

22    did they ever issue -- withdrawn.

23              Yes or no, are speed policies and

24    speed standards the same or not?

25         **A.      I can't answer the question.**

                        **A. BATA**

1        Q.        From the time you first got on the

2   speed policy committee until the time you left it,

3   did the speed policy for the Transit Authority for

4   subway trains ever change?

5        **A.        I don't know.**

6        Q.        So who was the secretary of the speed

7   policy committee when you were the chair?

8        **A.        When I was doing that I had a, a**

9   **colleague of mine who came sometimes and he took**

10  **notes.**

11       Q.        Who?  Is the question.

12       **A.        His name was Gerry Meagher.**

13       Q.        M-E-Y-E-R?

14       **A.        No.  M-E-A-G-H-E-R.**

15       Q.        Jerry with a J or a G?

16       **A.        Good question.  Honestly, it's**

17  **30 years ago.  I think it with a G.**

18       Q.        Whatever speed policies or standards

19  that were either promulgated or approved, could we

20  agree that they had to be reviewed first to

21  determine whether or not they should be changed --

22  withdrawn.  Awkward question.

23            You would have meetings where you

24  would have discussions, and after the discussions

1                    **A. BATA**
2    **you would issue or promulgate a speed policy,**
3    **true?**
4        **A.       No.**
5                        **MR. KEAVENEY:  Objection to**
6                **form.**
7        **A.       I said no.**
8        Q.       Okay.  Now, can we agree that a speed
9    policy has to be reviewed and to see whether or
10   not it makes, um, for a safe entry speed into
11   stations for the customers?
12                       **MR. KEAVENEY:  Objection.**
13       **A.       I, I, I, I don't know what you mean.**
14       Q.       Sure.  Okay.
15                       When the speed policy committee that
16   you chaired and it met and it had discussions, did
17   anyone ever discuss to see whether or not the
18   entry speed for trains into stations would help
19   promote safety of the public?
20       **A.       It was, it was discussed, yes.**
21       Q.       Okay.  And did people, in discussing
22   the safety the public, discuss what we called
23   earlier a code from the Transit Authority a 12-9,
24   contact between a train and a human being?
25       **A.       I don't exactly know what you mean.**

1              **A. BATA**

2       Q.      Okay.

3       **A.      The safety of customers was always**

4  **paramount.**

5       Q.      Okay.  So let's back up.

6              We discussed last time how the

7  Transit Authority was aware of every year many

8  people being struck or run over by trains.  True?

9       **A.      Yes.**

10      Q.      Okay.  At the speed policy committee,

11 did anybody ever discuss the relationship between

12 the speed of trains entering the station and the

13 number of 12-9, or incidents where people are hit

14 or run over by trains?

15      **A.      I don't remember.  Not specifically.**

16      Q.      Okay.  Did anyone ever consider from

17 the speed policy committee the effect of entry

18 speed of a train into a station and the safety of

19 the public to prevent or reduce the incidents of

20 12-9s, where people get -- have contact with

21 trains?

22              **MR. KEAVENEY:  Objection.**

23      **A.      You mean of people waiting for slower**

24 **trains and, and aspects of their safety?  Yes.**

25      Q.      So I want to make sure I understood

```
 1                     A. BATA
 2    what you just said.  So you're telling us the
 3    speed policy committee, during your time at the
 4    Transit Authority, considered how the speed of a
 5    train entering a station could affect the number
 6    of people getting hit or run over by trains?
 7         A.      (No verbal response.)
 8         Q.      Yes, no?
 9         A.      No.
10         Q.      No.  Okay.
11         A.      You said, you said number.
12         Q.      So your answer to my question is no,
13    correct?
14         A.      No.
15         Q.      We can't hear you.  You really have
16    to speak up.  The reporter has asked you several
17    times.
18         A.      I said no.
19                 MR. KEAVENEY:  Maybe you should
20                 (inaudible) closer to the speaker.
21                 THE WITNESS:  Okay.  I'll move
22                 up to the microphone.
23         Q.      Well, can we agree that any involved
24    speed policy must be based on a proper safety
25    study and analysis?
```

```
 1                      A. BATA

 2                      MR. KEAVENEY:  Note my

 3              objection.

 4      A.         As I said, safety is of paramount

 5  importance to MTA.  Of course.

 6      Q.         So you -- okay.

 7                 And a proper safety study must be

 8  guided by safety principals, true?

 9      A.         Yes.

10      Q.         And the main safety principal is what

11  keeps the public safe from unnecessary harm, true?

12      A.         This is true.

13      Q.         Okay.  And in doing its job, what

14  information did the speed policy committee rely

15  on?

16      A.         It's our knowledge of the -- of

17  customer needs and our knowledge of the system.

18      Q.         Okay.  And that would include

19  knowledge of people getting hit or run over by

20  trains, correct?

21      A.         And also the knowledge of people

22  standing on the platform.

23      Q.         Okay.  So is that, yes, that they --

24  the Transit Authority was to consider, when

25  looking at speed policy -- withdrawn.
```

1          **A. BATA**

2          **MR. GENIS:  Chris, can you**

3          **please read back my last question.**

4          **(Whereupon, the referred to**

5          **portion was read back by the**

6          **Reporter.)**

7     Q.     So when the Transit Authority would

8  address speed policy, they had to look at and

9  consider the number of people being hit or run

10  over by trains?  True?

11          **MR. KEAVENEY:  Objection.**

12     **A.     It considered all aspects of safety.**

13     Q.     Including what I just said, yes?

14     **A.     I don't remember it was specific**

15  **number.  It, it addressed all aspects of passenger**

16  **and customer safety.  On the train, on the**

17  **platforms.**

18     Q.     Okay.

19     **A.     Complete.**

20     Q.     So the Transit Authority, in

21  reviewing and promulgating a speed policy, was

22  required to look at people getting hit and run

23  over by trains in its stations, yes?

24          **MR. KEAVENEY:  Objection.**

25     **A.     There's no -- not required.**

```
 1                    A. BATA
 2      Q.      Well, in order to have a proper
 3  study, you have to look at the number of people
 4  being run over or hit by trains, true?
 5                  MR. KEAVENEY:  Objection.
 6      A.      It, it would have to consider all
 7  aspects of safety, a proper study, yes.
 8      Q.      Okay.  So good and accepted practices
 9  and procedures for the operation should be
10  considered, yes?
11      A.      All aspects of customer safety and
12  operations, yes.
13      Q.      Okay.  And professional standards of
14  care with respect to customer safety have to be
15  considered as well, correct?
16      A.      Yes.  Customer safety, yes.
17      Q.      Can we agree that one of the crucial
18  facts in a establishing a proper speed policy is
19  the stopping distance of the trains?
20      A.      I, I don't remember.  I'm not an
21  engineer.  I don't know what -- I'm not in the
22  signaling department.
23      Q.      I didn't ask if you were in the
24  signaling department.  I didn't ask if you were an
25  engineer.
```

1                    **A. BATA**

2                    **MR. GENIS:  Move to strike.**

3        Q.    Can we agree that one of the crucial

4   facts in establishing a proper speed policy is the

5   stopping distance of the train?

6        **A.    It's, it's one of the aspects of**

7   **operations.**

8        Q.    Okay.  I'd like to show you what

9   we've marked today for identification as

10  Plaintiff's Exhibit Number 1, an emergency

11  stopping distance chart promulgated by the Transit

12  Authority.

13            Do you see it on the screen, sir?

14       **A.    I see the title page.**

15       Q.    Okay. And let's see.  And I'm gonna

16  show you the chart itself.

17                    **MR. GENIS:  Could we scroll**

18                    **down, please.**

19       Q.    Do you see the chart by the Transit

20  Authority on car stopping distance?

21       **A.    Yes, I do.**

22       Q.    Okay.  And this is a document

23  created, kept and maintained by the Transit

24  Authority in the regular course of its business,

25  true?

                            A. BATA

1

2      A.        Something 1970s document.

3      Q.        And did this document ever get

4      reviewed?

5                     MR. KEAVENEY:  Objection.

6      A.        I don't remember.

7      Q.        Was this document ever updated?

8      A.        I don't know.

9                     MR. KEAVENEY:  Objection.

10     A.        I do not know.

11     Q.        Okay.  We'd like to show you

12     Plaintiff's Exhibit 2, an updated emergency

13     stopping distance chart.  Okay.

14               Now, when you -- first of all, do you

15     see Plaintiff's Exhibit Number 2?

16     A.        Yeah, I see this.  Yeah.

17     Q.        Okay.  And there are signatures on

18     it, correct?

19     A.        Yes.

20     Q.        And you see there are signatures in

21     2017, true?

22     A.        (No verbal response.)

23     Q.        Look on the bottom right.

24     A.        '27 (sic), yeah.  Yes, I do.

25     Q.        And the original date on it is 1995,

```
 1                    A. BATA

 2   correct?

 3              MR. KEAVENEY:  Just note my

 4              objection.

 5        A.    I don't know -- you pointed -- where

 6   you pointing?

 7        Q.    Yes.

 8        A.    Looks like '95, yeah.

 9              MR. KEAVENEY:  What page are you

10              referring to on the exhibit?

11              MR. GENIS:  It's the one on the

12              screen right now.

13              MR. KEAVENEY:  Page what?

14              MR. GENIS:  I'm trying to see if

15              it has a Bates number on it.  I'm

16              trying to look.  Oh, I see the Bates.

17              The Bates is 20264.  It's on the left

18              corner of it.

19        Q.    Okay.  So when we're looking at

20   Plaintiff's Exhibit 2 of today's date, do you see

21   the original date for this speed policy is 1995,

22   correct?

23              MR. KEAVENEY:  Note my

24              objection.

25        A.    (No verbal response.)
```

1                          **A. BATA**

2        Q.       Yes, no?

3        **A.       I can see where it says speed policy.**

4        Q.       I'm sorry, what?  What are you

5    saying, sir?

6        **A.       It, it doesn't say speed policy.**

7    **It's, it's a --**

8        Q.       No --

9        **A.       -- car equipment.**

10       Q.       Right.

11                We're discussing the stopping

12   distance chart.  That's what Plaintiff Number 2

13   is.  Okay?

14       **A.       Yes.**

15       Q.       It's a braking distance chart,

16   correct?

17       **A.       Correct.**

18       Q.       Okay.  And this braking distance

19   chart was first -- in Plaintiff's 2, the original

20   date is 1995, true?

21                    **MR. KEAVENEY:  Note my objection**

22                **to form.**

23                    **Go ahead.**

24       **A.       Yes, I'm -- yes, that's true.**

25       Q.       Okay.  So the chart on Plaintiff's 2

```
 1                    A. BATA
 2   has been in existence since 1995, and then it was
 3   ratified again in 2017, correct?
 4        A.      That, I do not know.  I wasn't there.
 5        Q.      Okay.  So, to your knowledge, sir,
 6   when you see the -- well, first of all, you see
 7   the date on it and the signatures, so you saw it
 8   was ratified in 2017, correct?
 9                    MR. KEAVENEY:  Note my
10               objection.
11        A.      I don't know what it meant by
12   ratified.
13        Q.      Well, why -- okay.  Let's, let's --
14   we're looking -- we see it says July 12th, 1995,
15   correct?
16        A.      Right.
17        Q.      Okay.  And then we saw how it was
18   signed on 2017, correct?
19        A.      Yes.
20        Q.      Have you ever -- so this means it
21   remained the same?  The brake -- the stopping
22   distance chart remained the same from 1995 to
23   2017, correct?
24                    MR. KEAVENEY:  Objection.
25        A.      This is a car equipment chart.
```

```
 1                      A. BATA
 2       Q.       I didn't understand what you just
 3  said.
 4                 THE COURT REPORTER:  Sir, say
 5                 that again, Mr. Bata.  Louder.
 6       A.       It looks like a chart by the car
 7  equipment department.  It looks like it.
 8       Q.       Sir, that's not what that asked you.
 9                 MR. GENIS:  Move to strike.
10       Q.       This -- we're showing you Plaintiff's
11  Exhibit 2.  The stopping distance chart for
12  emergency braking for the subway trains in New
13  York City that was promulgated in 1995 and then
14  signed off again in 2017.  True?
15       A.       It -- the -- as far as the chart,
16  yes.
17       Q.       Okay.  And the Transit Authority has
18  represented in this case that this is a document
19  that they relied upon for their policy for trains
20  entering stations.
21                 Are you aware of that?
22       A.       I -- I'm not aware.  Specifically,
23  no.
24       Q.       Do you agree with that statement?
25  That the Transit Authority relied upon the
```

1                    **A. BATA**

2    **stopping distance chart for their subway trains in**

3    **promulgating a speed policy?**

4                        **MR. KEAVENEY:  Objection.**

5        **A.      I do not know.**

6        Q.       Well, did the Transit Authority rely

7    upon the emergency brake stopping distance for its

8    customer cars for trains -- to have a speed policy

9    for trains entering stations?

10                       **MR. KEAVENEY:  Note my**

11                       **objection.**

12       **A.      I, I, I do not know specifically how**

13   **they -- (inaudible) directive.  All I know is that**

14   **this is a chart by the agency, and that's what it**

15   **is.**

16       Q.       When you were on the speed policy

17   committee and were a chair, did you utilize the

18   emergency -- and you and your committee, utilized

19   the emergency brake stopping distance chart for

20   customer cars for the Transit Authority in

21   promulgating a speed policy?

22                       **THE WITNESS:  Mr. Bata, louder.**

23       **A.      I don't remember.**

24       Q.       What was the speed policy for trains

25   entering stations from the time you got to the

1                          **A. BATA**

2    **Transit Authority until the time you left?**

3         **A.        There was no specific policy, if I**

4    **recollect.**

5         Q.        Now, you told us at the last

6    deposition that the slower the train is --

7    withdrawn.

8              Okay.  You told us at your last

9    deposition the slower the train is as it enters

10   the station, the shorter the stopping distance is,

11   correct?

12        **A.        That is correct.**

13        Q.        Okay.  And these stopping distance

14   charts that you have before you today, Plaintiff's

15   Exhibit 1 and 2, these were the stopping distance

16   charts when you first got on the speed policy

17   committee, true?

18        **A.        I don't remember seeing the chart**

19   **specifically.  I don't remember seeing the chart**

20   **the speed policy committee.  I don't remember.**

21        Q.        Well, Plaintiff's Number 2, that

22   speed policy chart -- withdrawn.

23              Plaintiff's Number 2, the braking

24   distance chart, was the same one you had when you

25   were the head of the, of the speed policy

```
 1                       A. BATA
 2    committee and on it, correct?
 3        A.       It's not a speed policy chart.
 4        Q.       I understand.
 5                 It's a braking distance chart.
 6        A.       Right.
 7        Q.       Okay.  And this was the braking
 8    distance chart for when you were on the speed
 9    policy committee --
10        A.       (Inaudible.)
11        Q.       -- yes?
12        A.       I don't remember that this was the
13    chart that I -- I don't remember.  It could have
14    been.  I don't remember specifically.  It was
15    30 years ago.
16        Q.       Okay.  So the faster the train enters
17    the station, the longer the stopping distance is,
18    true?
19        A.       Generally it's true, yes.
20        Q.       Okay.  At any time while you were on
21    the Transit Authority, did the stopping distance
22    chart change?
23        A.       It might have, because each car has a
24    different braking distances.
25        Q.       So are you saying that overtime, the
```

1              **A. BATA**

2    **brakes and braking systems of the trains have**

3    **improved?**

4         **A.      Many factors.**

5                   **MR. GENIS:  Move to strike.**

6         Q.      Answer my question.

7                 Yes, they've improved, no, they have

8    not?

9         **A.      Probably they improved.  I do not**

10   **know.**

11        Q.      Okay.  And if the train -- if the

12   brakes and braking systems of the train systems

13   have improved, then there would be even a shorter

14   stopping distance, true?

15        **A.      I do not, I do not know.  I would, I**

16   **would have to ask the signal people or**

17   **(inaudible).**

18        Q.      Well, when, if ever, during your

19   tenure at the Transit Authority, did the Transit

20   Authority get better improved brakes and braking

21   systems for its train?

22        **A.      I do not know.**

23        Q.      Okay.  Can we agree that there were

24   complaints about the speed of the Transit

25   Authority's subway trains as they entered the

```
 1                     A. BATA

 2   station?

 3       A.       I don't remember it.

 4       Q.       Well, did anybody at the committee

 5   say that they should study and analyze the speed

 6   of trains as they entered the station?

 7       A.       I don't remember anybody specifically

 8   saying that.  They might have.  I don't remember.

 9       Q.       Well, after the Transit Authority

10   received complaints about the speed of the trains

11   as they entered the station, did anyone from the

12   Transit Authority study and analyze this issue?

13                MR. KEAVENEY:  Objection.

14       A.       I don't remember receiving complaints

15   the trains coming into stations too fast.  I don't

16   remember getting a complaint.

17       Q.       Okay.  As the chair of the speed

18   policy committee, did you ever look to see if

19   there were ever any complaints about the speed of

20   trains entering the station?

21       A.       I don't remember it.

22       Q.       Well, you were still working on

23   safety issues for the trains until the time you

24   left, in 2016, true?

25       A.       No.
```

```
 1                         A. BATA

 2        Q.        Okay.

 3        A.        I'm not a safety engineer.

 4        Q.        I didn't say you were a safety

 5   engineer.

 6                       MR. GENIS:  Move to strike as

 7                  nonresponsive.

 8        Q.        Sir, we already went through some of

 9   your e-mails about the standards for safety

10   involving platform edge doors at the last

11   deposition.

12                  So are you telling us now that, from

13   the time -- 19 -- from after 1999 until the time

14   you left the Transit, you were not concerned with

15   safety of customers?

16        A.        All my career I was concerned about

17   safety of the customers.

18        Q.        Okay.  And you told us the Transit

19   Authority was supposed to be concerned with safety

20   of customers, true?

21        A.        Absolutely.

22        Q.        So if complaints are made about the

23   entry speed of trains entering stations, that's

24   something that the Transit Authority was supposed

25   to review, study, and analyze, true?
```

```
 1                      A. BATA

 2                  MR. KEAVENEY:  Objection.

 3      A.       Probably true.

 4      Q.       Okay.  And were you involved in any

 5  part of that?

 6                  MR. KEAVENEY:  Objection.

 7      A.       Not specifically.

 8      Q.       Okay.  Well, I'd like to show you

 9  what has been marked for identification as

10  Plaintiff's Exhibit Number 3.  Please take a look

11  at it.

12      A.       (Complying.)

13      Q.       Bates, looks like -- it's hard for me

14  to read, 419326 is where it starts.  It's a letter

15  from a Mark Crane.

16               Do you see that, sir?

17      A.       I see it.

18      Q.       And this is dated October 28, 2008,

19  correct?

20      A.       Correct.

21      Q.       And it's addressed to the director,

22  Office of Transit Safety and Security in

23  Washington DC, correct?

24      A.       Yes.

25      Q.       And it's -- he addresses a prior
```

1                    **A. BATA**

2      **letter of September 16, 2008, correct?**

3          **A.        Looks like it, yes.**

4          Q.        And do you see there's -- the letter

5      is date -- is entitled Dead Man's Curve And The

6      Killing of Marvin Franklin?

7          **A.        Yes.**

8          Q.        Okay.  And it indicates, "on

9      April 29, 2007, a track worker, Marvin Franklin,

10     was killed by a subway train that was moving

11     within the posted speed limit.  Due to the speed

12     the train was traveling, the train operator did

13     not and could not see Mr. Franklin in time to keep

14     from hitting him and a co-worker.  Even though

15     they were both wearing reflective safety vests.

16     And occupying the track before the train

17     appeared."

