# EXHIBIT H - AFFIDAVIT OF LARRY GOULD, SWORN TO NOVEMBER 21, 2001

[Pages 238 - 246]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------x
GERMAN DELEON,                         INDEX NO. 111405/00

                 Plaintiffs,       AFFIDAVIT of LARRY GOULD

      -against-

NEW YORK CITY TRANSIT AUTHORITY,

                 Defendant.
-------------------------------------------------------x

**STATE OF NEW YORK** )
                      ) ss:
**COUNTY OF NEW YORK**)

       **LARRY GOULD,** being duly sworn, deposes and says:

       1. I am the Senior Director of Operating Analysis for the NEW YORK CITY TRANSIT AUTHORITY (hereinafter AUTHORITY).

       2. My educational background includes a B. A. from New York University and all the coursework for a Masters Degree in Transportation from Northwestern University.

       3. I have been a NEW YORK CITY TRANSIT AUTHORITY employee since 1980. My duties have included the following: planning service for track-work disruptions, special events, emergencies and contingencies, analyzing operating strategies for bus/rail operations and customer information.

       4. I am a member of the New York City Transit Authority's Speed Policy Committee, and I am conversant, as part of my responsibilities with the AUTHORITY'S policies regarding rail speeds. I am familiar with the facts of the above-captioned action. Annexed hereto are the following documents which

GNH 255362

reflect the AUTHORITY'S concern with passenger safety and platform crowding in making its design and operations decisions: Rapid Transit Route Guidelines, dated February 8, 1988 (Exhibit 1) and Dwell time study (Exhibit 2).

5. The AUTHORITY'S systematically determines the appropriate speed for all segments of track on a recurring basis and was doing so long before plaintiff's incident at the 2/3-train line at Chambers Street Station. This is done directly by means of design specifications of the signal system and is reflected in crew training and car performance. If a train moves faster than the allowable speed, the signal system will automatically detect this and initiate an emergency stop. Further, the schedules of the AUTHORITY are made upon the assumption that the AUTHORITY'S speed policies will be followed and that trains will enter stations at the speed they were going in the tunnels. The AUTHORITY'S Speed Policy Committee reviews problems and proposed changes in all aspects of the system concerning train speed on a regular basis. The Speed Policy Committee has been in existence since before 1992. It is composed of members from departments throughout the NEW YORK CITY TRANSIT AUTHORITY, including Operations Planning, Capital Program Management, Car Equipment, and Rapid Transit Operations.

6. The NEW YORK CITY TRANSIT AUTHORITY is a *rapid* transit system. The daily purpose of the subway system is to transport, quickly and safely, millions of commuters to their destinations. Safe and acceptable speeds are based on, or limited by, the safety of commuters on the platforms and inside the train cars, the physical limitations of each subway station, the nature and

design of the tracks involved, the need to stop the train at a particular car marker at the end of each station, and the need to prevent collisions between subway trains.

7. The subway system was never intended to make allowances for pedestrian traffic on the track-bed, other than the need for authorized work personnel to complete necessary track work, for which elaborate safeguards are provided. Literally hundreds of millions of passenger miles go by between incidents involving persons on the tracks.

8. The AUTHORITY'S policy regarding train speed entering a station is that the train enters the station at the speed it was traveling in the tunnel. This is referred to as normal speed. Implementation of slower speed, e.g. 20 mph, for trains to enter stations would have a major destructive impact on the quality and quantity of service provided to customers. It is also economically unfeasible.

9. Using RAILSIM, a rail simulation program designed by Systra Systems, my office determined that the implementation of a 20-mph policy for entering stations would increase running time by 4.6 seconds per station. While this may not seem to be much time, this increase would cause the typical terminal to terminal travel time to increase from 66.5 minutes to 69.0 minutes, or 3.7 percent. The typical customer would experience a similar proportional increase in their travel time. There would be additional delays as a result of an increase in passengers attempting to board and to disembark each subway car.

10. This increase in running time is anticipated to cause a decrease in service of at least 3.5 percent on routes where service frequency is determined

by track capacity constraints. That is, the track capacity would be reduced in areas where we already do not have sufficient capacity to serve the number of customers. In these cases, overloaded trains and platforms would become more overloaded. This would make these trains and platforms less safe, and would impede the AUTHORITY in its job of moving massive numbers of riders.

11. On other routes, where the quantity of service is scheduled to reflect the maximum desirable loads and track capacity is not an issue, current car equipment (fleet) limitations and yard size limitations restrict our ability to compensate for the longer travel times and a decrease of 3.9 percent in service is anticipated to result from the lower speeds. This reduction in service would create a corresponding increase in loading in trains and on platforms.

