UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUISA JANSSEN HARGER DASILVA,<br><br>Plaintiff,<br>- against -<br><br>NEW YORK CITY TRANSIT AUTHORITY; METROPOLITAN TRANSPORTATION AUTHORITY, and RAQUIA SHABAZZ,<br><br>Defendants. | 17-cv-4550 (FB)(VMS)<br><br>**PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED FACTS PURSUANT TO RULE 56.1** |

## I. Responses to Defendants' Rule 56.1 Statement

1. Deny. Plaintiff did not fall in front of an "oncoming train". When Plaintiff fainted and fell onto the tracks, the train was not yet in the station. Ex. 1 to Roth Decl, Aug. 2, 2016 Memo to Chief of Transit ("The Train Operator, Shabazz, Raqia pass #809087, stated she observed the aided on the North Bound track as the train was entering the station."); Ex. 2 to Roth Decl, Donald Moeller Dep 128:7-14; Ex. 3 to Roth Decl, 911 call recording ("Somebody is on the train tracks. By the B and the Q, someone is in the tracks. The train hasn't come yet they're trying to talk him into getting up but he's still down there. Everyone was screaming and talking to him… I had to get service to call 911."); Ex. 4 to Roth Decl, George Brown Dep 86:23-88:3.

2. Deny. Admit as to First Cause of Action. Deny as to the Second Cause of Action, but admit to the extent it alleges the TA had the "nondelegable duty … to maintain the aforesaid subway platform, station and tracks, in a reasonably safe condition" and that the TA was "negligent, careless, reckless and grossly negligent in the ownership, management, operation, maintenance, design and control of the aforesaid subway station and platform, in failing to properly inspect, maintain, repair and design said platform; in failing to keep said platform clear from

defects and hazards; in allowing and permitting a dangerous and defective condition to exist and remain on said platform; failing to prevent plaintiff, Luisa Janssen Harger Da Silva, from falling onto the subway tracks and/or roadbed." ECF 1 ¶ 124. Deny as to the Third Cause of Action, but admit to the extent it alleges, "[t]he aforesaid injury was caused by negligence, carelessness, recklessness and gross negligence of defendants in that the Defendants, New York City Transit Authority. and Metropolitan Transportation Authority, their agents, servants, employees and executives, including but not limited to the station agents and radio control/command center employees knew or should have known that plaintiff Luisa Janssen Harger Da Silva, was on the subway tracks and/or roadbed, and failed communicate said information to the train operator, defendant Raqia Shabazz; failed to take the proper precautions to advise and warn the train operator, defendant, Raqia Shabazz, that the plaintiff was on the tracks and/or road bed; failed to instruct train dispatchers, the power department, the switching department, and/or the train operator, and failed to use the communications and technology available to radio control/command to cut the electric power, stop or reroute the subway train that struck plaintiff Luisa Janssen Harger Da Silva; all of the foregoing created a dangerous and defective condition/situation that caused plaintiffs injuries." ECF 1 ¶ 131. Deny as to Count Four but admit to the extent it alleges, "That defendants New York City Transit Authority and Metropolitan Transportation Authority were further negligent, careless, reckless and grossly negligent in their failure to properly maintain their platform and trains; failure to provide lighting on the platform sufficient to light the tracks; failure to provide adequate lighting on the platform so as to light the tracks; failure to properly maintain the lighting on the platform; failure to provide lighting for the train sufficient to light the tracks; failure to light the tracks sufficiently to detect a person on the tracks; failure to maintain the lighting on the train; failure to properly maintain the train in good

working order so that it could stop in a timely fashion; failure to maintain the brakes and emergency stopping systems in good and correct working order; failure to maintain the brakes in sufficient working order so as to stop the train in sufficient time to avoid striking the plaintiff; in failing to properly repair and maintain the subway train." ECF 1 ¶ 140.

3. Admit.

4. Admit.

5. Admit.

6. Objection. This is not a statement of fact, but a legal argument. This paragraph violates Local Rule 56.1(a) and should be stricken. To the extent it is not stricken, Plaintiff admits that the Statute is cited accurately, and denies that ownership, operation and maintenance and control of the subway system is a "governmental function"; instead, the Courts have held for over a century that it is a "proprietary function." See, e.g., *Matter of Board of R.T. R.R. Commrs. of NY*, 197 N.Y. 81, 96 (1909) and *Pedraza v. N.Y.C. Transit Auth.*, No. 2022-00255, at *1 (1st Dept 2022).

7. Objection. This is not a statement of fact, but a legal argument. Thus, this paragraph violates Local Rule 56.1(a) and should be stricken. To the extent it is not stricken, Plaintiff admits that the cited Statute is cited accurately, and denies that ownership, operation and maintenance and control of the subway system is a "governmental function"; instead, the Courts have held it is a "proprietary function." See, e.g., *Matter of Board of R.T. R.R. Commrs. of NY*, 197 N.Y. 81, 96 (1909) and *Pedraza v. N.Y.C. Transit Auth.*, No. 2022-00255, at *1 (1 Dept 2022).

8. Objection. This paragraph should be stricken because it does not cite to admissible evidence; instead, it only cites to a statement in Defense Counsel's declaration, which is inadmissible hearsay, and thus violates Local Rule 56.1(a) and (d). *Vuona v. Merrill Lynch & Co.*,

919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.,* 856 F.Supp.2d 437, 443 (E.D.N.Y.2012).”). Moreover, the paragraph should be stricken because the paragraph in Defense Counsel’s declaration does not cite to admissible evidence, but instead to a document that was never exchanged in discovery, which violates Judge Scanlon’s order that Defendants could not rely on any documents not exchanged in discovery. ECF 173 p. 4 (“Defendants are on notice that in motion practice or at trial, they will not be permitted to rely on any materials not produced during the discovery phase of this case.”).

9. Admit.

10. Objection. This paragraph should be stricken because it does not cite to admissible evidence; instead, it only cites to a statement in Defense Counsel’s declaration, which is inadmissible hearsay, and thus violates Local Rule 56.1(a) and (d). *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.,* 856 F.Supp.2d 437, 443 (E.D.N.Y.2012).”). To the extent this statement is not stricken, Plaintiff denies, 52% of the documents and pages Defendants produced in discovery were duplicates, or redacted for relevance, and thus did not total nearly 60,000. Roth Dec ¶ C.

11. Deny. Ex. 6 to Roth Decl, Document Bates No. NYCTA_2_00406271 to NYCTA_2_00406275, March 3, 2010 email from Greg Sanchez to Thomas Lamb and Thomas Milbury (“Platform edge doors (or planform screen doors) are not an innovation or new technology in 2010. In the mass transit industry, they have existed for over 15 years.”); Ex. 16 to Roth Decl, Sanchez Dep at 107:4-111:24. Berk Report Ex VV, President Larry Reuter 43:9-45:2 (Reuter

states the Transit Authority was looking Platform Screen Doors since the 1980s); Defendants' Ex M (2010 report states PED (similar to PSDs) have been in use for 15 years).

12. Deny. Defendants have "looked at" PSDs, but have never conducted a proper "safety study". See Def Ex. VV, Berkowitz Report p. 7; Ex. 17 to Roth Decl, Kennedy Dep at 218:6-219:7.

13. Admit.

14. Admit

15. Deny. Defendants' Ex.s demonstrate that metros that have installed PSDs have not had serious hazards resulting from the PSDs, and instead that they have only increased safety. See Defendants' Ex BB International Research Report p. 2; Ex. 43 to Roth Decl at NYCTA_2_00134472.

16. This paragraph should be stricken to the extent it cites to a statement in Defense Counsel's declaration, which is improper and inadmissible hearsay, and thus violates Local Rule 56.1(a) and (d). *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.*, 856 F.Supp.2d 437, 443 (E.D.N.Y.2012)."). To the extent this statement is not stricken, Plaintiff denies, as Defendants' Ex. WW does not support this contention; Plaintiff also denies because Heavy Rail is not defined. Heavy rail is a gauge of rail and there are numerous "heavy rail systems" that use PSDs in the United States, such as the AirTrain at several airports, including John F. Kennedy airport in New York City, the Newark airport, and Chicago O'Hare Airport. See Def Ex. VV, Berkowitz Report p. 84.

17. Objection. This paragraph should be stricken to the extent it cites to a statement in Defense Counsel's declaration, which is improper and inadmissible hearsay, and thus violates Local

Rule 56.1(a) and (d). *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.,* 856 F.Supp.2d 437, 443 (E.D.N.Y.2012).”). To the extent this statement is not stricken, Plaintiff denies, as the common denominator and root cause of people getting struck by subway trains is not people standing too close to the platform edge, but instead open access from the platform edge to the tracks/track bed, and Defendants' failure to install PSDs, fixed guardrails, rope barriers, TIDs or any other barriers or safety devices or safety measures to prevent or reduce number and severity of contacts. See Def Ex. VV, Berkowitz Report pp. 7, 9; Ex. 7 to Roth Decl, Jones Dep at 104:17-105:12. Ex. 36 to Roth Decl, Bata Dep 66:12-68:9.

18. Objection. This paragraph should be stricken because it does not cite to admissible evidence; instead, it only cites to a statement in Defense Counsel's declaration, which is inadmissible hearsay, and thus violates Local Rule 56.1(a) and (d). *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.,* 856 F.Supp.2d 437, 443 (E.D.N.Y.2012).”). To the extent this statement is not stricken, Plaintiff denies, because according to the Defendants' System Safety Program Plan (“SSPP”) and testimony, customers falling on the tracks and being hit by trains is classified as Probability Level “1A”, or “Frequent.” Def. Ex. CCC at NYCTA-04608; Def Ex. VV, Berkowitz Report pp. 19; Ex. 7 to Roth Decl, Jones Dep at 152:12-18, 157:3-6; Ex. 19 to Roth Decl, Reuter Dep at 190:14-19.

19. Objection. This paragraph should be stricken to the extent it does not cite to admissible evidence, and instead cites to an unsupported statement in Defense Counsel's declaration, which is inadmissible hearsay, and thus violates Local Rule 56.1(a) and (d). *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co.,*

*Inc.,* 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.,* 856 F.Supp.2d 437, 443 (E.D.N.Y.2012).”). To the extent the paragraph is not stricken, Plaintiff denies, as Ex. WW does not support this contention. Plaintiff also denies as Defendants' own SSPP, MIL 882, 49 C.F.R. §§ 673.25, 673.27 and 5329, and Federal Transit Administration Guidelines require that Defendants implement a “corrective action plan” because customers falling on the tracks and being hit by trains is categorized as Risk assessment code 1A High hazard. Def. Ex. VV, Berkowitz Report p. 6; Def. Ex. CCC at NYCTA-04608 to NYCTA-04609; Ex. 7 to Roth Decl, Jones Dep at 157:3-14.

20. Objection. This paragraph should be stricken to the extent it does not cite to admissible evidence, and instead cites to an unsupported statement in Defense Counsel's declaration, which is inadmissible hearsay, and thus violates Local Rule 56.1(a) and (d). *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.,* 856 F.Supp.2d 437, 443 (E.D.N.Y.2012).”). To the extent the paragraph is not stricken, Plaintiff denies, as Ex. WW does not support this contention. Plaintiff also denies as Defendants' own SSPP, MIL 882, 49 C.F.R. §§ 673.25, 673.27 and 5329, and Federal Transit Administration Guidelines require that Defendants implement a “corrective action plan” because customers falling on the tracks and being hit by trains is categorized as Risk assessment code 1A High hazard. Def. Ex. VV, Berkowitz Report p. 6; Def. Ex. CCC at NYCTA-04608 to NYCTA-04609; Ex. 7 to Roth Decl, Jones Dep at 157:3-14.

21. Objection. This paragraph should be stricken to the extent it does not cite to admissible evidence, and instead cites to an unsupported statement in Defense Counsel's declaration, which is inadmissible hearsay, and thus violates Local Rule 56.1(a) and (d). *Vuona v.*

*Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.*, 856 F.Supp.2d 437, 443 (E.D.N.Y.2012).”). To the extent this paragraph is not stricken, Plaintiff denies, as this statement is argumentative to the extent it claims that “Defendants have determined” and is not stated as a fact. To the extent that this statement is claiming that only 128 of the 472 stations are feasible for the installation of platform screen doors, Plaintiff denies. Plaintiff’s experts have determined that the Transit Authority’s analysis was faulty, and that PSDs were feasible at the subject station and most other stations throughout the subway system. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38.

22. Deny. This statement is argumentative to the extent it claims that “stations were deemed infeasible”, as this paragraph is not stated as a fact. To the extent this paragraph is not stricken, Plaintiff denies. To the extent that this statement is claiming that only 128 of the 472 stations are feasible for the installation of platform screen doors, Plaintiff denies. Plaintiff’s experts have determined that the Transit Authority’s analysis was faulty, and that PSDs were feasible at the subject station and most other stations throughout the subway system. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38.

23. Deny. There were numerous no-cost financing options or funding for installation, operation and maintenance of the PSDs throughout the system, including Build-Operate-Transfer (“BOT”) Agreements. In fact, numerous companies who responded to RFI No. 10RFIN44, stated they could finance the installation of PSDs using a BOT agreement. Ex 9 to Roth Decl, PSDTF Evaluation of RFI responses (Bates No. NYCTA_2_00589606); Ex 10 to Roth Decl, Faiveley RFI Resp. at p. 48 (NYCTA-5597-6432); Ex 11 to Roth Decl, TIS partners RFI Response at 1-12, 36-41 (NYCTA-5597-6432); Ex 12 to Roth Decl, KABA RFI Response at NYCTA-005901 (NYCTA-

5597-6432); Ex 13, GE- Singapore Elec RFI Response (NYCTA-5597-6432); Ex 14 to Roth Decl, Westinghouse- Knorr-Bremse RFI Response (NYCTA-5597-6432); Ex 70 to Roth Decl, Crown response to RFI #10RFIN44NYCTA (NYCTA- 5597 to NYCTA-6432).

24. Deny. This statement is argumentative to the extent it claims that "Defendants have determined", and it is not stated as a fact. To the extent that this statement is claiming that "it is not feasible to install platform screen doors at the stations [sic] where the accident occurred (Atlantic Avenue-Barclays Center)", Plaintiff denies. Plaintiff's experts have determined that the Transit Authority's analysis was faulty, and that PSDs were feasible at the subject station. Def. Ex. VV, Berkowitz Report pp. 72-73; Def. Ex. WW, Glismann Report pp. 5-6, 31, 37. Ex. 22 to Roth Decl, Foell Dep at 121:10-20.

25. Deny. Safety is the top priority for operating the transit system. Ex. 7 to Roth Decl, Jones Dep at 232:17-24; Ex. 15 to Roth Decl, Sullivan Dep at 75:24-76:7, 79:4-81:21; Ex. 16 to Roth Decl, Sanchez Dep at 30:19-32:2; Ex. 17 to Roth Decl, Kennedy Dep at 24:11-27:11; Ex. 18 to Roth Decl, Prendergast Dep at 50:22-25; Ex. 19 to Roth Decl, Reuter Dep at 241:2-11.

26. Objection. This statement is argumentative and is not stated as a fact, and should be stricken. To the extent it is not stricken, Plaintiff denies that Defendants conducted "reasonable" studies; Def. Ex. VV, Berkowitz Report pp. 6, 10-11, 72-73; Def. Ex. WW, Glismann Report pp. 22-23.

27. Admit.

28. Deny. Defendants did not conduct any study prior to Plaintiff's accident. The PTSB requested the TA to study TIDS in 2009, but the TA refused. Ex.s 55-58 to Roth Decl

29. Deny. Defendants do not define "heavy rail". Futher, Defendants misquote Ex. YY, in which their expert, Kenneth Korach states that he is "not aware" of any systems that use TIDS.

