**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------X
Luisa Janssen Harger Da Silva                          :
                                                       :   Civil Action No.
                                                       :   1:17cv04550-FB-VMS
                                                       :
Plaintiff,                                             :
                                                       :   **DECLARATION**
     -against-                 :
                                                       :
New York City Transit Authority, Metropolitan          :
Transportation Authority, and Raqia Shabazz            :
                                                       :
                                                       :
Defendants.                  :
--------------------------------------------------------------------------X


**DECLARATION OF CARL BERKOWITZ, Ph.D. PE,**
**(INTERNATIONAL TRANSPORTATION ENGINEERING EXPERT AND RETIRED**
**PROFESSOR OF TRANSPORTATION)**


    CARL BERKOWITZ, Ph.D., PE, AICP hereby declares under penalty of perjury and

pursuant to 28 U.S.C. § 1746 that the following is true and correct:

    1.    I make this declaration in support of the opposition of the affirming language

applicability of how they used

    2.    I affirm everything in my report which is attached to Defendants papers as

Defendants Ex. VV as if fully set forth herein. The conclusions and opinions I have expressed in

my report and herein are made with a reasonable degree of engineering and mass

transportation/transit certainty.

    3.    I am a licensed Professional Engineer, with a PhD in Transportation Engineering

and planning. I am an expert in mass transportation engineering and have been recognized as an

expert by the US Government.  I was appointed to the Surface Transportation Security Advisory

Committee, which was established by Congress and chaired by Homeland Security. As fully laid out in my attached Curriculum Vitae, (Roth Declaration, Ex. 75 hereafter all exhibits  referred to simply as Ex.___ are attached to the Roth Declaration with the exception of Defendants exhibits) an accurate copy of which is attached to the Roth Declaration and deemed fully incorporated herein, I have extensive international experience working in the transportation industry, including the government, private and academic (university and college) sectors.  I have comprehensive multi-modal experience in transportation planning, design, engineering, safety, security, construction, maintenance, operations and management. In addition to my work experience, I have conducted research, consulted, and given presentations on transportation safety, including specifically passenger safety.  I have worked as a transportation engineer for over fifty-five years, including four years as the highest ranking civil-service transportation engineer in the New York City Transportation Department.  I have multiple degrees, including a Ph.D. in Transportation Planning and Engineering from the Polytechnic Institute of New York (NYU-Tandon), have held numerous teaching positions, have published academic and news articles, transportation safety commentator for television (CBS, NBC and ABC), national and local radio and newspapers. I am a member of many transportation industry and transportation engineering professional organizations, including American Railway Engineering and Maintenance of Way Association (AREMA); American Public Transportation Association (APTA); Academic Committee of the International Association of Public Transport (UITP); voting member of the Surface Transportation Security Advisory Council (STSAC) established by Congress and chaired by Homeland Security Administrator of TSA; American Association of Railroad Superintendents (AARS); American Society of Biomechanics (ASB), International Society of Biomechanics (ISB); Human Factors and Ergonomics Society (HFES); American

Society of Civil Engineers; American Society of Mechanical Engineers; Institute of Electrical and Electronic Engineers; Institute of Transportation Engineers (ITE); and Air Brake Association (ABA).   In March 2021, I was also appointed to UITP research committee, whose reports defendants have relied upon in analyzing transportation one of which is attached to Defendants motion papers as **Ex K.**

4.      I am and was familiar with good and accepted practices, procedures, protocols and professional standards of care with respect to of engineering and mass transportation/transit systems during the pertinent time periods.

<u>**Preliminary Note**</u>

5.      Based on a review of the voluminous records and depositions in this matter, my education, training, knowledge and experience, it is my conclusion, made with a reasonable degree of certainty, that the Defendants violated good and accepted practices, procedures, protocols and professional standards of care with respect to of engineering and mass transportation/transit systems, the CFR, US Mil Standard 882, FTA Guidelines, and the TA's System Safety Program Plan (SSPP), and that said violations were a substantial factor and proximate cause of Defendants' train hitting and running over Ms. Harger and causing her arm and leg to be severed – a catastrophic injury.

6.      Among the safety devices and measures that were known to be effective and safe, measures that existed well before Ms. Harger's incident and that could have and should have been installed or used and any of which would have prevented her injuries from occurring are: Platform Screen Doors ("PSDs" [also known as "full height" PSDs]), Platform Edge Gates ("PEGs" [also known as "half height" PSDs or Automatic Platform Gates]), Rope Platform

Screen Doors ("RPSDs"), and fixed guardrails (all collectively referred to as "platform barriers");TIDS includes CCTV cameras, Video feed to train operator, Front facing cameras, detection mats, laser detection, thermal detection, radar detection.

7.      Engineers solve problems; that is what we do.  We meet challenges. Engineers have all said that whatever challenges exist to implement the installation of safety devices or measures to prevent or reduce the number of these frequent, "1A" High Hazard catastrophic 12-9/CWIs, they can be met and overcome.  Defendants' failure to install any of these known and effective safety devices or measures to resolve the known recurring High Hazard that existed of open access to the track from the unprotected platform edge, constituted a violation of good and accepted practices, procedures, protocols and professional standards of care with respect to of engineering and mass transportation/transit systems, the CFR, US Mil Standard 882, FTA Guidelines, and the TA's System Safety Program Plan (SSPP), and that said violations were a substantial factor and proximate cause of Defendants' train hitting and running over Ms. Harger and causing her arm and leg to be severed - a catastrophic injury.

8.      If a proper and adequate feasibility study was to have been performed, the purpose and goal of this study would be to see how to best implement a System Safety Plan (SSP) that requires corrective action by installing PEDs or other safety devices or measure along the hierarchy of safety.—In other words, which safety device or measure works best for each different station, or what modifications, if any, were needed to accommodate these differently configured stations.

