# ROTH & ROTH, LLP
192 LEXINGTON AVENUE, SUITE 802, NEW YORK, NEW YORK 10016
ROTHANDROTHLAW.COM T: (212) 425-1020 F: (212) 532-3801

October 13, 2025

**VIA ECF**
Hon. Frederick Block
Senior United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East, 1214 South
Brooklyn, New York 11201

    Re:   *Da Silva* v. *NYCTA, et al,* 17-cv-4550 (FB)(VMS)

Honorable Sir:

    Plaintiff Luisa Harger Da Silva claims that defendants were negligent and breached their nondelegable duty to take reasonable care, through any of a number of available measures, to properly safeguard their customers from the hazard of train strikes. Train strikes resulting in fatalities or serious injuries have occurred three to five times per week for decades. Plaintiff also claims that the train operator was negligent in her operation of the train. Plaintiff claims that defendants' negligence was a proximate cause of her being struck by the train, which severed her left arm and left leg. Defendants have asserted affirmative defenses, including qualified immunity, with respect to their failure to take any of these claimed safety measures to prevent or reduce the number of train strikes and the severity of the injuries sustained.

    Plaintiff respectfully submits this letter pursuant to this Court's instruction at the October 7, 2025 pretrial conference to address the admissibility of key evidence for trial, all of which was produced by the defendants. This letter addresses nine categories of probative evidence that defendants have objected to; and exclusion of two categories of prejudicial evidence. Defense counsel has advised us that they agree that post accident reports/records are inadmissible; plaintiff is not briefing this issue. However, because defendants have claimed that installation of platform barriers prior to the accident was infeasible, under Fed. R. Evid. 407, their actual installation of fixed barriers throughout the system since January 2024, is admissible to prove feasibility.

**I.   EVIDENCE PLAINTIFF SEEKS TO ADMIT OBJECTED TO BY DEFENDANTS**

    **A.  911 Call Recording of a percipient witness who saw plaintiff fall on the tracks before the train entered the station (FRE 803(6), 803(1))**

    Plaintiff moves to admit the NYPD's "911" call recording of witness "Jodi" (Exhibit 102). The recording establishes Ms. Da Silva fell onto the tracks *before* the train entered the station,

1

directly contradicting train operator Shabazz's claim. The caller's descriptions, made while perceiving the event, are admissible as present sense impressions and excited utterances. *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006); *United States v. Mejia-Valez*, 855 F. Supp. 607, 614 (E.D.N.Y. 1994). The recording qualifies as a routinely kept record by emergency services under FRE 803(6). *United States v. Smothers*, 652 F. Supp. 3d 271 (E.D.N.Y. 2023).

### B. CoMET, UITP and Banedanmark Safety Reports (FRE 803(17), 803(18), 801(c)): Industry Standards

Plaintiff moves to admit benchmarking reports, data publications, safety reports, surveys and other records published by CoMET and UITP (Exhibits 24, 40, 67, 84, 107, 130, 131), and the Banedanmark Study on Platform Edge Safety (Ex. 66). All reports predate the August 2, 2016 accident and were kept by defendants in the regular course of their business. The reports establish defendants' notice and knowledge of: the hazard of train-strikes; industry standards to prevent or reduce the number of people killed or injured by this hazard; proven corrective actions; and that since the 1980s, Platform Screen Doors virtually eliminated such incidents in systems that installed them.

Numerous current and former executives and high-level employees testified that the NYCTA was a founding and active member of CoMET and UITP, that CoMET and UITP are "premier international professional trade industry groups" whose publications are "authoritative", are "benchmarks", their published data is "accurate", and were kept, used and relied upon by defendants, who also contributed data. The Banedanmark study (Ex. 66) complements the CoMET and UITP evidence by providing detailed technical analysis of the same safety technologies, references CoMET data, documents international consensus that "Platform doors are, by far, the most common solution," recognized "since the 1980s" as virtually eliminating track intrusions, and includes a case study of New York's subway system (Section 8.7).

