UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| LUISA JANSSEN HARGER DA SILVA, | : | 17-CV-4550(FB) |
| Plaintiff, | : | |
| - against - | : | United States Courthouse Brooklyn, New York |
| NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, | : | November 10, 2025 10:00 a.m. |
| Defendants. | : | |

- - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants: LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, New York 10271
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

Court Reporter: Andronikh M. Barna
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2178

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(In open court; parties present.)

THE COURTROOM DEPUTY: Civil cause on trial, Harger Da Silva versus New York City Transit Authority.

I believe all Counsel are present. You can all be seated.

THE COURT: Good morning, everybody. I hope you all had a nice time while I was flying back and forth to California. And we're all here, healthy and ready to go.

Now, we have some logistical problems. I just spoke to the jurors, not about the case, only about their plans. And one of the jurors is scheduled for an operation next Monday. And that's why I wanted to sit tomorrow. But the higher authority said no, and that it would be unpatriotic, and we can't close the court, the courtroom is closed, you can't come. Because of that, we're going to be lapping over into next week obviously now, right? So one of the jurors is scheduled for an operation on Monday. She will have to be excused, and we're going to be going with seven jurors. So that's why we pick a couple more than six so we have that flexibility.

It's the juror who is in seat number --

THE COURTROOM DEPUTY: Number seven, Your Honor.

THE COURT: Number seven. All right? So when she comes in here, I'm going to excuse her and thank her publicly for her service. And I just wanted to let you know that

that's what we have to do.

The others are okay. All right?

All right. So let's bring the jurors in now.

Who do we have as your next witness? Bring him in now so we can have him ready to go.

MR. ROTH: Mr. Jimenez, go up to the stand, please.

Can you hear me, Your Honor?

THE COURT: Yes.

MR. ROTH: I thought before we started, I made a list because there is a lot of exhibits that are going to be used.

THE COURT: Bear this mind: We're on the record now.

MR. ROTH: Okay.

THE COURT: You don't have to say more than you have to say and burden our wonderful reporter having to write everything down. She doesn't have to do that.

MR. ROTH: Do you want to go off the record?

THE COURT: If there's any problem, you let me know, but if there's no problem, let's just start questioning the witness.

MR. ROTH: I have -- there's approximately 40 exhibits.

THE COURT: You want this on the record?

MR. ROTH: Yes.

THE COURT: What is your concern?

MR. ROTH: That there's approximately 40 exhibits that we're going to be entering today.

THE COURT: 40?

MR. ROTH: 40, yes, approximately.

THE COURT: You have them all identified here?

MR. ROTH: Yes, they're all identified. I made a list for you so you can mark. I can hand it up. And none of these are objected to at this time.

THE COURT: Okay. So I have my master list that I am keeping here.

MR. ROTH: And I could hand you a list, the same list, and you can look at it and mark your list.

THE COURT: Is it any different than what I have?

MR. ROTH: Only to the extent that it's going to be -- if you want to circle what is now entered into evidence. It's not different. It's the same, but, you know, because.

THE COURT: Give me whatever you want, but I'm going to use my list as the master list.

MR. ROTH: Do you want me to read the numbers then?

THE COURT: Pardon?

MR. ROTH: Should I read you the numbers?

THE COURT: No, you're going to go off of this list. I have them 1 through 90 -- to 102. That's how I have them identified.

MR. ROTH: Okay. So I don't have to worry about formally entering them into evidence or anything else.

THE COURT: That's why we had this enormous time we spent at our conferences, to avoid exactly that. You have exhibit number, you can refer to it, there's no objection, it's in evidence. Okay?

MR. ROTH: Okay.

MS. WINTERS: Your Honor, just to be clear, we would still like Counsel to publish the document to us before it's moved in because for some of the documents they seem to be moving in only portions of the documents.

THE COURT: I have no idea. All right?

You want to show her anything you want to put in evidence now, let her take a look.

MR. ROTH: I e-mailed it all to her last night, Your Honor, every document.

MS. WINTERS: At 12:30 this morning.

MR. ROTH: That's true.

THE COURT: Just one second. We don't do this. We do not have this type of cross-conversation on the record. All right?

You want to just talk off the record to your adversary?

MS. WINTERS: We spoke off the record, Your Honor. We advised him that we need to be able to review the exhibit

because they are attempting to move in portions of documents whereas we stipulated to the whole document.

THE COURT: If there is any problem, you're not going to introduce those exhibits at all. I expected you to wash all this out between the two of you so we don't have to do what we're doing now.

Let's bring the jurors in. We'll proceed.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: So, good morning, folks.

So I told the lawyers that I spoke to you briefly about our plans. And as I mentioned to you just briefly before you came into the courtroom, we can't sit tomorrow. I was hoping we would be able to do that, but, you know, we're not allowed to do that tomorrow. And the reason why is because I was wanting to try to have the case completed this week. We can't do that now. So it's going to lap over to next week. And maybe Monday, Tuesday it will be finished, you know, the beginning of the week, I suspect. I suspect that I will be giving the case to you folks, you know, maybe Tuesday, maybe Monday. Certainly not later than Wednesday. That's the way I anticipate the case unfolding.

Now, Juror Number 7 has a problem, and I feel badly that we could not accommodate it. We tried our best to get

this done before next Monday, but you have a serious medical issue that requires you to take care of and that takes priority over everything else. So we picked eight jurors because under the law we have to have at least six. So I always pick a few more just in case something like this happens. So, we can go with seven. And the rest of you folks have told me that you're okay; you have to be available next week and for at least part of it, maybe the whole week, but just make sure that you have nothing that's going to interfere with your deliberations once they start because nobody knows, once the clock starts, how long it's going to take. We don't want anyone to be under any pressure because they have some conflict with their personal lives, and all I can do is just tell you about this. You've been excellent jurors.

But in the meantime, I just want Juror Number 7 to make sure that you're going to be properly taken care of on Monday and hopefully everything will work out for you, and I think we all wanted to express our gratitude to you that you have sat during the trial so far and paid great attention. And I don't want you to talk about the case to anybody in this courtroom. You can go home and talk all you want to now because you're being discharged. But make sure that in case you run into any of your fellow jurors, you just don't say anything. Okay?

JUROR NO. 7: Okay.

THE COURT: Thank you very much for your cooperation and for your service to our great country. You can be excused now.

THE COURTROOM DEPUTY: All rise.

(Juror Number 7 excused.)

THE COURTROOM DEPUTY: You can be seated.

THE COURT: All right. Mr. Roth, call your next witness.

MR. ROTH: I call Orlando Jimenez.

(Witness takes the stand.)

MR. ROTH: Mr. Jimenez, before we start your testimony, I would like to play the 9-1-1 call, Exhibit 72.

THE COURT: All right. So this is a 9-1-1 call.

Just one second, let me catch up to you. I think this is November 4th, right?

THE COURTROOM DEPUTY: Should I swear in the witness?

THE COURT: Yes.

THE COURTROOM DEPUTY: I ask the witness, if you can remain seated and if you could just raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Please state and spell your name and keep your voice up.

THE WITNESS: My name is Orlando Jimenez. O-R-L-A-N-D-O, J-I-M-E-N-E-Z.

THE COURTROOM DEPUTY: Thank you, Mr. Orlando.

THE COURT: Now, you wish to offer in evidence the 9-1-1 call?

MR. ROTH: Yes, Your Honor.

THE COURT: What number is that?

MR. ROTH: Exhibit 72.

THE COURT: Exhibit 72.

All right. So members of the jury, as I've told you, you know, we've paid a lot of attention to screening this before so we don't have to waste unnecessary time. And there's a 9-1-1 call, which is not objected to, which I'm going to allow you to hear at this particular time.

You want to lay a little groundwork for us, so the jury knows why he is testifying?

MR. ROTH: Sure.

**ORLANDO JIMENEZ**, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Jimenez, you're here because you're a former train operator for the New York City Transit Authority; is that correct?

A That is correct.

Q And you're a trainer and you were a union representative; is that correct?

A That is correct.
Q And you're going to be offering testimony about the manner in which this accident happened as well as --
THE COURT: Go a little slower.
So what is your connection with the Transit Authority, Mr. Jimenez?
THE WITNESS: Well, I started as a bus operator in 1978.
And then I went, I took a promotional test from bus operator to train operator. Actually then it was motorman, to motorman in --
THE COURT: So you were a prior train operator for the Transit Authority; is that correct?
THE WITNESS: That is correct, yes.
THE COURT: You're retired now?
THE WITNESS: I've been retired for a little bit of time.
THE COURT: And how are you spending your retirement years?
THE WITNESS: Grandkids, camping, wife.
THE COURT: So you were at the train station at the time that this incident happened?
THE WITNESS: No, I was not.
THE COURT: So tell me a little bit about why you are here. You made a 9-1-1 call?

THE WITNESS: No, I did not.

THE COURT: What's your next question?

MR. ROTH: Mr. Logan, can you play the 9-1-1 call?

THE COURT: Just one second. I'm not allowing it in evidence.

MR. ROTH: Mr. Jimenez is an expert. He's an expert train operator.

THE COURT: Why is it that you want to introduce the 9-1-1 call? The person who made the 9-1-1 call is going to be a witness; yes or no?

MR. ROTH: No, no, it's already been admitted into evidence. We're not calling that person as a witness and it was --

THE COURT: Just one second.

So you're saying you want in evidence a 9-1-1 call and there was no objection to it?

MR. ROTH: Correct.

THE COURT: All right. I will let you play it first.

Now I understand that you have nothing to do with that.

Go ahead.

MR. ROTH: Okay.

(Audio played.)

THE COURT: I don't think we need more. That's the

end of it.

(Audio stopped.)

THE COURT: So there was a 9-1-1 call that was made. Okay. Next. Start questioning this witness.

Q Mr. Jimenez, in addition to your work at the Transit Authority, did you work at the NYPD?

A Yes, I did.

Q What did you do at the NYPD?

A I was a telephone switchboard operator, police administrative aide, telephone switchboard operator, and a dispatcher also.

Q And what types of calls did you get regarding the Transit Authority when you were working in the '70s?

A Various kinds. We had sick on the train, we had lost children, we had people who were on the tracks, people who were under the trains. It just varied.

Q Did you have same cases, like, even back in the '70s as like what we have here today? Were you getting calls on those?

A Yes.

Q And then after you left there, you went to the Transit Authority; is that correct?

A That is correct.

THE COURT: A little slower. You have a tendency to talk fast, and we are making a record of everything you say.

You have to slow down and chill out. Okay?

Go ahead. Next question.

Q Why don't you tell us a little bit about your career and the different things you did at the Transit Authority?

A So I started out in 1978. I believe it was July of 1978 as a bus operator. I was there for 18 months. And during the time that I was a bus operator, I had taken a promotional exam to motorman, which became the title train operator.

When I became a train operator, I worked various lines in the B division, which is IND and BMT. And I operated trains, I trained new train operators come -- who were coming after me. That was after a little bit of a period of time of me gaining some experience.

And I also became a union representative with Transport Workers Union. And I represented train operators, conductors, and tower operators for different situations that they happened to be involved in during their course of employment in New York City Transit. I started out as a shop steward, and I rose to the rank of staff representative in that.

Q As a union representative, did you attend conventions and seminars and events?

A Yes, I did.

Q Where you learned about train operations and safety practices used by other transit systems as well?

A Yes. We would go to conventions, we would have seminars, lectures. And we would have different subjects that discussed safety, train operations. It varied, whatever it was. Because there's also air, rail, and other transportation industries involved in, in what the International Union does.

So when we went to those conventions, there was a myriad of discussion about different subjects. But train operation, safety of train operation was also included in that.

Q And so as your position as a union rep and you working with the New York City Transit Authority, you learned about best practices, good and accepted professional practices in the industry related to train operation; is that fair to say?

MR. KEAVENEY: Objection.

A That is fair to say.

THE COURT: You objected?

MR. KEAVENEY: Leading, Your Honor.

THE COURT: Sustained. This is really not somebody you have to cross-examine that's an adverse witness I suspect, right?

MR. ROTH: That's correct, Your Honor.

THE COURT: It's a leading question.

So, members of the jury, when we have somebody questioning somebody who is an adversary, we allow different types of questioning. You can go right to, did you say this,

did you say that. But when we are talking about a witness that's called as a direct witness by the parties, their witness, we don't allow these types of leading questions. We say were you here, explain this, you know, that type of thing. So that's sort of a technical thing that, you know, has been raised right now. But Mr. Keaveney is correct, these are leading questions, and we're going to try not to use them. Okay?

So, go ahead.

Q Were you retained as an expert on this case?

A Yes, I am.

Q And can you tell the jury what work you did on this case prior to today?

A So I reviewed New York City Transit Authority documents involved or related to this case.

I reviewed New York City Police Department documents related to this case.

I read depositions related to this case.

And any other information that was given to me to be reviewed, I would review it. But it was all related to the case.

Q What else did you do as far as going to the site, and to -- going to the scene, and to listening to, like, 9-1-1 calls, et cetera? Can you just elaborate on that?

A So in the summer of 2023, I believe it was August, was my

first visit to the scene as the expert on this case.

And then I did revisit it yesterday.

And I went there and I just looked around to see what was the situation as far as what could be seen, what couldn't be seen, where did the actual accident happen on the station. I observed trains coming into the station, what they were doing. But it's from a perspective of a train operator that I was doing that.

Q And when was the last time you went there?

A Yesterday.

Q And why did you go yesterday?

A Well, I wanted to refresh my memory. And it was -- I wanted to refresh my memory.

And it was interesting because I also went to Seventh Avenue because I rode the train from Seventh Avenue back to Atlantic Barclay's and --

THE COURT: So listen to me. I may interrupt here and ask some questions. I just want to move it along and get to the substance of things, and I know you can probably talk a lot about many things, right?

Ask a direct question that's relevant to this case.

Q Mr. Jimenez, how many times had you driven as a train operator through the intersection approaching this station when you were a train operator?

A Over a hundred times.

Q And what type of train was it that was involved in this incident?
A An R68A.
THE COURT: Have you ever driven those types of trains?
THE WITNESS: Yes, I have, Your Honor.
THE COURT: For many years, right?
THE WITNESS: Well, they came in 1988. Yeah, I guess, for over 20 years.
THE COURT: Over 20 years.
THE WITNESS: Yes.
THE COURT: You know how to drive that train?
THE WITNESS: Absolutely.
THE COURT: Next question.
Q So based upon your review of the evidence, your experience operating this line, your training, have you reached an opinion within a reasonable degree of professional certainty whether the train operator in this matter met the standards of care for a train operator on the date of this accident?
THE COURT: First of all, do you have an opinion?
THE WITNESS: Yes, I do, Your Honor.
THE COURT: Tell the jury what your opinion is.
THE WITNESS: My opinion is that the train operator, Train Operator Shabazz failed to stop the train safely.

THE COURT: And what is the basis of that opinion that you came to? Why do you say that?

THE WITNESS: Because in my 30 years of experience and operating trains and being in situations similar, I have been trained, I have been skilled, I have developed the skills, I have trained myself, I have developed the skills.

THE COURT: Tell the jury why it is you came to that conclusion. What did this person, in your opinion, do wrong?

THE WITNESS: She did not safely stop the train. She did not observe properly. She did not pay attention to what she was doing, nor did she apply a safety -- a standard of safety that was --

THE COURT: Okay, yes, those are your conclusions. Why do you say all that? You can just explain it to the jury, and then you're going to be cross-examined.

THE WITNESS: Okay.

Well, basically, as a train operator you're required to renew your skills all the time. You cannot just get the job, sit down and operate.

THE COURT: Well, how do you know she didn't do that?

THE WITNESS: Because in the same situation from different evidence that I've seen plus what I have observed from the video, from the depositions, reading through the depositions, I saw that she was not really in full sync with

what it was that she was doing, in my opinion.

MR. ROTH: Your Honor.

THE COURT: I just want to give you ample opportunity to explain to the jury why you came to those conclusions. All right? What else were you -- do you want to tell the jurors?

THE WITNESS: So basically I am going to say that as a train operator, you're going to be trying to operate in the safest possible way that you can.

THE COURT: We know that. They're supposed to be safe, right?

THE WITNESS: Well, not only safe, Your Honor. I'm sorry. Not only safe, Your Honor, but you're supposed to be aware. You're supposed to be situationally aware. You're supposed to apply all your skills, and you're supposed to be looking for anything that is on the roadbed or the right of way, all right, that is going to obstruct your or impede your way to travel across those tracks.

THE COURT: Obviously that's a good thing. Now, how did you come to the conclusion that she didn't do that in this case?

Q Mr. Jimenez, did you review documents that lead you to this conclusion?

A Yes. Well, that's what I was trying to say.

THE COURT: You can say it now to the jury.

THE WITNESS: So I reviewed --

Q Mr. Jimenez, can you explain to the jury based on the credible -- discuss the credible evidence --

THE COURT: Answer my question. It's simple. Just tell the jury that you reviewed anything, right?

THE WITNESS: Mm-hm.

THE COURT: And as a result you came to these conclusions?

THE WITNESS: Right.

THE COURT: And the jury wants to hear why you came to those conclusions. Go ahead. I am giving you ample opportunity to explain that.

THE WITNESS: Because it's my belief as a train operator in a similar situation that my reaction would have been very different than hers.

Q Did you have the opportunity to review a video of the train coming into the station?

A Yes.

Q Okay. And would that video help you to explain your testimony to the jury?

A Yes.

Q And is that video a fair and accurate depiction of the way -- of the same -- essentially the same view that the train operator would have had entering the station?

A Yes.

Q And what is that video of, the video that you reviewed?
A So the video is a nostalgia train trip on an R1-type train.
THE COURT: Is this video something that you want to introduce into evidence?
MR. ROTH: Yes, it's Exhibit 76 now that he's --
THE COURT: Just one second.
All right. If it's not objected to, you want that video in evidence now, right?
MR. ROTH: It is objected to.
MR. KEAVENEY: We object to the video. It's not an R46A train.
THE COURT: Just one second.
76 is one out of three videos of train entering the station.
MR. ROTH: Yes.
THE COURT: That's the video you're talking about?
MR. ROTH: Yes.
THE COURT: I don't have any objection to it.
MR. KEAVENEY: We did object do it, Your Honor. It's not the same train. It's a nostalgia train.
THE COURT: Just one second.
According to my list, there's no objection to Exhibit 76.
MR. KEAVENEY: Judge, we certainly did object to

that.

THE COURT: You think this is mistaken?

MR. KEAVENEY: Absolutely.

THE COURT: Members of the jury, we're going to have to talk about this. I don't want you to be here when we talk about it. Just wait in the jury room a little bit. Okay?

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: The jury is not here.

We have to get to the bottom of this because I'm not going to waste time with this now. I went over this carefully with you folks at our pretrial conferences. Number 76, I don't have any objection on the list. Now you're telling me you made a mistake.

MR. KEAVENEY: Judge, I'm not saying I made a mistake. I was certain that we would object to this document.

THE COURT: You're assuming now and you're wasting our time.

MR. KEAVENEY: Judge, we --

THE COURT: 76 is what?

MR. KEAVENEY: 76, to my understanding, is a video not of this train, but of a nostalgia train, a train that was built probably back in the '30s. That is a video of someone taking it from the front windshield or the front window of it, not from the train operator's perspective, but from a

passenger's perspective.

THE COURT: So you want that video in evidence?

MR. ROTH: Yes, Your Honor.

THE COURT: It's not the same as this train, it's a different train, right? All right.

MR. ROTH: Mr. Shields wants to argue the issue.

THE COURT: So this is -- you want this in evidence --

MR. ROTH: Yes.

THE COURT: -- because you want this witness to say this is a basis of his testimony?

MR. ROTH: Yes.

THE COURT: Just listen to me. We're going to allow that with the proper instruction to the jury; this is one of the things you base your testimony on and because of that, it will be offered into evidence for that limited purpose. And you can cross-examine all you want to about that. But I think that's probably fair. He relied upon this to give his expert supposed testimony, and we're going to allow the jury to see what the basis of his opinion was. And you will have a lot of opportunities to question him. It will be limited to that purpose alone. Okay?

What else? Anything else before we bring the jurors back in?

MR. ROTH: Not from me.

THE COURT: That's the only one, just one of those videos is what you're going to be introducing?

MR. ROTH: Yes.

THE COURT: Bring them back in.

MR. ROTH: Logan, do you have it ready to go? Okay.

THE COURT: Make sure it's ready to go.

MR. ROTH: Logan, why don't you put it up and get it started at 1:30 so the jury is not wasting time. Just let it sit at 1:30. Okay? Thank you.

MR. SHIELDS: Can we dim the lights, Your Honor?

THE COURT: Mike will take care of that when the jurors come in.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: You can all be seated.

So thank you for your patience, members of the jury. Sometimes these things happen and we're going to proceed.

So we're going to allow into evidence Exhibit 76, which will be one video. And it's being allowed in evidence for a limited purpose. This is apparently not a video of the same train, but it is going to be allowed by me because the witness said that he relied upon this. This is one of the things he relied upon to prepare to give testimony today. So for that limited purpose, we're going to allow this video, even if it's apparently of a different train, and we'll be

able to have Mr. Keaveney or Ms. Winters question him about it all. But since he relied upon this for his opinion and for his testimony, I'm going to allow you to see what he relied upon for that limited purpose.

Go ahead. Play the video.

MR. ROTH: Your Honor, I think turning the lights down?

THE COURTROOM DEPUTY: Yes. It's down all it can go.

THE COURT: The other way, Mike.

MR. ROTH: There we go.

BY MR. ROTH:

Q So Mr. Jimenez, you have seen this video before, correct?

A Yes, I have.

Q So why don't you tell the jurors what we're seeing at 1:30, 1 minute and 30 seconds on this video. What location is this?

A So this is a 4 track between Seventh Avenue and Barclay's, Atlantic-Barclay's.

Q It's the track leading into this station, correct?

A Into Atlantic-Barclay's, yes.

MR. ROTH: So can we play that until you get to 1:42 and please stop, Logan.

(Video played; video stopped.)

Q So what are we seeing here at 1:42?

And this is -- just to say, this is the same direction of the train operator's view in this case, correct?
A Yes.
MR. KEAVENEY: Objection.
THE COURT: Just one second.
So tell us, this video shows a train coming into a station. So the jury understands what exactly that is, just explain it to them.
THE WITNESS: So it's a view from the middle window of a train. So I'm sure a lot of you have taken trains and have seen, you know, stood at the front of the train and looked out to see where the train is going.
THE COURT: So it's not the same train, but it's a train, which is coming into the station I think is what you're telling us?
THE WITNESS: That is correct, Your Honor.
THE COURT: And it's the view from the inside middle window?
THE WITNESS: That is correct, Your Honor.
THE COURT: That's what you're seeing here?
THE WITNESS: That's what you're seeing there.
THE COURT: Go ahead. Next question.
THE WITNESS: Okay.
Q At this point, can you see -- what do you see, the light in there, what is that at the front of the -- in the middle

of --

A So what I'm seeing at the all inset where the light is, that is the entrance to the station, some people call it the mouth, but it's actually called the entrance to the station.

MR. ROTH: Can we move forward to 1:45, please?

Q Excuse me. And how far back, at this moment, approximately based on your experience as a train operator, about how far back is this photo at 1:42?

A Approximately three car lengths.

MR. ROTH: Could you move to 1:45, please?

(Video played; video stopped.)

Q And what are we seeing here now?

A Here you're seeing, again, the mouth, the entrance to the station and the complete station.

Q So at this point, I know you said car lengths, how many car lengths do we have here from the -- what's the distance from here inside the tunnel to the mouth of the station, the entrance?

A Approximately two at 75 feet on an R68 would be 300 feet -- I'm sorry, 350 feet.

THE COURT: Tell the jurors what you mean by car lengths.

THE WITNESS: Oh. How long the car is.

THE COURT: How long is the car?

THE WITNESS: Each car is 75 feet.

THE COURT: How many cars are we talking about?

THE WITNESS: From -- for the depiction -- for the definition of what Mr. Roth is asking, from here to the entrance to the station, that's two car lengths.

THE COURT: Do you have any idea how many cars were involved in this particular incident?

THE WITNESS: Well, it was an eight-car train with four cars that were involved in it.

THE COURT: And each car is 75 feet?

THE WITNESS: That is correct, Your Honor.

THE COURT: Jury understands.

Go ahead.

Q So from here, what is the point of view that you can see? You said you can see into the station?

A Right. You can actually see to the conductor's position, which is the approximate area of where Ms. Harger was.

Q And how do you know that?

A From --

Q What information did you use to derive that information?

A From reading depositions and from viewing pictures, I'm sorry.

Q So right here, you're 150 feet back, and you would be able to see what? If she was on the tracks, would you be able to see her or not?

A Yes, you would be able to see her on the tracks.

MR. ROTH: Okay. All right.

Can we move just to the entrance of the tunnel?

(Video played.)

MR. ROTH: Stop it there.

(Video stopped.)

Q So now you can clearly see the length of the tunnel, correct? I mean, the length of the station; is that correct?

