UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
LUISA JANSSEN HARGER DA SILVA,

Plaintiff,

- against -

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, and RAQIA SHABAZZ,

Defendants.
--------------------------------------------------X

**DECLARATION IN SUPPORT OF DEFENDANTS' MOTIONS PURSUANT TO FED. R. CIV. P. 50(B) AND 59**

17-cv-04550(FB)(VMS)

**TIMOTHY J. COLLAZZI** declares pursuant to 28 U.S.C. § 1746:

1. I am a member of the law firm Landman Corsi Ballaine & Ford P.C., attorneys for defendants New York City Transit Authority, Metropolitan Transportation Authority, and Raqia Shabazz ("Defendants") and as such, and from a review of our files, I am fully familiar with the matters herein.

2. I submit this Declaration in support of Defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b); or, alternatively, for a new trial pursuant to Fed. R. Civ. P. 59; or, alternatively, remittitur of the jury's verdict.

3. Attached hereto are true and accurate copies of the referenced documents.

4. Attached as **Exhibit A**, is a copy of the transcript of the trial proceedings that occurred from October 27, 2025 through November 20, 2025.

5. Attached as **Exhibit B**, is Plaintiff's Exhibit 13, South Korea Trip Reports, which were bates stamped as NYCTA_2_00002614 to NYCTA_2_00002630 and NYCTA-02675 to NYCTA-02701. Plaintiff's Exhibit 13 was received into evidence at trial on October 30, 2025. (Tr. at 499; *see also* ECF Doc. # 340 at p. 2).

6. Attached as **Exhibit C**, is Plaintiff's Exhibit 24, an October 6, 2011 "Evaluation Summary of Responses Received to RFI #10RFIN44," which was bates stamped as NYCTA_2_00589606 to NYCTA_2_00589608. Plaintiff's Exhibit 24 was received into evidence at trial on October 28, 2025. (Tr. at 205; *see also* ECF Doc. # 340 at p. 2).

7. Attached as **Exhibit D**, is Plaintiff's Exhibit 54, "Collisions with Individuals" from 1987 to 8-02-2016, which was bates stamped as NYCTA-02822 to NYCTA-03218. Plaintiff's Exhibit 54 was received into evidence at trial on October 30, 2025. (Tr. at 466; *see also* ECF Doc. # 340 at p. 2).

8. Attached as **Exhibit E**, is Plaintiff's Exhibit 71, "Struck Chart: 2001-2018," which was bates stamped as Da Silva 007146. Plaintiff's Trial Exhibit 71 was received into evidence at trial on October 30, 2025. (Tr. at 469; *see also* ECF Doc. # 340 at p. 2).

9. Attached as **Exhibit F**, is Plaintiff's Trial Exhibit 73, a May 11, 1999 memo regrading "Platform Edge Guard Rail/Fencing," which was bates stamped as NYCTA_02_00005926 to NYCTA_02_00005927. Plaintiff's Exhibit 73 was received into evidence at trial on October 30, 2025. (Tr. at 620; *see also* ECF Doc. # 340 at p. 2).

10. Attached as **Exhibit G**, is Defendants' Exhibit II, "September 30 to October 8, 2013: Track Intrusion Detection / Platforms Doors Trip Report," which was bates stamped as NYCTA_2_00249217 to NYCTA_2_00249230. Defendants' Exhibit II was received into evidence at trial on November 18, 2025. (Tr. at 1870; *see also* ECF Doc. # 340 at p. 1).

11. Attached as **Exhibit H**, is Defendants' Exhibit JJ, "CPM Master Plan Track Intrusion Detection" dated November 8, 2013, which was bates stamped as NYCTA-00675 to NYCTA-00701. Defendants' Exhibit JJ was received into evidence at trial on November 18, 2025. (Tr. at 1872; *see also* ECF Doc. # 340 at p. 1).

12. Attached as **Exhibit I**, is Defendants' Exhibit LL, "CPM Master Plan Platform Screen Doors Pilot (PSD)," which was bates stamped as NYCTA_2_00265435 to NYCTA_2_00265488. Defendants' Exhibit LL was received into evidence at trial on November 18, 2025. (Tr. at 1874; *see also* ECF Doc. # 340 at p. 1).

13. Attached as **Exhibit J**, is Defendants' Exhibit NN, 12/18/24 "Platform Screen Doors" PowerPoint, which was bates stamped as NYCTA_2_00251461 to NYCTA_2_00251472. Defendants' Exhibit NN was received into evidence at trial on November 18, 2025. (Tr. at 1874; *see also* ECF Doc. # 340 at p. 1).

14. Attached as **Exhibit K**, is Defendants' Exhibit PP, "CPM Master Plan Track Intrusion Detection Pilot Phase II" dated January, 2016, which was bates stamped as NYCTA-00726 to NYCTA-00753. Defendants' Exhibit PP was received into evidence at trial on November 18, 2025. (Tr. at 1877; *see also* ECF Doc. # 340 at p. 1).

15. Attached as **Exhibit L**, is Defendant's November 20, 2025 letter regarding Plaintiff's counsel's improper statements during summation. Defendants' letter was electronically filed on the Court's docket on November 20th. (*See* ECF Doc. # 337).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 20, 2026
New York, NY

/s/ Timothy J. Collazzi
Timothy J. Collazzi

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUISA JANSSEN HARGER DA SILVA, Plaintiff, | Civil Action No. 17-CV-4550 (FB) |
| vs. | JURY SELECTION AND TRIAL |
| NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, and RAQIA SHABAZZ, Defendants. | Brooklyn, New York<br>Date: October 27, 2025<br>Time: 10:00 a.m. |

---

TRANSCRIPT OF JURY SELECTION AND TRIAL
HELD BEFORE
THE HONORABLE JUDGE FREDERIC BLOCK and a JURY
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For the Plaintiff: Robert Genis, Esq.
Sonin & Genis
One Fordham Plaza, Suite 907
Bronx, New York 10458
718-561-4444
-and-
David Roth, Esq.
Elliot Shields, Esq.
Roth & Roth LLP
192 Lexington Ave, Suite 802
New York, New York 10016
212-425-1020

For the Defendants: Andrew P. Keaveney, Esq.
Landman Corsi Ballaine & Ford PC
120 Broadway, 27th Floor
New York, New York 10271
212-238-4800

(Appearances continued on the next page.)

Court Reporter: Annette Montalvo
Official Court Reporter

APPEARANCES: (Cont'd)

For the Defendants: Janelle N. Winters, Esq.
Landman Corsi Ballaine & Ford PC
One Gateway Center
22nd Floor
Newark, New Jersey 07102
973-623-2700

Also Present:
Logan Morales, Paralegal, Roth & Roth
Perdita Barchuk, Paralegal, Landman Corsi Ballaine & Ford PC

Malcolm Drenttel, Law Clerk to Honorable Frederic Block

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

(Proceedings commenced at 10:22 a.m., in open court, outside the presence of prospective jurors, to wit:)

THE COURT: Let's call the case and get going.

THE COURTROOM DEPUTY: Civil cause for jury selection and trial, *Harger Da Silva v. New York City Transit Authority*.

I ask counsel to state their appearances.

MR. GENIS: Robert J. Genis, Sonin & Genis, for the plaintiff.

THE COURT: Okay.

MR. SHIELDS: Elliot Shields, Roth & Roth, for the plaintiff.

MR. ROTH: David Roth, Roth & Roth, for the plaintiff.

THE COURT: Okay.

MR. KEAVENEY: Andrew Keaveney for defendants.

MS. WINTERS: Janelle Winters, Landman Corsi, for the defendants.

THE COURT: And sitting next to you is the plaintiff?

MR. KEAVENEY: Your Honor, this is our paralegal, Perdita Barchuk.

THE COURT: Okay. Welcome to court.

All right. Now, we have got to try to pick a jury today, okay. And Mike is going to go down to bring up about

50 people, and then we'll start, and I will start to talk to them. In the meantime, if you want to say anything now before we do that, by all means -- Mr. Keaveney, you want to say something, right?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: We haven't done anything yet, but go ahead.

MR. KEAVENEY: I know. And that's why I want to make my statement first regarding the jurisdiction of this Court for this -- for some of the matters that are being tried today.

Plaintiff claims that defendants are negligent in failing to properly study, plan, and install platform doors and other safety devices in its system --

THE COURT: Go a little slower. A little slower.

MR. KEAVENEY: Defendants have raised affirmative defenses based on qualified and governmental immunity --

THE COURT: We know you have an affirmative defense of qualified immunity.

MR. KEAVENEY: Yes, Your Honor.

And that it is immune from suit for such claims, at least that's our allegation and our claim.

Just for a little background, for the record, defendants moved for summary judgment on its affirmative defenses, which this Court denied. Defendants then filed an

appeal to the Second Circuit based on the collateral order doctrine. This Court thereafter granted plaintiff's motion, seeking to deem the appeal frivolous on the grounds that state law governmental immunity --

THE COURT: Wait a second. Why are you doing this now? We want to pick a jury. I mean, I will give you all the time you need to make a record, but right now we've got to get the jury up here.

Is this necessary to do this now?

MR. KEAVENEY: It is, Your Honor, because --

THE COURT: Why?

MR. KEAVENEY: Because I'm saying that this Court doesn't have jurisdiction to hear these claims, and I want to put that on the record before the jury comes in.

THE COURT: Okay. Now, why do I not have jurisdiction?

MR. KEAVENEY: That's what I am getting to, Your Honor.

THE COURT: You want to challenge the jurisdiction?

MR. KEAVENEY: It's just a couple more sentences, Your Honor.

THE COURT: Okay. So what we're going to do -- listen to me. I really covet the use of the jurors' time. I will give you all the opportunity you have to make whatever speeches you feel you want to make for your client, okay. But

I want to use the jurors when they're here.

So this is not going to change anything, obviously, right?

MR. KEAVENEY: No, Your Honor, but I need to preserve my record for appeal.

THE COURT: Look. Listen to me. I am going to give you the chance to do that. But let's pick the jury first, and then afterwards you can put it on the record. How about that?

MR. KEAVENEY: That's fine, Your Honor. I just don't want to waive anything --

THE COURT: You are not waiving anything. So I am now -- we have a reporter here. We usually don't make a record of jury selection in civil cases. We never do.

So I don't think we should do it here. Why should we make an exception? But you have made a speech, and I am telling you right now, while we have the reporter here, what I'm going to do, okay?

You can make, as I said before, all the record you want. I am going to give you ample opportunity to do that, but not on the jurors' time, okay? Okay.

MR. KEAVENEY: Your Honor, though, the jury is going to be told certain things. At this stage --

THE COURT: The jurors, we'll take that as it comes. Okay? You can make your record, but we want to bring the jurors up now and select the jury, okay?

All right. While we have the reporter here, let me tell you exactly what we are going to do, all right?

In civil cases we don't keep a record of the jury selection, okay. It is never done in this court. We are making a record right now because this is kind of a different type of case, it is an emotionally charged case. I think we maybe have to be flexible enough to do things a little differently than maybe we normally do.

So what we are going to do is we are going to bring 50 people up here, okay, and I'm going to then talk to the whole group at once, I think, and just flush out if there's anybody there that just can't sit on this case.

And I will explain to them, we have an emotional case, there's no question about it, but we have to be able to just be able to put that aside and just make a decision based solely on the evidence. And I am going to be candid with them. This may be difficult to do. Everybody is a human being. You are obviously going to feel sympathy towards this woman. But it is going to be terribly important that you are going to have to deal with that. And if you can't put that aside and just be willing to make a decision based upon the record in this case, then you can't sit on this case. Also, if you have any prejudice against the Transit Authority, you can't sit on this case as well.

So we're making a record that I am going to give the

jurors that little speech to begin with. I think that's probably really relevant in this particular case, okay?

And then after that, Mr. Innelli will select 14 people. They will be sitting in that box. And then I am going to maybe talk to them all again briefly. I think we want to find out if there's anybody that has any real physical problems that they can't sit on the case. So we have to flush that out, in this particular case especially, because of the human dynamics with this woman, who obviously is going to evoke sympathy and should evoke sympathy, all right? I am going to make a little speech about that.

Maybe it wouldn't be a bad idea that we keep -- make a record of that speech, all right? It may not be a bad idea. And then after that, you know, we will just go forward with the normal jury selection process. That's what I'm going to try to accomplish today.

Mr. Innelli has asked for 50 prospective jurors. Usually we ask for 35. But because of the nature of this case, we thought we would err on the side of caution, and hopefully we'll have enough people to select a jury, who will be able to commit themselves to deciding this case solely on the evidence and have the -- as a practical matter, deal with the emotional aspects of it. So we are going to be very careful about doing that because I think it is very important for the defendant to have that type of assurance that the

judge is going to make every effort to level the playing field and to try his best to see whether the jurors can put aside their emotions and decide this case solely on the evidence.

Now, as far as Mr. Keaveney is concerned, you are going to be able to make all of your objections, jurisdictional-wise, anyway, as well as the plaintiff, but we are going to do it when the jurors are not here, okay. So we can do this early in the morning, we can do it when the jurors are at lunch, we can do it at the end of the day.

I respect the fact that lawyers have an obligation to make a clear record for their clients, okay. So that's how we're going to proceed.

The jurors are coming in now, and let's just take a break while they all sit here, and then I will make my statements to them on the record, and we will go from there.

MR. GENIS: Judge, may I ask three questions related to voir dire solely?

THE COURT: You are not going to ask any voir dire. We are going to talk about that later.

MR. GENIS: No, no. I have three questions with the Court with respect to voir dire.

THE COURT: What about?

MR. GENIS: One, is the Court going to advise, because we are having a break during the trial, that the trial may be three to four weeks in length so we don't lose every

prospective juror --

THE COURT: Well, why don't you let me try to do my job that I've been doing for 31 years and see if I can do a good job or not.

MR. GENIS: Okay. I'm stopping.

THE COURT: What's your guess? Do you think the judge will do a good job after doing this for 31 years?

MR. GENIS: I think so.

THE COURT: Maybe yes, maybe no. We'll find out.

MR. GENIS: But I have to do my job of -- you know.

THE COURT: Not when the jurors are here.

And then we'll introduce Malcolm, and he'll go through the questions.

MR. GENIS: Okay.

THE COURT: Let's not talk about anything now as the jurors are walking into the courtroom.

(Short pause; prospective jurors enter the courtroom.)

THE COURT: Good morning, folks. We are waiting for everyone to come in here, and then I will start talking to you. Just relax in the meantime.

(Short pause; prospective jurors continue to enter the courtroom.)

THE COURT: All right. Good morning, folks.

You are sitting there, and you are probably puzzled

as to what this is all about, and what's going to happen to our lives today, correct?

THE COURTROOM DEPUTY: Should I swear them in first?

THE COURT: Good idea.

THE COURTROOM DEPUTY: Thank you.

I ask you all to please stand and raise your right hand.

(Prospective jurors duly sworn.)

THE COURTROOM DEPUTY: Thank you. Have a seat.

THE COURT: Good morning, folks.

So I am Judge Block, and I am going to be presiding over this trial.

And we are going to start nice and slow today because I have a feeling that probably most of you have never been exposed to a jury selection process before, I assume.

So give me a sense of who we have in the audience.

How many of you folks have ever sat or gone through a jury selection process before?

Okay. So it's just a small number. And that's not unusual. This is strictly a random selection process, but I find generally that, surprisingly, most of the people have not had the experience and the opportunity to sit as jurors in our great country. And we have about maybe 15 or so who have already done that.

So you folks who have a prior sense of this will

probably know a little bit about what I am about to say, but I am going to talk to you as if nobody has ever sat on a jury before so that the majority of people will all be on the same page as I am, okay?

You're probably mystified about what the process is and how are we going to go about jury selection. So I am going to explain things to you as we go along to give you a comfort level because my guess is that people are a little concerned, they have no idea what to expect, they have no idea how long they are going to be here. So we want to get a practical handle on things to be able to get started.

Let me tell you how the process works.

I am going to make some general comments about this case to you to begin with. You know nothing about it whatsoever as you sit right now. But I am going to start to explain a little bit about what type of case this is, and we are going to ask you folks some questions as to whether you can sit objectively, and just be able to render a decision strictly based upon the evidence and nothing else. It sounds simple, but sometimes it is easier to say that than it is to do that. But that's what we're trying to do.

We are going to wind up at the end of the day, hopefully, with 8 jurors who will be sitting in the jury box. And in order to do that, Mr. Innelli, who is the Court's deputy clerk, does an excellent job, is going to help me with

that process.

So after I finish with these preliminary comments to you, he's going to select, strictly by random, 14 names. And those 14 people will be sitting here. Everything is by random. It is as simple as that.

And then when you are all sitting here, we are going to then have you folks answer a lot of basic questions about where you live, what your hobbies are, to give us a sense of who you are, because lawyers have an obligation to pay close attention to your answers, and they will have an opportunity even to speak to you a little bit as well. And at the end of the questioning session, we hopefully will have 14 people who will be qualified to sit as jurors.

Why do I say who will be qualified? Because, obviously, things happen. For all I know, some of you folks may have a doctor's appointment tomorrow. You may have a legitimate reason not to be part of the jury selection process. We are going to find that out. You've got to be as candid with me as possible because it's important that we have jurors in the United States who will be sitting here passing judgment on your fellow citizens.

We're the only country in the world that does this. Believe it or not. There's no other country that I know of that has juries in civil cases. Criminal cases, some do. But in civil cases, even the UK abandoned the jury selection

process in civil cases, except for defamation cases.

So we are really unique in that respect, and I just wanted to tell you that you have to be a citizen to sit as a juror in the United States because the founders just thought that jury service was so important in our country that they said in the Constitution, you have to be a citizen to be a juror.

It's a major responsibility. And the reason why I talked to you initially as a group is that some people have a bad attitude about jury service. Most people do not. I guarantee that all those who are going to be fortunate enough to sit as a juror here will have an experience that they'll remember for the rest of their life and have greater respect for the jury process in the United States than they have really right now as you are sitting here. It always works out that way because you'll appreciate the fact that, yes, you have to sacrifice some of your time, and you're going to at the end of the line have to make very difficult decisions, and you are going to really be, I think, believe it or not, very glad that you're selected as jurors, if that happens.

Now, usually I don't make a record here of these preliminary comments because in civil cases we select the jurors without having to burden the court reporter of having to put everything down in black and white. In criminal cases, it's different. We do start from the beginning to record

every single thing that happens in the courtroom. I guess the reason is because you are dealing with a person's freedom, and the law really requires that. But in civil cases we don't do that. I'm making the exception here because of the nature of this case. I will tell you in a few seconds why.

Now, as a general group, before we call the 14 people up here, go through getting to know a little bit about you, the general concerns I have is whether or not we should even be burdening some of you with having you come up here if you're selected as one of the 14. Why? For all I know, you may have some real physical issues. Maybe you have a doctor's appointment. And you can tell me if there's anything you have now because why burden you with having to call you if you are going to the doctor tomorrow if you're scheduled for an operation.

And so I am willing to be open-minded to really try to accommodate you folks, obviously. But I can't do it to a fault because otherwise we will never have a jury selected, all right. So if you have any real physical problems, and you can't sit on this jury or any other jury, you let me know now by a show of hands.

We have two or three or four.

All of you come up here. Stay right in front here. One at a time.

THE COURT REPORTER: Do you want to stay on the

record?

THE COURT: Yes. We'll keep this on the record.

THE COURTROOM DEPUTY: Ma'am, I need you to state and spell your name. Keep your voice up.

THE PROSPECTIVE JUROR: First name Renee, R-e-n-e-e, last name, Kinsale, K-i- --

THE COURT: Okay. What's your problem?

THE PROSPECTIVE JUROR: It's just a slew.

THE COURT: It's a what?

THE PROSPECTIVE JUROR: It's more than one thing.

THE COURT REPORTER: Can you use this microphone?

THE PROSPECTIVE JUROR: Sure.

THE COURT: You know, I don't think I need to put this on the record now. You can just tell me off the record.

(Off the record proceedings had.)

(14 prospective jurors seated in jury box.)

THE COURT: We will put this on the record what I am going to say now.

All right. So there are two of you who came and spoke to me, if I see you correctly, right? And so you're going to want to try to find a reason to stay away from the courtroom, but you are going to have to understand, all of you, if I allow a run on the court, we will never have a jury. So I have to be a little bit tough on people. If you have a legitimate reason, fine. But if you're just trying to get out

of jury duty, which is really regrettable, then it is going to be a different situation, okay? So we will see how it works.

The reason why I want to talk to you now, and I want all of you to listen to me as well, we have a very, very, very important trial here, and we need people to be jurors who can decide this case strictly on the evidence and not based upon sympathy at all. Easier said than done because we all are human beings, and we naturally ought to have sympathy when we see that the plaintiff is a disabled person.

The case really involves a basic situation where the plaintiff was on the railroad -- was on the platform, and she had an episode, she fell into the tracks, she may have fainted, you will hear more about that during the course of the trial, and, unfortunately, she was hit by a train.

The defendant is the MTA. And it is just natural that you would be inclined to have sympathy for somebody who had that type of situation because you are going to see a person who's going to be in the courtroom with not one arm and not one leg. And we would not be human if we didn't have natural sympathy and feelings for somebody who had this unfortunate episode.

The problem I have with jury selection here is that I have to really be comfortable in knowing that aside from the natural sympathy that all of us as human beings would have for somebody who is seriously injured, we have to abide by the

rule of law and base the decision not on sympathy, but only on the evidence in court. Because the defendant, the MTA, has rights as well, and they have to be protected and safeguarded because, you know, it may well be that because of the MTA, you may feel that, you know, you have some bias against the MTA. We have to make sure that they are going to have a fair trial. And that's the primary responsibility I have as a judge.

And that's why I am being a little circumspect in just not being cavalier about letting people just leave the courtroom because they may have some concerns about whether they want to sit on this case. So I have to ask you, though, and you have to answer me honestly, because it is the foundation of our whole system of laws in this country that once the bell rings and a trial starts, your decision, ultimately, and it is going to be a very compelling decision, obviously, in this case, has to be based solely on the evidence, and you've got to put away the natural sympathies that all human beings would have in a situation like this, and it is easier said than done.

It is a challenging case that we have here because it is obviously one where any human being is going to be sympathetic to a person who has suffered this type of injury. Doesn't mean, though, that the MTA should be held responsible.

So that's why I am taking pains to talk to you right from the inception about the practical difficulty in this type

of case, in being able to put aside your sympathy, hold it in check, and say, no, I know that my responsibility, if I am fortunate enough to be selected as a juror on this very important case, it is to base my decision solely on the evidence without any prejudice against the MTA, and that is why I am taking these pains to talk to you in the first instance.

So it's easy to raise your hand, if you're the type of person that says I don't want to sit as a juror. We get those situations periodically. And a lot of times when I see that, I invite them to stay in the courtroom during the trial so they can have a good opportunity to see how justice happens in the United States of America.

And, but, you know, you have to be candid with me and yourself because you can tell me anything you want. But you have to tell me honestly whether you can sit on a case of this nature. Because if you feel that you can't put your sympathies aside, and you can't render a fair verdict, and if you feel any bias towards the MTA or you have some close connections with the MTA and you feel you can't sit as a fair juror for the MTA, you've got to tell me that. You've got to tell me that. And you have to tell me that honestly. Because we are going to have a jury in this case eventually. But I want to make painstakingly clear that we have to make sure that we are going to have a jury of good citizens who are

going to be able to make their determinations according to the rule of law and based upon solely the evidence, not what you may read about in the paper, not what you may hear about the people outside the courtroom, but only the evidence during the course of this trial.

So right from the get-go, before we go any further, I've got to ask all of you to tell me whether you have any problems with sitting on this type of case.

Let me see if there's anybody who really has a problem with that, by a show of hands.

Okay. Come up here.

(Off the record discussion had.)

THE COURT: One person is candidly telling me good reasons why he can't sit on this case.

(Prospective juror exits the courtroom.)

THE COURT: All right. Mike?

THE COURTROOM DEPUTY: Yes.

THE COURT: Let's bring somebody else up here.

How's your hearing? Can you hear me?

THE PROSPECTIVE JUROR: Most of it.

THE COURT: Look. If you have a real problem, then I will let you go. If you tell me candidly, you know a little bit about the case now, and, you know, I have some moderate hearing loss, also. So I am sympathetic to people, you know, we all, you know, age differently. If you really can't sit

here and hear and be able to follow the evidence, I will let you go. You have to tell me.

THE PROSPECTIVE JUROR: I am just afraid that I am going to miss information.

THE COURT: All right. I will let you go.

Select somebody else.

This gentleman was candid with me, and you are excused. Go back to the jury room.

(Prospective juror exits the courtroom.)

THE COURT: Let's call somebody else up, also.

THE COURTROOM DEPUTY: Prospective juror number 4 is James Edouard, E-d-o-u-a-r-d.

THE COURT: James, while you're walking up here, are you okay?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay.

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Fine.

THE COURTROOM DEPUTY: You can have the fourth seat in the fourth row.

And prospective juror number 9 is Angela Ippolito, I-p-p-o-l-i-t-o.

Good morning, Ms. Ippolito. You can take the third seat in the second row.

THE COURT: Ms. Ippolito, how are you this morning?

THE PROSPECTIVE JUROR: Good.

THE COURT: You feel you're under a microscope, everyone's looking at you as you are walking up here.

Okay. So here's what we are going to do now.

All right. You have all these questions, and the idea of it all, we are not going to be too intrusive, but we've got to get a sense of, you know, your hobbies, and, you know, a little information about you because at the end of the questioning process. The lawyers have the right to exercise what we call peremptory challenges. And during the questioning session, if there's any good cause for you folks not to sit, I can understand that.

And at the end of the line, lawyers each have three peremptory -- we call them peremptory challenges, for any reason at all. And they can say, you know, we prefer that you do not sit. Don't personalize it. But that's why we want to have you answer these questions, the lawyers get a feel for it, whether they're comfortable with having you as a juror or not. It's their prerogative to do that. And I'm going to give them a little opportunity for follow-up questions as well.

So these are basically rudimentary questions, your occupation, your employer, things of that nature. And we'll go through it one by one, starting with the person that has the good fortune to sit in the first seat.

I am not going to do it. My law clerk, Malcolm Drenttel, is going to sit up here, and he's going to lead you through the questioning and the answering session. And I will be nearby, if there's any problems. But Malcolm is kind enough to spare the judge's voice and his vocal cords because I'm going to have to be doing a lot of work once the trial starts.

So, Malcolm, come on up here right now.

So let me have your name again. You're number 1.

THE PROSPECTIVE JUROR: Natalia Souza-Stone.

THE COURT: All right. So this is Malcolm Drenttel. Wonderful law clerk. You have the questions in front of you?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Malcolm's going to take over right now, and I will be nearby.

And I want to thank all of you for your care about this. You understand why Judge Block is making these sort of herculean efforts to try to level the playing field here and get us off in a good way so we can all, you know, feel really good about being citizens of the United States and have the opportunity to serve our country.

With that, Malcolm, you take over.

THE COURT REPORTER: Judge, do you want stay on the record?

THE COURT: No.

(Further voir dire proceedings had, which were had off the record and not stenographically recorded.)

(Continued on the next page.)

A F T E R N O O N S E S S I O N

(Proceedings continue in open court; jury present.)

THE COURT: On the record now.

Let the record reflect that the jury's been selected, and we are going to now talk to you folks a little bit, and then we're going to excuse you for the rest of the day, and then you'll come back tomorrow at 10:00, and you are going to start the trial. We are going to hear opening comments by the lawyers. But I'm going to take a few minutes to give you little ABCs about how the process works.

I don't know whether any of you are those that have sat before on juries, but I think we have mostly new people here. Am I right?

After I finish talking to you, you'll go to the jury room. I don't think you have been there yet. You are going to get to know that place pretty well. And Mr. Innelli is going to talk to you a little bit about making sure we have ourselves coordinated properly, know how to get a hold of you, tell you what to do if there's an emergency, and, you know, a lot of basic rudimentary things.

The first thing we are going to do, now that you have been selected, is we give you another oath.

The first oath we gave this morning is the oath we give for all the people who are part of the jury selection process. Now that you're selected, we give you a separate oath. It's very short. We begin the trial with it, and we end the trial with it. It will go by like a blur, but it is so important. Listen very carefully as Mr. Innelli is going to give you your jurors' oath now.

THE COURTROOM DEPUTY: I ask you to all stand and raise your right hands.

(Jury duly sworn.)

THE COURTROOM DEPUTY: Thank you. You may be seated.

THE COURT: Okay. So it's a powerful statement, without fear, favor, anybody's race, national origin, whatever, religion. It's strictly based upon the evidence in the court. You understand that very well.

I want to thank you for your patience, and I think we are going to have a very good jury and a very important case.

Now, let me just spend about 10 or 15 minutes to give you some practical sense of what you can expect.

I already told you that, you know, we anticipate the case will lap over to the 10th, I think, of November. It will work out okay because, you know, you are going to probably deserve a good break, and you will have that opportunity on

the 4th, 5th, 6th, and 7th, those four days, to really take care of your personal affairs and whatever else you may have to do.

We are going to go the rest of the week. We may take off Fridays. A lot of times, you know, I think a full week of trial is going to be exhausting, and I think that people need a break. We probably will do that. But I can't guarantee what's going to happen because I don't have a crystal ball either, all right?

So we have to just work together and be flexible. I will try to give you a heads up as we go along as to what we can anticipate in terms of the length and duration of the trial. In all probability, it's going to end during the week of the 10th, okay. So you have a good sense of that.

So how do we go about handling a trial? You already have a pretty good education of the jury selection process. And I also, you know, gave you a lot of comments about how important it is to really try to check your emotions at the jury door and come in here and just focus on the evidence. But there are a few ABCs. You are going to do that, I am sure of that. But when you go home -- I'm not going to sequester you. We don't do that.

You are going to be talking to your loved ones, your significant others, or your friends, whoever. And they, out of curiosity, are going to pepper you with all sorts of

questions, what's going on, can you tell us a little bit about the case, and we will have opinions, right?

And you may see something in the newspaper. This is the type of case, because of its very nature, could wind up in the newspaper. Case against the MTA, a woman who's really lost an arm and leg could wind up in the paper. And it is going to be hard for you, you know, not to see anything. Maybe it will be on television also. I don't know. But it's the type of case that has that potential, obviously.

You've got to try not to read it. You've got to try not to listen to it, if that does happen. Once again, easier said than done. You are going to see it. Whatever. But you have to always be mindful of the fact that what people write in the newspaper, we know, we know for sure, it's not always the case, right? But yet people can be influenced by what they read and what they hear, and media today is, you know, pretty intense, right?

So all you can do is just listen to what I am telling you and to really use your good common sense and not to read anything, if you can avoid it, because it may not be true. And they also may write about things that have nothing to do with the trial but may deal with the emotions, who knows what. So all I can do as a judge is give you some cautionary tales about how important it is for you, especially in this case, to try to be oblivious to what you may see inadvertently

and what you may hear, or anything they may inadvertently tell you.

So here's what I suggest you can do. Because I am a great believer in using humor sometimes to make an important point -- Shakespeare used to do that all the time in his plays. And when you get home, they say, what's the case about, tell me a little bit about it, oh, oh, it's this type of case, I read about it, I heard about it, you know, let me tell you what I think. Right?

You're going to say, look. I can't talk to you about it. Afterwards, for sure. I'll tell you everything, you know, that you want to know. But right now, the only thing I can tell you is that Judge Block said that the only thing that you're allowed to tell them is that Judge Block looks just like Brad Pitt. Okay? That's it. So you get the point.

So we are going to start at 10:00, and we normally go from 10:00 to 5:00. It's not chiselled in stone because at the end of the day, I let you go, may let you go home a little earlier, if somebody just finished their testimony and it's a quarter to 5:00. Common sense says why start a new witness when there's only 10 to 15 minutes left in the day. Conversely, somebody may be wrapping up their testimony and I may keep you a few minutes after 5:00, rather than to impose on that person to have to come back the next day for five or

ten minutes.

So, once again, we have no crystal ball, we just have to all be flexible, and I'm going to try to be as mindful and as attentive to the realities of your lives and the situation as best as I can.

Now, look. If at any time anybody has to use the facilities, just don't hesitate, all right? And that implies to everybody in the courtroom, the lawyers, the jurors as well.

We are going to want to be here at 10:00 promptly because you see what happens if we have to wait. Things happen sometimes. So that's Mr. Innelli is going to tell you how to contact him in case there's an emergency. We understand that, right. But you have to be in contact with him if there's a problem. And we hope that everybody will be able to be here at 10:00, including the judge.

And as I mentioned before, I give myself high grades, I think I have done a pretty good job after 31 years. But when it comes to time, I have a problem. It is just not one -- it's not in my DNA for some reason. But, trust me, I have so far over the few years I have been on the bench, which is going to be starting my 32nd, after Halloween, I have got a 99.9 percent success in getting here by 10:00 because I realize that if you have to wait for the judge, it's wrong.

And the same thing, if we have to wait for each

other, it's wrong. So just try to do that. I start the trial at 10:00 because, from my experience, I find that it is a good time to do it because it's a little after the traffic comes. You probably want to take public transportation, not rely upon a car. Things happen. If they do, you'll just call Mr. Innelli. We will do the best we can under the circumstances. But we all understand how we want to be supportive of each other and not have to wait for any of us, right?

And, trust me, if I am late, I will give you lots of apologies. But sometimes I get stuck on the Brooklyn Bridge because I drive. I live in the West Village. And once in a while, you know, New York City, right. We understand that. Once in a while the trains don't run. But we all are committed to making our very best efforts to start at 10:00.

We are going to take a lunch break. Could be 12:30, could be a quarter to 1:00, thereabouts. Depends on what's happening in court, what's a logical place to take a break. You'll have an hour. Usually take an hour to just go outside. Hopefully it won't start snowing and you'll be able to enjoy the nice weather. And we'll take a mid-morning break, we'll take a mid-afternoon break to use the facilities, to stretch our legs, whatever. And, you know, maybe in the morning about 11:00, the afternoon about 3:00, depends on what's cooking in court, right. But you will have a chance to have a little bit

of a break.

The way the trial is going to unfold is that we start tomorrow morning. We did enough today. We've got a jury, you've been terrific, we're ready to rock and roll at 10:00, and we start with the lawyers making what we call opening statements.

Now the plaintiff has the burden of proof. In civil cases, the burden of proof is the preponderance of the evidence. That means the -- picture the scales of justice. If they tip ever so much in this direction, that's the preponderance of the evidence. I will tell you more about that as we go along with the trial.

It is different than criminal cases. Criminal cases, because the person's liberty is at stake, it's a higher burden. It's proof beyond a reasonable doubt. You probably see that all the time, in television and in the newspapers, right? Civil case, the plaintiff still has the burden, but it is a lesser burden. It is proof by a preponderance of the evidence, all right. So bear in mind that.

But because the plaintiff brought the lawsuit and the plaintiff has the burden, the plaintiff is going to go first. That's why they're sitting at this table, I guess, right? And they do that by standing before you and giving what we call an opening statement.

And then, of course, the defendant will have the

opportunity to stand and give you his opening statement, and then the bell will ring, and we will have the first witness, and the trial will start.

Now, the opening statements, the purpose of it is to give you a little bit of a snapshot. A little overview of what the parties hope to establish during the course of the trial. It is not evidence. The lawyers weren't there. So they're committed, it is their ethical obligation to zealously argue on behalf of their clients. They are the least neutral people in the courtroom, and that's the way it should be. Their job is to focus on their clients and give their clients the best shake they can give.

We're different. We're the objective ones, all right. My job is to try my best to give everybody a fair trial, and your job is, of course, to be totally impartial, and, once again, for the 7,000th time, render your verdict based upon the evidence and only the evidence, et cetera, et cetera, okay.

So we're not -- we're the neutrals, right? So why did we need -- well, let me back up.

So the opening statements, they can take 15 minutes, they can 20 minutes, they can take half an hour. I don't keep a clock, unless it is really necessary. Sometimes lawyers will go on and on and on, and then I have to do the job of sort of managing the courtroom a little bit more.

But they're going to give you a sense of what the case is all about, and you're going to get a feel for it. And what they say is not evidence. And, you know, they may or may not establish what they think they are going to establish. That's going to be your job at the end of the trial to say we agree or disagree, right. But it will help you get oriented. You know a little bit about the nature of the case. It's a pretty dramatic case, obviously, right. So you are going to hear the arguments and the presentation from both sides, and then we are going to start the trial after that by the plaintiff that has the burden of proof calling his first witness, and we get going.

Now, when a party calls a witness and questions the witness, we call that direct evidence. And after that party who calls the witness completes the questioning of that witness, then the other party has the right to question that witness. We call that cross-examination. And then the other party can come back and ask some follow-up questions. We call that redirect, and maybe recross. In other words, we are going to have the opportunity to fully exhaust the witness' testimony by the lawyers questioning back and forth. And then when that's completed, you go on to the next witness.

Now, there's going to be a number of documents that are going to be introduced into evidence. I have spoken to the lawyers in advance of the trial. We try to get our act

together so that when the trial starts, the case will progress smoothly with minimum interruptions, hopefully. And in that respect, I have asked the lawyers to give me a proposed exhibit list, and I have got that.

And I have spoken to them about whether they have any objections to that. All this type of stuff is what we call pretrial conferences that we have.

And so I have this witness list, and there may be some objections that we're going to have to deal with, but most of them we have sort of flushed them all out in advance, and I made certain rulings in terms what the lawyers want to offer you folks as evidence, and they will be able to then use these exhibits without having to fuss about it. And they're not going to have to make objections to it because they already have agreed to these, and they're deemed to be in evidence as they are used.

So we don't have to worry about the lawyers going back and forth and making objections. We try to handle all of that before the trial starts, making the trial go through smoothly, with a minimum amount of objections.

Now, we need both of us. And what is the function of the judge and what is the function of the jury? We're a team together. We need each other. One without the other just won't make it. We can't have a trial.

So my job, as you can see already, is to be the one

who's going to be managing the trial, hopefully with Mr. Innelli, my wonderful court deputy, to make sure the trains run on time, and explain the law to you, so you understand what the law is. And then your job, you are the triers of the facts. I have nothing to do with that. I am not going to be in that jury room when you go into that room at the end of the trial to decide the facts of this case.

I am going to explain the law to you, I am going to talk to you like I am talking to you now. I am going to try to get the case processed in a smooth way, in a fair way to both parties. That's my job. I'm in charge of the law department.

As part of my responsibilities, during the questioning of the witness you will undoubtedly hear the word "objection" because that's what good lawyers are supposed to do. If they have a problem with the question that's being asked, they object.

Now, I'm not going to have them march back and forth unless there's something that I really think is something which I need to speak to them about. I'll make a ruling, I will say objection sustained or objection overruled.

If it's sustained, that means that the witness is not going to answer that question because I agree that it is a proper objection.

If I say "overruled," it means the witness will go

forward.

Now, I'm supposed to be trained, and I think I am, to make those evidentiary rulings, based upon my experience and my knowledge of the law, right. It is nothing that you know about. You should not know about that. So sometimes I may have to talk to the lawyers at sidebar, and whisper to them about an issue or problem that maybe surfaces that I want to talk to them about, about the law.

And we are not being rude to you if that happens. We're intentionally doing this so that you can't hear us because it is nothing that you have anything to do with. These are legal matters, right, and it could confuse you, if you heard us go back and forth about questions about law.

So you may see that happen once in a while, probably not too often, but it may happen, right. If I have a real problem and I need to spend a little time with the lawyers, I may excuse you, have you wait in the jury room while we try to flush out what we have to do. And you'll see that type of thing unfold over the course of the trial.

So it's okay to take notes. Some people, you know, are comforted by making little notes as they go along. I remember law school, the ones who took the best notes didn't get the best grades necessarily. You want to really pay attention to the testimony. But if it's your comfort to write little notes down to help you follow the ball, it's okay to do

that. They are going to be personal to you. And you will leave them behind. This is not who keeps the best notes. It is strictly a convenience for you. If you are comfortable in doing that, it is okay. The important thing is that you, as the fact finders, are going to be responsible for sizing up the credibility of the witnesses. You believe them, you don't believe them. How much do you believe them, or not. You will hear me give you instructions about that later on.

So it's a pretty good idea for you to check out who the witnesses are and look at them and pay attention to them because a lot of communication can be verbal and nonverbal, right? So you want to really be on top of that. And if you take notes, don't be distracted from just making sure that you are going to be able to assess the credibility of the witnesses, okay?

Now, if I forget anything here, I am not bashful, you know, I will remind myself and I will say some other things to you as we go along.

I may interrupt the witness' testimony from time to time. I am not going to try to do it too often, if I can avoid it. Because I don't want to impose myself into the case. If I do ask any questions of a witness, I don't want you to think that I am sort of tipping what I believe or don't believe about the witness' testimony. If I hear testimony rambling a little bit, getting a little bit confusing or

commingled, you are not allowed to ask questions. By the way, in the UK, the witnesses are allowed to ask question. I sort of like that. But you can't do that in this country. So I have to be your surrogate. And if I'm a little confused about what a witness is saying or if they're going on and on, I am going to assume that you may be confused, also, and I will butt in, and I'll try to clarify things. When I do that, once again, I'm not telling you whether to believe or not believe the witness, I am just -- common sense things, as the person in charge of the management of the trial. So you should understand that.

I think that, basically, is what I want to say. But when you're going to be at your lunch break or the end of the day, talk to each other, get to know each other. Look. We have a wonderful, wonderful court we have in Brooklyn. We have diversity. Just look around you, all right? It is unique, in a way, to Brooklyn, right? I love being a judge here because we are blessed with diversity. And it gives you an opportunity, when you're hanging out together in the jury room, or afterwards, you get to know each other. It is fine.

I think it's one of the real beauties and value of being selected as a juror because people tend to hang out with their own kind, right? Here, you're going to have an opportunity to really broaden your reach into the wonderful diverse world we have, especially in the Eastern District of

New York.

So the Eastern District of New York -- I'm going to give you a lot of information that's sort of like a little civics lesson as we go along.

The United States federal system is divided into 96 districts, 94, and we, in New York, we have four districts, the Eastern, Southern, Western, and Northern. Works out handily that way. Some states just have one district, and it's somewhat correlated to population. So each district has district judges, and they have -- you know, they call that doing the business throughout the country.

The Eastern District, where we are, covers Brooklyn, Staten Island, Nassau County, Suffolk County, and Queens. I think we have some from Nassau here, right?

Yeah.

We have some from Brooklyn. I think we may have some from Queens, right? I think -- I don't think we have anyone from Staten Island, right, if I remember? Staten Island person. So we have pretty good representation of the Eastern District, and it also covers Suffolk. Now, we don't get too many jurors from Suffolk. We can, but we have another courthouse in Central Islip, which is a beautiful courthouse. We have judges out there. And they cover basically most of the cases out in Long Island. But we can overlap.

So we get most from Brooklyn, most from Queens,

Nassau County, Staten Island, is usually what we have. And so that's the Eastern District.

The Southern District is across the bridge. So, actually, the Eastern District, wonderful courthouse, and the Southern District, they're bookends to the Brooklyn Bridge. How many people have walked the Brooklyn Bridge? Couple here maybe, right? And it is not a bad thing to do.

So that really is what we call the megalopolis between the Southern District and the Eastern District, most of the action in the United States, the real cool cases, happen here. You read about them all the time in the paper, right? The Western District is Buffalo, Rochester. The Northern District is Albany up to, you know, Lake Placid. So that's the way the structure is. And each district has a complement of judges. We have about 23 in the Eastern District. And the cases are assigned randomly. I mean, I got this case not because I did anything spectacular, just that you come to court, you start a lawsuit, it goes into what we call the wheel. The administrators downstairs, they select the judge, and it is just totally a random type of case, okay?

I will have an opportunity to talk to you a little bit more about the federal court and the federal system because we have in our country pretty much an abject lack of good civic education. A lot of people just don't know a lot about the federal judiciary, or they don't know a lot about

the courts. I think we should do better in educating the young people about it all, but doesn't seem to be something we have done a good job at.

So I'll have a chance after the trial is over, and maybe, you know, during the course of the day, to give you some history lessons or to answer questions you have about how the federal judicial system works, what's different between the federal and the state, all right?

And at the end of the trial, it's my practice after you render your verdict to make myself available to you, if you'd like to talk to the judge. You may have some curiosities, you may be speculating about things, which you're not allowed to do, but then you can ask me the questions. And I find that's probably a very good opportunity for me to, you know, be available to give you a little bit of a better sense of what you experience as judges on a federal trial.

So that's basically the ABCs of what I wanted to talk to you about before I sent you home today. And I think that when you meet people, when you talk to each other, once again, talk about -- you can talk about me, you can talk about anything, you can talk about football, baseball, volleyball, whatever you want, the weather, anything about the case. And just, you know, you may be tempted to just -- you know, what did you think of this witness, or what do you think about that. Just cool it, and wait until all the evidence comes in.

Because it doesn't come in all at once. It comes in piecemeal, right? So you have to wait until the end of the line, and then you will be able to, you know, go out and deliberate, and I will explain the law to you at that time. And then I will send you into the jury room to commence your deliberations. So that's basically the ABCs, which I wanted to chat with you now, before we are going to start the actual trial tomorrow. We started the trial already by my talking to you, but the formal part with the lawyers, we'll start tomorrow at 10:00.

We will hear the opening statements, I suspect, by Mr. Genis.

Are you going to be the delivering the opening statements on behalf of your client?

MR. GENIS: Yes.

THE COURT: And defendant will be speaking by Mr. Keaveney, right?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: Okay. And, you know, they have other people, so they may all have the opportunity to participate in the trial as it goes along, but those are going to be the initial people speaking for you.

Now, is the plaintiff going to be in court?

MR. GENIS: No.

THE COURT: No.

MR. GENIS: Actually, tomorrow, she will be here, but then not again until she testifies.

THE COURT: All right.

Now, listen. The parties have the absolute right to be in the courtroom. The courtroom is open to everybody. People can walk in here, and, you know, actually, when they walk through the doors, everyone's going to turn around and look to see who they are. It's just a normal knee jerk reaction. But we don't close the courtroom. It's a public facility. The public is welcome to be here.

So you will see people. There are a couple of people here. I don't even know who they are, but it is okay to do that.

The plaintiff -- the parties have a right to be in the courtroom, okay. And Mr. Genis has told us that the plaintiff will be here. And she's going to look -- I haven't seen her. But I'm sure she's going to look terrible. You are going to get a sense of her, then she won't come again, I don't think. But that's going to be probably why she's here, and she's entitled to be here, and we'll all be sympathetic, no question about it, okay?

So you can look forward to that tomorrow, 10:00. And I think, with that, get home safely. Mr. Innelli is going to talk to you now in the jury room a little bit to get you information, contact information. Okay?

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

(Proceedings continue in open court; no jury present.)

THE COURT: Okay. Sit down.

While the jurors are out, we can talk a little bit now, on the record.

MR. GENIS: Sure.

THE COURT: And the first thing is that I hope you are satisfied that Judge Block has made his best efforts to get a fair jury. Any problems with that?

MR. KEAVENEY: No problems.

THE COURT: Okay. And then I think that you are anxious to say something on the record. I already wrote the decisions on the qualified immunity issue to the Circuit Court. That's already a matter of record.

MR. KEAVENEY: Yes.

THE COURT: But if you feel comfortable about putting something -- articulating something on the record, I will let you do that. I don't think it is necessary, but, you know, you have a client you want to represent. If you want to say something, which apparently you wanted to do before, now is a good chance to do it.

MR. KEAVENEY: Let me just pull up my notes real quick.

THE COURT: Make a record, but don't --

MR. KEAVENEY: Yeah. I was halfway through my --

THE COURT: Because you just want to make a record.

MR. KEAVENEY: I just want to make a record. But I did write it down so I didn't forget anything. Just give me a second, and I will find it.

THE COURT: Did you want to say something, Mr. Genis, in the meantime?

MR. GENIS: Sure.

The only thing I would know note, Your Honor, is when you were giving your instructions about the burden of proof, you did not mention that the defendant has the burden of proof on their affirmative defense, particularly of immunity.

THE COURT: That's true. But I think they don't know what affirmative defenses are yet.

MR. GENIS: I couldn't hear you.

THE COURT: I don't think they know what affirmative defenses are. I didn't want to overload and confuse them. It will all come out in the wash.

MR. GENIS: Okay.

MR. ROTH: Can I go off the record?

THE COURT: You can go off the record.

(Off the record discussion had.)

THE COURT: Mr. Keaveney, you already have a record

here.

MR. KEAVENEY: It just took me a while, Your Honor, because --

THE COURT: Do you want to make a speech?

MR. KEAVENEY: I do have my speech ready.

THE COURT: Try to keep it down to 60 seconds, if you can.

MR. KEAVENEY: It will be 90 seconds, tops.

Okay. My statement is regarding the jurisdiction of this Court, in light of the appeal to the Court of Appeals on some of the issues relating in this case.

Just for background, plaintiff claims that defendants are negligent in failing to properly study, plan, and install platform doors and other safety devices in its system. The defendants have raised affirmative defenses --

THE COURT: One second, one second. I have to take this call.

(Short interruption.)

THE COURT: Thank you very much for your indulgence.

You don't have to take this down.

(Off the record discussion had.)

THE COURT: All right. On the record.

Are you finished with your spiel?

MR. KEAVENEY: I am not. I have seven sentences to go.

THE COURT: You want to say a few more things?

MR. ROTH: Seven sentences.

MR. KEAVENEY: Can I continue?

Defendants have raised affirmative defenses based on qualified and governmental immunity, and that it is immune from suit for such claims.

The defendants move for summary judgment on its affirmative defenses, which this Court denied. The defendants then filed an appeal to the Second Circuit based on the collateral order doctrine.

This Court thereafter granted plaintiff's motion seeking to deem the appeal frivolous on the grounds that state law governmental immunity claims and qualified immunity claims are only defenses to damages and not to suit. However, defendants did not allege their governmental immunity claims was based on state law. Instead, the defendants argued on its motion that it was performing a governmental and not a proprietary function.

This Court's disagreement with the defendant's legal arguments does not strip away the Second Circuit's jurisdiction over the appealable issues. As such, defendants are objecting to this Court's asserting jurisdiction over the matters that are presently before the Court of Appeals.

THE COURT: Okay. Are you satisfied? You got it?

MR. KEAVENEY: Yes. Thank you, Your Honor.

THE COURT: Okay, good.

You know, when it comes time for jury instructions, I think I've got to ask the jurors focused questions on a qualified immunity issue. Just think about what the questions should be that they have to opine on, and I've got to make the ruling of law as to whether qualified immunity attaches or not. But the tricky part is what the right questions are that we want the jurors to answer that will allow me to then make the legal conclusions.

So that's going to be something I want you folks to think about. Maybe you can both agree on those questions. It's possible.

MR. GENIS: I'll draft something, Judge. And I did send you a request to charge on the qualified immunity affirmative defense.

THE COURT: Yeah, we'll work on that because there's going to come a point in time when we are going to have to ask the jurors questions. And if we can agree on those questions, that would be a good thing to do. If you can't, you can't, okay?

Otherwise, this case, we have the issue about the prior so-called remedial efforts in terms of putting up barriers. We're ready to rock and roll on that issue. I think we can allow the plaintiff to do some of that, and we are going to start tomorrow.

Anything else we want to talk about today?

Okay. So see you tomorrow at 10:00.

MR. GENIS: Thank you, Judge.

MR. KEAVENEY: Thank you, Judge.

(At 2:43 p.m., the proceedings were adjourned until Tuesday, October 28, 2025, at 10:00 a.m.)

* * * * *

**REPORTER'S CERTIFICATE**

I, ANNETTE M. MONTALVO, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings.

Dated this 27th day of October, 2025.

/s/Annette M. Montalvo
Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUISA JANSSEN HARGER DA SILVA, Plaintiff, | 17-CV-4550 (FB) |
| vs. | Brooklyn, New York<br>October 27, 2025<br>10:00 a.m. |
| NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, and RAQIA SHABAZZ, Defendants. | |

---

TRANSCRIPT OF JURY SELECTION AND TRIAL
HELD BEFORE
THE HONORABLE JUDGE FREDERIC BLOCK and a JURY
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For the Plaintiff:
Robert Genis, Esq.
Sonin & Genis
One Fordham Plaza, Suite 907
Bronx, New York 10458
718-561-4444
-and-
David Roth, Esq.
Elliot Shields, Esq.
Roth & Roth, LLP
192 Lexington Ave, Suite 802
New York, New York 10016
212-425-1020

For the Defendants:
Andrew P. Keaveney, Esq.
Landman Corsi Ballaine & Ford, PC
120 Broadway, 27th Floor
New York, New York 10271
212-238-4800

(Appearances continued on the next page.)

APPEARANCES: (Cont'd)

For the Defendants: Janelle N. Winters, Esq.
Landman Corsi Ballaine & Ford, PC
One Gateway Center
Newark, New Jersey 07102
973-623-2700

ALSO PRESENT:

Logan Morales, Paralegal, Roth & Roth

Perdita Barchuk, Paralegal, Landman Corsi Ballaine & Ford, PC

Malcolm Drenttel, Law Clerk to Honorable Frederic Block

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Michele D. Lucchese, RPR, CRR
E-mail: MLuccheseEDNY@gmail.com
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2272

(In open court - jury not present.)

THE COURTROOM DEPUTY: Civil cause on trial Harger Da Silva versus New York City Transit Authority.

I ask counsel if you could just state your appearances.

MR. GENIS: Robert Genis, Sonin & Genis for the plaintiff.

MR. SHIELDS: Elliott Shields, Roth & Roth for plaintiff.

MR. ROTH: David Roth, Roth & Roth for plaintiff.

MR. KEAVENEY: Andrew Keaveney, Landman Corsi Ballaine & Ford for defendants.

MS. WINTERS: Janelle Winters, Landman Corsi Ballaine & Ford, for defendants.

THE COURT: All right. So the jurors are all here. So far so good.

And Mr. Genis, are you ready to give your opening statements?

MR. GENIS: Yes, Your Honor.

THE COURT: We will bring the jurors in. And now we are off and running.

MR. GENIS: Yes, Your Honor.

THE COURT: Mr. Shields, while we are waiting for the jurors, I can't accommodate your requirement to get the Friday morning doctor here. I just forgot that I have a

mediation session at 10:30. It's going to last two hours. I tried to help you as best as I can.

What's wrong with the person coming on Monday?

MR. GENIS: We actually have a doctor and an economist scheduled on Monday, just like I told you I would get two experts in one day.

THE COURT: I tried my best to accommodate you. We're not going to sit on Friday. I just can't do it. Okay?

MR. GENIS: Can we do it subject to connection, Your Honor?

THE COURT: I am not sitting on Friday.

MR. GENIS: The Friday witness is a prosthetist. What I'm saying is --

THE COURT: We will take it as it comes. The jury is coming in.

MR. GENIS: Sure.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Good morning, folks. I assume you can hear me okay, unless I hear to the contrary. I think the mic is working. I will keep my voice up.

And I am proud of you. You are all here on time, with 30 seconds early, in fact. And we will start the trial now.

As I mentioned yesterday, the first thing that is going to happen is we will hear the opening statements from the lawyers, right. And as I mentioned, that will give you sort of a bird's eye view of the type of case and what they hope to accomplish.

And I will also caution you, what the lawyers say, they are not witnesses. They don't know the facts. They are there to advocate zealously for their clients.

Let's see. The opening bell rings now.

Mr. Genis, opening statements.

Opening Statement - Mr. Genis

MR. GENIS: Thank you.

You will learn that there is a known hazard in the New York City subway system: Trains striking people. Something that occurs three to five times a week, three to five times a week, seriously injuring and killing people every year.

The Transit Authority and MTA, you will learn, have known this for decades. You will learn that the number one cause of death and catastrophic injury in the subway system are train tracks.

You will learn that the New York City Transit Authority, MTA, could have remediated this hazard at little or no cost, little or no cost.

You will learn four following good and accepted

subway safety practices and rules: One, a subway system must identify all potential hazards, such as trains striking their customers and assess the risk of harm to its customers and implement a written safety plan to take effective corrective action to remove or mitigate the hazard.

Two, a subway system must review the data, the number of train strikes and severity of injuries suffered to see if its safety plan has been effective in removing or mitigating the hazard in light of its actual operation.

Three, when the subway system reviews the data and sees that its plan was not effective in removing or mitigating the hazard in light of its actual operations, it must change its plan until it either effectively removes or mitigates the hazard of train strikes or accepts the hazards.

Four, an important part of the job of the New York City Transit Authority is to take reasonable measures to prevent preventable and foreseeable harm to its customers so that they are not unnecessary exposed to the hazard of train strikes. These subway safety rules only protect us when jurors [sic] enforce them. When a subway system violates any of these good and accepted safety practices or rules, it is responsible for whatever harm its negligence caused.

Facts that you will learn that are more likely than that not, the New York City Transit Authority and the MTA operate a subway system in New York City. It is the job of

these defendants to make and keep their subway system reasonably safe for its customers. As I told you, according to their own data, people are killed or seriously injured with frequency: Three to five times a week. And you will learn not only has this been going on for decades, many decades, if we just look at the entire 10 years before this incident, 2006 to 2016, you will learn that not only did the defendants know this fact and they knew that the hazard could be remediated at little or no cost, they knew that they could have prevented hundreds, if not thousands, of people from being harmed, and they knew that it had been trending upwards from 2006 to 2016.

It is the job of the defendants to be aware of good and accepted safety practices and procedures. Good and accepted safety practices and procedures in the field of mass transit or subways, international best practices and industry standards for subways, professional engineering principles and practices.

It is the job of the Transit Authority, MTA, to investigate these incidents of train strikes so that it can identify the root cause of this hazard. They must perform a proper safety analysis. A hazard analysis is the actual term. And they do this pursuant to a written standard known as U.S. Military 882, which was adopted and incorporated and used by the New York City Transit Authority to determine if corrective action is needed.

This is done by reviewing safety performance indicators, known as SPI, safety performance indicators. In other words, the number of train strikes to see the likelihood of another train strike occurring and the severity of the injuries sustained in the train strikes.

If the subway system fails to perform a proper and adequate hazard analysis, the hazard will remain unabated and more people will be killed or seriously injured.

And while there are a variety of precursors to train strikes, such as a person has a medical emergency, heart attack, stroke, they faint, whatever, and they fall on to the tracks; two, they trip or slip on a defective platform surface and wind with up on the tracks; three, they get pushed by somebody; four, they go to retrieve an object that they dropped; and five, suicides.

Now, there is one common denominator or root cause for all of these incidents, and that is open access to the tracks and to the train, the track bed, and around the train, what is known as the safety zone or envelope of the train, which extends on to the platform itself.

If you prevent access, you prevent the hazard of train strikes, plain and simple.

If the hazard analysis of train strikes in the system indicates a probability of recurring and the injuries sustained in the train strikes are serious or catastrophic,

then the subway system should implement a safety plan with a reasonable basis to effectively address and mitigate the hazard of train strikes by eliminating or reducing the hazard to prevent or reduce such incident and the severity of injuries caused by them.

If the subway system fails to implement a safety plan with a reasonable basis, the hazard will remain and there will be more unnecessary train strikes killing and harming more people every week.

After a reasonable period of time after the subway system takes whatever measures it takes, they are to review the data, the safety performance indicators, compare the number of train strikes and that severity of injury sustained before the implementation of their plan and whatever measures they took, right, that data, and after it took measures or implemented a plan to see whether or not the plan has been effective. Either the numbers have gone down or they have not.

If the numbers and injuries have not gone down, then the safety plan has not been effective unless the subway system now implements a new safety plan, which they are supposed to do, to take effective corrective action, the hazard again will remain and more unnecessary train strikes, deaths and injuries will occur every week.

You will learn that the train strikes are the number

one cause of death and serious injury in the subway system.

The one way that subway systems learn how to effectively address the hazard of train strikes is by seeing what other subway systems throughout the world do. We live in a global world.

What have they done in other steps to effectively remediate this hazard?

Well, there are international industry organizations, subway groups. And one of them you will hear about is called the Community of Metros, COMET for short, that the Transit was actually a founding member of and member throughout. And all of the different subway systems, they give their data, COMET collects the data, reviews the data from all over the world and publishes its data, along with best practices and industry standards that objectively identify measures that have been effective and successful at preventing or reducing the hazard of train strikes. This way the Transit Authority does not have to reinvent the wheel. It belongs to these international organizations, attends their conferences and receives their publication and studies. It knows what has been effective elsewhere.

It can then review in hierarchical order, in other words, the most effective to least effective, the different measures that can be taken. And while even the least effective is better than doing nothing, the most effective is

what makes sense. And they way -- and you will see that any of these measures is better than what the Transit Authority had done here.

You will learn how, as a result of all of this, the T.A. learns how other subway systems throughout the world have met the challenges, because there are challenges, in implementing these safety measures successfully using engineers and engineering.

The only real issue left for the Transit is how to best implement and adapt any or all of these proven and effective safety measures to our system.

Now, you have cities, you will learn, like Paris and London, who are comparable to New York City, population, usage, age. In fact, Paris and London are older, their subway systems, than ours.

And you will learn how these other comparable systems and throughout the world, other steps, have done retrofits of platform screen doors, which we are going to talk a lot about, on some of their existing lines, in other words, older lines, not every line, but it is a process, as well as in other subway systems worldwide. And the New York City Transit Authority has been able to see how the challenges of implementation have been met in these other subway systems.

You will see, from internal e-mails from high-level executives, employees of the Transit, that there is a motto on

the bottom their e-mails, and it says: Every second counts, but not every life counts. That begins to explain effective remedial measures, why they have not been made.

As I said, every week that goes by without corrective action means another three to five people will be hit, injured or killed. This hazard requires prompt and effective corrective action.

Now, you will learn there are a number of different safety measures.

Some subway systems have tried measure as a stopgap because it is fast and easy while they are looking to implement more other permanent effective measures.

It is undisputed that since the 1980s and 1990s the New York City Transit Authority has been aware of the different safety measures taken worldwide to effectively address the hazard of train strikes. And there are basically two types of approaches worldwide that have been effective. The first is prevention.

Prevention consists of a barrier, different types of barriers. There are a variety of different barriers. Some are horizontal, like an elevator door opening, okay, or vertical, like you see store fronts that have things that come down the storefront, or fixed, nonmoving barriers, like a fence or a rail.

Detection, the other method, consists of sensors,

like in stores when the door opens before you get to the door, before you touch it.

There are what's known -- you're going to learn lots of alphabet abbreviations here. There are what's known as TIDs, track intrusion device -- I'm sorry -- detection systems and LIDS, laser intrusion detected system. So including what's known as CCTV, closed-circuit TV. There are cameras in stations, have been for years, viewing the platforms. And the CCTV have been used in two ways. The most effective is if it's used in conjunction with the track intrusion detection system, like TIDs or LIDS, because then they can verify. In other words, if a newspaper goes and the sensor catches it, you don't want to stop the train for a newspaper. But if you have the CCTV, oh, it's not a newspaper; it's a person. Okay.

Now, once the person is detected in an unsafe location, the train could be stopped automatically or the information can be relayed to the train operator or someone else who could stop the train to avoid hitting or running over a person. In fact, if you use the cameras properly, if there is an erratic person on the platform, looks crazy, you can take action.

Prevention is more effective than detection because it prevents the contact to begin with between the person and the train or the tracks. Detection just let's them know it happened and hopefully can take corrective action in time.

The gold standard for decades in prevention is platform screen doors, known as PSDs. It provides a barrier and it has the doors, like an elevator, horizontal, that align with the subway car train doors so that when the train comes in, the doors are closed. When the train doors open, the platform door is open. They close together. That's it.

Now, they have synchronized movement. And there are different heights for these types of barriers. There is what's called full height, three-quarter, and half. Even a half height platform screen door -- and they have different initials -- is at least four, five feet high, about five feet high. I think it's about five feet high.

Now, for ease of reference, I'm just going to call them all platform screen doors even though they are known by other names and different initials.

Now, there's also what is known as dynamic doors. And when does that come into play? Because not all of our trains are the same in the system and not all of the stations are the same. There could potentially be an alignment issue with the platform screen door and the door of the train car. A dynamic door moves. It is dynamic. It senses where it is so it lines up. That is one solution to that challenge.

Other ones are the ones that pull down. While they are not made of rope, they are called rope barriers that they pull down, okay. And there are also vertical ones that come

up. The ones that come down are better, but you will hear all about that.

Now, as I said, they have been around since the 1980s, the platform screen doors. Singapore was the first city that used one in the 1980s. But you only need to go -- you don't have to travel to Singapore to see this. You can take the AirTrain to JFK, the train to the plane, with its nine stations because they have had platform screen doors since 2003.

And in those nine stations using a system, just like Paris and London did it before that even, before that, when they had their retrofits, you will learn not a single death or injury, serious injury from the platform screen doors at JFK in its nine stages since 2003. You will learn that not one subway system in the world has removed the platform screen doors because they are not effective, they don't work, or they harm people that they are hazardous in some way.

You will learn that contrary to the Transit's claims, the Brits do not boil differently, to quote from My Cousin Vinny.

You will learn that around 2007 a number of companies offered to install platform screen doors in the New York City subway system at little or no cost in exchange for the advertising revenue, okay, from ads placed on the surfaces of the platform screen doors, a wall from one end of the

platform to another where ads can be displayed. This is a common type of finance agreement called a BOT: Build, Operate, Transfer Agreement. And they have what's called original equipment manufacturers, the companies that make it, that do these, just like how we have private companies that actually build and maintain the bus shelters we have throughout the City of New York done pursuant to these BOT agreements, where in exchange for the ad revenue on the bus shelter, they install and maintain.

You will learn that in Seoul, Korea, the platform screen doors were installed in a BOT agreement at no cost and that the company that did it in Korea offered to do it here in New York City not only at no cost -- they have a 30-year agreement, okay -- that after seven years of the agreement, they start giving a percentage of the profits to the Transit Authority. That was rejected. You will learn that the Transit Authority sent people all over the world to look at these. They went to Korea. They went to Paris. They went to London. They went all over and these people saw firsthand that these platform screen doors were effective and were successful and virtually eliminated train strikes.

In Singapore, they installed them because one person died.

In Japan, they installed them because of suicides.

In Korea, it went from 22 deaths in a year to zero.

Now, after all of that, in 2011, the Transit Authority issued what's called a request for information, an RFI -- you're going to hear a lot about this -- seeking original equipment manufacturers, companies that have experience in large-scale subway operations, a proven track record, and could meet the challenges of installing and maintaining a platform screen door system in the New York City subway system, here, by entering into a BOT agreement -- build, operate, transfer -- in exchange, at little or no cost to the Transit, in exchange for the advertising revenue.

You will learn that 12 of the biggest original equipment manufacturing companies in the world, major corporations, conglomerates offered to do so, sent in proposals to install and maintain platform screen doors in our subway system at little or no cost.

Some offered to do it for the entire system.

Some of them said okay, we can do like 160 stations, 158, which is better than zero.

And one of the companies, you will learn, called Faiveley, a French company, that had 40 percent of the world market share in platform screen doors put in their written proposal that they could do this throughout the entire city system, meet all of the challenges of doing so, and it would not costs the New York City Transit Authority one dollar in writing.

And you will learn that the Transit Authority evaluated these proposals. These are big proposals. Engineers evaluate things. They write up proposals, and they submit them. It's not just like yeah, sure, we can do it. Okay.

And after they evaluated these proposals, the Transit Authority narrowed down the list to five original equipment manufacturers and then did nothing, and then did nothing. They abandoned the project. You will hear excuses. You will hear all kinds of excuses. You will hear talk about how Transit is looking at things for decades, for decades, considering things, talking about things, talking about pilot projects to test it, pilot projects that have all been cancelled by the Transit Authority. Not one held for the platform screen door.

And you will learn that looking and considering is not doing. Looking and considering is not taking effective corrective action. Looking and considering is not a study or a valid study, an adequate study.

A PowerPoint presentation is not a study or an adequate study.

Failing to have a plan that effectively remedies the hazard is not reasonable, period.

Delaying the implementation of a plan for years is not reasonable.

Failing to properly revise an ineffective plan and ineffective measures for decades is not reasonable.

You will hear from the Transit Authority's designated corporate witness, the man who they claimed had all of the knowledge reasonably knowable by the New York City Transit Authority, MTA and he doesn't know why they abandoned this offer to get safety for free, a win-win.

While the least effective barrier, but better than nothing, is a fixed rail fence. It doesn't move, but it has openings aligned with the subway car doors. Because the openings are always there, they are not as effective because they can't prevent as many train strikes as the movable barriers. And you will learn that all of the technology that I have discussed today is not new.

The platform screen door, the sensors, all of these things have been around for decades.

Fixed rail was put in some stations over 100 years ago.

The facts will show more likely than not that the Transit knew of the frequent and recurring hazard of train strikes for many decades and despite their knowledge of the number of fatalities and the number of serious injuries caused by this hazard, okay, it was reasonably foreseeable it would happen again. And they knew if they failed to take effective, prompt corrective action, this trend will continue.

The facts will show more likely than not that the -- that they knew that the measures that they had taken were ineffective but failed to take effective corrective action besides being able to do at little to no cost.

So what measures did the Transit take? What did it consists of?

You will learn that they had supposed announcements, signs, help points, and message boards for train arrivals, and the required tactile yellow strip for blind people.

According to the defendants own witnesses, they took these measures decades ago. According to their own data, the safety performance indicators, like I say, from 2006 to 2016, the train strikes trended upwards. The measures taken by the Transit Authority were ineffective.

The facts will show more likely than not that they failed to perform an adequate study to address the actual issues, how to best prevent the hazard of train strikes and how to adopt platform screen door and other safety devices here in the New York City subway system.

The question wasn't what's effective. The question wasn't what can we do. They knew those answers. The question is how you implement it, period.

Now, not only did they fail to have a safe system and a good plan for their entire subway system, the station we care about today is the one at Atlantic Avenue and Barclay

Center, and they had no adequate study for that station, no effective safety plan for that station.

And the facts will show more likely than not that because they failed to have a proper safety plan for their system and their station, because the measures taken system wide and for the station in light of their actual operation were not effective, but they -- despite that they failed to implement an effective plan to take proper corrective action.

The facts will show more likely than not they used less than reasonable care and were negligent in the operation of their system.

So why are we here? What happened?

On August 2nd of 2016, Luisa Janssen Harger Da Silva was a 21-year-old Brazilian architect student. She was in New York visiting her then boyfriend George Brown. They were in the Atlantic Avenue Barclay Center, the BMT subway, waiting for their Q train to take them towards Manhattan, okay.

They were about in the middle of the platform, the halfway point and they put their bags down on the platform next to a column, and then they were standing a little behind, a little to the side of the column. And George was facing the wall and the track bed. Luisa Janssen Harger Da Silva was facing George. And she was about five feet from the edge of the platform, five feet away from the edge.

And despite her drinking a lot of water that day,

that August day, while waiting for the train, she fainted. She fell backwards and on to the tracks below. People screamed. There was no train in the station or coming into the station at that point, not coming in. And people ran up flights of stairs to go from the platform to the street so that they could have cellphone service and they called 911 trying to get someone to stop the train before it entered the station and ran over Luisa.

You will hear 911 calls.

The facts will show more likely than not that while the tracks in the tunnel coming into the station were curved, there was a line of sight from the train operator into the station and down the length of the platform passed the halfway point where Luisa was and George was, allowing the train operator, if paying proper attention, to see Luisa on the tracks.

The facts will show more likely than not that if the train operator was paying attention in the tunnel could have seen and stopped.

The facts will show more likely than not even if the train operator did not see Luisa on the tracks until she actually entered the station, she still could have stopped the train in time to avoid running over Luisa. The train operator, Ms. Shabazz, admitted to the police officer, who responded to this incident, that when Shabazz first saw Luisa,

Luisa was already on the tracks, on the tracks.

However, Ms. Shabazz told her bosses that when the train was already entering the station, Shabazz saw Luisa as she was falling, not already on the tracks, couldn't stop in time.

The train ran over Luisa's left arm and leg, severing them. When the train stopped, Luisa's body was under the second car, not the first train car. The facts will show more likely than not that the train operator was not paying proper attention and was traveling at an excessive rate of speed for the circumstances, coming into a curve into that station.

The facts will show more likely than not that both the Transit Authority and its operator were both negligent: The Transit for failing to take safety measures that would have prevented this, and their operator in the operation of her train was negligent.

Defenses: Before we came here today we considered what were the defenses to our claims. And they're a house of cards. You may hear from them glib lines like you get what you pay for when it's for free. That doesn't hold water.

They admit that they have law department attorneys to write ironclad agreements. They have the ability to have these manufacturers post bonds, have insurance, to take other steps to protect the interests of the Transit Authority.

Nobody is saying you just take somebody's word, okay?

Now, if the Transit Authority wasn't sure that any of these original equipment manufacturers could do their job, they could request more detailed information. They can get -- like how would you handle this? How would you handle that? Okay. But they didn't.

You will hear excuses like the platform can't hold the weight of a platform screen door. Something you will hear debunked on multiple grounds, and putting aside it's not true.

Second, that you will hear they never did proper testing of the platforms to see if that claim was valid.

Two, platforms get replaced -- it's precast concrete -- every number of years.

Three, concrete can be reinforced, shored through other measures taken to support the weight.

Next, the design of the platform screen doors could be made to accommodate the infrastructure of the Transit Authority.

You will hear other excuses: Oh, we have to get more electricity down into the station to power these doors, just like they did for the help points and the message boards.

Where there is a will, there is a way.

You will hear excuses like it might cause another hazard. But you will learn worldwide there has only been a few incidents compared to the three to five times a week we

have here alone in a valid risk assessment, proper methodology. In a heartbeat you would swap three to five times a week death and catastrophic injuries for less than a handful of things over many years not as bad, even if they are bad. Seven versus hundreds of thousands. This is a no-brainer.

You may hear -- and, again, over 23 years, no deaths or serious injuries at the nine stations on the AirTrain to JFK. You're going to hear that's a different kind of train. That's not the same kind of train.

You may hear that if the Transit Authority installs these platform screen doors in all stations that it will violate or might violate their interpretation of the Americans For Disability Act. Not the actual act itself, not the code itself.

And you will hear how the New York City Transit Authority has so many stations without elevators. Just like the code is there for the wheelchair people. Without elevators or where the excessive gap distance between the door sill of the train and the platform does not allow wheelchair access. So these stations are already out of compliance with the ADA. And to use that as an excuse not to install safety devices to protect all of us is not reasonable.

You may hear well, our system is old, it's old. Paris is older. And they did a retrofit on some lines. Not

all, but some.

A straw man argument is that because it's old, so you can only do new construction. But you will learn when we had a Second Avenue subway, brand-new construction and the No. 7 extension line to Hudson Yards, they didn't do. New construction.

You may hear, well, not every other subway system in the world has it. Okay. Nobody else has the safety devices in the U.S.

First of all, two wrongs don't make a right. We will get past that. But the defendants themselves, in one of the e-mail years ago, it was probably 15 years ago, compiled a list of 39 of their international subway stations that had platform screen doors and they didn't count the subways that had other safety measures. Some of which we have discussed. But in their count they included JFK. And by the way, Las Vegas. You may hear them brag about we're safe because statistically they have a billion riders a year. The thousands of people hit is insignificant statically. Well, just think about one second the fallacy of that argument. If one percent of a billion is 10 million, that comes out to 192,308 a week.

Point one percent of a billion is 1 million.

Point 01 percent of a billion is 100,000.

Even point 001 percent is 10,000.

So the question is how many deaths and injuries due to a known hazard is acceptable. That's really the bottom line question.

You will hear -- I have subpoenaed multiple defense employees and former employees and I will question them on this witness stand. They have all been subpoenaed. And I will ask each and every one of them when they are under oath how many deaths and injuries are acceptable to the Transit Authority. They say zero or close to zero as possible or as few as possible. But I think you will find three to five times a week is way above zero, or a few, or as few as possible. And it is beyond what is acceptable.

You may hear that platform screen doors can't be installed in every station. Putting aside they're wrong, so what?

THE COURT: Mr. Genis, Mr. Genis, let me interrupt you.

MR. GENIS: Yes, sir.

THE COURT: You have been going for about 45 minutes. I told the jury that whatever you say is not factual.

MR. GENIS: Yes.

THE COURT: The idea is to get them oriented. And I think you have gone extensively and I have given you a lot of latitude.

Why don't you save something for the trial?

You will have an opportunity to give a summation. You will not be precluded from doing that. But I think the jury has an idea what the case is about now and I think we can now hear from the defendant.

MR. GENIS: May I address damages?

THE COURT: Just wrap it up in a minute or two, okay?

MR. GENIS: If I may just address damages.

THE COURT: Just a few minutes.

MR. GENIS: She lost her arm and leg. She was 21 years old. She had nine surgical procedures after that. She had to have God knows how many what's called debridements, cutting away, whittling away dead skin from her stumps.

THE COURT: Mr. Genis, they are going to hear all about this.

MR. GENIS: Yes.

THE COURT: So the purpose of opening statements is not to get emotionally overwrought. Obviously the woman is seriously damaged.

You are going to have experts, doctors. Save it for the trial. I think you have gone far enough.

Let me hear from Mr. Keaveney now.

MR. GENIS: So I'm not allowed to say anything else?

THE COURT: I don't want to be difficult. I will

give you thirty second to wrap it up and then we will hear from Mr. Keaveney.

MR. GENIS: You will hear from an economist and a physician life-care planner that the costs of care for her and the needs for the rest of her life will $65 million, not a penny for her. That's for care and her needs, not for pain and suffering.

THE COURT: I think the jury has an idea of what you hope to establish during the course of the trial.

Mr. Keaveney, your turn now.

Opening Statement - Mr. Keaveney

MR. KEAVENEY: Good morning. My name is Andrew can Keaveney. My firm represents the Transit Authority, MTA, and the train operator Ms. Shabazz.

We are here today because Mr. Genis, Mr. Roth and Mr. Shields have filed a lawsuit on behalf of their client Luisa Harger in which they allege that she was injured due to the negligence of my clients.

Now, I, along with my colleague, Ms. Winters, intend to show you through the evidence, that is documents and witness statements and testimony, that the claim is not true.

Now, let me be clear, this is not a case where someone claims to have an injury that can't be seen. Ms. Harger's accident was traumatic. Her injuries are real and life changing.

She will tell you about that hot August day that ended in tragedy.

She will tell you how she was hospitalized, underwent multiple surgeries and months of therapy. And as a result, she will require prosthetics, along with associated treatment.

Despite all of that, the evidence will show that Ms. Harger is an extraordinary person who has been able to achieve many things despite her injuries, such as obtaining a bachelor's degree, a master's degree in architecture, pursuing her profession and getting married.

But the evidence will show that my clients are not responsible for Ms. Harger fainting on that very hot August day and falling backwards from the platform on to the tracks in front of an oncoming train.

(Continued on next page.)

(Continuing...)

MR. KEAVENEY: Of course, Mr. Genis will call that victim blaming, but the evidence will not support his claim.

The evidence will show that on August 2, 2016, Ms. Harger was in New York visiting her then boyfriend George Brown. At that time, Mr. Brown was working in lower Manhattan. They left Mr. Brown's apartment by 8:30 and took a train downtown.

Mr. Brown went to work, while Ms. Harger spent the morning sight-seeing before they met up for lunch.

Ms. Harger then spent the afternoon walking with around and shopping before returning downtown and waiting outside for Mr. Brown to finish work.

They then walked around, walked up to the World Trade Center, walked around there some more, and then took a train back to Brooklyn, where they walked back to Mr. Brown's apartment to drop off his bag, and then left again to walk 30 minutes to Atlantic Avenue to go to the Target there.

They walked around again, purchased some items, and then proceeded to the station, with the intention of taking a train back to Mr. Brown's apartment to finally have dinner.

They descended the staircase to platform level and waited for the train.

Now, also on that day Raqia Shabazz was operating a B train for New York City Transit. Although she hadn't been a

train operator very long, she was very familiar with the B line, its equipment, the Atlantic Avenue station. She had operated trains through there numerous times before.

Ms. Shabazz started her first run that afternoon in the Bronx, operating the B train to Brighton Beach and Brooklyn. After a break, she got the train assignment for a return trip back to the Bronx. She performed all the necessary pretrip inspections, found no exceptions with the equipment, and left the station before 7:00 p.m.

Ms. Shabazz will testify about operating the R68 train that day, how it takes power, how it slows, and how it brakes. She will testify about the signal timers in the station prior to the Atlantic Avenue station, and that they restrict the train speed to 25, now less than 25 miles per hour.

She will testify that it was nothing unusual that day until her train entered Atlantic station. When the train was one and a half to two cars into the station, she saw a woman slowly falling backwards from the platform towards the track. She was not reaching out for anything, she was not trying to grab on to anything. She just fell.

Ms. Shabazz immediately put the train into emergency, praying that it would stop in time.

Following the accident, Ms. Shabazz told supervisors that she saw Ms. Harger faint and fall from the platform.

You will hear from defendants' engineering expert who will opine based on witness' statements the location of the train, its speed and braking capabilities, that the accident was unavoidable.

The evidence will also show that the subway platform at the Atlantic Avenue station was safe for the one billion passengers who use the subway station or subway system each year, and the millions of people who use the station each year, also.

The evidence will show that the platform complied with all rules and regulations regarding subway platforms.

The evidence will also show that in the ten years prior to that accident, there will only be three incidents at the station. One involving someone who stumbled into the side a train, one who was found on the tracks, unknown how, and one who, unfortunately, committed suicide.

Mr. Genis claimed in his opening that the platform was unsafe, not because someone hit the train due to intoxication or suicide or medical cognition or intentionally accessing the tracks, but because it was no barrier between the edge of the platform and the train.

The evidence will show that not a single existing or newly built mass transit system in the United States has platform doors.

The evidence will show that there are no rules or

regulations or laws that require their use.

But despite this, the evidence will show that the Transit Authority had been studying platform doors and other platform safety initiatives for years prior to Ms. Harger's accident.

The evidence will show that these studies consisted of overseas trips to learn foreign mass transit practices, that they solicited information from manufacturers regarding the knowledge and installation of platform doors, and that they assessed pros and cons of retrofitting platform doors such as structural limitations, ventilation issues, electrical power sources, car equipment classes, operational issues, platform widths, and column placements.

Despite these concerns, the evidence will show that the Transit Authority continued to pursue platform doors and other safety initiatives, such as track intrusion devices. In addition, the TA implemented other initiatives to improve platform safety, such as awareness campaigns, countdown clocks, and help points.

Mr. Genis says he intends to call current and former transit employees to show that they did not care about safety. Listen to what they say and not what Mr. Genis says.

The witness will testify -- those witnesses will testify about the newer studies, reports, meetings, and trips to assess and consider passenger safety. They will testify

that as a public authority, they're required to follow open bidding procurement regulations, despite any too good to be true offers. More importantly, they will testify about the efforts to pursue platform doors.

The evidence will show that despite the obstacles inherent in a 120-year-old subway systems, the Transit's efforts and its plans for platform and passenger safety prior to and at the time of Ms. Harger's August 2, 2016 accident was reasonable.

At the conclusion of the trial, the judge will instruct you on the law. Although it is likely that this will be a difficult decision, we will ask you to set aside any sympathies and apply the law to the evidence which we will believe will demonstrate my clients are not responsible for Ms. Harger's accident.

Thank you.

THE COURT: All right, folks. Now, I think it's a good time to take a little bit of a break, and in about 15 minutes, we will come back at about quarter after, and then we'll have the first witness who will testify, all right?

Don't talk about the case now. You are on your way, you have a good idea what it is all about. Just keep it to yourself, talk about anything else except the case, okay?

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

(Recess taken.)

THE COURTROOM DEPUTY: You can all be seated.

(Proceedings continue in open court; no jury present.)

THE COURT: Everybody ready? Let's bring the jurors in.

Any problems?

MR. KEAVENEY: I have an issue for the judge.

MS. WINTERS: Are we on the record?

THE COURT REPORTER: Yes.

THE COURT: We'll have the jurors in -- is there something critically you have to say?

MR. KEAVENEY: Well, it is.

During openings, Mr. Genis referenced a lot about a hazard analysis, and that was contained in the system --

THE COURT: Well, what's done is done.

MR. KEAVENEY: Well, it is contained in their policy program manual, which --

THE COURT: Why are we talking about this? Bring the jurors in.

MR. KEAVENEY: Judge, we made a motion on it that wasn't decided. And you said wait until that time, and now it's this time.

MS. WINTERS: He's about to examine Mr. Sullivan on these issues, and we wanted to address it with Your Honor and

have the motion resolved before the exhibit --

THE COURT: What exactly do you want now?

MS. WINTERS: Sure.

So we had a motion in limine pending related to the internal policies and protocols of Transit not being a standard for negligence or the standard of care.

Under New York law, you cannot use internal policies and procedures to establish a standard of care in violation of the standard of care, especially when those policies --

THE COURT: All right. So what we'll do is this. I will look at it at lunch time, and, you know, if I agree with you, I will instruct the jury accordingly, okay?

In the meantime, let's go forward.

(Short pause.)

THE COURT: Tell us again, so we understand.

So you have a pending motion --

MS. WINTERS: Absolutely, Your Honor.

THE COURT: -- and we haven't decided --

MS. WINTERS: So we have a motion in limine pending in this matter that was filed on October 13 related to the internal policies and protocols not establishing a standard of care or breach of standard of care. We believe that Mr. Genis intends to examine Mr. Sullivan related to issues that are --

THE COURT: Is Mr. Sullivan going to be your first witness?

MR. GENIS: Yes.

MS. WINTERS: I mean, I believe Mr. Genis just represented to us he's going to take this witness at least through lunch, so perhaps he can reserve those questions, if Your Honor needs time, until after the lunch break.

THE COURT: Why don't we do this. We will get on top of it, again, and you understand what the issue is, and I may have a ruling against you, and I may have to instruct the jury accordingly that I may rule for you.

I'll tell you right now, we do have this pending matter, and I don't know what your take is about these internal policies --

MR. GENIS: I think they're wrong.

THE COURT: -- and counsel feels very strongly about it.

You think they're wrong?

MR. GENIS: Yes.

THE COURT: All right. So we'll check it out.

MR. GENIS: Okay.

THE COURT: And I'm going to give you latitude, and if, in fact, I have to instruct the jurors, I will do so.

(Jury re-enters the courtroom.)

THE COURTROOM DEPUTY: All rise.

You all may be seated.

THE COURT: So, Mr. Genis, I am not going to allow

that, and I am going to have to instruct the jurors accordingly. You'll have a record, okay?

MR. GENIS: All right. Because I'd like to be heard on that, Your Honor.

THE COURT: Bring your first witness in. I made my ruling, okay.

MR. GENIS: You made the ruling, but we weren't heard on it, Judge. I'd like to be heard.

THE COURT: Call your witness.

MR. GENIS: Okay. He's getting it, under subpoena, Mr. Sullivan.

THE COURTROOM DEPUTY: Who's this? The name of your witness? I'm sorry.

MR. GENIS: Michael Sullivan is his name.

THE COURTROOM DEPUTY: Good morning, Mr. Sullivan.

Take the witness stand, please.

I ask if you can remain standing, and if you can raise your right hand.

(Witness duly sworn.)

THE COURTROOM DEPUTY: Thank you.

Please have a seat.

And I ask you to please state and spell your name.

THE WITNESS: Michael, M-i-c-h-a-e-l, Sean, S-e-a-n, Sullivan, S-u-l-l-i-v-a-n.

THE COURTROOM DEPUTY: Thank you, Mr. Sullivan.

MR. GENIS: May I proceed, Your Honor?

THE COURT: You may. Go ahead. Your witness.

MR. GENIS: Thank you.

MICHAEL S. SULLIVAN,

called as a witness herein by the Plaintiff, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GENIS:

Q Mr. Sullivan, you're here pursuant to subpoena today; true?

A Yes, sir.

THE COURT REPORTER: Wait. Can you please go to the podium and use the microphone?

MR. GENIS: Oh. I'm sorry.

Q Sir, what, if anything, did you do to prepare for your testimony today?

A Reviewed the depositions from a few years ago.

THE COURT REPORTER: Sorry. Can you move the microphone near you. It moves.

THE WITNESS: Yes.

THE COURT REPORTER: Thank you.

A I reviewed the deposition from a few years ago.

Q And that was when you gave testimony under oath a few years ago?

A Yes, sir.

Q Okay. Other than that, did you review anything else?
A No.
Q Have you testified before, sir?
A I believe once.
Q Okay. When you say once, are you talking about this deposition or something else?
A Something else.
Q Okay. Would it be fair to say before this deposition you testified twice before, once at another deposition and once at a trial?
A Yes.
Q Okay. And all of the times you've testified before were on behalf of the New York City Transit Authority where there were claims of negligence against Transit causing injury, correct?
A Yes.
Q Okay. And so having testified before, you're somewhat familiar with this procedure, sir?
A Yes.
Q Okay. What I'm going to do to try to move things along is I will ask you where possible questions that call for a yes or no answer, true or false answer.
Please say yes or no, or true or false, and if you are unable to do so, just say you are unable to do so, and I will ask a question, okay?

A Okay.
Q Fair enough?
A Fair enough.
Q Okay. Sir, you started at the Transit Authority in 1991, correct?
A Yes.
Q And you are a track worker?
A Yes.
Q And you received training for your job, correct?
A Yes.
Q And then in around 1991, '93, you became a power distribution maintainer?
A 1993, yes.
Q Okay. Sorry.
And then in '95 you became a maintenance supervisor Level 1 for track?
A Yes.
Q And then you became supervisor -- maintenance supervisor Level 2, correct?
A Yes.
Q And then you became a superintendent in the track department, the track maintenance and track instruction, correct?
A Yes.
Q And then you were promoted, still a supervisor, but you

went to rapid transit operations emergency response officer in the rail control center, correct?
A Superintendent, not supervisor, but, yes.
Q I'm sorry. I thought I said superintendant. My apologies. No disrespect intended.
A Yes. No, it's fine.
Q Okay. And then as a superintendent, you work in trains, correct?
A Worked trains, yes. As a superintendent.
Q And then in 2014 you went to the Office of System Safety as a superintendent investigator, correct?
A Yes.
Q Until you were promoted to manager of rapid transit investigations unit, correct?
A Yes.
Q You worked for the Transit for about 30 years in different roles, correct?
A Yes.
Q And your final role was manager of rapid transit investigations unit in the Office of System Safety for Transit?
A No.
Q Okay. Did you have another position after your last deposition?
A I don't recall what my title was at the deposition, but

when I retired, I was a senior director of operations for Systems Safety.

Q Okay. Thank you.

And when you were, I guess before that, the superintendent of Rapid Transit, in emergency response, you would respond to situations involving train delays, you'd be on site, correct?

A Correct.

Q And from the site, you would communicate with the rail control center; true?

A Correct. We'd keep them updated. Yes.

Q And as part of your job, you were involved in something, a code called a 12-9, correct?

A It's a radio code, yes, 12-9.

Q And 12-9 is what is referred to in the Transit as a man under, correct?

A Man under or a collision with individual, yes.

Q And collision with individual is known as a CWI, correct?

A Correct.

Q Okay. And either of these are interchangeable, correct?

A Correct.

Q And that's when a train strikes somebody, basically, correct?

A When a person comes in contact with a train, yes.

Q Okay. And you would respond to these incidents, correct?

A Correct.
Q And according to your protocols, the operator of the train would have to come out and do an investigation to see the body and the body parts; true?
A Can you repeat that?
Q According to the protocols at the time, the operator of the train had to come out and do an investigation and see the body and the body parts?
A The train operator of the train who was -- if they did not know why the brakes of their train were in emergency -- so there are brakes that are activated. If they do not know or were not aware of what caused their train to go brakes in emergency, they would then be required to go out and do an inspection to find out what the cause of the brakes in emergency was. And if it was a person that was struck by the train, then, yes, they would see that person.
Q Okay. So, sir, when I asked you that yes or no question, basically, according to your protocols, the operator has to come out and do an investigation and see the body and body parts; true or false?
A True.
Q Okay. Sir, and the Office of System Safety does the oversight for the New York City Transit, correct?
A Correct.
Q And there's a safety officer, there's oversight over the

entire bus and rail operations, correct?
A Not oversight over them. Over -- we were -- depends on what you are discussing.
Q Okay. Sir, were you asked the following questions -- I will skip it. It's not important.
So you would provide -- you worked in operations and maintenance-of-way department for a while, correct?
A Yes.
Q And as a senior director of operations for Office of System Safety, you reported directly to the vice president of the Office of System Safety, correct?
A Yes.
Q And you provided technical expertise and counsel to the vice president and senior management of the Office of System Safety; true?
A Yes.
Q And you acted on behalf of vice president for day-to-day safety matters involving critical operations, task force work groups, and partnering projects, some involving task force for safety; true?
A As required, yes. True.
Q Part of your job is to evaluate and analyze investigation results to identify causal factor trends and prevent recurrence; true?
A True.

Q And that's important to do this, to prevent recurrence and learn from the experience; true?
A True.
Q And the Office of System Safety has oversight over the rail operations; true? And buses?
A We're not the subject matter experts, but true.
Q The job of the Office of System Safety is to make sure that the Transit system is a safe as possible; true or false?
A True.
Q Okay. And you have to operate in the real world in terms of system safety, correct?
A Can you explain that?
Q Sure. Let me ask you this.
Sir, at the time of your deposition, that was on February 2 of 2022, correct?
A Okay, yes.
Q And at that time it was closer to the time of this incident that we are here now in 2025, correct?
A Yes.
Q And you were still working for the Transit at the time, correct?
A Yes.
Q And your memory was better and fresher back then than it is now a few years later, correct?
A Yes. Most definitely, yes.

Q And at that time of your deposition, you had reviewed materials and spoke with the attorney to prepare for your deposition, correct?
A I don't recall reviewing any materials other than the incident report, and I did speak to the lawyers, yes.
Q Okay. And at that time when you had your memory refreshed, looking at documents, talking to the lawyer closer to the time, you were under oath; true?
A Yes. True.
Q And at that time when you were under oath, were you asked the following question and did you give the following answer. This is page 215, line --
THE COURT: Let me understand, Mr. Genis. Are you using that to impeach the testimony?
MR. GENIS: Yes. Correct.
THE COURT: All right. Go ahead.
MR. GENIS: So I am just, for everyone's benefit, giving page and line.
THE COURT: Let me explain to the jurors.
So, you know, there are these depositions and testimony which, you know, you have probably heard a little bit about. So before trial starts, lawyers are entitled to depose whoever they may feel is relevant to the case, and expert witnesses as well. That takes place out of the courtroom.

And so -- and these are depositions under oath, and they can be used during the course of a trial under certain circumstances. So if, you know, there is a witness that says something here in court, and he said something maybe that was inconsistent at one of these prior depositions, the lawyer can bring that inconsistency out, and that's one of the ways he can use a prior deposition. There are other ways he can use it, but that's what we are talking about right now. So I'm going to allow Mr. Genis to go forward, to read part of that, and you'll decide whether it is inconsistent with his testimony, as part of your fact-finding responsibilities, to listen to what was said at trial, listen to what may have been said at a prior occasion, and see whether or not it harmonizes it, or if there are any problems. It is part of your total mix in terms of sizing up the credibility of the witness.

Let's hear what you have to say.

MR. KEAVENEY: Your Honor, I just want to object to that because the response was, can you explain that, and there was no statement that contradicted anything.

THE COURT: You know, I don't know whether -- what statement are you talking about, specifically?

MR. GENIS: I'm looking --

THE COURT: No, tell me, because I'm going to get on board here.

What did he just say that you feel you want to

contradict by his prior deposition testimony?

MR. GENIS: About in looking at system safety, you have to operate in the real world; true or false.

THE COURT: Okay. Go ahead. Let me see what he said.

Q Okay.

"QUESTION: And one of the things, in looking at system safety, is you have to operate in the world, real world; true?

"ANSWER: True."

Sir, when I asked you that question under oath at the deposition, you gave that answer; true?

A Okay. If it's in the deposition, true.

Q And that was the truth at that time, correct?

A Yes.

Q And is it still the truth today?

A Correct.

Q Okay. Thank you.

A Can you explain what you meant by real world?

THE COURT: You are going to have an opportunity for Mr. Keaveney to question you as well, if he chooses.

THE WITNESS: Sorry.

Q Sir, at the time of the deposition, did you have any problems answering that question?

A Not that I recall, no.

Q Okay. And for this trial, have you met with anybody on behalf of the Transit Authority to prepare?
A Just Andrew.
Q Their attorney?
A Yes.
Q By the way, as part of the job, do you have to see about foreseeable use and even misuse?
A Excuse me?
Q As part of that job at the Transit, did you have to see, as you are doing these investigations, about foreseeable use and misuse?
A Foreseeable use and misuse of what?
Q Okay. Were you asked the following question, same page, very next question. Line 21, page 215.
"QUESTION: So you have to see about foreseeable and even misuse, correct?
"ANSWER: Correct."
Were you asked that question under oath and did you give that answer under oath?
A I don't recall.
MR. GENIS: Andrew, would you consent that I read that accurately?
MR. KEAVENEY: Can we get --
THE COURT: Well, he answered the question. He said he doesn't recall.

MR. GENIS: Okay.
Q And the system has to be designed for people that might misuse the product and still make it safe, correct?
A Yes.
Q Okay. And the TA should make things safe for foreseeable use and misuse; true?
A Yes.
Q Okay. And they are to coordinate and revise the New York City Transit System Safety Program Plans, correct?
A Well, System Safety Program Plan is an overall description of the system.
Q So could you please answer my question. It's a yes or no question, sir.
THE COURT: You understand the question? I think the general tenor is, the tenor is you do things to keep it safe. I don't know what he's saying.
THE WITNESS: Well, if you don't know what he's saying, then I am really confused.
THE COURT: Makes two of us.
Next question.
MR. GENIS: Sure.
Q Were you asked the following question under oath, and did you give the following answer under oath. Page 188, line 3.
"QUESTION: And they are to coordinate and revise the New York City Transit System Safety Program Plan, SSPP?

"ANSWER: Yes."

Were you asked that question and did you give that answer?

A I don't recall the question.

Are you referring to the Office of System Safety being required to do that?

Q Sir, when I asked you that question under oath, you just answered yes, correct? Sir?

THE COURT: The record reads what he said, okay.

Q Sir, do you remember you agreed if I asked you a yes-or-no question or a true-or-false question, to just answer yes or no, or true or false? And if you can't, just say you can't. Do you recall that instruction, sir?

A I do.

Q And I gave you a similar instruction at your deposition, correct?

A Yes.

Q Okay. And could you kindly keep your word on this, please?

All right. Now, sir, did the Office of System Safety make any recommendations to prevent 12-9s, contact with individuals?

A None that I'm aware of, no.

Q Now, let's talk about the job of the Transit Authority.

Do we agree that the Transit Authority essentially

has one job, to safely operate its mass transit system subways and buses?

MR. KEAVENEY: Objection.

Is he asking Transit Authority --

THE COURT: I don't know if you understand the question, has one job? You have to -- if you are confused about that, I guess there are many jobs, but they want to know whether they should run a safe transit system. I guess the answer to that is yes, right?

THE WITNESS: Yes.

THE COURT: Not to run an unsafe one.

THE WITNESS: Yes.

THE COURT: Next question.

MR. GENIS: Thank you.

Q So, following up, part of the job of the Transit Authority is to safely operate its subway system in the safest way possible; true?

A Yes.

Q And safety is the most important thing a public transportation organization can strive for. Safety is goal number one; true?

A Yes.

Q And the highest priority is safety of the public and paying customers, employees, correct?

A True.

Q And everything that Transit does is supposed to be guided by safety and what promotes safety the most for the public and its paying customers; true?
A True.
Q And the customers have a right to expect that the subway system in New York is safe; true?
A True.
Q And a prudent transit agency does what is safest for its passengers and employees in terms of whatever's possible, correct?
A True.
Q The Transit Authority should make sure that all reasonable safety features, devices, or equipment are present; true?
A True.
Q And there are certain uniform good and accepted practices and procedures that get followed by transit agencies throughout the country; true?
A I'm not sure about the practices, but I would imagine so, yes.
Q Well, let's see.
Were you asked the following questions under oath and did you give the following answer, on page 26, line 12?
"QUESTION: So there's certain uniform good and accepted practices and procedures that get followed by transit

agencies throughout the country, correct?

"ANSWER: Yes."

Were you asked that question and did you give that answer?

A Yes.

Q Is it the truth then?

A Yes.

Q Okay. And there's certain uniform good and accepted practices -- sorry.

And the public is safer when the Transit Authority complies with good and accepted practices and procedures, professional standards of care industry standards and customs; true?

A True.

Q And part of the job of the Transit is to prevent presentable harm, that's what's required under good and accepted practices and procedures and professional standards of care; true?

A True.

Q And the TA should have the knowledge necessary to prevent preventable harm; true?

A True.

Q And according to good and accepted practices and procedures for the Transit Authority, it is never allowed to unnecessarily expose people to harm; true?

A True.
Q And according to professional standards of care for the Transit Authority, it is never allowed to unnecessarily expose people to harm; true?
A True.
Q And the requirement of industry standards customs and practices and guidelines is that the Transit Authority is never allowed to unnecessarily expose people to harm; true?
A True.
Q And a prudent public transportation system must select the safest way to do things; true?
A True.
Q And if the Transit Authority unnecessarily exposes the public to harm, that is not prudent; true?
A True.
Q And you are not aware of any industry standard customer practice that permits the transportation company to unnecessarily expose the public to harm; true?
A True.
Q Now, there are times the TA has to use its judgment, correct?
A Correct.
Q And according to the training you received, the Transit Authority is never allowed to use its judgment in a manner that unnecessarily exposes the public to harm; true?

A True.
Q And according to professional standards of care, the TA is never allowed to use its judgment in a manner that unnecessarily exposes the public to harm?
A True.
Q And the same thing for good and accepted practices and industry standards, they are never allowed to expose the public to any more danger than is necessary, correct?
A Correct.
Q And the TA is not allowed to ignore signs of danger, correct?
A Correct.
Q The more danger, the more careful the transportation company has to be in addressing it, correct?
A Correct.
Q The level of care must match the level of danger; true?
A True.
Q And when the TA sees there's a possible danger, it is required to remove the danger and make it safe; true?
A True.
Q And the customers have a right to expect that the Transit Authority will be second to none in terms of safety; true?
A True.
Q And customers of the Transit Authority have the right to expect the TA will use technology equipment and devices where

it can reasonably do so to make the New York City subway system the safest in the world; true?
A True.
Q Part of the job of the Transit Authority includes anticipating how customers may become harmed; true?
A True.
Q Part of the job of the Transit Authority is to take all reasonable steps to prevent foreseeable harm; true?
A True.
Q And there are uniform good and accepted practices and procedures followed by Transit agencies throughout the country; true?
A True.
Q And good and accepted practices and procedures is to evaluate and analyze investigation results to identify causal factors and it complies with professional standard of care to do so; true?
A True.
Q And it complies with good and accepted practices, procedures, and professional standards of care to analyze and evaluate investigation results to prevent the recurrence, correct?
A True.
Q And there is a priority in actions the TA takes. Urgent conditions come first; true?

A True.
Q And if there's a type of incident that can cause death or serious injury, it should be attended to before a condition that causes minor injuries; true?
A True.
Q And the contact with individual, the CWI, that is a known hazard of contact between trains and people, correct?
A Correct.
Q And these contact with individuals, these 12-9s, result in more fatalities than any other type of incident in the transit system; true?
A True.
Q It results in more serious injuries and amputations than anything else in the system, correct?
A Correct.
Q The main cause of death in serious injury and amputations in the subway system is contact with individuals, correct?
A Correct.
Q And a hazard is defined as any existing or potential condition that can result in an accident; true?
A True.
Q And these 12-9s are major safety hazards; true?
A True.
Q And safe means you don't want the 12-9s to occur, people killed or maimed by trains, correct?

A Correct.
Q And if somebody gets hit by a train, it's not safe, correct?
A No.
Q Okay. Let's see.
Were you asked the following question under oath and did you --
A True. No. I said, no, it is not safe. I meant true. Sorry.
Q Thank you. Okay. No worries, no harm.
Okay. It's important to know how many deaths are due to 12-9s each year, correct?
A Correct.
Q And on a yearly basis, we're averaging it and we're going before 2016 or up to 2016, there's, what, about 40 to 50 deaths a year from 12-9s?
A Sounds about right. Yes.
Q And about a third of the people hit by trains are killed?
A Sounds about right. Yes.
Q So, yearly, it's, give or take, 150 to 175, 12-9s?
A Back then, yeah, I would say so. Yes.
Q And so every ten years between 1,500, 1,700 people get hit by trains and are seriously injured?
A Yes.
Q And over the past 30 years that you were with the

Transit, thousands and thousands of people were hit by trains, correct?
A Yes.
Q And you agree it's a serious catastrophe to have that many people hit by trains and that many people killed by trains?
A Yes.
Q Now, as part of the Transit Authority investigation process, you're supposed to determine causal factors and develop recommendations and implement corrective actions, true?
A Correct.
MR. KEAVENEY: Objection.
Is he reading from a manual or --
MR. GENIS: I am reading from my notes.
THE COURT: Objection overruled.
Go ahead.
Q And the Department of Subways is supposed to gather this information and determine the root cause of the incident, correct?
A Correct.
Q And in doing a root cause analysis, you look to see what can prevent the event from occurring, regardless of how it is occurring; true?
A Correct.

Q So root cause of death or root cause of severed limb is the train having contact with the individual, correct?
A Correct.
Q And root cause is when the envelope of the train is violated, correct?
A Correct.
Q And the only practical way to stop 12-9s from occurring is restricting access or stopping the trains; true?
A Correct.
Q And the Transit Authority can control access to the track and track bed; true?
A True.
Q Okay. So if the Transit Authority prevents access to the track and track bed, it can reduce the number of 12-9s, correct?
A True.
Q And if at any time prior to issuing a final report, if they determine there is a need for immediate action to correct an unsafe condition, they should make that immediate recommendation, correct?
A Correct.
Q And regular investigation could also make long-term recommendations, correct?
A Correct.
Q So the TA must have the knowledge necessary to do their

job safely and properly, correct?
A Correct.
Q And the more knowledge they have about preventing a known cause of harm, the better the chance that they can use this information to prevent that harm; true?
A True.
Q Because a lack of knowledge about safety and how to prevent preventable harm can be dangerous to the public, correct?
A True.
Q And the people with knowledge about the professional -- withdrawn.
The people with knowledge about what professional trade groups and industry standards are in the field of engineering, correct?
A Correct.
Q And the Transit Authority has engineers, correct?
A Correct.
Q Now, part of the job of a public transportation company includes keeping up with the latest research and literature guidelines and standards, correct?
A Correct.
Q And part of the job of the Transit Authority is to keep up these applicable rules, protocols and procedures for safety; true?

A True.
Q Part of the job is to seek advice from others with knowledge, correct?
A Correct.
Q The job includes membership in professional groups, correct?
A Correct.
Q And they receive information from international groups, see if somebody has a good idea where things can be done differently from another country that you can benefit from and be safer, correct?
A Correct.
Q And you have heard of CoMET, the Community of Metros, correct?
A Correct.
Q And you reviewed other research about -- the Transit, I should say, has reviewed other research about prevention of 12-9s, correct?
A Correct.
Q You reviewed about platform screen doors, track intrusion systems, and barriers, railings to prevent 12-9s, correct?
A Correct.
Q They learned different options to prevent or reduce these incidents of 12-9s, correct?
A Correct.

Q And often there are several available choices to achieve the same level of benefit, correct?
A Correct.
Q Some choices expose people to more harm or danger than others, correct?
A Correct.
Q So every choice has to meet the risk benefit required, correct?
A Correct.
Q So a prudent transportation company must pick what affects safety the least, in other words, least safe, avoid that?
A Could you repeat that?
Q Sure. Poor English. It's withdrawn. I'm sorry.
When the benefit of different choices is the same, extra danger is not allowed; true?
A True.
Q Okay. And the TA wants to be the safest system in the world, correct?
A Correct.
Q And they want to be the safest system in the world of comparable size of other systems, correct?
A Correct.
Q Second best is not acceptable to the TA, correct?
A Correct.

Q And one of the ways the TA's supposed to make the New York City subway system the safest in the world is by seeing what other subway systems around the world do; true?
A True.
Q The TA can learn from other Transit systems around the world how to do better and be safer and more efficient, correct?
A Correct.
Q And there are rankings that enable the TA to be compared to similar size entities to see how they compare in terms of safety; true?
A I don't know.

(Continued on the next page.)

BY MR. GENIS: (Continuing.)
Q Were you asked the following question on Page 77, Line 13, and did you give the following answer:
"Question: Can we agree that there are ranking systems around the world that would enable the New York City Transit system to be compared to other similar sized entities to see how it compares, how it ranks next to them in terms of safety?
"Answer: Yes, yes."
A Yes.
Q And if another transit entity is doing things safely, if possible, the Transit Authority should model itself and emulate that; correct?
A Correct.
Q Okay. If another transit agency is not following good and accepted practice and is not safe, the TA should not model themselves after that; correct?
A Correct.
Q Okay. So if all the other transit agencies are not safe, it's not an excuse for the TA not to be safe; true?
A True.
Q The TA does not get a pass on safety; correct?
A Correct.
Q Okay. Now track intrusions, you're familiar with the COMIT study that the New York City Transit Authority compared

to other similar systems at the very high end of people getting hit by trains, true?
A I don't -- I don't recall it, but I'm familiar with TIDS, true.
Q Okay. "True" is the answer?
A True.
Q Okay. So, when compared, the TA was at the very high end of these types of accidents, ranked highest amongst agencies for proportion of accidental track intrusions from 2012 to 2016, true?
A True.
Q 12-9s are preventable, true?
A True.
Q Okay. And there are different types of systems that can be utilized for safety; correct?
A Yes.
Q There's platform edge protection and there's intrusion protection systems; correct?
A Correct.
Q Okay. You're familiar with platform edge protection, true?
A I'm familiar with it, true.
Q And platform edge protection can be provided to protect people from a potential hazard of being struck by a moving train, true?

A True.
Q Rails, fences, barriers have been effective safety devices in preventing people from jumping, being pushed, or falling on the tracks below in the subway system; true?
A I don't -- I don't recall. I would imagine so.
Q And, in fact, there are railings in certain subway stations in New York City well before you even worked for the Transit Authority, true?
A True.
Q Now, platform screen doors are effective at preventing 12-9s from occurring, true?
A True.
Q So they could reduce 12-9s from occurring; correct?
A Correct.
Q And you're aware that there are platform screen doors, not only at Disney World, but at airports at JFK, the train to the plane, those nine stations; correct?
A Correct.
Q And JFK installed the platform screen doors, and they were operational in 2003; correct?
A Correct.
Q And you're not aware of a single 12-9 at JFK since the platform screens were installed; correct?
A I'm not responsible, but correct.
Q Okay. And it is highly unlikely for a person to fall

onto the tracks at JFK with the platform screen doors; correct?
A I couldn't swear to it, but I would say correct.
Q Well, sir, did you ever swear to that, that it was 99.9 7 percent?
A 99.97 percent.
Q Yeah. Effective.
A Okay.
Q And other subway systems throughout the world also have the platform screen doors; correct?
A Correct.
Q Let's discuss other benefits.
A 12-9 disrupts service anywhere from a-half-an-hour to three hours correct?
A Correct.
Q So when you have platform screen doors, you have fewer disruption of service; true?
A True.
Q Track fires in an area are a problem and a common cause of debris on the tracks; true?
A True.
Q Platform screen doors help prevent track fires; true?
A To keep debris off, true.
Q Okay. And there's -- withdrawn. Let's move on.
And there was a group at the transit -- and again,

all my questions are before August 2nd of 2016, in case there's any question in your mind.
Understood.
A Okay, yes.
Q And there's a group that did research on platform screen doors and track intrusion detections; correct?
A Correct.
Q And you were familiar with TIDS, the Track Intrusion Detection Sensors?
A I'm familiar with it, yes, correct.
Q And they have sensors that if the envelope of the train is violated, it can activate warning signals to approaching train that something is on the road bed; correct?
A Correct.
Q And when we have discuss the envelope or safe zone of the train, that encompasses a portion of the platform, true?
A I don't know about that.
Q Okay. And the TIDS are the second type of safety device to prevent 12-9s in addition to the platform screen doors; correct?
A TIDS isn't going to prevent the 12-9. It's going to warn the train operator there's something on the track.
Q That's why it's not as effective as the platform screen doors, correct?
A Correct.

Q Okay. Now, there's also cameras and videos throughout the subway system; correct?
A Correct.
Q And that's known at CCTV, closed-circuit TV?
A Correct, yeah.
Q And it's feasible to have a feed from a closed circuit to the train operator and a monitor in the cab so that the operator can see before they enter the station what it looks like and if anyone is either on or near the tracks, true?
A I'm not familiar with that technology in the subway.
Q Let's start on Page 170, Line 19. Were you asked the following question; did you give the following answer:
"Question: And what could also be done is" --
MS. WINTERS: Objection, Your Honor, looking at the --
THE COURT: I haven't heard the question.
MS. WINTERS: -- testimony in question, it's not proper impeachment --
THE COURT: All right. Sit down.
Overruled.
I haven't heard the question yet. I'll listen to the question, and if it's improper, we'll take it from there.
BY MR. GENIS:
Q "Question: And what could also be done if there is a feed from that closed-circuit to the train operator and they

have a monitor in their cab, there" --

THE COURT: He said he has no knowledge of that technology.

Objection sustained.

MR. GENIS: Okay. But in his deposition, he testified that he would image it's feasible.

THE COURT: If the deposition testimony says that he does have knowledge of that technology, I'll let you bring that out.

MR. GENIS: Okay.

THE COURT: If he has no knowledge of it, he's got nothing to testify about.

MR. GENIS: So if his answer was I imagine that was feasible --

THE COURT: We're not going to talk about imagination.

Next question.

MR. GENIS: We're not. Okay.

BY MR. GENIS:

Q So, closed-circuit TV can help with safety; true?

A To monitor, true.

Q And it complies with good and accepted practices and professional standards of care to used closed-circuit TV so that the train operator can see what's on the track before they enter the station; true?

A If the technology's available, true.
Q Now, there's also different approaches. There's barriers for the platform screen doors, there's also known as rope or vertical or fixed rail.
And for all of these, the purpose is to prevent contact protrusion; correct?
THE COURT: Do you know of that type of protective measures?
THE WITNESS: There are -- there's -- there are a couple of measures out there.
BY MR. GENIS:
Q Their purpose --
THE COURT: And their purpose, obviously, is to provide for safety; correct?
THE WITNESS: I would imagine so, yes.
THE COURT: Okay.
BY MR. GENIS:
Q Now, you used the word "feasible" before.
"Feasible" means capable of being done, effected, or accomplished; true?
A True.
Q And it is feasible to have platform contractors installed in our system; correct?
MR. KEAVENEY: Objection.
THE COURT: You can answer that.

Do you have an opinion about that?
A My opinion would be: I would imagine it's feasible in some locations.
BY MR. GENIS:
Q Okay. And it's also feasible to have track intrusion devices, true?
A Well, if the technology is correct and you don't get false alarms.
Q And it's feasible to have closed-circuit TV to see if there's anything on the track; correct?
THE COURT: I think he already said that.
MR. GENIS: I'm sorry. I didn't hear you, Judge.
THE COURT: "You have closed-circuit TVs?
"Okay" --
THE WITNESS: Well, there is closed-circuit TV throughout the system. I'm not aware of any of it specifically looking at the tracks. It's more on surveillance on the platforms and, you know, on mezzanine areas.
BY MR. GENIS:
Q So if the Transit Authority wanted, they could have closed-circuit TV cameras looking at the platform of track; correct?
A I would imagine so.
Q Okay. By the way, is it also feasible to have markings on the platform where people should stand?

A Yes.
Q Now, the OSS, Office of System Safety, has the assessment group who assesses and analyzes the data on 12-9s; correct?
A I don't believe so, but I -- I couldn't swear to it.
Apparently I did already, so...
Okay. Yes.
Q And the hazard assessment group does assessment and analysis is responsible for conducting studies about passenger and employee safety; true?
A True.
Q Okay. And they're supposed to conduct in-depth system safety studies to identify, assess, and resolve safety hazards which impact passengers and employee safety; true?
A True.
Q And a study must be complete to have any validity or reliability; correct?
A Correct.
Q An invalid study can result in people being unnecessarily harmed, true?
A True.
Q A study must be thorough, accurate, objective, fair, look at all the data, and not engage in speculation, surmise, or guessing to be valid and reliable; true?
A True.
Q And it's important that the study be complete, thorough

honest, objective, accurate and fair, and based on fact and science, and not opinion, true?
A True.
Q Otherwise it's invalid; correct?
A Correct.
Q And any opinions in the study must be backed up with hard data; if they give an opinion, there has to be an analysis based on facts provided in the study; correct?
A Correct.
Q If an opinion is reached and there's no factual data in the study to support the opinion, it is an invalid and unreliable opinion, true?
A True.
Q And Office of Systems Safety whose job is to make the subway system safe knows the main cause of death and serious injury and amputations are 12-9s, but no one at OSS evaluates and analyzes investigation results to identify what causes 12-9s and how they can be prevented from recurring, true?
A True.
Q Okay. And there is no need for further study because the transit already knows from day one that the cause is contact with people and the trains on the track bed, true?
A True.
Q And proper evaluation and analysis for how to prevent that from occurring is a safety study that says how to prevent

trains from having contact with people; correct?
A Could you repeat that? I'm sorry.
Q Sure.
Proper evaluation and analysis for how to prevent that occurring, the 12-9s, is a safety study that says how to prevent trains from having contact with people, true?
A True.
Q And the point of the study is to see what is the best way to prevent 12-9s from occurring, true?
A True.
Q And a proper safety study, looking at root cause analysis and how to get corrective action to prevent 12-9s, is you control the control -- you control access to the track and track bed or stop the train; correct?
A True.
Q And the study should be how do we properly -- whether it be PSDs, TIDS, whatever, how do you properly and safely implement those systems, correct?
A Correct.
Q And you're not aware of any such studies being done; correct?
A Well, there were studies on platform screen doors and --
Q Sir, let me ask you -- were you asked the following question under oath, and did you give the following answers, sir: Page 257, Line 22.

"Question: Okay. Are you aware of any such studies being done?

"Answer: I'm not aware of any right now."

Were you asked that question and did you give that answer under oath?

A I am not aware of any studies.

Q Now, you're not aware of a safety study that says, how do we solve the problem how to prevent 12-9s from occurring; true?

A True.

Q You're not aware of a safety study that says what it would take from preventing 12-9s from occurring; true?

A True.

Q You're not aware of any safety studies whatsoever at all at any time up to August 2nd, 2016 for this Atlantic Terminal station where this incident occurred, for the platform and tracks where this incident occurred; true?

A True.

Q You're not aware of any safety studies for the station with respect to platform screen doors; true?

A True.

Q You're not aware of any studies for this particular station with respect to track intrusion devices; true?

A True.

Q You're not aware of any safety study that addresses how

platform screen doors can be properly installed in different types of stations and different types of platforms that the TA has, true?
A There was a white paper.
Q Sir -- hold on. Let's go to Page 201.
Sir, were you asked the following question under oath and did you give the following answer, Page 201, Line 18:
"Question: Are you aware of a safety study that addresses how platform screen doors can be properly installed in different types of stations and the different type of platforms that the Transit Authority has?
"Answer: No."
Were you asked that question under oath; did you give that answer under oath?
A I gave the answer "no" at the time, and it was correct.
Q Okay. So it was the truth then; correct?
A As far as I can recall.
Q Thank you.
Are you aware of a single safety study that addresses how platform screen doors can be used that is not a one-size fits all approach but one that adapts to different stations?
A No.
Q Are you aware of a safety study that addresses how stations can be altered or modified to install platform screen

doors?
A No.
Q And you're not aware of any safety studies about the efficacy of making markings on the platform of where people should stand to prevent 12-9s from occurring; correct?
A No.
Q And so, when you say "no," I'm correct?
A Correct.
Q Thank you.
And you're not aware of any safety study that says, how do we solve the problems of the width of a platform or the weight of the door or station with curves or environmental issues or mainline issues for platform screen doors; true?
A True.
Q You're not aware of any safety study that addresses what can be done to make platform screen doors lighter in weight; true?
A True.
Q You're not aware of any safety studies that address what could be done to make platform screen doors thinner; true?
A True.
THE COURT: Are you aware of any safety studies at all? That's what he's trying to find out?
THE WITNESS: No.
THE COURT: Next question.

BY MR. GENIS:

Q Let's discuss plans.

Once the Transit Authority has done a safety study and they concluded the only way to prevent 12-9s from occurring is by either controlling access, preventing the access, the only issue is implementing the plan; correct?

A Correct.

Q Okay. And from 1991 to 2000, do you know of any plan the Transit Authority had to prevent 12-9s from occurring?

A No.

Q Okay. From 2000 to 2005, do you know what the safety plan was to prevent 12-9s from occurring?

A No.

Q From 2005 to 2010, you don't know what the safety plan was to prevent 12-9s from occurring; correct?

A No.

Q 2010 to 2015 -- you know, let's go right to 2016.

2010 to 2016, you don't know what the safety plan was to prevent 12-9s from occurring; true?

THE COURT: I think you said you're not aware of any safety plans, just so we understand?

THE WITNESS: No.

THE COURT: He says he's not aware of any safety plans.

MR. GENIS: Okay.

THE COURT: Let's move on.

BY MR. GENIS:

Q Sir, is there a document that describes in detail the tasks and activities of system safety management, system safety engineering, and the safety certification process required to identify and evaluate and eliminate or control hazards or reduce associated risks to a level acceptable to the authority?

THE COURT: Do you understand the question? He wants --

A I believe -- I believe you're talking about the SSPP.

BY MR. GENIS:

Q If that's what it called. You tell me.

A System Safety Program Plan.

Q Is that what it is?

A I believe that's what you just talked about.

Q Okay.

A Yeah.

Q And shall that have, as its number one objective, to provide for the safety of passengers, employees, and the --

MS. WINTERS: Your Honor.

BY MR. GENIS:

Q -- general public and equipment?

THE COURT: Just one second.

What's the question?

No speeches. Just ask the question.

MS. WINTERS: Objection. Your Honor, this is related to the motion you ruled on.

THE COURT: You have your objections. We'll talk about this later.

You can continue your questions.

MR. GENIS: Thank you.

BY MR. GENIS:

Q So did that have, as its number one objective, to provide for the safety of passengers, employees, the general public, and equipment?

THE COURT: Well, I'm a little confused.

MR. GENIS: Sure.

THE COURT: What's the exactly the question you want to ask of this witness?

MR. GENIS: Sure.

A moment ago, he testified how there is a document that describes in detail the tasks --

THE COURT: It's a document, right?

MR. GENIS: Yes.

And he said it was called the System Safety Program --

THE COURT: That's correct.

MR. GENIS: So now I'm asking about that document, Your Honor.

THE COURT: Well you're asking about a document that's not even in evidence.

MR. GENIS: I'll gladly put it in evidence.

THE COURT: It's up to you.

MR. GENIS: Sure.

Can we please have --

May I approach the witness with two documents, Your Honor.

THE COURT: Of course.

MR. GENIS: 40, my apologies. This was on the exhibit list that we submitted to the Court. 40.

MS. WINTERS: Does counsel have a copy for us?

MR. GENIS: I have one for the witness.

THE COURT: So I think we may be on the verge of having offered into evidence a document now, and we'll have to find out what it is, and we'll see if there's any objection to it, and let's go forward.

MR. GENIS: Sure.

THE COURT: Do you have an exhibit number you're talking about?

MR. GENIS: Yes. 40 is what's on the exhibit list, Your Honor.

THE COURT: Exhibit Number what?

THE COURTROOM DEPUTY: 40.

THE COURT: 40?

MR. GENIS: Yes.

THE COURT: Okay.

MR. GENIS: May I approach the witness?

THE COURT: Show him the document and see if he can identify it.

(Counsel approaches.)

MR. GENIS: So the witness has identified 40 and 48, System Safety Program Plan, 2015 to 2016.

Q And these documents, sir --

THE COURT: You're talking about proposed Exhibit 40 now?

MR. GENIS: Yes.

THE COURT: Okay.

MS. WINTERS: Your Honor, we would object to it being moving into evidence consistent with --

THE COURT: So tell us what this document is all about. Just tell me what kind of document it is.

THE WITNESS: It's called the System Safety Program Plan. Every rail transit agency has to create one. Basically what it lays out is how often inspections are done for each apparatus or each piece of equipment in the system. So it will say the track has to be inspected every other day, the train cars would be inspected say every 30 days. And it just lays out each department's responsibilities in terms of keeping the entire system safe -- safe.

I'm not familiar with it specifically, but that's pretty much what the document lays out.

THE COURT: All right. And how many pages is this document?

MR. GENIS: The first one, the 2015 is 242 pages but the 2016, we printed out a couple of pages.

THE COURT: Which do you wish to introduce?

MR. GENIS: I'll do the 2016 that is --

THE COURT: All right. So what we're going to do now, members of the jury, is that, you know, we're going to sort all this out.

You have five pages you want to --

MR. GENIS: Yes.

THE COURT: -- introduce?

MR. GENIS: Yes, sir.

THE COURT: All right. So I'm going to have a little bit of a careful look at it.

And I think we may as well take our lunch break now and come back at maybe 1:30 would be perfect on time, okay?

Don't talk about the case.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

MR. GENIS: Your Honor, will the witness be instructed not to talk to anybody--

THE COURT: Yes.

Be back at 1:30, okay?

THE COURTROOM DEPUTY: You can all be seated.

MR. GENIS: And he's not to talk to anyone about the case or testimony; correct, Your Honor?

THE COURT: Yeah.

Don't talk about the case during the lunch break to anybody.

All right. There's no jurors here. Now we can talk about a few things. Let's take it one step at a time.

You have five pages of this multi-page document you want to introduce; right?

MR. GENIS: Correct.

THE COURT: All right. So you don't want the entire document. I think it's burdensome, I think it's just going to confusing, and we don't need all of that.

MR. GENIS: Correct.

THE COURT: But the five pages you have, specifically we spoke about this before.

Let me see those five pages.

MR. GENIS: Sure.

MR. KEAVENEY: And identify the Bates Numbers.

THE COURT: Show the five pages to counsel.

MR. GENIS: Sure.

THE COURT: And show me the five pages.

MR. GENIS: Sure.

And, Andrew, you asked for the Bates?

MR. KEAVENEY: Yes.

MR. GENIS: It starts on 04541.

MR. KEAVENEY: The cover page?

THE COURT: Yes. I'm sorry, The cover is -- no, 04541 is the cover.

MS. WINTERS: And it ends on 04544?

MR. GENIS: I'm handing it to you, and the numbers are on the page.

THE COURT: I think you've seen this before.

Can I please have a copy of it?

MR. GENIS: I'll hand it up to you right now, Judge.

MS. WINTERS: All right. So it looks like --

THE COURT: Do you know what they're talking about --

MR. GENIS: Can I hand it up to the Judge since he's asked for it?

THE COURT: All right. Let me see the document. Okay.

(Counsel approaches.)

THE COURT: Here is my take on this. We have spoken before about whether or not the policies should be allowed in evidence, and let me talk about that first, since we have issues about that in limine application.

The law is pretty clear that you can't predicate

liability based upon violation of an internal policy. I think the Court of Appeals has said that many times. So, you know, that's clear. You can't say that because they violated an internal policy, that means they must be held responsible. So the jurors are going to be told that very clearly.

But I think it may have some relevancy on relevance and knowledge, okay? So to that extent, I will allow it for that limited purpose; not because we're going to predicate liability for violation of the policy, but it's some indication of notice that the Transit Authority had. So I'll allow it for that limited purpose.

And I think the same thing is true of this proposed Exhibit 40, and we'll give all sorts of instructions to the jury when the proper time comes. But I think that to allow this five-page document on the issue of notice is appropriate in this particular case, so I think that we'll allow that. That's my take on it.

Do you object to that.

MR. GENIS: Judge --

THE COURT: So do you object to that? Now, I'll listen to what you have to say, all right, but that's my preliminary thinking about this.

So a lot of these documents that the jury's going to be cautioned about the fact they're not going to predicate liability on it, but I think they are relevant.

You want to talk? Or you want to stand, please --

MR. GENIS: No.

THE COURT: If you want to talk, then tell me.

MR. GENIS: I'm just waiting for you to be done because that rude.

THE COURT: You're standing for some reason.

MR. GENIS: There's two additional --

THE COURT: What?

MR. GENIS: May I just point out two facts?

One, it's required by federal statute; two, it goes to their affirmative defenses.

They claimed immunity with respect to their policies and procedures so this is also admissible --

THE COURT: -- but I'm going to allow it on notice, and also, it may have some other relevancy. We'll see about that.

Now, what do you want to say? Make your record, and let's move on.

MS. WINTERS: Sorry. I just wanted to clarify what notice -- what it is notice of, for one.

And the second point I want to make is, to the extent he wishes to examine on any alleged failure to follow that policy, I would assume based off of your ruling that that would not be permitted.

THE COURT: Once again, I'm going to allow this into

evidence. I think it has some relevancy, and I will instruct the jury that they cannot base a decision based upon violation of the internal policies. I think that's the fair, balanced way to handle it here, okay? So you understand what my goal is.

All right. So we'll give the proper limiting instructions, but we'll allow this in evidence at the present time, okay?

MR. GENIS: Thank you.

THE COURT: At the end of the day, I will be explain to the jury what, you know, this is all about.

All right. Let's come back at 1:30. I think we're moving it along. And I think you have some sense of what we're trying to accomplish.

Now, Mr. Shields? Mr. Shields -- no.

MR. ROTH: I'm Roth.

THE COURT: You're not Shields. You are Mr. --

MR. ROTH: I'm David Roth.

THE COURT: Mr. Roth, if you need to stand to exercise, I can appreciate that, but you don't have to stand unless, you know, you have to talk to the judge, right?

MR. ROTH: Fair enough, Your Honor.

THE COURT: You let me know if you want to exercise. Let me know, and we'll provide you with an opportunity to do that, okay?

MR. ROTH: Yes, Your Honor.

THE COURT: All right. Anything else?

Okay. We'll see you at 1:30. We'll move it along one step at a time.

MR. GENIS: Thank you.

THE COURT: How much longer do you have of this witness?

MR. GENIS: Let me look in my notes so I can answer you, Judge.

I'm moving along nicely, Judge.

THE COURT: I just need a general idea of what you --

MR. GENIS: Yeah. Put it this way, in my notes, I'm already on Page --

THE COURT: I do not need a speech. I mean, I just have to manage the trial, have some sense of --

MR. GENIS: I'm going to guess a half an hour, give or take.

THE COURT: Mr. Keaveney, are you going to question him now or wait until later on.

MR. KEAVENEY: I will question him now.

THE COURT: Okay. See you at 1:30.

(Luncheon recess taken.)

A F T E R N O O N S E S S I O N

THE COURT: Let's get the jury.

THE COURTROOM DEPUTY: All rise.

(Jury enters the courtroom.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right. Members of the jury, we are going to allow the evidence, the first exhibit, which we have marked as Exhibit 40, Plaintiff Exhibit 40, and so you can consider this on the issues of knowledge and notice of the Transit Authority's knowledge and notice about the conditions, about the subways in general, right?

And I will give you some further instructions. So at the end of the trial, I'm going to be explaining a lot of the law to you, and I will go through some of these things as well.

So this will be admitted now as Plaintiff Exhibit 40, in evidence.

(Plaintiff Exhibit 40 received into evidence.)

MR. GENIS: Thank you, Your Honor.

THE COURT: This is the document, Mike?

THE COURTROOM DEPUTY: Thank you.

THE COURT: So it worked out well. While you had your lunch, it gave me an opportunity to look over these pages to make sure I was comfortable with allowing them in evidence

for that limited purpose. And if they can be considered for other purposes, I will let you when we do cross.

Now, you are going to see other exhibits that are going to be offered into evidence.

Now, the lawyers and I have met before. We have gone through their proposed exhibits, so most of them are not objected to. We sort of worked that all out without you being imposed upon.

So when they are offered into evidence, when there's no objections, they will just be deemed in evidence. And I want to thank the lawyers because they have a responsibility as officers of the court to work together to try to, you know, agree on things that should not be confrontational so we can present the trial to you in an expeditious way.

So that's what we talk about when we talk about exhibits. This one, we spent a little time looking at it, and it is in evidence now as Exhibit 40.

And you can continue with your questioning, Mr. Genis, at this time.

MR. GENIS: Thank you so much.

DIRECT EXAMINATION (resumed)

BY MR. GENIS:

Q Mr. Sullivan, I am going to ask you seven questions before getting to the document, okay?

One. The System Safety Program Plan shall have,

number one, their objective to provide for the safety of passengers, employees, the general public and equipment; true?
A True.
Q The system safety shall emphasize the prevention of accidents by resolving hazards in a systematic manner; true?
A True.
Q A system should be designed to protect against unauthorized persons or foreign objects entering the vehicle dynamic of the track?
A True.
Q And the Transit Authority considers a person, whether they fall, jump, or get pushed, to be an unauthorized person, correct?
A True.
Q And the general system safety requirements criteria, it shall describe general engineering requirements and design criteria for safety, correct?
A Correct.
Q And when they say "shall," it is mandatory, correct?
A Correct.
Q Okay. Last one before I get to it.
And the System Safety Program Plan should describe the risk assessment procedures and the hazard severity categories, hazard probability levels, and the system safety precedences that should be followed to satisfy the safety

requirements of the program; true?
A True.
Q Okay. Now, you have in front of you number 40.
Do you see that there is a table called risk assessment matrix? If you need me to find it for you, I will.
A Page 63?
Q Yes.
A Yes.
Q Okay. And that is a table or a chart, correct?
A Correct.
MR. GENIS: And, Your Honor, may I approach the witness?
THE COURT: You may.
MR. GENIS: Thank you.
Q I am going to show you something, and tell us if -- it is a copy, but it is an enlargement of the chart you just looked at that is in evidence.
THE COURT: So that's an enlargement of what's in evidence as Exhibit 40. And then you are showing that enlargement to the witness.
Go ahead.
A You are talking about that one?
Q Yes.
A I was talking about this one, but okay. Yes.
Q Thank you.

A Same thing.

MR. GENIS: Your Honor, may I put this on the easel so the jury may see it?

THE COURT: This is just an enlargement of what's already in evidence.

MR. GENIS: Yes. Correct.

THE COURT: You can show it to them quickly, and let's move on.

MR. GENIS: I did. Thank you.

Q So the way risk assessment is done is first you have to look at the severity of the injuries; true?

A True.

Q And you look at the probability of an occurrence; true?

A True.

Q So if we have something that's catastrophic or critical, and it's either frequent, probable, all of that would be a high risk assessment on the matrix, correct?

A Correct.

Q And even if it's occasional catastrophic, that's also high, correct?

A Correct.

Q Okay. And then --

THE COURT: So that document is not going to be in evidence. It is okay to show it to you for demonstrative purposes since the underlying document, the real document, is

in evidence, if you wish to look at it, of course.
Q And categorizing the hazards as shown in this table allows for hazards to be prioritized for corrective action; true?
A Correct.
Q Okay. And high hazards may require immediate corrective action; true?
A True.
Q Okay. And, sir, the System Safety Program Plan is done pursuant to federal requirements; true?
A True.
Q And the Federal Transportation Administration, the FTA, has literally statutes that require the System Safety Program Plan; true?
A True.
Q Okay. And they state that this section shall specify information to be included in the rail train agency System Safety Program Plan relating to hazard management; true?
A True.
Q And there must be a clear definition of the goals and objectives with the safety program and management responsibilities to make sure they're achieved; true?
A True.
Q And they identify a description of the processes used for hazard management that are hazard identification,

investigation evaluation and analysis, hazard control and elimination, and hazard tracking; true?
A True.
Q And there should be processes used to develop, implement, and track corrective actions that address investigation findings, correct?
A True.
Q And there's requirements from the FTA about corrective action plans; true?
A True.
Q And each corrective action plan should identify the action to be taken by the rail transit agency, and implementation schedule, and the individual or department responsible for that implementation; true?
A True.
Q And safety principles shall be observed when they define unacceptable and undesirable habits, correct?
A True.
MR. KEAVENEY: Your Honor, is this document not in evidence, or is he just -- what's he doing?
Just objection to the question.
THE COURT: All right. Tell me again what your concerns are?
MR. KEAVENEY: That he's reading from a document that's not in evidence.

THE COURT: Well, don't read from a document that's not in evidence. Move it along. Let's go.

MR. GENIS: Sure. I was looking at my notes.

Q So, sir, do we agree, according to the requirements, where there is a high hazard, corrective action is required; true?

A True.

Q And when the system is operating normally for a safety principle, there should no unacceptable or undesirable hazard condition; true?

A True.

Q And the safety principle shall be observed when they define unacceptable and undesirable hazards; true?

A True.

Q Okay. And then the effectiveness of the mitigation, if any, shall be monitored, correct?

A Correct.

Q Now, let's talk about what the Transit did here.

The TA knew that there was a problem that was killing people and injuring them and deciding that action had to be taken to prevent or reduce this from occurring; true?

A I can't say what Transit said.

Q Okay.

THE COURT REPORTER: Can you move your microphone back towards you.

A I can't say what Transit did.
Q Were you asked the following question under oath and did you give the following answer, on page 155, line 8?
"QUESTION: Okay. So the Transit knew this was already a problem that was killing people and injuring them seriously, and decided that action had to be taken to prevent or reduce this from occurring; true or false?
"ANSWER: True."
Were you asked that question and did you give that answer under oath?
A Okay.
Q So the Transit put up signs and made announcements, and they did so because they had no awareness of people getting hit and run other?
THE COURT: You are not asking a question, you are giving testimony. If you want to take -- change places with him, I'll allow you to do it. But you just want to ask questions. Save your speeches for your summations, okay?
MR. GENIS: Well, it's an adverse party witness, Your Honor.
THE COURT: Next question. You just ask questions.
MR. GENIS: Okay.
Q So what did the Transit Authority do to address the hazard of train strikes?
A We had awareness programs, that I am aware of.

Q Okay.
A All -- none of this pertained to my position with Transit.
Q Sir, I'm just asking you what they did.
THE COURT: Do you know of anything, one way or the other.
A Unrelated to my position, they had awareness campaigns. I saw them as a frequent rider. You hear announcements. You see signs.
Q Okay.
A I was aware there was a TIDs pilot program, track intrusion detection pilot program. I was not directly involved with it, but I was aware it was going on. And I was aware there were some working groups working on the platform doors. But, again, it was not part of my job.
Q Okay. So there are records about before and after these measures you just told us about to see what, if any, difference these measures made regarding the incident rate of 12-9s occurring; true?
A True.
Q Okay. Did anyone from the TA ever look at the before and after to see if it was -- whatever they had done was effective in reducing or preventing 12-9s from occurring?
A I don't know.
Q Okay. Did anyone ever -- there's also those yellow

tactile strips on the edge, correct?
A Those are there for ADA requirements.
Q Okay. For visually impaired people, correct?
A Correct.
Q All right. Did anyone from the TA ever analyze or evaluate to see if the tactile strips had prevented any 12-9s from occurring?
A None that I'm aware of.
Q So if we put it all together, did anyone from the TA analyze what, if any, difference the signs, the announcements, the tactile strips, all the things you told us about, had any affect on the incidence rate of 12-9s?
A I'm not aware of any.
Q Okay. Do you agree that platforms have to be changed, altered, or modified?
A Or what?
Q Okay. Let me back up.
Do we agree, first, certain applications, what was acceptable a hundred years ago or 76 years ago are no longer acceptable?
A Yes. I guess so. Yeah.
Q Over time, safety standards have improved and changed; true?
A True.
Q And subways, bridges, roads, buildings, all have to

modernize and comply with safety standards, correct?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Should the TA also modernize and comply with safety standards?

A Not a decision that was up to me.

Q I didn't ask if it was your decision.

A My opinion, you should be as up to date as you can be.

Q Okay. And engineers help meet these challenges by designing how to effectively and safely modernize the system and make it safer; true?

A True.

Q And as part of the modernization of our stations over the past hundred years, electronic, electric devices have been added to the subway system, correct?

A Correct.

Q Track beds and tracks have been changed and modified, correct?

A Correct.

Q Many stations have been altered, modified, rehabbed, correct?

A Correct.

Q Same thing with the platforms, correct?

A I'm not aware of platforms being modified.

Q Well, platforms have to be changed, altered, or modified,

correct?
A For what purpose?
Q Hold on a second.
Sir, were you asked this question under oath, and did you give this answer? Page 107, line 20.
"QUESTION: Okay. So there's times that platforms have to be changed, altered, or modified, correct?
"ANSWER: Yes."
Were you asked that question under oath and did you give that answer under oath?
A Yes.
Q Was it the truth then?
A As far as I can remember.
Q Okay. And platforms may need additional support, correct?
A Possible, yes.
Q Okay. And there's times work on track beds and rails, and track bed gets replaced, track gets replaced, platforms get replaced; true?
A No.
Q Okay. Page 108, line -- I'm sorry, 107 -- wait a minute. Let me just -- it was 108. Line 3.
Were you asked the following questions, and did you give the following answers? 108, starting line 3.
"QUESTION: There's times and there's work on the

track bed and the rails as well?
"ANSWER: Correct.
"QUESTION: There's times that the track bed gets replaced?
"ANSWER: Correct.
"QUESTION: Time the track gets replaced?
"ANSWER: Correct."
"QUESTION: And times platforms get replaced?
"ANSWER: Correct."
Were you asked those questions and did you --
A I'm sorry. I -- yes. Platforms do get -- yes. Correct. Platforms do get replaced. Correct.
Q Okay.
A But I understood it to do with a track bed replacement.
Q Okay.
A Understood. Platforms do get replaced on occasion.
Q Okay. And, let's see.
And sometimes they do -- the TA does rehab projects to different stations to maintain them in a good state of repair, correct?
A Correct.
Q Now, when the system was built, there were no elevators, correct?
A I wouldn't think so.
Q Okay. But some stations now have elevators, correct?

A Yes.
Q So the stations that have elevators, they had to be altered or modified in order to accommodate or meet the challenges of installing elevators, correct?
A I would imagine so, yes.
Q And engineers helped meet these challenges, correct?
A Correct.
Q And the TA did new turnstiles and vending machines for metro cards, then OMNY, to collect money and be modernized, correct?
A Correct.
Q And that called for more electrical power and other challenges to be met as well, correct?
A Correct.
Q And some stations, they even have the message boards, and that requires power, correct?
A Correct.
Q Some stations have air-conditioning, correct?
A Correct.
Q That's another challenge that was met, correct?
A Not systemwide, but in locations, correct.
Q And they built the TA new stations and new subway lines, correct?
A Correct.
Q And when you build something new, you're not constrained

by old, preexisting problems, correct?
A Correct.
Q You can build it however you want, correct?
A I would imagine so, yeah.
Q And the Second Avenue subway was a whole new train line, correct?
A Correct.
Q And the number 7 extension to Hudson Yards was brand new, correct?
A Correct.
Q And platform screen doors could have been installed in these brand new subway lines and stations; true?
A I am not aware of the plans for the programs.
Q Okay. By the way, is it good to have uniform train cars for consistency in operations?
A When you say uniform train cars, you mean the same car?
Q Yes.
A Both ways?
Q Yes.
A I would imagine so.
Q Okay. And you don't know why the TA never previously made all the train cars uniform, correct?
A Well, they couldn't.
Q Well, sir, hold on a second.
Page 106, line 24. Were you asked this question,

and did you give this answer?

"QUESTION: By the way, do you know why the Transit Authority hasn't previously made all their train cars uniform?

"ANSWER: No."

Were you asked that question and did you give that answer?

A I would imagine I gave it.

Q Okay. And, sir, by the way, the older train cars were 75 feet, and the newer ones were 60 feet long, correct?

A On the B division, correct.

Q Okay. But the 75-foot cars run on the same track as the 60-foot trains, correct?

A Correct.

Q Sir, stations are different, some have curves coming into it, some are straighter, what's called tangent track, a straight track?

A Correct.

Q And there are main lines that operate more than one line per platform, correct?

A Correct.

Q Multiple car classes and different door openings use the same platform, correct?

A Correct.

Q There could be environmental issues, correct?

A Correct.

Q The TA has many stations with different designs, correct?
A Correct.
Q And because they have different designs, they are not all exactly the same, right?
A Right.
Q But because all of these differences, you cannot have a one size fits all approach, it's not practical, when you look at the Transit Authority; true?
A True.
Q Can't have a cookie cutter approach, right?
A Correct.
Q And since one size fits all does not work, are you aware of any individualized safety studies for different stations?
A No.

MR. GENIS: No further questions.

THE COURT: Mr. Keaveney, you wish to question?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: So while Mr. Keaveney is getting to the podium, many times you have a situation where the plaintiff calls witnesses, and to make out the case, but it is perfectly okay for the plaintiff to call an adversarial witness. This is, you know, a witness that the defendant really has put forward. And we allow that type of thing.

So now Mr. Keaveney, which is his witness, basically, has the choice, he can even ask the questions now

that he wants to ask, or if he wants to wait until his turn comes to present his case, he can do that as well. It is his choice.

He wishes to question the witness while the witness is here now, so we're going to go forward with that understanding.

Go ahead.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Good afternoon, Mr. Sullivan.

A Good afternoon.

Q What's the purpose of OSS, Office of System Safety?

A We provide oversight for the operating departments in New York City Transit.

Q Which departments?

A We have car equipment, we have track, infrastructure, power distribution, rapid transit operations or service delivery, stations, EMD, which is electronic maintenance division, telephones, elevators, escalators. Anything that falls under the Department of Subways.

Q Okay. Buses, too?

A Yes. And buses as well, correct.

Q Okay. And when did you start at OSS?

A November of 2014.

Q So you were at OSS for less than two years prior to this

accident occurring?
A Yes.
Q You testified earlier about some of the studies and some of the programs that OSS did.
Did they do any trend analysis of 12-9s?
A Not that I'm aware of.
Q Did they look at 12-9s and find any commonalities in them?
MR. GENIS: Objection.
He just said they didn't do it, Your Honor.
THE COURT: Overruled.
Can you answer the question?
A We would run up like data sheets of, you know, locations and where they were to see if there was any common denominator, if they were happening in a particular station, a particular time and day, day of the week, and so forth.
Q Did you find anything that was similar to 12-9s?
A Nothing.
Q So there was no similar time of days?
A Nothing. Nothing that really stuck out.
Q No similar stations?
A No.
Q No similar passengers?
A No.
Q No similar lines?

A No.
Q Is the primary reason there are 12-9s is because passengers are too close to trains?
MR. GENIS: Objection.
THE COURT: Overruled.
You can answer that.
A It is one of the reasons why. They're too close to the train.
Q And has Transit done anything to prevent people from getting too close to the train or to platform edge?
A They've painted the platforms, stand back. They make announcements. There's signage. They were doing, like I said before, they were doing a TIDs thing, track intrusion. And there was a group that was working on, you know, the feasibility of platform screen doors.
Q And all these things are cues to a passenger to stand back, correct?
A Yes.
Q To not get too close?
A Correct.
Q To stand away from the platform edge?
A Yes.
Q A lot of this is common sense, right?
A Yes.
MR. GENIS: Objection.

THE COURT: Well, sustained.

Go ahead.

MR. GENIS: Move to strike.

Q Have you ever heard of a rail company using closed circuit TV to allow a train operator in a far away tunnel to see what was happening on a far away platform?

A I haven't, no.

Q Mr. Genis talked about issues regarding delays. Signal issues, that's a big part of delays in the transit system, correct?

A Yes.

Q Track issues, that's a big part of delays in the transit system, correct?

A Yes.

Q And if you don't maintain those systems, you have more delays, correct?

A Yes.

Q Now, you indicated earlier that Transit was studying platform screen doors, correct?

A Yes.

Q Do you have any knowledge --

MR. GENIS: Objection. He said they were not before, Your Honor.

THE COURT: Overruled.

MR. KEAVENEY: He said he was aware.

Q Do you know what that was about?
A There was just a group that was working, you know, looking into it, feasibility.
Q And do you know what years those were? Was it prior to 2016?
A I couldn't -- I wouldn't have been -- I might not even have been aware of it before 2016, but after 2016, definitely.
Q Okay.
MR. GENIS: Move to strike. Objection.
THE COURT: Overruled.
Q What about --
MR. GENIS: You have ruled nothing after --
THE COURT: Overruled.
You have an opportunity to have redirect, if you wish.
Q What about the white paper you were mentioning?
MR. GENIS: Objection.
THE COURT: Overruled.
A I was asked to look over a white paper regarding the feasibility of the installation of platform screen doors throughout the system. I don't remember specifically when I was given it, but I reviewed it.
Q What about track intrusion devices?
A Track intrusion devices, it was a working group that was dealing with that. I was able to see -- I knew what the

program was and where it was taking place, and they would provide my boss at the time, you know, video of intrusions. So we knew when -- we kind of had an idea of what was going on, but I wasn't directly involved in it.

Q Now, you talked about the awareness campaign. What did that include in terms of advising customers to stand back from the platform edge?

MR. GENIS: Asked and answered. Objection.

THE COURT: Look. This is a combination of technically cross, but it is really his direct case. So we are going to allow him to bring out whatever he wishes to bring out that would be part of his direct case for the economy of time so he doesn't have to call the witness back when it's his term to present his case. So I am going to allow that type of flexibility.

Go ahead.

Q What did they --

A Signages, stations would make announcements, they would make announcements on the trains. They started painting the platforms, you know, stand back.

Q Okay.

A That's pretty much it.

Q Have you ever heard of help points?

A Yes. They installed help points probably, I don't know, maybe 2010, they started putting them in. Maybe even earlier.

Q And what was the purpose of those?
A If someone was down, they can hit a button, and it was a direct line into the rail control station, rail control center, where someone from stations departments would pick up, and they would be able to speak to someone. So they wouldn't have to the dial the phone. It was just a direct line to the RCC.
Q Okay. Have you heard about countdown clocks?
A Yeah, they have been around for a while. They tell you how long the train's coming.
Q Okay. So you don't have to stick your head over the platform edge to see if something's coming down the tunnel?
MR. GENIS: Objection. Form.
THE COURT: Overruled. Go ahead.
Can you answer that?
A Correct. It tells you when the train's coming so you don't have to look for it.
Q Okay. Now, in terms of these things being effective, is there any way to tell if a passenger notices a countdown clock and keeps away from the platform? Obviously, that passenger has been made aware that a train is coming and is stepping back. Is there any way --
THE COURT: I don't hear a question. I hear a speech.
Q Is there any way to quantify that behavior?

A No.
Q So you don't know unless you actually ask the person --
A Correct.
Q -- the question?
A Correct.
Q Mr. Genis showed you a diagram, and you recognized it, right?
A Yes.
Q What's that diagram used for?
A It's a risk assessment matrix. It's -- they use it to identify risks, and, you know, then you would -- it would build out to mitigations so that you can lower it from catastrophic to marginal.
Q Is it used for passenger accidents within the system?
A Not that I'm aware of.
Q Is it used for significant operational changes within the system?
A It may be. If there was an operational change that came in, yes.
Q And what would be an example of an operational change?
A The one thing I can think of was there was a time when -- on the L line, they wanted to go from two-person operation, train operator and conductor, to a single person train operator. So they did a hazard assessment on it. And they came up with, you know, whatever the decision finally was. I

believe it stayed with two of them.
Q Okay. So that would determine what would be the hazards of operating a train with one person as opposed to two people?
A Correct.
Q What about -- and that would also be a modified work practice, right?
A Yes.
Q So you would do a hazard assessment on that, correct?
A Yes.
Q Now, of course you'd look at accidents, right, when they occur?
A Yes.
Q And different departments investigate those accidents?
A All accidents are investigated, yes.
Q Okay. And that is investigated a different way, and hazard analysis is not done for each and every accident within the system, correct?
A Correct.
Q Does the Office of System Safety identify issues that cause reoccurrence of accidents?
MR. GENIS: Objection. Form.
THE COURT: Just wants to know whether or not you know whether they do that.
A Could you say that again?
Q Did it look at issues that might cause reoccurrence,

accidents from reoccurring over and over again?
A Yes.
Q So if a staircase is missing a tread, would that be something that could be a recurring issue?
A Yes.
Q Would OSS look at that issue?
A It might show up on an inspection form, and if it wasn't, you know, mitigated in a timely fashion, yes.
Q Okay. And how would OSS do that?
A It would be brought out, sent out to the operating department, and in that case stations or infrastructure were making a repair.
Q Okay. So that's just one example of how they will look at recurring factors and try to address those, right?
A Yes.
Q So with someone who gets hit by a train, a recurrent factor might be suicide, right?
A Correct.
Q Okay. Would you put more police officers or homeless outreach in the subway in response to that?
MR. GENIS: Objection.
Q Would you do that?
A That wouldn't be up to me. You might.
Q Okay.
MR. GENIS: Objection. Speculative.

THE COURT: Well, he gave his testimony.
Go ahead. Next question.
Q Thank you, Mr. Sullivan.
A Thank you.
THE COURT: No further questions?
All right. Next witness.
Oh. You want to have some follow-up questions? Go ahead.
MR. GENIS: Thank you, Judge.

REDIRECT EXAMINATION
BY MR. GENIS:

Q Okay. So you were just asked about the TIDS.
Was it effective, the TIDs?
A I have no idea.
Q If they were effective, should they have been implemented?
A If proven to be effective, in my opinion, sure, why not.
Q Okay. Now, you just mentioned about the help points. How many 12-9s have been prevented by the help points?
A I couldn't tell you that.
Q Can you name one?
A Not that I'm aware of, no.
Q In fact, you said the help point -- let's be clear.
Does the help point go directly to the operator of the train?

A No.
Q So the help point goes to RCC, correct?
A Correct.
Q And then they have to give it to a dispatcher who would then radio the operator, correct?
A Correct.
Q Okay. You mentioned about where people should stand when he was questioning you.
Do we agree that if you are -- a person is allowed to be five feet away from the edge, correct?
A Correct.
Q In fact, the only place you are not supposed to be is on that yellow tactile strip, correct?
A Correct.
Q So if Luisa Harger was approximately five feet from the edge, she's where she's supposed to be, correct?
A She's standing on the platform. Correct.
Q Okay. So she's not doing anything wrong standing five feet from the edge, correct?
A Correct.
Q Okay. With the countdown clocks, do some people still look to see if the train is coming?
A I don't know.
Q You said you never heard of anywhere in the world where there's that connection of the CCTV to the cab of the thing.

Did you know that in Israel they do that?
A No.
Q You talked about accident investigation. So let me see if I get this straight --

THE COURT: Let me interrupt.

Sometimes you get a question, which this is a good example of, do you know the Israel did it.

So that's what the lawyers said. But, you know, unless the witness says, yes, I know, there's no confirmation of that.

So I just want to caution you. It's like when's the last time you beat your wife, right.

So just because the lawyer says it doesn't mean that it is an established fact, unless the witness confirms that, okay? So you are aware of this type of thing. It happens periodically.

Next question.

MR. GENIS: Subject to connection, Your Honor.

BY MR. GENIS:
Q So you said accident investigations.

So they investigate if an employee gets hit by a train, correct?
A Correct.
Q But if a regular passenger customer gets hit by a train, they don't investigate?

A Who is they?
Q Office of System Safety, which you were just telling about with counsel for the TA?
A I believe he was talking about the independent departments.
Q Okay. I am talking about Office of System Safety.
A Office of System Safety does not investigate customers struck by a train.
Q Okay. How about if it's a high profile case? Do they do it then?
A It's determined by the president.
Q Okay. So, in other words, where there's a high profile case, it's in the media, then the Transit Authority does an investigation of that; true?
A It is up to the president.
Q Sir, isn't it written in your accident manual, investigation manual, that that's what it says?
A It does say that.
Q Okay. So you know for a fact, because it is in your manual, where you worked and you investigated, that they only investigate high profile cases for regular people; true or false?
A At the request of the president.
MR. KEAVENEY: Objection. Your Honor, he made a --
THE COURT: He answered it.

MR. KEAVENEY: But he conflated Transit Authority --

THE COURT: You can ask other questions. But he answered it. He said -- you just heard the answer.

BY MR. GENIS:

Q Now, you were telling defense counsel that, oh, if there's a defect in the stairs, well, that's a risk and reoccurrence, it's got to be addressed, correct?

A Correct.

Q Okay. So where have more people been killed? On the stairs or by the trains hitting them?

A I would guess by the trains.

Q Okay. Where have more people had catastrophic or critical injuries? On the stairs or being hit by trains?

A By the trains.

Q Okay. So would it be a good idea to do a risk assessment for people hit by trains?

A Wasn't in my position.

Q Is it in somebody's position?

A I would imagine it is.

MR. GENIS: No further questions.

THE COURT: Mr. Keaveney, do you have anything to follow up?

You can do it from there, if it's just a few questions. You don't have to come back up here. It is up to you.

THE COURTROOM DEPUTY: Put your mike on.

MR. KEAVENEY: I'll be very quick.

RECROSS-EXAMINATION

BY MR. KEAVENEY:

Q Mr. Sullivan, all accidents are investigated, correct?

A All accidents are investigated. Yes.

Q Are you aware of any mass transit company that uses hazard analysis for 12-9s?

MR. GENIS: Objection.

Q Are you aware?

MR. KEAVENEY: Still objection.

Q Are you aware?

THE COURT: Overruled.

A I'm not aware of any.

Q Thank you.

THE COURT: All right. You may step done.

Anything further?

MR. GENIS: If I am allowed.

THE COURT: You have a follow-up question of this witness?

MR. GENIS: Yes.

THE COURT: Go ahead.

FURTHER REDIRECT EXAMINATION

BY MR. GENIS:

Q So are you aware of what all the other subway systems do

worldwide?
A No.
Q Okay.

MR. GENIS: Nothing further.

THE COURT: You may step down.

(Witness excused; witness exits courtroom.)

THE COURT: Next witness.

MR. ROTH: Your Honor, we're going to do it remotely so I think there's some stuff that we have to get --

THE COURT: Pardon?

MR. ROTH: May we take a break?

THE COURTROOM DEPUTY: It's a couple of minutes. The jury can stay here.

THE COURT: The jury can stay here. You have somebody outside?

THE COURTROOM DEPUTY: No. We're going to do it by Zoom.

THE COURT: Okay. So we're going to use our technology. The next witness is going to be testifying by Zoom.

And it is okay, sometimes people are not readily accessible in Brooklyn, and we allow that type of flexibility.

We'll all stay here, okay?

(Short pause.)

THE COURT: Mr. Roth, why don't you tell us who is

going to be testifying.

MR. ROTH: Mr. Ulysse Wurtz is going to be testifying.

THE COURT: Mr. Wurtz?

MR. ROTH: Wurtz. W-u-r-t-z.

THE COURT: Okay.

MR. ROTH: He's testifying by Zoom.

(Short pause.)

THE COURT: Are we ready?

MR. ROTH: I am working on it, Your Honor.

THE COURT: If you need some time, if you have another live witness we can take in the meantime, why don't we do that.

MR. ROTH: Your Honor, I am joining right now, and hopefully the other witness -- the witness will join, and we will be all set.

We have no more witnesses today. So this will be it.

THE COURT: Are you able to do this?

MR. ROTH: I believe so.

THE COURT: Let's do it.

(Continued on the next page.)

(Continuing)

THE COURT: How long is this witness going to be?

MR. ROTH: Maybe 40 minutes.

THE COURT: Okay.

MR. ROTH: 30 minutes. I will try to make it as quick as possible.

THE COURT: It's okay, I just wanted to know.

MR. ROTH: I don't seem to be getting it.

Can you hear me?

THE COURT: You should have had this done in advance.

THE COURTROOM DEPUTY: Just give me a second.

MR. ROTH: Mr. Wurtz, can you hear me?

THE COURT: Look, here's what we are going to do --

THE COURTROOM DEPUTY: Continue.

MR. ROTH: Are we good?

THE COURTROOM DEPUTY: At this time, I ask the witness if you could raise your right hand.

Can you hear me?

THE COURT: I don't think the witness hears you, Mike.

It seems we are close but no cigar here. Why don't we just adjourn and you will have him testify some other time.

THE LAW CLERK: I think we are very close, Judge.

THE WITNESS: I hear you perfectly.

THE COURTROOM DEPUTY: Try now.

THE WITNESS: I don't think it is working.

MR. ROTH: How about now?

THE WITNESS: I hear you, but I have an echo.

THE COURT: Let the jurors go back to the jury room now, please, and we will talk about this.

THE COURTROOM DEPUTY: I called IT. IT is coming up.

THE COURT: The jurors should not be imposed upon. Go back to the jury room. I will let you know what's going to happen.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: Listen to me, this should have been taken care of so we could have avoided what is happening here and it wasn't done properly. The witness could have been ready 20 minutes ago and we should not have had this type of problem. I don't think we can go forward today.

Do you have any deposition testimony you can read in in the meantime so we can use the jurors' time?

This witness is not going to testify today.

THE COURTROOM DEPUTY: Well, IT is on their way up.

MR. GENIS: I can read deposition testimony, if you would like, Your Honor.

THE COURT: Why don't we do that. We have problems

with the technology, but this should have been taken care of way before, okay. Let's read some deposition testimony if you have some.

MR. GENIS: The only issue, Your Honor, is I did give a list to defense counsel in advance of what I'm reading and they did have certain objections. And I don't know if you want to us address it now or if you want us to try to resolve it privately.

THE COURT: We take the testimony as it comes. I don't know what the objections are. You can make an objection and I will make a ruling.

Let's wait. We have IT here. Maybe we can solve the problem.

Mr. Wurtz, can you hear me?

THE WITNESS: Absolutely, Your Honor.

THE COURT: Keep your voice up. We are going to try to get through this disaster today. Okay?

THE WITNESS: Okay. No problem. I can speak loud.

THE COURT: Mr. Roth, you speak loud also.

MR. ROTH: Yes, Your Honor.

THE COURT: Let's bring the jurors back in and see if we can manage this now.

THE WITNESS: Can you hear me now?

MR. ROTH: Yes.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Well, I thought we had it. And we have it on your machines.

Can you all see it? We are trying get it on the big screen, and I don't know whether we are going to be able to do that.

Can you folks see it in the meantime.

THE JURY: Yes.

THE COURT: Who is this witness? This is Mr. Wurtz; right?

MR. ROTH: Yes.

THE WITNESS: Correct.

THE COURT: He has been given the oath?

THE COURTROOM DEPUTY: No.

Mr. Wurtz, you could remain seated and raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Thank you. I ask you to state your name.

THE WITNESS: My name is Ulysse Wurtz.

THE COURTROOM DEPUTY: Thank you, Mr. Wurtz.

THE COURT: Welcome to the 21st Century. And thank you for your patience with the technology. We have problems also from time to time. But I think maybe we can go forward now and hopefully you can see everything and you can hear

everything. Let me know if you have a problem.

Your witness, Mr. Roth.

MR. ROTH: Thank you.

**ULYSSE WURTZ**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Wurtz, how did you come to testify in this matter today?

You are here pursuant -- you got a subpoena?

A Yes. I was subpoenaed. Yeah. It was last week. Correct.

Q And when was the last time you testified in this case?

A I think it was three years ago, 2022.

Q What did you do to prepare for your testimony for the jury today?

A Well, I -- I -- I -- I was rereading all documents and luckily I have good recollection. I re-familiarized myself, reacquaint myself from the facts from the period.

Q Let's get to it.

Why don't you tell the jurors about how you got involved with platform edge protective safety barriers?

A Okay. So I started with -- I am French, so I --

THE COURT: I think you have to speak a little

slower. The technology is a little challenging. I don't know if we can go forward with this. Let's see whether we can do that. You are going to speak slower and speak louder.

THE WITNESS: All right.

A So, originally, so, I was hired by a French company in 1997 in Hong Kong.

I am originally French. I became a proud American citizen last December. But originally I'm French.

I was living already for two years in Hong Kong and I got hired by this French company, transport out of Paris, France. I started to develop this platform screen business line.

Is that slow enough? Is that clear for everything?

MR. ROTH: I think that's good. Is that okay?

THE COURT: Go ahead.

A In 1997, I joined Faiveley and very quickly I understood that this is the future, this is like every Metro, every subway should be equipped with.

MR. KEAVENEY: Objection.

THE COURT: Sustained. Let's go ask questions.

Be mindful of the fact that I am leaving at 4:00. He may have to come back at another time to testify. If we can't, you know, complete his testimony.

MR. ROTH: Okay, Your Honor.

Q So just for your experience at Faiveley, for what period

of time were you working on platform screen doors and managing them at Faiveley?
A From 1997 until 2011, my last 13 years I was in charge of platform screen door business worldwide.
Q Okay.
A And I was the business unit director or CEO, whatever you want to call it.
THE COURT: This goes back to 2011? Did I hear you correctly?
THE WITNESS: Until 2011, yes. I was with Faiveley. And for Faiveley, in charge of platform screen doors worldwide.
THE COURT: Back in 2011, right?
THE WITNESS: Yes.
THE COURT: How about from 2011 to the present time, 2025, have you been involved with any of this type of work at all?
THE WITNESS: I was -- while I was still for five years in Hong Kong, I did some consulting for some other companies also in platform screen door business because I decided that this was just the right thing to do for any subway and --
MR. KEAVENEY: Objection.
THE COURT: Sustained.
So let's go back to 2011.

Is that what you want to question him about, Mr. Roth?

MR. ROTH: Between 1997 and 2011, Your Honor, absolutely.

THE COURT: But we are talking about 14 years ago. Ask direct questions.

MR. ROTH: I'm asking direct questions, Your Honor, because he --

THE COURT: What do you want to know about that timeframe from this witness?

Q To start, between let's just talk about the 10 years up to 2011, from 2001 to 2011, can you describe what the platform screen doors were and, you know, the type of different --

THE COURT: Do you know anything about the platform situation during that period of time at this particular location?

THE WITNESS: So I came to New York a few times, way before 2011. And many times we started at Faiveley, it was surprising for us that in North America there was still no platform screen doors. So, of course, given that we were the world leader and that we have a service-proven solution, I said this would be a perfect target to introduce platform screen doors to North America.

Q What were platform screen doors?

What are the different types of platform screen

doors that were in existence back then?
A Platform screen doors, to make this short, were borne out of safety needs and other --
MR. ROTH: You got to go slower.
THE COURT: We are having a hard time hearing you. Where are you now? In China?
THE WITNESS: I'm in Dallas.
THE COURT: Or are you in New York or where?
THE WITNESS: Dallas.
THE COURT: In Dallas, Texas?
THE WITNESS: Yes, sir.
THE COURT: Go directly to the substance of the testimony you want him to tell you about.
A We introduced platform screen doors in France and --
THE COURT: I will allow to you to ask leading questions. Let's get to the chase.
Q So I'm going to ask you some leading questions, Mr. Wurtz, for the economy of time with the jury and with the judge.
So from early 2000s to 2011 did you continuously every six months go to the New York Transit Authority and have meetings with executives there about platform screen doors?
THE COURT: Yes or no.
A Yes.
Q And all you have to do is say yes or no to these

questions until the judge said --

THE COURT: I'm giving you a little latitude. Let's move it along, Mr. Roth, quickly.

We are going back 14 years ago.

THE WITNESS: Yes.

Q So at some point in time, did -- let me show you Plaintiff's Exhibit 19, and this is an RFI that was published by the New York City Transit Authority, okay.

MR. ROTH: Is it on everybody's screen? I can't tell.

THE COURTROOM DEPUTY: No.

THE COURT: There is no objection to that. We will allow that into evidence at this time. Exhibit 19 in evidence. Go ahead.

(Plaintiff's Exhibit 19 received in evidence.)

MR. ROTH: It's on my screen. Nobody else sees it?

THE COURTROOM DEPUTY: No.

Q Anyway, Mr. Wurtz, do you have a copy of that RFI with you?

A Yes, I do.

Q I want you to look at that RFI.

A Okay. I have seen it.

Q Tell me when you have it available and that is Exhibit 19 and that is a three-page document that's dated March 1, 2011.

A Yes.

Q Can you tell the jury what that is that you are looking at? What's that document?
A I'm looking at three pages of an RFI which was finally happening so --
Q Slow down.
A In 2011, three pages request for information by MTA for platform screen doors, the whole system refurbished.
Q At the top, what is the reason that they published this RFI that's at the top of the document?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Do you happen to have that document? You want it in evidence, don't you?

MR. ROTH: Yes.

THE COURT: Is it mystery document or is it an actual copy of it.

Mark it Exhibit 19 in evidence at this time.

MR. ROTH: Yes.

THE COURT: What other questions do you have of this witness?

MR. ROTH: I'm asking about this document, Your Honor.

THE WITNESS: It's exactly document in 2011.

THE COURT: Go ahead.

Q So, in this document -- what's contained in this

document?

What is the Transit Authority asking for in this document?

A Like the very first paragraph says, they are looking for firms which are experienced in providing the turnkey solution, design, manufacturing, installation of platform screen doors in order to enhance passenger safety. Very clear.

THE COURT: All right. So this document is now on the screen so the jurors can see what's in evidence.

What other questions do you want to ask about that document?

MR. ROTH: Your Honor, just let me ... I have to make this a little smaller. Okay.

Q So I am showing on the screen, Mr. Wurtz, we are looking at the top of the document?

Do you see where on the document it says that the second paragraph, where it says we're looking for firms experienced?

What does that mean?

It says, Experienced in designing furnishing and installing a platform screen doors, platform edge door and/or platform edge gate system to enhance passenger safety.

Do you see that?

A Yes, first paragraph.

Q And you received this document?

A 100 percent. It's original. That's what we worked on, yes.
Q Then it has some other requirements, right?
Further down on the page it says what they are interested in. Do you see that, where it says New York City is particularly interested in?
A Absolutely. Minimal on-site assembly, yes.
Q For each one of those bullet points up there, minimal on-site assembly --
THE COURT: You don't have to read it all. What's your question?
Q Do you see all of those?
A Yes.
Q It was Faiveley.
Let me go to the next page and it continues with the -- it continues with the requirements.
Do you see all those requirements?
A Requirements, minimum requirements. Yes, sir.
Q Was Faiveley ready, willing, and able to meet those requirements for the platform screen doors for the New York City Transit Authority system?
A 100 percent. That was all what we did. We were the world leader. We did this every single month.
Q Okay. And now if we could go down a little further where it says PSG project finance. Do you see that?

A Yes.
Q And do you see where it says they are considering cost-sharing financing options for potential PSG retrofit project?
A Correct. And we did offer that.
Q And do you see where it says build, operate, transfers and advertising revenue?
A Yes, sir.
Q And additionally, it gave other background. Towards the bottom of the document, it says background information and it goes through all of the different intricacies and original -- I guess the unique design and issues that are prevalent in the Transit Authority system.
A Yes.
Q And was Faiveley aware of that?
A 100 percent. We have been many times to New York, even before the RFI come out.
We have checked the stations. So we were totally ready and eagerly looking forward to this RFI.
MR. ROTH: I want to introduce Plaintiff's Exhibit 3, the Faiveley response. Do we have the Faiveley response?
THE COURT: Which exhibit number?
MR. ROTH: This is Exhibit 3, which is Bates numbered 5718.
THE COURT: So there has been no objection to that.

We will allow that in evidence at this time.

MR. ROTH: And this is a 48-page document.

(Plaintiff's Exhibit 3 received in evidence.)

Q Mr. Wurtz, do you have a copy of that document?

A I have it right here on my screen. Correct.

Q So this document, which says request for information on the front page, this was Faiveley's response at the Transit Authority request for request for information; is that accurate?

A Yes, sir.

Q And now let's look at the executive summary real quick. So this is 48 pages.

MR. ROTH: We're not going to bore the jury or the judge by going through all 48 pages, I promise.

THE COURT: Do you want all 48 pages in evidence or just parts of it?

MR. ROTH: We want all 48 pages into evidence so the jury can look at it.

THE COURT: Let's go.

Q So we have with the executive summary. It is 40 pages.

Can you tell us does that summarize what Faiveley was prepared to do for the New York City Transit Authority as far as --

A It's exactly that. And there's a reason why we put executive summary only one page like here today in court. You

don't know want to a -- a -- you know everybody. We summarized in one page why we have fully understood the requirements, why we are ready to provide a state-of-the-art solution, but also even financing, and why we could accommodate all of the complexities and difficulties of the New York subway system.

Q And this executive summary, is it fair to say that Faiveley was ready, willing, and able to install platform screen doors or gates or whatever was required, whatever would be the best fit in the entire New York City Transit Authority system as they were requesting?

A Yes, sir. Exactly.

Q Now, I want to focus in on one thing.

Do you see where it says -- if I can focus in on that. All right.

And do you see down here where it says: As mentioned, in case of adopting our BOT scheme, Faiveley, within a qualified project consortium, would provide for a turn-key-solution, technically, in terms of operation and maintenance and most importantly with a financial solution where NYC Transit would not be required to spend one single dollar on the construction and operation of the platform edge doors, let alone any upfront payment, whilst enjoying from day one of the going into service of the platform edge doors, the absolute safety and convenience on the platform for all

Case 1:17-cv-04550-FB-VMS Document 360-1 Filed 05/05/26 Page 201 of 2327
PageID #: 22393



passengers and staff and collateral benefits of uninterrupted rail services for New York City Transit?

Do you see where it says that?

A I see it totally. I wrote it, but that's exactly what we were willing to do and capable to do, and that's what I committed to do.

THE COURT: Did you write that yourself?

THE WITNESS: Yes, sir.

THE COURT: Okay.

THE WITNESS: That's my French English.

Q And before Faiveley submitted this 48-page document, what did they do to prepare before they just submitted this? What did they do?

A Well, first of all, we had years -- I know it's a long time ago. But I think it's five, six years. We came repeatedly to New York. I mean, me, at least two, three times a year. But I also had my specialist, my mechanical engineers. We had a great lady on the team for all electrical, electronics, and system engineering. She used to work for the French railway. She was one of the best in the world.

We had a comprehensive survey. We wanted to make sure that what we offered is realistic and doable and make sure our company was perfectly ready to deliver.

Q Can you slow down?

THE COURT: You're going so fast. The jury may have a difficult time understanding your testimony. Try to slow down.

THE WITNESS: Okay.

Q Mr. Wurtz, also there is a court reporter here and I don't want her fingers to break. So you got to go slow, okay?

You have a lot to say. Let's take deep breaths. Okay?

THE WITNESS: Apologize to Your Honor. And apologize to the Court. Let me slow down and make this a bit more concise.

My best engineers and myself, we came repeatedly to New York. They surveyed. We surveyed specific stations, specific complexities. Of course it is an old network. It is a great subway. So we wanted to make sure 100 percent we know what we are doing. We know what we are offering and that we would give the highest level of confidence to the MTA that we would be the right contractor because we can deliver.

Q Okay. So let's talk about the fact that you would be the right contractor. We are going to go over a couple of pages.

Looking at page 7, okay, this gives a company background.

Can you tell us a little bit about Faiveley when they submitted this to show that they were actually, in fact, able to do it.

Tell us a little bit about Faiveley on page 7.
A Are you on page 7 of our submission?
Q Yes, of your submission.
A Page 7 simply says so we are family-owned business, okay. 7 out of 48 correct. This shows all -- we are roughly 5,000 employees back then spread over 45 sites in 23 countries, and we were only specialized in railway subway systems, meaning we don't build the train. We build the core systems that go on to a train or in this case that go on a platform. This shows the map with all our implementations, 45 sites in 23 countries, right.
Q It also shows some of the challenges that you have met; is that correct, in the bottom left page?
A Yes. Bottom. Yeah.
You see what we were renowned for. So we have seven product lines and first product line air conditioning. Faiveley was number one worldwide.
Second was platform doors and gates. That was my business unit. We were number one worldwide.
The third is passenger access doors. The third is electrical mechanical systems.
The next is braking system.
Then we have coupler.
And then we have electronics.
Q Thank you. That's good. We are just interested in

platform screen doors.

Now let's skip to page 10. Tell us a little bit about what's going on page 10 here where -- let me scroll back up a little bit here so the jurors can see.

So this is a list of some of your projects worldwide; correct?

A Correct.

Page 10 and then the subsequent page 11 that Faiveley had been implementing worldwide in matters of platform screen doors.

Q And all of the dark blue, what do those indicates?

A The one highlighted, is it gray or blue? I'm sorry. I'm color blind. I think it is grayish, right?

So these are retrofits, meaning exist -- installing platform screen doors on an already running operation, running railway.

So even in this field, we had 10, go to the next page, 11, we had almost 15 experiences with retrofit and MTA would have been -- should have been, hopefully one day will be, a retrofit.

MR. KEAVENEY: Objection.

THE COURT: Go ahead. Next question.

Q So -- and then just one other thing.

It says here -- and then we're going to skip to some of the pages. It says that you have over 153 kilometers of

facade and 27,500 door modules.

What does that mean in English?

A That means -- so, it has a certain length, correct. So that's why you simply sum up, say if you install in City X 18 stations, how long the stations that have been equipped with. Modules means -- a module is a definition for a one single door set of bi-parting sliding doors. It's like the Walmart doors. It's like a -- a -- -- 10 times more robust. That's the module.

Q Slow down. So at this time that you did this, there's no question that the New York City Transit Authority knew that you had successfully installed 27,500 platform screen door modules around the world; is that correct?

A Correct. Correct.

Q Okay. Then I'm going to flip through the pages real quick. The rest of this document is all about the services that you are going to offer and how far you're going to meet the challenges of the New York subway system, correct? That you are going to meet the codes and you are going to meet the different -- strength of the platforms and you're going to come up with solutions for stations that are too thin or stations that need to have the concrete shored up, correct?

And that's basically what the rest of this document is, is to show the capabilities of Faiveley and all of the different problems or challenges that there are?

THE COURT: All right. Enough. Is he accurately describing what is contained in that exhibit?

THE WITNESS: Absolutely. Yes, Your Honor.

THE COURT: Move on. Next question.

Q Let's go to the very end. That's basically what all this is. It's all of the different things. And just to be clear, you did this in response to the New York City Transit Authority's request?

This wasn't your idea? It was their idea to submit it and you submitted it for them; correct?

A Absolutely. We worked hundreds of hours with all of the experts in the team to make sure we had totally customized and the --

THE COURT: The Transit Authority asked you to do that, is that your testimony?

THE WITNESS: The Transit Authority asked us to propose the most accurate proposal in regard to the needs and specificities of the Transit Authority.

THE COURT: This is your response to this document to their request.

So I think we understand his testimony. Anything else?

Q Let's go to the very last page. Again, it talks about at no cost build, operate, transfer scheme as a financial solution, so, you know, it's hard to --

THE COURT: I think what he is trying to ask you is there anything in this document that addresses the issue of the cost of these services?

MR. ROTH: That's what we are talking about.

THE WITNESS: Yes. I said yes.

THE COURT: You can tell the jury, focused in on what part of the document addresses the cost aspects of it.

Q So on the very last page --

THE COURT: Just one second.

The judge just asked the question.

I'm trying to do this to clarify it. Move it along. We have a little bit of a deadline today.

Mr. Keaveney has the right to ask questions as well. So let's get to the chase. I thought I asked a simple question.

Is there anything in the document that talks about the cost aspects of doing all of this?

THE WITNESS: Yes.

THE COURT: Would you explain that to the jury now. The document is many pages. You can tell them where in the document it addresses that issue.

THE WITNESS: Okay, I'm going through the document. We just spoke about build, operate, transfer, that was our solution, which has been proven elsewhere.

And I'm not sure if Mr. Roth has found the right

page when we speak about it.
Q It's the last page. Go to the last page.
A Good.
Q If you could -- the jury has already heard about build, operate, transfer agreements today.
A Okay.

THE COURT: The jury could read this document for themselves if they wish to do it. It's in evidence. And if you want to assist them and point to some part of the document which addresses the issue of cost, you can do that now. Let's move on.

MR. ROTH: I would like the witness to explain what the build, operate, transfer agreement is.

THE WITNESS: I can do it in 30 seconds.

THE COURT: Where in the document do you address this issue?

Focus the jurors so that they can follow your testimony.

THE WITNESS: Page 48, Your Honor.

THE COURT: All right. Now, go ahead. Sum it up, what you believe you have written there.

THE WITNESS: Okay. We proposed to MTA that if they allow us to take in the revenue from advertising and maintenance over a given period of years that would allow us to recover our cost over time. And after X years, typically

that could be something like 15 years, 20 years, then we would stop operating, we would stop handling the equipment. We would transfer it to the City as the City's assets.

We would build it. We would operate it on our own risk and costs, but we would generate revenue from advertising maintenance, which would eventually allow us to recover the costs we put in to bring up the system, and then we would transfer the property back to the great City of New York.

THE COURT: That's all in this document, right, that you are telling us about now; correct?

THE WITNESS: Yes, Your Honor.

Q Let's go to the next document, which is Plaintiff's Exhibit 24. It's been stipulated into evidence.

This is the --

THE COURT: 24, you now wish to have that in evidence.

MR. ROTH: Yes.

THE COURT: Exhibit 24 is called an RFI evaluation summary and that's the document. It's in evidence at this time.

No objection.

(Plaintiff's Exhibit 24 received in evidence.)

Q Mr. Wurtz, can you pull that document up for us?

A I see it. That's the document, yeah.

Q Other than the obvious that's the evaluation of all of

the RFI submissions, could you tell us generally the -- what this document is, you know, in relationship to what you submitted?
A I think this was a very professional evaluation. First of all, it was a simple observation and --
Q Mr. Wurtz, slow down.
THE COURT: You're going so fast that I have a hard time understanding. So I think you have to try harder to slow down and let's get to the end of the line here because we need to give Mr. Keaveney an opportunity to ask you some questions as well. Go ahead.
THE WITNESS: Apologies. Apologies. Okay.
THE COURT: Make it succinct.
THE WITNESS: First observation, I was surprised, but this indeed details the 12 companies that had submitted. See, everybody was really keen and interested and hopeful this was finally going to go ahead in New York, okay. So 12 companies had submitted and these are the 12 companies.
Q Okay.
A Out of which -- and that would be my second observation -- I think three and four are obviously seriously. We were one of them.
I think there is an evaluation paper of two pages, two and a half pages that did a very thorough job. And I was not surprised to hear that our long-time competitor

Knorr-Brense, which are German, and then Swiss KABA Gilen, and then us came out on top out of the three because these were back then clearly the very best companies, including our two most respected competitors and ourselves.

Q And all these companies submitted the response that they could all do this for the entire system and they could do it with the build, operate, transfer agreement; correct?

MR. KEAVENEY: Objection.

THE COURT: He's putting words into your mouth. I am allowing a little flexibility.

MR. ROTH: I will rephrase the question.

THE COURT: The objection sustained.

Listen to the question now. You have no question in front of you.

What's the question?

Q All of these other companies also made submissions; correct?

A These are all respectable companies, but clearly the three out of them stand out, I think, and then they added two more.

Q Let's look at page 2, okay, of this document, and if you go to -- can you tell us what the -- the evaluation of Faiveley was on page 2; correct?

A From what I read, the document we came out best because I think we had the entirety of the very specific MTA issues on

difficult stations, interfaces, curve platforms, structure columns.

Q So --

A -- et cetera. I think we came out with a great rating, yes.

Q Let me interrupt you.

I'm going to read this to you.

Do you see where it says, in the second paragraph, it says, However, Faiveley's response was more impressive due to the defendants substantial amount of technical analysis of existing challenges?

THE COURT: Just be mindful because at 4:00, I have to leave. And if he has to come back here, he will have to come back.

MR. ROTH: I promise you, it is five to 3:00.

THE COURT: All right. The jury can read. The jury is capable of reading. I know that.

Do you want to read something for them to call their attention to it now? I will let you do that and let's move on.

MR. ROTH: I'll just call their attention to the fact that this document says Faiveley's submission meets all of the challenges.

THE COURT: Okay. So you called their attention to that. You want them to look at that.

Q Mr. Wurtz, is that correct?

THE COURT: Mr. Roth, do you have any other questions of this witness?

THE WITNESS: I have no questions.

THE COURT: There is no question before you. Just listen. This is not easy. We're doing this long distance.

I want to know if there are any other questions that he wants to ask you.

Q This also talks about the build, operate, transfer agreement. And then we go to the back and we come to the five finalists.

THE COURT: Now, in your summation, you can read whatever you want. It's is in evidence.

MR. ROTH: I just want to point out --

THE COURT: We don't have to have this type of back and forth. I'm giving you a lot of latitude under the circumstances to move this along, do this by asking some direct questions. But I think you have exhausted it.

Do you have any other questions?

Q I want to say there were five finalists and Faiveley was one of them; correct?

A Correct.

THE COURT: Okay. Anything else?

Q Okay. So -- and after this happened, did Faiveley or any of the finalists actually get the project to do the work

there?

A The answer is no. We were surprised it fell somehow through the crevices.

MR. KEAVENEY: Objection.

THE COURT: One second.

After this happened, did you get any response from the Transit Authority, yes or no?

THE WITNESS: No, nothing for action. It -- it -- it fell apart and for years there was no more follow up.

THE COURT: Anything else?

Q Mr. Wurtz, are you aware of the successful -- the success or failure of platform screen doors around the world as far as safety goes?

A It's -- there's none. There's none. By the very definition, platform screen doors provide -- actually, some people call them platform safety doors.

Platform screen doors make any track-related accident a matter of the past, whether they use somebody falls on the track, somebody pushes you on the truck or even suicide detector. Once you put in platform safety doors or platform screen doors, there are no more track-related incidents ever.

Q As far as retrofits or any other difficulty assignment, did Faiveley ever not -- was Faiveley unable to commit to finish -- strike that.

What was Faiveley's completion rate for any job that

they have ever started installing platform screen doors?
A 100 percent completion rate for us, 100 percent completion rate for the competition. There is not a single subway in the world that has taken out platform doors once they were installed.
Q And what is your understanding of the safety benefits of platform screen doors --
A Well --
Q -- compared to any other type of public awareness campaign or anything else?
What's the comparison in your experience?
A There were big discussions that some laser beam or more loud public announcements, I mean, everything is good to make safety better, but nothing is as good as a physical barrier, a physical barrier, which would make any track-related incidents or accidents impossible.
This is why all over the world the laser projects were given up, and you cannot tell the people five times when the train comes in step back, step back, mind the gap, mind the track.
It's the best thing to do and the smart thing to do. Everybody's doing it.
Q By 2011, were platform screen doors a recognized standard of good and accepted practices?
MR. KEAVENEY: Objection.

A Yes. Standard all over Asia. Not a single --

MS. WINTERS: Your Honor, this is beyond this witness' --

THE COURT: I will allow it.

Do you have any more questions after this, Mr. Roth?

MR. ROTH: Your Honor, I don't think so.

THE COURT: I'm not wanting to put you under pressure, but I have to allow for cross-examination and I have to leave at 4:00.

MR. ROTH: Your Honor, Mr. Keaveney can ask questions. And if I have to come back up, I will ask other questions.

THE COURT: Mr. Keaveney, you have some questions. And I just want to make sure he can hear you properly and maybe you can do it from where you are sitting.

Mr. Wurtz, can you see Mr. Keaveney?

I don't know whether you can see him. He is going to question you now.

THE WITNESS: I can hear you very well. I have very small windows here on my top right corner of my laptop.

THE COURT: As long as you can hear him, that's what we want to know.

THE WITNESS: All good.

MS. WINTERS: I apologize, Your Honor, we didn't know this witness would be virtual until after lunch. We are

doing our best to adapt.

THE COURT: Are we good to go?

THE WITNESS: Mr. Keaveney, can you raise your hand for a second so I know where you are in the courtroom.

THE COURT: You don't have to do it again. You are still under oath regardless of who is questioning you.

THE WITNESS: Of course.

THE COURT: We are just trying to get our technical act together here.

Mr. Keaveney, why don't we let our IT person come there to help you so we can move this along.

Mr. Wurtz, can you hear me?

THE WITNESS: If you can get closer to the mic, that may help.

THE COURT: You have to speak louder, because I'm even having a hard time hearing you. Go ahead. Speak into the microphone.

MR. KEAVENEY: Mr. Wurtz, can you hear me?

THE COURT: I don't see Mr. Wurtz other than in the little window. Ask a question.

MR. KEAVENEY: Can you hear me?

THE WITNESS: I can hear you. It sounds a little hollow, but I can hear you.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Mr. Wurtz, you graduated college with a bachelor's in political science in Middle Eastern studies; is that correct?
A I have a bachelor in political science and an M.B.A. with a highlight in marketing.
Q Okay. So you are a salesman; correct?
A I was in my first year as a salesman before I became -- before I acquired leadership responsibilities and became managing director and CEO.
Q That was to sell platform screen doors; right?
A My first two years, yes.
Q As a good salesman, you are very enthusiastic about selling platform screen doors; correct?
A Can you please repeat that? I didn't hear you.
Q You are very enthusiastic about selling platform screen doors; correct?
A Yeah. It is -- I mean, it became evident for everybody we should do it. But my first two years, I was in sales, and then I took over the whole product line, the unit.
Q It was to make money, right? Because you wouldn't do something if you weren't going to make money; correct?
A Yes, through this private business. I'm not in charity. That's true.
Q You have other business endeavors where you also sell stuff, such as power brain subscription, you were customer to business software or something?

A No. That was a B to C business, which it was an American franchise, which is called Learning Rx, which is where you take care of mostly children which have cognitive issues and which are underprivileged and which are struggling in school. That's my -- that was the next endeavor once I left the platform screen door business.
Q And you were also involved in selling jet bridges at airport, correct?
A Correct. Here in the U.S.
Q You were also involved in selling a cigarette-making machine in China; correct?
A Oh, that was way before I joined platform screen doors.
Q Okay. But that's your business? Your business is selling?
A No. You start your career as a salesman and people trust you and see you have success. If you can lead project managers, I even build a factory. I build myself in Shanghai where we have been producing and still continue to produce platform screen doors.
I think you have a right to evolve and become more knowledgeable and broaden your horizons and take on more responsibilities.
Q You have a marketing degree and you sell things?
What is an RFI?
A A request for information.

Q Okay. And RFI is not a request for proposal; right?
A No, not at that stage, never.
Q It is not a request for bid, right?
A No. That would be RFP or RFQ.
Q It's a very preliminary document; correct?
A Not at this level.
When you see that you have 12 companies from all over the world coming together, that was way more than some preliminary information gathering. The -- that would be -- that would be a not acceptable understatement.
Q You gave testimony in this matter before; right?
A Yes, sir.
Q Okay. And you testified at page 27, line 5 through 17: Are RFIs something that is commonly used in the transportation industry?
Answer: The RFI is used when its technology, which is not yet very well introduced either with a customer or region, otherwise you would go straight for an RFP. For common technology, for something which is established or which is a common product or system a customer typically would go directly for an RFP.
If it's new technology, if it's something of a novelty for a customer or a region, then an RFI makes great sense.
Do you recall that testimony?

A I -- I totally recall it. It makes total sense. So it was a novelty for MTA, not a novelty for this industry, not FOR the last 20 years.
Q But it was a novelty for the United States?
A No, not really because you have Faiveley, Faiveley France with O'Hare Airport in the '90s. And the Swiss KABA, they did the JFK Airport link in New York.
So not in New York and not in Chicago.
Q Is that a mass transit system at JFK?
A That's the airport link. It would have been-- it would have been a novelty for mass transit. I agree.
Q Okay. In fact, you tried to sell this product in Dallas; right?
A I'm sorry?
Q You tried to sell this product in Boston; correct?
A No.
Q No?
A Did you say Dallas? What did you say?
THE COURT: Start again. You wanted to ask him whether he sold this product where?
MR. KEAVENEY: In Boston.
THE COURT: In Boston.
A No, never. We sold it in --
THE COURT: Wait a second. Answer the question. Listen to the question. Don't volunteer more than you are

asked, okay?

THE WITNESS: Boston, no.

Q Do you recall again testifying in this matter at page 28, line 15 through 18: So from a pure marketing perspective, we had approach the MTA a few times, but it was very difficult to get any traction in North America. The same was true, we also tried California. It didn't work in Boston, Montreal.

So anyplace that you marketed in North America didn't work; correct?

A Under my leadership, we had no sales to mass transit system. But we had sales before. If you may remember what I said a minute ago in Chicago, and the Swiss, our Swiss competitors, the same who were answering to this RFI of MTA, he had a success in a New York airport link.

Q An airport link --

THE COURT: We have a hard time hearing you. We want to make sure we get all of your questions down. You have to speak into the microphone, Mr. Keaveney, because our wonderful reporter can't hear you.

Q An airport link is not a mass transit system, correct?

A Correct.

Q Okay. You talked about build, operate, transfer agreements, right?

A Yes.

Q And you said it was done before you introduced it to MTA;

correct?

A It was used by competitors before and is now commonly used not only in this industry, but many other industries. It is a very common financing procedure -- process. Very common.

Q You never used it for platform screen doors prior --

A Me, personally, no, not the team. But we found the right partner in the New York we were ready to do it. We had the right partners.

Q Did you have financing partners at the time?

A I'm sorry?

Q Did you have financing partners at the time that was willing to put up billions of dollars?

A We had the Publicity Partners. I don't know whether they are still around, Clear Channel was one of them. There is also JCDecaux. These are the two biggest billboards advertising companies in North America.

THE COURT: This is not the way we are going do it. Next question.

Listen to the question and answer it directly. Do not offer more than you are asked.

Next question.

Q Did you obtain written financial agreements from them?

MR. ROTH: Objection.

THE COURT: Yes or no.

A We had no written financial commitment since this was a

RFI.

THE COURT: The answer is you did not have a written financial commitment, is that your testimony?

THE WITNESS: The answer is we had no written financial commitment from either party.

Q Correct. Because an RFI, which means nothing; right?

MR. ROTH: Objection.

THE COURT: Sustained.

Q You could walk away from this RFI; right?

MR. ROTH: Objection.

THE COURT: Overruled.

Did you have any obligation to go forward with any of these proposals, yes or no?

Did you enter into any formal agreement where you committed to having to do these things, yes or no?

THE WITNESS: We had a handshake and everybody was ready.

THE COURT: Next question.

Q You just talked about an evaluation of responses and there was four companies that were being considered. Did they all have handshakes?

MR. ROTH: Objection. He doesn't know what other companies.

THE COURT: Overruled. If you can answer that, go ahead. If you can't, you can't.

THE WITNESS: You said four. The first three and then three other. You added three or five, but not four. What is question?

Q Did they all have handshakes to do something or was it just -- was your company special?

A Sir, with all due respect, what should I know about my competitors. We were ready. We had a clear consortium. We had the financing. We had the agreement from the board. We were ready with the BOT.

Q Your RFI response was not a contract; correct?

A Of course not. It's an RFI.

Q Now, there is a lot of technical -- in your words, technical issues to tackle in New York City subways; correct?

A Correct. And that's why we took great care to submit such a detailed, technical answer to the RFI.

Q And if you did platform doors, you wouldn't start out with the most difficult complex station; correct?

A Again, please.

Q If you got a contract to install platform doors, you wouldn't start out with the most difficult complex column-filled station; correct?

MR. ROTH: Objection.

THE COURT: Sustained.

Next question.

Q You would start with a very simple station; correct?

MR. ROTH: Objection.

THE COURT: Sustained.

I think he has explained himself sufficiently as best he can do that. Let's go on to something else.

Q Now, when you were looking at the MTA for platform screen doors, you did visual inspections; correct?

A We did surveys.

Q On your own, you weren't accompanied by the MTA?

A No, not me. It was my technical people. Of course you need access. You need platform access and if you want to use some measuring tape or do some video or anything you like, you need to be escorted. So I am 100 percent sure my team was escorted by MTA personnel.

Q Well, according to your testimony, at page 32, line 23 to 33, line 4, you responded to a question did you do any site visits out of curiosity with the MTA --

THE COURT REPORTER: I'm sorry, "out of curiosity with the MTA"?

MR. KEAVENEY: I will repeat the question.

THE COURT: You have to speak louder into the microphone. She's having a hard time hearing you. We have to get the transcript of everything you say.

Q Question: Did you do any site visits out of curiosity with the MTA, like to show up at the station, here's what we can do with the station or anything like that?

Answer: I don't think so, no, I don't think, not that I remember.

Do you remember that testimony?

A The answer is yes, but personally I did not have a thorough survey myself of the stations.

I went there more than once looking at particular features, particular complexities. But myself, I did not have an in-depth survey. It was my team who did that.

Q Even if you got a contract for platform screen doors, it would be a very lengthy process; correct?

A Well, normally from --

THE COURT: Would it be a lengthy process, yes or no?

THE WITNESS: Yes. Yes.

THE COURT: Yes.

THE WITNESS: 12 months for the bid and evaluation.

Q And how long would the build agreement last?

A Depending on the final cost analysis, anything from -- on easy platforms, on easy stations, it could be as short as maybe 10, 12 years.

On complex stations, on complex platforms where you have to remove columns or be very smart to accommodate the difficulties, it would be longer, maybe 15 to 20 years.

Q Maybe 35 years?

A 35 years, I would not expect that, but I don't recall.

That's a long time ago. 35 years, I would not expect that, no.
Q As long as it would take to recoup your costs; correct?
A Recoup costs and reasonably and accepted profits.
Q Again, we are here to make money; right?
A Yes. It's not -- correct. Of course.
Q Now, are you aware that they used a build, operate, transfer program in Seoul, Korea?
A Yes, I do.
Q And are you aware that they only get 28 out of 300 stations?
A No, I'm not.
It's an option. You can give a buyer's credit.
THE COURT: I think you have answered the question. There is no question before you.
MR. ROTH: You answered the question.
Q Are you aware of any mass transit system in the United States that uses platform screen doors?
A Mass transit, I would say no.
MR. KEAVENEY: Thank you.
A Canada, so I think U.S., even Germany does now.
So I think U.S. is one of the last developed countries surprisingly without any platform screen doors in the mass transit system.
Q They don't even put them in new stations; correct?

MR. ROTH: Objection.

THE COURT: Overruled.

A I'm sorry?

Q They don't put platform screen doors in new stations in the United States; correct?

MR. ROTH: Objection.

A I have left the industry. I don't know what happened in the last 15 years. But in my time, they had not put in new stations. That's correct.

Q Exactly. You don't know.

MR. KEAVENEY: Thank you for your time.

THE COURT: Is there any redirect?

MR. ROTH: Yes, Your Honor.

THE COURT: Mr. Wurtz, the lawyers have the right to come back and forth and ask you more questions. We call this redirect testimony now.

THE WITNESS: Okay.

MR. ROTH: I am going to introduce Defendants' Exhibit RR and Plaintiff's Exhibit 46.

THE COURT: Just one second.

You want Plaintiff's Exhibit 46.

MR. ROTH: 46.

THE COURT: There's no objection to that. International research report, that's what you're talking about, right?

MR. ROTH: Yes.

THE COURT: No objection. 46 is in evidence.

(Plaintiff's Exhibit 46 received in evidence.)

THE COURT: Now, what is the other one that you wanted?

MR. ROTH: It's the same one. I'm making a point that it's on the defendants' list. It is Defendants' Exhibit RR.

THE COURT: Okay. So it's 46 pages. It's plaintiff's exhibit in evidence.

Let's go forward.

MR. ROTH: Okay.

REDIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Wurtz, Mr. Keaveney asked you about new stations right now; is that correct?

A Correct.

Q I'm going to show you -- I took an abstract, but this document -- this international report from 2016, but contained within it on Bates No. 5230 is the 2007 Faiveley proposal for the 7 line new extension.

Are you familiar with that?

A Hundred percent.

Q Excuse me?

A Yes, I am.

Q When you were -- so that this is a document I'm showing to the jury right now. And it is a -- I guess -- it is 57 pages of all of Faiveley, once again telling that the Transit Authority that hey --

THE COURT: Do you wish to point out any particular part of the 57 pages that you want the jury to see now? You can do so. Let's move on.

MR. ROTH: Okay.

Q Could you tell the jury what this document is?

A This document is a visibility study. I think it was for -- it was for the 7th Avenue extension. It goes back to 2007. And one more time, we were eager to help and eager to bring something forward to provide a high level of confidence that this is doable, that one should do it, and we could even start with a pilot project.

Q Even though it was a new station, and we have heard of the claims that oh, because the Transit Authority is so old that's the reason we're not putting platform screen doors in.

Here, this document says we are ready, willing, and able in 2007 to put in a new station. And did they take you up on that offer?

THE COURT: Mr. Roth is testifying now. But let's cut to the chase.

Did he sum up what the document says correctly?

Q Was this your offer to -- was this your proposal to say

hey, Faiveley can put in platform screen doors at the 7th Avenue extension?

A Correct.

THE COURT: That's your proposal, right?

THE WITNESS: Yes, sir.

Q And you personally were involved in this and yet once again they didn't take you up on it; is that correct?

A Correct.

MR. ROTH: No further questions.

THE COURT: Anything further, Mr. Keaveney?

MR. KEAVENEY: Yes.

RECROSS-EXAMINATION

BY MR. KEAVENEY:

Q Did Mr. Roth provide you with that document prior to today?

A Yes.

Q Did you have a discussion with Mr. Roth prior to today?

A Not really because when I discovered the document I realized yeah, that's a long time ago, but, yeah, that was our document.

Q Between the time of your deposition and today, did you have any discussion with Mr. Roth or anyone with his firm regarding your testimony today?

A Sorry, Between the time of deposition three years ago?

Q Yes. And today?

A Yes.
Q How many conversations?
A We had two short conversations.
Q Okay. And did he provide you with documents?
A Most -- because I didn't have all of these documents, I needed to speak to him, and I need to make sure that I have all of the documents, including the transcript of my first testimony in 2022, offer, the evaluation. And that was for me the most important that I get a copy, and I have them now.
Q What are the documents that he sent you?
A We discussed them already. One, two, three documents. You have opened them.
After almost 15 years, it was to refresh my memory. Request for information of the MTA and then our answer and then the evaluation summary. Yeah. It took me time, but I got myself reacquainted. That looks all -- yeah, that's what I did. That's what I committed to, what I signed up to.
Q And that response -- that evaluation of the RFIs, that is not a Faiveley document; correct?
A Hold on.
Now I see you. Here we go.
No, of course not. The response to RFI is not a Faiveley document.
Q And the feasibility study he just showed you, that's not a Faiveley document, correct?

A Our submission, that's a Faiveley document.
Q That's a Faiveley document?
THE COURT: Can you answer the question?
A The feasibility study, I don't see it right here. But if you speak about the same document, of course it's a Faiveley document.
Q The one he just showed you, is that a Faiveley document, just two minutes ago?
A Well, I didn't see it. But I just -- I didn't see it. My apologies.
MR. ROTH: Objection.
THE COURT: Can you answer that question, yes or no? Do you want to look at the document again?
THE WITNESS: Show me the document. I didn't see it. I have one.
THE COURT: This is the document. He will ask you that question.
THE WITNESS: Please show it to me.
THE COURT: Do you see it now?
MR. KEAVENEY: That's not 33.
MR. ROTH: I didn't say 33.
THE COURT: Just one second. Do you want to show it to the witness and ask him a question about it, do it now.
MR. KEAVENEY: That's fine, Your Honor.
Okay. Thank you.

THE COURT: Anything else?

Mr. Roth, what other questions do you have?

MR. ROTH: No other questions.

I just want to show -- I'm going to hold it up. Do you see that? Is that the Faiveley logo?

THE WITNESS: Yeah. That's our document, of course. Yeah. Thank you.

MR. ROTH: Thank you. I'm done, Your Honor.

THE COURT: I think we have finished the testimony of this witness. It's been a little bit challenging technically, but we have managed to get through it all. Thank you very much. That completes his testimony.

THE WITNESS: Thank you. Thank you, everybody.

THE COURT: We can shut off the Zoom now if you can figure how to do that.

THE WITNESS: I will do that now.

THE COURT: Okay. So it turns out to be good timing because this was the last witness that the plaintiff had for us to hear today. We will continue tomorrow at 10 o'clock. We can expect a full day tomorrow.

We are moving along.

Some witnesses by their nature or knowledge in a particular case may be more lengthy than other witnesses. You're going to see a variety here. We had two today. It took a good deal of time. That's not unusual given the fact

that these were witnesses that had a lot to testify about. There will be other witnesses who will probably take less time. It is just the way things work out.

We are moving along nicely. So we are not going to sit on Friday. You know that now.

We have a full day tomorrow, and we will try to have a full day on Thursday. I may have to get here late in the morning. But we will see how it goes. So far so good. Keep up the good work. See you tomorrow promptly at 10 o'clock.

Don't talk about the case.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: The jury is out of the courtroom now. I want to have a sense of what we can expect tomorrow. Maybe you can tell me.

MR. GENIS: Tomorrow, Your Honor, we have two witnesses subpoenaed from the defendant, Mr. Doddo, who is head of Office of System Safety, and Mr. Eric Jones, who is the 30(b)(6) witness.

THE COURT: So, Mr. Keaveney, you understand what we have tomorrow to deal with, right?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: Will that take up the whole day?

MR. GENIS: I'm guessing yes, Your Honor.

THE COURT: Anything else you want to put on the record now briefly now that the jurors are not here, Mr. Genis?

MR. GENIS: I'm good.

THE COURT: Mr. Keaveney?

MS. WINTERS: The only other thing I just wanted to clarify is they indicated that P46 was Defendants' Exhibit RR. That's incorrect. Defendants' Exhibit RR is a different document.

THE COURT: Wait a second. One second. We don't want to have this type of conversation because it is very difficult for the reporter to do that.

If you want to talk to each other off the record about getting your act together, fine. I don't think you need to put anything on the record unless you think something has to go on the record.

MS. WINTERS: Just for admissibility purposes, the indication was RR and 46 were the same. I want to make sure it is clear. It is different.

THE COURT: We only have 46 in evidence.

MS. WINTERS: Understood. Agreed.

THE COURT: That's what we have in evidence.

Anything else, Mr. Keaveney?

Ms. Winters?

MR. KEAVENEY: We will figure it out, Your Honor.

THE COURT: Okay.

MS. WINTERS: All right. That's the document that's in evidence. Okay.

See you tomorrow, 10 o'clock.

MR. KEAVENEY: Thank you.

MR. GENIS: Thank you, Your Honor.

MR. ROTH: Thank you, Judge. Have a good one.

(Matter adjourned to October 29, 2025 at 10:00 a.m.)

oooOooo

# I N D E X

| WITNESS | PAGE |
|---|---|
| Opening Statement - Mr. Genis | 55 |
| Opening Statement - Mr. Keaveney | 79 |
| MICHAEL S. SULLIVAN | 90 |
| DIRECT EXAMINATION BY MR. GENIS | 90 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 163 |
| REDIRECT EXAMINATION BY MR. GENIS | 173 |
| RECROSS-EXAMINATION BY MR. KEAVENEY | 178 |
| FURTHER REDIRECT EXAMINATION BY MR. GENIS | 178 |
| ULYSSE WURTZ | |
| DIRECT EXAMINATION BY MR. ROTH | 185 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 213 |
| REDIRECT EXAMINATION BY MR. ROTH | 226 |
| RECROSS-EXAMINATION BY MR. KEAVENEY | 228 |

E X H I B I T S

Plaintiff Exhibit 40 145

Plaintiff's Exhibit 19 190

Plaintiff's Exhibit 3 195

Plaintiff's Exhibit 24 205

Plaintiff's Exhibit 46 226

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

- against - : United States Courthouse
Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, : October 29, 2025
10:00 o'clock a.m.

Defendants. :

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458

BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants: LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, new York 10271

BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

APPEARANCES: (Continued)

Court Reporter: Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2643

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

* * * *

(In open court; outside the presence of the jury.)

THE CLERK: Civil cause on trial. Harger Da Silva versus New York City Transit Authority.

All counsel are present.

THE COURT: All right. Let the record will reflect everyone is here and the jury is here. So, so far so good. And we have hopefully a full day ahead of us.

And, look, I got your letter requests. I'm not going to give any special instruction. I told my law clerks that there will not be a minute that goes by where you won't get a letter or an application from one of the parties, which is okay to do, but if I want to give any instructions I'll do it later on.

At the present time, let's call the next witness, whoever that is going to be. Is he in the courtroom now?

MR. GENIS: He's in the hallway. I'll go get him.

It's a subpoenaed defense witness.

THE COURT: Bring him or her in.

In the meantime, bring the jurors in.

(Jury enters.)

THE COURT: Good morning, everybody; and my compliments, you're all on time and terrific jurors. So far two for two; and we're ready to start promptly, and hopefully we'll have a full day. We'll see how it goes.

We have this gentleman sitting here because he's going to be the next witness; and, Mr. Genis, tell us who this person is.

MR. GENIS: Pursuant to subpoena, Eric Jones.

THE COURT: Eric Jones.

THE CLERK: Good morning, Mr. Jones. I ask you to please stand and raise your right hand.

(The witness, ERIC JONES, was duly sworn/affirmed by the clerk.)

THE CLERK: Thank you. Please have a seat.

THE COURT: Keep your voice up.

THE CLERK: I ask you to state your name.

THE WITNESS: Eric Jones.

THE CLERK: Thank you, Mr. Jones.

THE COURT: Your witness.

MR. GENIS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GENIS:
Q Mr. Jones, you're here pursuant to a subpoena, true?
A Yes.
Q And I'm going to ask you some questions today. I'm going to try to ask you yes-or-no, true-or-false questions to move it along; and, if you're unable to answer with a yes or no or true or false, please just say you're unable to answer the question.
Do you understand that?
A Yes.
Q And you agree to those terms?
A Yes.
Q They're fair?
A Yes.
Q All right. And you've testified before, true?
A Yes.
Q And you've testified in this case in a deposition, correct?
A Yes.
Q And you testified at a trial before on behalf of the Transit Authority?
A Yes.
Q Okay. And you understand that the Transit Authority in this case designated you to testify on their behalf regarding matters of examination for the knowledge of the Transit

Authority on different issues?
A Yes.
Q Okay. You're their corporate designee witness, correct?
A That's what I understand, yes.
MR. KEAVENEY: Objection.
Q All right. Let's go into your background.
You have a Bachelor's degree in natural sciences, a Master's in environmental science, and a Master's in public administration, and you're a certified construction manager, true?
A That's correct.
Q And you started working for the Transit Authority in 1994, correct?
A Yes.
Q And you worked in the Office of Systems Safety, doing audits of facilities, to ensure compliance with state and federal environmental regulations, true?
A Correct.
Q And then in 1999, you moved from the Office of Systems Safety to the Capital Program Management division of the Transit Authority and became a project administrator, correct?
THE COURT: So let me explain something to the jurors. Okay?
So when you have a witness that you call who's your witness, then we require that this type of questioning is not

permissible. They have to testify, you know, on direct not being led, so to speak. Is this true, is this true, is this true, is this not true.

But here, when we call somebody who is not, who's been subpoenaed, as you might say an adverse witness, somebody who is not part of the plaintiff's list of witnesses, then we can allow this type of questioning because of the nature of the fact that this witness is one that was subpoenaed and it's really not a witness that the plaintiff would normally call, but they're allowed to do this during the course of a trial. So that's why you're getting a lot of yes, yes, yeses.

That normally would not be permitted through his direct tomorrow. Direct testimony you say to the witness, tell us your background, tell us this, and then you would go along like that, without eliciting the answers in the first instance. We allow it here because we call this as a witness that's not one of the plaintiff's witnesses but somebody who might be considered to be an adverse witness. So we allow this type of questioning here.

And you'll see the differences when you have testimony being produced by the plaintiff, like doctors and other eyewitnesses or whoever else they may have. You'll see a different type of questioning. We won't allow this type of thing then. Okay?

So I wanted to explain that to you.

MR. GENIS: Thank you, judge.

MR. GENIS: I just don't remember. Did we get an answer to the last question?

THE COURT: I think it was yes.

A About moving to the CPM?

Q Yes.

A Yes.

Q And then CPM, Capital Project Management, as it existed at the Transit Authority, you are responsible for the design and construction of capital projects that are part of the New York City Transit Authority's five-year capital program, true?

A True.

Q And then from 1999, when you were the project administrator, to your next title, you became management with responsibilities were the same and you were promoted to construction administrator, correct?

A Correct.

Q And then you became a construction manager, correct?

A Correct.

Q And then from 2009 to 2013, you were a construction manager, managing capital projects that were under the station's program area of capital managed program, true?

A True.

Q And you were doing rehab projects for different subway stations, correct?

A True.

Q And these were structural rehabilitation, reconstruction of platforms, mezzanine areas of the stations, new fire alarm systems, new staircases, full rehab, everything, correct?

A Correct.

Q And that was to bring it to a state of good repair, true?

A True.

Q And then in 2013, still as construction manager, you moved to the Security Program, correct?

A Correct.

Q And the Systems and Security Program of Capital Program Management managed security, primarily electronic security projects, correct?

A Correct, and systems projects.

Q Thank you. And the programs involved electronic security projects in the deployment of CCTV, closed-circuit TV, and intrusion detection systems as well, correct?

A Correct.

Q And then 2013 to '15, construction manager, and then in 2015 program manager overseeing all the security cases, projects I should say?

A Yes.

Q Thank you.

And as program manager in 2015, you had the responsibility of overseeing all platform safety, platform

safety initiatives, true?
A Capital initiatives, yes.
Q Okay. Sir, I'm going to ask you a lot of questions, but all the questions I ask you have an end date, so to speak, of August 2, 2016. That is the date my client got injured. So we're not going to ask you anything beyond that. Okay?
A Understood.
Q All right. Thank you.
So from 2015 through August 2nd of 2016, you have the responsibility of overseeing all platform safety -- I'm sorry. We just asked that one.
From 2015 to August 2nd of 2016, with program management involving security for the entire system, overseeing it and the platform safety initiative, correct?
A Capital initiatives, yes.
Q Okay.
A Yes, correct.
Q And let's talk about the job of the Transit Authority.
Can we agree the number one job of the transit is to have a safe system, nothing is more important?
A Yes.
Q Okay. And you were taught that the Transit Authority is required to have a safety philosophy and a safety culture, true?
A True.

Q And the New York City Transit Authority, part of its job is to prevent foreseeable harm of the hazardous train strikes, true?
A True.
Q And they were to prevent preventable harm of the hazardous train strikes, true?
A True.
Q And can we agree that no deaths are acceptable to the Transit Authority when people get hit by trains or run over by trains?
A True.
Q And no catastrophic injuries are acceptable to the Transit Authority in any given year, true?
A True.
Q No critical injuries caused by contact with the train -- in other words, a train hits or runs over a person -- are acceptable to the Transit Authority per year, correct?
A Correct.
Q Okay. But every year, a certain number of people either get hit or run over by trains, causing them to die or have catastrophic injuries, true?
A True.
Q And, again, up until August 2nd, 2016, approximately anywhere from 100 to 200 people get hit every year by trains and are either catastrophically injured or killed, and that's

a frequent occurrence, true?
A True.
Q And the Transit Authority has acknowledged that one of the main hazards and the main cause of death in catastrophic injury in its system are contacts with individuals by trains, when people get hit or run over by trains, true?
A Yes.
MR. KEAVENEY: Objection. Judge, we went over this yesterday.
THE COURT: A little louder.
MR. KEAVENEY: We went over this yesterday with the other witness. It's the same questions.
THE COURT: Yes. We don't need this. It's getting repetitive.
MR. GENIS: Your Honor, if I may.
THE COURT: Let's move on. It's established that people do get hit by trains. We know that. Sometimes we don't have to go over and over again with the same. People know that. No question, people get hit by trains.
What else do you want to ask?
MR. GENIS: Just, if I may, Your Honor.
Q Sir, there's different divisions and subdivisions within the Transit Authority, correct?
A Correct.
Q And for lack of a better word, I'll call it

interdisciplinary, they all have to kind of work together, right?

A I would say so.

Q So, for example, there's the Office of System Safety, correct?

A Correct.

Q There's the Department of Subways, correct?

A Yes.

Q And you've got like Maintenance of Way and all these different departments and subdepartments, right?

A Right.

Q So each one has a different perspective on safety, correct?

A I, I would not say that.

Q Okay. They all have the same perspective on safety?

A I would believe so, yes.

Q And so for all departments, safety is number one, correct?

A Yes.

Q When you -- you've been on different committees and tasks forces, correct, before August 2, 2016?

A Yes.

Q And when you have these committees, whatever, there's representatives of the different departments and subdivisions, correct?

A Yes.
Q Why is that?
A Because you want to have their perspective, as you said earlier. Each division has different level of responsibility and, you know, brings a different knowledge set to basically a team solution. If you have a task force or a committee, it's about resolving a given problem.
Q Okay. So one of the issues might be Office of System Safety says we should do A, but some other department of operations or planning might say no, we don't want to do that; something like that could happen?
MR. KEAVENEY: Objection. Calls for speculation.
THE COURT: Sustained. Next question.
Q Well, when you're on these committees, you're interacting with all of these people from the different divisions and subdivisions?
THE COURT: You can explain to the jurors. I'm going to try to move things along a little bit. I'm just telling the lawyers right now.
Why do you have these committees? You can tell the jurors.
THE WITNESS: Well, it typically starts with having a problem that you want to resolve; and then you look, you try to find all the stakeholders that would provide knowledge of information so you could listen and as a group come to a

solution, come up with a plan to resolve the issue. So that's why these committees are formed.

THE COURT: All right. Next question.

Q All right. And, sir, that's why, because of this, each different division or subdivision has to become aware --

THE COURT: You're not testifying under oath now. Next question.

MR. GENIS: Okay.

Q Well, sir, does each division or subdivision have to be aware of the other divisions or subdivisions', as we said, perspective on any given issue?

A Yes, but there are different authorities. So, for example, Office of System Safety would perhaps have the last word on some things.

Q Okay.

A And so it's who ultimately has that, that authority.

Q Okay. So when you were doing Platform Safety Initiative Committee before August 2nd of 2016, so whose recommendations carried the most weight, so to speak?

A What committee are you referring to?

Q I think you told us you were on a platform committee of some sort, Platform Safety Initiative before August 2nd of 2016?

A No.

Q Okay. And do you have knowledge of the Platform Edge

Door Task Force, sir?
A Yes, I have knowledge, not total knowledge, yes.
Q So getting back to when you're on these tasks force and things, yet you told us there are different members, correct?
A Correct.
Q And they all have their input, you told us.
So is there ever any conflict, for example Office of System Safety --
THE COURT: Next question. Now you have to, Mr. Genis, I'm just advising you that I'm going to move it along here.
MR. GENIS: Okay.
THE COURT: So you're forewarned now. So you're not testifying. When you want to ask a question, ask a question. The jury has a pretty good idea of what's happening here. Okay?
MR. GENIS: Thank you, judge.
THE COURT: Let's try not to be repetitious.
Q Well, moving along, do you agree there were frequent incidents of people being killed or catastrophically injured as a result of contact with trains?
MR. KEAVENEY: Objection, judge. We're going back.
THE COURT: Go ahead. There's frequent incidents.
A Yes.
Q And you have safety performance indicators, correct?

A Yes.
Q And that's when you look at the number of people hit and either killed or injured?
THE COURT: You're not testifying.
MR. GENIS: Okay. Your Honor, as an adverse witness --
THE COURT: You're not testifying. Next question.
Q Okay. What are safety performance indicators?
A Well, I'm not the safety expert. That's kind of with the Office of System Safety. But it's basically a metric that is saying how much of this incident is occurring over a given period of time and does that equate to what our objectives are. Right?
So if you have an objective of zero but you're at two, then you are not meeting your objective.
Q So it's each year, you're just looking at the number of train strikes and deaths?
THE COURT: He wants to know how you go about deciding, you know, what kind of safety measures, if any, to take and what the Transit Authority does, what kind of committees it has. You know, he wants to try to develop that type of testimony. Maybe you can just explain it to the jury and then we can move on. Okay?
A Well, again, I'm from, I work for the Capital Program Management division during those years and, overall, system

safety is the responsibility of the Office of System Safety.

Q Okay.

A So I'll speak to what I understand the authority does.

THE COURT: Well, tell us what you know. Go ahead.

THE WITNESS: Could you repeat the question? Sorry.

THE COURT: It's my question.

THE WITNESS: Yes, yes.

THE COURT: I'm trying to cut to the chase here. You have safety protocols, you have a lot of committees. I think you've established that, right?

So what these committees are designed to really make sure that there's going to be safety measures at the Transit Authority, I assume, right?

So you can tell us a little bit about how that all works out, and then we can move on. Okay?

THE WITNESS: Okay. So there are policy instructions. When it comes to safety you have a whole plethora of policy instructions that are typically written by the Office of System Safety, and they are issued to the various divisions that those policy instructions would impact. And so there are a lot of safety-related policy instructions and typically signed off up to the president level, and they are then implemented; and, obviously, there is, there are compliance checks to make sure that that division or department is in compliance.

System safety does, they do a lot of audits to make sure that the authority of the various divisions are in compliance with those policy instructions.

THE COURT: So that's the overview.

THE WITNESS: Yes.

THE COURT: Of how your process work administratively so to speak.

And I guess we want to know, you know, what comes out of all of that. Are there reports? Are there conclusions that the Transit Authority has come to prior to 2016? I mean you can tell us a little bit about that. Okay? If you know.

THE WITNESS: Are, am I to speak specifically of platform safety initiatives?

THE COURT: You can do, you know, you can break it down. Mr. Genis can follow up after that.

THE WITNESS: Okay.

So that was the overall view of how safety is implemented and tracked. And, yes, reports are written, system safety does, they do hazard investigations, they do audits, they do a lot of checking to make sure that the various divisions are in compliance.

THE COURT: So I'm going to ask you a simple question. So what has come out of the wash?

You have all of these processes, you explained it, you have these committees, you have all these things that are

happening. So what has been the result of all of that? Perhaps you can explain that to us.

THE WITNESS: So, you know, typically there are corrective actions to be taken or implemented, recommendations. So typically if there's an audit done and there are adverse findings, then the Office of System Safety would provide a list of corrective actions that must be implemented and then they track that.

THE COURT: Does that actually happen?

THE WITNESS: I'm sorry?

THE COURT: Has that happened? Have they made a list, have they identified problems, and have they taken corrective programs?

THE WITNESS: That's a routine practice. I work in the capital, although in the environmental safety division, and that's basically how it's done. We issue corrective action report. We follow up.

If, for example, at a lower tier of management they're not complying with those corrective actions, we would elevate it above.

THE COURT: So, look, I don't know, I'm a basic guy. What's the result of all of that? What did you find?

THE WITNESS: What specifically --

THE COURT: What corrective action was taken, and what did you conclude?

THE WITNESS: So in terms of platform.

THE COURT: You can do platform first. Mr. Genis is going to ask you other questions I'm sure.

THE WITNESS: Okay. My involvement with the --

THE COURT: We know about your involvement.

THE WITNESS: It Started in 2015.

THE COURT: Right. Or it started in 2016.

THE WITNESS: I'm sorry?

THE COURT: You have no knowledge of what happened before 2016?

THE WITNESS: 2015. I started -- my responsibility --

THE COURT: You started when, 2015?

THE WITNESS: Correct.

THE COURT: So we want to know --

THE WITNESS: Capital Platform Safety Initiatives came under my portfolio in 2015.

THE COURT: 2015. Tell me, go ahead, what you learned at that time and what corrective action, if any, did you take.

THE WITNESS: Okay. So talking about Platform Safety Initiatives, my understanding of what happened prior to 2015 when I came on board was that they started an investigation into, you know, platform screen doors, there was a committee, they did some overseas, they had some oversees

trips, they came up with, you know, some recommendations.

They worked on a concept of operations, that if you were to implement platform screen doors, how would it operate in the system, what are the parameters, how would you have to design it, you know, what are the rules of the Department of Subway that had to be complied with, et cetera.

THE COURT: What did you do? In 2015 you got all these studies, you got all these things you explained to us. What did you do?

THE WITNESS: Right. So in 2015, when I came on board, there was a task corridor consultant to do a state of the industry study and, in tandem, they were supposed to design a pilot project for implementation of platform screen doors.

THE COURT: Did they do that?

THE WITNESS: It did not occur immediately in 2016 because we were trying to find an optimal station to do it, subway station. Ultimately.

THE COURT: So --

THE WITNESS: Ultimately it was found, and a design for that system started, and, during the procurement process, now which, that goes beyond 2016.

THE COURT: So my understanding is clear, I'm just trying to get clarity. That's what my job is.

THE WITNESS: Okay.

THE COURT: So by 2016, had you not implemented anything? You had these plans, you had these.

THE WITNESS: Studies, yes.

THE COURT: But nothing was done as of 2016. Maybe afterwards but not as of then.

THE WITNESS: Well, there was another capital track safety initiative called TIDS, Track Intrusion Detection Systems. When I came on board there was a pilot already in process at Rector Street for that system.

THE COURT: For that, okay. And what was that all about?

THE WITNESS: What it is, it's electronic, using sensors, electronically detect when somebody gets on, falls off the platform or deliberately falls off the platform edge into the right of way and sends an alert. It would alert a train, an oncoming subway car, a train coming, you know, with audio/visual enunciators and the train operator, if sufficiently alerted with sufficient time --

THE COURT: You did that on the Rector Street station?

THE WITNESS: As a pilot.

THE COURT: At that place, right?

THE WITNESS: Involving four vendors, yes.

THE COURT: At that place.

THE WITNESS: Yes.

THE COURT: All right. Mr. Genis, you have a sense how I want to move this trial along right now. Next question.
Q Sure. You mentioned this TIDS project.
When was it?
A I think, the work for it, the design, getting the vendors on board, I think started some time in 2013 or '14. When I came on board in 2015 it was in progress.
Q Okay. So as of August 2nd of 2016, was that TIDS pilot complete?
A Yes. I believe so, yes.
Q Okay.
Q And when it was completed before August 2nd of 2016, was it shown that the TIDS were effective?
A Measured, it was not 100 percent effective.
Q Okay. What percent?
A Well, I could tell you what the drawbacks were.
Q No. I'm just asking you --
A Percentage?
Q -- what percentage were effective on the TIDS?
A If we're to say did it recognize intrusions and issued alerts, yes, it did.
Q Okay.
A So if that's -- you know, but there are other things to consider. Are there false alerts, et cetera.
Q So, again, false alerts, how many, percentage-wise,

positive alerts as opposed to negative false alerts were there?
A There were, there were four vendors. One of the vendors' system did not, you know, they backed out midway during the pilot. They couldn't, I don't know. Their systems failed somewhat.
Q Why no disrespect to you, can you just answer my question, sir.
A Can you repeat it?
Q Sure.
What was the number or percentage of effective positive results from the TIDS as opposed to negative false results from the TIDS?
A There were overwhelmingly more positive than false.
Q Thank you.
And that was completed in, what, 2013, 2014, that test pilot?
A No, no. It started around 2013 or '14. It either finished 2015 or 2016.
Q Okay. And assuming for the sake of discussion it was in 2015 it was completed, in 2015 through August 2nd of 2016, did they implement that TIDS program?
A No.
Q In other words, put TIDS in stations?
A No.

Q Okay. All right. Sir, we're talking about platform safety.

Do you agree that since the 1980s, 1990s, the Transit Authority was aware of safety devices like platform edge doors to prevent you from getting hit or run over by trains, killed?

A Yes.

Q And do you agree that platform screen doors are doable or feasible in certain portions of the city subway system?

A Yes.

Q Has anybody ever said it's impossible to install platform screen doors in the subway system?

A No.

Q And there are other different devices or equipment -- like you mentioned, TIDs -- available for years or decades to prevent people from getting hit by trains, true?

A No.

Q That's not true?

A No.

Q Okay. Were you asked the following question under oath at your deposition on February 7, 2023, and did you give the following answer, on page 135, line 24?

Question: And we agree that there are different devices, equipment or technologies that have been available for years and decades to prevent people from being hit and

killed and run over catastrophically by trains?

Answer: Yes.

Were you asked that question and did you give that answer, sir?

A If that's --

THE COURT: He gave the answer. It's your deposition, that's what you testified to.

A Yes, whatever is on my deposition, yes.

THE COURT: I'm not so sure that this is inconsistent with anything he just said. Next question.

MR. GENIS: But it was flatly contradictory. Okay.

Q Sir, there's different precursors to a train hitting somebody, but the common denominator, whether they trip, they try to get their phone, they get pushed, they jump, they have access to the track bed, true?

A Yes.

Q And if you remove access to the track bed and the tracks, you remove the ability for trains to hit people, true?

A True.

Q So the root cause --

THE COURT: What is the root cause there is what he wants to know? Witness within the root cause of people getting hit by --

THE COURT: Yes.

THE COURT: It could be anything, right?

THE WITNESS: Yes, it's a lot of reasons.

THE COURT: Suicide, they can faint, any possible ways they wound up on the tracks. Right?

THE WITNESS: Yes.

THE COURT: You don't have a breakdown of all of that by any chance; how many people are shoved, how many people faint, how many people commit suicide.

THE WITNESS: The office of safety maintains that.

THE COURT: They have that, the number of people who wind up on tracks.

THE WITNESS: Yes.

THE COURT: Next question.

Q Were you asked the following question under oath and give the following answer, on page 104, line 11?

Question: Do we agree that the common denominator, whether somebody trips, whether they fall, whether they try to get their phone, whether they get pushed, whether they jump, is that they can have access to the track bed, correct?

A Yes.

Q Then the question is: So if we remove access to the track and track bed we remove the ability for the train --

MS. WINTERS: Your Honor, objection.

THE COURT: Sustained.

The jury understands.

This is getting repetitive. I should tell you folks

one thing. I think some of you may be taking notes, it's okay, but you should know that we have wonderful court reporters. So during your deliberations, if you don't remember anything, you can always come back and we'll get a read back. I should have told you that before. Check and balance.

You can take notes if you want to, but at the same time you should understand that whatever happens, whatever testimony you're hearing, can be read back to you if you want to hear it during your deliberations. Okay?

Let's move on.

MR. GENIS: Sure.

Q Do you agree that platform screen doors are the most effective means of preventing people from being killed or catastrophically injured as a result of getting hit by a train?

A Yes.

Q And for decades there have been platform edge doors used in other parts of the world, true?

A Yes.

Q And in fact you traveled abroad to see platform screen doors?

THE COURT: Don't need that. Next question.

Q But, sir, you learned personally about platform screen --

THE COURT: He testified. He answered. He said

yes. Next question.

Look, Mr. Genis, with all due respect, I have a lot of respect for you. You're very well prepared. My job is going to move along. This trial is not going to take as long as it would be if I let it go your way.

I'm just going to be candid with you. To give you all the information that gets it to move along. Move it along. Do you have any other questions to ask of this witness?

MR. GENIS: Yes.

THE COURT: Let's do it.

Q You mentioned a CONOPS before and that was in 2011, correct?

A Correct.

Q And in that report, it was noted by the Transit Authority that the use of platform screen doors was successful and was common in many European and Asian subway systems --

THE COURT: He testified about this already. It's repetitious.

MR. GENIS: I have not asked him about the CONOPS report.

THE COURT: Move on to another subject.

MR. GENIS: And the recommendation.

THE COURT: Move on to another subject now.

Q Okay. Did the CONOPS decide that the goal of the

platform doors was to improve safety, and they recommended it?

THE COURT: Next question. Don't answer it. Next question.

MR. GENIS: All right. I'm trying to move to a different topic since you're instructing me to do so?

THE COURT: Good idea.

Q Sir, you're familiar with the request for information the Transit Authority issued and published, true?

A True.

Q Okay. So the Transit Authority put out a request asking manufacturers throughout the world to see if they could put in platform screen doors in the New York City Transit Authority at little or no cost, in exchange for them getting the advertising revenue, true?

A True.

Q And they wanted to do so through a build-operate-transfer agreement, BOT agreement, correct?

A Correct.

Q And in exchange for this, twelve major companies responded to the RFI, true?

A I can't recall the number. But I know they received responses.

Q Okay. You read the document and you read 12 original equipment manufacturers responded to the Transit Authority's RFI to install platform or screen doors at little or no cost

in exchange for ad revenue, true?
A I believe so.
MR. KEAVENEY: Judge, objection. We had one of the manufacturers testify yesterday. We've heard this yesterday.
THE COURT: My apologies. I'm having a hard time hearing you clearly. Maybe you can get the microphone a little bit liver.
MR. KEAVENEY: We have one of the manufacturers testify about this yesterday.
MR. GENIS: But this --
THE COURT: I'm moving it along. Okay? I'm sure he's not happy with that but, you know, the jurors understand when I do this, I have no stake in this. I'm not suggesting you should believe or disbelieve or be critical of Mr. Genis.
My job is to move it along. Lawyers tend to be repetitive. They want to make sure they cover everything 100 percent. I get it. I used to be a lawyer myself.
But my job is different. It's getting repetitive, and it would be in Mr. Genis' best interest to focus and move on. I'm trying to help him. Go ahead.
Q So you saw how the Transit Authority narrowed that list down to five equipment manufacturers, correct?
A I don't recall all the details. I have not read it recently; but if that's what it states, I have no objection to that.

Q And you felt that that was a positive or a benefit to the Transit Authority, true?
A Can you repeat the question?
Q You felt that that was a positive or a benefit to the Transit Authority, it's a pro, correct?
A What specifically was a pro?
Q To have the Transit Authority have platform screen doors installed at little or no cost in exchange for ad revenue?
A True.
THE COURT: Did you think it was a good idea to do that?
THE WITNESS: Yes.
THE COURT: Okay. Next question.
Q Okay. And when the Transit Authority was doing the RFI and evaluating all of the responses, they spent thousands of hours of work and money on all of this, correct?
A I don't know the amount of hours or money they spent on it.
MR. GENIS: Well, sir, hold on.
THE COURT: We don't need it. Next question. Next question.
MR. GENIS: Your Honor, he testified in his deposition --
THE COURT: Next question.
MR. GENIS: You're not allowing me to read out of

the deposition?

THE COURT: I'm not allowing this now. He's testified candidly. You can't do better than what he's already told you.

You don't have to go over and over again. You don't need it, and I don't want it. Next question.

MR. GENIS: It's to impeach credibility, Your Honor.

THE COURT: Next question.

MR. GENIS: Okay.

Q Do you know why the Transit Authority walked away for no-cost or low-cost platform edge door program by equipment manufacturers?

A What I recall is that they needed to pursue this through an open procurement, an open public procurement. That's my recollection.

THE COURT: Do you know why they never did this? Yes or no. I don't know. Maybe you don't.

THE WITNESS: That's my understanding, that they needed to do it through -- that was an RFI, and if you were to bring a contract on board, you need to go through a proper public procurement process. And as far as I know that never happened.

THE COURT: Okay. You answered. Next question.

Q Well, sir, did you ever testify under oath -- on page 320, line 23 -- can you tell me why, right here, when the

Transit Authority spent thousands of hours and work and money on all this and all offers from 12 or 13 original manufacturers and then narrowed it down to the five who would install platform screen doors to save life and limb --

THE COURT: Go slower, Mr. Genis. You're losing me and the jurors.

MR. GENIS: Sorry.

Q -- narrowed it down to five who would install platform screen doors to save life and limb would have other benefits to the Transit Authority at little or no cost to the Transit Authority, why didn't the transit do it?

Answer: I did not know.

MR. KEAVENEY: Objection. There was an objection in the record, and he skipped over it.

THE COURT: Overruled. Go ahead. Next question.

Q So did you give that answer?

THE COURT: He gave the answers. He told you he gave all the answers. Next question.

Q Okay. So if you didn't know it back then when you were under oath and that was the truth then, when did the truth change?

THE COURT: Objection to the form of the question.

MR. GENIS: Okay.

THE COURT: You can explain to the jurors.

MR. GENIS: I'll ask another question.

THE COURT: There seems to be a little bit of confusion here.

Did you know or did you not know why this never happened? Simple question. And you said something at your deposition, you didn't know. You said something else today.

You can explain to the jurors, if you wish, what you mean by all this.

THE WITNESS: Absolutely, Your Honor.

Again, I'll say it, I was not involved in any of that decision making. What I read and what I heard, anecdotally from folks who were involved --

MR. GENIS: Objection. Hearsay, Your Honor.

THE COURT: Overruled.

THE WITNESS: Okay.

-- is that they put all the RFI, they got responses, and they needed to go through a public procurement process.

THE COURT: So the testimony you gave is just based upon things you heard from other people about your own particular --

THE WITNESS: Or what I read.

THE COURT: Okay. I think you clarified it. Next question.

Q Well, sir, did you testify repeatedly that you don't know why it wasn't done, not just once but three different times?

A The reality is I --

Q Sir, yes or no. Did you testify?

THE COURT: You can explain that once again. You gave testimony that you know about it. You can tell the jury why you said that. Go ahead.

THE WITNESS: So I don't know why they did not pursue that public procurement. That's what, I don't know the reason why they never pursued a public procurement at that point.

Q Objection. So in other words, the process is you have to put it to open competitive bidding when you say public procurement?

THE COURT: Sustained. Next question. You're not testifying. Next question.

MR. GENIS: Okay.

Q When you say public procurement, what does that mean?

A It means that you are going to put out like, like what we do in the capital world is, at least when you're spending public monies, you want competition among, you know, the community of contractors who would be interested in a particular project and not give it to, select a contractor and give that work to that person.

Q Okay. Because you can't just give away public money, correct?

A Correct.

Q Okay. So when all the companies said they will do it for

free, you're not giving away public money, true?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Well, sir, did they ever put out a competitive bidding process to do it for little or no columns in exchange for ad revenue?

A Not to my knowledge.

Q Okay. And did you ever see any follow-up that they pursued some sort of public procurement process?

A Not before 2016.

MR. GENIS: Okay. Thank you. I'm trying to move it along, judge. I'm looking through my notes to go quickly.

THE COURT: Take your time.

Q Okay. There are different devices, safety devices, I'm not going to go through all of them, but different platform screen door heights and there's rope barriers, vertical barriers, fixed rail, different types of barriers, correct?

A Yes.

Q There's the different track intrusion devices, there's DIVs, there's TIDS and there's the CCTV, correct?

A Yes.

Q And for the laser?

A Correct.

Q Do you agree that doing any of these options is better than doing nothing?

A Yes.
Q And each or any of these options is a means of reducing, if not eliminating, the number of people killed or catastrophically injured by contact with trains, true?
A Reducing, yes.
Q Okay. Thank you.
And taking some corrective action to prevent people from being hit by trains is better than nothing, correct?
A Correct.
Q Okay. And you agree that there's professional standards of care that the Transit Authority is supposed to follow and comply with?
A Yes.
Q And do you agree in addition to -- sorry.
Do you agree there has to be a root cause analysis?
A For?
Q In order to do a hazard analysis.
A Yes.
Q And the Transit Authority has adopted what's called U.S. Military Standard 882 for its hazard analysis and identification process and procedure, true?
A I believe so.
Q And one of the probability levels is frequent, correct?
A I believe so.
Q Okay. And a high hazard is unacceptable to the Transit

Authority, correct?
A I believe so.
Q A high hazard or high risk of hazard requires immediate corrective action, true?
A I believe so.
Q And catastrophic and critical injuries occur in the transit system with frequency, correct?
A Correct.
Q High-risk category, correct?
A I believe so.
Q That's what must be corrected immediately, correct?
A I believe so, yes.
Q Sir, and do we agree, since it's frequent and catastrophic, the train strikes, that is the highest risk assessment that requires immediate corrective action?
A I would believe so, yes.
Q Okay. To your knowledge, did the Transit Authority at any time up to August 2nd of 2016 do a hazard analysis to compare the number of deaths and catastrophic injuries from contact with trains if there are platform screen doors or the system as is?
MR. KEAVENEY: Objection. Your Honor, there was testimony yesterday as to why --
THE COURT: I don't know. Do you understand the question that's being asked now? Is it clear to you?

THE WITNESS: I'm not a safety professional.

THE COURT: All right.

THE WITNESS: And so a lot of the questions he's asking, someone from system safety would provide a better answer.

THE COURT: You're not comfortable in answering that question; you don't have the knowledge that you feel you need?

THE WITNESS: Correct. I'm not a safety expert. That has never been my forte.

THE COURT: What's your next question?

Q Well, sir, when you were designated by the transit to be its representative on safety issues, did you do anything to become familiar with these safety issues in platforms?

MR. KEAVENEY: Objection, 30(b)(6) is policy, not specific things.

THE COURT: Overruled. Do you know anything about it?

THE WITNESS: Well, I was never designated to speak on behalf of the office --

THE COURT: I'm a simple person. I ask simple questions.

Do you know anything about it? Yes or no. If you don't know, you don't know. If you don't, he'll ask you some other questions.

THE WITNESS: I know, you know, generally.

THE COURT: Generally.

THE WITNESS: What the safety protocols are, what a hazard analysis is, et cetera.

THE COURT: You have a general understanding?

THE WITNESS: General understanding, yes.

THE COURT: So you can tell the jurors what your general understanding is.

THE WITNESS: So typically if you are going to introduce a new system into the subway system, the Office of System Safety typically does a hazard analysis. So, you know, I'm in the Capital Program Management Division, and so our job is to deploy new systems, upgrade old systems, repair existing systems, and we work on the capital side.

If we have a project that has the potential of introducing something new that has not been in the system before, then we go to the Office of System Safety to do a hazard analysis. Is this going to cause, you know, exacerbate the problem or is it gonna, how, how is this going to potentially --

THE COURT: That's your general knowledge.

THE WITNESS: Yes.

THE COURT: So you can ask a question, Mr. Genis.

MR. GENIS: Yes, Your Honor.

Q Right off the bat, when you said the Office of System Safety typically does hazard analysis, that's what they're

supposed to do, correct?
A Yes.
Q That's what they're required to do under their office procedures, policies and practices, correct?
A Yes.
Q And to your knowledge, did they ever do before August 2nd of 2016 a hazard analysis comparing the number of deaths and catastrophic injuries from contact with trains if there are platform screen doors as opposed to the system as is?
A Not to my knowledge.
Q Okay. Did they ever do a hazard analysis before August 2, 2016, comparing the use of fixed rail as opposed to how it is?
A I don't remember the timing, but I know they did a hazard analysis for fixed rails. Yes.
Q All right. Well, sir, let's take a look.
Were you asked the following question under oath and give the following answer, on page 334, line 8.
Question: Did they ever do such a hazard analysis comparing fixed rail as opposed to how it is now?
Answer: No, not to my knowledge.
Were you asked that question, and did you give that answer, sir?
A I'm not -- I can't question what is in the transcript; but from my knowledge at the moment, I know that they did an

analysis --
Q Sir. I'm not asking that.
MR. GENIS: Move to strike, sir.
THE COURT: Just answer the question, if you can, specifically. All right?
THE WITNESS: Okay.
Q So were you asked that question under oath, and did you give that answer?
A If I -- yes.
Q And was it the truth at that time?
A Yes.
Q Thank you. Did the Transit Authority, to your knowledge, at any time before August 2nd of 2016 do a hazard analysis with respect to those rope barriers, vertical barriers system as is or system that they used then?
A Not to my knowledge.
Q Did they ever do a hazard analysis with respect to the closed-circuit TV and front cameras on the trains as opposed to how the system is as is?
A Not to my knowledge.
Q Are you aware of any time between August 2, 2016, if the transit ever performed any kind of study to see how to prevent or reduce people from getting killed or injured at Atlantic Avenue-Barclays station?
A Not to my knowledge.

Q Are you aware of the Transit Authority ever performing any kind of safety study about the prevention or reduction of the number of people getting killed or catastrophically injured as a result of contact at the Atlantic Avenue-Barclays station?
A Not to my knowledge.
Q Before August 2nd of 2016, did the Transit Authority ever do a study to see how to best protect and prevent people from being killed or harmed from being hit by trains?
A Repeat the question?
Q Sure.
Do you know if before August 2nd of 2016, if the Transit Authority ever did a study to see how to best protect people and prevent them from being killed or injured or reduce these amounts as a result of people being hit or run over by trains?
A I know that they had -- I recall reading some reports where the whole, the issue was discussed and as a result, they embarked on initiatives like, you know, improved messaging, signage, et cetera.
Q Okay. Sir, were you asked the following question under oath, and did you give the following answer? Page 336, line 6.
Question: Before August 2nd, 2016, did the Transit Authority ever do a study to see how to best protect and

prevent people from being killed or seriously injured or reduce these amounts as a result of people being hit or run over by trains? Yes or no.

Answer: I don't know.

Were you asked that question under oath?

A Yes.

Q And did you give that answer under oath?

A Yes.

Q And was it the truth, sir?

A At the time, yes.

Q Thank you. Okay.

Now, sir, do you agree that certainly as of 2011, there was no comprehensive study for safety, true?

A I'm not aware of it.

Q Okay. All right.

Sir, were you asked the following question, and did you give the following answer under oath? Page 116, line 2.

Question: So you're saying as of 2011, there had been no comprehensive study?

Answer: True, not to my knowledge, there was not.

Were you asked that question under oath, and did you give that answer, sir?

A Yes.

Q And was that the truth then?

A Yes.

Q Thank you. All right.

Did the Transit Authority ever do a study to see the actual costs of people being killed or injured by contact with trains?

A I'm not aware.

Q Okay. Well, let's talk about some of the costs.

Are there different costs due to death or injury?

A Repeat?

Q Are there different costs due to death or injury?

A Costs to the Transit Authority?

Q Okay. Well, fair enough.

Well, let me ask you: If a person is injured but not killed, there may be costs of medical care to them, such as Medicaid or Medicare, correct?

A Sounds correct.

Q And that's a cost to the public, correct?

A Correct.

Q Okay. And if somebody can't work any more and they were paying taxes, now they're no longer able to work and pay taxes, that's a loss to the government, true?

MR. KEAVENEY: Objection. Leading, speculative.

THE COURT: Sustained. It's really argumentative. Go ahead. Next question.

Q All right. Well, at the Transit Authority, after a train runs over somebody, the train operators have suffered

posttraumatic stress disorder as a result of that, true?
A Yes.
MR. KEAVENEY: Objection.
THE COURT: All right. He answered, but I don't know the relevancy of this. Go ahead.
Q So that also cost the Transit Authority money, when they go out, true?
A Yes.
Q Okay. And there's a disruption in service when people get hit by trains, true?
A True.
Q And there's a cost to that as well, correct?
A True.
Q So did anybody at the transit do an analysis what the costs are to the Transit Authority attributable to people getting hit by trains in terms of its own operations, its own costs?
A I'm not aware.
Q Did anybody at the transit ever look at the total costs by people getting hit by trains as opposed to what the cost is to prevent that from occurring?
A I don't know.
Q Was there ever an analysis by the transit what the costs are for litigation for people who are hit by trains as opposed to fixing it?

A I don't know.
MR. KEAVENEY: Objection.
THE COURT: Well, he answered. We'll let it go.
Q Sir, was there a need to study each and every station to come up with an individual safety plan for each station?
A That is logical and makes sense, yes.
Q And the best way to make a station safe or safest is by doing a separate safety plan for each station, correct?
A I would say so.
Q Okay. So each unique station needs its own unique safety plan, correct?
A Yes.
Q And each station -- you know, I'll skip that.
So before August 2nd of 2016, did the Transit Authority ever have a safety plan for that station to prevent people from getting hit by trains?
A I'm not aware. I don't know.
Q And were there any signs posted at that Atlantic Avenue-Barclays station on or before August 2nd of 2016, to stay away from the edge of the platform?
A I don't know.
Q You mentioned before that they had done certain measures, correct?
A Yes.
Q Okay. When were these measures instituted?

A I can't recall the exact years, but I know that just from my personal use of the subway system, you know, since the late '80s when I came to this country, that there had been messages about staying back from the platform edge, you know, signs posted.
Q Okay. And you told us before, when the judge was questioning you, how they track it when they do audits to see whether or not the measures were actually effective or not, correct?
A That is typically done, yes.
Q Okay. So did the Transit Authority ever do that kind of analysis to see if the measures they took were effective?
A I don't know.
Q And you told us before that's what they're supposed to do and required to do, correct?
A Yes.
Q And you agree that a one-size-fits-all approach, in terms of safety devices or measures, for each and every one of the 472 stations is unreasonable, correct?
A Yes.
Q And you agree that that's what the Transit Authority has always tried to do, is a one-size-fits-all approach, correct?
A I'm not aware of that.
Q Okay. By the way, even -- when you say you're not aware of it, are you denying it's true?

THE COURT: He answered. He said he's not aware of it. Next question.

MR. GENIS: All right.

Q There are challenges to putting in platform screen doors at certain stations, true?

A True.

Q So some stations, maybe you couldn't have a full-height door but you could have a three-quarter or half-height door, correct?

A Correct.

Q And even a half-height door is about five or six feet high, correct?

A Correct.

Q Some could be mounted from the top, some could be mounted from the bottom, correct?

A A half-height door? I'm not aware of a half-height door being mounted from the top.

Q That would be a full-height door?

A Correct.

Q And in Paris, that's an older system than we have here and it's comparable to New York City, correct?

A In some aspects.

Q Okay. And in Paris, they shored up the underground platforms, correct?

A In regards to?

Q The platforms.
A Yes, yes.
Q Okay. All right. And for decades and decades, the Transit Authority orders new train cars, correct?
A Yes.
Q And if the Transit Authority wants to have a homogenous fleet, were all the same design, they could do that, true?
A I believe so, but I'm not the car expert.
Q And the Transit Authority can order, design, whatever specifications they want, can have any whatever kind of train with the specs that they want within the limits of manufacturer, correct?
A Makes sense, yes.
Q Okay. And you can make things feasible depending on the extent of modification that you determine is doable, correct?
A Correct.
Q And a proper and valid feasibility study would be one that says, how do we accomplish the goal, how do we make it effective, correct?
A I'm not sure that's how I would define a feasibility study.
Q Okay. Well, let's take a look at it. Okay.
Were you asked the following questions under oath, and did you give the following answers. I'll start on page 181, line 6.

Question: So a proper and valid feasibility study is one that looks to see how can we accomplish the goal, true?

Answer: Correct.

Were you asked that question, and did you give that answer?

A Yes. If you're reading from the transcript, yes.

Q Yes, I am. And the very next question, on line 10:

Question: So in other words if you wanted to do a proper and valid feasibility study about platform edge doors, the study would look at how can we make it work, how can we make it effective, true?

Answer: True.

Were you asked those questions, and did you give those answers?

A Yes.

Q And you've told us with rehabs of stations, they can get new concrete for the platform, for the track, track bed, other parts of the station, columns, roofs, staircase, all those things, can and have been rehabilitated, correct?

A To some measure, yes.

Q Okay. You've seen stairwells get installed as part of rehabs, correct?

A Correct.

Q Elevators get installed?

A Correct.

Q And you know when there's rehabs, you usually replace the concrete slab or the edge that overhangs the tracks, correct?
A Sometimes, yes.
Q And it's easier to have platform edge doors installed where there's new construction for a new station, correct?
A Yes.
Q Did they do it on Second Avenue?
A No.
Q Did they do it on the number 7 extension?
A No.
Q And those are both new lines and new stations, correct?
A Yes.

MR. GENIS: I'm skipping. You know what, judge. I'm going to say no further questions right now.

THE COURT: All right. So, Mr. Keaveney, let me know if you want the jurors to have their morning break now, or do you want to start your questioning and then take a break.

MR. KEAVENEY: I won't be long, Your Honor. So I'll just do it now.

THE COURT: You want to go now? Okay.

CROSS-EXAMINATION
BY MR. KEAVENEY:

Q Good morning, Mr. Jones.
A Good morning.

Q You talked about the track intrusion pilot study before.
A Yes.
Q Was there more than one pilot study done?
MR. GENIS: Was this before August 2, 2016?
THE COURT: One moment. We've got an objection. I guess the question is was there just one study done.
THE WITNESS: Yes. There was only one done before August, started before August 2, 2016.
Q And was there a second one planned?
A Yes, there was a second one planned ahead of.
Q And what was that going to look at?
A It was going to look at other vendors. So was -- the intent of both pilots is to find which technology would be more suitable and proved to be most effective.
Q Okay. So the plan was to look at the systems from the Rector Street TIDS pilot and subsequently for the other one that was going to take place to see what worked, correct?
A That's correct.
MR. GENIS: Objection. Form. Leading.
THE COURT: Well, he answered the question so he understood the question. Next question.
Q And you talked a little bit either earlier about the platform screen door international research trip.
Do you recall that?
A Yes.

Q Okay. And you went on that trip?
A Yes.
Q And you went on with other people from the Transit Authority?
A Yes.
Q Or the groups?
MR. GENIS: Judge, you wouldn't allow me to inquire into this. It's beyond the scope. Objection.
THE COURT: Next question.
Q Was there a plan to do a pilot program as of August 2016 for platform screen doors?
A Yes.
Q And where was that being planned?
A Sixth Avenue on the L line.
MR. KEAVENEY: Okay.
THE COURT: So, Mr. Genis, I'm going to allow him to ask questions that haven't been covered now because he could call that person as a witness on his case. Let's just do it all when we have the witness in court rather than have him come back later on.
So I'm going to allow him to develop as if he's using this witness with his testimony as well.
MR. GENIS: Of course. So he's not going to be able to lead since it's his direct testimony.
THE COURT: I'm going to have him questioned now

rather than have him come back again. So we're going to allow questions beyond the scope of your questioning so he doesn't have to come back a second time. Okay? That's what we're trying to accomplish. Go ahead.

Q And when we talked about the hazard analysis earlier, that's also for new things that are introduced into the system, correct?

A Yes.

Q So you would do a hazard analysis, for example, for platform screen doors because that's new equipment that's going into the system?

A Right.

Q And that would be done probably a little later in the process, right, not immediately?

A Repeat?

Q That would be done later in the process, it wouldn't be done immediately?

A A hazard analysis?

Q Yes.

A For PSDs, for example?

Q For example.

A The Office of System Safety would act upon a request that it gets; and I believe for PSDs, once we had decided we were going to move ahead with a pilot project, they were asked to conduct that hazard analysis.

Q Okay. So that's part of the whole process too, when you're introducing a new piece of equipment to the system, correct?
A Correct.
Q Okay.
MR. KEAVENEY: That's all I have. Thank you.
THE COURT: Okay. So this is a perfect time -- do you have any further questions?
MR. GENIS: Yes.
THE COURT: So ask your questions.
MR. GENIS: Go ahead.
THE COURT: Follow-up question, I'll give it to you if you have some. Go ahead.

REDIRECT EXAMINATION

BY MR. GENIS:

Q Sir, you just gave testimony about that L line, correct?
A Yes.
Q And that was, the most that was done was a design for a design, right? It was a design for how to do something for a pilot, correct?
A A design for a design?
Q Yes.
A That's a little confusing.
Q Okay. It wasn't the actual design to install them in the station.

It was a design to set up people to start bidding so to at some later point do a bidding, correct?
A Yes.
Q And, by the way, since he's raised the topic, did they ever do the PSD, L pilot project?
MR. KEAVENEY: Objection. My question was as planned.
THE COURT: I'll allow it. Did they ever do such a thing?
THE WITNESS: No.
MR. GENIS: Thank you. Nothing else.
THE COURT: Anything further, Mr. Keaveney?
MR. KEAVENEY: Nothing, Your Honor.
THE COURT: You may step down. Thank you very much.
(Witness excused.)
THE COURT: So, folks, this is an ideal time to take our break, and we'll reconvene at 11:30 promptly for the next witness.
THE CLERK: You can step down.
(Jury exits.)
THE COURT: You can all be seated.
All right. So, Mr. Genis, tell us who we have next so I can get a sense of what we have to look forward to for the rest of the day.
MR. GENIS: Certainly. I believe Mr. Doddo can come

now for the afternoon.

MR. KEAVENEY: He's the afternoon.

MR. GENIS: He's our next live witness.

THE COURT: Do you have someone you can call?

MR. GENIS: Well, I can read the transcript.

THE COURT: Well, if you have deposition testimony, you might as well use the time, and then you have a live witness coming at 2 o'clock. Is that what you're telling me?

MR. KEAVENEY: Yes. I could move up that time.

THE COURT: Well, do the best you can.

MR. KEAVENEY: I can try.

THE COURT: We're making a record here so we have to talk one at a time. See if you can move it up because you get the sense that I can move the trial along a little bit more expeditiously than you may have anticipated so we want to make sure we have a full day of testimony today. All right?

MR. GENIS: Yes.

THE COURT: And we'll see you again at 11:30.

(Recess taken.)

(In open court; outside the presence of the jury.)

THE COURT: All right, Mr. Genis. What do we have next?

MR. GENIS: What we're going to do, Your Honor, because we subpoenaed Cheryl Kennedy but she has not appeared, we're going to do a reading. With the Court's permission, I'm

going to have somebody read with me so we're not going to get bored with my monotonous voice.

THE COURT: Anyway, you have some deposition to read?

MR. GENIS: Correct.

THE COURT: This is the deposition testimony of which?

MR. GENIS: Cheryl Kennedy.

THE COURT: And you want to have somebody sit up here?

MR. GENIS: Yes.

THE COURT: So members of the jury, we allow this type of thing to happen. We can read in somebody's deposition testimony if they're not here in court for whatever reason, it's permissible, and the next witness is going to be a person who has been deposed.

We're going to allow her deposition testimony to be read as if she was in court and we're going to allow this type of interaction. Pretend her to be the witness right now.

Let's hear your name.

MS. ROSS: My name is Audra Ross.

THE COURT: And you are going to be pretend to be Cheryl?

MS. ROSS: Cheryl Kennedy.

MS. WINTERS: Your Honor, there's portions that we

counter-designated for completeness, for completeness sake since they complete the testimony, you know.

THE COURT: I'm not so sure I understand your objection.

MS. WINTERS: No objection, Your Honor. I'm just saying we counter-designated a portion.

THE COURT: You'll have a chance to read from the deposition testimony as well.

MS. WINTERS: No, I understand, but there's portions of the testimony that we designated for completeness.

THE COURT: Well, if you have any question that's asked and you want to object to, you can make your objection and I'll rule on it, just like she's testifying here.

Okay?

MS. WINTERS: Understood.

THE COURT: Go ahead.

MR. GENIS: I'm going to start from the deposition of Cheryl Kennedy dated August 24, 2022.

(The deposition testimony of Cheryl Kennedy was read as follows. The questions were read by Mr. Genis and the answers were read by Ms. Ross.)

MR. GENIS: I'm going to start on page 5, line 15.

Q Good morning, Ms. Kennedy. My name is Rob Genis. I represent a young woman who lost her arm and leg. I'm going

to be asking you some questions today. If there's anything I ask that you do not understand, please say so and I will gladly rephrase the question. Otherwise, if you answer the question, we're going to assume that you understood it. Do you understand everything I've said so far?

MR. GENIS: And we're continuing on page 6 line 2.

A Yes.

Q And the answer is, I'm sorry?

A Yes.

Q Agree to these terms?

A Yes.

Q They're fair?

A Fair.

Q Okay.

MR. GENIS: Now we're going to go to page 16, line 9.

Q Thank you.

By the way, since we have a limited amount of time, there are times I will ask you yes/no questions or true/false questions. When I do so, can you please just answer with a yes or no or true or false and if you're unable to do so, just tell me I can't answer it with a yes or no. Fair enough?

A Fair enough.

MR. GENIS: Let's go to page 6, line 25.

Q How much time have you spent discussing this matter with

defense counsel for the Transit?
A A couple of hours.
Q And was this over one session, a number of sessions or something else?
A Two.
Q Was each session a few hours?
A The first one was a couple of hours. The second one was shorter.
MR. GENIS: Okay. We're now going to page 8, line 2.
Q Have you ever testified before?
A Maybe once.
Q When you testified before, was it in a deposition like this, was it at trial or something else?
A I guess it was twice. Once was a deposition and once was a trial.
MR. GENIS: Let's go to page 9, line 18.
Q Okay. When you got your Bachelor of Science undergraduate, was that in education, was it in Phys. Ed or something else?
A It was in physical education.
Q Okay. And then you got your Master's degree in safety of some sort?
A Safety management.
MR. GENIS: Let's go to page 10, line 10.

Q Did you take any classes in engineering?
A No.
Q What is your work history?
A I've worked --
Q Go ahead. I'm sorry.
A I -- after I graduated, I went directly to work for New York City Transit and I work in safety my entire career there. I started in 1982.
Q Okay. So you started at the Transit Authority in 1982, correct?
A Yes.
Q And you started with the Office of System Safety?
A Yeah, I started with the Office of System Safety. That office just dealt with subway-related issues. There were two safety offices at that time and I was employed by the office that dealt with subway, mostly customer areas. The other safety office dealt with buses as well -- excuse me -- with buses as well as employee safety. And it wasn't until I think 1985 when they merged.
Q Okay. When you first started working for the Office of System Safety, did you have a title or position?
A Yeah. I was transit analyst and I think I worked there from '82 to '85 and then I went and became a manager. I was a manager of hazard analysis from '86 to about '89. Then I was director of hazard assessment from '89 to '99. And then I was

the vice president of system safety from 2000 until I retired March 1st of 2018.
Q So I just want to make sure we're accurate here. You started working in 1982 for the New York City Transit Authority in the Office of System Safety, you were involved in subway-related issues, they merged in '85, so you worked there from '82 to '85 as a Transit analyst, then you became a manager for the hazard, hazardous assessment?
A Hazard, hazard assessment, yes.
Q Okay. And that was in '86 to '89, correct?
A Yes.
Q And then you became the director of hazard assessment or hazardous assessment from '89 to '96, correct?
A Um-hum, yes.
Q And then you became the director of --
A '99, is that what you said?
Q I said '96 but if it was '99 --
A '99, yeah.
Q My apologies.
A No problem.
Q And then so from 1999 to 2018, were you the director of Office of System Safety, correct?
A Yes, the year 2000 to the end of 2017 really.
Q Okay.
A Yeah, March 1st, 2018.

Q Okay.

MR. GENIS: Page 17, line 19.

Q I believe you told us you reported directly to the president of the Transit Authority, correct?

A Correct.

Q And you agreed that the president of the Transit Authority relied upon you and your office for safety recommendations and advice?

A Yes.

MR. GENIS: Go to page 24.

Q Do we agree that according to the good accepted practices of simply operating a mass Transit system as it existed when you were working for the Transit, the Transit Authority --

MR. GENIS: And let me stop.

Andrew, I'm going to change the word that appears next to August 2nd of 2016. Correct?

MR. KEAVENEY: Objection.

MS. WINTERS: We would just request that you read the transcript as written.

MR. GENIS: Okay. Because I thought -- okay. All right.

Q -- never allowed to unnecessarily expose the public to harm?

A We shouldn't expose people to harm. I agree with that.

MR. GENIS: Okay. Page 26. I'm going to skip that

one because it goes to 2018. I'm skipping that.

Okay. Page 26, line 22.

Q My question is nice and simple. According to the professional standards of care, was the Transit Authority ever allowed to unnecessarily expose people to harm?

A We would not expose people to harm.

Q Okay. Are you familiar with any professional standards of care that allowed the New York City Transit to unnecessarily expose people to harm?

A No.

MR. GENIS: 104, page 104, line 15.

Q All right. When you worked for the Transit Authority, what was the acceptable or tolerable number of fatalities caused by 12-9s?

A There was none, no acceptable level.

Q And what was the acceptable or tolerable number of fatalities according to the Transit Authority? Because I think you gave me for your opinion but not for --

A There's not.

Q Okay.

MR. GENIS: I continue the question.

Q The Transit Authority?

A There's none.

MR. GENIS: Page 14, line 13.

Q Can we agree that the job of the Office of System Safety

was to ensure that safety was integrated into all operations of the Transit Authority?
A Yes.
Q And that would include accident investigation hazard analysis, safety audit programs and performance indicators for customer and employee statistics, occupational safety, environmental safety and fire safety?
MS. WINTERS: Your Honor, we have an objection on the record to that question and we objected to form.
THE COURT: Objection overruled. Next question.
Go ahead you can answer it.
A Yes.
MR. GENIS: Page 17, line 15.
Q And was it part of your job to make sure that safety was integrated into all operations?
A Yes.
MR. GENIS: Page 13, line 2.
Q What is the Office of System Safety? What is its purpose?
A It basically was to develop policies and procedures to make sure there was a comprehensive overall safety management of New York City Transit. So it was to the development of policies, procedures, and oversight of that, those issues in order to ensure a comprehensive safety program for all of New York City Transit on both bus and rail, customer and

employees.

MR. GENIS: Let's go to page 18, line 13.

Q Okay. And you knew that the presidents of the Transit Authority relied upon the recommendations of yourself and your office with respect to hazardous assessment and how to mitigate these hazards, true?

A True.

Q Okay. And we agree that performing adequate, reasonable and proper hazard assessment and making property adequate safety programs to mitigate these hazard was an extremely important job of yours in your department?

A True.

MR. GENIS: Page 85, line 22.

Q Okay. The goal shall always be to eliminate the hazard if possible when hazard cannot be eliminated, the associated risk should be reduced to the lowest acceptable level, true?

MS. WINTERS: Your Honor. We have an objection here in light of the fact that he's referencing a document that's not in evidence.

MR. GENIS: I'm not referencing any document.

THE COURT: Overruled.

A True.

MR. GENIS: Let's go to page 64, line 11.

Q Okay. Should the goal always be to eliminate the hazard if possible?

A If possible.
Q When a hazard cannot be eliminated, the associated risk should be reduced to the lowest acceptable level by applying the system safety design order of precedence, true?
A True.
MR. GENIS: Page 102, line 18.
Q When you were the head of the Office of System Safety, did you want to get rid of, alleviate or reduce the 12-9s from occurring?
A I did.
Q Okay. Was that your top priority or not?
A No.
MR. GENIS: Next page 103, line 2.
Q Okay. In terms of rank in priority, was alleviating or reducing 12-9s from occurring 2, 3, 4 or something else?
A I didn't prioritize them in that way so I can't answer that.
MR. GENIS: Okay. Let's go to page 155, line 23.
Q So is preventing and reducing 12-9s from occurring somewhere between 5 and 10?
A I don't know. I mean I'm not ranking them. I'm just saying that I had many concerns and there were a lot of things going on at New York City Transit. There was a lot of safety related issues that were needed to be dealt with and that was one.

Q Okay.

MR. GENIS: On page 156, line 16.

Q So wouldn't that be the top of your list of things that are of high priority?

A It was a high priority along with many other things.

MR. GENIS: Page 103, line 9.

Q Okay. Did the Transit Authority prioritize the importance of alleviating or reducing 12-9s from occurring?

A They wanted to reduce them but to give them a priority level, I can't tell you. I can't answer that.

MR. GENIS: Page 155, line 7.

Q So, yes, was preventing or reducing or mitigating 12-9s from occurring either in frequency or severity of injury one of your top three concerns when you were in Transit?

A I wouldn't say it was one of my top three concerns. There was so many concerns that rated very high and it was a high one, you know, I can say that.

Q Okay.

A But there were many concerns that were high.

MR. GENIS: Let's go to page 19, line 2.

Q Among the hazards you assessed was contact between trains and people, true?

A That was an issue that we did look at, yes.

MR. GENIS: Okay. Let's go to page 99, line 24.

Q Now, there's different terminology the Transit uses and I

just want to make sure that we're all on the same page here.
Are you familiar with the initials CWI?
A Yes. Contact with individual.
Q Okay.
MR. GENIS: We're still on page 100 line 17.
Q Okay. And are you familiar with 12-9s, code 12-9?
A Yes.
Q And 12-9 is also contact between a train and a person, correct?
A Correct. And it could be on the rail bed or on the platform, station platform. I'm sorry.
Q So do you distinguish between CWI or the 12-9s or are they interchangeable?
A They're interchangeable.
MR. GENIS: 131, line 23.
Q All right. Let's see if I can help you this way.
There are a number of different types of 12-9 incidents, correct?
A Correct.
Q So, for example, a person can fall, okay, onto the tracks because of an unsafe condition of the platform, true?
A True.
Q Okay. And a person could become ill, have a medical condition and faint or fall onto the tracks, correct?
A True.

Q A person get pushed onto the tracks, correct?
A True.
Q A person can jump on to the tracks, correct?
A Correct.
Q And when somebody -- I'm sorry.
And so whether somebody falls, is sick, gets pushed or jumps, the common denominator is that their body had contact with the train, correct?
A Okay. Correct.
MR. GENIS: Page 167, line 7.
Q Well, do you agree that the data shows that crowding of a platform does not play a significant role in causing 12-9s?
A Yes. The -- it's a random type thing.
MR. GENIS: Page 133, line 8.
Q But can we agree that the common denominator is that there is nothing preventing them from landing or falling into the track bed for one, true? Yes?
A That's one thing but --
Q Thank you. Thank you.
And another thing is that there's nothing preventing them even when they're on the edge of the platform from having contact with the train, true or false?
A True.
MR. GENIS: 134, line 16.
Q So if there's no barrier to prevent a person from having

contact with the train, that person contact can have contact with the train, true or false?

A True.

Q Okay. So we have different causes for people falling onto the tracks or having contact with the train, correct?

A Correct.

MR. GENIS: Page 176, line 5.

Q Okay. Do we agree that it has been a known and current problem to you and to the Transit Authority for many, many decades is contact between train and person, 12-9 incidents?

A Yes, many, many years.

Q And that is a known and recurring problem to both you and the Transit Authority for many, many decades is contact between train and people known as these 12-9s, correct?

A Many, many years, yes.

MR. GENIS: Page 124. Line 4.

Q We're discussing right now solely the number of incidents that occur, okay? Just the number of 12-9s and the number of fatalities. So --

A It's a high number.

MR. GENIS: Page 113. And we're referring to an exhibit. It was number 2 at the plaintiff's deposition and Bates 743.

(Pause.)

MR. GENIS: Your Honor, may I approach --

THE COURT: Do you have an exhibit you want to offer into evidence?

MR. GENIS: Yes.

THE COURT: Tell me what number it is.

MR. GENIS: 80.

THE COURT: 8-0?

MR. GENIS: 8-0.

THE COURT: All right. I don't -- is that the 1987 chart you're talking about? That's what I have as number 80.

MR. GENIS: It is a chart. May I approach to show you?

THE COURT: No. No. There's no objection to it so you can have it offered into evidence.

MR. GENIS: Thank you.

MS. WINTERS: Your Honor, we did object to this exhibit.

THE COURT: I don't have a record of you objecting to it.

MS. WINTERS: There was. This was an exhibit that was added when they revised their exhibit list and we have an objection, Your Honor.

THE COURT: So I'm sorry that we have to interrupt this but I tried to sanitize this before.

On my list, I have number 80 and that there's no objection. Are you telling me you made a mistake?

MR. KEAVENEY: Your Honor, there was supposed to be some redactions to that.

MR. GENIS: There are.

THE COURT: There are redactions.

MR. GENIS: This is 2016. This is what the Court looked at and everybody agreed to.

THE COURT: It's in evidence now. I assume there's redactions. We discussed this before.

MR. GENIS: Yes.

THE COURT: It's in evidence at this particular time. 80 in evidence.

MR. GENIS: Yes.

THE COURT: And there are redactions and you took care of that, all of that in advance of the trial?

MR. GENIS: Yes.

MS. WINTERS: Counsel, can you please provide us a copy? I don't believe we have a redacted version.

MR. GENIS: Sure.

THE COURT: We can't take this down. We have a record we're trying to make.

That's the exhibit you want to offer into evidence now, that's the blowup of it?

MR. GENIS: Yes.

THE COURT: Put the exhibit in first. Let counsel, Ms. Winters have a copy. She doesn't know what you're talking

about.

Let the record reflect we've gone over all of these proposed exhibits in a number of pretrial conferences and there's no objection. Things have been redacted. I'm allowing it into evidence and have you a blowup that's only for demonstrative purposes. The blowup is not in evidence. Just the document.

MR. GENIS: Yes.

THE COURT: All right. Go ahead.

(Plaintiff's Exhibit 80 so marked.)

MR. GENIS: All right. We're on page 113 referring to this exhibit, line 23.

Q Are you able to see that? Do you need -- it says we -- to make it bigger?

A Oh, I can see. It's good.

MR. GENIS: Let's go to page 119, line 8.

Q Okay. And that this is a known and recurrent problem to both you and the Transit Authority for many, many decades that contact between trains and person has resulted in hundreds, if not thousands of catastrophic or major injuries, true?

A True.

MR. GENIS: Okay. Let's go to 118, line 25.

Q Okay. And do we agree that this known and recurrent problem to both you and the Transit Authority for many, many decades of contact between trains and persons has resulted in

hundreds, if not thousands of fatalities?
A That's what it says, 1,684.

MR. GENIS: I'm going to skip the next question because it goes beyond what was redacted, Judge.

THE COURT: Okay. Go ahead.

MR. GENIS: I'll go on page 114, line 6.

Q So, for example, and we have on this chart the number of 12-9 incidents and the number of fatalities for any given year as reported by the Transit Authority. Do you see that?
A Yes.

MR. GENIS: Line 12.

Q So, for example, in 1987, there were 195 12-9 incidents with 62 fatalities?
A True.

MR. GENIS: Going to line 20 on page 114.

Q So when we go through the numbers, we see for many decades, at minimum, there are over a hundred incidents per year and as many as 200 12-9s occurring, true?
A There is, yes. There is, yes.

MR. GENIS: Page 116, line 19.

Q And it never dips below, let's say, a hundred or 109?
A That's correct.
Q In terms of number of incidents, correct?
A That's correct.
Q Okay. And the lowest number of fatalities in any year of

recorded ones is a low of, is it 30?
A It looks like 25.
Q Twenty-five. What year is that?
A 1998.
Q Yes. And a low of 25 of 150 incidents, correct?
A Correct.
MR. GENIS: Let's go to 256, line 10.
Q Okay. So the Transit Authority acknowledged that something had to be done to prevent or dramatically reduce the number of 12-9s, true?
A True.
MR. GENIS: Page 104, line 15.
Q All right. When you worked for the Transit Authority, what was the acceptable or tolerable number of fatalities caused by 12-9s?
A There was none. No acceptable level.
Q And what was the acceptable or tolerable number of fatalities according to the Transit Authority, because I think you gave me for your opinion but not for --
A There's none.
MR. GENIS: Okay. I continue.
Q The Transit Authority?
A There's none.
Q Go ahead.
A There wouldn't be a tolerable limit. Like you wouldn't

say, Oh, we can have ten and we can have five. You know, there, there wasn't any, any, anything written like that.

MR. GENIS: Question on 105, line 14.

Q All I'm trying to find out is, for example, any time you worked at the Transit Authority, whether it would be you or someone else at the Transit Authority, did anyone ever say, okay, we can accept or tolerate X number much fatalities per year due to 12-9s?

A No.

Q Did anybody, whether you or someone else at the Transit Authority while you worked for them, ever say we can tolerate X number of either catastrophic, serious or major injuries attributable to 12-9s?

A No.

MR. GENIS: Let's go to page 35.

THE COURT: You have another exhibit you want to put into evidence?

MR. GENIS: Yes, Your Honor. I want to make sure we have the correct number.

THE COURT: Let's get it done.

MR. GENIS: The correct number is Plaintiff's 35.

THE COURT: Thirty-five? All right. That's the hazard mitigation form.

MR. GENIS: Yes.

THE COURT: There's an objection to that. Let me

see it.

MR. GENIS: Sure. May I approach, Your Honor? I have a highlighted copy that you can see the parts that I'm interested in.

THE COURT: Give Ms. Winters a copy.

MR. GENIS: Okay.

THE COURT: You want the Elmo?

You have now questions about this?

MR. GENIS: Yes.

THE COURT: All right. I'll allow this in evidence.

MR. GENIS: Thank you.

(Plaintiff's Exhibit 35 so marked.)

MR. GENIS: Okay. We're showing you a portion now of Plaintiff's Exhibit 35, but let me go back to reading from the transcript. And this is on page 125, line 15.

Q Now, it's entitled "Hazard Mitigation Form," correct?

A Yes.

MR. GENIS: Okay. Page 126, line 6.

Q This is a form created, kept and maintained by the Transit Authority in the regular course of its business, true or false?

A True, for specific projects.

Q Oh, and by the way, does this indicate anywhere on this document that this form should only be used for specific projects?

A No.
Q Thank you.
Now, this form asked for information that then gets filled in, correct?
A Correct.
MR. GENIS: Page 128, line 23.
Q Now, getting back to the specific description of hazard, it states, "Insufficient protection for person on platform," correct?
A Correct.
MR. GENIS: Page 130, line 17.
Q And what's written in is a reference measure to prevent persons from approach platform edge and accidentally falling onto the tracks, correct?
A True.
MR. GENIS: And then I'm going to still want page 30, go up to line 3.
Q Operating procedures shall specify the requirements to limit train movement into a platform where a person has fallen onto the tracks, correct?
A Correct.
MR. GENIS: Let's go to page 253, line 8.
Q You have a known recognized hazard, true?
A True.
Q All right. So the question is what's the best way to

rectify or mitigate that hazard, correct?
A True.
MR. GENIS: Page 130, line 22.
Q So the Transit Authority identified as a known hazard type, "Where there are no protective measures in place to prevent persons from approaching the platform edge and when there is no train aligned," correct?
A Correct.
MR. GENIS: Let's go to page 134, lines 16.
Q If there was no barrier to prevent a person from having contact with the train, that person can have contact with a train, true or false?
A True.
MR. GENIS: Page 103, line 21.
Q Okay. And we can call it something else if you would like, but do we agree that the Transit Authority should have had, when you were there, an adequate and proper plan that was reasonable to prevent or reduce the number of these 12-9s from occurring?
A They should have had methods to reduce that from occurring.
Q And can we agree that the Transit Authority should have had an adequate, reasonable and proper plan to reduce the severity of 12-9 injuries from occurring, true?
A You would reduce the overall issue, okay, I guess, yes.

There was some, some things that you could do that could reduce the severity, I guess you could say.

MR. GENIS: Okay. Page 169, line 3.

Q Because it would have been part of your job to keep current with literature and publications to keep abreast of developments in your field, true?

A True.

MR. GENIS: Page 147, line 5.

Q All right. Now, by the way, what is benchmarking?

A Seeing what other properties do and comparing yourself with others.

MR. GENIS: Okay. Same page 147, line 16.

Q So, in other words, if you want to see what the benchmarks are for safety and how to prevent certain types of catastrophic or serious injuries, you can do so, true?

A Yes.

Q And it's a good and accepted practice and procedure to do so, true?

A True.

MR. GENIS: 140, line 16.

Q Okay. And there are international professional trade industry association groups for mass transit, like the New York City subway system, correct?

A True.

Q And the Transit Authority belongs to some of these

international professional trade industry groups or associations, true?
A True.
MR. GENIS: Next page 141, line 2.
Q Have you ever been a member of these international professional trade industry groups?
A As part of the Transit Authority, yes.
MR. GENIS: Let's go to 142, line 6.
Q All right. Can we agree that, and by the way, the Transit Authority belonged to both COMet and UITP, correct?
A Correct.
Q And did you also belong through the Transit Authority to COMet and UITP?
A As part of the Transit Authority.
Q Okay. And can we agree that COMet is the premiere professional trade industry group for mass transit that includes subways?
A Yes, that's a good one.
MR. GENIS: Okay. Go to page 143, line 19.
Q First of all, to make life simple, do you acknowledge the publications of COMet as being authoritative?
A Yes, they're authority, they're authority on other properties all over the world.
MR. GENIS: 142, line 18.
Q Okay. And is UITP another premier international

professional trade industry group?
A Yes.
MR. GENIS: Go to 146, line 23.
Q Well, do you recall that COMet published certain international standards and best practices and good and accepted practices and procedures, true?
A For this topic or for any? They do, yes, true.
MR. GENIS: Go to page 151, line 15.
Q Well, COMet would send out questionnaires to different transit agencies and New York City Transit would routinely fill them out and give them to COMet and then receive results of the COMet studies, correct?
A True, yes.
MR. GENIS: Page 142, line 22.
Q And do you agree that the Transit Authority gives data to COMet, correct?
A Correct.
MR. GENIS: 151, line 22.
Q So you would participate so that COMet can conduct an adequate study of the various metro systems and give feedback on best practices, what safety issues each system was having, and why, correct?
A Correct.
MR. GENIS: Page 145, line 14.
Q Do you have any reason to doubt the accuracy of the

information that COMet provides?
A No.
MR. GENIS: Page 149, line 9.
Q Were you encouraged to see internationally what other subway systems were doing and what their benchmarks and best practices were?
A Yes.
Q In fact, the Transit Authority sent people all over the world to see what other countries were doing, true?
A Correct.
Q The Transit Authority sent people to Seoul, Korea, true?
A True.
MR. GENIS: Line 25.
Q To Paris and London and other cities, true?
A Yes.
MR. GENIS: 248, line 12.
Q So, for example, on the topic of comparables, we discussed earlier if you are going to compare the New York City subway system, you have to use a comparable or an equivalent subway, true?
A True.
Q Okay. And that's why we said Paris and London were comparables but Washington, D.C. was not, correct?
A Correct.
MR. GENIS: Go to 179, line 23.

Q I'd like you to assume Mr. Prendergast testified recently that you cannot compare New York City, for example, to the Washington Metro but you have to compare it to a larger older system like that of Paris and London. Would you agree or disagree with that statement?
A Agree.
Q Okay. So, in other words, you have to compare apples to apples, a system of similar volume size and things of that nature?
A Yes, I agree.
MR. GENIS: Page 190, line 15.
Q Okay. In fact, you learned that with London and Paris, comparable subway systems, they have done retrofits to some of their subway systems, correct?
A Correct.
Q Okay. And you learned that the platform screen doors in London and Paris were also effective at preventing or reducing 12-9s from occurring, true?
A Correct.
MR. GENIS: Page 153, line 12.
Q There have been platform screen doors in use for different systems for decades now, correct?
A Correct.
MR. GENIS: Page 172, line 21.
Q Okay. Now, all right. So you and the Transit Authority

are aware of actual studies and instances of other subway systems installing platform screen doors, correct?

A Correct.

MR. GENIS: 165, line 21.

Q Okay. So was it your understanding based on international experience that platform screen doors were highly effective at preventing or reducing the number of 12-9 incidents?

A Correct.

MR. GENIS: 173, line 21.

Q And at the time you were there, and that Transit would have been aware of platform screen doors had been proven to be effective at dramatically reducing the number of 12-9s, true?

A At some properties, yes. The ones that would have them, okay.

MR. GENIS: Page 307, line 14.

Q Okay. And you told us earlier that there were studies, in fact, you got a report when you sent somebody to Korea that they were 100 percent effective at preventing 12-9s, talking about platform screen doors, true?

A Correct.

MR. GENIS: Page 165, line 6.

Q Now, let me ask you this. Do you remember a guy named Ken Brown? Did he work for you?

A Yes.

Q Was he in your division, true --

MR. GENIS: I'm sorry.

Q He was in your division, true?

A Yes.

Q And he went to India and gave you a copy of his trip report, true?

A Yes.

Q Do you recall on his trip report, he said once platform doors were installed, platform screen doors were installed and it brought down the number of 12-9 incidents to zero?

A Correct.

MR. GENIS: Page 307, line 9.

Q Okay. You told us earlier it's an important and significant fact that 12-9s can be prevented or dramatically reduced by platform screen doors, correct?

A They can be reduced, yes.

MR. GENIS: Page 191, line 2.

Q And you learned that there were no hazards associated with the platform screen doors in London and Paris, true?

A Well, to them, yes.

MR. GENIS: Page 213, line 15.

Q Okay. Are you aware of any city in the world that has ripped out the platform screen doors, removed them because of problems with them?

A No.

MR. GENIS: Page 167, line 17.

Q Okay. So, for example, we're mentioning platform screen doors and platform screen doors can have different heights, correct?

A Yes.

Q You can have full height, three quarter and half, etc., true?

A True.

Q There's also platform edge doors and APGs, platform gates, correct?

A Gates, okay, yes.

Q And there's also other types of devices to prevent people creating a barrier to prevent people having contact with the train, correct?

A Correct.

MR. GENIS: 185, 19.

Q While you were the head of the Office of System Safety for the New York City Transit Authority, you were aware that the Transit Authority published and issued an RFI, request for information, seeking manufacturers of platform screen doors, to submit proposals to install them in the City of New York in our subway system in exchange, at little or no cost to the subway system in exchange for getting ad revenue, advertising revenue?

A I remember that, yes.

MR. GENIS: And we're on 186, line 11.
Q Well, do you recall a number of manufacturers responding to the Transit Authority's RFI?
A Correct, a number.
MR. GENIS: Page 188, line 9.
Q And you're aware that there was an offer to get funding for installation of platform screen doors if the Transit Authority established a standard for new construction, new stations, to have platform screen doors, true?
A I don't recall.
Q Okay. Would that be significant to you?
A It would be good, sure.
MR. GENIS: Page 189.
Your Honor, we have plaintiff's Exhibit 27, I would offer into evidence.
THE COURT: There's no objection that I have here so we'll allow that into evidence at this time.
MR. GENIS: Thank you.
(Plaintiff's Exhibit 27 so marked.)
Q All right. So you were looking at this exhibit.
MR. GENIS: Question on line 189.
Q So you saw how in terms of having the standards to require platform screen doors that Andrew Bata was in favor of?
A Yes. On new.

MR. GENIS: Okay. And 190.
Yes, we're continuing what you just said.
A Designs, uh-uh, on new lines or --
Q Okay. And, in fact, Mr. Bata thought that should have been the standard ten years earlier, correct?
A Yeah. Go back down. Yes, he did, um-hmm.
Q Okay. All right. And what was your position on that?
A If it was new construction, and it could be designed into it safely, that would be, that would be good.
MR. GENIS: Page 170, line 24.
Q Okay. There's also what's known as fixed rail, true?
A True.
Q And fixed rail was in existence for over a hundred years in the City of New York, correct?
A Okay. Correct.
Q And the purpose of a fixed rail is also to create a barrier to prevent 12-9s from occurring, true?
A You mean like a gate?
Q Yes.
A Is that what you're talking about?
Q Sure. A gate. A rail. Sure.
A It could be, yes.
MR. GENIS: Going to line 19.
Q Okay. Well, does a fixed rail provide same areas of safety for customers on a platform?

A I can't give you a yes or no.
MR. GENIS: 1469, line 14.
Q All right. Are you familiar with track intruding devices known as TIDs?
A Yes.
Q Okay. And those are devices to say whether or not a body is on a track bed, correct?
A Correct.
Q And this way, if there's an electronic notification through the TIDs system, that can be relayed to a train operator so they stop the train before they run over somebody, true?
A True.
Q And before they hit somebody, true?
A Correct.
Q Okay. We mentioned briefly closed circuit TV, how they have a cameras in the station by the platforms and you can have a live video to the train so that the train operator actually sees before he or she enters the station if anybody is on the track on the edge of the platform, true?
A That's one of the detection devices, yes.
MR. GENIS: Page 208, line 20.
Q All right. So as a result of this study, you learned that CCTV could be useful, true?
A True.

Q And you learned that CCTV could be effective, true?
A True.
MR. GENIS: Page 38, line 11.
Q Safety means the freedom from conditions that can cause death, injury, occupational injury or illness, true?
A True.
MR. GENIS: Going to page 35, line 25.
Q Okay. Hazard, a real or potential condition that could lead to an unplanned event or series of events, i.e., mishap, resulting in death, injury or occupational injury, true?
A True.
MR. GENIS: I'm sorry. "Occupational illness," it said.
A True.
MR. GENIS: Page 35, line 16.
Q Okay. First, acceptable risk. Can we agree that risk, that is, that the appropriate accepted authority is willing to accept without additional mitigation?
A True.
MR. GENIS: Page 36, line 20.
Q Mishap. Do we agree that the definition of that is an event or series of events resulting in unintentional death, injury or occupational illness?
A True.
Q Mitigation measure, an action required to eliminate the

hazard or when a hazard cannot be eliminated, reduce the associated risk by lessening the severity of the resulting mishap or lowering the likelihood that a mishap will occur?
A True.
MR. GENIS: Page 67, line 8.
Q Okay. Let's discuss reducing risk. Do we agree that mitigation measures are selected and implemented to achieve an acceptable risk level?
A True. They, they all go together though.
Q Okay. So you present the current hazards, their associated severity and probability assessments, and the status of risk reduction efforts in technical reviews, correct?
A Yes, in some type of assessments.
MR. GENIS: 64, line 20.
Q The system safety design order of precedence involves alternative mitigation approaches and lists them in order of decreasing effectiveness, true?
A True.
MR. GENIS: Page 45, line 5.
Q Okay. Let's try it this way. Have you ever heard of hazard tracking, of a hazard tracking system?
A Yes.
Q Okay. And do we agree that a hazard tracking system would include, at a minimum, the following data elements:

One, identify hazards; Two: Associated mishaps; Three: Risk assessment including initial target and events; next. Identify risk mitigations measures; next, selected mitigation measure; next, hazard status; next, verification of risk reductions; and risk acceptance, true?

A True.

MR. GENIS: Let's go to 150, line 4.

Q Okay. And an important thing to look at are key performance indicators, KPI, correct?

A Yes.

Q And another thing to look at are safety performance indicators, SPI, correct?

A Correct.

MR. GENIS: Line 11.

Q And while you were at the Transit, you would be asked to collect data, evaluate the data and study that data, correct?

A Correct.

Q And you would evaluate risks and hazards and give that information to the president and other decisionmakers at Transit about safety issues, true?

A True.

Q And that information will be documented by your office and other agencies within the Transit Authority about what was causing injuries, the frequency of the injuries, the probabilities of the injury, the severity of the injuries, so

that you could figure out the cause and how to mitigate the frequency and severity of the injuries in the future, true?
A Yes, for various things.
MR. GENIS: Okay. Page 28, line 12.
THE COURT: So let me ask you, how much longer do you have?
MR. GENIS: I don't know the time but a bit, Your Honor.
THE COURT: Can you estimate? Because we want to know when to let the jurors have their lunch.
MR. GENIS: I can break any time you like and resume later.
THE COURT: Give me some idea of how much longer you have?
MR. GENIS: About a half an hour is my guess.
THE COURT: All right. So, you know, because it's not a live witness, I can't move you along, but I want to avoid repetition.
MR. GENIS: Understood.
THE COURT: Well, let's go to 12:30 and we'll break at that time.
MR. GENIS: Okay.
Page 28, line 12.
Q Okay. Good. Now let's discuss hazard analysis. Have you performed hazard analysis for the Transit Authority?

A Yes.

MR. GENIS: Page 131, line 4.

Q Okay. Now do we agree that hazard analysis is important?

A Yes.

Q It's very important for safety, correct?

A Correct.

MR. GENIS: Page 28, line 16.

Q Okay. Do we agree that there are good and accepted procedures that are to be followed in performing hazard analysis?

A Yes.

Q Do we agree that there are certain professional standards of care that are supposed to be complied with when performing a hazard analysis?

A There are standards and guidelines that you can use to perform hazard analysis.

MR. GENIS: Page 29, line 12.

Q Okay. And the way that one has an adequate reasonable and proper hazard analysis is by following good and accepted practices and procedures in performing the hazard analysis, correct?

A Correct.

Q The way one performs an adequate, reasonable and proper hazard analysis is by complying with professional standards of care, true?

A There are guidelines and procedures that we follow to do a hazard analysis.

MR. GENIS: Page 30, line 2.

Q And one must follow the proper methodology in order to perform an adequate reasonable and proper hazard analysis, true?

A Yes.

MR. GENIS: Page 21, line 2.

Q So in order to do a proper adequate reasonable review and analysis, you have to use standard performance indicators, true?

A True.

Q And you have to base any opinions you have on hard fact and data, true?

A True.

Q And you have to base your opinion on safety performance or lack thereof, true?

A I -- true. I -- yes.

MR. GENIS: Page 55, line 13.

Q Do we agree that identifying and documenting hazards, you should use mishap data, true?

A True.

MR. GENIS: Page 246, line 24.

Q Now, do we agree that when doing an analysis, it has to be based on the fact and the data, not on speculation, guesses

or hypothesis, true?
A True.
MR. GENIS: Page 242, line 16.
Q And if you don't do anything with the data or for the statistics, then it's not valid for safety, true?
A True.
MR. GENIS: Page 247, line 5.
Q So to do a proper adequate reasonable study, you have to compare the probabilities of any hazard you've identified, true?
A You have to look at the probabilities, yes.
Q And then so you have to -- so we looked at that matrix, you have to look at the frequency and you have to look at the severity, correct?
A Correct.
Q And this is how you compare apples to apples as opposed to oranges to oranges, correct?
A Correct.
MR. GENIS: Page 253, line 15.
Q And a proper method and adequate method of assessing, analyzing and study is to look at the different consequences or outcomes by using the different applicable possible methods, true?
A True.
Q And you could see that device A is far more effective at

preventing both in terms of severity of injury and in terms of frequency and occurrence than something category B or C, true?
A True.
MR. GENIS: Page 31, line 19.
Q Do we agree that an adequate reasonable and proper hazard analysis has certain hallmarks?
A Certain what?
Q Hallmarks.
A Correct.
Q Okay. For example, the hazard analysis, in order to be adequate, reasonable and proper, must be complete, true?
A True.
Q The hazard analysis must be accurate in order to be adequate, reasonable and proper, true?
A True.
Q The hazard analysis must be thorough in order to be adequate, reasonable and proper, true?
A True.
Q The hazard analysis must be honest in order to be adequate, reasonable and proper, true?
A True.
Q The hazard analysis must be objective in order to be adequate, reasonable and proper, true?
A True.
Q And the hazard analysis must be based on objective data

in order to be adequate, reasonable and proper, true?
A True.
MR. GENIS: Page 30, line 6.
Q Okay. Because if one does not follow the proper methodology in performing the hazard analysis, that would result in an inadequate, unreasonable and improper hazard analysis, true?
A True, if you're not going to follow the, the -- true. Okay.
Q And the same is true; if one does not follow good and accepted practices and procedures, then the hazard analysis would be inadequate, unreasonable and improper?
A There are many ways to perform hazard analyses.
MR. GENIS: Line 23.
Q Can you answer my question, please?
A Ask it again.
MR. GENIS: The question was read back.
Q And the same is true? If one does not follow good and accepted practices and procedures, then the hazard analysis would be inadequate, unreasonable and improper, true?
A True.
MR. GENIS: Page 178, line 19.
Q But if an analysis is not done properly, can we agree that the study is inadequate, improper and unreasonable?
A Yes.

MR. GENIS: Page 254, line 5.
Q And that's what a proper, adequate, reasonable study does, is it looks at the whole picture?
A Okay.
Q And evaluates everything?
A Um-hmm. Um-hmm.
Q And then comes to the logical rational conclusion based on the data and the statistics, true?
A True, but there's more to it.
MR. GENIS: Page 32, line 25.
Q Now, do we agree that the New York City Transit adopted, incorporated, used and followed the practices, procedures and methodology for performing a hazard analysis as set forth in the United States of America military standards?
A Yes, true.
Q In fact, you used Standard 882E in your analysis, correct?
A When I first started, it was C, then D, now E.
Q And not only did the Transit adopt, incorporate and use and follow the practices, procedures and methodology for properly performing a hazard analysis as set forth in USA military standards, you did it, you did as well, true?
A True.
Q And you used the military standards because it is an authoritative source, true?

A True.

MR. GENIS: Page 216, line 24.

Q So I just want to make sure I'm crystal clear with you.

So, yes, you or the Transit Authority followed the methodology and complied with the requirements of military standard 882E in performing your hazard analysis of 12-9s? Yes or no. You did not?

A Not of 12-9s. We did an analysis but not in accordance with 882.

Q Okay.

A Which is okay.

MR. GENIS: Page 57, line 7.

Q And those tables list how to do this proper analysis, correct?

A If you're referring to hazard severity and probability of occurrence, and the items listed there, there is verbiage that describes each one.

MR. GENIS: Your Honor, with your permission, it's already in evidence and this is the document the witness is being questioned on that I can put up to the jury again.

THE COURT: You want to offer something in evidence now?

MR. GENIS: It's already in evidence, Your Honor.

THE COURT: All right. We want to take our lunch break. How many more questions do you have about this?

MR. GENIS: I'm sorry. What was your question, Your Honor?

THE COURT: Just give us an idea because I haven't decided whether to have lunch, how many questions on this topic.

MR. GENIS: I'm going to guess about 15 minutes or less.

THE COURT: Just do this one and we're going to take our lunch break.

MR. GENIS: Sure. Whatever you like, Judge.

Page 57.

THE COURT: You're referring to an exhibit in evidence which is Exhibit No. 40-A, right?

MR. GENIS: We made the main one 40 and since this is a blowup of it, we made this 40-A.

THE COURT: The blowup is 40-A. It's only for demonstrative purposes only. You have Exhibit 40 in evidence. Go ahead.

MR. GENIS: Thank you.

Page 57, line 2.

Q Okay. And in that military standard, you have definitions tables, true?

A True.

Q And those tables show you how to do this properly?

A If you're referring to severity and probability of

occurrence, and the items listed there, there is verbiage that describes each one.

Q Thank you. So you anticipated my next question.

Severity categories and probability level tables, correct?

A Correct.

Q And then you use risk assessment matrix, correct?

A Correct.

Q And all of these three tables are listed in military standard 882, correct?

A Correct.

MR. GENIS: Would you like me to break for lunch now or keep going, Judge? Whatever you want.

THE COURT: All right. If you're finished with this, we'll take a lunch break at this particular time.

Members of the jury, we'll come back at 1:30. Don't talk about the case. We'll see you then.

(Jury exits.)

THE CLERK: You can all be seated.

All right. The jury is out.

You can step down.

THE COURT: So, Mr. Genis, let me know what you have planned now.

MR. GENIS: Sure.

THE COURT: You're the lawyer. Whether you're

losing the jury or not, that's up to you to assess. You're getting very repetitious. If the witness was here testifying, I would have asked questions to move it along. Be mindful of that. All right? I don't want to be critical of you to a fault in front of the jury.

MR. GENIS: Thank you.

THE COURT: But you're getting repetitious and you're losing me. I don't know about the jurors. I don't think you want to do that.

MR. GENIS: Point taken.

THE COURT: All right.

MR. GENIS: During the lunch break, I'll look through it.

THE COURT: Sometimes, you know, too much of a good thing is a bad thing.

MR. GENIS: I hear you. I'll try to edit at the lunch break.

THE COURT: I admire your energies and effort. I can appreciate you spent a lot of time preparing for this trial, it's obvious, but now you're trying the case before a judge and a jury and you have to be a little more realistic about not putting people to sleep and not being repetitious and I don't want to be too critical of you.

What do you have now in store for us? Do you want another half hour of this testimony?

MR. GENIS: No, I think less than a half hour. I'm going to guess 15 minutes. As I said during the lunch break, I'll try to edit it down.

THE COURT: If you want to read any of the deposition testimony, you can do that now. If you feel any of it is something that the jurors should hear, you can do that. All right?

What do we have after that that's going to bring us maybe close to 2 o'clock?

MR. GENIS: We have the current head of the Office of System Safety, Mr. Timothy Doddo, D-O-D-D-O.

THE COURT: Will he be here by about 2 o'clock?

MR. KEAVENEY: He will be here at 2 o'clock.

THE COURT: So we can move ahead, right?

MR. GENIS: Yes.

THE COURT: And give me some sort of a sense of how much time you are going to take with that witness?

MR. GENIS: You know. I just kind of assumed, between myself and Andrew, it will be the full afternoon. That's what I guess.

THE COURT: Well, it probably won't be the case.

Is there anybody else after that that you are going to call as a witness on liability?

MR. GENIS: Not today, Your Honor. What I can do is we can pull a deposition of a past president, Mr. Lawrence

Reuter, and I can read portions of that.

THE COURT: If you have any other deposition testimony, we want to use the jurors' time.

MR. GENIS: Okay.

THE COURT: All right? So you think about that.

MR. GENIS: Sure.

THE COURT: All right. And then tomorrow, we have scheduled a full day and I have a feeling that you may not be prepared to finish your liability testimony tomorrow.

MR. GENIS: Correct. I have another witness that we've also subpoenaed for tomorrow, Mr. Glenn Lunden. We're down on Friday.

THE COURT: Let me know what you have for tomorrow.

Are we going to have a full day of testimony tomorrow?

MR. GENIS: We have Mr. Lunden and then Mr. Abdallah.

THE COURT: I don't know what that means.

MR. GENIS: It's two witnesses.

THE COURT: I don't know whether it's going to take the morning or the whole day, but it probably won't be the whole day.

What other liability witnesses do you have to call?

MR. GENIS: Well, not for this week, Your Honor, but we have two expert witnesses.

THE COURT: You have your experts?

MR. GENIS: Yes.

THE COURT: Do you have any other liability witnesses --

MR. GENIS: Yes.

THE COURT: -- other than your experts?

MR. GENIS: Yes.

THE COURT: Who?

MR. GENIS: George Brown who was an eyewitness to this incident and we also have that 911 call to play.

THE COURT: The 911 call will be in evidence.

George Brown you have as a witness, right?

MR. GENIS: Yes.

THE COURT: He can come tomorrow to testify.

MR. GENIS: Okay.

THE COURT: What else do you have? We're going to finish the liability part short of experts tomorrow. What else do you have?

MR. GENIS: Okay. I still have my client but she's liability and damages, but I wanted to wait until after the doctor testified.

THE COURT: So have your client ready because we're going to have a full day maybe up until 4:30 or thereabout tomorrow just so you know that. All right?

MR. GENIS: Okay.

THE COURT: So we could actually finish. Your experts are not going to be available until, when, Monday?

MR. GENIS: No. Monday, I have the doctor and economist coming in. So the liability experts are going to be when we come after that.

THE COURT: Why can't we have them come before?

MR. GENIS: Because I've already scheduled the doctor and he's actually going away on vacation.

THE COURT: You scheduled --

MR. GENIS: But he's going on vacation.

THE COURT: So let's go off the record to just talk about scheduling, nothing substantive.

MR. GENIS: Sure. Okay.

(Off the record.)

(Luncheon recess.)

AFTERNOON SESSION

(In open court.)

(Parties present.)

COURTROOM DEPUTY: You can all be seated.

THE COURT: Mr. Genis, continue with your deposition read.

MR. GENIS: All right. I'm going to play a little bit because I took out a lot of pages during the break.

Start on Page 176, Line 8.

If you like, I have another transcript if it's easier for you.

MS. LOGAN: No.

MR. GENIS: Question.

"QUESTION: Okay. So we're performing a study you have to study the pertinent issue; correct?"

"ANSWER: Correct.

THE COURT: Okay. Now, same page, go to Line 16.

"QUESTION: Well, if you don't study the pertinent issue, can we agree that the study by definition would be improper, unreasonable, and inadequate?"

"ANSWER: Yes. If that's how you're phrasing it."

MR. GENIS: Now, go to 175, Line 9.

"QUESTION: But all I'm asking you now is, okay, could we agree that there is a difference between studying

effectiveness of a safety device as opposed to studying how to adopt and use that device here?"

"ANSWER: Yes."

MR. GENIS: 176, Line 3.

"QUESTION: Okay. Because there's no need to study what's already been studied and established; correct?"

"ANSWER: If it was studied, yes."

MR. GENIS: 175, Line 15.

"QUESTION: Okay. So, in other words, the Transit Authority and yourself were aware that their platform screeners were effective so that was -- it was not necessary to study that; true?"

"ANSWER: True.

MR. GENIS: Page 245, Line 3.

"QUESTION: But the last part is the most important part, correct? Because you're already aware platform screen doors can be installed, can be retrofitted, and are effective. So the only question is: How can we best adopt them here; correct?"

"ANSWER: Yes."

"QUESTION: And that's the only thing that really should be studied; true?"

"ANSWER: Right."

MR. GENIS: 175, Line 21.

"QUESTION: Okay. So the only kind of study that

would make sense to do is to do a study to see how do we best adopt platform screen doors or some other safety device to our system; true?"

"ANSWER: True."

MR. GENIS: Page 268, Line 2.

"QUESTION: And as we sit here today, you don't know how many pilot projects were cancelled for platform screen doors; correct?"

"ANSWER: Correct."

"QUESTION: And as we sit here today, you don't know why they were cancelled; correct?"

"ANSWER: Correct."

MR. GENIS: Page 18, Line 19."

"QUESTION: Okay. And we agreed that performing adequate, reasonable, and proper hazard assessments and make reasonable safety plans to mitigate these hazards was an extremely important part of your job in your department?"

"ANSWER: True."

MR. GENIS: Page 78, Line 19.

"QUESTION: Okay. Now, let's talk about the System Safety Program Plan and its -- what's that supposed to do."

MR. GENIS: 78, Line 19 I was reading.

"ANSWER: Okay."

MR. GENIS: Line 23, continuing.

"QUESTION: Should that be an integral part of the System Engineering Management Plan; correct?"

"ANSWER: The System Safety Program Plan is the overarching plan that manages safety at, at New York City Transit or all transit properties."

MR. GENIS: Same page, Line 15.

"QUESTION: Well, do you agree that the System Safety Program Plan shall detail the tasks and activities that are required to implement a systemic approach of hazard analysis, risk assessment, and risk management?"

"ANSWER: Yes.

MR. KEAVENEY: Your Honor, we have an objection about the System Safety Program Plan that we talked about yesterday.

THE COURT: Well, I don't know enough about it. Let me hear a little bit more.

MR. GENIS: Going to Page 41, please.

THE COURT: What is the nature of the objection? You don't think the safety plan should be questioned?

MS. WINTERS: This was a subject of the motion yesterday, Your Honor.

MR. GENIS: You already allowed it in evidence?

THE COURT: It's already in evidence, yes.

MR. KEAVENEY: The pages of it, not the whole thing.

THE COURT: I'm sorry, I don't have a clear understanding of what your objection to it is. You want to be clear and articulate now, do it. And we'll see whether we have to talk about it.

MR. KEAVENEY: It was a legal issue.

THE COURT: It's a what?

MR. KEAVENEY: It was a legal issue, the reason.

THE COURT: A legal issue about the introduction of the testimony or the evidence?

MR. KEAVENEY: The evidence.

THE COURT: About the evidence, the testimony, that you are about to hear?

MR. KEAVENEY: The testimony that she referenced about what the System Safety Program Plan was.

THE COURT: That she referenced about what the plan was?

MR. KEAVENEY: Right; and what its purpose was.

THE COURT: I think it's perfectly okay. You can question.

Go ahead.

MR. GENIS: Thank you. Page 41, Line 12.

"QUESTION: System safety engineering and engineering discipline that employs specialized knowledge and skills in applying scientific and engineering principles criteria, and techniques to identify hazards and then to

eliminate the hazards or reduce the associated risks when the hazards cannot be eliminated; true?"

"ANSWER: True."

MR. GENIS: Page 79, Line 25."

"QUESTION: Okay. The goal of the System Safety Program Plan be that when the hazard cannot be eliminated, the associated risk should be reduced to the lowest acceptable level?"

"ANSWER: Yes, that's part of the System Safety Program Plan pieces of it, yes."

MR. GENIS: Go to Page 42, Line 6.

"QUESTION: The target risk, the projected risk level, when, I'm sorry, the projected risk level the project manager plans to achieve by implementing the mitigation measures consistent with the design order of precedent, true?"

"ANSWER: True."

MR. GENIS: And Page 80, Line 24."

"QUESTION: That's okay. At a minimum, with respect to hazard analysis, the System Safety Program Plan shall describe the processes for hazard identification, risk assessment, risk mitigation, risk communication, and support to risk acceptance; true"?

"ANSWER: True."

"QUESTION: Okay. And for risk assessment, the

System Safety Program Plan shall list the severity of categories, probability levels, and risk assessment codes that shall be followed; true?"

"ANSWER: It can either left them in the plan or refer to them in the plan."

MR. GENIS: All right.

"QUESTION: Now, let's discuss supporting data. At a minimum, the System Safety Program Plan shall describe the approach for collecting and processing pertinent hazard mishap and lessons learned data; true?"

"ANSWER: True."

MR. GENIS: Go to Page 215, Line 15.

"QUESTION: Okay. Did anybody whether it be you or anyone from the Transit Authority ever study the difference, and I'm talking about the number of either fatalities or serious injuries between leaving the system as it was versus adding safety devices like we've been discussing today?"

"ANSWER: No, but adding the safety devices -- I'll just say no."

MR. GENIS: 214, Line 15.

"QUESTION: Did you or anybody from the Transit Authority ever do a study to see how to best reduce the number of lines in the Atlantic Avenue Barclay Center subway station?"

"ANSWER: No."

"QUESTION: Okay?"

"ANSWER: Not to my knowledge, anyway."

MR. GENIS: Page 220, Line 24.

"QUESTION: Hold on a second. Did you do an assessment for the number of injuries that would occur whether there was a barrier of any kind whether it was a platform screen door regardless of height, a fixed rail, a gate, anything at all compared to not having such a device?

"ANSWER: No."

"QUESTION: Did you do an assessment of the severity of injuries when there was such a barrier regardless of the height, the platform screen door, or if it's a PED or an APG?"

"ANSWER: No."

MR. GENIS: I'm going skip that, Judge.

Page 221, Line 14.

"QUESTION: Okay. Did you do an assessment of the number of injuries and the severity of injuries if it's a fixed rail or no fixed rail?"

"ANSWER: No."

MR. GENIS: That's it, Judge.

There should be a witness, I believe, outside.

With your permission, I'll go get him and I could start with the next witness.

THE COURT: All right. So are you completed now?

MR. GENIS: Yes.

THE COURT: Mr. Keaveney, do you have any of the deposition you wish to read into evidence?

MR. KEAVENEY: We do, your Honor. But since the witness is here, the live witness, I would like him to go on so he's not here for longer than he needs to be. And then we'll ready if there's time at the end of the day.

THE COURT: All right. So you have something else you would like to read from the deposition testimony?

MR. KEAVENEY: We would like the witness to go on first.

THE COURT: To accommodate, let's do that. I use the word live advisedly. The witness is here, let's do it.

(A brief pause in the proceedings was held.)

(Witness takes the witness stand.)

THE COURT: Come up here.

COURTROOM DEPUTY: What's the witness's name.

THE WITNESS: Timothy Doddo, D-o-d-d-o.

COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm that the answers and the testimony that you are about to give to the Court will be the truth, the whole truth, and nothing but the truth.

**TIMOTHY DODDO**, called by the Plaintiff, having been first

duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

COURTROOM DEPUTY: Please have a seat. State your full name for the record.

THE WITNESS: Timothy, T-i-m-o-t-h-y. D-o-d-d-o.

THE COURT: Your witness, Mr. Genis.

DIRECT EXAMINATION

BY MR. GENIS:

Q You're here pursuant to subpoena today, correct?
A Yes.
Q What, if anything, did you review to prepare for today?
A I spoke briefly a few minutes ago with Mr. Keaveney.
Q Did you review any documents or do anything else to prepare?
A No.
Q Have you reviewed any transcripts?
A No.
Q Have you been working with the Transit Authority for 25 years?
A Approximately, yes.
Q Okay. And the New York City subway system is a system; correct?
A Yes.
Q And the Transit Authority gave you training to perform your duties; true?

A True.
Q And in 2000, you came to the New York City Transit Authority Office of System Safety and the Hazard Analysis Unit, correct?
A Correct.
Q And you were a system safety specialist; true?
A Yes.
Q And your duties were responsible for supporting the hazard analysis that occurred; true?
A Yes.
Q You would go into the field and do various observations and take data; true?
A True.
Q And then you would file, assist your superior who is editing, and you're involved in editing the System Safety Program Plan?
A Yes.
Q You were involved in some other auditing activities to ensure compliance with the System Safety Program Plan?
A True.
Q And then you would respond to certain types of incidents you would look to see in there were trends to the facilities; correct?
A Yes.
Q And then you went to work for the Long Island Rail Road

for a period of time; correct?
A Correct.
Q And that's, like New York City Transit, that's part of the MTA; correct?
A Correct.
Q And you became the manager of hazard statement for the Long Island Rail Road; correct?
A Yes.
Q And, again, you would look at things based on trends and results of investigations; correct?
A Yes.
Q And when we talk about trends, we're talking about accident trends like the way people are getting hurt; correct?
A Yes, among others.
Q Okay. And you would prioritize based on the accommodation of frequency and severity; correct?
A Prioritize what, I'm sorry.
Q Your analysis of trends, accident trends?
A Yes.
Q Okay. And then you came back to the New York City Transit from Long Island Rail Road; correct?
A Correct.
Q When did you come back to the New York City Transit Authority?

A 2018.
Q Well, in 2017, didn't you become the New York City Transit Senior Director of Hazard Assessment?
A Yes, 2017. Apologies.
Q No worries.
And then, at some point, you became Vice President of the Office of System Safety; correct?
A Correct.
Q So above you is just the president; correct?
A Incorrect.
Q Who is above you?
A Senior Vice President of Safety and Security.
Q Got it. Okay. And you were also a co-chair of the Track Safety Task Force; correct?
A Correct.
Q All right. And based on your education, training, and experience, are you familiar with good and accepted safety practices and procedures in operating a mass transit subway system?
A Yes.
Q And based on your education, training, and experience, are you familiar with the professional standards of care in safely operating a mass transit subway system?
A No.
Q Sir, were you asked the following -- were you asked the

following question?

MR. GENIS: Line 13.

MR. KEAVENEY: Your Honor, I have an objection regarding this transcript it's from a different case and that was not completed.

THE COURT: What is it that you want to ask him now?

MR. GENIS: If he gave this certain testimony under oath.

MR. KEAVENEY: Your Honor, this is from another different case from a deposition that was not completed. We didn't have a chance to question the witness. It was a deposition --

THE COURT: I heard nothing about this. You have deposition testimony of this witness, what's your question?

MR. GENIS: Yes.

THE COURT: I'll rule on it as you ask him questions.

MR. GENIS: Okay.

Question, Line 13.

"QUESTION: And based upon your education, training, and experience, are you familiar with professional standards of care in safely operating a mass transit subway system?"

Answer --

MR. KEAVENEY: Judge, do you want to hear the question, not the answer.

THE COURT: That's the question.

MR. GENIS: Yes.

THE COURT: There's an answer to that?

MR. GENIS: Yes. Then there's another question or two.

THE COURT: Let me hear the answer.

MR. GENIS: Sure. The anticipates first?"

"ANSWER: Again I don't operate the system, sir."

"QUESTION: I said for safety. Do you need the question read back, we'll read it back."

"ANSWER: Yes, please."

THE COURT: Look, let's try to understand this.

Do you have any knowledge or experience in this area that we're talking about?

THE WITNESS: I have knowledge and experience in safety, yes, sir.

THE COURT: Knowledge about what?

THE WITNESS: I'm a certified safety professional, so I have an understanding of general safety principles and I have experience with New York City Transit and knowledge of its safety plans.

THE COURT: What exactly do you do in dealing with safety issues for the New York Transit Authority?

THE WITNESS: We're responsible for technical and professional oversight of the safety program as a whole. So we care for the Safety Program Plan which describes how we comply with the safety standards that are required to run a transit system.

THE COURT: So you know all about the safety plans that were enacted by the Transit Authority, is that what you're testifying about?

THE WITNESS: Correct.

THE COURT: I'll allow him to question. What's your next question?

MR. GENIS: Thank you.

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q And according to the professional standards of care of a mass transit entity with respect to safety, when there are train strikes three to five times a week resulting in death or catastrophic injury that calls for the Transit Authority to take effective corrective --

THE COURT: I don't like the question. It rambles, it's confusing. He's here, ask him questions. He's a live witness. You don't have to read from the deposition testimony. That's the problem, it goes on and on and has many parts to it and you can ask more focused,

simple questions like I can. I'll he let you do it in the first instance before I do it.

MR. GENIS: Sure.

EXAMINATION BY
MR. GENIS:
(Continuing.)

Q You just told us you were familiar with professional standard of care of a mass transit entity; correct?

A Correct.

THE COURT: He said that.

Q And one of the things you look at with safety is frequency of hazards; correct?

A Yes.

Q And when you have a hazard that results in death or catastrophic injury three to five times a week, according to those standards, are you supposed to take effective corrective action?

A Yes.

Q Okay. And the corrective action is to prevent or reduce the number of deaths and injuries due to the hazard of train service?

THE COURT: What corrections do you know, if any, that was taken to deal with this obviously unfortunate situation?

MR. GENIS: That's before August 2nd of 2016.

THE COURT: Before August 2, 2016.

THE WITNESS: Every incidence of that nature is investigated for root causes. If those root causes are due to an operational or a system defect, the corrective action will be put into place. My office would oversee those corrective actions or certain criteria-type incidences.

THE COURT: That's great. I don't know what corrective actions you're talking about. Maybe you can tell the jury what you're talking about.

THE WITNESS: Sure. That would be highlighted platform edges. There are tactile strips of a certain width to warn those that are sight impaired of that platform edge. There are announcements. There's multimedia knowledge-based awareness campaigns that we put out.

THE COURT: What did you do?

THE WITNESS: We would --

THE COURT: I hear all these words, but I want to know what you did. You had these issues, you know there were problems there, you tried to address dress them; right?

THE WITNESS: Right.

THE COURT: What specifically did you do before August 2, 2016?

THE WITNESS: We would speak with our public relations department to make sure the messages were on par with the trends that we were --

THE COURT: You have a PR firm?

THE WITNESS: No, internal.

THE COURT: Internal PR?

THE WITNESS: Yes.

THE COURT: And you asked them to do certain things?

THE WITNESS: We do announcements at the station before the trains arrived, posters at stations.

THE COURT: What do they do? I mean, internal analysis, what is it all about? What did they find out? What did they do?

THE WITNESS: In a vast majority of the cases, we find that there was no operational or system defect. So we attributed the incident to that our customers needed to be aware to stand away from the platform edges. So we did all the things that we could to try to get people to do that.

THE COURT: What exactly -- you found no incidences, is that what you're telling me?

THE WITNESS: The incidents that we looked at, the cause was not that there was a system defect or an operational issue, it was that people needed to be more aware to stand away from the platform edge.

THE COURT: So what you did is what you do to make them more aware? Did you use signs? You can tell the jurors. Did you do anything?

THE WITNESS: Yes, we put --

THE COURT: Aside from talking to each other, did you do anything?

THE WITNESS: Yes. We put various posters up. There were commercials. There's a website with safety links that are used. I believe they used even the fare media, they would put stand away from the platform edge on the back of the fare media. We used as many queues as possible to try to bring folks away from the platform edge.

THE COURT: You had television announcements and radio announcements?

THE WITNESS: Both.

THE COURT: Anything concrete here?

THE WITNESS: I'm not sure exactly at that time what was done. But I'm aware that we have used newspapers, we have used radio announcements, we used announcements on the PA system within the system.

THE COURT: What do you say in the announcements? Be careful?

THE WITNESS: Stand back from the platform edge, the train is approaching. We'd also had, previous to COVID, very, very crowded platforms, so we'd actually assign platform conductors that would cause folks to move back from the platform edge until the train is fully berthed.

THE COURT: You hired conductors who had to watch

people to make sure they weren't too close to the tracks?

THE WITNESS: Correct.

THE COURT: Anything else you did?

THE WITNESS: Other than what I mentioned about the highlighted yellow platform strips, tactile strips awareness campaigns.

THE COURT: Did you put the yellow strips down --

THE WITNESS: Yes.

THE COURT: -- at all the stages?

THE WITNESS: Yes. The platform edges are highlighted yellow. And the platform strips are approximately two and a half feet from the platform edge highlight the platform edge, it's not a good place to stand.

THE COURT: What if somebody was standing five feet away or six feet away? Did you do anything about those people?

THE WITNESS: No, that's...

THE COURT: What others questions do you have?

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q So if somebody is standing five feet away, that's where they're supposed to be; correct?

A That would be away from the platform edge.

Q Okay. Now, you just talked about the different

measures taken when the judge asked you.

Do you agree that the signs and announcements have not been effective at reducing the number of train strikes resulting in death and catastrophic injury?

A I can't draw that conclusion.

THE COURT: You don't know one way or the other whether the signs made a difference?

THE WITNESS: Correct.

Q Sir, were you asked this question under oath and did you give this answer on Page 286, Line 2.

Question --

MR. KEAVENEY: Your Honor, I have a running objection with using the transcript from another case in which we didn't have an opportunity to question the witness.

THE COURT: This is relating to his testimony about the subject?

MR. GENIS: Yes.

THE COURT: I'll allow it. I don't care whether it's used in another case or not.

MR. KEAVENEY: My objection, though, your Honor, is that the deposition itself was not complete. He was subpoenaed for that deposition and --

THE COURT: I'll allow you to ask him questions. In the meantime, he testified under oath, these were questions that were taken under oath, and these were

answers. Ask the questions that I assume it relates to what we're talking about in court.

MR. GENIS: Yes.

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q Were you asked this question and did you give this answer under oath?

"QUESTION: You agreed that the signs and announcements have not been effective at reducing the number of train strikes resulting in deaths and catastrophic injuries; true?"

"ANSWER: True."

Were you asked that question under oath and did you give that answer?

A I don't recall.

THE COURT: You don't recall that.

Doesn't matter whether it was this testimony or some other testimony. Any time a witness testifies under oaths relevant to the case you can use it.

All right. Let's go.

Q Were you asked this question on page Page 236, Line 10:

"QUESTION: So they were not effective; correct?"

"ANSWER: Correct."

Did you give that answer?

A I don't recall.

THE COURT: You don't know whether it was effective or not, is that what you're saying now in court?

THE WITNESS: Yes, sir.

THE COURT: Okay.

Q But did you previously testify, and I can go through all of them, that you said they were not effective?

THE COURT: Did you ever testify that they were not effective, that's the question.

THE WITNESS: I may have. You have it written in front of you if that's the case.

Q And, sir, if you don't change the behavior of the customers, right, that's what that's announcements and signs you are trying to do; correct?

A Correct.

Q So if you don't change the behavior of the customers, do you agree that you then have to implement preemptive products or systems to prevent incidents from occurring like train strikes?

A That would be the next step.

Q Okay. And if customers are prevented from accessing the train or the tracks such as through the use of a barrier that eliminates or reduces the hazard of being struck by a train; correct?

A They reduce it.

Q Okay. Did you ever testify --

MR. GENIS: Well never mind.

Q If customers are prevented from accessing the train and tracks, people can't get struck by trains?

THE COURT: Sustained. You're testifying now.

Why don't you ask a question. Do you want me to ask him? I don't want to do that.

MR. GENIS: I'm fine.

THE COURT: You're getting things a little confused and you're not being focused. Ask him the questions, what did they, if anything?

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q Do you agree platform screen doors are the most effective means of preventing people getting hit by trains?

A Offhand, it is an effective method for preventing access to the railway.

THE COURT: You think they are effective?

THE WITNESS: Yes.

THE COURT: Did they do anything to do that?

THE WITNESS: Yes.

THE COURT: Tell us what they did.

THE WITNESS: There have been many explorations and groups that have looked at installing platform screen

doors of various types in the subway system.

THE COURT: So they looked at this, right?

THE WITNESS: Yes.

THE COURT: Considering it, right?

THE WITNESS: Yes.

THE COURT: Did they ever do it?

THE WITNESS: No, it was not done.

THE COURT: Next question.

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q Did the Transit Authority ever have a written plan of how to prevent or reduce the number of train strikes and to mitigate or lessen the number of these injuries due to the train strikes?

A No, not that I'm aware of.

MR. GENIS: No further questions.

THE COURT: Would you like to inquire, Keaveney.

MR. KEAVENEY: I'll reserve my right to bring Mr. Doddo back on my case.

THE COURT: So, I'm sorry, I'm not hearing you clearly enough. You have to talk a little louder into the mic.

MR. KEAVENEY: I reserve my right to bring Mr. Doddo back on my case, if necessary.

THE COURT: You have the choice, you don't have to question him now. You want to reserve your right to bring him back on the defendant's case; correct?

MR. KEAVENEY: Correct.

THE COURT: Fine. So you can step down. Thank you very much.

(Witness leaves the witness stand.)

THE COURT: Mr. Genis, do we have another live witness.

MR. GENIS: Live, no, but the Past President of the Transit Authority, Mr. Reuters, testimony to read.

MR. KEAVENEY: Your Honor, we were never provided page and line designations for that witness, so we have no counter designations.

THE COURT: They have no way of following the bouncing ball, is that what you're saying.

MR. KEAVENEY: Absolutely not.

MR. GENIS: We didn't know until now.

THE COURT: Look, I try to give you folks advanced notice that we're going to most trial along, I want to use the jurors' time. How much time would it take to give counsel what you should have given him before.

MR. GENIS: I'll give it to them right now.

THE COURT: Well, we need about 15 minutes so he knows what you're about to do?

MR. GENIS: I'll hand him -- I marked the transcript, exactly start and stop.

THE COURT: Do you want to have the jurors excused while you do this or you can do it now?

MR. GENIS: Your preference, your Honor.

MS. WINTERS: Your Honor, if I may?

We still have to our designations for Ms. Kennedy as well. I just wanted to alert the Court to that for timing purposes.

THE COURT: I'm sorry, I didn't hear you.

Look, why don't tell counsel what you plan to do now. Let the jurors wait and let's see whether it can be done quickly so we can use the jurors' time and we don't have to have these gaps, okay? Take a few moments. Take a look at what he wants to show you.

Management problems crop up. We don't know exactly what to expect and that's why I get paid the big bucks.

So you probably don't know how much money federal court judges make, and I don't know whether you want to make record of that or not, but you're probably curious to know, that right? So I'll tell you all about that after we ended the case, right? I'll let you know that we get the same pay through out the United States whether we're a judge in South Dakota or New York City. There is no adjustment for

location. A little more expensive to be a judge in New York City than in South Dakota, right so? If I were a judge in South Dakota, I would be the richest guy in town. In New York, not so. But, you know, we are committed to take on this awesome responsibility and we do it even though we're not going to be as we're wealthy as the President of the United States.

Tell me when you're ready.

MR. GENIS: I've handed him my transcript with the notes.

THE COURT: Take your time.

So another thing I'll tell you now is when you get a position like this, it's really an honor to be here and have the opportunity to represent the country as a federal court judge.

So you can sort of -- you're really a good candidate for one of these big fancy law firms to hire you like the coach of the Indiana football team, right? And to pay you lots of money. We have this wonderful choice whether to continue with our vow of poverty or whether to become multimillionaires. So you know the foolish decision that I made.

MR. GENIS: Mr. Doddo has been excused since there is going to be another testimony. Should he leave the courtroom, your Honor?

THE COURT: He's been excused because we don't need him now, I don't think.

Mr. Keaveney Ms. Winters, can we let him go?

MR. KEAVENEY: Yes.

MS. WINTERS: Yes.

THE COURT: Okay.

So you never know exactly how things are going to turn out. This is all normal stuff, don't hold it against any of the lawyers. And, you know, I'm somewhat responsible for maybe moving it along faster than they anticipated. It's the real world, you're getting a real bird's eye view of how we manage a court trial. You can critique me later on. Most people think the judge has good job, not everybody.

We're in a position of power and authority and we try not to abuse that position. We're making a record of all of this so maybe the Supreme Court will see what we talked about today, you never can tell.

Cases been appealed. You probably know about that. We're the trial court and if you take issue with anything we do here, you have the right to go through an appellate authority and we call that the Court of Appeals. They can review the record if they think that I made a mistake. They have the opportunity and the right to appeal, and then that's the appellate court. And from that court,

you can try to get to one other Court. It's called the United States Supreme Court. They don't take every case. They have to give permission to have the case brought before them. And they roughly take about 80 cases as a year, thereabouts. You read a lot about them in the newspaper those are really the high-end cases that are really striking at the heart of what's really terribly important in our world today, obviously. But they have the right to take the case to the Supreme Court if the Supreme Court will accept it. So they decide which cases they're going to hear. So it's not an automatic right to appeal and few exceptions, there are a couple of little exceptions about that. But by and large you have to give permission from the Supreme Court to get before that court.

So this gives me a great opportunity while we're going through what we are doing right now to try to educate you a little bit because I'm a great believer in the fact that we don't have enough civic education in our country. We have a lot of education when it comes to math and technical things and how to make robots and stuff like that. But I believe that we have just an abject lack of effective civic education for the young people in school. That's just my own particular peccadillo but that's an issue in our country.

So when I have an opportunity to educate people I

try to do that and I appreciate the fact that the lawyers are taking this time to give me a chance to maybe give you a little bit of a civic education in court today.

I read one place that maybe ten percent of the population believes that Judge Judy is a United States Supreme Court Justice. And most people don't even know what the three branches of government are. And I'm not going to question you folks but it's just so important, especially the next generation, understands what the constitution is about and how we become federal court judges and what we do and how we do it. So my next book will be all about that. I hope it will come out in the fall. You don't have to read it there's no mandatory requirement, but I will give you an opportunity of what's coming down the pike.

JUROR: Will you sign it for us?

THE COURT: I will be definitely be happy to autograph it for you. I may even give you a free copy, who knows?

It's a work in progress but it's designed to really deal with what we do. What kind of cases do we have? And it's, you know, all the questions you should ask about the federal judicial system and my answers.

And it's going to be published, I think, I'm pretty sure, by Oxford Press. And hopefully, it will be available to all the schools and everybody as Judge Block's

effort to try to educate people about civic education.

I'm sure all of you want to read it, I know that, but you don't have to. Even my best friends don't read all my books. We get our on the internet, there's less and less reading of books today because of I guess basically media and the internet, right? But it's still good to have books.

Are we ready?

MR. KEAVENEY: It's clearly not enough time to go through it all but I'll let Mr. Genis read it. But we certainly don't have time to do our counter designations for it.

THE COURT: I'll give you time. Why don't we see whether we can help the jurors do something today so we don't have to let them go home early. Maybe we can start half hour 45 minutes and then we can pick up again tomorrow.

MR. KEAVENEY: Okay.

THE COURT: Let's give it a try.

MR. KEAVENEY: It would be helpful if Mr. Genis went in page order because it's very difficult to follow when we don't have the designations ahead of time.

THE COURT: This is true. But we're going to make sure they have ample opportunity to question the witness.

MS. WINTERS: Your Honor, we still have to read our portion of Kennedy as well. I wanted to alert you to that.

THE COURT: All right. Let's see what we can do now, all right?

MR. GENIS: Thank you.

And, Judge, with your permission, may Mr. Shields be the reader for that?

THE COURT: Let Mr. Shields be the reader.

MR. GENIS: Thank you.

THE COURT: I'm trying to move the trial along without doing any harm or prejudice to either party.

MR. GENIS: This is the deposition of August 8, 2022, of Lawrence Reuter, R-e-u-t-e-r.

May I proceed?

THE COURT: Certainly, get this down here.

I'm looking at where you have it on your witness list. I don't see it.

COURTROOM DEPUTY: What was the name again?

MR. GENIS: Lawrence Reuter, past president of the Transit Authority.

THE COURT: Am I missing something? I have your witness list but I don't see that.

MR. GENIS: It might be on the exhibit list possibly, your Honor.

THE COURT: I don't have the name of this gentleman, I'm sorry. So I don't think, under the circumstances, I can just allow you to go into questioning

somebody. I don't have it on your witness list.

MR. GENIS: Okay, your Honor. Respectfully excepted.

THE COURT: If it's necessary for rebuttal, we can possibly allow some flexibility but not in terms of your primary case.

MR. GENIS: Okay.

THE COURT: I think that's the way to do it.

So I take it, you know, thank you for coming in here and sitting here a little longer.

I take it you have nobody else today.

MR. GENIS: That's it, Judge, for today. I'm sorry.

THE COURT: All right. So you folks get off early.

Now, when you leave I'm going to chew out all the lawyers.

MR. KEAVENEY: Judge, we can still read from our counter --

THE COURT: You have something?

MR. KEAVENEY: From Mrs. Kennedy's deposition.

THE COURT: That's going to be one of your witnesses, right?

MR. KEAVENEY: No, that's the transcript that Mr. Genis read earlier that would be our counter.

THE COURT: You can do that?

MS. WINTERS: Yes, Your Honor.

THE COURT: Great. Let's do it. The lawyers are trying hard. They have, you know, it's a lot of pressure on them.

MS. WINTERS: My colleague Perdita Barchuk will be reading.

THE COURT: Come up we'll see how good an actress you are.

We should have your name for the record.

THE WITNESS: Perdita Barchuk.

THE COURT: Ms. Winters, you're going to go ahead and do the questioning?

MS. WINTERS: That's correct. I'll be reading from the transcript and Ms. Barchuk will be sitting in as another Ms. Kennedy.

THE COURT: Once again, this is the transcript from the witness who testified earlier and Mr. Doddo.

MS. WINTERS: It was Cheryl Kennedy.

THE COURT: I'm sorry, Cheryl Kennedy, the retired vice president and we're talking about now.

So this is more from the testimony of Cheryl Kennedy. You heard Mr. Genis read from it, now the defendants have the right to read other parts of it you can see as a totality.

Go ahead.

MS. WINTERS: Thank you, your Honor. So starting on Page 8 Line 22.

"QUESTION: I'm going to now ask you questions about your background.

First, what's your educational background?"

"ANSWER: I have a masters of Science in Safety Management from West Virginia University.

THE COURT: Keep your voice up?

"ANSWER: I have a masters of science in safety management from West Virginia University."

THE COURT: Much better.

MS. WINTERS: We're not at Page 10, Line 2.

"QUESTION: What is safety management?"

"ANSWER: What's the -- you're talking about my degree? Basically, over management of safety issues. Both, you know, environmental, occupational, engineering-related, emergency preparedness all aspects of safety. It can be an organization so that it would be my degree area."

MS. WINTERS: Now we're on Page 14, Line 10.

"QUESTION: Was it your job to oversee the daily safety of all customers and employees in the subway system?"

"ANSWER: No, not on that level. You know, every customer, I wasn't overseeing every customer's safety if that's what you're talking about, if that's what you're

saying. I was basically we were, we were at the top of the chain at New York City Transit. I reported directly to the president and we developed policies and procedures. And it covered, you know, all those areas that you discussed. And we also audited all those areas to make sure that the various departments were following policies and procedures and all the different, like, subways, buses, both also had safety departments within them that we coordinated with. And we coordinated with many people within the bus and rail to ensure that safety was paramount to New York City Transit. And every one was responsible for safety down to the lowest-level employee at the organization."

MS. WINTERS: Page 18, Line 5.

"QUESTION: And the presidents of the Transit Authority relied upon you and your office for advice on how to make the system safer; true?"

"ANSWER: That's true. Along with, you know, many other departments' input.

MS. WINTERS: Page 19, Line 7.

"QUESTION: And among hazards you assessed was people coming into the track or track bed?"

"ANSWER: As I stated, they were not looking at -- you're calling that a hazard. We looked at the issue of contact with individuals, you know, persons getting struck by trains."

"QUESTION: And?"

"ANSWER: And the causes of those types of incidents.

MS. WINTERS: Page 31, Line 6.

"QUESTION: And if one does not comply with professional standards of care in performing hazard analysis, the result would be an inadequate, unreasonable, and improper hazard analysis; correct?"

"ANSWER: What are your standards of care."

"QUESTION: So you can't answer that question?"

"ANSWER: Correct because you're not telling me --"

"QUESTION: That's fine."

"ANSWER: The standard of care."

MS. WINTERS: Page, 33 Line 23.

"QUESTION: And there are other authorities, source as well; true? In other words, that's not the only authority of the military?"

"ANSWER: Right, true."

MS. WINTERS: Page 37, Line 8.

"QUESTION: Monetary loss, the summation of the estimated cost for equipment repair replacement facility repair or replacement, environmental cleanup, personal injury or illness, environmental liabilities or related costs?"

"ANSWER: That's true. But we did not use the cost in our assessment.

MS. WINTERS: Page 44, Line 14.

"QUESTION: I'm going to get to all of that in a minute. But first, talking about something, talking about documenting hazards with the Hazard Tracking System. Do we agree that's a good and accepted methodology, practice, and procedure?"

"ANSWER: I just said you do document the hazards. And you document them and ensure that you have dealt with all the recommendations you made."

"QUESTION: Well, let's back up. What is --"

"ANSWER: I'm not saying that you would put all hazards in the Transit Authority into a system like that, so I don't know if that's what you're trying to get at."

MS. WINTERS: Page 46, Line 7."

"QUESTION: And you told us the military standards are what the transit is supposed to comply with; correct?"

"ANSWER: For certain things, yes. For certain things, not for everything. I mean, you're not going to use that for everything that is done in the Transit Authority, okay? There are many ways to identify hazards. There are many different procedures and processes and that you can use in order to identify and address hazards. They don't all have to be done in accordance with the Military Standard

882."

MS. WINTERS: Page 47, Line 8."

"QUESTION: My question is, other than using the prescribed methodology and practices and procedures detailed and outlined in the military standards what, if any, other written standards used to identify and document hazards?"

"ANSWER: We use -- there are many different procedures that can be used. I'm not saying that they are written down as a standard but there's a job hazard analysis. There's a job safety analysis, you know, where you go out and take a look at someone performing a task. This known method of doing, identifying hazards that's different from the military standard. So they're what -- I'm talking about is there are other methods. You can take a look at statistics that have and you can go from there. That you have and go from there. Every single thing in the authority is not. You don't perform a hazard analysis such that you are seeing, okay? We perform hazard analysis in accordance with Military Standard 882 for new equipment, for changes in equipment, for new procedures, for changes to current procedures, okay? Every single thing in the authority that you are looking at, you are not going to do a hazard assessment as you are reading."

MS. WINTERS: Page 567 action Line 12.

"QUESTION: And identifying hazards shall be

documented in the hazard -- at the HTS, the Hazard Tracking System; correct?"

MS. BARCHUK: Page number, again?

MS. WINTERS: Page 56, starting at Line 12?

"ANSWER: In some cases, it would. You can have your own way of tracking hazards."

MS. WINTERS: Page 58, Line 19.

"QUESTION: So, first, you would have to identify a potential risk mitigation, yes?"

"ANSWER: Yes."

"QUESTION: And then you'd have to identify the expected risk reduction; true?"

"ANSWER: No."

"QUESTION: Okay. So, in other words, when you have a risk mitigation plan, do you have expected risk reductions?"

"ANSWER: You have -- we utilize that to do assessments and various things, okay? For example, an operation and you want to address all the hazards relative to the changes in an operation, and you would come up with recommendations. Say you come up with ten those ten recommendations were tracked to completion. We are not stating that one particular one is going to reduce the risk by more than another, okay? That's how we went about doing that."

MS. WINTERS: Page 70 Line 21.

"QUESTION: And when you've concluded that there's nothing that can be done, you've basically accepted the risk; correct?

"ANSWER: No. If nothing can be done, then maybe the procedure that we were looking at wouldn't be implemented, okay? If nothing could be done. If I, if we couldn't identify any means of reducing the risk then what we are assessing if it were given an example of procedure, then it wouldn't be implemented."

MS. WINTERS: Page 77, Line 7.

"QUESTION: Do you agree that with hazard identification in mitigation effort using system safety methodology, is the goal should always be to eliminate the hazard, if possible. And when hazard cannot be eliminated, the associated risk should be reduced to the lowest acceptable level within the constraints of cost, schedule, and performance by applying the system safety design order of procedure?"

"ANSWER: True."

MR. GENIS: Precedence.

MS. WINTERS: Sorry, system safety design order of precedence.

"ANSWER: True."

"QUESTION: Okay. We didn't really take cost into

consideration in my --"

MR. GENIS: You're reading the answer.

"ANSWER: We didn't really take cost into consideration in my office, but overall you would."

MS. WINTERS: Page 88, Line 2.

"QUESTION: Well, let's say we're discussing probability levels of different types of harm whether it be catastrophic or something else, we're going to get into those levels in a moment, but if you were going to look at the probability levels of a catastrophic event and it was frequent?"

"ANSWER: You would look."

"QUESTION: Define frequent."

"ANSWER: You would look how many times. You could also look at in order to calculate that ten how many people you carry a year or in that given example we carried 1.7 billion people a year. So you would take that into consideration when you are calculating that."

MS. WINTERS: Page 90 Line 6.

"QUESTION: There is severity category number one is catastrophic, correct?"

"ANSWER: Correct."

"QUESTION: And catastrophic means could result in one or more of the following: Death, permanent total disability, irreversible significant environmental impact,

or monetary loss equal to or exceeding $10 million. Do you agree with that?"

"ANSWER: Yes, but we didn't use the cost."

"QUESTION: All right."

MS. WINTERS: Then the next questions relate to P-35 which was entered into evidence before so we're going to call that up.

THE COURT: Which document is that now?

MS. WINTERS: That's Plaintiff's Exhibit 35, your Honor.

THE COURT: Let's see that I have it. 35 is the hazard mitigation form?

MS. WINTERS: That's correct. There was a highlighted version on the screen before.

THE COURT: Go ahead.

MS. WINTERS: Starting on Page 125, Line 18.

"QUESTION: And this is a preprinted form from the New York City Transit Authority; correct?"

"ANSWER: Right. It's for the flashing CPTC project."

"QUESTION: Okay. But this is a form that is not only for a particular project, it may have been used in this particular case for this project; true?"

"ANSWER: True. It's used for projects like that."

MS. WINTERS: Then on Page 127, Line 3.

"QUESTION: And then it lists IEE 1474.1 hazard type, correct? Do you see that on the left?"

"ANSWER: Okay, yes. Okay."

"QUESTION: And the IEE is referring to some international standard; true?"

"ANSWER: Yes."

"QUESTION: And is that an international standard that you recognize as authoritative as well?"

"ANSWER: Yes."

"QUESTION: That's a standard that the Transit Authority incorporates, uses, and adopts; correct?"

"ANSWER: Correct. This is for projects such as that CPTC. They have this hazard mitigation form so that we made sure when we are implementing -- we were implementing a new project that all that hazards are taken care of."

"QUESTION: Continue."

MS. WINTERS: On Page 134, Line 2.

MR. GENIS: 134, Line 2?

MS. WINTERS: Yes.

THE WITNESS: They are too close to the platform edge well.

MS. WINTERS: I'm sorry.

MR. GENIS: There's no question.

MS. WINTERS: 134, Line 4."

"QUESTION: So there could be one more cause, I get that?"

"ANSWER: Okay. If they weren't that close to the platform edge they wouldn't be on the track."

MS. WINTERS: 149, Line 4."

"QUESTION: When you were at the Transit Authority, did anyone at the Transit Authority say to you, whatever you do, don't look at best practices or international benchmarks?"

"ANSWER: No."

MS. WINTERS: 152, Line 12.

"QUESTION: If there was a device that could prevent thousands of people from being killed or having catastrophic injuries, would it comply with good and accepted practices and procedures for the Transit Authority to obtain and you utilize such a device?"

"ANSWER: You would have to study that. Systemically study that device and see whether or not it could be used."

MS. WINTERS: 1535, Line 19.

"QUESTION: So was preventing or mitigating 12-9s from occurring in your top ten of priorities?"

"ANSWER: Yes.

MS. WINTERS: 156, Line 20.

"QUESTION: Well, what's more important than

saving lives and limb, what's more important than that?"

"ANSWER: Well, there were many other things that you were saving."

Sorry.

"Well there were many other things that we were saving lives and limbs doing."

MS. WINTERS: 163, Line 6."

"QUESTION: So on that risk matrix, is the highest he level of severity -- 1-A is the highest level of severity and higher probability, correct?"

"ANSWER: Correct."

"QUESTION: So does that mean that derailments are lower on the matrix than 12-9s are?"

MR. GENIS: Objection, your Honor. Derailments are no the in this case.

THE COURT: I'll allow it."

"QUESTION: Okay. So?"

"ANSWER: No. If you look at how many customers we carry per year, 1.7 billion customers -- "

THE COURT: A little bit slower. I'm having a hard time hearing you and following you. You got to slow down and speak clearly.

THE WITNESS: Yes, sir. Okay?"

"ANSWER: If you look at how many customers we carry per year, 1.7 billion customers, about that 8 million

a day."

MS. WINTERS: 164 Line 14."

"QUESTION: How high? What category? Where is it -- 1-A, 1-B, 1-C, 2, 3, 4 you tell me?"

"ANSWER: They are high. They are obviously, they are catastrophic, sorry, they wouldn't be frequent, you know. I would have to calculate it out to see whether or not they are the occasional. But the number of people that could be injured as a result of derailment is very high. But I'm not saying that the contact with individuals is not, you know, important to us."

MS. WINTERS: 174, Line 4."

"QUESTION: So could we agree that if something has already been studied and a fact already established, there's no need to study it again or reinvent the wheel?"

"ANSWER: False."

"QUESTION: So let me ask you, if there had been other studies and other research over a period of time about the effectiveness of platform screen doors in other cities and it established that they were effective at dramatically reducing or preventing 12-9s from occurring, why would you need to study it again?"

"ANSWER: Because I would have to study it for institution into your own property and the challenges that you might have in your property and to see whether or not

you could be placed in a property."

"QUESTION: Okay?"

"ANSWER: Safely."

"QUESTION: So, in other words, I want to make sure we're understanding each other?"

"ANSWER: Those are the properties that you are talking about, most them were built that way."

MS. WINTERS: Page 184, Line 4."

"QUESTION: Now, we agree that there were certain challenges installing safety devices to prevent 12-9s in the City of New York; correct?"

"ANSWER: Correct."

"QUESTION: Now, some of the challenges can be addressed; correct?"

"ANSWER: Correct."

"QUESTION: In fact, all of the challenges can be addressed one way or another, correct?"

"ANSWER: I don't know if they all can be addressed."

MS. WINTERS: 193, Line 2."

"QUESTION: So when you were at the Transit Authority, where there instances of people getting dragged by the trains?"

"ANSWER: Yes."

"QUESTION: And that could happen because their

clothing got stuck, as you said, or they were trapped in the doors or something to that effect; correct?"

"ANSWER: There was down to pretty much the clothing could caught in the door where the door sensors wouldn't identify that. And if the train operator wasn't doing his job by looking or couldn't see before he moved the train you could have a drag."

MS. WINTERS: 194, Line 13.

"QUESTION: So if a concern of drags is that somebody's clothing could get on stuck on a subway car in the train or their body could get stuck in the train door and that's how they get dragged, if there's a platform screen door barrier that prevents their clothing from getting stuck on the subway train or their body being stuck inside the door of the subway train car; correct?"

"ANSWER: No."

"QUESTION: Okay?"

"ANSWER: That would prevent that."

MS. WINTERS: I think I misread that?"

"ANSWER: That would not prevent that."

"QUESTION: Well, if you can't get to the car?"

"ANSWER: You have to get in, okay? Listen, if I can talk? You have to -- a passenger boards or alights and then gets there, a platform door has to be opened as well as the train door has to be opened, okay? And you could have

the door closed on the train door, not the same as the platform door. The person could get their clothes caught, the train still could move because the train operator at the point can't see and he could get dragged into the platform edge. So if we have to be synchronized very well and there has to be a very -- there has to be a way that the train operator can tell that everything is closed and no one is caught in there."

MS. WINTERS: Page 208, Line 9."

"QUESTION: And so, what did you learn from what you just told us why there more or less drag incidents when CCTV was used properly?"

"ANSWER: We found that it worked. It wasn't really more or less. I don't know whether there were many on the line in the first place, okay, but I had to make sure that if we were moving the conductors and his view and task that the train operator could pick up that task safely and he was able to."

MS. WINTERS: Page 210, Line 22.

"QUESTION: So did you ever do any analysis to see the number of lives that could have been saved or the number of catastrophic injuries that could have been prevented or reduced if some form of safety device had was utilized whether it be a platform screen door, a PED, an APG, a TIDS, CCTV, fixed rail, or lower entries?"

MS. WINTERS: I'm going to stop there. Go ahead.

THE WITNESS: Okay.

MR. GENIS: She's reading half the question, not whole question.

MS. WINTERS: I'm happy to sidebar it, your Honor, if counsel --

THE COURT: What is the issue here?

MS. WINTERS: There's a portion of the question that I omitted consistent with your Honor's prior ruling on the point.

THE COURT: You can read it if you want. If you want to read that in later on, I'll let you read it in.

MS. WINTERS: Thank you, your Honor.

You can answer?"

"ANSWER: All of those items were and are being evaluated."

THE COURT: I think Mr. Genis wants you to read something in that you did not read. You want her to do that now, or do you want to do it when you have a chance to do it?

MR. GENIS: I believe she had.

THE COURT: You want her to read a line she missed?

MS. WINTERS: Your Honor, reading the portion would be in -- I'm happy to sidebar it, your Honor -- I

don't know if you want me to speak about it in front of the jury.

THE COURT: If you left something out and he wants it to be read, I don't see a reason why that can't be allowed.

MS. WINTERS: Your Honor, if I may? It's inconsistent with a prior ruling of your Honor and I don't want to violate it.

THE COURT: Read it.

MS. WINTERS: Okay.

I'll skip that question. I won't enter that question into the record, we'll strike it.

THE COURT: We'll let Mr. Genis read it.

MR. GENIS: Can we then strike what was read because she didn't?

MS. WINTERS: I'm happy to have that stricken.

THE COURT: Go on with your questioning.

MS. WINTERS: Thank you, your Honor.

Page 211, Line 25."

"QUESTION: Did you ever an do an analysis for the hazards that could be mitigated in the subway system by using one of the these or safety devices that we've just been talking about?"

"ANSWER: We did look at the hazards that or the --"

THE COURT: I'm having a hard time hearing you. It's my problem. Do me a favor, speak slower and louder so I can hear you clearly. Try to do that.

THE WITNESS: Okay?"

"ANSWER: We did look at the hazards. Or the, basically, the causes of the contacts with individuals and platform screen doors was one method of reducing the train track intrusion was another. Public awareness was another. Another thing that was done was, you know, we added countdown clocks so you don't have people stretching their necks out looking for the train. They could easily see when the trains were arriving so those different things were being looked at done or whatever.

THE COURT: How many more questions do you have here?

MS. WINTERS: Not much longer.

THE COURT: Go ahead.

MS. WINTERS: Page 219, Line 8.

"QUESTION: And was there any kind of assessment of hazards where if there were track intrusion devices and no track intrusion devices?"

"ANSWER: No because we didn't even know if it worked. I mean, there wasn't any, so you couldn't really do it."

MS. WINTERS: Page 220, Line 16."

"QUESTION: So when you did an assessment, did you assess the hazards for a different high screen door?"

"ANSWER: That went into it, okay."

"QUESTION: When you did the assessment for the dangers, okay, let me just be clear?"

"ANSWER: So maybe I can explain or you want to keep."

MS. WINTERS: Page 222, Line 6.

"QUESTION: And when did you the hazard assessment, was that done following the methodology of Military Standard 882 in complying with it or not?"

"ANSWER: Which one are talking about."

"QUESTION: Hold on, withdraw that question.

Okay. Was there ever an analysis done to see which devices, if any, should be installed at which stations?"

"ANSWER: No."

"QUESTION: Okay. Now --"

"ANSWER: They are still evaluating them."

MR. GENIS: Objection. Move to strike. It's post date of accident, they're still evaluating.

THE COURT: Sustained; next question.

MS. WINTERS: Page 223, Line 14."

"QUESTION: Well has the Transit Authority from when you first got there until the time you left ever

completed and finalized study and analysis about the best way to prevent or reducing 12-9s from occurring or are they still studying it?"

MR. GENIS: Objection she left in 2018.

THE COURT: Overruled.

Let me hear the testimony. The question is did they did ever do anything?

Just speak clearly and loudly so I can hear you?"

"ANSWER: They were looking at the numbers, the number of different issues and some of the them were implemented, okay? Some customer awareness campaign which was the huge campaign that had a lot of different media. You had the help points, that's where installed to assist passengers if they dropped something son the track. They could call and get somebody to come get it. They installed countdown clocks that would keep people from needing to go or thinking they need to go to the platform edge to look to see if the trains were coming. This now told them the train was coming. They were looking at something new which was the track intrusion devices to see if they could get -- to see if they could even work. I believe they looked at four and then they were going to look at another four when I left and they were evaluating platform screen doors to see whether or not they could be installed in our system."

MR. GENIS: Objection. It's two years later.

THE COURT: I'm allowing it. Next question; continue.

MS. WINTERS: Page 224, Line 20.

"QUESTION: But to get to the question. So it would be fair to say from the time you started the transit until the time you left, the transit has not completed its studies for safety and prevention of 12-9s; true?

They're still looking at it, so it's still not complete yet still studying it?"

"ANSWER: Well, they are looking at various remedies or resolutions. They have implemented a number of other --"

MS. WINTERS: Page 226 Line 6."

"QUESTION: So would it be fair to say that from the time you got to the transit until the time you left, the only system-wide safety items that the Transit Authority had implemented would be signs, announcements, painting the tactile strips, help points, and the other signs you mentioned to prevent 12-9s from occurring; fair enough?"

"ANSWER: There were other media associated with the customer awareness but, in general, true."

MS. WINTERS: Page 228 Line 19.

"QUESTION: I understand you don't recall the exact date or year or month even, but can you tell me, for example, what decade did they start putting in the help

points?"

"ANSWER: The help points. In the 2000s."

"QUESTION: Okay. And what point did they put in those message boards that, you know, the train will be here in five minutes or whatever?"

"ANSWER: I think that was in the 2000s as well."

"QUESTION: At what point did they put in signage?"

"ANSWER: Signage was overtime. I'm sure they had different things back in the old time but the newer stuff came into play in 2013. They did a huge campaign on it, but I'm sure there were other things and messages long before that."

"QUESTION: And when did they start making announcements?"

"ANSWER: I don't know. I don't know when that started."

"QUESTION: Okay. Now, when you say, "the 2000s," you're referring to the decade between 2000 and 2010; correct?"

"ANSWER: Oh, could be 2000 now, right?"

"QUESTION: Backing up. I asked you about certain things, for example?"

"ANSWER: I don't know when help points were finished being installed or started. The late 2000s.

There -- I know that the awareness campaign that was really detailed and had all the different media in place was around 2013."

"QUESTION: Okay?"

"ANSWER: 2016 they started looking at intrusion detection. They did the pilot study of that, but..."

(Continued on the next page.)

(Deposition reading continues.)

MS. WINTERS: Page 235, line 2.

Q How many help points did they put on a platform?

A It depends on the platform and I don't know or I can't recall how many were on each.

Q Well, was more than one ever put on a platform?

A Yes, of course.

Q Okay. How many?

A I don't know. I just said I don't know how many were put, how many on the platform. All the platforms are different sizes, different configurations. They would have different number of them on there.

Q So, first of all, we have stations that have no help points at all, true?

A I don't believe that's true anymore. I believe they all do.

MS. WINTERS: And page 243, line 6.

Q Now, when you were head of OSS, what did you do to prevent or reduce 12-9s from occurring?

A Okay. We took a look at the data to analyze the different causes or reasons for people getting hit by trains, some of them being on the platforms, some of them being on the track in the station confines, some of them being in between stations, some of them being medical conditions, some of them being suicides, some of them falling between cars, and also

took a look at to see if there was any trend to see any particular station or times of the day or anything that you could pick out as being a trend.

Q Okay.

A And took that information and utilized that information to put it into the customer awareness campaign as well as some of the other measures that I went through which we don't want people going out onto the train, onto the tracks to pick up items.

We want to make sure that they are able to contact someone from the Authority to assist them. We want to make sure it's very clear where they should not be standing which is a yellow tactile strip and also so many messages to tell people to stand back from the platform edge.

We went ahead and continued on with, you know, going further in trying to find new technology and new technology being intrusion detection to see if it could work. We went further in trying to see whether or not platform doors could be safely constructed and designed and implemented at New York City Transit and they are still doing that. And those things were done in a systematic way. You can't just decide that you are going to put platform screen doors out all over the system without really doing a good, your due diligence in looking at it to see if it can be done, if it can be done safely, and what do we have to do in order to do it safely.

MS. WINTERS: Page 246, line 12.

Q You mentioned earlier that you did a preliminary hazard analysis. Did you ever do a final hazard analysis?

A That's what the analysis are called that normally did. If you look in the standard, the one that we used all the time was called preliminary hazard analysis, but that was really the only one my office used. It's not necessarily meaning -- it does not necessarily mean it's preliminary. It's final when it's done, but that's just a type of analysis we used.

MS. WINTERS: Okay. And page 255, line 12.

Q Thank you.

And when doing this, you have to weigh the danger and consequences of using the matrix of leaving it as is, not making the changes, as opposed to what happens when you put in the safety device, true or false?

A It's not that, that simple.

MS. WINTERS: Page 258, line 17.

Q Now you mention ad few times pilot project. What is a pilot project?

A That is to identify in this case some type of technology. This was an intrusion detection and you analyzed it to see, put it in place somewhere in the system and see if it works okay.

Q Why does the Transit Authority do pilot projects?

A To see if they can be installed or they can operate in

our system from an operational standpoint from a maintenance standpoint, from a safety standpoint, and to see if they do what they are supposed to do dependent on what technology is and it would give you time to evaluate whether or not it's working. With respect to intrusion detection, to see whether or not it was identifying people actually soon enough as they go on to the track, whether it was identifying things that were not people, you know, whether it was false notifications.

You would have to see what technology worked the best and some of those technology might work better in some type of configurations of our system than others. So that's why they couldn't just pick one and pick it out and think it's going to work when you don't know.

MS. WINTERS: Page 261, line 21.

Q So during the time were you at the Transit Authority, did the Transit Authority have any pilot projects planned for platform screen doors?

A Yes.

Q Okay. How many pilot projects did the Transit Authority have planned for platform screen doors?

A I don't recall how many. I just remember the one on the L line.

MS. WINTERS: Page 264, line 16.

Q Now, did the -- when you were at the Transit Authority, did they have any pilot projects for the track intrusion

devices?
A Yes.
Q Okay. Did they have any pilot projects for the CCTV?
A That was part of that, I think. It was all intrusion. I think it is what you are asking about. That could have been a piece of that -- that was one of the type of intrusion.
MR. GENIS: Judge, this is all post accident.
MS. WINTERS: Your Honor --
THE COURT: Are you finished?
MS. WINTERS: I have one more question, Your Honor.
THE COURT: One last question. Go ahead.
MS. WINTERS: Yes.
Page 265, line 7.
Q And when we were talking about the CCTV, I want to be clear that that's informing the train that somebody is on the track before it gets into the station, correct?
A Well, I don't know what those four intrusion detection things were. One was laser, one was thermo imaging and some of the them were CCTV associated with it -- some of them had CCTV associated with it.
So, yes, it would be -- you would want to be notifying the train that someone was on the track for all of those different devices and they were piloting four. They piloted four and they were going to pilot four more when I left.

MS. WINTERS: No further questions, Your Honor.

THE COURT: Mr. Genis, do you have anything else you want to read from the transcript?

MR. GENIS: Give me one second, Judge. Can I --

THE COURT: Why don't you ask the question and answer it yourself.

MR. GENIS: That's what I will do, Judge.

They had read, just a frame of reference, 194, line 13, to 195 line 17. I'm going to continue on line 18. Line 18.

Q Okay. So the fixes to all that problem were, A, the doors are synchronized, both the platform screen doors and the train car doors, true?

A True.

Q That's fix number one?

A Right.

Q Fix number two is to have the sensors with retraction devices on the doors as well, true?

A True, that's one. That's good.

Q And number three is the train operator does the job properly, observes and sees when it is or is not safe to have the train start moving, true?

A Correct.

MR. GENIS: I'm done.

THE COURT: Okay. Anything else?

I think that pretty much covers it, right?

MR. KEAVENEY: Correct, Your Honor.

THE COURT: So, folks, I don't think there is anything else we can do today so we're going to let you go home a little earlier but, look, we've had a full day and we've had a full week and there's a lot of testimony you heard and listened to and it's all recorded.

You want to hear it again, you have the right to do that, but you've been very attentive and we're going to see you tomorrow. And I don't know how long we're going to be here tomorrow but, you know, we'll do the best we can and we will see you at 10 o'clock tomorrow morning.

(Jury exits.)

THE COURT: The jury is out and I don't think we have to go over again what we said before. We'll see you tomorrow at 10 o'clock.

Hopefully, we'll have as much of a full day as possible. I'll leave it to you folks.

Anything you want to state on the record now that the jury is not here? Here's your opportunity.

Go ahead.

MR. SHIELDS: Just one question, Judge.

You had mentioned the other day that with respect to the motions in limine that you were going to let -- I don't want to put words in your mouth, but I thought you were saying

that some subsequent remedial measures would be allowed, but not the records, but I wasn't really clear and I didn't know what your ruling was.

THE COURT: Well, I thought I explained it.

You know, the issue is whether or not the violation of the internal policies can be used as a standard by which, you know, evidence can be based and I said no, but I said you can go ahead and show what efforts were made. I'm allowing to you do all of that, what knowledge they had. I think that's permissible here.

I don't know whether that helps you or not.

MS. WINTERS: Your Honor, if I may, he's talking about a different motion in limine that there was no argument on and I don't believe there's been a ruling on.

THE COURT: I don't know exactly what you're talking about. The jury is not here. It's not easy to manage all this stuff. I don't know what you're talking about.

MR. SHIELDS: Your Honor, on the first day, we had a short discussion about the subsequent remedial measure of the Transit Authority installing fixed platform rails.

THE COURT: Right.

MR. SHIELDS: And you said before the jury came out, you said we're going to allow the plaintiff to put in some of that evidence.

THE COURT: Yes.

MS. WINTERS: So, I'm sorry, Your Honor. There was not argument on this issue on day one so I take issue with that.

THE COURT: Well, you can say that --

MR. SHIELDS: He said it on the transcript.

THE COURT: -- but I think the issue is whether or not we're going to allow any testimony about the feasibility, I guess, of putting in fixed rails and those type of things that you're concerned about, right?

MS. WINTERS: This is a little different. They have images that they've taken of platforms that were taken after the accident --

THE COURT: Right.

MS. WINTERS: -- showing these gates which are not at issue in this case, which no expert has offered a liability opinion on or a causation opinion on, that they intend to show the jury. These are installations that were done post accident, in fact, only in the past two years, and are absolutely not relevant to any liability.

THE COURT: So the general rule is remedial measures post the incident usually are not allowed in evidence.

There could be some exceptions to that. I'm not so sure this falls into that exception. So you want to talk about that, fine, but we're going along now, I'm hearing more about the case, and I'm, you know, more comfortable in making

rulings, but as a general proposition, things that happened after the accident in terms of remedial measures that were taken, I don't think that that's really appropriate and I don't know what you have here that makes it an exception.

MR. SHIELDS: Two exceptions, Your Honor.

First, under Rule 407, the first exception is two of their witnesses who are going to come in and testify, specifically, employee Abdallah put in a declaration in support of their motion for summary judgment specifically saying that these specific fixed rails that they put in after the accident were infeasible and too hazardous to install.

So, number one, they've put feasibility at issue.

THE COURT: It hasn't happened yet.

MR. SHIELDS: Yes, it has.

MS. WINTERS: It has not.

MR. SHIELDS: It's has been installed in 74 stations throughout the City including Clark Street which is two blocks away.

THE COURT: Let's back up.

So he testified that these remedial measures were put into place after --

MR. SHIELDS: No, Your Honor. He said in his declaration in support for the motion for summary judgment that he filed in this court to Your Honor three months before they were put in.

THE COURT: We have not had any testimony about that.

MR. SHIELDS: And it will -- so we haven't had testimony, Your Honor, but he will -- the second Rule 407 exception is impeachment.

THE COURT: He's not going to be able to testify about that.

MR. SHIELDS: We're going to impeach him on it, of course.

MS. WINTERS: Your --

THE COURT: Stop it. Stop it.

Look, we have depositions, we have affidavits about all sorts of things that happened before the motions for summary judgment, but we're at trial now.

MR. SHIELDS: Yes, sir.

THE COURT: And I don't think it's relevant to talk about post-remedial measures that have been taken. All right?

MR. SHIELDS: Your Honor, you did already rule on this.

THE COURT: I allowed testimony about this?

MR. SHIELDS: Yes, you already ruled on it.

THE COURT: Was there testimony about this?

MR. SHIELDS: There hasn't been testimony.

THE COURT: There's not going to be testimony. Okay?

MR. SHIELDS: We're going to cross him on it when he's on the stand.

THE COURT: There's not going to be testimony about it. We're not going to allow post-remedial measures to be put into evidence.

MR. SHIELDS: Your Honor --

THE COURT: Do you want it in evidence? Do you want him to testify about the post-accident remedial measures that were taken? You want him to do that?

MR. SHIELDS: Yes, Your Honor, because we're going to impeach his credibility to say that, because their claim throughout this entire case is that it is infeasible to put these things in before that.

THE COURT: I understand that, and they can testify about the feasibility about doing this or not. Right? And what you're saying is that because they actually were able to do this after the incident, it goes to the question of whether or not it was feasible or not to have done it before.

MR. SHIELDS: Correct, Your Honor.

THE COURT: That's relevant.

MR. SHIELDS: Yes, Your Honor.

THE COURT: Okay. That's relevant.

MS. WINTERS: Your Honor --

THE COURT: So I think that, really, on the issue of feasibility, it may be relevant.

MS. WINTERS: If I may briefly speak on that, Your Honor, the issue of feasibility of these specific gates is not an issue in this case. Berkowitz is their liability expert.

THE COURT: Wait a second.

Don't you have an affirmative defense here or am I not imagining it?

MS. WINTERS: Not related to these devices. So they have not put these devices at issue.

THE COURT: What is your affirmative defense? I assume your affirmative defense is that they did all these plans and had all these good things that they did.

MS. WINTERS: Right.

THE COURT: And because of that, you know, qualified immunity attaches, right?

MS. WINTERS: And that's related to platform screen doors and these other measures that were being investigated and they were having planning committees about at the time. It was not related to these gates and I have to clarify --

THE COURT: So what you're saying now is that the only issue in the case would be these doors, right?

MS. WINTERS: With track intrusion, I believe Berkowitz's opinions are that track intrusion devices, that platform screen doors, rope doors and PEDs would have been the standard of care and that failure to install them was a

proximate cause of this accident.

THE COURT: I think I'm listening to testimony that there's more involved than just those things, right? And you have also adduced testimony that there were other problems that they were not attending to arguably, right?

MR. SHIELDS: Correct, Your Honor.

THE COURT: Specifically what were they again? We had the platform doors, we have that. We know a lot about that.

MR. SHIELDS: Correct, Your Honor.

THE COURT: What else?

MR. SHIELDS: In short, Your Honor, there's a hierarchy and she was bringing up our expert.

THE COURT: Just specific, what else?

MR. SHIELDS: Fixed rail, Your Honor.

THE COURT: Fixed rail. We have the fixed rail. And I think there was a lot of testimony about whether fixed rails could have been installed or not. I think I heard --

MR. SHIELDS: Correct, Your Honor, and that's subsequent remedial measures that we're talking about.

MS. WINTERS: Again, I've got to challenge counsel on this. There are two types of fixed rails. There are rails at the platform edge which there has been testimony about, the historic use of those.

THE COURT: So here's my take. Look, the jury ought

to know, you know, what all the problems were, what all their concerns were and what measures they took, you know, either before or thereafter if it was feasible to do that. I think we should allow them to hear the totality of the evidence because it all deals with the defense of qualified immunity.

So what is really going to be central here, I suspect, and what the Circuit Court is going have to grapple with would be, you know, a fair sense of things that the jury may find liability and then things of that nature here, I guess. Right?

So qualified immunity is going to be the big enchilada, I suspect, right? And we're going to have to ask the jurors specific questions about that so we can make our ruling as matter of law as to whether or not you're entitled to qualified immunity.

I think that's basically the heart of what your defense is all about, right?

MS. WINTERS: But not on this issue. That's really critical. Had Berkowitz opined on this issue, we would have --

THE COURT: There's been depositions taken of that.

MS. WINTERS: That's incorrect. The affidavits he's referencing do not talk about it.

MR. SHIELDS: Yes, they do.

THE COURT: We're making a record quietly.

MR. SHIELDS: Sorry, Your Honor.

THE COURT: We're making a clear record because the Circuit Court may look at this. Okay?

You're telling me that the plans and what they were thinking about it and what they were planning to do and what they were checking out had only to do with the doors, right?

MS. WINTERS: Correct.

THE COURT: Nothing to do with the price of tea in China.

MS. WINTERS: It had nothing to do with these types of gates, absolutely nothing, and, in fact, the affidavits he's referencing talk about gates at the platform edge which they specifically referred --

THE COURT: Look, I think I may not agree with you, I think I've heard a lot of testimony about the fixed rails here, and we'll think about it again tonight, but tentatively I think that it's going to be okay for them to bring this out to see whether or not they knew about the possibility that they could put fixed rails here, that they may have had plans to do that, they may have decided it was not feasible to do that. It sounds to me, intuitively, that that's all relevant.

We'll think about it again tonight and we'll come to a final conclusion tomorrow. Okay? I think it's an important part of the case, but you have my general thinking at the present time and I have your concerns. You want it to be

limited. You don't want anything about fixed rails in the case. Right?

MS. WINTERS: Well, these specific fixed rails. That's the distinction that they're trying to conflate in order to confuse the issue.

THE COURT: You can bring all that out, you know, by your cross-examination or whatever else you can make it clear that we're not only, we're talking about certain fixed rails and not other fixed rails, whatever it's all about. I don't understand, quite frankly.

MS. WINTERS: Yes. So I think that's the issue. They're hoping that confusion translates to the jury.

THE COURT: You're trying to confuse me.

MS. WINTERS: I do believe they are trying to do that as well.

THE COURT: I'm trying my best not to allow you to do that to me because with my age, I'm confused enough as it is.

MS. WINTERS: I think that's the problem. They're trying to confuse this.

THE COURT: All right. Talk to you tomorrow at 10 o'clock.

MS. WINTERS: Thank you, Your Honor.

MR. SHIELDS: Thank you, Your Honor.

(Matter adjourned to October 30, 2025 at 10:00 a.m.)

# I N D E X

WITNESSES:


ERIC JONES

DIRECT EXAMINATION BY MR. GENIS 239

CROSS-EXAMINATION BY MR. KEAVENEY 289

REDIRECT EXAMINATION BY MR. GENIS 293

TIMOTHY DODDO

DIRECT EXAMINATION BY MR. GENIS 358


EXHIBITS:


Plaintiff's Exhibit 80 313

Plaintiff's Exhibit 35 317

Plaintiff's Exhibit 27 328


* * * *

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -X
LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550 (FB)

Plaintiff,

-against- : United States Courthouse
: Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, AND RAQIA SHABAZZ,

: Thursday, October 30, 2025
Defendants. : 10:00 a.m.
- - - - - - - - - - - - - - - - - - - - -X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT SENIOR JUDGE

A P P E A R A N C E S:

For the Plaintiff: SONIN & GENIS
One Fordham Plaza
Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

-- and --

ROTH & ROTH LLP
192 Lexington Avenue.
Suite 802
New York, New York 10016.
BY: ELLIOTT DOLBY SHIELDS, ESQ.
DAVID A. ROTH, ESQ.

For the Defendants: LANDMAN, CORSI, BALLAINE & FORD P.C.
120 Broadway
27th Floor
New York, New York 10007
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

A P P E A R A N C E S (CONTINUED)

Court Reporter: DAVID R. ROY, RPR
225 Cadman Plaza East
Brooklyn, New York 11201
drroyofcr@gmail.com

Proceedings recorded by Stenographic machine shorthand, transcript produced by Computer-Assisted Transcription.

P R O C E E D I N G S

--ooOoo--

(In open court.)

THE COURTROOM DEPUTY: Civil cause for a jury trial, Harger Da Silva versus New York City Transit Authority, et al.

All counsel are present.

THE COURT: Well, they are now.

THE COURTROOM DEPUTY: Yes.

THE COURT: Mr. Keaveney just walked in.

MR. KEAVENEY: Good morning, Your Honor.

THE COURT: All right. Good morning, everybody.

So, you know, we have a lot of things about fixed rails. Ms. Winters, has something about fixed rails. So I thought I would share a few things on the record, because, you know, they're focused on them very specifically.

And here's my take: So we know that *407*,

*Federal Rules of Evidence 407*, bar the admission of remedial measures to prove negligence. But such measures we know that there are some exceptions to that. For the admissible -- for the purposes of impeachment and to prove admissibility when it is contested.

So I looked at the expert's report and essentially just to let you know, you had plenty of notice that they were going to talk about fixed rails. You have your expert. Plaintiffs have their expert. That's what this trial is all about, all right? So there's no question you know about fixes rails. It's not a surprise. It's not ambush. You had plenty of knowledge of the fact that fixed rails is very much an issue in this case, all right?

So the defendant's experts can acknowledge and can controvert the feasibility of fixed rail barriers. And the premises in depositions that rails have been installed in 70-plus stations around New York, the plaintiff is permitted to cross-examine and impeach these witnesses with evidence of the contradiction between their prior testimony and the installation of the rails because it goes directly to their credibility as experts and safety in the City's subway system.

As the Transit Authority continues to dispute whether the rails such as these are feasible to the Atlantic area and Barclays Station, the rails are also admissible as

to feasibility.

And I found one case that really supports what we have said here. It's a Northern District case that goes back in 1995. So in that case, which is *Bellinger, B-E-double-L-I-N-G-E-R, versus Deere, D-E-E-R-E & Company, 881 F.Supp. 813 Northern District, New York, 1995.*

And in the evidence, it had a different track of model and its safety mechanism that indicated feasibility on the track. The issue the Court ruled that, quote, Whereas here, another model includes safety device, and the failure to improve that safely device on the model at issue is the basis for the claim. Evidence of the design with the safety device is admissible to prove the feasibility, including that safety device. End quote.

I think the same logic applies here. The plaintiff may use evidence of rails at similar stations to show feasibility of the rails at the station in question, and the Transit Authority's experts will have the opportunity to distinguish the Atlantic area station and explain why these barriers are not feasible there.

Now, the Transit Authority also moves to exclude the evidence on the grounds that it is irrelevant, and that it will confuse the jury because they contend this case is not about fix rails, it's about PSDs. However, the plaintiff's expert's report mentions rails no less than 14

times and clearly includes them as an option, albeit a less effective one, to prevented accidents on the tracks. This is a case about what kind of platform barriers could have protected the plaintiff, and fixed rails are relevant to that issue. If the defendant believes that fixed rails would not have protected the plaintiff from the injury, they can elicit such testimony from their expert.

So we have a record, and we know when the Second Court of Appeals gets this record they can reflect upon it.

But Ms. Winters, you raised the issue, so I want you to make it very clear. You have your objection, okay?

MS. WINTERS: Your Honor, yes.

If I may just briefly, you know, put a few statements on the record?

THE COURT: You want to put something on the record, you can do it, but we want to bring the jurors in now.

MS. WINTERS: I will make it very brief, Your Honor, I promise you that.

THE COURT: So you want to -- you'll feel better about putting something on the record?

MS. WINTERS: If you wouldn't mind.

THE COURT: Speak now. If you want to do it, I'll give you 30 seconds.

I'll give you all the time you want later on.

MS. WINTERS: Thank you, Your Honor. I'll be very brief.

So we gave Your Honor a rendering of fixed rails which were at issue during discover in this case. We don't dispute that, Your Honor. The issue is related to the motion is that the gates, the platform gates that are being installed now post-accident, post-remedial measures that they're trying to bring in images of at this point are distinct from the fixed rails, which were platform edges --

THE COURT: Very good. So we'll let it all get washed out. During the questioning you'll have ample opportunity to question people about all of these things, all right? I've made my rulings about fixed rails, which is what I wanted to focus on, and you'll have ample opportunity to do whatever you think is appropriate during your questioning of the witness.

MS. WINTERS: Understood.

THE COURT: But go ahead.

MS. WINTERS: Understood, Your Honor.

And just one thing I wanted to alert the Court to, is that if these platform gates, which weren't part of discover, are being brought into the case at this time, we would need to amend our exhibit list and bring in additional witnesses.

THE COURT: Well, you know, I'll give you some

opportunity, you know, some flexibility if you think that you want to bring in some people who were not on your witness list, because of this, I will consider it, okay? We're trying to conduct a fair trial for everybody.

Let's bring the jurors in.

MR. SHIELDS: And we don't object to that, Your Honor.

MS. WINTERS: Understood, Your Honor.

THE COURT: Everyone wants to object.

MR. GENIS: I'm getting the witness from outside, Your Honor.

THE COURT: Bring the witness in.

Right up here, sir.

THE WITNESS: Okay.

THE COURT: You're going in the right direction.

THE COURTROOM DEPUTY: All rise.

(Jury in.)

THE COURTROOM DEPUTY: You all may be seated.

THE COURT: All right, good morning, Members of the Jury. You're a terrific group of jurors. You're punctual, and you're here on a terrible day like today. But you're all here on time.

And so now we can continue the trial today, which we hopefully have a productive day.

And at this time, I understand that we have

another witness. So Mr. Genis, can you tell us who we have here?

MR. GENIS: Mr. Glenn Lunden, pursuant to *subpoena*.

THE COURT: Mr. Glenn Lunden, correct?

THE WITNESS: Correct, sir.

THE COURTROOM DEPUTY: Good morning, Mr. Lunden.

THE WITNESS: Good morning.

THE COURTROOM DEPUTY: If you can please stand --

THE WITNESS: Yes.

THE COURTROOM DEPUTY: -- and raise your right hand?

**GLENN LUNDEN**,

called as a witness having been first duly sworn/affirmed, was examined and testified as follows:

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Thank you. Please have a seat.

THE WITNESS: Thank you.

THE COURTROOM DEPUTY: And if you could please state and spell your name and keep your voice up.

THE WITNESS: My name is Glenn Lunden, G-L-E-N-N, L-U-N-D-E-N.

THE COURT: All right. Very good.

And I can hear you okay, but please keep your voice up.

THE WITNESS: Okay.

THE COURT: We have the microphone here so we can all hear you clearly.

Your witness.

MR. GENIS: Thank you.

DIRECT EXAMINATION

BY MR. GENIS:

Q Good morning, Mr. Lunden.

A Good morning.

Q You're here pursuant to a *subpoena* today, true?

A Yes.

Q What, if anything, did you do to prepare for your testimony today?

A I met with MTA's outside counsel, and I reviewed documents that he had provided to me. And I reviewed those documents that were provided to me by the MTA Law Department that were passed along -- along to your team in the discovery process.

THE COURT: Can you pull the microphone up a little closer to you?

THE WITNESS: Okay.

THE COURT: All right.

Are you nervous?

THE WITNESS: Of course.

THE COURT: Well, so am I.

MR. GENIS: That makes three of us.

THE WITNESS: Thanks.

BY MR. GENIS:

Q All right. And so, sir, did you ever review your deposition transcript from -- from the *Javier* case where you met me before?

A I actually did not review the deposition transcript.

Q Okay.

All right. Did you review any of your transcripts from the Pedrazza case?

A I reviewed those transcripts prior to the Javier deposition, but not prior to this case.

Q Okay. Did you review your declaration from the Pedrazza case?

A Again, I reviewed that declaration prior to the Javier deposition.

Q When you say you reviewed certain documents, did you review any studies from the Transit Authority issued before August 2nd of 2016 that specifically studied how to best prevent people from getting hit by trains?

A So I reviewed the Concept of Operations document that had been prepared in 2011 -- 2010, 2011.

Q Uh-huh.

A That was addressing how we would operate the platform screen door system if you were to install them.
Q Okay. So the CONOPS -- if I'm correct, sir, the Concept of Operations, and this was to then from that have somebody hire a consultant to do a design to then have somebody else do a design and install platform screen doors on pilot project, correct?
A It was a very early phase of means of doing that, yes.
Q Okay. So it was not an actual study to see what is the best way to prevent the hazard of train striking people, true?
MR. KEAVENEY: Objection, leading.
THE COURT: Sustained.
MR. GENIS: Okay.
BY MR. GENIS:
Q Well, was it a study that looked at the issue of how to best prevent people from the hazard of train strikes?
A It was a study that looked at how if you installed platform screen doors you could prevent people from having the habit of train strikes.
Q Okay. I appreciate that answer, sir. But, for example, did the study discuss other alternative safety devices or measures to prevent the hazard of train strikes?
A No, it did not.
Q Okay. Did it discuss comparative before and after

numbers of hazard of train strikes deaths and injuries as opposed to if there were no platform screen doors?
A It did not.
Q Did it study any of the data of people getting hit by trains over the years?
A No.
Q Okay. You started to work -- you know, let me back up.
And in the documents you reviewed, did you see a single plan, a written plan for safety specifically with prevention of people getting hit by trains?
A No single thing like that, no.
Q Okay. Thank you.
You started the Transit in what year, sir?
A 1986.
Q And I know you've had a lot of different posts over your years. What's your current situation with the Transit?
A I am currently a contingent temporary employee working as a planner in the operations planning department.
Q Okay. And you always worked in operations -- well, I shouldn't say "always."
You work in operations and office manage -- and budget?
A I work in operations planning and office management department.
Q Thank you.

A Yes.
Q I'm going to kind of cut it short, because it will take me awhile to go through all of your background. You have an extensive background. So let me cut to chase, if I may.
Did you hold fairly high-level positions and titles in your duties within the Transit Authority?
A Yes.
Q And you were on various policy committees, groups, and task forces all on behalf of the Transit Authority?
A Yes.
Q And you've chaired certain policy committees, groups, and task forces for the Transit?
A Yes.
Q And you have knowledge about the policies and procedures of the Transit as it related to the duties that you had?
A Yes.
Q And you've helped created some of the policies on behalf of the Transit Authority, true?
A Yes.
Q And you've given sworn testimony on behalf of the Transit with respect to these policies and procedures, true?
A Yes.
Q And you've also given statements under oath about the policies and procedures about the Transit Authority that

cover its entire history, true?
A Yes.
Q Okay. And you've also testified as an expert on behalf of the Transit with respect to their policies and procedures on its entire history?
A Yes.
Q Okay. Let me get to three questions before I get to a policy.
One, are familiar with an area known as the envelope of the train?
A Yes.
Q And envelope means the movement of a train, up, down, sideways as it's going down the tracks, correct?
A Correct.
Q So it's not just solely the size of the car, because with the track and the suspension system of the train car, they could move side-to-side and up-and-down, correct?
A Correct.
Q Okay. So the envelope completes a portion of the platform, correct?
A Yes.
Q Let's get to policies.
Are the policies and procedures of the Transit Authority based upon the premise that customers will not enter the envelope for the train or the track bed?

A No.
Q Okay. Just a second, sir.
THE COURT: You know, I'm just curious. Let me just ask you: How many employees does the Transit Authority have?
THE WITNESS: The Transit Authority has about 50,000 employees. The MTA as a whole has about 70,000 employees.
THE COURT: Okay.
MR. GENIS: If I may, Your Honor -- Judge, may I --
THE COURT: Yes, go ahead.
MR. GENIS: Thank you.
BY MR. GENIS:
Q Sir, were you asked the -- when you were deposed on September 19th of 2025, were you asked the following questions and did you give the following answer on Page 253, Line 7?
Question: And the policies and procedures of the Transit Authority are based on the premise that customers will not enter the envelope of the train or the track bed, true?
Answer: Yes.
Were you asked that question and give that answer, sir?

A I did.
Q Thank you.
And by the way, to move it along, if I ask you a question that calls for a yes, a no, or a true or false, can you please state yes, no, or true or false; or if you're unable to answer it, just say you're unable to answer it, okay?
A Yes.
Q And Mr. Keaveney will have an opportunity to question you when I'm done to elicit whatever other testimony you wish, okay?
A Yes.
Q Okay.
And were the policies and the procedures of the Transit based on the premise that the customers will not enter the envelope of the train and the track bed, and that's been its policy since the inception through 2016, true?
A Yes.
Q And it's the policy and procedure of the Transit that customers who enter that track bed are unauthorized to be there, correct?
A Yes.
Q And the policy of the Transit is that because customers are not authorized to enter the envelope zone of the train

and the track bed, it is an unforeseen occurrence when they get hit by a train, true?

MR. KEAVENEY: Objection, leading.

THE COURT: Well, you have a tendency to do that. But I am going to allow it because this is, obviously, an adverse witness, and as part of your case, you can call him an adverse witness or --

MR. GENIS: Thank you.

A Yes.

BY MR. GENIS:

Q And it's been the same policy of the Transit Authority since its inception, is because customers are not authorized to enter the envelope of the track bed, it's an unexpected occurrence, true?

A Yes.

Q And, in fact, even if a person winds up on the track because they're sick, a heart attack, whatever, they fall, there's been an unsafe condition, they get pushed, or suicidal, or anything, they're still considered to be unauthorized on the tracks under your policy, correct?

A Yes.

Q And, in fact, the Transit Authority refers to customer in the envelope of the train and track bed as trespassers, correct?

A Yes.

Q Okay. Now, we discussed studies a moment ago. Do you agree that -- well, let's back up.
How long has the Transit Authority been looking at safety measures to prevent the hazard of train strikes?
A It must predate my -- my starting in 1986.
Q Okay. And, in fact, you testified as far as the '80s and certainly through 2013, correct?
A Yes.
Q And can we agree that there's a difference between looking into something and actually taking proper and effective correction action to prevent or mitigate the number of train strikes, that hazard?
A Yes.
Q Okay. And can we agree there's a world of difference between looking at something and doing a proper study of something?
A No.
Q Okay. Let's see, sir, were you under oath on August 14th of 2025 for the follow question and did you give the following answer?
MR. GENIS: Page 167, Line 6.
BY MR. GENIS:
Q Question: Okay. We agree that there's a world of difference between looking at something and doing a proper study of something, correct?

Answer: Correct.

Were you asked that question and did you give that answer under oath, sir?

A I suppose so, yes.

Q Okay.

Now let's discuss planning for a moment. The Office of System Safety and the Department of Subways and the MTA Construction & Development Departments, is that who's supposed to properly plan how to best prevent, reduce the number of deaths and injuries caused by the hazards of train strikes?

A Can you repeat that question, please?

Q Sure.

Okay. I'll do it this way so it's not leading. What departments with the Transit Authority and MTA are supposed to properly plan how to best prevent or reduce the number of deaths and catastrophic injuries caused by the hazard of train strikes?

A There are multiple departments that get involved in that.

Q Okay.

A You mentioned the Office of System Safety. That's one of them. Another one would be what's now called the MTA Construction & Development Corporation, which back in the 2010s was the New York City Transit Capital Program

Management Department. But a very important component would also be the New York City Transit Department of Subways.

Q Thank you.

Okay. So those are basically the three departments that are supposed to properly plan how to best prevent or reduce the number of deaths and injuries due to the hazard of train strikes, true?

A Yes.

Q Okay. Thank you.

And from the 1980s certainly through August 6th of 2016, did they ever actually implement a plan to effectively prevent and reduce the hazard of train strikes and the resulting death and injuries?

A Yes.

Q Okay. Sir, were you asked the following question under oath and did you give the following answer?

MR. GENIS: And this is on August 14th of 2025 Page 136, Line 25 -- I'm sorry. I went to wrong page.

BY MR. GENIS:

Q Question: And having decided that platform screen doors are effective at preventing and reducing the hazard of train strikes and the resulting deaths and injuries, has the Transit Authority granted a plan to take effective corrective action to effectively prevent or reduce the number of train strikes that hazard in the resulting deaths

and injury?

Answer: Are you asking me does the Transit Authority have a plan for platform screen doors?

Question: Well, since you told us that, that's what they concluded was effective -- okay. I'll ask it that for them.

Answer: At the moment, I don't believe so.

Question: So up to the present time, has the Transit -- withdrawn.

So up to the present time, the Transit Authority does not have a plan of how to effectively prevent or reduce the hazard of train strikes and the result in deaths and injury, true?

And you said --

MR. KEAVENEY: Objection.

THE COURT: Yeah. I don't see where that contradicts his testimony.

So the purpose of using a deposition, as I've tried to explain to you before --

MR. GENIS: You're right. Withdrawn, Judge. I'm sorry.

THE COURT: And this is -- you try to show that the witness who testified said something and you said something else during his deposition, so counsel can bring that forward. And then you can consider it in terms of the

credibility and assessment of the witness. But I don't see how that happens right here.

MR. GENIS: You're correct, Judge. It's withdrawn.

THE COURT: Sustained.

MR. GENIS: It's withdrawn, Judge. I was looking at the wrong page from my notes. I'm sorry. I apologize.

THE COURT: If he says something here that you think is inconsistent --

MR. GENIS: Yes.

THE COURT: -- bring it out. Otherwise, don't do that.

MR. GENIS: I apologize. It was a mistake, Judge.

THE COURT: Next question.

MR. GENIS: Okay.

Going to Page 142, Line 2.

BY MR. GENIS:

Q Were you asked this question and did you give this answer? Okay. And you're telling us from the '80s -- 1980s or the '90s to the present time, they never actually implemented a plan to effectively prevent and reduce the hazard of train strike and the resulting deaths and injuries, true?

Answer: Yes.

Were you asked that question and did you give that

answer?

MR. KEAVENEY: Objection to relevance.

THE COURT: I don't know what he said that was inconsistent --

MR. GENIS: Before he said --

THE COURT: -- with --

MR. GENIS: -- "no," Your Honor.

THE COURT: Excuse me.

Let me explain to the jury. There's a little confusion now.

You can explain to the jury the answer to that question.

THE WITNESS: So I -- when that deposition was done it was in the context of talking about platform screen doors, and we had not implemented anything related to platform doors.

There were, however, a number of initiatives that were intended to reduce the number of incidents, such as the introduction of customer information screens that would announce the arrival of trains and could count down for the time the train would arrive, which would give -- be an incentive for people to not lean over the platform.

So there were efforts underway. They were not as fail-safe as something like a platform screen door system would be.

MR. GENIS: Okay.

THE COURT: Thank you. You've explained yourself.

Next question.

BY MR. GENIS:

Q Okay. Now, when you say was in the context when I asked that earlier question at your deposition where you said there was no plan, the question right before was only asking you about study -- the hazard. It wasn't about platform screen doors.

Would you like me to read that for context?

MR. KEAVENEY: Objection, Your Honor.

THE COURT: I don't understand this. He explained himself.

Next question.

MR. GENIS: Okay. But he said it's not what the transcript indicates, Your Honor.

THE COURT: Next question.

MR. GENIS: Okay.

BY MR. GENIS:

Q So when you said there were measures, so was there an actual -- did you ever see a written safely plan by the Transit Authority for how it wanted to prevent or reduce the hazardous -- hazard of train strikes?

A No.

Q Okay. And for the measures that you were talking about

that has no written plan, was there an implementation date?
A The implementation date was a rolling one. Several years.
Q So there was no specific deadline for when these measures were supposed to be taken, correct?
MR. KEAVENEY: Objection. What time --
THE COURT: You know, you're saying --
MRL KEAVENEY: -- are we --
THE COURT: When you say there was no plan, but these things over a period of time, right?
THE WITNESS: Yes.
THE COURT: So how does that come to pass? Did you sit down or talk about these things? These's no plan.
THE WITNESS: There -- there are individual plans for measures, like customer information screens, which are addressing multiple issues. The main one is information for our customers. The plan would be to -- to have a contract and have it implemented over the course of that contract.
The customer information screens were installed starting in the 1990s, and they were --
THE COURT: But we've already heard about that.
THE WITNESS: Yeah.
THE COURT: I guess, you just -- there's some confusion in this trial, right?
THE WITNESS: Okay.

THE COURT: There was no general plan to do this, but these things happen sporadically or how does that --

THE WITNESS: It was an overall arching concept that we wanted to have these information screens in all stations, but --

THE COURT: You would talk about it and things would happen, but there was no plan as such, correct?

THE WITNESS: Not at one point. It was a series of things?

THE COURT: Did you reduce it to writing?

THE WITNESS: Huh?

THE COURT: Was it reduced to a written format?

THE WITNESS: Of course they were. They would have gone to the MTA board for approval of the --

THE COURT: Okay.

THE WITNESS: -- general contract.

THE COURT: So there were plans, but there were no plans. So I'm confused.

THE WITNESS: There -- there would have been plans as an entire planning process undertaken by the -- at that time, the Department of Capital Program Management. They would have put forth a plan to invest in platform -- platform signs, and that would then go and be approved in the Capital Program, and then they would issue contracts, engineering and then construction contracts.

THE COURT: So I'm a little bit confused. You said there was no overall plan, right?

THE WITNESS: In the context that Mr. Genis was asking of specifically for reducing --

THE COURT: Right.

THE WITNESS: -- people to -- falling on the track -- being on the tracks. But there have been, as far as I know, no overall plan --

THE COURT: No individual --

THE WITNESS: -- per se, but it was something that was expanding, yes.

THE COURT: Well, but from time to time that would be addressed; is that what you're saying?

THE WITNESS: Yes.

THE COURT: All right.

Your next question?

BY MR. GENIS:

Q And do any of these writings for these things that popped up from time to time say on them, that this is a safety plan?

A I don't know.

Q There was a plan in the late teens --

MR. GENIS: You know, it's after the time. I'm sorry. I'm not going to get into that.

BY MR. GENIS:

Q You mentioned before the CONOPS, that there was a design that would lead to other things that would eventually lead to a platform screen door pilot, correct?
A Correct.
Q Was that plan to do that ever carried out?
MR. KEAVENEY: Objection.
What time?
THE COURT: Yeah. What plan are you talking about? Remember he had plans all the time here.
MR. GENIS: I'm sorry.
THE COURT: Go ahead.
BY MR. GENIS:
Q Sir, you mentioned at the beginning of your testimony that one of the things you reviewed to prepare for this was what's called a CONOPS, Concept of Operations, correct?
A Yes.
Q And you told us that that was a CONOPS for -- to get -- to have somebody do a design to have further steps to eventually lead to a contract and having somebody install platform screen doors in a pilot project, correct?
A Eventually, yes.
Q Okay. Was that plan ever carried out?
MR. KEAVENEY: Objection, Your Honor. What time are we talking about? What time is --
THE COURT: Do you understand the question or do

you need to have some clarification?

MR. KEAVENEY: Your Honor, I'm talking about the time frame. Are we talking up to Ms. Harger's death?

MR. GENIS: Sure.

THE COURT: Ask him to explain. You know, if you are confused about it and -- if you don't understand what he's asking.

BY MR. GENIS:

Q And I'll gladly limit it to August 2nd of 2016 as your attorney suggested. I'll gladly do that.

A As of August 2nd of 2016, the plans that -- that stem from the platform screen door task force and the CONOPS document were still in place to have a pilot installed in a station, but no pilot had been installed by that time but it was still part of the planing. We were expecting to do so.

Q Okay. So let's back up a little bit. There was a plan, but it was carried out or it was not carried out?

A As of August of --

THE COURT: 2nd.

A -- 2nd of 2016, it was in the process of being carried out. It had not been completed.

BY MR. GENIS:

Q Well --

THE COURT: How much of it was completed --

THE WITNESS: It was --

THE COURT: -- under the process -- I mean, explain --

THE WITNESS: It was still --

THE COURT: Yeah, excuse me. Let me finish.

Explain what you mean in the process that it wasn't carried out.

THE WITNESS: It was still in the planning and engineering phases --

THE COURT: Right.

THE WITNESS: -- in the Department of Capital Program Management. I am not certain whether a contract had actually been awarded at the time -- at that time for construction, but it was -- there was design going on.

THE COURT: So it was in the planning stage?

THE WITNESS: Yes.

THE COURT: But you have no idea whether or not anything was done other than the fact that it was in the planning stage? That's what you're saying?

THE WITNESS: Yes.

THE COURT: All right. Go ahead.

BY MR. GENIS:

Q All right. So if it's just in the planning stage, can we agree that the plan was not carried out, effectuated, or implemented?

THE COURT: Well, he just testified.

Next question.
MR. GENIS: Okay.
BY MR. GENIS:
Q And when you say there was a plan, they had different plans that kept changing for where they were going to do a pilot, correct?
A Correct.
Q And then each time the earlier pilot proposal got canceled, correct?
A Correct.
Q Let's discuss study for a moment. What departments in -- of the Transit Authority are supposed to properly study how to best prevent or reduce the number of deaths and injuries caused by the hazards of train strikes?
A So then I'll go back to the three departments that I discussed earlier: The Office of Systems Safety, what was then called the Department of Capital Program Management, and Department of Subways.
Q Okay. And the Transit Authority has concluded that platform screen doors are an effective means of taking corrective action to address the hazard of train strikes, true?
A Yes.
Q By the way, did the Transit Authority ever do a study of how to best remediate the hazard of train strikes

resulting in death or injury?
A I don't know if the term -- for the term "best." So I can't answer.
Q All right.
MR. GENIS: Give my just a moment.
BY MR. GENIS:
Q Do you know -- and what is the name of this study that's concluded platform screen doors are the most effective means of preventing the hazard of train strikes?
A I -- I do not recall the name of the study.
Q When was that study issued?
A It would have been sometime around the time that we were doing the CONOPS, otherwise we wouldn't have gone forward with the CONOPS.
Q Okay. And this document was in writing?
A I don't know if it was in writing or it was a PowerPoint presentation.
Q Okay. Is a PowerPoint presentation a study?
A It can be a summary of study findings.
Q Okay. Is there a difference between a summary of study findings and an actual study?
A An actual study is, in fact, going through and collecting data and understanding the -- the issues at hand. The PowerPoint presentation can be a way of presenting the findings of a study.

Q Okay. So in other words, the PowerPoint is not the actual study, it's somebody's shorthand take on it, correct?
A It can be.
Q Okay. So getting back to the actual question. Have you seen the written study that concluded that platform screen doors were the most effective means of preventing the hazard of train strikes?
A I don't recall.
Q By the way, do you know if when they did this study there was a comparative analysis of the effectiveness side-by-side of the different safety measures and devices that were available?
A I do not know.
Q And, sir, according to the policies of the Transit Authority, they're supposed to evaluate the effectiveness or whatever -- of safety measures they've taken to prevent or reduce the number of hazardous train strikes, true?
A I believe so, but I can't be certain.
Q All right, sir.
And according to the good and accepted practice and procedures and protocols for the Transit Authority, should they evaluate whatever measures were taken in light of the actual operation of the system based on real data?
A That is their practice --

Q Okay.
A -- yes.
Q And in other words, you look back at the data to see if whatever you did was effective by reducing the numbers of hazardous train strikes, correct?
A Yes.
Q Okay. And do you know of any such studies, sir?
A I do not.
Q Have you ever read anything that said -- withdrawn, withdrawn.
So you told us they have to collect the data, which is the number of train strikes, the number of fatalities, the number of injured people for hazardous train strikes, true?
A I imagine so, but I'm not in the Office of System Safety, so I can't speak for them.
Q Okay. Well, you just told us a moment ago about how the data is collected and -- let's see -- well, sir, when you say you're not sure how the data is collected, were you asked the following question under oath and did you give the following answer?
MRL KEAVENEY: Objection. He's asking if how --
THE COURT: Sustained.
MRL KEAVENEY: -- the Office --
THE COURT: Sustained.

Next question.
MR. GENIS: Okay.
BY MR. GENIS:
Q So do you know if the Transit Authority has to collect the data of the number of train strikes, the number of fatalities and injuries as a result of hazardous strikes?
A Yes.
Q Okay. And do they?
A Yes.
Q Okay. And these are the key metrics used by the Transit Authority, correct?
A Yes.
Q Those are the metrics that are supposed to be analyzed, correct?
A Yes.
Q And part of your job is to manage and process data for external reporting of performance metrics, correct?
A It was at that time, yes.
Q Okay. And part of your job was to use data to support internal planning in operations improvement, correct?
A Yes.
Q And they keep these records of the train strikes, correct?
A My job did not involve keeping records of train strikes.

Q But you are aware of the strike list, the record number of people getting hit and killed by trains each year?
A I'm aware that it exists, but I don't work with it.
Q Okay.
MR. GENIS: And excuse me one second.
(Pause in proceedings.)
BY MR. GENIS:
Q And, sir, as a member of the different committees you were on and the platform task force, did you ever look to see if -- withdrawn. Foundation.
You're familiar with CoMET, correct?
A Yes.
Q Community of Metros?
A Yes.
Q And you've read some of their documents and you've been involved with them over the year, correct?
A Off and on, yes.
Q Okay. Since about 1997, I believe?
A Yes.
Q Okay. And when you've looked at their data, let's say from 2012 through 2016, can we agree that the Transit Authority ranked highest among the agencies proportionate to accidental train track issues for that time period?
A I don't recall the specific data, but I do recall the

Transit Authority did have that high number.
Q And, in fact, that categorization aligns with the Transit's data, correct?
A I believe so, but I was not familiar enough with the data to, you know, definitively.
Q All right. And when you saw that -- when your -- when we discussed data from 2012 through 2016, that had the Transit ranking Number 1 for accident worldwide, correct?
A I don't know.
Q And Number 3 for passenger hit on the platform worldwide, correct?
A I don't know.
Q And, sir, you also -- you're familiar with CoMET and Nova 2015 Safety Performance Indicators, correct?
A No, I'm not.
Q Are you familiar with Operations Planning, Global Benchmarking Best Practices?
A There is a group within Operations Planning called Global Benchmarking and Best Practices, yes.
Q And the Transit Authority would distribute CoMET and Nova safety performance indicators, correct?
A Yes.
MR. GENIS: And could I get Exhibit 44, please?
(Pause in proceedings.)
BY MR. GENIS:

Q Let me ask some other questions while he's looking for that.

You also reviewed both of the Pedrazza trials, as well as his deposition in Manhattan here, and a strike list involving incidents of people getting struck by trains, correct?

A I was shown the strike list.

Q Okay. And that was a document from the Transit Authority that was an accurate statement of how many people got hit by trains year-by-year and how many fatalities year-by-year, true?

A I believe so. But I had never seen it before the trial.

Q Okay. And --

MR. GENIS: One second.

BY MR. GENIS:

Q Okay. Sir, I have Exhibit 54 in front of me.

MR. GENIS: May I approach the witness with it?

THE COURT: Go ahead.

MR. GENIS: Okay.

BY MR. GENIS:

Q Sir, I would like to show you Transit Authority printout of collisions with individuals.

Is that a document --

MR. KEAVENEY: Which exhibit is that?

MR. GENIS: Exhibit 54.

THE COURT: Just a second. Is this in evidence?

MR. GENIS: Platform.

THE COURT: Is this in evidence?

MR. GENIS: Was there an objection?

THE COURT: Just one second.

You're showing him a document now?

MR. GENIS: Yes.

THE COURT: Is that a document that's in evidence or do you wish to introduce it into evidence?

MR. GENIS: I wish to introduce it into evidence.

THE COURT: So do you have this on your evidence list?

MR. GENIS: That's what I was just asking.

MR. KEAVENEY: What number is it.

MR. SHIELDS: 54.

THE COURT: So which number is it?

MR. GENIS: 54.

THE COURT: All right. And you want to introduce 54 in evidence?

This is why we spend a lot of time, ladies and gentlemen of the jury, talking before the trial starts to avoid this type of, you know, back-and-forth.

So I have 54 on your list, and I don't have any objection to it. So there's no reason why it can't be

posted into evidence.

MR. GENIS: Thank you.

THE COURT: You can explain to the jurors what it is.

MR. GENIS: Okay.

BY MR. GENIS:

Q So, sir, do you see how that -- it's data from the Transit Authority for collisions with individuals?

A Yes.

Q And has that ever been reviewed by you?

A No.

THE COURT: So 54 is -- I have here 1987 through 1988, a 2016 struck list. That's what you have identified, right?

THE WITNESS: Yes.

THE COURT: And that's what this document is, right?

MR. GENIS: Yes.

THE COURT: All right. So that's in evidence at this time.

(Plaintiff's Exhibit 54 received in evidence.)

MR. GENIS: Okay. 54.

BY MR. GENIS:

Q And we also -- you've looked at what's in evidence as a struck chart, correct?

THE COURT: Are you referring to --

MR. GENIS: I'm going to show --

THE COURT: -- Exhibit 54?

(Pause in proceedings.)

MR. GENIS: This one is in evidence, and we made a poster of it, as well, Your Honor.

THE COURT: Now, you have a blowup of that document that's in evidence, correct?

MR. GENIS: Yes, Your Honor.

THE COURT: You're representing that that's part of Exhibit 54; is that what you're saying?

MR. GENIS: No --

MR. ROTH: 71, Your Honor.

MR. GENIS: 71, Your Honor.

THE COURT: This was part of 71?

MR. GENIS: Yes.

THE COURT: All right. Let me take a look at that again.

MR. GENIS: Sure.

THE COURT: 71 is not in evidence now, but there's no objection to it.

So this is your 2001 to 2018 struck chart, right?

MR. GENIS: No, we stopped at 2016, Your Honor.

THE COURT: It's 2001 to 2015 --

MR. GENIS: '16.

THE COURT: -- is that what you have?

MR. GENIS: 2016, like until the date of the incident.

THE COURT: 2016, right?

MR. GENIS: Yes.

THE COURT: That's the struck chart, all right. 2001 to 2016?

MR. GENIS: Yes.

THE COURT: That's what Exhibit 71 is?

MR. GENIS: No, 2006, I'm sorry to 2016.

THE COURT: Look, we're just trying to make a record.

MR. GENIS: I'm sorry, Your Honor.

THE COURT: There's no objection to posting Exhibit 71, but we want to hear exactly what it is.

All right. Maybe the witness can tell us what this document is?

THE WITNESS: I have seen charts like that before, but I don't know whether I have seen this very specific chart.

THE COURT: Okay.

You can tell the jurors, Mr. Genis, what that represents.

MR. GENIS: Okay.

BY MR. GENIS:

Q Sir, this is train strike incident fatalities by the year, and you see, sir, 2006 --

THE COURT: Look, just tell the jurors what that chart represents.

MR. GENIS: Thank you.

THE COURT: I'm allowing you enter the chart into evidence. There's no objection to it.

MR. GENIS: Thank you.

(Plaintiff's Exhibit 71 received in evidence.)

THE COURT: Just explain in simple terms what it is.

MR. GENIS: Sure.

It's a chart that shows the train strike incidents and fatalities by year. It's colored-coded in black --

THE COURT: All right. So it shows fatalities throughout the years from what year to what year?

MR. GENIS: 2006 to 2016.

THE COURT: That's what it shows, all right.

I think we saw something similar to that before. Maybe I'm confused.

MR. GENIS: This one, Your Honor.

THE COURT: That was previously introduced into evidence?

MR. GENIS: Yes, Your Honor.

THE COURT: Well, I don't have that one.

MR. ROTH: Your Honor --

THE COURT: This is 71. I'm a little confused.

MR. ROTH: Your Honor --

THE COURT: You don't talk.

71's in evidence. I think that chart was in evidence before.

MR. GENIS: Yeah.

THE COURT: So it's in evidence twice?

MR. GENIS: May he.

THE COURT: Let's go forward with your questioning.

MR. GENIS: All right.

THE COURT: Let's proceed.

BY MR. GENIS:

Q So, sir, you see how -- well, the lowest --

THE COURT: What questions do you want to ask the witness about that chart?

MR. GENIS: I would like to ask him if he sees the lowest year was 2006 with 109 strikes and 38 fatalities --

BY MR. GENIS:

Q Correct?

THE COURT: Well, you can explain it.

MR. GENIS: All right.

THE COURT: It's right before the jury.

MR. GENIS: All right.

THE COURT: You can say what it shows.

Okay.

BY MR. GENIS:

Q Do you see how it trended upwards over the ten years for 109 train strikes in 2006 to 168 in 2016?

THE COURT: All right. That's in evidence, the jurors see it.

Next question.

So folks, you know, when you're deliberating I'm going to give you an exhibit list instead of giving you all of these documents and charts in the jury room, and you'll be able to pick and choose as you choose to see what you want to see from the list I'm going to give you, okay?

MR. GENIS: Thank you, Judge.

BY MR. GENIS:

Q So, sir, according to the Transit Authority how many train strikes resulting in death or serious injury are acceptable to the TA per year?

A I can't answer that question. I don't know what you mean. How do define "acceptable"? We try to have as few as possible and preferable none.

Q Okay. So, for example, we've already had some testimony that if it's -- if it's high-risk level, corrective action is required --

THE COURT: You've had a lot of testimony --

MR. GENIS: Yes.

THE COURT: -- about that.

MR. GENIS: Yes.

THE COURT: This is getting a little repetitious.

What do you want to know from this particular witness.

MR. GENIS: Okay.

BY MR. GENIS:

Q Well, assuming that testimony, can you tell us since corrective action is required what is the number? What's the cutoff for you deciding, Yes, it's a high risk that requires immediate corrective action --

THE COURT: The question is not -- look, nobody wants to see anybody killed at a train station, right? So as a practical matter, these thing happen, you know that, right?

THE WITNESS: Yes.

THE COURT: Is there any policy that you have that you take certain corrective action when the number of deaths exceeds a certain number? I think that's what he's trying to understand.

Do you do anything about that?

THE WITNESS: That is something that I don't know what the answer would be, because that's a high-level-policy decision that would be made by the president or the --

THE COURT: Just give us your --

THE WITNESS: And I don't have particular knowledge about it. I'm not involved in making a decision as to what is an acceptable number of such strikes. So I can't answer that question.

THE COURT: Is that your involvement -- is that your answer?

THE WITNESS: Yes.

THE COURT: All right. Next question.

BY MR. GENIS:

Q I would like to show you Plaintiff's 44.

MR. GENIS: I don't recall, Judge, if you said that was in evidence or --

THE COURT: Well, 44 is not in evidence yet. If you want to introduce it as evidence at this time?

MR. GENIS: Yes.

THE COURT: There's some objections to that.

Let me hear what this witness is going to explain what that document is.

MR. GENIS: Sure. May I approach the --

THE COURT: And you can show it to the witness.

MR. GENIS: Okay.

BY MR. GENIS:

Q Sir, I've shown you a document from 2015, and do you see how it says at the bottom MTA, New York City Transit?

A Yes.
Q Okay.

THE COURT: Do you understand what that document is, when you review it, do you understand what it says?

THE WITNESS: I -- I understand it was a -- a summary of a study from CoMET and Nova about safety performance indicators. I don't recall seeing it.

THE COURT: A document from your -- from the Transit Authority?

THE WITNESS: From the Operations Planning Department's Benchmarking Group, yes.

THE COURT: Okay.

THE WITNESS: That much I can tell you.

THE COURT: We'll allow 44 into evidence at this time.

(Plaintiff's Exhibit 44 received in evidence.)

MR. GENIS: Thank you.

And what I'm going to do, Your Honor, with the assistance is put on the scene --

THE COURT: Well, let's go forward.

MR. GENIS: Thank you.

BY MR. GENIS:
Q So this is the --

MR. GENIS: Oh, got -- it's upside down.

BY MR. GENIS:

Q -- this is the CoMET Nova Safety Performance Indicators --

THE COURT: Let me interrupt.

Explain to the jurors what CoMET and Nova means.

THE WITNESS: So CoMET and Nova were two benchmarking groups of rapid transit systems where individual members would compare the data of -- of their performance.

CoMET was for large metros, like New York City Transit or London Underground or Paris Metro.

Nova was for smaller organizations --

THE COURT: That was all prepared by the Transit Authority?

THE WITNESS: So this is summarizing what the CoMET and Nova documents that were sent to Transit Authority by the Imperial College of London, which actually London is in London England, which actually manages --

THE COURT: We don't need -- you don't have to get that complex about it. These are documents of the Transit Authority, correct?

THE WITNESS: These are summary documents from the Transit Authority --

THE COURT: Transit Authority documents.

Let's go.

MR. GENIS: Sure.

BY MR. GENIS:

Q And there is a section for safety performance indicators, correct?

A I see that.

Q And then you'll note that New York City Transit rates the highest number of persons on platforms struck by trains. The metros that they have -- at least 75 percent of their stations that have platform doors have no instances of persons hit by trains, correct?

A I see that.

Q All right.

MR. GENIS: Is 67 and 68 in evidence?

MR. SHIELDS: No.

THE COURT: Do you want 67 and 68 in evidence at this time?

MR. GENIS: Yes.

THE COURT: All right. There are no objections to that. It's in evidence.

MS. WINTERS: Actually, Your Honor, if I may? There were objections to that document.

THE COURT: Oh, yes, there were.

So show it to the witness and we'll have him identify what they are.

MS. WINTERS: Okay.

THE COURT: Let's take 67 first.

MR. GENIS: Sure.

THE COURT: Tell me what 67 is.

THE WITNESS: So 67 would appear to be a summary of key performance indicators that the New York City Transit submitted to CoMET for calendar year 2013.

THE COURT: That's an additional summary of the documents from the Transit Authority, correct?

THE WITNESS: Data from the Transit Authority that then went to CoMET and came back to the Transit Authority.

THE COURT: Okay. The note I have here is 2013 data?

THE WITNESS: Yes.

THE COURT: All right. That's in evidence at this time.

(Plaintiff's Exhibit 67 received in evidence.)

MR. GENIS: And I'm showing the witness now 68, Your Honor.

THE WITNESS: 68 is basically the same kind of document but it's for calendar year 2009.

THE COURT: All right. So 67 is for 2013 and 68 is for 2009, correct?

THE WITNESS: Correct.

THE COURT: All right. I will allowed them both into evidence.

(Plaintiff's Exhibit 68 received in evidence.)

MR. GENIS: Thank you, Your Honor.

BY MR. GENIS:

Q And this is a performance data, and it shows how New York is one of the poorest subway systems, correct, for safety?

MR. KEAVENEY: Objection.

A So --

THE COURT: Yeah, go ahead.

Do you want to ask him a question about that, you want to point out something on that document?

MR. GENIS: You know what, Judge? It's in evidence, the jury has it, I'm going to move on.

THE COURT: Okay.

BY MR. GENIS:

Q All right. So what I was asking you before, I'm not sure, is there, for example, some sort of plan or safety plan with the Transit about what the number or the acceptable level is that they don't need to do corrective action; is there a number of people hit by trains?

A I don't know. But it's not, as the judge, my bailiwick.

Q Okay.

Now, who is the paramount safety arbitrator within the MTA family?

A So the Office of Systems Safety, the paramount for the

New York City Transit in -- and I can't speak how it was in 2013 or '16. Currently it's the System Safety is the MTA department.
Q Okay. We're talking about before August 2nd of 2016, just all my questions are --
A I believe Systems Safety --
Q All right.
A -- would have been the New York City Transit Department at this time.
Q And, sir, you were in Operations, correct?
A I was in Operation Planning, which is actually not part of the Operating Department.
Q Okay. Was safety an important part of your operation?
A Safety is one of the many factors that we have to be aware of. We are all trained in safety. But it is -- it is not the only thing that we're focused on. We're focussed on many other factors, as well.
Q And can changes in operational practices be done to improve safety with respect to train strikes?
A They can be, yes.
Q And did your unit take any action to reduce train strikes?
A My unit would not have been involved --
Q Okay.
A -- in specifically reducing train strikes.

Q Okay.
Sir, I -- I don't want to beat a dead horse about what other witnesses testified. But do you agree that train strike resulting in death or serious injury about three to five times a week is frequent?
A Yes.
Q Okay. And do you agree that every week that goes by without taking effective correction action, another general three to five people will be hit?
MR. KEAVENEY: Objection. Calls for speculation.
THE COURT: Sustained.
BY MR. GENIS:
Q Well, if they fail to take corrective action to prevent or reduce the number, can we agree it will just continue?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
MR. GENIS: Okay.
BY MR. GENIS:
Q Well, sir, have you ever -- well, withdrawn.
Does it comply with the policies and procedures of the Transit Authority that where they have three to five people getting hit a week, that they should take prompt and effective corrective action to either prevent or reduce that number?
A I don't know the answer to that question. I -- I -- I

cannot answer that based on policies and procedures.

Q Okay. How about does it comply with good and accepted practices and procedures for a mass transit subway system where there's three to five people a week getting hit on average, to take prompt corrective and effective corrective action to prevent that from occurring?

A One can take prompt -- one can look at it and examine it and study it. But whether it's prompt, I cannot answer that question. That is, again, outside of my bailiwick.

Q Well, sir, were you asked this question and did you give this answer on August 14th 2025?

MR. GENIS: Page 19, Line 5.

No, that's it.

BY MR. GENIS:

Q Sir, Question: You worked for the -- okay. Well let me ask you: According to good and accepted practices and procedures for mass transit subway systems where there was a system that allows three to five people on average to get hit by trains that resulted in death or catastrophic injury, does it comply with good and accepted practices and procedures for that system to take prompt and effective corrective action to either prevent or reduce the number of people being struck by trains or killed or catastrophic injured?

Answer: In general, yes.

Did you give that answer to the question, sir?
A Yes.
Q And do you agree with that answer?
A In general.
Q Okay. Thank you.
Do you agree that without question, platform doors can be installed in many, many train stations in the New York City Subway System?
A In many train stations, yes.
Q Okay. Now, some of the stations have curves and really sharp curves in the tunnels coming into the station, right?
A Yes.
Q Okay. And that can make it difficult for an operator to see the station before they enter the station, correct?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
BY MR. GENIS:
Q Well, where there's a limited sight distance, would that help prevent incidents if there were platform screen doors at those stations?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
MR. GENIS: Okay.
BY MR. GENIS:
Q Sir, you mentioned before Nova. Did you ever compile a

last of 39 rapid transit systems that have installed platform screen doors in some or all of their stations based on Nova?
A Based on Nova and CoMET, yes.
Q Okay. And your list of 39 different systems that have it, this was years ago that you did it, correct?
A Yes.
Q So back in 2010, correct?
A Yes.
Q And you included Las Vegas and JFK train -- train-to-the-plane, correct?
A Air train, yes.
Q And, sir, you're also familiar with fixed rail like a fence, correct -- or rail links, like a fence?
A Oh, rail links?
Q Yes, sir.
A Okay.
Q And that's not new technology, correct?
A No.
Q And one of the purposes of a fixed rail barrier is to prevent the person from coming into contact with a train, correct?
A Yes.
Q And can fixed rail be effective at reducing the number of people killed as a result of hazard of train tracks?

A I may. I really don't know specifically.
Q Okay. Well, can we agree that at this station where my client was standing, if there had been a fixed rail barrier at that location, can we agree she has no contact with the train?
MR. KEAVENEY: Objection.
THE COURT: Overruled.
A I don't know whether she was standing. I can't answer that question.
BY MR. GENIS:
Q Okay. Well, wherever it was she was standing if there was a rail right there?
A If there had been a rail right there, yes. But I -- I can't answer the question specifically for the incident because I don't know --
Q Fair enough.
A -- where she was standing.
Q Fair enough.
Okay. By the way, was it feasible, possible, and practical to install fixed rails when you first started at the Transit in the 1980s?
A I imagine so. It had -- it had not come up at that time, so I don't know the answer. But I imagine it would have been.
Q Well, and was it feasible, possible, and practical to

install railings in 2010?
A Again, it hadn't come up in that context, but, again, I imagine it would have been.
Q Okay. Well, sir, now you're imagining. I would like to ask you under oath on September 19th, 2025 --
THE COURT: Well, assuming you said anything differently at your deposition. He's going to read back what you said in your deposition to see whether it was inconsistent with what you said now.
Go ahead.
BY MR. GENIS:
Q Question -- Line 16, Page 312: It was feasible, possible, and practical to install railings in 2010, true?
Answer: Yes.
MR. KEAVENEY: Objection. That's what he said.
MR. GENIS: No, he said "I imagine."
THE COURT: Overruled.
Go ahead and wait for the reply.
BY MR. GENIS:
Q Is that true, sir?
A Yes.
Q And then question, next line: It was feasible, practical, and practical to install railings when you first started at the Transit in the 1980s, true?
Answer: Yes.

Were you asked that question?
A Yes.
Q Thank you.
Now, one of the biggest concerns -- or challenges, I should said, of installing the platform screen doors is the cost, true?
A Yes.
Q Okay. And cost is a factor in terms of evaluating the challenges to the installation of these, correct?
A Yes.
Q Okay. And, sir, I'm going mispronounce the name. I apologize.
Are you familiar with a Mysore Nagaraja?
A Mysore Nagaraja.
Q Thank you.
And the spelling for the reporter is?
A N-A-G-A-R-A-J-A.
Q Correct.
And Mysore is?
A M-Y-S-O-R-E.
Q Outstanding.
Okay. And what was his position.
A In what year?
Q Well, was he president at one point of the MTA CC?
A The MTA Capital Construction Company, yes.

Q Okay. And what is that, just for our benefit?
A For the MTA Capital Construction Company is the organization that has now turned into the MTA Construction & Development Department. It was in the mid-2010s and early 2010s responsible for undertaking major construction projects in the -- in the world of the MTA, both the Transit Authority and for other MTA agencies like Long Island Railroad and MetroNorth.
Q And, sir -- you gave testimony, sir, about how Mysore had almost negotiated to install platform screen doors at no cost at certain stations and that was rejected, correct?
A Mysore was involved in that, and ultimately, it did not happen.
Q Okay.
A But I -- I can't give you the saying that he negotiated that, but -- or specifically what his -- his role was in that. But I do know he was involved.
Q Okay. And you know that that was rejected, correct?
A Ultimately it was, yes.
Q Okay. And then you're familiar with the Number 7 Line Extension, correct?
A I am.
Q And you were involved in that as well, correct?
A I was.
Q And there were writings, emails back and forth between

you and a Lisa Schriebman, S-C-H-R-I-E-B-M-A-N, correct?
A Yes.
Q Okay. And there was discussion with that MTA CC staff, correct?
A Yes.
Q And you were familiar with what was known as the HYDAC, the Hudson Yards Development Corp., correct?
A Yes.
Q And they were the funding partner for the Number 7 Line Extension, correct?
A Yes.
Q And they offered to pay for platform screen doors to be installed for free on that Number 7 Extension if the Transit Authority would declare platform doors a new standard for new construction, true?
A I don't recall it in that specific way.
Q Well, let's see...
MR. GENIS: I'm just trying to flip through it. Okay.
(Pause in proceedings.)
BY MR. GENIS:
Q Sir, when you say you don't remember the particulars. You responded literally the same day and thought that that would be rushing to make some procedural -- profound decisions, correct?

MR. KEAVENEY: Objection. Leading.

THE COURT: Well, I'm going to allow these questions here.

Go ahead.

A Perhaps if you could read the email that I was responding to?

MR. GENIS: Judge, we're getting it right now.

BY MR. GENIS:

Q But I could flip to your transcripts now if you would like where it was testified about.

(Pause in proceedings.)

MR. SHIELDS: It's Number 18 in evidence.

THE COURT: Is this in evidence?

MR. KEAVENEY: No objection.

THE COURT: What?

MR. SHIELDS: Yes, Your Honor, it's in evidence.

THE COURT: What is the exhibit number?

MR. SHIELDS: Number 18, Your Honor.

THE COURT: Pardon?

MR. SHIELDS: 18.

THE COURT: Let me check.

18 is not evidence before. But to the extent it's going to be in evidence now, no objections, go ahead.

(Plaintiff's Exhibit 18 received in evidence.)

THE COURT: It's an email, apparently?

MR. GENIS: It's a chain of emails, Your Honor.

THE COURT: Yeah. If you want to read something from it, go ahead.

MR. GENIS: Yes, please.

(Pause in proceedings.)

MR. GENIS: All right. Let's go to the deposition and see if that helps.

THE COURT: Well, wait a second. What about that Exhibit 18? It's in evidence now. Do you not want to read something from that for the jurors?

MR. GENIS: I will use it at a different point. Right now I'm not discussing it, Your Honor.

THE COURT: But it's just in evidence right now?

MR. GENIS: Yes?

THE COURT: You're not using it at this particular time?

MR. GENIS: Correct.

THE COURT: All right. Next question.

MR. GENIS: All right.

There we go.

BY MR. GENIS:

Q So, sir --

MR. GENIS: -- I'm going to refresh his recollection. May I show the witness his transcript?

THE COURT: I have no idea what you have to

refresh the recollection about.

MR. GENIS: Okay.

THE COURT: Michael, you might want to shut off the screen.

THE COURTROOM DEPUTY: Yeah, I got it shut off.

(Pause in proceedings.)

MR. GENIS: All right.

BY MR. GENIS:

Q Sir, on Page 350, Line 7 you asked this --

THE COURT: Why don't you ask him a question.

MR. GENIS: Sure.

BY MR. GENIS:

Q Okay. I was asking you before about the emails that you were involved with with Lisa Schriebman and the New York City Number --

I'll withdraw it -- on the Number 7 Line Extension? And did you ever put after that offer was made to do it for free that this is highly premature, we are in no position to create a new standard even for new construction. Rushing to make some profounding decisions --

A Yes.

THE COURT: Well, are you reading from a document in evidence?

MR. GENIS: I am reading from his sworn deposition.

THE COURT: Well, why are you reading from his deposition? This objection is sustained.

If you want to ask him a question, ask him a question.

MR. GENIS: Sure.

THE COURT: You're not reading from his deposition now.

MR. GENIS: Okay.

THE COURT: You're using it for impeachment purposes. He's a witness. You can ask him the questions.

MR. GENIS: That's why I wanted -- I offered it before I showed to him to refresh his recollection, Your Honor.

THE COURT: Maybe he has no need to have his recollection --

MR. GENIS: Okay.

THE COURT: -- refreshed.

MR. GENIS: All right.

BY MR. GENIS:

Q Did you say that -- response to the pre-funding, that "This is the tail wagging the dog"?

A I used that phrase. But I don't recall that it was an offer from Hudson Yards for free funding of platform screenings.

THE COURT: Well, what is your knowledge about the

funding in any of this?

THE WITNESS: To some degree, a very limited degree, but yes.

THE COURT: A limited knowledge? I don't know exactly what he wants, if he wants to know about whether that was funding or whether that was --

THE WITNESS: So the Hudson Yards Development Corporation was funding the construction of the 7 Line Extension, the construction of it, not the operation of it, not even the purchasing and cost.

The station at 34th Street had already been in design when New York City Transit suggested that they wanted to install platform scene doors there. It was being evaluated and my recollection -- and -- and if Mr. Genis can find the email I was responding to -- was that Lisa Schriebman said that Hudson Yards Development Corporation would or might fund doors if the Transit Authority declared platform screening doors to be a standard for new construction.

But it wasn't actually a statement by the Hudson Yards Development Corporation. It was a statement by Lisa Schriebman, who works for New York City Transit. So I didn't know if that was actually an offer from Hudson Yards or just her interpretation of what they would offer if we went forward.

So that's why I said I can't --

THE COURT: So it was a possibility of what was being offered?

THE WITNESS: Yes.

THE COURT: Is what was explained.

So basically you have this conversation or you have this knowledge of this Lisa woman.

And who is she again?

THE WITNESS: Lisa at that time was working in the -- in the Capital -- Department of subways, I believe.

THE COURT: For the Transit Authority?

THE WITNESS: For the Transit Authority.

THE COURT: She was talking about possibly that this would be funded? If you could explain it again for the jury?

THE WITNESS: She was explaining of the possibility that there might be funding from the Hudson Yards Development Corporation if the Transit Authority were to declare platform screen doors to be the new standard for new construction.

THE COURT: Okay.

THE WITNESS: But I don't know if that information for her assertion comes from Hudson Yards Development Corporation telling her that.

THE COURT: All right. I think you have explained

this sufficiently for the jury.

Next question.

MR. GENIS: Sure.

BY MR. GENIS:

Q And were you a proponent of doing this or an opponent for doing this?

A There was no --

THE COURT: Did you have anything to do about whether it should be funded or should not be funded?

THE WITNESS: I was not involved in funding, so I cannot -- I -- I couldn't say whether it should be funded this way or that way or whatever.

THE COURT: All right. You were not involved in that --

THE WITNESS: No.

THE COURT: -- at all is what you're --

THE WITNESS: Yes.

THE COURT: -- saying.

THE WITNESS: Yes.

THE COURT: Okay.

Next question.

BY MR. GENIS:

Q Now, sir, when they were talking about this as a new standard, you were on some other emails with a Don Iannuzzi and an Andrew Bata, correct?

A Correct.

MR. GENIS: And, Your Honor, I'm going to offer Plaintiff's 27 in evidence.

THE COURT: Let me take a look.

27 I have in evidence already. An email from Bata, RE: Platform door recommendation.

That's already in evidence.

MR. GENIS: Thank you.

THE COURT: Go ahead.

MR. GENIS: All right. I'm putting it on the screen now.

BY MR. GENIS:

Q The bottom email is where it starts --

MR. GENIS: And if I could zoom in a little?

And this is a zoom on email November 7, 2011.

BY MR. GENIS:

Q And you're cc'd on it, and it's from Don Iannuzzi, correct?

A Yes.

Q And Don Iannuzzi was the chief mechanical engineer for Capital Program Management, correct?

A Yes.

Q And Don Iannuzzi said, platform scene doors should have been a standard at the new stations ten years ago, correct?

A Yes.

Q And then Andrew Bata, he was the chief of Strategic Improvement and Best Practices in the Office of Strategic Innovation and Technology, correct?
A Yes.
Q And he said "absolutely," with four question marks -- or exclamation points, I should say, correct?
A Yes.
Q And so there was support by engineers and others for this project?
THE COURT: Save it for summations.
MR. GENIS: Sure.
MR. KEAVENEY: Your Honor --
BY MR. GENIS:
Q Then there were other offers to build an Operation Transfer Agreement before the RFI New York City, correct?
A Yes.
Q And there were offers in 2010, January 12th to be specific, an offer to retrofit New York City Transit Subways at not cost, correct?
A Yes.
Q And, in fact, President Prendergrast requested that you explore the viability of that offer, correct?
A As part of the team, yes.
Q Okay. And the Transit Authority decided it was necessary to send people to Korea to see installations of

platform screen doors in Seoul and Bucheon, correct?
A Yes.
Q And in the trip to Korea, the company said -- let's back up.
The original offer was by the SMRT Company to retrofit in New York City in a bought agreement at no cost, correct?
A Yes.
Q All right. And that was unsolicited proposal, correct?
A Correct.
Q Okay. And there were other unsolicited proposals over the years, 2007, 2009, 2010 earlier in the Transit Authority for that, correct?
A I'm not aware of them.
Q Okay.
Well, then people went to Korea, and they issued trip reports, correct?
A I believe so, yes.
Q Okay. And what you were told by the team that went to Korea is that -- is that it successfully completed the installation of platform screen doors in all 148 operating stations, correct?
A If that's what the report says, yes.
THE COURT: If you have the report -- what year was this again?

MR. GENIS: This is in 2010, January.
THE COURT: 2010.
Are you aware of that report?
THE WITNESS: Yes.
THE COURT: Okay.
MR. GENIS: He's getting it for us right now, Your Honor.
(Pause in proceedings.)
THE COURT: Do you want that report in evidence?
MR. GENIS: Yes, Your Honor.
THE COURT: What exhibit number?
MR. GENIS: I have it as 13.
THE COURT: All right. Let me double-check.
All right. I have it. That's the trip to Korea reports.
No objection, in evidence at this time.
MR. GENIS: Thank you.
(Plaintiff's Exhibit 13 received in evidence.)
BY MR. GENIS:
Q It's dated -- and this one's dated February 12th of 2010, correct?
A Yes.
Q And, in fact, the inspection team included a gentleman by the name of Tony Abdallah, correct?
A Yes.

Q And the recommendation was, "Overall the trip was a success. The team walked away with a detailed description of overall operation understanding."

Correct?

A Yes.

Q And the team proposed that these Korean companies be granted the opportunity to install several modular units at unused stations, correct?

A I can't read the bottom of it. I'm sorry.

Q Oh, I'm sorry. Let me try to...

Is that better?

A Yes.

Q Okay. I could restate it --

A No, no. It just -- it was cut off at the bottom.

Q All right.

And then the proof of concept recommended locations to that, correct?

A Yes.

Q And so after people went to Korea and they agreed it was successful, they recommended that they follow up with that, correct?

A Yes.

Q Okay.

In fact, when they went to Korea they leaned that the platform screen doors were 100 percent effective at

removing suicide deaths, correct?
A If it's that report, yes.
Q And they also offered that Korea company that New York City Transit would get up to 10 percent of net profit sharing for 30 years after they had it for a number of years of their own, correct?
MR. KEAVENEY: Objection, leading.
THE COURT: Well, look, the report is in evidence.
THE WITNESS: Okay.
THE COURT: Do you want to read to the jurors any part of it? I'll let you do that.
If you want the witness to read it? If you want me to read it?
Let's move on.
MR. GENIS: Okay. Thank you.
BY MR. GENIS:
Q Sir, let me get to the RFI, because you're familiar with that; you helped create the RFI, correct?
A Yes. I was part of the team for that.
Q Okay.
MR. GENIS: I have a copy of it, and that's in evidence already, Your Honor.
And I'm going to look at Plaintiff's 19 in evidence.
THE COURT: 19 is in evidence.

MR. GENIS: Okay.
BY MR. GENIS:
Q Okay. And this was the RFI that you helped create, true?
A Yes.
Q And you put the necessary criteria that was needed to evaluate responses to this RFI, correct?
A The team put together the criteria, yes.
Q Okay.
And the reason -- why did you do this RFI, Request For Information?
A So we had gotten this unsolicited proposal from the Korean team called Test Partners. And from a procurement standpoint, we couldn't move forward with just a single proposal that had been brought to us unsolicited. That would be, to my understanding, inconsistent with procurement rules and laws for the MTA Transit Authority. We also felt that we needed to see more from the industry. So that is why we had a two-pronged approach following the Test Partners' proposal.
One was to put together the Concept of Operations that basically was to say if we were to install platform scene doors in the system, this is how we would want to operate, maintain, and install, et cetera. And that in turn was done in parallel with developing the RFI. So that

essentially the same team that was developing the -- the CONOPS was also developing the RFI, and the evaluation of the RFI would be based on what the CONOPS had said.

So a number of these -- the attributes that are listed in the RFI came out of the CONOPS as to what we wanted the system to look like if we were to do it. And then it went out to the industry to -- to known vendors and engineering companies that have --

THE COURT: Well, let me interject there. You're going on and on and on --

THE WITNESS: Okay.

THE COURT: -- and I don't believe the juries following you.

THE WITNESS: Yes.

THE COURT: Let's limit your testimony and stay a little bit more focused.

Let's take our morning break now. We've been going for almost an hour and a half. And we'll return at a maybe quarter 'til 12:00. I have a conference I have to attend to.

And in the meantime, you can see whether you can focus your questioning a little bit better --

MR. GENIS: Thank you.

THE COURT: -- and maybe conclude with his testimony.

How much more time do you think it will take?

MR. GENIS: I think I'm done in under a half an hour, Judge.

THE COURT: Well, you'll have a chance to reflect upon that at our break.

MR. GENIS: Thank you.

THE COURT: We'll see if we can conclude his testimony at 12:00 or 12:15, or thereabout. Maybe we'll take our lunch break then, maybe we won't.

MR. GENIS: All right. Thank you.

THE COURT: We'll see you at 11:45.

MR. GENIS: Thank you, Your Honor.

THE COURTROOM DEPUTY: All rise.

(Continued on the next page.)

(Witness takes the witness stand.)

THE COURT: Mr. Keaveney, do you have a lot of cross? Do you want to do it before or after lunch.

MR. KEAVENEY: It's at least a half hour.

THE COURT: There's no pressure.

MR. GENIS: I got myself organized with the records, Judge, so I can go smoother. I apologize.

THE COURT: Look, action you're very well prepared, okay? Mr. Roth, you're a well prepared guy. He's your man, he's on top of you all the time, I get it. But sometimes the jurors start yawning a little bit. There's such a thing as too much a good thing sometimes, but it's your case.

MR. GENIS: I took to heart what you said.

THE COURT: You've been around the block a few times. I like the word block, by the way. You haven't been around this block. You are highly skilled and you have to deal with Judge Block.

COURTROOM DEPUTY: All rise.

(Jury enters courtroom at 11:57 a.m.)

COURTROOM DEPUTY: You can all be seated.

THE COURT: I kept you waiting a little bit I just had an important conference I had to take care of. Sometimes we judges have to multitask because this is not the only case we have, like, try 450. So we can't do them

all at once, right? So we have a lot of moving parts and once in a while I have to keep you folks waiting while I tend to other things as well. It hasn't been too bad. We're going to try to finish the direct examination of this witness before the lunch break.

I hope you brought lunch with you because it's raining outside. You may or may not know that downstairs in the cafeteria, they have a lot of food in case you want to use it, that's what I do. In the meantime, let's see whether we can let these people go out for lunch in the next 20 minutes or half hour.

Go ahead. Wrap up your direct examination.

MR. GENIS: Thank you.

We have Plaintiff's 15 in evidence and it's already on the monitor, Judge.

THE COURT: 15?

MR. GENIS: 15.

THE COURT: One, five?

MR. GENIS: One, five.

THE COURT: There is no objection to that, you want that in evidence?

MR. GENIS: Yes, your Honor.

MR. KEAVENEY: No objection.

THE COURT: 15 is in evidence now.

EXAMINATION BY
MR. GENIS:
(Continuing.)
Q Mr. Lunden, I don't know if you see this on the screen. This was the proposal for the Transit Authority by the Korean company?
A Yes.
MR. GENIS: Can you please scroll to the proper page. Make it bigger so I can see it or is that as big as you can make it?
Page 10?
Your Honor, Page 10 of this document. 13, I'm sorry, Plaintiff's 15. It's a little hard to read, your Honor, with your permission we have an enlargement, a poster of it and may we publish it to the jury?
THE COURT: 15 is in evidence and you say it's impossible to read it, right?
MR. GENIS: I'm having a hard time. I don't know you can read it.
THE COURT: You're representing as an officer of the court that this is 15. It's an enlargement, I'll accept your representation.
MR. GENIS: Yes.

EXAMINATION BY
MR. GENIS:
(Continuing.)
Q And you say see this on Page 15 the different projections and the talk about profit sharing with the transit in the 7th through the 30th year for 23 years up to ten percent of the net profits; right?
A Yes.
Q And when the transit makes money, that's a good thing; right?
A Yes.
Q Now, let's go back to the RFI, if we can, for a minute.
When you did the RFI, you requested in it that systems for financing, do the cost sharing in the Build, Operate, Transfer Agreements, you have advertising revenue sharing agreements. And the transit was interested in financing options involving little-or-no up-front construction cost to the transit; correct?
A Correct.
Q All right. And then you got responses to that RFI and they were then evaluated by you; correct?
A Yes.
Q All right.
MR. GENIS: And I'm going to put Plaintiff's 24 in evidence. Can you take that down so I can use this.

THE COURT: There's no objection to 24. That's the evaluation. 24 is in evidence already?

MR. GENIS: Yes, it is, your Honor.

THE COURT: That's the evaluation summary. And can we get to back on the Elmo?

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q So you see there were 12 responses that you reviewed; correct?

A Yes.

Q And after you did this, you guys had a serious review of everything and evaluation; correct?

A We did.

Q Spent a lot of time looking through everything; correct?

A Yes.

Q You could have all these big thick proposals from all these different companies; correct?

A Yes.

MR. GENIS: And can we go to the next page, please. First full paragraph, that's it.

Q And they mention how on September of 2011 they reconvened to go through everything; correct?

A Yes.

Q All right. And let's see let's scroll down to the next paragraph as well, they talked more.

Let's just get to the bottom line.

Can you go to the very last page, we'll just cut to the chase. All right.

So after reviewing everything and noting certain companies were really large, other companies had done at JFK, et cetera, you narrowed it down to five; correct?

A Yes.

Q And Favely was the first one listed; correct?

A Yes.

Q And Favely had a 40-percent world market share; correct?

A If it says so in the document, yes. I don't recall specifically.

Q Okay. And then after reviewing everything, the task force unanimously agreed that after narrowing to the five that they are recommended to be included in future discussions pertaining to PSD projects; correct?

A Yes.

Q And, sir, have you ever seen, heard, or read anything that indicated the Transit Authority reached a written contract agreement with any entity whatsoever at all to install platform screen doors in the subway system of New York at little-or-no cost to the transit?

A No.
Q And did the Transit Authority ever hire or contract with any of these five companies to install these platform screen doors even at a pilot at little-or-no cost to the transit?
A No.
Q Okay. Do you know the reasons why the transit chose not to install platform screen doors?
MR. KEAVENEY: Objection.
THE COURT: I'll allow it.
Do you have any knowledge as to why they didn't do this?
THE WITNESS: The next step after the RFI was received, there was a decision to do a pilot. And as the pilot was being considered, I believe we did let a contract with an engineering firm to engineer the design of the pilot. So it would have been premature to go to any of these five companies to actually contract for the installation.
Over the course of that pilot, the concept of the work changed if -- I'm not exactly certain when that changed, but we decided that we needed to take a step back and study the entire system to figure out which stations would be compatible with platform doors and which would not be compatible with platform doors.

Q Sir, I don't mean to interrupt. Was any of this before August 2nd of 2016?
A I believe it may have been. But although, I'm not certain of the timeframe.
Q Okay. So let's get back to this.
So you're saying you do know the reasons not to install platform screen doors?
MR. KEAVENEY: Objection, timeframe.
THE COURT: Can you answer the question?
You are trying now to explain the reasons why it wasn't done. I think you said something about you wanted to have a pilot program. Explain it to me.
THE WITNESS: Wanted to have a pilot program and then we decided, the agency, I should say, decided because I was not involved in this decision, the agency decided that we wanted to study the entire system.
Q Okay. So the answer to the question was you do know why; correct?
A I do know why but it doesn't mean that we would not have installed them. It's just being first.
THE COURT: You wanted to study it more, is that basically what you're saying?
THE WITNESS: Yes, basically.
Q Well, sir, were you asked the following questions under oath and did you give the following answers on September 19,

2025.

Question on Page 338 Line 17:

"QUESTION: Okay. And do you agree that a reason the Transit Authority did not install platform screen doors anywhere was that they did not want to be forced to install them everywhere?"

"ANSWER: I don't know the reasons for the choice not to install the platform screen doors. I don't know."

Were you asked that question and did you give that answer?

MR. KEAVENEY: Objection, that's a different question.

THE COURT: No.

So you say that you did not know the reasons at that time of your deposition?

THE WITNESS: That is correct.

THE COURT: Okay. Next question.

MR. GENIS: Okay.

Q And, in fact, sir, did you also testify at Page 231 Line 2:

"QUESTION: Okay. Well, can you tell me why didn't the Transit Authority pick up on any of these offers to have it built, platform screen doors built, and installed in our subway system to help people dying unnecessarily at little-or-no cost to the transit?"

"ANSWER: I don't know. I was not involved in that decision."

Did you go give that answer?

A Yes.

Q And, sir, do you remember seeing anything written anywhere in the world about why the transit did not proceed with any of these companies who offered to install safety device at little-or-no cost?

A Can you clarify the word "offered to install"?

Q Okay. Hold on, I'll phrase it exactly in a second.

Have you ever seen anything written anywhere in the world about why the Transit Authority did not proceed with any of these companies who offered to install a safety device designed to prevent or reduce the number of hazardous train strikes causing unnecessary deaths and catastrophic injury; do you recall that?

A Yes.

Q You do?

A Yes.

Q Sir, were you asked this question on Page 231 under oath:

"QUESTION: Have you ever seen anything written anywhere in the world about why the Transit Authority did not proceed with any of these companies who offered to install a safety device designed to prevent or reduce the

number of hazardous train strikes causing unnecessary deaths and catastrophic injury?"

"ANSWER: I don't recall that. I don't remember seeing anything that discusses that particular question."

Were you asked that question and did you give that answer?

A Yes.

Q Was that the truth at that time?

A Yes.

Q Okay. Now, sir, there has been press at time about people getting hit by trains; correct?

A Yes.

Q And you have responded to some of these articles with e-mails internally in the Transit Authority; correct?

A I have.

Q Okay. And you had done some correspondences with a Dave Greenberger, correct?

A Yes.

Q And, at the time, you were Senior Director of Subway Operations Improvement, Operations Planning?

A Yes.

Q And you knew about some sort of Daily News article on platform doors was coming in 2011, February 1st?

A Yes.

Q Okay. And was there a discussion between you and

Mr. Greenberger about how it should be phrased in the press?
A There was discussion between me and Mr. Greenberger about how the New York City Transit should be phrasing platform screen doors.
Q Okay. And the reason you were doing that was you wanted to be very careful to avoid linking platform screen doors to safety; correct?
MR. KEAVENEY: Objection, leading.
THE COURT: I'm going to allow it. Go ahead.
Can you answer that?
THE WITNESS: We wanted to be -- we wanted to avoid specifically linking it solely to safety so that it would not expand out to -- leave us in a situation where we were making commitments to install doors where we couldn't install doors.
Q So, in other words, you were concerned that it would be taken as an admission that the they are required for safety everywhere and need to be installed everywhere?
MR. KEAVENEY: Objection.
THE COURT: Well, I don't know what the nature of the objection is.
Are you reading something now?
MR. GENIS: Actually, yes, I am.
THE COURT: Ask a question. It's easier that way.
MR. GENIS: I'm sorry, I didn't hear what you

said.

THE COURT: Ask him a question.

MR. GENIS: Okay.

THE COURT: All right. Your adversary is complaining about the fact that you are reading and reading and reading and there reaches a point where we allow some of this to happen but maybe it's better you ask him a question; okay?

MR. GENIS: Sure. Okay.

Q First, did Mr. Greenberger put in an e-mail to you in the regular course of business that did we just fall into a trap if we installed platform screen doors. Did he do something to that effect?

A Yes.

Q And was the discussion that it will be taken as an admission that they are then required for safety; true?

A Yes.

Q And then there was a concern that they would have to be installed everywhere for safety reasons; correct?

A Yes.

Q And, in fact, you said you kept raising that issue at Con Ops meetings; correct?

A Yes.

Q You needed to review the language; correct?

A I asked the law department. That the law department

review the language.
Q Okay. Now, in addition to safety, did the Transit Authority ever look --
MR. GENIS: Withdrawn, I'm sorry.
Q Sir, let me back up.
You were discussing that Con Ops before for the PSDs. Was that Con Ops used for the development of procurement requests for proposals?
A I don't know it was used for development of the RFI but I don't know about RFPs.
Q Have you ever said that, yes, it informed the RFI but was not used for development of a request for proposal?
A I don't recall if I said that specifically. I have a feeling you might be asking me about it.
Q Okay. I could read from the transcript but will you take my word for it?
A I'll take your word.
Q Thank you.
Now, getting to other cost issues, okay? Did the Transit Authority ever publish a request for proposals to get competitive bidding to get companies to do it for free?
A I know there was an RFP. I don't know if it was for free.
Q Can you tell me why would after getting the offers from 12 companies, getting five finalists, that you've agreed on

and saying, oh, okay maybe we need to open this up to competitive bidding. Why they wouldn't have put out a competitive bidding to get people to do it at little-or-no cost when you knew there were 12 companies that wanted to and you narrowed it down to five?

A So the RFIs, basically, were based on cost-sharing concepts. And, for instance, the TIS Partners, one, focused solely on a certain number of high-volume stations where there would be the most passengers to look at advertisements in the station.

So these were not plans or proposals to install platform screen doors at every station that could accommodate them. And, at that point in 2011, we didn't know how many stations could accommodate them. They were basically proposals to install them in a few stations here and there and the president of the Transit Authority at the time Thomas Prendergast was much more interested in getting installations where ever they could be including stations that may not have as much volume in terms of passengers and as many eyes to look at advertising.

So these proposals were incomplete, shall we say. They did not cover as much of the Transit Authority's stations as we would have liked.

Q Now, are you talking about all the proposals now or just one from the Korean company?

A The TIS Partners I was the one I was most familiar with. I can't speak to the other proposals specifically.
Q So there were another 11 proposals that you are not talking about right now?
A I don't recall the financial details about all of them.
Q And let's talk about Favely for a minute.
Are you aware that the Favely proposal was for the entire subway system to meet all the challenges without costing the transit a dollar?
A I'm aware that the RFI said that, but we would not be able to determine that until we went through a full contracting process through an RFI, et cetera.
Q Let's back up.
My question was: Are you aware that Favely put in writing in the proposal that they would do -- install platform screen doors in every subway station in the city at no cost, not a dollar cost, in exchange for the advertising revenue and they could meet all the challenges of doing such an installation, are you aware of that?
A I don't recall that.
Q And when you say you don't recall, are you just telling us, hey, this was 2011, it's 2025, you just don't remember?
A Yeah.
Q Okay. So you're not denying it actually occurred, you just don't remember at this point?

MR. KEAVENEY: Objection, asked and answered.
A I also was not involved in reviewing the financial side -- the RFI responses. I was reviewing the operational sides.
Q Okay. Sir, was a factor when you talk about costs and liability issues, was a factor looking at the costs of litigation?
MR. KEAVENEY: Objection. It's been ruled on.
THE COURT: Yes, sustained.
Q Well, was a financial -- you worked in procurement for years?
A I did not.
Q You did not, I'm sorry.
THE COURT: You have no knowledge of the financial aspects of this I think is what you're saying.
THE WITNESS: Not really. It wasn't part of my, I will use the term again, bailiwick.
Q I'll move on. Let's see. I think I have two points left.
Sir, did you ever tell us that the transit supposed to give deference to politicians' input to the design of subway stations in the system?
A We listened to politicians. The word deference is not something I think I would have said we do, but I have a feeling you might find something in a deposition that says

that so...
Q Okay.
A I'll take your word on it.
Q All right. Thank you.
Last question. You told us when the judge had asked you questions you answered them about their efforts to reduce by posting signs and things like that. Did it have any measurable effect on subway deaths?
A I don't actually know the answer to that because it's the sort of thing where if you didn't do these things, would the rate of death be different than what they are now? So I don't think that has been studied. I certainly have not seen a study that says that.
Q So you're telling us you never saw a study that said that. So would it be fair to say that the Transit Authority never did such a study?
A It would be fair to say. I never saw such a study.
Q Okay. And since you were involved in platform safety --
THE COURT: Save that argument for summation, he answered. He said he never was aware of that, okay?
That's what you said, right?
THE WITNESS: Yes.
THE COURT: Go ahead.
Q And, sir, you were on platform safety committees and

task forces, all of that; correct?
A Yes, in 2010 through 2012 or thereabouts.
Q And the committee was looking at platform screen doors to have something as an effective measure to reduce deaths and hazardous train service; correct?
A Yes.
Q So would they have done so measure had been taken in the past had actually been effective?
A That's a very hard question to answer because the measures in the past may have been effective to some degree. You want to go to the next step and explore further and that's what the platform screen doors would do.
Q Okay. No question they would do more.
A Correct.
Q But what I'm asking you is, before making a decision when you were talking about spending a lot of money on platform screen doors, would it make sense to do an evaluation to see is what we're doing effective or not?
A It may have.
Q Okay.
A But I did not see such an evaluation.
MR. GENIS: No further questions, Judge.
THE COURT: I think we probably can complete this witness's testimony before lunch break, Mr. Keaveney. Let's give it a shot.

(A brief pause in the proceedings was held.)

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Good afternoon, Mr. Lunden.

A Good afternoon.

Q Can you tell me your educational background?

A I have a Bachelor of Arts in American History from Wesleyan University and a Master in Public Affairs and Urban and Regional Planning from Princeton University.

Q When did you start at the Transit Authority?

A I first had an internship for the summer, an unpaid internship, in the summer of 1981 and I started full time as an employee on June 23, 1986.

Q And what was your first position at transit?

A I was an Associate Transit Management Analyst which basically is a planner in the Operations Planning Department the Rail Service Design Group.

Q How long did you do that for?

A I was there for about two-and-a-third years.

Q And what did you do next?

A I then became Manager of Fare Structure Analysis in what was then called the Operating and Revenue Budget Department and was reorganized to become the Office of Management and Budget for the Transit Authority shortly thereafter.

Q How long did you do that for?
A I was in that role until 2013, I believe.
Q And after 2013, what did you do?
A I took a different position in the Office of Management and Budget as a Manager of Subway Business Planning which basically was focusing on the budget of the Department of Subways and, specifically, the Car Equipment Rapid Transit Operations and Stations Divisions.
Q And did that take you up to 2016?
A That took me up to 1997.
Q What did you do next?
A 1997 I returned to the Operations Planning Department as Manager of Rail Operations Review and I was in that position until about 2006.
Q After that?
A I was promoted to be Director of Systems Planning and Operations Planning which covered many of the same areas of Rail Operations Review but it had a somewhat wider purview and I was in that until 2008.
Q Okay. And after that?
A In 2008, I was promoted to be the Senior Director of Subway Operations Improvement which was focused on looking at the subway operations and trying to make them more effective, more efficient, carry our customers better. Basically, look at different techniques of making the system

run better and I remained in that position until 2013.
Q Okay.
A And after that position, I became the senior director of subway schedules which was involved in writing all of the train schedules and crew work programs for the system both for the permanent schedules that the crews picked twice a year as well as the many, many more supplementary schedules that we run every night and weekend and midday to accommodate work in the subway.
Q And how long did you do that for?
A I was in that position until 2017.
Q Okay. So that would be take you past the accident in this case?
A Correct.
Q Okay. Have you testified on behalf of the Transit Authority in the past?
A I have.
Q Okay. And Mr. Genis was talking a lot about a transcript that, or a deposition that you gave, in September of 2025; do you recall that?
A Correct.
Q And do you recall that that deposition was left opened; right?
A It was.
Q And that you were supposed to return to that

deposition?
A Correct.
Q And that deposition hasn't been concluded; correct?
A Correct.
Q And you weren't given an opportunity to be questioned by me during that deposition; correct?
A I was not.

MR. GENIS: Objection, form.

Q Did there come a time that you got involved with looking at platform screen doors for the Transit Authority?
A Repeat your question.
Q Did there come a time that you got involved with looking at platform screen doors?
A Yes.
Q And what was your first experience with that?
A We were aware within Operations Planning that platform screen doors were being installed on systems, particularly, in Asia starting in the 1990s. And in 1999, we know that London Underground installed platform screen doors on an extension of an existing underground line or subway line called the Jubilee Line Extension.

I happened to go to London on vacation that year shortly after it opened and I was able to not only look at it, observe the Jubilee Line Extension platform screen doors, but also to meet with the head of the London

Underground who happens to be, at that time, happens to be a friend of mine and we were able to --

THE COURT: So you are going on and on and on.

THE WITNESS: Yes.

THE COURT: And I understand that you want to explain everything but try to be a little more succinct. It creates practical difficulties in terms of getting all your testimony down. Maybe the jury will be lost. So if you can succinct.

Have you completed your answer yet?

THE WITNESS: We continued to look at this over the course of the next several years.

THE COURT: You continued to look at it.

THE WITNESS: And then we started to look at it in the context of the Second Avenue subway project and then in the context of the 7 Line Extension Project.

THE COURT: You checked all these things?

THE WITNESS: We were checking these out.

THE COURT: Next question.

Q The London Jubilee Line, that was new construction; correct?

A That was new, correct.

Q The Second Avenue construction was new construction?

A That was new construction.

Q The Atlantic Avenue station in Brooklyn was new

construction?
A It was not.
Q If platform doors were installed there, would that be considered a retrofit?
A It would be considered a retrofit.
Q Did there come a time that you got an unsolicited, or transit got an unsolicited offer to install platform screen doors for free?
A Yes.
Q Okay. And who was that from?
A That was from an organization called TIS Partners which was associated with the having installed doors in Seoul, South Korea.
Q And did there come a time that you met with somebody from TIS Partners?
A I attended a meeting with members from the TIS Partners Group as well as other staff from the MTA and New York City Transit.
Q And was that approximately in January of 2010?
A It was.
Q Okay. And following that meeting, did you put together a summary of what occurred during that meeting?
A I did.
Q And was that in an e-mail?
A It was in an e-mail to my colleagues and my boss.

MR. KEAVENEY: Can I show the witness Defendant's Exhibit S.

(Exhibit published.)

THE COURT: This is a defendant's exhibit, the first of its kind, and it's Exhibit F.

MR. KEAVENEY: S, as in Sam.

THE COURT: There's no objection to that. That will be in evidence at this time.

MR. GENIS: No objection.

THE COURT: No objection here.

(Defendant's Exhibit S was marked in evidence.)

THE COURT: Go ahead.

EXAMINATION BY
MR. KEAVENEY:
(Continuing.)

Q Mr. Lunden, do you recognize that e-mail?
A Yes.
Q And what is that e-mail, what's that consist of?
A It's summarizing the meeting with TIS Partners and with other staff at New York City Transit.
Q Okay.

MR. KEAVENEY: Can we go to just the second page of that e-mail. And the attendees.

Q Do you see that?
A Yes.

Q Okay. And the first attendee, at least a group, says "Procurement."

Why would they at that meeting?

A Procurement would be the group that is responsible for purchasing systems, items, et cetera. And so, they were the lead on responding to this proposal by TIS Partners.

Q Subway Cap Program. What is that?

A That's the group within the Department of Subways that manages their Capital Program working with Capital Program Management and the operating departments.

Q And it also says, "Also representing Signals." What are signals?

A Signal engineering is part of the -- well, signals at the MTA is divided between the Capital Group and the Operating Group. Subways is the Operating Group, so the Signal Engineering Group in Subways will be the one I'm referring to here. The individual shown here Winter Habersham had worked at MOW, Signals, and was now working at that time in Subways Capital Programs.

Q What is a signal?

A A signal is basically a system to tell the train operator or the operator when it can move safely or when it must stop at its most basic.

Q Okay. Similar to a traffic light?

A Similar to a traffic light except in most cases in the

subway, the signal system enforces the stop instruction.
Q How does it do that?
MR. GENIS: Objection, your Honor. You said speed is not in this case, speed policy.
THE COURT: I'm sorry, I didn't hear.
MR. GENIS: I said there is an objection as speed policy is not in this case and that's what he's talking about now with the signals.
MR. KEAVENEY: I'm talking about how the train stops.
THE COURT: Overruled. Go ahead.
A So, in the conventional signal system lights, there is an arm next to the rail, a trip arm, that when the signal is red, the trip arm goes up and there is a valve on the front of the train that hangs down.. and if the signal is red and the train passes the red signal, that valve will strike the trip arm and that will set off the emergency brakes and cause the train to stop.
Q That's just one part of the signal system?
A That's one part of the signal system.
Q One small part?
A It's a very important part.
Q Important, but okay. MOW Engineering, what is that?
A MOW Engineering is in charge of all the engineering aspects for Maintenance of Way. So that would be track

engineering, signal engineering, structures and the like, ventilation, et cetera, et cetera, et cetera.

All of those are engineering aspects that they oversee the standards and the practices for the actual maintainers who maintain the tracks, the signals, et cetera.

Q And if you're putting in platform screen doors, this group would be a very important group to consult with?

A Absolutely.

Q Okay. The next group, DCE Engineering. What is that?

A The Division of Car Equipment Engineering Group. And because the platform screen doors would have some form of interfacing with the cars themselves, you need to have DCE involved in this discussion.

Q Okay. Who is Booz Allen, is that a --

A Booz Allen is the consulting form and they were contracted to DCE.

Q And TIS Partners that is the person or the group that brought the recommendation or the offer to transit?

A Correct.

Q The second paragraph of your e-mail, it kind of talks a little bit about the BOT arrangement.

And what is a BOT?

A It stands for Build, Operate, Transfer. They would essentially build the doors, operate them on behalf of the Transit Authority, and then, at the end of a defined term of

transfer ownership and responsibility fully to the Transit Authority.

Q And here, it discusses that arrangement with -- TIS' arrangement with the Seoul subway, what is that?

A Yes.

Q What is that arrangement?

A They arranged to install the doors at just 28 of the stations in the system which number well over 300.

MR. GENIS: Objection, your Honor. On direct, he testified to the opposite. He didn't know how many stations there were.

THE COURT: Next question. Objection overruled.

A I'm able to read what's on the screen.

Q Why don't we read that one sentence regarding how many stations were put or --

MR. KEAVENEY: Strike that.

Q Why don't you read that part of the e-mail regarding the BOT arrangement with Seoul?

A Starting with the word "However?"

Q Yes.

A However, they acknowledge that while they had installed these doors under this business plan with a core of corer stations on the Seoul Subway, 28 stations, I believe, the Seoul Transit Agency went ahead and installed screen doors on the rest of their system, about 300 stations without

TIS Partners' direct involvement.

Q So this Build, Operate, Transfer Agreement the way TIS initially represented to transit was not exactly accurate, it was limited to a few stations?

MR. GENIS: Objection, form.

THE COURT: Well, yes, but do you understand the question?

He wants to know whether it was limited to a few stations or more.

THE WITNESS: Our understanding, it was limited to just busy stations.

THE COURT: Next question.

Q Let's go to the next page.

The discussion. So what were the main topics of discussion that you had or transit had with TIS starting with the first one. It looks like car equipment or car classes?

A So we did discuss with them that on some of our lines, we operate cars with different door spacing and different lengths of the cars. And the door spacings are incompatible with one another and we were curious as to how they would be able to deal with that with their platform doors. And, as I said in this e-mail, they didn't have an answer to that.

Q Do you know if Seoul had cars that were of similar size and familiar door locations?

A I do not.
Q Okay. The next sentence, they were looking at a particular line; correct?
A They weren't looking at a particular line. We were suggesting to them that maybe they could look at the A Division, which are the numbered lines in the subway, where the door spacings for all the doors are pretty similar.
Q Okay. And it was your thoughts that a pilot should be done first anyway; correct?
A Yes.
Q Okay. So, back in 2010, the first time this is suggested to transit, transit thinks a pilot is really the way to go; correct?
A Correct.
MR. GENIS: Objection; form, leading.
THE COURT: Overruled.
Q What is a pilot?
A A pilot is basically a proof of concept project where you install something and see how well it works. And then, based on the results, you can modify the design, expand the design, or say it's not going to work and drop it entirely.
Q So you take the lessons learned from the pilot and you implement them in a future system or say it can't be implemented?

A Correct.
Q Okay. Let's go to the fourth bullet point starting with, "This would"?
A Yes.
Q Do you see that?
A Yes.
Q What are you talking about in that paragraph?
A This is talking about how much electricity a platform system, screen door system, would require and making it clear that many of our stations don't have spare electricity in the stations and would require power upgrades.
Q Okay. Is that a significant concern or was that a significant concern at the time?
A That is a very significant concern for multiple reasons, one of which is that a lot of the older stations have very small electrical supply rooms and it would be very difficult to expand the power in them.
Q You say these are power-hungry installations, what do you mean by that?
What was being proposed to transit?
A So what was being proposed were not only the door operations which themselves require electricity but also lights around the doors, CCTV cameras, lots of electronic screens for advertising and customer information. And if it changes the temperature and ventilation of stations,

possibly HVAC systems. So all of these require power that we don't use currently in the system.

Q What about the platform doors themselves?

A Well, the platform doors as I mentioned they require a lot of power to open and close.

Q Next topic, ventilation. Why was that a concern?

A It's a concern because if you install barriers between the track and the platform, the piston effect for air to move through the tunnels and into the stations becomes blocked; and so, you need to be able to compensate for the change in air ventilation within the stations. Most of our stations have passive ventilation, that is, there's no fan, no air-conditioning, nothing like that. And they rely on the trains moving through the tunnels to bring air through and refresh the air. So if you block the air in some way, shape, or form you have to make some sort of compensation. It's just a concern.

Q Is that the breeze you feel when a train is coming into your station?

A Absolutely.

Q Okay. Next topic: Flag needs. Why was that important?

A So flagging refers to when there is work taking place on the right of way for safety purposes for our workers or the contractors' workers. You need to set up zones whereby

the trains must move slowly past the work or move slowly on an adjacent track past the work. And those have to be planned very carefully through what we call GOs, which stands for General Orders. And my department does the coordination for mapping this work throughout the system every night, every weekend, every midday.

Q And that's a difficult task?

A It's not a difficult task, it's a task that requires a lot of effort and work but I wouldn't call it difficult. But there's a lot of it because we do a lot of work on the subway every single day.

Q And this would increase that workload?

A It all depends upon how this project would be rolled out. There are two aspects of this: One is for installation where they definitely would need access to the tracks to install the platform doors. The second would be maintenance.

And one of the aspects that we discussed later on in the Concept of Operations is trying to maximize the amount of maintenance that would occur on the platform side of the doors as opposed to on the track side because that would reduce your need for flagging and general orders.

Q Would you still need flagging, though, for those situations?

A For some situations, some maintenance would have to be

on the track side.
Q Okay. The next topic they discussed a module design. Why was that important?
A Well, if you use a modular design, every piece would be the same and can fit easily. Modular designs are much easier to do when you have stations that are straight, without curves, and don't have significant grades in them and the like. But, you know, it is just a means of doing it efficiently and effectively for the installation.
Q And the last comment there under "After it was unclear"?
A I think you have to scroll up a little bit. Okay, yes.
Q What was unclear?
A What was unclear is that as we were talking to them, they were kept being surprised by some of these issues that we were raising as if they had not thought through their proposal to identify all the costs that they would need to cover.
Q So was it your understanding that they wanted to take these module units, plop them on the station platform, and start generating revenue?
A That was what they were proposing.
Q And they hadn't looked at behind the scenes at all the issues that were involved in installing these things?
MR. GENIS: Objection form your Honor.

Q Did they look at those issues, to your knowledge?

MR. GENIS: Objection. How could he answer their state of mind?

THE COURT: Can you answer the question one way or the other?

Do you know?

A The impression I had from that meeting is that they had not fully looked at them. They have may have looked at some of them.

THE COURT: The impression is that they did not fully look at it.

THE WITNESS: Correct.

THE COURT: Go ahead. Next question.

Q Can we go up to the top of that e-mail. Very first page, sorry.

You wrote a follow-up e-mail?

A Yes.

Q Okay. And what was your first follow-up thought?

A I was just making it clear to my colleagues that the proposal came from TIS Partners and was not something that we, the MTA, had solicited.

Q And the next one?

A The next one was discussing that the installation of these platform screen doors might actually present problems for train crews to see the signals because we actually, in

many stations, suspend signals from the ceiling and that would be where you would be installing your doors. So you'd have to do kind of a site-specific analysis for each station to see if there was any blockage of the view of the signals.
Q Okay. Was there an issue with bringing these module units to stations?
A We weren't certain that the modular units would fit on our flat cars or whatnot to get in the stations, or they were going to be using cranes, how they were going to be using those them to get the modules in. It required further investigation.
Q The next two issues regard maintenance. Can you expand a little bit on those thoughts?
A So, as I mentioned earlier, we were very interested in making certain the routine maintenance is done on the platform side so it would not interfere with train operations. But at the same time, they said that maintenance require the doors to be kept open. And when the doors are kept open in this case, we would probably have to have flagging anyway because if you ordinarily had closed doors when a train is entering a station, that change in operating practice would require flagging, so there's an expense there.
Q And you give some numbers in terms of how much maintenance would be required on, for example, if it was

done on one line?
A Yes.
Q What was the results of those thoughts and comments?
A It's a lot of maintenance, a lot of occasions that we would be having people going out there and doing maintenance every night if you're doing the maintenance between midnight and 5:00 a.m., for instance. And there are a lot of stations and it's just you're constantly maintaining something somewhere and there's a constant need for flagging. And when you have flagging, the trains have to run more slowly so there could be a major impact in operations.
Q New York City Transit runs 24/7; right?
A Correct.
Q So that limits the time for maintenance?
MR. GENIS: Judge, I have an objection to all of the testimony about can, might, it's all speculative.
THE COURT: You can question him on your redirect.
Overruled.
Q Do you know if the Seoul Metro is a 24/7 system?
A My understanding is that Seoul Metro shuts down overnight.
Q Leaving time for maintenance and other issues?
A Yes.
Q Okay. You address what happens in Seoul when a

platform door malfunctions. Do you see that?
A Yes. If you can scroll up a bit.
Q And what happens in Seoul at least?
A So they lock the doors opened. Now, you've gone too far. And in their case, they choose to keep the station operational while the doors are locked open.
Q Locked open, meaning, access to the tracks?
A Access to the tracks, access to the trains when they stop there.
Q Okay. So kind of defeating the purpose of the platform door?
A When the doors have failed.
MR. GENIS: Your Honor, he's summing up.
Q As a result of this, what steps did transit take next?
A The next step was to, well, the next step after this was if we dispatched some of Transit Authority personnel to look at the Seoul installation. And then, following that, we started on the process of developing the Concept of Operations and the RFI.
Q Okay. Did there come a time when you formulated a group to look at platform doors?
A Yes, shortly after the TIS Partners' proposal.
MR. KEAVENEY: Can we put up Defendant's Exhibit U?
THE COURT: What exhibit are you referring to now?

MR. KEAVENEY: U, as in under.

THE COURT: All right.

MR. GENIS: No objection.

THE COURT: No objection that's in evidence at this time, Defendant's Exhibit U.

(Defendant's Exhibit U was marked in evidence.)

(Exhibit published.)

Q Do you see this e-mail?

A Yes.

Q Have you seen this before?

A Yes.

Q And what is the e-mail referring to?

A It was referring to the kickoff of the Platform Screen Door Task Force.

Q What was the Platform Screen Door Task Force?

A This is the task force that was charged with developing the Concept of Operations and supporting the development of the RFI.

Q Why was it created in terms of who authorized it?

A They came, my understanding, from the President of the Transit Authority, Tom Prendergast.

Q Can we go to the second page of that e-mail, the first sentence.

Is that a reflection of Mr. Prendergast's desire to desire to pursue platform doors?

A Yes.
Q Where it says, "Senior management is keen on pursuing platform screen doors"?
MR. GENIS: Judge, how can it say -- objection, he's talking about Mr. Prendergast, he's not named on it.
THE COURT: Sustained. Next question.
What's your question?
Q What was the outcome of this first meeting?
A The outcome it was to start the Concept of Operations document and we were all going to be involved in putting that together.
Q Okay. When you say, "all," you have a bunch of attendees at this meeting again?
A Yes.
Q Again, who are the groups that are involved?
A So the main group involved of course is the Department of Subways. You may want to scroll back up to the list of groups. So the Department of Subways, which has many disciplines within it.
THE COURT: I think you answered the question. Try to be succinct.
THE WITNESS: Department of Subways.
THE COURT: Don't go on and on and on. Just answer the question that's asked of you.
Q Just the groups involved?

A Material Department, which also handles procurement; capital Program Management; signal Department and System Safety and Operations Planning.
Q Why is operational planning important for this?
A Two reasons. The first is we are very concerned with how the trains will operate and how it will change the operation, if at all. When you have platform doors, is it going to change the amount of time that the train spends in the station which we call dwell time, it's longer.
The other reason is that operations planning is responsible for coordinating and planning access to the tracks for construction and maintenance and that was an obvious part of this project.
Q Okay. What came out of this in terms of the path forward, the plan forward?
A The plan forward was to develop a concept of operations that we would be able to know how to evaluate the RFI and to move forward if we decided to go into procurement.
Q You had a concept of operations and an RFI?
A Yes.
Q And did Procurement develop that RFI?
A Procurement developed the RFI with input from all the other departments.
Q Why was an RFI needed?
A We wanted to see what the rest of the industry was

doing with regard to platform screen doors. We didn't want to go solely with what TIS Partners had presented to us.

Q What is an RFI?

A RFI is a Request For Information and it is essentially a precursor to doing a Request for Proposals to actually put out a contract. It's just trying to get information from the industry. It is not actually a proposal, it is not actually something that you would sign and say, we're going to do this. We're just asking our industry partners to come to us and say, if we were to do this, this is how we could go about doing it.

Q Can you talk briefly about financial risk in that e-mail, or was that discussed at that initial meeting?

A I believe it was discussed at the initial meeting. I'm not a finance guy for this effort. I was more focused on the operational issues, not on the finance.

THE COURT: The question was, was it discussed at that meeting?

THE WITNESS: It was discussed.

Q You indicate on that there was platform doors at JFK Airport, do you see that at the bottom of that e-mail?

A I know it was in the e-mail. It has to scroll down to show to here. Yes.

Q What is the JFK Air Train?

A Air Train is a fully automated rapid rail-type system

that circulates within JFK Airport and connects to the Howard Beach station on the A Train and to the Jamaica station on the Long Island Rail Road and the E and J Trains.

Q What do you mean it's fully automated?

A There is no operator on board. It runs completely automatically.

THE COURT: That's the train that takes you to JFK, right?

THE WITNESS: Yes.

Q Is that similar to the New York City Transit?

A Insofar as it has the same track gauge and car that are the same length as some New York City Transit cars. There is a certain similarity but the fact that it operates completely automatically, the fact that it is completely equipped with platform screen doors makes it different from New York City Transit as well.

Q Did transit do an RFI; correct?

A Yes.

Q And we talked about that with Mr. Genis?

A Yes.

Q And you got some responses back from some of the responders to that RFI; correct?

A Yes.

MR. KEAVENEY: Can we look at Plaintiff's 15?

THE COURT: Plaintiff's 15 you want him to look

at?

MR. KEAVENEY: Yes, it's already in evidence.

THE COURT: It's already in evidence.

Q What is Plaintiff's 15?

A It looks like it was the proposal, the financial proposal that TIS Partners submitted to New York City Transit in July 2010 which would have been before the RFI.

Q Can we go to Page 6 of that. Keep going. Keep going. Keep going. I'm sorry. That's it. Okay.

Do you see that paper?

A Yes.

Q And what does that indicate?

A It's a list of the stations that TIS Partners was interested in installing platform screen doors at.

Q Why, if you know, would they be interested in those particular stations?

A These are high-ridership stations in Manhattan only.

Q Okay. Do you know if that was to increase profits to TSI?

A It was to increase the number of people who would be looking at ads and therefore presumably able to sell ads, so probably to increase profit.

Q So their plan was to generate profit, not for safety?

A It would appear to be. I can't speak to that specifically but this is profit driven.

Q Do you see on that list Atlantic Avenue/Barclay Center?
A I do not.
Q Are there any stations outside of Manhattan?
A No.

MR. KEAVENEY: Judge, I do have some more I don't know it's good time to break.

THE COURT: You have a little more to go yet?

MR. KEAVENEY: Yes.

THE COURT: All right. So you're going to have to come back and let's reconvene at 2:00 o'clock and you will complete your direct.

MR. KEAVENEY: Cross.

THE COURT: 15 minutes or so.

MR. KEAVENEY: 15 minutes to 30 minutes. So I know there is another witness this afternoon.

THE COURT: There may be some redirect.

So we're going to have to just be patient and we'll be back at 2:00 o'clock.

Don't talk to anybody in the meantime about your testimony.

All right. The jury is excused.

COURTROOM DEPUTY: All rise.

(Jury exits courtroom at 12:59 p.m.)

COURTROOM DEPUTY: You can all be seated.

(Witness leaves the witness stand.)

THE COURT: So we have the next witness who is going to be Abdallah?

MR. KEAVENEY: Yes, Your Honor. He's not here, he's in the area. He hasn't come to the courthouse yet because they would take his phone.

THE COURT: So we're probably talking about 2:30 or thereabouts for him to be here?

MR. KEAVENEY: I'll instruct him of that time.

THE COURT: That will probably take us through the rest of the day, I would imagine.

MR. KEAVENEY: I would think so.

THE COURT: Okay. 2:00 o'clock.

MR. KEAVENEY: Thank you.

MR. GENIS: Thank you.

(Luncheon recess taken; 12:59 p.m.)

(Continued on the next page.)

A F T E R N O O N S E S S I O N

--oo0oo--

THE COURTROOM DEPUTY: The witness can come on up. I'll get the jury.

(Pause in proceedings.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: Okay. You can all be seated.

THE COURT: Let me know when you're ready to proceed, okay?

MR. KEAVENEY: I'm ready, Your Honor.

THE COURT: You're still under oath, Mr. Witness, and we're going to continue with the questioning by Mr. Keaveney now.

CROSS-EXAMINATION (CONTINUING)

BY MR. KEAVENEY:

Q Mr. Lunden, we just talked about an initial response from TIS --

MR. KEAVENEY: Can we look at Defendants' Exhibit -- the whole thing -- Double A.

THE COURT: Double N?

MR. KEAVENEY: Double A, A, "Adam."

I think the witness is supposed to look at what's in evidence, AA, Your Honor.

THE COURT: Is this in evidence?

THE COURTROOM DEPUTY: Is this just for the witness?

MR. KEAVENEY: Yeah.

THE COURT: What document are we looking at -- try to speak a little louder.

MR. KEAVENEY: AA.

THE COURT: AA?

MR. KEAVENEY: Yeah.

THE COURT: I don't have an AA in evidence.

MR. GENIS: There's no objection, Your Honor.

THE COURT: No, I don't know what AA is.

What is it?

MR. KEAVENEY: It's a response to the RFI.

THE COURT: So let me put this --

MR. KEAVENEY: And there's no objections.

THE COURT: -- down here.

No objections. Let me just make a record of it here, okay?

Yes, I do have AA. There's no objection to it. It's in evidence at this time.

(Defendants' Exhibit AA received in evidence.)

THE COURT: Go ahead.

MR. KEAVENEY: Okay.

Can we go to Page 45 of that document?

BY MR. KEAVENEY:
Q Mr. Lunden, do you see that page?
A I do.
Q Do you see where it gives Mr. Koo's background?
A Yes.
Q Do you know who Mr. Koo is?
A He was one of the people involved in the TIS Partners puzzle.
Q Okay. And according to this, he's an experienced investment banker and entrepreneur?
A Yes.
Q Okay. And he's the one who brought the initial proposal of MTA regarding platform screen doors?
A I don't know if it was he specifically or if it was --
Q So that's --
THE COURT: Try to speak a little louder.
THE WITNESS: Okay.
THE COURT: Maybe it's my problem, but --
THE WITNESS: No, it's me.
THE COURT: -- I'm not hearing you.
A He was one of the people who brought it to the MTA.
BY MR. KEAVENEY:
Q Okay.
MR. KEAVENEY: Let's go to Page 39 of that document.

BY MR. KEAVENEY:
Q Now, I know you weren't involved in financing at this point, but the third paragraph goes a little bit beyond financing in terms of what was needed to complete the project. Do you see that?
A Yes.
Q Okay. And could you read for me the third sentence starting with "thus"?
A "Thus even PSDs and new stations, retrofitting in exhibiting stations have various factors to consider, such as platform upgrades and their costs, operational diaries, advertising revenue ex- -- expectations, and et cetera. As one joint team within NYCT, it is imperative to enter into the memorandum with call operation agreement with NYCT allowing us to move forward with the feasibility study which requires significant time and budget in advance."
Q So based on this, CYS wasn't prepared to go forward with anything in terms of a --
MR. GENIS: Objection. He can't get into --
THE COURT: Yeah -- yeah, I -- try to not ask those types of questions, perhaps.
But I think you gave your answer, right?
THE WITNESS: Yes.
THE COURT: All right. Next question.
MR. KEAVENEY: Okay.

All right. Can we show the witness Defendants' Exhibit EE?

THE COURT: EE?

MR. KEAVENEY: EE.

Just the witness.

THE COURT: Well, you know, if you can tell me what that is? We have a little note here that's maybe an objection to this.

Can you identify what EE is?

MR. KEAVENEY: That's an email that's --

THE COURT: No, no, let the witness tell me.

MR. KEAVENEY: Oh.

THE COURT: Can you identify this document?

THE WITNESS: I can't see it.

THE COURT: Pardon?

THE WITNESS: It's not on my screen.

THE COURTROOM DEPUTY: Okay.

THE WITNESS: It's not on my screen so I cannot see it.

THE COURTROOM DEPUTY: Check now.

THE COURT: Don't show it to the jurors yet.

THE COURTROOM DEPUTY: Right.

THE COURT: What is this document?

THE WITNESS: It is a letter to a state senator.

THE COURT: Is this something that you wrote or

your received?

THE WITNESS: I am aware of it, but I did not write the letter. I -- I may have reviewed a version of it.

THE COURT: Did you review the record; have you read it?

THE WITNESS: Not for --

THE COURT: You don't --

THE WITNESS: Not for some years -- not for 13 or so years.

THE COURT: You know, you don't -- listen to me.

THE WITNESS: Okay.

THE COURT: Do you know anything about this letter whatsoever?

THE WITNESS: Not really, no.

THE COURT: Then I'm not going to offer it -- it's not going to be in evidence, then, right now.

MR. KEAVENEY: Your Honor, he's cc'd on the last page.

THE COURT: Pardon?

MR. KEAVENEY: He's blind carbon copied on the last page of that letter. There's a bcc on it.

THE COURT: Yes.

Do you know if you received it?

THE WITNESS: I received a letter. I imagine --

THE COURT: Well, you have to have received --

THE WITNESS: Yes.

THE COURT: -- this letter?

THE WITNESS: Yes.

THE COURT: So you know of the letter.

THE WITNESS: I know of the letter.

THE COURTROOM DEPUTY: I know of the letter.

THE COURT: Well, the fact that he knows of the letter, why is it about evidentiary quality?

MR. KEAVENEY: Well, I just want to ask him a question about the -- what was going on at that time --

THE COURT: All right.

MR. KEAVENEY: -- that's reflected in this letter.

THE COURT: So you can ask him this question, but this letter is not going to be in evidence now.

MR. KEAVENEY: That's fine.

THE COURT: All right.

MR. GENIS: Your Honor, may I object? It's also in response to something else and they're not --

THE COURT: No, it's not in evidence now.

BY MR. KEAVENEY:

Q Let me ask you this: Does that letter reflect your recollect as to what MTA and New York City Transit was doing with regard to platform --

THE COURT: Do you have any acknowledge --

BY MR. KEAVENEY:

Q -- at that time?

THE COURT: -- about that?

It's not in evidence, but you can read it to see whether it refreshes your recollection so that you can answer that question.

THE WITNESS: That's fine.

MR. GENIS: Your Honor, he hasn't indicated he needs his memory refreshed on any of this.

THE COURT: Do you have any recollection?

THE WITNESS: It is consistent with what was going on at that time, and --

THE COURT: Well, look -- all right. So anyway, you can ask him questions now. It's not in evidence.

MR. KEAVENEY: Okay.

THE COURT: Go ahead.

BY MR. KEAVENEY:

Q What was going on in terms of platform safety?

THE COURT: Do you know what was going on -- now that you've looked at this, do you know what was going on at that time --

THE WITNESS: Yes.

THE COURT: Can you answer that question?

THE WITNESS: Yes.

THE COURT: Go ahead.

THE WITNESS: So in addition to the platform

screen door initiatives which were underway at that time, we also were rolling out customer information screens in the stations that would tell passengers that trains are coming in a certain amount of time. That discourages passengers from leaning over the platform edge. It also alerts passengers to when the trains arrive to the station.

MR. GENIS: Judge, this is going into repeated --

THE COURT: What's your next question?

BY MR. KEAVENEY:

Q The question is, what was going on in 2012?

THE COURT: Do you know what's going on? You were testifying.

THE WITNESS: Yes.

THE COURT: Did you finish --

THE WITNESS: Yes.

THE COURT: -- your answer?

THE WITNESS: Yeah. I -- I -- those -- those are major aspects of what was going on in 2012.

THE COURT: You know about that?

THE WITNESS: Yes.

THE COURT: Okay. Next question.

MR. KEAVENEY: Okay. Let's -- can we look at -- show the witness GG?

THE COURT: So GG there's no objection to. So if you want that in evidence, we can do that.

MR. KEAVENEY: Sure.

THE COURT: Do you want that in evidence now?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: In evidence now at this time. There's no objection.

(Defendants' Exhibit GG received in evidence.)

BY MR. KEAVENEY:

Q Do you recognize this document?

A I -- I've seen it in my preparation for this, but I don't recall from when I was working in 2015.

Q Okay. What does it involve in terms of their contents?

A It was a report --

MR. KEAVENEY: Well, can we get -- can we scroll through it for the witness?

A It's discussing statistics related to incidents in which --

THE COURT: Try to speak a little clearer.

THE WITNESS: It's -- it's discussing --

THE COURT: Excuse -- excuse me.

It's maybe the way you're positioned.

Jurors, can you hear his testimony clearly.

THE JURY: (Indicating in the positive.)

THE COURT: That's all that counts. I'm having a bit of a problem because maybe I'm over here and it's hard for me to hear you.

THE WITNESS: Okay.

THE COURT: Try to speak a little loud into the microphone so the Judge can hear you clearly also.

Can you do that for me?

THE WITNESS: Very well.

MR. KEAVENEY: Let's go down one page at a time, then.

Let's go to Page 4.

BY MR. KEAVENEY:

Q Okay. So this talks about statistics, right, customer contact with trains?

A Yes.

Q Okay.

MR. KEAVENEY: All right. Let's go to the next page.

BY MR. KEAVENEY:

Q And that addresses causes, right; do you see that?

A Yes.

Q What are the causes for individual who are struck by trains?

A Tripping, falling onto track when reaching for the train, alleged suicide or attempted suicide, intentionally entering the track, leaning over the platform edge, pushed or bumped onto track or onto moving train, medical condition, fell between cars --

THE COURT: I think you meant medical conditions, right?

THE WITNESS: Yes, medical.

THE COURT: I thought you said "mental."

Medical?

THE WITNESS: Medical, yes.

MR. KEAVENEY: Okay. So let's go to the next page.

BY MR. KEAVENEY:

Q Mitigation strategies. And these are the strategies that Transit was implying at the time?

A Yes.

Q And what were they?

A So awareness campaign means customer-information campaigns, posters and the like. Technical -- technological solutions, help point intercoms. Those are placed on platform, platform screen doors which we've been discussing. Intrusion detection -- detection technology.

Q Okay.

MR. KEAVENEY: Okay. Let's go to the next page.

BY MR. KEAVENEY:

Q Customer awareness campaign.

MR. KEAVENEY: Let's go to the next page.

BY MR. KEAVENEY:

Q Communication strategies, what is that?

A That's outreach to our customers to -- to tell them to be safe. To stand back from the platform edge. Don't go onto the tracks to retrieve anything that fell onto the tracks.

The strategies include posters, brochures, car cards, our website, announcements. And the bottom one says, implementing target and public information campaigns specific to platform safety to increase awareness of hazards.

Q Okay.

MR. KEAVENEY: Let's go to the next page.

BY MR. KEAVENEY:

Q It talks about announcements a bit?

A Yes.

Q Okay. Increased frequency and distinctive attentive voice -- or tone?

A Yes.

Q Okay.

MR. KEAVENEY: All right. Next page.

BY MR. KEAVENEY:

Q What's that?

A That's an example of a car card that would have been placed in a subway car. That's basically telling people stand back from the platform edge and giving information about how many people were struck or killed by trains in

2012.

Q It's meant to have an impact so people don't stand close to the edge?

A Yes.

Q Does it give --

MR. GENIS: Objection --

BY MR. KEAVENEY:

Q -- a statistic --

MR. GENIS: -- Judge leading.

THE COURT: Well, does this have an impact? I don't know whether it has an impact.

Well, do you know whether or not this was successful?

THE WITNESS: I believe he just said --

THE COURT: Well, I don't know --

THE WITNESS: I don't know if it was successful or not.

THE COURT: Well, the question was raised.

THE WITNESS: Right.

THE COURT: You have all these things that you had planned. I guess the question is whether you know whether any of this thing materialized? I don't know.

Do you have any knowledge about that?

THE WITNESS: I don't have knowledge about --

THE COURT: Do you know what success --

THE WITNESS: -- success.

THE COURT: Well, you've identified success.

THE WITNESS: Yes.

THE COURT: All right. Next question.

MR. KEAVENEY: Okay. If we can go to -- keep going. The next page.

And the next page.

The next page.

Next?

BY MR. KEAVENEY:

Q So these were also on buses?

A Yes.

MR. GENIS: Judge, relevance. Buses?

THE COURT: One second.

We're not talking about buses here, are we?

MR. KEAVENEY: No. The -- the warnings were on buses, is what I'm saying. The campaign was wide, is what I'm saying.

THE COURT: All right. Look, you know, but they had warnings on buses, right?

THE WITNESS: Yes.

THE COURT: All right.

But we're talking about trains here.

Go ahead.

MR. KEAVENEY: All right. Next page?

BY MR. KEAVENEY:
Q These were on -- in stations also?
A Yes.
Q Okay. These were at Metro --
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q These were at MetroCard vending machines?
A Yes.
Q Okay.
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q These were on back of MetroCards?
A Yes.
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q These were on digital planners outside of stations?
A Yes.
Q Okay.
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q These were at kiosks also?
A Yes.
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q These were in brochures?

A Yes.
Q Okay.
MR. KEAVENEY: Let's go to the next page.
Next page.
Next page.
BY MR. KEAVENEY:
Q Additional media, where were -- else were they -- were these placed?
A We had a -- a podcast on -- on the MTA website. They were advertisements in newspapers, including non-English language newspapers, online advertising. Back then we had a TV cable segment called *Transit Transit,* honestly had a segment on that; and YouTube video, social media, *Facebook* and *Twitter*.
Q Okay.
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q Safety technology?
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q You talked about the help points, right?
A Yes.
Q Okay.
We talked a little bit about -- well, we talked a lot about the platform doors.

MR. KEAVENEY: We can go to the next page.
BY MR. KEAVENEY:
Q This is -- the purpose of help points, I think we -- we talked about that briefly. But if there's something else?
A It was a twofold purpose. One is in case somebody observed an emergency or experienced an emergency on the platform, they can go to help point, press the red button.
The second reason for the help point was to get information. Press the green button. And they were on all platforms.
MR. KEAVENEY: We can go a few pages.
Next page.
Next page.
Next page.
BY MR. KEAVENEY:
Q Okay. Platform doors.
MR. KEAVENEY: Let's go to the next page of that.
BY MR. KEAVENEY:
Q This talk as trends, right?
A Yes.
Q Okay.
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q Potential benefits. Obviously, the benefits were well known, correct?

A Yes.
Q Okay.
MR. KEAVENEY: Next page.
Again.
Okay. We can stay on that one.
BY MR. KEAVENEY:
Q You talked about the challenges also, right?
A Yes.
Q Did those challenge change from 2010 to 2013?
A No.
MR. KEAVENEY: Next page.
BY MR. KEAVENEY:
Q Again, talking about the same challenges we talked about the break: The train rolling stock, the signals, the operations.
MR. KEAVENEY: Okay. Let's go to the next page.
Next page.
BY MR. KEAVENEY:
Q Steps taken. Okay. We talked about the trip to Seoul, right?
A Yes.
Q Okay.
We talked -- we talked about continued outreach to other U.S. and international transit systems. I don't think so.

And what that -- involved with that?
A Our benchmarking group and -- operation training would be reaching out to other operating systems, both CoMET and the Nova program, as well as directly. I other staff and other departments may have been also reaching out. I can't say whether they were or not.
Q Okay.
The last part of that, what's that about? Monitor --
A So this is just to finding out from various professional organizations what is going on with the platform door. APTA is the American Public Transit Association, which is essentially a North American consortium -- not consortium -- North American Association of Large and Small Transit Agencies.
UITP, the -- I can't tell you what the letters stand for because it's in French. But it's an international association of transit agencies around the record.
And COMET, we already discussed, as well. It focuses on the large metros around the world.
Q Okay.
MR. KEAVENEY: Next page.
Next.
Next.
BY MR. KEAVENEY:

Q Okay. Intrusion detection, you weren't involved with track intrusion, right?
A No.
Q Okay. And in about 2013, were you still involved with platform screen doors or did something else happen?
A Well, in 2013 when we were -- I was promoted to Senior Director of Subway Scheduling, my involvement in the platform screen door projects basically was minimized.
Q Okay. So any knowledge you had after 2013 was indirect involvement, but what you heard or what other colleagues were saying?
A Yes.
Q Okay.

MR. KEAVENEY: Can we go back to Plaintiff's 54, which is in evidence?

BY MR. KEAVENEY:
Q Now, the exhibit we had just looked at talked about statistics and contact with individuals. What is a contact with individuals?
A Contact is when a train actually makes contact with somebody.
Q Okay.

MR. KEAVENEY: Can we go to Page 4 of that document?

Can we go to the last entry?

Maybe we can enlarge it a bit?

Okay.

BY MR. KEAVENEY:

Q Do you see under the section Narrative on that last entry from February 28th, 1987?

A Yes.

Q Male passenger on crutches. Got off southbound train in front of birthing [sic] closed -- it looks like birthing doors -- tell me if I'm incorrect -- closed on train. Passenger fell backwards.

Okay. That's classified as a contact with an individual?

A Yes.

MR. KEAVENEY: Can we go up to Page 3.

I'm sorry page, Page 4.

And can we go that 1, 2, 3, 4 -- 5th one up, February 14, 1987?

I'm sorry. 3 of 4 -- the third page, I'm sorry.

Right there, yeah.

BY MR. KEAVENEY:

Q An entry on February 14th, 1998. I guess this customer failed -- exiting train door, failed to open. Black eye, contusion to body.

Is that a collision with trains, according to this document?

A It was a contact with a customer.
Q Okay.
MR. KEAVENEY: Let's go to Page 7.
The third one from the bottom, April 17th, 1997.
BY MR. KEAVENEY:
Q Can you see that?
Passenger fell while walking to next car. Laceration above right eye.
Is that a contact with a train with an individual?
A Yes.
Q Okay.
MR. KEAVENEY: And let's do one more.
Page 5.
March 6, 1987, the fourth one down.
BY MR. KEAVENEY:
Q Passenger stated that MH was between cars urinating. Train stopped. He didn't observe MH between cars.
Is that a contact with individuals according to this chart?
A Apparently so, yes.
Q So you can pee between cars, and it be classified as a contact with individuals. You can be on the platform, and it can be a contact with a train. You can be exiting the car --
MR. GENIS: Objection, summation --

BY MR. KEAVENEY:
Q -- and it could be a --
MR. GENIS: -- Judge.
BY MR. KEAVENEY:
Q -- contact by the train --
THE COURT: Yeah, yeah --
BY MR. KEAVENEY:
Q -- correct?
THE COURT: -- save that for summation, all right?
MR. KEAVENEY: Okay.
THE COURT: Let's find out -- this document is in evidence and he can read it to himself.
BY MR. KEAVENEY:
Q According to this chart, there are various ways that the Transit classifies contact with individuals, correct?
A Yes.
MR. KEAVENEY: Okay. Thank you.
THE COURT: All right.
Redirect to Mr. Genis.
MR. GENIS: Thank you.
REDIRECT EXAMINATION
BY MR. GENIS:
Q Okay. Let's start off with what you were just talking about. The Transit keeps mass records on these voluminous collision with individuals that you were just going through,

correct?
A Yes.
Q And then they also distill it down to actual real contacts with trains where trains hit somebody and the number of fatalities or serious injuries, true?
A Yes.
Q Okay. So when you were talking about in 2012 all of those measures taken, did the numbers go up or down from 2012 after that big campaign?
A Can you get a little bit closer to the --
Q My pleasure.
THE COURT: Well, this is the evidence.
MR. GENIS: Correct.
THE COURT: It is what it is. It shows that the numbers went up, correct?
THE WITNESS: Yes. It shows that the numbers went up.
BY MR. GENIS:
Q All right. Let's go to one of the other things you were chatting about. You were focussing a lot on one particular company, the TIS, correct?
A Yes.
Q Okay. Now, let's discuss the --
MR. GENIS: Okay. I'm putting up what's in evidence as Plaintiff's 24. This is the evaluation after

the 12 companies submitted proposals.

THE COURT: 24 is in evidence --

MR. GENIS: Yes.

THE COURT: -- already?

MR. GENIS: Yes, Your Honor.

BY MR. GENIS:

Q And showing you -- do you see where it says, "Faiveley's response was more impressive due to this substantial amount of technical analysis between existing challenges with New York City infrastructures, including different subway car door space and patterns, compatibility with existing signals and subway cars, and curved platforms."

Did I read that sentence accurately?

A Yes.

THE COURT: Now, that highlighting is yours; that's not --

MR. GENIS: Yes.

THE COURT: All right.

MR. GENIS: Correct.

THE COURT: You did that?

MR. GENIS: Yes.

THE COURT: All right.

BY MR. GENIS:

Q "Faiveley's analysis also provided alternatives to each

solution compete with an explanation of the potential benefits and detriments associated with each alternative."

Correct?

A Yes.

Q Okay. And you told us earlier, you did not review the other 11 proposals other than TIS, correct?

THE COURT: Did you review the evidence?

THE WITNESS: I reviewed all of them.

BY MR. GENIS:

Q So when you testified to my question earlier and you said you didn't, which was true?

A No. I reviewed all of those -- we were only talking about TIS the prior time. But I reviewed only one of them --

Q Excellent.

A -- but I was not reviewing the financial side, I was reviewing technical side.

Q Okay.

A Operational side.

Q Okay. So do you agree -- this was the unanimous report and finding of your platform screen door task force, correct?

A Yes.

Q So the entire task force unanimously found that Faiveley was impressive, and that all the technical

analysis, et cetera, true or false?
A True.
Q Okay. I noticed you didn't answer a single question about Faiveley.
THE COURT: Well --
BY MR. GENIS:
Q Is there a reason?
THE COURT: -- sustained.
MR. GENIS: Thank you.
THE COURT: Save that for argument.
MR. GENIS: No problem.
THE COURT: Anything else?
MR. GENIS: Yes.
BY MR. GENIS:
Q If the TIS was so lousy, why they did they apply this?
A I actually don't recall at this point.
Q I mean, you told us everybody did this exhaustive review and evaluation --
THE COURT: Save the speeches.
MR. GENIS: Okay.
THE COURT: Go to the next thing.
BY MR. GENIS:
Q We were discussing retrofits. Do you recall that Paris had retrofits; was a comparable system?
A Paris had retrofits with a combo from an old system.

Q Thank you.

Now, by the way, you were talking before with counsel about how there were only 28 stations in Seoul, Ko9rea that got the platform screen doors, correct?

A Yes.

Q Okay. I'm going to show you 13 in evidence. This is the trip report to South Korea.

Do you see that?

A Yeah.

MR. GENIS: And let's go to the second page.

BY MR. GENIS:

Q Do you see how it talks about 148 stations and how SMRT had successfully completed installation of PSDs in all 148 stations?

A Yes.

Q Okay.

THE COURT: Okay. The circles are yours --

MR. GENIS: Yes.

THE COURT: -- and not in the original document?

MR. GENIS: Correct.

THE COURT: All right.

BY MR. GENIS:

Q Okay. So which is true, what you told this jury today about 28 stations or what's written in the official report that says 148 stations?

A The email that we're discussing --
Q True or false?
A -- says 28 --
THE COURT: He's trying to explain here.
A It's my impression after our meeting in January 2010, I may have not have gotten the right numbers from the minute minutes. My information may not have been correct. But the -- this report comes a month later where staff let their -- to see it themselves.
The 28, by the was how many TIS partners, I understood from the January meeting, had taken care of in terms of installing. And the 148 includes SMRT, which may been in addition to TIS's installations.
So I don't think the two are incompatible or inconsistent.
BY MR. GENIS:
Q Fantastic. Let's follow up on that, then.
SMRT TIS was a partnership. You were shown that before when Mr. Keaveney was questioning you, true or false?
A True.
Q Okay. So they are the same.
MR. GENIS: Next.
BY MR. GENIS:
Q You read this report about the trip report to South Korea, true or false?

A I did.
Q Okay. So you knew after reading it that all 148 stations had PSDs installed, true or false?
A After reading it in 2010, yes.
Q Okay. But now in 2025, you told this jury under oath --
THE COURT: Don't -- Mr. Genis, save it for your summation.
MR. GENIS: Sorry.
THE COURT: You're getting too emotional.
MR. GENIS: Sorry, Judge.
THE COURT: I understand that. You need to cool it.
MR. GENIS: Yes.
THE COURT: Just get the facts out.
MR. GENIS: Yes.
THE COURT: You'll have the opportunity at the end of the trial to do your summations.
MR. GENIS: Okay.
BY MR. GENIS:
Q So, sir, having read this document and having read it before you testified today, you still look these jurors in eye and told them only 28 stations were completed when it was, in fact, all 148, true or false?
A I was reading the.

MR. KEAVENEY: Objection.
A -- which I had in front of me that said 28, which if I wrote 28, my impression in January of --
BY MR. GENIS:
Q So --
A -- 2010.
THE COURT: Wait a second.
Chill out.
So this is your initial impression. But this is the real deal when it comes out of the wash, right?
THE WITNESS: Right.
THE COURT: Okay. Let's go.
BY MR. GENIS:
Q You talked before -- are you an engineer, sir?
A I am not.
Q Okay. Now, we agree that engineers are who solve the problems and meet the challenges?
MR. KEAVENEY: Objection. What problems.
THE COURT: Sustained.
MR. KEAVENEY: What challenges.
MR. GENIS: Okay.
BY MR. GENIS:
Q The problems and challenges of installing platform screen doors into the New York City Subway System?
A Engineers are part of it -- of addressing those issues,

yes.

Q Well, engineers actually are the ones that design them, correct?

A Yes, they design them.

Q Okay. And the engineers are the ones who figure out how to address the challenges, yes?

A Yes.

Q Okay. And you're not an engineer, correct?

A That is correct.

Q And there was an engineer from the Transit Authority by the name of Gregory Sanchez, true or false?

A I actually don't remember him.

THE COURT: Do you know the name, Gregory Sanchez?

THE WITNESS: No.

THE COURT: He says he doesn't know it.

BY MR. GENIS:

Q Mr. Sanchez was an engineer that figured out how to solve all of these ventilation --

THE COURT: He says he doesn't know Sanchez.

MR. GENIS: Okay.

BY MR. GENIS:

Q Well, sir, are you aware that the ventilation problems were easily solved, in fact, by Transit's own engineers?

MR. KEAVENEY: Objection.

THE COURT: Are you aware of that, yes or no.

THE WITNESS: I'm aware that there were strategies suggested for addressing ventilation issues. Whether you could call that solved or not, I can't answer that question. But there were strategies that were suggested.

BY MR. GENIS:

Q Okay. I noticed a lot of your testimony was "might" or "can" or "could," correct?

A Yes.

Q Okay. Can we agree there's a difference between stating a fact and saying something speculative like "can" "might" or "could"?

A We can.

Q Thank you.

Wasn't procurement involved in the RFI?

A Yes.

Q Okay. So if somebody testified in court that the whole reason this RFI was no good is because they didn't follow procurement procedures but procurement was involved in this, doesn't that not make sense?

A I am not aware of any testimony that says that. I can't answer that question.

Q Okay.

Let's see, in fact, you have -- you agree that engineers know and meet the challenges, but they do so to effectively prevent or reduce the hazard of train strikes,

correct?
A Yes.
Q They tell you whether or not it's possibly or impossible to have a certain design, correct?
A Yes.
Q And they could tell you if a design includes installation of devices and equipment if it's feasible or not, correct?
A Yes.
Q Okay.
MR. GENIS: Let's go to the next thing.
BY MR. GENIS:
Q And, in fact, we have another trip report.
MR. GENIS: I believe it's Plaintiff's Exhibit 52 in evidence.
THE COURT: 52 is not in evidence now.
MR. GENIS: I'm offering it into evidence, Your Honor.
THE COURT: All right. There's no objections to that. It's in evidence now.
(Plaintiff's Exhibit 52 received in evidence.)
THE COURT: It the trip to Korea report, correct?
MR. GENIS: Yes.
THE COURT: Okay.
BY MR. GENIS:

Q I'm going to show you the first page. And we can see a trip to Korea involving SMRT TIS platform screen doors all systems safety by Ken Brown, correct?

A Yes.

Q Okay. I'm going flip to the last page here.

And do you see Point Number 11?

A Yes.

Q And it says, "Prior to the use of platform screen doors, SMRT had safety fences along the track edge"?

MR. KEAVENEY: Objection, beyond the scope of cross, Your Honor.

THE COURT: Well, it says what it says.

And there's little marks next to it. It's not part of the exhibit --

MR. GENIS: Correct.

THE COURT: -- correct?

MR. GENIS: Yes.

THE COURT: All right. It speaks for itself.

All right. Next question.

BY MR. GENIS:

Q By the way, did that -- also report, Item Number 9 indicate that "SMRT is very a forward-thinking organization stressing use of technology"?

THE COURT: That's what it says here. You just read it.

BY MR. GENIS:

Q And were there other companies that also before you ever -- withdrawn.

Were there other companies in addition to those 12 that made proposals to install platform screen doors for free in the New York City Subway System?

A I'm not aware of any.

MR. GENIS: Okay. Well, I'm going to offer into evidence -- I think Plaintiff's 70, is it entered into evidence already?

THE COURT: Well, let's take a look and see, all right?

70 is not in evidence. But there's no objection to it, do you wish it to be in evidence now?

MR. GENIS: Yes, Your Honor.

THE COURT: 70 is in evidence now.

(Plaintiff's Exhibit 70 received in evidence.)

THE COURT: It says Email from Layman to Halmar, right?

MR. GENIS: Yes.

THE COURT: Go ahead. It's in evidence.

MR. GENIS: Okay.

MR. KEAVENEY: Well, there is an objection.

THE COURT: Well I don't have it on my list.

MR. KEAVENEY: Well, we stipulated to

authenticity.

THE COURT: Oh, well, wait a second. I have no objections on the exhibit list that I have.

Are you telling me that there's an inadvertent mistake and you want to object to it?

MR. KEAVENEY: Well --

THE COURT: It's okay. It's in evidence now. We can make of it what we want to make of it. There's no objection to it.

MR. KEAVENEY: But there is an objection, Your Honor. It's for hearsay.

THE COURT: All right. Overruled.

BY MR. GENIS:

Q And this is January 8th of 2013, to Tom Prendergast, who was the president, correct --

A Yes.

Q -- regarding PSTs?

THE COURT: Do you know about this document?

THE WITNESS: I may have seen it, but it doesn't really --

THE COURT: I allowed it into evidence and I overruled the objection that was made before. But, you know, I don't know what the relevancy is of it now.

Move on to something else.

MR. GENIS: Yes.

BY MR. GENIS:

Q It's just about another company called Halmar Offering to install platform screen doors for free in the Transit System, right?

THE COURT: It speaks for itself.

Go ahead.

BY MR. GENIS:

Q And you talked about how there's a problem with alignment of the doors, with the platform screen doors, and the doors of the train car, correct?

A I talked about different alignments between different car classes.

Q Okay. So, sir, in fact, you sent out emails about dynamic doors, correct?

A Can you show them to me?

Q Sure.

MR. GENIS: May I approach the witness, Your Honor?

THE COURT: Which document are you referring to?

MR. GENIS: It's not on the exhibit list. It's for impeachment purposes, and I can give you Bates Numbers.

THE COURT: Show it to him and let him identify what this is.

MR. GENIS: Sure.

BY MR. GENIS:

Case 1:17-cv-04550-FB-VMS Document 360-1 Filed 05/05/26 Page 596 of 2327
PageID #: 22788



Q It's a two-page document. It's an email, and they start at the bottom and move up.
A Okay. Thank you.
Q You're welcome.
THE COURT: Do you know what that document is; can you identify it?
THE WITNESS: It was a document about --
THE COURT: Do you know anything about this document?
THE WITNESS: Yeah. I got an email from a colleague about a Japanese --
THE COURT: Can you just answer that question?
Have you seen this documents; do you know about this document? It's got your signature.
THE WITNESS: I saw it 14 years and not since.
THE COURT: You don't know anything about this document, right.
THE WITNESS: Not since then, only what I saw 14 years ago.
THE COURT: All right. It's not going to be in evidence.
Next question.
BY MR. GENIS:
Q Did you ever write to anybody at the Transit about dynamic doors that could move so that it would solve your

alignment problem?

MR. KEAVENEY: Objection, Your Honor, assumes --

THE COURT: Sir, did you ever do that?

THE WITNESS: I believe that particular document raises that concept, and so I asked about it further, yes.

THE COURT: So you have done that?

THE WITNESS: Yes.

THE COURT: Based on that document, it was reflected in that document that you were just shown?

THE WITNESS: Yes.

THE COURT: I'll allow that in evidence.

What number was that again?

MR. GENIS: We did not have a number on that, Your Honor.

THE COURT: So we can put this document down as 98, okay?

(Plaintiff's Exhibit 98 received in evidence.)

THE COURT: And that document was from who to who?

MR. GENIS: It starts with an email from -- oh, one second -- it's to Glenn Lunden --

THE COURT: Glenn Lunden, right?

MR. GENIS: Yes.

THE COURT: That's in evidence at this time.

MR. GENIS: Thank you.

MR. KEAVENEY: Your Honor, we've never been

provided a copy of that document?

MR. GENIS: You got it --

THE COURT: No, no. Look you can't argue back and forth. We don't allow that to happen.

He identified it was a document. He knew about the document. I'm allowing it into evidence.

Do you want to make a copy available to your colleague?

MR. GENIS: Sure. I'll show it him right now with the Bates numbers on it.

THE COURT: Sometimes things happen during the course of the trial, which are not on our original exhibit list, and we allow some flexibility if they can identify this is a document.

Okay its in evidence.

Anything else, Mr. Genis?

MR. GENIS: Yes, Your Honor.

THE COURT: How much more do you have?

MR. GENIS: Okay.

BY MR. GENIS:

Q The report that we talked about from Korea, it's also talked about doing at an abandoned station a pilot project, correct?

THE COURT: Which exhibit is that again?

MR. GENIS: 13.

THE COURT: You're looking at Number 13.
Go ahead.
A So, yes.
BY MR. GENIS:
Q All right. And so -- and that was in Brooklyn, actually, correct?
A There were a number of abandoned stations that had been discussed. I believe this one had been in Brooklyn -- or abandoned platforms, I should say.
Q So it wasn't just in Manhattan as you've told the jury, correct?
MR. KEAVENEY: Objection. I don't think that was the testimony.
THE COURT: Well, I don't understand. Was it Manhattan or more than Manhattan; can you explain?
THE WITNESS: So the concept of doing a pilot in a non-revenue station was to test the technology. It would not have been anything that any passengers would have seen. We would have not done any live advertisements for any passengers to see. So this was just proposed for, I believe it was, the Hoyt–Schermerhorn Station?
Q Right.
A Platform that is not used by passengers.
THE COURT: It was for that type of station?
THE WITNESS: Yes.

THE COURT: It's not used by passengers?

THE WITNESS: Correct.

THE COURT: We understand.

Next question.

BY MR. GENIS:

Q Now, you testified when Mr. Keaveney was questioning you about, what you called, causes of accidents. Do you recall that?

A There was a list on that presentation, yes.

Q And, in fact, aren't those actually different precursors to an accident?

MR. KEAVENEY: Objection, leading.

THE COURT: Sustained.

MR. GENIS: Okay.

BY MR. GENIS:

Q Well, sir, when you gave that testimony, you know the difference between a precursor and a cause, true?

THE COURT: I don't know whether you know the difference. But maybe you can explain to the jurors the difference between those two, and then we'll go from there.

THE WITNESS: I'm really not certain why you would make a distinction between precursor and a cause. But a precursor comes before the actual thing that causes the incident. So it is setting up a situation for a cause instance to take place. It's all part of the continuum.

BY MR. GENIS:

Q I agree with you a hundred percent, sir.

So in order words, the precursors are where somebody trips on the platform, has a medical emergency, is pushed or whatever, those are all the precursors. And the actual cause is that there is no -- there is open access --

THE COURT: If you want to testify now, we'll change place.

Save it for summations.

Precursor's what happened before an accident. It's sort of anticipated how an accident can occur; is that what you're trying to say?

THE WITNESS: It is, but I'm not agreeing with his definition of something like somebody had a medical problem as being a precursor. That is a cause.

THE COURT: You don't have to really get into extensive discussion about this.

THE WITNESS: Yes.

THE COURT: We understand this is anticipatory type of stuff that could happen.

THE WITNESS: Yes.

THE COURT: Is that what you're telling us?

THE WITNESS: Yes.

BY MR. GENIS:

Q Were you asked the following questions under oath in

your deposition, and did you give the following answers?

MR. GENIS: Page 111, Line 20.

BY MR. GENIS:

Q Question: Okay. And the different precursors, the different events leading up to the train strike, whether it be a trip and fall, a defect on the platform, whether there be a medical emergency, somebody faints, has a heart attack, whether somebody is pushed, whether they were intoxicated, or whether they're suicidal, can we agree that all of these difference precursors have one common denominator? They could not have been hit by the train without open access to the train or the track?

Correct?

MR. KEAVENEY: Objection. He's calling for --

THE COURT: Overruled.

Was there an answer to that?

MR. GENIS: Yes.

BY MR. GENIS:

Q The answer was: First, you used the term "open access"?

Question: Yes.

Answer: I will assume that definition is the platform opened to the tracks and --

Question: Yes.

Answer: -- so I will agree, yes.

Okay. Were you asked -- were you asked those questions and did you --

THE COURT: Obviously he was asked that question. You're reading it just now.

BY MR. GENIS:

Q Was it true, sir?

THE COURT: That was what you said --

THE WITNESS: Yes.

THE COURT: -- way back when, right?

BY MR. GENIS:

Q And was that the truth when you said that in 2025?

THE COURT: If you want to explain it more now, you can do that. Go again.

THE WITNESS: So again, I -- the terminology precursor is not one I use myself. I use cause.

So, yes, if somebody falls on the tracks because there is an open -- there's an open -- open to the -- to the road bed, yes, that is -- that is part of the cause.

THE COURT: I think the jury has --

THE WITNESS: But another cause is if somebody has a medical --

THE COURT: Stop.

The jury has a lot of common sense. They understand. Move on.

MR. GENIS: Thank you.

BY MR. GENIS:

Q And you're aware from CoMET and Nova that they have defined what a precursor is, it's not just what you --

THE COURT: The objection is sustained.

Next question. Do you have anything else?

MR. GENIS: No further questions. Thank you.

THE COURT: Mr. Keaveney, do you want to follow up with questions.

MR. KEAVENEY: Yes, Your Honor.

THE COURT: Go ahead.

RECROSS EXAMINATION

BY MR. KEAVENEY:

Q Mr. Lunden, you testified earlier this morning that you did a serious review of all the responses to the RFI, right?

A Back in 2011, yes.

Q You spent a lot of time doing that, right?

A Yes.

Q Okay. You reviewed them, you studied them, right?

A Yes.

Q Okay. And at that initial meeting with TIS, you made a statement based on that conversation?

MR. KEAVENEY: Can we look at S real quickly?

THE COURT: What exhibit --

MR. GENIS: Objection, Judge, leading.

THE COURT: -- are you now referring to?

MR. KEAVENEY: S.

THE COURT: F?

MR. KEAVENEY: S, as in "Sam."

THE COURT: S as in "Sam." One second.

MR. GENIS: Objection to form, leading.

THE COURT: I don't have an S that's evidence yet.

Do you have -- do you want to offer S into evidence?

MR. KEAVENEY: Yes, Your Honor, we had talk about that.

THE COURT: Just one second.

MR. KEAVENEY: Yes, Your Honor.

THE COURT: There's been no suggestion it's an email, and it's in evidence at this time.

(Defendants' Exhibit S received in evidence.)

BY MR. KEAVENEY:

Q And I just want to clarify something that Mr. Genis said talking about the stations that were done by SMRT, and I just want to compare and contrast. Your email says, "However they acknowledge that while they had installed these doors under this business plan on a core of stations on the Seoul Subway, 28 stations I believe, the Seoul Transit Agency went ahead and installed screen doors on the rest of their system."

I read that correctly, right?

A Yes.

MR. KEAVENEY: Can we go to AA?

BY MR. KEAVENEY:

Q And this is TIS's official response to the platform screen door to the RFI, correct?

A Yes.

Q Okay.

A They appear to be.

MR. KEAVENEY: All right. Can we just go to Page 306 of that -- you have it up. Thank you.

BY MR. KEAVENEY:

Q And according to their official response, it says "The first BOT project for the platform screen doors in the world. Location, Seoul Metro."

Do you see that?

A No, I don't -- oh, there we go. Okay.

Q Okay. It gives a period.

Quantity. Do you see that?

A Yes.

Q 1,920 doors on 24 stations.

Do you see that?

A In Seoul -- yes.

Q Okay. So I'm sorry. You were incorrect when you said it was only 28. It was 24 sections, correct?

MR. GENIS: Objection.

THE COURT: Sustained. The document speaks for itself.

Next question.

BY MR. KEAVENEY:

Q It was only 24 stations, not --

MR. GENIS: Objection.

BY MR. KEAVENEY:

Q -- 28, correct?

A Yes.

MR. GENIS: Objection.

THE COURT: It speaks for itself.

Next question.

BY MR. KEAVENEY:

Q Your testimony was accurate, correct?

MR. GENIS: Objection.

THE COURT: The jury has it all front of them.

MR. KEAVENEY: Okay.

THE COURT: They can see these documents. They're intelligent people. They can make their determinations. The important thing is to have the evidence before them, okay?

MR. KEAVENEY: Okay. Thank you, Your Honor.

THE COURT: Anything else?

MR. KEAVENEY: Nothing else.

THE COURT: All right.

Mr. Genis.

MR. GENIS: Very briefly on that one point.

THE COURT: Let's make it short.

MR. GENIS: Could I see 13, in evidence?

THE COURT: 13 is in evidence. That's right.

REDIRECT EXAMINATION

BY MR. GENIS:

Q I'm going to show you Exhibit 13 --

THE COURT: It's the trip report to Korea. They've see this.

MR. GENIS: I have not shown them this one page --

THE COURT: You want to show them a particular page.

MR. GENIS: Yes.

THE COURT: Now, that little highlight, that yellow and that dash is yours?

MR. GENIS: Yes.

THE COURT: It's not part of the original exhibit.

MR. GENIS: Yes. That's a Post-It-Note.

THE COURT: You want to read that to the jury?

MR. GENIS: Yes.

THE COURT: All right. Read it to the jury.

BY MR. GENIS:

Q "The New York City Transit Team propose that TIS and -- it says NRT -- be granted the opportunity to install several

modular PST units at the unused platforms A1 Track at Hoyt-Schermerhorn Street Station in Brooklyn."

Correct?

MR. KEAVENEY: Objection, Your Honor.

THE COURT: I'm allowing you to read it. It's in evidence.

MR. GENIS: Okay.

MR. KEAVENEY: Your Honor, it's got nothing to do with recross.

THE COURT: But you're going to argue back and forth between the jury? We have it in evidence. They see it. You want the highlighting. I'm allowing you to do that.

Do you have any other questions of this witness?

BY MR. GENIS:

Q So do you agree that when he -- Mr. Keaveney just asked you some questions saying only Manhattan, that the Transit wanted it done in Brooklyn?

MR. KEAVENEY: Objection. That wasn't part of the cross.

THE COURT: Overruled.

MR. KEAVENEY: It's extended scope.

THE COURT: You can explain. Did they want it in Brooklyn? Did they want it in Manhattan? Did they want it in New Jersey? Did they want it China?

Just explain once more to the jury so we can avoid any possible confusion, okay?

THE WITNESS: So this was a suggestion by the New York City Transit Team to offer the unused platform where no passengers ever go to -- to the TIS team to install platform screen doors as a pilot to demonstrate it, basically to NYCT personnel that it would work.

THE COURT: All right.

THE WITNESS: It was not TIS's list of stations.

THE COURT: All right. Mr. Genis, anything else?

MR. GENIS: No.

THE COURT: All right. Mr. Keaveney are you okay?

MR. KEAVENEY: Okay. Your Honor.

THE COURT: Okay. Believe it or not you can step down.

THE WITNESS: Thank you very much, Your Honor.

THE COURT: All right.

All right. So it's almost 3 o'clock. We have a projected additional witness, which may take a long time, and that's going to be Mr. Abdallah, I believe.

Right?

MR. GENIS: Yes.

THE COURT: So the question is, do we want to start his testimony now and go for two hours? I have a feeling that it's not going to be completed in two hours, or

do you want to wait until Monday and have somebody else testify now?

MR. GENIS: I would rather today. But can we have a bathroom break?

THE COURT: A what?

MR. GENIS: A bathroom break and then Mr. Abdallah today.

THE COURT: You want to start today?

MR. GENIS: Yes, please.

THE COURT: Well, it may be that you won't finish in two hour. If this is anything similar to this prior witness, it's going to lapse over to Monday, right?

MR. GENIS: Well, the thing is we have two experts lined up for Monday.

THE COURT: Well, look, this is my job. I have to administer the trial.

MR. GENIS: Yeah.

THE COURT: Will you be able to finish with Mr. Abdallah today?

MR. GENIS: I hope to do so, Judge.

THE COURT: Let's see whether we can do, all right, this last witness.

MR. GENIS: Okay.

THE COURT: All right. Look, members of the jury, now I have a bird's eye view of how tough it is to be the

judge. So I have an obligation to, obviously, make sure the trains run on time -- that's a good expression in this case, right -- but I try to keep a clear record as you can see, right? Because you'll have the opportunity to look at these exhibit. You'll have a clear record of which evidence were allowed into evidence. So that's part of what a judge does. You can see this in realtime, okay?

And if the lawyers are appropriately passionate about their cases I expect it. But I'm the one who has the real tough job, okay? And I'm trying to do the best I can to give everybody a fair trial, to get the evidence before you.

Now, they're going to each have an argument to make to you in summation. You can anticipate what those summations are going to be already, right? And I don't put necessarily a time constraint on them, unless it goes five days, right? We'll see how that does, right? They're going to talk to you passionately at the end of the trial. I'm trying to see that that doesn't happen during the course of the trial, okay?

We're here now just to try to get the evidence out. But they're going to have the opportunity to sum up, and you're going to hear them talk about why you should, you know, find in their favor. That's going to come later. So I try to make sure it doesn't happen during the course of

Case 1:17-cv-04550-FB-VMS Document 360-1 Filed 05/05/26 Page 613 of 2327
PageID #: 22805



the trial. We save it for their summations.

But this is normal. You know, people are passionate about their cases. I understand that. But now I'm trying to regulate this.

So this witness look took a long time. There's nothing wrong with that. Some witnesses by the nature of their knowledge and, you know, their testimony may be lengthier than others, right?

So now Mr. Abdallah, I know in advance, because I talked to the lawyer is going to be their next witness. And he's also a person who is, you know, really -- you know might say a defense witness is going to be called by Mr. Genis, and it's okay to do that.

Let's see whether we can complete his testimony in two hours' time today, otherwise we're going to have to go over into Monday.

Mr. Genis?

MR. GENIS: Thank you. I believe he's outside.

THE COURT: Okay. It would be a good idea to bring him in.

MR. GENIS: Thank you.

(Pause in proceedings.)

THE COURT: All right.

Next witness?

THE COURTROOM DEPUTY: Good morning.

Mr. Abdallah, may I ask that you remain standing and raise your right hand?

**AHMAD "TONY" ABDALLAH**,

called as a witness having been first duly sworn/affirmed, was examined and testified as follows:

THE COURTROOM DEPUTY: Thank you. Please have a seat.

May I ask you to state and spell your name and please keep your voice up.

THE WITNESS: Good afternoon.

My name is Tony Abdallah.

Did you ask me to spell it? I'm sorry. I have a head cold.

THE COURTROOM DEPUTY: Yes, please.

THE WITNESS: It's last name A-B-D-A-L-L-A-H.

THE COURTROOM DEPUTY: Thank you.

THE WITNESS: Thank you.

THE COURT: Now, I have your first listed as Ahmad --

THE WITNESS: Yes.

THE COURT: -- A-H-M-A-D?

THE WITNESS: Yes.

THE COURT: That's your formal name, but people call you Tony?

THE WITNESS: Most of my life, they've called me Tony.

THE COURT: Okay.

Your witness.

MR. GENIS: Thank you.

DIRECT EXAMINATION

BY MR. GENIS:

Q Mr. Abdullah, you're here pursuant to a *subpoena* today, correct?

A Yes.

Q Okay. And what, if anything, did you do to prepare for today?

A I reviewed the declaration that I prepare for New York City Transit.

Q Okay. For this case?

A For this case, correct.

Q And did you review anything else?

A I looked the CONOPS briefly.

Q Anything else?

A That's pretty much it.

Q Okay. Did you talk with anyone before you started to testify?

A I did not.

Q Okay.

Okay. Sir, could you, as quickly as you can, give

us your background at the Transit?
A Certainly.
I started out in New York City Transit Operation -- in operations. I was a train operator for three and a half years. I got promoted to motorman instructor, which teaches train operators. Then I became a manager, running the F Line. After running the F Line, I quickly got promoted to a unit called Technical Standards & Procedures, which pretty much oversaw the rules and regulations, bulletins, investigate operational incidents. Anything technical that came through New York City Transit came through my unit.
After which I got promoted to the Rail Control Center, remained there for about ten years. And subsequent to that, various promotions. Ran a station department for 15 months, vice president of -- Acting Vice president of Operations. And then I retired in January of 2024.
Q Okay. Thank you.
So based on that -- and you've been on different committees and task forces involving platform screen doors, correct?
A Correct.
Q Okay. And, in fact, you went to Korea and -- and you also went to Europe to look at platform screen doors, correct?

A I did.
Q Okay. How many places has the Transit sent you to look at platform screen doors?
A I went to Europe, Paris, London. I went to Korea. That was really it.
Q And didn't you have a trip to JFK?
A I did not do the JFK trip.
Q All right.
A I'll be there Sunday.
Q Okay. Too far?
Okay. Sir, you are aware that there have been fixed rails throughout our subway system and some have been there for almost a hundred years, correct?
A Correct.
(Continued on the next page.)

EXAMINATION BY
MR. GENIS:
(Continuing.)
Q And I'd like to introduce some photographs that were previously marked as Plaintiff's Exhibit 74, there's four photographs.
MR. GENIS: I don't believe there was an objection.
THE COURT: Yes, 74. We have in our of those you with an to put in.
MR. GENIS: Yes, your Honor.
THE COURT: All right. Go ahead.
(Plaintiff's Exhibit 74-A through D was marked in evidence.)
MR. GENIS: May we publish these to the jury, oh, actually I have the Elmo.
Q Let me start showing you some of the pictures.
MR. KEAVENEY: Your Honor, may we see these first because we don't have copies.
THE COURT: Show counsel the four that you want.
MR. GENIS: May the record reflect that I've shown them to defense counsel.
Q The first one --
THE COURT: You may want to mark them as 74-A, B, C, D.

MR. GENIS: 74-A.

THE COURT: The first one is 74-A.

Q And do you recognize this as being at Times Square; correct?

THE COURT: You can tell us what it is.

A It's been a while. I think they're fixed rails at Times Square, that's all I know about them.

Q Okay. And 74-B.

THE COURT: 74-D?

MR. GENIS: 74-B, like Bob.

Q That's another example of a fixed rail at Times Square-42nd Street; correct?

A I believe so.

Q And 74-C, it's another one; correct?

A Correct.

Q And the last one or different type of rail is 74-D. Do you recognize that, also?

A I can't say I recognize it. It must have been installed after I left. Otherwise, I didn't see this particular rail.

Q Okay. So the shuttle for Times Square was renovated and these rails were taken out but before that?

A They were there for a really long time; correct. I believe so.

Q Okay. And were they ever designated for removal

because they were dangerous?
A I'm not certain of that.
Q When you say you're not certain of it?
A I wasn't part of that decision-making.
THE COURT: Do you know how long they've been there? Was it before 2018.
THE WITNESS: Judge, honestly, they may have been there before 2018 but I can't ascertain when they were there.
THE COURT: All right.
Q Okay. As of August 2, 2016, how many other fences or railings are you aware of within the subway system? How many stations?
A After 2016?
Q No, before I'm asking.
A Before 2016.
THE COURT: Do you have any knowledge of how many rails were in the subway system before August 2, 2016?
THE WITNESS: I don't believe that there were any rails or fences before 2016.
Q How about at Herald Square?
A Which line we're talking about?
Q The N Train?
A I can't recall if there was any.
Q Okay. Do you remember before they redid Bowling Green

or the South Ferry they had rails there, too; correct?
A That's correct. Those rails I'm familiar with.
Q All right. Now, sir, have you ever reviewed in a memo by a Charles Yongue regarding platform edge guard and rail fencing?
A I believe I may have taken a look at it a while ago. I do remember Charles Yongue. He was a lead in System Safety who was given the task of evaluating recommendations from a safety perspective.
Q Okay. And, in fact, when you said you reviewed your declaration before, that was a declaration you told us for this case when you were looking to dismiss this case; correct?
A Correct.

MR. KEAVENEY: Objection.

THE COURT: One second. You just answered. Let's move on. You want to see something in evidence is that what you want to do now?

MR. GENIS: Well, I have his declaration, Judge, but I just wanted to address something that he noted in his declaration first.

THE COURT: Just ask him a question.

MR. GENIS: Sure.

Q In your declaration, did you refer to multiple exhibits in support of your declaration?

A I did.
Q Okay.
THE COURT: What declaration are we talking about? Is that an exhibit?
MR. GENIS: Is that an exhibit?
MR. SHIELDS: No.
MR. GENIS: For impeachment purposes.
THE COURT: I don't know what you're talking about.
Next question.
MR. GENIS: Surely.
Q Okay. So, sir, you reviewed the Yongue memo; correct?
A I may have reviewed the Yongue memo. There was a lot of material regarding platform screen doors, gates, recommendations so that may have been one of the memo.
Q Okay. And do you recall that in 1999, it was the transit policy that these gates, these rails or fences, whatever you want to call them, were not safe?
A Correct they did bring some hazards.
Q Okay. And, in fact, when you were making your declaration to dismiss this case --
THE COURT: I don't know what declaration you're talking about. You're talking about a document that we have to be a little bit mindful of the record we're trying to keep. I don't have any declaration in evidence here, you're

talking about something which is not in evidence.

Next question.

MR. GENIS: Got it. Okay.

Q And, sir, you have taken the position before that these fixed-rail gates are hazardous; correct?

MR. KEAVENEY: Objection.

THE COURT: He's trying to find out whether or not, you know, you said anything or took a position before saying that these fixed rails are not hazardous or are hazardous, what do you know about that?

THE WITNESS: So I relied, your Honor, on our System Safety Group who does an analysis, a hazard analysis, of equipment such as that. And I believe that Charles Yongue at the time said that those gates were or railings were hazardous because they brought hazards.

THE COURT: I don't have any documents for Charles Yongue. You said you saw something and that is what you believe to said.

THE WITNESS: Correct. And I worked with Charles Yongue.

THE COURT: There's nothing in evidence about this.

MR. GENIS: I'm sorry, Plaintiff's Exhibit 73 is the Charles Yongue memo.

THE COURT: Just one second. Now we're making

some headway.

So 73 is now going to be in evidence without objection.

1999, Yongue, Y-o-n-g-u-e, memo; correct?

MR. GENIS: Yes.

THE COURT: We're on the same page.

MR. GENIS: With your permission, I have one that I put highlights on the document.

THE COURT: Let's see your highlights.

Q So this is the Charles Yongue memo?

THE COURT: It's dated May 11, 1999.

MR. GENIS: Yes.

THE COURT: The yellow highlights are yours, Mr. Genis; right?

MR. GENIS: Yes.

THE COURT: Okay.

Q You're going to go towards the bottom and it says, "If platform guardrail fencing openings are not provided with some form of gate, the potential for pushing incidents and/or suicides will not have been precluded. The cost maintenance and operational reliability of such system are prohibitive on two counts and unknown on the other."

THE COURT: So the highlights are yours and it's in evidence so I allowed you to read that.

Do you have a follow-up question?

MR. GENIS: Sure.
Q And you agree that under the heading of customer safety, Yongue concluded the installation of these platform guard rails or fences --
THE COURT: You want to read from the document in evidence to the jurors or you want the witness to read it?
Q Can you read the highlighted portion?
THE COURT: It's up to you. But do you have a follow-up question after that?
MR. GENIS: Yes.
THE COURT: All right. So you can read, I guess the jurors can see it themselves. But you want to read it to them, go ahead.
MR. GENIS: Thank you.
Q Under the heading of customer --
THE COURT: This is preliminary to a follow-up question.
MR. GENIS: Yes.
Q So under, Customer Safety: Installation of platform guardrail fences could lead to an increase in the severity of such incidents when they occur; correct?
A Correct.
Q And they talked later on about dragging as well; correct?
A Correct.

Q And it had an effect on the conductor to see somebody and possibly getting injured as well; correct?
A Correct.
Q Okay. So I'm going to show you now we have Plaintiff's 79.

MR. GENIS: I'm offering in evidence, your Honor, pursuant to your ruling yesterday.

THE COURT: 79 is, well, why don't you identify what that is first.

MR. GENIS: Sure. They are pictures of railings installed about three months after.

THE COURT: Those are photos.

MR. GENIS: From his declaration.

THE COURT: How many photos do you have?

MR. GENIS: Seven.

THE COURT: We don't need so many photos.

MR. GENIS: It shows different types of railings.

THE COURT: Pick a couple out, these are things after 2016?

MR. GENIS: Yes.

THE COURT: Go ahead.

MR. KEAVENEY: Objection, your Honor. Foundation, authenticity for the records. Who took them? How are they applicable?

THE COURT: Show the witness the photos that you

want to have in evidence. Let him take a look at them and you don't need seven or eight, just a couple.

MR. GENIS: Sure. Okay.

MR. KEAVENEY: Judge, we have -- have we been provided these?

THE COURT: See if he identify these.

MR. KEAVENEY: Judge we haven't been provided these. Counsel has not been provided these.

MR. SHIELDS: That's not true.

MR. KEAVENEY: Counsel has not been provided these.

THE COURT: You know what they are, can you identify them?

THE WITNESS: I do not. I've never see these.

THE COURT: Not in evidence.

Next question.

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q Well, sir, are you aware that within a few months of you putting under oath that fixed rails are hazardous that the Transit Authority then installed them including Clark Street?

THE COURT: One second.

Do you know anything about whether they were

installed after August 2, 2016, yes or no?

THE WITNESS: No.

THE COURT: He knows nothing about it.

Next question.

Q Sir, you testified at your deposition --

THE COURT: Did he say anything at his deposition that was inconsistent, you can read it.

THE WITNESS: Did you say 2016?

THE COURT: I think we're talking about August 2nd, if I remember correctly.

MR. GENIS: Correct. And you asked the question if it was after that.

THE COURT: After August 2, 2016. He want to know if you know anything about the installation of these fixed rails.

THE WITNESS: No, I do not.

THE COURT: He doesn't know anything about it. Go ahead.

EXAMINATION BY
MR. GENIS:
(Continuing.)

Q So I would like you for the purposes of my question. Assume that rails have been installed a few months after your declaration was submitted to court; okay?

Would you agree --

MR. KEAVENEY: Objection, your Honor.
Q If rails were --
THE COURT: Just one second.
I don't know. You're asking him to assume something. I don't have any evidence of that now. You're asking him to assume something that's not in evidence, right?
Okay. Next question.
MR. GENIS: Okay. All right.
Q Sir, when you traveled abroad, it was to look at best practices; correct?
A Yes.
Q And you learned that best practices were to have platform screen doors; correct?
A It depended on the application. The purpose of their installation.
Q Well, sir, the platform screen doors, regardless of why somebody put it in, provide a safety publication, true or false?
A True.
Q Okay. And did you learn that it was a best practice to install platform screen doors?
A In some locations; correct.
THE COURT: Some locations, yes. Others, no.
What other kinds of --

THE WITNESS: So, yes. In some locations, I've learned that platform screen doors were installed for, let's say, in Hong Kong for air-conditioning; it wasn't for safety. But, however, in Korea, when we visited Korea, the installations there were for safety to prevent customer suicides.

THE COURT: So when you were in Korea, you saw these doors were installed and they were there for safety perhaps.

THE WITNESS: Correct. Overall, they were there for safety.

MR. GENIS: All right.

Q And sir, let me get this in pictures.

And, sir, I have Exhibit 46. I believe if there is no objection to that going into evidence.

THE COURT: 46 is in evidence. It's the international research.

And, sir, do you recognize this?

A Yes.

Q Okay.

THE COURT: Is this 46?

MR. GENIS: Yes.

THE COURT: Okay.

Q And this is dated in 2016. It was completed, but it is involving information prior to August 22nd of 2016; correct?

A Yes.
Q Okay. And it shows different pictures of platform screen doors like that's an example of one; correct?
A Yes.
Q Okay. And then it shows how in Shanghai they've done retrofits with a different height platform screen door?
THE COURT: You can tell us what that picture is all about, go ahead.
I mean, it's in Chinese, so it's hard for me to read.
THE WITNESS: These were photos of platform edge doors at various locations in Asia.
Q Those were retrofits in Shanghai; correct?
THE COURT: New construction or was it doors that were put in after?
THE WITNESS: Your Honor, I'm not sure if in Shanghai they were new construction. It says "retrofit."
THE COURT: So it says "retrofit," okay.
Q Then in Paris they did a retrofit; correct?
A Correct.
Q These are some pictures of Paris; correct?
A Correct.
Q And here's some other pictures of what the platform screen doors like in Paris.
A Yes those are automatic platform gates.

Q Last one. This is another PSD installation; correct?
A Correct.
Q You also reviewed submissions, the 12 submissions from Plaintiff's Exhibit 3; correct?
A Yes.
Q Okay. And those submissions also had photographs; correct?
A I believe so, yes.
Q Okay. And there were renderings under done in the submissions of what things would like look in New York if they installed the platform screen doors here; correct?
A I believe so.
Q Okay. I'm going to show you some from Plaintiff's Exhibit 3, okay. It's for the South Ferry. This is another one, okay? Some more.
So you looked at these types of photographs when you looked at the different proposals; correct?
A Correct.
Q Okay. Now, sir, you have seen different types of barriers; correct?
A Yes.
Q Okay. You've seen full-height platform screen doors, three quarter, half-height; correct?
A Yes.
Q You've seen the -- I'm going to alphabet soup. The

APGs, PEDs, the PEBs; correct?

A Correct.

Q By the way, there was an RFI for the BOT agreements; correct?

A The RFI was borne out of the proposal that came from the Boston Sovereign Group.

Q And, again, when we're talking about proposals from Exhibit 3, they even gave samples of how advertisements would be placed on the structure of the PSD; correct?

A Correct.

Q And, sir, you said a few moments ago that you were not aware that shortly after your declaration was submitted and filed, that they started installing fixed rails. Were you asked the following question at your deposition on September 3rd of this year and did you give the following answer. Page 251, Line 21?

"QUESTION: Okay. Are you aware that shortly after your declaration was submitted and filed, that the Transit Authority started installing fixed rails?"

"ANSWER: Yes, I heard that they were."

Were you asked that question and did you give that answer under oath?

A I did. I'm not denying that.

Q Okay. So you did, in fact, know that after you did the declaration that they were installed; correct?

A Counselor, the declaration was prepared in 2023. The question that I thought you asked was, was I aware of railings that were installed after 2016? So they started installing.

THE COURT: The question is, were you aware after August 2, 2016, that these fixed railings were installed, yes or no.

THE WITNESS: Your Honor, I wasn't aware until 2024 right after I retired.

THE COURT: You're aware now?

THE WITNESS: I am aware now, correct.

THE COURT: They actually were installed; correct.

THE WITNESS: When I left, yes.

THE COURT: Okay.

Q So they were installed in 2024 and you put in writing in November 6th of 2023 that they were hazardous; correct?

A Yes.

Q Okay. And based on your experience with the Transit Authority, have you ever seen them have that quick a turnaround time for an idea as opposed to doing a Con Op about it and then a proposal and then bids. And we've heard about this whole process and procedure involving platform screen doors. Was there something similar like that for these fixed rails?

MR. KEAVENEY: Objection, he wasn't employed at

the time.

THE COURT: Do you understand the question? Are you able to answer the question?

THE WITNESS: I do understand, your Honor.

I wasn't involved in the decision-making in this process. To your question, have I seen anything that quickly? I don't know how quickly it actually was. If there were meetings that went on months before a year before, I wasn't involved at the time.

THE COURT: That's his answer.

MR. GENIS: Thank you.

Q So if there were meetings and different things arranged a year before, that's while you were working at the Transit Authority; correct?

A I was working but I wasn't involved in this project anymore.

Q Okay. But when you were signing something under oath to dismiss this case, did you inquire as to whether or not there were any plans to install fixed-rail barriers in the New York City Subway System?

A I did not.

Q Okay. And you didn't actually draft this declaration, did you?

THE COURT: We're talking about something that's not even in evidence. Don't mention declarations anymore.

MR. GENIS: All right.
Q And, sir, it was submitted to this court in Docket Number 244; correct?
THE COURT: He doesn't know that.
MR. KEAVENEY: Objection.
THE COURT: What's your question?
THE WITNESS: Thank you.
THE COURT: Ask him the question. You don't have to refer to a document. He may be able to answer it. He may not be able to answer it.
MR. GENIS: May I approach the witness and show him something?
THE COURT: You can do that. Let's move on.
MR. GENIS: Thank you. I'm going to approach the witness if I may. Thank you.
THE COURT: What is your question?
MR. GENIS: I'm just showing him where he signed it and the date so he knows it's his.
THE COURT: Are you showing him a document to refresh his recollection?
MR. GENIS: Yes.
THE COURT: Then what is the question that you want to refresh his recollection about? Let's hear it again.
EXAMINATION BY

MR. GENIS:
(Continuing.)
Q Okay. Did you ever write in November 2023 that fixed barriers on the platform could pose hazards?
A Yes.
THE COURT: He did, okay.
So, members of the jury, if a witness doesn't remember something, they can be shown any document just for the sole purpose of seeing if it refreshes their recollection. The document is not in evidence but it can be used to for a limited purpose. He says now he's looked at this document, it does refresh his recollection, he's testified.
Next question.
Q Now, sir, there was also different records about collisions with individuals that you reviewed; correct?
A Yes.
Q Okay. If there were -- and this is from what is in evidence as what number is this one?
54 in evidence.
THE COURT: 54 is in evidence. Go ahead.
MR. GENIS: Mr. Keaveney was showing another witness some portions of this.
Q I'm going to show you right now, we've highlighted it.
And do you see how in one day, four different people

were struck by trains in one day in January of 2012?

MR. KEAVENEY: That's two days.

MR. GENIS: Sorry, two days.

A Yes, I do.

Q And when that many people get hit by trains in two days, is there an investigation?

A There's always an investigation when someone gets struck by a train.

Q Okay. And just showing you another page from that same exact document.

And do you see here's a day with one?

MR. KEAVENEY: Your Honor, we can't see the dates.

THE COURT: The yellow highlights are all yours.

MR. KEAVENEY: Can he identify the date and the page number?

THE COURT: Referring to Document Number 54, I believe.

MR. KEAVENEY: What page?

THE COURT: 54. What page?

MR. GENIS: Right now. I'm on Page 344 of 397.

Q And you see how there were four fatalities on January 19th and 21st of 2012; correct?

THE COURT: 2012, you're talking about?

MR. GENIS: Yes.

THE COURT: Those are highlights? Those are

yours, right?

MR. GENIS: Correct.

THE COURT: They're your highlights, correct?

MR. GENIS: Yes.

Q So, four fatalities. And you're saying would that require any kind of corrective action to be taken?

A It would require an investigation. First and foremost, it's investigated by the line by the line managers, by the supervisors. If there are corrective actions, if it's a suicide, it's part of the investigation. If it requires a corrective action, a defect on the platform, or something else.

THE COURT: So you investigated all of that. That's normal procedure?

THE WITNESS: Correct.

THE COURT: Do you know as a result of that investigation if anything was done? Just maybe you know, maybe you don't know.

THE WITNESS: Your Honor, it all depends. Usually on suicides, there's not much that can be done.

THE COURT: As far as these are concerned.

THE WITNESS: I don't know the details of these particular ones.

THE COURT: You don't know what happened.

THE WITNESS: I don't know. 2012, it's not

unusual to have two or three.

THE COURT: You say you know or don't know.

THE WITNESS: I don't know.

THE COURT: Thank you. Next question.

Q I'm now looking at Page 360 of that same exhibit.

And do you see this is, for example, on May 30th and 31st of 2013. And you see there is one, two, three, four, five and of those five we've got removed by ambulance, removed by ambulance, fatality, fatality, fatality; correct?

A Correct.

Q Would that result in corrective action being taken?

A Again, it would result in an investigation? I don't know if there was any corrective action.

THE COURT: Does it tell us what station that it was at?

THE WITNESS: If you can pull it up, I'll see. Usually, it says it.

Q Yes, it says it?

A Chambers, Pacific Street, 23rd Street on the C and E. These are in the --

THE COURT: So it tells you what the station was?

THE WITNESS: Correct.

Q By the way, where it says Pacific Street it says Atlantic Avenue; correct?

A Yes.

Q Now, when you say every accident gets investigated you, in fact, would get copies of these different cases involving collisions with people; correct?
A Can you clarify.
Q Sure. There were certain what's known PTSB cases; correct?
A Correct.
Q You would be notified of them?
A Correct.
Q And so, for example, if in 2014 within a week or two weeks there was one, two, three, four, five, six, seven, eight different incidents of people being struck by trains that's something that you would report to the PTSB; correct?
A Correct.
Q Okay. I actually missed a couple.
So if there was another 8, 9, 10, 11, 12, 13, 14. If there were is a people struck by trains between, let's say, March 1st of 2014 and March 14th of 2014, those would be PTSB cases; correct?
A I believe so.
Q Okay. And would that require corrective action?
A It requires an investigation and, again, depending on the circumstances of each incident, it may require corrective action, it may not.
Q The PTSB is the Public Safety Transportation Board?

A Correct.
Q That's a state oversight body?
A Yes.
Q When you say every incident has to be investigated, they don't actually investigate every single incident where a customer is hit; correct?
A Of course they do.
Q They do. So, for example, we have a case here today and you would get e-mails about these PTSB cases; true?
A I don't know what you mean, I'd get e-mails. E-mails from who? The PTSB?

MR. GENIS: May I approach the witness to refresh recollection with a document.

THE COURT: Let's go on with another question. I think we've exhausted this sufficiently.

Next question.

Q This incident that we're here for today investigated?

THE COURT: You can answer that question if you know.

THE WITNESS: I would know for certainty that the incident was investigated. But I don't know by who or I was not...

THE COURT: It would be investigated because all incidents are investigated. I think that's your testimony; right?

THE WITNESS: Yes.

THE COURT: So you assume this was investigated also but you don't know what happened?

THE WITNESS: I don't know what happened. I wasn't involved.

THE COURT: Okay.

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q Who is SD, Service Delivery. What's a Service Delivery Package?

A Service Delivery refers to the Rapid Transit Operations, the Transportation Operations Division within the Department of Subways.

THE COURT: Okay.

Q And that's who does Department of Subways train incident reports; correct?

A Correct.

Q They would indicate whether or not there was an investigation done; correct?

A Correct.

Q Okay. And you're telling us there was an investigation here; correct?

A I'm assuming there was.

Q All right.

Case 1:17-cv-04550-FB-VMS Document 360-1 Filed 05/05/26 Page 644 of 2327
PageID #: 22836



MR. GENIS: May I approach the witness, your Honor.

THE COURT: You may.

(Approaching the witness.)

Q And, sir, does this refresh your memory as to whether or not there was no investigation of this incident?

MR. KEAVENEY: Your Honor, what's he showing the witness? We haven't been provided with it.

MR. GENIS: I will gladly show it to counsel.

THE COURT: Take a look at this document.

Does that refresh your recollection as to whether there was an investigation or not?

THE WITNESS: So this document is not unique, your Honor. It's a document that comes from the System Safety Department.

THE COURT: Have you looked at this document. Can you recall whether there was an investigation of this particular --

THE WITNESS: I can't recall.

THE COURT: Next question. It's not in evidence.

Q So, sir, I just want to make sure I understand you. So the Office of System Safety investigate this incident?

MR. KEAVENEY: Objection. He said he assumed they did.

THE COURT: You know that there is an

investigation because all these things are investigated. You know anything about what happened in this particular situation, is that your testimony?

THE WITNESS: That's my testimony.

THE COURT: That's what he said. He doesn't know.

Q So is it your testimony that every incident is supposed to be investigated, is that what the testimony is?

THE COURT: Just one second.

Do you know whether this incident was or was not investigated or you assume it was investigated because all incidents are supposed to be investigated. Explain to the jurors.

THE WITNESS: The procedure, the policy, is that all the incidents get investigated.

THE COURT: That's the policy.

THE WITNESS: That's the policy.

THE COURT: Whether it happened here or not, you have no knowledge.

THE WITNESS: Correct. So I'm assuming that this incident because of the policy --

THE COURT: The jury understands. Next question.

MR. GENIS: Thank you.

EXAMINATION BY

MR. GENIS:

(Continuing.)

Q And, sir, when you went to Korea, you came to the conclusion that the platform screen doors could eliminate fatalities due to collisions; correct?
A Correct.
Q And you recommended that the Transit Authority utilize platform screen doors; correct?
A Correct.
Q You were the team leader, in fact; correct?
A I was.
THE COURT: Was your recommendation ever followed by the transit, do you know that one way or the other?
THE WITNESS: Your Honor, it was investigated by the Transit Authority. We did our due diligence.
THE COURT: You investigated it but did it ever come to pass?
THE WITNESS: At that moment, no.
THE COURT: Some subsequent moment?
THE WITNESS: So subsequent to that, we --
Q Before August 2nd of 2016?
A Correct. We took the initiative, I took the initiative as a team leader to prepare a Con Ops for screen doors. We did not have a Concept of Operations. And we also wanted to get some information from the world on what Request for Information on companies who had experience in platform --
THE COURT: You did a lot of investigation?

THE WITNESS: We did a lot of investigation, a lot of digging.

THE COURT: Did it ever come to pass?

THE WITNESS: No, it didn't.

THE COURT: Next question.

Q And, sir, by the way, there were different measures you've testified about it reduce this that were in effect on or before August 2nd of 2016. Are you aware of anybody from any department you worked with reviewing the data to determine the effectiveness of any of the safety measure purportedly taken?

A I'm not sure if I understand your question, Counselor.

Q Okay. Well, to your knowledge, did anybody from the transit ever review the data to determine whether or not whatever measures were taken by the transit were actually effective in preventing people from being hit by trains?

A I don't know of anyone specific, no.

Q Okay.

THE COURT: So, Mr. Genis, it's 20 to 4:00. I'm mindful of the fact that usually we take a break now. But the tension I have is that I would like to complete his testimony today.

MR. GENIS: I'm trying to move it along.

THE COURT: Take a break now or not take a break. How much more do you have?

MR. GENIS: I think I'm done in about ten minutes. It's up to you.

THE COURT: I'm trying to do the common sense thing.

MR. GENIS: Okay.

THE COURT: We can accommodate this witness and we can finish his testimony today so he doesn't have to come back on Monday. We would like to try to do that if it's possible to do that. Why don't you do another ten minutes now and complete his direct testimony and see whether we take an a little bit of a break.

MR. GENIS: I think you're actually being sharper than I am on this. I don't think I will finish it in ten minutes. If we'd like to have him come back another day, unfortunately, we may have to do that.

THE COURT: Give me an estimate now. I've got to manage the trial.

And, Mr. Keaveney, you give me a sense, also. If we can't finish it today, you have to come back on Monday. But you tell me, you're going to have a lot of questioning of the witness?

MR. KEAVENEY: Probably some that will take at least a half hour, if not longer.

THE COURT: So we're going to do this. We're going to take a little break. I see one or two people

yawning. We have to take a little break.

We'll come back at 4:00. We'll go for another hour. He may have to come back on Monday, it may be unavoidable and I guess on Monday we will be able to finish his testimony and move on.

THE WITNESS: Excuse me, your Honor, I'm not here on Monday. I'm in the Middle East.

THE COURT: I can't do anything about that. You have to come back. I'm trying to get you done today. You want to tubing it Mr. Genis, you can talk to Mr. Keaveney and if we can get you accommodated today, I'm willing to do that. If you can't, you can't.

THE WITNESS: That's fine.

THE COURT: Talk to them during the break to see whether they can do that. If not, you have to come back on Monday. What can I tell you? We're trying.

Don't talk about the case. We'll see you at maybe five to 4:00 or thereabouts.

COURTROOM DEPUTY: All rise.

(Jury exits courtroom at 3:45 p.m.)

THE COURT: The jury is not here. What plans do you have for Monday?

THE WITNESS: I'm leaving Sunday morning for Saudi Arabia.

THE COURT: Talk to lead counsel. We'll try to do

that see if we can try to finish your testimony for obvious reasons we can do it. I'm sure Mr. Genis wants to do that. I'm sure Mr. Keaveney can do that. See if we can accomplish that.

See you at five to 4:00 and make your best efforts to do that.

THE WITNESS: Thank you.

(Witness leaves the witness stand.)

(In open court; outside the presence of the jury.)

THE COURT: All right. The jurors are being brought in.

Mr. Genis, I'm sure you'll be able to finish him.

MR. GENIS: I'm trying to be very focused.

THE COURT: He's going to Saudi Arabia on Sunday. We're trying to accommodate his trip.

MR. GENIS: Understood, Judge.

(Jury enters.)

THE COURT: All right. Mr. Genis, your witness. Go ahead. See if we can wrap it up.

MR. GENIS: Sure.

BY MR. GENIS: (Continuing)

Q First, have you ever seen anything in writing, a memo, letter, report or anything from the Transit saying we are not going to pursue our own RFI?

A No, I have not.

Q And did you ever have -- do you recall a meeting with anybody where they said, Yeah, we're not doing this?

A No.

Q Okay. Next: The safety performance indicators like on this chart, that's what the Transit goes by in deciding things, correct?

MR. KEAVENEY: Objection.

A I'm not sure what that --

THE COURT: He's not sure. Sustained.

Next question.

Q So, well, the Transit looks at safety performance indicators, just the data on the number of train strikes and the numbers of deaths resulting from the train strikes, correct?

A It's a safety performance indicator.

Q Yes, but that's -- that's what they look at, the number of train strikes and the number of fatalities from them; that's the safety performance indicators, right?

A Look at for what? I'm not sure.

Q Safety performance.

A We look at a lot of other indicators: Trips, slips, falls. There's a whole host.

Q Okay. I'm only talking now about safety performance indicators involving the hazard of train strikes, sir. They weed out all the other things, correct?

A Correct.

Q So that's what I wanted to be clear on.

Next: Did you ever get any e-mails from architects indicating how Paris, an older system, and London, an older system, met the challenges of installing platform screen doors?

A I can't recall if I got any e-mails. I remember talking to folks from the --

THE COURT: Do you know if they were able to do it?

THE WITNESS: I'm sorry?

THE COURT: Do you have any knowledge about whether they did it, they were able to install these things in Paris, whatever?

THE WITNESS: They installed them early 2000s from what I remember but I don't know what --

THE COURT: So they were there in early 2000, right? Okay. Next question.

Q Sir, are you familiar with defensive rail operations?

A Defensive rail operations? I've never heard that term.

Q You've never heard that term.

Do you know the difference between a safe zone and a, and the envelope of the train?

A Yes.

Q What's the difference?

A The envelope of a train from what I understand is the, how a train travels through a tunnel and taking the sway so the left and the right sway doesn't hit the tunnel. The safety zones are areas where people on the tracks clear up.

Q Well, is the safe zone the space for a train than an operator must make sure remains clear of obstructions for people that may come into contact with the train while it's in motion, whale they're on the platform?

A On the platform?

Q Yes, sir.
A I believe so, yes.
Q Okay. And, in fact, you're very familiar with these defensive rail operations and the safe zone, correct?
A Correct, but I didn't call them defensive.
Q Okay. Well, let's get back to that in a second.
And you agree that the space around the train has a potential of entering and violating the dynamic envelope, correct?
A Correct.
Q Okay. And you're saying you didn't know it was called defensive rail operations.
Did you ever receive -- because your name is on it as being a contributing member or participant -- an APTA defensive rail operations recommended practice?
A Again, I never heard -- I can't remember it being called a defensive rail operation. I am on several APTA committees.
Q Okay. All right. So they have to have that safe zone so it's safe for the customers who are on the platform that the train may still contact, correct?
A Correct.
MR. GENIS: That's it, Judge.
THE COURT: Mr. Keaveney, any questions?
MR. KEAVENEY: Judge, we're going to reserve and bring him back on on our case.

THE COURT: A little louder?

MR. KEAVENEY: We're going to reserve and bring him back on our case.

THE COURT: All right. So then he's going to be able to leave now. He has some personal plans we want to accommodate, but you reserve your right to call him as a witness for you when it comes your turn to present your case, correct?

MR. KEAVENEY: Correct.

THE COURT: Have a good trip.

THE WITNESS: Thank you.

THE COURT: You can step down.

(Witness excused.)

THE COURT: All right. So I think we've reached the end of the line for today.

As it turns out, it's raining. Get home safely. We'll let you leave you a little early today and we're going to see you folks again Monday at 10 o'clock.

You may be hearing some testimony from experts. They each have expert witnesses and you are going to be hearing from the experts.

I suspect probably on Monday, we're going to have that?

MR. GENIS: Two. The doctor and the economist, Judge.

THE COURT: Monday is going to be a doctor and an economist.

And the expert witnesses will be after that?

MR. GENIS: The liability expert witnesses will be after that, yes.

THE COURT: Okay. We're making good progress. We've gone a long, long way in four days, and just get a rest this weekend.

Don't talk about the case. You can think about it. It may not be a good idea to go to the train station and check it out. I think it would probably be a good thing not to do that. Since we're talking about that train station, I don't think you need to go there and examine it. I think that would not be the right thing to do. The condition today, who knows what it is. We're going back to 2016.

So we have had some testimony, if I recall correctly, about events that happened after August 2, 2016, and I'm allowing that to be in evidence. Normally, remedial measures, we don't allow that in evidence, but we can if there's an issue as to whether it's feasible to make these types of changes. So I'm allowing it in for that limited purpose.

Also, for cross-examination, we've heard testimony back and forth, but the fact that there were remedial measures in and of itself doesn't establish liability, but it's

relevant, in my opinion, to this case on the issue of feasibility. So you should understand that instruction. Okay?

See you Monday at 10 o'clock.

A JUROR: Thank you.

(Jury exits.)

THE COURT: All right. So it's 4 o'clock.

I try not to rush you along but, you know, the witness had plans to fly to Saudi Arabia on Sunday. We wanted to try to accommodate him. And, you know, he can always be called back, I guess, by, you know, Mr. Keaveney, so there's no harm being done here.

Anything you want to put on the record now before we leave until we see each other again Monday?

I'd be shocked if Ms. Winters didn't want to say something, but if you want to say something, do it loud so I can hear you.

MS. WINTERS: I will speak loudly, Your Honor. I can't refuse to have a conversation with you.

At this time, we would move for a mistrial on the basis of the improper references to our motion to dismiss made on multiple occasions by Mr. Genis during the examination of our witness.

It was clearly done with the intent to signal to the jury the fact that we tried to dismiss this case and did not

succeed which is why we are here at trial and that's highly prejudicial and information that should not have been brought before the jury.

THE COURT: All right. So here's what we'll do. Give me a proposed limiting instruction which we will give to the jury on that issue.

MS. WINTERS: Thank you, Your Honor.

THE COURT: And I certainly will consider saying something to them, but I don't think that's a basis for a mistrial. We've come a long way but I'll consider giving a limiting instruction. Write it out before Monday. Okay?

MS. WINTERS: Absolutely.

I just want to alert that our concern would be further emphasizing it to the jury and we'll be mindful of that in the language, but the concern would be by giving the instruction, it further emphasizes what was already improperly brought before the jury.

THE COURT: I'm willing to give an instruction. If you don't want me to give it, I won't give it but I'm offering you the opportunity.

MS. WINTERS: Understood, Your Honor.

THE COURT: Very good.

MR. GENIS: I just would note, Judge, there was no impropriety. The witness signed a declaration under oath. It's a public record on the docket.

THE COURT: I don't have -- look, we discussed this. I had no declaration. We managed this as best as we could.

I'll give the defendant an opportunity, if they want to use the opportunity, to consider giving them a limiting instruction and we'll see you on Monday.

Anything else?

MR. GENIS: Have a nice weekend.

THE COURT: Okay.

MS. WINTERS: Thank you, Your Honor.

(Matter adjourned to November 3, 2025 at 10:00 a.m.)

--ooOoo--

*I (we) certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

*/s/ David R. Roy* — *October 30, 2025*

*DAVID R. ROY* — *Date*

W I T N E S S E S

**GLENN LUNDEN** 434

DIRECT EXAMINATION 435
BY MR. GENIS

CROSS-EXAMINATION 524
BY MR. KEAVENEY

REDIRECT EXAMINATION 576
BY MR. GENIS:

RECROSS EXAMINATION 600
BY MR. KEAVENEY

REDIRECT EXAMINATION 604
BY MR. GENIS

610
**AHMAD "TONY" ABDALLAH**

DIRECT EXAMINATION 611
BY MR. GENIS

E X H I B I T S

Plaintiff's Exhibit 54 466

Plaintiff's Exhibit 71 469

Plaintiff's Exhibit 44 474

Plaintiff's Exhibit 67 477

Plaintiff's Exhibit 68 477

Plaintiff's Exhibit 18 489

Plaintiff's Exhibit 13 499

Defendants' Exhibit S 530

Defendants' Exhibit U 545

| | |
|---|---|
| Defendants' Exhibit AA | 554 |
| Defendants' Exhibit GG | 562 |
| Plaintiff's Exhibit 52 | 587 |
| Plaintiff's Exhibit 70 | 589 |
| Plaintiff's Exhibit 98 | 593 |
| Defendants' Exhibit S | 601 |
| Plaintiff's Exhibit 74-A through D | 614 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

- against - : United States Courthouse
Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, : November 3, 2025
10:00 o'clock a.m.

Defendants. :

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458

BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants: LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, new York 10271

BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

APPEARANCES: (Continued)

Court Reporter: Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2643

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

* * * *

(In open court; outside the presence of the jury.)

THE CLERK: Civil cause on trial, Harger DaSilva versus New York City Transit Authority.

Counsel are present. I'll bring the jury in.

(Jury enters.)

THE COURT: All right. Good morning.

Are we ready to proceed?

MR. GENIS: Yes, Your Honor. We're just getting the doctor in.

By stipulation and agreement, pursuant to Court, assuming Court approval, Plaintiff's 82 through 95 are being offered into evidence. I think there may be one or two objections to some of them. I'll let defense counsel speak for themselves.

THE COURT: Just let me catch up to you.

MR. GENIS: Sure. Just different medical records,

Judge.

THE COURT: So let me hear this again. You stipulated to have introduced into evidence certain exhibits?

MR. GENIS: Yes, Your Honor. We are offering 82 through 95. I'll let defense counsel speak for what, if anything, they're objecting to.

THE COURT: 82 to 95?

MR. GENIS: Yes, Your Honor.

THE COURT: Well, we're not there yet, are we?

MR. GENIS: Well, we have a doctor on the stand. I thought it would make sense.

THE COURT: 82 to 95, and you said there's an objection to one of them?

MR. GENIS: I'll let defense counsel speak for themselves, if there is any objections.

THE COURT: Wait a second. So we agree hospital records 85 to 92 will be in evidence. There's no objection to that, I don't think. What's the problem?

MS. WINTERS: Your Honor, we've stipulated with respect to all domestic records that have certifications, that would be all the records except the Brazilian records. And we've stipulated subject to --

THE COURT: The jury is here. You agreed to 82 to 96, the hospital records, in evidence. Yes or no, Ms. Winter?

MS. WINTERS: No.

THE COURT: It's in evidence. Thank you.

MR. GENIS: Thank you.

THE COURT: Why is it not in evidence? You just said they stipulated. Now you're telling me you did not stipulate. Why are you doing that?

MS. WINTERS: Your Honor, we did not stipulate with respect to that one set of medical records.

THE COURT: Which document are you speaking about?

MS. WINTERS: Unfortunately, I'm having difficulty locating it on plaintiff's list.

THE COURT: I want to try to avoid this. We have 82 to 95. Is there any one of those 13? These are the hospital records that are normally admitted into evidence. Which one of those do you have a problem with. Tell me now, quickly.

MS. WINTERS: It looks like 89, Your Honor.

THE COURT: 89. So you have a problem with 89?

MS. WINTERS: That's correct, Your Honor.

THE COURT: All of those, okay, except 89, will be in evidence.

Now, do you need 89 right now, Mr. Genis?

MR. GENIS: No.

THE COURT: We can take care of it later.

MR. GENIS: I can address it later.

THE COURT: 82, 83, 84, 85, 86, 87, 88, 90, 91, 92, 93, 94, 95, in evidence at this time. We'll talk about 89

later on.

I don't know what your problem is. These are hospital records. These are normally not contested. You know, they are what they are.

(Plaintiff's Exhibits 82, 83, 84, 85, 86, 87, 88, 90, 91, 92, 93, 94 and 95 so marked.)

So now you are going to call a doctor to testify? Go ahead.

MR. GENIS: Thank you.

Dr. Stuart Kahn, please, to the stand.

THE CLERK: Good morning, Dr. Kahn. Remain standing and raise your right hand.

(The witness, STUART B. KAHN, was duly sworn/affirmed by the clerk.)

THE CLERK: Please have a seat.

Can you please state and spell your name?

THE WITNESS: Stuart, S-T-U-A-R-T, B, Kahn, K-A-H-N, M.D.

THE COURT: Your witness, Mr. Genis.

MR. GENIS: Thank you, Judge.

DIRECT EXAMINATION

BY MR. GENIS:

Q Are you a medical doctor duly licensed to practice medicine in the State of New York?

A Yes, I am.

Q Do you hold any other licenses?
A No. Certifications and boards but not a license, and a driver's license.
Q Okay. Do you have a specialty in the field of medicine?
A Yes, I do.
Q What is that?
A I'm board certified specialist in physical medicine and rehabilitation, board certified specialist in pain management.
Q Okay. What is physical medicine and rehabilitation?
A So, to describe that field quickly, I would describe it as the field of taking care of people with rehabilitation needs such as disabilities, taking care of people with musculoskeletal disorders and pain management disorders and trying to rehabilitate a person to their highest level of function with the, with the impairments or the abnormalities that they have.
Q Okay. And what is a life care plan?
A A life care plan, of which I am a certified life care planner, is a person who is trained to look at an ill or injured person and look at all of their injuries and impairments and how those impairments are affected in their environment, where they live, where they work, and how they can or cannot function, and what can, what health care product, so to speak, so what medical care, what therapeutic care, what paramedical treatments, what durable medical

equipment, what supportive community services, what housing needs can be provided to help bring about a better outcome to prevent further demise and improve their function and lessen their suffering within --

THE COURT: So, Doctor, let me talk now. Okay?

THE WITNESS: Sure.

THE COURT: I should have alerted the lawyers as to how I handle expert witnesses. My apologies to them.

But the jury is anxious to find out why you're being called as an expert witness. Obviously you're here to render certain opinions. Otherwise, you would not be here. Right?

THE WITNESS: Correct, sir.

THE COURT: So what I'd like to do is first, you know, tell the jurors that you have, you know, rendered an expert opinion about a subject matter and explain to them what it was that you were called here to testify about and what your opinion was and, you know, a little bit of a brief explanation; and then we're going to go back and forth with the lawyers, your credentials, your background and things of that nature. Because I find with experts, usually, if I don't do this they talk and talk and talk, and they know more than I know and they want to tell the jurors how smart they are. So it seems we're going to do it that way.

The jury wants to know why you're here, what you are going to opine about. Let's get that out first and then go

back and forth. Okay?

THE WITNESS: Okay.

THE COURT: Let's try to do that.

THE WITNESS: Okay.

THE COURT: So, Doctor, you're here to render an opinion about a certain subject?

THE WITNESS: Correct.

THE COURT: What were you asked to or intend to opine about?

THE WITNESS: A life care plan, primarily, which is what I just described.

THE COURT: And did you come to any conclusions or opinions based upon all the knowledge and the information you have and investigations you made and the due diligence I assume you conducted, right?

THE WITNESS: Yes.

THE COURT: So tell the jurors what your opinion is and then we can elaborate a little bit about it. Okay?

THE WITNESS: Okay. So overall my opinion is that Luisa Harger requires substantial future medical care, future household intervention, future durable medical equipment for the rest of her life.

THE COURT: Now, you can maybe tell the jurors a little bit more about why you came to that conclusion, and then we'll go from there.

THE WITNESS: Sure. So it's my opinion, based on my evaluation, that she needs that because she's a traumatic amputee above the knee with a short stump that is not well, and that is not -- well, it's well healed but not in a manner that is normal because of all of the scarring and the grafts.

And she has an extremely short-above elbow amputation, which is, in my opinion, a very, very poor stump for any kind of purchase and suspension of a prosthesis. And it's been almost, so it's over nine years since the accident and she still doesn't have a working prosthesis. So the chances of getting one are, even though there's one pending right now, very slim.

THE COURT: All right. So that basically is your opinion. That's the conclusion you have drawn from everything you looked at. Correct?

THE WITNESS: Among many other conclusions, but that's the biggest conclusion.

THE COURT: Mr. Keaveney, do you want to question him at all about this now?

MR. KEAVENEY: No. We'll wait, Your Honor.

THE COURT: Do you have any questions at all?

MR. KEAVENEY: We will.

THE COURT: Let's do cross-examination now, and then we'll go back and forth.

MS. WINTERS: I'm sorry, Your Honor?

THE COURT: Question him. Go ahead. He gave you his opinion. Do you have any questions to ask of him?

MS. WINTERS: We have numerous questions, Your Honor.

THE COURT: Do it now. This is the way we do it, and then we'll go back and forth.

MS. WINTERS: You would like me to start my examination of the witness, Your Honor?

THE COURT: Correct.

MS. WINTERS: Okay.

THE COURT: You can go there, if you want to, and then Mr. Genis will have a chance to go back afterwards. We'll get it all out that way. But he gave you his opinion, and you can question him about that now.

MS. WINTERS: Just to be clear, Your Honor, you only want me to examine him as to the issues he already spoke about.

THE COURT: He just gave you his opinions. If you have any questions, you can ask him. That's the way I do it, and then we go back and forth.

CROSS-EXAMINATION

BY MS. WINTERS:

Q Dr. Kahn, you're being paid by plaintiff to offer testimony and opinions in this matter, correct?

A I would -- yes, I am being paid today, yes, an hourly

fee, yes.
Q What's that hourly fee?
A $500.
Q Sorry.
A $500 per hour.
Q Okay. And did you meet with plaintiff's counsel to prepare for your testimony today?
A Yes, I did.
Q Okay. On how many occasions did you meet prior to today to prepare for your testimony?
A One.
Q Okay. And you were paid when you met with plaintiff's counsel as well, right?
A That was included in the retainer fee, yes.
Q Okay. And what was the retainer fee?
A Based on what I'm estimating, it would be a total of 24 hours for reviewing all of the records, going over things, it was $12,000.
Q And that's in addition to what you're being paid for today, right?
A No. That includes all of today.
Q Okay. And did you meet with Ms. Harger prior to today?
A Yes.
Q Okay. Did you charge for meeting with Ms. Harger as well?

A Yes.
Q And how much did you charge with that?
A Well, for the meeting itself, $1500.
Q Okay. You drafted a report in this matter, correct?
A Yes.
Q And you drafted a life care plan?
A Yes.
Q And you charged for that as well, correct?
A Yes, I did.
Q And how much did you charge for that?
A The total, including a meeting with Ms. Harger, the life care plan, the narrative report, all of the record reviews, was also $12,000.
Q And did you review -- you said you included the record review in that $12,000?
A Yes, I did.
Q Okay. And this is not the first case where plaintiff's counsel in this matter retained you, correct?
A This is the first case, yes.
Q This is the first case?
A Yes. I've never worked for this counsel before.
Q Okay. You've been paid to testify for other plaintiffs in other cases though, right?
A I've been retained to give my opinion in a court, yes.
Q Okay. And in fact, you've almost exclusively testified

for plaintiffs in lawsuits, right?
A I wouldn't say almost exclusively, no.
Q Okay. Let's go through a few of your most recent cases.
So you testified in September of this year, right?
A Yes, I did.
Q And that was on behalf of --
MR. GENIS: Judge, is this beyond the scope of my limited direct?
THE COURT: It's okay. You can go back and forth.
MR. GENIS: Okay.
THE COURT: Go ahead.
Q And that was on behalf of an individual named Alberta Sousa?
A Yes. That was a case similar to this, where there was an amputation in the subway.
Q And I'm going to do my best, just for efficiency sake -- I know we're trying to move things along -- to ask questions that require a yes or no answers.
A I'll do my best to answer them that way.
Q Understood. And if you're unable to do so, let me know, and we'll try to rephrase it or address it. Okay?
A Okay.
Q Great. And you testified for the plaintiff in that Alberta Sousa matter, right?
A Yes, I did.

Q And then in August of this year, you testified in a matter involving Sophia Lecosas, correct?
A Yes.
Q And you also testified for the plaintiff in that matter?
A Yes, I did.
Q And you also testified in February of this year for an individual named Kelly Burly, right?
A Yes.
Q And you testified for the plaintiff in that matter?
A Yes.
Q And, similarly, you testified in the Caballo matter in February of this year and that was for the plaintiff?
A Yes.
Q Okay. And in January of this year, you testified in a Cabrera matter as well as a Christopher Lee matter and both of those cases, you testified for the plaintiff, right?
A Those were several years ago, not this year.
Q But you testified for the plaintiff in those cases?
A Yes.
Q Okay. And you also testified in a matter called Hussein, right?
A Yes.
Q And you, in that matter, testified for the plaintiff as well?
A Yes.

Q And you testified by deposition or at trial numerous times, right?
A Yes.
Q Okay. Over six times this year alone?
A I don't know how many times this year. I don't think it was six times. I think it was three or four.
Q All right. And we briefly touched upon your life care plan when Mr. Genis was questioning you.
You don't complete life care plans in your normal practice as a doctor, right?
A Well, I think almost all rehabilitation physicians who practice physical medicine and rehabilitation to some degree complete a portion of life care planning for their long-term plan for their disabled patients.
So do I make a formal life care plan with tables and charts? No, I do not. That is part of a separate business that I do for this particular purpose.
Q Right. And when you just make, you know, individual assessments over the course of your treatment of a patient about their life-care needs at that time, you're not projecting their future life-care needs and making projections on the cost and things like that into the future for those patients you treat, correct?
A Not to the degree and the formality that I have here, no. That is not part of what a physician usually does for treating

but, if patients ask me what the future might hold, I give them a rough estimate and talk to them about that.

Q And when you do that in that general sense for the plaintiffs you actually treat, do you charge them, you know, $12,000 or any sum of money for that assessment?

A No, but then I'm not acting as a life care planner or expert, like I am here; and, as I said, this is a separate business and this why we are here today.

Q Understood. Okay. And in your life care plan, you recommended that plaintiff undergo various assessments to perform her medical and life-care needs, correct?

A I don't understand the question.

MS. WINTERS: Perdita, if you can bring up document 1.

MR. GENIS: What is document 1?

MS. WINTERS: Document 1 is Dr. Kahn's report in this matter.

MR. GENIS: Then, can we offer it as evidence, Your Honor, since they're using it and putting it before the jury right now?

MR. KEAVENEY: Just for the witness.

THE COURT: Do you want to introduce this document in evidence now?

MS. WINTERS: No, Your Honor. We're just displaying it for the witness.

THE COURT: Mr. Genis, do you want to introduce that document now?

MR. GENIS: Yes.

THE COURT: I'll let you now. We'll go back and forth. If you want to introduce any documents because she wants to question, I'll let you do that.

MR. GENIS: We're offering his report with the tables into evidence, Your Honor.

THE COURT: Why don't you pick up with your direct examination now. Okay? Let's see how it goes.

MR. GENIS: Sure.

THE COURT: They know who the doctor is, they know he gets paid for services, and we're going to listen to a little bit more of direct testimony, but be focused if you can. I'll give you some latitude.

MR. GENIS: Okay.

DIRECT EXAMINATION

BY MR. GENIS:

Q Let me cut to the chase. The Judge asked you to get to the bottom line, and we're going to go through your report and your tables, but did you prepare --

MR. GENIS: I'm offering the report and tables into evidence. I'll just do that.

THE COURT: So we have all these documents in evidence already?

MR. GENIS: Yes.

THE COURT: All right. Go ahead. You want to spend some time referring to them so that we can have cross-examination about them, go ahead.

MR. GENIS: Okay. So the medical records are already in evidence. We're putting his report now in evidence, correct, Your Honor?

THE COURT: What document is that?

MS. WINTERS: Your Honor, we would object to the report being moved --

THE COURT: Stop. Reports don't go into evidence.

MR. GENIS: Counsel put it on the screen before the jury. That's why I was asking.

THE COURT: We don't put reports into evidence.

MR. GENIS: Okay. All right.

Q So you were telling us that you did computations and calculations to the Court, and from your tables and charts. You just said table 1.

Did table 8 have a recapitulation and a summary of all your different conclusions and opinions that you've reached within a reasonable degree of certainty?

A Yes, I did.

THE COURT: Which exhibit number is that?

MR. GENIS: This is for demonstrative purposes, Your Honor.

THE COURT: It's a demonstrative in respect to what exhibit?

MR. GENIS: With respect to his report that they just had that I offered into evidence.

THE COURT: Report's not in evidence.

MR. GENIS: Correct.

THE COURT: So next question. There's no report in evidence.

MR. GENIS: Correct.

THE COURT: So you can put that down.

Q Would it assist you, sir, Doctor, if you had the summary or recapitulation of services and costs so could you explain to the jury what opinions you just gave when the judge asked you?

A Yes, it would.

Q What we have here, is this a fair and accurate summary of your opinions?

A If it matches my table 8, then yes. Yes, that looks like my table 8.

Q And would it assist you if we posted this for the jury to see so that you could explain your conclusions and how you reached them?

A Yes.

THE COURT: So, if you want, we'll mark that as, give me a number. We can identify that for the record.

MR. GENIS: Sure. We are up to number 99.

THE COURT: That's 99. That's a summary. That's for identification.

And, members of the jury, we'll allow this. It's not evidence as such. This is just an aid in his testimony, which he's going to give you apparently, which is in evidence. He can testify as to his conclusions.

And if he wants to refer to something to assist him as he explains his testimony to you, we'll allow that. It's not evidence as such. It's just to help him explain to you his testimony. Okay? Go ahead.

Q Okay. We put this in front of the jury, and we haven't gotten to your education or review of medical records or anything else yet but let's just cut to the chase on this.

Can you please tell us what conclusions did you reach and what's the basis for them.

A So, sure --

MR. KEAVENEY: Judge --

THE COURT: You already gave us your conclusions, and you want to elaborate on that now based upon this document --

MR. GENIS: Yes.

THE COURT: -- to help you elaborate on your conclusions?

THE WITNESS: That would be helpful because I think

I just gave an overview.

THE COURT: What's the problem; you can't see it?

MR. KEAVENEY: Yes.

THE COURT: So move it to the back of the courtroom so counsel can see it.

MR. GENIS: Sure. It has been exchanged in discovery to the defendant. So they have a copy of it, Judge.

THE COURT: All right. So, ladies and gentlemen, we don't normally allow expert's reports into evidence. It's their testimony that we want to hear, and the reports go hundreds and hundreds of pages. We don't need that, and it's not really what we are here for.

He's going to explain his conclusions. I'll allow these aids to help him with his testimony so we understand how we do this. Okay? Go ahead.

A So table 1, or the first line of that as well, would be the medical visits she's going to require, based on a reasonable degree of medical certainty, for the remainder of her life. Different pain management doctors, the rehabilitation doctors who see her and evaluate her for her different prostheses that she needs, the doctors who will be prescribing her wheelchair, the surgeons and the vascular doctors who have to evaluate and treat the wound breakdowns of her stumps and things like that.

This does not include the surgeries themselves.

That we'll see in another table.

And that over her lifetime, for the next approximate life expectancy of over 40 years, comes to approximately a range of 104,000 to 183,000 and change.

THE COURT: How old is she now?

THE WITNESS: She is presently 35.

THE COURT: Go ahead.

THE WITNESS: I'm sorry. Born in '94 would make her 36. I apologize.

Q Born in '94 I think is 31.

A Yes. I'm sorry.

THE COURT: Take your time.

THE WITNESS: Bad math. And her life expectancy is to age 83.

THE COURT: So how do you arrive at a life expectancy for somebody?

THE WITNESS: Using U.S. Census Bureau data. And if there are amputations, do not change life expectancies. If there were illnesses that do, then you would use that data.

THE COURT: Right. So you start off with the census data. So for women, I think somebody told me once for women, it was 83. They live longer than men because they behave better.

THE WITNESS: Yes.

THE COURT: Is that where we are at today, 83 for

women?

THE WITNESS: It is.

THE COURT: Barring any unusual circumstance?

THE WITNESS: Correct.

THE COURT: And the men, it's about 35?

THE WITNESS: It's about 80, 81 at this point.

THE COURT: About 80. So women outlive us three years?

THE WITNESS: Yes.

THE COURT: They deserve it.

THE WITNESS: For putting up with us.

THE COURT: Next question.

Q Can you continue going through how you reached the numbers you did in the summary?

A Sure. As far as methodology, you evaluate what the patient is going to need, how often it is common for people with her kind of conditions to require those services; and then you look in databases that are well recognized and considered gold standards, if you're able to find them online, which most of the medical appointments you can, based on the codes that physicians would be using to bill and what private paid data would pay for that.

Q Okay. So you told us about, I believe, based on table 1.

Did you do table 2?

A Yes. So table 2 would be what I would call other

licensed medical professionals and paraprofessionals, the people who are doing a lot of the hands-on care, the actual therapy that she'll need over her lifetime, physical therapy, occupational therapy, various kinds of pain management therapies to help with the pain that she hasn't been able to eliminate over time with that therapy. The post-operative care she'll need, things of that nature. Psychologic therapy and psyche support over time for different kinds of crisis intervention in her life that are brought up from the challenges she has with this disease.

And that, over her lifetime comes to, again in the 400,000 range. I want to give you an exact number. I apologize. I'm looking through my pages. $441,000 to 502,000 and change.

Q Tell us about table 3, please.

A Table 3 is potential future surgeries, not including if she were to have substantial skin breakdown enough that she needed a stump revision. So the only future surgery in here is considered what's called osteo integration surgery of her upper extremity stump because that's been recommended.

And we can also see from her history, even though I saw her a while back, she still doesn't have a workable prosthesis for her arm. What osteo integration is is an orthopedic surgeon in combination with neurosurgeons and vascular surgeons, who would open up the stump again. They

would remove all of the scar tissue and bone down to the point where she has viable, active, healthy bone.

And they would insert into the actual bone marrow, the center of the bone that's round, a metal rod that grows into the bone marrow cavity and attaches, just like a hip replacement or joint replacement does, and it sticks out of the skin and it has, you know, if you know plumbing and hoses, those little click hoses, those little nozzles that click on and her prosthesis would then click on and off; and it gives you incredible purchase.

So right now her stump is literally only seven inches long or approximately. It's 14 centimeters, no, 16 centimeters, which comes to about 7 inches. So no matter what, even with the best intentions -- and the new one she has is very good even though she doesn't use it yet because it's not quite ready -- but it's probably not going to be functional because you have a hand that's two feet away and you lift something and the torque on that won't be great, but if she has this osteo integration, it would allow it to be rigidly attached.

The costs of that are between 50 and over $100,000, depending on how complex her surgery was. It's not including any future costs to fix it when it gets infected. It has a rate of infection of about every five to six years.

Q Dr. Kahn, you were explaining the surgery, and I couldn't

really picture it.

We have some exhibits, Plaintiff's, for demonstrative purposes, 96N and 96M, like Mary.

Have you reviewed these posters before?

A Yes, I have.

Q Are they accurately -- withdrawn.

Are they anatomically fair and accurate?

A In my opinion, they are.

Q And do they accurately depict the procedure you were just discussing?

A In my opinion, the procedure is a little more gross and violent but yes, they do.

Q And would it assist you to explain this to the jury, if we can for demonstrative purposes, and show the jury what you were discussing that is involved in the surgery?

A I think it would help them get a nice idea.

MS. WINTERS: Your Honor, we would object. This is not a procedure that the plaintiff underwent and he is not here to testify about surgery.

THE COURT: Next question.

MR. GENIS: May I put it on for the jury to see for demonstrative purposes?

THE COURT: What is it that you want to show?

MR. GENIS: A diagram that depicts the surgery that he just testified about she will need.

THE COURT: A diagram?

MR. GENIS: Yes.

THE COURT: You want the jurors to see the diagram?

MR. GENIS: Yes.

THE COURT: As a demonstrative evidence as well?

MR. GENIS: Yes.

THE COURT: All right. We'll let them look at it.

MR. GENIS: And, again, for the record, this is 96N and this is --

Q Can you please explain to us what we see here.

A Sure. So the first picture in the upper left is like I described how, and she doesn't have such a nice smooth stump at that point, but the surgeon would go in --

MS. WINTERS: Objection, Your Honor.

THE COURT: Let's mark this. You want this as another demonstrative to support his testimony?

MR. GENIS: Yes.

THE COURT: We'll mark that 100. Identify it as another demonstrative document. And let's try to not overdo it. All right? We know the woman was seriously injured. All right?

And I'll let you have a little flexibility, but I just do not want to go beyond a certain type of testimony because we don't want to be overly prejudicial.

MR. GENIS: We are not being prejudicial.

THE COURT: I'll let him explain this now. How many more of these do you have?

MR. GENIS: Just these two, to show the surgery that she'll need in the future that the doctor was explaining to us that these graphically illustrate.

THE COURT: I'll let you talk about the surgery that you believe in your professional opinion she's going to need in the future. If you think any of these things will help in your testimony, okay, but I don't think we need it so much as we need to hear your testimony.

So you can explain to the jury a little bit about that. Okay?

THE WITNESS: Okay. Fair enough.

A So, as you can see, you can go through the pictures from top to bottom, and it really does display what it will look like. It doesn't go through what the OR procedure is, but the bottom line is she would have a metal rod sticking out of her arm with open tissues because obviously the skin can basically adhere to the metal.

So she would be precluded from swimming, for example, in flat water like lakes or rivers. Saltwater is permissible but still increases risk for infection. Showering puts her at risk. So most people would do sponge baths with her arm and then shower with a plastic bag around the arm to protect from infection growing in. So there's upsides to it

but there's also long-term downsides and risks to it.

But most of the doctors who have seen her or at least two of the doctors who have seen her and are treating physicians for her upper extremity stump are recommending this surgery.

THE COURT: So you're saying basically because of her condition, she's at risk more so than maybe people who do not have these problems, so certain problems in the future.

THE WITNESS: Yes, this is one of them.

THE COURT: You can tell the jurors if there's anything else you believe professionally she's at a high risk for because of her condition. I'll let you testify about that.

THE WITNESS: Okay. Thank you.

A So other things she would need, in my opinion to a reasonable degree of medical certainty, based on both my experience and what the medical literature shows, patients with amputees of her nature are at risk of not only osteo-arthritis of the hip joint on the affected side but also on the unaffected side.

She as at risk of increased back issues and spine issues because of the abnormal forces across her spine and the abnormal posture that she literally goes into the minute she puts her prosthesis for her leg on. So one of the things in my physical exam that I noted was as soon as she was evaluated

and examined with her prosthesis on, she goes into a forward flexed lumbar posture.

THE WITNESS: Can I stand up, Your Honor?

THE COURT: Sounds okay to me.

THE WITNESS: Okay.

A Where, with the prosthetic leg on, she's bent forward and her neck is forward because the knee is always a little bent so you have to counterbalance the weight.

THE COURT: So you're standing up to demonstrate what part of your body.

THE WITNESS: Right. And when I examined her where she is just standing with the cane and the single leg with just the stump, her posture corrects. So that's just an indication of how she normally walks with the prosthesis on and the forces on her back.

She has already exhibited and complained that she gets back pain, and that's one of the reasons with the stump pain she can only walk short distances. So there's that.

She has a risk of continued stump breakdown, which she gets blisters all the time. Fortunately, she hasn't had tremendous stump breakdown since she had the second surgery, which we call a revision of her leg stump.

She's at risk of what we call heterotopic ossification, where the bone at the end of the stump can grow outward into the scar tissue and cause more pain. People who

have what we call a traumatic amputation have a much higher risk of that.

And she's at risk of, because of her low cardiovascular activity, she doesn't exercise any more and she only walks very short distances and she's mostly in a wheelchair and mostly pushed in that wheelchair, she's at risk of osteoporosis, cardiac disease, hypertension, weight gain, which she has gained a lot of weight, and things like that.

THE COURT: All right. Next question.

Q You just mentioned a revision surgery that she had in the past.

Would it assist you in explaining to the jury about that surgery that you just told us about, if you had a fair and accurate anatomical illustrations depicting that procedure?

A I think that would be important, to understand how bad her stump was preop to this and even though it's not great now, why it is even shorter than it was and what the problems are with it now.

MS. WINTERS: Objection, Your Honor. This is beyond the scope of his report.

THE COURT: I'll allow it. Go ahead.

Q So for demonstrative purposes --

THE COURT: You can cross examine about that, if you wish.

MS. WINTERS: Sure.
Q This is marked as 96K, and then what was previously marked for identification as 96J.
Can you please explain to us -- I put the wrong order -- about these surgeries, sir, that you were just explaining?
A So very briefly --
THE WITNESS: And I will keep it brief, Your Honor.
A -- when Luisa left NYU or Bellevue to go back to Brazil to try to heal, she had the surgery done on a traumatic amputation. So she had irregular bone edges, she had healing and a scar that was filled and completely covered with what we call skin grafts. It had to be debrided every day for months but she finally healed.
But when she came back to the states and she was given her first prosthesis, because of the scar tissue, which I don't know if pictures have been shown to the jury yet, but she had an invagination of the scar tissue, almost an inch and a half deep all around. So every time she would put the socket on, it would squeeze that tissue and air would get in, in the socket, because the air would go up and down.
So one of the early prosthetists she saw in the states recommended that she see a surgeon or specialist in amputee at Harvard. She did, and it took a year to process this whole situation; and she eventually had a surgery there,

where they went in and they shortened the bone, they shortened the stump but in a good way. They also did some what we call muscle flaps, and they did what we call muscle transfers, where some of the muscles on her that were torn off of her bones were reattached to areas that could actually be functional for her.

So that did help her a fair amount, and at the first time then after that, a year after, it took a year, that she was finally able to get a prosthesis that actually fit her reasonably enough that she could take her first reasonable steps.

And I think she's incredible to have the wherewithal to have gone through that and do that and now trying her best to improve.

But even with this prosthesis, she still gets, she doesn't necessarily get the skin breakdown but she gets blisters on the areas that are still covered with the skin grafts. What the surgeons were able to do is take skin from other parts of the thigh and bring it down and over. So there is an area of her stump now that isn't skin graft, which is miraculous.

Q I would like to show you, you mentioned a moment ago about photos, talking about invagination of her wound.

Have you seen before what we've marked for identification as Plaintiff's 97H, which was, for counsel's

edification, Bates 2145?

A I have seen that photo, yes.

Q Does this fairly and accurately depict what you just described?

A Yes, and I think it's important to show that and then the one in the lower right box because then you can see how much improvement there is, even though there's still invagination, and that's why she gets the pistoning up and down but it's still way better than it was.

MR. GENIS: May I, for demonstrative purposes, show it to the jury?

THE COURT: What do you have here? Is this in evidence or demonstrative?

MR. GENIS: This is in evidence, I believe.

THE COURT: Which one is that?

MR. GENIS: This is photograph 97, and it's specifically 97H.

THE COURT: 97. You've told me you have a lot of photos. Okay. I'll let you put some of them in evidence, to identify, what he already did. Right? So that's a photo 97.

MR. GENIS: H, yes. H, like "Harry."

THE COURT: 97H? All right. We'll let that in. He's identified it.

(Plaintiff's Exhibit 97H so marked.)

Q Please explain to us what we're seeing here.

A So that is what her prosthesis looked like before it was revised up in Mass General at Harvard, where she had the skin grafts over almost every part of the stump that would be touching and weight bearing on the socket.

The one on the outer side, or closest to the jury and closest to her body, is a donor site; and you can see the difference compared to where on the stump.

Q When you say "donor site," what do you mean?

A So when one has a skin graft, it's their own skin. So a spine surgeon, plastic surgeon, has to literally peel off the skin in the dermis in other parts of the body, and that will, they only go so far and to a depth where that will naturally heal and grow back. And then they adhere that over an area of wound, and even though that's the best skin closure you are going to get and that will actually close a wound, it's not normal or natural because you don't have all of the subcutaneous tissues. Subcutaneous meaning below the skin.

So you might have a layer or two of dermis but you don't have all of the subcutaneous fats and what we call facia protecting between the skin and the muscle.

MR. GENIS: Okay. And, Your Honor, he's just been discussing skin grafts and donor sites. We'd like to show 97A, B and C, three photographs, to depict what the doctor just was explaining to us.

THE COURT: So there's no objections to these

photos, but I don't want 35 photos in evidence.

MR. ROTH: There's not going to be 35.

THE COURT: So which one do you want now?

MR. GENIS: 97A is going to be the first one. We're going to put it up electronically.

THE COURT: 97H is the first one.

MR. GENIS: A, like "apple," and B and C.

THE COURT: Can you identify what these are.

MR. GENIS: Certainly. 97A --

THE COURT: Let the witness tell us.

MR. GENIS: I'm sorry.

THE COURT: Can you tell us what that is, Doctor? Take a look at that.

THE WITNESS: Oh, you're asking me?

THE COURT: Yes.

THE WITNESS: Okay. So this is a picture of Luisa, probably postoperatively from the first days at NYU. You can see her lying in a hospital bed.

She has, on her right good leg, a device that pumps the leg to prevent blood clots which, unfortunately, didn't work because she did have a clot to her lung. We see her on the right good leg, all the nice healthy pink-looking tissue where some of the donor site, she has several on her back as well.

You see on the left leg, which you could see in

addition to, there's a very large dressing on it; but even so, you can see there's some pink tissue higher up and, the part that looks black is not what we call gangrene or necrotic. That is part of a dressing.

THE COURT: So you identified that. You want to identify these documents. That is the picture that you can testify is the way she looks, correct?

THE WITNESS: Yes.

THE COURT: All right. That's in evidence.

What's the other one you wanted?

MR. GENIS: 97B.

THE COURT: Let's show the witness 97B.

THE WITNESS: So, again, there you can see on her amputated leg higher up, the healthier pink tissue. So even from that same leg they took donor site to put over her wound, and you can see where the wound, where the actual black is. That is part of what we call a vacuum suction wound, to allow for healing, but you can also see the size of that thigh compared to the other thigh, the amount of the soft tissue swelling.

THE COURT: You want one more.

Q And by the way, what's a wound vac? You were just talking about that.

A It's a kind of, it creates a negative suction on the tissue to help with healing and bring vascularity and blood

flow to the area.

Q We now have 97C being displayed.

Can you please tell what us that is.

THE COURT: What is that?

A That is the majority of her donor site or a good portion of her donor site that was taken from the skin on her back, and this is a wound vac. Most likely, that's a wound vac there as well to cover and help heal the back.

THE COURT: That's in evidence too. Anything else?

MR. GENIS: That's all with those photos for now. With the Court's permission I would like to actually go through your background so that you're competent to say this.

THE COURT: Let's do this. Save the background for last.

MR. GENIS: Okay. Then I'll go to other things.

THE COURT: Let's finish the substantive part of it. I want to make sure we don't have 35 photos.

MR. GENIS: Okay.

THE COURT: It gets to a point where I really don't think it's appropriate.

MR. GENIS: So then I'm going to start at the beginning, if I may.

We have Plaintiff's 82 in evidence, the Bellevue chart, and we're going to put up the operative report for a moment.

Logan, can you please put up from Plaintiff's 82, it's pages 1 to 3, operative report of August 2, 2016.

THE COURT: That's the Bellevue Hospital records?

MR. GENIS: Yes, Your Honor.

THE COURT: All right. That's in evidence.

MR. GENIS: Can you make it any bigger so we can read it?

Q Now, Doctor, we're looking at the operative report.

Do we also have -- before we even get to the operative report, have you also reviewed Plaintiff's 82 to see what her condition was when she first came into the hospital?

A You mean the pre-hospital record, the ambulance?

Q Right. The ambulance call report.

A Yes, yes.

Q And when we're discussing what condition she was, is there a difference between a traumatic amputation and a surgically scheduled amputation?

A A huge difference.

Q What's the difference?

A So in a surgically scheduled amputation from someone who might have a health-related condition or a tumor or something like that, the surgeon and the patient get to choose at which level, for example, and with good planning, if, for example, there is a vascular disease and there's gangrene at a certain level, depending on how close to the joint is, the surgeon and

the patient can decide to go to the next joint level up. Or, the surgeon gets to choose at the length of the amputation as long as there's viable tissue at that length so he knows or she knows it will heal well. Healing is important.

The surgeon gets to smooth the bone out, makes sure the bone is far away enough from the bottom of the stump, round the stump up so there's only nice healthy muscle away from the bone, and that the scar line will be far away from the weight bearing surface of where ultimately a prosthesis will go. The stump will be long enough to carry, carry a prosthesis, whether it's below the arm or, below the elbow or above the elbow.

They usually pick and choose for, you know, the level that there's going to be viable vascular supply so the wounds will heal. They would do the appropriate muscle testing, to make sure that the strength of the, the strength of the arm or the leg can support the prosthesis.

And overall, it's, you know, done sterilely, as opposed to a patient coming in, having had, in this case, an amputation by a train, where nothing is sterile, there's jagged edges, there's torn tissue. The muscles were literally ripped off her bones, as we know, because we saw in the second surgery they had to reattach several of them, jagged edges.

Have to cut bone, have to use whatever little skin is there, and we saw a skin graft on her leg but there's also

a skin graft on her arm, with minimal tissue to make a stump; and the scarring is incredible and the risk for infection is incredible and the ability to have a good-fitting socket for the prosthesis down the road is extremely, potentially limited.

Sometimes you have a trauma that's a clean cut and you can do well, but in this case that was not the situation.

MS. WINTERS: Objection, Your Honor. Move to strike as beyond the scope of his report. None of these opinions are within his report.

THE COURT: I'll give you the opportunity to conduct all the cross-examination you want. I'm giving the doctor latitude.

Let's move it along. I think the jury has an idea. And if it gets to a point where it's too prejudicial, we understand she has these problems. What else do you want to ask?

MR. GENIS: Sure.

Q You were just explaining to us the difference of a traumatic amputation.

As we look at what has been marked for identification as Plaintiff's Exhibit 96, it looks like --

THE COURT: 96, there was no objection. Those are medical illustrations.

Q So let me show you these two so that we can, you can

explain to us what is depicted here about traumatic amputations.
A Kind of what I described about the jagged edges and the horrific, horrific situation with the soft tissue without having skin over it, muscles being torn away from the body, risk of infection and not having anything that you can actually operate or close the stump with, and a stump that's so short that it's going to be too close to the actual joint to have any kind of reasonable purchase.
Q Now, after the first operative report, which we had on there, did she then have treatment at Bellevue about -- you mentioned an embolism before.
What's an embolism?
A An embolism is just a word for a blood clot.
So when someone has a heart attack, that's a cardiac embolism. She didn't have that. She had what's called a pulmonary embolism. When someone has severe trauma to their legs, it's very high risk of having a blood clot in the leg; and that blood clot can travel up the venous system into the superior vena cava, outside the inferior vena cava, and then ultimately into the lungs.
Q And I'd like to show you to help explain to us 96G, about that pulmonary embolism from the CAT scan.
Would that assist you?
A Sure.

Q Please explain this to us.
A Sure. So the upper right is what a CAT scan slice of the lungs would look like; and on the right you can see that there's more white, so to speak, and just below that, there's an area that looks instead of pink, it's dark. That's a tissue that would die off from the pulmonary embolism because it's just like, in a heart attack the tissue dies if it doesn't get blood supply. So too in your lungs, the tissue would die off.

Also, if enough of the lung, and not in her case, not in this case, but if enough of the lung were to die off, someone would be left with substantial problems breathing for quite a while until that tissue would heal and grow back.

MS. WINTERS: Your Honor. We move to strike. He's not a radiologist and he's not qualified to interpret radiology.

THE COURT: I'll allow you a lot of latitude in cross-examination. Your objection is overruled.

How much more do you have of the witness?

MR. GENIS: I'd like to just go through quickly about eight other surgeries that she had.

Q To not belabor the record, I'm going to show -- did she have what's known as washout debridements and irrigation?
A I think she had four additional of those at NYU and some additional skin grafts.

Q Okay. And would it assist you in explaining to us what debridements and irrigations are to the body by using these anatomical posters?
A Yes, it would.
Q Okay. First, I'm just going to show you 97E.
Can you explain to us what is shown here?
A So basically it looks like in the upper left, they're opening up some of her wound, and that looks like the upper extremity one, they're opening up her wound and cleaning it out. They're kind of taking away tissue that has died off because it didn't heal well, and they're cutting back to what we call viable or living tissue and allowing it to heal.
Q And I want to show you one now for the left lower extremity.
A Very similar process. Opening up the wound, cutting out and cleaning out any dead tissue, pus, and infected tissue allowing viable tissue to start to heal.
Q Now, by the way, when you say NYU, you're referring to Bellevue or NYU? I think you've done that a couple of times.
A I'm sorry. Well, they are connected academically although one is a city institution, one is private. Let me just get it right.
Bellevue.
Q Okay. Thank you.
And, sir, did she also, when she first -- you looked

at the ambulance call report. When she first got to the hospital, were there also lacerations to parts of her body?
A Multiple.
Q Okay.
MS. WINTERS: Objection. Leading.
THE COURT: Overruled.
Q Does 96C fairly and accurately show what she looked like when she first got to the hospital?
A Yes, it would.
Q Please explain.
A So, well, 96C also shows her arm and her leg, which were taken to the hospital with the hopes they can be reattached, but they weren't able to be. But she has a laceration to her face over her right eye, which was cleaned and closed. And she had other lacerations to her right leg as well, which is not depicted in the image.
Q Okay. So I'm not going to go into great detail about these multiple other surgeries. Let's go to Mass General, which was Plaintiff's 83.
You told us about some of the revision surgery. Can you just explain what was happening overall at Mass General.
A Sure. So the process that started in, almost to the day, a year before she had the surgery, she met with surgeons there who felt they could improve upon her ability to use a prosthesis. The risk there was even though they would give

her better skin and better use of muscle, they were shortening the prosthesis by several inches, which is a big and difficult decision for a person who needs a prosthesis and especially an above knee.

But she took a leap of faith and decided that she couldn't use her prosthesis that she had because of the skin irritation. Every time she wore it, she would have horrible pain and she would get blisters and skin breakdowns. So it went beyond the blisters and tore the skin. So she would have days where she would use it for a day or two and then couldn't use it for a week. That was no way to progress.

Her ultimate goal is to become more and more independent and try to approximate a reasonable life, similar to what she thinks could have had, had she not had this accident. So she went for it and, to a good degree, that's exactly what they told her. Her stump is shorter so she still has some trouble --

MS. WINTERS: Objection. Narrative.

THE COURT: Well, you are going on and on and on. See where you can crunch it. I'll allow you to give your testimony but try not to give a whole lecture of your medical knowledge.

THE WITNESS: Sorry.

THE COURT: It gets to a point where it's almost too much of a good thing.

THE WITNESS: Sorry, Your Honor.
A Her stump is shorter, but she also still does have skin irritation and problems with it pistoning.
Q From Mass Gen at Harvard, did she then get transferred to what's called Spaulding Rehab, Plaintiff's 84?
A Yes. She spent 14 or 15 days at an inpatient rehabilitation center, and obviously --
THE COURT: So she got transferred to a rehab?
THE WITNESS: Yes.
THE COURT: Next question.
MR. GENIS: And from Plaintiff's 84, can you please put up pages 230 to 233.
Q Explain to us what is occupational therapy evaluation?
THE COURT: Let's get that exhibit. It's in evidence.
MR. GENIS: Yes. I'm waiting for it to be put up.
A So in rehabilitation therapies, OT tends to work more with upper extremities and activities of daily living. So this is an evaluation of the therapists who do that.
MR. GENIS: Okay. And can you scroll down, please, Logan, to where it gives discharge planning. Yes, that should be good. Impression.
Q Okay. Are you able to see that? It's a little small for my eyes.
But can you see it, Doctor?

A I can read it very well. Thank you.
Q Just tell us in a nutshell, what does that say?
A So continued problems are her inability to stand long period of times. She's going to need continued occupational therapy. Difficulty with every single ADL. She can't -- including bathing, feeding, toileting, dressing, personal hygiene and grooming, community mobility, difficulty shopping, social activities, pretty much everything.
Q Okay. What's the difference between occupational therapy and physical therapy?
A I think I just covered that.
Q I'm sorry.
A So occupational therapy would be more upper extremities and actives of daily living. Physical therapy in her case would be more sitting down, standing, balance, transfers, walking, and generalized strengthening condition.
Q Okay. Let's go, on the same exhibit, pages 235 to 237, the PT evaluation. I think it starts, "Patient is currently below baseline level."
A Okay. And that is what you would expect if someone just went through major surgery and has been bed bound for a while and may have a new stump that isn't ready to have a prosthesis yet.
MR. GENIS: Okay. And, Logan, go to page 242, 243.
Q For the wheelchair evaluation, what is that?

A A wheelchair evaluation is also done usually by either a physician who's a rehab physician or a therapist who has some specialty training in wheelchairs.
Q Okay. And did they note that it may be months before she could still get a prosthetic fitting at this point?
A Yes, and that's common for the first time after a stump revision or a new stump. You have to wear a shrinker for -- I'm sorry. There's a lot of reasons.
Q Okay. And, in fact, did they indicate in the Spalding record that the patient will benefit from participation of skilled physical therapy with any comprehensive rehab program, to address these deficits?
A Yes, they did.
Q And then after she was discharged, was she to continue with any kind of treatment outpatient?
A Yes.
Q Okay. And did she, in fact, continue at Mount Sinai Hospital?
A Yes, she did.
Q Okay. And what I'm going to do for Mount Sinai Hospital, I'm just going to go to the most recent date.
A Okay.
Q Okay? So this is from Plaintiff's 86 in evidence. Let's go to page 6, which is for August 8 of '24, I'm sorry, July 8 of '25 notes. It's actually, I'm sorry, July 8th of '25.

MS. WINTERS: Your Honor, we would object. The expert did not have these records or opine on them.

THE COURT: Well, the document is in evidence, so he can use it. Go ahead.

Q Okay. Are you on page 6, where it talks about abnormal gate and problems?

A No, I'm not on page 6 yet. I'm on page 1.

MR. GENIS: Logan, please go to page 6.

THE WITNESS: Scroll down a little bit more, to physical exam, please, sir.

Q Do you see the problem list, abnormal gait, page 6, page 6 PDF, please.

A Yes. Abnormality of gait. I'm sorry. I think he was in the right place.

Q Okay. All right. And if we can go to page 7, still July 8 of '25, do you see where it talks about sciatica, needs pain management and plastic surgery?

A Yes.

Q Explain that to us.

A So, as I talked about earlier, because of the abnormal forces and her abnormal posture and with each step, the abnormal twisting in the back is going to lead to back problems. It's not uncommon in any way for people with above-knee amputations to have sciatica either in their actual stump or in the opposite leg, but it's very common to have

back problems, sacroiliac problems, hip joint problems, and other pain issues.

MR. GENIS: Logan, let's go to page 14.

Q Tell us if it talks about the osseous integration that you were discussing earlier. It's in the second full paragraph.

(Pause.)

A Yes. I see that, and that is what I was talking about when I described the osseous integration surgery and what has been suggested by other doctors as well.

Q Okay. And -- all right. So she's still having issues walking and having problems with the socket and skin breakdown?

A Yes, she is.

Q And this is in 2025, correct?

A Yes. This is just a few months ago.

MR. GENIS: Okay. And just go to page 35, please.

Q All right. Is she having any issues here with her prosthetic?

A Yes. Difficulty with suction, not feeling confident walking. Her socket and foot warranty is up, recommending a new one.

And that's pretty common in the prosthetic field. Once a warranty is up because of the cost of repairs and each individual component add up to much more than a new

prosthesis.
Q Okay. And did you examine her at some point?
A Yes, I did.
Q And you took a history?
A Yes, I did.
Q What were the results of your physical exam and history, and tell us the significant findings?
A So the history was very lengthy. It's consistent with a lot of the things we've already described. A lot of the emotional component came out during that lengthy time of talking with her, which, you know, we didn't even get to, but pretty much the whole history covered, you know, her, in addition to reading through the records, it kind of confirmed without the kind of detail to medical words and medical diagnoses what she went through and what she's been through and how she's trying to rehabilitate herself and better herself. So the stories were very consistent.

The part about dealing with life as a same-side amputee above the elbow and above the knee, having gotten through the trauma with limited resources, is sad and trying; and the physical exam was, was very remarkable for a lot of abnormalities, substantially more than I might have expected, but I put down what is objectively found. I talked about when I do a physical exam I start with just observation and looking at the posture.

She was, came to the office very well dressed and put together in her above-knee prosthesis. Walked in with a cane, sat for a history, which was a full hour, shifting side to side because of discomfort. And when it came time to examining her, she was able to put on and off the prosthesis in a few minutes. We examined both stumps, described them as I have over the time that we've spent here already.

What was striking about the shoulder besides the posture abnormalities was the gross weakness not of the shoulder joint itself but of the shoulder blade, which becomes even more important than the shoulder joint because the shoulder blade, again, even if she then gets the osteo integration, it's the shoulder blade that has to hold the arm up when you're using it. I know it's not her dominant hand but it also has to be, even if you use it as an assist or for guarding, so just to hold something against what you're pushing, it still has to be stable. So that was striking, and that concerned me.

Her lower extremity, her hip strength, is what we call in the four to four-plus range, which is 30 to 40 percent below normal range. If it's four plus and where it's four, it would be 50 below normal range.

She has severely limited range of motion on her, on her injured side and on the stump side, and that could be one of the reasons why she's so bent forward when she stands,

because she can't actually bring the hip back at all and she has difficulty moving it. Those were some very significant findings, besides all the skin findings.

There were some blistering, very small blisters at the end of her above-knee amputation stump. There was no skin break at the time. What's important is even though she doesn't have the deep ridges that go the entire length of her scar, she did have about a two-centimeter-by-two-centimeter pit in the bottom of her stump, about the size of a golf ball that you can probably fit in there, and that also allows for air to get in there. And we're seeing now in the most recent notes exactly what she's been complaining about is consistent with what her doctors and prosthetists are reporting, that this stump is also pistoning.

We're talking about someone who is now, and when I saw her, it was seven years from the injury and now we're at nine years plus from the injury, and we're talking about someone who still can't walk well with her prosthesis. It's striking to me to think that this person is going to ever have a normal life without the resources to help supplement her deficits and her disabilities --

MS. WINTERS: Objection, Your Honor. Beyond the scope of the examination.

THE COURT: Overruled.

Keep going, Doctor.

THE WITNESS: I'm sorry.
A -- without assistance to help her overcome those disabilities.
I think though, to her credit, and it's in my report, she is a superstar. She's overcome adversity at every level. She doesn't stop. Not only in her own health care and being her own advocate but working really hard to have a career; and I know she talked about wanting to be a mom and how devastating it is to know that she can't do that without additional resources. So all of those things came to help me come to my conclusions of what I recommended.
Q All right. And we're going to get to what you recommend in one second, but we have two photographs on one board, 97I.
Can you tell me, do these accurately reflect what she appeared like at the time of your physical examination?
A Yes.
MR. GENIS: Your Honor, may I publish it to the jury?
THE COURT: Go ahead.
A So, yes, I think that's very accurate.
So you can see how on the left, she is standing and balancing on the one leg, on the right leg, but she is also very upright. And on the right, you can see how she's a little twisted. She's still putting more weight on the right leg, and there's a little flex in her posture and her posture

is also rotated to the right, yes.

And that is -- she has what's called a cross-chest harness for that suspension of that arm; and I don't believe she's used that, she uses that arm or goes to work with it.

Q Now, I wanted to go back to when we were just talking a second go about her different needs. Let's go back to the original chart that we had up. And I think --

A We finished three.

Q Okay. So go to table 4 now, please.

A So table 4 is by far the single most expensive table. It is all of the prostheses she would need over her lifetime.

So people who are able to, as amputees, besides having a regular prosthesis that they would want to walk with or use in daily function, if she's ever able to get one that can be suspended on that socket without the osteo integration, would not only want to have a regular walking prosthesis, but there is other types of prosthesis. There's sports-specific prosthesis.

She was a runner beforehand and she was a swimmer and she was a cycler. So my plan includes some sport prostheses as well. And in her upper extremity it includes both regular useable prostheses and cosmetic and sport prostheses, which it sounds like that's crazy, that's excessive, but it's typical for someone who is young, active, and healthy.

If she was 75 years old and just a home ambulator or maybe just went to the supermarket, out once in a while to socialize with her friends, she would not get those other prostheses. But for someone who has her motivation and wants to achieve what she wants to achieve and with the right health plan in action should be able to achieve the utilization of all those prostheses, it's in the plan.

So overall, it's going to sound like an insane number, but I can break it down. So it's going to come to between 16 and $20 million over her lifetime, because in prosthesis-land, if you're a prosthetist or an orthotist, the way the insurance works and the way the warranties on prostheses works --

THE COURT: Objection, Your Honor. He's speaking about insurance.

THE WITNESS: I apologize.

THE COURT: Finish your testimony.

A The way prostheses work and the way the warranties on prostheses work, they're only warrantied for three years. And, as I mentioned a few minutes ago, replacing and repairing components just doesn't make sense. Because you might put a $40,000 new part on a $200,000 prosthesis and a month later another $30,000 part is going to go without it being warrantied.

THE COURT: So, Doctor, look, I have given you a lot

of latitude to explain to the jurors about all of this, but I don't want to go too far beyond, you know, the obvious. Okay? She's obviously had problems.

THE WITNESS: Okay.

THE COURT: Is there any way you can wrap it all up now so we can move on?

THE WITNESS: Yes.

A So between all of those prostheses, her main prostheses for the arm and the leg being in the $200,000 range every three years and the sports prostheses being 75 to $80,000 every two or three years and she's going to live as many years we talked about earlier, that's where the numbers come from.

THE COURT: Where do you get these numbers from? Is there some sort of basis for them?

THE WITNESS: Yes. I talked about that earlier. The basis for all of my numbers come from main sources, not just her own prosthetists who gave me what numbers he would use, but come from her previous prosthetist as well, come from data bases such as, if I can get the name -- I apologize.

Q And -- sorry. Go ahead.

THE COURT: Just let him finish his testimony.

MR. GENIS: Sure.

Q Did you receive anything in writing --

THE COURT: Just one second.

MR. GENIS: I'm sorry.

THE COURT: I just want to make sure. You didn't make up these numbers?

THE WITNESS: No. These are all researched online and/or by prosthetists and/or using not insurance databases but private-paid databases using all of the data that they've collected over years.

THE COURT: All right. Anything else?

MR. GENIS: Yes. May I approach the witness, Your Honor?

THE COURT: Go ahead.

Q You were mentioning prosthetists. I'm showing you Prosthetics in Motion records from the prosthetist, Mr. Chris Kort, involved in this.

THE COURT: What exhibit is this?

MR. GENIS: This was exchanged in his expert and part of the basis that he relied upon, and, as you questioned, where did he get the numbers from. This is from the prosthetist.

MS. WINTERS: Objection, Your Honor. We don't have this.

THE COURT: I don't know what you're referring to. Objection sustained. Next question.

MR. GENIS: If we give it an exhibit number, would that be of assistance, Your Honor?

THE COURT: I don't know. We have a record here.

We have documents in evidence where you can refer to as documents.

MR. GENIS: Okay. So this -- I think we'll mark it Plaintiff's 99.

Q Is this a type of material --

THE COURT: 99? We already have that.

MR. GENIS: I'm sorry. 100, Judge.

MR. ROTH: 103.

THE COURT: What type of evidence are you talking about?

MR. GENIS: These are records of cost of prostheses.

THE COURT: Is there a document in evidence?

MR. GENIS: No. I'm going to offer it into evidence.

MS. WINTERS: Your Honor, we don't have this exhibit.

MR. GENIS: Yes, it was included.

THE COURT: At this time, we'll take a little bit of a morning break.

MR. GENIS: Sure.

THE COURT: How much more do you have of this witness?

MR. GENIS: I just want to go through a few of the items left on the chart, and that's it, and his credentials, if I'm allowed.

THE COURT: Why don't you go through the few matters left on the chart first and save this other part for later.

MR. GENIS: Sure. Okay.

Q Continue going down the tables for the next item on the table.

A Sure. So table 5 is other types of equipment that she would need for a disabled person, you know, modifications of home, modifications of beds and things like that and in her bathroom, grab bars, reachers, grabbers and other type of durable equipment. And all in over her lifetime, the range comes to $70,000 to $127,000, depending on the frequency with which she'll need to replace that, et cetera.

THE COURT: Now, once again, you're talking about dollars. So what we're trying to get a feel for is we didn't get all this information, and you have given us some testimony about that. I think that, you know, during our break, you may want to look at the documents and exhibits so you can answer that question, because you're throwing out a lot of numbers. There's no question she has some serious problems, it's obvious.

But anyway, complete that questioning and then we'll take our break.

A The wheelchairs, for example, all of those numbers come from reputable wheelchair catalogs online and reputable orthopedic surgical supply shops. All of the durable medical

equipment come from online catalogs.

My methodology is to take the lowest price of an item, the highest price and the middle price of the item and divide by three and get the recommended price.

THE COURT: We can go through that a little bit more later.

Do you have anything else about this chart?

MR. GENIS: Sure.

Q Go to the next table. I think we're up to six.

A So all of the various home and community services that she would need, which would include someone to help her for household activities, to help her within her home to help with preparing, for getting to work, preparing, helping prepare with meals, keeping her house neat and clean, helping her commute to work, childcare down the road, if and when she has a child, to help and assist with feeding a child, bathing a child, things that she can't do at night.

THE COURT: Is she capable of having children?

THE WITNESS: I'm sorry?

THE COURT: Is she capable of having children?

THE WITNESS: She's totally capable and wants to have children, as does her husband.

A So those costs all come together over her lifetime at $4,800,000 to $5,800,000.

THE COURT: Go through the charts and we'll talk

about all this other stuff later.

Q Go to table 7, please.

A Sure. And table 7 would be the cost of transportation over her lifetime; and, calculating it out, I locked at different cost methods and the most efficient method and came up with the utilization and purchase of used and utilizing the van that she has and the trade-in values are always, always taken into consideration, buying a wheelchair-accessible van with a wheelchair lift to have her be able to commute around -- and this would include parking in the Brooklyn area near where she lives for her lifetime -- comes to 476,000 to 680,000, the range being based on the costs of different items.

Q Why can't she just take Access-A-Ride like she's already doing?

A She takes Access-A-Ride now, and that's a miraculous service that the city provides, and I'm not knocking the service; but because she is employed and works and because she also has to go from work to various doctors' appointments and therapy appointments several times a week, the average Access-A-Ride from her home into her office, because it makes several stops along the way to pick up other disabled people -- and, again, I'm not saying it shouldn't. That's how it functions and it comes at a reasonable cost -- is about two hours, some days with traffic two and a half. And the same

thing going from her office to a doctor and doctor back to the office, we're talking about some days four hours in a van to six hours in a van. And this could help her cut down to less than half of that.

Q Other than just time in a van, is there any adverse effect upon her health having to do the Access-A-Ride for that duration?

A Not necessarily.

MS. WINTERS: Objection, Your Honor. Calls for speculation.

THE COURT: It's sustained.

Q So what's the bottom line projected costs over her lifetime, sir?

A 22,095,000 to 23,554,000.

Q And that's in current dollars?

A That is in current dollars.

Q So no inflation taken into account?

A Not a bit.

Q Can you now tell us your background?

A Sure. I went to SUNY Binghampton undergrad, mathematics degree.

SUNY Stony Brook immediately thereafter. Graduated with an M.D. degree in 1988.

Went on to Columbia Presbyterian for my training. The first year of that was called an internship, which I did

at one of Columbia's off-site centers in New Jersey called Overlook. I finished with physical medicine rehabilitation in 1992.

My type of specialty in physical medical rehab is two board tests. I passed the first one when I was eligible in '92 and the second one a year later, which was an oral exam in '93.

I sat for the pain management boards in '95, which was the first year that rehab doctors were able to sit for the pain boards because it was a field that was limited to only anesthesiologists until then. I passed that.

I subsequently passed every board recertification test on the first try until about ten years ago, when they switched from taking a grand test every ten years to doing what's called longitudinal tests where you take quarterly tests, and I passed every one.

THE COURT: Let me ask you this, because you can probably go the next ten days telling us how great you are.

Are you affiliated now with any particular institution?

THE WITNESS: Yes.

THE COURT: Tell the jurors that. There's no objection to your expertise. You're an expert witness. Nobody is questioning that, but just give the jury a little bit about what you do now and what your affiliations are.

THE WITNESS: You got it. Thank you, Your Honor, for keeping me on track.

I'm an associate professor of rehabilitation medicine in two departments at Mount Sinai, the rehab department and the orthopedic department. I primarily see my patients now in the rehabilitation clinics, because I gave up my full-time practice.

I also teach and lecture at least several times a year at Mount Sinai and other institutions all over the world when I'm invited to.

I have written textbooks and sat on editorial boards of journals. I do some research, which I don't, I no longer do that now that I'm not in full-time practice.

I'm licensed, I'm sorry. I'm certified as a life care planner by ICHCC which is the board that certifies life care planners. I teach in life care planning.

I have a limited liability company that does this type of medical legal expert work; and I do it for defense as well as plaintiffs. As the other lawyer pointed out, more trial testimony happens to be plaintiff. And that's who I am.

MR. GENIS: Okay.

THE COURT: All right. So do you have anything else you have, Mr. Genis?

MR. GENIS: Sure.

Q Have you had any honors as well?

A When I was practicing full time, every year I was in Best Doctors or Top Doctors. You know, I often won, I ran a fellowship program for 31 years, teaching pain management doctors how to be pain management doctors, probably the best honor of my life.
Q Have you ever served on the editorial board in a review of the Journal of Life Care Planning?
A Yes, I did, from 2015 to '18.
Q How many -- do you have experience treating amputees?
A Yes.
Q How many have you treated?
A Hundreds.
MR. GENIS: You know what, Judge, I think that will do it for me.
THE COURT: All right. So let's take a break now.
You have, how much of your cross-examination do you anticipate?
MS. WINTERS: Probably about 45 minutes to an hour.
THE COURT: Forty-five minutes? I'm just trying to think. Well, why don't we do this. Why don't we take 15 minutes now, and then you'll complete your cross-examination maybe by 1 o'clock. Is that realistic?
MS. WINTERS: I will make it happen, Your Honor. Absolutely.
THE COURT: So see you at 12:15. Don't talk about

the case.

(Jury exits.)

THE CLERK: You can all be seated.

You can step down if you like.

THE WITNESS: Thank you, sir.

(Witness steps down.)

(Recess taken.)

(In open court; jury present.)

THE COURT: All right. Ms. Winters, your witness.

MS. WINTERS: Thank you, Your Honor.

CROSS-EXAMINATION (Continued)

BY MS. WINTERS:

Q Dr. Kahn, we meet again.

A Yes, we do.

Q So you talked a bit with Mr. Genis about your plan in this matter. Your plan for Ms. Harger starts in 2022, right?

A It did, when I first met her. It started in about '23 actually.

Q And, again, listen, I know you want to give some explanation. I'm going to try to, do my best to keep to the 45 minutes that I promised the Judge.

THE COURT: You can take as long as it's indicated.

MS. WINTERS: Thank you.

Q If you can answer "yes" or no's where you can and if you can't, let me know. Okay?

A Yes.
Q So you included predictions in your plan for what her care needs would be starting December 1, 2022, right?
MR. GENIS: Objection. Form.
A No.
THE COURT: Overruled.
Q And you did not include, you did not include predictions in her plan for care needs that start December 1, 2022?
MR. GENIS: Objection. Form.
A The -- December 1st? No.
MS. WINTERS: Okay. Let's pull up the life care plan and display it to the witness.
THE COURT: What exhibit is this?
MS. WINTERS: This is document 2. It's his life care plan.
THE COURT: Just one second. We do this slowly.
If you want to refer to an exhibit, refer to an exhibit. Otherwise, ask your next question.
MS. WINTERS: Sure. I'm displaying his life care plan for the purpose of refreshing his recollection.
THE COURT: Just asking questions. I have no idea what document you're referring to.
MR. GENIS: It's not in evidence but I'll stipulate to it in evidence.
THE COURT: It's not in evidence? You want to agree

that something is in evidence? You want to stipulate to something? I'll consider it. We only talk about the documents that are in evidence and the witness' personal knowledge. That's all we do at trial.

MS. WINTERS: Understood.

I'm introducing this to the witness only for impeachment purposes and refreshing his recollection.

THE COURT: One second.

Do you want this document in evidence?

MS. WINTERS: I do not, Your Honor.

THE COURT: You want to impeach him on something that he said or he testified to before?

MS. WINTERS: Yes.

THE COURT: Under oath?

MS. WINTERS: Not under oath --

THE COURT: Next question.

MS. WINTERS: But on the plan he served in this case.

THE COURT: Next question. There's nothing further before you.

THE WITNESS: Okay.

Q And you met with Ms. Harger November 15, 2022, right?

A That is correct.

Q Okay. And you've never met with Ms. Harger since November 15, 2022, right?

A No, I have not.
Q Okay. So next week will be three years since you first, since you met with Ms. Harger, right?
A That is correct.
Q And over the past three years, we've had the benefit of, you know, additional knowledge regarding her treatment and her current abilities now, but you did not consider that in forming the opinions contained in your plan in this matter, right?

MR. GENIS: Objection to form.

THE COURT: So the opinion you rendered is based upon all these documents that are in evidence. And the last time you saw her was how long ago?

THE WITNESS: The time I saw her was in November of '22 as you pointed out.

THE COURT: Of 1922?

THE WITNESS: No. 2022.

THE COURT: 2022. So for the last three years, you have not seen her?

THE WITNESS: I have not seen her.

THE COURT: So you really don't have any information about how she's doing today?

THE WITNESS: I've been sent updated records.

MS. WINTERS: Your Honor, I'd move to strike that --

THE COURT: I'm sorry. Have you seen her since, in

the last three years?

THE WITNESS: No, I have not.

THE COURT: Do you have any knowledge, medical knowledge of her condition today since you haven't seen her?

THE WITNESS: Only through updated records.

THE COURT: You have updated medical records?

THE WITNESS: Yes.

THE COURT: Which updated medical records? Are they in evidence?

THE WITNESS: Well, for example, Prosthesis in Motion. I've spoken to her prosthetist. I've seen the records from Mount Sinai before today and those are the records I'm relying on.

THE COURT: And you're relying on these exhibits that we have here in evidence?

THE WITNESS: Some of them, yes.

THE COURT: Go ahead. What's your next question?

MS. WINTERS: We would just move to strike that because that's beyond the opinions contained in his report.

THE COURT: He's explained himself. Objection overruled. Go ahead.

Q But since your life care plan, you've not made any adjustments or updates to reflect her current capabilities, correct?

A No, I have not.

Q Okay. And you've not supplemented your report in any way to update to reflect her current care recommendations and her capabilities, right?

A No. I don't believe it's necessary based on what I know.

Q And, again, if you can try to answer with a "yes" or "no."

THE COURT: That's okay. Next question.

Q And this injury happened nine years ago, right?

A Correct.

Q And over the course of those nine years, she's received various medical care from various treating providers, right?

A That is correct.

Q And she's had teams of providers that she's worked with to address her medical needs, right?

A Yes.

Q And wouldn't you agree that you would expect that if there were medical needs she would have, that they would be addressed by those providers and recommended by those providers?

MR. GENIS: Objection.

THE COURT: Sustained.

Q We can agree that Ms. Harger experienced significant injuries as a result of this accident, right?

A We can certainly do that.

THE COURT: That's obvious.

A Yes.
Q And she will have certain medical needs throughout the rest of her life as a result of that?
A Yes. They're outlined in my report.
Q Okay. You would also agree, however, that many of the predictions and recommendations contained in your life care plan go beyond Ms. Harger's medical needs, right?
MR. GENIS: Objection.
A No, I would not agree to that in any way whatsoever.
Q Okay. Let's go through the plan a little bit.
We have the table here on display. So let's start with table --
THE COURT: What document are we referring to now?
MS. WINTERS: We're just -- the demonstrative that plaintiff used.
THE COURT: The demonstrative? You want to put that up on the easel again?
MS. WINTERS: I can, Your Honor.
THE COURT: It would be easy for the jury to see what you're talking about.
That's the demonstrative document which the doctor testified about and you want to question him about that, you can do that.
Q All right. So table 1 as referenced in this demonstrative includes orthopedic recommendations related to

Ms. Harger, right?
A That is correct.
MR. GENIS: Objection to form.
Q And you're not an orthopedist?
A I am appointed to the orthopedic department and I work with the orthopedic department as an associate professor but, no, I'm not an orthopedist.
Q Your medical practice is not in orthopedics?
A My medical practice is in orthopedics. As I just said, I work in the orthopedic department.
Q And you would agree that none of Ms. Harger's medical records have recommended the injection treatments that you suggested in her life care plan over the last three years?
A I would agree that that is the case.
Q And let's look at table 2 now.
Table 2 includes references to psychiatric and psychological treatment needs, right?
A Correct.
Q You're not a psychiatrist?
A No, but as a rehab doctor, you take care of people's emotional needs as well.
Q You're not a psychiatrist, are you?
A No, I'm not a psychologist.
Q And you're not a psychologist either, right?
A No, I'm not a psychologist.

Q And you're not an expert in diagnosing mental health conditions, right?
A I would disagree with that. MDs and especially physical medicine rehabilitation has substantial training in psychologic and psychiatric illnesses affecting those of the disabled.
Q Okay. So included in table 2, you reference the need for a psychiatric assessment of Ms. Harger, right?
A Yes, for a whopping total of $400, yes.
Q But she's never had a psychiatric assessment in the past four years, right?
A I don't know because I haven't seen all of the records but I know it's been recommended.
Q What record do you believe it was recommended in?
A In the last three years, I don't know if it's been recommended. It's certainly in the records I've reviewed.
Q So in the last three years, you're not aware of any record recommending that, right?
A No. I just know that she told me how depressed she is, how sad she is, how her life is not going the way she wanted.
THE COURT: Speak a little louder.
MS. WINTERS: Move to strike the nonresponsive sections.
THE COURT: Move closer so we can hear you better.
THE WITNESS: I thought you wanted me to move

further way.

THE COURT: There's a little problem when I'm here and you're there.

THE WITNESS: Okay.

Q In table 2, you also predicted that plaintiff would need weekly psychological sessions from 2022 to 2023, correct?

A Yes.

MR. GENIS: Objection to form.

Q Okay. But plaintiff did not attend any psychological counseling during this period, right?

THE COURT: Do you know that he never -- she never attended psychological counseling?

THE WITNESS: Well, I don't know that because I didn't see all of the records but even if she hadn't, it's my opinion that it's necessary to try to help her overcome some of her illnesses.

Q But the prediction was related to 2022 to 2023, right?

A Yes, it was.

MR. GENIS: Objection to prediction.

A It wasn't a prediction. It was a recommendation of future care and the life care plan still holds for future care.

Q In that period of time where you recommended or suggested she would need psychological sessions from 2022 to 2023, she didn't actually receive those sessions, right?

A To my knowledge, she did not but I don't know that for a fact, number one, and a life care plan doesn't work that way. A life care plan --

THE COURT: But you don't know.

Try to answer the questions directly without offering more than is asked of you. You don't know is your answer.

THE WITNESS: Okay. Sorry, Your Honor.

Q You also suggested that plaintiff would need crisis intervention counseling beginning this year and couples' counseling from 2022 to 2023, right?

A I did recommend that and I still would recommend that, yes.

Q But to date, plaintiff has not attended crisis counseling or couples counseling during the period you suggested, right?

A I don't know that.

Q Okay. And you've never modified your plan to reflect the fact that these suggestions didn't actually move forward in the periods that you identified in your life care plain, right?

MR. GENIS: Asked and answered, Judge.

THE COURT: You can answer that.

A No, but the plan would be starting on today's date and be more or less the same plan.

Q All right. Let's turn to table 4 of your plan.

Okay. And we agree that Ms. Harger's injuries will require prosthetics throughout the course of her life, right?

THE COURT: That question is a simple question.

A Yes. Of course we agree on that.

Q Absolutely. But looking at your predictions for Ms. Harger's prosthetic needs, you suggest that she will need four separate types of above knee prosthetics, right?

MR. GENIS: Objection to form.

THE COURT: Overruled.

Can you answer that? Do you understand the question?

THE WITNESS: Yes.

A That's what I recommended.

Q That includes a prosthetic for bicycling?

A Yes.

Q And a prosthetic for running?

A Yes.

Q And a prosthetic for everyday use?

A Yes.

Q And a prosthetic for cosmetic use?

A Yes.

Q And the total cost of that would be approximately 16 to 20 million?

A No.

Q Would it be 16 to 20 million if you included the arm

prosthetics?
A Yes.
Q And for the arm prosthetics, you recommended two for everyday use, one for bicycling and one for cosmetic purposes, right?
A That would be the ideal situation, yes.
Q And Ms. Harger does not currently have four separate leg prosthetics, right?
A No, and she's currently not functioning at optimal level.
MS. WINTERS: Move to strike the nonresponsive portions.
THE COURT: No, no, he answered the question.
Go ahead.
Q And Ms. Harger does not currently have four separate arm prosthetics, right?
A No. It's eight to nine years later and she doesn't have any functioning prosthesis yet.
THE COURT: Just answer the question. She doesn't have it, right?
THE WITNESS: No.
Q And you're here to give testimony about Ms. Harger's medical needs and life care needs, right?
A That's what I'm here for, yes.
Q It's specific to her needs, right?
MR. GENIS: Asked and answered, Judge.

A I think so, yes.

Q Okay. And you're not aware of any medical record in the past nine years that has recommended four separate leg prosthetics for Ms. Harger, right?

THE COURT: Are you aware of that? Yes or no.

THE WITNESS: I believe I am aware of that.

A The plan from prosthetics, I believe it was from her last prosthetist recommended this type of plan as a prosthetic, a long-term prosthetic plan.

Q So it's your testimony that her prosthetist has recommended four separate leg prosthetics?

A I believe so.

Q Including one for running, one for bicycling, one for cosmetic purposes and one for everyday use?

A Yes. And I just spoke to Mr. Chris Court recently and that is what he is still recommending.

MS. WINTERS: Move to strike. Hearsay.

THE COURT: Overruled.

Q Now, Ms. Harger has not had four separate prosthetics over the course of the last three years since you first issued your life care plan, right?

MR. GENIS: Asked and answered. Objection.

THE COURT: Do you know whether she has gotten these devices?

THE WITNESS: She has gotten the everyday prosthesis

to, the one suggested in the report.
Q And the everyday prosthesis, that's her X3 prosthetic that she currently has?
A I believe that is, yes.
Q And would you agree that the X3 prosthetic has a walk-to-run feature?
A It does have a walk-to-run feature. It is not optimal for her needs in my opinion.
Q Okay. And it allows -- that feature allows for Ms. Harger to transition from walking to running including short distance and automatically detects a transition from walk to run, right?
MR. GENIS: Objection, Judge.
THE COURT: Do you understand the question?
THE WITNESS: I do. She just said it, it would be for short distance, for example, to run a step or two to grab a cab or to get out of the way of something. It is not for exercise in my opinion and what I know about it.
Q Okay. And it can also be switched to running mode for longer distances, correct?
A Yes, but it's not ideal and it's not sufficient, and it certainly wouldn't be safe for her because of the way she ambulates within it.
Q Do you have any information that indicates that Ms. Harger was a competitive runner or ran for sport prior to

her injuries in this matter?
A According to her, she did, yes.
Q And would you agree that the most recent medical recommendation from Ms. Harger's treating providers does not provide for a running prosthetic?
A Well, I think they're still doing -- yes, I'm aware of that.
Q Okay. And that most recent recommendation from her actual treating provider was from February of this year, right?
A I think I just saw an entry from July of this year for a new prosthesis.
Q And in February of this year, they recommended a renewal of her X3 prosthetic, correct?
A I would have to have you put that up for me to read it.
Q Sure.
MS. WINTERS: If you can pull up document 11, just displaying to the witness, please to refresh his recollection.
MR. GENIS: Your Honor --
THE WITNESS: This is P95.
THE COURT: Excuse me. Is this in evidence?
MS. WINTERS: Yes, Your Honor. This is Plaintiff's Exhibit 95.
THE COURT: Yes, that's in evidence. The Prosthetics in Motion. Go ahead.

Q Okay.
A You have a question about that?
Q Sure.
Does that refresh your recollection that in February of this year, they recommended an extended warranty on her X3 everyday use prosthetic?
A I see that, yes.
Q And this record does not make a recommendation for a running prosthetic?
A No, because it was dealing with the issue of the X3. It didn't not recommend one either.
Q And the record does not recommend any other forms of prosthetics, correct?
A No, it was a follow-up visit. It's not asking -- it's not a visit pertaining to future needs of future prostheses. It's a visit where this practitioner is dealing with a current issue.
Q Okay. And let's go to table 5 of your life care plan. Okay?
In table 5, you recommend four different types of wheelchairs for Ms. Harger as well?
A Over time, yes. They're not all at the same time.
Q And so none of them would overlap?
A Many of them would overlap.
Q Okay. Which ones would overlap?

A At 55, the cane lever wheelchair would overlap with the ultra light sports chair and the lightweight push chair.
Q Would it overlap with the all terrain power wheelchair as well?
A Not until she's aged 55. She doesn't need a power chair until she becomes much more disabled as she ages.
Q Okay.
MS. WINTERS: I move to strike that as speculation.
THE COURT: No. No. He answered. Go ahead.
Q And no treating provider to date has recommended that Ms. Harger needs four separate wheelchairs at this time, or three separate wheelchairs at this time?
MR. GENIS: Objection.
THE COURT: Overruled.
A As I said, I haven't read all the records. I told you which records I have read so I can't really tell you that. I also know she doesn't have the resources to get those at this point so she wouldn't probably have someone prescribing things she can't get.
MS. WINTERS: Your Honor, I move to strike as speculation. I request a sidebar at this time.
THE COURT: No. Next question.
Q You're aware that Ms. Harger has insurance, correct?
A Yes.
MR. GENIS: They objected to insurance before,

Your Honor.

THE COURT: Yes. Sustained.

Q Do you have any information that suggests that any medically recommended devices for Ms. Harger were ever not -- withdrawn.

Do you have any information that indicates that any recommendations for a wheelchair were not pursued due to financial reasons or a lack of coverage?

MR. GENIS: Objection.

A When I met with Ms. Harger --

MR. GENIS: Objection.

THE COURT: I'll allow it.

A When I met with Ms. Harger, she was very clear on what she could not obtain not just with durable medical equipment, but with services as well, because of a lack of funding and the already incredible cost to her and her husband for the co-pays and the coinsurance and covering things that aren't covered already. So, yes, I am aware of the situation.

Q So my question was a little different.

You're not aware of there being an instance where a medical provider recommended any type of wheelchair and it was denied or not given to Ms. Harger as a result of a lack of coverage, right?

A I'm not aware of it but I would clarify the answer to that.

As a person who would write for wheelchairs and have to fight for prior authorizations, the insurer would cover or the third party would cover one wheelchair every five years. So there wouldn't be an opportunity to even try to obtain another one.

THE COURT: The question is do you know whether any of these -- you testified about a lot of expenses and what you anticipate.

Do you have any idea whether or not there's insurance coverage for that, what her real expenses would be, as compared to what would not be covered by other third party sources?

THE WITNESS: Many of the things I write would not be covered because they're entitled to one every certain number of years and not multiples of one, for example, for additional items.

MS. WINTERS: Your Honor, we move to strike as calling for speculation.

THE COURT: No. The jury is going to understand what it is.

So your testimony is that you don't know how much out-of-pocket expenses she's incurred today? Yes or no.

THE WITNESS: I don't know the exact amount.

THE COURT: Okay. Next question.

Q And you're aware that Ms. Harger is fully employed,

right?
A Yes, I am.
Q And she's presently making a six figure salary, right?
A Yes, I am.
Q Okay. And her husband's employed as well?
A Yes, I am.
Q Okay. And one of the wheelchairs you recommend was a sports wheelchair, correct?
A Yes.
Q And you have no records reflecting that a treating provider has recommended a sports wheel care for Ms. Harger?
A I have none, no.
Q Okay. And I'm going to move on to table 6.
Table 6 includes your suggestion that Ms. Harger requires housekeeping services, correct?
A Yes.
Q And pursuant to your life care plan, you suggested that those housekeeping services would need to start in 2022, right?
A Yes.
Q Okay. And your life care plan at table 6 recommends continued housekeeping services four hours per week through the rest of her life, correct?
A Yes.
Q Okay. And you're aware that Ms. Harger is able to take

care of most household duties on her own independently, right?

MR. GENIS: Objection.

THE COURT: Overruled.

Do you have any knowledge of that?

THE WITNESS: I have knowledge that she is capable of completing many of the household tasks that a housekeeper would do at approximately, on average, of the ones that I observed her doing through recent videos, six to eight times the time it takes an able-bodied person to do that.

MS. WINTERS: Your Honor, we would strike that calling for speculation.

THE COURT: He's trying to give you a complete answer to your question. Next question.

MS. WINTERS: Let's cull up that video.

So at this time, we would move into evidence Defendants' VV which is a combination of videos produced and recorded by plaintiff in this action.

THE COURT: This is an exhibit that you want in evidence?

MS. WINTERS: That's correct, Your Honor.

THE COURT: And it's VV. Just one second. Let me catch up with you.

So that's the e-mail response that you're talking about?

MS. WINTERS: No, Your Honor. VV --

THE COURT: I'm sorry. I have V. It's EE? DD?

MS. WINTERS: VV, V as in "Victor."

THE COURT: Oh, VV?

MS. WINTERS: Yes, Your Honor.

THE COURT: Sorry. One second.

A day in the life video. There's no objection to that. It's in evidence.

MR. ROTH: Does that have a file number?

MS. WINTERS: We combined all --

THE COURT: That's enough cross conversation. We're going to allow this video to be in evidence. This is a life video.

MS. WINTERS: Okay. And if you can go to minute 1, 58 seconds.

(Video played.)

THE COURT: How long is this?

THE WITNESS: About 30 seconds.

THE COURT: All right.

THE WITNESS: Part one. 44 seconds.

THE COURT: How much of this do you want to show?

MS. WINTERS: Right now, Your Honor, we'd like to show a couple of minutes of it.

THE COURT: You want to show a couple of minutes to show how she's getting around?

MS. WINTERS: That's correct, Your Honor.

We can stop it there, Your Honor, for the sake of brevity.

THE COURT: All right.

(Video stopped.)

Q And you mentioned you had the opportunity to review these videos before you testified today?

A Yes, I did.

Q And were you aware that Ms. Harger recorded those videos to product in this case?

A Yes, I am.

Q And you would agree that in the clip we just saw, Ms. Harger is emptying a trash can, changing a trash bag, taking out the recycling and doing laundry independently?

A I would call it independent at an incredible increased time.

Q Ms. Harger lives with her husband, right?

A Yes.

MS. WINTERS: At this time, I want to cull up a portion of Plaintiff's 86, Your Honor.

THE COURT: 86 is in evidence.

MS. WINTER: Thank you, Your Honor.

MS. WINTERS: Document 13.

MR. GENIS: When you say document 13, is that the page number?

MS. WINTERS: I will give you the page number, 3394.

I will just make clear to the jury that I've annotated this with my highlights. These highlights were not originally on the record just for making a clean --

THE COURT: Your highlights. Okay. Go ahead.

Q And if you want to take a second to review this record.

(Pause.)

THE COURT: Well, ask him a question.

MS. WINTERS: Sure. Okay.

Q Would you agree that in this record, it indicates that Ms. Harger remains -- it's important for Ms. Harger to remain independent in all aspects of her life?

A Yes, I would agree that that's important.

Q And this is from July of 2025, right?

A Yes.

MS. WINTERS: Okay. And let's turn to document 13 now which is Plaintiff's 93, Your Honor. Sorry, 14.

MR. GENIS: Is this Exhibit 93 or not?

MS. WINTERS: It's Exhibit 93, Bates stamp DA SILVA 3870.

THE COURT: 93 we entered into evidence before, the seating and mobility document?

MS. WINTERS: That's correct, Your Honor.

THE COURT: Okay. Go ahead.

MS. WINTERS: Thank you.

Q And would you agree that this record which is from

January of 2023 indicates that Ms. Harger is able to complete almost all of her care with the use of her wheelchair with the exception of needing some assistance with lower body dressing and bathing and some home management?
A I do see that, yes.
Q That was back in January of 2023, right?
A Yes.
Q And that's before you issued your report in this matter?
A Yes, it is.
MS. WINTERS: Okay. And if we can go back to the video at time marker 13 minutes, 28 seconds.
(Video played.)
MS. WINTERS: We can stop it there.
(Video stopped.)
Q Would you agree we witnessed Ms. Harger independently entering her apartment with laundry and independently cleaning dishes, right?
A I do.
MR. GENIS: Objection to form.
THE COURT: Overruled.
MS. WINTERS: If we can go to 20 minutes and 28 seconds.
(Video played.)
MS. WINTERS: Okay. We can stop it there.
(Video stopped.)

Q You agree in the clip we just watched you can see Ms. Harger independently unloading the dishwasher?

MR. GENIS: Objection to form.

THE COURT: Next question. The video speaks for itself. You really don't have to ask that. It's on the video. What's your next question?

MS. WINTERS: Understood.

If we can go to minute 26 and 10 seconds.

(Video played.)

MS. WINTERS: Okay. We can stop it there.

(Video stopped.)

Q And did you review this video of Ms. Harger folding laundry before you testified today?

A I reviewed all the videos.

Q And table 6 which is what we've been talking about, in addition to housekeeper, it also calls for a home health aide, correct?

A Yes, it does.

Q Okay. And the total costs between the housekeeper and the home health aide is approximately $2.7 million, right?

A Approximately, yes.

Q Okay. And you've not identified what specific activities of home care that you believe a home health aide is necessary to complete anywhere in your life care plan, right?

MR. GENIS: Objection.

A That's totally --

THE COURT: If he can answer it, let him answer it. Go ahead.

Q Your life care plan doesn't specify what specific activities a home health aide and a housekeeper would need to complete because Ms. Harger cannot complete them, right?

A It's in the report part.

Q Okay. And no treating medical provider has recommended a home health aide for Ms. Harger in the past three years, right?

A I don't know that for a fact because as I said, I only have a limited number of records.

THE COURT: Keep your voice up.

A Oh. I said I don't know that for a fact because I only had a more limited number of the recent records.

Q You're not aware of there being any recommendation by a treating provider?

A That is correct.

Q And you're not a treating medical provider for Ms. Harger?

A That is definitely correct.

Q And as we just discussed, Ms. Harger's medical records and video reflect independence and health care and home care, right?

MR. GENIS: Objection.

THE COURT: The video speaks for itself. The jury has seen the video. Next question.

A Independence and practicality --

THE COURT: There's no question before you, Doctor.

THE WITNESS: I'm sorry.

THE COURT: There's no question before you.

Next question.

MS. WINTERS: Okay. Let's look at the video at minute 36, 26 seconds.

(Video played.)

THE COURT: So we have a record, the jury reflects that she's doing what to her clothes, ironing them or cleaning them?

MS. WINTERS: I believe she was steaming her clothes, Your Honor.

THE COURT: Steaming then. So that video portion that's being shown to the jury shows her steaming her clothing. Right?

MS. WINTERS: That was correct, Your Honor.

THE COURT: Now you have a question?

MS. WINTERS: And now we see Ms. Harger is flossing.

THE COURT: Now we have part of the video which shows that she's flossing her teeth. Right?

MS. WINTERS: Yes. And brushing her teeth, Your Honor.

THE WITNESS: Yes.

THE COURT: There are no questions before you. Counsel is just showing the jurors what she's able to do.

All right. So she's brushing her teeth now. What else?

Q And at this point in the video, Ms. Harger is manicuring -- you saw this part of the video where Ms. Harger manicures her nails and paints her nails, correct?

A Yes.

MS. WINTERS: And in order to not show the whole video which I believe will be available to the jury to view, Your Honor, correct?

THE COURT: It's all evidence. If the jury wants to see it, they can see it, but in the meantime, do you have any questions about all of this?

MS. WINTERS: Yes. Just to move forward, I'll ask the question.

Q You saw the part of the video where she manicured --

A Where she holds the bottle in her mouth.

Q Where she holds --

THE COURT: The jury has seen it.

MS. WINTERS: I'll let the video play, Your Honor.

THE COURT: Do you want to show more of the video?

MS. WINTERS: I'll continue it playing. I was trying to move it along.

THE COURT: Do take your time. Do you want to show the jurors the video? You want to show more of the video?

MS. WINTERS: Yes, Your Honor.

THE COURT: Then go ahead.

MS. WINTERS: Thank you, Your Honor.

THE COURT: You can describe what she's doing so we have a record of this.

MS. WINTERS: Ms. Harger is removing what appears to be nail polish from her nails using nail polish remover.

THE COURT: Okay.

MS. WINTERS: And, sorry, Your Honor. Now Ms. Harger is filing her nails.

THE COURT: She's filing her nails now. Right?

MS. WINTERS: Yes, Your Honor.

All right. We'll continue just a few minutes longer if that's okay.

THE COURT: She's putting something in her mouth now?

MS. WINTERS: Yes, Your Honor. I believe that's the cap of the nail polish.

THE COURT: She's putting that in her mouth.

MS. WINTERS: And she's painting her nails.

THE COURT: And she's painting her nails?

MS. WINTERS: Yes, Your Honor.

All right. We can stop it there.

(Video stopped.)

THE COURT: Is there a question of the witness?

MS. WINTERS: Yes.

Q And would you agree in all of the tasks we saw Ms. Harger perform, she was doing so independently, correct?

A Independently with extreme extra effort.

THE COURT: I think the video speaks for itself.

Go ahead. Next question.

Q And Ms. Harger lives with her husband, correct?

MR. GENIS: Asked and answered.

A At the present time, she does.

Q And you also, in table 6, in addition to the home health aide and the housekeeper, you included a suggestion that she would need a personal assistant, correct?

A To help her with transport and at work, yes.

Q And so the basis for that or the justification was to drive her to and from work, right?

A To help her to and from work with transportation which was a lot less expensive than car service over her lifetime. Also to help her with tasks at work so she can be treated as closer to an equal at her job at the present time and have a better opportunity to excel in her career.

MS. WINTERS: I'm going to move to strike the speculative statements.

THE COURT: Well, you know, the jury understands.

Next question.

MS. WINTERS: Understood.

Q And the cost of this personal assistant is projected to be 2.4, anywhere from 2.4 to 2.7 million, correct?

A Over her work life, I think we put a work life of 25 and a half, 26 years, yes.

Q And you're suggesting specifically that Ms. Harger would require a personal assistant for 12 hours a day, five days per week, throughout her work life?

A Yes, twelve hours being because two hours of helping her in the morning, going to park the car, then helping her at work during the day and then taking her home.

Q And outside of driving her to and from work and potentially helping her with measurements at work, you don't specify in your life care plan what tasks this personal assistant would be needed to complete, right?

A Well, those are several of the tasks, but there would be other tasks at work that she can assist with.

Q Okay. You're not a vocational expert, right?

A Other than the amount of vocational training that a rehabilitation doctor gets early in their career, no, I would not.

Q Then the answer to my question is yes?

A No, the answer to your question was exactly how I answered your question.

Q And no vocational expert has done an assessment of Ms. Harger in this matter, right?

THE COURT: Do you know one way or the other?

A I haven't seen one, no.

Q You recommended that a vocational assessment be completed in this matter?

A Correct.

Q And are you aware that Ms. Harger's medical records indicate that she was able to return completing onsite visits to construction sites as part of her job as early as May of 2022?

MR. GENIS: Objection.

A I'm not aware of that and it, she has not done that.

MS. WINTERS: Okay. If we could cull up document 15 which is a portion of P95, Your Honor.

THE COURT: So I've got to let the jurors have lunch. How much more? I don't want to rush you. We can continue the questions after lunch but you tell me.

MS. WINTERS: I think I can wrap it in about 15, 20 minutes, Your Honor.

THE COURT: Let them take lunch now and let's come back at, I think, 2:15 and you'll complete your questions and we'll do redirect and we'll move on.

MS. WINTERS: Thank you, Your Honor.

THE COURT: Don't talk about the case. It's

tempting to talk about it, but you'll talk about it once you start your deliberations, not now.

(Jury exits.)

THE COURT: All right. The jurors are out of the courtroom.

So give me a general idea, Ms. Winters, you have another 15 minutes or so. We'll have redirect, I suspect. There's another witness today that we have available?

MR. GENIS: She's in the courtroom already.

THE COURT: Another doctor?

MR. GENIS: No, an economist.

THE COURT: So it looks like we're probably going to reach the economist, I would imagine, about 2:30 or thereabouts. All right? See you then.

Anything else?

MS. WINTERS: Thank you, Your Honor.

MR. KEAVENEY: Can the economist be excluded until she testifies? Can the economist be excluded from the courtroom until she testifies?

THE COURT: Yes.

MR. KEAVENEY: Thank you.

(Lunch recess.)

AFTERNOON SESSION.

(In open court; jury present.)

THE COURT: You can continue questioning.

MS. WINTERS: Thank you, Your Honor.

(The witness, STUART KAHN, having been previously sworn, resumed the stand.)

CROSS-EXAMINATION (Continued)

BY MS. WINTERS:

Q So, Dr. Kahn, before the break, we were talking about the home health aid and housekeeper services included in Table 6 of your life care plan. Do you recall that?

A I do.

Q Do you have any information or did you investigate which home services or household services that Mr. Brown helps with, her husband?

MR. GENIS: Objection, form.

THE COURT: Sustained.

Q Did you investigate or include in your assessment any information on which household services Ms. Harger's husband helps with?

MR. GENIS: Objection.

THE COURT: I'll allow it. Do you know whether he was helping out at all?

THE WITNESS: Yes, and I did investigate that. That was part of the conversation but it also is very clear in the

life care plan guidelines that you're supposed to plan a care for independence for the individual.

Q What services does Mr. Brown help with?

A He helps with some of the cleaning, some of the grocery shopping, some of the cooking, things like that.

Q And did you review any documents to prepare for today?

A Many documents.

Q And that would include -- we've already talked about this, the records, the videos and things like that?

A Correct.

Q Did you also review your report again before testifying today?

A Yes.

Q Now, do you have your report in front of you?

A I do.

Q Okay. If you could turn to page 15 of your report?

A The tables or the report?

Q Your report.

MR. GENIS: It's not in evidence, Your Honor.

THE COURT: The report's not in evidence. What's your question?

Q Would you agree that page 14, fourth paragraph down of your report is where you reference a personal aide or professional aide?

MR. GENIS: Objection. Not evidence. She's reading

something not in evidence.

THE COURT: Not in evidence.

MS. WINTERS: Okay.

Q Do you specify anywhere in your report the specific tasks that a personal work assistant would be needed for Ms. Harger?

THE COURT: Did you consider that at all?

THE WITNESS: Yes, I did.

Q What specific tasks other than transporting her to and from work and helping her with measurements for site visits at work do you specify that she needs in your report and life care plan?

A Well, those are specific tasks.

Q Other than those two, do you specify any other tasks?

A No, I do not.

Q Okay. And --

A I'm sorry. I will correct that.

I think I mentioned toileting at one point in the report, how difficult it is for her to toilet herself at the office at times when she needs to remove her leg.

THE COURT: I'm sorry. I can't hear you.

A I did mention in the report how difficult it is for her to toilet herself when she has to go to the bathroom at work and she has to remove her prosthesis in order to clean herself.

Q Okay. Would you agree with me that you discuss the

personal assistant on page 15 of your report, right?

MR. GENIS: Objection, Judge.

THE COURT: You can explain it. Is there anything in your report here that's inconsistent with this testimony, is that what you want to know?

MS. WINTERS: Correct, Your Honor.

THE COURT: You want to show him something where he said it was consistent?

MS. WINTERS: Sure.

THE COURT: You want to call his attention to it.

MS. WINTERS: Absolutely now.

THE COURT: What she's trying do now is maybe you said something in the report that is inconsistent with your page.

MS. WINTERS: Only showing to the witness.

MR. GENIS: Judge, it's not in evidence.

THE COURT: Just a second. You can answer whether or not you ever said anything in your report that was inconsistent with what you testified to. I'm going to allow that.

MR. SHIELDS: But it shouldn't be on the screen, Your Honor.

THE COURT: Objection overruled.

Let him look at the report. What is the specific question that you think was inconsistent with what he wrote

about in his report.
Q If we can go to the fourth paragraph down, it states --
THE COURT: You're showing him his report, right?
MS. WINTERS: That's correct.
Q And you discuss here that Ms. Harger would need an assistant at work, right?
A Yes, I do agree that on what appears to be the third paragraph to me but okay, yes.
Q And you would agree that the only tasks identified for that assistant is taking measurements at site visits at work? Right?
A That is listed but that doesn't mean that's the only task.
Q Okay. And then if we can go to the next page.
THE COURT: Members of the jury, the reason I'm allowing that is the witness testifies and he relies on his report and you have all these things in evidence and I'm going to allow the defense to say did you say anything inconsistent with the report. That would be permissible right? Okay.
Q And then in the first full paragraph on page 16, you again talk about the personal assistant at work and you say that she requires an attendant to help her transport to work and to complete her work, correct?
A Yes.
MS. WINTERS: Okay. And if we can now go to

document 2 and that is his life care plan.

MR. GENIS: Okay.

A I didn't really get to finish answering the question.

Q You answered the question.

A No.

Q It was a "yes" or "no" question.

THE COURT: Well, counsel can ask you follow-up questions if they want.

THE WITNESS: Okay.

MS. WINTERS: You have document 2 up.

THE COURT: What are you now showing him?

MS. WINTERS: This is his life care table.

THE COURT: What document in evidence is that?

MS. WINTERS: It's not a document in evidence. It's part of his report.

THE COURT: No, you're not going to show him that. It's not in evidence. You can ask him a question and then you can say did you ever say anything contrary to that in your report. Can you do that? And then you can even show him something. You don't have to read it, it's not in evidence, to refresh his recollection. If he doesn't have a recollection, that's how we do it. Okay?

MS. WINTERS: Okay.

Q Would you agree that at table 6 of your report where it discusses --

THE COURT: No. No. Did he ever say anything in your report that was inconsistent with his testimony. Right?

Q Did you ever specify any specific work tasks that a personal assistant would be needed to complete besides driving the plaintiff to and from work and taking measurements at site visits?

MR. GENIS: Objection, Your Honor.

THE COURT: Do you understand the question?

Did you ever say anything that's inconsistent with your testimony? I have no idea exactly what she's talking about but maybe you know.

A Yes, I did.

Q Which specific tasks do you specify in the report besides those two?

A I also talked about bringing her wheelchair in and out of her car and to assist her in her wheelchair activities at work.

Q That would be part of her transportation to and from work?

A You can classify it how you like.

Q Any other tasks besides those?

A I didn't specify them but they're there, they're needed.

Q Okay. Understood. And you're aware that Ms. Harger's medical records indicate that she was able to return to completing site visits, construction sites, as part of her job

as early as May of 2022, right?
A Someone being cleared to do that and someone being able to do that are two very different things.
MS. WINTERS: If we can pull up Plaintiff's 95. It's document 15.
MR. GENIS: Is there a Bates page on that?
MS. WINTERS: And the page number is 8230.
Q Okay. And this is a document from Prosthetics in Motion, correct?
THE COURT: It's in evidence. Go ahead. What's your question?
Q And would you agree in this document, it indicates that Ms. Harger has been able to start returning to onsite construction sites, correct?
A That's what it says there and she's optimistic, but according to my interview with her around the same time, she has not and did not.
Q Okay. And this document was from May of 2022, correct?
A That is correct.
Q And that's before you issued your report in this matter, right?
A That is correct.
Q And, again, you suggested that Ms. Harger would require a personal assistant at the beginning of your life care plan in 2022, right?

A Correct.
Q And are you aware of any medical record that has recommended that for her at work?
A I am not.
Q And did you review Ms. Harger's employment records before making that opinion as to her need for a personal assistant?
A No, I did not.
Q So you're not aware that she has worked full time since you issued your report?
A I am aware of that.
MR. GENIS: Objection to form.
Q You are aware of that?
A With many days missed and with many accommodations.
Q Okay. Are you aware that Ms. Harger has hit her billing requirements in her job over the past three years?
A I'm aware of that. She actually talked about it and we talked about it. I don't know about the last three years, but at the time of my interview with her, she talked about how she has to work a lot of weekends to make up for the multiple appointments and times she misses, how she has to work a lot of nights to do that but, yes, I'm aware of that.
Q And that conversation you're referring to was back in November of 2022 when you met with Ms. Harger, right?
A Yes, it was.
Q And have you reviewed her employment records over the

past three years?
A Already answered. No, I have not.
Q So are you aware that she actually achieved a promotion in the past three years?
MR. GENIS: Objection.
Q Without a personal assistant?
THE COURT: I haven't even heard the question.
MR. GENIS: There's no records in evidence. When I was doing something similar, you admonished me.
THE COURT: Objection overruled.
Let me hear your question what you want to ask him about.
MS. WINTERS: All right. I'll withdraw and rephrase, Your Honor.
Q If we were to assume that Ms. Harger -- let's assume that Ms. Harger had achieved a promotion in the last three years without a personal assistant. Would that change your opinion about her need for a personal assistant?
A Absolutely not. One promotion in three years for someone who is as bright as she is, as highly educated as she is, would probably be not so great.
Q And it doesn't change your opinion that she has achieved her billing requirements and achieved bonuses as a result of her performance at work?
MR. GENIS: Objection, Judge.

THE COURT: Well, look, we have a lot of testimony, Doctor, listen to me, all right, and you know, she's obviously able to do a lot of these under the circumstances. Right? We saw her do things and handle her nails and her teeth and everything else like that. So she's made a remarkable job, I think you testified, considering her profound disability. So the question is designed to find out how well she's doing it.

THE WITNESS: Correct.

THE COURT: So you can tell the jury. She's obviously an extraordinary human being.

THE WITNESS: She is.

THE COURT: You've testified about that. And you testified she's able to go to work and things like that. And Counsel wants to find out really if there's any limitations really considering how profound she is and how capable she seems to be. I think that's the general thrust of the questions. If you want to comment about it, you can do that, and then we'll move on to something else.

THE WITNESS: Okay.

THE COURT: Go ahead and speak clearly into the microphone so I can hear you.

MS. WINTERS: Understood, Your Honor.

THE COURT: I think that's the thrust of your questions.

MS. WINTERS: Yes, Your Honor. I'll continue.

THE COURT: No. No. I wanted him to explain that so we can move on.

MS. WINTERS: No, I'm going to move on, Your Honor.

THE COURT: You can answer the Judge's question. You can explain that to the jury so you can get to the heart of this. Okay?

THE WITNESS: Okay. In my opinion, to get to the heart of it, I do think that Luisa Harger is a remarkable person for what she's achieved and what she's done and the fact that she does get up every day and go to work and achieve a raise and a promotion and a bonus is great.

I do think that there's more that she can achieve and more that she can do if she was given the level of assistance and the abilities to do so. I think the fact that we've, what we've, what we have all been presented to the jury and what I witnessed in my records and then the subsequent records that I've read and reviewed since then to prepare for court is witnessing someone who is really, as the Judge pointed out, a superstar, someone who's spectacular, and has achieved these things despite all that's gone on in her life and all her adversity.

Now, that doesn't mean that a person who's achieving these things in my opinion as a life care planner doesn't deserve to have the things that would help them or the services and/or the goods that would help them achieve a much

higher level, something closer to what they might have achieved or probably would have achieved if they didn't have this accident and that is what is in my report.

The goal of my report is to bring about the best functional medical and psychosocial outcome as it pertains to the injuries she sustained. I'm not trying to give her more than what her normal life and her normal existence would have been if she didn't have these injuries and that's what I'm trying to get across here.

THE COURT: Any other questions you have?

MS. WINTERS: Yes, Your Honor.

Q You opine in your report that she needs reasonable accommodations, right?

A Correct.

Q And that she's entitled to accommodations at work?

A Yes.

Q And that's provided by her employer, right?

A Yes.

Q Also in table 6, you include a personal fitness aquatic trainer, right?

A Yes.

Q And that's at a cost of approximately $156,000?

A Over her lifetime, yes.

Q Okay. And she's over nine years post accident, right?

A Yes.

Q And she's not required an aquatic trainer since this accident, right?

MR. GENIS: Objection. Form.

THE COURT: Has she had to incur, if you know, any of those expenses during the nine years since the accident?

THE WITNESS: Well, she doesn't exercise because she's not able to, but having a disability trainer would allow her to do that and help her.

THE COURT: Do you know whether she's had such a trainer?

THE WITNESS: No, I don't believe she can afford one. That's what she told me.

THE COURT: That's what she told you.

All right. Next question.

Q And also in table 6, you offer some suggestions regarding modifications to Ms. Harger's home, right?

A Well, ultimately, I recommend that she relocate to an Americans with Disabilities access, accessible home, but if not, then, yes, of course, modifications so she can turn the wheelchair around, et cetera, have a wheel-in shower, things of that nature that would help make her life more comfortable.

THE COURT: Can she get around now in the facilities where she's at?

THE WITNESS: She can survive and she can get by but she certainly doesn't have it easy and there are things --

that's why they have American with Disabilities Act housing for people who have such severe disabilities.

THE COURT: All right. Next question.

Q And one of the recommendations you specifically included in table 6 was a modification to her bathroom in order to make it a walk-in shower, correct?

A A roll-in shower. If it says walk-in, then it's a typo. I apologize. I can look.

Q Why don't we turn to page 12 of your life care plan if you want to refresh your recollection.

A It's meant to be a roll-in shower, not a walk-in shower.

Q You would agree that your plan presently calls a modification to a walk-in shower, correct?

A Yes. I apologize for the typo.

MS. WINTERS: Okay. If we can cull up video VV again and go to the 27 second mark. 27 seconds so at the very beginning.

(Video played.)

MS. WINTERS: Okay. You can stop it now.

(Video stopped.)

Q So when you issued your life care plan in this matter calling for a modification to her bathroom, were you aware that she's able to transfer independently from her shower in its current state?

A Yes, I am. It's pretty standard for someone at

wheelchair level to be able to roll in and out of their shower for ease and not have to move a chair that someone else might have put out of the way and just be able to move in and out of their shower, dry off while they're in that chair, and save time and efficiency and human energy.

Q As part of your life care plan at table 6 still, you also suggest that she would need renovations related to interior doorway threshold removal and/or door widening, right?

A Correct.

MS. WINTERS: Okay. So let's go to the video at 1 minute 35 seconds.

(Video played.) (Video stopped.)

THE WITNESS: You saw how she got stuck there.

MS. WINTERS: Your Honor, we would move to strike.

THE COURT: Next question.

MS. WINTERS: If we can move to 21, 21 minutes 40 seconds.

(Video played.) (Video stopped.)

MS. WINTERS: Okay. And we can move to 28 minutes 6 seconds.

(Video played.) (Video stopped.)

MS. WINTERS: We can move to 32 minutes, 6 seconds.

(Video played.) (Video stopped.)

MS. WINTERS: Okay. We can take it down. Thank you.

Q And so we just watched a number of videos. To your knowledge, this is the same residence that Ms. Harger had at the time you issued your report in this matter, right?
A Yes.
Q Okay. And no home assessment has been conducted by you in this litigation to discuss her ability to maneuver in her household, right?
MR. GENIS: Objection to form.
A I assessed the situation verbally with her and discussed the struggles that she has in this particular home which we observed and I can go over them. If would you like to put the videos back on, we can talk about what is wrong with all of the different things she's doing and where they're harming her.
Q Are you aware that her medical records specifically indicate that Ms. Harger has, can maneuver and traverse freely in her home?
A Maneuvering and traversing freely again does not imply that it's not harming her. As you saw with the wheelchair, the forward and backward motion of trying to propel in such small spaces and not being able to use her arms to propel the wheelchair, number one. Getting caught on the door jamb in the bathroom door, number two.
MS. WINTERS: Your Honor, I'm going to move to strike the narrative.

THE COURT: That's all. Disregard all this last testimony. You're not being terribly responsive.

Let's wrap it up. Come on.

MS. WINTERS: Absolutely, Your Honor. I'll just move ahead. Give me one second.

Q And let's move on to table 7. Included in table 7, you testified to this a little bit when Mr. Genis was talking to you, was a suggestion that she requires a modified van. Correct?

A That is my impression. That would be the best way to transport.

Q And in the past three years since you issued your report, she has not had a modified van, right?

A To my knowledge, that is correct.

Q Okay. And you included both the cost of the purchase of the van and van maintenance over her lifetime in your cost for that, right?

A That is correct.

Q And that's approximately $680,000?

A It's a range but it goes as high as 680, yes.

Q And none of plaintiff's treating physicians have recommended a modified van, right?

A That is correct.

Q And are you aware that Ms. Harger's medical records indicate that she's able to ambulate throughout her community?

MR. GENIS: Objection.
THE COURT: Overruled.
A She is considered a K3 ambulator.
Q And there's -- so K3, there's four tiers of that ambulation assessment, right?
A Correct.
Q And K3 is the second to last one, the second highest, right?
A Correct.
Q Okay. And she's reported as an K3 ambulator throughout her medical records, right?
A No. She's achieved K3 ambulation.
Q As early as 2022, right?
A Correct.
Q And that was before you issued your report?
A Correct, and recently in more updated reports that I've seen.
Q And, in fact, in her most recent reports, it consistently indicates that Ms. Harger was able to come into the facilities and independently ambulate to get there, correct?
A Well, she didn't walk to the facility. She took transportation to the facility. So she was able to get to the front door to the floor where the doctor's office is, yes.
Q So it does indicate that she ambulated independently at the facility, right?

A Yes.
Q Okay.
A No one's disputing that she can ambulate short distances independently.
THE COURT: The answer is yes. Use the microphone.
THE WITNESS: Okay. Sorry, Judge.
Q And Ms. Harger continues to use Access-A-Ride, right?
A Yes.
Q And her medical records, some of her most recent medical records actually indicate that she is an extremely active K3 ambulator, right?
MR. GENIS: Objection.
THE COURT: She's very active, right?
THE WITNESS: She's active for a disabled person, I'd agree with that, but I don't know what record you're referring to.
MS. WINTERS: It's P95 just for the record, Your Honor, which is in evidence. If you can cull up document 9.
MR. GENIS: Can you give me a date, please?
MS. WINTERS: Sure. It's from February 11, 2025, and the Bates number is 008729.
Q And would you agree with me that indicates here that Ms. Harger is an extremely active K3 ambulator, right?
A Correct.

Q And, in fact, it specifies later in that paragraph that she traverses far more than 400 yards per day and normally stands for over ten hours per day, correct?
A That's what it says here, yes.
MS. WINTERS: You can take that down.
All right. And if can you bring up --
Q You said you reviewed a number of photos and videos before your testimony today, is that correct?
A Yes.
MS. WINTERS: If you could bring up Defendants' UU and I'd like to move that into evidence at this time, Your Honor.
THE COURT: I don't think there's any objection to it. UU?
MR. GENIS: We'll look right now.
THE COURT: Those are photos.
MR. GENIS: No objection to photos.
THE COURT: All right. There's no objections to that. Which photos do you want to show?
MS. WINTERS: I'm showing two photos from Exhibit UU.
(Defendants' Exhibit UU so marked.)
Q Were you given these photos to review before you testified today?
A No, I have not seen that photo.

Q Okay. Were you given these photos to review before you issued -- so you didn't review these photos before you issued your report in this matter, right?
A Nor that one, no.
Q So I'll represent to you that these are photos of plaintiff from a presentation she gave in Brazil in 2017.
Would you agree that that's something you would have liked to have seen as part of your assessment in this matter?
A It would be nice to see more photos. It's always nice to see photos of Ms. Harger when she is at her best.
MS. WINTERS: Okay. You can pull that down.
Q I'm just going to quickly go back to table 5. One of the recommendations you included in table 5 was a fully adjustable bed frame, right?
A Yes.
Q And you suggested in your life care plan that she would need that beginning in 2022, right?
A That is correct.
Q But she doesn't currently have a fully adjustable bed frame, right?
A I don't know that but she didn't at the time I evaluated her.
Q So you have no information suggesting that she's had one over the past three years?
A No, I do not.

Q Are you aware of any prescription for one or any recommendation for a fully adjustable bed frame from any of her treating medical providers?
A No, I am not.
MS. WINTERS: All right. If you can cull up video VV again, at 27 minutes, 50 seconds.
(Video played.)
MS. WINTERS: Okay. You can end it there for now.
(Video stopped.)
MS. WINTERS: And you can show 47 minutes 2 seconds.
(Video played.)
MS. WINTERS: All right. We can stop it there for now.
(Video stopped.)
Q And would you agree with me that in both of those clips, they're standard beds that Ms. Harger is transferring from independently?
A Well, one looked like a full size or queen sized bed and the other one looked like a twin bed.
Q They're not medical beds, correct?
A No, they're not medical beds, correct.
MS. WINTERS: Okay, Your Honor, that's all the questions I have.
THE COURT: Any redirect?
MR. GENIS: Yes.

REDIRECT EXAMINATION

BY MR. GENIS:

Q What's the difference between where you would treat patients with disabilities as opposed to preparing a life care plan for them?

A Well, normally, when you treat someone with an illness or a disability, you're taking care of the reason they're coming to you for your, you know, in your office, and managing that particular issue and problem and writing treatment plans for that particular issue and problem and not writing or recommending life care worth of future treatment and plans.

So that is one of the biggest difference in what I do when I am working on a life care plan. And it is not uncommon that I am asked a question does any treating physician or have treating physicians recommended these things because I never did in the 31 years of practice unless I was asked by, specifically by a patient, can you tell me what things I'm going to need in the future, can you help me with that, and then I would document that not charging them for it because that would also be part of what a doctor could do or should do if they're asked about that.

THE COURT: You're giving a long explanation to a simple question.

Next question.

MR. GENIS: Sure.

Q What -- you saw those videos. Please explain to us what you saw as a physician?

THE COURT: If there's an objection, it's sustained.

Is there anything in there that would make you change any of your testimony that you gave here now that you've seen those videos? Yes or no.

THE WITNESS: No, definitely not.

THE COURT: Next question.

Q So as a layperson, I might not notice things that you do. Can you please explain to me what, if anything, you saw about disability and effect on function in the videos that the defense attorney just showed you?

A Sure.

MS. WINTERS: Objection, Your Honor.

THE COURT: Is there anything about the videos that you think sort of requires some medical explanation?

THE WITNESS: Yes, I think it does.

THE COURT: And you can tell us.

THE WITNESS: I'll try to keep it short.

So some of the earlier ones that we were shown and we were all watching was -- what impressed me the most was, first of all, great that she can do it, but the amount of time it took her to do simple tasks.

When I got the videos about a week ago, what I did was I did some of the tasks myself at a normal speed and the

average time of some of those tasks was six to eight times --

MS. WINTERS: Objection, Your Honor. This assessment was not a part of his --

THE COURT: Overruled. You showed the videos.

If there's something in the videos that you feel has some medical relevance to your testimony, I'm going to allow you to explain it.

THE WITNESS: So that's one.

The need for a housekeeper isn't because she a hundred percent absolutely cannot do those things, but the amount of time and energy and effort and the amount of discomfort and emotional distress to do simple daily tasks that an able-bodies person would normally do. Changing a garbage bag should take someone 10 to 12 seconds, not a minute and a half. Taking out the garbage, literally, taking it to the garbage pail wasn't a problem. While she was moving around in her wheelchair, she was able to, fully admit, she's independent getting around in the apartment in a wheelchair. She cannot turn her wheelchair around so should something be behind her in certain places or, God forbid when she has a kid who's crawling on the floor, to hit the kid because she can't see behind her --

MS. WINTERS: Your Honor, objection. This is highly speculative.

THE COURT: Look, the jury has seen the video. The

doctor is testifying. The doctor can testify what impact this has on her medical conditions, what she's not able to do, what she can do. It's all part of the testimony. It's all part of this trial.

You can complete your testimony.

THE WITNESS: Also, because of the imbalance of having only one arm and one leg, while she's using the wheelchair to propel, the forces of coming back and forth on her lower back and hip and joint are going to take their toll.

There's recent medical records of the ones I did see at Mount Sinai which already talks about increased low back pain. She's had to go to a pain management doctor for this and the recommended treatment including opiate pain medication which is really, you know, a route to go down that you want to avoid if possible.

With regard to taking, doing the washing and the nails, her nails, it's amazing that she's doing that and I don't want to take anything away from her, but giving someone some assistance doesn't mean that they're going to not become independent and all of a sudden, just stay at home and do nothing. She's going to user her time, I presume, to achieve more and that's the purpose of the plan.

With regard to a hospital bed, it's not for the purpose of being able to transfer in and out of the bed. It's for the purpose of having some comfort to have your legs

supported at night for comfort and to rest the muscles and have your back supported at night to rest your muscles. So it prevents you, if you have a little tilt, it prevents you from falling over to the side that has no limbs. There's other purposes than just getting in and out of bed.

With the roll-in shower, there's a lot of time that can be saved and especially if she does have an assistant, the assistant will help get her in the shower, washes her, dries her, and then it's all done.

THE COURT: All right. I think you sufficiently explained it.

Any other questions?

MR. GENIS: Yes.

Q Sir, you were asked questions about prosthetics an getting the prices.

Do you have in front of you part of Prosthetics in Motion records that detail the different prosthetic devices she needs and their costs?

A Yes.

MS. WINTERS: Objection, Your Honor.

Q Is that professionally reliable?

THE COURT: One second. We do it in an orderly way.

What's the nature of your objection?

MS. WINTERS: I don't believe this document is in evidence.

THE COURT: You can testify. You mentioned about costs. I think that the question is do you have anything that documents the costs or are you just speculating.

THE WITNESS: Yes. I had received a record from Prosthetics in Motion which is her present prosthetic company of different prostheses and their costs and incorporated some of that information into my records.

She has had updated records from Prothesis in Motion which are not incorporated into my note because that was after I wrote my note.

THE COURT: So I guess I'm just curious as to, you know, you mentioned a lot of money here. Right? Which of these have you actually documented, you know, that these are real figures and numbers, and not speculation?

THE WITNESS: No, nothing. I never make up a number. Nothing is speculation.

THE COURT: But we want to know what it is.

THE WITNESS: Okay. So the company I couldn't remember the name of before is Fair Health. They are an internationally well recognized company that almost every medical institution in the United States uses to figure out --

THE COURT: Do you have anything that explains what the costs are?

THE WITNESS: Of course I do. Yes.

There's a sheet of references, about 90 different

references that I use.

THE COURT: Where are those references, in your report or elsewhere?

THE WITNESS: Yes.

THE COURT: Tell us where are those records. I mean are you looking at your report?

THE WITNESS: Yes, it should be attached to the back of the report.

THE COURT: So you say it's in your report?

THE WITNESS: Yes. And there's footnotes, all the footnotes and different footnotes.

THE COURT: Your report is not in evidence.

THE WITNESS: Okay.

THE COURT: Do you have any other questions?

MR. GENIS: Yes, Your Honor.

Q You were cross-examined about whether or not she was having any psychological issues as a result of this. I'm going to put -- you were read, cherry-picked, from Plaintiff's Exhibit 83 --

MS. WINTERS: Objection, Your Honor.

THE COURT: I haven't heard the question.

Q -- from Plaintiff's Exhibit 83, Bates 5392.

THE COURT: What is your question?

Q Okay. Sir, do you see --

THE COURT: Is this something in evidence?

MR. GENIS: Yes.

THE COURT: What document?

MR. GENIS: It is from Plaintiff's 83 where defense counsel read.

THE COURT: You're showing document 83, Massachusetts Hospital records in evidence.

MR. GENIS: Yes.

Can we please turn on the Elmo? Thank you.

Q Okay. So I'm showing you the date of August 20, 2025, and do you see where it talks about generalized anxiety?

A Yes, I do see that. And that's something I spoke about and that's right around the time --

THE COURT: There's no question in front of you.

Q Let's go -- you mentioned gait impairment. I'm showing you from Plaintiff's 86 at Mount Sinai and that is July 8th of 2025.

Do you see "gait impairment" written there?

A Yes, I do.

Q Okay. And do you see that there is also about late complications of amputation of stump and how pain management is recommended as well as plastic surgery?

A Yes, I did.

Q Okay. Okay. You were questioned on Plaintiff's 86 and a follow-up visit involving Chris Kort. Let me get the date. It is July 8th of 2025. I just want to zoom it out a little

bit.

Do you see how it says: The patient plans to see Chris and Kyle from Prosthetics in Motion about getting a new socket for above-knee amputation and explore the option of osseus integration for her transhumeral amputation. Her above-knee prosthetic is having issues with suction and she does not feel confident walking. She thinks she has gained some weight and the socket is now too tight. It causes discomfort and now with the heat, she is developing skin breakdown over her groin and buttocks. Her above-elbow amputation has poor suction and cannot withstand the weight of the elbow and forearm, therefore, she does not turn it on right now for fear of it falling off.

THE COURT: So counsel has read from a document that's in evidence. We'll allow that. The jurors can look at any document that's in evidence, that's what they're here for, if they wish to see anything, but it's okay if counsel wants to point out something in particular from a document in evidence. Usually it's done on summations but I'll allow it here.

Are the highlights your highlights?

MR. GENIS: Yes.

THE COURT: Next question. Do you have a question?

Q Okay. Do you see how for functional limitations in the same document --

THE COURT: I don't hear a question.

MR. GENIS: Sure.

Q Okay. You were questioned by the defense attorney about her having no problems with activities of daily living.

Does this note from Mount Sinai Hospital in July 8th of 2025 discuss that?

A Yes, it does.

Q And what does it say?

A It says that her ADLs are impacted by deficits including a prosthetic is needed for all ADLs.

Q Okay.

MS. WINTERS: Counsel, can you give me that page number, please?

MR. GENIS: Sure. That is Bates 3394.

THE COURT: And the highlights are counsel's highlights.

MR. GENIS: Yes.

Q And do you see how it says it is medically necessary for Luisa to receive a new prosthesis to continue her activities of daily living safely and independently?

A Yes, I do.

Q Okay. Sir, you were questioned in detail about a note, Plaintiff's, from 93, starting Bates 3870. I would like to address some other issues that you were not questioned about.

Let's just get to it.

We're going to go to the bottom of the page. Do you see the highlights I put on the last paragraph?

A Yes, I do.

Q Can you please explain?

A Similar to what I was trying to explain, that her present wheelchair does not meet her needs and there are needs for -- it doesn't say, but I'm reiterating a need for multiple types of wheelchair in her particular situation.

Q Does it indicate -- we're talking about cost of wheelchair. Does it indicate she paid for the wheelchair?

A Yes, because she couldn't get one that met her needs so she bought a wheelchair of her own.

Q Okay. And can you explain, you were talking about before on cross exam that she had to use one leg to push the wheelchair. Can you explain to us what is written here by this doctor?

A It's her -- because of her right upper extremity pain and back pain, it's impacting her ability to propel her wheelchair which is what I described around her house. She's relying on her husband for more and more assistance to access the rooms in her own residence. She requires power add-on to the chair which is something I didn't even put in the plan until age 55 and this is just this year. Then it's describing that she must have a properly configured chair.

Q Okay. And then we've discussed the type of wheelchair with power assist.
A Correct.
Q Is it essential?
A It is essential.
Q Okay. And then she was then referred for an optimally configured wheelchair as well that's manual, correct?
A Correct, so that would be a separate second wheelchair.
Q Okay. And then they're talking about problems because of scar tissue and certain pain.
Can you please explain that to us?
A So if you are going to have scar tissue and you have lots of donor sites, you need certain special seating so there's pressure relief on that and the chronic pain from the postural changes that we talked about so having an ability to more easily maneuver the chairs without having those forces across your back and hip.
Q I'm going to go down to equipment recommendations. You were questioned about if anybody ever made recommendations that were treating her. Can you please go through some of these?
A It's not focused, Mr. Genis.
Q I'm sorry.
Can you see it? Is that better?
A So the one-arm drive which is in the lower paragraph is

one of the ones that I was talking about earlier where there's a lever that you can use with her good arm and that would propel both wheels simultaneously, similar to one where a person who has two arms, can propel both of those at the same time. Right now, you see when you saw her using the wheelchair, she can only propel with her legs because if she would just push on one wheel, it would go in circles.
Q And, in fact, does the doctor who is treating her indicate that her disability is permanent and would require the use of a wheelchair for the remainder of her life?
A Yes.
Q And then it discussed some of the problems with imbalance, asymmetry and things of that nature?
A Yes, they do discuss similar things to what I brought up as well. And then there's the other wheelchair which is the semi-motorized wheelchair as well.
Q And did she talk about the issues in her own home in moving from room to room?
A Yes. I think we discussed that in a previous note as well, that she's relying more on her husband to assist her with that.
Q By the way, what is the role of a life care planner or physician with respect to spouses or other people providing care?
A So I mentioned briefly, you try to agree to a plan where

the person is considered to be independent and not reliant on a spouse or other caregiver. That doesn't mean that person cannot continue to help, but we don't know, nobody knows the future and whether or not that person is going to, A, want to continue to assist or, B, be available to continue to assist.

Q In fact, did the doctor here write: There is truly no alternative option for safe and independent mobility throughout her residence to access all rooms independently to perform her own care independently. Currently, she is reliant on her husband for this, but this is not a realistic option since he himself works and is not always home?

A Correct, and that goes more down the road. You know, you just don't know who's going to be with who in the future. You hope for happiness and relationship, but you just don't know. You don't know what it's going to be like so you have to strive for independence in these plans.

Q And do they then go into the length of need, lifetime, various accessories that she needs?

A Yes. Those are what you call build-ons to the wheelchair.

Q Okay. And that would include side guards, tabular armrests, footrests, handles for wheel locks?

A Yes.

Q Lap belt, recommended seating system?

A Correct.

Q And there is no less costly alternative available, correct?
A That is my opinion as well.
Q Okay. And then the justification, do you see that?
A Yes, I do.
Q Okay. And she's made every attempt to be as functional and independent as possible, however, she can't. Is that it?
A Yes.
Q Okay. Defense counsel then read from Plaintiff's 95 for February 11, 2025. I'd like to look at that same document.
She said you didn't know -- defense counsel indicated you weren't familiar with her prior history.
Do you see what's written here?
A Yes.
Q So she was a healthy, fiercely independent and active young girl. She spent most of her life at the beach with friends, modeling, participating in Zumba classes, studied architecture. She would travel often and spent a year in England where she met her fiancee, et cetera.
Correct?
A Correct.
Q Okay. She is -- and then it indicates how she's feeling very limited in her everyday activities and life, correct?
A That is correct as well which is what I point out.
Q And there was problems with her prosthesis ill-fitting,

and use of wheelchair, how she can't do, even though she's motivated to do these activities, she can't?
A Correct.
Q And then it talks about with insurance you were questioned on: Unfortunately, due to the policy language of her current insurance plan, this technology is no longer provided.
Is that correct?
A They're talking about the electrical computerized knee that she has that would allow basically for it to integrate resistance and for it to allow, as I said, those few steps if she has to quickly increase her pace, things like that, the component can be tens of thousands of dollars.
Q And it indicated she needs maximum safety and stability, correct?
A Yes.
Q And then July 30th of 2025 follow-up. Do you see how she was having bruising on the distal end of her limb and they found, with her prosthetic, her liners were excessively worn, beginning to tear. The prosthetic foot has excessive wear and tear as well. The carbon fiber of the foot was deteriorating at the toe and the shock module had excessive rotation.
What does that mean?
A That means -- it could be two things. It could be just time for a new one. It also could be that she is not landing

on the foot appropriately because it's pistoning up and down and it's not fitting properly on her stump so, therefore, it hits, the prosthetic foot, the rubberized foot will hit the ground and she's pushing off on her toe with abnormal force so, therefore, it's getting torqued onto the ground and in her shoe and it's wearing out in an inappropriate manner.

Q And does it indicate that she's now a candidate for new liners and prosthetic foot and -- new liners, yes, and new prosthetic foot, correct?

A Correct.

Q And they were still discussing the osseus integration, correct?

A Correct.

MR. GENIS: And I offer into evidence the records you got from Prosthetics in Motion with their costs and needs for prosthetic devices and that should be actually part of 97, Your Honor.

THE COURT: 97?

MR. GENIS: Yes.

THE COURT: 97 talks about photos.

MR. GENIS: Maybe I have the wrong number. I apologize.

THE COURT: Take your time.

MR. GENIS: 95. I'm sorry. Wrong number. 95.

THE COURT: 95 is in evidence already.

MR. GENIS: Yes, and this should be added to it because it's from Prosthetics in Motion, the same company.

MS. WINTERS: Your Honor, this was not disclosed or part of that exhibit.

THE COURT: 95 is in evidence. You can refer to whatever is in that document.

MR. GENIS: Okay. And may we supplement what's in 95 with the documents he was referring to that are professionally reliable from Prosthetics in Motion?

THE COURT: Let's take it one step at a time.

MR. GENIS: Sure.

Q Are those documents that you have from Prosthetics in Motion, the same company that's Plaintiff's 95, are they professionally reliable?

A In my opinion, they are.

Q And is that the type of materials that life planners such as yourself typically rely on?

THE COURT: You're testifying, not him.

So what is it that you want to adduce from the document in evidence?

MR. GENIS: It's proper to be admitted into evidence, Your Honor.

THE COURT: 95 is in evidence already.

MR. GENIS: I would like these additional documents added to it.

THE COURT: You want these additional documents?

MR. GENIS: Yes.

THE COURT: Do you have a proposed document you want in evidence?

MR. GENIS: Yes.

THE COURT: What is that proposed document?

MR. GENIS: It's the documents in front of the doctor right now from Prosthetics in Motion, the same company that is in 95, where they talk about the needs and the cost of the different devices.

THE COURT: You have a document in front of you I have not seen. Have you seen that document before?

THE WITNESS: Yes, I have.

THE COURT: Maybe you can just explain to me what that document purports to represent so I can make a ruling.

THE WITNESS: They're basically spreadsheets of costs of additional types of prostheses that she would need.

THE COURT: Is there any reason it wasn't included in the original 95?

MR. GENIS: It was in table 4.

THE COURT: It is in Document 95? I just want to get clarification.

MS. WINTERS: Your Honor, plaintiff's counsel is attempting to supplement 95.

THE COURT: It's okay. We allow that to be done

under proper circumstances. All right?

Is the document here? Let me know what that document is that you want in evidence.

THE WITNESS: So this was one of the things I used to help calculate cost.

THE COURT: What is it a document from? Is this something you made up, your wife made up or somebody else?

THE WITNESS: No. It's from Chris Kort, Prosthetics in Motion, where she gets her prosthetics made.

THE COURT: And that's a document you relied upon in your testimony?

THE WITNESS: Yes.

THE COURT: So we'll mark that as 101 in evidence. Your objection is noted.

(Plaintiff's Exhibit 101 so marked.)

Q Okay. Why so many different types of prosthetics and so many different types of wheelchairs?

A So -- well, the wheelchairs I think we discussed already but I'll go over it very briefly.

Different activities require different needs. As she gets older, she's going to need more and more power. She'll have less and less strength in the one arm left to power them. So that's that need.

A super lightweight folding wheelchair that she can get in and around in the apartment, in and out of the shower

with. One for sports. That covers the wheelchair.

And the prostheses, because there are different needs that a person, if they become better at using their prosthesis, and she had other prostheses she could work with and exercise.

THE COURT: It sounds to me you're getting a little repetitious. We heard a lot about this, but that document which is in evidence now refers to the costs of all of this. Right?

THE WITNESS: Yes.

THE COURT: Do you have any other questions to ask?

MR. GENIS: No. Thank you, Judge.

THE COURT: Do you have any recross?

MS. WINTERS: Briefly, Your Honor.

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MS. WINTERS:

Q During Mr. Genis's redirect of you, he talked about a record from Mount Sinai from July of 2025, right?

A Yes.

Q And that record references the need for Ms. Harger to have a prosthetic, right?

A Correct.

Q I think we can agree she needs a prosthetic for the rest of her life?

A Yes.
Q Do you agree with that?
A I just said yes.
Q Okay. And have you reviewed the report of Dr. Reid in this case?
A I believe I did, yes.
Q He agrees that she needs a prosthetic device, right?
A Yes.

MR. GENIS: Objection, Your Honor.

THE COURT: Overruled. Go ahead.

Q Now that document he referenced relating to her need for a prosthetic device in order to complete activities of daily living, it doesn't reference four prosthetic devices, right?
A No. He wasn't asked to opine on a life care plan. He was asked to opine on whether or not -- I don't know what you asked him to opine on.

MR. GENIS: It's the examining doctor for the defense, Your Honor.

THE COURT: Don't do it that way. Objection overruled.

Do you have any other questions?

That's a doctor about one prosthetic device is what you're saying, right?

THE WITNESS: Yes.

THE COURT: Next question.

Q Referring again to the Mount Sinai record that Mr. Genis showed you from July of 2025 of this year, it does not recommend four prosthetics, right?
A No, they're concentrating on getting her up and moving into one good prosthetic to start with.
Q And it does not specifically reference a running prosthetic?
A No. That would be absurd to give someone a running prosthetic as their only prosthetic.
THE COURT: Is there any medical records or documents that talks about the need for four prosthetics or is that just your opinion based upon what you read?
THE WITNESS: The prosthetic records.
THE COURT: Is what?
THE WITNESS: The prosthetist's records.
THE COURT: It refers to four?
THE WITNESS: Yes.
THE COURT: So you can explain to her where it shows four.
MS. WINTERS: Your Honor, we move to strike. There's been no prosthetist's record entered into evidence that indicates that.
THE COURT: You say there are records that talk about four that you relied on? What record are you talking about?

THE WITNESS: Prosthetics in Motion records from January 23, 2023.

THE COURT: Exhibit 95?

MR. SHIELDS: Exhibit 101, Your Honor.

THE COURT: Exhibit 101 that was just received in evidence talks about that?

THE WITNESS: Yes.

THE COURT: All right. It's in evidence.

Next question.

Q You were also shown by Mr. Genis a report from National Seating, right?

A Yes.

Q You talked about that pretty extensively with him on redirect?

A I don't know about extensively, but he mentioned it.

Q And it talks about the recommendation that she can have a power assist wheelchair?

A Correct.

Q And it talks about some of her issues she was having at that time, right?

A Yes.

THE COURT: Do you have a question?

MS. WINTERS: Yes, Your Honor.

THE COURT: Let's hear the question. Save all your arguments for summation. We're now to hear your questions and

get the facts out. Okay?

MS. WINTERS: Understood.

Q And that record that you went over with Mr. Genis just now, that's from January of 2023, right?

A I'd have to ask you to put it up again.

THE COURT: By the way, is this whole thing about four prosthetics, anything in your report about that?

THE WITNESS: Yes.

THE COURT: It's in your report?

THE WITNESS: Yes, not just in the tables and charts but in the report.

THE COURT: It's in your report and now Exhibit 101 also talks about that. Is that your testimony?

THE WITNESS: Yes.

THE COURT: Go ahead. Next question.

MS. WINTERS: Sure. I'm going to refresh the witness' recollection. I just need to pull up the document, Your Honor.

THE COURT: Which document do you think he needs to have his recollection about?

MS. WINTERS: Sure. The witness just testified he was not sure of the date of the National Seating record.

THE COURT: So if you're not sure, then the law allows counsel to show you, it's not in evidence, a piece of paper just for the sole purpose to see if it refreshes your

recollection so then you can answer the question you're not sure about.

What do you want him to look at?

MS. WINTERS: One second, Your Honor. I almost have it.

(Pause.)

THE COURT: This is just for his eyes alone.

Take a look at that. The question is does it refresh your recollection so you can now answer that question. Take a moment and see if you can answer the question.

THE WITNESS: I'm looking at the date. Yes.

Q So would you agree with me that that record from National Seating was from January of 2023, right?

MR. GENIS: Objection. It's Mount Sinai. It's Exhibit 93.

THE COURT: Now that it refreshes your recollection -- objection sustained.

Now that it refreshes your recollection, can you answer the question if you remember what it was?

THE WITNESS: Yes. To my knowledge, it's not from National Seating. It's from Mount Sinai Physical Medicine and Rehabilitation Department.

THE COURT: So I think I heard you clearly.

THE WITNESS: It's not from a seating company. It's from Mount Sinai Hospital.

THE COURT: So that refreshes your recollection --

THE WITNESS: Yes.

THE COURT: -- about that?

Next question.

Q This is the record you just went over with Mr. Genis, right?

A It's one of them.

Q That talked about her wheelchair needs?

A Among the many records that did, yes.

Q And you would agree that this record does not speak to what Ms. Harger's abilities are and needs are in the past three years, right?

A Well, it's from 2023 so one of the three years, well, yes.

Q In the past two years?

A Correct.

Q Okay.

MS. WINTERS: That's all I have, Your Honor.

THE COURT: I assume there's nothing else, Mr. Genis?

MR. GENIS: You're correct.

THE COURT: All right. You may step down. Thank you.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

THE COURT: All right. We have our next witness now.

MR. GENIS: Yes.

THE COURT: We're talking about having an economist testifying. Call your next witness.

MR. GENIS: At this time, we call Kristen Kucsma to the stand.

THE CLERK: Good afternoon, Ms. Kucsma.

THE WITNESS: Good afternoon.

THE CLERK: Remain standing and can you raise your right hand.

(The witness, KRISTEN KUCSMA, was duly sworn/affirmed by the clerk.)

THE CLERK: Thank you. Please have a seat.

If you can state and spell your name, please.

THE WITNESS: Sure. Kristen, K-R-I-S-T-E-N, Kucsma, K-U-C-S-M-A.

THE COURT: I can hear you very clearly. So you get the drift because somehow, the acoustics are different when I'm sitting here than maybe it is out there. So keep your voice up.

THE WITNESS: Yes, Your Honor.

MR. GENIS: May I, Judge?

THE COURT: Go ahead.

MR. GENIS: Thank you.

DIRECT EXAMINATION

BY MR. GENIS:

Q Are you an economist?

A Yes, I am an economist.

THE COURT: You don't have to talk that loud.

THE WITNESS: I'm loud, Your Honor, without the microphone so I apologize.

Q Okay. What are your qualifications to give economic analysis in this case?

A I have a Bachelor of Arts degree in economics that I received from Seton Hall University where I was graduated with highest honors. I have a Master of Arts degree in economics that I received from Rutgers University. And in addition to my Master of Arts degree in economics, I was enrolled in the Ph.D. program in economics. I had completed all of my coursework in that program at Rutgers, passed my qualifying examinations but did not have a chance to complete my dissertation.

THE COURT: So, look, we know you're an economist and, obviously, you're here to testify about how much income or money she's going to lose as a result of this incident. Correct?

THE WITNESS: Yes, Your Honor.

THE COURT: So what we're going to do now is give the jury the bottom line and then we'll back into it and

you'll explain how you came to that number. Okay?

THE WITNESS: Sure. Absolutely.

I did -- all right. I considered -- first of all, when I calculated the --

THE COURT: Before we get into what you considered, what's the bottom line?

THE WITNESS: Well, the bottom line is I calculated the total value of economic loss at between $60,076,772 and $65,812,363.

THE COURT: You got it right down to the last dollar, right?

THE WITNESS: Yes, Your Honor.

THE COURT: Now, you can explain to the jury how you arrive at that opinion and that calculation.

THE WITNESS: Sure.

I considered two elements of economic damages in my analysis.

I started by considering the impact that Luisa's injuries will likely have on her earning capacity going forward. So what I did was really compare how much she would have earned if she had been able to commence her career without any disabilities and continue her career through her retirement without any disabilities.

Then I compared to that what she may be able to earn going forward. She is employed right now. Based on my review

of Dr. Kahn's plan, I expect that she will be able to continue working for a period of time in the future so I calculated, again, the lost earning capacity.

THE COURT: How much time do you think she would be able to work? We have tables, we have ways of sort of giving opinions about that, right?

THE WITNESS: Yes, Your Honor.

THE COURT: Tell the jury.

THE WITNESS: Based on my research, based on U.S. Government data, the actual experience of a roughly 22 year old woman with a Master's degree, I expect that she would have retired if she hadn't been impaired at the age of 67.5 years.

THE COURT: All right. So you use that as the basis of coming to your ultimate conclusions, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: You may continue to explain how you did it.

THE WITNESS: Sure.

Based on my review of Dr. Kahn's plan, I learned that at least in his expert opinion, there is a likelihood that once Luisa hits age 55, she will either no longer be able to work at all going forward as the impact of her disabilities becomes more severe or she may be forced to work part-time.

So I considered how much she would earn if she was only able to work until age 55 and no further and how much she

would be able to earn if she could work full time until age 55 and then part-time thereafter to the age of 67.5.

Obviously, if she had not been impaired, I calculate how much she would have earned based on the assumption she would have continued working straight through, albeit with some possible interruptions, until age 67.5.

THE COURT: All right. So go ahead. And you came to your conclusions based upon that sense of things, correct?

THE WITNESS: Yes, Your Honor. And specifically, I relied upon U.S. Government data published through the American Community Survey and I considered how much women with a Master's degree who worked as architects typically earn and I looked at what we call the median earnings.

Those earnings data were consistent with W-2 wage and tax statements I reviewed for Luisa, pay stubs I reviewed for her, a compensation statement and so on. The advantage though of using this data is it allowed me to track, if you will, how the earnings of a young woman typically change and progress over her career. So as she gains more experience and so on, how her earnings continue to change over her entire career.

THE COURT: All right. So now, look, usually in most cases, I try to turn it over at this time the questioning to counsel here.

It's up to you. Do you want to question her now or

do you want to wait until Mr. Genis brings out more information?

MS. WINTERS: We'll wait, Your Honor.

THE COURT: You want to wait?

All right. So how much more do you have?

MR. GENIS: Not that much more, Judge.

Q With your permission, Ms. Kucsma, would it assist you in explaining how you got to the numbers, what the numbers are because I'm terrible at numbers, if we used posters for demonstrative purposes of your analysis?

A Yes.

MR. GENIS: Your Honor, with your permission --

THE COURT: This is, once again, not in evidence but just to help her testify.

MR. GENIS: Yes.

THE COURT: I will allow that once again as sort of a helpful aid. And we're going to mark that for identification purposes as 102.

MR. GENIS: Okay. I'll make a note. 102.

Q And if you'd like me to flip any pages, just tell me and I can be Vanna White.

A Okay. Great.

What we see on the first page really is just a summary of some of the things I mentioned already.

If we split to the third page, actually, that would

be the -- there's a lot of meat and potatoes here.

What we see on the top table there, that is a summary of the data that I mentioned before. U.S. Government data that shows me how much women with a Master's degree working as an architect, how much women earned in 2017 at various ages. So I was allowed to examine how much women with a Master's degree working as an architect earned when they were 25 to 29, then as they gained more experience, 30 to 34, and so on. Just a couple of things to point out.

The data that I relied upon is national data. So the first thing I did was take into account the fact that earnings in New York are typically higher than the nationwide average. So I took that national data and I increased it by 28 percent, again, based on U.S. Government data that shows me that, on average, earnings in New York are about 28 percent higher than the nationwide average.

These figures are a snapshot in time. This shows me how much women earned in 2017. So the next thing I needed to do was take into account the effects of inflation.

Not yet.

Just take into account, for example, that a 30 year old woman today in 2025 with a Master's degree working as an architect earning more than a 30 year old woman with a Master's degree who had been working as an architect in 2017. So I'm going to take into account the fact that earnings have

increased over time.

I also made several downward adjustments that you see summarized up there. I did want to take into account the fact that even if Luisa hadn't been disabled in this incident, she may have missed work now and then. She may have strained an ankle. She may have gotten the flu. She may have had children, taken time off to raise her children there. So I'm going to make a downward adjustment in each and every year to my calculations, the amount of 14.4 percent. And I am assuming that if Luisa had missed work to raise children or because she had the flu, that she would not have been paid during those periods she wasn't working.

I also made another downward adjustment each and every year in the amount of 3.3 percent to take into account the probability that Luisa may have become unemployed. She may have been laid off by one employer, she may have chosen to leave one employer to look for a better opportunity at another employer, but I certainly needed to take into account over the next roughly 40 years the likelihood that Luisa may have missed work because of injury, illness or because she was in between jobs.

I made one third and final downward adjustment and that was to take into account the fact that if Luisa had continued working or she does continue working, she will spend a fraction of her earnings on what we call job related or job

maintenance expenses. So this would be transportation to and from work and this obviously is what the expense would have been if she were not disabled, but she would have had to pay for transportation to and from work perhaps, a cup of coffee in the morning, a hot dog for lunch or whatever, and I made that a downward adjustment of 5 percent each and every year.

And then, lastly, I did take into account the fact that Luisa, as part of her compensation, does receive various fringe benefits so I actually added, when I calculated the lost compensation, I made the upward adjustment to take into account the monetary value of those fringe benefits, health insurance benefits, 401(k) plans and so on.

If you now flip to the next page, the numbers may be kind of small. These are my calculations and I apologize if you can't see them, but you will be able to see the total in just a minute, but this really just shows my calculations.

In column 4, that's where I'm calculating the gross earnings. So what Luisa's earnings would have been at various milestones, if you will, as she continued to advance in age and as she continued to gain more and more experience. Those figures represent how much money Luisa would have earned in any given year if she never missed a day of work, had no job related expenses, and received no fringe benefits.

And it is worth noting that the figures you see in column, in this column here are consistent with my review of

her W-2 wage and tax statements, pay stubs and her most recent compensation summary. So right now, she actually is receiving earnings that are consistent with the median earnings of women with a Master's degree who work as architects.

THE COURT: So let me ask this question. This is all based upon her work expectancy, right?

THE WITNESS: Yes.

THE COURT: And the number of years that she's going to, according to the tables that you use, would be able to live and work is what again?

THE WITNESS: As a woman with master's degree working as an architect, Your Honor.

THE COURT: Right. And how much longer would she have to go?

THE WITNESS: She would retire at the age of 67.5.

THE COURT: 67.5?

THE WITNESS: Yes. In the year 2062.

THE COURT: Just curious, do you take into consideration any possibilities that she may work beyond that age or that's not a factor at all that you use?

THE WITNESS: That's a great question, Your Honor. I've used the --

THE COURT: I only ask great questions.

THE WITNESS: I've used the median data which means very specifically that women with Luisa's education working as

an architect of her age, 50 percent of women in that category will actually continue working beyond the age of 67.5, and to be fair, 50 percent will retire before then. That's what we mean when we talk about the median data.

THE COURT: So you considered the fact that you could work beyond that number of years, right?

THE WITNESS: Yes. My calculations end at her age of 67.5, but it certainly would be reasonable to extend those calculations beyond 67.5.

THE COURT: People work until they're 91 but that's not a factor.

THE WITNESS: That's very true.

THE COURT: Go ahead.

Q Do you need me to go to the next page now?

A Yes. Thank you.

Here's just a summary of my calculations here.

What you're looking at at the top there is a calculation of the total amount of money that Luisa would have earned had she not been impaired and had she been able to continue working as an architect with a Master's degree until her age of 67.5. And these earnings figures also are median figures which also means that 50 percent of women with a Master's degree working as an architect actually over their working lifetime will earn more than the median figures I have and, again, to be fair, 50 percent of women in this category

would earn less.

Luisa's current earnings, however, even with her disabilities, are consistent with the earnings data for women at the median.

So if she had not been disabled and been able to continue working until age 67.5, she would have earned a total of $12,155,626. Then what I did was calculate how much money she likely will earn through the age of 55.

Remember, based on my review of Dr. Kahn's report, this is a point at which Luisa may be forced to retire altogether or maybe forced to kind of cut back and finish out the rest of her career working part time.

So through the age of 55, I calculate that she likely will earn $5,708,069 which means that if Luisa is not able to continue working after she turns age 55, then the lost earnings will be the difference between the $12,155,626 she would have earned if she wasn't disabled, minus the $5,708,069 she likely will earn until she's forced to retire at age 55.

Alternatively, if she were able -- not yet.

Q Okay.

A If she were able to continue working beyond age 55, then she would earn an additional $6,447,557 assuming she could continue working full time from age 55 through 67.5.

So, again, based on my review of Dr. Kahn's report, he indicated that if she was able to continue working at all

beyond age 55, it would be in some part-time capacity.

I wasn't -- I didn't know specifically what part-time meant, so what you see down below in this table is if she were able to work full time, she would earn $6,447,557 from age 55 to 67.5. If, for example, she is forced to work part time and she can only work about 25 percent as much as she's working now, then she would earn 25 percent of $6,447,557 which means she would earn $1,611,889.

Q Can I do it now?

A I was going to say one more thing before you flip it.

Alternatively, if she hits age 55 and she can continue working about half as much, then we would take the $6,447,557 number and multiply it by 50 percent.

So that's what you see in the bottom table there is my calculation of how much Luisa may be able to earn assuming she can continue working when she turns age 55, but she's only able to work 25 percent as much as she was working before, 50 percent as much as she was working before or 75 percent as much as she is currently working.

Now that sort of concludes my analysis of the impact that Luisa's injuries likely will have on her income over her working lifetime.

The second part of my analysis includes an analysis of the total cost of lifetime care, in other words, the total amount of money necessary to cover the cost of care that

according to Dr. Kahn, Luisa is going to need for the rest of her lifetime.

And in this regard, my job is fairly limited. As the economist, I have no opinion about what Luisa may or may not need. I'm not qualified to offer those opinions. My job though is to take into account the effects of inflation, the fact that the cost of physical therapy, the cost of x-rays, the cost of medicines, the cost of prosthetics five, ten, fifteen years from now will not continue to be the same as they are today. So what we're looking at here is just an analysis or just a summary of the various inflation rates that I applied to all of the categories of care contained in Dr. Kahn's life care plan.

Before I get into the calculations -- you can probably flip it, Bob, if you want to -- but just to give you a sense of kind of where all these inflation rates come from, I started by looking back historically and I learned a couple of things when I looked back historically.

I looked specifically at data published by the U.S. Department of Labor, I looked at various what we call consumer price index data, and consumer price index data is what the government collects and uses to calculate how much prices have increased year over year in the past and there's a lot of data. We have consumer index price data in general that helps us figure out how much more expensive it is to put food on the

table and pay our rent now compared to five or ten years ago. There is consumer price index data for eggs, for cereal, for socks and for various categories of medical care. So that's specifically what I looked at.

So the first thing I learned when I looked back historically is that the cost of medical care has increased year over year in the past and, in my professional opinion, will continue to increase year over year going forward. I also learned that the cost of different items changes differently over time. So the cost of eggs, for example, change differently than the cost of socks, toothpaste and so on.

So in order to calculate how much the cost of all of the care outlined in Dr. Kahn's plan will increase, I needed to make sure I drilled down as far as I could and picked inflation rates that were specific to services provided by physicians, prescription medications, services provided by other medical professionals like physical therapists and so on.

Now in addition to looking back historically though, I also considered projections of future inflation and future growth, projections published by the Social Security Administration, the Congressional Budget Office. I also reviewed projections published in something called the Occupational Outlook Handbook in the, or published by the U.S.

Department of Labor.

What I learned, again, by looking at these sources is that the costs of various categories of medical care will likely continue to increase year over year going forward.

Just to give you one example, when I looked at the Occupational Outlook Handbook for home health aides and home care, according to the U.S. Department of Labor, that's an industry that is expected to grow much faster than average over the next ten years. What that means to me as an economist is that the demand for those services will continue to grow, that will continue to put upward pressure on those costs, they'll continue increasing.

THE COURT: Let me interrupt because I think if I didn't interrupt, you might go on for the next four months.

THE WITNESS: Probably, Your Honor.

THE COURT: Talking is not one of your problems.

THE WITNESS: My mother would tell you I've been doing this for a long, long time.

THE COURT: We want to try to crunch it a little bit. We've heard so much.

THE WITNESS: Sure.

THE COURT: Why don't we give Ms. Winters a chance to question you if you like to do that now. You can come back later on if you wish.

MR. GENIS: If that's what Your Honor wishes, that's

what I'll do.
Q Can we just get the total number?
THE COURT: Give us the bottom line.
Q Is that on the last sheet?
A Well, actually it's on page 9.
THE COURT: I think you gave us that number before.
THE WITNESS: I gave the bottom-bottom line figure. Are we talking about the bottom-bottom line or the cost of medical care?
THE COURT: Whatever it is. I'm confused myself.
THE WITNESS: Okay.
A In the life care plan, there were two different options. One of the options included a personal assistant through age 55 and the other included a personal assistant through age 60.
When I calculated the total cost of lifetime care including a personal care assistant through age 55, that figure, taking into account the effects of inflation, amounts to $58,464,883 and the total cost of lifetime care with a personal assistant through age 60, taking into account the effects of inflation, is $59,364,806.
Q So tell us the bottom-bottom line now.
A Sure.
As I mentioned at the beginning of my testimony, when I take into account the impact that these injuries had on Luisa's earnings and the cost of lifetime care, I have

calculated the total value of economic loss at between $60,076,772, and that is based on the assumption that Luisa will continue working through age 55 and will continue working thereafter and earning about 75 percent of what she's earning now through age 67.5 and she has a personal assistant through age 55.

On the other end, I calculated the total view of economy loss at $65,812,363 and that is based on the assumption that Luisa will continue working through age 55, she will be forced to retire prematurely, and she will need a personal assistant through age 60.

THE COURT: So did you take into consideration the fact that, you know, most people have insurance for these types of things, right? And did you take that into consideration at all that some of these needs to have help might be covered by insurance?

THE WITNESS: I have not done that for really, for at least, at least three reasons, Your Honor.

Number one, I'm really not qualified to offer an opinion about what insurance may or may not cover.

Number two, my experience in New York has been that any sort of collateral sources, so if something else is going to cover some of these costs, my experience has been that that's typically handled by Your Honor in a post verdict hearing.

THE COURT: Well, let's not get into that, but there has to be a way of getting some sense as to what the collateral sources might be because, realistically, I assume that some of these expenses will be covered by insurance or whatever plans people do have to help them be able to afford these types of things when they age.

Did you take that into consideration at all in your calculations?

THE WITNESS: That is not part of my analysis, Your Honor. I have not taken that into account.

THE COURT: But realistically, is that what we're talking about? I know that we had these projected expenses but, obviously, some of them are going to be met by health insurance plans, I don't know if you call it Obamacare or Trump-care, but isn't it a realistic thing to consider when you think about the actual realistic bottom line of what it's going to cost as we age?

THE WITNESS: I will tell you, Your Honor, from an economic perspective, whether or not someone else pays for any of these costs actually has no impact on the value of the damage that was caused and the reason I say that is the value of the damage that was caused is the value of the life care plan. Whether someone else pays for some of it or not really, from an economic perspective, doesn't have an impact on the damages.

THE COURT: You seem to have some knowledge of the phrase "collateral sources." You really a very skilled person. Maybe you can explain to the jury what you mean by that.

THE WITNESS: Sure. Are you sure you want me to? Okay, Your Honor. I'll just give you my experience and tell me if I'm wrong.

Usually when we talk about collateral sources of income or benefits, we're talking about a third party, somebody sort of unrelated to the litigation here, who may pay for part of the damages there. So it could be something like health insurance if a health insurer or Medicare, for example, the taxpayers, were going to pay for some of the costs associated with the cost of lifetime care.

THE COURT: We don't know exactly what that would be but, obviously, that's a realistic factor to consider, isn't it?

THE WITNESS: More likely than not, insurance would cover some of these costs. It has been my experience though that, for example, medical -- for one thing, we don't have "universal health care" in this country despite what we hear on the news.

And Medicare, for example, has pretty strict limits on various elements of care, specifically home care. So one of the things, if you review Medicare, you will see that

Medicare very often will only cover X number of hours a week. Physical therapy actually is another category that usually has pretty severe restrictions imposed where you can only have several sessions of therapy and so on.

I don't know if many of the prosthetics in this case would be covered but, again, I'm not an insurance expert but, again, my experience has been that very often, insurers consider only what they deem is absolutely medically necessary as opposed to things that may be provided to improve the quality of someone's life or attempt to make them whole after they've suffered some catastrophic injury but, yes, to be fair, I would think some of these things would be covered by some form of insurance.

THE COURT: Any other questions?

MR. GENIS: No. Thank you.

THE COURT: Ms. Winters, do you have any questions?

MS. WINTERS: Yes, Your Honor.

THE COURT: I think I may have asked some of them for you.

MS. WINTERS: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. WINTERS:

Q Hi.

A Good afternoon.

Q It's Ms. Kucsma, right?

A Yes. Thank you.
Q I just want to make sure I get that right.
A Sure.
Q And you're being paid to offer testimony in this matter, right?
A My firm has been paid for all of the services we've provided, yes.
Q Okay. And how much are you being paid for your testimony today?
A My firm received a payment of approximately $6,000 for my appearance here today. That included my preparation for my appearance here today, updating my calculations, making the demonstrative aids and so on.
Q And you drafted a report in this matter, right?
A Yes.
Q And how much was you or your firm paid for that report?
A I don't recall off the top of my head. I would estimate approximately $7,000, give or take.
Q Okay. And did you also review records in order to prepare that report?
A I did and my review of records would have been reflected in the cost of my analysis.
Q Did you have any conversations with Dr. Kahn or any of the other witnesses in this matter in order to prepare your report or opinions?

A No, I did not.
Q And you said you've looked at some documents to prepare for today. Did you also meet with counsel for Ms. Harger?
A I did not, no.
Q Okay. And you also, you drafted a report in this matter back in January of 2023, right?
A Yes, I did.
Q And you drafted a supplemental report more recently?
A I believe so, yes.
Q Were you paid for that supplementation as well?
A Probably. I don't specifically recall. We may have been paid between 1 and $2,000 for the supplemental report.
Q Okay. And you've been paid to testify by other plaintiffs as well, right?
A Well, I'm paid for the services I provide by both plaintiffs' attorneys and defense attorneys, yes.
Q You testify almost exclusively for plaintiffs though, right?
A I am very rarely asked to testify for matters on which I was retained by defense counsel. So, typically, when I'm actually asked to testify, yes, it is for a matter in which I was retained by plaintiffs' counsel.
Q Fair to say that over 97 percent of your testimony is for plaintiffs?
A I don't know. Actually, I had a trial just last week in

upstate New York where defense had calculated it at about 94 percent but, yes, over 90 percent of the time I testify in court, it was for a matter which I was retained by plaintiff's counsel.
Q And would you also agree that over 97 percent of the time you testify at deposition, it's for plaintiff as well?
A I wouldn't agree it's 97 percent. I don't know specifically what the percentage is but, yes, I would estimate that probably 90 percent of the time I'm deposed, it also, if not more, it is also for a matter on which I was retained by plaintiffs' counsel.
Q You had to produce a list of the prior depositions you testified at in this matter, right?
A Pursuant to Federal Rule 26, I did provide a list of trial and deposition testimony.
Q Okay. And the list you provided showed depositions you testified at between January 2022 and January 2023, is that fair?
A No. The list that I prepared and provided would have been for the four years ending December 31, 2023.
Q Okay. And during that period contained in your list, would you agree that of the 260 cases listed, 257 of them were for the plaintiff?
A Again, I would not disagree with that. About 30 percent of the cases I review each year are at the request of defense

counsel but, again, defense attorneys very rarely ask me to testify either in court or at deposition for the matters on which I've been retained by them. So that would not surprise me.

Q And you've been retained by Ms. Harger's attorneys before, right?

A I believe so, yes.

Q And you've testified many times?

A In general, yes, I have.

Q And you were previously retained by Mr. Roth, Ms. Harger's counsel, in a matter named Melissa De Jesus, do you remember that?

A I actually don't. I have no reason to disagree with you but I don't actually specifically recall the case as I sit here today.

Q As part of that case, were you required to disclose the amount of times you've previously testified?

A I don't recall whether that was a federal case or not.

Q In that case, a disclosure was made on your behalf just this past September, right, just a couple of months ago?

A I really don't recall. I work on hundreds of cases every year and I've worked with thousands of attorneys so I don't recall.

MS. WINTERS: Okay. Can we pull up document 2. I'd like to just publish this document to the witness, Your Honor,

just to refresh her recollection.

THE COURT: About what?

MS. WINTERS: About her prior disclosure about the number of times she's testified in the De Jesus matter.

THE COURT: So she's going to show you a document to help refresh your recollection about how many times you testified.

Go ahead and show her.

MR. GENIS: Judge, I have an objection to collateral evidence on an extrinsic matter.

THE COURT: It's not evidence.

MR. GENIS: Well, then she wants to use it but she can't. It's improper.

THE COURT: You said you don't know exactly how many times.

Are you giving this so she can testify about how many time she's testified?

MS. WINTERS: That's correct, Your Honor.

THE COURT: I think she's trying to find that out.

A I do know that. I misunderstood your question.

Q Just to be clear, am I correct that disclosed in September 2025 that you testified in over 485 trials?

THE COURT: Let her give the answer.

Does that refresh your recollection as to how many times you testified?

THE WITNESS: Yes, it does, Your Honor.

THE COURT: With your recollection refreshed, you can now answer that question.

THE WITNESS: Sure.

A To date, I testified in federal and state courts around the country approximately 500 times, give or take, and I believe that through today's date, I have been deposed at least 900 times give or take.

THE COURT: Do you have time for dinner?

THE WITNESS: I love to cook, Your Honor. I always make time for that.

THE COURT: Next question.

Q You made a similar disclosure in this case about the number of times you previously testified, right? Do you recall that?

A In which case?

Q In the case, Ms. Harger's case.

A I don't follow your question.

Q Do you recall disclosing in June of 2023, the number of times you had testified as of June of 2023?

A I don't recall doing that. I mean what -- did I do it, in what form?

Q In your disclosure in this case.

A I don't specifically recall.

Q Okay.

MR. GENIS: Is she talking about attorney disclosure?

THE COURT: Wait a second. Wait a second.

The question is how many times did she testify? I'm not clear.

MS. WINTERS: Sure.

Q So in June --

THE COURT: She's testified that she testified a lot.

MS. WINTERS: Absolutely.

THE COURT: I mean she testifies almost every day she's awake. Okay? Next question.

MS. WINTERS: I agree, Your Honor.

Q And at the time of your report in June of 2023, you had testified in 410 trials, right?

THE COURT: I think -- look, you made your point. She testifies a lot. Okay? Next question.

Q Each of the times you testified at trial, you're paid for that testimony, right?

A Well, my firm is. None of this money goes directly to me. I am privileged to be the chief economist of a group that has about 18 team members. They all receive salaries and benefits and we have rent to pay and we're actually owned by a small --

THE COURT: Do you get paid by the amount of time

you testify or do you get a straight salary?

THE WITNESS: I get a straight salary and I do get a year-end bonus but it's not a function of how many times I testify.

THE COURT: Next question.

Q Your firm is similarly paid each time you are deposed, right?

A Yes. For any service that I or we provide, yes, my firm gets paid for those service.

Q Would you agree then your firm has been paid millions of dollars over the course of your career for your deposition and your trial testimony?

MR. GENIS: Objection.

THE COURT: They make a lot of money, right?

THE WITNESS: They do and I don't own any of it. There are four or five people that own my firm so I think they make a lot of money, Your Honor.

Q I think we've established that you're pretty experienced at testifying.

MR. GENIS: Objection to form.

THE COURT: Look, look, let's not be silly. Ask a substantive question. Come on.

MS. WINTERS: Absolutely.

Q Now, you just started testifying a bit with Mr. Genis about your life care plan in this matter, right?

A Well, yes. It's not my life care plan, but I did talk about the analysis I performed, yes.
Q About the life care plan that was submitted by Dr. Kahn, right?
A Yes.
Q Okay. And a significant portion of your damage in this matter rely on that life care plan, right?
A Well, I did rely upon his expert opinions with respect to what Luisa will need for the rest of her lifetime, yes.
Q And I know you had a lot of opportunity to testify with Mr. Genis. I would just ask -- I'm going to try to move this along. I'm going to ask "yes" or "no" questions. If possible, try to answer with a "yes" or "no." Okay?
A Sure.
Q And the only source you rely on for what Ms. Harger's present and future medical and life care needs are is Dr. Kahn, right?
A Yes.
Q And you're not a medical expert as you mentioned before?
A That is correct, I'm not.
Q And you're not opining on whether or not these future medical projections from Dr. Kahn are reliable and accurate, right?
MR. GENIS: Objection.
THE COURT: Overruled.

You're relying on his report; you got the information from him and you went from there, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: The jury understands.

Q Okay. And you also rely exclusively on Dr. Kahn for the cost he assigns to each of these care needs or devices, right?

A Yes.

Q Okay. So if Dr. Kahn said Ms. Harger needs --

THE COURT: It's argumentative. Next question.

Q Let's assume for a second that you received a life care plan that said, you know, Ms. Harger needs 30 wheelchairs at a cost of $10,000 apiece. You would not yourself investigate whether or not she needs 30 wheelchairs, right?

MR. GENIS: Objection.

THE COURT: You relied upon his report; you didn't do any separate examination of those figures or anything else like that, did you?

THE WITNESS: Correct. I'm not qualified to do that.

THE COURT: She says she took it from the report.

MS. WINTERS: Understood, Your Honor.

Q And you're aware that Dr. Kahn's report makes projections beginning in 2022, right?

A I believe that's when he prepared his report, yes.

Q Okay. And you've not looked at anything over the last

three years to check whether or not those projections of her medical needs turned out to be true over the last three years, right?

MR. GENIS: Objection.

THE COURT: Overruled.

So you just took it from his report that ends in 2022; I think that's what you're saying, right?

THE WITNESS: Yes.

THE COURT: You don't know anything subsequent to that time, do you?

THE WITNESS: I have not reviewed any medical records whatsoever.

THE COURT: You got your answer. Go ahead.

Q And you didn't speak to Ms. Harger yourself about what her abilities are, for instance, whether she's able to ambulate throughout the community or anything like that?

MR. GENIS: Objection.

THE COURT: Did you talk to her at all?

THE WITNESS: No, Your Honor.

THE COURT: Next question.

Q And you've not yourself investigated whether or not she has vocational needs that are impacting her work, right?

MR. GENIS: Objection.

THE COURT: She said she took it only from the report. Next question.

Q In order to have a valid economic report, would you agree that it's important to use data that's reliable?
A Yes. All of the data I relied upon is reasonably reliable and generally accepted by economists and forensic economists.
Q And it's important for that data that you rely upon to be credible?
A Yes.
Q Okay. But you yourself have not researched the reliability or credibility of Dr. Kahn's opinions, right?
MR. GENIS: Objection.
THE COURT: Sustained.
Q So as it relates to the life care needs set forth in Dr. Kahn's report, you're doing calculations only, right?
A Yes. As I said, my job is fairly limited on taking into account the effects of inflation.
Q Okay. So if the life care plan that Dr. Kahn provided you told $500,000, you would just apply inflation to that number, right?
MR. GENIS: Objection.
THE COURT: Overruled.
So you take the number and then do you do anything with the numbers that he provided?
THE WITNESS: I relied upon the base costs provided by Dr. Kahn in his life care plan and then starting in 2025, I

calculated what the inflation will be each year going forward.
Q Okay. So if the jury were to determine that aspects of the life care plan are not consistent with Ms. Harger's medical needs --
THE COURT: That's an improper question. You are going to have a problem so I'm not going to let you complete it. Go ahead. Next question.
Q In order for the jury to accept your appraisal, they have to accept the life care plan as well, right?
MR. GENIS: Objection, Your Honor.
THE COURT: Save it for your summation if you want to do that. That's not a question. Next question.
Q Have any of your opinions ever been precluded by a court of law?
A In totality?
Q Have you ever been precluded to testify?
THE COURT: Of all the testimony you've given, she wants to know whether a judge ever said that, you know, they don't believe it or they discounted it or you sort of were not credible. That's what she's trying to find out.
A Not to my knowledge, no.
Q You were retained in a matter called Jackson versus Mattis, correct?
A I don't recall that case at all.
Q Okay. Let me cull up --

THE COURT: Why don't you ask a question and then we can see whether you have to go forward.

MS. WINTERS: Absolutely.

Q Do you recall your testimony being excluded and your opinions being excluded in a matter called Jackson versus Mattis in 2020?

MR. GENIS: Objection.

THE COURT: Sustained.

You said you have no recollection of ever being, having your testimony excluded, I think was your testimony, right?

THE WITNESS: Yes, Your Honor.

THE COURT: She wants to show you a document. You say you have no recollection.

She has no recollection. You can show her a document to refresh her recollection if it's possible.

MS. WINTERS: Sure. If we can bring up document 4.

And this is just being shown to the witness, right, Your Honor?

THE CLERK: Yes.

MS. WINTERS: Thank you. And we can scroll through it for the witness so she has an opportunity to review it.

THE COURT: She's showing you a document. Take a look at it. The question is whether it refreshes your recollection that any of your testimony has been questioned or

excluded.
A I don't recall this case.
Q Let's --
THE COURT: So the answer is it doesn't refresh your recollection?
THE WITNESS: No, Your Honor.
THE COURT: Okay.
MS. WINTERS: Your Honor, at this time, we'd move to have it brought into evidence for impeachment purposes.
THE COURT: I'm not going to allow that. She said it doesn't refresh her recollection, and we don't go forward. Go ahead.
Q One of the aspects of your projection of Ms. Harger's future lost potential earnings is that you apply a 3.6 percent multiplier year over year for those earnings, correct?
A Well, it's not a multiplier. That's the inflation rate. Yes, that is an average yearly increase in her earnings.
Q So each year, you multiply the prior year's earnings by 3.6 percent, correct?
A Yes. I did increase, on average, the earnings by 3.6 percent a year.
Q And that 3.6 percent number that you rely upon, that is a number created by OASDI, right?
A No. That figure is based on my review of several sources of information. One is information published by the Social

Security Administration which is what you're referencing. I also considered projections published by the Congressional Budget Office. I also reviewed historical data published by the U.S. Department of Labor and then I also took into account other economic factors that will likely have an impact on wage growth going forward.

Q And that 3.6 number is not derived from a study of the actual historic growth of the U.S. economy, right?

MR. GENIS: Objection.

THE COURT: If you can answer that.

A It is based, in part, on historical data, but in my professional opinion as an economist, it is not appropriate to rely only on historical data.

To assume that the next 20, 30, 40 years will mirror the last 10, 20, 30 years, in other words, assuming the next 10, 20, 30 years will look exactly like the last 10, 20, 30 years is simply not consistent with economic practices and principles, but there is value in looking back historically and that is certainly one source of information I considered.

Q Okay. And that 3.6 percent number also is a number that's supposed to be projecting the wage growth across all sectors of the U.S. economy, right?

A The projections of future wage growth that are available are not occupation specific. The historical data I reviewed is specific to architects and engineers.

Q So the 3.6 number is not specific to the wage growth of architects, right?
A Some of the data upon which that is based is specific to architects but, to be fair, the projections published by the U.S. Government are not occupation specific.
Q And you don't rely on any projection of wage growth specific to architects in forming your opinions?
A I'm not aware of any reasonably reliable economic projections of earnings for architects.
Q In assessing Ms. Harger's future earnings, however, you do rely, in part, on the national average for architects, right?
A The -- for what?
Q For the salary of architects.
A Specifically, I used, as my starting point, the median earnings for women with a Master's degree who work as architects, yes. That data is available according to occupation.
Q And that national average that is your starting point encompasses all architects across the United States, right?
A Well, it's not an average. It's a median. And those are different but it does include all women with a Master's degree working as architects excluding, it doesn't include Naval architects.
Q Okay. It does include New York, however, right?

A The national figure, yes, it's based on all 50 states so, certainly, New York would be represented in there, yes.
Q And you selected the median of this national average for the starting point of your calculation of Ms. Harger's future wage projection, right?
A Well, no. I used the median data, not the average data, but I did use the median earnings data which is consistent after I adjust it for New York with her actual earnings. I reviewed pay stubs of hers, W- 2 wage and tax statements of hers, a compensation summary, and my calculations, based on the statistical data, are in line with what she has actually been earning.
Q That gets to my next point.
So her actual earnings as you reviewed them at the time were consistent with that median number, right?
A Yes.
Q And that median number incorporates New York into the assessment, right?
A Yes.
Q Okay. But, nonetheless, you still applied a 128 percent multiplier to her earnings to account for New York, right?
MR. GENIS: Objection. Mischaracterization as well.
THE COURT: I don't know if you understand the question. You know, can you answer it so we can move on?
THE WITNESS: Sure.

A The earnings after the adjustment for New York, those earnings figures are consistent with Luisa's actual earnings.

So after I take the nationwide data, take into account the fact that earnings in New York are higher, and then take that figure, that is consistent with based on my review of Luisa's pay stubs and her compensation summary she has, in fact, been earning.

Q No one's claiming that Ms. Harger presently can't work, right?

MR. GENIS: Objection.

THE COURT: That's not a question. Next question.

Q Is anyone claiming that Ms. Harger can't work right now?

MR. GENIS: Objection.

THE COURT: Sustained.

We've heard testimony about her ability to work and we're going to hear more testimony, I suspect, as well. She's not here for that purpose.

Q And one of the things you noted in your report was that in the year 2022, Ms. Harger was actually able to work well enough to earn a $9,000 bonus, right?

MR. GENIS: Objection. She's reading something --

THE COURT: Sustained.

We don't have reports in evidence. We don't do that. You can ask her a question. If there's anything that she testifies to that's inconsistent with what she said under

oath or in a report, I'll allow you to explain that and go further. Ask her the question though. Don't lead with something that's not in evidence.

Q Did you have Ms. Harger's salary and bonus information for 2022 when you formed your opinions in this matter?

A I did have some pay stubs, yes, that had a breakdown of salary, bonus and so on.

Q Okay. And included in that material that you reviewed and relied upon before forming your opinion in this matter was a reference to a bonus that she earned in 2022 for performance at her jog, right?

A I believe so, yes. I don't specifically recall the number but, yes, I believe she received a bonus.

Q Does 9,000, approximately $9,000 sound correct to you?

THE COURT: How much was the bonus, if you know?

THE WITNESS: I don't recall, Your Honor.

THE COURT: Well, all right. So we can say $9,000; you're making that representation so we don't have to waste any time?

MS. WINTERS: Absolutely. I will say it was slightly below 9,000.

THE COURT: 9,000. Go ahead.

MS. WINTERS: Understood.

THE COURT: She had a $9,000 bonus.

MS. WINTERS: Okay.

Q And your entire lost earnings projection in this matter is based on the assumption that Ms. Harger's ability to work will be reduced at age 55, correct?

MR. GENIS: Asked and answered, Judge.

THE COURT: Well, I think she's asked her that, yes. Next question.

Q You're not a vocational expert, right?

MR. GENIS: Asked and answered.

THE COURT: She's not a vocational expert. Next question.

Q And no treating provider for Ms. Harger has ever opined that she will need to reduce her work or need to reduce her work at 55?

MR. GENIS: Objection.

THE COURT: You don't know anything about that, do you?

THE WITNESS: I have reviewed no medical records, Your Honor.

Q So you relied exclusively on Dr. Kahn --

THE COURT: She said that many times.

Q And in Dr. Kahn's report, he doesn't actually opine on to what extent her actual employment capacity will decrease after age 55, right?

MR. GENIS: Objection to form.

THE COURT: Sustained as to the form of the

question.

Do you have any knowledge about whether or not in your calculations, you considered whether her, what, her future employment will be diminished or her salary? Is that what you're asking?

MS. WINTERS: A little different, Your Honor. I can try to ask it differently.

THE COURT: Try to go on to something else.

Q So you relied on Dr. Kahn's opinion that Ms. Harger's employment capacity will reduce after age 55 in order to form your lost earnings projections in this matter, right?

MR. GENIS: Objection. Asked and answered.

THE COURT: Overruled.

Did you rely upon that? I think you said you did.

THE WITNESS: My calculations, yes, are based on Luisa's disabilities having a more severe impact or, yes, when she reaches age 55.

Q Okay. But Dr. Kahn didn't actually project that, for instance, she would only be able to work 25 percent, right?

MR. GENIS: Objection.

THE COURT: Sustained.

Q Was there any document that you actually relied upon, any testimony from Dr. Kahn that you relied upon that actually says that her capacity to work will be reduced by 75 percent after age 55?

MR. GENIS: Objection.
THE COURT: I'll allow that.
A I believe what he said was that assuming she could even continue working beyond age 55, she would likely need to work part time.
THE COURT: And you relied upon that?
THE WITNESS: Yes.
Q And he did not specify 25 percent, right?
MR. GENIS: Objection.
THE COURT: You know when you talk about part time, 75 percent, 25 percent, I don't know. Maybe you know.
THE WITNESS: I don't know specifically, Your Honor, which is why I provided a range there, 25 percent, 50 percent, 75 percent.
THE COURT: Because you didn't have that knowledge, you provided a range, right?
THE WITNESS: Yes.
Q It could have been 5 percent though, right?
MR. GENIS: Objection.
THE COURT: It could have been anything, right?
Next question.
Q Is that right, it could have been anything?
MR. GENIS: Objection.
THE COURT: No, she answered that question. She said she didn't have that knowledge, she provided for a range.

You can't do better than that.

What is that range based upon, just your experience, your guess or what?

THE WITNESS: What I did specifically, Your Honor was I selected that range based on Dr. Kahn's testimony about, you know, part time which typically means somebody can work about half of what they were working before, but I did specifically note that if Luisa had been able to work full time, she would earn $6 million --

THE COURT: We're talking about how do you calculate the part time aspect of it.

THE WITNESS: Right.

THE COURT: You just assumed 50 percent, 25 percent. That's what we're trying it find out.

THE WITNESS: Yes.

THE COURT: What did you base that range on? Simple question.

THE WITNESS: Just based on my usual experience, part time is usually 20 to 25 hours per week typically.

THE COURT: Based upon your experience in the 17 million times you testified?

THE WITNESS: Yes, Your Honor.

THE COURT: Next question.

Q And but there's no scientific authority that supports the proposition that Ms. Harger --

THE DEFENDANT: That's argumentative. She's given you the facts. Go ahead.

Q And there's no document in the record that you can point to that actually --

THE COURT: She said -- she already testified. You're beating it to death. She said it's based on her experience, et cetera, et cetera. The jury has heard it all.

MS. WINTERS: Thank you, Your Honor.

THE COURT: Any redirect?

MR. GENIS: No.

THE COURT: Well, because you talk fast, we don't have to stay here until 5 o'clock.

THE WITNESS: I hope it wasn't too fast but thank you, Your Honor.

THE COURT: All right. You're excused.

(Witness excused.)

THE COURT: Is there anything else we can do today or should we call the next witness?

MR. GENIS: I can very briefly recall Dr. Kahn to ask him one question.

THE COURT: You can do that.

MR. GENIS: Thank you.

THE COURT: I'll let you do that.

MR. GENIS: Thank you.

(The witness, STUART KAHN, having been previously

sworn, resumed the stand.)

THE COURT: Do you know the one question he's going to ask you?

THE WITNESS: Not specifically.

THE COURT: Because I told you not to talk to counsel.

What's the question?

FURTHER DIRECT EXAMINATION

BY MR. GENIS:

Q When you gave the projections for cost of future care, what, if anything, is covered by insurance, what, if anything, is not?

A I don't think anybody can predict what type of health care insurance someone would have in the future.

MS. WINTERS: Your Honor, we would object. This is not included in his opinion.

THE COURT: No, I'll allow it. We want to get to the bottom of this.

Do you have any idea about, in your projections, whether you considered insurance or anything of that nature?

THE WITNESS: Certainly in my projections, I did not consider insurance, but it's my experience as a treating physician --

THE COURT: Well, you did not consider insurance. Is there a reason why not?

THE WITNESS: Yes. The reason why I didn't consider insurance is for several reasons.

One, it's not known if she'll have coverage. We don't know the nature of the coverage in the United States going forward.

THE COURT: You say it's speculative. Is that what you're saying?

THE WITNESS: Yes.

THE COURT: You don't know what's going to happen in the future, right?

THE WITNESS: Correct.

Most of the items in the life care plan such as advanced prosthetics, most of those components are not covered. As we've already seen, she's been denied some of that componentry by her present private, good quality insurance. They certainly aren't going to allow for multiple prosthesis. Home care is almost never covered by private insurance and Medicare certainly covers extremely little home care only after you're hospitalized for about three weeks so that's not covered. Transportation costs aren't covered, things like that.

In the New York City region, it's virtually impossible to, in my opinion as a physician referring other patients to psychologists and psychiatrists, it's very hard to find people who are in network on those plans. So the

majority of these costs are considered and measured for out of network.

What I do to mitigate that is my methodology is coming up with costs using various data, published data through this Fair Health company, through using hospitals' published costs bringing down what the average person would actually pay for private care, not what the charges are, which makes it a little bit fairer and a little bit less.

THE COURT: I guess we really don't know what the future is going to be. The government is kind of like up and down and in and out. We have no way of predicting, I imagine, what health care coverage would be in the future, but you did base it upon what you explained to the jurors now, that was your best way of dealing with it?

THE WITNESS: Yes, Your Honor.

THE COURT: So the jury understands.

MR. GENIS: Thank you.

THE COURT: Any further questions, Ms. Winters?

MS. WINTERS: I'm just going to do it from here, Your Honor, if that's okay.

THE COURT: Yes, sure.

FURTHER CROSS-EXAMINATION

BY MS. WINTERS:

Q Did you consider at all in your assessment what, if any, devices or care you recommended would be covered by Ms. Harger

in Brazil?

MR. GENIS: Objection.

A No, she's presently living --

THE COURT: He can answer that question.

A No, I did not consider that.

MS. WINTERS: That's all, Your Honor.

THE COURT: You may step down. Thank you very much.

(Witness excused.)

THE COURT: Am I correct in assuming that we've gone as long as we can go today?

MR. GENIS: One second, Your Honor.

THE COURT: Do you have anybody else?

MR. GENIS: That's it, Judge.

THE COURT: No other witnesses today?

MR. GENIS: It doesn't --

THE COURT: It's okay.

You know, we had a full day even though we started late because of me and we still accomplished a lot. You heard a lot of testimony. You heard a lot of expert opinions back and forth. It's all for you folks to consider. And as I mentioned before, you will be able to look at anything you want to if you want to look at any documents during your deliberations.

I've tried to be careful to identify what the exhibits are. It would be yours to look at. We'll give you a

list of all the exhibits. You can call for them if you want to see them. And you can also have the testimony read back.

So if you're a little bit confused about all of that or you don't remember it all, it's all here. Part of my job is to make the best, clear record that I can do, okay, so to help you folks out.

All right. I think we're going to see you on Monday the 10th and Tuesday the 11th and maybe Wednesday the 12th and possibly the 13th.

So I think that when you return, that's going to be a pretty important full week. Probabilities are that you'll be getting the case sometime during that week. Don't make any plans because you don't know how long it's going to take to complete this trial. We know it's not going to be months. We know it's going to be probably during that week and we have no idea how long your deliberations are going to take. Nobody knows that. Right?

So just stay the way you have been, perfect jurors, you've been excellent, and I'll try to get here on time the next time we come to court.

See you on Monday, 10 o'clock, November 10th. Enjoy your week. Don't talk about the case.

(Jury exits.)

THE COURT: The jury is out.

Look, this is a real trial. All of you are doing a

really good job, professional, representing your clients as zealously as you ought to represent them and I respect that a great deal. I'm trying to do my job. Okay? So we're all doing the best we can and you've done a great job.

So we're going to see you next, I guess, 10 o'clock on the 10th of November. Give me a little bit of an idea of what we have in store for us on that day and on the 11th as well if you can.

MR. ROTH: We're going to have two experts on Monday. We're going to have the accident reconstructionist and the transportation expert, a train operator, Mr. Mendez. I've exchanged who it's going to be with defense counsel. I told them ahead of time so they would be able to prepare.

We're going to fill in with George Brown who's the husband. He's probably going to go that day to fill in. If there's any -- what we've done if there's any extra time, he's right there to fill it.

THE COURT: So Mr. Brown will be available.

MR. ROTH: Yes, Mr. Brown will be available Monday.

Then we'll have spillover witness on Tuesday. Ms. Harger is probably going to testify on Tuesday. Her boss, supervisor, Mr. Kevin Moring, is probably going to testify on Tuesday. Maybe --

THE COURT: So what I'm trying to hear from you is you're sure you're likely to wrap up your direct case on

Wednesday.

MR. ROTH: Yes, on Wednesday.

THE COURT: So you have a good idea. You have a whole week to prepare so you're not going to be caught short.

You have some witnesses also possibly, I suspect?

MR. KEAVENEY: Yes, Your Honor.

Just to confirm, we will be sitting that Friday, correct?

THE COURT: I haven't made that decision yet. I'm willing to listen to what you would like.

MR. KEAVENEY: Just in terms of scheduling my experts.

THE COURT: Yes.

MR. KEAVENEY: So that's really why. If we're going to sit on that Friday, I'll schedule some for that Friday. If not, we'll do the following Monday.

THE COURT: So, you know, I'm getting a sense that maybe we're going to go over into the following week and the reason why I need to know that is because I have a criminal trial backed up here. Believe it or not, this isn't the only case I have to deal with. And as a courtesy to those folks, I have to let them know what realistically they can expect.

So if we're going to finish the direct case on Wednesday, we can start the defense case on Wednesday, I suspect?

MR. KEAVENEY: Either Wednesday or Thursday morning, I would think.

THE COURT: So I'm going to want to sit on Friday because I have a criminal trial backed up.

MR. KEAVENEY: Okay. So then I'll make arrangements for witnesses on Friday also.

THE COURT: Yes. And is it realistic that we can complete the defendants' case by the end of Friday?

MR. KEAVENEY: It's possible to complete it. I don't think we would get to summations though.

THE COURT: I'm not saying you will, but I'm just trying to get a sense of it.

So it may be that summations will happen on Monday which is okay, not a bad thing, and the case will go to the jury sometime on Monday. That tells me a great deal.

The other thing I want to you do in terms of your homework assignment, you have plenty of time to reflect -- I think the timing is pretty fortunate, in a way, because you don't want to rush, as the saying goes, to judgment, this is a big case -- the question of qualified immunity.

I'm going to give you some questions perhaps tomorrow, the next day, about what we think the questions are that the jurors should answer in respect to qualified immunity and then you folks can have an opportunity, you have the whole week to let me know whether you agree or whether you want

other questions to be asked or questions not to be asked.

So that's your homework assignment because as I look at this case, qualified immunity is terribly important, and we have to make sure we ask the right questions to the jurors.

So I'm going to take the first shot and tell you what I think possibly we should think about and I'm going to listen to you folks as well. You may agree with everything I have. You may not. I'll carefully consider your suggestions. We have ample time to wash that all out to make sure we have it down perfectly which is critical because all the other testimony, the jury has heard a lot from me but they'll be able to assess it, but if we don't ask them the right questions of qualified immunity, that can be a real sticking point. We have to make sure we get that down correctly. Okay?

What else can I talk about today?

MR. KEAVENEY: Will that be e-mailed or on the docket?

THE COURT: Well, we're going to e-mail it. We'll communicate with you.

MR. KEAVENEY: That's okay.

THE COURT: Off the record.

(Discussion off the record.)

THE COURT: Anything else you want to talk about on the record?

MS. WINTERS: The only thing was we had submitted the curative instruction.

THE COURT: I'll give the instruction.

MS. WINTERS: Okay.

MR. SHIELDS: Judge, we oppose.

THE COURT: Doesn't matter. You can oppose it, but to me, I'll give it to you, you want it, make them happy.

MR. GENIS: I just object because in the request, they're accusing me of impropriety.

THE COURT: Don't worry. Every day I get accused of all different things. It's not an offensive instruction. The jury will know what I'm talking about. It's not going to be a big deal.

MR. GENIS: Because there was nothing improper. It was a prior sworn affidavit --

THE COURT: You know, from defendant's side, it's okay. Look, if I give it to them, you're not going to have a hard time getting a reversal, right?

All right. See you Monday, the 10th of November.

MS. WINTERS: Thank you, Your Honor.

MR. GENIS: Safe travels.

THE COURT: Thank you very much.

(Matter adjourned to November 10, 2025 at 10 a.m.)

# I N D E X

WITNESSES:


STUART B. KAHN

| | |
|---|---|
| DIRECT EXAMINATION BY MR. GENIS | 662 |
| CROSS-EXAMINATION BY MS. WINTERS | 667 |
| DIRECT EXAMINATION BY MR. GENIS | 674 |
| CROSS-EXAMINATION BY MS. WINTERS (Cont'd) | 725 |
| REDIRECT EXAMINATION BY MR. GENIS | 783 |
| RECROSS-EXAMINATION BY MS. WINTERS | 803 |
| FURTHER DIRECT EXAMINATION BY MR. GENIS | 856 |
| FURTHER CROSS-EXAMINATION BY MS. WINTERS | 858 |

KRISTEN KUCSMA

| | |
|---|---|
| DIRECT EXAMINATION BY MR. GENIS | 811 |
| CROSS-EXAMINATION BY MS. WINTERS | 830 |


## EXHIBITS:


| | |
|---|---|
| Plaintiff's Exhibits 82, 83, 84, 85, 86, 87, 88, 90, 91, 92, 93, 94 and 95 | 662 |
| Plaintiff's Exhibit 97H | 691 |
| Plaintiff's Exhibit 101 | 802 |
| Defendants' Exhibit UU | 780 |


* * * *

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - - - - - - - X

LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

\- against - : United States Courthouse
Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, : November 10, 2025
10:00 a.m.

Defendants. :

\- - - - - - - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants: LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, New York 10271
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

Court Reporter: Andronikh M. Barna
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2178

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(In open court; parties present.)

THE COURTROOM DEPUTY: Civil cause on trial, Harger Da Silva versus New York City Transit Authority.

I believe all Counsel are present. You can all be seated.

THE COURT: Good morning, everybody. I hope you all had a nice time while I was flying back and forth to California. And we're all here, healthy and ready to go.

Now, we have some logistical problems. I just spoke to the jurors, not about the case, only about their plans. And one of the jurors is scheduled for an operation next Monday. And that's why I wanted to sit tomorrow. But the higher authority said no, and that it would be unpatriotic, and we can't close the court, the courtroom is closed, you can't come. Because of that, we're going to be lapping over into next week obviously now, right? So one of the jurors is scheduled for an operation on Monday. She will have to be excused, and we're going to be going with seven jurors. So that's why we pick a couple more than six so we have that flexibility.

It's the juror who is in seat number --

THE COURTROOM DEPUTY: Number seven, Your Honor.

THE COURT: Number seven. All right? So when she comes in here, I'm going to excuse her and thank her publicly for her service. And I just wanted to let you know that

that's what we have to do.

The others are okay. All right?

All right. So let's bring the jurors in now.

Who do we have as your next witness? Bring him in now so we can have him ready to go.

MR. ROTH: Mr. Jimenez, go up to the stand, please.

Can you hear me, Your Honor?

THE COURT: Yes.

MR. ROTH: I thought before we started, I made a list because there is a lot of exhibits that are going to be used.

THE COURT: Bear this mind: We're on the record now.

MR. ROTH: Okay.

THE COURT: You don't have to say more than you have to say and burden our wonderful reporter having to write everything down. She doesn't have to do that.

MR. ROTH: Do you want to go off the record?

THE COURT: If there's any problem, you let me know, but if there's no problem, let's just start questioning the witness.

MR. ROTH: I have -- there's approximately 40 exhibits.

THE COURT: You want this on the record?

MR. ROTH: Yes.

THE COURT: What is your concern?

MR. ROTH: That there's approximately 40 exhibits that we're going to be entering today.

THE COURT: 40?

MR. ROTH: 40, yes, approximately.

THE COURT: You have them all identified here?

MR. ROTH: Yes, they're all identified. I made a list for you so you can mark. I can hand it up. And none of these are objected to at this time.

THE COURT: Okay. So I have my master list that I am keeping here.

MR. ROTH: And I could hand you a list, the same list, and you can look at it and mark your list.

THE COURT: Is it any different than what I have?

MR. ROTH: Only to the extent that it's going to be -- if you want to circle what is now entered into evidence. It's not different. It's the same, but, you know, because.

THE COURT: Give me whatever you want, but I'm going to use my list as the master list.

MR. ROTH: Do you want me to read the numbers then?

THE COURT: Pardon?

MR. ROTH: Should I read you the numbers?

THE COURT: No, you're going to go off of this list. I have them 1 through 90 -- to 102. That's how I have them identified.

MR. ROTH: Okay. So I don't have to worry about formally entering them into evidence or anything else.

THE COURT: That's why we had this enormous time we spent at our conferences, to avoid exactly that. You have exhibit number, you can refer to it, there's no objection, it's in evidence. Okay?

MR. ROTH: Okay.

MS. WINTERS: Your Honor, just to be clear, we would still like Counsel to publish the document to us before it's moved in because for some of the documents they seem to be moving in only portions of the documents.

THE COURT: I have no idea. All right?

You want to show her anything you want to put in evidence now, let her take a look.

MR. ROTH: I e-mailed it all to her last night, Your Honor, every document.

MS. WINTERS: At 12:30 this morning.

MR. ROTH: That's true.

THE COURT: Just one second. We don't do this. We do not have this type of cross-conversation on the record. All right?

You want to just talk off the record to your adversary?

MS. WINTERS: We spoke off the record, Your Honor. We advised him that we need to be able to review the exhibit

because they are attempting to move in portions of documents whereas we stipulated to the whole document.

THE COURT: If there is any problem, you're not going to introduce those exhibits at all. I expected you to wash all this out between the two of you so we don't have to do what we're doing now.

Let's bring the jurors in. We'll proceed.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: So, good morning, folks.

So I told the lawyers that I spoke to you briefly about our plans. And as I mentioned to you just briefly before you came into the courtroom, we can't sit tomorrow. I was hoping we would be able to do that, but, you know, we're not allowed to do that tomorrow. And the reason why is because I was wanting to try to have the case completed this week. We can't do that now. So it's going to lap over to next week. And maybe Monday, Tuesday it will be finished, you know, the beginning of the week, I suspect. I suspect that I will be giving the case to you folks, you know, maybe Tuesday, maybe Monday. Certainly not later than Wednesday. That's the way I anticipate the case unfolding.

Now, Juror Number 7 has a problem, and I feel badly that we could not accommodate it. We tried our best to get

this done before next Monday, but you have a serious medical issue that requires you to take care of and that takes priority over everything else. So we picked eight jurors because under the law we have to have at least six. So I always pick a few more just in case something like this happens. So, we can go with seven. And the rest of you folks have told me that you're okay; you have to be available next week and for at least part of it, maybe the whole week, but just make sure that you have nothing that's going to interfere with your deliberations once they start because nobody knows, once the clock starts, how long it's going to take. We don't want anyone to be under any pressure because they have some conflict with their personal lives, and all I can do is just tell you about this. You've been excellent jurors.

But in the meantime, I just want Juror Number 7 to make sure that you're going to be properly taken care of on Monday and hopefully everything will work out for you, and I think we all wanted to express our gratitude to you that you have sat during the trial so far and paid great attention. And I don't want you to talk about the case to anybody in this courtroom. You can go home and talk all you want to now because you're being discharged. But make sure that in case you run into any of your fellow jurors, you just don't say anything. Okay?

JUROR NO. 7: Okay.

THE COURT: Thank you very much for your cooperation and for your service to our great country. You can be excused now.

THE COURTROOM DEPUTY: All rise.

(Juror Number 7 excused.)

THE COURTROOM DEPUTY: You can be seated.

THE COURT: All right. Mr. Roth, call your next witness.

MR. ROTH: I call Orlando Jimenez.

(Witness takes the stand.)

MR. ROTH: Mr. Jimenez, before we start your testimony, I would like to play the 9-1-1 call, Exhibit 72.

THE COURT: All right. So this is a 9-1-1 call.

Just one second, let me catch up to you. I think this is November 4th, right?

THE COURTROOM DEPUTY: Should I swear in the witness?

THE COURT: Yes.

THE COURTROOM DEPUTY: I ask the witness, if you can remain seated and if you could just raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Please state and spell your name and keep your voice up.

THE WITNESS: My name is Orlando Jimenez. O-R-L-A-N-D-O, J-I-M-E-N-E-Z.

THE COURTROOM DEPUTY: Thank you, Mr. Orlando.

THE COURT: Now, you wish to offer in evidence the 9-1-1 call?

MR. ROTH: Yes, Your Honor.

THE COURT: What number is that?

MR. ROTH: Exhibit 72.

THE COURT: Exhibit 72.

All right. So members of the jury, as I've told you, you know, we've paid a lot of attention to screening this before so we don't have to waste unnecessary time. And there's a 9-1-1 call, which is not objected to, which I'm going to allow you to hear at this particular time.

You want to lay a little groundwork for us, so the jury knows why he is testifying?

MR. ROTH: Sure.

**ORLANDO JIMENEZ**, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Jimenez, you're here because you're a former train operator for the New York City Transit Authority; is that correct?

A That is correct.

Q And you're a trainer and you were a union representative; is that correct?

A That is correct.
Q And you're going to be offering testimony about the manner in which this accident happened as well as --
THE COURT: Go a little slower.
So what is your connection with the Transit Authority, Mr. Jimenez?
THE WITNESS: Well, I started as a bus operator in 1978.
And then I went, I took a promotional test from bus operator to train operator. Actually then it was motorman, to motorman in --
THE COURT: So you were a prior train operator for the Transit Authority; is that correct?
THE WITNESS: That is correct, yes.
THE COURT: You're retired now?
THE WITNESS: I've been retired for a little bit of time.
THE COURT: And how are you spending your retirement years?
THE WITNESS: Grandkids, camping, wife.
THE COURT: So you were at the train station at the time that this incident happened?
THE WITNESS: No, I was not.
THE COURT: So tell me a little bit about why you are here. You made a 9-1-1 call?

THE WITNESS: No, I did not.

THE COURT: What's your next question?

MR. ROTH: Mr. Logan, can you play the 9-1-1 call?

THE COURT: Just one second. I'm not allowing it in evidence.

MR. ROTH: Mr. Jimenez is an expert. He's an expert train operator.

THE COURT: Why is it that you want to introduce the 9-1-1 call? The person who made the 9-1-1 call is going to be a witness; yes or no?

MR. ROTH: No, no, it's already been admitted into evidence. We're not calling that person as a witness and it was --

THE COURT: Just one second.

So you're saying you want in evidence a 9-1-1 call and there was no objection to it?

MR. ROTH: Correct.

THE COURT: All right. I will let you play it first.

Now I understand that you have nothing to do with that.

Go ahead.

MR. ROTH: Okay.

(Audio played.)

THE COURT: I don't think we need more. That's the

end of it.

(Audio stopped.)

THE COURT: So there was a 9-1-1 call that was made. Okay. Next. Start questioning this witness.

Q Mr. Jimenez, in addition to your work at the Transit Authority, did you work at the NYPD?

A Yes, I did.

Q What did you do at the NYPD?

A I was a telephone switchboard operator, police administrative aide, telephone switchboard operator, and a dispatcher also.

Q And what types of calls did you get regarding the Transit Authority when you were working in the '70s?

A Various kinds. We had sick on the train, we had lost children, we had people who were on the tracks, people who were under the trains. It just varied.

Q Did you have same cases, like, even back in the '70s as like what we have here today? Were you getting calls on those?

A Yes.

Q And then after you left there, you went to the Transit Authority; is that correct?

A That is correct.

THE COURT: A little slower. You have a tendency to talk fast, and we are making a record of everything you say.

You have to slow down and chill out. Okay?

Go ahead. Next question.

Q Why don't you tell us a little bit about your career and the different things you did at the Transit Authority?

A So I started out in 1978. I believe it was July of 1978 as a bus operator. I was there for 18 months. And during the time that I was a bus operator, I had taken a promotional exam to motorman, which became the title train operator.

When I became a train operator, I worked various lines in the B division, which is IND and BMT. And I operated trains, I trained new train operators come -- who were coming after me. That was after a little bit of a period of time of me gaining some experience.

And I also became a union representative with Transport Workers Union. And I represented train operators, conductors, and tower operators for different situations that they happened to be involved in during their course of employment in New York City Transit. I started out as a shop steward, and I rose to the rank of staff representative in that.

Q As a union representative, did you attend conventions and seminars and events?

A Yes, I did.

Q Where you learned about train operations and safety practices used by other transit systems as well?

A Yes. We would go to conventions, we would have seminars, lectures. And we would have different subjects that discussed safety, train operations. It varied, whatever it was. Because there's also air, rail, and other transportation industries involved in, in what the International Union does.

So when we went to those conventions, there was a myriad of discussion about different subjects. But train operation, safety of train operation was also included in that.

Q And so as your position as a union rep and you working with the New York City Transit Authority, you learned about best practices, good and accepted professional practices in the industry related to train operation; is that fair to say?

MR. KEAVENEY: Objection.

A That is fair to say.

THE COURT: You objected?

MR. KEAVENEY: Leading, Your Honor.

THE COURT: Sustained. This is really not somebody you have to cross-examine that's an adverse witness I suspect, right?

MR. ROTH: That's correct, Your Honor.

THE COURT: It's a leading question.

So, members of the jury, when we have somebody questioning somebody who is an adversary, we allow different types of questioning. You can go right to, did you say this,

did you say that. But when we are talking about a witness that's called as a direct witness by the parties, their witness, we don't allow these types of leading questions. We say were you here, explain this, you know, that type of thing. So that's sort of a technical thing that, you know, has been raised right now. But Mr. Keaveney is correct, these are leading questions, and we're going to try not to use them. Okay?

So, go ahead.

Q Were you retained as an expert on this case?

A Yes, I am.

Q And can you tell the jury what work you did on this case prior to today?

A So I reviewed New York City Transit Authority documents involved or related to this case.

I reviewed New York City Police Department documents related to this case.

I read depositions related to this case.

And any other information that was given to me to be reviewed, I would review it. But it was all related to the case.

Q What else did you do as far as going to the site, and to -- going to the scene, and to listening to, like, 9-1-1 calls, et cetera? Can you just elaborate on that?

A So in the summer of 2023, I believe it was August, was my

first visit to the scene as the expert on this case.

And then I did revisit it yesterday.

And I went there and I just looked around to see what was the situation as far as what could be seen, what couldn't be seen, where did the actual accident happen on the station. I observed trains coming into the station, what they were doing. But it's from a perspective of a train operator that I was doing that.

Q And when was the last time you went there?

A Yesterday.

Q And why did you go yesterday?

A Well, I wanted to refresh my memory. And it was -- I wanted to refresh my memory.

And it was interesting because I also went to Seventh Avenue because I rode the train from Seventh Avenue back to Atlantic Barclay's and --

THE COURT: So listen to me. I may interrupt here and ask some questions. I just want to move it along and get to the substance of things, and I know you can probably talk a lot about many things, right?

Ask a direct question that's relevant to this case.

Q Mr. Jimenez, how many times had you driven as a train operator through the intersection approaching this station when you were a train operator?

A Over a hundred times.

Q And what type of train was it that was involved in this incident?

A An R68A.

THE COURT: Have you ever driven those types of trains?

THE WITNESS: Yes, I have, Your Honor.

THE COURT: For many years, right?

THE WITNESS: Well, they came in 1988. Yeah, I guess, for over 20 years.

THE COURT: Over 20 years.

THE WITNESS: Yes.

THE COURT: You know how to drive that train?

THE WITNESS: Absolutely.

THE COURT: Next question.

Q So based upon your review of the evidence, your experience operating this line, your training, have you reached an opinion within a reasonable degree of professional certainty whether the train operator in this matter met the standards of care for a train operator on the date of this accident?

THE COURT: First of all, do you have an opinion?

THE WITNESS: Yes, I do, Your Honor.

THE COURT: Tell the jury what your opinion is.

THE WITNESS: My opinion is that the train operator, Train Operator Shabazz failed to stop the train safely.

THE COURT: And what is the basis of that opinion that you came to? Why do you say that?

THE WITNESS: Because in my 30 years of experience and operating trains and being in situations similar, I have been trained, I have been skilled, I have developed the skills, I have trained myself, I have developed the skills.

THE COURT: Tell the jury why it is you came to that conclusion. What did this person, in your opinion, do wrong?

THE WITNESS: She did not safely stop the train. She did not observe properly. She did not pay attention to what she was doing, nor did she apply a safety -- a standard of safety that was --

THE COURT: Okay, yes, those are your conclusions. Why do you say all that? You can just explain it to the jury, and then you're going to be cross-examined.

THE WITNESS: Okay.

Well, basically, as a train operator you're required to renew your skills all the time. You cannot just get the job, sit down and operate.

THE COURT: Well, how do you know she didn't do that?

THE WITNESS: Because in the same situation from different evidence that I've seen plus what I have observed from the video, from the depositions, reading through the depositions, I saw that she was not really in full sync with

what it was that she was doing, in my opinion.

MR. ROTH: Your Honor.

THE COURT: I just want to give you ample opportunity to explain to the jury why you came to those conclusions. All right? What else were you -- do you want to tell the jurors?

THE WITNESS: So basically I am going to say that as a train operator, you're going to be trying to operate in the safest possible way that you can.

THE COURT: We know that. They're supposed to be safe, right?

THE WITNESS: Well, not only safe, Your Honor. I'm sorry. Not only safe, Your Honor, but you're supposed to be aware. You're supposed to be situationally aware. You're supposed to apply all your skills, and you're supposed to be looking for anything that is on the roadbed or the right of way, all right, that is going to obstruct your or impede your way to travel across those tracks.

THE COURT: Obviously that's a good thing. Now, how did you come to the conclusion that she didn't do that in this case?

Q Mr. Jimenez, did you review documents that lead you to this conclusion?

A Yes. Well, that's what I was trying to say.

THE COURT: You can say it now to the jury.

THE WITNESS: So I reviewed --

Q Mr. Jimenez, can you explain to the jury based on the credible -- discuss the credible evidence --

THE COURT: Answer my question. It's simple. Just tell the jury that you reviewed anything, right?

THE WITNESS: Mm-hm.

THE COURT: And as a result you came to these conclusions?

THE WITNESS: Right.

THE COURT: And the jury wants to hear why you came to those conclusions. Go ahead. I am giving you ample opportunity to explain that.

THE WITNESS: Because it's my belief as a train operator in a similar situation that my reaction would have been very different than hers.

Q Did you have the opportunity to review a video of the train coming into the station?

A Yes.

Q Okay. And would that video help you to explain your testimony to the jury?

A Yes.

Q And is that video a fair and accurate depiction of the way -- of the same -- essentially the same view that the train operator would have had entering the station?

A Yes.

Q And what is that video of, the video that you reviewed?
A So the video is a nostalgia train trip on an R1-type train.

THE COURT: Is this video something that you want to introduce into evidence?

MR. ROTH: Yes, it's Exhibit 76 now that he's --

THE COURT: Just one second.

All right. If it's not objected to, you want that video in evidence now, right?

MR. ROTH: It is objected to.

MR. KEAVENEY: We object to the video. It's not an R46A train.

THE COURT: Just one second.

76 is one out of three videos of train entering the station.

MR. ROTH: Yes.

THE COURT: That's the video you're talking about?

MR. ROTH: Yes.

THE COURT: I don't have any objection to it.

MR. KEAVENEY: We did object do it, Your Honor. It's not the same train. It's a nostalgia train.

THE COURT: Just one second.

According to my list, there's no objection to Exhibit 76.

MR. KEAVENEY: Judge, we certainly did object to

that.

THE COURT: You think this is mistaken?

MR. KEAVENEY: Absolutely.

THE COURT: Members of the jury, we're going to have to talk about this. I don't want you to be here when we talk about it. Just wait in the jury room a little bit. Okay?

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: The jury is not here.

We have to get to the bottom of this because I'm not going to waste time with this now. I went over this carefully with you folks at our pretrial conferences. Number 76, I don't have any objection on the list. Now you're telling me you made a mistake.

MR. KEAVENEY: Judge, I'm not saying I made a mistake. I was certain that we would object to this document.

THE COURT: You're assuming now and you're wasting our time.

MR. KEAVENEY: Judge, we --

THE COURT: 76 is what?

MR. KEAVENEY: 76, to my understanding, is a video not of this train, but of a nostalgia train, a train that was built probably back in the '30s. That is a video of someone taking it from the front windshield or the front window of it, not from the train operator's perspective, but from a

passenger's perspective.

THE COURT: So you want that video in evidence?

MR. ROTH: Yes, Your Honor.

THE COURT: It's not the same as this train, it's a different train, right? All right.

MR. ROTH: Mr. Shields wants to argue the issue.

THE COURT: So this is -- you want this in evidence --

MR. ROTH: Yes.

THE COURT: -- because you want this witness to say this is a basis of his testimony?

MR. ROTH: Yes.

THE COURT: Just listen to me. We're going to allow that with the proper instruction to the jury; this is one of the things you base your testimony on and because of that, it will be offered into evidence for that limited purpose. And you can cross-examine all you want to about that. But I think that's probably fair. He relied upon this to give his expert supposed testimony, and we're going to allow the jury to see what the basis of his opinion was. And you will have a lot of opportunities to question him. It will be limited to that purpose alone. Okay?

What else? Anything else before we bring the jurors back in?

MR. ROTH: Not from me.

THE COURT: That's the only one, just one of those videos is what you're going to be introducing?

MR. ROTH: Yes.

THE COURT: Bring them back in.

MR. ROTH: Logan, do you have it ready to go? Okay.

THE COURT: Make sure it's ready to go.

MR. ROTH: Logan, why don't you put it up and get it started at 1:30 so the jury is not wasting time. Just let it sit at 1:30. Okay? Thank you.

MR. SHIELDS: Can we dim the lights, Your Honor?

THE COURT: Mike will take care of that when the jurors come in.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: You can all be seated.

So thank you for your patience, members of the jury. Sometimes these things happen and we're going to proceed.

So we're going to allow into evidence Exhibit 76, which will be one video. And it's being allowed in evidence for a limited purpose. This is apparently not a video of the same train, but it is going to be allowed by me because the witness said that he relied upon this. This is one of the things he relied upon to prepare to give testimony today. So for that limited purpose, we're going to allow this video, even if it's apparently of a different train, and we'll be

able to have Mr. Keaveney or Ms. Winters question him about it all. But since he relied upon this for his opinion and for his testimony, I'm going to allow you to see what he relied upon for that limited purpose.

Go ahead. Play the video.

MR. ROTH: Your Honor, I think turning the lights down?

THE COURTROOM DEPUTY: Yes. It's down all it can go.

THE COURT: The other way, Mike.

MR. ROTH: There we go.

BY MR. ROTH:

Q So Mr. Jimenez, you have seen this video before, correct?

A Yes, I have.

Q So why don't you tell the jurors what we're seeing at 1:30, 1 minute and 30 seconds on this video. What location is this?

A So this is a 4 track between Seventh Avenue and Barclay's, Atlantic-Barclay's.

Q It's the track leading into this station, correct?

A Into Atlantic-Barclay's, yes.

MR. ROTH: So can we play that until you get to 1:42 and please stop, Logan.

(Video played; video stopped.)

Q So what are we seeing here at 1:42?

And this is -- just to say, this is the same direction of the train operator's view in this case, correct?
A Yes.
MR. KEAVENEY: Objection.
THE COURT: Just one second.
So tell us, this video shows a train coming into a station. So the jury understands what exactly that is, just explain it to them.
THE WITNESS: So it's a view from the middle window of a train. So I'm sure a lot of you have taken trains and have seen, you know, stood at the front of the train and looked out to see where the train is going.
THE COURT: So it's not the same train, but it's a train, which is coming into the station I think is what you're telling us?
THE WITNESS: That is correct, Your Honor.
THE COURT: And it's the view from the inside middle window?
THE WITNESS: That is correct, Your Honor.
THE COURT: That's what you're seeing here?
THE WITNESS: That's what you're seeing there.
THE COURT: Go ahead. Next question.
THE WITNESS: Okay.
Q At this point, can you see -- what do you see, the light in there, what is that at the front of the -- in the middle

of --
A So what I'm seeing at the all inset where the light is, that is the entrance to the station, some people call it the mouth, but it's actually called the entrance to the station.
MR. ROTH: Can we move forward to 1:45, please?
Q Excuse me. And how far back, at this moment, approximately based on your experience as a train operator, about how far back is this photo at 1:42?
A Approximately three car lengths.
MR. ROTH: Could you move to 1:45, please?
(Video played; video stopped.)
Q And what are we seeing here now?
A Here you're seeing, again, the mouth, the entrance to the station and the complete station.
Q So at this point, I know you said car lengths, how many car lengths do we have here from the -- what's the distance from here inside the tunnel to the mouth of the station, the entrance?
A Approximately two at 75 feet on an R68 would be 300 feet -- I'm sorry, 350 feet.
THE COURT: Tell the jurors what you mean by car lengths.
THE WITNESS: Oh. How long the car is.
THE COURT: How long is the car?
THE WITNESS: Each car is 75 feet.

THE COURT: How many cars are we talking about?

THE WITNESS: From -- for the depiction -- for the definition of what Mr. Roth is asking, from here to the entrance to the station, that's two car lengths.

THE COURT: Do you have any idea how many cars were involved in this particular incident?

THE WITNESS: Well, it was an eight-car train with four cars that were involved in it.

THE COURT: And each car is 75 feet?

THE WITNESS: That is correct, Your Honor.

THE COURT: Jury understands.

Go ahead.

Q So from here, what is the point of view that you can see? You said you can see into the station?

A Right. You can actually see to the conductor's position, which is the approximate area of where Ms. Harger was.

Q And how do you know that?

A From --

Q What information did you use to derive that information?

A From reading depositions and from viewing pictures, I'm sorry.

Q So right here, you're 150 feet back, and you would be able to see what? If she was on the tracks, would you be able to see her or not?

A Yes, you would be able to see her on the tracks.

MR. ROTH: Okay. All right.

Can we move just to the entrance of the tunnel?

(Video played.)

MR. ROTH: Stop it there.

(Video stopped.)

Q So now you can clearly see the length of the tunnel, correct? I mean, the length of the station; is that correct?

A Yes.

Q And assuming that somebody was on the tracks, is there any reason why, at that point, that you couldn't -- you wouldn't be able to see a person on the tracks, any reason?

A No, there is not.

MR. KEAVENEY: Objection, leading.

THE COURT: So technically, it's a leading question, but I will allow that. Go ahead.

So you have a vision here, the person would be on the track is your testimony, right? You'd be able to see that person, right?

THE WITNESS: You would be able to see a person on the track from this position, absolutely.

Q When you say on the track, where on the track are we talking about? Where was Ms. Harger?

A Close to the conductor's position about halfway down the platform.

Q And you would be able to -- and from that spot, okay,

what is your opinion, if she was on the track at that spot, what is your opinion or have you formed an opinion as to whether the train could stop under regular braking without striking Ms. Harger?

A Yes, I believe it could.

Q Okay. And so if -- and what about under emergency braking?

A Yes, definitely.

Q And the evidence that you've seen in this case, what other evidence are we talking about? You said the deposition testimony. Did you see police reports?

A Yes, I did.

Q Did you see pictures showing sand on the tracks?

A Yes, I have.

Q And those pictures and those police reports led you to the -- what information?

THE COURSE: As a result of looking at those pictures, does that reinforce your testimony in any respect? He's asking you whether you saw the police report and pictures, right?

THE WITNESS: Yes.

THE COURT: And he asked you that for a reason, I assume, right? Is there anything about those pictures that you want to tell the jurors or the police report that supports your testimony?

THE WITNESS: Well, the pictures show the location of where Ms. Harger was. And judging from the distance from different points coming into the station, it would give me an idea of how a train could stop, how long it would take a train to stop, from my experience as a train operator.

So yes, it gives me a clear indication of what it is that is going on while the train is being operated.

THE COURT: So basically on all of this, the deposition testimony and the police reports, you saw pictures, you have the video now, that your opinion is that the plane -- the train could have stopped before striking the Plaintiff, right?

THE WITNESS: Absolutely.

THE COURT: Next question.

Q But could you just explain the difference between emergency braking and regular service braking, since I brought it up?

A So emergency braking is when a train operator takes a train and releases all the air in the brake system, and now the train is basically braking itself. There's no control anymore for the train operator to manipulate or use the brakes on a train.

When you're doing normal service braking, you're braking within a range. The train operator has the control to bring the train to a controlled stop, and that controlled stop

could be in certain distances. It could be shorter, it could be longer, but it's a controlled stop based on what the train operator does with the brake handle and how he applies the brakes to the train. Or she.

Q Why don't we take the train --

MR. ROTH: Logan, take the train -- take the video.

Q And Mr. Jimenez, why don't you tell Logan when to stop the video to show approximately where Ms. Harger was on the tracks based on your review of the evidence?

MR. ROTH: Logan, you can run it.

(Video played.)

A There.

(Video stopped.)

Q And when you say there, so what location are you indicating?

THE COURT: Can you identify for the record where it stopped? Maybe there's a way, in case the jurors want to see this again.

MR. ROTH: What's the time on that, Logan?

MR. MORALES: 1:56.

MR. ROTH: 1:56 at the video.

Q Using the columns, can you tell the -- columns or staircases or any other information that you have, any other landmarks on this video where she was, approximately?

A You know, I'm sorry, Mr. Roth, and Your Honor, I'm sorry,

I don't have my glasses. Can I go get my glasses?

THE COURT: Would you like to borrow mine?

THE WITNESS: I hope they're strong enough.

THE COURT: These are hearing aids, by the way.

What do you need? Do you want to put the light on?

THE WITNESS: No, I just need to -- because I can't focus on the -- I'm sorry, Your Honor.

THE COURT: You don't have to apologize.

THE WITNESS: Okay.

Oh, much better.

THE COURT: All right. Can you see better now?

THE WITNESS: Much better, Your Honor. Thank you.

Let me see. No, go further, Logan. I'm sorry, go further.

MR. KEAVENEY: Objection. It's supposed to be the witness saying where it stopped.

THE WITNESS: Well, I'm looking for something and --

THE COURT: One second.

What is it now that you're looking for?

THE WITNESS: Well, I'm looking for -- okay. Thank you.

I'm looking for the elevator.

THE COURT: All right. Go ahead.

(Video played.)

THE WITNESS: Stop.

(Video stopped.)

THE COURT: Now, when you stop, identify for the record where you're stopping.

THE WITNESS: 1:58.

THE COURT: 1:58?

THE WITNESS: Yes, Your Honor.

THE COURT: What is your question of the witness?

MR. ROTH: I don't have another question on this video.

Can we take down the video and put up -- I'm going to show Plaintiff's Exhibit 38.

THE COURT: Plaintiff's 38 you want in evidence now?

MR. ROTH: Yes.

THE COURT: Just one second while I find it.

I don't have any objection to that, Mr. Keaveney; am I correct, memo to the chief? In evidence at this time.

MR. KEAVENEY: There is no objection to that.

THE COURT: Thank you.

(Plaintiff's Exhibit 38 received in evidence.)

MR. ROTH: Can I use the ELMO? Document now.

THE COURTROOM DEPUTY: Using the ELMO.

(Exhibit published.)

Q Okay. So this is one of the police reports that you reviewed; is that correct?

A Yes.

Q Okay. Can you read for the -- the yellow section?
A The train operator, Shabazz, Raqia, Pass No. 809 --
THE COURT: Yes, we see it.
THE WITNESS: Okay.
A -- stated she observed the aided on the northbound track as the train was entering the station.
Q And is that one of the documents that you used to determine that she was already on the tracks before the train got to the station?
A Yes.
MR. KEAVENEY: Objection, leading.
THE COURT: That's one of the documents you relied upon based upon what you just testified, correct?
THE WITNESS: One of them, yes, Your Honor.
THE COURT: Next question.
MR. ROTH: Logan, would it be easier for you to put this one up? Because it's hard to read this. Exhibit 39B. Do you think you can put it up?
THE COURT: Just one second. 39, there's no objection to that. These are records, right? Okay. In evidence at this time.
(Plaintiff's Exhibit 39B received in evidence.)
(Exhibit published.)
MR. ROTH: Logan, just zoom in on it so that Mr. Jimenez can read it and move it around as necessary.

Q So you recognize that document? What's that document?
A That is a police report filed by Detective Donald Moeller.
Q And is that document the statement that he took of Ms. Shabazz?
A Yes, it is.
Q Okay.

MR. ROTH: So can we zoom in on that, Logan, please, so he can read it. Maybe he can read it now.

Q Can you read that?
A Yes, I can.
Q So why don't you read what the statement was to the jury, please?
A The whole thing?
Q Just up until the Judge tells you to stop, I'm guessing?

THE COURT: You want him to read what's in evidence now to the jurors?

MR. ROTH: Yes, correct.

THE COURT: All right. Go ahead. He wants you to read -- this is in evidence, but he wants you to read it anyway so the jury could hear you read it.

A On August 2nd, 2016, at approximately 1940 hours, I was present at the Atlantic Avenue subway station and spoke with MTA train operator.

THE COURT: A little slower because we're trying to

get all your words down.

THE WITNESS: I'm sorry.

A Raqia Shabazz with pass number --

THE COURT: There's a pass number that's referenced, right?

THE WITNESS: Right.

THE COURT: Okay.

A Ms. Shabazz stated that she was operating the 1848 B train out of Brighton Beach at the time of this incident. She continued that as she was entering the Atlantic Avenue station, she observed a person lay on the tracks. She continued that she immediately activated the brakes in emergency in an effort to stop the train at which time the train did make contact with the person on the tracks. Ms. Shabazz continued that she immediately notified her radio dispatcher notifying them of this incident and requested assistance.

Q So this is a document you relied on to determine --

THE COURT: He said that.

MR. ROTH: Okay. All right.

So Logan, could you put up Exhibit 74A, which was marked in at the --

THE COURT: 74?

MR. ROTH: 74.

THE COURT: Now, look, 74 has a lot of photos.

Okay?

MR. ROTH: We're doing one photo.

THE COURT: Just one second.

How many of the photos under that exhibit number do you wish to introduce into evidence? We're not going to need tons of them.

MR. ROTH: Just one. Just for now.

THE COURT: Just one. All right? One photo.

That's in evidence at this time. This one photo.

(Plaintiff's Exhibit 74E received in evidence.)

(Exhibit published.)

Q Can you tell us what you see on the tracks there?

A Sand.

Q And what is sand? What is sand used for related to an incident like this?

A Sand is used to absorb hazardous materials, things like blood or other -- fuels or something like that so that there's no -- you know, so that it's not exposed.

MR. ROTH: Thank you. Logan, you can take that down.

Q Now, as far as your opinion goes, you've read Ms. Shabazz's testimony, correct?

A Yes, I have.

Q In her testimony she describes her point of view entering the station. How does the video contradict what she said in

her point of view?

THE COURT: Did it contradict what she said?

I don't know what you're talking about. What she said is what you just showed the witness --

MR. ROTH: No. Ms. Shabazz.

THE COURT: Ms. Shabazz's statement?

MR. ROTH: No, her testimony at deposition.

THE COURT: Just one second.

We want to avoid confusion.

MR. ROTH: Okay, sure.

THE COURT: I allowed you to put in evidence one photo. I allowed you to put in evidence the train station, we just saw that.

What is the question you want to ask?

MR. ROTH: Your Honor, I've just been informed that that photo was 74E.

THE COURT: 70 what?

MR. ROTH: 74E was that photo.

THE COURT: Is the photo. 74E?

MR. ROTH: E, yes.

THE COURT: That's the photo?

MR. ROTH: That was the photo.

THE COURT: 74E. All right. We saw the photo. The witness saw everything that you played.

What question do you want to ask?

Q So now I'm asking a separate question.

So as part of your job as an expert, do you sometimes read deposition transcripts that are taken into account?

THE COURT: Sustained. There's nothing before the jury. Next question.

MR. ROTH: He said he relied on the deposition testimony.

THE COURT: That's what he said.

Q Okay. So in the testimony of Shabazz, is there anything about -- that she testified about her view into the station that you disagree with?

A Yes.

Q And what do you disagree with in her testimony about when she's entering the station?

A So she stated that when you're entering a station, you can't see fully into the station coming from dark to light because of the lighting situation. She said it's a common -- it's not an exact quote, but it's a common knowledge that you can't see clearly coming from dark to light. Which is actually completely opposite because you come from dark to light you can see very far. Coming from light to dark, you're going to have a difficult time trying to focus.

Q And what about the point of view based on the curve of the track entering the station? What do you -- what did she

testify about that, and what did you have an issue with?
A Well, she said that she came -- she was talking about speed around the curve and she said that --
Q I'm just asking about the point of view. I'm not asking anything about speed. That's not what we're talking about.
A Okay.
Q We're talking about the video that you saw compared to what she testified about her ability to see in the station based on the curve. That's what I'm asking you to testify to as to your opinion as well as what the video showed to the jury?
A So the other part is that she said she couldn't see completely into the station until she was at -- entered the station, which is not true because the video actually shows that you can see far into the station as much as two car lengths out.
Q And two car lengths, again, is how long?
A That would be 150 feet.
Q So just to reiterate, so what's the -- so the basis of your opinion that she wasn't paying attention was based on what evidence -- what evidence, and restate your opinion, if you could, for the Court?
A That she did not operate the train safely because she wasn't paying attention to what she was doing as far as operating that train.

Q Now, let's just say it was -- you know, I know you don't agree with it, but let's just say she really couldn't see around the curve, okay? What should she have done differently, if anything --

THE COURT: Assume she could not see, you're not saying that's the case. Assume she could not see coming around the curve, I think that's what you want to question about.

MR. ROTH: Yes.

THE COURT: What is your question with that assumption? Okay?

Q What should she have done -- did she --

THE COURT: If she could not see coming around the curve, do you have anything to show the jury about what, if anything, she should have done?

THE WITNESS: So if you're in an area where you have restricted sight and you're not sure what you're driving or operating into, all right, it's incumbent upon you to act in the safest manner. So the best action would be to slow your train down. The best action would be to --

MR. KEAVENEY: Objection.

THE WITNESS: -- approach the --

THE COURT: One second. You have an objection to his testimony?

MR. KEAVENEY: Yes.

THE COURT: You're going to have ample opportunity to cross-examine him, trust me.

You're saying that if you can't see, assuming you can't see, you have some sort of responsibility to slow the train down? Is that your testimony?

THE WITNESS: Right. You're required to operate according to what you can see, what your vision is. You're required to operate in the safest manner possible, which --

THE COURT: Well, we know you're supposed to operate safely obviously. That's obvious. But you are telling the jury that if she could not see, she should have slowed the train down; is that what you're saying?

THE WITNESS: That's what I'm saying, Your Honor.

THE COURT: Next question.

Q What was her testimony as to how fast she was entering the station?

THE COURT: We haven't heard her testimony. But since the witness has said that he relied upon something he read, I'm allowing him to explain. She probably will be testifying, I don't know. But you will assume that this is what she was testifying to or would be testifying, so we don't have to call them back if she does testify to ask these questions. I am allowing that type of flexibility. Go ahead.

A 22 to 24 miles per hour.

Q Okay. And if she couldn't see, what is your opinion --

if she couldn't see around the curve, how fast should she be entering the station?

A Fast enough to stop the train before she came in contact with anything on the track.

Q And it's possible that somebody could be on the track at the mouth of the station, correct?

THE COURT: Sustained.

Q So what things should she be considering when she enters into the station, if she can't see?

A That the track could be obstructed, that she could be -- that the track could be obstructed.

THE COURT: How far down the track? I mean, should she had stopped as soon as she couldn't see? Or you said she should slow down? I'm not so sure I understand, you know, how much time she would have to stop the train in this situation.

(Continued on the next page.)

bY MR ROTH: (Continuing.)

THE WITNESS: Well, Your Honor, you're right. It's a judgment call. That's what our skills --

THE COURT: So, she should have gone slower?

THE WITNESS: She should have gone slower.

THE COURT: Basically from what you've seen here, you feel that if she had gone slower, she should have been able to stop.

THE WITNESS: If she said she couldn't see, which she did say in her deposition, Your Honor.

THE COURT: She said she couldn't see.

Next question.

MR ROTH: No further questions, Your Honor.

THE COURT: Do you want to start now Mr. Keaveney or take a break? It's up to you.

MR. KEAVENEY: We can take a quick break.

THE COURT: How much time do you need?

MR. KEAVENEY: Ten minutes?

THE COURT: Let's make it fifteen.

So, at this stage in the trial, counsel will go back and forth a little bit. And before Mr. Keaveney begins his questions, we will have a little break. See you promptly at 11:15.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(Recess taken.)

(Jury enters.)

THE COURT: Mr. Keaveney, are you ready for your cross-examination?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: Go ahead. You may proceed.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Good morning, Mr. Jimenez.

A Good morning.

Q Mr. Jimenez, did you bring your report, a copy of your report today?

A Yes, I did.

Q Do you have it in font of you?

A I will get it.

THE COURT: The report's not going to be in evidence and about unusual circumstances, but counsel can refer to it for cross-examination purposes.

A Okay. I have it.

BY MR. KEAVENEY:

Q Mr. Jimenez, are you being paid today?

A Yes, I am.

Q What's your rate of compensation?

A $350 an hour.

Q How many hours have you spent on this file?

A Total -- I'd have to do the math, but close to 40.
Q And have you met with Mr. Roth or his team prior to today?
A Yes.
Q And when was the last time you met with him?
A Yesterday.
Q Okay. Did you go over the video with him?
A Yes, I did.
Q Did you go over documents with him?
A Yes, I did.
Q Which documents did you go over?
A Yesterday?
Q Yes.
A The documents that we went over -- hold on.
Okay. We went over the -- the pictures that he was -- that he -- that he showed me today, and we went over -- it was -- it was my -- no, we went over the pictures, we went over my -- my report, and pretty much, that was it.
Q Did you look over the video that he showed you?
A Oh, yes, I'm sorry.
Yes, the video, also.
Q Let's talk about that video for a second.
A Sure.
Q That video is not from an R68A train; correct?
A That is correct.

Q That is from a nostalgia train; correct?
A That is correct. An R-1 to be exact.
Q What is a nostalgia train?
A It is a train that is used to carry passengers on a special trip throughout the subway system, giving them a sense of what it was like in the old days to ride trains.
Q And when was that model built?
A Oh, the R-1?
It's 1930s, '40s.
Q Okay. It operates differently than the R68A?
A The -- yes.
Q The consoles are different?
A Yes, they are.
Q The braking is different?
A Yes, it is.
Q You don't know how fast that train's operating through that station in that video, do you?
A No, I don't. I -- I could take a guess, but you don't want me to guess.
Q That video wasn't taken from the operator's position; correct?
A That is correct.
Q It was taken from a middle position; correct?
A That is correct.
Q And the operator sits on the right side of the trains;

correct?
A That is correct.
Q And coming around a curve, an operator wouldn't have the same sight lines as a person sitting in the middle; correct?
A That is correct.
MR. KEAVENEY: Your Honor, at this time I move to strike the video as irrelevant and not accurate, respecting --
THE COURT: No, the jury's heard it all.
And you folks can consider to what extent you want to rely on that video. You heard the questions from Mr. Roth, and you hear the cross-examination by Mr. Keaveney. It's all part of your fact finding responsibilities.
We'll allow it in evidence.
BY MR. KEAVENEY:
Q Mr. Jimenez, where did you go to school?
A Brooklyn Preparatory High School.
Q Where did you go to college?
A I spent a year in John Jay -- a-year-and-a-half in John Jay College of Criminal Justice and one year in Baruch College.
Q Okay. Did you obtain a degree?
A No, I did not.
Q After your experience at Baruch, did you go somewhere?
A After my experience at Baruch, yes, I -- oh, do you mean yo school?

Q Did you have any additional educational train?
A No.
Q Okay. And you went to work; correct?
A That is correct.
Q And you became a 911 operator or administrator?
A I was a police administrative aide originally assigned to -- as a 911 TS operator and then moved up to a consult dispatcher. There's a difference between the two.
Q Okay. You would hear calls coming in from people in distress or accidents; correct?
A Oh, abs- -- yes.
Q Okay. And most of the times, you would get more than one call on a specific accident?
A Yes, you would.
Q Okay. Did you listen to more than one 911 call regarding this incident?
A Yes, I did.
Q Okay. But you only picked up one when you discussed it with Mr. Roth; correct?
A Correct.

MR. KEAVENEY: Your Honor, at this time, I'd like to play some additional 911 calls.

THE COURT: Would this be considered the same document that's in evidence, I think -- I'm just trying to find out where it is.

MR. KEAVENEY: I think Mr. Roth --

THE COURT: 72, 72.

MR. KEAVENEY: Mr. Roth's 72 was limited to one and --

THE COURT: But this is still part of the 911 call which is in evidence as 72; correct?

MR. KEAVENEY: This would be Defendant's Exhibit WW.

THE COURT: Just answer this question: Is it the same as the Plaintiff's 71, the 911 call?

MR. KEAVENEY: It's not, because Mr. Roth only admitted one.

THE COURT: This it a different call?

MR. KEAVENEY: It's different calls, yes, Your Honor.

THE COURT: These are different calls by somebody else?

MR. KEAVENEY: Correct.

THE COURT: All right. Let me just get your exhibit list so you can get it down.

MR. KEAVENEY: WW.

THE COURT: 77, Defendant's Exhibit 70 -- I'm sorry, what is it?

MR. KEAVENEY: Defendant's WW.

THE COURT: WW.

All right. Those are initial 911 calls.

Okay. Go ahead.

(DX Exhibit 77 received in evidence.)

MR. KEAVENEY: Why don't you play Call Number 1.

(Audio played/audio paused.)

MR. KEAVENEY: You can turn that off. We also go to call number six.

THE COURT: Now, this is all part of your Exhibit WW?

MR. KEAVENEY: Yes, Your Honor.

(Audio played/audio paused.)

BY MR. KEAVENEY:

Q Mr. Jimenez, did you listen to those, as well, correct?

A Yes, I did.

Q Okay. Did you review the police department records?

A Yes.

Q Did you review all of them?

A Yes, I did.

MR. KEAVENEY: Can we put up for Mr. Jimenez only --

MR. ROTH: Is this something that we objected to and redacted because --

MR. KEAVENEY: Yes, that's why I'm showing Mr. Jimenez. He looked at it.

THE COURT: Wait, so we can't get this down if you're talking to each other. Let me know.

What do you want to do now?

MR. KEAVENEY: I want -- Mr. Jimenez just said he looked at the entire police records.

THE COURT: Okay.

MR. KEAVENEY: I want to show only Mr. Jimenez those records, not the jury at this time.

THE COURT: All right. Just these records, did you look at these records, looked at these? Have you looked at that?

THE WITNESS: I haven't seen it yet.

THE COURT: You haven't seen this?

THE WITNESS: This is a New York City Transit correspondence sheet.

THE COURT: Stop it.

Something is being shown to you now; right?

THE WITNESS: Okay.

THE COURT: You want to identify what you're showing the witness, please.

MR. KEAVENEY: It should be -- our Bates number is --

THE COURT: What is the number?

MR. KEAVENEY: -- 4504.

THE COURT: You're showing him a proposed exhibit now or some other document?

MR. KEAVENEY: It's some other document. I might move it into evidence, Your Honor.

THE COURT: All right. So he's showing you some documents not in evidence.

What's the question?

MR. KEAVENEY: My assistant's just trying to get it up right now.

THE COURT: Well, the jury's not seeing this.

MR. KEAVENEY: Correct, Your Honor. I want the witness to look at it.

THE COURT: Why don't you ask him a question?

MR. KEAVENEY: Okay.

THE COURT: He's showing you this document that you apparently looked at. It's not in evidence, but he's showing it to you preparatory to asking you some questions.

Go ahead.

BY MR. KEAVENEY:

Q There are several reports contained in the police department records; correct?

A Say it again.

Q There are several reports contained in the records; correct?

A That is correct.

Q Several witness statements; correct?

THE COURT: Do you want this in evidence?

MR. ROTH: I'm objecting because, Your Honor, I believe the witness --

THE COURT: Just one second.

The question is objected to?

MR. ROTH: Yes.

THE COURT: Sustained.

Do you want this document in evidence, yes or no?

MR. KEAVENEY: He reviewed it. It's a police department record.

THE COURT: Do you want it in evidence, yes or no?

MR. KEAVENEY: Yes.

THE COURT: What exhibit number?

MR. KEAVENEY: It hasn't been marked as an exhibit, Your Honor.

THE COURT: This is the police report?

MR. KEAVENEY: Correct, Your Honor.

THE COURT: Is there any objection to the police report being in evidence?

MR. ROTH: I object.

I don't know what --

THE COURT: I'm sorry?

MR. ROTH: Yes, I object, Your Honor.

I don't know what document it is. I'd like the opportunity to see it before --

THE COURT: Your objection: You don't want the police report in evidence?

MR. ROTH: I don't know the --

THE COURT: Did you rely upon this document? Is this one of the documents you relied upon in your testimony?

THE WITNESS: I'm not sure if it's one of the --

THE COURT: Look at it and tell me whether you relied upon that document in your testimony.

THE WITNESS: Okay.

THE COURT: Just take a moment.

THE WITNESS: (Reviewing.)

THE COURT: Answer yes or no. If you can't answer yes or no, we'll move on to another question.

THE WITNESS: I don't know what document you want --

THE COURT: Next question.

THE WITNESS: -- Your Honor.

THE COURT: All right. Let's move on.

BY MR. KEAVENEY:

Q Okay. Mr. Jimenez, you did look at the police department records; correct?

A Yes, I did.

Q Okay. Was there any notations in those records that you reviewed that --

THE COURT: He said he did not review this. He can't identify this as a document he reviewed.

MR. KEAVENEY: Judge, he said he couldn't rely -- he didn't --

THE COURT: Next question.

BY MR. KEAVENEY:

Q When you made your opinion this morning, did you base it on all the police department records or just one page?

MR. ROTH: Objection, asked and answered.

THE COURT: Overruled.

So when you testified, he wants to know, what document you relied upon when you gave your testimony this morning.

All right. Go ahead, ask him if he relied on a particular document.

BY MR. KEAVENEY:

Q Did you rely on a particular document in the police department records, to make your opinion today?

A I relied on more than one.

Q Okay. Which other police department documents did you rely on?

A So, the document to the chief of transit and the document provided by Detective Mullen.

THE COURT: If you want to show him those documents, you can do that.

MR. KEAVENEY: Right, Your Honor.

BY MR. KEAVENEY:

Q Did you rely on the unusual occurrence report contained in the police department records?

MR. ROTH: Objection.

That's --

THE COURT: He's telling you what he relied upon.

MR. ROTH: That's not a police --

MR. MORALES: Objection, Your Honor.

That's not a police report.

THE COURT: Overruled.

So we just want you to tell the jury what documents you relied upon, and I'm going to allow Mr. Keaveney to question you about the documents that you relied upon.

It's a simple thing I think I'm asking you; right?

THE WITNESS: Yes, you are.

THE COURT: You testified those are the documents you relied upon; correct?

THE WITNESS: That's correct.

THE COURT: No other documents; right?

THE WITNESS: No other documents.

THE COURT: You could question him about the documents that he relied upon. Nothing else.

BY MR. KEAVENEY:

Q So those two documents --

THE COURT: Excuse me. Now why don't we identify for the record which documents we're talking about, so the jury can see it.

MR. KEAVENEY: Your Honor, that document's not

evidence yet. I'm just asking --

THE COURT: Well, just one second.

Do you want it in evidence? It's being relied upon.

MR. KEAVENEY: Well, if he's looking at it, I want to get an answer first --

THE COURT: Just one second.

Let's see those two documents.

MR. KEAVENEY: Those two documents are already in the record. I'm asking about a different document --

THE COURT: One second.

Which are the two documents?

We want to identify them so the jury knows what you're talking about.

MR. ROTH: This is Exhibit 38 --

THE COURT: All right. What numbers are they? Tell the jury.

MR. KEAVENEY: Your Honor, I'm not asking about the documents that Mr. Roth moved into evidence this morning. I'm --

THE COURT: Just a second. I'm just trying to painstakingly help the jury.

You're questioning him about documents. They don't have a clue what you're talking about.

MR. KEAVENEY: Correct, Your Honor.

THE COURT: So if we can let the jury know what

documents you're talking about, that will help them follow the testimony.

MR. KEAVENEY: Thank you, Your Honor.

THE COURT: Can you do that?

MR. KEAVENEY: I cannot do that because I'm asking if he's looked at a document.

THE COURT: Next question.

BY MR. KEAVENEY:

Q Did you look at any police documents that indicated that the train operator, as she entered the station, saw the plaintiff fall off the platform?

MR. ROTH: Objection to form.

MR. MORALES: Objection to form.

THE COURT: Sustained.

Look, you can bring out other evidence, if you want.

But as far as this witness is concerned, he has only told us which documents he relied upon. You can question him about that. No other documents he relied upon.

MR. KEAVENEY: Okay.

THE COURT: Next question.

If you want to show other evidence --

MR. KEAVENEY: That's fine.

THE COURT: -- police reports, you will have an opportunity to try to do that. But let's just confine your questions to what this witness has testified to.

BY MR. KEAVENEY:

Q Out of the police report documents, you only looked at two pages; correct?

A Three, actually.

Q Okay.

THE COURT: Identify which pages those are so the jury can follow along.

MR. KEAVENEY: Plaintiff's 38 and Plaintiff's 39B.

BY MR. KEAVENEY:

Q What else did you look at?

THE COURT: All right. Just one second.

So those are in evidence; right?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: Okay. Now we know what we're talking about.

BY MR. KEAVENEY:

Q And what else did you look at?

A I looked at the Transit Authority report, the incident report.

Q Okay. I'm talking about the police department records.

A Police department records?

Q Are these the only documents --

THE COURT: I'm under the impression that those are the only two police report documents you looked at. If I'm not correct, you correct me now.

THE WITNESS: Those are the only two documents I relied upon, Your Honor.

THE COURT: Next question.

BY MR. KEAVENEY:

Q Did the police department report contain any other documents, other than these two?

A Yes.

Q And you didn't rely on those?

A No, I did not.

Q Did you look at Mr. Shabazz's G-2?

A Yes, I did.

Q What is a G-2?

A A G-2 is a written report that every employee is supposed to file upon -- prior to leaving the property when they're involved in an in-service incident. Or it's actually a correspondence form that the -- the Transit Authority uses generally for any type of communication.

Q And that's done in the normal course of business?

A Every day.

THE COURT: Which document now do you want to offer in evidence?

MR. KEAVENEY: I do, Your Honor.

I want to offer Defendant's Exhibit H.

MR. ROTH: Objection.

THE COURT: Just one second.

H?

MR. KEAVENEY: H.

THE COURT: All right. It's in evidence at this time.

COURT: You looked at that; right?

So for the purposes of reviewing that document, we'll allow that in evidence at this particular time.

MR. ROTH: Your Honor, objection.

There's hearsay contained in that document.

THE COURT: Overruled.

It's being allowed in evidence as a document you relied upon to support your testimony --

MR. ROTH: No. Objection --

THE COURT: -- correct?

MR. ROTH: Objection, Your Honor.

He did not rely on it. He said he saw it. He did not rely on it.

THE COURT: You did not rely on that?

THE WITNESS: To support my testimony?

THE COURT: You reviewed it; right?

THE WITNESS: I did review it, yes.

THE COURT: If you have questions you want to ask him about that document, go ahead.

It's in evidence strictly for the purpose of the fact that I'm going to allow you to question him about the

fact that you reviewed it.

And you reviewed that document; correct?

THE WITNESS: I did, Your Honor.

THE COURT: Did you consider that document in terms of your testimony?

THE WITNESS: No, sir. No, Your Honor.

THE COURT: Did you rely upon it at all?

THE WITNESS: Did I rely upon it? No, I did not, Your Honor.

THE COURT: All right. I am not going to allow it in evidence then.

Objection sustained.

BY MR. KEAVENEY:

Q Mr. Jimenez, why didn't you rely on a document --

THE COURT: It's not in evidence.

MR. KEAVENEY: I know, but I'm asking him --

THE COURT: Look, you have a case, also. If you want to introduce other documents as part of your case, I'll consider it and I'll allow you to do it, in all probability, right, if you lay a proper foundation.

Right now we just want to question him about what he relied upon, and you can question him all you want about what he relied upon. All right?

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q You didn't look at it though?

MR. ROTH: Objection.

THE COURT: Overruled.

Sir, you looked at other documents but you didn't rely upon them; right?

THE WITNESS: Correct, Your Honor.

THE COURT: All right. Go ahead.

BY MR. KEAVENEY:

Q Did you read that document?

MR. ROTH: Objection.

THE COURT: Okay. So what we're going to do is this: He's only said he hasn't relied upon it. I'll allow you, as part of your case, to introduce documents that you think that are relevant, and then you can tell the jury he should have relied upon them but he didn't, okay? Or he can be recalled as a rebuttal witness, possibly. That's how we're going to structure the trial.

BY MR. KEAVENEY:

Q Mr. Jimenez, in your report, you said that you looked at the G-2 and didn't find it credible; correct?

MR. ROTH: Objection.

THE COURT: Sustained.

So I'll do it once again, Mr. Keaveney, so you understand how Judge Block wants to handle the trial.

Whatever he relied upon, I'll allow you cross-examination, okay? If he says he didn't rely upon the document, he didn't rely upon it.

Now, as part of your case, if you want to, you can introduce other testimony, right, and then maybe he can be called back as a rebuttal witness, if the plaintiff chooses to do that. That way we have a clear structure instead of going back and forth referring to documents that are not in evidence, okay?

MR. KEAVENEY: Your Honor, he relied on it. It's in his report, the substance of that document.

THE COURT: He --

MR. ROTH: Objection.

THE COURT: You're going to have the opportunity, in your case, to say, here's your document. He said he didn't rely upon it. You can tell the jury he should have relied upon it, okay? I'm not going to preclude you from doing that.

But let's just focus now on his questions and his answers.

BY MR. KEAVENEY:

Q Mr. Jimenez --

THE COURT: Excuse me. You can lay a foundation for all the documents that you want to identify that he did not rely upon. We can have them marked as proposed exhibits, even though they're not in evidence at this time. If you want to

do that, I will allow you to do that.

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q Well, I think we established, Mr. Jimenez, that a G-2 is a document kept in your main course of business; correct?

MR. ROTH: Objection.

THE COURT: Sustained.

He didn't rely upon it.

Next question.

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q You reviewed deposition transcripts regarding this matter; correct?

A I did.

Q Okay. Did you review the deposition transcript from Gabrielle Smith?

A Yes, I did.

Q And did you review testimony from her in which she indicated --

MR. ROTH: Objection.

BY MR. KEAVENEY:

Q -- that Ms. Harger was on the track seven to ten seconds before the train hit her?

MR. ROTH: Objection.

THE COURT: So here's what we're going to do.

You apparently want to read that deposition testimony into evidence as part of your case, I assume.

MR. KEAVENEY: I'm asking if he's --

THE COURT: Am I correct or not?

MR. KEAVENEY: Not at this time, Your Honor. I just want to know --

THE COURT: Well, all right. So at a later time you wanted to read that deposition testimony into evidence; correct?

MR. KEAVENEY: Your Honor, this is just --

THE COURT: You did not rely upon this at all; right.

THE WITNESS: I'm sorry.

THE COURT: Did you reply upon -- let's just identify what it is he did not rely upon.

Go ahead.

BY MR. KEAVENEY:

Q Did you rely on that testimony?

A No.

THE COURT: "No," that's his answer.

BY MR. KEAVENEY:

Q Now, we just heard 911 calls. And the last one we that heard...

(Counsel confer.)

THE COURT: So, Mr. Keaveney, so a thousand percent

clear, I'm allowing you to lay a foundation about what he did not rely on. And then if you want to go forward as part of your case, I will allow you to do that, all right?

MR. KEAVENEY: Okay.

THE COURT: And then he can possibly be called as a rebuttal witness, if the plaintiff wants to do that. That way we have a structure that the jury can follow, instead of having to talk about things which are not in evidence.

BY MR. KEAVENEY:

Q When just heard 911 calls; correct?

A Correct.

Q And the last one we heard was someone saying that Ms. Harger fell on the tracks just as the train came in; correct?

MR. ROTH: Objection, mischaracterization.

THE COURT: You know, you heard the 911 call, all right? You want to ask him a question about that? It's in evidence. You can play that to the jury again, if you want to.

BY MR. KEAVENEY:

Q Mr. Jimenez, did you hear that in the --

MR. ROTH: Objection.

BY MR. KEAVENEY:

Q -- in the recordings?

THE COURTO: He heard it?

Is your hearing okay?

THE WITNESS: Usually.

THE COURT: Okay. He heard it.

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q Did you consider that, in making your opinion?

THE COURT: Did you consider that 911 call, which you just heard, that the defendant has is now introduced into evidence, did you consider that as part of your opinion and your testimony that you have given the Court today? Did you consider it?

THE WITNESS: No, I did not.

THE COURT: You did not consider it?

You got your answer.

BY MR. KEAVENEY:

Q Did you read Ms. Shabazz's deposition testimony?

A Yes, I did.

Q Did you consider her deposition testimony in making your opinion today?

A Yes, I did.

Q Okay. And Ms. Shabazz said that as she was coming into the station, one or two --

MR. ROTH: Objection.

THE COURT: You said you considered some of her testimony. Now he's going to make a reference that this is

her testimony. I'm going to allow him to make that representation, as an officer of the court, and you're going to answer whether you considered this or not.

Go ahead.

MR. ROTH: Your Honor, just, I request page and line, if he's reading from --

THE COURT: What?

MR. KEAVENEY: I'm not reading from the transcript. I'm summarizing.

THE COURT: Just one second.

You want to summarize the testimony?

MR. KEAVENEY: I'm asking --

THE COURT: If you didn't summarize it correctly, Mr. Roth is going to let us know. I'm relying upon you to summarize it correctly. You're making a representation. If it's not correct, Mr. Roth will tell us about it.

BY MR. KEAVENEY:

Q In reviewing that deposition transcript, did Ms. Shabazz say that her train was one-and-a-half to two car lengths into the station when she saw the plaintiff fall from the platform?

THE COURT: Did you read that part of her testimony? Do you understand that's what counsel said she said?

THE WITNESS: Right.

THE COURT: Did you consider that?

THE WITNESS: I believe, yes, I did.

THE COURT: All right. Next question.

Just one second.

So while this is happening -- this goes back and forth. It's called direct, cross-examination, redirect when you ask questions until we've fully explored his testimony back and forth. That's what you're seeing right now.

Okay. You may continue.

BY MR. KEAVENEY:

Q Was her testimony consistent with the G-2 that she wrote?

MR. ROTH: Objection.

THE COURT: Objection overruled.

What's the question again?

BY MR. KEAVENEY:

Q Was her deposition testimony, that portion of it, consistent with the G-2 that she wrote that you reviewed?

MR. ROTH: Objection.

THE COURT: I do not know whether you understand the question.

Do you understand the question? If you don't, tell me you don't.

THE WITNESS: No, I don't.

THE COURT: Ask another question.

(Continued on the following page.)

BY MR. KEAVENEY: (Continuing)
Q Did you review any other deposition testimony?
A Luisa Harger's, her husband's, and Ms. Shabazz's.
THE COURT: You reviewed all of those testimonies, right?
THE WITNESS: Well, yes, I read through it.
THE COURT: Okay. There's your answer. Go ahead.
Q Did you consider Ms. Harger's testimony credible?
A Yes, I did.
Q Did you consider Mr. Brown's testimony credible?
A Yes, I did.
Q Did you consider Ms. Shabazz's testimony credible?
A No, I did not.
Q Ms. Shabazz's testimony is consistent with the last 9-1-1 call we played you, correct?
MR. ROTH: Objection.
THE COURT: I don't know if I understand that question. Sustained.
MR. KEAVENEY: Okay.
THE COURT: If you want to make arguments, you can do it in summation, if you want to do that. This is not the time to do that. Next question.
MR. KEAVENEY: I'm just asking if one piece of evidence is consistent with another.
MR. ROTH: Objection.

THE COURT: Sustained.

Do you understand that? I'm a little confused. He wants to know if it's consistent with this, with that.

If you want to ask him a specific question, I will let you do that. He can say this is what that testimony was, and was it the same as this? You can argue that to the jury, but let's get the facts out.

MR. KEAVENEY: Okay.

Q Your opinion is based on the fact or on the -- your reading of the facts that Ms. Harger was on the tracks before the train came in, correct?

A Correct.

Q And you didn't consider any other evidence that showed that she fell on the track as the train was already in the station, correct?

MR. ROTH: Objection.

THE COURT: Overruled. Do you have any knowledge as to how she came on the track?

A Other than reading through testimonies, no.

THE COURT: You read about the testimony, all right. Go ahead.

Q And you would agree that listening to all 9-1-1 calls would be appropriate in making an opinion regarding this case, right?

THE COURT: You considered all the 9-1-1 calls or

not?

MR. ROTH: Objection.

A I've listened to all the 9-1-1 calls, but a lot of them were --

THE COURT: You heard all these 9-1-1 calls that we played for the jury, correct?

THE WITNESS: Them and others too.

THE COURT: Do you have any questions about those calls?

Q You picked the 9-1-1 calls that were favorable to Ms. Harger, correct?

MR. ROTH: Objection.

THE COURT: Sustained. So it's argumentative right now. Save it for summation. All right?

Q When is the last time you operated a subway car through the Atlantic Avenue station on a revenue train?

A I'm going to say in 2004, 2005, somewhere in that area.

Q 20 years ago, correct?

A That is correct.

Q And you had a clear recollection of how those trains enter that station from an operator's perspective?

A Absolutely.

Q After 20 years?

THE COURT: Well, wait a second. It's not 20 years. The accident happened in 2016. You want to know what his

recollection is today?

MR. KEAVENEY: Correct. 20 years.

THE COURT: So today what you just testified to, that happened 20 years ago.

THE WITNESS: Yes, I do, Your Honor.

THE COURT: Next question.

Q And you returned to the station, correct?

A Yes, I did.

Q You returned to the station a few weeks ago?

A No, I returned to the station yesterday.

Q And you didn't get into the operating cab yesterday, correct?

A No, I did not.

Q And you observed the train from the platform, correct?

A No. I observed the train -- oh. You're talking about coming into the station?

Q Correct.

A No, I observed it from the middle window.

Q Not from the operating cab, correct?

A From right outside the operating cab.

Q Not from the operating cab, correct?

MR. ROTH: Objection.

Q Were you in the operating cab or not?

THE COURT: One second. Objection.

MR. KEAVENEY: He said right outside --

THE COURT: Just one second. Sustained.

Next question.

Q Mr. Jimenez, what have you been doing since you left the Transit Authority?

A Lots of things.

Q Like what?

A I started out as a legislative advisor for my County Legislator for one year. I was a Hispanic Advisory Council advisor for her.

And then I went to the Knights of Columbus and started volunteering with the Knights of Columbus and helping them do good charitable works. And of course, most Knights of Columbus run a bingo game. I don't know if they still do that here in the city, but I know out of Suffolk County they do, and those bingo games produce revenue for the Knights of Columbus to donate to charity. And I rose up through the ranks, the chairs of the Knights of Columbus from a guard, a door guard to the grand knight of the council, and I ran their bingo game. And as a result of running their bingo game and the changes that I implemented with the game and the way that my game was conducted, the Town Clerk from the Town of Brookhaven called me and asked me if I would be interested in working for her as a bingo inspector. And I said, sure. So I went to working for her as a bingo inspector, and I went from a regular inspector to -- everyone laughs at bingo inspector.

I went from being a bingo inspector to a senior bingo inspector.

During that time, I also started doing this consulting, and I found it extremely fascinating, very gratifying, and very difficult because there was a lot to learn.

Q So you haven't operated a train in over 20 years, correct?

MR. ROTH: Objection. Asked and answered.

THE COURT: Overruled. He said he hasn't operated a train in 20 years, right?

THE WITNESS: I have not, no.

Q You haven't been involved in the train industry, other than your current work now in over 20 years, correct?

A Correct.

Q Okay. And you base your opinion then today on a limited amount of documents then, correct?

MR. ROTH: Objection.

THE COURT: Well, he testified as to what he based his opinion on. Save that for your argument.

MR. KEAVENEY: Okay. Thank you, Your Honor.

THE COURT: All right. So any redirect now?

Now, look, Mr. Roth, I'm trying to structure this so the jury can follow the bouncy ball obviously. So you can question him now, and then if you feel there is a need after

the Defendant rests its case to recall this witness, I will give you the flexibility to allow you to do that, if you think that you want to do that. Okay? That's how we're going to go back and forth. All right?

Now just question him now about what was raised today, this morning, about his testimony and let's see how it goes.

MR. ROTH: I'm taking the hint, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q So just a couple of questions. All right? First, I don't think I got how long were you a train operator because Mr. Keaveney was saying that you hadn't done it for a certain amount of time. How long were you a train operator?

A 29 and a half years.

THE COURT: Don't forget the half a year.

THE WITNESS: Please don't. My granddaughter would be upset.

Q And there is a lot of talk about the angle of view between the center car --

THE COURT: Why don't you ask a question?

Q What's the difference between -- if any, between the view from the operator's car or to the view that we saw in the video?

A So there is a difference but it's miniscule. It's -- I

trained train operators for lots of years. And in my training of train operators, I would have to stand in that position where that video was taken from, and I would have to be able to observe what the train operator was doing and whether they were doing it right and be ready to stop them if they weren't going to respond to an emergency situation. So I had to be in a position where I could, indeed, take over that train if I had to.

Q Okay. And when you were -- when they were playing the 9-1-1 calls, okay?

A Mm-hm.

MR. ROTH: Your Honor, I took a screenshot of what they had. Can I put that up, please? It's not in evidence, but it was what the jury saw when they had the --

THE COURT: I don't know what you're talking about.

MR. ROTH: When the seven 9-1-1 calls -- when Defendants were playing the seven 9-1-1 calls, they had a screenshot of all seven calls. I would like to put that up, if that's possible.

THE COURT: Well, it's in evidence, I think, isn't it?

MR. ROTH: But the view. I just need the view. I sent it to Logan.

THE COURT: Just one second.

MR. ROTH: Yes.

THE COURT: You want something that's in evidence to be placed on the screen, right?

MR. ROTH: Yes. All seven. They had it in their folder.

THE COURT: Objection sustained. Next question.

Q So there was one through seven 9-1-1 calls, correct?

A Actually it started at two.

Q Okay. So those, those, those calls, are they in some type of order as a 9-1-1 operator; is that correct?

A The order that they were received, yes.

Q And the call you listened to, do you recall what number that was?

A Six.

Q Six, that was their call. The one that we played was five?

A Five, correct.

Q Can you tell us, having just gone down to the Atlantic station yesterday --

A I'm sorry, he also played number two. Two, six, and we used five.

THE COURT: So the jury has heard calls two, six, and seven, correct?

MR. ROTH: Two, five, and six, Your Honor.

MS. WINTERS: Sorry, Your Honor. It's actually call one. Call one, five, and six.

THE COURT: Just one second. The jury has heard what? You want to let the jury know which calls they heard? There were a series of 9-1-1 calls.

THE WITNESS: Correct, Your Honor.

THE COURT: And the ones you listened to in evidence today were two, five, and six?

MR. ROTH: One.

MS. WINTERS: One, five, and six.

THE COURT: One, five, and six.

MS. WINTERS: Thank you, Your Honor.

THE COURT: So we've identified them for the record. The jury heard calls one, five, and six.

What's your question?

Q So how deep is Atlantic terminal for you to get to the street?

A Pretty deep.

Q So when the calls -- you were listening to the calls come in, what was similar for all the calls as far as cell service?

A I'm sorry, I didn't --

Q As far as cell phone service, did you hear when they were talking about cell phone service during the calls?

A Yes, I did.

Q And what was important back in 2016 about having to get service? What did you need to do?

A Go up to the street.

Q And how far is it to go up to the street?
A So one, two, three platforms. So you first go up to the mezzanine. Then you go from the mezzanine -- the most -- if they went through the most direct route. Because we don't really know which route they took to get there.

THE COURT: So they can't call from the station, you can't get reception. So in order for those calls to have been made, they have to have had cell phone reception.

THE WITNESS: Correct, Your Honor.

THE COURT: You can explain to the jury what kind of -- when the calls would be made, are they on the street, halfway up the street? I think that's what he's trying to establish.

THE WITNESS: So what happens basically is you're on the platform, no service, back in 2016. So you would go running up and you keep looking at your phone, looking for service, looking for service, looking for service. I believe all of the calls said that they were in the street.

THE COURT: You think they were all in the street?

THE WITNESS: I believe so.

So to get to the street, it's not just one flight up and then you're at the street. To get to the street, you have to go up one, maybe two flights, to get close to the street.

There is one exit -- there is one exit that is at street level, but it's, like, a good 300 feet away from when

you get to the top of the stairs.

THE COURT: The closest would be that 300 feet away they would have to go in order to get any cell phone service; is that your testimony?

THE WITNESS: About 300 feet and a staircase.

THE COURT: All right. Go ahead. Next question.

Q That's the closest, but there's other ways to get up, there's many different ways, correct?

A Correct.

MR. ROTH: No further questions, Your Honor.

THE COURT: Mr. Keaveney, anything? Followup?

Limit it to the questions that he's asked.

MR. KEAVENEY: Of course.

RECROSS-EXAMINATION BY

BY MR. KEAVENEY:

Q Mr. Jimenez, you indicated the calls are -- come in in order, the 9-1-1 calls, they come in in order, correct?

A Correct.

Q So the first call would be the first caller, right? Caller one would be the first --

THE COURT: He wants to know, that was the first call that was made, if you can answer that.

A That I can't answer without seeing a time stamp on the call.

Q Well, what did you just tell Mr. Roth?

MR. ROTH: Objection.

THE COURT: Sustained.

If you can explain to the jury, what we're trying to ascertain is that there are three phone calls that they've heard: Number one, number five, and number six. I think Counsel is trying to find out what the order of those calls were. Which came first, which came second, which came third. If you have any way of explaining that to the jurors, fine. Otherwise we will move on.

THE WITNESS: No, I don't, Your Honor. I didn't say that it was specifically in order. What I said was that they do come in in an order.

THE COURT: So you can't tell which ones came first, second, or third from what you've heard here, right?

THE WITNESS: Not from what I've heard here.

THE COURT: That's his testimony.

Q Did you ever review a call log?

MR. ROTH: Objection.

THE COURT: Well, he can answer that question.

Did you do anything at all to determine which calls came first, which calls came second, which calls came third, Any order at all?

THE WITNESS: No, Your Honor.

Q So if you reviewed a call log, that would show which calls came in at which time, correct?

MR. ROTH: Objection.

THE COURT: No, that's sustained. He said he hasn't reviewed it. If you want to introduce it as part of your case testimony about which calls came first, second, or third, I will give you the opportunity to do that.

MR. KEAVENEY: Okay. Thank you, Your Honor.

THE COURT: Anything further, Mr. Roth?

MR. ROTH: No, thank you, Your Honor.

THE COURT: Thank you very much. Enjoy your retirement. Nice to see you in court.

So it's 12:00. I think we can start another witness now possibly before our lunch break. Do you have anybody else?

MR. ROTH: Sure, Your Honor.

I would like to call Dr. Berkowitz to the stand.

Your Honor, can we just take a five-minute break?

THE COURT: I'm sorry?

MR. ROTH: Can we just take a quick break?

THE COURT: You want to take a break? You have to use the facilities? Okay. By all means.

Doctor, you can come up here and sit here in the meantime.

THE WITNESS: Thank you, Your Honor.

THE COURT: And do you want us to have the jurors wait here and you can take your time.

MR. ROTH: They could wait.

THE COURT: We'll wait.

Anyone else want to take a break, you will let me know at any time.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Sit down, relax, and make yourself comfortable.

(Witness steps down.)

(Witness takes the stand.)

(Pause in proceedings.)

THE COURTROOM DEPUTY: Doctor, remain standing and raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Thank you. Please have a seat. I ask you to please state and spell your name.

THE WITNESS: Carl Berkowitz, C-A-R-L, B-E-R-K-O-W-I-T-Z.

THE COURT: Mr. Roth, are you going to question Dr. Berkowitz?

MR. ROTH: I am going to question him.

THE COURT: Okay. You're under oath, and I think we can hear you okay, but the microphone is on. Keep your voice up. Okay?

Go ahead.

**CARL BERKOWITZ**, having been first duly sworn/affirmed, was

examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Dr. Berkowitz, how long have you been involved in transportation engineering, transportation work generally?

A Since I was a junior in college at City College.

Q And how many years is that?

A I have to say?

Q Yes, you do.

A 65.

Q Okay. And about how many pages is your resumé?

THE COURT: I'm going to interrupt. You're here to give some expert testimony, obviously, right?

And what have you been asked to opine about? Just so the jury has a foundation and a basis of why you're here. Okay?

THE WITNESS: I'm here basically -- I'm a transportation engineer and involved in transportation safety for my entire life, and I'm here to give an opinion as to what happened in this particular incident.

THE COURT: All right. And obviously you reviewed a lot of documents, we're going to allow Counsel to explore all of this. But give the jury some orientation as to what you were asked to opine about, and then I'm going to ask you to tell them what your opinion was, and then we'll go from there.

THE WITNESS: I was asked to review numerous documents. And from those numerous documents to come up with an opinion. And I did come up with two opinions. One is that the standard of care and good and accepted practices were violated by the New York City Transit Authority. And my second opinion has to do with the train operator who failed to follow standard operating procedures and failed to do a proper job in terms of operating the train into the station. Those are my two opinions.

THE COURT: Those are the two opinions which you came to, correct?

THE WITNESS: Yes, sir.

THE COURT: And you can explain to the jury briefly before we find out about all your wonderful qualifications what the basis of those two opinions was, in general, then they're oriented, then we can go from there.

THE WITNESS: Well, it's foundation and my education, training, and experience. I've been involved in understanding rail accidents, rail reconstruction incidents. In fact, I'm writing a book called Train Accidents.

THE COURT: We know you're writing a book and you're doing a big deal. Okay? Tell the jury, you came to those opinions, why did you come to those opinions?

THE WITNESS: By reviewing the information that was provided, some of which you've seen, additional information

that I gleaned from e-mails that were produced, from inspecting the station, listening to the 9-1-1 calls, listening to -- watching videos, looking at animations, looking at depositions, reading depositions.

THE COURT: So all of that stuff you read and you looked at, you came to that opinion, those opinions?

THE WITNESS: My two opinions.

THE COURT: Based upon reviewing all --

THE WITNESS: Two separate sets of information, but my two opinions are derived from that information.

THE COURT: Now, I will let you go forward and tell the jury a little bit about why he's so qualified to render those opinions, and then I will let you elaborate a little bit about that here before we go into cross-examination. Okay? Okay.

Q So Dr. Berkowitz, why don't you just tell us; just give us the highlights of your career in transportation that makes you qualified to be an expert here today in transportation safety and engineering?

A From day one, my first job was with the New York City Transit Authority, in college. And I've always been interested in transportation safety, but more particularly, the safety of people, passengers, pedestrians, workers. And that's what I've dedicated my entire career to. And I have an extensive background in what we call intermodal

transportation. And in fact, in the field of intermodal transportation, which is the safe movement of people and goods, I was the first professor in the United States to teach that subject, at the bachelor's and the master's level. And interestingly enough, the master's program I developed with Tom Prendergast, who was the president of the Long Island Railroad, ultimately became president of New York City Transit, and ultimately became MTA chairman. He and I developed this MBA, the first in the nation, which we taught at the Hillside facility of the Long Island Railroad for all MTA employees, essential staff, the bus operations, the Triborough Bridge and Terminal Authority construction. And I've had multiple jobs.

I went to City College. I have a bachelor's in civil engineering with a minor in mechanical, electrical, and military because I was in ROTC.

Following that, I got an MBA from Baruch College.

Following that, I went to Brooklyn Polytech, which is around the corner, and earned a Ph.D. in transportation engineering and planning.

While I was -- after I graduated college, I went to work for New York State Department of Transportation, and they sent me back to school for two-and-a-half years in their training program.

So my mother and father said I was a perpetual

student, constantly going to school. But I was working as well.

While I was working for New York State Department of Transportation, I was recruited by Governor Nelson Rockefeller to be his assistant in transportation manager from Dutchess County to Montauk Point, including New York City.

From that position, I was recruited by the Mayor of the City of New York to become the first transportation planner for the Department of Transportation of the City of New York. While I was working in the Department of Transportation, City of New York, I was involved in oversight of capital programs for -- in those days, most of the money that the Transit Authority earned for capital construction came from bond issues or City funds. Today, it's a State operation. But in those days, so any project that the New York City Transit Authority wanted to undertake, I had to -- my staff and I, we had to review for the Mayor, for the Commissioner and for the Mayor, you know, whether it was valid or not.

And interestingly enough, one of my very first projects was the 75-foot cars. I think it was called the R44, which is the predecessor to the R68A, which we're talking about today. And my second day working on this, we get the delivery of the first car, first two cars I guess it was, and they're running it for -- on the test run to the system, and

they smash into a tunnel wall and destroy the train, $250,000.

MR. KEAVENEY: Objection.

THE COURT: Sustained.

All right. So we just asked you a little bit about your qualifications.

Why don't you now continue with your questioning, okay?

MR. ROTH: Your Honor, can I just go over a couple of his jobs?

Q Dr. Berkowitz --

THE COURT: I will let you go briefly, but we're not going to spend a lot of time on it.

Q Let's hold off on the stories. Just tell us what was your -- you had a ranking civil service job as an engineer?

A Administrative engineer. Top in the city.

Q Okay. And were you the director of any other transportation facilities in the City of New York?

A Yeah. My favorite, I was the executive director of the Staten Island Ferry.

Q And what were you responsible for there?

A Running six ferry boats, and tug boats, and mini ferries to serve Potters Field up in the Bronx, and also we also operated ferry service to Rikers Island prison.

Q Are you familiar with good and accepted standards of practices in the field of transportation?

A Yes.
Q And what associations and affiliations do you have with committees and national transportation agencies that gives you that, if you can tell us?
A If there's an organization that's involved in transportation, I'm a member or I'm a retired member.

Just recently I completed a term, I was appointed to a congressional committee that was chaired by Homeland Security on surface transportation security. It was called STSAC, Surface Transportation Security Advisory Committee, and we acted as advisors to the executive branch and also to congress. I was the only nonindustry person voting -- nonindustry person appointed to that committee.
Q And as far as your expert -- being qualified as an expert across the country, can you tell us a little bit about that? And then we can get into your opinions.
A Because of my passion in this field, I've been asked to consult just about everywhere. And I've stopped -- I also did international consulting, which I stopped because the traveling, it gets a little hectic at my age traveling back and forth. But I consulted in Russia, China, the Middle East. And I've done work in almost every major -- you know, every state in the union over my lifetime.

THE COURT: So I think the jury has a pretty good idea of his qualifications.

MR. ROTH: Okay.

THE COURT: Let's go on to something else.

Q All right. So first of all, whenever I ask you a question here, it's going to be within a reasonable degree of engineering certainty. I'm not going to say that before every question; do you understand that, Dr. Berkowitz?

A Yes, I do.

Q Additionally, unless there's some very specific reason, there's no questions that are going to be asked after August 2nd, 2016, which is the date of the incident here. Okay? You understand that?

A Yes, sir.

Q If you're going to refer to documents or anything else, everything I'm asking you is prior to that date because of the rulings of this Court. Okay?

A Yes.

Q Okay. Now, in transportation, what's supposed to be the number one priority?

A Safety. So it's not only in transportation, but engineering we're taught safety is job one.

Q Okay. And could you tell us -- I guess you already told us a little bit about your work in this case.

And did you have a particular -- after reviewing all the documents, the records, transcripts, did you come up with an opinion within a reasonable degree of certainty whether --

engineering certainty whether the New York City Transit Authority and the Metropolitan Transportation Authority violated good and accepted industry standards, best practices, and professional standards?

A Yes, I did.

(Continued on the next page.)

DIRECT EXAMINATION: (Continued.)

Q What was that opinion?

A The opinion is that they did violate it, that they had a circumstance. I have two areas of opinion. One was related to the Transit Authority operation in general, in terms of passengers ending up on the tracks, and the other one is the operation of the train that struck Ms. Shabazz. So if we could separate a deal one at a time.

THE COURT: Take them one at a time. The first one you mentioned was about the Transit Authority.

THE WITNESS: Right. And passengers ending up on the tracks.

THE COURT: All right. And you have an opinion about that, right?

THE WITNESS: Yes, I do.

THE COURT: Tell the jury what the opinion is and what the basis of your opinion is, and move to the second.

THE WITNESS: The basis of the opinion is my education, training, and experience all around the world. I've been very fortunate in that respect. And that all these passengers are ending up on the track. And since data was collected in 1988, since 1988 to 2016, 50 people have been -- an average of 50 people --

THE COURT: Your opinion is that the Transit Authority was remiss in some respect, right?

THE WITNESS: Yes.

THE COURT: Tell the jury why.

THE WITNESS: Because if I operated a business that killed 50 people, a person a week, and injured another three every week, I would not be in business.

MR. KEAVENEY: Objection.

THE COURT: Sustained. I'm giving you the opportunity to explain why you think that they were remiss. We know that they have a lot of situations where people wound up on the tracks over the years. So what should they have done?

THE WITNESS: I'm sorry.

Q Dr. Berkowitz --

THE COURT: You can answer my question.

THE WITNESS: In the world, this is not an unusual occurrence. Other places have come up with solutions for people interfacing with the track, such as platform edge doors, platform screen doors, gates, fencing, all sorts of technologies.

And in addition to physical technology, preventing people from reaching the track. I'm sure you're familiar with that, like AirTrain in Kennedy.

THE COURT: So you think that they should have done something, they could have done something. I think that's what you're trying to explain to the jury.

THE WITNESS: Yes, Your Honor.

THE COURT: Explain to them what you think they should have done that they did not do. That would be your opinion, right?

THE WITNESS: Yes. They should not have allowed the passengers to interface with the tracks. They should do everything humanly and technically and engineering possible to prevent people from being on the track.

If people are on the track, they have a system to warn the train operators that there was somebody on the track. The technology, for example, warning train operators that somebody is on the track was developed in 1956 by the Japanese Fuji company.

THE COURT: Before we get to the Gucci company, that's your opinion is that the Transit Authority could have done something to prevent this accident from happening, right?

THE WITNESS: Yes, sir.

THE COURT: I'm allowing you to explain to the jury. We don't care about the Gucci company. What do you think they should have done as of August 2, 2016?

THE WITNESS: Right. They should have prevented people from falling on the track by using such things as platform edge doors, platform screen doors, rope doors, gates, things of that nature. In addition, before that, to the long-term program in the interim, there are other technologies

that could be used, which interface between somebody being on the track and the train operator. CCTV is used in parts of the world. They use LiDAR and radar and sonar and infrared. This has been around.

THE COURT: All these things were around and they could have been employed as of August 16, 2016?

THE WITNESS: Long before.

THE COURT: That's your testimony, right?

THE WITNESS: Yes.

THE COURT: As far as the operation of the train by the train driver, do you have an opinion about that?

THE WITNESS: Yes.

THE COURT: What is your opinion about that?

THE WITNESS: That the train driver had many opportunities to stop to avoid interacting with Ms. Shabazz.

THE COURT: You can explain to the jury, briefly, without cross-examination what the basis of that opinion is.

THE WITNESS: Yes, Your Honor.

THE COURT: Go ahead. Why do you say that?

Q Answer his question.

THE COURT: Why do you say the train operator should have been able to stop, is that what your opinion is?

THE WITNESS: Yes.

THE COURT: Tell the jury why you say that.

THE WITNESS: It has to do with math and science,

such as Newton's laws, and basic math. We know -- can I go back why I know? When I worked for the New York City Department of Transportation --

THE COURT: I don't care about when you worked for them. Why do you think that the train operator should have been able to stop in time and not have struck the plaintiff? Correct?

THE WITNESS: Yes. It has to do with time and distance.

THE COURT: What?

THE WITNESS: Time and distance.

THE COURT: There was enough time and there was enough distance?

THE WITNESS: Exactly.

THE COURT: Why don't we do this now. Let's have cross-examination. The jury understands the opinions and the basis of the opinions. Mr. Keaveney or Ms. Winters, do you want to cross-examine now?

MR. KEAVENEY: We'll do it at the end. I would prefer to do it at the end. Let him finish his direct examination.

THE COURT: Do it now so the jury can follow the bouncing ball.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Dr. Berkowitz, how many years have you been an expert witness?
A Since 1997.
Q How many cases have you testified against the Transit Authority?
A I really don't know.
Q Because it's too many?
THE COURT: Is this your first rodeo?
THE WITNESS: No. Many times, but I don't recall.
THE COURT: More than a thousand, less than a thousand?
THE WITNESS: Not a thousand.
THE COURT: Tell us the best estimate.
THE WITNESS: I don't know. Maybe 20.
THE COURT: You know better than anyone else.
THE WITNESS: I don't keep track, Your Honor.
THE COURT: Can you give us an estimate?
THE WITNESS: I'm guessing 20, maybe.
THE COURT: Next question.
BY MR. KEAVENEY:
Q In fact, you just testified against the Transit Authority last June, correct?
A We were together. That's where I met you. I guess I could call you an old friend.
THE COURT: You're old friends. You've been here

before. You know each other. Next question.
Q You've testified not only against Transit but against New Jersey Transit, correct?
A And I represented New Jersey Transit, as well.
Q And Long Island railroad, correct?
A Yes, I've done that.
Q And you've testified against Metro North?
A Yes.
Q Washington Metro?
A Yes.
Q Amtrak?
A Yes.
Q Illinois Central?
A Yes.
Q CSX?
A Yes.
Q Chicago Transit?
A Yes.
Q Union Pacific?
A Yes.
Q All these companies, they've all done something wrong, correct, based on your testimony?
A Yes. And, also, I worked for many of the transit companies. I worked for Boston, Philadelphia, Washington.
Q Just listen to my question.

A Los Angeles, Cleveland.

THE COURT: Just answer his questions. We know you're a superstar witness.

THE WITNESS: I'm not a superstar.

Q You've testified in Chicago, in Atlanta, in Jacksonville, in Miami, in Baltimore, in Los Angeles.

MR. ROTH: Objection.

THE COURT: Sustained. Next question.

Q In fact, you testified, or given deposition testimony, over 50 times against railroads in the past four years, correct?

MR. ROTH: Objection.

THE COURT: Overruled. You can answer.

A I don't know. I don't keep track. I have a Rule 26, Your Honor, but I don't count.

THE COURT: Next question.

Q If I were to represent to you that that indicated, that Rule 26, that you gave testimony at trial or depositions 50 times in the past four years, would that be accurate?

A If you say that's what I did, I guess you're right.

THE COURT: You testified a lot.

THE WITNESS: Mostly depositions, not many trials.

THE COURT: A lot of times you testified. Next question.

Q It would all be on behalf of plaintiffs?

MR. ROTH: Objection.

THE COURT: Overruled. Have you ever testified on behalf of the Transit Authority?

THE WITNESS: No. But I've worked for the State of New York.

THE COURT: Have you ever testified on behalf of the Transit Authority?

THE WITNESS: No.

THE COURT: Have you just testified for plaintiffs? Yes or no.

THE WITNESS: No. Plaintiff and defendant.

THE COURT: You also testified for the defendant?

THE WITNESS: 50/50, Your Honor.

THE COURT: Next question.

BY MR. KEAVENEY:

Q When was the last time you testified on behalf of a defendant?

A New Jersey Transit in depositions.

Q When was the last time? What year?

A Last year, I believe. They don't do depositions. They're not actually testifying because I wrote a report.

THE COURT: You wrote a report for the New Jersey Transit Authority. Is that your testimony?

THE WITNESS: And the case was settled.

THE COURT: Next question.

Q Out of those 50 times that you gave deposition testimony or trial testimony in the last four years, how many times did you testify on behalf of plaintiffs?

MR. ROTH: Objection.

THE COURT: That you gave actual testimony the question is.

THE WITNESS: Most of the time with defendant cases, I write a report and that's where it ends.

THE COURT: So as far as testifying in court, can you tell the jury how many times you've testified for the plaintiff, how many times for the defendant, if you can?

THE WITNESS: All I know is who I represent. 50 percent of my representations --

THE COURT: I'm just asking you a simple question.

THE WITNESS: I don't know, Your Honor.

THE COURT: So you can't answer that question. Go ahead. You say that whether it's reports or testimony, whatever, it's 50/50 between the plaintiffs and the defense?

THE WITNESS: Right. Some of it is for both, both plaintiff, defendant for the same transit organization.

THE COURT: Okay.

BY MR. KEAVENEY:

Q So in the past four years you've testified half for defendants, I just want to clarify, and half for plaintiffs, correct?

A That's not what I said.

THE COURT: You didn't testify half and half. You represented half plaintiffs, half defense, whether it may be reports or testimony. I think that's your testimony. I'm not putting words in your mouth.

THE WITNESS: That's exactly correct.

THE COURT: Next question.

Q Are you being compensated today?

THE COURT: You can answer that question.

A Yes.

Q How much?

A My rate is 525 and hour.

Q How many hours have you spent on this file?

A Well, I spent time on writing my report and I did that and I got paid for that. I don't remember the exact amount, but I did a lot of pro bono work after that because it was so many documents and I just felt kind of guilty.

THE COURT: He's asking you a question.

A I don't know the amount that I charged.

Q How many hours did you spend on your hundred page report?

A On a hundred page report, maybe 40, 50 hours.

THE COURT: Can you give the jury any sense of how much money you're going to be getting because you're representing the plaintiff in this case? Simple question.

THE WITNESS: I got paid for my report.

THE COURT: Just give the jury the total sum.

THE WITNESS: Let's say 50 hours times 525.

THE COURT: Give the jury some idea.

THE WITNESS: Maybe the report was 30,000. I haven't billed yet for court.

THE COURT: About 30,000 so far, and the report and whatever else you've done.

THE WITNESS: I did a lot of pro bono.

THE COURT: I'm just asking you how much you're going to get paid for your testimony.

THE WITNESS: So far I earned $30,000. And for the time I spent in court, which I haven't billed for.

THE COURT: So if I keep you for 100 days --

THE WITNESS: I'd love you. Please do that, Your Honor.

THE COURT: Next question.

BY MR. KEAVENEY:

Q Are you getting paid hourly or getting paid a flat fee?

A I'm sorry?

Q Are you getting paid hourly or a flat fee?

A I work on an hourly basis.

Q You made two general statements, that Transit was negligent for not installing platform screen doors; is that correct?

A No. What I said was that New York City Transit is

negligent for not implementing something to prevent people from interfacing with the track.

Q How many mass transit systems in the United States have implemented platform screen doors?

A There's the one in Washington, D.C., which goes between the Congressional --

THE COURT: You don't have to go into the Congressional. He asked you a simple question. How many, do you know?

Q How many mass transit, not people movers, not airport movers, mass transit systems in the United States have implemented platform screen doors?

THE COURT: Do you understand the question?

A I understand mass transit refers to anything that moves people rapidly. And people mover is --

THE COURT: You're doing mass transport.

THE WITNESS: It's considered part of mass transportation.

THE COURT: Like the defendant here.

THE WITNESS: Any vehicle that moves people between point A and B rapidly is considered mass transportation. Like a bus is mass transportation.

THE COURT: The question is not -- listen to Judge Block. The question is not terribly complicated. You know what the system is here, right?

THE WITNESS: Yes.
THE COURT: Are there any others like this system that you know of in the United States or the world or whatever, that have instituted any safety devices? Yes or no.
THE WITNESS: In the United States, similar to subways, no.
THE COURT: Next question.
BY MR. KEAVENEY:
Q And then you gave your opinion regarding the operation of the train, correct?
A Yes.
Q And you said that was based on math and science, correct?
A Yes.
Q And those calculations are accurate, which you discussed with Mr. Roth, I imagine, correct?
A What did you say?
Q Those calculations are accurate, correct?
A My calculations?
Q Yes.
A That I do are accurate, yes.
Q Thank you. I'll hand it back to Mr. Roth.
THE COURT: All right. Do you have any redirect now based upon what we've heard from Mr. Keaveney? Go ahead.
REDIRECT EXAMINATION
BY MR. ROTH:

Q I think that the judge had asked you about in the United States or the world, and I don't think you heard him say the world about the other systems similar to New York City that have safety measures. Did you hear that?
A Yes, the world.
Q Why don't you follow up and tell us. Let's finish that question.
A Okay. So my first exposure --
Q Not your exposure. The judge asked you how many other systems, stations, whatever. Let's answer the judge's question first. How many systems --
A Hundreds. Around the world there are hundreds, Your Honor.
THE COURT: So you can explain to the jury. You have the United States, there are other transit systems similar to what we have in New York? Yes or no.
THE WITNESS: Yes.
THE COURT: Are there any others that have employed any safety devices as of August 2, 2016?
THE WITNESS: Outside the United States, yes.
THE COURT: Not in the United States?
THE WITNESS: Not in the United States.
THE COURT: And tell us what you know about outside the United States, just so the jury has all the answers to the questions.

THE WITNESS: Basically, I worked all around the world. So I'm familiar in China. My very first exposure to platform edge doors was when I worked in St. Petersburg, not in Florida, but in Russia, and they put those doors in the 1960s.

THE COURT: So it's common outside the United States, people who are outside the United States have better protection than in the United States.

THE WITNESS: Pardon me?

THE COURT: Are you better off being outside the United States when you take a train?

THE WITNESS: Safer?

THE COURT: Yes.

THE WITNESS: Absolutely.

THE COURT: So what's going on here?

THE WITNESS: That's what I want to know. That's the $64 question.

THE COURT: So it's a lot of times outside the United States, where you travel outside the United States you're going to be safer, right?

THE WITNESS: Absolutely.

THE COURT: Not in the United States?

THE WITNESS: Unfortunately.

MR. ROTH: I'm not sure where I am. You said you want me to follow up on his redirect or start my full direct?

THE COURT: He asked questions. I'm giving you the opportunity to now ask further questions.

BY MR. ROTH:

Q Let's talk about from -- what is the reason? What information did the Transit Authority have between 1987, at least, until August 2, 2016 that should alert them that they need to do something different with the operation of the design of their system?

A Like myself, traveling around the world, there are a lot of organizations. Like there's an organization called UITP, which is an international organization in Belgium, where you hold an annual conference. And at that annual conference, the MTA sends employees. And every year it's in a different city, Paris, London, Moscow, Dubai.

So people in the industry, we're always exposed to what the technology is. We're always exchanging. Even on conferences that we hold in the United States in the American Public Transportation Association, we invite foreign speakers.

So the programs that are used in other countries to prevent people from interfacing with the trains is common knowledge. It's not a secret thing. It's not space science. It's been around a long, long time. There are many companies, even American companies, like Westinghouse. They're doing these kind of platform edge doors. Why it hasn't happened in the United States is beyond me.

Q When you say that they share information, what do they share information about as far as the different things that work because if something works in one place, maybe you can adopt it in your place.

THE COURT: He's trying to make a big speech. What is your question?

Q What other information did they share about the safety measures that are implemented in other parts of the world?

A That's what we do all the time. There are organizations out there that are keeping track of it. For example, one of my colleagues in Imperial College in London they have a group called COMET. They do performance indicators of Transit. And one of the international members, the only one in the United States, is the New York City Transit Authority. What they're tracking is people getting killed or injured on the track. Guess who is number one in the world?

MR. KEAVENEY: Objection.

THE COURT: Overruled.

Q Let's talk about that. I want to introduce Plaintiff's Exhibit 56, which is a document from COMET.

THE COURT: Is that in evidence?

MR. ROTH: I believe so.

THE COURT: Let me double check.

MR. ROTH: I don't note an objection on my list, Your Honor.

THE COURT: One second. 56 is not in evidence yet. You want that in evidence?

MR. ROTH: Yes.

THE COURT: I don't have any objection to it on my reports, so I'll allow it in evidence at this time.

(Plaintiff's Exhibit 56 was received in evidence.)

THE COURT: Go ahead.

Q Can I get the -- I put it up. This is a document that we had received from the Transit Authority. You reviewed this document, correct?

A Right.

Q And what is this about?

A This is an indicator showing deaths from accidents per billion passenger journey.

Q What is the time period?

A This is from 2004 to 2013, three years prior to our incident.

Q Let's talk about what information and what are all -- it's very little. It's hard to see. What are along the bottom row?

A Those are cities. Like LN is London, PR is Paris, NY is New York.

Q New York is at the far right, correct?

A Yes. The one on the right.

Q And they have the worst in the world at that time?

A Well, almost double of Paris.
Q And when the transportation agencies get this information, so on one hand they learn about what's safe, like what did you guys use over here to make your subway system safe, they also learned how they're doing compared to other people.
THE COURT: I don't know who's testifying. You're the witness. Do you want to change places with him? What is your question?
Q How is this information supposed to be used by the different transportation agencies that receive it?
THE COURT: You can answer that question.
A Yes, it's like a call to action.
MR. KEAVENEY: Objection.
THE COURT: Overruled. He's going to give his opinion. You can question later. Go ahead.
THE WITNESS: Can I continue, Your Honor?
THE COURT: Yes.
A It's like a call to action. Why am I doing badly and everyone else is doing better.
Q And from the documents you reviewed, what, if any, additional safety measures did the New York City Transit Authority do, other than the public awareness campaigns and the yellow strips after receiving this information?
A Practically nothing else. They had a button campaign.

They spent $1,000 on six-inch buttons, be careful or something, 5 or 6-inch buttons. They didn't do anything.
Q So when -- a transportation agencies has -- can you describe -- strike that. People being struck by trains, you looked at the CWI report that we have in evidence, Exhibit 54; is that correct?
A Yes, I did.
Q In that report what did you -- and that is the data you were talking about from 1987 to 2016; is that right?
A Yes, sir.
Q And that information, you mentioned before I think safety performance indicators that this is a safety performance indicator, this 56?
A Yes.
Q What about the people that are being struck by trains and killed by trains and injured by trains that are in that report, that 1987 report? What is that?
A Safety performance indicators, as well. If you do a tabulation, you can find that there's 105 days where two or more people were killed on the same day, literally.
Q When you said you could, did you?
A Yes, I did.
Q Do you have any notes you would like to help refresh your recollection about some of the --
THE COURT: He doesn't say he has a lack of

recollection. What is your question?

Q Do you recall how many weeks that three or more people were killed in one week in the period from 2006 to 2016?

A I think that's where I got that 105, actually.

Q So when you say you got that, I'm asking, so I understand you analyzed the CWI report.

A It's a huge report.

Q Did you make any notes for yourself? Do you recall right at this moment how many people -- and feel free, I think it's page 16 of your notes -- how many times people between 2006 and 2016 --

THE COURT: Was it between 2015 and 2016?

MR. ROTH: 2006.

THE COURT: Wait a second. You want to ask him if he knows how many people were killed between 2006 and 2016, is that your question?

MR. ROTH: Yes.

THE COURT: Can you answer that?

THE WITNESS: Over that 30-year period?

THE COURT: Yes.

Q How many times --

A Three times per week.

THE COURT: Just one second. If you don't have -- listen to me. If you need to refresh your recollection, I will allow you to do that. I think the question is, if I

remember correctly, can you tell the jurors how many people died on the tracks, I guess, between 2006 and August 2, 2016? I think that's the question.

MR. ROTH: My question was, how many times -- how many weeks where three people were killed in one week in that period?

THE COURT: Can you answer that question or do you need to look at something?

THE WITNESS: According to my notes, over that 30 year period of time --

THE COURT: We're not talking about 30 years.

Q From 2006 to 2016. It's the third line down in your notes.

A I can't see that. I'm sorry.

THE COURT: You have this in evidence already. It's in evidence. It's in evidence.

MR. ROTH: I understand, Your Honor.

THE COURT: It's in evidence.

Q This is the period of time, 2006 to 2016. All of these numbers here, the safety performance indicators, are these safety performance indicators?

A Yes, they are.

THE COURT: Excuse me. I have to manage the trial. It's not so simple. Even you may have a hard time doing it. You're referring to a document in evidence. Tell the jury

what document you're referring to. It's in evidence.

MR. ROTH: 71.

THE COURT: You're being shown Exhibit 71. It's in evidence. It shows all the incidents of, I guess, fatalities during that period of time.

MR. ROTH: The red is fatalities.

THE COURT: It's in evidence. What question do you want to ask him about the document in evidence?

THE WITNESS: May I step up to the chart, Your Honor?

THE COURT: I want to hear the question.

Q We talked about safety performance indicators.

THE COURT: I want to hear the question.

Q What are these numbers? What is the relevance of these numbers to the Transportation Authority when they collect these numbers?

A Every year it's an indicator.

Q What do you do with safety performance indicators?

A It's a call to action. You want to try to reduce those numbers or eliminate them.

Q When you say you want to try to do that, are there tools that transportation authorities use to manage the hazards of people being struck by trains?

A You mean in terms of evaluating the data?

Q Is there a hazard management process?

A Yes, there is.
Q So are there different types of hazard management processes?
A They're basically all the same. There are different approaches, but they're basically all the same. You want to look at the hazard and determine -- we have to categories, a catastrophic hazard, less than catastrophic hazard. You want to look at the hazard and hierarchy the hazard. The higher the hierarchy of the hazard, the more imperative it is to remove it.
THE COURT: I think the question is you've seen this document in evidence. You see the incident report over this period of time. The question is, what, if anything, knowing this to be the case do you think, in your expert opinion, the Transit Authority should have done, if anything?
THE WITNESS: Each year they should have evaluated that data and determined whether it's a serious hazard or a less than a serious hazard. Anybody who is -- when you lose a life, that's a serious -- that's a catastrophe.
Q This is from -- this was marked as 40A. This is from --
THE COURT: That's in evidence, I believe.
MR. ROTH: This is in evidence. Your Honor, could I approach and give this to the witness?
THE COURT: What is your question? It's in evidence.

Q Explain the relevance and the significance of the different categories.

THE WITNESS: May I step up, Your Honor?

THE COURT: I think you've already adduced a lot of testimony about this. You want to go over this again?

MR. ROTH: Your Honor, it's important, I think.

THE COURT: What's your question. It's in evidence.

Q How is this supposed to be used by transportation authorities to manage their hazard?

THE COURT: He's showing you this document that's in evidence. It's 40-A, specifically, right? And your question is what? Looking at that document, what is your question?

Q When you see this, explain the hazard management process. First, you identify a hazard, correct?

A Yes.

Q Can you describe what's --

THE WITNESS: May I step up to the chart?

THE COURT: Put it on the easel. You had a lot of testimony about this already. Ask a couple of focused questions and then move on.

THE WITNESS: May I step up? It would be easier for me.

THE COURT: You can't see that unless you step up?

MR. SHIELDS: He wants to show the jury, Your Honor.

THE COURT: Let the jury see this. Let me hear a

question. The jury has seen this before.
Q This is part of the risk management system, which apparently you're familiar with.
THE COURT: I want to hear your question. Listen to the judge. I want to hear a question that he wants to ask you about that document. Question.
Q Can you explain the right-hand column, the first column that has no color in it?
A Yes. This is the level. Is the incident frequent, probably, occasional, remote, improbable, or eliminated. So this is a hierarchy of frequent or eliminated.
Q And then what is it across the top?
A What's the severity? Somebody dies, there's no doubt, right? It's catastrophic. It's frequent. Where are we? We're high. We're right here. If you move to address a hazard, what hazard would you address first.
Q What happens once a Transportation Authority, using the risk management process and according to the federal rules and regulations and the good and accepted practices and procedures in transportation, what are you supposed to do as far as an action plan when you have a high hazard?
A Eliminate or remediate.
Q What's that called? What's that called in transportation?
A We call that the hierarchy of control.

Q Is it a corrective action plan?
A You develop a plan to eliminate. You do a study and then you do a plan to eliminate or remediate.
Q And how far back did the -- from the documents you reviewed, how far back did the Transit Authority know that they needed to do an adequate study to analyze this?
A It looks like it goes back to 1988.
Q At least, right?
A Huh?
Q At least?
A At least after 1988. But I've read articles of people falling on the tracks in 1905, actually.
Q And since that time, since that time, what -- other than public awareness campaigns, from the documents you've reviewed, from the testimony you've heard, what has the Transit Authority done differently in their design or operation of the system to alleviate this hazard to create a corrective action plan?
A They did nothing. Absolutely nothing.
Q Between August 2nd in 2016?
A Pardon me?
Q Excuse me. Up to August 2, 2016?
A Yes. And even now they --
MR. KEAVENEY: Objection.
THE COURT: Sustained. They did nothing up to that

date is what your testimony is.

THE WITNESS: Yes, Your Honor.

THE COURT: You can get back on the witness stand. Any other questions?

MR. ROTH: I have many other questions. I have a lot of questions.

THE COURT: How many? It's close to lunch.

MR. ROTH: We can do lunch now.

THE COURT: Give me an idea.

MR. ROTH: At least an hour.

THE COURT: Let's go to 1:00 and see where we are.

MR. ROTH: Sure.

BY MR. ROTH:

Q So you mentioned hierarchy. Is that another type of --

A It's a partner.

Q What does that --

A It's not another a kind of tool. It's the toolkit.

Q Explain that to the jury, in similar fashion.

A Basically, back in the early 1900s we developed a concept called the triangle of safety. And from that triangle of safety, we developed what we call reversed the triangle and we call it the hierarchy of control. What do you do if you have a hazard? We all know what we do. We want to eliminate it. If you can't eliminate it completely, you try to substitute something to replace that hazard, which is safer.

If you can't eliminate or substitute, then you want to try to do something that's remediation using engineering, doing some kind of remediation. If you can't do remediation and if the system doesn't allow you to eliminate or substitute or remediate, then you have to provide people with enough information and enough safety precautions so they are as safe as if it was eliminated.

Q And at the time, as of August 2, 2016, in the 20 years leading up to that, what known effective safety measures existed?

A I'm sorry. You broke up at the end.

Q I said from the 20 years prior to August 2, 2016, what known effective safety measures were available to the Transit Authority to alleviate the hazard of people being struck from trains?

A A number, which I mentioned previously like platform edge doors.

Q Describe what that means, platform edge doors.

A This is a system. It's like elevator doors in front of the train. When the train door opens, these doors open and people can go from the platform onto the train. They come in different shapes, sizes, and forms. They come ceiling height. They come three-quarter height. They come without doors, with doors, gates, sliding gates.

Like in Japan they have like sliding gates, instead

of elevator type doors. In Russia and some other countries, in Spain, they came up with the idea of rope. It's like chain link and it goes up and down and you can see through it. They call it rope doors, or platform rope doors, or gates, platform gates.

And in Japan they had lots of problems with people falling on the track. What they did is they put up little walls and the train doors would stop between these little walls. They would encourage people to stand behind these little walls.

Q Did you work with an animation company to create some animation of what, at this station, what the platform screen doors or different barriers would look like at this station?
A Yes, we did. We worked together to show examples of what it would look like trying some of these technologies. And one additional, which we didn't talk about.
Q And the computer animation videos, would they help you to describe the way in which Ms. Harger would have been prevented from falling onto the tracks?
A Yes.

MR. ROTH: Your Honor, I'd like to for demonstrative evidence purposes publish to the jury to help Mr. Berkowitz testify to show that the rendering for the platform doors and other barriers that we had created at the station.

MR. KEAVENEY: Objection, Your Honor. The witness

is not an accident reconstructionist. That's the only way it would be helpful.

THE COURT: I think this is a good time to take a lunch break. We'll be back at 2:00. Don't talk about the case during the break.

(Jury not present.)

THE COURT: You can step down. Don't talk about the case during the break to anybody. We'll see you back at 2:00. You can step down. Tell me, Mr. Roth, what exhibit you want to introduce into evidence now.

MR. ROTH: It's an animation. It's a demonstrative.

It's not a document in evidence. It's a document to help him testify.

THE COURT: He doesn't need any help, from what I can understand.

MR. ROTH: Well, to show what this platform, the different barriers that could be installed at the location. It has dimensions. It has the barriers. It would show --

THE COURT: I think that he can testify -- look, from what I understand, you're relying upon the doors and the barriers. That's what your case is about. We're not talking about ropes.

MR. ROTH: There's all different types of barriers that we're relying on.

THE COURT: You're relying on PSDs and TIAs. That's

what I understand your case to be about. That's what I have here. It's about PSDs and TIAs. Am I missing something?

MR. SHIELDS: There's different types of platform screens.

THE COURT: There are different types of PSDs and TIAs. I'll allow you to explore that.

MR. SHIELDS: Can we show Your Honor the video that we were suggesting to show to the jury as demonstrative evidence that we can have --

THE COURT: What I would prefer would be for him to testify. I don't know whether he needs any demonstrative support. Maybe he can testify and that could be sufficient.

MR. SHIELDS: Judge, a picture is worth a thousand words.

THE COURT: One second. I don't want to introduce something in evidence which would inflame the jurors that haven't seen it.

MR. SHIELDS: Our suggestion, Your Honor, is that we show you the video so that you can understand why we want to show it to the jury, so we can have a ruling before Dr. Berkowitz comes back after lunch.

MR. ROTH: I don't think it's inflammatory.

MR. SHIELDS: There's no other way for the jury to understand what it would look like at this station to have these barriers here and how it would have prevented this

accident.

THE COURT: This is a video that you want the jury to see to help him testify as to what type of barriers he thinks could have been or should have been installed. Correct?

MR. SHIELDS: Correct.

THE COURT: How long is the video?

MR. SHIELDS: About one minute, Your Honor.

MR. KEAVENEY: Judge, the video, from what I understand, it's speculative. There's been stuff that's been formed after the accident which shows that PSDs are not feasible for this station. Unless we can get to that, it's irrelevant.

THE COURT: The video is one minute. If he needs that to help him with his testimony, I'll consider it. Let me see it.

MR. KEAVENEY: Judge, what is his testimony?

THE COURT: I don't know what his testimony is. He's already testified.

(Video played.)

THE COURT: So this is a video of what you think could have been installed?

MR. GENIS: That's the rope barrier, Judge.

MR. KEAVENEY: That's speculative. It's not --

THE COURT: One second. Let me do it my way. So

he's going to testify what could have been done, right? And I don't know why he can't explain that. I don't see why he can't explain that.

MR. SHIELDS: It would assist the jury.

THE COURT: Just try to handle this in a structured way. Let him testify about what he thinks should have been done. Okay. That's what he'll be able to testify to. He can say you should have put up doors, you should have put up ropes. And you want to show this as demonstrative evidence to support that testimony. Right?

MR. SHIELDS: One other part, Your Honor, is the word rope barrier is confusing. It's deceptive.

THE COURT: It's okay. Let him testify first. I will allow this as demonstrative evidence. Let him testify first. See you at 2:00.

MR. KEAVENEY: Judge, it was two videos there.

MR. SHIELDS: One video.

THE COURT: Look, you can't talk to each other. Stop it. You cannot talk to each other. You talk to me.

MR. SHIELDS: Yes, sir.

THE COURT: That's how we make a record. This is the video you want the jury to see to assist him in his testimony. That's it. No other video. That's sufficient.

MR. ROTH: Well, there's a video for the --

THE COURT: One second. You'll mark it for

demonstrative purposes as the exhibit I think it's going to be 103.

MR. SHIELDS: Yes, Your Honor.

THE COURT: Let's hear his testimony first. You have your objections. See you at 2:00.

MR. KEAVENEY: Judge, may I add that by showing this, plaintiffs are opening the door to our feasibility study that showed that this was infeasible at this station.

THE COURT: I'll allow you to do that.

MR. GENIS: Judge, you ruled nothing is permissible post August 2nd.

THE COURT: I ruled what?

MR. GENIS: You ruled that nothing is admissible, other than the measure that was taken of putting in the rails, no documents, no testimony.

THE COURT: You're opening the door with his testimony. I'm going to given him the opportunity, if he wants, to show it's not feasible.

MR. GENIS: It's not opening the door, Your Honor.

THE COURT: We'll take it one step at a time. Maybe I won't even allow this. Let's hear his testimony. 2:00.

(Recess taken; continued on next page.)

AFTERNOON SESSION

(In open court.) (Parties present.)

THE COURT: Listen to me, all right? This is important testimony, obviously, okay? And we have to be careful about how we're going to manage it. And I don't want you people to go talking back and forth to each other, you're going to have to address all your concerns to me. I'm just trying to give everybody a fair trial; that's my job description.

So my thinking is that I don't want to have a whole video in evidence. Okay? For demonstrative purposes or otherwise. I think it would be -- he's going to testify that this is what he thought could have been done he already explained that it was feasible. I'll let the questioning go forward on both sides.

If you want a picture of what he thinks should have been done, I will consider that, if you want to have a photo of that. I don't want to go beyond that because it can become a little bit too prejudicial. It introduces a lot of variables in that video. There's a picture of somebody jumping on a train or whatever, we don't want that. So I would think that that's a fair balance in terms of how I'm going to process this part of the case. Okay?

MR. GENIS: Okay.

THE COURT: Let's have him back on the stand. You

don't have to make any statements now.

MR. GENIS: That's exactly -- I was going to say, we're withdrawing it based on what you said earlier, Judge.

THE COURT: So let's get the witness back on the stand before we have the jury sit.

Obviously this case requires some judicial management. Okay? And we're trying our best to make a clean record, which is what I have to try to do. Okay?

(Witness resumes the stand.)

(Pause in proceedings.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right, folks. We're going to continue with the direct testimony of this witness. And when we left off, Mr. Roth was going to ask him some questions.

Go ahead.

BY MR. ROTH:

Q Dr. Berkowitz, we had talked about the hazard management process. What is the next step after implementing a written corrective action plan? What's the next step?

A Once you have a plan, you move towards implementing it, putting into place whatever is required to complete what the plan asks to be done.

Q Okay. And how were they supposed to evaluate their

written corrective action plan for protecting people from the hazard of train strikes prior to August 2nd, 2016?
A Well, after you implement, you go back and you get your indicators again and see how you're doing, how am I doing.
Q What, if anything, are they supposed to do after they evaluate the effectiveness, if any, of their corrective action plan in light of its actual operation?
A Keep going. Do more. Complete the system.
Q What, if anything, did the Transit Authority do after identifying these hazards?
A Well, I'm not so sure what they had -- other than their indicators, I don't know what they did beyond that.
Q I'm asking what did they do as far as the evaluating the effectiveness of their plan? What documents have you seen that -- or testimony have you heard --
THE COURT: Do you know whether they did anything?
THE WITNESS: Well, they went and took a trip to Korea and all around the world to see how these systems worked, and they found out they worked really good. And then they put it in the circular file.
THE COURT: All right. So do you have any opinion as to what they should have done or what they could have done?
THE WITNESS: They knew they had a problem. They knew the solutions to the problem a long time ago. The logical thing is to implement it.

In fact, one of the documents I reviewed was from the president of the Transit Authority, said if we have something we need to do, we can get the money to do it.

THE COURT: They should have done it is what you're saying, right?

THE WITNESS: Yes, sir.

THE COURT: They should have done what?

THE WITNESS: They should have developed a system where people could not access the track and being run over by the train.

THE COURT: Do you have any other further questions?

MR. ROTH: Yes.

Q How did doing nothing different violate good and accepted transportation safety engineering practices, procedures, and standards of care?

A How can you have an engineering process and do nothing? I mean, you have to do something. Nothing is not a solution. At least from my experience.

THE COURT: Next question.

Q What, if any, written safety plan to prevent or reduce the hazard of train strikes in the New York City subway system have you seen before August 2nd, 2016?

A None.

Q Okay. What, if any, adequate study to protect or reduce -- to protect -- to prevent or reduce the hazard of

train strikes in the New York City subway system before August 2nd, 2016 have you seen?
A No, none.
Q How did not having a written safety plan or doing an adequate study violate good and accepted safety engineering practices and procedures?
A I think we've mentioned that, that the purpose is to solve a catastrophic problem, have a plan and implement a plan and solve the problem.
Q Okay. All right. Do you remember how earlier you said you had two opinions, one was about the New York City subway, the MTA, the New York City Subway Transit Authority's negligence, but you also had an opinion about the train operator, okay? So let's focus on that now.
What, if any, engineering analysis did you do for this train strike incident?
A Well, I went to the station and I looked at the station. I, using the photographs where we see the sand on the ground, which they used to cover the blood or to absorb the blood. I assumed that was the location. I measured from that point to the portal, the entry to the station. I don't exactly -- in my report, I think it's either 243 or 247 feet. And then I look from my experiences, I know that you can see the station from in the tunnels. So I first observed into the tunnel from a -- as a person on the platform, and then I had an

opportunity to see a video of that nostalgia train, which is mentioned earlier, and from that nostalgia train, I tried to estimate the distance on the nostalgia train that I could see the entrance of the station, and I estimated that to be I think 143 feet, approximately, like that. Based upon the speed of the film and things of that nature.

The other thing is I looked at Shabazz's testimonies and she, in one of her testimonies, indicated that she saw Ms. Harger on the track 180 feet prior to -- she was 180 feet before Ms. Harger. And unfortunately, the R68s don't have what we call an event data recorder. The next series of trains that came on, like an -- every automobile has an event data recorder. So the next series of trains that come on, you could not estimate something, but you could exactly calculate the emergency braking rate. But I do know a little about the R68 from my experience with the R44, and I know that when the trains were set that the maximum service braking rate was three miles per hour per second, and the minimum emergency braking rate --

MR. KEAVENEY: Objection.

THE COURT: You're going on and on and on. Next question.

Q You had mentioned the service braking rate.

MR. ROTH: I would like to move into evidence Exhibit 2 and 45.

THE COURT: Which document?

MR. ROTH: Exhibit 2 and 45.

THE COURT: Two? Both 2 and 45.

MR. ROTH: For some reason Exhibit 45 is covered --

THE COURT: Let's take it one at a time. You want Document Number 2 in evidence, correct?

MR. ROTH: Exhibit 45 is the cover to Exhibit 2.

THE COURT: So 45, I have listed as specifications.

MR. ROTH: Right.

THE COURT: I don't have any objection to that.

MR. ROTH: No.

THE COURT: That's in evidence at this time. Go ahead.

(Plaintiff's Exhibit 45 received in evidence.)

MR. ROTH: And then Exhibit 45 is the --

THE COURT: 45 is in evidence at this time.

MR. ROTH: And Exhibit 2.

THE COURT: You want 2 in evidence at this time also? You want 2 and 45?

MR. ROTH: Yes.

THE COURT: 2 and 45 are in evidence. You can speak a little bit more clearly.

MR. ROTH: I'm sorry, Your Honor.

(Plaintiff's Exhibit 2 received in evidence.)

THE COURT: Go ahead.

Q So you had mentioned the specification, so if I could put this up on the screen, please?

THE COURTROOM DEPUTY: Sure. There you go.

(Exhibit published.)

Q So this is Exhibit 2 and this is the appendix, and you can see that this is the specifications for what train? Can you tell --

A You want to go up a little.

I guess it doesn't say -- I guess it's inside the --

MR. ROTH: The other way. The other up, sorry.

THE WITNESS: There it is.

Q You see it?

A R68A. See it all the way at the end.

Q And that is the train that was involved in this incident?

A Yes, sir.

Q And if we turn to Exhibit 2.

You had mentioned service braking, and I think it was the last thing that you had mentioned.

And here it says -- and what did you say, you said that it was -- that your full service braking was based on --

A 3.0, which is line 3. That's service -- that's normal maximum brake rate.

Q And then down here, it talks about what type of braking?

A Emergency braking.

Q And that's the type of braking that occurred in this

incident?
A Yes, it is.
Q Okay. And then over here, you talked about the rate of deceleration. Oh, sorry. Sorry about that.
A Yes.
Q Where my finger is?
A Yes.
Q And that is -- what's the rate there?
A 3.2 miles per hour per second.
Q And is that what you used for your basis of your calculation of the stopping distance?
A Even though I know it's better, I took the worst case. I took the best case for the -- the worst case. I guess it's -- it's the worst -- the worst case. I calculated the worst situation, not the best situation.
Q In other words, what you're trying to say is that's minimum stopping distance?
A Right.
Q The trains can come better, but that's the minimum and that's what you used?
A I took the worst yet, yes. What's the worst the train could do, not the best the train can do.
Q And you know that how? From what part of your experience is that, how do you know that that's --
A I've been working on this subject area for about

25 years, and I'm very familiar with event data recorders all over the United States.

MR. KEAVENEY: Objection.

THE COURT: Objection is sustained. Next question.

Q First, let's talk about, what was the max speed that you are aware that the train operator testified to?

A She said that she went a maximum speed of 25 miles an hour, and I used that --

MR. KEAVENEY: Objection.

THE COURT: Listen, answer the question specifically. Don't ramble on and on.

THE WITNESS: Sorry, Your Honor.

THE COURT: Because I'm going to stop you.

THE WITNESS: Thank you.

THE COURT: What was the question? What was the max speed that she testified to; is that what your question was?

MR. ROTH: Yes.

THE COURT: Answer that question.

THE WITNESS: 24 miles an hour.

THE COURT: Thank you. Next question.

Q It might help to speed things up and to focus you, why don't you look at your notes on page 40?

THE COURT: Ask him a question.

Q Did you calculate what the stopping distance at 24 miles an hour of this type of train was?

THE COURT: Yes or no?
A Yes, I did.
THE COURT: What is the calculation you made?
THE WITNESS: That's in my report.
THE COURT: You need to look at that to refresh your recollection? Go ahead.
Q In your notes, it's page 40, I believe.
THE COURT: You could refer him to a page to help refresh his recollection quickly.
MR. ROTH: Okay.
Q Page 40 of your notes. Do you have page 40?
A They're not numbered, unfortunately. My notes have no numbers.
Q Okay. Do you want to pull out your report?
THE COURT: Do you want to show him something to refresh his recollection, why don't you do that?
MR. ROTH: I'll do that.
THE COURT: Let's move on. Come on.
THE WITNESS: I found the page.
THE COURT: Take a look at this. Does this help you refresh your recollection?
THE WITNESS: Yes, it does.
THE COURT: Answer the question with your recollection.
A My mathematical calculation at 24 miles an hour says that

the train can stop at 153 feet.

THE COURT: That's your testimony.

Next question.

Q And that's for this type of train for a train operate entering the station?

A For the R68A.

Q And other than 3.2 miles per hour per second of deceleration, what other factor did you use for making that determination?

A Well, we have a -- in order to do something, there has to be perception and reaction time. And when I listen to Mr. Jimenez, a train driver operating a train coming into the a station is getting ready to brake. So there's no perception because you're already anticipating you're going to brake, your hand is on the brake handle. Studies done by the U.S. Department --

THE COURT: What is your answer? You're rambling on and on.

THE WITNESS: I'm sorry. I wanted to give a little background.

THE COURT: Just forget about your background. Answer the questions.

THE WITNESS: Okay. There's no perception time, it's the reaction time, and it's .67. That's the maximum --

THE COURT: Next question. Next question. Listen

to me, Mr. Witness. I'm trying to not get you to ramble on and on. Listen to the question and answer it specifically.

THE WITNESS: I'll try my best.

THE COURT: Try to do that better. Next question.

Q The train operator gave a range, correct? It wasn't just 24, it was 20 to 24?

A Yes.

THE COURT: You're not testifying, he's testifying. What's your question?

Q Can you go to the next page of your report? Did you do a calculation at 20 miles per hour?

A Yes, I did.

Q What would be the stopping distance be for that train entering the train station at 20 miles per hour?

A 109 feet.

THE COURT: Next question.

Q And was that -- in coming to that conclusion, what did you use for that?

A Pardon me?

Q What kind -- how do you get to that?

A I calculated it. I know the rate -- I'm taking the worst case deceleration, I'm taking the speed of the train, so I can -- if you have two variables with a train moving, you can calculate the third, which is distance.

Q Would it assist you in explaining these complex formulas

for the jury if you could show graphically to demonstrate how these complex formulas --

THE COURT: I don't think he needs the assistance. He answered the question. Next question.

MR. ROTH: Your Honor, we have a video --

THE COURT: Next question.

Q Did you ever view a video that represented the calculations that you did?

A Yes, I did.

Q Okay. And did that video fairly and accurately represent the stopping distance that you're describing at 24 miles an hour, et cetera, et cetera?

A Yes.

Q Would it help you to demonstrate to the jury --

THE COURT: Is there something you want to introduce into evidence?

MR. ROTH: Yes, for demonstrative purposes.

THE COURT: What is the exhibit number?

MR. ROTH: For demonstrative evidence, Your Honor.

THE COURT: Next question.

He's explained his answer. Next question.

MR. ROTH: Your Honor, there's no chance of --

THE COURT: Next question. He explained his answer.

Q Do you have an opinion of whether the train operator could have stopped in time -- strike that.

Do you have an opinion of where Ms. Harger was at the time she fell at the station?
A Yes.
Q Where was she?
A She was approximately 246 feet from the portal of the --
Q And assuming --
THE COURT: Just one second. So she was about 245 feet from where?
THE WITNESS: From where the train -- the entry to --
THE COURT: The entry --
THE WITNESS: To the station.
THE COURT: Of the train into the station.
THE WITNESS: Right.
THE COURT: You made that calculation, you're a professional engineer, you're an expert. 240 foot away --
THE WITNESS: Well, exactly I measured 246.5.
THE COURT: 246.5. That's where she was when the train was entering into the station.
THE WITNESS: Yes, sir.
THE COURT: That's your answer.
Next question.
Q Okay. And what information did you use to make the determination of where she was located within the station?
THE COURT: I don't think we need that. He's

testified.

MR. ROTH: Okay, Your Honor. No problem.

THE COURT: He's the expert. Next question.

Q So from -- you heard Mr. Jimenez, you were here for his testimony, from 150 feet inside the tunnel, would she have been able to stop the train in time without hitting Ms. Harger?

THE COURT: Do you understand that question?

MR. ROTH: I'll rephrase the question, Your Honor.

THE COURT: Next question.

Q Okay. So from all of the data points that we have, for 150 feet seeing into the station, from the front of the station even from a 180 feet, would the -- should the train operator have been able to stop before hitting Ms. Harger?

A Whatever distance scenario we undertake, the train should have missed Ms. Harger. And the worst case scenario would have been about 27 feet.

Q And, in fact, what actually happened?

A The train overran Ms. Harger by 85 feet.

Q Okay. And how did that deviate from good and accepted train practices, operations, and procedures?

A If she said that she executed the emergency brake 180 feet away, she should have stopped at 153 feet, yet she stopped 85 feet beyond the 180 feet, so she stopped at 260 feet where she could have stopped at 153 feet.

MR. ROTH: Pass it off to Mr. Keaveney now.

THE COURT: I think he's explained himself. Any other questions?

MR. ROTH: I said that I can pass it off to Mr. Keaveney now.

THE COURT: You're finished with your questioning. Mr. Keaveney, cross-examination.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Dr. Berkowitz, where is that matrix from?

A This matrix? From a document of the New York City Transit Authority.

Q Isn't it from Military Standard 882E?

A It's part of the Military Standard 880.

Q Okay. And you reviewed Military Standard 882E, correct?

A Pardon me?

Q You reviewed Military Standard --

A And A, B, C, D as well.

Q Okay. So you are familiar that the system safety standard referenced in Military Standard 882E provides a standard for generic method for the identification, classification, and mitigation of hazards, you're familiar with that?

A You broke up a little bit. I apologize.

Q It's for the standard -- it provides a standard generic

method for identification, classification, and mitigation of hazards, correct?
A Yes.
Q Okay. And that is done -- the system safety standard identifies hazards and assesses mitigation associated risks encountered in the development, test, production, use, and disposal of systems, correct?
A Not exactly. That's part of it.
Q Well, that's what the Military Standard 882 says?
MR. ROTH: Objection.
MR. SHIELDS: Objection.
THE COURT: Excuse me, stop. When you hear objection, stop. That means I have to earn my income.
THE WITNESS: I'm sorry, I wouldn't want to take a nickle.
THE COURT: I heard two voices. Who is going to be making the objections? I can't have both of you talking at the same time. Do you want to pose an objection to that question? If you want, you can tell me.
MR. ROTH: Yes.
THE COURT: Sustained. Next question.
Q Military Standard 882 is for new developments and new equipment, correct?
MR. ROTH: Objection.
A No, not correct.

Q That's what's Military Standard 882 says, correct?
MR. ROTH: Objection.
THE COURT: Overruled.
Is that what that standard says or not, if you know? Is it for new equipment or otherwise?
THE WITNESS: It's for all activities. 882 is also part of 49 CFR.
THE COURT: I know what that means. It's for everything.
THE WITNESS: That's one of the things that it's for, but that's not the only thing it's for. It's for all hazards.
THE COURT: Next question.
Q So are you telling me and the Court that if someone trips over a raised sidewalk, that they're supposed to use military analysis 882?
MR. ROTH: Objection.
THE COURT: Overruled.
THE WITNESS: Can I answer?
THE COURT: Yes. Does that apply to somebody that trips?
A What does a sidewalk have to do with --
THE COURT: Well, you know, we're not dealing with a trip here now, so I will sustain the objection.
Q Well, Doctor, you said all hazards?

MR. ROTH: Objection.
A We're talking about New York City Transit Authority hazards.
Q If someone trips on a -- in coming down the stairs in New York City Transit, do you employ Military Standard 882?
MR. ROTH: Objection.
THE COURT: I will allow that. He said all hazards.
A If that's a hazard, and we have data that shows that this is a continuous hazard that a lot of people are tripping over that kind of a situation, of course.
Q No, Doctor, that's not I'm asking. I'm not asking about data.
MR. ROTH: Objection.
THE COURT: Sustained. Next question.
Q All hazards; that's your testimony, right?
MR. ROTH: Objection.
THE COURT: Sustained. He testified.
What do you mean by all hazards? He's trying to ask you --
THE WITNESS: Anything that --
THE COURT: Listen to me. Listen to my question first.
THE WITNESS: Okay.
THE COURT: Can you do that?
THE WITNESS: Absolutely.

THE COURT: He's pointing to that document.

THE WITNESS: Yes.

THE COURT: He's trying to cross-examine you. He's trying to show that this, whatever the military reference is, that it's not necessarily relevant, I guess that's what he's trying to do. You said it applies to all hazards, now he's asking you, what do you mean by all hazards. That's what he's asking you. Is that part of this?

THE WITNESS: Yes, sir. A hazard is anything that can cause injury or death.

THE COURT: That's part of that exhibit, right?

THE WITNESS: Yes, sir.

THE COURT: Next question.

Q And what hazard are you talking about in this case?

A People being hit by a train or on the tracks.

Q And according to the chart, you look at severity times frequency, correct?

A Yes.

MR. ROTH: Objection.

THE COURT: Overruled.

Q What's the frequency of someone being hit by a train?

A 200 people a year, approximately.

Q Okay. Let's take 2011 statistics because you reference them in our report. There was 146 people hit by a train and 1,000,000,650 people that were passengers?

MR. ROTH: Objection.

THE COURT: I don't know. I haven't heard a question. What's your objection? You don't like the way he's talking? You have a question, please.

Q What is the frequency of that event occurring based on those numbers?

THE COURT: Do you understand the question?

THE WITNESS: Yes.

THE COURT: If you understand the question, you can answer it. Or if you're confused, you can let me know.

THE WITNESS: No, I'm not confused.

THE COURT: Okay.

THE WITNESS: But, Your Honor, what he's creating --

THE COURT: Can you answer that question?

THE WITNESS: Yes, Your Honor.

THE COURT: Answer it.

THE WITNESS: It's irrelevant. The number of people that the transit system carries and people being killed is irrelevant. People are being killed.

Q Doctor, what's the number?

A I don't care if they're carrying a hundred billion people.

Q Doctor, what's the number? It's a simple math equation. You do math.

A No, I'm not doing that math because it makes no sense.

It's an illogical index -- indicator.

THE COURT: If you can't answer that question, you have to explain why you can't answer that question.

Is that what you're trying to do?

THE WITNESS: You know.

THE COURT: Just answer my question. You can explain to the jury why you can't answer that question.

THE WITNESS: Because it's not a measure of anything. A billion and 50 -- if you carry a billion people and 50 die, that's not so bad? How could I answer that kind of question? That's crazy. That's a crazy question.

Q Doctor, you're the one that's relying on this chart?

THE COURT: Stop it. Next question. Do you have another question?

Q When you perform a safety improvement or mitigation, that can cause its own hazards, correct?

A Yes.

Q Are you aware that at least six people have died in Korea as a result of platform screen doors?

A I wasn't aware that six people had died.

Q Are you aware that over a hundred injuries were reported on the Jubilee line in England between 1999 and 2011 related to platform screen doors?

MR. ROTH: Objection.

THE COURT: Can I hear the question first, please?

You want to ask her what's happening in England?

MR. KEAVENEY: I'm asking if he's aware of injuries as a result of platform screen doors.

THE COURT: Go ahead. Answer that question.

A No.

MR. ROTH: Objection.

THE COURT: I'm sorry. Overruled. Can you explain, are you aware of any injuries -- what's the question -- because there were not screen doors? Is that your question? I'm trying to understand for the jury what you're asking.

MR. KEAVENEY: I'm asking the witness if he's aware of any incidents, or fatalities, or injuries on other systems that employ platform screen doors.

THE COURT: Can you answer that question?

THE WITNESS: No, because with the data that I have shows that it's nearly 100 percent safe. The data that I have seen from various organizations on these doors, they're nearly 100 percent safe. So I don't know what he's referring to.

THE COURT: 100 percent what?

THE WITNESS: Safe.

THE COURT: Next question.

Q Did you ever call the space between the train and a platform an ordinary risk?

MR. ROTH: Objection.

THE COURT: Overruled.

A I don't recall.
Q Did you write an article in *Railway Terminal World Magazines* in March of 2011 where you called that an ordinary --
MR. ROTH: Objection.
THE COURT: Overruled. I would suggest to you that you harbor your objections a little bit. I am going to allow this type of questioning as to his knowledge, what he's written, and anything else is perfectly okay.
MR. ROTH: Okay.
THE COURT: All right? Now, you continue to object on that basis, I'm going to continue to overrule your objection, so you have a good idea what's going to happen. We're going to allow this type of questioning.
Go ahead. What's the question again?
Q Did you ever -- do you recall writing that in *Railway Terminal World Magazine* in March 2011?
A I know I wrote an article called *Mind the Gap* for that magazine, but I don't remember what was, you know, in that article.
THE COURT: That's your answer.
Q In 2015, did you coauthor a paper entitled *High Level Station Platforms and Passenger Safety* and present it to the 2015 AREMA annual conference?
THE COURT: Do you remember doing that?

A I don't recall. I've done hundreds of papers.

THE COURT: Just answer the question. If you don't recall, you don't recall.

THE WITNESS: I don't recall.

THE COURT: Next question.

Q Do you recall testifying at a case this year called *Scott versus Washington Metro?*

A Yes.

Q During that testimony of you, did you say that New York City Transit puts a lot of time and energy into their safety standards?

A Yes.

Q By the way, Doctor, have you ever been precluded from testifying as an expert witness?

A I've been restricted but not precluded.

Q Has your opinions been precluded from testifying?

A They've been restricted but not precluded.

Q Have you ever been excluded -- has any Court ever excluded your opinions because they're faulty, or unsupported, or conclusory?

MR. ROTH: Objection.

THE COURT: Sustained.

A Not to my knowledge.

THE COURT: I think he's trying to find out whether you've ever been criticized because your opinions were

accepted or not accepted.

THE WITNESS: Lots of times.

THE COURT: Listen to my question. Have your opinions ever been held by any judicial authority that they're not acceptable?

THE WITNESS: I've been reduced -- limited in my testimony.

THE COURT: So your testimony has been limited in some respects, right?

THE WITNESS: To some extent.

THE COURT: That's his general answer. Go ahead.

Q You testified earlier about systems overseas, correct?

A Yes.

Q And you testified earlier about systems in Asia, right?

A Pardon me?

Q You testified about subway systems in Asia?

A Yes.

Q And for the most part, those systems are modern, post-1970?

A Some are older than that.

Q Which systems in Asia are older than 1970?

A Singapore.

Q Singapore is older than 1970?

A Portions of it, the elevated sections.

China built their first subway in Beijing over in

the 1970s, I believe.

Korea had surface transportation type of subways.

I mean, a lot of this was destroyed during World War II.

THE COURT: He is not asking you that question. He's just asking you have these other examples --

THE WITNESS: Yeah.

THE COURT: Next question.

Q For the most part, they're post-1970, correct?

A Yes.

Q And Seoul's system was post-1970, correct?

A Some of it.

Q Seoul's subway system, correct?

A The underground, yes.

Q Have you ever questioned the validity of Korean and Chinese metrics?

A Have I ever criticized --

MR. ROTH: Objection.

A -- Chinese or Korean metrics?

THE COURT: Overruled.

Q Yes.

A No.

Q Do you remember testifying in a case called *Randall versus Meta,* Cook County, Illinois, 2009?

A I don't recall.

MR. KEAVENEY: Can we put that up for Dr. Berkowitz, please?

MR. ROTH: Not in evidence.

MR. KEAVENEY: I want to refresh his recollection.

THE COURT: Just one second. He says he doesn't recall. You want to follow up as to whether there's something in there to refresh his recollection?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: He can show -- the jury is not going to see it. So he's going to show you some piece of paper to see whether you can now, with your recollection recall, if it's the case, whether you can say whether you did testify there or not.

MR. KEAVENEY: Can you show the witness page 75.

THE COURT: Take a look at that and just tell us whether it refreshes your recollection.

MR. KEAVENEY: Line 14 to 21.

Q Doctor, does that refresh your recollection as to whether or not you ever criticized the validity of Chinese and Korean research?

A It's not a criticism, it's just a general comment. It says, as I am not sure how valid they are. I'm not sure one way or the other.

THE COURT: That's the answer. Next question.

Q Doctor, you indicate that the accident was preventable

because Transit didn't have or install platform screen doors; is that your testimony?

MR. ROTH: Objection.

THE COURT: Overruled. I don't remember whether that's the testimony or not. He gave a lot of testimony. What's your focused question?

Q Are you aware there's been testimony that a platform screen door pilot program was in the works as of August 2nd, 2016?

MR. ROTH: Objection.

THE COURT: Was there any program or study as of August 2nd, 2016 on --

A Back in 2010, 2012, I saw that they were thinking about these things, but they never went beyond thinking.

THE COURT: They were just thinking.

THE WITNESS: They were just thinking.

THE COURT: Any documents, anything in writing?

THE WITNESS: Yeah, a lot of documents. Just thinking.

THE COURT: Next question.

Q Are you aware that there was a track intrusion detection system program in the works as of August 2nd, 2016?

MR. ROTH: Objection.

A They were testing, yes.

Q And you would agree that to implement a new system into a

existing system, that a pilot program would be the proper course of action, correct?
A Sometimes. When you're working with established technology, why do you have to polish -- pilot something that's already been established, such as track intrusion detection equipment? It's been around -- that equipment has been around since 1956.
Q In August of 2016, was PSDs a used system in the United States?
A Pardon me?
Q In August -- on August 2nd, 2016, were PSDs a used system in the United States for mass transit?
A The United States --
Q Was it a used system in the United States at that time for mass transit?
THE COURT: Can you answer that question one way or the other?
A They didn't start using these safety systems in the United States, other than on the airport access, on the airport trains, and at the congressional subway that goes between the Capitol building and the congressional office building, but the Federal Government was testing this equipment.
THE COURT: Was it in existence in 2016 in August any place at all? Congress, congressional facilities?

You tell us.

THE WITNESS: Kennedy. Kennedy. Atlanta. Airports.

THE COURT: You're saying that there were screens there at that time, right?

THE WITNESS: They were putting in mass transit, which they're classifying as people movers. Any train or bus is a people mover. But they were building these new trains and they were putting in platform edge doors.

THE COURT: How about down in Washington, D.C., in the Capitol, so that the senators can't fall on the tracks?

THE WITNESS: That's right. They did it.

THE COURT: They did it.

THE WITNESS: I had a chance to ride it.

THE COURT: They had that in existence at the Capitol, right?

THE WITNESS: Yes.

THE COURT: So our good congressmen are not jumping the tracks, right?

THE WITNESS: Yes. Maybe they're not happy.

THE COURT: Okay. Next question.

Q Doctor, are you aware of what complications or issues Transit looked at in connection with considering platform screen doors?

A Yes, I am.

Q And there were several factors that they looked at, correct?
A Yes.
Q Such as structural issues, correct?
A Yes.
Q Electrical issues?
A Yes.
Q Platform strength?
A Pardon me?
Q Platform strength?
A Yes.
Q Column placement?
A Yes.
Q Same size car fleets?
A Yes.
Q These are all things that they looked at and studied, correct?
A Yes.
Q And while they were doing that, you are aware that they started an awareness campaign, correct?
A Yes.
Q Okay. And the awareness campaign was to prevent people from getting close to the tracks, correct?
A Yes.
Q And you've testified in the past that such awareness

campaigns can be a comprehensive way of addressing those types of issues, correct?
A That particular type of issue?
Q Getting close to a train, yes?
A It could help, yes.
Q So what Transit was doing could help people from getting too close to the train, right?
A Well, it didn't work that way because the numbers, they tried these programs, they didn't work, but they kept -- if something doesn't work, what do you keep doing? You keep doing it over again, over again? And that's what they basically did. Their campaigns work really well that they had no impact on the number of people that were being killed or injured on the trains. So having something that doesn't do any good, in engineering we have a name for that. It's called post hoc rationalization, where you make things up to resolve a question that you have, you just make up information or you make up situations which have no reality to solving the problem.
MR. KEAVENEY: Move to strike as nonresponsive.
THE COURT: He answered the question. Go ahead.
Q Doctor, have you ever written about what causes people to make contact with trains?
A What causes people to make contact with trains?
Q Have you written about that?

A I think I have. I think I gave a seminar on it.
Q And have you, in that seminar or any seminar indicated that it's people jumping down into the track area, correct?
A That's one of the things, people go down on the track to pick up their telephone and things of that nature.
Q Right. Suicide's another thing, right?
A Well, I don't know. Every time I've been told something is a suicide, you know, that there's no medical rationale for the declaring -- a suicide is being declared, but it's not being declared by a psychiatrist, it's being declared by a bureaucrat.
Q Slip and trips are another reason?
A There shouldn't be no slips and trips. The platform should be such that it meets all the standards so there are no trips and flips.
Q Drug use, alcohol use?
A One of the things that I remember when I was growing up, they said if you drink --
THE COURT: We don't care. Wait a second. Wait a second. We don't care about what happened when you were growing up.
There are many different ways in which people can end up on the tracks is what you're saying, right?
THE WITNESS: Yes.
THE COURT: All right. Next question.

Q Prior to this case, did you ever opine that platforms -- the absence of platform screen doors was a reason why people ended up on the tracks?
A On this case?
Q Prior to this case, was that ever your opinion?
A It's always been my opinion.
Q Did you ever report that anywhere in any document or any courthouse?
A I've written reports where that is mentioned.
Q Which report that you mentioned that?
A I don't recall.
Q You don't recall.
A Not off the top of my head.
Q It's an important topic and you don't recall?
MR. ROTH: Objection.
THE COURT: Sustained.
He just answered. He said he's written reports, but he doesn't recall specifically what you had in mind.
Q Doctor, has the Federal Transit Administration required the use of platform screen doors or track intrusion devices?
A No.
Q Does New York State Public Transportation Safety Board require the installation of platform screen doors or track intrusion devices?
A No.

Q Has the State or City of New York required the installation of platform screen doors or track intrusion devices?
A No.
Q Now, you performed an analysis of the accident, correct?
A Yes.
Q A mathematical analysis, correct?
A Yes.
Q And you testified earlier that your math is correct, right?
A Yes.
Q What documents did you use to rely on making that calculation?
A Pardon me?
Q What documents did you rely upon to make that calculation?
A The location of the -- of Ms. Harger or the track, which is clearly identified in many sources. The information that the train driver said that she saw her 180 feet away and overran her by 75 feet. The distance that one could see into the tunnel, which I obtained from the video. I used that information. And once -- and then I know the worst case scenario in terms of emergency braking, and I know it's the worst case scenario because the Transit Authority, as part of discovery in this case, provided me with 30 event data

recorders which show the emergency braking rate of 30 different trains, Your Honor. And every one of those trains had way better than 3.2 miles per hour per second stopping distance.

THE COURT: Next question.

MR. KEAVENEY: Move to strike. I don't know what he's talking about.

(Continued on the next page.)

BY MR. KEAVENEY: (Continued.)
Q Did you review Ms. Shabazz's G2 form?
A Yes.
Q In fact, you attached it to your report, correct?
A I believe so.
Q Did you consider that?
A Of course.
Q I'd like to show you that G2 report.
MR. ROTH: Objection.
THE COURT: I don't know whether this is in evidence or not.
MR. ROTH: I'd like to move it into evidence.
MR. ROTH: He never said he relied on it.
THE COURT: Ask him the question. Did you ever look at a document? Is that your question?
MR. ROTH: That's my question.
THE COURT: What is the document you want to ask whether he looked at?
MR. ROTH: It's Defendant's H.
THE COURT: You want to show him the document to refresh his recollection?
MR. ROTH: Objection. He said he looked at it.
THE COURT: He looked at that document. What is your question?
BY MR. KEAVENEY:

Q Did you rely on that document in making your calculations?
A There was not --
THE COURT: The question is, did you rely on this document that he showed you? It's not in evidence. Did you rely on that in making your calculations? Yes or no.
THE WITNESS: No.
THE COURT: The answer is no.
Q Did you listen to any 911 calls?
A Yes.
Q Did you rely on any 911 calls?
A Yes, I did. I heard one 911 call where a person said --
THE COURT: The answer is yes, he relied upon it.
THE WITNESS: I'm pontificating. Just yes.
Q You were in the courtroom when those 911 calls were --
THE COURT: That's not a question. What is it you want to ask him, specifically?
Q You've heard those audio calls before, right?
A Yes.
Q In fact, you heard them today, right?
A Yes.
Q You heard one of them saying that the train -- strike that.
THE COURT: It's 1, 5, and 6 in evidence. You want to ask him questions about 1, 5, and 6, go ahead.

MR. ROTH: I want to get the --
Q You heard audio that Ms. Harger fell onto the tracks just as the train came in, correct?
A Yes.
Q Did you consider that audio in making your opinion?
A Yes. I took that in consideration that she's entering the station 243 feet away from Ms. Harger. She's entering the station. I absolutely took that into consideration.
Q Did you review the police report?
A Yes.
Q Did you review all pages of the police report?
A Yes.
Q Did you take those reports into consideration when making your opinion today?
A Yes.
Q How many pages did you review of the police report?
A I don't remember. I reviewed thousands of pages of documents.
THE COURT: The police weren't there, were they?
THE WITNESS: No.
THE COURT: Somebody made a report.
THE WITNESS: Based on what other people told them.
THE COURT: Next question.
Q Did you review any police report that it was reported that Ms. Harger fell onto the tracks as the train was entering

the station?

MR. ROTH: Objection.

THE COURT: Sustained. If you have any evidence of that nature, you can produce those witnesses. You can produce that evidence. It's okay. But that's not a proper question to ask.

Q You made a calculation regarding time, distance, and speed, I imagine, correct?

A I'm sorry?

Q You made a calculation based on time distance and speed, correct?

A Time, distance, and I also used the rate of deceleration.

Q And you made the following assumptions, at least according to your report. That the train consist was made up of eight 75-foot cars?

A Yes.

Q The next assumption you make is that the train wasn't in the station and that Ms. Harger was on the tracks 7 to 10 seconds before the train ran her over?

MR. ROTH: Objection. Leading from something not in evidence.

THE COURT: What is the question?

Q Did you make that assumption?

THE COURT: He's asking you a question. Did you make that assumption?

THE WITNESS: I didn't make any assumptions, Your Honor.
Q Did you make that assumption in your report?
MR. ROTH: Objection.
A It's not an assumption.
THE COURT: Sustained.
Q On your report under assumptions it says exactly that.
MR. ROTH: Objection. Argumentative.
THE COURT: Is there anything that you said in your report that's based on an assumption.
THE WITNESS: I misused the word. The information I gathered was from the information that was provided. I didn't make up a number. My use of the word assumption was incorrect.
THE COURT: Next question.
BY MR. ROTH:
Q You relied on the fact that it was told by someone that she was on the track for 7 to 10 seconds before the train ran her over?
MR. ROTH: Objection.
THE COURT: Do you understand the question?
A The information I focused on is that there was a lot of information that said that when she fell on the track the train was not yet in the station or approaching the station. So that's why I took the measurement from the portal of the

station to where Ms. Harger was, which was 246 feet. That's where I got the number from.

THE COURT: That's how you based your testimony?

THE WITNESS: Many, many people said the train didn't enter the station. I took the worst scenario and said the train entered the station.

THE COURT: You looked at all these papers and the 911 calls, and whatever else, the police report. You made your calculation, not withstanding any of that, and you explained that all to the jury, correct?

THE WITNESS: I picked the worst case, not the best case.

BY MR. ROTH:

Q In your report it says you relied on a statement from Ms. Smith. Did you look at her statement?

A I looked at her statement.

Q And she gave deposition testimony, correct?

A Yes.

Q And she said that Ms. Harger was on the tracks for 7 to 10 seconds, correct?

MR. ROTH: Objection.

THE COURT: One second. Just stop. It's not in evidence what her testimony is. Okay. So you relied upon her testimony, whatever it was.

THE WITNESS: Yes. 7 to 10 seconds, Your Honor. If

a train is going 24 miles an hour, that's 36 feet a second; 36 feet by 10 seconds is 360 feet.

THE COURT: You just answered the question.

Q You made another assumption about perception?

MR. ROTH: Objection.

THE COURT: He said he didn't make any assumptions. He said he used the word incorrectly.

THE WITNESS: It's not an assumption. I used verified scholarly research done by MIT for the US Department of Transportation. That's where I got the number.

THE COURT: So whenever the word assumption appears, you're telling the jury that --

THE WITNESS: I misused the word.

Q So it's a fact that Ms. Shabazz's perception of the action time is a .6 second?

MR. ROTH: Objection. Argumentative.

THE COURT: Do you understand the question?

THE WITNESS: Yes.

THE COURT: You can answer.

A When you're preparing for an event, an unexpected event is perception reaction time. When you're coming into a station, you're expecting that somebody could possibly be on the track. Right? 50 people are killed and another 150 maimed, average, and another hundreds --

THE COURT: Just try to answer the question. You

answered the question.

THE WITNESS: So the train driver is getting ready to pull the emergency brake. The hand is on the brake. It takes .6 seconds to activate the emergency brake.

THE COURT: Go ahead.

Q Are you a train operator?

A No.

MR. ROTH: Objection.

THE COURT: Overruled.

Q Have you ever operated a New York City Transit train?

A Yes, I have.

Q In service?

A No, not in service. When I was at the New York City Department of Transportation, I was the overseer of the capital budget. So I used to go down to the Coney Island yard and joyride around the yard on the train.

And when I was working in England, actually on the Jubilee line, the London transport let me drive their train into the yard and I remember when I --

THE COURT: You're answering. I don't remember the question anymore.

THE WITNESS: He asked if I had driven a train. I've driven one several times.

Q Have you ever been trained in the operations of New York City transit trains?

A Yes, in the yard.
Q So you're a trained train operator?
A No.
MR. ROTH: Objection.
A You didn't asked if I was a trained train operator. You asked if I had any training. How could I operate the train in the yard if I'm not trained to operate the train? I didn't have a manual that said do this, do that. They trained me how to do it and then I did it. And they did it because I was controlling the budget.
Q When was this?
A In the '70s, 1970 and 1975.
Q 40 years ago someone told you how to operate a train?
MR. ROTH: Objection. Argumentative.
THE COURT: One second. What's your question?
Q I want to know how he was trained in the operation of trains to make this testimony.
THE COURT: If you want to elaborate anything further, go ahead.
A Whoever was in the yard at the time took me on the train, taught me how to operate the train. I was able to drive back and forth in the Coney Island yard. When I was operating on the London transport, they showed me how to operate the train. I drove the train into the yard. When I was in Shanghai I was trained on the Maglev.

THE COURT: Did you do that? Did you drive those trains?

THE WITNESS: I drove the Maglev from Shanghai airport to Pudong.

THE COURT: How about London?

THE WITNESS: They didn't let me drive in service. I went from the N station into the yard.

THE COURT: Next question.

BY MR. ROTH:

Q So .6 seconds is not an assumption and it's not a fact. Then what is it?

A It's the result of a very careful scholarly study that was conducted by MIT for the US Department of Transportation.

Q Was that safety study done in relationship to Ms. Shabazz's perception reaction time?

A No.

Q But you put in here that that was her perception reaction time --

MR. ROTH: Objection.

A Because the study showed a range of -- they had train operators and students conduct the test, and they took -- and I took the highest number. It went as low as .2 seconds. The .6 was the highest number and I took the .6. I wanted to err on the worst side, not the best side.

Q Have you testified in the past that perception reaction

time is a range?
A That's right.
Q And someone could have 1.5 perception reaction time?
MR. ROTH: Objection.
A The best perception reaction time --
THE COURT: Mr. Witness, stop it.
THE WITNESS: I'm sorry. I was trying to answer his question.
THE COURT: Stop it. We are conducting a trial. Questions and answers. We don't ramble on and on, and we don't have cross conversation. Do you understand that?
THE WITNESS: Yes, Your Honor.
THE COURT: Hopefully you've testified before.
THE WITNESS: Yes, sir.
THE COURT: Have you had a judge explain this to you before?
THE WITNESS: Yes, sir.
THE COURT: Listen to me. Question, let me hear the question again that you want him to answer.
Q Are you saying that someone jumping on or ending up on the train tracks in front of Ms. Shabazz's train is an expected occurrence for her?
THE COURT: Can you answer the question? Do you understand the question?
THE WITNESS: Yes.

THE COURT: You can answer.
Q Is that an expected occurrence for Ms. Shabazz?
A Yes.
Q How many times had it happened before August 2, 2016?
MR. ROTH: Objection.
THE COURT: Sustained. I don't know if he can answer the question. Next question. Sustained.
Q You indicated that at .6 seconds in your report is when someone has situational awareness training, correct?
A Yes.
Q Is that required of train operators to have situational awareness training operation?
A Yes.
Q By who?
A By the people who train the train operators. That's one of the things they train them. If you don't have situational awareness, how do you bring the train into the station and stop at the right spot?
How do you know how to do anything if you don't have situational awareness? No one operates a train with blinders on. They have to know where they're going and how they're getting there.
Q Situational awareness is a training according to you, right?
A Situational awareness, everybody has. This concept was

developed by Dr. Etsley where he tried to explain what happens when somebody sees something and has to do something. In order to see something and do something, we call it situational awareness.

You have to be aware. You have to be aware you're coming into a station. You have to be aware where the train has to stop. You have to be aware to avoid jerk rate so people don't fall. There are a lot of things you have to be aware of.

THE COURT: You testified to the jury. Go ahead.

THE WITNESS: I'm sorry, Your Honor.

Q Dr. Etsley was using an expected outcome when he conducted his tests, right?

A Yes.

MR. ROTH: Objection.

THE COURT: Overruled. The answer is yes, he was using that. Go ahead.

Q So you did your calculations based on what then?

A I told you.

THE COURT: He answered that question already. Next question. It's getting repetitious.

Q So you used the braking distance, right?

MR. ROTH: Objection.

THE COURT: He already testified.

Q So your testimony is that going 24 miles an hour it would

take how many feet, 153 feet to stop, correct?
A Yes.
Q And that would take 8.1 seconds, correct?
A I didn't calculate. Maybe I did, but it may be in my report. I have to go look.
Q Look at your report.
THE COURT: What page? If you have something in the report, you can refresh your recollection and we can move it along.
Q Page 57 of your report.
THE COURT: Does that refresh your recollection so you can answer that question now?
THE WITNESS: Yes.
THE COURT: What is your answer?
THE WITNESS: That it takes about eight seconds to stop at 153.
THE COURT: Okay. That's in his report. Go ahead.
BY MR. ROTH:
Q And, again, you reviewed Ms. Smith's testimony when she said that plaintiff was on the tracks from 7 to 10 seconds before the train?
MR. ROTH: Objection.
THE COURT: Sustained. Next question.
Q Did you review that testimony?
MR. ROTH: Objection.

A When a train --

MR. ROTH: Objection.

THE COURT: Stop it. Stop it before I hold you all in contempt of court. Now stop it. Mr. Roth, do you understand what I just said to you? Stop it.

Your question is, did he review any particular testimony. That's your question. What testimony is it that you want to ask whether he reviewed?

MR. ROTH: Regarding how long Ms. Harger was on the tracks before the train struck her.

THE COURT: Did you review such testimony?

THE WITNESS: Yes.

THE COURT: He said yes.

BY MR. KEAVENEY:

Q Was that testimony -- how many seconds was she on the tracks?

A It's two different seconds.

THE COURT: You can explain it all. He's opened the door. You can explain it. Go ahead.

A If you're going 24 miles an hour, in eight seconds you travel 36 times eight. So that's -- I don't have a calculator.

THE COURT: He's going to explain to you the calculation. He's going to be given the opportunity to answer it completely.

MR. ROTH: Thank you, Your Honor.

A If you're traveling at 24 miles an hour in eight seconds you travel 284 feet. If you're braking the train and slowing down, it takes you longer to get to a point when you're slowing down than when you're going 24 miles an hour, because you go 24, 22, 20, 18, 16, all the way down to 0. So the times are not related because one is at a constant speed and one is at a speed that's being reduced.

THE COURT: Next question.

Q If it took the train a 153 feet to stop when Ms. Shabazz put the train into emergency, and the distance from the mouth of the station to the accident location is 246 feet, then the train must have been in the station, correct?

MR. ROTH: Objection.

THE COURT: Can you answer that question?

A I'm confused by the question.

THE COURT: I'm confused by it, too.

Q Let me try to clarify the question.

THE COURT: Next question. You can save this for argument if you put something together.

MR. ROTH: It's not argument, Your Honor. I'm trying to understand the math.

THE COURT: Next question.

Q We have from the mouth of the station to the accident location 246 feet?

THE COURT: That's correct, right?
THE WITNESS: Yes.
THE COURT: Next question.
Q And it takes eight seconds for the train to stop when the emergencies are applied and it will take 153 feet, correct?
THE COURT: Is that correct or not?
THE WITNESS: Yes.
Q So we have 153 feet. That means it's almost 100 feet left from the 246 feet, correct?
A Yes.
Q So the train must have been in the station when the plaintiff fell to the platform?
MR. ROTH: Objection.
THE COURT: Can you answer that?
THE WITNESS: No.
A It doesn't matter if the train was in the station or not. The emergency brake was not applied at 180 feet because she overran 85 feet. So the emergency brake was applied 75 feet approximately before Ms. Harger.
THE COURT: He answered the question. Go ahead.
Q What about your calculation for 20 miles an hour?
THE COURT: What about it?
A The train would stop faster and a shorter distance, 109 feet, approximately.
THE WITNESS: Your Honor, I took the worst case.

THE COURT: You mentioned you took the worst scenario 17 times.

Q You took the worst case in terms of braking systems, you didn't use to write charts for braking distance.

THE COURT: What's the question? Save that for summation. You can do that. Do you have a question?

Q It took 6.9 seconds, based on your calculations, for the train to stop at 20 miles per hour, and that train would have gone 109 feet, correct?

MR. ROTH: Objection.

Q That's based on your calculations.

THE COURT: Overruled. Can you answer that question?

A Yes.

Q Again, 246 feet from the mouth of the station to where Ms. Harger was, right?

A Right.

Q So there's almost 150 left for that train to come in?

A That's right. Absolutely. Thank you.

Q So the train had to be in the station again?

A No. What are you talking about? The train -- Ms. Harger wasn't paying attention. She ran over -- Ms. Shabazz wasn't paying attention, not Ms. Harger. Ms. Shabazz was not paying attention because the train overran 58 feet, and at 20 miles an hour it needed 109 feet. So she had to apply the emergency

brake 20 feet in front of Ms. Harger, but she said -- I'm taking the worst case. She's 180 feet away.

THE COURT: We went over this over and over again.

Q Did you take into account time in your calculations?

A Time is a result of speed and deceleration.

Q Did you take into account your calculations the time witnesses said she was on the tracks before --

MR. ROTH: Objection. Asked and answered.

THE COURT: Sustained. We've gone over this many times. Do you have any other subject you want to ask him about, otherwise we'll move on.

Q You indicated earlier that you looked at the collision with individuals chart, correct?

A Yes, I did, CWIs.

Q And there's many ways of contact with trains, correct?

A Yes.

Q Such as tripping on a platform and hitting upside a train, correct?

MR. ROTH: Objection. Asked and answered.

THE COURT: Sustained. Next question. Listen to me, if I sustained it, you don't talk.

THE WITNESS: I'm sorry, Your Honor.

Q And there's accidents that occur in between train cars?

MR. KEAVENEY: Objection. Asked and answered.

THE COURT: Sustained.

Q You've never designed a New York City station, correct?
MR. ROTH: Objection.
A Yes, I did.
Q You've designed a station?
A Yes.
THE COURT: Stop it. Stop it. You've testified many times, haven't you?
THE WITNESS: Yes, sir.
THE COURT: Have you ever had a problem like this now?
THE WITNESS: No.
THE COURT: There's a first time for everything. There's an objection and I have to rule on it, and then you can answer. You have an objection to the last question?
MR. ROTH: Yes. It's argumentative.
THE COURT: Overruled. What's the question again?
Q Have you ever designed a New York City transit subway station?
A Yes, two.
Q What was the answer?
A On the Second Avenue downtown I designed one in Chatham Square as part of a joint development in Chinatown, and one at 14th Street as part of a post office school joint development. The stations are not being used.
THE COURT: He answered the question. You answered

the question. Next question.
Q I didn't hear the end of that statement. They're not being used, is that what you said?
A There is no downtown Second Avenue subway.
Q Have you ever designed a subway station with platform screen doors?
THE COURT: Have you ever designed a subway station with platform screen doors? Yes or no.
THE WITNESS: No.
THE COURT: Next question.
MR. ROTH: Thank you.
THE COURT: Any redirect?
REDIRECT EXAMINATION
BY MR. ROTH:
Q You mentioned JFK AirTrain. What type of doors does that have?
THE COURT: What type of what?
Q Doors.
A Platform edge doors.
Q When was that installation completed?
A 2006, maybe.
Q Are you aware of how many deaths, catastrophic injuries occurred at the JFK AirTrain?
A Yes.
Q How many?

A Zero.
Q Since when?
A Since it was opened until today.
Q I couldn't hear. What was the year again?
A I'm not sure.
Q Approximately.
A I think it was 2006. I'm not 100 percent sure.
Q Many challenges were mentioned by Mr. Keaveney, that they had challenges. How long had those exact same challenges existed, as far as you know, in the New York City subway system?
A There's always -- in engineering there's always challenges.
Q Is there any evidence that you've seen by any of the submissions for the RFI evaluations and the RFI submissions that said they couldn't meet those challenges?
A There was an RFI done by the New York City Transit Authority to the top 13, 12. There was an independent submission of the top manufacturers. In fact, one of them, I think, built 500,000 miles, an incredible amount. I think I measured it's 1,500 football fields. They said there's not any situation that they can't solve.
Q Mr. Keaveney talked about all the different ways people can come into contact with trains and the precursor. What's the difference between precursor and the root cause of what's

happening to people being struck by trains in the New York City Transit Authority?
A I don't think people are deliberately going on the track. They end up there somehow. And the only way to prevent this from happening is by taking positive action. It has to be -- I remember when I was in engineering school --
THE COURT: You don't have to talk about what you remember in engineering. Next question.
Q So I want to show you -- you mentioned in 2010, I think Mr. Keaveney mentioned 2011, how many accidents there were. Plaintiff's Exhibit 16, we'd like to move that into evidence. No objection noted.
THE COURT: 16.
MR. ROTH: Yes, 16.
THE COURT: We'll allow that in evidence. It's an email.
(Plaintiff's Exhibit 16 was received in evidence.)
Q If I could use the overhead, projector. Let's start off with --
MR. ROTH: Objection, Your Honor.
THE COURT: It's in evidence.
MR. ROTH: Judge, there's hearsay within it. There's no foundation to it in terms of --
THE COURT: I have this as a document here where there has been no objection posed.

MR. ROTH: There was someone on the witness list that was supposed to testify.
THE COURT: Overruled. It's in evidence.
Q Who is it from?
A Tom Prendergast.
Q You mentioned him before.
A I knew him when he was president of the Long Island Rail Road. I think he's now president of New York City -- now he's MTA. I'm not sure.
Q As of 2010.
A I knew him before that.
Q I'm asking you on the date of the email, do you know what -- this is July 2010?
A Yes.
Q And it's to some other people. Do you recognize any of the names, Paul Fleuranges and Carmen Bianco?
MR. ROTH: Your Honor, can we ask if he's seen this email before?
THE COURT: You can cross-examine him on this, if you want.
Q And this email is in response to something. What I'd like you to do is read the top portion that's highlighted in yellow so we can get to it quickly and the jury doesn't waste its time. Can you read it?
A Paul, is this the customer who died of injuries sustained

as a result of a train striking her on the head at five this morning, I guess. The sheer number of incidents involving jumps, falls, slips, and pushes to the track bed, combined with these provide a strong justification for platform doors.

When you consider the number of suicides and other accidental deaths just this year alone, we're in the 50 to 60 range annually. This is absolutely insane in 2010, regardless of what history has revealed.

THE COURT: Now you read that. Who is Tom Prendergast again?

THE WITNESS: I think he was president of the New York City Transit Authority at that time.

Q This was now -- these documents, you've seen similar documents. Mr. Keaveney mentioned how many people ride the subway. Have you ever seen a single document ever in anything that has been produced by the Transit Authority that based on number of people that ride the train they don't have to make it safer?

A Yes. They ignore it. I've read documents. In fact, one, don't say anything because they'll think we're an unsafe system or something. Crazy, crazy statements.

MR. ROTH: Objection.

THE COURT: Objection sustained. Next question.

MR. ROTH: I'd like to admit Plaintiff's Exhibit 18.

THE COURT: 18 is in evidence already, I believe.

MR. ROTH: Okay.
Q So this is an email, and you've seen this before; is that correct?
A Yes. Glenn Lunden, I think he was director of systems safety, something like that.
Q So you have Glenn Lunden and also to Tony Abdallah.
A I think he was an engineer.
Q Let's go to the highlighted section here. Can you read this highlighted section?
A As we discussed at the meeting, we may want avoid discussing enhanced safety so as not to imply the current system is intrinsically unsafe. I would focus on convenience, security. No unwanted intrusions onto the right of way. And cleanliness, eliminating, reduce trash debris falling from the platform to the track bed. I suggest rewriting the first paragraph as follows.
MR. ROTH: Let's go to the next highlighted section. This is for --
THE COURT: These are all your highlights, correct?
MR. ROTH: That I highlighted for the jury.
THE COURT: They're not in the original. It's what you did?
MR. ROTH: Yes.
Q Let's read the top line.
A There are 468 stations currently in operation that will

eventually be equipped with PSD, PED, or PEG system.
Q Is there anything in this email that says it's impossible to put them into our system?
A No.
Q In fact, Mr. Lunden is a smart guy?
A Very smart guy.
Q So let's look at the next highlight. Can you read from that?
A The lack of platform doors issues with noise as trains enter and leave pass through the station. Comfort, convenience, the ease of intrusion from the open platform, vandalism, security and, yes, safety, and trash/debris falling onto the rail bed, this is the point at which the number of incidents in which passengers fall, jump, and climb down onto the tracks should be discussed without implying the current operation is unsafe.
Q Is there any evaluation there with whether it's actually unsafe or not?
A Obviously they think it's unsafe.
THE COURT: Any evaluation was the question. Was there any evaluation is the question.
THE WITNESS: No, there was no evaluation.
THE COURT: Next question.
Q You had mentioned that --
MR. ROTH: It's Plaintiff's Exhibit 29, Your Honor.

THE COURT: Is that in evidence?

MR. ROTH: It's not in evidence yet.

THE COURT: It's not in evidence. No objection. You want that in evidence?

MR. ROTH: Yes.

THE COURT: It's in evidence.

(Plaintiff's Exhibit 29 was received in evidence.)

Q Do you see this?

A Yes, I have.

Q You recognize that name?

A Yes.

Q You previously testified that they basically took the platform screen door project and --

A I can't hear you.

Q I said you had testified earlier about what had happened to the platform screen door project. Can you read this email? It's a 2012 email.

A You want me to read this? At present, we have not received additional guidance from senior management regarding the future of the platform screen door project. So the project has, unfortunately, been placed on hold until further notice maybe. We sincerely appreciate GE's interest in the New York City Transit platform screen door project.

THE COURT: How much longer do you have of your questioning now? We're getting close to a break point.

MR. ROTH: I'll finish in five minutes.
THE COURT: Good. Go ahead.
Q We talked about some of the safety measures. You had mentioned buttons. I'm going to put Plaintiff's Exhibit 36.
THE COURT: That's in evidence now. No objections.
(Plaintiff's Exhibit 36 was received in evidence.)
Q Can you tell me, you don't have to read this, but can you tell us what this document is?
A That's procurement of the buttons.
Q This is --
MR. ROTH: Objection.
THE COURT: It says paid invoice. One second. It's in evidence at this time. 36, there's no objection. What question do you want to ask?
Q So just take a better look at that. Can you see what --
A Paid invoice, work order, safety campaign practice, good subway sense. I guess they ordered different products.
THE COURT: Is there a question?
Q Do you see where it says: Subway safety standing behind the edge. Can you see what the total labor materials budget was for that?
A No, I can't see.
THE COURT: One second. So the document is in evidence. Do you want to read any portion to the jury now or later?

MR. ROTH: I could read it for myself.

THE COURT: I'll let you do it. He doesn't have to testify.

Q Subway safety, stand behind the edge, posters 11 and a half by 17 material; material, $88; labor, $165; and another subway stand behind the edge, $190 for materials, 310 for labor and it was a paid invoice from 2015 and 2016.

THE COURT: You read that from the document. I didn't see it from my screen. I assume the jurors have seen it.

Q I'm going to show you Plaintiff's Exhibit 12. Plaintiff's Exhibit 12 is an email and there's no objection to it.

THE COURT: One second. We have that in evidence already, I believe. Exhibit 12.

Q And this is a 2010 email from Tony Abdallah, who testified here.

THE COURT: Do you want to read something from the document?

Q Can you read the top of the document right there?

A Rapid Transit operations has already made customer safety its number one priority.

Q Do you agree with that statement from what you've seen from the Transit Authority?

A It's a nice statement but nobody implemented it.

Q Let's look at Plaintiff's Exhibit 11.

THE COURT: That has not been placed in evidence yet. We'll allow it in evidence now. No objection.

(Plaintiff's Exhibit 11 was received in evidence.)

Q And this is an email. Have you seen this before?

A Yes. I think it's Cheryl Kennedy.

Q This is from James Wincek to Patrick Lavin. CEK stands for Cheryl Kennedy, that's correct, just to move more quickly.

THE COURT: You want to read that to the jury?

Q It says that with regard to the PRS 2345 emergency subway, we are addressing the same issue (train striking individuals within train limits.)

THE COURT: One second. I don't have it on my screen. I want to make sure the jury has seen it. Everyone sees it now. Next question.

Q The PTSB requested New York City to explore the possibility of installing intrusion detection devices to forewarn train operators to stopping the train. And then at the top of it, it's from James Wincek. Did you come to learn who James Wincek is?

THE COURT: Who are these people? As long as we understand it's from a James Wincek. Who is James Wincek?

MR. ROTH: Objection, Your Honor. Looks like there's handwriting on that.

Q Whose handwriting is that?

A Mine.

THE COURT: One second. This is from James Wincek. It's in evidence. You can explain who this person is. Can you answer that question?

THE WITNESS: Pardon me?

THE COURT: Do you know who that person is?

THE WITNESS: I know of him. Director of operations.

THE COURT: Whose handwriting is that?

THE WITNESS: Mine.

THE COURT: That's your handwriting?

THE WITNESS: Yes. I'm not good at cursive.

THE COURT: He's director of operations. You wrote that on the document?

THE WITNESS: Yes, I did.

BY MR. ROTH:

Q And this document is about the safety platform intrusion detection, which in 2009 what was the state of platform intrusion detection?

A It was pretty well established, the technology, but not implemented.

Q I'll read this for you. It says: Pat, are we expecting DOS, which is Department of Subways to seriously consider this intrusion detection device? How does that comport with making safety the number one priority?

MR. ROTH: Objection.

THE COURT: Sustained.

MR. ROTH: Your Honor, Plaintiff's Exhibit 13A is a trip to Korea. I'm not sure if it's in or not.

THE COURT: Well, is that in, Mike?

THE COURTROOM DEPUTY: I have it down as being in.

THE COURT: We have 11 in, we have 12 in, and 13 in evidence. Okay.

Q This is 13. Do you recognize this? You've seen this before, right?

A Yes.

Q What is it?

A A group went on a paid holiday to Korea.

MR. ROTH: Objection.

Q And it's from whose report is this?

A Tony Abdallah.

Q And he testified here, right?

THE COURT: He's already testified. I don't know whether this has already been spoken about or not when he testified, but go ahead. It's in evidence now.

Q I'll just read this. It says: Prior to the installation of the PSD SMRT average approximately 22 customer jumper or fatalities per year. Operators were extremely traumatized and often couldn't operate trains properly after an incident. After installation, the customer jumper rate was reduced to

zero.

THE COURT: You read it. Go ahead. You don't have to ask any questions. You read the document. Go ahead.

Q And then at the back of the document, which you've seen, correct, there are -- they talk about operation of advantages. And looking at it they talk about the incidents that there's -- there was 121 incidents of jumpers.

THE COURT: If you want to read that to the jury, they have it. It's in evidence. You may want to refer to it in summations. You'll be allowed to do it. Anything else in evidence you can use in your summations. Let's move on to the next question.

Q The only thing is that this was -- what was the recommendation? Do you recall what the recommendation was here?

A Yes. They really learned a lot. It was a big success.

Q Then it said their plan was to do a pilot at an unused station?

A Yes.

Q Did that ever happen?

A No.

MR. ROTH: No further questions.

(Continued on next page.)

(continuing)

MR. ROTH: No further questions, Your Honor.

THE COURT: So I want to take a break now unless you have a few questions.

MR. KEAVENEY: Yes, Your Honor.

THE COURT: But if you have a lot of questions, we'll take a break. You let me know.

MR. KEAVENEY: Just a few.

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MR. KEAVENEY:

Q Dr. Berkowitz, Mr. Roth just showed you an e-mail in which the president of Transit in 2010 thought there was a strong justification for platform screen doors, correct?

A Yes.

Q So in 2010, what was Transit doing?

MR. ROTH: Objection.

THE COURT: Just one second. Overruled.

Q In 2010, did members of Transit go to Korea to investigate the platform screen doors?

A Yes.

Q When they returned, was a platform screen door task force initiated?

A What do you mean?

Q Do you know if a platform screen door task force was

initiated when you got back?
A I believe so.
Q And they also issued a request for information?
A A what?
Q A request for information, an RFI?
A Yes, they did.
Q To investigate what was going on in the community regarding platform screen doors, correct?
A Yes.
Q And did they also develop a con-ops, concept of operations?
A Yes.
Q And they also planned for a pilot program during that time, right?
A They didn't do any planning. They talked about a pilot program.
Q Did they issue a contract for a pilot program?
MR. ROTH: Objection.
A I think there was some preliminary work that was done.
Q Are you aware if they issued a contract for a pilot program?
A No.
Q So other than your lack of awareness on that, but you're aware of everything else?
MR. ROTH: Objection.

Q They did something after this, they took Mr. Prendergast's suggestion seriously, right?

MR. ROTH: Objection.

THE COURT: Sustained. So that's argumentative.

MR. KEAVENEY: No further questions.

THE COURT: I don't think there's anything else you have. So this a good time for you to step down now. Thank you for coming back.

THE WITNESS: I'm done. Thank you. My wife thanks you.

THE COURT: You are done. You can walk out. You can stop now. All right? And we're going to take a break now, and we're going to continue with the next witness who will be whom?

MR. SHIELDS: The Plaintiff's mother, Your Honor.

THE COURT: The Plaintiff's mother is going to testify next.

MR. SHIELDS: Yes, Your Honor.

THE COURT: So let's come back in about 15 minutes, okay? Ten to 4:00, all right?

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: The jury is out of the courtroom now.

You're excused. Thank you for coming.

THE WITNESS: Thank you so much.

THE COURT: All right.

(Witness excused.)

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: So, folks, you've heard a lot today, you know, it's been very intense. And we're going to continue probably until about quarter to 5:00. We're going to start a new witness now.

Do you think this witness will be finished today, or will the witness have to come back tomorrow? Or Wednesday?

MR. SHIELDS: She'll probably have to come back, Your Honor, just because we're testifying through a translator.

THE COURT: Why don't we do this, we're going to get started today, we'll go for about a half hour, then I have something else I have to do. And we'll get started with the witness, and he or she will come back on Wednesday. Okay?

MR. SHIELDS: Yes, Your Honor.

THE COURT: Ready to go. Who do we have now?

MR. SHIELDS: We have Marlize Janssen Harger Da Silva, Your Honor.

(Witness takes the stand.)

THE COURTROOM DEPUTY: First, I ask the interpreter

if you could raise your right hand.

(Interpreter sworn/affirmed.)

THE COURTROOM DEPUTY: Please state your name spell it.

THE INTERPRETER: Connie Raicovich, C-O-N-N-I-E, R-A-I-C-O-V-I-C-H.

THE COURTROOM DEPUTY: Thank you. I ask the witness if you could raise your right hand.

(Witness sworn/affirmed.)

THE WITNESS: Yes.

THE COURTROOM DEPUTY: State your name.

THE WITNESS: Marlize Janssen Harger Da Silva.

THE COURTROOM DEPUTY: Madame Interpreter, would you like a chair, or are you okay standing?

THE INTERPRETER: I'm fine.

THE COURT: So obviously you're not speaking English. You can tell us, the jurors, what language you're talking in.

THE WITNESS: I speak Portuguese.

THE COURT: Portuguese.

All right. So members of the jury, we have interpreters when people come and testify who do not speak English, then we have an interpreter. It's perfectly acceptable. Right? So you're going to listen to testimony through the interpreter. All right?

Your witness, Mr. Shields.

MR. SHIELDS: Thank you, Your Honor.

Marlize Janssen Harger Da Silva

**MARLIZE JANSSEN HARGER DA SILVA,** having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SHIELDS:

Q Good afternoon, Ms. Da Silva, how are you today?

A I am a little nervous. Good afternoon. I'm a little nervous. I've never been in front of a jury before.

Q That's okay. Everyone will be nice to you.

Can you tell the jury --

A Thank you.

Q -- where you live?

A I live in Florianopolis in the State of Santa Catarina, and that state is in the south of Brazil.

Q And are you the Plaintiff, Luisa Harger's, mother?

A Yes, I am Luisa Harger's mom.

Q And are you married?

A Yes, I'm married to Claudio Mumme Harger Da Silva.

Q And do you have any other children?

A I have two more children. Ricardo. He is a mechanical engineer. Augusto, he's an electrical engineer. And Luisa is my oldest child.

Q And is Luisa your only daughter?

A Yes, Luisa is my only daughter.
Q And what is your profession?
A I am an architect.
Q And what is your husband's profession?
A My husband's a doctor. He is a general practitioner. He's also a psychiatrist.
Q And can you just tell the jury about the city where you're from, where Luisa grew up?
A So Florianopolis is a beautiful city. We have a lot of beaches. Probably more than 40 beaches. We also have a rural area that is a -- it is a beautiful city.
Q And can you tell the jury about Luisa's childhood?
A Luisa was always an extrovert. She had lots of friends. She was very intelligent child, dynamic, active. She was also a very responsible child. She helped me take care of her brothers. That's it.
Q And can you tell us a little more about your family, Luisa's extended family in Brazil?
A There are five of us. You know, myself and my husband and our children. And also have a big extended family. We are always meeting at the beach or at a beach house, we're always meeting there with all the cousins. And because Luisa was the oldest child, she was always the leader of all the games they played and everything.
During her childhood, Luisa loved, you know, the

beach house. We had a big garden in our house there and they loved, like, climbing trees, you know, playing games. We had a playground. You know, slides and, you know, we had -- she also had a doll house. And we, you know, that's where, you know, they played with -- we were very close family, not only our nuclear family, but also the extended family.
Q When Luisa was growing up, did she have any health problems?
A No. She was always very healthy. And because my husband is a doctor, we always had a very active life and she was always very healthy.
Q Before the accident, did Luisa take any kind of medications for any reason?
A Only the pill. You know, the -- just, you know, just the pill.
Q The birth control pill?
A Birth control pill.
Q And how about any illegal or recreational drugs? Did Luisa ever take any illegal or recreational drugs?
A No. Luisa was always very against -- she was against drugs, drug use of any kind because my husband is a psychiatrist, and you know, he treats people with addiction. She knows firsthand what -- how drugs can ruin a person's life.
Q You mentioned before that Luisa was kind of the leader of

the family, of the children, the younger children in her family. Can you explain that a little more?
A So she used coordinate, like, all the plays. Like she would plan -- one time she planned, like, a world cup of soccer for the family. So they had teams. She organized the whole thing. She was very good at, you know, doing -- they had, like, houses, sales at her doll house. All the games that they played, bike rides, and the places that they would go visit and all of that, she would organize all of those things.
Q And was Luisa an independent person?
A Yes. She was always very independent. She is -- it's in her nature to be independent. Because she was always a leader, so she had that independence built in.
Q Tell us what activities Luisa liked to do for fun.
A She was very active, physically active. She loved to dance many different types of dance. Ballet, jazz, Capoeira, ballroom dance, belly dance. And right before the accident, she was really into Zumba. Also, she was into theatre, she loved to walk and swim. She was very active.
Q You told us that your family had a home at the beach. Can you tell us what types of things Luisa liked to do at the beach?
A So, you know, she loved to walk on the beach and swim. And also, she loved to use the body board, you know, for the

waves.

And also there is another beach called Joaquina, she loved to go there. She used to sand board on the dunes.

Q Sand boards on the dunes, is that like what we would do for sledding on snow up here?

A It used to be, like, you would use the -- to go down on the slope on the snow by using a board.

Q And growing up --

A Because these dunes are very high. So you slide down using the board, and then you carry your board up those dunes again to do it over.

Q And growing up, did Luisa and your family travel together?

A So yes, we traveled, we had -- we took several weekend trips. We went exploring caves and traveled to tourist sites. And we visit many -- during vacations, we visited many Brazilian cities and cities abroad as well.

Q What were some of your favorite trips that you guys would go on? Like, would you do activities when you went on certain trips?

A So one of our favorite trips was to Canada, to Montreal where we went snowboarding. Luisa loved that. And also, Disney, the trip to Disney we also loved that.

So in Brazil, we used to love to visit working farms, you know, hotels and working farms. She loved to go

horseback riding, paddle boating, all activities like that, at the farm.

Q How about before the accident, did Luisa have any creative hobbies?

A So yes, she used to play the guitar very well and sing. She would bring the guitar to family parties. I was very proud of her when I saw her singing and playing.

Also, she loved to do crafts. Like, she made, like, jewelry, scrapbooking, and some collage.

Q And did Luisa ever do any modeling?

A Yes. When she was 15, she was signed by a famous modeling agency, Ford Models International Agency. And because she was very confident, she was very elegant on the runway. And yes, she studied modeling around that age. She was very good at it.

MR. SHIELDS: Your Honor, I would like to play two videos that are part of Exhibit 97.

THE COURT: Just one second.

So some of these have already I think been introduced into evidence, correct?

MR. SHIELDS: Correct, Your Honor.

So these two videos have not yet been introduced into evidence.

THE COURT: Just identify. We have H, we have A, B, O. Which ones are these now?

MR. SHIELDS: I think that these will be I and J.

THE COURT: Okay. We'll allow that in evidence.

(Plaintiff's Exhibits I and J received in evidence.)

MR. SHIELDS: We'll see if this works, Your Honor.

THE COURT: How long are they going to be?

MR. SHIELDS: They're about one minute each, Your Honor.

THE COURT: Okay.

(Video played; video stopped.)

MR. SHIELDS: And the second video.

(Video played; video stopped.)

MR. SHIELDS: So I'm just pausing here at one minute and 20 seconds into the one minute and 24 second, second video.

Q Is Luisa the last model walking off the stage, the person in the back?

A Yes, she's the last model there.

MR. SHIELDS: I'm just going to ask a similar question with the first video.

I'm going to put that one back for one second.

Q And in this video, is that one Luisa?

A Yes, this is the one -- she is the one you just pointed at.

Q Thank you.

And how did Luisa feel about modeling?

A She loved modeling. She felt really good about it. She felt beautiful. It was something that she felt very -- you know, very good about.

Also, the brands that she was -- she had a lot of work, the brands were always calling. They wanted her, you know, to show their collections. She loved the runway.

Q Thank you.

Now, growing up, can you tell us, was -- what type of student was Luisa in school?

A Ever since she was little, she was very studious. She was very intelligent. She was very good in school. She always met her deadlines. She loved school. She was very good at school.

Q What were some of her favorite subjects?

A She always liked science. She participate in some Olympics of math and also geography.

Q When you say she competed in the Olympics of math and geography, what do you mean? Can you tell us more about that?

A So these were like knowledge tests and they were organized by the states, and the schools would send their best students to compete.

Q And after high school, did Luisa attend university?

A Yes, she went to study at the Federal University of Santa Catarina. It's the best university in the state.

Q And in 2016, was there any particular field of study that

Luisa was pursuing at university?
A Yes, she was in the last year of the architecture.
Q And why did Luisa choose to become an architect?
A I think she was influenced by me. She loved to come with me to work. She loved to, you know, see me working and see the work done. She was very creative. She loved the artistic part of the job and also the technical part of the job. She loved to see the architectural models and she loved to draw. She was very creative. And I think that's why she wanted to be an architect.
She also loved to watch those shows on TV about remodeling and construction. I think she, you know, became very familiar with the process. And I guess that helped also her decision.
Q And when you say architectural models, are those, like, small, like, small buildings or other projects that you would have to, as an architect, put together in your office before the final construction?
A Yes. That's what, you know, the digital architectural models are what you said. But also the university, they usually build their own architectural models. Luisa used to build hers by hand. They build them by hand in school.
Q When Luisa was growing up, would she go on site visits with you?
A Yes. She used to come with me, she used to help me take

some measurements, you know, make some annotations.
Q What else would you do on site visits? Did you have to, like, climb ladders and go up stairs, things like that?
A Depending on the type of construction. If they had, like, a one floor home, then we didn't have to go up the stairs. But if we had a two-floor home, yes, we had to use steps to go up.
Q And in addition to building models as an architect either in school or after you're working, you have to draw renderings of buildings or other projects too, right?
A Yes.
Q And in university, what kind of student was Luisa?
A It was, like, a continuation to her -- from her schooling before. She was an excellent student. She had wonderful -- she had great grades. She was a great student.
Q And how competitive is admission to that university that she went to?
A Yes. It's -- this university is the best university in the state, so there is a lot of competition to get there. Many, many students per opening. There is this testing called Vestibular. There's a knowledge test that have you to take to get in, and she was able to get in the first time. She took it and she got into the first semester with very good score, with a very good score.
Q While she was at the university, did she receive any

academic honors?
A They didn't have really, like, any, like, special, like, honors or prizes or anything, but her grades were always very, very high. She, you know, she was always very well-liked and her grades were high.
Q When she was in school, did she ever receive any scholarships, like to study abroad?
A Yes. Because of her high grades, high scores, she was awarded by the government, she was awarded a scholarship to study in London at one of the best universities there, Westminster University.
Q And when did she study in London?
A She studied there on the first -- last semester of 2014 and first semester of 2015.
Q And can you tell us about her time in London?
A So she liked -- she loved it. The courses were very dynamic. They had field visits. She was very independent. She traveled throughout Europe. So that time in London was very good academically and also personally.
Also, she was able to validate all the courses she took there for her course in Brazil.
Q And during her time in London, did she also meet her husband, George?
A Yes. She met her husband George in London during the exchange, the school exchange. And they fell in love during

that period.
Q And did you meet George during that period?
A So, yes, I went to London to visit her and also to meet him. And I liked him when I met him, I liked him a lot. He had -- he was an engineer. He had a good job. He was a very polite young man. I liked him a lot. He did not have any vices or anything like that. I really liked him.
Q And despite falling in love and traveling around Europe to meet her friends, Luisa was still able to achieve top grades during that semester in London?
A Yes. She kept her grades up and so much so that she was able to use all those grades and all the courses that she took in London in Brazil for her course of architecture there.
Q And as an architect yourself, how would you describe Luisa's talent in architecture before the accident?
A Yes. She was very independent and very talented. They took a lot of field visits to develop projects. Even in school she was able to use a lot of the software to develop projects, like AutoCAD. And she was -- you know, she was talented. She was very creative.
Q And before the accident, did Luisa have any plans for after she graduated from university?
A Yes. She wanted to work as an architect for a period of time and then go on for her master's degree.
Q And did the accident change those plans?

A Yes, it changed everything because she could not work. And also, she had to delay for a whole year to get her degree. She -- after the accident during 2016, she had to stop for one whole semester, so that delayed, you know, her getting her degree.

And also, even after she graduated, she was not able to work.

Q So when did she return to university after the accident?

A The accident happened on August of 2016. She returned to university in March of 2017, and she was still using the wheelchair then.

Q And she eventually graduated from university?

A Yes, she graduated in March of 2018.

Q And just going back to her year in London. After she completed her study abroad in London, she moved back to Brazil; is that right?

A Yes. She came back. She went back to Brazil. She stayed in Brazil. She left to go to London once to meet George's family. And George came to Brazil to meet our family as well.

Q And, like, how often would George and Luisa talk after she moved back to Brazil?

A Yes, they spoke on the phone every day. They spent about, you know, between an hour and two hours talking to each other every single day on the phone. And then he came to

visit in Brazil. And then she came here to New York to visit him as well.

MR. SHIELDS: Judge, probably in the next couple of questions would be a good time for me to stop for the day.

THE COURT: So just give me an idea, how much longer do you have of your direct testimony?

MR. SHIELDS: It's going to be a while longer, Your Honor.

THE COURT: So we'll take our break right now.

And members of the jury, you're going to come back on Wednesday. Tomorrow is Veteran's Day.

Don't talk about the case. You're doing great. A lot of things have been happening. There's a lot of testimony already. You've been absorbing it all. It's all going to come together at the conclusion of the trial.

At that time, as I mentioned to you before, the lawyers will have an opportunity to each come before you to argue on their behalf as to what they would like to you do, and they'll be able to discuss the law and the evidence. We call those summations.

And then after that, I am going to come down and explain the law to you. I will go over the verdict sheet with you. I'll give you your marching orders, and then you're going to start your deliberations.

You're doing great. We've have had these

interruptions, I know that, and I apologize for that. But we're coming along just fine. See you Wednesday, 10:00 o'clock. Don't talk about the case.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: You may step down.

You will be back here Wednesday morning at 10:00 o'clock. Okay?

The jury is out of the courtroom. We have a few things to talk about.

So the Chief Judge has just recently contacted me because we have some scheduling problems again. And she would like to close the courtroom on Friday. I don't want that to happen. But apparently because of our wonderful government, the people are not getting paid, and we want to show our solidarity to support and give these folks an opportunity to not have to work on Friday. So we have these realistic problems with our great government today, and we have to just do the best we can under these dire circumstances.

Now, if it was up to me, we were prepared to all come on Friday. I know Mr. Keaveney made arrangements for your experts to come, but I have to now respond to the Chief Judge. Everybody else seems to feel that we have to shut the courtroom down on Friday.

There is a window of possibility that maybe our wonderful government can, you know, resolve the problems that we have of people not getting paid, et cetera, et cetera. I will know more tomorrow, but in the meantime, I'm trying to, you know, cooperate with the best I can to really deal with our wonderful government. Okay?

Now, Mr. Keaveney, I really appreciate the fact that you made arrangements to have your experts come on Friday. So tell me now a little bit about that because it looks like we may not be able to accommodate that.

MR. KEAVENEY: I will work on changing his schedule. He's local, so I'm hoping that's not an issue. Might just switch some patients around. It's a doctor. I will have more information the next time.

THE COURT: Let's try to be anticipatory, see if you can rearrange for him to come on that Monday.

MR. KEAVENEY: Yes, Your Honor. And I think Plaintiff will have finished up by Thursday afternoon. I think that's the anticipation.

THE COURT: Well, now, let's -- we're making a record here, so let's just go off the record while we just talk about scheduling matters.

(Discussion off the record.)

THE COURT: Anything you want to put on the record before we adjourn for the day? We've had a tough day. I've

yelled at you folks. I apologize. And in my old age, I'm just getting a little nasty. What can I tell you? It's difficult to manage a case like this because there's a lot of emotions, there's a lot of passions. There's a lot of work that you folks have done, and sometimes we have a witness like this distinguished gentleman, and you expect me to reign him in, it places a lot of burden on the judge, and sometimes have I to sort of raise my voice to get everybody on the same page, and I'm just trying to do it even handedly. So I'm giving everybody an equally bad time. Okay? See you tomorrow -- Wednesday, 10:00 o'clock.

MR. KEAVENEY: Thank you.

MS. WINTERS: Thank you, Your Honor.

MR. SHIELDS: Thank you.

MR. GENIS: Have a good day, tomorrow, Judge.

(Matter adjourned to Wednesday, November 12, 2025 at 10:00 a.m.)

# I N D E X


| WITNESS | PAGE |
|---|---|
| ORLANDO JIMENEZ | |
| DIRECT EXAMINATION BY MR. ROTH | 875 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 912 |
| REDIRECT EXAMINATION BY MR. ROTH | 945 |
| RECROSS-EXAMINATION BY BY MR. KEAVENEY | 950 |
| CARL BERKOWITZ | |
| DIRECT EXAMINATION BY MR. ROTH | 954 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 967 |
| REDIRECT EXAMINATION BY MR. ROTH | 976 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 1015 |
| REDIRECT EXAMINATION BY MR. ROTH | 1057 |
| RECROSS-EXAMINATION BY MR. KEAVENEY | 1071 |
| MARLIZE JANSSEN HARGER DA SILVA | |
| DIRECT EXAMINATION BY MR. SHIELDS | 1076 |

**E X H I B I T S**


| | |
|---|---|
| Plaintiff's Exhibit 38 | 900 |
| Plaintiff's Exhibit 39B | 901 |
| Plaintiff's Exhibit 74E | 904 |
| DX Exhibit 77 | 918 |
| Plaintiff's Exhibit 56 | 981 |
| Plaintiff's Exhibit 45 | 1005 |
| Plaintiff's Exhibit 2 | 1005 |
| Plaintiff's Exhibit 16 | 1059 |
| Plaintiff's Exhibit 29 | 1064 |
| Plaintiff's Exhibit 36 | 1065 |
| Plaintiff's Exhibit 11 | 1067 |
| Plaintiff's Exhibits I and J | 1082 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

- against - : United States Courthouse
Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, : November 12, 2025
10:00 a.m.

Defendants. :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:
SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants:
LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, new York 10271
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

Court Reporter:
Andronikh M. Barna
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2178

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(In open court; parties present.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Mr. Roth, so this next witness is going to be by Zoom from what I understand, and we're ready to do the best we can to take his testimony via Zoom.

So why don't you let me know who we have right now and let's get started.

MR. ROTH: This is Christopher Kort, Ms. Harger's prosthetist who does her prosthesis.

THE COURT: Let me look at my list here. This is Christopher whom?

THE COURTROOM DEPUTY: Kort. Number 17.

THE COURT: Okay. I got it.

THE COURTROOM DEPUTY: Mr. Kort, you can remain standing. I just ask if you can raise your right hand. You could be seated. You can remain seated.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Thank you. Put your hand down.

Just state your name.

THE WITNESS: Christopher Kort, K-O-R-T.

THE COURTROOM DEPUTY: Thank you, Mr. Kort.

THE COURT: Your witness, Mr. Roth.

**CHRISTOPHER KORT**, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Kort, thank you for coming today. I know it's a little challenging. We're going to see if we can get some exhibits up by Zoom, but for now, can you tell us a little bit about you and your company. Okay?

A I am an American board-certified prosthetist orthotist, and I have been in this profession for 30 years, and I own Prosthetics in Motion, which is my prosthetics practice here in midtown for 16 and a half years.

Q What does a prosthetist orthotist do? I don't think -- most people don't know what that actually -- what do you do?

A There's a difference between prosthetics and orthotics. Prosthetics, I'm working with patients who have lost limbs. Orthotics, I'm working with patients whose limbs are intact but they're not functioning properly.

Q Let's just get right to the chase, approximately when did Ms. Harger become one of your patients?

A In January of 2022.

Q And can you describe her condition from a prosthetist orthotist point of view?

A She presents with a left short transhumeral residual limb. That's her above-the-elbow amputation, and a short

above-the-knee residual limb.

Q And when you say short, can you explain the significance of short to the jury, please?

A Sure.

When you have -- the shorter the residual limb, the more challenging it becomes. The longer the residual limb, you have more total surface area to work with and you will have more leverage. So for example, if a patient comes to my office with a long above-the-knee residual limb, I have more of the limb to work with, and they have better results. The shorter, the less total surface area, and the more energy expenditure required for that patient.

Q And in the world of amputations, where does Ms. Harger fall into the range?

MR. KEAVENEY: Note my objection.

Q Compared to other --

THE COURT: One second. There's an objection.

MR. KEAVENEY: Objection. Comparing to other people.

THE COURT: I will allow the question. I don't know, if he can answer it. Do you understand the question that -- listen to me. I may be interrupting from time to time. And any objections, when you hear that, stop testifying until I rule on them. And then I may ask you some questions also. We'll see how it goes. Okay?

Next question.

MR. ROTH: Thank you, Your Honor.

Q And when she came to your office, when Luisa came to your office, did your office start making records related to her; is that correct?

THE COURT: Sustained. Sustained. Sustained. Move on. I will ask you some questions.

You've been brought into this court, Mr. Kort, I suspect, right? Mr. Kort, correct?

THE WITNESS: Kort, correct.

THE COURT: To give testimony as an expert as a person in your field of prosthesis; is that how you call yourself?

THE WITNESS: A prosthetist, yes.

THE COURT: So we're going to move it along. And what we're going to ask to testify about, just give the jurors a general understanding of why you're here.

THE WITNESS: Okay. I am here to talk about Luisa's case, to discuss the prosthetic care that she's going to need for the rest of her life and the challenges from her accident and how she presents as an amputee.

THE COURT: Good. So --

MR. KEAVENEY: Judge, he's not an expert. He's a treater.

THE COURT: You're not an expert here at all, right?

So you're just a person who has treated her, correct?

THE WITNESS: Yes, I am her treating prosthetist.

THE COURT: All right. So we understand that.

Now, let's get direct questions and not stumble around. We're going to get to this directly. What question do you want to ask him?

Q As part of her care, were you asked to create an analysis of the costs and types of future prosthesis she would need?

A Yes.

MR. ROTH: I would call the Court's attention to Exhibit 101 that is in evidence.

THE COURT: Just one second. 101 is in evidence already. Okay?

Q Why don't you just tell us generally, from it's Exhibit 101 and then I marked it -1 to -- it's 19 pages. Why don't you tell us what that record is?

A That record shows the different types of prosthesis that she will require, and it gives a projection of times, cost, and different activity levels for each residual limb. So for --

Q Why don't we start, take it upper and lower. Okay?

So first tell the jury what the different limbs were and what the costs would be, please.

A Okay. Her everyday myoelectric prosthesis, that prosthesis would be her everyday prosthesis. A myoelectric

prosthesis picks up signals from her residual limb to electrodes so that the elbow and hand can work in conjunction.

THE COURT: He asked you what it would cost. Now you're talking about the -- one second. Listen to me.

THE WITNESS: The projection was $221,000.

THE COURT: Listen to me. Everyone has to listen to the Judge, whether you like it or not.

THE WITNESS: Okay.

THE COURT: You were asked -- we're talking about the -- I'll call it the arm; is that okay, the lay term? That's what we're talking about now. There were two, I guess. One for the arm, one for the leg; am I correct?

THE WITNESS: Yes.

THE COURT: Let's talk about the arm.

Now, you have made an assessment of what it would cost to do what?

THE WITNESS: Okay. I will -- okay. The myoelectric arm is $221,000. The body powered prosthesis, which is not electronic, is $26,000. The activity-specific prosthesis is $29,000. The cosmetic prosthesis is $42,000. And a myoelectric prosthesis with pattern recognition was $267,000.

THE COURT: Let me ask you this question. Is that what she has now?

THE WITNESS: She only has one prosthesis right now.

THE COURT: I just want to make it clear: She has one right now, and that obviously has cost some money to have, right?

THE WITNESS: Yes.

THE COURT: And then she may have some in the future? Is that what you're trying to testify about?

THE WITNESS: Yes, there are different -- yes.

THE COURT: Tell the jurors, first, what her condition is now, what prosthesis she has now, what the cost of that is, and then you can testify of what she's likely to have in the future. Okay? That way the jury can follow you along clearly.

THE WITNESS: Okay.

So her primary prosthesis as of now is the myoelectric prosthesis.

And would you like me to explain what the myoelectric prosthesis is?

THE COURT: What the cost of that is.

THE WITNESS: The cost?

THE COURT: Yes.

THE WITNESS: That's $220,000.

THE COURT: That's what she has now, right?

THE WITNESS: Yes.

THE COURT: You can explain what that does.

THE WITNESS: Okay.

A myoelectric prosthesis picks up the EMG signals, which are the signals from your -- the residual muscles. Inside the prosthetic socket there are electrodes. For example, she wants to flex her muscles, a signal comes, the EMG signal is picked up by the electrode, it goes to the elbow, it can go to the hand and go to the wrist. It's myoelectric. It's electronic. But her muscles within her residual limb have to be -- we have to locate the sites where the EMG signals are the strongest to control the prosthesis.

THE COURT: That's what her condition is right now, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: Now this is the arm.

Now, you're saying there's going to be other prostheses that will be required in the future. I think that's what you testified about?

THE WITNESS: Yes, because one arm doesn't fit all the needs. There are different types of arms for different activities.

THE COURT: Tell me what the future holds for her then. She has this at the present time. Tell me what she's likely to experience in the future.

THE WITNESS: Well, she would benefit from a cosmetic arm, which encompasses a life-like realistic skin. She would benefit from an activity-specific prosthesis, which

is a lightweight prosthesis for whatever recreation she would like to do.

Then there is another myoelectric arm that has more advancements, meaning, I just talked about EMG signals, well, there's pattern recognition that has eight EMG -- eight electrodes and it picks up her patterns. It's higher tech.

THE COURT: Now you're getting very specific about three or four other prostheses, if I'm saying it correctly, that you say she would need or are indicated. You tell us. And tell us each one, what they are, and what the cost would be, and what they're for.

THE WITNESS: Okay. As on my chart that I submitted, the body -- a body-powered prosthesis is nonelectric and it used gross body movements for her to open and close her terminal device. It's lightweight and it can get subjected to water. And that is $26,000.

THE COURT: What is that for? What would that do?

THE WITNESS: So for example, if there are activities where she doesn't need to -- like, for example, if she wants to get her prosthesis wet or be in a situation where she want to utilize her prosthesis, but technology cannot be subjected to the elements, this would be a prosthesis that would benefit her.

THE COURT: All right. Now, next we have two others I think you mentioned.

THE WITNESS: Three others.

THE COURT: Three others.

One at a time.

THE WITNESS: Okay. Activity-specific prosthesis. That's so if she wants to -- whatever activities she would like. For example, this type of prosthesis, you could have terminal devices, which are considered hands, but just consider them terminal devices. If there's an activity that she would like to do, we could make a specific prosthesis. For example, if she wants to get on a bike, she needs to hold the handlebars. Say she wanted to golf, there's a certain terminal device to grab a golf club. Say if she wanted to swim. There are all different types of terminal devices, and that would be for an activity-specific prosthesis, and the cost that I put in was $29,000.

THE COURT: Now you have two more to go.

THE WITNESS: Right.

The cosmetic prosthesis is $42,000. And what that is is that is a lightweight passive prosthesis, meaning doesn't have too much function, but cosmetically it will make her feel whole again. I have another company where we make life-like skins, and we match her other side, and that's for cosmetics.

And the last prosthesis on the list is similar to the first one, except it has pattern recognition, so instead

of two electrodes, you have a minimum of eight.

THE COURT: So what are the costs of those last two?

THE WITNESS: The last two I have down for the cosmetic 42,000, and for the pattern recognition, 267,000.

THE COURT: Why would she need the pattern recognition? You said it was similar to what she has now.

THE WITNESS: It's better, it's better technology.

THE COURT: Why would she not have that now then?

THE WITNESS: Because insurance companies don't pay for everything.

MR. KEAVENEY: Objection.

THE COURT: Sustained. Disregard that. Sometimes we ask a question, we don't know what the answer is. We're not talking about insurance in this case at all, you don't have to consider it, unless I tell you otherwise.

So I think you've explained that. Now, you want to follow-up with some questions, and let's see if you can be focused.

MR. ROTH: Your Honor, I think that you covered it. We should just go to the lower limb next.

THE COURT: Okay. Let's do the lower limb. I'll let Mr. Roth lead the questioning. He knows what I am going to do if he doesn't do it.

Go ahead.

MR. ROTH: Okay, Your Honor.

Q So going to, for the lower extremity, why don't we start with what does she have now, and how much that costs, and then we'll go to the next set of prostheses that you recommended.

THE COURT: I think he's got the drill down now from what the Judge wants. Okay?

Mr. Kort, let's go. Let's go to the lower extremity now. What does she have now?

THE WITNESS: Right now she has a left above-the-knee prosthesis that incorporates the Ottobock X3 microprocessor knee. The cost of that knee, that above-the-knee prosthesis is $233,000.

The next one on the list is the running prosthesis, which is specialized for running. It's half the weight of her everyday prosthesis. It's made specifically for running. That's 80,000.

The cosmetic prosthesis incorporates an electronic microprocessor knee as the X3, but it has a custom silicone skin covering the prosthesis, so it looks life-like.

And the last prosthesis is a specialized prosthesis just made for cycling, it's made very differently, and it's $84,000.

THE COURT: Any other questions?

Q So now you gave us the costs. Those costs include what? Not just the price of the -- that's an all-inclusive cost, correct?

A That includes -- that's a three-year projection and that, if you read my chart, it gives the price of the prosthesis. And then for the next three years, it gives supplies and a new socket, 12 to 18 months into that three-year time period.
Q So that's every three years that that's -- that's what it covers; is that correct?
A Yes.
Q And that's for the rest of her life; is that correct?
A Yes, yes.
Q All right.
THE COURT: You know, out of curiosity, Mr. Kort, I'm listening, and I'm sure the jury is listening to you, how we have these advances in your field.
When did this all start? I mean, if this was ten years ago, would she have had the same opportunities that she has today because of the advances you made in this incredible technology? I'm just curious. The jury would like to know a little bit about that.
THE WITNESS: Well, I put this together in 2022, and since that time, you talk about advancements in technology. If I would have done this years ago, there would have been no such thing as the X3 microprocessor knee or pattern recognition. So every year, things are getting more and more high tech. So did that answer your question, Your Honor?
THE COURT: Yeah, I think this is a general idea

because I'm listening to this, and I know I'm sure 30, 40 years ago this would never have been possible, I imagine.

THE WITNESS: No, not at all. And the microprocessor knees, which means a computerized knee joint, only came out in the mid-'90s. So technology -- and that was the first one. That was called the Ottobock, which is the German company, C-leg. Now they have four different models of different microprocessors, and that's just one manufacturer.

The benefit of a computerized knee is to provide safety and stability, unlike traditional prosthetic knees before it was invented.

THE COURT: I just wanted the jury to have a general overview because I think this is something that you don't know much about and we have an expert here. You're an expert in the technical sense, a person who does this type of stuff.

Next. Anything else?

MR. ROTH: Yes, a couple other things, Your Honor.

Q So just to be clear, this is every three years and every three years that she needs -- there's a new one, and there's new technology, and there's different upgrades for these; is that correct?

A Yes. So components, parts, knees, feet, hands, elbows, they have a three-year warranty, some have a two-year warranty like a car. So they have to be maintained through that warranty period. And after three years, the warranty is

expired, and that's the time to get an upgrade.

For example, Luisa currently has the Ottobock X3 computerized knee. They don't make it anymore. Now it's the Ottobock X4. So they've made advancements. They took that knee and made it better. So three-year warranty, some components are two-year warranties, but we always try to keep up with the times and replace the components as they progress and evolve.

Q So now, you described that a couple of these -- these devices, you just described four of them. In the range of having a conservative plan or an aggressive plan, what type of plan did you make for her in this matter?

A I think my plan is conservative. There are many activities that we do as able-bodied people, and not one prosthesis can provide the ability to do all activities. Like I discussed, there was a cosmetic prosthesis, there was a -- all different types of prostheses. So one leg, one arm --

Q Let me interrupt you, Mr. Kort. Let me just interrupt you.

What would a more robust plan for her include and what would the costs of that be that you -- you gave a conservative plan. But if she could get a more robust plan, what is available to her and what would the cost be?

MR. KEAVENEY: Objection.

THE COURT: Just one second. Just one second.

It's kind of speculative. We don't have any direct testimony as to whether this is likely to happen, but, you know, I will accept this now, but we're going to have to show them this is something that's realistic. All right?

Q Okay. And Mr. Kort, if you could follow-up the Judge's question, explain why it's realistic, and who else is getting this stuff. Okay?

A Okay. One example that's not in my plan are powered prosthetics. For example, there is a powered ankle and foot on the market right now. It's $82,000. It's not in the plan. And I didn't put it in the plan because I didn't want to be too aggressive. And also in the next years to come, those powered prosthetics, right now they come with a weight. They're very heavy. But as technology gets better, they will become lighter. And in terms of getting everything as -- can you repeat your question?

THE COURT: Let me ask. None of us have a crystal ball, so we don't know what the future is going to bring. The technology we have is incredible. I'm wearing glasses right now that have hearing aids in them, believe it or not. So anything is possible with the rapid technology that we have for all we know, right? So it's okay to get a little bit of a sense of the future, if we have a crystal ball, but we just don't know what the future is going to bring.

Am I putting words into your mouth, or is this a

fair assessment of what we're dealing with in reality?

THE WITNESS: Well, I think, yes, we don't have a crystal ball, but we know where it's generally going. We're going to incorporate AI, we're going to incorporate powered. But right now, there is a powered ankle, like I just said earlier, that's $82,000 that's not in my plan.

THE COURT: That's about it. All right. So we'll see hopefully the future, you know, who knows what will happen, but I think that we have a pretty good idea of what's confronting the plaintiff in this particular case.

Anything else, Mr. Roth.

MR. ROTH: Your Honor, there's a couple of more I think terminal devices that are available now that the jury should know that --

THE COURT: Well, they're not in the plan that you have here now?

MR. ROTH: That's correct.

THE COURT: Something else now you want to offer?

MR. ROTH: No, I just want to offer his testimony, that's it.

THE COURT: I will let you have a little flexibility in terms of that type of questioning, even though it's not in his plan. Go ahead.

THE WITNESS: Okay. So for example, Luisa currently has a myoelectric hand that was given to her three years ago,

three and a half years ago. That hand has been surpassed by other manufacturers. It's lighter, faster, has powered thumbs, meaning she can position the thumb -- it's powered where her current hand she has to take her other hand and position it. There are also products where we can go online and go to the cloud and make adjustments from our office. So technology is advancing, and since 2022 when we wrote this plan, it's evolved right in front of our faces, so.

Q And if you were to include all of those things, how much more expensive would the plan be, approximately?

A Well, if you would just do the $80,000 foot and ankle, I'm not a life planner, but you would have to do the formula, but 80,000 every three years, the lifetime. I don't have a calculator, but it would be significantly more. And that's just one product. And there are numerous products on the market, but multiple activities.

Q Okay. Now, we talked about --

MR. ROTH: Are we going to be able to share any exhibits or no?

MR. MORALES: Yes.

MR. ROTH: Okay, great.

Q Why don't we talk about the challenges, Mr. Kort, that you've experienced with her upper extremity and her lower extremity.

So tell us about --

MR. ROTH: First, if we could put up 97-K, if that's possible. That's actually in evidence.

THE COURT: Just one second. 97 is in evidence. We have a lot of subsections to that one. This is going to be another one, this is going to be K now, correct?

MR. ROTH: It's one of these pictures.

This is a picture the jury has already seen.

THE COURT: Can you see that, Mr. Kort?

THE WITNESS: I don't see anything yet.

I see it.

Q So looking at that picture, let's start with her upper extremity. Explain what challenges there are based on the length of that, of her upper extremity, and also -- if you can make that a little bit bigger, please -- and also what challenges that you have physically -- what she has physically using that stump with her prothesis?

A If you compare her amputated side, which we call her residual limb, compared to her sound side humerus, her other arm, you can see it's less than 25 percent the length of her sound side. So that is challenging because there's minimal surface area for suspension and to access her sites for the electrodes.

In addition, due to the traumatic nature of her amputation, she has skin grafts on her residual limb, which impede the EMG signals for the electrodes and it makes it

challenging.

In addition, if you look at her residual limb with the scarring, it creates a very textured surface area. So when you're trying to get suction, you want it to be airtight, and when you have crevices in between the skin and the socket, it could lead to loss of suction. Suction is the way you keep your prosthesis on.

Q What happens when there's no suction, what happens to the health of the area and the person?

A Well, what happens is her myo -- so technology comes with a price. The price is weight. So her electronic elbow is two and a half pounds, her hand is a pound and three-quarters, a wrist rotator is over a pound. All those components are just hanging from that short residual limb, and it becomes challenging. And if it were to slip and migrate to the floor because of gravity, the electrode sites are no longer in the proper position, and she can't operate the prosthesis. That's why we have a harness on it.

Q We'll get to the harness in a second.

MR. ROTH: Let's go to 97-G.

THE COURT: So 97-G is now in evidence.

(Plaintiff's Exhibit 97-G received in evidence.)

Q Do you have that in front of you, Mr. Kort, also? You have some photos. So if you want to look at it, and then while we're getting it up, just orient yourself. Wait, it's

coming.

THE COURT: Mr. Roth, when you talk like that, it presents a challenge for the reporter because she doesn't know whether to record all your mumbles or not. Try not to do that.

MR. ROTH: Yes, Your Honor.

Do we have it up on the screen?

(Exhibit published.)

Q Can you see that, Mr. Kort?

A Yes, I can. So that is a picture of --

Q Hold on. Just wait until I ask you a question, okay?

So please describe for the jury what we're seeing here and what significance it is.

A This is the picture of her left above-the-elbow amputation, and she's lying on her back with her residual limb facing the ceiling. But as you can see, the soft tissue is dangling, meaning it's not one uniform residual limb, that there's excessive tissue at the bottom. And if you look at the texture of her residual limb, you can tell that that is a skin graft. It's not her natural skin. It's skin from another area and has been wrapped over due to the nature of her amputation.

Q And what problems does that cause with her prosthetics and communicating the electric impulses to the arm?

A Well, it impedes the signal, the EMG signals. And like I

said earlier, it would be better if her skin was in better condition for suction.
Q Okay. And let's look at 97-L, please.
THE COURT: It's in evidence now.
(Plaintiff's Exhibit 97-L received in evidence.)
(Exhibit published.)
Q Tell us, what are we seeing there, and what are the challenges there?
A Well, you can see all the invaginations. That is a skin graft above the amputation on her residual limb for her upper extremity. And you can see the skin grafting has all those crevices in there, like I said earlier, that poses a challenge for suction and it poses a challenge for the transmission of the EMG signals.
Q As far as comfort and pain, what happens to the individual when they have this type of a connection with the prosthetic device? What are the factors that come into play due to the fact of the skin?
A Well, the skin just really poses a problem with fit and suction. In my experience, sometimes when patients have ingress, their sensation is compromised. So she could develop a wound, she won't feel it.
Q Let's try to go to the lower limb now. Okay?
A Mm-hm.
MR. ROTH: So let's look at, this is 97-H.

(Exhibit published.)

Q All right. So this was at what point in time in her treatment?

A This picture was before she saw me.

Q Okay. And what are we seeing here and what -- up until the -- this was for the first five years after her healing, what effect did this have on her walking, et cetera, during that time?

A So she's on her back. And that is the back of her residual limb. Those are her hamstrings and the back. You could see that big large crevice, that's what we call an invaginated scar, and you can see the different texture of the skin graft area versus the natural area of her skin. And once again, all those invaginations can lead to challenges in suction, suspension. They also cause blisters because the weight of the prosthesis is hanging during swing phase and that could pull and she blisters. And also, skin graft breakdown. It's very challenging and not ideal.

Q So, you know, when laypeople hear the word blister, you know, people get a blister on your toe, it's not that big of a deal. Why is it such a big deal for an amputee like Luisa?

MR. KEAVENEY: Objection.

THE COURT: This was an objection. Overruled.

Go ahead. You can answer that.

A Because when you're wearing a prosthesis and you have a

blister, just like you have a blister when you wear your shoes, it's painful. You get a blister, you wear new shoes, you get a blister, it's uncomfortable, so you don't want to walk around with blisters on your residual limb.

MR. ROTH: Let's go to 97-M.

THE COURT: M, did you say?

MR. ROTH: Yes 97-M as in Mary.

(Exhibit published.)

Q Now, this is taken after what happened to your understanding? This is what it looked like when she came to you?

A This is how she presented when she came to me in January of 2022.

Q And this is after it was already fixed as best they could, correct?

A Correct. It's better than it was and there's still some invagination on the bottom on the suture line.

Q And how is that affecting to -- that's the condition it is as of today, correct?

A Yes.

Q And how is that affecting her now?

A Well, if you -- in my notes of her chart, she was fit with this, I fit her for the first socket, and she did have blisters. But as her residual matured, a year later, I made her a smaller socket, and the blisters are not as prevalent

but it still can happen.

MR. ROTH: Let's look at 97-N.

Q And Mr. Kort, I sent you a chart, your own chart for the 97-N, so I'm going to refer to that. Those letters there are just for testimony so that the jury can know what you're talking about. Okay?

(Exhibit published.)

A Okay.

Q So looking at 97-N, where it says A, what part of her prosthesis is that?

A That is the above-the-elbow socket and frame. So there's a two-part system. There's a soft inner socket, and there's an outer rigid frame. What it's pointing to is the socket and frame, and that's what I make here in my office, in my shop.

Q And there's a little -- it looks like a little black circle?

A That's a valve.

Q Explain what the valve is for and how does it function?

A Okay. So for her to put her prosthesis on, she needs to take out the valve. So there is a circular valve, and inside there is a housing, which is the outside, and there is a valve that threads into the housing. She takes the valve out of the housing, she puts her residual in, into the socket, and she takes a pull sleeve and pulls the tissue through, out of there, and it comes out of the valve, the pull sleeve, and she

gets as deep as she can, and then she dials the valve into the valve housing to create a sealed environment. So that's how she gets her prosthesis on.

Q Now, for that part, that's the upper shoulder, if the jurors can't see it, that's A is the very first arrow.

For that upper shoulder, how much does that piece weigh, just that piece of the arm, approximately?

A Approximately two pounds.

Q Okay. Now, we see the next arrow down is pointing to mid-forearm; do you see that, where it says B?

A Yes.

Q Can you explain to the jury what part of the prosthesis that is, and how does it function, and how much does it weigh?

A That's the electronic elbow. That's approximately two and a half pounds.

And how does that operate?

Q Yes.

A Once again, there are electrodes in the socket. At the bottom of the socket, there are wires that connect to the top of the elbow. It's electronic. So when we have to program the elbow, we have to program the hand, and we have different programs for different levels of abilities. She fires the muscles in the socket, flex or extend, and it tells the elbow to lift up, to flex the elbow or extend the elbow.

Q The total weight of that arm is approximately how much?

A Six pounds.
Q And the total length of her -- excuse me.
So she has six pounds.
And can you explain what the relationship of the weight is to the strap across her chest? Is that -- how does that help her?
A The strap across her chest is auxiliary suspension, so the main primary suspension is through suction through pulling her residual limb through the valve. And the strap is a chest harness, and that is a secondary form of suspension and helps keep her prosthesis in place because when she's trying to function and operate the prosthesis, the less movement, the better.
Q So in practice in the clinical environment, she can get all that done, what's happening with her in the real world environment? What do you know is going on as far as the ability to use it and to have it functioning properly?
A She has had challenges. And she's had challenges because she has a short residual limb that's full with a textured skin from the skin grafts. And since her residual limb is so short, you have all this weight pulling. That's why we have a secondary strap. So what's happening is she can operate it, but if it starts to migrate just a little bit, the electrodes aren't in the right spot, and then she can't function with her elbow, and that is a challenge.

Q And when she comes into your office, is that something that she has happened frequently?
A She has come in and we have made adjustments.
Q So what's the -- although there's, you know, you're doing your best, what is the fix to that if you just can't get that right and you have such a short stump, what is the next possibility that is available to her?
A Well, that's a decision that she'd have to make, but there are other options where you can get a surgical procedure called osteointegration.
Q We've heard a little bit about osteointegration. Assuming that she was willing to get the osteointegration, what would be available to her and what -- how much better would she function if she was willing to take that risk?
A Osteointegration is a bone-anchored prosthesis. So what they do is they hollow out the femur -- I mean, the humerus, they insert a -- they put a 3-D printed insert into her humerus, it ossifies, they close the skin around the bottom on the residual limb, there's a little bit of an opening. She will just click her prosthesis on, there's no more need for a socket, but she can still utilize all the different prostheses that I've outlined because -- she would do better because now she doesn't have to worry about socket migration, electrodes. The prosthesis stays on through the bone anchor. Kind of like when you get a dental post in your tooth.

MR. ROTH: Can we put up the medical illustration exhibit -- what exhibit is this?

Wait. Hold on a second.

MR. MORALES: 96-H.

MR. ROTH: 96-H.

(Exhibit published.)

MR. ROTH: This is just for demonstrative purposes, Your Honor.

THE COURT: This was in evidence before. I think I have it in evidence. You have a bunch of medical illustrations. You want to show one of them?

MR. ROTH: Just one.

THE COURT: Go ahead.

MR. ROTH: Is it possible to zoom in a little bit on that, please? To the left. Yes, right there.

Q So looking at the -- on the -- just the left side of that illustration where you can see the bone, explain to the jurors how this would help her and where would the anchor using that picture as best you can explain it, using anything on that illustration that will help you to explain to the jurors what she's going to actually have to do?

A This is just a picture of her residual limb, her bone and the spike. Is that what you want me to describe?

Q Yes. Just describe how, you know, when she comes to you with the osteointegration, what would you see and how would it

work, looking at this?
A Well, I believe there is another -- I'm sorry, Mr. Roth. There is another diagram that you have that's much better when it comes to osteointegration.
Q I understand that. I just want to know, what would it be hooked into? Just explain, that's it.
A Okay. They would undo her soft tissue at the bottom, they would drill into her humerus, they would shave all those bones off. And the surgeon, the orthopedic surgeon would put a 3-D printed insert into her humerus bone. Then they would do a nice clean surgical revision around the bottom, and there's going to be a post sticking out of her arm. And that's where she'll just clip on the prosthesis. That's the best way I could describe it.
Q In your experience, what are the dangers -- okay, so on the one hand, she's going to have better function. What are the risks if she has that procedure?
A Infections. And it's not a bone infection because the infections come around the skin because basically you have an open portal for bacteria to get into your skin, into your residual limb because it's not closed off because that button, that pin has to come out of her skin. So the one downside is infections. For example, instructed not to go into fresh water, like a pond, still water. It's full of bacteria, it can get into her skin, and she can get an infection. That's

the downside.

THE COURT: Has she had any infections over these several years?

THE WITNESS: She didn't have the procedure yet, but I have patients that have had infections.

THE COURT: This procedure is going to be required? Is that what you're testifying about?

THE WITNESS: It's not required. It's her choice. But it would give her a better outcome functionally because her residual limb is so short, she's having a difficult time. And then she would be able to utilize her prostheses much better.

THE COURT: When will she have to make that decision, if at all?

THE WITNESS: That's up to her. She could -- whenever she chooses to.

THE COURT: And if she decides to do that, then you're saying there's a risk of infection, right?

THE WITNESS: Yes.

THE COURT: All right. Anything else?

Q So now, Luisa came to you --

MR. ROTH: You can take that down, please.

Q Luisa came to you and she is a double amputee, correct?

A Yes.

Q And as far as manipulating her -- we talked about -- I'm

not going to go back to it, but the --

MR. ROTH: You know, why don't we put back up 97-N.

Q Because we talked about the upper, now we've got to talk about the lower, and the weight of it, and how it effects her.

MR. ROTH: So I didn't get to that, Your Honor. I'm sorry.

Could we put up 97-N?

THE COURT: What are you showing the jury now?

MR. ROTH: Back to the same, the same --

THE COURT: 97.

MR. ROTH: N.

THE COURT: The same one that's in evidence already, 97-N.

MR. ROTH: Yes. Let's focus on the lower portion of that photo, if we could.

(Exhibit published.)

Q Okay. So let's talk about the arrow where the C, where the C is. The top arrow. What is that that we're pointing at?

A So that is the prosthetic socket and frame. So to make that, I have to take a cast of her limb, and then we fabricate it in-house, and it has to fit just right and it incorporates her pelvis. So that's something that I made in my office, in my lab. That's called the socket.

Q Since in the last nine years, how many times would you

say that she's had to have adjustments to her socket?
A Well, nine years, I don't have --
Q Approximately, do you think? Or since you've been working with her?
THE COURT: As far as your experience.
A Since I've been working with her.
THE WITNESS: Sorry, Judge. I'm sorry.
Q I'll rephrase the question. Since you have been working with her, how many times have you had to adjust her socket?
A She's been in at least a dozen times. And a year later, she got a new socket because her residual limb got smaller.
THE COURT: How many times have you been working with her? How long has this been that you have been involved with her?
THE WITNESS: January of 2022.
Q And this socket, you know, when people say, oh, it's just a socket, how important is this to her and how -- and what needs to happen, like, inside the socket there's other stuff going on that -- can you explain to the jury -- to get her leg into the socket, what has to happen?
A Okay. First, she has to put on a silicone liner. I don't have one to show you. But she has to roll a rubber sleeve on her residual limb. It's sized according to her residual limb. Then she has to lubricate -- there's a ring, which is called a seal. She lubricates it with either alcohol

or Purell, and she slides into the prosthesis. The alcohol or the Purell evaporates, air comes out of that black valve, and her leg stays on through suction.

In addition, when I designed her socket, I have to incorporate her pelvis. So if anybody -- if you ever sit on a hard stoop for a long period of time, your bone on your rear end called your ischial tuberosity, it gets uncomfortable, right, because you're sitting on that hard surface. That bone has to be inside the socket because it has to capture her pelvis, so it's inside -- the bone is inside the socket where she sits, and it's over her hip joint to lock in her pelvis to provide stability. So it's a very invasive, it's very difficult for toileting, but it has to be up there to provide stability so she can walk.

Q And that is because of the high level of her amputation because she also has a short upper amputation unfortunately also?

MR. KEAVENEY: Objection, leading.

THE COURT: Sustained. You know, he's trying to testify now. So we don't allow that. So it's technically an objection, which is sustained.

You want to comment about anything else, about the degree of difficulty, or how she has to manage this, I will allow you to do that.

Q Go ahead.

A The shorter her residual limb, the more challenging because less surface area.

Also, the shorter the residual limb, the more energy expenditure a patient requires. So above-the-knee amputees require four to five percent more energy expenditure than able-bodies. That's a lot of energy required to walk. And the shorter -- it's all about biomechanics. The longer the limb, the easier it is for them to walk. The shorter limb, the more effort they require.

Q Now, you said that there was a bunch of different types of prosthetics that she needed because they didn't do the same things. For instance, the bicycle, the bicycle, explain why this can't work for a bicycle limb?

A Sure. I will explain it.

A bicycle, when we sit down on a bike seat, right, it's a very narrow seat. Her socket, her prosthetic socket will hit that seat and bicycling would be very difficult. So what I do is I make -- in my projections, there is a prosthesis for a bike -- a specialized bike prosthesis where I would make it low profile so she can sit her rear end on the seat, function, and have suspension. But it's not good for walking because there's no pelvic stability. So it's a modified prothesis to allow her to bike.

In addition, her knee has bike mode. Not ideal. I can make a prosthesis half the weight, if not three-quarters

of the weight for a bike prosthesis.
Q So that's why she needs all these different types of prostheses, because what -- what's the -- in the -- when the Defendants were crossing Dr. Kahn, they had mentioned that why can't you use this leg has different modes. What different modes?
MR. KEAVENEY: Objection.
THE COURT: You're getting too far ahead of yourself.
I think you're saying that depending upon what activities she wants, she may have to have different prostheses in order to do that activity. Is that basically what you're saying?
THE WITNESS: Yes.
THE COURT: If she wanted to change, if she wanted to go biking, she has to put a different prosthesis on, that's what you're saying, correct?
THE WITNESS: Yes.
THE COURT: The jury understands. What else?
Q Let's go to the next section on her leg. What is the next arrow pointing, D, what is that pointing at?
A Letter D is the -- that's what we're talking about, the Ottobock Genium X3, that is the computerized knee joint. So it has six main sensors, it has a hydraulic cylinder, it has a five-day battery life. That is the knee joint, it weighs just

shy of four pounds.
Q I didn't ask you how much the socket weighed. How much does the socket weigh?
A Depends on the size of the limb. But overall -- how about this, the overall weight of the prosthesis, her prosthesis is approximately 12 pounds.
Q And let's go to the bottom, the last arrow, the foot. What can you tell us about that?
A That is a prosthetic foot. There are all different types of prosthetic feet depending on what you're trying to achieve. You can see above the foot and below the knee there is that black and gray ring. That's a shock module. It compresses and it rotates. So that's a vertical shock dynamic foot. It gives a lot of energy return. We want energy return because she's already expending five times what an able-body does, so we want to give a foot that gives her more pep in her step.
Q So can you describe her gait? Because you've seen her many times, correct? So can you describe her gait for the jury? How does she walk compared to a regular person?
A Compared to a regular person, she has gait deviations. All amputees have some sort of gait deviations. When she walks, she has a little bit of a lateral trunk lean. A lateral trunk lean, what that means is they shift more weight onto their sound side, and she positions her torso in a way that gives her more stability.

Q And how does that effect her though, the health of the rest of her body when she's leaning and walking on one side?

MR. KEAVENEY: Objection. He's not a doctor.

THE COURT: Sustained.

Q How have you seen it effect her ability to walk any distance?

A Well, over time and she gets fatigued in her ankle, knee, and hip. All amputees get fatigued on their sound side residual limb.

MR. ROTH: No further questions.

THE COURT: Do you want to take a little break now before we start cross-examination?

MR. KEAVENEY: Sure.

THE COURT: How long are you going to be?

MR. KEAVENEY: We can take a few minute break.

THE COURT: So let's take a 15-minute morning break. I will be back at 11:15.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

MR. ROTH: We're off the record?

Your Honor, we're off the record?

THE COURT: Yes. The jury is not here.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Mr. Keaveney, cross-examination.

MR. KEAVENEY: Mr. Kort, can you hear me?

THE COURTROOM DEPUTY: Sorry. I muted. Go ahead.

MR. KEAVENEY: Mr. Kort, can you hear me?

THE WITNESS: Yes, I can.

MR. KEAVENEY: Okay.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Mr. Kort, you're here today because pursuant to a subpoena, correct?

A A subpoena?

THE COURT: You've been brought into court not voluntarily, you've been required to come here because you got a subpoena to testify. That's what he wants to know.

THE WITNESS: I have to look.

THE COURT: Well, look, why are you here today? Who brought you here?

THE WITNESS: I'm here to testify on behalf of Luisa and prosthetic care.

THE COURT: Right. Okay. Next question.

Q Did you discuss this matter with Mr. Roth or any attorneys associated with Ms. Harger?

A I -- I talked to Mr. Roth before about --

Q How many --

A About my plans that I projected.
Q How many times did you speak with him?
A Two.
Q Okay. When did you speak with him?
A I spoke to him last night via Zoom, and I spoke to him last Tuesday via Zoom.
Q Did you speak with a Dr. Kahn regarding Ms. Harger?
A Yes.
Q When did you speak with him?
A Before Halloween. Because I was originally supposed to testify on Halloween.
Q Now, Dr. Kahn is not a treater, right? He's an expert in this matter?
A To my knowledge.
MR. ROTH: Objection.
THE COURT: By the way, where are you testifying from? Where are you located right now?
THE WITNESS: Me? I'm in my office in Midtown.
THE COURT: In Manhattan?
THE WITNESS: Midtown Manhattan.
THE COURT: All right.
Q Now, Mr. Kort, you're not a medical doctor, right?
A No.
Q Does New York have any licensing requirements for your profession?

A I'm not licensed, no. I'm board-certified.
Q Does New York have any licensing requirements for your profession?
A Not New York State.
Q You said you have another company also in addition to Prosthetics in Motion?
A I have a few, yes.
Prosthetics Silicone Skins is the company that makes the custom skins.
Q You said you have a -- that would make the cosmetic limbs?
A Yes. The life-like skins. So people miss their fingers, miss their toes, and need a hand, that's all silicone life-like, will cover a prosthesis, it's whether above the knee, below the knee, arm, custom skins, life-like.
Q And you also make the sockets and the frames?
A Yes, sir.
Q So you benefit financially off those products, correct?
A Sure. It's a service that I provide.
Q There are dozens of prosthetics manufacturers, right? Is it prosthetics or prosthesis?
A So good question. So prosthesis -- so her, she's wearing a prosthesis, but we call it the prosthetics profession.
Q Okay. There are dozens of companies that make prostheses, correct?

A Yes.
Q And there are some that make better ones, or some that make lesser ones, and there are some that are pretty much at the top of the list, correct?
A Correct.
Q And one of them is Ottobock, right?
A Yes. They're the number one largest company in the world.
Q And according to your website, you specialize in fitting those products, right?
A Yes.
Q Do you obtain any financial benefits from referring Ottobock products?
A No.
Q Does your firm have any financial benefits?
A No.
Q Do you get any gifts, or any trips, or anything like that as a result of referring those products?
A No.
Q Now, when you first saw Ms. Harger, you took a history, correct?
A Yeah.
Q A history regarding her prostheses, correct?
A Yes.
Q So you're not a medical doctor, so you have no opinion

regarding the rest of her conditions, only the conditions relating to her prostheses, correct?

MR. ROTH: Objection.

THE COURT: Overruled.

So your knowledge just comes from your being with her and treating her, I guess, right?

THE WITNESS: Well, yes. But I --

THE COURT: Next question. Next question.

Q So you had a history that she received her first prosthesis in Brazil, correct?

A I'd have to -- I would have to read that again.

THE COURT: Well, you saw her in '22, so the accident happened here, you know, in 2016.

THE WITNESS: '16.

THE COURT: So did you see her at all between that time and 2022?

THE WITNESS: I didn't see her until January of 2022.

THE COURT: So he's trying to ask about what happened, I guess, before then. We'll see where it goes.

What's the next question?

Q Do your records indicate when she received the first prosthesis?

MR. ROTH: Objection.

THE COURT: Do you know when she received the

first -- do you have any history as to when she first got her prosthesis?

THE WITNESS: I don't know. I'd have to look. I would have to reread the 160 pages.

Q Did you review records prior to testifying today?

A I did.

Q Did you review any records indicating when she first got a prosthesis?

MR. ROTH: Objection.

A No, but I read --

THE COURT: Overruled.

So when the Judge starts talking, you hear an objection, you have to stop and then listen to the Judge. There's an objection. All right?

So we just want to know when she first got a prosthesis. I think Counsel wants to get a sense of the history. You didn't see her until six years after the incident, I suspect, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: Do you have any knowledge of what preceded that? I think that's what he wants to know.

THE WITNESS: I do. She did go to a company --

THE COURT: You want him to answer that?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: So give the jury a sense of what

happened during the, I guess it's the six years before you saw her.

THE WITNESS: Four years prior to her coming to me, she went to a company called Hanger, and they were unsuccessful in fitting her prosthetic sockets.

Q And Hanger is a reputable business, to your knowledge, correct?

MR. ROTH: Objection.

THE COURT: What was the question?

Q Hanger is a reputable prosthetic company, to your knowledge, correct?

THE COURT: Can you answer that question? Are they reputable?

THE WITNESS: Depends what the -- the question is -- there's 900 offices. Some are good. Some are not.

THE COURT: Okay.

THE WITNESS: That's the truth.

Q What type of prosthesis was she wearing at that time?

MR. ROTH: Objection.

Q When you first saw her?

THE COURT: One second. Don't say anything now. There's an objection. I don't understand why you want to object to that.

MR. ROTH: Time. He just said it plain.

THE COURT: Okay. You can answer that question.

A When she came to me, she just had a revision done. And the socket that she had was not properly fit.
Q Who manufactured that prosthesis?
A Hanger.
Q That was the company that did it, the prothesis or the socket?
A Okay. How it works is that patient care facilities, like myself, we make the socket. We all buy from different manufacturers. So Hanger buys from Ottobock, I buy from Ottobock. We buy the parts, but the patient care facility designs the sockets.
Q Okay. Was she using a Blatchford Endolite prosthesis when you first saw her?
A She had one, yes.
Q And that's a different manufacturer than Ottobock, correct?
A Correct. It's from England.
Q And that's a different cost than the Ottobock prosthesis, correct? They're not identical costs, are they?
A No, they're not identical.
Q And did that have a microprocessor also?
A That had a microprocessor knee and microprocessor foot.
Q Okay. And it's the socket that makes the prosthesis fit properly, correct?
A Yes.

Q Not the attachment, not the -- in this case, the Blatchford Endolite, correct?
A Correct.
Q And you make the sockets in your business, correct?
A Yes.
Q Okay. So you referred -- you suggested the Ottobock X3, correct?
A Yes.
Q Okay. Are you aware of the history of that prosthesis?
A Do I have a history of using that pros -- yes.
Q Are you aware of the history of that manufacturer, of that specific prosthesis?
MR. ROTH: Objection.
A Am I aware of Ottobock's history?
Q Of that specific X3?
MR. ROTH: Objection.
A I am aware of it. What's your question? I'm confused. What's your question?
MR. KEAVENEY: Judge, there was an objection. I don't know if you want to rule on it.
THE COURT: I didn't hear the objection. If you can answer, I don't know where you're going with this. Next question. He's aware of it. What's your question?
Q The Ottobock X3, that can do a lot of things that maybe its predecessor couldn't do, correct?

A Yes.
Q Just like now we're up to the X4, which can do certain more things?
A Yes.
Q So the Ottobock, it was waterproof, right?
A Yes.
Q It also had a walk to run feature, correct?
A It does.
Q And when we say walk to run, that's if you're crossing the street and you need to hasten your pace a little bit, you can run a little bit, right?
A Yes.
Q It also has a running mode, correct?
A Yes.
Q And the running mode, you can change by an app on your phone, correct?
A Yes.
Q And you could program that for a bicycle mode, correct?
A Yes.
Q Okay. So it has a lot of features that you said that Ms. Harger needs a specialized prosthesis for, correct?
A Yes.
Q What was Ms. Harger able to do when you first saw her?
MR. ROTH: Objection.
THE COURT: Overruled.

I guess he wants -- this is cross-examination, members of the jury. And I am a little bit, you know, permissive because you've heard the direct, and now Mr. Keaveney has the right to question him. And, you know, so we allow a little bit of latitude for that purpose, right? So I don't know what the nature of the objection is, but I think you wanted to know what her condition was like when he first saw her? Is that basically the thrust of your question, Mr. Keaveney?

MR. KEAVENEY: That is, but I'll be a little more specific.

Q Mr. Kort, in 2023, January of 2023, do your records indicate that Ms. Harger could traverse more than 400 yards per day?

A I have to look at the note, but -- I'd have to look at my notes.

MR. KEAVENEY: Okay. Could we look at page 42? This is from his records.

THE COURT: So you don't recall -- you need to look at your notes to refresh your recollection about that, correct? Is that you're saying? If you don't recall -- listen to me. If you don't remember something, you can look at your notes to refresh your recollection or anything else that Counsel wants to show you. Do you want to do that now?

THE WITNESS: Yes.

THE COURT: Do you want to show him what specifically, so we can move on?

MR. KEAVENEY: Yes.

THE COURT: Look at page 42 of this report? Is that what you want?

MR. KEAVENEY: That's what I'm showing him right now.

THE COURTROOM DEPUTY: Is it just for the witness?

MR. KEAVENEY: No, this is in evidence.

(Exhibit published.)

THE COURT: Look at that. Does that refresh your recollection? Can you answer the question?

THE WITNESS: Yes, yes.

THE COURT: Go ahead. Ask another question.

Q So according to the records in your file, Ms. Harger in January of 2023 traversed far more than 400 yards per day and normally stands for over ten hours a day?

A Yes, because she goes to work.

THE COURT: She was able to do that, right? I guess that's what he wants to know.

THE WITNESS: According to my records, yes.

Q And it also says that Luisa extremely enjoys keeping active by walking long distances, working, driving, dancing, swimming, going to the gym, cooking, cleaning, going grocery shopping, spending time with friends and family --

THE COURT: I think what he wants to know is if she's functioning, how she's functioning, all right? With all of the issues that she's had to deal with and everything else that you've testified about, how is she doing?

THE WITNESS: She's trying to live her life the best she can.

Q That's what your records indicate. Okay.

Mr. Roth talked to you about the challenges about wearing the prostheses, correct?

A Yes.

Q And one of the challenges were the adjustments, you need to go back for adjustments every now and then, correct?

A Yes.

Q Are you aware that in 2024, she only went back for adjustments twice in that year for the lower extremity?

A I am.

Q Is that unusual, is that typical?

A Depends how the patient is doing.

Q So that is just an approximation. An adjustment could be once a year, it could be eight times a year, it could be zero times a year depending on how the patient is doing, correct?

A Yes. And it depends on their availability and how much they want to come in. I have patients come in more often, some not as much.

Q And you're a busy practitioner, right? You see a lot of

patients, that's why you're not here today because of your schedule I would imagine, correct?
A Yes.
Q So you recommend for the lower extremity four prostheses, correct?
A Yes.
Q And currently she only has one, right?
A Yes.
Q And we talked about that in terms of what it can and can't do, right, in terms of a running mode, a bicycle mode, correct?
A Yes.
Q But you suggest a specific running prosthesis, correct?
A Yes.
Q And you suggest a separate bike riding prosthesis, correct?
A Yes.
Q Is there anything in your note that indicates that she rides a bike currently or rides a bike in the past?
A I don't recall.
Q Is there anything in your notes that indicates that she was running in the past or is running currently?
A No.
Q There isn't?
A I don't recall.

Q Is a running prosthesis medically necessary?
A Absolutely.
Q How is it medically necessary? She already has the everyday prosthesis.
THE COURT: It's argumentative.
The question is, why is it medically necessary?
THE WITNESS: For her, because she wants to be -- keep healthy and exercise, why should she use a prosthesis that's twice the weight when I can make her a prosthesis that's lighter, more efficient, and she can get a better workout, and it's made specifically for running, it's half the weight.
Q So a prosthesis which has no indication that she used to run in the past or the present, you're recommending for her now, correct?
A If she wants to exercise, yeah.
Q And again, the everyday prosthesis allows you to do that, running, correct? It allows you to do the bicycle, correct?
A There are modes in there. It doesn't mean it's ideal. There are 20 -- just so you know, there are 20 additional modes in the X3. So what I said earlier is that the weight of the prosthesis is overall heavy, so there are specific legs just for specific activities. That's what I was trying to say.
Q Okay. So you could -- you would suggest then a thousand

prostheses because she might want to do something then; is that your testimony?

MR. ROTH: Objection.

A A thousand? I think a thousand would be --

THE COURT: So once again, listen to Judge Block. When you hear objection, you're anxious to answer the question, but you have to let me earn my living first. Okay?

THE WITNESS: Yes.

THE COURT: Now, do you understand the question? If you -- do you remember the question.

MR. KEAVENEY: Judge, I'll withdraw the question.

THE COURT: Rephrase the question.

MR. KEAVENEY: I'll withdraw it.

Q Let's talk about the upper extremity. Okay?

She currently has a myoelectric upper extremity prosthesis, correct?

A Yes.

Q Okay. But in addition to that, you recommend a body-powered prosthesis, correct?

A Yes.

Q Are you aware that your records indicate that a body-powered option is insufficient for her needs?

A That is for documentation for justifying for a myoelectric prosthesis because she can only get one prosthesis.

Q So she should get the one -- the myoelectric then, correct?
A She should get as many as is medically necessary.
Q So you want to give her an activity-specific prosthesis, just in case she wants to go golfing; is that your testimony?
MR. ROTH: Objection.
THE COURT: Overruled.
Do you have any idea how you prescribe such a prosthesis for her, for bicycling, I guess that's the question.
MR. KEAVENEY: Well, this is the upper extremity.
THE COURT: Upper extremities. You have it.
THE WITNESS: I do not prescribe, I just make based off the doctor's orders. I don't prescribe.
THE COURT: Have you gotten any orders at all to make any other of these prostheses?
THE WITNESS: I have not.
THE COURT: Next question.
Q And the same thing with the pattern recognition prosthesis, there's been no recommendation by any doctor regarding --
THE COURT: Has there been any recommendations by any medical people, doctors, for such prostheses.
THE WITNESS: No, because it's not covered.
MR. KEAVENEY: Objection.

THE COURT: You don't have to say covered. We're going to get into that maybe later, maybe yes, maybe no, but there have not been any recommendations, right? That's your answer. Okay.

THE WITNESS: Correct.

Q So you testified earlier about the osteointegration, correct?

A Yes.

Q And if she moved forward with that procedure, that would essentially eliminate blisters because there's no socket, correct?

A Correct.

Q Okay. And generally it will eliminate skin breakdown for the same reason, correct?

A Well, there's no socket, so there's no skin breakdown, but as I stated, there is a chance for infection.

Q And it eliminates the socket itself, correct?

A Yes.

Q It eliminates the donning sleeve, correct?

A Yes.

Q It eliminates the harness, correct?

A Yes.

Q It eliminates the frame?

A Yes.

Q And these are all things that you put into your

calculations in terms of what she needs in the future, correct?
A Yes.
Q What's a warranty?
A Well, do you want me to finish -- so you're saying that, but you left it open-ended.
Q You said yes. That was fine. That was fine, Mr. Kort.
A But I just want to convey --
Q Just yes or no. Thank you.

THE COURT: Mr. Kort, there is no question before you.

Now, Mr. Roth will have the opportunity to come up again and ask you some follow-up questions, if he wants to do that.

Just answer his questions now.

So cross-examination, I guess people are not happy with that, they're a little bit tense and nervous about it, but that's the way the process works. So everybody has a fair opportunity to be able to present their case.

Mr. Roth now is listening and he can come back and ask you questions. Just answer the questions that this attorney is asking you now. Okay?

THE WITNESS: Yes, Your Honor.
Q What's a warranty?
A A warranty is based off the -- a warranty is, for

example, if something needs to be repaired within that warranty time period, we send it back to the manufacturer, and they repair it, and they send us a loaner.
Q Okay. So based on your projections, you put these prostheses out at about three years, correct, before a new one is needed?
A Yes.
Q And you base that on the warranty for each one, correct?
A Yes.
Q Okay. And you can extend that warranty, correct?
A For a price, yes.
Q For a price. Okay.
A lot less of a price than what you would pay for the entire prosthesis, correct?
A Yes.
Q So, for example, the upper extremity, you priced out at $195,000, correct?
A The X3? Yes.
Q And the warranty that she extended on the upper extremity for the X3 is $31,000, correct?
A Yes.
Q So there's a difference of $164,000 just for the prosthesis, we're not talking about the sleeves, or the sockets, or things like that?
A Yes, just the mini joint, yes.

Q And you can get those warranties, assuming the prosthesis is in good shape, on any number of these prostheses, correct?
A They have to be purchased and typically insurance companies don't want to pay --
MR. KEAVENEY: Move to strike.
THE COURT: Look, the problem is that you're talking about insurance companies. I will instruct the jury about that eventually as to what they could consider, but it's normal and natural to say these things in response to your questions.
What else do you want to ask him?
MR. KEAVENEY: Well, the reason I asked that question is there is a significant difference in price when you get the warranty.
THE COURT: You can get to the differences in price, that's okay. Go ahead.
Q We talked about advancements in technology, correct?
A Yes.
Q So as technology grows, it grows every day, currently there's the X4 out?
A Yes.
Q Right? And that can do a lot more functions than the X3, correct?
A A few more, yes.
(Continued on the next page.)

EXAMINATION BY
MR. KEAVENEY:
(Continuing.)
Q Okay. And Ms. Harger certainly has taken advantage to her benefit, I'm not putting her down, to her benefit, she has taken advantage of the X3's functions already in terms of going to the beach; right? She can get it wet; she can go on the sand; she can do a lot of things that she did in the past with the X3 prosthesis?
THE COURT: You're making a speech now. You're giving testimony now. She can do a lot of things. She's done a good job I think is what you're telling us.
MR. KEAVENEY: I want Mr. Kort to tell us.
THE COURT: Tell us how she's doing with all of these things. How she's overcoming her handicap.
MR. KEAVENEY: I want to know what the prosthesis allows her to currently do.
THE COURT: So you understand the question? If you can answer that, go ahead. If you can't, let me know.
THE WITNESS: Okay. I'll answer it to the best of my ability.
Her currently below-the-knee prosthesis with the X3 gives her the ability to do certain things that other product don't. For example, like you said, she's able to go to the beach, get it wet, because it is a hundred percent

fresh- and saltwater-proof.
Q Okay. Thank you Mr. Kort.
THE COURT: Any redirect?
MR. ROTH: Yes, your Honor.
THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Kort, just to follow-up on some things that Mr. Keaveney said.
First, he said that -- you were trying to explain about using the different prosthesis and Mr. Keaveney said that the X3 can do all of these things, right?
You can do them; correct?
A Yes.
Q And how would you compare that to running a marathon in dress shoes, right?
Like, can you explain that? What the difference is? Why are you recommending this when you can but would you and explain that to the jury?
A Okay; that's a fair question.
So, yes, there is a running mode in the X3. But like I said earlier, the overall weight of that prosthesis that she's wearing every day due to the componentry and the technology weighs about 12 pounds.
A specific running prosthesis is half the weight and is

made specifically for running. So if you're going to run long distance, if she ever chooses or wants to run, running any specific prosthesis made her is much more ideal, less energy expenditure, and she'll be able to achieve more.

Q Now, also there was a -- thank you for that answer.

And then, we were talking about -- there was notes that she could walk 400 yards or she was on her feet. Is there anything in the notes how she was doing that or how -- the fact that she could, there was nothing in there or you described how easy or difficult it is for her when you write those notes or you just write down --

A I'm just writing that it can be done. I'm not saying it's difficult or easy. I'm not, I didn't say that.

Q Okay. Now, there was talk about the osseointegration would eliminate all of these other things that are currently in your plan?

A Yes.

Q It would be better. And Mr. Keaveney made a note it would be better.

What does it add beyond those costs? Explain to the jury how much more or less it would be?

A Okay. So, if you have osseointegration, the other attorney was correct: You do not need a socket, you do not need all these other supplies. But what you do need no that you have the bone-anchored prosthesis is an adapter for each

prosthetic that she has and that adapter costs $23,000. So it replaces the old school with the new school, but you still need the componentry to interchange. So she'll be able to clip on her myeloelectric prosthesis, pop it off. Then she'll take her activity prosthesis, clip it on. To clip it on, she needs components. Those components are part of the whole osseointegration package and that -- it comes at a cost.

Q And that cost. Is new technology more expensive than the old technology or is it the same or less?

A It always gets --

MR. KEAVENEY: Objection.

A -- more expensive.

Q Okay. Now, there was all this talk about warranty and that you could keep warranteeing and that the X3 is so good and that why not just keep the warranty.

Can you explain to the jury --

MR. KEAVENEY: Objection.

THE COURT: Wait a second. He's just testifying now.

You're objecting to his testifying?

MR. KEAVENEY: I'm objecting to Mr. Roth testifying.

THE COURT: Let him have an opportunity to pose the question.

What's your question?
EXAMINATION BY
MR. ROTH:
(Continuing.)
Q In response to Mr. Keaveney's statement to you that the X -- 3?
THE COURT: You don't have to make a comments, just ask a question.
Q All right. Why are you recommending to get the X4 which is more expensive than just continuing the warranty with the X3.
Can you explain that?
A Well, there's a few reasons. One, well, here's the thing. The X3 is no longer in existence, it's been discontinued, so now there's only the X4. You can get an extended warranty, but typically, I don't know if I'm allowed to say this, but it's not covered. So you can get an extended warranty but it's typically not covered. So usually we just do the three years, it's not covered, and get another microprocessor knee. And three years later, the advancements are a better; it's a safer prosthesis. It's always getting better; they're always getting safer.
Q Okay. And, you know, you keep talking about covered, et cetera, recommendations?
MR. ROTH: And, your Honor, I don't know what you

want me to do.

THE COURT: Covered what? Covered by insurance, is that what you mean?

Q Mr. Kort the judge is asking you?

A Yes. When I said "covered," I'm talking about insurance because --

THE COURT: So what you're saying is that some of these things are covered by insurance, some are not. I think that's you're saying; correct?

THE WITNESS: Yes, your Honor.

THE COURT: You can explain that if you want. It's okay.

THE WITNESS: Okay.

EXAMINATION BY

MR. ROTH:

(Continuing.)

Q Let me ask a question here, okay?

For your -- right now, for your projections, the coverage that you're talking about, what is the position of the insurance companies related to -- your experience -- related to the plans you're recommending?

A Insurance companies only allow so much. And medical necessity is not taken into consideration, it's the policy language of the insurance company.

THE COURT: So you're saying some of these things,

just so we understand in the real world, some of these things here that you're talking about will have to come out of her own pocket, it's not going to be covered by any possible insurance.

I think that's what you're saying; correct?

THE WITNESS: Yes, your Honor.

THE COURT: You can elaborate on that if you wish. Go ahead.

EXAMINATION BY

MR. ROTH:

(Continuing.)

Q Okay. So when --

THE COURT: I'll ask this question.

Do you have any idea? You mentioned about her expenses and what the cost was of the prosthesis she has.

Do you have any idea whether that came out of her own pocket or whether it was covered by insurance?

THE WITNESS: Well, what came out of her own pocket recently in the past year is that her computerized knee was out of warranty. We sent it in for a service estimate. The insurance company that she has now wanted to downgrade her in technology. So she chose to go pay out of her pocket $31,000 for an extended warranty.

THE COURT: So here's what I want to really understand, all right? We have a lot of these dollar

figures which you gave. The covered prosthesis she has, you talk about what the expense was. Did that come out of her own pocket or was it covered by insurance?

THE WITNESS: Okay. The warranty came out of her own pocket, everything else came out of insurance.

THE COURT: That's what we want to know. How much does show have to spend?

THE WITNESS: She paid $31,000 to extend her warranty for her knee for an additional three years.

THE COURT: That's what's cost her so far, is that what you're saying?

THE WITNESS: Since she's been in my office, yes.

THE COURT: Everything else was paid by insurance?

THE WITNESS: Yes.

THE COURT: Next question.

EXAMINATION BY

MR. ROTH:

(Continuing.)

Q Is the X4 covered by insurance? Can she now get the X4 or not?

A It's very difficult to get an X4 through insurance companies. They are writing them out of the policies.

Q So right now, all of the stuff that you have that's in your plan, is it mostly covered or mostly not covered?

A That's a question -- they all can be covered but

they're only going to cover so much. They're not going to -- how do I say this?

THE COURT: Here's what I want you to say.

The jury wants to get an idea how much it's cost her to the present time and what it's likely to cost her out pocket in the future. That's what they want to know.

Can you give them any information about that, otherwise we move on.

THE WITNESS: The only information I can give you is that since she's been with me, the only cost she's had a to pay for her everyday prosthesis was the extended warranty. And the insurance companies do not pay for all these other legs or arms.

THE COURT: Anything else. That's what she had to pay so far; right?

THE WITNESS: Right.

THE COURT: Next question.

MR. ROTH: No further questions, your Honor.

THE COURT: Anything else, Mr. Keaveney.

MR. ROTH: One second, your Honor.

THE COURT: Anything else?

EXAMINATION BY
MR. ROTH:
(Continuing.)

Q Just to get some clarity. You previously said, and I

just want to get to cover it, your Honor, I'm not trying to lead --

THE COURT: What is your question?

Q How many prosthesis maximum will the insurance company cover at any one time?

A One every three years.

Q Okay. And all the other ones are not covered; correct?

A Correct.

Q Okay.

THE COURT: Do you have any idea before you saw her in 2022, I think that's what we're talking about, right? Do you have any idea of what her expenses were before, or that's something that she would know about and whether you can tell us about, I assume, right?

THE WITNESS: I don't know what her expenses were prior.

THE COURT: She's going to testify and we'll deal with the other evidence.

Anything else? Thank you very much for your time. I appreciate it.

THE WITNESS: All right.

COURTROOM DEPUTY: Defense counsel has questions.

MR. KEAVENEY: Recross.

THE COURT: You have some more questions?

MR. KEAVENEY: Yes.

THE COURT: Defense counsel likes you so much they don't want you to leave right away.

THE WITNESS: All right. I'm popular.

RECROSS-EXAMINATION

BY MR. KEAVENEY:

Q Can we show the witness Page 88 of his records?

THE COURT: What exhibit?

MR. KEAVENEY: It's Plaintiff's Exhibit 104? David?

MR. ROTH: 95.

MR. KEAVENEY: It's Exhibit 95.

THE COURT: 95?

MR. KEAVENEY: 95 page from a.

THE COURT: All right. 95.

MR. GENIS: What page?

MR. KEAVENEY: Page 88 on the PDF.

THE COURT: That's in evidence.

(Plaintiff's Exhibit 95 was marked in evidence.)

THE COURT: You're showing him something from that exhibit.

MR. KEAVENEY: 88. That's not 88.

THE COURT: Look at that. Can you see it?

MR. KEAVENEY: Hold on. We are getting to this one.

EXAMINATION BY
MR. KEAVENEY:
(Continuing.)
Q Do you see that document?
A Yes.
Q We received a request to cover healthcare based on information received from your provider. We're pleased to tell you?
It says, We received a request to cover healthcare services based on the information.
THE COURT: Here is what it is. What question do you want to ask him about that exhibit or do you want to read something from the exhibit?
MR. KEAVENEY: I will ask him a question, your Honor.
Q Does that indicate that that prosthesis was approved by a healthcare company?
A Are you talking about the warranty?
Q Yes.
A They approved $6,000 and it went to co-insurance and deductible.
Q Where does it say that?
A She didn't pay one cent.
THE COURT: Let him give a complete answer. What's the big secret here? You can explain. You want to

get an idea of the cost of things. Go ahead.

You can answer the question.

A Okay. So we put this in. We told her, we went out of network which we do. We said the price is $31,000. United healthcare, she appealed, she won the appeal. They paid $6,000 and $6,000 went to a co-insurance and deductible not one cent went to her. So even though they approved a warranty for three years, they approved it at $6,000 and not $31,000 and she didn't get one cent because of the co-insurance and the deductible.

THE COURT: She didn't get anything of that at all?

THE WITNESS: She didn't get any of it. Not after coinsurance and deductible. So she didn't get one cent back from the $31,000.

THE COURT: Ask the question; you got the answer.

What else.

Q Where in your records is that?

MR. ROTH: Objection.

THE COURT: What's the question?

Q Where in your records is that?

MR. ROTH: Objection.

A These are not my billing records.

THE COURT: There's nothing in that document, right?

Q You're doing all that from memory, okay?

THE COURT: One second. Just stop.

He's showing up a document, all right? So you're testifying about something that's not in that particular document which you have knowledge of; correct?

THE WITNESS: Correct.

THE COURT: Now, you got the answer.

Next question.

EXAMINATION BY

MR. KEAVENEY:

(Continuing.)

Q Mr. Harger currently doesn't run; correct?

A Not currently.

Q Okay. And she's not -- again, there's nothing in the records in the past to indicate that she ran or biked in the past; correct?

MR. ROTH: Objection.

A What it does state is she was an active young lady before she had her accident.

Q There's nothing in the records that indicate that she biked or ran in the past in the record; correct?

THE COURT: And that she was doing in the past?

MR. KEAVENEY: Biked or ran.

THE COURT: Did she bike in past, is that your question?

MR. KEAVENEY: That's the question.

THE COURT: Do you have any knowledge of whether she was a biker before?

THE WITNESS: No, I do not.

THE COURT: Next question.

Q The prosthesis that you want to recommend for her that you've allocated every three years into the future, one is fore biking and one is for running. So why don't we wait until she wants to bike or run --

MR. ROTH: Objection.

Q -- before you get the prosthesis?

THE COURT: Come up here and testify and I'll ask you some questions under oath. You don't want to do that.

MR. KEAVENEY: Okay.

THE COURT: So you don't know the past whether -- she's going to testify obviously, she'll tell the jury about what she's done, what she hasn't done. You'll hear all about it.

You don't have any knowledge of that specifically I expect; correct?

THE WITNESS: No.

THE COURT: Okay. We're clear.

MR. KEAVENEY: Thank you, Judge.

THE COURT: I don't think you need anything else, Mr. Roth.

MR. ROTH: No, your Honor, we're finished.

THE COURT: I would say step down if you were here but you can't step down. You're finished with your testimony, thank you very much. Go back and help all these people down.

COURTROOM DEPUTY: Thank you, Mr. Kort.

THE WITNESS: Thank you, your Honor.

(Witness excused.)

THE COURT: It's 5 to 12:00. Do we have another witness?

MR. ROTH: Now we have Kevin Morin, M-o-r-i-n, from Code Consulting Inc., the plaintiff's employer.

THE COURT: What is the name of your next witness and is he or she here; and if so, bring the person into court.

MR. ROTH: Okay. Kevin Morin.

THE COURT: Kevin Morin.

MR. ROTH: M-o-r-i-n. And he is on his way into the courtroom.

THE COURT: Give me a general idea of how long your direct will be?

MR. ROTH: 20 minutes, your Honor.

THE COURT: See if we can do that before the lunch break.

MR. ROTH: I think we can.

(Witness takes the witness stand.)

COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm that the answers and the testimony that you are about to give to the Court will be the truth, the whole truth, and nothing but the truth.

**KEVIN MORIN**, called by the Plaintiff, having been first duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

COURTROOM DEPUTY: Thank you. Please have a seat.

THE WITNESS: Thank you.

COURTROOM DEPUTY: Please state and spell your name and keep your voice up.

THE WITNESS: Kevin David Morin. K-e-v-i-n. D-a-v-i-d. Morin, M-o-r-i-n.

COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Morin, good morning.

A Good morning.

Q Tell us a little bit about yourself and the company you work for.

A Good morning. So, like I said, my is name is Kevin Morin. I'm principal and owner at CCI, Code Consultants, Inc. I have a Bachelor's Degree in Mechanical Engineering, a

Masters Degree in Fire Protection Engineering.

I joined the company in 1999. I spent my first five years with the firm out in St. Louis, Missouri, which is our headquarters. I then, in 2002, assisted the company -- am I speaking too fast, sorry -- assisted the company in opening an office in New York. I traveled back and forth from St. Louis to New York for approximately four years and moved here permanently in 2004.

I became an owner and partner in the company in 2009. So I've been with the company for approximately 26 years and I'm due to retire at the end of this year.

Q What does your company do?

A My company is a privately owned fire protection engineering and consulting firm. We primarily specialize in fire engineering, code consulting, and accessibility compliance under the code compliance umbrella.

Q Do you have different groups in that company?

A Yes. We have a consulting group that primarily does fire and life safety code consulting. Accessibility compliance; fire modeling; time to egress modeling.

The other half of the firm is fire engineering-related for fire alarm design and fire sprinkler design.

Q Let's talk about the Accessibility Group. What types of things does your Accessibility Group do? When you say accessibility, is that disability code compliance; is that

right?
A Correct, ADA, Fair Housing, ANSI compliance.
Q Tell the jury a little bit about what that group does. And just for orientation, that's where Ms. Harger works in that group?
A Correct. So we have ten people currently in the Accessibility Compliance Group. That group focuses on accessibility compliance in the build environment or what will be the built environment. So drawings, plans. Their role primarily is plan reviews and site surveys.
Q Let's talk about site survey. What goes into a survey? What do the employees in your group do for site surveys?
A So our site surveys are both for new and existing structures and it physically entails our consultants to be onsite walking the site and measuring, viewing, all of the stuff that needs to be looked at for ADA, Fair Housing, accessibility overall compliance. So measuring toilet locations, grab rails, grab bars, paper toilet dispensers, the threshold at a door, walking the exterior, looking at the parking lot, the ramps. Making sure the slope is correct, can't be more steep than one-in-twelve life. So we have a digital level that tells you what slope of that ramp is.
After the survey, we then document your findings in a Blue Beam Session, PDF, and annotate at each location what

the violation might be and what the code citation would be.
Q So what -- kneeling, walking, and encountering uneven terrain do the people do in that group regularly?
A All right. A hundred percent. The scope of the surveys vary greatly. As you might imagine, it could be a 1,000-square foot retail shop. One of the projects we did and opened recently was SoFi Stadium in Los Angeles for the Rams and Chargers. As you might imagine, that was a one-week effort walking every single concourse, every single bathroom, every single locker room at SoFi.
Q That's an integral of the job of the Accessibility Group?
A Yes.
Q When did you first meet Louisa?
A I first met Louisa, approximately, the end of or beginning of 2021 maybe the end of 2020. She came highly recommended to CCI through an architectural contact that we have at HOK, which is one of the biggest architectural firms in the city, in the world, actually. She had interned there and they contacted us directly and said we have this really bright person that interned for us, would you guys be interested in looking at her for your Accessibility Group.
Q So what did you do next?
A Contacted her immediately, interviewed her, and hired as an intern -- that was her preference -- at the beginning,

January of 2021.
Q When you say you hired her as an intern, her preference, can you explain what that was about?
A Louisa asked to have a non-paid internship to see if she liked accessibility consulting full time. So she asked for a three-month internship. So we said yes but you're not going to do it for free, we're going to pay you. At the end of that three months, we extended it another three months. At the end of that three months, I then hired her permanently and she's been with us in a permanent role since approximately June of '21.
Q And that's you personally, you personally hired her?
A Correct.
Q So you were interacting with her. So the first six months, she had the missing arm and a leg at that point in time; correct?
A Correct. I've never known Louisa without her prosthetics.
Q And so, in that first six months, what did you see her doing at work and how did the prosthetics affect her that you could see?
A We clearly didn't send her on site surveys because that is extremely taxing on her. And we made that accommodation from day one. But she has, obviously, she has a degree in architecture. She's incredibly, incredibly bright. She's

really dedicated, a really good communicator. She's actually probably one of out best in the office. She actually leads all of our team-building activities to this day. She did that almost from day one.
Q So since she got the permanent job, what job did you hire her for?
A Accessibility consultant as an associate.
Q How many of the accessibility consultants are there at your company?
A We have a total of ten right now.
Q Okay. Is that in the Accessibility Group or company-wide?
A Oh, I'm sorry. Ten in the Accessibility Group, roughly 120 employees nationally.
Q And they're all some version of a consultant, that level of --
A Consulting or engineer.
Q Okay. So why don't you take us a little bit before we go into what you've seen in her, just give us how she's been doing at work up to this day, the jobs that she's been doing. Why don't you tell us about that?
A So she's been doing incredible. I think if you look at her past history of employment at CCI, we continue to elevate her. She started as an Intern, moved to an Associate, moved to a Full Project Consultant, and then

recently was promoted to Senior Project Consultant.

She's taking on a big leadership role in the Accessibility Group. One of our directors in that group decided to move on, he wanted to get back in the field more, and she volunteered, of all those consultants in that field, to start running the work flow, prioritizing deadlines, scheduling deliverables.

And she did that, she volunteered to do it because the group needed it, and that takes away from her day-to-day billing role which goes to a target we have a target-based -- performance-based system at our company. If you hit a certain number of hours, you get a guaranteed bonus. If you exceed that number of hours, you get a percentage of your billing rate on top of that. So she volunteered to do the extracurricular project management work even though she's not a project manager for the betterment of the group. So that's just an example of how she's kind of risen through our ranks and really excelled.

Q So if somebody were to be listening to you, you'd be like, oh, she has no troubles at work, everything's great. So why don't you tell us about what are the challenges that you've seen her have at work compared to the other employees. Why don't you go from the basics and then you can give us some specifics?

A Sure.

Q So from the beginning to, you know, however you want to do it?

A The day-to-day process for Louisa, as you might imagine, is greatly different than probably everybody in this room. She takes an Access-A-Ride to work every day when she comes in. We have a minimum three days in the office, maximum two days at home, and she's in a minimum of three days, if not more. But because she takes Access-A-Ride, she's usually the first one in, last one out. She can't take a van and come through -- our office is in midtown Manhattan, we're at 40th and 7th, so you might imagine what that traffic looks like at 8:00, 9:00, 10:00 in the morning, so she's in there at 7:00 typically before me and typically doesn't leave until 6:00. That's just the day in the life of Louisa getting to work.

As a matter of fact, we put a chair, fold-up chair in our lobby in the building. We got permission from ownership to put it in the stairwell because Access-A-Ride doesn't show up on time, a majority of the time and she needs to sit somewhere and we asked to put a fold-up chair in the lobby for her.

Just on a day-to-day basis, it's the things that I take for granted like going to the kitchen, filling a cup of coffee, and my water bottle and taking both back to my desk she can't do because she has only has one arm. Trying to

slice a bagel and put cream cheese on it, not happening. She needs help sometimes just opening her lunch because of the packaging. Everyday stuff like that that's just I'm sure not easy.

From a work perspective, clearly, she can only type with one hand. A lot of what Louisa -- like I said, we do surveys, we do plan reviews, and the way we document our findings is mark it up and annotate on Blue Beam via mouse, type in your comment, so she clearly has to do that with one hand, not two. She puts in a lot of hours and I suspect she puts in a lot of hours because it's little slower for her.

She's come to me on a couple occasions in the morning after Access-A-Ride crying because she was verbally harassed by her driver in a sexual way. She's very vulnerable because of her prosthetics. She came to the office one morning, was the first one there; I came in ten minutes later. She unlocked the door, let her herself in, went to use the bathroom came out and there was a person in the office hiding in one of my partner's offices.

She was like --

THE COURT: I think he's going on. We'll be here for the next hour. Ask another question. We have a sense of his testimony.

What else would you like to ask him.

Q When you said she was vulnerable, do you mean like --

what does that mean?

MR. KEAVENEY: Objection, your Honor.

THE COURT: Speak a little louder.

THE WITNESS: Louder?

THE COURT: The microphone will pick you up.

A I think she feels vulnerable that she can't protect herself at times.

MS. WINTERS: Objection, your Honor. Speculation.

THE COURT: Sustained. Do you have any questions?

MR. ROTH: Yes.

Q So give us examples of what the other employees in her position are able to do specifically regarding site visits, et cetera, that she's unable to do?

THE COURT: Is there anything that she can't do that normally other people would be able to do. I guess that's what he wants to find out.

THE WITNESS: A hundred percent, surveys.

THE COURT: What?

THE WITNESS: Site surveys, site survey work. Like going out.

THE COURT: She can't do that.

THE WITNESS: No, she cannot.

A Louisa does not complain very often and we ask her if she would join one of our other consultants at Barnard College on the Upper West Side to do a survey and of course

she said yes. The next day, she called me and said I need to stay home, I can't put my prosthesis on, I have blisters.

THE COURT: So she can't go out in the field?

THE WITNESS: No, correct.

Q Okay. What does your company have to do it because she can't go in the field?

What happens with the other people in the company?

THE COURT: What adjustment do you make? Is it an economic --

THE WITNESS: Yes.

THE COURT: Detriment or anything to prevent her from otherwise experiencing advancements or more money whatever?

THE WITNESS: Sure. So to accommodate the fact that Louisa can't go in the field we fly other consultants in from our headquarters in St. Louis to do the surveys that are required in New York City or elsewhere. I don't think that her not being able to do surveys has held her back because we, as a company, have not allowed that to happen.

THE COURT: You're happy to have her?

THE WITNESS: Correct, for sure.

Q And, as far as the effort that it takes her, what effort do you see that the other employees have to put in compared to what she has to put in to do any type of job that you've seen?

A Like, outside of the surveys which I think is obvious, it's the day-to-day struggle of just walking to the bathroom. I mean, we've tried to create better-sized bathrooms for her and put in additional accommodations because just doing that simple human activity...

THE COURT: You made adjustments to accommodate her situation?

THE WITNESS: Yes.

THE COURT: You need to do that we.

So she's an inspiration to everybody I suspect.

THE WITNESS: One hundred percent.

Q How do you see her walk differently than the other employees? What's the difference between her and them? I mean, she can walk, right, so what do you see? What's the difference?

A Labored. We've all seen her walk at this point. It's a labored walk, it's slower. She has to be extremely careful if it's raining, if it's snowing. I shouldn't say this in front of you, your Honor, but we've all jay walked. She will not jay walk because she needs the sloped ramp and plenty of time to cross when she gets to cross and walk.

Q When everybody in the office goes to party or go to like go out if you complete something, what happens with her?

A We either keep the party close. We actually have a

restaurant-bar in our building, so we have a lot of our happy hours there to accommodate Louisa. But, yeah, no, we've had offsite events and we typically, as an office, all walk there but Louisa has to a car out. So it's not as inclusive for her as, you know, we'd like it to be.

Q So you said what she can do. What are those things that you know she wants to do that she's been unable to do as far as networking and traveling within the company?

THE COURT: Are there any limitations that you experienced with her work involvement?

THE WITNESS: With her work?

THE COURT: She comes to the office and I guess they want to know what she can't do.

THE WITNESS: Yes.

THE COURT: She can't go out field.

THE WITNESS: She can't really do the site survey work but she's also limited in her ability to network. Like, do evening events, awards events, symposiums. Traveling is very difficult for her on an airplane, for example. We have sent her to some symposiums by airplane and, unfortunately, three dimes in a row her wheelchair got damaged or lost. That's just a very difficult situation.

THE COURT: I think we understand that. But you know to your firm's credit, she's an asset in many maybe intangible ways, correct?

THE WITNESS: I totally agree.

THE COURT: That's good that you're doing this. All right. Anything else.

EXAMINATION BY
MR. ROTH:
(Continuing.)

Q So I understand that you and your partners are committed to her, what concerns do you have about her continued employment with your firm?

A As I mentioned, I'm retiring at the end of this year, end of 2025. I have a pretty strong voice in the group. I've been a partner since 2009, I'm close to a majority owner. But when I retire, I don't have that voice anymore and I hired Louisa directly. We've been approached as a privately owned firm by investors, private equity firms, to purchase us. Many times, probably in the dozens, and we've long said no. But when I leave, I don't have that voice.

THE COURT: Nobody can predict the future.

THE WITNESS: Right. My point is if my future partners choose to sell, I don't know what kind of loyalty might be there for Louisa or other employees.

MS. WINTERS: Objection.

THE COURT: So your saying the situation is an X factor. We don't know the future, correct?

THE WITNESS: Correct.

THE COURT: Anything else?
Q So the reason that somebody might want to give in to let her go --
THE COURT: Objection sustained. The jury understands.
Any questions.
MR. ROTH: I want to admit one thing. Her employment records just to authenticate them as Exhibit 104. This defendant stipulated to it, it's a new exhibit. New Exhibit 104.
THE COURT: 104?
MR. KEAVENEY: Yes.
THE COURT: No objection?
MS. WINTERS: No objection.
THE COURT: What is 104?
MR. ROTH: 104 is the Code Compliance records for Louisa. Just the basics of her employment file.
THE COURT: That's in evidence.
(Plaintiff's Exhibit 104 was marked in evidence.)
Q Mr. Morin, you looked through this and that's a fair and accurate inclusion of her employment records and history?
A My recollection of when I reviewed it, yes.
Q Okay. Thank you.
A I haven't reviewed that exact exhibit.

THE COURT: All right.

Ms. Winter, maybe we can complete the testimony before lunch.

MS. WINTERS: Absolutely, your Honor.

CROSS-EXAMINATION

BY MS. WINTERS:

Q Hi, Mr. Morin.

A Hi.

Q What is your role or title at Code Consultants.

A I am a principal and owner.

Q Okay. And in that role, do you manage a team?

A Yes.

Q And how many people on the team?

A It's a hard question to answer because all my partners manage a team. So I oversee a big team of fire and life safety consultants, the Accessibility Group, and also the Fire Modeling Group. They also get co-managed by others.

We have 16 people in the New York City office that I directly oversee, Louisa being one of them. We have 120 people nationally. I'm probably directly involved with at least 50 percent of those people because the other 50 percent of those employees are really on the design side and I'm on the consulting side of the firm.

Q What kind of tasks do you do in your daily activities as part of your role as a principal and supervisor?

A 30-minute zooms all day long. So my primary role is we consult with developers, architects, owners, and we make sure that the design or existing is code compliant. We then present those findings to either the architect to revise plans for the HJ, the building official, the fire official to make sure they're approved.

So the day-to-day basis, we're reviewing jobs discussing with clients, discussing with AHJs. My particular role also includes all the invoicing and billing, overseeing the financials. And then also, of course, as an owner, I have a pretty significant business development role as well.

Q Okay. And your role primarily has you in the office, right?

A Nowadays post-COVID, I would say yes. Pre-COVID, it was a lot of in-person meetings. Post-COVID, is a lot of Zoom, Teams, those kinds of meetings. We still do in-person meetings; for example, I was out in Deer Valley, Utah, meeting with the building fire officials.

Q You personally aren't going out and taking the measurements and doing those site visits you talked about before; right?

A Not anymore. I did as a junior employee. I've been there since '99, right, so I worked my way up from Associate.

Q And you said Ms. Harger started with you as an intern?
A Correct.
Q You were happy with her performance as an intern?
A Yes.
Q And when she started as a full-time consultant, she had a billing requirement associated with her position; right?
A Yes. Everybody on our professional services side has a billing requirement.
Q Okay. And when she was first hired on, in addition to her base salary, her role included certain other benefits like a 401(k); right?
A Correct.
Q Did it include fully covered short-term disability as well?
A Yes.
Q Okay. And it included some level of life insurance covered by the firm as well?
A The firm covers all of our professional, I'm sorry, a hundred percent of our employees up to $50,000. Yes, it's up to $50,000, life insurance.
Q And she has paid time off included in her benefits package as well?
A Yes.
Q When she first started with the firm full time in 2021, what was her billable hour requirement?

A When she started full time?
Q Yes.
A 1750. I think that was standard back then. As each produce -- we call them Producers on the professional side of the firm is the minimum requirement to make a bonus was 1750 hours in a billable year.
Q And that was to make a bonus or was that just the minimum without a bonus?
A At the time, that was to make a bonus. We didn't have a minimum expectation set at that time.
Q And just for the lucky jurors who don't have to bill as I do, can you explain what that means as far as a 1750 billable requirement?
A Yes. So every single project that we work on, we have a unique project number. And based on what you're doing for that project, you record your time in quarter hour basis. So .25. To each one of those numbers at the end of the year, we want those to add up to 1750.
Our strategy is that means you have no coverage costs for the firm. When you hit 1750 we give a guaranteed ten percent bonus your salary. For every hour you work thereafter you get back then was 30 percent of your billable, right. So if you're billable rate is 150 an hour, you get an extra $50 an hour on top of your salary and on top of the ten percent bonus.

Q When say 1750, just to be clear, that's 1,750; right?
A That is correct.
Q That was as of 2021?
A Correct.
Q And Ms. Harger, met the bonus requirements to get the ten percent bonus in 2021; right?
A I believe so.
Q Okay. And similarly, in 2022, her salary and benefits were tied to a minimum billable requirement; right?
A Yes.
Q Okay. And, again, in 2022, she achieved her minimum billable requirement and received that bonus?
A I believe that is correct.
Q In fact, she exceeded and received the additional ten percent bonus as well; right?
A I believe that's correct.
Q Okay. And the bonus in 2022 was paid part in 2022 at approximately $2,900; right?
A That sounds correct, I don't have the numbers in front of me but that is what we do as a firm. We hold the bonuses a lot until we can collect. We're a cash basis firm, so we collect our fees first before we bonus. So we start -- we give a holiday bonus, so a portion of the earned bonus before the holidays. And then when we collect the money albeit February March, April, we pay out the remaining

because we are a cash basis.
Q So the more substantial portion of her bonus was paid in 2023, correct?
A That would make sense, yes.
Q Okay. And if I represent to you that was approximately $9,000 or just under $9,000, does that sound right?
A Yes, because we typically do 25 percent in December, 75 percent in March-April, with a maximum in December, I think, of $10,000.
Q And similarly in 2023, her benefits and salary and bonus were tied to minimum billable requirements; right?
A Yes.
Q And she hit the minimum billable requirements; right?
A Yes.
Q She exceeded them to achieve that bonus again; right?
A Correct.
Q Okay?
A That's why we love her.
Q And the minimum billing expectation, at least as of 2023, was 1,650 hours just to hit minimum bill. And 1,700 hours to get ten percent additional; right?
A That is correct. We modified the bonus program to make it more fair. After COVID, because so much of our world is now Zoom and Teams which means you're meeting all during the day as opposed to getting on a plane, which was billable

time, pre-COVID.
Q And similarly, in 2024, again, her salary and benefits and bonus package was tied to a minimum billable requirement; correct?
A Yes.
Q The minimum billable requirement increased slightly to 1,682 hours; correct?
A Because of the leap year.
Q Okay. And the bonus target also increased to 1,733 hours in 2024; correct?
A It account for 53 weeks.
Q In 2024, she again hit her minimum billable requirement; correct?
A Yes.
Q And, again, in 2024, she hit her bonus target billable requirement; right?
A Yes.
Q Okay.
A Can I clarify one item?
Q Sure.
A So I just want to be clear what billable also means. It's not the every single hour billed to a client. We also give credit for things like trainings, conferences, symposiums because we're asking our employee to do that on our behalf, the benefit of CCI. So because we might send

somebody to a symposium that means we can't bill the client, but give them credit for that time as though they did. So, yes, she hit the billable target. Some of it may have been the training. I want to clear that may not 100 percent to clients or projects.

Q So that --

A And we do that company-wide, not just for Louisa.

Q So 1,628 would encompass whether or not it was billed to the client but work for CCI that she performed --

A Yes.

Q -- for CCI; right?

A Yes.

Q Similarly the 1,733-hour billable requirement would reflect work she performed for CCI?

A Yes.

Q And CCI is Code Consultants, Incorporated?

A Correct.

Q I just wanted --

A Let me clarify that, to. Our corporate name at the headquarters is CCI, Code Consultants, Inc., our New York registered name is Code Consultants Professional Engineers, P.C. We have to have a different name because we provide engineering services in the state and state laws don't allows us to just say in Code Consultants, Inc., if we do engineering. So just to be clear.

Q And you testified before to a number of promotions that Ms. Harger has achieved since she joined the firm as an intern in 2021; right?
A Yes.
Q And that was three separate promotions?
A We could call it -- yeah, three because intern to associate to project consultant to senior.
Q Right. Okay.
You talked a little bit a little bit about some social events within the firm and you indicated sometimes Ms. Harger has to take a car to them. When Ms. Harger does take a car, does CCI cover the cost?
A Probably. If she submits the expense report, we would. I'm not sure she always expenses it, to be honest with you.
Q Okay. And you also mentioned that you sent her to some conferences; is that right?
A She was the guest speaker at the AIA ADA Symposium. The Americans with Disabilities Act as one of the guest speakers for prosthetics.
Q What year was that?
A That was, I believe, last year. And I think she went the year before as educational.
Q When you say last year, do you mean 2024?
A I think it was 2025, I don't know.
Q Okay. All right. So some time in the last two years

or so?
A Yes.
Q She went to symposiums twice?
A At least.
Q Where was it located?
A I have no idea.
Q Was it in a different state?
A Yes.
Q She had to fly to get there?
A Yes.
Q Okay. Have you sent her to any other conferences or symposiums?
A Maybe. I don't recall off the top of my head.
Q Okay.
MS. WINTERS: No further questions.
THE COURT: Any redirect?
MR. ROTH: Yes, your Honor.
THE COURT: I don't think you need more than one or two questions.

REDIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Morin, compared to the other employees, how much effort do you see it takes Louisa do the tame tasks as they do?
MS. WINTERS: Objection. Speculation.

THE COURT: I think you covered that on your direct.

MR. ROTH: I have a reason for your Honor.

THE COURT: What is your question?

Q I want to know that she's working all these hours, what have you seen how much harder is it for her to compared to the other employees who are doing the same tasks, what have you seen?

THE COURT: Did you answer that question before? If you haven't, I'll let you it. I thought you already did.

THE WITNESS: Kind of. We talked a lot about making her bonuses and targets and those numbers. And a big reason that she does is because of her dedication to the firm. She puts in a ton of hours. She works evenings and weekends, which, if we work with a lot of millennials these days, they get a bad rap not wanting to put in some hours, Louisa puts in the hours.

Q How would an assistant help do her job that she's doing right now to be more efficient?

A I think it depends on what that assistant would be doing for her. Clearly, Access-A-Ride is not a good situation for Louisa, it's not efficient. Clearly, some of the things that she has to do in the office and ask for help is probably something that an assistant could help with. I'm not very well versed in what an assistant might do for

somebody like Louisa, but there's clearly tasks that Louisa just can't do and has to ask for help.

Q As far as the site visits, what does your company have to do to cover her since projects that she's working, she's not doing the site visits what do they have to do?

A Right. So we fly some other consultants in. So it's either the cost of the flight that sometimes we have to just absorb, or it's the time for that individual to fly six hours from St. Louis that we absorb as opposed to a half-hour subway ride.

THE COURT: These records are all how much costs you have her as an employee that might not have been the case if she did not have the disabilities.

THE WITNESS: I do not. We haven't been asked to do that.

THE COURT: You don't know?

THE WITNESS: I don't know.

THE COURT: Next question.

Q Okay. But certainly, that's one of your concerns?

THE COURT: You can argue that on summation.

Anything else.

MR. ROTH: No, your Honor.

THE COURT: No other questions.

MS. WINTERS: Just briefly. I'll do it from here your Honor.

RECROSS-EXAMINATION

BY MS. WINTERS:

Q Have you ever received any client complaints about Ms. Harger's performance?

A I have not.

Q Okay. And does your company provide any accommodation she needs to perform her work?

A If she asks for it, yes. But she does not ask for anything.

Q Okay.

A She does not complain.

Q Over the past three or four years since she's been employed by your company, has she ever had a personal assistant work with her?

A She has not.

Q Okay. Thank you.

THE COURT: Thanks an awful lot. Keep up the good work.

THE WITNESS: Thank you very much.

THE COURT: So, folks, I think this is a perfect time for our lunch break. It's 12:30, we'll see you back here at let's make it 1:30.

COURTROOM DEPUTY: All rise.

THE COURT: Make it 1:45.

(Jury exits courtroom at 12:29 p.m.)

(Witness leaves the witness stand.)

THE COURT: The jury is not here. Let me explore a few things from a timing point of view.

Mr. Shields, now who is your next witness going to be?

MR. SHIELDS: It will be the mother, your Honor, finishing.

THE COURT: She had already testified, I think there's maybe a half hour more of testimony.

MR. SHIELDS: More than that, your Honor.

THE COURT: I don't think so. What else after that?

MR. SHIELDS: If we finish the mother today, then her husband is here to continue. He should be here around 3:00.

THE COURT: The next witness would be Mr. Brown, right.

MR. SHIELDS: Yes, your Honor.

THE COURT: And what do you anticipate the direct questioning would be of him?

MR. SHIELDS: Two hours.

THE COURT: So maybe yes maybe no. And after that your last witness will be Ms. Da Silva?

MR. SHIELDS: We might have one other damages witness tomorrow before Ms. Harger by Zoom.

THE COURT: I'm just very concerned about the fact that the jury is going to have enough time to deliberate. So I'm going to really push things along a little bit.

So you're going to have Mr. Brown this afternoon and you'll have Ms. Harger here. If necessary, she can start her testimony today.

MR. ROTH: Tomorrow.

THE COURT: Today.

MR. ROTH: She's not here today, your Honor.

THE COURT: We want the jury to work till 5:00 o'clock.

MR. SHIELDS: It will be until 5:00 o'clock with her mother and the husband.

THE COURT: I don't know about that. I just know --

MR. ROTH: We can't have Louisa here today, your Honor.

THE COURT: Who other witness do you have aside her?

MR. ROTH: It's going to be the mom and the husband are going to go until 5:00.

THE COURT: That will be it.

MR. ROTH: Yes, your Honor.

THE COURT: So she's going to testify tomorrow morning at 10:00 o'clock, correct?

MR. ROTH: As long as the husband finishes today, your Honor.

THE COURT: All right. You have anybody else? That would be the end of your case, correct?

MR. ROTH: If there's time, your Honor, we would squeeze in possibly one damages witness before Ms. Harger.

THE COURT: What I'm trying to tell you is that tomorrow is going to be Thursday and we are going to complete your testimony, your case, tomorrow.

MR. ROTH: Yes, your Honor.

THE COURT: All right. And then they will be completing it into the afternoon, I don't know. So that's going to be Thursday. I think Friday we're not going to be here. So that means Monday morning you're ready to rock and roll, correct?

MR. KEAVENEY: Yes, we made some accommodations now. So we think we can have our doctor in the first thing on Monday morning and then do three witnesses that day. And I think we can finish our case in two days.

THE COURT: That's okay. I just got to -- we're going to try complete this hopefully by Tuesday.

MR. KEAVENEY: Yes, that is my plan right now.

THE COURT: All right.

MR. KEAVENEY: I moved a witness that was supposed to be Wednesday morning.

THE COURT: Great.

MR. KEAVENEY: To Monday morning.

THE COURT: We want the jurors to be able to have summations and if everything goes according to plan on Wednesday, charge the jury Wednesday. That will work I think well. That's what we're going to aim for. And we can have our charging conference, you know, tomorrow afternoon if we have some time to do that. Maybe some spend a lot of time Monday or Tuesday with it. We'll start to talk about the law.

One thing I want to talk about now is how to handle the insurance dynamic, okay? These are collateral matters, I guess. I guess you're title entitled to find out what her out-of-pocket expenses are, I imagine.

MR. KEAVENEY: Well, we certainly didn't think that that was going to be introduced as any type of topic for discussion. I think there would have to be an instruction that it's not relevant, the insurance.

THE COURT: Let's talk about that, okay? So the jury is not going to be considering any insurance aspects at all, right?

MR. GENIS: Correct.

THE COURT: So there's no collateral source issue here.

MR. KEAVENEY: Well, it will be after a verdict.

THE COURT: It will be after the verdict, right?

MR. ROTH: Yes.

THE COURT: All right.

MS. WINTERS: Yes.

THE COURT: So I want to instruct the jury appropriately about that, that they're not going to consider that. That's just the issue is raised. And we'll deal with collateral source dynamics after the verdict if there is a verdict.

MR. ROTH: Yes.

THE COURT: So we're clear about that.

The other thing I want you to think about now is the issue of proximate cause. So normally, you know, in a negligence case, you charge negligence, you have a separate question of whether or not there was a proximate cause.

I don't see that here and I'm trying to keep it as simple as possible to the jury, we'll talk more about this. But if you want a separate proximate cause charge and a separate verdict sheet on that, let me know. But I don't see, as a practical matter, where it's really indicated here.

So think about that, okay. And we'll talk a little bit more about, you know, things I'm going to try to get you some draft things for you to consider by tomorrow afternoon so you have a chance over the weekend to think

about it, okay?

MR. KEAVENEY: Okay.

MS. WINTERS: Thank you.

MR. GENIS: Thank you.

MR. ROTH: Thank you.

(Luncheon recess taken; 12:34 p.m.)

(Continued on the following page.)

AFTERNOON SESSION

(In open court.)

(Parties present.)

COURTROOM DEPUTY: All rise.

(Jury enters courtroom at 1:51 p.m.)

COURTROOM DEPUTY: You can all be seated.

I ask the interpreter and the witness to just remind you that you are both still under oath.

(Interpreter sworn.)

COURTROOM DEPUTY: I ask the interpreter to state and spell your name.

THE INTERPRETER: Connie Raicovich. R-a-i-c-o-v-i-c-h.

**MARLIZE JANSSEN HARGER DA SILVA**, called as a witness, having been previously duly sworn, was examined and testified as follows:

COURTROOM DEPUTY: State your name for the record.

THE WITNESS: Marlize, Janssen Harger Da Silva.

THE COURT: We're going to pick up where we left off. Now, you are still under oath, do you understand that?

Continue with your questioning, Mr. Shields.

MR. SHIELDS: Thank you.

DIRECT EXAMINATION
BY MR. SHIELDS:
Q Good afternoon, Ms. Da Silva, how are you today?
A Good afternoon, everyone. Yes, I'm well. I'm a little nervous.
Q Okay. So last time we were talking about a little background of Louisa's time in London. And I think that where we left off was Louisa had moved back to Brazil after her study abroad year in London; correct?
A Yes, okay.
Q And after Louisa moved back to Brazil, did her and George continue dating?
A Yes.
Q And how often would they talk?
A They spoke daily between one and two hours a day.
Q And when Louisa moved back to Brazil, did she move back into your home?
A Yes, she lived with us.
Q And did George ever come and visit your family in Brazil?
A Yes, he came to Brazil to meet our family and Louisa traveled to London to meet his family.
Q And eventually, did George move from London to New York City?
A Yes, he was transferred. His company transferred him

from London to New York. He works for Citicorp, which is an international company, so he was transferred from London to New York City.
Q And at some point did Louisa visit George in New York City?
A Yes. In July of 2016, she came to visit him. She was on vacation from university.
Q During that trip, did you speak with Louisa?
A Yes, we spoke frequently. Even nowadays we speak frequently. And so, yes, during that trip, also.
Q Did she tell you about the things that she was doing in New York during that trip?
A Yes. She spoke to me during the trip, especially on that day of the accident she told me that they had, you know, a trip to Vegas, they were going to watch a magic show and also a helicopter ride to visit the Grand Canyon. They were going to visit the Grand Canyon on that day, on a Tuesday, they went on a boat, a boat tour in the morning and then she was waiting for George to leave work. To leave work so that they could go out -- they were just going to go meet him someplace to do something and then also go to the market. So she was waiting for him to get off work. She was very happy and excited.
Q So, during the trip, before the day of the accident, she spoke to you and described what was going on and she

also spoke to you again on the day of the accident, is that what you are saying?
A Yes.
Q Do you remember what time you had the call with Louisa on the day of her accident?
A Yeah, it was in the afternoon between 5:00 and 5:30 p.m.
Q Did she tell you how she was feeling? Was she feeling sick at all?
A She did not say that she was feeling, you know, sick in any way. She did not say she was feeling bad in any way physically. She just talked about what they had done over the weekend. She was happy with that and she was looking forward, you know, to the evening.
Q Okay. Can you tell us how you learned about Louisa's accident?
A So George called me on my cell and he said, "Louisa accident." So I was very, very worried, so I passed the phone to my son Ricardo because he speaks English.
Q And what did you learn from your son?
A Ricardo said that George told him that Louisa fell ill and lost consciousness and fell onto the tracks and was run over by a train, and that she was at the Bellevue hospital and she was having surgery at that moment.
Q And what was your reaction?

A I was in shock. That was the strongest pain I ever felt in my whole entire life at that moment. The only thing I could do at that moment is to pray.
Q And what did you do next?
A So, at that moment, my husband was very, very worried that she was going to pass away. And so, we would try -- he was trying to get in touch with the doctor. He was able to get in touch with a Brazilian doctor that worked at Bellevue Hospital and this doctor, he was not in the New York at the moment, but he was able to contact the hospital for us. And in the middle of the night, he got back to us and he told us that she -- that Louisa was through the surgery, the surgery had ended, but that it was not possible to reimplant her arm and her leg. Up to that moment, I had the hope that maybe they would be able to reimplant her leg and her arm again.
So all of this was happening, at the same time, in the middle of the night, we were filling all those forms and documents to apply for an emergency room visa to come to the United States because we wanted to come here as soon as possible and we made a decision that my stepson, his name is Claudio, he was coming with me to United States. So we spent the night, like, filling out all these documents, going through all the bureaucracy, and also purchasing our tickets to come to New York.
Q And when did you arrive at Bellevue Hospital?

A So we flew to Sao Paolo the very next day, that was a Wednesday. We went to the interview, the visa interview. And I arrived at Bellevue we arrived at Bellevue 7:00 a.m. on a Thursday, 36 hours later.
Q And what did you see when you entered Louisa's hospital room?
A When I got there, she was in her room. She was in bed and she looked terrible; she was destroyed. She had no arm, no leg. It was very, very hard to see her that way. Her face also was she was hurt all over. Her face was also hurt. And the hardest part was also to know that damage was irreversible.
Q Were you able to hug her?
A I didn't hug her the way she deserved to be hugged because she was hurt, I couldn't really do that. And she was happy to see me; she smiled at me. But you could tell, you know, how sad she was. And I told her that we couldn't take back what had happened, we couldn't undo what had happened, but that we were going to do our best and we were going to fight and she had to fight. And then I remembered that Louisa, that her names means "famous warrior." And so, I thought that that's what we had to do. We had to fight.
Q And how long was Louisa in the ICU for at Bellevue Hospital?
THE INTERPRETER: Counsel for the interpreter?

Q How long was Louisa in the ICU at Bellevue Hospital?
A 24 days.
Q And did you stay with her during those 24 days?
A Yes. I stayed with her for the 24 days. George and I would take turns during the day. And at night, we would stay during the day, and then at night, we'll take turns to go home and take a shower.
Q And can you describe Louisa's pain throughout that time, that 24 days in the hospital?

MS. WINTERS: Objection, your Honor.

THE COURT: Yes, sustained.

Ask another question.

Q How did you know that Louisa was in pain when she was in the hospital?

MS. WINTERS: Objection, your Honor.

THE COURT: Overruled.

I don't know whether that simple question requires such a lengthy answer. I don't know what she's saying but you want to answer the question more specifically instead of going on and on and on. Let's see if you can husband your energy and answer the questions directly, okay, without offering more than you're being asked.

Do you want to rephrase the question? I don't know if it requires an elaborate answer.

MR. SHIELDS: Can the interpreter interpret what

she had said so far?

THE COURT: Let's give it a shot but try to be realistic here and move on. I don't think you need much more.

A When she was in pain because she was taking strong pain medication for pain. She was on morphine. She kept pressing the button over and over again because she felt the pain. Also, when she changed the dressings, the skin on her stumps was still very raw. So the gauze would get stuck to her. So when they came to change it, she kept holding my hand, squeezing my hand very hard. Also, they couldn't find veins to take her blood anymore. They could take blood from foot. She cried in pain when those things happened so I knew she was in pain.

THE COURT: Ask one or two more questions. Go ahead.

MR. SHIELDS: I got a lot more, Judge.

THE COURT: I'll see about that.

I'm going to intentionally tell you I don't want to are have much more of this type of questioning by this witness, okay? So I'll give you another so minutes or so to wrap it up.

MR. SHIELDS: Judge, we got to go into when she returned to Brazil.

THE COURT: I'll give you ample opportunity. We

don't have to go on and on and on go on. I'll give you 10 or 15 minutes. It's 10 after 2:00, by 2:30 you will be finished. You can use the 20 minutes as you see fit.

EXAMINATION

BY MR. SHIELDS:

Q What happened after Louisa was eventually discharged from Bellevue Hospital?

A She was discharged but she needed intensive rehab.

Q And where did she do that rehab?

A She did that in Brazil at a rehabilitation center.

Q Okay. How did she get back to Brazil?

THE COURT: Stop. That's a long answer to a short question because you have an interpreter. I really can't hear what she's saying. Normally, I would say, look, let's not go on and on. Try to focus your answers. I can't do that here when we're dealing with an interpreter, so I will her answer that question, but you're going to finished by 2:30. You're going to use the time as you deem appropriate. I can't let her ramble on and on and on.

You can answer this question. Go ahead.

A We took a regular flight because the insurance did not authorize the medical flight. And it was very uncomfortable at the airport because the ambulance dropped her off on a stretcher in the middle of the lobby of the airport. And the manager there was very nervous, said she couldn't fly

like that.

THE COURT: Next question.

Q How long was the flight?

THE COURT: The question was a simple one, how long was the flight?

Can you answer that yes or no?

A So the flight was ten hours to Sao Paolo, Sao Paolo to Florianopolis was three hours of connection time.

THE COURT: It was a long flight.

Next question.

Q How did she go to the bathroom on the flight?

A She could not go to the restroom on the plane so we changed her diaper while she was in her seat.

THE COURT: Were you with her then?

THE WITNESS: Yes, I was with her.

THE COURT: Next question.

Q Tell us about the rehab process when she arrived back in Brazil?

A Rehab was done at the rehabilitation center and we used to go every single day for her to change the dressings.

MR. SHIELDS: I want to put up what's going to be Exhibit 97-L, I think, the next exhibit.

THE COURT: So 97. We have a bunch of 97s. L is in evidence already.

MR. SHIELDS: Okay. Whatever the next 97 will be,

your Honor.

EXAMINATION BY

MR. SHIELDS:

(Continuing.)

Q And is that a picture of Louisa at the rehab center?

A Yes.

Q And can you describe what they're doing for her there?

A They were doing the debridement.

Q Okay. Can you explain what they do? What debridement means.

A So this debridement is done with tweezers and scissors and they remove the dead skin.

Q And eventually, did you stop going to the rehabilitation center to do that, and did you do that at home yourself?

A Yes, we started doing it at home. My husband is a doctor, so I helped him and we did it together at home debridement.

(Continued on the next page.)

BY MR. SHIELDS: (Continuing)

Q And is that what is depicted on the screen in front of you, a picture of you and your husband --

THE COURT: Identify that for the record.

MR. SHIELDS: For the record, that would be the next exhibit number for 97. Actually, this will be -- we premarked this as 97-E, Your Honor.

THE COURT: So it's not in evidence. All right. This is 97-E we're looking at right now.

Q And is that your husband who is performing the procedure?

A Yes, that's my husband.

Q And can you describe what that process was like when you would do the debridement at home?

A We would remove the bandages and clean the area, do the debridement, like I explain, we removed the dead skin from the stump. And then we put gauze, again, with some medication on it. And then we would put the bandages back on. And in the end, we would put the special compression bandage for the stump.

Q How often would you have to do that?

A Every day.

Q How long would it take?

A At first, we would take about three hours, and then later on we managed to do it in two.

Q And for how long did you have to continue doing these

debridements?
A At first, she was doing it at the rehab, and then we doing it at our house and we had to do it every day. But I think we -- after that, after a while, we were doing it a little more spaced. And it took about three months.
Q Every day for three months?
A Yes. After that time, the areas were not completely healed yet, but we didn't have to do the debridement anymore.
Q Was it painful for Luisa when you would do the debridement?
MS. WINTERS: Objection.
THE COURT: Sustained.
Q Can you describe what this was like for Luisa physically that you could observe?
MS. WINTERS: Objection.
THE COURT: Sustained.
Q What would Luisa do when you were doing the debridement?
THE COURT: She can testify about that tomorrow. Sustained.
Q During this time period for about the first three to four months when Luisa returned home to Brazil, what other things did you have to do for her?
A So I helped her with everything, with her, you know, eating, hygiene, her medication, taking her to the doctors, and also with her emotional -- providing emotional support.

Q How would Luisa eat during that time?
A We prepared her plate. We would cut up all her food and we would put the tray in front of her so she would eat with, you know, one arm. But she was not able to cut anything.
Q Eventually did Luisa return to university in Brazil?
A Yes, she returned to school in March of 2017. She did not have her prosthetics yet. She went back using a wheelchair.
Q And how would she get to school?
A I would drive her, you know, help her into the car, put her wheelchair in the trunk, and then take her to school, to the classroom. And once she was in the classroom, I would wait around. And during the breaks, I would take her to the restroom. And at school it was very difficult because it was not very accessible for a wheelchair. No ramps and things like that. So it was difficult there.
Q And what was that like for Luisa, going to school in that condition?
THE COURT: Why can't she testify about that?
You want her to testify about that, I assume, or do you want me not to let her testify about that? If you want to elicit all the testimony through the mother, I'm not going to let you do it again through the Plaintiff.
MR. SHIELDS: Okay.
THE COURT: She's going to testify about all of

that.

Look, I've got to move the case along with all due respect. Let's wrap it up and have cross-examination. Five minutes.

Q Did Luisa eventually graduate from university?

THE COURT: I'm sure she could testify about that.

What other questions do you have?

You don't have to answer that question.

MR. SHIELDS: Give me one second, Your Honor.

(Pause in proceedings.)

Q What are the biggest things that Luisa struggles with that you see today?

A So she struggles with pretty much everything, like eating, getting dressed. She can't cook. She can't, like, hand wash a piece of clothing. All the things that she loved to do before she can no longer do, like dancing and walking just regularly, playing the guitar, which she loved to do, she can no longer do that as well.

MR. SHIELDS: All right. Your Honor, I have no further questions at this time.

THE COURT: I'm not going to foreclose you if you want to ask some follow-up questions, but if she's going to testify, you know, you're going to obviously want her to testify about all these things, I assume, right? And we want to leave enough time. Because we have problems now, not of

our making, the government is shutting down. You understand that. I'm not trying to give you the bum's rush. I'm trying to manage this case in an intelligent way under all of the dire circumstances so we can deal with it because of the government shutdown.

MR. SHIELDS: Can I actually ask one more set of questions?

THE COURT: I'm going to give you flexibility, but I want you and everybody else to understand what I'm faced with here because this government is not functioning. Okay?

What other questions?

Q What has Luisa expressed to you about her biggest fears for the future?

A So her worries about the future is that, you know, the process of aging. I mean, she's going to get older. And also she had a dream of being a mom and then she doesn't know if she will be able, you know, she take care of her children, to take good care of her children.

Q Would she need help to take care of her children?

MS. WINTERS: Objection.

THE COURT: Excuse me. How many children does she have again?

THE WITNESS: Three.

THE COURT: Three? Okay.

Q She wants to have three children, she does not currently

have three children, correct?

THE COURT: How many children does she have at the present time?

THE WITNESS: She does not have any.

THE COURT: No children now. She would like to have children, right? She told you that, she wants to make you a grandmother, right?

THE WITNESS: Yes.

THE COURT: Any questions you have, Ms. Winter, if any? I assume you have just a few.

MS. WINTERS: Yes, Your Honor. We'll keep it brief.

CROSS-EXAMINATION

BY MS. WINTERS:

Q Hi, Ms. Da Silva.

A Hello.

Q When did you arrive in New York City for this trial?

A The 22nd or the 23rd of October.

Q Have you been staying with Luisa during that time?

A Yes, I am.

THE COURT: Is your daughter living in New York City now?

THE WITNESS: Yes, she does.

THE COURT: Where does she live?

THE WITNESS: In Brooklyn.

THE COURT: And you were staying with her when you

came up here?

THE WITNESS: Yes.

THE COURT: Next question.

Q What have you been doing with her in the time while you've been waiting to testify?

A With Luisa?

Q Yes.

THE COURT: Interpreter, we don't need a long answer.

You've been with her since you came up here, correct?

THE WITNESS: Yes.

THE COURT: Mother and daughter, right?

THE WITNESS: Yes. My husband was also here at the beginning, but he already went back to Brazil.

THE COURT: I'm trying not to make it too complicated.

You've been spending time with your daughter I take it, correct?

THE WITNESS: Yes.

THE COURT: Have you gone out to the theater, have you gone out to dinner? Just give the jury a general idea how mother and daughter are spending their time together since you came here. Not very lengthy. Just a little bit of a short example. Tell the jury.

THE INTERPRETER: May the interpreter interpret the previous answer?

THE COURT: Okay.

THE INTERPRETER: About the...

THE COURT: Can you answer that?

Q You can give the answer.

A I stayed home with her a lot because she's working online. She works from home.

And then we went -- you know, we came, you know, to see some places in Brooklyn here, like the Dumbo part and also we went to the aquarium.

THE COURT: Do you have any other questions?

MS. WINTERS: Yes, Your Honor.

Q And Luisa was married a few years ago, right?

A Yes, she was married here in New York in 2022.

Q And I assume you attended the wedding?

A Yes. Well, because it was during that COVID time, so I came with my husband and her in-laws came as well.

Q And was there a ceremony?

THE COURT: Next question.

I don't think we need that.

Q Did Luisa go on a honeymoon after the wedding?

A Not right after the wedding, no. But, you know, they went, you know, just some -- took some trips after, they went to some places. But not directly after the wedding.

Q And what year did Luisa move to New York again?
A When she came to get her master's degree in 2018, second semester.
Q And since that time in 2018 when she moved here, how often have you come to visit?
A Okay. So because we, you know, with the COVID restrictions after 2019, we were not able to come. There were restrictions for us to travel. So we came for the wedding.
THE COURT: So I'll ask you a few questions and then we're going to move on. And you can ask Luisa all these questions too, okay?
Has she gone down to Brazil? Have you come up here? Have you seen each other some frequency? You can explain to the jury, short and simple, the nature of your relationship in terms of the times you spent together a little bit. That's the nature of the question. You can answer that short.
THE WITNESS: So our relationship, it's very, very good. We speak -- we speak every day. We use the WhatsApp to make calls to each other. And once I -- she goes, Luisa goes to Brazil. And I don't come here often because this is an expensive trip for us. But I -- you know, she -- the only time we didn't really see each other that much was during COVID because we could not travel then. But she goes once a year and we talk on the phone every day.
THE COURT: So she's come to Brazil to visit you

also once or so a year?

THE WITNESS: Yes. She doesn't have set dates to go. But, yes, she goes and visits us there.

THE COURT: A couple of times a year? You tell us.

THE WITNESS: It happened that she went twice, but usually it's once a year.

THE COURT: And you stay in touch with each other by WhatsApp, or phone, or otherwise? You can explain.

THE WITNESS: Yes, we do video calls using WhatsApp. And she says good morning and good night to me every single day.

THE COURT: How often do you talk to each other a week? Just how often?

THE WITNESS: Practically every day.

THE COURT: What was that? I didn't hear it.

THE WITNESS: Practically every day.

THE COURT: Practically every day.

Do you have any other questions?

MS. WINTERS: Yes. I'll move to a different topic, Your Honor.

Q Are you currently working full-time as an architect?

MR. SHIELDS: Objection.

THE COURT: Is the mother working full-time?

MS. WINTERS: Yes.

THE COURT: Are you an architect?

THE WITNESS: Yes.

THE COURT: I don't think that she's the Plaintiff. Sustained.

Q Did you attend the same architecture school as Luisa did?

MR. SHIELDS: Objection.

THE COURT: Sustained. I don't think we need that. She's not the Plaintiff. She's the mother.

MS. WINTERS: Your Honor, no further questions.

THE COURT: Anything further, Mr. Shields?

MR. SHIELDS: Just a couple of quick follow-ups, Your Honor.

THE COURT: Just one or two questions.

REDIRECT EXAMINATION

BY MR. SHIELDS:

Q Ms. Winters asked you about Luisa's wedding. Was Luisa able to walk down the aisle?

A Yes, she was able to walk because she can walk short distances.

THE COURT: She walked down the aisle; is that your testimony?

THE WITNESS: Yes.

THE COURT: Okay.

Q Was she able to dance?

A Yes, she was able to dance her own way.

Q What was her own way?

A It's -- the prosthesis limits her movements, so she doesn't dance as she, you know, she's not as agile to dance. She's kind of hard.

THE COURT: When was she married again? I don't know whether I followed that.

THE INTERPRETER: When?

THE COURT: Yes.

THE WITNESS: March 2nd, 2022.

THE COURT: This is her second marriage?

THE WITNESS: No.

THE COURT: Oh, this is first marriage?

THE WITNESS: Yes.

THE COURT: Okay. I was just a little confused about that.

Anything else?

MR. SHIELDS: No, Your Honor.

THE COURT: You may step down.

Let's take ten minutes and you'll have your next witness here by then.

MR. SHIELDS: He's here, Your Honor.

THE COURT: All right. So then let's start now and we'll go for a little while.

(Witness steps down.)

THE COURTROOM DEPUTY: Good afternoon. You can take the witness stand.

(Witness takes the stand.)

THE COURTROOM DEPUTY: You can remain standing and raise your hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Thank you. Please have a seat.

I ask you if you can state and spell your name, and keep your voice up.

THE WITNESS: George William Nicholas Brown, G-E-O-R-G-E, W-I-L-L-I-A-M, N-I-C-H-O-L-A-S, B-R-O-W-N.

THE COURTROOM DEPUTY: Thank you, Mr. Brown.

THE COURT: The microphone is there. You can use it.

**GEORGE WILLIAM NICHOLAS BROWN,** having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SHIELDS:

Q Good afternoon, Mr. Brown. How are you today?

A I'm well, thanks. A little nervous. This is the first time I've testified.

Q That's okay. I'm sure everybody will be really nice to you.

Can you tell the jury; where do you currently live?

A 1191 Ocean Avenue, Brooklyn, New York.

Q And where are you from originally?

A I'm originally from the UK.
Q When did you move to New York?
A I moved to New York in April of 2016.
Q And why did you move to New York?
A For a work opportunity.
Q Where do you work?
A I work at a company called SIM Corp.
Q What do you do there?
A I'm the senior director, and I'm responsible for our cloud operations in North America.
Q Does your job require you to travel frequently?
A Yes, I travel frequently.
Q How frequently do you travel?
A Every month I would travel.
Q Like, what types of places do you have to travel to?
A Predominantly I'll travel to Europe, Denmark, or London, or I'll be traveling to Mexico or Canada. So international travel.
Q How long are those trips, generally?
A Typically, about a week.
Q So you're gone for about a week every month?
A Yeah.
Q And you worked for SIM Corp. before you moved to New York?
A Yes, I started working there in the UK.

Q And you're currently married to the Plaintiff in this case, Luisa Janssen Harger Da Silva, correct, or that's her maiden name?
A That's her maiden name. We got married on March 2nd 2022.
Q Can you tell us how you met?
A Yeah, we met while she was studying abroad in London.
Q Can you tell us about your first date?
A Yeah. So it was October 17th, 2014 and we met up to originally go for lunch in Camden in London. Camden is a bit like Williamsburg in New York. So we originally met up there and kind of just see where the day would take us. So we, you know, had lunch. After that, we kind of wandered around and explored the area. I suggested going and grabbing a drink, and Luisa is Brazilian, so she thought that meant coffee, and I'm English, so I thought that meant a beer. So we went and got a beer. Then we continued looking around the neighborhood. We found a Brazilian restaurant that Luisa wanted to show me --
THE COURT: Mr. Brown, we don't have to go into all those details. Speak a little louder into the microphone. You met in 2014. This is before this unfortunate incident obviously, right?
THE WITNESS: That's right.
THE COURT: You established a relationship, you

starting dating with each other and going to get to know each other. Okay?

What else do you want to ask about those preliminary meetings?

Q How long was her study abroad in London?

A One year.

Q Tell us about some of the things, the activities you liked to do together in that year?

A In that year, we liked to explore London, see the tourist sites there as it was her first time there. Our favorite date that we would do together would be going to arcades, especially the basketball, you know, hitting all the buttons and things. Also going to restaurants and concerts.

Q Active things, right?

A Active things, yes.

Q During that first year, did you travel together?

A Yes. We traveled to Amsterdam, Milan, Budapest, as well as Portugal in that year.

Q Did you fly to all of those locations?

A With the exception of Amsterdam, we flew to all of the locations. Amsterdam we took a bus because it was too expensive to fly at that time to Amsterdam. In Europe, it's a lot cheaper generally to travel around than here.

MR. SHIELDS: I want to show one picture. Your Honor, I guess this would be 97-P. 97-P as in pony.

THE COURT: Sorry, as in T, did you say?

MR. SHIELDS: P, like pony, Your Honor.

THE COURT: P. All right.

(Exhibit published.)

MR. SHIELDS: Trying to make it smaller.

Well, I guess I can't make it smaller.

Q Mr. Brown, do you recognize this picture?

THE COURTROOM DEPUTY: Maybe you can use the focus thing on top.

The other way.

There you go. How about that?

A This is a picture of Luisa. We've gone rowing in Hyde Park. This was just an impromptu activity. We saw it and thought we would do it.

Q And what happened after Luisa moved back to Brazil in the summer of 2015?

A After Luisa moved back to Brazil, we continued dating long distance.

Q Did you ever visit her in Brazil?

A Yes. I visited her for Christmas that year.

Q Can you describe Luisa's personality before the accident?

A Before the accident, Luisa was an extremely outgoing, adventurous, inquisitive person, very spontaneous.

Q Can you give us some examples about when you say she was spontaneous and adventurous?

A Yes. When Luisa was studying --

THE COURT: Only what you can say in public.

So she was adventurous, she was somebody you fell in love with and you've been obviously with her ever since, right?

THE WITNESS: That's right.

THE COURT: She's an exceptional young lady, you loved her, you married her eventually.

THE WITNESS: Yes.

THE COURT: This is how she was before she had this incident. She's rowing, you in the boat with her, right?

THE WITNESS: That's right.

THE COURT: Okay, next question.

Q How was Luisa different than the other Brazilian exchange students at her school in London?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Tell us about some of the campus activities Luisa engaged in.

THE COURT: Sustained. We don't need that.

Was she active on campus? She was very active, I guess, right?

THE WITNESS: That's right. Luisa participated in many of the activities available for her as an exchange student, and she also traveled with the other exchange

students to visit other people participating in the program, which was facilitated by Brazil. And she also took part in, like, the local drama society at her university as well.

THE COURT: It was not by accident that you fell in love with her, correct?

THE WITNESS: That's right.

THE COURT: She was special than the others, right?

THE WITNESS: Yes.

THE COURT: You had all these other women you could have married, but you chose her, right?

THE WITNESS: Yes.

THE COURT: Next question.

Q In the summer of 2016 before the accident, where was Luisa living at that time?

A Luisa was living in Florianopolis in Brazil with her parents.

Q She was in school?

A Yes.

Q And in the summer of 2016, did Luisa come and visit you in New York?

A Yes, she came to visit.

Q Okay. Around that time, did she have any health problems?

A No.

Q Before the accident, had she ever visited you in New York

previously?
A No, she had never visited me before.
Q And where were you living at that time?
A At the time, I was living at 309 Gold Street in Brooklyn.
Q And what were your plans for her visit?
THE COURT: We can take this picture off now. It's not being used anymore.
Go ahead.
A So for Luisa's visit, our plan was we went to a music festival on Randall Island called Panorama. After that, we went on a trip to Vegas, and then we were going to spend time in New York City.
Q And can you tell us about some of the things that you did in Las Vegas?
A We went to lots of different shows in Vegas, like the Blue Man Group, went swimming in the many pools which were available, and we went on a helicopter tour of the Grand Canyon, which was probably the best thing.
MR. SHIELDS: Your Honor, I just want to put up a few pictures from their trip in Vegas.
THE COURT: Is this part of 97?
MR. SHIELDS: Yes, Your Honor.
THE COURT: Just one or two.
MR. SHIELDS: Okay. So this will be 97.
THE COURT: I'm sorry.

MR. SHIELDS: 97-Q, Your Honor.

THE COURT: P? I think we have P in evidence already.

MR. SHIELDS: No. Q, Your Honor.

THE COURT: Q.

(Exhibit published.)

Q So can you describe for the jury what 97-Q is on the screen?

A This is Luisa in the helicopter while we were visiting the Grand Canyon.

MR. SHIELDS: And the Judge said two.

Q How about this picture?

A This is us on our way back to the hotel after going out in Vegas.

THE COURT: Which letter is that?

MR. SHIELDS: R, Your Honor.

THE COURT: R, okay.

MR. SHIELDS: And maybe one more, Your Honor.

(Exhibit published.)

Q Could you describe what that picture is?

MR. SHIELDS: This would be S, 97-S.

THE COURT: Those are feet and toes.

A Those are Luisa's feet and toes next to the pool.

THE COURT: We now have the feet and toes. What number is that?

Q She had two legs and two feet at that time, right?
THE COURT: What number is that?
MR. SHIELDS: S, Your Honor.
THE COURT: S. Okay.
Q Can you tell us a little bit about the music festival that you went on before you went to Las Vegas?
A It was a three-day music festival at Randall's Island, and we would take the ferry there each day. So we would take the subway into Manhattan, and then the ferry to Randall's Island, enjoyed the music festival, danced, listened to music, and then we would go back each night.
Q Did you drink alcohol at the music festival?
A Yes.
Q Did you take any drugs at the music festival?
A No.
Q Did Luisa ever take any recreational drugs?
A No. Luisa would never take any drugs. Her dad is a psychiatrist, and he runs a clinic, and a lot of his patients suffered from drug abuse, and because of that Luisa is --
THE COURT: That's why she doesn't take drugs, right?
Did she drink any alcohol?
THE WITNESS: At the music festival, yes.
THE COURT: That's the only time she drank alcohol?
THE WITNESS: At the music festival, yes.

THE COURT: You never saw her drink alcohol except for at the music festival?

THE WITNESS: I've seen her drink alcohol outside of the music festival.

THE COURT: Well, you can describe how many times did she drink a week, did she enjoy drinking.

THE WITNESS: Luisa drinks occasionally. I would say maybe once every other week.

THE COURT: Okay. Next question.

Q What did you do after you came back from the trip to Las Vegas, from Las Vegas to New York?

A I went back to work. And on that Monday, Luisa stayed at home planning the rest of her stay in New York.

Q Okay. Mr. Brown, let's talk about August 2nd, 2016. Do you remember that day?

A Yes. That was the day of Luisa's accident and the worst day of my life.

Q Walk us through what you did that morning.

A That morning, I got ready just like any other day and was preparing to go to work. I took the train into work from DeKalb Avenue to Whitehall South Street Ferry, and Luisa came with me.

Q And what did Luisa do that morning when you went to work?

A Luisa went on the Staten Island Ferry to look at the Statute of Liberty.

Q How did Luisa seem that morning? How was she feeling?
A She was well.
Q Was she taking any medications at that time for any reason?
A Only birth control.
Q Do you remember what Luisa was wearing that day?
A She was wearing a tank top, shorts and sandals.
Q And do you remember what the weather was like that day?
A It was a nice summer day. Probably about 75 degrees and slightly cloudy.
Q And when is the next time you saw Luisa after you went to work in the morning?
A We met up for lunch.
Q What did you do for lunch?
A We went to a sandwich shop, got sandwiches, and then we ate them in the park at Bowling Green.
Q Did you have any alcohol at lunch?
A No.
Q Did Luisa?
A No.
Q How long did you spend having lunch together that day?
A Probably about an hour.
Q How did she seem at lunch?
A She was happy, excited, telling me about her day so far and what she was planning to do.

Q And what did you do after lunch?
A I went back to work.
Q And what did Luisa do after you went back to work?
A She went shopping.
Q And what were your plans for after work that day?
A We were planning to go to the 9/11 Memorial Museum. After work, we went there and we saw the queue, it was too long, so we decided instead to go home and then go shopping Atlantic Avenue.
Q When you say the queue, you mean, the line?
A The line, yes.
Q So you decided to go home and go shopping; is that what you said?
A Yes.
Q Did you make any stops along way before you went home?
A No.
Q What did you do when you got home?
A We just dropped off my bag, and then we went on to Atlantic.
Q And how did you get to Atlantic Terminal?
A We walked there.
Q And how far was that walk?
A It's about half an hour.
Q Did Luisa have any complaints during that time?
A No.

Q Did you make any stops, get any food or drinks along the way?
A No.
Q And why were you going to Target?
A We were going to pick up some food and some cleaning supplies because my parents were going to come and visit later, so I wanted to get the apartment looking good.
Q And when were your parents planning to visit?
A The following week.
Q And when you got to Atlantic Avenue shopping center, what did you do?
A We went in and we went to Target and did our shopping.
Q Okay. And do you remember what you bought?
A We bought some food. I remember we bought a broom. And just other cleaning supplies.
Q Okay. What did you do when you left the Target?
A After we left Target, we went up to the top floor of Atlantic Avenue and went to the bathroom there and also got some water to drink.
Q And how many shopping bags did you have with you when you left Target?
A About two each.
Q And do you have any idea what time it was when you left the Target?
A It was in the evening. Probably about 6:00, 6:30. Maybe

7:00.

Q Okay. And after you finished using the bathrooms and filling the water, what did you do next?

A We decided to go home. So we left Atlantic Avenue Barclay's Center, the shopping center. And then after we stepped outside with the bags, we decided it was a bit too far to walk, so we decided to take the subway home.

Q And did you go to -- what subway platform did you go to?

A So we went into the subway and we took B/Q line northbound.

Q How did you get from wherever you were outside after you left the Target down to that platform?

A We went down the elevator, which takes you down to kind of, like, the lobby area, and then from there we walked through the barriers along the 4/5 platform down the stairs there, and then down the concourse, which is underground to the left. And from there, down the stairs onto the B/Q platform.

Q Okay. And I want to show you a picture.

MR. SHIELDS: Logan, I'm going to put the picture up. And then hopefully Logan can help us remember which exhibit number this is, Your Honor.

This is part of Exhibit 74.

THE COURT: This is a photo. We already have 74-E, I think.

MR. SHIELDS: I think it's 74-F, Your Honor.
THE COURT: This is 74-F. Okay.
(Exhibit published.)
Q Mr. Brown, I'm showing you a picture that's been marked as Exhibit 74-F. Do you recognize this picture?
A Yes.
Q And do you see the staircase that you used in this picture to descend to the platform on that day?
A Yes. The staircase, which is in the picture, is the one I used. I think you can see I've labeled it GB.
Q In black letters at your deposition?
A Yes.
Q And does this picture generally depict where you and Luisa stood when you got to the bottom of the stairs?
A Yes. We were near the -- you can see a metal box on the right-hand side in between that and the stairs.
Q So in this general area right here between the metal box --
A Yes.
Q -- and the stairs?
Is that where you're standing?
A Yes. A little bit further south than directly in between them, but yeah.
Q Okay.
MR. SHIELDS: Is that not in yet?

THE COURT: Just tell us which letter.
MR. SHIELDS: Your Honor, this one is 97-E.
THE COURT: 97.
MR. SHIELDS: E, Your Honor.
THE COURT: I think that's in evidence already.
MR. SHIELDS: Yes.
THE COURT: Go ahead.
(Exhibit published.)
Q And Mr. Brown, do you recognize this picture that's on the screen right now?
A Yes.
Q Okay. And does this picture depict the area where you and Luisa were standing when you descended the stairs to the platform?
A Yes.
Q And do you see the markings on this picture?
A Yes, I see the markings.
Q Were those markings that you made at your deposition in this case?
A I don't think this is the picture I made the markings on.
Q Okay. Does this picture generally -- but you can see the markings on this picture?
A Yes.
Q And can you describe for the jury what you did and where you stood with Luisa when you got to the bottom of the stairs

on that day?
A Yes. So we came down the stairs and decided to stand here. I rested my bags against the column, which is pictured. And Luisa placed her bags on the ground.
The LJ, which is labeled there, is roughly in the area where I was standing, and then Luisa was standing diagonally between myself and the column, about five feet away from the platform edge.
Q Okay. So would this set of markings be where Luisa was standing?
A Yes.
MR. SHIELDS: Hold on.
I'm going put up a different picture.
THE COURT: Just identify which one it is.
MR. SHIELDS: This one -- Logan?
This is 97-G, Your Honor.
THE COURT: This is 97-G. Okay. G, that's in evidence already.
MR. SHIELDS: Yes, Your Honor.
(Exhibit published.)
Q All right. So Mr. Brown, do you recognize this picture?
A Yes. This is the picture I labeled at my deposition.
Q Okay. On your screen, can you see the drawings that you made at your deposition?
A Yes.

MS. WINTERS: Sorry, just for clarity, this is 74-G, right? Not 97-G?

THE COURT: I have this as 97, you said.

MR. SHIELDS: Sorry, Your Honor. Defense Counsel is correct. 74-G.

THE COURT: Okay. 74, we have E and F and this is G now, okay. All right.

Q And so using this picture, can you describe what the drawings are that you made on it and what they represent?

A The G, which your pen is pointing at now, is roughly where I was standing. The line in between represents the packages. The L is where Luisa was standing. And then the P, which is resting against the column, is where the broom was and my packages.

Q Okay. Were there other people on the platform when you descended the stairs before the accident?

A Yes.

Q Was it crowded?

A It wasn't crowded.

Q Were there people near you?

A Yeah, there were people around us.

Q And what train were you waiting to take?

A The B or the Q.

Q Northbound?

A Northbound.

Q And where were you going to get off the train?
A At DeKalb Avenue.
Q Was there any particular reason that you stopped in that location that we just were looking at? And the exhibit that we had up is 74-G.
A We were carrying bags, and so wanted to stop fairly quickly when we got down. It also seemed like a safe location to be on the platform, not too close to the edge, but also with some obstructions, like the stairway or the column blocking us from, you know, being pushed onto the train tracks.
Q Did you have any particular safety concerns? I mean, you just mentioned pushing. Anything else? Or was pushing your main concern?
A That was our main concern.
Q How long did you stay in that spot before the accident happened?
A Around five minutes.
Q And just to make clear, about how far from the platform edge was Luisa standing?
A At least five feet.
Q And was her back to the track area the entire time you were standing there?
A Yes.
Q And what were you doing while you were waiting for the

train?
A We were just talking. At some point we hugged.
Q What happened after you hugged?
A After we hugged, Luisa said that she felt faint. She said she didn't feel well, and then she immediately fainted and fell backwards onto the tracks.
Q And can you describe how she fell onto the tracks? What happened after she fainted?
A So after she fainted -- sorry. After she said she felt faint, she took one or two steps back and fell directly onto the platform, so onto the tracks. And her legs -- her body was laying across the tracks with her left arm and her left leg across the rail.
As soon as that happened, I stood up and I yelled at Luisa wake up, get up. She did not get up.
I looked to my right and there was no train. I looked back at Luisa and I started yelling at her, I carried on yelling, get up, wake up.
I looked to my right again and I saw the train coming into the station.
Q How did Luisa appear to you before she fainted?
A She appeared fine up until the moment that she said she fainted -- or said she didn't feel well.
Q And since you met Luisa, has she ever fainted on any other occasion?

A No, I've never known her to faint before or after that incident.
Q Now, you said you only saw the train after you looked to the right the second time; is that correct?
A That's correct.
Q Where was the train when you first saw it?
A It was coming into the station.
Q And that was after the second time that you looked to the right?
A And that was after the second time I looked to the right.
Q What did you do when you saw the train entering the station?
A As soon as I saw the train coming into the station, I stopped yelling at Luisa and I started waving my hands at the train, and I was screaming and shouting at the train to stop.
Q And how long did you do that for?
A I was doing that until the train hit Luisa.
Q When you did that, did you hear the brakes of the train?
A Eventually I heard the brakes of the train, probably when it was halfway between where it entered the station and where Luisa was on the tracks.
Q Did the train -- did you hear the train's brakes immediately after you started waving your hands and shouting at the train driver?
A No. It was several seconds.

Q And how far was Luisa from the train when you first heard the brakes?
A She was about halfway between where the train entered the station and where the train was when I first heard the brake.
Q Could you see the train operator when you were waving your hands and screaming at her?
A Yes, I could see her through the glass of the train window.
Q When the train was entering the station, did it appear to be going at full speed?
MR. KEAVENEY: Objection.
THE COURT: Well, you can answer that question, if you can.
What was your sense of the speed of the train?
THE WITNESS: It was going fast.
Q After you heard the brakes, what happened?
A I kept waving my hands and screaming at the train to stop.
When it didn't stop and then it hit Luisa, I waited for the train to stop, and then I knelt down on the side of the platform to check to see if Luisa was still alive.
Q And what happened next?
A I was lying down on the platform edge, and I looked down, and I could see that Luisa was alive. I could see that her arm and her leg had been amputated by the train and she was

bleeding. She was panicked. She was confused and she was scared.

Luisa looked at me and she said: Am I going to live?

And I had to reassure her that she was going to be okay.

She asked me if she was going to die. When she realized that -- when she realized that she had lost her arm and her leg, she asked me if I would still love her without an arm and a leg. And she asked me to tell her parents that she loved them.

Q What happened next?

A I kept reassuring Luisa, and all this time I was, you know, screaming and shouting for someone to call 9-1-1 to get an ambulance.

At some point, someone handed me some water, which I gave to Luisa and she drank that.

Eventually, the fire department arrived and they came under the train and, you know, started getting her out.

Q How did they get her out from underneath the train?

A I think they managed to maneuver her after putting like something to stop the bleeding on her, managed to move her to a gap in the -- between the carriages.

At some point, I was kind of ushered away by the police or the fire brigade.

Q Was she awake at that time?
A Yes, she was conscious then.
Q What happened while they were taking her to the ambulance?
A At some point, someone asked her if she was okay. They said, you know, is she okay. And Luisa shouted at them: I've lost my fucking leg.
The fire department took her up to an ambulance on a board. They walked back roughly the way that we came in. So along the concourse, up the stairs, along the 4/5 platform, and then out at the Atlantic Avenue exit where she was put in an ambulance and taken to Bellevue Hospital.
Q And what happened when you arrived at the hospital?
A I followed behind in a police car. And when I arrived at the hospital, she had been taken to an intake room.
After a while, they left the intake room and they were taking her to surgery.
Luisa asked me not to tell her parents what had happened because she didn't want to worry them. I obviously ignored that and I tried to find her, you know, a phone number for her family in my phone, which I found. I called her mom, and when she picked up, I asked to speak to Ricardo, which is her younger brother because her mom doesn't speak English, so I could not communicate what happened. So I spoke to Ricardo, and I explained that she had been hit by a train and that she

was going to go into surgery now.

I also called my own parents to let them know. And they were in Iceland at the time, and they canceled their plans and immediately started planning to come to New York immediately.

Q And how long was Luisa in Bellevue Hospital for?

A Luisa was at Bellevue for a month.

Q And what did you do while Luisa was in the hospital?

A I stayed with Luisa and saw her every single day between her -- sorry, myself and her mom and her brother, she was never left alone for a single hour of that time. So we stayed with her 24/7 for a month, and helped look after her, and give her comfort while she was in the hospital.

(Continued on the next page.)

EXAMINATION

BY MR. SHIELDS:

Q I want to show a picture. So this would be 97-T, your Honor. 97-T.

THE COURT: I'm sorry. What number?

MR. SHIELDS: 97-T, as in Tom, your Honor.

THE COURT: T as in Tom. Okay.

(Plaintiff's Exhibit 97-T was marked in evidence.)

Q Mr. Brown, do you recognize that picture?

A Yes, it's a picture I took of Louisa after her surgery to send it her family. She's smiling. She wants them to be reassured.

Q And what's the significance of like the peace sign that she's making?

A In Brazil, that sign is kind of like an everything's okay. It's like a thumbs up type of signal.

Q Can you tell us about Louisa's pain while she was in Bellevue Hospital?

MR. KEAVENEY: Objection.

THE COURT: Overruled.

If you can describe, you know, if you observed her in pain or what you observed. It's a broad question.

A Louisa was in a considerable amount of pain throughout her time at Bellevue. And the way that the medication was administered is that she had a button that she could press

to give her the drug. And I could tell that she was in a lot of pain because she would often be pressing the button and unable to have more medication delivered because it had already been -- it's time restricted, so you can only get some every two hours, every four hours. And often, within half an hour of pressing it, she would be pressing it again but she could not get any more medication so I knew that she was in significant pain.

Q And what else did they do for Louisa when she was in Bellevue Hospital?

A They brought in a volunteer whose name is Theresa. She was an amputee and she kind of reassured Louisa about what life might be like in the future. They also had an art therapist, Irene, that Louisa worked with to kind of express how she was feeling throughout other stay in the hospital. Louisa still works with Irene now. And they also provided a therapist for her which she worked with for a while. Louisa didn't like the therapist because the first thing the therapist wanted to do was tell her that I was going to leave her and Louisa refused to accept that.

Q Anything else that you remember about Louisa's time in Bellevue?

A I remember the first time that she was allowed food from outside the hospital, Louisa could have anything she wanted and she chose McDonald's. So the first meal she had

after the accident, first real meal, was McDonald's.

MR. SHIELDS: Your Honor, this is a good time to break.

THE COURT: This is an appropriate time. Let's reconvene at 20 to 4:00.

COURTROOM DEPUTY: All rise.

(Jury exits courtroom at 3:19 p.m.)

COURTROOM DEPUTY: You can be seated.

THE COURT: So the jury is not in the courtroom now. You can take a break if you want to, just don't talk to anybody in between, okay? We'll come back in 15, 20 minutes.

(Witness leaves the witness stand.)

THE COURT: So, Mr. Shields, you notice I've not interrupted you once when you questioned this witness.

MR. SHIELDS: Thank you, your Honor.

THE COURT: So you see the contrast of how I'm trying to manage the trial.

MR. SHIELDS: Yes, your Honor.

THE COURT: I think all these questions are obviously relevant and I'm not interrupting you. But let me ask you to give you some time sense of what we have to do.

MR. SHIELDS: I can tell you, your Honor, that we're obviously through the incident and we were going to go through, you know, obviously, Mr. Brown lives with Louisa.

So we were going to go through the time after the incident.

THE COURT: Realistically, if we can have his testimony finished today.

MR. SHIELDS: Yes.

THE COURT: That would be great but we need some cross-examination, I suspect you would want to ask.

MR. KEAVENEY: Yes, your Honor.

THE COURT: You're not going to ask too many questions but you're going to ask some.

MR. KEAVENEY: Yes.

THE COURT: Even if we have to keep them a little late, I'll try to do that because tomorrow morning we don't want to be under any pressure when she's going to be testifying which I suspect will happen tomorrow morning; correct?

MR. SHIELDS: Yes, your Honor.

THE COURT: I want ample time for questioning the whole day. I don't want anyone to feel inordinate pressure tomorrow. That will be the last day we're going to be here until Monday so that's why I'm thinking about in terms of managing the trial.

Anything else you want to say now? Are we on the same page, I think?

MR. KEAVENEY: We're on the same page.

THE COURT: Pardon.

MR. KEAVENEY: We're on the same page.
THE COURT: See you at 20 to 4:00.
(A recess in the proceedings was taken.)
(Witness takes the witness stand.)
COURTROOM DEPUTY: All rise.
(Jury enters courtroom at 3:47 p.m.)
COURTROOM DEPUTY: You can all be seated.
THE COURT: Go ahead, Mr. Shields.
EXAMINATION
BY MR. SHIELDS:
Q Mr. Brown, what happened after Louisa's stay at Bellevue Hospital?
A Sure attend she returned to Brazil.
Q After she returned to Brazil, how often would you talk?
A Texted every day or calling.
Q When was the next time that you saw Louisa after she returned to Brazil?
A Christmas that years.
Q And what was her condition at that time?
A She was still recovering from the amputations. And, at that time, she did not have prosthesis and her wounds were still recovering. So she still had to have, like, dressing changes regularly and ointments and creams and everything being applied on to those wounds.
Q And when is the next time you saw her after that trip?

A July the following year.
Q Where did you see her in July of 2017?
A She visited me in New York.
Q And what was the purpose of that visit?
A A vacation.
Q Okay. Anything else that she came to New York for other than vacation?
A I think it was also when we did the deposition perhaps.
Q Okay. So, as part of case, it was part of getting the case started?
A Yes.
Q And what was her emotional state during that trip?
A She was happy to see me but upset because she was reminded about everything that had happened leading to the situation she was in and being reminded of the accident and what had happened up until then.
Q How did she feel about getting the case started?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
Q How long did she stay in New York during that trip?
A Two to three weeks.
Q And how was she doing physically at that time?
A She could only -- at that time, she had a prosthetic leg. It was a mechanical prosthetic leg which means it doesn't have any of the electronics that you get in modern

prosthesis. She did not have a prosthetic arm. She could walk short distances. And when I say short distances, I mean very short distances. And otherwise, she would get around with a wheelchair. So it was very difficult for her.
Q Now, I want to show you a picture that will be 97-U, your Honor?
THE COURT: 97-U.
MR. SHIELDS: Correct.
(Plaintiff's Exhibit 97-U was marked in evidence.)
Q When you described the mechanical prosthetic leg as the picture we marked as 97-U in evidence, is that what you were describing?
A Yes.
Q Okay. So that's the leg, basically, that she had as of July 2013 when she visited you in New York?
A Yes.
Q And about how far could she walk on that leg?
A No more than 50 to a hundred meters.
Q And during that trip, how would she get around New York City?
A We'd take either accessible Ubers or taxis that had an accessible option in them.
Q So every time that you had to go anywhere, you had to bring a wheelchair?
A Yes.

Q What did she do after that trip ended?
A She returned to Brazil and completed her architecture degree.
Q And when did she complete her architecture degree?
A In March 2018.
Q Eventually, after she got her degree, did she move to New York City?
A Yes, she moved to New York in August 2018.
Q And what was her condition at that time?
A At that time, she still had the same prosthesis. She had a prosthetic arm, but the arm she had at that time was also a mechanical prosthesis. And what that meant is it had cables attached, and so, she could move it by moving her opposing shoulder. Her mobility was slightly improved from before but not greatly and still relying on that mechanical prosthetic leg as well.
Q And why did she move to New York City?
A To be with me but also to pursue a Masters in Architecture at CUNY.
Q When you say CUNY, you mean the City University of New York?
A Yes.
Q And why did she choose to go to City University of New York?
A Louisa chose to go to City University because it was

the one she got the largest amount of scholarships for out of the universities that she got into in New York. So it was the most affordable.

Q When she moved to New York, did she move into your apartment?

A Yes, she moved in with me.

Q And where were you living at the time?

A I was living at 1191 Ocean Avenue, Apartment 4C, at the time. So a different apartment in the same building I live in now.

Q Okay. And what's that building like? Is it accessible for wheelchairs?

A It is accessible in that it has an elevator. It only has one elevator. So if that elevator is having maintenance, then it's no longer accessible. The apartments are modern which means that, by New York Law, they have to have certain adaptations available, but that doesn't make the apartment accessible. So, for example, the shower that we have it has handrails in it which were put in on request. But to get into the shower, she cannot wheel her wheelchair in. So it is still not an accessible apartment.

Q And when you moved into that apartment building, did you do that intending that Louisa may move there with you?

A Yeah, I chose that apartment building because of the fact that it was more accessible than other options

available on the market.
Q And do you still live in that same building?
A I still live in that building.
Q With Louisa?
A With Louisa.
Q And so, you said that Louisa moved to the city to go to CUNY. Can you describe what her first or when did she begin going to classes at CUNY?
A So she started in the fall term. So I think classes start in September 2018.
Q And how would she get to school?
MR. SHIELDS: Let me withdraw that.
Q Where was the CUNY campus?
A CUNY is up in Harlem on 235th, I think.
Q 135th?
A 135th. It's far.
Q And how would Louisa get from Ditmas Park, Brooklyn, to CUNY in Harlem?
A She'd take Access-A-Ride.
Q Can you explain to the jury what the process of taking an Access-A-Ride is like for Louisa?
A So Access-A-Ride is a service provided by the City and it allows those people with mobility issues to get around. It's a shared ride service, essentially. And the way it works is that you have to book the ride that you want to

take at least one day in advance by 4:00 p.m. the day before. So if I want to go to college or she wanted to go to her college, you would book that the day before. And then you would book a pick-up time and where you want to be dropped off. Because it was a shared service, the amount of time that it takes is variable and the longer the distance that you're traveling the more variable it is. So if you're only going, you know, five kilometers or something, they can guarantee that you'll be dropped off within half an hour of the time that you would like to be dropped off. But if you're traveling, I think it's more than ten miles, which it is, from my apartment to CUNY, that guarantee is basically over an hour maybe even two hours. So if you want to arrive somewhere on time, you have to plan that you could be dropped off at least two hours before you actually need to be there. So if you have a class starting at 9:00, you need to plan to be there at 7:00 because there is no guarantee that you will be there otherwise.

Q And what was it like for Louisa to return to school?

A It was really challenging for Louisa and exhausting. Obviously, we're talking about two-hour commutes in each direction which is very tough for anyone but especially for Louisa. And then, when she was studying, she had to get around her classes using her prosthesis because she could not use her wheelchair effectively at the university. So

she would have to walk around very slowly and it would be a struggle for her. And by the time that she would get home, she would be exhausted.
Q Do you recall any particular difficulties that she had when she went back to school?
A Yes. One winter, the first snowstorm of that winter, she missed the access a ride that was meant to be picking her up because it did not come all the way into the university to pick her up because of the type of Access-A-Ride it was. They did not call to let her know that they were there. That was just an expectation they would be waiting for the Access-A-Ride. Access-A-Ride is allowed by their terms to be up to a half an hour late, so this was in the middle of a snowstorm. So Louisa didn't manage to get that Access-A-Ride.
So now she's stranded at her university and can't make it back home. The metro or the subway is too far away for her to walk it so she can't use that. And all of the ride share services that she could try and book to get home were costing $200, $300 for that ride so she couldn't afford that either.
So, instead, she waited and held out in that university until, you know, the snowstorm had died down a bit and the Uber was only a hundred dollars or so.
Q At the time that she moved to New York, what types of

things would you have to help her with?

A I would have to help Louisa with so many things. I still do. You know, simple things like all of her -- all of the cooking in the house. I will do that because it's very difficult for Louisa to cook independently. Things like maintenance of her wheelchair, you know, a tire on the wheelchair becomes deflated, I have to reinflate that for her because she can't do that by herself. It's very difficult to apply the pump with just one hand, almost impossible.

Things like putting on clothes, I will help her with because with one hand it's very difficult to put on certain items of clothing. Like, anything with buttons is a challenge; or if she's wearing something with a sleeve, getting the sleeve to the right location on her arm is difficult as well.

Personal hygiene: I've helped wash her. There are certain things which she can't even wash herself like her entire right arm and hand is basically really difficult for her to wash, so I help with that. Cutting her nails on her right hand is something I have to do for her because she can't do that herself. Everything that we take for granted as easy tasks are really difficult for Louisa and I have to help her with those tasks.

Q When she moved to New York City, did she have to attend

medical appointments?

A Yes. When Louisa moved to New York, I was able to put her on my company's insurance and through that, that enabled her to get more treatment. And part of that was getting a new prosthesis for her arm and for her leg. So she needed to go to many appointments for that before you can get an appointment for her getting a prosthesis. You have to get appointments at doctors and the doctors will tell you and give you a prescription for a prosthesis so she has to go to appointments for that as well.

All of these appointments she has to get to and then she that is use Access-A-Ride to get to and from those appointments which means that takes up a huge amount of her time as well both in scheduling the appointment but also arriving one, two hours ahead of everything and then leaving up to half an hour and arriving two hours later back at home after those appointments.

Q So you said that she got some new prosthetics. Was it hard for her to learn how to use those new prosthetics?

A Yes. Learning to work with a prosthetic is kind of like -- or walk with a prosthetic, it's like learning to walk again for the first time. You have to learn specific techniques for different obstacles. So particularly tough things for prosthetic users are ramps because you kind of don't naturally bend, like, the left doesn't bend naturally

on the way up. Stairs are difficult as well. When we're walking up stairs, we would walk foot over foot. But for prosthesis you'd only have to walk up one step at a time. So it takes longer and you have to use that. And also, you might have to learn to walk in a way where you swing you leg out to the side to get up the step versus naturally walking with a standard gait forward.

If you're thinking about things around the house, how do you use your prosthetic hand or arm is a challenge to learn. For Louisa, the prosthetic arm she has is not particularly useful because although it is an electronic arm, the connections are not particularly good. But she can still use the prosthesis as kind of the dead weight that she can use to hold things in place or put pressure against. So learning techniques to make the most of what she has takes a lot of time and effort. She went to the Spaulding Rehabilitation Facility in Boston for three weeks where they did training on various aspects of using prosthesis.

Q Did she ever have to use a cane or any other safety device when learning to walk?

A Yeah, for a long time, and still to this day, Louisa uses a cane. It's a specialist cane. It's got three prongs at the bottom instead of one which provides more stability. If the weather is bad, or slippery or wet, or if there's any uncertainty, Louisa will take that cane with her to feel

more secure.
Q Does she wear her prosthetics when she's at home?
A No. The prosthetics are incredibly uncomfortable to wear. So when Louisa gets back from work, the first thing that she'll do is take off her prosthesis and then she'll use her wheelchair around the house.
Q Does the fit of the prosthetic ever change?
A The prosthesis change, like, the fit changes every day and can change every day. Things like the amount of water in your body, if you've had too much salt or not enough salt each day can change. And how swollen or not swollen her leg is. Also, things like just natural weight gain or weight loss will change the size and shape of her stumps. Over time, stumps also atrophy. So those that's when muscle is dying. So when that happens, the shape of her stump is also changing which can affect the fit. So every time the fit changes too substantially, she'll have to go back to the doctors to give her a new prescription and then go back to the prosthetic technicians to build a new socket for her leg so that it can fit and start working for her again.
Q Does she wear her prosthetics every day?
A Louisa only wears her prosthetics on days when she's leaving the house. So if she's going to work, which she does three days a week, she will wear it for that period of time. But when she can avoid it, she will.

Q So you're saying she works in the office three days a week?
A That's right.
Q And she works at home?
A For the other two.
Q Okay.
A And often, on the weekend as well, she'll work because she's trying to catch up on the work she hasn't managed to do because she's missed work because of all the appointments she has to attend or because of delays caused by transit. So she's working in the evenings, you know, extra time just to hit the same number of hours which is easy for us.
Q When would Louisa leave the house and bring the wheelchair with her versus when she would leave the house without the wheelchair?
A Louisa would only leave the house without a wheelchair if every aspect of what we're doing has been planned thoroughly. So she knows that she will not need to walk too far. So if we're going out to a specific restaurant that we know then we'll not take a wheelchair. If we're going to a place that we don't know, we'll take a wheelchair. If we're going and meeting up with some friends and, you know, you don't know if you're going to go to just this restaurant and then a bar, or if you're going to go to this restaurant and home. If there's any uncertainty in the plan, then we'll

take the wheelchair so that we can be flexible.
Q Eventually, Louisa graduated from her master's program, correct?
A That's right.
Q And she was able to get a job?
A Yes, she has a job at CCI.
Q Can you tell us about her job?
A Louisa works in accessibility consulting for a company called CCI, who do co-consulting with various different areas. So she works with architecture firms using her architect degree to assess the compliance with state and federal law including the ADA for buildings which are being built for the first time or being renovated.
When she is doing that assessment, she will review code like and architecture drawings for the building to make assessments. And rarely, she will attend in person at sites to take measurements and review what the actual site looks like.
Q And eventually, you got married; right?
A We got married March 2, 2022.
Q And can you tell us about your honeymoon?
A Yeah.
THE COURT: Don't tell us everything about it.
A So we took our honeymoon. We decided to go to an island off of Nicaragua. It's called Calala Island. And to

get to this island it's a bit of a mission.

So, first of all, we have to fly from New York down to Nicaragua. There's no direct flights, so I think you have to fly via Miami. And then from Nicaragua, you have to fly on a small regional plane from there to a place called White Plains. And from White Plains, you can take, you take a boat which sails you out to the actual island that you're on.

There's several challenging moments across this. So, first of all, whenever we travel by via air, it's very challenging because we have to take Louisa's wheelchair with us to the airport. Airports do offer a service where they will push you in a wheelchair through the airport but it's not a particularly nice experience if you do do that because they basically push you to a location which is like a holding area. And then when they decide it's time for you to go to the gate, you will be picked up from there and taken. And you have to have a lot of advocacy for yourself if you do this because the airport staff will often forget about you. People miss flights this way. So we never do that. We will, if we're together, you know, I will push her through the airport.

The first challenge that you have is getting through airport security. So because Louisa has a prosthetic legs and prosthetic arms, the metal detector will always go off

on her. And that means she has to be searched. So when she's searched, it can often take up to half an hour maybe even longer for a female assist to come and do that search. And in that time, we're just waiting, standing around, wondering what's going to happen. So that's happened on that occasion.

Then, when you got onto the plane, you have to gate check the wheelchair. What that means is that you push the chair down to the end of the jet bridge and then someone will -- your wheelchair will be tagged. And then you hope that they remember to put that wheelchair on the plane because sometimes they forget and you arrive at your destination and you look and your wheelchair is nowhere to be found. If that happens, and you are at a, well, if that happens, you're basically out luck.

THE COURT: Has that ever happened?

THE WITNESS: That has happened multiple times to us. Fortunately, only ever happened to us when we're arriving back in New York. But when that happens, we've basically gone home and Louisa has a spare wheelchair at home and then we can use that. But if we are to go on holiday and the wheelchair not arrive, I don't know what we would do. We would probably have to find a place to buy a wheelchair. The wheelchair did make it no Nicaragua, though.

When we got to Nicaragua, we managed to get on to the small plane and everything on there. Constantly, we're watching our wheelchair. Watching everything to make sure it doesn't get lost. You're constantly afraid of this and you're constantly checking on this. I don't think most people ask where their bag is every half an hour when they're traveling but we ask where the wheelchair is.

THE COURT: Couldn't you have gone to Brooklyn for your honeymoon or some place a little closer?

THE WITNESS: We could have but we still like to kind of dream of doing the things we always want to do and this is, you know, an adventure that we wanted.

Then we're moving from the final airport to the boat. And in Nicaragua, the cars are smaller; and so, they didn't have space in the car for her wheelchair. They just threw it on top of the car and it wasn't even strapped down. So we're watching it bouncing around, and unfortunately for us, we were in the car behind. So we're seeing it getting slammed from side to side on top of the car. And, you know, your wheelchair getting lost is one thing, but your wheelchair getting damaged is also a fear. And, in this case, the wheelchair did get damaged. The brake, one of the brakes, got snapped off. So, you know, it's not the worst thing that could happen but it's still very frustrating that you can't use a brake any more on the left side or the right

side of the wheelchair.

So we make it to the honeymoon. We make it to the island after doing the boat trip and everything. And on this island, everything is -- it's a small island. There's only, you know, I think there was like six different cabins on the island and that's all there was.

So you would think that you could walk around the island but everything is sand there and walking on a prosthesis in sand is really difficult. So we had to use the wheelchair there. But actually using a wheelchair on sand is really difficult as well. And so, we tried to kind of like find a place and stay there as much as possible throughout that. And it's really upsetting that even in the times where it's meant to be like the happiest moments of your life, Louisa is still upset. She can't move the way she wants to. She's still dependent on other people and she can't get the most out of it. And she feels guilty because, you know, this is meant to be happiest time and she's feeling sad and she feels guilty about feeling sad at that moment. So during our honeymoon, Louisa cried several times.

After we finished that, on the way back through to Miami, we were at the security in Nicaragua and they forced her to take her leg off to go through the security and they forced her to take the leg off and put the leg through the

x-ray machine. And when you're in a foreign country, you can't really disobey what, you know, security professionals are telling you to do. This has never happened to us in America or anywhere else, but that was extremely traumatic for Louisa basically taking a piece of her body off and then she had to go back into her wheelchair after this putting on her leg takes a long time. So she had to try and get her leg back on. When you're putting a prosthetic leg on, you use a kind of lubricant or alcohol gel to kind of rub the socket and, you know, the socket. And what's going, the line that's on the leg to make it more lubricated going in. She didn't have any of that with her because you can't take liquids through security with you. So now the leg is basically falling off for the remainder of our trip back to New York. She can't walk on it at all without being terrified it's going to fall. So that put a massive downer on the end of the honeymoon as well, that trip back. So yeah. That was the honeymoon.
Q So you still live with Louisa today. Can you just give us a picture of what her daily life is like today?
A So on a day that Louisa is going to work, she'll wake up at about 5:30 a.m. which is normally two hours earlier than I would wake up. She wakes up that early because she has to do a lot of preparation to get ready for the day and because of the Access-A-Ride situation. So she has to leave

early as well to get to work on time. So she'll leave at 6:30 to get to work at 8:30 so she's ready for the start of the day at 8:30. So if you leave at 6:30, it doesn't take two hours to get there but you have to leave that early to be sure that you'll be on time. If Louisa -- her job is really important to her, so she is why she will always make sure she leaves early. She'll start the day by putting on her prosthetic leg and her arm. And putting on the prosthesis can take anywhere between 20 and 45 minutes depending on, you know, how bad the fit is that morning. Sometimes, she'll have to start and kind of try again later to get it going. Sometimes, you know, she will come in like while I'm still asleep and wake me up because she needs assistance on something to do with her prosthesis or maybe something, you know, like to do with getting dressed. So you can't get this button to work or this zipper to work on the back of her dress, for example.

After that, she will go into work, she'll work a full day, and then she'll come back. And when she comes back is unpredictable as well because Access-A-Ride can be half an hour late as well. So I have so much more time than her in a typical day, you know. Her workday basically goes from 6:30 when she leaves the house until 6:30 or 7:30 p.m. when she gets home versus I might have gone to the gym or something already but for, like, she's even halfway home.

So that's frustrating for her as well.

And she's so tired when she gets home from work. The first thing she does is takes off her prosthesis. She has a quick shower because after a day of using her prosthesis, the stumps are sweaty, often have got wounds on them, you know, blisters from friction. And so, she just wants to get clean, get into her pajamas. We eat dinner and she'll start getting ready for the next day. That means putting on, you know, out the clothes that she needs. If she's going to be taking lunch in for the following day, she'll prepare that as well in advance because she just doesn't have time in the morning to do these things.

And then, finally, she'll have another shower before she goes to bed so that she's clean and ready for work the next day. A shower for her will take between, you know, 20 minutes for like a simple shower or 45 minutes to an hour if she's washing her hair because it takes much longer for her to do because of her disability.

Q What do you guys usually do on the weekends?

A Normally, on the weekends, Louisa doesn't really want to do anything because she's so tired from the work that she's done during the week and everything which is, you know, happened during the week. So she wants to relax and do nothing. As I mentioned earlier, sometimes she'll catch up on work or catch up on all of the administrative tasks

that she has to do as well.

One aspect of Access-A-Ride I didn't mention early is that if you take an Access-A-Ride within the borough, you can do it in a kind of like a reimbursement fashion. It gives you more flexibility at the time because you can book an Uber and get reimbursement as long as it's within the borough. But then you have to do all of the reimbursement documentation. So she'll spend an hour or two every weekend working on these administrative tasks.

THE COURT: How much more do you have? Just give an idea. We want to have an opportunity for cross-examination.

MR. SHIELDS: I've got a little more, your Honor.

THE COURT: You want me to keep the jurors till 5:30 or 6:00 today?

MR. SHIELDS: Or we could finish first thing in the morning, your Honor..

THE COURT: Why don't you go for another ten minutes and then we'll have some questions from your adversary if he wants ask any questions. And you can come back maybe again and we'll see how it goes. But I think we want to try to start tomorrow with the plaintiff's testimony, okay?

All right. So go for another ten minutes.

MR. SHIELDS: Okay.

EXAMINATION

BY MR. SHIELDS:

Q Do you ever go out without Louisa when she's too tired?

A Yeah, I'll often go out without Louisa. It's tough on both of us because I know that she wants to be there, she wants to be there as well, but it can just be too difficult for us to go and Louisa doesn't want me to miss out on experiences just because of her because then she'll feel even more guilty.

Q Can you talk about some of the other --

(A brief pause in the proceedings was held.)

Q Can you talk about some of the other difficulties that Louisa faces in her daily life.

A The lack of independence is a big difficulty for Louisa and the lack of ability to do anything unscheduled is a challenge for Louisa. We mentioned going out. If I wanted to go out after work for a drink, I can could that. Louisa can't go out for a drink with her colleagues after work because that's not scheduled into her life.

And another thing I think is when I'm talking about her independence and lack of independence. As an example, when I was traveling, Louisa has very limited food options because she can't cook anything for herself easily and she is basically restricted to microwave meals or meals that

I've prepared in advance for her before traveling.

There's an example of a trip I went on a few months ago, the smoke detector in our house went off. In a previous time, Louisa had tried -- the smoke detector had gone off as well. It's not as though it was a fire, it's when it runs out battery. So Louisa tried to change the battery. When she did that, the smoke detector, because she only has one hand, it fell on her, hit her head, and cut her. So this next time that the smoke detector started going off without a battery, Louisa just left it and kind of put up with this beeping noise for a while until this got too much. And then she went into the breakers in the house and she turned off half of the power to the house just to stop that noise.

So Louisa is so dependent on when there's no one around to help her, she ends up in really vulnerable situations. Half the house was unusable for her for the remainder of that drip.

THE COURT: Mr. Brown, you gave us a pretty complete sense of what life with Louisa is all about. And I have some time constraints I have to be sensitive to. But I want to give you an opportunity maybe you can wrap it up. Is there anything else you want the jurors to hear that you think is important in terms of life with Louisa, I'll give you a few minutes to do that. Then we have the adversaries

here, the defendant can have an opportunity to question you as well.

So why don't see if you can wrap it up.

MR. SHIELDS: Instead of asking more about her current life, can I ask a couple questions and then turn it over.

THE COURT: I'm trying to give him a chance if he wants to say anything else now you can do that. If you don't want him to do that, fine.

MR. SHIELDS: There are a couple of other questions I wanted to ask before we turn it over.

THE COURT: Wrap up what I said. Is there anything else because you've spoken to the lawyers I'm sure, right? You think of any highlights you want the jurors to know about. You've gone a long way, I think they have a pretty good idea of what life was all about. But I want to give you the opportunity if you want to add anything now. And I want to give the defendants the opportunity to question you today, okay?

THE WITNESS: The last thing I would like to highlight is the ambitions that we have for the future and, you know, my fears and ours fears surrounding those. The biggest of which is always dreamed of having children, two to three children. And thinking about how that could possibly work with Louisa is something which is terrifying

for me. Louisa cannot pick up a baby with one hand. So how can she nurse a baby with one hand? How can she change a baby's diapers with one hand? How, if the child is growing up and runs into a dangerous situation, how can Louisa run after that child to stop them and, you know, protect them with one hand and one leg, whereas she can barely run. What is the situation going to look like for us when I have to look after not just the children we have but also Louisa. Like Louisa cannot look after herself completely so I have to look after everyone. So, yeah.

THE COURT: Are you planning to have children?

THE WITNESS: Yes.

THE COURT: All right.

MR. SHIELDS: Just a couple of follow-up questions, your Honor, and then I'll turn it over.

EXAMINATION

BY MR. SHIELDS:

Q Going back to the incident itself, Mr. Brown.

Can you just -- so where was the train when you first saw it when you first looked to your right and saw the train, where was it located?

A It was entering the station.

Q Okay. And what did you do when you saw the train entering the station?

A I started --

THE COURT: He already testified about that. You want him to say it again?

MR. SHIELDS: It's okay. I'll ask a different question, your Honor.

Q How many feet away from Louisa was the train when you heard it start to brake?

A I can't say exactly.

Q Okay. Was it close to her, can you give any kind of estimate?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

You don't think -- you weren't thinking about taking measurements at that time I'm sure.

Anything else?

Let's have cross-examination.

MR. SHIELDS: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Good afternoon, Mr. Brown.

A Good afternoon.

Q Did you review any documents in preparation for your testimony today?

A Yes.

Q What did you review?

A My own deposition.

Q When did you review that?
A I've reviewed it several times leading up to this.
Q When was the last time you reviewed it?
A A week ago.
Q Did you discuss your testimony with Mr. Shields, Mr. Genis or Mr. Roth?
MR. SHIELDS: Objection.
MR. GENIS: Objection.
THE COURT: Sustained. You discussed it with your lawyer?
THE WITNESS: Yes.
THE COURT: Nothing wrong with that.
Q Are they lawyers your lawyers?
A Yes.
Q Do you drive?
A No.
Q Do you have a driver's license?
A I have a UK driver's license.
Q Is there a reason why you haven't got a driver's license in New York?
MR. SHIELDS: Objection.
THE COURT: Sustained.
Q Your current residence: When did you first start living there?
A 2021 maybe, I think.

Q Were you living in that building at the same time?
A Yeah, I was living in that building prior.
Q So you just switched apartments; right?
A Yes.
Q Did you sign a -- when did you start living in that building?
A I think it would be in 2017.
Q And how long was the lease for when you started there in 2017?
A Two-year lease.
Q Did you up your lease again in 2019?
A Yes.
Q How long was that lease for?
A I think it was another two-year renewal.
Q Did you redo your lease in 2021?
A Yes.
THE COURT: Are you leasing? Do you have a lease at the present time that's operative?
THE WITNESS: Sorry.
THE COURT: You have a lease now?
THE WITNESS: Yes.
THE COURT: When does the lease expire.
THE WITNESS: In a year, I think. We're halfway through.

EXAMINATION BY
MR. KEAVENEY:
(Continuing.)
Q You had four opportunities to leave at that building is what I'm getting at and you decided to stay in that building?
MR. SHIELDS: Objection.
THE COURT: Sustained.
It's a nice building, you like to stay there?
MR. KEAVENEY: It needs --
THE COURT: Mr. Brown, listen to me, I'm going to ask you some questions. I'm the judge, okay?
He wants to know you like the building, you're staying there, you're happy there?
THE WITNESS: Yes, it's a nice building.
THE COURT: Next question.
MR. KEAVENEY: Judge, I want to know if it meets his and Louisa's needs.
THE COURT: If -- it what.
MR. KEAVENEY: If it meets his and Ms. Harger's needs that building.
THE COURT: Does it meet your needs? Are you okay there?

THE WITNESS: It meets the needs as best as it can based on our budget.

EXAMINATION BY

MR. KEAVENEY:

(Continuing.)

Q Okay. And you certainly had opportunities to move other places within your budget within the last --

MR. SHIELDS: Objection.

Q -- six years?

THE COURT: Sustained. He wants live in that building.

Next question.

Do you think you have to be forced to move because of your wife's condition? Is that a problem?

THE WITNESS: If I could move to an apartment which would better suit Louisa and match our needs, I would do that.

THE COURT: The question is whether you can afford it and whether or not it's feasible, right?

THE WITNESS: Exactly.

THE COURT: Next question.

Q What's your current title at work?

A I'm a senior director.

Q How long have you held that position?

A I have had that position for a year or two.

Q What type of company is that?
A It's a financial services technology company.
Q And do you make a good salary at that company?
MR. SHIELDS: Objection.
Q How many business trips have you taken since Ms. Harger's accident?
A Louisa's accident was in 2016. I have probably taken 50-plus trips.
THE COURT: Who takes care of her when you're away?
THE WITNESS: Louisa has to cope the best that she can while I'm traveling.
THE COURT: Do you have any help? Anybody there to help her out?
THE WITNESS: No.
Q What are your hours at work when you're working in Manhattan?
A My hours are very variable because of the job I have. I'm working a lot with international clients, so I might be working from, you know, 7:00 a.m. or 6:30 a.m. in the morning, and then I might end my last meeting of the day at 8:30 or 9:00 p.m.?
Q Do you ever meet Ms. Harger at her work to assist her home?
A Yes, sometimes.

Q Sometimes. You do it often or just once in a while?
A Once in a while.
Q Going back to your business trips for a second. Have you ever taken Ms. Harger with you?
A Yes.
Q How many trips have you taken her with you?
A One or two.
Q Where?
A Toronto.
Q Twice?
THE COURT: He said Toronto.
THE WITNESS: Yeah, once or twice. And then Toronto and maybe another trip, I'm not sure.
Q Let's talk about the day of the accident.
When did Ms. Harger arrive in New York prior to the accident?
A In July 2016.
Q What day?
A I don't recall.
Q What day of the week was the accident?
A A Tuesday.
Q So can you tell me the day of the week that she arrived prior to the accident?
A I don't recall.
Q When was the music festival?

A A week before.
Q So the previous Tuesday or Wednesday?
MR. SHIELDS: Objection.
THE COURT: Does it make a difference, really?
MR. KEAVENEY: I want to establish a timeline.
THE COURT: Next question.
Let's be focused on what's relevant.
MR. KEAVENEY: I think it is relevant, your Honor.
THE COURT: Whether it is Tuesday or Wednesday is relevant is what you say? Okay, you say it's relevant. Next question, I'll accept what you say.
Q This was a three-day concert event?
A Yes.
Q And you went there all three days?
A Yes.
Q When did you go to Las Vegas?
A After that.
Q What day of the week?
A I don't recall.
Q How many days did you stay in Las Vegas?
A No more than five days.
Q When did you return to New York?
A On Sunday.
Q What time?
A In the afternoon.

Q Okay. Did you work the next Monday?
A On Monday I worked.
Q And Tuesday was the accident, correct?
A Yes.
Q What did you do that Monday?
A I went to work and I remember in the evening we went out for dinner.
Q What did Ms. Harger do that day, if you know?
A She was just planning what to do for the rest of the time she was in New York.
Q The day of the accident, what time did you get up?
A It was a normal day, so probably 8:00 o'clock.
Q What time did you have to be at work?
A 9:00 o'clock.
Q What time did you leave your house?
A Probably 8:30. I don't know for sure.
Q Did you have anything to eat that morning?
MR. SHIELDS: Objection.
THE COURT: Overruled.
A I might have had a snack. I don't recall.
Q Did Ms. Harger have anything to eat that morning?
A I don't recall.
Q How did you get to downtown?
A To downtown?
Q To your work?

A We took the train from DeKalb.
Q How did you get to DeKalb?
A We walked.
Q Okay. What did you do when --

(Continued on the next page.)

BY MR. KEAVENEY: (Continuing)
Q What did you do when you got to lower Manhattan?
A I went to work.
Q And what did Ms. Harger do?
A She went on the Staten Island Ferry.
Q Did she spend her entire morning there, or did she do something else after that?
MR. SHIELDS: Objection.
Q If you know?
THE COURT: Overruled.
A I don't know what else she did.
Q Did she call you during that time?
A I don't think so.
Q Did you have prearranged plans to meet up for lunch?
A Yes.
Q And did you meet up for lunch?
A Yes.
Q And what time was that?
A Around noon.
Q And how long were you with her for lunch?
A About an hour.
Q And when did you return to work?
A After lunch.
Q And what did Ms. Harger do after lunch, if you know?
A She went shopping.

Q Where did she go shopping?
A I think she went to Victoria's Secret.
Q Where was that?
A I don't know.
Q Did you have plans to meet up again after work?
A Yes.
Q And what time?
A I finished work at 5:00, so about there.
Q And where did you meet? By your work, someplace else?
A By my work.
Q And once you met up, what did you do?
A We walked to the World Trade Center memorial.
Q And how long of a walk was that?
A 20 minutes, 30 minutes.
Q And what did you do when you got there?
A We looked at the memorial, and then we looked at the queue for the museum and saw that it was long.
Q How long were you in that area for?
A I'm not sure.
Q What did you do next?
A Then we went home.
Q How did you get home?
A Took the train.
Q To what station?
A To the DeKalb station.

Q And from the DeKalb station, how did you get to your apartment?
A Walked.
Q How long did that take?
A It's a short walk, five minutes maybe.
Q And once you got back to your apartment, what did you do?
A Might have had a drink of water, and then we dropped my bags, and then went to Atlantic.
Q How long of a walk was that?
A 20 to 30-minute walk.
Q Once you got to Target, how long were you there for?
A I'm not sure exactly.
Q What exactly did you buy?
A Bought some cleaning supplies, some food, and a broom.
Q How many bags did you have?
A About two each.
Q Were you carrying them, or was Ms. Harger carrying them?
A We were both carrying bags.
Q Why did you decide to take the train instead of walk back home?
MR. SHIELDS: Objection.
THE COURT: Overruled.
A Because we didn't want to walk that far with the bags we were carrying.
Q What did you do next instead?

A We went down onto the -- into the subway and took -- or tried the take the Q train.
Q And Mr. Shields outlined where you were standing. Do you recall that?
A Yes.
Q When you got to the platform level, were you standing in that area until the incident occurred?
A Yes.
Q Did you ever move from that area?
A No.
Q How long were you standing there before the incident occurred?
A About five minutes.
Q Were you getting anxious waiting for the train?
A No.
Q Were you tired?
A No.
Q Was Ms. Harger tired?
A No.
Q Where were you standing in relationship to Ms. Harger?
A In front of her.
Q And where was she standing?
A In front of me.
Q So you're facing each other?
A Yes.

Q Are you facing the tracks?
A Yes.
Q Was Ms. Harger's back towards the tracks?
A Yes.
Q And at this moment, how far was Ms. Harger from the tracks?
A At least five feet.
Q And what were you doing during that time you were waiting for the train?
A Just talking.
Q Did there come a time that you hugged each other?
A Yes.
Q So Ms. Harger was pretty close to you?
A Yes.
Q Within reaching distance, correct?
A Yes.
Q Did there come a time when she said she felt faint?
A Yes.
Q Did she say anything else?
A She said I don't feel well, I think I'm going to faint. And then she fainted.
Q Prior to that day, had you ever heard announcements in the subway telling you to stay back from the platform edge?
MR. SHIELDS: Objection.
THE COURT: Overruled.

A I don't recall.
Q Did you give testimony at your deposition indicating that you did recall hearing announcements?
A May I see it?
Q Well, I'm going to read from your deposition transcript at page 51, lines 9 to 24.
Question: What kind of announcements do you hear?
Answer: Delays, transit, police search and check. I'm sure there were others, but that's all I know of at the time.
Question: Train coming in three to five minutes. Have you heard that announcement?
Answer: Rarely.
Question: Stay away from the edge of the platform. Do you hear that announcement?
Answer: I've heard announcements like that.
Does that refresh your recollection as to whether or not you have heard announcements to stay away from the platform edge prior to this event?
A I've heard announcements like that.
Q And were you staying back from the platform edge because of announcements like that?
MR. SHIELDS: Objection.
THE COURT: Overruled.
He's trying to find out exactly where you stood.

Did you hear the announcements at all while you were there one way or the other?

A No, I didn't hear any announcements while we were there.

Q My question was is the reason why you were standing back from the platform edge five feet because you heard announcements like that in the past?

MR. SHIELDS: Objection.

THE COURT: Overruled.

Did you hear any announcements at all while you were in the subway that day?

THE WITNESS: No, I did not.

MR. KEAVENEY: The question is, respectfully, Your Honor, had he heard them in the past, and is that the reason why he was standing five feet --

MR. SHIELDS: Objection.

THE COURT: One at a time. Have you ever heard an announcement like that in the past? Yes or no?

THE WITNESS: I've lived in London, and in London they always say announcements like that.

THE COURT: Have you heard it here in New York?

THE WITNESS: No.

THE COURT: All right. Is there any reason why you were standing where you were on platform? I think that's what he wants to know. I think you said you were five feet away, right?

THE WITNESS: Because trains are dangerous and it makes common sense to stay away from the edge of the platform.

Q When Ms. Harger said she thinks she was going to faint, what happened next?

A She fainted.

Q Did she fall backwards?

A She had took one or two steps back and fell onto the plat -- onto the bed.

Q Did she take one or did she take two steps backwards?

A She took one or two steps.

Q Well, one or two, what is it?

MR. SHIELDS: Objection.

THE COURT: Overruled.

To the best of your recollection, he wants to know exactly what happened. Was she standing facing you, was she facing the tracks? You can explain exactly where she was. Was she fainting while she was walking back, or did she walk at first and then she fainted? We want to give you an opportunity to give a full explanation of what you observed.

THE WITNESS: So while Luisa was facing me, we stopped hugging and then she said, I think I'm going to faint. And then she fainted and she took one or two steps and fell onto the tracks.

THE COURT: So what happened first, was she fainting and then she took the steps, or she took steps and then she

said she doesn't feel well?

THE WITNESS: She was fainting and then she took the steps.

Q Did you testify at deposition that she took one or two steps?

MR. SHIELDS: Objection.

THE COURT: Overruled.

I don't know whether he was ever asked that question. If he was asked -- look, if he was asked the question at the deposition and it was contrary to anything he testified to here today, you can bring that out.

Q I'm going to read from your deposition transcript again.

THE COURT: See whether this is contrary to what he said today.

Q Page 69, starting at line 3.

Question: Describe how she was falling backwards.

Answer: She took one step backwards and fell backwards.

MR. SHIELDS: Objection. That's not --

THE COURT: Just one second. Cool it, if you can. You got to try to stay calm. Okay? Try to curb your enthusiasm.

So it's for the jury to decide whether it was inconsistent with anything he said, and if it was, you can decide how relevant it is. It's all up to you as the fact

finders. You heard his testimony. You heard what he said at the deposition. You decide whether it's anything inconsistent, a matter that's material. It's all for you to consider as the fact finders.

Next question.

Q How did she fall onto the tracks?

MR. SHIELDS: Objection. Asked and answered.

THE COURT: Well, you know, he wants to go through this again. So if you want to explain to the jurors again exactly how it happened, I will let you do that. You want to stand again, you stood again before, you can do that again, if you want.

MR. KEAVENEY: I'll withdraw the question.

THE COURT: All right. You want to change. Go ahead.

Q When she fell backwards, did she ever land or touch the platform as she was falling?

A No.

Q How tall is Ms. Harger?

A I think 5'9.

Q And when she landed on the tracks, what position was her body in?

A Her head was to the north and her feet were to the south, her left arm, her left leg were over the inner rail.

Q So prior to the accident, her back is towards the tracks,

and after the accident or before the train comes in, her body is parallel to the tracks?

A Yes. She was diagonally facing me and she fell backwards onto the tracks.

Q Well, you said that she was right in front of you just earlier. Was she right in front of you or was she something else?

MR. SHIELDS: Objection.

THE COURT: If you can answer. You want to explain it again, if you understand the question, you want to tell the jurors again exactly how it happened, I will let you do it. Go ahead.

A So Luisa was standing on the inside of the column towards the center of the platform, and I was standing in front of her. Her back was facing the tracks, but also, like, north. So she was, like, diagonally facing me, and I was facing straight. So we were both directly in front of each other. And then when she fainted, she fell backwards, straight backwards. But in the context of the train tracks, diagonally onto the tracks. So when she landed, her left arm and her left leg were overlapping the inner rail.

THE COURT: So I guess there's possibly some confusion as to she says I feel like I'm fainting, and then she took two steps back, what did she take two steps back first before she said she was fainting? Or one or two steps,

however you described it.

THE WITNESS: She took -- she said -- you know, we stopped hugging and we were standing in front of each other, and then she said she was feeling faint, and she fainted, and while she was fainting, she took one or two steps and fell onto the tracks.

Q Where was she standing right before that? You said, inside the column? Was that inside the column towards that staircase or towards the track?

A Towards the staircase.

Q How far were you from that staircase?

A I don't recall exactly. Probably six feet.

Q When she was falling, did you try to grab her?

MR. SHIELDS: Objection.

THE COURT: Sustained.

Q Did you try to prevent her from falling?

MR. SHIELDS: Objection.

THE COURT: Did he try what?

MR. SHIELDS: Objection.

MR. KEAVENEY: Did he try to grab her when she started to fall?

THE COURT: So when she was starting to fall, what did you do? Did you try to grab her, did you try to prevent her from falling, did you do anything at all?

THE WITNESS: I was in shock and I didn't move until

she had already fallen. And then I ran to the platform edge and started shouting at her to get up.
Q From where you were standing prior to the accident, could you see the entrance to the subway tunnel where the train was coming from?
A I don't recall.
MR. KEAVENEY: Can we show the witness Exhibit 74?
THE COURTROOM DEPUTY: It's just for the witness.
MR. KEAVENEY: No, it's in evidence.
THE COURT: Is this in evidence?
MR. KEAVENEY: It is in evidence. It's part of 74, I believe.
THE COURT: 74. Okay. Which part of 74 do you want him to see? We have E, F and G so far.
MR. KEAVENEY: I think this is I.
THE COURT: Now we have I. All right. So we have now 74-I that's being shown to the witness and to the jurors.
Go ahead.
(Exhibit published.)
Q Is this the area where you were standing, approximately?
A We were closer to where the people at the back of this photo are. You know, behind them.
Q Could you see the station -- the entrance to the station for the train from your location with the placement of those columns?

MR. SHIELDS: Objection.
THE COURT: Sustained.
Q Were you able to see --
THE COURT: Rephrase the question.
MR. KEAVENEY: Yes.
Q From where you were standing, now looking at this picture, were you able to see the entrance --
MR. SHIELDS: Objection.
Q -- from the tunnel --
THE COURT: Disregard comments. It's inappropriate to interrupt.
All right. You want to phrase your question again?
I think you want to know where he was standing, was he able to see the entrance to the tunnel? Was that your question?
MR. KEAVENEY: Exactly, Your Honor.
THE COURT: Disregard the interruptions by Counsel. He should not have done that.
Do you understand the question?
THE WITNESS: Yes, I understand the question.
THE COURT: You can answer it.
A I don't recall if I could see.
MR. KEAVENEY: Okay. You can take that down.
A I could see the train coming into the station when I was standing by the platform edge, after Luisa fell.

Q After she fell, what, immediately, did you do?
A Immediately, I ran to the platform edge and I started shouting at her to get up and to wake up. I then looked to my right and the train was not in the platform, it was not in the station. I went back to shouting at Luisa to wake up. I looked to the right again, and then the train was coming into the station.
THE COURT: That's exactly what you testified to before.
What other question do you have?
Q When you looked to the right, did you see any lights of the train?
A The first time I looked to the right, I did not see any lights.
Q Did you ever attempt to jump down on the tracks to move Ms. Harger off the tracks?
MR. SHIELDS: Objection.
THE COURT: Overruled.
A I didn't.
Q So after you didn't see the train, you went back and started to shout at Ms. Harger, correct?
A That's correct.
Q And eventually the train came, correct?
THE COURT: Well, we know the train came. That's the one thing we know about this case, is that the train came.

Q How many trains -- what was in front of the train in relationship to where Ms. Harger was when it stopped?
A It was past Luisa.
Q How many cars?
A I don't recall.
Q Did the police come?
A Yes.
Q Did you talk to them?
A Yes.
Q Did you give them a statement? A statement about what happened.
A I talked to them about what happened.
Q What did you tell them happened?
A What I just testified.
Q Well, you testified to a lot.
Did you testify that she fainted?
A Yes.
Q Did you testify that she fell onto the track bed?
A Yes.
Q Not testified. Did you tell them. I'm sorry.
Did you tell them anything else, other than those two issues?
A I don't recall everything I told them.
Q And you were in shock, you said, correct?
A When Luisa fainted? Yes.

Q And after she -- the train came, you were shouting call an ambulance?
A Yes.
Q And did EMS eventually come?
A It was the fire services, but yes.
Q After the accident, other than your honeymoon, have you gone on vacations?
A Yes.
Q How many times have you gone on vacation?
A Probably at least once a year.
Q Where did you go this year?
A I think we went to London this year. Yeah, we went to London and we saw my family.
Q Does Ms. Harger return to Brazil each year?
A Most years.
Q Has she gone this year?
A Yes.
Q Did she go last year?
A Yes, I think so.
Q Have you gone with her?
A About half the time I go with her.
Q Other than your honeymoon, have you gone on to any other beach vacations?
A We went to Hawaii once.
Q When was that?

A 2020, I think. Or 2021.
Q Other than London, Brazil, and Hawaii, have you gone anyplace else with her?
A I think we've been to Florida, to Disney and Universal Studios. Yes.
Q Anyplace else?
A I'm sure there are other trips we've been on. I don't recall all of them.
Q Is Ms. Harger on any medication currently, other than birth control, which was previously mentioned?
A No.
Q Early in the trial we saw a day-in-the-life video, at least that's how it was termed. Did you take that video?
A Sorry, which video is this?
Q There was a day-in-the-life video showing Ms. Harger doing things around the house, around the apartment. Did you take that?
MR. SHIELDS: Objection. He hasn't seen the video.
THE COURT: Any of these videos that were shown here today, did you take them or were they taken by other people?
MR. SHIELDS: Objection.
THE COURT: If you know.
MR. SHIELDS: He hasn't seen the videos, Your Honor.
MR. KEAVENEY: Okay. I'll rephrase, Your Honor.
Q Did you take a video of Ms. Harger doing activities

around the apartment?
A Yes.
Q And when did you take that video?
A I don't recall exactly.
Q Was it within the past two years, past year? When was that?
A Maybe in the past two years.
Q And what was the purpose of taking that video?
A To demonstrate what a day in her life might look like.
Q Were you instructed by anyone to take that video?
MR. SHIELDS: Objection.
THE COURT: You can answer that question.
You took the video. You knew this was going to happen. I guess you were preparing for this possibility. And did somebody suggest that you take the video, it would be good to show how she was doing?
THE WITNESS: Yeah.
THE COURT: Okay.
Q And who was that, that suggested you take that video?
THE COURT: Sustained. You know he took the video. Okay.
And you knew, when you took that video, it was possible it could be shown to a jury at some time if the case was going to a trial or whoever else might be relevant, I assume, right?

THE WITNESS: Yes.
Q Currently, do you go to the movies with Ms. Harger?
A Yes.
Q Do you go to the theater with her?
A Yes.
Q And you still go to restaurants with her?
A Yes.
Q And you still go to concerts with her?
A Yes. And these all have challenges associated with them.
Q I understand that. I understand that it's challenging.
THE COURT: Look, look, you're taking her out and she's able to do things and you're able to live a life as a husband and wife and do the best you can, I assume, right?
THE WITNESS: Yes.
Q And those are the same things that you were able to do prior to the accident with each other?
MR. SHIELDS: Objection.
THE COURT: Can you answer that question?
A We did those activities before.
Q Okay. And I understand that those activities are more challenging now, but you still do them before the accident and currently, correct?
A To a lesser degree, yes.
Q You talked a lot about Access-A-Ride.
How much does Access-A-Ride cost?

A I think now it's 2.90 or $3. The same as the metro.
Q It's the same as the subway system, correct?
A Yeah.

THE COURT: Can you give me some idea, Mr. Keaveney?

Because I have to be sensitive to the jury here as well. It's five after 5:00. I would like to be able to complete his testimony today. I can keep the jurors here a little bit late. But, you know, I have to really, you know, sort of manage this thing.

MR. KEAVENEY: Your Honor, I'm done.

THE COURT: Okay. Mr. Shields, you don't have too many questions, but you may have one or two and then we can send the jurors home.

So I told you there may be some times I might keep you after 5:00. This one of those times. This makes up for the times I let you go home early.

MR. SHIELDS: Your Honor, I just want to put up 74-G and ask some followup questions.

THE COURT: One second.

I have 74-E. And G is already in evidence.

MR. SHIELDS: Yes, Your Honor.

THE COURT: You want to show it to the witness again.

(Exhibit published.)

(Continued on the next page.)

REDIRECT EXAMINATION
BY MR. SHIELDS:
Q When Luisa fell, as you indicated on this picture, you guys were standing at an angle and she was facing you first, right?
A Yes.
Q When she fell backwards, did her body make contact with the column?
A No.
Q When she fell backwards, did her body fall close to the column?
A Yes.
Q And Mr. Brown, do you regularly take the subway in New York City?
A Yes.
Q And have you seen fixed rail barriers that have been installed in the subway system?
MR. KEAVENEY: Objection. Now?
THE COURT: I think you're going beyond, you know, your direct here now.
MR. SHIELDS: Your Honor, I just want to show him what we have in evidence as two pictures from Plaintiff's 79.
THE COURT: From 79?
MR. SHIELDS: Yes, Your Honor.
THE COURT: 79 is not in evidence.

MR. SHIELDS: Okay.
THE COURT: And I don't think we need it. Okay.
Q Is there anything that could have prevented Luisa from falling on the tracks after she fainted and fell backwards?
MR. KEAVENEY: Objection. Calls for --
THE COURT: Was there anything there at all, I mean, that was between you, Luisa, and the railroad tracks?
THE WITNESS: On that day, there was nothing blocking Luisa from falling onto the tracks.
Q If there had been a barrier, like fixed rails, would that have prevented --
A Yes.
THE COURT: You don't have to go there. He's just testifying to what he observed at that particular time.
All right. There was nothing there at that time, correct?
THE WITNESS: That's right.
MR. SHIELDS: Nothing further, Your Honor.
THE COURT: Mr. Keaveney, have we completed his testimony?
MR. KEAVENEY: Yes, Your Honor.
THE COURT: All right. It's been a long day, Mr. Brown. Thank you very much.
THE WITNESS: Thank you.
THE COURT: You can step down now.

(Witness steps down.)

THE COURT: I think that's all we need the jurors for today.

Tomorrow, 10:00.

And I think that we're going to hear from the Plaintiff tomorrow. I'm pretty sure that's what is on tap. All right?

So, get a good night's sleep. See you tomorrow at 10:00. Don't talk about the case.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right. So there's nothing I have to talk to you folks about. I'm just working on trying to get a proposed charge to you, which I'll get to you tomorrow sometime.

In the meantime, anybody want to put anything on the record? Any objections, any exceptions, any motions for mistrials? Anything at all?

Mr. Shields?

No.

Mr. Keaveney?

You don't have to say yes. I am just giving you the opportunity.

MS. WINTERS: Is there anything? I don't think so,

right?

MR. SHIELDS: Nothing for now, Your Honor. Thank you.

THE COURT: See you tomorrow morning, 10:00.

(Matter adjourned to Thursday, November 13, 2025 at 10:00.)

# I N D E X


| WITNESS | PAGE |
|---|---|
| **CHRISTOPHER KORT** | |
| DIRECT EXAMINATION BY MR. ROTH | 1097 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 1134 |
| REDIRECT EXAMINATION BY MR. ROTH | 1156 |
| RECROSS-EXAMINATION BY MR. KEAVENEY | 1165 |
| **KEVIN MORIN** | |
| DIRECT EXAMINATION BY MR. ROTH | 1171 |
| CROSS-EXAMINATION BY MS. WINTERS | 1186 |
| REDIRECT EXAMINATION BY MR. ROTH | 1195 |
| RECROSS-EXAMINATION BY MS. WINTERS | 1198 |
| **MARLIZE JANSSEN HARGER DA SILVA** | |
| DIRECT EXAMINATION BY MR. SHIELDS | 1206 |
| CROSS-EXAMINATION BY MS. WINTERS | 1221 |
| REDIRECT EXAMINATION BY MR. SHIELDS | 1226 |
| **GEORGE WILLIAM NICHOLAS BROWN** | |
| DIRECT EXAMINATION BY MR. SHIELDS | 1228 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 1284 |
| REDIRECT EXAMINATION BY MR. SHIELDS | 1315 |

**E X H I B I T S**


| | |
|---|---|
| Plaintiff's Exhibit 97-G | 1115 |
| Plaintiff's Exhibit 97-L | 1117 |
| Plaintiff's Exhibit 95 | 1165 |
| Plaintiff's Exhibit 104 | 1185 |
| Plaintiff's Exhibit 97-T | 1254 |
| Plaintiff's Exhibit 97-U | 1260 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

United States Courthouse
Brooklyn, New York

- against - :

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, :

November 13, 2025
10:00 a.m.

Defendants. :

- - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:

SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants:

LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, new York 10271
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

Court Reporter:

Andronikh M. Barna
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2178

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(In open court; parties present.)

THE COURTROOM DEPUTY: Civil cause on trial, Harger Da Silva versus New York City Transit Authority. All counsel are present.

THE COURT: So the jurors are here. They are terrific. They've always been on time.

Let me say a few things -- the jury is not here now -- to give you a little bit of a heads up of what I would like to do today.

I am going to give you, I think, a proposed jury charge sometimes during the day, and then a proposed verdict sheet, and you'll have turns to yell at the Judge and to do whatever you want to do to protect your clients and whatever.

But you know, I'm always open to suggestions, right? And what my practice is is to try to keep it as simple as possible for the jurors. Okay? So you'll understand when you see this, this is really what I try to do. But if there is anything in here that is wrong, I just really would appreciate if you would let me know, so we don't have to go to the Circuit Court and have to try the case again. Okay?

The other thing is that Mr. Roth or Mr., I don't know, Mr. Shields, I forget which one, I really hate to have to admonish a lawyer in front of the jury. I think it was Mr. Roth, you have a propensity to do a lot of objections. Nothing wrong with that, but if you start doing it to a fault,

then sometimes I have to admonish you in front of the jury. You have a unique personality, which I respect, but you got to sometimes cool it. All right? Because I don't want to keep admonishing you in front of the jury. God gave you a certain personality, God bless. Okay? But unfortunately, I have to manage the trial. When I have lawyers talking to each other, I have to stop the action because we can't do that. You know that. Sometimes, you know, we know what we're supposed to do, but we can't help it emotionally. I know I should not be yelling at judges, but some -- lawyers. Judges, I yell at. But sometimes I do it because we're all human. I don't want to have to do that again. Okay? So you understand that. All right? So try to get a sense of your unique personality and try to get control over so I do not have to do that again. Okay?

MR. ROTH: I think that's fair, Your Honor.

THE COURT: All right. Let's bring the jurors in.

THE COURTROOM DEPUTY: Yes.

(Pause in proceedings.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Members of the jury, yes, I did confirm that Friday you will not be sitting. My preference would be to have you sit on Friday, but we're going to respect the fact

that we have some government shutdown issues still, and we're going to be closing the courtroom on Friday.

You will be coming back on Monday, Tuesday, and next week you can anticipate that you're going to be deliberating on this case. And I'm going to try to work it out so that you have ample opportunity to really deliberate as long as you think it's necessary, but you can pretty much count on the fact that next week will be the final week of this trial. Okay? So you have a sense of things.

Don't make any plans for next week because we're going to try to get the case to you by Wednesday. I don't want you to be under any pressure. I want you to take as much time as you think will be necessary to answer all the questions I'm going to be asking you on the verdict sheet. You've been a terrific jury. And let's keep up the good work.

And at this time, I think maybe you have the last witness for the Plaintiff.

MR. ROTH: Yes, Your Honor.

THE COURT: Who is that person going to be?

MR. ROTH: That's the Plaintiff, Luisa.

THE COURT: The Plaintiff.

MR. ROTH: We can bring her in now?

THE COURT: I take it this is Ms. Da Silva, and she's going to come right up here now.

THE COURTROOM DEPUTY: Good morning.

(Witness takes the stand.)

THE COURT: Just take your time to make yourself comfortable. I just want you to keep your voice up. The microphone is working. I want to make sure that we all can hear you clearly.

THE WITNESS: Okay.

THE COURT: Take your time.

And if you need to take a break, just let me know. I tell that to everybody.

THE COURTROOM DEPUTY: Just remain standing and raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Thank you. Please have a seat.

Just state your name.

THE WITNESS: Luisa Janssen Harger Brown.

THE COURTROOM DEPUTY: Thank you.

THE COURT: Your witness, Mr. Roth. And once again, if you want to take a break at any time, just let me know.

Go ahead.

**LUISA JANSSEN HARGER BROWN,** having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Good morning.

Okay, Luisa. You ready? How are you feeling? How are you feeling about testifying today?
A I'm feeling a bit overwhelmed. I carry a lot of pain every day, but every day I have to push that down just to keep me going because it's the only option I have. My arm and my leg are not going to grow back. So it's hard for me to talk about my pain. But it also feels like a relief to be here because I waited nine years to have this chance to share and to fight and ask for help.
So yes, it's just a lot of feelings. And I'm thankful that everyone is here working on this.
Q So why don't you tell the jurors a little bit about yourself.
A Okay. So my name is Luisa. I am 31 years old. I'm originally from Brazil.
THE COURT: I'm going to sometimes interrupt.
THE WITNESS: Yes.
THE COURT: So don't be surprised if that happens. And if I do that, it's just to get clarity out, or maybe if I hear you talking on and on, which I can understand, I may cut you short a little bit. So just understand that the Judge may also be involved in this questioning process. All right?
THE WITNESS: Okay.
THE COURT: So when he asked you to tell me something about yourself, I don't want to listen for the next

three days. You could probably talk about yourself for days, so try to keep your responses, you know, reasonably, you know, responsive to the questions that are being asked. Okay?

THE WITNESS: Okay.

A So originally from Brazil. I've been living in New York for the past seven years. I live here in Brooklyn with my husband, George.

I have lived with my family in Brazil, with my parents, Marlize, Claudio, my brothers, Ricardo, Augusto.

And I lived abroad in London for a year.

So let me take a step back. I have a bachelor's degree in architecture and urban planning from Brazil.

During my bachelor's, I had a scholarship to spend a year studying in London, so that was in 2014, '15.

I have a master's in architecture from City College of New York, CUNY.

And I work as an accessibility consultant, so that means I work with architecture projects making sure they are ADA compliant, building code compliant. I work in code committees where we write the future laws for accessibility. So I think that's it.

Q Okay. Thank you.

So why don't you tell us a little bit about when you were back in Brazil. Not all growing up, but just in high school, what kind of activities were you doing, what kind of

things were you involved in?

A Yeah. I was a very active person, regular person. I used to participate in all sorts of school activities. We had sports. We had, like, sports competition every year. I personally was very into dance. Like, I've done dance classes all my life, like all the way when I was little. And then in high school, I was doing ballroom dancing, belly dancing. All sorts of things I could try out.

Other activities, like, hobbies, I used to go for walks, go for runs, go ride a bike. Like, anything really.

Q And so where would you -- you said you would go for runs and ride bikes?

A Right.

Q What were you doing?

A In my hometown, there's a very nice avenue by the ocean, so I used to go there during the week, like, in the evenings, to, like -- or on the weekends to run. I would rent a bike there with my friends. That was just more of, like, hobby. I would also exercise by going to the gym. I did Zumba classes.

Q How frequently would you be exercising in high school and leading up into college, and how important was that to you?

A Every day I would do something because I would -- so my past semesters before I lost my arm and my leg, I was going to university in the mornings, I was doing my internship in the afternoon, I would stop at this, like, sports club near my

house on my way home, and I would either do Zumba or I would do the gym or, I don't know, just be there. And then I would go home. Yeah, so almost every day. It was just part of my routine.

Q So why don't you tell us a little bit about what your interests were in high school, and what you were doing academically in high school?

A Yes. So I had a traditional high school. In Brazil, it's not, like, targeted on any specific matter. But then the third year of school, you study very hard because each university has an exam. So I studied a lot for the university exam.

Q And did you make it?

A Yes.

Q Where did you go?

A So my top priority was the Federal University of Santa Catarina. That's in my hometown. It's a federal university, like, the federal ones are, like, the most competitive to get into, so that was always my dream. And I studied, that was my goal.

I -- okay. Getting approved in university was, like, a big joy in my life. They print your name on, like, the walls of a gymnasium, so my entire family went there and saw my name. In Brazil, they throw eggs, and flour, and paint on you so they can see that you passed university. It was,

like, the biggest achievement that I got in. And I got one of the top classifications to get in.

Q And then you got a scholarship, you said?

A Yes. So for the year abroad in London, I applied for a scholarship, the Brazilian Government had this program where they would pay for you to study a full year abroad. So I remember I researched the universities, I researched with my mom. She was, like, you know, if you're going to go abroad, you're going to go to the top university. So we worked hard on the application and I got in. Yeah.

Q So before we go on to that, just let's talk about a little bit some of your other activities that you would do in Brazil. Tell us about the stuff that you did at the beach and the dunes, and the body boarding and the other stuff that you did. Tell the jurors about that.

A Yes, of course.

So Florianopolis, my hometown is part island, part mainland. We would also spend the summers and the weekends in another town that had a beach. And being by the water, being on the sand, like, that's just -- it's a part of my personality. Like, I grew up going to the beach every weekend, playing with my brothers that are a bit younger than me. We used to body board, like, we would take our -- each of us had a board, me, my brothers, my cousins would just each take our boards to the beach and spend the entire day at the

beach. We would have lunch at the beach. I used to love walking, running at the beach. Swimming. It's just something I love, like, being with nature, specifically the ocean.

Q And so then you went to -- you studied abroad in London. And why don't you tell us a little bit about that before you met George?

A Okay.

Q Just tell us about the trip to London. And what year was that?

A Yes, so I got to London September 2014. So I studied at the University of Westminster. The campus where I studied was in Central London, and I lived in a different campus. Still part of the university, but a bit further out. I lived with other students from the same year -- from the same scholarship program. So they were from all over Brazil, but they were there too.

I had the time of my life in London. I had my independence. I could -- I had the chance to, like, experience, like, studying. Like, I loved the challenge of studying abroad and, like, learning. You know, it was a big challenge for me because, like, you learn technical terms in English and all of that, and I met people from different cultures. And I loved it. And at some point not too long after I arrived, I met George.

Q And tell the jury about some of the spontaneous things

that you --

A Yes.

THE COURT: Mr. Roth, use the microphone, if you can.

MR. ROTH: Oh, it's not working.

THE COURT: I don't think it's working. Just one second.

A So I have --

MR. ROTH: Wait.

THE COURT: One second. We just want to technically get this working.

THE COURTROOM DEPUTY: I don't know. I have them all open.

MR. ROTH: I'll just talk loud, Judge.

THE COURTROOM DEPUTY: Let's see.

There you go.

MR. ROTH: Hello.

THE COURT: That's better.

Go ahead.

THE WITNESS: Okay.

Q I think I asked you what spontaneous things that you would do on the fly that you could do when you were studying abroad?

A Yes. I loved exploring London. I loved taking a bus, taking a train to, like, you know, one neighborhood at a time,

and I would walk around, like, see the street markets, go to different shops, grab a coffee here and there. And I always told people how much I loved London. Now when I go back to London, I see it with different eyes. So I don't know if we can talk about that now.

Q We'll talk about that in a little bit.

Would you do this by yourself or with other people?

A Yes, 100 percent. Like, I loved just taking those, like, red London buses, like, they're very cool and nice. You just sit there, and you go anywhere, and you get off at different stop. Yeah, I loved the freedom. The ability to come and go. It sounds simple, but looking back, it means a lot. It means a lot.

Q Okay. And when you went to London in your internship, were you with other architectural students? Did you do stuff abroad, like, with other people?

A Yes, so, like, there were a lot of, like, locals or other exchange students. We had all sorts of course works. We had a hands-on construction experience.

Q Let's talk about that. That's a good spot.

MR. ROTH: Can we put up Exhibit 97-V, as in Victor. Not yet in evidence.

THE COURT: All right. I think that's the first time we're mentioning that part of 97. So V now is in evidence.

(Plaintiff's Exhibit 97-V received in evidence.)

(Exhibit published.)

Q So you said you did some construction thing. Why don't you tell us about the circumstances around that, what you were doing there?

A So this was a very cool experience as part of my university. Like, they had a partnership with this construction site where you could go hands on, build something. So I spent about seven days, like, living at the quarters of this construction site, and we literally built a miniature oil rig. So I worked on the team that would, like -- I was on the rebar team, so I would carry the rebar around. We calculated before how much rebar we needed, and then we, like, put it together, we twisted, like, the tweezers, like, we put it together, and then we poured concrete on it. So in this photo, I'm just very dirty because I was helping with the concrete pouring.

Q And then did you also go on other trips, like other adventures to Greece and other places?

A Yes.

MR. ROTH: Why don't we put up Exhibit 97-W.

Q You can keep talking.

A Yes. As part of the year abroad, the university setup a field trip to Athens. So I went to Athens with my architecture, like, make a classmates, and we went to all the

historical sites. We did a lot of hiking on the rocks, and we studied, like, we took measurements of the site because we went back to London and we designed a building for that site.

Q Okay. So looking on the screen to Exhibit 97-W, okay, that's the next exhibit --

THE COURT: W.

MR. ROTH: Yes.

(Exhibit published.)

Q Could you identify yourself for everybody in that photo? I think it's obvious, but can you do that?

A I'm the one making a silly face while my friend is taking a picture, yes.

Q Where was that actually?

A This is on the top of a hill in Athens. Yes.

THE COURT: Where was that, in Athens?

THE WITNESS: Athens, Greece. Yes.

Q And what kind of time were you having there?

A A great time. Like, we had the ability to, like, explore and just go anywhere. And for example, right now, going to Greece sounds terrifying because it's not the most accessible place.

Q And with the grounds you stand in, you had to hike there, there's a mountain or something?

A Yes, like, we were walking up the rocks to go take pictures and go see, like, the -- there's lots of ruins that

you can look at and you can explore.

Q And you made some friends in London also?

A Yes. These are my Brazilian friends from the year abroad, so we did lots of trips together.

MR. ROTH: I would like to introduce the video, Exhibit 97-X.

THE COURT: X.

MR. ROTH: I think it's about -- it's very short. If we could just play that, and then you can tell us what's going on there, if that would be okay.

(Exhibit published.)

MR. ROTH: You could play sound, yeah.

(Video played; video stopped.)

THE COURT: So you obviously -- have you finished?

MR. ROTH: Yes.

THE COURT: Obviously that was taken some time ago.

Years ago?

THE WITNESS: This was 2014, 2015.

THE COURT: And how did that happen? Somebody took that picture?

THE WITNESS: Yes. This was at the kitchen of the halls in university where I lived with my friends. So I guess one of my friends was taking it. And my friend, Dani, who is in this video with me --

THE COURT: Was this taken back ten years or so ago?

THE WITNESS: Yes.

THE COURT: Okay. Go ahead. Next question.

THE WITNESS: Mm-hm.

Q And did you also visit France?

A Yes, I did. Like, a trip with my friends.

MR. ROTH: And could we put in 97-Y?

You could put it up. I'll put it over here also.

That's 97-Y.

(Exhibit published.)

A Yes.

Q So why don't you tell us about what happened, what the circumstances about this photo, and tell us a little bit about this, what this means to you?

A To me, this picture represents my best self. Like, this was when I was having my year abroad and I had the -- like, I was living in London, so I had the ability to take a bus, take a train, travel anywhere. I had so many, like, long weekend trips where I visited so many European countries. And it was so fun. It was so spontaneous. I could just go. I could just go back -- I traveled so much by myself. I loved that. I loved the independence of just doing it. And I had this, like, large backpack. I was, you know, trying to be cheap, so I would carry my stuff around and stay at hostels. I slept at, like, the airport. I slept at the train station. Like, all those, you know, things you're trying to do when you're

trying to travel as much as you can and enjoy life and take as many towns and cities and countries as you can.

Q And how does it make you feel now looking at that picture?

A It's hurtful because I still travel, but travel is a struggle. I need assistance. I don't have the spontaneous aspect to it that I had before. And I had lots of friends living abroad at that time, so I went to see them, I went to visit them by myself. I would sleep at their dorm room floor. And right now I still have friends all over the world, but I cannot go see them. Like, I cannot -- you know, it needs to be a whole setup. I need to have assistance to get there, to help me while I'm there. Because I don't want to visit my friends and tell them, well, you need this, you need that, you need to assist me. So it's just not part of my reality anymore.

Q All right. So then after that, why don't we talk about, you met George?

A Yes.

Q And tell us a little bit about that, and take us back to when you met George, and then when you went back to university in Brazil. Okay?

A Yes. So I met George early on in my year abroad. Like, he worked near my university. And I mean, we're still together 11 years later. We're now married for about three

years. And meeting George was awesome. Right? Like, he's a lovely person. I love him so much. But also, like, the things we did together were so cool. Like, I met his family. I went to his sister's wedding. Like, later on, he met my family. And, like, we would go on trips together as well. So I had the trips with my friends, by myself, and then with George. So and it allowed me to experience England on, like, a very, like, you know, real-life approach. I got to go to his parents' house, and his house, and meet his friends. And his friends would feel awkward when I hugged them because I'm Brazilian, I hug everyone. So it was just so cool to live that, and right now we're a couple with, like, two different cultures and we learn from each other. It's just awesome.

Q And then you went to university back home; is that correct?

A Yes. My university was in my hometown, Florianopolis.

Q And then did you go -- leading up to the week of this incident, did you come back the week before on a vacation with George?

A Yes. So in 2016, I had completed my first semester at university in Brazil. We do two semesters, like, March to July. Then August, September to December. So I had completed the first one, and I was on break between semesters when I came to visit George.

Because before then, I had completed my year in

London. I went back to London, spent the holidays with George and his family. Then he came to Brazil. And then a couple of months later, I came to visit him.

Q And when you were traveling, were you doing this by yourself, with other people, or explain the traveling. You were traveling all over by plane; is that correct?

A Yes, I was traveling all by myself.

One thing that's funny, I remember I had no problem with connections, right? I remember I tried to get a cheap flight, so when I got to the United States, they told me, like, why on your way back you have, like, four stops? I'm, like, well, because it's cheaper. He was, like, okay, got it. So I never got to use those flights back to Brazil. But it's just part of who I was. I was saving up to see George as much as I can. And I had this freedom. I could just -- it was not a big deal for me to get on a plane and go somewhere.

Q And then you went on vacation with George to Vegas; is that right?

A Yes. So we spent some days in New York. We spent some days in Vegas. And then some more days in New York before I suffered my accident.

MR. ROTH: So why don't we put up Exhibit 97-R.

(Exhibit published.)

MR. ROTH: That one. Can you zoom in a little bit?

Q Who is that?

A This is us in Vegas.
Q That's you?
A Yes, that's me.
Q What's going on there?
A This was a night that we did some sort of, like, party crawl thing, like, where they take you, like, on multiple venues. It was a karaoke night, I remember that because then I would go karaoke in every single place. I think this was towards the end of the night. We went to Buffalo Wild Wings, which we discovered is, like, our favorite restaurant. So yeah, it was a great time in Vegas.
Q And then did you also lay by the pool?
A Yes.
MR. ROTH: Can you put up 97-S, which has already been entered in evidence, I believe.
(Exhibit published.)
Q Whose feet are those?
A They're my feet.
Q And where is that?
A This is by the pool at the hotel we were staying in Vegas.
Q And what do you see there?
A I mean, it's just how my body was. Right? It's no longer -- like, I don't have that left leg anymore.
Q And then did you also go on a helicopter ride?

A Yes.

MR. ROTH: Let's pop that up, Logan. 97-AA. It's a new exhibit. AA.

THE COURT: This is part of what?

MR. ROTH: 97-AA.

THE COURT: Okay.

(Plaintiff's Exhibit 97-AA received in evidence.)

(Exhibit published.)

Q So what's going on there?

A George wanted us to have a helicopter tour of the Grand Canyon. So I was very happy, very excited. Like, I always wanted to see the Grand Canyon. Never dreamed I would be on a helicopter. It was the coolest thing ever.

Q What's the peace sign in Brazil, what does that mean?

A Peace and love. But to me, it's just a joyful thing. It just tries to bring that joy.

Q And then I want to -- and then you came back to New York; is that right?

A Yes.

Q And we heard all about how, you know, you went to New York and you did a couple of other things there.

MR. ROTH: I would like to show Exhibit 97-BB.

THE COURT: That's in evidence now.

(Plaintiff's Exhibit 97-BB received in evidence.)

(Exhibit published.)

MR. ROTH: 97-BB.

Q When was that photo taken?

A This photo was taken in the morning of August 2, 2016.

MR. ROTH: Could you zoom in on that a little bit, please?

And can you move that up at all or no, is it not possible?

Yes, okay.

Q So how were you feeling that day?

A I was feeling great. It was another day of my vacation in New York visiting George, going anywhere I wanted, explore the city.

Q So before this incident happened, just tell us a little bit about you were -- that's located where? What spot?

A This picture was taken on the Staten Island Ferry.

Q And who took it?

A Oh. A person who worked at the ferry. I asked him to -- I think they kind of volunteered because I was trying to take a selfie with the Statute of Liberty, and the view, and all of those things.

Q I don't think they got the Statute of Liberty.

A No, not in this one. I think this was, like, at the part. But people took pictures for me because I was clearly there, like, as a tourist just trying to get some free views of Manhattan, and the Statute, and all of that.

Q And all of these pre-incident photos, how does it make you feel when you see them?
A It makes me feel very sad because the -- that Luisa had, like, no idea what was coming. And this photo, I didn't have the chance to post on Facebook, but every year my Facebook says those, like, memories, like, oh, look what you were doing. Those pictures before I lost my arm and my leg, they're the most hurtful to see because Facebook reminds me, like, oh, look, you posted this picture on Times Square, and I can see, I said, oh, Times Square can shine as bright as you. Like, I was so -- you know, a song I like. I was -- I had no big worry in my life. Like, I was having a great life. You know, my biggest worry was, oh, which university I'm going to do my master's, and will I get approved, and will I pass my calculus course, right? And I did pass it. Like, all of those little things that looking back they were so small. And it's just painful. Because I -- you know, and my photos on my phone, they go from being in a helicopter and sightseeing in New York to a bunch of hospital photos, so, like, it's not -- it's just -- like, what happened to me shows me, like, how life is so unpredictable. Like, I'm way more scared about life now, and I fear for other people because I -- you know, when you hear about something bad and you just think, like, oh, I'm sorry to hear, but you move on? Like, I haven't moved on. And I have that feeling of this could happen to me again,

this could happen to someone else I love. You know, not just about trains, but about any sort of accident. It just makes me very, I guess, traumatized is a good word.

Q Okay. All right.

So why don't we talk about the day of the incident or before the incident. Can you just generally tell us -- you don't have to go in any great detail, we know that everybody knows, everybody here has heard the testimony before. Why don't you take us, you know, kind of what you did that day until you got to the subway platform?

A Yes. It was a lovely day. George worked and still works near Battery Park. So we went to Manhattan together. He went to work. I waited around. I took the ferry. I remember it was kind of, like, after rush hour, late morning. Loved doing the ferry. I just came -- you know, just took the ferry, came back on it and come back to Manhattan. I did a lot of waiting around Battery Park, like, just hanging out under a tree waiting for George. We had lunch at that park. So I remember, like, a picnic vibes kind of lunch.

And he went back to work, and I went to lots of stores. I remember going in and out of department stores. I remember I bought something in Victoria's Secret, like, some perfumes. It was a regular day, like, I was just enjoying New York. And then I went back to Battery Park to wait for George to come out of work.

Q And then after George came out of work, what did you guys do?
A So we wanted to go to the 9/11 Museum. We heard that Tuesdays they had free tickets, so we went all the way there to the memorials, but they didn't have the tickets anymore, so we decided to go home.
Q And then how did you do that?
A So we took a train towards Brooklyn, but we decided we want to shop at Target first. So we went all the way to Atlantic Terminal. There is a Target there. So we bought some stuff at Target, and then we were planning to go home.
Q Where were you -- what train station were you going to take to go home?
A So we were at the Atlantic Terminal station.
Q Okay. And how did it feel down there at that time?
A I was still feeling okay, normal.
Q How did you feel? What was the temperature in the station at that time?
A It was a warm summer day, right, it was, like, New York summer, it was August. The subway was the traditional hot, like, boiling hot summer kind of subway station, that kind of oven kind of feeling. But I think that that's how it is. And -- but other than that, I was feeling good.
Q And you got water back at George's apartment?
A Oh, I had water all day. Like, I carried a bottle of

water with me, like, no big deal. I had water just before as well.

Q And now you took a deposition in this case, and you marked a photograph; is that correct?

A Yes.

Q All right. So I'm going to show you what's been already marked --

MR. ROTH: Exhibit FF is what?

MR. MORALES: 74-E.

Q 74-E I'm showing you.

(Exhibit published.)

MR. ROTH: I think everybody's already seen that photo before.

Q You see that photo? Is that where you marked the photo where you were standing?

A Yes. I marked with an X, like, the approximate location of where I was standing.

Q Right.

A While I was waiting for the train.

Q When you were over there, was anybody else -- was it an empty station, was there other people in the station, or something else?

A It was a medium level of business. I only remember a woman who was kind of behind me on the opposite side of the column. She was -- I remember her because she was performing.

Like, she was singing and, like, waiting, getting money for her performance. So I just gave her some space.
Q And what happened after you were standing there for some period of time? What happened?
A So I remember we got to the platform, we put our bags down, and we were just having conversation while we waited for the train.
Q And just again, you were, you know, in relationship to the yellow strip along the edge, where -- you weren't standing over there? Were you standing -- excuse me. Let me rephrase the question.
Just to refresh your recollection, so where the X is is a couple of tiles away from the yellow strip; is that correct?
A Yes, I was not on the yellow line. I was nowhere near.
Q And when you were talking for a while, what happened?
A So we were just talking and I felt faint. Like, I felt -- and I kind of mumbled I think I'm going to faint. And as I'm mumbling that, I fainted. Like, I just felt my body collapsing.
Q Okay. And just take us through what you remember from that point in time for the next minute or two, couple minutes?
A Okay. So after I fainted, the next time I opened my eyes, I'm already on the tracks and I'm injured. I was kind of going in and out of conscious. I remember being afraid of

dying. I remember telling myself that I don't want to die. I remember feeling like it was not fair, like I -- I thought a lot of things that moment. Like, I thought of my family. I thought they were, like, so far away and they had no idea that I was there lying on the tracks. I thought about my career, like, how, oh, my God, I haven't achieved anything yet, I don't want to die now.

But I remember that feeling, like, I'm going to die, and I was, like, no, I'm not going to let that happen. So I started shouting as loud as I could so desperate for help. I --

Q What did you see next to you?

A So first, I was confused. Like, I could not really tell, like, have I been struck yet? Like, I just felt so destroyed, like, and confused, like, what's going on. Like, and it slowly came to me that it had already happened because I saw my arm almost perfectly just lying a few feet from me, and then I saw my leg lying elsewhere, and then I saw my bag. So I was just, like, looking around and, like, putting the pieces together, like, this has already happened.

So then I put myself together. Like, okay, I'm going to fight to survive. So I started shouting as loud as I could. And then other worries came to me, right, like, I'm worried maybe I'm going to die because I'm bleeding, or I'm going to die because there is bacteria here, or there is

electricity, and maybe emergency will not come, like, maybe they won't come.

And the images of my arm and my leg lying there is just something that just comes to me all the time. Like, that's -- that's -- I saw it all. And I saw my left arm and my left leg, like, amputated. Right? This happened at the accident. So I saw my bone, I saw my muscle, I saw my -- the fat, like, I saw the skin flap hanging down. So, like, I -- all of that I was, like, trying to sink in at that moment and just so much desperation and asking for help.

I could see George up on the platform, and he would was telling me help is going to come, help is going to come.

I was so desperate. I felt a little better when two policemen came down to the tracks. They came, like, a bit far from me. Like, in between wagons they managed to go down, and then they told me help was coming. They told me they couldn't touch me because they were police officers, but I just remember them, like, angels kind of coming down the platform, Tom and Joe, they told me don't worry, help is coming. So that gave me a lot of hope.

Then the firemen came. I was so thankful for the firemen. Like, up to this day, I see a fireman, I want to cry because I want to just say thank you. And they started doing tourniquets on me. They put me on the stretcher. And they pulled the stretcher into two -- between two wagons, and then

they put meet vertically up to the platform.

Q And how were you feeling physically during that time?

A I was feeling pain in, like, every inch of my body. When people say expressions, like, oh, I feel like I was run over by something, I can attest to that because it was not so much a pain, like, specific to where the cut was because you have phantom limbs, which now became phantom pain, but just -- I was -- my entire body was pain, like, I hit my head as well. And when I was, like, being transported, like, any touch, any movement would just be this massive pain. And I remember the, like -- and ambulance people telling me, we're sorry, it was going to be a bumpy ride. Every single bump I could feel. The x-rays in the hospital, they had to put this huge plate under me. I could feel everything. Yeah.

Q And so you went -- so you took the ambulance, do you know what hospital you took the ambulance to?

A Yes. They took me to Bellevue Hospital.

Q And can you tell us the first -- your first experience at Bellevue and what happened there at the beginning?

A So I was conscious when they took me to Bellevue. I remember the doctors asking if they could rip my clothes so they could prepare me for surgery. They made me sign some paper.

I remember I was talking to George, and believe it or not, like, I told George, you know what, call my family

after the surgery because I'm going to -- at that point, I still thought, like, maybe I am going to wake up and my arm and leg would be back on, and George would just tell my family, you know, this happened, but she's fine. But George is, like, no, we have to call them now. So I begged George, like, speak with the clearest, most, like, down simple English you can so they can understand you.

Q And as far as when you said that you thought maybe you would wake up with your arm and your leg, was there any discussion about reattaching your arm and your leg at that time?

A Yes. So the hospitals, they always try to reattach. But because I lost the arm and the leg at the accident, like, they were ripped by the train, like, these is what is called, like, a traumatic amputation. And, you know, they didn't have much to work with. It's, like, just a rough cut. So they tried to reimplant, but they told me they couldn't, that it was too damaged both ways, right, what's remaining and what was taken.

Q And then at the hospital, did you get admitted and have some kind of surgery or procedures or anything?

A I had multiple surgeries. It was, like, every other day they would take me and they would do a surgery at the arm, the leg. And I just remember being under a lot of pain, a lot of medication. And just going in and out of surgery for days.

Q And at some point in time, was it, like, you were

stabilized as far as lifesaving techniques, and they were just doing your arm and leg, or something else? What was going on with that?

A There was a lot going on. They had to do a lot of blood exams to make sure I was not getting an infection because there was risk of infections.

I got a blood clot from the amputation, so the blood clot got stuck in my lungs, so that's called a pulmonary embolism. So they had to treat for that. They were very worried about that.

And I just remember a lot of exams. Like, they would take my blood every couple of hours. And they ran out of places to take my blood from, and they started taking on my hand and my foot. And up to this day, I have a problem with having my blood drawn because my veins are messed up because they were so overused.

Q For the time period. So they were hurting -- even though they were saving your life, to use the veins, they were hurting your veins at the same time?

A Yes. I understand they were doing lots of things that were medically necessary, but it hurts. Like, one thing, for example, they did was the skin grafts. Right? They needed to take skin from my back, from my thigh, and move that skin into the stumps because they had to reconstruct the stumps as much as they could. And I know that's medically necessary, but to

me, it just hurt so much because I was already injured for missing an arm and a leg, and then they went ahead and took scrapes of skin from other parts of my body. So I remember being, like, what? Like, I'm just more injured now?

And I couldn't move because of, like, I say mostly, you know, few weeks later I started, like, you know, doing physical therapy to sit up and go to a chair and all of that. But mostly I was just lying in bed connected to a bunch of equipment, bunch of wires and IVs. And besides the leg and arm that were healing, I had all the skin grafts. So like, I just, I had to stay still.

MR. ROTH: So let's look at 97-T, which was entered in yesterday.

Put that up, please.

(Exhibit published.)

MR. ROTH: Can you zoom in a little bit, please?

Q Okay. So tell us about that picture. What's going on there?

A So this picture was taken in hospital by George, my husband. Boyfriend at the time. And I wanted him to take that picture to send to my family. Obviously my family was devastated, and as soon as they heard, they started working on American visa, emergency visa.

So my mom came, like, the next day. She was traveling. But then my dad and my brothers were still working

on their visas, so I knew they were not going to come straightaway. So I wanted to say -- I want to take a picture specifically for my dad and say I'm alive, like, I'm okay. We got this.
Q And did that go out? That got sent?
A Yeah. My dad still says that he still looks at this picture as a symbol of strength. Like, he has it on his phone, and every now and then he loses it, and he asks me to send it back to him. Because I think this photo shows a lot about who I am.
Q I do too.
So tell me just what the rest of your experience in the hospital was like?
A So the hospital, I was under a lot of physical pain. And there is obviously the emotion pain of, like, what has happened. But honestly, at the hospital I had a lot of hope. Like, I told myself, like, I'm just going to get out of here, put some protheses. I've seen people running on TV in the Olympics or something. Like, I knew nothing about prostheses back then, so I was just telling myself, like, it will be possible to go back to my life.
MR. ROTH: All right. So let's look at -- can you pull up the first hospital photo? That's what we have the blow up of also, I believe, Logan.
A Can I just say another feeling about the hospital?

Q Go ahead.

A Also, despite everything that was happening, right, I felt like a giant sense of gratitude, right? My mom was there, my brother was there, George was there. They were 24/7 with me. It was nice that the hospital allowed them to stay, even though it was the ICU. They slept there. And all the staff was, like, so nice. Like, I have to grateful for all the people I meet in this journey. It's obviously a weird feeling because, like, I wish I was not there, and I wish I'm not going to support groups, and even being here, I wish I was not here. But the people I'm meeting along the way are people I'm grateful for.

Q So tell us about that picture.

MR. ROTH: Logan, if you can zoom in a little bit, please.

Q First, tell us about -- let's start with the not-so-obvious. What's going on with your right arm there?

A So on the right arm, they had a lot of IVs to put medication on. I was allowed to get morphine. I think hydromorphone injection every few hours. And I remember the injections helped with the pain because I could feel it helped, I would ask for them, but you're only allowed every few hours because they don't want you to get addicted to the pain medication. But I was craving for it all the time. And in the IV they had, like, a -- I could press the IV myself to

get a little bit of morphine, and I just remember pressing it all the time, even when it was not coming out, I would just keep pressing.

And I remember, even though the doctors would say yes, you can get injection every few hours, I remember when the nurse -- the nurses' shift would change, I had to fight with every nurse, like, no, the doctor said I can, like, I swear, go get the doctor. It was just -- this is the thing about the hospital too. It was very overwhelming for me, very tiring, because I had to advocate for myself the entire time. George could do some advocation in English, but for example, my mom doesn't speak English fluently, so it was a very tiring thing that besides everything going on, I have to manage, I have to manage everything.

Q And looking at your right stump, tell us about what was going on there at that time?

A So my stumps, they are my, you know, the residual limbs. I learned so many magical terms in nine years. So the stumps, the residual arm, the residual leg. They are wrapped with the sponges, this material, and they're connected to a machine called vac that drains the wounds. And eventually, after a lot of surgeries, they removed the vac to start the healing with the dressings.

Q And let's talk about your -- at that time, how was your stump functioning at that time? Was there swelling?

A Yes, there's zero function of the stumps. Like, they were just sitting there. They were heavy. They were swollen. They were hurting.

I remember a bit later after this, like, when they started having just a dressing, I remember one time my dressing fell off of my arm, and the nurse just tried to kind of push it back in. Like, I screamed in pain because, like, that doesn't work, right? They had to redo it and, like, start layer by layer again.

Q And let's talk about your upper left stump.

A Yes. So it was similar to the leg. Right? No movement, no function.

Q Okay.

A And I can see the -- these -- the bits of red skin on my right leg, and you can see on the stump a little bit too. Like, those are the donor sites I was referring to where they scrape off your skin.

MR. ROTH: 97-D. Let's look at 97-D.

(Exhibit published.)

MR. ROTH: If you can zoom in on that, please.

First show the -- go a little bit lower. Zoom out a little bit. All right. A little bit more.

Q So using the colors, can you describe what the different healing process was, and what you had to do regarding the different areas of skin that are depicted in this photo?

A Yes. So this photo was taken at my home in Brazil after I was discharged from the hospital. And this was my reality for many months. Right? So this was my first realization because I had the expectation about, oh, I'm just going to put protheses back on and get on with my life. But the first thing I learned, your wounds have to heal first to even get started with, like, trying to fit the prostheses.

So for months, we had to take care of the stumps. And in this photo, there's different colors of skin. Like, the pink -- first of all, like, it's all done as skin grafts, right? All this skin on the stump, it came from other parts of my body. And the pink color is, like, the skin that's going well. The bright red, that's just raw skin. And the black skin is, like, dead skin. So there was a lot to do there, like, every day or every couple of days, either at the rehab center or at home; my parents would change my dressings. So that meant removing all the dressings, cleaning. Things would get stuck into the raw skin, so obviously that's very painful to pull it out. And the dead skin, the dead skin is not good. Like, you actually have to remove the dead skin bit by bit so it can heal from inwards and not this just dead skin layer. So they would use, like, tweezers, yeah, to kind of pick out bit by bit.

Q And on your left hip, what do we see there?

A So on my hip, those are the donor sites. The donor sites

also went through this process, right? Like, they also needed healing, they also needed dressings, and dressing changes, and picking out the dead skin.

MR. ROTH: You could take that down.

Q So let's just take you -- so how many days altogether were you in the hospital, in Bellevue Hospital?

A 24, I believe.

Q Do you know how many surgeries and debridements that you had there, approximately?

A I know I went in to surgery four days and each day it was, like, two surgeries because they were doing the arm and they were doing the leg, so eight.

Q Okay. And then after 26 days in the hospital, what was the next step for your treatment?

A So the next step was rehab, right? So we started contacting places in Brazil. Ideally, I would have had a medical ambulance, like, a medical flight, but the -- you know, we had travel insurance. Bellevue Hospital was helping out. But essentially, the next step was flying home on a regular flight.

Q And what challenges did that present to you and what did you come to learn during that, your first foray into the public venue?

A It was terrifying because hospital, one way or the other, you are in a bubble, right? You are in a bubble of people

taking care of you. And I had no idea, like, what the real world would look like. So it was very stressful for us. I remember it was very stressful for my mom and I to think about it, how are we going to do this? Right?

So we took an ambulance from the hospital to the airport. So the ambulance staff, they had to, like, lift me from my bed with, like, the sheets, so like -- and that hurts a lot, every time people move you, but it had to be done, right? They moved me from my bed to stretcher. They took the stretcher to the ambulance. The ambulance to JFK Airport. And I remember arriving in the JFK Airport with a stretcher, and everyone looking at me, and me telling the American Airlines staff that, like, I had a ticket for a flight, and they just couldn't believe me. They're, like, what? You cannot fly. You are sick. You are, like, in a stretcher. Like, so that was already, like, my first taste of -- even when you're going through all of that, like, you have to advocate for yourself because, like, you're just -- the world is not welcoming, right? So I had to, like, shout back at them, show them a bunch of papers. Like, look, I'm allowed to fly, I just need to be transferred to a wheelchair now. So then the ambulance people transferred me from the wheelchair with the sheet -- sorry, from the stretcher to the wheelchair with the sheet.

And then they left. They allowed George to

accompany my mom and I to the gate, even though George was not flying. And yeah, real-life experiences. Right? Like, we had to eat. Then I realized how awkward it was to try to do things with my mouth with one hand. I remember my mom being, like, oh, let me just do it for you because it's embarrassing. And I remember thinking, like, everyone's looking at me. Everyone's so sorry for me. Like, I have my dressings showing. And I just remembered thinking I need to be strong, I need to, like, look put together. I got this. And this is pretty much -- this is my reality every day. Right? Like, I want to put my best foot forward. Yeah, true things.

Q So how was the flight? You flew back there and you know --

A Yeah. The flight was very uncomfortable because I had to -- you know, I got there with the wheelchair to the airplane door, then they transfer you from the aisle chair, which is a tiny chair that fits in the airplane. Then they rolled me to my seat. They gave us first class seats. Which is so ironic because it's meant to be nice. You know, people around me were having a good time, and then there was my mom and I just, like, panicking. Right? I was traveling with a diaper. And I was exhausted. I remember I slept most of the flight. I was just, like, just energy zero. And my mom had to change my diapers during the flight, like, in our seat.

I remember the flight attendant was very kind.

Like, she gave me earrings that she made. I don't know. Like I say, I met people through this journey and that helps. But I remember she was so -- she was so confused and so awkward when my mom was, like, oh, we have this trash and, you know, it was my diaper trash, and, like, that's not a normal way of plane procedure. So it was just so awkward.

Q And then when you got to -- you finally got to Brazil what happened, and what was your -- you want to take a break now? You want to take a little break?

A No, it's okay.

Q You sure?

A Yeah. And it goes back to the beautiful memories and the hard memories.

MR. ROTH: Hold on. The Judge --

THE COURT: Listen, we've been going for about an hour, so maybe it's not a bad idea to take 15 minutes now. And, you know, take your time and just compose yourself, whatever time you need.

Members of the jury, don't talk about the case.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right. We'll see you in about 15 minutes.

(Recess taken.)

MR. KEAVENEY: Judge, I just noticed that Mr. Roth is showing a lot of photographs to the witness and to the jury, and we had discussed photographs in pretrial proceedings, and Mr. Roth was instructed to limit the photographs as best he can.

THE COURT: We've had enough photographs.

What is the concern? That you don't want him to show anymore photographs?

MR. KEAVENEY: Well, you said to limit the photographs as best he could.

THE COURT: Yes, yes, I think we have enough photographs. We've got tons of photographs. I don't think we need more.

It gets to the point where I have to weigh on the 403 whether there is undue sympathy here, and I have to seriously consider whether all of these photographs are really crossing the line. I think you don't want to run that risk.

MR. ROTH: Your Honor, I'm willing to abide by your ruling.

I would note that we had agreed to limit the videos to six minutes, and they put in 47 minutes of video, so it's a little disingenuous.

THE COURT: Okay, okay.

THE COURTROOM DEPUTY: All rise.

THE COURT: No more photographs.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right. Are we ready to continue? Are you okay?

THE WITNESS: Yes.

THE COURT: Continue with your questions.

Q I think we took a break just when you got to the airport in Brazil, so why don't we pick up there. Tell the jury what happened at the airport.

A Yes. So when I arrived at the airport in my hometown, I actually have a happy memory about that because all my family came to see me at the airport. They brought balloons, they brought flowers, and we drove to my house. And, you know, my little brother baked a cake. Like, everyone was trying to cheer me up and, you know, that's when I got a lot of cards and a lot of flowers.

And one thing I just want to say about the airport is we took some photos, and a couple years later I saw a photo where the photo is about me being hugged by someone, but then I saw in the back of the photo I saw my brother crying to -- I don't know who exactly it was, but I just remember it was my brother crying on the shoulder of someone else. And that photo broke my heart because I thought at the airport everyone was so smiley to me, everyone was, like, you got this, we love you, you know, you got to go through this. But when I saw

that photo, it reminded me of, like, the brutal reality that, like, everyone is suffering with me. So -- and I never told my family this. I didn't even tell David that. Like, it's just -- this is the constant feeling I live with where everyone is worried about me, and I'm trying to be strong for other people. And I'm grateful because how can you not be grateful when your family shows up with flowers and balloons and to take you home.

Q And so then when you got to Brazil, did you go home, or did you go to a rehab facility, or did you go someplace else?

A So I went home, and there was an outpatient rehab clinic in my hometown, so I would go there for treatments. And at the beginning, it was, like, multiple days a week. It was a very holistic approach. You know, there was the nurses to do the dressing changes, there were doctors, there was a dietician, there was a psychologist. The physiotherapist started to introduce some exercises. The people who were going to work on the prostheses a few months later when I get there. So that became my routine. Right? Like to be home, go to rehab.

Q And did you try to pick up -- well, how long were you in a condition where your stumps had bandages so you really couldn't do anything? How long was that period of time before you could start trying to get back to some activities that you used to do? How long a period of time you think?

A It was months until I felt like I could try to be productive. I remember at the beginning I was very frustrated because I was in my bedroom using my wheelchair, I had the dressings, and I was, like, looking around, it was my bedroom, I want to tidy, I want to fold my clothes, I want to put my pencils somewhere. And I just got the reality check, like, I can't. It was just frustrating. Everything I would try to do, I would fail.

So I had to not take a semester at university. Like, I had to message the course coordinator and tell her I could not make it this semester, which to me was one of the most painful moments because it meant so much to me to go to university. Like, I loved it. I had a goal to graduate as soon as I can and, like, be efficient, go get a job, go study abroad, all of that. So to me, to have to not go back because of this injury was, like, the worst. So it took me a while to accept that.

Okay. Then I'm home and I'm, like, I want to be productive, I want to study, I want to have a routine. And I remember bring very frustrated, and my mom telling me, like, it's okay, your routine is to wake up, have breakfast, have assistance. I would do some exercises. In the afternoon, I would just sleep, just rest and watch a movie maybe. And I had a lot of people come to visit me. I'm very grateful for, like, friends who stopped by. But even that is, like, you

know -- people express their sympathy and they go back to their lives. So it's not that great either.

But yeah, my routine was just very slow, very basic for months. The focus was rehab. The focus was resting, healing.

Q And while this was going on, what -- how did you go back to school, like, what was your direction, school after you said --

A So I couldn't wait to go back to school. Like, I did not want to abandon, like, what my goals were. Like, this is something I stand by, like, how I'm going to get there and achieve things is completely different from before, but I know I'm going to get there.

And my mom was able to dedicate herself to help me go back to university. So I'm so grateful for my mom. She's right there. Because she would go to university with me. Right? Like, she would help me. She would push my wheelchair to the car. She would let me transfer from the wheelchair to the car seat. She would put the chair on the back. She would drive me to the university. Do the whole process to get me out of the car. Push me to class. Get me set up on the chair. I would do the class by myself, but she was right there at the corridor to, like, take me to the bathroom, to get my water bottle, like, anything. To go on the lunch break with me. Because this is another thing, right? Because at

the beginning, people, like, my friends at university, they were, like, oh, yeah, of course I'm going to have lunch with you here where it's accessible, where it's easy. But with time passing, you know, people want to go elsewhere because it's cheaper, people want to go elsewhere because they're busy, and you fall back into the reality that, like, you are standing out, like, you are in a difficult position versus everyone else. So I am so grateful that I had my mom there because I could count on her to push me places and keep me company.

And emotionally it was very hard going back to university. It's interesting, like, meeting people who didn't know me before is less hurtful than people who did know me before. Because I went back to university and everyone knew me as, I don't know, regular person, good student, nice person. No, but then suddenly I became the girl with not an arm and a leg, and everyone was sorry for me, and to my face people say, like, oh, we're so sorry, you got this. But I could see, like, you know, the message groups, people just being so sorry, like, oh, my God, this is the worst tragedy possible. And people would say that to George, to me, to my parents. And I just felt a sense of, like, my whole life became that, right? Like, my personality became crushed into the girl who was run over by a train. And I hated that. I still do.

So when I went back to university, like, this was my, you know, going back to my reality, trying to, and I was trying, like, to be strong because it was so painful to see people treating me that way. And I did not want to be the girl who was run over by a train. I was trying so hard. I'm still trying so hard to not be.

Q So during that time period you went back to school, could you have done it by yourself? Like, what if your mother was there, what would have happened?

A I couldn't have done it. So I feel proud of having achieved that, but the truth is, like, I had a whole team of people to make that happen. My family, I have a loving family. But it was -- and I don't like that I had to depend so much on them. Right? Like, at some point in your life, you want to start taking care of your parents instead of them taking care of you, so it's very heart breaking that I realized so much for assistance.

Q So when you were there, the medical treatment that you were getting was at what location? Where were you going?

A So before I moved to New York, all my treatments -- not all, most of them were at this rehab center, which is very holistic. They would suggest appointments, we have additional doctors elsewhere, so I would go to outpatient appointments too.

With the prosthesis, like, for my arm, for example,

they made me go to another clinic. They had a partnership. But it was all, like, rotating around the rehab center.

Q So when were you finally able to start to -- obviously, if you have open raw wounds, you can't put a prosthesis on it, so when did that end where they started fitting you for a prosthesis where you were going to have a chance? When did that happen?

A So I was run over by the train in August. In March, the year after, was when I started putting on, like trying out the prosthesis.

And one thing I learned with the prosthesis is, like, okay, this is day one, like, here is your prosthesis. It doesn't mean you're even allowed to wear it for, like, to wear it all day. You need to start slow and see how your skin reacts to it. And this is an issue I have long term, that, like, my stumps are not the best stumps to work with.

Q So and then you had a -- you got prostheses. What type of prostheses were they fitting you with in Brazil?

A So in Brazil they fit me with what's, like, an entry level very basic prostheses. Like, they had no electronics. And even the ones I got, I know I got lucky that they had the knee on the -- at their warehouse because they normally fit people with an even simpler prosthesis, but they had, like, okay, we ordered this one, there's no warranty on it, but we can fit it. It was a bit better. Even that, like, it doesn't

compare with all the technology that's out there, though it is a lighter weight type of prosthetic knee.

And the arm, it was -- I don't know, like, they call it, like, an aesthetic arm. Like, you know, it supposedly has some movement if you make a lot of strength, like, with your shoulders, you pull the string, the hand opens, but I just couldn't do that.

Q And so how were you ambulating during this period? Were you on crutches, wheelchair?

A So when I went back to university, I went wheelchair and no prostheses.

Then wheelchair with prostheses.

And I would try walk a little bit, like, within the building, and then I had a walker called a hemi walker, it was, like, for people with just one usable side.

Then I had the cane. It's, like, a specialized cane that stands by itself with support at the bottom.

So I always had the wheelchair, and then just additional walkers and stuff to try to -- you know, I was trying to get back to walking as much as I could.

Q At any point in time before you left from -- at some point in time, you went back to New York, correct?

A Yes, I came to study.

Q Okay. So you spent -- you said you did a semester in Brazil. How long did it take you to graduate?

A I had one year left to graduate in Brazil. So I delayed the semester and then I went back. I still had courses, like everyone else, but I also had the graduation project, like, a big deal in Brazil where you work with a professor, and then you present your coursework, and then you get a -- that grade is very important so you can graduate.

Q And when -- how were you ambulating until you left Brazil the next year? Like, did you ever -- were you ever successful in ambulating with the prosthesis, were you using that wheelchair, or something else?

A No. I have always used a wheelchair for long distances, and in my world long, a distance is anywhere longer than a block. And I was able to use the prosthesis, like, at the actual location I was, right, like inside the building. Like, I just walked in this courtroom, like, I can walk.

Q Okay. And what activities did you try to do that you were able to do or the ones you couldn't do in that year before you left for New York while you were in Brazil?

A So, like, my entire personality had to adapt to this new reality. Like I said, like, I used to be a person who loved the beach, who loved the outdoors, who loved swimming, who loved exploring. And that's just something, like, I don't do anymore, so I have to be cool about it. Like, okay, that's -- I can't do it. And I had so many, like, creative hobbies as well. Like, I used to play guitar, which it was just, like,

that moment where you grabbed your guitar and, like, you either have a break, like I used to do it on the weekends, go by the balcony and play my guitar, or I would play, like, at family gatherings. I don't know if they liked it, but I made everyone watch me and sing along. And it's just something so joyful for me that -- there's no way I can play a guitar right now. I still dream a little bit of, like, okay, maybe one day I can have a very specialized prosthesis. Like, I've seen a video somewhere of someone playing a violin with a -- the violin thing was, like, in their arm. So there are some ideas out there, but, like, how do I get there? I'm, like, so far off from that, so it's kind of like a dormant dream of, like, going back to who I was.

There was lots of arts and crafts. Like, I grew up doing jewelry. Like, I loved doing earrings, bracelets. I would even, like, sell them when I was a kid. I would sell it at school, I would sell it to my cousins. It was just a hobby. Like, we would get together to do jewelry. I used to do scrapbooking a lot. Anything arts and crafts. My mom is like that too, so, like, we would have a birthday party, we would make the party favors with, like, a candle. I don't know, there was no -- just a creative person. Like, I loved expressing myself through this type of activity.

Q And those activities, were you able to do any of them? Did you try to do them and fail? Or what happened?

A I can't do most of it. It's very frustrating when I try to do. Even in hospital, I had an art therapist, which was very helpful because she helped me, like, work through my feelings. And even for that way, like, to do a simple drawing, I had to have, like, a flat surface. I cannot just hold a pad and do a quick sketch. She had to tape the paper to the table because I cannot hold the paper with one hand and then sketch it. And this is very painful for me because I am an architect by my education. And, like, architects express themselves by drawing. Right? And it's not just the drawing. It's, like, holding the different, like, angles we have and the rulers.

Like, I had a drawing drafting desk, like, in my bedroom. So later on we changed because I was no longer a Luisa who drafts and does all of that. And like, it's just something I just can't do because I don't have two hands and I don't have anyone to -- I can direct to do it for me. Right? But making models, sketching, it's just how architects express themselves.

Q What if you had somebody to direct to help you, what help would you get from that?

A It would still not be the full enjoyment of, you know, being able to let your imagination run, but at least I would have someone to be my hands to say, hey, we doing this, this is how I want it. Because otherwise, how can I?

Q Okay. So then you finished school.
Did you graduate?
A Yes.
Q Okay. And then what happened after that? Where did you go?
A So I graduated in March 2018 in Brazil, and I had applied to do master's abroad. So I was accepted at a couple different colleges in New York. I chose the City College of the City University of New York. And the start was August 2018.
Q And just -- we didn't finish up because I just got distracted for a little bit, I apologize.
How long did you have to go through the debridements until they were finished? How many months?
A A debridement, like the dressing changes, those took hours, like two and a half hours. Again, my whole reality was, like, focused on that. Right? Dressing changes.
Q And how long a period of how many months or weeks did you have to do that once you got back to Brazil?
A Well, it's pretty much until the time I started trying on the prostheses. So the leg all the way into early 2017, so six, seven, eight months.
And then the arm, the arm healed later than the leg. Like, the wounds closed later. So September 2017. Like, that's when I started fitting with the arm.

Q So you were going through some form of debridements from when you left the hospital in September of 2016 for the next year?
A Yes.
Q On a weekly basis?
A Yes.
Q Okay.
A At least, like, you know, you have to watch the wound, like, the wound was -- I am sure you've seen pictures where I have dressings, and then I have a bandana on top of the dressing. Like, there was dressing there because there was gauze and, like, the ointments to heal it inside.
Q And so then you came to New York. And what did you do in New York? You flew to New York. Tell us about the trip to New York. Was that hopefully uneventful?
A Traveling is never uneventful. George went to Brazil to help me fly to New York. So I had my husband's assistance to fly to New York. Yeah, he was already living here since 2016, so I was moving in with him about two years later.
Q Okay. And what was your plan when you got to New York?
A So I've always dreamed about doing my master's abroad because I had a very positive experience in London, and I wanted to keep striving for the best places. Right? I wanted to be -- like, New York is, like, the forefront of so many amazing things in architecture and career opportunities, so I

wanted to keep studying, I wanted to study here. Study always opens a lot of doors. So I had this goal for years to do my master's.

Obviously, with one arm and a leg, coming to New York was so scary. My parents were extremely scary. My mom was, like, how are you going to get around? And I told her, like, it's okay, like, even if I have to sit on the bus for two hours, I'm going to get there. Or I heard about this thing called Access-A-Ride, which back then I was hopeful that it would be a good way to get around. So I said I'm going to do it. Like, no matter what, I'm going to do it. And my mom was very worried that you cannot even put your prosthesis on by yourself because for months I didn't have the strength to do it because you have to roll what's called a liner, like a protective layer between the stump and the leg and the prosthesis. So this was a proud moment for me because my mom was, like, oh, like, she was trying to encourage me but also, like, how can you possibly move to New York. And I worked so hard in, like, putting that liner on with one hand and still challenging. It was meant to be with two hands. But I managed and said I can go to New York. And I did. I did. I moved in with George. Yeah.

Q And for many people just moving is, like, okay, I'm going to fly and move. What things did you have to set up in place so that you could be successful in New York? What did you do?

A Well, the reality is just, it's all very limited. Right? I need assistance to do everything. Or I have to do it myself to a very low standard. So I just kept it simple. Right? My routine was taking a car from home to university, doing the courses I could. I couldn't take all courses I wanted. And go home.
Q Where did you go? Where did you get your master's?
A The university? Yeah, City College of New York. Part of CUNY City University.
Q Where is it located?
A It's located in Upper Manhattan. It's very far from where I live, but that's where the architecture school is.
Q Can you describe how you would get there?
A Yeah. First, I was using Ubers. And then I applied to Access-A-Ride. I went to, like, a medical exam to apply for Access-A-Ride, and they granted me the ability to use Access-A-Ride, which is a paratransit service.
Q How long did you go to get your master's?
A About two years. From 2018 to 2020.
Q And so what challenges did you have that you had to overcome while you were getting your master's? What are the things that you did?
A So I'm very proud that I got my master's. Right? I'm proud that I went there and I took the courses I could. It's painful that I didn't have the full experience that I dreamed

of having. Right? There were courses I wanted to sign up for, but they included traveling abroad with the classmates, and I thought I cannot do that. I wanted to sign up for, like, a construction course. I actually remember, like, there was one that I was building something inside the building, so I thought, okay, maybe I could sign up for that, maybe I can be more, like, the manager and the drawing person. And then I bumped into the professor on the corridor, and I said, oh, I signed up for your course. And he didn't know I had a permanent disability. Like, he just saw me with my cane and he just saw me, like, with, you know, weird posture, and he said, oh, great, see you next semester, hope you get better. So that, like, I just went home and I canceled that course. I chose another course because it's so tiring to go through the, like, whole, like, I'm going to prove myself no matter what all the time. So I have to pick my battles. So it's easier, you know, to do it -- I like taking some online courses that I can do from home or some computer modeling courses. But I just -- I didn't have the choice anymore of choosing a drawing course, or a model-making course, or a construction course because I would just not enjoy that. I would just be the person having assistance from strangers, right? And again, I was a new person in New York. I didn't know anyone. I was making friends and I was making connections. So it's just not welcoming. There's no setup to help a person with disability.

Q So how did you do in the master's program?

A I did well. I have worked so hard on it. Like, I studied a lot. Like, my -- this has always been my life. Right? If you are a student, that's your profession, so you study as hard as you can. Like, so I got good grades.

I took my time. The first semester, I did a lot of courses and that was a lot. Because I would spend all day university. Access-A-Ride is very time consuming, so I would arrive very early and leave very late. And it was just too much. So I started taking less courses. I started throwing in internships because work experience is very important.

So, yeah, I graduated successfully in 2020.

Q And while this was going on, what effect were your injuries having on your energy, your ability to do stuff? What were you overcoming during this time?

A Well, just doing the basics was a struggle. Right? Just taking the car for a long journey, like, and it's longer with Access-A-Ride because you share with other people you don't know, the drivers, they want to avoid the tolls, and that's the whole topic about getting around places. So just by the time you get there, you're already tired of sitting in a car, and my protheses, they start hurting if you're sitting in a stiff position.

Then getting around the building, just going from one class to another is already a lot of energy, is a lot of

pain. So I kept it simple.

For me to go one block over to the library building, like, the academic, like, that was my challenge of the week. If I really needed to go there. They had the international student's office there. For me it was, like, such a -- oh, my God, how am I going to do this? I need to take some breaks. I need to, like -- I had to plan for that, like, not carry any heavy bag. So yeah, I just said no to lots of opportunities. Right? Like, there were events that I didn't go. I remember my friends going to -- you know, the experience I had in London where I would just say yes to anything, and explore, and go grab a coffee, like, I never left university building to, like, go explore the neighborhood and grab a coffee, like, because it's hard, because it's painful. So I keep it simple. I do the basics so I can graduate and I can have a degree. And it's not the full experience, but it's better than no experience. Right? So that's who I am.

Q You said something a couple of times, and I don't think everybody understands. You said that it's painful. Tell me what about the -- that you get these prostheses and they're supposed to help you. What about them is painful?

A So the prostheses -- well, let's start with the leg.

So, like, the leg obviously comparing to a wheelchair, it gets you more places. Because if you have the wheelchair -- actually, if I'm not wearing my prosthesis, I'm

more comfortable without the prosthesis and then using the wheelchair. But then the wheelchair I cannot really propel myself with one arm. And then you face one step and that's it. And, like, there's so many steps to go places in New York, or you are at a restaurant and the bathroom is downstairs, or the table they got you is downstairs. So with the wheelchair is, like, zero accessibility unless you have assistance to carry your wheelchair, help you go through those steps. So putting on the leg helps me go through certain challenges, but the leg is uncomfortable. Like, both the leg and the arm, they're, like, these heavy objects connected to my body. They don't feel like my body. They feel like things just there. So when I get home, the first thing I do, I take the prostheses off. It's like taking a shoe off, it's like taking a heavy bag off. So the reality is, yeah, the leg takes me places, and for that I'm grateful, but I cannot say, like, it's -- it's not comfortable. It's painful.

Q Okay. So you got -- so you do your master's, you go through that program, and now it's time for getting a job or getting an internship. What did you do next?

A So I graduated in March 2020. COVID time. So I had them send internships during my master's, and I was able to connect with my first internship. I did an internship during the summer 2019 at the New York City Department of Homeless Services. They had a project about bringing shelters to

compliance with ADA accessibility regulations. And the people who supervised me on the internship, they were able to suggest another internship. So when I graduated, I worked online, I worked remotely from my house for a few months, 2020, before I got the job that I have now.

Q Okay. So before we get to the job you have now. During that period of time you came to New York, where did you start to get treatment and go for your prostheses? What happened in New York for medical?

A It was very overwhelming to restart everything in New York. I had looked up prostheses clinics. I first went to a clinic called Hanger Clinic. They are, like, a nationwide chain. And I had to start from zero. Right? Like, I had to go there and say, look, I need someone to fix my prostheses when they break. And they told me, like, yeah, we can, you know, give you an emergency, but really, they need to do a knew prostheses, so you have to start all again because, you know, they cannot work on someone else's prostheses. This industry is all, like, you know, there is the warranty or the responsibility. And then later on, I learned about software. Like, there's software into the electronic ones. So they told me I had to find a general physician and get prescriptions. And that took a lot of energy, like, to put all these pieces together just to get started.

Q And when you went to the Hanger Clinic, you said that to get it fixed, why is -- I mean, when they make a prosthesis, doesn't it -- like, what needs to be fixed about it so often?

A It's normal to have maintenance on your prostheses. Like, in Brazil it had it happened where, like, a screw on my knee got loose, and then you have to go to the clinic so they tighten it up. Something I learned throughout the years, I also have fitting issues because if you put on a little weight, if you lose a little weight, they have to remove some of the layers inside the socket. The socket is that part that comes around the stump. So you need to go to the clinic all the time to make these adjustments. And, you know, when there's too much change, they need to make a whole new socket, which I had been through a couple of times. Like, you know, when I had the -- and even, like, after surgery, your stump changes. Right? Like, it's very swollen and then it starts to -- the shape of my stump changed a lot from day one to, you know, years later.

Q So can you explain to the jury, like, if there's a screw loose on your prosthetic or it doesn't fit right, what happens to your ability to get around?

A I need to fully depend on someone else. Right? It's terrifying. Like, if the prosthesis doesn't work, then okay, then I can use the wheelchair, but I cannot put a wheelchair in and out of a car myself, I cannot open a door and go

through the door with my wheelchair. So I -- I just -- I'm vulnerable. Right? Like, I depend on other people to make it work, to get it fixed, to take it to the assistance to get it fixed.

Q And what about the wheelchair?

A The wheelchair breaks too. And also the wheelchair is this large object that with one hand you can't really fix it. I cannot do maintenance on my wheelchair.

Q Hold on a second. I don't think everybody understands. You have a wheelchair, are you able to -- you only have one arm. How does that affect you and the wheelchair, how do you get around with the wheelchair? Explain to everybody.

A At home, when I take my prostheses off, I stay around the house with my wheelchair because it's more comfortable for me to take a break from wearing the prostheses. My skin, it's time to breathe. And it's normal to take the prostheses off to shower, to sleep, that's part of the routine. But then for me, I also just don't wear it at home, so I use the chair.

Then with the chair, wheelchairs are designed for people to use two hands to propel forward and make the direction, you know, push one wheel or the other, you direct yourself. So I use my foot, my right foot to steer and my arm to put strength in moving forward and to steer as well. But often I have my hand busy, right? If I'm trying to carry something around the house, I need to hold it, and then I

basically just propel myself with the leg. So this is very tiring, this is very painful, so I only do it at home. And then if I go out, you know, I can do a little bit. Like, my mom can open the bathroom door and I can wheel myself in, but this is pretty much it. Like, I don't go places by myself with my wheelchair.

Q So you just mentioned the bathroom. You know, up until this point, what -- you know, I know it's not pleasant, but explain what your experience with toileting is and how you're handling that, or how you handled it up to that point.

A Well, toileting is just one example of, like, all the basic activities that have changed. Right? Like, if I'm sitting on a toilet, I cannot even kind of lift up with one leg. I, you know, have to wing it. And it's hard to pull toilet paper out of a toilet roll. It's hard to wash my hand. I don't really wash my hand. I always feel awkward when I'm trying with one hand to wash itself. So yeah, it's just a -- I have to set up a very low standard for myself and carry on and do it because I cannot -- I don't have assistance to do that otherwise.

Q But what if you did have assistance, what would that mean to you, if you had assistance all the time, another set of hands, what would that mean to you?

A There are so many activities that I would have more enjoyment because there would be portions that I could have

assistance, they could have things set up for me, and then I can do the part you actually want to do.

Can I talk about cooking?

Q Sure.

A Yes. So for example, cooking for me, I know cooking can be enjoyable. It used to be, like, when I lived in London I used to cook, like, fajitas for, like, 20 people. It was, like, that kitchen you saw on the video. That was the time of, like, okay -- because at home, I used to be my mom's assistant. But when I lived by myself, I was, like, I could do this, right? This is fun. But now, for me to try to cook something is extremely frustrating. Like, I cannot hold a pot with one hand and stir with the other because I don't have two hands. I cannot hold a vegetable and chop with the other hand. If I'm trying to chop something, its just this frustrating thing where I'm trying to stab it with a knife and find a way to hold it against the table and chop it. So there is no enjoyment in that. I just, again, set my standards low or depend on other people. So if someone else is cooking, I will eat whatever they are cooking. If I don't have anyone to cook, I will buy a microwavable meal or something and I get by.

Q So it would mean something to you to have an assistant to help you with all of these things?

A Yes, of course. Like, I was always a healthy person,

right? I love the idea of, like, getting, like, some healthy food, shopping a bunch of fresh foods, and preparing a meal, like, that's amazing. But, like, as of right now, like, without assistance, I'm not that person. But maybe if I had all the things set up for me, if I had someone to hold the pot, I can actually have the enjoyment of putting the ingredients together and say how I want it because there is creativity in that as well. But right now, it's just a no-no.

Q So at that point, when you started going to -- I guess, when did you get your full-time job? Or when did you get the internship at the -- we know you work at Code Compliance. When did you get the internship there?

A So January 2021 is when I started at the company I work now. It's called Code Consultants Inc., or CCI for short. I started as an intern, it was COVID, they were not really hiring anyone, but they saw my potential in terms of my curriculum and my passion for architecture and accessibility.

Q And what happened? You interviewed there?

A I had a recommendation from my past internship. It was very nice, my supervisor from the past one, he sent a recommendation to the president of the company where I work with, and he said, like, you have to talk to her, like, give her a shot.

Q And then you got your shot, and what did you do with that shot?

A I'm making the best of it, right? Like, I'm very dedicated to my job. I -- regardless of all the struggles, like, I'm very grateful I have a job and I'm going to keep striving to do the best job I can.

Q Why don't you tell us about your job. When you first started working there as an intern, why don't you take us through those six months, and then take us into the job that you -- your current job?

A Yes, of course when I joined I was, like, learning from the other people in the team, like, how the processes were. And I just slowly took over some of the tasks, right? Like, so they -- our job is essentially to look at drawings, like, for new buildings or for renovation of an existing building and make sure they comply with the ADA standards, they comply with building code. And it's, like, there's the part where it's, like, computer-based where you make lots of comments on the drawing, you measure things in the drawings, and there's the site visit part where you actually go to the place and you verify what's there, or you verify if they built it according to the drawings they showed you before.

Q So when you got the internship, what would -- were you doing similar stuff as to what you're doing now?

A So the similar -- all the tasks that I could have done as an intern or now is the same type of task, but, like, you learn, like, you know, more independent -- not independence,

but, like, you know, before I had to join a call with a client with, like, other more senior people, and now I can handle a client call myself.

Q So when did -- tell us about what it meant to you when you got the full-time offer, and what did you start doing at the company.

A Yeah, it meant a lot to me. Right? I was always, like, yeah, you know, sort of as a technicality you hired me as an intern. I'm learning. I'm doing well. And they were happy to offer me a full-time, you know, call it official.

Q And then what was the position you got when you first got there?

A So I was first associate consultant, then a regular consultant. And as of June of this year, I'm a senior consultant. There's still more tiers I'm aiming for though.

Q Okay.

A Yeah.

Q And are you -- is it easy for you, is it difficult for you? How do you find the job compared to what you see other people are doing at the company?

A It's very frustrating because the knowledge about architecture and about code compliance, like, I have. Like, I studied so hard to have this knowledge. It's, like, a growing knowledge, there's new codes that come out and you need to study them, and you need to put all these pieces together.

Like, the same project have a lot of codes. So I love that. I love studying. But even studying is challenging. Right? Like, holding a book open with one hand is challenging. Highlighting something is challenging. Stapling some papers together, getting them together and stapling them is hard. So there's all these little challenges to just getting to the point to study.

And then there's parts of my job that I can't do because I don't have assistance. And I have tried before, and it was, like, very traumatizing experiences where I tried to prove myself. And I remember, even when I joined the company, I used to tell them, like, oh, no, my prosthesis, I have issues, but I'm going to do a surgery about my leg, and I think I'm going to be, like, you know, I think I'm going to do site visits after that. And the reality has been that, even though my -- I did a revision surgery in 2021, that helped with the fit of my leg, but I'm still not there. So I still don't do site visits.

Q When you say you don't do them, some you do once in a while, or I mean, there's some information in the records and something that you have done them, and why don't you tell us when you did do them, what actually happened to you and your physical health?

A I've tried to do it a couple of times, but, like, we all concluded that, like, that was not good. Like, I just became

a person who was, like, no, I don't do surveys. You have to pass it to my colleague, my colleague is an expert.

But the surveys I tried to do. Like, so in the survey, you have to measure things, so you need to hold a tape measure and take a photo of what you're measuring. You have to bend down to measure something low, like a toilet, or you have to reach high to measure something high, like a shelf. And I remember I tried to do it myself once, like, a small survey of, like, some toilet rooms, and I remember spending the entire day doing that one toilet room. And, like, not even taking all the photos I wanted to take. But, like, I was trying so hard. I was trying to, like, balance the tape measure with, like, under my arm, and, like, a photo and the timer. I don't know, something that my coworkers would take, like, half an hour to do, a one person bathroom, and I was taking an entire day, and I was trying to prove myself, and I was trying to, you know -- we realized, like, that's not feasible, right? The company is wasting money if they send me on a site survey like that. I've tried to take coworkers -- I've never done, like, a large survey. My coworkers, they do, like, stadiums, and parks, and giant shopping center. Like, I've done, like, two fashion stores where I took someone with me, and it was very frustrating because they had their own thoughts on, like, how they were going to do it, and they were not really my hand, they were just someone else doing the job

for me.

Q So if you had an assistant in that, you would be able to direct them in what way? How would that help you?

A I think the truth is I don't have an arm and a leg. I just need someone to be my hand. Someone to -- it's a physical thing. Right? The thinking, the thinking I got. The intellect to work with what I work, I got. So that's what keeps pushing me. Like, I have my knowledge from all these years, I'm not going to let it go, I'm not going to give up on that.

Q So what do you do that you've been getting promotions then? Why don't you tell the jury -- let's talk about something that you're good at. Let's go.

A Well, all of my background in architecture helps me a lot at this job because I read a lot of drawings. I'm very good at -- I'm a quick learner, like, I get a new building code and I learn, I study, I can convey the information I learn, I can make a presentation about it. I like the thinking, I like the challenging. Codes are not always clear, so you have to look at all the sites. And I'm good at that. I'm also good with the people on the team. Like, our team has right now, like, you know, an opportunity for, like, management of the team, and I'm trying so hard to, like, help out manage the team, you know, assign the projects and whatever needs to be done. I'm, like, you know, doesn't require any physical activity, they

can count on me.

Q So let's talk about what physical -- let's talk about what physical activity you are doing. So take us through right now, like, when you go to work, how many days a week are you able to go to work?

A The policy of my work is that you go three days a week in the office. There is definitely an encouragement to go every day, but going three days for me is, like, hard enough, so I try to stick to the limit, to the minimum, even though I like when I'm at there, but then it becomes uncomfortable because I'm stiff with my prosthesis in the same place all day, and then I have to commute there and commute back. So in general, working from home is more comfortable. But I'm missing out on the office experience.

Q But you physically, what is the -- what would happen if you worked five days a week? What physically would happen to you with your prosthesis? Explain it to the jury.

A So when you wear the prosthesis, there's friction between the prosthesis and your skin. I do put lotion, like, I think what they put in babies' diapers, like, if you have moisture or friction. So I put that on my leg. But if I wear my prosthesis every day, I get blisters. Like, if I walk long distances, I get blisters and it's exhausting. So working from home a couple of days is very important because it kind of let's it breathe out, and then I can put the prosthesis

back on.

Q And --

THE COURT: So I'm going to ask you a question now because I like to ask questions once in a while.

THE WITNESS: Okay.

THE COURT: And we're going to take a little bit of a break now, and we're going to come back at 1:30 to continue your testimony.

But you know, what kind of work basically do you do as an architect? I'm just curious. I think of an architect, I think about making buildings, or houses, or parks. Just give the jury a little bit of a sense of exactly what type of work do you do.

THE WITNESS: Good question. Yeah, my work is very exciting. Like, we're a company that works across the United States. And we work on the coolest projects. Like, right now I'm, like, working on World Trade Center drawings. Like, how could that be more exciting? I'm working in Hudson Yards. We work in schools. We work in residential buildings. And yeah, like, any sort of project. It's very diverse.

THE COURT: And a lot of it is just planning and drawing and using computers? I mean, is that basically the work of an architect?

THE WITNESS: So the -- I work in the capacity of a consultant. So I get the drawings who -- the ultimate

responsibility is the architect's responsibility to sign them, but then they have different consultants chiming in on their design. So I'm responsible for the accessibility part. Someone else does fire safety, structure, plumbing, all of those.

THE COURT: So this building was built several years ago, and it was done by an architect, Cesar Cully I think was the great architect, you probably know that name. So if you were working on this project to make this courthouse, what would you be doing?

THE WITNESS: I would tell you this temporary ramp is not a good idea because the accessibility needs to be permanent.

THE COURT: All right. So anyway, I think we -- it's a good time for us to take our lunch break. We'll reconvene at 1:30. Don't talk about the case.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: So we'll reconvene at 1:30.

And Mr. Roth, we do want to complete her testimony today. You do understand that?

MR. ROTH: That's the plan, Your Honor.

THE COURT: All right. And you have to give your, you know, worthy adversary ample opportunity to question also.

MR. ROTH: Okay, Your Honor.

THE COURT: And we're going to keep the jurors here as long as we have to because it's important that we complete her testimony today. Okay?

MR. ROTH: I have a question.

You said no more photos, but I can use photos that are currently in evidence; is that correct?

THE COURT: What's in evidence. Look, hear me clearly, all right, I've given you ample latitude. We have A through DD and CC, and I haven't restricted you. And I think that whatever is in evidence, of course, you can use.

MR. ROTH: Okay. That's all.

THE COURT: But I think I have to draw a line someplace because you come to the point where can it be unduly prejudicial. This is the type of case we're concerned about. Okay?

MR. ROTH: No problem.

THE COURT: So you have a sense of that. See you at 1:30. Okay.

(Luncheon recess taken.)

(Continued on the next page.)

AFTERNOON SESSION

(In open court; outside the presence of the jury.)

THE COURT: So we have to know the difference between a federal rule and a state rule.

We talk about a lot of things. Right? But this is not the federal rules. This is New York State law. We'll talk about it. Maybe at the end of the day, I'll give you a little bit of a lecture on the law. Okay?

I want you to give me all your submissions, I suspect hundreds every day from now on. You want to think is it federal law or state law. Maybe you want to think about that. Right?

MR. ROTH: Okay.

THE COURT: It's okay. Send me everything you want. We'll talk about it at 5:00.

MR. ROTH: Before the jury comes in, the plaintiff would like to take off -- demonstrate to the jury how she takes on and off her prosthesis.

THE COURT: You know, my gut feeling is it's not necessary. There's so many pictures you have here.

Now, I understand, I'm sympathetic to the plaintiff. Obviously, I'm a human being. Okay? But I also have to manage this in a way that's not overly beneficial to ensure that. You have to understand that.

They understand exactly what your situation is.

There's been so much testimony. There's been so many pictures. I don't think it's necessary. It's going to unduly inflame the jury. The problem with your case is not going to be her testimony. The immunity issue is what really challenges people than anything else.

The jury really knows very well what her problems are. Okay? I don't think you need more. Okay. I don't think you need to do more.

MR. ROTH: I know. It's just that it's very hard. I don't know if they realize how hard. I mean it's one thing to say -- it's not going to inflame them. It's not gross. They're not going to say anything bad that they haven't already seen.

THE COURT: You have so many pictures. All right? And I'm not going to limit her to explaining how difficult it is, but I do think that maybe a demonstration here might be a little bit going, a little bit more than what's necessary and what's appropriate. That's my gut feeling. Okay?

MR. ROTH: All right.

THE COURT: So you have to do it my way obviously.

MR. ROTH: Can I use her other prosthesis as a show-and-tell?

THE COURT: You have a prosthesis here?

MR. ROTH: I have two boxes full.

THE COURT: I'll let you do that, but not to have

her stand up there and put it on and --

MR. ROTH: Because it's heavy. I want to show the jury how heavy it is.

THE COURT: Show them that. It's good that you ask me these questions before the jury comes in.

MR. ROTH: I thought it would be impolite otherwise.

THE COURT: So while the jury is coming in, I'll ask Ms. Winter.

I told you I'd give, a long time ago, in the prior century, when we started this case, a limiting instruction about your concerns about something that was said during opening statements.

I have it. I'm willing to give it but they won't understand what this is all about. If you still want me to give this to the jury, I will, a limiting instruction.

MR. KEAVENEY: I think if Mr. Abdallah comes back and testifies, which he might, I think then it might be appropriate.

THE COURT: It's up to you. You gave me this. I'm willing to do it. But the jury won't have the foggiest idea. It's up to you. It's a matter of your own trial strategy.

MS. WINTER: We'll reserve unless and until Mr. Abdallah comes back.

THE COURT: You'll reserve this?

MS. WINTER: Yes, Your Honor.

(Jury enters.)

THE COURT: All right. Mr. Roth, continue with your questioning.

(The witness, LUISA JANSSEN HARGER DA SILVA, having been previously sworn, resumed the stand.)

DIRECT EXAMINATION (Continued)

BY MR. ROTH:

Q I think we were at the point where you were talking about, I think you explained to the Judge why the ramp was no good over there. I see it's been removed.

And you were going to tell us what you do, how you get to your job, what you do in your job that, compared to these employees, how you do it.

A Yes.

So I have to take Access-A-Ride to work. I don't have the ability to walk far distances to get to the train station or bus stop. You know, there's always a bit of walking between those means of transportation so I choose to use Access-A-Ride. Access-A-Ride is a pain but at the end of the day, it gets me places so I have to use it. I don't have another option.

Then I use Access-A-Ride from my building in Brooklyn to my work which is in Manhattan. It's like near Times Square. I get dropped off in front of the building, I take the elevator, and I work at my desk. It's an office job.

Q So what does it take for you to get to that point? What do you have to do to prepare the day before and the night before and the morning of to get to work? Can you explain that?

A Yes.

Q On time. Excuse me. To get to work on time.

A Yes.

Wearing prostheses means there's a lot of preparation involved. I like to shower the night before because if I shower in the morning, it will affect the way my leg fits because the leg gets a little more swollen if I don't put the leg on straight-away.

I have to wear a shrinker to sleep. That's like a sock, it's a compression sock that you wear on your stump to make sure the shape of the stump is, you know, more fitting to the prosthesis. It's painful to wear the shrinker. Like, often I wake up in the middle of the night and, like, I really want to take it off, but if I know I'm going to wear the prosthesis, I have to wear it to maximize my chances of the prosthesis fitting.

When I wake up in the morning, I wake up around 5:30 -- not around. My alarm is 5:30 on the days I want to go out. The first thing I have to do is clean my liner. So I'll take the shrinker off and put the liner on, put the prosthetic on. And it's a lengthy process and it's a very unpredictable

process. Like, my stump is part of my body. Like, it's swollen. It depends what I ate the night before, if I ate something salty. It could be dependent on the weather. It could be dependent on my hormones, if I'm menstruating or something like that. It's just unpredictable.

Then I've learned that the best chance I got is to put the leg right away. So I roll the liner, I put the, I squeeze in the prosthesis. This is how we do it. There's a suction method. And then I have to focus on letting my stump sink into the prosthesis for about half an hour. Like, I use the half an hour, like, maybe brushing my teeth or something else, but I have to be standing, slamming my leg against the floor to make sure it sinks in or you need your stump to be all the way in to maximize your suction.

Then once I'm, you know, towards the end -- I take about an hour to get ready to go to work. I, I put the arm towards the end. You know, I put my shoes and my pants before I do the arm because the arm by itself is just something that gets in the way. It's just this object hanging there, not helping, just limiting me. But I mean I want to wear the arm.

Should I explain why I wear my arm?

Q Yes. I think it's a good idea.

A Yes.

So I feel like I have good technology. Like, the wrist, the elbow, they have electrodes, but I'm not able to

control the electrodes because my stump is very short. There's no good suction and without the suction, I cannot precisely touch the electrodes.

So, essentially, there's an electrode in the front biceps and the triceps, and I have to contract my stump to touch those electrodes. I need to directly think, like, okay, contracting, contracting the other, contracting twice the same time to trigger the prosthesis. But because of that lack of suction, I can't do it. Like, my arm is, like, loose.

So on a daily basis, my arm is off. I've had experiences before where I had it on, like, when I first started trying, right, and I had this experience where I'm at work and my arm is going crazy and I have to go to the bathroom and I just take it off, turn it off, and that was very humiliating for me so I just keep it off, but then the reason I still wear it, even though it's off, it's because I haven't lost the hope of making it work and I've heard that, you know, this is challenging.

Many people give up on wearing a prosthetic arm but I don't want to give up. I know there's surgeries out there. There's more -- there's other ways. Instead of just two electrodes, they can have more electrodes. They also have integration, something like a metal ball comes out and you click your prosthesis so you don't have suction issues. So I know there's procedures out there.

And I was also told by, like, doctors that it's important to wear prosthesis to keep your body a little more aligned because when I'm -- the prosthesis is not the ideal replacement for the arm I lost, but it helps a bit with the balance. Like, overall, I feel my body feels very imbalanced because of the obvious losses. So I still wear it.

So whenever I go out, not -- to work, I always wear it. I think there's an aesthetics part to it. I'm trying to fit in. I'm trying to look as normal as I can. And sometimes I trick myself to not wear the arm on the weekend if I'm going to go out with, like, good friends. Then I tell myself, like, it's okay to go without the arm and just have a comfortable T-shirt or something.

And I just remember, like, very difficult situation for me is when we throw parties at home, like, my birthday, 4th of July or something, and I have the debate with myself do I want to look better in photos by wearing an arm or do I want to feel more comfortable in my own home. Right? And I don't know. Most times, I choose to wear the arm so I can take all those photos for the future. And, again, there's the hope that I will be a proud user of a prosthetic arm one day.

But, yes, to go to work, I wear it. I go and it doesn't help me at work.

Q And, in fact, what does it do at work? And even when you're around, because it's not working and so heavy, how does

it affect you?
A So both the arm and the leg, they are just these foreign objects. They're painful to wear, they're uncomfortable to wear, but the leg has a mobility benefit and the arm is not there yet but, again, it's part of a process. I will get there. But, right now, it's not functional.
Q And then if you get the osseus integration, why don't you tell us -- since you're talking about it now --
A Yes.
Q -- I understand you've got reservations, but why don't you tell the jury about the osseus integration, your hope for that?
A Well, osseus integration is something I learned over the years because the first prosthetics I tried in Brazil, there was hope it was going to work out. Then I moved to New York and I went to new clinic and I thought, okay, they probably have better technologies, that should work out. Then I changed clinics and I thought that should work out.
The clinic I'm currently on, Prosthetics in Motion, when we worked on my arm stump, we worked so hard. Like, I think we did about eight test sockets which is -- a socket is just this part that goes around the stump. They would, like, they cast it with -- they put plaster, they make a mold, and they make the plastic thing and then they check if there's suction. And I remember with it, multiple times, like, I

would go there every week and get a new test. Then at some point, they decided that's good suction but then the reality kicked in because they attached the rest. Right? They attached the wrist, the elbow, the hand. This is very heavy.

Q The weight?

A The weight. So the suction doesn't hold by itself. Right? So they focused on the harness.

Like, the harness is this thing I wear across my chest and my back to keep the arm on. And I think the harness is, like, the most painful part because it's just a strap that, it needs to be as tight as possible, and the suction needs to be as tight as possible. The suction naturally loses a little bit.

The harness, during the day, I can pull it a little -- the tighter you make, the best -- it keeps the arm in place, but it's just not comfortable. Right? I have this -- you know, after a long day, I have marks on my chest. If I wear my prosthesis every day for a week on vacation and I want to wear it every day, I'm just destroyed because I can have all these marks and it's so painful, but that's all about the harness to keep in place.

Osseous integration is something I heard about where you just click the prosthesis because they make a metal ball come out of your stump and you don't need the harness. So to me, that sounds like a dream. I have some fears because

there's risk of infections and stuff, but recently, like, I met a person that had done it on their leg. So, you know, I'm seeing a real person who's done it.

So I want to try it for my arm, is, like, my next, my next hope. I think, unfortunately, in my life, I've been going through this process a lot where I think a new country, a new clinic or a revision surgery is going to, you know, fix me, but I, I still try to hold onto that hope that maybe, okay, just integration will actually be very helpful.

Q Maybe this will be a good point to talk about some of the procedures that you've had. Okay?

MR. ROTH: Let's look at 97H, if you can put that up. It's already in evidence, 97H.

Q So you said that you had some revision surgeries. Now this -- there's already been testimony. Everybody knows this is before you had your revision surgery.

THE COURT: I don't hear you.

MR. ROTH: Sorry. 97H.

THE COURT: Try not to, you know, give all these introductory comments if you can avoid it. Okay? She's seen that picture.

THE WITNESS: Yes.

THE COURT: Go ahead.

Q So describe what we're seeing in this picture that's been admitted 97H?

A Yes. So this is the best I got. I had surgeries at Bellevue Hospital, then healed.

Like, in this picture, it's considered fully healed so, in the sense of the wounds. Right? I still have new wounds every time I wear the prosthesis.

This is a hard thing I learned about the difference between a traumatic amputation and a medical amputation. If you have a medical one that was planned by the doctor, some people do it to save their lives from cancer or diabetes, it's a clean cut. Mine was not a clean cut. This type of crevices and this type of skin, it makes it very hard for the prosthesis to fit. This was my reality for years until I did the revision surgery in 2021.

Q Okay. So let's talk about that.

MR. ROTH: So, I'm sorry, Your Honor. If we can move over here for a second, I'm just referencing -- this is the Bellevue chart that's already in evidence, this chart right here.

Q You went to Bellevue Hospital and that was the end result after Bellevue, is that correct?

A Yes.

Q Okay. And then you went to University of Massachusetts Hospital -- excuse me -- Mass General. Why don't you tell the jury what happened at Mass General?

A Yes.

Q And that's Exhibit 83A that I'm referring to.

A Yes.

So the Mass General, they looked at my stump at that state and they -- I mean, they said what I'm saying to you now, these crevices are not good, the skin quality is not good. A revision surgery was recommended to make it more smooth and get better skin. And then I did that.

Q Hold on a second.

Before you get to that, what did that entail? What did you have to commit to to fix that as far as work goes, personal life goes? What went into that?

A This was very stressful for me because I knew I had to do it but I was starting my new job. Like, this was all 2021, I started. I remember some people telling me, Oh, you've got to prioritize that, this is important. I said I got a new job, I've got to prioritize that.

THE COURT: Go a little slower because we're trying to take down everything you're saying and I have to protect our wonderful court reporter. She's not going to interrupt but I think she's very happy that I told you to slow down a little bit. Try to do that. Okay?

THE WITNESS: Sorry.

A Yes. So it's always everything and everything at the same time. Right? I'm trying to succeed in my career. I'm trying to get as function as I can. I'm trying to be healthy,

to exercise, et cetera, et cetera.

So that year, I had started my new job. I learned about Mass General. And I remember, like, the concern, like, okay, let's push it towards November. So I planned for it, I had to take time away from work and focus on being at the hospital, then being in rehab, and then working from home because you cannot put the prosthesis back right away. Right? You need to let the wounds heal again and then you need to work from the start.

So that was my first prosthesis of Prosthetics in Motion.

Q So let's talk about the process at Mass General. What did you go through, how long were you there, and take us up to the point of the rehabilitation center that you got transferred to.

A Yes.

The surgery in Mass General was quite intense. They took a big chunk of skin from my right leg and this time was different from Bellevue because Bellevue took skin grafts and Mass General, they took, like, the full skin layer. So it's like as good as it gets, all the layers, but then that meant I have a fish, fish scale scar from, like, my knee to the top of my thigh because they just took that good chunk and put it on the left stump. So my stump right now has the scars from the Mass General Hospital surgery.

Q And how long were you at Mass General?

A I think I was there for about two weeks at the hospital and then I did Spaulding which is a rehabilitation hospital so I spent a couple more weeks there.

Q At Mass General, how did it go? Was it successful? Were there complications? What happened at Mass General?

A Well, it was the standard, like, post-op state. Right? I was under intensive care. Then I was able to go to more regular type of room, lots of blood checking, the whole deal, all again.

It's funny because some things like the blood drawing, I told them get your most experienced nurse, I have bad veins, and they never trust you. They always think they got it and then they had this, like, giant, like the purple things, like, you know, showed the veins didn't work out and they had to keep doing it.

So all of the hospital things, right, you cannot go to the bathroom, you need to use a bed pan. So just full care, full care.

Q And then you got transferred to Spaulding. Was that in Massachusetts or is that down in New York or something else?

A Spaulding is also in Boston. So those were two Boston hospitals. This is something that -- that's why I choose Boston. They have this very nice system where the surgery, Mass General, they know Spaulding. Spaulding is, like, one of

the best rehabs in the United States.

In Spaulding, they kept taking care of, like, the wounds but they started me on physical therapies. Spaulding was a very inspiring place to be. And later on, a couple of, like, maybe a year or two after that, I went back to do some intense physical therapy there which was great.

MR. ROTH: So can we put up 97M which is already in evidence, please. Can we zoom in on that.

Q Can you tell the jury what we're looking at there and how you feel about it?

A So this is my leg in the current state. The crevice on the center, that's the scar. It's just -- you're not seeing the full scar but it's like a circle. Right? Like the whole chunk of skin at the tip, that's what came from my right leg.

One thing which is remarkable for me is when they took that skin from the right leg, that skin was not the perfect skin. It already had a donor site. So I feel like a rag doll because they moved that skin from the right to the left and the donor site that was on the right is now on the left. So they just worked with what they got. Like there's not too much to work with.

Q Okay. And was that 100 percent successful, 50 percent, and how does it affect you now?

A It helped compared to what it was before but we can see it's not fully smooth yet. Like, it has the crevice, it has

the scar tissue, and it's quite wobbly. Like, you can never tell those things right away. When they do the surgery, they need to let it heal and it kind of shrinks into place.

So right now, I see potential for more surgeries in my life. Like, I think it will be part of my life forever, to keep an eye and improve it.

Q Now, if you were going to do the same thing to the upper extremity, what would that entail? What is your understanding and what it would take to figure out how the healing process would go from the upper extremity?

A Yes, it would be similar. I would have to take time from work, I would need assistance to get there, a system while I am there.

Q And how long, how long was the total process from the time that you went to Mass General until the time that you got home and then how much longer was it until you could get the prosthesis when you go to work?

A Well, it was at least a month and a half to, like, go home.

Q Okay.

A And then I worked from home for about two months, maybe a little more, because at some point, I was ready to go to the clinic but when you go to the clinic, it's not like you get the prosthesis right away. You get the casting, the molding, the suction tests, and putting the knee together, all of that.

Q Okay. And since then, where else have you treated?

Let's just talk about your treatment for a second because your treatment was in New York, then you went to U Mass. What are the other medical facilities you have gone to and what have they given you?

A Yes. It's very overwhelming because there's not a person in my life, like, helping me, telling me exactly what to do. I'm trying to figure out by myself.

And I have asked for physical therapy. The doctors -- the insurance approves, like, a certain amount of physical therapy. Okay, you can go ahead and do ten sessions, 20 sessions. So throughout the years, I had months where my focus was, okay, I can go to physical therapy. It wasn't as much physical therapy as I wish I got. It was half an hour session at Mount Sinai, Upper East Side, Access-A-Ride, and going to work after. It's just a lot of effort to just get a half an hour session. I could feel the benefit of it but this is it.

Like, if I wanted to do physical therapy now, I have to fight and figure out, beg my insurance to cover more sessions and it would be the same type of session. It would be somewhere far.

Q What would you hope for for physical therapy? What options would you want? Occupational therapy? Physical therapy? From what you now know, what options? If they could

come your house or something else, what would you like to have?

A Yes.

I cannot stretch by myself. Like, simple things like just pulling your arms up or extend standing up and pulling your leg back, like, those are things that I can't do. So when I have assistance to stretch, it just feels so good. Like, I feel like I'm getting help to align myself. And I walk better when I am stretched. I can do stairs better if I'm stretched.

If I'm, like -- if I work on those things, I have to work on -- like, the physical therapist told me before, like, this is good for you. But for right now, just the logistics to get that, it's not compatible. It's too much pain, too much effort to go do something for a small benefit.

So my dream life would be to have help come to me so I could get some physical therapy, get some stretching, some exercise and get on with my day.

Q And as far as the prosthetics go, let's talk a little bit of the prosthetics.

Now, you had described about going to Prosthetics In Motion. Is that the prosthetics you have now?

A Yes. The prosthetics I wear are from Prosthetics In Motion.

Q Okay. And can you --

MR. ROTH: At this time, Judge, I'd like to use the prosthetics that we have.

Can I approach the witness?

THE COURT: Yes.

MR. ROTH: Okay. Thank you.

A I have brought a selection of prosthetic components that I have wore and tried during the years.

MR. ROTH: Mr. Logan, I'm going to ask you --

THE COURT: You can mark this as an exhibit for demonstrative purposes, I think, would be sufficient to help her in her testimony. It doesn't have to be a formal exhibit which would then have to be packaged and processed. Right?

So that will be demonstrative evidence and that's going to be Exhibit No. 105?

THE CLERK: Yes, Judge.

THE COURT: So 105 would be the prosthetics, for demonstrative purposes only.

Q So we now have an assistant, Mr. Logan here, who can help you. You can direct him to do whatever you want to set that stuff up and then we can proceed.

THE COURT: So you can show the jury. This will help you explain your evidence, your testimony, I should say, to the jurors. You can do that. All right?

Q So to start, what I would like to do is you can have Logan take out the closest socket for your leg. Let's start

with that to what you're wearing now.

Direct him to do that and then once he does that, I want you to have him hold that and you can use your other accessories to explain to the jury what has to be done to put this leg on. Okay?

(Pause.)

A Yes.

So this is a socket. I think that what he's holding is one of my first sockets in Brazil. This is one I had before Prosthetics In Motion, but it's a similar strategy. Right? It's, like, carbon fiber and, like, a silicone layer inside.

Q So why don't you have Logan hold it and take out your accessories and explain to them what it takes for you to put it on to your leg.

MR. ROTH: Logan, put it down. Just hold the one she's talking about.

A So this is a liner. This is, like, a silicone layer that you have to roll over your stump before you squeeze your leg into the prosthetic socket to protect your skin. It has to be very careful when I put the liner. It is meant to be a two hand activity. I have to take my time and use a lot of strength and roll it over.

Then to wash your liner, I can't do that. Like, you have to roll it in and out to scrub it, but I just can't roll

it out with one hand, so what I do is just clean it with a hand sanitizer.

Q And then you have to put that -- that goes onto your stump and what's the next step that happens?

A I have to open the valves.

Can you come closer, Logan?

It's a valve with a key that I have to open and push the leg out while I'm slamming the leg in.

Q And when you do that, what piece is attached?

That's just the socket. Can you have Logan pick up the piece that was normally attached to it?

A Yes. Let's get rid of the socket. There's this one.

So this one is a socket from Prosthetics in Motion but it has my leg from Brazil. Like it's my collection of random things.

Q Hold it so the jury can see it.

A Yes.

This is my first prosthetic knee. It's, like, what they call a mechanical knee, a pneumatic knee because it's air and fluids inside. There's no electronics. And that's a socket similar to what I have now.

Can you rotate it? Other side, please.

I've also had issues with the skin. So this is a test they made of, like, removing the carbon fiber from this to let the skin have less friction there, but it removes from

the suction so it was like give and take.

Q And when that was there, what was happening to your leg? How were you feeling in it?

A Well, like --

Q Before they cut it away. There's a reason why they cut it away, right?

A Yes, because I was having blisters on that spot more than other spots. So they were trying to move the pressure on that spot. It didn't fix it for sure, but it's an attempt, yes.

Q So we've heard a lot about blisters. When I get blisters, it's a little thing. Can you explain what it means for you to get a blister?

A Well, when I get a blister, it's, like, you know, the doctors will tell you don't wear the leg, let the blister heal, but then you also have to wear the leg to keep on going.

The prosthetist encourage you to wear the leg. So that's why I have the balance. Right? Like, I wear the leg when I have to, when it's the most useful, like I go to work, I go places. And when I'm home, if I keep wearing them, I keep having blood and pain and it's a risk of infection too.

Q Okay. So how long does it take, that whole process from the beginning, from the very first second where you pull out your liner to the time that it's completely, solidly on your leg each morning, how long does that take?

A It's 30 to 40 minute process to feel confident on the leg

and, like, try to adopt around it.

And I plan. If I want to go somewhere, like, I want to go downstairs to grab takeaway or grab a package, I need to plan that I will put my prosthesis on or I have to just wing it. And if I, if I poorly put my prosthesis, I can do it real quick, five minutes, and then it would not be fitted and that's bad for the stump because then if it's not well fitting, you get 100 percent blisters.

Q What about the safety issue with that when it's not well fitted, what kind of risks are associated with that for you?

A I think Logan can put it down for now. It's heavy, very heavy.

Q Did you hear my question? Do you want me to ask it again?

A About -- yes, it's easier. Go ahead.

Q What safety risks are involved if the prosthetic is not solidly on your leg with the suction?

A So losing suction throughout the day is the normal thing for amputees but it's, like, you know, you try your best when you're putting it on, but then throughout the day, it's normal that, like, the leg is compressed all day so it's naturally -- you might lose a bit of suction because now your leg is more compressed.

A lot of people have the ability to take the prosthesis off and toss out the sweat, because it gets sweaty

in there, and then they quickly clean it and put it back on and get on with their day. I cannot do that without assistance.

Q Why can't you?

A Because you need to have a place to sit, a place to spread your things, all of these components. With one arm and hand, I cannot do it. Right? People with two hands can hold onto things. Like, I just can't.

Q So this is a problem at any point in time when you leave the house, that if you had another person, like, what -- what I'm asking you is what would an assistant do for you in those instances?

A Yes. Assistants could definitely help me keep my balance, help me remove the liner, clean the liner, roll the liner back on, help me, like, get into the prosthetic because it's very hard to do that balancing one leg anyway and then with one hand, I don't have much ability to get support and do the actual task. Right? So there's other things that people do.

This is something called socks and rings. I brought that.

(Pause.)

A So you see the liner has a ridge. That's to help, like, keep the suction and they give you extra rings. So throughout the day, if you feel like you're losing suction, you can just

roll more rings on top of your liner. You could roll, like, a sock to make, you know, just to make the layer thicker so the leg is tighter.

These are all like little tricks that for me is just impossible to do with one hand. So often, at the end of the day, my preference, again, not very good options, but my preference is to go home even if my leg is, like, falling off, like, I know my suction is not good so, like, the final steps, like, walking, you know, out of Access-A-Ride. It doesn't help either to be there for like two, two and a half hours, like, stuck in the car. And when I get out, those final steps are just, like, messed up. My leg is falling, but I prefer to just go home and take it off then to actually deal with it.

So my entire day has to be planned. Right? If I want to do something in the evening, I have to be careful what activity I might do before because I lose suction and then I cannot do the next activity.

Q What would it mean for you to have like a driver and transportation, a personal driver to take you places? What would that mean to you?

A That would mean my ability to come and go places because right now, I feel very stuck. Like, I have to plan everything I do.

So can I talk more about Access-A-Ride now?

Q You can if you want.

A So Access-A-Ride is a big part of my routine. I'm not a complainer but Access-A-Ride is a pain. It's, like, a torture to the way it serves people because they have so many, like, clauses when you accept Access-A-Ride, that you cannot even complain.

So you have to set up where you are going and at what time the day before. So by 5 p.m., they need to know exactly what I'm doing the next day. And people who know me know this is how I roll, like, you cannot change plans, otherwise, I will not go or I will have to pay expensive Uber by myself. So I set the night before, then I set the time.

I have a subscription on Access-A-Ride to pick me up at home at 6:28. I figure out that that's a good time because I match with less people because sometimes I match with two, three people. So I leave early because I cannot count on Access-A-Ride to take me on time. I need to go so early that even if I'm late, even if I take two hours, I'm not actually late for work.

So I book Access-A-Ride. The drivers are allowed to be half an hour late, period. Like it's a window. It's a pick-up time window. Once they get you, you still have no idea who you're sharing with, if they're going to drop them first, if they're going to pick more people.

Sometimes they pick more people like they own the ride. One time I went to work, I crossed the bridge three

times because I was in Brooklyn, we went to Manhattan, we came back to Brooklyn and then Manhattan. I was, like, I'm in the car and then I get it work, I'm sorry, like, you know, because even though I'm required to be there by 9, but you know if I get there earlier, I can start clocking in, I can start billing my time. So and I explain myself when I'm late. And it's always these crazy stories, oh, I shared with three other people and we went to Queens or we went to somewhere not on the way.

Q Your boss seems pretty understanding. Why is it so important for you to be on time?

A I want to be a good worker. I don't want to miss a meeting. Because, you know -- let's say if I chose to, okay, I'm going to leave at 8 to be there at 9, but then if I have an Access-A-Ride problem, I'm going to show up at 10. That's not good.

So I'm trying to make it work. Right? Even if it means, like, waking up way earlier than other people or -- I know I wake up earlier than George.

Q Okay. So we were -- I think we got off on a tangent.

A Sorry.

Q No, no, no, because we went off -- you were about to -- we talked about your prosthetics, we talked about Access-A-Ride, and I think you had just gotten to work. You started before to tell us what your day is like at work and

what things you struggle with at work.
A Yes.
At work, my main concern is just it's painful to wear my prosthesis for a long period of time. So if I'm work from home, I have the ability to not wear them or to wear them a limited time. When I go to the office, I'm making a commitment to be there for eight hours wearing a prosthesis. It starts to be painful. It starts to wear off. It is what it is. It's a foreign object.
Q And during work, what benefit would you get from any help, like, just getting your lunch or anything else?
A For sure. I mean the same limitation I was saying about, like, when I was in City and wouldn't go out and explore about, like, grab a coffee.
Like, I have the experience now, like, sometimes a co-worker buys the coffee for the team. I'm never the person who is going to buy coffee because I can't walk to the coffee shop and grab a bunch of coffees. It's something I would maybe get help to do, but I, I just can't myself. Or with my own lunch, like, I order takeaway to the door, but I cannot afford takeaway every day. So I don't know, I just bring something from home and, like a microwaveable thing or cold thing.
Q So tell us about when you go out to eat and like how this has affected just your regular thing of getting food?

A Yes.

At lunch time, I don't even try. Like, I keep it simple and stay at my desk. But when I'm going out with friends, and this is the type of activity I chose to do with friends, like if friends want to see me, I suggest a dinner somewhere because it involves little walking and I can get a car to the door and I know I'm not going to walk too much, but even then, the whole thing is planned out. Like, I need to plan where will I wait if I arrive early with Access-A-Ride or where will I wait if I finish dinner and it's not time for Access-A-Ride yet or if Access-A-Ride is late. So people just learn that I have to stick to what I planned before and sometimes it changes.

Then everything is thought, right, even the choices of what I eat. I don't eat steak, I don't eat things that require cutting because I cannot cut with a knife when I'm -- I mean I can cut with a knife, but maybe at home, I can deal with the wild side, bite it, but if I'm out and about, I, I try to almost hide my disability. Right? I order some fish. I order something I can eat with my hand. Often we eat things that just requires one hand I feel like to fit in because if it's any other activity, like I don't know, you don't think about it, there's so many things with two hands.

Like, people offer you an appetizer, like, you have to hold a little dish and grab it with a little fork. I can't

do that. I need somebody to hold it for me so I can eat. So I'm often saying no to things because I just can't do it.

MR. ROTH: Okay. Now, let's put up Exhibit 97C which is in evidence right now.

Sorry. I'll just put it on the screen. We'll use this. I apologize. This is 97C.

Q And this is -- okay. Now, could you just say what that is?

A Yes. This is a picture of my donor sites on my back while I was in Bellevue Hospital.

Q And how did those donor sites heal now until today?

A I still have all the scars from the donor sites. Like, they're still sites that my skin is more delicate.

Q How did this affect your sleeping?

A It was extremely uncomfortable for months. Today I don't, I don't have pain on the donor sites, but I couldn't, like, wear a bra for, like, years because the bra would touch those areas.

MR. ROTH: Okay. We can take that down.

Q So during work, as far as what everybody else is doing that you don't do, you mentioned site visits. Where is your headquarters for work?

A It's in St. Louis, Missouri.

Q And what group are you in? We really haven't talked much about your work. Why don't you talk about your group and what

your role is there and what you would like to do that you can no longer do?
A Yes.
The company has offices throughout the United States and the main one is in St. Louis. The accessibility team is mostly there. So if I had the ability to travel easily, like, I would love to go there more often. Like, it's an important part of growing in the company to, like, especially, like, right now. Like I said, it's an opportunity that the team needs a new leader. We used to have a director who is no longer there, so the principals are asking us to help out and I'm trying to help out as much as I can, but connecting with the team is a challenge for me because traveling is challenging.
Q So are you able to travel or you just don't? What's the result of that?
A I'm able to travel with assistance throughout, but it's a painful experience. Right? Like I have to put all my energy and all of my effort to just making that one trip work.
So, for example, I went to St. Louis this year because I felt if I don't go, I'm going to miss out. Like, they had people from the other offices fly in and I couldn't be the one to stay behind.
Q And how hard was it for you to do that? Can you describe what it took?

A It was very hard because other times I have traveled for work, my husband George was able to accompany me but this one, he wasn't. So I was, like, okay, I have to rely on the kindness of other people. Right? And it starts right when you order an Uber. I cannot put a wheelchair on the car back so I have to ask a stranger to do it for me and sometimes they're not happy about it.

Q So when you say you can't do it by yourself, for you to travel, you have to be in a wheelchair, correct?

A Yes, I have to take my wheelchair with me because I cannot walk around an airport. I need the wheelchair pushed around the airport. When I'm in the hotel, I take the prosthesis off and I always have to have my wheelchair.

Q In your house, how do you move with the wheelchair? Describe the only way or any ways you're able to move your wheelchair outside the house?

A I don't. So I use my wheelchair at home. I don't go places by myself with the wheelchair. I only use the chair if I have assistance because then they'll push me or they will set up, like, a little motor thing, like an add-on thing you can stick to the wheelchair underneath.

So the reality is that, like, by myself, the only places I go out is, like, I go to a shop or I go to dinner with a friend. Like, I never go explore or say, hey, friend, let's meet at this, like, food market or something like that.

That sounds terrifying because it might involve a lot of walking or if somehow I got the wheelchair there, I would need the friend or someone else to push me and that's not, that's not what I want. I don't want to depend on friend, especially making a new friend, like I want to take care of myself.

Q Okay. What -- let me rephrase that.

How have people's misconceptions, when you're wearing your prosthesis, affected you and caused you some difficulty, if any?

A It still does. It's having a disability. Using a wheelchair, using prosthetics somehow gives people the -- people come up to me, like, they can say things to me. Like they say, I'm so sorry for you, or they don't realize it's a permanent thing. They say, I hope you get better. They say, God bless you. They say, Thank you for your service, and, like, all of these things. Of course, I'm like, wow, where do I start. Right?

So I just try to shut it off. Like, I became a way more closed off person because sometimes a person will start conversation and give it two seconds. They are asking me about the details of my amputation.

MR. ROTH: We'll put that down. Thank you.

Q Is there anything else would you like to say about --

MR. ROTH: Logan, while you are going there, pull up Exhibit VV when you're ready.

Q And Luisa, is there anything else you would like to tell us about work and what you do at work and what your goals are and how they've been difficult for you?

A Yes.

So I have this goal of, like, one day, being able to do the site visits. It's a very important part of the job. Like, I work throughout years on the drawings, so when it gets built, I would love to be the person who is there and checking out if they built according to the comments I made. For example, right now, I had a co-worker fly from St. Louis to survey a building that I work on the drawing. So I have to pass over to other people that part of the job.

So it would really help in my growth, and I know I'm growing on the company because I'm working hard on the things I can do, but there's this part, there's this whole side of my work that I just can't excel right now.

There's another part which is the business development side. Right? I mean I dream big. I want to grow in the company. I want to be a partner one day. Why not? And to be a partner, you need to bring business. You need to meet clients, you need to go to lots of events, and you need to go to their office and take them out for lunch.

Those things just sound like impossible for me right now. It's, like, so much energy, so much effort to, and at the end of the day, assistance. Right? I would need someone

to help me. A couple of times I've done something like that, I had my husband assist me throughout and that's not something I can do all the time. So I'm just trying to focus on the things I can do in the meantime.

Q Okay, but you seem to be able to do a lot. So why don't we take a look at -- I think that these are the videos that defendant played.

So let's go to 1:58 on the VV, Exhibit VV, 1:58. Okay?

A Okay.

Q Why don't we play that for, play that and I want you to narrate what you see you're doing here and compare this to like how it would have been before you had these injuries.

A Right.

(Video plays.)

A Here I'm going to prepare the trash bag to be taken out. And I mean, no one does that, right? Like, I have to be sitting in my wheelchair so I can use my leg as a second arm, essentially, to hold the bin down while I can pull with the arm and I'm going to tie the bag with my mouth. Right?

To me, watching this is so painful. Right? This is not hygienic. Some people don't even touch trash and I'm putting my mouth on it to close it. But this is something I do every few days because my husband is the one who takes the trash out and I want to be helpful. I want to do one part of

it. Right?

So I do that part because I, you know, compared to taking the trash out, this is the little easier, let's say it, even though it's humiliating for me to do that but I do it so I can feel like I'm helping out.

MR. ROTH: Okay. Let's stop it.

(Video stopped.)

MR. ROTH: Can we go to 13:28, please.

(Video plays.)

Q Tell us what's going on here?

A So here, I'm, like, doing laundry. Laundry is something, like -- this part of laundry I avoid as much as possible because I need to put on my leg to be able to even get downstairs to the laundry room. We have this, like, special hamper with wheels. So I had a regular one before.

MR. ROTH: Pause it.

(Video stopped.)

A Because I need the wheels to at least drag it. Right?

Yes, we also divide the tasks. Right? The putting in and out of a machine is so frustrating because I drop half of the things and it gets dirty again when it falls to the floor and I just throw it back in. So I try to avoid that as much as possible. I only do it if my husband is traveling and I have no choice.

Q Let's play, play this and can you narrate this, please.

A I was going to say one thing about laundry.

Q Go ahead.

A I'm always trying to do one part of it. So he does it all, the taking it down to do the actual wash, and then I fold it. I take a long time to fold it with one hand and I need the sofa, like, a clean surface to put it down and fold it. I cannot just quickly do it in the air with two hands. But I do it because I want to be on the same level as him. Like, I want to contribute for household or family. It's the two of us but it's a family.

Q Okay. All right. So let's look at this. Narrate this.

(Video plays.)

A So this is -- there, I'm washing the dishes.

The only way can I wash the dishes is to push things against the bottom of the sink. So, you know, I can get through it, but I have obviously a very low standard because every time I'm putting it on the sink, I'm touching the sink again. And if I, you know, if I want to wash the other side of this bowl, I'm going to turn it upside down and touch the sink again. So it's not --

MR. ROTH: Let's stop it.

(Video stopped.)

A I just low my standards so can I get by and have some degree of independence.

Q How long would that normally have taken you to do?

A I guess very quick. Right? Grab it with one hand, scrub it really hard with the other one.

Q Bates stamp Defendants 2610. Folding laundry.

(Video plays.)

A So that's the laundry folding I described.

Like it's not efficient to fold it with one hand. It gets painful after a while too because it's not ergonomic for me to be, like, in my wheelchair kind of leaning sideways and trying to fold it. I don't have, like, an accessible surface, a good height for me to approach the wheelchair or anything. So I'm just trying.

Q So this causes you pain right here? What's the painful part? Can you explain that?

A Well, first of all, like I'm putting all the effort in one arm. Right? Like, this is part of my reality. I'm doing everything with one arm. So it gets painful. It gets tired. I know it's not good for my body.

There's so many activities I do that I know I'm managing because I'm young and I am healthy, but I had physical therapists tell me, like, this is not good, like, you're putting too much strain, like, too much. I feel like I'm pushing my body to its limits. Right?

Every time I enter a car, I'm, like, trying to hoist myself in. Or if, like, I'm getting into the shower, I need to pull all my strength transferring from the chair to the

seat. All those little things, they pile up, and it's hurtful.

MR. ROTH: Let's go to the Defendants' Bates stamp number 3626.

Okay. Go a little bit further in that. Go about 20 seconds further. Good.

Q Let's talk about this. We're going to play that and you can narrate that as you're watching that, please.

(Video plays.)

Q What's going on here?

A I'm preparing to brush my teeth.

Normally I have some trouble, like, just balancing the toothbrush because I have to make sure it doesn't move. Then I have to put the paste.

(Continued on next page.)

(Continuing)
A Yup. And it often, like, falls because the toothbrush is not standing still. So in this video, I just gave up, right? Like, I just grabbed the paste that was in the sink and I carried on.
Q What would you have normally done had you had two hands?
A First of all, I don't think I would have failed. I would have held the toothbrush firmly and put the paste and brush my teeth. But also, like, even if I had failed somehow, it would be a quick thing to do it again, but for me, it's like, okay, I need to put my energy again, and balancing the toothbrush, getting the paste, squeezing with one hand. It's, like, it's just so frustrating over and over that you just -- I lower the standards and I get by.
Q So tell us what you're doing here. This is the continuing of the section that they played for you.
A I'm removing nail polish with, like, acetone. And normally what I do is, like, I file my nails, and I even paint my nails sometimes.
MR. ROTH: Logan, go about 15 seconds ahead, I think.
A Painting my nails is something, like, I've always done. Like, it was part of my creative self. Like, I could do cool nail designs. And I could do the whole process myself. I could, like, you know, painting the nails is not just putting

the polish on, right? You have to clean it around the sides and remove the polish that went over. So right now, when I paint it, and I paint it with my mouth, I don't know, it goes back to it's just a low standard where, like, I feel good because I painted a little bit, but if you look closely, you can see, like, all the flaws with it. So it's not as good as it used to be.

Q Okay. And so why don't you just go get this done at a nail salon?

A They are expensive, David. They're expensive.

Q But you have a job, right?

A But things pile up because I need assistance to do everything. It's, like, I cannot do my hair either, right? I cannot do a pony tail, I cannot do a braid, but I cannot go to a hairdresser to do my hair and to go to the other one and do my nails. Like, I do my nails for a special occasion. If I have a work event, I go to the nail salon.

Q So how did you --

MR. ROTH: Keep playing it.

Q And what are you doing here? How did you figure out the accommodation here? What is that?

A So I'm holding the -- normally I hold the file under my arm. And at that point, I'm holding the stick, like, to kind of clean under the nail, you know.

Q And obviously I don't have to ask you, if you had two

hands, how would you be doing this?

A Much easier, much quicker, which I would enjoy doing. Painting my nails is something I enjoy. Now it's something I kind of, like, try, you know, I feel good if I have my nails painted, especially if it's done by a professional person or a person with two hands.

MR. ROTH: I can only take so much more of this.

Can we go to 1:36, the Defendants played for you. To 1:35, I'm sorry.

Q Tell us what's happening here.

A About the shower?

Q Yeah.

A So I need the shower chair because I cannot stand up while I shower. Like, I don't have the balance, the strength, and it's dangerous, right? So sitting down is required.

I have a portable seat at home. Something like I bought on Amazon. Ideally I would have a fixed shower chair.

MR. ROTH: Pause.

Keep on.

A For the shower, like, ideally I would have a fixed shower chair.

I asked the building owner to install grab bars, they didn't install exactly how I wanted because the buildings come with, like, limited reinforcement on the walls, but they helped a little bit. But I still have that giant curb between

my wheelchair and the shower chair, so I have to transfer by putting all my strength into holding that grab bar and transferring over.

And this is my house, right? So this is -- we try to adapt. But everywhere I travel, everywhere I visit, I go through, like, from zero. Like, I need -- it's a big -- it's a big struggle because everywhere I go, like, what is the accessibility of it. Right? And sometimes I can find a hotel that has an accessible room, and it's actually more enjoyable to have a shower in the hotel room because it's actually designed as accessible. But there's other trips where I just didn't shower because I could not get into the shower, and I just thought, okay, I'm not going to shower. It's easier to just not shower or to have assistance to get into the shower. Like, maybe it's a chair they got from somewhere else. And I've just tried so many showers. So I think something -- you know, when people go to hotels and they complain about, oh, the water is not that good. For me, like, I'm assessing the entire shower.

Q So why don't you --

MR. ROTH: Logan, can you go to 27, please? 27 seconds.

(Video played; video stopped.)

Q So what -- if you could, what would you want to have happen here?

A Well, ideally I would have a shower like actually designed as accessible. Right? This shower is not. Like, it has the grab bar add-on, but that curb, that curb is not accessible, like, you should be able to approach the seat with your wheelchair. Also, like, to be able to have a chair, like a waterproof chair or something. You need to approach the shower and not transfer over a curb.

Q So the question I'm going to ask is why don't you move? Why don't you guys move to another place?

A We feel like this is what we can afford. Is like from what we paid is a good apartment. Like, I've thought about moving closer to the city, like to Manhattan, and it's too expensive. I don't know, it's a rent stabilized apartment. So I mean, we don't have better option, like, we just can't afford it.

Q So these things that you can do, it takes some effort, right? And so I'm going to ask you --

A Yes.

Q I think this picture was shown.

MR. ROTH: This is Defendant's UU, I believe. We can put this up.

(Exhibit published.)

Q Okay. Can you tell us about that -- that was put up in -- can you tell us about that photo, what's going on there, and the back story behind that photo?

A So this photo was taken somewhere towards the end of 2017. I know that because I already have the prosthetic arm. It was taken in my university in Brazil. So this was that time where I managed to go back to university with my mom's assistance. My mom took this picture. And I was very proud that I had done a presentation about universal design, which is designing for people with all abilities in architecture.
Q You're smiling. Are you having an easy time of that in that picture?
A This is my typical life. I am happy about something. I'm happy I made a presentation, but that doesn't mean I'm not struggling, I'm not in pain from wearing the prostheses. And my wheelchair is in the background, not the actual background, but it's behind the camera, right?
Like, my mom, my wheelchair, all the things to get me there, they're there. But in that moment, I'm just trying to focus on standing proud that I made a presentation.
Q We know, back in Brazil, that you liked to go to the beach, and now you have a waterproof leg, so why don't you tell us what your experience is like if you want to go to the beach and tell us what you call it.
A Yes. So having the waterproof leg, it's a great start. Right? The other legs you just can't approach the water at all. But there's still the challenge of, okay, how do I walk in the sand? I need some assistance for safety. How do you

get into the water? Definitely need assistance there, otherwise I'll be thrown off by the waves. And even when I get in -- there's two scenarios, right? If I manage to get in with the prosthetic leg, now the leg is dirty and I need assistance to clean the leg, to wash the leg, put the leg apart where you need to take the shoe off, the foot off, there's, like, a sock underneath the cover. For example, in that picture, there's just a cover in front of prosthesis, and right now I have a cover too. So if you have to remove all of those things, get it cleaned, I need assistance to do that. So there is a whole operation if the leg is dirty.

The second scenario is if I want to just swim without the leg. And swimming without the prosthesis actually feels wonderful because I feel like I'm floating, I feel like I don't need any of these mobility devices. When I'm in the water, I feel good. But to get to the water, it's such a pain because I need to -- how do I get there? Do I leave my prosthesis behind, and someone has to push me in the wheelchair, and I'm all there visible with my stumps showing, and then I go in the water. Or do I walk with the prosthesis to the edge of the pool and then what? Where do I leave my prosthesis? How do I put it back on, right? That's the big question. How -- I cannot just quickly put it back on standing on one leg by the pool. So I need assistance the whole time.

Q Okay. Now, can you tell us, which we haven't gone over yet, tell us about when you first saw your condition. When you first saw your stumps, when you first actually took a look at yourself after this happened?

A Yes. So the hospital was a bit of a bubble. Of course, I was shocked but I was seeing from the perspective of lying in bed. I could see the stumps there. I felt like the alien thing going on. But it was only when I went home and even a few months after when I was able to remove the dressings for a little bit. Because at the beginning, you take the dressings off to get the dressing changed, put them back on, so it's not like I was even looking at myself. And I remember the first time I looked at myself in the mirror, like, without the dressings, I -- I felt hurt. Like, I just looked at that and I was, like, how? Right? Like I'm -- it's very hard to describe. I just saw myself missing and it's not missing for a good reason. I always feel this struggle that it's not like I was a soldier fighting for the country and I suffered an injury. I was going home after the supermarket and now I'm injured like that. And that's the image, like, that I see every day. Right? Like, that's not going to change. So it's very challenging for me to look at myself every day, to go out of the house, even with the prostheses. But it's the body have. It's what I got to do.

Q And when you first got it, tell us about your hope and

how you felt about that and how you feel now about the hope that you used to have?

A From the start, I tried to be hopeful. That's what kept me going. Sometimes people think that the hospital is the hardest part emotionally, but I thought I was so certain, like, I'm going to get prostheses, I'm going to go back to life. But the more I live, the more the challenges pile up. And I'm going through life, like, I'm going through milestones in my life, right, like I went back to university, I went to study in New York, I got married. And I'm going through these milestones with all this pain inside and all the struggles that I'm happy that I'm going through these milestones, but it's not the same as I dreamed or that other people manage to do. So that sense of hope, it actually -- it's diminishing throughout the years. Every year gets harder because I'm seeing it's not getting fixed. Right? Like, I'm trying so hard, I'm overwhelmed, I'm tired. And I have no choice, right? Like every day I try to push that down, that desperation about, like, what's my next step, like, how I'm going to -- what my future is going to look like. I'm insanely scared of the future, right? And I just go one day at a time.

Q If you're going through all of that, why aren't you complaining more?

A Because there's no point, right? Like, I -- I already

feel like a burden. People already see me as a burden. And I'm still trying to be a joyful wife, a daughter, a sister, a friend. Like, I want to be pleasant. Like, sometimes people complain about they're in pain that day, but, you know, the next day they won't because they're no longer in pain, but I'm in pain all the time, and my leg and arm are not going to grow back, and I'm going to keep wearing prostheses. And my reality is I take Access-A-Ride almost every day. So I used to go home crying to George about Access-A-Ride, but at some point it stopped because I felt like -- I mean, at some point, people get tired of listening, right? And I just hold it all in because I have no choice. Sometimes people think I'm positive and optimistic, but I don't see it that way. I see it as extremely realistic because I only have two options, right? I either give up, and I'm depressed, and I'm in bed, and people take care of me. That would be easy. But I'm trying so hard to build back the life I had, and I'm fighting for the basics because I still have those big dreams that I've always had. Like, and right now I'm just -- I'm just dreaming about the basics. I'm dreaming about doing the basics so I can still dream about being excellent at my work, about having children, about traveling and actually enjoying things, or just going to somewhere to have the freedom to come and go. Right? That's basics.

Q So why don't you tell us about how this has affected your

marriage and George?

A I can say it's a lot on George. Like, the carers are always, like, hit as well. And I see, like, he loves me, he helps me, but I don't want to ask for too much because I see, like, it's not good. Like, it wears him out too. So, like, I'm trying so hard with the house chores, right? Like, I'm trying to show that I'm doing my part, like, I'm putting as much as I can because I don't want to -- I mean, I need to try my hardest, right? I want to be on the same level.

Q So what about you said you wanted to have children. What are your hopes and goals for children?

A I've always wanted to have children. I've always loved children, other people's children. I mean, I would love to be a mom. I still dream to be a mom. But it's absolutely scary. Right? Because I cannot. Right now I think if I told people I'm having a child, they would be like, what, like how? Because I can barely take care of myself, like, how would I take care of a child, right? So this is extremely painful to me to know that I would not be able to do a lot of things that, like, my parents did for me. And the only way I think it would be possible would be to have assistance to do that. And even then, like, the -- it would take away from the enjoyment, right? Like, it's having help right now sounds like a dream, but even then it's not -- like, it's not -- it's not what I envisioned. Like, I thought I would be, like, a

super mom, and grab all the children, and go travel, and have a dog. Like, even having a pet right now sounds like, how could I take care of a pet? So I barely take care of my plants because the balcony is not accessible. I like buying the plants, but then I cannot get to the balcony to water them.

Q So is there anything else you would like to say about this, about your situation, Luisa?

THE COURT: Just take a deep breath. You've been going for a long time. Make some final comments, and then I think we would take a break, and I think we would have to give the other parties a chance to question you. I think you've gone a long way here today. Anything final you want to leave the jury with?

A I don't know what else to say because I think, like, there's no way I can compile all of my life into an afternoon. But I just feel like I want to emphasize I was a regular person, a happy person, successful person, and having lost my arm and my leg took a lot from me. I'm trying to go back to the basics of who I was so I can carry on trying to do the things, like -- and I'm just tired. I'm tired. Like, every day I have to try as hard as I can, and it still hurts, it's still painful. And I'm going to keep trying, but I'm hoping I have to try a little less, that I can have a bit of assistance, a bit of comfort, a bit of normalcy, normality in

my life.

THE COURT: So we're going to take our break now. And we'll let the jurors leave the courtroom first. And then you could take your time in getting off of the chair.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURTROOM DEPUTY: You all may be seated.

Judge, how long is the break for?

THE COURT: I think until a quarter after 3:00.

THE COURTROOM DEPUTY: I'll let the jury know.

THE COURT: So now, why don't you help --

MR. ROTH: I'll get her.

THE COURT: Ms. Da Silva down.

And I will ask Mr. Keaveney what your pleasure is now.

MR. KEAVENEY: I don't think I will be long, Your Honor. I will be fairly short.

THE COURT: Yes. Oh, so that's good. And then we will have a chance to chat about a bunch of legal things. Okay.

Let's go into the Judge's robing room.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right. Mr. Keaveney, if you want to ask some questions of the witness, you can do so now.

MR. KEAVENEY: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Ms. Harger, I will be brief with you this afternoon. Good afternoon to you.

A Good afternoon.

Q You gave deposition testimony in this matter, correct?

A Yes.

Q And did you review that prior to today?

A Yes, I read my transcripts.

Q Okay. Have you been working since this trial started on October 27th?

A Yes, I'm working.

Q Are you working from home, are you going to the office?

A I'm working mostly from home. I've been to the office when there were a team gathering.

Q Was that within the last couple of weeks?

A Yes. Yesterday I went to the office. And the week before I went on the Wednesday as well. So two days I went to the office. Other days from home.

Q Was that also by Access-A-Ride?

A Last week I took an Access-A-Ride to the office, but then I had dinner with my coworker and it finished earlier, much

earlier than my Access-A-Ride time, so I treated myself to an Uber home.

Q What is your current title at work?

A I'm a senior accessibility consultant.

Q And as a senior accessibility consultant, what do you do on a day-to-day basis?

A I work with what we call plan reviews where I look at drawings and I make comments and take measurements on the drawings. And I work with assigning projects. I do a bit of everything that the team needs.

Q Do you supervise anyone?

A Not officially, but like they -- they're asking me to train the newer hires, and both just, like, setting the quality standards for the team.

Q Do you have a resumé?

A Yes.

MR. KEAVENEY: Can we put up Plaintiff's Exhibit 104?

THE COURT: Is this a new exhibit?

MR. KEAVENEY: No. This is part of the employment records.

THE COURT: This is 102.

MR. KEAVENEY: 104, Your Honor.

THE COURT: Oh, 104.

(Exhibit published.)

THE COURT: And that's her employment records, right?

MR. KEAVENEY: Yes, Your Honor.

And we're just looking at her resumé, which is Bates Number 8648 and 8649.

Q Is this your current resumé, or is this an older version?

A I still work at Code Consultants, though I have a -- the most updated version would say senior accessibility as of June this year.

Q Okay. Your code consultant job, that's your first job, your first official job, right?

A Yes.

Q And you've been working there for about four years now?

A It will be five in January.

Q And according to the resumé, is this still currently what you do there? And that is building expertise on accessibility regulations within the ADA standards, international, state, local codes and others?

A Yes.

Q That's still part of your description? Or job duties, I should say, right?

Performing architectural plan reviews and site survey observing accessibility compliance; that's another part of your job?

A Yes, it's a part of my job.

Q And that's part of your job today also?
A Hm?
Q That's still part of your job?
A It's still part of my job description.
Q And providing reports and accessibility guidelines through different projects stages. Is that still part of your job responsibilities?
A Part of the job description.
Q Anything else that you've had to do or that this could be modified based on your promotion as a senior consultant?
A I believe in my latest one, I also threw some wording in about helping manage the team, workflow, assign projects.
Q Down at the bottom of that on the second page, under skills, these are some of the skills that you have that are related to your job or being an architect, correct?
A Yeah, these are typical architecture consultant job -- skills.
Q Skills. Okay. That would be hand sketching, digital drafting, reading blueprints, referring to compliance documents, report writing and proof reading, graphically designing boards and presentations, program briefing, communications, and presenting projects, site inspections and documentation.
Is that part of the skills that you have that you bring to your job?

A Well, because it's part of my job description, like, you know, if someone asks what does CCI do, what does CCI Code Consultants do? I would say, oh, we do site surveys, we do this, we do that. I don't tell the clients I, Luisa, specifically don't do surveys, even though I have to delegate the surveys. So it will always be part of, like, you know, I'm not physically doing the survey, but I still have the skill to talk about it, to direct it.

Q So underneath that it says software and these are the software programs that you're capable of using as a senior consultant?

A I don't use all of them at my current job. Like, these are all things that I've learned throughout my life, and I'm not necessarily proficient at them right now. But it's my resumé, I added a bunch of things throughout my life, and I don't really take things out.

Q Are you part of the Accessibility Professionals Association?

A Yes.

Q Did you go to Austin this year to give a presentation?

A Yes.

Q Did you go by yourself, did you go with somebody else?

A Yes, so that was a conference where I made a presentation about accessibility for people with prosthetics and ambulatory because there's a difference between wheelchair accessibility

and ambulatory accessibility. And yes, I had my husband accompany on the travel. And at the hotel, the hotel was at the conference.

Q And part of that seminar was about providing insights into how accessible designs can support experiences of prosthetic users in the built environment; that was the presentation?

A Yes.

Q And I notice that you said earlier that you're a big advocate for yourself, and it seems like now you're an advocate for others; is that correct? Is that an accurate statement?

A So at my work, I'm not an advocate, I'm technical code consultant. And even that presentation, they told me they were looking for different types of presentation to talk about different types of disabilities because normally it's very wheelchair focused. So I said, look, I can talk about the codes involving requirements that are helpful for people with prosthetics, I can talk about prosthetics, I made a lot of research to show the different types of prosthetics, different types of amputation levels. So it was not a presentation about me, but it was a presentation to show that universe, and I'm hoping that presentation will lead into code changes, more awareness and things.

Q Have you given any other presentations?

A I did the same presentation at the National ADA Symposium in Atlanta.

Q When was that?

A June this year.

Q Did you go to Atlanta by yourself, or were you accompanied by someone?

A I went with my husband.

Q Okay. When you were in Austin, did you stay extra days to do sightseeing, stuff like that?

A We arrived a couple days earlier, yes.

Q Same thing with Atlanta, did you stick around for a little bit or come earlier?

A I don't recall if it was just before or just after, but yes, we tried to make it an opportunity to see the city.

Q Let's just talk briefly about the accident.

When you went down to the platform, did you have an understanding that you shouldn't stand near the platform edge?

A Yes.

Q And prior to the accident occurring, how long were you waiting on the platform?

A About five minutes. I was chatting with George.

Q Prior to fainting, where -- which direction were you standing? Were you standing facing the direction of the train when it would come in? Were you standing -- were you faced forward to the tracks? Were you standing with your back

towards the tracks? Which direction were you standing?
A I was facing George. George was kind of in front of me, more towards the center of the platform.
Q So he's in front of you. I just want to get this accurate. Where is he facing?
A In what sense? Like, it's a bit of a -- we're -- you know, diagonal within the, like, the platform's a straight line, we are not exactly parallel to the straight line. We are more, like, diagonal, like, he's looking out into the tracks, I'm looking more, like, towards him who is more center.
Q Were you looking to where the train was coming in?
A I know that I was looking towards the side that the train would come, so I guess I was looking at the train. We were trying to take us northbound, so I was looking southbound.
Q From where you were standing, were you -- were the columns blocking your view of the tunnel entrance?
A I don't recall specifically, but I could see the tracks. I could see as far as it went.
Q Well, could you see the entrance to the tunnel is really what I'm asking, from where you were standing?
A Yeah, I could see the entrance where, like, the train would come in because I would know if I had seen a train.
Q Okay. And you had just gone to Target and you bought some goods for the evening and for cleaning the apartment,

correct?
A Yes.
Q And who was carrying those bags? Was it George carrying both bags?
A I don't really remember. I think we were both carrying bags. I feel like George was probably carrying more bags.
Q When you fainted, did you become unconscious?
A Yes.
Q And when you woke, awoke, were you already on the tracks and the accident occurred?
A I was already on the tracks when I opened my eyes, yes.
Q And had the train passed you by at that time?
A I assume so. I was kind of going in and out of conscious. But, you know, when I first, like, understood what was going on, I could see my arm and my leg already severed, so after.
Q Well, did you speak with any police officers at the hospital after this?
A At the hospital, I recall the policemen who went down on the tracks to see me, they paid me a visit, they brought me a teddy bear and flowers, but yeah.
Q Did you give any statements to them at the hospital?
A I don't recall that.
Q You talked a lot about assistance with Mr. Roth. And you said earlier that when you were at home prior to the accident

that you assisted your mom. Do you remember that testimony?
A Yes.
Q Is your husband your assistant now?
A No, because I cannot -- like, he -- we both try to help out, but I cannot rely on him, like. Like, he assists me with certain tasks, of course, like.
Q Okay. Your mom also gave some testimony yesterday. And you look alike, actually. She testified that she would sometimes take you with you -- with her to work and that you would assist in taking measurements. Do you recall doing that with your mother?
A Yes.
Q Are you taking any medications currently?
A No.
Q Are you still a Brazilian citizen?
A Yes.
Q Are you licensed -- a licensed architect in Brazil?
A A licensed architect and urban planner.
Q But you're not a licensed architect in New York, correct?
A Correct. You have to go through series of exams and work experience and education. The education part I got though.
Q Do you have any intention of taking those steps to become a licensed architect in New York?
A Yes.
Q And when do you plan on doing that?

A Ideally as soon as I can. Like, it would be important, like, for our companies, like, it shows a lot of credibility to have licensed architects on the team, even though we're acting as consultants. But right now I don't -- I don't have the time or the energy to focus on that.

Q Have you ever had plans to return to Brazil?

A I like to see things one step at a time, like see where opportunity is. Like, I'm succeeding at my work, so I mean, I love Brazil. I think in an ideal world, I would be able to work multiple places, but I don't know.

Q Your mother is an architect also, correct?

A Yes.

Q And I believe that she may have testified -- or that you might have testified that she was able to pick and choose some of her projects that she works on?

A Yes.

Q Is that something that you would like to do in the future, be able to have that option to pick and choose projects that you work on?

A I don't know. I like being an accessibility expert. I also like designing. All architects do. So I'm not sure what the future holds.

MR. KEAVENEY: Thank you.

THE WITNESS: Okay.

THE COURT: Thank you.

Anything else, Mr. Roth?

MR. ROTH: Just one thing, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q Sorry. I think, I apologize, I forgot to ask you one question.

You had mentioned --

MR. ROTH: And I apologize, Your Honor, I should have covered this, but just one question.

Q You had mentioned some support groups. I don't think you -- can you tell us about what support groups you're in?

A Sure.

MR. KEAVENEY: Objection, Your Honor. It's beyond the scope.

THE COURT: Well, it is. Do we really need it?

MR. ROTH: I just felt bad that I missed it.

THE COURT: I don't think you really need it.

MR. ROTH: Okay.

THE COURT: So I think we've gone as far as we're going to go today.

And I'm just going to talk to the jurors. As it turns out, the government I think is trying to function again. I just read that they passed the necessary act. But we made our plans so that we're not going to be sitting tomorrow. I can't change them at the 11th hour. So you will be back on

Monday at 10:00. I am advised that you will have some expert witnesses that the Defendants are going to produce on Monday and possibly Tuesday as well. That's what you can anticipate. Don't go to the train station over the next three days. Try not to talk about the case. Look, I can understand from a human perspective, you may want to tell everybody at home what's going on. Try to resist that if you can. And after it's all over, of course, you can say everything you want. Because you don't want to get any feedback from people who are not here hearing all of the evidence. All right? That's an X factor that will be introduced into your deliberations, and especially in a case of this nature, we don't want to really do that. So try to keep up the good work you've been doing. Talk about anything at home other than the case. And you just tell them that the Judge has said that, you know, we're relying on you not to talk about the case.

All right. We'll see you on Monday, 10:00 o'clock. Get a good day's rest. Today, tomorrow, Saturday, Sunday, Monday. Next week is a big week.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right. So help Ms. Da Silva down, please.

(Witness steps down.)

THE COURT: So here's what I would like to do now. I expect momentarily my law clerk to bring me the latest iteration of what the proposed charge is as I contemplate it to be. And then we could talk a little bit about a few things and why I did what I did. And I have some questions to ask you folks as well.

You can sit now and relax.

But I can ask preliminarily before I get the proposed charge. One of the things that I was thinking about is that in the normal negligence case, we charge negligence, we charge proximate causation, but I don't see where this can possibly be an a factual issue as to whether or not the negligence was a proximate cause. So I try to keep things as simple as possible to the jury. You will see manifestations of my style when you get the proposed jury instruction. I just, you know, talk about the minimum things that they have to do. I don't explain a lot of things to them. But I didn't have anything in there about proximate cause. I just don't see it here. So I try to simplify it by not talking about causation in the proposed charge. You will see that.

Now, you can consider that, but I can't possibly fathom how there's a jury factual issue on whether there was a proximate cause here. So think about that. That's one judgment I have made to simplify the charge. Okay?

We'll take a little bit of a break and then the --

you'll focus on will be the questions, which I'm going to ask the jurors. I suspect you each have proposed tons of questions. I'm not going to ask all of these questions. I have I think four or five, and I expect you folks to have all sorts of interaction with me. I would be surprised if you didn't, but we'll take it one piece at a time. As things have worked out, we have ample time to get it done right before we charge the jury.

So those are just some preliminary things I want to share with you. And we'll come back in a few minutes. I'm going to wait here, I'm going to try to get my law clerk to come down hot off the press with what I told him to do, and we'll be back here at a quarter to 4:00 hopefully.

MR. KEAVENEY: Judge, just one question. Is Plaintiff resting now?

THE COURT: I'm sorry?

MR. KEAVENEY: Is Plaintiff resting his case now? Is he resting his case today?

THE COURT: Oh, yes, we should go through the formality of that. I forgot to do that. Mr. Roth, I assume you're going to rest at this time?

Thank you for calling my attention to that.

Sometimes we get focused on things which we overlook the technical aspects of what he's supposed to do.

So you have to decide now, Mr. Roth, Roth and Roth,

whether you rest the case.

MR. ROTH: Your Honor, Elliot is going to handle this one part, but my question is that we had a lot of exhibits that were stipulated to that were not formally entered into. Is that something I have to do if I want to talk about in my closing, is that something I have to do now?

THE COURT: Look, we went through all of the possible exhibits. I said as you use them, they will be deemed in evidence. That's the way it is. If they're not in evidence, you don't use them.

MR. ROTH: So then we still have the two days on them. Okay.

THE COURT: Now, we're going to make the exhibit list. We're going to have to pay a lot of attention to that. And then we kept a close record of it. So Mr. Innelli is going to give you the exhibit list. Go over it carefully to make sure we didn't miss anything. Okay? And you will have ample time to do that. In fact, you can start working on it now, even though there may be some more exhibits next week. Okay? So we have the luxury of time, which is pretty good in a case of this nature.

Anything else, Mr. Shields, you want to talk about now before we continue in a few minutes?

MR. SHIELDS: Yes, Your Honor.

Two things.

THE COURT: First I want to know whether you rest.

MR. SHIELDS: Before we rest, two things, Your Honor.

First, the Plaintiff requests that the Court take judicial notice of the applicable Federal Regulation 49 CFR 659.

THE COURT: Next. I don't take judicial notice of that. We'll talk about that. The federal regulations, we're not talking about federal regulations in this case. We'll talk about that later.

What else?

Let's get your evidence complete. I know you like to talk a lot. I get it.

Do you have any other witnesses or any other evidence that you think you want to offer in this case?

MR. SHIELDS: No, Your Honor.

But before we rest, at this time before resting and pursuant to rule -- Federal Rule of Civil Procedure 50(a), the Plaintiff moves for judgment as a matter of law based on the evidence presented in the Plaintiff's case in chief. There is no legally sufficient evidentiary basis for a reasonable jury to find in favor of the Defendants on any of the contested elements in Plaintiff's claims.

In addition, we move under Rule 50(a) for judgment as a matter of law dismissing each of the Defendants'

affirmative defenses. Plaintiff called numerous Defense witnesses during our case in chief.

THE COURT: Well, first of all, they haven't even put in their case.

MR. SHIELDS: Yes, Your Honor, but we called numerous Defense witnessed.

THE COURT: Whatever record, it's denied. What else do you want to say?

MR. SHIELDS: We needed to make our record, Your Honor, under 50(a) that we were moving for judgement as a matter of law on both of our claims and to dismiss their affirmative defenses.

THE COURT: I'm not sure that's appropriate at this time before the whole case is completed, but you know more than I know. What else do you want?

MR. SHIELDS: That's it, Your Honor. Thank you.

THE COURT: Do you rest now?

MR. SHIELDS: Yes, Your Honor.

THE COURT: All right.

Mr. Keaveney, do you want to preserve your, you know, your record here. You don't have to have a big discussion, but you want to preserve your record.

MS. WINTERS: Sure. Now that the Plaintiff has rested, we move for judgment, directed verdict under Rule 50. And we could -- it's up to Your Honor if you would like us to

argue the merits of that now, if you would like us to submit a brief.

THE COURT: Well, I won't preclude you from putting something on the record. You have a client. But I'm not inclined to grant it. A lot of times, I will reserve and then I will decide later, but in this case, I'm not going to grant it. But you want to put something on the record, go ahead.

MS. WINTERS: Yes. I prepared an argument, Your Honor, so there's numerous points, I just want to make sure that's okay to proceed.

THE COURT: I don't want to be Teutonic about it. You want to make your argument first? Go ahead. Put it on the record.

MS. WINTERS: Absolutely. Okay. So under Rule 50, we move for directed verdict at this time as to Counts Two and Three of the complaint as it relates to negligent design claims. These counts are specific to the design and maintenance of the Atlantic Avenue Barclay's B/Q platform. Plaintiff has failed, one, to establish an appropriate standard of care and, two, to establish a breach of the appropriate standard.

Plaintiff's burden under New York law is to prove that Transit failed to exercise ordinary care in the design and maintenance of the Atlantic Avenue Barclay's B/Q platform, but Plaintiff presented no evidence that the design was

inconsistent with industry norms or standards or that Transit ignored norms and standards or design requirements in the design of the B/Q platform.

(Continued on the next page.)

(Continuing)

MS. WINTERS: Every witness that has testified so far in this matter has, on the issue of the design of the BQ platform, including plaintiff's own expert, has acknowledged that open platform designs are the norm and standard in the rail industry in the United States of America, and that the retrofits, technologies, and structures proposed by Plaintiff's expert are not the standard in the United States. They have not established that they are the standard in the majority of rail systems internationally, though this case is about standards in the United States, so we would argue that wouldn't even apply.

What is clear from the testimony of Plaintiff's only expert on the issue of negligent design, Dr. Berkowitz, is that he is not applying industry standards or the standard of ordinary care when opining on the purported required design features for the BQ platform. Instead, he is applying a heightened standard. For this reason alone, Plaintiff's claims that Counts Two and Three must fail as a matter of law. When Berkowitz was asked to explain what Transit failed to do, that it should have done, he testified at Page 965 of the trial transcript, they should do everything humanly and technically and engineering possible to prevent people from being on the track. Transit is not required to do everything humanly possible. Transit is required to exercise ordinary

care.

Throughout his testimony, Dr. Berkowitz echoed this incorrect heightened standard of care, testifying consistently that it was his opinion that Transit needed to do something, anything, until it eliminated the hazard. Berkowitz further acknowledged that platforms screen doors are not the standard in the United States and that platform screen doors and TIDs are not required by the Federal Transit Administration, the New York Public Transportation Safety Board, or the City of New York. And critically, since it's their burden of proof, he did not identify any agency, law, or regulation that required installation of these technologies or designs.

He also failed to establish that any of these design features are installed in any domestic mass transit system in the United States and not used by any domestic mass transit agency in the United States. Only a handful of operators worldwide have been identified as having these features. Berkowitz repeatedly said it was what's best to install them, but we are only required to do what is consistent with reasonable practices. It is undisputed that the standard is reasonable care in this case. Plaintiff's own proposed jury charges acknowledge this fact, and without expert testimony, establishing that the designs proposed by plaintiff are the established standard and represent reason and ordinary care, Plaintiff's claim at Counts Two and Three must file fail.

With the evidence establishing that the BQ platform was consistent with design standards, Plaintiffs then attempt to, instead, establish breach of standard of care at the BQ platform with misleading systemwide stats related to all contact with train incidents. But this data does not establish that the BQ platform was not reasonably safe. Not a single witness testified to frequent track intrusions at the BQ platform. And the contact with train incidents includes a substantial number of incidents unrelated to track intrusion, as well as an additional number of voluntary intrusions, including suicides. Transit analyzed that data and found no commonalities or trends, no trends related to track line, no trends related to station, no trends related to time of day, nothing suggesting a trend that connects the incidents of track intrusions with the BQ platform.

And plaintiff presented no testimony or any evidence from any expert contradicting that analysis that demonstrates there was no trend or connection between track intrusions and the BQ platform.

THE COURT: All right. Anything else?

MS. WINTERS: I have a little more, Your Honor.

THE COURT: All right. So now that's all denied.

But you know, you have another defendant in this case.

Do you want to say anything about the train

operator?

MS. WINTERS: Absolutely, Your Honor.

THE COURT: You want to make a record for that? You have a responsibility to represent that person also, right?

MS. WINTERS: Absolutely, Your Honor.

THE COURT: You're representing both the defendants, right?

MS. WINTERS: That's correct.

I'll just make one last point, and I think this is relevant to the charge Your Honor referenced.

THE COURT: Just make your record. It's already been denied, but make your record.

MS. WINTERS: Absolutely.

So Plaintiff's expert failed to establish that any of these design features or that many of the design features that he testified to such as TIDs, if they were the industry standard, would have prevented this accident. And also, we would note that the record is clear that under New York Law, any hazard related to potential train strikes at the platform edge is an open and obvious hazard, and that therefore, the claim is also subject to dismissal on that point.

Regarding the negligent operation claims in this matter, Plaintiff failed to establish a breach of reasonable care, under the circumstances. Plaintiff relied on both their experts, Berkowitz and Jimenez, related to these allegations,

Case 1:17-cv-04550-FB-VMS Document 360-1 Filed 05/05/26 Page 1480 of 2327 PageID #: 23672



but both experts critically relied on anticipated testimony of Train Operator Shabazz in reaching conclusions and making their calculations. They relied on train operator's anticipated testimony on issues such as the speed of the train, whether she could see the station as she exited the tunnel, line of sight, and the timing of her engagement of the emergency break. Yet, Train Operator Shabazz was never called to testify by Plaintiffs. She was on their witness list, we were prepared to produce her to testify, but she was never called.

Significantly, when Dr. Berkowitz discussed his reliance on Train Operator Shabazz' anticipated testimony concerning speed, Your Honor instructed that we haven't heard her testimony and that you're allowing them to testify, subject to connection, with anticipated testimony in the future related to these those elements. But ultimately, they did not produce her to lay a foundation for those critical elements that they relied upon in forming their opinions. So as a result, their claim of negligent operation should be dismissed.

THE COURT: All right. So that's denied. We'll take 10 minutes. I have to make some changes to the proposed charge.

(A recess was taken.)

THE COURT: Let the record reflect that a dear

friend of mine has just come into the courtroom, one of the finest trial lawyers I have ever experienced in my career. So we have you officially on the record now in case the case goes up to the Supreme Court, okay.

Now, so look, there's no rush to judgment, as we say.

Are you standing for any particular reason?

MS. WINTERS: Yes, Your Honor.

If I may, there was one other piece of the argument that I wanted to preserve.

THE COURT: You want to say something else on the record?

MS. WINTERS: Related to the motion, yes, Your Honor. Is that okay? I'll keep it very brief.

THE COURT: You have clients to represent, so say what you want to say.

MS. WINTERS: Yes. So finally, we also want to move under Rule 50 to dismiss the lost earning potential claim. The experts -- the expert that was present related to that was Ms. Kucsma. She testified she's not a medical doctor, she's not a life care expert, and she relied exclusively on Dr. Kahn for her opinions in this matter. However, Dr. Kahn never testified in this case about any potential that plaintiff would lose her ability to work at any time or that she would eventually have to be a part-time employee.

As a result of the fact that Ms. Kucsma relied exclusively on that testimony, we would request dismissal.

THE COURT: Go a little slower. It's okay. You can go slower.

MS. WINTERS: Okay. We would request dismissal of the lost earning capacity element of Plaintiff's claim.

We'd also note that following Ms. Kucsma's testimony, Dr. Kahn was actually brought back up to testify further, and at that time, he still did not offer any testimony related to the employment capacity, present or future, of Ms. Harger.

THE COURT: You got it all down?

MS. WINTERS: That's it, Your Honor.

THE COURT: All right.

MS. WINTERS: Thank you so much.

THE COURT: So that will be considered part and parcel of your application, and I'm denying all of this, okay. So we know that.

Now, look, let me give you a homework assignment. As things have worked out because the Government is now functioning again, we knew that before we'd be working on Friday, but we're not going to do that now. So we have ample time to think about what we want to tell the jury, et cetera, et cetera. So this is just what I'm going to give you now and you don't to react to it now. You have plenty of time to

think about it. I'm just going to tell you some of my thoughts about it for you to consider, okay. And on Monday, we'll have the Expert Number 1, maybe Expert Number 1 and Number 2?

MR. KEAVENEY: Two experts, as plain and the train operator, Your Honor.

THE COURT: So the game plan is to have your case in by Tuesday, right?

MR. KEAVENEY: Then one expert on Tuesday and then one -- a potential fact witness, Mr. Abdallah, that already testified. That should be it. So, yes --

THE COURT: Make it clear because, look, I've got plans to leave Saturday, all right. So we are going to try to get this case resolved before.

MR. KEAVENEY: Absolutely, Your Honor.

THE COURT: In order to do that, we have to complete your -- the case by Tuesday afternoon. That's the game plan.

MR. KEAVENEY: Yes.

THE COURT: All right.

And if that can't be done, well, you know, we'll have to do what we have to do.

MR. KEAVENEY: I'm anticipating Tuesday, Your Honor.

THE COURT: All right. So then you should be prepared for your summations on Wednesday morning.

And, you know, I'm not going to really put you on

the clock unless you really don't want, because Mr. Roth is going to deliver, I may have to put him on the clock. I don't know.

Who's going to sum up for the plaintiff? Mr. Genis?

MR. GENIS: Yes, Your Honor.

THE COURT: All right. And I guess Mr. Keaveney, you're going to have the tough job of summing up for the defendants, right?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: All right. And as and you know, as you probably know, the plaintiff gets the last word in federal court, unlike state the Court. But federal court, you get the last word. But you're not going to have a repeat of your summation. I'm going to keep you down to a reasonable amount of time. But give me a general idea so I can prepare myself as to what I have to do as to what you anticipate your summation will be length-wise Wednesday morning.

MR. GENIS: I'm going to -- an hour a little over, Judge.

THE COURT: Just as long as we can get the summations in during the morning, that would be great, if possible. Okay.

And that will give me an opportunity to charge the jury. It's not going to be a lengthy charge, and then they hopefully can start their deliberations Wednesday afternoon,

Thursday, have off Friday. It should be ample time. So that's the game plan that we want to try to adhere to schedule-wise. And I rely upon all counsel as officers of the court in this situation to be able to see whether we can accomplish that, okay.

Having said that, you're not going to have to a chance to look at this charge now, but I'm going to tell you about a few things. First of all, I already told you that I don't think that proximate cause need to be part of this charge, okay. And but, you know, if you really think that there's a basis for charging proximate cause, I'll think about it. But I can't possibly imagine there can be any factual issue as to whether if there was negligent that she was hit by the train, all right. So you're going to think about that. That's one thing.

If you insist on it, I'm not sure I'm going to give it to you, but I'll listen to you. But, you know, if we don't have to burden the jury with having to answer whether there's a proximate cause, it's going to make it less confusing for them because they have the comparative aspect to deal with in any event. So the jurors will just be very confused by all of that, okay. So that's the one little homework assignment I'm going to give you.

The second thing is that I have tried to craft the most important part of this charge, obviously, is the

questions to ask on the issue of immunity. I looked at your submissions. They go 15, 20 questions. We're not going to do that. We have to just try to just ask, you know, the essential questions to the jury, otherwise, it gets a little entangled and it's inappropriate. So I've crafted five or six. You'll look at them. I will be shocked if Mr. Roth didn't come back with 14 others or the defendant didn't come back with 700 others. But, you know, we'll take them as it comes. Okay. But at least you'll know what Judge Block is thinking about.

Trust me, I just didn't do this on the spur of the moment. And I try to be faithful to what I think is the State Court of Appeals decision as operative here. And I think that is the *Turturro* case. I don't think there's anything subsequent to that that's quote as on point. And I'll tell you that the original *Weiss* case back in 1960, I look upon that with some fondness because it was a decision by Judge Fuld. Now, you didn't know who Judge Fuld was, but I did, because after I was lucky enough to graduate from law school and get a job in Albany as a law clerk, Judge Fuld, was the chief judge of the Court of Appeals. And you may or may not know that he was really a highly regarded judge at the time. He was almost like the Weinstein of the Court of Appeals.

So he took it upon himself to write the decision on *Weiss*. And I was up there at the time. So it reminds me how

old I am, all right. But it's also a bit of the history about that. When I saw it's a Fuld decision, I know that he would pick the cases that he felt he wanted to be heard on and right for the Court. That's a bit of relevant history to you and I'll share that with you.

But subsequent to that, in *Turturro* which was decided on December 22nd, 2016, months after this incident, the Court of Appeals spoke again extensively. So the questions that I have put forward in what I have given to you today, taken religiously from *Turturro*, I think I got it down right. All right. But you'll have an opportunity to talk to me about it possibly Monday afternoon, okay.

Just to toss out some general charges about, you know, the compensatory economic damages, but I want you to see whether you can agree amongst yourselves whether we want to break down the damages a little bit more specifically, that we want to have, certainly, medical expenses, you know, future medical expenses. We may want to ask that as a separate question, I suspect. Lost earnings, I think we should make it clear we want to know what their lost earnings were up to the present time and the future. We may want to break it down between current and future. See what you can agree amongst yourselves how you wish to do that.

My preference would be to have it broken down in what's up to the current time or what may be the future in

terms of future pain and suffering and future medicals and the lost earnings. But you can work yourself, collectively. I think you folks can agree amongst yourselves how you want the damage aspect to be handled, okay. So think about that all right. Right now it's just all lumped together.

So that's just the basic things that I want you folks to think about. I'll mention to you now and read through with you what I have down as the questions because, look, you have here a responsibility to represent both defendants, and you obviously are going to be talking about whether the train operator should be held responsible, and if the jury says that there is negligence on the part of the train operator, we'll have the comparative negligence. It's okay. You may want to argue that maybe she should have prevented or who knows what. So I'll leave that in as part of the dynamics here.

But I'm not telling the jury that if the train operator is found liable, that you guys got to pay. I don't think I should do that. So I'm going to instruct them to the contrary, that they're not to consider anything about who's to pay or whether it's insurance coverage or anything else like that. Just decide the case based upon the evidence without speculating about anything else. I think that's the right thing to do there. But we know as a matter of law, I don't think I have to ask any further questions that if they find

negligence on the part of the operator, I think as a matter of law that the Transit Authority is going to get stuck with the bill, but I'm not going to say anything about that, okay. Those are just my thinkings. If you have any thoughts, you'll share them with me, of course.

So then if the jury were to decide that there's no negligence on the part of the train operator, which is a real question for them to have to decide, then the only way that the Transit Authority is going to be able to get hit, I guess, would be if they are able to come under the umbrella of this governmental immunity. Okay. So here are the questions that I think should ask the jury on Page 10. You don't have to comment now, but I'm just letting you know what I think should be done and I'll listen to you folks later on.

Number one, Roth and Roth, I mean you have a huge stationery, and now that I look at your Roth and Roth stationery, why didn't I put down a big block when I practiced law? I missed that opportunity. Okay. Any way, I'm glad you did that because my eyesight is not as good as it used to be, so I was able to read Roth and Roth without any problem. Okay. But you know, it's a compliment to you, the size of your stationeries is as large of your personality.

All right. So I note the following here: I was going to tell you that with all due respect, this is not a federal case, so the federal rules don't apply. If the State

of New York had said we adopt the federal rules, then I guess you have a different argument. But I don't see where they are applicable here. This is the law of the State of New York we're talking about. You can argue otherwise. But I don't see anything here where the State of New York is saying we are adopting the federal codes, okay. If you think that's not correct, you can argue that to me, all right. You're going to have to show me that the State of New York has adopted those federal codes. I don't think you need it, but any way, you have my thoughts okay.

So whether -- here's what I'm writing down. If you find that Ms. Da Silva, on her negligence claim for her and her negligence claim against the Transit Authority, you will then answer as appropriate. So now we're only talking about the immunity for the Transit Authority. The following questions as of August 2nd, 2016. Remember that here, the Transit Authority bears the burden of proof by a preponderance of the evidence. One, whether the Transit Authority developed a duly executed safety plan that both considered and passed upon the question of whether to install platform barriers or TIDs. Well, maybe we can say what TIDs means again. If your answer is no to the first question, then you will not have to consider the remaining questions.

Otherwise, two, whether that safety plan was based upon an adequate study into platform barriers or TIDs. Three,

whether that safety plan had a reasonable basis. Four, whether the Transit Authority regularly reviewed its safety plan in light of actual operation.

Now, that's not what Judge Fuld wrote about in *Weiss*, but certainly *Turturro* goes and explains that, all right. And then whether there was any delay in implementing the safety plan, and the last, if there was a delay, whether that delay was justifiable. I think I took this all faithfully from *Turturro*. But you know what my thinking is right now, so you have an ample opportunity to think about it, and I'll be more than happy to hear your other thoughts when we have the continuation of our charging conference which will be Monday, probably about 5:00 o'clock.

All right. So I'm doing all the talking. I'm trying to prove to you that at my tender age I still can handle the law, I think. But if it's not the case, you can tell me I should resign from the bench. I won't feel hurt about that if you suggest that. But in the meantime, you have my thoughts about your homework assignments. So think about it and continue your excellent, excellent discharge of your professional responsibilities to now act as officers of the court, without sacrificing your arguments or whatever else you're obliged to do ethically for your clients, okay.

Now, I've done all the talking, and Mr. Roth or Mr. Shields or Mr. -- I'm not going to ask Mr. Genis, you have

nothing to say -- if you want to say anything now, you can do it. Otherwise, see you Monday at 10:00 o'clock, and I expect to get inundated by lots of Roth and Roth papers.

MR. KEAVENEY: Judge, can we get the interrogatories e-mailed to us that you just read e-mailed to you us?

THE COURT: I can send it to you. Work with Kyle, my wonderful law clerk, and he'll take care of whatever your needs are.

Off the record.

(Off the record.)

THE COURT: Now, I haven't prepared the verdict sheet yet, but it'll track the charge, of course and we can go over that Monday.

Anything else you want to talk about before we adjourn today? Mr. Shields?

MR. SHIELDS: Yes, Your Honor. We had filed a letter requesting permission to ask for a specific dollar amount in closing for pain and suffering.

THE COURT: I don't know why you did that. I mean, you cited my decision of 2013.

Did you think I forgot about it?

MR. SHIELDS: In that decision you made clear, Your Honor, that it was necessary to make the request, and so we wanted to be 100 percent clear that there was a record.

THE COURT: I always allow it and I give the jury

instructions. But I was -- in 2013 I was correct, right?

MR. SHIELDS: Yup. We agree with that, Your Honor.

THE COURT: But you had to spend all that time to write three pages to tell me all that? I guess you thought that at my age I forgot?

MR. SHIELDS: Not saying that.

MR. GENIS: If we didn't ask, we'd be in trouble.

MR. SHIELDS: Yes. Exactly, Your Honor.

THE COURT: Ms. Winter, what wisdom do you have to share with me now?

MS. WINTERS: Just going to note our objection to that request, under Second Circuit precedent.

THE COURT: I think that's an appropriate request. Look, you're doing a good job, you're doing what you have to do, but sometimes you have to say maybe I'm not correct.

So the apparently, that decision of mine was affirmed by the Court of Appeals, and the -- we're going to instruct the jury properly how to handle that. But I always allow the suggestion of what counsel thinks the jury should award. And when I practiced law, I insisted on that when I was out in Suffolk County.

It's the right thing to do, with proper instructions to the jury that you're only to consider the evidence, it's just their argument, blah, blah, blah, blah, blah, okay.

MR. KEAVENEY: Judge, we would still object because

there's no facts as to what the value of pain and suffering is.

THE COURT: Put your objection on, but I'm going to give them the opportunity to make a suggestion, all right.

MR. KEAVENEY: With the appropriate instruction to the jury?

THE COURT: Of course. And you can even tell me what you think those appropriate instructions should be. I'll give you the opportunity to do that, but I think I can figure it out by myself.

What else? Okay, Mr. Shields, you're happy?

MR. GENIS: Yes, Your Honor.

THE COURT: Now, I don't expect you people to go flue the theater over the next couple of days. I expect to you stay at home and work on good summations.

I'll see you Monday at 10:00 o'clock, as long as Mr. Cole allows me to come back to court.

* * * * *

(Proceedings adjourned at 4:23 p.m. to resume on November 17, 2025 at 10:00 a.m.)

# I N D E X


| WITNESS | PAGE |
|---|---|
| LUISA JANSSEN HARGER BROWN | |
| DIRECT EXAMINATION BY MR. ROTH | 1325 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 1452 |
| REDIRECT EXAMINATION BY MR. ROTH | 1463 |


# E X H I B I T S


| | |
|---|---|
| Plaintiff's Exhibit 97-V | 1334 |
| Plaintiff's Exhibit 97-AA | 1342 |
| Plaintiff's Exhibit 97-BB | 1342 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

United States Courthouse
- against - : Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, :

November 17, 2025
10:00 a.m.

Defendants. :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants: LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, New York 10271
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

Court Reporter: Michele D. Lucchese,
E-mail: MLuccheseEDNY@gmail.com
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2272

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(In open court; parties present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Civil cause on trial. Harger versus New York City Transit Authority.

THE COURTROOM DEPUTY: You can all be seated.

And all counsel are present.

THE COURT: The great jurors are all here and ready to get started. Everyone had a nice weekend, plus an extra day.

You have your next witness here, Mr. Keaveney?

MR. KEAVENEY: I have my first witness here, Your Honor.

THE COURTROOM DEPUTY: By Zoom, just so you know, he is present. The doctor is here.

We are going to get to him in a few seconds.

I am surprised I only got three our four letters from the plaintiffs over the weekend. You must have been partying or something.

Mr. Keaveney, the first thing is they don't think you have complied with the discovery requirements and we are getting a letter requesting that we should not allow your expert to testify. I'm not going to grant it. But tell me what's going on here.

MS. WINTERS: Yes, Your Honor. As -- we submitted a response to that this morning. As you will see outlined in

our response, plaintiff has had these disclosures since as earlier as 2019, in 2023. All of the disclosures from the outset included lists --

THE COURT: You're trying to tell me that he is wrong?

MS. WINTERS: Yes, Your Honor. I'm sorry, Your Honor.

THE COURT: That's what you're trying to say?

MS. WINTERS: Absolutely.

THE COURT: Right? That you have complied with your discovery requirements, right?

MS. WINTERS: Absolutely, Your Honor. And to the extent they have any objections, they have waived them.

THE COURT: All right. So now we are going to go forward.

MS. WINTERS: Thank you, Your Honor.

THE COURT: If I found out that you haven't, then maybe I will strike it all out and we will start a new trial. Okay?

What do you have to say?

MR. SHIELDS: They didn't provided any of the required information in order for us to be able to work off any of the --

THE COURT: What is it that you don't have that you think she should have given to you?

MR. SHIELDS: Document numbers, Your Honor, for all of the list of prior testimony?

THE COURT: Like what?

MR. SHIELDS: Docket numbers or index numbers so that we could locate prior testimony.

THE COURT: You didn't get index numbers?

MR. SHIELDS: And other required information so we can look at the prior testimony of the defense experts.

THE COURT: I don't think this is a valid type of objection. You have the documents. You don't like the index numbers, what could I tell you?

You shouldn't be asking me at the eleventh hour. We will bring the witness in and let's start.

THE COURTROOM DEPUTY: Yes. I will bring the jury in.

All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Mr. Keaveney, you have your first witness today. Who do we have?

MR. KEAVENEY: Dr. Malcolm Reid.

THE COURT: And he is going to be testifying by Zoom. We are all set to go, Mr. Innelli?

THE COURTROOM DEPUTY: Yes.

THE COURT: Why don't you swear in Dr. Reid.

THE COURTROOM DEPUTY: Good morning, Dr. Reid.

THE COURT: You don't have to stand. It's all right.

THE COURTROOM DEPUTY: You can remain seated and raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: If you could state your name.

THE WITNESS: Malcolm Reid.

THE COURTROOM DEPUTY: Thank you, Doctor.

THE COURT: Dr. Reid, I want to make sure that you. Can hear me and I think I hear you pretty clearly. Can you hear me okay?

THE WITNESS: I can hear you very well. Thank you.

THE JURY: We don't have it on our screens.

THE COURT: Mike, we have a technical problem.

THE COURTROOM DEPUTY: How about now?

THE JURY: Yes.

THE COURT: There's always something with the technology that we have. This is another witness who is testifying by Zoom. You have done it before, so you know exactly what we are doing now. This is as if he was in court.

At this time, Mr. Keaveney, go forward.

MR. KEAVENEY: Would you like me to jump to the million-dollar question?

THE COURT: I will let you start.

MR. KEAVENEY: Okay.

**MALCOLM REID**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KEAVENEY:

Q Good morning. Doctor.
A Good morning.

THE COURT: Let me interrupt now that I have told you to start. I would like the jurors to get an idea why you called him and what he is going to be opining about, the focus, and then we can go from there. We have done this back and forth a little bit, I think, and that way it's helpful for them to get oriented right away.

MR. KEAVENEY: I will ask him what type of doctor he is and then his opinion and then we can work backwards. Is that okay, Your Honor.

THE COURT: And then you can go into his credentials a little bit if you want.

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q Doctor, what type of doctor are you?
A I'm a physical medicine and rehabilitation physician.
Q What do those types of doctors do?

A Basically I see adults. It is helping individuals regain their independence, their functional mobility, their ability to ambulate.

Basically I see individuals who sometimes have sustained traumatic injuries, such as amputations, getting them to do pre-prosthetic ambulation.

I see individuals who have had strokes, getting them to improve their neuro muscular abilities, to get them to do mobility, transfer, ambulation, basically trying to get patients to become as independent as possible. And specifically for inpatients, to get them back home.

I work closely with other therapists, physical therapists, occupational therapists, and speech therapists. And we have also rehabilitation nurses in the inpatient setting.

Q Did there come a time when you were retained to provide an opinion regarding Ms. Harger?

A Yes.

Q And did you review relevant records relating to her treatment?

A Yes, I did.

Q Did you examine her?

A I examine her, yes.

Q Based on all of that, again, we are going to jump to the end and then we will work backwards, did you formulate an

opinion regarding her present care and future care?

A Yes. When I first saw her, I formulated an opinion then, and subsequently I received additional information, additional medical records recently and also formulated an opinion.

Q Can you provided us, in a nutshell, what that opinion is?

A The opinion is there are certain medical needs that Ms. Harger De Silva will have for the remainder of her life due to the serious injuries she sustained from the subway accident.

In a nutshell, those are primarily prosthetic needs for her left above-knee amputation prosthesis, also prosthetic needs for her left-above elbow prosthesis, and also seeing a prosthetist who will make these adjustments and provide her with these prostheses, also requirements for ongoing physical therapy, ongoing occupational therapy, and ongoing follow up certainly with a rehabilitation medicine specialist, and also specific equipment, such as a wheelchair, a manual wheelchair with power assist and one-arm driving.

MR. KEAVENEY: Judge, do you want me to continue?

THE COURT: Go ahead. I mean, you said that basically you formed an opinion that she will need all of these types of assistance, right?

THE WITNESS: Yes.

THE COURT: Go ahead. I mean, you want to quantify this or qualify this, go ahead.

MR. KEAVENEY: Okay.

THE WITNESS: I'm sorry. Is that question to me?

MR. KEAVENEY: It's to me.

THE COURT: I am talking to the lawyer. I'm giving him permission to get some more detail from you. You told the jury that you have opinions about the type of care she will need in the future, and now we are going to go sort of go deeper into that and see if you can quantify or qualify it further, okay.

BY Mr. KEAVENEY:

Q So, Doctor, you talked about the need for a prosthesis; correct?

A Prostheses, yes.

Q Let's limit it for this discussion right now to the upper limb prosthesis. Okay.

A Yes.

Q What type and/or how many prosthesis does she require for the upper extremity?

A When I initially saw her, she had sort of a simple prosthesis, upper extremity prosthesis, which she used more for facilitating dressing. When I -- the one time that I saw her.

Subsequently, my understanding is she has obtained a higher tech type of prosthesis, but I believe it is a bit ill-fitting, and she has been having difficulty with her residual limb and her upper extremity. And the records I

reviewed suggest that she's in the process of considering either a possible revision, which would be a surgical revision to her upper extremity limb amputation such to facilitate the better fitting of the prosthesis.

And she's also thinking of perhaps interosseous type of system, which is a different type of prosthesis, which would be sort of connected to the bone in her upper arm. So I believe she's in the process of sort of weighing the pros and cons of -- to facilitate enhanced function that would be most suitable and she would require that upper prosthesis indefinitely.

Q Would she require multiple prosthesis?

A I would not say she requires multiple prosthesis. She would likely need the one for the upper extremity, which would be microprocessor technology. High tech technology, which would afford her the ability to use her second hand in a more functional setting, as opposed to just as a stabilizer.

Q Okay. Did you have an opportunity to review Dr. Kahn's life care plan for Ms. Harger?

A Yes, I did.

MR. GENIS: Objection, Your Honor. Beyond the scope. He never mentioned his reports.

THE COURT: Overruled.

Q Did Dr. Kahn --

THE COURT: You can use that for cross-examination,

right. We are going to let all of his opinions come out just like we allowed your experts' opinions to flow freely.

MR. GENIS: We exchanged everything.

THE COURT: You can ask all of those questions that you are concerned about on your cross-examinations.

MR. GENIS: Okay.

Q What did Dr. Kahn, in his life care plan, suggest for Ms. Harger's upper extremity?

MR. GENIS: It's not in evidence, Your Honor. He is asking a question not in evidence.

I will gladly put it in.

MR. KEAVENEY: He looked at it. The expert can rely on hearsay.

THE COURT: Overruled.

Next question.

You can answer that question.

A I believe he suggested multiple upper extremity prosthesis.

THE COURT: Now, how do you know that?

THE WITNESS: That was through his life care plan.

THE COURT: Let me ask you this: You are getting that from what he wrote and what he said to you?

THE WITNESS: I'm getting it from a life care plan that was put forth by Dr. Kahn.

THE COURT: Is that in evidence?

MR. KEAVENEY: No, Your Honor. But he relied on it.

THE COURT: Just a second. So tell the jury what you replied upon. I want to find out whether you relied upon anything that's in evidence or something else that you relied upon and that could be the basis of cross-examination. You relied upon some sort of safety plan, right?

MR. KEAVENEY: No. It was a life care plan.

THE COURT: It was a life care plan.

Q Correct?

THE WITNESS: Correct. A life care plan.

THE COURT: One second. It would be nice if that was in evidence so the jury could see what he relied upon. You don't have that.

MR. KEAVENEY: It was what Dr. Kahn testify to. It's Dr. Reid's rebuttal witness.

THE COURT: Just one second. So the jury knows that there was a lot of testimony about the life care plan. Apparently you have reviewed this, Mr. Witness?

You looked at that life care plan. Is that what he testified?

MR. KEAVENEY: That's his testimony, I think.

THE COURT: Is that your testimony?

THE WITNESS: Yes.

THE COURT: Or is this this other life care plan that you talked about? I'm a little confused.

What life care plan are you referring to that you want to testify about?

Is it what Dr. Kahn gave you or somebody else?

THE WITNESS: It's what I received through the attorneys, by Dr. Kahn, by Dr. Stewart Kahn, it's the life care plan.

THE COURT: Now, is that in evidence?

MR. KEAVENEY: No, it's not, Your Honor. He looked at it in formulating his opinion for his testimony.

THE COURT: Next question. Sustained.

Q Doctor --

THE COURT: If you have the plan, by all means, you know, I will let him look at it and you will have it in evidence, just like the other plan is in evidence.

Q Dr. Reid, did you have an opinion regarding plaintiff's lower extremities?

A Yes.

Q What is that opinion?

A The opinion is that she appears to be doing well with the X3 microprocessor-type of above-knee amputation prosthesis. That's per the records that I reviewed which included records from Mount Sinai where she was evaluated for prosthesis. It's my opinion that she will continue -- that she will continue to require this indefinitely.

Q Does she require any other type of lower limb prosthetic?

A No, I do not believe she does.

Q Okay. Does she require a separate running prosthetic?

A No, the prosthetic that she has, the X3 is actually waterproof. It's also cited to be corrosive proof. It is also -- one can use that for running, and certainly for going up and downstairs and also for bicycling. So it's multi-purpose.

Q Would she need typical care associated with those prosthesis?

A They are under warranty for about three years, but the warranty can be extended. And I believe, from the records, that is what she has done at some point, extending the warranty.

THE COURT: Doctor, let me ask you a few questions so I can be clear.

Dr. Kahn testified in this case, as well as Chris Kort, the prosthetist. Did you listen to their testimony? Are you aware of their testimony, yes or no?

THE WITNESS: Not everything that they testified to, no.

THE COURT: Did you listen to any of Dr. Kahn's testimony?

THE WITNESS: I don't believe I listened to any of it. I have the life care plan.

THE COURT: You looked at his report?

THE WITNESS: Yes.

THE COURT: So you are familiar with his report; right?

THE WITNESS: Yes. Yes.

THE COURT: All right. And then based upon his report, you have some opinions about whether or not you agree or disagree with it?

THE WITNESS: Yes.

THE COURT: Tell me to what extent you disagree with what Dr. Kahn has reported.

THE WITNESS: The ones I disagree is somewhat what the attorney just alluded to, that I don't believe she needs multiple leg or upper extremity prosthesis.

I think for the lower extremity she appears to be doing well with the X3, which is the multi-purpose, waterproof type of prosthesis.

And with regard to the upper extremity, it sounds like she's at a point, a juncture where she's actually deciding whether she may try a different type of system, which would be an integrated -- an intra osteo system, which would be integrated into her upper extremity, residual upper extremity, and that would require its own -- maintenance. But -- and she also may be undergoing a surgical revision of the upper extremity from what the records have suggested.

But she certainly needs, again, an appropriate upper

extremity prosthesis, which she will require, as with the lower extremity prosthesis indefinitely, for the rest of her life.

THE COURT: Did you listen to the testimony of Chris Kort, the prosthetist, did you?

THE WITNESS: No, I did not.

THE COURT: Do you know who he is?

THE WITNESS: Yes, I do know who he is.

THE COURT: Did you review any of his reports or records?

THE WITNESS: Yes, I received some of his reports and records.

THE COURT: Next question.

Q In reviewing those reports and records, do you agree with the recommendations that are in Mr. Kort's records regarding the need for several prosthesis?

A I did not agree with the need for several prosthesis, no.

(Continued on next page.)

(Continuing.)

BY MR. KEAVENEY:

Q Okay. And with the one prosthesis with the upper extremity and the lower extremity she, of course, would need sleeves and other things associated with those prostheses, right?

A Yes.

Q Okay.

A Yes, certainly.

Q Okay. And fittings and stuff like that?

MR. GENIS: Judge, leading. This is his witness.

THE COURT: Overruled.

Next question.

BY MR. KEAVENEY:

Q Would she need therapy associated with changing prosthesis?

A Yes. I believe I had mentioned that. And with prostheses, there is just general maintenance that is required that the prosthetist typically takes care of with regard to the sleeves and such, and all the different parts of the -- the prosthesis.

Q Those adjustments, are they based done on a yearly basis, on a bi-annual basis, an as-needed basis; do you know?

A As-needed basis.

Q So if an adjustment doesn't need to be made, and the patient doesn't need to --

THE COURT: Listen, that's not a proper question.

You're testifying when you start talking like that.

BY MR. KEAVENEY:

Q Dr. Reid, you examined Ms. Harger --

A I did.

Q -- right?

A I did.

Q Okay. Is she classified in terms of any type of ambulation skills based on her --

A At the time I saw her, I would deem that she's a K3 prosthetic ambulator, and the record suggests that she's still a K3 prosthetic ambulator.

Q And what is a K3 prosthetic ambulator?

A A K3 prosthetic ambulator is someone who is able to ambulate in the community, but beyond the basic needs of community ambulation. Meaning they can ambulate at a variable rate or speed or cadence. They're able to ambulate curbs, able to go up and down stairs in a New York setting, even perhaps going into the subway, just handling more than just basic ambulation. That is -- that's what a K3 ambulator would be.

And she has been such since I -- well, since the

day I say her, which was October 23, 2019, and she remains a K3 ambulator from what the prosthetist and the other -- and what any other doctors state.

Q Doctor, did you review a video showing Ms. Harger in a home?

A Yes, I did.

Q Okay. And what did the video show?

A It showed that she was quite independent in doing numerous activities of daily living and/or instrumental activities of daily living.

As I recall, it included her folding clothes, putting dishes in a dishwasher, putting clothes in a -- in a -- in a washing machine, ambulating within her apartment, even going up and reaching something at a relatively high height and wearing her -- her prosthesis. She was able to take out the trash, to take out the recyclables. She actually was able to do nail care. She did quite a lot of things, but -- quite a lot of activities she was able to demonstrate and not unlike the day-in-the-life video that was done.

Q All right. And is that what you would anticipate from a KE ambulator?

A Well, a K3 ambulator is really more their ability to ambulate outside of their apartment. And she -- from the records that I reviewed, my understanding is that she's

working successfully as an architect. She's able to go to and from work, et cetera. That's really the K3 ambulator.

The -- the activities of daily living, the instrumental activities of daily living that were demonstrated on the video really show a broadened picture of her ability to manage a lot of what we say are day-to-day chores or weekly chores that individuals have to do and despite her being an above-knee amputee and an above-elbow amputee.

Q And when you talk about K3 ambulator, is that a scale that starts at something and ends at something?

A Yes, K0 to K4.

Q Okay. And what would be a K0 ambulator?

A Nonambulatory. So that type of person would be one who would likely have a cosmetic prosthesis, perhaps to wear in church or a synagogue or at -- in a theater, just so a person can see that they -- they have what appears to be a leg. It's not a functional prosthetic. You can walk on that, a cosmetic prosthesis. That would be the case of K0.

K1 would be a limited household ambulator, someone who is able to likely walk to and from the bathroom in their apartment or their home but not beyond that, and they don't walk outside really.

K2 is a limited outdoor ambulator, which is what I would say is basis ambulation outside, meaning they can walk

outside their home or apartment, perhaps to get into a car, to get into a vehicle to be taken somewhere, but they don't walk functional distances outside.

K3, which is where she is, would be somebody who can walk functional distances, several blocks or maybe even more; outside ambulation, traversing the streets of New York, for instance, which would be environmentally challenging place -- a place to manage.

K4, which would be the highest level, would be an elite athlete, someone who, perhaps, ran marathons before their amputation. Someone who is doing a -- a mountain climbing. And again, likely did that sort of activity before their amputation. That would be the highest level at K4.

But I would place her at K3, and it seems like the treating doctors, prosthetists, and throughout her report she's been deemed a K3.

Q Did you assess her functional status as part of your review?

A I did. And again, I saw her that one time and that was in 2019.

Q Okay. And did you review the recent medical records indicate her current functional status?

A Yes, correct.

Q And that was what? I know you went over a few of those

issues. Anything else?

A And that the current record suggests that she's still a K3 ambulator. I saw the video, and the data of the video, but she certainly seems quite independent with regards to activities of daily living, instrumental activities of daily living. And from the records that I've reviewed and from things that were mentioned to me to review, that she is -- had continued to work. Because when I saw her, she was actually working on --

MR. GENIS: Objection. He's relying from the attorney.

THE COURT: Yes, sustained.

Rephrase the question.

BY MR. KEAVENEY:

Q Did you conduct a physical examination of her?

A I did, yes, sir.

Q Okay. And that was back a few years ago?

A 2019, yes.

Q Okay. At that time, was she using a prosthesis?

A Yes.

Q Okay. For both the upper and lower extremity?

A I believe it was primarily for the -- the lower extremity, but she did have an upper-extremity prosthesis, yes.

Q Okay. Were there any issues that you noted regarding

those prostheses?
A I believe she might have stated that -- I think she might have said that the upper extremity might have been a little heavy at that time, but the lower one she was certainly using and I believe wearing eight hours per day.
Q And where did you get that information, eight hours a day?
A She told me that.
Q Okay.
And following that examination and review of the medical record back in 2019, did you have an opinion at that time?
A Yes.
Q Okay. And what was that opinion at that time?
A My opinion was that she -- she still had the capability of being a community ambulator, and that she would likely be able to finish her architectural training and be -- and vocationally be able to be successful working as an architect, given her mobility -- her ability to manage, not just walking inside, but walking outside.
Q Were you requested or asked to prepare a second report regarding Ms. Harger?
A Yes, recently.
Q Okay.
A Yes.

Q And what was that report based on?

A That was based on information that I received. Those were records which included the video that was mentioned before: Records from Mt. Sinai Hospital Rehab, Spaulding Rehab Network, and Poly Physiotherapy.

Q Was there anything significant in those records?

A Well, it's significant in that she did undergo a revision of the left above-the-knee amputation and also underwent a targeted muscle reinnervation procedure. That was done at Mass General. I believe that was done in 2021. She was there maybe five days. And then moved on to the Spaulding Rehab for acute inpatient rehab, where she was there for a while, and she -- she did well with the acute rehab there.

Q Okay. Was there anything else in your review of the records that was significant?

A Functionally, she was certainly making progress. They talked about the new prostheses she had received since I had seen her. And the function, again, she was still quite independent with regards to her activities of, you know, daily living.

Q Okay.

All right. Did you review current medical records regarding Ms. Harger, current within the past year?

A Yes. I did receive some -- some of those, as well,

yes.

Q All right. Did any of those records indicate that she was on any pain medication?

A No. They did not indicate she was on any pain medication.

Q All right. Did you review records regarding -- from her doctors, her treating doctors?

A Yes.

Q Okay.

All right. Did any of those treating doctors, based on your review of the records, suggest multiple prosthesis?

A No, they did not.

Q Okay.

All right. Did they suggest any assistance regarding personal care or work abilities?

A No, they did not.

Q Okay. Based on your review of the records and examination of Ms. Harger, did she need any type of pain medication currently?

A Not from the records I reviewed, no.

Q Did she need any type of injections?

A Certainly not from the records I reviewed.

Q Did she need any type of personal care?

A Not from -- not from the records that I reviewed.

Q Okay. Did she need any type of care relating to her ability to work?
A Not from the records I reviewed.
Q You talked about the osteointegration earlier. How would that affect her if she has it, and that's up to her going forward in terms of her abilities?
A It may be a better fit for the upper-extremity prosthesis. But again, I believe it's a personal decision she has to make with her doctors, and perhaps, prosthetists as well who may way in.
And, again, once she's decided which type of prosthesis to use, I -- I would just recommend whatever works for her the best and provides her the optimal function, the ability to bi-manual -- facilitated bi-manual activities?
Q All right. If she had that procedure, would that eliminate the immediate -- or things associated with her current upper-limb prosthesis?
A Yes, it would?
Q What type of things would it eliminate?
A With regards to the socket, it would be kind of connected to the bone --
Q Okay.
A -- so this...
Q Would she require a sleeve, then, if she went forward

with that procedure?
A No, I don't believe so.
Q Okay.
When you first saw her, do you recall the type of prosthesis, lower-limb prosthesis she was using?
A Yes. I believe it was a microprocessor Endolite Prothesis that fit well, and she ambulated with good balance using that prosthesis.
Q Okay. And when you reviewed the records relating to her currently what, type of prosthesis does she currently have?
A I believe that's about X3 microprocessor --
Q Okay.
A -- and --
Q Is that an advancement from the Endolite?
A I believe it is, yes.
Q Is that a better prosthesis?
A I believe so, yeah.
Q Doctor, let's go through your school and work history briefly.
A Sure.
Q Can you tell me a little bit about your educational background?
A Sure. I graduated from Fordham University with honors, *Magna Cum Laude*, with a Bachelor's of science in 1982.

Subsequently, I matriculated to Harvard Medical School, which is located in Boston. While at Harvard Med School, I actually applied and just kind of got into the -- and I was accepted at the John F. Kennedy School of Government, Harvard -- Harvard University JFK School of Government. So in 1987, I graduated with two degrees, a medical degree from Harvard Med School and a Master of policy from John F. Kennedy School of Government at Harvard University.

Subsequently, I moved on to do my internship, preliminary medicine, at Winthrop University Hospital which is located in Mineola. Now it's part of the NYU-Langone System. I successfully completed my internship there. And I -- at that point, I took the third part of the -- the medical boards to receive my medical license in 1988.

Then after finishing my internship, I moved on to Columbia Presbyterian, where I was -- served as a physical medicine and rehabilitation resident. And in my third year there, I was one of two out of the six residents selected -- I was one of two residences, I should said, selected to serve as the chief resident, myself and one other colleague.

I stayed on another year as the junior attending, and that's -- successfully completed the written part the boards at the end of the residency. I successfully did the oral part in the following year, which would be 1992. So I became Board certified in physical medicine and

rehabilitation in 1992. After -- I stayed at Columbia until '93.

Then I moved on to North General, where I was head of physical medical and rehabilitation at North General Hospital, located in Manhattan.

And then '98, November of '98, I moved on to become vice chair of St. Luke's Roosevelt Hospital Rehab -- Rehab Department. And over the ensuing 27 years, I've stayed here at St. Luke's Roosevelt. But now we're -- it's been taken over by Mt. Sinai. So we are now part of the Mt. Sinai Health System. So current -- my current position is I'm the vice chairman of Mt. Sinai Morning Side, Mt. Sinai West for the Department of Rehabilitation Medicine.

I also am an associate professor in physical medicine and rehabilitation, and my duties include teaching residents and being on-call every -- following at least -- roughly about ten patients every day -- inpatients on our inpatient rehab unit and doing consultations and being on call every third week and coming into the hospital every fourth weekend to see all, up to, 25 patients that we follow. Every fourth week I have to come in and do that.

So that's a basic sense of what I do.

Q Okay. Are you published in any peer-reviewed papers?

A No. But I'm very involved with organized medicine. And I have served as the president of the New York County

Medical Society, and also as the president of the Medical Society of the State of New York, which represents really all the doctors in the state of New York.

Q Okay.

All right. Have you testified in court before?

A Yes, I have.

Q Okay. Have you been qualified as an expert in court before?

A Yes.

Q Okay. Have you testified on behalf of the Transit Authority before?

A Yes, I have.

Q Okay.

All right. You said earlier you treated patients as part of your practice with amputations, correct?

A Correct.

Q Okay. And what type of patients do you treat; do you treat patients with traumatic amputations, with plain amputations, both?

A Both, both.

Q Is there a difference in those types of amputations?

A Yes. In individuals who have a traumatic amputation, like Ms. Harger de Silva, she was a healthy individual beforehand. Typically they're going to heal a lot better, much better and quicker than an individual who, for

instance, has longstanding diabetes, personal vascular disease or poor circulation, or may be a smoker, or other comorbidity.

So individuals who have a planned amputation often, because they've had recurrent complications, such as infection of their bones, loss sensation, for instance, diabetic neuropathy. They can't feel -- feel the bottom of their foot. They get a cut, they get an infection, that may lead to further additional problems.

So individuals oftentimes they have a planned amputation, sometime it's semi-planned, meaning they come in very ill. They come in very ill, perhaps -- perhaps with a -- a -- they're bacteremic, they're septicemic, they have bacteria in their blood, they have to have the amputation urgently because they have -- because they had an ongoing issue.

Q Okay. During your examination and review of the records, did you -- did they indicate any sort of infection with the prosthetic site?

A I don't know. I don't believe they did.

Q Did they reveal any indication of problems with sensation at the -- at the stumps?

A No, no.

Q Based on your review of the records, did Ms. Harger have any problems healing from the injury in terms of the

stump?

A No, I don't believe she did.

MR. KEAVENEY: Okay. Thank you, Doctor.

THE WITNESS: You're welcome.

THE COURT: Any cross-examination, Mr. Genis?

MR. GENIS: Lots.

THE COURTROOM DEPUTY: Mr. Genis, are you going to be using the Elmo?

MR. GENIS: I probably will -- well, would the Elmo -- well, will he be able to see it?

THE COURTROOM DEPUTY: Yeah, I'll share it.

MR. GENIS: Excellent. So I'll be using the Elmo and then maybe putting up some records, as well.

THE COURTROOM DEPUTY: Fair enough.

CROSS-EXAMINATION

BY MR. GENIS:

Q Do we agree as the rehab doctor your goal is to improve your patient's physical condition so they can live a more independent life, despite the disability?

A Yes.

Q Okay. And a huge factor is motivation to recover, true?

A Yes.

Q Do we agree Luisa has been incredibly motivated to recover as best she can?

A Yes.
Q Okay. Do you agree for some patients, money is an issue for proper treatment?
MR. KEAVENEY: Objection.
THE COURT: Overruled.
A It can be an issue.
BY MR. GENIS:
Q Have you ever testified that for some patients that money for therapy is an issue, yes or no?
A Have I testified to that?
Q Yes, sir. Under oath?
A It's possible.
Q Okay.
A It's possible.
Q Okay.
A Yes.
Q And, sir, you want a patient to keep improving and to not slip back or regress, true?
A True.
Q Okay. Let's discuss what you have said what her needs are.
And by the way, you wrote three reports, not two, as was indicated on direct exam, true?
MR. KEAVENEY: Objection.
A It's three reports, yes, three.

BY MR. GENIS:

Q Thank you.

THE COURT: And the record will reflect three reports.

BY MR. GENIS:

Q And by the way, the defendant asked you about testifying before, how many times have you testified?

A In court?

Q Yeah -- well, actually, no. How many times have you testified, period?

A I typically testify in court. Typically no more than about three times in any given year.

Q Okay. Now, when you say "in court," let's be crystal clear with one another. Do you testify in depositions?

A Yes, in Court, or even by Zoom. By Zoom or in depositions --

Q Okay.

A -- I agree.

THE COURT: Well, Zoom is in court.

THE WITNESS: Yes.

THE COURT: Now, the question is whether you were also had -- were you deposed under other cases, even though the case never went to court, but you also testified under oath on other occasions.

I guess that was the question, correct?

And did you.

THE WITNESS: I would say again, roughly about three times in any given year.

BY MR. GENIS:

Q Okay.

And in addition to court, do you testify in workers' compensation proceedings?

A Exceedingly rare. Maybe I've done --

Q Is that a "yes"?

THE COURT: Well, just a second.

A Maybe a few others -- maybe five times ever that --

THE COURT: Excuse me?

THE WITNESS: Yes.

THE COURT: Listen to me.

THE WITNESS: Okay.

THE COURT: Have you ever testified in workers' compensation proceedings over the years, yes or no?

THE WITNESS: Yes.

THE COURT: Can you tell us how many times you did that?

THE WITNESS: I would say possibly fewer than five.

THE COURT: Okay.

BY MR. GENIS:

Q Have you testified in arbitrations or no-fault

proceedings, as well?

A No, I don't believe so.

Q Okay.

Now let's go through some of your background and relationship with the Transit Authority since you've mentioned you've testified for them.

A Okay.

Q You finished your residency in June of 1991, true?

A Correct.

Q And you didn't get Board certified until 1992, true?

A Correct.

Q And you stared doing exams for the Transit Authority in 1992, true?

A After I was Board certified, yes.

Q Okay. And you've been on the Transit Authority's Examining Board since 1992, true?

A They've described it that way, yes.

Q Okay. And you have been doing work for the Transit Authority now for about 33 years, true?

A True.

Q And the Transit Authority is your largest individual entity that you do legal work for, true?

A At this point, no, I don't believe so.

Q I didn't ask you at this point.

Over your career, the 33 years you've been

testifying, was the Transit Authority the largest individual entity that you did legal examinations for, for lawsuits?

A I would have to -- I would have to check my records. It's possible.

Q Well, let me see if I can help you, sir.

Do you recall --

MR. GENIS: You kept me busy all weekend, Doctor.

(Pause in proceedings.)

MR. GENIS: Thank you so much.

BY MR. GENIS:

Q Sir, do you recall testifying in the case of *Pareja against Transit Authority*, Supreme Court, Bronx County, July 6, 2006.

Do you recall that, sir?

A Likely. But you'll have to refresh my memory. It's possibly, yes.

Q Okay. And while I'm refreshing your memory, let's see if I can refresh your testimony on some testimony that you gave under oath.

Let's see, were you asked the following question on Page 1018, Line 23:

Question: You do IMEs for other clients, correct -- well, actually, is New York City Transit your biggest client for this kind of work?

Answer: A small percentage of my practice is

IMEs. Of the IMEs that I do, they're probably -- they're the largest individual entity that I do IMEs for.

When you were asked that question under oath, did you give that question under oath, sir?

A That sounds correct.

Q Okay.

A And at that time, that is -- that was correct, yes.

Q Thank you so much. Let's continue.

And by the way, in that *Pareja* case, you also testified how you did workers' comp for the Transit Authority and others, true or false?

A I did some of that work.

Q Okay. How many injured people have you examined on behalf of the Transit Authority over 33 years?

A I do not know the exact number.

Q Well, sir, have you ever testified under oath it's hundreds, and could be over thousand exams, true?

A That's possible.

Q Okay. Do you remember the *Beauchamp* case of last year, February 16, 2024.

A Yes.

Q The Transit Authority, February 16, 2024?

A Yes.

Q Okay. And, sir, at that time did you testify that you've examined hundreds of patients on behalf of the

Transit Authority, it could be over to thousand exams?
A It's possible over 33 years, yes.
Q Okay. Now, by the way, you typically see people on behalf of the Transit Authority, these people with amputations or very serious injuries, true?
A Many could have very serious injuries, correct --
Q And --
A -- yes.
Q Well, is it typically is my question?
A I would say it -- it's one of the more common diagnoses.
Q So typical, yes or no?
A Yes. Typical could be used there for that, perhaps, yes.
Q Okay. Thank you.
Now, sir, there are many fine doctors in the city of New York, true?
A Yes.
Q There are many fine physical medicine rehab doctors, true?
A Yes.
Q And you agree that the Transit Authority could have chosen any one of these doctors if it wanted to, true?
THE COURT: Sustained.
MR. GENIS: Okay.

BY MR. GENIS:

Q Do you agree that they chosen you for this case?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Obviously they chose him.

BY MR. GENIS:

Q Sir, you've discussed Dr. Kahn's life care plan, true or false?

A Yes.

Q And you are aware that Dr. Kahn is a Certified Life Care Planner, true?

A Yes.

Q Are you a Certified Life Care Planner, yes or no?

A No.

(Continued on the next page.)

CROSS-EXAMINATION

BY MR. GENIS: (Continuing)

Q Sir, when you have been doing, for 33 years, exams, you charge for them; true?

A Yes, I do.

Q What do you currently charge to do an exam on behalf of the Transit Authority or for any other defendant, for that matter?

A It's based on the amount of material that I review, the amount of hours, but roughly 3,500 to about $4,000. That would be reviewing and also doing a report.

Q Okay. So, the 3,500 to 4,000 would cover the exam, the review of records, and your report; correct?

A Yes.

Q Okay. And by the way, in this case, you did an exam, you reviewed records, and you wrote three reports; true?

A Yes.

Q How much altogether did you charge for your exam, those review of records, and those three reports?

A The first one would have been for, I assume, roughly 3,500, roughly. I don't have that exact amount.

The other two, I do have the exact amount. I believe 1,800 and 1,125.

Q When you say "1,125," $1,125?

A Well; correct. Yes. Yes.

Q And, sir, when you say you don't have it exactly, you knew you were testifying today; true?

A Yes, but --

Q And, sir --

A -- I just don't have that bill in front of me.

Q Okay.

And, sir, how many times have you testified?

I don't think I ever got an answer to that question.

A It --

THE COURT: In court or at depositions?

MR. GENIS: Altogether.

THE COURT: I thought we asked that question before.

MR. GENIS: Altogether.

We did, but I don't think we got an answer.

MR. KEAVENEY: Objection.

BY MR. GENIS:

Q So, how many times altogether have you testified?

MR. KEAVENEY: Objection.

A Approximately three times per year.

Q Okay. I'm not asking you approximately per year how many times you currently testified.

My question, plain and simple, is: Over your 33 years of testifying, how many times have you testified?

A Approximately 100, but I --

THE COURT: I'm going to refine it.

A Approximately 100. Approximately 100.

THE COURT: Let's be clear.

In court? First, in court, how many times over your career have you testified in court?

THE WITNESS: Almost all of it has been in court. That's what I am saying, I -- in court, roughly, 100, roughly.

BY MR. GENIS:

Q Okay. And when you have testified in court, what percentage of the time was it for defendants?

A I believe less than 10 percent, roughly.

Q Less than 10 percent for defendants?

A Maybe 10 percent. Maybe 10 percent. It could be 10 percent, 20 percent, possibly.

Q For defendants?

A I'm sorry, for plaintiffs. About 80 to 90 percent, I'm sorry, for defendants.

Q Okay. And, in fact, you have testified before 90 percent for defendants; correct?

A Yeah. I said 80 to 90 percent. Yes.

Q And by the way, you do do some plaintiffs' work, you told us; correct?

A I have, yes.

Q And if we take the Perecman law firm out of the equation, now what percentage of your work is plaintiffs?

A I'm currently not doing much plaintiffs' work, no.

Q Okay.

And, in fact, the only plaintiffs' firm you really do work for is the Perecman law firm; true?

A I believe there were others.

Q Okay. That was your biggest plaintiff client; correct?

A That could be, yes.

Q And by the way, you have testified as -- on behalf of defendants that people with all four limbs, I'm sorry -- withdrawn.

You have testified on behalf of plaintiffs that people with all four limbs are totally disabled, cannot work, and need life care plans and home health aides; true or false?

A You would have to go over -- or give me the exact case.

Q I will gladly go through your cases, sir. I've got lots of your transcripts and reports.

But my question is --

THE COURT: Disregard those comments.

MR. GENIS: Sure.

BY MR. GENIS:

Q My question is: In your 33 years of testifying, have you testified ever that people with all four limbs are totally disabled, cannot work, and need life care plans and home health aides; true or false?

MR. KEAVENEY: Objection. Asked and answered.

THE COURT: No. No. Overruled.

Case 1:17-cv-04550-FB-VMS Document 360-1 Filed 05/05/26 Page 1540 of 2327 PageID #: 23732



I think the question is whether or not you ever gave testimony for somebody who had all their limbs. Did you ever give testimony about --

THE WITNESS: Oh, now I understand what's your question. I didn't understand your question.

Yeah. It's possible a person with all four limbs could be totally disabled, that's -- yes.

BY MR. GENIS:

Q Well, not just possible. You have, in fact, testified that they are disabled; true or false?

A Well, I would have to see the case, but --

THE COURT: Just one second.

A -- yes.

THE COURT: Okay. Listen to me now. I'm going to ask questions for clarification, right.

You have given a lot of testimony. The question is: Did you ever give testimony for somebody who had all of their limbs, and testified that they were, nonetheless, disabled?

I think that's the nature of the question. If you understand it, you can answer it.

THE WITNESS: That's certainly possible that I did that, yes.

Q Well, when you say "possible," is it more likely than not that you have done so?

A More than likely. I don't remember the exact case, but,

yes, that's...
Q In fact, have you done so repeatedly?
THE COURT: Has it been often or just once or twice that you said that somebody with all their limbs could, nonetheless, still be disabled?
THE WITNESS: It certainly could be more than once, it's just -- it's based on all of their other injuries. And I'd have to know the case to be able to state that.
THE COURT: It depends upon the individual case; right?
THE WITNESS: Correct.
THE COURT: And what the individual's problems were, a lot of variables; correct?
THE WITNESS: Correct.
THE COURT: Next question.
MR. GENIS: Sure.
BY MR. GENIS:
Q And you have testified, when you were hired by a plaintiff's lawyer, that people could have all their limbs yet be totally disabled; correct?
A Yes, that is possible. Yes.
Q When you were hired for defendants, have you ever testified that somebody missing an arm and leg, for example, are not totally disabled and could go to work?
A The question being, I'm sorry?

Q We can read it back, if you would like.
A Yes, please.
MR. GENIS: Do you mind reading it back, and with the Court's permission?
(Question read back.)
A Yes, that's feasible.
I mean, it really depends on the individual and their ability to do whatever their job is, their perseverance and -- it is based on the individual.
Q Okay. So, is Luisa disabled; yes or no?
A She's has a disability.
Q Okay. Are her disabilities permanent?
A Yes.
Q Okay. Now, to prepare for trial, did you review records of any kind?
A Yes.
Q Okay. And you charge for your time; correct?
A Yes.
Q What do you charge per hour for your time now?
A $450.
Q Okay. How much time did you spend reviewing records to prepare for trial?
A I -- I'd have to...
At least -- I don't know. Five or six hours, I would say.

Q Well, when you say "at least," you submit bills; correct?
A Yes. Yes.
Q Okay. And your reports, the last two you did were dated October 14th and October 16th of 2025; true?
A Correct.
Q Okay. So, that was about a month ago; correct?
A Correct.
Q Okay. Have you submitted your bill?
A Yes, I have a bill for today. Yes.
Q Okay.
A Yes.
Q How many hours did you bill for, for reviewing the records?

MR. KEAVENEY: Objection. He --

A The bill was for $4,000 and --

MR. KEAVENEY: Objection.

A -- that includes the review of records.

THE COURT: Listen. When you hear someone say "objection," then you have to let me --

THE WITNESS: I'm sorry.

THE COURT: Okay. So, I think you went through this before.

MR. GENIS: No.

THE COURT: But, you know, the question is, how much did he -- I think he said 3,000 or 1,100 and --

MR. GENIS: That was earlier for review, Judge.

THE COURT: Earlier --

MR. GENIS: Now we're talking about to prepare for trial.

THE COURT: You're talking about just to review and what you did to prepare for this trial. Have you billed for that review?

THE WITNESS: Yes, it was billed in the fee for today's testimony. It's part of that, yeah.

THE COURT: And how many hours did you bill for to prepare for your testimony?

THE WITNESS: It was 4 -- it's $4,000 for half a day's testimony.

THE COURT: No. No. We are talking about the reports that you made --

THE WITNESS: The --

THE COURT: -- to testify to, how many hours is it that you have to bill for those reports? How many hours did you spend making those reports?

THE WITNESS: Okay. Okay. Oh, the reports, we had gone over that exactly --

MR. GENIS: That's not what I am asking, though, Judge.

THE COURT: Look, he wants to know what the total bill was for your reports; right?

MR. GENIS: No, and I think he gave us that answer -- he already did answer that. I'm asking a different question now.

THE COURT: Well, I'm not sure I understand the question.

MR. GENIS: Sure.

BY MR. GENIS:

Q What I'm asking is: Doctor, you told us to prepare for trial, to give testimony to this jury, you reviewed records, and I believe you said it took you about five to six hours to do so; true?

A Correct, but --

Q Okay. So, what did you charge for those review of records in order to come to court to tell this jury your testimony?

A Like I said, it's 450 an hour, but it is encompassed in the bill for coming to court.

Q When you say you bill for coming to court, are you aware that your attorneys -- or I should say, the Transit attorneys have represented that you charge $8,000 for your testimony today?

MS. WINTERS: Objection, Your Honor.

THE COURT: Sustained.

BY MR. GENIS:

Q Okay.

A Yeah, that --

THE COURT: All right. He answered the question, but I sustained the objection.

BY MR. GENIS:

Q What do you charge for a day in court to give testimony?

A A full day, 8,000. Because this was done via Zoom and it's, presumably, half a day, 4,000. 4,000.

THE COURT: So, 4,000 -- you are going to be charging $4,000 for a half a day for your Zoom testimony, I think. Is that what you're saying?

THE WITNESS: That's it, yes. Not the 8,000. That's it.

Q And so, are you saying you're only charging for your testimony today, but you are not charging for the five to six hours of record review at 450 an hour?

MR. KEAVENEY: Objection.

THE COURT: Are you charging for both, your review of the records? I think you said yes.

And separate from that, you are also charging for time you are spending in court testifying.

Am I correct in understanding what your testimony is?

THE WITNESS: Yes, it was encompassed in that bill. Yes.

BY MR. GENIS:

Q Okay. I still don't understand what you're saying.

THE COURT: I think the jury understands.

MR. GENIS: I don't.

BY MR. GENIS:

Q So, if it's 4,000 for time in court, plus review of five to six hours of records at 450 an hour, we come out to more than $4,000; true or false?

A Yes, I said it was encompassed in that amount.

Q Now, did you also meet with the attorneys in this case?

A That part, yes, we spoke.

Q Okay.

A Yes.

Q And did you charge for that time?

A I would have to look and see that's in that fee.

Q Well, would it be your custom and practice to charge the attorney for your consultation and your time with them?

A Yes. Yes.

Q Okay. So, how much time did --

A And I --

Q -- you spend with them? What did you charge?

A That's about two hours. And that I don't think I billed for, no. Correct.

Q So, you haven't submitted that bill yet?

A No.

Q Okay. But you plan on it; correct?

A Yes.

Q Okay. Now, sir...

And of the 100 times, approximately, you have testified, can we agree the majority of the times was on behalf the Transit Authority?

THE COURT: I think we have covered this already.

MR. GENIS: I -- we covered that 90 -- 89 percent was defense, and that his biggest client is the Transit.

Now I am asking about when he comes to court and testifies, does he testify the majority of the time for the Transit Authority.

THE COURT: All right. You are going through a lot of these questions.

Last question on this. When you were in court, you have testified about the times you have been in court.

The question was: Is it always for the Transit Authority? And, if not, what the percentage was with the Transit Authority?

This is the last question on this subject. Can you answer that?

THE WITNESS: The last question being -- yes, predominantly it would have been Transit. Yes.

THE COURT: Next question.

MR. GENIS: Thank you.

THE COURT: Go on to something else.

MR. GENIS: Okay.

BY MR. GENIS:

Q Now, you have performed what you'd call an IME; true?

A Yes.

Q And that stands for independent medical exam; true?

A Yes.

Q Now, are you certified by anybody to perform IMEs?

A I am a board-certified physical medicine and rehabilitation doctor.

Q My question was: Are you board certified, for example, by the American Board of Medical Examiners -- Independent Medical Examiners?

A No, I do not have that.

Q Are you certified by the international -- I'm sorry, the American College of Independent Medical Examiners?

A No.

Q Are you certified by the International -- Academy of International Medical Examiners?

A No.

Q Okay. Have you reviewed independent medical examinations standards of care?

A Not specifically.

Q Okay. Do you think you should be familiar with the standards of care of independent medical exams if you are going to be performing them?

A In my practice, for what I do, I'm very comfortable --
Q That's not what I am asking. That's not my question, sir.
You've performed, you have told us, over 1,000 independent medical exams.
Did you ever look to see what the standards of care are for conducting an independent medical exam; yes or no?
A No.
Q Okay. Do you think it would be a good idea to learn the standards of care --
THE COURT: That's argument. All right. Next question.
He said he never did.
BY MR. GENIS:
Q Did you ever even read an article or look at a book on independent medical evaluation best practices and standards of care?
A Not -- no, sir.
THE COURT: I will ask you this question: Why do you think you are qualified to conduct those examinations?
THE WITNESS: Based on my extensive training in rehabilitation, my extensive training as a practicing doctor taking care of thousands and thousands of injured individuals and/or individuals who have diseases that have resulted in whether it was amputations, strokes, all of these have more

than prepared me to take care of and to assess individuals who have --

THE COURT: I think -- excuse me. I think you said it was your practical experiences in conducting these examinations, not necessarily based upon any reports or any particular standards, I think that's what you're saying; correct?

THE WITNESS: Yes. Yes.

BY MR. GENIS:

Q Okay. So, now, let's get back to some of your opinions.

Now, first of all, do we agree a prognosis is what one anticipates what will happen with regard to a patient's recovery?

A Yes.

Q Now, prosthesis, you agree that Luisa will require a prosthesis for both arm and leg for the rest of her life; true or false?

A True.

Q And do you agree a warranty is typically only three years, and these devices can be very expensive to repair if you are out of warranty?

A True.

Q Do you agree that this past summer of 2025, Luisa had to get a new socket for her leg prosthesis?

A True.

Q Do you agree that it is critical that the socket is comfortable and does not irritate or injure the residual limb?
A True.
Q Do you agree that a doctor recommended that Luisa get her new leg prosthesis in 2025?
A Yes.
Q And you agree that doctors have recommended, you have mentioned, two different types of surgery for Luisa; correct?
A Yeah, one she had. And one I think she's contemplating, yes.
Q Okay. And do you agree the major problem with osseointegration has been with infection because of the limited ability to create a bacterial seal at the skin-metal interface, similar to the one that naturally forms at the interface of the tooth and gum?
A Yes.
Q And do you agree that there are other problems encountered, including fracture and loosening?
A Yes.
Q How long is the recovery period for that type of surgery?
A For recovery before wearing -- you mean wearing a prosthesis, is that what you mean?
Q Nope. First of all, you have the surgery. How -- is that inpatient surgery?
A I believe it would be. I believe.

Q Okay. How long would the patient have to be inpatient for that type of surgery?
A I -- I believe that -- it really would depend on how well they do, but I believe it takes months before they would be able to use -- start using a prosthesis.
Q Okay. I understand months before prosthesis, but that's not my question.
My question is: How long would they have to be an inpatient in the hospital after the osseous integration surgery?
A I really -- I would say it would be variable, but I do not --
Q From what to what?
A -- know the exact time.
What?
Q What's the range?
A I'm not sure what the exact range is.
THE COURT: Well, look, you have to say day or you have to say multiple days. Just give the jury some idea.
A Yeah, I would say multiple days. I would...
Q And would she then require inpatient rehab with occupational therapy and physical therapy after she gets out of the hospital for the surgery?
A I believe it would be dependent on when she's allowed to use the prosthesis, but she may. It really would depend on if

there is a regression in her functional mobility, then that would be indicated in taking rehab.

Q Okay. Let's see if I understand you.

You went to Harvard Med School; right?

A Yes.

Q That's affiliated with Mass General Hospital; true?

A Yes.

Q She was an inpatient at Mass General Hospital; true or false?

A Yes.

Q And when she had the surgery --

THE COURT: One second. One question at a time.

A And she went to Spaulding; correct. I'm well aware of that. I said that, yes.

(Reporter clarification.)

THE COURT: Just one second. We can't do it this way.

Do you know how long she was hospitalized?

THE WITNESS: I believe, approximately, five days. I think she had the surgery on the 21st, and then went to Spaulding on the 26th. She did receive inpatient rehab; correct.

BY MR. GENIS:

Q And so, in -- when she had prior surgery at Mass General, she then required inpatient for a prolonged period of time at

a rehab hospital; true or false?

MR. KEAVENEY: Objection. Asked and answered.

A Correct. Yes.

THE COURT: Overruled.

Q Okay. And by the way, what are the costs altogether of the inpatient hospital, anesthesia, the room, medications, surgery, doctors, everything soup to nuts? How much does that cost?

A I don't know that exact number.

Q Okay. How about at the outpatient -- I'm sorry, the inpatient rehab facility, how much does that cost? Again, room, board, OT, PT, medication, doctor exams, diagnostic tests, whatever, soup to nuts, what does that cost?

A It would be typically about 2,000 a day, typically 2,500 a day.

Q Okay. 2,500 a day. And how long will she need inpatient rehab for?

A Again, that was for -- when she had the leg, she was there for inpatient rehab. The arm, it may require an inpatient stay. Typically, inpatient stays are roughly 10 days, typically.

Q All right. So, 10 days at 2,500 a pop; correct?

A Yes.

Q Okay.

MR. KEAVENEY: Objection, Your Honor.

There is no claim as to past medical costs, so this is irrelevant.

THE COURT: Overruled. We are getting a general sense of it.

BY MR. GENIS:

Q Okay. And then after the inpatient rehab, she should have outpatient rehab, occupational therapy, and physical therapy; true or false?

A That's true.

Q Okay. How much does that cost?

A It's typically governed by one's insurance, but --

Q Sir, I'm not asking about that.

I'm asking --

THE COURT: Not insurance, just how much would it cost.

Q Well, what do they charge if it -- for a regular person, walks in off the street, says, I need physical therapy, occupational therapy, here's my wallet, what's it cost?

A About 150 per visit. 150 per visit.

Q Okay. How many times is she going to need it after the inpatient rehab? With what frequency?

A Well, she -- it really depends on how she's doing functionally, but likely for at least four weeks.

Q Okay.

A So, twice a week for about four weeks.

Q Okay. And then you told us earlier that she's going to need physical therapy and occupational therapy for life; true or false?
A I did say that, yes.
Q Okay. And -- let's see. Now, also, when she has to have this surgery, inpatient, inpatient rehab, and then you said she won't be able to -- it will be months before she can get a prosthesis; correct?
A That's my understanding, yes.
Q How many months?
A That could be several months, maybe three months or so.
Q Well, and you say could be three months. Could it be seven months?
A Depends on how one heals.
Q Okay. Now, when the person is not -- and then after they get the prosthesis, it takes a while for it to become adjusted to them; true or false?
A That's true.
Q And modifications may need to be made; correct?
A Yes.
Q They have to learn how to use it; correct?
A That's correct.
Q So, how long is it before they are proficiently able to use the prosthetic device after the time they receive it?
A I -- it truly is variable.

Q From what to what?

A It could be four weeks to three or four months. It could be a longer period of time for some people.

Q Okay. So, for that entire period of time that she has the inpatient hospitalization, the inpatient rehab, the outpatient rehab, healing until you can get the prosthesis, and then that whole process of the prosthesis until you are finally able to use it functionally, if a person can't work, do they lose earnings?

A Certainly, they would lose earnings if they can't work.

Q Okay. A person could even lose their job if they are out that long; true?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

BY MR. GENIS:

Q So, do you recommend that a new prosthesis -- withdrawn.

Do you agree that a new prosthesis needs to be replaced every three or four years; true?

A Yes.

Q Okay. Now, do you agree that there are different types of prosthesis for different purposes?

A There are prosthesis that are designed for different purposes; correct.

Q Okay. Are there specific -- give me one second.

THE COURT: So, Mr. Genis, while you are doing that,

do you want to take -- how much longer do you want to go?

MR. GENIS: Oh, I got a lot.

THE COURT: Just one second. It is 20 after 11. Let's take our morning break at this time.

MR. GENIS: Sure.

THE COURT: And don't talk about the case. We will see you at -- maybe 15, 20 minutes.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURTROOM DEPUTY: You all can be seated.

(Recess taken.)

THE COURT: Give me an idea of how much time you will take?

MR. GENIS: I'm going to guess an hour, Judge.

THE COURT: An hour?

MR. GENIS: This is the gentleman who testified that my client, who is missing an arm and a leg, is A-okay and wonderful.

THE COURT: You don't have to argue. An hour is what you want. Thank you.

And Mr. Keaveny, who do you have after this person?

MR. KEAVENEY: Judge, I have the train --

THE WITNESS: Can you turn the volume up. I cannot hear.

THE COURT: We are not talking to you right now.

MR. KEAVENEY: Hold on.

THE WITNESS: I'm sorry.

THE COURT: I'm just trying to find out what we have in store for the rest of the day.

Go ahead.

MR. KEAVENEY: I have the train operator, who is actually waiting outside. And then I have another expert today.

THE COURT: All right.

MR. KEAVENEY: Okay.

THE COURT: So, I'm -- so, we will finish with this witness before our lunch break, And then right after lunch we will have the train operator. Okay?

MR. KEAVENEY: Yes.

THE COURT: All right. Let's bring the jurors back in.

Mr. Genis, let's see if we can finish this by about 12:30, about 40 minutes. I think that is going to be sufficient. And then we will let the jurors go for lunch, unless there's redirect.

MR. GENIS: Got it.

THE COURT: Let's just move it.

MR. GENIS: Okay. I will do my best, Judge.

THE COURT: I may push you around a little bit.

MR. GENIS: You won't be the first or the last,

Judge.

THE COURT: I have been waiting for this opportunity all week.

THE COURTROOM DEPUTY: All rise.

THE COURT: I am going to give you the proposed charge over lunchtime. You can look at it and we will talk about it later on. We will have a chance to do that, I think.

MR. GENIS: And, Judge, just for clarity, I can't remember if we put it in writing or not, we are not claiming --

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right. The jury is back here.

And I think we still have the Doctor on Zoom. You can hear me, Doctor? You are okay?

THE WITNESS: Yes, I can, loud and clear.

THE COURT: Continue with your questioning.

MR. GENIS: Thank you.

BY MR. GENIS:

Q Do we agree that Luisa has a right to be as active and try to return to as much as possible of her life pre-accident?

A Yes.

Q Okay. And to do so, she might need more than one type of prosthesis for each extremity; true?

A I didn't see that based on the records I took -- I saw.

Q Okay. Well, let's be crystal clear about records and what you saw.

First of all, do we agree that there are different types of prostheses for people to engage in different activities?

A Yes.

Q Okay. And there are many different prostheses for different activities --

MR. KEAVENEY: Objection. What is he showing to the jury?

MR. GENIS: I'm showing pictures of different --

MR. KEAVENEY: What --

THE COURT: Wait. Wait a second. Are you showing something here?

MR. GENIS: Yes.

THE COURT: In evidence?

MR. GENIS: No.

THE COURT: Well, then I don't think we need it.

MR. GENIS: Okay.

BY MR. GENIS:

Q Do you agree that there are different types of prosthetic devices for different activities that people can get?

A Yes, there are.

Q Okay. So, if Luisa wants to ride a bike, should she be

allowed to do so?
A Yes.
Q And if she wants to run, should she be allowed to do so?
A Yes.
Q If she wants to play golf, if she wants to do anything, does she have a right to do so?
A Within the parameters of what's feasible, yes.
Q Okay. And part of feasibility is giving her the right equipment, so that she could do it; correct?
A Yes.
Q Okay. Now, let's talk about things that would be beneficial to her.

Would it be beneficial to her to have a home health care aide?
A I don't think it is needed.
Q I didn't ask you that.

Would it be --

THE COURT: Wait a second. We have to control the questions and the answers, no talking collectively. Let me help you out.

The question is whether or not it would be a good thing to have a health care aide.

It is a general question.

THE WITNESS: In general, it's a good thing to have that.

THE COURT: Okay. It depends on the circumstances, right?

THE WITNESS: Correct.

THE COURT: Right.

BY MR. GENIS:

Q So, now -- and just so we are crystal clear, so we can move it along, I'm going to ask you yes/no questions. Would you please be kind enough --

THE COURT: Just let's hear the question.

MR. GENIS: Okay. What --

THE COURT: I think there was a movie once called "Curb Your Enthusiasm."

MR. GENIS: Yes.

THE COURT: Let's try to think about that.

MR. GENIS: It was a TV show.

THE COURT: TV show. Okay. All right. Because if you don't curb your enthusiasm, I'm going to do it.

MR. GENIS: Okay. Well, in that case, I will curb it.

THE COURT: Good.

MR. GENIS: All right.

BY MR. GENIS:

Q Now, sir, you -- when you -- you have done life care plans; true?

A I have done some --

Q Okay.
A -- yes.
Q And when you have done life care plans, you do it typically dealing with medical issues that they may need, such as transportation, equipment, housing needs, and, in fact, future physicians?
You've done healthcare -- I'm sorry, for -- let's see.
And you look at what their past history was for their baseline; correct?
A That's helpful, yes.
Q Okay. And do you agree that she should be afforded a level of dignity?
A Yes.
Q Okay. So, for example, if a person has difficulty cutting food and preparing food, have you ever put in writing and testified that somebody should prepare it for them?
A That's certainly -- that -- yes. I would say, yes, I did.
Q And that's even where the person did not lose an upper extremity; true or false?
A It -- likely true.
Q Okay. And, in fact, you've said that one of your people who you did a life care plan, who could only walk about two blocks twice a day, up to four blocks a day, is disabled and

very restricted; true or false?
A It's possible. But there are other factors, I'm sure. I don't have all of that information in front of me, but that's likely true.
Q Now, by the way, if somebody has a spouse and they are helping take care of them, have you ever concluded that that's not proper?
A I said that, yes.
Q Okay. And, in fact, you have testified under oath that that's not that person's role, and that there's largess or the family situation helping, but they may not be there next week; true?
A I didn't follow totally what you said, but --
Q Have you ever testified that when there -- somebody has a spouse and they are assisting in caring for the injured spouse, that whether it is largess of the spouse or the family situation or friends helping out, they may not be there next week? Have you ever said that under oath?
A Yes, I have. Yes.
Q Okay. And do you agree that when you have the spouse take caring of you, that is certainly suboptimal and will lead to relationship issues that will become rancorous; true?
A That's possible, yes.
Q Okay. And it's suboptimal, and you have said it's not going to be healthy. And that was your opinion with a

reasonable degree of certainty; true or false?

A That's true.

Q Okay. Do you agree that there's a difference between independence and efficiency?

A Yes.

Q When you said her gait was normal, was that compared to a normal, healthy, young, able-bodied person's gait or normal for somebody with an above-knee amputation at her level?

MR. KEAVENEY: Objection.

THE COURT: Objection. Sustained. Rephrase the question.

MR. GENIS: Sure.

BY MR. GENIS:

Q You told this jury that at the time of your exam in 2019, she had a normal gait; true or false?

MR. KEAVENEY: Objection.

THE COURT: I don't know whether or not that was your testimony. He is telling -- was that your testimony?

THE WITNESS: I don't recall if I said that she had -- I don't recall if I testified to that, no.

Q Did you ever put under oath in writing in 2019, that she had a normal gait; yes or no?

You have your report right in front of you.

A I'm look at my report -- I'm looking at my report --

THE COURT: One second.

The question is: Did you ever say in your report that she had a normal gait?

THE WITNESS: I don't believe I wrote that in the report. I'm looking at the report now. That's something --

THE COURT: Your answer is you don't recall saying that.

Next question.

BY MR. GENIS:

Q Let me see if I can help you.

Okay. Antalgic is a limp, not -- it is an abnormal gait; correct?

A It's a painful gait; correct -- yes. Thank you.

Q Okay. Did you ever say under oath that she ambulated with and without a cane with good bilateral foot clearance, good balance and cadence, and her gait was not antalgic?

A Yes.

Q Okay. Was that true?

A Yes, that was true. Yeah.

Q Okay. Now, let's -- let's discuss that a little, about being true.

You saw her before she had her revision surgery at Mass General; true or false?

A True. Yes.

Q And you examined her leg at that time, her knee, her stump; correct?

A Not her knee.

Q I'm sorry, her stump? She lost her knee?

A Yes. Correct. Yes.

Q And did it look like Plaintiff's Exhibit 97-H at that time?

A I can't see what that exhibit is, I'm sorry.

Q It's not going -- I'm putting something on the ELMO. It's not going forward to you?

THE COURTROOM DEPUTY: Wait a minute.

MR. GENIS: Okay.

THE COURTROOM DEPUTY: I'll help you.

THE COURT: Let's see if we can get it.

THE COURTROOM DEPUTY: Is it on the ELMO? Here you go.

MR. GENIS: Okay. Let me see if I can zoom in a little bit.

THE COURT: Can you see that now?

THE WITNESS: Not -- let me see if I can broaden the picture and -- I'm not....

THE COURT: I can't hear him at all.

THE WITNESS: I can't make it out. I'm sorry. I can't make it out. I cannot see it.

BY MR. GENIS:

Q Okay. Let's see.

Well, let's talk about when you did your exam at

that time, "Skin."

Did you write in your report under oath that her left above-knee amputation was split, but well healed?

A Yes.

THE COURT: I don't think his report was given under oath, was it?

MR. GENIS: Yes, signed under penalty of perjury.

THE COURT: It was. Okay.

Q Okay. And you can't see this photo of what it looked like at around the time of your exam, can you?

A No, I can't. I'm sorry, no.

Q Okay. Let's do some other questions.

By the way, do you agree that contralateral amputations are common, with one in six patients ultimately ending up with a contralateral amputation over 10 years, regardless of etiology; true or false?

MR. KEAVENEY: Objection.

THE COURT: If you can answer that question. I mean, there is a lot of words there. Do you understand the question?

THE WITNESS: You're saying contralateral amputation --

Q Yes.

A -- is common in individuals, irrespective of --

Q One in six --

A -- irrespective of etiology? Is that what you said?

Q Regardless of etiology, one in six over 10 years?

A I'm not sure where you are citing that from. I have certainly seen individuals have contralateral amputations, but overwhelmingly they had diseased entities that predispose them.

THE COURT: Can you explain to the jurors what that word means? Contra -- what is the word?

MR. GENIS: "Contralateral" is the word.

THE COURT: Contralateral?

MR. GENIS: Yeah.

THE WITNESS: An amputation on the other side, you're saying; correct?

BY MR. GENIS:

Q Yes.

A Then I'm saying, in my experience, it's overwhelmingly been with individuals with numerous comorbidities, particularly diabetes, poor circulation, poor sensation, poor healing. And that would be the other --

THE COURT: I would like you to explain to the jurors what does "contralateral" mean?

THE WITNESS: The other leg, the other leg being amputated.

THE COURT: Okay.

BY MR. GENIS:

Q Now, in physical medicine and rehab, and when you studied physical medicine and rehab, there were certain standard reference books that you used to learn your craft; true?
A Yes. Yes.
Q Okay.
A Yes.
Q And these were recommended -- when you were learning physical medicine and rehab, you were being taught by professors who were doctors; true?
A Correct. Yes.
Q And they wanted you to learn the medicine of physical medicine and rehab; true?
A Correct. Yes.
Q You wanted to learn that medicine; correct?
A Yes.
Q So, when they recommended certain standard reference works, you would naturally look at them; true?
A That's correct, yes.
Q And when you teach, do you recommend to your students that they use certain standard reference works?
A Yes.
Q Okay. And there are certain standard reference works that are professionally reliable; true?
A Yes.
Q And in their field they are considered by physicians,

such as yourself, as authoritative? Not the only authority, but authoritative; true?

A Yes.

Q Okay. And in the field of physical medicine and rehab, *Braddom's Physical Medicine and Rehabilitation*, 6th Edition, is considered an authority in the field of physical medicine and rehab; true?

A More than likely. I --

Q Uh-huh. Do you own a copy of it?

MR. KEAVENEY: Objection. Is he showing something to the jury, Your Honor?

THE COURT: Overruled.

You know about his work. Are you aware of that book?

THE WITNESS: And can you give me the name of the book, I'm sorry?

BY MR. GENIS:

Q Braddom's. You said you were familiar with it before, *B-R-A-D-D-O-M-'-S Physical and Medicine Rehab*. We are now at the 6th Edition.

A Okay. Yes.

Q Okay. And --

MR. KEAVENEY: Is the attorney still using this photograph up on the screen?

MR. GENIS: I'm sorry. I took it down.

THE COURT: Take it down.

All right. So, listen. He is going to question you about that book, which you have identified you are familiar with.

Go ahead.

BY MR. GENIS:

Q Okay. And, in fact, you told us this is one of the authoritative books in the field of physical medicine and rehab; true?

A I have heard of it, yes. So, yes.

Q And on page -- do you agree with the following statement from Braddom on page 177: Contralateral amputations are common, with a population study finding one in six patients who survive a lower limb amputation, ultimately ending up with a contralateral amputation over a period of 10 years, regardless of etiology?

Do you agree with that statement from that authoritative medical book?

A You stated it. I -- it's likely believable, yes.

Q Okay. And you are familiar with -- you keep up with medical literature in your field; correct?

A Yes.

Q And are you familiar with the article: Risk of contralateral lower limb amputation and death after initial lower limb amputation - a population-based study?

THE COURT: Are you familiar with that; yes or no?

THE WITNESS: No, I'm not. Not specifically. So, no.

BY MR. GENIS:

Q Okay.

Sir, the fact that somebody can lose their other leg is a significant fact; true?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Well, are you --

THE COURT: You don't have to answer that.

Next question. Okay.

Q Well, if contralateral amputations are common, with one in six over 10 years, regardless of etiology, that's a significant fact; true?

MR. KEAVENEY: Objection.

THE COURT: I think you said, yes, that's a significant fact; right? You agree with that?

THE WITNESS: Yes, I agree with that. Yes.

Q Did you contain that significant fact in your report, any of the three?

(Reporter clarification.)

BY MR. GENIS:

Q -- include that significant fact in any of your three reports?

A I did not include that significant fact.

Q Okay. By the way, do you agree that when you have young traumatic amputees, more than half have had Post-Traumatic Stress Disorder, anxiety, and depression?

MR. KEAVENEY: Objection.

THE COURT: No. No. Do you know that? Can you testify about whether you know about that?

THE WITNESS: Certainly, a fair number of individuals who have had -- young amputees do suffer from PTSD, yes.

Q And anxiety and depression; true?

A That's certainly -- yes, I've seen that. Yes.

Q Okay. And, in fact, you saw repeated references in Luisa's medical records about anxiety; true?

A Not repeated -- I don't know which records you're referring to.

Q Well, tell you what --

THE COURT: Did you ever see any -- in the records that you reviewed, the question is, whether you ever saw anything about anxiety in those records?

THE WITNESS: I don't recall seeing much about anxiety.

BY MR. GENIS:

Q Okay. Well, you told us you looked over the recent records from this past summer from Mount Sinai; true?

A That's correct.

Q Did you notice in those records it talked about anxiety, medication, and an abnormal gait?

A I don't believe she was on medication for anxiety.

Q I didn't say for anxiety. I know --

A Okay.

Q Are you familiar with Gabapentin?

A Yes.

Q It is a medication by prescription; true?

A That's correct.

Q And you saw that she was prescribed Gabapentin; true or false?

A Yes, she has certainly been on Gabapentin; correct.

Q Okay. So, when you told this jury she was not on any medications, was that a true or false statement?

A When I saw her --

Q True or false, sir?

THE COURT: Just one second.

Do you know whether she was on medication at the time that you examined her?

THE WITNESS: Yes, and she said she was not. And that's what I told the jury, she was not when I saw her, when I examined her.

BY MR. GENIS:

Q And you read the records and you learned that

subsequently she was placed on medication --

THE COURT: Did you learn that after you examined her she was on medicine?

THE WITNESS: Correct, with the supplemental records I have seen that she has been on medication at times.

Q Okay. And that's a significant fact; true?

A Yes, but most recently she was not on medication.

Q Sir, would you --

A Yes.

THE COURT: One second.

What was that medication --

MR. GENIS: Gabapentin.

THE COURT: -- she was on? What was it for? Maybe you can explain to the jury.

THE WITNESS: For pain, it would be for pain.

THE COURT: What is that all about?

THE WITNESS: She either had stump pain and/or phantom pain. I didn't prescribe it. And then she was on it at a particular time.

THE COURT: It's for pain; right?

THE WITNESS: Correct.

THE COURT: All right.

THE WITNESS: But as of July 8ht, she was not on that -- July 8th of 2025, she was not on it.

THE COURT: She was on it -- afterwards she took

that medicine?

THE WITNESS: Right, I think prior to July 8th, 2025, she was on it at some point.

BY MR. GENIS:

Q Okay. So, when she was on it and you read the records stating that she was taking Gabapentin, and you told us that's a significant fact, did you put that in your report under oath?

A I believe I have it in my report that she was on Gabapentin TID. That was at the time of discharge from -- yes, it is in the report, to answer your question. When she was in Spaulding she was on Gabapentin three times a day and Tylenol as-needed.

Q Okay. And, sir, did you tell that to the jury when you were asked the question if she was on medicine?

THE COURT: Sustained.

Q Okay. Now, sir, let's go through some of the other records. Let's talk about Spaulding.

Do you agree at Spaulding she needed assistance with all activities of daily living?

A Actually, by the time she was discharged, she actually was independent in activities of daily living.

Q Well, let's -- okay.

On December 31st of 2021, did it indicate in the Spaulding chart, on page 228, Bates 7387, that she was a

27-year-old female with now a history of anxiety, and --

(Reporter clarification.)

Q -- anxiety, and needs assistance with all activities of daily living?

Did you see that, sir?

A I don't have that, but I have from that same admission --

Q Sir, can you just answer my question. I gave you a page number specifically and a date.

A I don't have every page from that in -- that admission in front of me.

Q Okay.

A That's what I am saying.

Q All right.

A But I have the discharge --

Q And, sir --

THE COURT: Just a second. You are both talking at the same time, which you cannot do.

What is it your specific question is? You have gone over some of this material already.

MR. GENIS: Yeah, I'm moving on.

BY MR. GENIS:

Q Now, sir, when she was at Spaulding there was a physical therapy consult note; true or false?

A I believe so, yes.

Q Okay. And did it indicate that she could only walk one

to two blocks with her above knee prosthesis prior to that recent surgery at Mass General; true or false?

A I believe that's true, but I don't have that in front of me. But I believe that's true. Correct.

Q And did it indicate that her sitting posture was forward head/neck hyperextension; correct?

A I don't have it in front of me, but you are reading from -- okay. So, yes.

Q And by the way, she was five foot nine at the time; correct?

A I believe so.

Q Now, with a prosthetic device, are the leg lengths supposed to be equal?

A Sometimes -- typically, you will get them equal with the other side, yes.

Q Okay. Because if the leg length is not --

THE COURT: Don't make speeches.

MR. GENIS: No.

THE COURT: He said they are supposed to be equal.

MR. GENIS: Okay.

BY MR. GENIS:

Q Because if the leg lengths are not equal, does that affect walking, gait?

A Yes.

Q Okay. And do you agree that when she was at Spaulding

and they measured her leg lengths, her right leg was 18 inches, and leg -- left leg length was -- I'm sorry, 18 for the right inches, 16 for the left; true?

A I don't have it in front of me. I apologize. I don't. Sorry.

Q Okay. It's page 240, Bates 7399, of December 1, 2021, by Michelle Kerr, K-E-R-R, physical therapy.

And did -- at that time, did they note that for her functional assessment she was unable to propel community distances?

A I know you are stating it. I don't see that. But I thought you said that she was walking two blocks. You just stated that.

THE COURT: I'm a little confused. I think -- is that in evidence, by the way? You served it?

MR. GENIS: Yes, it is.

THE COURT: It is in evidence.

MR. GENIS: Yes.

THE COURT: In evidence you have this document, you are looking at it. Did you ever see it? Are you aware of it; yes or no?

THE WITNESS: I don't have it in front of me, so I can't answer exactly to his question. But I'm hearing what he's saying, yes.

THE COURT: So, obviously, it is in evidence. And

it shows it is not the same distance, I guess, that we are talking about and it is not an even gait. I guess that's what it is; right?

Okay. Next question.

BY MR. GENIS:

Q So, do you disagree that she was unable to propel community distances?

A If the therapist said she could not and she didn't, I would concur with whatever the therapist stated at that time.

Q Okay. And if the therapist stated, ambulation unable, would you disagree with that?

A I would not disagree again.

Q And did they, in their assessment, indicate that she was unable to ambulate, requires an ultra lightweight wheelchair for all independent mobility?

THE COURT: The question is, was he aware of that part of the document in evidence?

Are you aware of that; yes or no?

THE WITNESS: I don't have it in front of me, as he is saying, but I'm looking -- what I have here is the admission note --

Q Could you just answer my question, sir.

THE COURT: Just one second.

THE WITNESS: Yes.

THE COURT: Look, you are asking whether he is aware

of all these documents. It's going to take us days for him to look through all of the papers, so we don't want him do that.

MR. GENIS: Sure.

THE COURT: All right? It is in evidence. It is there.

Next question.

MR. GENIS: All right.

BY MR. GENIS:

Q Okay. All right. I'm then going to look at another note from Spaulding, and it indicates: Leisure Activity. Reports difficulty finding leisure activities secondary to poor prosthetic fit; correct?

THE COURT: I think the question is -- these are reports that are in evidence. The question is: Were you aware of those reports? Did you consider those reports at all in your testimony?

Can you answer that?

THE WITNESS: I -- I'm not sure if I saw all of the reports that he's describing. But I don't disagree with what he's saying; correct.

BY MR. GENIS:

Q Okay. And at Spaulding, the patient reported avoiding many containers or foods that need to be cut, reporting increased difficulty with containers/cutting.

Do you agree with that?

A I wouldn't disagree if that's what was stated, yes.
Q Okay. Skip that.

And there was an impression at Spaulding, stating prior to admission, she was independent with all activities of daily living. Then it talked about, after the injury, that presenting current problem, function or performance.

Patient presents with five or more performance deficits in the areas: Bathing/showering, toileting, dressing, eating, functional mobility, personal hygiene, and grooming, community mobility, shopping, leisure participation and social participation due to impairment in body mechanics, functional mobility, functional transfers, and motor function.

Do you agree disagree that was stated in the Spaulding chart for impression?
A The --

THE COURT: Doctor, we have this report in evidence and Mr. Genis is questioning you about it. The jury hears the report again. It is already in evidence.

Basically, the question is do you have any disagreement with this report?

You know about the report, I take it, right?

THE WITNESS: Yes, I do not disagree with that report.

THE COURT: He has answered the question. He agrees with the report.

What's your next question?

MR. GENIS: Okay. All right. Let's go to the next thing.

Q When you were talking about July 8th of 2025 at Mount Sinai rehab, did they note the chief complaint was gait impairment and diagnosis abnormality of gait?

A Yes.

Q And at that time, pain management to consist of Oxycodone, acetaminophen, Gabapentin and patient did -- recommended to follow up with plastic services Dr. Eberlin one-week post; true or false?

A And this is the July 8th note? I'm sorry?

Q Yes. Page 2, Bates 3384.

THE COURT: That's in evidence?

MR. GENIS: Yes, sir.

THE COURT: All right. So he wants to know whether all of these documents in evidence, whether you have any issue with those documents? That's what he is asking you.

A I don't recall seeing that she was on the Oxycodone or that was suggested.

I have on July 8th that the plan was she was going to see Prosthetic in Motion to discuss a new socket for her above knee amputation and the plan was physical therapy after the new socket was made and discuss osseous integration versus revision surgery for the above-elbow amputation.

Q So, in other words, are you telling us that you disagree that that's what's stated in the hospital chart of Mount Sinai?
A That's what I have documented here.
Q I didn't ask you --
A That's what --
THE COURT: One second. Stop it.
That report is in evidence. He wants to know whether you disagree with any of these reports. That's what he's trying to find out.
THE WITNESS: I'm not disagreeing. I don't recall seeing the Oxycodone, nor seeing her on that. I'm not disagreeing that you say you saw it.
THE COURT: All right. It's in the report. You don't disagree with what's in the report?
THE WITNESS: Correct.
THE COURT: He is agreeing with what's in the report. What other questions do you have?
Q So when you told this jury a few minutes ago the only pain medicine she was on was Gabapentin and she was not on that in July of 2025, was that a true or false statement?
A That was what the record stated to me. I did not see she was on it as of July 8th of 2025.
Q Sir, naturally, before you prepared your three different reports, you took this matter seriously; true?

A Yes.

THE COURT: He took it seriously. Next question.

Q Okay. You knew when you were writing your reports that you would come to court and I would question you on them; true?

A Yes.

Q You knew that you signed them under penalty of perjury; correct?

A Yes.

Q And you knew that this was a very important matter; true?

A Yes.

Q You took it seriously to do -- to the best of your ability --

THE COURT: What's your question? What's your question? Why don't you save that for summation? What's your question?

MR. GENIS: Okay.

THE COURT: I'm moving you along a little bit now.

MR. GENIS: Sure.

Q You did not include any of those facts in any of your reports, nor did you tell that to the jury; true or false?

MR. KEAVENEY: Objection.

THE COURT: I don't know what facts you are talking about.

MR. GENIS: Okay.

THE COURT: You want to ask specifically --

MR. GENIS: Sure.

THE COURT: -- a particular fact.

MR. GENIS: Will do.

THE COURT: There are a lot of things included in the report. You don't include everything in the report. What specifically do you want to focus the jury on --

MR. GENIS: Sure.

THE COURT: That he did not include. Let's see if we can wrap up your questioning.

MR. GENIS: I'm going to move on, Judge.

Q You mentioned a moment ago you do recall seeing the note of July 8th of 2025 and how the patient planned to see Chris Kort of Prosthetics in Motion to discuss getting a new socket for above-knee amputation and to explore the options of osseous integration for her left transfemoral amputation; correct?

A Yes.

THE COURT: Do you think anybody is going to understand what you just said? Next question.

Q Does that mean she had to get a new socket for her knee, for the above knee, I should say?

THE COURT: Did she have to get a new socket for her knee?

THE WITNESS: I believe she was getting a new socket

for -- yes.
Q She's having issues with suction and did not feel confident walking; correct?
A Yes.
Q And that she gained weight and the socket is now too tight and it causes discomfort now with heat. She's developing skin breakdown over groin and buttocks; true?
A I believe so, yes.
THE COURT: Did you put all that in your report or is this something that you are just hearing for the first time?
THE WITNESS: Well, I stated she was going to get a new socket after conferring with her doctor. I did include some of that in the report.
THE COURT: Okay. Next question.
Q Okay. And did you note how her above-elbow amputation has poor suction and cannot withstand the weight of the elbow and forearm, therefore she does not turn it on right now for fear of it falling off; true or false?
A Yes. I put that in my report, yes.
Q Okay. And then did you note how it found skin breakdown over ischial tuberosity, posterior thigh, and groin tenderness over bone prominent of humerus. And then tell us what that means.
A I put that in my report. It would suggest that it was

not -- it was not fitting well with regard to the prosthesis and that's why she needed to have -- the socket needed to be replaced.

As I said, I documented just what you said. I actually have the same sentence I believe you said.

Q Okay. Let's go to another.

Let's do something else?

Now, by the way, you do life care plans. Let's discuss some literature.

MR. KEAVENEY: Objection, Your Honor. He didn't do a life care plan for this case.

THE COURT: I think we discussed life care plans already.

MR. GENIS: You raised a great point.

Q You have done life care plans in your life; true?

A A while ago, yes.

Q Okay. And, in fact, on another case, the Transit Authority hired you do a life care plan for the plaintiff in that case; true?

A I'd have to recall -- I don't recall the case.

THE COURT: Have you done life care plans before?

THE WITNESS: I said yes.

THE COURT: You have. All right.

Q Did you do one for this case?

A No.

THE COURT: Is there any reason why you did not do that for this case?

THE WITNESS: I wasn't asked to.

THE COURT: Okay. That's the answer. Next question.

Q Are you familiar with the standards of care of a life care plan?

A I'm very familiar. I have seen many life care plan.

Q That's not what I asked you.

Are you familiar with the standards of care of preparing a life care plan?

A I have some degree of familiarity.

Q Some degree of familiarity?

I'm asking you are you conversant --

THE COURT: He answered the question.

MR. GENIS: Okay.

THE COURT: He has some familiarity. Next question.

Q What do you think is better, somebody with some familiarity with life care plans or someone who is certified with providing life care plans?

MR. KEAVENEY: Objection.

THE COURT: Obviously the more you know the better you are. Next question.

Q Well, you told us you were criticizing Dr. Kahn's life care plan; right?

A I said I have issues with certain things that were suggested in the life care plan.

Q Now, Dr. Kahn, you are familiar with him; correct?

He's at Mount --

A I do know Dr. Kahn, yes.

Q In fact, he is at the main campus; correct?

A He does clinics there I believe now, yes.

Q In fact, he is double board certified; correct?

A I believe in pain and rehab.

Q And he is also a professor not only of rehab but in orthopedics; true?

A He was retired under the orthopedic department. That's why he is part of ortho as well.

Q And Dr. Kahn, you are aware, has published three books, multiple articles, and over 53 peer review journal articles; true?

MR. KEAVENEY: Objection.

THE COURT: Sustained. You are familiar with him. And he is recognized. You accept him as an authoritative source, I assume?

THE WITNESS: Yes. I don't know how many things he published. Yes.

Q Okay. So certainly he is qualified and competent to prepare a life care plan; true?

A Yes. He is competent to prepare a life care plan.

Q By the way, in any of your three reports, do you mention Dr. Kahn's life care plan and report?

THE COURT: He is going to have to spend the next hour reading --

A I don't believe, no.

Q Now, that was served in 2023, about two years before you did your two supplemental reports; correct?

A That's correct, but I don't know -- I received it recently.

Q Okay. So you received it before you wrote your two supplemental reports; correct?

A Yes. That's true.

Q So you knew you were coming to court to criticize his life care plan, but you never even mentioned his life care plan in any of your three reports; true or false?

A It didn't exist because the first report -- the other two -- I wasn't asked about it. So, yes, I did not.

Q Do you think it would be important to read the life care plan of a qualified double board-certified physician, certified in life care planning, who is on the faculty of the med school?

THE COURT: Objection sustained. We don't do that.

Q Do you think it would be an important fact to note in your reports for litigation that Dr. Kahn had written a life care plan?

THE COURT: Is there any reason you didn't say anything in your notes about Dr. Kahn?

Is there any reason why not?

THE WITNESS: I wasn't asked to do a life care plan. So I did not.

THE COURT: He question is was he asked to do a life care plan. It's not in your report; correct?

THE WITNESS: Correct.

MR. GENIS: That's a separate question, if you were asked to do a life care plan.

I'm asking about mentioning in any of your reports Dr. Kahn's life care plan.

THE COURT: I think he said no.

MR. GENIS: All right.

THE COURT: He said he wasn't asked to do a plan. He didn't mention anything about Dr. Kahn. Is that correct?

THE WITNESS: That's right.

THE COURT: Next question.

Q Do you agree when you reviewed the records for Bellevue there was no reported loss of consciousness for Luisa?

A That's correct.

Q Okay. And you noted how she, in addition to the traumatic amputations, she had a right temporoparietal scalp laceration on the right side of her head?

A Yes.

Q And hematoma, and right frontal scalp hemoglobin?
A Yes.
Q And she had multiple debridements?
A Correct.
Q Debridement means to literally cut away and surgically remove; correct?
A Correct.
Q So, in other words, the cutting away the non-viable tissue to try to help salvage the viable tissue; correct?
A That's correct.
Q And then you saw that there were eight surgical procedures performed at Bellevue; correct?
A Correct.
Q When you wrote seven in your report, that was a typo?
A Then it would have been a typo, presumably.
Q Okay. And you saw that the skin grafts were over 900 centimeter squared; true?
A Yes. Yes.
Q And that means there were donor sites on the good leg and from her back and other body parts to place on the amputated leg and arm; correct?
A Correct.
Q Okay. Now, by the way, you indicated how her prosthetics fit well in 2019; correct?
A Yes.

Q By the way, did you note that in Mass General Hospital when she had the above-knee amputation revision with sciatic and saphenous TMR for targeted muscle re-innervation; correct?
A Yes.
Q Sciatic is the sciatic nerve that is from the back and goes down the leg; correct?
A Correct.
Q Okay. And you indicated that it was on the right leg in your report; correct? Page 2.
A Yes. That's likely a typo. Uh-hum.
Q Okay. So when you say a typo -- I understand seven and eight, that's a typo.
Can we agree that there is a difference between right and left?
A Yes.
Q Skip that.
By the way, in Mount Sinai, even on October 18th of 2022, she had an abnormal gait; correct?
A Give me a second.
It is documented as such, yes.
Q Okay. Now, by the way, you mentioned videos that you reviewed; correct?
A Yes.
Q And you told the jury you didn't know when they were taken; correct?

A I don't recall offhand what day it was. I'm not sure.
Q And the videos had no dates or years on them; correct?
A I don't believe they did.
Q So you were commenting in your reports based in part on your review of these videos; true?
A Yes. I was discussing how she appeared to be doing, the activities of daily living on the video; correct.
Q So you based your opinions under penalty of perjury on videos that you don't even know when they were taken; true or false?
A I didn't know when they were taken but they appeared to be her doing these activities.
Q Okay. So do you know if those activities were before a revision surgery, after a revision surgery?
A I do not know that.
Q Okay. You talked about how she can do certain things at your physical exam; correct?
A Yes.
Q You noted how she gets blisters in the groin area from the prosthesis; correct?
A She mentioned that.
Q And you noted how her arm prosthesis was not functional; correct?
A Correct.
Q And you noted how she had back pain and bilateral

shoulder pain; correct?
A I believe so, yes.
Q And do you agree that a leg injury can affect everything up the line, including the spine?
A It can.
Q Okay. And you noted that she could walk two blocks with a quad cane or without; correct?
A That's what she told me, yes.
Q Was it painful for her to do so?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
Q Did you ask her?
MR. KEAVENEY: Objection.
THE COURT: Wait. Overruled. Go ahead.
Did you ever ask her that?
THE WITNESS: I certainly asked her her complaints.
Q Not my question, sir.
Did you ask her if she walks two blocks, with or without a quad cane, if it hurts?
A I don't know if I asked that specifically.
Q Okay. You documented how she one time had to go up a flight of stairs; correct?
A She stated that the elevator -- correct. She stated that.
Q How did she do it, like a child one step at a time or in

some other fashion?

A I did not document that. I did not ask.

Q Okay. Was it painful for her to go up or down the stairs?

MR. KEAVENEY: Objection.

THE COURT: If you know. Can you answer that?

THE WITNESS: I do not know.

Q Did you ask her how many steps can she go up or down?

A She just quantified it was going from one floor to another in school when she was doing her master's. That's what she told me.

Q Okay. Did she do it out of choice, like oh, I feel like getting some exercise today or she had no choice?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Did you ask her was it hard for her? Was she tired? Did she have to take breaks?

A I did not ask that. The elevator malfunctioned. That's why she did the stairs.

Q When you watched her ambulate, how far did you watch her walk?

A A limited distance in my office.

Q How much?

A Let me see. What year was this?

Q 2019, in November.

A At least 10 feet.

Q So you based your opinions, under penalty of perjury, about her ability to walk based on watching her walk 10 feet; am I correct?

A I said at least --

Q Am I correct?

A At least that, I'm saying.

Q Okay. Can we agree there is a world of a difference between 10 feet and 100 feet?

THE COURT: Sustained.

Q Did you time her, how long it took her to walk those 10 feet?

A I did not time her.

Q Was the walking surface flat?

A Yes.

Q Okay. Did she -- when you asked her about activity, did she advise you that George does most of the cooking, cleaning and heavy shopping?

A She said her boyfriend did it. I assume that's George, yes.

Q When you documented how she makes a sandwich or a salad, did you ask her how she did it or how long it took her?

A I did not.

Q Did you ask her how much effort or energy it takes her to do any of the tasks she performs on a daily basis?

A I did not.
Q Okay. Now, you noted that she had a manual wheelchair at the time; correct?
A Yes.
Q So that means she needs somebody to push her; correct?
A That's correct.
Q Right. You can't do a manual wheelchair with only one arm; correct?
A There are one-armed wheelchairs. I don't believe she had one at that time. But you can do that with a one-arm drive. I think there is a power assist now.
Q Okay. So you would agree and tell this jury that it would be advisable for her to get that wheelchair that's good for one-arm people; correct?
A Yes. I actually testified to that even before the break.
Q Excellent.
A I agree.
Q Now, did you ask her in the past what athletic and recreational activities she engaged?
A I did ask.
Q Did you ask her if she swam?
A I don't know if I asked that.
Q Did you ask her if she used a boogie board at the beach?
A I did not ask that.
Q Did you ask if she went sand boarding at the beach?

A No.

Q Did you ask her if she went hiking?

A No, I did not.

Q Did you ask her what kind of exercise she did?

A She just said she exercised regularly.

Q Did you ask if she cooked for herself before this?

A She said she helped her mother with cooking and cleaning. That's what she told me.

Q Okay. And did she live independently when in college in London?

A I'm -- I don't know if I asked that, but if she testified to that fact, I would not disagree.

Q Did you ask her if --

A She was independent before.

Q Okay. Did you ask if she was a model who walked the runway before this?

A I did not ask that question.

Q Did you even know that she was a Ford model?

A I did not know it.

Q She took off both of her prosthetics and put them on in front of you; true?

A Yes.

Q How long did it take her to do that?

A Some time. I did not quantify it.

Q Well, when you say some time, how long was your session

with her?
A It probably was at least an hour.
Q Did it take over a half hour just to take off the two devices and put them back on?
A No. It wasn't that long a period of time.
Q You timed it?
A No. No. I'm saying it was definitely not a half hour.
Q Did you make a note --
THE COURT: Wait. Wait. You can't do that.
A I did not write a note. I'm saying if it took roughly an hour of seeing her, it wouldn't have taken a half hour for her to do that.
Q How do you know that?
A I wouldn't been able to ask the questions and done my exam in that period of time.
Q So you're saying that would be your normal custom and practice to do so?
A To do what? I'm sorry.
Q Let me try it this way: Would it violate your personal standards not to ask her all these questions?
A About being a Ford model and things that?
Q That all of her different activities.
THE COURT: He is trying to ask questions about whether you knew what she was doing, whether you asked her questions about her past, her present, her abilities to do

what she was doing and not doing it in the past. Those are the general questions he is trying to ask you about.

If you have any evidence or testimony that you want to give the jury about what you asked her? You can do that now.

THE WITNESS: I asked questions about her general function before the amputation. And I saw her in the presence of one of her attorneys at that time and there was a female witness that was there. I believe it was an open question as to her functional status.

Q So did --

THE COURT: One second.

You asked her a lot of questions about how she was getting along, is that what you're saying?

THE WITNESS: Well, I asked her basic questions about her mobility. It was an open-ended question. I didn't ask all of these pointed questions that he raised.

THE COURT: Now he is asking you specific questions.

He has answered the question. Let's go on to your next question.

MR. GENIS: You got it.

Q You mentioned she goes to work. Do you know what kind of effort or energy it takes for her to go to work?

A I wouldn't know exactly what kind of efforts. I believe she takes Access-A-Ride is what I was told. That's what she

told me, excuse me, how she got to and from at that time.

Q Where did she live at that time?

A At that time, I believe she lived in an apartment with her then boyfriend, I believe.

Q Where?

A I don't have that in front of me. I don't know.

Q Where was her work?

A I do not know.

Q How long did it take her to get to work?

A I don't know.

MR. KEAVENEY: Objection.

She wasn't working at the time.

THE COURT: Did you ask her --

THE WITNESS: At that time I think she was in school. I don't know if she was working. I think she was still a student.

THE COURT: Listen to me. He wants to get specific questions to you. He asked how long did it take her to get to work? He has questions about that type of thing.

THE WITNESS: I don't think she was working. She was still a student at that time.

THE COURT: So at that time she was not working? She was a student?

THE WITNESS: That's what she had told me. Correct.

Q Okay. Sir, did you tell this jury on direct exam how

Luisa goes to work?

A I've -- yes. The new records have stated that she works, I believe, as an architect.

Q So is that a yes to my question?

A I believe so, yes.

Q Okay. How long does it take her to do that? What effort and energy does it take?

A I don't know the effort or energy. I would have to refer to the records. I did not ask -- she wasn't working when I met her.

THE COURT: Did you find out subsequently that she was working and do you know that to this day?

THE WITNESS: I did find out subsequently.

THE COURT: Tell the jury. What did you find out about it? Did she have to go 10 miles to work, or go 50 feet to work? Do you have knowledge about that?

THE WITNESS: I didn't have knowledge of that. I just know that she was working in the field of architecture. She was a student when I met her.

THE COURT: At that time, since then you have learned and you have testified that she works.

THE WITNESS: Yes.

THE COURT: All right. We want to know what you know about that. Was it ten minutes away from her home? Did she have to get there long distance? Do you know anything

about the type of work she was doing?

Was she in the field, not in the field?

Let's get the bottom line of what you know about the work that she did and how she was able to do that work. And we can move on to something else.

THE WITNESS: Yeah. I believe she worked in the field of architecture. That's my understanding, and I believe she takes Access-A-Ride from the records that I reviewed.

THE COURT: You don't know specifically what she did when she was working, yes or no?

THE WITNESS: I don't know specifically.

THE COURT: Next question.

BY MR. GENIS:

Q You told this jury that she ambulates in her apartment. Did you notice in the video that you told us you watched that she used a wheelchair in her apartment?

A She used a wheelchair as well.

Q Thank you.

Now, you told the jury how she could take out the trash; correct?

A She appeared to demonstrate that on the video.

Q Did you see how she had to put the garbage bag in her mouth to take out the trash?

A Yes. It was onerous. Yes, I saw that.

Q You saw -- you told the jury she did her nails that she

had to put it in her mouth to do her nails?
A Correct.
Q Do you consider that normal?
A No, I do not.
Q Okay. Now -- you told the jury the difference between a traumatic amputation and non-traumatic; correct?
A Correct.
Q Okay. Let's discuss that.
Sir, where there is a planned amputation, examination we agree they can make a clean cut.
A Correct. Typically.
Q Okay. So there's not comminuted broken bones like Luisa had; correct?
A Correct.
Q Her legs were shattered and crushed as they were amputated; correct?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
Q You read her records?
A Yes. It was traumatic.
Q So can we agree it was not as clean as when there was a planned amputation; is that correct?
A That's correct.
Q Okay. And before -- you talked about comorbidities.
Before this accident, did Luisa have comorbidities?

A I don't believe so, although one of the records she had a past medical history of anxiety. I don't know if that's correct. She did not seem to have any comorbidities.

Q The anxiety was after this accident and as a result of these injuries; true or false?

A I believe so. But it said in the records past medical history. So I think that might be indirect at that point.

Q Well, if somebody goes, whether it would be 2025 or 2021, for a past medical history going back to 2016, and after 2016, August 2nd, they developed anxiety, that would be part of the moment history, just like traumatic amputation; true or false?

A Absolutely. That's what I would say that. I understand. Yes.

Q Thank you.

THE COURT: Let's see if we can wrap this up.

MR. GENIS: I will try my best.

THE COURT: I think it is getting repetitious now. I think the jury understands the testimony.

MR. GENIS: I will try to go very quickly then, Judge.

THE COURT: It's ten to 1:00 and we want to have some opportunity for redirect.

Q She has a risk of infection if she gets the osseous integration; is that correct?

A That's correct.

Q When you said you did sensor exam, did you exam her left lower stump?
A Let me see.
Q It's on page 9 of your report under the heading sensory.
A Yeah, I don't have that there. I don't have that there.
Q Okay. Now, you did a musculoskeletal and you found that her left stump shoulder was severely limited in terms of its range; true or false?
A Yes. It was on my exam, yes.
Q Okay. In fact, when you had her do left forward flexion, normal is 180 degrees, and she could only go 40 degrees; true or false?
A I believe that's correct. 40 or 45 degrees. It was markedly limited.
Q Okay. Look on page 9 of your report. 40 degrees; correct?
A Yes. Got it. 40 degrees.
Q In fact, you have testified, when you were for the plaintiff that, a 45-degree limitation of range of motion is disabling; true?
A Yes.
Q Okay. Now, did you even measure the other ranges of motion of her left shoulder?
A All I have is forward flexion. I just know it was markedly restricted. It was quite restricted.

Q And there are different ranges of motion that are part of a normal physical examination; correct?
A Correct. Correct.
Q Okay. And in the shoulder, the most common test done would include, after forward flexion, abduction, A-B-D-U-C-T-I-O-N; correct?
THE COURT: You examined her shoulder?
THE WITNESS: Correct.
THE COURT: Did you do that?
THE WITNESS: I did. I only have the forward flexion. That's all I have documented.
Q Did you measure abduction, adduction, internal rotation, Hawkins sign, Neer sign?
I can go on.
Did you measure anything else?
A I don't believe so.
I believe she had a very short amputation. But some of those positions would be very difficult to even see if she had any range because she had a short amputation as I recall.
Q In fact, it would be impossible to do some of those measurements; correct?
A Correct.
Q And you agree she has phantom limb pain; correct?
A Yes. She definitely had that. She complained of it. Yes.

Q All right. Sir, do you agree that you did not see her for purposes of treatment; correct?
A Correct.
Q Okay. And you were not selected by her to exam her; correct?
A That's correct.
Q You were not selected by the Court to examine her; correct?
A Correct.
Q When you say you did an independent medical exam, there are certain hallmarks of an independent medical exam; correct?
A Yes.
Q Okay. And you have to be independent, neutral and objective; correct?
A Yes.
Q Were you dependent upon the defendants for scheduling this exam?
A Was I dependent on the defendant?
I mean, I was with the plaintiff's schedule, technically, I guess.
Q Well, the --
A The defendant asked me to see her.
Q Thank you.
A Is that what you're saying?
Q Yes.

You were dependent on them for receipt of whatever medical records you received; true?
A Yes.
Q You were dependent on them for the medical records and to get paid for the exam?
A Yes.
Q You were dependent to pay you for the reports you wrote; correct?
A That's correct.
Q You were dependent on them to schedule you and pay you for court; true?
A That's correct.
Q So you were retained for one purpose and only one purpose, to assist the defense in this matter; true?
A To look at the records and determine what medical needs she had, but through the defense, correct.
Q I mean, you weren't examining her for purposes of treatment; true?
A True.
Q Okay. When you authored your report, it was to assist the defense in defending this case; correct?

THE COURT: I think we've heard enough about this. It's about one o'clock.

MR. GENIS: Sure.

THE COURT: You have one or two more questions --

MR. GENIS: You got it.

THE COURT: -- and then you're finished.

MR. GENIS: Maybe three, Judge.

Q Sir, whether you wrote your reports, since there was no patient/physician relationship -- let's back up. Sorry.

When you see a patient and make records and reports on them, if you are wrong in your diagnosis opinions, there could be adverse consequences for you; true?

A Yes.

Q When you do this exam for a lawsuit, there is no doctor/patient relationship; true?

THE COURT: We know that.

A That's correct.

Q So if you are wrong in the opinions you give to this jury and in this case, there are no possible adverse consequences to you; true?

THE COURT: Objection sustained. Next question.

Q If you're wrong and Luisa is --

THE COURT: I'm not going to allow that. Listen to me. Objection sustained.

Do you have any other questions?

It's argumentative. Do you have any other questions?

MR. GENIS: You know what judge, I'm good.

THE COURT: Good. All right.

Mr. Keaveney, I would like to see you complete his testimony before lunch break. If it's possible, if not, let me know.

MR. KEAVENEY: I will do my best.

MR. GENIS: I'm just clearing my stuff out.

REDIRECT EXAMINATION

BY MR. KEAVENEY:

Q Dr. Reid, is Dr. Kahn a treating provider?

A No, he is not.

Q You are familiar Dr. Kahn?

A Yes. I know Dr. Kahn. Yes.

Q You are familiar with him through work?

A Yes. Yes.

Q Okay.

A We actually did residency together. I was his chief resident.

Q When was that?

A That would have been about 1990, 1991. He followed one year after I did.

Q When you say you were his chief resident, what do you mean by that?

A We were residents together, and I happened to be chief resident when he was, I guess, postgraduate three. He was one year behind me.

Q Okay.

A So we did the same residency at Columbia Presbyterian.
Q Mr. Genis asked you a lot of questions about contralateral amputation.
In your review of the records, did you see any reference to contralateral amputation?
A No, I did not.
Q Did you see any communication that Ms. Harger nine years post incident was at risk for contralateral amputation?
A No, I did not.
Q You reviewed the Prosthetic in Motion records?
A Yes.
Q Okay. In your review of those records --
THE COURTROOM DEPUTY: Are you using the ELMO?
MR. KEAVENEY: Yes.
THE COURTROOM DEPUTY: Okay.
Q -- were there several indications that the limb was found no signs of redness or irritation?
A That's my understanding, yes.
Q And they were found on numerous parts of that record?
MR. GENIS: Objection.
THE COURT: That's my understanding.
MR. GENIS: Judge, there is an objection.
THE COURT: Overruled.
Q And no one is disputing that Luisa or Ms. Harger has a permanent disability; correct?

A Correct.

Q Now, you indicated that Ms. Harger will also need physical therapy and occupational therapy; correct?

A Correct. Yes.

Q Okay. And that will be needed for a lifetime?

A That's correct.

Q Is that needed on an as-needed basis or just lifetime? Can you explain that to me?

A I mean, as needed basis.

As the other attorney had mentioned, if she were to undergo a revision surgery, for instance, in her upper extremity that may necessitate an inpatient rehab stay, that would certainly be followed up with a course of outpatient therapies. But there are some periods of time where she has gone with -- she hasn't really received outpatient therapy presumably because she has been very stable with both the upper and lower extremities. So it is as needed. She will require for the rest of her life for physical and occupational therapy.

Q Again, on an as-needed basis; correct?

A Yes.

Q Mr. Genis also talked about the numerous prosthesis, some of which were recommended.

Is it prudent to prescribe a prosthesis for every single activity imaginable?

MR. GENIS: Objection.

THE COURT: If you can answer that question. If you know the question, you can answer it.

A Yeah, I would say it's not prudent for every imaginable activity.

I believe the leg prosthesis she has is multi-functional. We went through it in great detail earlier, waterproof. You can run, use a bicycle in it, et cetera.

With the upper extremity, it sounds like she's at a juncture where she's deciding which way to proceed with that.

And as I said and I say again she would benefit from a prosthesis, an upper extremity prosthesis that affords her increased functionality, which affords bimanual activities, to facilitate bimanual activities, two-handed activities.

Q It's your knowledge that she's currently using the X3 Ottobock prosthesis for the lower extremity?

A Yes. That's my understanding.

MR. GENIS: Beyond the scope. I never asked him about it.

THE COURT: Rephrase the question.

Q Are you aware of what type of prosthetic or prosthesis she is currently using for the lower extremity?

A Yes. My understanding is the X3 Ottobock. That's what she's using. That's -- we talked about that, the X3 with the microprocessor. Yes.

Q Okay. And in your review of the video, did that video show an X3 Ottobock prosthesis?
A I believe so. I don't have the video in front of me, but I believe so.
Q Mr. Genis asked you a lot of questions about her activities.
In your review the records, did it indicate that Ms. Harger could traverse a long distance?
A I believe Prosthetic in Motion said she could walk 400 yards in their records.
Q Okay. And that she could stand for a period of time?
A I believe so, yes.
Q And that she could do her job with her current prosthesis?
A That's what the records stated, yes.
Q And you have no reason to doubt her own records, do you?
A No, I do not.
MR. GENIS: Objection.
THE COURT: He answered it.
Q Mr. Genis also asked you that you would want a patient to exceed, to go forward and not to go backwards; correct?
A Correct. You would not want them to regress. Correct.
Q So in your reports, you indicated that she should continue to have the current prosthesis that she has; correct?
MR. GENIS: Objection. It's not in evidence.

THE COURT: Just one second. Overruled.

Q Is that your recommendation?

A Yes.

Q And you wouldn't recommend that she had a lesser prosthesis, would you?

A No, not at all.

Q Okay.

Thank you, Doctor.

THE COURT: Do you have any further questions? Is.

MR. GENIS: Very brief.

RECROSS-EXAMINATION

BY MR. GENIS:

Q How long was the video?

THE COURT: How long what?

Q How long was the video you watched?

A I -- I don't recall. I don't know if I have that documented.

Q How much of it did you watch?

A I watched the entire video. Maybe 20 minutes or so. As I recall, 20-plus minutes.

Q Did you know it was 47 minutes long?

A I don't recall exactly, but I did watch the entire video, yes.

Q Are you a prosthetist?

A No, I'm not.

Q You said you presumed if she wasn't going to certain appointments that she was stable.

What if she didn't have money to pay? Did you consider that?

MR. KEAVENEY: Objection.

Q Did you review any of the trial transcripts in this case?

A No, I did not.

Q Sir, you are a member of the American Medical Association; true?

A Yes.

Q And they have a code of medical ethics; true?

A Yes.

Q And you agree that an expert giving medical testimony must give testimony that reflects the standard of care; correct?

A Yes.

Q And you told us you are not familiar with the standards of care of an IME. You are not a certified life care planner and you're not a prosthetist?

THE COURT: Objection sustained.

We've had this testimony.

MR. GENIS: Okay.

THE COURT: Save your arguments for summation.

Q Do you agree that according to the code of medical ethics you are not allowed to have your testimony to be influenced by

financial compensation; true?

MR. KEAVENEY: Objection. Beyond the scope.

THE COURT: Sustained. Sustained.

MR. GENIS: Nothing further.

THE COURT: Folks, we kept you a little bit late for lunch today. But we are going to reconvene at 2:15. And I think at that time we will have the train operator testify, I understand, is that correct?

MR. KEAVENEY: Yes, Your Honor.

THE COURTROOM DEPUTY: All rise.

THE COURT: You can shut off the screen.

MS. WINTERS: Thank you, Dr. Reid.

THE COURTROOM DEPUTY: He is gone. Good.

(Lunch recess.)

A F T E R N O O N   S E S S I O N

(In open court; jury not present.)

THE COURT: All ready for the jury?

THE COURTROOM DEPUTY: You can have the witness take the stand while I get the jury.

MR. SHIELDS: Judge, one issue before the witness takes the stand.

THE COURT: Yes, what do you want?

MR. SHIELDS: The defense has indicated that they want to introduce a hearsay document through this witness that we made a motion about. It's an incident report that she completed. We filed a motion on this issue.

THE COURT: What is it that you want to do? Let me see what it is that you want to introduce.

There's an issue about this?

MR. SHIELDS: Yes, sir.

MR. GENIS: We want to redact out the hearsay, Judge. Best evidence is the witness herself. We want to redact the hearsay that's self-serving.

THE COURT: This is her correspondence sheet?

MR. SHIELDS: Yes, Your Honor.

THE COURT: So what is it you're concerned about? What's in the red here?

MR. SHIELDS: Yes, Your Honor. It's clearly

hearsay. It's not best evidence, which would be her testimony, Your Honor.

MR. GENIS: It's self-serving.

THE COURT: But she's going to testify.

MR. SHIELDS: Correct.

MR. KEAVENEY: Judge, it comes in under 803(b). It's a business record made at the time of the incident.

MR. SHIELDS: It was not made at the time of the incident, Your Honor.

THE COURT: Well, wait a second --

MR. KEAVENEY: It's an accident report.

THE COURT: Let me read what it is you want here.

MR. GENIS: It is not an accident report. It's correspondence.

MR. KEAVENEY: It's a business record.

THE COURT: Just one second.

(Pause in proceedings.)

THE COURT: All right. So she wrote this thing out. Why don't we just have her testify. I'll probably admit it in evidence.

MR. SHIELDS: It's double hearsay, Your Honor.

MR. KEAVENEY: Again, as an exception --

THE COURT: What she said is -- you're going to question her. Here's what she said, here's her report. Let's let her testify. She's testifying. It's not hearsay.

She's testifying.

MR. GENIS: Her testimony is the best evidence, not the document, Your Honor, which is self-serving and cumulative, bolstering.

THE COURT: What does this say? On the --

MR. GENIS: She's free to say whatever she wants, Judge.

THE COURT: It's hard for me to read this. I have a hard time reading this. So why don't we have her testify, okay? Let's hear her testimony, okay? If she subsequently put that down in writing, she can testify about that, okay? Let's see what she says.

We'll bring the jury in.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

(In open court; jury present.)

THE COURTROOM DEPUTY: You can all be seated.

I'd ask the witness if you can stand and raise your right hand.

(Witness takes the stand and is sworn.)

THE COURTROOM DEPUTY: Thank you. Have a seat.

I'll ask you to state and spell your name, and keep your voice up.

THE WITNESS: Raqia Shabazz; R-A-Q-I-A, last name S-H-A-B-A-Z-Z.

THE COURTROOM DEPUTY: Thank you, Ms. Shabazz.

THE COURT: Your witness. Go ahead.

**RAQIA SHABAZZ**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KEAVENEY:

Q Good afternoon, Ms. Shabazz.

A Good afternoon.

Q Just remember to speak into the microphone.

A Okay.

Q Thank you.

Are you currently employed?

A Yes.

Q Who are you employed by?

A New York City Transit.

Q Before you were employed by New York City Transit, did you attend a college?

A Yes, I did.

Q Where did you attend college?

A I attended college at John Jay University, or John Jay College.

Q Did you obtain a degree?

A Yes, I did.

Q Following your college experience, did you begin working for the Transit Authority?

A Yes.

Q In what year?

A I began working for Transit Authority in 2014.

Q And did you immediately start -- strike that.

In what capacity?

A In 2014 I began working as a train operator.

Q Were you trained as a train operator?

A Yes.

Q What did the training consist of?

A We had to learn the mechanics of the train, the different train classes, how to troubleshoot fixing the train, how to operate the train, the electricals of the train, the pneumatics. We had to learn the system, the lines, the signals, the routes that we would take throughout the subway system. We had to learn even about certain sights that might be of interest to the passengers, to the righting period.

Q How long was that classroom training?

A The classroom training was nine months.

Q Was that every day?

A Five days a week.

Q How many hours a day?

A Eight hours each day.

Q During your training, were you trained on any particular equipment?
A Yeah, we was trained on several types of equipment, all the -- all of the trains that we operate within the B division.
Q What is the B division?
A The B division is basically a distinction between number trains, which is -- the number trains are the A division and the letter trains are the B division.
Q And you were trained to operate cars within the B division?
A Yes.
Q Are there differences between cars in the B division and A division?
A There are differences. Like, in the A division, the tracks are more narrow, so the trains are smaller. And also, the trains sometimes have a longer concepts length in A division, whereas in the B division, for the most part, all trains are going to be between 600 feet to 500 feet -- 500 feet to 600 feet.
Q Did your training consist of on-the-road training?
A It did.
Q How much of your training was on the road?
A So I would say it -- sometimes we -- I can't really give you an exact answer because it was both at the same

time. Like, sometimes we would be training in the classroom and immediately go on the road or be sent to the yard. A lot of the training was mostly on the road.

Q During that on-the-road training, did you learn how to accelerate the trains?

A Yes.

Q Did you learn how to brake the trains?

A Yes.

Q Did you learn how to apply the emergency brake?

A Yes.

Q You said earlier that you learned about signals, right?

A Yes.

Q What is a signal?

A So a signal can be either an illuminated light that displays either red, yellow, or green, you know, like a regular traffic signal, or it could be a fixed miscellaneous signal, which is something that is permanently affixed to the wall, and it's just -- it displays a message on it or stop or no clearance or grade time or station time.

Q Are there a lot of signals within the New York City Transit?

A Yes.

Q Okay. The -- okay.

A And we actually have to pass that class with 100 percent, the signal test, or we won't be allowed to

become train operators.

Q So that's an important part of operating a train?

A An extremely important part. Verbatim we have to pass a signal test.

Q What I said earlier, when you were trained to move a car or train, how do you do that?

A So first the train has to be charged, meaning that, like, I guess if you would think about it like in the same way you turn on the ignition of a car, you first have to charge the train so that it's powered, I guess, to make it easy.

Q Okay.

A So you have to charge the train. Once it's charged and you've done the test to make sure that everything is well, then you can take power.

Q How do you take power?

A So that is basically -- it depends on the train that you're on. So, for example, if I'm on a 68, I have to release the brakes because the train is holding brake. I have to release the brakes and then I can take power.

Q Would a picture help you explain how you do that?

A Okay.

MR. KEAVENEY: Your Honor, I want to show the witness Defendant's Exhibit XX for identification and only for demonstrative purposes.

THE COURT: XX. You don't want this in evidence, do you?

MR. KEAVENEY: It's only for demonstrative purposes so that she can explain how she operates a train to the jury.

THE COURT: All right. So why don't we identify that for demonstrative purposes XX, all right, at this time.

MR. KEAVENEY: Okay.

Is that up on your screen?

THE WITNESS: Yes.

THE COURT: So will this help you explain your testimony to the jury?

THE WITNESS: Maybe it will help them to understand a little bit better.

THE COURT: Keep your voice up a little bit. The mics are on and I've got to hear you better.

THE WITNESS: Okay. So maybe it will help them to understand what I'm saying.

THE COURT: Help you?

THE WITNESS: Well, I know what to do.

THE COURT: He's showing you this to aid you if you need help, okay?

THE WITNESS: Okay.

THE COURT: So you can refer to this, you know, if you want to look at it and then you can testify.

Go ahead.

THE WITNESS: Okay.

So your question was how do I take power?

BY MR. KEAVENEY:

Q Is this a fair and accurate representation of the controls on an R68A train?

A Yes.

MR. KEAVENEY: Your Honor, I'd like to just publish this to the jury so she can go over it with the jury.

THE COURT: Maybe you want to introduce it in evidence, then.

MR. KEAVENEY: For now, I'll just mark it as identification and we'll go through it. I mean, without objection, I'll put it into evidence.

THE COURT: Let me ask your adversary, is there any objection to having this in evidence?

MR. GENIS: No, no objection.

THE COURT: XX is in evidence.

(Defendant's Exhibit XX received in evidence.)

THE COURT: Go ahead.

(Exhibit published.)

Q What are we looking at?

THE COURT: So this is a picture of the controls on that train?

THE WITNESS: Yes.

THE COURT: On that very train?

THE WITNESS: Yes.

MR. GENIS: This is the exact same train?

MR. KEAVENEY: No.

Q Is this a fair and accurate representation of --

A Of the train class.

Q Okay.

THE COURT: I'll allow it in evidence.

That's really what the train looks like, the controls on that train? Is that what it looked like back years ago on August 2, 2016?

THE WITNESS: Yes.

THE COURT: Okay. Go ahead. Next question.

BY MR. KEAVENEY:

Q What are we looking at?

A Okay. So this is, like, what I see when I enter the cab. This is what I would see, like, directly in front of me. To your extreme right you see the duplex air gauge, and you can see right now all the needles are down; the train is not charged.

Q Is that this right here (indicating)?

A Yes.

Q Okay.

A And then right next to it with the red handle, you have

the brake.

Q Okay.

A And next to that is the horn, and then next to that is the master controller which I use to take power.

Q And how do you take power on the train?

A So in order to take power, the brakes have to be released, because I can't take power while there are brakes applied. So I would have to release the brakes by -- well, this is also assuming the train has been charged.

Q Okay.

A So if the train is charged, then I would have to release the brakes so that there are no more brakes being held -- holding the train in place. And once --

Q How do you release the brakes?

A So I would push the brake handle in the clockwise position to about 9:00.

Q This is the brake handle again (indicating)?

A Yes.

Q And we're pushing this to 9:00?

A Yeah, about 9:00, and that releases the brakes. And then before it's fully released, I'm already taking a little -- I'm taking power.

Q On the master controller?

A On the master controller.

Q So you're using one hand for this or two hands?

A So one hand to release, and then one -- my right hand to release, and then my left hand to take power. But also I forgot to mention I have to throw the reverser into a little notch on the side of the master controller to either tell the train to go forward or reverse.
Q Okay. And we're always going forward?
A Always forward, always forward.
Q Okay. Did you learn how to brake the train in school?
A Yes.
Q How would you do that? Using the photograph if it's helpful.
A So if the train is -- before I -- before I say that, you can't simultaneously do both. It's not -- it has to be (indicating). Sorry, (indicating) is not a word, right? So I have to take the train into coast, meaning I'm not having the train into position of power in order for me to take brake, because if the train is in a position of power while I'm taking brake, the train is going to still keep accelerating. So I have to let off the gas, so to speak, and then take brake.
So basically I would just go to coast and just take brake, meaning pull the brake handle counterclockwise towards me without putting it into emergency. So the notch between emergency, full service, that's the braking range.
Q Were you taught how to place the train into emergency?

A Yes.
Q And how would you do that? And use the diagram if it's helpful.
A Okay. So to place the train into emergency very quickly, you just -- the master control is in coast, you put the brake handle into the emergency notch.
Q Do you let up on the master control?
A We do -- we do put the train into the emergency by, like, going with the master controller. We call that releasing a dead man, but that's not how we place the train into emergency. That's only something that's done at the end, when we go to the end of terminals.
Q Did you complete school car?
A Yes.
Q And when did you complete school car?
A I can't remember.
Q Okay.
A Maybe August of -- I don't remember.
Q Was it in 2015?
A Yes.
Q And once you finished school car, did you start operating trains?
A Yes.
Q Were you assigned any specific run or route?
A No, not initially.

Q And why is that?

A So in order to be assigned a run or a consistent job, you have to pick it, meaning you have to select it. It's something you're going to pick and you're going to work it for a set duration. So being that I came -- I completed school car, you know, whatever that date was, I was just considered, like, extra extra, and I was going to any open job or any open terminal or open yard that was needed for that day.

Q Like a substitute?

A Like a substitute.

Q How long does that generally last?

A So I was really lucky, I was only extra extra for about six months. But there were people who I know of who are extra extra for a few years, and they were bouncing around from terminal and place to place, from tour to tour for years. But for me, it was only six months.

Q Is there another step after extra extra?

A No.

Q So you just get a route after that?

A So you can -- if you're lucky, you are able to pick a job, or you can win a bid on a job.

Q Is that based on seniority?

A Yes, it is.

Q And being a new conductor, did you have seniority?

A Oh, I was a train operator.
Q Sorry, train operator, thank you.
A No, I had zero seniority. So I had a very high number. The lower the number, the more seniority you had.
Q And as an extra extra, which trains did you operate?
A Every single train in the B division. Every single line. Wherever I was needed.
Q Did you operate B trains?
A Yes.
Q Did you operate B trains through Atlantic Avenue/ Barclays Center?
A Yes.
Q From the time you finished school car up until August 2, 2016, can you tell me how many times you had operated a B line car?
A I wouldn't be able to tell you exactly, but I know that they -- the crew officer is the person who assigns jobs to us, and they try as much as possible to keep you close to home, and I live in Harlem, so they frequently assign me the A, the B, the C, the D. But I couldn't tell you exactly how many -- I wouldn't be able to tell you exactly how many times I was assigned, but I know it was several times.
Q After completing school car and prior to the August 2, 2016 accident, had you operated a train through Atlantic Avenue/Barclays Center?

A Yes.
Q Had you operated that train both ways?
A Yes.
Q And which trains operate through that station?
A So routinely, meaning according to the timetable, the B and the Q are supposed to go through that area. But any train can go through that area at any time if there's a change in service or a reroute, a train reroute.
Q Were you working on August 2, 2016?
A Yes.
Q Were you working as an extra?
A Yes, extra extra.
Q Do you recall where you were assigned that day?
A I was assigned to start at Bedford Park Boulevard in the Bronx.
Q What equipment were you assigned to?
A So on the B train, or on that day the B train only has 68s and 68As, so it's whatever train that happens to be on the platform or the stand at that time. It could be a 68 or a 68A.
Q And that's based on when you're scheduled to start?
A It's just random. It's whatever they put on the road.
Q Okay.
A It's just random.
Q Do you recall what time you arrived at work that day?

A I don't.

Q Was it in the morning, was it an overnight shift, was it late night shift?

A I don't know. I have no -- I don't have no recollection of what time I started.

Q Do you recall how you went about operating the train that first day, that first run?

A Well, I have, like, a set practice that I do each and every signal time I enter the train.

Q And has that changed at all?

A No.

Q So what is that set practice that you would do?

A Before I even enter the train, I look at the very front of the train and I look to make sure that it's displaying the correct letter for the line that I'm supposed to be on. If I'm the B or the D or the A, you know, whatever it is, it has to display the correct letter. I have to make sure that the visual glass is clear, I have to make sure that the safety chains are up, I have to make sure that the cover is closed. You know, I just inspect the front of the train before I come on, before I actually enter the train.

Q Once you do those checks, what do you do next?

A Then I enter my -- the train and I enter my cab. I'm looking down the platform slightly to see if there's any illuminated lights that I need to distinguish. I enter my

cab, open the door, unlock it, turn the light on. I check the circuit breakers, you know, I beep the horn to make sure that it's audible. After that, I -- if I see all the circuit breakers are cutting, then I start putting my tools in, I check the window to make sure they open on both sides, and then I begin charging my train.

Q When you say you start putting your tools in, is that, like, a key?

A So depending on the train, it's like a key. So for the 68 and the 68A and the 46 and the 32, it looks like a wrench. It's like a reverser that goes into the side of the master controller on the -- that would be on my -- that would have been on my left-hand side. It's like a little notch that you stick the reverser in, and then that powers the windshield wipers, it turns the headlights on for some trains.

Q What would you do next?

A So once I put the reverser in and I throw it forward, then the duplex air gauge, which is that little gauge that's all the way to the right, it should move the needle -- the needle should move and it should give me back feed, which tells me that, you know, that the trains are going to be able to charge on train run, because if there are eight cars or ten cars, the duplex air gauge, depending on where it goes, it tells me how long the train has been on standby and

how long it's going to take the charge. The duplex air gauge has to be at about 110 PSI.
Q Did you find any exceptions with that that morning, if you recall, with that train?
A No.
Q Did you do anything in preparation for that first trip from the Bronx down to Brooklyn?
A No. So after, you know, do the reverse, saw the back feed, I charge the train, I did a standing break test. And then I just waited for some type of communication from my conductor, who is in the middle of the train, and we wait for the appropriate lineup to leave the terminal. Wait for the starting lights, the conductor waits for the starting lights to close the doors. It's just a waiting process at that time.
Q Do you get permission from anybody to leave that station?
A So me giving the lineup, the correct lineup, meaning the lineup is, like, the signal telling me, like, a green light saying, okay, you can go, that's the lineup. Because normally it's red, but once it's green or yellow, it's telling me, okay, I can go once I have my lineup and the conductor has his or her starting lights telling them that they can close the doors and it's time to go. So usually if we're scheduled to leave at noon, the lights will go on

about 11:30 -- I'm sorry, 11:59 and a half, like, the conductor's lights will go on so they can have time to close the doors.
Q Did you leave that station that morning, that day?
A Bedford Park, yes, I did leave Bedford Park.
Q Where was that train going?
A That train was going to Brighton Beach.
Q Do you recall making all scheduled stops on that line?
A Yes.
Q You made it all the way down to Brighton Beach?
A Yes.
Q Once you got to Brighton Beach, what happened?
A So Brighton Beach is the terminus; you know, that's the end. I dumped the train, meaning the released the master controller. Once you let go, the train will dump. I secure the cab, normalized all my tools, took them out, put everything back in, like, a neutral position so that it wouldn't affect anything inside the cab, and I went and sat in the crew room.
Q How long did you sit in the crew room for?
A I have -- I don't remember.
Q How long, typically, would you sit in the crew room in between runs?
A Maybe about 25 minutes to -- 20 to 30 minutes break in between each run.

Q Were you scheduled for the return run back up to the Bronx?
A Yes.
Q And which equipment were you assigned to?
A That one was a 68A.
Q Did you get up on the platform to reach that train?
A Did I get --
Q To the platform and get on that train?
A Yes, yes, yes.
Q Before taking that train out, did you conduct all your inspections that you just mentioned?
A Yes.
Q Was there anything different?
A No.
Q Do you recall taking any exceptions with anything regarding that train's operation?
A No.
Q Do you recall that everything was working properly?
A Yes.
Q And did you leave Brighton Beach that day in that R68A?
A Yes.
Q Were you taking that train Manhattan bound?
A Yes.
Q Do you recall the first station after Brighton Beach?
A Sheepshead Bay.

Q And the station after that?
A Kings Highway.
Q And after that?
A Newkirk Plaza.
Q And after that?
A Church Avenue.
Q After that?
A Prospect Park.
Q After that?
A 7th Avenue.
Q And after that?
A Atlantic/Barclays.
Q Let's talk about the time between 7th Avenue and Atlantic. Okay?
A Yes.
Q Are there any signals between 7th Avenue and Atlantic Avenue?
A Yes. Immediately at the end of the station is a green -- an automatic signal.
Q At the end of the 7th Avenue station?
A Yes, like right by the -- so we stop at the ten car marker. That's where we know where to stop. So right by the ten car marker, there's an automatic -- an automatic that's right at the end of the -- you know, at the station. And then going further into the tunnel, you have a bunch of

grade time signals.

Q What's an automatic?

A An automatic signal -- how can I explain it? An automatic signal, it is -- it's the signal that is clear based on whether there's a block, a clear block. So, for example, if there's a train -- let me see -- if I'm here and there's a train here (indicating), the signal is going to be red. But as they train starts moving, the block, the signal block -- it's like an electric signal block that clears the track, and then that's when it turns yellow. It won't allow me to move past the signal if there's a train there. It's like an electric signal block.

Q Did there come a time when that train signal turned yellow?

A Yes.

Q And that directed you to proceed?

A Yes. Actually, that signal leaving 7th Avenue will be green.

Q So once that signal turned green, you proceeded?

A Yes.

Q Was there a signal after that?

A Yes.

Q What type of signal came after that?

A Another automatic, another yellow automatic.

Q Meaning that you have to be a certain distance from the

train in front of you before you could proceed?
A No, because when -- the way Atlantic/Barclays -- the length between Atlantic -- between 7th and Atlantic, the way it's set up, if -- once the -- if, in fact, there's a train ahead of me, once that train clears that last timer, my signal at 7th Avenue will turn green. If the train is anywhere in the tunnel, my signal may be red or yellow.
So at this particular day, there was -- there was no train at all in front of me, so my signal was green, my leaving signal was green, the next automatic was yellow, and the following signals were on time.
Q What is a time signal, or grade signal?
A So a grade time signal is basically a signal that tells you, okay, if you travel at a set speed, this signal -- expect the signal in front of you to clear.
Q Was there a set speed on that grade timer?
A Yes, there was.
Q And what was that?
A I believe it was 25 miles per hour.
Q Meaning what?
A Meaning that if I approached that grade time signal -- so I know it's on time because it's yellow with an S, and then the following signals are red. So if I approach that signal at the correct speed or less than the correct speed, then the next signal will clear for me. So it's like a

series of grade times where if I clear each signal at or less than the speed as posted, then all the signals will clear for me.

Q What if you are exceeding that posted speed?

A So if I were to exceed the posted speed, the signal -- okay. Let me also add that in addition to the grade time signal, there's also a stop arm associated with the signal. So the signal itself is there, but the stop arm will go down in conjunction with the signal clearing. So if -- if I -- if the isn't doesn't clear, the stop arm doesn't go down, the stop arm will hit the train and the train will go into emergency.

Q Is the stop arm on the tracks?

A Yes, the stop arm is on the tracks on the left side.

Q And where are the grade timers?

A The grade timers are on the right side.

Q Where are you in relationship to the train? Are you on the right side, the left side, the middle?

A I'm on the right side.

Q Is that for all trains?

A Well, now they have a new train, which is the 211, where we sit in the middle.

Q Was that for all R68A trains?

A Yes, all R68A trains, yes, in the right -- every train is on the right side.

Q How many grade timers were there between 7th Avenue and Atlantic Avenue?
A I want to say about seven; about seven.
Q Did your train go into emergency at all between 7th Avenue and Atlantic Avenue?
A No.
Q Does that indicate that you cleared all the grade timers?
A Yes.
Q Does that indicate that you were going the appropriate speed?
A Yes.
Q Do you recall your speed as you're entering Atlantic Terminal station?
A Atlantic -- Atlantic/Pacific?
Q Atlantic/Barclays.
A Atlantic/Barclays. I was going about 20, 24, about.
Q Where was the last grade timer in relationship to the mouth of the entrance to Atlantic Avenue?
A So the last grade timer is, like, right at the end. So I would say about one -- wait, state the question again. Where is the last grade timer in relation to the entrance of the mouth?
Q Yes.
A It's about -- about one car length from that last timer

clearing.
Q And as you passed that last timer, are you giving the train power?
A No, because actually as that -- that -- when that last signal clears, that last signal is actually on a curve and there's still yet another signal that you can't see. So I still have to see -- I have to get around the curve to make sure that that signal cleared around the curve, so I'm still in my off -- in a coast position.
Q Is the train still traveling at what speed?
A About the same speed, the same speed all the way through; about 20 to 24 miles per hour.
Q Did you enter Atlantic Avenue station?
A Yes.
Q And as you were entering the station, did you see anything on the tracks?
A No.
Q Did you proceed further into the station?
A Yes.
Q And as you proceeded further into the station, did you see anything on the tracks?
A I didn't see anything on the tracks.
Q Okay. As you're proceeding into Atlantic Terminal, did you see anything fall onto the tracks?
A Yes. After I had about two cars into the terminal, I

saw a woman fall backwards from the platform onto the roadbed.

Q What did you do?

A I put the train into emergency.

Q Did you wait?

A No.

Q Did you do it right away?

A Immediately.

Q Did you see anybody on the edge of the platform waiving their arms?

A No.

Q Did you have a clear view of the edge of the platform as you were entering Atlantic Avenue station?

A Yes.

Q How was the person falling onto the tracks?

A She -- she fell backwards. Like, she just fell backwards and, like, just drifted onto the roadbed.

Q How far was she from the front of the train from where she fell?

A How far from -- how far was she from the front of the train? I have no way of knowing.

Q Once you put the train into emergency, did you do anything else?

A Nothing else.

Q Could you do anything else?

A No.
Q Could you steer that train out of the way?
A No.
Q Is putting the train into emergency the best way to stop a train due to an unexpected event?
A It's the only way that we were taught to stop the train.
Q Did the train end up contacting that person?
A Yes.
Q Before it contacted the person, was it slowing down?
A Yes.
Q And as it was slowing down, were you doing anything?
A I stood up, I stood up and I just watched to see if it would stop before it made contact with her, and I watched and I watched and I saw her on the roadbed. And then eventually I didn't see her because the train passed over her.
Q Did the train eventually stop?
A It did stop.
Q How long after it made contact?
A I have no way of knowing how soon.
Q What did you do next?
A I called -- I have a radio that I use to contact the Rail Control Center. That's, like, who's in charge of us or whatever. And I contacted -- I contacted Rail Control

Center and I informed them that someone had fell to the roadbed and that -- you know, I informed them of what happened.

Q Did you say anything -- well, what exactly did you say?

A I said -- I don't remember. I believe I said -- I was crying and I said, control, because we call -- it's called Rail Control Center, but I said, control, I had a 12-9, and he asked me where I was, what track I was on. He asked me if I could see the person and, you know, and everything.

Q Do you recall your response?

A No.

Q Do you recall what you did next?

A So I was -- I left the cab, I left my cab. I had to -- the train was already stopped, and I -- there's like a little key on the side, it's called a crew door, and I keyed myself to physically see -- to physically go and see where she was, if she was alive, you know, to see if I can see her. First I went -- I didn't -- I didn't -- I had no knowledge of where she was.

So first I went to the front of the train to see if I can see her underneath, you know, see her from the front underneath, and I couldn't see her there. I had my flashlight with me and I walked through the side of the platform and I was looking in the side of the platform, like in between the gap on the train. I didn't see her. Then I

went to the back of the car -- like the first car, my operating cab, and then in between my cab and maybe the second -- the cab right behind me, I saw her.

Q Did RCC send anybody to the scene?

A I believe they sent the fire department and the police department and supervisors from my own department, like Transit, you know, maintenance.

Q Did you report back to RCC once you found out where she was?

A I believe I did. To be honest, everything is very fuzzy.

Q What did you do after that? Did you return to your cab?

A I guess. I don't remember. I think I went -- I had to have gone back to my cab. I know -- I remember putting on a hand brake on the train. Everything that happened is -- I don't really remember all the details of everything that happened afterwards, to be honest.

Q Did your supervisors come to the scene?

A My supervisors? Yeah.

Q Did you tell them what happened when they came to the scene?

A Yes.

Q What did you tell them?

A I told them I was coming into the station and she just

fell all of a sudden on the roadbed, that she just fell and I put the train into emergency and had a 12-9.

Q Did you talk to any police officers?

A I did.

Q Did you tell the police officer what happened?

A Yes.

Q What did you tell him?

A I told everybody the same exact thing. I was coming into the station, all of a sudden she fell backwards onto the roadbed, and that's what I said.

Q Did you write any report regarding the incident?

A Yes.

Q What would you call that report?

A It's called, like, a G2.

MR. KEAVENEY: I'd like to put up --

MR. SHIELDS: Objection.

THE COURT: You made a report out and you have a document that you put it on? Is that what you're telling me? There's an official report you have to make?

THE WITNESS: Yes.

THE COURT: Are you required to make that report?

THE WITNESS: Yes.

THE COURT: And when did you make that report? How soon after the accident?

THE WITNESS: So that same day. I did it

physically in the superintendent's office at DeKalb, which is one station away.

THE COURT: I want to know what time it is. Did you make it out the same day or the next day?

THE WITNESS: No, the same day, the same day, before I even -- I had to go for incident testing, which is a drug test and alcohol test. Before I did that, I wrote a G2.

THE COURT: All right. So let me show you this. Is this the document you're talking about now?

MR. KEAVENEY: Yes, Your Honor, Exhibit H.

THE COURT: So I can't read this, by the way. I have a hard time doing that.

Why don't we do this. Let the jury leave the courtroom for a few minutes and you can read this to me, because I can't read it, all right? And then we'll come back.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(In open court; jury not present.)

THE COURT: Everybody is here? Okay.

Ms. Shabazz, look, I'm showing you this document, and I know it has some highlights on it, and I'm going to ask you some questions about it. We'll mark this as -- what is it that you've identified it as?

MR. KEAVENEY: H.

THE COURT: This will be Exhibit H for identification. I'll ask you some questions.

THE WITNESS: Okay.

THE COURT: I have a hard time -- let me ask you, is this what you wrote down?

THE WITNESS: Yes.

THE COURT: And that was the same day, you testified, the next day, or --

THE WITNESS: No, no, no, the same day.

THE COURT: I see it talks about a Superintendent Broderick. Is that his name?

THE WITNESS: Yes.

THE COURT: Who is that person?

THE WITNESS: This was the person I submitted the G2 to. He was the person in the office with me, and I submitted this to him.

THE COURT: Is it your responsibility to make out that report?

THE WITNESS: Yes.

THE COURT: That's required?

THE WITNESS: Yes.

THE COURT: Whenever you have an accident of this nature or any other nature, you have to make out a report?

THE WITNESS: For everything, yes.

THE COURT: Now, just read that to me because I have a hard time reading all of it. Go slow.

THE WITNESS: All right.

I was the 1848 Bravo out of Brighton Beach to 145th Street. As I approached Atlantic Avenue, a female customer fainted from the platform and fell to the roadbed. I placed the train in emergency, but came in contact with the person. RCC was notified, EMS was requested, and I followed RCC's instructions. There were no other reported customer injuries due to the BIE.

BIE is brakes in emergency.

THE COURT: That's what it means?

THE WITNESS: Yes.

THE COURT: That's what you wrote?

THE WITNESS: Yes.

THE COURT: I'm going to allow that into evidence.

MR. SHIELDS: Your Honor, we object.

THE COURT: You have your objection.

MR. SHIELDS: Your Honor, the Second Circuit has clearly held that these types of records are inadmissible. In *United States vs. Yousef* --

THE COURT: Well, this is a contemporaneous report.

MR. SHIELDS: Your Honor, it's hearsay, and under Rule 801(d)(2)(A) --

THE COURT: I'm not so sure. You have a case --

MR. SHIELDS: Yes, Your Honor, I do have a case.

THE COURT: It was her duty and responsibility to make this report out --

MR. SHIELDS: Your Honor --

THE COURT: If you have a case that says it is not admissible, show it to me.

MR. SHIELDS: Yes, Your Honor. Want would you like me to bring the case up here?

THE COURT: Yes, yes, yes. I don't have to look at the machine. You don't have it printed out?

MR. SHIELDS: I'm sorry, Your Honor, I did not print it out. I'll highlight it. Or I can send it to your clerk --

THE COURT: No, no, wait a second. This will come as a surprise to me. This is a decision saying a contemporaneous report made by a person who has a duty to make a report is not admissible in evidence. This is what you're telling me, right?

MR. SHIELDS: Yes, Your Honor.

THE COURT: So what we'll do is this. We're going to continue with your questioning without putting this in evidence now, and we'll talk about this at our break. In the meantime, we'll have continued questioning. We can go back to that. What if it's a recent fabrication, is that

what your claim is?

MR. SHIELDS: No, Your Honor. We're claiming it's inadmissible because a party's own statement is not admissible; it's hearsay.

THE COURT: Well, I'm going to look at this. In the meantime, we're continuing your questioning. Print out a copy of this so I can look at it.

MR. KEAVENEY: Judge, I only have a few more questions, so let's just take the break now. Literally, like, less than a few minutes left.

THE COURT: So let's get a copy of this and look at it.

MS. WINTERS: Can Mr. Shields please provide the site to us as well?

MR. SHIELDS: Not a problem. It's in the letter motion.

THE COURT: I know you did this. Give me the case and the citation.

MR. SHIELDS: Yes, Your Honor. I will email it to --

THE COURT: No, just tell me.

(Pause in proceedings.)

THE COURT: I'm not so sure that this is really relevant. What we're going to do is this; err on the side of caution. I'm not sure what court this is. I'm not so

sure this is really applicable here.

What is the case and the citation?

MR. SHIELDS: Yes, Your Honor.

THE COURT: Go ahead.

MR. SHIELDS: I'm sorry, I need to look at my computer.

THE COURT: Well, go ahead.

MR. SHIELDS: It's the Second Circuit, Your Honor.

THE COURT: Well, that's a different situation. That's a report that talks about what somebody else said.

MR. SHIELDS: Here it says when the defendants --

THE COURT: Just print it out.

MR. SHIELDS: Yes, Your Honor.

THE COURT: Mr. Keaveney, what's your response to this?

MR. KEAVENEY: Judge, they made this motion last night at about 5:00. I haven't had an opportunity to look at it. But under 803.6, this is a statement made contemporaneous by someone that was required to make it --

THE COURT: Look, we want to be extra cautious here because this case is likely to go to a higher authority.

I tend to agree with you on that. I think this is a hearsay statement that talks about what somebody said to somebody, which is a lot different cup of tea than what

we're talking about here. This is a report that she made out. There was a responsibility to make the report out. I don't see where it's hearsay.

MR. KEAVENEY: And she can certainly authenticate it too.

MS. WINTERS: Your Honor, if I just may add, it looks like the case they're citing to relates to 801(d)(2)(A), whereas --

THE COURT: What's been shown to me by Mr. Shields seems like it's hearsay, unless it's reporting about what somebody else said.

MS. WINTERS: Correct.

THE COURT: So it's good to be very careful about it. Where is the decision? I don't have it.

MR. SHIELDS: So after conferring with my co-counsel, we've decided we're going to maintain our objection for the record, but we're not --

MR. GENIS: Just withdraw the objection.

MR. SHIELDS: We'll withdraw the objection with respect to this specific record, Your Honor.

THE COURT: Look, it's up to you. I mean, we're going to be very careful. I think it's admissible. I don't think the case you showed me, the snippet of it, has anything to do with what we're talking about here, okay? And if, in fact, somebody makes a report out and in that

report they're talking about what somebody else told them, well, that's a different cup of tea.

MR. SHIELDS: Thank you, Your Honor.

THE COURT: But you're not correct, Mr. Shields, but I wanted to give you every opportunity to make your record here.

So let the jury come back in and we'll allow it into evidence.

I'd like to see this wonderful decision you relied upon. Will you please send it to me so I can look at it?

MR. SHIELDS: Yes, Your Honor.

THE COURT: Is it a Justice of the Peace case? Is it a State Court of Appeals case? Or you don't know?

MR. SHIELDS: It's a Second Circuit case, Your Honor.

THE COURT: Second Circuit. All right. And what you showed me does have hearsay in it, no question about it.

MR. GENIS: As you just noted, we're withdrawing it on this one. Other documents that might have the hearsay is a separate issue.

THE COURT: All right.

MS. WINTERS: Your Honor, I'm just going to go to the restroom, but I won't hold up -- he can continue, if that's okay.

THE COURT: You don't have to say anything here at

all. I always like to learn. Let me read that decision. I'm just using my best intuition and my best knowledge of the law by questioning it.

Let's bring the jurors back in.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

(In open court; jury present.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: A lot of times these things can be introduced as recent fabrication material as well, but I don't think we really have to deal with that at this particular time, if at all.

So we're going to allow Exhibit H into evidence.

(Defendant's Exhibit H received in evidence.)

THE COURT: The highlighting on that was what you put in, Mr. Keaveney?

MR. KEAVENEY: It's not my copy of the document.

THE COURT: It's not the original document, it's your copy. Do you have the original?

MR. KEAVENEY: We have one.

THE COURT: Without the highlighting?

MR. KEAVENEY: Yes.

THE COURT: Exhibit H in evidence without the highlighting.

Q Ms. Shabazz, you can hold on to that because I'm going

to ask you to read it.

(Exhibit published.)

THE COURT: That's the report you made out?

THE WITNESS: Yes.

THE COURT: The same day to the person you're responsible to give the reports to when you have an accident, correct?

THE WITNESS: Correct.

THE COURT: You can read that to the jury, what you said.

MR. KEAVENEY: Let me just back up, Your Honor.

BY MR. KEAVENEY:

Q Did you make this report after the accident?

A Yes.

Q And you were taken to the next station to make it?

A Yes.

Q You have it in front of you now?

A Yes, I do.

Q Can you read what you wrote --

Is this your handwriting?

A Yes.

Q Can you read what you wrote?

A Okay.

I was the 1840A Bravo out of Brighton Beach to 145th Street. As I approached Atlantic Avenue, a female

customer fainted from the platform and fell to the roadbed. I placed the train in emergency, but came in contact with the person. RCC was notified, EMS was requested, and I followed RCC's instructions. There were no other reported customer injuries due to the BIE.

Q How long after the incident did you make this report?

A I have no clue.

Q Was it within an hour? Within an hour and a half?

A I immediately -- after they removed her body from the roadbed, we immediately went to DeKalb. So they had to deal with her first.

Q Of course.

A And then immediately we went to DeKalb, which is where the superintendent's office is.

Q Okay.

A One station over.

(Continued on the following page.)

DIRECT EXAMINATION

BY MR. KEAVENEY: (Continuing)

Q You indicated on your -- this is called a G2; right?

A Yes.

Q Okay. And you indicated on your G2 that the female customer fainted. How did you know that?

A I mean, I didn't know exactly if she fainted. I just assumed that she fainted because if somebody is pushed, you see. It's like the way she just fell like...fell back. She just fell backwards like gracefully.

If someone was pushed, their body would move differently.

If someone was conscious, maybe their arms would be flailing, maybe there would be some type of movement.

She just fell. So that -- I didn't know if she fainted. I just assumed that she fainted.

Q Did anyone tell you that she fainted?

A No. I just assumed that she did.

Q What happened next?

A After the --

Q After you wrote the G2.

A Then I went with my -- I went with my supervisors for incident testing.

Q What is incident testing?

A So they do like a Breathalyzer to see if there is -- if I

used any alcohol or, you know, had consumed alcohol prior to the incident and they tested my urine to see if there were any drugs present in my system.

Q And were there?

A No.

Q Prior to this event, have you ever had a 12-9 before?

A No.

Q Was the plaintiff falling off the platform an expected event for you?

A No.

Q Thank you.

THE COURT: Any cross-examination?

MR. GENIS: Yes, Your Honor.

CROSS EXAMINATION

BY MR. GENIS:

Q Ms. Shabazz, my name is Bob Genis. I represent Luisa, the woman that was injured here. Okay?

A Yes.

Q I'm going to ask you some questions. If you don't understand my questions, just please say so. Okay?

A Okay.

Q This was upsetting to you?

A Yes.

Q And is it your understanding that when other train operators have had these 12-9s, it's upsetting to them as

well?

A Yes.

Q Is it your understanding that the union, in fact, complained to the Transit Authority about making operators like you look at the body when these happen?

MR. KEAVENEY: Objection.

A I have no knowledge of --

THE COURT: Just one second.

What was the question again?

MR. GENIS: Could we read it back.

THE COURT: Read back the question.

(Question read back.)

THE COURT: Objection sustained.

Q Are you aware that the unions, before this happened, had complained about the number of 12-9s and that measures being taken by the Transit were not effective at preventing them?

THE COURT: Were you aware anything like that at all?

THE WITNESS: No.

MR. GENIS: May I approach the witness with what has been marked for identification as Plaintiff's Exhibit 34?

THE COURT: Okay.

MR. GENIS: Thank you.

It's been redacted pursuant to your rulings earlier, Judge.

THE WITNESS: Thank you.

Q Tell me when you are ready.

THE COURT: That's the redacted letter?

MR. GENIS: Yes.

THE COURT: Let me see that again.

MR. GENIS: Of course.

While we are at it, we have 35 as well. I'm going to show her in a minute, but if you would like me to show it to you first, Judge.

THE COURT: Yes. I looked at this before.

Not in evidence?

MR. GENIS: Correct.

MR. ROTH: Not yet.

THE WITNESS: Okay. I read it.

MR. GENIS: Thank you. I'm just going to hand it up to the judge.

Your Honor, this is the other one.

THE COURT: All right. I don't think this is a proper document to introduce through this witness.

MR. GENIS: Okay.

THE COURT: Objection sustained.

MR. GENIS: Your Honor, how about this one? There is another one as well.

THE COURT: Is this one letter?

MR. GENIS: But you have that. That's it is

different than this one.

THE COURT: I'm not going to allow any of this to be introduced through this witness, if at all.

MR. GENIS: Okay.

THE COURT: So we have it marked as Exhibit 34? Objection sustained.

MR. GENIS: Okay.

BY MR. GENIS:

Q I'm going to back up a little bit with you, Ms. Shabazz. Okay?

A Okay.

Q When you got all of that training you told us about before, were you trained and taught to operate the train safely, not to just follow a schedule?

A So do you want me to answer with a response or with yes or no?

Q Yes or no would be preferable, please.

A So that particular question cannot be answered with a yes or no.

Q Okay. And I know we never met before, but do you remember having a deposition in this case before?

A Yes.

Q And at that time it was much closer to the time of the events than we are here today, many years later?

A Yes.

Q Was your memory fresher at that time?
A Yes.
Q And you had an attorney at that time as well?
A Yes.
Q You had the opportunity to look over documents to help refresh your memory as well, at that time?
A No.
Q You were questioned on different documents at that time?
A No.
Q Did you review your transcript to prepare for today?
A Review my transcript?
Q Yeah. From that deposition, that book with all of the questions and answers.
A Oh, yes.

THE COURT: You remember when you met on a prior occasion, you were asked these questions. We call it a deposition under oath. Do you remember that?

THE WITNESS: Yes.

THE COURT: How long ago was that?

Q September 4th of 2019?

THE COURT: A long time ago.

THE WITNESS: Okay.

THE COURT: He is asking you about whether you said things at that time.

What do you want to ask her? Go ahead.

MR. GENIS: Okay.

Q Were you asked this question under oath and did you give this answer under oath?

THE COURT: By the way, you can read that substantive evidence --

MR. GENIS: Yes.

THE COURT: -- if you would like to. She's a party to this lawsuit.

MR. GENIS: Thank you, Judge.

THE COURT: So members of the jury, you have heard me talk about deposition testimony before. It can be used for two purposes: First of all, you can read the deposition of anybody who is a party, and you can consider that to be substantive evidence even if she's testifying in court, or it can be read to suggest that somebody was telling something different on a prior occasion who is not a party. And I told you you can consider that for what we call impeachment purposes as to whether there is any inconsistency of the testimony given in court compared to what the person said on a prior occasion.

When we are dealing with a party, it can be read to you as substantive evidence.

All right. Go ahead.

MR. GENIS: Thank you, Judge.

Q Page 40, line 20. And you were asked this question under

oath and did you give this answer under oath:

Question: Okay. So when you got your training, did your training say that if there is a schedule you're supposed to try to follow the schedule as closely as you can?

Answer: Absolutely not. We were trained to operate safely, not to follow a schedule.

Were you asked that question?

THE COURT: That's her testimony.

MR. GENIS: Yes. Yes.

Q And was that the truth at that time, ma'am?

A Yes.

Q Is it still the truth today?

A Yes.

Q Okay. And you were trained to operate efficiently and safely; correct?

A Yes.

Q Safety and nothing else?

A Safety and nothing else?

THE COURT: What else is there? There is safety. What else?

MR. GENIS: You're right.

THE COURT: You weren't trained to be a judge, were you?

Q Okay. And were you taught repeatedly that a train operator is responsible for the safe operation of the train;

correct?
A Yes.
Q Okay. And were you taught the lower your speed the less distance it takes for you to stop the train?
A I can't answer that question yes or no.
THE COURT: If you have anything in there, I'm going to allow you to read it.
MR. GENIS: All right. I will, Judge. Thank you.
Q And, so, let me give you an example. If you were going 10 miles an hour, could you stop in less distance than if you were going 30 miles an hour?
A It's relative. There are real conditions.
Q Okay.
A There is ice, water, oil.
Q Okay. That's fine. You mentioned a 12-9 before.
Does that mean like when there is contact between a person and a train?
A Yes.
Q And a 12-9 can occur with passengers on the platform if a passenger is bumped by the train; correct?
A Yes.
Q And it is very common to see people standing on that yellow strip; correct?
A Yes.
MR. GENIS: Can we please have Plaintiff's Exhibit

8, I believe, in evidence.

THE COURT: I'm sorry, Defendant's Exhibit X.

Q Do you see this picture? Is?

THE COURT: What exhibit are you talking about?

MR. GENIS: I'm sorry. Which exhibit number is this?

MR. MORALES: This is going to be 74-J.

MR. GENIS: 74-J. My apologies.

THE COURT: 74-J. Okay.

Q And you were shown this picture at your deposition, okay.

Do you see how there's a guy standing right on the yellow strip there?

A Yes.

Q And that's at the same station; correct?

A Yes.

Q And he is looking for the train to come in?

A I mean, I can't answer to what he's looking for, so I didn't answer.

Q Well, you see a person standing on the yellow disability bumps and it's something you see routinely; correct?

A Yes.

Q And you and people in your class were trained to avoid 12-9s where possible; correct?

THE COURT: Just wait one second. You are showing 74-X?

MR. GENIS: That marking is from the deposition in 2019, Judge.

THE COURT: Pardon?

MR. GENIS: That marking that's on it was from the deposition in 2019.

THE COURT: Right. It's in --

MR. SHIELDS: 74-J.

THE COURT: I have G. F, G.

J is in as well?

MR. SHIELDS: Yes.

MR. GENIS: We can take it down now.

Q When you were in this school class, you and the other operators were trained to avoid 12-9s where possible; true?

A I can't answer that question yes or no.

Q Okay.

A I would have to give you an explanation.

Q That's okay. Either you were taught to avoid them or you weren't. That's it.

And with your training, were you taught to possibly avoid 12-9s before placing the train into emergency to try to stop it before it becomes a 12-9?

MR. KEAVENEY: Note my objection.

THE COURT: Do you understand the question?

MR. KEAVENEY: Compound.

THE WITNESS: I understood the question.

THE COURT: If you understood the question, you can answer it.

THE WITNESS: I will answer the question, but it is a question that needs elaboration. It's something that I can't answer yes or no.

Q No problem. I'm going to go to your deposition.

A Okay.

Q Page 230, starting on line 5.

Question: Okay. And at that point are there certain procedures that you were trained to do when a 9-12 happens?

Answer: Well, to possibly avoid the 12-9 before placing the train into emergency, you know, to try to stop it before it becomes a 12-9. But other than that, just to -- you know, you hear the train, try to investigate to see what happened with the person.

Were you asked that question under oath and did you give that answer?

THE COURT: Well, she did.

MR. GENIS: Okay.

Q Was that the truth when you said that, ma'am?

A I would have to -- hearing you say it and obviously as I was speaking I was saying, you know, but hearing it in that way, it doesn't sound like a coherent response. I would have to maybe see it to --

Q I'm not asking if it was coherent. I am just asking you -- I read out of a sworn deposition of yours.

So was that the truth when you said that, ma'am?

A Anything I said in a deposition was the truth.

Q And it is still the truth today; correct?

A Yes.

Q Okay. So you were taught that one of the reasons the train operators get that very training on avoiding 12-9s is because they are common occurrences; true?

A No.

Q Okay.

A No.

Q Let me ask you this: When you called RCC and gave them your call letters and said you had a 12-9, it's common that everybody knows what a 12-9 is; is that correct?

A Yes.

Q Okay. You agree that train strikes occur in the New York City subway system about three to five times a week?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

A I don't know.

THE COURT: If I say sustained, you don't have to answer the question.

THE WITNESS: Okay.

Q We are talking about operation of the train now,

controller. You have to maintain pressure on the controller constantly because if you do not maintain constant pressure and the train is in full service, it will go into emergency; correct?

A Yes.

Q And if you let go of the controller, the train goes into emergency stop; correct?

A Yes.

Q And an emergency stop, the train stops in less distance and faster than just regular braking; correct?

A Yes.

Q So the fastest way to stop the train is by engaging the emergency brake; correct?

A Placing the emergency?

Q By engaging the emergency brakes.

A You have to be clearer as to what you're saying.

Q Not a problem.

Let's go to page 97.

Were you asked the following question on page 97, line 22?

Question: Is it your understanding that the fastest of possible way to stop the train by engaging the emergency brake?

Answer: By placing the train, indicating, into emergency?

Yes.

Question: Did you have training about when to place the train into emergency?

Answer: Yes.

Were you asked those questions and did you give those answers?

A Was I asked those questions to give those answers?

Q Yes. Did you do that?

A Yes, I gave those answers.

Q Again, that was the truth?

A Yes.

Q All right. In fact, when it goes into emergency and the train stops, it jerks and stops; correct?

A It depends on the speed.

Q Well, page 97, line 15, were you asked this question:

Question: And what happens to the train when the train gets put into emergency brake?

Answer: It stops. The air is no longer, indicating, you know, going, flowing train line and it stops, it jerks and stops?

Is that what you -- was that the truth when you said that?

A That was the truth when I said it.

Q Thank you.

A But the train can also already be --

Q Ma'am, that's not the question.
A Okay.
Q Okay.

Now, I asked you a moment ago about a number of train strikes.

You have not seen signs into the subway system, the train station that says this is how many people have been hit by trains or killed in a year, true?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Well, you are riding in the trains and going through the station, right, all the time; correct?
A I'm operating, yes. I'm operating the train, yes.
Q And you have never seen signs in the train system on the trains that say this is how many people have been hit by trains or killed in a year; correct?

MR. KEAVENEY: Objection.

A I have no knowledge.

THE COURT: Can you answer that question?

THE WITNESS: I have no knowledge. I can't answer yes or no.

Q In fact, you are not aware of any such posters; correct?
A I have no knowledge of them.
Q Let's read page 76. Let's start on line 22.

Question: Have you seen signs in the train system

on your trains that say this is how many people have been hit by trains or killed in a year?

Answer: I haven't seen them. I haven't.

And let me go to the next one.

Yeah. And then continuing on page 77, line 5.

Question: If I told you that the attorneys here introduced at the prior deposition a poster that said this is how many people got struck by trains and this is how many people were killed in a year, would that surprise you, that such a poster exists?

Answer: I don't -- I don't understand how to answer the question.

Question: Okay, are you are you aware of any such posters?

Answer: No, I'm not.

Q When you gave that testimony, was that the truth?

A Yes.

Q Now, do we agree that curvature of the train -- I should say of the tracks -- can effect your line of sight?

A Yes.

Q Okay. So if you have a limited line of sight into a station, you can't see if a person is on the tracks near the mouth or entrance of the train of the station; correct?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Well, if there is a curve, can you see around the curve?
A Yes.
Q Okay. So you could see around a curve, all right.
And, so, let me -- how is it that you can see around a curve?
A Is that an open-ended question or --
Q I'm just saying if there is a curve -- for example, you have operated trains on the lines; correct?
A Yes.
Q -- in different stations?
And some of them have curves approaching the station and you cannot see into the station because of the curve; correct?
A Correct.
Q So if you cannot see into the station because of the curve, that limits your line of sight, it affects your line of sight; true?
A Correct.
THE COURT: Were there any curves here?
THE WITNESS: Yes, going from Seventh Avenue to Atlantic there is a curve and approaching Atlantic.
THE COURT: How far away from the Atlantic, from the entrance into the station was this curve?
THE WITNESS: It's about one car length.
THE COURT: About one mile?

THE WITNESS: About one car length.

THE COURT: So one car length before you entered into the station there is a curve?

THE WITNESS: Yes.

THE COURT: What's your next question?

Q And a car length for this type of train is 75 feet; correct?

A Yes.

Q So you're telling us that when you are 75 feet before the entrance or mouth of the station it is straight and you could see into the station?

A Wait. Say that once more.

Q Okay. Let's back it up.

I believe you told the judge a minute ago the curve ends and you could see ahead of you 75 feet or one car length into the station; correct?

A Correct.

MR. KEAVENEY: Objection.

Q So when you are 75 feet away from the mouth of the station, not there yet, you could see the station; correct?

A Fully, yes.

Q Okay. And you were instructed to place the train into emergency at any time if you feel an emergency situation is about to occur and you're not able to stop the train in time; true?

THE COURT: Do you understand?

He is asking, I think, if you see there is an emergency, you're supposed to stop the train at that time. I think that's what he is asking you.

A I -- could you clarify your question?

Q Sure.

I'm going to read from the transcript at page 98, line 12, were you asked this question: What circumstances were you trained to put the train into emergency?

Answer: Hum, we are instructed to place the train into emergency at any time if we feel an emergency situation is about to occur and we are not able to stop our train in time.

THE COURT: That's her answer. That's actually her testimony. Go ahead.

MR. GENIS: All right.

Q And that was true when you said that; right?

A Yes.

Q And immediately upon seeing a person, you would put your train into emergency; correct?

A Yes.

Q And that's what you did here; correct?

A Yes.

Q And the train also had headlights, the R68A; correct?

A Yes.

Q They are called seal, S-E-A-L, beams; correct?
A Yes.
Q There is also lights in the tunnel. So between the light in the tunnel and the seal beams, you see fine; correct?
A Yes.
Q Now, you mentioned earlier you get trained or taught, a better word, you get instructed on how to operate different trains; correct?
A Correct.
Q Okay. And you told us how you got instructed or trained on the R68 and the R68A; correct?
A Correct.
Q Are you familiar with an R 38?
A No.
Q Are you familiar with regard to an R42?
A No.
Q Are you familiar with an R44?
A No.
Q Those are old trains that got put out of service in 1986. Is that why you're not familiar with it?
THE COURT: She said she's not familiar with it.
Q Okay. By the way, some of the older trains that were out of service for decades they were only 60 feet long; correct?
MR. KEAVENEY: Objection.
THE COURT: Sustained.

MR. GENIS: All right.

THE COURT: She's said she's not familiar with the older trains.

MR. GENIS: Got it. Moving on, Judge. Let's go back to my notes.

Q Now, normally, you like to sit when you are making a stop; correct?

A Yes.

Q And from August of 2015 through August of 2016, you did not routinely check the speedometer when you were operating the train; correct?

A That's false.

Q That's false. Okay.

Let's go to the deposition. Page 14, line 20, were you asked this question under oath and did you give this answer?

Wrong page. I did a typo. It might be 114. Yes. Page 114, sorry, line 20.

Question: In the -- from -- it says -- August 2015 to August 2016, you were operating the train, did you routinely check the speedometer when you were operating the train?

Answer: No.

Was that the truth when you said that?

A I said no then?

Q Was that the truth when you said no?
A I have to say no because I check the speedometer.
Q Now, by the way, after your deposition, did they ever send it to you to review and sign or make any corrections you deemed appropriate?
A After? Like immediately after?
Q No. At some point after. It takes a while to get the transcript.
At some point, did they send it to you?
A I received it may be a month ago.
Q All right. When you received it a month ago, did you review it?
A I did.
Q Okay. Did you make any changes or corrections?
A No.
Q Did you tell the lawyer, hey, there's mistakes here?
A No.
Q Now -- so, at Atlantic station particular station, where there's that curve, you told us a minute ago you can see into the station one car length or 75 feet away. But did you ever say that you can't fully see the entire station until your cab is entering the station, until it goes from dark to light, like you're entering it?
A Yes, I did say that.
Q So Was that the truth when you said that?

A Yes.
Q Okay. So which is it, that until you are actually in the station at the mouth then you could see the whole station or when you told this jury earlier today 75 feet away, one car length away you could see the whole station?
MR. KEAVENEY: Objection. Mischaracterizes the testimony. THE COURT: Sustained as to form. Repeat the question.
MR. GENIS: Sure.
Q So which is it: Can you see the whole station when you are 75 feet away from the mouth or the entrance of the station or only when you are actually entering it?
A I can see into the station as I rounded the curve when I'm one car length past that last timer.
Q Okay. I would like that better.
And as you round that curve to enter the station, that's when you are going at about 20 to 25 miles per hour; correct?
MR. KEAVENEY: Objection. Mischaracterizing the testimony.
THE COURT: I don't know. Can you answer that question?
THE WITNESS: Say it one more time.
Q Sure. Hold on. Let me just get to the transcript.
It's another typo.

It should probably be... Okay. So first on page 203, line 21.

THE COURT: This is her deposition?

MR. GENIS: Yes, Your Honor.

THE COURT: You can read it to the jury as substantive evidence.

Q Question: And at what point on the approach to Atlantic terminal, how far back can you start seeing into Atlantic terminal?

Answer: So, indicating. That station is a curve. I can't fully -- fully see the entire station until -- uhm -- until my cab is entering the station, until it goes from dark to light, until the -- until I'm like entering it.

Okay.

Answer: And I can see, like, the end of it, but I can't see fully into the station until I have rounded the curve.

Question: And as you round the curve and you enter into the station, that's when you are doing 20 to 25?

Answer: Uh-hum.

Your lawyer says you have to answer.

Your answer is: Yes. Yes. Yes. Correct.

THE COURT: That's her testimony.

MR. GENIS: Yes.

Q Was that the truth when you said it?

THE COURT: Wait one second. You just read it. I said you can read it into evidence.

MR. GENIS: Yes, Your Honor.

Q So when you gave that sworn testimony, was that truthful and accurate?

A Yes.

Q Now, when you were at the mouth of the station, based on the curvature of the station, if the woman had fallen when you reached the mouth of the station, you would have been able to see her; true?

A Yes.

Q And if the woman had been laying on the tracks when you entered the station at the mouth of the station, you would have been able to see her; correct?

MR. KEAVENEY: Objection.

A Correct.

THE COURT: Just one second.

You can answer that question.

If she's lying on the tracks at the time you entered the station, would you have been able to see her.

THE WITNESS: Yes.

THE COURT: That's the question.

Can you answer that?

THE WITNESS: Yes. I would have been able to see her as I enter.

Q And when you are entering the mouth, typically, of the station, your left hand is on coast on the controller and your right hand, is it supposed to be hovering over the brake handle or on the brake handle?

A So, hovering, prepared to take brake if needed.

Q Okay. So your hand is not always on the brake handle?

A Hovering, like right there. Like you just....

THE COURT: When you say hovering, what do you mean by hovering?

THE WITNESS: Hovering, hovering meaning --

THE COURT: Not touching it?

THE WITNESS: Touching it, but not gripping it, because the handle needs a grip.

THE COURT: So you are talking about hovering, you are talking about touching it, but not gripping it? That's your testimony?

THE WITNESS: Correct.

Q So you don't mean just a little over it or almost touching it, you mean actually touching it; correct?

A Like palm open, prepared to -- prepared to grip and --

Q Okay. But are you touching it is my question?

A Touching it, yes.

Q Okay.

And usually you start braking, when there's no incident, about three or four car lengths into the station;

correct?

A It depends.

Q Okay. Well, were you asked the following question under oath and did you give the following answer, on page 208 line 25?

Question: Typically, when you start -- I want to make sure I'm on the right one. Yeah.

Typically, when you start putting pressure on the brake to start stopping the train, had no incident occurred when you went into Atlantic terminal?

Answer: Maybe three cars in. I would have started to -- three or four cars in, I would have started to take a brake.

And B-R-A-K-E.

A Yes. Yes.

Q Was that the truth when you said that, ma'am?

A It was the truth.

Q Okay. And when you first saw the woman on the track, you told us you were about two car lengths into the station; correct?

A Correct.

MR. KEAVENEY: Objection. Mischaracterization. She saw the woman falling, not on the track.

THE COURT: I'm sorry?

MR. KEAVENEY: She saw the woman falling.

MR. GENIS: Excuse me --

THE COURT: You can ask follow-up questions. All right. She answered.

Q And at the moment you saw Luisa, your speed was between 20 and 25, and then you said 20 to 24; correct?

A I can't recall exactly what I said on that day.

Q You said today 20, 24, I could live with that.

A Okay.

Q Okay. All right.

Now, when you saw the woman on the track, Luisa, she was about 180 feet away from you when you first saw her; correct?

A I have no knowledge of the distance.

Q Okay. Well, let's take a look at 214.

Okay. Were you asked the following question under oath and did you give the following answer?

It's on page 214. I will start on line 15.

Question: Okay. I'm not asking you how far your train was into the station. I'm asking you the distance, speed.

Can you estimate distance between where she was and where you were when you first saw her?

Answer: So each -- I would say maybe 180 feet.

Was that the truth when you said that?

A I -- I can't remember.

Q Okay.
A I can't remember.
Q All right. So let's do some quick math here.
If the train car is 75 feet long and you're two cars in when you see her, that's 150 feet; right?
A Correct.
Q And if she is 180 feet away from you, that would add up to 330 feet; correct?
Right? 180 and 150.
A Yes.
Q Okay.
So you were 330 feet away from her when you were at the mouth of the station and you first saw her; correct?
A I didn't see her until I was at least --
Q Withdrawn. I'm sorry. Correct. Let me withdraw that question.
A Okay.
Q I misstated what you said. My apologies.
A Okay.
Q So when you first -- withdrawn?
Withdrawn.
Now, by the way, was -- did you ever -- do you recall ever looking at the speedometer from when you left Seventh Avenue until there was contact with the woman?
A Oh, yes.

Q And you have a specific memory of looking at it? You recall that?

A Yes. I mean, not a specific memory. But it's that we glance at the speedometer. Like when you are driving, you periodically just glance.

Q All I wanted to know is if you recalled it, because your testimony here, 327, line 13, says:

Question: So my question is did you ever look at the speedometer between leaving Seventh Avenue and the point in time where your train came into contact with the woman?

Answer: I can't recall.

Was that the truth when you said that?

A Uh-hum.

Q Okay. And, in fact, you don't even know if the speedometer was working on August 2, 2016, true?

A I don't recall anything specific about the speedometer on that date.

Q Okay. And back in 2019, you had no memory of the speedometer working; correct?

A 2019, the day of the deposition?

Q Correct.

A I can't recall what I recalled in 2019.

Q Okay. All right. As you told us, how you immediately went into emergency, it was split second; right?

A I ... there was no time. I just put the train....

Q You said immediately, like that (indicating); correct?
A I can't do that (indicating), but I did that (indicating).
Q Well, do you remember your deposition was on videotape? Had?
A Okay.
Q All right. And it showed you making a motion when you said you put it into immediate.
And did you make that kind of motion (indicating)?
A I can't recall.
Q All right. And you have no idea how far the train traveled from the point it went into emergency until it stopped; correct?
A No.
Q When the train finally came to a stop, how far was it into the station?
A I would say -- I don't know.
THE COURT: I didn't hear. A little louder.
A I don't know exactly. I don't know.
Q Okay. That's fine. If you don't know, you don't know. That's okay.
And then you told us you saw the person was a woman; correct?
A Yes.
Q And you kept under your constant observation until the

train passed over her; correct?
A Correct.
Q And as the train was passing over her, you looked down and you saw she was on the rail closest to the platform; correct?
A Correct.
Q And you don't remember if her head was closer to you or her feet; correct?
A No, I don't remember.
Q Okay. And you revisited the scene afterwards; correct?
A Yes.
Q And you went with your conductor; correct?
A Yes.
Q You don't remember how many train cars were in it when you stopped; correct?
A No.
Q And you called RCC, but you don't exactly recall everything that day, do you?
A No.
Q And all radio calls are recorded; true?
A Yes.
Q Okay. And the recording would tell us exactly what you said at the time of the occurrence to RCC; correct?
A Yes.
Q Have you ever listened to any of those audio recordings

between you and RCC from that day?

A No.

Q Okay. Do you know where they are right now?

A No.

Q Did you ever ask the attorneys can we get that recording, could we listen to it?

MR. KEAVENEY: Objection.

A No.

THE COURT: What is it that you want to do?

MR. GENIS: I just wanted to know if she ever asked to get that recording so she could hear what she said.

THE COURT: Anyway, objection sustained.

MR. GENIS: Okay.

Q Do you know why we don't have that recording now?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q You did have a cellphone with you that day; correct?

A Did I? Yeah. I guess. I don't....

Q All right. 267.

Were you asked this question and did you give this answer, page 267, line 13?

Question: Okay. At that time did you have a cellphone?

Answer: Yes, I did?

Does that refresh your memory?

A No.
Q Was that the truth when you said that?
A Yes.
Q Okay. And you said after this happened, you don't even know where you were on the platform; correct?
A Where I was on the platform?
Q Yeah. You don't know where you were? Because after it happened, you went out on the platform.
A Yes.
Q And you looked towards the front because you didn't know where she was located, and you didn't see her in the front of your car, so you went further down with your flashlight and you saw her between the first and the second car?
A Correct.
Q All right. Now, the police came, you told us; correct?
A Yes.
Q And you spoke to the police officer on the platform when they arrived; correct?
A Correct.
Q And the police took your statement; correct?
A Yes.
Q And what you told the police was true and accurate; correct?
A Yes.
MR. GENIS: Can I please have the police report?

There is two of them, in evidence.

Q While they're getting that, and I apologize, I did bad math before. I'm going to try to fix that now.

So, if you are 150 feet into the station when you see her and she's 180 feet away, that would mean the distance from the mouth of the station to where her body was was 330 feet; correct?

Let me do that again because I'm bad at math. I'm going to try that again.

You were two car lengths in --

A About.

Q About. Okay.

So we agree that's about 150 feet; right?

A Okay.

Q Okay. And she was 180 feet away from you; correct?

A No.

Q Didn't we read that transcript a minute ago?

A 180 feet away from me?

Q Yeah. When you first saw her. Yeah.

A All I know is that she was two car lengths.

I was two car lengths into the station when she fell.

Q Ma'am, I understand.

A I have no knowledge of any distance.

Q Okay.

So you don't know if, when you first saw her and you were two car lengths in, if she was 180 feet away from you, 200, 300, 400 feet away; correct?

A I mean, I can see her, but I wasn't gauging like she's this. I just saw her. I didn't gauge distance.

Q Okay. So do you have any idea was she 200 feet away from you, 250?

Give me an idea.

A I can't guess.

Q Okay. If she was, let's say, 180 feet from you, that would mean from --

THE COURT: That's argumentative. Save that for summation. She was just testifying what she knows.

MR. GENIS: I understand, Judge.

THE COURT: So you got into the station. You saw her there. You have no idea how far away she was. You gave us your best estimate.

You can explain once more if you can.

THE WITNESS: I came into the station. The train was somewhat into the station prior, and then she suddenly fell. I wasn't gauging distance or estimating time. I just -- it was just....

THE COURT: You weren't measuring how far away she was? This happened quickly; right?

THE WITNESS: Yes.

THE COURT: Your best estimate is when you got into the station, you know, wherever you thought she was.

MR. KEAVENEY: Your Honor, I have an objection regarding the document he is about to show.

THE COURT: I don't know what document you're talking about.

MR. KEAVENEY: It looks like two documents.

MR. ROTH: They are both in evidence.

THE COURT: We are trying to find out to the best of her knowledge how far the plaintiff was when she first saw the plaintiff.

MR. GENIS: I'm on to something else.

THE COURT: What do you have here now?

MR. GENIS: This is 39B in evidence. It's a police report involving this incident.

THE COURT: Is the police report in evidence?

MR. GENIS: Yes.

MR. KEAVENEY: Your Honor --

THE COURT: What exhibit is that?

MR. GENIS: 39B, as in Bob.

THE COURT: 39?

MR. GENIS: B.

THE COURT: I have 39 in evidence. What's the question?

MR. KEAVENEY: We don't have this. This is two

documents under the same number.

THE COURT: I have 39.

Is there a problem? I have New York City Police Department general investigation records.

MR. GENIS: That's exactly what this is.

THE COURT: That is 39 in evidence. Is that 39?

MR. GENIS: Yes.

THE COURT: It's 39. It's in evidence.

Q And do you see how it says: The police officer interviewed the MTA train operator?

A Yes.

Q And then it says -- After it says Interview, on August 2, 2016, at approximately 1940 hours, I was present at the Atlantic Avenue subway station and spoke with MTA train operator Raqia Shabazz with pass No. 809087.

Ms. Shabazz stated that she was operating the 1848B, as in Bob, train out of Brighton Beach at the time of this incident.

She continued that as she was entering the Atlantic Avenue station she observed a person lay on the tracks.

I will stop right there for a minute.

Have I read that accurately so far?

THE COURT: Well, you are a good reader. Go ahead.

MR. GENIS: Thank you, Judge. I'm working on it.

(Continued on next page.)

(Continuing.)

BY MR. GENIS:

Q She continued that she immediately activated the brakes in emergency in an effort to stop the train, at which time the train did make contact with the person on the tracks. Ms. Shabazz continued that she immediately notified her radio dispatcher, notifying them of this incident and requested assistance.

THE COURT: That's what you said to the police, right? That's the police report.

THE WITNESS: That's what the police report is.

THE COURT: That's how the police reported it.

THE WITNESS: Yes.

THE COURT: Fine.

Q Now let's look at Plaintiff's 38 in evidence, and this is to the Chief of Transit, and it's involving what's called a man under. That's another term for 12-9s, correct, "man under"?

A I've never heard that.

Q It's man under the Atlantic Avenue subway station within the confines of Transit District 32/88 Precinct, aided female not likely, transported to Bellevue Hospital, correct?

THE WITNESS: Well, you're reading a document in evidence. What's your question?

Q And you see item 3 highlighted, and we added the highlighting: The train operator, Shabazz, Raqia, and gives the pass number, stated she observed the aided on the northbound track as the train was entering the station.

Correct?

THE COURT: Is that correct or not? That's what the police report says.

THE WITNESS: That's what it says, but that's not what -- okay.

THE COURT: Well, you can tell us that's what the police report says, right?

THE WITNESS: Uh-huh.

THE COURT: Right, okay.

THE WITNESS: He -- he read it.

THE COURT: Is there anything about that that you take issue with, that you don't think is correct?

THE WITNESS: Yes, yes, because --

THE COURT: Tell us.

THE WITNESS: Because he took my testimony, he took my -- he asked me what happened, and I explained to him exactly what happened, and he made notes in his notebook and then later on made a report.

THE COURT: You can tell the jury, if you recall, what did you tell the police officer?

THE WITNESS: I told him exactly everything that

I've said to you today, everything I said in my G2. I came into the station, and as I came into the station, a woman fainted onto the roadbed. And the only reason why I even physically saw her was because she fell onto the roadbed when she was fainting, and as she was fainting, I placed my train into emergency. This is what I told the officer. And I said -- I told the officer I placed my train into emergency hoping that the train would stop before it made contact with her, but it didn't. And in some way, they took it to -- I don't know what they did, but that's what they wrote. This is what I'm saying to you today.

THE COURT: That's your testimony that that's what you told the officer.

THE WITNESS: This is what I --

THE COURT: This is what came out of it, what they put on the report.

THE WITNESS: Yes.

THE COURT: Okay. Go ahead.

BY MR. GENIS:

Q Are you aware that the detective that made that report testified under oath in a deposition that that's exactly what you said to him, that she was laying on the track --

THE COURT: The objection is sustained --

A I don't know that --

THE COURT: If you hear me talk, then I have to do

the talking first.

Objection is sustained.

THE WITNESS: Okay.

Q You were sitting next to a gentleman over there with the glasses. Do you know who he is?

A No, but he told me he was an engineer.

Q Did he tell you that he wrote in his report that that's exactly what Detective Muller testified to under oath?

A He didn't --

MR. KEAVENEY: Objection.

A He told me he was an engineer.

Q Okay. Are you aware that there were calls made to 911 about this incident?

A No.

MR. GENIS: Can we please play in evidence 911?

THE COURT: I think there are a couple of 911 calls.

MR. GENIS: Yes. I think we're going to do, what is it, number 5?

THE COURT: Which one is this? What exhibit?

MR. GENIS: Exhibit 72.

THE COURT: You're playing Exhibit 72, a 911 call now. Go ahead.

(Audio played.)

Q Did you hear that that person called 911 and said that

Luisa was on the track and you had not yet entered the station?

A Did I hear --

Q Yes, just right now.

A This is the first time I'm ever hearing that.

Q I understand. But you heard it, right?

THE COURT: She heard it.

MR. GENIS: Okay.

Q Now, eventually your bosses from the TA came to the scene, the superintendents, correct?

A Yes.

Q And there was -- and what does TSS stand for?

A Train Service Supervisor.

Q And at the scene was Train Supervisor Sasso, Pearl, Zabaleta, and Superintendent Gaskin and RCI Laurent, correct?

A Correct.

Q And the TA supervisors and investigators were there when the woman was still on the tracks, correct?

A I don't remember --

THE COURT: Do you know that to be the case?

THE WITNESS: I don't remember.

Q Did you testify at your deposition, page 267, line 22 -- I'm sorry, 266, line 22:

Question: Okay. While the Transit supervisors

investigator was at the scene, did you -- was the woman still under the track -- under the train, or did they come afterwards?

Answer: They were -- they were there while she was still on the tracks.

When you gave that testimony, was that truthful?

A Yes.

Q Okay. And you did not see any of these Transit people, investigators, interviewing anyone or taking measurements or photos, correct?

A I have no knowledge. I don't remember that day.

Q Well, did you say the following at your deposition, page 267, line 5:

Question: Okay. When you were standing there, did you see any of them taking any measurements, interviewing people?

Answer: No, I didn't see anything.

Question: Did you see any of them taking photographs or pictures with their cell phone or anything else?

Answer: No, I didn't.

So when you said that back then, was that the truth?

A I have to -- yes.

Q Okay. And you did not tell each of these TA people, or

any of them that came to the scene, what happened, correct?

A False.

Q That's false. Let's go to page 261, then, line 15:

Question: When the different people from Transit came to the scene, did you tell each one -- did each one of them ask you what happened and did you tell each one of them what happened?

Answer: No.

When you were asked that question under oath and you gave that answer under oath, was that the truth, ma'am?

A Yes.

Q Thank you.

At the scene, the TSSs were only asking you if you were okay, correct?

A I can't recall.

Q Okay. Let's go to page 266, line 4:

Question: Okay. And then when you spoke to the other people that came to the scene, you sure you spoke to Gaskin about what happened? Any other Transit people talk to you about exactly how the incident happened, to your recollection?

Answer: On -- are you asking about on the scene?

Question: Yes, at the scene.

Answer: On the scene, I believe the TSSs, they were only like are you okay. You know, they weren't -- they

knew what happened, they knew why they were there, so they didn't really push the issues. You know, they were like are you all right.

Were you asked those questions under oath and did you give those answers?

A Yes.

Q Okay. And that was the truth at that point?

A Yes.

Q And you did not have any conversation with TSS Zabaleta, and that's Z-A-B-A-L-E-T-A, about how the incident happened. True?

A That's true.

Q And then the ambulance took her out first, they passed her arm and leg up in between the first and the second cab, correct?

A Yes.

Q And you don't remember where you were standing, correct?

A I was on the platform.

Q And you have no clue how long you stayed at the station altogether, correct?

A No.

Q It's a blur, it all happened so fast?

A Yes.

Q And then you saw Luisa -- you stayed until the

ambulance took her away, correct?
A I can't remember.
Q Well --
A If I saw her leg and arm, then her body was next, so I'm pretty sure I was still there.
Q Okay. And then you saw her being brought up the staircase, correct?
A Maybe.
Q Well, if I told you that's what you testified to, would you believe me or --
A Yes.
Q -- do you want me to read it?
A No, I believe you.
Q All right. Thank you.
And you did not speak to or learn the identity of any witnesses to this incident at the scene. True?
A True.
Q And you did not try to talk to anybody about what you saw at the scene or what they saw, correct?
A Yes.
Q And you learned the name of the person you ran over, correct?
A Yes.
Q And that was Luisa?
A Yes.

Q And, in fact, you even looked up this incident online to see if she lived?
A Yes.
Q And you saw there was an article in the New York Post about it?
A I don't remember the paper, but I --
Q The only record you ever authored related to this incident is the G2 you showed us before, correct?
A Authored? I mean, I had to go out on -- when I went out on comp, I had to write something related to this incident.
Q Okay. That was -- okay, that's fine.
Did you testify, page 254, line 22:
Question: Did you author any reports related to this incident?
Answer: Just my G2.
Were you asked that question and did you give that answer?
A Okay.
Q And then actually, in fairness, you did say later on, when you went on comp, you did something. So you did say that at the time.
A Okay.
Q And a G2 is just a correspondence sheet, right?
A Yeah.

Q It says it right on it, it's a correspondence sheet, right?
A I guess so.
Q Well, let's take a look at it so we can be accurate.
A Okay.
MR. GENIS: Where is that exhibit?
(Exhibit published.)
Q Do you see how it says "Correspondence Sheet" at the top?
A Yes.
Q It doesn't say "accident report" or "incident report" or anything else, correct?
A Correct.
MR. GENIS: You can take it down.
Q You were in the superintendent's office in DeKalb when you wrote that G2, correct?
A Yes.
Q And TSS Zabaleta took you over on the train with TSS Pearl, and Gaskin went there, correct?
A No.
Q Were you asked the following questions and did you give the following answers, page 282, line 8:
Question -- let me even back up. Line 4:
Question: Okay. Where were you when you wrote that statement?

Answer: I was at DeKalb, the superintendent's office in DeKalb.

Question: Is that the next stop or two more stops?

Answer: That's the next stop.

Question: How did you get there?

Answer: Um, the TSS, it was a TSS Zabaleta, he took over the train, and so me and Pearl -- me and TSS Pearl and Gaskin -- Zabaleta was operating the train, and I got off with Gaskin and Pearl to be with them; Gaskin and the TSS worker.

When you gave that testimony, was that the truth?

A Can I clarify?

Q Can you just answer if that was the truth?

A It was the truth, but you're not understanding it.

Q It's okay. I'm just reading what you testified to.

A Okay, okay.

Q Now, then you sat with Superintendent Gaskin to do your G2, and you spoke with control on the telephone, and you spoke to another superintendent, correct?

A Yes.

Q And you had already spoken to the police by that point, correct?

A Yes.

Q Okay. Now, when you wrote that statement for the G2,

you can't recall if you made that determination based on what you observed or if somebody gave you that information. True?

MR. KEAVENEY: Objection.

A False.

THE COURT: Just one second.

Objection sustained.

Q Well, were you asked the following question under oath, page 293, line 16:

Question: What I am asking you is, when you wrote this --

Answer: Right.

Question: -- was it your determination based on what you observed that she fainted, or did somebody else give that you information? That's what I'm asking you.

Answer: I can't recall.

Were you asked that question and did you give that answer under oath?

A I don't remember, but --

Q Okay.

A If that's what I had, then --

Q All right. You're not able to tell us if somebody else told you that she fainted and then you put that in your report, correct?

MR. KEAVENEY: Objection.

THE COURT: Well, I think you've explained this. I don't know if there's anything else.

Q Let's be crystal clear. On page 291, line 8, were you asked this question:

Question: Is it possible somebody else told you that you fainted and then you put it into your report?

Answer: I wouldn't be able to tell you that.

Were you asked that question under oath and did you give that answer under oath?

THE COURT: You just read it. It's okay.

MR. GENIS: Okay.

Q Now, there was also a union rep, I believe the name was Goddy, G-O-D-D-Y, correct?

A Yes.

Q Did you also speak to your union rep before you wrote out that G2?

A No.

Q Do you remember if you spoke with him, or you don't remember?

A I remember speaking with him. He was there at my drug test.

Q Do you remember if you spoke with him about this incident to help you before you wrote your statement?

A No, I can't remember.

Q So it's possible you spoke with him before then?

A No.

Q Well, if you don't remember --

THE COURT: Please, you're argumentative now. I allowed you to question her. She said she made that report. We know that. I allowed you question whether or not it was based upon any conversation she had with other people. I've allowed a lot of those questions. Let's go on to something else.

MR. GENIS: Thank you so much.

Q So when you told on direct exam that at the scene you told the supervisor what happened, can we agree that you actually gave different testimony under oath back in 2019?

THE COURT: Sustained.

MR. GENIS: Okay.

Nothing further, Judge.

THE COURT: All right. Mr. Keaveney, it's 25 to 5. I don't want to rush you inappropriately, but if we could complete her testimony today, that would be a good thing.

REDIRECT EXAMINATION

BY MR. KEAVENEY:

Q Ms. Shabazz, did you tell TSS Agent Sasso what happened that day?

A I don't remember.

Q I'd like to show you Defendant's Exhibit G.

THE COURT: This is 74G?

MR. KEAVENEY: No, just G.

MR. GENIS: Objection.

THE COURT: Just one second.

MR. GENIS: We're getting into what we discussed during the break, Judge.

THE COURT: Just one second.

G is not in evidence. Do you wish to offer that in evidence?

MR. KEAVENEY: Yes.

MR. SHIELDS: We have an objection, Your Honor.

THE COURT: I don't see the objection. Are you sure you made an objection --

MR. GENIS: The asterisk --

THE COURT: Just one second. I don't see that I have that. Let me see that.

MR. SHIELDS: The 2016, Your Honor, there's the asterisk indicating --

THE COURT: Yes, I'm sorry, I do see that. Let me take a look at it.

(Pause in proceedings.)

THE COURT: I'm not going to allow that in evidence. We'll mark it G for identification, and my ruling is that it's not in evidence.

MR. KEAVENEY: Can we play the 911 call, number 6,

that's in evidence.

THE COURT: The 911 call is in evidence.

MR. KEAVENEY: Yes, we're going to play recording number 6.

(Audio played.)

BY MR. KEAVENEY:

Q Ms. Shabazz, did you see the person fall on the tracks just as the train was coming into the station?

A Yes.

Q Did you do everything you could to stop that train to avoid hitting her?

A Yes.

Q Did you operate your train safely that day?

A Yes.

MR. KEAVENEY: Thank you.

THE COURT: No further questions.

Anything further, Mr. Genis?

RECROSS EXAMINATION

BY MR. GENIS:

Q You heard at the tail end of that last 911 call that before the train came in, she was on the tracks?

A No.

MR. GENIS: Nothing else.

THE COURT: Thank you very much. You may step down.

(Witness is excused.)

THE COURT: Members of the jury, I think we've gone as far as we're going to go today. It's about a quarter to 5. See you tomorrow at 10:00. We'll have some more testimony, and it's possible that the evidentiary part of the case may be completed tomorrow. There's a good chance that that may happen. Just stay tuned. We're getting towards the end.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(In open court; jury not present.)

THE COURT: I gave you a proposed charge and I assume you have it. It runs for 17 pages. You don't have to do anything about it right now, unless you want to hang around here for a little bit and look at it and you want to share some thoughts with me now, you can do that, or we can save this all for tomorrow. Whatever your pleasure is.

Why don't you do this. Why don't you look at it now. I have some other things to attend to, and we'll reconvene at 5:30 and talk a little bit about some of your thoughts about this. Okay?

(Court is in recess.)

THE COURT: We're going to go on the record now and talk about a few things. The jury's not here, and I've handed out a proposed jury charge. Let me make a few

general comments.

The case is a complicated case in many respects, but the charge is not so complicated. And as I said at the beginning, you know, the thing that's really the most challenging thing, from what my sense was, is to get the questions down right on the issue of the immunity defense.

So before we even get to that, as far as the negligence of the driver is concerned, the operator, that's a pretty straightforward charge, and I don't think there's any problem with that. You know, I did adopt the proposal by defendants that I should talk a little more about emergencies when we talk about the responsibility of the driver, so I incorporated that, and I can't see where you have any real serious problems with it.

If you want to do nitpicking, just put your nitpicking aside and let's talk about the substance now so we can get the important stuff on the same page.

(Continued on the following page.)

(Continuing)

THE COURT: On the comparative fault, we're not going to talk about proximate cause, and I don't know if you heard my comments about that. I don't think it's really relevant here.

Comparative fault, yes, that's certainly at issue. And, of course, the affirmative defense theory of the immunity, which I think is the big enchilada. I mean, if there's going to be a verdict here, it may not be a bad idea for the Second Circuit to chime in against -- again, it's a been long time since the Court of Appeals rendered the decision, which I think is what I should follow in the *Turturro* case back in 2016.

And, you know, I looked at the cryptic cases that plaintiff wanted to -- or defendant, I should say, wanted me to consider. This *Hartford* case and the -- of course, we have the *White* case and *O'Brien*, but it's *Turturro* which I'm going to rely upon, sink or swim with that, because it is a fully-developed opinion by Chief Judge Fulks, who I have a great respect for, and I think we want to try to follow that.

So I tried to craft the questions tracking almost literally the language in *Turturro*, and I know there can be other ways these questions can be posed, but I feel comfortable on Page 11 with the questions which we want to

ask the jury. And you'll have a chace to consider it again. We can talk about it again tomorrow. I just wanted to kick the ball off today, right?

So I think the first question is whether the Transit Authority developed and adopted a purely safety plan that both considered and passed upon the issue of persons falling into -- onto the tracks? Well, that's what we're talking about here. I think that's a correct beginning question.

And if the answer is no, I think that's probably the end of it here, there is no safety parameter at all. And if the answer is yes, then they should answer the other three questions: Was the plan an adequate study, and did it regularly review the safety plan in light of actual operation? Whatever that means. I don't know. We may have the jury coming back and asking us some questions about that, but we'll take it one step at the time.

You may want to anticipate that the jury may ask us, What does an "actual operation" mean? I don't know, but I can't predict what their questions are. But I think that that's the correct question to ask.

And then the last is, Whether the Transit Authority decision not to install the barriers or the TIDs had a reasonable basis? Well, that's what I think I ought to charge the jury. The defendants' proposals are

not necessarily incorrect, in fact, they're specific I imagine. But I just feel more comfortable in tracking *Turturro* and that's way I conceptionalize this.

Now, as far as the damages are concerned, I think we have broken them down now appropriately into futures, past, and present for lost earnings, as well as medicals. They're here. And the noneconomic, as well. We've broken that down. If there's anything we missed, let me know. I haven't paid 1000 percent attention to that. I've been preoccupied with all the issues. But you have what I have here now.

I don't know with whether I gave you a proposed verdict sheet. If not, I'll give it to you tomorrow.

Do we have something now by any chance?

But, you know, it's going to track, obviously, the charge, and we can go over the verdict sheet specifically tomorrow.

So having said that, I invite your concerns. Try to make them as substantive as possible. If there's any little mistakes here let me know. I'm going to not give this charge to the jury verbatim. I always talk it through with them when I talk to them. And, you know, many times I give them a copy of the charge. This one is maybe not so relevant. It's what a 15-page charge in a complicated criminal case, but I can give them the instructions, if you

want me to do that. But basically, that's my comments to you to hopefully get you oriented.

I'm going ask the plaintiff first whether you have anything else you want to let me know or we can talk further tomorrow?

MR. GENIS: I'll go real quick, Judge.

I'll skip the picky stuff because you said to do that, and the only thing --

THE COURT: If you have any picky stuff let me know because we're making a note of it.

MR. GENIS: Okay.

THE COURT: I haven't proofread all of this --

MR. GENIS: Okay. So --

THE COURT: -- with specificity yet.

MR. GENIS: -- on Page 4 and 5 of the expert witness, it says, "he." If we could put, "he/she" because Dr. Kucsma was a woman.

THE COURT: That's correct.

MR. GENIS: So there's that one.

And in terms of lost earnings and medical bills, we're not asking for past, only future.

THE COURT: Okay. Just future medicals.

MR. GENIS: Future medicals and future loss of earnings, not past.

THE COURT: All right.

MR. GENIS: So everything else is good on damages.

And the third and the last thing I have, is can you just ask -- tomorrow, they're going to call an expert that you -- could you keep in mind on possible charge for statutory violation until after tomorrow. If you say no after tomorrow, that's what it is.

THE COURT: Well, but the statutory violation that you submitted to you me was based upon the federal --

MR. GENIS: Yes.

THE COURT: -- regulations.

Look, I'll look at it, but I just don't get it.

MR. GENIS: Okay.

THE COURT: I mean, I just don't get it. I think it's wrong to charge federal regulations when this is all state law.

MR. GENIS: There was testimony in the case from Mr. Sullivan how they have to follow it, it's applicable to them. And if you look in the comments in that part, it says it's applicable to all such systems, which would include New York City.

THE COURT: Well, you know, the regulations are extensive.

MR. GENIS: Uh-huh.

THE COURT: It's going to be confusing.

MR. GENIS: Okay.

THE COURT: It's going to make things very complicated and complex. But I don't think that what we're charging here is necessary incompatible or inconsistent with the federal regulations. And I'd rather keep it more simple than more complex if I have an option.

If there was something critical, you know, that really this case was going to depend upon that created a clash between federal and state law and whether truly the state law has embraced the federal, I think we would have to think hard about all of that. But I don't see the incompatibility here necessarily.

MR. GENIS: All right.

THE COURT: All right. So very good.

So who wishes to speak, if anybody, for the defendant? You're not going to pass up the opportunity, I suspect?

MS. WINTERS: Certainly not, Your Honor.

So I'll start with the simplest first, because the plaintiff already addressed the past wages and past medicals.

The only other thing are the damages I wanted to note --

THE COURT: We're not talking about past anymore.

MS. WINTERS: Yeah.

THE COURT: We're talking about future.

MS. WINTERS: Yes, absolutely, Your Honor.

MR. GENIS: And pain and suffering, yes.

THE COURT: And pain and suffering is here, obviously.

MS. WINTERS: Sure.

So the only note I wanted to make is that on damages, we would like to add an instruction to the noneconomic, that, you know, counsel's statements related to what the number they assigned to economic is are not evidence.

THE COURT: Well, I'm going to say that. You know, I do that automatically.

And, you know, so be -- pay attention, because I don't just read the charge. You know, I talk to the jury like I'm a professor of law, right?

MS. WINTERS: Absolutely.

THE COURT: Yeah, I'm going to -- I'll have to explain that to them. It's not in the charge right now, but, you know, you'll remind me, Malcolm, to make sure that I tell that to the jury, okay?

What else?

MS. WINTERS: On the issue of proximate cause we'll request that Your Honor reserve on that. We do believe that the issue of proximate cause is still an issue in this case, especially as it related to TIDs, since that

would still remain an open access to the platform.

THE COURT: So you have to be more specific. You want me to charge the jury that the -- they have to decide that if there's negligence that it was the proximate cause of the injury?

MS. WINTERS: Yes, Your Honor. As it relates to TIDs --

THE COURT: I'm trying to understand that.

MS. WINTERS: Sure. So as it relates to TIDs specifically, and what you'll continue to hear is that there is a delay between the track intrusion and the actual notification to the train operator. So they would have to prove that this accident would have happened -- would not have happened if TIDs were installed; whereas the evidence is going to show that given the timing of the accident, that the TIDs would not have prevented it.

THE COURT: Well, it doesn't resonate with me. But, you know, if you want to make a record, by all means, go ahead.

Anything else?

MS. WINTERS: Sure.

And then the only other small note before I talk about qualified immunity a little is under the negligence and platform --

THE COURT: See, they're going to have to find

liability. If they find liability, I don't see how anybody can say that falling onto the tracks was not a proximate cause of their negligence. I don't understand that.

MS. WINTERS: Sure.

So assuming they were to find liability on the issue of the failure to install track intrusion detection devices, those devices take time to notify central and the then notify the train operator. And given how brief the period was between the actual track intrusion and the strike of the train, that technology would not have prevented this accident.

THE COURT: I don't get the logic. I just think it's kind of, like, obtuse. But, you know, I'm not inclined to really confuse the jury with that. They just really won't understand that, and I don't understand it necessarily understand myself.

But in any evidence, make your record. What else?

MS. WINTERS: Okay. So under the negligence and platform safety we just, to make it consistent, we would request that the one, two -- the third sentence in the third paragraph be modified to --

THE COURT: What page?

MS. WINTERS: Sure. Page 9, Your Honor.

THE COURT: Okay. Go ahead.

MS. WINTERS: The third line of the third

paragraph, we would request that it reference the United States, as well.

THE COURT: Wait a second.

Third paragraph?

MS. WINTERS: Third line which starts off with, "Of course, you must first decide from the evidence whether there is a general custom or practice, meaning operation of subway systems in the United States."

THE COURT: I'll put in "the United States."

MR. GENIS: Judge --

THE COURT: Yes.

MR. SHIELDS: Judge, we object to that.

THE COURT: Oh, so we have some issues here.

MR. GENIS: Judge, there's testimony about -- repeatedly from the TA witnesses that --

THE COURT: Well, I'm going to leave it the way it is.

MR. GENIS: Thank you.

THE COURT: That way you can argue it.

MR. GENIS: Then I'm shutting up.

THE COURT: All right.

MS. WINTERS: And then turning to qualified immunity, Your Honor. We've heard, Your Honor -- you know you've talked about that *Hartford* case, so we'll moved past that.

But to extent that we are trying to stay consistent with *Turturro*, the issue of qualified immunity in that case turned on whether or not the entity reasonably studied the dangerous condition. The alleged dangerous condition here is intrusions on the track due to open access to platforms. So we would request that the interrogatories related to *Turturro* be modified to reflect whether or not there was a study -- not a safely plan -- a study into that dangerous condition, which is alleged to be intrusions onto the track bed.

THE COURT: Well, you're not being prevented from arguing that, whether the Transit Authority developed and adopted a duly executed a safety plan that both considered and passed upon the issue of persons falling onto the tracks.

MS. WINTERS: So --

THE COURT: By the way, I accepted your recommendation in that respect. It's not what I originally put.

MS. WINTERS: So the issue there is *Turturro* does not speak to a requirement that there be a safety plan. It speaks to whether or not there was a study. And this instance, whether there was a study of the dangerous condition. So in *Turturro* the dangerous condition was alleged to be speeding on that highway, the dangerous

condition alleged here if people falling onto the track bed. So qualify immunity would turn on whether or not there was a study of people falling onto the track bed, and whether a determination was made that certain steps need not be taken related to that dangerous condition, which those steps would be PSDs and TIDs.

THE COURT: I don't see really, you know, what's wrong with the questions I have here. I just don't get your proposed difference. I don't get it. I just don't get it.

All right. Anything else? Any comments that the plaintiffs has?

Maybe she's right. Do you agree with her?

MR. ROTH: We're good. We're good.

THE COURT: Okay. Anything else? You have a record.

MS. WINTERS: Thank you, Your Honor.

MR. KEAVENEY: Just one more thing, Your Honor.

On Page 10, where it's talking about governmental immunity.

THE COURT: Page 10.

MR. KEAVENEY: Defendants made certain immunity claims in this case, governmental immunity and qualified immunity. I know you don't want to confuse the jury, but I don't know whether --

THE COURT: It's governmental, it's discretionary

governmental immunity, that's what we're talking about.

MR. KEAVENEY: Okay. I'm just saying, we did raise two immunity defenses in this case. One was denied, which we will be -- we're appealing right now the Second Circuit. And the other one was qualified immunity, which applies to this case.

THE COURT: Wait a second. I'm a little bit confused here.

I don't see two immunity defenses here. I see governmental immunity defense.

What am I missing here?

MR. KEAVENEY: It's qualified immunity.

THE COURT: They say qualified immunity, but --

MR. KEAVENEY: But if you try not to confuse the jury, that is just --

MR. GENIS: I have not a clue of what we're talking about.

MS. WINTERS: So right now, the charge says governmental immunity, whereas the issue is qualified immunity. I think that's what we're saying.

MR. GENIS: Do you think the jury gets the difference?

MS. WINTERS: Well, the Second Circuit -- :

THE COURT: We're just saying that it is a need for liability because it is a governmental entity. What's

wrong with that?

MS. WINTERS: Because there were two theories of immunity --

THE COURTROOM CLERK: It's in the next sentence, Judge.

MS. WINTERS: -- both in this case and in *Turturro*, governmental immunity and qualified immunity. Your Honor ruled on governmental immunity already. There's an appeal pending on that.

The issue that's before the jury, you know, pursuant to Your Honor's prior ruling is qualified immunity.

MR. GENIS: A rose by another name.

MR. KEAVENEY: It's semantics, but it's just -- it's an appealable issue.

MR. ROTH: So you want to change that word from "governmental" to "qualified," is that what you're asking him to do?

MS. WINTERS: Correct.

THE COURT: All right. I can cross out the word "governmental" and just say immunity, okay?

MR. ROTH: Okay.

MR. KEAVENEY: Okay.

THE COURT: Okay.

MR. KEAVENEY: Yep.

THE COURT: All right.

Anything else?

MR. KEAVENEY: Thank you.

THE COURT: Okay. We'll see you tomorrow. Thank you, everyone.

MR. GENIS: Thank you, Judge.

MR. KEAVENEY: Thank you, Your Honor.

MS. WINTERS: Thank you.

(Matter adjourned to Tuesday, November 18, 2025 at 10:00 a.m.)

-ooOoo-

# I N D E X


| WITNESS | PAGE |
|---|---|
| **MALCOLM REID** | |
| DIRECT EXAMINATION BY MR. KEAVENEY | 1497 |
| CROSS-EXAMINATION BY MR. GENIS | 1523 |
| REDIRECT EXAMINATION BY MR. KEAVENEY | 1612 |
| RECROSS-EXAMINATION BY MR. GENIS | 1617 |
| **RAQIA SHABAZZ** | |
| DIRECT EXAMINATION BY MR. KEAVENEY | 1623 |
| CROSS EXAMINATION BY MR. GENIS | 1665 |
| REDIRECT EXAMINATION BY MR. KEAVENEY | 1717 |
| RECROSS EXAMINATION BY MR. GENIS | 1719 |


## E X H I B I T S


| | |
|---|---|
| Defendant's Exhibit XX | 1629 |
| Defendant's Exhibit H | 1661 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

United States Courthouse
- against - : Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, :

November 18, 2025
10:00 a.m.

Defendants. :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:
SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants:
LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, New York 10271
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

Court Reporter: Michele D. Lucchese,
E-mail: MLuccheseEDNY@gmail.com
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2272

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(In open court; parties present.)

THE COURTROOM DEPUTY: Civil cause on trial, *Harger Da Silva versus New York City Transit Authority.* And all Counsel are present.

THE COURT: Good morning. So the jurors are all here and we are ready to go.

Before we start, you will get the latest iteration of the charge. You want proximate cause, you are getting proximate cause, okay?

MS. WINTERS: Thank you, Your Honor.

THE COURT: There are a couple of changes I made, but this is, you know, a fast-moving train -- it's a good expression -- and --

MR. GENIS: I hope we don't get hurt by it, Judge.

THE COURT: Remember there was a collective charge you wanted me to give you? I don't know what it was. I don't know whether you still want it. Nobody even remembers it. But if you want it, you let me know, I will give it to them. They won't understand what we're talking about. Remember?

MR. GENIS: I never had a chance to oppose the application.

THE COURT: I am asking if she wants it. I read it. I don't even remember it myself. It's up to you.

MS. WINTERS: I think at this point it might confuse them. It's just been too long.

THE COURT: You what?

MS. WINTERS: Sorry. I think at this point it might just confuse them because of how long it's been.

THE COURT: I have to make a record here, right? Because your job is to make sure I get reversed if things don't go your way. But I'll give you that -- you gave it to me. If you want me to tell the jury, I will do that. If you don't want to anymore, it's a practical decision you have to make to let me know so we have a clear record.

MS. WINTERS: I understand, Your Honor. Based on the time, I just think it won't make sense to them.

THE COURT: Well, that's what I thought. So we have a record. We don't need to give the jury that curative instruction, all right?

MS. WINTERS: Right.

THE COURT: Anything else, Mr. Genis?

MR. GENIS: Your Honor, I have an application, I can hand up the case, but we previously made -- filed a motion, Elliot would know whatever docket entry it was, but it's *Dibble against New York City Transit*, 76 --

THE COURT: What is this all about?

MR. GENIS: The expert that they wish to propose, Mr. Marpet.

THE COURT: I want to get the jury here. I want to complete the case.

MR. GENIS: Should not be allowed to talk about a reaction time particularly based on studies for automobile drivers.

THE COURT: I don't know what he is going to testify. Why don't we let the questions come forward?

MR. GENIS: Because it's in his report.

THE COURT: What?

MR. GENIS: That he says he wants to testify to a reaction time based on a study for car drivers, not train, but motor vehicle, and --

THE COURT: Here's how we are going to do it. We are going to have the witness asked questions, you can make your objections however you want it.

MR. GENIS: Okay.

Can I at least hand up the case so you can parous it at your leisure?

THE COURT: You can hand up the case, but what I do is I take it as it comes. We have a question, we have an answer. All right?

THE COURTROOM DEPUTY: We are still waiting for defense witness.

MR. KEAVENEY: I think he just entered the building.

THE COURT: If we have to wait, we have to wait.

MS. WINTERS: He's not even into the building yet.

So false alarm.

THE COURT: Is this your last witness or do we have anything else after this?

MR. KEAVENEY: Three witnesses.

THE COURT: Who else do we have?

MR. KEAVENEY: We have Mr. Abdallah, he's coming back, he testified earlier. And then another expert witness. So an expert witness this morning and an expert witness at the end.

THE COURT: Who is the afternoon expert witness?

MR. KEAVENEY: Ken Korach.

THE COURT: And what is that going to be about?

MR. KEAVENEY: He is going to be talking about custom, practice, industry --

THE COURT: We are not going to be on the record now. We are just trying to get our orientation as to what to expect. So you don't have to take anything down now.

(Off the record.)

MR. GENIS: With respect to another witness the defendant plans on calling we have made a prior motion, is Mr. Korach, K-O-R-A-C-H. He gives certain opinions, but according to his appendix, virtually everything he basis his opinions on are post date of accident. Any alleged studies, alleged reports, he's relying on are post. And since your ruling is that none of that is admissible, he could only

give testimony with respect to predate of accident.

THE COURT: Right. You have ample opportunity for cross-examination.

MR. GENIS: But I cannot un-ring that bell, Judge.

THE COURT: I can't micromanage these things, you know, by papers in advance of testimony. He'll testify and you'll make your objections and I have no idea what he's going to testify about, all right?

MR. GENIS: But according to his declaration, which was submitted in support of their motion for summary judgment, he lists in literally almost every item is post date of accident. I cannot un-ring that bell. Once he says it to the jury, they cannot unhear it.

THE COURT: Just chill out. I am not going to allow that into evidence.

MR. GENIS: Okay.

THE COURT: I don't know what he wrote. He may have written five books about things.

MR. GENIS: Okay, thank you.

And will the witness be advised not to do so by his Counsel so that we don't have to make objections?

THE COURT: It will be in your favor when the jury hears me tell him that.

MR. GENIS: Okay.

THE COURT: We try to try cases in real-time.

Everybody wants to micromanage it in advance of the trial. This is going to be offered into evidence, we object to this, we object to that. I don't do that. Sometimes you have a profound issue where you want to get your hands on it before the trial, but most of the times, you just let unfold.

And a good example -- we are not on the record now, I guess? We can talk on the record.

A good example of how things happen in real-time was the driver's report that I allowed in evidence. So I have to process it in real-time and I thought that the best way to do that would be to excuse the jurors and to see whether she can, you know, say that that was really a record, she had an obligation to do that, or was it her responsibility to process it that way in real-time and then I allowed it into evidence. Instead of having a big debate for four hours. That's the way you handle the trial.

MR. GENIS: Understood.

THE COURT: We will do the same thing here.

MR. GENIS: And I will note, we did withdraw that objection.

THE COURT: I am just trying to tell you, you know, it's not an easy job when you are a judge.

MR. GENIS: I get it.

THE COURT: All right? Because it's a fast-moving

train, I like to say that in this case, right? Okay?

MR. SHIELDS: Just for the record, the application that Mr. Genis made was filed at ECF number 324.

THE COURT: I have been around a long time, we do this in real-time, okay? And that was an example I tried to explain to you. We had this big debate on whether that should be in evidence, or not in evidence. We could spend 17 hours talking about it. But reality is, you just ask her a couple of questions, you won't let the jury be here when you do that, and you make the ruling up or down.

I read someplace that people are not entitled to a perfect trial, there is no such thing, right, as a perfect trial?

MR. GENIS: Sure.

THE COURT: And when you have to make these rulings to the objections, sustain them, you are not going to be right a hundred percent of the time and nor are you supposed to be right a hundred percent of the time, all right? The idea is that you have a fair trial on balance, all right? And that's what we try to do.

MR. GENIS: Understood.

THE COURT: What else can I tell you?

While we are waiting for the expert, I am looking at the Second Circuit decision that Mr. Genis gave to me about the fact that the expert should not be allowed to

testify about the average reaction time. And I don't know what he is going to testify to, but, you know, if he says that I am going to testify to the average reaction time, he has to be qualified to do that, it doesn't seem as if I need this decision about something which is acceptable. So we will see what he says.

MS. WINTERS: What is the citation?

THE COURT: I don't know. He gave me a decision here by this *Dibble*. And it says that the Second Circuit rejected the utilization of an average reaction time as a constant in a similar case. We'll hear what he says. I don't know whether he is qualified to do that.

MR. KEAVENEY: Well, I think that's the key, Your Honor. The constant part. It's not a constant reaction time; it's a range.

THE COURT: We are going to hear what he says, right?

He can talk about what the average reaction time would be in this case, in this case.

MR. KEAVENEY: Okay.

(Pause in proceedings.)

THE COURT: What good news do you have for us?

MS. WINTERS: Sorry. I have both experts, and it's going to be whoever gets here first at this point.

THE COURT: Let's just get everybody here as soon

as we can.

MS. WINTERS: Yes, Your Honor.

(Pause in proceedings.)

(Witness takes the stand.)

THE COURT: You should have been here by 10 o'clock. We've been waiting 49 minutes, and everybody is waiting for you. You kept us waiting for 40 minutes. It's going to hurt your client's case.

THE WITNESS: I apologize.

THE COURT: You can apologize all you want to, but I think it's harmful for your client's case. You should apologize to him. They're the ones that may have to suffer. I haven't told the jury anything about this.

THE WITNESS: Well, thank you. Traffic was impossible. I left an extra half an hour.

THE COURT: Whatever.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

At this time, I ask the witness if you can stand and raise your right hand.

THE WITNESS: Sure.

(Witness sworn.)

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please have a seat. If you can please state and spell your name.

THE WITNESS: My name is Mark, M-A-R-K, Marpet, M-A-R-P, as in Peter, E-T, as in Tom.

Did you ask for my address?

THE COURTROOM DEPUTY: No, thank you.

THE WITNESS: Okay.

THE COURT: Keep your voice up. Your witness.

MARK MARPET,

called as a witness, having first been duly sworn/affirmed was examined and testified. as follows:

DIRECT EXAMINATION BY

MR. KEAVENEY:

Q Good morning, Dr. Marpet.
A Good morning.
Q Dr. Marpet, are you currently employed?
A Yes.
Q Where are you employed?
A I'm employed -- I'm self-employed.
Q As what?
A An engineering -- forensic engineer.
Q And what is a forensic engineer?
A A forensic engineer is a person who provides, in my case, engineering services to the legal and justice communities.
Q And do you provide opinions to attorneys and other

entities?
A I do.
Q And were you asked to provide an opinion regarding an accident that happened on August 2, 2016, at the Atlantic Avenue station, and to rebut opinions of plaintiff's expert, Dr. Berkowitz and Mr. Jimenez?
A Yes, sir.
Q And did you review documents to assist you in reaching your opinion?
A Yes, I did.
Q And have you visited the station?
A Yes, I did.
Q And did you formulate an opinion regarding how the accident occurred?
A I did, yes.
Q And did you formulate an opinion as to whether or not the accident could have been prevented?
A I did.
Q In summary, just tell me briefly, what is your opinion?
A That this accident could not have been prevented, that's the first thing. And the second thing is that Dr. Berkowitz has some serious problems in his realization of the accident.
THE COURT: I'm sorry to hear that.
MR. GENIS: Objection.

THE COURT: Sustained -- I am not going to sustain anything. I just want to hear what his opinions are.

The first opinion, tell me again.

THE WITNESS: This accident was not preventable by the train operator.

THE COURT: You have an opinion that the accident was not preventable.

THE WITNESS: By train operator, yes.

THE COURT: By the train operator or by the Transit Authority?

THE WITNESS: Well, I'm only discussing the accident reconstruction. There's going to be another --

THE COURT: I just want to know your opinions.

THE WITNESS: My opinion is that the train operator could not have prevented this accident.

THE COURT: The train operator?

THE WITNESS: Yes.

THE COURT: You are talking about the train operator?

THE WITNESS: Yes.

THE COURT: And what's this second thing that you were asked to opine about?

THE WITNESS: Well, what I was really asked to opine about is Dr. Berkowitz's analysis and my opinion is that it's problematic, to say the least.

THE COURT: I don't know need an opinion on this or that.

Go ahead. Your witness.

Q Can you briefly tell me your educational background?

A Sure.

THE COURT: You are here to give your opinion about the facts and circumstances of this case not to give an opinion about what someone else testified about. Whatever you think you can tell us about the facts of this case, I'll listen to.

THE WITNESS: Got it.

THE COURT: But we are not here to say I don't agree with this witness, I don't agree with that witness.

THE WITNESS: I understand completely.

THE COURT: We are not here for that. We are here to get your opinions out and the facts of this case.

THE WITNESS: Okay.

THE COURT: Your witness.

Q Can you briefly describe your educational background?

A Sure. I graduated Stuyvesant High School.

THE COURT: That makes two of us.

THE WITNESS: Oh, yeah, very good.

THE COURT: You look familiar.

THE WITNESS: You were in a class below mine, you know.

THE COURT: I just graduated two years ago.
THE WITNESS: I hear you.
A From there I went to the Cooper Union School of Engineering where I got a bachelor of engineering in mechanical engineering.
From there I went to Stevens Institute of Technology and got a master of management science and operations research, which is the branch of applied mathematics to solve engineering and other problems.
And then I went to New York University School of Engineering and Science, which is now called Tandon School of Engineering.
THE COURT: I don't think anybody's questioning your qualifications to testify. So let's go forward.
You have an opinion about the fact that the train operator is not at all responsible, I guess, right?
THE WITNESS: That's correct. He could not have prevented it.
Q Let me ask you this, Doctor: You said you reviewed records in preparation for providing an opinion, right?
A That's correct.
Q Did you review transcripts?
A I did.
Q Did you review station plans?
A Yes.

Q Was that important to review station plans?
A The station plan gave me the south end of the station's survey marker.
Q And we will get to that.
A Okay.
Q Did you review signal plans?
A I did.
Q Okay. We heard testimony yesterday regarding what a signal was. I think you were in the courtroom for that?
A Yes, I was.
Q Okay. And was signal plans significant for your opinion?
A They were.
Q Did you review any emergency braking stopping distances charts?
A Yes.
Q And were they relevant to your analysis and opinion?
A Yes.
Q Did you review any emergency brake deceleration charts?
A Well, it's not a deceleration chart. It's a stopping distance chart.
Q Was that relevant for your --
A Yes.
Q Did you review any accident reports or incident reports?

A Many, yes.
Q Let's just go through a few.
MR. KEAVENEY: Can we put up Exhibit H which was admitted into evidence yesterday.
THE COURT: H?
MR. KEAVENEY: H.
THE COURT: Okay.
(Exhibit published.)
Q Did you view this document?
A I did. That's the train operator's G2.
MR. KEAVENEY: Let's go to Defendants' Exhibit I. I don't think this is in evidence yet.
MR. ROTH: Is this the one we had an objection to?
MR. KEAVENEY: There was no objection to I.
THE COURT: One second. Don't talk to each other.
You want to offer Defendants' Exhibit I?
MR. KEAVENEY: Yes, Your Honor.
THE COURT: One second, let me catch it.
MR. SHIELDS: We do have an objection, Your Honor.
THE COURT: Just one second.
I don't see any little star next to that one. This is the department's train incident report, I?
MR. KEAVENEY: I, yes.
THE COURT: There's no objection to it here. It's in evidence.

MR. GENIS: I thought we had an asterisk on that, Judge.

THE COURT: It's in evidence.

(Defendants' Exhibit I received in evidence.)

(Exhibit published.)

Q Did you review that document also?

A Yes.

MR. KEAVENEY: I am going to show a redacted Exhibit B. And maybe we can just show Counsel just to make sure that the redaction is correct.

THE COURT: This is E?

MR. KEAVENEY: B, as in boy.

THE COURT: There is an objection to that.

MR. SHIELDS: We do have an objection to that, Your Honor.

MR. KEAVENEY: And we are showing him a redacted version of that, just to Counsel for now, just to make sure that the redaction's correct.

MR. ROTH: We don't see a redaction.

THE COURT: Is there any objection it?

MR. ROTH: Is that what we gave you? We are using the same document --

THE COURT: Just one second. We are making a record here so your mumbles are not being recorded.

MR. ROTH: As redacted, we consent.

THE COURT: Okay. So that's great.

E, as redacted --

MR. KEAVENEY: B, as in boy.

THE COURT: Sorry. B, as redacted, is in evidence at this time.

(Defendants' Exhibit B received in evidence.)

MR. KEAVENEY: Can we show the witness now?

(Exhibit published.)

THE WITNESS: What's the question?

MR. KEAVENEY: Is the witness looking at it?

THE WITNESS: I am.

Q Did you look at that document also to prepare your opinion in this case?

A I did review it.

Q Does that give distances in that document?

A I don't know.

Q You don't know without looking through the whole thing?

A Right.

Q Did you review any deposition transcripts in this matter?

A Yes.

Q From who?

A From the train operator, from Ms. Da Silva, from Mr. Brown. And there were others.

Q Did you review a deposition transcript from a

Ms. Smith?
A Yes.
Q Did you review Mr. Jimenez's report?
A I did.
Q Did you review his testimony, his trial testimony?
A I did.
Q Let's start with Mr. Jimenez's report.
When did you go to the station?
A Oh, I think in 2020 or 2021.
MR. KEAVENEY: Can we put up Exhibit 74-H?
THE COURT: 74?
MR. KEAVENEY: And this is Plaintiff's Exhibit.
THE COURT: Plaintiff's Exhibit 74, I think, is in evidence, yes.
(Exhibit published.)
Q Do you recognize that?
A Yeah. That's the station. That's the northbound tracks of the -- the B train.
Q From your visit to the station and from that picture is a customer on a platform able to see the end or the entrance to the station --
MR. GENIS: Objection.
Q -- at that point?
MR. GENIS: Objection. Your Honor, he can't answer the state of mind of somebody else.

THE COURT: Objection overruled.
Can you answer that?
THE WITNESS: From this position, no.
THE COURT: Okay.
THE WITNESS: From the position of the photograph, no.
Q And why is that?
A Because the curvature of the tracks before the end of the station and the columns prevent a full view. That column is a rather extreme column. It's pushed out further than most of them, but nonetheless.
Q If someone is on the column side closer to the track, would they be able to see the entrance to the tunnel?
A Yes.
Q Or an entrance to the station, I should say. Okay.
A Well, it's both.
Q Okay. Did you review Dr. Berkowitz' report?
A I did.
Q Did you review his trial testimony?
A I did.
Q Do you agree with his opinion?
MR. GENIS: Objection.
THE COURT: Sustained.
Q Did --
THE COURT: You can offer an opinion that may be

different than his opinion.

THE WITNESS: Understood.

THE COURT: The jury will decide who it wants to believe. But I don't want to have criticism about everybody's reports. We can be here forever if we do that. Just testify about what you know and what your expert opinion is.

THE WITNESS: Yes, sir.

Q Based on Dr. Berkowitz's report and trial testimony, did he set forth any facts or assumptions regarding the length of the car train involved in this case?

MR. GENIS: Objection to the Berkowitz report not in evidence.

THE COURT: Sustained. Sustained. Sustained.

You can ask him whether he has an opinion about all those questions that was asked of Dr. Berkowitz, you ask him. He may say the same thing. He may say something different. It is for the jury to decide who it should be believe. That's what we do here, okay?

Q What is the length of the cars involved in this accident?

A They're 75 feet long.

Q Where did you get that information?

A Gee, I really always knew that. Not always, always, but I've known that for years.

Q Okay. It would come from somewhere, I imagine?
A It obviously comes from somewhere.
Q Okay.
A I may have, early in my career, measured them. They're in a --
THE COURT: We don't take any issue that they are 75 feet.
THE WITNESS: I agree.
THE COURT: Next question.
Q Do we know what the deceleration rate in full service for that subject car is?
A The nominal deceleration rate is -- for service braking is three miles per hour per second.
Q Did you use that number in your calculations and opinion?
A No.
Q Did you use a different number?
A I did for braking in an emergency.
Q What's that number?
A That's 3.2 miles per hour per second.
Q Did you review any information as to how long Ms. Harger was on the tracks prior to the train hitting her?
A Yes, I did.
Q And what was that, in a distance, in a time?
A Well, it varies according to who was testifying.

Q And you said you reviewed a transcript from a Ms. Smith?
A Yes.
Q And what was her testimony?

MR. GENIS: Objection. Not in evidence.

THE COURT: Sustained.

MR. KEAVENEY: Actually, it was testified by Dr. Berkowitz.

THE COURT: Sustained.

You can tell us what you read that, you know, you reviewed, you know, that, you know, you used as a basis for your opinion. You can say what you read, all right?

THE WITNESS: Okay.

THE COURT: If you want to do that, you can. You said you read transcripts here. You read police reports. Whatever else?

THE WITNESS: The Smith testimony was that 7 to 10 seconds elapsed between the fall and the train --

THE COURT: Why don't you tell us what you think.

MR. GENIS: Objection. Judge, it's not in evidence.

THE COURT: Let me try to be clear. I don't want to get involved in a contest, this person said this, I don't agree with that. Just testify what you know, what you know, right? Not what somebody else may have said that you agree

or disagree with. The jury will decide.

THE WITNESS: I understand that, but I wasn't there. I have to go by somebody's testimony.

THE COURT: You base your report upon information that you took from some other source?

THE WITNESS: Yes.

THE COURT: You can tell us what it is. Maybe it's not a valid source. I don't know. You can say you based it upon what the man in the moon told you. I have no idea. You can tell the jury you came to your opinion, right, and was it based upon something that somebody told you?

THE WITNESS: With respect to Ms. Smith, she estimated that the difference in time between when the plaintiff fell on the tracks and when she was run over was 7 to 10 seconds.

MR. GENIS: Objection.

THE COURT: Did you consider that in forming your opinion? Is that correct?

THE WITNESS: I used that as a reality check, yes.

MR. GENIS: Objection, move to strike.

THE COURT: What is your opinion? I am trying to get you oriented. I don't care what they said. I want to know what you said, what your opinion is. It may be based upon what the man in the moon told you.

THE WITNESS: No, it wasn't based upon what the man in the moon said.

THE COURT: Tell us what you know as an expert what happened here.

MR. KEAVENEY: Well, Your Honor, may I inquire because I think we can get to what --

THE COURT: I don't want to hear him talk about I looked at this, I don't agree, I disagree. I don't want to hear that. Just let me know what he says. The jury may hear two different versions and then you say you think they can believe what he said and not what somebody else said.

MR. KEAVENEY: I am trying to elicit where he got his information from that was part of his opinion.

THE COURT: That information may not be something that he should have considered.

MR. GENIS: Exactly.

THE COURT: You considered that, right?

THE WITNESS: I did.

THE COURT: Well, you can consider whatever anybody else said to you, right?

THE WITNESS: I guess, but --

THE COURT: You can consider my opinion, too, right?

THE WITNESS: Your opinion is very important, sir.

THE COURT: Right.

Okay, what other questions do you want to ask?
Q Did you review 911 calls or listen to them?
A I listened to the 911 calls, yes.
Q And you were in the courtroom yesterday and you heard one of the 911 calls?
A I heard two of them, actually.
Q Okay. Do you know the speed of the train as it entered the station?
A Yes.
Q And what was that?
A There's -- there's two issues. One of them is that there is a grade timer, which is sort of speed control, which limits you to 25 miles an hour. He would not have been going faster.
THE COURT: Do you know as an expert, are you able to tell the jury -- maybe yes or no -- what the speed of the train was as it entered into the station? That is a simple question.
THE WITNESS: There is -- there is testimony that it was between --
THE COURT: I don't care about testimony. I want to know what you know. You come to a conclusion as to what the speed of the train was that entered into the station; yes or no?
THE WITNESS: Yes.

THE COURT: What was your conclusion?
THE WITNESS: 20 to 24 miles an hour.
THE COURT: You can say what the basis of that conclusion was.
THE WITNESS: That was based upon testimony and the station general signal arrangement.
MR. GENIS: Objection.
THE COURT: And the what?
THE WITNESS: The general signal arrangement.
THE COURT: I don't know what that means.
THE WITNESS: It's the basic mapping of the signals and what that does is that gives you a maximum speed in that area.
THE COURT: Okay. So you can testify.
Objection overruled.
What else?
Q Did you determine the measurement from the entry to the station to where the train finally came to a rest?
A Yes.
Q And do you recall what that distance was?
A From memory, I think it was 265 feet.
THE COURT: You can use something to refresh your recollection.
THE WITNESS: I have it in my computer which --
THE COURT: Look, if you don't know, you can look

at any document to refresh your recollection to get the answer. Is it 275?

THE WITNESS: 265.

THE COURT: 265, okay.

Q Did you take or did you determine where Ms. Harger was on the platform prior to getting -- prior to falling off approximately?

A Yes, yes.

Q And can you tell me the distance for that?

A She was 86 feet in back of the front of the train. So it would be 265 feet minus 86 -- 85 or 86 feet.

Q Do you know what perception and reaction time is?

A Yes, I do.

Q What is perception and reaction time?

MR. GENIS: Objection, Your Honor.

THE COURT: Overruled.

A Perception-reaction time is the time it takes from a stimulus, which can be visual -- here, it's visual -- until an action happens. Once the action begins, perception-reaction time stops.

So for example, if you are traveling on a road and someone jumps out in front of your car, the instant that that person jumps out is the beginning of the perception-reaction time. And assuming your reaction is to put your brakes on, once your brakes are depressed,

perception-reaction time stops.

And it consists of basically four parts.

It's first, the stimulus, in this case, travels through your eye, through the optic nerve into your brain. And your brain crunches on it and what your brain -- to use a computer metaphor -- it's just a bitmap of nothing in particular -- and then they say somebody is running in front of my car. At the instant it becomes from just nothing to someone running in front of your car, then that's the first phase of perception-reaction time.

The second phase is you've got to decide what to do. You may do nothing. You may jam on the brakes. You may try and steer. You have to make a decision. And once you made that decision, that phase is over.

And then the next phase is that you -- in the case of someone running in front of your car, you would step on the gas -- not the gas. You want to step on the brake.

THE COURT: You don't want to step on the gas, do you?

THE WITNESS: Depends on who is running in front of your car, I suppose, but generally not.

THE COURT: I think you explained to the jurors what the perception and reaction time is.

Next question.

Q How does that apply to a train operator?

A Very, very similar.
Q How so?
A Well, the only difference is between a train operator, in the circumstance we're talking about, here, is that the train operator doesn't have a steering wheel, so the option of steering out of the way is not there. It simplifies the decision bit.
And the controls are different. The controls on a train, putting a train in an emergency is actually a little bit quicker than moving your foot from the accelerator to the brake because you don't have to move anything. Your hands have to be on those controls. It has to be on the dead man's control anyway. If you were to lift your hand off the dead man control, the train would go into emergency.
So perception-reaction time is ever so slightly quicker for a train operator than a car driver.
THE COURT: Next question.
Q Is perception-reaction time the same for everybody?
A Not only is it not the same for everybody, but it can be different from one single person from time to time.
Q So the same person facing the same event can have a different perception-reaction time?
A They will, within a range.
Q Did you determine a range of perception-reaction time regarding this incident?

MR. GENIS: Objection.
THE COURT: I don't have the answer.
Did you do that?
THE WITNESS: I did that based upon research, yes.
THE COURT: All right.
Q And what range did you determine was applicable to this incident?
MR. GENIS: Objection.
THE COURT: In this particular situation, can you tell the jury what you thought -- or what you concluded was the perception and reaction time?
THE WITNESS: Well, it's a range.
THE COURT: It's a range.
MR. GENIS: Your Honor, may we hear the basis of it?
THE WITNESS: Sure.
THE COURT: Objection sustained.
THE WITNESS: Sorry.
THE COURT: Listen to me. So they wanted to know what the perception and reaction time was in this case, right? In this case.
THE WITNESS: It would --
THE COURT: Just listen to me.
THE WITNESS: Yeah.
THE COURT: Were you able to make a determination

in this case, yes or no, as to what the perception and reaction time was in this case?

THE WITNESS: Yes. Within a range.

THE COURT: You say within a range. What do you mean by that?

THE WITNESS: Well, people's perception-reaction time vary. So you can't --

THE COURT: Every human being is different. Some have big hands, some have small hands. We understand that, right?

THE WITNESS: Exactly.

THE COURT: Okay. So when you say a range, what do you base that on?

THE WITNESS: I base it on -- on significant and extensive research on that topic. It's a very important topic.

THE COURT: All right. So what research are you talking about?

THE WITNESS: Well, the first thing I would go to is the AASHTO Green Book, which is a design guideline for engineers who are --

THE COURT: In any event, you can answer the question. You did research. Cross-examination can happen afterwards. Tell us what your conclusion was.

MR. GENIS: Judge, that's for highways. That's

what "AASHTO" stands for.
THE COURT: Objection overruled.
If you can answer what you believe the perception time was in this particular case, what the range was. Is that what you are able to testify about?
THE WITNESS: Yes.
THE COURT: You can give the answer.
THE WITNESS: Some people -- the range I used was a second to two-and-a-quarter seconds. The -- some people are faster than a second.
THE COURT: Right.
THE WITNESS: Some people, unimpaired normal people are slower than two-and-a-quarter seconds.
THE COURT: But you don't know in this case what the perception-reaction time is.
THE WITNESS: You can only characterize it within a range.
THE COURT: Next question.
Q What was the range?
A I used one second to two-and-a-quarter seconds, understanding that some train operators would be quicker than a second and some, a minority, again, would be slower than two-and-a-quarter seconds.
THE COURT: So we don't know in this case exactly what the perception and reaction time was for this

particular train operator, obviously?

THE WITNESS: At this particular time.

THE COURT: Right.

THE WITNESS: Yes.

THE COURT: Next question.

Q Did you look at any information to determine what the braking distance of that train would be at a certain speed?

A Yes.

Q And what did you look at?

A I looked at the emergency braking distance charts that were put out by the Transit, because they did research into this.

THE COURT: So there is a way of knowing what the braking speed is, I guess, right?

THE WITNESS: Braking distance.

THE COURT: Braking distance.

THE WITNESS: Yes, sir.

THE COURT: And you have a conclusion you reached as to what the braking distance was in this case?

THE WITNESS: Well, I used Transit Authority figures, yes.

THE COURT: Okay, but what was it? If you can tell us what it was.

THE WITNESS: Yeah, I think so. At 20 miles an hour, on level track, it would be 121 feet to stop.

THE COURT: Okay.

THE WITNESS: On -- at 24 miles an hour, again, on level track, it would be I think 167 feet.

And you have to -- understanding there's a slight downgrade there, you have to add a few feet for the additional braking distance, about 5 feet at 20 miles an hour, about 8 feet when you're going 24 miles an hour.

THE COURT: So you came to a conclusion as to what the braking distance was in this case?

THE WITNESS: Yes, sir.

THE COURT: And you can tell the jury again what that was.

THE WITNESS: It would be 121, plus 126 feet, call it 125 feet, at 20 miles an hour. And 175 feet at 24 miles an hour.

THE COURT: So the basis for that conclusion, you were about to tell us.

THE WITNESS: That was from the Transit Authority braking charts and a simple calculation to account for the grade.

THE COURT: Next question.

THE WITNESS: I should add to that, that doesn't include the perception-reaction time. That's just when the brakes are applied.

THE COURT: We know that. You explained the

perception-reaction time and now you explained this.

Any other questions?

Q Based on what we just talked about, what inputs did you use to determine the stopping distance for this car -- for this train?

A Do you mean including perception-reaction time?

Q Yes, what were your inputs to determine --

MR. GENIS: Objection.

THE COURT: You came to a conclusion as to how long it would take to stop this train, I guess, is what you're trying to say, right?

THE WITNESS: Yes.

THE COURT: Tell the jurors.

MR. GENIS: Objection, Your Honor.

THE COURT: Objection's overruled. I am not going to allow the objections -- they are going to be overruled. We're going to hear his testimony. He's here to tell you what in his expert opinion was the braking was and the time it took and you can cross-examine him all you want to.

MR. GENIS: Understood, Judge, but you have already ruled he can't give because he doesn't know in this case what it was.

THE COURT: In this case we're talking about.

MR. GENIS: Correct. Since he already testified he doesn't know what it was in this case, how can he use

that to basis his calculation?
THE COURT: Do you know or do you not know?
THE WITNESS: Within a range.
THE COURT: You can testify. You already explained.
THE WITNESS: Yes, I did.
THE COURT: Next question.
THE WITNESS: It would be like asking how tall is a person.
THE COURT: I get it.
Next question.
Q What I'm trying to get at, Dr. Berkowitz, is --
A I'm Dr. Marpet.
Q Marpet, excuse me.
What inputs did you use in reaching or in making your calculations?
THE COURT: I thought he already testified to that.
MR. KEAVENEY: I just want to have everything together so we know how he reached his conclusion.
THE COURT: Is there anything you want to add to what you've already said?
THE WITNESS: I would add that to get the total stopping distance, you have to take the perception-reaction travel and add to that the stopping distance.

THE COURT: You explained all of this.

Now, do you have a final conclusion as to whether you can answer the question how long it would take to stop this train?

THE WITNESS: Yes. Again, within a range, yes.

THE COURT: Tell us.

THE WITNESS: At 20 miles an hour, the stopping distance would be about -- about 150 feet, 125 feet plus the perception-reaction time, which is -- give me a second -- from memory, 30 feet. So it would be -- I'm sorry, 155 feet.

THE COURT: So we have an answer.

THE WITNESS: That's the lower end of the range.

THE COURT: The lower end, but we don't know in this case because we're talking about a range, right?

THE WITNESS: Yeah, I've got to give the upper section. The stopping distance was about 175 feet when you take the downgrade in. And it is, using the longer perception-reaction, we're looking for the upper end of that range, it would be two-and-a-quarter seconds times 35 feet per second, that's 24 miles an hour.

THE COURT: Do we have an answer?

THE WITNESS: We're going to have an answer in a second, as soon as I get it. It would be 167 feet plus 70 -- 85 feet, 250 feet, roughly. I think that's my

calculation.
Q Would it be helpful, Doctor, if you looked at your report?
A Absolutely.
THE COURT: Look, we're trying to get focused answers, you know. And what you are doing is that you are giving us your thought process. Maybe you can give the jury an answer.
THE WITNESS: If I had my computer --
THE COURT: Well, if you need something to refresh your recollection --
THE WITNESS: I do.
THE COURT: -- we will do that.
Q Do you have your report on your computer?
A I do.
THE COURT: If you want to take a moment to refresh your recollection, you can do that.
THE WITNESS: I don't have the computer. It was --
THE COURT: I can't help you.
MR. KEAVENEY: We have it over here, Your Honor. Can we give it to him, just so he can review his report?
THE COURT: It's up to you. If you want to show something. Otherwise, let's go forward.
MR. KEAVENEY: Yes, Your Honor.

THE COURT: But while he's doing that, in this particular case, we do not know, precisely, the entire distance because we have a range and you have all these variables, so we can't say exactly what happened in this case, I guess, or you tell me otherwise.

THE WITNESS: Well, I would disagree with you a little bit because when you characterize something within a range, it's characterized.

THE COURT: Okay. Look at this now to see if it will refresh your recollection. And if so, you can now answer the question.

THE WITNESS: What was the question again?

Q Doctor, did you make a calculation regarding the total distance, stopping distance, when the train was traveling at 20 miles an hour?

THE COURT: I think you already answered that question. Now you have the other question. Let's go back.

MR. KEAVENEY: I think the doctor just wanted to confirm his numbers.

THE COURT: Let's try to get some specific answers.

A At 20 miles an hour, the total stopping distance is 151 feet at 20 miles an hour -- well, actually 155 feet for the downhill. And at 24 miles an hour, it was 167 plus 80 -- about 250 feet, including the downhill.

THE COURT: All right. We have your answer.
Next question.
Q Is that a range including a one-second perception-reaction time and a two-and-a-quarter second perception-reaction time?
A Yes.
Q So a train going -- so we have a train -- we have two ranges, then. We're talking about a range in speed and a range in perception-reaction time?
A Yes.
THE COURT: We have been through this already. He already explained it. We spent a lot of time talking about perception and reaction time and then this other testimony.
Next question.
(Continued on the following page.)

DIRECT EXAMINATION
BY MR. KEAVENEY: (Continuing)
Q The range for those estimates is 153 to 246?
THE COURT: Whatever he just said. Go ahead.
Q Did you also determine how much -- how long it would take in terms of time to stop that train?
MR. GENIS: Objection.
THE COURT: Overruled. Were you able to come to a conclusion, an opinion, in your professional capacity, of how much time it would take to stop the train -- I don't know -- going 20 miles an hour?
THE WITNESS: Well, 20 and 24.
THE COURT: Did you make a calculation --
THE WITNESS: Yes, I did.
THE COURT: -- based upon how long it would take to stop the train going 20 miles an hour?
Tell the jury.
A If a train decelerated at 3.2 miles per hour per second, it would be -- once the brakes were applied, it would be about six and a quarter seconds. And then you have to add the perception reaction time.
To get the lower end of the range, you use the short perception and reaction time.
THE COURT: Look, look, look.
THE WITNESS: Yes.

THE COURT: I'm trying to ask you a simple question. And what you're doing in your answers is you're going through this whole mental process.

THE WITNESS: You don't want me to do that?

THE COURT: Well, you have explained that already.

THE WITNESS: All right.

THE COURT: We are trying to get an answer from you. Based upon everything that you have considered here, can you give an opinion, yes or no, about how much time to stop this train?

THE WITNESS: Yes. Seven and a half seconds at the lower range, nine and three-quarter seconds at the higher range.

THE COURT: That would depend upon how fast the train was going, I guess, right?

THE WITNESS: How fast and the perception, yes.

THE COURT: So you gave your opinion.

Next question.

Q Based on the total stopping distance and the location of where the train had come to a stop and the location to where Ms. Harger was, did you make a determination as to when the brakes were applied in terms of where in the station?

A Yes.

MR. GENIS: Objection.

THE COURT: Were you able to make that

determination?

THE WITNESS: Yes.

THE COURT: How were you able to do that?

THE WITNESS: Because you know where the train is stopped and you know the stopping distance, including the perception and reaction time.

THE COURT: You like that perception and reaction time. That's a big part of this case.

THE WITNESS: That's a part of the process.

THE COURT: Yes. So give your answer of what the conclusion was.

THE WITNESS: The train -- the front of the train was somewhere between just entering the station and I think a car and a half, I think.

THE COURT: What's the next question?

Q Based on your calculations for distance and your calculation for time, is it your opinion that the train could not have stopped on time?

THE COURT: Do you have an opinion as to that?

THE WITNESS: Yes, sir, I do.

Q What is your opinion?

A It could not have.

THE COURT: That's based on everything you told the jury right now in court, right?

THE WITNESS: Yes.

THE COURT: So we have your testimony.

Anything else?

MR. KEAVENEY: Thank you.

THE COURT: Mr. Genis, you apparently have some questions.

MR. GENIS: Lots.

THE COURT: That you can't wait to ask.

MR. GENIS: Correct. Let me just have a moment to get together all of my different things, Judge.

CROSS-EXAMINATION

BY MR. GENIS:

Q Good morning.

A Good morning.

Q We have never it met before today; right?

A I think you're right.

Q Let's see. Right off the bat, let's discuss a couple things: One, you have a CV, a curriculum vitae, a resume; correct?

A Yes. I have a couple of them, actually.

Q Well, there was one exchange in this very case. Are you aware --

A Yes.

Q -- of that?

A Yes, I am.

Q And at the very top of your CV it says what your

expertise is and what it is in; is that correct?
A That's correct.
Q Okay. And you list bicycle accidents, trips and falls, all kinds of things of that nature; correct?
A That's correct.
Q On that top, those couple of lines, does it say subway train accidents? Yes or no?
A I don't think so. No.
Q Does it say train accidents?
A I think it mentions the word train.
Q Really?
A I have to go a look.
Q Let's take a look.
THE COURT: Calm yourself a little bit, please. I don't want you to have a heart attack.
MR. GENIS: I won't.
THE COURT: Just ask him questions and try to keep your emotions down.
MR. GENIS: Okay.
Q So yes or no, does your resume say that you have an expert in trains?
A I don't -- I have to go back and look at the CV.
Q Okay.
A Do you want me to do that?
THE COURT: We don't want to spend a lot of time

here doing that.

MR. GENIS: Okay. Let's move on then.

Q You agree that Luisa's left arm and left leg were traumatically amputated by the train whose wheels ran over her; correct?

A Based on the records, yes.

Q And you agree that if the train operator stopped the train before the wheels reached her body she would not have the amputations; correct?

A Yes.

Q Do you agree the best or easiest accident to reconstruct is the one that never happened?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Well, in performing an accident reconstruction, do you have to be open-minded and look at all of the evidence to see where it leads you?

A I would hope so.

Q You're not supposed to have an opinion and look for facts to support it; true?

A That's correct.

Q You must consider all possibilities; correct?

A Well, consider it. Sure.

Q Okay. And in performing your accident reconstruction, did you consider what would have happened if there was a

barrier separating the platform from the track bed and the train?

MR. KEAVENEY: Objection.

THE COURT: Well, did that have any relevance to your expert opinion, whether there was a barrier or not?

THE WITNESS: No, I did not address that at all.

THE COURT: Go ahead.

Q Well, you're engineer and you do design; correct?

A No.

Q Did you ever say that you have done design?

A I certainly don't do design now.

Q I didn't ask you if you do design now.

Have you ever testified under oath that you do design, or I should say have done design?

A I have done design.

Q Thank you.

And as a mechanical engineer who has done design --

A Go ahead.

Q -- you would be able to do a reconstruction about if there was a barrier present; correct?

MR. KEAVENEY: Objection.

THE COURT: Look, look. He is not here to talk about whether there should be barriers or should not. Yes, that's in the case. We know that. But he is only testifying about the train operator, whether the train operator could

stop in time.

MR. GENIS: Okay.

THE COURT: And that's what we're going to limit his testimony to.

MR. GENIS: Got it. Okay.

Q Now, the Transit Authority is who hired you for this case; correct?

A Ultimately the Transit Authority's paying the bill. I don't think they are the one that hired me.

Q Well, you have a relationship with the Transit Authority; true?

A I do indeed.

Q And you have testified in numerous cases that your relationship with the Transit Authority began in 1994; true?

A Well, it's --

Q Yes or no?

A -- over 20 years.

Q Well, 1994 is more than 20 years, correct?

A That's what I said.

THE COURT: You have had a long time relationship with the Transit Authority is your testimony; correct?

THE WITNESS: I have had a longstanding relationship.

THE COURT: All right. Next question.

Q Do you agree that the Transit Authority is a big and

steady client of yours?
A Yes.
Q Okay. And do you agree you have been testifying for the Transit Authority since 1994?
A Well, for at least the last 20 years anyway.
Q Sir, I'm asking a nice simple question.
Have you ever said under oath that you have been testifying for the Transit Authority since 1994?
A Certainly, I'll take your word for it.
Q Okay. And in addition to testifying for defendants, you consult for them in cases that don't come to court; true?
A That's mostly the case, yes.
Q And you get paid for those consultations and case reviews?
A God willing, yes.
Q Okay. After 1994, you started getting more and more work from the Transit Authority; correct?
A Well, I supposed to so because if I started in 1994, I would have to get more work.
Q Okay. In fact, the Transit Authority was one of your best clients?
A Yes, at one time it was.
Q You have never testified against the Transit Authority; correct?
A That is correct.

Q And you'd like to keep that relationship going with the Transit Authority; correct?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Have you ever testified to that under oath, that you would like to keep that relationship going with the Transit Authority?

MR. KEAVENEY: Objection.

THE COURT: Just one second.

Go on to the next question. Obviously you made your point that he obviously has a relationship with the Transit Authority. All right.

MR. GENIS: Okay.

Q Well, have you made between 1 million and $2 million from the Transit Authority defending them in cases?

MR. KEAVENEY: Objection.

THE COURT: I will allow that.

THE WITNESS: I don't think so.

Q Okay. Have you ever testified to that?

A I don't think so.

Q Okay. Let me ask you, have you testified or done consulting work for the Transit Authority since the year 2014?

A Yes.

Q Okay. And how many times have you testified since 2014 for the Transit?

A I don't know.
Q Well, how much money have you made from the Transit since 2014?
A I don't know.
Q Well, have you done a lot of cases for the Transit since 2014?
A Well, at some point I was doing a lot of work for them. Now I'm doing some work for them.
Q So let's talk about in any given year, since 2014, how many cases would you review for them per year?
A Honestly, I can't give you a number.
Q Okay. You do tax returns and have returns for when you have a client; correct?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
Move on to another subject.
MR. GENIS: Sure.
Q Did you ever ask --
THE COURT: Listen to me. I get it.
Let's move on to another subject.
Q Were you ever asked this question under oath and give this answer under oath?
The case Searcy, S-E-A-R-C-Y, against Transit, Supreme Court, Kings County, July 24, 2014 --
THE COURT: You don't need all of that.

Q -- page 15, line --
THE COURT: You don't need all of that. Ask the question.
MR. GENIS: Okay.
Q Question, line 14, so, isn't it a fact that you have made between 1 million and $2 million doing work for and testifying for the Transit Authority with regard to the defense of personal injury cases in the 20 years you have been doing work for them? Is that true, sir?
MR. KEAVENEY: Objection.
THE COURT: Overruled.
Is there an answer?
Q Answer: As far as the million, perhaps. As far as the 2 million, I very much doubt it.
And then he says: Well, between 1 and 2 million perhaps. Okay.
THE COURT: You have read his testimony?
A And that hasn't changed. It's still perhaps.
Q Okay. And that's in 2014 --
A I understand.
Q -- 11 years ago, sir.
THE COURT: You've made a lot of money testifying, or providing services?
THE WITNESS: Well, actually, it's providing services, not testifying.

THE COURT: Providing services. You made a lot of money.

All right. Next question. Go on to something else.

Q And in fact, in 2014, they had sent at that point 100 cases to you to make that amount of money?

A I don't know.

Q Well, did you ever testify to that under oath?

THE COURT: We don't need it.

MR. GENIS: Okay.

THE COURT: See whether you can ask something substantive now, okay?

MR. GENIS: Okay.

Q You have testified dozens and dozens of times, 36 to 48 time for the Transit when somebody fell onto the tracks and somebody was hit by a train?

A I don't know.

Q Well, have you ever said to that under oath?

A I don't know.

Q Well, let's go to that same transcript, 2014. Let's see. At page 18. Page 18, line 25.

Question: I want to ask about the number of times you have testified in cases where somebody fell onto the tracks and was struck by a train that did not stop on time. How many times, sir?

Answer: I would expect a few dozen.

Question: So a few dozen.
A few dozen would be 24.
A few dozen would be between 36 and 48 times.
Answer: I don't have a count on that, but it's certainly possible, yes.
Question: Is it possible?
Answer: Yeah, it is probable.
Were you asked that questions and did you give those answers under oath?
A I don't recall. It is not unreasonable, but I don't recall.
Q Well, when you said that under oath was it true?
THE COURT: Just one second.
He read back your testimony. You've testified before at a deposition. He is just trying to ask you whether you did say that. That's all.
THE WITNESS: If it's in there, I said it.
THE COURT: If you think he read it to you incorrectly, you can say it.
THE WITNESS: I very much doubt it.
THE COURT: Next question.
MR. GENIS: Thank you.
Q And in this particular case, you did a review of materials, you told us, and you wrote a report; correct?
A Yes.

Q And just for the reviewer of materials and the report, how much did you charge?
A I actually brought that with me, so give me a second.
Q Sure.
Do you have your whole file with you or is it only on your computer?
A Yes and yes.
Q Can I please see your file while your look?
A Here.
Q May I approach?
THE COURT: Can you answer the question? Give us an idea.
You charged money obviously, right?
THE WITNESS: Yes.
THE COURT: Can you give us a ballpark figure? Do you recall what you charged, to the best you can recall?
THE WITNESS: Yeah. I charged at the beginning, which was in 1919, 1920 [sic], I was billing at $350 an hour. Today I'm billing at 425 an hour. I'm sorry. 410.
THE COURT: Let's talk about substantive things here.
You charged money for your services; correct?
THE WITNESS: Yes, sir.
THE COURT: Tell the jury altogether how much you charge for the services you are providing in this case, if you

can do that, for the Transit Authority?

THE WITNESS: I can look it up.

THE COURT: Can you give a ballpark figure? We don't want to spend an inordinate amount of time with these types of questions if possible.

THE WITNESS: I would -- I would estimate, without looking at the bills and including what I'm doing here today, I would say 20 hours, maybe a little more.

THE COURT: And what does that come out to?

THE WITNESS: Times 400 and -- well --

THE COURT: I'm asking you simple questions. I apologize if you don't understand the question.

THE WITNESS: No, I understand the question.

THE COURT: Give the jurors a ballpark figure of what you are charging here.

Let's move on to substantive things. Okay? Can you do that for us?

THE WITNESS: In very round numbers, $10,000.

THE COURT: All right. Very good.

Next question.

Q And, sir, the most frequent reason you're hired by the Transit is when somebody is run over by a train; correct?

A Yes.

Q And you have always testified on all of these cases for the Transit it was unavoidable; correct?

A If I testified it was unavoidable, yes.
Q Okay. And the Transit has never called you in to do an on-scene investigation right after the accident, correct, contemporaneous?
A That is correct.
Q Okay. And in your experience, people end up on the tracks for different kinds of reasons; true?
A I think that's correct, yes.
Q And, sir, you, in New York State, you have -- you testified almost exclusively for the defense and you still do more work for the defense; correct?
A In New York City basically.
Q Okay.
A Yes.
Q In fact, it was 90 percent for the defense; correct?
A Way back when, yes.
Q Okay. Skip all that.
Let's go to the reconstruction.
Do we agree if your measurements are not accurate the whole analysis falls apart?
A Well, to the extent that they are inaccurate, there could be a problem, yes.
Q Okay. And is engineering a precise science?
A Absolutely not.
Q Okay. Thank you.

A Engineer has to work with --
Q Sir --
A -- uncertainty.
Q -- sir, you said absolutely not. I'll accept that answer.
A Okay.
Q So let me ask you, engineers design buildings. They build subway stations, tracks, all kinds of things.
Are you telling me when they do all of this, they're not precise?
A That's why we have safety factors, yes.
Q Okay.
So being not precise -- in fact, you gave us ranges, anywhere between 155 feet to 250 feet. That's a pretty big range; true?
A It's what the data says.
Q I didn't ask you that.
It's a pretty big range?
THE COURT: It speaks for itself. The jury has heard it.
MR. GENIS: Okay.
Q In fact, you said you weren't sure if the train stopped as she entered the station -- withdrawn.
You didn't know if the train hit the brakes, the emergency, when she first entered the station or was one-and-a

half car lengths in; correct?
A That's what the data says, yes.
Q Okay. And that's 112.5 foot difference; correct?
A Go ahead.
Q Yes or no?
A I'll take your word for it.
Q Well, if the train is 75 feet, like you told us, one-and-a half car lengths would be 112.5 feet; correct?
A Okay.
Q All right. So did you factor in in your reconstruction -- withdrawn.
You were here yesterday and you heard Ms. Shabazz testify in court; correct?
A I did.
Q And you heard her say that from inside the tunnel, one car length away, 75 feet away from the entrance of the station, she could see the entire station completely?
Do you recall that?
A I don't recall those were her words, but I remember that testimony.
Q Okay. So did you factor in that additional 75 feet in your calculations?
A What additional 75 feet?
Q That she can see the entire station before even entering it while she is 75 feet away from the entrance of the station.

Did you use that in your calculation? Yes or no?
A I didn't use that because --
Q Thank you. I didn't ask you why, sir.
A Okay.
Q Thank you.
Now, sir, you also testified that used, for your perception reaction time, you mentioned AASHTO; correct?
A Yes.
Q And that's the American Association of State and Highway Transportation Officials; correct?
A That's correct.
Q And the Green Book is used for design of roadways and highways throughout the country; correct?
A That is correct.
Q And that's for motorist drivers, not subway trains; correct?
A And I adjusted for that.
Q Sir, I didn't ask you that.
It's for cars; correct?
A AASHTO numbers in AASHTO are for cars.
Q Thank you so much.
Now, here -- and by the way, when you said before if measures aren't accurate the whole analysis falls apart, would you agree it would be completely wrong and improper to speculate and give an opinion?

A I agree.
Q Okay. So when you talk about AASHTO, can we agree there's many differences between driving a vehicle and operating a train?
A Not with respect to perception and reaction time.
Q Well, let's talk about then.
A Okay.
Q When you are driving a car and you're approaching an intersection, somebody could hit you from the left, somebody could hit you from the right, somebody could hit you from behind, and you have to look in front as well; correct?
A That is correct.
Q Okay. A kid could dart out from the sidewalk, a dog could run out, a ball could come out; correct?
A Among other things, yeah.
Q Okay.
And as a driver, you have to make a decision, do you swerve left, do you swerve right, do you hit your horn; right? Do you accelerate. Do you hit the brakes.
Those are all decisions you have to make; correct?
A Yes, but --
Q Okay.
And when you're a car, one of the factors you might have is if you stop short somebody hits you from behind; correct?

A That is correct.
Q Okay. With a train, you can't steer left and you can't steer right; correct?
A That's correct.
Q Because of the signals, you don't have to worry about getting hit from behind; correct?
A We would hope, yeah.
Q And you heard Ms. Shabazz testify yesterday that they're trained to look and watch and see if there's anybody on the tracks or on the platform next to the tracks; true or false?
A I'm sure --
THE COURT: You have to look to be careful, right?
THE WITNESS: Yeah. I mean, I don't remember the testimony.
THE COURT: Well --
THE WITNESS: But it's obviously true.
THE COURT: When I start talking, you have to stop talking.
Next question. All right.
Q And you heard her testimony that she said she immediately did the brakes?
THE COURT: Sustained.
We're not talking about what he recalls her testimony to be. Save it for summation.
MR. GENIS: Sure.

THE COURT: Next question. Go on to substantive things.

MR. GENIS: I am, Your Honor.

Q So your analysis has to be fact based; correct?

THE COURT: Your analysis has to be fact-based; right?

THE WITNESS: Yes.

Q So fact is how quickly the driver here, the operator reacted, perceived and reacted; true or false?

A That's true.

THE COURT: True.

Next question.

MR. GENIS: Okay.

Q You did not use her actual reaction time. You used a range of averages for motor vehicle drivers from AASHTO; true or false?

A False.

Q Okay. Sir, there are publications out there in your field that discuss perception and reaction time of train operators; true or false?

A Not really.

Q Not really. Let's see if I could help you with that.

All right. Are you familiar with the journal article of *Investigation of Train Driver Visual Strategies* from Rail Safety and Standards Board?

A No.
Q Okay. Are you familiar with *Evaluating Train Drivers' Performance to Inform the Development of Automatic Train Operations* from *Applied Ergonomics*, that journal?
A Is that the one that Dr. Berkowitz used?
Q No.
A What's the question?
THE COURT: One at a time. The question was was that the one that Dr. Berkowitz used, that was the question. And your answer is what? Do you know that?
THE WITNESS: I asked him.
THE COURT: Are you familiar with that journal? That's the question.
A *Applied Ergonomics* was the journal?
Q Yes.
A I've probably seen it.
Q Okay. And did you ever read *Evaluating Train Drivers' Performance to Inform the Development of Automatic Train Operation*, yes or no?
A No.
Q Okay. Did you ever look at the article from AHFE *When Something is in the Way, Parameters of Perception and Reaction Speed in Train Drivers*?
A No.
Q Did you ever read -- same article again. Sorry.

Did you ever read in *Scientific Reports Open Eye* -- I'm sorry -- *Eye Movement Predictor of Hazard Response Performance in Train Drivers Under Different Speed Conditions*?
A No.
Q Did you ever read *Beyond Object Identification, How Train Drivers Evaluate the Risk of Collision*?
A No.
Q Did you ever review *Train Driver Visual Performance: A Parametric Survival Mode of Reaction Time*?
A No.
Q Did you ever read *An Investigation of Train Driver Visual Strategies*?
A No.
THE COURT: All right. Look, look, look, I think you have asked enough questions about what he read. Do you have anything specifically you want to ask of him?
MR. GENIS: Yes.
THE COURT: Do it now.
Q Well, did you look at the U.S. Department of Transportation Federal Railroad Administration on *External Perception For Locomotives: Systems and Algorithm Development*?
Did you look at that?
A No.
Q I have a list more, but the judge wants me to move on.

THE COURT: You have asked him a bunch of questions. Why don't you ask him a substantive question.

Go ahead.

Q So, in your report which you did for this case, the only citation you have for perception reaction time is that AASHTO publication; true or false?

A That is correct.

Q Okay. By the way, what year was that publication that you used?

A The AASHTO started using the numbers I used in the mid '80s and they kept those numbers up until today.

Q Okay. Did you bring the AASHTO Green Book with you, sir?

A No.

Q So we have no way of independently verifying?

THE COURT: Save that. All right. He didn't bring the book with him.

MR. GENIS: Okay.

Q Sir, you did your analysis and -- withdrawn.

The T.A. did an investigation, took measurements and took pictures; correct?

A That's correct.

Q And you reviewed that; correct?

A I did.

Q And when you reviewed it, did you actually say that they were incorrect in what they did?

A One of them was incorrect, yeah.
Q Okay.
A One of the measurements.
Q In fact, one of them, you said, according to TSS Zabaleta, on page 4 of your report, that the train stopped four-and-a-half car lengths in, or 337.5 feet, but other people said other things and, in fact, the car equipment department train trouble control report says something completely different?
MR. KEAVENEY: Objection.
Q True?
THE COURT: I heard a speech not a question.
MR. GENIS: Sorry.
Q Okay. You saw different contradictory reports from the Transit about their own measurements for where this occurred; true or false?
A I wouldn't put it that way.
Q Well, didn't you say that there was a mistake?
THE COURT: One second. You can explain to the jury how you would put it.
THE WITNESS: What I used was a survey marker, which is a hard point. They are stenciled on to the wall. And -- so I thought that was good.
Now, when people go -- how many trains were in the station, they glance and, you know, some people say four cars,

some people say three-and-a-half cars, you know. I didn't use that. I used the survey markers.
Q Let's back up a little.
You're saying that when somebody gets run over by a train and has amputations that they don't just kind of casually look at it, they don't really count how many cars there were, where things are, what happened? Is that what you're telling us?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
Q So you're saying -- you have reviewed dozens and dozens of these train cases?
A Yes, sir.
Q Is the Transit Authority usually wrong in their measurements?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
Q Well, have you seen this before, where you noted in your report that they're clearly incorrect in what they were saying?
MR. KEAVENEY: Objection.
THE COURT: The question is did you say anything in your report where there was something that was incorrect about the Transit Authority?
A Yeah. There was a reference to a survey marker that they

couldn't see.

THE COURT: All right.

Q When you say they couldn't see, were you there at the time?

A I didn't have to be there. The train was --

Q Sir, were you there at the time?

A You know I wasn't there at the time.

Q Were Transit people there at the time?

A I would assume so.

Q Okay. So you're saying the Transit people who were there at the time making measurements and looking had the wrong marker for where this occurred? Is that what you're telling us?

THE COURT: Cool it.

Do you understand the question?

THE WITNESS: I understand the question, but it's a little more complicated than that.

THE COURT: It may be complicated. He wants to find out whether or not the Transit Authority -- do you have any knowledge that they ever made a mistake about their markers? That's what he's asking you.

THE WITNESS: I don't know that they know.

THE COURT: Pardon?

THE WITNESS: I don't know whether they know.

THE COURT: You don't know what the what?

THE WITNESS: I don't know whether the Transit Authority knows.

THE COURT: I guess we want to find out whether there are any reports that they made or that you looked at that you found out they were incorrect. I guess that's the general question.

THE WITNESS: The general question, yes. For example, the number of cars in the station, different people will always give different estimates.

THE COURT: There is always different estimates.

Next question.

Q Okay. Is there a difference between an estimate and counting cars?

Is there a difference?

A I don't think they count cars they look and say it looks like about three cars.

Q When you say --I'm sorry. Let me slow down.

When you say you don't think, can we agree that there's a difference between making a factual statement and your surmisals?

A I think so.

Q Okay. So, factually, do you know in this case if anybody counted cars?

A I wasn't there.

Q Okay.

THE COURT: The answer is you don't know, you weren't there, right?

THE WITNESS: Yes, sir.

THE COURT: All right.

Q Now, you use a stopping distance chart; correct?

A That's correct.

Q Now, one of the things -- I'm really bad with math, and I want to understand what you were saying.

You were saying that if it's regular service brake it stops at three feet a second; right?

A Three miles per hour per second.

Q And if it's an emergency, it stops at 3.2?

A That's an average stop, but, yes.

Q Okay. Now, let's back up even a little further.

The stopping distance that you looked at, it comes from certain manuals and Memorandum of Understanding; correct?

A That is correct.

Q Okay. And do you agree that there are specifications for the different trainings?

A I'm sure there are, yes.

Q And there are specifications for the brakes by the Transit Authority?

A I'm sure that's true.

Q And the manufacturers of the train, they have to comply with the specifications of the Transit Authority for stopping

and brakes; correct?
A I believe so, yes.
Q Okay. And the chart --
A I'm not a party to any of that, but --
Q Okay.
A -- go ahead.
Q And the chart that you looked at, that was from the 1970s; correct?
A The MOU I think was from 1970s, but they have updated it to include --
Q Sir, sir, can I ask yes-or-no questions?
A Yes.
Q You have testified --
THE COURT: The question is the chart that you looked at, what year was it? It's a simple question.
THE WITNESS: I don't know the year it was originally published, but it has been constantly updated.
Q Would you be surprised to learn that it is still -- from 1975, it has not been updated?
A If you look at the --
Q Sir, can you answer my question, please?
A I think that's incorrect.
Q Okay. Now, by the way, when the stopping distance charts were done, they were used for specific trains; correct?
A I don't know what you mean.

MR. GENIS: May I approach the witness with a document?

THE COURT: No, no.

MR. GENIS: For impeachment purposes.

THE COURT: He's trying find out whether these stop distances were uniform for all trains or different trains had different stopping distances, I guess.

THE WITNESS: This is the MOU.

THE COURT: Can you answer that?

Q Take a look. Do you see what trains that stopping distance is for?

The model numbers are right on the cover.

THE COURT: Just one second. We can do without your comments.

The question is are there different stopping distances for different trains, asked and answered.

Tell me the answer to that it.

THE WITNESS: This particular MOU --

THE COURT: I'm not asking you what that says. I'm asking you are there differences for different trains?

THE WITNESS: The Transit Authority says no.

THE COURT: It's a general question.

MR. GENIS: That's not my question.

THE COURT: You have to answer my question.

Are there different stopping distance for different

trains, yes or no?

THE WITNESS: Again, the Transit Authority says no.

THE COURT: Now, what's your question?

MR. GENIS: I'm not asking the Transit Authority. I'm asking him, that the stopping distance charts that you look at for the Transit -- this is a Transit Authority document and it says --

THE COURT: Don't say what it is. One second.

MR. GENIS: I offer it into evidence.

THE COURT: Just one second.

What document are you looking for? I have no idea what you're looking at.

MR. GENIS: Certainly. This is for impeachment purposes.

THE COURT: Just one second. Do you have a document? Do you want that in evidence?

MR. GENIS: Yes.

THE COURT: Is there any objection to that?

MR. KEAVENEY: I haven't seen the document.

THE COURT: Show him the document.

We try to do this in an orderly trial and keep the emotions down in an orderly way. We are keeping the jurors here a little bit late now. We want to give them a chance to have lunch soon.

You can look at that. Maybe you have no objection

to it being in evidence so we can go forward. Maybe you do.

MR. KEAVENEY: Your Honor, I'm going to object. I don't know if that document is complete.

THE COURT: It's not in evidence.

Go ahead. What's your question?

Q Okay. Well, sir, since you know -- do you know if there is a difference between R38 or R42 and R44 car as opposed to an R68A or just R68?

THE COURT: Do you know? Can you answer that question?

A There are, of course, differences, but that's -- I just want to say that's not --

Q Thank you.

THE COURT: The question is -- we will do this one step at a time.

THE WITNESS: Okay.

THE COURT: Are there differences? Yes? Right?

THE WITNESS: Absolutely.

Q In fact, they stopped making the R38, the R42, and the R44 cars in 1986; correct?

A I don't know the date. They haven't been around for a long time.

Q Okay. And those were 60-foot trains, not 75-foot cars; correct?

A I thought the R44 was a 75-footer.

Q Well, have you ever testified under oath that it was a 60-foot train?
A I don't recall.
THE COURT: We are talking about this train, okay. Next question.
Q Okay. So there would be -- and specifications for braking have improved over the years; correct?
A Well --
Q Yes or no?
THE COURT: Listen to me, because we have to move along. He is trying to find out whether there are specifications for braking for this particular train that we are talking about in this case. Yes or no?
THE WITNESS: I'm not sure how to answer that because I didn't use that document.
THE COURT: Okay. I'm just asking if you know whether there are specifications for braking for this particular train? Maybe you say yes. Maybe you say no. Maybe you say I don't know. But can you answer my question?
THE WITNESS: Well, yes.
THE COURT: Next question.
Q So, do you have, sir, with you the stopping distance chart for an R68A train?
A Yes.
Q Can I see it, please?

A Come on up.
Q Can you hand it to me?
A Here.
And that's not what you used.
THE COURT: Just one second.
Do you have information that tells the jury what the stopping distance is for this particular train?
THE WITNESS: Yes.
Q Where does it say R68 --
THE COURT: Just one second. Just one second. I'm asking the questions now to make it clear to the jury what we are trying to talk about.
Are there any stopping distances that you have here for this particular train, yes or no?
THE WITNESS: This particular class of train, yes.
THE COURT: What is the stopping distances, do you know that?
THE WITNESS: Excuse me?
THE COURT: Can you answer the question?
THE WITNESS: It's the chart I used.
THE COURT: Tell us what it is again.
Q Can you show us where on this chart it says R68A?
THE COURT: Mr. Genis, don't do that.
Let's hear the answer again.
You said you used the chart to determine what the

stopping distance would be for this particular train?
THE WITNESS: This particular class of train.
THE COURT: This class of train.
THE WITNESS: R68.
THE COURT: Yes. R68?
THE WITNESS: Yes.
THE COURT: What was it? You testified before what it was; right?
THE WITNESS: Yes.
THE COURT: You can tell us again.
THE WITNESS: You mean the numbers?
I'm not sure I understand.
THE COURT: Do you know what stopping distance means?
THE WITNESS: Absolutely.
THE COURT: You told us this before.
THE WITNESS: I'm not sure what you're asking me.
THE COURT: What is the stopping distance for this class of trains? Do you know that, yes or no?
THE WITNESS: Yes, it's a function of speed.
What am I missing here?
THE COURT: You're missing the answer. What is the stopping distance for this class of trains?
Can you answer that question, yes or no?
THE WITNESS: Yes. It varies by miles per hour. It

varies by speed.

THE COURT: So you testified about the different speeds with respect to --

THE WITNESS: Yes, sir.

THE COURT: All right. And you got that stopping distance from a particular chart?

THE WITNESS: This chart right here.

THE COURT: What chart are you talking about?

THE WITNESS: It is drawing number 130-9002.

THE COURT: That chart is not in evidence, I don't believe, right? But if you want to ask him anything about that, go ahead.

MR. GENIS: Sure. With your permission, can I ask defense counsel if they believe that's in evidence or not?

MR. KEAVENEY: No, it's not but it is --

THE COURT: One second. Do you want that chart in evidence, yes or no?

MR. GENIS: No. And I'm moving to strike his testimony based on something not in evidence.

THE COURT: Overruled.

We are going to take a lunch break soon. I think we are getting a little beyond ourselves.

MR. GENIS: I actually have quite a few, Judge. But if you want to break for lunch, I'm fine with that.

THE COURT: Give me an idea of how much more you

have.

MR. GENIS: 20 minutes to half an hour.

THE COURT: Let's see whether we can finish the cross before we take the lunch break.

MR. GENIS: Sure.

THE COURT: That would be a good thing to do. Go on to something else.

MR. GENIS: Surely.

BY MR. GENIS:

Q Sir, you testified based on what you read from a deposition of Gabriella Smith; correct?

A Among other things, yes.

THE COURT: Did you rely on her testimony at all in respect to any of the answers you have given the jury?

THE WITNESS: I relied on the seven- to ten-second interval that she mentioned in her testimony.

THE COURT: You relied o that in forming your own conclusions?

THE WITNESS: Actually, the way I used that is as a reality check to see whether my numbers made sense in terms of her numbers.

THE COURT: You used that as a check against your numbers?

THE WITNESS: Yes.

THE COURT: You already testified about your

numbers.

THE WITNESS: Yes.

THE COURT: Next question.

Q Did you rely on part of her testimony where she said that she could see the -- I ride the trains all the time. When I look, I could see the lights, those two lights, headlights, like way before you get to the station?

THE COURT: The objection is sustained.

We're not going to do that. Objection sustained.

He has testified to what he relied upon. He said he used that as a check.

Next question.

Q Well, did you read the part of her testimony --

THE COURT: Next question.

Q -- where she said --

THE COURT: We are not going to do that.

MR. GENIS: Judge, he said something that --

THE COURT: Next question.

MR. GENIS: Contradicts it, Judge.

MS. WINTERS: Objection, Your Honor.

MR. GENIS: -- if it's not in evidence.

THE COURT: Next question.

BY MR. GENIS:

Q Okay. Sir, did you read any portion of her transcript that contradicts what you told this jury today?

A I don't think so, no.
Q So if she testified that it was seven to ten seconds before the train entered the station, would that be flatly different than what you told this jury?
MR. KEAVENEY: Objection.
THE COURT: Look, look. Let me try to do this once more. He gave his testimony. She gave her testimony. You're going to have a chance to sum up. You can make all of these comments you want in summation.
MR. GENIS: Not if it's not in evidence, Judge.
THE COURT: We just want his testimony. We got her testimony.
MR. GENIS: And if the basis --
THE COURT: If they are different than each other, the jury will decide. That's their factfinding responsibility, which they find more credible and which is more believable. That's what jurors do.
MR. GENIS: Exactly.
THE COURT: I don't want to get involved in a he said/she said dynamic. I'm just trying to make that clear to you.
MR. GENIS: Understood, Judge.
THE COURT: Do you have another question?
MR. GENIS: Yes. But as you just noted, Judge, the jury has to assess the evidence. That's why I am trying to

put into evidence her contrary sworn statement that he ignored.

THE COURT: Sustained. Sustained.

Q Do you agree if you ignored sworn testimony --

MS. WINTERS: Your Honor --

THE COURT: Sustained.

Q -- from the witnesses --

THE COURT: Sustained.

You're not getting it. Just get his testimony. What he relied upon, I'm allowing that, okay?

You can then comment as you choose during your summation.

Next question.

Q According to your own emergency braking distance chart, at 18 miles an hour, can we agree that it stops at 101 feet?

A I have to look it up.

Q Go ahead.

A It sounds right.

THE COURT: He said it sounds right.

THE WITNESS: Give me a second.

A 101, right.

Q Okay. And by the way, if it takes one second to react at 18 miles an hour, the train stops at 127 feet; correct?

A That would be 27 feet per second. That would be 128 feet.

Q And if the train is going 18 miles per hour and it takes two seconds to react, it stops at 154 feet; correct?
A Yes.
Q And you heard Ms. Shabazz testify yesterday that she was not 180 feet away from Ms. Luisa?
THE COURT: So save that for summation. Save that for summation. Next question.
Q Well, your calculations in your report are based on that 180 feet difference; correct?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
A I don't understand the question anyway.
THE COURT: You don't seem to get it, Mr. Genis. I'm not going to get involved here with questioning whether he agrees or disagrees with all of that.
MR. GENIS: I'm allowed to impeach his opinions and the basis of his opinions, Your Honor.
THE COURT: Next question. You can appeal if you want.
MR. GENIS: I'd rather not.
Your Honor, I would --
THE COURT: Listen to me. I'm letting you ask questions on what he based his opinion on.
MR. GENIS: I understand.
THE COURT: That's perfectly okay. All right? And

then you can say whatever you want about the fact that maybe that was not correct, maybe you should believe the other person. That's what a jury is here for.

MR. GENIS: And that's exactly what I was trying to do, Your Honor.

THE COURT: Ask him if he based his opinion on that, fine. You get the answer.

Q So did you base your opinion on testimony from Gabriella Smith that said --

THE COURT: Did you base your opinion on her testimony?

I think you testified about this before. Yes or no? Or did you make your own calculations?

THE WITNESS: I used the seven- to ten-second estimate that she gave.

THE COURT: So you did base --

THE WITNESS: As a reality check on my calculations.

THE COURT: That's what he did, okay.

MR. GENIS: Okay.

BY MR. GENIS:

Q So if the seven to ten seconds was before the train entered the station, does that change your calculations?

A It would.

Q Okay. Tell us right now, if the train -- if Ms. Harger is on the tracks for seven to ten seconds before the train

enters the station, tell us what your calculations say now.
A I didn't do those calculations.
Q Do it right now?
A No, I'm not.
MR. KEAVENEY: Objection.
THE COURT: Overruled.
Can you make that calculation?
THE WITNESS: Not under this pressure.
THE COURT: Do you need some time to do that?
THE WITNESS: If we define the problem, I can do the calculations.
THE COURT: I just want to know whether you can make that calculation and give that answer. You're the engineer. Can you do that, yes or no?
THE WITNESS: I can.
THE COURT: Would it take some time to do that?
THE WITNESS: I would need some time.
THE COURT: How much time do you need to do that?
THE WITNESS: 15 minutes.
THE COURT: 15, 20 minutes?
THE WITNESS: Yes.
THE COURT: So we'll take an earlier lunch break and he'll make the calculation during the lunch break and give the jury the answer when we return.
Let's come back at 1:15.

MR. KEAVENEY: Your Honor, can we define the calculation that he is supposed to be doing at lunch?

I'm not exactly sure what --

THE WITNESS: I'm certainly not sure.

THE COURT: Just to be very specific, a very good question.

Look, members of the jury, obviously we are talking about an important part of the case.

Tell the witness what calculation --

MR. GENIS: Sure.

THE COURT: -- you want him to make it precisely.

MR. GENIS: Okay.

THE COURT: And then he will give his answer when he makes that calculation and then we will proceed.

MR. GENIS: Sure.

THE COURT: Very clear.

MR. GENIS: Thank you.

THE COURT: Listen to what he wants you to calculate.

THE WITNESS: Okay.

Q And since we're doing it, there are two different calculations, one at a time.

First, if Luisa is on the tracks for seven to ten seconds before the train enters the station, what's the stopping distance for that driver now?

And two, second calculation, if the driver is 75 feet out from the entrance to the tunnel and sees Luisa, what is the stopping distance?

A What do you mean by out?

Q Before the entrance.

A Before, okay.

THE COURT: Before the driver comes into the station; correct?

MR. GENIS: Yes.

THE COURT: Okay. Do you understand what we're trying to ascertain from you?

THE WITNESS: I hope so.

THE COURT: So then let's get back here at 1:15. Make the calculations. Take your time doing it and we are moving forward after that.

Don't talk about the case, members of the jury.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: You can step down.

THE WITNESS: Thank you.

THE COURT: Don't talk to the lawyers or anybody, Mr. Witness. Don't talk to anybody about your testimony or anything else while you are at liberty, okay?

THE WITNESS: Sure.

(Witness steps down.)

THE COURT: So obviously we are at a point where there is going to be a lot of argument back and forth. We get it. And obviously it is an important part of this case because we are dealing with the liability of the train operator. It's an important issue. We get it. But we have to still try to do the best we can in an orderly way so we have a correct record.

I'm not stopping you from asking him, as I said before, what the basis for his opinion is. And you have gone a long way, but what I am trying not to have happen is a he said/she said thing, I agree, disagree.

I think we have struck a proper balance here, which is what I am trying to do, otherwise, as appropriate in this case, it will become a runaway train.

See you at 1:15.

MR. GENIS: Thank you. If there is cherry picking by the witness, I'm allowed to explore that, Judge.

THE COURT: Well, you know, I have to try to get a clear record here and I'm trying to do the best I can to give you a fair trial.

See you at 1:15.

MR. GENIS: You got it.

MR. SHIELDS: Judge, just one note, with a 180-foot calculation --

THE COURT: Look, do you think the jury really understands all of this?

You're going to have summation. You're going to tell them what they think they should do. Okay? I will allow that to happen in summation.

Right now I'm having a hard time following all of these numbers. I'm sure the jury does as well.

Let's just get the facts out the best we can.

Save it for summation.

See you at 1:15.

(Lunch recess.)

AFTERNOON SESSION

THE COURT: Let's bring the jurors in.

Are you ready to tell you what your calculations are?

MR. GENIS: Yes, Your Honor. And I've trimmed down my questions.

THE COURT: We're going to ask for your calculations and move it along.

MR. GENIS: I've trimmed down, like, 20 pages of questions.

THE COURT: We want to try to complete the testimony today.

MR. GENIS: Understood. I'm going to try my best.

(Jury enters.)

BY MR. GENIS: (Continuing.)

THE COURT: All right. Have you made your calculations and can you give us your answers now? Just short and to the point.

THE WITNESS: Assuming, correct me if I'm wrong, seven to ten seconds before the train --

BY MR. GENIS:

Q That's not the question. The question is if she sees Shabazz the operator, 75 feet before entering the station sees Luisa on the track, what is the stopping distance?

A The stopping distance would be the same.

Q Just answer that question, please.

THE COURT: Madam reporter, I want you to read the question before lunch.

(Discussion off the record.)

THE COURT: What other questions do you want?

I thought it was simple. Did you understand the questions I wanted you to answer.

THE WITNESS: Yes, Your Honor.

I understand the question to be if the testimony was that the accident happened seven to ten seconds before the train enters the station.

MR. GENIS: I can work with that.

BY MR. GENIS:

Q She's on the track seven to ten seconds before the train enters the station?

A That was the question I thought you asked.

Q Not a problem. So if Luisa is on the track seven to ten seconds before the train enters the station and the operator can see Luisa when the operator is 75 -- 75 feet before getting to the entrance, what's stopping distance?

A The stopping distance would be the same.

Q So what is it?

A Speed. I gave it to you already. I think that --

THE COURT: What was the calculation you made at lunchtime?

THE WITNESS: What was the -- what was the visibility from seven to ten seconds back.

THE COURT: I do not think that was the question that I asked.

BY MR. GENIS:

Q Let me ask you this --

A Sure.

Q -- where was Luisa --

THE COURT: Do you have anything else to ask in the meantime?

MR. GENIS: Yes.

BY MR. GENIS:

Q -- from the mouth of the station?

A Yes.

Q What was the distance to Luisa?

A 180 feet.

Q Okay. And how do you know that?

THE COURT: He testified to that already.

MR. GENIS: No, he said something else before, Your Honor. That's what I'm trying to figure out.

THE COURT: Objection sustained.

He answered what now? If he said something different before, he'll tell us all about it.

MR. GENIS: Objection. This cross is on what he said on direct. I should be allowed to cross him on it.

THE COURT: No. Next question.

BY MR. GENIS:

Q What's the stopping distance for the train, again, 75 feet before the train what's the stopping distance?

A Let me say it again; the stopping distance is solely a function --

Q Can you just answer my question, sir?

THE COURT: I asked you precise questions before we broke for lunch. Do you remember what I asked you to calculate? You were going to make calculations.

THE WITNESS: I made the calculations assuming that the testimony was that it was seven to ten seconds before the tunnel.

THE COURT: What was your calculation?

THE WITNESS: That it would be 210 and 350 feet back.

THE COURT: 210 to 350 feet. That was your calculation.

Anything else?

BY MR. GENIS:

Q And that distance of 210 to do 350 is before striking Luisa?

A If you want to add the distance to Luisa you would add the 180 feet.

THE COURT: You have 180 feet from that, right?

THE WITNESS: Yes.

THE COURT: Next question.

BY MR. GENIS:

Q So you're telling us the train cannot -- I don't understand this. So, if the train sees Luisa and it's 75 feet before the entrance to the station, the stopping distance you're saying is over 210 to 350 feet; is that what you're telling us?

A Let me try this again. The stopping is solely a function of the train speed and the perception reaction.

Q Just taking --

THE COURT: We've gone through this enough. All right?

Your testimony is that she couldn't stop in time, right, based on all of these things you told us, right?

THE WITNESS: From before, yes.

THE COURT: Whether it's 80 feet, 100 feet, 200 feet, 300 feet, you gave us your testimony; correct?

THE WITNESS: Yes.

THE COURT: What else do you want to ask him?

BY MR. GENIS:

Q Well, when you use your perception reaction time as you insist, do you agree that you cited in your report when you relied the AASHTO that it's three-quarters of a second reaction time according to AASHTO?

THE COURT: I think we had this testimony.

A I don't agree.

THE COURT: What is happening here is I'm confused. The jury is going to be confused. We've done the best we can. We're going back and forth. We can't do better than what we've done. I will get the last questions that I wanted him to answer momentarily and then we'll move on to something else. Please do that now.

MR. GENIS: I'm trying my best, Your Honor.

THE COURT: Ultimately you can talk in summations whatever you want 350, 200, whatever you want to do. In summations you can talk about. It all right?

MR. GENIS: All time trying to do is --

THE COURT: Next question. And all I'm trying to do is move this trial along. Do it.

BY MR. GENIS:

Q Do you need your memory refreshed as to whether or not you noted a median PRT value of three-quarters of a second?

THE COURT: Next question.

A That's wrong by the way.

THE COURT: Don't answer when I'm talking.

THE WITNESS: Sorry.

BY MR. GENIS:

Q Sir, have you ever testified that almost half of the train operators have a perception reaction time of less than a

second?
A No. If I did, that was a mistake.
Q Well, if you said it under oath, did you ever correct that at the *Acevedo against Transit Authority* trial on February 6th of 2008 at page 1190, line eight to 18?
A I don't remember last week, let alone 2008.
Q Well, sir, are you doubting that you said that?
A Give me the context, please.
Q A train ran over somebody and they severed their legs.
A I got that. That's the context of my testimony.
Q Your answer: "Yes, less than half per second, but a fair number -- yes, absolutely. It's not -- it's not a crazy number to use."
Did you give that answer under oath?
A I have no idea.
THE COURT: Now, Mr. Genis, we have the questions that Judge Block asked that he was going to make the calculations. We're going to have the reporter read it back very carefully.
(Record read.)
THE COURT: These are the questions. Did you make your calculations.
THE WITNESS: Yes.
THE COURT: And can you give us the answers to those two questions?

Number one, read the question again, please.

(Record read.)

THE COURT: Let's do that now.

THE WITNESS: Seven to ten seconds before the train enters, the train is before visibility. You can't see it.

THE COURT: Did you make the calculation, yes or no?

THE WITNESS: I did make the calculation and I found it to be 210 to 350 feet back.

THE COURT: That was your calculation.

THE WITNESS: That was your calculation.

BY MR. GENIS:

Q And that's based on not seeing Luisa; correct?

A It's based on time, speed and distance.

THE COURT: No, wait a second.

Finish, second question.

(Record read.)

THE COURT: Now, I want the answer to that.

THE WITNESS: I need one second.

THE COURT: I gave you time to make those calculations.

THE WITNESS: I didn't make that calculation. I'm doing it now.

THE COURT: You didn't make the second one?

THE WITNESS: No. I will do it right now.

At 20 miles an hour it would be in the tunnel for

two and a half seconds before it brakes into the station and at --

THE COURT: Do you need another 15 minutes?

THE WITNESS: No. I need a half a minute at most.

THE COURT: Mr. Genis, these are going to be your last questions on this subject, I'm telling you now.

MR. GENIS: Okay, but I needed to clarify --

THE COURT: What's your answer?

THE WITNESS: It would be two to three seconds before it brakes through the tunnel. So it's whatever it was on the first -- not the first answer here, but the one I gave earlier plus that time.

THE COURT: It would be what?

THE WITNESS: First of all, the stopping distance is --

THE COURT: You're giving me a lot of information. I think I'm asking you a simple question.

Do you have an answer to that, yes or no?

THE WITNESS: The stopping distance is not a function of where you are. The stopping distance is function of the speed of the train and the perception of --

THE COURT: So you can't give an answer to that question?

THE WITNESS: The question does not make sense in that context.

THE COURT: Mr. Genis, I direct you to go on to another subject.

MR. GENIS: Sure.

BY MR. GENIS:

Q Sir, you told this jury that you used an empirical analysis from the Transit Authority; is that correct?

A That's correct.

Q And you said you used a nominal stopping distance from their chart; correct?

A Yes, nominal means level track.

Q Okay. Now -- and you said on direct exam that -- not getting into perception reaction just straight stopping distance according to their chart at 20 miles an hour is 121 feet, plus grade, equals 125 feet; true?

A Yes.

Q And then you said at 24 miles per hour, it's 167 feet plus the grade equals 175 feet; correct?

A Yes.

Q And you said you reviewed different depositions in looking at everything and you said you looked at the George Brown deposition; correct?

A I did.

Q And you noted in your report that according to Mr. Brown it was 20 to 40 seconds.

MS. WINTERS: Objection, Your Honor. This was not

testified to by Mr. Brown.

THE COURT: Overruled.

Last question about this subject and go on to something else.

BY MR. GENIS:

Q Did you rely in part on Mr. Brown's testimony in performing your analysis?

THE COURT: Yes or no.

A No.

Q Did you rely on the portion of Ms. Smith's testimony where she said it was seven to ten seconds before the train entered the station?

A I reviewed that testimony over lunch.

Q Sir, yes or no?

THE COURT: You said you used it as a crosscheck was your testimony; right?

THE WITNESS: Yes.

BY MR. GENIS:

Q So, did you rely upon page 16, lines three to --

THE COURT: Sustained. Move it along. Next question.

MR. GENIS: Thank you, Judge.

THE COURT: We've enough of this kind of testimony now. Go on to something else. The jury has had lots of testimony, lots of numbers. It's all in the record. Go on to

something else.

MR. GENIS: Thank you, Your Honor.

BY MR. GENIS:

Q Now, you said on direct exam that you utilized the 9-1-1 tapes; correct, the recording?

A I listened to them.

Q Yes. And did you rely in part on recording number five which is Plaintiff's Exhibit 72 where the caller said the train was not yet in the station?

A I didn't particularly rely on any of those calls.

Q All right. You relied on a photograph that defense counsel showed you. I would like to look at another photograph in evidence, Plaintiff's 74-J.

MR. GENIS: If we can turn on the ELMO?

THE COURT: I think that may be in evidence already.

MR. GENIS: That's what I thought, Your Honor.

(Exhibit published.)

Q Do you see this photograph, sir?

A I do, yes.

Q Do you agree that in this photograph, 74-J, that a person standing where that gentleman is with the backpack can see the mouth of the station and from the headlights of a train, see it before it enters?

A Perhaps, yeah.

Q Okay.

A I'm not sure.
Q Do you know where Gabriela Smith was standing when she said she saw what she saw?
A She was next to Mr. Brown and Ms. Harger.
Q So, was she at the double yellow line -- the yellow tactile strip, sorry?
A The yellow tactile strip. She would be near there, otherwise she couldn't have fallen over.
Q I'm not asking you about Luisa. Luisa was five feet away. I asked you about Gabriela Smith.
A With all due respect --
Q Sir, sir --
THE COURT: What is the question?
Q Do you know where Gabriela Smith was when she made her observations?
THE COURT: Yes or no.
A Roughly, yes.
Q Okay.
A She was near the couple.
Q Okay. And when she was near the couple, was she standing near to the edge of the platform or not?
A That, I don't know.
Q Okay. Next, when you were discussing that empirical analysis, did you use the 3.2 stopping distance?
A The 3.2 is a time, not a stopping distance.

Q It's a deceleration rate, you told us, of 3.2.
A That's correct.
Q Did you use that?
A I used it for the time calculations. I didn't use it for the distance calculations.
Q You did not use it for distance?
A That's correct.
Q Okay. And, sir, in fact you have stated that using the 3.2 gives you a shorter stopping distance than the Transit's empirically based emergency brake stopping distance chart, true or false?
A That is correct.
Q Okay. So, that's why the 3.2 gives a shorter stopping distance and that's what the Transit actually says in their chart, correct, that you looked at?
A I'm not following your question.
Q You're right, withdrawn.
Okay. According to the document you saw in evidence for emergency braking, it's supposed to have that deceleration rate of 3.2; correct?
A It's very nominal, but yes.
Q Okay. If that's what's actually used there's a shorter stopping distance than the Transit's empirically based emergency brake stopping distance chart, true or false?
A That is correct.

Q Thank you. Sir, you told us that you looked at police reports and deposition testimony of Detective Muller; correct?
A Yes.
Q And did you rely in part on that?
A In part.
Q Okay. And you saw two different police reports and the deposition testimony of Detective Muller that Ms. Shabazz told the police that Luisa was already on the track before she entered the station.
MR. KEAVENEY: Objection.
A I'm not sure. I think it had to do with the tense of the word made.
Q Sir, on page 13 of your report you quoted Detective Muller's testimony; correct?
A I'll take your word for it.
THE COURT: What is your question?
MR. KEAVENEY: Objection.
THE COURT: What is your question?
BY MR. GENIS:
Q Did you rely in part on the sworn testimony of the police officer and the two police reports that Shabazz said as she's entering the station she observed the person laying on the tracks -- she was already laying before Ms. Shabazz entered the station, correct, answer, yes. Did you rely in part on that?

A I'm reading the quote in the report.
Q Did you rely in part on it is my question?
THE COURT: Did you look at that report?
THE WITNESS: Absolutely.
THE COURT: And did you rely upon that at all in the testimony that you're giving the testimony, yes or no?
THE WITNESS: As far as what I gave the jury, no, but I relied on it.
THE COURT: You relied on it?
THE WITNESS: Yes.
THE COURT: Next question.
BY MR. GENIS:
Q And, sir, did you consider the car maintenance history in making your analysis for the stopping distance here?
A No.
Q Okay. So the maintenance records would indicate servicing to the brakes and the condition of the brakes, true?
A It would indicate the PM, the preventative maintenance.
Q Okay. So, do you know what condition the brakes were in?
A No, I don't.
Q Okay. Can the condition of the brakes affect stopping distance?
A It shouldn't.
Q I didn't ask you if it should or shouldn't. Can it?
THE COURT: If the brakes are not working, it's

going to have an effect on the stopping distance?

THE WITNESS: Exactly.

THE COURT: Next question.

BY MR. GENIS:

Q And if the brakes are in great shape, that can affect it as well yes or no?

THE COURT: Yes, the brakes are important. Next question.

MR. GENIS: Let me see if I'm done.

BY MR. GENIS:

Q Are you saying that Louise's body was found 180 feet away from the mouth of the tunnel?

A Yes.

THE COURT: It's not a question. It's a statement.

Q How far was Louise's body from the mouth of the entry to the station?

A Hold on. I have to look that up.

THE COURT: Do you know that? Can you tell us how far her body was from the entrance of the station?

Is that the question?

MR. GENIS: Yes.

THE WITNESS: Yes, I have it here.

THE COURT: How long will it take you to answer it?

THE WITNESS: Two minutes.

THE COURT: Okay. We'll wait.

Is that your last question?

MR. GENIS: Yes -- actually, I have one other question. I'm sorry. I just have two follow-up questions.

(Pause in proceedings.)

THE COURT: Can you answer that question or do you need some more time? The question I think is simple.

THE WITNESS: Yes, the question is simple. Yes.

THE COURT: Do you want to take ten or fifteen minutes to do that?

THE WITNESS: Hopefully not.

THE COURT: Is it difficult for you to answer that question for you?

THE WITNESS: I just want to look at what I wrote.

BY MR. GENIS:

Q Did the Transit take measurements?

THE COURT: Don't ask questions.

A They took measurements, yes.

THE COURT: We're still waiting for an answer. Can you answer that question, yes or no?

THE WITNESS: I can.

THE COURT: Well, tell us.

THE WITNESS: I'm looking.

THE COURT: I think you have testimony about this from other witnesses if I recall correctly, but he has to tell you from his own knowledge how far away she was from the

impact.

MR. GENIS: And I have a few short followup and I'm done.

THE COURT: If you need some time, let me know and we can take a break.

THE WITNESS: Can we take a five-minute break?

THE COURT: You want five minutes?

THE WITNESS: Yes.

THE COURT: Do you want them to wait here? You need five minutes to answer that question?

THE WITNESS: I have to look it up, yeah.

THE COURT: Members of the jury, don't talk about the case.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: The jurors are not here now.

Mr. Witness, it seems to me that it's a simple question.

THE WITNESS: It is a simple question, but I --

THE COURT: Why is it taking you so long?

THE WITNESS: Because I think I gave the wrong answer a few moments ago.

THE COURT: You're holding us up.

THE WITNESS: I'm sorry.

THE COURT: I don't understand why you need so much

time to answer that one simple question.

This may not be a bad time for you to end your questioning.

MR. GENIS: I have two more questions.

THE COURT: I do not know if I'm going to allow it. Tell me now so we can move it along.

And if you can't answer the questions, let me know.

MR. GENIS: Sure. Question, if he uses the 3.2 as per what he said he's supposed to at 20 miles an hour, according to what is the stopping distance. I'm not asking about perception reaction time just what is the stopping distance. The same thing at 20 miles an hour -- 20 and 24 miles an hour using 3.2, what is that distance.

THE COURT: Are those your questions?

MR. GENIS: Those are my questions.

THE COURT: He may have to take another ten or fifteen minutes to answer that.

Can you do that quickly?

THE WITNESS: Berkowitz answered those numbers.

THE COURT: Do you want to tell him again? He's having a hard time absorbing information. Take the first one. Are you able to tell us how far she was away?

With all due respect, I have to call the jurors back and say he wasn't able to answer the question in the time we gave him. I have no alternative.

Call the jurors back in.

THE WITNESS: 250 feet.

THE COURT: Oh, you made the calculation?

THE WITNESS: Yes.

THE COURT: He said he has the answer.

MR. GENIS: 250 feet?

THE COURT: And what's the last question?

MR. GENIS: The last ones were 24 miles an hour and 20 miles an hour and then I'm done.

THE COURT: I thought we had it.

MR. GENIS: Not at 3.2.

THE COURT: Specifically what is it? If he's going 24 miles an hour? What's your question?

MR. GENIS: The question is if the 3.2 deceleration rate is used, not getting into perception --

THE COURT: Assuming 3.2 acceleration rate going 20 miles an hour?

MR. GENIS: Yes, and again at 24.

THE COURT: And the same acceleration at 24, would you be able to answer those questions rather quickly?

THE WITNESS: Yeah, I can look them up.

THE COURT: How much time does it take you to answer those questions?

MR. GENIS: Well, Berkowitz said it. You can adopt --

THE COURT: I don't want to hear that. Stop it.
THE WITNESS: Okay.
THE COURT: How much time would it take you to answer those questions? We're in a trial.
THE WITNESS: Another two minutes.
THE COURTROOM DEPUTY: All rise.
(Jury enters.)
THE COURT: You've had a chance now to look at your notes and you can give us the answer to that question about how far she was, whatever it was. What's your answer?
THE WITNESS: 250 feet from the mouth of the station.
THE COURT: Do you have any other questions?
MR. GENIS: Yes, the two I told you.
THE COURT: I think we spoke to you about what the other question might be so have you had an opportunity to make that calculation? What's the question?
MR. GENIS: The question is if we're using that deceleration rate of 3.2 at 20 miles an hour and again at 24 miles an hour, not going into perception reaction times, what is the stopping distance?
THE COURT: Assume deceleration rate of 3.2 at 20 miles and then at 24 miles, can you tell us the distance?
That's what you want to know?
MR. GENIS: Yes, without perception reaction time.

A About 110 and 150 feet.

THE COURT: He gave you the answers.

MR. GENIS: Thank you very much.

THE COURT: Any redirect?

MR. KEAVENEY: A few, Your Honor.

REDIRECT EXAMINATION

BY MR. KEAVENEY:

Q Let's just stay on assumptions briefly. Assume that Ms. Shabazz testified that she was two cars into the station when she saw Ms. Harger fall from the platform edge, how would that change your calculations, everything else being equal?

THE COURT: If at all.

A It wouldn't. The calculations are the same.

Q Would that change your conclusion?

A No, because it -- no, no it wouldn't.

Q Would that give Ms. Shabazz more or less time to stop the train?

A With respect to what?

Q Before hitting Ms. Harger.

THE COURT: Do you understand the question?

THE WITNESS: No, I don't.

THE COURT: The next question, use the microphone.

BY MR. KEAVENEY:

Q Did you rely on anything else from the NYPD in making your opinion?

A Not that I can recall.
Q Can you review your report to make sure?
MR. GENIS: Objection.
THE COURT: Sustained.
Next question.
MR. KEAVENEY: Can we show the witness Exhibit M and N?
(Exhibit published to witness only.)
THE COURT: Is it in evidence?
MR. KEAVENEY: No, it's not.
THE COURT: Do you want to -- I don't have any stars on N at all so there is no objection to that. Do you want that in evidence at this time?
MR. KEAVENEY: Yes.
MR. GENIS: I'm going to object, Your Honor. It's beyond the scope. There was direct, cross and now it's redirect.
MR. SHIELDS: And we had objections on our list, Your Honor --
THE COURT: I'm not going to allow it into evidence now. Do you have any other questions? Just ask all the questions and then I'll have to see what documents you want in evidence. I'll have to look at them and make my decisions.
MR. KEAVENEY: Can I show just the witness --
THE COURT: M and N?

MR. KEAVENEY: Yes.
THE COURT: Let me see those exhibits. Can you ask him some other questions while I'm looking at those exhibits?
BY MR. KEAVENEY:
Q You indicated earlier that the braking distance chart was an empirical based stopping chart. What do you mean by that?
A By that I mean by that is that the Transit Authority took a set of trains on a level track and ran stopping distance tests on instrumented trains to see what actually took them to stop as opposed to a nominal number.
Q And once they conducted those tests, they memorialized the results?
A They did in a memorandum of understanding and an emergency braking distance chart, which is what I used.
Q Okay.
MR. KEAVENEY: Judge, can I show the witness those documents?
THE COURT: I am just looking at it on the screen here. Do we have a hard copy of it?
MR. KEAVENEY: We don't have a hard copy. Does defense counsel?
THE COURT: It's kind of hard to put something in evidence if you don't have a copy of it.
Can you identify this document? Do you see it on the screen?

THE WITNESS: I don't have anything on the screen.

THE COURT: Just show it to him so we can ask questions. Now counsel and witness can see the exhibit?

THE WITNESS: Yes. That's the MOU, the memorandum of understanding that the TA created.

THE COURT: Created by whom?

THE WITNESS: I would have to move up to see the signatures.

THE COURT: Just tell us who created it.

THE WITNESS: Well, the Transit Authority created it.

THE COURT: You recognize that as a document that the Transit Authority created?

THE WITNESS: Absolutely. On the second page are all the signatures.

THE COURT: And look at number N. Is that also a document that the Transit Authority created?

THE WITNESS: Yes, I used that. That was on my computer.

THE COURT: And those are things you relied upon that the Transit Authority had, those are copies of the Transit Authority documents correct?

THE WITNESS: Yes.

THE COURT: I'll allow them in evidence at this time. Have a hard copy of those prepared.

MR. GENIS: We're objecting, Your Honor. You've ruled.

THE COURT: M and N in evidence at this time.

(Defense Exhibits M and N received in evidence.)

MR. KEAVENEY: Can we flip through Exhibit M and the witness can explain that briefly for the jury.

A Yes, the Transit Authority ran a series of tests with instrumented trains and it was on approval with some of the MTA mucky mucks, the Transit officers, because they needed that information in the design of their stations and so on.

MR. KEAVENEY: And can we go to Exhibit N?

(Exhibit published.)

Q And that's the chart --

A That's the end result.

Q And -- you used those calculations in determining braking distance at 20 miles per hour and braking distance at 24 miles an hour?

A You can't see it because it's too small but at the right-hand side of that is a pair of columns of numbers and that has the braking distances from, I guess, five to 55 miles an hour.

Q Okay.

THE COURT: This tells what the braking distance would be between five and 50 miles per hour?

THE WITNESS: Yes.

BY MR. KEAVENEY:
Q You testified earlier about AASHTO, do you remember that?
A Yes.
Q And you said you looked at it and adjusted it for subways?
A I adjusted it for train operators.
Q Can you tell me what you mean by that?
A Well, the neurological processes --
MR. GENIS: Your Honor, he's not a doctor.
THE WITNESS: I beg your pardon?
THE COURT: Excuse me.
Objection, overruled.
Can you answer that question?
THE WITNESS: I can. And I am a doctor.
MR. GENIS: Not a medical doctor.
A The neurological processes are exactly the same. You have to see something, you have to have that image travel to your brain. You have to analyze it and then you have to make a decision and that's exactly the same.
Now, the difference is that a train operator has a much simpler set of controls and also his hand -- their hands are on the controls. Whereas a car driver or a truck driver would have to take their right foot and put it from the accelerator to the brake.
THE COURT: I think you told us there's a difference

between operating a car a truck and operating a train.

THE WITNESS: Absolutely.

THE COURT: Next question. I think you answered enough.

Next question.

BY MR. KEAVENEY:

Q How did that affect your calculations when assessing train operators?

MR. GENIS: Objection. It's been asked and answered before.

THE COURT: I think the question is asked and answered.

Next question.

MR. KEAVENEY: I want to know how he adjusted it for subway operators.

MR. GENIS: He did it on direct, Judge.

THE COURT: You can't do this. You are all professional lawyers. You have to control yourselves. Just like I do, you have to make an effort to do that because this would be literally and figuratively a runaway train if I didn't assert my authority. I think the jurors have heard so much about this, ample information. You can tell them about it in your summations, arguments. We have enough facts.

Next question.

MR. KEAVENEY: Thank you, Your Honor.

THE COURT: Can you call your next witness?

MR. GENIS: May I do my recross?

THE COURT: No.

Next witness.

MR. GENIS: I would like to do my recross.

THE COURT: Next witness.

MR. GENIS: I'm not allowed to do followup?

THE COURT: Not under these circumstances.

Next witness.

MR. GENIS: Judge, it's not right.

THE COURT: The next witness.

THE WITNESS: I guess that means I should get off the stand.

THE COURT: You can leave.

Mr. Genis, we've had so much of this back and forth and back and forth. I'm not precluding you from asking your questions we've done.

MR. GENIS: I have not asked a question on M or N and --

THE COURT: Come back here. I will let you ask a question about M and N since I allowed it in in evidence and that will be it. There comes a point in time that we have to mover in. M and N, if you want to ask one or two questions about it.

MR. GENIS: Yes.

THE COURT: He said it's a whole big range there.

RECROSS-EXAMINATION

BY MR. GENIS:

Q You just looked at Defendant's Exhibits M and N. Where does it say it applies to the R68A?

A On Exhibit N, if you look in the legend at the lower part of the thing, it says all revenue cars. I think that's the word.

Q Revenue cars is all kinds. I'm asking specifically about the R68A.

A Let's try this again. All revenue cars would include an R68A.

Q Sir, you're saying that an R40 or 42 or 38 that was a different length made 30 years earlier has the exact same stopping distance as an R68A?

A That's by design.

Q Just yes or no, please.

A Yes.

THE COURT: I allowed in evidence these two documents of the Transit Authority, and the question is does that relate to this particular train or to all trains? That's it. You can answer it.

THE WITNESS: Yes and yes.

THE COURT: Give me -- so explain that. He wants to know whether those relate to this particular train.

THE WITNESS: I got that.

THE COURT: Yes or no?

THE WITNESS: Yes, it does.

THE COURT: And can you explain to the jury why it relates to this particular train.

THE WITNESS: It's not that they can't make them stop faster. They probably could, but if they did that, people standing on the train would get knocked over like bowling pins. They have to limit the peak deceleration forces so that people standing up can stay standing up under emergency braking.

THE COURT: I will ask you again, why do these documents that I allowed into evidence apply to the R68A, tell me why it applies to the R68A? That's all I'm asking you.

THE WITNESS: Well, it applies because it applies, that's what is used.

THE COURT: It's used for all trains including R68s is your testimony?

THE WITNESS: Yes.

THE COURT: That is his testimony. Next question.

BY MR. GENIS:

Q And, sir, was the R68A built in 1995?

A I don't know when it was built. I think it was way before that.

Q All right. And, sir --

MR. GENIS: I would like to approach with the cover of document in evidence, 45 and 2. It's specifications and it's for the R68A.

Q Do you see that, sir?

(Counsel approaches.)

THE COURT: Don't ask him those questions. What's your question?

Q Do you see in accordance with the specifications by the MTA for the R68A that the emergency --

THE COURT: That is not a question. Save it for summation.

Q -- the emergency stopping distance is 3.2 miles per second, true or false?

THE COURT: Save it for summations.

A Miles per hour.

THE COURT: Listen to me. I'm going to hold you all in contempt. Now stop it.

Next question, next witness. Thank you for staying here. We appreciate it. It's not easy to manage things from a judge's point of view.

You can leave.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Next witness.

MR. KEAVENEY: The defense calls Mr. Tony Abdallah.

THE COURT: Mr. Abdallah, you testified before under oath back on the 30th of October. You are re-called now, which is permissible, but I can just advise you that you are still testifying under oath.

THE WITNESS: Thank you.

THE COURT: Your witness.

MR. KEAVENEY: Thank you, Your Honor.

**TONY ABDALLAH**,

re-called as a witness, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KEAVENEY:

Q Good afternoon, Mr. Abdallah.

A Good afternoon.

Q Do you recall your earlier testimony when you testified about taking a trip to Korea?

A Yes.

Q Briefly, what was the purpose of that trip?

A That trip was in response to --

MR. GENIS: Relevance, objection.

MR. KEAVENEY: I'm trying to move it along, Your Honor.

THE COURT: Can you answer that question?

THE WITNESS: Yes.

A That trip was in response to a proposal made by the

Boston group regarding the installation of platform screen doors at select stations at New York City Transit.
Q And were there any lessons learned from that trip?
A Yes.
Q And what were they?
A Initially back in 2010, our view of the platform screen door installation install was positive. We liked what we saw at the time.
Q Okay. And when you returned from Seoul, what did you do?
A Wrote a trip report and forwarded it up the chain.
Q Okay. Was there any task force created in response to that trip?
A Yes. I created or we created the Platform Screen Door Task Force at that time.
Q Okay. And was a request for information sent out to manufacturers?
A Yes.
Q Okay. Was cost an issue regarding platform screen doors?
A Cost was always an issue.
Q Okay.
MR. KEAVENEY: I would like to show the witness Exhibit X.
THE COURT: Are you offering that in evidence?
MR. KEAVENEY: Yes, Judge.
THE COURT: I don't see any stars here. It will be

in evidence.

(Defense Exhibit X received in evidence.)

MR. KEAVENEY: Can you show the witness Exhibit X?

(Exhibit published.)

THE COURT: We have X now. That's X.

BY MR. KEAVENEY:

Q Mr. Abdallah, are you copied on that memo?

A Yes, I am.

Q What's that memo about?

A I believe that memo is in response to a letter that sender Diane Savino had written to New York City Transit regarding platform screen door installation.

Q Did she have any concerns regarding that plan?

MR. GENIS: Objection to her concerns. The letter is not in evidence.

THE COURT: Objection overruled.

Did you have any concerns? Do you know what that means?

MR. GENIS: I'm not objecting to the document.

THE COURT: Why don't you ask him another question.

You got that document in evidence. What's your follow-up question?

BY MR. KEAVENEY:

Q Why were you writing this letter, this memo -- or why was this memo created that you were copied on?

MR. GENIS: Objection.

THE COURT: Do you know why this memo was created?

THE WITNESS: Yes, I do, Your Honor.

BY MR. KEAVENEY:

Q And why was it created?

A It was created because Diane Savino's office raised some concerns regarding costs related to the installation of platform screen doors.

Q Do you know why her office would be concerned about cost?

MR. GENIS: Objection.

THE COURT: I don't know.

Do you have any knowledge as to why there was any concern about costs?

THE WITNESS: The only thing I can think of is that the MTA gets state funding and Senator Diane Savino is a state senator who was to appropriate funding to the MTA.

MR. GENIS: Judge, I move to strike as speculative. He's entering the state of mind of somebody else.

THE COURT: Do you know that? Did she tell you that? Do you know that for a fact?

THE WITNESS: Your Honor, we were responding to a letter from Diane Savino.

THE COURT: So this was in response to a letter that you received from her and that's why this letter was created?

THE WITNESS: Yes.

THE COURT: That is your testimony?
THE WITNESS: Yes.
THE COURT: Next question.
BY MR. KEAVENEY:
Q And what was the proposed response to her?
A The proposed response was we would look for alternate funding or shared funding but cost was a factor.
Q And those alternative fundings, those were set out in the request for information that we discussed a couple of weeks ago?
A Yes.
Q I would like to show you Exhibit GG.
THE COURT: GG is in evidence. That goes back to October 30th.
(Exhibit published.)
BY MR. KEAVENEY:
Q Have you seen that document before?
A I believe I did.
Q And if we can flip through it, what's this document -- what's the purpose of this document?
A It basically gave some figures for data on -- related to train strikes.
Q Did it provide any mitigation strategies to address train strikes?
A Yes it did.

THE COURT: Let me ask you this: We have it here that it predates 2016. I see that and mitigation strategies were done at that time or after that time?

THE WITNESS: They were done -- they started at that time, Your Honor.

THE COURT: Well, was it before or after?

THE WITNESS: Before.

THE COURT: Next question.

BY MR. KEAVENEY:

Q On that page, mitigation strategies, it says "awareness campaigns."

Are awareness campaigns common in other rail carriers?

MR. GENIS: Objection.

THE COURT: I did not hear the whole question.

Q Are awareness campaigns common to other rail systems?

MR. GENIS: Objection.

THE COURT: Why does it say "awareness campaign"? You can answer that question.

A Awareness campaign to give information to our riders of the hazards or possible hazards within the subway system, getting too close to the platform, things like that; trips, slips, falls.

Q Are those awareness campaigns common in other transit systems?

MR. GENIS: Objection.

THE COURT: Sustained.

MR. KEAVENEY: Judge this goes to our affirmative defense.

THE COURT: The documents are in evidence.

You said it's an awareness campaign, right?

MR. KEAVENEY: Your Honor, this goes to our affirmative defense.

THE COURT: I do not know about awareness campaigns in Tokyo or China -- what does it have to do with whether they have an awareness campaign? Isn't that sufficient? Next question.

I'll allow it. I'm thinking about it differently now. You put it together before.

This is before 2016, right?

THE WITNESS: Yes.

THE COURT: And there's a reason why you put down "awareness campaign" and I guess the question was that something that was common in other places?

THE WITNESS: Correct. It's benchmark around the world or other places, like you mentioned Tokyo or Paris, they have awareness campaigns as well.

THE COURT: All right. So I'll allow in that question and answer, next question.

BY MR. KEAVENEY:

Q What about the next point health point intercoms, are they used in other systems to assist in platform safety?
A Yes, they are.
Q Okay. Platform screen doors are also?
A Yes.
Q What about tactile strips, for example; are they employed in other systems?
A Yes.
Q What about countdown clocks, are they employed in other systems as a method or platform safety?
A Yes.
MR. KEAVENEY: Let's go to Exhibit II.
THE COURT: II I don't have as an exhibit here.
MR. KEAVENEY: I don't think there's any objections.
THE COURT: There's no objection to that and we'll allow that in evidence at this time.
(Defense Exhibit II received in evidence.)
(Exhibit published.)
BY MR. KEAVENEY:
Q Do you recognize that document?
A Yes.
Q What was that?
A This is a document -- a trip report that was prepared after a trip we had taken. I was -- I participated in to various locations around Europe including Munich, Budapest to

view track intrusion systems.
Q And what was the reason for doing that? You said to view it, but was there more of a reason for that?
A Yes. We were looking for alternative methods for safety, track safety, customer safety, and one of them was track intrusion systems.
Q Do you know how track intrusion systems work?
A So track intrusion system, it's seemingly simple but complicated technology. If someone were on the tracks, it would alert through a series of technological systems via the control center and the control center would then notify the operators. It would also be built into the signal system, if possible, allowing train operators outside of the station to either slow down or stop depending on the proximity to the station.
Q Are you aware of any challenges to implementing that system?
A Track intrusion systems work well if there are no trains entering the station or near the station, but they don't really work if a train is already in the station.
Q And why is that?
A Because the trains come in at what we call simple speed. Normal speed anywhere between 25, 35 miles an hour and for trains to stop almost immediately is -- I don't want to say impossible, but not possible.

Q The technology, the transmission of something on the track, wouldn't be relayed in time; is that --
A There are too many intermediary things that have to happen with track intrusion systems and if the train is already in the station those things don't happen.

MR. KEAVENEY: Let's go to Exhibit JJ. I'm sorry, it's not JJ -- yes, JJ.

THE COURT: Is this from the same exhibit?

MR. KEAVENEY: This is a different exhibit, Your Honor, JJ.

THE COURT: There's no objection to that. It is in evidence at this time.

(Defense Exhibit JJ received in evidence.)

BY MR. KEAVENEY:

Q Do you recognize that document?
A Yes.
Q And what is that?
A I believe that's the bid, the contract that went out for terrorism.

(Continued on the following page.)

DIRECT EXAMINATION
BY MR. KEAVENEY: (Continuing)
Q Was that a pilot program?
A Yes. I'm sorry. It was a pilot program.
Q What is a pilot program?
A So pilot program is really a testing phase of a technology that we want to explore for various reasons, whether it's safety or -- so we test it out at a -- the technology at a station or possibly two stations.
Q Was this technology tested?
A Yes.
Q And what stations was it tested at?
A I believe it was tested at Rector Street. If I recall the other station, it might have been 50th Street in Manhattan.
Q What year was that, Approximately?
A 2-13, 2-14.
MR. KEAVENEY: Can we go to Exhibit KK?
Q Do you recognize this document?
A Yes.
Q What is it?
A I believe this was a document for a proposal for the platform screen door on 14th Street, Sixth Avenue on the L line.
Q Was it in response to something?

A It was in response to the four, I believe, proposals that -- well, we received more than four, that we actually took seriously from the RFI.
Q Was this for a pilot program for PSDs --
A Yes.
Q -- Platform screen doors. Okay?
Go to document, or Exhibit LL.
THE COURT: LL in evidence now. No objection.
(Defense Exhibit LL was received in evidence.)
Q Do you recognize that document?
A Yes, I believe it was the contract for the platform screen doors.
Q For that pilot program?
A For that pilot program, correct.
MR. KEAVENEY: Can we go to Exhibit NN?
THE COURT: NN?
MR. KEAVENEY: NN, as in Nancy.
THE COURT: Double M or double N?
MR. KEAVENEY: Double N as in Nancy.
THE COURT: No objection. That is in evidence at this time.
(Defendant's Exhibit NN received in evidence.)
Q Do you recognize that document?
A Yes.
Q What is that?

A That looks like the presentation on platform screen doors back in 2014.

MR. KEAVENEY: And can we go to the second page.

Q It says Agenda. What does that mean?

Is it the agenda for this PowerPoint or something else?

A It's the agenda for this PowerPoint.

MR. KEAVENEY: Can we look to the next page.

Q Can you tell me about that page?

A So, yes. We were looking for ideal locations, feasible locations to install platform screen doors and alternatives.

Q Was that for the pilot?

A That was for the pilot.

Q Was the location changed from the initial station?

A So, I think funding had been an issue. I'm not sure. There were some variables. We moved away from 14th/Sixth Avenue to Pelham Parkway in the Bronx.

MR. KEAVENEY: Can we go two pages in on that exhibit.

Q Was that the schedule for that pilot program?

A Yes, it is.

Q And the construction award, what does that mean, at the very bottom?

A So construction award would be given to the --

MR. GENIS: Post date of accident, Your Honor. Not

admissible.

MR. KEAVENEY: The document is not.

THE COURT: I'm sorry. What's the question?

MR. GENIS: They have something they're showing to the jury that is postdate of accident.

MR. KEAVENEY: It's the date.

THE COURT: One second. Is this -- excuse me. Is this in evidence?

MR. KEAVENEY: Yes, we just put it into evidence.

MR. GENIS: The redaction, Your Honor.

THE COURT: What I see goes back to 2015 and 2016. But there are two of these that postdate August of 2016. I think is what you are talking about, right?

MR. GENIS: Yes.

THE COURT: So those will be redacted we are not going to consider anything that happened after August 2nd, 2016.

MR. KEAVENEY: Judge, this was a document that was created before that time. This is just a timeline.

THE COURT: Okay. So when was this document created?

THE WITNESS: I believe it was created in 2014.

THE COURT: We will allow that in.

Q Going back to the question on the design schedule, the last entry, construction award, what does that mean?

A It means that they were going to begin construction of the platform screen doors than date.
Q Okay.
MR. KEAVENEY: Can we go to Exhibit okay.
I'm sorry, Exhibit PP. I don't think that's in evidence yet, Your Honor.
THE COURT: Which document is this?
MR. KEAVENEY: PP, as in Peter.
THE COURT: I don't have any objection to that here, so I will allow that in evidence at this time.
(Plaintiff's Exhibit PP received in evidence.)
Q Do you recognize that document?
A I believe so.
Q Okay. And what is it?
A So I think that was the second phase of looking into the track intrusion detection system or the pilot.
Q Is that document dated?
A Yes, it is.
Q What's the date on that?
A January 2016.
MR. KEAVENEY: Can we go to Exhibit RR.
Q And I believe this is already into evidence, it might have been marked as a Plaintiff's Exhibit?
THE COURT: I don't have RR here in evidence. This is the same as the different exhibit?

MR. KEAVENEY: I believe it is the same as a plaintiff exhibit.

THE COURT: It won't do any harm to allow it in again now.

MR. KEAVENEY: I don't think so.

THE COURT: RR in evidence.

MR. GENIS: Judge, it is post. It is.

MR. ROTH: No, no, it's in.

THE COURT: Go ahead.

(Defendant's Exhibit RR received in evidence.)

BY MR. KEAVENEY:

Q Do you recognize that document?

A Yes.

Q What is that a document of?

A This was a research report that was I believe done by STV on international -- an international study on platform screen doors.

Q Was it based on a trip?

A Yes.

Q Okay. Did you go on that trip?

A I did.

Q Did you go to any cities to look at platform screen doors?

A We went to London and Paris.

Q What was the takeaway from that trip?

A We had observed that in Paris that they had installed platform screen doors on one of their 14 lines.
Q Okay. What about London?
A And same with London. I believe they installed platform screen doors on the Jubilee extension.
Q And what was the significance, if anything, of those observations?
A That platform screen doors was still an option, if possible.
Q What do you mean if possible?
A Given the factors that we always looked to overcome the issues in terms of -- the engineer issues, the station, design issues, the electrical issues, the car equipment issues. There's a host of things that needed to really come together to make it work.
Q Okay. And I believe some of those issues were already testified in prior testimony.
Did those issues ever change in terms of its challenges for platform screen doors?
A That's probably a better word. The challenges never really changed. The challenges were there given that it is 110-year-old system.
Q Are you currently employed?
A Yes.
Q Who's your employer?

A So I work for the Massachusetts Department of Transportation in Boston.
Q What's your role?
A My role is Deputy Chief Safety Officer that oversees rail, commuter rail, some regional airports, highway.
Q Okay. Does that also oversee the T up there, the Rapid Transit System?
A Yes.
Q Does that system have platform screen doors?
MR. GENIS: Objection.
MR. KEAVENEY: Your Honor, it goes to custom and practice.
MR. GENIS: He's asking about now as opposed to prior 2016. It's improper.
Q Prior to 2016, did it have platform screen doors?
THE COURT: Prior to 2016, prior to August 2nd, 2016. That's what we are talking about here. Everything we want to know about is what existed as of August 2nd, 2016.
What's your next question?
Q Did the Boston T have platform screen doors prior to August 2nd, 2016?
A No.
Q Did it have track intrusion devices prior to August 2nd, 2016?
A No.

Q Are you familiar a member of the American Public Transportation Association?
A Yes, I am.
Q What is that?
A The American Public Transit Association is a consortium of some sort that most of the rail systems in this country belong to.
Q What's their purpose?
A It's really information gathering, updates and news on rail properties, technologies, et cetera.
Q Do they issue any recommendations?
A I don't think they issue recommendations, no.
Q Okay.
Did you know if New York City Transit is a member of the American Public Transit Association?
A They are.
Q Are there any rules, standards or working groups associated with that organization?
A So, my role with APTA is I belong to the rules and standards committee, subcommittee of APTA, and we do write standards and recommended practices.
Q Prior to August 2nd, 2016, have you written any rules or standards regarding the recommendation to install platform screen doors?
A No.

Q How about track intrusion devices?
A No.
Q Are you familiar with CoMET?
A I am.
Q What is CoMET?
A CoMET is also a consortium of Metro properties around the country as opposed to around the U.S. I'm sorry, around the world as opposed to the U.S.
Q Okay. Is Transit a member of CoMET?
A I believe New York City Transit is the only member in North America of CoMET.
Q Does CoMET issue any regulations?
A CoMET's role, from what I understand, is really to gather benchmarking practices from properties around the world.
Q Okay. Are they limited to that?
A From what I understand, yes.
Q Do you know what a safety plan is?
A Yes.
Q Are you aware of any rapid transit system that has a separate safety plan for each individual station?
MR. GENIS: Objection.
THE COURT: Overruled. You can say yes or no. Are you aware of any?
THE WITNESS: No.
THE COURT: Next question.

Q Do you know if New York Transit Authority has a safety plan?
A Yes, they do.
Q Do you know if that safety plan has to be approved?
THE COURT: The question is did they have a safety plan before August 2nd, 2016. Do you know anything about that?
THE WITNESS: Yes, Your Honor.
THE COURT: Your answer is?
THE WITNESS: They did have a plan before August 2nd, 2016.
THE COURT: All right.
Q Do you know if that plan has to be approved by a New York Public Transportation Safety Board?
A Yes.
Q Do you know if the Public Transportation Safety Board conducts any reviews of the audits of the Transit safety plan prior to August 2nd, 2016?
MR. GENIS: Objection.
THE COURT: Overruled.
MR. GENIS: Not a member of the PTSB.
THE COURT: Overruled.
A Yes.
Q It does conduct those?
A Yes, it does. Yes.

Q Prior to August 2nd, 2016, did New York City Transit have any plans related to 12-9s?
THE COURT: Related to what?
MR. KEAVENEY: 12-9s, customer contact with trains.
MR. SHIELDS: Objection.
THE COURT: What is 12-9?
MR. KEAVENEY: There has been testimony.
Q Do you know what a 12-9 is?
THE COURT: I don't remember what 12-9 is. Maybe the jury does or doesn't.
A Yes. A 12-9 is a customer coming in contact with the train.
THE COURT: Okay.
Q Okay. Do you know if they had any safety plans related to 12-9s?
A Yes.
Q Have you ever seen any documents related to those safety plans?
A Have I ever seen any documents? Yes.
Q Okay.
MR. KEAVENEY: I would like to show the witness a document for identification.
THE COURT: Which exhibit number.?
MR. KEAVENEY: This is not on the exhibit list.
MR. GENIS: Objection.

THE COURT: I have no idea what you're even talking about.

MR. KEAVENEY: It's just.

THE COURT: Do you want to offer something into evidence that hasn't been identified yet?

MR. KEAVENEY: I want to show it to the witness first.

THE COURT: Well, the whole idea of doing it in advance is to avoid this type of thing.

MR. KEAVENEY: I understand that, Your Honor.

THE COURT: Unless something was raised on direct that you think you would want you to introduce this exhibit. I will consider that, but otherwise let's go on to his next question.

MR. GENIS: Judge, it's his direct.

THE COURT: All right.

Q Have you seen written plans related to 12-9s?

THE COURT: 12-9 is the situation where somebody has this type of accident, right?

THE WITNESS: Yes.

THE COURT: Okay.

A Yes, I have.

Q Do you know the procedures to -- that are done in relationship to 12-9s in response?

THE COURT: Prior to August 2nd, 2016.

A Yes.
Q What are those procedures?
A Procedures for 12-9s are customers that say on the roadway or roadbed, we usually get them one of two ways from either police or a station department to the control center through what's called the six wire, and the control center will then put an all-out call to train operators or trains in the area to caution them that someone might be on the roadway and to be prepared to stop their train in an emergency.
THE COURT: So somebody is in the roadway -- on the tracks, you have systems to be able to deal with that situation, is what you're saying?
THE WITNESS: That's correct.
THE COURT: Next question.
And that's after somebody has fallen onto the tracks?
THE WITNESS: That's correct.
THE COURT: All right. Next question.
Q As of August 2nd, 2016, are you aware of any U.S. Metro systems that use platform screen doors?
A I am not.
Q Okay. And as of August 2nd, 2016, are you aware of any U.S. Metro systems that use track intrusion devices?
A I am not.
MR. KEAVENEY: Okay, thank you.

MR. GENIS: May I have five minutes before --
THE COURT: Cross-examination?
MR. GENIS: Can I have about five minutes, please?
THE COURT: Sure.
MR. GENIS: Thank you.
THE COURT: So let's take a little afternoon break. We will take about 10 or 15 minutes. Don't talk about the case.
THE COURTROOM DEPUTY: All rise.
(Jury exits the courtroom.)
THE COURTROOM DEPUTY: You can all be seated.
THE COURT: Okay. Let's bring the jury in. How are we doing, Mr. Genis?
MR. GENIS: I'm ready to go. I hope you give me a little more time, because this morning, to be honest, market was late and you took it out on me and that wasn't right.
THE COURT: What?
MR. GENIS: Dr. Marpet was late.
THE COURT: I'm not going to penalize you. I have plans to fly out of here on Saturday, but I will change them if that's what we have to do. But I'm trying my best to get this down and --
MR. GENIS: I appreciate it. That's all I'm asking, Judge.
THE COURT: You know, one juror wanted a calculator.

I said no, we will do it after the summations and after I present the case to them. I don't want them to suddenly start calculating things now.

MR. GENIS: Okay.

THE COURT: I'm reporting to you what's happening.

MR. GENIS: Thank you.

THE COURT: No calculator now, Mike.

THE COURTROOM DEPUTY: I know that.

THE COURT: All right.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right. Cross-examination.

MR. GENIS: Thank you.

CROSS-EXAMINATION

BY MR. GENIS:

Q Good afternoon, Mr. Abdallah.

Right off the bat, you told this jury on direct that when you discussed Defendant's Exhibit KK by STV that they were one of the four finalists from the RFI; correct?

A STV wasn't one of the finalists. Maybe I misspoke. STV was a consultant that we hired.

Q All right. So, in other words, when did you the RFI and you had the evaluation, you narrowed it down to five finalists; correct?

A I believe four, five or four.
Q Would you like me to show it to you --
A No.
Q -- to refresh your memory?
And they were all offering to do things for free, yes?
A I think there was an element of cost sharing.
Q According to the RFI and the finalist from what was submitted, in fact, they all said -- I will show you Faively -- - not for a dollar in exchange for the ad revenue in the build-out transfer agreement?
THE COURT: There has been some testimony about that, some documents about that. Do you recall that?
THE WITNESS: Yeah, I recall.
THE COURT: Next question.
Q Did the Transit Authority pay STV to do what it did?
A I believe so. I wasn't involved in that, but I believe so.
Q Did the Transit Authority say hey, look, why don't we get somebody who will agree to do it for free to do a design?
A Again, my area of expertise, Counselor, is operations. It wasn't really the financial end of it.
Q Okay. I just -- you were talking about costs --
A Yes.
Q -- and talking about this whole procedure before?

A The decision.
Q In fact, and that contract you were going through, that was merely to do a design for a future anticipated pilot; correct?
It was for the design of it, yes?
A I believe so.
Q Okay. So it's not the actual installation, it's just to design it?
A Correct.
Q And they kept changing locations; correct?
A Yes.
Q You showed us this whole document and it had a completion date in September of 2016. Do you recall that?
A Yes.
Q Was it completed?
A No.
MR. KEAVENEY: Objection.
THE COURT: Wait a second. If there is an objection, you have to stop.
MR. GENIS: Sorry.
THE COURT: When was it completed, that's your question?
MR. KEAVENEY: It asked for a date.
THE COURT: Ask the question again.
MR. GENIS: Sure.

Q You testified on direct exam about how there was a date to complete things in September of 2016.

Do you recall that testimony?

A I do.

Q Okay. Was that completed and was it completed on that schedule?

MR. KEAVENEY: Objection. It goes beyond the date of the accident.

THE COURT: Was it completed before August 2nd, 2016?

THE WITNESS: No.

Q Was it completed for the date that the jury looked at in September of 2016?

MR. KEAVENEY: Objection.

THE COURT: Well, I don't know --

MR. GENIS: Judge, you allowed that into evidence. You allowed him to testify.

THE COURT: If I did, I shouldn't have allowed anything after August 2nd. Maybe the judge makes a mistake too sometimes.

But we want to know whether it was completed as of August 2, 2016?

THE WITNESS: No.

THE COURT: Anything else after that is not relevant in this case, all right.

Q And every pilot was always cancelled before it ever got off the ground before August 2nd, 2016; correct?
A For platform screen doors, yes.
Q And then you talked about a pilot for the track intrusion devices of -- detection systems, I should say, and you mentioned Rector and 50th Street.
Did they show that they were effective?
A There were some false positives in both. Some.
Q Some?
A Right.
Q Overall, in fact, when you looked at the report, it showed very few false positives; it was a positive recommended report; true?
A I believe so.
Q Okay. But they didn't install them; correct?
A They never implemented that.
MR. KEAVENEY: Objection.
Prior to August 2nd?
MR. GENIS: Prior to August 2nd.
THE COURT: Hold it. So we understand for the seventh-thousand time, what's relevant is what was happening as of August 2nd, 2016. There could have been all sorts of other things that happened over the last 10 years. That's not what the case is about. It's what the situation was at the time of this accident. I think we understand that.

So I will allow all sorts of evidence that's appropriate dealing with anything that happened or did not happen before that date. Okay. Go ahead.

MR. GENIS: Thank you.

Q Sir, until August 2nd, 2016, did they implement the track -- the TIDS, the track intrusion detection systems after seeing that there was a positive project in 2013, 2014?

THE COURT: Was there any implementation as of August 2nd, 2016, yes or no?

THE WITNESS: Beyond the pilot, no.

THE COURT: Okay. There is your answer.

Q Sir -- we covered that.

You mentioned the awareness campaign and the help points.

How many 12-9s, as you call them, people getting hit by trains, were prevented by use of the help points?

A I don't think you can really measure how many were prevented.

Q Well, were any?

A It's hard to say.

Q Well, let me ask you. The help point, it's a button, it's an electronic device; correct?

A Are you talking about the help points or the --

Q The help points. The help points.

THE COURT: Lower the volume. That's what he is

talking about.
A So the help points have two buttons. They have a button for information. They have a button for emergencies.
Q Okay.
A I haven't seen the documentation on either, to be honest.
Q Well, have you heard of a single case, just one case where somebody depressed the emergency button on the help point and it prevented somebody from getting hit by a train?
A I'm going to go out on a limb and say yes.
I ran the control center for a number of years and I heard various emergency calls that come in on that, whether they were people on the tracks or whether people fighting, so they served all kinds of purposes.
Q I'm not asking if people ever used help points for fighting or whatever.
What I am asking you is very simple: Did a single person depress the help emergency button and that that actually resulted in a train being stopped so a person was not run over?
That's my question.
MR. KEAVENEY: Objection.
A I can't recall, Counselor.
Q Certainly that's an important fact?
MR. KEAVENEY: Objection.
THE COURT: Save that for summation.

Q Sir, as your attorney was questioning you, that's the defense of this case, is that they had these other measures taken. So the question is were they effective or not in light of their operations; true?
A True.
Q So was it effective?
A The helps point were one of several things that we installed, whether they were the tactile strips or the surveillance cameras, or the automated announcements. If you put all those together, they become part of a campaign that we think are effective.
Q Okay. I'm not -- if I want to know what we think, I will ask other people.
THE COURT: You're asking argument now.
He wants to know whether or not any of these things that may or may not have happen resulted in anything of a positive nature, I guess.
THE WITNESS: Yes, I believe they were.
Q Where's the data that shows that?
A Again, I don't know where the data is. I don't have the data.
Q Okay.
A But --
Q Mr. Abdallah, no disrespect. You're coming to court and giving sworn testimony to a jury about certain measures taken

by the Transit Authority and you don't know whether or not they were actually effective in light of its actual operation and you have no records to show even one life was saved as a result of any of these measures?

THE COURT: It's a long speech.

MR. KEAVENEY: Objection.

THE COURT: He wants to know whether anything you've talked about --

THE WITNESS: Som Your Honor, yes, I do understand the question.

I just think those types of actions or that campaign can't really be measured. These are things that we effectuated, for example, announcements, when a train comes in, we have people that are deployed throughout the system that make announcements, train's coming, stay clear on the platform.

Does it work? I think it works.

THE COURT: Okay. So you talked about the fact that you make announcements, train is coming with, right?

THE WITNESS: Yes.

THE COURT: Next question.

Q When we look at effectiveness, do you see how the numbers have gone up over the past decade, up to 2016?

THE COURT: Identify the exhibit for the record.

MR. GENIS: Yes, and it is in evidence. It's

Exhibit 71.

THE COURT: He is showing you 71. It shows figures over the years.

Q Do you see how the numbers go up?

A Yes.

Q Okay. So if they were effective, you would expect the numbers to go down; true?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Sir, but -- let me back up. I understand maybe you can't figure from an announcement or a sign, but the electronic help point, and you said that they go through the rail control center, there would be an electronic trail to show somebody depressed the emergency button, action was taken, and it prevented somebody from getting hit.

THE COURT: Do you have any records at all about that?

Is there any information we have about any of that type of information?

THE WITNESS: Your Honor, I have been removed from New York City Transit for a few years.

THE COURT: Just say yes or no.

THE WITNESS: I don't have any information.

THE COURT: He doesn't have any.

MR. GENIS: Thank you.

Q Now, sir, corrective action means somebody actually doing something to prevent a recurrence of the hazardous train strike; true or false?
A True.
Q Okay. And a safety plan is something that's written to keep people safe, you said; right?
A Yes.
Q Okay. And you've told us train strikes were a known hazard since 1984; correct?
A Yes.
Q Number one cause of death and catastrophic injury in the system; correct?
A I believe so. I don't know if that's the number one incident, but....
Q Well, sir, did you review your sworn deposition testimony before giving testimony today?
A I did not.
Q I will gladly read.
A Sure.
Q But did you testify before under oath that yeah, it's the number one cause of death and catastrophic injury?
A Yes. I'm recollecting that the number one are 12-9s, correct, people jumping.
THE COURT: 12-9s once again, are people that fall into the platform one way or another?

THE WITNESS: Or jump.
THE COURT: Whatever.
Q Or get hit, they fall, get sick?
THE COURT: They are in the tracks?
THE WITNESS: Correct.
Q You have testified in the past how these train strikes are frequent occurrences; correct?
A Yes.
Q Okay. Let me just skip over. I want to just cut to the stuff.
And have you placed in writing and said under oath that platform barriers would likely eliminate or diminished contact with individual events?
Have you said that ever?
A Yes.
Q And that was when you went to London and Paris, those were comparable subway systems to New York City; correct?
A Yes.
Q In fact, there is no other city in the United States of America or North America comparable to New York City, correct?
A That's correct.
Q So the only really comparable, you know, apples and apples would be London and Paris; correct?
A In terms of volume and customers, yes.
Q And age of system?

A And age of system.
Q Okay. And, in fact, you have testified that there are industry best practices; correct?
A Yes.
Q And, in fact, industry best practices is to utilize platform screen doors to prevent or eliminate or reduce the number of deaths and catastrophic injuries that result from the hazard of train strikes; true?
MR. KEAVENEY: Objection.
THE COURT: Well, overruled. He's trying to recall what he thinks your testimony was.
What's your question?
MR. GENIS: That is the question. But I will gladly read from the transcript, if you would like, Judge.
THE COURT: You can answer that if you can.
A Yeah, I believe so.
Q Okay. And, in fact, that's why you went, in June of 2016, with five other people and STV, in fact, to go to London and Paris to see how the industry best practices involving PSDs --
THE COURT: He is making a speech.
Is that why you went to Paris?
THE WITNESS: Yes.
THE COURT: Next question.
MR. GENIS: Thank you.

Q And by the way, the five companies that the Transit Authority agreed were capable and trustworthy and reliable to install platform screen doors at little or no cost, Transit didn't ask one of them to do a pilot; correct?
A Correct.
Q Okay. Now, by the way, you're familiar with what is known as defensive rail operations; correct?
A Yes.
Q Okay. And, in fact, you are familiar with what's known as the safe zone; correct?
A Elaborate on that.
Q Sure. The space around a train that the operator must ensure remains clear of obstructions or people that may come in contact with the train while it's in motion.
A Yes, I call it the envelope.
Q Well, have you ever called it the safe zone?
A I believe so.
Q And that encompasses more than the track bed because of the sway of the trains; true?
A Correct.
Q So the safe zone includes the platform; correct?
A To some degree, yeah.
Q Thank you.
Let's skip this.
In terms of the platform screen doors --

MR. GENIS: Your Honor, I'm going to offer Plaintiff's Exhibit 60 in evidence. I could show it to the witness.

THE COURT: Let me take a look at it.

MR. GENIS: Sure.

THE COURT: Hold on one second.

MR. GENIS: No problem.

THE COURT: All right. I don't have any objections to that, so we will allow that in evidence.

(Plaintiff's Exhibit 60 received in evidence.)

MR. GENIS: Okay, with your permission, I have highlighted it. The highlights are mine, and I would like to use the ELMO, if I can.

Q And do you see an e-mail, Mr. Sanchez, he was one of the head engineers at the Transit; correct?

A I wasn't familiar with Mr. Sanchez.

Q Let's see.

Do you see that J. Greg Sanchez P.E., principal mechanical engineer, MTA, New York City Transit?

A Yep.

Q Do you see that in 2010 he sent this e-mail and he said: Platform edge doors, or platform screen doors are not an innovation or new technology in 2010. In the mass transit industry, they have existed for over 15 years. I designed the Jubilee line extension in London with partial height doors --

skipping a little -- to address the issue New York City Transit has today -- same. He goes on.

And then he says: We are not talking about innovation or new technology, we are talking about a design process, it is a design exercise.

What kind of PED should be installed; correct?

MR. KEAVENEY: Objection. Move to strike. It's hearsay.

THE COURT: Sustained.

MR. GENIS: It's in evidence.

THE COURT: You can show him what's in evidence.

Were you concerned about the fact that its in evidence?

MR. KEAVENEY: I'm concerned about the fact that it is hearsay, that he didn't see it.

THE COURT: If it's in evidence, he can refer to what's in evidence.

MR. GENIS: Let's go to the next one. So we are not confused. Okay.

Q I would like to show you what has been marked for identification as Plaintiff's Exhibit 34 but before I do, I have some questions.

Mr. Abdallah, you mentioned before about your public awareness campaign.

Did you ever receive notification from the president

of the Transit workers union about whether or not these measures were effective?
A I don't recall receiving anything, no.
Q Let me be clearer?
Did the Transit Authority receive any such correspondences?
A I'm not sure.
Q Now, the system safety program plan requires the Transit Authority to take into account complaints from unions; true or false?
MR. KEAVENEY: Objection.
THE COURT: If you can answer it.
A I believe so. I'm not sure.
Q Okay. So I would like to show you Plaintiff's Exhibit 34.
THE COURT: Let me see that also.
MR. GENIS: Of course.
THE COURT: That's one of the things we have to take a look at.
MR. GENIS: I will hand it up to you first. Pursuant to your instructions, it was redacted.
MR. KEAVENEY: Judge, you ruled on this pretrial.
MR. GENIS: Ruled on redactions.
MR. ROTH: There is an e-mail.
MR. GENIS: My apologies.

THE COURT: What's your question? Did they consider the information in this letter they got from the union?

What's your question?

MR. GENIS: I'm sorry. I have to approach the witness to remind him whether or not he actually ever received it, some documents --

THE COURT: You can look at --

MR. KEAVENEY: Is this in evidence, Your Honor?

THE COURT: It's not in evidence. At the present time, he wants to over it into evidence. We have to decide whether I should allow it in evidence.

MR. KEAVENEY: He just handed the witness some documents.

MR. GENIS: Yes.

THE COURT: They are not in evidence though.

MR. KEAVENEY: But what did he hand him?

THE COURT: I think he wants to offer this document in evidence; is that correct?

MR. GENIS: Yes, and I'm laying the foundation to refresh his recollection.

THE COURT: The jurors have not seen this document, okay. He is entitled to see whether he can lay a foundation, since there is an objection. Whether I will allow this in evidence or not. Do you have that in front of you?

THE WITNESS: I do.

Q Do you see what's referred --

THE COURT: Did you receive this from the union?

THE WITNESS: It didn't come directly from the union. It came first to Tom Prendergast, who was the president, from Tom Prendergast to John Gall, who was the executive vice president.

THE COURT: That is something you got eventually from the union?

THE WITNESS: Yes.

THE COURT: What's your question?

MR. GENIS: I offer it into evidence.

THE COURT: I don't think it belongs. I'm not going to allow it.

MR. GENIS: I couldn't hear.

THE COURT: I'm going to sustain the objection. It is a letter from the union. I don't see what the relevance is.

MR. GENIS: It's something he received. It went to the president. It goes to whether or not the measures are effective.

THE COURT: You don't have to argue in front of me like that.

You received this document. Does it have anything to do with what the Transit Authority did or did not do? Was it in any way a consideration of what the Transit Authority

did or did not do?

THE WITNESS: No.

THE COURT: Next question.

Q Does that refresh your recollection as to whether the president of the Transit Authority said that the measures were not effective?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q To you, if he said that.

MR. KEAVENEY: Objection.

THE COURT: Sustained.

THE WITNESS: I'm sorry, are you asking me a question?

THE COURT: I have sustained the objection.

Next question.

Q Okay. So Transit Authority -- your attorney put into evidence some response to --

THE COURT: Just one second. I want to do something technical. We are going to mark 34 for identification at this time. It's not in evidence.

The question is does this have any impact at all upon you or the Transit Authority in terms of anything that you did or did not do?

THE WITNESS: No, sir.

THE COURT: That's why it's not in evidence.

Q Was there a response drafted, sir, to that?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
Q Did you draft a response to it?
MR. KEAVENEY: Objection.
THE COURT: Objection sustained.
Q Well, sir, the Transit Authority also has a chaplain; correct?
A A chaplain, yes.
MR. GENIS: And I would like to approach and show the witness -- I'm offering 65 into evidence.
THE COURT: 65. Just one second. I don't have any objection to 65, so I will allow that in evidence.
MR. GENIS: Thank you.
(Plaintiff's Exhibit 65 received in evidence.)
Q And 65, has, among other things, a letter in 2012, to Mr. Prendergast, president, and it is from the chaplain of the Transit Authority.
You can see her e-mail.
And it is complaining about the lack of effectiveness in the measures and the problem it's causing on the train operators who are going out on disability after seeing people dismembered.
THE COURT: It is in evidence. Do you want to read it to the jury now or do you want to read it later?

MR. GENIS: You know what, I'll read it later.
THE COURT: Okay.
Q Have you ever seen that document before?
A I have not.
Q Did that have any effect on you -- withdrawn.
What, if any, effect did that have on you if you learned that the chaplain of the Transit Authority was complaining about the lack of adequate measures and the ill effect it's having on their own train operators?
MR. KEAVENEY: Objection.
THE COURT: You have seen that. You know about that. This is the chaplain who wrote that letter, all right. As a result of that letter -- did you know about that letter? Did you do anything at all?
THE WITNESS: I did not see that letter.
THE COURT: You have not seen that letter?
THE WITNESS: No.
THE COURT: It's a letter from the chaplain.
THE WITNESS: It's one of the chaplains.
THE COURT: It's in evidence. But you never seen the letter, right?
THE WITNESS: No.
THE COURT: That's his answer.
MR. GENIS: I'm offering Plaintiff's Exhibit 63 in evidence to shortcut it.

THE COURT: Okay. Let's take a look at that.

So I don't have any objection to that either. So we will allow that in evidence at this time.

(Plaintiff's Exhibit 63 received in evidence.)

Q Okay.

THE COURT: So, members of the jury, just to give you a reminder, I have sat down with counsel. They both have been very, very professional, and we have had many conferences before the trial started. The purpose was to go over their proposed exhibit list. Because if I didn't do that, we would be here forever. It is sort of a prescreening process that I employ, and I keep a very accurate list here if there are any objections, if there are no objections.

So you saw in realtime that there were some objections that I had to deal with during the course of the trial, but most of these documents that we have looked at before, they were not objected to, so I told the lawyers that they can be in evidence if and when used because there are no objections. So you understand what's going on here.

And if I didn't do that, we would have to process 150 documents and we would be here forever. We try to do this to prepare the case for trial to give everyone an opportunity to talk about their proposed exhibits and if they have any objections, so noted, and then we deal with them as need be. So you saw this in realtime.

Go ahead.

MR. GENIS: To move it along, I offer Plaintiff's Exhibit 8 in evidence.

THE COURT: 8?

MR. GENIS: 8.

THE COURT: So there is no objection to that. So that will go in evidence also.

(Plaintiff's Exhibit 8 received in evidence.)

MR. GENIS: Okay. If there is an objection that I haven't processed before, we have to stop the action. You saw some examples of that actually.

MR. KEAVENEY: Is he asking questions about these exhibits?

THE COURT: I'm allowing it into evidence. If he wants to use it, You know.

Do you have any questions about the documents?

MR. GENIS: I will gladly do it, but I'm trying to move it along.

THE COURT: I'm pushing them along a little bit. It would be good if you ask the witness if there are any relevancy to these documents.

MR. GENIS: Sure. My pleasure.

THE COURT: If he knows about it. If he doesn't know about it.

MR. GENIS: I'm happy to do so.

Q Let's go to No. 8 in evidence. Do you see this is an e-mail to Cheryl Kennedy who is the head of the Office of System Safety?
A Yes.
Q And this is in 2009; correct?
A Correct.
Q And do you see that there is an e-mail here about how they did originally have conceptual scope of work for the platform barrier doors, the PEDs, and they did a study and recommended it to the president, Mr. Reuter at the time, and he killed it, no way, no how, that was the end of it. We never went beyond conception.
THE COURT: Now, that highlighting was done by counsel. That's not the original.
You recognize these documents as part of the Transit Authority's documents, right?
THE WITNESS: I recognize the type of e-mails, but I've never seen this.
THE COURT: You never saw it, but you can identify it as the --
THE WITNESS: Sure. Yes. I know the names.
THE COURT: Okay.
MR. KEAVENEY: Move to strike, Your Honor, it's irrelevant. There's no foundation for it either.
THE COURT: I'm going to allow it in. He can

identify this is a document from the Transit Authority.
Q And then the e-mail noted -- by the way, do you know who Robert Monfort is and Ken Brown?
A I know Ken Brown. I don't remember Robert Monfort.
Q And Ken Brown was on the platform committee with you; correct?
A Ken Brown was the Director of Risk Hazard Assessment for System Safety.
Q You see this e-mail to Ken Brown in March of 2008, I believe it is --
MR. ROTH: 2009.
Q 2009.
THE COURT: He sees it.
MR. GENIS: My apologies.
THE COURT: We are just trying to give some context to these documents. These are documents of the Transit Authority.
You recognize these people? You know these people; correct?
THE WITNESS: Yes.
THE COURT: So that's why we're allowing it in evidence.
Q And it states platform edge --
THE COURT: Do you want to read that to the jury now or later?

MR. GENIS: I will do it now.

THE COURT: Members of the jury, we allow a little flexibility, documents that are in evidence, counsel can refer to them at summations and sometimes they like to have them read as they are introduced. We allow a little flexibility do that. But if you want to read it now, go ahead.

MR. GENIS: Thank you.

Q And the subject is platform edge doors. This subject is so pollical that I do not know who, if anyone, will talk to other properties. There are many people totally in favor of them and we have done considerable study of them under 2nd Avenue and 7 West with our consultants, Don and I are totally for their use, but there is no champion for the use within the operating department. I think every new subway around the world uses them except New York City Transit.

Did you ever learn about that?

A No, I have never seen that.

Q Okay.

MR. GENIS: I offer Plaintiff's Exhibit 42 in evidence.

THE COURT: I don't have any objection to that as well. So let's go through the same routine that we did here. I will allow that in evidence and maybe you can ask the witness if he can identify and tell us what it is.

(Plaintiff's Exhibit 42 received in evidence.)

MR. GENIS: Sure. I'm putting it up on the screen I'm trying to back it up a little bit.
Q And it is dated June of 2016. Do you see that?
A Yes.
Q And it is benchmarking, at the MTA, the benefits of understanding global best practices; correct?
A Correct.
Q All right. And that's a New York City Transit document; correct?
A Uh-hum. Yes.
Q And according to your own records, New York City Transit has a relatively high number of fatalities per journeys compared to other CoMET members, initiatives like platform screen doors can reduce fatalities; correct?
A That's what it says.
Q Sir, I'm not going to go into it, but I questioned you last week on the 1999 Charles Young memo; correct?
A Yes.
Q That was the one where they concluded that fixed rails were hazardous. Do you recall that?
MR. KEAVENEY: Objection.
THE COURT: I don't know --
MR. GENIS: It's in evidence.
THE COURT: I don't remember all of that. What's your question?

Q Do you recall the Transit saying that fixed rails, in other words, not moving ones, are hazardous?

MR. KEAVENEY: Objection.

THE COURT: So he testified to it, so be it. We are not going to repeat it now.

Objection overruled.

MR. GENIS: Sure.

THE COURT: But let's not just regurgitate everything that happened before.

MR. GENIS: I'm trying not to, Judge.

I offer Plaintiff's Exhibits 60 and 63 in evidence.

THE COURT: 60, I have in evidence.

MR. GENIS: 60 is in. I'm sorry.

THE COURT: And 63 I have in evidence.

MR. GENIS: That we already did, and 63 if it's in evidence, we can deal with it later in summation.

THE COURT: I'm allowing in evidence documents that you have from the Transit Authority as contrasted to the one I did not allow from the union, all right, so the record is clear about that.

I didn't think that the letter from the union would be appropriate, but the others I'm allowing in.

(Continued on next page.)

(Continuing.)

MR. GENIS: Judge, I have -- I don't see -- hold on one second.

Okay. Judge, I have a document exchanged by the Transit Authority. It has not been on the evidence list. It's for impeachment purposes. It's an e-mail to Tony Abdallah and as an offer of proof.

MR. KEAVENEY: Objection.

THE COURT: You know, I told you that we would allow for rebuttal purposes some additional documents, if it's relevant for rebuttal.

And you tell me it's what you need now; right?

MR. GENIS: Yes.

THE COURT: All right. I haven't seen the document.

Show it to counsel, and you let me know whether there's any objection.

MR. GENIS: Sure.

THE COURT: We're going to mark this 106 for ID and possibly in evidence. We'll see.

(Plaintiff Exhibit 106 marked for identification.)

MR. GENIS: Thank you.

And if after counsel looks at it, if I may show it to the witness?

THE COURT: Yes.

Do you have anymore of these because it's going to

eat up a lot of time? If you do --

MR. GENIS: -- I counted, I have very few left.

THE COURT: Well, if there are any other documents that we haven't seen --

MS. WINTERS: Your Honor --

THE COURT: -- let me know because it's going to take a lot of time --

MR. GENIS: That's why I'm trying to move it along.

THE COURT: -- the one document.

Yes?

MS. WINTERS: We would object. We don't believe this impeaches any of his testimony. He's not offered any testimony that is inconsistent with this document.

THE COURT: Let me see it.

MS. WINTERS: Sure.

THE COURT: If it's a document that the witness can identify, I'll allow it.

(Counsel approaches.)

THE COURT: So take a look at this. This is a document you received that's dated -- I think it has a date.

Is there a date on this?

MR. GENIS: Yeah. It's usually on the e-mails, Judge. Just, it's small.

THE COURT: On the top?

Thank you. I can't see.

Is there a date on this thing?

Oh, yeah. It says received 2016, I guess, on July.

Is that it?

Maybe you can help me out. I think it was July.

THE WITNESS: Yes, it was July 2016.

THE COURT: All right. And that's addressed to you?

THE WITNESS: That's correct.

THE COURT: And who is it from?

THE WITNESS: It's from one of the gentlemen that worked for me.

THE COURT: All right. You can identify you've received that?

THE WITNESS: Yes.

THE COURT: All right. We'll allow it in evidence. It's 106.

(Plaintiff Exhibit 106 received in evidence.)

MR. GENIS: Thank you.

BY MR. GENIS:

Q Mr. Abdallah, when you look, there's a page with a Post-It on it, and it's a chart; correct?

A Yes.

Q And it indicates how New York City Transit is one of the least safe subway systems in the world; correct?

MR. KEAVENEY: Objection.

THE COURT: Well, whatever it says it says. Look,

if you want to read it, I allowed it in evidence. You may want to save it for summation.

Do you want the jury to hear it now? We've got to move on. I'll give you the floor.

MR. GENIS: If I just may approach, and then I'll read the key portions and show the jury the chart. Thank you.

Just put the chart that we were discussing on here.

BY MR. GENIS:

Q Do you see it talks about incidents of falls on the tracks, right? No train present?

THE COURT: All right. It's part of the document.

What question do you want to ask him?

BY MR. GENIS:

Q Do you see how New York...

THE COURT: Do you have a question to ask him?

MR. GENIS: Sure.

Q Sir, do you see how New York, compared to every other system, the only one that was close to it was in Australia; correct?

A Right. These are international systems. Nothing in North America.

Q And you told us how you have to look internationally; correct?

THE COURT: Yes, he told you that.

Do you have any other documents --

MR. GENIS: Yes.

THE COURT: Do you have any other documents you want to put in?

MR. GENIS: I've got first No. 10. I'd like to --

THE COURT: Let's try to take care of that now and move it along.

MR. GENIS: I'm sorry, I couldn't hear what you said, Judge.

BY MR. GENIS:

Q Sir, did --

THE COURT: Do you want 10 in evidence now.

MR. GENIS: Yes, sir.

THE COURT: All right. There's no objection to that now. It's in evidence now.

(Plaintiff Exhibit 10 received in evidence.)

MR. GENIS: Okay. Your Honor, I would then offer an unmarked for rebuttal purposes e-mails involving the PTSB to Cheryl Kennedy, head of office of system safety, back and forth that relate to Exhibit 10.

MR. KEAVENEY: Objection, Your Honor.

Your Honor --

THE COURT: I'm sorry, what is this exhibit?

MR. GENIS: E-mails to Cheryl Kennedy, then head of the office of system safety, from the PTSB in response to what is now in evidence, Plaintiff's No. 10 --

THE COURT: Wait a second.
What's the PTSB?
MR. GENIS: That's what Mr. Abdallah discussed on direct examination, Public Safety Transportation Board.
THE COURT: Okay. Show him the documents.
MR. GENIS: Sure. I'm going to show him 10 and the other and the other one.
THE COURT: No. These are identified as what exhibit now?
MR. GENIS: 10 is in evidence. The others --
THE COURT: 10 is in evidence already.
MR. GENIS: And the others do not have --
THE COURT: Just one second.
MR. GENIS: Oh, I'm sorry. 107. It would be proposed 107. Plaintiff's 107.
THE COURT: Just one second. You're showing him now something in evidence or proposed 107?
MR. GENIS: Correct. 10 in evidence, 107 proposed.
THE COURT: 107, mark it for identification.
Can we show it to the jurors?
(Exhibit published.)
THE COURT: All right.
MS. WINTERS: We have not seen it, Your Honor. We're unaware of this document.
THE COURT: You've got to show it to counsel. Time

is getting late. We've got to move it along, but at the same way --

Is this the last document you're going to offer into evidence?

MR. GENIS: I'll tell you what. While they're looking at it, let me look at my list, Your Honor. It's on top.

THE COURT: All right. So if there's any other documents, get them now so we can, you know, utilize that time effectively. Mr. Roth is trying to show you a lot of other things.

MR. GENIS: Those are the only other documents I'm going to offer into evidence. I have --

THE COURT: That is all I want to know --

MR. GENIS: Yes.

THE COURT: -- so we can show them to counsel all at one time.

MR. GENIS: Yes.

MS. WINTERS: Your Honor, we'd object to this document.

THE COURT: It doesn't surprise me to hear that. But let me see -- I haven't even seen the document myself.

MS. WINTERS: Absolutely.

If I may, Your Honor, this is a document that was not sent to Mr. Abdallah. It was not --

THE COURT: I don't know. I haven't even asked him a question.

MS. WINTERS: Understood.

So he has to establish --

THE COURT: You object to it because it was a document that wasn't sent to Mr. Abdallah?

MS. WINTERS: He's not here as an MTA rep- -- as a Transit representative, so he cannot --

THE COURT: It's a hard job to sit in the jury, okay?

MR. GENIS: This is the one in evidence. These are the ones --

THE COURT: Just one second.

MR. GENIS: Sure.

THE COURT: The ones in evidence I know, okay?

All right. So, you gave me two documents, Mr. Genis.

MR. GENIS: Yes.

THE COURT: Which one do you want now to be in evidence?

MR. GENIS: Yes. They go together, Your Honor.

THE COURT: Both of them?

MR. GENIS: Yes. And you could see they're official emails to and from Transit.

THE COURT: Exercise with each other -- so maybe you

and the jurors can take a few minutes off and you can maybe identify what you saw for me. Look at them collectively as one --

MR. GENIS: Yes, will do.

THE WITNESS: So these are documents that I wouldn't be privy to. They're between Cheryl Kennedy who is systems safety and the PTSB, which is a state oversight of systems safety.

THE COURT: No, I know that you haven't seen these present, apparently.

THE WITNESS: Right.

THE COURT: You don't --

THE WITNESS: I don't know what they are.

THE COURT: All right. But do you know who these people are?

THE WITNESS: The -- the only person I know is Cheryl Kennedy. That's it.

THE COURT: Who is she?

THE WITNESS: She was the head of systems safety at the time.

THE COURT: For the Transit Authority?

THE WITNESS: For New York City Transit.

THE COURT: I'll allow that. You can identify that.

Now, are they both through her?

THE WITNESS: They're both to her --

THE COURT: They're both to --

THE WITNESS: -- from Jerry Shook, who I do not know.

THE COURT: Do you have any idea who that person is?

THE WITNESS: I have no idea. He might be with the PTSB, state oversight.

THE COURT: Do you know one way or the other?

THE WITNESS: I don't know.

MR. GENIS: If you look at it, it indicates PTSB --

THE WITNESS: How do I know what?

THE COURT: Do you know who the other one is from?

THE WITNESS: They're both from the same person, Jerry Shook.

THE COURT: To her?

THE WITNESS: To her.

THE COURT: But from whom?

THE WITNESS: From Jerry Shook. He's -- from his e-mail he looks like he's from the Department of Transportation, which is probably PTSB.

THE COURT: He's part of that?

THE WITNESS: Right.

THE COURT: And the other document, also?

THE WITNESS: And the other document, also.

THE COURT: All right. So I'll allow them in evidence.

(Plaintiff Exhibit 107 received in evidence.)
MR. GENIS: Thank you.
THE COURT: All right.
MR. KEAVENEY: Objection, Your Honor.
THE COURT: Objection is so noted.
BY MR. GENIS:
Q And by the way, I'm showing you --
THE COURT: Now, let's see, collectively, we're going to say that's 107.
MR. GENIS: Yes.
THE COURT: It's two documents, okay?
BY MR. GENIS:
Q I'm showing you what's in evidence as Plaintiff's 10.
It's transit; correct?
THE COURT: Well, look, you've got it in evidence, right? So if it's in evidence, you can refer to it.
MR. GENIS: Thank you.
THE COURT: Don't cross-examine him about the documents. Maybe your adversary will. But it's in evidence.
What else do you want to know?
MR. GENIS: I just wanted to read certain things to the witness.
THE COURT: Go ahead.
MR. GENIS: Thank you.
BY MR. GENIS:

Q And it's from Cheryl Kennedy, okay?
And do you see it's involving the PTSB intrusion detection systems? Do you see that?
A Yes.
Q And do you see how they're requesting that the Transit Authority, the PTSB is requesting the feasibility of installing the means of intrusion detection.
Do you see that?
THE COURT: He sees it. We all see it, okay?
Anything else?
MR. GENIS: Yeah, I'm going to -- can I just have the responses, please? Thank you.
(Counsel approaches.)
BY MR. GENIS:
Q Sir, you made a comment before on direct examination that the Transit Authority has a written system safety program plan, true?
A True.
Q And you said that that was specifically for preventing people from getting hit by trains, to avoid and prevent the hazard of 12-9s, true?
MS. WINTERS: Objection, misstates prior testimony.
THE COURT: I know what the objection is.
You don't think he's saying this correctly?
MS. WINTERS: Correct.

THE COURT: Overruled.

Do you understand the question?

I don't know whether you understand it or not.

THE WITNESS: I understand the question, but --

THE COURT: Let's go on to something else, all right?

MR. GENIS: Okay.

BY MR. GENIS:

Q So, my question is, sir --

MR. GENIS: I've got a complete copy of the 2015. It's Exhibit 40-B. I believe it's in evidence.

BY MR. GENIS:

Q Can you please show me where, anywhere at all, it says in the system program plan what the written plan is to prevent people from --

THE COURT: So I don't have --

BY MR. GENIS:

Q -- getting hit by trains?

THE COURT: I don't have 40 in evidence.

MR. GENIS: Your Honor, just let me clarify --

THE COURT: All right.

All right. Next question. Let's go move on. I'm not going to allow it.

MR. GENIS: It's in --

MR. ROTH: 40 is in evidence, I think.

THE COURT: 40 is in evidence.

MR. GENIS: Yes.

MR. ROTH: I'm sorry.

MR. GENIS: 40 came from this --

THE COURT: You want to talk also, Mr. Roth, now? We have to make a record here.

MR. GENIS: 40 is a portion of this -- it's only a couple pages from the system safety program plan. So in other words, 40's just a couple of pages --

THE COURT: It's already in evidence.

MR. GENIS: Yes.

THE COURT: What's your question?

BY MR. GENIS:

Q So, sir, this is the complete systems safety program plan. I'd like to show it to you.

MR. GENIS: And may I approach --

THE COURT: Why don't you ask him a question. We have to move on.

MR. GENIS: I offer this into evidence.

THE COURT: It is in evidence. 40 is in evidence.

MS. WINTERS: So, Your Honor, it's not in evidence.

THE COURT: Now we have a little bit of a problem that the judge has to resolve.

40 is in evidence.

MR. GENIS: Yes.

THE COURT: What are you showing him now?

MR. GENIS: This is the complete program plan. Only a few pages from this are actually in evidence.

THE COURT: I don't think we need it. I don't --

MR. GENIS: Well, yes, Your Honor. This is the crux of their affirmative defense. It's --

THE COURT: Objection sustained.

BY MR. GENIS:

Q Okay. You testified on direct that there's this written plan.

Where is it?

THE COURT: Is there a written plan?

THE WITNESS: A written plan regarding what, Your Honor?

THE COURT: Well, that's a good question.

BY MR. GENIS:

Q Okay. Is there a written plan to prevent the hazard of train stations? To prevent people from falling off of platforms and getting hit by trains?

A The system --

THE COURT: I think you said no to that.

THE WITNESS: Yeah.

A The system program safety plan really is a action plan on -- for safety. I don't think it drills down to preventing 12-9s.

Q Okay.

THE COURT: So he answered that. So that takes care of what you wanted to question him about.

MR. GENIS: Yes.

THE COURT: We don't want to have 400 pages of evidence again.

MR. GENIS: Understood.

BY MR. GENIS:

Q So, sir, you testified on direct that there was a written document that was the safety plan, you used those words, for the New York City Transit Authority to prevent people from getting hit by trains.

Where is that written plan?

THE COURT: First of all, do you recall saying that there was a plan?

THE WITNESS: Yes, I do.

THE COURT: Do you have the plan?

THE WITNESS: So, Your Honor, the control center, which is the nucleus of the train operation has plans or protocols that prevent people -- well, give instruction to operators to prevent safety incidents.

THE COURT: I am trying to get evidence here. If you don't have that plan, you don't have it.

You think there is a plan, but we don't have it, right?

THE WITNESS: Yes, there is a plan.
THE COURT: But you don't have it?
THE WITNESS: I don't have it with me, no.
THE COURT: There's the answer.
MR. GENIS: Okay.
BY MR. GENIS:
Q When was this written plan written to prevents people from getting hit by trains?
A So, plans are written -- I have put into a -- in place a procedure where plans are written or revised or reviewed every five years. So that plan is in the cycle of those plans that have been written and rewritten.
Q Okay. So when was it before August 2nd of 2016 that there was an actual written safety plan to prevent people from being hit by trains?
A I would say I remember seeing something in 2009.
Q Okay. Where is it?
THE COURT: Yeah, is there any reason why we can't have that?
THE WITNESS: I -- I can obtain it for you. I don't --
THE COURT: We don't know. I mean, we're just doing the best we can.
THE WITNESS: Yeah.
THE COURT: We don't have that thing --

THE WITNESS: I don't work there, Your Honor.

THE COURT: You think there was a plan --

THE WITNESS: Yes.

THE COURT: -- back in 2009? That's about the best you can testify?

THE WITNESS: Yes.

THE COURT: All right. You got his answer.

BY MR. GENIS:

Q All right. And how many pages long was this plan?

A Counselor, these are usually what we call directives. They can range from one page to four or five, depending on what the topic is.

Q Okay. Well, we have a very specific topic here. The topic is keeping people from falling off platforms or getting hit by trains. That's the topic, okay, the 12-9s.

So you're telling us that there -- you've seen but you don't have a written plan for that; correct?

A Yes.

Q Okay. And you don't know how many pages long this purported written plan is; correct?

A Correct.

Q Who wrote, allegedly, this written plan?

A So, at the control center, I would have an assistant chief who reports to me and four generals. It would be assigned to the assistant chief, who would buck it to the

generals, and we would get a plan. Everyone would review it. It doesn't come from one person.
Q Okay.
A And I would ultimately sign off on it, let's say, or someone under me.
Q Okay. Did you sign off on a system -- I'm sorry, on a safety plan to prevent people from getting hit by trains?
A Not me. No, I did not.
Q Okay. Did anyone with your firsthand knowledge, you saw it, sign off on a written safety plan to prevent people from getting hit by trains?
A Yes.
Q Okay, who? Who signed it?
A I would name my Assistant Chief Pam Elsey.
Q You said you would name.
Is that who signed it?
A I believe that's who signed it.
Q You believe it.
When's the last time you looked at it?
THE COURT: Listen, we don't have any such document here.
MR. GENIS: Correct.
THE COURT: You're asking questions about a document we don't have.
MR. GENIS: Right.

THE COURT: Go on to something else.

MR. GENIS: Okay.

BY MR. GENIS:

Q Can you think of any reason on this planet why it's not here?

MS. WINTERS: Your Honor, it was exchanged in discovery, and we're prepared to produce it.

MR. GENIS: It was never exchanged in discovery.

THE COURT: No arguments back and forth.

Next question. We've had his answer. The jury has heard it all.

Next question.

MR. GENIS: Okay.

BY MR. GENIS:

Q Sir, are you familiar with Eric Jones?

A Yes.

Q Okay. And Eric Jones was also involved in platform safety, true?

A True.

MR. GENIS: And Eric Jones, just for your edification, Judge, was their 30(b)(6) witness that they produced.

MR. KEAVENEY: Objection.

THE COURT: Yeah, I -- what's your question?

MR. GENIS: Okay. I would like to read testimony to

Mr. Abdallah from Eric Jones, the 30(b)(6) witness, and then question him on it.

MR. KEAVENEY: Objection.

What's the --

THE COURT: Sustained.

MR. KEAVENEY: -- foundation?

MR. GENIS: It's the Transit-designated representative, Eric Jones.

MR. KEAVENEY: Your Honor, he already testified that --

THE COURT: He has testified already.

Next question.

MR. GENIS: Okay.

BY MR. GENIS:

Q So if Eric Jones testified in this matter that there was supposed to be plans for each station, would you agree or disagree with him?

MR. KEAVENEY: Your Honor, could you take the --

THE COURT: -- he's testified. You have all of this evidence already. You can say all sorts of things in summation. But we don't want to have to repeat things now. We've been here for many, many days.

Next question.

MR. GENIS: Okay.

BY MR. GENIS:

Q By the way, APTA is not involved with safety, is it?
A I'm sorry?
Q Okay. Let's see if I can assist you.
You gave testimony about APTA in this case; correct?
A Correct.
Q Okay. And you testified that there was no mention that APTA promotes safety to the public; correct?
A I may -- maybe I misspoke. They do promote safety, of course they do.
Q Well, didn't you actually testify that they're a group that promotes and updates the interest of the public transportation industry in the U.S. but no mention of promoting safety to the public, true?
A Again, I don't recall that, but, yes they do promote safety.
Q Well, were you asked the following questions under oath and did you give the following answer under oath, September 3, 2025, Page 21, Line 14:
"QUESTION: And there's no mention that APTA promotes safety to the public in this footnote, true" -- "in your foot note?
"ANSWER: True."
A I'm sorry, I may have misspoke.
But yes, part of the --
Q Sir, I just asked you if I -- did I read -- sir --

THE COURT: You did give that testimony, right?

THE WITNESS: I'm remembering, yes.

THE COURT: Okay. Mr. Genis can ask you follow-up questions if he wants.

BY MR. GENIS:

Q Sir, you were called by the defendant for their case in chief; correct?

A Yes.

Q And you were called -- and you discussed with Mr. Keaveney before you testified the subject matter of your testimony; correct?

A We had some discussion.

Q Okay. And he asked you a number of questions, and you gave a number of answers specifically about this written safety plan to prevent the 12-9s; correct?

A Correct.

MR. KEAVENEY: Objection, calls for attorney/client discussion.

THE COURT: What's your question?

MR. GENIS: Okay.

BY MR. GENIS:

Q Well, you knew in advance you were going to tell these jurors that you had a written safety plan to prevent 12-9s, true?

MR. KEAVENEY: Objection.

A True.
Q Okay. And knowing that you were going to give --
THE COURT: What is your question?
Q Knowing you were going to give this testimony to this jury, did anybody from the Transit, including yourself, say, why don't we bring them a copy of this alleged written safety plan to prevent 12-9s from occurring?
THE COURT: You can answer that question.
THE WITNESS: Well, I wasn't aware, Your Honor and counselor, that I was supposed to bring any documents.
THE COURT: Well, I know that. But that's not the question.
He just wants to know if anybody ever said anything to you about it?
THE WITNESS: No.
MR. GENIS: Okay.
Q And, sir, you, in fact, have said under oath that fixed rail barriers on platform edges could pose hazards; correct?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
MR. GENIS: All right.
BY MR. GENIS:
Q Is there any reason that you can think of right now before August 2nd of 2016 that the Transit Authority did not install even fixed rail barriers in the subway stations?

MR. KEAVENEY: Objection.
THE COURT: Yeah, I'll allow that.
Do you have any knowledge about that, why they didn't do it? Do you have anything you can tell us about that?
I'll allow you to answer that.
A Other than the variables that I discussed earlier, all of the components that go into an installation of something like a platform screen door, the electrical, the platform integrity, the station design, the car equipment.
I can't think of anything else. I was never given a decision.
THE COURT: Okay. You got your answer.
BY MR. GENIS:
Q That's not my question. I was not asking about platform screen doors or anything electrical.
I was asking specifically about fixed rails, like they put in.
MR. KEAVENEY: Objection.
THE COURT: Did they have fixed rails? That's what he wants to know.
THE WITNESS: So at -- at that point I wasn't allowed -- involved in that fixed rail program.
THE COURT: You know nothing about it?
THE WITNESS: So I know nothing about it.

THE COURT: He knows nothing about it.

MR. GENIS: All right.

BY MR. GENIS:

Q And when you were on the platform safety -- task force such as a platform safety committee, did anybody on that committee say, geez, why don't we put in fixed rails?

MR. KEAVENEY: Objection.

THE COURT: Were you privy to any discussion about whether there should be fixed rails installed or not?

THE WITNESS: No, not in my time --

THE COURT: There's your answer.

MR. GENIS: Okay. Let me just think. Give me one second.

THE COURT: Think.

MR. GENIS: You know what Judge? I'm good.

You know what? I'm sorry. One other thing.

BY MR. GENIS:

Q Sir, when you said --

MR. GENIS: Two things.

BY MR. GENIS:

Q You didn't say it was a written plan. You said there would be a directive issued by somebody.

Is there a difference between a plan that is promulgated by the Transit Authority, then sent to the Public Safety Transportation Board and approved by the Public Safety

Transportation Board? Is there a difference between that type of a plan and a directive?

MR. KEAVENEY: Objection.

THE COURT: Do you understand the question?

What is a directive?

THE WITNESS: A directive is what I said earlier, something that could be one page up to four or five pages that are -- is an instructional guide for our operators, console operators in a control center.

THE COURT: And a plan is something different?

THE WITNESS: A plan is something more overarching that goes to system safety --

THE COURT: More comprehensive?

THE WITNESS: More comprehensive.

THE COURT: Okay.

MR. GENIS: Okay.

THE COURT: Anything else?

BY MR. GENIS:

Q All right. So you're only telling us there was a directive, true?

A True.

MR. GENIS: You know what? I think I'm good, Judge.

Oh, I'm sorry. There's one last thing. I apologize.

THE COURT: That's what you said --

BY MR. GENIS:
Q You said you would look over every five years.
Are you aware that according to the FTA, you're required to review the plan every three years to see if it's been effective or not and make changes if it's not?
A Yeah, that -- the difference between the directives and the plan, the directives were every five years, the bulletins were ever five years.
Q Okay. That's not my question, sir.
My question is: Are you aware that according to the FTA, that you are required every three years to review to see if it's been effective in light of its actual operation, and if not, to change the written plan for safety to prevent this?
A Yes.
Q Okay. So it's not every five years, it's every three years; correct?
A Sir, there -- again, there's a difference between the five years, which are the directives and --
Q I'm not asking about the directives.
A Then I can't answer --
THE COURT: Five years you said is the directives; right?
THE WITNESS: Right.
THE COURT: And then there's something else that has to be done every three years?

THE WITNESS: Correct.

THE COURT: What has to be done every three years?

THE WITNESS: What the counselor is talking about, the system safety plan, any changes, et cetera. That's every three years.

THE COURT: Every three years?

THE WITNESS: Yes.

THE COURT: Now, did you do that?

THE WITNESS: It wasn't under my purview to do that.

THE COURT: Okay. Next question.

BY MR. GENIS:

Q And you told us there's nothing in the system safety program plan that actually discusses how to prevent 12-9s from occurring, true?

A Again, not that I'm aware.

THE COURT: You've asked that question many times, all right?

MR. GENIS: I'm done.

THE COURT: I think you're finished.

MR. GENIS: I am.

THE COURT: Mr. Keaveney, do you have any other questions?

MR. KEAVENEY: Your Honor, may I approach the witness and show him a document?

THE COURT: Well, I don't know what document you

want to show him, so why don't you ask him a question?

REDIRECT EXAMINATION

BY MR. KEAVENEY:

Q Mr. Abdallah, if I showed you a directive regarding unauthorized persons on or near the right of way, would you be able to identify --

THE COURT: Do you have a document that you say is a directive?

MR. KEAVENEY: Yes.

THE COURT: Show it to him, go ahead.

MR. GENIS: Well, it's not a plan, Judge, and it was never exchanged.

May we see the document also, Your Honor?

THE COURT: You're going to have a chance.

Look, members of the jury, this is what happens in realtime, okay? You're being exposed to what a real trial is all about.

And towards the end of the trial, sometimes you get a lot of give and take and a lot of back and forth. We just want to get everything out that we want for your consideration.

Is this a directive?

THE WITNESS: Yes.

THE COURT: Do you recognize it as a directive?

THE WITNESS: Yes.

THE COURT: Before August 2nd, 2016?

THE WITNESS: Yes.

MR. GENIS: Judge, may we approach and --

THE COURT: Show it to counsel.

MR. GENIS: When we see it, we have to approach.

THE COURT: I want you to look at it.

MR. GENIS: I looked at it. I don't want to say things in front of the jury.

THE COURT: No, it's is okay. But we may have to excuse the jurors, but you asked about directives.

MR. GENIS: Yes.

THE COURT: And if this is a directive, I think it sounds, at least in the first instance, that it might be relevant; right?

MR. GENIS: Except it's contrary to your ruling.

THE COURT: It's what?

MR. GENIS: It's contrary to one of your prior rulings. That's why I don't --

THE COURT: Well, maybe I'll have to change my prior ruling based on what's happened in realtime here because you asked questions about the directive.

This is before August 2nd, 2016, yes or no? Let me see it then.

MR. GENIS: Sure.

THE COURT: All right. You asked the questions

about the directive.

MR. GENIS: I asked about the plan, and he answered about it.

THE COURT: And you asked about directives, also, okay?

Just one second, all right?

Mr. Genis, please calm yourself down. I make rulings based upon the information before me at the time.

MR. GENIS: Okay.

THE COURT: Now you ask questions about directives, and now he wants to show a directive.

MR. GENIS: Sure.

THE COURT: Okay. Let me look at it.

(Reviewing.)

So who is this directive from? Let's see if you can identify that. Is that one of these directives you're talking about?

THE WITNESS: Yes, it is.

THE COURT: Who is this from?

THE WITNESS: This is a directive. This was issued by David Spivey who was an assistant chief transportation officer in the rail control center back in April of 2009.

THE COURT: All right. We're going to allow that in evidence. You have your exception.

MR. GENIS: Your Honor, then I'd like to reopen our

case on speed policy. Let's go.

THE COURT: That's the directive.

Mr. Genis, you asked him whether he's seen directives.

MR. GENIS: No, I asked about the plan, Your Honor.

THE COURT: You asked him about the difference of a directive and a plan, all right? You raised the issue of a directive. I'll give you an opportunity to stay until midnight, okay? I'm just trying to run a fair trial.

MR. GENIS: I understand.

THE COURT: It's a directive. He identified that. That will be in evidence now as Exhibit 108. .

MR. KEAVENEY: No. It's Defendant's Exhibit YY.

(Defense Exhibit YY received in evidence.)

(Exhibit published.)

BY MR. KEAVENEY:

Q Is this the directive you were talking about?

A Yes.

Q And is this a directive that addresses unauthorized persons on or near the right of way?

A Correct.

Q Now, you indicated earlier about the plans to install platform doors and plaintiffs said that they would do it for free. Do you recall that testimony?

A Yes.

Q Was it free or was it in exchange for something?
A Counsel, you never get anything for free. You pay for what you get.
MR. GENIS: Objection.
THE COURT: Well, look. It seems like something that anybody would say. Nothing is free in this world. Do you want to explain --
THE WITNESS: Sure.
THE COURT: There is evidence here about the fact that there was a deal to -- I don't know -- he wants to know more about what that's all about.
A Yes, in exchange for installing the platform screen doors, they wanted the revenue from advertising in the subway system --
Q Okay.
A -- which was pretty substantial.
THE COURT: That was a quid pro quo. We'll do it for nothing and we want to advertise?
THE WITNESS: Correct.
THE COURT: Next question.
(Exhibit published.)
BY MR. KEAVENEY:
Q This is Plaintiff's Exhibit 8 which said that there was no champion for the use of PSDs in the operating department. Do you see that?

A Yes.
Q And this was dated March 12th it looks like -- March 12, 2009; correct?
A Correct.
Q And then after that in 2010, you went to Korea; right?
A Yes.
Q And then after that later in 2010 they issued a request for information, right?
A Yes.
Q And after that in 2011 they did the concept of operations; right?
A Yes.
Q Okay. You testified earlier about best practices. What do you mean by best practices?
A So, we reach out to CoMET or AASHTO or whoever does best practices and request information on what they do in a particular situation, what is their practices and procedures.
Q Okay. And is that a requirement to follow those practices and procedures?
A No.
Q How does that work in terms of obtaining that information in New York City Transit?
A So, if we were to use CoMET -- there's a CoMET liaison that I reach out to and I say this is what we want to know and that CoMET liaison will reach out to all members of CoMET,

take the information and put it in a spreadsheet, a chart, a table.

Q Does Transit take action on any of that information?

A It depends.

Q It depends on whether it's feasible or whether it's doable or whatever?

A Exactly.

Q Okay. Does the number of 12-9s directly relate to whether or not a system is safe or unsafe?

A Not in my opinion, no.

Q So, the fact that Transit might have more 12-9s than another system, does that mean that Transit is more safe than a different system?

A No.

Q Okay.

MR. KEAVENEY: Thank you.

MR. GENIS: May I, Your Honor?

THE COURT: Anything else?

MR. GENIS: Oh, yeah recross.

RECROSS-EXAMINATION

BY MR. GENIS:

Q I would like so show you the exhibit that just came into evidence, please.

(Exhibit published.)

THE COURT: What is it you would like shown?

MR. GENIS: I would like to show the document I.

THE COURT: Can we see that on the screen, Mike? It's Exhibit YY, the directive.

MR. GENIS: Yes, a document never on the exhibit list before.

THE COURTROOM DEPUTY: Go ahead.

(Exhibit published.)

BY MR. GENIS:

Q Do you see where it says "restricted speed with extreme caution"? Do you see that, sir?

A Yes, sir.

MR. GENIS: Can you scroll down or up or whatever the word is? Thank you.

Q So that means do not go faster than ten miles per hour; correct?

A Correct.

Q So if the train operator in this case was entering at 25 miles an hour and then was going down between 20 and 24 miles per hour that would be in violation of this directive, true or false?

MR. KEAVENEY: Objection.

THE COURT: Can you answer that question one way or the other?

THE WITNESS: It's only true if the operator was given the order to operate with restricted speed in extreme

caution.
Q Well, it says "a report of an unauthorized person be on or near the right of way." Here, there's been testimony and evidence that a person -- right; you view anybody that goes onto the tracks that's not an employee as unauthorized; correct?
MR. KEAVENEY: Objection.
THE COURT: Sustained. Save it for your summation.
BY MR. GENIS:
Q Does the Transit Authority view a person like Luisa going onto the tracks as being unauthorized?
A Yes.
Q Okay. So -- and, if there were reports made to the Transit Authority, right, through a 9-1-1 call, complaints, whatever, that this was an unauthorized person on the track bed, then the train had to go at no more than ten miles per hour, true or false?
A True.
Q Okay. So if the train operator failed to do that, she violated that directive, true or false?
MS. WINTERS: Objection.
THE COURT: Sustained.
BY MR. GENIS:
Q And are you aware that the signals here were for 25 miles per hour?

A Signals in what location?
Q To get into the Atlantic Avenue Barclays station.
A I don't remember.
Q Would you agreed if Ms. Shabazz testified that the signals were for 25 miles per hour that that was true?
A Yes.
Q Okay. Are you aware that Dr. Marpet testified 35 miles per hour?

THE COURT: We're not going do that. We're not going to have those types of questions.

MR. GENIS: Okay.

THE COURT: What other questions do you have?

BY MR. GENIS:

Q Let me ask you this: What training was given to the operators to go at only ten miles per hour?

MS. WINTERS: Objection.

THE COURT: Sustained. I don't know whether they were given any training at all. Were they given any training to go ten miles an hour?

THE WITNESS: Your Honor, that's an unusual question. Training is training. If they have to reduce their speed to ten miles an hour they would if they had the time to do that.

THE COURT: I think we've had enough.

What is the next question?

BY MR. GENIS:

Q Sir, are you aware that there was -- you talked about Senator Savino; correct?

A Yes.

Q Are you aware that there was someone named Crespo who had a Crespo bill to lower speed limit for entry of the trains into the station and that Transit opposed it?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Are you aware that there was a proposed bill by Assemblyman Crispino to reduce the entry speed of trains?

MR. KEAVENEY: Objection.

MS. WINTERS: Move to strike.

THE COURT: Are you aware of any such thing?

THE WITNESS: No.

MR. GENIS: Then I would like to enter into evidence the Crespo bill to do just that since they've opened the door on speed policy, Judge.

THE COURT: Objection sustained. I'm not going to allow it. You have your record.

BY MR. GENIS:

Q What studies, if any, were performed by the Transit Authority about lowering the speed in terms of reducing the number of 12-9s?

MR. KEAVENEY: Objection.

THE COURT: The question is whether any studies that were done by the Transit Authority about the reduction of speed in relation to 12-9s?

THE WITNESS: I'm not aware of any studies.

THE COURT: You have your answer.

BY MR. GENIS:

Q So, was this directive just to the control center and console dispatchers and the superintendents?

A Yes, it's to the personnel in the rail control center; correct.

Q So is this distributed to the operators?

A No.

Q Is it distributed to anyone else in the Transit other than the superintendant and the console dispatcher?

A This is a document to the control center.

Q So it's not distributed?

THE COURT: So we're clear it's an internal document. It wasn't distributed to train operators or anyone else?

THE WITNESS: No.

Q Was this filed with Public Safety Transportation Board?

A I don't know.

Q After 2009, did anyone review this to see if this was effective at reducing or preventing 12-9s?

A I don't know.

THE COURT: You have no knowledge?

THE WITNESS: None of those directives, no.

THE COURT: You have your answer.

BY MR. GENIS:

Q Is this directive, Defendant's Exhibit YY the entire plan for the Transit Authority to stop people from getting hit by trains?

A Can you clarify your question?

Q Sure.

A Is it the entirety --

THE COURT: Is there anything else out there that you know of?

THE WITNESS: Other than what I mentioned earlier, our campaign.

THE COURT: We don't want to go through all the testimony again. I think we've covered the fact that this is all you have, right? This was issued in 2009, I think that's what you testified to, right?

THE WITNESS: I'm certain there was subsequent --

THE COURT: You don't know of anything else other than this?

THE WITNESS: No.

THE COURT: All right. There's your answer.

BY MR. GENIS:

Q Was this effective?

THE COURT: Was this what?

MR. GENIS: Effective.

A No way for me to measure.

Q Okay. Okay.

MR. GENIS: And by the way, Judge, I renew my request unredacted for the Samuelson letter because it talks about speed restriction.

MS. WINTERS: Objection.

THE COURT: We're not going to do that. I think you've gone far enough and we have a big record here.

MR. GENIS: Thank you, Judge.

THE COURT: Mr. Keaveney, anything else for this witness?

MR. KEAVENEY: Nothing else for the witness, Your Honor.

THE COURT: Thank you very much. You may step down.

(Witness excused.)

THE COURT: Let's find out if you have anything else for today.

MR. KEAVENEY: Your Honor, we do have one final witness but we won't finish today.

THE COURT: So that person will be there at 10 tomorrow morning?

MR. KEAVENEY: Guaranteed.

THE COURT: Can you tell me how long you think it

will take?

MR. KEAVENEY: I think my direct will be about an hour.

THE COURT: Members of the jury, we're going to hear more testimony tomorrow.

Will there be any rebuttal witnesses.

MR. ROTH: I believe so, Your Honor.

THE COURT: Who is that.

MR. ROTH: Dr. Berkowitz.

THE COURT: You want him back as a rebuttal witness.

MR. ROTH: Yes.

THE COURT: Anybody else?

MR. ROTH: Not to my knowledge.

THE COURT: That is to give you an idea of what to anticipate. It seems to me we should be able to wrap up the evidentiary part of the case by the end of tomorrow morning hopefully. I was hoping to do it today, but we can't control these things, right. So get a good night's sleep. I know you're taking notes and we'll all pull it together, I'm sure, during summations and I'll explain the law to you so we're getting close to the end of the line. Don't talk about the case. See you tomorrow at 10:00.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(Continued on the following page.)

(Continuing.)

(In open court; jury not present.)

THE COURT: The jury is not here and I think what.

I should do is give you my 50th iteration of the jury questions. You ought to have them. I don't know whether they have been given to you or not. Let me try to get that down from my law clerk. And so just be a little patient because I think I want to show them to you again. Because, you know, as I anticipated at the beginning of the trial, the questions are all important and I must have x-ray vision to have come to that conclusion before we even started the trial.

So let's see what we can do now. It's 4:30. And I guess we should be prepared for summations tomorrow afternoon. Does that make sense?

MR. KEAVENEY: Sure.

THE COURT: Let's see what happens. And realistically if I can get the case to the jury tomorrow, I don't really know. I am not going to really press you to a fault in terms of your summations. Everybody says an hour, it winds up to be two hours. And I am not going to impose any time limits unless you go on and on and I have to step in. I don't do that in the first instance. I don't think there is a right to do that. It's a big case, there's a lot of testimony. There is a lot of back and forth. You should

have the luxury of your time in your summations. Do not feel any undue pressure, okay? But if we can get the case to the jury tomorrow, fine, otherwise it will go to them, I assume, Thursday morning, which may not be a bad thing, okay?

MR. GENIS: If we are calling a rebuttal witness, I'm not sure when we will be done.

THE COURT: All I want is to make sure the witnesses are here.

MR. SHIELDS: Dr. Berkowitz will be on Zoom, Your Honor.

THE COURT: All right. So just wait here. I just want to get the proposed verdict form, we can work off of that. I may have to make some further knits on the jury charge. We have gone through 20 iterations of it so far. But I think what we should ask the jury is not whether there was a safety plan, but whether there was a study and I think that's what should be asked.

MR. GENIS: Judge, you ask about the study, item number two, in the one we have before. The first question is the issue on the plan, which --

THE COURT: So anyway, look, we're going to talk about this.

MR. GENIS: Okay.

THE COURT: The initial thing I thought about was

whether there was a safety plan.

MR. GENIS: Right.

THE COURT: So reviewing all of the law and the caselaw, I think the right question is whether there was a study and whether it was accurate and whether there was reasonableness. I think that's what it's going to come down to.

Let me try to get that document down here so we can look at it collectively, okay?

MS. WINTERS: How much time do we have, Your Honor?

THE COURT: Off the record.

(Off the record.)

MR. GENIS: Judge, if we have a moment since we are not doing a charge yet, may I place certain objections on the record?

THE COURT: Yes. We will let you do all of that. Let me just try to do something right here.

MR. GENIS: Sure.

(Recess taken.)

(In open court; jury not present.)

MR. GENIS: Judge, you are asking did the plaintiff's negligence contribute before you even ask if she was negligent.

THE COURT: Of course. We're going to ask --

THE COURTROOM DEPUTY: Are we on the record?

THE COURT: We're breaking it down. First they have to decide whether there's negligence and then we ask proximate cause after that.

MR. GENIS: I get it. One and two is: One, was Shabazz negligent. Two, was there proximate cause. Two, was Transit negligent, proximate cause, I'm fine with that.

When you get to affirmative defenses, it says does plaintiff's negligence --

THE COURT: I see.

MR. GENIS: Yeah, assumes she was negligent.

THE COURT: Just one second. Let's get this on the record here.

If the plaintiff was negligent.

MS. WINTERS: Yes.

MR. GENIS: Right.

THE COURT: That's why we are here to talk. I have given 25 iterations of this to my law clerks --

MR. GENIS: I liked the last one better.

THE COURT: -- and we are trying to break the record, which is 30, which is the same as the football quarterback of Indiana. We're trying to break the record.

MS. WINTERS: So it would be: Was plaintiff negligent and did it contribute?

THE COURT: So just take a look and we will talk

it through. I think that would be if plaintiff was negligent.

So you want a separate question to ask was the plaintiff negligent also?

MS. WINTERS: Yes.

MR. GENIS: Yes. Should be just like for one and two, was she negligent, was that a proximate cause. Just like we do for the defendants.

MS. WINTERS: I think we should keep the word contribute, though.

MR. GENIS: Well, it's proximate cause, just like you do for the other ones and then whatever they find, they find, and then there's an apportionment.

I would also respectfully submit that since the first questions are defendants' negligence, they should come on item four, before plaintiff. That's the order of things.

MS. WINTERS: That's fine. We're fine with that.

THE COURT: You want the proximate cause that makes the verdict sheet much longer, right?

MR. GENIS: That was defendants, yes.

THE COURT: So is everybody here?

THE COURTROOM DEPUTY: Do you want me to get anybody on the phone?

THE COURT: You can call up Ty. I have another law clerk who is not here. We're going to get him on the

phone.

THE COURTROOM DEPUTY: Okay. Ty's on the line.

THE COURT: Ty, how are you doing today? We miss you in court.

THE CLERK: I am here. I am doing fine.

THE COURT: All the lawyers wish you were here.

THE CLERK: I don't know about that.

THE COURT: So let's look at the verdict sheet and before we do that, the jury charge, we'll add proximate cause to it. I have eliminated any questions about prior medical and prior earnings. And I think we're getting close to having it all together. And I am going to look it over again and give it to you tomorrow, but you know what we're doing. So let's just look at the verdict sheet here.

So I think that the first question is simple enough: Was Shabazz negligent, and was it a proximate cause. Was the Transit Authority negligent, was that negligence a proximate cause.

So far so good, right?

MR. GENIS: Yes.

THE COURT: Now, we don't want to make this more challenging for the jurors than we absolutely have to, all right? So I guess we want to ask: Was the plaintiff also negligent? I guess we want to ask that question.

MR. GENIS: Yes. I don't think you need the word

also, but yes, was the plaintiff negligent.

THE COURT: And, you know, I would like to just leave it at that and then ask whether or not that negligence contributed to the cause of the accident. I don't know. I hate to ask proximate cause again.

MR. GENIS: I know, but shouldn't it be consistent, Judge? It's the same, you know, for them as for us?

THE COURT: In terms of realistically.

MR. GENIS: I just think the aesthetics, it makes it look uneven.

THE COURT: Well, you know, if she was also negligent, I don't know that we need proximate causation after that. If she was negligent, to apportion the negligence.

MR. GENIS: What if the jury says negligent, but not proximate cause?

THE COURT: I don't see where it flows, but I will ask my brilliant law clerk who is not here whether he agrees with me or not after you guys go home. I will ask my brilliant law clerk who is listening intently on the phone whether he agrees with me or not. But I don't think we need that.

MR. GENIS: But that shouldn't be for the defendants either then.

THE COURT: Mr. Genis, I love you, but I don't agree with you all the time. Okay?

So anyway, we are going to work it all out. We are going to ultimately find whether there is, you know, contributory negligence. We are going to have the percentages that they're going to have answer, I guess.

The thing that really I think is the heart of all of this, are the questions dealing with immunity. By the way, I struck out the word "Government" in the charge. So there's no Government immunity here.

MR. KEAVENEY: Thank you.

THE COURT: Very easy to get things confused, right?

MR. KEAVENEY: Yes.

THE COURT: So let's just go through the questions.

I will consider whether we want to elaborate on the affirmative defense of contributory negligence, I'll reflect upon that, but I sort of like to keep it shorter rather than longer, but let's look at the telltale questions.

As of August 2nd, 2016, did the Transit Authority study -- I'm changing my glasses -- study the issue of persons falling onto the tracks and consider whether to install platform edge barriers or track intrusion devices?

I think that's a simple enough question. I don't see where there's any problem with that.

MR. ROTH: Your Honor, should we wait for you to finish going through it all?

THE COURT: Tell me about that. Do you have any problem with that?

MR. ROTH: The last iteration you had --

THE COURT: You have to speak loud if you want me to hear you.

MR. ROTH: I'll come up, Your Honor.

THE COURT: You have a problem with that question?

MR. GENIS: Yes.

MR. ROTH: Yes, yes, Your Honor.

THE COURT: Well, let me know what your problem is.

MR. ROTH: It's the last iteration of this was that there was -- what, Elliot --

THE COURT: You can't mumble if you want to make a record here.

MR. ROTH: In your last iteration, you said that they had to have a plan --

THE COURT: I changed that because when I read *Turturro*, I think we're talking about a study, okay? The study could lead to a plan.

MR. SHIELDS: Your Honor, and the key difference

in *Turturro* was that there was no plan at all. And so that's why in *Turturro*, they talked about a study first.

THE COURT: What authority do you have here that tells me that they have to have a plan? We have to be clear about that.

MR. SHIELDS: *Turturro*. In *Turturro*, it says at 734, it says: They alleged *inter alia* that the city was negligent in failing to perform a proper and adequate study of the speeding problem in response to these complaints, and in failing to timely implement a specific plan to control or resolve the speeding problem.

That shows that the thing -- the reason they went to the study first, Your Honor, is because there was no plan there in the first place. So the first question should be, like you had it in your jury charges originally, was there a plan in the first place.

THE COURT: Well, that's going to be a big question, and that's going to go to the Court of Appeals. The first time, I thought that's what it was, but as I read *Turturro*, I think, you know, the question was did they have a study, was it an adequate study.

MR. GENIS: If there is no plan, it makes everything else moot, Judge.

THE COURT: Pardon?

MR. GENIS: If there's no plan, it makes

everything else moot.

THE COURT: I don't know about that.

MR. ROTH: Your Honor, my position on this has always been, it's adequate study, plan with the reasonable basis, review that plan in light of its actual operations. So here, as of August 2nd, did the Transit Authority study the issue of persons falling onto the tracks, that should be it. Not to consider whether to install platform edge --

THE COURT: Stop. Now, there's no way we can keep of record of what you are saying.

MR. ROTH: Why?

THE COURT: So you think it should not be a study, it should be a plan.

MR. GENIS: Correct.

THE COURT: And I have gone back and forth with this, you know, and I have got to come to a final resolution. We have a difference here. And so that may make all the difference in the Court of Appeals.

MR. GENIS: Yes.

THE COURT: Okay? And you can read *Turturro* different ways and you can read the law different ways. You can go back to *Weiss* different ways. And I think *Weiss* originally talked about a plan.

MR. GENIS: That's really the issue, because the only thing is let's say you have a plan, okay? If the

defense says we had a plan. Okay, was there a reasonable basis for the plan. And how do you have a reasonable basis, because you do an adequate study. But it all flows from the plan, because if there's no plan, everything else is irrelevant. If there is a plan, okay, was there a reasonable basis for it, yes or no.

THE COURT: So this was -- I'll share with you what's going on in my Chambers. This was my initial sense of it all. And then distinguished counsel, you know, got me to think about whether this study is really sufficient and you don't need a plan, all right?

MR. GENIS: It's also that the study as of August 2nd, does that mean if the morning of August 2nd they did a study, that shouldn't be. You'd have to do the study well in advance in order to have a plan.

THE COURT: Let's not debate it. I have an issue. You want plan. You want study.

MR. ROTH: I just want to say one other thing, please.

MR. GENIS: We're not against study being later on.

MR. ROTH: Hold on. Here's the thing. What -- you would not review your study in light of its actual operation. You would review your plan in light of its actual operation, right? The study, like, what would you be

reviewing? That's why the plan is what you review. Did -- hey, does your plan work? Are all these people --

THE COURT: That was my initial sense of things.

MR. ROTH: Yes, because what else would you review?

THE COURT: This is going to be an issue for the Court of Appeals, okay? Is the proper question whether or not they studied it, study, whatever that means, or did they actually have to have a plan, a duly executed plan.

MR. GENIS: Right. Because then you look at the plan in light of its actual operation to see whether it was effective or not.

THE COURT: Way back when, Judge Foe talked about a duly executed plan.

MR. GENIS: Right.

THE COURT: And that was my initial assumption.

You are going to make an exception, if I go that way, and you are going to argue that in the Court of Appeals. I don't know which way I'm going to come out yet. Stay tuned. You will be surprised tomorrow, okay, one way or the other. But I think that, I've never had so much fun, but whether it was a plan or whether it was a study, we are going to ask whether it was adequate, I guess, right?

And then there is a decision not to install have a reasonable basis, I guess that comes from the caselaw. And

did they review it in light of actual operations. I'm taking that faithfully from *Turturro*.

MR. ROTH: And the decision is the plan. Even this, if you look at D, it says, because that's why -- that's what they have to review. They review -- it's the decision is another word for plan. So that's why plan should be -- is what they're reviewing.

THE COURT: So you want study.

You want plan. Anything else?

MS. WINTERS: If I can just highlight in *Turturro* the holding on qualified immunity was whether or not the entity conducted a reasonable study of the dangerous condition. The dangerous condition here would be people falling onto the tracks.

THE COURT: You are talking so fast, the reporter can't get this down.

MS. WINTERS: So in *Turturro*, the holding was whether the entity conducted a reasonable study of the dangerous condition. The dangerous condition there was speeding. The dangerous condition here is people falling on the tracks.

MR. GENIS: No.

THE COURT: So *Turturro* says that after the state implements a track or plan, so they're talking about the implementation of a plan; aren't they?

MS. WINTERS: The key difference there, and this is why we've taken exception with relying on *Turturro* is in highway law there is a specific requirement to have a traffic plan. So they had to specifically look into that plan to see whether or not -- whereas the question that's being asked of this jury is whether or not the --

THE COURT: So they cite -- you know, they cite *Friedman* and I'll look at *Friedman* again and they comingle it. They say a study of a traffic condition plainly inadequate, or there is no reasonable basis for its traffic plan.

MS. WINTERS: Right.

THE COURT: So look, this is not the epitome of clarity for this Judge to really sort out. Because the distinguished Court of Appeals is talking out of the same side of their mouth on the study, and they're also talking about a traffic plan. So that's what makes this job very difficult, all right?

So I will make the hard decision and my tendency is to think that we're talking about a plan here somehow. And we'll have to just reflect upon it. So that's what we're talking about today. Everything else I think will line up okay.

MR. GENIS: I don't want to interrupt.

THE COURT: What else?

MR. GENIS: Okay. Two things. At the risk of beating a dead horse, you can only do corrective action on a plan, not on a study.

But the other issue is what is the central issue? The issue is not people falling onto the tracks. The issue is, as all the witnesses have agreed, the hazard of train strikes. It's preventing the hazard of train strikes. There's even the testimony, in fact, of Mr. Abdallah today, you could be on a platform and have a train have contact with you because of that safety --

THE COURT: What are you saying? There should not be a plan?

MR. GENIS: No, there should be a plan, but the issue is did they have a plan to prevent the hazard of train strikes? We had multiple witnesses the very first week of trial, each and every witness, including Mr. Abdallah, admitted that's the issue. The hazard here is the hazard of train strike.

THE COURT: They have had to deal with people falling into the tracks, right.

MR. GENIS: It's not just falling. You could be pushed. There is a number of reasons everybody's gone into that somebody can get hit by a train. The hazard is train strikes. And in *Turturro*, they talk about they have to address the hazard. What is the issue. The hazard here is

train strikes.

MR. ROTH: And that's how they --

THE COURT: So anyway, if they say did they have a plan, did they plan --

MR. GENIS: To prevent the hazard of train strikes.

THE COURT: They are talking about falling onto the tracks. What's wrong with that?

MR. SHIELDS: Your Honor, because the witnesses testified about the envelope of the train which takes into account the train rocking back and forth and meaning that people can get hit even if they're standing on the platform and haven't fallen onto the tracks.

MR. GENIS: Or somebody could get pushed onto the tracks. Somebody comits suicide. The issue is the hazard of train tracks.

THE COURT: We are talking about the issue of persons falling onto the tracks includes what you want to talk about. What is the issue of persons falling on the tracks?

MR. GENIS: The issue is even, as we are saying, you could be standing on the platform and still get hit by a train absent a barrier. Even a track intrusion devices will not prevent that from occurring. And the issue is: Did they have a plan to prevent it? Did they do an adequate

study to prevent it? And that's what all the questioning has been on this trial.

THE COURT: Just one second. You don't think the plan should deal with the issue of persons falling on to tracks?

MR. GENIS: No, I think the plan should and the study should get to the prevention of the hazard of train strikes.

THE COURT: The hazard of train strikes.

MR. ROTH: Hazard of train striking --

MR. GENIS: People.

MR. ROTH: -- people.

THE COURT: I don't know.

MR. GENIS: Judge, I elicited that testimony from each and every transit witness. Everyone of them has said that.

MR. KEAVENEY: Mr. Genis got the law wrong, I guess, when he was trying to elicit that testimony.

MS. WINTERS: Clearly, Your Honor, their expert is opining that the hazard --

THE COURT: I have to identify what the law is. You say there should be a plan to prevent the hazard of train strikes, is what you think it should be.

MR. GENIS: Yes, correct.

THE COURT: And then, Ms. Winters, you think it

should be what?

MS. WINTERS: People falling onto the track bed or onto the track.

MR. GENIS: Because is there a hazardous condition? The condition here is the hazard of train strikes.

MS. WINTERS: The condition is the open platform design.

THE COURT: All right. So I have your arguments. Anything else? We will see you tomorrow at 10 o'clock.

MR. GENIS: Just like we see earlier on item number four and they consent that it should be defendants before plaintiff before attribution of fault, percentages.

THE COURT: What should be percentage of fault attributable to --

MR. GENIS: Just like the same order, what percentage was Shabazz if any, what percentage was transit if any, what percentage of plaintiff if any.

THE COURT: Oh, change the order, okay.

MR. GENIS: Yes.

THE COURT: All right. See you tomorrow.

MR. KEAVENEY: Judge, I just have one comment on the plan/study thing.

THE COURT: What?

MR. KEAVENEY: One comment on the plan/study

thing.

THE COURT: Yes, go ahead.

MR. KEAVENEY: You can't have a plan and then pass it on. The caselaw says you have a study and then you pass upon that. It doesn't work the other way. And that's clearly what the caselaw says.

MR. GENIS: No.

THE COURT: I'm sorry, it doesn't what?

MR. KEAVENEY: It doesn't work that way. You can't develop a plan and then pass upon, it's contradictory. You can study something and say it's not going to apply and then pass on that.

THE COURT: You should have a study that leads to a plan, I guess, right?

MS. WINTERS: Absolutely.

MR. KEAVENEY: Yes, if you do the plan, that's why. But if you pass upon it, then there's no plan. That's the way the caselaw means.

MR. ROTH: You mean pass like don't do it.

THE COURT: I think we had enough. I have to make the hard decisions here.

MR. KEAVENEY: Judge, in terms of scheduling, I talked to Counsel. We believe that since this case, the jury will have it Thursday. We believe it just make more sense to just sum up Thursday morning as opposed to trying

to squeeze it in tomorrow afternoon.

THE COURT: Let's see how it goes, because I have some personal adjustments to make. I have plane flights scheduled for Saturday. I thought we would get this done. I'm sorry I didn't have you last Friday. I don't know why I accommodated them. And, you know, I've got to change my whole plans, but if we have to do it, we have to do it. I don't know how long they are going to deliberate.

MR. GENIS: We may get a verdict for Friday. In civil cases, they don't stay out that long.

THE COURT: Anyway, my main concern is to pump this up for the Second Circuit the right way. I think I have your arguments and we will do the best we can.

MR. GENIS: Thank you, Judge.

THE COURT: See you tomorrow morning.

(Trial adjourned to Wednesday, November 19, 2025, 10 o'clock a.m.)

* * * *

# I N D E X


| WITNESS | PAGE |
|---|---|
| MARK MARPET | |
| DIRECT EXAMINATION BY MR. KEAVENEY | 1748 |
| CROSS-EXAMINATION BY MR. GENIS | 1783 |
| REDIRECT EXAMINATION BY MR. KEAVENEY | 1852 |
| RECROSS-EXAMINATION BY MR. GENIS | 1860 |
| TONY ABDALLAH | |
| DIRECT EXAMINATION BY MR. KEAVENEY | 1863 |
| CROSS-EXAMINATION BY MR. GENIS | 1888 |
| REDIRECT EXAMINATION BY MR. KEAVENEY | 1946 |
| RECROSS-EXAMINATION BY MR. GENIS | 1952 |


# E X H I B I T S


| | |
|---|---|
| Defendants' Exhibit I | 1755 |
| Defendants' Exhibit B | 1756 |
| Defense Exhibits M and N | 1856 |
| Defense Exhibit X | 1865 |
| Defense Exhibit II | 1870 |
| Defense Exhibit JJ | 1872 |
| Defense Exhibit LL | 1874 |
| Defendant's Exhibit NN | 1874 |
| Plaintiff's Exhibit PP | 1877 |

| | |
|---|---|
| Defendant's Exhibit RR | 1878 |
| Plaintiff's Exhibit 60 | 1902 |
| Plaintiff's Exhibit 65 | 1908 |
| Plaintiff's Exhibit 63 | 1910 |
| Plaintiff's Exhibit 8 | 1911 |
| Plaintiff's Exhibit 42 | 1914 |
| Plaintiff Exhibit 106 | 1917 |
| Plaintiff Exhibit 106 | 1919 |
| Plaintiff Exhibit 10 | 1921 |
| Plaintiff Exhibit 107 | 1927 |
| Defense Exhibit YY | 1949 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

- against - : United States Courthouse, Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, : November 18, 2025, 10:00 a.m.

Defendants. :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants: LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, New York 10271
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

Court Reporter: Michele D. Lucchese,
E-mail: MLuccheseEDNY@gmail.com
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2272

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(In open court; parties present.)

(In open court - jury not present.)

THE COURT: Let's go on the record now. Everyone is here, and the jury is here. So we will get a good start today. And at this time you have your last witness, presumably.

MR. KEAVENEY: Yes, Your Honor.

THE COURT: All right. And he is in the courthouse. Just give me a general idea. I think you said about an hour; is that right?

MR. KEAVENEY: I would think about an hour for direct, yes.

THE COURT: Let's see how it goes, and, you know, I did put you on notice yesterday that if we can have summations this afternoon, we should be prepared to do it because my problem is that if we give the case to the jury Thursday afternoon, from my experience they may want to rush to judgment because of the weekend. That's why I would like to give them as much as time before Friday night to deliberate.

MR. KEAVENEY: Okay.

THE COURT: So that's why I'm putting pressure on you folks, okay? So I am being very candid with you because it's my responsibility to manage this effectively.

All right. So I think we can be bring the jurors in now.

Mr. Genis, do you have any objection to any of that?

MR. GENIS: Not an objection, but a request and a brief motion.

THE COURTROOM DEPUTY: All rise.

THE COURT: A request for what? Anything we need to talk about now?

MR. GENIS: I can talk later. I can talk later. We already have the jury. We can do this later, Judge.

THE COURTROOM DEPUTY: You can all be seated. I'm sorry.

THE COURT: All right. Good morning.

So it is a little rainy day, and I think I have the discretion to do something that will cost the Government a couple of dollars, but it is warranted. We are going to bring lunch in today for you folks. And Mr. Innelli will tell you how that works. I don't think we have flaming crepes Suzette or anything like that. So we will do that because today will be the last day I anticipate of the evidentiary part of the case. And we will take it from there and we'll see how it goes. But in the meantime, we will have lunch for you today compliments of the President of the United States.

I think we have another witness.

Mr. Keaveney, this might be your last witness.

MR. KEAVENEY: Yes, Your Honor.

THE COURT: Let's have this gentleman step up right now.

THE COURTROOM DEPUTY: His name is?

MR. KEAVENEY: Kenneth Korach, K-O-R-A-C-H.

THE COURTROOM DEPUTY: Take the witness stand. I ask if you can remain standing and raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Thank you. Please have a seat.

If you could state and spell your name and keep your voice up.

THE WITNESS: Kenneth A. Korach, K-O-R-A-C-H.

THE COURTROOM DEPUTY: Thank you.

THE COURT: Your witness.

**KENNETH KORACH**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KEAVENEY:

Q Good morning, Mr. Korach.

A Good morning.

MR. KEAVENEY: Can you hear me?

THE COURT: Are we ready to start?

MR. KEAVENEY: There was just a little feedback on the mic.

THE COURT: Okay.

BY MR. KEAVENEY:

Q Good morning, Mr. Korach.

A Good morning.

Q Were you retained by my firm to render an opinion regarding this matter?

A I was.

Q Okay. And let's just jump right to that opinion, and then we will work our way backwards, okay? Did you formulate an opinion regarding the issues in this matter?

A Yes.

Q And what were they?

A That there is no industry standard requirements or use of platform edge barriers in the use of heavy rail rapid transit.

THE COURT: You were asked to opine as to whether there was any industry standard. Is that what you're telling me?

THE WITNESS: Industry standard or actual operational practices.

THE COURT: So the microphone I think is working. Is it, Mike?

THE COURTROOM DEPUTY: It should be.

THE WITNESS: Is this better?

THE COURTROOM DEPUTY: There you go.

THE WITNESS: Yes.

THE COURT: Okay. So use it, keep your voice up.

THE WITNESS: I'll try.

BY MR. KEAVENEY:

Q Can you repeat your response?

I don't know if everyone heard.

A Yes.

The answer is there is no industry standard and there is no actual operating practice or policies requiring the use of platform edge barriers in heavy rail rapid transit in the United States.

Q What about track intrusion devices?

A There is no industry standard or requirement for the use of track intrusion devices.

Q Okay. Let's talk about your background then.

What is your educational background?

A I have a bachelor of science degree with a concentration in economics and I have an M.B.A. with a concentration in finance and I have a law degree.

Q Can you tell me briefly your professional background?

A Yes. I will try.

Q As briefly as possible. I know it is extensive.

A I have almost 50 years' experience working in the rail transit industry.

I started working in the rail transit industry for the Chicago Transit Authority in 1976.

I was a conductor on the trains. I was a motorman on the trains. I worked in the Rail Vehicle Maintenance

Department.

I worked in the Rail Operations Control Center that controls the movement of trains.

I worked in the bus division. The bus maintenance division.

I then went to work for the Southeastern Pennsylvania Transportation Authority. Its acronym is SEPTA, S-E-P-T-A. I worked there for 11 years in a wide variety of different positions.

While I was there, I went to grad school at night and I went to law school at night.

THE COURT: You went to law school?

THE WITNESS: Yes, Your Honor.

THE COURT: Did you graduate from law school?

THE WITNESS: I did.

THE COURT: And you decided you wanted to make a lot of money instead of becoming a lawyer?

THE WITNESS: I was never in private practice.

THE COURT: Next question.

THE WITNESS: So if I can continue, at SEPTA, at the Transit Authority at Philadelphia, I worked in the rail operations division supervising the operation. I was responsible for all rail train operations, the operators, and the supervisors. I was responsible for -- we, at one point, took over the operation of the commuter railroad system from a

company called Conrail, and I was responsible for the takeover of that, which involved taking over all of the employees and activities that Conrail had done and moving those over to SEPTA.

I was involved in labor relations and helping ensure, in fact, the employees followed operating rules and procedures, and that if there were any arbitrations or disputes between employees and the unions and the authority, that I tried to address those and resolve those to the best of my ability.

I started my own firm, Transportation Resource Associates, by myself in 1990. And I recently sold that firm to four of my vice presidents last January.

I -- so I was there for over 35 years.

And in that time period, we worked for every -- and still do. They still work rail transit agency in the United States and Canada with the exception of Montreal. Maybe it is my French. But we have work experience with every single rail transit agency, either directly for them or in doing the safety oversight for their safety oversight agencies.

Q Let's talk about that for a second. What is a state oversight agency?

A So transit is very unique in the United States in that it's always been a local responsibility, so the New York City Transit Authority, the New York MTA, it's part of the state

agency, and that's the way most transit agencies -- I shouldn't say most -- all transit agencies are in the United States. They are not federally operated. Unlike, for example, aviation or railroads which come over a general national framework and regulatory structure. For example, the general railroad system, the commuter railroad, Amtrak, the freight railroads, they all come under the Federal Railroad Administration. The Federal Transit Administration is not a traditional regulatory agency. So its power to enforce rules and procedures is based upon the fact that they fund all transit agencies in the United States, either through direct money -- either by giving them money to build new things or to buy new things -- that's call capital dollars or -- through operating funds. So every transit agency in America takes federal money.

So what the Federal Transit Administration starting doing beginning in 1995 --

THE COURT: Let's go -- so let me interrupt.

THE WITNESS: Yes, Your Honor.

THE COURT: I'm going to do that, because experts have a tendency to spend he years in impressing everybody with their brilliance, okay? So I'm going focus you on this case, okay? I think you testified enough about all of this. Next question.

BY MR. KEAVENEY:

Q Is there a New York State oversight agency?
A There is. The state oversight agency for the New York MTA, New York City Transit Authority, is the New York State Public Transportation Safety Board.
Q And what is their role in connection with New York City Transit?
A Under the F.T.A. rules, 49 CFR Part 659, which has been updated to part 674, they're responsible for making sure that the Transit Authority complies with the requirements of those regulations I just mentioned, and in ensuring that their documents, their procedures, and their policies are in conformance with that. They also have to conduct independent reviews and inspections and audits as necessary under those federal requirements. It is the oversight, the safety oversight agency for the New York City Transit Authority. And there is a safety oversight agency in every state that has a rail transit agency.
Q Are you familiar with the American Public Transportation Association?
A I'm sorry.
Q Are you familiar with the American Public Transit Association?
A Yes.
Q What is that?
A The American Public Transit Association is both the lobby

organization for all transit agencies in the United States and Canada, and it also is the agency that sets forth policies, procedures, and documents to help govern the safe operations of transit systems.

Q Have you ever been a member of that association?

A I've been a member of that since 1990.

Q In what roles?

A Individually, I served on the Rail Operations Control Center. I served on the APTA Legal Affairs Committee, and the firm Transportation Resources, the firm I recently sold -- this firm I sold, which -- the acronym T.R.A is the name of the firm.

THE COURT: Let's have some substantive questions.

THE WITNESS: I was --

THE COURT: Enough. I'm going to interrupt you.

THE WITNESS: Yes, Your Honor.

THE COURT: Otherwise we are going to be here forever.

THE WITNESS: Yes, Your Honor.

THE COURT: We are very impressed with your qualifications, all of us.

BY MR. KEAVENEY:

Q What is a platform edge barrier?

A A platform edge barrier is a device that would be installed at the edge of the platform that would have movable

doors, doors that would open and close in conjunction with the doors on the train that would open and close.
Q Throughout your career up to August 2016, have you been involved with any transit projects involving platform edge barriers?
A Yes.
Q Okay. Which ones?
A Several of them.
Q Can you --
A My firm -- my firm is the safety oversight consultant to the port authority of New York and New Jersey, which operates both airtrain systems, Airtrain JFK and Airtrain Newark.

THE COURT: The answer is yes. Next question.

THE WITNESS: And --

THE COURT: Look. I'm going to intentionally tell you I'm going to cut you down. We want to be focused here and not just ramble on and on. We are very impressed with your expertise.

Ask some substantive questions, Mr. Keaveney.

BY MR. KEAVENEY:
Q When you said your firm was involved in some of these projects, what role did you take?
A I personally was the project manager for these projects.

THE COURT: That's your answer. Next question.

Q Throughout your career, have you been involved with any

accident investigations?
A Yes.
Q What --
A Maybe.
Q In what ways?
A We have been called in to do independent investigations of accidents or unsafe conditions or hazardous conditions at numerous rail transit systems.
Q Okay. Have you been involved in any accident investigations regarding contact with individuals? Or we have been calling them 12-9s in this case.
A Yes, many.
Q What is a heavy rail transit system?
A A heavy rail rapid transit system is like the New York City subway system: High-level platforms, trains made up of more than one car coupled together, carrying thousands and thousands people an hour, designed to very efficient, move people very quickly from one place to another.
Q Is New York City Transit considered a heavy rail transit system?
A It is.
Q Are there several other heavy rail transit systems throughout the United States?
A There are.
Q Can you just name a few?

A Boston, New York, the path system, SEPTA in Philadelphia, Baltimore, Washington, D.C., Atlanta, Miami, Cleveland, the BART system, Los Angeles Metro.

Q Okay. Do any of those systems have, as of August 2nd, 2016, platform edge barriers?

A They do not.

Q Do any of those systems have track intrusion devices?

A They do not.

Q Can a platform edge barrier be installed as stand-alone system?

A It cannot.

Q And why not?

A Because it is tied into the entire train operation system. It has to tie into the signal system. It has to tie into the electrical system. It has to tie into the civil engineering elements of the station that is -- is there room to actually install the barriers? It has to tie into what is known as fire life safety systems, so if there are fire conditions, a very serious situation in a subway environment, it has to be able to ventilate and exhaust any smoke from those areas. So there's are a number of different factors that would come into play before you would install platform edge barrier.

THE COURT: So you are saying they can be installed or they can be if they are able to accommodate those

situations?

THE WITNESS: They could be installed where they could accommodate all those situations.

BY MR. KEAVENEY:

Q Is that generally feasible for existing stations?

A It is not.

Q Are platform edge barriers and track intrusion devices failsafe?

A They are not.

Q In what ways?

A Platform edge barriers, they have to open and cycle exactly all the time precisely with the train doors. If they don't, then the train doors won't open up. So if there was a security incident or safety incident, the doors would not open up on the train if the platform edge doors didn't open at the same time.

In addition, I have been involved in situations where -- and it is rare, but where the platform edge doors didn't close properly and people were stuck in them when the train moved.

Q Okay. I want you to assume that the B line has 37 stations. Okay?

And a regular B train has eight cars with four sets of doors on each car. Would that require 32 platform doors on each station?

A Yes.
Q And they would all have to act in concert with each other?
A Yes.
Q And if there were 37 stations, would that require over 1,000 platform edge barriers also?
A Yes.
Q Okay. And if there were 110 trains running on any given day would that require over $130,000 door openings that would have to be in synch with each other?
A Without doing the math, yes.
Q Okay. And that's just on one line with one train?
A Correct.
Q So can that present a maintenance issue?
A Absolutely, it would require a huge level of maintenance efforts to keep those in a state of good repair.
Q Have you been to the Atlantic Avenue station?
A I have.
Q Okay. And you talked about some of the challenges in retrofitting some of those existing stations. During your visit to Atlantic Avenue, did you recognize any obvious signs of retrofitting that station with platform edge barriers?
A The most obvious is how close the columns are that hold up the station to the platform edge. And without exact measurements, it looked like it was about two and a half feet

from the platform edge to the columns, which would not allow enough room to have the platform edge barriers installed and get people by them.

Q Let's just switch gears to track intrusion devices, and we have talked about them, but what are they?

A A track intrusion device would be something that would detect that somebody has broken what I will refer to as the dynamic envelope between the edge of the platform and where the train is. So if somebody were to cross that, the system would detect that somebody has crossed that barrier and let the train know that there's somebody who's in the dynamic envelope of where the train should be.

Q Can intentional and unintentional conditions trigger an alarm?

A Yes.

Q Can that have operational implications?

A It -- it can and it does.

Q In what ways?

A At this point there are no train intrusion detection systems used in any of these rail systems that I'm talking about, and that's because the technology is not advanced enough to determine whether or not -- has not been developed well enough to determine whether or not it is a person that is in the track area or somebody waved their umbrella over the track area or somebody waved their arm or if the wind blew a

box in the track area. So what would happen is the train -- a train intrusion detection -- and there have been tests of this technology -- would be stopping the trains all the time because it doesn't know what is in the track area. It knows something is there. It just don't know what it is, so you have a huge number of delays, and where the test of this has gone on, that's been the problem.

Q I want you to assume there has been testimony in this matter that Ms. Harger fell onto the tracks approximately 180 feet from an oncoming train. In that situation --

MR. GENIS: Objection. That's not what the testimony was.

THE COURT: You just assume that to be the case.

MR. GENIS: There was testimony that yesterday that it was 250.

THE COURT: Mr. Genis, sit down. You have cross-examination. That's his assumption. That assumption may not be based upon facts. You can cross-examine him about that. He is asking you to assume that.

BY MR. KEAVENEY:

Q In that situation would track intrusion devices be effective?

A No.

Q And why not?

A Because the track intrusion detection systems would tell

the train to come to a stop.

THE COURT: You are so knowledgeable, you testify so fast, it is very difficult.

THE WITNESS: Yes, Your Honor.

So for the system to work, there has to be enough advanced warning for the train to come to a stop. So if a train was entering a station at the normal track speed, and whatever object or person triggered the train detection system, the train would still be moving. It wouldn't allow the train to stop in time.

BY MR. KEAVENEY:

Q Would that be the same situation if the person was 250 feet from the train?

A Yes, it would all depend on how fast the train is going and what the stopping distance for that train is. So we all know trains enter the station at a certain speed. In whatever time it takes to bring that train to a stop in an emergency condition, that's when the train will stop.

THE COURT: You have to listen to me. So it depends on the people, like driving a car -- can go too fast or they can go within the speed limit; right?

THE WITNESS: Yes, Your Honor.

THE COURT: All of these depend on how fast the train was going; correct?

THE WITNESS: Yes, Your Honor.

BY MR. KEAVENEY:

Q Are track intrusion devices necessary to safely operate a transit system?

A No.

Q Are platform edge barriers necessary to safely operate a Transit system?

A No.

Q Are you aware of any technical analysis, professional literature, industry standards, rules, procedures or generally accepted practices which would support a claim that requires platform edge barriers in a transit system?

A I'm not aware any industry standard, practices, literature, professional research that dictates that.

Q Same question but for track intrusion devices.

A The same answer. I'm not aware of any.

Q Okay. And we talked about the APTA, the American Public Transit Association, do they issue standards or suggestions regarding operating procedures?

A They do. My company has help and at that develop the sentence and operating practices for rail transit.

Q And do they have any operating practices regarding the installation of platform edge barriers or track intrusion devices?

Do they have any rules or regulations regarding the installation of platform edge barriers or track intrusion

devices?
A There are none.
Q Does the absence of platform edge barriers or track intrusion devices constitute an unsafe or hazardous condition that requires remediation?
A It does not.
Q And why not?
A Because being on a station platform, a high-level station platform is not a hazard.
Q Does the New York Public Transportation Safety Board require the installation of track intrusion devices?
A It does not.
Q Does it require the installation of platform edge barriers?
A It does not.
Q Are you familiar with military standard 882-E?
A Yes, I am.
Q What is that?
A It's a hazard analysis technique developed by the Department of Defense that's intended to look at technical deficiencies or technical hazards when you are looking at systems and the interchange between various systems that have to work together.
Q Have you used that standard in your career?
A I have.

Q Okay. And what for?

A We used it when there has been technical issues or technical failures either in infrastructure or vehicle systems where there has been a problem, something hasn't worked properly or it's broken, and we are trying to figure out how severe it is and what are the possible corrective actions to fix it.

Q Is that used for every situation in which a passenger makes contact with the train?

A No. I have seen it never used for contact between people -- people and trains.

Q Do you know why it hasn't been used for that type of situation?

MR. GENIS: Objection.

Q Do you know why?

MR. SHIELDS: Objection.

THE COURT: Can you answer that question?

MR. GENIS: By whom?

THE COURT: You can answer the question.

THE WITNESS: Thank you. That's an operational risk situation, and we would use an operational risk analysis, not Mil standard 882-E.

BY MR. KEAVENEY:

Q If you don't use that standard, is there an appropriate response or remediation effort to prevent someone from falling

off a platform edge?

A There are.

Q And what would they be?

A New York City Transit along with other rail transit systems that have high-level platforms and commuter rail systems with high-level platforms have a combination of different techniques they use. The most important ones are public awareness, getting people to stand back from the edge of the platform. It's obviously demarcating the edge of the platform. We have all seen the -- what -- they are called truncated half-domes, those yellow strips with the little bumps in them to keep people away from the edge of the platform. There can be devices or technology that lets people alert the operations control center that somebody has fallen into the track area, they should stop the trains.

There is -- if there is a situation where you have a crowding condition, usually a anomaly, something has happened where the station gets very crowded, either having additional transit authority personnel or police or security personnel there to make sure that it's so crowded that people get too close to the edge --

THE COURT: You answered the question. Next question. Move along.

BY MR. KEAVENEY:

Q Are those efforts a way to change customer behavior?

A They are.

Q And is that, in your opinion, a reason why there are contact with trains?

MR. GENIS: Objection.

THE COURT: Well, you can testify.

It's a good thing to have people stand back; right?

THE WITNESS: Yes.

Obviously the safe course of action is to have people step away from the platform.

THE COURT: Do you need an awareness for people to use common sense not to be close to the tracks?

THE WITNESS: Unfortunately, Your Honor, there are people that continue to stand very close to the edge of platforms, so I think it is important that we always have programs to get people to focus on standing back from the edge of the platform.

THE COURT: Go ahead.

BY MR. KEAVENEY:

Q Are you familiar with a build, operate, and transfer arrangement?

A I'm very familiar with those.

Q Okay. Can you tell jury what they are?

A So in the world of rail transit and transit, a lot of public transit agencies contract out for services with the private sector, so some of them are where -- something -- a

private company will build or operate something for them under a contract. Sometimes they will actually hire them to run things for them. Mostly, often smaller transit systems, but eastern some larger ones will contract out for certain services, whether it is operating trains, maintaining trains, even building train systems for them. My firm has been involved in --

THE COURT: You don't have to talk about your firm.

THE WITNESS: -- dozens of these.

BY MR. KEAVENEY:

Q In your opinion, would they be successful -- would that be a successful program, to install platform edge barriers?

MR. GENIS: Objection.

A No.

Q And why not?

A Huge risk on the part of the public agency and the part of the New York City Transit Authority to have a private contractor undertake what would be billions of dollars worth of work utilizing all the systems that are owned by the New York City Transit Authority and the risk that it doesn't work and what that would result in the Transit Authority if they went bankrupt or they didn't complete the work.

THE COURT: It costs a lot of money?

THE WITNESS: It costs a lot of money.

Q All right. You testified earlier that you were involved

with one of the projects, the platform edge barriers in London?

A I was.

Q Okay. Are platform edge barriers custom throughout Europe?

A They are not.

Q Are they a custom throughout the world?

A They are not, with the exception of the newer systems in China?

Q Newer meaning newly built?

A Newly built systems in China.

MR. KEAVENEY: Okay. Thank you.

THE COURT: The Chinese know how to do this better than we do?

THE WITNESS: Well, they spend a lot more money than we do, Your Honor.

THE COURT: Cross-examination.

MS. WINTERS: Sure.

CROSS-EXAMINATION

BY MR. GENIS:

Q Good morning.

A Good morning.

Q Okay. Let's see. Let me start right off the bat -- a couple of things.

Sir, you were talking at length about movable

barriers; correct?

Yes.

A When I use the term platform edge barriers, it incorporates lots of different types of barriers.

Q Okay. Because I heard you talk about movable and synchronizing the doors and electrical hookups and that stuff; right?

A Yes, sir.

Q Did you say a word about fixed rail nonmovable barriers?

MR. KEAVENEY: Objection.

THE COURT: Overruled.

THE WITNESS: I wasn't asked about fixed rail barriers.

BY MR. GENIS:

Q Got it. Okay.

Now, sir, you have -- when -- they mentioned you were retained in this case. When were you first retained in this case?

A I believe it was 2018.

Q All right.

A And it could have been 2019, but I think it was 2018.

Q Okay. That's all right.

A Hard to remember.

Q No problem.

By the way, do you charge for your time?

A I do.
Q How much?
How much?
A $800 an hour.
Q Okay. Now, for this case you reviewed materials, you told us you got hired in 2018 or 2019. I assume over the years you have reviewed materials?
A I reviewed materials when I was first retained. I reviewed some materials back in -- I think it was 2023 and then most recently starting last month, I was asked to --
THE COURT: I think counsel is going to ultimately find out how much do you expect to get paid for all of your work here.
THE WITNESS: Again, I worked for a company at the time, so I don't have the exact number.
BY MR. GENIS:
Q It's your company.
A But I don't -- I don't do the billing. I think it was probably about $25,000 to date.
THE COURT: Okay.
Q So, for example, in addition to reviewing -- well, let me ask you -- I mean, God bless you, you are entitled to get paid. I'm trying to figure out how many hours you actually worked on reviewing these thousands and thousands of pages.
A I just can't recall. I mean, I don't have -- I -- for 35

years I billed 2000 hours a year. I just can't recall exactly how many for this case.

THE COURT: He wants you to give us an estimate. He wants to know how much time you spent on this.

THE WITNESS: Probably -- I don't know, 70 hours, 50 hours. I'm not certain.

BY MR. GENIS:

Q Okay.

And, so, for example, one of the things you did in this case is you drafted an affidavit that was about 23 pages long; correct?

A A declaration, yes. Yes, Your Honor -- yes, Counsel.

Q Was that included in your billing when you did that?

A Yes.

Q Okay. And in addition to with that, you've now done review to prepare for this trial; correct?

A Yes.

Q Was that included in the building you told us before?

A No.

Q Okay. So how much time did you spend preparing for this case?

A Since I was contacted this last month, probably 10 hours.

Q Okay. So 10 hours at 800 an hour?

THE COURT: $8,000; right?

THE WITNESS: Yes, Your Honor.

THE COURT: Go ahead.

BY MR. GENIS:

Q And then I'm assuming you met with counsel to prepare?

A Yes.

Q Okay. How much time did you spend there?

A Six hours.

Q Okay. And then you have had different phone calls, e-mails, things like that; right?

A Yes.

Q How much time for that?

A Another six hours.

Q Okay. And then you're here in court today.

Did you charge for travel time to get to court?

THE COURT: I don't think we need to get into this.

MR. GENIS: Well, Judge, I would like to know how much he's getting altogether.

THE COURT: We have enough -- the jury understands he is going to be charging a lot of money, spending a lot of time. Let's go on to another question.

MR. GENIS: Well, I would just like to know what he's charging for his time in court and travel time and hotels and other things.

THE COURT: All right. Are you still charging $800 an hour?

THE WITNESS: Yes, Your Honor.

THE COURT: You're working for a firm; right?

THE WITNESS: I work for myself now since I told my firm.

THE COURT: You work for yourself?

THE WITNESS: Yes, Your Honor.

THE COURT: This is money coming to you?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. You have the answer go ahead.

BY MR. GENIS:

Q About another 25,000 for this trial?

A Probably.

Q Okay. Okay. Now, back when you were reviewing this case, did you ever advise that fixed rails on station platform edges can create a very dangerous safety condition?

A Yes, that's what I said.

Q Okay. And you said that under oath; correct?

A Yes, Counselor.

Q And that was the truth when you said it at that time; correct?

A Yes.

Q Is it still the truth today?

A Yes.

Q Okay. So, sir, are you aware that a few months after you signed your declaration the Transit Authority started installing fixed barrier rails in the City of New York?

MR. KEAVENEY: Objection, post remedial.

MR. GENIS: Judge allowed it into evidence. I have your ruling right here.

THE COURT: Overruled. If you can answer the question, you can.

THE WITNESS: Yes, we are talking about two separate things. We are talking about apples and oranges.

Q Sir, sir --

THE COURT: One second. We are here to educate the jury. You can explain the apples and the oranges.

THE WITNESS: What I refer to in my declaration is that fixed barriers that are exactly on the edge of the platform. So they would be right between where the train would be and the end of the platform is.

The ones that I have seen installed in the Transit Authority are back many feet, okay, that have been put on. That's not what I am referring to as fixed rails.

I'm referring to fixed rails that would be attached right to the edge of the platform, and the reason you don't put those there --

THE COURT: So you don't have to go too fast. You have explained the apples and the oranges.

Next question.

MR. GENIS: Thank you. And if I may, Your Honor, this is cross-examination. I would like permission to lead

the witness so I can move it along.

Q So, sir --

MR. GENIS: May I approach the witness and show the witness --

THE COURT: You have something you want to show him?

MR. GENIS: Yes. 74 -- actually, is 74-D in evidence?

THE COURT: Just tell me.

MR. GENIS: 74, D like David.

THE COURT: I think it probably is. Let me double-check.

74.

MR. GENIS: D.

THE COURT: I may have this correct; I may not. I have an E. I have an F. I have an I. I have a J.

Is this another one?

MR. GENIS: Yeah, it's a picture.

THE COURT: It's another photo; right?

MR. GENIS: Yes.

THE COURT: Which one is this?

MR. GENIS: 74-D.

THE COURT: Is it D?

MR. GENIS: D like David, yes.

THE COURT: Maybe I inadvertently did not put that down. But there would be no harm to do that right now.

(Plaintiff's Exhibit 74-D received in evidence.)

MR. GENIS: I am going to put on the ELMO now, 74-D.

BY MR. GENIS:

Q This is -- do you consider this rail to be a barrier edge rail or not?

A Not really.

Q Okay. And do you know how many years this rail was in the station?

A I do not.

Q Well before 2016?

THE COURT: He says he doesn't know.

Q And, sir, there has been rails, looking at 74 A, that have been in the system or over 100 years?

THE COURT: This is the first time you are mentioning 74-A.

MR. GENIS: Yes.

Q And that's an old rail, that's been there for over 100 years; correct?

THE COURT: Do you know what that is?

THE WITNESS: I do not.

Q Do you see its says Times Square?

MR. KEAVENEY: Objection.

THE COURT: He says he doesn't know what it is.

Q Do you see how it says Times Square on the column?

THE COURT: It says Times Square on the column.

MR. KEAVENEY: Objection.

THE COURT: Next question.

BY MR. GENIS:

Q And here's 74 B.

THE COURT: Now we have a B.

Q And this is another one. Do you see this? And give the location on the column.

THE COURT: Do you recognize that?

Just one second. Can you tell us whether you know what that is.

THE WITNESS: It appears to be a -- a -- a railing affixed to the concrete platform, probably -- maybe a foot back from the edge of the platform at the Times Square/42nd Street station.

THE COURT: Have you seen that?

THE WITNESS: I have not seen that personally.

THE COURT: Go ahead.

BY MR. GENIS:

Q All right. And 74-C?

THE COURT: Now we have a C.

Q Do you see how there are some rails --

THE COURT: This 74-C?

THE WITNESS: Yes.

THE COURT: Do you know what that is?

THE WITNESS: It looks like the shuttle between

Times Square and Grand Central.

THE COURT: Have you seen that before?

THE WITNESS: Many years ago I was there.

THE COURT: You have seen those rails there?

THE WITNESS: I have.

BY MR. GENIS:

Q Do you see some of the rails are closer to the edge than others; correct?

A Correct.

Q So fixed rails are not new technology; correct?

A It's old tech.

It's not new technology, correct.

Q You are saying the new rails, like -- let's see. Let's grab 79.

MR. KEAVENEY: Objection, Your Honor.

THE COURT: Just one second.

79 is not in evidence.

Sorry. We are not going to have recent fixed rails.

MR. GENIS: Okay.

THE COURT: We're talking about what happened back in August 2nd, 2016. So it's not relevant what happened after. Maybe the Chinese came in and did all sorts of things for all I know.

MR. GENIS: Your Honor, you have said we are allowed

to get into the subsequent remedial measure that they did. I'm allowed to show photos of what they actually did. And he has already talked about what they actually did.

MR. KEAVENEY: Objection.

THE COURT: I'm a little confused. We are not going to have anything post August 2nd, 2016.

MR. GENIS: Judge, I could show you your transcript. We are on the record. You advised the jury. I'm allowed to --

THE COURT: I made a mistake, next question. I'm sorry. We are talking about what existed as of August 2nd, 2016.

MR. GENIS: Okay.

THE COURT: If I said something inadvertent before, then I apologize and I made a mistake. Now, we all can make mistakes.

MR. GENIS: We had lengthy argument. We submitted law. This was no mistake.

THE COURT: You are telling me that what's relevant here is what's happened after August 2nd, 2016? I don't think so.

MR. GENIS: Because they claimed infeasibility and you allowed it into evidence and he just said infeasible. It goes to the issue of --

MR. KEAVENEY: Judge --

MR. GENIS: -- infeasibility.

MR. KEAVENEY: -- this is prejudicing --

THE COURT: One second. This is totally improper. All right. Okay.

Was it feasible to have these installed as of August 2nd, 2016?

THE WITNESS: I'm sorry. Which barriers?

THE COURT: Anything. He is trying to find out that this is feasible because it's been done after August 2nd, 2016. That's what he's trying to do.

THE WITNESS: I suppose anything is feasible.

THE COURT: Is it feasible today?

THE WITNESS: I'm sorry. I just don't understand the question.

MR. GENIS: Judge, I'm waiting for an answer to your question.

THE COURT: No, next question.

BY MR. GENIS:

Q Okay. So let's see if I get this straight.

When you say anything is feasible, we know that there were rails over 100 years ago. So it was feasible then; correct?

THE COURT: That's correct; right? It was feasible then; you agree?

THE WITNESS: Yes.

BY MR. GENIS:

Q And the rails that you told us now are further from the edge, is this like some new concept that nobody in the world ever thought about before, could we do these rails but just move them in a little bit?

MR. KEAVENEY: Objection. Argumentative.

THE COURT: Look. Listen to me, Mr. Genis. I admire your passion.

MR. GENIS: Thank you.

THE COURT: But sometimes passion can interfere with my ability to manage a trial. We have been going on for a few weeks. All right. Maybe I said something three weeks ago; maybe I did not. We are not here to find out what I said. I'm here to take things in realtime.

If it was feasible to do this in August 2nd, 2016, you can ask all of the questions you want.

MR. GENIS: Thank you.

THE COURT: If it is feasible to do it today, I don't think it's relevant.

MR. GENIS: I'm not asking that.

THE COURT: If I said something to the contrary, I made a mistake.

Next question.

MR. GENIS: I'm not asking about today, Judge, to be crystal clear.

THE COURT: Okay. Good.

Q So sir --

THE COURT: You know, it wasn't feasible to have an internet years ago. You know, the internet came in 1988; right? Today it is feasible to do these things, but then it wasn't; right?

Next question.

MR. GENIS: Thank you, Judge.

BY MR. GENIS:

Q So, sir, it was feasible in the 1980s to have a fixed rail barrier not directly on the edge but in a few feet; true?

A Can you define the term feasible?

I'm still confused.

Q You have used it before and you used it on direct exam with Mr. Keaveney.

THE COURT: Okay. No arguing about that.

He is questioning you about feasibility. All right. He is showing you pictures of things that were there before August 2nd, 2016. All right. And he wants to know whether you agree that it was feasible to do these things. I think that's the thrust of what he is trying to find out.

THE WITNESS: I've seen the pictures, Counselor. What I don't know is what analysis was done that made the decision 100 years ago to install this. What I am saying is that in rail transit today, you did not install --

THE COURT: We are not talking about today.

THE WITNESS: I mean, even --

BY MR. GENIS:

Q Sir, if I may, and just to move things along, because the judge would like me to do so --

THE COURT: You have tried to answer the question. Next question.

Q What I would like to do, sir, so we can move things along is I'm going to try to ask you questions that call for a yes-or-no answer. Please just answer yes or no. And if you are unable to do so, please just tell me, and I will rephrase the question.

Fair enough?

A Yes.

Q Agree to do so?

A Yes.

Q Okay. You are a lawyer, you understand this; right?

A I do.

Q Right. You are admitted to the bar of two states?

A Yes.

THE COURT: Excuse me. From what I understand, lawyers don't understand an awful lot.

MR. GENIS: Mea culpa.

THE COURT: Maybe that's one reason he is not a lawyer today. Next question.

BY MR. GENIS:

Q So you on direct exam were asked questions about feasibility; correct?

A Yes.

Q Okay. And you understood what the word feasibility meant at that time; correct?

A Yes.

Q Okay. And does feasible mean that something is doable, it can be done?

A Yes.

Q Okay. And since the technology of fixed rails is not new and all people are doing is basically planting it into the concrete, can we agree that it was feasible in the 1980s --

MR. KEAVENEY: Objection.

Q -- to install fixed rails?

THE COURT: Assume that in 1980 you have these rails, they were there. So obviously it was there. It was feasible to do it, I assume; correct?

THE WITNESS: Yes.

THE COURT: That's the answer.

Q So it's been feasible for decades to put in fixed rails in the New York City Transit system, true?

THE COURT: Well,, that's your argument. All right. Next question.

MR. GENIS: Well, can I get an answer to it?

THE COURT: I think --

MR. KEAVENEY: Objection.

THE COURT: I think he said that he saw those rails and it was feasible to have those rails there; correct?

THE WITNESS: Yes.

THE COURT: You got your answer.

MR. GENIS: Thank you, Judge.

BY MR. GENIS:

Q Now, you have told us that you are familiar with the JFK airtrain. You're familiar with Paris, London. You have been to Tokyo. You have been all over the world; correct?

A Yes.

Q Tokyo has platform edge barriers; correct?

Yes?

A I can't give you a yes-or-no answer.

THE COURT: What do they have?

THE WITNESS: Some stations have platform barriers, some stations don't --

THE COURT: Some do, some don't.

THE WITNESS: Some do, some don't.

BY MR. GENIS:

Q Same thing in Paris: Some do, some don't?

A There are 16 lines in Paris --

Q Sir, yes or no: There are some lines in Paris, yes or no?

A I can't give you a yes-or-no answer.
Q Okay. London. Jubilee lines has it; some other lines don't; correct?
A I can't give you a yes-or-no answer.
Q Okay.

THE COURT: Well, wait a second. Wait a second.

Is it you can't give an answer because you don't know or for some other reason?

THE WITNESS: Because there's -- in Paris, there are 16 lines. Two lines were completely rebuilt with platform edge doors.

In London, there are 11 lines. Only part of one line has platform edge barrier doors.

THE COURT: Go ahead.

THE WITNESS: So it's not like half and half.

BY MR. GENIS:
Q Sir, did I ask you for a quantitative analysis?

MR. KEAVENEY: Objection.

Q All I ask is yes or no.

THE COURT: Next question.

Q Do they have them?

THE COURT: They do have them even though they may not have it in every place; right?

THE WITNESS: Yes, Your Honor.

THE COURT: Next question.

BY MR. GENIS:

Q So London and Paris are the most comparable cities to New York City Transit; correct?

A I can't answer that with a yes or no.

Q Okay. Are you aware that there has been repeated testimony from Transit Authority employees that London and Paris are the only comparable cities?

THE COURT: That's not a proper question.

Q I would like you to assume there has been testimony that London and Paris --

THE COURT: The objection is sustained.

MR. GENIS: Judge, you allowed him to ask assumption questions.

THE COURT: My objection is sustained.

The jury has heard the testimony. You are going to be allowed to tell them about it again on your summations. Here's what the witness said, okay?

But we don't want to cross-examine about what somebody has said.

MR. GENIS: Well, that's the whole point of cross-exam, Judge.

THE COURT: I don't agree with that.

MR. GENIS: Okay.

BY MR. GENIS:

Q Well, sir ... okay.

So let me ask you, what, in your opinion, are the cities that are closest, most comparable to New York City Transit in terms of ridership, volume, usage, age of system, the different metrics that you would use --

THE COURT: Can you answer that question?

Q -- to compare a comparable system?

THE COURT: There is Paris. There is London and China, whatever.

THE WITNESS: In terms of throughput capacity, number of trains operated, I would say Tokyo. However, that wouldn't be the same in terms of age, when it was built. I mean, the New York City Transit system, it's now over 100 --

Q Just answer the question, naming the cities.

THE COURT: He just wants to know, in your best testimony, what's the most --

THE WITNESS: Well, there would be parts of Tokyo, parts of Moscow, parts of London, parts of Paris. New York City Transit Authority is a very unique system.

Q Sir --

THE COURT: You have answered. That's the best answer you can give.

Next question.

Q So let me ask you this: If somebody were to say that the only comparable cities were London or Paris, would they be true or false?

THE COURT: Next question.
MR. GENIS: Okay.
Q Sir, when you saw JFK, London, Paris, Tokyo, did these places say that the -- the doors, the platform screen doors, were effective at preventing people from getting hit by trains?
A Yes.
Q Okay. At JFK, which you said -- that started -- that was opened in 2003; correct?
A Correct.
Q Okay. And since 2003 through August 2nd of 2016, for the different stations for the AirTrain, how many people were killed altogether in train strikes?
A I don't know the answer to that question.
Q Would the answer be zero?
MR. KEAVENEY: Objection.
THE WITNESS: I don't know the answer.
THE COURT: If you know.
THE WITNESS: I don't know the answer.
THE COURT: He doesn't know the answer.
BY MR. GENIS:
Q Okay. So how many catastrophic injuries occurred in that AirTrain since 2003 to August 2nd of 2016?
A In the stations?
Q Yep, in all of those stations as a result of contact

between a train and a person.

A I don't know the answer too that question.

THE COURT: Maybe we could clarify things.

There is a difference between the AirTrains that go to JFK and the New York City Transit system, I take it.

THE WITNESS: There is a huge difference.

THE COURT: So, you know, if you want to explore that, I will allow you to do that.

MR. GENIS: Thank you, Judge.

Q So my question is when you say you and your company were doing work for all these years for JFK, were you looking at the safety of the system?

A Yes.

Q Okay. And when you looked at the safety of the system, did you look to see how many incidents, if any, were of collisions with individuals, trains having contact with people in that AirTrain system?

A Yes.

Q Okay. And when you looked at the safety of this system and you looked to see how many people, if any, were hit by trains, what was the answer? How many people were hit by trains in that AirTrain system?

A People have been hit by trains.

Q How many?

THE COURT: Can you answer that question yes or no?

THE WITNESS: I can't answer -- I don't have any data on me to know how many -- I can tell you that people have been hit by trains. However, probably not through the platform edge doors, but they have been hit by trains. I just can't tell you how many. I don't have that data.

Q I'm talking about in the station when they are on the platform, okay?

So based on that, okay. I'm not talking about somewhere else along the line or in a tunnel or whatever. On the platform, how many? How many train strikes?

A None.

Q Okay. Thank you.

Now, did they remove from this AirTrain system -- they said, You know what? These devices, they are not worth it, the maintenance, it's too complicated, it's hard, it's expensive, let's take them out?

Did they do that with the AirTrain?

A No.

Q Did they take them out in London?

A No.

Q Did they take them out in Paris?

A No.

Q Did they take them out in Tokyo?

A No.

Q Did they take them out in Korea?

A No.
Q And by the way, you are also familiar with what's colloquially known as a rope barrier; correct?
A I have never seen one in person, but generally, yes.
Q And we call them rope barriers, but they are not really ropes; correct?
A Correct.
Q Okay. And they come down vertical, like you see storekeepers bring things down at night; correct?
A Yes.
Q Okay. And the benefit of a rope barrier, that vertical-type barrier, is that even if it's a narrow -- even if there is different issues that you might have a problem with the platform screen door, the rope barrier solves that problem, correct?
A I can't answer that question.
Q Okay.
A I don't know that answer.
Q Okay. Let's see. Do you know where this collision took place? In other words, where Luisa's body was at the moment the train ran over her?
A Not exactly. I can't tell you the column number or the that number.
Q Okay. Would it assist you if we had photos that showed the marker number?

A Yes.

MR. GENIS: Can I have that, please?

THE COURT: Identify the exhibit.

MR. GENIS: Yes.

Exhibit 75-A and 75-B.

THE COURT: So 75 is in evidence. But I don't know that we identified A and B. So you are talking about A and B now; right?

MR. GENIS: Yes.

THE COURT: Okay.

MR. GENIS: And may I approach the witness to show him to see if -- let me offer it into evidence.

THE COURT: Put it on the screen.

MR. KEAVENEY: Can we see them, Your Honor?

MR. GENIS: Sure.

MR. KEAVENEY: Judge, earlier we objected to this one when they presented them to us. We are okay with one of them, not both.

THE COURT: Look, we allowed 75 into evidence. They're a bunch of photos. I think we showed a few before.

MR. KEAVENEY: We are okay with one of them, Your Honor, but not both.

THE COURT: Let me see what the problem is. You have a problem with one of those pictures?

MR. GENIS: Judge, the cite of where the body is.

It shows the marker.

THE COURT: We allowed 75 in evidence, so these are a bunch of photos of that. You can have and explain what it is and you can ask him questions about it.

MR. GENIS: Thank you.

Q Sir, when we have a subway systems, there are different markers along the tracks?

THE COURT: Do you want to show him that? It's in evidence now.

(Plaintiff's Exhibit 75-A received in evidence.)

MR. GENIS: Sure.

BY MR. GENIS:

Q I'm showing you 75-A in evidence.

THE COURT: Do you know what that is?

THE WITNESS: It's a marker in the station.

Q What does it do? What's its purpose?

A It identifies primarily the Transit Authority employees and perhaps outside responders exactly where they are in the platform and where they are in the station.

Q And I'm now going to show you 75-B. And you see that same marker, but now you see a column and some other things for context; correct?

A Yes.

Q Okay.

MR. GENIS: I don't want to mix up evidence.

Q Okay. Now, sir, you mentioned earlier -- you were talking about the F.T.A. and you mentioned your knowledge and experience with the F.T.A. and you specifically talked about 49-659; correct?

A 49 CFR, yes, Part 659.

Q Okay. And I believe you told us that that is applicable to the New York City Transit system; correct?

A Through the states, it is. It is directed at the state the -- through the state to the Transit Authority.

Q Okay. And so -- and in that -- those are mandatory -- that's a statute that's mandatory; correct?

A It is.

Q Okay. Must be complied with; correct?

A Yes. If -- if you wish to get federal funds.

Q Okay. And New York City does get federal funds; correct?

A It does.

Q By the way, did you ever look to see if New York City ever requested funds for platform screen doors or these types of safety devices from the Federal Government?

A I don't know the answer to that question.

Q Okay. And it's common for Transit Authorities throughout the country to ask for money from the F.T.A.; correct?

A It is.

Q Okay. And if you don't ask, you don't get; right?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Disregard the question.

Q Well, sir, I'm going to -- I'd like to go through certain things with you. Let's take out that first.

Here it is.

Okay. And are there certain portions of 49 CFR, Part 659 specifically applicable to the rail agencies and what the requirements are?

A Yes.

Q Okay. And, in fact, they also give definitions for different things; correct?

A It does.

Q And those definitions are applicable in New York City to the Transit Authority on and before August 2nd, 2016; true?

A Yes.

Q And 659 is applicable to the Transit Authority on or before August 2nd of 2016; correct?

A Yes.

Q Okay. And do you agree that the definition of a corrective action plan means a plan developed by the rail transit agency that describes the actions that the rail transit agency will take to minimize, control, correct, or eliminate hazards and the schedule for implementing those sections; correct?

A Yes.

Q And hazard means any real or potential condition that can cause injury, illness, or death; correct?
A Yes.
Q And an individual means a passenger, pedestrian, or even a trespasser or any person on rail transit control property; true?
A Yes.
Q And an investigation means the process used to determine the causal and contributing factors of an accident or hazard so that actions can be identified to prevent recurrence; true?
A Yes.
Q Okay. And passenger means a person who on board, boarding, or alighting from a rail transit vehicle for the purposes -- I'm sorry. I went too fast.

Passenger means a person who is on board, boarding, or alighting from a rail transit vehicle for the purpose of travel; true?
A Yes.
Q And passenger operations means the period of time when any aspect of rail transit agency operations are initiated with the intent to carry passengers; true?
A Yes.
Q Their definition of safety means freedom from harm resulting from unintentional acts or circumstances; correct?
A Yes.

Q And a system safety program plan means a document developed and adopted by the rail transit agency describing its safety policies, objectives, responsibilities, and procedures; true?
A Yes.
Q Okay. And the system safety program plan shall specify the minimum requirements to be contained in the rail transit agency's system safety program plan; correct?
A Yes.
Q Okay. And the system safety program plan shall include at a minimum certain things; correct?
A Correct.
Q Include specifying the annual assessment of whether the system safety program plan should be updated is one of the minimum requirements; true?
A Yes.
Q And a description of the process used by the rail transit agency to implement its hazard management program, including activities for I am about to list, but am I correct so far?
A You are, yes.
Q Number one, hazard identification; number two, hazard investigation, evaluation, and analysis; am I correct so far?
A Yes.
Q Number 3, hazard control and elimination; am I correct so far?

A Yes.
Q Number 4, hazard tracking; true?
A Yes.
Q And then they must have a description of a process used to collect, maintain, analysis, and distribute safety data to ensure that the safety function within the rail transit organization receives the necessary information to support implementation of the system safety program; true?
A Yes.
Q And when we talk about accident investigation process and references, the process used to develop, implement, and track corrected actions and address investigation findings; correct?
A Yes.
Q And they must -- during the internal reviews every year, they must ensure that all elements of the system safety program plan and system are reviewed in an ongoing manner and completed over a three-year cycle; true?
A Yes.

THE COURT: I want to ask you a couple of questions.

THE WITNESS: Sure.

THE COURT: All right. From what you testified, there was no plan that was adopted here as of August 2nd, 2016, yes or no?

THE WITNESS: No, there was a plan. The New York City Transit Authority had a system safety program plan in

place.

THE COURT: They had a plan?

THE WITNESS: Yes, Your Honor.

MR. GENIS: Outstanding.

BY MR. GENIS:

Q Let's discuss the system safety program plan, Plaintiff's 40 in evidence.

MR. GENIS: And I'm going to -- on the screen -- I have a copy of it. Give a copy, Logan, please, to Mr. Korach, so he has the benefit of it.

And I'm going to put on the screen, the ELMO, certain things I have highlighted. The highlighting is mine.

THE WITNESS: Okay.

THE COURT: So let me know, is that the plan, Exhibit 40, that we are talking about?

Q That's the system safety program plan; correct?

THE COURT: Let me have the witness answer these questions.

MR. GENIS: That's what I was asking.

THE COURT: That's the system safety program plan --

MR. GENIS: Chapter 6.

THE COURT: -- after 2016, Exhibit 40. Is that the plan you are talking about?

THE WITNESS: That's what I have been handed.

THE COURT: Just tell me.

THE WITNESS: Yes.

THE COURT: That's the plan?

THE WITNESS: Yes.

THE COURT: Okay. And that was the plan that was adopted by the Transit Authority; is that your testimony?

THE WITNESS: I don't know the answer to that. I have just been handed it. I have never seen --

THE COURT: I just want clarity.

You've talked about the fact that there was a plan, and I'm trying to find out what plan that is, what you mean by that plan. We are showing you Exhibit 40. Is that what you mean by the plan? You just said there was a plan.

THE WITNESS: Your Honor, this is, I think, a portion of it, because usually a system safety program plan is this big, thick document, so I'm not sure what I have been handed.

THE COURT: Take a look at that. You said there was a plan. I would just like to get clarification as to what you mean by the fact that there was a plan.

MR. GENIS: Mr. Korach, if you would like, we have the big fat one, if you want to look at it.

THE WITNESS: I believe it.

THE COURT: Would that help refresh your recollection as to whether there was a plan and what it was?

THE WITNESS: I have never been asked to review the

New York City Transit Authority system safety program plan.

THE COURT: I understand, but we are in the course of a trial. Show him the document and ask him whether that's the plan.

MR. GENIS: Do you mean the big fat one or the one that's in evidence?

THE COURT: Whatever it is. He said there was a plan. We have Exhibit can 40. What else do you have?

MR. GENIS: 40 is Chapter 6 from the system safety program plan. We offer it --

THE COURT: He is showing you a document. And I just want to get clarification, when you said there was a plan, whether that's what you're referring to.

THE WITNESS: Your Honor, I mentioned -- to clarify, I said there was a plan because I was told that there was a system safety program plan in effect. I've never personally reviewed New York City Transit Authority's system safety program plan.

THE COURT: If you can tell us whether that's the plan, that would be helpful.

THE WITNESS: Having reviewed many system safety program plans, it looks like it would be the plan. But not having read this, I can't --

THE COURT: If you want to take a little bit -- look, we're trying to find out whether there was a plan and

whether we can tell the jurors what that plan was. That's we are trying to do. If you can help us, fine. If you can't, you can't.

THE WITNESS: I just want to be as clear as possible.

THE COURT: Listen, you're the expert. All right. You should be able to tell us whether that looks like it was the plan. You can take your time.

THE WITNESS: Your Honor, this looks like a general system safety program plan.

THE COURT: You can take your time.

THE WITNESS: Without having a --

THE COURT: You don't know every single thing in there.

THE WITNESS: Exactly.

THE COURT: But if you can just generally tell us, when you said that there is a plan, is that basically the type of thing you are referring to?

THE WITNESS: Yes.

THE COURT: We will allow that in evidence.

THE WITNESS: Your Honor, if I could just --

THE COURT: All right. So that will be in evidence. And let's have that whole document now identified as an exhibit, a separate exhibit, which would be 108. That's in evidence at this time.

(Plaintiff's Exhibit 108 received in evidence.)

THE COURTROOM DEPUTY: Yes. 108.

THE COURT: Do you have any other questions?

MR. GENIS: Yes.

BY MR. GENIS:

Q So I am going to show you what's in evidence as Number 40, and it is -- pages 6-1 is where it starts. It's now 108, if you want to flip. And we earlier gave you the actual 40 itself, so whichever is easier for you to look at, feel free. But the smaller -- 40 is only a few pages or that big 108. Okay?

A Yes.

Q And I'm going to put on the screen, so we can all see -- and as I said, I have done the highlighting there. As you see, there is a heading: Hazard Management Process, Section 6; correct?

A Yes.

Q And the overview says: The hazard management process is the primary tool utilized to ensure the safety of New York City Transit activities, passengers, et cetera. It's a process whereby hazards are identified, assessed for potential impact, and resolved in a manner acceptable to management.

Did I read that accurately?

THE COURT: He reads very well; right?

THE WITNESS: Yes.

MR. GENIS: I'm working on it.

BY MR. GENIS:

Q And hazard identification is the initial step in the hazard management process. Within the Office of System Safety, hazard identification is achieved through the conduct of safety inspections, safety reviews, accident investigations, and so on; correct?

A Correct.

Q And then they do trend analysis as well; correct?

A Yes.

Q And further down it says, Additionally, hazard assessments conducted in accordance with Military Standard 882 -- okay, and it talks about some other things; is that correct?

A It does.

THE COURT: So those are highlights which counsel has put on that document. Do you have a question about that now that you read from it?

MR. GENIS: I'm going to read a little more and then question him on it.

THE COURT: You want to read some more from that document?

MR. GENIS: Yes.

THE COURT: All right.

MR. GENIS: Thank you.

Q And on page 62, the very next page, hazard analysis. And it talks about in accordance with established system safety principles outlined in Military Standard 882 and the analysis conducted to identify the hazards, assess the hazards relative to their severity and probability of occurrence, and identify corrective actions to bring the hazard to an acceptable level; correct?

A Yes.

Q Okay. And by the way, among the things they look at are complaints, inquiries from people; correct?

A Yes.

Q And union inquiries, work practices, et cetera; correct?

A Yes.

Q Okay. And then we discussed the hazard classification, 6.2, and they mention one of the methods by Office of System Safety to identify hazards is performance of the hazard analysis in accordance --

THE COURT: You know, you're going so fast.

MR. GENIS: My apologies.

THE COURT: Just try to focus because we will be here forever if you want --

MR. GENIS: I'm trying my best.

THE COURT: I'll let you read it to the jurors if you --

MR. GENIS: Thank you, Judge.

Q So it is used in accordance with Military Standard 882; correct?

THE COURT: You are reading it. Do you want to ask a question?

MR. GENIS: Yes, because he was discussing 882 before.

BY MR. GENIS:

Q So the methodology --

MR. GENIS: I don't want to interrupt you, Judge.

THE COURT: You want to read more?

MR. GENIS: Yes.

Q The methodology incorporates hazard classification by assessing the severity effects of the hazard and the probability or likelihood of hazard occurrence; true?

A Yes.

Q Okay. And then on 64 they have this risk assessment matrix; correct?

A Yes.

Q It talks about eliminating a hazard; correct?

THE COURT: It says what it says.

THE WITNESS: Yes.

MR. GENIS: The poster. Excuse me.

Q And I'd like to -- as they are getting that, the last thing I am going to start reading from this is Section 6.3,

Hazard Resolution.

The hazard resolution for each risk level as determined in the hazard assessment matrix is as follows: High hazards are unacceptable. Serious hazards are undesirable and require a management decision to reduce the hazard.

And then scoot down.

Therefore, the high hazard may require immediate corrective action.

Did I read that correctly, sir?

A You did, yes.

Q Okay. And you agree that that's applicable to the New York City Transit system; right?

A Yes.

Q And in fact, this is in their system safety program plan; correct?

A Yes.

Q Okay. And we have the poster of that same document you were just looking at; correct?

THE COURT: All right. I think that was used for demonstration, or maybe it's in evidence.

MR. GENIS: It's in evidence.

THE COURT: Tell us what it is.

MR. GENIS: 40-A.

THE COURT: He is showing you Exhibit 48.

MR. SHIELDS: Your Honor, it's 40-A.

THE COURT: Oh, it's 40-A. Thank you for correcting me.

Q So now, do we agree that if somebody is killed or loses a limb, that's a catastrophic injury?

A Yes.

Q Okay. And, so, do we agree if it happens -- if people are getting hit by trains and either killed or catastrophically injured three to five times a week, can we agree that that is a frequent occurrence?

A I can't answer that question with a yes or a no.

Q Okay. Well, can we agree it's a probable occurrence?

A I can't answer that question with a yes or a no.

Q Can we agree it is an occasional occurrence?

A I can't answer a that question with a yes or a no.

Q I would like you to assume there has been some testimony during this trial from other Transit employees that it is, in fact, a frequent occurrence.

MR. KEAVENEY: Objection.

THE COURT: You know, this is not what we want to do now it. If you want to ask him a question, you can ask him a question. But we have this issue: We don't agree the way you are going about it. We have evidence about this.

I don't want him to have to say do you agree or disagree. We're not going to allow that type of thing.

The jury has that testimony. The jury can be reminded of testimony, which you are going to do. Then the jury may hear other testimony. It's for the jury to assess it. My job is to get it all out before the jury, not having the do you agree, do you disagree, because we will be here for the next year, okay? So you understand. We may have a disagreement. I've got to respect your position. You respect mine. Unfortunately, I'm the judge.

MR. GENIS: Thank you.

BY MR. GENIS:

Q So if we have a catastrophic or critical injury that is frequent or probable, do we agree that according to both federal statute and the New York City Transit system safety program plan they are required to take immediate corrective action?

MR. KEAVENEY: Objection.

THE COURT: Well, do you understand the question?

THE WITNESS: I do.

THE COURT: So he wants to know when they would be required, if at all, to take remedial action.

THE WITNESS: And I can't answer that question with a yes or a no.

THE COURT: Next question.

MR. GENIS: Okay.

THE WITNESS: It's too complicated.

MR. GENIS: Okay. All right.

BY MR. GENIS:

Q Now, you have the complete system safety program plan. It's got an index, a table of contents.

Can you please show us where, if anywhere, in that entire document, it talks about what the New York City Transit Authority is doing, if anything, to prevent the hazard of train strikes, in other words, to prevent or reduce the number of people hit by trains and the severity of their injuries?

MR. KEAVENEY: Objection.

THE COURT: Well, you know he's going to have to spend a couple of days to read the documents.

MR. GENIS: It has got a table of contents. It's got an index.

THE COURT: So we're not going to allow that to happen.

So he is making a representation there is nothing in there that deals with that.

Now, do you have any knowledge about that one way or the other?

THE WITNESS: I do not.

THE COURT: And you have to read the whole thing; right?

THE WITNESS: Yes.

THE COURT: Go ahead.

MR. GENIS: Sure.

BY MR. GENIS:

Q Let's see. Is the Transit Authority -- withdrawn. I already asked that.

By the way, you had mentioned on direct exam that there was no requirement for safety devices such as platform screen doors or track intrusion detection systems; correct?

A Yes.

Q Okay. Is the Transit Authority -- well, let me back up. Should the Transit Authority act in the best interest and safety of its customers?

A Yes.

Q Is it part of the job of the Transit Authority to prevent preventable harm?

A Yes.

Q Is it part of the job of the Transit Authority to prevent foreseeable harm to its customers?

A Yes.

Q Okay. And should they do what best promotes, furthers, enhances the safety of its customers?

A Yes.

Q Should safety be the number one concern?

A Yes.

Q Number one priority?

A Yes.

Q And if there is an Office of System Safety and they said safety of the customers was not number one, not two, not three, not top five, but actually number ten, would that be in accordance with your understanding of good accepted practices and procedures?

MR. KEAVENEY: Objection.

THE COURT: Well, I don't know. Assume that's the case. You know, I guess the answer would be no; right?

THE WITNESS: No.

Q So is the Transit Authority supposed to promote the safety of its customers only when they're required to by law?

A No.

Q Okay. So the Transit Authority is allowed to be safer than the minimum requirements of the F.T.A.; correct?

A Yes.

Q Okay. And the Transit Authority is allowed, in New York City, to be safer than Chicago or Philadelphia or Boston or any of these other places; correct?

A Yes.

Q In fact, New York City Transit is supposed to be the leader in the U.S. because it's the biggest system; correct?

MR. KEAVENEY: Objection.

THE COURT: I don't know whether you understand that question.

THE WITNESS: I can't answer that yes or no.

THE COURT: Next question.

MR. GENIS: That's fine. Let's see. We covered that.

Q Now, on direct exam, you were talking a lot about the synchronization of the doors and how many doors have to be synchronized?

Do you recall all of that?

A Yes.

Q Now, for the train cars themselves, they have that same number of doors; correct?

A Yes.

Q And they have to be synchronized as well; correct?

A No.

Q So you're saying the doors of the different train cars don't have to be synchronized?

A I can't answer that question with a yes or a no.

Q Okay. So do you ever ride the subway in New York City?

A Yes.

Q Okay. And when you get there and the train pulls in, don't all the doors open at the same time?

A They're supposed to.

Q Okay. And they are supposed to close at the same time true?

A They are supposed to.

Q Okay. So the same issue they have with the cars, they

would have with the platform screen door; true?

A No.

Q Okay. Let's see. Are you familiar with close-circuit TV, CCTV?

A Yes.

Q And you agree that New York City, for decades now, they have close-circuit TV cameras in the stations?

A Yes.

Q Okay. And do you agree that if you use the track intrusion detection system, the TIDs, combined with the CCTV, when you say you could have this false positive, it could be looked on the monitor immediately. Ah a newspaper, no, it's a person; correct?

MR. KEAVENEY: Objection.

THE COURT: I think the question could be improved upon.

Sustained.

MR. GENIS: I will work on improving it.

Q Does using a CCTV in combination with the TIDs help eliminate false positive?

A I can't answer that question with a yes or no.

Q Okay. By the way, you said on direct exam if the person is on the track that it won't prevent anything?

How about if the person is on the track and the train is not even at the station yet and then it gets

triggered that there is a person to stop the train, then it would prevent it; correct?

A Yes.

Q Okay. By the way, you talked about those yellow things. That's pursuant to the Americans for Disabilities Act, it's required for blind and visually-impaired people; correct?

A Yes.

Q That's why they are there; correct?

A Yes.

Q Thank you.

Now, you talked about these build, operate, transfer, the BOT agreements; correct?

A Yes.

Q And you are aware that the Transit Authority issued its own requests for information that it wrote and sent out to the world asking for companies to give proposals to do a build, operate, transfer agreement for platform screen doors where the companies would assume the risk of installing it and maintaining it in exchange for the advertising revenue; true?

A I can't answer that with a yes or no.

Q But, sir, you were just talking about that; correct?

Give me one second I'm going to pull up the RFI.

MR. GENIS: We have in evidence Plaintiff's Exhibit 19.

Q Okay. This is the RFI. Have you seen this document

before?
A No.
Q So wait. In all of the many, many hours you have been on this case reviewing documents, reviewing transcripts, doing all these different things, you've never seen this before?
A Not to the best of my recollection.
Q Okay. Let's see if we can educate you.
That the RFI, and they asked specifically -- hold on a second. Let me get a non-highlighted one.
Did they look to see if there are people, companies to give proven systems to improve it ... sorry. My eyes in my old age.
For project financing -- I'm looking at the second page. Do you see where it says PSG, PED, PEG financing?
A Yes.
Q Just for our benefit -- I'm a little slow -- what is PSG? What is PED? What is PEG?
A PSG. Platform screen gates.
Platform edge doors.
Platform edge gates.
Q It says, New York City is considering cost-sharing financing options for a potential PSG, PED, PEG FOR retrofit project, including design, build, operate, transfer, and advertising revenue sharing agreements. New York City Transit is particularly interested in financing options involving

little or no upfront construction costs to New York City Transit; correct?

A That's what it says.

Q So this isn't somebody else saying have I got a deal for you, this is the Transit saying we want; right?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

Q Okay. Is this a document issued by the Transit Authority soliciting companies to respond to its requests for information?

MR. KEAVENEY: Objection. He said he never seen it before.

THE COURT: Sustained.

Q Wait. So you are testifying --

MR. GENIS: It's in evidence. I'm allowed to cross-examine an expert on something in evidence.

THE COURT: Go ahead. Next question.

MR. GENIS: Okay.

Q So you just gave testimony on these very agreements on direct exam.

Do you remember that?

THE COURT: What? Give me the question again.

MR. GENIS: Sure.

Q Mr. Keaveney asked you questions and you said there is a huge risk -- that was your words -- by the defendant.

THE COURT: What's the question now?
Q So are you familiar with these types of agreements and what the City -- Transit tried to do here?
A I can't answer that question with a yes or no.
Q Okay. Well, let's see, you're in the business.
Have you heard of Faively before?
A Yes.
Q They are one of the biggest in the world; correct? 40 percent market share?
A I don't know the answer to that question.
Q Well, have you heard of -- let's look at the five finalists. GE Transportation?
A Yes.
Q Okay. You have heard of KABA, K-A-B-A, Gilligan; right? You have heard of Gilligan?
A Yes.
Q Didn't they do JFK?
A I don't know the answer to that question.
Q Who did JFK?
A I don't know the answer to that question.
It is a Bombardier system. I don't know who their subcontractors are.
Q Bombardier makes the subway cars also; correct?
A Bombardier is no longer in business, so it's Alstom. A-L-S-T-O-M.

Q Years ago Bombardier made, for the Transit Authority, their cars?
A They made some of the cars, yes.
Q Okay.
And you are familiar with Knorr, K-N-O-R-R, Bremsd B-R-E-M-S-D, Rail Systems?
A I am not.
Q Let me ask you this: If the Transit Authority -- let's back up.
Should -- can we assume that if the Transit Authority issued this RFI they did so for a reason?
A I -- I -- yes.
Q Okay. Can we assume that they've thought this out, they didn't just say hey why don't we do this today; right?
A Yes.
Q Okay. So they were actively looking for cost reasons to see if somebody could do it at little or no cost to the Transit Authority; correct?
MR. KEAVENEY: Objection.
THE COURT: Sustained.
Q Sir, when you say there are risks, you're a lawyer. Can we agree that there's ways for one covering one's butt for risk?
A I can't answer that with a yes or no.
Q Okay. Now, you have heard of bonds, people making bonds;

right?

THE COURT: Let's see whether we can take a little break now.

How much longer do you have on your questioning?

MR. GENIS: I think I'm going to be done in about 15 minutes.

THE COURT: Let's take a little morning break now. Be back at quarter to 12:00. You will complete your cross-examination.

MR. GENIS: Sure.

THE COURT: You can ask further questions, Mr. Keaveney. So let's see if we can complete all of this before lunch time.

MR. GENIS: Sure.

THE COURT: Don't talk about the case. See you at a quarter to.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: All right. You want to say something now?

MR. GENIS: Just to save time, there is no objection to 30 and 31 in evidence, so while the jury is not even here, we can move it along quicker.

THE COURT: So let's deal with that.

MR. GENIS: Okay.

THE COURT: 30, and which other one?

MR. GENIS: It's 30 and 31.

THE COURT: So you are representing there is no objection.

MR. KEAVENEY: There is an objection, Your Honor. He's got to establish that the witness has even seen these documents. Again, they are e-mails.

THE COURT: Wait a second. There is no objection or there is an objection?

MR. KEAVENEY: Well, there is an objection.

THE COURT: Well, you can't do it. There is an objection.

MR. ROTH: There --

MR. GENIS: I don't see any objection.

THE COURT: Please, I'm trying not to lose my temper. I do have a little temper at times. I can't have three people talking at the same time. One person address their question to Judge Block. That's the way we do it. Sit down.

I am trying to run an orderly trial. You make a representation there is no objection. He disagrees with you. It's not easy for me to process a case like this. Let's bring the jurors in.

MR. GENIS: I'm looking at the rulings. I don't see any objection.

THE COURT: I don't see any objection either.

MS. WINTERS: Just to clarify, so the previous rulings by Your Honor was that with these witnesses, expert witnesses should only be questioned on the record that relied upon, and we object to him being able to establish foundation through this witness.

THE COURT: Just one second. I don't know who this e-mail is from.

Does he have any knowledge about this --

MR. GENIS: I'm not going to question him on it. I just want to get it into evidence.

THE COURT: We are not going to allow it that way.

As used, you can do it, but you have to use through somebody who is going to tell us about this.

MR. GENIS: All right.

THE COURT: That's what I mean by that. As used. Not everything goes into evidence.

MR. GENIS: Okay. Because I thought you told me in the past, Judge, that I can comment to the jury on summation and just put the records in evidence and I can use it on summation.

THE COURT: Look, if I wasn't clear, let me be crystal clear. As I have told you, we have gone through all of these proposed exhibits. And as you use them, you can have them in evidence --

MR. GENIS: Okay.

THE COURT: -- if there is no objection.

But if you are not going to use them, you just can't just throw everything into the pot.

MR. GENIS: Then I will use it.

MS. WINTERS: Your Honor, we would object to him using it as well.

THE COURT: So you're clear, if this witness wants to identify something and we can have relevance of this document through the witness, fine. But you haven't done that. I'm not going to allow it.

MR. GENIS: Okay.

THE COURT: Let's try to wrap up your questioning.

MR. GENIS: No problem.

THE COURT: I have some real serious time concerns that I have to manage here.

MR. GENIS: I understand. I'm doing the best I can here.

THE COURT: We are finished with your cross-examination in 15 minutes.

MR. GENIS: I will do my best.

THE COURT: Let's bring the jurors in. And then we will be finished with your case; right?

MR. KEAVENEY: Yes, Your Honor.

THE COURT: We are making progress. The only thing

you have left is that you want to have somebody as a rebuttal witness?

MR. ROTH: Yes, Your Honor.

THE COURT: He's not going to be able to wrap up his testimony. He gave it once before.

You're going to have to tell me exactly what it is that happened during the defendant's case which you feel requires rebuttal. If you can't do it, I'm not going to allow it. Okay? He is not going to give his testimony again. We don't do that.

You will have to do that while the jury is out for lunch because I may or may not allow it depending on what you tell me.

Bring the jurors in.

THE COURTROOM DEPUTY: All rise.

THE COURTROOM DEPUTY: You can all be seated.

MR. GENIS: May I, Your Honor.

THE COURT: Continue, Mr. Genis. You will complete your cross-examination in 15 minutes. Let's do it.

MR. GENIS: I will try to go quick.

(Continued on next page.)

(Continuing.)

CROSS-EXAMINATION

BY MR. GENIS:

Q Sir, you've told us before the different requirements of the federal statute, that 49 CFR 659. Do you recall that?

THE COURT: He told us.

A Yes.

MR. GENIS: Okay.

THE COURT: The answer is yes. He told us.

BY MR. GENIS:

Q So if the Transit Authority failed to comply with that, would that be a violation of that federal statute?

A I can't answer that with a yes-or-no question -- or answer.

THE COURT: You says he can't answer yes or no.

MR. GENIS: Okay.

BY MR. GENIS:

Q Okay. So aren't you either in compliance or you're not?

THE COURT: Next question.

BY MR. GENIS:

Q Okay. Well, if the SSPT does not comply with the requirements of the federal statute, has it violated the federal statute?

THE COURT: I'm going to sustain that objection. I'm not so sure it's relevant to this case.

Next question.

MR. GENIS: Okay.

BY MR. GENIS:

Q All righty, sir, you told us that you -- one of the things to look at is trends, correct?

MR. KEAVENEY: Objection, misstates his testimony.

THE COURT: I don't know. You're telling him he said something. What's your question.

MR. GENIS: Okay.

BY MR. GENIS:

Q Okay. Well, is it a good and accepted practice for the Transit Authority to look at trends?

A Yes.

Q Okay. And you mentioned different measures taken by them, whether it be the announcements or the health points or whatever, correct?

THE COURT: He did that.

MR. GENIS: Yeah.

THE COURT: Move on.

BY MR. GENIS:

Q Okay. Since they have instituted those measures, have the number of people hit by trains and killed or injured gone down, stayed the state --

A That's a difficult anal- --

THE COURT: We've had this already. We've shown that document to many people.

Next question.

MR. GENIS: This is their expert. I'm allowed to cross-examine their expert.

THE COURT: Next question.

MR. GENIS: Okay.

THE COURT: We don't want to be repetitious.

MR. GENIS: Sure.

BY MR. GENIS:

Q So is what they did, was it effective?

A I can't answer that question --

Q Okay.

A -- with a yes-or-no answer.

Q All righty.

Sir, have you ever seen for pre- -- before -- I'm not asking when you saw it, but the document itself from before August 2nd, 2016, a written safety plan from the New York City Transit Authority to prevent or reduce the number of people hit by trains and the severity of their injuries?

THE COURT: All right. That's a very specific question. Can you answer that?

A I do not believe so.

BY MR. GENIS:

Q Okay. Have you ever seen a written corrected action plan for the Transit Authority to address the severity and frequency of people being killed or injured by the hazards of train strikes?

A No.

Q Okay. Have you seen an adequate and proper study about how to best prevent the hazard of train strikes and the result in deaths and catastrophic injuries for the Transit Authority before August 2nd of 2016?

MR. KEAVENEY: Objection.

THE COURT: Has there been before a study about that issue?

THE WITNESS: No -- I don't know what the -- I don't know the answer.

THE COURT: All right. Next question.

BY MR. GENIS:

Q All right. You were mentioning a minute ago before the break, we were questioning you about the risk by the defendant that you said on direct, are there means that the Transit Authority can take to protect itself in the event a company that is doing the platform screen doors goes bust?

A I can't answer that with a yes or no.

Q Okay. Have you ever seen written agreements to do such posting bonds, insurance, ironclad agreements, collateral,

things like that?

A Yes.

Q Okay. So there's means of addressing those concerns, correct?

A I can't answer that yes or no.

Q Okay. That's fine.

Sir, you have told us as an expert you are familiar with the standards and good and accepted practices, correct?

A Yes.

Q Okay. And are you familiar with *Safety Professionals' Reference and Study Guide* (indicating)?

A I -- I can't see what you're holding up.

MR. GENIS: Okay. Are you familiar with that (indicating)?

A Generally.

Q Okay. And should you comply with this; should the Transit Authority comply with this book?

A I can't answer that with a yes or no.

Q Okay. How about *Control System Safety Evaluation of Reliability, (3rd Edition)*?

A I don't know if I'm familiar with the 3rd Edition. I'm familiar with the document -- or book.

Q Should the Transit Authority comply with that?

A I can't answer with a yes or no.

Q Are you familiar with *Reliability, Maintainability & Risks*?

A I am.

Q Should the -- 10th Edition.

Should the Transit Authority comply with this?

A I can't answer that with a yes or no.

Q Are you familiar with the *Safety Critical Systems Handbook?*

A Yes.

Q 5th Edition. Okay. And should the Transit Authority comply with this?

A I can't answer that with a yes or no.

THE COURT: I think we've had enough of that.

Next question.

BY MR. GENIS:

Q By the way, the US Department of Transportation, the FRA -- not the FTA, I understand there's a difference -- did they publish a *Practical Risk Assessment Methodology*?

A I don't have any knowledge of this document.

Q Okay. And do you have any opinions today as to whether or not the Transit Authority complied with the different requirements in some of the books we have gone through today?

A I can't answer that with a yes or no.

Q Okay. Sir, are you an engineer?

A I am not.

Q Okay. And in your declaration you refer to engineering practices, engineering design, and how critical it is to have engineers involved in this all whole process, correct?

MR. KEAVENEY: Objection.

THE COURT: Well --

MR. GENIS: I'll withdraw the question. I'll ask a new question.

THE COURT: All right. Go ahead.

BY MR. GENIS:

Q Are engineers critical in designing the system, evaluating what's feasible, what's not feasible to install safety devices?

A Yes.

Q Okay. So the Transit Authority should listen to the engineers, correct?

THE COURT: Sustained.

MR. KEAVENEY: Objection.

MR. GENIS: Okay.

BY MR. GENIS:

Q Are you aware that the engineers have all recommended that they install the Platform Screen Doors?

MR. KEAVENEY: Objection.

THE COURT: Sustained.

MR. GENIS: Okay.

BY MR. GENIS:

Q Okay. Sir, you're here today as an expert with -- hold on a second.

Do you have any personal knowledge as to the activities of the Transit Authority, whatever they're doing, carrying out to keep people on the platform as opposed to the track?

THE COURT: Do you understand the question?

THE WITNESS: No.

THE COURT: I'm not sure I do either.

Next question.

BY MR. GENIS:

Q Okay. Do you have personal knowledge as the activities that the Transit Authority is carrying out to keep people on the platforms as opposed to the track?

MR. KEAVENEY: Objection. At what time?

THE COURT: Yeah, I don't know --

MR. GENIS: Anytime before August 2nd of 2016.

THE COURT: Are we talking about, Do you have any personal knowledge --

MR. GENIS: Yeah.

THE COURT: -- prior to August 2nd, 2016? I don't --

THE WITNESS: No.

THE COURT: -- understand the question.

He has no personal knowledge.

MR. GENIS: Okay.

BY MR. GENIS:

Q Okay. And do you agree that the Transit Authority should take all the precautions and actions that it can to keep people on the platform --

THE COURT: You asked that question --

BY MR. GENIS:

Q -- and away from the track --

THE COURT: -- a thousand --

MR. GENIS: I never asked that question.

THE COURT: -- times.

MR. GENIS: I never asked that question.

THE COURT: And I believe he said that they're very careful to do what they can to make people safe.

Right?

MR. KEAVENEY: Objection.

THE WITNESS: Correct.

THE COURT: He's given you that answer.

BY MR. GENIS:

Q And by the way, have you ever not been allowed in the state of New York to give expert testimony?

A There is a double-negative in there. Yes, I was precluded.

Q Okay.

MR. GENIS: I think I'm done, Judge.

THE COURT: Mr. Keaveney, do you have anything further?

MR. KEAVENEY: Yes, Your Honor.

MR. GENIS: I just -- I want to clear out my stuff, if you don't mind. This is evidence, and I don't want to confuse the evidence.

(Pause in proceedings.)

REDIRECT EXAMINATION

BY MR. KEAVENEY:

Q Is there a difference between the JFK air train and the New York Transit Authority trains?

A Yes.

Q And you were precluding from responding to that question. What's the difference?

MR. GENIS: Objection.

THE COURT: Well, wait a second.

I don't know what you mean, "precluded from responding to that question."

MR. KEAVENEY: Okay.

THE COURT: Ask him what is the difference that --

BY MR. KEAVENEY:

Q What's the difference?

A The air train JFK system is an automated people-mover system.

MR. GENIS: Judge, he answered this on direct. It was covered.

THE COURT: He wasn't precluded from answering it, because he was not asked that question.

MR. KEAVENEY: I apologize, Your Honor.

THE COURT: He wasn't asked that question, and intentionally did not ask that question.

Next question.

MR. KEAVENEY: It was a yes-or-no question, and he wanted to elaborate on it.

THE COURT: Next question.

BY MR. KEAVENEY:

Q You testified -- you were asked questions about rope barriers what you knew about them. Are there any issues that you're aware of with installing rope barriers?

A Yes.

Q What are they?

A You have to have some of the same requirements that you would for more permanent ones; that is with regard to fire, like safety issues; with regard to electrical systems, and with regard to civil engineering systems.

Q Are you aware of any mass transit system in North America that uses rope barriers?

A Not that uses rope barriers.

Q Does anyone monitor violations of 49 CFR 659?

A Yes.
Q Who does that?
A In New York, it would be the New York State Public Transpiration Safety Board.
Q Are you aware of the New York State Public Transportation Safety Board issuing any violations to Transit regarding the absence of platform edge barriers or track intrusion devices?
MR. GENIS: Objection.
THE COURT: Overruled.
A I'm not aware of any findings by the New York State Public Transportation Safety Board on that subject.
BY MR. KEAVENEY:
Q You were shown Exhibit 40, which has been also reclassified as Exhibit 108. I'm going to show you a section from that.
This is Section 6.3. You read a portion of it at this top here: "The hazard resolution for each risk level..." -- I'm sorry.
THE COURT: All right. Do you want to read something to the jury from that document?
MR. KEAVENEY: Yes, Your Honor.
THE COURT: All right. Go ahead.
BY MR. KEAVENEY:

Q Under Hazard Analysis, it says: "Hazard analysis is performed on significant operational changes, new or modified work practices and procedures if deemed necessary by the operating department and selected maintenance equipment in accordance with the established system safety principles outlined in military standard 882E."

Question is: If someone falling from the edge of the platform, does it fit into that category?

A It does not.

Q Does this section require a hazard analysis, which is right here, to be performed by someone if someone falls off the edge of a platform?

A No.

Q Are there other tools available to investigate when someone falls off the edge of the platform?

A Yes.

Q And what tools are available to do that?

A Traditionally, it would be an operational risk assessment.

Q You had testified that tactiles stips are used to warn blind passengers of the edge of the platform, correct?

A The visually impaired --

Q Okay.

A -- yes.

Q Are they also used to warn other people of the edge of

the platform?
A Yes.
Q So they have a dual purpose?
A Yes.
Q You were asked questions about build operate transfer agreements. Are you aware of transit entering into any contracts under build operate transfer agreement for platform edge barriers or track intrusion devices?
A I'm not aware of any.
Q Do you know when platform edge barriers were first installed? The ones that we see today in other countries, do you know when they were first installed?
A Not -- not being exact, but probably sometime in the mid-to-late 1980s, maybe early 1990s.
Q Do you know when they were first installed in existing stations as opposed to newly built station?
A Probably within the past 20 years.
Q And finally, there was a lot of times when you were -- you could not answer Mr. Genis's questions with a yes or a no. Is there a reason for that?
MR. GENIS: Objection.
THE COURT: Well, you know, it's a very general question. There were a lot of times he said that we would be here for the next three hours. So see if you can focus your question a little bit more specifically.

BY MR. KEAVENEY:

Q Well, could you have elaborated on those responses?

MR. GENIS: Objection.

THE COURT: Which ones specifically are you talking about?

MR. KEAVENEY: On any response, Your Honor.

THE COURT: Pardon me?

MR. KEAVENEY: On any response.

THE COURT: No. There were several times where he said he could not answer it.

MR. KEAVENEY: Yeah.

THE COURT: And if you could focus on which one of those concerns you have, I will allow you to do that. Otherwise we will be here forever.

BY MR. KEAVENEY:

Q Could you have elaborated on some of the -- Mr. Genis's questions --

MR. GENIS: Objection.

BY MR. KEAVENEY:

Q -- yes or no?

MR. KEAVENEY: I asked him could you.

THE COURT: Sustained. You're not accomplishing anything, here.

If you want to ask him specifically about a particular question where he said he cannot answer, I'll

allow you to explore that.

MR. KEAVENEY: Okay. Thank you, Your Honor. I have no more question.

THE COURT: Anything else, Mr. Genis?

MR. GENIS: Yes.

THE COURT: You can't have a lot --

MR. GENIS: Nope.

THE COURT: Because he only asked three or four questions.

MR. GENIS: I'm very limited, yes, Judge.

RECROSS EXAMINATION

BY MR. GENIS:

Q First, did you see and operational risk assessment for this incident?

A I did not.

Q Okay. Did you see any operational risk assessments for any of the people hit by trains?

MR. KEAVENEY: Objection.

THE COURT: Well --

MR. KEAVENEY: He just asked that.

THE COURT: No, overruled.

Did you ever see anybody about that, anybody being hit by a train?

THE WITNESS: At the New York City Transit Authority?

THE COURT: Yeah.

THE COURTROOM DEPUTY: No.

THE COURT: Okay.

BY MR. GENIS:

Q In London, didn't they have the Jubilee PSDs installed by 1999?

THE COURT: He didn't ask my questions about London --

MR. GENIS: Yes, he did --

THE COURT: -- during his --

MR. GENIS: He asked about the rest of the world.

THE COURT: Okay. Go ahead.

BY MR. GENIS:

Q Okay. Wasn't in London in 1999 it was operational?

A The extensions to the Jubilee Line entered service in 1999. I worked on that project.

Q Okay. That's more than 20 years ago, right?

THE COURT: Next question.

MR. GENIS: Okay.

BY MR. GENIS:

Q Okay. You said that --

A I'm sorry. I -- I -- no, you -- it wasn't --

Q There was no question?

THE COURT: Sir, one second.

BY MR. GENIS:

Q Sir --
A It wasn't --
THE COURT: Give him a chance if he thinks he needed to clarify his answer.
Go ahead.
A It was not an existing line. The Jubilee Line that -- portion that has platform screen doors, it's a new line. It's not an existing line.
MR. GENIS: Okay.
THE COURT: Was it in existence back in 2016?
THE WITNESS: Yes.
THE COURT: All right.
Go ahead.
BY MR. GENIS:
Q And, in fact, in Paris is what, around 2000, is when they did their retrofits for the RATP, correct?
A I think it is 2002, but I --
Q Okay.
By the way, earlier on direct exam when he asked you about both barriers you said you were not really familiar with them, but now you seem to be familiar. Which is it?
THE COURT: I don't think he really asked any questions on this -- you know, examination about that.
Next question.

MR. GENIS: Okay.

BY MR. GENIS:

Q You were just asked about the PTSD, and you said you're not aware of any findings. Are you saying there were none or you're just not aware?

THE COURT: You can answer that question.

A I'm not aware of any findings by the New York State Public Transportation Safety Board.

MR. GENIS: Nothing further, Judge. Thank you very much.

THE COURT: Okay. Anything else, Mr. Keaveney?

MR. KEAVENEY: Nothing, Your Honor.

THE COURT: Thank you very much for coming here. You may step down.

(Witness is excused.)

THE COURT: So Members of the Jury, it's 10 after 12:00. I've been advised by Mr. Innelli that your filet mignons will not be here until 1 o'clock. I need to talk to the lawyers a little bit about how we're going to proceed now. So maybe at this time, you can just wait a few minutes while I talk to them.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: You can all be seated.

I guess at this time, Mr. Keaveney, at this time

you rest -- you should have done that in front of the jury, but you rest, I guess?

MR. KEAVENEY: The defendant rests.

(Defense rests.)

THE COURT: Yeah.

MR. GENIS: I have a motion, Your Honor.

THE COURT: Just one second.

Well, normally, Mr. Keaveney, we do that in front of the jury, but, you know, if the jury just left there's no question the record will reflect that the defense rests its case at this time.

So it would be appropriate if you want to protect the record and raise your motions at this time --

MR. GENIS: Sure.

THE COURT: -- we can do that. But I got to manage things a little bit here.

MR. GENIS: Yes, Your Honor.

THE COURT: But just put your record down.

MR. GENIS: Thank you.

The plaintiff makes a motion both for directed verdict and to dismiss all the affirmative defenses.

In this case the testimony would be as succinct as you want me to be, is A: We have established that they had no written plan to address the issues here. There was no adequate studies --

THE COURT: Wait -- well, just one second.

MR. GENIS: Yes, Your Honor.

THE COURT: We need you to go in front of the microphone.

MR. GENIS: Oh, yes, Your Honor.

THE COURT: I'll let you is speak. But you speak brilliantly and rapidly, and it creates difficulty for our excellent reporter.

MR. GENIS: I'll agree that I speak rapidly, Judge.

How about that?

THE COURT: No, no, I speak rapidly sometimes also. In fact, I used to speak very rapidly, but then I sort of disciplined myself when I got this terrible job, to try to train myself to speak slower. And the reason why is because we can't get our words down otherwise, all right?

So, but I wanted to do is this --

MR. GENIS: Yes, Your Honor.

THE COURT: -- just to protect the record.

MR. GENIS: Uh-huh, sure.

THE COURT: And, you know, I'll give you time later on to make all arguments --

MR. GENIS: Okay.

THE COURT: -- about it.

I just want to see whether we can go forward and

complete the evidentiary part of the case now.

MR. GENIS: Sure.

THE COURT: All right? So I'll give you a chance to elaborate on that. You've made the record now, so you have complied with the law, okay?

MR. GENIS: All right. That's what I'm looking to do, Judge.

THE COURT: That's what we're trying to do, okay?

MS. WINTERS: (Indicating.)

THE COURT: Do you want to argue now?

MS. WINTERS: No.

THE COURT: We're not even arguing.

MS. WINTERS: Just similarly, we will be renewing our Rule 50 motion and filing a Rule 50 motion as to our position.

THE COURT: All right. You know, everyone's going to protect the record. I expected lots of paper afterwards. You may give me chance to write another brilliant opinion in my lifetime, okay? I'm ready for another one.

All right. Now, look, let me hear -- Mr. Shields you can't wait to jump up now and tell me you have a rebuttal witness, I think, right --

MR. ROTH: (Indicating.)

THE COURT: -- or Mr. Roth?

MR. ROTH: Roth.

THE COURT: Okay.

All right. And stand front and central. And tell me, what part of the defendant's case do you think you have to have a rebuttal witness for? We're not going to have a repeat of his testimony.

MR. ROTH: All right. I want to re-call Carl Berkowitz --

THE COURT: Yeah.

MR. ROTH: -- to rebut the testimony of Mr. Marpet.

THE COURT: Well, I need you in front of a microphone so we can all hear you. You know, speak into the microphone so the reporter can hear you, as well as all the rest of us.

Now, you want to re-call him?

MR. ROTH: Carl Berkowitz.

THE COURT: To do what?

MR. ROTH: To the -- the testimony of Mr. Marpet they entered into evidence at that time Exhibit -- Defendant's Exhibit N, which is the braking chart, and that braking chart and the distances that were used in there, there's very, very serious defects with that chart. Mr. Berkowitz will explain that --

THE COURT: Okay. Just one second.

MR. ROTH: Yes.

THE COURT: So the purpose of your rebuttal testimony would be to address that chart, which was put in evidence by the defendant --

MR. ROTH: And --

THE COURT: -- is that what you're saying?

MR. SHIELDS: -- yes. And the rate of deceleration.

THE COURT: Just one second.

I think that might be appropriate, because that's evidence that was put in and I'll allow some limited questions about that. But we're not going to give him the opportunity to go through his testimony again.

MR. ROTH: Yes, Your Honor.

THE COURT: I'm going to be very, you know, on top of that, because we just don't allow that, okay?

MR. ROTH: Okay. I understand, Your Honor.

So I have more -- I --

THE COURT: What exhibit is it, N?

MR. ROTH: N --

THE COURT: N.

MR. ROTH: -- Defendant's Exhibit N.

THE COURT: Just one second. Just one second.

All right. So N was introduced into evidence on the 18th, I think it was yesterday. That's the emergency brake stopping distance document, which was put in by

Mr. Keaveney, if I recall correctly, right?

MR. KEAVENEY: Correct.

THE COURT: All right. And your rebuttal is going to be dealing with that document?

MR. ROTH: That's one document.

THE COURT: Well, go -- what else?

MR. ROTH: Defendants put in Defendant's Exhibit GG, among -- and as well as several other documents. But I'll be mainly --

THE COURT: GG.

MR. ROTH: Yes.

THE COURT: That was way back -- GG was put into evidence back on October 30th, believe it or not?

MR. ROTH: But it was discussed by the witness -- Mr. Abdallah for the first time yesterday.

THE COURT: Okay.

All right. What else? Anything else?

MR. ROTH: And there were -- they put in several documents, but I would be using that document to cover all of the other documents.

And --

THE COURT: All right. So look --

MR. ROTH: -- defendants also put in Exhibit Y yesterday, which is their alleged safety plan, which is the one-page directive --

THE COURT: Wait a second.

I don't see where Defendant's Y -- was that put into evidence --

MS. WINTERS: It's YY, Your Honor.

THE COURT: Just one second. One at the time. I may have made a mistake?

Is Y in evidence?

MS. WINTERS: It's YY, Your Honor.

THE COURT: YY?

MS. WINTERS: Yes, Your Honor.

THE COURT: Okay. I do have a double Y. That is in evidence.

That is the directive?

MR. ROTH: Yes.

THE COURT: Yes.

MR. ROTH: That came in yesterday after --

THE COURT: Okay.

MR. ROTH: And he would address that -- let me see what else, because I don't want to surprise you, Your Honor.

THE COURT: Well, I think you've got enough there, you know. We want to move it along.

MR. ROTH: Okay. Well, I just wanted to give -- you just asked me the question, I wanted to give you a fair answer.

THE COURT: Okay. Go ahead. Is there anything

else?

I think I'm going to allow you to question him about those documents that were introduced be the defendant, okay? You can question him about that.

Okay. Anything else now?

MR. ROTH: I think there's one other document that I want to move in. It's related to -- it's an email.

THE COURT: Look, I think you have enough.

MR. ROTH: Okay.

THE COURT: Okay?

Yes, Mr. Keaveney?

MR. KEAVENEY: With regard to the braking distance chart, Mr. Berkowitz was well aware of that chart. He never addressed it. He could have addressed it. He used a different calculation. That doesn't mean that they can come back and rebut it, because he was aware that Mr. -- that Dr. Market question was relying on it via his report. So that would be inappropriate for him to come back on rebuttal.

THE COURT: Well, you know, we try to, you know, balance things out a little bit. And I will be on top of whether or not he's repeating his prior testimony or not. We're not going to allow him do that. He has to very focused and specific about anything in that document that he hasn't testified to before, okay?

MR. KEAVENEY: Okay.

THE COURT: All right. Go ahead.

MR. KEAVENEY: Regarding Exhibit GG, within that document is a chart, statistics which is in Mr. Berkowitz's report, the exact document. For him to say now that he hasn't seen it or that he's seeing it for the first time when we put it into evidence is absolutely false. He should not be allowed to have any testimony --

THE COURT: Well, I haven't read the report, so I don't know whether what he's telling me is correct or not. But basically if it's in his report and he wrote about it all, I don't really think we should have the opportunity to go back to what is in his report.

MR. ROTH: Your Honor, it's about the testimony of Mr. Abdallah yesterday. The very first time the defendants -- and they didn't do it through their witness on the stand -- they talked about this, as if this document was a plan, that it was a process. And I am not going to be talking about that statistic in this chart --

THE COURT: All right. Here what we're going to do, we had --

MR. KEAVENEY: Judge.

THE COURT: State for the record what your concerns are. I can manage it. It's sort of a balance here proportionally that I have to deal with it.

MR. KEAVENEY: He had knowledge of it, and he could have testified to it and he didn't. That's the problem. You can't come back and say, Oh, something else was brought up. I want to talk about it now. That's exactly what he's trying to do.

THE COURT: I get it. I think I know the law, and that the real law is what we're going to deal with. Let's hear the questions and the answers, and I may, you know, sustain the objection or I may not, all right? But let's hear the specific question.

As long as you people are focused on what your responsibilities are in terms of rebuttal testimony, that's what I'm concerned about, all right? And I'll manage it, and I will hopefully call the balls and strike in a fair way.

Now, why don't we -- is he here now?

MR. ROTH: By Zoom.

THE COURT: Okay. Because we don't have food coming until 1:00, so it would be great if we can start right now.

MR. ROTH: I could.

THE COURT: Okay.

MR. ROTH: Or we can set it up --

THE COURT: So let's Zoom him up.

MR. ROTH: Or let's do it before the jury comes in

so I don't...

THE COURT: So it's all possible now --

MR. ROTH: Yes.

THE COURT: -- that maybe we can finish it all by lunch time?

MR. ROTH: That's the goal, Your Honor.

THE COURT: And I'm going to see if we can make that happen.

THE COURTROOM DEPUTY: I'm going to try to do that now.

THE COURT: Let's see, do you have anybody else after, or this would be your only rebuttal witness?

MR. ROTH: That is correct, Your Honor.

THE COURT: And at that time the case will be completed, there will be nothing else to do. And then we'll be able to take a little bit of a lunch break at that time. And I think we're going to have the plaintiff's summation at least this afternoon.

Listen to me, Mr. Genis -- you're going to be giving the summation I take it, right?

MR. GENIS: Yes.

THE COURT: So if everything works out well, maybe we can do it at 3 o'clock. You'll have time to really, you know, gather your whits and stuff like that. And I know your concern is that you would like to have it in one day.

But you're going to get a rebuttal. You see, so you're going to have the last word. So we're going to be able to do that tomorrow.

MR. GENIS: I understand that, Judge. One thing last night, I thought, again, you're wiser than I, because you thought I would need two hours. You're right. I'm going to need two hours for my summation. I underestimated it yesterday.

THE COURT: I'm going to give you the rest of the afternoon.

MR. GENIS: And just if we do it all -- we could do it all in one day if we start in the morning.

THE COURT: Well, you know what? Once again, my problem -- and we have different problems that the Judge and the lawyers have, right, is that I told you before that I will make whatever arrangements that I personally have to do to be here. That's not the issue. That's my responsibility. But from my experience, which is more than a couple years now, when a jury gets a case late Thursday afternoon or early Friday morning, I always worry about the fact that they're going to race to a judgment because the weekend is looming. That's why I'm doing this, all right?

You are certainly prepared to do this. I'm going to keep them here as long as you want to talk. If they want to stay after 5:00, I will let them stay after 5:00. It

will be up to you if you are willing to do that. And tomorrow morning a 10 o'clock, we will have, you know, Mr. Keaveney's summation and you are going to get the last word in.

So the fact that it's an overnight dichotomy here is not going to prejudice you here, because you've got the last word in the federal courts. In the state courts, it's different, okay?

MR. GENIS: Yes.

THE COURT: All right. So is he on Zoom now?

THE COURTROOM DEPUTY: I just sent out the invitations to everybody and everybody is joining.

THE COURT: All right. And Mr. Roth, probably I'm going to put a little pressure on you, because I do want to see if we can do this before lunch.

MR. GENIS: And just, Judge, if I may since the jury's not here? Could we get the final charge and the verdict sheet before I have to sum up?

THE COURT: Yes.

MR. GENIS: Thank you.

I mean -- don't mean like two seconds before I sum up, Judge.

THE COURT: No, no, no...

MR. GENIS: Do you know what I mean?

THE COURT: I think you got the substance of the

charge already. The thing is to make sure the verdict sheet is correct.

MR. GENIS: Yeah. Because we're had a couple changes --

THE COURT: Maybe 21 or 22?

All right. So off the record here. We're not talking about the case now.

(Pause in proceedings.)

MR. KEAVENEY: I just want to point out one more thing.

THE COURT: All right. Go ahead.

MR. KEAVENEY: All right. In addition to having that one chart in Mr. Berkowitz's report, he also has the emergency brake stopping distance chart in his report.

THE COURT: See, I haven't read the report, the whole --

MR. KEAVENEY: I understand that, Your Honor, but he had an opportunity to talk about it. He was well aware of it.

THE COURT: So now your focus will be on it.

So, look, whatever is in his report, I think it's a fair comment by counsel, that if it's in his report, I don't want to utilize his report now because it's there, all right? And I know you want to do that. I'll be willing to sort of try to balance things out to give you a little

opportunity to focus in on the exhibits that you identified and we'll hear your questions.

MR. ROTH: It's Exhibit N that he put in yesterday and Mr. Marpet testified to. This is also about the testimony on these documents.

THE COURT: Well, look, let's not talk about that. I'm going to allow you to question him --

MR. ROTH: Okay.

THE COURT: -- about Exhibit N, and we'll hear what question you ask.

MR. ROTH: Okay.

Dr. Berkowitz, can you see Exhibit N?

THE COURTROOM DEPUTY: I haven't conferenced him in yet.

THE COURT: He has to --

MR. ROTH: Oh, okay.

(Pause in proceedings.)

THE COURT: All right. So let me see whether Dr. Berkowitz is here on the Zoom.

(Pause in proceedings.)

THE COURT: All right. So we're going to call the jury in now, and I've given your counsel some instructions about the limits of the questions that's he's going to be allowed to ask, and we're going to finish this, certainly by 1 o'clock or not sooner.

So we have a record here. I understand the defendant's concerns. He's pointed out certain parts of the report that Dr. Berkowitz has rendered. I have not read the report, but I'm sure he's represented himself accurately.

And Mr. Roth, you are forewarned that we are not going to have a repeat of anything in his testimony or elaborate on anything that's in his report. We're just going to limit you to the documents that were put in by the defendant and if he knew anything about that, I will allow you to do that. Otherwise, we are not going to allow you to continue with this type of questioning.

MR. ROTH: Am I allowed to comment on Mr. Marpet's testimony and what -- the information that he used, because that is -- and it's also to comment on his testimony.

THE COURT: You know, you're going to focus on a particular document --

MR. ROTH: Yes.

THE COURT: -- and you can ask him a particular question.

MR. ROTH: Okay.

THE COURT: All right? And I will listen to the questions and we'll make our rulings accordingly.

MR. ROTH: Very good.

THE COURT: All right. Let's bring the jurors in.

THE COURTROOM DEPUTY: And before we do, I just

want to run a test with Mr. Roth's laptop.

THE COURT: And, you know, I'm going to instruct the jury about this also, what the purpose of rebuttal testimony is.

(Pause in proceedings.)

THE COURT: All right. Let's bring the jury in at this time.

MR. GENIS: Judge, I would like to renew my request for statutory violations in the charge. We previously requested it, and we have now got --

THE COURT: Okay. You have a record. I'm not going to charge the jury on those alleged statutory violations.

MR. GENIS: Okay.

THE COURT: I figure it's going to all be subsumed in the questions they're going to have to answer. And you will have ample opportunity to talk about all that.

MR. GENIS: Respectfully accepted, Your Honor.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right, Folks, we're making very good progress.

And then when you left, the defendant has rested. It doesn't mean they're resting. It means they're not going

to be offering any more evidence. They've submitted everything that they want you to know about, so the record reflects that.

And now we turn this back to the plaintiff. The plaintiff has the right to call rebuttal witnesses, and the plaintiff, apparently, chooses to have Dr. Berkowitz come back and testify. He's on Zoom as a rebuttal witness.

Now, the purpose of rebuttal testimony from somebody who's already testified, he has testified extensively in this case, is not to repeat his testimony, but strictly to be focused on what was introduced in evidence by the defendant that was new to give him an opportunity to address new information, if that information was known to him before as part of his report.

If he could have testified about this on his direct case, I'm not going to allow it. But if there is something brand-new that was introduced by the defendant, then that would be a proper thing for a rebuttal witness to talk about. So I am allowing this to happen for that limited purpose. Let's see how it goes.

Go ahead. Your witness.

**CARL BERKOWITZ**:

Called as a witness having been previously duly sworn/affirmed, was examined and testified as follows via Zoom.

DIRECT EXAMINATION

BY MR. ROTH:

Q Okay. Dr. Berkowitz, so you heard the Judge. We're just going to be very focussed on, this is the chart, Exhibit N.

First, the information that's in this chart --

THE COURT: This is Exhibit N.

MR. ROTH: Defendant's Exhibit N that Dr. Marpet relied upon for --

THE COURT: All right. That was the document that was introduced by the defendant yesterday?

MR. ROTH: Yes.

THE COURT: Okay. Go ahead.

BY MR. ROTH:

Q Dr. Berkowitz, are you familiar with this chart, first of all?

A Yes, I am.

Q Okay. And can you tell me what trains were used for the testing for the data that derived ed this chart?

A I believe it was the R40, the R42, and R44.

Q Okay. And what year did that happen, that testing?

A Around 1974, and maybe some of it a little earlier.

Q And the R68A, is there any -- been testing of that that you've seen?

A No.

Q Okay.

Now, this has stopping distances, correct, on here, the different --
A Yes, it does.
Q -- stopping--
Okay. So Defendant's Exhibit N, at 24 miles an hours, what was the stopping distance?
A On -- in this report?
Q Yeah, from -- on this chart.
THE COURT: When you're referring to this chart, this is part of Exhibit N, correct, Mr. Roth?
MR. ROTH: Yes.
A It looks to me like it's 167 feet.
BY MR. ROTH:
Q Okay. And at 20?
A Miles an hours --
Q Yes.
A -- it's 121 feet.
Q Okay. And that's for emergency -- this is the emergency braking chart that the Transit Authority is using, correct?
A Yes.
Q Okay. And did you calculate the rate of deceleration for these numbers that are on this chart?
A Yes, I did.
Q Okay. And what is the rate of deceleration of 24 miles

per hour at 167 feet stopping distance?
A The 2.53 miles per hour per second.
Q Okay. And what about at 20?
A At 20, it's 2.42 miles per hour --
Q Okay.
A -- per second.
Q Okay. And how does that differ from the specifications of 3.2 miles per hour per second of stopping distance that were shown to you in Exhibit 2 when you testified?
A Well, at 24 miles an hour, the braking rate is 20 percent lower. And for 20 miles an hour, the braking rate is 24 percent lower.
Q Okay. And have you come to a conclusion about the accuracy and applicability of that braking chart to the R68A trains involved in this incident?
A It doesn't apply.
Q Okay. And why is that?
A Because it was -- it doesn't reflect the capability of the R68A, which is capable of emergency braking that's at 22 miles per hour per second. And this chart is for other trains, and their braking rate is 2.53 at 24 miles an hour, and 2.42 at 20 miles per hour, which is significant less than the 2.2 miles per hour per second for the train --
Q So --
A -- the R68A is capable of doing, minimum. That doesn't

mean it can't do better. That's minimum.
Q Okay. And so that's -- you're saying this is -- you can easily tell the jury, so that train stopped at the specifications, does it the stop shorter than on their chart or worse or their chart if it follows --
A Significantly worse.
Q -- specifications?
A Basically about 25 percent worse.
Q So their chart is 25 percent worse --
THE COURT: Don't be argumentative. He answered the question.
MR. ROTH: I'll just making it clear, so --
THE COURT: Well, he's making it clear enough. Just ask the questions --
MR. ROTH: All right.
THE COURT: -- and get the answer.
MR. ROTH: All right.
BY MR. ROTH:
Q Now, there was also testimony that there was -- that the line of sight of Ms. Shabazz was 75 feet in the tunnel to the station. Can you tell us at the braking rate of 3.2 if she had gone into emergency 75 feet from the mouth of the tunnel, how far from Mr. Harger would she have been -- would the front of the train have been when the train finally came to a stop?

MR. KEAVENEY: Objection. He testified to that already.

THE COURT: Yeah. Didn't you already testify about that before?

MR. ROTH: No. The 75 feet was --

THE COURT: Hold on just one second.

MR. ROTH: Okay.

THE COURT: Right here your remark, it gets really confusing, right? But I just want to know whether you -- I think you testified about all of that before, but maybe I'm right, maybe I'm wrong. You tell me.

THE WITNESS: Your Honor, I spoke about -- my calculation was 147 feet. But I'm willing to accept the train operator's one car length, which is 75 feet.

THE COURT: What's your next question?

BY MR. ROTH:

Q So if the train operator --

THE COURT: Well, you're going to save it for argument. You got the facts.

Go ahead.

MR. ROTH: Well, I just wanted to know how far in the station if the train operator's --

BY MR. ROTH:

Q Well, if that what she testified to, it's 75 feet from the tunnel, where does the train stop in the station?

THE COURT: Can you answer that?

MR. KEAVENEY: Objection, Your Honor. He testified to this already.

THE COURT: It's okay. I'll allow that question. Let's just get it done.

Go ahead. You want to answer -- can you answer?

A The train would have been one car length into the station, perhaps.

BY MR. ROTH:

Q And how far from Ms Harger when she on the tracks?

A Well, we -- we would -- do you want me to get a pencil and calculate?

THE COURT: Yeah. I think we have testimony about how far she was.

MR. ROTH: Okay.

THE WITNESS: Yeah. She was -- she was 246.5 feet away from entrance, Your Honor. So from that, we deduct 75 feet, you have 5, 1 -- 171.5 feet.

THE COURT: Okay. Great.

MR. ROTH: All right. Let's move on. Thank you.

THE COURT: Next question.

MR. ROTH: Could we put up Defendant's Exhibit GG?

THE COURT: All right. GG was placed in evidence a long time ago in the prior millennia, on October 30th.

BY MR. ROTH:

Q Okay. Are you familiar with this report?
A Yes, I am.
Q What is it? Can you tell the jury what this is?
A It's -- it's a presentation of information concerning train incidents and issues that -- that they -- they -- issues that the Transit -- MTA Transit Authority felt existed in terms of dealing with customer contact.

THE COURT: Was this part of your report? I mean, I haven't read your whole report, but I have a sense that you may have -- it may have something you considered in your report?

THE WITNESS: No, I didn't. I -- I saw that after.

THE COURT: All right. Go ahead. Next question.

BY MR. ROTH:
Q Okay. So I think, Dr. Berkowitz, you did see -- you did see the chart in this --

MR. ROTH: Logan, could you go to the Challenges? Just scroll down.

Okay.

THE COURT: Is this is first time you've seen that, is what you're telling me?

MR. ROTH: Your Honor, if he is stating that --

THE COURT: One second.

MR. ROTH: -- he's mistaken.

THE COURT: Pardon -- what?

MR. ROTH: Your Honor, if he is stating that, he's mistaken. I mean, it's in his -- there's no question --

MR. KEAVENEY: Your Honor, he has seen this report. That's the problem.

THE COURT: One second.

Have you seen this chart before?

MR. KEAVENEY: No --

THE COURT: Answer my questions.

THE WITNESS: I -- I seen -- I viewed this after my report, yes.

MR. KEAVENEY: Your Honor --

THE COURT: And you --

MR. KEAVENEY: -- may we approach?

THE COURT: Just one second.

Before you testified or after you testified?

THE WITNESS: Both, Your Honor.

THE COURT: Pardon?

MR. ROTH: Both -- he said "both."

THE COURT: Before and after?

MR. ROTH: Your Honor, it's in his report.

THE COURT: All right. Next question. He's already said he reviewed it.

You've had this report, you knew about this report when you testified, correct?

MR. ROTH: Your Honor, I'm referring to --

THE COURT: I'm talking.

MR. ROTH: Oh, I'm sorry.

THE COURT: Just try to answer -- I try to keep my questions very focussed.

The question is, Did you know about this report? Is it part of your report? Were you familiar with it before you testified?

THE WITNESS: I don't recall, Your Honor, because I wrote the report about two years -- two and a half years ago.

THE COURT: What question do you want to ask?

THE WITNESS: I have to look at the report. I don't want to go through the whole report.

THE COURT: I'll let you have one or two questions about it.

MR. ROTH: Your Honor, I -- okay.

BY MR. ROTH:

Q All I was going to ask is: The report that's in -- that's in front of you, can you tell us why is that not a study? Why does that not qualify as a study?

A It's just --

MR. KEAVENEY: Objection --

A -- it's a presentation -- it's not a study. It's like a report.

BY MR. ROTH:

Q Okay. And do you see the challenges that are on this list --

MR. ROTH: Logan, if you could go to the challenges on this page and then the next two pages?

One more.

THE COURT: What's the question?

MR. ROTH: Go back to the first page.

Right there.

BY MR. ROTH:

Q And do see where it says, ADA Accessibility is one of the challenges?

A Yes.

Q Okay. Can you tell the jury -- can you tell us what challenges there are for ADA accessibility for platform screen doors or other barriers at the Barclays Station?

THE COURT: Didn't you testified about that before?

THE WITNESS: I don't believe so, Your Honor.

MR. ROTH: Not about the ADA.

THE COURT: Go ahead.

MR. KEAVENEY: Objection, Your Honor. He could have testified about it.

THE COURT: Well, I don't know, but, you know, we'll just have a brief answer and then we'll move on.

MR. KEAVENEY: But how does is it rebuttal to any testimony in this case?

THE COURT: I'm not going to look at the whole record in front of what he testified to.

You said you did not testify before, correct, about this?

THE WITNESS: On ADA? No --

MR. ROTH: Your Honor --

THE WITNESS: -- I didn't bring up -- that subject never came up.

THE COURT: You can bring that out in your summation, okay? The jury can consider that.

THE WITNESS: Your question again? I'm sorry.

BY MR. ROTH:

Q The question is what ADA issues for platform screen doors or anything else are at Barclays Station, so it would be what challenges --

A Well, the -- the Barclays Station only has very limited ADA accessibility to the train, and at the Barclays Station the -- the primary accessibility to the train is at the elevator. The rest of the platform is not ADA accessible.

Q So what does it need? Is it in compliance with that just limited access?

MR. KEAVENEY: Objection, relevance.

THE COURT: Sustained.

MR. ROTH: Okay.

All right. Let's go to -- if we can put up Exhibit YY, please?

THE COURT: This is Exhibit YY.

Go ahead. That's the directive.

Have you seen that before, yes or no?

THE WITNESS: I don't see YY, Your Honor. I still see Challenges.

THE COURT: Well, let's get it on the screen so he can see it.

This was put into evidence yesterday, Directive.

Do we have that?

MR. SHIELDS: One moment, Your Honor.

THE COURT: Mr. Innelli is looking for the food. Maybe you folks could put it up?

(Pause in proceedings.)

THE COURT: Do you see that, Dr. Berkowitz?

THE WITNESS: Yes, I do.

THE COURT: What's your question.

BY MR. ROTH:

Q Can you tell us what this document is?

A This is, like, the train order that the -- that the train control center issued to -- to train drivers, train operators.

THE COURT: Have you ever --

A It's --

THE COURT: -- have you ever seen that document before?

THE WITNESS: Yes, I have.

THE COURT: Was it part of your report?

THE WITNESS: I don't recall.

THE COURT: Next question.

Go ahead.

BY MR. ROTH:

Q Can you tell us, is this an adequate study to protect people from being struck by trains?

MR. KEAVENEY: Objection.

A This is not a -- this is --

THE COURT: Just a second.

A This is not a study. This is a directive.

THE COURT: Just a second. I will allow you to explain what you believe that directive to cover.

Go ahead.

THE WITNESS: This is a directive to train operators concerning unauthorized persons on or near the right-of-way.

THE COURT: Okay.

THE WITNESS: It's just a guidance.

THE COURT: Okay. You've explained it.

BY MR. ROTH:

Q After you've reviewed this document, did you come to any conclusions as to whether this is a plan, a safely plan for --

A No, it's a -- it's -- it's a directive. You know, I'm telling you to do something.

Q Okay. And how does that differ from a plan, a safety plan for people who are stuck by trains?

MS. WINTERS: Objection.

THE COURT: We've had testimony about that before.

Next question. We have had other people explain that.

MR. ROTH: It was only the defendants that put that up there.

THE COURT: Well, yeah, but I think he answered the questions carefully.

But do you want to explain it again in your own expert opinion the difference between a directive and a plan? I guess that's what we're trying to talk about.

MR. KEAVENEY: Note my objection --

THE WITNESS: Yes, I could --

MR. KEAVENEY: -- Your Honor.

THE WITNESS: I -- I could do that.

A -- a directive is -- is like a rule or regulation or something you're told to do. A plan is the result of a study where you study a problem and the plan

is -- is the solution -- the action of that plan is the solution of that problem.

THE COURT: Okay. So you answered that. Anything else?

MR. ROTH: Could we put up 107, which was marked in yesterday?

MR. KEAVENEY: Objection, Your Honor --

THE COURT: 107 --

MR. KEAVENEY: -- that wasn't discussed.

THE COURT: What is --

MR. ROTH: It was marked in yesterday.

THE COURT: What is 107.

MR. ROTH: It's an email from Jerry Shook to the Public Transportation --

MR. KEAVENEY: Well, you can't -- it's not --

THE COURT: That's not the way you conduct yourself during a trial.

MR. KEAVENEY: Your Honor, it's plaintiff evidence.

THE COURT: 107, let see what you want. Is this the last thing you want?

MR. ROTH: Yes, that's it --

THE COURT: The last thing --

MR. ROTH: We're done --

THE COURT: -- you want?

MR. ROTH: -- after this.

THE COURT: Just one second.

107 are letters, right?

MR. KEAVENEY: That's plaintiff's evidence, Your Honor. It's --

THE COURT: Just one second.

MR. KEAVENEY: 107 is --

THE COURT: Plaintiff put this in evidence?

MR. KEAVENEY: Plaintiff did.

THE COURT: I think that's your -- it's your exhibit.

MR. ROTH: That's true, Your Honor.

THE COURT: Pardon?

MR. ROTH: That's true, Your Honor. But Mr. Korach on the stand testified about the oversight of the Public Transportation Safety Board, and this is extremely relevant to that issue.

THE COURT: Well, the letter speaks for itself, all right?

Next question.

MR. ROTH: I'm --

THE COURT: I'm not going to --

MR. ROTH: I've got nothing further, Your Honor.

THE COURT: Mr. Keaveney, you've given the Judge a hard time her today.

MR. KEAVENEY: I apologize.

THE COURT: Okay. Apology accepted.

The end of the trial sometimes is fraught with lots of humor. Humor is important. Shakespeare always used humor in his plays. And he believed that humor was a very good way of delivering a message, and I try to do that once in a while, too, but even though I'm not as good a Shakespeare.

Okay.

THE WITNESS: Your Honor, you're close second.

THE COURT: I'm a close second? It's kinds of you to say that.

CROSS-EXAMINATION

BY MR. KEAVENEY:

Q Dr. Berkowitz, I know you can't see me, but you can her me, correct?

A Yes, sir.

Q Okay.

All right. You did refer to Exhibit GG in your report at Page 14; isn't that accurate?

A Pardon me?

Q You did refer to Exhibit GG in your report at Page 14; isn't that accurate?

A I don't recall.

THE COURT: He doesn't recall.

A I'd have to look at the report.

THE COURT: But look, let's assume he did it. So I am allowing a little flexibility here. We've had a short, short rebuttal where -- with this witness. I think we can move on beyond this.

MR. KEAVENEY: Okay.

BY MR. KEAVENEY:

Q And that presentation shows what Transit has been doing in terms of platform safety, correct?

A No.

THE COURT: Well, look, the report's in evidence, a lot of testimony already about it, and you can comment about during summations.

MR. KEAVENEY: Okay. I will comment about --

THE COURT: Yes.

MR. KEAVENEY: -- what they were doing that's referenced in that portion.

THE COURT: But we're not going to do that here back-and-forth now.

MR. KEAVENEY: Just give me a second, Your Honor.

(Pause in proceedings.)

BY MR. KEAVENEY:

Q The braking distance chart, that was also in your report at Page 78; isn't that correct?

A Yes.

Q Okay.
A I believe so. Yes.
Q Okay. And Dr. Marpet did you 3.2 feet per second in his analysis, didn't he?
MR. ROTH: Objection.
THE COURT: All right. Sustained.
How do I -- who remembers what he used by?
MR. KEAVENEY: Well --
THE COURT: He answered --
THE WITNESS: I don't --
THE COURT: -- the question.
THE WITNESS: I don't recall.
THE COURT: He doesn't recall.
THE WITNESS: If he did -- if he did, then, that's good.
THE COURT: All right. All right. Let's go.
Any other questions?
BY MR. KEAVENEY:
Q And the emergency braking distance that is based empirical data, correct?
A No. Mine is based upon a -- a -- a transit car that was purchased by the New York City Transit Authority, and it had certain specifications. One of the specifications before it would be accepted by the New York City Transit Authority is that the emergency braking rate shall be at a

minimum 3.2 miles per hour per second, and if it didn't meet 3.2 miles per hour per second, I think it's Article I in the contracts, generally, then the car is rejected and the manufacturer has to --

THE COURT: I think you have --

A -- bring it up to that specifications.

THE COURT: -- you've answer the question.

Your question was whether that was based upon what, speculation?

MR. KEAVENEY: Empirical data.

THE COURT: Empirical data.

MR. KEAVENEY: And I don't think he answered that at all.

THE COURT: Was it based upon empirical is what he's asking, I guess?

THE WITNESS: No. It's based upon the specifications --

THE COURT: Your answer is --

THE WITNESS: -- of the car.

THE COURT: The answer is that it's based upon the specifications and not anything else, right?

BY MR. KEAVENEY:

Q That -- I'm just -- I'm confused.

THE COURT: So am I.

BY MR. KEAVENEY:

Q The emergency braking chart that is Exhibit N is based on specifications, not on empirical data; is that your testimony?

A No. That was one is based upon trials of the R40, 42, and 44.

Q Right. Based on observing a train in motion and seeing how long it would take to stop at a specific speed, correct, yes or no?

A That's correct -- yes.

MR. KEAVENEY: Okay. I have nothing further.

THE COURT: Anything else, Mr. Roth?

MR. ROTH: I just have one thing.

THE COURT: Okay. This is your last question, so make it good.

MR. ROTH: This is my big change.

REDIRECT EXAMINATION

BY MR. ROTH:

Q All right. Dr. Berkowitz, just to clarify, when you say "those trains," are the same trains that -- as the braking chart or are they different trains that the R68A that --

MR. KEAVENEY: Objection, asked and answered.

BY MR. ROTH:

Q -- you've referring to?

THE COURT: I'll allow it.

A The R68A was not tested in the 1947 testing of -- of train. They tested the R40, the R42, and the R44.
Q Thank you.
A The R68A was built by Kawasaki. The others were built by other companies.

THE COURT: We don't have to have you say anything more. That's your last question.

Anything further, Mr. Keaveney?

MR. KEAVENEY: Nothing further.

(Pause in proceedings.)

THE COURT: Wait a minute.

MR. ROTH: The court reporter is asking what the other word is: You said Kawasaki and you said something else, but he didn't hear it. Dr. Berkowitz, if you could tell me --

THE WITNESS: The only thing I mentioned was, I believe that the R68A was built by Kawasaki.

MR. ROTH: Okay.

THE COURT: Okay.

THE WITNESS: It was build in -- it was instructed --

THE COURT: You've answer the question, Dr. Berkowitz. That's it.

THE WITNESS: Okay.

THE COURT: You answered the question,

Dr. Berkowitz. That's the problem with Zoom witnesses.

THE WITNESS: Thank you, sir. Have a great day. Thank you.

THE COURT: Okay. So I have some good news here. Mr. Innelli says the lunches are here.

Don't talk about the case. You may be tempted to do so. And let's get back here at maybe at 2 o'clock, and let's see whether we can come up with something at that time further, okay?

All right.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: All right.

All right. So Malcolm is handing out the 40th version of the verdict sheet. The charge, you know, is going to track all this --

All right. Let me know when everyone's ready.

I'll go through it one by one collectively to make sure we have it down to our collective satisfaction, okay?

All right. So first question: "Was Raqia Shabazz negligent in her operation of the train, yes or no?"

And yes, that's the one question we can all agree on.

MR. GENIS: Yes.

THE COURT: If the answer is yes, next question: "Was that negligence a proximate cause of the accident?"

All right. So I think that flows, yes or no.

Okay. And then 2A: "Was the Transit Authority negligent in failing to keep the Atlantic Avenue Barclays Center BQ Subway Platform in a reasonable safe condition."

MR. GENIS: And I'm objecting to that.

THE COURT: You don't think that their negligence -- you don't think they had to keep it in a reasonably safe condition?

MR. GENIS: It's two different issues, Judge. Keeping the platform in a reasonably safe condition would mean, like, there's no tripping hazards, or there's no slipping hazards.

THE COURT: Well, you had some language before. What do you think it should be? I think that's the standard for negligence, isn't it?

MR. GENIS: I think we could just ask, Were they negligent?

THE COURT: Okay.

MR. GENIS: If you want to keep it simple, Was there negligence? Otherwise, if the issue is, Were they negligent -- what we originally submitted to the Court was, Were they negligent in failing to properly prevent people

from being hit by trains or to properly protect the customers from hazard train strikes? That's what the question is about.

THE COURT: Well, you can say, Were they negligent in not properly protecting the public from falling onto the tracks? Is that what you want me to ask?

MR. GENIS: Sure --

MR. SHIELDS: (Indicating.)

MR. GENIS: Well, go ahead.

MR. SHIELDS: No, Your Honor. What we want is to say, Were they negligent in preventing people from being struck by trains?

MR. GENIS: That's the case.

MS. WINTERS: Your Honor, respectfully, we pulled this language -- there's other language we would have preferred, but we pulled this language directly from your jury charge to conform it to the jury charge, and that's where this is from.

It's --

THE COURT: I'm having a hard time hearing you clearly.

MS. WINTERS: Sure. Yes. So we pulled this language directly from your jury charge to conform --

MR. KEAVENEY: Jury instruction.

MS. WINTERS: -- to your jury instruction to

conform it to the jury instructions. These are words direct directly verbatim from there.

THE COURT: What are you trying to tell me?

MS. WINTERS: That Question Number 2 as written is currently consistent with the jury instruction.

THE COURT: Well, I think that's what we instructed the jury on.

Okay. We'll take a look at that again.

But, you know, it gives you ample opportunity to talk about the condition. I don't know why that's really a problem.

MR. GENIS: We're not saying the platform itself is unsafe. What we're saying is they failed to take proper safely preventative measures.

THE COURT: Oh, I see. All right. All right. So we'll reconsider that.

And then: "Was the negligence the proximate cause of the accident?" All right.

Yeah. I'm going to consider how to rephrase that question, because you may have a point, that we're me not talking about whether the platform was in a reasonably safe condition. So I get it. Okay?

So now the affirmative defense: "Was the plate negligent? Was the negligence the proximate cause of the accident?" I think that's okay, okay?

All right. And then we're going to deal with having to deal with the comparative negligence. I guess those numbers there. They're going to have to answers those questions. The big thing is Question Number 5.

I'll get back to you on how I'm going to phrase the issue of the negligence of the Transit Authority. I think you have a point there. It's more than just whether the platform was in a reasonably safe condition, obviously.

All right. So Malcolm's going to have to do the 31st change, okay?

Let's go to the big enchilada, okay? And the first question: "As of August 2nd, 2016, did the Transit Authority study the issue of persons falling onto the tracks and being hit by trains and consider whether to install platform edge barriers or track intrusion devices?" So we're focused on that.

Now, I don't think the issue is whether or not there was a plan or whether they followed the plan. And I think that this is really the correct way to phrase this question, okay?

And --

MR. GENIS: Tell me when I can be heard, Your Honor.

THE COURT: Yeah. So if you want me to say, Was there a plan or not? I don't think you want to do that,

because the issue here under my understanding of what the meaning is all about, is not whether there was a plan and whether they followed a plan, okay? And so that's the way I think we should phrase that.

And then you can say, Was the study adequate? And then the next question is: Was the Transit Authority's decision not to install platform edge barrier, TDIs, as of August 2nd, did it have a reasonable basis, and did they regularly review this decision in light of actual operations? That's the way I conceptualize this?

So if you want to say anything now about it, because I want to give you your marching orders now. And I will change the Question 2A.

MR. GENIS: Okay. And on 5A, Your Honor, the issue is, did they study how to protect people, how to prevent from occurring --

THE COURT: Well, we have the issue of --

MR. GENIS: -- it seems that we're conflating two different things, the study and planning it and combining it into one?

THE COURT: Look, did they study the issue of persons falling onto the tracks and hit by trains? That's what we're talking about here. And I'm also adding whether they considered to install platform edge barriers or track intrusion devices? That basically what the case is all

about, okay?

So I think it give you ample opportunity to argue what you want about what falling onto the tracks means, okay? But I think that that's a reasonable question.

MR. ROTH: Your Honor, can I be heard of that, please?

THE COURT: Yes.

MR. ROTH: Okay. So the first part of that, okay, I can live -- I'm telling you right now, consider whether to install platform edge barriers or track intrusion devices considering it from 20 years, 30 years, 40 years, considering it, that's that basically devastating to the charge.

That limits --

THE COURT: Well, wait a second.

MR. ROTH: Where it says "Consider" --

THE COURT: Prior to August 2nd, 2016 --

MR. ROTH: Yes.

THE COURT: -- all right, did they conduct a study --

MR. ROTH: Right.

THE COURT: -- about whether to install platform edge barriers --

MR. ROTH: No.

THE COURT: -- or track intrusion devices?

MR. GENIS: What if they considered --

MR. ROTH: No --

MR. GENIS: -- the day before, Judge?

MR. ROTH: Look, Your Honor, the thing is -- hold on a second.

The thing is to consider. If they can just say, We considered it -- they get up and they say, Hey, we considered it --

THE COURT: Just one second.

MR. ROTH: But the study part, if you just cut off the back of that -- if the back of this, "...after being hit by trains." and ended it there, then that would be a fair compromise. But --

THE COURT: Wait a second.

MR. ROTH: Yes.

THE COURT: You think it should just be "...study the issue of persons falling onto the tracks and being hit by trains?"

MR. ROTH: That would be a fair compromise, Your Honor --

THE COURT: Well --

MR. ROTH: -- because to consider the other stuff goes into the other --

THE COURT: Well, maybe you're right.

MR. ROTH: -- section --

THE COURT: Because you can say, "under study," you can talk about the traffic intrusion devices, and everything else --

MR. ROTH: Right.

THE COURT: -- you wanted to talk about.

MR. ROTH: Exactly.

THE COURT: I think you're right.

MR. ROTH: Thank you.

THE COURT: Okay.

All right. So then you have my sense of what we're going to be doing here, okay? The issue is not whether there was or was not a plan, whether there was an official plan or not an official plan. But, you know, the question is, you know, the issue of what did they study, and I think that's what the law is all about.

(Continued on the next page.)

(Continuing)

THE COURT: So let me see what we will be able to do in terms of changing 2-A. Let me see if we can collectively agree upon that. That should be simple enough to do.

Was the Transit Authority negligent in failing to keep the Atlantic Avenue subway platform ....

MR. GENIS: If I can give an analogy, Judge, like when you have an inadequate security --

THE COURT: We are not talking about negligence in terms of the platform.

MR. GENIS: Right.

THE COURT: The negligence I think you are talking about was their failure for them to put up protective devices.

MR. GENIS: Right. To properly protect their customers.

THE COURT: So, anyway, doesn't that really encompass keeping the platform in a safe condition?

MR. GENIS: No, because a platform in a safe condition is, like I said, there is a big hole, you trip on the platform.

THE COURT: You want it to be focused upon was it negligent in failing to take protective measures?

MR. GENIS: Yes.

THE COURT: To prevent the incident, I guess, right. What do you think, Ms. Winters?

I guess the point is that they're concerned that the platform could have a crack in it someplace and that could be sort of defective --

MS. WINTERS: I trust that Your Honor will be able to clarify that by explaining to the jury. But what I would say is that the jury charge tracks with PJI, which is the standard and requirement for Transit to have a reasonably safe people --

THE COURT: So we can say to keep its premises in a reasonably safe condition. That's the basic duty that they had, right.

MS. WINTERS: Yes, Your Honor. We have a duty to provide a reasonably safe place for people to board and disembark a train.

THE COURT: We can say that, if you wanted to board.

MR. GENIS: It's not just boarding. While you are standing there. This happened when nobody was boarding or, you know, unboarding.

THE COURT: I'm going to consider the best language.

MR. GENIS: It's to protect their customers from the hazard of being hit by trains, that's what it is.

THE COURT: I'm looking at what your proposed charges are. It's not consistent. We will see you at 2:15. We will make that a little more referable to the facts of this case.

MR. GENIS: Thank you.

THE COURT: I think you're right. I'm not happy with the platform in a reasonably safe condition, although I think it's understood what they mean here.

MR. GENIS: I don't think so.

THE COURT: Nobody talking about a crack in the platform. Nobody is claiming that.

MR. GENIS: We are not claiming that. But when I read that, that's what I think, when I read this question. Plaintiff didn't give a single word of testimony that the platform itself is unsafe.

THE COURT: Look. Look. The issue here is not whether there are cracks in the platform. So I don't think the jurors can be confused about that. We will see what I will do with it.

Let's do this: Why don't we figure about 2:30. You will have about an hour and a half to prepare for summations. I will make this revision so you will have this specifically. Otherwise, what do you want to add, Ms. Winters?

MS. WINTERS: Yeah. I would just note Count Two and Three of the Complaint specifically relates to the reasonableness of the design of the platform. So to the extent we are considering a revision, it might reflect that.

THE COURT: You know, I understand that. We just want to make sure -- I don't think the jurors are going to be

confused about what this is all about.

MS. WINTERS: I agree.

THE COURT: I don't think the jurors is going to get a predicated case about whether there is a crack on the platform. I think you are unduly concerned about things which you should not be concerned about.

MR. GENIS: I get very concerned with the verdict sheet, Your Honor.

THE COURT: All right. So we are trying to do the right job. I will see what else I can come up with other than the platform. All right.

We're talking about the premises in a reasonably safe condition, that's their responsibility, that's their duty?

MR. GENIS: It is. And, for example, if this was a premises case where there was an assault, it wouldn't just say keep the premises in a reasonably safe condition.

THE COURT: You're not going to be able to get high grades from our court reporter.

MR. GENIS: I'm sorry.

THE COURT: And she's going to tell me never let that man come into this Court again.

MR. GENIS: With good reason.

What I was saying, Your Honor, is, for example, in an inadequate security case, you don't just charge the jury

are the premises reasonably safe. The issue is did they properly protect it.

THE COURT: I think they understand all of that.

In any event, we will see you at 2:30. We will see whether we will make an adjustment or not. I don't think you are giving the jury enough credit here.

MR. GENIS: Judge, the jury is smarter than I am.

THE COURT: See you at 2:30.

(Lunch recess.)

AFTERNOON SESSION

THE COURT: So, Mr. Genis, how do you like the way I changed the questions?

MR. GENIS: Much better, Judge. Much better. Thank you.

THE COURT: I try to accommodate everybody. No good deed goes unpunished. It is all in the charge. I will do whatever you want.

MS. WINTERS: Your Honor, we significantly take issue with the charge. We think it's going to result in confusion as to what the basis of liability is, including possibly --

THE COURT: You have your exception. It is all in the charge.

MS. WINTERS: So we would request, Your Honor, that the jury receive a copy of the charge.

THE COURT: Now?

MS. WINTERS: No. No. After you charge it, of course.

THE COURT: Cool it. All right. Sometimes I do it; sometimes I don't. And you're going to make sure that I say the right thing, because I don't give the charge the way its written. I just give that to the lawyers.

So I like to talk to the jury, when I talk to them, about a lot of things, okay? So you will make careful notes.

You will make your objections and you will preserve your record. That's your job.

Are you ready to role?

MR. GENIS: Locked, cocked, ready to rock.

THE COURT: Okay. Let's do it.

THE COURTROOM DEPUTY: One of the jurors, we are waiting for them to come back from lunch.

THE COURT: I guess they didn't like our lunch.

THE COURTROOM DEPUTY: They did. But it was a little long, so they went out for a walk, I guess.

(Pause in the proceedings.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Members of the jury, you have been troopers. I hope you enjoyed the lunch. I heard somebody went out for lunch and they didn't care for the food or something like that.

JUROR: It was great. Thank you.

THE COURT: So we are now at the and of the trial, and what remains is to hear the arguments from the lawyers. And believe me, they are going to argue a lot about things, all right. And you can expect that. That's what they are supposed to do.

So the way it goes is since the plaintiff has the burden of proof, the plaintiff sums up first. Then after that, the defendant will sum up.

I understand Mr. Genis is ready to rock and roll and Mr. Keaveney is going to be doing the summation.

In the federal court, we give the plaintiff the last word. They have the burden of proof. So they can have a brief rebuttal. I may have mentioned that to you before. It is not going to be a repeat of their summation. We are not going to put the lawyers under time pressures because it's been a long time. We have had a lot of interruptions. I want to give them the latitude to make their best case for their client. We are going to give Mr. Genis the rest of the afternoon. Presumably he will finish by 5:00 if I stop talking soon. That will be enough for one day.

And then tomorrow morning, promptly at 10 o'clock, Mr. Keaveney will give his summation. And then we have a brief rebuttal. I think that can be done in the morning. And then after that, I am going to come down and tell you what the law is and then you will be starting your deliberations tomorrow.

The one thing I want to talk about is I'm always concerned when a case ends close to a Friday, because people have a tendency with the weekend -- and I don't want anybody to rush to judgment on this case. We never know how long the deliberations are going to take. Whatever it takes is what we want it to do. As long as you properly consider the evidence and follow my instructions, and you're going to do that

because you're and outstanding jury. I can tell that.

So we have a Friday dynamic that I am concerned about. We are going to have you folks have the case to start tomorrow early afternoon, I think, right. I don't want anybody to feel that they have to rush because Friday afternoon. You know, people have weekend plans and there is a tendency for people to want to really get rid of cases before the weekend. If you have to come back on Monday, you come back on Monday. You have to take whatever time it takes to really give this the proper deliberations, which you are obligated to do, to render a fair and just verdict.

So I want you to think about this: You don't have to go home at 5 o'clock tomorrow. I'm going to turn the courtroom over to you once I give you the charge. And then you are in charge of my life. You are going to tell me when you want to go home, when you want to come back. And we are doing it on a 10 to 5:00 type of dynamic. We don't have to adhere to that. We can come earlier. And you can even stay, if you want to, later on Thursday night. The reason I tell you that is because you have the option, you may decide yes to do that or no to do that. But if you want to take the pressure off of you, perhaps, so you don't have this Friday thing in your head, then you can stay later, and then we can even give you more food. And we have done that before. We had one juror who ordered in for dinner and ordered seven

meals and he brought them all to his family afterwards. So we see everything here in the course of trying to do our job. So just think about that. If you can stay later tomorrow, it may be a good idea. You might be able even to stay until 6:00. You talk amongst yourselves. I don't want anybody to feel under pressure to do that. I just want to let you know that we will be able to accommodate you if you wanted to do that and we bring you in some more food on top of that. Think about all that.

In the meantime, Mr. Genis, your summations.

MR. GENIS: Thank you.

THE COURT: When the lawyer sums up, they are going to say a lot of things that the other lawyer does not going to agree with. So we try to minimize interruptions as best as we can. I don't want to hear a lot of objection, objection, objection. Sometimes it is necessary. But if I give you this cautionary tale, maybe it will help so we cannot interrupt the lawyers when they talk. Obviously they're not going to all agree with each other, right. I would be shocked if they do. That's why we have a trial, right.

So if the lawyers says something which you don't think is correct, you don't accept it just because the lawyer said it. That's argument, right. It's your recollection of the facts that count. So whatever the lawyer says, you don't have to agree with it. You could disagree with it, right. So

the lawyer is arguing on behalf of his client, okay.

Hopefully by telling you this we won't have a lot of interruptions. I would like not to interrupt the lawyers when they talk on both sides and have a lot of objections. So by my telling you now over and over again, if a lawyer says something that a party doesn't agree with, you don't have to necessarily object to it unless you really feel something is very, very poignant, because I'm telling you now you don't accept what the lawyers says just because he says it, okay. So you understand that.

So with that admonition, let's hear what Mr. Genis is going to tell you now.

Summation - Mr. Genis

MR. GENIS: Thank you.

Folks, tomorrow you are going to go into a deliberation room and you are going to have three jobs: Job number one, answer the questions the judge gives you.

Job number 2, to make sure everyone on the jury carefully follows the law that the judge gives.

Number three, before you answer any questions, explain to one another why you feel the way you do about each question.

And most important, respect one another.

Now, before -- I'm going to try to give you a couple of ways to look at what you have all heard and seen and

listened to.

Before I review how the defendants, Transit Authority and Ms. Shabazz, disregarded the safety of your community, ignored foreseeable harm, were negligent and how their negligent choices were substantial factors in causing Luisa to lose her arm and her leg.

A member of our community has been harmed and I'd like you to ask yourself four questions when you look at the evidence and consider the law that the judge gives you: Number one, do you want to give the defendants a pass on safety?

Number two, does operating a subway system in the City of New York and operating a train mean that you have responsibilities and duties to keep us safe or is it an excuse?

Three, did they do their jobs properly?

We all have jobs. We know what it is to do a job properly.

Four, did they act safe enough for our community?

Now, if you want to give them a pass on safety, vote for them.

If you want them not to have duties and responsibilities to keep us safe, their customers, and use their job as an excuse, vote for them.

If you want an unsafe subway system, the least safe

system in the world, vote for defendants. That simple.

But when you view all of the evidence and you listen to the law, ask yourself who actually enforces safety standards to make sure we are safe, and that the New York City Transit Authority is not immune from accountability for their action and that they should be held accountable for their actions. Nobody is above the law.

They are going to ask you to find them immune from the law.

They put many lives at risk by its conduct. Anyone could have been harmed by their negligence. They chose not to do their jobs properly.

And we say we are more likely right than wrong that their negligence was a substantial factor in causing her catastrophic, irreparable damage.

Now, we are going to discuss the verdict sheet the judge is going to give you. I will do that in a minute. I'm going to try to say some things to assist you in answering those questions. The first ones I'm going to start doing are the simple ones. The train operator, that a simpler issue. It is undisputed that a train operator must keep a proper look out and be attentive, see what is there to be seen when operating a train, undisputed.

Line of sight. It is undisputed, because out of the words -- out of the mouth of Ms. Shabazz herself, she could

see in that tunnel before entering the station. 75 feet before entering the station, she could see the entire station, the entire station.

You have also seen a video with your own eyes and heard testimony how actually -- I'm going to round it to 150, but I think 147 feet or whatever, from the -- in the tunnel, that distance, 150 feet from the mouth of the tunnel, you could still see the entire station.

Whether you accept the video of that testimony or not, that's your call. But we know a minimum of 75 feet.

Now, it is undisputed where Luisa's body was. And you've heard testimony from two different experts who basically told you, give or take, she was 250 feet away from the mouth or entrance of the station.

The train operator herself, Ms. Shabazz, told you, admitted that while she was at the mouth of the station entering it, at that time she could see everything. And if at the time, if at the mouth of the station she applied her emergency brake, this doesn't happen, period, end of story. Shabazz admitted that. I asked her that. If you would have at the mouth of the station done the emergency brake, this doesn't happen. Obviously, if she could have done the emergency brake while still in the tunnel, this doesn't happen.

You have heard from Shabazz herself that she reacted

immediately, immediately, flatly contraindicating, flatly rebutting the paid opinion witness Dr. Marpet who has admitted making one or two million dollars from the Transit Authority, and that's up to only 2014. And he has been doing work for them ever since.

You saw the usual suspects on this trial.

You heard Marpet tell you oh, yeah, I've been doing the Transit since what, 1994, for years, all these subway cases.

You heard Dr. Reid, oh, yes, since 1992. They get somebody with an amputation from the subway, there I am. They got their team.

But even Marpet admitted he didn't use the right standard. He admitted, when I was -- yeah, yeah, it's supposed to 3.2, but he didn't do that. He gave it a fancy name, about empirical blah, blah. But he admitted that wasn't what it was supposed to be.

And he admitted that they longer. And he admitted how he uses a perception reaction time based on cars on roadways. And he admitted that even if, that it's a one-second be reaction time. Then he gave a range. But he admits that if there is no thought involved, which there is none here, there is no decisionmaking, this isn't you're driving your car, suddenly darts out in front of it, do I steer left? Do I steer right? Do I hit my horn? Do I

accelerate? Do I slam on the brake? Do I have to worry about somebody hitting me from behind? Is there a car in the other lane that if I swerve I'm going to hit them? What if there's another child?

Look at the decisions you make when you drive a car. That's why there is that longer reaction time.

When you are driving a train, you're not steering left or right. You don't have to worry about getting hit from behind. You are on rails. You ain't going anywhere. The only issue brake, not brake. That's it. Nothing else.

Your hand is on it the whole time, she said.

And the second, the second you let go, emergency brake, split second.

You heard Dr. Carl Berkowitz tell you how he used the figure based on studies of actual train drivers, train operators, point six of a second for perception reaction time, or reaction time, point six.

You heard Marpet admit that when he uses what he calls AASHTO, the American Association of State and Highway Transportation Officials GLOB for cars, that the median, median, not the average, the median, the midpoint, is three quarters of a second, three quarters of a second.

He admitted that you have to shave off a quarter of a second, only a quarter of a second to differentiate between a car, when you are driving a car, and of all of those

choices, decisions to make, as opposed to a train.

Now, I'm not even going to comment if that makes sense to you, that that's the difference, a quarter of a second. Really? For driving a road with all of those things and operating a train.

But let's assume for the sake of our discussion today that that was true. Okay. Three quarters of a second minus a quarter of a second, you're half a second now for reaction time.

Dr. Berkowitz said point six. That's even more than a half a second. Berkowitz was very conservative in all of his estimates, in all of his calculations, which, by the way, calculations, when Berkowitz was here in front of you, off the top of his head he could do the math, today even, give him a pencil, done.

Marpet, gee, I don't know, I need an hour to figure this stuff out. Let's break for lunch. Another calculation, I need another 15 minutes. He is an expert. He is coming to you as an expert he can't do the simple mast that he was paid a lot of money to come into court to do. You got to be kidding me?

Let's get back to Shabazz for a moment, though. Should she have seen her? Well, we have a clear line of sight if you are looking, if you are paying attention. She wasn't invisible. She was there to be seen.

You didn't hear somebody say she's wearing dark clothes, you couldn't see her, it was so dark. Nobody said that. Nobody said well, jeez, she's only three feet tall. We couldn't find her. She's 5'9", okay. Nobody said she wasn't visible. She was there. She was visible.

And I was wondering to myself last night why wasn't Shabazz paying attention. You don't need a reason why. People day dream. People think about things, people get distracted every single day. And okay, she was pretty new at it. She had only finished the school a year before, pretty inexperienced. But then I remembered, I asked one question, did you have a cellphone on you?

Yeah, I did.

I was waiting to see if there would be any follow up on that. I was waiting to see if there was any follow up on that, no follow up, no additional comments, nothing at all. Nothing at all.

You know, we have all heard about distracted drivers, distracted driving. We all know one of the main causes is cellphone use.

Do we know if she used it? We don't.

Was it there testimony? No. But was there testimony that she didn't? No.

Now, so if she could see her 75 feet away, that means Luisa was 325 feet away. And if she saw even earlier,

there was even more distance.

And you have heard of what the stopping distance is.

You have heard how they should have been able to stop the train more than 100 feet away from her. We are not talking a couple inches, just made it. More than 100 feet away. This was so easily preventable. And it hurts because there was enough time -- you folks heard 911 calls. You heard call number five where clearly -- and you heard, by the way, the testimony, this is a big station, okay, and how many flights of stairs there are to get up to the street and that's not close. You got to haul to get there.

And this was so serious that there were multiple calls to 911. We live in a city where when you see somebody on the sidewalk missing a leg, you throw a coin in the cup. You walk over them. We live in a cold, cruel city, okay. And it's a cold, cruel world. I don't pretend it is otherwise. I don't know your lives, but people have hard lives and I understand that.

But in New York City, in this cold, cruel world, look at the number of people that went out of their way to run up all those flights of steps, to run through a station, to get to the street, to take out their phone, to call for help, a member of our community, please help. She's on the tracks. The train is not in the station. It's not near the station. Why would you even run up to make that call if you didn't

think you could beat it, get in time to prevent this from happening. And she did that, a stranger, someone no one knows made that call. And what was done? Nothing. Nothing. Nothing.

And then other people called. You may have heard some calls later. She got run over, yeah, send an ambulance. Okay. That's closing the door after the horse has left the barn.

But all those people called to help Luisa who they didn't know.

Shabazz, at the scene, spoke to the police. You have in evidence -- you have seen it. I don't need to show it again, two different police reports, a detective wrote down what she said. They were there. And then at the scene, oh, yeah, as I was entering the station, as I was entering the station, I saw someone laying on the tracks, laying on the tracks, not falling, not fainting, not jumping, not getting pushed, laying on the tracks as I entered the station. If she saw it as she entered the station, she admitted, Shabazz admitted I could have stopped.

(Continued on next page.)

(continuing)

MR. GENIS: What happened next? Well, after she said that to the police, all the TA bosses came down, because they knew stuff was hitting the fans. And they all got it. Did they interview witnesses? No. Did they try to get videos of what happened? No. Did they try to do this whole investigation that they talked about? No. They hustled her off. They grabbed her, put her on the train. They took over a train and went to DeKalb to go to the superintendent's office where she's there with her union rep and the big superintendents, including Mr. Gaskin. And you heard her admit, yeah, he helped me fill out that form, that correspondent sheet, the cheat sheet you heard about. He helped me. Helped her. Woman who was only working for about a year after school. It's a good job. Surrounded by her bosses, union boss. They helped her fill it out.

I asked her: Did anyone suggest to you that she fainted? You know, I don't know was her answer. I'm not sure. She's not sure if she actually saw it or somebody told her that Luisa fainted. They circled the wagons. They knew stuff was going down. Okay?

And they could have said -- they had choices. Choices. What did you tell the police? What's the truth? What happened here? But oh, no. Oh, no. They met with her, surrounded by her bosses. And now that's when they start.

And that's when all these things happen.

Now, I'm not saying that they lied because Luisa did, in fact, faint. She did faint. Shabazz didn't know that. Shabazz only saw her laying on the tracks as she entered the station. Where did they learn that from? How did they learn that? Hey, did they ask George? I don't know. Did they ask somebody else that they didn't identify as a witness? I don't know. But we do know that that's when the story changed. That is fact. Okay?

Why would you change your story if what you said was the truth and exculpated you if you did nothing wrong? Stick with the truth. But that's not what happened. That's just not what happened.

Now, then they tried to blame the victim. Luisa, this is your fault. You. Your fault.

What did she do? She stood on a platform waiting for a train, five feet away from the edge. Has anybody disputed that? No. And when I questioned the Transit witnesses, I said she was where she was supposed to be. They said yeah. If she was where she's supposed to be and did nothing wrong, ask yourselves when you get your verdict sheet, why is there a question, was she negligent? Why is there a question, was that a cause of anything? Ask yourselves that question. She did nothing wrong. Blaming her would be a sin.

I'm sorry.

What else do we know? We know from George Brown that after she fell onto the tracks -- and I feel for George. I can't imagine being in that position where someone you love is on the tracks where trains can come. And you heard it, it's high level. It's not, like, okay, you fell down, let me get you. Powerless. Helpless. In shock. In fear. And he said it was about 20 to 40 seconds before the train came, which coincides with people running upstairs to make calls to 9-1-1. Okay? That's consistent.

And finally, the train.

And by the way, there's one other thing you heard about mainly from Marpet and whatever that there may have been another person there; Gabriella Smith. And she testified -- when asked this question, Marpet ignored it, even though he said it would be wrong, it would be improper to cherry-pick evidence as an expert, that's exactly what he did repeatedly, over and over again on everything. And oh, yeah, like, yeah, okay, she might have, maybe Gabriella did say that for 7 or 10 seconds Luisa was on the track before the train even came to the station. Before the train even came to the station. And they tried to play with that 7 to 10 seconds every which way they could.

But you know, my dad told me when I was a kid, you can't shine manure. You can try to buff it and polish it all you want, but you can't shine it. And that's what they're

doing. All right?

And we know she's there for a period of time before the train ever came. What does all the evidence show consistent when you weigh the evidence? 9-1-1 calls, two different witnesses saying a period of time, the driver herself saying, yeah, she was already on the track to the police. Where is the factual evidence to say anything else?

Where was she? Okay. And George is waving and screaming. And who wouldn't be? Who wouldn't be waving and screaming to try to get the train to stop?

For Shabazz to say I didn't see anyone, didn't see anyone, defies credibility. Defies credibility. To imagine, oh, yeah, there's somebody on the track, no one is waving to get me to stop or to slow down or do anything. The same time, people are running upstairs, running upstairs to call 9-1-1. People calling for an ambulance. No, it was just a regular day, nobody doing a thing. She kept saying one thing after another that wasn't true.

I didn't count, but how many times did I have to ask the same question twice? Once was a question where we got one answer, the other times to read out of her sworn deposition testimony where she gave a different answer. Just like she said something different to the police that she said to her bosses.

Luisa was there. And I think one of the questions I

asked Dr. Reid -- let me talk about Dr. Reid. And by the way, if I have offended any one of you, the Judge, Counsel, anybody in this room, including Dr. Reid, I apologize. Please, please do not hold it against Luisa. You want to hate me, you want to call me names, feel free. Please do not hold that against her.

I'm sorry.

So Luisa is on the ground, and Dr. Reid says there's no loss of consciousness. No loss of consciousness. And I'm thinking, what would a person think when they're on the tracks, they can't move, they're in and out of it, and you feel the vibrations of the train approaching, you hear the oncoming train? If your eyes can be opened, you see those headlights coming at you, bearing down at you. Literally, the Judge even said being hit by a train. Okay? I cannot for the life of me imagine what was going through her head: The terror, the fear of what was about to happen. Those 20 to 40 seconds, oh, 7 to 10 seconds, whatever amount of time you think it was, that must have been the longest period in eternity for Luisa, lying there helpless. Helpless. Not able to move. Feeling the vibrations. Hearing the train. Seeing the lights.

And then the lights went out for her. And yes, they went out for her. And not just the first set of wheels of the train. You heard, there's all these different doors and

wheels. Not the second set. Not a quarter of the train. Not a half of the car. Not three-quarters of the car. Not just one car. Her body is found somewhere between the first and the second car, partially under the second car. An entire train car ran over her body. And part of another one.

And you heard, even from Shabazz, they couldn't get her out because she's under the train. And they find her severed limbs. And they have to pass up an arm, and pass up a leg, and then try to carry her poor shell of a body that is remaining and bring it up to the platform so that the ambulance can take her away. And she was conscious for that. Can you imagine, imagine seeing your arm, seeing your leg? She even told you, while she was on the track she saw that. Seeing your severed arm and leg lying there, unable to move, stuck under a train car?

When you get to question one on your verdict sheet, was Shabazz negligent, I respectfully submit that the fair preponderance of the credible evidence, the answer is yes, unanimously. Was that a proximate cause, that negligence, was it a proximate cause? Yes, it was. Unanimous.

Now, let's talk about the negligence of the Transit Authority. They were profoundly negligent in such a manner that it is offensive. Offensive. The Transit Authority admits they knew for decades, for decades of the hazard condition, the hazard of train tracks. Why do you think they

started keeping records in 1987? And what was going on? What was going on at the Transit? Well, you have in evidence Plaintiff's Exhibit 16. And I think...

Mike, could we please turn this on?

THE COURTROOM DEPUTY: Sure.

MR. GENIS: And this is an e-mail from the president of the Transit Authority. You have seen this before. Tom Prendergast. And what he says -- and they're talking about not Luisa, but this is in 2010, about somebody else who got hit by a train. Paul. Paula Fleuranges. Is this the customer who died of injuries sustained as a result of a train striking her on the head at 53rd and Lex this morning? Are there eyewitnesses? Anybody -- was she leaning over? They look, they look to blame the victim every time. They're coming up, oh, was she doing this, was she doing that? Can they find a way to blame the victim? And then, even then, the shear number of incidents involving jumps, falls, slips and pushes to the track bed combined, would these provide a strong justification for platform doors. When you consider the number of suicides and other accidental deaths just this year alone, we're in the 50 to 60 range annually. This is absolutely insane in 2010 regardless of what history has revealed. These are not my words. These are not Dave's words. Elliot's words. Logan's words. They're not Luisa's words. Tom Prendergast, president of the Transit Authority's

words. And what do they do with that? Zilch, zero, nothing, nada.

But let's go back, before we start blaming Mr. Prendergast. Because you've heard they've been looking at it since the 1980s. You've heard they all were thinking about it, we're looking, we're evaluating, we're considering, we're scratching our heads, geez, what do you think? You think we have a problem here, folks? No, no, we're good, we're good. We don't need to do anything. And then after looking at it in the 1980s when other cities throughout the world, throughout the world are putting in for the same reason protective devices, all over the world they were doing it. You heard even their expert, their expert -- talk about him in a minute -- oh, yeah, in the 1980s. What are we waiting for, folks? Okay? 1980s. 1990s. It's in London, it's in Paris, which the Transit admits are the only two comparable systems. Only two. Not a single U.S. city. You've heard, oh, but what about Philly, and Chicago, and Boston, and whatever the heck. Okay? What about Canada? What about whatever? Excuse me, they're not comparable. They're not comparable. Okay? You got to talk apples to apples, not apples to oranges. And these other cities were doing it. And they did it in the 1990s into early 2000. And then you saw, there's an e-mail in evidence, a bunch of e-mails. You're going to see when you -- if you want, internal e-mails from the Transit Authority.

Been working nine years to get here. There are e-mails.

Larry Reuter, R-E-U-T-E-R, president over 20 years ago, he killed it. They wanted to do it then. There were people back then who said we need platform screen doors, we need protection, we need to do something. We need something. Insane. And then Reuter killed it. No, we don't. No, we don't. Right in the e-mail. No way, no how. And then it died. Nothing. Dormant.

But what happened next? Then you get into the mid-2000s. Let's say 2007, give or take. Private companies were now knocking on the door of the Transit Authority saying, look, we can do this for you, and we could do it for free in a Build Operate Transfer Agreement. So they tried to make like it's something dirty. You heard their own expert, yeah, it's common, it's done all the time. You heard from other Transit experts, that's what we do at the bus shelters. Okay? And after multiple companies made that offer, the Transit Authority says, well, geez, we got to look like we're doing something here, folks. Okay? So I got up into your offices, a lot of offices, there's always this one guy, his jacket's always hanging on the chair. He's never there, but the jacket's there, so it looks like he's working, looks like he was just here. This is three-card monte. This is a shell game. This is let's have lip service. Let's have the appearance of doing something but don't do anything. That's

exactly what's going down here. Because then they say, geez, there's newspaper articles, there's press about people getting killed. We got to do something, folks, or look like we're doing something. Let's have a blue ribbon panel, let's have a task force, let's have a committee, let's look into this. They're a member of CoMET, the international organization that collects all of this data, disseminates best practices, standards of care, what is everybody else doing in the world? How are they doing it? How are they meeting the challenges? Because there's always challenges. Okay? And they knew, they knew that it was effective worldwide. And you know what, you didn't even have to travel worldwide. You saw that every which way back-pedaling from JFK. Oh, yeah, well, that's different, that's different. Same gauge rail. That's what heavy rail is defined as, okay? 9 or 10 subway stations. Yup. Oh, the big difference, driverless. No operator on the JFK ones.

But you also heard that it was built in 2003 in operation. 2003. No deaths. No catastrophic injuries. They didn't say, geez, this ain't working, not working, okay? Let's take it out. Get rid of it. No. No. It's still there. Okay?

So, what's going on? They knew it works. They knew it works in New York City. Right? Wasn't that the -- oh, how do we know it's going to work here? Our grits boil different

in New York than they do everywhere else. My Cousin Vinny. All right? No, we're different, we're different. Somehow we're different than London, we're different than Paris, we're different than Tokyo, we're different than Seoul, Korea. We're different from India, South America, Asia, the rest of the world, we're different. Oh, but in New York City, it actually worked at JFK with the Air Train. But we got to distinguish that.

So let's look like we're doing something because all these companies are offering it to us. I know, let's put out an RFI, request for information. That looks like we're doing something. And they put it out to the world. And they were kind of hoping, you know what it's like when you have this wedding and you really don't want people to come, so let's do it in Iowa where nobody is going to want to come out there, but you send me a check anyhow? All right. So let's do this RFI. Maybe nobody will respond, and then we can say, look, we did our best, we tried, we tried. But 12 of the biggest companies in the world offered to do it. 12 of the biggest companies in the world offered to do it. And what was the response to that? They're, like, oh, my God, now we actually got to do something here. So they evaluate. They evaluate the 12 responses. And they narrow it to five. Five. And they admit, I don't have to put it up on the screen or on the ELMO, you saw it all.

Actually, let's do a couple. First of all, why do they have to take action? Because they're the worst in the world. This is in evidence. I'm looking at Plaintiff's Exhibit 44. Okay? Worst in the world. We're number one. Not the way you want to be, but we're number one.

Now, this is New York City. We're supposed to be the best. We're supposed to be the Big Apple. We're supposed to be the leader, the trendsetter. Okay? We are lagging behind the entire world in terms of safety.

And then when they said, oh, okay, with this RFI, you know, well, let's see. Oh, my goodness, not only can you get somebody to build it for free, but you will share the profit. Share the profit. You can make money from this Transit. Talk about a win/win. Safety for the public, doesn't cost a dime, and you'll make money on it. Is this is a no-brainer? Okay? I mean, if any one of you at your job said, hey, we could get somebody to do something for us, and it's not going to cost us, and it's going to benefit us, if you told your boss, yeah, I passed on it, you would be fired. Okay? So they had that and they ignored it.

But then they said, well, geez, we didn't like that, yeah, that company, they're a bad company. We knew they really couldn't do it. We actually -- well, that's the same company that we visited in Korea because they built it in Seoul, Korea on that Build Operate Transfer model at no cost.

And they looked at it, and we saw the trip to Korea report and we heard from people who went. Oh, yeah, it works, it works great. It's effective. We've had nobody getting killed. Nobody getting hurt. It's working great.

And then you saw the peeling of the onion, the lies. Oh, well, that company, we couldn't take them seriously. We heard that they only did it in 28 out of over 300 subway system stations. Well, actually, that's not true. When we looked at the actual trip to Korea report, it said that they did all of the stations. All of the stations in Seoul, Korea. I think it was, like, 128 of them. Okay? All of them.

So why would -- this is not a document that we just invented. This is not a document that was created. This is their records. Their trip reports. They wrote, they disseminated, they distributed. They knew what it said.

And then they have somebody that we subpoenaed. We subpoenaed all the high level people we could from the Transit Authority. Notice they didn't call. We call. And you knew you were going to testify. You knew you were going to look these jurors straight in the eye, and you knew you were going to tell them that company was no good because it couldn't do the job. It only did a couple of stations. Straight in the eye, looked at you. And now when I show them the actual report, oh, oh, see, I was thinking about the e-mail before this. This is 15 years ago. How many years ago this was?

You've already testified about this at a deposition. You're subpoenaed for trial. You know what is going down. And this is what you tell the jury? That is the insulting part, many parts of the insulting part of the Defense, defending the indefensible. Okay?

So they know it works and they know that model was effective, the Build Operate Transfer. And they know that vaguely from one of the biggest companies in the world, 40 percent market share, said we could do it -- and I'm looking now at Exhibit Plaintiff's 3 -- at not a dollar. Not a dollar. Not a dollar. One of the biggest companies, oh, well, we're worried about security. Who knows, what if they go bust? Right? Anything can happen, right?

And you heard from a lawyer today, who is their expert, which I found somewhat interesting because he even admitted this is all about engineering. This is all about engineering. You heard about challenges.

Sorry, I'm bouncing around a little bit.

Challenges. Did you see when they put up those PowerPoint presentations for you -- and by the way, a PowerPoint ain't a study. Not even close. Okay? We're going to talk about studies in a minute. And they talk about challenges. There were challenges building the subway system to begin with. Every day there are challenges. This is New York. You put up a skyscraper, that's a challenge. You

put in a subway system, that's a challenge. You add message boards because, oh, why can't we do? Oh, it needs electricity. Well, don't those message boards use electricity? Don't those help points use electricity? Don't these other things that you've been doing all require electricity? Didn't you figure out how to solve that challenge? Okay. They talk about challenges and it's nonsense. It's just -- yeah, there are challenges. You all have lives, you have challenges every day, whether it's your home life, your personal life, or your work life. You got challenges. We all do. Do you just say, oh, what do you want from me, there are challenges. Does Luisa say it's a challenge to get through life with one arm and one leg? No. No. She's doing the damn best she can. I would be lying in bed crying. She is going out and working her butt off, and they want to attack her for that.

That's what offended me so much about Dr. Reid. It was offensive. He takes a hypocratic oath to help people. He is in a line of work where that's what you do, physical medicine rehab, you help injured disabled people have the best life they can. But he's on their payroll since 1992, and he comes out on all their cases. So yeah, she doesn't need this, she doesn't need that. They begrudge her a wheelchair? They begrudge her a new leg? No, Luisa, you can't have a new leg. You can't. You can't have an arm either. You can't have a

wheelchair. You get nothing. Nothing. That's what they want. That's exactly what they want. It's outrageous. And to have a doctor say that is offensive. It's offensive.

Are they negligent? Let's talk about their negligence. So they know they have a hazard. They know three to five times a week people are getting hit by trains. You heard me with Mr. London, so if you don't fix it this week, you know next week it's going to happen again. And the week after. Oh, yeah, yeah, we know that. You heard even today going through with their expert -- and we did this with Mr. Doddo, the head of Office of System Safety at the beginning of the trial. Okay? And Mr. Sullivan from the Office of System Safety, that they know this will happen again and again and again. And the definition of insanity is doing something the same exact way and expecting a different result. Okay?

So what did they do? Well, they had to have something, they had to show they're doing something. I'm sorry, let's finish with this RFI. So then they bring down five companies, including Faively, who in their own evaluation addressed every challenge there was, gave great technical detail for every challenge. They want to talk about challenges, they said we could meet it.

You saw Mr. Wurtz, doesn't even work for them anymore, and he said, yeah, we could have done it. We could

have handled every challenge there was. And then it just died. It just died.

And then you saw the e-mails even from some other company. Guys, what ever happened? We put in a proposal. We're one of your finalists. Oh, yeah, we're not doing anything now. And now you start more of the shell game because they still have to have the appearance of doing something.

So then they came up with excuses, which you don't see in writing anywhere. We got a mountain of records, pile of records. By the way, the big piles are the medical records. Okay? Thousands and thousands of pages of medical records. So where are they? They're, like, well, geez, we haven't done anything with this, and now you come up with the excuse that they make up nine years later. Oh, they didn't follow the procurement procedure. Okay. They got people on the committee task force from procurement, but we'll put that aside. Yeah, because you need bidding because how could we give money without competitive bidding? Well, they're offering to do it for free. You're not giving them money. You're not giving public money to them, they're giving you the money. Okay. But you know what, let's pretend they're right. Let's pretend it's not a lie.

Okay. Why don't you now do that same RFI for competitive bidding, for free? Okay. But they didn't do

that. They didn't do that.

Oh, what we're going to do now is we're going to pay money to another company, to STV, to draw a design so that maybe at some later point we can actually make a plan to do a pilot project so we can test something we already know is effective and works worldwide for 30, 40 years at this point. It's a shell game. All right?

And they don't even do that. They don't even do that.

Okay, so they do a design. They pay more of our money to do a design to do nothing with it. Because then they keep three-card monte, the shell game. We're going to do on 14th Street at the L, we're going to do it in the Bronx, we're going to do it in Brooklyn. Every time they're moving the cheese. Every time someone says, okay, let's get it done. Let's do this pilot. Yeah, yeah, we're not going to do that. Canceled every single time. Never got past the design phase. It's a joke. It's an absolute joke if it wasn't so tragic.

So they do that. But now, okay, let's pretend we're doing something else. Let's actually pretend we're doing something else. I know, I know, let's look at track intrusion devices, the detection system, let's look at that. Oh, okay, so let's -- yeah, we're going to go all over the world because we didn't do enough shopping in London, Paris, and Korea, we're going to go to Germany, we're going to go here, we're

going to go there. All these trips to see what they know already works. We do trial testimony by Zoom, but they had to fly all over the world to look at these things to say, oh, yeah, it works. Okay. And then they say, okay, let's do a pilot on the track intrusion thing. Let's do a pilot. And they do. And it works. Okay? It works. You know, they go, oh, yeah, yeah, there are some false positives. But if you actually read the report -- and it's in evidence -- they said, they recommend doing it. Very few false positives. Overall, very effective. So what did they do? Nothing. They go, oh, you know what, we got to look at this a little longer. Well, we got to think about this more. And you know, they use certain words: We're looking at it. We're thinking about it. We're considering it. We're evaluating it.

You heard, when I questioned Mr. London, those words are meaningless. Thinking, looking, evaluating, considering, whatever. It's not doing anything. You're not accomplishing anything. You're not actually studying it, and you're not actually writing a plan to address the problem and fix it. You're just stalling and shuffling along until your pension kicks in. All right? They are doing nothing. They want the pretense to dress it up as if it was a study, not just one study, oh, we're looking at it, we're looking at it. Look how hard we are studying. We are studying this so hard. Since the 1980s we're studying. We're going to study this for

another 50 years. We're going to have the best study you ever saw in your life. It's going to be incredible. After we're all dead and gone, there's going to be this fantastic study. They're going to publish it, maybe make a movie out of it. It's going to be incredible. Okay?

Where is the study? What you will hear perhaps is at some point they hired this company DMJM Harris, something to that effect. And it's, again, the pretense of a study that did nothing, accomplished nothing, and nothing happened. Okay? Again, it's a shell game of pretending to do a study, of looking like you're doing a study, but not actually doing a study. Because you heard me ask questions of people. Okay, what is it that you need to study? You don't need to study, do they work. You know that already. Yeah, that's true. So the only thing to study would be how do we implement it here? Okay. And they said well, yeah, it's true. They admitted that. That's the only thing that needs to be studied. Because yes, well, like, did you do a comparative analysis, right? If you're going to buy a car, okay, here's the Toyota, here's the Honda. How do we compare? Okay? Anything you buy, you compare. Did they say, okay, why don't we compare, what's the effectiveness of let's say a platform screen door versus this kind of gate or that kind of barrier or some kind of barrier with the track intrusion detection system. How do they work? What's the cost? What's the effectiveness? They

never did that. They never did study how do we best prevent this known hazard from recurring? They never did that.

What else is there to look at? Right? You're the TA. People are getting mowed down three to five times a week. How do you fix it? How do you solve the problem? They don't do that. Okay?

Well, if you know there's something that works, how do you implement it? Oh, we need a pilot. Whether you do or not, you know what, nonsense, but okay. So do the pilot. They never did it.

And by the way, why are you paying money when you say money is an issue, cost is an issue, you're paying money to a company to do a design when you got five companies that say we'll do it for free.

(Continued on the next page.)

(Continuing)

MR. GENIS: In fact, you heard Mr. Wurtz when he testified, we would have done the design for free, but they don't. They don't. And they don't do the study. And they don't do the pilot. They don't do anything. So then again for the purpose of lip service, I know, I got it, we will put up signs. We will have an awareness campaign. We will make announcements. Okay. Fair enough. Give it a shot. And they did that decades ago.

And then you even saw the big dog and pony show, look in 2012, look what we did. We let -- we practically put it on everybody's doorstep that you got to watch these trains. Then I showed them the charts. The numbers went up. More and more people were getting hit.

And, again, if it's not effective, right, don't you have to, commonsense, evaluate what you're doing in the real world, in light of its actual operation, either it works or it doesn't, either it's effective or it's not. And it wasn't. It wasn't. We are still trying we got more signs. We got more announcements. We got buttons. We are going to do this. We are going to do that. It didn't work. None of it.

And what really exemplifies their entire attitude was Cheryl Kennedy, then the head of Office of System Safety, who didn't have the guts to come and look at any one of you in the eye, and I questioned her at her deposition, you are the

head of Office of System Safety. That's your job, is system safety.

Is safety your number one priority?

No.

Is it your top three?

No.

Is it your top five?

You are the head of Office of System Safety.

No. Safety's not that important.

And I asked her well, how about between 5 and 10? I can't say.

Finally, okay, it's number 10. It's number 10.

Can you picture that? Your job, your sole job is safety, but safety is not one of your top concerns. It blows the mind, okay.

So that kind of sums up their attitude. Who cares about safety? They don't. They just don't. They want to do lip service to safety, the pretense of safety, the pretense of a study, but no actual study, no actual plan.

You heard today, I questioned him, he is an expert in the requirements, the requirements under the federal law, what's a hazard? Mr. Doddo mentioned all of this the very first week of trial too. This is a known hazard, you are required to take corrective action. You are required to have a corrective action plan.

Have any one you seen the safety plan to prevent this from happening? No.

But we saw finally, almost the last day of trial yesterday, when I'm questioning Mr. Abdallah, where's the plan? We got a plan. We got a plan. Where is it? We haven't seen it.

You folks are here on trial for weeks, for weeks. You have heard one witness after another. They all said there's no plan. They all said there's no study. Aha, we got a plan, let's see it. I haven't seen it. I don't know, you know.

And then oh, here we go. Okay. They take out a one-page directive which Mr. Abdallah admits not circulated. It goes to just a couple people.

What does it say? If somebody is not authorized to be on the track and you know they are on the track, you should slow down to 10 miles an hour. That's the safety plan?

First of all, we know it's not a plan. He even admitted it's not a plan. It's a directive.

And how does that prevent people from falling off a platform or getting pushed from a platform or jumping off a platform?

How does it prevent contact with the train? It does not. Okay.

That was 2009. You heard their expert admit annual

reviews, every three years also for the corrective action. Well, 2009 to 2016, nothing changed. We know the numbers only went up from 2009 to 2016.

Did somebody say, jeeze, maybe this directive ain't cutting it? Maybe it ain't really effective. No. That's the best they got. I was so waiting for the secret plan, you know, aha, here's the real plan. It never came up.

You heard even the system safety program plan, that big fat book, nowhere in that big fat book does it say how to prevent these events from occurring, how to reduce it, how to mitigate it, how to diminish it, not one word. I challenge any one of you, I challenge any one on this planet to go through that book and find where it says here's how we are going to stop it, here's how we are going to prevent it, here's how we are going to reduce it, here's how we are going to mitigate it. Nope. Nope. Nope.

And then they admit there's a process you're supposed to go through, and it is kind of a commonsense process. How bad is the injury? Is it catastrophic? Is it critical? Is it serious? Who cares? How often does it occur? Is it frequent, probable, occasional?

You heard them admit -- except today, he couldn't answer. But you heard all the T.A. people admit it's frequent. Three to five times a week is frequent. And they admit it is catastrophic. And they admit according to their

own standard, that 8-82 you heard so much about, which you have a poster of, and I'm not going to show it to you again because you have seen it so many times, is that when it is catastrophic or critical, high, high risk required, required to take corrective action, immediate corrective action, you heard today from the mouth of their paid witness who gets $800 an hour to help them, okay and he admitted all of that, so. Where is it?

You heard me go through today the requirements under federal law of what they're supposed to do.

Have you seen any part of that during this trial? No.

Did you hear one of the T.A. witnesses said oh, we did this, here's our checklist, here's what we did?

Nope. Nope. Silence. Not a peep.

We know they violated federal law. We know that they haven't followed their own requirement requirements.

We know they never did a real study. We know all of these things. But let's get back to the question on the jury verdict sheet: Was the Transit Authority negligent? Yes.

How is that exercising reasonable care? Doing nothing is not reasonable care. And you know what? To have reason care, you have to care to begin with. They don't. They never have. Look at the facts. Look at the facts. They don't care.

When the head of Office of System Safety can't tell you safety is a priority, that is the whole answer right there. Okay. Are they negligent, yeah, there are so many things they could have done, they did none of them. Again, if it wasn't tragic, what would be laughable is okay, fixed rails, couldn't be done. You've seen their witnesses put under oath before, hazardous, dangerous, can't do, can't have a fence, can't do it.

Well, wasn't it done over 100 years ago?

Yeah. Yeah, it was. Okay.

Haven't you done it since?

Well, yeah.

But I thought it is dangerous, hazardous and not feasible.

You can't be a little pregnant, I'm sorry. Either it is feeble or it's not. Either it is hazardous and dangerous or it's not. And that's another game that they played.

And, you know, so were they negligent? Yeah.

If any one of you ran the Transit Authority -- and I don't know you folks from a whole in the wall. We've spent a lot of time together, but we don't know each other. If you said tomorrow, you, you, you, all of you, you are now running the Transit Authority, you are in charge, people are getting mowed down three to five times a week, do you think any one

you would say maybe we should do nothing? Do you think any one you would say let's do some more adds because they haven't worked in the past 20 years, but maybe they will start working now? No, you wouldn't.

You would think how do we fix the problem, what can we do. You mean there is a way we can do it for free. This is a no-brainer.

If that's not the definition of negligence, I don't know what is, okay. That is failing to do anything. That is a lack of care. That is negligent plain and simple. And that is a proximate cause of Luisa's injuries, plain and simple.

Had they done what they should have done, they admit, everyone, what is your job to keep us safe. It is your safe to prevent preventable harm. It is your job to prevent foreseeable harm. This is preventable, they admit. This is foreseeable,, they admit. But they didn't do anything. That's negligence, plain and simple.

If you were like that in your jobs, you would all be fired, okay, every one of us.

So, yes, negligence. Yes, proximate cause.

Then they are going to ask you was Luisa negligent. Yes, she shouldn't have been born. It wouldn't have happened if she wasn't born.

Maybe she shouldn't have come to New York. This wouldn't have happened if she stayed in Brazil.

Maybe she shouldn't have fallen in love. That's her fault too.

Maybe she shouldn't have gone to Target to buy some things that day. That's her fault. She shouldn't have a clean apartment and buying cleaning products.

She shouldn't have been standing five feet away from the edge. Luisa, you shouldn't have fainted. That's bad. You're negligent because you fainted.

Well, she could have had a heart attack. That would be her fault too, I guess, or a stroke, that would be her fault, right, if you want to look at it that way.

Was she negligent? No. No. No.

Then you're going to have to get to the apportionment question, what percentage to Shabazz, what percentage to the Transit Authority, and what percentage to Luisa. That's the last one. It'll do easy. Zero to Luisa.

I will leave it to you folks to distribute between Shabazz and the T.A. however you deem appropriate. I'm not going to give a suggestion on that. You all heard everything. You are smart people. You figure it out. I don't really care how you do the percentages.

If you wanted to say the Transit would have done this, they would have never put Shabazz in this terrible position or any driver in that terrible position. Okay. You will see, it's in evidence, there is a letter from the

chaplain of the Transit Authority complaining about how these operators, the train operators are all going out on disability because they are flipping out. You're making a person -- they are not soldiers in the army in a war. They are train drivers. And they make them look at the severed arms and limbs, decapitated people, and they are flipping out. I believe Shabazz on that part. It messed with her. She needs closure too, by the way, on this. We all need closure on this, because she may have been negligent, but she got hurt too. I'm not going to deny that, okay. It may be a self-inflicted wound on her part, but a wound nonetheless.

So whether you want to say you know what Transit, this is all your fault because if you would have had these barriers, this wouldn't happen, period, end of story.

She wouldn't have to think about it.

If you want to say well, this is the job, deal with it, you're a train operator, you got to drive safely, just like if you're a truck driver, a cabdriver, a bus driver. That's the job. She didn't do it right. You apportion how you see appropriate.

Now, let's go to the tougher ones, because the Transit Authority says they are immune. They want to be immune. That's what they are asking you to find.

Now, one of the questions is going to be as of August 2nd of 2016, did the Transit Authority study issues of

people falling on to the tracks and being hit by trains? No. No. Where is that study? There is no study.

In fact, -- let me look at my notes here.

You folks know I keep notes.

All right. Let's talk about studies.

Glenn Lunden. There is a world of a difference between look at something and doing a proper study of something. That's a quote.

If you want the transcripts, the Court is going to hate me for saying this, but you can get a copy of the transcript. You can have readbacks of anything you want. Page 444 into page 445 of the trial transcripts, Glenn Lunden, a world of a difference between looking at something and doing a proper study.

Glenn Lunden, page 458 to page 459 in the trial transcript, a PowerPoint presentation is not a study or an adequate study.

Glenn Lunden again, page 455, con-ops. They kept talking about these concepts of operations. Never carried out, still in the planning stages as of August 2nd, 2016. Only planning for like a few decades.

Glenn Lunden confirmed the plans for safety were still in the planning and engineering phases, okay.

Cheryl Kennedy admits, page 349, that the T.A. did not study the pertinent issue and the resulting study would be

improper, unreasonable and inadequate. That was their head of Office of System Safety.

Cheryl Kennedy agreed critical difference between study a device's effectiveness as opposed to studying how to adopt and use that device.

Cheryl Kennedy conceded, page 350 to 351, the only kind of study that would make sense to do is to see how to best adopt platform screen doors or some other safety device to our system.

Timothy Doddo, head of Office of System Safety now, 370 to 371, the measures they have implemented, signs and announcements, have not been effective at reducing the number of train strikes. Okay.

Eric Jones, page 273, T.A. did not put out a competitive bidding process for the low-cost, no-cost program.

Dr. Berkowitz nobody implemented it, nobody studied it.

Mr. Abdallah, Tony Abdallah confirmed that they must review their safety plans and there's nothing in the system safety program plan that actually discusses how to prevent these events from happening.

Mr. Sullivan, the first witness I called, page 55, he was not aware of any such studies being done to determine how to safely install platform screen doors across different station types. There was no study done, certainly no adequate

study done.

A PowerPoint ain't a study. A report ain't a study, hiring some consultant to do a fancy, expensive report is not a study. I don't care how long it is, how many pages it is, we should do this, we should do that, we have to consider this, there are challenges, we got to meet challenges. We got to think about challenges. That's not a study. Okay. So that question that you get is did they ever study it? No. They did not, unanimously. They did not study it.

And if you happen to get to the next question, which I think you shouldn't, but you have the right to do whatever you think is appropriate, was the study adequate? No. No. Their own people admit it's not.

By the way, their expert today, this guy gets 800 bucks an hour to say yeah, I'm not aware of any study. I'm not aware of any planning. I didn't even know that they had the RFI. He didn't know anything.

For 50,000, he knew nothing other than to say they are wonderful, they're terrific, yeah, they're the best, they're the best. Okay.

Next question: Did the Transit Authority's decision not to install platform edge barriers or track intrusion devices as of August 2nd have a reasonable basis? No.

And by the way, no decision was a decision, because according to their witnesses, they are still looking at it.

They're thinking. They're evaluating, considering. Who knows. Maybe on a good day. If it's a Friday, they will do it. On a Monday they won't. Who knows.

No, they never even made a decision, but that is a decision. We are doing nothing was the decision. The decision was we are going to do signs, we are going to do announcements, okay, they don't work, but that's what we are doing. Nothing else.

Okay. So no to that question.

Next one: Did they regularly review its decision in light of actual operation? No.

There was no review of what they did. And if they did a review, they would see it's not effective in light of its actual operation. It's not working. And you heard from their expert again today, you are required if it ain't working to take corrective action, and they failed to do so. Again, negligent and does not give them immunity, which is what they want.

Okay. Let's now talk about the damages to Luisa. I don't even know where to start.

Plaintiff's Exhibit 97-Y, this was Luisa. She was a beautiful young girl enjoying life to its fullest.

This was Luisa the morning that this happened. It is Exhibit 97-BB. The same day that this happened, this was her. She's a person. She's a human being and she has value.

I don't care what they say. I don't care that they begrudge her a wheelchair, they begrudge her a leg, they begrudge her help at work. Not that she's on welfare. Not that she's on public assistance. Not that she's wants a handout. She works. She works her ass off every day.

Could you imagine what it takes to work missing an arm and leg. I get a head cold, I don't want to go to work. I get a tummy ache, I don't want to go to work.

She has one freaking arm and leg and she works.

And oh, but look at her, she's great. She works. What does she need? Give her nothing. She has to take the garbage using her mouth. Oh, that's wonderful, wonderful. So insulting.

You know, whatever you folks do, again, it's your call. But no matter what they say and no matter what you do, you will never kill that spirit. They have tried to kill that spirit, and they will never kill her spirit.

This is Exhibit 97-T right after it happened. The same day. She didn't want to scare her parents. She said yeah. I'm good. She forced herself to smile. She made herself smile for her parents.

They cannot kill that spirit.

(Continued on next page.)

(Continuing.)

MR. GENIS: This was Luisa right after it happened, Plaintiff's 97-A. That was Luisa. It's not what they took away; it's what they left her with. This is what they left her with.

And you can see the skin grafts that she had on her back. And I was thinking to myself, how did she even sleep when she's on her back with those huge wounds on her back from the skin grafts and the pain?

97-B, this is Luisa. This is what they did to her. It didn't have to happen.

Let's talk more about what they did to Luisa.

Now, on 96-A, the actual x-rays, you see how her limbs were shattered and severed, okay? Comminuted displaced fractures. Not a clean cut from a planned surgery. The subway did this.

August 2nd, 2016, this is what she looked like at that time. This is what they did to her. She used to go down runways for the Ford model company. We're not talking the local neighborhood store. Ford International.

Oh, because it wasn't enough to make her lose her arm and leg and have wounds to her head, a blood clot that could have killed her from an embolism. The blood clot, August 4th -- I mean, I'm looking -- sorry, 96-G. She had a CAT scan. She had a blood clot. It could kill you. She's

too tough; they couldn't kill her.

Then you heard about the debridements. And even Dr. Reid admitted, that's cutting, that's getting rid of the dead devitalized tissue, cutting it away, whittling away, chopping away at her to get rid of the dead tissue so that the hopes that the tissue that's still alive can stay alive. They did this to her.

Leg -- arm and leg eight times in the hospital. They put in the wound vac, okay, to try to help with the healing, and the skin grafts like if you were making pasta at home. That's what they did to her skin, putting it through a processor to be able to do grafts on her.

More, okay?

The debridements, the cutting away, the whittling away, the skin grafts -- I'm sorry, this is 96-E. This is what they did to her. After the first surgery on August 5th with the wound vac, this is what she looked like.

Then we go forward, 2020. And by the way, before we get to 2020, she gets out of Bellevue. Oh, you were good enough to fly to Brazil, you should do this once a week. How offensive was that?

You heard what she had to go through to even get on a plane. Could you imagine being in that condition on a long flight to Brazil to go home?

Because when we are hurt, we want our mother, we

want our family. All of us do.

They blame her for going to her family? They begrudge her for family.

So she went to Brazil, and her parents took care of her, and her brothers took care of her. And every day she went for rehab in Brazil, and then her father and mother would have to cut away the dead flesh and change her bandages. No parent wants to see their child like that. No parent wants to do that for their child. No child wants their parent to have to do it for them.

And then because she is so beautiful, so resilient that when she had a prosthetic leg and arm and she tried in Brazil to put on a brave face and talk to people, they mocked her. They showed you a picture, look how good she's doing, look at her in Brazil with an arm and a leg, she's fantastic, never better. Oh, my god.

Most of the trial I could not forget if I wanted to throw up or cry, I'm sorry, but it's just -- so she's in Brazil.

And then she has dreams. Is that so wrong? She could've said, I'm just going to lie here. I want to be an architect like my mom. I have dreamed about being an architect my whole life. Not being a model, being an architect.

She's smart. She was not just a beautiful, young

woman on the outside; on the inside. Look who she is, look what she did. I mean, architect, that's not political science. Anybody can fake that, okay? Architecture is real. You can't fake architecture, all right?

Could you imagine what it was for her -- for her mother and her to go to school in Brazil and take her to class with her one arm and one leg to learn architecture? I couldn't do it.

And she graduates. She graduates. She was an architect. And then she comes to New York.

And, you know, they could criticize George Brown all they want, and they have and they will. And you heard how at the scene, when she was at that subway station, she said to him, are you going to leave me? It's a real question, something that would run through anybody's mind. But here he is. They're married. Say what you want about George. No, no.

And then she comes back, and she goes to get her master's degree in architecture. Whoa. Do you have any idea how hard that is for anybody? To have one arm and one leg.

And you heard what it was for her just to get out of bed in the morning. Look, we get out of the bed in the middle of the night, you go to the bathroom. At my age, you do it a lot. But, you know, you have to get up. One leg to

go to the bathroom, to get up in the morning, to get dressed, to eat breakfast, to brush -- you saw, she can't even brush her teeth. They showed you that video of her when she's trying to brush her teeth and the toothpaste falls into the sink.

And she does it. And she does it, and she gets her master's degree. And she works, she does internships, and she gets a job. She gets a job as an architect. And she schleps every -- not everyday, three days a week from Brooklyn to Manhattan.

Now, some of us commute from Brooklyn to other places, and we hate it. Commuting is rough, okay? It takes a lot out of you. Could you imagine doing it with one arm and one leg? Could you imagine that you have to always schedule yourself so that the Access-A-Ride, who's always late, is going to be there, and you're standing there on one leg waiting for the Access-A-Ride.

And then you get in. It's not so comfortable. It's not a limousine. And oh, you've got to pick up other people, and we've got to go here, and we've got to go there, and then eventually, get to work. And the rest of us would be exhausted already. And then she works all day. All day. All day.

But they say, don't even give her an assistant. Give her nothing, nothing. She wants to get a cup of coffee

and eat something. The rest of us, here's my coffee, here's my bagel. She can't do that. She can't do the simplest thing. Don't give her an assistant. Screw it.

They begrudge her every aspect of life. It's bad enough they take away her arm and her leg, but they say, no, don't give her a thing to make her life as good as it can be. Not what it was. She'll never go back to what it was. But give her some help.

Let's go back into what they did to her, okay?

2020, okay, 96-I, this is what she's looking like at this point. It's already three years, more than three years afterwards. This is how she's doing.

Then they take more x-rays. November 9, 2020, Exhibit 96-H. Yeah, who wants to wake up in the morning saying, oh, I want to look like this. Oh, yeah, I paid money to look like that. Please, please.

And then they do more surgery. She goes up to Mass General up in Boston because she wants to be as good as she can. It hurts. She told you how it was painful wearing those devices. Nobody goes under the knife voluntarily, okay? She did it because she had to.

And this is what they had to do to her. This is 96-J. This is not all of it. This is just part of what they had to do to her for the above-knee amputation surgery in 2021.

Here's the rest of it, Plaintiff's 96-K. This is what she had to go through.

By the way, in 2019, Dr. Reid said, oh, she's good, normal gate, walks wonderfully. With one leg, he said she had a normal gate. So offensive.

After the surgery, November 17, 2021, 96, it looks like, L. Here's how she's doing.

By the way, you saw the pictures of her before the revision surgery, and that's when she was being looked at by -- here we go.

This is 97-H. This is what Luisa looked at when Dr. Reid said, oh, yeah, her skin is healed, it's fine. This is what Dr. Reid looked at when he said, she can walk. This is what Dr. Reid looked at when he said she does not need any services or assistance, she doesn't need care and treatment, she needs nothing is what he said in 2019 when she looked just like this, just before the revision.

She has hopes for the future. More surgery. The osseointegration. This is her hope. Because right now, that arm is useless. And you heard from the medical records, not a doctor, medical record from treating doctors she's afraid of it falling off all the time, the arm. There's such a little stump, it is so small, they can't keep the arm on her. They have to do more surgery in the hopes of doing it. And then they have to reimplant things in her.

96-M. This is what they have to do to her for the hopes, the hopes to be able to get it done.

And this is what Luisa looks like now, 97-I, with and without her prosthetics. That's what they left her with, and that's where they say she doesn't need anything, she doesn't need a thing, give her zero, okay?

And then Dr. Reid, finally -- they sent him more medical records, and he realizes, oh, geez, she's pretty messed up, I can't stick with that original opinion that she's fine and doesn't need anything. Okay, she needs some things, some things. She doesn't need more than one arm. She doesn't need more than one leg. Why?

You heard, oh, how do we know she's going to want to ride a bike? How do we know she's going to want to do this? We will take away whatever sliver of hope she has left of trying to do something with her life, to enjoy her life.

I mean, we are not all about just working. How many people say they work for the weekend, okay? What's her weekend? What is she working for, okay? She ain't going on a ski trip. She can't even go to the beach anymore. She can't do any of the things she used to love to do. She tries, she tries her best, her best. Better than most of us could do, to be honest. Better than me I know.

And they say, no, we won't give you anything. You

don't get another arm or a leg to ride a bike. You don't get anything, so maybe you want to try to do something. We know there are Paralympics. We know people with disabilities, if you give them the tools, if you give them the proper prosthetics, if you give them the proper care and treatment, if you give them the services and the systems that they need, they're never going to be what they were, but they can be better, and they can have a better life.

And that's what we did, was we hired a qualified life care planner, double board certified, certified life care planner, published books, articles, renowned physician. And he said bear bones minimum, not giving her extras, very conservative.

This doesn't include what's called the terminal. So you have the fake arm, the prosthetic arm, but you can buy other devices to attach to that so that if you wanted to play tennis, you wanted to play golf, you wanted to do anything, there's certain things that you could buy as attachments. Not included in here. None of that's in here. This is bare bones.

You heard Dr. Kahn and you heard from her prosthetist, Chris Kort. Bare bones. This is the minimum. This is not a wish list. This is not all the things that will be good for her or that would help her or that would benefit her. This is the bear bones so that she could live,

and they begrudge her that. Okay?

And that was without factoring in the diminished loss of earnings or inflation. That alone is almost $24 million. Okay? Remember, even Dr. Reid admitted, it's over her lifetime. These things don't last long. They have to get replaced every three years. You need different ones for different functions.

And, look, I have these shoes. On the weekend, I wear sneakers, okay? I'll lay the odds, even though I don't know any one of you, you've got more than one pair of shoes. And I'll lay you odds that while you might own high heels, you'll probably not wanting to go dancing in -- well, I shouldn't say that. But you're not going to want to go running. You're not going to run the Boston Marathon in your high heels. That's what they want for her.

So what would we do to allow you to assist you in evaluating Luisa?

We then, after we have the life care planner have a prosthetist do everything, we hired an economist. And the economist says, okay, here 's her age, here's the statistical life expectancy. And as we have all seen, some people go way past 81 years of age. Some people work well past 81 years of age.

Now, not everyone does. Some people are exceptions, exceptional. Luisa is exceptional. Would any

one of us say she's not exceptional? She's my hero. So could she live longer? Could she work longer? Yeah, yeah, she can. And if anybody's going to do it and beat the odds, it's her; it's her. Why can't she live to 91, 92, 99? Why can't she work to 91, 92, 93 as an architect?

I'm not going to go through all of the tables here. You've seen them, and you're welcome to do so if you'd like. I'm just going to get to the bottom line. After the economist went through everything and she discussed earnings, she went through all that -- if you'd like I'll go through the other pages, but I just wanted to get to the bottom line, because she deserves it. This is not money for her. Not a penny of the 65, 66 million is for her. It's for other people. It's to pay for new prosthetic devices. It's TO pay for medicine. It's to pay for doctors. It is to pay for transportation. It is to pay other people. To pay for people to help her so she can work. To pay for people.

Really? We have to make her take out garbage with her mouth? That's what she has to be condemned to? She can't have somebody help her at home? She's a young woman. Can't she have a baby? She dreams of having a baby; three. Why can't she? Because what happens when the baby cries at night? How can she get out of bed with one arm and one leg? He could she comfort her child? How can she lift her child?

He could she care for her child with one arm and one leg?

I don't know if you folks have children or not. I know very little about you. But I know this much: It's hard to have kids. We love them, but it's hard. It's hard with two arms and two legs. Can you imagine having a child with one arm and one leg when they need you, when they want you? When they're little children, they drop things. When they're little children, they do all kinds of things. She can't do that. She wants to. They don't want to let her. No, no home care for you. No help at home. No, do your own laundry. Take out your own trash. You have to get up at night? Tough. Tough it out. You want to have a child? Tough. That's the Transit Authority's attitude.

She deserves every penny of this, if not more. This was a conservative, conservative estimate for other people in the hopes of giving her a semblance of a life.

So you're going to get questions on damages, and they're going to ask you about future medical expenses. I want to break it down so you're able to do that and see what her future loss of earnings are and the medical.

So 58 to 59 million or so are just for costs of care. The other 10 or so million is for loss of earnings over her lifetime. I'm not saying that she does this in a year. This is over her lifetime. So when you're asked how much for the medical expenses, not a penny less than 58, 59

million. She deserves every penny of it. And when they ask on the verdict sheet, well, how about a future loss of earnings? 10, 11 million. And that's assuming that she only works until 67 on the chart.

You are allowed to say, you know what, she is an exceptional person, she will live to 99, she will work until 90, 91 or whatever, okay? You're allowed to do that. And then those numbers go way up, because that's stopping at 67. And in those numbers she works to 90, lives to 90, that's another 30. So that's what you do for that, I respectfully submit. This is your decision what you do. I'm not telling you what to do. It's your decision.

Now we get to the hard stuff. What is her past and future pain and suffering, emotional upset, psychological, loss of enjoyment of life, what is that worth? Well, we've got nine years of hell that she's already gone through just to get to court today to see what she had to go through. To have to sit here at trial and get cross-examined. To have George and her mother cross-examined for the sin of loving her.

You know, I don't even know how -- how to put it in words, but I have certain beliefs, and I believe we're all here for a purpose. I don't believe in coincidences. You know, you were all here for jury selection, and it was a big room, a lot of people. You're here. That's no

coincidence. That's no coincidence. Things happen for a reason. We are all here together for a reason. I hope that that reason is to do justice to another member of our community.

You know, some people believe in a religion that there are 36 people in the world -- it's called the Lamed-Vavnik -- at all times that are just; 36 just people. And if the world does not have 36 just people, it's over. I pray that seven of you are just.

Now, we all know that justice is here. And we can't come back. This is it, this is it. You know, we vote in elections. Does our vote count? Maybe, maybe not. One of millions, hundreds of millions. Today and tomorrow, your vote counts.

The judge said at the beginning the most powerful body in the world is a jury. No other countries have them. No other countries trust regular people to make these profound decisions. But nobody can tell you what the facts are. You are the judges of the facts of this case. It matters not what any of us think. What I think, they think, they think, it doesn't matter. It's what you think, period.

You know, injustice anywhere is an injustice everywhere. If there's no justice for the least of us, there can be no justice for any of us. Without full compensation, no one is safe. No one. If you think it's

okay to break safety rules by allowing less than full compensation, because that's what that would be, not allowing full compensation is to give them a pass.

Our jury system exists to protect our communities. There's a reason it is open to the public, and we have members of the public here, because everyone in our community has rights. You are the enforcer of safety. You know, you're going to have to make hard decisions; hard. But you are up to that challenge. You are up to that challenge. So the question is, what is a lifetime, a lifetime worth of what she has to go through and what were the nine years.

You know, look, in cases like this, most lawyers would say -- and I don't care what lawyers would say. In lawyer talk, the judge will tell you, it doesn't mean a thing, okay? It's whatever you folks think. But can her life, her life be worth -- this is not even 10 percent of what they did to her. This is not even 10 percent of what they did to her. Think about it for a minute, what they did to her, what they left her with. 65 million is not for her. What's it worth to her? She would give you all the money in the world to have her life back. All the money in the world to have her life back. So the question becomes, what amount of money will fairly, reasonably, fully, and adequately begin to compensate her? It can't be less than 10 times

that. You can decide whatever you wish; that is your job.

I have done the best I can to represent her. I am not as good a person as her. She beats me on every count. But I've done my best. If it wasn't enough, I'm sorry. Please do your best and do justice to this woman and give her 100 percent justice, please.

Thank you.

THE COURT: Thank you, Mr. Genis.

So, folks, you've had a full day today and I think you deserve a good night's rest. You'll be able to leave a little early today. As I mentioned before, tomorrow you're going to decide how long you want to stay here. It's up to you. But we're there available to assist you whichever way we can help you. 10:00 tomorrow.

Of course, don't talk about the case. See you tomorrow morning at 10:00.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(In open court; jury not present.)

THE COURT: Folks, I think we've crossed all the Ts and dotted all the Is. I don't think there's anything that has to be done yet to protect the record, unless you feel you want to say something now, you can do so. Otherwise, I'll see you at 10:00 tomorrow morning.

Mr. Keaveney, anything from you?

MR. KEAVENEY: Yes, Your Honor.

I'd like to make a motion for a mistrial based on comments that Mr. Genis said in summations.

First, he said that defendants violated federal law. Second, he said that defendants PSTs never got past the design phase, that's post-accident. Next, he talked about what he would be doing; he'd be crying at home, that if he had a head cold, he wouldn't go to work, if he had a stomach ache, he couldn't go to work. That defendants mocked her. That she can do things better than me. He says, can you imagine having a child with one arm and one leg. He said, the jury is the enforcer of safety. He said, if no justice for Luisa, no justice for anyone. He said no one is safe. He said, if you give -- don't give them a pass if you don't find for her.

These are all prejudicial comments which cannot be reversed, cannot be undone, violate the golden rule, and therefore, a mistrial is warranted.

THE COURT: Okay. So you make your record, that's what I wanted you to do. I'm going to give you all the latitude that's reasonable when you make your summations, and you may want to comment on these things. I'll allow to you do that. But Mr. Genis is a talented person who is able to exhibit his emotions in front of an audience. He has a certain talent. The jury is not here, we recognize that.

But this is the type of case which does rise to an emotional level, obviously. But my job is to manage it as objectively as I'm capable of doing that.

I'll probably comment to the jurors when I give them my final comments that there's a lot of emotions here. I think I can say some appropriate things to try to cool the temperature a little bit. I think that's part of my obligations to do that. I'll try and handle that in my comments to the jury, and I'll try and encapsulate some of my concerns about, you know, comments that the jurors need not consider. I'll think about that.

In the meantime, you are free to comment as well; I'm not going to cabin you in. But you made your record. Obviously whatever happens here, I may have to put pen to paper in the future, so there's a long way to go here yet, I suspect. In the meantime, I just want to make sure we have a good, clean record. You made your record.

Anything else you want to put on the record today?

MR. KEAVENEY: No, Your Honor.

THE COURT: We'll reconvene tomorrow at 10:00. See you then.

(Trial adjourned until Thursday, November 20, 2025, at 10:00 a.m.)

* * *

# I N D E X


| WITNESS | PAGE |
|---|---|
| **KENNETH KORACH** | |
| DIRECT EXAMINATION BY MR. KEAVENEY | 1988 |
| CROSS-EXAMINATION BY MR. GENIS | 2010 |
| REDIRECT EXAMINATION BY MR. KEAVENEY | 2077 |
| RECROSS EXAMINATION BY MR. GENIS | 2083 |
| **CARL BERKOWITZ** | 2104 |
| DIRECT EXAMINATION BY MR. ROTH | 2104 |
| CROSS-EXAMINATION BY MR. KEAVENEY | 2121 |
| REDIRECT EXAMINATION BY MR. ROTH | 2125 |


# E X H I B I T S


| | |
|---|---|
| Plaintiff's Exhibit 74-D | 2018 |
| Plaintiff's Exhibit 75-A | 2036 |
| Plaintiff's Exhibit 108 | 2046 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

LUISA JANSSEN HARGER DA SILVA, : 17-CV-4550(FB)

Plaintiff, :

- against - : United States Courthouse
Brooklyn, New York

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY and RAQIA SHABAZZ, :

November 20, 2025
10:00 a.m.

Defendants. :

- - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:

SONIN & GENIS
One Fordham Plaza, Suite 907
Bronx, New York 10458
BY: ROBERT GENIS, ESQ.

ROTH & ROTH LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
BY: DAVID ROTH, ESQ.
ELLIOT SHIELDS, ESQ.

For the Defendants:

LANDMAN CORSI BALLAINE & FORD PC
120 Broadway, 27th Floor
New York, New York 10271
BY: ANDREW P. KEAVENEY, ESQ.
JANELLE N. WINTERS, ESQ.

Court Reporter: Michele D. Lucchese,
E-mail: MLuccheseEDNY@gmail.com
(718) 613-2272

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(In open court - jury not present.)

COURTROOM DEPUTY: Civil cause on trial, Harger Da Silva, versus New York City Transit Authority.

All counsel are present.

THE COURT: The jurors are here and we want to get started with Mr. Keaveney's summation.

Mr. Genis, what do you have to say?

MR. GENIS: I'm professionally embarrassed because I forgot in the heat of the moment of my summation to say something very important, and I would ask for permission before Mr. Keaveney's goes for less than five minutes to say something.

THE COURT: Why don't you handle it in rebuttal?

MR. GENIS: Okay.

THE COURT: I'm not going to pin you down, you know. So I think whatever you can say, you can say it in rebuttal. All right. It is not unusual, you know, for people to remember.

Every time I used to argue a case in the Court of Appeals or the Supreme Court, I used to say I could have done a better job. If Mr. Keaveney was here, he would have said, Judge, you could have done a better job.

MR. GENIS: I always forget something important.

THE COURT: You can handle it on rebuttal, okay.

MR. GENIS: Thank you.

THE COURT: Let's bring the jurors in.

So, Ms. Winter, if you want me to give them a copy of the short charge.

MS. WINTERS: Thank you, Your Honor.

THE COURT: Usually in a short charge, I don't do it. But if it will make you happy, that's what I want to do in my life.

MS. WINTERS: I would appreciate it, Your Honor.

THE COURT: Okay. We are waiting for the jurors. Off the record.

(Discussion held off the record.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Good morning, folks. The good news is that you are going to have lunch brought in again. Since you didn't like the lunch yesterday, you won't like it today, most of the jurors think it's pretty good.

And we have a full day ahead of us, so let's start by having Mr. Keaveney give us his summations.

Remember everything that I told you before about summations. I'm glad that wasn't any interruptions of the summation Mr. Genis gave you. There may not be any interruption here. The temptation is to stand up and say I object because they are hearing a lot of things. But to his

credit, he didn't do that. It is going to be his turn to give you his summation at this.

Go ahead.

Summation - Mr. Keaveney

MR. KEAVENEY: Good morning.

JURORS: Good morning want.

MR. KEAVENEY: I want to thank you for putting aside your time and daily routines for the past three and half weeks to perform your civic duty and to hear Mr. Genis and Mr. Roth talk about Ms. Harger's claim.

Mr. Genis gave his summation yesterday. I expect that you will hear from him one more time.

But unlike Mr. Genis, I'm not going to raise my voice. I'm not going to throw things to the ground. I'm not going to suggest Ms. Shabazz was on a cellphone or that Transit devised conspiracy theory about the accident which there is no proof for.

I'm not going to talk about what ifs.

I'm not going to tell you that it was fate that you are here on this jury.

I'm not going to tell you that Ms. Harger was not seriously injured.

I'm not going to tell you that she doesn't need future care.

And I'm not going to play on your emotions.

Instead, I will ask that you put sympathy aside, that you put your empathy aside.

I will ask that you only consider the evidence in this case instead of Mr. Genis's last second Hail Marys.

And I will ask that you find my client's not negligent. Why? Because sometimes accidents just happen.

Mr. Genis ended his summation with damages, so let's begin with that this morning.

I told you in my opening that Ms. Harger's injuries are real and life changing, that what happened to her on August 2nd, 2016 was significant and impactful on her life, that she required hospitalization and other significant medical treatment, and that she will require certain care and prostheses for the remainder of her life.

We did not hide that fact. We did not dispute it. Dr. Reid did not dispute it.

He told you about her future medical needs.

But what has been presented to you regarding her future needs is an overreach.

Let's look at Dr. Kahn, what he wrote in his initial life care plan for Ms. Harger three years ago, specifically for this litigation, but not for new treatment, was an overreach.

Every recommendation he testified to last week, he said was needed three years ago. For example, he recommended

immediate counseling and psychiatric treatment three years ago. Did Ms. Harger get that treatment? No.

Did Ms. Harger see any of the doctors or get any of the non-prosthetic treatment he said she needed over the past three years? No.

In fact, you will not be asked to award any damages for past medical care because she did not receive those recommended treatments.

Dr. Kahn also spoke about the need for vocational services. Was there any testimony about any required vocational needs? No.

In fact, Ms. Harger has been successful at her job, exceeded her minimum billing requirements, traveled to Austin and Atlanta to give job presentations, and obtained three separate promotions.

Significantly, Dr. Kahn testified that Ms. Harger only had one promotion and used that as a basis to justify his vocational intention or award or recommendation, but he didn't bother to check with her.

Dr. Kahn also recommended a personal assistant for 12 hours a day, 5 days a week; a home health aide for 21 hours a week; and a housekeeper for four hours a week. That represents 85 hours of assistance per 120 waking hours per week, pretty much all the time.

Dr. Kahn wants to increase that to 94 hours at the

age of 55.

Dr. Kahn recommended a sports wheelchair. But there is no evidence that a doctor ever recommended that type of sports wheelchair.

In fact, did Dr. Kahn ask any of Ms. Harger's doctors if these services or devices were necessary? No.

He could have called Kort and asked how many prostheses she needed, but he never asked a single doctor. In fact, despite all of the medical records, not one medical doctor has testified in this case. And why not?

Dr. Kahn also testified about the need for certain residential renovations. But Ms. Harger and her husband are apparently satisfied with their apartment having renewed their lease seven times since 2018.

Simply put, Dr. Kahn's recommendations are not bare bones. They're an overreach.

Mr. Kort does the same thing despite his records indicating that Ms. Harger demonstrated an impressive level of activity, such as using public transportation, travelling on stairs, uneven terrain, visiting construction sites, traversing 400 yards a day, and standing for over 10 hours a day. Despite this, Mr. Kort testified Ms. Harger needs several different types of prostheses.

For the upper extremity, he recommends an everyday prosthesis, which she has and which no one has said she

doesn't need.

But he also recommends a body power prosthesis despite his notes indicating that it is insufficient for her needs; an activity-specific prosthesis just in case she wants to take up golf; and a pattern recognition prosthesis, which is essentially the same as the everyday prosthesis.

As for the lower extremity, he recommends an everyday prosthesis, which again there is no dispute that she needs. And in fact, Dr. Reid did not testify that she could get a cheaper prosthesis or a less functional one. He agreed that she should continue to receive that X3 prosthesis and to continue to move forward in her care and not backwards.

But Dr. Kort also recommended a bike riding and running prosthesis despite her current prosthesis being able to perform those tasks.

Mr. Kort also admitted that he has no knowledge that she did any of these activities in the past and there are no medical records recommending these devices.

It would be different if there was a history of Ms. Harger doing these activities prior to the accident, but there isn't.

This is like telling someone who doesn't drive that they should buy a new car every three years just in case they decide to drive.

Finally, Mr. Kort conveniently lets out about the

fact that certain prosthesis can have their warranties extended for considerably less money. Why don't he just say that? Because he is overreaching also.

What does Ms. Kuzsma say?

She adds up numbers. That's all she does. And she does that a lot. Over 250 times in a three-year period and over 1,400 times in her career. She's a professional. She's a professional expert. She's a professional testifier. Reports, depositions, testimony. She earned $15,000 for this case. Even cutting that in half, because she doesn't testify in every case, that's still almost $2 million in a three-year period.

And what does she do for that money? She doesn't even verify the cost of anything. As she said, that's not her job. So if Dr. Kahn told her that Ms. Harger needed an apple a day that cost $5, Ms. Kuzsma would say the annual court of that apple would be $2,000 and the lifetime cost would be almost $10,000 -- $100,000.

That's essentially what she did here. She took Dr. Kahn's estimates without verifying them and projected out to the future. We call in that garbage in and garbage out.

She also estimated the cost of Ms. Harger's future lost earnings capacity. However, those estimates are pure speculation and does not conform with any of the testimony of Ms. Harger's ability and desire to work. She's simply

overreaching.

What about Mr. Brown?

He testified she needs to be able to get to the gym while Ms. Harger is stuck at work. He also testified that Ms. Harger can use an Uber and get reimbursed from Access-A-Ride.

In addition, despite her limitations Mr. Brown testified as to their numerous vacations, including their honeymoon too Nicaragua, which consisted of a commercial flight, then a smaller flight, and then a boat.

Now let's talk about Ms. Harger. Mr. Genis was incensed yesterday: How dare they question her, is what he said. He would have preferred that we sit back and didn't question her at all. But Ms. Harger brought this lawsuit.

Now, there is absolutely no doubt that her injuries have resulted in simple tasks taking longer and that her life has become more difficult and challenging. No one is disputing that.

As I said in my opening and as the evidence suggests, she's an extraordinary person who has been able to achieve many things in her life, go many places and excel at her job despite her injuries.

And no one is saying that she shouldn't enjoy life, that she shouldn't do those things, or that participating in them or doing well at work makes her less injured.

But she also testified about things that affect

everyone regardless of injuries, such as long commutes, preparing the night before for work and doing bills and other housework on weekends.

She also testified she's not taking any pain medication. Despite this, she also overreaches. She says she has to avoid many afterwork activities, but she admitted that she had dinner with a coworker. She testified she had to missed job opportunities with her coworkers. She testified that she had to miss job opportunities. She had a travel issue. She testified that she went to St. Louis by herself and that she had recently been to Austin and Atlanta.

We asked about her resume and her job skills, such as handed drafting, site inspection that she put on her resume, but she backtracked and denied that she did them.

Ms. Harger did not need to overreach. In fact, Dr. Reid told she wouldn't need a prosthesis for the rest of her life along with associated treatment. He also said she should have a one-handed wheelchair. No one is disputing this.

But he also testified that she was a K3 community ambulator and that she was independently performing all of her daily activities. The video which Mr. Brown took for this lawsuit confirmed that.

Based on this, if you decide to award damages, we request that you do so consistent with what the credible proof shows, that you don't overreach and that you would limit any

damages to what is reasonable and necessary and not to what Mr. Genis tells you to award.

But before you even consider damages, you must decide if the MTA, New York City Transit and Ms. Shabazz were negligent.

At jury selection, you promised that you could leave sympathy behind in deciding the issues in this case. Some prospective jurors admitted that they couldn't do that, but you said you did.

First, you are to decide if Ms. Shabazz was negligent in operating her train by failing to stop it in time.

To support this claim, Mr. Genis claims that Ms. Harger was standing five feet from the platform edge when she fainted, that she was on the track for more than 10 seconds before the train hit her, that Ms. Shabazz could have seen Ms. Harger while the train was still in the tunnel and it took Ms. Shabazz zero seconds to perceive and process the event and point-six seconds to react. But what has the evidence shown?

Let's first talk about the location where Ms. Harger and Mr. Brown were standing. Mr. Brown testified that they were standing five feet from the platform edge, which placed them on the inside of the support columns towards the center of the platform. Those columns prevent the train operators from seeing that portion of the platform and vice-versa;

however, Ms. Harger testified that she could see the station tunnel entrance from where she's standing, which is impossible unless she was standing near the edge of the platform, a place where she admitted she shouldn't be standing.

This was confirmed by Mr. Brown. He testified that he couldn't see the train coming into the station once he was at the platform edge barrier. The testimony revealed she fainted, fell backward and did not gain consciousness until after the event. How did she fall?

Mr. Brown testified that when Ms. Harger fainted, she fell right onto the tracks and no part of her body touched the platform. How does someone who is five-feet-nine inches and standing five feet away from the platform edge fall backwards onto the tracks without even touching the platform.

Mr. Brown knows that's not possible. That's why he changed his testimony from saying she took one step back before she fainted to saying last week, she took -- for the first time, that she took one to two steps back.

Mr. Brown showed you last week that when Ms. Harger fell, he stood up and yelled, Luisa, get up. And he looked to the right, saw no train. Carried on yelling, Luisa, get up, wake up. Looked to the right again and a train was coming into the station. Mr. Genis said there was testimony that this took 20 to 40 seconds. Did you hear Mr. Brown say that? No.

In fact, if that was the case, why didn't Mr. Brown jump onto the tracks to try to move Ms. Harger if there was no time? How do we know that? Because the 911 caller said that she fell on the tracks just as the train came. It was the B Q Manhattan-bound side, the Atlantic Avenue/Barclay stop, the Manhattan-bound side.

She fell on the tracks just before the train came. So she's under the train. Just before the train came, she fell onto the tracks. The guy who with her was yelling, call an ambulance, call an ambulance, call an ambulance. You got to get someone here fast. She's under the train. She fell just before the train came. That call was specific. That call was detailed. That call was consistent and it was accurate.

Mr. Jiminez and Dr. Berkowitz rely on a different 911 caller, who refer to Ms. Harger as a male who said she wasn't even paying attention and when asked what track, you can hear her ask someone, what side was that again?

And following the accident, Ms. Shabazz wrote her G2, her accident report: I was on 18:48 Bravo out of Brighton Beach to 145th Street. As I approached Atlantic Avenue, a female customer fainted from the platform and fell to the roadbed. I placed the train in emergency, but came in contact with the person. Just remember what you heard from the testimony, not on the day of the accident, not at her

deposition, not when repeatedly questioned in front of you.

Mr. Genis does not claim that placing the train in emergency was improper. Instead, he claims that Ms. Harger was on the tracks long enough for Ms. Shabazz to see and stop the train.

That's what Mr. Jiminez's testimony was, who essentially did not rely on anything. His testimony was merely that because the accident happened, Ms. Shabazz must not have been paying attending. His opinion is useless.

Dr. Berkowitz is no better. He picked the evidence that would best fit a narrative, so he could get paid and he ignored the rest.

He did not rely on Shabazz's G2. He did not listen to all of the 911 calls. He testified that the information he focused on was that when she fell, the train was not yet in the station. How far was with the train in the tunnel when plaintiff fell onto the tracks? He doesn't know. What about perception/reaction time or as it is better called, perception time, plus processing time, plus reaction time?

Dr. Berkowitz believes that Ms. Shabazz should have been aware of the potential for something on the tracks and should have automatically skipped perception and processing and gone right to the reaction, despite Ms. Shabazz never having a prior similar incident.

The evidence shows that Ms. Shabazz was faced with a

sudden and unforeseen event, and acted appropriately by placing the train in emergency.

Despite this, Dr. Berkowitz agrees with Dr. Marpet that it would have taken more than seven seconds to stop the train. Dr. Berkowitz's own calculations had the train stopping 8.1 seconds after the emergency brakes were activated. Dr. Marpet testified it would take between seven and a quarter to nine and three-quarters seconds to stop the train after it is placed in emergency.

This is consistent with the eyewitness who gave an estimate that Ms. Harger was on the track for seven to ten seconds. He also testified that depending on speed, 20 on the low end, 24 on the high end, which is not in dispute, that it would take between 153 and 246 feet to stop the train.

He then stated that the train came to rest 265 feet or three-and-a-half car lengths in the station. He used this distance to determine that the train was 19 feet to 120 feet into the station when it was placed in emergency, and this is consistent with someone falling on the tracks just as the train came in.

You will be asked to determine if Ms. Shabazz was negligent in the operation of the train. We believe the facts demonstrate that she was not.

Next, you will have to decide if the Transit Authority was negligent in failing to keep the B Q platform at

the Atlantic Avenue/Barclay Center reasonably safe because it did not take adequate steps from preventing people from falling on to the tracks and being struck by trains. Was there any evidence that the train platform is unreasonably safe?

You have heard from several witnesses regarding Transit's platform and safety efforts, the awareness campaigns, the help points, the countdown clocks, the painted tactile strips, the posters, the brochures, the websites, the announcements, the media campaigns. They are all common strategies and methods to address platform safety in Transit systems. They are designed to affect customer behavior.

How do you measure if they were effective at changing customer behavior to stay away from the obvious condition? Mr. Genis, look at the charts. Okay. Let's look at the charts.

If there were 1,660,000 riders in 2011, for example, and 146 incidents but not fatalities, then the T.A.'s efforts were effective 1,649,999,854 times.

Has there been any testimony regarding prior similar incidents at the Atlantic Avenue station? No, there hasn't. Of course, just because there are injuries in a system, it doesn't mean the system is unsafe.

The credible evidence in this case is that Transit safety measures and plans were consistent with industry

customs and practices.

You heard from Mr. Korach, who testified to open platforms being the custom and norm throughout rapid transit metro systems. In fact, there is not a single metro system in North America that does not have open platforms.

Despite this, Mr. Genis argues that the T.A. should have done more and installed platform edge barriers and track intrusion devices.

Mr. Korach and others have explained that the New York City subway system was built over 100 years ago. Platform screen doors have only existed on newly-built subway systems for less than forty years, and they were not retrofitted for existing stations until the mid-2000s and then initially only on newer systems.

Several witnesses have also testified that as of August 2nd, 2016, not a single North American mass transit agency has installed platform screen doors.

Dr. Berkowitz doesn't disagree with this, and confirmed that platform screen doors are not used and were not used in any U.S. mass transit system. He also confirmed that no regulatory oversight agency has recommended or required platform screen doors: Not the FTA, not the New York Public Transportation Safety Board and not the City or State.

Mr. Wurtz, who was attempting to sell and profit off platform screen doors confirmed that they were untested in

North America. The testimony was clear: Boston, Philadelphia, Baltimore, Washington, Miami, Atlanta, Chicago, Cleveland, Los Angeles, San Francisco, all mass transit systems without platform screen doors or track intrusion devices.

The testimony also confirmed that there are no regulations, industrial standards, research or guidance recommending PSDs or TIDs in the United States.

In fact, there is no system worldwide that uses track intrusion devices, and even if they were installed, there is no evidence that they would have prevented this accident, and therefore, their absence cannot be a proximate cause.

Mr. Genis talked about CoMET, which is a data-sharing organization among 40 large metros, with the T.A. being the only U.S. member. But even among these metros, only seven have platform screen doors as of the accident.

While each mass transit system is unique, the challenges to retrofitting existing New York stations with platform screen doors is significant. You have heard a lot about that during this case.

And while the existence of them in international stations show that they can be installed, that does not mean they are financially feeble or they can be installed in every system. In New York, as Senator Savino noted, cost is a

concern.

For these reasons, plaintiff has failed to demonstrate that platforms -- that the platform at Atlantic Avenue station was unreasonably safe.

This should be the end of your inquire, but if you continue, the Court will present you with some questions to answer yes or no.

The first is as of August 2nd, 2016, did the Transit Authority study the issue of persons falling onto the tracks and consider whether to install platform edge barriers or track intrusion devices.

To study something is to provide careful or extended consideration. The T.A. has been studying the issue of platform safety for years. The evidence has shown all of the significant efforts since 2010. At that time, platform screen doors and track intrusion devices were relatively new technology and as I just indicated, the first platform retrofit was only done a few years earlier, as such a third investigation of them was needed by the Transit Authority to see if they can be installed here and that's what they did, starting with that Seoul trip.

Mr. Genis called this pretending to do something. And Mr. Genis views the T.A. kept pretending, but that's not what happened.

Following the trip, the T.A. created the Platform

Screen Door Task Force, which developed and sent out request for information, which we heard so much about, to obtain further knowledge of PSDs.

As Mr. Wurtz testified, an RFI is used with technology that is not yet very well introduced either with the customer or a region. It's not a contract. It's not a request-to-bid. It carries no obligations. Its used to further study new technology.

The Transit Authority analyzed the responses it got back and met with several of the companies to further discuss their plans.

Next, the task force developed a concept of operations which served to facilitate the investigation into the use of platform doors by identifying the stakeholders needed, the technology available and the challenges in integrating such a system into an existing railroad system.

It sought input from almost all of the partners in the Transit Authority, from subway, rail control, service deliveries, electrical division, maintenance of way, track and infrastructure, capital program management, operations planning and system safety.

All these departments would be affected by the installation of platform doors. The report set forth the need for them, the benefits of them and the challenges of them facing each department with installation. But according to

Mr. Genis, the T.A. was just pretending.

During this time, the T.A. continued to pursue other safety initiatives for platform safety and invested in help points at each station. Subsequent technology included countdown clocks. Low tech technology included brightly-painted tactile strip edges, but according to Mr. Genis, the T.A. was just pretending.

T.A. representatives took several trips to investigate PSDs and TIDs. Of course, these trips were international because no U.S. mass Transit system used them.

Because of this, the transit Authority could have just sat back and done nothing, but they didn't, but according to Mr. Genis, the T.A. was just pretending.

The T.A. retained a contract to conduct almost a year pilot program at the Rector Street station. It was followed by a second pilot study to testify additional technologies. These pilots cost millions, but according to Mr. Genis, the T.A. was just pretending.

The T.A. sent out requests-to-bid in 2014 for its platform screen door pilot at the 14th Street L Train station. The initial work on this multimillion-dollar project began later that year and continued through August 2nd, 2016, but according to Mr. Genis, the T.A. was just pretending.

Finally, in June of 2016, the T.A. conducted another research trip to again study platform screen doors in Europe

and Asia documenting its findings in the platform screen door research report.

According to Mr. Genis, the T.A.'s numerous efforts from 2010 to 2016 were not a careful or extended consideration of platform safety. Mr. Genis is wrong.

And based on these efforts if, the answer to the first question must be answered yes.

The next question is whether the study of these issues was adequate. That answer is yes, too.

Dr. Berkowitz claims that the T.A. study of platform safety was not adequate because the T.A. failed to conduct a hazard analysis pursuant to Military Standard 882 e.

I'm sure you recall the matrix that Mr. Genis had enlarged to show the severity of the injuries or frequency of occurrence and the action needed based on the outcome.

The first issue with this false claim is that Military Standard 882 is not used for an operation risk of falling from a platform. It's only used on significant operational changes or new or modified work practices and procedures. It's right in the system safety plan in black and white. It is clear as day. The plan is in evidence. Read it. Section 6.1. Then why does Mr. Genis rely on it? Because he's got nothing else.

There are other tools, such as investigations to address this accident, which is what the Transit Authority

did. And even if the hazard analysis was required for each time someone entered the tracks to retrieve their cellphone, if they fell while walking between cars, if they struck the side of the car, maybe tripping on the platform or fell onto the platform due to drugs, alcohol, or a medical condition, the probability of this occurring are so miniscule that the implementation of warning devices such as announcements wouldn't be the appropriate response according to the matrix.

Next, he asks if the Transit Authority decision not to install platform edge barrier barriers and track intrusion devices as of August 2nd, 2016 had a reasonable basis. As of August 2nd, 2016, the Transit Authority was in the middle of phase II of its TIDs pilot program. It also commenced its PFC pilot program by issuing the design contract.

Pilot programs are a necessary step to the installation of any new system. According to Mr. Lunden, a pilot is basically a proof of concept, a project where you install something to see how well it works, and then based on the result, you can modify the design, expand the design or say it's not going to work and drop it entirely. Mr. Genis argues that the T.A. should have accepted the bid, operate, transfer proposal, but as previously noted, these offers were worthless.

For example, SMRT's proposal, that initial one, admitted that a feasibility study was necessary in order to

obtain financing. Mr. Wurtz also admitted that Faively would only do such an agreement if it was profitable and that at the time, he did not have a financial commitment.

SMRT, again, that Korean company, also wanted to put platform screen doors on select Manhattan stations, but not Atlantic Avenue.

In addition, their efforts to install was misleading as their build, operate, transfer agreement only applied to 24 out of 134 stations. You can read the proposals. It's in evidence.

In sum, the fact that the Transit Authority had necessarily first step pilot programs ongoing as of August 2nd, 2016 demonstrates a reasonable basis for not installing them at that time.

The last question is whether the Transit Authority regularly reviewed its decision on what of the actual operations. The answer to that is also yes.

The Transit Authority was aware of customer injuries and began platform screen doors and track intrusion devices as a means to enhance for platform safety in 2010. The Transit Authority made several presentations to show their ongoing efforts to address platform safety and their efforts as of August 2nd, 2016 showed that they continued to review and address these issues.

I want to thank you again for listening to this

matter for the last few weeks and I am confident that your decision will be true and actual reflection of the evidence.

THE COURT: All right. Thank you very much, Mr. Keaveney.

Now, at this time, members of the jury, we are going to allow the plaintiff to give a brief rebuttal, and as I told you before, the plaintiff has the burden of proof, so we allow the plaintiff to get the last word. Somebody has to get the last word.

Now, the purpose of a rebuttal is not to repeat the original summation, but it's to do exactly what the word says, to address whatever the Defendant has said, what Mr. Keaveney said. He can rebut whatever he believes you should hear.

We are going to give him a little latitude because he wanted to say something else that he forget to tell you yesterday. We will allow that.

Mr. Keaveney, if you wish to respond to that afterward, it's up to you. I will give you a minute or two to do that at this time. I don't think you need it, in light of the fact that we did not hear a very, very long summation from Mr. Keaveney, so I don't think you need more than 15 minutes or so for your rebuttal.

Rebuttal - Mr Genis

MR. GENIS: Now, let's start with what Mr. Keaveney said: Money. They didn't put on a life care plan. They

could have. They didn't put on an economist can. They could have. They didn't even give you what the costs were. He just spoke at length about what Dr. Reid, who was getting paid by the Transit Authority since 1992 to defend these cases, has made God knows how much money, he didn't tell you what these things would cost.

He didn't say they wouldn't benefit her. In fact, he testified everything we asked for would benefit her and he admitted when he does life care plans, he looks to see what will benefit people.

Now, one of the things -- my fault, nobody else's -- I forgot to mention yesterday, when we talk money, okay, what is here on the verdict sheet for the money when you answer certain questions?

Well, we went through Dr. Kahn's conservative analysis, and when we say conservative, Dr. Reid admitted that she may need an amputation on the good leg because statistically, one out of six people with an amputation within 10 years on the contralateral side, the other side will need another amputation. So she would have no legs in years in. We don't know, but Dr. Reid admitted that medical facts from an authoritative medical book, not written for this lawsuit, but for doctors.

Dr. Kahn did not have that. Dr. Kahn was incredibly conservative and that they want to attack what Dr. Kahn said.

They want to attack that she couldn't afford to do what she needs. That's what the attack is. The attack that they are blaming George, who is not -- you should have jumped in front of a train. The idea that they are blaming George for anything is offensive.

All I have to say about his character is he is here. You don't need to know another thing about George Brown. When they talk about the time, it's only 25 seconds. Nobody testified -- Marpet did, the one who makes millions and millions of dollars from the Transit Authority, which by the way, Gabriella Smith, you didn't hear her testimony. You heard Marpet cherry-pick and then I confronted them with the testimony of Gabriella Smith, who said exactly what we are claim caning.

Why didn't do that? They did not call the witnesses. They did not play all of the 911 calls and they mischaracterized one of the calls we all heard.

But let's get back to the money because you are going to have to figure what are things are worth. And no, we are not asking for a dime for past loss of earnings. She worked. We are not asking for that. The issue is the future.

We are not asking for past medical bills for reasons the judge -- she has not asked for a dime she doesn't deserve, plain and simple. She's not looking for double recovery. She is not looking for a dime. She's not interested. Okay?

So what are the costs, conservative, of future medical, not counting if she has another leg off, not counting -- because the osseointegration which you heard risk of infection, these bones fracturing and splinting, of having additional surgeries. She may need more surgeries. Look at how many she's already had, each time to fix her and she hasn't gotten fixed yet. Dr. Kahn didn't include any of that.

Very conservative, future medicals, $59,364,806, that's future medicals.

Future diminished loss of earnings, again, very conservative analysis going to age 67. We know people can work way past age 67. Another third can be added to that. Same thing for life expectancy. But with that conservative analysis, only going to that future loss of earnings, $12,155,626.

Past pain and suffering for the past nine, going on 10 years of what she has endured, I'm not going through it. You've heard the whole trial. You saw Luisa. You saw everything, that, $100 million, for the rest of her life --the rest of her life and we know as we age, it don't get easier, okay.

Every day, again, she goes to work, again, she does everything. They deprive her of a normal life. They want to deprive her of trying to have a semblance of a normal life. You just heard it again, okay. This is so offensive. Luisa,

you can't try to have a normal life.

For the rest of her life, she may live to 95, 99, but using the conservative numbers, future pain and suffering, $550,000,000.

Something else they never mentioned and we are going to talk about briefly.

And Mike, if I could use the ELMO, please.

THE COURTROOM DEPUTY: Yes.

MR. GENIS: The defense has conflated repeatedly distance and time. The issue is how far away was Luisa when she could have been seen because that's the bottom line. If she's two feet away, nobody can stop in time. Ten feet away, nobody can stop in time.

But one thing nobody seemed to notice and I was looking at yesterday, we put it into it evidence, and that is where she fell has a marker, 336 plus 50. They measure from the entrance of the tunnel to the end of the platform. She was at marker 336 plus 50. She was way a further away from the entrance of the tunnel than Dr. Marpet ever told you about.

And then you heard Marpet admit that the different T.A. records were incorrect and did not make sense, that the doctors and Dr. Berkowitz relied on their records.

Berkowitz, was he wrong? Yeah. There was even a greater distance. They had even more time to stop than you

even thought, than any of us thought, than they ever let on. This is their record and this is where it was, where she fell. And you have in evidence other photographs where they have circled and made markings of exactly where they were standing at the time this happened, that they didn't show you now either.

And by the way, in 2016, there were rails for what purpose? To protect the staircase, but not the people?

MR. KEAVENEY: Objection.

MR. GENIS: Okay. Now, he wants to talk about study, and oh, we did studies, lots and lots of studies.

What was the actual testimony? And all you have to do is ask for read-backs of Mr. Sullivan. He said pointblank, you are not aware of any safety studies how to solve the problem. He is the director of safety system in charge of hazard assessments? True.

You are not aware of a safety -- sorry.

You are not aware of a safety study that says what it would take to prevent?

Nope.

Okay, you are not aware of any kind at this station?

No.

No safety studies?

Nope.

You are not aware of any such studies?

Nope.

Okay. From 1991 to 2000, do you know of any plan to prevent it?

Nope.

2000?

Nope.

2005, 2010?

Nope.

No safety plan.

Okay. Let's go to some of the other testimony that we heard from people -- and by the way, the first thing I want to address. I'm sorry.

They talked about you could only do it for new construction. Second Avenue subway didn't do it. Oh, they wanted to say, well, yeah, because we would have had this $80 million cost overrun if they did that.

You mean because you didn't put it in the initial design to begin with, which you knew you should and now you're delayed and delayed and delayed, so then when they finally put it -- okay. We can do it. They didn't say we can't. But since you are asking at this late juncture, it would now delay the project, so we are not going to do it.

So they could have done it, they should have done it, they had plans to do it and then they chose not to do it.

And you heard before when we read the e-mail in

evidence, I think it's Plaintiff's Exhibit 60 in evidence, Mr. Sanchez, their chief engineer. This is not new technology. This was -- I think he says is 2010. Over 15 years ago. Andrew Bodda (phonetic) saying the same thing. So they could have done it in new construction, Second Avenue. They chose not to.

Let's talk about the next one. They admitted new construction for the Number 7 extension Hudson Yards, and you have in evidence there was the -- you had the Hudson Yard Development Corp., High Deck, offered to pay for the platform screen doors for that location if they would make that the standard for all new construction, which they refused to do. So they could have gotten that one and they didn't.

So the only two new constructions they've done, they didn't do it, which exposes the lie, oh, we'll only do it for new construction. They didn't retrofit. It's a blatant lie.

There were others. Oh, yes. She's going to wear prosthetics for the rest of her life. Yeah. And they hurt. You heard her. When she wears them, they hurt. Luisa's best day would be most people's worse nightmare. This is a nightmare that will never, ever end for her, ever. Every day. Okay. They have none of this.

You know, they are trying to make George her assistant now, and when Dr. Reid testified, he admitted, that's a bad idea. His word was rancorous, disharmony.

Okay. I know how many of you folks are married, but marriage is tough, and what, half the country gets divorced.

Could you imagine -- and I wish them the best. I wish they hopefully live together for the rest of their lives, but who knows? It's not easy. Who knows? Because there is a lot of stress on the relationship.

And oh, they want to talk about their wedding. Yes, she got to dance at her wedding with a fake leg. That's every bride's dream to have a fake arm and a fake leg at her wedding to dance. Please.

Okay. They admit so many different things. So read back all of Sullivan's transcript if you want. Gold, one after another, how they did no studies. They did nothing they are supposed to. They don't.

Eric Jones admitted he is not aware of any study, okay, that they ever can did to prevent or reduce people getting injured. Eric Jones, page 279, page 280. As of 2011, there have been no comprehensive study. He admits that as well.

Cheryl Kennedy, no studies. No studies about any kind of barriers -- by the way, Jones said each station needs their own station plan, yet they never did that. Each station needs their own study. They never did it.

Cheryl Kennedy: Did you do an assessment of the number of injuries or barriers of any kind, platforms,

regardless of height, fixed rail? Nope.

Did you do an assessment of the number of injuries if it's anything?

One after another.

How about where my client was standing?

Glen Lunden admitted if there was a fixed rail right there, it doesn't happen. Glen Lunden admits that.

Lunden: Yes, it was feasible, practical and possible to install railings in 2010, even from the 1980s. Page 485, Lunden. Okay.

Tony Abdallah, page 629, admits that they could have done fixed rails, that they were feeble. All right.

It's just -- Mr. Korach, what they just said now, oh, it's operational. It's not the regular hazardous assessment.

Okay. Did you do an operation hazard assessment?

No. This is, again, the shell game. It's not this analysis. It's that analysis, but they didn't do that either. They did nothing again.

Oh, yeah. We had pilots scheduled, pilots scheduled. All the pilots were cancelled. Nothing was done and they want to say, oh, they only wanted to build it for profit.

Yeah. This is America. This is capitalist country. What's wrong with them earning a dime? What's wrong with them

making money? Win-win. We get safety. Transit doesn't spend money. They make money. So what?

Okay. Same thing with the bus shelters. You heard Mr. Korach said it's common throughout the world. Then you even heard Lunden say nothing in North American, when Glen Lunden in the evidence and e-mail, when he looked at all the other places worldwide, he included in their analysis both JFK and Las Vegas for that matter having platform screen doors in their subway system.

So it's just -- it doesn't stop. Okay. It doesn't stop. They don't want to --oh, there is no history of her riding a bike. She said she did. Okay. And you heard the testimony, these fake legs, these prosthesis are painful. You can't sit on the bike with that thing coming up your thigh like that. And her femur is so short. It was cut so low that the prosthesis digs into it. That's why you need a special leg to be able to ride a bike. They deprive her of riding a bike.

I mean, I can't understand -- Korach made over $50,000 that he admits to -- who knows -- from this case to do what, not read the records? Not read the RFI? Not be familiar. Admit that according to the federal requirements, they didn't comply. That was Korach, Market millions of dollars. Read -- don't even get me started. Okay.

Everybody admits when I question the T.A. people --

he says it's unforeseeable. Three to five times a week is unforeseeable? Oh, we are doing great. Look at us, fabulous, only three to five times a week.

Statistically, 1.7 billion. Let's make it 2 billion for easier math. What's one percent of two billion? Because they all said zero is acceptable.

Every T.A. witness said zero is acceptable. If it's one percent of two billion, how many people is that? That's millions of people getting maimed and killed. If it's point one percent, how many is that? If it's point zero one percent, how many is that? Is that what it takes to make us safe.

And oh, the norms. Let's talk about what the norm is. Do norms change over time? Maybe what was acceptable in 1950 or 1960, not in 2000, when you saw everybody else doing it. Hey, discrimination used to be the norm too, right.

Discrimination used to be women can't vote. Minorities have no rights. That used to be the norm.

Do we say that's acceptable now?

No, it's not acceptable. And the only way -- the only way we are ever going to have a safe system, the only way we're going to save lives is when a jury says enough. We want it safe. We want it safe now, that you can have this case -- you heard about all of the cases. This is the very first one to say we need safety for public, not just blaming the driver

because the driver, like I said, they put her in this terrible position. If they had barriers, this doesn't happen.

You know, when you make a decision, it's written, and it is in the books for history and forever and eternity.

Well, you have an opportunity now to make a decision to make us safe. So when you look in the mirrors at yourself tomorrow, the day after, the week after, the year after for the rest of your lives, one, you will be proud with what you see and know that you did something to help make our community safer.

They don't want it to be safer. I don't understand that. I don't know why. You heard that whole summation, for what? Not once did you hear what can we do to make it safer, just we're looking, we're thinking, we're playing, we're playing games. That's what they're doing. Call it what you want.

That's what it is. Give her justice. Make us safe and give her every penny she deserves. She will give you the world not to have that. She would give you 10 times that.

THE COURT: You're getting repetitious now.

MR. GENIS: I'm done.

THE COURT: Okay.

So I we should take a little bit of a break, and then I will come down and talk to you about the law. We will be back at 11:15, and you'll get the charge.

MR. KEAVENEY: Your Honor, can I make my response?

THE COURT: You can respond a little bit because he did touch upon things which I allowed him to do.

MR. KEAVENEY: Briefly.

THE COURT: Keep it focused.

MR. KEAVENEY: I will.

THE COURT: So I'm allowing Mr. Keaveney to make some final comments. Normally, we don't allow him to do that. Since I gave Mr. Genis an opportunity to say some things yesterday, I think it's fair that Mr. Keaveney share that, just to address them, not to go over it again.

MR. KEAVENEY: Just that, Your Honor.

Surrebuttal Summation - Mr. Keaveney

MR. KEAVENEY: And Mr. Genis is at it again. He is at it again with the sympathy. He claims now that she's going to lose another leg is. Is there any evidence of that? Is there any proof that.

Dr. Reid testified that contralateral amputations occur with conditions like diabetes. He is overreaching again. Okay. He is overreaching now and he is overreaching when he is asking you to award over half a billion. Let the evidence direct your decision.

Thank you.

THE COURT: Don't talk about the case yet, folks. You will talk about the case plenty in a little while.

See you at 11:15.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Do you want to say something now?

MR. KEAVENEY: I want to renew or make an additional motion for a mistrial based on comments made by counsel during his rebuttal. He talked about fixed rails and that if they were there that this would not happen. That is not an issue in this case. This is confusing and misleading to the jury.

He talked about the only way to save lives is that the jury says enough, which is improper. He also told the jury that this would be a historical decision and to do something to make safer, which, again, is improper.

So for those reasons and the reasons set forth in document 337 that was failed on ECF last night, we request a mistrial in this matter.

THE COURT: You have a record. I'm not going to do that. If the circuit wants to do that, they will do that. You made your record. And I will be giving the jury some instructions, , of course.

Now, I will give them a copy of the charge. I guess it is okay. The important thing is we want to try to get that exhibit list together as soon as we can.

MR. KEAVENEY: We are working on that now.

THE COURT: And I rely upon all counsel in order to get that done. So, the sooner the better. In the meantime, I will give the jury the charge now.

MS. WINTERS: Your Honor, we need to -- we want to make a motion under Rule 50.

MR. KEAVENEY: For the record.

MS. WINTERS: For the record.

It is my understanding that plaintiff's counsel.

THE COURT: You already did that, didn't yuou? Didn't you already do that?

MS. WINTERS: I did, but we weren't able to put our statements on. Counsel for plaintiff filed a brief this morning. If we would have permission to file a brief --

THE COURT: Look, the record is protected. Let me get the charge to the jury. If you want to make speeches afterwards, I will let you have all the time you want to do that. Okay?

MS. WINTERS: Your Honor, if I may. The precedent is very clear that if we don't set forth our bases before the jury gets the case, then it is deemed waived.

THE COURT: It's not going to be waived. Okay. I'm telling you now the record will reflect the fact that you've made your application correctly, and I will give you ample opportunity afterwards -- it's not before the jury anyway -- to put on the record whatever you want to show that you are a

good lawyer. Okay. All right. That's the way we do it. Okay?

Otherwise, we are going to make a whole big speech here now and we have to charge the jury. All right.

Let's bring the jurors in.

THE COURTROOM DEPUTY: All rise.

You can all be seated.

THE COURT: So, my practice is to come down here and speak to you because, you know, now I'm going to talk to you about the law.

My voice is not as strong as it used to be when I was 10 years old. This way I'm able to more effectively talk to you. And I think it breaks down the barriers we have between the judge and the jury. The judge sits on top of the Mount Sinai all the time.

I think when it comes to explaining the law, I should be like a professor really. And I got the idea because the first time I charged the jury, I did it the way all my colleagues do. They sit up on the mountain there. And I saw that Juror No. 7 was fast asleep. That has never happened since. Don't take it personally.

So I try to break down the formality because there is a lot of passion, especially in a case like this. So the first thing that I want to talk about is that we all have our own personalities. You heard me yell a couple of times also

during the course of the trial. You have seen the real nature of contrast between the lawyers here. They each are ethically responsible, as I told you, to do the best job they can for their clients. We are the neutrals here: Us. So sometimes people get carried away. Mr. Genis has his own personality. Mr. Keaveney has his own personality. One is calm, cool and collected; the other is an emotional, crazy person. It's important for you to understand that the first thing they got to do is cool down the temperature because a lot of times in our world, in our country sometimes people let emotions rule their decisions instead of facts. Right. And we have a lot of this problem in our country today, especially with the media and the internet. People are more inclined to make the emotional decisions. And emotional decisions, emotional reactions are not based upon facts; they are based upon emotions. They are two different parts of the human species. Right?

So I know when I used to the Lincoln speeches, Steven Douglas in the debates years ago, what I was most impressed with was the lack of emotions when they were talking about the issues, like slavery, yes or no, and stuff like that. They were great debates. And they were based upon facts.

You know, I really owe this position that I have today to a great, great Senator Daniel Patrick Moynihan. You

may or may not recall hi. And he said something which I always have remembered: Everyone is entitled to their own opinion, but they are not entitled to their own facts.

So we are obviously going to decide this case based upon the facts and not upon the emotions. I think that you understand how important that is. That is not to discount that we are all human. Some of us yell. Some of us don't yell. Some of us have a faster trigger than others. We are all different obviously. You have a whole different range of how you deal with life as well. And you saw an example of how I lost it myself a couple of times. So when I do that, I don't remember whether I was being critical of the plaintiff or the defendant. I try to do it both to keep it even keel. But sometimes I have to do that because managing a trial which is froth with emotions, which obviously this is that type of case, right, it's a bit of a challenge for the judge, and even I lost it a couple of times. So don't take that personally. I wasn't giving you any idea that I was for or against a particular party when that happened. I was just dealing with the trial in realtime. This is not TV.

(Continued on next page.)

(Continued.)

THE COURT: I think you understand that. So when you're considering the facts, just make sure that you're thinking about the facts and not the emotions that went along with any of these arguments. That's important. I think you understand that. Now, the charge I'm going to give you is short. The trial was long. The charge is short. It's in three parts, and the first part is going to tell you about the general principles that govern your duties and responsibilities as jurors, the general things that apply to most cases.

The second part I'm going to instruct you about the legal principles in this case. You probably have an idea of what they might be already, but you're going to hear it all now, what's negligence and all that type of stuff, which is the essential part of this trial. Lastly, I'm going to instruct you on how you go about your deliberations. Periodically, I'm going to take a break and drink some of this water.

You've been a great jury. I know that because I always popped in at 10:00. You made me get up really early to get here at 10:00, but I did it, and you were terrific. You were all here together. When I spoke to you in the jury room I said good morning, and we'll have another day with your time and attention. We had some stops and halts here. I had to go

out to Palo Alto, California to make a speech at Stanford Law School, a pretty cool thing. But because of that, we had to take a break in the trial. Then we had Veteran's Day and we had Friday because we were trying to accommodate the staff because of the government shutdown situation, and here we are.

We only lost one juror for good, sufficient reasons and we still have you all together here. So here is what we're going to talk to you now. Your duty, as I mentioned in my opening instructions, is to find the facts from all the evidence in the case. Once, again, you're the Seoul judges of the facts and it is for you, and you alone, to determine what weight to give the evidence, to resolve conflicts as may have appeared in the evidence, and to draw such inferences as you deem to be reasonable and warranted from the evidence.

So you see me reading from something. So we have printed out the charge, but my style is to talk to you also informally as we go along. But what I'm telling you now is really what the instructions are, but you'll have the benefit of this charge. I'm going to make copies of it to give to you as an aid.

So if anything I say is inconsistent with this charge, it's what I'm talking to you about right now, which is the charge, you'll have this at the end. If you want to keep it, I'll autograph it for you. It would be a memento for you. In any event, we're going to continue here. So a lot of

things I'm telling you, I told you before. It's not a bad idea to have some repetition at this stage of the final words.

So, therefore, with respect to any questioning concerning the facts, it is your recollection of the facts that count, not counsel's recollections as expressed in their opening or in their closing statements, their passionate closing statements with respect to Mr. Genis, or my recollection if I made any reference to testimony. So you know that. It's all the facts that control.

So my job is to instruct you on the law. You have to apply the law whether you agree with it or not. The rule of law always applies in our country, hopefully it will stay that way, in accordance with my instructions as to the facts as you find them.

You know I've told you before you're in charge of the fact department. I'm not going to be marching into the jury room with you. I have no place in that world of yours, and I'm in charge of the law department, which is what I'm doing right now. So you've seen that in realtime. So if either of the lawyers have stated a legal principle which differs from that which I'm stating to you now in my instructions, you must be guided solely by what I instruct you about the law.

You should not single out any instruction as alone stating the law, but consider my instructions as a whole.

Now, since it's your job, once again, and not mine to find the facts, I have neither expressed nor attempted to intimate an opinion about how you should decide the facts of the case. You should not interpret anything I've said or done as expressing an opinion about the facts. Now, I have participated in this trial because I have asked questions of the witnesses. You saw that.

I think I told you at the beginning I will do that for clarification purposes. So if I asked any questions of a particular witness, I don't want you to think that I'm giving you a signal that I believe that witness or don't believe that witness. My whole purpose, hopefully I was successful, was to try to get focused questions, focused answers, and not to suggest to you whether you should believe the witness or not believe the witness. I was just trying to move the trial along because this is the type of case it could be a runaway train if I didn't do that.

So you understand that. You must determine the facts of this case based solely on the evidence of those inferences which can reasonably be drawn from the evidence. Evidence has been presented to you in the following form, sworn testimony from the witnesses and the exhibits that have been received in evidence by me during the course of the trial. Certain other things are not evidence. The arguments, once again, or the statements by lawyers, the testimony that

has been excluded. A couple of times I said objection sustained. So you don't consider that type of thing.

And so I've instructed you and I think you understand that well. The type of evidence we have is direct evidence and circumstantial evidence. So I think direct evidence is easy enough for you to understand. You can consider both direct and circumstantial evidence.

Direct evidence is pretty clear. It's what you see and what you hear. You have direct evidence of me bending over now drinking a little bit of water. That's a good example of direct evidence. What is circumstantial evidence? So we give an example, usually, to drive home what circumstantial evidence is. It's proof of a chain of circumstances pointing to the existence or non-existence of certain facts.

So that's the short sentence, but the example which we give will drive the fact home. So we're standing in the courtroom here and I'm looking outside and I can see what the weather is, but you can't because you don't have a window. You know that the last thing you saw when you walked into this courtroom was it was not raining. So you had direct evidence of that.

But you don't know whether it's raining or not now because you have no direct evidence of what the weather is like right now. If somebody walked through that door, they

shouldn't do it, but assume they did with a raincoat dripping wet. You have direct evidence of that. But you still don't have direct evidence of whether it's raining outside. Somebody else walks in a few minutes later with an umbrella. You have direct evidence of that, but you still don't have direct evidence of whether it's raining outside. But you can make the conclusion based upon that circumstantial evidence that it is raining outside.

So that's what we say. Circumstantial evidence is proof of a chain of circumstances pointing to the existence or non-existence of certain facts. That drives home the point the difference between direct evidence and circumstantial evidence.

So you are permitted to draw from the facts which you find to be proven such reasonable inferences as would be justified in light of your experience, use your common sense, and drawing inferences. You are not permitted to engage in mere guess work or speculation. I'm going to talk about that a little bit. You understand the difference between direct and circumstantial evidence. You can consider all the evidence, whether it's direct or circumstantial, and you also can consider reasonable inferences drawn from the evidence in light of your experiences.

Now, there's a big difference between speculation and inferences. I always stop to talk about that at this

particular time. You're not going to speculate. It's fraught with peril and it's something that you don't want to do.

For example, I'll give you an example of speculation. If we're going to award money, who's going to pay it? How is the money going to be paid? Who is going to be responsible? All that would be speculation and it's not what you're going to be doing here. If you speculate, the chances are you're going to be wrong anyway and you're going to be considering something which is not in evidence.

But it's a risk. The difference between an inference from the evidence is one thing. Idle speculation is something else. The reason why I stopped to do that, I think it was the second trial I had 100 years ago, where I spoke to the jurors afterwards. I'll make myself available here. I always do that. It was a criminal case, and one of the jurors said I don't know why this person didn't come in court and testify.

I heard about him during the trial and he wasn't here. And I said well, did you consider that in your judgment? He was looking awkward and he said well, should I not have done that? I said you don't even know whether that person is alive. For all you know, that person is dead. You can't speculate. Chances are if you do, you're going to be wrong anyway. Just the facts and the evidence before you in Court.

Inferences based upon common sense are reasonably to be drawn from the evidence, okay. Direct evidence, circumstantial evidence, okay. No speculation.

So you know that a big part of your fact-finding responsibilities is to assess the credibility of the witnesses and the weight their testimony deserves. Now, you've heard testimony all over the place here. This was a real trial. And you should carefully scrutinize all of the testimony given, the circumstances under which each witness testified, and every matter of evidence that tends to show whether a witness is worthy of your belief.

Your decision in this respect may depend on a bunch of common sense things. Was the witness candid and forthright, or did the witness seem to be hiding something, being evasive or suspect in some way.

These are just common sense guides for you. Use your common sense. How did the witness' testimony on direct compare with the witness' testimony on cross or on redirect or recross? You heard it all. Was the witness consistent in the testimony given or were there contradictions? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report that knowledge accurately?

How much you choose to believe any witness may be influenced by any bias you may perceive the witness to have.

If you find that any statement made by a witness is false in whole or in part, you may disregard the particular part you find to be false, or you may disregard his or her entire testimony is not worthy of belief.

So common sense matters. You have had the opportunity to observe a lot of witnesses here. And you are the finder of facts and it is for you to assess the credibility, how much you believe, how much you don't believe, which part of it you want to credit, which part you don't want to credit. It's all part of your fact-finding responsibilities.

So in evaluating the credibility of a witness, you should take into account any evidence that a witness may benefit in some way from the outcome of the case. Such interests in the outcome of the case may create a motive to testify falsely and may sway a witness to testify in a way that advances his or her interest. Now, look, people have interest in the case. There's no question about it. We're not dealing with strangers to the case.

They all are people who are relevant for you to consider. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of the trial, then you should bear that factor in mind in evaluating the credibility of the witness' testimony. Keep in mind, though, that it is not automatically -- does not

automatically follow the testimony given by an interested witness is to be disbelieved. It is for you to decide, based on your perceptions and common sense, to what extent, if at all, the witness' interests affected his or her testimony.

Obviously there were witnesses who had an interest in the case. It doesn't mean you can't credit their testimony, but you should be mindful of the fact that it's something for you to consider, whether their interests may have influenced their testimony and it's part of your fact-finding responsibility. You can believe all of it or you can believe part of it, but the fact that somebody has an interest in the case is something for you to consider.

We have had a bunch of experts. So you have heard testimony from experts. An expert is allowed to express his or her opinion. I think we only had male experts, I'm pretty sure, on matters of which he has special knowledge and training. So expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding evidence or in reaching an independent decision on the facts.

In weighing an expert's testimony, you may consider the expert's qualifications, opinions, and reasons for testifying, as well as all of the other considerations that ordinarily apply when deciding whether or not to believe a witness' testimony. You may give the expert's testimony

whatever weight, if any, you find it deserves in light of all the other evidence in this case.

You should not, however, accept a witness' testimony immediately because he is an expert, nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case, once again, rests solely with you, and that includes evaluating the expert's testimony.

They have not necessarily been consistent, but you know it's your responsibility to consider it all and to make your determination as to which experts you believe, what you don't believe, how much you believe. All of that is part of your fact-finding responsibility. You've heard a lot of testimony from experts.

Now, in determining the issues of fact in rendering your verdict in this case, you should perform your duty with complete impartiality, without bias, sympathy, or prejudice as to any party. That's easier said than done. We're dealing with the human world here. We can't just hide from the fact that we have an emotional case here.

So you have to really try to really ask yourself is your decision based upon sympathy. Everybody has to have sympathy for this woman. Right? But it's a difficult task for you to really say am I basing it on facts, or am I overwhelmed by the fact that this woman has had this

suffering.

And, yes, you consider the reality of situations, but you also have to check yourself about whether or not you're letting your emotions run away with you here. I think it's important for you to know that and be aware of that in this particular case. Yes, we have emotions. Yes, we have a sympathetic situation. Yes, you have to really try to work hard to not let this case be based upon your sympathy. Easier said than done, but I think you have to try to do that.

That doesn't mean you don't consider all the evidence. That doesn't mean you don't consider her condition. It doesn't mean you don't consider the testimony. So it can be a particularly challenging type of thing in a case like this to ask yourself all the time whether you're making the decision that's really based upon evidence and testimony. You can consider it all, right, whether or not you're getting carried away with your emotions. Easier said than done. I think you understand how important that is. Right?

So I'll remind you that in this case you have heard some testimony about medical procedures and prosthetics being covered or not covered by health insurance. There was some testimony that came out about that. I want to talk to you about that. You should not consider this testimony in coming to your verdict whether or not the insurance has covered or will cover any part of Ms. Da Silva's treatment is irrelevant

to your job. So you should not give anything you heard about insurance any weight as you're making your determinations in reaching your verdict.

I told you don't speculate. You have no idea what the law is if you render a verdict this way or that way. Just do the job that you have to do and don't try to guess about what will happen thereafter. It's not your job. You heard about the burden of proof, and so the burden is basically on the plaintiff by a preponderance of the evidence. I think I explained that before. So to establish a claim by a preponderance of the evidence means to prove that something is more likely so than not so.

A preponderance of the evidence means the greater weight of the evidence. That does not mean the greater number of witnesses or the greater length of the time taken by either side. This determination is based on the quality and persuasiveness of the evidence, the weight and affect it has on your minds.

So it's different than criminal cases. In criminal cases the burden is higher. It's the burden of proof beyond a reasonable doubt. I guess the difference is because when you have a criminal case you're dealing with somebody's liberty, so the law says it's a higher burden. But in a civil case there's still a burden, of course, on the person who brings the case but it's not proof beyond a reasonable doubt. It's

the preponderance of the evidence.

If the evidence that supports the plaintiff's claim, when considered and compared with that opposed to it, has more convincing force and produces in your minds a belief that what it seeks to prove is more likely true than not. That's what we talk about when we talk about the burden of proof, then you must find for the plaintiff on the claims that he has the burden of proof on.

If the evidence convinces you that it's more likely not true, or if it weighs so evenly that you're unable to say that there's a preponderance of the evidence on either side, then your verdict is for the defendant. So you understand, I think, the burden of proof.

Now, the defendants have raised two affirmative defenses, which I'm going to talk to you about. And for now let me just say that the defendant -- when a defendant raises an affirmative defense, then the burden shifts and the defendant has the burden of proving their affirmative defense by the preponderance of the evidence standard. I'll be talking to you a little bit about that when we reach these affirmative defenses.

Now let's talk about -- it's a good time for me to take another sip of water. So this lawsuit arises, as you know, from a personal injury sustained by the plaintiff, Ms. Da Silva, on August 2, 2016, when she fainted and fell on the

tracks of the Atlantic Avenue Barclays Center subway station. As you've heard, a northbound B train severed her left arm and left leg. The plaintiff claims the accident was caused by the negligence of the train operator, Raquia Shabazz -- I think I'm pronouncing her name correctly -- in operating the train and negligence of what we refer to as the Transit Authority. They're technically known as the New York -- NYCTA and MTA, but it's the Transit Authority that we're talking about. In their ownership, maintenance, and design of the platform edge. For simplicity I'll refer to them as the Transit Authority.

Ms. Da Silva claims that the Transit Authority is negligent because it did not take adequate steps to prevent people from falling onto the tracks and be struck by trains, such as by installing platform edge barriers or Track Intrusion Devices for the platform at the Atlantic Avenue Barclays Center. Ms. Shabazz contends that she was not negligent in operating the train on that. The Transit Authority contents that it was not negligent in choosing not to install platform edge barriers or Track Intrusion Devices, or to do these other things to prevent the fall. So you heard a lot about that. But that's generally what the claims are, which is no surprise to you. You heard about this a lot now.

Now, what is negligence? It's the failure to use the degree of care that a reasonably prudent person would have used under the same circumstances. It may arise either from

doing an act that a reasonably prudent person would not have done under the same circumstances, or from failing to do an act that a reasonably prudent person would have done under the same circumstances.

In order for Ms. Da Silva to prevail on her negligence claims, she must prove by the preponderance of the evidence one, that the defendant you are considering acted negligently; two, that the negligence was a proximate cause of the accident; three, that she incurred damages as a result of the accident.

Because the standard of care differs, I'll explain the claim against Ms. Shabazz and a claim against the Transit Authority separately.

First as to the train operator. As you have heard, Ms. Da Silva claims that Ms. Shabazz was negligent in operating the train. Specifically, Ms. Da Silva alleges that Ms. Shabazz had adequate time to stop the train before it struck her but failed to do so. The defendants deny these allegations and contend that Ms. Shabazz could not have stopped the train in time. Now, a subway operator owes a duty to operate the train using reasonable care for the safety of people in a station.

Reasonable care means that degree of care that a reasonably prudent operator would exercise under the same circumstances. In determining whether Ms. Shabazz exercised

reasonable care, you must consider the circumstances surrounding the accident, including whether a reasonably prudent train operator would have prevented the train from striking Ms. Da Silva.

Now, a person faced with an emergency, obviously this is an emergency, and who acts without opportunity to consider the alternatives is not negligent if she acts as a reasonably prudent person would act in the same emergency, even if it later appears that she did not make the safest choice or exercised the best judgment.

A mistaken judgment, or a wrong choice of action, is not negligence if the person is required to act quickly because of danger. This rule applies where a person is faced with a sudden condition, which could not have been reasonably anticipated provided that the person did not cause or contribute to the emergency or negligence. If you find that Ms. Shabazz was faced with an emergency and that her response to the emergency was that of a reasonably prudent person, then you will conclude that she was not negligent.

If, however, you find that the situation was not sudden or should have reasonably been foreseen, or was created or contributed to by Ms. Shabazz's own negligence, or that her conduct in response to the emergency was not that of a reasonably prudent person, then you may find that she was negligent.

Now, in addition to claiming the train operator was negligent, Ms. Da Silva claims that the Transit Authority was also negligent because they did not take adequate steps to prevent people from falling into the tracks and being struck by trains, such as by installing platform edge barriers or Track Intrusion Devices for the platform. The defendants deny that allegation and contend that the platform was reasonably safe and conforms to the industry standard by subway systems throughout the United States. The Transit Authority owes a duty to its customers to keep its premises in a reasonably safe condition.

More specifically, it owes the customers a duty to provide a reasonably safe place to board its trains. As with reasonable care, reasonable safety means the measures a reasonably prudent subway system operator would have taken in the same circumstances in light of the dangers and risks that were known or reasonably foreseeable to it.

The Transit Authority is not negligent simply because another entity would have taken additional or better safety measures. On the other hand, a general custom use or practice by those in the same business may be considered some evidence of what constitutes reasonable safety measures.

Of course, you must first decide from the evidence whether there is a general customer practice in the operation of subway systems. If you find that there is, then you may

consider the customer practice, along with all the other facts and circumstances of the case in deciding whether the platform at issue was reasonably safe.

Now, if you find both that Ms. Shabazz was not negligent in operating the train and that the Transit Authority was not negligent in providing a reasonably safe platform and taking care of its safety situations, which you've heard about, then your deliberations are to end and your verdict will be for the defendants.

If, however, you find negligence on one or both of Ms. Da Silva's claims, you will consider whether the negligence was a proximate cause of the accident. Now, an act or omission is regarded as a proximate cause of an accident if it was a substantial factor in bringing about the accident, that is, if it had such an effect in producing the accident that reasonable people would regard it as a cause of the injury.

To be a substantial factor, the act or omission cannot be slight or trivial. There may be more than one cause of an accident, and indeed, where two or more independent acts or omissions cause an accident, each of those acts or omissions is regarded as a cause of the accident, provided that it was a substantial factor in bringing about the accident.

You are to consider causation only with respect to

the acts or omissions you found to be negligent. If you found negligence only in the operation of the train, you should consider only whether the operator of the train -- operation of the train was a substantial factor in bringing about the accident.

If you found negligence only with respect to the safety of the platform, you should consider only whether platform safety was a substantial factor in bringing about the accident. If you found negligence in both the operation of the train and the safety of the platform, you should separately consider whether each alone was a substantial factor in bringing about the accident.

If you find that neither the operation of the train or the safety of the platform was a substantial factor in bringing about the accident, then your deliberations are at an end and your verdict will be for the defendants. If on the other hand, you find both negligence and proximate cause on one or both of Ms. Da Silva's claims, then you will proceed to consider the following issues.

These are the affirmative defenses. First, you have to consider negligence, proximate causation, and then you come to the affirmative defenses. If you find that there was negligence in one or both, then you have to consider the affirmative defenses.

Now, if you found negligence on one or both claims,

you have to consider whether Ms. Da Silva was also negligent and, if so, whether the negligence contributed to the accident. This so-called comparative negligence is an affirmative defense, which means that the burden is now on the defendant to prove by a preponderance of the evidence both that Ms. Da Silva was negligent and that her negligence contributed to the accident.

When I say that her negligence contributed to the accident, that is the same as saying that her negligence was a proximate cause of the accident. If you find that the defendants have met their burden of proof, you must apportion fault between the plaintiff and the defendants. That is, you must weigh all the facts and circumstances of the case, decide what percentage of the total fault for the accident is attributable to the plaintiff, and what percentage is attributable to the defendants.

You will be asked to state these percentages of fault which must total 100 percent on the verdict form, which I'm going to explain to you in detail. If, on the other hand, you find the defendants have not met their burden of proof, either because Ms. Da Silva was not negligent or because the negligence did not contribute to the accident, then you will not assign any fault to her.

Now, the Transit Authority's second affirmative defense, it's just the Transit Authority's, nothing to do with

the train operator. Regardless of whether you find Ms. Da Silva comparatively negligent, you will next consider the Transit Authority second affirmative defense that is immune from liability. Now Ms. Shabazz is not claiming immunity. So this only applies to the Transit Authority.

It's a good time to take another sip of water. Now, immunity is ultimately a legal question that I, the judge, will have to determine but I may need your help. My decision depends on certain facts that you, the jury, must determine. Thus, the verdict form will ask you to answer a number of questions -- we call them interrogatories -- relating to those specific facts.

The Transit Authority has the burden of proof by a preponderance of the evidence with respect to these questions. One, as of August 2, 2016, the Transit Authority studied the issue of persons falling onto the tracks and being hit by trains. So when we talk about the issue, a person falling on the tracks, you can consider all these issues that are relevant that you heard a lot of testimony about, Intrusion Devices, whatever you heard. That all comes under the umbrella of issues you are to consider as to whether the Transit Authority studied the issues that are relevant here to persons falling on the tracks and being hit by trains.

If your answer is no to this first question, you will not have to consider the remaining questions. If your

answer is yes, that means they considered -- they had the study. They studied the issues. You will consider the following three questions:

Whether that study was adequate. Next, whether the Transit Authority's decision not to install platform edge barriers or Track Intrusion Devices, they call them TIDs, as of August 2, 2016 have a reasonable basis, and last, whether as of August 2, 2016 the Transit Authority regularly reviewed its decision in light of actual operations. I'm going to hand out the verdict sheet to you and we'll go through this again.

Now, let's talk about damages. If you find the defendants liable on one or both of Ms. Da Silva's claims, your final task will be to determine her damages, if any. Obviously, you will limit your consideration to the claim or claims on which you have found negligence and causation, and you will not consider damages at all if you have found for the defendants on both claims.

Before I explain the types of damages, I want to make something clear. You are not to speculate, once again, on the source of damages payments, who is going to pay the damages, or whether medical expenses or -- or whether insurance will cover any of the damages you find. Just don't speculate on what's going to happen. You're just going to decide the damages from the facts and evidence in this case.

Similarly, if you found that Ms. Da Silva was

comparatively negligent, you are not to reduce any award or damages to account for that finding, nor should you reduce any award of future damages to its present value. You're just going to consider the damages.

Your job is simply to determine, if you find the defendants liable, the amount of damages owed to Ms. Da Silva and I will then make any reductions required by law but after judgment, if necessary. It's not your consideration.

The fact that I am instructing you on the law of damages does not in any way mean that I think you should find any of the defendants liable. It is entirely for you to decide based on the evidence presented and the law as I'm explaining it to you whether Ms. Da Silva is entitled to recover from any of the defendants.

Now for the claim or claims on which you find liability, you must award Ms. Da Silva a sum of money that will justly and fairly compensate her for all her injuries and issues resulting from the accident.

The attorneys may have suggested a specific dollar amount in their closing arguments. So that is okay, but their suggestions, like everything else in their closing statements, are simply argument and is not evidence. We allow this type of thing, but it's not to be considered a substitute of your own assessment of damages and your own judgment. And that must be based on the evidence in accordance with legal

principles that I'm about to explain to you. You should award -- your award should include just and fair compensation for the following categories of loss and injury. Once again, I allow counsel always to suggest what they think the amount should be, but you have to assess the damages based on the evidence, even though I allow you to get this type of comment from counsel. So you understand that doesn't mean it's evidence. That's me allowing that type of thing to happen, but the evidence is going to be based on what you find for the facts in the case.

Let's first talk about medical expenses. Ms. Da Silva is entitled to recover the amount of reasonable expenditures for medical expenses, including physicians' charges, nursing charges, hospital expenses, diagnostic expenses, x-ray charges, and medicine resulting from the accident.

In this case Ms. Da Silva is seeking damages only for future medical expenses. If you find that Ms. Da Silva will incur medical expenses in the future as a result of the accident, you will award her an amount that will fairly and justly compensate her for those expenses, which are reasonably certain to be incurred in the future as a result of the accident.

In addition, you will be asked to state the number of years for which any award of future medical expenses is

intended to provide compensation. However, you will be asked to state only the total amount of future medical expenses, not the expenses for each year.

Now, I'm going to talk about lost earnings. Ms. Da Silva is entitled to compensation for any loss in her capacity to earn money in the future as a result of the accident. If you find that she suffered such a loss, you will award her an amount of money that will fairly and justly compensate her for the loss.

In addition, you will be asked to state the number of years for which any award of damages for lost earning capacity is intended to provide compensation. However, you will be asked to state only the total loss of future earning capacity, not the loss of future earning capacity for each year.

Any award for lost earning capacity must not be the result of speculation or conjecture. It must be determined based upon Ms. Da Silva's earnings before the accident, her prospects for raises and promotions before the accident, the extent to which those earnings and prospects have been reduced by injuries caused by the accident, the length of time that Ms. Da Silva could reasonably be expected to work had she not been injured, and any other circumstances bearing on a future earning capacity. There's a lot of issues. We can't state them with definitive certainty. It's not possible, but these

are the standards with which you are to employ. In that regard you have heard evidence regarding Ms. Da Silva's work life expectancy. Those numbers are, of course, only statistical averages. They cannot assure you that Ms. Da Silva's working life will not be shorter or longer than average.

We have no way of knowing what the good Lord has in store for us, obviously. Thus, you are not bound by this evidence but may consider it together with any other relevant evidence and your own life experience. Now, I'm going to talk about not economic damages.

Ms. Da Silva is entitled to recover a sum of money that will fairly and justly compensate her for any pain and suffering caused by the accident between the date of the accident and today. That includes both physical pain and suffering and mental, emotional, and psychological anguish, including any physical consequences of such anguish.

In addition, she's entitled to recover for any future physical pain, mental, emotional, or psychological anguish, again, including any physical consequences of such anguish and loss of or reduction in her ability to enjoy life.

We don't have crystal balls, of course, but you have to base your decision on using your common sense on the evidence you've heard in this case. There's no way to precisely measure these so-called non-economic damages. That

doesn't mean, however, that you should simply speculate as to the amount of any such damages. Rather, you should make a reasonable estimate based on the evidence and your own common sense of an amount that will fairly compensate Ms. Da Silva for any non-economic injuries caused by the accident. So once again, based upon the evidence and your common sense.

Unlike medical evidence and lost earning capacity, Ms. Da Silva is seeking compensation both for non-economic damages she experienced between the date of the accident and today, and for non-economic damages she will experience in the future. For medical lost earnings, we're only talking about future. For pain and suffering, you go back to August 2nd.

With respect to future damages, you should consider the period of time during which Ms. Da Silva will incur them. If you find that the injuries proximately caused by the accident are permanent, you should consider her life expectancy. You heard evidence about her life expectancy. As with work life expectancy, the evidence provides only a statistical average and should be considered by you, not in isolation, but along with any other relevant evidence and your own common sense and experience.

Now, I'm going to give you some closing instructions. Now juror number one, I have your name up there. I forget it, again.

THE JUROR: Grace.

THE COURT: You happen to be the lucky person that was picked by lottery to sit in seat number one. That doesn't mean you have to be the foreperson. You can.

The first thing you're going to do, I suspect, after you start your deliberations is to pick amongst you who you're most comfortable with being your spokesperson. It doesn't have to be but it could be you. You folks seem to be getting along well with each other. I don't think you'll have a problem selecting who that person should be.

What I need is that person is going to have the requirement to stand up and deliver the verdict in open court. Some people may be more or less comfortable doing that. Just think about you have to do that. I need that person to have good handwriting, maybe, because I'm going to allow you to send notes to me if you want to have any read back or any testimony, if you want to see any exhibits. We're going to talk about that in a moment.

Any questions about the charge, anything you're confused about at all, don't speculate. Just write it out. You're going to have paper and pen. Just put a little note on the top, the time that you rendered that question so we keep track of it. And then we're going to have the person sitting outside the courtroom, there will be a marshal sitting out there, you'll hand those questions that you have, if you have any at all, to the marshal. I'll look at them and then I'll

decide what to do with them. If it's a short little question that I can answer on the same piece of paper -- don't rip it in half. Just keep the whole piece of paper and I'll probably just answer it on the piece of paper and send it back to you.

If I think maybe it's a good idea for me to call you in the courtroom to answer your questions in the courtroom, I'll do that. It depends on what you ask me. But I want you to feel that you have the capacity to not speculate.

If you have any questions, just ask the judge. So the foreperson, hopefully, will have handwriting that I can read. The foreperson will simply put on the top of it the time and the date that I asked you to read those questions. We keep track of that and put it in our record.

So as far as general instructions, I tell you once again to keep in mind that what I said in these instructions is not intended to suggest to you in any way what I think your verdict should be. Once again, that is entirely for you to decide. By way of reminder, I charge you once again that it is your responsibility to judge the facts in this case and the evidence presented during the trial, and to apply the law as I've given it to you to the facts as you find them from the evidence. So this is repetition, but it's okay to do that.

Remember, also, that your verdict must be based solely on the evidence in the case and the law I've given to you and not on anything else. Your verdict has to be

unanimous. We require everybody to agree on all these questions. Your answer has to be unanimous. If you can't be unanimous, you have to tell me about it. But you have to try to be unanimous in all your questions.

In order for your deliberations to proceed in an orderly fashion, you have to have a foreperson, as I just explained. So you will decide who that foreperson is going to be. The foreperson will be responsible, once again, for signing all communications to the Court and for handing them to the marshal during your deliberations.

Of course, his or her vote is not entitled to any greater weight. You're all the same. Just one person has to be administratively the foreperson to communicate with me. It's important for you not to communicate with anyone outside the jury room about your deliberations or about anything touching this case.

I don't know whether you're going to be walking around. I don't know whether any of you are smokers and you want to walk around, hopefully not, but you're just going to be talking to yourselves and nobody else during your deliberations. There is only one exception, and that is what I've said is if it's necessary to come into the courtroom. You're going to give a note to the marshal sitting outside and we'll see what your problems are.

The exhibits, we have lots of them. I've instructed

the lawyers, in this respect their officers of the court, to make sure we have a good exhibit list. Instead of sending them all in to you, we're going to give you an exhibit list. Hopefully we'll have that soon for you, and then you can just ask that you want a particular exhibit. You can look at the exhibit list and we'll send it in to you as quickly as we can.

Do we have the exhibit list now?

THE COURTROOM DEPUTY: I'm still waiting for it.

THE COURT: It may take them a little bit of time. In the meantime, when you start your deliberations if we haven't gotten the list in to you, if you remember anything you want, you can let me know and maybe we can get it without the list. But we'll have a list for you.

I'm also going to give you a copy of the charge, it's what I'm telling you, but this is just a guide. It will be a good memento to have. So if in the course of your deliberations your recollection of any part of the testimony should fail, or should you find yourself in doubt concerning my instructions to the law, it is your privilege, I think I've told you this before, if you so desire to return to the courtroom for the purpose of having such testimony or instructions read or played back to you.

And, again, you may make such a request by a note to the marshal. I suggest that you be specific to avoid hearing testimony you do not desire to assist in your deliberations.

And be patient because sometimes it may take us a little while to get what you want.

I told you that we have a record of everything that has happened. You can see our wonderful court reporter. It's not an easy job taking down everything that we say, including what I'm saying to you right now. So I told you even though I said it's okay to take notes for your own personal use and recollection, but it's the evidence that counts.

If you're in doubt about anything, you're not to really say I took this note, I took that note. Just come back and ask us because we have the real thing here for you to hear again, and we can do that for you.

Not every court in the United States does this, and it's difficult in places like Kansas for people to really do their jobs but here we do it. We have great court reporters, as we know, very skilled, and we're able to read back whatever you want to hear from any of the testimony whatsoever. If you're confused about my charge, of course, we'll come back and I'll answer your questions. But if you want readbacks, which is perfectly appropriate, try to be focused. Because if you want everything read back here, you'll be here for another ten days. Just zero in on what you feel you want to hear.

Let us know specifically what it is, and it may take us a little bit of time to find it, and you can continue with your deliberations while we're trying to accommodate your

questions or you can wait until you get the answers. It's going to be up to you if you want to wait to get the answers or whether you want to continue. I think that you have a good sense of that.

Now, let's wrap this up. Your duty, once again, is to reach a fair conclusion from the law and the evidence. Obviously it's an important duty. When you are in the jury room, listen to each other. Discuss the evidence and issues in the case amongst yourselves. Now you can start talking to each other about the case.

It is the duty of each of you as jurors to consult with one another and to deliberate with a view towards reaching an agreement on a verdict, if you can do so without violating your individual judgment and conscience.

You should not surrender conscientious beliefs of what the truth is and of the weight and effect of the evidence, and while each of you must decide the case for yourselves and not merely acquiesce in the conclusion of your fellow jurors, you should examine the issues and the evidence before you with candor and frankness and with proper deference to and regard to the opinion and respect you have for each other.

Now, you should not hesitate to reconsider your opinions from time to time and to change them if you're convinced they are wrong as part of the jury deliberation

process. However, do not surrender an honest belief as to the weight effect of the evidence simply to arrive at a verdict.

Now, the decision you reach, I told you before, must be unanimous as to each of these questions. When you reach the verdict, you will simply send me a note signed by the foreperson that you reached a verdict. You'll hand it to the marshal. Do not indicate what the verdict is in any communication to me. I don't want to know how you stand.

I just want the questions and I'll give you the answers. So in no communication with the Court should you give me a numerical count of where the jury stands in its deliberations. Remember in your deliberations that the dispute between the parties is, for them, no passing matter, obviously. They and the Court rely on you to give full and conscientious deliberation and consideration to the issues and evidence before you.

By so doing, you carry out to the fullest your oaths as jurors to well and truly try the issues of this case and render a true verdict. I told you we began with that oath, we end with that oath. I think you get it. What I'm going to do now is hand you the verdict sheet.

(Continued on next page.)

(Continuing)

THE COURT: One of them will be the original one, which will be returned to me when you reach your deliberations, and the others you can take home as a souvenir. And it probably help you to have this in front of you with your deliberations.

Let me hand it over to you now and you will go over it and start with your deliberations.

When is lunch going to arrive, Mike?

THE COURTROOM DEPUTY: I ordered it for 12:30.

THE COURT: Can you hand this out.

You may be short one, let me know if you are.

Now, take a look at it. Nothing on this thing is intended to tell you how to decide the case. Okay. These are the questions you have to answer.

And, of course, I'm not going to repeat all of the charge to you. Obviously the questions are focused specifically on the issues and you will be, of course, referring to the charge to assist you in any answering these questions, right.

One, was Raqia Shabazz negligent?

Yes or no.

If you answer yes, then you are going to answer the next question.

Was that negligence the proximate cause of the

accident?

Yes or no.

Second, we are going to talk about the train authority.

Was the Transit Authority negligent?

Yes or no.

If you answer yes, then you are going to answer the next subpart, B. Was that negligence a proximate cause of the accident?

Yes or no.

So if you answered no to questions 1 or 1B, and questions 2A and 2B, your verdict is complete.

Then you will have the foreperson sign and date this form and return to the courtroom. Otherwise you will proceed to question number three.

These are the affirmative defenses.

Was the plaintiff negligent at all?

Yes or no.

If your answer is yes, then you are going to answer was the plaintiff's negligence a proximate cause of the accident?

Yes or no.

Now, if you answered yes to 3A and 3B, then you're going to answer question number 4.

If you answer no to question 3A or 3B, skip to

question number 5.

Okay. Then you're going to consider the percentage of fault, which I explained is comparative negligence.

What percentage of fault is attributable to defendant Shabazz, to defendant Transit Authority, to the plaintiff. And that's the total of 100 percent. So you can decide 100 percent for one, two, or three, or you can break it up 90 percent, 20 percent, 10 percent. You are going to have to apportion the full, if any, that you ascribe to either of these parties, what percentage they are responsible for the happening of the accident.

Then question number five, these are specific questions you have to answer with respect to the affirmative defense that applies only to the Transit Authority.

A, as of August 2, 2016, the date the Transit Authority study -- I'm sorry -- did the Transit Authority study the issue of persons falling on to the tracks and being hit by trains?

Yes or no.

So when it talks about the study, it encompasses everything you have heard. You have heard track intrusion devices. You have heard all sorts of things. You consider it all when you consider the issue of the person falling on the tracks, and was there a study.

If you answer yes to that question, then you answer

questions 5B and 5D.

If your answer is no, skip to question 6 and 9, the damages, okay?

So if you say there is no study about these issues that are relevant to this case, which you heard all about, then you don't have to go further, then you would go to question 6, which will then be damages.

But if you say that there was a study of the issues, okay, then you are going to answer the question was that study an adequate study?

Yes or no.

And then you have to answer this question: Does the Transit Authority's decision not to install platform edge barriers or track intrusion devices as of August 2, 2016 have a reasonable basis?

And then the last question is as of August 2, 2016, did the Transit Authority promptly review its decision -- I'm sorry -- regularly review its decision in light of actual operations?

Once again, you refer to the charge, which I gave you. That will assist you in answering those questions.

Now, if you get to damages, we have to talk about that. And those are questions 6 through 9.

6, what amount will fairly and justly compensate the plaintiff for medical expenses reasonably certain to be

incurred in the future?

Dollar amount.

Now, the above award is intended to provide compensation for future medical expenses over X amount of years.

You're going to have to tell me -- you know, we have no crystal ball, obviously, but based upon your commonsense and everything I explained to you, you're going to have to give me a number to put in here as to what amount is intended to provide compensation for future medical expenses over how many years.

Number 7, what amount will fairly and justly compensate the plaintiff for lost future earning capacity?

And the above award is intended to provide compensation for lost earning capacity over X amount of years.

Nobody knows how long we are going to live. The good Lord knows that we don't know that, right.

But you've heard a lot of testimony. You're going to have to make your best commonsense judgment on that issue based upon the testimony and everything else you have heard and your life experience and your common sense.

Question number 8, what amount will fairly and justly compensate the plaintiff for past physical pain and suffering and mental, emotional, or psychological distress?

You have heard a lot about her past physical. You

have to put in a dollar amount.

And then the last question: What amount will fairly and justly compensate the plaintiff for future physical pain and suffering; mental, emotional, or psychological distress; and loss of, or reduction in, the ability to enjoy life?

Now, that's the one where we don't have a crystal ball, but I have instructed you that you have to try to make your best judgment call on your commonsense and the evidence in this case.

And then you are going to tell about that award.

The above award is intended to provide compensation for future non-economic damages over how many years.

So you have a lot to do.

So this verdict will be complete when you finish those answers. And then your foreperson will sign it once again, date it, and return to the courtroom after you give it to the marshal.

Actually, you can bring it in with you. The foreperson can bring it in with you. You just tell the marshal you have a verdict. You don't have to give the marshal your verdict. You will bring that in, the foreperson. And you will be then asked to stand in court and you will be asked probably by either me or Mr. Innelli what your verdict is.

Now, I have to talk to the lawyers because I want

them to give me an opportunity for them to tell me whether I said something that is incorrect and to give me an opportunity, if that happened, to maybe re-instruct you. So give me a moment while I speak to them.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: So let's huddle around here.

MR. GENIS: Three things, if I may.

THE COURT: Let me hear first from Mr. Genis.

MR. GENIS: Just one thing on the verdict sheet I just noticed.

On the damages one, number eight, for past pain and suffering does not mention loss of enjoyment of life, which we do have for the future, and that can confuse the jury that they might think it's only for the future, not for the past.

THE COURT: Well, I did explain it to them.

MR. GENIS: I know, but they are going to look at the verdict sheet and see it is on nine but not on eight.

THE COURT: The loss of?

MR. GENIS: Enjoyment of life.

THE COURT: I guess I should say that?

MR. KEAVENEY: That's fine, Your Honor. We have no problems with that.

THE COURT: I guess I should do that.

What else?

MR. GENIS: Just two things on the charge, Judge. When you were talking about the emergency charge, you stated -- you said obviously this was an emergency. I don't think you probably meant to say that, but you did. And that might

need to be corrected.

THE COURT: They don't have to determine whether it is an emergency or not. I will say that to them. Okay.

MR. GENIS: Okay. And then the last thing that just caught my eye are medical expenses. You list physicians, nurses, et cetera, but nothing about prosthetics or devices or services, prosthetics, devices, service.

MS. WINTERS: We will object to that.

MR. KEAVENEY: It is included in everything.

MR. GENIS: But you just list everything except for those things and that's a big part of her futures, the prosthetics.

THE COURT: Get me a pen. So it includes that. And get me something to write on.

MR. GENIS: Here's my verdict sheet. Feel free.

MR. KEAVENEY: We would object to that inclusion as it is already encompassed in the charge.

THE COURT: So let me take a look at this.

So first you talk a little more about emergency, I have to include that. There is an emergency. I will say something about that.

The other thing.

MR. GENIS: Well, the medical expenses that would include, if they find, prosthetics, devices, and services.

MR. ROTH: And home care.

MR. GENIS: Home care.

MR. ROTH: Not home care, assistance.

THE COURT: Prosthetic devices and services.

What else?

MR. GENIS: Assistance.

THE COURT: And assistance?

MR. GENIS: Yes.

THE COURT: So I guess I should change the verdict sheet.

MR. GENIS: That would be helpful.

MR. KEAVENEY: It is already included in the charge.

THE COURT: I will mention that to them. I will say to include that, emergency situation.

What else?

MR. GENIS: And as I said we went through with the prosthetic and services.

THE COURT: We said prosthetic, services.

MR. GENIS: I'm sorry. You wrote that. I didn't see that.

And on the verdict sheet was item number eight, to add loss of enjoyment of life.

THE COURT: We will have to change the verdict sheet.

MR. GENIS: Thank you.

THE COURT: We will have to change that. That's

number eight, right?
MR. GENIS: Yes, sir.
THE COURT: Next.
MR. KEAVENEY: We agreed to advise the jury as to what the PJI would say was the life expectancy.
MR. GENIS: I have no problem with that.
THE COURT: Did you agree to that?
MR. GENIS: Yes.
THE COURT: I think it's on the chart.
MR. GENIS: It is.
Would you like me to get the chart?
MR. KEAVENEY: That's what it is. They don't have to agree with it.
THE COURT: Life expectancy.
MR. KEAVENEY: Is 76, I think.
MR. GENIS: No. Life expectancy was 83, I can look quickly and let you know.
THE COURT: It is in evidence. Do you want to tell me?
MR. GENIS: It's on our demonstrative chart. It's on the first page.
MR. KEAVENEY: We are just going to double check that.
MR. GENIS: Sure.
THE COURT: Anything else in the meantime?

MR. KEAVENEY: That's it.

THE COURT: That's it?

I'm going to give the verdict sheet back and we will go over it and make the changes. I will show it to counsel and give it to the jurors, okay.

So, what is it?

MS. WINTERS: There are two numbers.

THE COURT: 81.83.

MR. GENIS: Life expectancy is 81.83, and 67.5 for work life. Life expectancy is 81.83.

THE COURT: Maybe we should change that and put that in the charge as well, I think, so we have that.

MR. KEAVENEY: Okay.

THE COURT: Let's try to do it.

(End of sidebar conference.)

(Continued on next page.)

(In open court.)

THE COURT: Now, a couple of things. Let me have back the verdict sheet, because I am going to add something to it and put all together.

Counsel was kind of to point out to me I didn't add on question 8 that you are to consider the loss of enjoyment of life. I will change it. And I really appreciate their help.

Also, before I give you the charge, I'm going to add a few things to it, because we all agree that the life expectancy is 81.83 years and the work life expectancy is 67.5. I will be including that in the charge so you have that number so you don't have to wrestle with it. All parties agree to that.

And also, I want to let you know when I mention emergency, I don't want you to think that I said that there was an emergency. It is for you to determine from all of the facts whether there was an emergency and all of the circumstances. You heard all of the evidence, right? So don't conclude because I used the word emergency that I'm telling you there was an emergency. It is for you to decide everything.

And then we are going to talk about prosthetic devices and services are also going to be part of the damages that you can consider. So I'm going to make a couple of

changes to the verdict sheet and to the charge before I give it to you.

And at this time, though, I think you can possibly -- perfect. Lunch is here. You can start talking about the case after I let you go free.

Hopefully we will get that exhibit list in to you as soon as possible. You can start deliberating without it. I will get the charge to you in a few minutes. You may want to take a break and have your lunch first. It's up to you. You may want to decide who your foreperson is going to be.

So what I am doing now is something which is important, you are the judge now, not me. So I'm going to be controlled by your decisions. So if you want to go home at eight o'clock tonight, we will do it. If you want to go home at five o'clock, we will do it. Use your good commonsense. My only concern is that I don't want anyone to feel any pressure because we have a weekend coming up, I want to make sure that's not going to impact your decision or deliberation, however long or short it will be. That's important.

As I told you, you can let me know when you want to go home. I assume it's not going to be before 5:00, but if you want to go earlier, but, you know, I think as a practical you probably don't want to do that. So if you want to stay later, you let me know. So are basically you are in charge of my life. You're going to ask me questions if you want. I'm

going to have to try to answer them to the best of my ability. And at this time, before you commence your deliberations, we will give the marshal an oath, and then you're going to start.

Do we have the marshal here?

THE COURTROOM DEPUTY: Yes.

THE COURT: Mr. Innelli has been terrific.

(Marshal sworn.)

THE COURTROOM DEPUTY: Thank you.

THE COURT: Where is our marshal?

THE COURTROOM DEPUTY: He is right here.

THE COURT: The jurors are in your good hands and they are now to commence their deliberations.

And we will get the verdict sheet into you and the charge as soon as we can. All right.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(Court is in recess at 12:35 p.m., awaiting verdict of the jury.)

(Continuing)

THE COURTROOM DEPUTY: We are on the record now. The joint exhibit list was marked as Court Exhibit No. 1 and the jury charge was marked as Court Exhibit No. 2, and both were sent in to the jury.

THE COURT: So the jury has everything that it ought to have. They haven't asked any questions yet.

In the meantime, Ms. Winters, you feel like you want to say something to support your motion. I'm going to give you a brief opportunity to make a record. You don't have to make a big speech.

MS. WINTERS: So, thank you, Your Honor.

So we are renewing, as indicated prior, our Rule 50 motion that was previously made at the close of plaintiff's case, and we will renew the bases that we articulated at that time.

In addition, since that original motion, it has been made clear that there's no reasonable basis for there to be a finding that Ms. Shabazz failed to use reasonable care under the emergent circumstances. The record in this case is clear that the accident happened sometime within seven to ten seconds.

In addition, with respect to the specific expert opinions relied on by plaintiff in this case, the .6 reaction time that Dr. Berkowitz assigned to Ms. Shabazz is speculative

and impermissible pursuant to *Dibble*.

THE COURT: I don't think you have to go into that detail to protect the record.

MS. WINTERS: I will try to be as succinct as possible, Your Honor.

In addition, the -- pursuant to -- pursuant to *Bethel* and *Searacy*, there is no basis to find that Shabazz was acting unreasonably under the circumstances.

And furthermore, the case law in New York is clear, that if even one variable in the math calculations relied upon by Dr. Berkowitz and Jiminez in this matter fail or are speculative, the entire opinion must be excluded and fails.

Related to the negligent design issue, you know, we renew our arguments that were previously stated on the record.

In addition, what's been made clear during the defense case-in-chief is that the PSDs and TIDs proposed by plaintiff's counsel in plaintiff's case are not the standard and practice or common practice in the United States, in North America or even internationally. More pointedly. Plaintiff, as we stated in our original motion, is attempting to elicit a heightened standard here. He elicited testimony from Dr. Berkowitz --

THE COURT: You don't have to make a big speech. Please do not do that.

MS. WINTERS: Okay.

THE COURT: Try not to do that. You are becoming a professional lawyer. You don't have to do that.

MS. WINTERS: Dr. Berkowitz is applying a heightened standard instead of a standard of reasonable care. During the examination of Mr. Korach, that heightened standard was elicited as well and plaintiff also closed on that heightened standard of care attempting to have jury apply that to the Transit Authority.

THE COURT: Okay. I think you said enough.

MS. WINTERS: Your Honor, if I may, I don't have any record on the qualified immunity issue or the governmental immunity yet.

THE COURT: You made a record. It will be deemed like you made a record. Okay. We don't need more than that.

MR. SHIELDS: Can I just make one quick --

THE COURT: You want to say something too?

MR. SHIELDS: Yes, Your Honor.

So, just for the record, the plaintiffs, prior to the case going to the jury, filed our renewed motion for a directed verdict under Rule 50(a), which is on the docket at ECF No. 338. I'm not going to go into all of our arguments now, but all of the arguments are in the record at docket No. 338.

THE COURT: Very good. You want to complain about everything. You made a record. Fine. Don't worry about it.

MS. WINTERS: In addition, Your Honor, I would just note that we're moving pursuant to governmental immunity and the case law that has been set forth in the briefing in this case related to the standards for both governmental immunity and qualified immunity.

THE COURT: Okay.

As mentioned before, I'm denying all of the motions, right. You can submit things post verdict. We will take it as it comes.

THE COURTROOM DEPUTY: Here you go. We have a jury note.

THE COURT: Is everybody here?

All counsel are here and we have a court reporter.

MR. KEAVENEY: Mr. Roth is not here.

THE COURT: Do you want to wait for Mr. Roth?

MR. GENIS: No, we could proceed.

THE COURT: We have the first question, and I have marked it as Court Exhibit No. 3, dated today, and it is by the foreman, who is Joe Maissel.

He is Juror No. 7?

THE COURTROOM DEPUTY: Juror No. 5.

THE COURT: Juror No. 5. Okay. Dated 2:10, just a few minutes ago.

The first question: Why do we skip question four when Da Silva is found not negligent? Is there no

apportionment if both the MTA and Chavez are found negligent but not Da Silva?

Well, I think that, you know, obviously if she's not found negligent, then they don't have to worry about apportioning fault.

MR. KEAVENEY: Well, for her --

THE COURT: If they say no in answer to three, plaintiff negligent no, apparently that's what they're asking me, if she is found not negligent.

MR. GENIS: They can still proceed to number four, just put zero for plaintiff.

THE COURT: They proceed to four if they don't deal with Shabazz.

MR. GENIS: With plaintiff.

If I understood the note correctly, they want to know about the two defendants.

THE COURT: They don't have to deal with the plaintiff.

MR. GENIS: Correct. They should put zero for plaintiff.

THE COURT: They should put zero.

MR. GENIS: Yes.

MR. SHIELDS: Well, it sounds to me, Your Honor, like if --

THE COURT: They don't have to consider comparative

negligence if they found she's not negligent, is the question.

MR. GENIS: Correct. Yes.

So if they proceed to number four, zero for plaintiff and whatever they assign --

THE COURT: If they consider Shabazz and the Transit Authority, they put zero for the plaintiff. I think that is the right answer.

MR. GENIS: Yes.

THE COURT: Next: May we have a calculator for everything?

So I was asked for a calculator when the jurors were out, I didn't give it to them. I wanted them to hear the charge first. Now I think it's okay to give them a calculator.

MR. GENIS: Sure.

THE COURT: Next question, may we hear the 911 calls in evidence, and in parenthesis WW.

Is that the calls?

MS. WINTERS: Yes.

THE COURT: Are we ready to do that?

MS. WINTERS: Yes, Your Honor.

THE COURT: So we will have to bring them in. I will answer their questions and they will hear the 911 calls now. Have them ready to rock and roll.

Another note. They are coming fast and furiously.

Number four, the jury requests a break to step outside briefly, 20 minutes.

What do we do now?

MS. WINTERS: That's fine.

THE COURT: I think we should honor that. Maybe I will call them in first.

MR. KEAVENEY: If they want to take a break, then when they come back, we can play the tape and they can go back to deliberating.

THE COURT: Why don't we call them in now and we can answer these questions and take the break.

MR. GENIS: Okay.

THE COURTROOM DEPUTY: Who's going to be playing the 911?

MS. WINTERS: I have WW.

THE COURT: I just changed my mind. Mike said they may want to call their family because they're going to want to stay late. Let them take the break and we will come back in 20 minutes.

THE COURTROOM DEPUTY: Okay.

(Continued on next page.)

(Continuing)

THE COURT: Let's bring the jurors in and answer their questions now.

We have the 911 calls to go?

MR. GENIS: Judge, apparently, the different 911 calls, I thought they were all one exhibit, but they apparently are two exhibits.

THE COURT: WW.

MR. GENIS: Right. Can we just ask a clarifying question of the jury?

I don't know if they realize that it's two different exhibits for the calls, if they just want all of them or if they only want those?

If they want the defendant's 911 call or ours or both?

THE COURT: Ask them which one they want. They said WW.

MR. GENIS: But they may not realize,, you know....

THE COURT: Let's bring the jurors in.

MR. GENIS: We are respectfully requesting that the Court ask for clarification.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Folks, I hope you had a good lunch.

And I have your note. So I want to attend to it now. We marked it as Court Exhibit 3. We keep a record of everything, and I appreciate that.

Am I pronouncing your name correctly; Maissel?

THE FOREPERSON: Correct.

THE COURT: Maissel. So you are the foreperson. Very good. I can read your handwriting. Excellent.

Andthe first question: Why do we skip question four when Da Silva is found not negligent? Is there no apportionment if both the MTA and Shabazz are found negligent, but not Da Silva?

So it's a good question.

You could just simply answer, in number four, you could put zero, all right. You can skip right by that or you could write zero for plaintiff.

And if you want to portion fault, then you will have Shabazz and the Transit Authority to deal with.

I hope that answers that question.

May we have a calculator for arithmetic?

I think you have one now. It has been sent to you.

THE COURTROOM DEPUTY: We have one here right, Judge.

THE COURT: Give it to Mr. Maissel. May we hear the 911 calls in evidence?

You say WW.

I want clarification, Mr. Maissel. Do you want to

hear one of them, both of them?

THE FOREPERSON:: Whatever is in evidence.

THE COURT: All of them?

THE FOREPERSON: Yes, please.

THE COURT: Can we do that?

THE COURT: We can send them --

(Audio playing.)

THE COURT: I was going to say we can send everything in to you that we can send, but when you want to hear the calls or the videos, you have to come to court.

THE FOREPERSON: Understood.

THE COURT: Which one is this now?

MS. WINTERS: Your Honor, this is WW, call number one.

THE COURT: All right. WW, call number one.

(Audio playing.)

THE COURT: Is that it?

MS. WINTERS: There is more, but it is between the operators.

THE COURT: Just the ones that are in evidence. Msw it's in evidence.

THE COURT: Is there a problem here that you want to talk to me about? I assume you know what we are doing.

MS. WINTERS: No. But there is more, Your Honor.

THE COURT: We want you to play all of the calls in evidence.

What's next?

MS. WINTERS: This one is not done yet.

THE COURT: That's it.

MS. WINTERS: It is still going. It's up to you, Your Honor.

THE COURT: Look, we want to hear the 911 calls in evidence.

MS. WINTERS: No, we are playing it, Your Honor.

THE COURT: Is there more?

MS. WINTERS: Yes, Your Honor.

THE COURT: Let's hear it.

(Audio playing.)

THE COURT: Is there one more now?

MR. ROTH: Two more.

THE COURT: Is there one more?

MR. MORALES: Yes, Your Honor. We will play the call that comes before that, call number five.

(Audio playing.) (Audio stopped.)

THE COURT: Is that it?

MR. ROTH: That's it.

THE COURT: Okay. Folks, continue with your deliberations.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURTROOM DEPUTY: You can all be seated.

(Continuing)

THE COURT: Since we were last here, we had a jury note, number five, which was a request at 3:55 p.m.

Please provide testimony from Dr. Kahn discussing Table 80, specifically that which provides an overview of the life care plan, signed by our foreman.

And then we have now, at 5:30, just a few minutes ago, Court Exhibit No. 6, the jury has reached a verdict.

Let's call the jurors in.

THE COURTROOM DEPUTY: Yes.

All rise.

(Jurors enter.)

THE COURTROOM DEPUTY: You can all be seated.

THE COURT: Everyone sit except Mr. Maissel. And I have your last note that you arrived at an unanimous verdict, I take it.

And before you read the verdict, which will be momentarily, as I told you, I will make myself available to chit-chat with you.

Mr. Innelli, do you want to take the verdict, please?

THE COURTROOM DEPUTY: Sure.

Has the jury reached a unanimous verdict?

THE FOREPERSON: Yes, we have.

THE COURTROOM DEPUTY: Liability, 1A, was Raqia

Shabazz negligent?

Yes or no?

THE FOREPERSON: Yes.

THE COURT: 1B, was the negligence a proximate cause of the accident?

Yes or no?

THE FOREPERSON: Yes.

THE COURT: 2A, was the Transit Authority negligent?

THE FOREPERSON: Yes.

THE COURT: 2B, was the negligence a proximate cause of the accident?

Yes or no.

THE FOREPERSON: Yes.

THE COURTROOM DEPUTY: Affirmative defenses, question 3A: Was the plaintiff negligent?

Yes or no?

THE FOREPERSON: No.

THE COURTROOM DEPUTY: So you went on to question number 4.

What percentage of fault is attributed to defendant Shabazz?

THE FOREPERSON: 0.01 percent.

THE COURTROOM DEPUTY: 0.01.

For defendant Transit Authority?

THE FOREPERSON: 99.99 percent.

THE COURTROOM DEPUTY: And for plaintiff?

THE FOREPERSON: 0.

THE COURTROOM DEPUTY: Question 5: As of August 2, 2016, did the Transit Authority study the issue of persons falling on to the tracks and being hit by trains?

Yes or no?

THE FOREPERSON: No.

THE COURTROOM DEPUTY: So, now you went on to question number 6, which is under damages.

What amount will fairly and justly compensate the plaintiff for medical expenses reasonably certain to be incurred in the future?

THE FOREPERSON: $10 million.

THE COURTROOM DEPUTY: The above award is intended to provide compensation for future medical expenses over how many years?

THE FOREPERSON: 50 years.

THE COURTROOM DEPUTY: Question number 7: What amount will fairly and justly compensate the plaintiff for lost future earnings capacity?

THE FOREPERSON: $1.7 million.

THE COURTROOM DEPUTY: The above award is intended to provide compensation for lost earnings capacity over how many years?

THE FOREPERSON: 50 years.

THE COURTROOM DEPUTY: Number 8: What amount will fairly and justly compensate the plaintiff for past medical pain and suffering and mental emotional and psychological distress and loss of or reduction in the ability to enjoy life?

THE FOREPERSON: $20 million.

THE COURTROOM DEPUTY: Question No. 9, what amount will fairly and justly compensate the plaintiff for future physical pain and suffering, mental, emotional, and psychological distress and the loss or reduction in the ability to enjoy life?

THE FOREPERSON: $50 million.

THE COURTROOM DEPUTY: The above award is intended to provide compensation for future non-economic damages over how many years?

THE FOREPERSON: 50 years.

THE COURTROOM DEPUTY: Thank you. You can be seated.

Juror No. 1, is that your verdict? Yes or no.

JUROR NO. 1: Yes.

THE COURTROOM DEPUTY: Juror No. 2, is that your verdict?

JUROR NO. 2: Yes.

THE COURTROOM DEPUTY: Juror No. 3, is that your verdict?

JUROR NO. 3: Yes.

THE COURTROOM DEPUTY: Juror No. 4, is that your verdict?

JUROR NO. 4: Yes.

THE COURTROOM DEPUTY: Juror No. 5, is that your verdict?

JUROR NO. 5: Yes.

THE COURTROOM DEPUTY: Juror No. 6, is that your verdict?

JUROR NO. 6: Yes.

THE COURTROOM DEPUTY: Juror No. 7, is that your verdict?

JUROR NO. 7: Yes.

THE COURTROOM DEPUTY: And Juror No. 8, is that your verdict?

JUROR NO. 8: Yes.

THE COURTROOM DEPUTY: The jury is polled, Your Honor.

THE COURT: Folks, you are discharged. You had quite a challenge here, and I am proud of all of you. And if you want to talk to the judge, I will be there in a few minutes.

THE COURTROOM DEPUTY: All rise.

MR. GENIS: May we thank the jury, Your Honor?

THE COURT: Well, of course. If you would like to

do that.

MR. GENIS: We really appreciate everything and your time. Thank you.

(Jury exits the courtroom.)

THE COURTROOM DEPUTY: You all may be seated.

THE COURT: All right. So I don't think you have to say anything now. You have your right to make your applications, your motions.

Do you want to say anything now for the record, you can do it.

MR. KEAVENEY: Just request a collateral source hearing at the Court's convenience and that we will be filing a motion to set aside the verdict.

THE COURT: I'm sorry?

MR. KEAVENEY: We will be filing a motion to set aside the verdict.

THE COURT: So, I think you probably -- I'm going to deny that. And you can, you know, make your applications as you deem fit, you know, but I don't think I have to reserve on that. Many times I do, but I think here I'm comfortable with denying it.

So I'm going to talk to the jurors now. You are free to speak to them if they want to speak to you.

There is nothing else we have to say right now. It's been quite a trial.

MR. KEAVENEY: Judge, I wasn't making a motion now. I was going to file the motion.

THE COURT: So you want to file the motion?

MR. KEAVENEY: Yes.

THE COURT: Okay.

MR. KEAVENEY: Thank you.

THE COURT: By all means, you can do that.

MR. KEAVENEY: I appreciate it.

THE COURT: I don't have how much time you have. Just make sure you follow the law. I don't pay much attention to -- you have to. Okay?

MR. KEAVENEY: Yes. And, again, to request a collateral source hearing regarding any insurance or collateral sources that might cover the damages.

THE COURT: Are we going to need this collateral source hearing here?

MR. KEAVENEY: Not today. I think that we should set it for the future.

THE COURT: All right. I haven't thought much about it because we are dealing with future medicals, but the collateral source rule applies to that as well?

MR. KEAVENEY: Yes.

THE COURT: I really have not had that, believe it or not, in 31 years, but this may be the first one. I'm aware that it applies to the futures, but we can do that in the

future. Anything else at this particular point?

MR. KEAVENEY: No, Your Honor. As long as it is on the record that we are requesting it.

THE COURT: So you will make your application and whatever the time constraints are, and we will deal with all of that in a future time, I guess. Right.

MR. KEAVENEY: Thank you.

THE COURT: All right. Nothing else from the plaintiff.

Let me talk with the jurors.

MS. WINTERS: Thank you, Your Honor.

THE COURT: Thank you very much.

(Matter adjourned.)

oooOooo

# I N D E X


| | PAGE |
|---|---|
| Summation-Mr. Keaveney | 2212 |
| Rebuttal - Mr Genis | 2234 |
| Surrebuttal Summation - Mr. Keaveney | 2247 |