IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
LUISA JANSSEN HARGER DA SILVA,

17-CV-4550 (FB) (VMS)

Plaintiff,

vs.

NEW YORK CITY TRANSIT AUTHORITY,
METROPOLITAN TRANSPORTATION
AUTHORITY, and RAQIA SHABAZZ,

Defendants.
---------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS PURSUANT TO FED. R. CIV. P. 50(B) AND 59

SONIN & GENIS
ROTH & ROTH, LLP
*Attorneys for Plaintiff*

On the brief:
Robert J. Genis, Esq.
David A. Roth, Esq.
Alexander J. Wulwick, Esq.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT 1

THE STANDARDS OF REVIEW ON RULE 50(b) AND 59(a) MOTIONS 2

POINT I

Defendants Are Not Entitled to Either Governmental or Qualified Immunity. 3

A. Defendant Is Not Entitled to Governmental Immunity. 3

B. Defendant Is Not Entitled to Qualified Immunity as a Matter of Law. 5

POINT II

The Jury Was Not Charged With A Heightened Standard Of Care For Defendant. 19

POINT III

That The Defendant Did Not Violate Any Industry Standards Of Care Does Not Entitle It To Judgment As A Matter Of Law. Nor Is It Dispositive That The Risk Of Falling Off The Subway Platform Was Open And Obvious. 23

A. Defendant's "Industry Standard" Argument Is Without Merit. 23

B. Defendant's "Open and Obvious" Argument Is Without Merit. 28

POINT IV

The Trial Evidence Supports The Jury's Verdict Against The Defendant Train Operator. 29

## TABLE OF CONTENTS (cont.)

Page

POINT V

Defendant Is Not Entitled To Vacatur Of Plaintiff's Lost Earnings Verdict. 35

POINT VI

The Jury's Award Of Future Pain And Suffering Should Not Be Disturbed On Account Of The Issue Of Pre-Impact Terror. 37

POINT VII

Defendant's Argument Concerning "Subsequent Remedial Measures" Is Without Merit. 38

POINT VIII

Defendant's Argument That The Court Committed Prejudicial Trial Errors Is Meritless. 41

A. As to Glenn Lunden's Causation Testimony 42

B. The Court Did Not Err on the Issue of Defendant's Internal Policies. 43

C. The Court Did Not Erroneously Limit Cross-Examination of Plaintiff's Experts. 44

D. Plaintiff's Counsel's Summation Was Not Prejudicial. 45

E. Defendant Is Not Entitled to a New Trial. 48

**TABLE OF CONTENTS (cont.)**


Page

POINT IX

The Jury's Verdicts For Past And Future Pain And Suffering And Loss Of Enjoyment Of Life Are Warranted By The Evidence And Should Not Be Disturbed. 49

A. The Relevant Facts 49

1. Plaintiff's immediate injuries 49

2. Plaintiff's return to school in a wheelchair and initial prosthetic attempts 52

3. Plaintiff's problems with her prosthetic devices 54

4. The devastating effects of plaintiff's injuries on her daily life and previous recreational activities 56

5. The negative effects of plaintiff's injuries on her work life 59

6. Plaintiff's husband's and mother's testimony 59

7. Plaintiff's expert in physical medicine and pain management 60

8. Plaintiff's expert in prosthetic devices 62

9. Defendant's Dr. Reid's confirmation of plaintiff's experts' testimony 63

10. The emotional toll of plaintiff's injuries 65

B. The Standard of Review of a Jury's Damages Verdict 67

**TABLE OF CONTENTS (cont.)**

Page

C. The Jury's Verdicts for Past and Future Pain and Suffering and Loss of Enjoyment of Life Are Fair and Reasonable and Should Not Be Disturbed. 68

D. Comparison to Other Awards Justifies the Jury's Awards Here. 70

CONCLUSION 76

# TABLE OF CASES


| | Page |
|---|---|
| *Aguilar v. New York City Tr. Auth.*, 81 AD3d 509 (1st Dep't 2011) | 72 |
| *Alexander v. Eldred*, 63 NY2d 460 (1984) | 15 |
| *Baity v. General Elec. Co.*, 86 AD3d 948 (4th Dep't 2011) | 23 |
| *Becker v. Koch,* 100 N.Y. 394 (1887) | 6 |
| *Bolduc v. Sheth*, 208 AD2d 789 (2d Dep't 1994) | 67 |
| *Brown v. State of New York*, 79 AD3d 1579 (4th Dep't 2010) | 15 |
| *Burke v. Weatherbee*, 98 N.Y. 562 (1885) | 28 |
| *Caprara v. Chrysler Corp.*, 52 NY2d 114 (1981) | 68 |
| *Carroll v. Trump*, 151 F.4th 50 (2d Cir. 2025) | 67 |
| *Chase v. New York City Tr. Auth.*, 288 AD2d 422 (2d Dep't 2001), *lv. denied*, 98 NY2d 611 (2002) | 17 |
| *Coleman v. New York City Tr. Auth.*, 37 NY2d 137 (1975) | 31 |
| *Cruz v. New York City Tr. Auth.*, 136 AD2d 196 (2d Dep't 1988) | 18 |
| *Cummins v. County of Onondaga*, 198 AD2d 875 (4th Dep't 1993), *aff'd*, 84 NY2d 322 (1994) | 14 |
| *Da Silva v. New York City Tr. Auth.*, 2025 WL 722967 | 5 |
| *D.R. v. Santos Bakery, Inc.*, 716 F.Supp.3d 228 (S.D.N.Y. 2024) | 74 |

**<u>TABLE OF CASES</u> (cont.)**

Page

*Danbois v. New York Cent. RR Co.*, 12 NY2d 234 (1963) 44

*Dibble v. New York City Tr. Auth.*, 76 AD3d 272 (1st Dep't 2010) 32,33,34

*Doxiades v. Triboro Bridge & Tunnel Auth.*, 232 AD3d 461 (1st Dep't 2024) 13,14,17

*Drake v. Delta Airlines, Inc.*, 2005 WL 1743816 (E.D.N.Y. 2005), *aff'd*, 216 F. App'x 95 (2d Cir. 2007) 2

*Ernest v. Red Creek Cent. Sch. Dist.*, 93 NY2d 664 (1999) 14

*Friedman v. State of New York*, 67 NY2d 271 (1986) 15

*Giaccotto v. New York City Tr. Auth.*, 150 Misc.2d 164 (Sup. Ct., NY Co. 1990) 18

*Graham v. City of New York*, 128 F.Supp.3d 681 (E.D.N.Y. 2015) 46

*Guerra v. 100 Stevens Ave.*, 227 AD3d 467 (1st Dep't 2024) 23,28

*Harford v. City of New York*, 194 AD2d 519 (2d Dep't 1993) 15

*Hotaling v. CSX Transport*, 5 AD3d 964 (3d Dep't 2004) 67

*Huang v. New York City Tr. Auth.*, 49 AD3d 308 (1st Dep't), *lv. denied*, 11 NY3d 702 (2008) 44

*In re Nassau County Strip Search Cases*, 958 F.Supp.2d 339 (E.D.N.Y. 2013) 4

*In re PCH Assocs.*, 949 F.2d 585 (2d Cir. 1991) 4

*Jackson v. New York City Tr. Auth.*, 30 AD3d 289 (1st Dep't 2006) 14

**TABLE OF CASES (cont.)**

Page

*Janover v. Ryder Systems, Inc.*, 2006 WL 2335546 (E.D.N.Y. 2006) 23,24,28

*Kellman v. 45 Tiemann Assocs., Inc.*, 87 NY2d 871 (1995) 23,26

*Laruccia v. Lewis J. Newton & Sons*, 242 AD3d 854 (2d Dep't 2025) 28

*Leon v. New York City Tr. Auth.*, 96 AD3d 554 (1st Dep't 2012) 13,14,17

*Lippel v. City of New York*, 281 AD2d 327 (1st Dep't 2001) 42

*Loftus v. Union Ferry Co. of Bklyn*, 84 N.Y. 455 (1881) 26,27

*Madden v. Town of Greene*, 64 AD3d 1117 (3d Dep't 2009) 14

*Malmberg v. United States*, 2020 WL 611503 (N.D.N.Y. 2020) 73

*Martelly v. New York City Health & Hosps. Corp.*, 276 AD2d 373 (1st Dep't 2000) 47

*Martinez v. New York City Tr. Auth.*, 203 AD3d 87 (1st Dep't 2022) 4,18

*Matter of 91st St. Crane Collapse Litigation*, 154 AD3d 139 (1st Dep't 2017) 38

*Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270 (2d Cir. 1989) 47

*Maxfield v. Tofany*, 34 AD2d 869 (3d Dep't 1970) 45

*McCord v. City of New York*, 298 AD2d 438 (2d Dep't 2002) 17

*Mirjah v. New York City Tr. Auth.*, 48 AD3d 764 (1st Dep't 2008) 31,32,34

**<u>TABLE OF CASES</u> (cont.)**

Page

*Morsette v. "The Final Call,"* 309 AD2d 249 (1st Dep't 2003), *lv. dismissed,* 5 NY3d 756 (2005) 68

*O'Brien v. City of New York*, 231 AD2d 698 (2d Dep't 1996), *lv. dismissed*, 89 NY2d 1026 (1997) 15

*Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534 (2d Cir. 1992) 47

*Parslow v. Leake*, 117 AD3d 55 (4th Dep't 2014) 23

*Pedraza v. New York City Tr. Auth.*, 203 AD3d 95 (1st Dep't 2022) 4,17,33

*People v. Lugo*, 218 AD2d 711 (2d Dep't 1995) 47

*Perlov v. Port Auth. of N.Y. & N.J.*, 189 AD3d 1624 (2d Dep't 2020) 18

*Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1 (2d Cir. 1996) 4

*Powell v. New York City Tr. Auth.*, 2025 WL 1605353 (Sup. Ct., Kings Co. 2025) 71,72

*Po Yee So v. Wing Tat Realty*, 259 AD2d 373 (1st Dep't 1999) 67

*Ramirez v. State of New York*, 143 AD3d 880 (2d Dep't 2016) 14

*Rodriguez v. City of New York*, 191 AD2d 420 (2d Dep't 1993) 67

*Rondon v. 328 W. 44 St. LLC*, 243 AD3d 493 (1st Dep't 2025) 23,26

*Saladino v. Stewart & Stevenson Servs., Inc.*, 2011 WL 284476 (E.D.N.Y. 2011), *aff'd sub nom, Saladino v. American Airlines*, 500 F. App'x 69 (2d Cir. 2012) 73

*Savillo v. Greenpoint Landing, LLC*, 2011 WL 2941341 (Sup. Ct., N.Y. Co., 2011) 73

**TABLE OF CASES (cont.)**


Page

*Seargent v. Berben*, 235 AD2d 1024 (3d Dep't 1997) 75

*Soto v. New York City Tr. Auth.*, 6 NY3d 487 (2006) 31

*Suarez v. Big Apple Car, Inc.*, 2019 WL 402853 at *2 (E.D.N.Y. 2019), *aff'd*, 806 F. App'x 19 (2d Cir. 2020) 3

*Tenuto v. Lederle Laboratories*, 26 Misc3d 1225(A), 2010 WL 625223 (Sup. Ct., Rich. Co. 2010) 73

*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014) 67,74

*Turturro v. City of New York*, 28 NY3d 469 (2016) 5,14,17,18,43

*United States v. Bacote*, 201 F.Supp.3d 230 (E.D.N.Y. 2016) 47

*Utsey v. City of New York*, 30 Misc3d 1204(A), 2010 WL 5373920 (Sup. Ct., Bx. Co. 2010) 72

*Weiden v. Schwartz*, 193 AD2d 570 (1st Dep't 1993) 75

*Weiss v. Fote*, 7 NY2d 579 (1960) 14,17

*Yvonne Y v. City of New York*, 199 AD3d 551 (1st Dep't 2021) 71

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
LUISA JANSSEN HARGER DA SILVA,

17-CV-4550 (FB) (VMS)

Plaintiff,

vs.

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, and RAQIA SHABAZZ,

Defendants.
---------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTION**

## PRELIMINARY STATEMENT

Plaintiff, Luisa Janssen Harger Da Silva (hereinafter "plaintiff" or Ms. Harger) submits this memorandum of law in opposition to the motion by defendants, New York City Transit Authority, Metropolitan Transportation Authority, and Raqia Shabazz (hereinafter collectively referred to as defendant or Transit Authority, unless otherwise indicated), for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b) or, in the alternative, pursuant to Rule 59(a)(1)(A). Both grounds for relief are meritless.

The Court will immediately observe that defendant's motion consists of a scattershot approach, containing, by our count, as many as 16

separate arguments and sub-arguments, which mainly consist of incorrect and unwarranted criticisms of the Court's rulings. As shall be demonstrated herein, none of them warrants a new trial, let alone judgment as a matter of law.

We will not burden the Court with even a brief review here of the arguments contained below but will proceed forthwith and address defendant's numerous arguments seriatim.

**THE STANDARDS OF REVIEW ON RULE 50(b) AND 59(a) MOTIONS**

As this Court stated in *Drake v. Delta Airlines, Inc.*, 2005 WL 1743816 (E.D.N.Y. 2005), *aff'd*, 216 F. App'x 95 (2d Cir. 2007), in deciding a Rule 50(b) motion, "[a] district court may set aside a verdict only where (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him." *Id.*, at *1 (internal quotation marks and citations omitted; alterations in original). Defendant has satisfied neither of these conditions.

