UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
LUISA JANSSEN HARGER DASILVA,

Plaintiff,

-against-

Civ. No.: 1:17-cv-04550 (FB)(VMS)

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, and RAQUIA SHABAZZ,

Defendants.
---------------------------------------------------------X

# MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTIONS PURSUANT TO FED. R. CIV. P. 50(B) AND 59

LANDMAN CORSI BALLAINE & FORD, P.C.
Attorneys for Defendants
120 Broadway, 13th Floor
New York, New York 10271
(212) 238-4800

On the brief

Timothy J. Collazzi, Esq.
tcollazzi@lcbf.com
Andrew P. Keaveney, Esq.
akeaveney@lcbf.com
Jerry A. Cuomo, Esq.
jcuomo@lcbf.com

# Table of Contents


Table of Authorities .......... iv

ARGUMENT .......... 1

POINT I:

TRANSIT IS ENTITLED TO GOVERNMENTAL IMMUNITY .......... 1

A. There is No Final Order on Governmental Immunity .......... 1

B. The 3/6/25 Order Did Not Dismiss the Governmental Immunity Defense. .......... 3

C. The Court Did Not Find Transit's Governmental Immunity Defense to be "Frivolous" .......... 5

D. Recent Supreme Court Decisions Are Not Relevant .......... 5

POINT II:

TRANSIT IT ENTITLED TO QUALIFIED IMMUNITY .......... 6

A. No Reasonable Jury Could Find Against Transit Based on the Trial Evidence .......... 6

B. Plaintiff Misapprehends Defendants' Argument as to Turturro .......... 12

POINT III:

TRANSIT IS ENTITLED TO JMOL BECAUSE PLAINTIFF'S EXPERT APPLIED AN INAPPLICABLE HEIGHTENED STANDARD OF CARE .......... 14

POINT IV:

TRANSIT IS ENTITLED TO JMOL ON PLAINTIFF'S NEGLIGENT DESIGN CLAIM .......... 17

A. Transit's Open Platform Design Does Not Violate Any

Industry Standard, Statute or Regulation ........................................ 17

B. Plaintiff Concedes that Transit's Platform is "Open and Obvious" and Not "Inherently Dangerous" .................................................... 21

POINT V:

DEFENDANT SHABAZZ IS ENTITLED TO JMOL ON PLAINTIFF'S NEGLIGENT OPERATION CLAIM ..................................................... 24

POINT VI:

DEFENDANTS ARE ENTITLED TO JMOL ON PLAINTIFF'S FUTURE LOST EARNINGS CLAIM ..................................................... 28

POINT VII:

DEFENDANTS ARE ENTITLED TO A NEW TRIAL ON PAST PAIN AND SUFFERING BECAUSE PLAINTIFF SOUGHT DAMAGES FOR PRE-IMPACT TERROR WITHOUT ANY EVIDENCE OF SAME ........................................................................ 33

POINT VIII:

TRANSIT WAS PREJUDICED BY THE ADMISSION INTO EVIDENCE OF ITS SUBSEQUENT REMEDIAL MEASURES ............. 34

POINT IX:

TRANSIT IS ENTITLED TO A NEW TRIAL BECAUSE IT WAS PREJUDICED BY OTHER ERRORS AT TRIAL ............................................... 39

A. Glenn Lunden of Transit Was Not an "Expert" ............................... 39

B. The Court Erred in Allowing Evidence of Defendants' Internal Policies ......................................................... 41

C. The Court Improperly Limited Defendants' Expert Cross-Examination ......................................................... 42

D. Plaintiff's Improper Summation Prejudiced Defendants ................. 43

POINT X:

TRANSIT IS ENTITLED TO REMITTITUR OF THE JURY'S $70 MILLION AWARD FOR PAST AND FUTURE PAIN AND SUFFERING OR, ALTERNATIVELY, A NEW TRIAL ............................44

A. Prior Verdicts Should Not be Increased Using the CPI ...................45

B. Plaintiff's Cases Confirm the Jury's Verdict is Not Reasonable .....48

CONCLUSION ........................................................................................ 51

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Matter of 91st St. Crane Collapse Litig.*,
154 A.D.3d 139 [1st Dept 2017] ....................34

*Aguilar v New York City Transit Auth.*,
81 A.D.3d 509 [1st Dept 2011] ....................46, 48

*AIG Glob. Sec. Lending Corp. v Banc of Am. Sec., LLC*,
386 F.Appx 5 [2d Cir. 2010] ....................35

*Albrecht v. Balt. & Ohio R.R. Co.*,
808 F.2d 329 [4th Cir. 1987] ....................36

*Baity v Gen. Elec. Co.*,
86 AD3d 948 [4th Dept 2011] ....................19

*Barron v E. Athletic, Inc.*,
150 AD3d 654 [2d Dept 2017] ....................19

*Beh v Jim Willis & Sons Builders, Inc.*,
28 A.D.3d 1227 [4th Dept 2006] ....................33

*Bethel v. New York City Trans. Auth.*,
92 NY2d 348 [1998] ....................15

*Bondi v Bambrick*,
308 AD2d 330 [1st Dept 2003] ....................46

*Brooks v Outboard Marine Corp.*,
234 F3d 89 [2d Cir. 2000] ....................16

*Brown v State*,
79 AD3d 1579 [4th Dept 2010] ....................11

*Buck v Davis*,
580 U.S. 100 [2017] ....................16, 17



4933-6916-4457v.1

*Capricorn Mgt. Sys., Inc. v Govt. Empls Ins. Co.*,
No. 15-cv-2926, 2019 WL 5694256 [E.D.N.Y. 2019] ....................................39

*Carroll v. United States*,
No. 1:19-cv-1230, 2023 WL 3981420 [N.D.N.Y. 2023] ..................................40

*Chainani v Bd. of Educ.*,
87 N.Y.2d 370 [1995] ..........................................................................22

*Chowdhury v. Wordtel Bangl. Holding, Ltd.*,
746 F.3d 42 [2d Cir. 2014] ....................................................................35

*Chung v New York City Tansit Auth.*,
213 A.D.2d 619 [2d Dept 1995] ...............................................................46

*Coleman v Newsom*,
No. 2:90-cv-0520, 2025 WL 1163350 [E.D. Cal. 2025] ..................................46

*Columbus v Smith & Mahoney P.C.*,
259 AD2d 857 [3d Dept 1999] .................................................................18

*Cruz v New York City Transit Auth.*,
190 A.D.2d 651 [2d Dept 1993] ...............................................................20

*Cupo v Karfunkel*,
1 A.D.3d 48 [2d Dept 2003] ...................................................................22

*Da Silva v New York City Transit Auth.*,
No. 17-cv-4550 2025, WL 1527309 [E.D.N.Y. May 29, 2025] .........................5

*Da Silva v New York City Transit Auth.*,
No.17-cv-4550, 2025 WL 722967 [E.D.N.Y. Mar. 6, 2025] ..............................1

*Dalton v. United States*,
No. 12-cv-506, 2014 WL 7423760 [E.D.N.Y. 2014] .......................................25

*Diamond State Door, LLC v Diamond State Pole Bldgs., LLC*,
No. 21-1258, 2023 WL 3625000 [D. Del. 2023] ...........................................47

*Dibble v New York City Transit Auth.*,
76 AD3d 272 [1st Dept 2010] ...........................................................26, 27

*DiSorbo v Hoy*,
343 F.3d 172 [2d Cir. 2003] ....................................................................47

*Ewans v Wells Fargo Bank, N.A.*,
389 F.Appx 383 [5th Cir 2010] ...............................................................21

*Firmes v Chase Manhattan Auto Fin. Corp.*,
50 A.D.3d 18 [2d Dept 2008] ...................................................................46

*First Nat. Bank of Hollywood v Am. Foam Rubber Corp.*,
530 F.2d 450 [2d Cir 1976] ........................................................................3

*Fried v Signe Nielsen Landscape Architect, PC*,
34 Misc. 3d 1212(A) [Sup Ct, Kings Cty. 2012]..........................................18

*Fusco v. Rome Cable Corp.*,
946 F. Supp. 171 [N.D.N.Y. 1996]..............................................................2

*Galette v. New Jersey Transit Corp.*,
607 U.S. ___, 146 S. Ct. 854 [2026].............................................................5

*Garcia v New York City Transit Auth.*,
114 A.D.3d 720 [2d Dept 2014] ................................................................22

*Geressy v Digital Equip. Corp.*,
980 F. Supp. 640 [E.D.N.Y. 1997] .............................................................49

*Graham v Playtex Prods, Inc.*,
993 F. Supp. 127 [N.D.N.Y. 1998]..............................................................15

*Guerra v 100 Stevens Ave. LLC*,
227 AD3d 467 [1st Dept 2024] .................................................................19

*Harding v Onibokun*,
14 Misc.3d 790 [Sup Ct, Jefferson Cty. 2006] ............................................48

*Harford v. City of New York*,
194 AD2d 519 [2d Dept 1993] ..................................................................10

*Harger Da Silva v. New York City Transit Auth.*,
No. 25-0727, 14.1 ..........................................................................................2

*Hoenig v Shyed*,
284 A.D.2d 225 [1st Dept 2001] ....................................................................46

*Holmes v. United States*,
85 F.3d 962 [2d Cir. 1996] ...........................................................................3

*Howard v. Walker*,
406 F.3d 114 [2d Cir. 2005] ........................................................................43

*Jang Hee Lee v Sung Whun Oh*,
3 A.D.3d 473 [2d Dept 2004] ......................................................................23

*Janover v Ryder Sys., Inc.*,
No. 1:05-cv-2841, 2006 WL 2335546 [E.D.N.Y. 2006]........................20, 21, 22

*In re Joint E. Dist. & S. Dist. Asbestos Litig.*,
995 F.2d 343 [2d Cir. 1993] ........................................................................36

*In re Lake Minnewaska Mountain Houses, Inc.*,
50 B.R. 374 [S.D.N.Y. 1985] .........................................................................1

*Laruccia v Lewis J. Newton & Sons*
242 A.D.3d 854 [2d Dept 2025] ...................................................................22

*Lebron v. City of New York*,
208 A.D.3d 656 [2d Dept 2022] ...................................................................23

*Lee Valley Tools, Ltd. v. Indus. Blade Co.*,
288 FRD 254 [W.D.N.Y. 2013] ...................................................................32

*Leon v. New York City Trans. Auth.*,
96 A.D.3d 554 [1st Dept 2012] ....................................................................13

*Levine v Harriton & Furrer, LLP*,
92 A.D.3d 1176 [3d Dept 2012] ...................................................................18

*Lippel v. City of New York*
281 A.D.2d 327 [1st Dept 2001] ..................................................................40

*Lombardi v. Silk Mill. Condos, Inc.*,
37 A.D.3d 429 [2d Dept 2007] .....................................................................23



4933-6916-4457v.1

*Maraia v Church of Our Lady of Mount Carmel*,
36 A.D.3d 766 [2d Dept 2007] ....................22

*Martinez v. New York City Tran. Auth.*
203 A.D.3d 87 [1st Dept 2022] ....................13

*Martinez v. Porta*,
601 F. Supp.865 [N.D. Tex. 2009] ....................16

*McDermott v. Manhattan Eye, Ear & Throat Hosp.*,
15 N.Y.2d 20 [1964] ....................40, 41

