

ATTORNEYS AT LAW
*192 Lexington Avenue, Suite 802*
*New York, NY 10016*
*Office: (212) 425-1020  Fax: (212) 503-3248*

May 11, 2026

**VIA ECF**
Hon. Frederick Block
Senior United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East, 1214 South
Brooklyn, New York 11201

      Re:    *Da Silva* v. *NYCTA, et al,* 17-cv-4550 (FB)(VMS)

Dear Judge Block:

## I.    Introduction

By letter dated January 20, 2026, Defendants ask the Court to schedule a post-verdict collateral source hearing under CPLR 4545. The application should be denied. Defendants pleaded the collateral source defense as their Second Affirmative Defense (ECF Doc. 20 ¶ 141) at the outset of this diversity action; they thereafter produced no documents in discovery, designated no expert, and made no Rule 26(a)(2)(B) or (C) disclosure. The application now consists of a four-page letter from counsel — nothing more.

Four independent grounds, each individually sufficient, require denial of the application:

(1) **Federal Rule 37(c)(1) preclusion.** Having pleaded the defense and then refused to develop it in discovery, Defendants are automatically barred from offering any evidence in support of the defense at a post-verdict hearing.

(2) **Failure to tender even "some competent evidence" under *Liciaga*.** The *Liciaga* defendant only crossed the threshold for a hearing because it submitted affidavits from a licensed insurance broker identifying a specific Fidelis policy and from a forensic economist quantifying the offset. *Liciaga v. New York City Transit Authority*, 231 A.D.3d 250, 258, 218 N.Y.S.3d 359 (2d Dep't 2024). Defendants here have submitted only a four-page letter from counsel.

(3) **Direct controlling effect of *Dowdy v. Brooklyn Hospital Center*.** The same Second Department panel that decided *Liciaga* denied a defendant's request for a CPLR 4545 hearing because "the defendant did not submit any evidence that the plaintiff could mitigate future medical expenses by obtaining a health insurance plan under the Patient Protection

1

and Affordable Care Act." *Dowdy v. Brooklyn Hospital Center*, --- N.Y.S.3d ----, 2026 WL 1155463, 2026 N.Y. Slip Op. 02630 (2d Dep't Apr. 29, 2026). The opinion expressly distinguishes *Liciaga* via a "*cf.*" signal, confirming that *Liciaga* is an evidence-based rule, not an automatic-hearing rule.

(4) **Substantive failure to satisfy CPLR 4545's clear-and-convincing / highly-probable burden.** Future ACA-marketplace coverage, future Medicaid eligibility (for a non-citizen, foreign-trained professional), and theoretical Brazilian SUS coverage are speculative as a matter of law and cannot meet the "reasonable certainty" / "highly probable" burden. *Kihl v. Pfeffer*, 47 A.D.3d 154, 163–64, 848 N.Y.S.2d 200 (2d Dep't 2007).

Section II addresses the federal procedural overlay (*Erie*/*Hanna* and Rule 37(c)(1) preclusion). Section III addresses *Liciaga*'s threshold tender standard and Defendants' failure to meet it. Section IV addresses the controlling effect of *Dowdy*, as reinforced by *Riley v. Rupp* and modeled by *Brown v. 271 Madison Co.* Section V addresses the substantive CPLR 4545 standard. Section VI addresses the Harger-specific facts that independently defeat any offset. Section VII addresses the double-discount problem. Section VIII concludes.

## II.     The Federal Procedural Overlay: Erie/Hanna and Rule 37(c)(1)

### A.     CPLR 4545 Supplies the Substantive Rule; Federal Rules Govern Procedure

It is undisputed that New York State law governs substantive issues, including damages and collateral source offsets in this matter. However, the Federal Rules of Civil Procedure governs procedure, including discovery, expert disclosure, and preclusion sanctions. *Hanna v. Plumer*, 380 U.S. 460, 471–73 (1965). That allocation is fatal to Defendants' application because they were obligated to develop their CPLR 4545 defense within the federal procedural framework, and they did not.

