STUART B. KAHN, MD
25 SUTTON PLACE SOUTH
NEW YORK, NY   10022
ASSOCIATE CLINICAL PROFESSOR DEPARTMENT OF ORTHOPEDIC MEDICINE
ASSOCIATE CLINICAL PROFESSOR DEPARTMENT OF REHABILITATION MEDICINE
THE MOUNT SINAI ICAHN SCHOOL OF MEDICINE

06/04/2023

PATIENT NAME: Luisa Janssen Harger Brown

DOB: 10/02/1994

PATIENT ADDRESS:        1191 Ocean Ave, Brooklyn, NY

DATE OF INJURY: 08/2/2016

I am writing the report to discuss the present medical conditions, previous medical care, causality, diagnosis, prognosis, and recommendations for future medical and supportive care needs of Ms. Luisa Janssen Harger Brown as it pertains to her injuries sustained on 08/2/2016.  In creating the report, I will rely on copious medical records reviewed, diagnostic reports, imaging studies reviewed when available, and a comprehensive medical history and complete physical examination performed on 11/15/2022.

**CHIEF COMPLAINT**:
Left above knee amputation
Stump blisters and breakdown on lower extremity stump
Difficulty donning and doffing lower extremity prosthesis due to one handedness
Inability to Donn and doff upper extremity independently at all
Left above elbow amputation with severely short stump
Severely poor fitting prostheses
Trouble standing and walking, and, transferring
Inability to participate in sports
Poor use of left arm even for gross assist
Inability to take care of myself
Inability to efficiently work and exceed in career\
Pain in back and buttock while wearing prosthesis.
Interference in relationship
Depression
Anxiety
Severe stress over transportation issues
Multiple more complaints.
Phantom pain in both left upper and lower extremities
Pain in bilateral shoulder, from wearing prosthesis and from carrying the harness.
Substantial interference in relationships, intimacy and social life.
Self-consciousness,
Inaccessibility in non-accessible spaces

**HISTORY OF PRESENT INJURY**: Ms. Luisa Janssen Harger Brown was in her usual state of good health when on 08/2/2016 she was involved in a catastrophic subway accident. She reports having had a Vaso Vagal event on the day of her injury.  She reports that she was standing with her now husband on the subway platform.  She was not on the yellow strips when she fell into the subway tracks.  A train then came into the station and ran her over severing her entire left leg just below her hip, and her left entire arm above her elbow, just below her shoulder. Her life has not been the same ever since that day, it has been hellish and difficult.  Though she is grateful to be alive, she knows she will never be the same, and feels she will never be normal and never be able to live a normal life.  She struggles every day just to get through some of the tasks she needs to complete to survive. She reports being very upset that the despite the transit authority knowing  people  fall on the track and get hit by trains weekly, that there was no mechanism in place to prevent her from falling onto the tracks or to alert subway operators when there is a human being on the tracks.

She describes the horror of opening her eyes and realizing she was under the train. She describes in great detail seeing her arm and leg laying on the track under the train next to her, and seeing the layers of bone fat, muscle ,skin and blood oozing out of them. She recalls continually screaming in horror, and her now husband sticking his arm down between the train and the platform reaching towards her, until police and firemen were able to scurry to affix her to a back board and vertically hoist her out. She recalls being brought by ambulance to Bellevue hospital on a stretcher grateful to be alive, yet in complete shock, in agony with every bump and turn.  She was in the US alone on vacation.

When she arrived at Bellevue hospital, after being evaluated, she recalls being told that the surgeons would try reattachment surgery, but it was likely not possible.  When she awoke from approximately six hours of surgery, she discovered that she had a permanent amputation of her left leg above her knee and left arm above her elbow.  She had to undergo numerous skin grafts.  Leaving painful and disfiguring donor sites on her back and thigh.  She remained in intensive care at Bellevue and stayed at the hospital for 24 days.  During the time, she started some sitting exercises.

Her Mother and one of her brothers flew in from Brazil, and helped make arrangements to take her home. With the assistance of her mother, she was taken by ambulance to JFK hospital in an ambulance wearing diapers for the transport home.

Once back in Brazil, she remained living in her family home and dedicated two year to outpatient rehabilitation. During that time, she suffered not only the physical issues related to her condition, but substantial psychiatric and emotional issues.  She obtained care for this as well. She was completely dependent on her family for all ADL's until she was able to transfer in and out of a wheel chair.  She slowly healed with regard to her stumps.

After returning to her family home, she had to cancel her semester at the university.  She needed to focus on her care and rehabilitation.  She  spent her days having a routine of dressing changes three hours per day.  This painful process included debridement daily, bed exercises daily as she was not able to be upright or put any pressure on her stumps.  She was not able to

partake in the rehabilitation process during this time.

The slow healing of her stumps delayed the OT and PT substantially. She started out patient PT, and OT three times per week after the stumps healed. She never really was able to walk, though with her prosthesis from Brazil she could stand with poor mobility. Her upper extremity prosthesis from Brazil primarily functioned as a cosmetic prosthesis and was utterly useless for any function due to her short stump, poor fit and inability to maintain stability.