18                    Do you see that?

19                    **THE COURT REPORTER:  Mr. Bata,**

20                    **louder.**

21         **A.        Yes, I do see it.**

22                    **THE COURT REPORTER:  Thank you.**

23         Q.        Do you see where it says, "subway

24     trains weigh 400 tons, and so they take a long

25     time to stop once the brakes are applied"?

```
 1                      A. BATA
 2        A.      Yes.
 3        Q.      Okay.  Do you agree with that
 4   statement?
 5        A.      It -- I guess, yes.
 6        Q.      Okay.  Do you see where it talks
 7   about how the subway trains do -- did not have
 8   windshield washing features?
 9        A.      Yeah, I see it.  Yeah.  Mm-hmm.
10        Q.      And do you agree with that statement?
11        A.      I don't know specifically if they
12   have windshield washers or not.  Which was have,
13   which do not.
14        Q.      Okay.
15        A.      I do not know.
16        Q.      At any time through the time you left
17   the Transit Authority, did its trains have
18   windshield wipers or washing features?
19        A.      Do not know.
20        Q.      Okay.  Can we agree that windshields
21   get dirty in the subway system?
22        A.      Correct.
23        Q.      And --
24        A.      Yes.
25        Q.      -- if the windshields are dirty, it
```

```
 1                      A. BATA
 2   makes it even more difficult for the operator to
 3   see if there's someone on the track in front of
 4   the train, true?
 5        A.      Yes.
 6                MR. GENIS:  Let's scroll down,
 7           please.
 8                MR. ROTH:  (Complying.)
 9                MR. GENIS:  Keep going.
10                MR. ROTH:  (Complying.)
11                MR. GENIS:  Stop, stop, stop.
12           Back up one second.
13                THE ROTH:  (Complying.)
14        Q.      Do you see where it talks about four
15   people are killed by being struck on New York City
16   subway trains each month?
17        A.      I do see that.  Yeah, okay, I see it.
18        Q.      Do you agree or disagree with that?
19        A.      I do not know the exact statistics.
20   Um, I, I cannot -- I, I do not know the exact
21   specific statistics.  It's probably correct.
22        Q.      Okay.  It then addresses the topic of
23   alleged suicides, true?
24        A.      Yes.
25        Q.      What is the basis for Transit
```

```
 1                    A. BATA
 2   Authority deciding that any particular incident
 3   was a suicide?
 4                    MR. KEAVENEY:  Note my
 5                    objection.
 6        A.      I -- I'm not in the -- I -- that's
 7   beyond me how to determine that.  It's an
 8   investigation.
 9        Q.      Did the -- when you were on the speed
10   committee, did it know that four people a month
11   were being killed by subway trains?
12        A.      Not specifically that number.  We --
13   we're aware of some people were killed.  And by
14   suicide and others, yes.
15        Q.      Was the Transit Authority speed
16   policy committee aware of the number of people hit
17   by trains?  Or not just killed, but hit and
18   injured by trains?
19        A.      They keep it -- they keep records.
20   Yes.
21        Q.      Okay.
22                    MR. GENIS:  Let's scroll down.
23                    MR. ROTH:  (Complying.)
24                    MR. GENIS:  Let's go here.
25                    THE ROTH:  (Complying.)
```

```
 1                    A. BATA

 2                    MR. GENIS:  Stop.

 3                    THE ROTH:  (Complying.)

 4        Q.     There's a boldfaced portion where it

 5   says, um, "in a survey of 25 subway killings,

 6   48 percent of the killing occurred on areas of the

 7   track where the train operator's view of the road

 8   is limited by a curve."  True?

 9        A.     That's what it says.

10        Q.     Do you agree with that?

11        A.     I don't know the specific statistics.

12   Obviously when a train is on a curve, there's less

13   visibility.

14        Q.     Okay.

15                    MR. GENIS:  Can you scroll down,

16             please.

17                    MR. ROTH:  (Complying.)

18                    MR. GENIS:  Keep going.

19                    MR. ROTH:  (Complying.)

20                    MR. GENIS:  Yeah -- no, we

21             could -- keep going.

22                    MR. ROTH:  (Complying.)

23                    MR. GENIS:  You could keep

24             going.

25                    MR. ROTH:  (Complying.)
```

```
 1                    A. BATA
 2                    MR. GENIS:  I want to see if
 3              there is anything else here.  Keep
 4              going, please.
 5                    MR. ROTH:  (Complying.)
 6                    MR. GENIS:  Keep going -- I'm
 7              sorry.
 8         Q.       Now, when there's an emergency --
 9    okay.  That's it.  Let's go to the next thing.
10    Okay.
11              Okay.  I am now going to show -- now,
12    did the speed policy committee ever look at this
13    Crane complaint?  This letter?
14         A.       (No verbal response.)
15         Q.       Yes?
16         A.       I don't, I don't remember seeing this
17    letter ever.  I don't remember it, no.
18         Q.       Should have this letter been
19    considered by the speed policy committee?
20                    MR. KEAVENEY:  Objection.
21         A.       It -- I, I do not know.
22         Q.       Should the letter have been
23    considered by the Transit Authority?
24                    MR. KEAVENEY:  Objection.
25         A.       I'm sure they read it.
```

```
 1                    A. BATA

 2       Q.       Okay.

 3                    MR. GENIS:  Let's go to the next

 4                one, which we marked for

 5                identification as Plaintiff's Exhibit

 6                Number 4.

 7                    MR. ROTH:  (Complying.)

 8                    MR. GENIS:  Okay.  And let's

 9                just get the Bates number on there

10                for the record, please.

11                    MR. ROTH:  (Complying.)

12                    MR. GENIS:  Just scroll back for

13                a second.

14                    MR. ROTH:  (Complying.)

15                    MR. GENIS:  Okay.  Where did it

16                go?  I can't see the Bates number,

17                Dave.

18                    MR. ROTH:  (Complying.)

19                    MR. GENIS:  Okay.  It is -- just

20                make it bigger, please.

21                    MR. ROTH:  (Complying.)

22                    MR. GENIS:  All right.  13594.

23                    Okay.  Let's just go to the top

24                now, please.

25                    MR. ROTH:  (Complying.)
```

```
1                         A. BATA
2       Q.      Okay.  Do you see that this is a
3   letter it from the Transit Workers Union to Thomas
4   Prendergast, president of the Transit Authority,
5   on January 9, 2013?
6       A.      Yes, I see it.
7       Q.      Now, this is from the president of
8   the union, correct?
9       A.      I didn't see the signature, but it --
10      Q.      Let's scroll -- okay.  Let's scroll
11  down to the bottom so you can see the signature.
12              Do you see it's John Samuelsen,
13  president --
14      A.      Yeah.
15      Q.      -- of the union?
16      A.      Yes.
17      Q.      Okay.
18      A.      Yes, I see it.  Yes.
19      Q.      Okay.  And were you aware of this
20  complaint by the union?
21      A.      No.
22      Q.      Okay.  Now, the president of the
23  union, that's, that's a significant person and a
24  significant position, true?
25                      MR. KEAVENEY:  Objection.
```

```
 1                      A. BATA

 2        A.      Yes.

 3        Q.      And let's read this highlighted first

 4   paragraph on this letter.

 5                 MR. GENIS:  Could you just make

 6                 this bigger, please.

 7                 MR. ROTH:  (Complying.)

 8        Q.      "The TA's effort to reduce 12-9s by

 9   posting signs encouraging riders to stand back

10   from the edge of the platform has not had a

11   measurable effect on subway deaths."

12                 Did I read that accurately?

13        A.      Yes, you did.

14        Q.      Okay.  Do you agree with that

15   statement?

16        A.      That's his statement.

17        Q.      I understand, but I'm asking if you

18   agree with it.

19        A.      I'm not sure.

20        Q.      Okay.  Would you have any reason to

21   disbelieve it?

22        A.      That's his opinion.

23        Q.      I understand.  That's not my

24   question.

25                 My question is:  Do you have any
```

1          A. BATA

2   reason to disagree with this factual assertion by

3   Mr. Samuelsen?

4               MR. KEAVENEY:  Objection.

5      A.     It, it -- when -- it's, it's got to

6   be factual because if not -- it says measurable,

7   so I cannot answer the question to you.  I cannot

8   answer the question.

9      Q.     Okay.  The next sentence, "the two

10  widely covered pushing incidents and the New

11  Year's Day suicide has focused intense public

12  scrutiny on an issue that it has been all -- an

13  all too common occurrence in our system."  True?

14     A.     That is true.

15     Q.     And the proof of whether or not the

16  signs posted by the Transit Authority have had a

17  measurable effect on subway deaths and serious

18  injuries would be in the records of the Transit

19  Authority, correct?

20              MR. KEAVENEY:  Objection.

21     A.     I can't answer the question because I

22  don't know how you measure it.

23     Q.     Well, can we agree that the best way

24  to measure it is you see the number of 12-9

25  incidents, in other words, people being injured or

```
 1                    A. BATA

 2    killed by contact with the train, before the

 3    signage was placed and comparing it to after the

 4    signage was placed?  True?

 5                    MR. KEAVENEY:  Objection.

 6         A.     No, because you could have had more

 7    crowding and more people.  So it's not, it's not

 8    science.  It's not scientific.

 9         Q.     Stop.  Withdrawn.

10                I am sorry.

11                    MR. GENIS:  Move to strike as

12                not responsive.

13         Q.     Sir, the Transit Authority keeps

14    records and statistics, true?

15         A.     Yes, it does.

16         Q.     They keep records and statistics of

17    12-9 incidents, where people are injured or killed

18    by being struck or run over by a train, true?

19         A.     Correct.

20         Q.     And certainly, while data may be

21    analyzed, the first thing to look at would be the

22    factual data of how many people were hit and

23    either injured or killed before the signage and

24    how many people were hit or killed after the

25    signage.  True?
```

```
 1                        A. BATA
 2        A.       (No verbal response.)
 3        Q.       Yes, no?
 4        A.       No.
 5        Q.       I'm sorry, no?
 6        A.       No.   There are many factors.
 7        Q.       Okay.  So you're telling us it is
 8   irrelevant and of no significance whatsoever at
 9   all if the rates of 12-9 incidents before signage
10   remained the same after the signage?  True?
11   That's what you're telling us?
12        A.       Not true at all.
13        Q.       Okay.  So let's be clear about what
14   you're saying under oath.
15                 You're saying it is irrelevant to
16   look at the numbers of people being hit or run
17   over by trains before signage is placed and after
18   signage is placed?  Yes?
19                 MR. KEAVENEY:  Objection.
20        A.       I did not say that.
21        Q.       Okay.  So when we're talking about
22   objective measurements, objective measurements
23   mean numbers, correct?
24        A.       Correct.
25        Q.       Okay.  And -- so what is the best
```

A. BATA

1

2    way, in your opinion, sir, to see whether or not

3    the signage had any measurable effect on injuries

4    or death caused by 12-9 incidents?

5        A.       You have to analyze all the factors.

6        Q.       Okay.  And what are those factors,

7    sir?

8        A.       More people on the train, more people

9    on platform, wet weather, conditions of the

10   trains, track conditions, water on the track,

11   announcements, announcements on the train,

12   behavioral passengers.  Many, many, many factors.

13       Q.       Okay.  So if we're looking at --

14   okay.  And a proper analysis would look at a long

15   period of time before and a long period of time

16   after, correct?

17       A.       Sure.

18       Q.       Okay.  And weather, if you have a

19   long period of time before -- well, you have --

20   when you say water, is that some unusual

21   occurrence or is that Transit Authority generally

22   year to year knows how much water is on, on the

23   tracks or on the platforms?

24       A.       Changing.  All the time.

25       Q.       Okay.  So you're saying there's a

```
 1                      A. BATA
 2   huge difference and disparity from year to year?
 3        A.        Many factors.  It changes.
 4        Q.        Sir, answer my question.
 5        A.        Many factors.  Can't answer your
 6   question.
 7        Q.        I didn't ask you that.  Not my
 8   question.
 9                      MR. GENIS:  Move to strike
10                  again.
11        Q.        So let's see.  You teach students,
12   correct?  Or you taught students?
13        A.        Yes.
14        Q.        Did you ever teach them that there
15   should be proper safety study and analysis in
16   transportation planning?
17        A.        I never taught transportation safety,
18   I --
19                      THE COURT REPORTER:  Mr. Bata,
20                  louder.
21        A.        I never taught transportation safety,
22   but, of course, I tell the students that safety is
23   of paramount importance to any Transit agency,
24   yes.
25        Q.        Okay.  And --
```

1                          A. BATA

2          A.         Of course.

3          Q.         Okay.  So when you would teach your

4    students, if one of them asked you what's the best

5    way to see whether or not, let's say, placing

6    signage had a measurable effect on reducing 12-9

7    incidents from occurring, would you tell them that

8    they should look at the number of 12-9 incidents

9    that occurred before and after or would you say,

10   no, ignore that, that's irrelevant?

11         A.         I would not say that.

12         Q.         Okay.  So, so you would say it would

13   be a good and accepted practice to review the

14   number of 12-9s before and after the signage is in

15   place?  True?

16         A.         I would say look at all the factors.

17         Q.         And would that include the number of

18   12-9 incidents that take place before and after

19   signage is placed?

20         A.         It's one of the factors.

21         Q.         Okay.  And what is the most important

22   factor to look at in seeing whether or not signage

23   had a measurable effect on 12-9s?  Would it be the

24   number of 12-9s that occurred before and after?

25         A.         Um, I guess, yes.

1                    **A. BATA**

2        Q.        Okay.  What, if any, response did the

3    Transit Authority have to this letter of complaint

4    from the president of the Transit union about

5    trying to reduce it 12-9?

6        **A.        I --**

7        Q.        -- incidents?

8        **A.        I do not know.  I never saw this**

9    **letter.  I do not know.**

10       Q.        Okay.  All right.  So were there ever

11   any responses by the Transit Authority to this

12   complaint by the union?

13       **A.        I answered.  I said I do not know.**

14       Q.        It states, "following are a list of

15   common sense, cost effective proposals that will

16   quickly reduce the number of 12-9s and advance the

17   discussion on how to eradicate these incidents

18   from our system."  Did I, did I read that

19   accurately?

20       **A.        Yes.**

21       Q.        "Effective immediately, encourage

22   train operators to operate with caution when

23   entering stations."  True?

24       **A.        That's what he said.**

25       Q.        "Post speed restrictions at the

1                     A. BATA

2    entrance of every station reducing the allowable

3    speed to ten miles per hour."  True?

4        A.      That's what -- it's true that that's

5    what he said.

6        Q.      Okay.  "Place a customer-activated

7    safety warning light at the entrance to stations

8    to be used if someone falls onto the tracks."

9    True?

10       A.      I'm reading it.  Yes.

11       Q.      Okay.

12               MR. GENIS:  Is there anything

13               else on this, Dave?  I can't see the

14               rest of the page.

15               MR. ROTH:  (Complying.)

16               MR. GENIS:  Okay.  Yes.

17       Q.      "Place power cutoff switches in all

18    station booths."

19       A.      I, I see, I see it, yes.

20       Q.      "Create a customer information

21    campaign to let Transit customers know what to do

22    if someone is on the tracks and how to signal a

23    train operator to come to a stop."

24       A.      Yeah, I, I see what it said.  It's

25    written over there.  Yes.

1                           **A. BATA**

2       Q.      All right.  And you see all the rest

3   of it, correct?

4       **A.      Yes, I do.**

5       Q.      Okay.  Do you agree with all of these

6   recommendations from the president of the Transit

7   Authority?  I'm sorry.

8       **A.      (Inaudible.)**

9       Q.      Withdrawn.  Withdrawn.

10              Do you agree with the recommendations

11  from the president of the Transit union?

12      **A.      It's an -- it's their opinion.  It --**

13  **I don't necessarily agree with everything.  I, I**

14  **do not know.**

15      Q.      Okay.

16      **A.      I, I --**

17      Q.      So let's take it point by point then.

18              Do you agree with speed restrictions

19  at the entrance of every station?  Do you agree

20  with that?  That that would reduce 12-9s from

21  occurring?

22      **A.      I don't agree with it, probably.**

23      Q.      Okay.  Well, you told us earlier that

24  if you reduced the speed upon entering the

25  station, the train stops in less distance,

1                        **A. BATA**

2    **correct?**

3         A.        Yes.

4         Q.        Okay.  And if they can stop in less

5    distance, that can reduce the number of 12-9s,

6    because they can stop before hitting or running

7    over the customer, true?

8                        **MR. KEAVENEY:  Objection.**

9         A.        Yeah.

10        Q.        Okay.  Are you familiar with the

11   Public Transportation Safety Board?

12        A.        Yes.

13        Q.        And that's the oversight agency of

14   the Transit Authority?  Transit answers to them,

15   correct?

16                       **MR. KEAVENEY:  Objection.**

17        **A.        I don't know.**

18        Q.        Okay.  So let's break that up.

19                  Is the PTSB the oversight agency of

20   the Transit Authority?

21        **A.        No, I don't know.**

22        Q.        Okay.  I'm showing you now what has

23   been marked for identification as Plaintiff's

24   Exhibit 5.  It's an e-mail exchange, between a

25   board member, Berke, discussing speeds and some

```
 1                    A. BATA

 2   other items in 2010.  I'm going to read from the

 3   bottom of it.

 4                    MR. GENIS:  Let's just get the

 5               Bates stamp on that last page -- on

 6               this bottom.

 7                    MR. ROTH:  (Complying.)

 8   Q.        It is 96954.  I'm reading a portion

 9   that is boldfaced and italicized.

10               "Mr. Berke stated that he would like

11   the board to consider making a recommendation that

12   addresses this topic.  Mr. Fitzgerald that in lieu

13   of a recommendation, that the New York City

14   Transit review their current practice to see if

15   there's any practical application for these types

16   of technologies, advanced warning technologies or

17   individual detection technologies out there and

18   report back to the board.

19               Mr. Berke added that he would like to

20   hear from the NYCT on speed control coming into

21   the platform areas and exiting, if that would also

22   be something that could be implemented to that

23   would be able to give the motorman enough time to

24   stop.

25               Mr. Berke and Mr. Fitzgerald stated
```

```
 1                    A. BATA
 2   that they thought we should have something in
 3   writing from the MTA about what the policy is.
 4              Mr. Baker summarized the discussion
 5   by directing the staff to follow up and have the
 6   New York City Transit respond to the board's
 7   request."
 8              Did you see that?
 9        A.    Yeah.  Yes, I do.
10        Q.    Okay.  And do you agree with that?
11              MR. KEAVENEY:  Just note my
12              objection.
13        A.    It's, it's, it's a memo.  I don't
14   disagree with it or agree.  That's what it says.
15        Q.    Okay.  I'm now going to show you what
16   we've marked for identification as Plaintiff's
17   Exhibit 6.
18              THE COURT REPORTER:  Robert,
19              before we do that, could we take a
20              short break, please, for the
21              reporter?
22              MR. GENIS:  Sure.
23              THE COURT REPORTER:  I really
24              appreciate it.
25              MR. GENIS:  Not a problem.
```

```
 1                    A. BATA
 2               THE COURT REPORTER:  So I will
 3          mark it -- I will note the time.
 4          Don't worry.
 5               MR. GENIS:  11:22.  You got it.
 6               THE COURT REPORTER:  Thank you,
 7          everyone.  Five-minute break.  Thank
 8          you, everyone.
 9               MR. GENIS:  Sure.
10               (Whereupon, a short recess was
11          taken at 11:22 p.m.)
12               (Whereupon, back on the record
13          at 11:28 p.m.)
14               MR. GENIS:  It's 11:28.
15     Q.        Okay.  So after the Transit Authority
16  received the letter of complaint from the
17  president of the Transit union for safety for
18  12-9s, did the Transit Authority do any analysis
19  or study to see if there was any measurable
20  difference in the number or rate of 12-9 incidents
21  from before and after the Transit Authority
22  started signage?
23               MR. KEAVENEY:  Objection.
24     A.        I, I do not know.
25     Q.        Okay.  All right.  We're now going to
```

```
 1                    A. BATA
 2   show you Plaintiff's Exhibit Number 6.
 3                    MR. GENIS:  Dave, please put it
 4               up on the screen.
 5                    MR. ROTH:  (Complying.)
 6      Q.       Okay.  And the Bates stamp is --
 7   okay.
 8                    MR. GENIS:  Could you just make
 9               it a little bigger so I could see the
10               bottom, the Bates number.
11                    MR. ROTH:  (Complying.)
12      Q.       Okay.  We're starting on Bates
13   391297.  Okay.
14                    MR. GENIS:  And you could now go
15               to top.
16                    MR. ROTH:  (Complying.)
17      Q.       And I'm showing you a press release
18   dated February 8, 2011, from New York State
19   Assemblyman Marcos Crespo introducing legislation
20   to increase safety throughout MTA stations.  And
21   it states that they will require all MTA trains to
22   come to a complete stop prior to entering each
23   station and then proceeding into each station at a
24   maximum of five miles per hour.  Do you see that?
25      A.       (Inaudible.)
```

1                          **A. BATA**

2        Q.        Yes, no?

3        **A.        Yes, I do.**

4        Q.        Okay.  Now, can we agree that the

5    concept or the purpose of such a proposed bill was

6    to try to reduce the number of people hit by

7    trains?  Can we agree on that?

8                          **MR. KEAVENEY:  Objection.**

9        **A.        I'm not sure.**

10       Q.        Okay.  Well, when -- let's look at

11   the next paragraph then.

12                   According to Assemblyman Crespo,

13   "over the past three years alone more than 110

14   New Yorkers have been killed by and 155 have been

15   injured by moving New York City Transit trains."

16   And then it talks about other things.

17                   But do you see that that's what he's

18   talking about?  Do you --

19       **A.        Yes.**

20       Q.        -- see that?

21       **A.        Yes.**

22       Q.        Okay.  All right.  Now, after

23   Assemblyman Crespo had this proposed bill to make

24   trains stop before entering stations and then only

25   proceed at a max of five miles per hour, did the

```
 1                    A. BATA
 2   Transit Authority then do any kind of study or
 3   analysis to see about the effect of train speed
 4   entering stations upon the number of 12-9
 5   incidents that occurred?  People getting hit or
 6   killed -- injured or killed by trains?
 7        A.      I'm not aware of the letter --
 8                THE COURT REPORTER:  Mr. Bata,
 9                say that again.
10        A.      I'm not aware of this letter or any
11   response to it.  I don't -- I do not know.
12        Q.      Okay.
13        A.      I'm not involved.
14        Q.      So you're telling us, when you worked
15   at the Transit Authority in 2011 and were involved
16   with safety, you never became aware of a proposed
17   bill to increase safety at MTA stations by
18   requiring the trains to stop and then have a
19   maximum entry speed of five miles per hour?
20        A.      I never --
21                MR. KEAVENEY:  Objection.
22        A.      I was not aware of this, no.
23        Q.      Okay.  Now, these are just some of
24   the complaints and samples of them about how the
25   entry speed of trains into stations is excessive
```

1                    **A. BATA**
2      **and if the speed was reduced trains could stop in**
3      **less distance, so more trains could stop before**
4      **running over or killing or maiming people.  True?**
5                    **MR. KEAVENEY:  Objection.**
6          **A.      I, I don't know what you mean.  There**
7      **are many, there are many, many, many letters like**
8      **this.**
9          Q.      Okay.  And the intent or purpose for
10     these different, many, many letters, is to get the
11     trains to go slower entering the station to reduce
12     the number of people killed or maimed by contact
13     with the trains?  Correct?
14         **A.      Some letters.  This particular**
15     **letter's only aim has the agency spend less money.**
16         Q.      Okay.
17                    **MR. GENIS:  Move to strike as**
18                    **not responsive.**
19         Q.      That's not what I asked you.
20                 I said you -- we've gone through some
21     of these complaints, right, the Crane letter, we
22     saw notes from the PTSB with Berke, we saw the
23     Crespo bill, we saw the letter from the president
24     of the union, and they're all in essence saying,
25     if you have a slower entry speed, the trains could

```
 1                    A. BATA
 2   stop in less distance, and reduce the number of
 3   people getting hit and run over by trains.  True?
 4        A.       That's what the letter said.
 5        Q.       Okay.  So the goal is to reduce the
 6   number of 12-9s, correct?
 7                    MR. KEAVENEY:  Objection.
 8        A.       That's what, that's what the letter
 9   said.
10        Q.       Okay.
11        A.       Yes.
12        Q.       Now, when people are hit by trains,
13   Transit investigates the incidents, correct?
14        A.       Yes.  They do.
15        Q.       They take pictures, they make
16   measurements so they know exactly where, by what
17   marker number the contact took place, true?
18        A.       Correct.
19        Q.       And the investigation shows how far
20   into the station, what distance the train traveled
21   in the station to the point of contact with the
22   person, true?
23        A.       They make a complete investigation,
24   yes.
25        Q.       Okay.  So has the Transit Authority
```

```
1                         A. BATA

2       ever done a study to see where 12-9s occur?  In

3       other words, at -- when it first enters the train

4       station, in the middle of the station, or at the

5       end of the station?

6                         MR. KEAVENEY:  Objection.

7            A.        They might have.  I'm not aware of a

8       specific study.  I do not know.

9            Q.        Okay.  Well, has the Transit

10      Authority ever done a study to see if there are

11      certain locations or portions of the station that

12      more 12-9s occur in about?

13           A.        I do not know.

14           Q.        Has the Transit Authority -- and

15      just, last question on this exact topic, so, for

16      example.  Do more 12-9s take place at the

17      beginning of the platform, the middle, or the end,

18      where the train has the greatest distance to stop?

19           A.        I don't know.

20           Q.        Okay.  Has the Transit Authority ever

21      done a study to see the effect of different entry

22      speed limits of trains entering stations on the

23      number of 12-9s that occur?

24           A.        I do not know.

25           Q.        Okay.  Would that be something -- the
```

```
 1                    A. BATA
 2   number -- let's back up.
 3                    Would the location of where 12-9s
 4   occur be something that should come to the
 5   attention of the speed policy committee?
 6        A.         I cannot comment on that.  I do not
 7   know.  I'm not involved with it.
 8        Q.         Well, when you were on -- when you
 9   were the chair of the speed policy committee, is
10   that the type of information that you would have
11   wanted to see?
12        A.         It could be a subject to interest.
13        Q.         Okay.  And similarly, when you were
14   chair of the speed policy committee, would you
15   have been interested to see the data or study
16   about the number of 12-9s that occur with the
17   lower speed limit upon entry of the station and a
18   higher speed limit for entry of the station?
19        A.         I, I don't know.
20        Q.         Okay.  Well, if there's a study or an
21   analysis to see what, if any, effect entry speed
22   of a train into the station has on the incident
23   rate or number of 12-9s, that would be a
24   significant fact, true?
25        A.         Yeah, I guess, I think so.
```

```
 1                        A. BATA

 2        Q.      Okay.  That would be incredibly

 3   important, true?

 4        A.      It's a factor.

 5        Q.      Okay.  And did anyone from the

 6   Transit ever look at that?

 7                        MR. KEAVENEY:  Objection.

 8        A.      I, I do not know.  I don't --

 9        Q.      Did you ever look at it?

10        A.      I don't remember.

11        Q.      Did the speed policy committee ever

12   look at it?

13                        MR. KEAVENEY:  Objection.

14        A.      I don't remember specifically looking

15   at that specifically.  I don't remember.

16        Q.      Okay.  Is it the premise or policy of

17   the Transit Authority that slowing down the trains

18   entering the stations would cause more safety

19   hazards?

20        A.      It has its own safety hazards.

21        Q.      Okay.  Well, is it greater safety

22   hazards, more safety hazards, less, or not?

23        A.      I cannot answer the question.

24        Q.      Okay.  So, in other words, is it the

25   position of the Transit Authority, to your
```

```
 1                        A. BATA
 2    understanding, that if upon entry into the
 3    stations, if the trains are slower upon entry,
 4    that causes more safety hazards than if they do
 5    not slow down entering the station?
 6         A.     I do --
 7                    MR. KEAVENEY:  Objection.
 8         A.     I do not know.  I just know that it
 9    had implications.
10         Q.     Okay.  Well, let's, let's look at
11    Plaintiff's Exhibit Number 7.  Which are two
12    e-mails.  Okay?
13                    MR. GENIS:  And let's start at
14                    the bottom.  And I just want to get
15                    the Bates number first.
16                    MR. ROTH:  (Complying.)
17         Q.     It is 554446.  Is the bottom of the
18    page.  And let's see.  All righty.  Let's look at
19    the bottom of it first.  And you see there's an
20    e-mail from Tom Prendergast, the president of the
21    Transit Authority, correct?
22         A.     Yes.
23                    MR. GENIS:  Could you just make
24                    this a little bigger, please.
25                    MR. ROTH:  (Complying.)
```

```
 1                    A. BATA

 2                MR. GENIS:  Okay.

 3       Q.       And do you see where it states, "it

 4  is important for us to articulate a position as to

 5  why slowing trains down actually creates more

 6  safety hazards than by leaving them as is."  Do

 7  you see that?

 8       A.       Yes.

 9       Q.       Okay.  So is, so is that the position

10  of the Transit Authority?

11       A.       That was Mr. Prendergast's view.

12       Q.       Okay.  And he was the president,

13  correct?

14       A.       That's correct.

15                MR. KEAVENEY:  Objection.

16       Q.       Do you agree with that?

17       A.       Generally I do.

18       Q.       Okay.  And so what are the hazards

19  that Prendergast was referring to?

20                MR. KEAVENEY:  Objection.

21       A.       There are many.

22       Q.       Okay, what?  What specifically are

23  the safety hazards, and I'm again discussing 12-9

24  incidents, people getting run over or hit by

25  trains, what are the safety hazards created by
```

```
 1                        A. BATA
 2   slowing the trains down as they enter the station?
 3       A.        How many you want to hear?
 4       Q.        I'm sorry?  I didn't hear you.
 5       A.        How many you want to hear?
 6       Q.        I want to know what those safety
 7   hazards are that are created by -- and let's back
 8   up again.  I want a coherent question.
 9                 What are the specific safety hazards
10   with respect to 12-9 incidents, people being hit
11   or run over by trains, that are created by slowing
12   down trains as they enter the station?
13                        MR. KEAVENEY:  Note my
14                        objection.
15       A.        A key example is enraged customers on
16   the trains.
17       Q.        Okay.  So you're saying somehow, um,
18   if the train enters at a slower speed, we're not
19   talking about the travel time between the
20   stations, but just the entry speed, that somehow
21   that will cause all the customers to be enraged?
22   Is that what you're telling us?
23       A.        I didn't say all.
24       Q.        Okay.  So, so you're saying that more
25   12-9 incidents will occur if upon entry into the
```

1              A. BATA

2    station the trains go slower, is that what you're

3    telling us?