12. Over the long run, these situations could be offset by an enormously expensive increase in the subway fleet by 3.9 percent, while storage and maintenance facilities would have to be increased as well. Conductor, Train Operator, and Car Maintenance requirements would also increase. The initial capital outlay alone for one typical subway line – the "F" line – would be over $50,000,000, with additional costs for personnel, maintenance, etc. System wide, the initial capital outlay would be approximately 1.2 billion dollars, with corresponding costs for increased personnel, maintenance and other associated expenses.

13. The end result would be a substantial increase in operating costs. Capital costs would also increase as the fleet size was increased. With all this

investment, the customers would travel significantly slower. Furthermore, safety issues could result from overcrowding on platforms and in trains.

### Speed Limits

14. Speed limits are set at various points on the railroad in order to ensure safe operation. They are posted on signs and when appropriate, enforced by the signal system. Rule 39i of *Rules and Regulations Governing Employees Engaged in the Operation of the New York City Transit System* states that **when a station is bypassed**, a train should enter at normal speed and decelerate gradually to ensure that the train <u>leaves</u> the station at 15 miles per hour. <u>The rule does not apply to trains stopping at a station</u>, such as was the case herein. Under the AUTHORITY's rules, there is no requirement that trains slow down as they <u>enter</u> stations. Normal speed is considered to be the speed the train was traveling in the tunnel before it reached the station.

15. The entire New York City subway system began a major signal improvement in the 1980's that continues as a part of the Capital Program. At that time, the AUTHORITY determined the appropriate speed which the signals were intended to enforce at every location in the railroad, based on professional and agency standards.

16. At the time of the above captioned incident, all of the foregoing policies of the above captioned accident, all of the foregoing policies of the above captioned accident, all of the foregoing policies, procedures and principles had been in existence and had been reviewed and implemented by the AUTHORITY. The AUTHORITY has had since its inception, (including its

corporate forebears) reviewed and has had a rational foundation for its speed policy, i.e., that trains should enter stations at maximum speed within the above outlined restrictions, and has regularly reviewed this policy. Decisions made by the AUTHORITY in virtually every aspect of the day-to-day operations of the subways, from scheduling to signals to maintenance, have been made in light of this policy, which is standard urban subway practice. Without this policy, the AUTHORITY could not hope to carry its 4.6 million daily passengers, and would anticipate an increase in persons injured in the system, due to overcrowded platforms and trains, and increased commuting and waiting times.

**Summary**

17. The AUTHORITY'S policy of entering stations at full speed from the tunnel (not slowing down on entering stations) was arrived at as the result of a complex series of decisions. The speed policy is an integral part of the signal design for the system. Signals are set up throughout the system which enforce the speeds at which trains may travel (if a train passes through a signal at too high a rate of speed, it will be automatically thrown into an emergency stop). These signals and the speeds they enforce were designed to prevent trains from running into each other, and to allow the efficient movement of the millions of subway passengers who daily use the system. The signals and timers in place controlled the speed of the number 2/3 trains at the Chambers Street station on the day of the accident. The automatic signal system is the paramount device that controls the speeds of all trains at every location. If the operator had been

moving at an excessive speed according to the AUTHORITY'S policy the installed signal machinery would have automatically stopped him.

18. It is integral to the notion of a subway system that no persons on the tracks, allowing unobstructed movement of trains. When the signals were redone in the late 1980's, the AUTHORITY decided to retain its policy of full-speed-entrance to stations. To do otherwise would have caused huge overcrowding problems, and greater delays between trains. It would have ill-served the ends of overall passenger safety, and would have created a crushing burden of public expense

19. The schedules of the AUTHORITY are made with the intent of moving millions of people a day. The schedules are made on the assumption that the trains can enter from the tunnels at full speed. To slow train entry into subway stations from their tunnel speeds has been avoided because this policy would cause greater crowding and delays, would require the AUTHORITY to buy more equipment and redesign its signal system, at a cost in the billions, and would make the platforms less safe.

20. In short, forcing subway trains in New York to slow to 20 miles an hour as they entered stations would create a transportation and expense nightmare for the City of New York. The speed policy of the AUTHORITY, uniformly followed since its inception, is responsible and carefully thought out and is an essential component of the fully integrated plan of operations for the entire New York City subway system.

21. The presence or absence of speedometers in the train operator's cab does not, and did not on the day of the occurrence, have any effect on the motorman's entry speed into the station.

Dated: November 21, 2001
Brooklyn, New York

LARRY GOULD

Sworn to before me this
21st day of November, 01

NOTARY PUBLIC

RENEE Y. A. van PUTTEN
Notary Public, State of New York
No. 24-01VA4732188
Qualified in Kings County
Commission Expires September 19th, 2005

Gould 368947

- 8 -