30. Objection. This statement is argumentative and is not stated as a fact, and should be stricken. To the extent it is not stricken, Plaintiff denies, as Defendants' own SSPP, MIL 882, 49 C.F.R. §§ 673.25, 673.27 and 5329, and Federal Transit Administration Guidelines require that Defendants implement a "corrective action plan", which would likely include use of TIDS at at least some stations, because customers falling on the tracks and being hit by trains is categorized as Risk assessment code 1A High hazard. Def. Ex. VV, Berkowitz Report p. 6; Def. Ex. CCC at NYCTA-04608 to NYCTA-04609; Ex. 7 to Roth Decl, Jones Dep at 157:3-14.

31. Deny. Shabazz testified that she did not know if the speedometer was working on the date of the incident and she did not remember checking the speedometer between the train leaving the prior station (Seventh Avenue) and making contact with Plaintiff. Def. Ex. TT, Shabazz Dep. at 326:9-327:23.

32. Deny. There is no visible posted speed limit between the prior station, Seventh Avenue, and the Atlantic Avenue / Barclays Center Station on the subject tracks. See Ex. 20 to Roth Decl at 18:48 to 20:15.

33. Deny. The Transit Authority noted that Ms. Harger was found at 10 feet south of survey marker #A4 336+50, under the second car, # 5147 under the front doors, door panels 9 and 10. Ex. 21 to Roth Decl

34. Admit.

35. Objection. This statement is argumentative and should be stricken. To the extent it is not stricken, Plaintiff denies to the extent it claims that there were no "defects" on the platform, as the Plaintiff's claim is that the platform was "hazardous" and "defective" because there were no platform barriers, safety devices or safety measures that would have prevented Ms. Harger from falling onto the tracks and being hit by the train. Def. Ex. VV, Berkowitz Report pp. 27, 41, 72.

## II. Responses to "facts" alleged in the declaration of Andrew Keaveney, which should have been included in Defendants' Rule 56.1 statement.

36. Paragraphs 11-14: Plaintiff objects to these paragraphs because they rely on Ex. "PP", which was not exchanged in discovery, and thus violates Judge Scanlon's Order that Defendants could not rely on any documents not exchanged in discovery. ECF 173 p. 4 ("Defendants are on notice that in motion practice or at trial, they will not be permitted to rely on any materials not produced during the discovery phase of this case.").

37. Paragraph 15: Plaintiff objects to this paragraph because it relies on information not exchanged by Defendants in discovery, and thus violates Judge Scanlon's Order that Defendants could not rely on any documents not exchanged in discovery. ECF 173 p. 4 ("Defendants are on notice that in motion practice or at trial, they will not be permitted to rely on any materials not produced during the discovery phase of this case.").

38. Paragraph 16: Plaintiff objects to this paragraph because it relies on information not exchanged by Defendants in discovery, and thus violates Judge Scanlon's Order that Defendants could not rely on any documents not exchanged in discovery. ECF 173 p. 4 ("Defendants are on notice that in motion practice or at trial, they will not be permitted to rely on any materials not produced during the discovery phase of this case."). Plaintiff also objects because "heavy rail" is not defined.

39. Paragraphs 17-19: Objection. These paragraphs are not statements of fact, but legal arguments, and should be disregarded or stricken. *Genometrica Research Inc. v. Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent they are not stricken, Plaintiff admits that the cited Statute is cited accurately, and denies that ownership, operation and maintenance and control of the subway

system is a "governmental function"; instead the Courts have held it is a "proprietary function." *Pedraza v. N.Y.C. Transit Auth.*, No. 2022-00255, at *1 (1 Dept 2022).

40. Paragraph 20: admit.

41. Paragraph 21:

a. Admit that the action was commenced by filing a complaint on July 16, 2018.

b. Admit that the 142 paragraphs allege numerous acts of negligence and four numbered causes of action.

c. Admit that the First Cause of Action alleges that Train Operator, Defendant Shabazz, was negligent in her operation of the train because she (1) entered the station at an excessive rate of speed for the circumstances existing then and there ; (2) failed to pay proper attention and be reasonably attentive and see what was there to be seen and observe Plaintiff on the tracks; (3) failed to engage the emergency brake in a timely manner; (4) failed to stop the train before running over the plaintiff.

d. Deny that the Second Cause of Action solely alleges that Defendants were negligent in failing to install platform edge barriers. The Second Cause of Action primarily alleges the TA had the "nondelegable duty … to maintain the aforesaid subway platform, station and tracks, in a reasonably safe condition" and that the TA was "negligent, careless, reckless and grossly negligent in the ownership, management, operation, maintenance, design and control of the aforesaid subway station and platform, in failing to properly inspect, maintain, repair and design said platform; in failing to

keep said platform clear from defects and hazards; in allowing and permitting a dangerous and defective condition to exist and remain on said platform; failing to prevent plaintiff, Luisa Janssen Harger Da Silva, from falling onto the subway tracks and/or roadbed." ECF 1 ¶ 124.

e. Deny as to the Third Cause of Action, to the extent Defendants claim it is limited to allegations that Defendants were negligent for failing to install "intrusion technology." Instead, the Third Cause of Action alleges, "[t]he aforesaid injury was caused by negligence, carelessness, recklessness and gross negligence of defendants in that the Defendants, New York City Transit Authority. and Metropolitan Transportation Authority, their agents, servants, employees and executives, including but not limited to the station agents and radio control/command center employees knew or should have known that plaintiff Luisa Janssen Harger Da Silva, was on the subway tracks and/or roadbed, and failed communicate said information to the train operator, defendant Raqia Shabazz; failed to take the proper precautions to advise and warn the train operator, defendant, Raqia Shabazz, that the plaintiff was on the tracks and/or road bed; failed to instruct train dispatchers, the power department, the switching department, and/or the train operator, and failed to use the communications and technology available to radio control/command to cut the electric power, stop or reroute the subway train that struck plaintiff Luisa Janssen Harger Da Silva; all of the foregoing created a

dangerous and defective condition/situation that caused plaintiffs injuries." ECF 1 ¶ 131.

f. Deny as to the Fourth Cause of Action, to the extent Defendants claim it is limited to "deficiencies with the station and train's lighting and the train's brakes." Instead, the Fourth Cause of Action alleges, "That defendants New York City Transit Authority and Metropolitan Transportation Authority were further negligent, careless, reckless and grossly negligent in their failure to properly maintain their platform and trains; failure to provide lighting on the platform sufficient to light the tracks; failure to provide adequate lighting on the platform so as to light the tracks; failure to properly maintain the lighting on the platform; failure to provide lighting for the train sufficient to light the tracks; failure to light the tracks sufficiently to detect a person on the tracks; 14ailuree to maintain the lighting on the train; failure to properly maintain the train in good working order so that it could stop in a timely fashion; failure to maintain the brakes and emergency stopping systems in good and correct working order; failure to maintain the brakes in sufficient working order so as to stop the train in sufficient time to avoid striking the plaintiff; in failing to properly repair and maintain the subway train." ECF 1 ¶ 140.

42. Paragraph 22: Admit.

43. Paragraph 23: Objection. This paragraph should be stricken because it does not cite to admissible evidence; instead, it only cites to a statement in Defense Counsel's declaration, which is inadmissible hearsay, and thus violates Local Rule 56.1(a) and (d). *Vuona v. Merrill Lynch &*

*Co.*, 919 F. Supp. 2d 359, 387 (S.D.N.Y. 2013) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73–74 (2d Cir.2001); and *Russo v. Estee Lauder Corp.,* 856 F.Supp.2d 437, 443 (E.D.N.Y.2012).”). To the extent this statement is not stricken, Plaintiff denies, as 52% of the documents and pages Defendants produced in discovery were duplicates, or redacted for relevance, and thus did not total nearly 60,000.

44. Paragraph 24: deny, to the extent that many of the alleged “additional” 300 documents were actually duplicates of other documents.

45. Paragraphs 25-26: Deny. Defendants never conducted a proper “study” regarding PSDs; instead, Defendants have “looked at” PSDs, but have never conducted a proper “safety study” or “hazard analysis”, as required by their SSPP and MIL 882. Defendants have “looked at” PSDs, but have never conducted a proper “safety study”. See Def Ex. VV, Berkowitz Report pp. 5-10.

46. Paragraph 27: Deny. The common denominator and root cause for individuals coming into contact with trains is that there was open access from the platform edge to the tracks and track bed; were no barriers on the platform edge, or other safety devices or other safety measures taken to prevent or reduce number and severity of contacts. Def. Ex. VV, Berkowitz Report p. 7; Ex. 7 to Roth Decl, Jones Dep at 104:9-25; Ex. 19 to Roth Decl, Reuter Dep at 319:20-25; Ex. 15 to Roth Decl, Sullivan Dep at 253:5-18.

47. Paragraph 28. Deny: Addressing this issue required taking effective corrective action and resolving the hazard. See Def. Ex CCC at NYCTA-04605 to NYCTA-04609. Defendants failed to address the issue because the measures they implemented (signs, announcements, etc.), were ineffective at reducing the number of people hit by trains. Ex. 17 to Roth Decl, Kennedy Dep.

at 242:20-243; Ex. 24 to Roth Decl; Ex. 25 to Roth Decl; Ex. 43 to Roth Decl at NYCTA_2_00134561*;* Ex. 46 to Roth Decl at NYCTA_2_00426596.

48. Paragraph 29. Admit that Defendants claim suicides are an issue and that they have installed Help Points, cameras and blue lights; but note that Defendants have not "addressed" this issue, because these steps have been ineffective and have not reduced the severity of injuries sustained and the number of people hit or run over by trains and killed or catastrophically injured and they have a continuing duty to evaluate the effectiveness of steps taken and to reevaluate their safety plan in light of the actual operation of the system and the ineffectiveness of the steps taken. Ex. 17 to Roth Decl, Kennedy Dep. at 242:20-243; Ex. 24 to Roth Decl; Ex. 25 to Roth Decl; Ex. 43 to Roth Decl at NYCTA_2_00134561*;* Ex. 46 to Roth Decl at NYCTA_2_00426596.

49. Paragraph 30 Deny. Defendants did not conduct any study prior to Plaintiff's accident. The PTSB requested the TA to study TIDS in 2009, but the TA refused. Ex.s 55-58 to Roth Decl

50. Paragraph 31:

a. Admit that Defendants have "looked at" PSDs.

b. Object to Defendants' claim that "there is no known use of platform screen doors (PSDs) by any rail carriers in the United States," to the extent that this is incorrect and relies on information not exchanged in discovery, and thus should be stricken for violating Judge Scanlon's order at ECF 172.

c. Object to Defendants' claim that there is "no requirement for [PSDs'] use by any federal, state, or local authority," as this is not a statement of fact, but legal arguments, and should be disregarded or stricken. *Genometrica Research Inc. v. Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL

394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent they are not stricken, Plaintiff denies, as Defendants' own SSPP, MIL 882, the CFR and FTA require that Defendants implement a "corrective action" plan that effectively reduces the severity of injuries and number of people being hit or run over by trains, and frequency of people being hit or run over by trains and the catastrophic nature of the severity of their injuries is categorized as Risk assessment code 1A High hazard. Def. Ex. VV, Berkowitz Report p. 6; Def. Ex. CCC at NYCTA-04608 to NYCTA-04609; Ex. 7 to Roth Decl, Jones Dep at 157:3-14.

d. Object to Defendants' claim that there is "a very small chance of customer being struck by a train," as this is not a statement of fact, but legal argument, and should be disregarded or stricken. *Genometrica Research Inc. v. Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent this claims is not stricken, Plaintiff denies, Under their own SSPP, the Risk Assessment Code categorizes train strike incidents as "frequent"; and numerous Transit Officials testified at depositions that these incidents are "frequent." Def Ex. CCC at NYCTA-04605 to NYCTA-04609; Def Ex. VV, Berkowitz Report pp. 19; Ex. 7 to

Roth Decl, Jones Dep at 152:12-23, 157:3-6; Ex. 17 to Roth Decl, Reuter Dep at 190:4-19.

51. Paragraph 32: Admit that the cited document, which contains numbers self-reported by Defendants, is cited accurately.

52. Paragraph 33: Objection. This paragraph contains arguments and thus violated Local Rule of Civil Procedure 7.1(a) and thus should be stricken. *Genometrica Research Inc*. *v*. *Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent it is not stricken, Plaintiff Denies, as this methodology is improper Rail Mass Transit risk assessment analysis. See Berkowitz Declaration ¶¶ 22-24. CoMET, whose members account for the largest Transit Systems in the world, routinely conduct surveys and collect data from its members. In a 2010 Key Performance Indicators report, NYC transit was ranked last for accidental deaths from customers falling onto the tracks and being struck by trains out of the 26 metros surveyed. Ex. 44 to Roth Dec at NYCTA_2_00390645, Deaths per accident per billion journeys compared to the other mass transit systems is the proper metric. The below chart shows that from 2000-2009, NY is approximately twice as deadly than the next closest Mass Transit system surveyed. CoMET states that, "[t]his is the primary safety indicator, evaluating the safety of the metro for passengers". Ex. 44 to Roth Dec

at NYCTA_2_00390771. Below is a copy of the chart from the CoMET report:




53. Paragraph 34:

a. Deny that "PSDs are a relatively new technology." Document Bates No. NYCTA_2_00406271 to NYCTA_2_00406275, March 3, 2010 email from Greg Sanchez to Thomas Lamb and Thomas Milbury ("Platform edge doors (or planform screen doors) are not an innovation or new technology in 2010. In the mass transit industry, they have existed for over 15 years."); Ex. 16 to Roth Decl, Sanchez Dep at 107:4-111:24; Def Ex VV, Berkowitz Report Ex VV p. 6, 27; President Larry Reuter 43:9-45:2; Berkowitz Decl ¶ 9. The Transit Authority was looking Platform Screen Doors since the 80s. The challenges were the same through 2007 when President Reuter left in 2007. Reuter 44:20-25 Ex M 2010 report states PED (similar to PSDs) have been in use for 15 years.

b. Deny that no other "rapid transit" systems in the United States use PSDs, as they are common at Airports like the AirTran at JFK and its stations. Plaintiff also denies because there are numerous "heavy rail systems" that use PSDs in the United States, such as the AirTrain at several airports, including John F. Kennedy airport in New York City, the Newark airport, and Chicago O'Hare Airport. See Def Ex. VV, Berkowitz Report p. 84.

c. Admit that the NYC Subway was not originally built to use PSDs, However the Plaintiffs claims are not limited to PSDs, as of 2016 for example fixed guardrails have been at certain stations in the system, like the Times Square Suttle, for 100 years. Ex. 7 to Roth Decl, Jones Dep. at 121:9-122:4; Def. Ex VV, Berkowitz Report at pp 6, 41. Below is a photograph of the railing at the Times Square Shuttle, which was marked as Ex. "3" at the deposition of Godrey Gaksin, and is attached to the Roth Decl as Ex. 60.



d. Deny that any of the existing station builds and layouts preclude installation of PSDs; numerous PSD manufacturers responded to Defendants' RFI in 2011 and confirmed they could overcome engineering challenges and install PSDs throughout the system. Ex 9 to Roth Decl, PSDTF Evaluation of RFI responses (Bates No. NYCTA_2_00589606); Ex 10 to Roth Decl, Faiveley RFI Resp. at p. 48 (NYCTA-5597-6432); Ex 11 to Roth Decl, TIS partners RFI Response at 1-12, 36-41 (NYCTA-5597-6432); Ex 12 to Roth Decl, KABA RFI Response at NYCTA-005901 (NYCTA-5597-6432); Ex 13, GE- Singapore Elec RFI Response (NYCTA-5597-6432); Ex 14 to Roth Decl, Westinghouse- Knorr-Bremse RFI Response (NYCTA-5597-6432); Ex 70 to Roth Decl, Crown response to RFI #10RFIN44NYCTA (NYCTA-5597 to NYCTA-6432).

e. Deny that "car equipment and signal issues" preclude installation of PSDs. The TA hired STV as a contract designer for numerous jobs with the transit system, Bates STV technical proposal bid for the PSD pilot program which was cancelled and never completed. STV's proposal states:

> **Signals** The interface between the signaling system and the PSD operating system control and indication panel is a safety critical interface. The integration to the existing signal system at stations, where PSD operating systems are to be implemented, will incorporate the latest industry safety standards.