9.      As set forth below, the TA has rejected multiple safety measures that are time proven and not new technologies as they keep claiming.  Platform edge barriers doors are NOT new; the concept is written in the Bible: "When you build a new house, you shall make a parapet

for your roof, so that you will not bring guilt for bloodshed on your house if anyone falls from it." Platform Edge Barriers (PEBs)for mass transit systems have been used since their inception, and the first patent for one, a fixed guardrail, was issued in 1908.  Moving Platform Edge Barriers are not new technology; they were used in St. Petersburg in the 1960s, and glass PEBs were used in the Singapore system, which was in use in 1987 (designed and built before that); almost 40 years ago.  Similarly, Track Intrusion Devices (TIDs) are not new technology; automatic door sensors have been in use since the 1970s, and electronic sensors have been used in  elevators since the 1990s.

10.    As set forth at length below and in my report, a proper safety study and feasibility may be necessary, but proper protocols must be followed in doing so.  To perform a proper feasibility study, a pilot project may be necessary, as a test run and for comparative analysis.

11.    According to the CFR, and Defendants' (as well as the FTA Guidelines), good and accepted engineering and mass transportation practices, procedures, protocols and professional standards of care, a proper safety study and proper safety plan was and is required for each and every one of the 472 subways stations in Defendants' system, because a "one size fits all approach" is irrational and unreasonable and will not work in the NYC subway system. NO proper safety study was performed for the subject station. It is undisputed that there was NO safety plan for the subject Atlantic Terminal Station.

12.    While Defendants falsely claim that there are no applicable Codes, Standards and Guidelines, 8 such items are identified in their 2013,  Scope of Work for Engineering Design, and Technical Services for the Development of Conceptual Engineering documents for PSD Pilot at 14th Street/"L" Line. (Ex. 73 P. 10 , Bates No. NYCTA_2_00202877). This list includes

NFPA 130: Standard for Fixed Guideway Transit and Passenger Rail Systems. Conspicuous by its absence is reference to the CFR and the FTA Guidelines as well as Defendants own SSPP.

13.     A proper feasibility study was never performed by or on behalf of Defendants before Ms. Harger's incident.  A proper feasibility study has not been performed after her accident that I am aware of.  No pilot project for PEDs was ever performed. While a number of pilot projects were scheduled to be conducted for PSDs, each and every one of them was cancelled by Defendants.  For example, in 2013, a Scope of Work for Engineering Design, and Technical Services for the Development of Conceptual Engineering documents for PSD Pilot at 14th Street/"L" Line. (Pl. Ex. 73, Bates 202868-202878).  This document lists the many benefits and advantages, in addition to safety by effectively preventing 12-9s/CWIs, of PSDs. (Pl. Ex. 73, at Bates 202869-202870).

14.     A proper safety study was not performed. A proper safety or feasibility study was not performed for  any of the safety devices or measures that would have helped prevent the plaintiff's accident herein. While there was a TIDS pilot, completed after Ms. Harger was injured, and there was no records of them causing additional hazards and in fact the TIDs proved effective.  Pilot projects, if necessary, should have been done years before Ms. Harger's incident. The effectiveness and safety of the PEDs, TIDs and other safety devices and measures I have discussed was well known and established years before Ms. Harger's incident, and it may not have been necessary for the TA to study it further or perform pilots on.

15.     Had the TA/MTA performed a proper Hazard Analysis and Risk Assessment, pursuant to US Mil Standard 882 (and the SSPP), they would have identified the root cause of this "1A" High Hazard as an open and unprotected platform edge, and taken immediate steps to remedy this hazard with corrective action, and then they would have performed comparative

analysis to measure the effectiveness of the steps taken, and gone down (if necessary) the hierarchy of safety devices/measure until the hazard was resolved or accepted.  This known and recurring High Hazard was and remains preventable or reducible.

16.    If the TA/MTA had not violated good and accepted engineering and mass transit practices, principles, protocols and standards of care, they would have properly identified this High Hazard and taken effective corrective action in a timely manner and well before Ms. Harger's incident, so that these High Hazards would have been resolved before her accident, and she would not have been harmed.

17.    I have also noted the train operator's failures and how she should have been able to stop the train before it ran over Ms. Harger. The defendants' negligence was and is a proximate cause and a substantial factor in causing Ms. Harger to lose her arm and leg.

### New York City Subway System and Proper Comparative Systems

18.    The NYC Subway system is properly comparable to other systems internationally; there are no comparable subway systems in the USA,  facts conceded by Michael Sullivan, Senior Director of the Office of System Safety of the day (Ex.15. P. 77:13-21)  Cheryl Kennedy, Director of Office of System Safety. (Ex. 17 P. 179-180:23-10). Past TA/MTA President/Chairman Prendergast admitted this as well (Ex. 18 P. 123:5-10). (Any analysis or comparison with transit systems in the US are therefore of limited value, if any, value or validity).

19.    The New York City Subway annual ridership for 2016 was approximately 1.756 billion people,[1]  which was the ninth largest annual ridership of any subway system worldwide.

[1] https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021

Whereas the next closest systems in the US are in the low hundred million, such as Chicago's CTA, which is one legacy system in the United states that has a ridership in 2016 of 238 Million. It is appropriate to compare and use the best practices for international systems as they are more comparable and that mass rail mass transit systems is a global community. The Community of Metros (CoMET),[2] which the TA is a member, standards and best practices show that the only comparable subway systems are international systems with an annual ridership of more than 1 billion people, of which there are 19 such systems worldwide, 16 of them have PSDs or another type of platform barrier to prevent trains from making contact with people and killing or maiming them. The only 2 other systems in this category that lack such safety devices are Mexico City and Moscow. It should be noted that Moscow is built as a bomb shelter is not comparable to any other system.

## Safety Performance Indicator

20.     The number of people struck and killed or catastrophically injured is a Safety Performance Indicator ("SPI"), which is the most important metric when performing safety and hazard analyses, safety studies, safety planning and corrective action efficacy.