These reports are admissible to establish defendants' constructive notice of safety hazards and available protective measures. *George v. Celotex Corp.*, 914 F.2d 26, 29 (2d Cir. 1990) (unpublished report admissible to show what manufacturer "reasonably should have known had it conducted its own tests or been in contact with others in the industry"); *Gonzalez v. Digital Equipment Corp.*, 8 F.Supp.2d 194, 197-98 (E.D.N.Y. 1998) (internal materials of other manufacturers admissible as non-hearsay to establish notice of potential dangers); *Bellinger v. Deere & Co.*, 881 F.Supp. 813, 818 (N.D.N.Y. 1995) (manufacturing and safety standards relevant to show "overall awareness and concern for safety among engineers"). The reports also qualify as business records under FRE 803(6) because defendants received, maintained, and relied upon them in regular business operations. Under FRE 803(17), these reports constitute published compilations "generally used and relied upon" by major transit systems. *King v. Wang*, 2021 WL 5232454, at *14 (S.D.N.Y. Nov. 9, 2021). Under FRE 803(18), key findings may be introduced as learned treatises. *Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000). Defendants are estopped from challenging reliability of data they contributed to, used, relied upon, deemed accurate and authoritative. The probative value substantially outweighs any potential prejudice under FRE 403.

### C. NYCTA Speed Policy and Failure to Study Reduced Entry Speeds (FRE 401, 402, 403, 801(d)(2), 803(6), 803(3))

2

Defendants claim qualified immunity for their speed policy, which directs trains to enter subway stations at Maximum Attainable Speed (MAS) policy (Ex. 37). Plaintiff claims that the defendants' train negligently entered the station at an excessive rate of speed, and moves to admit evidence of this policy, and evidence that NYCTA received notice and requests to reduce the entry speed of trains into stations to reduce the number of customers killed or injured by train strikes. [FRE 803(3) & (6); 401, 402, 403]. The MAS policy causes trains to enter stations at an excessive speed, which directly increases the stopping distance and time, thereby decreasing the ability of a train operator to stop the train before striking a person on the tracks, a proximate cause of the train running over Ms. Da Silva, at Atlantic Avenue-Barclays Center station on August 2, 2016.

Plaintiff claims that defendants had a nondelegable duty to exercise reasonable care and take reasonable measures to safeguard their customers from the hazard of train strikes, including the speed of trains entering stations. Plaintiff claims that defendants do not have qualified immunity for the MAS policy because they failed to perform an adequate study. Under *Martinez v. NYCTA*, 203 A.D.3d 87 (1st Dep't 2022); *Pedraza v. NYCTA*, 203 A.D.3d 95 (1st Dep't 2022), qualified immunity requires station-specific, hazard-focused studies. Defendants failed to study: (1) the effects of the MAS entry speed policy on the number of train strikes of customers and the severity of injuries resulting from trains entering at MAS; (2) the effect of reducing entry speeds on the number of people hit by trains and the severity of injuries that would result from reduced entry speeds. Defendants failed to conduct these studies for either the subject station or its subway system, in light of the actual operations, despite their own data showing the frequency of train strikes, resulting in hundreds of injuries and dozens of fatalities every year. There was no study on "how to best prevent or reduce the number of 12-9s" at Atlantic Avenue-Barclays Center station, or system wide. Because defendants failed to conduct such studies, defendants failed to establish a reasonable basis for their MAS policy.

### D. Other Measures & Prior Complaints

With respect to notice of the hazard and proven effective safety measures that plaintiff claims were available to defendants but not taken, Plaintiff moves to admit correspondence from members of the public requesting installation of safety partitions, platform barriers, and track sensors, providing notice to the defendants of the hazard of train strikes and of reasonable and available measures to mitigate this hazard. [FRE 401, 402, 403, 803(3) & (6), 804, 807]. Defendants do not object to admission of the records themselves but contend plaintiff must also introduce all of defendants' responses, which are in their possession, to all such complaints. This contention is without merit—defendants are free to introduce their responses, if they wish, but plaintiff has no obligation to do so.

### E. Contact With Individuals (CWI) Chart (FRE 401, 402, 1006)

Plaintiff moves to admit the Contact With Individuals (CWI) "strike list" chart (Ex. 101) covering incidents from 1987 to 2016. This chart summarizes approximately 5,000 incidents in which trains came into contact with individuals on or near the tracks. Defendants object to admission of the entire chart, claiming some incidents are dissimilar to this case. This objection is meritless. Defendants themselves categorize all such incidents under the single umbrella category of "Contact With Individuals" in their own business records, reports to the PTSB and FTA, and

3

international industry groups for publication in their publications. NYCTA does not distinguish whether the person was on the platform or tracks, or what preceded the strike, whether medical emergency, trip and fall, push, intoxication, or suicide. Having tracked and reported all train strikes as a single hazard category for decades. Defendants cannot now object to their own classification. The chart establishes defendants knew the numbers of people struck by trains, and the number of resultant fatalities. The probative value substantially outweighs any potential prejudice under Rule 403. This same chart was admitted into evidence at the *Pedraza v NYCTA* trial, where the two plaintiffs also fell on the tracks and were struck by trains.