A Yes.

Q And assuming that somebody was on the tracks, is there any reason why, at that point, that you couldn't -- you wouldn't be able to see a person on the tracks, any reason?

A No, there is not.

MR. KEAVENEY: Objection, leading.

THE COURT: So technically, it's a leading question, but I will allow that. Go ahead.

So you have a vision here, the person would be on the track is your testimony, right? You'd be able to see that person, right?

THE WITNESS: You would be able to see a person on the track from this position, absolutely.

Q When you say on the track, where on the track are we talking about? Where was Ms. Harger?

A Close to the conductor's position about halfway down the platform.

Q And you would be able to -- and from that spot, okay,

what is your opinion, if she was on the track at that spot, what is your opinion or have you formed an opinion as to whether the train could stop under regular braking without striking Ms. Harger?

A Yes, I believe it could.

Q Okay. And so if -- and what about under emergency braking?

A Yes, definitely.

Q And the evidence that you've seen in this case, what other evidence are we talking about? You said the deposition testimony. Did you see police reports?

A Yes, I did.

Q Did you see pictures showing sand on the tracks?

A Yes, I have.

Q And those pictures and those police reports led you to the -- what information?

THE COURSE: As a result of looking at those pictures, does that reinforce your testimony in any respect? He's asking you whether you saw the police report and pictures, right?

THE WITNESS: Yes.

THE COURT: And he asked you that for a reason, I assume, right? Is there anything about those pictures that you want to tell the jurors or the police report that supports your testimony?

THE WITNESS: Well, the pictures show the location of where Ms. Harger was. And judging from the distance from different points coming into the station, it would give me an idea of how a train could stop, how long it would take a train to stop, from my experience as a train operator.

So yes, it gives me a clear indication of what it is that is going on while the train is being operated.

THE COURT: So basically on all of this, the deposition testimony and the police reports, you saw pictures, you have the video now, that your opinion is that the plane -- the train could have stopped before striking the Plaintiff, right?

THE WITNESS: Absolutely.

THE COURT: Next question.

Q But could you just explain the difference between emergency braking and regular service braking, since I brought it up?

A So emergency braking is when a train operator takes a train and releases all the air in the brake system, and now the train is basically braking itself. There's no control anymore for the train operator to manipulate or use the brakes on a train.

When you're doing normal service braking, you're braking within a range. The train operator has the control to bring the train to a controlled stop, and that controlled stop

could be in certain distances. It could be shorter, it could be longer, but it's a controlled stop based on what the train operator does with the brake handle and how he applies the brakes to the train. Or she.

Q Why don't we take the train --

MR. ROTH: Logan, take the train -- take the video.

Q And Mr. Jimenez, why don't you tell Logan when to stop the video to show approximately where Ms. Harger was on the tracks based on your review of the evidence?

MR. ROTH: Logan, you can run it.

(Video played.)

A There.

(Video stopped.)

Q And when you say there, so what location are you indicating?

THE COURT: Can you identify for the record where it stopped? Maybe there's a way, in case the jurors want to see this again.

MR. ROTH: What's the time on that, Logan?

MR. MORALES: 1:56.

MR. ROTH: 1:56 at the video.

Q Using the columns, can you tell the -- columns or staircases or any other information that you have, any other landmarks on this video where she was, approximately?

A You know, I'm sorry, Mr. Roth, and Your Honor, I'm sorry,

I don't have my glasses. Can I go get my glasses?
THE COURT: Would you like to borrow mine?
THE WITNESS: I hope they're strong enough.
THE COURT: These are hearing aids, by the way.
What do you need? Do you want to put the light on?
THE WITNESS: No, I just need to -- because I can't focus on the -- I'm sorry, Your Honor.
THE COURT: You don't have to apologize.
THE WITNESS: Okay.
Oh, much better.
THE COURT: All right. Can you see better now?
THE WITNESS: Much better, Your Honor. Thank you.
Let me see. No, go further, Logan. I'm sorry, go further.
MR. KEAVENEY: Objection. It's supposed to be the witness saying where it stopped.
THE WITNESS: Well, I'm looking for something and --
THE COURT: One second.
What is it now that you're looking for?
THE WITNESS: Well, I'm looking for -- okay. Thank you.
I'm looking for the elevator.
THE COURT: All right. Go ahead.
(Video played.)
THE WITNESS: Stop.

(Video stopped.)

THE COURT: Now, when you stop, identify for the record where you're stopping.

THE WITNESS: 1:58.

THE COURT: 1:58?

THE WITNESS: Yes, Your Honor.

THE COURT: What is your question of the witness?

MR. ROTH: I don't have another question on this video.

Can we take down the video and put up -- I'm going to show Plaintiff's Exhibit 38.

THE COURT: Plaintiff's 38 you want in evidence now?

MR. ROTH: Yes.

THE COURT: Just one second while I find it.

I don't have any objection to that, Mr. Keaveney; am I correct, memo to the chief? In evidence at this time.

MR. KEAVENEY: There is no objection to that.

THE COURT: Thank you.

(Plaintiff's Exhibit 38 received in evidence.)

MR. ROTH: Can I use the ELMO? Document now.

THE COURTROOM DEPUTY: Using the ELMO.

(Exhibit published.)

Q Okay. So this is one of the police reports that you reviewed; is that correct?

A Yes.

Q Okay. Can you read for the -- the yellow section?
A The train operator, Shabazz, Raqia, Pass No. 809 --
THE COURT: Yes, we see it.
THE WITNESS: Okay.
A -- stated she observed the aided on the northbound track as the train was entering the station.
Q And is that one of the documents that you used to determine that she was already on the tracks before the train got to the station?
A Yes.
MR. KEAVENEY: Objection, leading.
THE COURT: That's one of the documents you relied upon based upon what you just testified, correct?
THE WITNESS: One of them, yes, Your Honor.
THE COURT: Next question.
MR. ROTH: Logan, would it be easier for you to put this one up? Because it's hard to read this. Exhibit 39B. Do you think you can put it up?
THE COURT: Just one second. 39, there's no objection to that. These are records, right? Okay. In evidence at this time.
(Plaintiff's Exhibit 39B received in evidence.)
(Exhibit published.)
MR. ROTH: Logan, just zoom in on it so that Mr. Jimenez can read it and move it around as necessary.

Q So you recognize that document? What's that document?
A That is a police report filed by Detective Donald Moeller.
Q And is that document the statement that he took of Ms. Shabazz?
A Yes, it is.
Q Okay.
MR. ROTH: So can we zoom in on that, Logan, please, so he can read it. Maybe he can read it now.
Q Can you read that?
A Yes, I can.
Q So why don't you read what the statement was to the jury, please?
A The whole thing?
Q Just up until the Judge tells you to stop, I'm guessing?
THE COURT: You want him to read what's in evidence now to the jurors?
MR. ROTH: Yes, correct.
THE COURT: All right. Go ahead. He wants you to read -- this is in evidence, but he wants you to read it anyway so the jury could hear you read it.
A On August 2nd, 2016, at approximately 1940 hours, I was present at the Atlantic Avenue subway station and spoke with MTA train operator.
THE COURT: A little slower because we're trying to

get all your words down.

THE WITNESS: I'm sorry.

A Raqia Shabazz with pass number --

THE COURT: There's a pass number that's referenced, right?

THE WITNESS: Right.

THE COURT: Okay.

A Ms. Shabazz stated that she was operating the 1848 B train out of Brighton Beach at the time of this incident. She continued that as she was entering the Atlantic Avenue station, she observed a person lay on the tracks. She continued that she immediately activated the brakes in emergency in an effort to stop the train at which time the train did make contact with the person on the tracks.

Ms. Shabazz continued that she immediately notified her radio dispatcher notifying them of this incident and requested assistance.

Q So this is a document you relied on to determine --

THE COURT: He said that.

MR. ROTH: Okay. All right.

So Logan, could you put up Exhibit 74A, which was marked in at the --

THE COURT: 74?

MR. ROTH: 74.

THE COURT: Now, look, 74 has a lot of photos.

Okay?

MR. ROTH: We're doing one photo.

THE COURT: Just one second.

How many of the photos under that exhibit number do you wish to introduce into evidence? We're not going to need tons of them.

MR. ROTH: Just one. Just for now.

THE COURT: Just one. All right? One photo.

That's in evidence at this time. This one photo.

(Plaintiff's Exhibit 74E received in evidence.)

(Exhibit published.)

Q Can you tell us what you see on the tracks there?

A Sand.

Q And what is sand? What is sand used for related to an incident like this?

A Sand is used to absorb hazardous materials, things like blood or other -- fuels or something like that so that there's no -- you know, so that it's not exposed.

MR. ROTH: Thank you. Logan, you can take that down.

Q Now, as far as your opinion goes, you've read Ms. Shabazz's testimony, correct?

A Yes, I have.

Q In her testimony she describes her point of view entering the station. How does the video contradict what she said in

her point of view?

THE COURT: Did it contradict what she said?

I don't know what you're talking about. What she said is what you just showed the witness --

MR. ROTH: No. Ms. Shabazz.

THE COURT: Ms. Shabazz's statement?

MR. ROTH: No, her testimony at deposition.

THE COURT: Just one second.

We want to avoid confusion.

MR. ROTH: Okay, sure.

THE COURT: I allowed you to put in evidence one photo. I allowed you to put in evidence the train station, we just saw that.

What is the question you want to ask?

MR. ROTH: Your Honor, I've just been informed that that photo was 74E.

THE COURT: 70 what?

MR. ROTH: 74E was that photo.

THE COURT: Is the photo. 74E?

MR. ROTH: E, yes.

THE COURT: That's the photo?

MR. ROTH: That was the photo.

THE COURT: 74E. All right. We saw the photo. The witness saw everything that you played.

What question do you want to ask?

Q So now I'm asking a separate question.

So as part of your job as an expert, do you sometimes read deposition transcripts that are taken into account?

THE COURT: Sustained. There's nothing before the jury. Next question.

MR. ROTH: He said he relied on the deposition testimony.

THE COURT: That's what he said.

Q Okay. So in the testimony of Shabazz, is there anything about -- that she testified about her view into the station that you disagree with?

A Yes.

Q And what do you disagree with in her testimony about when she's entering the station?

A So she stated that when you're entering a station, you can't see fully into the station coming from dark to light because of the lighting situation. She said it's a common -- it's not an exact quote, but it's a common knowledge that you can't see clearly coming from dark to light. Which is actually completely opposite because you come from dark to light you can see very far. Coming from light to dark, you're going to have a difficult time trying to focus.

Q And what about the point of view based on the curve of the track entering the station? What do you -- what did she

testify about that, and what did you have an issue with?
A Well, she said that she came -- she was talking about speed around the curve and she said that --
Q I'm just asking about the point of view. I'm not asking anything about speed. That's not what we're talking about.
A Okay.
Q We're talking about the video that you saw compared to what she testified about her ability to see in the station based on the curve. That's what I'm asking you to testify to as to your opinion as well as what the video showed to the jury?
A So the other part is that she said she couldn't see completely into the station until she was at -- entered the station, which is not true because the video actually shows that you can see far into the station as much as two car lengths out.
Q And two car lengths, again, is how long?
A That would be 150 feet.
Q So just to reiterate, so what's the -- so the basis of your opinion that she wasn't paying attention was based on what evidence -- what evidence, and restate your opinion, if you could, for the Court?
A That she did not operate the train safely because she wasn't paying attention to what she was doing as far as operating that train.

Q Now, let's just say it was -- you know, I know you don't agree with it, but let's just say she really couldn't see around the curve, okay? What should she have done differently, if anything --

THE COURT: Assume she could not see, you're not saying that's the case. Assume she could not see coming around the curve, I think that's what you want to question about.

MR. ROTH: Yes.

THE COURT: What is your question with that assumption? Okay?

Q What should she have done -- did she --

THE COURT: If she could not see coming around the curve, do you have anything to show the jury about what, if anything, she should have done?

THE WITNESS: So if you're in an area where you have restricted sight and you're not sure what you're driving or operating into, all right, it's incumbent upon you to act in the safest manner. So the best action would be to slow your train down. The best action would be to --

MR. KEAVENEY: Objection.

THE WITNESS: -- approach the --

THE COURT: One second. You have an objection to his testimony?

MR. KEAVENEY: Yes.

THE COURT: You're going to have ample opportunity to cross-examine him, trust me.

You're saying that if you can't see, assuming you can't see, you have some sort of responsibility to slow the train down? Is that your testimony?

THE WITNESS: Right. You're required to operate according to what you can see, what your vision is. You're required to operate in the safest manner possible, which --

THE COURT: Well, we know you're supposed to operate safely obviously. That's obvious. But you are telling the jury that if she could not see, she should have slowed the train down; is that what you're saying?

THE WITNESS: That's what I'm saying, Your Honor.

THE COURT: Next question.

Q What was her testimony as to how fast she was entering the station?

THE COURT: We haven't heard her testimony. But since the witness has said that he relied upon something he read, I'm allowing him to explain. She probably will be testifying, I don't know. But you will assume that this is what she was testifying to or would be testifying, so we don't have to call them back if she does testify to ask these questions. I am allowing that type of flexibility. Go ahead.

A 22 to 24 miles per hour.

Q Okay. And if she couldn't see, what is your opinion --

if she couldn't see around the curve, how fast should she be entering the station?
A Fast enough to stop the train before she came in contact with anything on the track.
Q And it's possible that somebody could be on the track at the mouth of the station, correct?
THE COURT: Sustained.
Q So what things should she be considering when she enters into the station, if she can't see?
A That the track could be obstructed, that she could be -- that the track could be obstructed.
THE COURT: How far down the track? I mean, should she had stopped as soon as she couldn't see? Or you said she should slow down? I'm not so sure I understand, you know, how much time she would have to stop the train in this situation.
(Continued on the next page.)

bY MR ROTH: (Continuing.)

THE WITNESS: Well, Your Honor, you're right. It's a judgment call. That's what our skills --

THE COURT: So, she should have gone slower?

THE WITNESS: She should have gone slower.

THE COURT: Basically from what you've seen here, you feel that if she had gone slower, she should have been able to stop.

THE WITNESS: If she said she couldn't see, which she did say in her deposition, Your Honor.

THE COURT: She said she couldn't see.

Next question.

MR ROTH: No further questions, Your Honor.

THE COURT: Do you want to start now Mr. Keaveney or take a break? It's up to you.

MR. KEAVENEY: We can take a quick break.

THE COURT: How much time do you need?

MR. KEAVENEY: Ten minutes?

THE COURT: Let's make it fifteen.

So, at this stage in the trial, counsel will go back and forth a little bit. And before Mr. Keaveney begins his questions, we will have a little break. See you promptly at 11:15.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(Recess taken.)

(Jury enters.)

THE COURT: Mr. Keaveney, are you ready for your cross-examination?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: Go ahead. You may proceed.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Good morning, Mr. Jimenez.

A Good morning.

Q Mr. Jimenez, did you bring your report, a copy of your report today?

A Yes, I did.

Q Do you have it in font of you?

A I will get it.

THE COURT: The report's not going to be in evidence and about unusual circumstances, but counsel can refer to it for cross-examination purposes.

A Okay. I have it.

BY MR. KEAVENEY:

Q Mr. Jimenez, are you being paid today?

A Yes, I am.

Q What's your rate of compensation?

A $350 an hour.

Q How many hours have you spent on this file?

A Total -- I'd have to do the math, but close to 40.
Q And have you met with Mr. Roth or his team prior to today?
A Yes.
Q And when was the last time you met with him?
A Yesterday.
Q Okay. Did you go over the video with him?
A Yes, I did.
Q Did you go over documents with him?
A Yes, I did.
Q Which documents did you go over?
A Yesterday?
Q Yes.
A The documents that we went over -- hold on.
Okay. We went over the -- the pictures that he was -- that he -- that he showed me today, and we went over -- it was -- it was my -- no, we went over the pictures, we went over my -- my report, and pretty much, that was it.
Q Did you look over the video that he showed you?
A Oh, yes, I'm sorry.
Yes, the video, also.
Q Let's talk about that video for a second.
A Sure.
Q That video is not from an R68A train; correct?
A That is correct.

Q That is from a nostalgia train; correct?
A That is correct. An R-1 to be exact.
Q What is a nostalgia train?
A It is a train that is used to carry passengers on a special trip throughout the subway system, giving them a sense of what it was like in the old days to ride trains.
Q And when was that model built?
A Oh, the R-1?
It's 1930s, '40s.
Q Okay. It operates differently than the R68A?
A The -- yes.
Q The consoles are different?
A Yes, they are.
Q The braking is different?
A Yes, it is.
Q You don't know how fast that train's operating through that station in that video, do you?
A No, I don't. I -- I could take a guess, but you don't want me to guess.
Q That video wasn't taken from the operator's position; correct?
A That is correct.
Q It was taken from a middle position; correct?
A That is correct.
Q And the operator sits on the right side of the trains;

correct?
A That is correct.
Q And coming around a curve, an operator wouldn't have the same sight lines as a person sitting in the middle; correct?
A That is correct.

MR. KEAVENEY: Your Honor, at this time I move to strike the video as irrelevant and not accurate, respecting --

THE COURT: No, the jury's heard it all.

And you folks can consider to what extent you want to rely on that video. You heard the questions from Mr. Roth, and you hear the cross-examination by Mr. Keaveney. It's all part of your fact finding responsibilities.

We'll allow it in evidence.

BY MR. KEAVENEY:
Q Mr. Jimenez, where did you go to school?
A Brooklyn Preparatory High School.
Q Where did you go to college?
A I spent a year in John Jay -- a-year-and-a-half in John Jay College of Criminal Justice and one year in Baruch College.
Q Okay. Did you obtain a degree?
A No, I did not.
Q After your experience at Baruch, did you go somewhere?
A After my experience at Baruch, yes, I -- oh, do you mean yo school?

Q Did you have any additional educational train?
A No.
Q Okay. And you went to work; correct?
A That is correct.
Q And you became a 911 operator or administrator?
A I was a police administrative aide originally assigned to -- as a 911 TS operator and then moved up to a consult dispatcher. There's a difference between the two.
Q Okay. You would hear calls coming in from people in distress or accidents; correct?
A Oh, abs- -- yes.
Q Okay. And most of the times, you would get more than one call on a specific accident?
A Yes, you would.
Q Okay. Did you listen to more than one 911 call regarding this incident?
A Yes, I did.
Q Okay. But you only picked up one when you discussed it with Mr. Roth; correct?
A Correct.

MR. KEAVENEY: Your Honor, at this time, I'd like to play some additional 911 calls.

THE COURT: Would this be considered the same document that's in evidence, I think -- I'm just trying to find out where it is.

MR. KEAVENEY: I think Mr. Roth --

THE COURT: 72, 72.

MR. KEAVENEY: Mr. Roth's 72 was limited to one and --

THE COURT: But this is still part of the 911 call which is in evidence as 72; correct?

MR. KEAVENEY: This would be Defendant's Exhibit WW.

THE COURT: Just answer this question: Is it the same as the Plaintiff's 71, the 911 call?

MR. KEAVENEY: It's not, because Mr. Roth only admitted one.

THE COURT: This it a different call?

MR. KEAVENEY: It's different calls, yes, Your Honor.

THE COURT: These are different calls by somebody else?

MR. KEAVENEY: Correct.

THE COURT: All right. Let me just get your exhibit list so you can get it down.

MR. KEAVENEY: WW.

THE COURT: 77, Defendant's Exhibit 70 -- I'm sorry, what is it?

MR. KEAVENEY: Defendant's WW.

THE COURT: WW.

All right. Those are initial 911 calls.

Okay. Go ahead.

(DX Exhibit 77 received in evidence.)

MR. KEAVENEY: Why don't you play Call Number 1.

(Audio played/audio paused.)

MR. KEAVENEY: You can turn that off. We also go to call number six.

THE COURT: Now, this is all part of your Exhibit WW?

MR. KEAVENEY: Yes, Your Honor.

(Audio played/audio paused.)

BY MR. KEAVENEY:

Q Mr. Jimenez, did you listen to those, as well, correct?

A Yes, I did.

Q Okay. Did you review the police department records?

A Yes.

Q Did you review all of them?

A Yes, I did.

MR. KEAVENEY: Can we put up for Mr. Jimenez only --

MR. ROTH: Is this something that we objected to and redacted because --

MR. KEAVENEY: Yes, that's why I'm showing Mr. Jimenez. He looked at it.

THE COURT: Wait, so we can't get this down if you're talking to each other. Let me know.

What do you want to do now?

MR. KEAVENEY: I want -- Mr. Jimenez just said he looked at the entire police records.

THE COURT: Okay.

MR. KEAVENEY: I want to show only Mr. Jimenez those records, not the jury at this time.

THE COURT: All right. Just these records, did you look at these records, looked at these? Have you looked at that?

THE WITNESS: I haven't seen it yet.

THE COURT: You haven't seen this?

THE WITNESS: This is a New York City Transit correspondence sheet.

THE COURT: Stop it.

Something is being shown to you now; right?

THE WITNESS: Okay.

THE COURT: You want to identify what you're showing the witness, please.

MR. KEAVENEY: It should be -- our Bates number is --

THE COURT: What is the number?

MR. KEAVENEY: -- 4504.

THE COURT: You're showing him a proposed exhibit now or some other document?

MR. KEAVENEY: It's some other document. I might move it into evidence, Your Honor.

THE COURT: All right. So he's showing you some documents not in evidence.

What's the question?

MR. KEAVENEY: My assistant's just trying to get it up right now.

THE COURT: Well, the jury's not seeing this.

MR. KEAVENEY: Correct, Your Honor. I want the witness to look at it.

THE COURT: Why don't you ask him a question?

MR. KEAVENEY: Okay.

THE COURT: He's showing you this document that you apparently looked at. It's not in evidence, but he's showing it to you preparatory to asking you some questions.

Go ahead.

BY MR. KEAVENEY:

Q There are several reports contained in the police department records; correct?

A Say it again.

Q There are several reports contained in the records; correct?

A That is correct.

Q Several witness statements; correct?

THE COURT: Do you want this in evidence?

MR. ROTH: I'm objecting because, Your Honor, I believe the witness --

THE COURT: Just one second.

The question is objected to?

MR. ROTH: Yes.

THE COURT: Sustained.

Do you want this document in evidence, yes or no?

MR. KEAVENEY: He reviewed it. It's a police department record.

THE COURT: Do you want it in evidence, yes or no?

MR. KEAVENEY: Yes.

THE COURT: What exhibit number?

MR. KEAVENEY: It hasn't been marked as an exhibit, Your Honor.

THE COURT: This is the police report?

MR. KEAVENEY: Correct, Your Honor.

THE COURT: Is there any objection to the police report being in evidence?

MR. ROTH: I object.

I don't know what --

THE COURT: I'm sorry?

MR. ROTH: Yes, I object, Your Honor.

I don't know what document it is. I'd like the opportunity to see it before --

THE COURT: Your objection: You don't want the police report in evidence?

MR. ROTH: I don't know the --

THE COURT: Did you rely upon this document? Is this one of the documents you relied upon in your testimony?

THE WITNESS: I'm not sure if it's one of the --

THE COURT: Look at it and tell me whether you relied upon that document in your testimony.

THE WITNESS: Okay.

THE COURT: Just take a moment.

THE WITNESS: (Reviewing.)

THE COURT: Answer yes or no. If you can't answer yes or no, we'll move on to another question.

THE WITNESS: I don't know what document you want --

THE COURT: Next question.

THE WITNESS: -- Your Honor.

THE COURT: All right. Let's move on.

BY MR. KEAVENEY:

Q Okay. Mr. Jimenez, you did look at the police department records; correct?

A Yes, I did.

Q Okay. Was there any notations in those records that you reviewed that --

THE COURT: He said he did not review this. He can't identify this as a document he reviewed.

MR. KEAVENEY: Judge, he said he couldn't rely -- he didn't --

THE COURT: Next question.

BY MR. KEAVENEY:

Q When you made your opinion this morning, did you base it on all the police department records or just one page?

MR. ROTH: Objection, asked and answered.

THE COURT: Overruled.

So when you testified, he wants to know, what document you relied upon when you gave your testimony this morning.

All right. Go ahead, ask him if he relied on a particular document.

BY MR. KEAVENEY:

Q Did you rely on a particular document in the police department records, to make your opinion today?

A I relied on more than one.

Q Okay. Which other police department documents did you rely on?

A So, the document to the chief of transit and the document provided by Detective Mullen.

THE COURT: If you want to show him those documents, you can do that.

MR. KEAVENEY: Right, Your Honor.

BY MR. KEAVENEY:

Q Did you rely on the unusual occurrence report contained in the police department records?

MR. ROTH: Objection.

That's --

THE COURT: He's telling you what he relied upon.

MR. ROTH: That's not a police --

MR. MORALES: Objection, Your Honor.

That's not a police report.

THE COURT: Overruled.

So we just want you to tell the jury what documents you relied upon, and I'm going to allow Mr. Keaveney to question you about the documents that you relied upon.