The Court in *Drake* went on to say that, "[w]hen considering a post-verdict motion for judgment as a matter of law, the trial court should view all the evidence in the record as a whole and draw all reasonable in-

ferences in favor of the nonmoving party, [but] it may not make credibility determinations or weigh the evidence." *Id.* (internal quotation marks and citations omitted; alterations in original).

Viewing the trial testimony and evidence, defendant's Rule 50(b) motion must fail.

Defendant's Rule 59(a)(1)(A) motion should meet a similar fate. The trial record makes clear that the jury did not reach a seriously erroneous result, and the verdict certainly was not a miscarriage of justice -- the standards of review for the Court. *See Suarez v. Big Apple Car, Inc.*, 2019 WL 402853 at *2 (E.D.N.Y. 2019), *aff'd*, 806 F. App'x 19 (2d Cir. 2020).

## POINT I

## Defendants Are Not Entitled To Either Governmental Or Qualified Immunity.

### A. Defendant Is Not Entitled To Governmental Immunity.

Defendant contends that "Plaintiff's negligent design claim should never have gone to trial" (Defs. Memo, p. 10), which is to say that plaintiff's claim should have been dismissed as a matter of law on the ground that they are entitled to governmental immunity. The short, and sufficient, answer to defendant's argument is that this Court has already rejected that contention on the merits, and its ruling is law of the case.

In its previous order denying, in part, defendant's motion for summary judgment, 2025 WL 722967 (E.D.N.Y. Mar. 6, 2025), the Court wrote that "[f]or the past century, New York state courts have consistently held that operating the subway system is a proprietary function", not a governmental one, *id.*, at *3, to which holdings the Court "adheres." *Id.* "Thus, the TA and the MTA are not entitled to governmental function immunity." *Id.* In fact, this Court found such a claim to be "frivolous." 2025 WL 1527309 at 1. *See Pedraza v. New York City Tr. Auth.*, 203 AD3d 95, 104-105 (1st Dep't 2022) (Transit Authority "is not entitled under any circumstances to the shield of governmental function immunity" regarding "claims arising from ownership and care relating to transportation of passengers," which is a proprietary function); *accord*, *Martinez v. New York City Transit Authority*, 203 AD3d 87 (1st Dep't 2022).

"'Under the law of the case doctrine, a decision on an issue made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re Nassau County Strip Search Cases*, 958 F.Supp.2d 339, 343 (E.D.N.Y. 2013), quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991). Employing the doctrine is discretionary, but ignoring it is permitted only when "'cogent or compelling reasons'" exist, *Nassau County Strip Cases*, 958 F.Supp.2d at 343, quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir.

1996), such as a change in the controlling law, new evidence, or the need to correct clear error or to prevent manifest injustice. 958 F.Supp.2d at 343. No such reasons exist in the present case, and defendant has offered none. Accordingly, defendant is not entitled to dismissal of the complaint based on governmental function immunity.

On a related matter, we would direct the Court's attention to two unanimous decisions from the United States Supreme Court that were handed down on March 4, 2026, *Galette v. New Jersey Transit Corp.*, No. 24-1021 and *New Jersey Transit Corp. v. Colt*, 24-1113, holding that the New Jersey Transit Corporation is not an arm of the State of New Jersey and does not enjoy sovereign immunity.

**B. Defendant Is Not Entitled To Qualified Immunity As A Matter Of Law.**

The Transit Authority maintains that "[n]o reasonable juror could conclude otherwise" than that it is entitled to qualified immunity. Defendant is mistaken. There is no dispute that the issue of whether a municipality, or municipal agency such as the Transit Authority, is entitled to qualified immunity is generally a triable question of fact, as when a defendant's motion for summary judgment on the issue is denied. *See Da Silva v. New York City Tr. Auth.*, 2025 WL 722967 at *3, *4, citing *Turturro v. City of New York*, 28 NY3d 469, 483 (2016). In *Turturro*, the Court found that the conflicting evidence at trial "presented questions of fact

and competing inferences for the jury to resolve", *id.*, at 487, which it resolved in the plaintiff's favor. *Id.*

In the present case, there was a mountain of evidence from defendant's own present and former employees,[1] from which the jury could reasonably have found for plaintiff on the issue of qualified immunity. The jury answered "No" to whether, as of the date of the accident, the Transit Authority studied the issue of persons falling on the tracks and being hit by trains (Tr. 2316).

To begin with, Michael Sullivan, a 30-year veteran of the Transit Authority (Tr. 92) and former senior director of its Operations for Systems Safety (Tr. 93-94), testified that, prior to the day of the accident,

- he was "not aware of a safety study that says, how do we solve the problem how to prevent 12-9s[2] from occurring" (Tr. 130, 133);
- he was "not aware of any safety studies for the station with respect to platform screen doors" (Tr. 130);

---

[1] *See*, *Becker v. Koch,* 100 N.Y. 394, 401 (1887) ("What favorable facts the party calling him obtained from such a witness may be justly regarded as wrung from a reluctant and unwilling man, while those which are unfavorable may be treated by the jury with just that degree of belie which they may think is deserved, considering their nature and the other circumstances of the case."

[2] The Court will recall that the expression "12-9s" was a shorthand reference to a train making contact with a person, or a collision with an individual (CWI) (Tr. 94).

- he was "not aware of any safety studies for this particular station with respect to track intrusion devices" (Tr. 130);
- he was "not aware of any safety study that addresses how platform screen doors can be properly installed in different types of stations that the TA has" (Tr. 130-131, 162);
- he was not "aware of a safety study that addresses how stations can be altered or modified to install platform screen doors" (Tr. 131-132); and
- he was "not aware of any safety studies about the efficacy of making markings on the platform of where people should stand to prevent 12-9s from occurring" (Tr. 132, 154-155, 169-170).

In short, Mr. Sullivan, in answer to the Court's question, was not "aware of any safety studies at all" (Tr. 132).

Eric Jones, defendant's "corporate designee witness" at trial (Tr. 241), a former member of the defendant's Office of Systems Safety, and a former construction manager for the Transit Authority's capital projects program (Tr. 241, 243), testified that, prior to 2016, he did not know if defendant "ever performed any kind of study to see how to prevent or reduce people from getting killed or injured at Atlantic Avenue-Barclay station" (Tr. 279, 280, 284).

According to Mr. Jones's deposition testimony, portions of which were read into the record, he again answered, "Not to my knowledge," with regard to fixed rails (Tr. 278) and to whether any studies at all were performed (Tr. 280-281).

When asked if the Transit Authority, prior to August 2, 2016, the date of the accident, did "a hazard analysis comparing the number of deaths and catastrophic injuries from contact with trains if there are platform screen doors as opposed to the system as is," Mr. Jones answered, "Not to my knowledge" (Tr. 278).

Mr. Jones testified that no decision was ever made in response to the offers made in 2011 by a dozen original equipment manufacturers to install platform screen doors at little or no cost. This was in response to the request for information (RFI) the Transit Authority put out to the platform edge door industry to prevent 12-9s. (Tr. 269, 273). Defendant reviewed and evaluated these submissions but went no further. "As far as I know," Mr. Jones said, "that never happened." (Tr. 269).

The Court will recall that the RFI entailed defendant's soliciting, in 2011, information from firms experienced in installing platform screen doors to enhance passenger safety. (Tr. 190-193, 202). Twelve companies submitted proposals, all of which stated they could install the platform screen doors at little or no cost, which defendant narrowed down to five

(Tr. 206-209). Those finalists submitted proposals that would not have cost the Transit Authority any outlaying of funds at all. (Tr. 202-205). As testified to by Ulysse Wurtz, a representative of the number one finalist, (Tr. 187-189, 193), "in terms of operation and maintenance and most importantly with a financial solution where NYC Transit would not be required to spend one single dollar on the construction and operation of the platform edge doors" (Tr. 196). The fact that defendant could have had these effective safety devices installed at little or no cost was undisputed and unrefuted; defendant failed to offer any evidence in this regard.

One of the finalists offered to give the Transit Authority a percentage of the profits from advertising revenue after a certain number of years. (Tr. 204-205, 266-267). Mr. Wurtz, said that neither his nor any other candidate received a go-ahead on the project. (Tr. 209-210).

Cheryl Kennedy, vice president of defendant's Office of System Safety as of 2018, (Tr. 301), testified at her deposition, portions of which were read into the record, that since defendant was aware that platform screen doors were effective at preventing or reducing 12-9s and could be retrofitted to the stations, there was no need for a study. (Tr. 350). She further testified that the pilot programs for installing platform screen doors were canceled for reasons she did not know. (Tr. 351).

Also at her deposition, Ms. Kennedy, who reported directly to the Transit Authority's president, (Tr. 385-386), was asked the following question (Tr. 356): "Did you do an assessment for the number of injuries that would occur whether there was a barrier of any kind whether it was a platform screen door regardless of height, a fixed rail, a gate, anything at all compared to not having such a device." She answered, "No" (Tr. 356). Ms. Kennedy further testified at her deposition that no analysis was ever done "to see which devices, if any, should be installed at which stations. … They are still evaluating them." (Tr. 404).

Similar testimony was given at trial by Timothy Doddo, a safety specialist and 25-year employee of the Transit Authority. (Tr. 358-359). Mr. Doddo answered, "No, not that I'm aware of," to whether "the Transit Authority ever ha[d] a written plan of how to mitigate or lessen the number of these injuries due to the train strikes." (Tr. 374).

Glenn Lunden, a long-time Transit Authority employee working in the "operations planning and office management department," (Tr. 438) and a member of the Platform Screen Door Task Force (Tr. 545), testified regarding the documents the Transit Authority provided to him on how to prevent 12-9s. (Tr. 435):

- They did not "study any of the data of people getting hit by trains over the years." (Tr. 438).

- He did not recall seeing a written study analyzing "the effectiveness side-by-side of the different safety measures and devices that were available" to "reduc[e] the numbers of hazardous train strikes." (Tr. 459-460).
- He did not "discuss other alternative safety devices or measures to prevent the hazard of train strikes." (Tr. 437).
- He did not "discuss comparative before and after numbers of... train strikes deaths and injuries as opposed to if there were no platform screen doors." (Tr. 437-438).
- He did not "see a single plan, a written plan for safety specifically with [*sic*] prevention of people getting hit by trains." (Tr. 438, 450, 453).

With respect to platform screen doors in particular, Mr. Lunden attested, "I did not see such an evaluation" (Tr. 523).

The last of defendant's employees to testify on the subject of studies to prevent 12-9s was Ahmad Abdallah, acting vice president of operations, who retired in 2024. (Tr. 611-612). Mr. Abdallah was on the Platform Screen Door Task Force that issued the RFI and its evaluation and that traveled to South Korea and Europe to consider the advisability of installing platform screen doors in the New York City subway system. (Tr. 612).

Mr. Abdallah, who agreed that the platform screen doors were highly effective at preventing or reducing the number of deaths and injuries caused by the hazard of train strikes. (Tr. 642), also testified that he never saw “anything in writing, a memo, letter, report or anything from the Transit saying we are not going to pursue our own RFI,” (Tr. 647). Nor did he “recall a meeting with anybody where they said, Yeah, we’re not doing this.” (Tr. 647). He never saw, or was aware of, “a written plan to prevent the hazard of train stations [read “strikes”]. To prevent people from falling off of platforms and getting hit by trains,” (Tr. 1931, 1945).

With regard to installing platform screen doors as a pilot program, Mr. Abdallah testified that it never went beyond the design or conception stage, (Tr. 1890, 1912), and that “they kept changing locations” (Tr. 1890). No pilot project was actually commenced, let alone completed, before the date of the accident (Tr. 1890-1891, 1892). Glenn Lunden testified to the same effect (Tr. 455, 456, 510-511) and that the pilot proposals were canceled (Tr. 457). On the issue of installing platform screen doors, Mr. Abdallah said, “I was never given a decision” (Tr. 1941).

Dr. Carl Berkowitz, P.E., a transportation safety engineer with extensive experience in the field, (Tr. 954-960), testified for plaintiff concerning the Transit Authority’s task force’s visits to South Korea and Eu-

rope. In answer to the Court's question, he said that "they went and took a trip to Korea and all around the world to see how these systems worked, and they found out they worked really good. And then they put it in the circular file." (Tr. 1001).

Dr. Berkowitz said that he has never seen any "adequate study…to prevent or reduce the hazard of train strikes in the New York City subway system before August 2nd, 2016." (Tr. 1002-1003). "[T]hey were thinking about these things, but they never went beyond thinking." (Tr. 1028). Dr. Berkowitz also said that there was a plan to do a pilot program at an unused station, but it was never implemented. (Tr. 1070).

As stated in *Leon v. New York City Transit Authority*, 96 AD3d 554, 555 (1st Dep't 2012), "[a] mere informal review or internal policy will not suffice" to establish qualified immunity. *Accord*, *Doxiades v. Triboro Bridge & Tunnel Auth.*, 232 AD3d 461 (1st Dep't 2024).

On its direct case, the Transit Authority called Kenneth Korach -- an attorney, not an engineer -- as an expert witness. (Tr. 1990). He testified on cross-examination that a corrective action plan is one that is designed "to minimize, control, correct, or eliminate hazards and the schedule for implementing those sections [*sic*]" (Tr. 2038-2041) and was required by the Federal Transit Administration. (Tr. 151). He never testified, however, that the defendants ever put such a plan into effect. In

fact, Mr. Korach testified on further cross-examination that, prior to August 2, 2016, he has "[n]ever seen a written corrected [*sic*] action plan for the Transit Authority to address the severity and frequency of people being killed or injured by the hazard of train strikes" (Tr. 2071). Nor did Mr. Korach have personal knowledge of such a plan (Tr. 2075).