*Mirjah v New York City Transit Auth.*,
48 AD3d 764 [2d Dept 2008] ....................26

*Natoli v City of New York*,
180 AD3d 477 [1st Dept 2020] ....................33

*Newton v State*,
165 AD3d 421 [1st Dept 2018] ....................29

*Nielsen v 300 E. 76th St. Partners, LLC*,
111 AD3d 414 [1st Dept 2013] ....................18

*Nisanov v. Black & Decker (U.S.) Inc.*,
No. 05-cv-5911, 2009 WL 3347088 [E.D.N.Y. 2009] ....................47

*Northrop v Hoffman of Simsbury, Inc.*,
12 F. Appx 44 [2d Cir. 2001] ....................7

*Norville v. Staten Island Univ. Hosp.*,
196 F.3d 89 [2d Cir. 1999] ....................4

*O'Brien v City of New York*
231 AD 698 [2d Dept 1996] ....................10, 11

*Okraynets v Metro. Transp. Auth.*,
555 F. Supp. 2d 420 [S.D.N.Y. 2008] ....................46

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
571 F. Supp. 3d 106 [S.D.N.Y. 2021] ....................32

*Parker v Jones*,
70 Misc.3d 1202(A) [Sup Ct, Warren Cty. 2020] ....................................48

*Peat v Fordham Hill Owners Corp.*
110 AD3d 643 [1st Dept 2013] ....................................................46

*Pedraza v. New York City Trans. Auth.*,
203 AD3d 95 [1st Dept 2022] ....................................................8, 14, 28, 33

*Perlov v. Port Auth. of New York and New Jersey*
189 AD3d 1624 [2d Dept 2020] ....................................................14

*Powell v New York City Transit Auth.*
2025 N.Y. Slip Op. 32023[U] [Sup Ct, Kings County 2025] ......................50, 51

*Prunier v City of Watertown*,
936 F2d 677 [2d Cir. 1991] ....................................................25, 26

*Rangolan v. Cnty. of Nassau*,
370 F.3d 239 [2d Cir. 2004] ....................................................45

*RCD Bldg., L.L.C. v Park Slope Condos, L.L.C.*,
14 Misc. 3d 1215(A) [Sup Ct, Kings Cty. 2007]....................................18

*Rondon v 328 W. 44 St. LLC*,
243 AD3d 493 [1st Dept 2025] ....................................................19

*Rotman v. Progressive Ins. Co.*,
955 F. Supp. 2d 272 [D. Vt. 2013] ................................................17

*Ruby v Budget Rent A Car Corp.*,
23 A.D.3d 257 [1st Dept 2005] ....................................................46

*Saladino v Stewart & Stevenson Servs*,
No. 01-cv-7644, 2011 WL 284476 [E.D.N.Y. 2011]..................................46, 47

*Savillo v. Greenpoint Landing Assoc., LLC*,
2011 N.Y. Slip Op. 31950[U] [Sup Ct, New York County 2011] ......................49

*Sherman v Robinson*,
80 N.Y.2d 483 [1992]............................................................41

*State Farm Fire & Cas. Co. v Bell*,
30 F. Supp. 3d 1085 [D. Kan. 2014] ........ 43

*T.B. by and through Bursch v. Indep. Sch. Distr.112*,
619 F. Supp. 3d 886 [D. Minn. 2022] ........ 16

*Tarpon Bay Partners LLC v. Zerez Holdings Corp.*,
79 F.4th 206 [2d Cir. 2023] ........ 4

*Torres v. State*,
18 AD3d 739 [2d Dept 2005] ........ 23

*Turturro v City of New York*,
28 NY3d 469 [2016] ........ 12, 13, 14, 41

*United States v Uccio*,
940 F.2d 753 [2d Cir. 1991] ........ 3

*Weiner v. Metro Transp. Auth.*,
55 N.Y.2d 175 [1982] ........ 1

*Weiss v Fote*,
7 NY2d 579 [1960] ........ 7

*Wight v. Bankamerica Corp.*,
219 F.3d 79 [2d Cir 2000] ........ 2

*Williams v E. Meadow Union Free Sch. Dist.*,
No.2:21-cv-3310, 2026 WL 790580 [E.D.N.Y. 2026] ........ 17

*Wu v Dunkin' Donuts, Inc.*,
4 F. Appx 82 [2d Cir. 2001] ........ 22

*Yvonne Y. v City of New York*,
199 A.D.3d 551 [1st Dept 2021] ........ 46, 49, 50

*Zhao v. Brookfield Off. Props*,
128 A.D.3d 623 [2d Dept 2015] ........ 23

*Zvinys v Richfield Inv. Co.*,
25 AD3d 358 [1st Dept 2006] ........ 19

**Statutes**

28 U.S.C. § 1291 .....2

28 U.S.C. § 1292 .....5

**Other Authorities**

49 C.F.R. Part 659 .....42

CPLR § 5519 (c) .....51

CPLR § 5501(c) .....45

F.R.E. 407 .....36, 37

F.R.E. 702 .....15

# ARGUMENT

## POINT I

## TRANSIT IS ENTITLED TO GOVERNMENTAL IMMUNITY

Plaintiff's opposition provides no response to *any* of Transit's[1] substantive arguments. (*See* Transit Br., at pp. 9-10).[2] Instead, Plaintiff's arguments are exclusively procedural - - she claims that the Court's prior March 6, 2025 order (the "3/6/25 Order")[3] denying Defendants' summary judgment motion is the "law of the case" and establishes that it does not have governmental immunity. That argument is simply wrong.

### A. There is No Final Order on Governmental Immunity

The "law of the case doctrine" ***does not*** apply to "any [and all] statement[s] made by a court on the record, ***but only to final judgments or orders issued by a court***." *In re Lake Minnewaska Mountain Houses, Inc.*, 50 B.R. 374 [S.D.N.Y. 1985]

---

1 "Transit" refers to Defendants New York City Transit Authority and Metropolitan Transportation Authority. "Defendants" refers collectively to Raqia Shabazz ("Shabazz") and Transit.

2 For example, Plaintiff fails to identify a "specific act or omission" by Transit and "the capacity in which that act or failure to act occurred," such that Transit should supposedly be stripped of governmental immunity. *See Weiner v. Metro Transp. Auth.*, 55 N.Y.2d 175, 182 [1982].

3 *See Da Silva v New York City Transit Auth.*, No.17-cv-4550, 2025 WL 722967, at *1 [E.D.N.Y. Mar. 6, 2025].

[emphasis added]; *see also Fusco v. Rome Cable Corp.*, 946 F.Supp. 171 [N.D.N.Y. 1996] [where prior ruling was "not a final order," "the law of the case doctrine is not implicated"]. Here, the Court's 3/6/25 Order is not a "final order" and the "law of the case doctrine" is simply inapplicable for that reason alone.

Indeed, Plaintiff previously argued that the 3/6/25 order was ***not*** a final order. After Transit filed its notice of appeal of that Order, Plaintiff moved this Court to find the appeal frivolous because the 3/6/25 Order ***was not "final" and not immediately appealable***. (*See* ECF Doc. # 264). She also filed the same motion in the Second Circuit.[4] This self-serving reversal in position is pure gamesmanship barred by the doctrine of judicial estoppel. *See Wight v. Bankamerica Corp.*, 219 F.3d 79, 89 [2d Cir 2000] [judicial estoppel "prevent[s] a party who plays fast and loose with the court from gaining an unfair advantage" by adopting "inconsistent positions"].[5]

Lastly, even if there were a basis to apply the law of the case doctrine - - which

---

[4] *See Harger Da Silva v. New York City Transit. Auth.*, No. 25-0727, 14.1 at p. 4 of 39 [Plaintiff's motion to dismiss appeal on ground that it purportedly "*lacks a jurisdictional basis under 28 U.S.C. § 1291 ["final decisions of district courts*"] and the collateral order doctrine . . . ."] [emphasis added]. Hereinafter, any references to the appellate docket are cited as "App. 25-0727."

[5] *See also* 18B Charles A. Wright & Arthur R. Miller § 4477 (3d ed. 2026) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigating on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.").

there is not - - it is "a discretionary doctrine that need not be applied when no prejudice results from its omission." *First Nat. Bank of Hollywood v Am. Foam Rubber Corp.*, 530 F2d 450, 453 n.3 [2d Cir 1976]. "Prejudice" exists only where there is "a lack of sufficiency of notice or a lack of sufficient opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling." *United States v Uccio*, 940 F2d 753, 758 [2d Cir 1991] [quotations, alterations, and citation omitted].

Plaintiff had ample (and repeated) notice Transit was pursuing qualified and governmental immunity at trial. Indeed, Transit's counsel stated this on the record prior to jury selection. (*See* Tr. 0004-0006, 0048). Transit also moved for a directed verdict on the issue during its Rule 50(a) motion. (Tr. 2305-06).[6]

**B. <u>The 3/6/25 Order Did Not Dismiss the Governmental Immunity Defense</u>**

Even if the Court considers its 3/6/25 Order to have established the "law of the case" - - which it should not - - that Order did not adjudicate Transit's governmental immunity defense. The 3/6/25 Order simply denied Transit's summary judgment motion on that defense (among other things). Plaintiff ***did not*** move for summary judgment or otherwise seek to dismiss that defense (or any other).

[6] The purpose of such a Rule 50(a) motion is to put the opposing party "on notice of potential deficiencies in its proof before the case is submitted to the jury." *Holmes v. United States*, 85 F,3d 956, 962 [2d Cir 1996] [citation omitted].

Of course, mere denial of a summary judgment motion does not foreclose future argument on the defense that is the subject of the motion. To the contrary, that defense remains for adjudication at trial. *See Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 220 [2d Cir 2023] [denial of summary judgment "mean[s] that the status quo is preserved and the claims proceed to trial"].

In fact, the Second Circuit has confirmed that - - although the District Court may have denied summary judgment on a claim or defense - - at trial, the Court "is free to conclude that the record amassed at trial has . . . ***made judgment as a matter of law appropriate***." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 94 n.1 [2d Cir. 1999] [emphasis added]. Indeed, Plaintiff herself made this very point (*i.e.*, that the record on Transit's immunity defenses would be further developed at trial) when she opposed Transit's motion to stay the trial. (*See* ECF Doc. # 269). Specifically, Plaintiff argued:

> [A]llowing the trial to move forward will not erode defendants' immunity defenses but will instead enhance the appellate process. ***The development of a full factual record at trial -- through witness testimony, expert analysis, and evidence - - will provide the Second Circuit with a comprehensive foundation to evaluate the immunity claims.*** The enriched record, absent from the current interlocutory appeal, will enable a more informed and efficient review, potentially resolving factual disputes that underpin the immunity defenses . . . .

(*Id.* at p. 9 [emphasis added]).