### B.     Federal Rule 26 Required Affirmative Disclosure

Defendants pleaded the collateral source defense as their Second Affirmative Defense. Once pleaded, the defense became subject to the affirmative-disclosure obligations of Rule 26: initial disclosure of supporting documents (Rule 26(a)(1)(A)(ii)), expert identification and reports (Rule 26(a)(2)(A)–(C)), and a continuing duty to supplement (Rule 26(e)). Plaintiff served Rule 34 document demands on April 5, 2018, annexed hereto as **Exhibit 3**, specifically seeking, at Request No. 27, "*Documents supporting any affirmative defenses stated in defendants' answer*," and served additional discovery demands and expert demands throughout the case. Defendants produced nothing in response and disclosed no expert.

In a properly contested collateral source proceeding, the defendant typically retains and timely discloses (a) a licensed insurance broker who identifies a specific available policy with specific premiums, deductibles, out-of-pocket maximums, network composition, and benefit content; and (b) a forensic economist who quantifies the offset year-by-year over the damages period. That is exactly what the *Liciaga* defendant did. 231 A.D.3d at 258. Defendants here did neither. To this day, Defendants have not produced a single document supporting their Second Affirmative Defense — no insurance policy, no declarations page, no claim file, no broker affidavit, no actuary, no forensic economist, no Brazilian-healthcare specialist, no expert report, and no Rule 26(a)(2) disclosure of any kind.

### C.    Federal Rule 37(c)(1) Imposes Automatic Preclusion

Rule 37(c)(1) provides:

> *"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."*

Fed. R. Civ. P. 37(c)(1) (emphasis added). The Second Circuit has held that preclusion under Rule 37(c)(1) is "self-executing" and "automatic." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006). Courts weigh: (1) the offending party's explanation; (2) the importance of the precluded evidence; (3) the prejudice to the opposing party; and (4) the possibility of a continuance to cure the prejudice. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006).

Each *Patterson* factor cuts against Defendants. They have offered no explanation for their years-long failure to disclose. The precluded evidence — a policy, a broker, and a forensic economist — is the entirety of their collateral source case. Ordering plaintiff to litigate the issue years post-verdict without foundational disclosure on which to cross-examine would be acutely prejudicial. And there is no continuance that can cure the deliberate withholding of expert disclosure that should have been provided years ago.

The principle is no different from what the Court has already applied during trial: where a defendant fails to disclose, in discovery, the factual or expert basis for an issue, it may not introduce evidence on that issue thereafter. Just as none of the parties were permitted to offer proof at trial on subjects they had failed to disclose, they may not now offer record-bare collateral source proof through a letter brief. The *Patterson* framework applies identically to post-verdict hearings: the disclosure obligation is the same, and the preclusion sanction is the same.

### D.    *iRobot* Confirms EDNY Will Strictly Enforce the Disclosure Framework

EDNY courts apply this framework rigorously. In *iRobot Corp. v. Expeditors International of Washington, Inc.*, No. 23-CV-0580 (SJB)(AYS), 2026 WL 809964 (E.D.N.Y. Mar. 24, 2026), Judge Bulsara held that Local Civil Rule 56.1 and Rule 26 disclosure obligations are strictly enforced: "much of the evidence the parties rely on in their briefs and for their arguments is nowhere to be found in the Rule 56.1 statements — specifically the findings of [the defendant's] experts …. As such, the Court does not include those statements below or in deciding the motions themselves." 2026 WL 809964, at *3.

*iRobot* went further. A party seeking judicial relief "'must set forth specific facts …; he or she may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence.'" *Id.* at *2 (citation omitted). And critically, "[l]egal arguments are impermissible" as a substitute for evidence; they "are to be disregarded." *Id.* Defendants' letter-brief approach — four pages of counsel argument, no policy, no broker affidavit, no economist's report — is precisely what *iRobot* says the Court must disregard.

On the substantive collateral source / mitigation point, *iRobot* expressly distinguishes *Liciaga* as a narrow exception and adopts the broader rule that the duty to mitigate does not impose on a plaintiff a duty to seek recovery from insurance. *Id.* at *11 (citing *Hyosung America, Inc. v. Sumagh Textile Co.*, 25 F. Supp. 2d 376, 389 (S.D.N.Y. 1998) ("[I]t is plain that the duty to

mitigate does not impose on a plaintiff a duty to obtain compensation from its insurers, rather than from the tortious wrongdoer.")).