When she returned to the university she needed to be accompanied by her mother daily for transport and to classes as she could not take books out of a book bag, hold a notepad to write notes, or even take a sip of water from a bottle.

Approximately two years later, she returned to NYC to try to go back to school, to pursue her lifelong dream to obtain an architecture masters and a higher level of medical care. Though frightened, she knew she had to move forward or her life and function would never improve. She reports to me, that each day is a struggle between the need to push forward, and the fear and anxiety that grips her when she thinks about what her life will be like. She struggles each day with challenges knowing how much effort it takes just to achieve her days goals, just to survive. She is always utterly exhausted. She refuses to give up.

When in NYC, she obtained prescriptions for new upper and lower extremity prostheses with newer and more sophisticated componentry. She struggled with transportation, not able to utilize any public transportation other than Access-a-ride. Each ride takes her about two hours, there is a 30 minute window to wait for the ride, and add the additional 30 minutes to get her two prostheses on by herself in the morning, she needed three hours just to get ready and to and from school.

To get from school to a medical appointment or to her PT also took about two hours.

Despite the best attempts of her physician and prosthetists, these new prosthesis, although better, left her with the ability to walk only two blocks without resting. She would have blisters and skin breakdown nearly each time she would walk a few blocks. She could only use the lower extremity prosthesis about two to three times per week. Her new upper extremity prosthesis, though state of the art, was ill fitting, and again due to her short stump, became just a cosmetic prosthesis. This situation continued for several years. This condition remains.

Fortunately, Ms. Janssen Harger Brown was recommended to see the prosthetic team at one of the Harvard medical program in Boston Mass. Through these prosthetists, she was recommended to have a surgical consultation with specialists for amputees. She was recommended to have a revision surgery of her lower extremity stump. She was also introduced to the idea of having Osteointegration surgery for her upper extremity stump, as these surgeons realized that her upper extremity stump was likely too

short to properly attach a functional prosthesis.

In November of 2021 she had the revision surgery of her left above knee amputation stump which included a large tissue, not just skin graft, transplant from her right thigh. She remained in the hospital for 11 days. She was transferred to Spaulding inpatient rehab for 15 days for Rehabilitation and monitoring of her skin grafts. Upon discharge she remained in Boston for two to three additional weeks to have her grafts monitored vigorously, and to continue rehabilitation. Once home she continued to have the surgical sites monitored. In total she was out of work for 7weeks, and worked remotely for an additional month or two. She continued her PT and OT.

Since that time, after allowing the stump to heal, she had received a new lower extremity prosthesis, which fits a bit better, but not great. She still to the date gets blisters, but not as much skin breakdown when she walks. She can now walk up to two blocks without a cane or walker, most days with rest in between, and then continue. She usually only has skin irritation. Her Stump is still maturing, and she will likely need a new socket, once it is fully matured.

Her upper extremity prosthesis at the point is useless. She is due to have a new one produced, and if this one which will have a different suspension system does not function for upper extremity use from a myoelectric perspective to be even an assist to her right upper extremity, then she will pursue osteointegration surgery.

For several years she was working with Hanger prosthetic clinics, whose records are reviewed below. The prosthetics produced by them were less than ideal and she chose to move to a new company.

At present she is working with Prosthetics in motion for a production of a new upper extremity prosthetic prescribed by Dr. Frieden, it is a Pattern Recognition prosthesis. In addition, she has consulted with this firm to evaluate and recommend an appropriate schedule of her future prosthetic needs as discussed with her physician.

At present, Ms. Janssen Harger Brown is treating in PT once to twice weekly, but is concerned as her sessions are running out for the year in a week. She will obtain her new prosthesis and then start with sessions next year. She feels she never gets quite enough PT to really get proficient in her function. She is even more concerned about OT, as when she gets her new upper extremity prosthesis she knows that in order to learn how to use it, it will take at least six months of OT several times per week.

Ms. Janssen Harger Brown reports that obviously she has lost weight overall because her arm and leg were mass that she lost. However, she is "heavier" than she has ever been. She reports she has put on over 30 lbs. since she was released from the hospital in 2016. She can barely exercise, cook healthy meals, or shop for groceries. She was extremely athletic prior to the amputations.

Ms. Janssen Harger Brown used to model as a side career, and now she is no longer been requested do that.

Ms. Janssen Harger Brown reports that after sitting for more than twenty minutes she will experience moderate pain in her left thigh and  buttock from the direct pressure of the socket over her thigh and buttock.  She reports discomfort in her low back while walking.  Standing is also painful.

Despite all of the treatment, including the revision of her Above Knee Stump, Two sets of prostheses, years of PT, Ms. Janssen Harger Brown  continues to suffer daily with regard to limited function, poor fitting prostheses, depression, anxiety, pain and lack of fulfillment of life's potential.