4                    MR. KEAVENEY:  Objection.

5         A.        I'm not saying that.  I did not say

6    that.

7         Q.        Okay.  So let's back up.

8                    I'm asking you about safety hazards

9    specifically about 12-9 incidents, people being

10   hit or run over by trains and killed or injured.

11   So what -- how do more 12-9s occur if you slow

12   down the trains on entry into the station?

13                   MR. KEAVENEY:  Objection.

14        A.        The slower the trains are, the more

15   crowder the platforms are, and the more, less

16   safe, safe the platforms are with crowding, so

17   it's likely that more people fall into a track.

18        Q.        Okay.  When you say it's likely that

19   more people fall into the track, is this based on

20   any data or fact?

21        A.        It's, it's an opinion.

22        Q.        Okay.  I understand it's an opinion,

23   but is it an opinion based on a study, on a

24   survey, on any data or facts?

25        A.        It's, it's an opinion.

```
 1                        A. BATA
 2       Q.      I understand, but -- and -- can we
 3  agree that an opinion that is not based on fact,
 4  on data, on study and survey is less than
 5  reliable?
 6                    MR. KEAVENEY:  Objection.
 7       A.      Crowds cause --
 8       Q.      Answer my question, sir.
 9                    MR. GENIS:  Move to strike.
10       Q.      Answer my question.
11       A.      Crowds cause --
12       Q.      Not my question.  Answer my question,
13  please.
14       A.      I would probably say yes.
15       Q.      Okay.  Okay.  Do we agree that the
16  Transit Authority has the ability to test, study,
17  survey to see whether or not your opinion is valid
18  or not?  True?
19       A.      It probably could.  I do not know.
20       Q.      Okay.  So the Transit Authority has
21  the ability to test whether or not crowds cause
22  more 12-9 incidents, true?
23                    MR. KEAVENEY:  Objection.
24       A.      They can do a study.
25       Q.      Okay.  The Transit Authority keeps
```

1                      A. BATA

2    records of delays for trains, true?

3        A.        Yes.

4        Q.        And that's whether there's track

5    work, or other incidents, or things of that

6    nature, correct?

7        A.        Correct.

8        Q.        Okay.  So, so when there are delays

9    in the system, whether it be track work or for

10   whatever reason, is there -- are there any data to

11   show that, when there are delays in the system,

12   that causes more people to get injured?

13       A.        I'm, I'm sure there are some studies

14   about crowds being unsafe.

15       Q.        Well, let's be crystal clear.

16                 Where there are delays in the system,

17   you're telling us that causes crowding on the

18   platform, true?

19       A.        That's true.

20       Q.        And there are all kinds of delays in

21   the system for a variety of reasons, true?

22       A.        True.

23       Q.        And you're saying that causes

24   crowding, correct?

25       A.        Yes.

                            **A. BATA**

1

2      Q.      Okay.  So can you tell us a single

3   study, survey or analysis by the Transit Authority

4   that says crowding causes more 12-9s to occur?

5      **A.      I, I do not know at this moment.  No,**

6   **I don't know.**

7      Q.      Okay.  Well, the Transit Authority

8   would know when there is a 12-9 incident, because

9   they investigate it, whether or not there was

10  crowding on that platform where the 12-9 occurred,

11  true?

12     **A.      I don't know.**

13     Q.      Well, you told us that you do a

14  thorough investigation, correct?

15     **A.      Yes.**

16     Q.      Okay.

17     **A.      I don't, I don't, I don't know all**

18  **the aspect they do.  They do a thorough**

19  **investigation.  They do a very good job.**

20     Q.      Okay.  So when they do this very good

21  job of doing this thorough investigation of 12-9s,

22  they would know whether or not it's caused by

23  crowding or whether or not there was crowding at

24  the station, correct?

25                  **MR. KEAVENEY:  Objection.**

```
 1                    A. BATA

 2      A.        Crowing, crowding is one of the

 3  factors.

 4      Q.        Okay.  So can you please tell me a

 5  single study, survey or analysis that indicated

 6  crowding of trains causes 12-9s?  Crowding of

 7  platforms, I should say.

 8      A.        Not today, right now.

 9      Q.        Okay.  And, sir, how about

10  internationally?  Have there been any studies,

11  surveys, analysis that said crowding on platforms

12  causes more 12-9s?

13      A.        I'm sure there are many.

14      Q.        Well, again, you're -- you were the

15  president of UITP, correct?

16      A.        No.  Not correct.

17      Q.        Okay.  You were in UITP, correct?

18      A.        The agency was.

19      Q.        Okay.  Well, if there was any studies

20  internationally that stated crowding of a platform

21  causes 12-9s, that's something you would know

22  about, correct?

23                    MR. KEAVENEY:  Objection.

24      A.        I, I don't know specifically, but I'm

25  sure there is.
```

1              **A. BATA**

2    Q.      I didn't ask you what you're sure

3    about is.  Because you are speculating when you

4    say I'm sure or probably, correct?

5    **A.      I'm speculating.**

6    Q.      Okay.  Not interested in the

7    speculating or guessing.

8            My question is:  Are you aware of a

9    single study, survey or analysis that states

10   crowding on station platforms causes 12-9s to

11   occur?

12   **A.      I can't point to specifics right now,**

13   **but I'm sure there's one.**

14   Q.      Okay.  Again, are you speculating on

15   that?

16   **A.      Yes.**

17   Q.      Okay.  Have you ever -- even if you

18   don't know, can we agree someone at the Transit

19   Authority should know about that?  Correct?

20           **MR. KEAVENEY:  Objection.**

21   **A.      I defer to system safety.**

22   Q.      Okay.  So you're saying Office of

23   System Safety would know if there was ever a

24   single study, survey or analysis that indicated

25   crowding on platforms causes 12-9s?  True?

```
 1                        A. BATA

 2       A.        Speculating.  I do not know.

 3       Q.        Okay.

 4       A.        I don't know.

 5       Q.        So who at Transit would know if

 6   crowding on platforms in any way, shape or manner

 7   correlates to increased number of 12-9 incidents?

 8       A.        I can't answer the question.

 9       Q.        So if somebody came -- from the

10   Office of Systems Safety testified under oath and

11   said overcrowding has nothing to do with 12-9s,

12   would you agree with them?

13                        THE COURT REPORTER:  Mr. Bata,

14                   say it again.

15       A.        I do not know.

16       Q.        Okay.  Well, a moment ago you said

17   systems safety would know about this.  So I'm

18   asking you if somebody from the Office of Systems

19   Safety gave that testimony, would they be accurate

20   or not?

21       A.        I defer to system, I defer to system

22   safety.  It's their business.  I don't know.

23       Q.        Okay.  So since you defer to system

24   safety, if somebody from system safety testified

25   that overcrowding on platforms has nothing to do
```

```
1                    A. BATA

2  with causing 12-9s to occur, you would defer to

3  them, true?

4      A.    I, I defer the whole matter to them.

5      Q.    Okay.  So based upon that, would you

6  then agree that slowing the entry speed into

7  stations does not cause more 12-9s?  True?

8                    MR. KEAVENEY:  Objection.

9      A.    I -- not true.

10     Q.    Okay.  Well, is overcrowding the only

11 reason that slowing down the train, in your

12 opinion, causes 12-9s?

13     A.    You can't answer simple like that.

14 I, I cannot answer the question.

15     Q.    Okay.  Why not?

16     A.    It's, it's much more complicated.

17     Q.    Why?

18     A.    Many, many factors.  No.

19     Q.    What?

20     A.    No direct cause and effect.

21     Q.    Okay.  So you're not aware of any

22 direct cause and effect, any correlation between

23 overcrowding and 12-9s occurring, number one,

24 true?

25     A.    I, I don't have a specific number.  I
```

```
 1                      A. BATA

 2  just --

 3       Q.      Okay.

 4       A.      Intuitive.

 5       Q.      I'm not asking about your

 6  speculation, sir.  I'm asking simple cause and

 7  effect.  To use your words.

 8              Are you aware of any facts, data,

 9  surveys, study, analysis, either way that says

10  overcrowding causes or does not cause more 12-9s

11  to occur?

12                      MR. KEAVENEY:  Objection.

13       A.      I'm sure there are some.  I'm not

14  aware of them right now.

15       Q.      Okay.  And when you say you're sure

16  you are, you're speculating again, correct?

17       A.      Yes, I am.

18       Q.      And you said a moment ago that you

19  would defer to system safety, correct?

20       A.      Correct.

21       Q.      But you're not referring to them now,

22  correct?

23       A.      In general.  I'm saying it's their

24  business.  This is --

25       Q.      Okay.
```

                            **A. BATA**

1

2      **A.       -- out of my scope.**

3      Q.       All right.  And -- okay.  So I'd like

4  to show you Plaintiff's Exhibit Number 8 -- let

5  me -- before I even get to that, was it within the

6  scope of the speed policy committee when you were

7  on it to look at whether or not crowding of

8  platforms has any effect on the rate of 12-9

9  incidents?

10     **A.       I don't remember.  We might have**

11 **discussed on the -- on safety of crowded**

12 **platforms, we might have discussed it.  I'm not --**

13 **I don't remember exactly.  We might have discussed**

14 **it.**

15     Q.       So when you say you might have,

16 again, you're guessing, correct?

17     **A.       I'm trying to recollect, yes.**

18     Q.       And it's not whether or not you

19 discussed it, it's whether or not it's within the

20 purview or scope of the speed policy committee to

21 address that issue of crowding on platforms and

22 it's effect, if any, on 12-9s?  True?

23                  **MR. KEAVENEY:   Objection.**

24     **A.       I'm not sure if it's sure.**

25     Q.       Okay.

1          **A. BATA**

2              **THE COURT REPORTER:  Say that**

3          **again, Mr. Bata.**

4      **A.      I'm not sure if that's true.**

5      Q.      Okay.  So when you say you're not

6  sure, more probably than not it's within the

7  purview or scope of the speed policy committee to

8  look at whether or not crowding on platforms

9  causes or does not cause more 12-9s to occur?

10              **MR. KEAVENEY:  Objection.**

11     **A.      It -- it's -- I'm sure -- it's, it's**

12  **a potential discussion topic for sure, yes.**

13     Q.      I'm not asking if it's a potential

14  discussion topic.  I'm asking you very simply; yes

15  or no, is it within the scope or purview of the

16  speed policy committee to look at crowding on

17  subway station platforms to see what, if any,

18  effect they have on the incident rate of 12-9s

19  occurring?  That's the question.  Yes or no?

20     **A.      To look at, yes.**

21     Q.      Okay.

22     **A.      Yeah.**

23     Q.      Did the speed policy committee ever

24  do that?

25              **MR. KEAVENEY:  Objection.**

```
 1                    A. BATA
 2       A.       I, I said I don't remember.
 3       Q.       Okay.  And was it within the scope or
 4  purview of the speed policy committee to look at
 5  whether or not slowing the entry speed of trains
 6  into the stations has an effect, whether it be
 7  good or bad, on the incident rates of 12-9s?
 8                 MR. KEAVENEY:  Objection.
 9       A.       I think so.
10       Q.       Okay.  Did they do so?
11       A.       I don't remember specifically.  Um --
12       Q.       Okay.  Okay.  I'd like to now show
13  you Plaintiff's Exhibit 8.  It's a white paper on
14  12-9 speeds.  And the Bates number is 543 --
15  543458.  It's a one-page document.
16                 MR. GENIS:  Let's go to the top,
17                 please, so he can see it.
18                 MR. ROTH: (Complying.)
19       Q.       Do you see it's entitled "12-9 and
20  Speed Issues"?
21       A.       Correct.
22       Q.       Okay.  Now, when you look at this
23  document, and go -- look at -- just go through it,
24  and it talks about different speed limits, posted
25  limits, the potential increase in, in running
```

```
1                      A. BATA
2      time, potential -- and things about that, correct?
3          A.      Yes.
4          Q.      Now, can you tell me where on this
5      document does it state in any way, shape, or
6      manner that the speed of entry affects the number
7      of 12-9s from occurring?
8          A.      I, I, I, I don't -- I haven't seen
9      this document, so I don't know.
10         Q.      I'm showing you.  It's one page.
11     You're looking at the whole document.
12                      MR. KEAVENEY:  Just --
13         Q.      Let's start -- I'll read at the
14     beginning.  Very first paragraph.
15                 "This is intended to provide response
16     to a claim that by reducing the speed at which
17     trains enter a station, the possibility of injury
18     to customers who fall or who are pushed onto the
19     tracks would be greatly reduced because the
20     increased likelihood that the trains could be
21     stopped before reaching the falling customer."
22     Did I --
23         A.      (Inaudible.)
24         Q.      -- read that accurately?
25         A.      Correct.
```

```
 1                    A. BATA

 2      Q.       Okay.  So other than it discussing

 3  the potential increase in running time, okay, can

 4  you show me anywhere it actually discusses the

 5  effect of the speed or decreasing the entry speed

 6  of a train into a station how it affects the

 7  number of 12-9s?

 8      A.       It's, it's, it's a, it's a response

 9  to a 12-9 --

10               THE COURT REPORTER:  Sir, say it

11               again, please.

12      A.       It's a, it's -- the document is

13  called 12-9, and it shows the increase of running

14  times for slowing trains.

15      Q.       I understand that.  But you're not

16  answering my question.

17               Where on this document, if anywhere,

18  does it state that there's analysis of how slowing

19  down the train to enter the stations would affect

20  the number of 12-9s or affect the amount in number

21  of 12-9s in any way, shape or manner?

22      A.       I, I don't see that on this document,

23  no.

24      Q.       Okay.  Now, did the safety

25  committee -- I'm sorry -- the speed policy
```

```
 1                    A. BATA

 2   committee see the Crespo bill, the proposed Crespo

 3   bill?

 4                    MR. KEAVENEY:  Objection.

 5        A.    I, I think that was after I left.  I

 6   don't know.

 7        Q.    Okay.  Were you involved with the

 8   creation of this document that we just showed you,

 9   Plaintiff's Number 8, the one that's on the screen

10   right now?

11        A.    No.

12        Q.    Okay.  Have you ever seen this

13   before?

14        A.    No.

15        Q.    Okay.  After the Transit Authority

16   received and review the Crane letter, the Berke

17   note from the PTSB, the union president and the

18   Crespo bill, and after hundreds of thousands of

19   people have been seriously injured or killed by

20   trains, what did the Transit Authority do to make

21   its subway system safer to prevent or reduce the

22   number of 12-9s?

23                    MR. KEAVENEY:  Objection.

24        A.    Obviously it did many things.

25        Q.    What?
```

```
 1                         A. BATA

 2        A.        Announcements, signage --

 3        Q.        Well, other --

 4        A.        (Inaudible.)

 5        Q.        Okay.  What else?

 6        A.        Campaign.

 7        Q.        Okay.  What else?

 8        A.        A lot of information to customers,

 9   also any, any drivers.  It -- general safety

10   campaign all the time.  That's -- they --

11        Q.        Okay.

12        A.        -- do it all the time.

13        Q.        Well, when you talk about the safety

14   campaign or the signage, et cetera, that was

15   something specifically addressed by President

16   Samuelsen of the, of the union, true?

17        A.        This is opinion.

18        Q.        Okay.  So what my question was, after

19   the Transit Authority saw that the president of

20   the union put in writing that the signage has not

21   made a measurable difference after the Transit

22   Authority saw what the PTSB said, after the Crane

23   letter, after a state assemblyman proposed a bill

24   on this very topic, what did the Transit Authority

25   do to measure to see whether or not, whatever it
```

```
 1                    A. BATA

 2    had done, was effective?

 3                    MR. KEAVENEY:  Objection.

 4        A.       I'm sure, I'm sure they reevaluated

 5    their position and they did as much, as, as, as

 6    much as possible to improve safety.  Of course.

 7    They do that all the time.

 8        Q.       When you say you're sure, are you

 9    speculating?

10        A.       It's their primary mode to improve

11    safety, so I'm sure they did many things --

12        Q.       Okay.

13        A.       -- they do there.

14        Q.       Again, I'm not -- sir, I'm not asking

15    you what you're sure about.  I'm asking, when you

16    say you're sure, you've told us in the past that

17    meant you were speculating.  Are you speculating

18    again?

19        A.       No, because I hear the announcements

20    on the stations.

21        Q.       Okay.

22        A.       (Inaudible.)

23        Q.       Sir, we already discussed the

24    announcements.  We already discussed the signage.

25    That's what not what I'm saying to you, sir.
```

1                    **A. BATA**

2                    **MR. GENIS:  Move to strike.**

3        Q.        And, sir, if you continue to be

4    nonresponsive, I am going to have to ask the court

5    for more time because you have repeatedly been

6    nonresponsive again today.

7                    Can you please tell us, after the

8    Transportation Authority received all of these

9    different things we've talked about today, the

10   letter of complaint from the president of the

11   union, the Crespo bill, the PTSB, the Crane

12   letter, et cetera, after they said that, did they

13   take any measurement?  Do any analysis to see

14   whether or not any of the measures they took were

15   effective at reducing the number of 12-9s; yes or

16   no?

17                   **MR. KEAVENEY:  Objection.**

18       **A.        I, I do not know.  These dates are --**

19   **these things were after I left these people at the**

20   **committee.  I do not know.**

21       Q.        Okay.  So should the Transit

22   Authority have done anything to see whether or not

23   whatever measures it took were effective at

24   reducing the number of 12-9s?