Ex. 61 to Roth Decl at NYCTEA_2_

Numerous other RFI responses indicated that all the following would be able to handle the signal challenges along with any other challenges in the system. See Ex 9 to Roth Decl, PSDTF Evaluation of RFI responses (Bates

No. NYCTA_2_00589606); Ex 10 to Roth Decl, Faiveley RFI Resp. at p. 48 (NYCTA-5597-6432); Ex 11 to Roth Decl, TIS partners RFI Response at 1-12, 36-41 (NYCTA-5597-6432); Ex 12 to Roth Decl, KABA RFI Response at NYCTA-005901 (NYCTA-5597-6432); Ex 13, GE- Singapore Elec RFI Response (NYCTA-5597-6432); Ex 14 to Roth Decl, Westinghouse- Knorr-Bremse RFI Response (NYCTA-5597-6432); Ex. 70 to Roth Decl, Crown response to RFI #10RFIN44NYCTA (NYCTA- 5597 to NYCTA-6432); see also, Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38.

54. Paragraph 35. Deny. Defendants' speculation on this point is not based on any safety study, and other metros around the world have not reported concerns or any frequent number of such incidents resulting in catastrophic injuries regarding customers getting caught between the PSD array and the train. See Def. Ex. N; Def Ex. BB p. 41

55. Paragraph 36: Deny. STV did not conduct a proper safety study. STV also improperly claimed that installation of PSDs at numerous stations was infeasible because of the ADA, but the ADA analysis is flawed and erroneous because the platforms were already not compliant with the ADA even without the PSDs, because (1) wheelchairs don't have enough room to navigate around the structural support columns, and/or (2) excessive horizontal and/or vertical gap distances between the platform edge and floor of train car, and/or (3) no elevator to platform in the station, and (4) incorrect ADA criteria was used. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 22 to Roth Decl, Foell Dep at 117:21-118:19, 153:12-20, 156:6-11; Ex. 7 to Roth Decl, Jones Dep at 275:6-20.

56. Paragraph 37: Deny. The STV study claimed that PSDs could not be installed at the subject station because of "ADA issues", but the ADA analysis is flawed and erroneous because the platforms were already not compliant with the ADA even without the PSDs, because (1) wheelchairs don't have enough room to navigate around the structural support columns, and/or (2) excessive horizontal and/or vertical gap distances between the platform edge and floor of train car, and/or (3) no elevator to platform in the station, and (4) incorrect ADA criteria was used. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 22 to Roth Decl, Foell Dep at 117:21-118:19, 153:12-20, 156:6-11 Ex 7 to Roth Decl, Jones Dep at 275:6-20.

57. Paragraph 38: Admit.

58. Paragraph 39: Deny:

a. Carl Berkowitz provided extensive citations to the evidence in this case and other evidence to support his opinions. Def. Ex. VV, Berkowitz Report. Additionally, Defendants failed to attach to their moving papers the document entitled "Berkowitz Appendix", which was attached to his expert report, and listed the numerous ESI bates numbered documents that he reviewed in preparing his report. The appendix is annexed to the Roth Declaration as Ex. 62.

b. Peter Glismann provided extensive citations to the evidence in this case and other evidence to support his opinions. Def. Ex. WW, Glismann Report.

59. Paragraph 40:

a. Deny that no other heavy rail system uses PSDs. there are numerous "heavy rail systems" that use PSDs in the United States, such as the AirTrain at several airports,

including John F. Kennedy airport in New York City, the Newark airport, and Chicago O'Hare Airport. See Def Ex. VV, Berkowitz Report p. 84.

b. Deny. Ex. WW does not support this proposition.

c. Deny that no "rule, regulation or operational practice in the U.S." requires installation of PSDs, TIDs or other safety devices. The Transit Authority has a nondelegable duty to maintain and operate the subway system in a safe condition. The Transit Authority's SSPP, MIL 882, the CFR and FTA … require that the NYCTA implement an effective corrective action plan because people trains making contact with people, hitting or running over them causing deaths and catastrophic injuries is categorized as a category "1A High Hazard" under MIL 882. Def. Ex. VV, Berkowitz Report p. 6; Def. Ex. CCC at NYCTA-04608 to NYCTA-04609; Ex. 7 to Roth Decl, Jones Dep at 157:3-14.

60. Paragraph 41: Deny. The admissible evidence supports Plaintiff's claim that Shabazz was negligent. Ex. 1 to Roth Decl, Aug. 2, 2016 Memo to Chief of Transit ("The Train Operator, Shabazz, Raqia pass #809087, stated she observed the aided on the North Bound track as the train was entering the station."); Ex. 2 to Roth Decl, Donald Moeller Dep 128:7-14; Ex. 3 to Roth Decl, 911 call recording ("Somebody is on the train tracks. By the B and the Q, someone is in the tracks. The train hasn't come yet they're trying to talk him into getting up but he's still down there. Everyone was screaming and talking to him… I had to get service to call 911."); Ex. 4 to Roth Decl, Gabriel Smith testimony 13:24-16:23; Ex. 5 to Roth Decl, George Brown Dep 86:23-88:3.

61. Paragraph 42: Admit that the Shabazz's testimony is cited correctly; Deny that "TO Shabazz watched as plaintiff [fell] from the edge of the platform." Ex. 1 to Roth Decl, Aug. 2,

2016 Memo to Chief of Transit ("The Train Operator, Shabazz, Raqia pass #809087, stated she observed the aided on the North Bound track as the train was entering the station."); Ex. 2 to Roth Decl, Donald Moeller Dep 128:7-14; Ex. 3 to Roth Decl, 911 call recording ("Somebody is on the train tracks. By the B and the Q, someone is in the tracks. The train hasn't come yet they're trying to talk him into getting up but he's still down there. Everyone was screaming and talking to him… I had to get service to call 911."); Ex. 4 to Roth Decl, Gabriel Smith testimony 13:24-16:23; Ex. 5 to Roth Decl, George Brown Dep 86:23-88:3.

62. Paragraph 43: Deny. There was no emergency because Plaintiff was on the tracks before the train entered the station. Ex. 1 to Roth Decl, Aug. 2, 2016 Memo to Chief of Transit ("The Train Operator, Shabazz, Raqia pass #809087, stated she observed the aided on the North Bound track as the train was entering the station."); Ex. 2 to Roth Decl, Donald Moeller Dep 128:7-14; Ex. 3 to Roth Decl, 911 call recording ("Somebody is on the train tracks. By the B and the Q, someone is in the tracks. The train hasn't come yet they're trying to talk him into getting up but he's still down there. Everyone was screaming and talking to him… I had to get service to call 911."); Ex. 4 to Roth Decl, Gabriel Smith testimony 13:24-16:23; Ex. 5 to Roth Decl, George Brown Dep 86:23-88:3.

63. Paragraph 44: Objection. Defense Counsel does not cite to any admissible evidence to support this claim. Moreover, the claim is untrue, as Dr. Berkowitz cites the evidence that he used to support his conclusion that Shabazz was negligent and could have stopped the train prior to hitting Plaintiff. See Def Ex. VV, Berkowitz Report. To the extent Defendants claim that Dr. Berkowitz "made up" the deceleration rate of 3.2 mph/sec, that is untrue, as it is based on Defendants' document produced in discovery. Ex. 23 to Roth Decl

64. Paragraph 45: Objection. This paragraph contains arguments that are improper for an attorney declaration and should be stricken. To the extent they are not stricken, Plaintiff denies, as Berkowitz has explained how he conducted his calculations for the Perception Reaction Time, using reports published by the US Department of Transportation and defendants have not submitted any evidence from any expert that rebuts his calculations or demonstrates that they are improper in any way. See Def Ex. VV, Berkowitz Report pp. 50-52.

65. Paragraph 46: Objection. This paragraph contains arguments and thus violated Local Rule of Civil Procedure 7.1(a) and thus should be stricken. *Genometrica Research Inc. v. Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent it is not stricken, Plaintiff denies. Ex. 1 to Roth Decl, Aug. 2, 2016 Memo to Chief of Transit ("The Train Operator, Shabazz, Raqia pass #809087, stated she observed the aided on the North Bound track as the train was entering the station."); Ex. 2 to Roth Decl, Donald Moeller Dep 128:7-14; Ex. 3 to Roth Decl, 911 call recording ("Somebody is on the train tracks. By the B and the Q, someone is in the tracks. The train hasn't come yet they're trying to talk him into getting up but he's still down there. Everyone was screaming and talking to him… I had to get service to call 911."); Ex. 4 to Roth Decl, Gabriel Smith testimony 13:24-16:23; Ex. 5 to Roth Decl, George Brown Dep 86:23-88:3.

66. Paragraph 47: Objection. This paragraph contains arguments and thus violated Local Rule of Civil Procedure 7.1(a) and thus should be stricken. *Genometrica Research Inc. v. Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because

inclusion of legal arguments in declarations is improper). To the extent this paragraph is not stricken:

a. Admit that Dr. Berkowitz used a 3.2 mph/sec deceleration rate. Deny that that rate is improper or that it came from Wikipedia, as the decelteration rate comes from the Transit Authority's document, "Specifications – Car Design Parameters", Section 3.3.3.C.. Ex. 23 to Roth Declaration (Bates No. 0124).

b. Admit that Berkowitz calculates a 109-foot stopping distance at 20 miles per hour and 153 foot stopping distance for 24 miles per hour, which is *shorter* than the NYCT's stopping distance chart, which provides for 121 feet at 20 miles per hour and 167 feet at 24 miles per hour. Ex VV at 67-69.

c. Deny that the NYCT's stopping distance chart is "empirically based," as there is no evidence whatsoever regarding how the NYCT calculated the stopping distances in their chart or any evidence that the stopping distaces are "empiraclly based". See Def. Ex. XX at 8 (Marpet report, where he simply states what the NYCT chart states, but does not explain the calculation).

67. Paragraph 48: Objection. This paragraph contains arguments and thus violated Local Rule of Civil Procedure 7.1(a) and thus should be stricken. *Genometrica Research Inc. v. Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent this paragraph is not stricken, Plaintiff denies that the calculation of the train operator's visibility distance inside the tunnel was "unscientific and speculative." Dr. Berkowitz explained his calculations are based on his personal observations during a site visit, as demonstrated in the pictures included in his report;

and his opinions are consistent with the station blueprint provided by defendants in discovery, which shows that the length of straight track prior to entry into the station is greater than 147 feet. Def Ex. VV, Berkowitz Report pp. 52-64. The calculations are also consistent with the video exchanged by Plaintiff in discovery. Ex. 20 to Roth Decl at 18:48 to 20:15.

68. Paragraph 49: Objection. This paragraph contains arguments that are improper for an attorney declaration and should be stricken. To the extent this paragraph is not stricken, Plaintiff denies. Orlando Jimenez's report demonstrates he carefully considered all of the evidence and reached a conclusion based on his review of the evidence and his 30 years of experience working in various positions at the NYCT, including as a train operator and a trainer who has operated his train numerous times through this station. Def Ex. UU; See also Decl of Orlando Jimenez.

69. Paragraph 50: admit.

70. Paragraph 51: Objection. This paragraph contains arguments in violation of Local Rule of Civil Procedure 7.1(a) and thus should be stricken. *Genometrica Research Inc. v. Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent this paragraph is not stricken, Plaintiff denies. To the extent that Defendants claim Dr. Berkowitz "attacked" Defendants' decision not to slow the speed of trains entering stations, Dr. Berkowitz opined that, "If engineering controls cannot reduce or prevent the hazards, then administrative controls should be established to reduce the duration, frequency, or intensity of exposure to the hazards. Examples of administrative controls include operation changes to the train such as reducing the train speed entering the station (so that it takes less distance to stop the train)" Def Ex VV at p 24. He went on to explain that Defendants' decision not to reduce the speed at which trains enter stations was

not based on a proper safety study or hazard analysis, and failed to apply the Risk Assessment Matrix mandated by their own SSPP and MIL 882. *Id*. at 27.

71. Paragraph 52: Objection. This paragraph contains arguments in violation of Local Rule of Civil Procedure 7.1(a) and thus should be stricken. *Genometrica Research Inc*. *v*. *Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent this paragraph is not stricken, Plaintiff denies. Glismann states in his report that, "Another safety measure that has been proposed in NYC is simply reducing the speed at which trains enter the stations. This allows the train operator to stop the train more quickly reduces the stopping distance. Although speed policy and speed of trains entering the station is not a focus of this report the refusal to do a pilot to ascertain a safe speed or what affect the reduction in speed would have on the system is a general violation of good and accepted practices and procedures." Def. Ex. WW p. 11. Glismann also states, "Based on my review of the materials in this case, the MTA never conducted a safety study regarding whether slowing the speed at which trains enter the stations would have any impact on CWIs" and that "a proper hazard and root cause analysis required that the MTA conduct a comparative study to determine if slowing the speed at which trains enter the stations would have been effective, or had the unintended consequences as speculated by the MTA. *Id*. p. 32.

72. Paragraph 53: Objection. This paragraph contains arguments in violation of Local Rule of Civil Procedure 7.1(a) and thus should be stricken. *Genometrica Research Inc*. *v*. *Gorbovitski*, No. 11-CV-05802 ADS AKT, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (refusing to consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). To the extent this paragraph is not

stricken, Plaintiff denies to the extent it claims that there were no “defects” on the platform, as the Plaintiff’s claim is that the platform was “hazardous” and “defective” because there were no platform barriers, safety devices or safety measures that would have prevented Ms. Harger from falling onto the tracks and being hit by the train. Def. Ex. VV, Berkowitz Report pp. 27, 41, 72.

## III. <u>Responses to “facts” alleged in the declaration of Tony Abdallah, which should have been included in Defendants’ Rule 56.1 statement.</u>

73. ¶ 11: Deny. Fixed guardrails are a platform barrier that the TA refused to consider, and rejected without any study or evaluation. The TA has fixed guardrails at certain stations throughout the system. Ex. 60 to Roth Decl The TA commissioned STV to create renderings of fixed guardrail barriers. Ex. 63 to Roth Decl These fixed guardrails are inexpensive and relatively easy to install, and were even proposed as an interim safety measure while defendants were contemplating installation of PSDs. Ex 40 to Roth Decl A couple sample renderings created by STV are below:






74. ¶ 12

a. Admit that most systems that use PSDs were originally built with them or designed to install them later, but there have been retro-fits as well.

b. Deny that no systems domestically use PSDs; there are numerous "heavy rail systems" that use PSDs in the United States, such as the AirTrain at several airports, including John F. Kennedy airport in New York City, the Newark airport, and Chicago O'Hare Airport. See Def Ex. VV, Berkowitz Report p. 84.

c. Deny that no regulations require PSDs, as Defendants' own SSPP, MIL 882, 49 C.F.R. §§ 673.25, 673.27 and 5329, and Federal Transit Administration Guidelines require that Defendants implement a "corrective action plan" because customers falling on the tracks and being hit by trains is categorized as Risk assessment code 1A High hazard. A proper application of the Hazard Analysis requires elimination of the hazard if possible, and if not, then it requires a reduction to the lowest possible level. Def. Ex. VV, Berkowitz Report p. 8. Thus, in stations where PSDs

are feasible, they are required to be installed; and where they cannot be installed, other safety devices and/or measures must be taken, such as installation of RPSDs, fixed guardrails, or slowing the entry speed of trains into stations. Def. Ex. VV, Berkowitz Report p. 8.