21.     Mass Transit Safety analysis requires comparing SPI data to other systems, and to determine probability and severity of events, which is the appropriate metric;

22.     Dividing the number of people unnecessarily killed or catastrophically injured by the number of riders is improper methodology and a violation of 882, CFR, FTA Guidelines,

---

[2] CoMET consists of 42 metro systems in 39 cities around the world. CoMET is jointly owned and steered by its various members, and has four main objectives: (1) to share knowledge and identify best practices, (2) to support operational and strategic goals, (3) to measure performance, and (4) to prioritize and support decision making.

good and accepted engineering and mass transportation practices, protocols and professional standards of care.  Safe is safe; unnecessary deaths or catastrophic injuries that are preventable is never acceptable. Under the TA's Sophist analysis, if 1,000 people were killed every year, statistically, it would be insignificant, but in reality, intolerable and unacceptable.

23.    This type of analysis is not applicable to analyzing system safety, but is instead, applicable operations that do not involve injuries or death. These numbers should only be used when evaluating system operations, system performance, and system maintenance and not for evaluating the safety of passengers. This is more akin to a manufacturer of a car saying that a car should have a tune up every 10,000 miles; a manufacturer of a car, an airplane  (or any product, such as Tylenol) would never attempt to make this claim with a straight face.

24.    To claim otherwise shows a lack of understanding of mass transit safety analysis or a deliberate attempt at misdirection.  As to the frequency argument, the NYCTA's data shows that they have 3-4 track intrusions a day,  and someone being hit by a train 3- 5 times a week. This constitutes a frequent and probable catastrophic event, and an unacceptable High Hazard.

## What Constitutes a Proper Study

25.    A study has specific scientific meaning, it is not just simply a collection of data. To  constitute a proper study, proper scientific methodology must be followed, which  requires complying with and following applicable professional standards and good and accepted practices, protocols and procedures, so that the results are objective, and can be duplicated and withstand scrutiny.  Proper analysis is required and must be applied to in order for the study to have validity and be professionally reliable. Proper methodology includes being objective and without pre-conceived conclusion and  performing comparative analysis of the data. Using this methodology, the facts lead the study to its conclusion. A study should have an objective,

typically how to solve or address a problem or challenge.  A foregone conclusion that searches for facts to support its opinion is an invalid study. Suggestions or conclusions based upon presumptions, speculation, guesses, concerns or even public opinion are not a proper study. Merely denominating a collection of data a 'study" does not make it a study.  Rail Mass Transit safety planning and decisions must be made using the directives contained in the CFR, other Federal Guidelines as detailed herein, the System Safety Program Plan (SSPP), which all require a comparative analyzing leaving the hazard as compared to an alternative safety measure. It is required by the US Department Transportation that the state  Mass Transit Agencies apply the standards set forth in the CFR as well as in each states system plan.  No safety measure that could eliminate or reduce a hazard from a more severe to a less severe hazard can be rejected without a proper and complete study. A study for effectiveness is not required when experience and implementation in other rail transit systems has proven the efficacy of the safety to reduce a hazard.

26.    Each decision by the TA that rejected a safety measure to eliminate or reduce the hazard of people being struck by subway trains violated the CFR, the Transit Authorities own System Safety Program Plan (SSPP), MIL-SPEC 882E and good and accepted engineering practices and standards of care, which require reducing high hazards.

27.    A proper safety study is one that seeks how to best make the system safe by eliminating or modifying the hazard through effective corrective action, and requires the following steps: 1) identify the safety hazard using a root cause analysis and determining the common denominator,  2) Perform risk assessment and hazard analysis using a standardized risk-hazard matrix to objectively quantify the various risks and a comparative analysis of the severity and probability of harm, 3) Corrective action to address the hazard, a solution to a safety hazard

that eliminates or reduces the harm, and 4) Review and comparative analysis to objectively determine the effectiveness of the corrective action taken, and if ineffective, to then try a different corrective action plan and continue until the hazard is eliminated or mitigated to a satisfactory level, or accept the hazard and the resultant harms.

28.     In the present case, a proper root cause analysis reveals that the safety hazard is open access to the train tracks from the platform edge that allows contact between subway trains and people on the track/track bed or near the edge of the platform (referred to as a "12-9" or CWI [Contact With Individual] by Defendants) A second root cause is the lack of an adequate warning system to the train or its operator when a person is present on the subway tracks (See Ex. VV P. 15). Using the risk assessment - hazard matrix, the harms are catastrophic and frequent, and therefore require corrective action.  A proper safety study is one that seeks how to best  prevent such events from occurring or mitigate such events through effective corrective action.

29.     An objective review of the facts reveals that there are essentially 3 means of doing so: 1) Prevention; 2) Preemption; and 3) Intervention.  Prevention can be accomplished by a barrier, whether a Platform Edge Door or Platform Screen Door  ("PED"/"PSD"), a dynamic door (that moves to accommodate alignment with train car doors), a vertical barrier, such a  rope barrier, or a fixed rail.  Preemption includes reducing the entry speed of trains into stations so that they can stop in a shorter distance and in less time. Intervention includes Track Intrusion Devices ("TIDS"/"LIDS"), using CCTV cameras on the platforms and/or front facing cameras installed on the front to of the train car with a live remote feed to the train so that the operator can see the track and platform before entering the station.  This list is not exclusive and is merely illustrative.

30.     An examination of the documents that Defendants rely upon makes abundantly clear that Defendants have failed to perform a proper and adequate study, let alone a proper and adequate safety study nor do the Defendants have any corrective action plan in place as required by the 49 § 659.37 (Corrective Action Plans) nor is there any hazard reduction plan as required by the transit authority's own System Safety Program Plan (SSPP).  It is further undisputed that Defendants never performed a study or safety study for the actual subway station involved herein.  As testified to by the past president of the NY Transit Authority, there is no one size fits all plan approach to the NYCTA, rather you would need a safety plan for each individual station. (Dep of Thomas Prendergast (Ex.18 P. 57-58:22-10).