### F. Deposition Testimony from Other Actions Against NYCTA

Plaintiff moves to admit sworn deposition testimony from other actions against Defendants (Exhibits 134-138). These depositions have been sent to defendants, and are admissible under Fed. R. Civ. P. 32(a)(8), Fed. R. Evid. 801(d)(1)(A), and Fed. R. Evid. 613. Rule 32(a)(8) allows use of depositions from prior actions involving the same subject matter between the same parties or representatives, construed liberally for fairness and efficiency *FHFA v. Merrill Lynch*, 2014 WL 798385 (S.D.N.Y. Jan. 15, 2014); *Kreitman v. Fla. Dep't of Corr.*, 2020 WL 12188711 (N.D. Fla. Nov. 30, 2020). Here, prior depositions involve virtually identical issues of subway safety, and NYCTA practices, with NYCTA represented by the same counsel, and motivated to cross-examine, satisfying the "same parties" prong. *S.W. v. City of New York*, 2010 WL 4791712 (E.D.N.Y. Nov. 18, 2010); *Coan v. Dunne*, 2019 WL 1976146 (D. Conn. May 3, 2019). Such testimony is also admissible as prior inconsistent statements under Rule 801(d)(1)(A) or for impeachment under Rule 613 if witnesses testify inconsistently at trial. Plaintiff seeks admission to address credibility and systemic issues without redundant discovery, promoting efficiency.

### G. NYCTA System Safety Program Plan (FRE 803(6), 801(d)(2))

Plaintiff moves to admit NYCTA's System Safety Program Plan ("SSPP")(Ex. 76), created, kept and maintained by defendants in the regular course of business pursuant to (then) 49 CFR 659. The SSPP is admissible as a business record under FRE 803(6) because it is a regularly maintained, agency-wide manual that sets out mandatory procedures and responsibilities for hazard identification, analysis, and mitigation, created and kept as part of NYCTA's routine operations well before this litigation. Section 6 describes the "hazard management process," including identification methods, MIL-STD-882E-based hazard analyses, classification, and resolution protocols, confirming it is a prescriptive operational record rather than a litigation-driven narrative (SSPP §§6.0–6.4). The SSPP is also admissible as an admission by a party-opponent under FRE 801(d)(2), as it reflects NYCTA's own mandatory safety standards and procedures. The document's reliability is further reinforced because defendants' own head of system safety said it was the overarching safety plan for the entire Transit Authority. The SSPP is directly relevant to establish the safety procedures and standards NYCTA was required to follow, including the hazard-analysis procedures NYCTA should have conducted, and their failure to comply with their own mandatory safety protocols regarding the hazard of train strikes.

### H. Email Chain Re: Platform Edge Doors (FRE 801(d)(2), 803(6), 401, 402)

Plaintiff moves to admit the March 2010 email chain discussing platform edge doors for its "L" line (Ex. 23), among other email chains. These email chains are admissible as admissions by a party-opponent under FRE 801(d)(2) because they consist of statements made by high level NYCTA employees acting within the scope of their employment discussing platform safety initiatives. The emails are also admissible as business records under FRE 803(6), as they were exchanged among NYCTA engineers and managers in the regular course of business regarding a major platform door initiative. The email chains are highly relevant under FRE 401 and 402 because it establishes that NYCTA knew platform edge doors were "not an innovation or new technology" but rather an established technology that had "existed for over 15 years" and was designed specifically "to address the issue NYCT has today—safety." Principal Mechanical Engineer Greg Sanchez explicitly stated he had designed platform doors for London's Jubilee Line Extension (1994) and Hong Kong and Singapore metro systems, and that NYCTA had considered them for the Second Avenue Subway and 7 West Extension Line. The emails further demonstrate that in March 2010—over six years before Ms. Da Silva's accident—NYCTA was actively planning to implement platform doors on the "L" line, among others, and had the technical capacity to do so, yet failed to move forward with this proven safety measure that would have prevented her catastrophic injuries.