It's a simple thing I think I'm asking you; right?

THE WITNESS: Yes, you are.

THE COURT: You testified those are the documents you relied upon; correct?

THE WITNESS: That's correct.

THE COURT: No other documents; right?

THE WITNESS: No other documents.

THE COURT: You could question him about the documents that he relied upon. Nothing else.

BY MR. KEAVENEY:

Q So those two documents --

THE COURT: Excuse me. Now why don't we identify for the record which documents we're talking about, so the jury can see it.

MR. KEAVENEY: Your Honor, that document's not

evidence yet. I'm just asking --

THE COURT: Well, just one second.

Do you want it in evidence? It's being relied upon.

MR. KEAVENEY: Well, if he's looking at it, I want to get an answer first --

THE COURT: Just one second.

Let's see those two documents.

MR. KEAVENEY: Those two documents are already in the record. I'm asking about a different document --

THE COURT: One second.

Which are the two documents?

We want to identify them so the jury knows what you're talking about.

MR. ROTH: This is Exhibit 38 --

THE COURT: All right. What numbers are they? Tell the jury.

MR. KEAVENEY: Your Honor, I'm not asking about the documents that Mr. Roth moved into evidence this morning. I'm --

THE COURT: Just a second. I'm just trying to painstakingly help the jury.

You're questioning him about documents. They don't have a clue what you're talking about.

MR. KEAVENEY: Correct, Your Honor.

THE COURT: So if we can let the jury know what

documents you're talking about, that will help them follow the testimony.

MR. KEAVENEY: Thank you, Your Honor.

THE COURT: Can you do that?

MR. KEAVENEY: I cannot do that because I'm asking if he's looked at a document.

THE COURT: Next question.

BY MR. KEAVENEY:

Q Did you look at any police documents that indicated that the train operator, as she entered the station, saw the plaintiff fall off the platform?

MR. ROTH: Objection to form.

MR. MORALES: Objection to form.

THE COURT: Sustained.

Look, you can bring out other evidence, if you want.

But as far as this witness is concerned, he has only told us which documents he relied upon. You can question him about that. No other documents he relied upon.

MR. KEAVENEY: Okay.

THE COURT: Next question.

If you want to show other evidence --

MR. KEAVENEY: That's fine.

THE COURT: -- police reports, you will have an opportunity to try to do that. But let's just confine your questions to what this witness has testified to.

BY MR. KEAVENEY:
Q Out of the police report documents, you only looked at two pages; correct?
A Three, actually.
Q Okay.
THE COURT: Identify which pages those are so the jury can follow along.
MR. KEAVENEY: Plaintiff's 38 and Plaintiff's 39B.
BY MR. KEAVENEY:
Q What else did you look at?
THE COURT: All right. Just one second.
So those are in evidence; right?
MR. KEAVENEY: Yes, Your Honor.
THE COURT: Okay. Now we know what we're talking about.
BY MR. KEAVENEY:
Q And what else did you look at?
A I looked at the Transit Authority report, the incident report.
Q Okay. I'm talking about the police department records.
A Police department records?
Q Are these the only documents --
THE COURT: I'm under the impression that those are the only two police report documents you looked at. If I'm not correct, you correct me now.

THE WITNESS: Those are the only two documents I relied upon, Your Honor.

THE COURT: Next question.

BY MR. KEAVENEY:

Q Did the police department report contain any other documents, other than these two?

A Yes.

Q And you didn't rely on those?

A No, I did not.

Q Did you look at Mr. Shabazz's G-2?

A Yes, I did.

Q What is a G-2?

A A G-2 is a written report that every employee is supposed to file upon -- prior to leaving the property when they're involved in an in-service incident. Or it's actually a correspondence form that the -- the Transit Authority uses generally for any type of communication.

Q And that's done in the normal course of business?

A Every day.

THE COURT: Which document now do you want to offer in evidence?

MR. KEAVENEY: I do, Your Honor.

I want to offer Defendant's Exhibit H.

MR. ROTH: Objection.

THE COURT: Just one second.

H?

MR. KEAVENEY: H.

THE COURT: All right. It's in evidence at this time.

COURT: You looked at that; right?

So for the purposes of reviewing that document, we'll allow that in evidence at this particular time.

MR. ROTH: Your Honor, objection.

There's hearsay contained in that document.

THE COURT: Overruled.

It's being allowed in evidence as a document you relied upon to support your testimony --

MR. ROTH: No. Objection --

THE COURT: -- correct?

MR. ROTH: Objection, Your Honor.

He did not rely on it. He said he saw it. He did not rely on it.

THE COURT: You did not rely on that?

THE WITNESS: To support my testimony?

THE COURT: You reviewed it; right?

THE WITNESS: I did review it, yes.

THE COURT: If you have questions you want to ask him about that document, go ahead.

It's in evidence strictly for the purpose of the fact that I'm going to allow you to question him about the

fact that you reviewed it.

And you reviewed that document; correct?

THE WITNESS: I did, Your Honor.

THE COURT: Did you consider that document in terms of your testimony?

THE WITNESS: No, sir. No, Your Honor.

THE COURT: Did you rely upon it at all?

THE WITNESS: Did I rely upon it? No, I did not, Your Honor.

THE COURT: All right. I am not going to allow it in evidence then.

Objection sustained.

BY MR. KEAVENEY:

Q Mr. Jimenez, why didn't you rely on a document --

THE COURT: It's not in evidence.

MR. KEAVENEY: I know, but I'm asking him --

THE COURT: Look, you have a case, also. If you want to introduce other documents as part of your case, I'll consider it and I'll allow you to do it, in all probability, right, if you lay a proper foundation.

Right now we just want to question him about what he relied upon, and you can question him all you want about what he relied upon. All right?

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q You didn't look at it though?

MR. ROTH: Objection.

THE COURT: Overruled.

Sir, you looked at other documents but you didn't rely upon them; right?

THE WITNESS: Correct, Your Honor.

THE COURT: All right. Go ahead.

BY MR. KEAVENEY:

Q Did you read that document?

MR. ROTH: Objection.

THE COURT: Okay. So what we're going to do is this: He's only said he hasn't relied upon it. I'll allow you, as part of your case, to introduce documents that you think that are relevant, and then you can tell the jury he should have relied upon them but he didn't, okay? Or he can be recalled as a rebuttal witness, possibly. That's how we're going to structure the trial.

BY MR. KEAVENEY:

Q Mr. Jimenez, in your report, you said that you looked at the G-2 and didn't find it credible; correct?

MR. ROTH: Objection.

THE COURT: Sustained.

So I'll do it once again, Mr. Keaveney, so you understand how Judge Block wants to handle the trial.

Whatever he relied upon, I'll allow you cross-examination, okay? If he says he didn't rely upon the document, he didn't rely upon it.

Now, as part of your case, if you want to, you can introduce other testimony, right, and then maybe he can be called back as a rebuttal witness, if the plaintiff chooses to do that. That way we have a clear structure instead of going back and forth referring to documents that are not in evidence, okay?

MR. KEAVENEY: Your Honor, he relied on it. It's in his report, the substance of that document.

THE COURT: He --

MR. ROTH: Objection.

THE COURT: You're going to have the opportunity, in your case, to say, here's your document. He said he didn't rely upon it. You can tell the jury he should have relied upon it, okay? I'm not going to preclude you from doing that.

But let's just focus now on his questions and his answers.

BY MR. KEAVENEY:

Q Mr. Jimenez --

THE COURT: Excuse me. You can lay a foundation for all the documents that you want to identify that he did not rely upon. We can have them marked as proposed exhibits, even though they're not in evidence at this time. If you want to

do that, I will allow you to do that.

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q Well, I think we established, Mr. Jimenez, that a G-2 is a document kept in your main course of business; correct?

MR. ROTH: Objection.

THE COURT: Sustained.

He didn't rely upon it.

Next question.

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q You reviewed deposition transcripts regarding this matter; correct?

A I did.

Q Okay. Did you review the deposition transcript from Gabrielle Smith?

A Yes, I did.

Q And did you review testimony from her in which she indicated --

MR. ROTH: Objection.

BY MR. KEAVENEY:

Q -- that Ms. Harger was on the track seven to ten seconds before the train hit her?

MR. ROTH: Objection.

THE COURT: So here's what we're going to do.

You apparently want to read that deposition testimony into evidence as part of your case, I assume.

MR. KEAVENEY: I'm asking if he's --

THE COURT: Am I correct or not?

MR. KEAVENEY: Not at this time, Your Honor. I just want to know --

THE COURT: Well, all right. So at a later time you wanted to read that deposition testimony into evidence; correct?

MR. KEAVENEY: Your Honor, this is just --

THE COURT: You did not rely upon this at all; right.

THE WITNESS: I'm sorry.

THE COURT: Did you reply upon -- let's just identify what it is he did not rely upon.

Go ahead.

BY MR. KEAVENEY:

Q Did you rely on that testimony?

A No.

THE COURT: "No," that's his answer.

BY MR. KEAVENEY:

Q Now, we just heard 911 calls. And the last one we that heard...

(Counsel confer.)

THE COURT: So, Mr. Keaveney, so a thousand percent

clear, I'm allowing you to lay a foundation about what he did not rely on. And then if you want to go forward as part of your case, I will allow you to do that, all right?

MR. KEAVENEY: Okay.

THE COURT: And then he can possibly be called as a rebuttal witness, if the plaintiff wants to do that. That way we have a structure that the jury can follow, instead of having to talk about things which are not in evidence.

BY MR. KEAVENEY:

Q When just heard 911 calls; correct?

A Correct.

Q And the last one we heard was someone saying that Ms. Harger fell on the tracks just as the train came in; correct?

MR. ROTH: Objection, mischaracterization.

THE COURT: You know, you heard the 911 call, all right? You want to ask him a question about that? It's in evidence. You can play that to the jury again, if you want to.

BY MR. KEAVENEY:

Q Mr. Jimenez, did you hear that in the --

MR. ROTH: Objection.

BY MR. KEAVENEY:

Q -- in the recordings?

THE COURTO: He heard it?

Is your hearing okay?

THE WITNESS: Usually.

THE COURT: Okay. He heard it.

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q Did you consider that, in making your opinion?

THE COURT: Did you consider that 911 call, which you just heard, that the defendant has is now introduced into evidence, did you consider that as part of your opinion and your testimony that you have given the Court today? Did you consider it?

THE WITNESS: No, I did not.

THE COURT: You did not consider it?

You got your answer.

BY MR. KEAVENEY:

Q Did you read Ms. Shabazz's deposition testimony?

A Yes, I did.

Q Did you consider her deposition testimony in making your opinion today?

A Yes, I did.

Q Okay. And Ms. Shabazz said that as she was coming into the station, one or two --

MR. ROTH: Objection.

THE COURT: You said you considered some of her testimony. Now he's going to make a reference that this is

her testimony. I'm going to allow him to make that representation, as an officer of the court, and you're going to answer whether you considered this or not.

Go ahead.

MR. ROTH: Your Honor, just, I request page and line, if he's reading from --

THE COURT: What?

MR. KEAVENEY: I'm not reading from the transcript. I'm summarizing.

THE COURT: Just one second.

You want to summarize the testimony?

MR. KEAVENEY: I'm asking --

THE COURT: If you didn't summarize it correctly, Mr. Roth is going to let us know. I'm relying upon you to summarize it correctly. You're making a representation. If it's not correct, Mr. Roth will tell us about it.

BY MR. KEAVENEY:

Q In reviewing that deposition transcript, did Ms. Shabazz say that her train was one-and-a-half to two car lengths into the station when she saw the plaintiff fall from the platform?

THE COURT: Did you read that part of her testimony? Do you understand that's what counsel said she said?

THE WITNESS: Right.

THE COURT: Did you consider that?

THE WITNESS: I believe, yes, I did.

THE COURT: All right. Next question.

Just one second.

So while this is happening -- this goes back and forth. It's called direct, cross-examination, redirect when you ask questions until we've fully explored his testimony back and forth. That's what you're seeing right now.

Okay. You may continue.

BY MR. KEAVENEY:

Q Was her testimony consistent with the G-2 that she wrote?

MR. ROTH: Objection.

THE COURT: Objection overruled.

What's the question again?

BY MR. KEAVENEY:

Q Was her deposition testimony, that portion of it, consistent with the G-2 that she wrote that you reviewed?

MR. ROTH: Objection.

THE COURT: I do not know whether you understand the question.

Do you understand the question? If you don't, tell me you don't.

THE WITNESS: No, I don't.

THE COURT: Ask another question.

(Continued on the following page.)

BY MR. KEAVENEY: (Continuing)
Q Did you review any other deposition testimony?
A Luisa Harger's, her husband's, and Ms. Shabazz's.
THE COURT: You reviewed all of those testimonies, right?
THE WITNESS: Well, yes, I read through it.
THE COURT: Okay. There's your answer. Go ahead.
Q Did you consider Ms. Harger's testimony credible?
A Yes, I did.
Q Did you consider Mr. Brown's testimony credible?
A Yes, I did.
Q Did you consider Ms. Shabazz's testimony credible?
A No, I did not.
Q Ms. Shabazz's testimony is consistent with the last 9-1-1 call we played you, correct?
MR. ROTH: Objection.
THE COURT: I don't know if I understand that question. Sustained.
MR. KEAVENEY: Okay.
THE COURT: If you want to make arguments, you can do it in summation, if you want to do that. This is not the time to do that. Next question.
MR. KEAVENEY: I'm just asking if one piece of evidence is consistent with another.
MR. ROTH: Objection.

THE COURT: Sustained.

Do you understand that? I'm a little confused. He wants to know if it's consistent with this, with that.

If you want to ask him a specific question, I will let you do that. He can say this is what that testimony was, and was it the same as this? You can argue that to the jury, but let's get the facts out.

MR. KEAVENEY: Okay.

Q Your opinion is based on the fact or on the -- your reading of the facts that Ms. Harger was on the tracks before the train came in, correct?

A Correct.

Q And you didn't consider any other evidence that showed that she fell on the track as the train was already in the station, correct?

MR. ROTH: Objection.

THE COURT: Overruled. Do you have any knowledge as to how she came on the track?

A Other than reading through testimonies, no.

THE COURT: You read about the testimony, all right. Go ahead.

Q And you would agree that listening to all 9-1-1 calls would be appropriate in making an opinion regarding this case, right?

THE COURT: You considered all the 9-1-1 calls or

not?

MR. ROTH: Objection.

A I've listened to all the 9-1-1 calls, but a lot of them were --

THE COURT: You heard all these 9-1-1 calls that we played for the jury, correct?

THE WITNESS: Them and others too.

THE COURT: Do you have any questions about those calls?

Q You picked the 9-1-1 calls that were favorable to Ms. Harger, correct?

MR. ROTH: Objection.

THE COURT: Sustained. So it's argumentative right now. Save it for summation. All right?

Q When is the last time you operated a subway car through the Atlantic Avenue station on a revenue train?

A I'm going to say in 2004, 2005, somewhere in that area.

Q 20 years ago, correct?

A That is correct.

Q And you had a clear recollection of how those trains enter that station from an operator's perspective?

A Absolutely.

Q After 20 years?

THE COURT: Well, wait a second. It's not 20 years. The accident happened in 2016. You want to know what his

recollection is today?

MR. KEAVENEY: Correct. 20 years.

THE COURT: So today what you just testified to, that happened 20 years ago.

THE WITNESS: Yes, I do, Your Honor.

THE COURT: Next question.

Q And you returned to the station, correct?

A Yes, I did.

Q You returned to the station a few weeks ago?

A No, I returned to the station yesterday.

Q And you didn't get into the operating cab yesterday, correct?

A No, I did not.

Q And you observed the train from the platform, correct?

A No. I observed the train -- oh. You're talking about coming into the station?

Q Correct.

A No, I observed it from the middle window.

Q Not from the operating cab, correct?

A From right outside the operating cab.

Q Not from the operating cab, correct?

MR. ROTH: Objection.

Q Were you in the operating cab or not?

THE COURT: One second. Objection.

MR. KEAVENEY: He said right outside --

THE COURT: Just one second. Sustained.

Next question.

Q Mr. Jimenez, what have you been doing since you left the Transit Authority?

A Lots of things.

Q Like what?

A I started out as a legislative advisor for my County Legislator for one year. I was a Hispanic Advisory Council advisor for her.

And then I went to the Knights of Columbus and started volunteering with the Knights of Columbus and helping them do good charitable works. And of course, most Knights of Columbus run a bingo game. I don't know if they still do that here in the city, but I know out of Suffolk County they do, and those bingo games produce revenue for the Knights of Columbus to donate to charity. And I rose up through the ranks, the chairs of the Knights of Columbus from a guard, a door guard to the grand knight of the council, and I ran their bingo game. And as a result of running their bingo game and the changes that I implemented with the game and the way that my game was conducted, the Town Clerk from the Town of Brookhaven called me and asked me if I would be interested in working for her as a bingo inspector. And I said, sure. So I went to working for her as a bingo inspector, and I went from a regular inspector to -- everyone laughs at bingo inspector.

I went from being a bingo inspector to a senior bingo inspector.

During that time, I also started doing this consulting, and I found it extremely fascinating, very gratifying, and very difficult because there was a lot to learn.

Q So you haven't operated a train in over 20 years, correct?

MR. ROTH: Objection. Asked and answered.

THE COURT: Overruled. He said he hasn't operated a train in 20 years, right?

THE WITNESS: I have not, no.

Q You haven't been involved in the train industry, other than your current work now in over 20 years, correct?

A Correct.

Q Okay. And you base your opinion then today on a limited amount of documents then, correct?

MR. ROTH: Objection.

THE COURT: Well, he testified as to what he based his opinion on. Save that for your argument.

MR. KEAVENEY: Okay. Thank you, Your Honor.

THE COURT: All right. So any redirect now?

Now, look, Mr. Roth, I'm trying to structure this so the jury can follow the bouncy ball obviously. So you can question him now, and then if you feel there is a need after

the Defendant rests its case to recall this witness, I will give you the flexibility to allow you to do that, if you think that you want to do that. Okay? That's how we're going to go back and forth. All right?

Now just question him now about what was raised today, this morning, about his testimony and let's see how it goes.

MR. ROTH: I'm taking the hint, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q So just a couple of questions. All right? First, I don't think I got how long were you a train operator because Mr. Keaveney was saying that you hadn't done it for a certain amount of time. How long were you a train operator?

A 29 and a half years.

THE COURT: Don't forget the half a year.

THE WITNESS: Please don't. My granddaughter would be upset.

Q And there is a lot of talk about the angle of view between the center car --

THE COURT: Why don't you ask a question?

Q What's the difference between -- if any, between the view from the operator's car or to the view that we saw in the video?

A So there is a difference but it's miniscule. It's -- I

trained train operators for lots of years. And in my training of train operators, I would have to stand in that position where that video was taken from, and I would have to be able to observe what the train operator was doing and whether they were doing it right and be ready to stop them if they weren't going to respond to an emergency situation. So I had to be in a position where I could, indeed, take over that train if I had to.

Q Okay. And when you were -- when they were playing the 9-1-1 calls, okay?

A Mm-hm.

MR. ROTH: Your Honor, I took a screenshot of what they had. Can I put that up, please? It's not in evidence, but it was what the jury saw when they had the --

THE COURT: I don't know what you're talking about.

MR. ROTH: When the seven 9-1-1 calls -- when Defendants were playing the seven 9-1-1 calls, they had a screenshot of all seven calls. I would like to put that up, if that's possible.

THE COURT: Well, it's in evidence, I think, isn't it?

MR. ROTH: But the view. I just need the view. I sent it to Logan.

THE COURT: Just one second.

MR. ROTH: Yes.

THE COURT: You want something that's in evidence to be placed on the screen, right?

MR. ROTH: Yes. All seven. They had it in their folder.

THE COURT: Objection sustained. Next question.

Q So there was one through seven 9-1-1 calls, correct?

A Actually it started at two.

Q Okay. So those, those, those calls, are they in some type of order as a 9-1-1 operator; is that correct?

A The order that they were received, yes.

Q And the call you listened to, do you recall what number that was?

A Six.

Q Six, that was their call. The one that we played was five?

A Five, correct.

Q Can you tell us, having just gone down to the Atlantic station yesterday --

A I'm sorry, he also played number two. Two, six, and we used five.

THE COURT: So the jury has heard calls two, six, and seven, correct?

MR. ROTH: Two, five, and six, Your Honor.

MS. WINTERS: Sorry, Your Honor. It's actually call one. Call one, five, and six.

THE COURT: Just one second. The jury has heard what? You want to let the jury know which calls they heard? There were a series of 9-1-1 calls.

THE WITNESS: Correct, Your Honor.

THE COURT: And the ones you listened to in evidence today were two, five, and six?

MR. ROTH: One.

MS. WINTERS: One, five, and six.

THE COURT: One, five, and six.

MS. WINTERS: Thank you, Your Honor.

THE COURT: So we've identified them for the record. The jury heard calls one, five, and six.

What's your question?

Q So how deep is Atlantic terminal for you to get to the street?

A Pretty deep.

Q So when the calls -- you were listening to the calls come in, what was similar for all the calls as far as cell service?

A I'm sorry, I didn't --

Q As far as cell phone service, did you hear when they were talking about cell phone service during the calls?

A Yes, I did.

Q And what was important back in 2016 about having to get service? What did you need to do?

A Go up to the street.

Q And how far is it to go up to the street?
A So one, two, three platforms. So you first go up to the mezzanine. Then you go from the mezzanine -- the most -- if they went through the most direct route. Because we don't really know which route they took to get there.

THE COURT: So they can't call from the station, you can't get reception. So in order for those calls to have been made, they have to have had cell phone reception.

THE WITNESS: Correct, Your Honor.

THE COURT: You can explain to the jury what kind of -- when the calls would be made, are they on the street, halfway up the street? I think that's what he's trying to establish.

THE WITNESS: So what happens basically is you're on the platform, no service, back in 2016. So you would go running up and you keep looking at your phone, looking for service, looking for service, looking for service. I believe all of the calls said that they were in the street.

THE COURT: You think they were all in the street?

THE WITNESS: I believe so.

So to get to the street, it's not just one flight up and then you're at the street. To get to the street, you have to go up one, maybe two flights, to get close to the street.

There is one exit -- there is one exit that is at street level, but it's, like, a good 300 feet away from when

you get to the top of the stairs.

THE COURT: The closest would be that 300 feet away they would have to go in order to get any cell phone service; is that your testimony?

THE WITNESS: About 300 feet and a staircase.

THE COURT: All right. Go ahead. Next question.

Q That's the closest, but there's other ways to get up, there's many different ways, correct?

A Correct.

MR. ROTH: No further questions, Your Honor.

THE COURT: Mr. Keaveney, anything? Followup?

Limit it to the questions that he's asked.

MR. KEAVENEY: Of course.

RECROSS-EXAMINATION BY

BY MR. KEAVENEY:

Q Mr. Jimenez, you indicated the calls are -- come in in order, the 9-1-1 calls, they come in in order, correct?

A Correct.

Q So the first call would be the first caller, right? Caller one would be the first --

THE COURT: He wants to know, that was the first call that was made, if you can answer that.

A That I can't answer without seeing a time stamp on the call.

Q Well, what did you just tell Mr. Roth?

MR. ROTH: Objection.

THE COURT: Sustained.

If you can explain to the jury, what we're trying to ascertain is that there are three phone calls that they've heard: Number one, number five, and number six. I think Counsel is trying to find out what the order of those calls were. Which came first, which came second, which came third. If you have any way of explaining that to the jurors, fine. Otherwise we will move on.

THE WITNESS: No, I don't, Your Honor. I didn't say that it was specifically in order. What I said was that they do come in in an order.

THE COURT: So you can't tell which ones came first, second, or third from what you've heard here, right?

THE WITNESS: Not from what I've heard here.

THE COURT: That's his testimony.

Q Did you ever review a call log?

MR. ROTH: Objection.

THE COURT: Well, he can answer that question.

Did you do anything at all to determine which calls came first, which calls came second, which calls came third, Any order at all?

THE WITNESS: No, Your Honor.

Q So if you reviewed a call log, that would show which calls came in at which time, correct?

MR. ROTH: Objection.

THE COURT: No, that's sustained. He said he hasn't reviewed it. If you want to introduce it as part of your case testimony about which calls came first, second, or third, I will give you the opportunity to do that.

MR. KEAVENEY: Okay. Thank you, Your Honor.

THE COURT: Anything further, Mr. Roth?

MR. ROTH: No, thank you, Your Honor.

THE COURT: Thank you very much. Enjoy your retirement. Nice to see you in court.

So it's 12:00. I think we can start another witness now possibly before our lunch break. Do you have anybody else?

MR. ROTH: Sure, Your Honor.

I would like to call Dr. Berkowitz to the stand.

Your Honor, can we just take a five-minute break?

THE COURT: I'm sorry?

MR. ROTH: Can we just take a quick break?

THE COURT: You want to take a break? You have to use the facilities? Okay. By all means.

Doctor, you can come up here and sit here in the meantime.