The wealth of testimony at trial shows that defendant did not carry its affirmative burden of demonstrating that it "entertained and passed on the *very* same question of risk" the jury was asked to resolve, *Weiss v. Fote*, 7 NY2d 579, 588 (1960) (italics in original); *see Turturro v. City of New York*, 28 NY3d at 480; *Ernest v. Red Creek Cent. Sch. Dist.*, 93 NY2d 664, 673 (1999); *Doxiades v. Triboro Bridge & Tunnel Auth.*, 232 AD3d 461; *Ramirez v. State of New York*, 143 AD3d 880, 881-882 (2d Dep't 2016); *Leon v. New York City Transit Authority*, 96 AD3d at 555; *Madden v. Town of Greene*, 64 AD3d 1117, 1120 (3d Dep't 2009); *Jackson v. New York City Tr. Auth.*, 30 AD3d 289, 290 (1st Dep't 2006); *Cummins v. County of Onondaga*, 198 AD2d 875, 877 (4th Dep't 1993), *aff'd*, 84 NY2d 322 (1994), namely, "to minimize, control, correct, or eliminate" the hazard of train strikes. Indeed, not only did the evidence show that defendant conducted no studies, it further demonstrated that no decision on the issue was ever made. The immunity, after all, applies only when the governmental body arrives at a "planning decision" one way or the other, *Tur-*

*turro* at 479-480; *see Friedman v. State of New York*, 67 NY2d 271, 285, 286 (1986); *Alexander v. Eldred*, 63 NY2d 460, 465-466 (1984).

Here, as in *Brown v. State of New York*, 79 AD3d 1579, 1581-1582 (4th Dep't 2010), "defendant abandoned any study that had been undertaken with respect to" 12-9s, and "no study or plan was underway at the time of the accident." *Id.*

Defendants' reliance on *Harford v. City of New York*, 194 AD2d 519 (2d Dep't 1993) is misplaced, because the non-determination there that a traffic-control device was necessary was itself a decision on the issue. Here, the testimony was overwhelmingly to the effect that no study at all was conducted, and no decision made, on the question put to the jury, and this was particularly true of platform screen doors. As the Transit Authority's Michael Sullivan testified, in response to the Court's question, he was not "aware of any safety studies at all" regarding that device. (Tr. 132).

Similarly unpersuasive is *O'Brien v. City of New York*, 231 AD2d 698 (2d Dep't 1996), *lv. dismissed*, 89 NY2d 1026 (1997), cited by defendant. The court there held that the City was entitled to qualified immunity where it "had not completed the study at the time of the accident." *Id.*, at 699. That conclusion, however, was in the context of the law requiring that, upon determining that a safety device is necessary, the City "must

act with reasonable speed to correct the condition", *id.*, which was not violated. Also, the City had decided not to use an interim measure because it would increase the number of accidents.

Here, the Transit Authority had been on notice, at least since 1984 (Tr. 1898), of the frequency of 12-9 events, (Tr. 111, 462-463, 470-471, 480) and that corrective measures had to be taken. (Tr. 315). Despite this knowledge, defendant never did anything about it, except for instituting its public awareness program, the efficacy of which was either unknown or determined to be negative. (Tr. 169, 170, 173, 371, 1032, 1895, 1897). In fact, the frequency of 12-9s went up after the campaign was instituted. (Tr. 577).

In view of the wealth of testimony discussed above, defendant's assertion that "the trial record confirms that it is entitled to qualified immunity for its decisions on how to protect individuals on platforms from train-related incidents" (Defs. Memo, p. 11) is patently without merit. The jury's verdict on the issue is supported by the overwhelming weight of the evidence and should not be disturbed.

It cannot go without noting that defendant's post-trial memorandum contains little, if any, actual testimony from its current and former employees to support its claim that "[t]he trial record is replete with evidence that Transit's decision ***not*** to install PDSs or TIDs as of the date of

Plaintiff's accident was the product of reasonable study." (Defs. Memo, p. 13) (emphasis in original). The above-quoted testimony belies that claim and supports the conclusion that the jury acted reasonably in deciding otherwise. "Looking into" an issue, which defendant's employees testified was as far as it had gotten, (Tr. 256-257, 373-374, 403, 405, 409-410, 444), does not constitute a deliberative review, study, or plan. *Doxiades v. Triboro Bridge & Tunnel Auth.*, 232 AD3d 461; *Leon v. New York City Transit Authority*, 96 AD3d at 555. Mr. Lunden admitted that there was a "world of difference between looking at something and doing a proper study." (Tr. 444-445).

Finally, plaintiff submits that the Transit Authority's argument that "***Turturro* Does Not Apply as to Qualified Immunity**" (Defs. Memo, p. 15) because "[n]o case has ever expanded *Turturro's* application to **rail operations**" (*id.*) (emphasis in original) is without merit. *See Pedraza v. New York City Tr. Auth.*, 203 AD3d 95; *Leon v. New York City Transit Authority*, 96 AD3d 554, 555 (1st Dep't 2012). The decision in *Turturro* involved nothing more than the application of the settled law stated in *Weiss v. Fote*, 7 NY2d 579 to the facts of the case. *Turturro* did not announce new law. Moreover, qualified immunity was applied in the Transit Authority's favor, for example, in *McCord v. City of New York*, 298 AD2d 438 (2d Dep't 2002), and *Chase v. New York City Transit Authority*, 288

AD2d 422 (2d Dep't 2001), *lv. denied*, 98 NY2d 611 (2002), both of which involved whether the Authority's plan was based on an adequate study. More recently, in *Martinez v. New York City Transit Authority*, 203 AD3d 87, for example, where *Turturro* was again relied on, the decision was in the plaintiff's favor on the issue of whether the speed of a subway train into a particular station was properly studied.

In *Perlov v. Port Authority of New York and New Jersey*, 189 AD3d 1624 (2d Dep't 2020), the court relied on *Turturro* in concluding that "the plaintiff's allegations regarding the construction, operation, and maintenance of the *bridge* are analogous to roadway planning, design, and maintenance… ." *Id.*, at 1628. (Italics added). If a bridge is analogous to a roadway for planning, design, and maintenance purposes, so is a railroad. A protective railing serves the same safety function regardless of where it is placed; a bridge, a road, or a subway platform. Indeed, in *Cruz v. New York City Transit Authority*, 136 AD2d 196 (2d Dep't 1988), the court found that the defendant may be held liable for a negligently designed rail. *See*, *Giaccotto v. New York City Tr. Auth.*, 150 Misc.2d 164 (Sup. NY 1990).

Based on the forgoing, defendant's argument that it is entitled to qualified immunity as a matter of law should be rejected.

## **<u>POINT II</u>**

## **<u>The Jury Was Not Charged With A Heightened Standard Of Care For Defendant.</u>**

Defendants argue that the testimony of plaintiff's expert, Dr. Berkowitz, should be excluded, because he "sought to hold Transit to a heightened standard of care, far above the standard of ordinary care which applies to Transit." (Defs. Memo, p. 17). This argument is absurd and should be rejected out of hand. The only standard of care that matters in the instant case is the one the Court properly charged to the jury (Tr. 2270-2271):

> The Transit Authority owes a duty to its customers to keep its premises in a *reasonably* safe condition. More specifically, it owes the customers a duty to provide a *reasonably* safe place to board its trains. As with *reasonable* care, *reasonable* safety means the measures a *reasonably* prudent subway system operator would have taken in the same circumstances in light of the dangers and risks that were known or *reasonably* foreseeable to it. The Transit Authority is not negligent simply because another entity would have taken additional or better safety measures. On the other hand, a general custom[,] use or practice by those in the same business may be considered some evidence of what constitutes *reasonable* safety measures.
>
> Of course, you must first decide from the evidence whether there is a general customer practice in the operation of sub-

> way systems. If you find that there is, then you may consider the customer practice, along with all the other facts and circumstances of the case in deciding whether the platform at issue was *reasonably* safe. [Italics added].

There is nothing in this charge about a heightened duty of care beyond reasonable care. Moreover, the Court properly charged the jury that the testimony by the expert witnesses, which included Dr. Berkowitz, was to be given "whatever weight, if any, you find it deserves in light of all the other evidence in this case." (Tr. 2262-2263).

The jury was further instructed that they

> should not, however, accept a witness' testimony immediately [*sic*] because he is an expert, nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case, once again, rests solely with you, and that includes evaluating the expert's testimony. They have not necessarily been consistent, but you know it's your responsibility to consider it all and to make your determination as to which experts you believe, what you don't believe, how much you believe. All of that is part of your fact-finding responsibility. [Tr. 2263].

Here, again, there was no charge of a heightened duty of care.

The jurors were told to use "your own reason, judgment, and common sense" in weighing Dr. Berkowitz's opinion that the Transit Authority, in his words, "should do everything humanly and technically and

engineeringly possible to prevent people from being on the track." (Tr. 965). They were to do so along with weighing the testimony by the Transit Authority's own employee-witnesses that:

- the subway system should be "a[s] safe as possible" (Tr. Sullivan, 97, 104);
- the subway system should be "the safest system in the world" (Tr. *id.*, 116);
- "nothing is more important" than safety (Tr. Jones, 245);
- "safety is [job] number one" (Tr. *id.*, 248);
- no deaths or injuries "are acceptable to the Transit Authority in any given year" (Tr. *id.*, 246);
- there is "no acceptable level" of fatalities caused by 12-9s (Tr. Read, 303, 315);
- safety should "be the number one concern" and the "[n]umber one priority" (Tr. Korach, 2054).

Considering this and all the other expert testimony the jury heard on the issue of its liability, it is ridiculous for defendant to contend that the jury was somehow swayed solely and exclusively by Dr. Berkowitz's testimony, which, in turn, supposedly became the sole basis for its verdict against defendant on liability.

The Transit Authority failed to offer any testimony or any written industry guideline stating any standard of care that contradicted the proof submitted by the plaintiff. The Transit Authority's position is that there are no applicable industry or professional standards of care, so they cannot be held to any safety standard, and no safety measures were needed or required to be implemented.

Safety of customers and preventing or mitigating the hazard of train strikes was not a top priority for the Transit Authority. (Tr. 395). This startlingly admission was made by the head of the Office of System Safey.

The Transit Authority's argument is patently without merit and should be dismissed out of hand.

## POINT III

## That The Defendant Did Not Violate Any Industry Standards Of Care Does Not Entitle It To Judgment As A Matter Of Law. Nor Is It Dispositive That The Risk Of Falling Off The Subway Platform Was Open And Obvious.

### A. Defendant's "Industry Standard" Argument Is Without Merit.

We begin by noting that the jury was charged that "a general custom[,] use or practice by those in the same business may be considered *some evidence* of what constitutes reasonable safety measures," (Tr. 2270) (italics added), not that compliance with industry standards is evidence of reasonable care as a matter of law. In fact, the law is well settled that compliance with industry standards and practices "is not dispositive of whether [defendants] breached their duty of care under the common law," *Rondon v. 328 W. 44 St. LLC*, 243 AD3d 493, 494 (1st Dep't 2025), citing *Kellman v. 45 Tiemann Assocs., Inc.*, 87 NY2d 871, 872 (1995).

In *Guerra v. 100 Stevens Ave.*, 227 AD3d 467 (1st Dep't 2024), it was stated that "[a] jury may still find, under the circumstances, that even if the relevant statutes were complied with, defendant violated its common-law duty to maintain its premises in a reasonably safe condition… ." *Id.*, at 468; *see Parslow v. Leake*, 117 AD3d 55, 62-63 (4th Dep't 2014); *Baity v. General Elec. Co.*, 86 AD3d 948, 950-951 (4th Dep't 2011); *Janover v. Ryder Systems, Inc.*, 2006 WL 2335546 at *2 (E.D.N.Y. 2006)

(absence of violation of safety regulations "is hardly dispositive as a matter of law").

Thus, defendant's assertion that, "'[T]o prove negligence…in the design of a structure, the plaintiff must put forth expert testimony' that defendant 'deviated from accepted industry standards,' *Columbus v. Smith & Mahoney P.C.*, 259 A.D.2d 857, 858 (3d Dep't 1999)," (Defs. Memo, p. 25), is an incorrect statement of the law. Indeed, the quoted assertion is not supported by the cases cited in *Columbus v. Smith & Mahoney*. What the court wrote in *Janover v. Ryder Systems* in a similar context applies here. "However black letter-sounding is defendant's proposition, the moving papers fail to cite a single decision in support of it." 2006 WL 2335546 at *2. That is true of defendant's moving papers as well.

Moreover, defendant's own former acting vice president of operations, Ahmad Abdallah, testified that "industry best practices is to *utilize* platform screen doors to prevent or eliminate or reduce the number of deaths and catastrophic injuries that result from the hazard of train strikes." (Tr. 1900) (italics added).

Defendant conceded that since 2003, the "Airtrain" to JFK Airport, with its approximately 10 subway stations, has successfully installed and utilized platform screen doors throughout the system without a single incident or train strike. (Tr. 1057-1058).

If anything, it was defendant who received the benefit of this Court charging that a violation of industry practice is only some evidence of negligence, in view of the Transit Authority having adopted, and violated, what is known as U.S. Military Standard 882. This standard is applied in analyzing the severity of various hazards and their frequency, as well as the corrective measures that should be taken. (Tr. 274). Eric Jones, a former member of defendant's Office of Systems Safety, testified that the frequency and catastrophic nature of train strikes in the subway system "requires immediate corrective action." (Tr. 275). Yet, as the testimony at trial made abundantly clear, defendant took no corrective action whatsoever, immediate or otherwise.