## C. The Court Did Not Find Transit's Governmental Immunity Defense to be "Frivolous"

Plaintiff is also wrong that this Court's May 29, 2025 order ("the 5/29/25 Order")[7] found Transit's governmental immunity defense to be "frivolous." The 5/29/25 Order only found that Transit's act of *appealing* was itself "frivolous" because the Court had not certified that order pursuant to 28 U.S.C. § 1292. *See* 2025 WL 1527309, at *1 [Transit's "[a]ppeal . . . is improper and frivolous without the Court certifying an interlocutory appeal."]. The Court did not declare that Transit's governmental immunity defense was "frivolous" on the merits.[8]

## D. Recent Supreme Court Decisions Are Not Relevant

Finally, Plaintiff cryptically directs the Court to the Supreme Court's ruling in *Galette v. New Jersey Transit Corp.*, 607 U.S. ___, 146 S Ct 854 [2026]. There, however, the Supreme Court evaluated New Jersey Transit's claim that it was entitled to sovereign immunity under the Eleventh Amendment. *Id.* But Plaintiff herself ***previously argued*** that "federal qualified immunity is not at issue here; this

---

7 *See Da Silva v New York City Transit Auth.*, No. 17-cv-4550 2025, WL 1527309, at *1 [E.D.N.Y. May 29, 2025].

8 The 5/29/25 Order resulted in the Court asserting dual jurisdiction over the subject matter of Transit's appeal, which allowed Plaintiff to present the negligent design claims at trial while the appeal was pending.

case involves state law claims and state-law defenses"[9] and has made similar arguments to the Second Circuit.[10]

* * *

For these reasons, and those stated in Defendants' moving brief, Transit is entitled to judgment as a matter of law (JMOL) on its governmental immunity defense.

## POINT II

## TRANSIT IT ENTITLED TO QUALIFIED IMMUNITY

Plaintiff argues that Transit is not entitled to JMOL on qualified immunity because there supposedly was "a mountain of evidence" supporting the jury's finding that Transit had not "studied the issues of persons falling on the tracks" as of the date of her accident. (*See* Pl. Opp. Br. at p. 6). Plaintiff is wrong about that (the evidence established that Transit studied this issue) and every other aspect of Transit's qualified immunity defense.

### A. No Reasonable Jury Could Find Against Transit Based on the Trial Evidence

Transit is entitled to JMOL on its qualified immunity defense "if no reasonable jury could find for [Plaintiff]." *Northrop v Hoffman of Simsbury, Inc.*, 12 F. Appx

---

9 ECF Doc. # 264-3, at p. 7.

10 App. 25-0727, 14.1 at pp. 6-7 of 39.

44, 49 [2d Cir 2001]. Provided a state actor has sufficiently studied an issue, the State can only be stripped of qualified immunity when "no reasonable official could have adopted" the selected course of action. *Weiss v Fote*, 7 NY2d 579, 586 [1960]. Here, Transit did study and review the issue of passengers falling on tracks and - - for several reasons - - reached a reasonable conclusion ***not*** to install platform screen doors ("PSDs") or track intrusion devices as of the date of Plaintiff's accident. None of the trial evidence that Plaintiff has cited (and mischaracterized) compels a different conclusion.

For example, Plaintiff does not contest that the trial evidence established: (1) Transit has investigated every 12-9 event since the 1980s;[11] (2) an infinitesimal percentage of Transit's riders come into contact with trains (0.0000092% of riders) - - with even fewer experiencing catastrophic injury and/or death; (3) PSDs are not used in any mass transit system in the United States; (4) Transit nonetheless still reviewed whether PSDs could be implemented in portions of its system, including soliciting information from manufacturers and developing a Concept of Operations and pilot programs; (5) Transit specifically identified numerous complications and difficulties with installing PSDs; and (6) given those complications, Transit instead decided to implement other measures to minimize the risk of 12-9s (such as:

---

[11] This included maintaining CWI charts and reviewing each incident for a root cause - - Transit found "no operational or system defect." (Tr. 366-67).

initiating public awareness campaigns; painting visual indicators on the platform edge (and utilizing tactile strips); announcing train arrivals; using countdown clocks; and installing help points). (*See* Transit Br. at pp. 5-8).[12] Nor does Plaintiff contest that these alternative measures that Transit did employ are utilized in other systems. (*Id.*).

The foregoing evidence - - again, which Plaintiff failed to even address, much less dispute - - confirms, not only that Transit studied "the issues of persons falling on the tracks" (contrary to the jury's finding), but that their decision not to install technology that had not yet been tested in Transit's system was a reasonable one.

Instead of addressing this evidence, Plaintiff resorts to selectively cherry-picking excerpts from the testimony of certain witnesses. For example, Plaintiff cites Mike Sullivan's testimony that he was unaware of specific "safety studies". (*See* Pl. Opp. Br. at p. 7). Similarly, Plaintiff cites Eric Jones' testimony that he was unaware of a specific "hazard analysis" or "study" (as to the Atlantic Avenue-Barclay Station or elsewhere). (Pl. Opp. Br. at pp. 7-8).[13] However, there is no

---

12 Plaintiff is simply wrong that Transit "never did anything about [12-9s] except for instituting public awareness campaigns . . ." [Pl. Opp. Br. at. p. 16].

13 Notably, in *Pedraza v. New York City Trans. Auth.*, 203 AD3d 95, 104 [1st Dept 2022], the court rejected the plaintiff's argument that Transit was stripped of qualified immunity "because, while its speed studies looked at the overall system, they did not specifically investigate whether the curve at the [at-issue] station necessitated that train slow down upon entering the station."

requirement that Transit conduct a station-by-station study. Indeed, since Plaintiff claims the alleged risk of open platforms exists throughout Transit's system, it would only make sense that Transit conduct a systemwide analysis instead of limiting any analysis to a single station.

Further, Plaintiff cites no authority that Transit's "study" of this issue was required to be formally embodied in a "safety study" or "hazard analysis" to be entitled to qualified immunity - - because there is no such authority. The same is true for Plaintiff's references to testimony from certain witnesses that they did not see a "written plan" specifying Transit's strategy to avoid or minimize 12-9s. (*See* Pl. Opp. Br. at 10-12 [citing testimony from witnesses Doddo, Lunden and Abdallah]). Again, no authority requires that a state actor's "study" of an issue be reduced formally to a signed-and-sealed written document.

Equally unavailing is Plaintiff's citation to evidence that manufacturers responded to Transit's requests for information ("RFI")[14] by offering to install PSDs at little-to-no upfront cost.[15] (*See* Pl. Opp. Br. at pp. 8-9). But this misses the point

---

[14] Transit notes that the very fact that it requested information about this technology is in and of itself establishes that Transit studied ways to mitigate the risk of "persons falling on the tracks".

[15] Plaintiff simply speculates that the responding manufacturers could (or would) actually install PSDs in Transit's system, assuming feasible, at little-to-no up-front costs to Transit. Indeed, Wurtz - - the only witness who testified on behalf of *any* of the companies that responded to Transit's RFI - - admitted that there was "no written financial commitment since this was a RFI." (Tr. 219-20). Plaintiff also

- - indeed, Transit never argued that cost was one of the complications in installing PSDs in its system. Rather, in deciding not to install PSDs, Transit identified other problems related to electrical, ventilation, structural and maintenance issues. (Transit Br. at p. 6). It is the consideration of these potential barriers to installing PSDs that establishes Transit studied ways to mitigate the issue of persons falling onto the tracks. (*See*, *e.g*., Tr. 535-39, 556, 1030-31).

Plaintiff argues that *Harford v. City of New York* (194 AD2d 519 [2d Dept 1993]) and *O'Brien v City of New York* (231 AD 698 [2d Dept 1996]) - - cited by Transit in its motion - - are inapplicable because the actors were found immune for "non-determinations" that traffic control devices were unnecessary. (Pl. Opp. Br. at 15). But that is precisely what the trial evidence showed Transit did here - - as in *Harford and O'Brien,* Transit determined not to immediately install PSDs (or other barriers) in its system for valid reasons.

Transit did not simply "do nothing" in the meantime, as Plaintiff claims - - it continued to implement other industry standard safety initiatives (like tactile strips and countdown clocks) and continued to study the feasibility of installing PSDs.[16]

---

presented no evidence that any purported offer included installing PSDs on the at-issue platform.

[16] Transit also, for example: implemented a public awareness campaign that utilized announcements and signs for train arrivals and cautioning riders to stand back from the platform edge (Tr. 154, 165, 168); completed pilot programs for track intrusion detection systems (Tr. 165); and installed help points, which provide a

Significantly, Transit's study was continuing at the time of the accident. *See O'Brien*, 231 AD2d at 699 [City was entitled to immunity where it "had not completed the study at the time of the accident."]. Indeed, Transit continued to study *every* 12-9[17] and evaluate new technologies including track intrusion detection systems and PSDs. Regarding the later point, at the time of Plaintiff's accident, Transit had engaged in two separate pilot programs for track intrusions detection devices *and* had a pilot program planned for PSDs.[18]

However, these pointed arguments about station specific studies and whether PSDs were studied is not the applicable standard. Even applying Plaintiff's more stringent definition for the standard to apply qualified immunity, the question is: (1) whether Transit studied the specific issue of the risk that will be considered by the jury; and (2) whether Transit's decision had a reasonable basis. Here, the trial record established both.

---

direct line to the rail control center (Tr. 168-169, 570).

17 (*See* Tr. 406.)

18 Transit's actions do not resemble those of the defendant in *Brown v State*, 79 AD3d 1579 [4th Dept 2010]. There, the State "abandoned any study that had been undertaken" and "no study or plan was underway at the time of the accident." *Id*. at 1581-82. Transit here *did not* abandon any study about 12-9s and their review was continuing at the time of Plaintiff's accident.

Transit studied the specific risk that was presented to the jury - - 12-9 accidents and how to mitigate them. Transit kept statistical charts about every 12-9 incident on a yearly basis (Tr. 111) precisely because Transit was studying the issue. Transit considered PSDs and requested RFIs to gather more information about them (Tr. 500-03) because it was studying the issue of how to best mitigate the risk of 12-9s occurring within the system. Even after Transit realized that PSDs may not be feasible or viable in the century old system, Transit continued its study and considered and implemented alternative mitigation remedies - - tactile strips and countdown clocks (Tr 155, 169), public awareness campaign announcements and signs cautioning riders to stand back from the platform edge (Tr. 154, 165, 168); completed pilot programs for track intrusion detection systems (Tr. 165); and installed help points (Tr. 168-169, 570).

Therefore, no rational jury could have found that Transit is not entitled to qualified immunity.

### B. <u>Plaintiff Misapprehends Defendants' Argument as to *Turturro*</u>

Plaintiff misses the point of Defendants' argument concerning the Court of Appeals' decision in *Turturro v City of New York*, 28 NY3d 469 [2016]. Defendants do not dispute that *Turturro* recites the general test for qualified immunity. But *Turturro* also found - - ***in the context of the design of a roadway*** - - that a state actor has an ongoing duty to review its implemented design in light of actual operations

on that roadway. It is this holding in *Turturro* - - which the Court incorporated into the jury charge and verdict sheet over Defendants' objection - - that has never been applied to rail operations.

The cases cited by Plaintiff involving accidents during rail operations, in fact, ***confirm*** this point. For example, in *Leon v. New York City Trans. Auth.*, 96 AD3d 554, 555 [1st Dept 2012], where the plaintiff fell between a subway train and the platform, the First Department held that to establish qualified immunity, Transit was required to "demonstrate that a 'study inquiry or investigation' into that question was conducted and reached the determination now relied upon." The First Department *did not* even suggest that any case required Transit to engage an ongoing review of its actual operations.