### III.    Defendants Fail to Tender the "Some Competent Evidence" Required Under *Liciaga*

#### A.    The *Liciaga* Threshold Standard

CPLR 4545 is in derogation of the common law and must be "strictly construed … in the narrowest sense that its words and underlying purposes permit." *Oden v. Chemung County Industrial Development Agency*, 87 N.Y.2d 81, 86, 637 N.Y.S.2d 670 (1995); *Riley v. Rupp*, 233 A.D.3d 1313, 1315, 224 N.Y.S.3d 215 (3d Dep't 2024) (collateral source rule "must be strictly construed as it is in derogation of common law").

To obtain a hearing under CPLR 4545, a defendant must "tender some competent evidence from available sources that the plaintiff's economic losses may in the past have been, or may in the future be, replaced, or the plaintiff indemnified, from collateral sources." *Liciaga*, 231 A.D.3d at 258 (quoting *Firmes v. Chase Manhattan Auto. Fin. Corp.*, 50 A.D.3d 18, 36, 852 N.Y.S.2d 148 (2d Dep't 2008)). The *Liciaga* defendant met that bar *only because* it submitted "affidavits from a licensed insurance broker and a forensic economist." *Liciaga*, 231 A.D.3d at 258.

#### B.    Counsel's Argument Is Not Evidence

Defendants' application here consists of a four-page letter from counsel. It is well-settled that "Counsel's argument is not evidence." *United States v. Lumiere*, 249 F. Supp. 3d 748, 766 (S.D.N.Y. 2017); *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence."). A list of Bates numbers from plaintiff's own historical medical records, attached without expert interpretation or sworn affirmation, is not evidence of *future* replacement.

#### C.    The *Liciaga* Defendant's Evidentiary Package Was the Floor, Not the Ceiling

The Second Department's holding in *Liciaga* turned on the specificity of the defense evidentiary package. The broker identified "a specific policy issued by Fidelis available on the Marketplace and provided various details relating thereto, including, among other things, the types of care covered by the policy, the premium costs, and the maximum annual out-of-pocket costs." *Liciaga*, 231 A.D.3d at 258. The forensic economist then opined that, if plaintiff obtained the Fidelis policy, the future value of his future medical expenses would be reduced from $40 million to $36,248,230 — yielding a quantified offset of approximately $3.75 million. *Id.* That specificity is what cleared the "some competent evidence" threshold. Without specificity, there is no threshold tender, and no hearing. *See also Nunez v. City of New York*, 85 A.D.3d 885, 887–88, 926 N.Y.S.2d 113 (2d Dep't 2011) (offset based on expert showing of available coverage).

#### D.    *Liciaga* Itself Disclaimed Any View on the Merits

The *Liciaga* court was careful to distinguish the hearing-threshold question from the merits. The panel held only that the defendant "was entitled to a hearing pursuant to CPLR 4545 to demonstrate the extent, if any, to which the plaintiff's future medical expenses would be reduced by available insurance coverage," *Liciaga*, 231 A.D.3d at 252, and immediately limited its own holding:

> "We express no opinion, however, about the appropriate outcome following the hearing."

*Liciaga*, 231 A.D.3d at 252. *Liciaga* does not stand for the proposition that a defendant who clears the threshold for a hearing will ultimately obtain an offset. The merits-stage burden — the "clear and convincing evidence" / "highly probable" burden of *Kihl* and *Firmes* — remains a separate inquiry, on a different evidentiary standard, that *Liciaga* does not predetermine. *See Liciaga*, 231 A.D.3d at 257–58 (distinguishing "ultimate hearing burden" of "clear and convincing evidence that the result is highly probable" from the threshold standard of "some competent evidence").