She continue to see Doctor Richard Frieden  for treatment, which consists of Stump care, Prosthetic prescriptions and repairs, PT and OT, and recommendation for exercise and psychologic support.  Ms. Janssen Harger Brown  has been recommended for further treatment consisting of   new prostheses, new wheelchair additional PT, psychiatric and psychologic support, and evaluation for osteointegration surgery.

SOCIAL AND FUNCTIONAL HISTORY:
Luisa Janssen Harger Brown lives at 1191 Ocean Ave, Brooklyn, NY.  It is an Elevator building.  There are no stairs to enter.  She has a two bedroom two bathroom apartment.   This apartment lacks adequate room for her wheelchair to maneuver, cabinets that are lowered, has saddles which obstruct her ability to roll or walk in her prosthesis at the doorways, and in general is not accessible. in 2020.  She is married to the gentleman who was her boyfriend at the time of the accident.  She is an architect.  She completed her Master's degree at City college when she returned to NYC in 2020.  She is employed by a building code consulting firm, which is an architect firm and specializes in accessibility for architecture.

Ms. Janssen Harger Brown reports that she is struggling socially, functionally, emotionally and physically. Despite the reality, one might see her as a survivor who is a superstar and overlook these painful facts.  She returned to the US to try to improve on her situation, and that is exactly what she is doing.   That does not mean she is not also suffering.   She is remarkable in that she can also communicate and delineate just how the two sides coexist.

At present her daily struggles seem endless, and she sometimes does not know how she can keep up her same pace.  She feels just managing her health and her function would be a full time job.  Chasing after prosthetists for appointments, making sure that the prosthetists are in touch with her Rehabilitation doctor to assure the right components are going to be used in the prosthesis, making sure she can come up with the resources to will cover their costs, assuring she is not penalized at work for missing so much time, and dealing with countless other stressors.  She reports she misses at least two to two half days per week.  She reports that she handles as much work as her colleagues, but often has to work at night and weekends to make it up.  Her colleagues often will say she takes a lot of time off.  She gets depressed and emotional over that, as they do not realize that she makes the time up.   She feels that her disability is going to hurt her career, in that her supervisors will actually count her time loss, and limitations against her when deciding on promotions and evaluations.  She is keenly aware that she is not asked to go to site evaluations.  She needs an assistant to go to site

evaluations with her, who could take measurements with her  and that would enable her to complete a vital part of her job duties.

Transportation remains one of her greatest challenges. She is overwhelmed with planning out transportation.  Every trip has to be meticulously planned to and from work, to and from doctors' appointments, to and from a shop, to and from any social engagement.  Each trip taking about two hours during rush hour as Access-a-ride takes multiple riders. She needs to be ready up to ½ hour prior to the ride time, and they have a 30 minute window with which they can come.  They sometimes try to drop her a few blocks from her location, despite it supposed to be door to door. This causes her great emotional distress. If she goes to a supermarket with her wheelchair she sometimes has to wait an hour after shopping for the pickup to return home.

Functionally, prior to the accident, Ms. Janssen Harger Brown was completely independent with all of her   activities of daily living; now nearly everything she does is difficult. Putting on and taking off her prosthesis and dressing her prosthesis with only one arm and  hand is difficult. Showering and washing and putting shoes and socks on with only one arm and hand is difficult.  Cooking with only one hand and arm is difficult.  Computer work as an architect is more difficult with one hand.  There is no task that is not difficult or that takes more time  with one arm and hand.

Travel is a nightmare for her. Each and every step of travel is difficult, including the need for a wheelchair in an airport, additional secure luggage for all of her prosthetic equipment, and the risk of damage to her prosthetic equipment.  The risk involved if a plane does not come to a gate and there are stairs involved, she would need to be taken down by a "ambulift" equipment used for airplanes for passengers who cannot take stairs. She needs an assistant to accompany her, and she needs additional leg room.

Getting to the toilet at work and cleaning herself at work is difficult.  Intimacy with her husband is difficult for balance and for positions.  She has self-image issues and guilt about not being able to please him.  She cannot perform household cleaning.  Her husband does not do that either, they have had to hire someone.

She is unable to exercise except to swim, and there are really no appropriate disability pools for her at this time that she can afford or has time to get to with the way transportation is schedule.  She cannot do weight bearing exercises, as she does not have a sports prosthesis and her stump is still too fragile. She would like to have access to disability sports and to go back to playing a guitar, like she did  in the past.  She would like to have access to and the financial ability to participate in disability sports.

Ms. Janssen Harger Brown and her husband plan on having two to three children.  She is anxious and sometimes even has panic attacks thinking about how she will care for and raise these children with her severe disability.  She discussed that she knows that she has obvious physical impairments that lead to disabilities and when it comes to child rearing there are gross handicaps.  She expressed that she could only raise children with assistance of an aide, unless she and her husband both stopped working, which would not be possible.