25       **A.        I'm speculating that they have done**

```
 1                    A. BATA

 2   it.

 3      Q.     Okay.  I'm not asking you to

 4   speculate.  I'm asking you should they have done

 5   so.

 6            Should the Transit Authority

 7   measured, looked at data, surveys, study, analysis

 8   to see whether or not whatever measures they took,

 9   whether or not they were effective in actually

10   reducing the number of 12-9s?

11                    MR. KEAVENEY:  Objection.

12      A.     I don't know.

13      Q.     Okay.

14      A.     They, they always do safety studies.

15      Q.     That's not my -- I didn't ask you.

16                    MR. GENIS:  Move to strike the

17                    portion that's nonresponsive.

18      Q.     Again, are you volunteering things to

19   help the Transit Authority today, sir?

20      A.     I gave you my honest answers.

21      Q.     Sir, when you give speculation, is

22   that for the benefit of the Transit Authority?

23                    MR. KEAVENEY:  Objection.

24      A.     It's speculation of public safety.

25      Q.     Okay.  So would it be a good and
```

```
 1                      A. BATA
 2    accepted practice for a transportation
 3    organization to take steps to study to determine
 4    what can be done to reduce 12-9s from occurring?
 5         A.      Of course.
 6         Q.      And that would comply with
 7    professional standards of care, true?
 8                      MR. KEAVENEY:  Objection.
 9         A.      Of course.
10         Q.      And if you were in charge, you would
11    have taken steps to study whether or not the
12    measures taken by the Transit were effective at
13    reducing 12-9, correct?
14                      MR. KEAVENEY:  Objection.
15         A.      Yes, of course.
16         Q.      Okay.  And if one of the ways 12-9s
17    could be reduced is by reducing the entry speeds
18    of trains into the station, then that's something
19    that should have been done, true?
20         A.      No.
21         Q.      Okay.
22                      MR. GENIS:  Now let's look at
23                      the next document.  I think we're up
24                      to 8 or 9, I'm not sure.
25                      Dave, could you put up the
```

```
 1                    A. BATA

 2          policy.

 3                  THE COURT REPORTER:  Rob, FYI,

 4          we did 8 already, so we're up to 9, I

 5          believe.

 6                  MR. GENIS:  So, 9.  Thank you.

 7                  THE COURT REPORTER:  You're

 8          welcome.

 9     Q.      Okay.  All right.  Sir, we're showing

10     you Plaintiff's Number 9.

11                  MR. GENIS:  All right, Dave,

12          could you make it bigger, please, so

13          we could see it.

14                  MR. ROTH:  (Complying.)

15     Q.      Okay.  Now, we're showing you,

16     there's e-mails that were -- at the top.  Let's

17     just go to the top for a second.

18                  MR. GENIS:  Let's go to the

19          bottom for the Bates number, please.

20                  MR. ROTH:  (Complying.)

21     Q.      The first page is 11105.  Okay.  And

22     these are a series of e-mails, the top one's to

23     Tom Prendergast.

24              And it starts off, "below and

25     attached is our analysis of the massive impacts if
```

```
 1                      A. BATA
 2    the Crespo bill becomes law."  Do you see that?
 3    By Peter Cafiero?
 4         A.     Yes.
 5         Q.     Okay.  And this is dated
 6    February 10th of 2011, correct?
 7         A.     Yes.
 8         Q.     Okay.  And then below that is an
 9    e-mail from Glenn Lunden of February 10th, 2011,
10    2:55 p.m., about the evaluation of the Crespo
11    bill, correct?
12         A.     Yes.
13         Q.     Now, are you familiar with the people
14    at the top?  That top e-mail?  Do you see the
15    different names?  For example, Kevin Mooney --
16    Kenneth Mooney, I'm sorry, and others?
17         A.     Yes.
18         Q.     Okay.  And you've seen this before,
19    correct?
20         A.     No, I have not.
21         Q.     These e-mails?
22         A.     No.
23         Q.     Okay.  And do you agree with the
24    analysis in these e-mails?
25         A.     I have not seen it.
```

```
 1                      A. BATA

 2      Q.      Well, we're showing it to you, sir.

 3      A.      Okay.

 4              MR. KEAVENEY:  Stop scrolling.

 5              Just up at the top then.

 6      A.      I see it now.

 7      Q.      Okay.

 8              MR. GENIS:  Okay.  Scroll down.

 9              MR. ROTH:  (Complying.)

10              MR. KEAVENEY:  Part of the

11              substance is cut off by the --

12              THE WITNESS:  The video.

13              MR. KEAVENEY:  -- the video of

14              the people.  You got to make it just

15              a little smaller so he can see.

16              MR. GENIS:  Okay.  On mine is

17              big, but okay.

18              MR. KEAVENEY:  Well --

19              MR. GENIS:  Just keep scrolling,

20              please.

21              MR. ROTH:  (Complying.)

22              Is that better?

23              MR. KEAVENEY:  Yes.

24              MR. GENIS:  Okay.  Okay.  Scroll

25              please.
```

```
 1                    A. BATA

 2                    MR. ROTH:  (Complying.)

 3                    MR. GENIS:  Keep going, please.

 4                    MR. ROTH:  (Complying.)

 5                    MR. GENIS:  Keep going, please.

 6                    MR. ROTH:  (Complying.)

 7                    MR. GENIS:  Keep going, please.

 8                    MR. ROTH:  This is the end of

 9           the analysis.

10                    MR. GENIS:  Oh, okay.  Fine.

11                    So let's go to the, the next one

12           then, which is the -- next document,

13           please, Dave.

14                    MR. ROTH:  (Complying.)

15                    MR. GENIS:  Okay.  Okay.  Okay.

16                    MR. ROTH:  This exhibit is below

17           that.

18                    MR. GENIS:  Okay.

19      Q.      And it's an e-mail from Tom

20   Prendergast, correct?

21      A.      Yes.

22      Q.      And this is -- they're talking about

23   a quick and dirty analysis about the impacts to

24   the train schedules, running times throughout, pay

25   cost if they implemented the practice of noted in
```

```
 1                    A. BATA

 2   Crespo bill, correct?

 3                    MR. KEAVENEY:   Just note my

 4              objection.

 5        A.        That's what, that's what it says.

 6        Q.        Okay.  Does it say anything at all

 7   about analyzing safety and reduction of 12-9s?

 8        A.        I don't see it specifically.

 9        Q.        Okay.

10                    MR. GENIS:  And, Dave, could we

11              go to the next document, please.

12                    MR. ROTH:  (Complying.)

13                    MR. GENIS:  We already did that

14              one.

15        Q.        We're showing you the impacts of the

16   proposed legislation.  And it goes through running

17   times.

18                    MR. GENIS:  Keep scrolling,

19              Dave.

20                    MR. ROTH:  (Complying.)

21                    MR. GENIS:  Keep going, please.

22                    MR. ROTH:  (Complying.)

23                    MR. GENIS:  Keep going.

24                    MR. ROTH:  (Complying.)

25                    MR. GENIS:  Okay.
```

1                          **A. BATA**

2        Q.        Now, do you agree with this analysis?

3    And you've seen this before?

4                        **THE COURT REPORTER:  Mr. Bata,**

5                   **say that again, please, sir.**

6        **A.        I have not seen this before.  First**

7    **time I'm seeing it now.**

8        Q.        Okay.  Anywhere on this analysis is

9    there a discussion of 12-9s?  One way or the

10   other?

11                       **MR. KEAVENEY:  Note my**

12                  **objection.**

13       **A.        I don't see it specifically.**

14       Q.        Okay.  Anything at all about

15   reduction of 12-9s?

16       **A.        No.**

17       Q.        Are you familiar with the concepts of

18   this document, that if you slow the trains down

19   upon entering the station, it will affect running

20   time?

21       **A.        It affects more than running time.**

22       Q.        Okay.

23                       **MR. GENIS:  Now, let's go to the**

24                  **next document, Dave.  I think -- I'd**

25                  **like to see the speed policy**

```
 1                    A.  BATA

 2           document.

 3                    MR. ROTH:  Which document?

 4                    MR. GENIS:  (Inaudible) policy.

 5                    MR. KEAVENEY:  All right.  Could

 6           we go off the record for a minute.

 7                    (Whereupon, an off-the-record

 8           discussion was held at 12:10 p.m.)

 9                    (Whereupon, back on the record

10           at 12:11 p.m.)

11                    MR. GENIS:  We were off the

12           record.  We just used up another

13           minute of my time.  12:31.

14                    Okay.  So, so, Dave, can you

15           please put up Plaintiff's Number 10,

16           Bates stamp 391293.

17                    MR. ROTH:  (Complying.)

18                    MR. GENIS:  Make it bigger,

19           please.

20                    MR. ROTH:  (Complying.)

21      Q.     I'm showing you an e-mail, looking at

22  the top one, to Peter Cafiero, from Ken Mooney,

23  dated February 10, 2011, and it's involving that

24  same proposed Assemblyman Crespo legislation.

25  True?
```

```
 1                       A. BATA

 2          A.       (No verbal response.)

 3          Q.       Do you see it?

 4                       MR. KEAVENEY:  Objection.

 5          A.       Yeah.

 6          Q.       Okay.  And it's in reference to the

 7   study you just looked at a moment ago.  Correct?

 8                       MR. KEAVENEY:  Objection.

 9          A.       That's what it says.  I told you,

10   it's the --

11          Q.       Okay.

12          A.       (Inaudible.)

13          Q.       And it says, "should we need to

14   develop a full study, Joe Leader raises additional

15   concerns," and then it says "see attached,"

16   correct?

17          A.       That's what it says.

18          Q.       Okay.  So we could agree that the

19   person authoring this e-mail has knowledge,

20   correct?

21          A.       You're speculating, but yes.

22                       MR. GENIS:  Well, just scroll up

23                   a little bit, please.

24                       MR. ROTH:  (Complying.)

25          Q.       This is from Ken Mooney.  You told us
```

```
 1                        A. BATA
 2    you knew who Ken Mooney was, correct?
 3        A.        Yes.
 4        Q.        Okay.  Did Mooney have knowledge?
 5        A.        Yes.  Of course.
 6                    MR. KEAVENEY:  Objection.
 7        Q.        So if Mooney writes an e-mail
 8    saying, should we need to develop a full study, he
 9    knows what he's talking about, correct?
10        A.        That's an opinion.
11        Q.        And -- well, Mooney was one of the
12    chairs of the speed policy committee, true?
13        A.        I think after me he might have been
14    for a while.
15        Q.        Okay.  So, so Ken Mooney is already
16    noting that, whatever Glenn Lunden whipped up in
17    that dirty and quick analysis was not a full
18    study, true?
19                    MR. KEAVENEY:  Objection.
20        A.        I, I don't know.
21        Q.        Okay.
22                    MR. GENIS:  Let's now go to
23                    Plaintiff's Number 11.  Bates 7164.
24                    MR. ROTH:  (Complying.)
25        Q.        Okay.  It is entitled MTA-NYC -- the
```

```
 1                      A. BATA

 2    New York City Transit's Policy Speed Standards,

 3    correct?

 4         A.       Yes.

 5         Q.       And where -- have you ever seen this

 6    before?

 7         A.       What was the date of this thing?  I

 8    do not know.

 9         Q.       I'm just asking you, sir; yes or no,

10    have you seen this before?

11         A.       I don't recollect.  I don't know what

12    the date of this is.

13         Q.       Have you seen something like this

14    before?

15         A.       I --

16         Q.       Something similar to this?

17         A.       I'm not sure.

18         Q.       Are you familiar with this?

19         A.       I'm familiar with this, this type of

20    analysis, yes.

21         Q.       Okay.

22                       MR. GENIS:  And just keep

23                  scrolling down, Dave, slowly, so that

24                  he could go through it.

25                       MR. ROTH:   (Complying.)
```

1                           A. BATA

2       Q.        And when we go through the speed

3    policy standard of the Transit Authority, it's

4    talking about speed policies for curves, different

5    types of curves, and things of that nature,

6    correct?

7       **A.        Yes.**

8       Q.        Okay.  And can we agree that this is

9    talking about -- and turnouts it's also asking

10   about, correct?

11      **A.        Yes.  I see it, yes.**

12      Q.        Okay.  What is a turnout?

13      **A.        It's when tracks diverge.**

14      Q.        So can we agree that the purpose of

15   this standard is that if a train is going and

16   there is a sharp curve, if it goes too fast it can

17   derail or cause a serious injury, correct?

18      **A.        If it goes above a certain speed, of**

19   **course.**

20               **THE COURT REPORTER:  Mr. Bata,**

21               **louder.**

22      **A.        If it goes above a certain speed, of**

23   **course.**

24      Q.        Okay.  So this standard, and it has

25   an appendix, is to show what the speed should be

```
 1                        A. BATA
 2    as the trains travel from station to station,
 3    correct?
 4                    MR. KEAVENEY:  Note my
 5               objection.
 6       A.       No, that's not correct.
 7       Q.       Okay.  Well, let's back up.
 8               Trains travel from station to
 9    station, true?
10       A.       That's correct.
11       Q.       Okay.  And when they travel from
12    station to station, they can encounter curves,
13    they can encounter grades, things of that nature,
14    correct?
15       A.       That is correct.
16       Q.       Okay.  And that's when they get into
17    whether there's elevation, super elevation that
18    could make the train tilt, correct?
19       A.       Correct.
20       Q.       Okay.  And the concern is, in the
21    past, there had been some derailments of the
22    trains, correct?
23       A.       There have been some derailments,
24    yes.
25       Q.       Okay.  And so the purpose of the
```

1              A. BATA

2   speed policy standard is to prevent the trains

3   from derailing, hitting other trains, hitting

4   columns, correct?

5              MR. KEAVENEY:  Objection.

6      A.      It's certainly an objective.

7      Q.      Okay.  And when you went through the

8   speed policy, did you see anywhere where it

9   discussed entry speed into a station?

10             MR. KEAVENEY:  Objection.

11     A.      As I said, I'm not -- this document

12  came after me.  I do not know.

13     Q.      Well, you said you didn't know the

14  date, so how do you know it came after you?

15             MR. KEAVENEY:  He said if this

16             document came after me.

17  A.      If --

18             THE COURT REPORTER:  Hold on.

19             Andrew, say it louder.

20             MR. KEAVENEY:  He said if this

21             document came after me.

22             THE WITNESS:  Right.

23             MR. GENIS:  Well, I didn't hear

24             him say that.  I heard you say that,

25             and then he echoed you.  But let's --

```
 1                      A. BATA

 2       A.       So I am going to say it again.   If

 3  this document came after me.   I do not know the

 4  date of this document.

 5       Q.       Okay.  So getting back to this

 6  document, to stay focused, instead of the

 7  colloquy, this document -- can you show me

 8  where -- we'll scroll through it again -- it has

 9  any mention whatsoever about entry speed into a

10  station?

11                      MR. GENIS:  Keep scrolling,

12                 Dave.

13       Q.       I, I don't --

14                      MR. GENIS:  We'll let him look

15                 at it a second time.

16       A.       I didn't see it.

17       Q.       Okay.  And does it say anywhere about

18  12-9s?

19       A.       I don't, I don't know.  I didn't --

20       Q.       Okay.

21       A.       -- see it.

22       Q.       So, in other words, the speed

23  standard for the trains has nothing to do with

24  12-9s, correct?

25                      MR. KEAVENEY:  Objection.
```

```
 1                    A. BATA

 2       A.        That's, that's a speculation on your

 3  part.

 4       Q.        No, sir, I'm asking you a simple

 5  question.  It's a yes-or-no question.  When you go

 6  through the document --

 7                    MR. GENIS:  Dave, continue to

 8                    scroll.

 9                    MR. ROTH:  (Complying.)

10       Q.        Okay.  We see no mention of 12-9s in

11  Plaintiff's Number 11 the speed standards for the

12  Transit.  True or false?

13       A.        I don't see 12-9 on this document.

14       Q.        Okay.  Does it say anything -- and

15  you've told us already this document says nothing

16  about entry speed into stations, true?

17       A.        I, I didn't see it.  No.

18       Q.        Okay.  And can we agree that this

19  document says nothing about reduction of 12-9

20  incidents, correct?

21       A.        That's not the purpose of it.  Right.

22       Q.        And does this document say anything

23  about people being hit or run over by trains?

24       A.        No.

25       Q.        And it says nothing about addressing
```

```
 1                      A. BATA
 2   12-9s, correct?
 3       A.       It, it doesn't specifically say about
 4   12-9s, no, you're right.
 5       Q.       Okay.  And so if this is an --
 6   withdrawn.
 7               So if it is not in this document,
 8   then there is no speed policy or standard that
 9   addresses the issue of 12-9s, true?
10       A.       Not in this document, but it's not --
11   that's not -- that's -- this, this document is
12   about interaction between a rail vehicle and a
13   track.  That's what this is.
14       Q.       Yes.  And about the speeds, correct?
15       A.       The speeds of trains interaction
16   between the vehicle and the track.  That's the
17   focus.
18       Q.       Okay.  So do you have -- are you
19   aware of any other documents that address 12-9s
20   with respect to speed policy?
21       A.       I, I do not know.  I don't, I don't
22   know.
23       Q.       Okay.  Are you aware of, as we sit
24   heard today, a single survey, study, analysis,
25   anything whatsoever at all that addresses a speed
```

1                    **A. BATA**

2    **policy as it relates to 12-9s?**

3        A.        I, I do not know.  I do not

4    recollect.

5        Q.        Okay.  And you're not aware of any

6    speed standard, or policy, or guideline that

7    addresses or shows -- withdrawn -- that addresses

8    12-9s?  True?

9        **A.        I do not know.**

10       Q.        Okay.  And certainly from the

11   documents you've looked at in these two

12   depositions, you have not seen that the speed

13   policy ever considered 12-9s, true?

14       **A.        I'm not sure that's true.**

15       Q.        Okay.  What document have you seen

16   that talked about speed policies addressing the

17   issue of 12-9s?

18       **A.        I don't remember.  But I'm sure we**

19   **discussed 12-9s.**

20       Q.        Okay.  I didn't ask you about

21   discussing now, and I'm not asking you to

22   speculate.  I'm asking you; yes or no, did you see

23   a single document that addressed speed policy as

24   it relates and correlates to 12-9 incidents; yes

25   or no?

```
 1                        A. BATA
 2        A.      I do not remember.  That's the --
 3        Q.      Okay.
 4        A.      -- answer.
 5        Q.      Okay.  Sir, were you ever asked to
 6   draft an affidavit for purposes of litigation?
 7        A.      I don't remember an affidavit.
 8                MR. GENIS:  Dave, can you --
 9                Dave, did -- did -- Dave, put up the
10                next document.
11                MR. ROTH:  (Complying.)
12        Q.      Okay.  We're up to number 12.  And it
13   is Bates --
14                MR. GENIS:  I'm sorry.  You're
15                going too fast.
16        Q.      -- 390897.  And here is an e-mail
17   from Brian Alexander, do you see that?
18        A.      Yes.
19        Q.      And it's to Glenn Lunden, correct?
20        A.      (No verbal response.)
21        Q.      Yes?
22        A.      Yes.
23        Q.      And it says, "I found these notes
24   attached to an e-mail from some five plus years
25   ago.  Ops Analysis was asked by Andy Bata, et
```

```
 1                    A. BATA
 2   cetera, to come up with an affidavit for why
 3   platform doors are impractical on our subway."  Do
 4   you see that?
 5        A.     Yes.
 6        Q.     Okay.  This was done for litigation,
 7   true?
 8        A.     I do not know.
 9        Q.     Okay.  Why was this done?
10        A.     I, I have no -- I don't -- actually,
11   I don't recollect any of this stuff.
12        Q.     Okay.  What was this about?
13        A.     2010.
14               MR. KEAVENEY:  Is there a Bates
15               number on that?
16               MR. GENIS:  Yes.  We already put
17               it on the record.  Thank you.
18        Q.     Is Larry G Larry Gould?
19        A.     Larry Gould, yes.
20        Q.     Okay.  And this was involving
21   platform screen doors, that you were involved
22   with, correct?
23        A.     Yes.
24        Q.     Okay.  And it's for the platform door
25   task force kick-off meeting, correct?
```

```
 1                    A. BATA
 2      A.      I, I -- again, I don't recollect
 3  specifically.  I see the memo, I see this memo.  I
 4  have to, I have to reconstruct what it is all
 5  about.
 6      Q.      Okay.  Why did somebody ask you to do
 7  an affidavit to say why platform screen doors are
 8  impractical?
 9      A.      I don't know.  I do not remember.
10      Q.      Okay.
11      A.      I don't remember --
12      Q.      Did anyone ever ask you, did anyone
13  ever ask you to come up with an affidavit for why
14  platform doors are -- improve safety for the
15  public?
16      A.      I don't, I don't remember that, no.
17      Q.      Did anyone ever ask you to write up
18  an affidavit for how and why a proper study should
19  be done involving 12-9s?
20      A.      I, I don't remember that.  I don't, I
21  really don't know.
22      Q.      Okay.  Did anyone ever ask you to
23  do -- to draw up any papers to show why platform
24  doors should be implemented?
25      A.      I don't think so.  I think all I was
```

```
 1                    A. BATA

 2   saying they should be --

 3       Q.      Okay.

 4                    THE COURT REPORTER:  Mr. Bata,

 5                say that again.  I don't think so.

 6                What else?

 7       A.      I was advocating the concept.

 8       Q.      Okay.

 9                    MR. KEAVENEY:  Counsel, it's

10                12:31.

11                    THE WITNESS:  Thank you.

12                    MR. GENIS:  I'm sorry, I don't

13                see -- okay.  So you're, you're

14                saying we're done, correct, Andrew?

15                    MR. KEAVENEY:  (Inaudible.)

16                    THE COURT REPORTER:  Andrew, say

17                that again, sir.

18                    MR. KEAVENEY:  I'm saying the

19                court allowed for two hours.  We've

20                been at it a little over two hours,

21                actually, based on my calculations.

22                Minus breaks and everything.  So I

23                think we are done.

24                Bob, are you done?

25                    MR. GENIS:  I have more
```

```
 1                    A. BATA
 2          questions, but if you're allowing me
 3          to ask them, if you're not allowing
 4          me to, then I'm, then I'm not allowed
 5          to.
 6               MR. KEAVENEY:  Okay.  Yes,
 7          because the witness was gracious
 8          enough to stay over.  He had to get
 9          out of here at noon, so we are at
10          12:31 now.  The court order said two
11          hours, we allotted for breaks, and
12          any colloquy Mr. Genis saw fit, we
13          deducted that from the two-hour time,
14          and I think that that was recorded
15          accurately, so I think we are in
16          compliance with the court's order.
17               THE COURT REPORTER:  Am I
18          closing the record, gentlemen?
19               MR. GENIS:  Yes.
20               THE COURT REPORTER:  The record
21          is closed.
22               (Whereupon, emergency stopping
23          distance chart promulgated by the
24          Transit Authority, 22-page document
25          was marked as Plaintiff's Exhibit 1
```

```
 1                    A. BATA
 2              for identification as of this date by
 3              the Reporter.)
 4                   (Whereupon, updated emergency
 5              stopping distance chart, two-page
 6              document was marked as Plaintiff's
 7              Exhibit 2 for identification as of
 8              this date by the Reporter.)
 9                   (Whereupon, letter, seven-page
10              document was marked as Plaintiff's
11              Exhibit 3 for identification as of
12              this date by the Reporter.)
13                   (Whereupon, letter, two-page
14              document was marked as Plaintiff's
15              Exhibit 4 for identification as of
16              this date by the Reporter.)
17                   (Whereupon, e-mail exchange,
18              two-page document was marked as
19              Plaintiff's Exhibit 5 for
20              identification as of this date by the
21              Reporter.)
22                   (Whereupon, press release,
23              one-page document was marked as
24              Plaintiff's Exhibit 6 for
25              identification as of this date by the
```

```
 1                    A. BATA
 2          Reporter.)
 3               (Whereupon, e-mail exchange,
 4          two-page document was marked as
 5          Plaintiff's Exhibit 7 for
 6          identification as of this date by the
 7          Reporter.)
 8               (Whereupon, 12-9 and Speed
 9          Issues document was marked as
10          Plaintiff's Exhibit 8 for
11          identification as of this date by the
12          Reporter.)
13               (Whereupon, e-mail exchange,
14          nine-page document was marked as
15          Plaintiff's Exhibit 9 for
16          identification as of this date by the
17          Reporter.)
18               (Whereupon, e-mail exchange,
19          one-page document was marked as
20          Plaintiff's Exhibit 10 for
21          identification as of this date by the
22          Reporter.)
23               (Whereupon, MTA-NYCT's Speed
24          Policy Standards, 13-page document
25          was marked as Plaintiff's Exhibit 11
```

```
 1                    A. BATA

 2          for identification as of this date by

 3          the Reporter.)

 4               (Whereupon, e-mail exchange,

 5          three-page document was marked as

 6          Plaintiff's Exhibit 12 for

 7          identification as of this date by the

 8          Reporter.)

 9               (Whereupon, at 12:33 P.M., the

10          Examination of this witness was

11          concluded.)

12

13        °              °            °            °

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      A. BATA
 2              D E C L A R A T I O N
 3
 4              I hereby certify that having been
 5  first duly sworn to testify to the truth, I gave
 6  the above testimony.
 7
 8              I FURTHER CERTIFY that the foregoing
 9  transcript is a true and correct transcript of the
10  testimony given by me at the time and place
11  specified hereinbefore.
12
13
14
15              _____
                      ANDREW BATA
16
17
18
    Subscribed and sworn to before me
19
    this _____ day of _____ 20___.
20
21
22  _____
            NOTARY PUBLIC
23
24
25
```

```
 1                    A. BATA

 2                  E X H I B I T S

 3

 4   PLAINTIFF'S EXHIBITS

 5

 6   EXHIBIT       EXHIBIT                    PAGE

 7   NUMBER        DESCRIPTION

 8   1            Emergency stopping distance

 9               chart promulgated by the

10               Transit Authority, 22-page

11               document                     125

12   2            Updated emergency stopping

13               distance chart, two-page

14               document                     126

15   3            Letter, seven-page document 126

16   4            Letter, two-page document   126

17   5            E-mail exchange, two-page

18               document                     126

19   6            Press release, one-page

20               document                     126

21   7            E-mail exchange, two-page

22               document                     127

23   8            12-9 and Speed Issues

24               document                     127

25
```

```
 1                    A. BATA

 2   PLAINTIFF'S EXHIBITS

 3

 4   EXHIBIT         EXHIBIT                      PAGE

 5   NUMBER          DESCRIPTION

 6   9               E-mail exchange, nine-page

 7                   document                      127

 8   10              E-mail exchange, one-page

 9                   document                      127

10   11              MTA-NYCT's Speed Policy

11                   Standards, 13-page document   127

12   12              E-mail exchange, three-page

13                   document                      128

14

15

16

17

18        (Exhibits attached to E-Transcript.)

19

20

21

22

23

24

25
```

```
 1              A. BATA

 2            I N D E X

 3

 4    EXAMINATION BY                    PAGE

 5    MR. GENIS                         5

 6

 7

 8

 9

10        INFORMATION AND/OR DOCUMENTS REQUESTED

11    INFORMATION AND/OR DOCUMENTS        PAGE

12    (None)

13

14

15

16

17             QUESTIONS MARKED FOR RULINGS

18    PAGE LINE    QUESTION

19    (None)

20

21

22

23

24

25
```

1                     A. BATA

2                C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

                         :  SS.:

5    COUNTY OF SUFFOLK    )

6

7        I, CHRISTOS LIOPYROS, a Notary Public for and

8    within the State of New York, do hereby certify:

9        That the witness whose examination is

10   hereinbefore set forth was duly sworn and that

11   such examination is a true record of the testimony

12   given by that witness.