75. ¶ 13: Deny. Mr. Ahmad fails to mention two important kinds of platform barriers: fixed guardrails and Rope Platform Screen Doors ("RPSDs"). Def Ex Evaluation of Rope Barriers Ex FF at 2 of 15. Notably, fixed guardrails are much less expensive than PSDs and easier to install; and RPSDs solve the door alignment issue that concerned the TA. Def Ex VV, Berkowitz Report pp. 40-41.

76. ¶ 14: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

77. ¶ 15:

a. Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

b. Deny that "These concerns continue today for many stations." Instead, decades of Safety Performance Indicators and other data from systems that use PSDs show these are no longer concerns, and that all challenges to installing said safety devices can be met.

c. On January 12, 2010, Ken Brown an experienced official from the Office of System Safety, who on extremely familiar with the New York City Subway system and its infrastructure, circulated this memo from Charles Yongue to Cheryl Kennedy and Stanley Grill and stated: "This was a memo that was issued by Charles Yongue to John Gaul, Acting CTO "A" Division, back in 1999 regarding platform edge doors. These issues will all need to be discussed however I don't think there are any real show stoppers here."

d. Defendants' RFI in 2011 and confirmed they could overcome any engineering challenge(s) and install PSDs throughout the system. Ex 9 to Roth Decl, PSDTF Evaluation of RFI responses (Bates No. NYCTA_2_00589606); Ex 10 to Roth Decl, Faiveley RFI Resp. at p. 48 (NYCTA-5597-6432); Ex 11 to Roth Decl, TIS partners RFI Response at 1-12, 36-41 (NYCTA-5597-6432); Ex 12 to Roth Decl, KABA RFI Response at NYCTA-005901 (NYCTA-5597-6432); Ex 13, GE-Singapore Elec RFI Response (NYCTA-5597-6432); Ex 14 to Roth Decl, Westinghouse- Knorr-Bremse RFI Response (NYCTA-5597-6432); Ex 70 to Roth Decl, Crown response to RFI #10RFIN44NYCTA (NYCTA- 5597 to NYCTA-6432).

e. Numerous other RFI responses indicated that all the following would be able to handle the signal challenges along with any other challenges in the system. See

Ex 9 to Roth Decl, PSDTF Evaluation of RFI responses (Bates No. NYCTA_2_00589606); Ex 10 to Roth Decl, Faiveley RFI Resp. at p. 48 (NYCTA-5597-6432); Ex 11 to Roth Decl, TIS partners RFI Response at 1-12, 36-41 (NYCTA-5597-6432); Ex 12 to Roth Decl, KABA RFI Response at NYCTA-005901 (NYCTA-5597-6432); Ex 13, GE- Singapore Elec RFI Response (NYCTA-5597-6432); Ex 14 to Roth Decl, Westinghouse- Knorr-Bremse RFI Response (NYCTA-5597-6432); Ex 70 to Roth Decl, Crown response to RFI #10RFIN44NYCTA (NYCTA- 5597 to NYCTA-6432); Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38.

f. In addition to STV, the TA received two proposals for their platform screen door 2014 pilot project, both of which stated the companies knew the NYC subway system and they were up to the task to not only design and build the pilot but the rest the rest of the install as well. Ex. 64 to Roth Decl, ARUP Platform Screen Door Pilot Proposal; and Ex 65 to Roth Decl Parson Brinkerhoff proposal.

78. ¶ 16: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

79. ¶ 17: Admit that was Kennedy's response; deny that it was infeasible to install platform gates. Ex F states that they reviewed proposals but nowhere does it say they studied the issue. Def Ex VV p. 33-34.

80. ¶ 18: Admit that was Lapp's response; deny that the TA found that installation of platform barriers was infeasible; and deny that in fact, installation of platform barriers was infeasible. Def Ex VV p. 33-34; Ex. 7 to Roth Decl, Jones Dep at 363:17-21; Ex. 28 to Roth Dec, Nagaraja Dep at 89:9-23; Ex 10 to Roth Decl, Faiveley RFI Resp. at p. 48 (NYCTA-5597-6432); Ex 11 to Roth Decl, TIS partners RFI Response at 1-12, 36-41 (NYCTA-5597-6432); Ex 12 to Roth Decl, KABA RFI Response at NYCTA-005901 (NYCTA-5597-6432); Ex 13, GE-Singapore Elec RFI Response (NYCTA-5597-6432); Ex 14 to Roth Decl, Westinghouse- Knorr-Bremse RFI Response (NYCTA-5597-6432); Ex 70 to Roth Decl, Crown response to RFI #10RFIN44NYCTA (NYCTA- 5597 to NYCTA-6432).

81. ¶ 19: Deny that Director Lapp's point about system reliability is of "particular importance," as decades of performance data regarding platform barriers in systems around the world shows that platform barriers are reliable. Defendants' Ex.s BB and N note no instances of unreliability.

82. ¶ 20: Admit that the TA declined to install "safety rail ladders"; deny that this was infeasible. BERK DECL

83. ¶ 21: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradict that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

84. ¶ 22: Admit that is what the DMJM report stated.

85. ¶ 23:

a. Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

b. Deny that there was any basis for the conclusion that PSDs may lead to an "increase in claims resulting from passengers being truck or caught in the doors," as the data from around the world did not support this claim. The TA eliminated from Mr. Abdallah's declaration a line from the DMJM report that stated that claims resulting from passengers falling onto tracks will decrease. Def Ex I p. 2.

86. ¶ 24:

a. Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

b. Deny that: "rolling stock would have to be uniformed to provide proper alignment with train doors and PEDs." Instead, PSDs could be designed to work with trains

with different configurations and door openings. Alternatively, RPSDs could have been used, which don't implicate the door alignment issue. See Def Ex FF p. 2.

c. Deny that: "Rolling stock would have to be redesigned and reshaped so as to avoid contact with the PSDs and to maintain the required dynamic envelope of the train." Instead, PSDs could be designed to operate with existing cars. Ex 18 to Roth Decl, Prendergast Dep at 59:21-60:21.

87. ¶ 25: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). It should be noted that RATP overcame all of the same challenges to installation of PSDs that were faced by the Transit Authority. Ex BB at 6.

88. ¶ 26: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). To the extent this paragraph is not stricken, Plaintiff denies. The presentation was not about challenges it was about how other systems, like RAPT, overcame the challenges faced by the NYCT. The International Report, Def Ex BB at page 6 states: "New York City Transit and STV traveled to other destinations

where PSDs/APGs have been successfully installed including Paris, France; London, England; Shanghai, China and Seoul, South Korea." These other countries successfully met their challenges, and there is no indication that NYCTA could not do the same if they prioritized safety pursuant to their own system safety program plan. Def Ex CCC.

89. ¶ 27: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). To the extent this paragraph is not stricken, Plaintiff denies. Theses issues have been unchanged since the 1980s according to President Reuter. Ex. 19 to Roth Decl, Reuter Dep at 44:20-25. If these issues were really important, then the TA would have to take immediate corrective action to meet these challenges and fix this RAC 1A hazard. Ex. 19 to Roth Decl, Reuter Dep at 43:9-45:2

90. ¶ 28: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

91. ¶ 29: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition

testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

92. ¶ 30: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

93. ¶ 31: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

94. ¶ 32: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

95. ¶ 33:

a. Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

b. To the extent it is not stricken, Plaintiff admits that the report describes the incident detailed in the Abdallah declaration, but Denies that the potential danger of a person being stuck in a PSD mechanism is relevant compared to the hundreds of people who catastrophically injured or killed every year in the NYC subway as a result of falling on the tracks and being hit by trains.

96. ¶ 34: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

97. ¶ 35:

a. Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35

(2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

b. To the extent it is not stricken, Plaintiff Denies that the plan "lacked any significant detail", see Def Ex. L; however, admits that NYCT Senior Management was interested in reviewing the concept of retrofitting stations, but note that Defendants' Ex. "L" does not stand for that proposition, but Defendants' Ex. "M" does stand for that proposition.

98. ¶ 36: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). To the extent this paragraph is not stricke, Plaintiff notes that the paragraph is misleading, in that it fails to identify the group that went to Seoul by its name, the "Platform Screen Door Task Force." See Def Ex O.

99. ¶ 37: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

100. ¶ 38: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). To the extent this paragraph is not stricken, Plaintiff Denies. Insteadd, when Abdallah returned from the trip, he drafted a Trip Report dated February 5, 2010 in which he stated:

> Overall the trip to Korea was a success. I propose that the Vendor be granted the opportunity to install the gates at the Hoyt/Schermerhorn Station in Brooklyn and at key locations on the `L: on the Canarsie line. These locations with provide all interested parties a opportunity to examine and environmentally test the gates and there effectiveness.

Ex 32 to Roth Decl at NYCTA_2_00002319.

101. ¶ 39:

a. Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

b. To the extent it is not stricken, Plaintiff Admits that Abdallah accurately cites the report; but denies that there is any admissible evidence that SMRT "canceled the agreement after one year and took over the process itself," as the report states,

"Seoul Metro I believe, canceled the arrangement after one year and took over the process itself. The facts behind this development need to be confirmed and if true, better understood." Def Ex M at 3-4.

102. ¶ 40: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

103. ¶ 41: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

104. ¶ 42: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery.").

105. ¶ 43: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary

judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). Thus, this paragraph should be stricken. To the extent it is not stricken, Plaintiff:

a. Admits that SMRT chose 16 stations in Manhattan in the A-Division to retrofit.

b. Denies that "Out of the 58 station platforms identified, only four platforms -the two platforms on the 7-line at Grand Central and the two platforms on the 6- line at Lexington Avenue/51st Street - were subsequently deemed feasible for PSDs." The STV "feasibility study" used an incorrect method for determining if a station was ADA compliant. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-32; Ex. 7 to Roth Decl, Jones Dep at 277:13-24; Ex. 69 to Roth Decl; Ex. 20 to Roth Decl, Foell Dep at 118:14-19.

106. ¶ 44: Admit.

107. ¶ 45: Admit.

108. ¶ 46: Admit that is what the email states. Deny that the SMRT was a "low ball" offer or that it was infeasible financially. Ex. 9 to Roth Decl, and Ex.s 10-14 to Roth Decl; Ex. 29 to Roth Decl Ex. 48 to Roth Decl at NYCTA_2_00464087; Ex. 31 to Roth Decl (NYCTA-01280 / NYCTA_2_00589606).

109. ¶ 47: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents

will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). Thus, this paragraph should be stricken.

110. ¶ 48: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). Thus, this paragraph should be stricken.

111. ¶ 49: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."). Thus, this paragraph should be stricken.

112. ¶ 50: Objection. Defendants' Rule 30(b)(6) witness had no knowledge of anything prior to 2015. Ex. 7 to Roth Decl at 157:23-158:19. A party cannot support its motion for summary judgment by filing declarations that contradicts that party's Rule 30(b)(6) deposition testimony. See *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses,

then seeking to 'correct' them by offering new evidence after discovery."). Thus, this paragraph should be stricken.

113. ¶ 51: Deny. Abdallah selectively quoted Johnson's response to Senator Savino, which also stated that, "the RFI states clearly that 'NYCT is considering cost-sharing financing options for potential PSG/PED/PEG retrofit project, including design, build-operate-transfer and advertising revenue sharing agreements. NYCT is particularly interested in financing options involving little or no upfront construction costs to NYCT.'" Def Ex R.

114. ¶ 52: Admit.

115. ¶ 53: Deny. The ConOps identified the goals as:

> *-Improve Customer safety by:*
> *o Eliminating the occurrence of customers accidentally falling or being pushed onto the trackway.*
> *o Deterring customers from jumping onto the trackway.*
> *o Deterring unauthorized individuals and would be criminals (terrorist acts, vandalism, etc.) from accessing the trackway.*
> *o Mitigating the occurrence of objects (cell phones, PDAs, etc.) falling onto the trackway and customers trying to retrieve them.*
> *o Mitigating the occurrence of customers leaning over the trackway to seek train arrivals.*
> *o Deterring customers from surfing on cars.*
> *o Deterring customers from boarding and alighting between cars.*
> *• Reduce trash accumulating on the trackway.*
> *• Reduce track fires due to trash and debris thrown from platforms.*
> *• Increasing crew safety.*
> *• Improve safety of employees working on platforms while reducing requirements for flagging protection.*

Defendants' Ex. "S" p. NYCTA-00546.

116. ¶ 55: Admit.

117. ¶ 56: Admit.

118. ¶ 57: Admit.

119. ¶ 58: Admit.

120. ¶ 59: Admit.

121. ¶ 60: Deny. None of the measures implemented reduced the number of people who fell from platforms onto the tracks and were struck by trains or the severity of their injuries. Ex. 17 to Roth Decl, Kennedy Dep. at 242:20-243; Ex. 18 to Roth Decl, Prendergast Dep at 192:13-1938; Ex. 24 to Roth Decl; Ex. 25 to Roth Decl; Ex. 43 to Roth Decl at NYCTA_2_00134561*;* Ex. 46 to Roth Decl at NYCTA_2_00426596. The TA was aware that for at least 30 years that the hazard of people getting struck by trains was continuous and unchanged by any of the virtual cost free measures they were willing to implement. Ex. 18 to Roth Decl, Prendergast Dep at 192:13-193:16.

122. ¶ 61: Deny. This letter at Defendants' Ex. "V" does not show that "NYCT continued to pursue other devices to address platform safety." Instead, it shows that NYCT had already implemented several measures that have proved ineffective. Ex. 17 to Roth Decl, Kennedy Dep. at 242:20-243; Ex. 24 to Roth Decl; Ex. 25 to Roth Decl; Ex. 43 to Roth Decl at NYCTA_2_00134561*;* Ex. 46 to Roth Decl at NYCTA_2_00426596.

123. ¶ 62: Deny. The COMET data demonstrates that the alleged "other hazards" that were allegedly "not initially apparent"—people getting injured from getting stuck in the platform door mechanism itself—is a very rare event. Ex. 43 to Roth Decl at NYCTA_2_00134472.

124. ¶ 63: Admit that Ex. W is cited accurately. Deny that any "Hazard Analysis for platform safety" was ever completed, and deny that customers being trapped in PSDs is a serious hazard. Ex. 43 to Roth Decl at NYCTA_2_00134472; Def Ex BB at 2. In other Cities like Paris, where the gap between the train and the PSD exceeds a minimum distance, they install detection systems to prevent door closures with a passenger entrapped between the two panels. Defendants' Ex. CC; Ex. 14 to Roth Decl at NYCTA-005969 and NYCTA-006007 to NYCTA-006008.

125. ¶ 64: Objection. This paragraph should be stricken because it does not cite to admissible evidence, as Defendants admit that Ex. "X" was never exchanged in discovery. "List of Ex.s" p. 2, annexed to Keaveney Declaration. This violates Judge Scanlon's order that Defendants could not rely on any documents not exchanged in discovery. ECF 173 p. 4 ("Defendants are on notice that in motion practice or at trial, they will not be permitted to rely on any materials not produced during the discovery phase of this case."). To the extent this paragraph is not stricken, Plaintiff denies that any of the "mitigation strategies" were effective. Ex. 17 to Roth Decl, Kennedy Dep. at 242:20-243; Ex. 24 to Roth Decl; Ex. 25 to Roth Decl; Ex. 43 to Roth Decl at NYCTA_2_00134561; Ex. 46 to Roth Decl at NYCTA_2_00426596. The TA never analyzed the effectiveness of their signs, announcements or tactile strips. Ex. 17 to Roth Decl, Kennedy Dep at 218:6-219:7.

126. ¶ 65: Objection. This paragraph should be stricken because it does not cite to admissible evidence, as Defendants admit that Ex. "X" was never exchanged in discovery. "List of Ex.s" p. 2, annexed to Keaveney Declaration. This violates Judge Scanlon's order that Defendants could not rely on any documents not exchanged in discovery. ECF 173 p. 4 ("Defendants are on notice that in motion practice or at trial, they will not be permitted to rely on any materials not produced during the discovery phase of this case."). To the extent this paragraph is not stricken, Plaintiff denies that Defendants' Ex.s X and Y support the claim that the Committee was made aware of any of these issues. There is no evidence provided by Defendants that they prioritized any one project over another, and that priority resulted in taking money away from safety measures.