31.     The Defendants own System Safety Program Plan (discussed below in detail) defines what qualifies as a study.  Similarly, 49 CFR § 659, which requires that the Transit Authority has a system safety program,[34] also lists the elements that make up study (discussed below). Thomas Prendergast, the past President of the NYCTA in his deposition has also detailed what constitutes an engineering study (Ex. 18 P. 107:7-21) ( discussed below).  I have also defined an engineering study.  While I may digress on minor details, the overall criteria of a study is clear and the Defendants have not met the requirements of a study, nor shown any

---

[3] Cheryl Kennedy the NYCT Safety primary contact as the Vice President of the OSS (Def. Ex. CCC).

[4] Purpose (§ 659.1) In addition, the oversight agency must conduct safety and security reviews and ensure the conduct of accident and hazard investigations. The oversight agency must also ensure that corrective action plans are developed and implemented to address findings from accident and hazard investigations and track implementation to resolution. System Safety Program Plan (§§ 659.17– 19).  The rule stipulates that the oversight agency must require the rail transit agency to develop and implement a written system safety program plan that complies with the oversight agency's program standard. FTA has identified twenty-one (21) elements that, at a minimum, must be addressed by the rail transit agency.

documents that would lead a reasonable person to conclude the a valid study, or a valid proper safety study as defined has been conducted.

### Rail/Mass Transit Engineering Standards For
### Risk Assessment, Hazard Analysis, Hazard Resolution
### And Corrective Action

**Department of Subways System Safety Program Plan[5]**

32.     "The hazard management process is the primary tool utilized to ensure the safety of New York City Transit passengers (Ex. CCC P. 66).  The SSPP lays out the hazard management process as follows: **1) Hazard identification; 2) Hazard Classification; and 3) Hazard Resolution**.[6]

33.     **Hazard identification** (Section 6.2 ) is the initial step in the hazard management process there are reviews of new design and construction, Accident investigation, surveys, trend and hazard analyses. The hazard analyses is conducted with the established system and safety principles outlined in Military Standard 882E This  requires that the hazard be identified and then assess the hazards relative to their severity and probability of occurrence and identify corrective actions to bring the hazard to an acceptable level.

34.     Thereafter the SSPP requires **Hazard Classification** (Section 6.2) which is conducted in accordance with Military Standard MIL-STD-882E (MIL-STD-882E) (See Ex. ZZ Deposition of vice president of System Safety Cheryl Kennedy P. 33). The MIL-STD-882E classifies hazards by assessing the severity (effects) and the probability(likelihood) of the hazard occurrence.[7]  The safety plan, similar to the MIL-STD-882E also has severity categories with 1

---

[5] The 2016 plan provided Def. Ex. CCC (Bates No. NYCTA-04541) was approved and signed by Cheryl Kennedy, Vice President of Office of System Safety.
[6] SSPP § 6.1.
[7] Ex. CCC P. 67-72 (Bates No. NYCTA-04605- NYCTA-04611.

being the most catastrophic, this category includes death and permanent total disability and the probability levels with frequent, (likely to occur) also listed at the top of the chart at level A, this then goes into the risk assessment matrix.[8]  Thereafter if the risk level is determined, as it is in this case a "high hazard" which is both catastrophic injury or death and frequent to occur often in the life of an item, that is deemed unacceptable, and requires immediate corrective action. Additionally, if the hazard is determined to be unacceptable and catastrophic in nature, then the hazard has to be reported to the state oversight committee (PTSB).[9]

36.    Once the hazard has been identified and classified then there is a requirement, for **Hazard Resolution** (Section 6.3 of the SSPP) is required as follows: The SSPP deems high hazards as unacceptable, serious hazards are undesirable and require a management decision to reduce the hazard, medium hazards are acceptable with review by management and low hazards are acceptable without review by management.

### SSPP Section 12: Internal Safety Reviews

36.    High hazards (which is the case herein) may require immediate corrective action, the serious hazards would require a management decision, while the medium hazards requiring management review would have a lower priority.

37.    This section describes the process used by NYCT to ensure that planned and scheduled internal safety reviews are performed to evaluate compliance with the SSPP. The internal safety review process will determine if all organizational elements, equipment, procedures and functions are performing as intended from a safety perspective.

---

[8] Ex. CCC P. 69 (Bates No. NYCTA-04608)(Table 6-3 Risk Assessment Matrix).
[9] Def Ex CCC SSPP § 6.4 (Bates No. NYCTA-04609).

38.     The objectives of the review process are to provide a mechanism for determining if the plan has been effectively implemented. The internal safety review objectives are as follows:  1) verify that safety programs have been developed/implemented in accordance with SSPP elements, 2) assess the effectiveness of the safety programs,  3) identify program deficiencies, verify that corrective actions are being developed, implemented and tracked to closure, 4) recommend improvements to the SSPP, 5) provide management with an assessment of the adequacy of the SSPP, and  6) assure continuing evaluation of the safety related programs.

### 49 CFR § 659

39.     The CFR requires that transit authorities have at minimum a safety program, and the CFR lists the elements that transit agencies need to address in their safety program plans. This requires the transit authority to develop a plan and submit said plan to the oversight agency for review and approval.  The defendants have instituted the System Safety Program Plan (SSPP) as required by the 49 CFR § 659.  The objectives of the review process are to provide a mechanism for determining if the plan has been effectively implemented.  The internal safety review objectives are as follows: 1) verify that safety programs have been developed/implemented in accordance with SSPP elements, 2) assess the effectiveness of the safety programs, 3) identify program deficiencies, 4) verify that corrective actions are being developed, implemented and tracked to closure, 5) recommend improvements to the SSPP, 6) provide management with an assessment of the adequacy of the SSPP, 7) assure continuing evaluation of the safety related programs.  The CFR requires that transit authorities have at minimum, a safety program, and the CFR lists the elements that transit agencies need to address

15

in their safety program plans.[10]  This requires the transit authority to develop a plan and submit said plan to the oversight agency for review and approval.[11]

40.    The relevant provisions of the pertinent SSPP sections include but are not limited to: a) The transit agency is required to develop and implement a written system safety program plan that complies with requirements in this part; b) The oversight agency shall review and approve the transit's system safety program plan, and c) The oversight agency shall issue a formal letter of approval to the rail transit agency.[12]

41.    The CFR has an extensive list of requirements for the SSPP, here are the main ones that impact this action:[13] Hazard identification; 2) Hazard investigation, evaluation and analysis; 3) Hazard control and elimination; 4) Hazard tracking; 5) Requirements for on-going reporting to the oversight agency relating to hazard management activities and status; 6) a process used to collect, maintain, analyze, and distribute safety data; 7) a process used to develop, implement, and track corrective actions that address investigation findings; and 8) Techniques used to assess the implementation of operating and maintenance rules and procedures by employees, such as performance testing.