### I. Photographs of Fixed Rails at Other Station Platforms (FRE 401, 402, 1001, 1002)

Plaintiff moves to admit photographs of fixed rails installed at various subway station platforms *prior* to the August 2, 2016 accident (Ex. 105). These photographs are admissible under FRE 401 and 402 as highly relevant evidence demonstrating that NYCTA had the capability to install physical barriers at platform edges and had in fact done so at certain stations yet failed to install such protective barriers at Atlantic Avenue-Barclays Center station where Ms. Da Silva's accident occurred. The photographs establish that NYCTA recognized the need for physical barriers to protect passengers from falling onto tracks at some locations, demonstrating both notice of the hazard and the feasibility of implementing protective measures. The photographs are admissible under FRE 1001 and 1002 as original photographs or duplicate originals produced by defendants from their own files. The selective installation of protective rails at some stations but not at Atlantic Avenue-Barclays Center station is probative of NYCTA's inconsistent approach to platform safety and failure to conduct station-specific hazard assessments required for qualified immunity under *Martinez v. NYCTA*, 203 A.D.3d 87 (1st Dep't 2022); *Pedraza v. NYCTA*, 203 A.D.3d 95 (1st Dep't 2022). The photographs provide visual evidence of an available and implemented safety measure that could have prevented Ms. Da Silva's catastrophic injuries. The probative value substantially outweighs any potential prejudice under FRE 403.

## II. EVIDENCE PLAINTIFF SEEKS TO EXCLUDE

### A. Defendants' 1976 Braking Distance Chart (FRE 401, 403, 602, 901, 802; FRCP 37)

Plaintiff moves to exclude Defendants' "braking distance chart" (Defendant's Ex. O) created from tests conducted in February 1974 on older train models (R-38, R-42, R-44) that were not in use at the time of this incident. Additionally, the requirements for brakes on the newer trains,

5

like the one herein, has since changed and became more stringent. The chart is irrelevant to the stopping distances of the newer R68 model train involved herein, which was first put into service in 1986, and equipped with a new "dynamic braking system" not present in the 1974-era models tested. Braking distance charts are inherently unreliable because of numerous variables affecting actual stopping distance: train weight including passenger load, slope/grade of tracks, whether tracks were straight or curved, weather and temperature, condition of rails and wheels, coefficient of friction, condition and type of brakes, and operator perception-reaction time. Courts have held such charts inadmissible. *Murray v. Donlan*, 77 A.D.2d 337, 339-40 (2d Dep't 1980); *Dibble v. NYCTA*, 76 A.D.3d 272, 279-80 (1st Dep't 2010); *Seong Sil Kim v. NYCTA*, 27 A.D.3d 332 (1st Dep't 2006). In discovery, Defendants refused to produce the underlying raw data, test protocols, or supporting documentation. Defendants cannot produce any witness with knowledge who can testify about the chart's creation, methodology, or accuracy. Rule 37(c)(1) mandates preclusion for Defendants' willful failure to produce underlying documentation. The chart cannot be authenticated under Rule 901 and constitutes inadmissible hearsay with no applicable exception. Rule 403 requires exclusion because any potential probative value is substantially outweighed by unfair prejudice and jury confusion from false scientific authority.

### B. PTSB Accident Report (FRE 402, 403, 802)

Plaintiff moves to exclude the Public Transportation Safety Board (PTSB) Accident Report (Case No. 13806, Defendant's Ex. N), undated and unsigned, as it contains the inadmissible opinion that "the probable cause of this incident was the medical emergency experienced by the individual," which invades the jury's province on ultimate causation, and is based on multiple levels of hearsay. The PTSB did not investigate this accident; no PTSB investigator went to the scene, examined the train or brakes, or interviewed any witnesses or Ms. Da Silva. The report merely regurgitates a self-serving statement given by Shabazz to NYCTA employees, relayed through multiple NYCTA personnel, and filed with the PTSB. Courts uniformly hold that "no part" of such investigative reports—including purported "factual" portions, may be admitted in civil litigation. *In re Paulsboro Derailment Cases*, 2015 WL 4138950 (D.N.J. 2015); *Chiron Corp. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 941 (D.C. Cir. 1999) (statute "means what it says: No part of the Board's actual report is admissible"). The public records exception applies only to observations by government officials, not secondhand witness accounts. *John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632, 636 (3d Cir. 1977). Public policy strongly supports exclusion to ensure candid reporting, and courts recognize that "attempting to dissect Board reports for factual statements while excising opinions and conclusions is too great" a task. *In re Jacoby Airplane Crash Litig.*, 2007 WL 2746833, at *10 (D.N.J. 2007).

### CONCLUSION

Plaintiff respectfully requests that this Court admit the types of records offered by plaintiff, and exclude the records offered by defendants, into evidence.

Respectfully submitted,

~//s//~
Elliot Shields