THE WITNESS: Thank you, Your Honor.

THE COURT: And do you want us to have the jurors wait here and you can take your time.

MR. ROTH: They could wait.

THE COURT: We'll wait.

Anyone else want to take a break, you will let me know at any time.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Sit down, relax, and make yourself comfortable.

(Witness steps down.)

(Witness takes the stand.)

(Pause in proceedings.)

THE COURTROOM DEPUTY: Doctor, remain standing and raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Thank you. Please have a seat. I ask you to please state and spell your name.

THE WITNESS: Carl Berkowitz, C-A-R-L, B-E-R-K-O-W-I-T-Z.

THE COURT: Mr. Roth, are you going to question Dr. Berkowitz?

MR. ROTH: I am going to question him.

THE COURT: Okay. You're under oath, and I think we can hear you okay, but the microphone is on. Keep your voice up. Okay?

Go ahead.

**CARL BERKOWITZ,** having been first duly sworn/affirmed, was

examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Dr. Berkowitz, how long have you been involved in transportation engineering, transportation work generally?

A Since I was a junior in college at City College.

Q And how many years is that?

A I have to say?

Q Yes, you do.

A 65.

Q Okay. And about how many pages is your resumé?

THE COURT: I'm going to interrupt. You're here to give some expert testimony, obviously, right?

And what have you been asked to opine about? Just so the jury has a foundation and a basis of why you're here. Okay?

THE WITNESS: I'm here basically -- I'm a transportation engineer and involved in transportation safety for my entire life, and I'm here to give an opinion as to what happened in this particular incident.

THE COURT: All right. And obviously you reviewed a lot of documents, we're going to allow Counsel to explore all of this. But give the jury some orientation as to what you were asked to opine about, and then I'm going to ask you to tell them what your opinion was, and then we'll go from there.

THE WITNESS: I was asked to review numerous documents. And from those numerous documents to come up with an opinion. And I did come up with two opinions. One is that the standard of care and good and accepted practices were violated by the New York City Transit Authority. And my second opinion has to do with the train operator who failed to follow standard operating procedures and failed to do a proper job in terms of operating the train into the station. Those are my two opinions.

THE COURT: Those are the two opinions which you came to, correct?

THE WITNESS: Yes, sir.

THE COURT: And you can explain to the jury briefly before we find out about all your wonderful qualifications what the basis of those two opinions was, in general, then they're oriented, then we can go from there.

THE WITNESS: Well, it's foundation and my education, training, and experience. I've been involved in understanding rail accidents, rail reconstruction incidents. In fact, I'm writing a book called Train Accidents.

THE COURT: We know you're writing a book and you're doing a big deal. Okay? Tell the jury, you came to those opinions, why did you come to those opinions?

THE WITNESS: By reviewing the information that was provided, some of which you've seen, additional information

that I gleaned from e-mails that were produced, from inspecting the station, listening to the 9-1-1 calls, listening to -- watching videos, looking at animations, looking at depositions, reading depositions.

THE COURT: So all of that stuff you read and you looked at, you came to that opinion, those opinions?

THE WITNESS: My two opinions.

THE COURT: Based upon reviewing all --

THE WITNESS: Two separate sets of information, but my two opinions are derived from that information.

THE COURT: Now, I will let you go forward and tell the jury a little bit about why he's so qualified to render those opinions, and then I will let you elaborate a little bit about that here before we go into cross-examination. Okay? Okay.

Q So Dr. Berkowitz, why don't you just tell us; just give us the highlights of your career in transportation that makes you qualified to be an expert here today in transportation safety and engineering?

A From day one, my first job was with the New York City Transit Authority, in college. And I've always been interested in transportation safety, but more particularly, the safety of people, passengers, pedestrians, workers. And that's what I've dedicated my entire career to. And I have an extensive background in what we call intermodal

transportation. And in fact, in the field of intermodal transportation, which is the safe movement of people and goods, I was the first professor in the United States to teach that subject, at the bachelor's and the master's level. And interestingly enough, the master's program I developed with Tom Prendergast, who was the president of the Long Island Railroad, ultimately became president of New York City Transit, and ultimately became MTA chairman. He and I developed this MBA, the first in the nation, which we taught at the Hillside facility of the Long Island Railroad for all MTA employees, essential staff, the bus operations, the Triborough Bridge and Terminal Authority construction. And I've had multiple jobs.

I went to City College. I have a bachelor's in civil engineering with a minor in mechanical, electrical, and military because I was in ROTC.

Following that, I got an MBA from Baruch College.

Following that, I went to Brooklyn Polytech, which is around the corner, and earned a Ph.D. in transportation engineering and planning.

While I was -- after I graduated college, I went to work for New York State Department of Transportation, and they sent me back to school for two-and-a-half years in their training program.

So my mother and father said I was a perpetual

student, constantly going to school. But I was working as well.

While I was working for New York State Department of Transportation, I was recruited by Governor Nelson Rockefeller to be his assistant in transportation manager from Dutchess County to Montauk Point, including New York City.

From that position, I was recruited by the Mayor of the City of New York to become the first transportation planner for the Department of Transportation of the City of New York. While I was working in the Department of Transportation, City of New York, I was involved in oversight of capital programs for -- in those days, most of the money that the Transit Authority earned for capital construction came from bond issues or City funds. Today, it's a State operation. But in those days, so any project that the New York City Transit Authority wanted to undertake, I had to -- my staff and I, we had to review for the Mayor, for the Commissioner and for the Mayor, you know, whether it was valid or not.

And interestingly enough, one of my very first projects was the 75-foot cars. I think it was called the R44, which is the predecessor to the R68A, which we're talking about today. And my second day working on this, we get the delivery of the first car, first two cars I guess it was, and they're running it for -- on the test run to the system, and

they smash into a tunnel wall and destroy the train, $250,000.
MR. KEAVENEY: Objection.
THE COURT: Sustained.
All right. So we just asked you a little bit about your qualifications.
Why don't you now continue with your questioning, okay?
MR. ROTH: Your Honor, can I just go over a couple of his jobs?
Q Dr. Berkowitz --
THE COURT: I will let you go briefly, but we're not going to spend a lot of time on it.
Q Let's hold off on the stories. Just tell us what was your -- you had a ranking civil service job as an engineer?
A Administrative engineer. Top in the city.
Q Okay. And were you the director of any other transportation facilities in the City of New York?
A Yeah. My favorite, I was the executive director of the Staten Island Ferry.
Q And what were you responsible for there?
A Running six ferry boats, and tug boats, and mini ferries to serve Potters Field up in the Bronx, and also we also operated ferry service to Rikers Island prison.
Q Are you familiar with good and accepted standards of practices in the field of transportation?

A Yes.
Q And what associations and affiliations do you have with committees and national transportation agencies that gives you that, if you can tell us?
A If there's an organization that's involved in transportation, I'm a member or I'm a retired member.
Just recently I completed a term, I was appointed to a congressional committee that was chaired by Homeland Security on surface transportation security. It was called STSAC, Surface Transportation Security Advisory Committee, and we acted as advisors to the executive branch and also to congress. I was the only nonindustry person voting -- nonindustry person appointed to that committee.
Q And as far as your expert -- being qualified as an expert across the country, can you tell us a little bit about that? And then we can get into your opinions.
A Because of my passion in this field, I've been asked to consult just about everywhere. And I've stopped -- I also did international consulting, which I stopped because the traveling, it gets a little hectic at my age traveling back and forth. But I consulted in Russia, China, the Middle East. And I've done work in almost every major -- you know, every state in the union over my lifetime.
THE COURT: So I think the jury has a pretty good idea of his qualifications.

MR. ROTH: Okay.

THE COURT: Let's go on to something else.

Q All right. So first of all, whenever I ask you a question here, it's going to be within a reasonable degree of engineering certainty. I'm not going to say that before every question; do you understand that, Dr. Berkowitz?

A Yes, I do.

Q Additionally, unless there's some very specific reason, there's no questions that are going to be asked after August 2nd, 2016, which is the date of the incident here. Okay? You understand that?

A Yes, sir.

Q If you're going to refer to documents or anything else, everything I'm asking you is prior to that date because of the rulings of this Court. Okay?

A Yes.

Q Okay. Now, in transportation, what's supposed to be the number one priority?

A Safety. So it's not only in transportation, but engineering we're taught safety is job one.

Q Okay. And could you tell us -- I guess you already told us a little bit about your work in this case.

And did you have a particular -- after reviewing all the documents, the records, transcripts, did you come up with an opinion within a reasonable degree of certainty whether --

engineering certainty whether the New York City Transit Authority and the Metropolitan Transportation Authority violated good and accepted industry standards, best practices, and professional standards?

A Yes, I did.

(Continued on the next page.)

DIRECT EXAMINATION: (Continued.)

Q What was that opinion?

A The opinion is that they did violate it, that they had a circumstance. I have two areas of opinion. One was related to the Transit Authority operation in general, in terms of passengers ending up on the tracks, and the other one is the operation of the train that struck Ms. Shabazz. So if we could separate a deal one at a time.

THE COURT: Take them one at a time. The first one you mentioned was about the Transit Authority.

THE WITNESS: Right. And passengers ending up on the tracks.

THE COURT: All right. And you have an opinion about that, right?

THE WITNESS: Yes, I do.

THE COURT: Tell the jury what the opinion is and what the basis of your opinion is, and move to the second.

THE WITNESS: The basis of the opinion is my education, training, and experience all around the world. I've been very fortunate in that respect. And that all these passengers are ending up on the track. And since data was collected in 1988, since 1988 to 2016, 50 people have been -- an average of 50 people --

THE COURT: Your opinion is that the Transit Authority was remiss in some respect, right?

THE WITNESS: Yes.

THE COURT: Tell the jury why.

THE WITNESS: Because if I operated a business that killed 50 people, a person a week, and injured another three every week, I would not be in business.

MR. KEAVENEY: Objection.

THE COURT: Sustained. I'm giving you the opportunity to explain why you think that they were remiss. We know that they have a lot of situations where people wound up on the tracks over the years. So what should they have done?

THE WITNESS: I'm sorry.

Q Dr. Berkowitz --

THE COURT: You can answer my question.

THE WITNESS: In the world, this is not an unusual occurrence. Other places have come up with solutions for people interfacing with the track, such as platform edge doors, platform screen doors, gates, fencing, all sorts of technologies.

And in addition to physical technology, preventing people from reaching the track. I'm sure you're familiar with that, like AirTrain in Kennedy.

THE COURT: So you think that they should have done something, they could have done something. I think that's what you're trying to explain to the jury.

THE WITNESS: Yes, Your Honor.

THE COURT: Explain to them what you think they should have done that they did not do. That would be your opinion, right?

THE WITNESS: Yes. They should not have allowed the passengers to interface with the tracks. They should do everything humanly and technically and engineering possible to prevent people from being on the track.

If people are on the track, they have a system to warn the train operators that there was somebody on the track. The technology, for example, warning train operators that somebody is on the track was developed in 1956 by the Japanese Fuji company.

THE COURT: Before we get to the Gucci company, that's your opinion is that the Transit Authority could have done something to prevent this accident from happening, right?

THE WITNESS: Yes, sir.

THE COURT: I'm allowing you to explain to the jury. We don't care about the Gucci company. What do you think they should have done as of August 2, 2016?

THE WITNESS: Right. They should have prevented people from falling on the track by using such things as platform edge doors, platform screen doors, rope doors, gates, things of that nature. In addition, before that, to the long-term program in the interim, there are other technologies

that could be used, which interface between somebody being on the track and the train operator. CCTV is used in parts of the world. They use LiDAR and radar and sonar and infrared. This has been around.

THE COURT: All these things were around and they could have been employed as of August 16, 2016?

THE WITNESS: Long before.

THE COURT: That's your testimony, right?

THE WITNESS: Yes.

THE COURT: As far as the operation of the train by the train driver, do you have an opinion about that?

THE WITNESS: Yes.

THE COURT: What is your opinion about that?

THE WITNESS: That the train driver had many opportunities to stop to avoid interacting with Ms. Shabazz.

THE COURT: You can explain to the jury, briefly, without cross-examination what the basis of that opinion is.

THE WITNESS: Yes, Your Honor.

THE COURT: Go ahead. Why do you say that?

Q Answer his question.

THE COURT: Why do you say the train operator should have been able to stop, is that what your opinion is?

THE WITNESS: Yes.

THE COURT: Tell the jury why you say that.

THE WITNESS: It has to do with math and science,

such as Newton's laws, and basic math. We know -- can I go back why I know? When I worked for the New York City Department of Transportation --

THE COURT: I don't care about when you worked for them. Why do you think that the train operator should have been able to stop in time and not have struck the plaintiff? Correct?

THE WITNESS: Yes. It has to do with time and distance.

THE COURT: What?

THE WITNESS: Time and distance.

THE COURT: There was enough time and there was enough distance?

THE WITNESS: Exactly.

THE COURT: Why don't we do this now. Let's have cross-examination. The jury understands the opinions and the basis of the opinions. Mr. Keaveney or Ms. Winters, do you want to cross-examine now?

MR. KEAVENEY: We'll do it at the end. I would prefer to do it at the end. Let him finish his direct examination.

THE COURT: Do it now so the jury can follow the bouncing ball.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Dr. Berkowitz, how many years have you been an expert witness?
A Since 1997.
Q How many cases have you testified against the Transit Authority?
A I really don't know.
Q Because it's too many?
THE COURT: Is this your first rodeo?
THE WITNESS: No. Many times, but I don't recall.
THE COURT: More than a thousand, less than a thousand?
THE WITNESS: Not a thousand.
THE COURT: Tell us the best estimate.
THE WITNESS: I don't know. Maybe 20.
THE COURT: You know better than anyone else.
THE WITNESS: I don't keep track, Your Honor.
THE COURT: Can you give us an estimate?
THE WITNESS: I'm guessing 20, maybe.
THE COURT: Next question.
BY MR. KEAVENEY:
Q In fact, you just testified against the Transit Authority last June, correct?
A We were together. That's where I met you. I guess I could call you an old friend.
THE COURT: You're old friends. You've been here

before. You know each other. Next question.
Q You've testified not only against Transit but against New Jersey Transit, correct?
A And I represented New Jersey Transit, as well.
Q And Long Island railroad, correct?
A Yes, I've done that.
Q And you've testified against Metro North?
A Yes.
Q Washington Metro?
A Yes.
Q Amtrak?
A Yes.
Q Illinois Central?
A Yes.
Q CSX?
A Yes.
Q Chicago Transit?
A Yes.
Q Union Pacific?
A Yes.
Q All these companies, they've all done something wrong, correct, based on your testimony?
A Yes. And, also, I worked for many of the transit companies. I worked for Boston, Philadelphia, Washington.
Q Just listen to my question.

A Los Angeles, Cleveland.

THE COURT: Just answer his questions. We know you're a superstar witness.

THE WITNESS: I'm not a superstar.

Q You've testified in Chicago, in Atlanta, in Jacksonville, in Miami, in Baltimore, in Los Angeles.

MR. ROTH: Objection.

THE COURT: Sustained. Next question.

Q In fact, you testified, or given deposition testimony, over 50 times against railroads in the past four years, correct?

MR. ROTH: Objection.

THE COURT: Overruled. You can answer.

A I don't know. I don't keep track. I have a Rule 26, Your Honor, but I don't count.

THE COURT: Next question.

Q If I were to represent to you that that indicated, that Rule 26, that you gave testimony at trial or depositions 50 times in the past four years, would that be accurate?

A If you say that's what I did, I guess you're right.

THE COURT: You testified a lot.

THE WITNESS: Mostly depositions, not many trials.

THE COURT: A lot of times you testified. Next question.

Q It would all be on behalf of plaintiffs?

MR. ROTH: Objection.

THE COURT: Overruled. Have you ever testified on behalf of the Transit Authority?

THE WITNESS: No. But I've worked for the State of New York.

THE COURT: Have you ever testified on behalf of the Transit Authority?

THE WITNESS: No.

THE COURT: Have you just testified for plaintiffs? Yes or no.

THE WITNESS: No. Plaintiff and defendant.

THE COURT: You also testified for the defendant?

THE WITNESS: 50/50, Your Honor.

THE COURT: Next question.

BY MR. KEAVENEY:

Q When was the last time you testified on behalf of a defendant?

A New Jersey Transit in depositions.

Q When was the last time? What year?

A Last year, I believe. They don't do depositions. They're not actually testifying because I wrote a report.

THE COURT: You wrote a report for the New Jersey Transit Authority. Is that your testimony?

THE WITNESS: And the case was settled.

THE COURT: Next question.

Q Out of those 50 times that you gave deposition testimony or trial testimony in the last four years, how many times did you testify on behalf of plaintiffs?

MR. ROTH: Objection.

THE COURT: That you gave actual testimony the question is.

THE WITNESS: Most of the time with defendant cases, I write a report and that's where it ends.

THE COURT: So as far as testifying in court, can you tell the jury how many times you've testified for the plaintiff, how many times for the defendant, if you can?

THE WITNESS: All I know is who I represent. 50 percent of my representations --

THE COURT: I'm just asking you a simple question.

THE WITNESS: I don't know, Your Honor.

THE COURT: So you can't answer that question. Go ahead. You say that whether it's reports or testimony, whatever, it's 50/50 between the plaintiffs and the defense?

THE WITNESS: Right. Some of it is for both, both plaintiff, defendant for the same transit organization.

THE COURT: Okay.

BY MR. KEAVENEY:

Q So in the past four years you've testified half for defendants, I just want to clarify, and half for plaintiffs, correct?

A That's not what I said.
THE COURT: You didn't testify half and half. You represented half plaintiffs, half defense, whether it may be reports or testimony. I think that's your testimony. I'm not putting words in your mouth.
THE WITNESS: That's exactly correct.
THE COURT: Next question.
Q Are you being compensated today?
THE COURT: You can answer that question.
A Yes.
Q How much?
A My rate is 525 and hour.
Q How many hours have you spent on this file?
A Well, I spent time on writing my report and I did that and I got paid for that. I don't remember the exact amount, but I did a lot of pro bono work after that because it was so many documents and I just felt kind of guilty.
THE COURT: He's asking you a question.
A I don't know the amount that I charged.
Q How many hours did you spend on your hundred page report?
A On a hundred page report, maybe 40, 50 hours.
THE COURT: Can you give the jury any sense of how much money you're going to be getting because you're representing the plaintiff in this case? Simple question.
THE WITNESS: I got paid for my report.

THE COURT: Just give the jury the total sum.

THE WITNESS: Let's say 50 hours times 525.

THE COURT: Give the jury some idea.

THE WITNESS: Maybe the report was 30,000. I haven't billed yet for court.

THE COURT: About 30,000 so far, and the report and whatever else you've done.

THE WITNESS: I did a lot of pro bono.

THE COURT: I'm just asking you how much you're going to get paid for your testimony.

THE WITNESS: So far I earned $30,000. And for the time I spent in court, which I haven't billed for.

THE COURT: So if I keep you for 100 days --

THE WITNESS: I'd love you. Please do that, Your Honor.

THE COURT: Next question.

BY MR. KEAVENEY:

Q Are you getting paid hourly or getting paid a flat fee?

A I'm sorry?

Q Are you getting paid hourly or a flat fee?

A I work on an hourly basis.

Q You made two general statements, that Transit was negligent for not installing platform screen doors; is that correct?

A No. What I said was that New York City Transit is

negligent for not implementing something to prevent people from interfacing with the track.

Q How many mass transit systems in the United States have implemented platform screen doors?

A There's the one in Washington, D.C., which goes between the Congressional --

THE COURT: You don't have to go into the Congressional. He asked you a simple question. How many, do you know?

Q How many mass transit, not people movers, not airport movers, mass transit systems in the United States have implemented platform screen doors?

THE COURT: Do you understand the question?

A I understand mass transit refers to anything that moves people rapidly. And people mover is --

THE COURT: You're doing mass transport.

THE WITNESS: It's considered part of mass transportation.

THE COURT: Like the defendant here.

THE WITNESS: Any vehicle that moves people between point A and B rapidly is considered mass transportation. Like a bus is mass transportation.

THE COURT: The question is not -- listen to Judge Block. The question is not terribly complicated. You know what the system is here, right?

THE WITNESS: Yes.

THE COURT: Are there any others like this system that you know of in the United States or the world or whatever, that have instituted any safety devices? Yes or no.

THE WITNESS: In the United States, similar to subways, no.

THE COURT: Next question.

BY MR. KEAVENEY:

Q And then you gave your opinion regarding the operation of the train, correct?

A Yes.

Q And you said that was based on math and science, correct?

A Yes.

Q And those calculations are accurate, which you discussed with Mr. Roth, I imagine, correct?

A What did you say?

Q Those calculations are accurate, correct?

A My calculations?

Q Yes.

A That I do are accurate, yes.

Q Thank you. I'll hand it back to Mr. Roth.

THE COURT: All right. Do you have any redirect now based upon what we've heard from Mr. Keaveney? Go ahead.

REDIRECT EXAMINATION

BY MR. ROTH:

Q I think that the judge had asked you about in the United States or the world, and I don't think you heard him say the world about the other systems similar to New York City that have safety measures. Did you hear that?
A Yes, the world.
Q Why don't you follow up and tell us. Let's finish that question.
A Okay. So my first exposure --
Q Not your exposure. The judge asked you how many other systems, stations, whatever. Let's answer the judge's question first. How many systems --
A Hundreds. Around the world there are hundreds, Your Honor.
THE COURT: So you can explain to the jury. You have the United States, there are other transit systems similar to what we have in New York? Yes or no.
THE WITNESS: Yes.
THE COURT: Are there any others that have employed any safety devices as of August 2, 2016?
THE WITNESS: Outside the United States, yes.
THE COURT: Not in the United States?
THE WITNESS: Not in the United States.
THE COURT: And tell us what you know about outside the United States, just so the jury has all the answers to the questions.

THE WITNESS: Basically, I worked all around the world. So I'm familiar in China. My very first exposure to platform edge doors was when I worked in St. Petersburg, not in Florida, but in Russia, and they put those doors in the 1960s.

THE COURT: So it's common outside the United States, people who are outside the United States have better protection than in the United States.

THE WITNESS: Pardon me?

THE COURT: Are you better off being outside the United States when you take a train?

THE WITNESS: Safer?

THE COURT: Yes.

THE WITNESS: Absolutely.

THE COURT: So what's going on here?

THE WITNESS: That's what I want to know. That's the $64 question.

THE COURT: So it's a lot of times outside the United States, where you travel outside the United States you're going to be safer, right?

THE WITNESS: Absolutely.

THE COURT: Not in the United States?

THE WITNESS: Unfortunately.

MR. ROTH: I'm not sure where I am. You said you want me to follow up on his redirect or start my full direct?

THE COURT: He asked questions. I'm giving you the opportunity to now ask further questions.

BY MR. ROTH:

Q Let's talk about from -- what is the reason? What information did the Transit Authority have between 1987, at least, until August 2, 2016 that should alert them that they need to do something different with the operation of the design of their system?

A Like myself, traveling around the world, there are a lot of organizations. Like there's an organization called UITP, which is an international organization in Belgium, where you hold an annual conference. And at that annual conference, the MTA sends employees. And every year it's in a different city, Paris, London, Moscow, Dubai.

So people in the industry, we're always exposed to what the technology is. We're always exchanging. Even on conferences that we hold in the United States in the American Public Transportation Association, we invite foreign speakers.

So the programs that are used in other countries to prevent people from interfacing with the trains is common knowledge. It's not a secret thing. It's not space science. It's been around a long, long time. There are many companies, even American companies, like Westinghouse. They're doing these kind of platform edge doors. Why it hasn't happened in the United States is beyond me.

Q When you say that they share information, what do they share information about as far as the different things that work because if something works in one place, maybe you can adopt it in your place.

THE COURT: He's trying to make a big speech. What is your question?

Q What other information did they share about the safety measures that are implemented in other parts of the world?

A That's what we do all the time. There are organizations out there that are keeping track of it. For example, one of my colleagues in Imperial College in London they have a group called COMET. They do performance indicators of Transit. And one of the international members, the only one in the United States, is the New York City Transit Authority. What they're tracking is people getting killed or injured on the track. Guess who is number one in the world?

MR. KEAVENEY: Objection.

THE COURT: Overruled.

Q Let's talk about that. I want to introduce Plaintiff's Exhibit 56, which is a document from COMET.

THE COURT: Is that in evidence?

MR. ROTH: I believe so.

THE COURT: Let me double check.

MR. ROTH: I don't note an objection on my list, Your Honor.

THE COURT: One second. 56 is not in evidence yet. You want that in evidence?

MR. ROTH: Yes.

THE COURT: I don't have any objection to it on my reports, so I'll allow it in evidence at this time.

(Plaintiff's Exhibit 56 was received in evidence.)

THE COURT: Go ahead.

Q Can I get the -- I put it up. This is a document that we had received from the Transit Authority. You reviewed this document, correct?

A Right.

Q And what is this about?

A This is an indicator showing deaths from accidents per billion passenger journey.

Q What is the time period?