What is not true of defendant's papers is that "Plaintiff's expert (Berkowitz) admitted: Transit's open platform design (without PSDs and TIDs) ***is*** **the standard within the railroad industry in the United States** (Tr. 976-77)." (Defs. Memo. p. 26) (emphases in original). Dr. Berkowitz did not testify to that effect, which would explain why he was not quoted.

What Dr. Berkowitz did say was that no subway system in the United States has yet employed the kind of safety devices that were being discussed at trial. (Tr. 976, 977). He did not testify to the absence of those devices as being the standard for the industry, as though it were

put forth by an industry group as some sort of a requirement or best practice.

Defendant argues that, inasmuch as 1.7 billion riders per year use the subway system without mishap, there can be no "claim that it is unreasonably unsafe." (Defs. Memo, p. 27). If this logic were actually legally binding, every statistical analysis approaching these numbers, regardless of the industry, would render the defendant charged with negligence immune from liability even under the common law. But, we know this is not the case, as *Kellman v. 45 Tiemann Assocs., Inc.*, 87 NY2d at 872, and *Rondon v. 328 W. 44 St. LLC*, 243 AD3d at 494, among others cases, make clear.

Defendant has admitted that no deaths or injuries from train strikes are acceptable, but it is willing to accept such casualties in relation to its 1.7 billion yearly riders so long as the percentage is small. Given the huge number of yearly riders, however, even a small percentage of its customers hit by trains out of 1.7 billion per year, at a rate of about 3-5 times per week (Tr. 480), could number into the thousands and thousands, if not higher. (Tr. 111-112). Those casualties apparently *would* be acceptable.

Defendant cites an 1881 New York Court of Appeals case in support of its position on this score, *Loftus v. Union Ferry Co. of Bklyn*, 84

N.Y. 455, which involved millions of people passing over a bridge to a ferry without sustaining the type of fatal injuries the infant plaintiff suffered in that case. *Loftus* is distinguishable on its facts. There, unlike here, "until the occurrence in question *no accident* had happened from any person falling or getting through the space in the guard." *Id.*, at 459 (italics added). Therefore, "the company had no reason to apprehend an accident like this, and...the arrangements made were such as experience had, up to that time, shown to be safe and suitable, and sufficient to meet the requirements of its duty." *Id.*, at 461.

Here, of course, the Transit Authority was well aware that, "on a yearly basis, we're averaging...before 2016 or up to 2016, there's...about 40 to 50 deaths a year from 12-9s." (Tr. 111). Including all individuals struck by trains who were not killed, "it's, give or take, 150 to 175, 12-9s" per year. (Tr. 111; see Tr. 984). "[O]ver the past 30 years... thousands and thousands of people were hit by trains." (Tr. 111-112). *Defendant did not deny that there were three to five train strikes a week.* (Tr. 480).

Past NYCTA President Thomas Prendergast admitted that:

> When you consider the number of suicides and other accidental deaths just this year alone, we're in the 50 to 60 range annually. *This is absolutely insane in 2010*... [Exhibit A (Tr. Pl. Ex. # 16) (italics added)].

The same factual distinction applies to defendant's footnote citation to *Burke v. Weatherbee*, 98 N.Y. 562 (1885), which involved a mine cable that had *never* broken before the accident, despite several hundred thousand uses.

Defendant's "industry standard" argument is unavailing as a basis for obtaining judgment as a matter of law.

**B. Defendant's "Open and Obvious" Argument Is Without Merit.**

In *Janover v. Ryder Systems,* 2006 WL 2335546 at *2, the District Court wrote: "[P]roof that a dangerous condition is open and obvious does not preclude a finding of liability against [the owner of property] for the failure to maintain the property in a safe condition but is relevant to the issue of the plaintiff's comparative negligence." (Internal quotation marks and citations omitted; alterations in original). *See Laruccia v. Lewis J. Newton & Sons*, 242 AD3d 854, 855 (2d Dep't 2025); *Guerra v. 100 Stevens Ave, LLC*, 227 AD3d at 468.

Here, the jury found plaintiff free from comparative negligence. (As stated by defendant's Michael Sullivan, plaintiff did not do anything wrong in standing five feet from the platform edge [Tr. 174].) The court in *Janover* continued, "Thus, as to defendant's duty to maintain the truck in a reasonably safe condition, summary judgment is not appropriate even if the Court were to conclude that the defective condition here was

open and obvious." *Id.*, at *3. Just as summary judgment was not appropriate there, judgment as a matter of law is not appropriate here.

Defendant's "open and obvious" argument should be rejected.

## POINT IV

## The Trial Evidence Supports The Jury's Verdict Against The Defendant Train Operator.

The jurors were within their province in concluding that defendant Shabazz was negligent -- however slightly -- based on their acceptance of Dr. Berkowitz's testimony that the operator could have stopped the train approximately 27 feet before striking plaintiff, as opposed to having run her over 85 feet past her location on the tracks. (Tr. 1014, 1035, 1041-1042).

The jury's verdict was reasonably based on the following calculations by Dr. Berkowitz:

- Plaintiff's exact location on the track was 246 feet from the entrance to the station (Tr. 1003, 1013, 1053-1054);
- The distance of 143 feet from the entrance to the station when the defendant operator was first able to see into the station and to have seen plaintiff (Tr. 1003-1004, 1013);
- The train operator's reaction time of .67 seconds, (Tr. 1010. 1043-1044), considering that "[w]hen you're coming into a sta-

tion, you're expecting that somebody could possibly be on the track," (Tr. 1043, 1048), and considering further that the operator's hand is automatically already on the brake in anticipation of such an event, (Tr. 1043-1044), otherwise known as situational awareness (Tr. 1048-1049);

- The reaction time estimate was based on U.S. Department of Transportation studies of train operator's reaction times (Tr. 1046);
- The train-speed most favorable to defendant's own requirements of 3.2 miles per hour/second of emergency stopping, based on the operator's estimated speed of 24 miles per hour upon entering the station. (Tr. 1007-1010, 1053-1054).

In presenting its argument, defendant heavily relies on a view of the testimony most favorable to it, rather than to the non-movant plaintiff, as it must. Defendant does this most egregiously when it asserts that both its expert, Dr. Marpet, and plaintiff's expert, Dr. Berkowitz, *relied* on an uncalled witness's deposition testimony (which was not in evidence) that plaintiff was on the tracks between 7 and 10 seconds before the train struck her. (Tr. 1042) (see Defs. Memo, pp. 31-32).

Dr. Berkowitz merely testified that he *reviewed* the testimony. (Tr. 1050-1051). He did not testify that he accepted the deposition testimony as an established fact, which, of course, it was not.

Furthermore, the jury could have decided that well more than 10 seconds had elapsed during which plaintiff was on the tracks, based on plaintiff's husband's testimony that after plaintiff fell, he yelled at her to get up; that he twice looked to his right for the train and saw none; that when he did see the train he waived for it to stop; and that "[i]t was several seconds" (Tr. 1249) before he heard the train's brakes from when he started waiving his hands. (Tr. 1248, 1249, 1307-1308). The above testimony undermines all of defendant's calculations, on which it bases its unavoidable-accident theory.

The trial testimony comports with the law that "[a] train operator may be found negligent if he or she sees a person on the tracks 'from such a distance and under such other circumstances as to permit him [or her], in the exercise of reasonable care, to stop before striking the person, but does not do so." *Mirjah v. New York City Tr. Auth.*, 48 AD3d 764 (1st Dep't 2008), quoting *Coleman v. New York City Tr. Auth.*, 37 NY2d 137, 140 (1975); *see Soto v. New York City Tr. Auth.*, 6 NY3d 487, 493 (2006).

The jury was not required to, and evidently did not, accept a 7-10-second stopping-time in determining whether to assess liability against defendant Shabazz. Therefore, defendant's argument of a maximum of 7-10 seconds of stopping time in arguing that the accident was unavoidable must fall.

Defendant relies on *Mirjah* in arguing that the "tolerances" were too close here for the accident to have been avoided. Defendant's reliance on *Mirjah* is unfounded. There, the plaintiff's expert was found to have engaged in speculation when he merely assumed the train operator was traveling at less than 20 miles per hour upon entering the station, in contrast to the operator's testimony that he may have traveled faster than 20-25 miles per hour. The court in *Mirjah* further concluded that, given the close tolerances described [in speed and reaction time], a contrary inference is clearly warranted," 48 AD3d at 766, such that the defendant was entitled to summary judgment.

Defendant also relies on *Dibble v. New York City Transit Authority*, 76 AD3d 272 (1st Dep't 2010), where, after a jury verdict for the plaintiff, the issue before the appellate court was whether a mathematical time-distance measurement "may be the *sole* basis for establishing what amounts to a standard of care in these types of cases." *Id.*, at 273. (Italics added). The court held in the negative and dismissed the complaint.

*Dibble* is inapposite here, because the time-distance measurement was not the sole basis for the jury's determination of liability in the instant case. In *Dibble*, moreover, the plaintiff's expert, unlike here, (see Tr. 1046), offered no "foundation or evidentiary support for his observation that the average reaction time of a train operator is one second." *Id.*, at 280. Here, plaintiff's expert, Dr. Berkowitz, cited to the U.S. Department of Transportation studies, specifically relating to train operators, as his foundational support. (Tr. 1046). *See Pedraza v. New York City Tr. Auth.*, 203 AD3d at 99 ([P]laintiff's expert's calculations "were based on the TA's own published charts.").

Furthermore, in *Dibble* the train operator's reaction time was complicated by the fact that he said he saw what looked like garbage on the track, which caused him to slow the train but not stop it. "Then, when he was one car length away, he 'saw the debris move,' and he put the train into emergency." 76 AD3d at 274. It was that fact, to which the train operator was the only witness, that was determinative in *Dibble*.

In addition, the appellate court pointed to the plaintiff's expert's cross-examination testimony conceding that the train operator "had not testified that he had seen *a person* at three car lengths away, but only that he saw something, and that he did not discern that it was a person until it moved, at which time he was only one car length away. [The ex-

pert] acknowledged that [the operator] would not have been able to stop the train from that distance without hitting plaintiff." *Id.*, at 275. (Italics in original; alterations added). The plaintiff's expert also overestimated the length of the cars at 75 feet when they were only 60 feet, thus further shortening the distance before the operator could stop the train.

As can be seen, neither *Mirjah v. New York City Transit Authority*, 48 AD3d 764, nor *Dibble v. New York City Transit Authority*, 76 AD3d 272 is controlling here. The Transit Authority's argument, that defendant "Shabazz is entitled to JMOL because it was purely speculative that she could have avoided the accident," (Defs. Memo, p. 34) is without merit and should be rejected. As to the jury's assignment of only 0.01% of liability to defendant Shabazz, it is more reasonable to believe they felt sorry for her than that they thought the evidence was speculative.

## POINT V

## Defendant Is Not Entitled To Vacatur Of Plaintiff's Lost Earnings Verdict.

The jury's award to plaintiff of only $1.7 million for her future lost earnings was far less than the more than $6 million plaintiff's expert in economics, Ms. Kucsma, testified to. (Tr. 821).

Defendant argues that the jury's award is not supported by sufficient evidence because Ms. Kucsma's "opinion was based entirely on anticipated trial testimony from Dr. Stuart Kahn (Plaintiff's medical expert) that, when Plaintiff turned 55, she would be unable to work or would have to work part-time." (Defs. Memo, p. 35). Defendant's argument turns on its contention that, "at trial, Dr. Kahn gave **no such testimony**. (See Tr. 662-810)." *Id.* (Emphasis in original).

Defendants' argument is unavailing, since it misstates the record. Ms. Kucsma's opinion was not based on anticipated testimony from Dr. Kahn; it was, as she repeatedly said, "based on my review of Dr. Kahn's report," (Tr. 821; see Tr. 812-813, 839, 842-843), in addition to her own experience, research, and calculations, (Tr. 814, 854), to all of which defendant voiced no objection.

As to its argument that Ms. Kucsma "admitted that she was simply making **assumptions** that Plaintiff's capacity would be reduced," (Defs. Memo, p. 35) (emphasis in original), defendant again misrepresents the

record. In answer to the Court's question, Ms. Kucsma assumed the *percentage* of reductions in plaintiff's earning capacity, saying, "Just based on my usual experience, part time is usually 20 to 25 hours per week typically." (Tr. 854). Ms. Kucsma did not say she merely assumed plaintiff would not be able to work in her later years as much as she had before the accident, although that is a perfectly reasonable assumption, indeed a probability. In fact, Ms. Kucsma testified that her calculations "are based on Luisa's disabilities having a more severe impact…when she reaches age 55." (Tr. 852).

There is nothing about Ms. Kucsma's testimony to warrant striking the jury's verdict for lost future earnings.

In any event, there was sufficient other evidence from which the jury, using its common sense and everyday experiences, could reasonably have inferred that Ms. Harger would sustain a substantial, if not complete, loss of salary from her employment as an architect. Such an inference could have been based on Dr. Reid's testimony that Ms. Harger may well lose her good right leg and become a triple amputee, with no legs; that she will require future time-consuming and complicated surgeries, with significant risks and other consequences; and that she will need various prosthetic devices and accommodations to work, with the necessary multiple fittings and adjustments in addition to physical and occupa-

tional therapy. All these, and other, probabilities will add up to having a highly detrimental effect on her work-life expectancy.