The same is true of *Martinez v. New York City Tran. Auth.* (203 A.D.3d 87 [1st Dept 2022]), where the plaintiff was stuck by a subway train. The First Department described *Turturro* as requiring governmental bodies to "establish that the study was specifically tailored to the issue in question" to be entitled to qualified immunity. *Id.* at 92. Again, the court did not indicate that Transit was obligated to continually monitor its implemented design in light of actual operations, as the Court required in *Turturro* as to roadways. *See also Pedraza*, 203 AD3d at 95 [discussing requirements for application of qualified immunity to transit, with no mention of an obligation to continually monitor operations].

Even in *Perlov v. Port Auth. of New York and New Jersey* (189 AD3d 1624, 1628 [2d Dept 2020]) - - where the Second Department found that the defendants' "construction, operation, and maintenance of the bridge are analogous to roadway planning, design, and maintenance" in *Turturro* - - the Court did not impose a continuing obligation on the defendant to monitor its decision to not install suicide prevention barriers on its bridge in light of subsequent actual operations.

* * *

For these reasons, and those stated in Defendants' moving brief, Transit is entitled to JMOL on the basis of qualified immunity.

## POINT III

## TRANSIT IS ENTITLED TO JMOL BECAUSE PLAINTIFF'S EXPERT APPLIED AN INAPPLICABLE HEIGHTENED STANDARD OF CARE

Transit moved for JMOL on the ground that: (1) Plaintiff's negligent design claims must be supported by expert testimony; (2) the Court should revisit its prior *Daubert* ruling and preclude the testimony of Plaintiff's liability expert (Carl Berkowitz); and (3) without Berkowitz's expert testimony, Plaintiff's claims fail as a matter of law. (*See* Transit Br. at pp. 17-25). Plaintiff does not even address, let alone refute, any of these arguments.

Instead, Plaintiff's opposition addresses a different point. She argues that: "[t]he only standard of care that matters in the instant case is the one the Court properly charged to the jury" - - *i.e.*, the standard of reasonable care. (Pl. Opp. p.

29); But this is exactly Defendants' point and illustrates the defect in Berkowitz's opinions under F.R.E. 702 - - his opinions and trial testimony applied a heightened standard to Transit's conduct which all parties agree ***does not apply to Transit's conduct*** (*see Bethel v. New York City Trans. Auth.*, 92 NY2d 348 [1998] [common carriers are held to standard of reasonable care]).

For Berkowitz's opinions to be "helpful" to the jury - - as they must to be admissible under F.R.E. 702 - - the opinions "must relate to an issue that is actually in dispute . . . ." *Graham v Playtex Prods, Inc.*, 993 F Supp 127, 130 [NDNY 1998] (quotation and citation omitted). Here, Berkowitz's opinions - - premised on a heightened standard that required Transit to do everything "humanly and technically and engineering[ly]" possible[19] to avoid track-related accidents - - do nothing to "help" the jury determine the actual disputed issue: whether Transit acted "reasonably" under the correct standard.

As such, Berkowitz should not have been permitted to testify at trial (or his testimony should have been stricken and the jury instructed to lend it no weight). *See T.B. by and through Bursch v. Indep. Sch. Distr.112*, 619 F.Supp.3d 886, 892 [D. Minn. 2022] [precluding expert opinions based on an erroneous legal standard because it "may confuse the jury]; *Martinez v. Porta*, 601 F.Supp.865, 867 [N.D.

---

[19] *See* Tr. 965.

Tex. 2009] [precluding expert from offering opinions utilizing erroneous legal premise because they "are based on an improper foundation and fall on that basis . . ."]. As a result, Plaintiff's claims - - unsupported by any admissible expert testimony - - fail as a matter of law. *See Brooks v Outboard Marine Corp.*, 234 F3d 89, 92 [2d Cir 2000] [affirming exclusion of plaintiff's expert and, as a result, dismissing plaintiff's claims as unsupported by admissible expert testimony].

Plaintiff next argues that "it is ridiculous" that "the jury was somehow swayed" by Berkowitz's testimony. (Pl. Opp. Br., at p. 21). But, Berkowitz's heightened standard opinions pervaded his trial testimony. And Plaintiff's counsel stated to the jury in summation that Transit was obligated to remove *all possible hazards* in its system. (*See* Transit Br., at p. 47). As a result, it cannot be viewed as harmless because it plainly prejudiced Transit. Indeed, "swaying" the jury was precisely the point of this "expert" testimony from Berkowitz. The Supreme Court has held that the prejudicial effect of expert's testimony is particularly "heightened due to the source of the testimony." *Buck v Davis*, 580 U.S. 100, 121 [2017]. This is because an expert takes the stand "bearing the court's imprimatur" and the jury hears the expert's credentials and experience - - as a result, "reasonable jurors might well have valued [the expert's] opinion concerning the central question before them." *Id.*; *see Williams v E. Meadow Union Free Sch. Dist.*, No.2:21-cv-3310, 2026 WL 790580, at *17 [EDNY 2026] [noting "the risk that [expert] testimony could

cause unfair prejudice by lending an expert's imprimatur" to matters on which the expert testifies]; *Rotman v. Progressive Ins. Co.*, 955 F Supp 2d 272, 283 [D. Vt. 2013] [improper expert testimony "poses the risk of confusing and misleading the jury as it lends the imprimatur of the expert's qualifications and a stamp of credibility to what is otherwise rank speculation"].[20]

* * *

For these reasons, and those stated in Transit's moving brief, the Court should grant JMOL to Transit on the ground that Plaintiff presented no admissible expert testimony at trial to support her negligent design claim.

## POINT IV

## TRANSIT IS ENTITLED TO JMOL ON PLAINTIFF'S NEGLIGENT DESIGN CLAIM

### A. Transit's Open Platform Design Does Not Violate Any Industry Standard, Statute or Regulation

Plaintiff first argues it is inconsequential that not a single statute, regulation or industry standard mandated that Transit install PSDs on its platform. Plaintiff cavalierly declares that the Third Department's holding in *Columbus v Smith &*

[20] It is of no moment that - - according to Plaintiff - - fact witness testimony supported a verdict in her favor. Berkowitz's testimony as an expert placed a "stamp" expert approval on her theory that Transit had to do everything "humanly" possible to prevent her accident. *See Buck*, 580 U.S. at 121; *Rotman*, 955 F Supp 2d at 283. Such improper expert testimony independently operated to prejudice Transit.

*Mahoney P.C.*, 259 AD2d 857 [3d Dept 1999] is somehow "an incorrect statement of the law." (Pl. Opp. Br., at p. 24). There, the court held: "[i]t is well settled that in order to prove negligence . . . in the design of a structure, the plaintiff must put forth expert testimony" that the defendant "deviated from accepted industry standards." *Colombus*, 259 A.D.2d at 858 Plaintiff cites no case that purports to overrule or even call in question that holding.

In fact, *Columbus* correctly states "well-settled" New York law.[21] For this reason, where there is no industry standard (or statute or regulation) that requires the defendant to design or maintain a structure as alleged by the plaintiff, the defendant is entitled to JMOL. *See* Transit Br. at 25-26 (collecting cases); *see also Nielsen v 300 E. 76th St. Partners, LLC,* 111 AD3d 414, 415 [1st Dept 2013] [defendant entitled to judgment where "neither the ladder nor the hatch door violated any specific statutory provisions, and plaintiff submitted no evidence of another type of industry-wide standard applicable to this case"]; *Barron v E. Athletic, Inc.*, 150 AD3d 654, 656 [2d Dept 2017] [defendant gym owner entitled to judgment where plaintiff "failed to demonstrate that the defendant violated any statute or industry

---

[21] *Columbus* has been repeatedly cited by the New York courts for this very proposition. *See, e.g., Levine v Harriton & Furrer, LLP*, 92 AD3d 1176, 1180 [3d Dept 2012]; *Fried v Signe Nielsen Landscape Architect, PC*, 34 Misc. 3d 1212(A) [Sup Ct, Kings Cty. 2012]; Ku Sung Lee v Laybman, 16 Misc. 3d 1112(A) [Sup Ct, Queens Cty. 2007]; *RCD Bldg., L.L.C. v Park Slope Condos, L.L.C.*, 14 Misc. 3d 1215(A) [Sup Ct, Kings Cty. 2007].

standards of care which proximately caused the injured plaintiff's injuries."]; *Zvinys v Richfield Inv. Co.*, 25 AD3d 358, 360 [1st Dept 2006] [judgment for property owner and manager where plaintiff's "expert did not cite any statutes, codes or industry standards allegedly violated with respect to the circuit breakers."]

Rather than address or distinguish "well-settled" New York law as applied in these cases, Plaintiff instead cites a different line of inapplicable cases. Those cases hold that, if there ***is*** ***an existing applicable industry standard*** (or a statute or regulation), compliance with it "is not dispositive of whether [the defendant] breached their duty of care under the common law." *Rondon v 328 W. 44 St. LLC*, 243 AD3d 493, 494 [1st Dept 2025]. But that is not the case here - - there is simply no industry standard, regulation or statute at all which required Transit to install PSDs, and Plaintiff does not argue otherwise.[22]

The fact that Transit's platforms are designed consistently with those of every

---

[22] This also distinguishes the other cases cited by Plaintiff, which involved defendants who complied with an existing standard, regulation or statute. *See Guerra v 100 Stevens Ave. LLC*, 227 AD3d 467, 468 [1st Dept 2024] ["A jury may still find . . . that ***even if the relevant statutes were complied with***, defendant violated its common-law duty to maintain its premises"] [emphasis added]; *Baity v Gen. Elec. Co.*, 86 AD3d 948, 951 [4th Dept 2011] [that defendant "***comported with industry standards*** [does] not establish as a matter of law that [defendant] was not negligent"] [emphasis added, second alteration in original]. This is the same line of inapplicable cases cited by the District Court in *Janover v Ryder Sys., Inc.*, No. 1:05-cv-2841, 2006 WL 2335546, at *2 [EDNY 2006] [citing *Kellman v. 45 Tiemann Assocs., Inc.*, 87 NY2d 871, 872 [1995] for the proposition that "compliance with statutes is not dispositive on question of whether defendant satisfied common law duties."].

other mass transportation system in the United States - - which are open and do not utilize PSDs - - only bolsters Transit's entitlement to JMOL.[23] For example, in *Cruz v New York City Transit Auth.*, 190 A.D.2d 651, 654 [2d Dept 1993], the Second Department found Transit was entitled to judgment because "three other metropolitan areas in the United States (Boston, Philadelphia, and Chicago) had elevated subway lines and in none of them were there stairways with finials on the guard rails."[24] Again, it was Plaintiff's burden to establish that Transit deviated from an applicable industry standard, and she failed to do so.

Unable to cite an industry standard, regulation or statute with which Transit did not comply, Plaintiff's again cherry-picks testimony from Transit witness Abdallah that "industry best practices is to utilize [PSDs] to prevent or eliminate or reduce" deaths and injuries. (Pl. Opp. Br., at p. 24 (citing Tr. 1900)). But, as argued in Transit's moving brief, "best practices" is not the standard in this or any other

---

[23] Plaintiff somehow contends that her liability expert (Berkowitz) did not agree that open platform designs are the industry standard in the United States. (Pl. Opp. Br., at p. 25). But, in the same breath, Plaintiff admits Berkowitz conceded at trial "that no subway system in the United States has yet employed the kind of safety devices that were being discussed at trial." (*Id.*; *see also* Tr. T 977). Of course, this is tantamount to an admission that open platforms are the industry standard. The Court should reject Plaintiff's argument as rank semantics.