## IV.    The Controlling Effect of *Dowdy v. Brooklyn Hospital Center*

### A.    *Dowdy* Is Directly On Point

In *Dowdy v. Brooklyn Hospital Center*, ---A.D.3d---, --- N.Y.S.3d ----, 2026 WL 1155463, 2026 N.Y. Slip Op. 02630 (2d Dep't Apr. 29, 2026), the same Second Department that decided *Liciaga* affirmed the denial of a defendant's request for a CPLR 4545 hearing under the following reasoning:

> "Contrary to the defendant's contention, the Supreme Court properly denied that branch of its motion which was for a collateral source hearing. '[F]or a defendant to be entitled to a collateral source hearing, the defendant must tender some competent evidence from available sources that the plaintiff's economic losses may in the past have been, or may in the future be, replaced, or the plaintiff indemnified, from collateral sources' (Firmes v. Chase Manhattan Auto. Fin. Corp., 50 A.D.3d 18, 36; see Nunez v. City of New York, 85 A.D.3d 885, 887). Here, **the defendant did not submit any evidence that the plaintiff could mitigate future medical expenses by obtaining a health insurance plan under the Patient Protection and Affordable Care Act** (cf. Liciaga v. New York City Tr. Auth., 231 A.D.3d 250)."

*Dowdy*, 2026 WL 1155463, at *3 (emphasis added).

### B.    The "cf. *Liciaga*" Signal Is Decisive

The *Dowdy* panel's use of the "*cf.*" signal in citing *Liciaga* is purposeful. A "*cf.*" signal indicates that the cited authority "supports the proposition stated by analogy" but is not directly on point. *See* Bluebook, R. 1.2(a). The signal tells the reader: this is what *Liciaga* would have looked like if the defendant had not submitted broker and economist affidavits. The *Dowdy* panel is signaling that the *Liciaga* rule is an evidence-based rule — not an automatic-hearing rule — and that defendants who tender no evidence do not get a hearing.

### C.    *Dowdy* Is Effectively Binding on the *Harger* Court

Although *Dowdy* was decided by the Second Department, it is highly persuasive in EDNY. First, it is the most recent and most directly on-point New York appellate authority on the precise question presented here — whether a defendant who has produced no insurance-related evidence is entitled to a CPLR 4545 hearing. Second, in applying CPLR 4545 in a diversity case, an EDNY court must apply New York substantive law as the New York Court of Appeals would, and absent

guidance from the Court of Appeals, the court should give substantial weight to the most recent and on-point Appellate Division decision. *DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005). Where, as here, the panel that decided the principal contrary authority (*Liciaga*) expressly distinguishes its own prior holding on the same evidentiary point, the persuasive force is at its maximum.

### D.    *Riley v. Rupp* **Reinforces Dowdy**

The Third Department in *Riley v. Rupp*, 233 A.D.3d 1313, 224 N.Y.S.3d 215 (3d Dep't 2024), held that (i) CPLR 4545 collateral source determinations are post-verdict only, not on summary judgment; (ii) the statute "must be strictly construed" because it is in derogation of the common law; and (iii) the defendant's papers were "wholly inadequate for resolution of defendants' collateral source contentions" where no factual record had been developed. As *Riley* recognized:

> "CPLR 4545(a) modifies the common-law collateral source rule, which traditionally sought to ensure that tortfeasors pay for all damages caused by their tortious conduct and thus prohibited tortfeasors from reducing their liability by the proceeds of insurance or some other source to which they had not contributed. The principal goal of the statutory rule was to do away with the duplicative recoveries that the common-law rule accepted, to assure that plaintiffs are fully compensated — but not overcompensated."

*Riley*, 233 A.D.3d at 1315 n.2 (citations and internal quotation marks omitted). And on the inadequate factual predicate:

> "Ultimately, the papers before us are wholly inadequate for resolution of defendants' collateral source contentions, even if they were procedurally proper."

*Id.* at 1316. Although *Riley* arose at the summary judgment stage, its core principle applies equally post-verdict: a defendant who has not developed a record cannot tender "some competent evidence" and *a fortiori* cannot satisfy the "clear and convincing evidence" burden at the hearing.