**REVIEW OF SYSTEMS**:

Pertinent positive symptoms related to the injury of 08/2/2016 include:
Depression
Anxiety
Weight gain of 30 pounds
Poor balance
Dropping items out of/not able to hold items in prosthetic hand
Unable to lift prosthetic arm
Completely unable to wash right arm or parts of right side of body that right arm cannot reach
Buckling of the left prosthetic legs
Inability to stand or walk for more than a few minutes
Poor sleep pattern
Intimacy issues
Relationship issues
Body image issues
Transportation issues
Time management issues
Skin blisters
Stump pain

**ALLERGIES**: No known drug allergies

**MEDICATIONS**: None

**PAST MEDICAL HISTORY**:  None

**PAST SURGICAL HISTORY**: None prior to the accident

**FAMILY HISTORY**:
    1. Father – None
    2. Mothe – None

**RECORDS REVIEWED**:

Bellevue Hospital records reviewed: 08/02/2016, Operative report, Procedures, Traumatic amputation of left upper extremity and left lower extremity, 4 units of blood given. Surgery by Joseph Carter and Megan Jenkins. Transferred to ICU, given antibiotics. 08/03/2016, Negative Spine survey for fracture, Positive Pulmonary embolism on CT scan, Positive supraorbital swelling on facial CT scan.  Left nephrostomy tube and foley catheter in place. Multiple wound irrigation procedures and reoperations in the OR of both amputations on 084/2018, 08/6/2016 followed on multiple

days.  Pt. discharged home with mother 08/26/2016.

Medical records from Century medical with multiple prescriptions for upper and lower limb prosthesis were reviewed.  Routine primary care testing also reviewed.   Abnormal Cardiogram, abnormal labs Vit D deficiency, Hyperlipidemia, reported, treated and followed by Dr. Arnoff.

Mass General Hospital 11/9/2020 Dr. Heng, ortho trauma surgeon:
25 year old female with left trans humeral and above knee amputations. She has been unable to wear her prostheses with any sort of efficacy for the life that she wants to live. We do feel that she can benefit from surgical improvement in her AKA and trans humeral amputations. For the AKA, we would recommend revision AKA with free flap coverage after excision of the prior skin graft with TMR. We would plan to address this first as this is most bothersome. For the trans humeral amputation we would recommend TMR to create more targets for a myoelectric prosthesis with recontouring of the stump and we do feel that with her short stump and intolerance of a harness and conventional socket, that she would be a very good candidate for osteointegration at the trans humeral amputation even though it is under investigative device.

Surgical revision of stump, 11/16/2021: operative report reviewed.   1. Revision amputation left above-knee amputation 2. Left lower extremity debridement 75 cm2, excisional 3, Free anterolateral thigh flap for coverage of left thigh defect 4. Neuroma excision x3: Common peroneal (Eberlin), tibial (Eberlin), saphenous (Valerio) 5. Targeted muscle reinnervation with nerve transfer x3: Common peroneal to semimembranosus, tibial to semitendinosus, saphenous to vastus medialis 6. Local tissue rearrangement closure of left thigh 60 cm2.  Today, she reports her pain has been well controlled. She has been experiencing some phantom pain, but states the gabapentin has been helping. Prior to leaving Spaulding, received a new shrinker which she has been using daily. Does note one suture which was "missed" at her last visit and hoping it can be removed. Otherwise, she denies fever/chilis or any other signs/symptoms of infection.

She was then sent to Spaulding Rehab hospital as an inpatient, the discharge functional status was as follows: The patient is Independent with rolling to the left and Independent with rolling to the right. The patient is independent with supine to sit activities.  the patient is Independent x 1 with sit to stand activltio0,. The patient is Supervision x 1 with Transfers and Unable to assess () for ambulation. Ambulation Distance (Comments); Pt uses w/c as baseline when prosthesis doffed. The patient is Unable to be assessed on stairs. The patient is independent with wheelchair mobility.

Dr. Richard Friedman, Patient's Present Rehab specialist, 12/21/21 Pt needs new prosthesis due to surgical revision, and poor previous fit.  9/15/21 visit, needs new socket arm and leg.  Pt diagnosed at functioning at a K-0 level at that time and expected to achieve K-3 level. (K-levels run 0-4 and Medicare defines them as follows:

Level Zero: The patient does not have the ability or potential to ambulate or transfer safely with or without assistance and a prosthesis does not enhance their quality of life or mobility. This level does not warrant a prescription for a prosthesis.

Level One: The patient has the ability or potential to use a prosthesis for transfers or ambulation on level surfaces at fixed cadence. This is typical of a household ambulator or a person who only walks about in their own home.

Level Two: The patient has the ability or potential for ambulation with the ability to traverse low-level environmental barriers such as curbs, stairs or uneven surfaces. This is typical of the limited community ambulator.

Level Three: The patient has the ability or potential for ambulation with variable cadence. A person at level 3 is typically a community ambulator who also has the ability to traverse most environmental barriers and may have vocational, therapeutic or exercise activity that demands prosthetic use beyond simple locomotion.

Level Four: The patient has the ability or potential for prosthetic ambulation that exceeds basic ambulation skills, exhibiting high impact, stress or energy levels. This is typical of the prosthetic demands of the child, active adult or athlete.)