13       I further certify that I am not related to

14   any of the parties to this action by blood or by

15   marriage and that I am in no way interested in the

16   outcome of this matter.

17       IN WITNESS WHEREOF, I have hereunto set my

18   hand this 8th day of July 2022.

19

20

21       _____

             CHRISTOS LIOPYROS

22

23

24

25

July 1, 2022

1  **ERRATA SHEET FOR: ANDREW BATA**

   **ANDREW BATA, being duly sworn, deposes and**
2  **says: I have reviewed the transcript of my**
   **proceeding taken on 07/01/2022. The following**
3  **changes are necessary to correct my testimony.**
4  _____
5  **PAGE LINE    CHANGE                    REASON**
6  ----|----|--------------------|--------------
7  ----|----|--------------------|--------------
8  ----|----|--------------------|--------------
9  ----|----|--------------------|--------------
10 ----|----|--------------------|--------------
11 ----|----|--------------------|--------------
12 ----|----|--------------------|--------------
13 ----|----|--------------------|--------------
14 ----|----|--------------------|--------------
15 ----|----|--------------------|--------------
16 ----|----|--------------------|--------------
17 ----|----|--------------------|--------------
18 ----|----|--------------------|--------------
19 ----|----|--------------------|--------------
20 ----|----|--------------------|--------------
21 ----|----|--------------------|--------------
22 ----|----|--------------------|--------------
23      **Witness Signature:**_____
   **Subscribed and sworn to, before me**
24 **this ____ day of _____, 20 ___.**
   _____   _____
25 **(NOTARY PUBLIC)          MY COMMISSION EXPIRES**

**A**

**a.m (2)**
1:12 9:22
**ability (2)**
85:16,21
**able (1)**
70:23
**Absolutely (1)**
49:21
**accepted (3)**
37:8 65:13
103:2
**accurate (1)**
90:19
**accurately (4)**
59:12 66:19
96:24 125:15
**action (1)**
133:14
**added (1)**
70:19
**addition (1)**
14:16
**additional (1)**
111:14
**address (4)**
4:10 36:8
93:21 119:19
**addressed (4)**
36:15 50:21
99:15 120:23
**addresses (7)**
50:25 53:22
70:12 119:9
119:25 120:7
120:7
**addressing (2)**
118:25 120:16
**administerin...**
3:7
**advance (1)**
66:16
**advanced (1)**
70:16
**advocating (1)**
124:7

**affect (4)**
34:5 97:19,20
109:19
**affidavit (6)**
121:6,7 122:2
123:7,13,18
**against- (1)**
1:6
**agency (6)**
44:14 64:23
69:13,19
76:15 88:18
**ago (9)**
12:24 20:20
29:16 31:18
46:15 90:16
92:18 111:7
121:25
**agree (38)**
12:6 31:21
32:8 34:23
37:17 38:3
43:24 47:23
52:3,10,20
53:18 55:10
59:14,18
60:23 68:5,10
68:13,18,19
68:22 71:10
71:14 74:4,7
82:16 85:3,15
89:18 90:12
91:6 105:23
109:2 111:18
114:8,14
118:18
**Agreed (2)**
3:3 11:17
**ahead (2)**
15:21 41:23
**aim (1)**
76:15
**Alexander (1)**
121:17
**alleged (1)**
53:23

**allotted (1)**
125:11
**allowable (1)**
67:2
**allowed (3)**
15:11 124:19
125:4
**allowing (2)**
125:2,3
**amount (1)**
97:20
**analysis (25)**
34:25 63:14
64:15 72:18
75:3 79:21
87:3 88:5,11
89:9,24 92:9
97:18 101:13
102:7 104:25
105:24 107:9
107:23 109:2
109:8 112:17
113:20
119:24
121:25
**analyze (4)**
48:5,12 49:25
63:5
**analyzed (1)**
61:21
**analyzing (2)**
22:18 108:7
**AND/OR (2)**
132:10,11
**Andrew (14)**
1:16 2:16 4:8
8:3,10,18
9:20 10:3
116:19
124:14,16
129:15 134:1
134:1
**Andy (1)**
121:25
**announceme...**
63:11,11 99:2

100:19,24
**answer (28)**
8:4,15,23,25
9:3 10:14
11:12 13:8
15:20 16:14
18:15 28:19
30:25 34:12
47:6 60:7,8
60:21 64:4,5
80:23 85:8,10
85:12 90:8
91:13,14
121:4
**answered (1)**
66:13
**answering (1)**
97:16
**answers (3)**
10:15 69:14
102:20
**anybody (3)**
33:11 48:4,7
**anybody's (1)**
18:11
**Apartment (1)**
4:12
**apologize (1)**
6:15
**appeared (1)**
51:17
**appendix (1)**
114:25
**application (1)**
70:15
**applied (1)**
51:25
**appreciate (1)**
71:24
**approved (1)**
31:20
**April (1)**
51:9
**areas (2)**
55:6 70:21
**argument (1)**

8:7
**articulate (1)**
82:4
**asked (6)**
34:16 43:8
65:4 76:19
121:5,25
**asking (24)**
8:5 11:5 12:8
13:20,23 29:4
29:13,14
59:17 84:8
90:18 92:5,6
94:13,14
100:14,15
102:3,4 113:9
114:9 118:4
120:21,22
**asks (1)**
8:17
**aspect (1)**
87:18
**aspects (6)**
33:24 36:12,15
37:7,11 38:6
**assemblyma...**
73:19 74:12,23
99:23 110:24
**assertion (1)**
60:2
**assigned (1)**
19:20
**attached (4)**
104:25 111:15
121:24
131:18
**attend (4)**
15:12,25 19:2
24:6
**attended (3)**
13:21 17:10
18:7
**attending (2)**
14:17 16:16
**attention (1)**
79:5

**attorney (3)**
3:13 7:13,24
**attorney/clie...**
7:16
**attorneys (5)**
2:4,9,14 9:24
11:4
**authoring (1)**
111:19
**Authority (93)**
1:7 4:24 5:2,10
5:12 6:6 7:7
7:14,25 9:25
13:6,22 15:3
16:18 17:10
20:24 25:21
26:2,11,24
27:5,9 28:2
29:7,18 31:4
32:23 33:7
34:4 35:24
36:7,20 38:12
38:20,24
43:17,25 44:6
44:20 45:2
46:21 47:19
47:20 48:9,12
49:19,24
52:17 54:2,15
56:23 58:4
60:16,19
61:13 63:21
66:3,11 68:7
69:14,20
72:15,18,21
75:2,15 77:25
78:10,14,20
80:17,25
81:21 82:10
85:16,20,25
87:3,7 89:19
98:15,20
99:19,22,24
101:8,22
102:6,19,22
114:3 125:24

130:10
**Authority's (2)**
12:17 47:25
**Avenue (2)**
2:5 4:11
**aware (18)**
33:7 43:21,22
54:13,16
58:19 75:7,10
75:16,22 78:7
89:8 91:21
92:8,14
119:19,23
120:5
**Awkward (1)**
31:23

___

**B**

**B (2)**
4:2 130:2
**back (22)**
9:9,12,14,18
23:17,20
28:18,21 33:5
36:3,5 53:12
57:12 59:9
70:18 72:12
79:2 83:7
84:7 110:9
115:7 117:5
**bad (1)**
95:7
**Baker (1)**
71:4
**BALLAINE ...**
2:14
**based (6)**
34:24 84:19,23
85:3 91:5
124:21
**basically (2)**
14:7 22:15
**basis (2)**
19:22 53:25
**Bata (148)**
1:16 4:1,8,16

5:1 6:1 7:1
8:1 9:1 10:1
11:1 12:1
13:1 14:1
15:1,16 16:1
17:1 18:1
19:1 20:1
21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1 42:1
43:1,5 44:1
44:22 45:1
46:1 47:1
48:1 49:1
50:1 51:1,19
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1,19 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1,8
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1,13 91:1
92:1 93:1
94:1,3 95:1
96:1 97:1

98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1,4
110:1 111:1
112:1 113:1
114:1,20
115:1 116:1
117:1 118:1
119:1 120:1
121:1,25
122:1 123:1
124:1,4 125:1
126:1 127:1
128:1 129:1
129:15 130:1
131:1 132:1
133:1 134:1,1
**Bates (17)**
40:15,16,17
50:13 57:9,16
70:5 73:6,10
73:12 81:15
95:14 104:19
110:16
112:23
121:13
122:14
**bear (1)**
3:15
**beat (1)**
8:10
**beginning (2)**
78:17 96:14
**behavioral (1)**
63:12
**beings (1)**
12:12
**believe (2)**
12:25 104:5
**benefit (1)**
102:22
**Berke (6)**
69:25 70:10,19

70:25 76:22
98:16
**best (3)**
60:23 62:25
65:4
**better (2)**
47:20 106:22
**beyond (1)**
54:7
**big (1)**
106:17
**bigger (6)**
57:20 59:6
73:9 81:24
104:12
110:18
**bill (12)**
74:5,23 75:17
76:23 98:2,3
98:18 99:23
101:11 105:2
105:11 108:2
**bit (1)**
111:23
**blanket (1)**
27:4
**blood (1)**
133:14
**board (4)**
69:11,25 70:11
70:18
**board's (1)**
71:6
**Bob (1)**
124:24
**bodies (1)**
13:14
**body (1)**
12:13
**boldfaced (2)**
55:4 70:9
**booths (1)**
67:18
**bottom (9)**
39:23 58:11
70:3,6 73:10

81:14,17,19
104:19
**brake (3)**
42:21 44:7,19
**brakes (4)**
47:2,12,20
51:25
**braking (10)**
41:15,18 43:12
45:23 46:5,7
46:24 47:2,12
47:20
**break (3)**
69:18 71:20
72:7
**breaks (2)**
124:22 125:11
**Brian (1)**
121:17
**Broadway (1)**
2:15
**Bronx (1)**
2:10
**brought (1)**
21:24
**bulletins (1)**
24:12
**bus (1)**
7:5
**business (3)**
38:24 90:22
92:24

---

**C**

**C (4)**
2:2 129:2
133:2,2
**cabinet (2)**
24:19,22
**cabinets (1)**
25:2
**Cafiero (2)**
105:3 110:22
**calculations (...**
124:21
**call (2)**

8:19 11:11
**called (3)**
4:2 32:22
97:13
**Calls (1)**
7:15
**campaign (4)**
67:21 99:6,10
99:14
**car (5)**
38:20 41:9
42:25 43:6
46:23
**care (2)**
37:14 103:7
**career (1)**
49:16
**cars (2)**
44:8,20
**case (10)**
5:20,21,22,25
6:2,19 10:2
11:14 23:2
43:18
**cause (13)**
18:20 80:18
83:21 85:7,11
85:21 91:7,20
91:22 92:6,10
94:9 114:17
**caused (3)**
12:12 63:4
87:22
**causes (13)**
81:4 86:12,17
86:23 87:4
88:6,12,21
89:10,25
91:12 92:10
94:9
**causing (1)**
91:2
**caution (1)**
66:22
**ceased (1)**
25:19

**center (1)**
14:20
**certain (5)**
22:25 24:16
78:11 114:18
114:22
**certainly (4)**
27:16 61:20
116:6 120:10
**certify (4)**
129:4,8 133:8
133:13
**cetera (3)**
99:14 101:12
122:2
**chair (15)**
12:16 14:18
15:2 16:9
17:4 24:5
25:18,20,22
25:24 31:8
44:17 48:17
79:9,14
**chaired (1)**
32:16
**chairs (2)**
25:14 112:12
**change (5)**
23:24 24:8
31:5 46:22
134:5
**changed (1)**
31:22
**changes (4)**
22:24 24:16
64:3 134:3
**Changing (1)**
63:24
**charge (1)**
103:10
**chart (29)**
38:11,16,19
39:13 41:12
41:15,19,25
42:22,25 43:6
43:11,15 44:2

44:14,19
45:18,19,22
45:24 46:3,5
46:8,13,22
125:23 126:5
130:9,13
**charts (2)**
45:14,16
**Chris (1)**
36:2
**Christos (3)**
1:18 133:7,21
**City (9)**
1:7 12:13,17
43:13 53:15
70:13 71:6
74:15 113:2
**Civil (1)**
3:17
**claim (1)**
96:16
**clear (5)**
5:8 26:22
29:22 62:13
86:15
**clearer (1)**
6:14
**clock (1)**
8:10
**closed (1)**
125:21
**closer (1)**
34:20
**closing (1)**
125:18
**co-worker (1)**
51:14
**code (1)**
32:23
**coherent (1)**
83:8
**colleague (3)**
6:2,4 31:10
**colloquy (2)**
117:7 125:12
**columns (1)**

116:4
**come (12)**
9:21,22 13:15
13:18 15:23
16:4 18:23
67:23 73:22
79:4 122:2
123:13
**coming (2)**
48:15 70:20
**comment (1)**
79:6
**COMMISSI...**
134:25
**committee (81)**
4:25 5:11
12:18,21
13:11,22 14:2
14:11,18 15:3
15:6,12,13
16:2,10,17,23
17:11 18:10
18:13,14 19:8
19:17 21:16
21:22 22:10
22:19,23 23:4
23:8,10,23
24:7,11 25:4
25:15,16,19
26:3,17,24
27:11,21
28:13 29:7,17
29:23 30:2
31:3,8 32:15
33:10,17 34:3
35:14 44:17
44:18 45:17
45:20 46:2,9
48:4,18 54:10
54:16 56:12
56:19 79:5,9
79:14 80:11
93:6,20 94:7
94:16,23 95:4
97:25 98:2
101:20

112:12
**common (3)**
21:11 60:13
66:15
**communicati...**
11:4
**communicati...**
7:16,23
**communicati...**
7:6,12 9:23
10:6,8
**community (5)**
13:13,15 14:4
18:17 22:16
**comparing (1)**
61:3
**complaint (7)**
48:16 56:13
58:20 66:3,12
72:16 101:10
**complaints (7)**
47:24 48:10,14
48:19 49:22
75:24 76:21
**complete (3)**
36:19 73:22
77:23
**compliance (1)**
125:16
**complicated ...**
91:16
**comply (1)**
103:6
**Complying (...**
50:12 53:8,10
53:13 54:23
54:25 55:3,17
55:19,22,25
56:5 57:7,11
57:14,18,21
57:25 59:7
67:15 70:7
73:5,11,16
81:16,25
95:18 104:14
104:20 106:9

106:21 107:2
107:4,6,14
108:12,20,22
108:24
110:17,20
111:24
112:24
113:25 118:9
121:11
**computer (3)**
10:9 20:15
24:18
**concept (2)**
74:5 124:7
**concepts (1)**
109:17
**concern (1)**
115:20
**concerned (3)**
49:14,16,19
**concerns (1)**
111:15
**concluded (1)**
128:11
**conditions (2)**
63:9,10
**conduct (1)**
3:16
**conducted (1)**
3:4
**conference (1)**
1:18
**confirming (1)**
3:8
**cons (1)**
22:18
**consent (1)**
3:10
**consider (5)**
33:16 35:24
36:9 37:6
70:11
**considered (9)**
3:10 25:10
34:4 36:12
37:10,15

56:19,23
120:13
**consult (2)**
16:5,6
**contact (7)**
12:12 32:24
33:20 61:2
76:12 77:17
77:21
**contempt (1)**
8:20
**contents (1)**
28:10
**continue (2)**
101:3 118:7
**continued (2)**
1:15 16:16
**control (2)**
3:6 70:20
**coordinating...**
14:21
**copied (1)**
21:9
**copy (4)**
3:13,16 21:9
24:22
**corner (1)**
40:18
**correct (95)**
12:19 14:19
20:16 34:13
35:20 37:15
39:18 40:2,22
41:16,17 42:3
42:8,15,18,23
45:11,12 46:2
50:19,20,23
51:2 52:22
53:21 58:8
60:19 61:19
62:23,24
63:16 64:12
68:3 69:2,15
76:13 77:6,13
77:18 81:21
82:13,14 86:6

86:7,24 87:14
87:24 88:15
88:16,17,22
89:4,19 92:16
92:19,20,22
93:16 95:21
96:2,25
103:13 105:6
105:11,19
107:20 108:2
111:7,16,20
112:2,9 113:3
114:6,10,17
115:3,6,10,14
115:15,18,19
115:22 116:4
117:24
118:20 119:2
119:14
121:19
122:22,25
124:14 129:9
134:3
**correlates (2)**
90:7 120:24
**correlation (1)**
91:22
**CORSI (1)**
2:14
**cost (2)**
66:15 107:25
**costs (1)**
3:16
**counsel (4)**
3:4,5,14 124:9
**COUNTY (1)**
133:5
**course (13)**
21:11,12 35:5
38:24 64:22
65:2 100:6
103:5,9,15
112:5 114:19
114:23
**court (39)**
1:17 3:5,7,8

4:6,9 6:13,20
6:24 7:3 8:19
9:13 15:16
17:13,16 43:4
51:19,22
64:19 71:18
71:23 72:2,6
75:8 90:13
94:2 97:10
101:4 104:3,7
109:4 114:20
116:18 124:4
124:16,19
125:10,17,20
**court's (1)**
125:16
**covered (1)**
60:10
**Crane (6)**
50:15 56:13
76:21 98:16
99:22 101:11
**Create (1)**
67:20
**created (4)**
38:23 82:25
83:7,11
**creates (1)**
82:5
**creation (1)**
98:8
**Crespo (12)**
73:19 74:12,23
76:23 98:2,2
98:18 101:11
105:2,10
108:2 110:24
**crowded (1)**
93:11
**crowder (1)**
84:15
**crowding (20)**
61:7 84:16
86:17,24 87:4
87:10,23,23
88:2,6,6,11

88:20 89:10
89:25 90:6
93:7,21 94:8
94:16
**crowds (4)**
85:7,11,21
86:14
**Crowing (1)**
88:2
**crucial (2)**
37:17 38:3
**crystal (2)**
29:22 86:15
**current (1)**
70:14
**curve (4)**
51:5 55:8,12
114:16
**curves (3)**
114:4,5 115:12
**customer (10)**
35:17 36:16
37:11,14,16
44:8,20 67:20
69:7 96:21
**customer-act...**
67:6
**customers (10)**
32:11 33:3
49:15,17,20
67:21 83:15
83:21 96:18
99:8
**cut (1)**
106:11
**cutoff (1)**
67:17

——————
**D**
**D (3)**
4:2 129:2
132:2
**danger (1)**
12:5
**DaSILVA (1)**
1:3

**data (9)**
61:20,22 79:15
84:20,24 85:4
86:10 92:8
102:7
**date (23)**
1:11 39:25
40:20,21
41:20 42:7
51:5 113:7,12
116:14 117:4
126:2,8,12,16
126:20,25
127:6,11,16
127:21 128:2
128:7
**dated (4)**
50:18 73:18
105:5 110:23
**dates (1)**
101:18
**Dave (16)**
57:17 67:13
73:3 103:25
104:11
107:13
108:10,19
109:24
110:14
113:23
117:12 118:7
121:8,9,9
**DAVID (1)**
2:6
**day (4)**
60:11 129:19
133:18
134:24
**days (2)**
20:17 21:7
**DC (1)**
50:23
**Dead (1)**
51:5
**death (1)**
63:4

**deaths (2)**
59:11 60:17
**decade (1)**
18:5
**decide (1)**
19:12
**deciding (1)**
54:2
**decisions (3)**
19:8,10,14
**decreasing (1)**
97:5
**deducted (1)**
125:13
**Defendant (1)**
1:16
**Defendants (2)**
1:9 2:14
**defer (7)**
89:21 90:21,21
90:23 91:2,4
92:19
**define (1)**
12:3
**definition (2)**
12:6 30:19
**delays (5)**
86:2,8,11,16
86:20
**department (5)**
14:7,8 37:22
37:24 43:7
**departments ...**
14:5 20:5,5
21:25 22:16
**depending (2)**
13:16 14:8
**deposed (1)**
3:17
**deposes (1)**
134:1
**deposition (14)**
3:4,16 4:17 7:9
9:21 10:21
11:6,6,7 12:9
15:2 45:6,9

49:11
**depositions (1)**
120:12
**derail (1)**
114:17
**derailing (1)**
116:3
**derailments (...**
115:21,23
**DESCRIPTI...**
130:7 131:5
**designated (1)**
14:6
**desire (1)**
19:6
**detection (1)**
70:17
**determine (3)**
31:22 54:7
103:3
**develop (2)**
111:14 112:8
**dictionary (2)**
12:7 30:19
**dictionary.co...**
12:2
**difference (3)**
64:2 72:20
99:21
**differences (1)**
30:6
**different (16)**
14:5 21:25,25
22:4,4,8,14
22:16 24:14
46:24 76:10
78:21 95:24
101:9 105:15
114:4
**difficult (1)**
53:2
**dinner (1)**
6:18
**direct (2)**
91:20,22
**directing (1)**

71:5
**directive (2)**
30:4 44:13
**director (1)**
50:21
**dirty (4)**
52:21,25
107:23
112:17
**disagree (3)**
53:18 60:2
71:14
**disbelieve (1)**
59:21
**discuss (5)**
18:18 21:25
32:17,22
33:11
**discussed (13)**
22:6 27:23,25
32:20 33:6
93:11,12,13
93:19 100:23
100:24 116:9
120:19
**discusses (1)**
97:4
**discussing (9)**
11:24 22:3,17
32:21 41:11
69:25 82:23
97:2 120:21
**discussion (8)**
14:9 21:23
66:17 71:4
94:12,14
109:9 110:8
**discussions (8)**
7:21 28:16
29:2,12,13
31:25,25
32:16
**disparity (1)**
64:2
**distance (32)**
37:19 38:5,11

38:20 39:13
41:12,15,18
42:22 43:11
44:2,7,19
45:10,13,15
45:24 46:5,8
46:17,21
47:14 68:25
69:5 76:3
77:2,20 78:18
125:23 126:5
130:8,13
**distances (1)**
46:24
**distributed (1)**
19:24
**DISTRICT (2)**
1:2,2
**diverge (1)**
114:13
**document (64)**
27:24 38:22
39:2,3,7
43:18 95:15
95:23 96:5,9
96:11 97:12
97:17,22 98:8
103:23
107:12
108:11
109:18,24
110:2,3
116:11,16,21
117:3,4,6,7
118:6,13,15
118:19,22
119:7,10,11
120:15,23
121:10
125:24 126:6
126:10,14,18
126:23 127:4
127:9,14,19
127:24 128:5
130:11,14,15
130:16,18,20