127. ¶ 66: Admit.

128. ¶ 67: Admit.

129. ¶ 68: Admit.

130. ¶ 69: Admit.

131. ¶ 70: Admit

132. ¶ 71: Admit that this accurately cites the report.

133. ¶ 72: Admit. However, in other Cities like Paris, where the gap exceeds this minimum distance, they install detection systems to prevent door closures with a passenger entrapped between the two panels. Defendants' Ex. CC; Ex. 14 to Roth Decl at NYCTA-005969 and NYCTA-006007 to NYCTA-006008.

134. ¶ 73: Deny. If there were PSDs or certain other barriers, conductors would be unable to stick their heads out the windows. However, fixed guardrails could be designed to make this a non-issue. See Ex. 63 to Roth Decl

135. ¶ 74: Deny. Defendants' Ex. DD does not demonstrate why any decision was made, instead it only says that "proceeding with a pilot at Pelham Parkway should be reconsidered."

136. ¶ 75:

a. Deny that a "system-wide study was necessary" to install PSDs or other barriers at certain individual stations. Ex. 7 to Roth Decl Jones Dep at 363:17-21; Defendants' Ex.s AA, DD. However, admit that Defendants never performed a proper system wide study or a proper study for the subject station for how to install PSDs and overcome the challenges to their installation.

b. Admit that each station is unique and could require different kinds of platform barriers to protect the public from falling on the tracks and being hit by trains. Def. Ex. VV, Berkowitz Report p. 8 ("Here, application of the appropriate MIL-STD-882 analysis required installation of PSDs at stations where feasible, and

installation of other safety devices at stations where PSDs were not feasible. That is because in subway systems where PSDs have been installed, they have nearly eliminated CWIs. Moreover, where PSDs were not possible, alternative safety measures are required, because it is unacceptable to permit the hazardous condition to continue unabated."

137. ¶ 76:

a. Admit that STV began its purported, "study" in 2017.

b. Deny that the purpose of the study was to "determine the feasibility of installing one of the various types of platform barriers" at each platform in the system. Instead, the Transit Authority made the decision that STV could not consider fixed guardrails and could not consider vertical or RSPD barriers, without any rational basis, and without having conducted a safety study or hazard analysis. Defendants failed to have STV perform a proper study or hazard analysis; defendants failed to have STV study how to meet the challenges of installing PSDs and other safety devices and measures. The Transit Authority instructed STV to ignore and violate the ADA and instead instructed STV to use the TA's own criteria to ensure that STV would find numerous stations, including the Atlantic Avenue-Barclays Center Station, infeasible by providing incorrect ADA requirements that every door to every car had to have a clear path of travel to and from an elevator, instead of one door per train, as the ADA requires. Defendants failed to consider and advise STV that only 69 out of 472 stations actually had elevators in order to comply with the ADA, and failed to consider the wholesale violation of the ADA by the defendants with respect to the excessive "gap" distances, vertical and horizontal, between the

platform edge and the door sill of the train cars Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 7 to Roth Decl, Jones Dep at 274:4-275:11; Ex. 22 to Roth Decl, Foell Dep, 101:12-19; Ex. 26 to Roth Decl, at NYCTA_2_00364308; Ex. 69 to Roth Decl.

138. ¶ 77: Deny. The Transit Authority devised its own ADA criteria that was in excess of what the ADA actually required for wheelchair accessibility, thus eliminating many stations without any rational or lawful basis. Moreover, the Transit Authority's supposed analysis regarding the "decrease [in] the width of platform space available to pedestrians" was faulty, because it included the yellow tactile strips, where pedestrians are not supposed to stand or walk. In fact, adding PSDs would add space for pedestrians to stand, and wheelchairs to move, even if it cut into the yellow tactical strips, since no one is supposed to stand or walk on the yellow tactile strips. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 7 to Roth Decl, Jones Dep at 274:4-275:11; Ex. 22 to Roth Decl, Foell Dep, 101:12-19; Ex. 26 to Roth Decl, at NYCTA_2_00364308; Ex. 69 to Roth Decl.

139. ¶ 78: Deny that this was a proper hazard analysis according to Military Standard 882E; Admit this is the first time that the Transit Authority even considered conducting a hazard analysis pursuant to MIL 882E regarding any kind of platform barriers and/or any safety measures aimed at eliminating the frequent, recurring hazard of people falling on the tracks and being hit by trains. Ex. 7 to Roth Decl, Jones Dep 169:9-14; Ex. 17 to Roth Decl, Kennedy Dep at 205:16-206:4; Ex. 22 to Roth Decl, Foell Dep 216:9-217:13; Def Ex VV, Berkowitz Report pp. 42-43; Def Ex WW, Glismann Report p. 37.

140. ¶ 79:

a. Admit that the STV report noted some of the advantages and benefits and noted the challenges to installing them.

b. Deny that any proper hazard analysis was conducted, and deny that the potential disadvantages outweighed the advantages. According to a proper hazard analysis pursuant to MIL 882E, if a full or ¾ or half height PSD or APG was not feasible for a station, RSPDs or vertical or fixed guardrail or other safety device or measure should have be installed or used at said stations. Ex. 7 to Roth Decl, Jones Dep 169:9-14; Ex. 17 to Roth Decl, Kennedy Dep at 205:16-206:4; Ex. 22 to Roth Decl, Foell Dep 216:9-217:13; Def Ex VV, Berkowitz Report pp. 42-43; Def Ex WW, Glismann Report p. 37.

141. ¶ 80:

a. Admit that the pilot program was canceled.

b. Deny that it was canceled because of funding issues. Ex. 19 to Roth Decl, Reuter Dep at 66:13-67:8.

142. ¶ 81:

a. Admit the purported "study" was published in 2020 and included a chart.

b. Deny that the stations and platforms it concluded were infeasible could not actually accommodate PSDs, particularly because the ADA analysis was improper, as the Transit Authority made up a standard that was in excess of what the ADA actually required, and so the stations deemed infeasible due to ADA compliance issues was untrue. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 7 to Roth Decl, Jones Dep at 274:4-275:11; Ex. 22 to Roth Decl,

Foell Dep, 101:12-19; Ex. 26 to Roth Decl, at NYCTA_2_00364308; Ex. 69 to Roth Decl.

143. ¶ 82:

a. Deny that, "STV found that out of 472 stations, PSDs or PEGs were feasible *at only* 128 stations *(e.g.,* 27% of the system)." Instead, the Transit Authority forced STV to apply an incorrect criteria for ADA wheelchair accessibility compliance; if they had applied the proper standard of direct access from the elevator to one door per train, then many fewer stations would have been deemed infeasible. Further, the report was flawed because most stations are already not ADA compliant, and installing PSDs would not change their ADA non-compliance. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 7 to Roth Decl, Jones Dep at 274:4-275:11; Ex. 22 to Roth Decl, Foell Dep, 101:12-19; Ex. 26 to Roth Decl, at NYCTA_2_00364308; Ex. 69 to Roth Decl.

b. Deny that the total cost to install platform barriers at 128 stations was $7 billion. There were various financing options, such as BOT agreements, which would have allowed the Transit Authority to have platform barriers installed at little to no up front cost. Ex 9 to Roth Decl, PSDTF Evaluation of RFI responses (Bates No. NYCTA_2_00589606); Ex 10 to Roth Decl, Faiveley RFI Resp. at p. 48 (NYCTA-5597-6432); Ex 11 to Roth Decl, TIS partners RFI Response at 1-12, 36-41 (NYCTA-5597-6432); Ex 12 to Roth Decl, KABA RFI Response at NYCTA-005901 (NYCTA-5597-6432); Ex 13, GE- Singapore Elec RFI Response (NYCTA-5597-6432); Ex 14 to Roth Decl, Westinghouse- Knorr-Bremse RFI Response (NYCTA-5597-6432); Ex 70 to Roth Decl, Crown response to RFI

#10RFIN44NYCTA (NYCTA- 5597 to NYCTA-6432); Ex. 31 to Roth Decl (NYCTA-01280 / NYCTA_2_00589606). Moreover, former President Lawrence Reuter testified that if the Transit Authority wanted to obtain funding for installation of PSDs or other platform barriers or technologies, it could have obtained the funding. Ex. 19 to Roth Decl, Reuter Dep at 66:13-67:8.

144. ¶ 83: Deny that PSDs were only feasible at 6 of 37 stations. Instead, 24 of the 37 stations were deemed infeasible because of "ADA Clearance" issues; however, this is because of the false ADA criteria that the Transit Authority forced STV to apply (requiring wheelchair access from the elevator to every door of every train car, instead of one door per train). Ex. 49 to Roth Decl Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 7 to Roth Decl, Jones Dep at 274:4-275:11; Ex. 22 to Roth Decl, Foell Dep, 101:12-19; Ex. 26 to Roth Decl, at NYCTA_2_00364308; Ex. 69 to Roth Decl.

145. ¶ 84: Admit.

146. ¶ 85: Deny. Installation of PSDs at the Atlantic Avenue Barclay Center Station would not make the station non-compliant with the ADA, which only requires a direct path of travel from an elevator to one car per train. Ex. 26 to Roth Decl, at NYCTA_2_00364308; Ex. 69 to Roth Decl. The NYCT imposed a higher standard than the ADA requires by instead requiring that there be wheelchair access to every door for the entire train. Ex. 20 to Roth Decl, Foell Dep at 112:12-19; Ex. 69 to Roth Decl. Here, installation of PSDs or RSPDs would not create a non-compliant ADA condition because there would still be a direct path of travel from the elevator to one door of the train. Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 7 to Roth Decl, Jones Dep at 274:4-275:11; Ex. 22 to Roth Decl, Foell Dep, 101:12-19; Ex. 69 to Roth Decl.

147. ¶ 86: Deny. RSPDs or other safety devices or measures could be used at stations that use mixed car types with different door alignment profiles; or the car fleets can be homogenized. Ex. 22 to Roth Decl, Foell Dep at 240:2-9; Defendants' Ex. VV, Berkowitz Report p. 34, 40-41.

148. ¶ 87:

a. Deny that "The STV study found that 154 stations were infeasible due to ADA clearance issues." The STV study found that 154 stations did not meet the heightened criteria imposed by the Transit Authority, which required a clear path of access from the elevator to every door of the entire train; whereas the ADA only requires a clear path of access from the elevator to one door of one car on the train (which consists of multiple cars). Def. Ex. VV, Berkowitz Report pp. 33-42; Def. Ex. WW, Glismann Report pp. 5-6, 27-38; Ex. 7 to Roth Decl, Jones Dep at 274:4-275:11; Ex. 22 to Roth Decl, Foell Dep, 101:12-19; Ex. 26 to Roth Decl, at NYCTA_2_00364308; Ex. 69 to Roth Decl.

b. Deny that, "Separately, 100 stations were infeasible due to the structural integrity of the platform which is insufficient to support the weight of the barriers." The platforms could have been shored up or strengthened, like they were in Madrid, Spain. Def. Ex. VV, Berkowitz Report pp. 38-39; Defendants' Ex. WW p. 35-36.

c. Deny that, "The remaining were infeasible for other issues, including support columns being too close to the platform edge and lack of station space to house the necessary mechanical equipment." Other solutions could have and should have been implemented at these stations, such as installation of fixed guardrails, RSPDs, other

safety devices or measures instead of nothing. Def. Ex. VV, Berkowitz Report pp. 38-39; Defendants' Ex. WW p. 34-35.

149. ¶ 88: Admit.

150. ¶ 89:

a. Admit that several other safety initiatives were "considered" and "pursued."

b. Deny that these initiatives were effective in increasing passenger safety. Ex. 17 to Roth Decl, Kennedy Dep. at 242:20-243; Ex. 18 to Roth Decl, Prendergast Dep at 192:13-193:16; Ex. 24 to Roth Decl; Ex. 25 to Roth Decl; Ex. 43 to Roth Decl at NYCTA_2_00134561*;* Ex. 46 to Roth Decl at NYCTA_2_00426596.

151. ¶ 90: Admit.

152. ¶ 91: Deny that TIDs is an "emerging" or new technology. See Roth Decl Ex 51 at NYCTA_2_00005222 to NYCTA_2_00005224; Ex. 52 to Roth Decl

153. ¶ 92: Admit.

154. ¶ 93: Admit.

155. ¶ 94: Admit.

156. ¶ 95: Admit.

157. ¶ 96: Admit that this accurately reflects what the report states.

158. ¶ 97: Admit, however, Plaintiff notes that the Transit Authority has not implemented any safety measures that have effectively reduced the number of people struck by trains.

## IV. <u>Further Paragraphs Providing Additional Material Facts as to which it is Contended There Are Genuine Issues to be Tried</u>

### A. <u>Number of people who access the tracks and are struck by trains: a Recurring and Known Foreseeable hazard.</u>

159. There were approximately 1,000-1,267 “track intrusions”, or unauthorized people who access the track area, per year; or approximately 3-4 track intrusions per day. Def. Ex. DDD p. 1; see also Ex. 30 to Roth Decl, Collisions with Individuals 1987 to 8-2-2016.

160. From 1987-2021, there were a total of 5,928 instances where people were hit by trains; 1,896 of those people died as a result, and the rest were catastrophically injured. Ex. 24 to Roth Decl, Customer Contact with trains Chart (Bates No. Da Silva000743).

161. Since 1987, approximately 100 to 200 people per year are hit by trains. Ex. 24 to Roth Decl, Customer Contact with trains Chart (Bates No. Da Silva000743).

162. Since 1987, approximately 50-88 people are killed every year as a result of being hit by trains. Ex. 24 to Roth Decl, Customer Contact with trains Chart (Bates No. Da Silva000743).

163. Since 1987, approximately 150-227 people are catastrophically injured or killed every year as a result of being hit by trains. Ex. 24 to Roth Decl, Customer Contact with trains Chart (Bates No. Da Silva000743).

164. 12-9s/CWIs results in more fatalities than any other type of incident in the subway system. Ex. 15 to Roth Decl, Sullivan Dep at 46:4-7.

165. 12-9s/CWIs result in more serious injuries and amputations than anything else in the subway system. Ex. 15 to Roth Decl, Sullivan Dep at 46:8-11.

166. The main cause of death, amputations and other serious injuries in the NYC subway system is 12-9/CWI incidents. Ex. 15 to Roth Decl, Sullivan Dep at 46:12-15.

167. Past TA President and MTA Chairman Prendergast said that this number of deaths was “insane”. Ex. 25 to Roth Decl, Email dated July 11, 2010.

168. On January 9, 2013, John Samuelson, President of the National Transit Union and Current Board Member MTA, wrote a letter to President Thomas Prendergast in which he stated:

> The TA's effort to reduce 1 2-9s by posting signs encouraging riders to stand back from the edge of the platform has not had a measurable effect on subway deaths. The two widely covered pushing incidents and the New Year's Day suicide has focused intense public scrutiny on an issue that has been an all too common occurrence in our system.
>
> One fatal 12-9 per week, two additional, non-fatal 12-9's and the associated deleterious effects on train crews can no longer be accepted as the price of on-time service. In the interest of public safety and the well being of your employees, we believe it is imperative that the MTA take immediate steps to end this carnage.