### 49 CFR § 659.31 Hazard Management Process

42.    The CFR details the "**Hazard Management Process**" and requires the rail transit agency to identify and resolve hazards during: 1) operation, 2) system extensions, and 3) modifications.

---

[10] 49 CFR§ 659
[11] SSPP 4.2,  49 CFR §§ 659.17– 19.
[12] SSPP 4.2 49 CFR § 659.17 (general requirements)
[13] See, (System safety program plan: contents). 49 CFR § 659.19(f)(j)(m)

43.     As part of the system safety program plan, the rail transit agency must develop a "**Hazard Management Process**".  This process must, at a minimum: 1) Define the  transit agency's approach to hazard management, 2) the implementation of an integrated system-wide hazard resolution process, 3) specify the sources of, and the mechanisms to support, the on-going identification of hazards, 4) define the process by which identified hazards will be evaluated and prioritized for elimination or control, 5) identify the mechanism used to track to resolution the identified hazards, 6) define minimum thresholds for the notification and reporting to oversight agencies of hazards, and 7) specify the process by which the rail transit agency will provide on-going reporting of hazard resolution activities to the oversight agency.

44.     The CFR Require the transit agency to develop a **Corrective Action Plan** for the following occurrences: 1) results from investigations in which identified causal and contributing factors are determined by the rail transit agency or oversight agency as requiring corrective actions; and 2) findings from safety and security reviews performed by the oversight agency. Each  corrective action plan must identify the 1) action to be taken by the rail transit agency, 2) the schedule for its implementation;  and 3) the department responsible for its implementation. Furthermore, The corrective action plan must be reviewed and formally approved by the oversight agency.

### 49 CFR §659.25 Annual Review of System Safety Program Plan

45.     The CFR  requires an Annual Review of System Safety Program Plan.  The annual review of the  system safety program plan also requires that if there is any modification to the SSPP the modifications require review and approval and after the modification is approved, the oversight agency must issue a formal letter of approval.

### <u>Defendants Exhibits Do Not Constitute A Study</u>

46.    The below chart is a summary of a review of defendant's documents claimed to be a study. None of the documents meet the criteria of proper transportation safety study, pursuant to the CFR, SSPP, MIL 882 or a good and accepted engineering mass transportation practices and procedures standards of care. The Exhibits referred to below are Defendants exhibits. There is a brief Description of the document, and the summary basis why the document is not a study. The full description of why the document is not study is attached as Appendix A.

| Exhibit | Document description | Summary Basis |
|---|---|---|
| D | 2 page document, dated May 11, 1999 comments from Office System Safety (OSS) about potential challenges, re: platform edge guards/fencing (fixed rail) | Does not reference a study, analysis or data relied upon. This document notes challenges that have to be designed for and have successfully been met in other systems in both Europe and Aisa and South America.  just an outline of some station design issues which will have to be met. Nothing identified as a challenge could not be met by the engineering firm which did the installation or that has not been handled in other systems with Platform Barriers |
| F | One Page letter, dated June 16, 2000, from Office System Safety (OSS) to member of the public, rejecting  suggestion for Safety Gate System | Does not reference a study, analysis or data relied upon. Rather a conclusory statement. Ignoring the requirements of the SSPP and the CFR to conduct a hazard assessment,  hazard classification and hazard  resolution. |
| G | Two page letter dated April 19, 2002, from OSS to member of the public, as to Subway Safety Gate System- stating that the gates are not feasible. | Does not reference a study, analysis or any data relied upon. and ignoring the requirements of the SSPP and the CFR to conduct a hazard assessment,  hazard classification and hazard  resolution. Furthermore, there is no comparative analysis done as to the current RAC(1A) High Hazard and the system gates proposed. |
| I | Report from DMHM +HARRIS, dated July 18, 2007, Re: installing Platform Edge Doors ("PEDs") in | The report lists pro's and concerns as to the installation of PED's and recommends that the PED's be |

| | | |
|---|---|---|
| | Four subway stations, the 96th, 86th, 72nd and Lexington/63[rd] Street subway stations in the Phase I of the Second Avenue Subway. The report Concludes that PED's are used extensively in both Europe and Asia and have been in use  Russia since 1963 and provide a safer platform for passengers and transit workers | cancelled due to project delays on the 2nd Ave. Subway. This report does not Does not reference a study, or any data relied upon. There is no comparative analysis done.  This report also fails to comply with SSPP §§ 6 and12; Section 5.2.6 of the document violates the SSPP with 49 CFR§ 659.37 and with MIL 882E. |
| K | Metropolitan- Railways Committee ("MRC") of the International Association of Public Transport ("UTIP") Platform/Track Protection Systems Report dated October 2009. This report concludes that platform/track protection devices work, with deaths going down to zero, operational delays going down to zero, and sick days going down to zero.  Furthermore, PSD's have been successfully retrofitted into systems including Hong Kong, Barcelona and Paris | This report is a survey of different systems that utilize track protection systems, there is no comparative analysis done, nor data.  The report also does not comply with SSPP §§ 6, 12.3; with 49 CFR§ 659.37 and with MIL 882E |
| M | Trip report conducted by the NYCTA in January 2010, to evaluate PSDs installed at no cost (as could have been done in the NYCT subway system, see, Def. Ex. VV P. 28) in the Seoul Metropolitan Rapid Transit (SMRT) System | This report stemming from a trip to Korea to evaluate PSD's found that PSDs were reliable and effective (P. 1) and that there is sufficient merit to warrant a more thorough review and start a pilot plan to start testing and evaluation for the NYCT subway system (P. 2).  This report is a review however, there is no comparative analysis done, nor was a study conducted. |
| N | Memorandum from Tony Abdullah (Support Operations, Rail Control Center) to Chief Transportation Officer, Rail Control Center, dated Feb. 12, 2010, as to the Jan. 2010  trip to Korea to examine the PSD's. This confirms PSD's reduce deaths from 22 to Zero and are effective and safe. The Trip was termed a | This research and recommendation confirmed the appropriateness of PSD's, that the PSD's reduce the safety performance indicators (SPI's) down to zero and that they PSD's should be pursued further.  There was no comparative analysis done, nor was a study conducted. |