A This is from 2004 to 2013, three years prior to our incident.

Q Let's talk about what information and what are all -- it's very little. It's hard to see. What are along the bottom row?

A Those are cities. Like LN is London, PR is Paris, NY is New York.

Q New York is at the far right, correct?

A Yes. The one on the right.

Q And they have the worst in the world at that time?

A Well, almost double of Paris.
Q And when the transportation agencies get this information, so on one hand they learn about what's safe, like what did you guys use over here to make your subway system safe, they also learned how they're doing compared to other people.
THE COURT: I don't know who's testifying. You're the witness. Do you want to change places with him? What is your question?
Q How is this information supposed to be used by the different transportation agencies that receive it?
THE COURT: You can answer that question.
A Yes, it's like a call to action.
MR. KEAVENEY: Objection.
THE COURT: Overruled. He's going to give his opinion. You can question later. Go ahead.
THE WITNESS: Can I continue, Your Honor?
THE COURT: Yes.
A It's like a call to action. Why am I doing badly and everyone else is doing better.
Q And from the documents you reviewed, what, if any, additional safety measures did the New York City Transit Authority do, other than the public awareness campaigns and the yellow strips after receiving this information?
A Practically nothing else. They had a button campaign.

They spent $1,000 on six-inch buttons, be careful or something, 5 or 6-inch buttons. They didn't do anything.
Q So when -- a transportation agencies has -- can you describe -- strike that. People being struck by trains, you looked at the CWI report that we have in evidence, Exhibit 54; is that correct?
A Yes, I did.
Q In that report what did you -- and that is the data you were talking about from 1987 to 2016; is that right?
A Yes, sir.
Q And that information, you mentioned before I think safety performance indicators that this is a safety performance indicator, this 56?
A Yes.
Q What about the people that are being struck by trains and killed by trains and injured by trains that are in that report, that 1987 report? What is that?
A Safety performance indicators, as well. If you do a tabulation, you can find that there's 105 days where two or more people were killed on the same day, literally.
Q When you said you could, did you?
A Yes, I did.
Q Do you have any notes you would like to help refresh your recollection about some of the --
THE COURT: He doesn't say he has a lack of

recollection. What is your question?
Q Do you recall how many weeks that three or more people were killed in one week in the period from 2006 to 2016?
A I think that's where I got that 105, actually.
Q So when you say you got that, I'm asking, so I understand you analyzed the CWI report.
A It's a huge report.
Q Did you make any notes for yourself? Do you recall right at this moment how many people -- and feel free, I think it's page 16 of your notes -- how many times people between 2006 and 2016 --
THE COURT: Was it between 2015 and 2016?
MR. ROTH: 2006.
THE COURT: Wait a second. You want to ask him if he knows how many people were killed between 2006 and 2016, is that your question?
MR. ROTH: Yes.
THE COURT: Can you answer that?
THE WITNESS: Over that 30-year period?
THE COURT: Yes.
Q How many times --
A Three times per week.
THE COURT: Just one second. If you don't have -- listen to me. If you need to refresh your recollection, I will allow you to do that. I think the question is, if I

remember correctly, can you tell the jurors how many people died on the tracks, I guess, between 2006 and August 2, 2016? I think that's the question.

MR. ROTH: My question was, how many times -- how many weeks where three people were killed in one week in that period?

THE COURT: Can you answer that question or do you need to look at something?

THE WITNESS: According to my notes, over that 30 year period of time --

THE COURT: We're not talking about 30 years.

Q From 2006 to 2016. It's the third line down in your notes.

A I can't see that. I'm sorry.

THE COURT: You have this in evidence already. It's in evidence. It's in evidence.

MR. ROTH: I understand, Your Honor.

THE COURT: It's in evidence.

Q This is the period of time, 2006 to 2016. All of these numbers here, the safety performance indicators, are these safety performance indicators?

A Yes, they are.

THE COURT: Excuse me. I have to manage the trial. It's not so simple. Even you may have a hard time doing it. You're referring to a document in evidence. Tell the jury

what document you're referring to. It's in evidence.

MR. ROTH: 71.

THE COURT: You're being shown Exhibit 71. It's in evidence. It shows all the incidents of, I guess, fatalities during that period of time.

MR. ROTH: The red is fatalities.

THE COURT: It's in evidence. What question do you want to ask him about the document in evidence?

THE WITNESS: May I step up to the chart, Your Honor?

THE COURT: I want to hear the question.

Q We talked about safety performance indicators.

THE COURT: I want to hear the question.

Q What are these numbers? What is the relevance of these numbers to the Transportation Authority when they collect these numbers?

A Every year it's an indicator.

Q What do you do with safety performance indicators?

A It's a call to action. You want to try to reduce those numbers or eliminate them.

Q When you say you want to try to do that, are there tools that transportation authorities use to manage the hazards of people being struck by trains?

A You mean in terms of evaluating the data?

Q Is there a hazard management process?

A Yes, there is.
Q So are there different types of hazard management processes?
A They're basically all the same. There are different approaches, but they're basically all the same. You want to look at the hazard and determine -- we have to categories, a catastrophic hazard, less than catastrophic hazard. You want to look at the hazard and hierarchy the hazard. The higher the hierarchy of the hazard, the more imperative it is to remove it.
THE COURT: I think the question is you've seen this document in evidence. You see the incident report over this period of time. The question is, what, if anything, knowing this to be the case do you think, in your expert opinion, the Transit Authority should have done, if anything?
THE WITNESS: Each year they should have evaluated that data and determined whether it's a serious hazard or a less than a serious hazard. Anybody who is -- when you lose a life, that's a serious -- that's a catastrophe.
Q This is from -- this was marked as 40A. This is from --
THE COURT: That's in evidence, I believe.
MR. ROTH: This is in evidence. Your Honor, could I approach and give this to the witness?
THE COURT: What is your question? It's in evidence.

Q Explain the relevance and the significance of the different categories.

THE WITNESS: May I step up, Your Honor?

THE COURT: I think you've already adduced a lot of testimony about this. You want to go over this again?

MR. ROTH: Your Honor, it's important, I think.

THE COURT: What's your question. It's in evidence.

Q How is this supposed to be used by transportation authorities to manage their hazard?

THE COURT: He's showing you this document that's in evidence. It's 40-A, specifically, right? And your question is what? Looking at that document, what is your question?

Q When you see this, explain the hazard management process. First, you identify a hazard, correct?

A Yes.

Q Can you describe what's --

THE WITNESS: May I step up to the chart?

THE COURT: Put it on the easel. You had a lot of testimony about this already. Ask a couple of focused questions and then move on.

THE WITNESS: May I step up? It would be easier for me.

THE COURT: You can't see that unless you step up?

MR. SHIELDS: He wants to show the jury, Your Honor.

THE COURT: Let the jury see this. Let me hear a

question. The jury has seen this before.
Q This is part of the risk management system, which apparently you're familiar with.
THE COURT: I want to hear your question. Listen to the judge. I want to hear a question that he wants to ask you about that document. Question.
Q Can you explain the right-hand column, the first column that has no color in it?
A Yes. This is the level. Is the incident frequent, probably, occasional, remote, improbable, or eliminated. So this is a hierarchy of frequent or eliminated.
Q And then what is it across the top?
A What's the severity? Somebody dies, there's no doubt, right? It's catastrophic. It's frequent. Where are we? We're high. We're right here. If you move to address a hazard, what hazard would you address first.
Q What happens once a Transportation Authority, using the risk management process and according to the federal rules and regulations and the good and accepted practices and procedures in transportation, what are you supposed to do as far as an action plan when you have a high hazard?
A Eliminate or remediate.
Q What's that called? What's that called in transportation?
A We call that the hierarchy of control.

Q Is it a corrective action plan?
A You develop a plan to eliminate. You do a study and then you do a plan to eliminate or remediate.
Q And how far back did the -- from the documents you reviewed, how far back did the Transit Authority know that they needed to do an adequate study to analyze this?
A It looks like it goes back to 1988.
Q At least, right?
A Huh?
Q At least?
A At least after 1988. But I've read articles of people falling on the tracks in 1905, actually.
Q And since that time, since that time, what -- other than public awareness campaigns, from the documents you've reviewed, from the testimony you've heard, what has the Transit Authority done differently in their design or operation of the system to alleviate this hazard to create a corrective action plan?
A They did nothing. Absolutely nothing.
Q Between August 2nd in 2016?
A Pardon me?
Q Excuse me. Up to August 2, 2016?
A Yes. And even now they --
MR. KEAVENEY: Objection.
THE COURT: Sustained. They did nothing up to that

date is what your testimony is.

THE WITNESS: Yes, Your Honor.

THE COURT: You can get back on the witness stand. Any other questions?

MR. ROTH: I have many other questions. I have a lot of questions.

THE COURT: How many? It's close to lunch.

MR. ROTH: We can do lunch now.

THE COURT: Give me an idea.

MR. ROTH: At least an hour.

THE COURT: Let's go to 1:00 and see where we are.

MR. ROTH: Sure.

BY MR. ROTH:

Q So you mentioned hierarchy. Is that another type of --

A It's a partner.

Q What does that --

A It's not another a kind of tool. It's the toolkit.

Q Explain that to the jury, in similar fashion.

A Basically, back in the early 1900s we developed a concept called the triangle of safety. And from that triangle of safety, we developed what we call reversed the triangle and we call it the hierarchy of control. What do you do if you have a hazard? We all know what we do. We want to eliminate it. If you can't eliminate it completely, you try to substitute something to replace that hazard, which is safer.

If you can't eliminate or substitute, then you want to try to do something that's remediation using engineering, doing some kind of remediation. If you can't do remediation and if the system doesn't allow you to eliminate or substitute or remediate, then you have to provide people with enough information and enough safety precautions so they are as safe as if it was eliminated.
Q And at the time, as of August 2, 2016, in the 20 years leading up to that, what known effective safety measures existed?
A I'm sorry. You broke up at the end.
Q I said from the 20 years prior to August 2, 2016, what known effective safety measures were available to the Transit Authority to alleviate the hazard of people being struck from trains?
A A number, which I mentioned previously like platform edge doors.
Q Describe what that means, platform edge doors.
A This is a system. It's like elevator doors in front of the train. When the train door opens, these doors open and people can go from the platform onto the train. They come in different shapes, sizes, and forms. They come ceiling height. They come three-quarter height. They come without doors, with doors, gates, sliding gates.
Like in Japan they have like sliding gates, instead

of elevator type doors. In Russia and some other countries, in Spain, they came up with the idea of rope. It's like chain link and it goes up and down and you can see through it. They call it rope doors, or platform rope doors, or gates, platform gates.

And in Japan they had lots of problems with people falling on the track. What they did is they put up little walls and the train doors would stop between these little walls. They would encourage people to stand behind these little walls.

Q Did you work with an animation company to create some animation of what, at this station, what the platform screen doors or different barriers would look like at this station?

A Yes, we did. We worked together to show examples of what it would look like trying some of these technologies. And one additional, which we didn't talk about.

Q And the computer animation videos, would they help you to describe the way in which Ms. Harger would have been prevented from falling onto the tracks?

A Yes.

MR. ROTH: Your Honor, I'd like to for demonstrative evidence purposes publish to the jury to help Mr. Berkowitz testify to show that the rendering for the platform doors and other barriers that we had created at the station.

MR. KEAVENEY: Objection, Your Honor. The witness

is not an accident reconstructionist. That's the only way it would be helpful.

THE COURT: I think this is a good time to take a lunch break. We'll be back at 2:00. Don't talk about the case during the break.

(Jury not present.)

THE COURT: You can step down. Don't talk about the case during the break to anybody. We'll see you back at 2:00. You can step down. Tell me, Mr. Roth, what exhibit you want to introduce into evidence now.

MR. ROTH: It's an animation. It's a demonstrative.

It's not a document in evidence. It's a document to help him testify.

THE COURT: He doesn't need any help, from what I can understand.

MR. ROTH: Well, to show what this platform, the different barriers that could be installed at the location. It has dimensions. It has the barriers. It would show --

THE COURT: I think that he can testify -- look, from what I understand, you're relying upon the doors and the barriers. That's what your case is about. We're not talking about ropes.

MR. ROTH: There's all different types of barriers that we're relying on.

THE COURT: You're relying on PSDs and TIAs. That's

what I understand your case to be about. That's what I have here. It's about PSDs and TIAs. Am I missing something?

MR. SHIELDS: There's different types of platform screens.

THE COURT: There are different types of PSDs and TIAs. I'll allow you to explore that.

MR. SHIELDS: Can we show Your Honor the video that we were suggesting to show to the jury as demonstrative evidence that we can have --

THE COURT: What I would prefer would be for him to testify. I don't know whether he needs any demonstrative support. Maybe he can testify and that could be sufficient.

MR. SHIELDS: Judge, a picture is worth a thousand words.

THE COURT: One second. I don't want to introduce something in evidence which would inflame the jurors that haven't seen it.

MR. SHIELDS: Our suggestion, Your Honor, is that we show you the video so that you can understand why we want to show it to the jury, so we can have a ruling before Dr. Berkowitz comes back after lunch.

MR. ROTH: I don't think it's inflammatory.

MR. SHIELDS: There's no other way for the jury to understand what it would look like at this station to have these barriers here and how it would have prevented this

accident.

THE COURT: This is a video that you want the jury to see to help him testify as to what type of barriers he thinks could have been or should have been installed. Correct?

MR. SHIELDS: Correct.

THE COURT: How long is the video?

MR. SHIELDS: About one minute, Your Honor.

MR. KEAVENEY: Judge, the video, from what I understand, it's speculative. There's been stuff that's been formed after the accident which shows that PSDs are not feasible for this station. Unless we can get to that, it's irrelevant.

THE COURT: The video is one minute. If he needs that to help him with his testimony, I'll consider it. Let me see it.

MR. KEAVENEY: Judge, what is his testimony?

THE COURT: I don't know what his testimony is. He's already testified.

(Video played.)

THE COURT: So this is a video of what you think could have been installed?

MR. GENIS: That's the rope barrier, Judge.

MR. KEAVENEY: That's speculative. It's not --

THE COURT: One second. Let me do it my way. So

he's going to testify what could have been done, right? And I don't know why he can't explain that. I don't see why he can't explain that.

MR. SHIELDS: It would assist the jury.

THE COURT: Just try to handle this in a structured way. Let him testify about what he thinks should have been done. Okay. That's what he'll be able to testify to. He can say you should have put up doors, you should have put up ropes. And you want to show this as demonstrative evidence to support that testimony. Right?

MR. SHIELDS: One other part, Your Honor, is the word rope barrier is confusing. It's deceptive.

THE COURT: It's okay. Let him testify first. I will allow this as demonstrative evidence. Let him testify first. See you at 2:00.

MR. KEAVENEY: Judge, it was two videos there.

MR. SHIELDS: One video.

THE COURT: Look, you can't talk to each other. Stop it. You cannot talk to each other. You talk to me.

MR. SHIELDS: Yes, sir.

THE COURT: That's how we make a record. This is the video you want the jury to see to assist him in his testimony. That's it. No other video. That's sufficient.

MR. ROTH: Well, there's a video for the --

THE COURT: One second. You'll mark it for

demonstrative purposes as the exhibit I think it's going to be 103.

MR. SHIELDS: Yes, Your Honor.

THE COURT: Let's hear his testimony first. You have your objections. See you at 2:00.

MR. KEAVENEY: Judge, may I add that by showing this, plaintiffs are opening the door to our feasibility study that showed that this was infeasible at this station.

THE COURT: I'll allow you to do that.

MR. GENIS: Judge, you ruled nothing is permissible post August 2nd.

THE COURT: I ruled what?

MR. GENIS: You ruled that nothing is admissible, other than the measure that was taken of putting in the rails, no documents, no testimony.

THE COURT: You're opening the door with his testimony. I'm going to given him the opportunity, if he wants, to show it's not feasible.

MR. GENIS: It's not opening the door, Your Honor.

THE COURT: We'll take it one step at a time. Maybe I won't even allow this. Let's hear his testimony. 2:00.

(Recess taken; continued on next page.)

AFTERNOON SESSION

(In open court.) (Parties present.)

THE COURT: Listen to me, all right? This is important testimony, obviously, okay? And we have to be careful about how we're going to manage it. And I don't want you people to go talking back and forth to each other, you're going to have to address all your concerns to me. I'm just trying to give everybody a fair trial; that's my job description.

So my thinking is that I don't want to have a whole video in evidence. Okay? For demonstrative purposes or otherwise. I think it would be -- he's going to testify that this is what he thought could have been done he already explained that it was feasible. I'll let the questioning go forward on both sides.

If you want a picture of what he thinks should have been done, I will consider that, if you want to have a photo of that. I don't want to go beyond that because it can become a little bit too prejudicial. It introduces a lot of variables in that video. There's a picture of somebody jumping on a train or whatever, we don't want that. So I would think that that's a fair balance in terms of how I'm going to process this part of the case. Okay?

MR. GENIS: Okay.

THE COURT: Let's have him back on the stand. You

don't have to make any statements now.

MR. GENIS: That's exactly -- I was going to say, we're withdrawing it based on what you said earlier, Judge.

THE COURT: So let's get the witness back on the stand before we have the jury sit.

Obviously this case requires some judicial management. Okay? And we're trying our best to make a clean record, which is what I have to try to do. Okay?

(Witness resumes the stand.)

(Pause in proceedings.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right, folks. We're going to continue with the direct testimony of this witness. And when we left off, Mr. Roth was going to ask him some questions.

Go ahead.

BY MR. ROTH:

Q Dr. Berkowitz, we had talked about the hazard management process. What is the next step after implementing a written corrective action plan? What's the next step?

A Once you have a plan, you move towards implementing it, putting into place whatever is required to complete what the plan asks to be done.

Q Okay. And how were they supposed to evaluate their

written corrective action plan for protecting people from the hazard of train strikes prior to August 2nd, 2016?

A Well, after you implement, you go back and you get your indicators again and see how you're doing, how am I doing.

Q What, if anything, are they supposed to do after they evaluate the effectiveness, if any, of their corrective action plan in light of its actual operation?

A Keep going. Do more. Complete the system.

Q What, if anything, did the Transit Authority do after identifying these hazards?

A Well, I'm not so sure what they had -- other than their indicators, I don't know what they did beyond that.

Q I'm asking what did they do as far as the evaluating the effectiveness of their plan? What documents have you seen that -- or testimony have you heard --

THE COURT: Do you know whether they did anything?

THE WITNESS: Well, they went and took a trip to Korea and all around the world to see how these systems worked, and they found out they worked really good. And then they put it in the circular file.

THE COURT: All right. So do you have any opinion as to what they should have done or what they could have done?

THE WITNESS: They knew they had a problem. They knew the solutions to the problem a long time ago. The logical thing is to implement it.

In fact, one of the documents I reviewed was from the president of the Transit Authority, said if we have something we need to do, we can get the money to do it.

THE COURT: They should have done it is what you're saying, right?

THE WITNESS: Yes, sir.

THE COURT: They should have done what?

THE WITNESS: They should have developed a system where people could not access the track and being run over by the train.

THE COURT: Do you have any other further questions?

MR. ROTH: Yes.

Q How did doing nothing different violate good and accepted transportation safety engineering practices, procedures, and standards of care?

A How can you have an engineering process and do nothing? I mean, you have to do something. Nothing is not a solution. At least from my experience.

THE COURT: Next question.

Q What, if any, written safety plan to prevent or reduce the hazard of train strikes in the New York City subway system have you seen before August 2nd, 2016?

A None.

Q Okay. What, if any, adequate study to protect or reduce -- to protect -- to prevent or reduce the hazard of

train strikes in the New York City subway system before August 2nd, 2016 have you seen?
A No, none.
Q How did not having a written safety plan or doing an adequate study violate good and accepted safety engineering practices and procedures?
A I think we've mentioned that, that the purpose is to solve a catastrophic problem, have a plan and implement a plan and solve the problem.
Q Okay. All right. Do you remember how earlier you said you had two opinions, one was about the New York City subway, the MTA, the New York City Subway Transit Authority's negligence, but you also had an opinion about the train operator, okay? So let's focus on that now.
What, if any, engineering analysis did you do for this train strike incident?
A Well, I went to the station and I looked at the station. I, using the photographs where we see the sand on the ground, which they used to cover the blood or to absorb the blood. I assumed that was the location. I measured from that point to the portal, the entry to the station. I don't exactly -- in my report, I think it's either 243 or 247 feet. And then I look from my experiences, I know that you can see the station from in the tunnels. So I first observed into the tunnel from a -- as a person on the platform, and then I had an

opportunity to see a video of that nostalgia train, which is mentioned earlier, and from that nostalgia train, I tried to estimate the distance on the nostalgia train that I could see the entrance of the station, and I estimated that to be I think 143 feet, approximately, like that. Based upon the speed of the film and things of that nature.

The other thing is I looked at Shabazz's testimonies and she, in one of her testimonies, indicated that she saw Ms. Harger on the track 180 feet prior to -- she was 180 feet before Ms. Harger. And unfortunately, the R68s don't have what we call an event data recorder. The next series of trains that came on, like an -- every automobile has an event data recorder. So the next series of trains that come on, you could not estimate something, but you could exactly calculate the emergency braking rate. But I do know a little about the R68 from my experience with the R44, and I know that when the trains were set that the maximum service braking rate was three miles per hour per second, and the minimum emergency braking rate --

MR. KEAVENEY: Objection.

THE COURT: You're going on and on and on. Next question.

Q You had mentioned the service braking rate.

MR. ROTH: I would like to move into evidence Exhibit 2 and 45.

THE COURT: Which document?

MR. ROTH: Exhibit 2 and 45.

THE COURT: Two? Both 2 and 45.

MR. ROTH: For some reason Exhibit 45 is covered --

THE COURT: Let's take it one at a time. You want Document Number 2 in evidence, correct?

MR. ROTH: Exhibit 45 is the cover to Exhibit 2.

THE COURT: So 45, I have listed as specifications.

MR. ROTH: Right.

THE COURT: I don't have any objection to that.

MR. ROTH: No.

THE COURT: That's in evidence at this time. Go ahead.

(Plaintiff's Exhibit 45 received in evidence.)

MR. ROTH: And then Exhibit 45 is the --

THE COURT: 45 is in evidence at this time.

MR. ROTH: And Exhibit 2.

THE COURT: You want 2 in evidence at this time also? You want 2 and 45?

MR. ROTH: Yes.

THE COURT: 2 and 45 are in evidence. You can speak a little bit more clearly.

MR. ROTH: I'm sorry, Your Honor.

(Plaintiff's Exhibit 2 received in evidence.)

THE COURT: Go ahead.

Q So you had mentioned the specification, so if I could put this up on the screen, please?

THE COURTROOM DEPUTY: Sure. There you go.

(Exhibit published.)

Q So this is Exhibit 2 and this is the appendix, and you can see that this is the specifications for what train? Can you tell --

A You want to go up a little.

I guess it doesn't say -- I guess it's inside the --

MR. ROTH: The other way. The other up, sorry.

THE WITNESS: There it is.

Q You see it?

A R68A. See it all the way at the end.

Q And that is the train that was involved in this incident?

A Yes, sir.

Q And if we turn to Exhibit 2.

You had mentioned service braking, and I think it was the last thing that you had mentioned.

And here it says -- and what did you say, you said that it was -- that your full service braking was based on --

A 3.0, which is line 3. That's service -- that's normal maximum brake rate.

Q And then down here, it talks about what type of braking?

A Emergency braking.

Q And that's the type of braking that occurred in this

incident?
A Yes, it is.
Q Okay. And then over here, you talked about the rate of deceleration. Oh, sorry. Sorry about that.
A Yes.
Q Where my finger is?
A Yes.
Q And that is -- what's the rate there?
A 3.2 miles per hour per second.
Q And is that what you used for your basis of your calculation of the stopping distance?
A Even though I know it's better, I took the worst case. I took the best case for the -- the worst case. I guess it's -- it's the worst -- the worst case. I calculated the worst situation, not the best situation.
Q In other words, what you're trying to say is that's minimum stopping distance?
A Right.
Q The trains can come better, but that's the minimum and that's what you used?
A I took the worst yet, yes. What's the worst the train could do, not the best the train can do.
Q And you know that how? From what part of your experience is that, how do you know that that's --
A I've been working on this subject area for about

25 years, and I'm very familiar with event data recorders all over the United States.

MR. KEAVENEY: Objection.

THE COURT: Objection is sustained. Next question.

Q First, let's talk about, what was the max speed that you are aware that the train operator testified to?

A She said that she went a maximum speed of 25 miles an hour, and I used that --

MR. KEAVENEY: Objection.

THE COURT: Listen, answer the question specifically. Don't ramble on and on.

THE WITNESS: Sorry, Your Honor.

THE COURT: Because I'm going to stop you.

THE WITNESS: Thank you.

THE COURT: What was the question? What was the max speed that she testified to; is that what your question was?

MR. ROTH: Yes.

THE COURT: Answer that question.

THE WITNESS: 24 miles an hour.