The Transit Authority chose not to hire its own economist to rebut or refute any of Ms. Kucsma's testimony.

## POINT VI

### The Jury's Award Of Future Pain And Suffering Should Not Be Disturbed On Account Of The Issue Of Pre-Impact Terror.

We begin by pointing out that the Court did not charge the jury on the issue of pre-impact terror. It was raised only in plaintiff's attorney's summation, on the basis of which defendant speculates that the jury "may have based some or all of" its $20 million past pain and suffering award on pre-impact terror. This is an absurd argument.

Plaintiff testified that, while she was lying on the tracks after the train had run her over and seeing both her left arm and left leg severed and lying beside her, "I remember being afraid of dying. I remember telling myself that I don't want to die. …I thought about my career, like, how, oh my God, I haven't achieved anything yet, I don't want to die now." (Tr. 1348-1349).

In view of this testimony, does it really matter that plaintiff may not have experienced *pre*-impact terror when she most definitely experienced the immediate *post*-impact terror of dying right then and there on the subway tracks? In these circumstances, among all the others concerning

pain and suffering and loss of enjoyment of life, for which there was ample, unchallenged evidence (to be discussed later), it is highly doubtful the jury was swayed by counsel's reference to the possibility of pre-impact terror. We would note that in *Matter of 91st St. Crane Collapse Litigation*, 154 AD3d 139 (1st Dep't 2017), awards of $2.5 million and $2 million, respectively, were allowed on appeal for two decedents who experienced "inconceivable preimpact terror" when a crane collapsed. Those amounts compare favorably to the kind of terror plaintiff experienced immediately after the accident.

Defendant's argument on this issue should be rejected.

## POINT VII

### Defendant's Argument Concerning "Subsequent Remedial Measures" Is Without Merit.

Defendant complains that plaintiff elicited testimony from former Transit Authority employee, Ahmad Abdallah, about post-accident remediation in the form of fixed rails. (Tr. 623-624, 629-630). This testimony was, however, preceded by the same witness's statement that fixed rails were hazardous. (Tr. 619). See, Tr. Pl. Exhibit 73 (1999 memo by the Transit Authority to the same effect). Defendant argues that being hazardous and non-feasible are not the same thing, (Defs. Memo, pp. 41-42), but that is cutting the definitions too closely. In the context of subway platform safety, which was the overriding issue at trial, to say that a

fixed-rail safety device is itself not safe is, by definition, to say it is not feasible.

Earlier in the trial, defendant's R. 30(b)(6) witness Eric Jones testified that a working definition of feasibility is "how can we make it work, how can we make it effective." (Tr. 288). It is oxymoronic to state that a safety device that is supposedly hazardous to the customers is effective.

Defendant further argues that it was prejudiced by plaintiff's counsel's eliciting from Transit Authority employee Glenn Lunden that a fixed rail located where plaintiff had been standing would have prevented the accident. We fail to see how this testimony amounts to a violation of Fed. R. Evid. 407, as defendant contends, by "plant[ing] the seed with the jury that Transit should be liable because: (1) it should have installed fixed rails **before** the accident, but **did not**; and (2) it **did** install them after the accident." (Defs. Memo, p. 42) (emphasis in original).

The testimony in question does nothing of the kind. Of course, plaintiff's position is that defendant should have installed fixed rails, or some other device, before the accident, but we fail to how some improper seed was planted with the jury when defendant's own employee testified that "railings were hazardous because they brought hazards," (Tr. 619), which is the same as saying they were not feasible for that reason.

We are flabbergasted by defendant's next argument on this issue that, "[o]ther than Transit's post-accident installation of rails, there was *no other basis* for the jury to conclude that -- before the accident – Transit should have installed railings, PSDs or some other protective device on the platform." (Defs. Memo, p. 43) (italics added). We need only remind the Court of what we wrote earlier in this memorandum (page 27): "[T]he Authority was well aware that, 'on a yearly basis, we're averaging …before 2016 or up to 2016, there's…about 40 to 50 deaths a year from 12-9s'. (Tr. 111). Including all individuals struck by trains who were not killed, 'it's, give or take, 150 to 175, 12-9s' per year. (Tr. 111; see Tr. 984). '[O]ver the past 30 years…thousands and thousands of people were hit by trains' (Tr. 111-112)." These facts were reason enough for the jury to have concluded that defendant should have installed railings, PSDs, or some other protective device on the platform before the date of the accident

In view of the foregoing, defendant is not entitled to a new trial based on the improper admission of evidence of subsequent remedial measures. In making this argument defendant fails to mention that Ahmad Abdallah testified that, prior to August 2016, "there have been fixed rails throughout our subway system and some have been there for almost one hundred years," (Tr. 613). Mr. Abdallah identified photographs

in evidence (Tr. Pl. Ex. 74A-C) depicting fixed rails at Times Square, and testified about fixed rails at South Ferry, and Bowling Green. (Tr. 614-617).

Defendant cannot argue with a straight face that admission of evidence of post-accident corrective measures, in the form of fixed rails, is prejudicial when it actually installed those same corrective measures in other stations long before the date of the accident in question. Notwithstanding defendant's installation of these rails as long ago as a hundred years, it submitted a declaration to this Court, claiming that fixed rails were themselves a hazard to subway riders. (See Tr. 617-623). Defendant cannot have it both ways.

## POINT VIII

## Defendant's Argument That The Court Committed Prejudicial Trial Errors Is Meritless.

Heretofore, defendant's memorandum of law has employed a scattershot approach to attempting to convince the Court that defendant is entitled to judgment as a matter of law or that it was so prejudiced at trial that is it entitled to a new one. Defendant's Point VIII consists of a scattershot within a scattershot, containing, as it does, four assignments of error by this Court and one having to do with plaintiff's attorney's summation warranting a new trial. We will address them seriatim.

**A. <u>As to Glenn Lunden's Causation Testimony</u>**

Defendant contends that the Court erred in permitting Glenn Lunden, as a lay witness, to testify, over objection, regarding proximate cause. Mr. Lunden's "lay witness" credentials consisted of his having been employed by defendant since 1986, (Tr. 438), during which time he has held "fairly high level positions and titles in [his] duties within the Transit Authority" (Tr. 439).

Though characterized by defendant as a lay witness, Mr. Lunden has frequently testified for defendant "*as an expert* with respect to their policies and procedures… ." (Tr. 440) (italics added). He did so at this trial concerning the issues of subway platform safety; whether studies were conducted to prevent 12-9s (they were not); the feasibility of fixed rails and platform screen doors; defendant's RFI (request for information); the public awareness program; the trip to Korea; and the effectiveness of platform screen doors, among other things. It is evident that Mr. Glenn was no lay witness. He was, in fact, the Transit Authority's "in-house expert." *Lippel v. City of New York*, 281 AD2d 327, 328 (1st Dep't 2001).

Therefore, as a follow-up to his testimony regarding the feasibility and efficacy of fixed rails to prevent contact with a train, it was scarcely reversible error for Mr. Lunden to have testified, however tentatively, that

"[i]f there had been a rail right" where plaintiff was standing, then "yes," it would have kept her from being struck by the train. (Tr. 483-484). That is simple common sense, and there was no reversible error here. The jurors did not need Mr. Lunden's say-so to have arrived at their own conclusions that a fixed rail where plaintiff was standing more likely than not would have prevented her from falling onto the tracks. Defendant's argument is a contrivance that this Court should not accept.

### B. The Court Did Not Err on the Issue of Defendant's Internal Policies.

Yet another of defendant's contrived arguments is that the Court erred in allowing plaintiff's attorney to question defendant's employees and expert witness about defendant's internal policies, thereby resulting in the possibility that the jury "could have been confused" into, again, applying a heightened standard of care against defendant. (Defs. Memo, p. 47). Here, too, defendant has not bothered to quote any of the allegedly improperly-given testimony by the several witnesses named on page 46 of defendant's memorandum.

Defendant ignores the fact that it affirmatively placed its internal policies in issue by asserting the affirmative defense of qualified immunity. *See, Turturro v. City of New York*, 28 NY3d 469.

However, the Court, which was well aware that liability may not be predicated upon violation of a defendant's internal policies, permitted the

questioning solely on the issue of defendant's "notice about the conditions, about the subway in general", as the Court stated to the jury, (Tr. 145), and "it may have some other relevancy. We'll see about that." (Tr. 140-142). To be sure, the Court did not charge the jury that it could find defendant liable for violating its internal policies.

In a footnote, defendant asserts that the Court "did not expressly tell the jury they could not find liability against Transit based on its policies," (Defs. Memo, p. 46, fn. 41), but defendant makes no reference to any objection by it on that score. In any event, this argument is meritless. *Cf., Huang v. New York City Tr. Auth.,* 49 AD3d 308, 308-309 (1st Dep't), *lv. denied*, 11 NY3d 702 (2008); *Danbois v. New York Cent. RR Co.*, 12 NY2d 234 (1963).

**C. The Court Did Not Erroneously Limit <u>Cross-Examination of Plaintiff's Experts.</u>**

At least this manufactured argument is the shortest. It is also patently without merit. Defendant maintains that it should have been permitted to question plaintiff's expert, Mr. Jimenez, about facts he did not consider in formulating his opinions. The colloquy reveals, however, that the issue was not about facts Mr. Jimenez did not rely on but whether the document he reviewed should have been admitted in evidence. (Tr. 929-930).

Defendant's recourse at that time was to make an offer of proof on the record, which it did not do. Indeed, the Court permitted defendant to "lay a foundation for all the documents that you want to identify that he did not rely upon. …If you want to do that, I will allow you to do that." (Tr. 932-933; see 930-932, 934-935, 951-952).

Defendant cites an inapposite district court case from Kansas in support of its argument, but the issue before the court there was the admissibility of certain proposed expert testimony, which was not the issue here.

As to plaintiff's economics expert, Ms. Kucsma, defendant sought to impeach her credibility with a document not in evidence after her response that the document did not refresh her recollection. That is not a proper foundation for entering a document into evidence. *See Maxfield v. Tofany*, 34 AD2d 869, 870 (3d Dep't 1970).

Defendant's arguments on this issue do not warrant a new trial on the ground that the Court erroneously restricted cross-examination.

**D. <u>Plaintiff's Counsel's Summation Was Not Prejudicial.</u>**

Plaintiff's attorney's main summation and rebuttal covered a total of 71 pages and came at the end of a three-week trial, at which 22 witnesses were heard. After all that time and content, it is impossible to believe the jury was unduly swayed by the few examples of allegedly impro-

per remarks arising out of counsel's zealous advocacy, as showcased in defendant's memorandum. To believe otherwise, we submit, is to engage in sheer fantasy and wishful thinking.

As stated in *Graham v. City of New York*, 128 F.Supp.3d 681, 698 (E.D.N.Y. 2015),

> [i]n evaluating a motion for a new trial based on counsel's alleged misconduct, the court "must consider such a claim in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Claudio v. Mattituck–Cutchogue Union Free Sch. Dist.,* 955 F.Supp.2d 118, 144 (E.D.N.Y.2013) (quoting *Levitant v. N.Y.C. Human Res. Admin.,* 914 F.Supp.2d 281, 311 (E.D.N.Y.2012)); *In re Fosamax,* 742 F.Supp.2d at 477. Determining if counsel's conduct was so improper as to warrant a new trial is committed to the sound discretion of the trial judge. *Patterson v. Balsamico,* 440 F.3d 104, 119 (2d Cir.2006) (citing *Matthews v. CTI Container Transp. Int'l Inc.,* 871 F.2d 270, 278 (2d Cir.1989)); *see also Johnson v. Celotex Corp.,* 899 F.2d 1281, 1289 (2d Cir. 1990) ("Great discretion is to be given the judge who was present throughout the trial and is best able to determine the effect of the conduct of counsel on the jury."); *Claudio,* 955 F. Supp.2d at 144.

In *Pappas v. Middle Earth Condominium Association*, 963 F.2d 534 (2d Cir. 1992), the court "recognize[d] the trial court's superior vantage point when evaluating the possible impact of the alleged prejudicial conduct. A printed record is unable to replicate in full all the circumstances -- for example, tones of voices, demeanor of witnesses and jurors and the like -- that occur in the course of an unfolding trial. Consequently, normally the district court's determination as to whether counsel's improper conduct caused prejudice is reviewed under the traditional abuse of discretion standard." *Id.*, at 540 (citations omitted).

Plaintiff submits that there is no basis for this Court to conclude other than that, under all the circumstances, counsel's summation did not, even remotely, irreparably taint the trial. *See Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989). The cases relied on by defendant are all distinguishable on their facts.

We would add the general principles that a jury is presumed to follow the court's instructions*, e.g.*, *Martelly v. New York City Health & Hosps. Corp.*, 276 AD2d 373 (1st Dep't 2000); *People v. Lugo*, 218 AD2d 711 (2d Dep't 1995), and that whether error was committed (albeit not here) must be examined "in the context of the instructions as a whole as well as the evidence." *United States v. Bacote*, 201 F.Supp.3d 230, 235 (E.D.N.Y. 2016).

In that context, it was *defendant's* attorney who received the benefit of the Court's (not entirely tongue-in-cheek) reference to plaintiff's counsel, Mr. Genis, as "an emotional, crazy person," in contrast to defendant's attorney, Mr. Keaveney, as "calm, cool and collected" (Tr. 2251). The Court went on to caution the jury to decide the case solely on the facts, not on emotions. (Tr. 2251-2253).