[24] In *Cruz*, plaintiff fell from a horizontal railing he was sitting on at a Transit station. 190 A.D.2d at 253. Plaintiff claimed the railing "should have been topped with protruding spikes or finials . . . to deter people from sitting on the rail."

negligence case. "Negligence law is concerned with reasonable practices, not best practices." *Ewans v Wells Fargo Bank, N.A.*, 389 F.Appx 383, 390 [5th Cir 2010].

Because Transit did not violate any industry standard (or any statute or regulation), it is entitled to JMOL on Plaintiff's design defect claim.

## B. Plaintiff Concedes that Transit's Platform is "Open and Obvious" and <u>Not "Inherently Dangerous"</u>

Plaintiff also does not dispute that dangers on Transit's platform were "open and obvious" and does not claim the platform was "inherently dangerous." Instead, Plaintiff skirts those issues and solely argues that: "proof that a dangerous condition is open and obvious does not preclude [Transit's liability] . . . but is relevant to the issue of the plaintiff's comparative negligence" only. (Pl. Opp. Br., at 28-29) (citing *Janover*, 2006 WL 2335546, at *2). Plaintiff is ignoring most of Transit's motion and overlooking most of New York's law on "open and obvious" dangers.

The District Court in *Janover, supra* (in the passage cited by Plaintiff), was quoting *Cupo v Karfunkel*, 1 A.D.3d 48, 52 [2d Dept 2003], where the Second Department held that the "open and obvious" nature of a danger - - ***standing alone*** - - does not entitle a landowner to JMOL. *Id.* [emphasis added]. The *Cupo* court, however, was quick to reiterate that a property owner is still entitled to JMOL where:

> [T]he condition complained of by the plaintiff was both open and obvious ***and, as a matter of law, was not inherently dangerous***. [*Id.*] [emphasis in original].

This is precisely what Transit argued in its motion, citing cases awarding JMOL to property owners where plaintiffs were injured in falls from platformed areas (similar to Transit's subway platforms) because: (1) the dangers were "open and obvious;" and (2) the platformed areas were not "inherently dangerous."[25] (Transit Br. at 28-29).

For example, Transit cited *Laruccia v Lewis J. Newton & Sons* (242 AD3d 854, 854-55 [2d Dept 2025]), where judgment was awarded to the property owner when plaintiff fell from a Ferris wheel loading platform, because that platform was "open and obvious" and not "inherently dangerous." *See Maraia v Church of Our Lady of Mount Carmel*, 36 AD3d 766, 767 [2d Dept 2007] [landowner entitled to judgment when plaintiff fell from platform]; *Lebron v. City of New York*, 208 AD3d 656 [2d Dept. 2022] [City entitled to judgment where plaintiff fell into an open

[25] Although the cases cited in Transit's motion establish that its platforms are not "inherently dangerous" (and Plaintiff has not contested this), this conclusion is bolstered by further case law. "Inherently dangerous" areas and activities are those which are "dangerous in spite of all reasonable care." *Wu v Dunkin' Donuts, Inc.*, 4 F. Appx 82, 84 [2d Cir. 2001] [citations and internal quotations omitted]. Examples of such activities are blasting, certain kinds of construction and work with high tension electric wires. *Chainani v Bd. of Educ.*, 87 N.Y.2d 370, 381 [1995]. No court has ever suggested that simply waiting for a subway train is inherently dangerous or that subway platforms are inherently dangerous locations. If anything, the law is to the contrary. *See Garcia v New York City Transit Auth.*, 114 A.D.3d 720, 721 [2d Dept 2014] ["A subway company is not negligent merely because it permits crowds to gather on its platform." [citation omitted]].

inspection pit at Taxi and Limousine Commission ("TLC") facility].[26]

Stated another way, a landowner is not liable if the plaintiff was injured by a condition that is "inherent or incidental to the nature of the property, and that could be reasonably anticipated by those using it." *Torres v. State*, 18 AD3d 739, 739 [2d Dept 2005]. Of course, conditions at subway platforms throughout Transit's system (including the open platform edges) are "inherent and incidental" to the nature of Transit's operations[27] and are "reasonably anticipated" by riders waiting for trains. *See Lebron*, 208 A.D.3d at 657 (dangers of open inspection pit was "inherent and incidental" to TLC's facility). Indeed, Plaintiff and her husband were ***admittedly aware*** of those conditions.[28] (*See* Transit Br. at 29) (citing Tr. 1301, 1458).

In short, the evidence at trial - - in addition to establishing that dangers at the

---

26 *See also Zhao v. Brookfield Off. Props*, 128 A.D.3d 623, 623 [2d Dept 2015] [defendant entitled to judgment where plaintiff fell from "low concrete platform"]; *Jang Hee Lee v Sung Whun Oh,* 3 A.D.3d 473, 474 [2d Dept 2004] [defendant entitled to judgment when plaintiff fell into "one-meter-deep empty, artificial cement pond"].

27 As they are to all rapid transit heavy rail systems throughout the country.

28 *See Lombardi v. Silk Mill. Condos, Inc.*, 37 AD3d 429, 430 [2d Dept 2007] [granting summary judgment in defendant's favor where plaintiff admitted "she was well aware of the condition which allegedly caused her to fall, having previously observed it and having traversed the subject area without incident very shortly before her accident"].

edge of Transit's platform were "open and obvious" - - showed that the platform was not "inherently dangerous." Rather, the conditions which resulted in Plaintiff's accident were incidental to the use of Transit's platforms and stations by millions of passengers every day. This evidence makes this issue not relevant simply to comparative negligence - - as Plaintiff argues - - rather, it entitles Transit to JMOL.

## POINT V

## DEFENDANT SHABAZZ IS ENTITLED TO JMOL ON PLAINTIFF'S NEGLIGENT OPERATION CLAIM

Plaintiff opposes Defendants' motion for JMOL on the ground that there was insufficient evidence for Shabazz to avoid striking Plaintiff. She argues primarily that: (1) her liability expert (Berkowitz) did not concede that she was impacted by the train within 7-10 seconds of her fall onto the tracks; and (2) the jury could have concluded, based on her husband's testimony, that the train struck her "well more than 10 seconds" after the fall. (Pl. Opp. Br. pp. at 30-31). Plaintiff's arguments are contrary to the trial evidence on both counts.

First, the trial testimony of Plaintiff's husband (George Brown) did not provide the jury a basis to infer the passage of any specific amount of time between Plaintiff's fall and the train's impact. Indeed, Plaintiff's description of Brown's testimony confirms this - - she explains only that Brown was waiving his hands at the train to stop and that it was "several seconds" later that he heard the train's brake

applied. (Pl. Opp. Br., at 31).

Brown's generalized, non-specific testimony impermissibly invites the jury to speculate at the length of time Plaintiff was on the tracks before she was stuck by the train. *See Dalton v. United States*, No. 12-cv-506, 2014 WL 7423760, at *14 n. 31 [EDNY 2014] [rejecting witness' testimony that "maybe five seconds" passed between two events as "merely a guess or speculation"]; *Prunier v City of Watertown*, 936 F2d 677, 680 [2d Cir 1991] ["[A] jury may not base its verdict on mere speculation, surmise or guesswork."].

Allowing the jury to speculate based on Brown's testimony is particularly troubling here because Plaintiff's liability expert (Berkowitz) ***reviewed Brown's testimony,***[29] but nonetheless agreed - - based on the testimony of a witness who did not testify at trial - - that ***7 to 10 seconds*** elapsed between Plaintiff's fall to the tracks and the impact. To allow the jury's verdict to stand based on guesswork - - drawn from Brown's testimony or otherwise - - that "well more than ten seconds" elapsed, would be to allow a verdict based on pure speculation which directly contradicts the unequivocal testimony of Plaintiff's own expert. This is impermissible. *See Prunier*, 936 F.2d at 680.

Plaintiff claims that Berkowitz did not, in fact, base his opinion on that 7 to

---

[29] *See* Berkowitz Rpt. at 99 ("Supporting Documentation: Key Depositions, interviews and witness statements"); *see also id.* at p. 104.

10 second testimony. As Plaintiff tells it, Berkowitz "merely testified that he *reviewed* the testimony" and "did not testify that he accepted" that testimony. (*See* Pl. Opp. Br. at p. 31). That is plainly wrong. Indeed, the trial record is clear that Berkowitz not only reviewed and accepted that testimony, he expressly ***relied on it*** in formulating his opinion:

> The Court: One second. Just stop. It's not in evidence what her testimony is. Okay. So you relied upon her testimony, whatever it was.
>
> The Witness: ***Yes. 7 to 10 seconds, Your Honor***. If a train is going 24 miles per hour, that 36 feet a second; 36 feet by 10 seconds is 360 feet.

(Tr. 1042-1043) (emphasis added).

Plaintiff's attempt to distinguish *Mirjah v New York City Transit Auth.* (48 AD3d 764 [2d Dept 2008]) and *Dibble v New York City Transit Auth.* (76 AD3d 272 [1st Dept 2010]) - - cases where judgment was entered in favor of Transit, in part, due to the plaintiff's expert use of speculative data concerning a train operator's reaction time - - are unpersuasive.

First, the 0.67 perception reaction time ("PRT") Berkowitz used for his opinions as to Shabazz is not based on any reliable data or methodology. Indeed, the Department of Transportation ("DOT") "study" to which Plaintiff refers to prop up Berkowitz's opinions follows a statement about *a maximum* PRT - - "[b]y preparing to stop, the train operator has reduced the [PRT] from a maximum of 1.9

seconds (based on the study by U.S. Department of Transportation [et al.]) to approximately 0.6 seconds."(*See* Berkowitz Rpt. at p. 51). While the DOT study does contain a reference to "1.9 seconds" in a chart comparing students to engineers, ***0.6 seconds appears nowhere in the publication***.[30] In fact, the study cited shows that where a stop signal is *not* expected and *not previewed*, the "mean brake response time" is ***well over 1 second*** (far greater than Berkowitz's .67 estimate). (*See* DOT study at pp 27-28).

Furthermore, just like the "study" in *Dibble* which did not support a claim against Transit there, the DOT study here reflects "mean brake response time" that is ***not tied to Shabazz***. (Tr. 1046). As the First Department held in *Dibble*, this logically means some train operates have quicker reaction times and others have slower times. *See* 76 A.D.3d at 277 ("[I]t is self-evident that if the average reaction time is deemed to be one second for train operators, then a number of all train operators will have a reaction time of less than one second, and correspondingly a number of all train operators a reaction time of more than one second.").

Therefore, even assuming *some* engineers can theoretically achieve a 0.67

---

[30] *See* Preview Information in Cab Displays for High-Speed Locomotives, Human Factors in Railroad Operations, U.S. Department of Transportation Federal Railroad Administration and Mass. Institute of Technology, July 2005 (DOT/FRA/ORD-04/12), at p. 28, *available at*: https://rosap.ntl.bts.gov/view/dot/23188/dot_23188_DS1.pdf

PRT, Berkowitz simply applied that fastest reaction time to Shabazz without any basis for using it to specifically evaluate her performance. Indeed, Berkowitz himself performed no tests of Shabazz' specific PRT. Nor did he provide any basis for a jury to evaluate at what point an operator's slower reaction time becomes "negligent."[31]

Moreover, as a practical matter, the jury's apportionment of 0.01% negligence to the train operator for her conduct is irrational. How can anyone be 0.01% responsible for an accident upon a preponderance of the proof?