### E.    *Brown v. 271 Madison Co.* **Confirms That** *Liciaga* **Imposes a Real Evidentiary Threshold the Defendant Must Cross Before Any Burden Shifts to Plaintiff**

Justice d'Auguste's decision in *Brown v. 271 Madison Co.*, 2025 N.Y. Slip Op. 31715(U), No. 152267/2015 (Sup. Ct., N.Y. Cnty. May 12, 2025), confirms the burden-shifting architecture of CPLR 4545. CPLR 4545 has two distinct stages: (1) the defendant must tender "some competent evidence" to get a hearing under *Liciaga*; and only then (2) the parties litigate the substantive clear-and-convincing / highly-probable burden at the hearing itself. *See Liciaga*, 231 A.D.3d at 257–58. Stage one is the *defendant's* burden, alone. In *Brown*, the defendant cleared that threshold by tendering specific ACA exchange policies, a licensed insurance broker's affidavit, and a forensic economist's quantified offset calculations — precisely the evidentiary package *Liciaga* describes. *See* 231 A.D.3d at 258–59. Only then did any obligation arise on plaintiff to respond. Defendants here have produced no broker, no economist, no specific exchange policy, no premium projection, no offset calculation, and no Rule 26(a)(2) disclosure. They have not crossed *Liciaga*'s threshold. No burden has therefore shifted to Plaintiff to come forward with anything. *Liciaga* makes that

6

allocation explicit; *Brown* confirms it by example; and *Dowdy* enforces it by affirming denial of a hearing on facts materially identical to these.

## V.    The Substantive CPLR 4545 Standard

### A.    The Anti-Windfall Principle

"[CPLR 4545] was intended to eliminate double recoveries, not provide defendants and their insurers with an 'undeserved windfall.'" *Bryant v. New York City Health & Hospitals Corp.*, 93 N.Y.2d 592, 607, 695 N.Y.S.2d 39 (1999); *Andino v. Mills*, 31 N.Y.3d 553, 561, 81 N.Y.S.3d 331 (2018); *Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534, 537–38, 749 N.Y.S.2d 467 (2002); *In re September 11 Litigation*, 802 F.3d 314, 339 (2d Cir. 2015).

### B.    The Clear-and-Convincing / Highly-Probable Burden

The defendant bears the burden of establishing entitlement to a CPLR 4545 offset by clear and convincing evidence. *Stolowski v. 234 E. 178th St. LLC*, 89 A.D.3d 549, 549, 933 N.Y.S.2d 224 (1st Dep't 2011); *Firmes*, 50 A.D.3d at 35–36; *Kihl*, 47 A.D.3d at 163–64. All four Departments construe "reasonable certainty" as a clear-and-convincing standard meaning the result urged by the defendant must be "highly probable." *Kihl*, 47 A.D.3d at 163–64; *Firmes*, 50 A.D.3d at 33–34; *Quezada v. O'Reilly-Green*, 24 A.D.3d 744, 746, 808 N.Y.S.2d 720 (2d Dep't 2005); *Ruby v. Budget Rent A Car Corp.*, 23 A.D.3d 257, 258, 805 N.Y.S.2d 12 (1st Dep't 2005); *Sternfeld v. Forcier*, 248 A.D.2d 14, 16, 677 N.Y.S.2d 422 (3d Dep't 1998); *Caruso v. LeFrois Builders, Inc.*, 217 A.D.2d 256, 258–59, 635 N.Y.S.2d 367 (4th Dep't 1995).

### C.    The Direct-Correspondence Requirement

There must be "a match between the item of economic loss awarded by the jury and the collateral source payment." *Johnson v. New York City Transit Auth.*, 88 A.D.3d 321, 328, 928 N.Y.S.2d 716 (1st Dep't 2011); *Oden*, 87 N.Y.2d at 89 ("only those collateral source payments that actually replace a particular category of awarded economic loss may be used to reduce the injured's judgment"); *Bryant*, 93 N.Y.2d at 607 ("direct correspondence between the item of loss and the type of collateral reimbursement must exist before the required statutory offset may be made").

### D.    The "Contract or Otherwise Enforceable Agreement" Requirement

CPLR 4545(a) requires the court to make an affirmative finding that the plaintiff is "legally entitled to the continued receipt of such collateral source, pursuant to a contract or otherwise enforceable agreement." The Second Department in *Kihl* interpreted this requirement strictly:

> "Reasonable certainty for future collateral source payments also requires an affirmative finding by the court that a contract or other enforceable agreement entitles the plaintiff to the ongoing receipt of such benefits, conditioned only upon the continued future payment of premiums and other financial obligations required by the agreement."