Dozens of images of the stumps post operatively are included in the records. Ten photographs of the Stumps with wounds healed are included in the medical records.

Hanger prosthetic medical records: 12/7/2018, Functional eval pt with poor function, full prosthetic recommended. 12/21/18, prosthetic alignment and fitting. 3/8/19 prosthesis needs new socket delivered. 3/22/19 new test socket delivered, fit well, will send for fabrication. 4/12/19 entire new prosthetic delivered. 5/24/19, Adjustment of knee. 5/31/19 fitting for upper extremity prosthesis. 6/14/19, new upper prosthetic device recommended. 7/12/19 delivery of myoelectric device. 11/8/19, added pads to both prostheses for poor suspension. 2/11/20 repaired harness on suspension, but needs new one. 10/16 20, lining is cracked and risks skin and potential suspension. Harness is torn. 12/11/20 reuires new custom liners. 3/12/21, fitting for new socket.
4/26/21 new upper extremity socket given to patient. 4/29/21, 8/11/21, 9/20/21, 10/5/21 fitting new Lower extremity socket fitted. Multiple prescriptions for prosthetic treatments by Natalie Arnoff, DO.

Medical records Dr. Camila Passias, MD Mount Sinai Primary care: Referred to PMR for consultative services for left upper and lower extremity amputation. Referred to dermatology.

Medical Records Jacques Hacquebord 2/25/2020: Left upper and lower extremity amputations. He is recommending revision of upper and lower extremity stumps to improve stumps including potential for EMG control in upper extremity.

Medical records with images from Prosthetics in motion were reviewed. Multiple entrees with photos and notes were reviewed.

**EXAMINATION**: Ms. Janssen Harger Brown is a well-nourished female who is in no apparent distress. She is alert and oriented x3. Her resting posture reveals the cervical spine falling 6cm forward of her mid trapezius muscle, and is at rest at 6 degrees of flexion when measured with a goniometer. Her Lumbar spine at rest is measured with a resting posture of

8 degrees of forward flexion. Both of these measurements are with her prostheses' on. They correct when she stands without her prostheses', which she can only maintain for a few seconds.

Her upper extremity stump is only 16cm long. Her lower extremity stump is only 38cm long.

There are numerous scars seen relating to the following surgeries:
Above elbow surgery, 9x9cm circumferential graft covering the distal part of the stump it is tender and  one can feel the tip of the humerus through a pliable tissue that rolls over the distal bone.  There is a 2x2x2cm pit in the posterior aspect of the wound.

The above knee stump exhibits an 18cm by 9cm flap closure covering the distal portion of the stump with a 7x9cm section that is part of a tissue graft(not skin graft) from the right thigh, with a 2cm pit.  There are up to one dozen skin graft donor sites including on the back, left thigh,  and right thigh. There is a long full tissue donor site (15cm) incision healed on the right thigh from the tissue graft.

Range of motion of her cervical spine is full without limitation. Her lower back is bent forward due to her need to support her socket, she has limited range of motion for flexion 50 degrees, (90 degrees including hip flexion), limited lateral bending 20 degrees, (normal 45 degrees), limited rotation left 10 degrees, (normal 25), rotation right 20degrees, (normal 25) and limited extension to neutral, (normal 25 degrees) due to a sense of instability and a feeling that she will topple over in the prosthesis.  She reports axial low back pain with extension greater than flexion on the left side.

Left upper extremity stump ROM Reveals: limited active ROM due to weakness.  Forward flexion 130 degrees, Abduction 90 degrees, Internal rotation 40 degrees, External rotation 40 degrees, extension 30 degrees.  The right shoulder reveals FROM.  As Ms. Janssen Harger Brown actively ranges through her shoulder arc there is quivering in her musculature.  There is gross wasting of the shoulder girdle and rotator cuff musculature compared to the right side.

Lower extremity ROM reveals  Left hip ROM is limited, for active internal and external rotation to  7 degrees on internal rotation and 10 degrees of external rotation, and only neutral for extension.  Flexion is to 90 degrees. Right hip reveals normal ROM.

She is unable to stand and walk on her toes. She is unable to stand and walk on her heels.

Sensation in the  left extremities is decreased in all areas which have received skin graft donations, and full tissue donations.

Sensation in the  right extremities is intact in all dermatomes

Reflexes were 2+ the right upper and lower extremities, and not able to be tested in the left extremities.  No pathologic reflexes were noted.  Manual motor exam was 5/5 for all muscle groups in the right upper and lower extremities.

There is gross weakness in every muscle in the left upper extremity stump; 4/5 range for abduction, extension, adduction, 3/5 for rotation.

There was gross weakness of left hip abduction and adduction 4/5, Hip extension 3/5, and hip flexion 4+/5.

Spurling's test: Negative .
Lhermitte's test: Negative .
Facet loading of the cervical spine was: Negative.
Facet loading of the Lumbar spine was: Negative.
Straight leg test and slump test were: Negative .
FABER test: Positive for back pain on the left.
Pelvic rock test: /Negative.
Sacral compression: Negative.