130:22,24
131:7,9,11,13
**documents (6)**
4:24 5:10
119:19
120:11
132:10,11
**doing (5)**
24:3,25 31:9
35:13 87:21
**door (1)**
122:24
**doors (6)**
49:10 122:3,21
123:7,14,24
**draft (2)**
24:12 121:6
**draw (1)**
123:23
**drive (1)**
24:18
**drivers (1)**
99:9
**Due (1)**
51:11
**duly (4)**
4:3 129:5
133:10 134:1

---

**E**

**E (8)**
2:2,2 4:2 129:2
130:2 132:2
133:2,2
**e-mail (24)**
10:10 20:16,17
20:18 69:24
81:20 105:9
105:14
107:19
110:21
111:19 112:7
121:16,24
126:17 127:3
127:13,18
128:4 130:17

130:21 131:6
131:8,12
**e-mailed (3)**
20:22 21:5,12
**e-mailing (2)**
21:10,14
**e-mails (8)**
21:8,10 49:9
81:12 104:16
104:22
105:21,24
**E-Transcript...**
131:18
**earlier (2)**
32:23 68:23
**early (2)**
20:17 21:7
**EASTERN (2)**
1:2,2
**echoed (1)**
116:25
**edge (2)**
49:10 59:10
**effect (17)**
33:17 59:11
60:17 63:3
65:6,23 75:3
78:21 79:21
91:20,22 92:7
93:8,22 94:18
95:6 97:5
**effective (7)**
66:15,21 100:2
101:15,23
102:9 103:12
**effort (1)**
59:8
**either (4)**
6:5 31:20
61:23 92:9
**elevation (2)**
115:17,17
**emailed (1)**
3:14
**emergency (...**
38:10 39:12

43:12 44:7,18
44:19 56:8
125:22 126:4
130:8,12
**employee (2)**
6:18,21
**employees (1)**
7:8
**encounter (2)**
115:12,13
**encourage (1)**
66:21
**encouraging ...**
59:9
**engineer (5)**
25:8 37:21,25
49:3,5
**engineering (1)**
25:7
**English (1)**
23:18
**enraged (2)**
83:15,21
**enter (4)**
83:2,12 96:17
97:19
**entered (3)**
47:25 48:6,11
**entering (22)**
27:22 28:4
29:8,19,24
33:12 34:5
43:20 44:9,25
48:20 49:23
66:23 68:24
73:22 74:24
75:4 76:11
78:22 80:18
81:5 109:19
**enters (4)**
45:9 46:16
78:3 83:18
**entire (2)**
16:10 27:6
**entitled (3)**
51:5 95:19

112:25
**entrance (3)**
67:2,7 68:19
**entry (24)**
32:10,18 33:17
49:23 75:19
75:25 76:25
78:21 79:17
79:18,21 81:2
81:3 83:20,25
84:12 91:6
95:5 96:6
97:5 103:17
116:9 117:9
118:16
**equipment (3)**
41:9 42:25
43:7
**eradicate (1)**
66:17
**ERRATA (1)**
134:1
**ESQ (3)**
2:6,11,16
**ESQS (1)**
2:9
**essence (1)**
76:24
**establish (1)**
26:3
**establishing (...**
37:18 38:4
**et (3)**
99:14 101:12
121:25
**evaluation (1)**
105:10
**Everybody (1)**
20:10
**evolving (1)**
21:20
**exact (3)**
53:19,20 78:15
**exactly (4)**
25:24 32:25
77:16 93:13

examination ...
1:15 4:14
    128:10 132:4
    133:9,11
examined (1)
4:4
example (4)
24:18 78:16
    83:15 105:15
excessive (1)
75:25
exchange (11)
69:24 126:17
    127:3,13,18
    128:4 130:17
    130:21 131:6
    131:8,12
executive (1)
25:12
exhibit (35)
3:13,13,15
    38:10 39:12
    39:15 40:10
    40:20 43:11
    45:15 50:10
    57:5 69:24
    71:17 73:2
    81:11 93:4
    95:13 107:16
    125:25 126:7
    126:11,15,19
    126:24 127:5
    127:10,15,20
    127:25 128:6
    130:6,6 131:4
    131:4
exhibits (4)
3:12 130:4
    131:2,18
existence (1)
42:2
exiting (1)
70:21
EXPIRES (1)
134:25
express (1)

3:10
expressed (1)
22:8
expressing (2)
22:17 30:3
extremely (1)
26:9

——————
F
——————
F (1)
133:2
fact (3)
79:24 84:20
    85:3
factor (2)
65:22 80:4
factors (11)
47:4 62:6 63:5
    63:6,12 64:3
    64:5 65:16,20
    88:3 91:18
facts (4)
37:18 38:4
    84:24 92:8
factual (3)
60:2,6 61:22
fall (3)
84:17,19 96:18
falling (1)
96:21
falls (1)
67:8
false (4)
11:12,13 29:19
    118:12
familiar (5)
69:10 105:13
    109:17
    113:18,19
far (2)
43:15 77:19
fast (3)
48:15 114:16
    121:15
faster (1)
46:16

features (2)
52:8,18
February (4)
73:18 105:6,9
    110:23
figure (1)
14:21
file (3)
20:11 24:22
    25:2
files (6)
20:7,8,11,12
    20:13 24:21
filing (1)
24:19
Fine (1)
107:10
finished (1)
27:14
firms (1)
9:24
first (21)
4:3 12:20
    23:11 26:2,11
    26:17 31:2,21
    39:14 41:19
    42:6 45:16
    59:3 61:21
    78:3 81:15,19
    96:14 104:21
    109:6 129:5
fit (1)
125:12
Fitzgerald (2)
70:12,25
five (4)
73:24 74:25
    75:19 121:24
Five-minute ...
72:7
floating (1)
18:19
focus (1)
119:17
focused (2)
60:11 117:6

follow (1)
71:5
follow-up (1)
9:21
following (2)
66:14 134:2
follows (1)
4:5
force (1)
122:25
FORD (1)
2:14
Fordham (1)
2:10
foregoing (1)
129:8
form (3)
26:3 32:6
    41:22
formal (7)
18:14,16 19:2
    19:5,11,13,14
former (1)
7:8
forth (1)
133:10
found (1)
121:23
four (2)
53:14 54:10
Franklin (3)
51:6,9,13
freedom (2)
12:4,10
front (1)
53:3
full (3)
111:14 112:8
    112:17
further (3)
3:12 129:8
    133:13
FYI (1)
104:3

——————
G
——————

G (3)
31:16,18
    122:18
gather (1)
18:17
general (2)
92:23 99:9
generally (8)
12:10 18:11
    19:18 20:2
    24:20 46:19
    63:21 82:17
Genis (102)
2:9,11 4:15
    7:17,22 8:6
    8:18 9:2,4,11
    9:15 14:23
    17:6 23:16
    28:17 36:2
    38:2,17 40:11
    40:14 43:9
    47:5 49:6
    53:6,9,11
    54:22,24 55:2
    55:15,18,20
    55:23 56:2,6
    57:3,8,12,15
    57:19,22 59:5
    61:11 64:9
    67:12,16 70:4
    71:22,25 72:5
    72:9,14 73:3
    73:8,14 76:17
    81:13,23 82:2
    85:9 95:16
    101:2 102:16
    103:22 104:6
    104:11,18
    106:8,16,19
    106:24 107:3
    107:5,7,10,15
    107:18
    108:10,13,18
    108:21,23,25
    109:23 110:4
    110:11,18

111:22
112:22
113:22
116:23
117:11,14
118:7 121:8
121:14
122:16
124:12,25
125:12,19
132:5
**gentlemen (1)**
125:18
**Gerry (1)**
31:13
**getting (8)**
34:6 35:19
36:22 48:16
75:5 77:3
82:24 117:5
**give (3)**
10:14 70:23
102:21
**given (2)**
129:10 133:12
**Glenn (5)**
13:17,18 105:9
112:16
121:19
**go (23)**
15:21 41:23
54:24 56:9
57:3,16,23
73:14 76:11
84:2 95:16,23
95:23 104:17
104:18
107:11
108:11
109:23 110:6
112:22
113:24 114:2
118:5
**goal (2)**
22:11 77:5
**goes (4)**

108:16 114:16
114:18,22
**Gogansky (3)**
6:9,12,17
**going (21)**
6:11 26:9 53:9
55:18,21,24
56:4,6,11
70:2 71:15
72:25 101:4
107:3,5,7
108:21,23
114:15 117:2
121:15
**gonna (2)**
11:10 38:15
**good (8)**
4:16 31:17
37:8 65:13
87:19,20 95:7
102:25
**Gould (2)**
122:18,19
**gracious (1)**
125:7
**grades (1)**
115:13
**greater (1)**
80:21
**greatest (1)**
78:18
**greatly (1)**
96:19
**group (2)**
18:16 21:23
**guess (3)**
52:5 65:25
79:25
**guessing (2)**
89:7 93:16
**guidance (2)**
4:23 5:9
**guided (1)**
35:8
**guideline (1)**
120:6

**guidelines (3)**
22:20 23:25
27:13

---

## H

**H (1)**
130:2
**hand (4)**
18:18 22:18
27:17 133:18
**happening (1)**
8:11
**hard (2)**
24:22 50:13
**HARGER (1)**
1:3
**harm (1)**
35:11
**hazards (12)**
80:19,20,22,22
81:4 82:6,18
82:23,25 83:7
83:9 84:8
**head (1)**
45:25
**hear (11)**
6:10,15 11:23
15:19 34:15
70:20 83:3,4
83:5 100:19
116:23
**heard (2)**
116:24 119:24
**held (3)**
1:17 14:13
110:8
**help (2)**
32:18 102:19
**hereinbefore...**
129:11 133:10
**hereunto (1)**
133:17
**higher (1)**
79:18
**highlighted (1)**
59:3

**hit (19)**
33:13 34:6
35:19 36:9,22
37:4 54:16,17
61:22,24
62:16 74:6
75:5 77:3,12
82:24 83:10
84:10 118:23
**hitting (4)**
51:14 69:6
116:3,3
**hold (2)**
8:20 116:18
**honest (1)**
102:20
**Honestly (1)**
31:17
**host (3)**
25:5,6,8
**hour (5)**
11:9 67:3
73:24 74:25
75:19
**hours (3)**
124:19,20
125:11
**huge (1)**
64:2
**human (2)**
12:11 32:24
**hundreds (1)**
98:18

---

## I

**identification...**
38:9 50:9 57:5
69:23 71:16
126:2,7,11,15
126:20,25
127:6,11,16
127:21 128:2
128:7
**identity (1)**
3:8
**ignore (1)**

65:10
**immediately ...**
66:21
**impacts (3)**
104:25 107:23
108:15
**implemented...**
70:22 107:25
123:24
**implications ...**
81:9
**importance (2)**
35:5 64:23
**important (3)**
65:21 80:3
82:4
**impractical (2)**
122:3 123:8
**improve (3)**
100:6,10
123:14
**improved (5)**
47:3,7,9,13,20
**inaudible (18)**
8:24 15:4,15
17:2 19:14
21:15 34:20
44:13 46:10
47:17 68:8
73:25 96:23
99:4 100:22
110:4 111:12
124:15
**incident (5)**
54:2 79:22
87:8 94:18
95:7
**incidents (25)**
33:13,19 60:10
60:25 61:17
62:9 63:4
65:7,8,18
66:7,17 72:20
75:5 77:13
82:24 83:10
83:25 84:9

85:22 86:5
90:7 93:9
118:20
120:24
**include (2)**
35:18 65:17
**including (2)**
7:8 36:13
**increase (5)**
73:20 75:17
95:25 97:3,13
**increased (2)**
90:7 96:20
**incredibly (1)**
80:2
**indicated (2)**
88:5 89:24
**indicates (1)**
51:8
**individual (1)**
70:17
**informal (4)**
18:10,13,15
19:11
**information ...**
35:14 67:20
79:10 99:8
132:10,11
**injured (9)**
54:18 60:25
61:17,23
74:15 75:6
84:10 86:12
98:19
**injuries (2)**
60:18 63:3
**injury (4)**
12:4,11 96:17
114:17
**intended (1)**
96:15
**intense (1)**
60:11
**intent (1)**
76:9
**interaction (2)**

119:12,15
**interdepart...**
22:13
**interest (2)**
15:23 79:12
**interested (5)**
21:6,24 79:15
89:6 133:15
**intermediate...**
25:10
**international...**
88:10,20
**interpretatio...**
30:11
**introducing (1)**
73:19
**Intuitive (1)**
92:4
**investigate (1)**
87:9
**investigates (1)**
77:13
**investigation...**
54:8 77:19,23
87:14,19,21
**involved (8)**
25:6 34:23
50:4 75:13,15
79:7 98:7
122:21
**involving (6)**
5:20 28:7
49:10 110:23
122:20
123:19
**irrelevant (3)**
62:8,15 65:10
**issue (16)**
24:11 26:11,17
26:25 27:6,12
27:17 28:3
29:23 30:22
32:2 48:12
60:12 93:21
119:9 120:17
**issued (5)**

27:2,17,21
29:7,18
**issues (4)**
48:23 95:20
127:9 130:23
**italicized (1)**
70:9
**items (1)**
70:2

---

**J**

**J (1)**
31:16
**JANSSEN (1)**
1:3
**January (1)**
58:5
**Jerry (1)**
31:16
**job (4)**
21:21 35:13
87:19,21
**Joe (1)**
111:14
**John (1)**
58:12
**judge (4)**
7:17 8:7,14,21
**July (3)**
1:11 42:14
133:18

---

**K**

**KEAVENEY...**
2:16 5:13 7:15
7:20 8:5,16
8:24 9:6
15:14,21
16:12 18:22
19:4 26:12,18
32:5,12 33:22
34:19 35:2
36:11,24 37:5
39:5,9 40:3,9
40:13,23
41:21 42:9,24
44:4,10 48:13

50:2,6 54:4
56:20,24
58:25 60:4,20
61:5 62:19
69:8,16 71:11
72:23 74:8
75:21 76:5
77:7 78:6
80:7,13 81:7
82:15,20
83:13 84:4,13
85:6,23 87:25
88:23 89:20
91:8 92:12
93:23 94:10
94:25 95:8
96:12 98:4,23
100:3 101:17
102:11,23
103:8,14
106:4,10,13
106:18,23
108:3 109:11
110:5 111:4,8
112:6,19
115:4 116:5
116:10,15,20
117:25
122:14 124:9
124:15,18
125:6
**keep (19)**
51:13 53:9
54:19,19
55:18,21,23
56:3,6 61:16
106:19 107:3
107:5,7
108:18,21,23
113:22
117:11
**keeping (1)**
8:11
**keeps (3)**
35:11 61:13
85:25

**Ken (4)**
110:22 111:25
112:2,15
**Kenneth (1)**
105:16
**kept (4)**
20:6,11 24:17
38:23
**Kevin (1)**
105:15
**key (1)**
83:15
**kick-off (1)**
122:25
**killed (15)**
51:10 53:15
54:11,13,17
61:2,17,23,24
74:14 75:6,6
76:12 84:10
98:19
**killing (3)**
51:6 55:6 76:4
**killings (1)**
55:5
**kind (3)**
6:21 19:8 75:2
**kinds (1)**
86:20
**knew (1)**
112:2
**know (99)**
10:22 17:22
19:12,14
20:10,11
21:19 24:10
24:13 25:23
25:24 26:5,8
27:24 28:12
30:11 31:6
32:13,25
37:21 39:8,10
40:5 42:4,11
44:5,12,13
47:10,15,22
52:11,15,19

53:19,20
54:10 55:11
56:21 60:22
66:8,9,13
67:21 68:14
69:17,21
72:24 75:11
76:6 77:16
78:8,13,19,24
79:7,19 80:8
81:8,8 83:6
85:19 87:5,6
87:8,12,17,22
88:21,24
89:18,19,23
90:2,4,5,15
90:17,22 96:9
98:6 101:18
101:20
102:12
112:20 113:8
113:11
116:12,13,14
117:3,19
119:21,22
120:3,9 122:8
123:9,21

**knowledge (7)**
35:16,17,19,21
42:5 111:19
112:4

**knows (2)**
63:22 112:9

_____

**L**

**L (2)**
3:2 129:2
**label (1)**
18:11
**LANDMAN ...**
2:14
**Larry (3)**
122:18,18,19
**law (3)**
3:10 9:24
105:2

**lawyer (1)**
10:13
**lawyers (2)**
10:9,18
**Leader (1)**
111:14
**leaving (1)**
82:6
**left (14)**
5:16 13:5
16:18 25:15
25:15,20 31:3
40:17 45:2
48:24 49:14
52:16 98:5
101:19
**LegalView/Z...**
3:6
**legislation (3)**
73:19 108:16
110:24
**let's (41)**
8:22 33:5
38:15 42:13
42:13 53:6
54:22,24 56:9
57:3,8,23
58:10,10 59:3
62:13 64:11
65:5 68:17
69:18 70:4
74:10 79:2
81:10,10,13
81:18,18 83:7
84:7 86:15
95:16 96:13
103:22
104:16,18
107:11
109:23
112:22 115:7
116:25
**letter (26)**
50:14 51:2,4
56:13,17,18
56:22 58:3

59:4 66:3,9
72:16 75:7,10
76:21,23 77:4
77:8 98:16
99:23 101:10
101:12 126:9
126:13
130:15,16
**letter's (1)**
76:15
**letters (3)**
76:7,10,14
**Lexington (1)**
2:5
**Lexitas (1)**
3:7
**lieu (1)**
70:12
**light (1)**
67:7
**liked (1)**
13:14
**likelihood (1)**
96:20
**limit (3)**
51:11 79:17,18
**limited (1)**
55:8
**limits (3)**
78:22 95:24,25
**LINE (2)**
132:18 134:5
**Liopyros (3)**
1:19 133:7,21
**list (2)**
13:25 66:14
**litigation (4)**
3:11,17 121:6
122:6
**little (5)**
73:9 81:24
106:15
111:23
124:20
**LLP (1)**
2:4

**located (1)**
20:9
**location (1)**
79:3
**locations (4)**
3:5 22:25
24:17 78:11
**long (4)**
51:24 63:14,15
63:19
**longer (1)**
46:17
**look (32)**
8:20 10:13
28:14 36:8,22
37:3 39:23
40:16 48:18
50:10 56:12
61:21 62:16
63:14 65:8,16
65:22 74:10
80:6,9,12
81:10,18 93:7
94:8,16,20
95:4,22,23
103:22
117:14
**looked (4)**
30:19 102:7
111:7 120:11
**looking (7)**
35:25 40:19
42:14 63:13
80:14 96:11
110:21
**looks (5)**
40:8 43:6,7
50:13 51:3
**loss (1)**
12:5
**lot (2)**
22:14 99:8
**louder (8)**
6:14 17:17
43:5 44:22
51:20 64:20

114:21
116:19
**lower (1)**
79:17
**LUISA (1)**
1:3
**Lunden (5)**
13:17,21 105:9
112:16
121:19

_____

**M**

**M-E-A-G-H-...**
31:15
**M-E-Y-E-R (...**
31:14
**maimed (1)**
76:12
**maiming (1)**
76:4
**main (4)**
14:20 24:25,25
35:10
**maintained (1)**
38:23
**making (1)**
70:11
**Man's (1)**
51:5
**manner (5)**
3:9 25:12 90:6
96:6 97:21
**Marcos (1)**
73:19
**mark (2)**
50:15 72:3
**marked (19)**
3:13 38:9 50:9
57:4 69:23
71:16 125:25
126:6,10,14
126:18,23
127:4,9,14,19
127:25 128:5
132:17
**marker (1)**

77:17
**marriage (1)**
133:15
**Marvin (2)**
51:6,9
**massive (1)**
104:25
**matter (4)**
22:14 30:10
91:4 133:16
**matters (1)**
3:17
**max (1)**
74:25
**maximum (2)**
73:24 75:19
**Meagher (1)**
31:13
**mean (9)**
5:3,15,16,22
32:13,25
33:23 62:23
76:6
**means (1)**
42:20
**meant (2)**
42:11 100:17
**measurable (8)**
59:11 60:6,17
63:3 65:6,23
72:19 99:21
**measure (3)**
60:22,24 99:25
**measured (1)**
102:7
**measuremen...**
101:13
**measuremen...**
62:22,22 77:16
**measures (4)**
101:14,23
102:8 103:12
**meet (1)**
19:6
**meeting (12)**
3:6 10:7 14:21

16:23 17:3,10
20:3 25:13
28:16 29:3
30:3 122:25
**meetings (16)**
13:19,21 14:10
14:11,17 15:6
15:12 16:2,17
16:25 19:3,25
21:4,16 24:7
31:24
**member (4)**
13:23 16:10
18:12 69:25
**members (11)**
14:3 15:13,22
18:10,19,21
19:2 20:23
21:5 30:2,2
**membership ...**
13:25
**memo (3)**
71:13 123:3,3
**memory (5)**
4:19,21 10:16
12:23 27:2
**mention (2)**
117:9 118:10
**mentioned (4)**
5:24,25 6:18
28:6
**met (1)**
32:16
**METROPO...**
1:7
**microphone ...**
34:22
**middle (2)**
78:4,17
**miles (3)**
67:3 73:24
74:25 75:19
**mine (2)**
31:10 106:16
**Minus (1)**
124:22

**minute (7)**
7:18 8:2,8,12
9:5 110:6,13
**minutes (15)**
19:15,17,19,24
20:6,15,22
21:4,14 22:7
28:9,10,14,15
29:2
**mission (3)**
22:11,12,15
**Mm-hmm (1)**
52:9
**mode (1)**
100:10
**moment (5)**
29:16 87:5
90:16 92:18
111:7
**money (1)**
76:15
**month (3)**
15:8 53:16
54:10
**monthly (3)**
14:15 15:6,10
**Mooney (9)**
105:15,16
110:22
111:25 112:2
112:4,7,11,15
**morning (1)**
4:16
**motorman (1)**
70:23
**move (14)**
8:22 14:23
17:6 34:21
38:2 43:9
47:5 49:6
61:11 64:9
76:17 85:9
101:2 102:16
**moving (3)**
21:18 51:10
74:15

**MTA (11)**
6:17 7:7,14,25
9:25 11:5
35:5 71:3
73:20,21
75:17
**MTA-NYC (1)**
112:25
**MTA-NYCT...**
127:23 131:10
**mutual (3)**
25:5,6,8

_____
**N**

**N (5)**
2:2 3:2 4:2
129:2 132:2
**name (5)**
4:7 6:12 25:18
30:15 31:13
**names (1)**
105:15
**nature (4)**
22:21 86:6
114:5 115:13
**necessarily (6)**
15:8 29:10
30:16,18,20
68:13
**necessary (1)**
134:3
**need (3)**
3:7 111:13
112:8
**needs (1)**
35:17
**never (5)**
64:17,21 66:8
75:16,20
**New (24)**
1:2,7,19 2:5,5
2:10,15,15
4:4,12,12
12:13,17
43:12 53:15
60:10 70:13