Ex. 53 to Roth Decl

169. On February 8, 2011, New York State Assemblyman Marcos Crespo introduced a bill to require NYC subway trains to enter subway stations at a slower rate of speed as a safety measure to reduce the number of people hit and killed or catastrophically injured due to contact with trains. Ex. 59 to Roth Decl

170. TA opposed this proposed bill. Ex. 59 to Roth Decl

171. On January 27, 2017, New York State Assemblyman Michael DenDekker introduced a bill that would have required the TA to "study and examine the feasibility and impact of the installation" of PSDs, including the safety benefits, fatality prevention, and fiscal impacts. Ex. 67 to Roth Decl

172. The TA opposed the proposed PSD bill. Ex. 68 to Roth Decl

173. In recent years, the number of people who are hit by trains has increased. Ex. 7 to Roth Decl, Jones Dep at 323:24-324:11. In fact, despite ridership plummeting during the COVID-19 pandemic, the number of deaths and catastrophic injuries as a result of 12-9s/CWIs increased. Ex. 17 to Roth Decl at 307:17-306:2.

174. In recent years, the number of people who are hit by trains as a result of an attempted suicide has increased. Ex. 27 to Roth Decl, at NYCTA_2_00190281

175. According to CoMET, more people are struck by trains in New York due to accidents than in any other major mass transit system in the word. Ex. 27 to Roth Decl, at NYCTA_2_00190282; Ex. 43 at NYCTA_2_00134473; Ex. 44 at NYCTA_2_00390645; Ex. 46 to Roth Decl at NYCTA_2_00426596.

**B. <u>Defendants were aware that the root cause of individuals being struck by trains is the lack of any Platform Edge Protection</u>**

176. The common denominator and root cause for individuals coming into contact with trains is that there are no barriers on the platform edge. Defendants' Ex. BB p. 6; Def. Ex. VV, Berkowitz Report p. 7; Ex. 7 to Roth Decl, Jones Dep 104:9-25; Ex. 36 to Roth Decl, Bata Dep 66:12-68:9; Ex. 15 to Roth Decl, Sullivan Dep at 252:22-253:18.

177. A proper root cause analysis looks to see what can prevent the event from occurring regardless of how it is occurring. Ex. 15 to Roth Decl, Sullivan Dep at 249:15-19.

178. A platform barrier would eliminate contact between people and trains. Defendants' Ex. K p 7; Ex. 16 to Roth Decl, Sanchez Dep at 47:18-22, 49:6-9.

179. In 2003, the AirTrain to JFK opened with PSDs at all 10 stations, and there has not been one catastrophic injury or death as a result of a person coming into contact with a train since that time. Ex. 28 to Roth Decl, Nagaraja Dep at 33:2-34:13.

180. It was possible for the TA to install PSDs in the NYC subway system. Ex. 7 to Roth Decl Jones Dep at 363:17-21.

181. In conducting a root cause analysis, according to good and accepted practices and procedures, and engineering standards, the only thing to figure out is how to solve the problem and prevent it from recurring. Ex. 16 to Roth Decl, Sanchez Dep at 171:24-172:10.

182. Engineers make recommendations based on conducting a root cause analysis according to these good and accepted practices, procedures and standards. Ex. 16 to Roth Decl, Sanchez Dep at 172:11-16.

183. The TA should defer to its engineers because they have specialized education and training and because the TA is supposed to put safety first, and if engineers are saying what needs to be done to ensure the system is safe, then that is what should be done. Ex. 16 to Roth Decl Sanchez Dep at 176:22-177:13.

184. Safety is more important than trains being on time. Ex. 16 to Roth Decl Sanchez Dep at 178:3-5

185. If the TA's managers choose not follow the engineering safety recommendations, then the safety problem will not be solved. Ex. 16 to Roth Decl Sanchez Dep at 172 L. 18-22

186. The TA can control access to the track and track bed. Ex. 15 to Roth Decl, Sullivan Dep. at 252:13-16.

187. If the TA prevents access to the tracks then 12-9s will be reduced or eliminated. Ex. 15 to Roth Decl, Sullivan Dep. at 252:17-21.

188. 12-9s are preventable. Ex. 15 to Roth Decl, Sullivan Dep. at 143:9-13.

189. PSDs are effective at preventing 12-9s from occurring. Ex. 15 to Roth Decl, Sullivan Dep. at 167:13-17.

190. Fixed guardrails are also feasible and effective at preventing 12-9s from occurring. Ex. 16 to Roth Decl, Sanchez Dep at 154:5-22.

**C. The Transit Authority Has a Duty to Ensure Its System Operates As Safely As Possible**

191. TA essentially has one job: to safely operate its mass transit system, subways and buses. Ex. 15 to Roth Decl, Sullivan Dep. at 79:4-8

192. The TA's job is to operate its subway system in the safest way possible. Ex. 15 to Roth Decl, Sullivan Dep. at 79:22-80:16; Ex. 36 to Roth Decl, Bata Dep at 32:21-33:4; Ex. 19 to Roth Decl, Reuter Dep at 241:2-11.

193. The number of people struck and killed or catastrophically injured is a Safety Performance Indicator ("SPI"), which is the most important metric when performing safety and hazard analyses; safety studies, safety planning and corrective action efficacy. Ex. 43 to Roth Decl; Ex. 46 to Roth Decl at NYCTA_2_00426596.

194. The TA tracks SPIs and reports SPIs to international benchmarking organizations like CoMET. Ex. 7 to Roth Decl, Jones Dep at 63:4-11; Ex. 46 to Roth Decl at NYCTA_2_00426596.

195. Safety is the most important thing a to a public transportation organization like the Transit Authority, where employees are taught that safety is the top priority. Ex. 15 to Roth Decl, Sullivan Dep. at 81:4-13.

196. Everything the TA does is supposed to be guided by safety and what promotes safety the most for the public. Ex. 15 to Roth Decl, Sullivan Dep. at 81:14-25

197. Customers have a right to expect that the TA will be second to none in terms of safety. Ex. 15 to Roth Decl, Sullivan Dep. at 82:2-9

198. Customers of TA have a right to expect that the TA will use technology equipment and devices where it can reasonably do so to make the NYC subway system the safest in the world. Ex. 15 to Roth Decl, Sullivan Dep. at 82:10-17.

199. TA should make sure that all reasonable safety features, devices or equipment are present. Ex. 15 to Roth Decl, Sullivan Dep. at 84:20-85:4.

200. Part of job of TA is to prevent preventable harm, as that is what is required under good and accepted practices and procedures and prof standards of care. Ex. 15 to Roth Decl, Sullivan Dep. at 83:5- 23.

201. TA should have the necessary knowledge to prevent preventable harm. Ex. 15 to Roth Decl, Sullivan Dep. at 74:3-9.

202. According to good and accepted practices and procedures for NYCTA, and professional standards of care, it is never allowed to unnecessarily expose people to harm. Ex. 15 to Roth Decl, Sullivan Dep. at 85:20-86:24.

203. Industry standards, customs, practices and guidelines require that the TA never unnecessarily expose people to harm Ex. 15 to Roth Decl, Sullivan Dep. at 86:25-87:7

204. A prudent public transportation agency must select the safest way to do things. Ex. 15 to Roth Decl, Sullivan Dep. at 242:25-243:5.

205. If TA unnecessarily exposes public to harm, that is not prudent. Ex. 15 to Roth Decl, Sullivan Dep. at 243:6-10.

206. The TA must choose the safest option. Ex. 15 to Roth Decl, Sullivan Dep. at 243:14-18.

207. According to professional standards of care, the TA is never allowed to use judgment in a manner that unnecessarily exposes the public to harm. Ex. 15 to Roth Decl, Sullivan Dep. at 244:23-245:4.

208. According to good and accepted practices, procedures and industry standards, the TA never allowed to expose the public to more danger than is necessary. Ex. 15 to Roth Decl, Sullivan Dep. at 245:5-12.

209. When TA sees there is possible danger, it is required to remove the danger and make it safe. Ex. 15 to Roth Decl, Sullivan Dep. at 85:5-10.

210. The TA's engineers are the employees with knowledge about professional trade groups and industry standards in the field of engineering. Ex. 15 to Roth Decl, Sullivan Dep. at 76:18-22.

211. According to good and accepted engineering practice and procedures and standards of care, preventable harm is supposed to be prevented and foreseeable harm is supposed to be prevented where possible. Ex. 15 to Roth Decl, Sullivan Dep. at 119:25-120:7.

**D. Defendants never conducted an adequate safety study or hazard analysis.**

212. The Transit Authority never conducted a proper "safety study" or hazard analysis concerning PSDs, RPSDs, fixed rails, or other devices or operational changes (like slowing the speed at which trains enter stations), to reduce the number of people who fall on the tracks or are struck by trains. Def. Ex. VV, Berkowitz Report pp. 42-43; see also Ex. 17 to Roth Decl, Kennedy Dep 212:18-213:2, 214:3-20.

213. The Transit Authority never did a comparative analysis of different types of safety devices that could be utilized throughout the subway system to prevent or reduce people from falling on the tracks and being struck by trains. Ex. 17 to Roth Decl, Kennedy Dep at 213:5-215:23; Ex. 19 to Roth Decl, Reuter Dep at 341:20-342:13.

214. The Transit Authority never did a comparative analysis of with the number of people that would be hit by trains and seriously injured or killed if the Transit Authority utilized vertical barriers or rope barriers, versus maintaining the system as is. Ex. 7 to Roth Decl, Jones Dep at 174:12-18, 183:16-184:11.

215. The Transit Authority never did a comparative analysis of with the number of people that would be hit by trains and seriously injured or killed if the entry speed of trains was slowed, versus maintaining the entry speed of the stations as is. Ex. 7 to Roth Decl, Jones Dep at 39:6-19.

216. The Transit Authority never did a comparative analysis of different types of safety devices that could be utilized at the Atlantic Avenue-Barclays Center Station to prevent or reduce people from falling on the tracks and being struck by trains. See Ex. 7 to Roth Decl, Jones Dep at 175:19-167:6; Ex. 17 to Roth Decl, Kennedy Dep 214:15-22.

217. The Transit Authority never conducted a proper hazard analysis as required by their SSPP and MIL 882; instead they simply "investigated" CWIs and PSDs. Def. Ex. VV, Berkowitz Report pp. 42-43.

218. Plaintiff's expert, Carl Berkowitz, reviewed all the documents that Defendants claim in their papers constitute a study. Berkowitz Declaration ¶ 48.

219. In his declaration, Dr. Berkowitz explains that none of the documents meet the criteria of proper transportation safety study, pursuant to the CFR, SSPP, MIL 882 or a good and accepted engineering mass transportation practices and procedures standards of care. Berkowitz Declaration ¶ 48.

**E. Defendants were required to develop a corrective action plan with a separate safety plan for each station—because a "one size fits all" plan is infeasible.**

220. 49 C.F.R. § 695.31 requires transit agencies to develop and implement a safety assurance process, also known as a hazard management process, which includes monitoring for safety risks, managing changes, and continuously improving safety performance. If a transit agency identifies any deficiencies, it must develop and carry out a plan to address them, known as

a Corrective Action Plan. Ex. 19 to Roth Decl, Reuter Dep at 157:6-159:6; Berkowitz Declaration ¶¶ 42-44.

221. Similarly, 49 C.F.R. § 659.25 requires an annual review of the System Safety Program Plan, and requires that any changes to the SSPP be approved by the oversight agency. Ex. 19 to Roth Decl, Reuter Dep at 157:6-159:6; Berkowitz Decl ¶ 11, 45.

222. Pursuant to the controlling regulations Defendants issued their System Safety Program Plan ("SSPP"). Ex. CCC to Keaveney Decl; Ex. 19 to Roth Decl, Reuter Dep at 159:7-19.

223. The SSPP lays out the hazard management process as follows: 1) Hazard identification; 2) Hazard Classification; and 3) Hazard Resolution. Berkowitz Decl ¶ 32.

224. The hazard management process is the primary tool utilized to ensure the safety of New York City Transit passengers. Berkowitz Decl ¶ 32; Def Ex. CCC p. 66.

225. In the SSPP, the TA is required to apply the hazard management process established by the system and safety principles outlined in Military Standard 882E. This requires that the hazard be identified and then assess the hazards relative to their severity and probability of occurrence and identify corrective actions to bring the hazard to an acceptable level. Berkowitz Decl ¶ 33; Defendants' Ex. CCC, System Safety Plan at NYCTA-04605-04609; Ex. 7 to Roth Decl at 217: 15-19; Ex. 17 to Roth Decl, Kennedy Dep at 40:24-41:5.

226. Hazard Identification is the first step in the hazard management process, and applies to new design and construction, Accident investigation, surveys, trend and hazard analyses. Berkowitz Decl ¶ 33.

227. Hazard classification is the second step and is conducted in accordance with Military Standard MIL-STD-882E (MIL-STD-882E), which classifies hazards by assessing the

severity (effects) and the probability (likelihood) of the hazard occurrence. Berkowitz Decl ¶ 34; Def Ex. CCC p. 67-72 (Bates No. NYCTA-04605- NYCTA-04611.

228. The TA's SSPP, like the MIL-STD-882E, also has severity categories, with 1 being the most catastrophic—this category includes death and permanent total disability, and the probability levels with frequent, (likely to occur) also listed at the top of the chart at level A, this then goes into the risk assessment matrix. Berkowitz Decl ¶ 34; Def. Ex. CCC p. 69 (Bates No. NYCTA-04608)(Table 6-3 Risk Assessment Matrix).

229. If the risk level is both "catastrophic injury or death" and "frequent to occur" in the life of an item, that is deemed unacceptable, and requires immediate corrective action. Additionally, if the hazard is determined to be unacceptable and catastrophic in nature, then the hazard has to be reported to the state oversight committee (PTSB). Berkowitz Decl ¶ 34; Def Ex CCC SSPP § 6.4 (Bates No. NYCTA-04609).

230. Once the hazard is identified and classified, then there is a requirement for Hazard Resolution (Section 6.3 of the SSPP), as follows: The SSPP deems high hazards as unacceptable, serious hazards are undesirable and require a management decision to reduce the hazard, medium hazards are acceptable with review by management and low hazards are acceptable without review by management.

231. According to the SSPP, customers being hit by trains is classified as Severity Category Level 1A, or "Catastrophic." Defendants' Ex. CCC p. NYCTA-04607; Ex. 7 to Roth Decl, Jones Dep at 145:25-146:14.

232. According to the SSPP, customers being hit by trains is classified as Probability Level "1A", or "Frequent." Defendants' Ex. VV, Berkowitz Report p. 19; Defendants' Ex. CCC p. NYCTA-04608; Ex. 7 to Roth Decl, Jones Dep. at 152:12-153:22, 157:3-6.

233. According to the SSPP, the customers being hit by trains is classified as a "High Hazard" under the Risk Assessment Matrix. Defendants' Ex. VV, Berkowitz Report p. 19; Defendants' Ex. CCC p. NYCTA-04608.

234. According to the Transit Authority, high hazards are unacceptable and require immediate corrective action." Defendants' Ex. VV, Berkowitz Report p. 19; Ex. 7 to Roth Decl, Jones Dep. at 155:17-156:9; Defendants' Ex. CCC p. NYCTA-04609; Ex. 22 to Roth Decl, Foell Dep. at 222:18-23.

235. Any customer death, catastrophic injury or critical injury is unacceptable to the Transit Authority and requires immediate corrective action. Ex. 7 to Roth Decl, Jones Dep. at 156:10-157:14.

236. The TA was aware since at least 1987 that two to four people are stuck by trains every week. Ex. 17 to Roth Decl, Kennedy Dep at 114:2-25; Ex. 18 to Roth Decl, Prendergast Dep at 192:13-193:16; Ex. 24 to Roth Decl; Ex. 30 to Roth Decl

237. According to the SSPP, corrective actions must be implemented to reduce or eliminate High Hazards; the plan must be periodically reviewed by analyzing the safety performance indicators and revised accordingly. Defendants' Ex. VV, Berkowitz report p. 7; Ex. 50 to Roth Decl

238. Evaluation of effectiveness of SSP must be repeated, and corrective action(s) must be taken, until the hazard is removed or reduced to an acceptable level. Defendants' Ex. VV, Berkowitz report p. 7; Defendants' Ex. CCC.