|  | | |
|---|---|---|
|  | success, and he recommended a "proof of concept" (pilot) to begin PSD installation | |
| O | Email from Glenn Lunden (Senior Director, Subway Operations Improvement) dated Nov. 3, 2010 with the subject "Plat Door Task Force Kick Off Meeting," Discusses that the Transit is pursuing PSD | The Transit Authority will be issuing an RFI and developing a Concept of Operations (ConOps). This Email is not a study, nor was a comparative analysis conducted |
| P | Request for Information (RFI) 10RFIN44 Dated March1, 2011. This RFI is a request for information from firms seeking to pursue the installation of a platform edge gate system. | This is not a study nor a comparative analysis. |
| S | This is the ConOps for Platform screen doors, dated Aug. 9, 2011. This document concluded that the installation of PSD's has always been successful and improve safety, and security and are becoming common in Europe and Aisa as well as the Unites States for Airport people movers (such as the AirTrain to JFK) (P 1). | This is not a study, nor a comparative analysis, nor don't provide data for any of the conclusions. This document indicates that the Transit Authority is seeking, from prospective PSD suppliers, a platform door system and recommends that a pilot program approach be taken, The Pilot was never implemented. |
| T | This 3 page document dated Oct. 6, 2011, is a summary of the RFI responses submitted to the NYCTA. The Transit Authority selected 4 out of the 9 responses from companies, including Faiveley, (a company has installed thousands of PSD already) who said they could install and maintain the platform screen doors for free under a BOT (Build Operate and Transfer Agreement). | This is not a study rather a summary of submissions to the RFI. This document indicates that the Transit Authority received RFI responses from prospective PSD suppliers, and that the transit authority selected 4 of them, including Faiveley who was willing to install the PSD's on a BOT term. However, to date the first step in the installation, a pilot program, has never been done. |
| U | A 2 page Memorandum from Thomas Prendergast, President of NYCT, to Michael Horodniceanu, President of MTA Capital Construction, dated Dec. 12, 2011. This confirms that a PSD Pilot is the next step in installing PSD's. | This is not a study, nor does it purport to be a study. There is discussion as to a pilot program. However, to date the first step in the installation, a pilot program, has never been done. |

| | | |
|---|---|---|
| X | One page cover to a meeting of the committee on transportation discussing deaths on the subway track from train strikes | This is not a study, nor does it purport to be a study. It does establish that the Transit authority knew that there existed a RAC(1A) High Hazard, which required immediate corrective action according to the SSPP and CFR. |
| Y | Customer Contact With Train Incident Report, dated January 2013. Confirms that the systems in Paris, London, Hong Kong, Tokyo and Sao Paolo are being retrofitted with platform edge devices. (P. 27). This also lists help points, subway signs and safety saying on the metro cards, and lapel buttons as the transits safety campaign. | This is not a study as there is no hazard analysis, nor is there a comparative analysis, nor does it provide any corrective action plan or hazard resolution. It does establish that the Transit authority knew that there existed a RAC(1A) High Hazard, which required immediate corrective action according to the SSPP and CFR. |
| Z | This is a 4 page document dated Feb. 19, 2020, titled a summary of conclusions on system wide PSD's. STV, the Transit Authorities consultant recommended a PSD Pilot on the "L" line , which was cancelled by the NYCTA. Thereafter, another PSD (Pilot) at Pelham Parkway Station in The Bronx. Was recommended and the NYCTA asked that STV look at an PSD on the 3rd Avenue Subway, which was also cancelled in June 20187 (see P. 1). Thereafter STV was tasked with a system wide feasibility study, with an emphasis on the ADA, but using a standard greatly in excess of any ADA standards in effect. | This is not a study as there is no hazard analysis, comparative analysis, nor does it provide any corrective action plan or hazard resolution. Furthermore, STV utilized requirements greatly in excess of the ADA requirements, and also the marked of stations as infeasible, when Defendants were well aware, that by simply moving the stopping position of the train, that the station would be ADA compliant, which would change the station to feasible. There was no study as to structural integrity of the platform, which could have been shored up as was done in the Paris Metro. As well as marking a whole station as infeasible, when it could only have been one platform that was declared non-compliant. |
| AA | This 2 page document dated August 17, 2015, discusses the kick off meeting of the platform screen door pilot project | This does not purport to be a study, nor is there a comparative analysis, nor does it provide any data for any of the concerns that it lists. Defendants violated their very own SSPP and the CFR by shutting down the pilot project which was supposed to lead to a system wide installation of platform screen doors. The Defendants canceled the PSD Pilot not once but twice. |