THE COURT: Thank you. Next question.

Q It might help to speed things up and to focus you, why don't you look at your notes on page 40?

THE COURT: Ask him a question.

Q Did you calculate what the stopping distance at 24 miles an hour of this type of train was?

THE COURT: Yes or no?

A Yes, I did.

THE COURT: What is the calculation you made?

THE WITNESS: That's in my report.

THE COURT: You need to look at that to refresh your recollection? Go ahead.

Q In your notes, it's page 40, I believe.

THE COURT: You could refer him to a page to help refresh his recollection quickly.

MR. ROTH: Okay.

Q Page 40 of your notes. Do you have page 40?

A They're not numbered, unfortunately. My notes have no numbers.

Q Okay. Do you want to pull out your report?

THE COURT: Do you want to show him something to refresh his recollection, why don't you do that?

MR. ROTH: I'll do that.

THE COURT: Let's move on. Come on.

THE WITNESS: I found the page.

THE COURT: Take a look at this. Does this help you refresh your recollection?

THE WITNESS: Yes, it does.

THE COURT: Answer the question with your recollection.

A My mathematical calculation at 24 miles an hour says that

the train can stop at 153 feet.

THE COURT: That's your testimony.

Next question.

Q And that's for this type of train for a train operate entering the station?

A For the R68A.

Q And other than 3.2 miles per hour per second of deceleration, what other factor did you use for making that determination?

A Well, we have a -- in order to do something, there has to be perception and reaction time. And when I listen to Mr. Jimenez, a train driver operating a train coming into the a station is getting ready to brake. So there's no perception because you're already anticipating you're going to brake, your hand is on the brake handle. Studies done by the U.S. Department --

THE COURT: What is your answer? You're rambling on and on.

THE WITNESS: I'm sorry. I wanted to give a little background.

THE COURT: Just forget about your background. Answer the questions.

THE WITNESS: Okay. There's no perception time, it's the reaction time, and it's .67. That's the maximum --

THE COURT: Next question. Next question. Listen

to me, Mr. Witness. I'm trying to not get you to ramble on and on. Listen to the question and answer it specifically.

THE WITNESS: I'll try my best.

THE COURT: Try to do that better. Next question.

Q The train operator gave a range, correct? It wasn't just 24, it was 20 to 24?

A Yes.

THE COURT: You're not testifying, he's testifying. What's your question?

Q Can you go to the next page of your report? Did you do a calculation at 20 miles per hour?

A Yes, I did.

Q What would be the stopping distance be for that train entering the train station at 20 miles per hour?

A 109 feet.

THE COURT: Next question.

Q And was that -- in coming to that conclusion, what did you use for that?

A Pardon me?

Q What kind -- how do you get to that?

A I calculated it. I know the rate -- I'm taking the worst case deceleration, I'm taking the speed of the train, so I can -- if you have two variables with a train moving, you can calculate the third, which is distance.

Q Would it assist you in explaining these complex formulas

for the jury if you could show graphically to demonstrate how these complex formulas --

THE COURT: I don't think he needs the assistance. He answered the question. Next question.

MR. ROTH: Your Honor, we have a video --

THE COURT: Next question.

Q Did you ever view a video that represented the calculations that you did?

A Yes, I did.

Q Okay. And did that video fairly and accurately represent the stopping distance that you're describing at 24 miles an hour, et cetera, et cetera?

A Yes.

Q Would it help you to demonstrate to the jury --

THE COURT: Is there something you want to introduce into evidence?

MR. ROTH: Yes, for demonstrative purposes.

THE COURT: What is the exhibit number?

MR. ROTH: For demonstrative evidence, Your Honor.

THE COURT: Next question.

He's explained his answer. Next question.

MR. ROTH: Your Honor, there's no chance of --

THE COURT: Next question. He explained his answer.

Q Do you have an opinion of whether the train operator could have stopped in time -- strike that.

Do you have an opinion of where Ms. Harger was at the time she fell at the station?
A Yes.
Q Where was she?
A She was approximately 246 feet from the portal of the --
Q And assuming --
THE COURT: Just one second. So she was about 245 feet from where?
THE WITNESS: From where the train -- the entry to --
THE COURT: The entry --
THE WITNESS: To the station.
THE COURT: Of the train into the station.
THE WITNESS: Right.
THE COURT: You made that calculation, you're a professional engineer, you're an expert. 240 foot away --
THE WITNESS: Well, exactly I measured 246.5.
THE COURT: 246.5. That's where she was when the train was entering into the station.
THE WITNESS: Yes, sir.
THE COURT: That's your answer.
Next question.
Q Okay. And what information did you use to make the determination of where she was located within the station?
THE COURT: I don't think we need that. He's

testified.

MR. ROTH: Okay, Your Honor. No problem.

THE COURT: He's the expert. Next question.

Q So from -- you heard Mr. Jimenez, you were here for his testimony, from 150 feet inside the tunnel, would she have been able to stop the train in time without hitting Ms. Harger?

THE COURT: Do you understand that question?

MR. ROTH: I'll rephrase the question, Your Honor.

THE COURT: Next question.

Q Okay. So from all of the data points that we have, for 150 feet seeing into the station, from the front of the station even from a 180 feet, would the -- should the train operator have been able to stop before hitting Ms. Harger?

A Whatever distance scenario we undertake, the train should have missed Ms. Harger. And the worst case scenario would have been about 27 feet.

Q And, in fact, what actually happened?

A The train overran Ms. Harger by 85 feet.

Q Okay. And how did that deviate from good and accepted train practices, operations, and procedures?

A If she said that she executed the emergency brake 180 feet away, she should have stopped at 153 feet, yet she stopped 85 feet beyond the 180 feet, so she stopped at 260 feet where she could have stopped at 153 feet.

MR. ROTH: Pass it off to Mr. Keaveney now.
THE COURT: I think he's explained himself. Any other questions?
MR. ROTH: I said that I can pass it off to Mr. Keaveney now.
THE COURT: You're finished with your questioning. Mr. Keaveney, cross-examination.
CROSS-EXAMINATION
BY MR. KEAVENEY:
Q Dr. Berkowitz, where is that matrix from?
A This matrix? From a document of the New York City Transit Authority.
Q Isn't it from Military Standard 882E?
A It's part of the Military Standard 880.
Q Okay. And you reviewed Military Standard 882E, correct?
A Pardon me?
Q You reviewed Military Standard --
A And A, B, C, D as well.
Q Okay. So you are familiar that the system safety standard referenced in Military Standard 882E provides a standard for generic method for the identification, classification, and mitigation of hazards, you're familiar with that?
A You broke up a little bit. I apologize.
Q It's for the standard -- it provides a standard generic

method for identification, classification, and mitigation of hazards, correct?
A Yes.
Q Okay. And that is done -- the system safety standard identifies hazards and assesses mitigation associated risks encountered in the development, test, production, use, and disposal of systems, correct?
A Not exactly. That's part of it.
Q Well, that's what the Military Standard 882 says?
MR. ROTH: Objection.
MR. SHIELDS: Objection.
THE COURT: Excuse me, stop. When you hear objection, stop. That means I have to earn my income.
THE WITNESS: I'm sorry, I wouldn't want to take a nickle.
THE COURT: I heard two voices. Who is going to be making the objections? I can't have both of you talking at the same time. Do you want to pose an objection to that question? If you want, you can tell me.
MR. ROTH: Yes.
THE COURT: Sustained. Next question.
Q Military Standard 882 is for new developments and new equipment, correct?
MR. ROTH: Objection.
A No, not correct.

Q That's what's Military Standard 882 says, correct?
MR. ROTH: Objection.
THE COURT: Overruled.
Is that what that standard says or not, if you know? Is it for new equipment or otherwise?
THE WITNESS: It's for all activities. 882 is also part of 49 CFR.
THE COURT: I know what that means. It's for everything.
THE WITNESS: That's one of the things that it's for, but that's not the only thing it's for. It's for all hazards.
THE COURT: Next question.
Q So are you telling me and the Court that if someone trips over a raised sidewalk, that they're supposed to use military analysis 882?
MR. ROTH: Objection.
THE COURT: Overruled.
THE WITNESS: Can I answer?
THE COURT: Yes. Does that apply to somebody that trips?
A What does a sidewalk have to do with --
THE COURT: Well, you know, we're not dealing with a trip here now, so I will sustain the objection.
Q Well, Doctor, you said all hazards?

MR. ROTH: Objection.

A We're talking about New York City Transit Authority hazards.

Q If someone trips on a -- in coming down the stairs in New York City Transit, do you employ Military Standard 882?

MR. ROTH: Objection.

THE COURT: I will allow that. He said all hazards.

A If that's a hazard, and we have data that shows that this is a continuous hazard that a lot of people are tripping over that kind of a situation, of course.

Q No, Doctor, that's not I'm asking. I'm not asking about data.

MR. ROTH: Objection.

THE COURT: Sustained. Next question.

Q All hazards; that's your testimony, right?

MR. ROTH: Objection.

THE COURT: Sustained. He testified.

What do you mean by all hazards? He's trying to ask you --

THE WITNESS: Anything that --

THE COURT: Listen to me. Listen to my question first.

THE WITNESS: Okay.

THE COURT: Can you do that?

THE WITNESS: Absolutely.

THE COURT: He's pointing to that document.

THE WITNESS: Yes.

THE COURT: He's trying to cross-examine you. He's trying to show that this, whatever the military reference is, that it's not necessarily relevant, I guess that's what he's trying to do. You said it applies to all hazards, now he's asking you, what do you mean by all hazards. That's what he's asking you. Is that part of this?

THE WITNESS: Yes, sir. A hazard is anything that can cause injury or death.

THE COURT: That's part of that exhibit, right?

THE WITNESS: Yes, sir.

THE COURT: Next question.

Q And what hazard are you talking about in this case?

A People being hit by a train or on the tracks.

Q And according to the chart, you look at severity times frequency, correct?

A Yes.

MR. ROTH: Objection.

THE COURT: Overruled.

Q What's the frequency of someone being hit by a train?

A 200 people a year, approximately.

Q Okay. Let's take 2011 statistics because you reference them in our report. There was 146 people hit by a train and 1,000,000,650 people that were passengers?

MR. ROTH: Objection.

THE COURT: I don't know. I haven't heard a question. What's your objection? You don't like the way he's talking? You have a question, please.

Q What is the frequency of that event occurring based on those numbers?

THE COURT: Do you understand the question?

THE WITNESS: Yes.

THE COURT: If you understand the question, you can answer it. Or if you're confused, you can let me know.

THE WITNESS: No, I'm not confused.

THE COURT: Okay.

THE WITNESS: But, Your Honor, what he's creating --

THE COURT: Can you answer that question?

THE WITNESS: Yes, Your Honor.

THE COURT: Answer it.

THE WITNESS: It's irrelevant. The number of people that the transit system carries and people being killed is irrelevant. People are being killed.

Q Doctor, what's the number?

A I don't care if they're carrying a hundred billion people.

Q Doctor, what's the number? It's a simple math equation. You do math.

A No, I'm not doing that math because it makes no sense.

It's an illogical index -- indicator.
THE COURT: If you can't answer that question, you have to explain why you can't answer that question.
Is that what you're trying to do?
THE WITNESS: You know.
THE COURT: Just answer my question. You can explain to the jury why you can't answer that question.
THE WITNESS: Because it's not a measure of anything. A billion and 50 -- if you carry a billion people and 50 die, that's not so bad? How could I answer that kind of question? That's crazy. That's a crazy question.
Q Doctor, you're the one that's relying on this chart?
THE COURT: Stop it. Next question. Do you have another question?
Q When you perform a safety improvement or mitigation, that can cause its own hazards, correct?
A Yes.
Q Are you aware that at least six people have died in Korea as a result of platform screen doors?
A I wasn't aware that six people had died.
Q Are you aware that over a hundred injuries were reported on the Jubilee line in England between 1999 and 2011 related to platform screen doors?
MR. ROTH: Objection.
THE COURT: Can I hear the question first, please?

You want to ask her what's happening in England?

MR. KEAVENEY: I'm asking if he's aware of injuries as a result of platform screen doors.

THE COURT: Go ahead. Answer that question.

A No.

MR. ROTH: Objection.

THE COURT: I'm sorry. Overruled. Can you explain, are you aware of any injuries -- what's the question -- because there were not screen doors? Is that your question? I'm trying to understand for the jury what you're asking.

MR. KEAVENEY: I'm asking the witness if he's aware of any incidents, or fatalities, or injuries on other systems that employ platform screen doors.

THE COURT: Can you answer that question?

THE WITNESS: No, because with the data that I have shows that it's nearly 100 percent safe. The data that I have seen from various organizations on these doors, they're nearly 100 percent safe. So I don't know what he's referring to.

THE COURT: 100 percent what?

THE WITNESS: Safe.

THE COURT: Next question.

Q Did you ever call the space between the train and a platform an ordinary risk?

MR. ROTH: Objection.

THE COURT: Overruled.

A I don't recall.
Q Did you write an article in *Railway Terminal World Magazines* in March of 2011 where you called that an ordinary --
MR. ROTH: Objection.
THE COURT: Overruled. I would suggest to you that you harbor your objections a little bit. I am going to allow this type of questioning as to his knowledge, what he's written, and anything else is perfectly okay.
MR. ROTH: Okay.
THE COURT: All right? Now, you continue to object on that basis, I'm going to continue to overrule your objection, so you have a good idea what's going to happen. We're going to allow this type of questioning.
Go ahead. What's the question again?
Q Did you ever -- do you recall writing that in *Railway Terminal World Magazine* in March 2011?
A I know I wrote an article called *Mind the Gap* for that magazine, but I don't remember what was, you know, in that article.
THE COURT: That's your answer.
Q In 2015, did you coauthor a paper entitled *High Level Station Platforms and Passenger Safety* and present it to the 2015 AREMA annual conference?
THE COURT: Do you remember doing that?

A I don't recall. I've done hundreds of papers.

THE COURT: Just answer the question. If you don't recall, you don't recall.

THE WITNESS: I don't recall.

THE COURT: Next question.

Q Do you recall testifying at a case this year called *Scott versus Washington Metro?*

A Yes.

Q During that testimony of you, did you say that New York City Transit puts a lot of time and energy into their safety standards?

A Yes.

Q By the way, Doctor, have you ever been precluded from testifying as an expert witness?

A I've been restricted but not precluded.

Q Has your opinions been precluded from testifying?

A They've been restricted but not precluded.

Q Have you ever been excluded -- has any Court ever excluded your opinions because they're faulty, or unsupported, or conclusory?

MR. ROTH: Objection.

THE COURT: Sustained.

A Not to my knowledge.

THE COURT: I think he's trying to find out whether you've ever been criticized because your opinions were

accepted or not accepted.

THE WITNESS: Lots of times.

THE COURT: Listen to my question. Have your opinions ever been held by any judicial authority that they're not acceptable?

THE WITNESS: I've been reduced -- limited in my testimony.

THE COURT: So your testimony has been limited in some respects, right?

THE WITNESS: To some extent.

THE COURT: That's his general answer. Go ahead.

Q You testified earlier about systems overseas, correct?

A Yes.

Q And you testified earlier about systems in Asia, right?

A Pardon me?

Q You testified about subway systems in Asia?

A Yes.

Q And for the most part, those systems are modern, post-1970?

A Some are older than that.

Q Which systems in Asia are older than 1970?

A Singapore.

Q Singapore is older than 1970?

A Portions of it, the elevated sections.

China built their first subway in Beijing over in

the 1970s, I believe.

Korea had surface transportation type of subways.

I mean, a lot of this was destroyed during World War II.

THE COURT: He is not asking you that question. He's just asking you have these other examples --

THE WITNESS: Yeah.

THE COURT: Next question.

Q For the most part, they're post-1970, correct?

A Yes.

Q And Seoul's system was post-1970, correct?

A Some of it.

Q Seoul's subway system, correct?

A The underground, yes.

Q Have you ever questioned the validity of Korean and Chinese metrics?

A Have I ever criticized --

MR. ROTH: Objection.

A -- Chinese or Korean metrics?

THE COURT: Overruled.

Q Yes.

A No.

Q Do you remember testifying in a case called *Randall versus Meta*, Cook County, Illinois, 2009?

A I don't recall.

MR. KEAVENEY: Can we put that up for Dr. Berkowitz, please?

MR. ROTH: Not in evidence.

MR. KEAVENEY: I want to refresh his recollection.

THE COURT: Just one second. He says he doesn't recall. You want to follow up as to whether there's something in there to refresh his recollection?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: He can show -- the jury is not going to see it. So he's going to show you some piece of paper to see whether you can now, with your recollection recall, if it's the case, whether you can say whether you did testify there or not.

MR. KEAVENEY: Can you show the witness page 75.

THE COURT: Take a look at that and just tell us whether it refreshes your recollection.

MR. KEAVENEY: Line 14 to 21.

Q Doctor, does that refresh your recollection as to whether or not you ever criticized the validity of Chinese and Korean research?

A It's not a criticism, it's just a general comment. It says, as I am not sure how valid they are. I'm not sure one way or the other.

THE COURT: That's the answer. Next question.

Q Doctor, you indicate that the accident was preventable

because Transit didn't have or install platform screen doors; is that your testimony?

MR. ROTH: Objection.

THE COURT: Overruled. I don't remember whether that's the testimony or not. He gave a lot of testimony. What's your focused question?

Q Are you aware there's been testimony that a platform screen door pilot program was in the works as of August 2nd, 2016?

MR. ROTH: Objection.

THE COURT: Was there any program or study as of August 2nd, 2016 on --

A Back in 2010, 2012, I saw that they were thinking about these things, but they never went beyond thinking.

THE COURT: They were just thinking.

THE WITNESS: They were just thinking.

THE COURT: Any documents, anything in writing?

THE WITNESS: Yeah, a lot of documents. Just thinking.

THE COURT: Next question.

Q Are you aware that there was a track intrusion detection system program in the works as of August 2nd, 2016?

MR. ROTH: Objection.

A They were testing, yes.

Q And you would agree that to implement a new system into a

existing system, that a pilot program would be the proper course of action, correct?
A Sometimes. When you're working with established technology, why do you have to polish -- pilot something that's already been established, such as track intrusion detection equipment? It's been around -- that equipment has been around since 1956.
Q In August of 2016, was PSDs a used system in the United States?
A Pardon me?
Q In August -- on August 2nd, 2016, were PSDs a used system in the United States for mass transit?
A The United States --
Q Was it a used system in the United States at that time for mass transit?
THE COURT: Can you answer that question one way or the other?
A They didn't start using these safety systems in the United States, other than on the airport access, on the airport trains, and at the congressional subway that goes between the Capitol building and the congressional office building, but the Federal Government was testing this equipment.
THE COURT: Was it in existence in 2016 in August any place at all? Congress, congressional facilities?

You tell us.

THE WITNESS: Kennedy. Kennedy. Atlanta. Airports.

THE COURT: You're saying that there were screens there at that time, right?

THE WITNESS: They were putting in mass transit, which they're classifying as people movers. Any train or bus is a people mover. But they were building these new trains and they were putting in platform edge doors.

THE COURT: How about down in Washington, D.C., in the Capitol, so that the senators can't fall on the tracks?

THE WITNESS: That's right. They did it.

THE COURT: They did it.

THE WITNESS: I had a chance to ride it.

THE COURT: They had that in existence at the Capitol, right?

THE WITNESS: Yes.

THE COURT: So our good congressmen are not jumping the tracks, right?

THE WITNESS: Yes. Maybe they're not happy.

THE COURT: Okay. Next question.

Q Doctor, are you aware of what complications or issues Transit looked at in connection with considering platform screen doors?

A Yes, I am.

Q And there were several factors that they looked at, correct?
A Yes.
Q Such as structural issues, correct?
A Yes.
Q Electrical issues?
A Yes.
Q Platform strength?
A Pardon me?
Q Platform strength?
A Yes.
Q Column placement?
A Yes.
Q Same size car fleets?
A Yes.
Q These are all things that they looked at and studied, correct?
A Yes.
Q And while they were doing that, you are aware that they started an awareness campaign, correct?
A Yes.
Q Okay. And the awareness campaign was to prevent people from getting close to the tracks, correct?
A Yes.
Q And you've testified in the past that such awareness

campaigns can be a comprehensive way of addressing those types of issues, correct?
A That particular type of issue?
Q Getting close to a train, yes?
A It could help, yes.
Q So what Transit was doing could help people from getting too close to the train, right?
A Well, it didn't work that way because the numbers, they tried these programs, they didn't work, but they kept -- if something doesn't work, what do you keep doing? You keep doing it over again, over again? And that's what they basically did. Their campaigns work really well that they had no impact on the number of people that were being killed or injured on the trains. So having something that doesn't do any good, in engineering we have a name for that. It's called post hoc rationalization, where you make things up to resolve a question that you have, you just make up information or you make up situations which have no reality to solving the problem.
MR. KEAVENEY: Move to strike as nonresponsive.
THE COURT: He answered the question. Go ahead.
Q Doctor, have you ever written about what causes people to make contact with trains?
A What causes people to make contact with trains?
Q Have you written about that?

A I think I have. I think I gave a seminar on it.
Q And have you, in that seminar or any seminar indicated that it's people jumping down into the track area, correct?
A That's one of the things, people go down on the track to pick up their telephone and things of that nature.
Q Right. Suicide's another thing, right?
A Well, I don't know. Every time I've been told something is a suicide, you know, that there's no medical rationale for the declaring -- a suicide is being declared, but it's not being declared by a psychiatrist, it's being declared by a bureaucrat.
Q Slip and trips are another reason?
A There shouldn't be no slips and trips. The platform should be such that it meets all the standards so there are no trips and flips.
Q Drug use, alcohol use?
A One of the things that I remember when I was growing up, they said if you drink --
THE COURT: We don't care. Wait a second. Wait a second. We don't care about what happened when you were growing up.
There are many different ways in which people can end up on the tracks is what you're saying, right?
THE WITNESS: Yes.
THE COURT: All right. Next question.

Q Prior to this case, did you ever opine that platforms -- the absence of platform screen doors was a reason why people ended up on the tracks?
A On this case?
Q Prior to this case, was that ever your opinion?
A It's always been my opinion.
Q Did you ever report that anywhere in any document or any courthouse?
A I've written reports where that is mentioned.
Q Which report that you mentioned that?
A I don't recall.
Q You don't recall.
A Not off the top of my head.
Q It's an important topic and you don't recall?
MR. ROTH: Objection.
THE COURT: Sustained.
He just answered. He said he's written reports, but he doesn't recall specifically what you had in mind.
Q Doctor, has the Federal Transit Administration required the use of platform screen doors or track intrusion devices?
A No.
Q Does New York State Public Transportation Safety Board require the installation of platform screen doors or track intrusion devices?
A No.

Q Has the State or City of New York required the installation of platform screen doors or track intrusion devices?
A No.
Q Now, you performed an analysis of the accident, correct?
A Yes.
Q A mathematical analysis, correct?
A Yes.
Q And you testified earlier that your math is correct, right?
A Yes.
Q What documents did you use to rely on making that calculation?
A Pardon me?
Q What documents did you rely upon to make that calculation?
A The location of the -- of Ms. Harger or the track, which is clearly identified in many sources. The information that the train driver said that she saw her 180 feet away and overran her by 75 feet. The distance that one could see into the tunnel, which I obtained from the video. I used that information. And once -- and then I know the worst case scenario in terms of emergency braking, and I know it's the worst case scenario because the Transit Authority, as part of discovery in this case, provided me with 30 event data

recorders which show the emergency braking rate of 30 different trains, Your Honor. And every one of those trains had way better than 3.2 miles per hour per second stopping distance.

THE COURT: Next question.

MR. KEAVENEY: Move to strike. I don't know what he's talking about.

(Continued on the next page.)

BY MR. KEAVENEY: (Continued.)
Q Did you review Ms. Shabazz's G2 form?
A Yes.
Q In fact, you attached it to your report, correct?
A I believe so.
Q Did you consider that?
A Of course.
Q I'd like to show you that G2 report.
MR. ROTH: Objection.
THE COURT: I don't know whether this is in evidence or not.
MR. ROTH: I'd like to move it into evidence.
MR. ROTH: He never said he relied on it.
THE COURT: Ask him the question. Did you ever look at a document? Is that your question?
MR. ROTH: That's my question.
THE COURT: What is the document you want to ask whether he looked at?
MR. ROTH: It's Defendant's H.
THE COURT: You want to show him the document to refresh his recollection?
MR. ROTH: Objection. He said he looked at it.
THE COURT: He looked at that document. What is your question?
BY MR. KEAVENEY:

Q Did you rely on that document in making your calculations?
A There was not --
THE COURT: The question is, did you rely on this document that he showed you? It's not in evidence. Did you rely on that in making your calculations? Yes or no.
THE WITNESS: No.
THE COURT: The answer is no.
Q Did you listen to any 911 calls?
A Yes.
Q Did you rely on any 911 calls?
A Yes, I did. I heard one 911 call where a person said --
THE COURT: The answer is yes, he relied upon it.
THE WITNESS: I'm pontificating. Just yes.
Q You were in the courtroom when those 911 calls were --
THE COURT: That's not a question. What is it you want to ask him, specifically?
Q You've heard those audio calls before, right?
A Yes.
Q In fact, you heard them today, right?
A Yes.
Q You heard one of them saying that the train -- strike that.
THE COURT: It's 1, 5, and 6 in evidence. You want to ask him questions about 1, 5, and 6, go ahead.