It should also be noted that the jury awarded only a fraction of what plaintiff's counsel asked for in summation for plaintiff's pain and suffering. The jury similarly disregarded counsel's request for a total of $65 million for future costs of medical care and lost earnings, all of which belies defendant's claim that plaintiff's counsel's summation prejudiced the jury.

**E. <u>Defendant Is Not Entitled to a New Trial.</u>**

Defendant's arguments that the jury's verdict on liability was seriously erroneous are merely a pro forma recap of its previous positions and do not warrant further attention. There was nothing seriously erroneous about the jury's verdict by any stretch of the imagination, and nor was it a miscarriage of justice.

## POINT IX

## The Jury's Verdicts For Past And Future Pain And Suffering And Loss Of Enjoyment Of Life Are Warranted By The Evidence And Should Not Be Disturbed.

### A. The Relevant Facts

#### 1. Plaintiff's immediate injuries

After plaintiff fell backwards onto the subway tracks and the train had run her over, she saw both her left arm and left leg lying beside her, severed from her body. She testified, "I remember being afraid of dying. I remember telling myself that I don't want to die. …I thought about my career, like, how, oh my God, I haven't achieved anything yet, I don't want to die now." (Tr. 1348-1349).

Plaintiff further testified, "I saw my bone, I saw my muscle, I saw my -- the fat, like, I saw the skin flap hanging down. … [J]ust so much desperation and asking for help." (Tr. 1349-1350).

Plaintiff said that "every inch of my body" was in pain, and on the way to the hospital, "any touch, any movement would be just this massive pain. …Evey single bump [of the ambulance] I could feel" (Tr. 1351). It was at Bellevue that plaintiff was informed that, due to the traumatic nature of the amputations and because "they didn't have much to work with," it was impossible to reattach her severed limbs (Tr. 1352).

The photographs (Plaintiff's Exhibit B [Tr. Pl. Exhibits 97A-E,G-I,L-N]), introduced into evidence, and illustrations (Plaintiff's Exhibit C [Tr. Pl. Exhibits 96A-N]), graphically depict the horrific nature and extent of plaintiff's injuries.

Plaintiff underwent eight surgeries at Bellevue during her 24-day admission. (Tr. 1211, 1352, 1360, 1592). "[E]very other day they would take me and they would do a surgery at the arm, the leg. And I just remember being under a lot of pain, a lot of medication. And just going in and out of surgery for days." (Tr. 1352).

Plaintiff suffered a pulmonary embolism in the hospital. "They were very worried about that." (Tr. 1353). She underwent so many blood tests that "they ran out of places to take my blood from, and they started taking on my hand and my foot. And up to this day, I have a problem with my blood drawn because my veins are messed up because they were so overused." (Tr. 1353).

Plaintiff testified to the pain she endured from the several skin grafts that had to be taken from her back, thigh, and hip "and move that skin into the stumps because they had to reconstruct the stumps as much as they could... . It just hurt so much... ." (Tr. 1353-1354, 1359-1360). She was given morphine intravenously on a timed release, "and I

just remember pressing it all the time, even when it was not coming out, I would just keep pressing." (Tr. 1356-1357; see Tr. 1254-1255).

During the several weeks while all this was going on, plaintiff "couldn't move... . I was just lying in bed connected to a bunch of equipment, bunch of wires and IVs. And besides the leg and arm that were healing, I had all the skin grafts. So like, I just, I had to stay still." (Tr. 1354). Plaintiff testified that the stumps of her leg and arm "were just sitting there. They were heavy. They were swollen. They were hurting." (Tr. 1357-1358).

Plaintiff annotated photographs of her stumps showing her progress following her discharge from Bellevue. (Tr. 1358-1359). Her initial mindset at that time was, "[O]h, I'm just going to put prostheses back on and get on with my life. But the first thing I learned, your wounds have to heal first to even get started with, like, trying to fit the prostheses." (Tr. 1358-359).

The healing process took many months, during which either her parents helped her change the dressings every day for hours at a time, or she would go to a rehabilitation center for the debridements. (Tr. 1216-121359, 1360, 1366, 1368). This was when she had returned to Brazil to be with her parents. (Tr. 1215). In both cases, it was very painful be-

cause "[t]hings would get stuck into the raw skin," and the dead skin had to be removed. (Tr. 1359),

Plaintiff described the harrowing, not to mention painful and embarrassing, flight to Brazil, during which "my mom had to change my diapers during the flight, like, in our seat." (Tr. 1362).

**2. Plaintiff's return to school in a wheelchair and initial prosthetic attempts**

Plaintiff's return to school in New York City was very trying psychologically, "[b]ecause I went back to university and everyone knew me as, I don't know, regular person, good student, nice person. ...[T]hen suddenly I became the girl with not an arm or a leg, and everyone was sorry for me... . And I just felt a sense of, like, my whole life became that, right? Like, my personality became crushed into the girl who was run over by a train. And I hated that. I still do." (Tr. 1369-1370). Plaintiff also hated having to be dependent on others for assistance (Tr. 1370).

In March of 2017, plaintiff began the process of fitting her leg stump with a prosthesis (Tr. 1371, 1376). Then as now, however, "my stumps are not the best stumps to work with" (Tr. 1371).

Plaintiff first used a wheelchair when attending university, then a leg prosthesis with a walker and cane when she could (Tr. 1372), but "I have always used a wheelchair for long distances, and in my world...a distance is anywhere longer than a block" (Tr. 1373).

Plaintiff uses the wheelchair at home. (Tr. 1386, 1431). She explained that with only one arm, "I use…my right foot to steer and my [remaining] arm…in moving forward and to steer as well." (Tr. 1386). Plaintiff, however, cannot be by herself in the wheelchair, because "I cannot put a wheelchair in and out of a car by myself, I cannot open a door and go through the door with my wheelchair. So…I'm vulnerable. …I depend on other people to make it work, to get it fixed, to take it to the assistance to get it fixed." (Tr. 1385-1386, 1387). She said, "I don't go places by myself with my wheelchair." (Tr. 1386-1387). When not in her apartment, plaintiff needs someone to push the wheelchair. (Tr. 1431), but she does not like being dependent on others. (Tr. 1431-1432), apparently even her husband.

Plaintiff testified about the ordeal she had to go through commuting to school and to work via Access-A-Ride. (Tr. 1381). It is very exhausting as well as time consuming, as she has to adjust her schedule to the driver's and has to share her ride with others. (Tr. 1381, 1402, 1424-1426). That, in turn, means she has to sit for long periods, even hours, each way of her commute, which causes additional pain due to her leg prosthesis. (Tr. 1381).

### 3. **Plaintiff's problems with her prosthetic devices**

Plaintiff testified to the problems she has with her leg prosthesis, such as having "to go to the clinic all the time to make these adjustments" due to losing or gaining weight, or after surgery, or from swelling in the leg. (Tr. 1385). In fact, since January of 2022, plaintiff has undergone "at least a dozen" adjustments of the socket of her leg prosthesis. (Tr. 1128), and "when there's too much change, they need to make a whole new socket, which I had been through a couple of times." (Tr. 1385). Plaintiff spent six weeks in 2021 at Massachusetts General Hospital and a rehabilitations center undergoing complicated and major revision surgeries on her leg and arm. (Tr. 1410-1412, 1413-1415).

Plaintiff wears the leg prosthesis only when she has to (Tr. 1421) and takes it off whenever she is at home. (Tr. 1383, 1386).

Plaintiff testified that wearing the leg prosthesis creates "friction between the prosthesis and your skin", and "if I wear my prosthesis every day, I get blisters… ."[I]f I walk long distances, I get blisters and it's exhausting." (Tr. 1395). The comfort level between the prosthesis and her stump will depend on such innocuous variables as "what I ate the night before, if I ate something salty. It could be dependent on the weather. It could be dependent on my hormones, if I'm menstruating or something like that. It's just unpredictable." (Tr. 1403-1404).

After a full day of wearing her leg prosthesis, “those final steps” from the Access-A-Ride “are just, like, messed up.” (Tr. 1424-1425). The suction is not good, and “[m]y leg is falling… .” (Tr. 1425).

Regarding her arm prosthesis, plaintiff experiences a lack of suction. (Tr. 1405). Therefore, she does not wear it as often as she should, but she does try to wear it as much as possible to keep her body in balance. (Tr. 1405-1406). Plaintiff expressed “the hope that I will be a proud user of a prosthetic arm one day.” (Tr. 1406). She wears it at work, but “it doesn’t help me at work.” (Tr. 1406). “[R]ight now, it’s not functional.” (Tr. 1406-1407).

Plaintiff testified that because of the suction problem and the total weight of the prosthetic arm, which includes the elbow, wrist, and hand, she wears a harness around her shoulder to keep the arm in place. (Tr. 1407-1408). The harness, however, is “the most painful part because it’s just a strap that, it needs to be as tight as possible. … [A]fter a long day, I have marks on my chest. If I wear my prosthesis every day for a week on vacation and I want to wear it every day, I’m just destroyed because I can have all these marks and it’s so painful, but that’s all about the harness to keep it in place.” (Tr. 1408).

Plaintiff would like to be able one day to wear a prosthetic arm device attached by a process known as osteo-integration. (Tr. 1408). It en-

tails grueling surgeries, ending with a spike surgically reamed and implanted into the bone. (Tr. 681-682, 1123, 1125). That allows the prosthesis to stay attached and replace the harness, but it is a wish for the future, not to mention that "there's risk of infection" from that device, (Tr. 1408-1409; see Tr. 1125-1126, 1151), which can be caused simply from showering and getting it wet. (Tr. 685-686).

Plaintiff described both prostheses as "just these foreign objects. They're painful to wear, they're uncomfortable to wear." (Tr. 1406-1407).

#### 4. The devastating effects of plaintiff's injuries on her daily life and previous recreational activities

Plaintiff was quite active and outgoing before the accident. As a teenager, she was employed by the famous Ford modeling agency and was able to sashay down a runway prior to losing her two limbs. (Tr. 1081, 1082).

Prior to losing half of her limbs, plaintiff "was very into dance" and enjoyed sports" and all kinds of outdoor activities and did a lot of traveling. (Tr. 1327-1329, 1373). "[I[t was not a big deal for me to get on a plane and go somewhere." (Tr. 1340). Now, traveling by plane is a huge burden, as described by her husband. Traveling with the wheelchair is a "challenge", since it sometimes does not make it to their destination. (Tr. 1273). There are also the embarrassment and delay of plaintiff having to

go through the metal detector with her prostheses, which always results in her being searched. (Tr. 1272).

Plaintiff used to love to go swimming, play the guitar, and make her own jewelry. (Tr. 1374-1375). "I loved expressing myself through this type of activity," she said. (Tr. 1374). Since the accident, of course, "I can't do most of it. It's very frustrating when I try to do [it]." (Tr. 1364-1375).

Plaintiff was educated to be an architect, "[a]nd this is very painful for me because" she cannot express herself as architects do, "by drawing. Right?" (Tr. 1375). She said, "It's painful that I didn't have the full experience that I dreamed of having." (Tr. 1379-1380).

Plaintiff's reality now is that "it's all very limited. … I need assistance for everything. Or I have to do it myself to a very low standard." (Tr. 1378-1379).

Defendant showed the jury a video of a typical day in plaintiff's life, which she narrated. (Tr. 1434-1436, 1438-1441). Aside from the video, plaintiff testified that using her arm around the house to perform various chores is "very tiring" and "very painful." (Tr. 1386-1387, 1437).

Plaintiff said, "There's so many activities I do that I know I'm managing because I'm young and I am healthy," but she has been told by phy-

sical therapists that she is putting "too much strain" on her body, which is "not good." (Tr. 1437).

On the issue of personal hygiene, "if I'm sitting on a toilet, I cannot even kind of lift up with one leg. …And it's hard to pull toilet paper out of a toilet roll. It's hard to wash my hand…with one hand to wash itself." (Tr. 1387).

Plaintiff testified to the preparation she must go through if she has to wear her leg prosthesis the next day. (Tr. 1403). She must shower the night before because if she showers in the morning, "it will affect the way my leg fits because the leg gets a little more swollen if I don't put the leg on straight-away." (Tr. 1403). Plaintiff must also wear a compression stocking in bed the night before to allow for a better fitting, but "[i]t's painful to wear" it. (Tr. 1403).

Plaintiff wakes up extra early if she has to leave the apartment so she can clean the liner to her prosthesis, which is a 30-40-minute job by itself and a "very unpredictable process." (Tr. 1403-1404, 1421-1422). If the prosthesis is not well fitting, "you get 100 percent blisters." (Tr. 1421-1422).

Plaintiff testified that she loves children, and "I still dream to be a mom. But it's absolutely scary. Right? Because I cannot. …I can barely take care of myself, like, how would I take care of a child…?" (Tr. 1449).

**5. <u>The negative effects of plaintiff's injuries on her work life</u>**

Plaintiff works for a company that consults on compliance with the Americans with Disabilities Act. (Tr. 1172, 1173, 1390, 1454). She testified that her physical limitations make it impossible for her to do site visits, which would otherwise be part of her duties at the firm. (Tr. 1392-1393; see Tr. 1175, 1180-1181). Plaintiff works only two days in the office, because five days a week would put too much pressure on her stump due to the prosthesis. (Tr. 1395, 1427). Her limited in-office work week is a detriment to her advancement with the company. (Tr. 1395, 1433).

Plaintiff's employer, Kevin Morin, (Tr. 1173), testified that she is a very good employee (Tr. 1176) and succeeds at her work primarily because "[s]he puts in a ton of hours. She works evenings and weekends. …Louisa [*sic*] puts in the hours." (Tr. 1196). He also said that plaintiff must put in a lot more effort to do her work due to her disabilities. (Tr. 1181-1182).