For the above stated reasons, and those in Defendants' moving brief, Shabazz is entitled to JMOL on Plaintiff's negligent operation claim.

## POINT VI

## DEFENDANTS ARE ENTITLED TO JMOL ON PLAINTIFF'S FUTURE LOST EARNINGS CLAIM

Plaintiff's future lost earnings claim is based on her assertion that, at some point, she will no longer be able to work full-time and will lose income as she shifts

[31] It is unclear why Plaintiff cited *Pedraza v New York City Transit Auth.*, 203 AD3d 95, 97 [1st Dept 2022], in which the court found that the testimony of plaintiff's expert supported her claim against Transit. But there, the expert's "calculations about how many feet the train would travel after the operator applied the brakes . . . were based on the TA's own published charts." *Id.* at 99. Here, however, Berkowitz's PRTs applied to Shabazz were ***not*** based on any chart (or other document) published by Transit - - he only referred to the DOT study discussed herein.

to part-time. Plaintiff's economist (Kristin Kucsma) quantified Plaintiff's alleged lost earnings once she goes part-time. Kucsma testified that the report of Dr. Stuart Kahn (Plaintiff's medical expert) stated that Plaintiff would likely work part-time after the age of 55. (Tr. 813). The problem, however, is that Dr. Kahn never testified to that at trial (even though Plaintiff called him twice). And, as the Court reminded Plaintiff at trial, "[w]e don't put reports into evidence." (Tr. 675).

As a result, as argued in Defendants' motion, Kucsma's lost earnings calculations were impermissibly based on the bald assumption - - unsupported by any expert testimony at trial - - that Plaintiff would someday be unable to work full-time. If there was any trial testimony that Plaintiff would shift to part-time work at some point, Plaintiff would have cited to it. But the best she can muster is to claim that "this is a perfectly reasonable assumption, indeed a probability." (Pl. Opp. Br., at p. 26). But, mere assumptions and an assertion in a brief by counsel that part-time work is a "probability" for Plaintiff, cannot support her claim. For this reason alone, Defendants are entitled to JMOL. *See Newton v State*, 165 AD3d 421, 423 [1st Dept 2018] ["Claimant failed to prove lost earnings by a 'reasonable certainty' . . . as his experts' analyses were based on assumptions unsupported by the record." [internal citation omitted]].

Plaintiff tries to argue that Kucsma did not simply assume that Plaintiff would someday work-part time, but rather relied on her "own experience, research and

calculations." (Pl. Opp. Br., at p. 35). But, as an economist, Kucsma admittedly had no qualifications to opine that Plaintiff's ability to work full-time would end at any point. (*See* Tr. 839) (Kucsma admitting she is not qualified as a medical expert). And, Plaintiff's argument is flatly contrary to the trial record - - Kucsma testified that she relied on a single source for the assumption that Plaintiff would work part-time during her life:

> So, again, ***based on my review of Dr. Kahn's report***, he indicated that if she was able to continue working at all beyond age 55, it would be in some part-time capacity. I wasn't - - I didn't know specifically what part-time meant . . .

(Tr. 821-822) (emphasis added).

Kucsma's "experience, research and calculations" had nothing to do with her assumption that Plaintiff would work part-time - - that was drawn exclusively from Dr. Kahn's report. If there was any doubt about that she was relying exclusively on Kah's report, it was eliminated when Kucsma testified that: (1) the low end of her calculation of Plaintiff's lost earnings was "***based on the assumption*** that [Plaintiff] will continue working through age 55 and will continue working thereafter and earning" on a part-time basis; and (2) the high end of her calculation was "***based on the assumption*** [Plaintiff] will continue working through age 55, [and] she will be forced to retire prematurely." (Tr. 826-27). But, again, Dr. Kahn never testified to that at trial (nor did any other witness).

When Kucsma was cross-examined about these assumptions, she also admitted she did not vet or inquire about Dr. Kahn's statements in his reports:

> Q. Did you have any conversations with Dr. Kahn or any of the other witnesses in this matter in order to prepare your report or opinions?
>
> A. No, I did not.
>
> * * *
>
> A. Well, I did rely upon his expert opinions with respect to what [Plaintiff] will need for the rest of her lifetime, yes.
>
> * * *
>
> Q. And the only source you rely on for what [Plaintiff's] present and future medical and life care needs are is Dr. Kahn, right?
>
> A. Yes.
>
> * * *
>
> Q. And you're not opining on whether or not these future medical projections from Dr. Kahn are reliable and accurate, right?
>
> The Court: . . . You're relying on his report; you got the information from him and you went from there, correct?
>
> A. Yes, Your Honor.
>
> * * *
>
> Q. And you didn't speak to [Plaintiff] yourself about what her abilities are, for instance, whether she's able to ambulate throughout the community or anything like that?
>
> The Court: Did you talk to her at all?

A. No, Your Honor.

Q. And you've not yourself investigated whether or not she has vocational needs that are impacting her work, right?

The Court: She said she took it only from the report. Next question. (Tr. 830-43).

An expert "may not merely adopt another expert's opinion as his or her own reflexively and without understanding the materials or methods underlying the other expert's opinions." *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 116 [S.D.N.Y. 2021] [internal quotations and citation omitted]. But that is exactly what Kucsma did here - - she echoed Dr. Kahn's opinion in his report that Plaintiff would someday work part-time, without any independent basis or qualifications to opine on that subject. Indeed, expert testimony "must be excluded" where the expert merely serves as "a conduit for the opinion of a non-testifying expert." *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 FRD 254, 266 [W.D.N.Y. 2013].

Lastly, Plaintiff recites other supposed evidence from which she claims the jury could somehow "infer" that she would "sustain a substantial, if not complete, loss of salary . . . ." (Pl. Opp. Br., at p. 36).[32] But, she cannot dispute that ***no witness***

---

[32] For example, Plaintiff cites the possibility that she may require additional surgeries. (*Id.*).

- - not even Plaintiff herself - - testified that she would need to cease working full time and, if so, when that would occur. Invariably, in addition to expert testimony from an economist, the New York courts require an expert to testify that a plaintiff's work capacity would be reduced in order to prove lost earnings with "reasonable certainty."[33] Such testimony was absent here.

For these reasons, and those set forth in Defendants' moving brief, Defendants were entitled to JMOL on Plaintiff's lost earning capacity claim.

## POINT VII

## DEFENDANTS ARE ENTITLED TO A NEW TRIAL ON PAST PAIN AND SUFFERING BECAUSE PLAINTIFF SOUGHT DAMAGES FOR PRE-IMPACT TERROR WITHOUT ANY EVIDENCE OF SAME

Plaintiff does not dispute that she has no evidence that she suffered pre-impact terror (as discussed in Defendants' motion, she was unconscious until after the train struck her). Plaintiff simply asks "does it really matter that plaintiff may not have experienced *pre*-impact terror when she most definitely experienced . . . *post*-impact terror . . . .?" (Pl. Opp. Br., at 37).

---

33 *See, e.g., Natoli v City of New York*, 180 A.D.3d 477, 478-79 [1st Dept 2020] [testimony of plaintiff's treating orthopedic surgeon and neurologist, as well as that of his expert economist" supported "future lost earnings with the requisite degree of reasonable certainty"]; *Beh v Jim Willis & Sons Builders, Inc.*, 28 A.D.3d 1227, 1227-28 [4th Dept 2006] ["[P]laintiff established his loss of earning capacity with the requisite reasonable certainty by the competent testimony of his expert witnesses, *i.e.*, a vocational rehabilitation specialist and an economist"].

The answer is a resounding "Yes." Although Plaintiff now admits she did not experience pre-impact terror, her counsel made an impassioned plea that the jury award her damages for that very thing. (*See* Tr. 2160). In summation, counsel asked the jury to award Plaintiff damages because, among other things, she could "feel the vibrations of the train approaching" and could "see those headlights coming at [her], bearing down [on her]." (*Id.*). Counsel also explicitly claimed that Plaintiff experienced "[t]he terror, the fear of what was about to happen" and argued that "must have been the longest period in eternity for [Plaintiff]." (*Id.*). Those pleas were all fiction for which there was no evidence - - as Plaintiff now admits.[34]

Given counsel's explicit references to Plaintiff's non-existent pre-impact terror, it is not "absurd" - - as Plaintiff claims - - for the jury to have based as least some of its $20 million past pain and suffering ("P&S") award on this. Here, however, because the jury issued a general verdict, there is no way to tell if the jury based any part of that $20 million award on Plaintiff's alleged pre-impact terror.

Plaintiff does not dispute that where a jury issues a general verdict, and one theory of liability was improperly submitted to the jury (as Plaintiff's claims for pre-

---

[34] *Matter of 91st St. Crane Collapse Litig.* (154 A.D.3d 139 [1st Dept 2017]), cited by Plaintiff, bears no resemblance to this case. There, both plaintiffs experienced "inconceivable preimpact terror" - - the plaintiff operator was conscious and trapped in the cab of the crane as it fell fourteen stories and the other was conscious as the crane fell toward him, crushing him as it crashed to the ground. (*Id.*, at 153, 15). There was no such evidence in this case.

impact terror were here), the jury's verdict must be vacated and a new trial ordered. *See, e.g., Chowdhury v. Wordtel Bangl. Holding, Ltd.*, 746 F.3d 42 [2d Cir. 2014]; *AIG Glob. Sec. Lending Corp. v Banc of Am. Sec., LLC*, 386 F.Appx 5, 7 [2d Cir. 2010]

For these reasons, and those in Defendants' moving brief, the Court should vacate the award for past pain and suffering and direct a new trial on that issue.

## POINT VIII

## TRANSIT WAS PREJUDICED BY THE ADMISSION INTO EVIDENCE OF ITS SUBSEQUENT REMEDIAL MEASURES

Transit is entitled to a new trial because the Court admitted evidence of Transit's subsequent remedial measures - - *i.e.*, its installation of fixed rails in certain stations set back several feet from the platform edge. None of Plaintiff's arguments in opposition have merit.

First, Plaintiff pretends as if the Court did not state at trial - - on the last day of testimony - - that it had "made a mistake" in previously admitting evidence Transit's subsequent remedial measures. (*See* Pl Opp. Br., at p. 40). Clearly, that evidence was improperly admitted. The only question is whether admission of that evidence prejudiced Transit. It certainly did. As the Second Circuit has held: admission of post-accident corrective measures is a prejudicial error and has been

found to require a new trial in other cases." *In re Joint E. Dist. & S. Dist. Asbestos Litig.*, 995 F2d 343, 346 [2d Cir. 1993].

Second, notwithstanding the Court admitted error in admitting this evidence, Plaintiff appears to be arguing it admissible under the exception to F.R.E. 407 where a defendant controverts the "feasibility of precautionary measures." As Plaintiff sees it, the wholesale admission of Transit's remedial measures was allowed because one Transit witness (Abdallah) supposedly testified that "that fixed rails were hazardous." According to Plaintiff - - the concepts of "hazardousness" and "feasibility" are somehow the same thing. (*See* Pl. Opp. Br., at p. 38-39). This argument fails for several reasons.