*Kihl*, 47 A.D.3d at 164. No identifiable contract or enforceable agreement exists for either (i) future ACA-marketplace coverage that plaintiff has not procured (and may not even be eligible to procure as a non-citizen), or (ii) future Brazilian SUS coverage that depends on emigration. *See Young v.*

*Tops Markets, Inc.*, 283 A.D.2d 923, 926–27, 725 N.Y.S.2d 489 (4th Dep't 2001) (denying offset for unrealized Social Security disability benefits because plaintiff had not applied for and was not receiving them).

## VI.   *Harger*-Specific Facts That Independently Defeat Any Offset

### A.   Plaintiff Is a Foreign-Trained Non-Citizen With Uncertain Public-Program Eligibility

Plaintiff is a New York resident and a foreign-trained professional working in the United States, but not a United States citizen. Eligibility for ACA-marketplace coverage, Medicaid, and Medicare all turn on immigration status, work authorization, and continued lawful presence — and significant categories of non-citizens are categorically ineligible. Defendants have not introduced any record evidence concerning plaintiff's immigration status, her work authorization, her future eligibility to remain in the United States, or her eligibility to enroll on a state exchange in any given year.

- **ACA-marketplace eligibility.** Only "lawfully present" non-citizens may enroll in marketplace coverage and receive premium tax credits. 42 U.S.C. § 18081; 45 C.F.R. § 152.2. Defendants have not established plaintiff's immigration classification, and the burden of proof under *Kihl* is theirs.

- **Medicaid eligibility.** Medicaid eligibility for non-citizens is highly restricted. Most lawfully present non-citizens are subject to a 5-year waiting period after they obtain qualified status. 8 U.S.C. § 1613 (PRWORA). Undocumented non-citizens are categorically ineligible for full Medicaid (limited to emergency Medicaid only). 42 U.S.C. § 1396b(v).

- **Medicare eligibility.** Medicare eligibility generally requires either age 65+ or qualification for Social Security Disability Insurance after a 24-month waiting period. 42 U.S.C. §§ 426, 1395c. SSDI eligibility itself requires a sufficient quarters-of-coverage history under U.S. employment. Plaintiff's ability to qualify for Medicare in the future is doubly speculative.

The immigration-status premise that Defendants' ACA, Medicaid, and Medicare theories all require is itself an unproven and unprovable predicate on the present record. Each of these public-program theories fails before the analysis even begins.

### B.   Plaintiff's Coverage Is Job-Dependent and Trial Proof Showed It Is Inadequate

Plaintiff is currently insured under an employer-sponsored plan, but her continued employment is in jeopardy because of the injuries Defendants caused. The trial record establishes:

- **The jury awarded $1.7 million in diminished future earnings.** That award reflects a finding that plaintiff will not have a full work-life. Without work, plaintiff will not have an employer to pay for her health insurance, and without earnings she will not have the income to purchase private health insurance that actually provides coverage for her many complex needs as a bilateral amputee.

- **Plaintiff is a bilateral amputee with a possible future triple amputation.** Trial proof established that her prosthetic and medical care needs are extensive and not fully covered by any insurance, public or private. Defendants' own medical expert, Dr. Reid, conceded under cross-examination that contralateral lower-limb amputations are common — "one in

8

six over 10 years, regardless of etiology" — and that this is "a significant fact." Tr. 1571 (Reid cross-examination, Nov. 17, 2025). Because Ms. Harger is already a bilateral amputee (above-knee left leg and above-elbow right arm), a contralateral lower-limb amputation would make her a triple amputee, with a corresponding total inability to work and loss of all insurance benefits. Plaintiff's employer, Kevin Morin, separately testified that he could not vouch for plaintiff's continued employment if his company were sold or he retired. Tr. 1184:7–21. If plaintiff loses her job for any reason — whether through deteriorating health, employer turnover, or company sale — she loses her insurance, with no income to purchase replacement coverage.

- **Plaintiff has paid $31,000 out of pocket for a single prosthetic component.** Trial testimony established that plaintiff's present carrier (United Healthcare) denied advanced prosthetic technology, requiring her to pay $31,000 out of pocket for the extended warranty on her microprocessor knee. The carrier ultimately paid $0 of that $31,000 (with $6,000 applied to coinsurance and deductible). Mr. Kort's testimony at trial, Tr. 1159:9–1164:8; Tr. 1165:16–1167:15. This is but one minor example of testimony the jury heard about how significant medical care was not covered by insurance.