Skin integrity and integument: Blisters and irritation below the silicone suspension sock on the Above knee stump.

Left shoulder exam revealed:
Decreased ROM with +Neer
- signs of adhesive capsulitis
- crepitance
- drop arm/weakness.
- apprehension

Gait with prosthesis on was with mild circumduction, flat foot and poor push off on the left.

Respiration: Non-labored, no audible cough or wheezing
Appearance: Dressed and groomed appropriately, no repetitive movements, tremors or tics noted
Behavior: Cooperative, fully engaged, good eye contact
Speech: Normal volume, rate and tone
Mood: Sad, Ms. Janssen Harger Brown cried at least 30- 40 % of the time of the interview which lasted two hours.
Affect: Congruent to mood and the context of the discussion
Orientation: Alert and appeared oriented
Thought Process: Clear, logical, and goal-directed
Thought Content: No evidence of A/V hallucinations, flight of ideas, loose associations, or delusions
Judgment: Intact
Insight: Intact
Cerebellar exam: finger to nose right, within normal limits

**IMPRESSION**: It is my impression within a reasonable degree of medical certainty that Ms. Luisa Janssen Harger Brown is suffering from the following permanent diagnoses that are causally related to her injury 08/2/2016:

1. S/P Traumatic Above elbow amputation of left arm
2. S/P traumatic Above knee amputation of left leg
3. S/P trauma surgery with skin graft closure of left above elbow stump
4. Pitting of left above elbow stump

5. Severely short Left above elbow stump
6. Severe weakness of left stump shoulder musculature
7. Severe muscle wasting of left shoulder girdle
8. Severe deficiency of suspension of above elbow prosthesis on short stump
9. Likely need for osteointegration to achieve suspension for upper extremity prosthesis
10. S/P trauma surgery with skin graft closure of left above knee stump
11. S/P revision surgery with tissue graft closure of left above knee stump

12. Pitting of left above knee stump          .
13. Sensitive skin and frequent blistering of above knee stump.
14. Difficulty toleration ambulation with lower extremity prosthesis due to skin irritation
15. Lower extremity stump weakness for hip extension, adduction and abduction.
16. Depression
17. Anxiety
18. PTSD
19. Weight gain
20. Back Pain
21. Transportation challenges
22. Decreased ADL's
23. Partial permanent employment disability requiring reasonable accommodation
24. Sexual dysfunction
25. Permanent  partial disability from all ADL's including child rearing

**LIFE CARE PLAN ISSUES**:  It is my impression within a reasonable degree of medical certainty that Ms. Janssen Harger Brown will require continued and ongoing medical and supportive care for the remainder of her life due to the consequences of  her 08/2/2016 accident.  The goal of this evaluation is to provide a framework for the care that will maintain and increase Ms. Janssen Harger Brown  medical stability, quality of life, and prevent further complications.  This evaluation provides for medical and surgical care, evaluations with therapists, diagnostic testing, medication, supplies, equipment, transportation, and other services to promote and maintain independence, and to prevent complications.

Below are life care recommendations for medical care, supportive care, and equipment that will be made to help bring about the best medical, functional, and psychosocial outcomes as it pertains to treating the  impairments, disabilities, and handicaps that have arisen as a consequences of Ms. Janssen Harger Brown's 08/2/2016          accident.  All recommendations within the body of the report and within the life care plan tables that are annexed to the report (and which comprise an integral component of the Life Care Plan) are to treat the consequences of her accident, and slow the deterioration of those consequences.  None of the recommendations are to treat the aging process alone.  All recommendations will be made as to needed within a reasonable degree of medical certainty.

It is my impression within a reasonable degree of medical certainty that Ms. Janssen Harger Brown  requires the continued medical services and evaluations of a physiatrist to determine the type and frequency of rehabilitation therapies including physical, occupational, and complementary

medical therapies (acupuncture, massage, craniosacral and biofeedback,) to bring about a better outcome for her disabling conditions. This physiatrist needs to be a specialist for patients with amputations, such as Dr. Frieden so they will be able to write appropriate prescriptions for advanced prostheses. The physiatrist can be seen quarterly for the first two years, followed by twice a year for the remainder of her life to guide her rehabilitation program.

This physiatrist can work with a prosthetist to prescribe and produce the best types of prosthetic devices to enhance her function and allow for an imporved lifestyle. Durable medical equipment including all of her prostheses throughout her lifetime are required. This includes all of her functional prostheses and a set of cosmetic prostheses for when she is not using, but wants to go out in her wheel chair, socially, and have a light weight cover in place. She will need a lower extremity sports prosthesis in addition to her daily walking/functional prosthesis. She will also require a sports specific upper extremity prosthesis. These prostheses warranty runs out after three years, and prosthetists tend to recommend replacing rather than repairing older units due to the cost effectiveness of having a new unit with a warranty. She will need to see her prosthetist Quarterly for life, but more frequently when building and receiving a new prosthesis.