71:6 73:18
74:14,15
113:2 133:4,8
**nine-page (2)**
127:14 131:6
**nonresponsiv...**
49:7 101:4,6
102:17
**noon (1)**
125:9
**Nope (2)**
7:22 9:2
**Notary (5)**
1:19 4:3
129:22 133:7
134:25
**note (18)**
5:13 16:12
26:12,18 35:2
40:3,23 41:21
42:9 44:10
54:4 71:11
72:3 83:13
98:17 108:3
109:11 115:4
**noted (1)**
107:25
**notes (3)**
31:11 76:22
121:23
**noting (1)**
112:16
**noun (1)**
12:3
**number (64)**
10:5 33:13
34:5,11 36:9
36:15 37:3
38:10 39:15
40:15 41:12
45:21,23
50:10 54:12
54:16 57:6,9
57:16 60:24
65:8,14,17,24
66:16 69:5

72:20 73:2,10
74:6 75:4
76:12 77:2,6
77:17 78:23
79:2,16,23
81:11,15 90:7
91:23,25 93:4
95:14 96:6
97:7,20,20
98:9,22
101:15,24
102:10
104:10,19
110:15
112:23
118:11
121:12
122:15 130:7
131:5
**numbers (2)**
62:16,23
**NYCT (1)**
70:20

_____

**O**

**O (2)**
3:2 129:2
**oath (5)**
3:7 14:25
29:16 62:14
90:10
**objection (83)**
5:14 7:15,19
8:16 15:14
16:13 18:22
19:4 26:13,19
32:5,12 33:22
35:3 36:11,24
37:5 39:5,9
40:4,24 41:21
42:10,24 44:4
44:11 48:13
50:2,6 54:5
56:20,24
58:25 60:4,20
61:5 62:19

69:8,16 71:12
72:23 74:8
75:21 76:5
77:7 78:6
80:7,13 81:7
82:15,20
83:14 84:4,13
85:6,23 87:25
88:23 89:20
91:8 92:12
93:23 94:10
94:25 95:8
98:4,23 100:3
101:17
102:11,23
103:8,14
108:4 109:12
111:4,8 112:6
112:19 115:5
116:5,10
117:25
**objective (3)**
62:22,22 116:6
**Obviously (2)**
55:12 98:24
**occasionally ...**
16:4
**occupying (1)**
51:16
**occur (12)**
78:2,12,23
79:4,16 83:25
84:11 87:4
89:11 91:2
92:11 94:9
**occurred (5)**
55:6 65:9,24
75:5 87:10
**occurrence (4)**
12:4,11 60:13
63:21
**occurring (6)**
65:7 68:21
91:23 94:19
96:7 103:4
**October (1)**

50:18
**off-the-recor...**
110:7
**offer (2)**
4:23 5:9
**Office (4)**
50:22 89:22
90:10,18
**officer (1)**
3:7
**oh (3)**
27:14 40:16
107:10
**okay (299)**
4:20 5:6,8,19
7:12 8:11
9:23 10:17
11:10,23,24
12:8,16 13:10
13:20 14:16
14:22 15:11
16:16,22 18:5
18:9,25 19:7
19:10,16,20
19:23 20:6,8
20:14 21:2,13
23:8 24:5,22
26:22 27:5,15
29:4,22 30:13
32:8,14,21
33:2,5,10,16
34:10,21 35:6
35:13,18,23
36:18 37:8,13
38:8,15,22
39:11,13,17
40:19 41:13
41:18,25 42:5
42:13,17
43:17 45:8,13
46:7,16,20
47:11,23
48:17 49:2,18
50:4,8 51:8
52:3,6,14,20
53:17,22

54:21 55:14
56:9,10,11
57:2,8,15,19
57:23 58:2,10
58:17,19,22
59:14,20 60:9
62:7,13,21,25
63:6,13,14,18
63:25 64:25
65:3,12,21
66:2,10 67:6
67:11,16 68:5
68:15,23 69:4
69:10,18,22
71:10,15
72:15,25 73:6
73:7,12,13
74:4,10,22
75:12,23 76:9
76:16 77:5,10
77:25 78:9,20
78:25 79:13
79:20 80:2,5
80:16,21,24
81:10,12 82:2
82:9,12,18,22
83:17,24 84:7
84:18,22
85:15,15,20
85:25 86:8
87:2,7,16,20
88:4,9,17,19
89:6,14,17,22
90:3,16,23
91:5,10,15,21
92:3,15,25
93:3,25 94:5
94:21 95:3,10
95:12,12,22
97:2,3,24
98:7,12,15
99:5,7,11,18
100:12,21
101:21 102:3
102:13,25
103:16,21

104:9,15,21
105:5,8,18,23
106:3,7,8,16
106:17,24,24
107:10,15,15
107:15,18
108:6,9,25
109:8,14,22
110:14 111:6
111:11,18
112:4,15,21
112:25
113:21 114:8
114:12,24
115:7,11,16
115:20,25
116:7 117:5
117:17,20
118:10,14,18
119:5,18,23
120:5,10,15
120:20 121:3
121:5,12
122:6,9,12,20
122:24 123:6
123:10,22
124:3,8,13
125:6
**once (1)**
51:25
**one's (1)**
104:22
**one-page (5)**
95:15 126:23
127:19
130:19 131:8
**operate (1)**
66:22
**operation (1)**
37:9
**operations (3)**
25:9 37:12
38:7
**operator (3)**
51:12 53:2
67:23

**operator's (1)**
55:7
**operators (1)**
66:22
**opinion (12)**
59:22 63:2
68:12 84:21
84:22,23,25
85:3,17 91:12
99:17 112:10
**opinions (3)**
22:8,15 30:3
**Ops (1)**
121:25
**order (4)**
1:17 37:2
125:10,16
**organization ...**
103:3
**original (3)**
39:25 40:21
41:19
**outcome (1)**
133:16
**overcrowdin...**
90:11,25 91:10
91:23 92:10
**oversight (2)**
69:13,19
**overtime (1)**
46:25

**P**

**P (4)**
2:2,2,16 3:2
**P.C (1)**
2:14
**p.m (6)**
72:11,13
105:10 110:8
110:10 128:9
**page (14)**
38:14 40:9,13
67:14 70:5
81:18 96:10
104:21 130:6

131:4 132:4
132:11,18
134:5
**paper (1)**
95:13
**papers (1)**
123:23
**paragraph (3)**
59:4 74:11
96:14
**paramount (3)**
33:4 35:4
64:23
**part (4)**
12:12 50:5
106:10 118:3
**participating...**
3:6
**particular (4)**
22:2,9 54:2
76:14
**parties (5)**
3:4,10,15
21:24 133:14
**party (2)**
3:17,17
**passenger (1)**
36:15
**passengers (1)**
63:12
**Paul (3)**
6:9,12,17
**pay (1)**
107:24
**peace (1)**
25:11
**pending (1)**
9:12
**people (58)**
13:13,15 15:11
15:22 18:17
18:23,24 20:2
20:5,10,12,12
21:9 22:4
24:21 25:11
25:23 32:21

33:8,13,20,23
34:6 35:19,21
36:9,22 37:3
47:16 53:15
54:10,13,16
60:25 61:7,17
61:22,24
62:16 63:8,8
74:6 75:5
76:4,12 77:3
77:12 82:24
83:10 84:9,17
84:19 86:12
98:19 101:19
105:13
106:14
118:23
**percent (1)**
55:6
**period (4)**
21:18 63:15,15
63:19
**periodically (...**
24:6
**person (7)**
7:5 14:6 19:20
25:10 58:23
77:22 111:19
**personnel (1)**
20:23
**Peter (2)**
105:3 110:22
**phone (1)**
8:19
**phonetic (1)**
6:9
**physical (1)**
21:9
**pictures (1)**
77:15
**place (8)**
23:11 65:15,18
67:6,17 77:17
78:16 129:10
**placed (5)**
61:3,4 62:17

62:18 65:19
**placing (1)**
65:5
**Plaintiff (5)**
1:5,17 2:4,9
41:12
**Plaintiff's (37)**
38:10 39:12,15
40:20 41:19
41:25 43:10
45:14,21,23
50:10 57:5
69:23 71:16
73:2 81:11
93:4 95:13
98:9 104:10
110:15
112:23
118:11
125:25 126:6
126:10,14,19
126:24 127:5
127:10,15,20
127:25 128:6
130:4 131:2
**planner (2)**
6:23,25
**planning (2)**
25:9 64:16
**platform (15)**
35:22 49:10
59:10 63:9
70:21 78:17
86:18 87:10
88:20 122:3
122:21,24
123:7,14,23
**platforms (15)**
36:17 63:23
84:15,16 88:7
88:11 89:10
89:25 90:6,25
93:8,12,21
94:8,17
**playing (1)**
8:9

**Plaza (1)**
2:10
**please (40)**
4:7,10 6:14 8:4
8:15 11:12
23:13,18 36:3
38:18 50:10
53:7 55:16
56:4 57:10,20
57:24 59:6
71:20 73:3
81:24 85:13
88:4 95:17
97:11 101:7
104:12,19
106:20,25
107:3,5,7,13
108:11,21
109:5 110:15
110:19
111:23
**plus (1)**
121:24
**point (4)**
68:17,17 77:21
89:12
**pointed (1)**
40:5
**pointing (1)**
40:6
**policies (12)**
5:11 22:20
23:5,11,25
24:9,15 30:7
30:23 31:19
114:4 120:16
**policy (117)**
5:2 12:18,21
13:4,11,22
15:3,6,12
16:2,6,10,17
16:23 17:2,11
19:7 21:16,22
22:10,19,23
23:4,8,10,23
24:7,11 25:4

25:15,19 26:3
26:11,15,16
26:17,21,24
26:25 27:4,7
27:11,12,20
27:21 28:3,7
28:13 29:6,17
29:23 30:13
31:3,4,8 32:2
32:9,15 33:10
33:17 34:3,24
35:14,25 36:8
36:21 37:18
38:4 40:21
41:3,6 43:19
44:3,8,16,21
44:24 45:3,16
45:20,22,25
46:3,9 48:18
54:16 56:12
56:19 71:3
79:5,9,14
80:11,16 93:6
93:20 94:7,16
94:23 95:4
97:25 104:2
109:25 110:4
112:12 113:2
114:3 116:2,8
119:8,20
120:2,6,13,23
127:24
131:10
**portion (8)**
9:9,18 23:20
28:21 36:5
55:4 70:8
102:17
**portions (1)**
78:11
**position (5)**
58:24 80:25
82:4,9 100:5
**possession (1)**
3:14
**possibility (1)**

96:17
**possible (2)**
21:8 100:6
**Post (1)**
66:25
**posted (3)**
51:11 60:16
95:24
**posting (1)**
59:9
**potential (5)**
94:12,13 95:25
96:2 97:3
**power (1)**
67:17
**practical (3)**
22:13,13 70:15
**practice (5)**
21:11 65:13
70:14 103:2
107:25
**practices (1)**
37:8
**preexisting (1)**
24:8
**premise (1)**
80:16
**Prendergast ...**
58:4 81:20
82:19 104:23
107:20
**Prendergast'...**
82:11
**prepare (1)**
4:17
**present (2)**
3:4 7:8
**presented (1)**
3:14
**presenting (1)**
3:13
**president (17)**
26:8 58:4,7,13
58:22 66:4
68:6,11 72:17
76:23 81:20

82:12 88:15
98:17 99:15
99:19 101:10
**press (3)**
73:17 126:22
130:19
**prevent (3)**
33:19 98:21
116:2
**previously (1)**
24:2
**primarily (1)**
11:11
**primary (1)**
100:10
**principal (1)**
35:10
**principals (1)**
35:8
**prior (4)**
3:14 23:24
50:25 73:22
**probably (8)**
47:9 50:3
53:21 68:22
85:14,19 89:4
94:6
**problem (3)**
27:3,18 71:25
**procedures (1)**
37:9
**proceed (1)**
74:25
**proceeding (2)**
73:23 134:2
**professional ...**
37:13 103:7
**promote (1)**
32:19
**promulgate (9)**
22:20,24 23:5
23:9 26:25
27:10,12 28:3
32:2
**promulgated...**
24:2 31:20

38:11 43:13
125:23 130:9
**promulgatin...**
36:21 44:3,21
**proof (1)**
60:15
**proper (9)**
34:24 35:7
37:2,7,18
38:4 63:14
64:15 123:18
**proposals (1)**
66:15
**proposed (7)**
74:5,23 75:16
98:2 99:23
108:16
110:24
**pros (1)**
22:17
**provide (1)**
96:15
**PTSB (5)**
69:19 76:22
98:17 99:22
101:11
**public (13)**
1:19 4:3 32:19
32:22 33:19
35:11 60:11
69:11 102:24
123:15
129:22 133:7
134:25
**purpose (6)**
3:11 74:5 76:9
114:14
115:25
118:21
**purposes (1)**
121:6
**pursuant (1)**
1:17
**purview (4)**
93:20 94:7,15
95:4

**pushed (1)**
96:18
**pushing (1)**
60:10
**put (7)**
22:7 73:3
99:20 103:25
110:15 121:9
122:16

---

**Q**

**question (40)**
3:15 8:4,23,25
9:3,7,12 17:8
30:21,25
31:12,17,23
34:12 36:3
47:6 59:24,25
60:7,8,21
64:4,6,8
78:15 80:23
83:8 85:8,10
85:12,12 89:8
90:8 91:14
94:19 97:16
99:18 118:5,5
132:18
**questioning (1)**
3:15
**questions (3)**
11:10 125:2
132:17
**quick (2)**
107:23 112:17
**quickly (1)**
66:16

---

**R**

**R (4)**
2:2 4:2 129:2
133:2
**rail (1)**
119:12
**raises (1)**
111:14
**rarely (1)**
18:8

rate (4)
72:20 79:23
93:8 94:18
rates (2)
62:9 95:7
ratified (3)
42:3,8,12
reaching (1)
96:21
read (18)
9:9,11,13,18
23:16,20
28:18,21 36:3
36:5 50:14
56:25 59:3,12
66:18 70:2
96:13,24
reading (2)
67:10 70:8
reduce (12)
really (3)
34:15 71:23
123:21
reason (5)
59:20 60:2
86:10 91:11
134:5
reasons (1)
86:21
recall (1)
30:19
received (5)
17:4 48:10
72:16 98:16
101:8
receiving (1)
48:14
recess (1)
72:10
recollect (7)
15:9 45:4
93:17 113:11
120:4 122:11
123:2
recollection (1)
13:24
recommenda...

27:18 70:11,13
recommenda...
68:6,10
reconstruct (1)
123:4
record (9)
57:10 72:12
110:6,9,12
122:17
125:18,20
133:11
recorded (2)
3:9 125:14
recording (1)
3:9
records (6)
24:17 54:19
60:18 61:14
61:16 86:2
reduce (12)
33:19 59:8
66:5,16 68:20
69:5 74:6
76:11 77:2,5
98:21 103:4
reduced (4)
68:24 76:2
96:19 103:17
reducing (8)
65:6 67:2
96:16 101:15
101:24
102:10
103:13,17
reduction (3)
108:7 109:15
118:19
reevaluated (1)
100:4
reference (1)
111:6
referred (5)
9:8,17 23:19
28:20 36:4
referring (4)
12:10 40:10

82:19 92:21
reflected (2)
29:2,11
reflective (1)
51:15
refresh (3)
4:20 10:16
12:23
regarding (1)
3:15
regular (3)
18:10,21 38:24
regularly (1)
18:23
related (1)
133:13
relates (2)
120:2,24
relationship ...
33:11
release (3)
73:17 126:22
130:19
relevance (1)
15:24
relevant (2)
4:25 5:10
reliable (1)
85:5
relied (2)
43:19,25
rely (2)
35:14 44:6
remained (4)
25:23 42:21,22
62:10
remember (60)
16:3,8,24
17:12,15,20
17:24 18:2,4
18:8 21:17,19
23:22 24:3
25:17,22,25
26:20 27:3,4
27:8,24 28:5
29:25 30:2,4

30:5 33:15
36:14 37:20
39:6 44:23
45:18,19,20
46:12,13,14
48:3,7,8,14
48:16,21
56:16,17
80:10,14,15
93:10,13 95:2
95:11 120:18
121:2,7 123:9
123:11,16,20
remote (1)
3:5
remotely (2)
1:18 3:8
repeat (3)
6:11 9:6 23:13
repeatedly (1)
101:5
report (1)
70:18
reporter (53)
3:5,8 4:6,9
6:13,20,24
7:3 9:10,13
9:19 15:16
17:13,16
23:21 28:18
28:22 34:16
36:6 43:4
51:19,22
64:19 71:18
71:21,23 72:2
72:6 75:8
90:13 94:2
97:10 104:3,7
109:4 114:20
116:18 124:4
124:16
125:17,20
126:3,8,12,16
126:21 127:2
127:7,12,17
127:22 128:3

128:8
Reporting (1)
3:7
represent (1)
14:8
represented (...
43:18
representing ...
7:13,24 9:25
represents (1)
14:5
request (1)
71:7
REQUESTE...
132:10
REQUIA (1)
1:8
require (1)
73:21
required (2)
36:22,25
requirement ...
18:25 19:5
requiring (1)
75:18
resolution (2)
29:25 30:4
resolutions (8)
27:3 28:7,8,13
29:8,15,18,23
resolved (1)
27:19
respect (4)
23:5 37:14
83:10 119:20
respond (1)
71:6
response (13)
11:20 30:8
34:7 39:22
40:25 56:14
62:2 66:2
75:11 96:15
97:8 111:2
121:20
responses (1)

66:11
**responsive (4)**
14:24 17:7
61:12 76:18
**rest (2)**
67:14 68:2
**restrictions (4)**
22:24 24:16
66:25 68:18
**retired (4)**
6:12,17,21,23
**review (13)**
4:17,18,20
22:19,23 23:4
23:9,10 24:8
49:25 65:13
70:14 98:16
**reviewed (4)**
31:21 32:9
39:4 134:2
**reviewing (1)**
36:21
**riders (1)**
59:9
**right (28)**
9:14 11:7,8
24:25 29:14
30:6 39:23
40:12 41:10
42:16 46:6
57:22 66:10
68:2 72:25
74:22 76:21
88:8 89:12
92:14 93:3
98:10 104:9
104:11 110:5
116:22
118:21 119:4
**righty (1)**
81:18
**risk (2)**
12:4,11
**road (1)**
55:7
**Rob (1)**

104:3
**Robert (2)**
2:11 71:18
**role (1)**
25:3
**room (1)**
22:16
**rotating (1)**
13:12
**ROTH (51)**
2:4,4,6 53:8,10
53:13 54:23
54:25 55:3,17
55:19,22,25
56:5 57:7,11
57:14,18,21
57:25 59:7
67:15 70:7
73:5,11,16
81:16,25
95:18 104:14
104:20 106:9
106:21 107:2
107:4,6,8,14
107:16
108:12,20,22
108:24 110:3
110:17,20
111:24
112:24
113:25 118:9
121:11
**routine (2)**
15:5,5
**ruled (4)**
7:17 8:7,14,21
**rules (5)**
22:20 23:5,25
24:14 27:12
**RULINGS (1)**
132:17
**run (15)**
25:12 33:8,14
34:6 35:19
36:9,22 37:4
61:18 62:16

77:3 82:24
83:11 84:10
118:23
**running (9)**
69:6 76:4
95:25 97:3,13
107:24
108:16
109:19,21

---
**S**

**S (4)**
2:2 3:2,2 130:2
**safe (5)**
12:3 32:10
35:11 84:16
84:16
**safer (1)**
98:21
**safety (68)**
11:24 12:3,9
32:19,22 33:3
33:18,24
34:24 35:4,7
35:8,10 36:12
36:16 37:7,11
37:14,16
48:23 49:3,4
49:9,15,17,19
50:22 51:15
64:15,17,21
64:22 67:7
69:11 72:17
73:20 75:16
75:17 80:18
80:20,21,22
81:4 82:6,23
82:25 83:6,9
84:8 89:21,23
90:10,17,19
90:22,24,24
92:19 93:11
97:24 99:9,13
100:6,11
102:14,24
108:7 123:14

**samples (1)**
75:24
**Samuelsen (3)**
58:12 60:3
99:16
**saw (9)**
42:7,17 66:8
76:22,22,23
99:19,22
125:12
**saying (22)**
20:19,21 24:23
30:17 41:5
46:25 48:8
62:14,15
63:25 76:24
83:17,24 84:5
86:23 89:22
92:23 100:25
112:8 124:2
124:14,18
**says (19)**
41:3 42:14
51:23 55:5,9
60:6 71:14
87:4 92:9
108:5 111:9
111:13,15,17
118:15,19,25
121:23 134:2
**scheduled (1)**
14:10
**schedules (1)**
107:24
**science (1)**
61:8
**scientific (1)**
61:8
**scope (6)**
93:2,6,20 94:7
94:15 95:3
**screen (6)**
38:13 40:12
73:4 98:9
122:21 123:7
**scroll (12)**

38:17 53:6
54:22 55:15
57:12 58:10
58:10 106:8
106:24
111:22 117:8
118:8
**scrolling (5)**
106:4,19
108:18
113:23
117:11
**scrutiny (1)**
60:12
**second (5)**
8:12 53:12
57:13 104:17
117:15
**secretary (2)**
19:16 31:7
**Security (1)**
50:22
**see (98)**
32:9,17 38:13
38:14,15,19
39:15,16,20
40:14,16,20
41:3 42:6,6
42:14 48:18
50:16,17 51:4
51:13,18,21
51:23 52:6,9
53:3,14,17,17
56:2 57:16
58:2,6,9,11
58:12,18
60:24 63:2
64:11 65:5
67:13,19,19
67:24 68:2
70:14 71:8
72:19 73:9,24
74:17,20 75:3
78:2,10,21
79:11,15,21
81:18,19 82:3

82:7 85:17
94:17 95:17
95:19 97:22
98:2 99:25
101:13,22
102:8 104:13
105:2,14
106:6,15
108:8 109:13
109:25 111:3
111:15
114:11 116:8
117:16,21
118:10,13,17
120:22
121:17 122:4
123:3,3
124:13
**seeing (5)**
45:18,19 56:16
65:22 109:7
**seen (11)**
96:8 98:12
105:18,25
109:3,6 113:5
113:10,13
120:12,15
**sense (1)**
66:15
**sent (2)**
14:7 20:4
**sentence (1)**
60:9
**separate (2)**
3:5 30:12
**September (1)**
51:2
**series (1)**
104:22
**serious (2)**
60:17 114:17
**seriously (1)**
98:19
**Service (1)**
3:7
**set (7)**

10:7 13:14,24
14:10 15:22
133:10,17
**seven-page (2)**
126:9 130:15
**SHABAZZ (1)**
1:8
**shape (3)**
90:6 96:5
97:21
**shared (1)**
24:18
**sharp (1)**
114:16
**SHEET (1)**
134:1
**short (2)**
71:20 72:10
**shorter (2)**
45:10 47:13
**show (14)**
38:8,16 39:11
50:8 56:11
71:15 73:2
86:11 93:4
95:12 97:4
114:25 117:7
123:23
**showed (1)**
98:8
**showing (9)**
43:10 69:22
73:17 96:10
104:9,15
106:2 108:15
110:21
**shows (5)**
18:20,20 77:19
97:13 120:7
**sic (1)**
39:24
**signage (20)**
23:6 24:17
61:3,4,23,25
62:9,10,17,18
63:3 65:6,14

65:19,22
72:22 99:2,14
99:20 100:24
**signal (4)**
22:24 24:16
47:16 67:22
**signaling (3)**
25:7 37:22,24
**signature (3)**
58:9,11 134:23
**signatures (3)**
39:17,20 42:7
**signed (6)**
13:13,14 20:2
20:3 42:18
43:14
**significance (1)**
62:8
**significant (3)**
58:23,24 79:24
**signs (2)**
59:9 60:16
**similar (1)**
113:16
**similarly (1)**
79:13
**simple (4)**
17:8 91:13
92:6 118:4
**simply (1)**
94:14
**single (7)**
25:18 87:2
88:5 89:9,24
119:24
120:23
**sir (36)**
6:13,13,22 7:4
10:4 17:13,17
28:24 38:13
41:5 42:5
43:4,8 49:8
50:16 61:13
63:2,7 64:4
85:8 88:9
92:6 97:10