239. Where there is a High Hazard, the SSPP requires corrective action, even if it would not eliminate injuries, but could instead result in "possible" or "probable" minor injuries. In other words, the SSPP requires exchanging "frequent" or "probable" "catastrophic injuries" for

"possible" or "probable" "minor injuries". Defendants' Ex. VV, Berkowitz Report p. 7; Defendants' Ex. CCC at NYCTA-04609.

240. A proper corrective action plan would require a separate plan for each subway station to prevent people from falling onto the tracks and being struck by trains. In other words, because each station is unique, a "one size fits all plan" is infeasible. A solution that works for one station, like PSDs, might not work for other stations. However, a proper hazard analysis requires a safety plan for each station, independent of what might work or not work at other stations. Ex. 7 to Roth Decl, Jones Dep at 142:18-143:20, 212:9-25; Ex. 15 to Roth Decl, Sullivan Dep at 202:21-25; Ex. 16 to Roth Decl, Sanchez Dep at 112:9-15, 113:15-18; Ex. 18 to Roth Decl, Prendergast Dep at 57:22-58:17; Ex. 19 to Roth Decl, Reuter Dep at 28:12-22, 289:3-18; Ex. 28 to Roth Decl, Nagara Dep at 97:17-98:6.

241. Multiple sources of risk require multiple risk mitigation strategies. Ex. 45 to Roth Decl at NYCTA_2_00190314.

242. Prior to plaintiff's accident on August 2, 2016, the TA never developed a system wide corrective action plan to prevent people from falling on the tracks and being struck by trains. Ex. 17 to Roth Decl, Kennedy Dep 212:18-213:2, 214:3-20.

243. Prior to plaintiff's accident on August 2, 2016, the TA never developed a corrective action plan for the Atlantic Avenue / Barclays Center station to prevent people from falling on the tracks and being struck by trains. Ex. 7 to Roth Decl, Jones Dep at 175:19-176:6; Ex. 17 to Roth Decl, Kennedy Dep 214:15-20.

244. Prior to plaintiff's accident on August 2, 2016, the TA never conducted a study to support its decision not to implement PSDs or any other safety devices or technologies. Ex. 7 to Roth Decl, Jones Dep at 181:16-182:7, 336:6-12.

245. According to the SSPP, every three years, the Office of System Safety is required to complete an internal safety review to ensure compliance with all state and federal regulations. Def Ex VV, Berkowitz Report p. 19; Def Ex WW, Glismann Report p. 20; Ex. 50 to Roth Decl and Defendants' Ex. CCC at NYCTA-04638 to NYCTA-04641.

246. According to the SSPP, every three years, Senior Management is required to provide the Office of System Safety with a corrective action plan. Ex. 50 to Roth Decl and Defendants' Ex. CCC at NYCTA-04638 to NYCTA-04641.

### F. **Since the 1960s, comparable mass transit agencies have found engineering solutions to the hazard of open access to the subway tracks and people being struck and killed by trains; there are no comparable subways in the United States.**

247. There are no subway systems in the United States that are comparable to the NYC Subway. Ex. 47 to Roth Decl, Jones Memo to Bienstock dated September 20, 2016 re trip report to London and Paris; Ex. 18 to Roth Decl, Prendergast Dep at 123:5-25.

248. The Transit Authority has always compared itself to subway systems of comparable size and scope internationally and looked these systems for benchmarking and global best practices. Defendants' Ex. BB p. 2; Defendants' Ex. DDD p. 20; Ex.s 42-27 to Roth Decl

249. In June 2016, Tony Abdallah, Eric Jones (who was produced as the Rule 30(b)(6) witness), and several other senior Transit Authority officials "traveled as a collective team to London, England and Paris, France to conduct industry best-practice research regarding Platform Screen Door (PSD) systems in metro rail systems considered comparable to NYC Transit." Ex. 47 at NYCTA_2_00001201.

250. Past President Thomas Prendergast stated the only comparable subway systems to the NYC subway were the London Underground and the Paris Metro, because of their size and the

age of the systems—both of which retrofit some of their older subway stations to install PSDs. Ex. 18 to Roth Decl, Prendergast Dep at 123:5-25.

251. The New York City Subway annual ridership for 2016 was approximately 1.756 billion people,[1] which was the ninth largest annual ridership of any subway system worldwide. Berkowitz Declaration ¶ 19.

252. The next closest system in the United States is Chicago's CTA, which had an annual ridership in 2016 of 238 Million. Berkowitz Declaration ¶ 19.

253. The top 19 subway systems worldwide by ridership all have annual ridership of more than one billion; all but three—NYC, Moscow and Mexico City—have PSDs at some or all of their stations. Berkowitz Declaration ¶ 19.

254. Thus, it is appropriate to compare and use the best practices for international transit systems as they are more comparable to the NYC transit system, and because mass transit systems are a global community. Berkowitz Declaration ¶ 19.

255. The Transit Authority is a founding member The Community of Metros (CoMET), a multinational collection of metro systems focusing on international benchmarking. Ex. 41 to Roth Decl at NYCTA_2_00385648.

256. CoMET consists of 42 metro systems in 39 cities around the world. COMET is jointly owned and steered by the various members and has four main objectives: (1) to share knowledge and identify best practices, (2) to support operational and strategic goals, (3) to measure performance, and (4) to prioritize and support decision making.[2] Before 2018, NYC Transit was the only United States member. See Ex. 45 to Roth Decl at NYCTA_2_00 190322.

---

[1] https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021

[2] See https://communityofmetros.org/

257. For decades, CoMET has ranked the NYC subway as one of the most dangerous subway systems in the world as measured by reported trips and falls onto the tracks, and being struck by trains. Ex. 43 at NYCTA_2_001 3446465; Ex. 44 at NYCTA_2_00390645; Ex. 46 to Roth Decl at NYCTA_2_00426596.

258. From 2000 to 2009, according to CoMET data, the NYC subway had the worst world wide reported safety record, with nearly double the number of deaths from accidents as the next closest subway system. Ex. 44 at NYCTA_2_00390645.

259. From 2004 to 2013, according to CoMET data, the NYC subway had the worst reported safety record in the world, with slightly less than double the number of deaths from accidents as the next closest subway system. Ex. 46 to Roth Decl at NYCTA_2_00426596.

260. The number of people who fell onto the tracks when no train was in the station doubled between 2010 and 2018. Ex. 43 at NYCTA_2_001 34466.

261. The number of people in New York City who are caught in train doors while standing on the platform is very low, compared to other CoMET members. Ex. 43 at NYCTA_2_001 34468-72.

262. On the Risk Assessment matrix in the SSPP, drags are categorized as a lower risk level than 12-9s because they occur less frequently. Ex. 17 to Roth Decl, Kennedy Dep at 196:20-197:2.

263. Incidents of people in NYC caught in train doors and injured thereby while standing on the platform is attributable to train conductor/operator negligence. Ex. 17 to Roth Decl, Kennedy Dep at 210:5-11.

264. In contrast, New York has by far the highest number of people hit by trains while standing on the platform compared to other COMET members, and these incidents have increased over time. Ex. 43 at NYCTA_2_00134473.

265. PSDs are the gold standard for enhancing platform safety because they reduce the risk of passengers entering the track area to a negligible level. Ex. 45 to Roth Decl at NYCTA_2_00190313.

266. In 1963, St. Petersburg, Russia became the first transit system in the world to use platform barriers to protect passengers. Defendants' Ex. I p. 1. Since the 1980s, platform barriers have become ubiquitous in transit systems throughout Asia and Europe. *Id*.

267. Singapore installed PSDs in its metro system in 1987. Berkowitz Declaration ¶ 9.

268. Despite the challenges of installing PSDs, compared with other safety measures, transit systems such as Taipei, Taiwan, have chosen to retrofit their subways to install PSDs because they are the only method to eliminate people from accessing the track area and being struck by trains. Ex. 45 to Roth Decl at NYCTA_2_00190317.

269. In 2009, Seoul Metropolitan Rapid Transit Corporation Authority (SMRT) retrofitted the entire subway system in Seoul, South Korea, to install PSDs because of the high number of suicides every year (approximately 22 per year). Defendants' Ex. VV, Berkowitz Report p. 31; Ex. 11 to Roth Decl; Ex. 32 to Roth Decl

270. Since installing PSDs in 2009, Seoul has not had any customer fatalities as a result of train strikes. Def. Ex. VV, Berkowitz Report p. 31; Foell Dep 218:7-23.

271. Retrofitting the Paris Metro system to install PSDs began around the mid-2010s. The first line to receive these doors was Line 14, which was equipped with them from its inception in 1998 due to its use of fully automated trains. However, the broader initiative to retrofit existing

lines with PSDs started later, with significant efforts visible from the mid-2010s onwards. Ex. 47 to Roth Decl, NYCTA_2_00001219 *to* NYCTA_2_00001223.

272. The Paris initiative was part of a broader modernization effort aimed at enhancing safety, reducing accidents, and improving the overall efficiency of the network. Despite the challenges, the ongoing modernization of the Paris Metro represents a significant step in improving the safety and efficiency of one of the oldest and busiest subway systems in the world. Ex. 47 to Roth Decl, NYCTA_2_00001219 *to* NYCTA_2_00001223.

273. London also recently retrofitted its Jubilee Line, one of the busiest lines in the world, to include full height PSDs; it also installed PSDs at new stations on the Crossrail (known as the Elizabeth Line), and has plans to retrofit additional stations with PSDs in the future. Ex. 47 to Roth Decl at NYCTA_2_00001224 *to* NYCTA_2_00001229.

274. Even in systems where PSDs are impractical or infeasible, subway systems around the world have implemented other safety measures. Ex. 45 to Roth Decl

**G. <u>The Transit Authority Could have installed PSDs prior to Plaintiff's accident at NO cost</u>**

275. Installation of PSDs in the NYC Subway System is feasible. Ex. 7 to Roth Decl, Jones Dep at 363:17-21; Ex. 28 to Roth Dec, Nagaraja Dep at 89:9-23; Ex 9 to Roth Decl, PSDTF Evaluation of RFI responses (Bates No. NYCTA_2_00589606); Ex 10 to Roth Decl, Faiveley RFI Resp. at p. 48 (NYCTA-5597-6432); Ex 11 to Roth Decl, TIS partners RFI Response at 1-12, 36-41 (NYCTA-5597-6432); Ex 12 to Roth Decl, KABA RFI Response at NYCTA-005901 (NYCTA-5597-6432); Ex 13, GE- Singapore Elec RFI Response (NYCTA-5597-6432); Ex 14 to Roth Decl, Westinghouse- Knorr-Bremse RFI Response (NYCTA-5597-6432); Ex 70 to Roth Decl, Crown response to RFI #10RFIN44NYCTA (NYCTA- 5597 to NYCTA-6432).

276. The Transit Authority has considered installing PSDs since the 1980s. Ex. 19 to Roth Decl, Reuter Dep at 43:9-44:7; Ex. 29 to Roth Decl

277. It has been feasible to install PSDs in the NYC subway since at least the early 2000s. Nagaraja Dep at 89:9-23. Ex. 28 to Roth Dec, Nagaraja Dep at 89:9-23; Ex. 34 to Roth Decl; Ex. 59 to Roth Decl

278. In 2006, Crown Infrastructure Solutions LLC. proposed to the Transit Authority to install PSDs at no up-front cost to the Transit Authority, using a Build-Operate-Transfer agreement. Ex. 29 to Roth Decl; Ex. 70 to Roth Decl at NYCTA-005615.

279. Under the agreement, financing would have been accomplished through a Build-Operate-Transfer agreement by which Crown would have been repaid for the cost of installing and maintaining the PSDs via advertisement revenue derived from digital displays on the PSDs themselves. Ex. 29 to Roth Decl; Ex. 70 to Roth Decl at NYCTA-005615.

280. NYCT bus shelters are funded and maintained by private entities via ad revenue in via BOT agreements. Ex. 19 to Roth Decl, Reuter Dep at 41:18-42:12.

281. The Transit Authority rejected the 2007 Crown Infrastructure proposal without explanation and without conducting a proper safety study or hazard analysis. See Ex. 29 to Roth Decl

282. In July 2009, SMRT and its partner Boston Sovereign Bank submitted a proposal to the Transit Authority to install PSDs in the NYC Subway at no cost to the TA. Ex. 31 to Roth Decl (NYCTA-01280 / NYCTA_2_00589606); Ex. 48 to Roth Decl at NYCTA_2_00464087.

283. SMRT proposed to install the PSDs at no cost to the Transit Authority and finance the installation under a 30-year Build-Operate-Transfer ("BOT") agreement (the same as it had done with the government in Seoul), whereby SMRT would place advertising on the doors to

recover the expenses associated with the costs to construct, operate and maintain the PSDs. Ex. 31 to Roth Decl (NYCTA-01280 / NYCTA_2_00589606).

284. In January 2010, Tony Abdallah, Kenneth Brown, Thomas Milbury and James Maciag—all senior officials from different departments—traveled to Seoul and Jeonjoo, South Korea to examine the operation, manufacturing and installation of PSDs and to determine whether it would be feasible to install a similar system in the NYCT system. Ex. 32 to Roth Decl (NYCTA_2_00002315 to NYCTA_2_00002319)

285. Following the trip, Tony Abdallah drafted a "Trip Report" in which he concluded that, "Overall the trip to Korea was a success. I propose that the Vendor be granted the opportunity to install the gates at the Hoyt/Schermerhorn Station in Brooklyn and at key locations on the `L: on the Canarsie line. These locations with provide all interested parties a opportunity to examine and environmentally test the gates and there [sic] effectiveness." Ex. 32 to Roth Decl (NYCTA_2_00002315 to NYCTA_2_00002319)

286. For several months, The Transit Authority met with SMRT and its partners to explore Mr. Abdullah's recommendation of permitting SMRT to install PSDs at select subway stations. Ex. 37 to Roth Decl (NYCTA_2_00406320); Ex. 48 to Roth Decl at NYCTA_2_00464087.

287. The Transit Authority ultimately declined Mr. Abdullah's recommendation to allow SMRT and its partners to install PSDs at several subway stations. Ex. 31 to Roth Decl (NYCTA-01280 / NYCTA_2_00589606).

288. In July 2010, Faiveley provided a presentation to the Transit Authority to install PSDs. Ex. 48 to Roth Decl at NYCTA_2_00464089.

289. In December 2010, the Transit Authority issued Request for Information ("RFI") # 10RFIN44 for PSDs, to obtain information from companies that have installed PSDs in subways around the world, to investigate the possibility of installing PSDs in the NYC transit system at little or no cost to the TA. Defendants' Ex. P.

290. The RFI included a request that the PSDs be capable of displaying digital media advertisements and cost and revenue sharing agreements, like the BOT arrangement offered by SMRT, to offset construction costs. Defendants' Ex. P; Ex. 31 to Roth Decl (NYCTA-01280 / NYCTA_2_00589606).

291. The Transit Authority received 12 responses. Ex. 31 to Roth Decl (NYCTA-01280 / NYCTA_2_00589606); Ex. 9 to Roth Decl, and Ex.s 10-14 to Roth Decl

292. The Transit Authority evaluated the responses, and determined that five of the 12 met their subjective requirements to be included in "future discussions" about PSD projects. Ex. 9 to Roth Decl

293. In 2010, the Transit Authority also considered installing PSDs at the new subway stations on the Second Avenue Subway and the 7 West Extension Line. Ex. 6 to Roth Decl.

294. The Hudson Yards Development Corporation ("HYDC") offered to fund the installation of PSDs at the 7 West Extension Line, but made the offer contingent on the TA making PSDs the new "standard" for new construction. Ex. 33 to Roth Decl.

295. Engineers and other Transit Authority officials believed this was a good idea and platform doors should have been the standard for new construction since the early 2000s. Ex. 34 to Roth Decl

296. The Transit Authority rejected PSDs at the Second Avenue Subway and the 7 West Extension Line because they did not want to establish a "new standard" for PSDs for new construction. Ex. 33 to Roth Decl.