| | | |
|---|---|---|
| BB | International Research Project re: PSD's, conducted by STV's dated, September 21, 2016. This document supports the conclusions found in the UTIP report from 2009 (Ex. K), the conclusions found in the NYCTA's own report from Jan 2010 (Ex. M), and my own conclusions that PSD's eliminate customer contact with trains and improved train operations. The report also recommended a Pilot program which NYCTA canceled. | This does not purport to be a study, nor is there a comparative analysis, nor does it provide any data for any of the concerns that it lists. The UTIP does not list a single concern as to dragged passengers in their report/ Furthermore, it does not comply with SSPP §§ 6 and 12; with 49 CFR§ 659.37 and with MIL 882E |
| CC | One page Email from Ken Mooney to Kevin Coughlin, dated Jun. 7, 2016, which confirms that that there is no possibility of a drag with PSD. | This email notes challenges that have to be designed for and have successfully been met in other systems such as Paris. No study referenced or data, just an outline of some station design issues which will have to be met. Nothing identified as a challenge could not be met by the engineering firm which did the installation or that has not been handled in other systems with Platform Barriers |
| DD | One page Email from Mark Bienstock to Eric Jones, dated Aug. 25, 2016 regarding Platform Screen Doors pilot and deferring the pilot Platform Screen Doors. | Violates SSPP, 882 and CFR as well as good and accepted engineering practices because it does not take immediate corrective action of a RAC(1A) High Hazard. |
| EE | Email from Cheryl E. Kennedy, OSS, as to platform edge doors dated August 14, 2017, where the OSS uses, albeit incorrectly, the Mil Standard 882E to identify potential hazards | This email does not qualify as a study as there is no data backing the suggested hazard identifications. Furthermore, the UTIP report, (Ex. K), and the Transit Authorities own Trip report Ex. M directly contradicts the hazard identification as to customer being dragged is a hazard. Nor does this report have comparative analysis, between the current standard, no safety devices, vs. the hazard presented with Safety devices, nor is there any corrective action plan. |
| GG | One page memo from Don Willemann dated April 5, 2018 as | Does not purport to be a study. |

| | | |
|---|---|---|
| | to the costs for installation of the PSD at the 3rd Ave "L" station | |
| HH | Email from Eric Jones to Peter Gillespie dated Jun. 4, 2018 re: Cancellation of PSD Pilot at 3rd Ave. Station, | Does not purport to be a study. The Transit Authority by cancelling the 3rd Ave. PSD pilot, has gone against their own recommendations and their consultants' recommendations. Further, this violates SSPP, 882 and CFR as well as good and accepted engineering practices because it does not take immediate corrective action of a RAC(1A) High Hazard. |
| II | One page report of approximate costs for platform edge barriers, undated. | Does not purport to be a study. Nor is there data backing the suggested numbers. |
| JJ | STV's Report on feasibility of Platform Edge Barriers for "B" service stations dated May 17, 2019. | This report does not purport to be a study rather it confirms that Transit has cancelled previously recommended PSD Pilot projects (P. 3) There was no study as to structural integrity of the platform(s), which could have been shored up as was done in the Paris Metro. STV also wrongly marked a whole station as infeasible, when it could only have been only one platform that was declared non-compliant. STV also wrongly marked a whole station as infeasible, when the moving up of the train stopping point would have made the station feasible, even based upon incorrect ADA criteria. There is no comparative analysis, nor does it provide any corrective action plan or hazard remediation. |

## Additional Notes

47.     Defendants Ex. EE purports to be a Hazard Analysis, and notes that it was supposedly conducted in accordance with Mil. Standard 882E ("882"). Putting aside that a review of this memo makes clear that only lip service was paid to 882 and it was not complied with, even a cursory review notes the following: NO studies or tests or pilot projects were

performed that form the basis for this memo.  The speculative concerns are not based on actual study, actual testing and there was no pilot project ever conducted, and no corroborative or supporting factual basis for these guesses.

48.    The lack of frequency or probability of the supposed hazards are extremely low: 1 of the possible scenarios is marked "improbable", 7 of them are marked "remote" and 5 marked "occasional". NONE of these possible scenarios is noted as being "frequent", which is the current and past state of the subway system as is; 12-9s/CWIs are frequent catastrophic High Hazard occurrences – track intrusions take place 3-4x/day and death or catastrophic injuries caused by contact with trains occurs 3-5x/week. Even if this speculative, unsupported, untested, not studied memo was actually correct (it is not), because the frequency or probability of occurrence is so low down the Risk Assessment Criteria Chart in comparison with the frequency of 12-9s/CWIs, that pursuant to 882E, and the hierarchy of safety, the PSDs are safer and more effective and will prevent or reduce frequent High Hazards with catastrophic injuries, and as such are preferable to the improbable or remote or occasional risks noted in the memo. The memo also notes ways to minimize these unlikely events from occurring; they are fixable. Significantly, the author of the memo, Ms. Kennedy, admits in her deposition that the main cause of "drags" is operator negligence. (Ex. 17, Kennedy, P. 210:5-11).

49.    Moreover, the main concern raised in the memo is that of the possibility of a customer being "dragged" due to the PSDs.  As admitted by Kevin Mooney in his email to others at the NYCTA, "there is no possibility of a drag with PSD." Def. Ex. CC.  This confirms that the speculative concern voiced in the memo is an unsupported and false concern.

50.    More troubling are the OSS Comments on the 14th Street Union Square Fixed Platform Barriers memo (Ex. 72 Bates No. NYCTA_2_00001395-00001396); there is no

pretense of this being a Hazard Analysis – hence the name of the document. While it notes some safety benefits to fixed guard rails in preventing customers on platforms from being contacted by a train, it is not a study, it is not an analysis, it is not a pilot project, and it fails to provide any factual data (based on actual incidents involving the use of these fixed guard rails) to support its uncorroborated and unsupported speculative "comments".  It also ignores Kennedy's admission that the main cause of drags is train operator negligence. (Ex. 17, Kennedy, P. 210:5-11). Significantly, Defendants have had fixed guard rails in place at certain stations for over 100 years; if these safety devices were actually hazardous, why then hasn't the TA removed them? Indeed, the Transit Authority was contracting to put in fixed guard rails into the Canarsie subway line to reduce the number of 12-9s/CWIs. (Ex. 40). Additionally, the Comment notes injuries that are actually attributable to excessive "gap" spaces between the platform edge and the door sill of the train cars; the Defendants exceed the ADA requirements in this regard.