MR. ROTH: I want to get the --
Q You heard audio that Ms. Harger fell onto the tracks just as the train came in, correct?
A Yes.
Q Did you consider that audio in making your opinion?
A Yes. I took that in consideration that she's entering the station 243 feet away from Ms. Harger. She's entering the station. I absolutely took that into consideration.
Q Did you review the police report?
A Yes.
Q Did you review all pages of the police report?
A Yes.
Q Did you take those reports into consideration when making your opinion today?
A Yes.
Q How many pages did you review of the police report?
A I don't remember. I reviewed thousands of pages of documents.
THE COURT: The police weren't there, were they?
THE WITNESS: No.
THE COURT: Somebody made a report.
THE WITNESS: Based on what other people told them.
THE COURT: Next question.
Q Did you review any police report that it was reported that Ms. Harger fell onto the tracks as the train was entering

the station?

MR. ROTH: Objection.

THE COURT: Sustained. If you have any evidence of that nature, you can produce those witnesses. You can produce that evidence. It's okay. But that's not a proper question to ask.

Q You made a calculation regarding time, distance, and speed, I imagine, correct?

A I'm sorry?

Q You made a calculation based on time distance and speed, correct?

A Time, distance, and I also used the rate of deceleration.

Q And you made the following assumptions, at least according to your report. That the train consist was made up of eight 75-foot cars?

A Yes.

Q The next assumption you make is that the train wasn't in the station and that Ms. Harger was on the tracks 7 to 10 seconds before the train ran her over?

MR. ROTH: Objection. Leading from something not in evidence.

THE COURT: What is the question?

Q Did you make that assumption?

THE COURT: He's asking you a question. Did you make that assumption?

THE WITNESS: I didn't make any assumptions, Your Honor.

Q Did you make that assumption in your report?

MR. ROTH: Objection.

A It's not an assumption.

THE COURT: Sustained.

Q On your report under assumptions it says exactly that.

MR. ROTH: Objection. Argumentative.

THE COURT: Is there anything that you said in your report that's based on an assumption.

THE WITNESS: I misused the word. The information I gathered was from the information that was provided. I didn't make up a number. My use of the word assumption was incorrect.

THE COURT: Next question.

BY MR. ROTH:

Q You relied on the fact that it was told by someone that she was on the track for 7 to 10 seconds before the train ran her over?

MR. ROTH: Objection.

THE COURT: Do you understand the question?

A The information I focused on is that there was a lot of information that said that when she fell on the track the train was not yet in the station or approaching the station. So that's why I took the measurement from the portal of the

station to where Ms. Harger was, which was 246 feet. That's where I got the number from.

THE COURT: That's how you based your testimony?

THE WITNESS: Many, many people said the train didn't enter the station. I took the worst scenario and said the train entered the station.

THE COURT: You looked at all these papers and the 911 calls, and whatever else, the police report. You made your calculation, not withstanding any of that, and you explained that all to the jury, correct?

THE WITNESS: I picked the worst case, not the best case.

BY MR. ROTH:

Q In your report it says you relied on a statement from Ms. Smith. Did you look at her statement?

A I looked at her statement.

Q And she gave deposition testimony, correct?

A Yes.

Q And she said that Ms. Harger was on the tracks for 7 to 10 seconds, correct?

MR. ROTH: Objection.

THE COURT: One second. Just stop. It's not in evidence what her testimony is. Okay. So you relied upon her testimony, whatever it was.

THE WITNESS: Yes. 7 to 10 seconds, Your Honor. If

a train is going 24 miles an hour, that's 36 feet a second; 36 feet by 10 seconds is 360 feet.

THE COURT: You just answered the question.

Q You made another assumption about perception?

MR. ROTH: Objection.

THE COURT: He said he didn't make any assumptions. He said he used the word incorrectly.

THE WITNESS: It's not an assumption. I used verified scholarly research done by MIT for the US Department of Transportation. That's where I got the number.

THE COURT: So whenever the word assumption appears, you're telling the jury that --

THE WITNESS: I misused the word.

Q So it's a fact that Ms. Shabazz's perception of the action time is a .6 second?

MR. ROTH: Objection. Argumentative.

THE COURT: Do you understand the question?

THE WITNESS: Yes.

THE COURT: You can answer.

A When you're preparing for an event, an unexpected event is perception reaction time. When you're coming into a station, you're expecting that somebody could possibly be on the track. Right? 50 people are killed and another 150 maimed, average, and another hundreds --

THE COURT: Just try to answer the question. You

answered the question.

THE WITNESS: So the train driver is getting ready to pull the emergency brake. The hand is on the brake. It takes .6 seconds to activate the emergency brake.

THE COURT: Go ahead.

Q Are you a train operator?

A No.

MR. ROTH: Objection.

THE COURT: Overruled.

Q Have you ever operated a New York City Transit train?

A Yes, I have.

Q In service?

A No, not in service. When I was at the New York City Department of Transportation, I was the overseer of the capital budget. So I used to go down to the Coney Island yard and joyride around the yard on the train.

And when I was working in England, actually on the Jubilee line, the London transport let me drive their train into the yard and I remember when I --

THE COURT: You're answering. I don't remember the question anymore.

THE WITNESS: He asked if I had driven a train. I've driven one several times.

Q Have you ever been trained in the operations of New York City transit trains?

A Yes, in the yard.
Q So you're a trained train operator?
A No.
MR. ROTH: Objection.
A You didn't asked if I was a trained train operator. You asked if I had any training. How could I operate the train in the yard if I'm not trained to operate the train? I didn't have a manual that said do this, do that. They trained me how to do it and then I did it. And they did it because I was controlling the budget.
Q When was this?
A In the '70s, 1970 and 1975.
Q 40 years ago someone told you how to operate a train?
MR. ROTH: Objection. Argumentative.
THE COURT: One second. What's your question?
Q I want to know how he was trained in the operation of trains to make this testimony.
THE COURT: If you want to elaborate anything further, go ahead.
A Whoever was in the yard at the time took me on the train, taught me how to operate the train. I was able to drive back and forth in the Coney Island yard. When I was operating on the London transport, they showed me how to operate the train. I drove the train into the yard. When I was in Shanghai I was trained on the Maglev.

THE COURT: Did you do that? Did you drive those trains?

THE WITNESS: I drove the Maglev from Shanghai airport to Pudong.

THE COURT: How about London?

THE WITNESS: They didn't let me drive in service. I went from the N station into the yard.

THE COURT: Next question.

BY MR. ROTH:

Q So .6 seconds is not an assumption and it's not a fact. Then what is it?

A It's the result of a very careful scholarly study that was conducted by MIT for the US Department of Transportation.

Q Was that safety study done in relationship to Ms. Shabazz's perception reaction time?

A No.

Q But you put in here that that was her perception reaction time --

MR. ROTH: Objection.

A Because the study showed a range of -- they had train operators and students conduct the test, and they took -- and I took the highest number. It went as low as .2 seconds. The .6 was the highest number and I took the .6. I wanted to err on the worst side, not the best side.

Q Have you testified in the past that perception reaction

time is a range?
A That's right.
Q And someone could have 1.5 perception reaction time?
MR. ROTH: Objection.
A The best perception reaction time --
THE COURT: Mr. Witness, stop it.
THE WITNESS: I'm sorry. I was trying to answer his question.
THE COURT: Stop it. We are conducting a trial. Questions and answers. We don't ramble on and on, and we don't have cross conversation. Do you understand that?
THE WITNESS: Yes, Your Honor.
THE COURT: Hopefully you've testified before.
THE WITNESS: Yes, sir.
THE COURT: Have you had a judge explain this to you before?
THE WITNESS: Yes, sir.
THE COURT: Listen to me. Question, let me hear the question again that you want him to answer.
Q Are you saying that someone jumping on or ending up on the train tracks in front of Ms. Shabazz's train is an expected occurrence for her?
THE COURT: Can you answer the question? Do you understand the question?
THE WITNESS: Yes.

THE COURT: You can answer.
Q Is that an expected occurrence for Ms. Shabazz?
A Yes.
Q How many times had it happened before August 2, 2016?
MR. ROTH: Objection.
THE COURT: Sustained. I don't know if he can answer the question. Next question. Sustained.
Q You indicated that at .6 seconds in your report is when someone has situational awareness training, correct?
A Yes.
Q Is that required of train operators to have situational awareness training operation?
A Yes.
Q By who?
A By the people who train the train operators. That's one of the things they train them. If you don't have situational awareness, how do you bring the train into the station and stop at the right spot?
How do you know how to do anything if you don't have situational awareness? No one operates a train with blinders on. They have to know where they're going and how they're getting there.
Q Situational awareness is a training according to you, right?
A Situational awareness, everybody has. This concept was

developed by Dr. Etsley where he tried to explain what happens when somebody sees something and has to do something. In order to see something and do something, we call it situational awareness.

You have to be aware. You have to be aware you're coming into a station. You have to be aware where the train has to stop. You have to be aware to avoid jerk rate so people don't fall. There are a lot of things you have to be aware of.

THE COURT: You testified to the jury. Go ahead.

THE WITNESS: I'm sorry, Your Honor.

Q Dr. Etsley was using an expected outcome when he conducted his tests, right?

A Yes.

MR. ROTH: Objection.

THE COURT: Overruled. The answer is yes, he was using that. Go ahead.

Q So you did your calculations based on what then?

A I told you.

THE COURT: He answered that question already. Next question. It's getting repetitious.

Q So you used the braking distance, right?

MR. ROTH: Objection.

THE COURT: He already testified.

Q So your testimony is that going 24 miles an hour it would

take how many feet, 153 feet to stop, correct?
A Yes.
Q And that would take 8.1 seconds, correct?
A I didn't calculate. Maybe I did, but it may be in my report. I have to go look.
Q Look at your report.
THE COURT: What page? If you have something in the report, you can refresh your recollection and we can move it along.
Q Page 57 of your report.
THE COURT: Does that refresh your recollection so you can answer that question now?
THE WITNESS: Yes.
THE COURT: What is your answer?
THE WITNESS: That it takes about eight seconds to stop at 153.
THE COURT: Okay. That's in his report. Go ahead.
BY MR. ROTH:
Q And, again, you reviewed Ms. Smith's testimony when she said that plaintiff was on the tracks from 7 to 10 seconds before the train?
MR. ROTH: Objection.
THE COURT: Sustained. Next question.
Q Did you review that testimony?
MR. ROTH: Objection.

A When a train --

MR. ROTH: Objection.

THE COURT: Stop it. Stop it before I hold you all in contempt of court. Now stop it. Mr. Roth, do you understand what I just said to you? Stop it.

Your question is, did he review any particular testimony. That's your question. What testimony is it that you want to ask whether he reviewed?

MR. ROTH: Regarding how long Ms. Harger was on the tracks before the train struck her.

THE COURT: Did you review such testimony?

THE WITNESS: Yes.

THE COURT: He said yes.

BY MR. KEAVENEY:

Q Was that testimony -- how many seconds was she on the tracks?

A It's two different seconds.

THE COURT: You can explain it all. He's opened the door. You can explain it. Go ahead.

A If you're going 24 miles an hour, in eight seconds you travel 36 times eight. So that's -- I don't have a calculator.

THE COURT: He's going to explain to you the calculation. He's going to be given the opportunity to answer it completely.

MR. ROTH: Thank you, Your Honor.
A If you're traveling at 24 miles an hour in eight seconds you travel 284 feet. If you're braking the train and slowing down, it takes you longer to get to a point when you're slowing down than when you're going 24 miles an hour, because you go 24, 22, 20, 18, 16, all the way down to 0. So the times are not related because one is at a constant speed and one is at a speed that's being reduced.
THE COURT: Next question.
Q If it took the train a 153 feet to stop when Ms. Shabazz put the train into emergency, and the distance from the mouth of the station to the accident location is 246 feet, then the train must have been in the station, correct?
MR. ROTH: Objection.
THE COURT: Can you answer that question?
A I'm confused by the question.
THE COURT: I'm confused by it, too.
Q Let me try to clarify the question.
THE COURT: Next question. You can save this for argument if you put something together.
MR. ROTH: It's not argument, Your Honor. I'm trying to understand the math.
THE COURT: Next question.
Q We have from the mouth of the station to the accident location 246 feet?

THE COURT: That's correct, right?
THE WITNESS: Yes.
THE COURT: Next question.
Q And it takes eight seconds for the train to stop when the emergencies are applied and it will take 153 feet, correct?
THE COURT: Is that correct or not?
THE WITNESS: Yes.
Q So we have 153 feet. That means it's almost 100 feet left from the 246 feet, correct?
A Yes.
Q So the train must have been in the station when the plaintiff fell to the platform?
MR. ROTH: Objection.
THE COURT: Can you answer that?
THE WITNESS: No.
A It doesn't matter if the train was in the station or not. The emergency brake was not applied at 180 feet because she overran 85 feet. So the emergency brake was applied 75 feet approximately before Ms. Harger.
THE COURT: He answered the question. Go ahead.
Q What about your calculation for 20 miles an hour?
THE COURT: What about it?
A The train would stop faster and a shorter distance, 109 feet, approximately.
THE WITNESS: Your Honor, I took the worst case.

THE COURT: You mentioned you took the worst scenario 17 times.

Q You took the worst case in terms of braking systems, you didn't use to write charts for braking distance.

THE COURT: What's the question? Save that for summation. You can do that. Do you have a question?

Q It took 6.9 seconds, based on your calculations, for the train to stop at 20 miles per hour, and that train would have gone 109 feet, correct?

MR. ROTH: Objection.

Q That's based on your calculations.

THE COURT: Overruled. Can you answer that question?

A Yes.

Q Again, 246 feet from the mouth of the station to where Ms. Harger was, right?

A Right.

Q So there's almost 150 left for that train to come in?

A That's right. Absolutely. Thank you.

Q So the train had to be in the station again?

A No. What are you talking about? The train -- Ms. Harger wasn't paying attention. She ran over -- Ms. Shabazz wasn't paying attention, not Ms. Harger. Ms. Shabazz was not paying attention because the train overran 58 feet, and at 20 miles an hour it needed 109 feet. So she had to apply the emergency

brake 20 feet in front of Ms. Harger, but she said -- I'm taking the worst case. She's 180 feet away.

THE COURT: We went over this over and over again.

Q Did you take into account time in your calculations?

A Time is a result of speed and deceleration.

Q Did you take into account your calculations the time witnesses said she was on the tracks before --

MR. ROTH: Objection. Asked and answered.

THE COURT: Sustained. We've gone over this many times. Do you have any other subject you want to ask him about, otherwise we'll move on.

Q You indicated earlier that you looked at the collision with individuals chart, correct?

A Yes, I did, CWIs.

Q And there's many ways of contact with trains, correct?

A Yes.

Q Such as tripping on a platform and hitting upside a train, correct?

MR. ROTH: Objection. Asked and answered.

THE COURT: Sustained. Next question. Listen to me, if I sustained it, you don't talk.

THE WITNESS: I'm sorry, Your Honor.

Q And there's accidents that occur in between train cars?

MR. KEAVENEY: Objection. Asked and answered.

THE COURT: Sustained.

Q You've never designed a New York City station, correct?

MR. ROTH: Objection.

A Yes, I did.

Q You've designed a station?

A Yes.

THE COURT: Stop it. Stop it. You've testified many times, haven't you?

THE WITNESS: Yes, sir.

THE COURT: Have you ever had a problem like this now?

THE WITNESS: No.

THE COURT: There's a first time for everything. There's an objection and I have to rule on it, and then you can answer. You have an objection to the last question?

MR. ROTH: Yes. It's argumentative.

THE COURT: Overruled. What's the question again?

Q Have you ever designed a New York City transit subway station?

A Yes, two.

Q What was the answer?

A On the Second Avenue downtown I designed one in Chatham Square as part of a joint development in Chinatown, and one at 14th Street as part of a post office school joint development. The stations are not being used.

THE COURT: He answered the question. You answered

the question. Next question.
Q I didn't hear the end of that statement. They're not being used, is that what you said?
A There is no downtown Second Avenue subway.
Q Have you ever designed a subway station with platform screen doors?
THE COURT: Have you ever designed a subway station with platform screen doors? Yes or no.
THE WITNESS: No.
THE COURT: Next question.
MR. ROTH: Thank you.
THE COURT: Any redirect?
REDIRECT EXAMINATION
BY MR. ROTH:
Q You mentioned JFK AirTrain. What type of doors does that have?
THE COURT: What type of what?
Q Doors.
A Platform edge doors.
Q When was that installation completed?
A 2006, maybe.
Q Are you aware of how many deaths, catastrophic injuries occurred at the JFK AirTrain?
A Yes.
Q How many?

A Zero.
Q Since when?
A Since it was opened until today.
Q I couldn't hear. What was the year again?
A I'm not sure.
Q Approximately.
A I think it was 2006. I'm not 100 percent sure.
Q Many challenges were mentioned by Mr. Keaveney, that they had challenges. How long had those exact same challenges existed, as far as you know, in the New York City subway system?
A There's always -- in engineering there's always challenges.
Q Is there any evidence that you've seen by any of the submissions for the RFI evaluations and the RFI submissions that said they couldn't meet those challenges?
A There was an RFI done by the New York City Transit Authority to the top 13, 12. There was an independent submission of the top manufacturers. In fact, one of them, I think, built 500,000 miles, an incredible amount. I think I measured it's 1,500 football fields. They said there's not any situation that they can't solve.
Q Mr. Keaveney talked about all the different ways people can come into contact with trains and the precursor. What's the difference between precursor and the root cause of what's

happening to people being struck by trains in the New York City Transit Authority?

A I don't think people are deliberately going on the track. They end up there somehow. And the only way to prevent this from happening is by taking positive action. It has to be -- I remember when I was in engineering school --

THE COURT: You don't have to talk about what you remember in engineering. Next question.

Q So I want to show you -- you mentioned in 2010, I think Mr. Keaveney mentioned 2011, how many accidents there were. Plaintiff's Exhibit 16, we'd like to move that into evidence. No objection noted.

THE COURT: 16.

MR. ROTH: Yes, 16.

THE COURT: We'll allow that in evidence. It's an email.

(Plaintiff's Exhibit 16 was received in evidence.)

Q If I could use the overhead, projector. Let's start off with --

MR. ROTH: Objection, Your Honor.

THE COURT: It's in evidence.

MR. ROTH: Judge, there's hearsay within it. There's no foundation to it in terms of --

THE COURT: I have this as a document here where there has been no objection posed.

MR. ROTH: There was someone on the witness list that was supposed to testify.

THE COURT: Overruled. It's in evidence.

Q Who is it from?

A Tom Prendergast.

Q You mentioned him before.

A I knew him when he was president of the Long Island Rail Road. I think he's now president of New York City -- now he's MTA. I'm not sure.

Q As of 2010.

A I knew him before that.

Q I'm asking you on the date of the email, do you know what -- this is July 2010?

A Yes.

Q And it's to some other people. Do you recognize any of the names, Paul Fleuranges and Carmen Bianco?

MR. ROTH: Your Honor, can we ask if he's seen this email before?

THE COURT: You can cross-examine him on this, if you want.

Q And this email is in response to something. What I'd like you to do is read the top portion that's highlighted in yellow so we can get to it quickly and the jury doesn't waste its time. Can you read it?

A Paul, is this the customer who died of injuries sustained

as a result of a train striking her on the head at five this morning, I guess. The sheer number of incidents involving jumps, falls, slips, and pushes to the track bed, combined with these provide a strong justification for platform doors.

When you consider the number of suicides and other accidental deaths just this year alone, we're in the 50 to 60 range annually. This is absolutely insane in 2010, regardless of what history has revealed.

THE COURT: Now you read that. Who is Tom Prendergast again?

THE WITNESS: I think he was president of the New York City Transit Authority at that time.

Q This was now -- these documents, you've seen similar documents. Mr. Keaveney mentioned how many people ride the subway. Have you ever seen a single document ever in anything that has been produced by the Transit Authority that based on number of people that ride the train they don't have to make it safer?

A Yes. They ignore it. I've read documents. In fact, one, don't say anything because they'll think we're an unsafe system or something. Crazy, crazy statements.

MR. ROTH: Objection.

THE COURT: Objection sustained. Next question.

MR. ROTH: I'd like to admit Plaintiff's Exhibit 18.

THE COURT: 18 is in evidence already, I believe.

MR. ROTH: Okay.
Q So this is an email, and you've seen this before; is that correct?
A Yes. Glenn Lunden, I think he was director of systems safety, something like that.
Q So you have Glenn Lunden and also to Tony Abdallah.
A I think he was an engineer.
Q Let's go to the highlighted section here. Can you read this highlighted section?
A As we discussed at the meeting, we may want avoid discussing enhanced safety so as not to imply the current system is intrinsically unsafe. I would focus on convenience, security. No unwanted intrusions onto the right of way. And cleanliness, eliminating, reduce trash debris falling from the platform to the track bed. I suggest rewriting the first paragraph as follows.
MR. ROTH: Let's go to the next highlighted section. This is for --
THE COURT: These are all your highlights, correct?
MR. ROTH: That I highlighted for the jury.
THE COURT: They're not in the original. It's what you did?
MR. ROTH: Yes.
Q Let's read the top line.
A There are 468 stations currently in operation that will

eventually be equipped with PSD, PED, or PEG system.
Q Is there anything in this email that says it's impossible to put them into our system?
A No.
Q In fact, Mr. Lunden is a smart guy?
A Very smart guy.
Q So let's look at the next highlight. Can you read from that?
A The lack of platform doors issues with noise as trains enter and leave pass through the station. Comfort, convenience, the ease of intrusion from the open platform, vandalism, security and, yes, safety, and trash/debris falling onto the rail bed, this is the point at which the number of incidents in which passengers fall, jump, and climb down onto the tracks should be discussed without implying the current operation is unsafe.
Q Is there any evaluation there with whether it's actually unsafe or not?
A Obviously they think it's unsafe.
THE COURT: Any evaluation was the question. Was there any evaluation is the question.
THE WITNESS: No, there was no evaluation.
THE COURT: Next question.
Q You had mentioned that --
MR. ROTH: It's Plaintiff's Exhibit 29, Your Honor.

THE COURT: Is that in evidence?

MR. ROTH: It's not in evidence yet.

THE COURT: It's not in evidence. No objection. You want that in evidence?

MR. ROTH: Yes.

THE COURT: It's in evidence.

(Plaintiff's Exhibit 29 was received in evidence.)

Q Do you see this?

A Yes, I have.

Q You recognize that name?

A Yes.

Q You previously testified that they basically took the platform screen door project and --

A I can't hear you.

Q I said you had testified earlier about what had happened to the platform screen door project. Can you read this email? It's a 2012 email.

A You want me to read this? At present, we have not received additional guidance from senior management regarding the future of the platform screen door project. So the project has, unfortunately, been placed on hold until further notice maybe. We sincerely appreciate GE's interest in the New York City Transit platform screen door project.

THE COURT: How much longer do you have of your questioning now? We're getting close to a break point.

MR. ROTH: I'll finish in five minutes.

THE COURT: Good. Go ahead.

Q We talked about some of the safety measures. You had mentioned buttons. I'm going to put Plaintiff's Exhibit 36.

THE COURT: That's in evidence now. No objections.

(Plaintiff's Exhibit 36 was received in evidence.)

Q Can you tell me, you don't have to read this, but can you tell us what this document is?

A That's procurement of the buttons.

Q This is --

MR. ROTH: Objection.

THE COURT: It says paid invoice. One second. It's in evidence at this time. 36, there's no objection. What question do you want to ask?

Q So just take a better look at that. Can you see what --

A Paid invoice, work order, safety campaign practice, good subway sense. I guess they ordered different products.

THE COURT: Is there a question?

Q Do you see where it says: Subway safety standing behind the edge. Can you see what the total labor materials budget was for that?

A No, I can't see.

THE COURT: One second. So the document is in evidence. Do you want to read any portion to the jury now or later?

MR. ROTH: I could read it for myself.

THE COURT: I'll let you do it. He doesn't have to testify.

Q Subway safety, stand behind the edge, posters 11 and a half by 17 material; material, $88; labor, $165; and another subway stand behind the edge, $190 for materials, 310 for labor and it was a paid invoice from 2015 and 2016.

THE COURT: You read that from the document. I didn't see it from my screen. I assume the jurors have seen it.

Q I'm going to show you Plaintiff's Exhibit 12. Plaintiff's Exhibit 12 is an email and there's no objection to it.

THE COURT: One second. We have that in evidence already, I believe. Exhibit 12.

Q And this is a 2010 email from Tony Abdallah, who testified here.