**6. <u>Plaintiff's husband's and mother's testimony</u>**

We will not burden the Court with a summary of the testimony of either plaintiff's husband or mother. Suffice it to say that each of them corroborated and expanded upon plaintiff's account of her innumerable difficulties in every respect.

**7. <u>Plaintiff's expert in physical medicine and pain management</u>**

Dr. Stuart Kahn, board certified in both physical medicine and pain management, (Tr. 662-663), testified regarding plaintiff's post-accident treatment and prepared a life care plan for her. (Tr. 663, 669).

Dr. Kahn testified in sum that plaintiff "requires substantial future medical care, future household intervention, future durable medical equipment for the rest of her life." (Tr. 665). He noted that her above-the-knee stump is "well healed but not in a manner that is normal because of all the scarring and the grafts." (Tr. 665-666). Similarly, plaintiff's "extremely short above-elbow amputation…is…a very, very poor stump for any kind of…a prosthesis…, and she still doesn't have a working prosthesis." (Tr. 666, 737).

Dr. Kahn opined that the nature of plaintiff's traumatic amputations and irregular gait put her "at risk of not only osteo-arthritis of the hip joint on the affected side but also on the unaffected side." (Tr. 686, 785-786). Plaintiff is at increased risk of spinal problems due to her abnormal posture, which explains her complaints to him of back pain. (Tr. 686-687, 707-708).

Plaintiff is also at high risk "of continued stump breakdown, which she gets blisters all the time" as well as "what we call heterotopic ossification, where the bone at the end of the [leg] stump can grow outward

into the scar tissue and cause pain." (Tr. 687-688). Dr. Kahn said that plaintiff "has severely limited range of motion on her" leg stump side. (Tr. 710). He went on to opine (Tr. 707-708): "[B]ecause of the abnormal forces and her abnormal posture and with each step, the abnormal twisting in the back is going to lead to back problems. It's not uncommon in any way for people with above-knee amputations to have sciatica either in their actual stump or in the opposite leg, but it's very common to have back problems, sacroiliac problems, hip joint problems, and other pain issues."

Being in a wheelchair and the lack of exercise also puts plaintiff "at risk of osteoporosis, cardiac disease, hypertension, [and] weight gain, which she has" already experienced. (Tr. 688).

Of particular concern to Dr. Kahn when he examined her was "the gross weakness" of her shoulder blade, which makes it more difficult for her prosthetic device to work as well as it should. (Tr. 710).

Regarding plaintiff's activities of daily living, Dr. Kahn testified that household chores take her 6-8 times longer to perform than for an able-bodied person to do. (Tr. 746, 748, 756, 784-785; see Tr. 1132). At her place of employment, plaintiff has to work many additional hours to keep up with her responsibilities. (Tr. 768).

Dr. Kahn remarked that for "someone who is now…nine years plus from the injury," plaintiff "still can't walk well with her prosthesis. It's striking to me to think that this person is going to ever have a normal life without the resources to help supplement her deficits and her disabilities …without assistance to help her overcome those disabilities." (Tr. 711-712).

**8. <u>Plaintiff's expert in prosthetic devices</u>**

Christopher Kort is board certified in prosthetics and orthotics. (Tr. 1097). Plaintiff has been his patient since January of 2022. (Tr. 1097). Mr. Kort testified to the significance of her short residual limbs (Tr. 1097-1098): "The shorter, the less total surface area, and the more energy expenditure required for that patient." (See Tr. 1129-1130).

For prosthetic arm purposes, the shortness of her stump presents challenges, "because there's minimal surface area for suspension and to access her sites for the electrodes." (Tr. 1114). In addition, the scarring and skin grafts create "a very textured surface area," which impedes the necessity for an airtight surface to create a suction "between the skin and the socket. Suction is the way you keep your prosthesis on." (Tr. 1114-1115, 1122). Lack of suction can result in compromised sensation, in which case, plaintiff "could develop a wound, she won't feel it." (Tr.

1117). The lack of suction is why plaintiff must wear a shoulder strap. (Tr. 1115, 1122).

Mr. Kort testified regarding the possibility of osteo-integration for plaintiff's arm, comparing it to "a dental post in your tooth." (Tr. 1123, 1125). It has advantages, but it entails many surgical procedures and the risk of infection simply from going into a pond of fresh water, for example. "It's full of bacteria, it can get into her skin, and she can get an infection." (Tr. 1124-1126, 1151).

With respect to plaintiff's leg stump, the same serious challenges present themselves, including the possibility of blisters and "skin graft breakdown." (Tr. 1118). He noted that plaintiff has gone to him "at least a dozen times" for adjustments of her leg socket, and she recently "got a new socket because her residual limb got smaller." (Tr. 1128).

Mr. Kort estimated that plaintiff "expend[s] five times what an able-body does," (Tr. 1132), and that her unbalanced gait causes "fatigue[ ] in her ankle, knee, and hip. All amputees get fatigued on their sound side residual limb." (Tr. 1133).

### 9. Defendant's Dr. Reid's confirmation of plaintiff's experts' testimony

Defendant's expert in physical medicine and rehabilitation, Dr. Malcom Reid, (Tr. 1497), who examined plaintiff, (Tr. 1498), testified to her permanent disabilities and to the prosthetic needs she "will have for

the remainder of her life due to the serious injuries she sustained from the subway accident." (Tr. 1499, 1538, 1547, 1613-1614). Plaintiff will need physical and occupational therapy for the rest of her life. (Tr. 1499, 1553, 1614). He agreed with Dr. Kahn and plaintiff's prosthetist, Mr. Kort, that plaintiff will need replacement prostheses every three or four years (Tr. 1554, 1109-1110).

Regarding the surgical implantation of the osteo-integration device needed to hold and support yet another type of prosthesis, which takes months to perfect, Dr. Reid testified that the risks attending the surgical installation of the hardware include infection, fracturing, and loosening. (Tr. 1548-1549, 1553).

Most frighteningly, Dr. Reid agreed that "it's likely believable" that plaintiff could "ultimately end up with a contralateral amputation over a period of ten years, regardless of etiology." (Tr. 1570).

As to plaintiff's activities of daily living, Dr. Reid testified that she is deficient in every one of those activities, including but not limited to her hygiene, mobility, leisure, social interaction, personal care, and motor functions (Tr. 1581).

As the record bears out, plaintiff's existence is arduous, grueling, exhausting, and painful. Her physical injuries are compounded by her

emotional upset and anxiety, to which she testified at great length at trial, and which we have summarized in the following section.

**10. The emotional toll of plaintiff's injuries**

We believe it suffices here simply to quote some of plaintiff's testimony to make the point.

Tr. 1350: "[T]he images of my arm and my leg lying there is just something that just comes to me all the time."

Tr. 1447-1448: "I already feel like a burden. People already see me as a burden.

Tr. 1447:

> Sometimes people think that the hospital is the hardest part emotionally, but I thought I was so certain, like I'm going to get prostheses, I'm going to go back to life. But the more I live, the more the challenges pile up. … And I'm going through these milestones with all this pain inside and all the struggles that I'm happy that I'm going through these milestones, but it's not the same as I dreamed or that other people manage to do. So that sense of hope, it actually -- it's diminishing throughout the years. Every year gets harder because I'm seeing it's not getting fixed. Right? Like, I'm trying so hard, I'm overwhelmed, I'm tired. And I have no choice, right? Like every day I try to push that down, that desperation about, like, what's my next step, like, how I'm going to -- what my future is going to look like. I'm insanely scared of the future, right?

Tr. 1446:

> And I remember the first time I looked at myself in the mirror, like, without the dressings, I -- I felt hurt. … I just saw myself missing and it's not missing for a good reason. I always feel this struggle that it's not like I was a soldier fighting for the country and I suffered an injury. I was going home after the supermarket and now I'm injured like that. And that's the image, like, that I see every day. Right? Like, that's not going to change. So it's very challenging for me to look at myself every day, to go out of the house, even with the prostheses.

Plaintiff concluded her direct examination thus (Tr. 1450-1451):

> I don't know what else to say because I think, like, there's no way I can compile all of my life into an afternoon. But I just feel like I want to emphasize I was a regular person, a happy person, successful person, and having lost my arm and my leg took a lot from me. I'm trying to go back to the basics of who I was so I can carry on trying to do the things, like -- and I'm just tired. I'm tired. Like, every day I have to try as hard as I can, and it still hurts, it's still painful. And I'm going to keep trying, but I'm hoping I have to try a little less, that I can have a bit of assistance, a bit of comfort, a bit of normalcy, normality in my life.

* * *

Plaintiff was 21 years old at the time of the accident and 30 at the time of trial. The jury was charged that her life expectancy was just under 82 years. (Tr. 2299).

**B. <u>The Standard of Review of a Jury's Damages Verdict</u>**

"The calculation of damages is the province of the jury, and we will not vacate or reduce a jury award because we would have granted a lesser amount of damages." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014); *see Carroll v. Trump*, 151 F.4th 50, 80 (2d Cir. 2025); *Bolduc v. Sheth*, 208 AD2d 789 (2d Dep't 1994); *Rodriguez v. City of New York*, 191 AD2d 420 (2d Dep't 1993).

In *Po Yee So v. Wing Tat Realty*, 259 AD2d 373, 374 (1st Dep't 1999), the appellate court discussed the authority to modify a jury award. Holding that the trial court improperly reduced a jury award as excessive, the decision states: "Although possessing the power to set aside an excessive jury verdict, a trial court should nonetheless be wary of substituting its judgment for that of a panel of fact finders whose peculiar function is the fixation of damages. Modification of damages, which is a speculative endeavor, cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible." (Emphasis added).

Review of other cases cannot be the sole factor considered in determining whether a verdict is appropriate, as each case must be considered on its own merits. *Hotaling v. CSX Transport*, 5 AD3d 964 (3d Dep't 2004). As in *Hotaling*, the facts herein constitute "an extraordinary set of

facts", and as the Appellate Division did in that matter, this Court should not disturb the jury's award as to both past and future pain and suffering.

Furthermore, the "comparison to other awards" approach is not inflexible and requires a thorough examination of the evidence. *See*, *Morsette v. "The Final Call,"* 309 AD2d 249, 256 (1st Dep't 2003), *lv. dismissed,* 5 NY3d 756 (2005), where it was recognized that in reviewing awards approved in similar cases to assess whether an award "deviates materially from what would be reasonable compensation," the court must be "mindful of the fact that personal injury awards, especially those for pain and suffering are subjective opinions which are formulated without the availability or guidance of precise mathematical quantification."

In *Caprara v. Chrysler Corp.*, 52 NY2d 114, 127 (1981), the Court of Appeals spoke to the task assigned to courts, stating that "[i]n no two cases are the quality and quantity of such damages identical, [and] evaluation does not lend itself to neat mathematical calculation."

### C. The Jury's Verdicts for Past and Future Pain and Suffering and Loss of Enjoyment of Life Are Fair and Reasonable and Should Not Be Disturbed.

Plaintiff's catastrophic injuries are arguably unique. Plaintiff suffers from daily, chronic, and permanent pain to her leg and arm stumps, as well as the emotional trauma associated with those injuries and their nu-

merous residual effects, as to all of which there was ample, and undisputed, evidence at trial. This Court saw and heard, firsthand, the unimaginable and excruciating injuries Ms. Harger has suffered, injuries that are impossible to describe adequately in the limited space of this memorandum

The jury awarded plaintiff $20 million for her past physical and mental pain and suffering and loss of enjoyment of life, covering a period of more than nine years, from August 2016 to November 2025 (during which time she underwent eight surgeries and countless, painful, daily debridements), and $50 million for her future physical and mental pain and suffering and loss of enjoyment of life to cover a period of 50 years (and the need for more painful surgeries and possible loss of a third limb). That comes to an award of roughly $2.2 million per year for past pain and suffering and $1 million a year for the future. Her "aggregate" average of $ 1,186,440 per year.

Considering the excruciating, permanent pain and suffering plaintiff has endured and will endure due to her catastrophic injuries and the profound changes they have inflicted on her lifestyle, affecting literally every moment of her life, and the dashed expectations she had for her life as of the time trial, the awards are not a material deviation from what would be reasonable compensation.

No doubt entering into the jury's consideration in awarding damages for future pain and suffering is defendant's Dr. Reid's testimony that it is "likely believable" that plaintiff could "ultimately end up with a contralateral amputation over a period of ten years, regardless of etiology." (Tr. 1570). Dr. Reid's testimony was poorly worded, but the jury could certainly have inferred that he intended to convey a likelihood that plaintiff's good leg would be amputated in the next ten years, albeit surgically.

The jury could well have concluded that, sooner, rather than later, plaintiff will be without even one leg to stand on, thereby multiplying the arduousness and hardships of her daily life. Plaintiff will, in effect, be a triple amputee, which would further justify the jury's future damages award, as well as this Court's sustaining that verdict.