As a threshold issue, Plaintiff cites nothing to support her position that the "feasibility" exception in F.R.E. 407 is also triggered if a defendant contends those measures were not implemented because they were "hazardous." There is no such authority. Obviously, "feasibility" and "hazardousness" are not the same concept. Plaintiff is simply advocating an exception to Rule 407 that does not exist. And, the enumerated exceptions to F.R.E. 407 "are to be narrowly read in order to preserve the important policy of encouraging subsequent remedial measures." *Albrecht v. Balt. & Ohio R.R. Co.*, 808 F2d 329, 332 [4th Cir. 1987] (citations omitted).

Next, even if F.R.E. 407 had an exception for "hazardous" measures - - which it does not - - Plaintiff is wholly misstating Abdallah's prior testimony and conflating

two different kinds of fixed rails. The fixed rails Abdallah described as "hazardous" are those that would have been installed ***directly on the platform edge***. (*See* Transit Br. at 40). In contrast, the fixed rails that Transit installed in other stations several years after Plaintiff's accident are located ***several feet back*** from the platform edge.[35] As such, the "subsequent remedial measures" employed by Transit (*i.e.*, fixed rails set several feet back from the platform) are not the "hazardous" rails Transit did not install earlier. Abdallah's testimony that one kind of rail was "hazardous," therefore, provides no basis whatsoever to admit evidence of Transit's subsequent installation of a completely different kind of rail after Plaintiff's accident.

Finally, Plaintiff argues Transit was not prejudiced because "it actually installed those same corrective measures in other stations long before the date of the accident in question." (Pl. Opp. Br. at 41). But her argument relies on misrepresenting Abdallah's testimony about pre-accident fixed rails. The testimony Plaintiff quotes (*see* Pl. Opp. Br. at 40) ) actually comes from Plaintiff's counsel - - not Abdallah - - during cross-examination. (*See* Tr. 613). And, while Abdallah did identify Times Square as depicted in some of the undated photographs Plaintiff's counsel showed him (*see* Pl. Ex.'s 74A-C),[36] Plaintiff ignores the following

---

[35] This testimony was elicited by Plaintiff's counsel's during the cross-examination of Transit's expert (Ken Korach). (*See* Tr. 2016).

[36] Similarly, the single question Plaintiff's counsel asked about Bowling Green

exchange that occurred immediately thereafter:

> The Court: Do you know how long [the fixed rails] have been there? Was it before 2018?
>
> The Witness: Judge, honestly, they may have been there before 2018 but I can't ascertain when they were there.
>
> The Court: All right.
>
> Q. Okay. As of August 2, 2016, how many other fences or railings are you aware of within the subway system? How many stations?
>
> A. After 2016?
>
> Q. No, before I'm asking.
>
> A. Before 2016.
>
> The Court: Do you have any knowledge of how many rails were in the subway system before August 2, 2016?
>
> The Witness: I don't believe that there were any rails or fences before 2016.

(Tr. 616). Therefore, Plaintiff's argument fails.

* * *

For these reasons, and those stated in Defendant's moving brief, Defendants are entitled to a new trial based on the Court's admission of Defendants' post remedial measures.

---

and the South Ferry Terminal included no dates to compare when the fixed rails were allegedly present in relation to Plaintiff's accident.

## POINT IX

## TRANSIT IS ENTITLED TO A NEW TRIAL BECAUSE IT WAS PREJUDICED BY OTHER ERRORS AT TRIAL

### A. Glenn Lunden of Transit Was Not an "Expert"

In response to Transit's assertion that lay witness Glenn Lunden was improperly allowed to offer expert testimony on causation, Plaintiff erroneously claims that Lunden was, in truth, an "expert witness." (Pl. Opp. Br., at 42-43).

First, Plaintiff neither served disclosures under Rule 26(a)(2) identifying Lunden as an expert witness nor otherwise sought to qualify or identify him as an expert at trial. Nor did Defendants call him as an expert. Lunden, therefore, could not have offered any expert testimony at trial. *See Capricorn Mgt. Sys., Inc. v Govt. Empls Ins. Co.*, No. 15-cv-2926, 2019 WL 5694256, at *7 [E.D.N.Y. 2019] ["[A] party that fails to make adequate Rule 26(a)(2) disclosures is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." [citing Fed. R. Civ. P. 37(c)(1)]].

Plaintiff next claims Lunden was *per se* an "expert" at trial because he is supposedly Transit's "in-house expert." (Pl. Opp. Br., at p. 42). Plaintiff cites no federal procedural rules or authority, but rather relies on *Lippel v. City of New York*

(281 A.D.2d 327, 328 [1st Dept 2001]) and its application of the 62 year old New York Court Appeals' decision in *McDermott v. Manhattan Eye, Ear & Throat Hosp.* (15 N.Y.2d 20, 25 [1964]). In *McDermott*, the Court of Appeals permitted a medical malpractice plaintiff to "call the defendant doctor to the stand and question him both as to his factual knowledge of the case . . . and, if he be so qualified, as an expert . . . ." 15 N.Y.2d. at 25.

*McDermott*, however, applied rules of New York state court practice. For that reason, *McDermott* "does not provide a means to circumvent Fed. R. Civ. P. 26(a)(2), which requires that a party disclose the identity of any expert he intends to use at trial. . . ." *Carroll v. United States*, No. 1:19-cv-1230, 2023 WL 3981420, * 7 (N.D.N.Y. 2023), *aff'd,* 2024 WL 5103419 (2d Cir. 2024). Here too, *McDermott* does not allow Plaintiff to disregard the expert disclosure requirements of Rule 26 and to now - - after trial is over - - admit Lunden's testimony on causation.[37]

Lastly, Plaintiff speculates that Lunden's causation testimony was harmless because the jury "did not need Mr. Lunden's say-so to have arrived at their own

---

[37] Even if the Court were to consider *McDermott*, it has no applicability. There the Court of Appeals was concerned about a plaintiff being unable to bring a medical malpractice action because they could not find a doctor willing to serve as an expert against another doctor. 15 N.Y.2d at 27-28. Although *McDermott* has not been limited to medical malpractice cases, no such similar concern is present here. For example, Plaintiff was able to obtain an expert on causation and, in fact, present that testimony at trial.

conclusions." (Pl. Opp. Br. at 43). But Plaintiff's counsel found it compelling enough to specifically reference it in his summation: "Glen Lunden admitted if there was a fixed rail right there, it doesn't happen. Glen Lunden admits that." (Tr. 2243). It is inconceivable that a supposed admission by a defendant's employee on causation could somehow be harmless.

**B. <u>The Court Erred in Allowing Evidence of Defendants' Internal Policies</u>**

Plaintiff cannot and does not dispute that where a company's internal policies "transcend[ ] reasonable care, breach [of same] cannot be considered evidence of negligence." *Sherman v Robinson*, 80 N.Y.2d 483, 489 n.3 [1992] [citation omitted]. Instead, she tries to justify her extensive questioning of Defendants' witnesses about those policies on the ground that Defendants placed them at issue by asserting qualified immunity as a defense. (Pl. Opp. Br. at p. 43).

Even if there were any authority for that assertion,[38] Plaintiff plainly did not limit cross-examination (and argument) about Defendants' internal policies to issues of qualified immunity. (*See* Transit Br., at pp. 45-47). Rather, Plaintiff introduced Defendants' policies to do precisely what New York law forbids - - to establish negligence based on a supposed violation of those policies.[39] For example, Plaintiff

---

38 As support, Plaintiff cites only *Turturro*, 28 N.Y.2d at 469. But, *Turturro* has nothing to do with the admissibility of internal policies when a defendant asserts a qualified immunity defense.

39 Indeed, seeking to hold Transit liable based on its internal policies was

repeatedly referred to Defendants' alleged failure to perform a "hazard analysis" under Military Standard 882E - - which is part of Transit's policies - - to argue that Defendants were obligated to identify and remove all "hazards" in their system. (Transit Br. at p. 47).

## C. **The Court Improperly Limited Defendants' Expert Cross-Examination**

In response to Transit's assertion that it was prejudicially precluded from cross-examining Plaintiffs' experts on documents and data they reviewed, but did not "rely on," Plaintiff claims that never really happened. Instead, according to Plaintiff, this issue was really about "whether the document [an expert] reviewed should have been admitted into evidence." (Pl. Opp. Br. at 44). This is simply untrue.

The excerpts of the transcript cited in Defendants' motion clearly show that they were barred from cross-examining Plaintiff's experts about documents and data, unless the expert actually "relied upon" same. This prevented Defendants from cross-examining the experts about a separate universe of information - - documents and data the expert ***did not rely on***. That is fair game for cross-examination. *See State Farm Fire & Cas. Co. v Bell*, 30 F Supp 3d 1085, 1097 [D. Kan. 2014] ["[A]n

---

Plaintiff's strategy leading to the trial. For example, Plaintiff' asked the Court to charge the jury as to the "requirements imposed on the defendants under 49 C.F.R. Part 659 [which requires a System Safety Program Plan ("SSPP")] and instruct the jury, consistent with PJI 2:25, that any violation of these requirements may be considered evidence of negligence . . . ." (*See* ECF Doc. # 322 at p. 1). The Court, however, rejected this request to charge.

expert's decision not to consider certain facts in formulating his opinions is a matter for cross-examination"].

The Court's barring Defendants from cross examining Plaintiff's experts on that subject clearly prejudiced Defendants in confronting the opinions of those experts. *See Howard v. Walker*, 406 F3d 114, 129 [2d Cir. 2005] ["[R]ight to cross-examination" is "effectively denied when a defendant is prohibited from expos[ing] to the jury the facts from which jurors, as the sole triers of facts and credibility, could appropriately draw inferences relating to the reliability of the witness"] [alteration in original].

## D. Plaintiff's Improper Summation Prejudiced Defendants

Plaintiff does not even attempt to argue that her lawyer's summation was not rife with improper tactics (including references to facts not in evidence, "reptilian" tactics, and "Golden Rule" violations). Instead, she baselessly attempts to downplay the frequency, severity and impact of these prejudicial comments.

Defendants did not - - as Plaintiff claims - - identify just a "few examples" of improper comments. Defendants' 11/20/2025 letter to the Court detailed ***eighty-seven instances of misconduct spanning five pages***. (*See* Collazzi Decl., Exh. L at Appx. A). In fact, Plaintiff's counsel's initial summation spanned 60 pages of the

trial transcript[40] - - and yet, Defendants identified improper and prejudicial comments ***on almost every single one of those pages*** (with some pages containing as many as four prejudicial comments). (*Id*.). Given the pervasive nature of these violations, the Court must conclude that Defendants were prejudiced.

The Court should also not be persuaded by Plaintiff's argument that Defendants were not prejudiced because the jury awarded her only a fraction of her requested damages. This is certainly not a reasonable barometer by which to measure whether Defendants were prejudiced - - in summation, Plaintiff's counsel asked the jury to award almost ***three-quarters of a billion dollars***. (Tr. 2237-38).[41] That the jury awarded "less" than that astronomical figure, certainly does mean Defendants were not prejudiced. And the jury's "lesser" award was, for example, $70 million for past and future pain and suffering - - and award which is unprecedented and not a reasonable measure of compensation under any standard. (*See* Point X, *infra*).