- **Carriers are "writing [advanced prosthetic components] out of the policies."** Mr. Kort's testimony at trial, Tr. 1159:9–1164:8. The X4 microprocessor knee, the current standard of care, is "very difficult to get … through insurance companies."

- **Insurance covers only "one [prosthesis] every three years."** Mr. Kort's testimony at trial, Tr. 1159:9–1164:8. Replacement, backup, and limb-specific prostheses are by policy terms not reimbursable.

- **"Most of the items in the life care plan such as advanced prosthetics, most of those components are not covered."** Dr. Stuart Kahn's testimony at trial, Tr. 856:10–858:16.

- **"Many of the things I write would not be covered."** Dr. Kahn's testimony at trial, Tr. 743:6–744:20.

- **"Home care is almost never covered by private insurance … Transportation costs aren't covered."** Dr. Kahn's testimony at trial, Tr. 856:10–858:16.

Equally important is the absence of any contrary defense proof. Defendants' **own** retained medical expert, Dr. Reid, did not refute any of the foregoing testimony from Dr. Kahn, Ms. Kucsma, or Mr. Kort regarding what insurance does and does not cover for plaintiff's prosthetic and medical needs. Defendants cannot, post-verdict, manufacture a coverage record that their own retained expert declined to provide at trial.

This is trial-proven past non-replacement of the same future losses the jury awarded. As the Court of Appeals held in *Oden*, an offset requires that the collateral source replace the awarded loss. 87 N.Y.2d at 89. When the trial record proves past non-replacement, the defendant cannot make the affirmative showing that future replacement is highly probable.

### C.   The ACA Is in Legislative and Regulatory Jeopardy

Defendants' ACA fallback theory founders on the volatility of the ACA itself:

- **H.R. 114, the Responsible Path to Full Obamacare Repeal Act, 119th Cong.** Introduced January 3, 2025, this bill would repeal the ACA in its entirety. The bill is the latest in a

series of repeal bills introduced each Congress since the 115th. *See* H.R. 3276, 115th Cong.; H.R. 83, 116th Cong.; H.R. 6515, 117th Cong.; H.R. 112, 118th Cong.

- **The enhanced premium tax credits expired on December 31, 2025.** Senate cloture on both the Democratic clean-extension bill and the Cassidy-Crapo HSA-based alternative failed in December 2025.

- **The individual mandate tax penalty was zeroed by the Tax Cuts and Jobs Act of 2017.** Pub. L. No. 115-97, § 11081. The Supreme Court in *California v. Texas*, 593 U.S. 659 (2021), held the mandate unenforceable in light of the zero penalty.

- **Plaintiff's double Board certified physician told the jury that future U.S. coverage cannot be predicted.** "It's not known if she'll have coverage. We don't know the nature of the coverage in the United States going forward." Dr. Kahn's testimony at trial, Tr. 856:10–858:16. The Court agreed: "We have no way of predicting, I imagine, what health care coverage would be in the future."

A future statutory program subject to repeal, defunding, or fundamental restructuring — with an enrollee whose eligibility is itself unestablished — cannot generate the affirmative finding of legal entitlement to ongoing benefits required by CPLR 4545(a) and *Kihl*, 47 A.D.3d at 164.

### D.   The Brazilian SUS Theory Is Doctrinally Foreclosed

Defendants suggest that plaintiff, who has lived and worked in the United States for years, should be required to emigrate to Brazil to access the public-health system (Sistema Único de Saúde or SUS). That theory is foreclosed on multiple grounds:

- **CPLR 4545 applies only to collateral source payments that are or will be "made to the plaintiff."** A foreign government healthcare system that the plaintiff would have to relocate to obtain is not a "payment made to the plaintiff" within the strict-construction reading of CPLR 4545(a).

- **No defense expert.** Defendants have not produced an affidavit from a Brazilian healthcare expert, a SUS coverage manual, an eligibility analysis, or any foundation establishing that prosthetics, occupational therapy, microprocessor knees, advanced upper-extremity prosthetics, or home health aides would in fact be supplied by SUS.