It is clear from her records and her medical history that she did not benefit from her initial course of physical therapy , and her first two upper extremity prostheses. She is just starting to benefit from her present lower extremity prosthesis after six years with regard to limited ability to ambulate, and skin integrity. She will need PT that will concentrate on a functional and strength restoration program. At the same time Ms. Janssen Harger Brown could try different complementary integrative therapies such as acupuncture, biofeedback, craniosacral therapy ,Reiki therapy, and massage therapy all to benefit her chronic discomfort, her depressed mood, and her poor skin integrity.

Physical therapy is likely to be required three times per week for one year. The complementary integrative therapy would be once a week, 4 to 6 trial session  for each of the above-mentioned therapies. Whichever is most beneficial  should continue on a weekly basis for 6 months followed by monthly basis for maintenance of pain for the remainder of her life.

Once the PT ends, and Ms. Janssen Harger Brown reaches a new level of Maximum medical improvement, a home exercise program, which would be guided by an exercise trainer, who has specialty training working with the physically impaired,  and the amputation population, can ensue at a local gym facility.  An exercise trainer on an every week basis for life would be appropriate.

During her lifetime approximately every 2 years, it is not uncommon for patients with amputation to require up to 20 sessions of physical therapy for treatment. There are often times of rest from ambulation due to skin breakdown, or broken prosthetic components, and the need to retrain the patient on her prosthesis. With the delivery of a new prosthesis or socket, or even just changing a component of her prosthesis, there is a need to retrain how one walks with that.

As mentioned earlier, Ms. Janssen Harger Brown states, (and it is consistent with the physical exam findings) that she has difficulty with most ADLs. A

home evaluation for home ergonomics would be helpful given her above elbow amputation and poor fitting prosthesis.  She would benefit from an occupational therapy evaluation to further assess her functional mobility regarding activities of daily living and ability to perform household chores.  She may require assistive devices to facilitate ease with certain household tasks and ADLs.  She would benefit from 26 occupational therapy sessions for ADL training at home. She will likely also require 2 sessions per week of OT in the office for one year after she obtains her new upper extremity prosthesis.  If this fails to bring about a functional improvement due to poor suspension, then she will be a candidate for osteointegration surgery and a different type of myoelectric prosthetic device in her upper extremity.  And she would need yet another year of twice per week OT.

Future rounds of occupational therapy of up to 20 sessions will be needed approximately every two years as she ages and has further deterioration in her condition, new or updates to her prosthesis, or issues with her stump.

Ms. Janssen Harger Brown will continue to require intermittent office visits to a Stump Surgeon and a plastic surgeon when she has skin or graft breakdowns.  This has averaged at least once per year, and is likely to average once per year going forward.

Due to abnormal forces about her low back from the torque of her lower extremity prosthesis  lumbar spinal evaluations with Xray's, MRI's and injections will likely be needed every three to four years, as she increases her use of her prostheses.  .

Due to the abnormal forces on her left hip, and left shoulder joints that are involved, Ms. Janssen Harger Brown will continue to require general orthopedic follow up on an intermittent basis to evaluate and treat the pain and limited ROM of the joints that have been injured.  She will require corticosteroid, PRP or viscosuplementation  injection every two to three years once she starts to use her prosthesis more frequently and puts greater force on these joints. .

Due to the patients severe sedentary life style caused by her injuries, she require one additional primary care visit above and beyond that which is recommended for her age matched cohort in the United States to manage the risks of Osteoporosis, HTN, DM and atherosclerosis.

Psychiatry evaluation is needed and if  prescribed medication for her  mood disorder, then the likely course of treatment is two years with quarterly visits to a psychiatrist.

Psychologic counselling for weekly sessions of one year is indicated for adjustment disorder.

Couples counseling for 15 sessions is indicated, several of which are allotted to sex counseling.

Nutritional counseling once per year is indicated due to risks of obesity from decreased activity and inability to burn the caloric intake.

Tub/shower bench for safety and stability is needed. Raised toilet seat, with grab bars in the shower , near the toilet and sink are needed.  Dual sided motorized bed with leg and back lift to help restore sleep cycle and to ease getting in and out of bed, and to assist in positioning for relations with her husband is needed.  An ergonomic work station with orthopedic adjustable chair and adjustable height tilting top desk is indicated.  Reachers, Grabers, sock tool, long arm brush and shoehorn are all indicated for ADL tools. A quality orthopedic pillow would be beneficial to the patient. Manual wheelchair with one side dual control, in addition to a sports wheel chair is indicated, also every five years.  By age 55 in addition to these two manual wheel chairs, an electric wheel chair will be needed for long distances.

Since her injury, she has been struggling with her return to work.      Given her multiple present permanent conditions, it is unlikely that this type of work will be feasible for Ms. Janssen Harger Brown without reasonable accommodation  going forward.  Ms. Janssen Harger Brown  would benefit from a vocational evaluation to determine what type of work accommodations she would be best suited for.  [it is highly likely with her impairment, disabilities and handicaps, combined with her education and skill set that she will be able to continue to work, but will need assistance to do that.  She deserves the chance to have a successful career through ADA's promise of reasonable accommodation].