100:14,23,25
101:3 102:19
102:21 104:9
106:2 109:5
113:9 118:4
121:5 124:17
**sit (1)**
119:23
**slow (4)**
26:9 81:5
84:11 109:18
**slower (9)**
33:23 45:6,9
76:11,25 81:3
83:18 84:2,14
**slowing (9)**
80:17 82:5
83:2,11 91:6
91:11 95:5
97:14,18
**slowly (1)**
113:23
**smaller (1)**
106:15
**smoothly (1)**
25:13
**solutions (1)**
29:11
**somebody (7)**
6:4 19:18
20:14 90:9,18
90:24 123:6
**SONIN (1)**
2:9
**sorry (14)**
6:10 13:8
23:14 28:17
41:4 56:7
61:10 62:5
68:7 83:4
97:25 105:16
121:14
124:12
**sort (1)**
25:11
**speak (2)**

18:20 34:16
**speaker (1)**
34:20
**speaking (1)**
23:17
**specific (15)**
4:18,22 18:4
18:12 23:2
27:24 29:25
30:4 36:14
45:3 53:21
55:11 78:8
83:9 91:25
**specifically (...**
21:19 24:4
33:15 43:22
44:12 45:19
46:14 48:7
50:7 52:11
54:12 80:14
80:15 82:22
84:9 88:24
95:11 99:15
108:8 109:13
119:3 123:3
**specifics (1)**
89:12
**specified (1)**
129:11
**speculate (2)**
102:4 120:22
**speculating (...**
89:3,5,7,14
90:2 92:16
100:9,17,17
101:25
111:21
**speculation (4)**
92:6 102:21,24
118:2
**speed (179)**
4:25,25 5:11
5:11 12:17,20
13:4,10,21
15:3,6,12
16:2,6,9,17

16:23 17:2,10
19:7 21:16,21
22:10,19,20
22:23,24 23:4
23:8,10,23
24:7,9,11,14
24:16 25:3,14
25:19 26:3,11
26:14,16,17
26:21,24,25
27:4,7,11,12
27:20,21,22
28:3,4,7,13
29:6,8,17,18
29:23,24 30:7
30:7,13,14,23
30:24 31:3,4
31:7,19 32:2
32:8,10,15,18
33:10,12,17
33:18 34:3,4
34:24 35:14
35:25 36:8,21
37:18 38:4
40:21 41:3,6
44:3,8,16,21
44:24 45:16
45:20,22,25
46:3,8 47:24
48:5,10,17,19
49:23 51:11
51:11 54:9,15
56:12,19
66:25 67:3
68:18,24
70:20 75:3,19
75:25 76:2,25
78:22 79:5,9
79:14,17,18
79:21 80:11
83:18,20 91:6
93:6,20 94:7
94:16,23 95:4
95:5,20,24
96:6,16 97:5
97:5,25

109:25
112:12 113:2
114:2,4,18,22
114:25 116:2
116:8,9 117:9
117:22
118:11,16
119:8,20,25
120:6,12,16
120:23 127:8
127:23
130:23
131:10
**speeds (6)**
29:12 69:25
95:14 103:17
119:14,15
**spend (1)**
76:15
**spent (3)**
10:17,20 11:3
**sporadically ...**
24:6
**SS (1)**
133:4
**staff (1)**
71:5
**stamp (3)**
70:5 73:6
110:16
**stand (1)**
59:9
**standard (9)**
27:7 30:14
114:3,15,24
116:2 117:23
119:8 120:6
**standards (11)**
23:25 30:7,24
31:19 37:13
49:9 103:7
113:2 118:11
127:24
131:11
**standing (1)**
35:22

**start (3)**
21:13 81:13
96:13
**started (3)**
12:25 26:5
72:22
**starting (1)**
73:12
**starts (2)**
50:14 104:24
**state (9)**
1:19 4:4 12:3
73:18 96:5
97:18 99:23
133:4,8
**stated (3)**
70:10,25 88:20
**statement (5)**
43:24 52:4,10
59:15,16
**states (5)**
1:2 66:14
73:21 82:3
89:9
**station (45)**
33:12,18 34:5
45:10 46:17
48:2,6,11,20
67:2,18 68:19
68:25 73:23
73:23 76:11
77:20,21 78:4
78:4,5,11
79:17,18,22
81:5 83:2,12
84:2,12 87:24
89:10 94:17
96:17 97:6
103:18
109:19 115:2
115:2,8,9,12
115:12 116:9
117:10
**stations (29)**
27:22 28:4
29:9,19,24

32:11,18
36:23 43:20
44:9,25 48:15
49:23 66:23
67:7 73:20
74:24 75:4,17
75:25 78:22
80:18 81:3
83:20 91:7
95:6 97:19
100:20
118:16
**statistics (5)**
53:19,21 55:11
61:14,16
**stay (2)**
117:6 125:8
**steps (2)**
103:3,11
**STIPULATE...**
3:3,12
**stop (19)**
12:21 51:25
53:11,11,11
55:2 61:9
67:23 69:4,6
70:24 73:22
74:24 75:18
76:2,3 77:2
78:18 106:4
**stopped (3)**
16:25 24:5
96:21
**stopping (21)**
37:19 38:5,11
38:20 39:13
41:11 42:21
43:11 44:2,7
44:19 45:10
45:13,15
46:17,21
47:14 125:22
126:5 130:8
130:12
**stops (1)**
68:25

**strike (12)**
14:23 17:6
38:2 43:9
47:5 49:6
61:11 64:9
76:17 85:9
101:2 102:16
**struck (2)**
33:8 53:15
61:18
**students (4)**
64:11,12,22
65:4
**studies (4)**
86:13 88:10,19
102:14
**study (34)**
34:25 35:7
37:3,7 48:5
48:12 49:25
64:15 72:19
75:2 78:2,8
78:10,21
79:15,20
84:23 85:4,16
85:24 87:3
88:5 89:9,24
92:9 102:7
103:3,11
111:7,14
112:8,18
119:24
123:18
**stuff (1)**
122:11
**subject (7)**
13:16 15:23
18:18 22:2,18
27:25 79:12
**Subscribed (2)**
129:18 134:23
**substance (1)**
106:11
**subway (17)**
12:13 31:5
43:12 44:2

47:25 51:10
51:23 52:7,21
53:16 54:11
55:5 59:11
60:17 94:17
98:21 122:3
**SUFFOLK (1)**
133:5
**suicide (3)**
54:3,14 60:11
**suicides (1)**
53:23
**Suite (3)**
2:5,10,15
**summarized ...**
71:4
**super (1)**
115:17
**supposed (2)**
49:19,24
**sure (37)**
5:15 15:20
17:18 23:15
23:17 32:14
33:25 56:25
59:19 63:17
71:22 72:9
74:9 86:13
88:13,25 89:2
89:4,13 92:13
92:15 93:24
93:24 94:4,6
94:11,12
100:4,4,8,11
100:15,16
103:24
113:17
120:14,18
**survey (9)**
55:5 84:24
85:4,17 87:3
88:5 89:9,24
119:24
**surveys (3)**
88:11 92:9
102:7

**switches (1)**
67:17
**sworn (7)**
3:8 4:3 129:5
129:18
133:10 134:1
134:23
**system (16)**
35:17 52:21
60:13 66:18
86:9,11,16,21
89:21,23
90:21,21,23
90:24 92:19
98:21
**systems (7)**
47:2,12,12,21
90:10,17,18

———————
**T**
———————
**T (7)**
3:2,2 4:2 129:2
130:2 133:2,2
**TA's (1)**
59:8
**take (10)**
19:17 50:10
51:24 65:18
68:17 71:19
77:15 78:16
101:13 103:3
**taken (5)**
1:16 72:11
103:11,12
134:2
**talk (2)**
5:19 99:13
**talked (3)**
24:15 101:9
120:16
**talking (8)**
10:18 62:21
74:18 83:19
107:22 112:9
114:4,9
**talks (4)**

52:6 53:14
74:16 95:24
**task (1)**
122:25
**taught (3)**
64:12,17,21
**teach (3)**
64:11,14 65:3
**technologies ...**
70:16,16,17
**technology (1)**
21:18
**telephone (3)**
10:9,11,12
**tell (9)**
19:13 24:19
25:6 64:22
65:7 87:2
88:4 96:4
101:7
**telling (8)**
34:2 49:12
62:7,11 75:14
83:22 84:3
86:17
**ten (1)**
67:3
**tenure (1)**
47:19
**test (2)**
85:16,21
**testified (4)**
4:4 14:25
90:10,24
**testify (1)**
129:5
**testimony (5)**
90:19 129:6,10
133:11 134:3
**text (1)**
10:10
**Thank (9)**
7:3 17:16,17
51:22 72:6,7
104:6 122:17
124:11

**thing (8)**
7:9 13:12
26:14,20
30:14 56:9
61:21 113:7
**things (13)**
22:21 24:15
25:8 74:16
86:5 96:2
98:24 100:11
101:9,19
102:18 114:5
115:13
**think (26)**
10:11,12,12
12:24 13:2
14:14 15:10
16:15 19:22
26:4 27:14
29:20,20
31:18 79:25
95:9 98:5
103:23
109:24
112:13
123:25,25
124:5,23
125:14,15
**Thomas (1)**
58:3
**thorough (3)**
87:14,18,21
**thought (1)**
71:2
**thoughts (1)**
22:17
**thousands (1)**
98:18
**three (1)**
74:13
**three-page (2)**
128:5 131:12
**till (1)**
11:8
**tilt (1)**
115:18

**time (59)**
1:12 5:6,8,17
7:19 8:2,8,13
9:5 10:17,20
10:23 11:3
13:5 16:10,18
16:22 17:9
23:24 24:20
24:24 25:20
26:23 27:6
30:18 31:2,3
33:6 34:3
44:25 45:2
46:20 48:23
49:13,13
51:13,25
52:16,16
63:15,15,19
63:24 70:23
72:3 83:19
96:2 97:3
99:10,12
100:7 101:5
109:7,20,21
110:13
117:15
125:13
129:10
**times (6)**
11:2 20:18
34:17 97:14
107:24
108:17
**title (1)**
38:14
**today (11)**
8:10 9:22
10:22 11:25
38:9 45:14
88:8 101:6,9
102:19
119:24
**today's (2)**
4:17 40:20
**told (15)**
7:9 9:20,22

12:16 29:6,16
45:5,8 49:18
68:23 87:13
100:16 111:9
111:25
118:15
**Tom (3)**
81:20 104:23
107:19
**tons (1)**
51:24
**top (10)**
57:23 73:15
95:16 104:16
104:17,22
105:14,14
106:5 110:22
**topic (9)**
22:6,9 27:23
53:22 70:12
78:15 94:12
94:14 99:24
**topics (2)**
5:20 22:4
**track (14)**
8:12 25:7 51:9
51:16 53:3
55:7 63:10,10
84:17,19 86:4
86:9 119:13
119:16
**tracks (5)**
63:23 67:8,22
96:19 114:13
**train (38)**
12:13 32:24
33:18 34:5
36:16 38:5
45:6,9 46:16
47:11,12,21
51:10,12,12
51:16 53:4
55:7,12 61:2
61:18 63:8,11
66:22 67:23
68:25 75:3

77:20 78:3,18
79:22 83:18
91:11 97:6,19
107:24
114:15
115:18
**trains (86)**
26:9 27:22
28:4 29:8,19
29:24 31:5
32:18 33:8,12
33:14,21,24
34:6 35:20
36:10,23 37:4
37:19 43:12
43:19 44:2,8
44:9,24 47:2
47:25 48:6,10
48:15,20,23
49:23 51:24
52:7,17 53:16
54:11,17,18
62:17 63:10
73:21 74:7,15
74:24 75:6,18
75:25 76:2,3
76:11,13,25
77:3,12 78:22
80:17 81:3
82:5,25 83:2
83:11,12,16
84:2,10,12,14
86:2 88:6
95:5 96:17,20
97:14 98:20
103:18
109:18 115:2
115:8,22
116:2,3
117:23
118:23
119:15
**transcript (4)**
3:17 129:9,9
134:2
**Transit (114)**

1:7 4:24 5:2,9
5:12 6:5,23
6:24 7:7,13
7:24 9:25
11:5 12:17
13:6,22 15:2
16:18 17:10
20:23 25:20
26:2,10,24
27:5,9 28:2
29:7,17 31:4
32:23 33:7
34:4 35:24
36:7,20 38:11
38:19,23
43:17,25 44:6
44:20 45:2
46:21 47:19
47:19,24 48:9
48:12 49:14
49:18,24
50:22 52:17
53:25 54:15
56:23 58:3,4
60:16,18
61:13 63:21
64:23 66:3,4
66:11 67:21
68:6,11 69:14
69:14,20
70:14 71:6
72:15,17,18
72:21 74:15
75:2,15 77:13
77:25 78:9,14
78:20 80:6,17
80:25 81:21
82:10 85:16
85:20,25 87:3
87:7 89:18
90:5 98:15,20
99:19,21,24
101:21 102:6
102:19,22
103:12 114:3
118:12

125:24
130:10
**Transit's (1)**
113:2
**transition (1)**
21:18
**transportatio...**
64:16,17,21
69:11 101:8
103:2
**travel (4)**
83:19 115:2,8
115:11
**traveled (1)**
77:20
**traveling (1)**
51:12
**TRIAL (1)**
1:15
**tried (1)**
10:16
**true (86)**
11:11,13 12:18
15:7,13 18:10
18:21 19:3
28:14 29:9,19
32:3 33:8
35:8,11,12
36:10 37:4
38:25 39:21
41:20,24
43:14 45:17
46:18,19
47:14 48:24
49:20,25 50:3
53:4,23 55:8
58:24 60:13
60:14 61:4,14
61:18,25
62:10,12
65:15 66:23
67:3,4,9 69:7
76:4 77:3,17
77:22 79:24
80:3 85:18,22
86:2,18,19,21

86:22 87:11
89:25 91:3,7
91:9,24 93:22
94:4 99:16
103:7,19
110:25
112:12,18
115:9 118:12
118:16 119:9
120:8,13,14
122:7 129:9
133:11
**truth (1)**
129:5
**try (1)**
74:6
**trying (4)**
40:14,16 66:5
93:17
**turnout (1)**
114:12
**turnouts (1)**
114:9
**two (7)**
10:7 60:9
81:11 120:11
124:19,20
125:10
**two-hour (1)**
125:13
**two-page (8)**
126:5,13,18
127:4 130:13
130:16,17,21
**type (3)**
20:15 79:10
113:19
**typed (1)**
21:8
**types (2)**
70:15 114:5

———————
**U**
———————
**U (1)**
3:2
**UITP (2)**

88:15,17
**um (13)**
5:24,24,25 6:2
12:24 21:23
27:16 32:10
53:20 55:5
65:25 83:17
95:11
**unable (2)**
11:13,14
**unauthorize...**
3:10
**understand (...**
12:14 17:5
28:23 43:2
46:4 59:17,23
84:22 85:2
97:15
**understandi...**
81:2
**understood (2)**
11:15 33:25
**union (14)**
58:3,8,15,20
58:23 66:4,12
68:11 72:17
76:24 98:17
99:16,20
101:11
**UNITED (1)**
1:2
**unnecessaril...**
30:20
**unnecessary ...**
35:11
**unsafe (1)**
86:14
**unusual (1)**
63:20
**updated (4)**
39:7,12 126:4
130:12
**use (1)**
92:7
**utilize (1)**
44:17

**utilized (1)**
44:18

———————
**V**

**valid (1)**
85:17
**variety (1)**
86:21
**vehicle (2)**
119:12,16
**verbal (9)**
11:20 30:8
34:7 39:22
40:25 56:14
62:2 111:2
121:20
**vests (1)**
51:15
**video (3)**
1:18 106:12,13
**Videoconfere...**
3:4,6,9,16
**view (3)**
22:13 55:7
82:11
**views (2)**
21:25 22:3
**violation (1)**
3:10
**visibility (1)**
55:13
**voluntary (1)**
19:22
**volunteering ...**
102:18

———————
**W**

**W (1)**
4:2
**waiting (1)**
33:23
**want (9)**
10:22 26:22
33:25 56:2
81:14 83:3,5
83:6,8

**wanted (3)**
26:8 28:12
79:11
**warning (2)**
67:7 70:16
**washers (1)**
52:12
**washing (2)**
52:8,18
**Washington ...**
50:23
**wasn't (1)**
42:4
**wasted (1)**
9:5
**wasting (2)**
8:9,13
**water (3)**
63:10,20,22
**way (10)**
24:25 60:23
63:2 65:5
90:6 92:9
96:5 97:21
109:9 133:15
**ways (1)**
103:16
**we'll (2)**
117:8,14
**we're (21)**
5:8 8:9,11
40:19 41:11
42:14 43:10
54:13 62:21
63:13 72:25
73:12 83:18
103:23 104:4
104:9,15
106:2 108:15
121:12
124:14
**we've (5)**
38:9 71:16
76:20 101:9
124:19
**wearing (1)**

51:15
**weather (2)**
63:9,18
**weigh (1)**
51:24
**welcome (1)**
104:8
**went (3)**
16:23 49:8
116:7
**wet (1)**
63:9
**whatsoever (3)**
62:8 117:9
119:25
**WHEREOF ...**
133:17
**whipped (1)**
112:16
**white (1)**
95:13
**widely (1)**
60:10
**wife (1)**
5:24
**windshield (3)**
52:8,12,18
**windshields (2)**
52:20,25
**wipers (1)**
52:18
**withdrawn (...**
10:19 11:2
14:17 23:9
27:10 29:5
30:22 31:23
35:25 45:7,22
61:9 68:9,9
119:6 120:7
**withstanding...**
3:16
**witness (22)**
1:16 3:5,7,8,13
3:14,15 4:2,8
4:11 17:18
34:21 44:22

106:12
116:22
124:11 125:7
128:10 133:9
133:12,17
134:23
**witness's (1)**
3:8
**word (3)**
11:19 15:17,18
**words (6)**
20:14 60:25
78:3 80:24
92:7 117:22
**work (2)**
86:5,9
**worked (4)**
6:5 26:23 27:6
75:14
**worker (1)**
51:9
**Workers (1)**
58:3
**working (1)**
48:22
**works (1)**
6:5
**worry (1)**
72:4
**write (1)**
123:17
**writes (1)**
112:7
**writing (2)**
71:3 99:20
**written (7)**
3:10 26:25
27:7 28:3,8
29:14 67:25

———————
**X**

**X (4)**
1:3,10 130:2
132:2

———————
**Y**

yeah (16)
16:15 39:16,16
39:24 40:8
52:9,9 53:17
55:20 58:14
67:24 69:9
71:9 79:25
94:22 111:5
year (9)
16:22 17:9
18:6,6 33:7
63:22,22 64:2
64:2
Year's (1)
60:11
years (9)
12:24 14:14
15:9 18:4
20:20 31:18
46:15 74:13
121:24
yes-or-no (1)
118:5
York (23)
1:2,7,20 2:5,5
2:10,15,15
4:4,11,12,12
12:13,17
43:13 53:15
70:13 71:6
73:18 74:15
113:2 133:4,8
Yorkers (1)
74:14

Z

Zoom (1)
10:9

0

07/01/2022 (1)
134:2

1

1 (5)
1:11 38:10
45:15 125:25

130:8
10 (4)
110:15,23
127:20 131:8
10:00 (1)
9:22
10:09 (1)
1:12
10:14 (1)
9:16
10016 (1)
2:5
10128 (1)
4:13
10271 (1)
2:15
10458 (1)
2:10
10th (2)
105:6,9
11 (4)
112:23 118:11
127:25
131:10
11:22 (2)
72:5,11
11:28 (2)
72:13,14
110 (1)
74:13
11105 (1)
104:21
12 (3)
121:12 128:6
131:12
12-9 (31)
32:23 33:13
60:24 61:17
62:9 63:4
65:6,8,18
66:5 72:20
75:4 82:23
83:10,25 84:9
85:22 87:8,10
90:7 93:8
95:14,19 97:9

97:13 103:13
118:13,19
120:24 127:8
130:23
12-9s (61)
33:20 59:8
65:14,23,24
66:16 68:20
69:5 72:18
77:6 78:2,12
78:16,23 79:3
79:16,23
84:11 87:4,21
88:6,12,21
89:10,25
90:11 91:2,7
91:12,23
92:10 93:22
94:9,18 95:7
96:7 97:7,20
97:21 98:22
101:15,24
102:10 103:4
103:16 108:7
109:9,15
117:18,24
118:10 119:2
119:4,9,19
120:2,8,13,17
120:19
123:19
12:10 (1)
110:8
12:11 (1)
110:10
12:31 (3)
110:13 124:10
125:10
12:33 (1)
128:9
120 (1)
2:15
125 (1)
130:11
126 (5)
130:14,15,16

130:18,20
127 (5)
130:22,24
131:7,9,11
128 (1)
131:13
12th (1)
42:14
13-page (2)
127:24 131:11
1301 (1)
2:15
13594 (1)
57:22
155 (1)
74:14
16 (1)
51:2
1725 (1)
4:11
19 (1)
49:13
192 (1)
2:5
1970s (1)
39:2
1988 (1)
26:4
1990s (1)
21:17
1991 (4)
12:25 13:5
16:11 20:21
1995 (7)
39:25 40:21
41:20 42:2,14
42:22 43:13
1999 (6)
13:2 15:25
16:7,11 20:21
49:13

2

2 (12)
39:12,15 40:20
41:12,19,25

43:11 45:15
45:21,23
126:7 130:12
2:55 (1)
105:10
20 (2)
129:19 134:24
2000 (1)
18:6
2007 (1)
51:9
2008 (2)
50:18 51:2
2010 (4)
18:3,6 70:2
122:13
2011 (5)
73:18 75:15
105:6,9
110:23
2013 (2)
17:25 58:5
2014 (1)
17:23
2015 (1)
17:19
2016 (2)
17:21 48:24
2017 (6)
39:21 42:3,8
42:18,23
43:14
2022 (2)
1:11 133:18
20264 (1)
40:17
22-page (2)
125:24 130:10
25 (1)
55:5
27 (1)
39:24
28 (1)
50:18
29 (1)
51:9

July 1, 2022

Page 157

**3**

**3 (3)**
50:10 126:11
130:15
**30 (6)**
12:24 14:14
15:9 20:20
31:18 46:15
**390897 (1)**
121:16
**391293 (1)**
110:16
**391297 (1)**
73:13

**4**

**4 (3)**
57:6 126:15
130:16
**400 (1)**
51:24
**419326 (1)**
50:14
**48 (1)**
55:6

**5**

**5 (4)**
69:24 126:19
130:17 132:5
**5-D (1)**
4:12
**543 (1)**
95:14
**543458 (1)**
95:15
**554446 (1)**
81:17

**6**

**6 (4)**
71:17 73:2
126:24
130:19

**7**

**7 (3)**

81:11 127:5
130:21
**7164 (1)**
112:23

**8**

**8 (8)**
73:18 93:4
95:13 98:9
103:24 104:4
127:10
130:23
**802 (1)**
2:5
**8th (1)**
133:18

**9**

**9 (7)**
58:5 103:24
104:4,6,10
127:15 131:6
**907 (1)**
2:10
**95 (1)**
40:8
**96954 (1)**
70:8