297. The Transit Authority determined that significant ad revenue could be generated by installing PSDs and displaying advertisements on the doors. Ex. 36 to Roth Decl, Bata Dep at 158:25-159:7.

298. If the Transit Authority wanted to obtain funding for installation of PSDs or other platform barriers or technologies, it could have obtained the funding. Ex. 19 to Roth Decl, Reuter Dep at 66:13-67:8.

### H. The STV "feasibility" study was not a "safety" study and was conducted to justify not installing PSDs—as demonstrated by the fact that STV provided litigation support to defendants for this case while allegedly investigating the feasibility of PSDs

299. In 2013, the TA hired STV, Inc. for a pilot project to install PSDs at 14th Street / 6th Avenue Station on the L Line. Def Ex. Z p. 2; Ex. 69 to Roth Decl; Ex. 73 to Roth Decl

300. After Plaintiff's accident, the TA converted the 14th Street Pilot with STV, Inc. into a purported "feasibility study" regarding installation of PSDs or other platform barriers on each platform at all 472 subway stations throughout the system. Def Ex. Z p. 2; Ex. 38 to Roth Decl.

301. The Transit Authority did not start to conduct a purported feasibility study regarding PSDs until 2017, completed in 2019. See Ex. 7 to Roth Decl, Jones Dep at 181:16-24.

302. The purported "study" was conducted from 2017 to 2019 and published in February 2020. Def Ex. Z p. 2.

303. STV determined that each station required its own feasibility study to see what types of platform safety devices would be appropriate for each specific station. Ex. 20 to Roth Decl, Foell Dep at 104:20-105:3.

**304.** STV met with counsel representing the defendants in the instant lawsuit and provided litigation support to Defendants in this case while also conducting the so-called "feasibility" study. Ex. 22 to Roth Declaration, Foell Dep at 357:22-365:13.

**I. <u>The Americans With Disabilities Act is not an impediment to installation of PSDs</u>**

305. The Americans With Disabilities Act ("ADA") requires that, for existing subway stations, like the Atlantic Avenue Barclays Center Station, there must be an accessible path of travel from one door of every train (not every subway car) to the elevator or exit ramp, which serves as an exit path. Def. Ex. VV, Berkowitz Report p. 36; Ex. 7 to Roth Decl, Jones Dep at 274:4-275:11; Ex. 22 to Roth Decl, Foell Dep, 101:12-19; Ex. 26 to Roth Decl, at NYCTA_2_00364308.

306. The ADA states, "Existing vehicles which are retrofitted to comply with the "one-car-per-train rule" of 49 CFR 37.93 shall comply with §§1192.55, 1192.57 (b), 1192.59 and shall have, in new and key stations, at least one door complying with §1192.53(a)(1), (b) and (d)." 36 C.F.R. § 1192.51 (c). Ex. 26 to Roth Decl, at NYCTA_2_00364308

307. An accessible path involves achieving proper gaps between the train and platform and providing a pathway along the platform to the elevator, which complies with all horizontal dimensions. Ex. 22 to Roth Decl, Foell Dep, 99:20-100:7; Ex. 26 to Roth Decl, at NYCTA_2_00364308.

308. The Transit Authority informed STV that its internal "policy" required all doors for every subway car to be accessible for wheelchair users to access the path to the elevator, and that installation of PSDs could not reduce accessibility to any train car door, or the station would be deemed infeasible. Ex. 20 to Roth Decl, Foell Dep at 112:12-19; Ex. 26 to Roth Decl, May 10, 2017 meeting minutes; Ex. 69 to Roth Decl.

309. The Transit Authority's internal "policy" exceeds the ADA's "one-car-per-train" rule. Ex. 7 to Roth Decl, Jones Dep at 277:13-24; Ex. 69 to Roth Decl; Ex. 20 to Roth Decl, Foell Dep at 118:14-19.

310. Instead of complying with the ADA's "one-car-per-train" rule, the Transit Authority instructed STV to deem an entire station infeasible for installation of PSDs unless every single door for every subway car was wheelchair accessible with a path from each and every train car door to the elevator. Ex. 20 to Roth Decl, Foell Dep at 117:21-118:19, 153:12-20, 156:6-11; Ex. 69 to Roth Decl.

311. In its final report, STV was required to find that the Atlantic Avenue – Barclays Center station as not "ADA compliant" because of the Transit Authority's invented guideline that every single door for every subway car had to be wheelchair accessible. Def Ex. JJ pp. 5, 13; Ex. 22 to Roth Decl, Foell Dep 121:24-127:13.

312. Currently, only 126 out of 472 subway stations have complete elevator access for disabled persons to access the train platforms. See Michael Gold, *M.T.A. Vows to Make Subways 95% Accessible. It Will Take 33 Years,* N.Y. Times (June 22, 2022), https://www.nytimes.com/2022/06/22/nyregion/nyc-subway-accessibility-disabilities-elevators.html#:~:text=New%20York%20has%20lagged%20for,that%20make%20them%20fully%20accessible.

313. If a subway station does not have elevator access to the platform, the installation of PSDs at that platform in the station will have no effect on wheelchair users because said stations are already in violation of the ADA. Def Ex VV, Berkowitz Report p. 37.

314. If there is an excessive gap at the station between the platform and the train, then the station would be non-ADA compliant. Ex. 7 to Roth Decl, Jones Dep at 243:16-20.

315. Currently, without PSDs, the Atlantic Avenue – Barclays Center station complies with the ADA's "one-car-per-train" rule, but not with the Transit Authority's made-up guideline that every single door for every subway car had to be wheelchair accessible. Def Ex WW, Glismann Report p. 32; Ex. 22 to Roth Decl, Foell Dep 121:24-127:13, 132:9-133:7.

316. Currently, without PSDs, most of the 154 stations that STV stated in its final report were infeasible for installation of PSDs because it would supposedly create non-compliant conditions with the ADA, were already non-compliant with the Transit Authority's invented guideline that every single door for every subway car had to be wheelchair accessible. Def Ex VV, Berkowitz Report pp. 37-38; Ex. 22 to Roth Decl, Foell Dep at 154:7-15.

317. In contrast to its "policy" regarding PSDs, with respect to "gaps", the vertical and/or horizontal space between the platform edge and the train car door sill, the Transit Authority's "policy" only requires that two doors of every train be wheelchair accessible—the doors immediately to the left and right of the conductor in the center of the train. Ex. 22 to Roth Decl, Foell Dep at 290:5-291:14.

318. The "gaps" at the subject Atlantic Avenue-Barclays Center station were in excess of the ADA requirements on the date of the subject incident. Ex. 71 to Roth Decl

319. The excessive "gap" distances at the subject Atlantic Avenue-Barclays Center station violated the ADA. See Ex. 71 to Roth Decl.

320. Even if a station was deemed to violate the ADA, the Transit Authority could seek a waiver from the Federal Transit Administration. Ex. 19 to Roth Decl, Reuter Dep at 311:18-22; Ex. 22 to Roth Decl, Foell Dep at 93:16-21; Ex. 26 to Roth Decl, May 10, 2017 meeting minutes.

321. In stations that are already not compliant with the ADA, installing PSDs necessarily could not change the non-compliant ADA status. Ex. 19 to Roth Decl, Reuter Dep at 317:12-21.

**322.** The ADA did not preclude installing PSDs at the Atlantic Avenue Barclays Center station. Def Ex. Ex. WW p. 5, 28-29.

### J. Defendants could have installed Rope Barriers aka Vertical Platform Screen Doors on the platform edge, but chose not to without ever conducting a safety study or hazard analysis

323. Defendants could have installed Rope Barriers or Vertical PSDs on the platform edge to reduce the number of people who fall onto the tracks and get hit by trains. Def Ex VV, Berkowitz Report p. 34.

324. RPSDs are effective at preventing or reducing 12-9s/CWIa and address the challenges of PSDs in many respects cite. Def Ex VV, Berkowitz Report p. 34.

325. RPSDs have been successfully installed and effectively used internationally. Ex. 51 to Roth Decl pp. NYCTA_2_00005155 to NYCTA_2_00005157.

326. The Transit Authority determined not to install RPSDs without performing any study whatsoever. Ex. 39 to Roth Decl.

327. The decision not to install vertical rails or RSPDs on the platform edge without conducting a safety study or hazard analysis was a violation of their SSPP and MIL 882E. Def. Ex. VV, Berkowitz Report p. 33-34; Def. Ex. WW, Glismann Report p. 9.

328. The Transit Authority never requested funding from any local, state or federal government, or private entity, to have vertical or RSPDs installed on subway platforms. Ex. 7 to Roth Decl, Jones Dep 169:22-170:2.

### K. Defendants could have installed fixed guardrails on the platform edge, but chose not to without ever conducting a safety study or hazard analysis

329. Fixed guardrails have been used to prevent contact between trains and people in the NYC subway for over 100 years. Ex. 7 to Roth Decl, Jones Dep. at 121:9-122:4; Def. Ex VV, Berkowitz Report at pp 6, 41.

330. Fixed guardrails have been used in the NYC subway system for over 100 years, including at the Times Square Station, the rails remain in place and have not been removed by defendants. Ex. 7 to Roth Decl, Jones Dep. at 121:9-122:4; Def. Ex VV, Berkowitz Report at pp 6, 41; Ex. 60 to Roth Decl.

331. Defendants could have installed fixed guardrails on the platform edge to reduce the number of people who fall onto the tracks and get hit by trains. Reuter Dep 339:9-340:10; Jones Dep 121:2-122:4.

332. Prior to Plaintiff's accident, Defendants never conducted a safety study or hazard analysis regarding the installation of fixed guard rails. Ex. 7 to Roth Decl, Jones Dep 169:9-14; Ex. 17 to Roth Decl, Kennedy Dep at 205:16-206:4; Ex. 22 to Roth Decl, Foell Dep 216:9-217:13.

333. In 2017, the Transit Authority considered installing fixed guardrails as an "interim solution" while they further considered installing PSDs systemwide. Ex. 40 to Roth Decl

334. In 2017, the TA commissioned STV to create renderings of fixed guardrail barriers. Ex. 63 to Roth Decl.

335. Fixed guardrails are relatively inexpensive and easy to install,. Ex 40 to Roth Decl

336. On March 21, 2017, the TA circulated the drawings made by STV via email to various departments so that "each areas concerns can be put on the table". Ex. 74 at NYCTA_2_00351351.

337. The following day, March 22, 2017, the Office of System Safety circulated comments on the proposed fixed guardrails. Ex. 74 at NYCTA_2_00351350.

338. The decision not to install fixed guardrails on the platform edge without conducting a safety study or hazard analysis was a violation of their SSPP and MIL 882E. Def. Ex. VV,

Berkowitz Report p. 33-34; Def. Ex. WW, Glismann Report p. 9; Ex. 22 to Roth Decl, Foell Dep 216:9-217:13.

339. The Transit Authority never requested funding from any local, state or federal government, or private entity, to have fixed rails installed on subway platforms. Ex. 7 to Roth Decl, Jones Dep 169:22-170:2.

### L. Defendants could have slowed the speed at which trains enter stations, but chose not to without ever conducting a safety study or hazard analysis

340. Reducing the speed at which trains enter stations reduces the time and distance required to stop the train. Ex. 7 to Roth Decl, Jones Dep at 41:6-10; Ex. 17 to Roth Decl, Kennedy Dep at 171:23-172:16; Ex. 45 to Roth Decl at NYCTA_2_00190331.

341. Around the world, numerous subway systems have implemented the operational practice of reducing train speed when entering stations with crowded platforms as a method of increasing safety. Ex. 45 to Roth Decl at NYCTA_2_00190375.

342. The Transit Authority's policy is for trains to enter stations at full speed. See Ex. 7 to Roth Decl, Jones Dep at 39:6-19.

343. Defendants could have required trains to enter stations at a reduced speed—i.e., 10 m.p.h. instead of 30 m.p.h.—to reduce the number of people who get hit by trains. Def Ex VV, Berkowitz Report at 24, 67-70; Def Ex WW, Glismann Report at 32.

344. On February 8, 2011, New York State Assemblyman Marcos Crespo introduced a bill to require NYC subway trains to enter subway stations at a slower rate of speed as a safety measure to reduce the number of people hit and killed or catastrophically injured due to contact with trains. Ex. 59 to Roth Decl

345. In 2011 Prendergast requested a "quick and dirty" response to the Crespo bill. Ex. 59 to Roth Decl at NYCTA_2_00391363.

346. Two days later, Glenn Lunden, who is not an engineer, provided a response. Ex. 59 to Roth Decl at NYCTA_2_00391361 to NYCTA_2_00391363.

347. Notably, Vice President of Subways, Joe Leader, and Chief Engineering Officer, Ken Mooney, conceded was not a full study. Ex. 59 to Roth Decl at NYCTA_2_00391359 to NYCTA_2_00391360.

348. TA opposed this proposed bill. Ex. 59 to Roth Decl

349. On January 9, 2013, John Samuelson, President of the National Transit Union and Current Board Member MTA, wrote a letter to President Thomas Prendergast in which he stated:

> The TA's effort to reduce 1 2-9s by posting signs encouraging riders to stand back from the edge of the platform has not had a measurable effect on subway deaths. The two widely covered pushing incidents and the New Year's Day suicide has focused intense public scrutiny on an issue that has been an all too common occurrence in our system.
> One fatal 12-9 per week, two additional, non-fatal 12-9's and the associated deleterious effects on train crews can no longer be accepted as the price of on-time service. In the interest of public safety and the well being of your employees, we believe it is imperative that the MTA take immediate steps to end this carnage.

Ex. 53 to Roth Decl

350. Defendants chose not to reduce the speed at which trains enter stations, without ever conducting a safety study or hazard analysis. Ex. 7 to Roth Decl, Jones Dep at 169:15-21.

**M. <u>Other safety options that defendants did not consider</u>**

351. The TA failed to use closed caption TV ("CCTV") cameras on the platforms via a link to a monitor in the cab of the train that enables the operator to see people on or near the tracks before entering the station, and enabling the operator to stop the train before hitting a person. Def Ex VV, Berkowitz Report at 24.

352. The TA failed to use front facing cameras mounted on the front of trains, with a live feed to the operator, to provide a better view of the tracks in front of them while entering stations and enables the operator to stop the train before hitting a person. Def Ex VV, Berkowitz Report at 24.

353. The TA failed to use or mark "safe zones" on platforms—areas where people can wait on towards the end of the platform where the train is traveling the slowest before it comes to a stop, thereby reducing the risk of being hit by the train. Def Ex VV, Berkowitz Report at 24, 67-70.

**N. <u>Train Braking Distance</u>**

354. According to the Transit Authority's Specifications—Car Design Parameters, under emergency braking conditions, the Average Deceleration is 3.2 mph/second. Ex 23 to Roth Decl

**O. <u>Carl Berkowitz's Expert Report</u>**

355. Defendants included the report of Plaintiff's Expert, Carl Berkowitz, as Ex. VV to the Declaration of Andrew Keaveney.

356. Defendants omitted Dr. Berkowitz's CV, which was attached to his report as Ex. C, and which is attached to the Roth Declaration as Ex. 75.

357. Defendants omitted Dr. Berkowitz's CV, which was attached to his report, and which is attached to the Roth Declaration as Ex. 75.

358. Defendants also omitted the ESI Appendix that listed the ESI documents Dr. Berkowitz had reviewed in preparing his report, which was attached to his report as Ex. A, and which is attached to the Roth Declaration as Ex. 62.

Dated: New York, New York
January 18, 2023

Respectfully Submitted,
ROTH & ROTH LLP

By: ________~/s/~___________
Elliot Dolby Shields, Esq.
*Co-Counsel for Plaintiff*
192 Lexington Ave, Suite 802 New York,
New York 10016
Ph: (212) 425-1020

To: All parties (via ECF)