51.     As part of Defendants' irrational and unreasonable "one size fits all approach" to a system that is not uniform, Defendants note that certain safety devices or measures may not prevent all 12-9s/CWIs and that is their excuse for failing to take corrective action.  Defendants similarly speculate as to other unproven, uncorroborated, untested and not studied supposed hazards that might occur if actual corrective action is taken through installation of safety devices or use of safety measures, such as those noted herein and in my report.

52.     Both of these approaches is part and parcel of Defendants' abject and blatant violation of 882, their SSPP, the CFR, the FTA Guidelines and good and accepted engineering and mass transportation practices, protocols, and professional standards of care. "1A" High Hazards must be corrected or accepted; Defendants claim that these frequent catastrophic incidents are unacceptable, that even the loss of 1 life or 1 limb is too much and is unacceptable,

and therefore, these hazards must be corrected to the extent possible and reasonable.  Because saving even 1 life or 1 limb from any of these safety devices or measures is worthwhile and necessary, the Defendants' approach of essentially doing nothing or taking clearly ineffective measure is unconscionable and in violation of 882, their SSPP, the CFR, the FTA Guidelines and good and accepted engineering and mass transportation practices, protocols, and professional standards of care.  As noted above, even if there are unintended adverse consequences to this hazard remediation, if they are less frequent, even if the same level of injury, Defendants are required to trade a frequent catastrophic event for an improbable or remote or occasional event.  Reducing the number of catastrophic events is both required and desirable.  Allowing the number of catastrophic events to increase, is a violation of standards and is not desirable.

53.    Gauge: Defendants inexplicably do not seem to understand what "heavy rail" means and refers to. Heavy rail refers to the weight of the rail per foot. Both freight and commuter trains operate on heavy rail, and they frequently share these rails with private entities using them. Most freight carriers are private. NYCTA/MTA subway trains also use heavy rail.

**Reconstruction**

54.    Based on my education, training, experience and knowledge, I am familiar with good and accepted  accident/crash reconstruction and engineering techniques and methodology that comply with professional standards of care. I have performed numerous prior reconstructions, and reconstructions involving the use of NYC Subway trains, and such trains having contact with people, and I am competent and qualified to do so. I performed such an analysis and reconstruction for this matter.

55.     Sight distance: I have reviewed the schematic diagrams for the subject station, including the tracks in the tunnel leading to the station. I have personally ridden on this train and

reviewed a video of a train entering the subject station in the direction it was traveling at the time it severed Ms. Harger's limbs.  I have reviewed photographs of the station, its track and tunnel. The video and the pictures fairly and accurately depicted these areas.  I reviewed pertinent investigatory records from the Defendants and the NYPD about this incident, as well as deposition transcripts of the parties, the Detective that investigated this incident and obtained Ms. Shabazz's statement at the scene and at the time of this incident, and an eyewitness, as well as the "911" call records.  I have performed objective testing at this very station for this train to accurately determine distance, sight lines and speed. The distance, sight lines/views and speed noted in my report are accurate and correct.

56.    Stopping distance: The TA/MTA published their Specifications For Furnishing and Delivering Passenger Cars for the New York City Transit System, which contains Sec. 3.3.3.C., entitled EMERGENCY BRAKING, providing in pertinent part:

57.    Under emergency braking conditions, any size train shall maintain as irretrievable braking rate at car weight AW3 on open level tangent track as follows: Average Deceleration - 3.2 mph/s(5.16 Km/h/s), and notes Average Deceleration = initial speed divided by time from BRAKE signal to time of stop.   (Ex. 23 P 3-4).

58.    The stopping distance formula used was one created, kept, published and used by the Defendants; it is their formula. It was not obtained from Wikipedia. My calculations and basis for them and noted in my report were correct and accurate, and my methodology was proper.

59.    Based on the actual facts, my knowledge, education, training, and experience, using good and accepted  accident/crash reconstruction and engineering techniques and methodology that comply with professional standards of care, I performed a fair and accurate

27

reconstruction of this incident. My report fairly and accurately sets forth how I did so, and my conclusions are correct. Ms. Shabazz should have seen and was able to see Ms. Harger's body laying on the tracks well before the train ever entered the station; Ms. Harger was visible and there to be seen, and able to be visualized well before the train entered the station, as noted in my report. Factoring in proper operator response times, the speed of the train, the distances, in the exercise of normal and reasonable care, Shabazz could and should have been able to stop her train before coming into contact with Ms. Harger.

60.    Ms. Shabazz's negligence with respect to the operation of the train was a substantial factor, a proximate cause, of this incident and Ms. Harger's catastrophic injuries, along with the negligence of the TA/MTA as noted above and in my report.

## Conclusion

61.    As noted above, the conclusions/opinions and facts contained in my report (Defendants Ex. VV), which are incorporated through reference as if set forth herein at length and under oath subject to and pursuant to penalties of perjury,  and herein, that detail Defendants' acts and omissions, which constitute multiple violations of good and accepted engineering and mass transportation practices, procedures, protocols and professional standards of care, the CFR, US Mil. Standard 882, FTA Guidelines, and Defendants' SSPP, are all made with a reasonable degree engineering and mass transportation certainty, and are based on my knowledge, education, training, experience, study, research, and review of the voluminous records, deposition transcripts and exhibits, and were jointly, severally and individually, substantial factors and proximate causes of Ms. Harger's injuries; her severed arm and leg. But for the Defendants' negligence, this incident would not have occurred and Ms. Harger would not have been unnecessarily harmed.

I have read the foregoing, and it is true and made under penalty of perjury.

Dated: January 17, 2024

By: _____
Carl Berkowitz, Ph.D., PE