THE COURT: Do you want to read something from the document?

Q Can you read the top of the document right there?

A Rapid Transit operations has already made customer safety its number one priority.

Q Do you agree with that statement from what you've seen from the Transit Authority?

A It's a nice statement but nobody implemented it.

Q Let's look at Plaintiff's Exhibit 11.

THE COURT: That has not been placed in evidence yet. We'll allow it in evidence now. No objection.

(Plaintiff's Exhibit 11 was received in evidence.)

Q And this is an email. Have you seen this before?

A Yes. I think it's Cheryl Kennedy.

Q This is from James Wincek to Patrick Lavin. CEK stands for Cheryl Kennedy, that's correct, just to move more quickly.

THE COURT: You want to read that to the jury?

Q It says that with regard to the PRS 2345 emergency subway, we are addressing the same issue (train striking individuals within train limits.)

THE COURT: One second. I don't have it on my screen. I want to make sure the jury has seen it. Everyone sees it now. Next question.

Q The PTSB requested New York City to explore the possibility of installing intrusion detection devices to forewarn train operators to stopping the train. And then at the top of it, it's from James Wincek. Did you come to learn who James Wincek is?

THE COURT: Who are these people? As long as we understand it's from a James Wincek. Who is James Wincek?

MR. ROTH: Objection, Your Honor. Looks like there's handwriting on that.

Q Whose handwriting is that?

A Mine.

THE COURT: One second. This is from James Wincek. It's in evidence. You can explain who this person is. Can you answer that question?

THE WITNESS: Pardon me?

THE COURT: Do you know who that person is?

THE WITNESS: I know of him. Director of operations.

THE COURT: Whose handwriting is that?

THE WITNESS: Mine.

THE COURT: That's your handwriting?

THE WITNESS: Yes. I'm not good at cursive.

THE COURT: He's director of operations. You wrote that on the document?

THE WITNESS: Yes, I did.

BY MR. ROTH:

Q And this document is about the safety platform intrusion detection, which in 2009 what was the state of platform intrusion detection?

A It was pretty well established, the technology, but not implemented.

Q I'll read this for you. It says: Pat, are we expecting DOS, which is Department of Subways to seriously consider this intrusion detection device? How does that comport with making safety the number one priority?

MR. ROTH: Objection.

THE COURT: Sustained.

MR. ROTH: Your Honor, Plaintiff's Exhibit 13A is a trip to Korea. I'm not sure if it's in or not.

THE COURT: Well, is that in, Mike?

THE COURTROOM DEPUTY: I have it down as being in.

THE COURT: We have 11 in, we have 12 in, and 13 in evidence. Okay.

Q This is 13. Do you recognize this? You've seen this before, right?

A Yes.

Q What is it?

A A group went on a paid holiday to Korea.

MR. ROTH: Objection.

Q And it's from whose report is this?

A Tony Abdallah.

Q And he testified here, right?

THE COURT: He's already testified. I don't know whether this has already been spoken about or not when he testified, but go ahead. It's in evidence now.

Q I'll just read this. It says: Prior to the installation of the PSD SMRT average approximately 22 customer jumper or fatalities per year. Operators were extremely traumatized and often couldn't operate trains properly after an incident. After installation, the customer jumper rate was reduced to

zero.

THE COURT: You read it. Go ahead. You don't have to ask any questions. You read the document. Go ahead.

Q And then at the back of the document, which you've seen, correct, there are -- they talk about operation of advantages. And looking at it they talk about the incidents that there's -- there was 121 incidents of jumpers.

THE COURT: If you want to read that to the jury, they have it. It's in evidence. You may want to refer to it in summations. You'll be allowed to do it. Anything else in evidence you can use in your summations. Let's move on to the next question.

Q The only thing is that this was -- what was the recommendation? Do you recall what the recommendation was here?

A Yes. They really learned a lot. It was a big success.

Q Then it said their plan was to do a pilot at an unused station?

A Yes.

Q Did that ever happen?

A No.

MR. ROTH: No further questions.

(Continued on next page.)

(continuing)

MR. ROTH: No further questions, Your Honor.

THE COURT: So I want to take a break now unless you have a few questions.

MR. KEAVENEY: Yes, Your Honor.

THE COURT: But if you have a lot of questions, we'll take a break. You let me know.

MR. KEAVENEY: Just a few.

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MR. KEAVENEY:

Q Dr. Berkowitz, Mr. Roth just showed you an e-mail in which the president of Transit in 2010 thought there was a strong justification for platform screen doors, correct?

A Yes.

Q So in 2010, what was Transit doing?

MR. ROTH: Objection.

THE COURT: Just one second. Overruled.

Q In 2010, did members of Transit go to Korea to investigate the platform screen doors?

A Yes.

Q When they returned, was a platform screen door task force initiated?

A What do you mean?

Q Do you know if a platform screen door task force was

initiated when you got back?
A I believe so.
Q And they also issued a request for information?
A A what?
Q A request for information, an RFI?
A Yes, they did.
Q To investigate what was going on in the community regarding platform screen doors, correct?
A Yes.
Q And did they also develop a con-ops, concept of operations?
A Yes.
Q And they also planned for a pilot program during that time, right?
A They didn't do any planning. They talked about a pilot program.
Q Did they issue a contract for a pilot program?
MR. ROTH: Objection.
A I think there was some preliminary work that was done.
Q Are you aware if they issued a contract for a pilot program?
A No.
Q So other than your lack of awareness on that, but you're aware of everything else?
MR. ROTH: Objection.

Q They did something after this, they took Mr. Prendergast's suggestion seriously, right?

MR. ROTH: Objection.

THE COURT: Sustained. So that's argumentative.

MR. KEAVENEY: No further questions.

THE COURT: I don't think there's anything else you have. So this a good time for you to step down now. Thank you for coming back.

THE WITNESS: I'm done. Thank you. My wife thanks you.

THE COURT: You are done. You can walk out. You can stop now. All right? And we're going to take a break now, and we're going to continue with the next witness who will be whom?

MR. SHIELDS: The Plaintiff's mother, Your Honor.

THE COURT: The Plaintiff's mother is going to testify next.

MR. SHIELDS: Yes, Your Honor.

THE COURT: So let's come back in about 15 minutes, okay? Ten to 4:00, all right?

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: The jury is out of the courtroom now.

You're excused. Thank you for coming.

THE WITNESS: Thank you so much.

THE COURT: All right.

(Witness excused.)

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: So, folks, you've heard a lot today, you know, it's been very intense. And we're going to continue probably until about quarter to 5:00. We're going to start a new witness now.

Do you think this witness will be finished today, or will the witness have to come back tomorrow? Or Wednesday?

MR. SHIELDS: She'll probably have to come back, Your Honor, just because we're testifying through a translator.

THE COURT: Why don't we do this, we're going to get started today, we'll go for about a half hour, then I have something else I have to do. And we'll get started with the witness, and he or she will come back on Wednesday. Okay?

MR. SHIELDS: Yes, Your Honor.

THE COURT: Ready to go. Who do we have now?

MR. SHIELDS: We have Marlize Janssen Harger Da Silva, Your Honor.

(Witness takes the stand.)

THE COURTROOM DEPUTY: First, I ask the interpreter

if you could raise your right hand.

(Interpreter sworn/affirmed.)

THE COURTROOM DEPUTY: Please state your name spell it.

THE INTERPRETER: Connie Raicovich, C-O-N-N-I-E, R-A-I-C-O-V-I-C-H.

THE COURTROOM DEPUTY: Thank you. I ask the witness if you could raise your right hand.

(Witness sworn/affirmed.)

THE WITNESS: Yes.

THE COURTROOM DEPUTY: State your name.

THE WITNESS: Marlize Janssen Harger Da Silva.

THE COURTROOM DEPUTY: Madame Interpreter, would you like a chair, or are you okay standing?

THE INTERPRETER: I'm fine.

THE COURT: So obviously you're not speaking English. You can tell us, the jurors, what language you're talking in.

THE WITNESS: I speak Portuguese.

THE COURT: Portuguese.

All right. So members of the jury, we have interpreters when people come and testify who do not speak English, then we have an interpreter. It's perfectly acceptable. Right? So you're going to listen to testimony through the interpreter. All right?

Your witness, Mr. Shields.

MR. SHIELDS: Thank you, Your Honor.

Marlize Janssen Harger Da Silva

**MARLIZE JANSSEN HARGER DA SILVA,** having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SHIELDS:

Q Good afternoon, Ms. Da Silva, how are you today?
A I am a little nervous. Good afternoon. I'm a little nervous. I've never been in front of a jury before.
Q That's okay. Everyone will be nice to you.
Can you tell the jury --
A Thank you.
Q -- where you live?
A I live in Florianopolis in the State of Santa Catarina, and that state is in the south of Brazil.
Q And are you the Plaintiff, Luisa Harger's, mother?
A Yes, I am Luisa Harger's mom.
Q And are you married?
A Yes, I'm married to Claudio Mumme Harger Da Silva.
Q And do you have any other children?
A I have two more children. Ricardo. He is a mechanical engineer. Augusto, he's an electrical engineer. And Luisa is my oldest child.
Q And is Luisa your only daughter?

A Yes, Luisa is my only daughter.
Q And what is your profession?
A I am an architect.
Q And what is your husband's profession?
A My husband's a doctor. He is a general practitioner. He's also a psychiatrist.
Q And can you just tell the jury about the city where you're from, where Luisa grew up?
A So Florianopolis is a beautiful city. We have a lot of beaches. Probably more than 40 beaches. We also have a rural area that is a -- it is a beautiful city.
Q And can you tell the jury about Luisa's childhood?
A Luisa was always an extrovert. She had lots of friends. She was very intelligent child, dynamic, active. She was also a very responsible child. She helped me take care of her brothers. That's it.
Q And can you tell us a little more about your family, Luisa's extended family in Brazil?
A There are five of us. You know, myself and my husband and our children. And also have a big extended family. We are always meeting at the beach or at a beach house, we're always meeting there with all the cousins. And because Luisa was the oldest child, she was always the leader of all the games they played and everything.
During her childhood, Luisa loved, you know, the

beach house. We had a big garden in our house there and they loved, like, climbing trees, you know, playing games. We had a playground. You know, slides and, you know, we had -- she also had a doll house. And we, you know, that's where, you know, they played with -- we were very close family, not only our nuclear family, but also the extended family.

Q When Luisa was growing up, did she have any health problems?

A No. She was always very healthy. And because my husband is a doctor, we always had a very active life and she was always very healthy.

Q Before the accident, did Luisa take any kind of medications for any reason?

A Only the pill. You know, the -- just, you know, just the pill.

Q The birth control pill?

A Birth control pill.

Q And how about any illegal or recreational drugs? Did Luisa ever take any illegal or recreational drugs?

A No. Luisa was always very against -- she was against drugs, drug use of any kind because my husband is a psychiatrist, and you know, he treats people with addiction. She knows firsthand what -- how drugs can ruin a person's life.

Q You mentioned before that Luisa was kind of the leader of

the family, of the children, the younger children in her family. Can you explain that a little more?
A So she used coordinate, like, all the plays. Like she would plan -- one time she planned, like, a world cup of soccer for the family. So they had teams. She organized the whole thing. She was very good at, you know, doing -- they had, like, houses, sales at her doll house. All the games that they played, bike rides, and the places that they would go visit and all of that, she would organize all of those things.
Q And was Luisa an independent person?
A Yes. She was always very independent. She is -- it's in her nature to be independent. Because she was always a leader, so she had that independence built in.
Q Tell us what activities Luisa liked to do for fun.
A She was very active, physically active. She loved to dance many different types of dance. Ballet, jazz, Capoeira, ballroom dance, belly dance. And right before the accident, she was really into Zumba. Also, she was into theatre, she loved to walk and swim. She was very active.
Q You told us that your family had a home at the beach. Can you tell us what types of things Luisa liked to do at the beach?
A So, you know, she loved to walk on the beach and swim. And also, she loved to use the body board, you know, for the

waves.

And also there is another beach called Joaquina, she loved to go there. She used to sand board on the dunes.

Q Sand boards on the dunes, is that like what we would do for sledding on snow up here?

A It used to be, like, you would use the -- to go down on the slope on the snow by using a board.

Q And growing up --

A Because these dunes are very high. So you slide down using the board, and then you carry your board up those dunes again to do it over.

Q And growing up, did Luisa and your family travel together?

A So yes, we traveled, we had -- we took several weekend trips. We went exploring caves and traveled to tourist sites. And we visit many -- during vacations, we visited many Brazilian cities and cities abroad as well.

Q What were some of your favorite trips that you guys would go on? Like, would you do activities when you went on certain trips?

A So one of our favorite trips was to Canada, to Montreal where we went snowboarding. Luisa loved that. And also, Disney, the trip to Disney we also loved that.

So in Brazil, we used to love to visit working farms, you know, hotels and working farms. She loved to go

horseback riding, paddle boating, all activities like that, at the farm.
Q How about before the accident, did Luisa have any creative hobbies?
A So yes, she used to play the guitar very well and sing. She would bring the guitar to family parties. I was very proud of her when I saw her singing and playing.
Also, she loved to do crafts. Like, she made, like, jewelry, scrapbooking, and some collage.
Q And did Luisa ever do any modeling?
A Yes. When she was 15, she was signed by a famous modeling agency, Ford Models International Agency. And because she was very confident, she was very elegant on the runway. And yes, she studied modeling around that age. She was very good at it.
MR. SHIELDS: Your Honor, I would like to play two videos that are part of Exhibit 97.
THE COURT: Just one second.
So some of these have already I think been introduced into evidence, correct?
MR. SHIELDS: Correct, Your Honor.
So these two videos have not yet been introduced into evidence.
THE COURT: Just identify. We have H, we have A, B, O. Which ones are these now?

MR. SHIELDS: I think that these will be I and J.

THE COURT: Okay. We'll allow that in evidence.

(Plaintiff's Exhibits I and J received in evidence.)

MR. SHIELDS: We'll see if this works, Your Honor.

THE COURT: How long are they going to be?

MR. SHIELDS: They're about one minute each, Your Honor.

THE COURT: Okay.

(Video played; video stopped.)

MR. SHIELDS: And the second video.

(Video played; video stopped.)

MR. SHIELDS: So I'm just pausing here at one minute and 20 seconds into the one minute and 24 second, second video.

Q Is Luisa the last model walking off the stage, the person in the back?

A Yes, she's the last model there.

MR. SHIELDS: I'm just going to ask a similar question with the first video.

I'm going to put that one back for one second.

Q And in this video, is that one Luisa?

A Yes, this is the one -- she is the one you just pointed at.

Q Thank you.

And how did Luisa feel about modeling?

A She loved modeling. She felt really good about it. She felt beautiful. It was something that she felt very -- you know, very good about.

Also, the brands that she was -- she had a lot of work, the brands were always calling. They wanted her, you know, to show their collections. She loved the runway.

Q Thank you.

Now, growing up, can you tell us, was -- what type of student was Luisa in school?

A Ever since she was little, she was very studious. She was very intelligent. She was very good in school. She always met her deadlines. She loved school. She was very good at school.

Q What were some of her favorite subjects?

A She always liked science. She participate in some Olympics of math and also geography.

Q When you say she competed in the Olympics of math and geography, what do you mean? Can you tell us more about that?

A So these were like knowledge tests and they were organized by the states, and the schools would send their best students to compete.

Q And after high school, did Luisa attend university?

A Yes, she went to study at the Federal University of Santa Catarina. It's the best university in the state.

Q And in 2016, was there any particular field of study that

Luisa was pursuing at university?
A Yes, she was in the last year of the architecture.
Q And why did Luisa choose to become an architect?
A I think she was influenced by me. She loved to come with me to work. She loved to, you know, see me working and see the work done. She was very creative. She loved the artistic part of the job and also the technical part of the job. She loved to see the architectural models and she loved to draw. She was very creative. And I think that's why she wanted to be an architect.
She also loved to watch those shows on TV about remodeling and construction. I think she, you know, became very familiar with the process. And I guess that helped also her decision.
Q And when you say architectural models, are those, like, small, like, small buildings or other projects that you would have to, as an architect, put together in your office before the final construction?
A Yes. That's what, you know, the digital architectural models are what you said. But also the university, they usually build their own architectural models. Luisa used to build hers by hand. They build them by hand in school.
Q When Luisa was growing up, would she go on site visits with you?
A Yes. She used to come with me, she used to help me take

some measurements, you know, make some annotations.
Q What else would you do on site visits? Did you have to, like, climb ladders and go up stairs, things like that?
A Depending on the type of construction. If they had, like, a one floor home, then we didn't have to go up the stairs. But if we had a two-floor home, yes, we had to use steps to go up.
Q And in addition to building models as an architect either in school or after you're working, you have to draw renderings of buildings or other projects too, right?
A Yes.
Q And in university, what kind of student was Luisa?
A It was, like, a continuation to her -- from her schooling before. She was an excellent student. She had wonderful -- she had great grades. She was a great student.
Q And how competitive is admission to that university that she went to?
A Yes. It's -- this university is the best university in the state, so there is a lot of competition to get there. Many, many students per opening. There is this testing called Vestibular. There's a knowledge test that have you to take to get in, and she was able to get in the first time. She took it and she got into the first semester with very good score, with a very good score.
Q While she was at the university, did she receive any

academic honors?
A They didn't have really, like, any, like, special, like, honors or prizes or anything, but her grades were always very, very high. She, you know, she was always very well-liked and her grades were high.
Q When she was in school, did she ever receive any scholarships, like to study abroad?
A Yes. Because of her high grades, high scores, she was awarded by the government, she was awarded a scholarship to study in London at one of the best universities there, Westminster University.
Q And when did she study in London?
A She studied there on the first -- last semester of 2014 and first semester of 2015.
Q And can you tell us about her time in London?
A So she liked -- she loved it. The courses were very dynamic. They had field visits. She was very independent. She traveled throughout Europe. So that time in London was very good academically and also personally.
Also, she was able to validate all the courses she took there for her course in Brazil.
Q And during her time in London, did she also meet her husband, George?
A Yes. She met her husband George in London during the exchange, the school exchange. And they fell in love during

that period.

Q And did you meet George during that period?

A So, yes, I went to London to visit her and also to meet him. And I liked him when I met him, I liked him a lot. He had -- he was an engineer. He had a good job. He was a very polite young man. I liked him a lot. He did not have any vices or anything like that. I really liked him.

Q And despite falling in love and traveling around Europe to meet her friends, Luisa was still able to achieve top grades during that semester in London?

A Yes. She kept her grades up and so much so that she was able to use all those grades and all the courses that she took in London in Brazil for her course of architecture there.

Q And as an architect yourself, how would you describe Luisa's talent in architecture before the accident?

A Yes. She was very independent and very talented. They took a lot of field visits to develop projects. Even in school she was able to use a lot of the software to develop projects, like AutoCAD. And she was -- you know, she was talented. She was very creative.

Q And before the accident, did Luisa have any plans for after she graduated from university?

A Yes. She wanted to work as an architect for a period of time and then go on for her master's degree.

Q And did the accident change those plans?

A Yes, it changed everything because she could not work. And also, she had to delay for a whole year to get her degree. She -- after the accident during 2016, she had to stop for one whole semester, so that delayed, you know, her getting her degree.

And also, even after she graduated, she was not able to work.

Q So when did she return to university after the accident?

A The accident happened on August of 2016. She returned to university in March of 2017, and she was still using the wheelchair then.

Q And she eventually graduated from university?

A Yes, she graduated in March of 2018.

Q And just going back to her year in London. After she completed her study abroad in London, she moved back to Brazil; is that right?

A Yes. She came back. She went back to Brazil. She stayed in Brazil. She left to go to London once to meet George's family. And George came to Brazil to meet our family as well.

Q And, like, how often would George and Luisa talk after she moved back to Brazil?

A Yes, they spoke on the phone every day. They spent about, you know, between an hour and two hours talking to each other every single day on the phone. And then he came to

visit in Brazil. And then she came here to New York to visit him as well.

MR. SHIELDS: Judge, probably in the next couple of questions would be a good time for me to stop for the day.

THE COURT: So just give me an idea, how much longer do you have of your direct testimony?

MR. SHIELDS: It's going to be a while longer, Your Honor.

THE COURT: So we'll take our break right now.

And members of the jury, you're going to come back on Wednesday. Tomorrow is Veteran's Day.

Don't talk about the case. You're doing great. A lot of things have been happening. There's a lot of testimony already. You've been absorbing it all. It's all going to come together at the conclusion of the trial.

At that time, as I mentioned to you before, the lawyers will have an opportunity to each come before you to argue on their behalf as to what they would like to you do, and they'll be able to discuss the law and the evidence. We call those summations.

And then after that, I am going to come down and explain the law to you. I will go over the verdict sheet with you. I'll give you your marching orders, and then you're going to start your deliberations.

You're doing great. We've have had these

interruptions, I know that, and I apologize for that. But we're coming along just fine. See you Wednesday, 10:00 o'clock. Don't talk about the case.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: You may step down.

You will be back here Wednesday morning at 10:00 o'clock. Okay?

The jury is out of the courtroom. We have a few things to talk about.

So the Chief Judge has just recently contacted me because we have some scheduling problems again. And she would like to close the courtroom on Friday. I don't want that to happen. But apparently because of our wonderful government, the people are not getting paid, and we want to show our solidarity to support and give these folks an opportunity to not have to work on Friday. So we have these realistic problems with our great government today, and we have to just do the best we can under these dire circumstances.

Now, if it was up to me, we were prepared to all come on Friday. I know Mr. Keaveney made arrangements for your experts to come, but I have to now respond to the Chief Judge. Everybody else seems to feel that we have to shut the courtroom down on Friday.

There is a window of possibility that maybe our wonderful government can, you know, resolve the problems that we have of people not getting paid, et cetera, et cetera. I will know more tomorrow, but in the meantime, I'm trying to, you know, cooperate with the best I can to really deal with our wonderful government. Okay?

Now, Mr. Keaveney, I really appreciate the fact that you made arrangements to have your experts come on Friday. So tell me now a little bit about that because it looks like we may not be able to accommodate that.

MR. KEAVENEY: I will work on changing his schedule. He's local, so I'm hoping that's not an issue. Might just switch some patients around. It's a doctor. I will have more information the next time.

THE COURT: Let's try to be anticipatory, see if you can rearrange for him to come on that Monday.

MR. KEAVENEY: Yes, Your Honor. And I think Plaintiff will have finished up by Thursday afternoon. I think that's the anticipation.

THE COURT: Well, now, let's -- we're making a record here, so let's just go off the record while we just talk about scheduling matters.

(Discussion off the record.)

THE COURT: Anything you want to put on the record before we adjourn for the day? We've had a tough day. I've

yelled at you folks. I apologize. And in my old age, I'm just getting a little nasty. What can I tell you? It's difficult to manage a case like this because there's a lot of emotions, there's a lot of passions. There's a lot of work that you folks have done, and sometimes we have a witness like this distinguished gentleman, and you expect me to reign him in, it places a lot of burden on the judge, and sometimes have I to sort of raise my voice to get everybody on the same page, and I'm just trying to do it even handedly. So I'm giving everybody an equally bad time. Okay? See you tomorrow -- Wednesday, 10:00 o'clock.

MR. KEAVENEY: Thank you.

MS. WINTERS: Thank you, Your Honor.

MR. SHIELDS: Thank you.

MR. GENIS: Have a good day, tomorrow, Judge.

(Matter adjourned to Wednesday, November 12, 2025 at 10:00 a.m.)

# I N D E X


| WITNESS | PAGE |
|---|---|
| **ORLANDO JIMENEZ** | |
| DIRECT EXAMINATION BY MR. ROTH | 875 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 912 |
| REDIRECT EXAMINATION BY MR. ROTH | 945 |
| RECROSS-EXAMINATION BY BY MR. KEAVENEY | 950 |
| **CARL BERKOWITZ** | |
| DIRECT EXAMINATION BY MR. ROTH | 954 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 967 |
| REDIRECT EXAMINATION BY MR. ROTH | 976 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 1015 |
| REDIRECT EXAMINATION BY MR. ROTH | 1057 |
| RECROSS-EXAMINATION BY MR. KEAVENEY | 1071 |
| **MARLIZE JANSSEN HARGER DA SILVA** | |
| DIRECT EXAMINATION BY MR. SHIELDS | 1076 |

**E X H I B I T S**


| | |
|---|---|
| Plaintiff's Exhibit 38 | 900 |
| Plaintiff's Exhibit 39B | 901 |
| Plaintiff's Exhibit 74E | 904 |
| DX Exhibit 77 | 918 |
| Plaintiff's Exhibit 56 | 981 |
| Plaintiff's Exhibit 45 | 1005 |
| Plaintiff's Exhibit 2 | 1005 |
| Plaintiff's Exhibit 16 | 1059 |
| Plaintiff's Exhibit 29 | 1064 |
| Plaintiff's Exhibit 36 | 1065 |
| Plaintiff's Exhibit 11 | 1067 |
| Plaintiff's Exhibits I and J | 1082 |