**D. <u>Comparison to Other Awards Justifies the Jury's Awards Here.</u>**

Comparison to other awards bears out the reasonableness of the jury's pain and suffering verdicts. Before we begin, however, we note that the Court of Appeals for the Second Circuit has recognized that, "when considering the sizes of the awards in earlier cases, we must take into account inflation, as the reasonable range for [the plaintiff's] injuries to-

day is higher than what it would have been ten years ago." *DiSorbo v. Hoy*, 343 F.3d 172, 185 (2003).[3]

In *Yvonne Y v. City of New York*, 199 AD3d 551 (1st Dep't 2021), the 16-year-old high school student sustained severe burns to his body. The court reduced the award for pain and suffering to $12 million (CPI: $15.2 million) for five and a half years of past pain and suffering ($2.2 million per year) (CPI: $2.8 million per year) and $17 million (CPI: 21.5 million) for future pain and suffering -- a total of $29 million (CPI: $36.7 million). While the plaintiff's injuries in *Yvonne Y* resulted in severe cosmetic deformities to his face, neck, and arms, he is able to walk and use both his hands, which plaintiff Luisa Harger cannot do.

In *Powell*, the court allowed $26 million for past and future pain and suffering with $16 million for a past period of 6 years and 4 months (approximately $2.5 million per year), and for future pain and suffering to $10 million for a life expectancy of 25.4 years. In reviewing prior verdicts, to account for inflation over the passage of time, the court used the CPI and noted the "link" to this government website.

[3] In *Powell v. New York City Transit Authority*, 2025 WL 1605353 at *6, fn. 3 (Sup. Ct., Kings Co. 2025), the court used the Consumer Price Index Inflation Calculator. For the Court's convenience, we have included the monthly CPI inflation for the present value of each case. The index can be found at United States Bureau of Labor Statistics at: https://www.usinflationcalculator.com

Plaintiff here has lost two limbs, may lose a third limb, requires additional surgeries, has twice the life expectancy, and had far more extensive injuries than did the plaintiff in *Powell.*

The 45-year-old married mother of three in *Aguilar v. New York City Transit Authority*, 81 AD3d 509 (1st Dep't 2011), was awarded an aggregate pain and suffering verdict of $10 million (plus just under $7 million for future medical expenses) for the amputation of her left leg above the knee and the essential loss of use of her right leg. (CPI: $15.2 million). The award for past pain and suffering was $5 million (CPI: $7.6 million) for 3.5 years = $1.5 million per year. (CPI: $2.2 million per year). The award for future pain and suffering was also $5 million (CPI: $7.6 million) for 32.3 years.

Plaintiff's injuries here were visited upon a then-21-year-old college student, who was less than half the age of Mrs. Aguilar. Mrs. Aguilar has children; Luisa cannot. Luisa led an active life, was a Ford model and had a great future as an architect. Luisa's injuries, including her future surgeries and greater life expectancy, are sustainable for far more than was allowed in *Aguilar* case.

To be kept in mind is that, as stated in *Utsey v. City of New York*, 30 Misc3d 1204(A), 2010 WL 5373920 (Sup. Ct., Bx. Co. 2010), "[w]hen an appellate court affirms an award, the affirmance stands only as a de-

termination that the award fell somewhere within the range of awards justified by the evidence and does not indicate that a considerably higher verdict is above the upper limit of that range. Thus, even when the court affirms an award for more severe or extensive injuries, neither does it indicate that less severe or extensive injuries do not warrant an equal verdict." *Id.*, at *11 (citation omitted).

Defendant's comparison to paralysis cases warrants reference to the following decisions: *Malmberg v. United States*, 2020 WL 611503 (N.D.N.Y. 2020) ($18 million for pain and suffering to a veteran for loss of use of legs, CPI: $22.6 million); *Saladino v. Stewart & Stevenson Servs., Inc.*, 2011 WL 284476 (E.D.N.Y. 2011), *aff'd sub nom*, *Saladino v. American Airlines*, 500 F. App'x 69 (2d Cir. 2012) ($15 million aggregate pain and suffering award for quadriplegic with 24-year life expectancy, CPI: $22.3 million); *Savillo v. Greenpoint Landing, LLC*, 2011 WL 2941341 (Sup. Ct., N.Y. Co., 2011) ($35 million for pain and suffering to a 29-year-old paraplegic, CPI: $51.8 million; $10 million in past pain and suffering over 4 years, CPI: $14.8 million, amounting to $2.5 million per year, CPI: $3.7 million per year; $25 million for future pain and suffering for 42 years, CPI: $37 million); *Tenuto v. Lederle Laboratories*, 26 Misc3d 1225(A), 2010 WL 625223 (Sup. Ct., Rich. Co. 2010) (trial court upheld a

verdict for polio induced paraplegia of $17.5 million for pain and suffering, CPI: $26.7 million).

Without diminishing the consequences of such catastrophic injuries, quadriplegics feels no pain. Ms. Harger feels intense pain every day.

In the above cases, the plaintiffs were all older than the plaintiff herein, and had shorter life expectancy and therefore lesser amounts than herein were permitted for future pain and suffering. In defendant's recitation, it omitted accounting for inflation and the passage of time, and thereby "short-changed" Ms. Harger.

* * *

Plaintiff is well aware that the jury's damages verdicts here exceed the highest sustained New York jury awards cited and discussed above. That is not to say, however, that plaintiff is not entitled to those awards or to something closely approaching them. What the Second Circuit wrote in *Turley v. ISG Lackawanna, Inc.*, 774 F2.3d at 162, bears repeating: "The calculation of damages is the province of the jury, and we will not vacate or reduce a jury award because we would have granted a lesser amount of damages." *See D.R. v. Santos Bakery, Inc.*, 716 F.Supp.3d 228, 235-236 (S.D.N.Y. 2024).

To be sure, it is preposterous for defendant to suggest that the *maximum* reasonable number the Court should approve is a total of

$11.45 million in past and future pain and suffering. (Defs. Memo, p. 63). (Elsewhere on the same page, defendant suggests a maximum of $10 million.) Defendant proposes this amount while acknowledging that "[p]laintiff undoubtedly suffered serious injuries, underwent several surgeries, and will be living with prostheses for the remainder of her life." (Defs. Memo, p. 63). Defendant's brief summary of plaintiff's injuries, of course, hardly does justice to the wealth of uncontested evidence confirming the devastating nature of plaintiff's injuries and how profoundly they have affected her life over the past nine years and will do so for the next half-century.

Defendant points to plaintiff's "good recovery" (Defs. Memo, p. 63) in defending its suggestion, citing a case in which the plaintiff's good recovery there was made possible by "manag[ing] his pain with Motrin." *Seargent v. Berben*, 235 AD2d 1024, 1026 (3d Dep't 1997). Another such inapposite case, *Weiden v. Schwartz*, 193 AD2d 570 (1st Dep't 1993), involved an elderly woman who had a "pre-accident cardiac condition," and whose injuries from "her previous slip and fall accident…were not yet healed or were permanent at the time of the instant car accident." *Id.*, at 571.

These "good recovery" cases are almost an insult to plaintiff, who, only through her tenacity, perseverance, fortitude, courage, and ingenui-

ty, has just barely managed to create a life for herself that, unfortunately, bears no resemblance to the life she had before the accident or to the one she expected to live. In plaintiff's own words, "I'm tired. Like, every day I have to try as hard as I can, and it still hurts." (Tr. 1450).

Notwithstanding her present lamentable situation, plaintiff has proven herself to be, as the Court may recall observing about her at trial, "obviously an extraordinary human being." (Tr. 770). She is that, and she is entitled to as much, if not the whole amount, of the jury's verdict as the Court can see itself clear to allowing. Under no circumstances, we respectfully submit, should the Court order a new trial on damages.

## CONCLUSION

Defendant's motion should be denied in its entirety.

Dated: March 22, 2026

Respectfully submitted,

David Roth

SONIN & GENIS
ROTH & ROTH, LLP
*Attorneys for Plaintiff*

ROBERT J. GENIS
DAVID A. ROTH
ALEXANDER J. WULWICK
*Of Counsel*

# Exhibit A

**To:** Fleuranges, Paul[PAUL.FLEURANGES@NYCT.COM]; Bianco, Carmen[Carmen.Bianco@nyct.com]
**From:** Prendergast, Tom
**Sent:** 2010-07-11T00:13:35Z
**Importance:** Normal
**Subject:** Re: Tweet from: @stuartvernon
**Received:** 2010-07-11T00:13:35Z

PLAINTIFF'S EXHIBIT
16

Paul -
Is this the customer who died of injuries sustained as a result of a train striking her on the head @ 53rd/Lex this morning?

Are there any eyewitness accounts to the incident? Was she leaning over the track from the platform edge looking the wrong way?

[redacted]

Tom Prendergast

----- Original Message -----
From: Fleuranges, Paul
To: Bianco, Carmen
Cc: Prendergast, Tom
Sent: Sat Jul 10 19:48:29 2010
Subject: Tweet from: @stuartvernon

Gents

This received via Twitter. This person is a friend of the female killed overnight Who asked for confirmation of a death .. We confirmed an incident and expressed condolences. This was the reply:

From: @stuartvernon
Sent: Jul 10, 2010 7:26p

@NYCTSubwayScoop received and appreciated...thanks again for your response she was well known as an EMT in NY and will surely be missed

sent via UberTwitter in reply to @NYCTSubwayScoop

On Twitter: http://twitter.com/stuartvernon/status/18229762204

Paul J. Fleuranges
V.P. Corporate Communications
NYC Transit
paul.fleuranges@nyct.com

Sign up for EasyPayXpress - now available in Pay-per-Ride and Unlimited versions.

http://www.mta.info/metrocard/EasyPayXpress.htm

---------------------------
Sent from my BlackBerry Wireless Handheld

# Exhibit B

PLAINTIFF'S EXHIBIT 97A



PLAINTIFF'S EXHIBIT

97B




PLAINTIFF'S
EXHIBIT
97C

PLAINTIFF'S EXHIBIT
97D





**PLAINTIFF'S EXHIBIT**

97E


PLAINTIFF'S
EXHIBIT
97G


PLAINTIFF'S
EXHIBIT
97H



PLAINTIFF'S EXHIBIT
97L

Da Silva 003362


PLAINTIFF'S EXHIBIT
97M

PLAINTIFF'S EXHIBIT
97I-1



PLAINTIFF'S EXHIBIT
97I-2



PLAINTIFF'S EXHIBIT
97N



# Exhibit C

# LUISA JANSSEN HARGER BROWN

## TRAUMATIC AMPUTATION & X-RAY OF LEFT UPPER EXTREMITY, 08/02/2016

PLAINTIFF'S
EXHIBIT
96A



### Proximal Shoulder, Anterior View







### Partial Limb, Radial View



Comminuted displaced fractures of the proximal radial and ulnar shafts



### Distal Arm Limb, Volar View





Left upper extremity amputation through the mid humerus. There is associated comminuted displaced fractures of the amputated aspects of the mid humerus and proximal radial and ulnar shaft and complete amputation at the level of the proximal radial and ulnar shafts.



© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## TRAUMATIC AMPUTATION & X-RAY OF LEFT LOWER EXTREMITY, 08/02/2016

PLAINTIFF'S EXHIBIT 96B






© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## SUMMARY OF INJURIES, DATE OF CATASTROPHIC SUBWAY ACCIDENT: 08/02/2016

PLAINTIFF'S EXHIBIT
96C






© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## MULTIPLE WOUND IRRIGATIONS, DEBRIDEMENTS & VAC PLACEMENT OF LEFT LOWER EXTREMITY, 08/02/2016, 08/04/2016, 08/06/2016 & 08/08/2016

PLAINTIFF'S EXHIBIT 96D






© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## MULTIPLE WOUND IRRIGATIONS, DEBRIDEMENTS & VAC PLACEMENT OF LEFT UPPER EXTREMITY, 08/02/2016, (STAGE 1) 08/03/2016, (STAGE 2) 08/04/2016, 08/06/2016 & 08/08/2016






© 2025 Certified Medical Illustrations All Rights Reserved

PLAINTIFF'S EXHIBIT
96F

# LUISA JANSSEN HARGER BROWN

## POSTOPERATIVE X-RAY OF LEFT HIP, 08/05/2016







© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## CT SCAN OF LUNGS, 08/04/2016

PLAINTIFF'S EXHIBIT
96G




Axial Section, Series 2; Img 75/218




© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## X-RAY OF LEFT UPPER EXTREMITY, 11/09/2020

PLAINTIFF'S EXHIBIT
96H




### Proximal Shoulder, Anterior View




### Scar Photos





© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## PREOPERATIVE X-RAY OF LEFT LOWER EXTREMITY, 11/09/2020

PLAINTIFF'S
EXHIBIT
961






© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## REVISION LEFT ABOVE-KNEE AMPUTATION STUMP SURGERY, 11/16/2021

PLAINTIFF'S EXHIBIT 96J






© 2025 Certified Medical Illustrations All Rights Reserved

PLAINTIFF'S EXHIBIT
96K

# LUISA JANSSEN HARGER BROWN

## REVISION LEFT ABOVE-KNEE AMPUTATION STUMP SURGERY, 11/16/2021

### F Targeted Muscle Reinnervation Summary




### G Local Tissue Rearrangement Closure




### H Closure of Donor Site




### I Postoperative Photos





© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## POSTOPERATIVE X-RAY OF LEFT LOWER EXTREMITY, 11/17/2021

PLAINTIFF'S EXHIBIT
96L




Da Silva 007957

© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## FUTURE PRE-IMPLANTATION OF SOFT TISSUE REVISION SURGERY OF LEFT UPPER EXTREMITY




Da Silva 007958

© 2025 Certified Medical Illustrations All Rights Reserved

# LUISA JANSSEN HARGER BROWN

## FUTURE OSSEOINTEGRATION LIMB REPLACEMENT SURGERY FOR LEFT UPPER EXTREMITY PROSTHESIS




PLAINTIFF'S EXHIBIT
96N

Da Silva 007959

© 2025 Certified Medical Illustrations All Rights Reserved