---

40 (*See* Tr. 2146-2206).

41 If Plaintiff's counsel truly believed that $750 million was an appropriate measure of Plaintiff's damages, they would have moved for additur in response the jury's verdict. That they did not speaks volumes - - not even Plaintiff's counsel believed $750 million was a reasonable ask to the jury.

## POINT X

## TRANSIT IS ENTITLED TO REMITTITUR OF THE JURY'S $70 MILLION AWARD FOR PAST AND FUTURE PAIN AND SUFFERING OR, ALTERNATIVELY, A NEW TRIAL

Plaintiff admits the jury's $70 million verdict for P&S exceeds "the highest sustained New York jury awards." (Pl. Br., at 74). That is an understatement - - it significantly exceeds every verdict Plaintiff has cited even ***after*** she arbitrarily ***increased*** them using the Consumer Price Index ("CPI"). This alone is a concession by Plaintiff that the jury's verdict "deviates materially from reasonable compensation" under CPLR § 5501(c). *See Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 244 [2d Cir. 2004] [a court "compares the award to other New York cases in which evidence of similar injuries was presented] [citation omitted].

### A. Prior Verdicts Should Not be Increased Using the CPI

Unable to find P&S verdicts that approach $70 million, Plaintiff has increased older verdicts by multiplying them by the CPI. The New York Court of Appeals has never endorsed this approach when assessing if a jury's verdict "deviates materially from reasonable compensation." Indeed, the cases cited by both parties demonstrate that the New York appellate courts regularly use prior verdicts as comparators ***without*** multiplying them - - using the CPI or any other metric.

For example, in *Yvonne Y. v City of New York* (199 A.D.3d 551 [1st Dept 2021]) - - cited by Plaintiffs - - the First Department reduced the jury's P&S award

to the plaintiff burn victim after comparing it to the 2012 award in *Peat v Fordham Hill Owners Corp.* (110 AD3d 643, 644 [1st Dept 2013]). In doing so, the First Department did not even suggest that the nine-year-old verdict in *Peat* should be increased using the CPI. *See also Aguilar v New York City Transit Auth.*, 81 A.D.3d 509, 510 [1st Dept 2011] [cited by Plaintiff and comparing prior P&S verdicts without applying the CPI].[42] The New York federal courts have taken the same approach.[43]

CPI is particularly ill-suited for measuring the present-day value of older P&S awards. This is because CPI measures "changes in prices of all ***goods and services*** purchased for consumption . . . ." *See* U.S. Bureau of Labor Statistics, Consumer Price Index, www.bls.gov/cpi/overview.htm (last modified Sept. 9, 2024); *Coleman v Newsom*, No. 2:90-cv-0520, 2025 WL 1163350, at *3 n. 6 [E.D. Cal. 2025] [same]. It was never intended to value intangibles such as P&S - - which, in any event, is

---

42 Other cases cited by Transit have not used the CPI to inflate prior verdicts. *See Firmes v Chase Manhattan Auto Fin. Corp.*, 50 A.D.3d 18, 28 [2d Dept 2008]; *Bondi v Bambrick*, 308 AD..2d 330, 331 [1st Dept 2003]; *Hoenig v Shyed*, 284 A.D.2d 225, 226 [1st Dept 2001]; *Ruby v Budget Rent A Car Corp.*, 23 A.D.3d 257, 258 [1st Dept 2005]; *Chung v New York City Tansit Auth.*, 213 A.D.2d 619, 621 [2d Dept 1995].

43 *See Saladino v Stewart & Stevenson Servs*, No. 01-cv-7644, 2011 WL 284476, at *11 [E.D.N.Y. 2011] [cited by Plaintiff, reviewing prior verdicts without CPI]; *Okraynets v Metro. Transp. Auth.*, 555 F.Supp.2d 420, 438 [SDNY 2008] [same, cited by Transit].

subjective and "impossible" to precisely measure. *Saladino,* 2011 WL 284476, at *3. In fact, one New York District Court -- stating it was "skeptical" CPI could be used "to increase comparable awards from previously decided cases" -- has explained:

> [J]ury verdicts are not a consumer good subject to a market, and in the absence of empirical evidence showing that jury awards move like consumer prices, the assumption that they do is speculative. There is an inherent element of judgment in reviewing a jury's award, and I do not believe that attempts to remove or reduce the range of that judgment through the use of mathematical calculations . . . are persuasive. Rather, the Court should generally consider the age of prior awards as one factor bearing on comparability.

*Nisanov v. Black & Decker (U.S.) Inc.*, No. 05-cv-5911, 2009 WL 3347088, at *2 [EDNY 2009].[44]

Transit recognizes that, in *DiSorbo v Hoy* (343 F.3d 172, 185 [2d Cir 2003]), the Second Circuit stated that, when comparing to "awards in earlier cases, we must take into account inflation." But the Circuit has never held that this should be done by, across-the-board, applying the CPI to prior verdicts. Indeed, even when New York state courts have accounted for inflation, they have done so where the prior

---

44 Indeed, other courts have found CPI inappropriate to measure changes in the value of non-goods and services. *See Diamond State Door, LLC v Diamond State Pole Bldgs., LLC*, No. 21-1258, 2023 WL 3625000, at *3 n.2 [D. Del. 2023] ["Because the [CPI] covers a variety of categories of goods and services, advertising expenditures may not have experienced the same level of inflation."].

verdicts are sufficiently old and without a strict mathematical application of the CPI. *See, e.g., Harding v Onibokun*, 14 Misc.3d 790, 796 [Sup Ct, Jefferson Cty. 2006] [court "considered an inflationary factor in viewing some reported cases from more than 10 years ago to convert such cases to a realistic present day value"]; *Parker v Jones*, 70 Misc.3d 1202(A) [Sup Ct, Warren Cty. 2020] [finding jury's verdict appropriate after reviewing verdicts from "the last four decades" with "some considerations for inflation"].

**B. <u>Plaintiff's Cases Confirm the Jury's Verdict is Not Reasonable</u>**

Transit's motion asks the Court to remit the jury's $70 million P&S verdict to between $7.5 million and $10 million (or grant a new trial). (Transit Br. at 63). This represents "reasonable compensation" based on prior verdicts, as discussed in Transit's moving brief. (*Id.* at 57-62). Indeed, Plaintiff has cited cases that fall within that range. For example, in *Aguilar*, the First Department reduced the jury's $16 million P&S verdict in favor of the plaintiff-amputee to $10 million. 81 A.D.3d at 509.

The higher P&S verdicts Plaintiff has cited - - even when improperly inflated using the CPI - - ***do not approach the jury's $70 million verdict*** here and were issued in dissimilar cases.[45] For example, the highest P&S verdict Plaintiff cites is

---

[45] "Similar injuries or diagnoses are primary (but not controlling) criteria in choosing sufficiently analogous cases" against which to compare a jury verdict.

$35 million (which she inflated to $51.8 million using the CPI) in *Savillo v. Greenpoint Landing Assoc., LLC,* 2011 N.Y. Slip Op. 31950[U] [Sup Ct, New York County 2011]. That case involved a 29-year-old plaintiff who was rendered paraplegic in a construction accident. *Id.* The court described the plaintiff as having "a life which is all but gone." *Id.* at 1. The plaintiff: had "become an invalid"; had also "sustained a traumatic brain injury"; was "deaf on one side and markedly impaired on the other"; and, among other conditions, suffered "frequent spasms causing his legs to fly up uncontrollably." *Id.* at 2. Here, Plaintiff's life is not "all but gone" - - given the evidence of her recovery, continuation and completion of her education and her ongoing employment in her chosen field of study, Transit respectfully submits that Plaintiff's situation is dissimilar from the plaintiff in *Savillo*.

*Yvonne Y*, cited by Plaintiff, is similarly distinguishable. The First Department reduced the jury's P&S verdict from $59,170,000 to $29 million (which Plaintiff again increases using the CPI to $36.7 million). 199 A.D.3d at 551. The plaintiff had suffered third-degree burns over 31% of his body and degloving injuries to his hands. *Id.* These "permanent and incurable" injuries caused plaintiff to be "completely helpless" and "trapped in his own body." *Id.* at 552 [alteration in

---

*Geressy v Digital Equip. Corp.*, 980 F Supp 640, 657 [E.D.N.Y. 1997].

original]. Again, this is not a valid comparator to Plaintiff's situation.

*Powell v New York City Transit Auth.* (2025 N.Y. Slip Op. 32023[U] [Sup Ct, Kings County 2025]), also cited by Plaintiff, involved a similar accident (plaintiff was struck by a train). The plaintiff in *Powell* suffered amputations of his left arm at the shoulder joint and his left leg at his hip joint (a "hip disarticulation"). *Id.* at 1-5. The plaintiff also broke his right tibia and fibula. *Id.* The *Powell* court reduced the jury's $77 million P&S verdict to $16 million. *Id.* at 8.

Although the plaintiff in *Powell* suffered amputation, they were materially different from Plaintiff's amputations. Powell's amputations were of the entire limb at the shoulder and hip joints, while Plaintiff's were at the left elbow and left knee. Indeed, the "hip disarticulation" sustained by Powell was an "extremely rare" injury. *Id.* at 10, 12. Powell also suffered significant injuries to his ***right*** leg, which limited flexion of his knee to "95 degrees when it should be 140 to 160." *Id.* at 8. Plaintiff did not injure her right leg.[46] Indeed, Powell could not even walk "independently"

---

[46] Plaintiff claims that Transit's expert (Dr. Reid) testified that she might need to have her ***right*** leg amputated. (Pl. Opp. Br., at 64, 70). Neither Dr. Reid, nor any other witness, made any such prediction. Dr. Reid acknowledged that "contralateral amputations" ***can*** happen, but that they occur "overwhelmingly . . . with individuals with numerous comorbidities, particularly diabetes, poor circulation, poor sensation, poor healing . . . ." (Tr. 1567). Dr. Reid testified that he saw no such evidence that would put Plaintiff at risk for an amputation of her right leg. (Tr. 1613).

or "normally" because of his injuries. *Id*. at 10. Plaintiff ***can*** walk (and perform other functions) independently. (*See, e.g.*, Tr. 750, 778-779).

Nevertheless, *Powell* - - which respectfully involves more aggressive amputations and a poorer recovery - - confirms Transit's position that the jury's P&S verdict of $70 million is not "reasonable compensation." Moreover, Powell is currently being appealed and the Second Department is expected to significantly reduce the award even further based on its prior holdings. *See* Appellate Division Docket No. 2025-08770. Thus, the trial court's valuation of Powell's injuries does not have any bearing under CPLR 5519 (c).

* * *

For the reasons stated here, and in Transit's moving brief, the Court should remit the jury's P&S verdict to $7.5 million to $10 million (or grant a new trial).

## CONCLUSION

For the above stated reasons, the Court should:

1. grant JMOL to Defendants; or, alternatively,
2. grant Defendants' application for a new trial; or, alternatively,
3. grant remittitur of the jury's verdict.

Dated: May 5, 2026
New York, NY

Respectfully submitted,

LANDMAN CORSI BALLAINE & FORD P.C.

By: /s/ Timothy J. Collazzi

Timothy J. Collazzi
Attorneys for Defendants
120 Broadway, 13th Floor
New York, New York 10271
(212) 238-4800