- **No duty to emigrate.** The duty to mitigate damages does not require an injured plaintiff to relocate to a foreign country. *Cf. Hyosung America, Inc. v. Sumagh Textile Co.*, 25 F. Supp. 2d 376, 389 (S.D.N.Y. 1998); *Malmberg v. United States*, 816 F.3d 185, 196 (2d Cir. 2016) (rejecting analogous "forced VA care" theory).

- **Inherent speculation.** Whether plaintiff will ever return to Brazil, whether she will be eligible for SUS at the time, what SUS will cover, and whether SUS will accommodate the complex prosthetic and medical needs of a bilateral amputee are all questions of pure speculation.

## VII.   The Double-Discount Problem

CPLR 4545 prevents duplicative recovery for the same loss. Where the jury has heard insurance testimony and accordingly discounted its award, a court-ordered offset is not anti-duplication but anti-recovery. *In re September 11 Litigation*, 802 F.3d 314, 339 (2d Cir. 2015); *Fisher*, 98 N.Y.2d at 538; *Bryant*, 93 N.Y.2d at 607.

Here, the trial record is replete with insurance testimony — elicited by Defendants and developed by the Court — establishing what insurance has paid for, what insurance does not cover, and what plaintiff has paid out of pocket. The jury's $10 million future-medical award was fixed against the backdrop of trial proof that "most" advanced prosthetic components, replacement prostheses, multiple-limb devices, home care, transportation costs, and out-of-network mental-health care "are not covered" and that plaintiff has already paid tens of thousands of dollars out of pocket.

Significantly, Dr. Kahn's Expert Report and Life Care Plan, annexed hereto as **Exhibit 1**, and Ms. Kucsma's Economic Appraisal, annexed hereto as **Exhibit 2**, established that Ms. Harger's total economic losses are **$66,758,965**, comprising **$65,056,771** in costs of future lifetime medical care and **$1,702,193** in diminished earnings. The jury awarded $1.7 million for diminished earnings — accepting Ms. Kucsma's projection essentially in full — but awarded only $10 million for future medical care, a reduction of approximately $55 million from Dr. Kahn's projected $65 million Life Care Plan. Tellingly, Dr. Reid agreed with almost all of Dr. Kahn's testimony about Luisa's needs for future medical care, and mainly differed on the need for additional recreational prosthetics. Tr. 1506–07. Dr. Reid did not dispute the costs of care testified to by Dr. Kahn. The only reasonable inference is that the jury already deducted from its verdict the medical expenses they believed insurance would cover. Defendants now seek a second deduction — an impermissible double offset that would short-change a bilateral amputee plaintiff. That is the "undeserved windfall" that *Bryant* forecloses. 93 N.Y.2d at 607. Indeed, the jury's $1.7 million diminished-earnings award reflects a finding that Ms. Harger will not have a full work-life — meaning no employer-based insurance and no income to purchase replacement coverage.

Defendants' application identifies **no** specific item of awarded loss replaced by any specific collateral source, projects no offset, quantifies no premium, proposes no methodology, and produces no expert. It is a request for a hearing in search of a theory — exactly what *Dowdy* and *Riley* hold defendants may not have.

## VIII.  Conclusion

Defendants' January 20, 2026 letter application for a post-verdict CPLR 4545 collateral-source hearing should be denied in its entirety, with prejudice, and Defendants should be precluded from offering any evidence, expert testimony, or argument on collateral sources at any post-verdict proceeding pursuant to Federal Rule of Civil Procedure 37(c)(1).

Each of the four grounds identified at the outset is independently sufficient: (1) Rule 37(c)(1) automatic preclusion; (2) failure to tender "some competent evidence" under *Liciaga*/*Dowdy*; (3) the direct controlling effect of *Dowdy*, *Riley*, and the contrast with *Brown*; and (4) substantive failure to meet CPLR 4545's clear-and-convincing/highly-probable burden. The Harger-specific facts — a non-citizen, foreign-trained professional plaintiff with uncertain public-program eligibility; currently insured but job-dependent; trial-proven non-replacement of the same future losses the jury awarded; and the unrefuted nature of plaintiff's expert testimony — each independently confirm the result.

We thank the Court for its time and consideration.

Respectfully submitted,

11

~//s//~
Elliot Shields

CC:     All counsel of record (via ECF)

12