At a minimum, she will require round trip transportation by private door to door car service to and from work, and to and from sites that she needs to evaluate.

She will require an assistant at work when she has to go to site evaluations who can take the measurements that are required of an architect working in evaluating compliance in architectural accommodation.  She will need to be supplemented for lost income for time she needs to take off for her medical care.  As she ages, and likely by age 55, she will likely only be able to work part time,  if at all, as the physical demands on an amputee with above elbow and above knee amputations is demanding, and the energy consumption becomes more and more challenging.

As the patient ages, she will likely require diagnostic studies of her spine and peripheral joints, and stumps, including radiographs, MRIs, ultrasounds, and electromyographic studies periodically throughout her lifetime.

Because of Ms. Janssen Harger Brown  severe disabling accident related conditions, she will require extra-support and assistance to maintain the cleanliness of her home, complete her household responsibilities, and perform her ADLs. When she has children, which is her plan, she will need substantial assistance.

It is my recommendation that she would require a housekeeper 4 hours per week starting now for life.

She will require a home health aide for 21 hours per week starting now (3 hours per day 7 days per week).   Due to deterioration of her accident related conditions, her need for assistance will increase by age 55 to 35 hours per week for life(5 hours per day 7 days per week ). If she moves to a home that she owns instead of rents,  but it is in an apartment building, she will need chore  services of 12 hours per year for routine interior home maintenance and adaptations for life. Should she move to another home where she becomes responsible for exterior maintenance then these services may increase.

Ms. Janssen requires an assistant/attendant to help her with transportation to work, and to complete her work.  This would be twelve hours five days per week.   She needs access to disability transportation that is reasonably efficient, and no more time consuming than able bodied transportation.  This needs to  include an ability to convert to wheelchair transport when she cannot use her prostheses.  After evaluating multiple types of transportation, the most cost effective way to achieve this is for her to own an accessible van, which her Aide can drive.  Her aide would meet her at her home each morning, drive her to work, park the van, and continue to assist her throughout the work day, and then transport her home.  The aide would then finish her day after parking the van near her home.  This same van can be utilized by her husband on weekends.  It is unlikely that a person with both an upper and lower extremity amputation will be able to navigate a van on the NYC streets.

This would continue until approximately age 55, and then she would revert to the 35 hours per week as recommended above.

She will require substantial child care assistance once she has a child, and until her youngest child is approximately 12, and can self-supervise and prepare meals for themself.  Especially if she and her husband continue to work, there is no other way for them to have safe child rearing.   When her children are young, she has no ability to  safely hold them, wash them, feed them or dress them, while holding them, and will require assistance with them.  She will need assistance with them at all times when she is home with them until they are approximately age five.  The hours that are normally covered by parents for daycare or supervision while working would be exempt from this covered care.  She would require approximately 14 hours daily five days per week until the child is five years old.  She can then have assistance in the morning and evening for her children for two to three hours each till age 12.

As the above housekeeping and home attendant services are required to be arranged through home health agencies by the life care guidelines for Certified Life Care Planners, patients are required in NY, NJ and Connecticut to have both a nurse and case manager evaluate her case periodically.  The accounts for the minimal listing of these services.  Patient would benefit from a visiting nurse 2x per year starting at the age of 55 until the age of 70 followed by quarterly for the remainder of her life.  Patient would benefit from utilization of a case manager for her multiple musculoskeletal injuries.

Ms. Janssen Harger Brown  is not currently driving.  She currently cannot use public transportation.  Though she has been using disability type door to

door called   the NYC Access-a-ride program, which is affordable, it is a severe hardship for her.  Most clients of Access-a-ride do not work, and are disabled  from work, so they can tolerate the additional time spent to get from home to an appointment and from the appointment to home.  Because of her condition, it takes her at least 90 minutes to get ready to leave her house in the morning.  She needs to leave a 30 minute window for which access-a-ride can come and get her, and because Access-a-ride is a shared ride service, it can take 90 minutes to get the to her office on most days.  That is 31/2 hours from the moment she wakes up till the time she is in her office.  It takes about 2 hours to get to a medical appointment and two hours to get back to her office after the appointment.  Meaning any day she has a medical appointment; she must lose half a day.

Ms. Janssen Harger Brown will need to always live in a Wheelchair accessible home with no stairs, and no stairs to enter the building.  She will require sufficient space to house her children, and have room for the various aides that come and go during the day that assist her and her children while they are young enough to require that care. There will need to be a roll in shower for a waterproof wheelchair.  There needs to be sufficient space to store all of her prosthetic and wheelchair equipment.  Subject to availability a rental or purchase unit needs to be considered by the market. There needs to be available parking for a wheelchair accessible van. A real-estate professional and architect can be considered to further evaluate the costs.

I attest under the penalties of perjury pursuant to New York State Civil code CPLR-2106 that I am licensed to practice medicine in the State of NY, and  that the statements in the report are truthful and accurate to the best of my abilities with the information provided to me.

Submitted by,

Stuart Kahn, MD

2