# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
LUISA JANSSEN HARGER DA SILVA,

Plaintiff,

- against -

17-cv-04550(FB)(VMS)

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, and RAQIA SHABAZZ,

Defendants.
---------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS PURSUANT TO FED. R. CIV. P. 50(B) AND 59

LANDMAN CORSI BALLAINE & FORD P.C.
Attorneys for Defendants
120 Broadway - 13th Floor
New York, New York 10271
(212) 238-4800

On the brief:
Timothy J. Collazzi, Esq.
tcollazzi@lcbf.com
Andrew P. Keaveney, Esq.
akeaveney@lcbf.com
Jerry A. Cuomo, Esq.
jcuomo@lcbf.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................v

PRELIMINARY STATEMENT ..................................................................1

APPLICABLE STANDARDS……………………………………………4

POINT I

TRANSIT IS ENTITLED TO JMOL ON THE BASIS OF IMMUNITY ......4

A. Relevant Trial Evidence ........................................................................5

B. Transit is Entitled to Governmental Function Immunity ...........................9

C. Transit Is Entitled to Qualified Immunity ...............................................11

D. *Turturro* Does Not Apply as to Qualified Immunity................................15

POINT II

TRANSIT IS ENTITLED TO JMOL BECAUSE PLAINTIFF AND HER EXPERT APPLIED AN INAPPLICABLE HEIGHTENED STANDARD OF CARE..........................................................................................................17

A. Plaintiff's Claims Against Transit Require Expert Testimony .................18

B. The Court Should Exclude and Strike Berkowitz's Trial Testimony .......18

1. *Transit is Subject to a Reasonable Standard of Care*..........................19

2. *Berkowitz's Opinion is Based on an Improper Heightened Standard of Care* ...........................................................................................19

3. *Plaintiff Bolstered Her Negligent Standard Argument With Inadmissible Evidence of Transit's Internal Hazard Policies*.............23

C. Absent Admissible Expert Testimony, Plaintiff's Claims Against Transit Fail as a Matter of Law ........................................................................24

POINT III

TRANSIT IS ENTITLED TO JMOL BECAUSE PLAINTIFF FAILED TO SATISFY THE ELEMENTS OF HER NEGLIGENT DESIGN CLAIM….25

A. Transit Did Not Violate Any Applicable Industry Standard ....................25

B. Any Dangers Presented by Transit's Subway Platform Were Open and Obvious ........................................................................................................28

POINT IV

DEFENDANT SHABAZZ IS ENTITLED TO JMOL ON PLAINTIFF'S NEGLIGENT OPERATION CLAIM………………………………………29

A. Applicable New York Law ......................................................................29

B. Relevant Trial Evidence ..........................................................................30

C. Plaintiff's Trial Evidence Did Not Establish the Accident Was Avoidable ................................................................................................................31

POINT V

DEFENDANTS ARE ENTITLED TO JMOL ON PLAINTIFF'S LOST EARNING CAPACITY CLAIM…………………………………………..34

POINT VI

TRANSIT IS ENTITLED TO A NEW TRIAL BECAUSE THERE WAS NO EVIDENCE THAT PLAINTIFF SUFFERED PRE-IMPACT TERROR ……………………………………………………………………….36

POINT VII

TRANSIT IS ENTITLED TO A NEW TRIAL BASED ON THE

ERRONEOUS ADMISSION OF THEIR SUBSEQUENT REMEDIAL MEASURES……………………………………………………………..39

A. The Court Ruled That Transit's Subsequent Remedial Measures Are Inadmissible........................................................................................39

B. Plaintiff Repeatedly Referenced Transit's Post-Accident Installation of Fixed Rails on Platforms ....................................................................40

C. The Exception for "Feasibility" Does Not Apply ....................................41

D. Transit was Prejudiced..........................................................................42

POINT VIII

TRANSIT IS ENTITLED TO A NEW TRIAL BECAUSE IT WAS PREJUDICED BY OTHER ERRORS AT TRIAL……………………………………………………………...44

A. Erroneous Admission of Glenn Lunden's Causation Testimony .............44

B. The Court Erred in Allowing Evidence of Transit's Internal Policies .....45

C. The Court Improperly Limited Transit's Cross-Examination of Plaintiff's Experts ................................................................................................47

D. Defendants Were Prejudiced by Plaintiff's Counsel's Summation .........49

E. The Jury's Verdict Is Against the Weight of the Evidence……………...52

POINT IX

TRANSIT IS ENTITLED TO REMITTITUR OF THE JURY'S $70 MILLION AWARD FOR PAST AND FUTURE PAIN AND SUFFERING OR, ALTERNATIVELY, A NEW TRIAL…………………………………...54

A. Applicable Standard ..............................................................................54

B. Relevant Trial Evidence ........................................................................55

C. The Jury's Award "Deviates Materially" from "Reasonable Compensation" .....57

*1. Verdicts Involving Amputations* .....57

*2. Verdicts Involving Paraplegia and Quadriplegia* .....59

*3. Verdicts Involving Traumatic Brain Injuries* .....61

*4. Application to the Jury's $70 Million Verdict* .....63

CONCLUSION .....64

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affleck v. Buckley*,
96 N.Y.2d 553 (2001) ........................................................ 12, 13, 15

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
386 F. App'x 5 (2d Cir. 2010) ........................................................ 38

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ........................................................ 24

*Anderson v. Rowe*,
73 A.D.2d 1030 (4th Dep't 1980) ........................................................ 36

*Andino v. Mills*,
135 A.D.3d 407 (1st Dep't 2016) ........................................................ 62

*Angamarca v. New York City Partnership Hous. Dev. Fund*,
87 A.D.3d 206 (1st Dep't 2011) ........................................................ 61, 62

*Applewhite v. Accuhealth, Inc.*,
21 N.Y.3d 420 (2013) ........................................................ 9

*Arnold v. Krause, Inc.*,
232 F.R.D. 58 (W.D.N.Y. 2004) ........................................................ 25

*Arroyo v. City of Buffalo*,
2018 WL 4376798 (W.D.N.Y. 2018) ........................................................ 23

*Atkinson v. Oneida Cnty.*,
59 N.Y.2d 840 (1983) ........................................................ 16

*Aurigemma v. Costo Wholesale Corp.*,
2023 WL 197044 (D. Conn. 2023) ........................................................ 50

*Bethel v. New York City Transit Auth.*,
92 N.Y.2d 348 (1998) ........................................................ 19, 29

*Bondi v. Bambrick*,
308 A.D.2d 330 (1st Dep't 2003) ........................................................................59

*Brooks v. Outbound Marine Corp.*,
234 F.3d 89 (2d Cir. 2000) ...............................................................................24

*Brown v. City of New York*,
275 A.D.2d 726 (2d Dep't. 2000)........................................................................61

*Burke v. Witherbee*,
98 N.Y. 562 (1885) ..........................................................................................28

*Byrd v. Janssen Pharm., Inc.*,
333 F.Supp.3d 111 (N.D.N.Y. 2018)....................................................................51

*Carroll v. Trump*,
151 F.4th 50 (2d Cir. 2025) ...............................................................................55

*Chowdhury v. WorldTel Bangl. Holding, Ltd.*,
746 F.3d 42 (2d Cir. 2014) .................................................................4, 38, 39

*Chung v. New York City Transit Auth.*,
183 A.D.2d 741 (2d Dep't 1992).........................................................................58

*Chung v. New York City Transit Auth.*,
213 A.D.2d 619 (2d Dep't 1995).........................................................................58

*Clark v. New York City Hous. Auth.*,
2023 WL 8071800 (2d Cir. 2023) ......................................................................18

*Columbus v. Smith & Mahoney P.C.*,
259 A.D.2d 857 (3d Dep't 1999).........................................................................25

*Cruz v. Long Island R.R. Co.*,
22 A.D.3d 451 (2d Dep't 2005)...........................................................................60

*Dean/Carson Tappan, LLC v. State*,
178 A.D.3d 664 (2d Dep't 2019).........................................................................25

*Dibble v. New York City Transit Auth.*,
76 A.D.3d 272 (1st Dep't 2010) ...................................................................33, 34

*DIJO, Inc. v. Hilton Hotels Corp.*,
351 F.3d 679 (5th Cir. 2003) ....................................................................45

*DLC Mgmt. Corp. v. Town of Hyde Park*,
163 F.3d 124 (2d Cir. 1998) ......................................................................4

*Doe v. Uber Techs., Inc.*,
551 F.Supp.3d 341 (S.D.N.Y. 2021) ..........................................................19

*Drake v. Delta Air Lines, Inc.*,
2005 WL 1743816 (E.D.N.Y. 2005) ...........................................................19

*Driscoll v. New York City Transit Auth.*,
262 A.D.2d 271 (2d Dep't 1999).................................................................61

*Eastman v. State*,
303 N.Y. 691 (1951)...................................................................................16

*Ewans v. Wells Fargo Bank, N.A.*,
389 F. App'x 383 (5th Cir. 2010).................................................................23

*F. S. v. City of New York*,
242 A.D.3d 1135 (2d Dep't 2025)................................................................28

*Fane v. Zimmer, Inc.*,
927 F.2d 124 (2d Cir. 1991) .......................................................................18

*Farber v. New York City Trans. Auth.*,
143 A.D.2d 112 (2d Dep't 1988)..................................................................10

*Ferreira v. City of Binghamton*,
38 N.Y.3d 298 (2022)...........................................................................9, 11

*Figueroa v. Ministry for Foreign Affairs of Sweden*,
2018 WL 2089361 (S.D.N.Y. 2018)..............................................................24

*Firmes v. Chase Manhattan Auto. Fin. Corp.*,
50 A.D.3d 18 (2d Dep't 2008).....................................................................58

*Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*,
606 F.3d 494 (8th Cir. 2010) ......................................................................39

*Friedman v. Nat'l Presto Indus. Inc.*,
566 F.Supp. 762 (E.D.N.Y. 1983) ........................................................41

*Friedman v. State*,
67 N.Y.2d 271 (1986) ........................................................15

*Fulop v. Malev Hungarian Airlines*,
2003 WL 42016 (S.D.N.Y. 2003)........................................................26

*Gilson v. Metro. Opera*,
5 N.Y.3d 574 (2005) ........................................................23, 45

*Glaser v. Cnty. of Orange*,
54 A.D.3d 997 (2d Dep't 2008) ........................................................34

*Goldwater v. Metro-N. Commuter R.R.*,
906 F.Supp. 173 (S.D.N.Y. 1995) ........................................................10

*Grdinich v. Bradlees*,
187 F.R.D. 77 (S.D.N.Y. 1999) ........................................................26

*Guilbeau v. W.W. Henry Co.*,
85 F.3d 1149 (5th Cir. 1996) ........................................................41

*Hager v. United States*,
2024 WL 728711 (D. Ariz. 2024) ........................................................23

*Harford v. City of New York*,
194 A.D.2d 519 (2d Dep't 1993)........................................................14

*Hoenig v. Shyed*,
284 A.D.2d 225 (1st Dep't 2001) ........................................................59

*House v. Kent Worldwide Machine Works, Inc.*,
2010 WL 11607350 (S.D.N.Y. 2010)........................................................55, 58

*Idaho Golf Partners, Inc. v. TimberStone Mgmt.*,
2017 WL 3531481 (D. Idaho 2017) ........................................................38

*Jackson v. New York City Transit Auth.*,
30 A.D.3d 289 (1st Dep't 2006) ........................................................12

*In re Jackson*,
630 B.R. 700 (Bankr. D. Conn. 2021) ............................................................22

*James River Ins. Co. v. Rapid Funding, LLC*,
658 F.3d 1207 (10th Cir. 2011) ....................................................................44

*JGR, Inc. v. Thomasville Furniture Indus., Inc.*,
370 F.3d 519 (6th Cir. 2004) ........................................................................45

*In re Joint E. Dist. & S. Dist. Asbestos Litig.*,
995 F.2d 343 (2d Cir. 1993) .........................................................................42

*Jones v. United States*,
194 F.Supp.3d 849 (E.D. Wisc. 2016)...........................................................23

*Keenan v Molloy*,
137 A.D.3d 868 (2d Dep't 2016)....................................................................36

*Kinneary v. City of N.Y.*,
601 F.3d 151 (2d Cir. 2010) ...........................................................................4

*Kissoon v. Wal-Mart Real Estate Bus. Trust*,
2024 WL 4350726 (E.D.N.Y. 2024) ..............................................................23

*Korean Air Lines Co. v. McLean*,
118 F.Supp.3d 471 (E.D.N.Y. 2015) ..............................................................21

*Laruccia v. Lewis J. Newton & Sons*,
242 A.D.3d 854 (2d Dept. 2025) ....................................................................28

*Lee v. City of Troy*,
339 F.R.D. 346 (N.D.N.Y. 2021) ...................................................................52

*Leo v. Long Island R.R. Co.*,
307 F.R.D. 314 (S.D.N.Y. 2015) ....................................................................54

*Lewis v. Metro. Transp. Auth.*,
99 A.D.2d 246 (1st Dep't 1984) .....................................................................19

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
801 F.Supp.3d 330 (S.D.N.Y. 2025) ..............................................................18

*Loftus v. Union Ferry Co.*,
84 N.Y. 455 (1881) ....................27

*Loudoun v. Eighth Ave. R. Co.*,
162 N.Y. 380 (1900) ....................22

*Maraia v. Church of Our Lady of Mount Carmel*,
36 A.D.3d 766 (2d Dep't 2007) ....................29

*Marcoux v. Farm Serv. & Supplies, Inc.*,
290 F.Supp.2d 457 (S.D.N.Y. 2003) ....................49, 50, 51

*Mathews v. ADM Milling Co.*,
2019 WL 2428732 (W.D.N.Y. 2019) ....................35

*Matthews v. CTI Container Transp. Int'l*,
871 F.2d 270 (2d Cir. 1989) ....................49

*McCormack v. City of New York*,
80 N.Y.2d 808 (1992) ....................13

*McMillan v. City of New York*,
2008 WL 4287573 (E.D.N.Y. 2008) ....................61

*Mehra v. Bentz*,
529 F.2d 1137 (2d Cir. 1975) ....................32

*Messerschmidt v. Millender*,
565 U.S. 535 (2012) ....................13

*Miraglia v. H&L Holding Corp.*,
36 A.D.3d 456 (1st Dep't 2007) ....................60

*Mirjah v. New York City Trans. Auth.*,
48 A.D.3d 764 (2d Dep't 2008) ....................29, 32

*Morrison v. Flintosh*,
163 A.D.2d 646 (3d Dep't 1990) ....................25

*N. X. v. Cabrini Med. Ctr.*,
280 A.D.2d 34 (1st Dep't 2001) ....................32

*Napolitano v. Flynn*,
949 F.2d 617 (2d Cir. 1991) ..........5

*Newton v. State*,
165 A.D.3d 421 (1st Dep't 2018) ..........35

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ..........4

*Norcia v. Dieber's Castle Tavern, Ltd.*,
980 F.Supp.2d 492 (S.D.N.Y. 2013) ..........58, 59

*Nunez v. Levy*,
2008 N.Y. Slip Op. 51061(U), (Sup. Ct., NY Cty. 2008) ..........57

*O'Brien v. City of New York*,
231 A.D.2d 698 (2d Dep't 1996)..........15

*Okraynets v. Metropolitan Transp. Auth.*,
555 F.Supp.2d 420 (S.D.N.Y. 2008) ..........60

*Perlov v. Port Auth. of N.Y. and N.J.*,
189 A.D.3d 1624 (2d Dep't 2020)..........16

*Phiri v. Joseph*,
32 A.D.3d 922 (2d Dep't 2006)..........36

*Raedle v. Credit Agricole Indosuez*,
670 F.3d 411 (2d Cir. 2012) ..........52

*Ramirez v. State of New York*,
143 A.D.3d 880 (2d Dep't 2016)..........12

*Ramos v. Cnty. of Suffolk*,
707 F.Supp.2d 421 (E.D.N.Y. 2010) ..........49

*Ramos v. New York City Transit Auth.*,
2014 WL 11512022 (Sup. Ct., New York Cty, 2014)..........62

*Rangolan v. Cnty. of Nassau*,
370 F.3d 239 (2d Cir. 2004) ..........54

*Redish v. Adler*,
65 Misc.3d 1227(a) (Sup. Ct., Bronx Cty. 2019) ....................................62

*Rivera v. Guevara*,
2018 WL 3093339 (N.D. Ill. 2018) ....................................34

*Rivera v. New York City Transit Auth.*,
184 A.D.2d 417 (1st Dep't 1992) ....................................10

*Rodriguez v. Brit. Airways PLC*,
2017 WL 6372733 (E.D.N.Y. 2017) ....................................21

*Ruby v. Budget Rent A Car Corp.*,
23 A.D.3d 257 (1st Dep't 2005) ....................................60

*Saldino v. Stewart & Stevenson Servs., Inc.*,
2011 WL 284476 (E.D.N.Y. 2011) ....................................60

*Schultz v. Akzo Nobel Paints, LLC*,
721 F.3d 426 (7th Cir. 2013) ....................................48

*Scoma v. Wal-Mart Stores, Inc.*,
205 F.3d 1323, 2000 WL 19104 (2d Cir. 2000) ....................................54

*Searcy v. New York City Trans. Auth.*,
169 A.D.3d 1076 (2d Dep't. 2019)....................................29

*Seargent v. Berben*,
235 A.D.2d 1024 (3d Dep't 1997)....................................63

*Sherman v. Robinson*,
80 N.Y.2d 483 (1992) ....................................45

*Slavin v. Garrison Prop. & Cas. Ins. Co.*,
2017 WL 2928030 (D. Colo. 2017)....................................22

*Smith v. Lightning Bolt Prods., Inc.*,
861 F.2d 363 (2d Cir. 1988) ....................................53

*Stalling v. Union Pac. R.R. Co.*,
2003 WL 21317297 (N.D. Ill. 2003) ....................................42

*Stampf v. Long Island R.R. Co.*,
761 F.3d 192 (2d Cir. 2014) ........................................................................55

*State Farm Fire & Cas. Co. v. Bell*,
30 F.Supp.3d 1085 (D. Kan. 2014)..................................................................48

*TLT-Babcock, Inc. v. Emerson Elec. Co.*,
33 F.3d 397 (4th Cir. 1994) ..........................................................................39

*Turturro v. City of New York*,
28 N.Y.3d 469 (2016).....................................................................15, 16, 17

*United States v. 10.48 Acres of Land*,
621 F.2d 338 (9th Cir. 1980) ........................................................................47

*United States v. A&S Council Oil Co.*,
947 F.2d 1128 (4th Cir. 1991) ......................................................................48

*United States v. Fields*,
466 F.2d 119 (2d Cir. 1972)..........................................................................52

*United States v. Graham*,
2019 WL 2366724 (S.D.N.Y. 2019)................................................................44

*United States v. Henderson*,
409 F.3d 1293 (11th Cir. 2005) .....................................................................48

*United States v. Kahn*,
472 F.2d 272 (2d Cir. 1973) ..........................................................................47

*Valente v. Textron, Inc.*,
559 F. App'x 11 (2d Cir. 2014) .....................................................................18

*Weiden v. Schwartz*,
193 A.D.2d 570 (1st Dep't 1993) ..................................................................63

*Weiner v. Metro. Transp. Auth.*,
55 N.Y.2d 175 (1982).......................................................................................9

*Weiss v. Fote*,
7 N.Y.2d 579 (1960)............................................................................*passim*

*Westbrook v. Gen. Tire & Rubber Co.*,
754 F.2d 1233 (5th Cir. 1985) ....................................................................50

*Wills v. Amerada Hess Corp.*,
379 F.3d 32 (2d Cir. 2004) ....................................................................18, 44

*Zambrana v. New York City Transit Auth.*,
14 A.D.3d 23 (1st Dep't 2004) ....................................................................11, 12

**Statutes/Other**

N.Y. Pub. Auth. Law §§ 1201, 1202, 1263, 1264 ....................................................9

Fed. R. Civ. P. 50(b) ....................................................................4

Fed. R. Civ. P. 59 ....................................................................4

Fed. R. Evid. 407 ....................................................................39

## PRELIMINARY STATEMENT

On August 6, 2016, while standing near the edge of the B/Q subway platform at Transit's[1] Atlantic Avenue-Barclays Center subway station, Plaintiff fainted and fell onto the tracks below in front of an oncoming train that was entering the station. Within 7 to 10 seconds, Plaintiff was struck by the train, which was operated by defendant Raqia Shabazz ("Shabazz"). Plaintiff suffered an amputated left arm and leg.

Trial was held in October and November 2025. Plaintiff's claims went to trial against Shabazz on a negligent operation theory and against Transit on the theory that it negligently designed the station platform. The basis for Plaintiff's negligent design claim was that Transit should have: (1) installed platform screen doors ("PSDs") - - which are electric door panels that block entry to the tracks and are synchronized to the train's doors when in the station; and (2) installed track intrusion detection systems ("TIDs") - - technology that alerts the system when an object enters the trackbed. (Tr. 122, 125, 210).[2] Transit asserted several affirmative defenses, including governmental and qualified immunity.

---

[1] "Transit" refers to Defendants New York City Transit Authority and Metropolitan Transportation Authority. "Defendants" refers collectively to Shabazz and Transit.

[2] References to "Tr." are to the trial transcript attached as Exhibit A to the supporting Declaration of Timothy J. Collazzi.

On November 20, 2025, a jury found Shabazz 0.01% and Transit 99.99% liable for Plaintiff's accident. (ECF Doc. # 344). On the issue of qualified immunity, the jury found that Transit did not study the "issue of persons falling onto the tracks and being hit by trains." (*Id.*, Question 5(a)). The jury awarded Plaintiff $81.7 million dollars: $10 million for future medical expenses; $1.7 million in lost earning capacity; $20 million for past pain and suffering; and $50 million for future pain and suffering. (*Id.*, Questions 6-9).

Defendants now move for judgment as a matter of law ("JMOL") under Fed. R. Civ. P. 50(b) because:

- Transit is entitled to JMOL because it has "governmental function immunity" and/or "qualified immunity" for policy and planning decisions concerning how to protect passengers waiting for trains on platforms from coming into contact with trains.
- Transit is entitled to JMOL because Plaintiff's liability expert improperly applied a heightened standard of care and his related opinions as to Transit should be stricken. Without supporting expert testimony, Plaintiff's claims against Transit fail as a matter of law.
- Transit is entitled to JMOL because Plaintiff failed to meet certain elements of her negligence claim. Plaintiff failed to identify any applicable industry standard that Transit violated - - in fact, every mass transportation agency in

the United States has open platforms, just as Transit does. And, any dangers posed by Transit's open platforms are "open and obvious."

- Shabazz is entitled to JMOL because Plaintiff's trial evidence, including her expert's testimony, was entirely speculative as to whether Shabazz could have avoided striking Plaintiff.
- Defendants are entitled to JMOL on Plaintiff's lost earnings claim because it was based on speculation and not established with any "reasonable certainty."

Alternatively, if the Court does not grant JMOL to Defendants, they are entitled to a new trial under Fed. R. Civ. P. 59 because:

- Plaintiff sought damages for "pre-impact terror," but the trial evidence established that she was unconscious until after the accident. The jury's past pain and suffering award may have rested on this unsupported basis.
- Defendants were prejudiced by the erroneous admission of: (1) Transit's subsequent remedial measures; (2) causation testimony from lay witnesses; and (3) Transit's internal policies with respect to "hazard analysis."
- Defendants were also prejudiced: because the Court unreasonably restricted their cross-examination of Plaintiff's experts; and by repeated improper remarks and comments by Plaintiff's counsel in his summation.

If the Court does not grant JMOL or a new trial, Defendants are entitled to remittitur of the jury's $70 million pain and suffering award as it "deviates

materially" from any measure of "reasonable compensation" under New York law.

## APPLICABLE STANDARDS

JMOL under Rule 50(b) is appropriate "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]." *Kinneary v. City of N.Y.*, 601 F.3d 151, 155 (2d Cir. 2010).

A new trial under Rule 59 should be granted where "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). A new trial may be warranted based on the introduction of inadmissible evidence if there "was a clear abuse of discretion" and the evidence was "clearly prejudicial." *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005). A new trial may also be ordered if a claim or issue was erroneously submitted to the jury and may have served as a basis for the verdict. *See Chowdhury v. WorldTel Bangl. Holding, Ltd.*, 746 F.3d 42, 50 (2d Cir. 2014).

## POINT I

## TRANSIT IS ENTITLED TO JMOL ON THE BASIS OF IMMUNITY

All claims against Transit should have been dismissed because it is entitled to "governmental function immunity" and/or "qualified immunity" for performing a

"proprietary function." No reasonable juror could conclude otherwise.[3]

## A. Relevant Trial Evidence

For years before Plaintiff's accident, Transit participated in domestic and foreign transit organizations[4] to assess how other mass transit systems designed, constructed, and maintained their platforms to make them reasonably safe. (Tr. 572). This included a review of PSDs and TIDs. (Tr. 122, 125, 210).

PSDs - - which Plaintiff called the "gold standard" in preventing track-related incidents (Tr. 64) - - have been partially implemented in a handful of systems ***internationally***. But, ***no mass transit system in the United States uses PSDs,*** and almost no international mass transit systems have implemented them on a systemwide basis. (Tr. 976, 2027-28, 2084).

Even though PSDs are not used in any mass transit system in the United States, Transit studied whether they could be installed in portions of its system. (*See* Tr. 224, 975-76, 1997-98). That study included soliciting information from manufacturers and developing a Concept of Operations and pilot program. (Tr. 191-92, 266-67, 327, 454-55, 502-03). Transit evaluated complications in employing

---

3 Whether Transit is entitled to immunity is determined by New York law. *See Napolitano v. Flynn*, 949 F.2d 617, 620-21 (2d Cir. 1991).

4 Transit participated in: the American Public Transit Association and the North American Association of Large and Small Transit Agencies; and UITP and CoMET (both international associations of transit agencies). (Tr. 572).

such measures, including:

- **Electrical**: PSDs are "power hungry," requiring power upgrades (an acute issue where there is limited space in the electrical supply rooms). (Tr. 537).

- **Ventilation**: Many stations do not have air conditioning and rely on train movement for air flow, which would be blocked by PSDs. (Tr. 538).

- **Maintenance**: Determining when and how to perform track and PSD maintenance is difficult in Transit's system, which operates 24/7. (Tr. 538-39, 543).

- **Installation**: Although PSDs are efficient for platforms that are straight, they are more difficult to use in stations with curved platforms. (Tr. 540).

- **Operational**: PSDs increase dwell time (the time the train spends in the station) and they may block a train crew's view of signals. (Tr. 541-42, 547). PSDs also require a homogenous fleet (Transit's fleet is not homogenous). (Tr. 1031).

- **Structural**: Most stations require upgrades to the platform to enable them to bear the weight of PSDs. (Tr. 556).

- **Other hazards:** Certain incidents (for example, dragging incidents) would be more severe if platform barriers were installed. (Tr. 621).

Notably, Plaintiff's expert (Dr. Carl Berkowitz) acknowledged these challenges in utilizing PSDs. (*See* Tr. 1030-31).

There are approximately 1.7 billion riders annually on Transit's system (or 8 million per day). (Tr. 396-97). Transit tracks all "12-9" incidents (or CWIs (meaning contact with individual)).[5] Since the 1980s, Transit has investigated every 12-9

---

[5] "12-9s" and "CWIs" are interchangeable terms for instances where an individual comes into contact with a subway train car. (Tr. 94).

incident. (Tr. 171, 341, 366, 406, 437, 444). For example, Transit tracks incidents involving people who: voluntarily entered the trackbed (for example, to retrieve an item); were shoved onto the tracks; experienced a medical event (such as fainting); committed suicide; or walked into the side of a moving train. (Tr. 263).

Such incidents involve an infinitesimal percentage of Transit's riders - - far less than one percent. For example, for the two years preceding Plaintiff's accident, Transit's data is as follows:

| Total Incidents from August 4, 2014 to August 2, 2016 | | |
|---|---|---|
| **Incident Type** | **No. of Incidents** | **Frequency per riders (3.51B)*** |
| **On platform** | 135 | .0000038% |
| **Between cars** | 9 | .00000026% |
| **Suicide/ jumped** | 105 | .0000030% |
| **Retrieve item / entered track bed voluntarily** | 15 | .00000043% |
| **Pushed** | 2 | .000000057% |
| **Medical** | 2 | .000000057% |
| **Tripped onto tracks** | 17 | .00000048% |
| **Unknown** | 37 | .0000011% |
| **TOTAL** | 322 | .0000092% |

(*See* Pl's Ex. 54).

Regardless of the exceedingly low percentage of incidences, Transit endeavored to further minimize the risk by encouraging people to stand back from the platform edge[6] and to prevent or mitigate the occurrence of 12-9s. To do so, Transit initiated industry-standard measures, including: (1) initiating awareness campaigns (*e.g.*, station announcements and signage); (2) initiating pilot programs to investigate available technologies; (3) painting the platforms with visual indicators to stand back from platform edge; (4) installing tactile strips to warn those with visual impairments and others of the platform edge; (5) announcing train arrivals via countdown clocks so passengers would not lean over the platform edge to see if a train was arriving; and (6) installing help points on all platforms (which provide a direct line into the rail control center) beginning "in the 2000s." (Tr. 154, 165, 168-69, 366-67, 402-03, 406-07, 440, 570).

These mitigation strategies are used in other systems. (Tr. 1868-70, 2006-08). And, Plaintiffs' expert (Berkowitz) agreed that these measures are part of Transit's comprehensive plan to keep passengers safe. (Tr. 1031-32). Indeed, Berkowitz admitted that Transit puts significant resources into safety. (Tr. 1024).

---

[6] The envelope of the train includes a portion of platform edge. (Tr. 440-443).

## B. **Transit is Entitled to Governmental Function Immunity**[7]

"Governmental function immunity" applies when a State's "acts are undertaken for the protection and safety of the public pursuant to the general police powers" and affords a "full defense for discretionary acts." *Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 308-09 (2022). Because Transit engages in governmental and proprietary functions, the Court of Appeals has held that:

> It is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred.

*Weiner v. Metro. Transp. Auth.*, 55 N.Y.2d 175, 182 (1982).[8]

Plaintiff claims she was injured because Transit did not design its platforms to block the public from accessing the tracks. As the Court of Appeals has held: "[p]rotecting health and safety is one of a municipal government's most important duties." *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 427 (2013). Consequently, where Transit makes decisions and implements policies related to the public's safety

---

7 On March 6, 2025 the Court denied Transit's motion for summary judgment based on governmental immunity. (ECF Doc. # 260). Transit has appealed that decision. (ECF Doc. # 261). Although governmental immunity was not an issue for the jury, the evidence at trial confirmed Transit's immunity.

8 New York's Legislature has stated that Transit, in exercising discretion, performs essential governmental functions. *See* N.Y. Pub. Auth. Law §§ 1201, 1202, 1263, 1264.

and security, it is performing a governmental function. *See Farber v. New York City Trans. Auth.*, 143 A.D.2d 112, 113 (2d Dep't 1988) (decision to not lock a closed token booth area that allegedly facilitated an assault involves a governmental function); *Rivera v. New York City Transit Auth.*, 184 A.D.2d 417, 418 (1st Dep't 1992) (illumination of station exit involved passenger security and was governmental function). This includes Transit's decisions related to the design of stations which implicate passenger safety. *See Goldwater v. Metro-N. Commuter R.R.*, 906 F.Supp. 173, 177 (S.D.N.Y. 1995), *vacated in part on other grounds*, 101 F.3d 296 (2d Cir. 1996) ("Metro–North's design and maintenance of the Marble Hill station implicate the governmental functions of providing security to passengers and policymaking regarding the risks presented.").

Transit evaluated various designs as part of their safety and security efforts on their system (including evaluating the dangers that platform barriers themselves pose to the public). (*See* Tr. 399-400, 618-619, 1999). This falls squarely within the governmental immunity afforded to decisions on how best to protect the public (including on its subway platforms).

The trial record shows that Transit is entitled to governmental immunity and Plaintiff's negligent design claim should never have gone to trial.

## C. Transit is Entitled to Qualified Immunity[9]

If the Court continues to hold that Transit is not entitled to governmental immunity, the trial record confirms that it is entitled to qualified immunity for its decisions on how to protect individuals on platforms from train-related incidents.

Qualified immunity applies where the State acts in a "proprietary" role, meaning "its activities essentially substitute for or supplement traditionally private enterprises." *Ferreira*, 38 N.Y.3d at 309. Although a jury may consider whether State actors are liable for the "day-by-day operations . . . of government - for instance, the garden variety injury resulting from the negligent maintenance of a highway - ***[] submit[ting] to a jury the reasonableness of the lawfully authorized deliberations of executive bodies presents a different question***." *Weiss v. Fote*, 7 N.Y.2d 579, 585 (1960) (emphasis added).

State decisions (including Transit's)[10] that are the product of a study or investigation are entitled to qualified immunity. *See id.* at 588-89. If the State studies an issue, it is stripped of immunity only if a plaintiff establishes the study was

---

9 The Court denied Transit's motion for summary judgment on qualified immunity (which Transit has also appealed). (ECF Doc. ## 260, 261). The Court, however, found issues of fact for the jury. (ECF Doc., # 260, at pp. 8-9).

10 Policy decisions by Transit are protected by qualified immunity. *See, e.g., Zambrana v. New York City Transit Auth.*, 14 A.D.3d 23, 25 (1st Dep't 2004) (Transit's policy of keeping doors between cars unlocked while the train was moving was entitled to qualified immunity).

"plainly inadequate or there is no reasonable basis for [the State's] plan." *Affleck v. Buckley*, 96 N.Y.2d 553, 556 (2001).

This does not mean, however, that a jury in a tort case can second-guess the State and reassess whether the State's conclusions after studying the issue were proper. To the contrary, the New York Court of Appeals has held:

> To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts.

*Weiss*, 7 N.Y.2d at 585-86; *see Jackson v. New York City Transit Auth.*, 30 A.D.3d 289, 290 (1st Dep't 2006) (qualified immunity prevents "second-guessing" the "planning decisions of governmental bodies"). Indeed, "there is ample basis for doubting [a jury's] capacity to arrive at a conclusion" concerning the adequacy of the State's study. *Weiss*, 7 N.Y.2d at 588.

Thus, the bar for finding the State's study[11] "inadequate" or "unreasonable" is exceedingly high. Indeed, a State's decision is unreasonable only if "no reasonable

---

[11] Plaintiff has incorrectly argued that a formal written study or plan is necessary. Qualified immunity is not, however, dependent on such formalities, and no case so holds or even suggests such formalities are required. *See, e.g., Zambrana*, 14 A.D.3d at 23. Rather, the State need only engage in "a deliberative decision-making process"- - whether or not reduced to a formal plan or report. *See Ramirez v. State of New York*, 143 A.D.3d 880, 881 (2d Dep't 2016) (citations omitted).

official could have adopted it." *Weiss*, 7 N.Y.2d at 586; *see also McCormack v. City of New York*, 80 N.Y.2d 808, 811 (1992) (supplying bullet-proof vests with less protection but greater mobility than plaintiff's proposed alternative was not irrational). In fact, qualified immunity allows public officials to make "reasonable but mistaken judgments, and protects all but the plainly incompetent." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotations and citations omitted).

The State does not lose immunity simply because outside experts disagree. As the Court of Appeals made clear:

> [S]omething more than a choice between conflicting opinions of experts is required before a governmental body may be held liable for negligently performing its . . . function. The plaintiff must show not merely that another option was available but also that the plan adopted lacked a reasonable basis.

*Affleck*, 96 N.Y.2d at 557 (citations omitted).

The trial record is replete with evidence that Transit's decision ***not*** to install PSDs or TIDs as of the date of Plaintiff's accident was the product of reasonable study. Indeed, Transit's study was so extensive that it: spanned more than two decades;[12] involved multiple international trips by executive members of Transit's

12 (*See* Tr. 618).

operational team to assess PSDs and TIDs on systems in other countries;[13] included the retention of an outside consultant to assess the feasibility of retrofitting Transit's current century-old system;[14] considered proposals by contractors to install PSDs;[15] involved pilot programs to test the new technologies, and considered the hazards they might introduce to the system.[16]

In addition to studying PSDs and TIDs, Transit employed other methods to reduce 12-9's. (Tr. 154, 165, 168-69, 366-67, 402-03, 406-07, 440, 570). That Transit implemented other protective measures - - but, like every other mass transit system in the United States,[17] did not install PSDs or TIDs as of the date of the accident - - does not strip Transit of qualified immunity. As the Second Department held in *Harford v. City of New York*, 194 A.D.2d 519, 520 (2d Dep't 1993):

> [A]lthough the desirability of installing a traffic control signal at the location in question ***was considered, no determination was made that the traffic-control device was necessary.*** The failure to make such a determination is clothed in qualified immunity . . . . (emphasis added).

---

13 (*See* Tr. 256-57, 325-26, 498-500, 1863-64, 1870-71, 1878-79 Pl's Ex. 13; Def's Exs. II, RR).

14 (*See* Tr. 501-03, 1878-79, 1888; *see also supra* at pp. 5-6).

15 (*See* Pl's Ex. 24).

16 (*See* Tr. 290-93, 399-400, 618-19, 1999, 1872-77; Pl's Ex. 73; Def's Exs. JJ, LL, NN, PP).

17 This fact alone belies any suggestion that "no reasonable official" would have passed on installing PSDs or TIDs.

*See O'Brien v. City of New York,* 231 A.D.2d 698, 599 (2d Dep't 1996) (defendant City was entitled to qualified immunity where it was studying whether to install traffic control devices but "had not completed the study at the time of the accident").

Similarly, the conflicting opinion of Plaintiff's expert (Berkowitz) at trial that Transit should have installed PSDs and TIDs (or taken other steps) does not strip Transit of qualified immunity. *See Affleck*, 96 N.Y.2d at 557; *Weiss*, 7 N.Y.2d at 588. To allow the jury to decide that - - despite Transit's study - - they could be liable in tort to the Plaintiff would "constitute the type of judgment substitution that [*Weiss*] prohibits." *Friedman v. State*, 67 N.Y.2d 271, 286 (1986).[18]

**D. *Turturro* Does Not Apply as to Qualified Immunity**

Relying on *Turturro v. City of New York,* 28 N.Y.3d 469 (2016), the Court instructed the jury that Transit was entitled to immunity if: it engaged in a study; the study was adequate; its decision not to install barriers or TIDs was reasonable; and it regularly reviewed its decision in light of actual operations. (*See* Tr. 2274-75; *see also* ECF Doc. # 344, Question 5(a-d)).

*Turturro* is not applicable and the Court's instructions based on that case were

---

[18] The jury answered "no" to Question 5(a) on the verdict sheet. (*See* ECF Doc. # 344) ("As of August 2, 2016, did the Transit Authority study the issue of persons falling onto the tracks and being hit by trains?"). That finding was wholly unsupported by the evidence of trial and, at minimum, entitles Transit to a new trial. (*See* Point VIII(E)).

in error.[19] *Turturro* involved whether qualified immunity applied to a municipality's study of ***traffic conditions on public roadways.*** The requirement in *Turturro* that, for example, the municipality continue "to review its [traffic] plan in the light of its actual operation[s]" is based on long-established common law requirements for traffic studies in New York.[20] Many cases have applied this premise in assessing qualified immunity for traffic studies and other safety-related decisions impacting roadways.[21] No case has ever expanded *Turturro's* application to ***rail operations***.

In any event - - even if *Turturro* did apply - - the trial record is clear that, at the time of Plaintiff's accident, Transit ***was continuing to study*** PSDs and TIDs. (*See* Tr. 290-91, 404-05, 412-13).[22] This included each of the endeavors discussed above

---

[19] Transit repeatedly objected the applicability of *Turturro*. (*See* Tr. 1732-33, 1974-75; ECF Doc. ## 319, 332).

[20] For example, in *Weiss*, 7 N.Y.2d at 587, the Court of Appeals noted that a municipality has had a "continuing duty to review its [traffic safety] plan in the light of its actual operation" since at least its decision in *Eastman v. State*, 303 N.Y. 691 (1951). Because this is a common law principle, that Court has cited it in automobile tort cases where qualified immunity is not even at issue. *See Atkinson v. Oneida Cnty.*, 59 N.Y.2d 840, 841(1983).

[21] *See Perlov v. Port Auth. of N.Y. and N.J.*, 189 A.D.3d 1624, 1628 (2d Dep't 2020) (bridge was "analogous" to a roadway and, therefore, Port Authority's decision not to install suicide prevention barriers on bridge was subject to immunity analysis of *Turturro*).

[22] Because the jury answered "no" to Question 5(a) (*see* fn. 18, *supra*), the jury did not reach the remaining questions on the verdict sheet as to qualified immunity, including Question 5(d) ("As of August 2, 2016, did the Transit Authority regularly review its decision in light of actual operations?") (ECF Doc. # 344).

(*i.e.*, Transit's assessment of PSDs and TIDs in foreign systems; consultation with outside consultants about retrofitting the current system; considering proposals for installing PSDs; and considering the hazards posed by PSDs and other systems). Additionally, both before and after Plaintiff's accident, Transit ***did*** employ industry standard preventative measures (including station announcements, signage, pilot programs, visual indicators, countdown clocks and help points). The trial record was also clear that Transit continued to track CWIs/12-9s on its system to assess whether, in light of its "actual operations," the measures it ***did*** implement were effective. (*See* Tr. 406; 1893-96).

Accordingly, even if *Turturro* provided the relevant standard - - which it does not - - Transit satisfied that standard.

* * *

For these reasons, the Court should grant JMOL to Transit on the basis of governmental and/or qualified immunity.

## POINT II

## TRANSIT IS ENTITLED TO JMOL BECAUSE PLAINTIFF AND HER EXPERT APPLIED AN INAPPLICABLE HEIGHTENED STANDARD OF CARE

To support her negligent design claims against Transit, Plaintiff (and her expert) sought to hold Transit to a heightened standard of care, far above the standard of ordinary care which applies to Transit.

## A. Plaintiff's Claims Against Transit Require Expert Testimony

Expert testimony is required for matters beyond the ken of ordinary jurors. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (where, "the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required."); *Clark v. New York City Hous. Auth.*, 2023 WL 8071800, at *1 (2d Cir. 2023) (because they are "outside the ken of judges and jurors, [plaintiff] was required to prove both causation elements using expert testimony").

Plaintiff required expert testimony at trial to establish that Transit's platforms were defectively designed[23] and caused Plaintiff's accident.[24]

## B. The Court Should Exclude and Strike Berkowitz's Trial Testimony

This Court has a "gatekeeping responsibility" to "ensur[e] that expert testimony satisfies . . . Rule 702." *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F.Supp.3d 330, 365-66 (S.D.N.Y. 2025) (citation omitted). On October 13, 2025, Transit filed a *Daubert* motion to preclude Berkowitz from testifying at trial because, among other things, he applied the inappropriate standard of care. (ECF Doc. # 279). The Court denied the motion before trial. (ECF at 10/15/25

---

23 *See, e.g., Valente v. Textron, Inc.*, 559 F. App'x 11, 14-15 (2d Cir. 2014) (expert testimony required to establish design defect claim).

24 *See, e.g.*, *Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2d Cir. 1991) (where causation involves complicated issues "beyond the sphere of the ordinary juryman," expert testimony required).

Minute Entry).

Now that Berkowitz has testified at trial, this Court can reevaluate the admissibility of his opinion. *See Drake v. Delta Air Lines, Inc.*, 2005 WL 1743816 at *8 (E.D.N.Y. 2005) (Block, J.) (on Rule 50(b) motion, Court "reevaluate[d] whether Dr. Mann's testimony should have been excluded under *Daubert*").

### *1. Transit is Subject to a Reasonable Standard of Care*

In New York, common carriers such as Transit are not subject to a heightened standard of care. Rather, they are "subject to the same duty of care as any other potential tortfeasor - reasonable care under all of the circumstances of the particular case." *Bethel v. New York City Transit Auth.*, 92 N.Y.2d 348, 356 (1998); *Doe v. Uber Techs., Inc.*, 551 F.Supp.3d 341, 357 (S.D.N.Y. 2021) ("New York law no longer holds common carriers to a heightened duty of care; the ordinary standard of negligence applies.").

More specifically, as to "approaches [and] station platforms," Transit must "exercise ordinary care, in view of the dangers attending its use, to make it reasonably adequate for the purpose to which it was devoted." *Lewis v. Metro. Transp. Auth.*, 99 A.D.2d 246, 248 (1st Dep't 1984).

### *2. Berkowitz's Opinion is Based on an Improper Heightened Standard of Care*

Berkowitz broadly opined that Transit "should not have allowed the passengers to interface with the tracks" and:

> [Transit] ***should do everything humanly and technically and engineering possible*** to prevent people from being on the track. (Tr. 965) (emphasis added).

Berkowitz voiced this theme throughout his testimony:

- He testified that Transit should have done "whatever is required to complete what the plan asks to be done." (Tr. 1000).
- He testified unequivocally that Transit "should have prevented people from falling on the track by using such things as platform edge doors, platform screen doors, rope doors, gates, things of that nature . . . ." (Tr. 965-966).
- Just as unequivocally, he testified that Transit: "should have developed a system where people could not access the track and being run over by the train." (Tr. 1002).
- Again referencing Transit's supposed duty to "prevent" all track-related incidents, he testified that "[Transit] is negligent for not implementing something to prevent people from interfacing with the track." (Tr. 974-75).

Berkowitz went so far as to testify that comparing the number of track-related fatalities to the number of riders of Transit's system - - no matter how infinitesimal that percentage of riders - - was an "irrelevant" and "crazy" metric. (Tr. 1020-21). To Berkowitz, ***any*** track-related fatalities on Transit's system - - standing alone and

*a fortiori* - - showed that Transit's safety measures were ineffective and unreasonable.[25] He opined that any and all "high hazards" must be "eliminate[d] or remediate[d]" - - no matter the reasonableness of the means Transit had to employ. (Tr. 989).[26] Of course, "the mere happening of an accident [does] not establish liability on the part of a defendant." *Korean Air Lines Co. v. McLean*, 118 F.Supp.3d 471, 486 (E.D.N.Y. 2015).

In truth, Berkowitz held Transit to a heightened standard, opining that it must do anything "humanly" possible (*i.e.*, "whatever is required") to "prevent" all injuries arising from contact with a subway train. Berkowitz effectively told the jury that Transit was the guarantor of the safety of every passenger on subway platforms. Of course, even when courts held that railroads ***did have*** a heightened duty of care under New York law - - which they no longer do - - they were never "a guarantor of

---

[25] (*See* Tr. 1032) (Berkowitz testifying that Transit's measures "did not work" and (sarcastically) "[t]heir campaigns work really well that they had no impact on the number of people that were being killed").

[26] Another District Court has barred Berkowitz's testimony for similar reasons in *Rodriguez v. Brit. Airways PLC*, 2017 WL 6372733, at *4 (E.D.N.Y. 2017):

> [W]hat Dr. Berkowitz has done is take a number of safety standards that are either inapplicable or, at best, hortatory and vague, and conclude that the height differential here was excessive. It is a conclusion looking for grounds, rather than grounds leading to a conclusion. This is a wholly inadequate basis on which to present his opinion to a finder of fact.

the safety or security of its passengers." *Loudoun v. Eighth Ave. R. Co.*, 162 N.Y. 380, 386 (1900).

Because Berkowitz applied an inapplicable heightened standard to Transit, his testimony should be excluded. A court is not required to accept "expert opinions that . . . address the wrong standard of care." *In re Jackson*, 630 B.R. 700, 725 (Bankr. D. Conn. 2021), *aff'd*, 653 B.R. 1 (D. Conn. 2023). As a result, expert testimony applying the wrong standard of care has been excluded as irrelevant, unreliable, unhelpful to the jury, and prejudicial to the defendant. *See Slavin v. Garrison Prop. & Cas. Ins. Co.*, 2017 WL 2928030, at *9 (D. Colo. 2017), *aff'd*, 805 F. App'x 561 (10th Cir. 2020) (expert opinion excluded where it was "not the product of reliable principles in that they are based on an inapplicable [heightened] standard of care"); *Rivera v. Guevara*, 2018 WL 3093339, at *5 (N.D. Ill. 2018) (excluding expert testimony in part because expert utilized incorrect standard of care).

Far from giving the jury a helpful opinion to assess whether Transit acted "reasonably," Berkowitz instead urged the jury to find against Transit because it did not implement the "best" platform safety solutions on the globe. For example, he told the jury that railroads in Japan, China and Russia use PSDs and other platform protections. (Tr. 978, 992-93). He admitted, however - - but gave no weight to - - the fact that ***not a single mass transit system or subway in the United States has***

***implemented such safety devices***. (Tr. 976).

Such "testimony about 'best practices' is insufficient to establish the applicable standard of care in a negligence action" *Hager v. United States*, 2024 WL 728711, at *9 (D. Ariz. 2024). "Negligence law is concerned with reasonable practices, not best practices." *Ewans v. Wells Fargo Bank, N.A.*, 389 F. App'x 383, 390 (5th Cir. 2010). Put simply, a defendant charged with exercising reasonable care is "not under an obligation to exercise best practices . . . ." *Jones v. United States*, 194 F.Supp.3d 849, 855 (E.D. Wisc. 2016).

### *3. Plaintiff Bolstered Her Heightened Standard Argument With Inadmissible Evidence of Transit's Internal Hazard Policies*

Rendering Berkowitz's opinion even more improper, his opinion that all hazards on Transit's system must be "eliminate[d] or remediate[d]" is based on Transit's own internal hazard analysis policies. (Tr. 986-990). But, internal policies that "go beyond the standard of ordinary care . . . cannot serve as a basis for imposing liability."[27] *Gilson v. Metro. Opera*, 5 N.Y.3d 574, 577 (2005). Indeed, Courts have repeatedly rejected liability theories premised on a defendant's alleged violation of its internal policies. *See Arroyo v. City of Buffalo*, 2018 WL 4376798 at *5, n. 6 (W.D.N.Y. 2018).[28]

---

27 As discussed in Point VIII(B), the admission of evidence of Transit's internal hazard analysis prejudiced Transit and warrants a new trial.

28 *See Kissoon v. Wal-Mart Real Estate Bus. Trust*, 2024 WL 4350726 at *3, n.

## C. Absent Admissible Expert Testimony, Plaintiff's Claims Against Transit Fail as a Matter of Law

Without competent expert testimony, Plaintiff cannot establish that Transit's platform was defective. The Second Circuit has repeatedly dismissed design defect claims where the plaintiff's expert is excluded. For example, in *Brooks v. Outbound Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000), the Court affirmed exclusion of plaintiff's expert and, as a result, held that "the plaintiff has no evidence in the record to support his theory that the motor had a design defect which caused the accident or increased its severity." *See Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) ("Without the testimony of their expert witness, [plaintiff's] claims fail because there would be no evidence from which a reasonable jury could conclude that the [product at issue] was defective."); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 271 (2d Cir. 2002) (dismissal appropriate because, without expert testimony, plaintiffs had no "admissible evidence in support of their theory of causation").

* * *

For these reasons, the Court should exclude Berkowitz's testimony and, as a

---

4 (E.D.N.Y. 2024) (rejecting a slip-and-fall plaintiff's theory of liability premised on defendant's internal policy not to leave the site of a spill); *Figueroa v. Ministry for Foreign Affairs of Sweden*, 2018 WL 2089361 at *8 (S.D.N.Y. 2018) ("No policy adopted by [defendant] . . . may be used to impose a heightened standard of care against the [defendant] . . . .").

result, grant JMOL to Transit.

## POINT III

## TRANSIT IS ENTITLED TO JMOL BECAUSE PLAINTIFF FAILED TO SATISFY THE ELEMENTS OF HER NEGLIGENT DESIGN CLAIM

Even if the Court does not grant JMOL to Transit for the reasons stated in Points I and II, the Court should grant JMOL because no reasonable jury could conclude that Plaintiff met the elements of her negligence design claim.

### A. Transit Did Not Violate Any Applicable Industry Standard

"[T]o prove negligence . . . in the design of a structure, the plaintiff must put forth expert testimony" that defendant "deviated from accepted industry standards." *Columbus v. Smith & Mahoney P.C.*, 259 A.D.2d 857, 858 (3d Dep't 1999). Plaintiff's failure to establish that Defendants violated industry standards warrants dismissal of the claim as a matter of law. *See, e.g.*, *Arnold v. Krause, Inc.*, 232 F.R.D. 58, 70 (W.D.N.Y. 2004), *aff'd and adopted*, 233 F.R.D. 126 (W.D.N.Y. 2005) (dismissing negligence claims where "record is devoid of any evidence from [p]laintiffs regarding industry standards in manufacturing and designing ladders similar to the one at issue").[29]

[29] *See Dean/Carson Tappan, LLC v. State*, 178 A.D.3d 664, 665 (2d Dep't 2019) (claim for negligent design of culvert dismissed where expert failed "to identify any specific industry standards"); *Morrison v. Flintosh*, 163 A.D.2d 646, 648 (3d Dep't 1990) (claim for improper layout, design, construction and maintenance of trailer park and roadways dismissed where expert did not identify applicable "industry

Plaintiff's expert (Berkowitz) admitted: Transit's open platform design (without PSDs and TIDs) ***is the standard within the railroad industry in the United States***. (Tr. 976-77). Furthermore, such devices are not required by the Federal Transit Administration (the federal agency with oversight over Transit), the New York Public Transportation Safety Board (the state agency with oversight over Transit), or the City of New York. (Tr. 1034-35). Accordingly, Plaintiff's expert effectively conceded that Transit was in compliance with the standard for mass transportation systems in the United States. *See Fulop v. Malev Hungarian Airlines*, 2003 WL 42016, at *1 (S.D.N.Y. 2003) (expert testimony barred as unhelpful where expert could not "point to any specific federal regulations or written industry standards on how a flight crew should react during an in-flight medical emergency").[30]

As noted, Transit ***did*** implement various platform safety measures that ***are*** industry standard in the United States. This indicates - - as Berkowitz himself correctly admitted - - Transit puts significant time and energy into safety. (Tr. 1024).

Although these measures did not eliminate all track-related incidents in the

---

standards or practices").

[30] This is another reason to preclude Berkowitz's testimony. *See also Grdinich v. Bradlees*, 187 F.R.D. 77, 81 (S.D.N.Y. 1999) (rejecting expert testimony regarding industry standards in part because of expert's inability to refer to written industry standards or guidelines).

subway, neither New York law nor any other standard requires that for Transit to discharge its duty of reasonable care. Although Plaintiff's expert criticized Transit for having ***any*** fatalities due to track-related incidents, the number of incidents pales in comparison to the ***1.7 billion riders annually who used Transit's subway system.*** (Tr. 392). For example, in 2016 (the year of Plaintiff's accident), only 0.0000098% of rides (168 incidents/1.7 billion riders X 100) resulted in ***any***[31] contact with trains. (*See id.*; Pl's Ex. 71). And, in 2016, those incidents include 49 fatalities (only 0.0000029% of riders). (*Id.*).

The fact that over a billion riders use Transit's subway system each year without track-related incidents/injuries or contact with a train undermines any claim that it is unreasonably unsafe. The Court of Appeals confirmed this premise long ago in *Loftus v. Union Ferry Co.*, 84 N.Y. 455 (1881) - - a case where an infant fell through an opening in a bridge used by millions of passengers to deboard the defendant's ferry boats. The Court found the defendant not liable and held:

> That it was possible for a child or even a man to get through the opening was apparent enough. But that this was likely to occur ***was negatived by the fact that multitudes of persons had passed over the bridge without***

---

[31] Notably, CWIs include ***any*** contact with trains, not just those involving track intrusions or those resulting in serious injuries or death. (*See* Pl's Ex. 54; Tr. 573-76). For example, Transit treated as CWIs incidents where passengers: (1) sustained a black eye walking into a closed train door; and (2) urinated while standing between subway train cars. (Tr. 574-75; Pl's Ex. 54, at pp. 3, 5).

> ***the occurrence of such a casualty.*** (emphasis added).

*Id*. at 460.[32]

* * *

Accordingly, Transit is entitled to JMOL because the record is devoid of any evidence that Transit violated an industry standard and, in fact, the industry-standard safety measures it did employ have kept its system safe.

### B. Any Dangers Presented by Transit's Subway Platform Were Open and Obvious

"[A] landowner has no duty to protect or warn against conditions that are open and obvious and not inherently dangerous." *Laruccia v. Lewis J. Newton & Sons*, 242 A.D.3d 854, 854-55 (2d Dept. 2025). A condition is open and obvious "if it is readily observable by those employing the reasonable use of their senses, given the conditions at the time of the accident." *Id*.

Where plaintiff is injured by an open and obvious danger, her claim is subject to dismissal as a matter of law. *See id*. at 856 (granting summary judgment to defendant where ramp from a Ferris wheel loading platform was open and obvious); *F. S. v. City of New York*, 242 A.D.3d 1135, 1136 (2d Dep't 2025) (granting summary

---

32 *See also Burke v. Witherbee*, 98 N.Y. 562, 566 (1885) (where mine car was being hoisted and cable snapped, Court of Appeals explained that "[i]n this mine alone, cars drawn by a hook must have made several hundred thousand passages without a single accident. What more could any reasonable or prudent man have to justify him in believing that this convenient appliance was also a safe and proper one?").

judgment where rock in public park was open and obvious); *Maraia v. Church of Our Lady of Mount Carmel*, 36 A.D.3d 766, 767 (2d Dep't 2007) (granting summary judgment where tour bus operator's platform was open and obvious).

The dangers presented by standing too close to the edge of a subway platform - - including that a person could come into contact with a platforming train - - are plainly "open and obvious." Indeed, Plaintiff understood that she should not stand near the edge of the open platform. (Tr. 1458). George Brown (Plaintiff's then-boyfriend and now husband) similarly admitted: "[b]ecause trains are dangerous and it makes common sense to stay away from the edge of the platform." (Tr. 1301).

* * *

Accordingly, Transit is entitled to JMOL because the trial record confirms that the dangers which resulted in Plaintiff's accident were open and obvious.

## POINT IV

## DEFENDANT SHABAZZ IS ENTITLED TO JMOL ON PLAINTIFF'S NEGLIGENT OPERATION CLAIM

### A. Applicable New York Law

To prove her negligent operation claim, Plaintiff was required to show Shabazz failed to use "reasonable care under the circumstances" in operating Defendants' subway car. *See Bethel*, 92 N.Y.2d at 351; *Mirjah v. New York City Trans. Auth.*, 48 A.D.3d 764, 766 (2d Dep't 2008). But "no . . . liability attaches where the accident was unavoidable." *Searcy v. New York City Trans. Auth.*, 169

A.D.3d 1076, 1077 (2d Dep't. 2019).

## B. Relevant Trial Evidence

On August 2, 2016, Shabazz was operating an R68 model train, approaching Atlantic Avenue station at the appropriate speed (20-24 miles per hour). (Tr. 1646-47). When the train was approximately two car lengths into the station (about 150 feet), Shabazz saw Plaintiff fall backwards onto the track. (Tr. 1647-48, 1682, 1719). Shabazz immediately activated the emergency brakes. (Tr. 1648-49, 1683). The train, however, was unable to stop before striking Plaintiff. Alcohol and drug tests of Shabazz were negative. (Tr. 1664-65).

Dr. Mark Marpet (Transit's expert) opined that Shabazz could not have avoided striking Plaintiff. (Tr. 1748-50). He testified that an eyewitness estimated the difference between the time plaintiff fell on the tracks and when the train struck her was 7 to 10 seconds. (Tr. 1762).

Dr. Marpet testified that Perception-Reaction Time ("PRT") is the time between a stimulus (Plaintiff falling to the tracks) and an action (Shabazz initiating emergency braking). (Tr. 1766). Dr. Marpet applied a PRT range for Shabazz of 1.0 to 2.25 seconds (Tr. 1769-72), but noted that PRT varies from person to person and some "unimpaired normal people" could have a PRT slower than 2.25 seconds. (Tr. 1770-71). He also testified that there was no evidence of Shabazz's precise PRT during the accident. (Tr. 1771-72). Then, based on deceleration distances, estimated

train-speed (20 to 24 mph) and the accepted PRT range, Dr. Marpet concluded the time necessary to stop the train ranged from ***7.50 to 9.75 seconds.*** (Tr. 1776, 1780-81).

Dr. Berkowitz (Plaintiff's expert) opined that the accident was avoidable. (Tr. 966). Like Dr. Marpet, he also relied on witness testimony that Plaintiff was on the tracks for 7 to 10 seconds before the train struck her. (Tr. 1042-43). Berkowitz applied a PRT for Shabazz of 0.6 seconds, although he admitted this was not based on any study of her specific reaction time. (Tr. 1010, 1046). Using train speed, deceleration rates and Berkowitz's excessively fast PRT of 0.6 seconds, the time necessary to stop the train before it struck Plaintiff still ***ranged from 6.9 to 8.1 seconds***. (Tr 1049-50, 1054).

### C. Plaintiff's Trial Evidence Did Not Establish the Accident Was Avoidable

The experts for Plaintiff and Transit agree - - the train struck Plaintiff 7 to 10 seconds after she fell onto the tracks. Dr. Marpet and Dr. Berkowitz both testified to stopping calculations that ***fall within that range***: Marpet testified that the train needed 7.5 to 9.75 seconds to stop; Berkowitz testified that the train needed 6.9 to 8.1 seconds to stop. Thus, both experts would arrive at the same conclusion in the event there was only 7 seconds of time from when Plaintiff fainted onto the tracks to when the train reached Plaintiff - - the accident almost certainly would have been ***unavoidable***.

The evidence at trial fell far short of establishing that the accident was avoidable. Because Plaintiff did not establish several variable factors (including the train's speed or Shabazz's actual PRT), the jury was asked to speculate or guess whether the accident was or was not avoidable. As a matter of law, this cannot support Plaintiff's negligent operation claim. *See Mehra v. Bentz*, 529 F.2d 1137, 1139 (2d Cir. 1975) ("[P]ossibility of causation will not suffice to impress liability upon a defendant. Conjecture is not enough. A cause of action must be something more than a guess."); *N. X. v. Cabrini Med. Ctr.*, 280 A.D.2d 34, 41 (1st Dep't 2001), *aff'd as modified*, 97 N.Y.2d 247 (2002) ("[A] mere possibility of improper conduct is insufficient to impose liability since, historically, liability for negligence has been determined by what is probable, not merely by what is possible.").

Even if the Court only considers Berkowitz's stopping-time range of 6.9 to 8.1 seconds, it is mere speculation that Shabazz could have avoided the accident. This is because Berkowitz's range still overlaps the 7 to 10 seconds between Plaintiff's fall and the accident. "[G]iven the close tolerances" upon which Berkowitz's opinion is based - - including Shabazz's PRT and the train's speed - - "a contrary inference is clearly warranted." *Mirjah,* 48 A.D.3d at 766. As the Second Department explained in *Mirjah* in holding that Transit was entitled to summary judgment because plaintiff had failed to establish the train operator could have avoided striking Plaintiff:

> [E]ven accepting all of [plaintiff's expert's] data, an increase in [the operator's] reaction time of just over one third of a second, or an increase in the speed of the train of just over one mile per hour, would result in the train still striking decedent.

*Id*.

Indeed, given the razor-thin tolerances and variables that comprise PRTs, the First Department has held that expert opinions utilizing them are inherently speculative and insufficient to support a plaintiff's claim. *See Dibble v. New York City Transit Auth.*, 76 A.D.3d 272, 280-81 (1st Dep't 2010). In *Dibble*, plaintiff's expert utilized an average PRT of 1.0 second to conclude that the train-strike was avoidable. *Id.* at 279. In finding plaintiff's claim too speculative, the court held it was "self-evident" that some operators would have faster or slower PRTs and that "[n]othing in the record indicates where [the train operator] might be found along that spectrum." *Id.* at 280. Because a slower PRT would have made the accident unavoidable, the court held it was "clear that [the train operator's] failure to exercise reasonable care could be established only by arbitrarily imposing upon [the train operator] the purported average reaction time of one second." *Id.* at 279. Accordingly, the court reversed the verdict in Plaintiff's favor as "based entirely on impermissible speculation." *Id.* at 277.

Here, Berkowitz applied an even faster PRT of 0.6 seconds (almost twice as fast as the 1 second PRT in Dibble). But - - like the expert in *Dibble* -- Berkowitz

had no idea what Shabazz's actual PRT was. And, the uncontroverted testimony from Dr. Marpet is that PRT differs from person to person. In sum, Berkowitz speculated "that the accident ***could have been*** avoided[,] . . . based on nothing more than a series of estimated stopping distances that incorporated a purported [shorter than] average reaction time" - - the precise kind of expert testimony that was insufficient in *Dibble*. *See id.* at 277.

* * *

For these reasons, Shabazz is entitled to JMOL because it was purely speculative that she could have avoided the accident.[33] The jury appears to have recognized this when it assigned a mere 0.01% of liability to Shabazz.

## POINT V

## DEFENDANTS ARE ENTITLED TO JMOL ON PLAINTIFF'S LOST EARNING CAPACITY CLAIM

The jury awarded Plaintiff $1.7 million for "lost future earning capacity." (ECF Doc. # 344, Jury Verdict, Question 7). Such a claim "must be ascertainable with a reasonable degree of certainty" without conjecture. *Glaser v. Cnty. of Orange*, 54 A.D.3d 997, 998 (2d Dep't 2008). Evidence that loss of earnings is "possible" is

[33] Defendants reserve the right to renew their arguments why Plaintiff's other expert (Orlando Jiminez) should also be excluded because his opinions are *ipse dixit*, conclusory and speculative (*see* ECF Doc. # 280) if Plaintiff argues that Jiminez' s testimony somehow meets her burden.

insufficient. *See Mathews v. ADM Milling Co.*, 2019 WL 2428732, at *5 (W.D.N.Y. 2019). The trial evidence fell far short of proving that Plaintiff's alleged loss of future earnings was "reasonably certain."

Plaintiff's claim was supported by expert testimony from Kristen Kucsma (an economist), who opined that Plaintiff's future earning capacity will be reduced by millions. (Tr. 812-22). But this opinion was based entirely on anticipated trial testimony from Dr. Stuart Kahn (Plaintiff's medical expert) that, when Plaintiff turned 55, she would be unable to work or would have to work part-time. (Tr. 813).

But, at trial, Dr. Kahn gave ***no such testimony***. (See Tr. 662-810). For example, Dr. Kahn did not testify that: (1) there will be ***any*** reduction in Plaintiff's remaining work-life or work capacity; or (2) even if Plaintiff were forced to work part-time only, the extent to which her work capacity would be reduced (*e.g.*, 75%, 50%, 25%). Indeed, Plaintiff ***recalled*** Dr. Kahn at trial, and - - despite having that opportunity - - still did not elicit any such testimony. (Tr. 856-59).

In fact, when calculating Plaintiff's reduced earning capacity using different reduction percentages, Kucsma admitted that she was simply making ***assumptions*** that Plaintiff's capacity would be reduced. (Tr. 853-54). These unsupported assumptions cannot, of course, support a claim for damages. *See Newton v. State*, 165 A.D.3d 421, 423 (1st Dep't 2018) (plaintiff "failed to prove lost earnings by a 'reasonable certainty' . . . as his experts' analyses were based on assumptions

unsupported by the record" (internal citations omitted)).

Accordingly, Defendants are entitled to JMOL on Plaintiff's future earnings capacity claim and the jury's $1.7 million verdict should be stricken.

## POINT VI

## TRANSIT IS ENTITLED TO A NEW TRIAL BECAUSE THERE WAS NO EVIDENCE THAT PLAINTIFF SUFFERED PRE-IMPACT TERROR

The jury's $20 million award for past P&S included both physical injury and mental distress. (Tr. 2292; ECF Doc. # 344, Question 8). This encompassed damages for "preimpact terror."

To establish "pre-impact terror," a plaintiff must have "'perceived grave injury or death' ***prior to impact***." *Keenan v Molloy*, 137 A.D.3d 868, 871 (2d Dep't 2016) (emphasis added). The absence of such evidence is fatal to the claim. *See Anderson v. Rowe*, 73 A.D.2d 1030, 1031 (4th Dep't 1980) (dismissing claim where there was no "evidence from which one might imply that the decedents were aware of the danger" before the accident); *Phiri v. Joseph*, 32 A.D.3d 922, 923 (2d Dep't 2006) (same). A plaintiff cannot rely upon conjecture or speculation to meet this burden. *See Phiri*¸ 32 A.D.3d at 923.

The trial record is devoid of evidence that Plaintiff experienced pre-impact terror. Immediately before the accident, Plaintiff and Brown were standing near the platform edge. (Tr. 1247). Brown testified that, "at some point," Plaintiff "fainted

and fell backwards onto the tracks" without contacting the platform itself. (Tr. 1247-48, 1303). He then began yelling at Plaintiff to wake up, but she did not. (Tr. 1248).

Plaintiff testified that she recalled talking to Brown, feeling faint, and then suddenly feeling her body start to collapse. (Tr 1348). Plaintiff testified:

> [A]fter I fainted, ***the next time I opened my eyes, I'm already on the tracks and injured.***

(1348:21-24) (emphasis added). Plaintiff confirmed that she lost consciousness and that when she "first . . . understood what was going on," the accident had already happened and her left arm and left leg had already been severed. (Tr. 1460). By her own admission - - because she was not conscious - - Plaintiff did not know she had fallen onto the tracks or observe a train coming toward her. Therefore, she could not have "perceived grave injury" prior to being struck.

Despite Plaintiff's testimony, her counsel made the following unsupported statements in his summation:

> [W]hat would a person think when they're on the tracks, they can't move, they're in and out of it, and you feel the vibrations of the train approaching, you hear the oncoming train? If your eyes can be opened, you see those headlights coming at you, bearing down at you. . . . I cannot for the life of me imagine what was going through her head: The terror, the fear of what was about to happen. Those 20 to 40 seconds, oh, 7 to 10 seconds, whatever amount of time you think it was, that must have been the longest period in eternity for Luisa, lying there helpless. Helpless. Not able to move. Feeling the vibrations. Hearing the train. Seeing the lights. (Tr. 2160).

But, by her own admission, Plaintiff ***never made a single one*** of these pre-impact observations touted by her counsel.[34]

As the Second Circuit has explained, "[t]he Supreme Court decades ago announced the so-called general verdict rule, that a new trial will be required where there is no way to know that an invalid claim . . . was not the sole basis for a verdict." *Chowdhury*, 746 F.3d at 50 (citations omitted). This rule applies "where one of several legal theories of liability was improperly submitted to the jury" and "where a single legal theory was submitted to the jury, but one of several sets of facts presented as adequate to prove liability was found insufficient as a matter of law." *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 386 F. App'x 5, 7 (2d Cir. 2010).[35]

The jury gave Plaintiff a general award of $20 million for past physical and mental P&S. (ECF Doc. # 344, Question 8). Given the impassioned (but unsupported) pleas of Plaintiff's counsel, the jury may have based some or all of that award of Plaintiff's alleged "preimpact terror" - - for which there was no evidence

---

[34] After Plaintiff's counsel's closing, Transit objected to these (and several other) statements on the ground that they were unsupported by any evidence at trial. (ECF Doc. # 337, at p. 4).

[35] The "'general verdict' rule has been applied in cases where the jury issues a single damages award on multiple claims." *Idaho Golf Partners, Inc. v. TimberStone Mgmt.*, 2017 WL 3531481, at *15 (D. Idaho 2017).

at trial. Because it is impossible to untangle the extent to which the jury compensated Plaintiff for preimpact terror (or any other element of her past P&S), a new trial is ***required*** - - at minimum - - on the issue of Plaintiff's past P&S. *See Chowdhury*, 746 F.3d at 50.[36]

## POINT VII

## TRANSIT IS ENTITLED TO A NEW TRIAL BASED ON THE ERRONEOUS ADMISSION OF THEIR SUBSEQUENT REMEDIAL MEASURES

Fed. R. Evid. 407 precludes evidence of subsequent remedial measures to prove negligence or the existence of a product defect, but they may be admitted "for another purpose, such as impeachment or--if disputed--proving . . . the feasibility of precautionary measures." Rule 407 "encourag[es] potential defendants to remedy hazardous conditions without fear that their actions will be used as evidence against them." *TLT-Babcock, Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir. 1994). But, that is precisely what Plaintiff did here.

### A. The Court Ruled That Transit's Subsequent Remedial Measures Are Inadmissible

Over Transit's objections,[37] the Court initially allowed Plaintiff to introduce

[36] *See also Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 502 (8th Cir. 2010) (vacating a global damages award where the court had no way of knowing whether the jury awarded some portion of the award for a later-reversed claim).

[37] (*See* ECF Doc ## 295, 302; *see also* Tr. 416-32).

evidence of Transit' subsequent remedial measures - - specifically, its post-accident installation of "fixed rails" on some platforms. (*Id*.). Later, during Plaintiff's cross-examination of Kenneth Korach (Transit's liability expert) on the last day of testimony, the Court barred Plaintiff from admitting photographs depicting the rails. (Tr. 2020-24). When Plaintiff reminded the Court of its prior ruling, the Court said: ***"I made a mistake, next question. I'm sorry. We are talking about what existed as of August 2nd, 2016."*** (Tr. 2021) (emphasis added).

**B. Plaintiff Repeatedly Referenced Transit's Post-Accident Installation of <u>Fixed Rails on Platforms</u>**

By the time the Court precluded the evidence on the last day of testimony, Plaintiff had already referred repeatedly to Transit's post-accident installation of fixed rails. For example, Plaintiff called Tony Abdallah, a former Transit employee who studied fixed rails at the platform edge and found them to be hazardous. (*See* Tr. 619). During questioning, Plaintiff's counsel repeatedly referenced Transit's installation of fixed rails after Plaintiff's accident:

> Q. Well, sir, are you aware that within a few months of you putting under oath that fixed rails are hazardous ***that the Transit Authority then installed them including Clark Street***?
>
> THE COURT: One second. Do you know anything about whether they were installed after August 2, 2016, yes or no?
>
> THE WITNESS: No.

(Tr. 623-24). Plaintiff's counsel raised the post-accident rails yet again:

> Q: ***So they were installed in 2024*** and you put in writing in November 6th of 2023 that they were hazardous; correct?
>
> A. Yes.

(Tr. 630).

The jury, therefore, heard that Transit installed fixed rails on its platforms after Plaintiff's accident - - an act that was squarely inadmissible under Rule 407.

## C. <u>The Exception for "Feasibility" Does Not Apply</u>

Plaintiff argued that the "feasibility" exception applied. (Tr. 418). But, this applies only if the defendant "controverts" or "disputes" feasibility. *See Friedman v. Nat'l Presto Indus. Inc.*, 566 F.Supp. 762, 765 (E.D.N.Y. 1983). If the defendant does not, the measures are inadmissible. *See id*.[38]

At trial, Transit's witnesses testified that fixed platform rails ***were feasible***. (*See* Tr. 484-86 (testimony of Glen Lunden), 2024-27 (testimony of Korach)). Abdallah testified, however, that Transit concluded before the accident that fixed rails were ***hazardous***. (Tr. 619-30). Neither he nor any other witness ever suggested

[38] *See also Guilbeau v. W.W. Henry Co.*, 85 F.3d 1149, 1171 (5th Cir. 1996) (evidence was "properly excluded" as to subsequent remedial measure where witness "never claimed that it would not be feasible" to make the allegedly defective product in an alternative manner).

they were not feasible.[39]

Indeed, as Transit's expert (Korach) explained, the fixed rails Transit installed ***after*** the accident (which are set back several feet from the platform edge) are ***not even the same kinds of rails*** Transit determined were hazardous ***before*** the accident (which are at the very edge of the platform). (Tr. 2016). Transit's subsequent remedial measures, therefore, have no probative value whatsoever on feasibility.

**D. <u>Transit was Prejudiced</u>**

"The admission of post-accident corrective measures ***is a prejudicial error*** and has been found to require a new trial in other cases." *In re Joint E. Dist. & S. Dist. Asbestos Litig.*, 995 F.2d 343, 346 (2d Cir. 1993) (emphasis added). Plaintiff clearly planted the seed with the jury that Transit should be liable because: (1) it should have installed fixed rails ***before*** the accident, but ***did not***; and (2) it ***did*** install them ***after*** the accident.

This is precisely what Rule 407 is intended to prevent. Indeed, Plaintiff took full advantage of her opportunity (before the Court's exclusion ruling) to admit Transit's post-accident measures to establish causation and liability. For example,

---

[39] Plaintiff has argued that Transit contested "feasibility" in depositions and summary judgment affidavits. (*See* ECF # 292). Of course, the scope of pre-trial discovery is broader than what it ultimately admissible at trial. *See Stalling v. Union Pac. R.R. Co.*, 2003 WL 21317297 (N.D. Ill. 2003) (permitting broad discovery on subsequent remedial measures because they "***may be relevant . . . depending on what [d]efendants argue at trial***").

Plaintiff questioned Transit employee Glenn Lunden on causation as follows:

> Q. [C]an we agree that at this station where my client was standing, ***if there had been a fixed rail barrier at that location, can we agree she has no contact with the train***?
>
> [TRANSIT'S COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> A. I don't know [where] she was standing. I can't answer that question.
>
> Q. Okay. Well, wherever it was she was standing ***if there was a rail right there***?
>
> A. If there had been a rail right there, yes. . . .

(Tr. 484) (emphasis added). Plaintiff's counsel then argued in summations that: "Glen Lunden ***admitted that if there was a fixed rail right there, it doesn't happen***." (Tr. 2243) (emphasis added).

Other than Transit's post-accident installation of rails, there was no other basis for the jury to conclude that - - before the accident - - Transit should have installed railings, PSDs or some other protective device on the platform. For example, as discussed, no federal, state or City law required them and open platforms are the standard in the United States mass transit industry. As such, the jury very likely concluded that rails should have been installed for one reason - - that Transit installed some of them after the accident.

For these reasons, Transit is entitled to a new trial based on admissions at trial

of its subsequent remedial measures.

## POINT VIII

## TRANSIT IS ENTITLED TO A NEW TRIAL BECAUSE IT WAS PREJUDICED BY OTHER ERRORS AT TRIAL

### A. Erroneous Admission of Glenn Lunden's Causation Testimony

Transit immediately objected to Glenn Luden's lay witness testimony on causation. (Tr. 484). The Court, however, permitted Plaintiff to elicit testimony from Lunden on whether fixed rails would have prevented Plaintiff's accident. (*Id.*). This was improper because it is not based on Lunden's first-hand observations.[40] In fact, he disavowed such knowledge, testifying that he had no idea where Plaintiff was standing before the accident. (*Id.*).

Lay witnesses also cannot "express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011). And, as noted, expert testimony is required to establish that Transit's design of the platform caused Plaintiff's accident. *See Wills*, 379 F.3d at 46. But, Plaintiff was permitted to ask Lunden to make that casual connection. And, Plaintiff's counsel returned to Lunden's causation testimony prominently in his

40 *See United States v. Graham*, 2019 WL 2366724 at * 8 (S.D.N.Y. 2019) (lay witness testimony "must be grounded in observation or other first-hand knowledge").

summation. (Tr. 2243).

This clearly prejudiced Transit and warrants a new trial. *See, e.g.*, *JGR, Inc. v. Thomasville Furniture Indus., Inc*., 370 F.3d 519, 526 (6th Cir. 2004) (erroneous admission of lay witness testimony prejudiced defendant and warranted new trial); *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 687 (5th Cir. 2003) (same).

**B. <u>The Court Erred in Allowing Evidence of Transit's Internal Policies</u>**

As noted in Point II(B)(3), Transit's internal hazard analysis policies are inadmissible. *Gilson,* 5 N.Y.3d at 577; *see Sherman v. Robinson*, 80 N.Y.2d 483, 489 n.3 (1992) ("Violation of a company's internal rules is not negligence in and of itself, and where such rules require a standard that transcends reasonable care, breach cannot be considered evidence of negligence.").

Transit filed a motion *in limine* to preclude evidence of them. (ECF Doc. # 283). The Court did not decide the motion before trial, and Plaintiff's counsel took full advantage, making Transit's hazard analysis policies a focus of his opening:

> [Transit] must perform a proper safety analysis. A hazard analysis is the actual term. And they do this pursuant to a written standard known as U.S. Military 882, which was adopted and incorporated and used by the [Transit] to determine if corrective action is needed.

(Tr. 57).

Transit objected to Plaintiff's repeated references on the ground that Transit's hazard analysis processes are "in [Transit's] policy program manual" (also known

as its System Safety Program Plan or SSPP). (Tr. 86). The Court agreed with Transit, stating, "I am not going to allow that . . . ." (Tr. 88-89).

Undeterred, however, Plaintiff's counsel questioned his first witness (Michael Sullivan, Transit's former Senior Director of Operations for System Safety) about the SSPP over Transit's objection. (*See* Tr. 134-135). Then, the Court changed its ruling. Although "the law is pretty clear that you can't predicate liability based upon violation of an internal policy," the Court found Transit's policies had "relevancy on relevance and knowledge," which the Court framed as a "limited purpose." (Tr. 140-41).[41]

But, Plaintiff did not use Transit's policies for a "limited" purpose. Rather, she made Transit's hazard analysis processes - - and Transit's alleged deviation from them - - the centerpiece of her case. Plaintiff's counsel questioned multiple fact witnesses and cross-examined Transit's expert (Tr. 2046-53) about them.[42] As discussed, Plaintiff's liability expert improperly based his opinion on them. (Tr.

---

[41] The Court stated that it would "instruct the jury that they cannot base a decision based upon violation of the internal policies." (Tr. 143). The instruction the Court gave, however, was limited to telling the jury the policies were relevant "on the issues of knowledge and notice of [Transit's] knowledge and notice about the conditions, about the subways in general." (Tr. 145). It did not expressly tell the jury they could not find liability against Transit based on its policies.

[42] *See* Plaintiff's questioning of witnesses Sullivan (Tr. 146-52), Eric Jones of Transit (Tr. 274-79), Cheryl Kennedy of Transit (Tr. 334-54).

986-90).

Then, during summations, Plaintiff's counsel argued that Transit's violations of its policies were a reason for the jury to impose liability:

> [Transit] admit[s] according to their own standard, ***that [US Military] 882 you heard so much about, which you have a poster of, and I'm not going to show it to you again because you have seen it so many times***, is that when it is catastrophic or critical, high, high risk required, required to take corrective action, immediate corrective action . . . . Where is it? (Tr. 2180-81) (emphasis added).

This clearly prejudiced Transit. Plaintiff seized on Transit's hazard analysis policies to support her theme that Transit was obligated to remove ***all possible hazards*** on its system. Plaintiff's expert joined in this argument, basing his improper heighted standard of care on the very same policies. Faced with this, the jury certainly could have been confused into applying a heightened standard of care akin to a guarantee that Transit would prevent all track-related incidents. That, of course, is not the applicable standard.

### C. The Court Improperly Limited Transit's Cross-Examination of <u>Plaintiff's Experts</u>

The Court has significant discretion to control cross-examination. *United States v. Kahn*, 472 F.2d 272, 281 (2d Cir. 1973). It cannot, however, restrict cross-examination in a "wholly arbitrary, unreasonable and abusive" manner. *United States v. 10.48 Acres of Land*, 621 F.2d 338, 340 (9th Cir. 1980).

The Court unreasonably restricted Transit's examination of Plaintiff's experts

by ruling it could not question experts about: (1) documents the expert did not review, but which may have impacted the expert's opinions; or (2) documents the expert did review, but that the expert claimed they did not rely upon.[43] Instead, Transit was limited to questioning about documents the expert's actually "relied on." (*Id.*).

But, Transit is permitted to cross-examine an expert about documents and information the expert ***did not*** rely on in formulating their opinion. *See State Farm Fire & Cas. Co. v. Bell*, 30 F.Supp.3d 1085, 1097 (D. Kan. 2014) ("[A]n expert's decision not to consider certain facts in formulating his opinions is a matter for cross-examination . . . ."). This includes questioning whether - - had that information been considered - - it would have changed the expert's opinion. *See United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) ("[T]he ability to answer hypothetical questions is 'the essential difference' between expert and lay witnesses."). Indeed, "[o]ur system relies on cross-examination to alert the jury to the difference between good data and speculation." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432 (7th Cir. 2013).

Transit was unreasonably restricted in its cross-examination and was denied a full opportunity to challenge Plaintiff's experts. *See United States v. A&S Council*

---

[43] (*See* Tr. 924-926, 930, 934-935; 951-952 (cross-examination of expert Orlando Jiminez); Tr. 844-845 (cross examination of expert Kristin Kucsma)).

*Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991) ("Full examination of the underpinnings of an expert's opinion is permitted because the expert, like all witnesses, put his credibility in issue by taking the stand.").

## D. **Defendants Were Prejudiced by Plaintiff's Counsel's Summation**

The Court may order a new trial where "counsel's conduct create[s] undue prejudice or passion which played upon the sympathy of the jury." *Matthews v. CTI Container Transp. Int'l*, 871 F.2d 270, 278 (2d Cir. 1989). Plaintiff's counsel's summation was replete with prejudicial conduct and statements.[44]

First, counsel cannot "refer to facts not in evidence during summations." *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F.Supp.2d 457, 470 (S.D.N.Y. 2003). Plaintiff's counsel did so repeatedly. For example, he implied that there was evidence (which there was not) that Plaintiff was lying on the tracks for as much as 20 to 40 seconds. (Tr. 2158-60). *See Ramos v. Cnty. of Suffolk*, 707 F.Supp.2d 421, 428 (E.D.N.Y. 2010) (remarks in summation for which there was "no evidence in the record" warranted new trial).

Second, throughout his summation, counsel employed "reptile tactics." Such tactics are intended to persuade jurors to find for a plaintiff "by invoking the primal

[44] This brief provides illustrative examples of misconduct. Transit's letter filed on November 20, 2025 recites each instance of Plaintiff's counsel's improper statements during summation. (Collazzi Decl., Ex. L).

(or reptilian) part of jurors' minds, which drives them to act to protect themselves or their community." *Aurigemma v. Costo Wholesale Corp.*, 2023 WL 197044, at *7 (D. Conn. 2023). In condemning such tactics, the Fifth Circuit has held:

> Our condemnation of a "community conscience" argument is not limited to the use of those specific words; it extends to all impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation. Such appeals serve no proper purpose and carry the potential of substantial injustice when invoked against outsiders.

*Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238-39 (5th Cir. 1985).

Counsel repeatedly characterized Transit as having "disregarded the safety of [the jurors'] community," resulting in "[a] member of our community" being harmed. (Tr. 2147). He urged the jury:

> We are all here together for a reason. I hope that that reason is to do justice ***to another member of our community***.
>
> * * *
>
> Our jury system exists to ***protect our communities***. There's a reason it is open to the public, and we have members of the public here, because ***everyone in our community has rights. You are the enforcer of safety***.

(Tr. 2204-05) (emphasis added).

Third, the "Golden Rule" prohibits counsel from telling jurors on damages "that they should put themselves in plaintiff's place and render such a verdict as they would which to receive were they in plaintiff's position." *Marcoux*, 290 F. Supp. 2d

at 463. But, Plaintiff's counsel did exactly that by, for example, urging the jury: "imagine seeing ***your arm***, seeing ***your leg,***" "seeing your severed arm and leg lying there." (Tr. 2161). Counsel also asked the jury to imagine themselves commuting or raising a child with one arm and one leg. (Tr. 2195, 2022).

Lastly, a new trial is warranted where counsel "refers to his or her personal opinions regarding the evidence." *Byrd v. Janssen Pharm., Inc.*, 333 F.Supp.3d 111, 133 (N.D.N.Y. 2018). Counsel injected his own views by, for example, stating that Transit's conduct was "outrageous" and "offensive." (Tr. 2162, 2170-71).[45] He also argued that, if he had to "get through life" with Plaintiff's injuries "[he] would be lying in bed crying." (Tr. 2170).

In deciding if misconduct warrants a new trial, the Court examines "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments." *Marcoux*, 290 F.Supp.2d at 471-72. A new trial is warranted.

Plaintiff's counsel employed these improper tactics at every turn of his summation. (*See* Collazzi Decl., Ex. L). Transit sought a mistrial, which the Court

---

[45] As the Court will recall, throughout his summation, Plaintiff's counsel repeatedly gestured at and pointed to counsel for Transit.

denied.[46] The Court likewise refused Transit's request for a specific curative instruction to address Plaintiff's counsel's comments. (*See* ECF Doc. # 337, at p. 2). Although the Court generically instructed the jury that arguments of counsel are not evidence (*see* Tr. 2256, 2276), that does not cure the prejudice resulting from counsel's pervasive misconduct. *See Lee v. City of Troy*, 339 F.R.D. 346, 370-71 (N.D.N.Y. 2021) (similar generic instruction "alone does not undo the prejudice" caused by counsel's conduct). The prejudice to Transit was likewise compounded by the Court's instruction that Transit not object to specific misconduct during Plaintiff's summation. *See id*. at 370 (new trial warranted where counsel was not permitted to object during improper summation).

For these reasons, Plaintiff's counsel's improper conduct and remarks during summation warrant a new trial.[47]

### E. <u>The Jury's Verdict Is Against the Weight of the Evidence</u>

A trial court has discretion to grant a new trial "if the verdict is against the weight the evidence." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir.

---

[46] The Court did not rule on Transit's mistrial request at the conclusion of Plaintiff's summation-in-chief. (Tr. 2207-08). The Court denied Transit's renewed motion after Plaintiff's rebuttal closing. (Tr. 2248).

[47] The trial errors identified in Point VIII require a new trial both individually and based on their cumulative effect. *See, e.g.*, *United States v. Fields*, 466 F.2d 119, 121 (2d Cir. 1972).

2012). This occurs when "the jury has reached a seriously erroneous result or [where] the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988). The jury reached a "serious erroneous result" on the following issues.

First, the jury stripped Transit of qualified immunity when it concluded that Transit did not study the "issue of persons falling on the tracks and being hit by trains." (ECF Doc. # 344, Question 5(a)). As stated above, Transit extensively studied this issue and the jury's conclusion that it did not is "seriously erroneous." (*See* Point I).

Second, Shabazz is entitled to a new trial because Plaintiff's expert could only speculate that Shabazz could have avoided the accident. (*See* Point IV). That does not meet the standard for establishing negligence.

Lastly, Transit is entitled to a new trial because the evidence at trial demonstrated that: (1) Transit's platform design is consistent with all other domestic mass transit systems; (2) no federal, state or local law, rule or regulation require Transit to install PSDs or TIDs in its system; and (3) the purported "defect" in Transit's platform design was open and obvious. (*See* Point III). For the jury to find Transit liable in the face if this evidence was "seriously erroneous."

For the above stated reasons, Defendants are entitled to a new trial based on the weight of the evidence.

**POINT IX**

**TRANSIT IS ENTITLED TO REMITTITUR OF THE JURY'S $70 MILLION AWARD FOR PAST AND FUTURE PAIN AND SUFFERING OR, ALTERNATIVELY, A NEW TRIAL**

The jury awarded Plaintiff $70 million for past ($20 million) and future ($50 million) pain and suffering ("P&S"), "mental, emotional, or psychological distress," and "loss of, or reduction in, the ability to enjoy life." (ECF Doc. # 344, Questions 8-9). Because the verdict is excessive, even if the Court does not grant JMOL or a new trial, it should remit the verdict significantly.

**A. Applicable Standard**

A verdict is excessive "if it deviates materially from what would be reasonable compensation." *Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 244 (2d Cir. 2004) (citing C.P.L.R. 5501(c)). A District Court "reviews the evidence presented at trial . . . and compares the award to other New York cases[48] in which evidence of similar injuries was presented." *Id*.[49] If a verdict is excessive under this standard, the Court may order "a new trial without qualification, or conditioned on the [plaintiff's]

48 This includes reviewing verdicts affirmed, reversed or modified by the NY Supreme Court, Appellate Division. *See Rangolan*, 370 F.3d at 246-47.

49 Notably, New York state standard (whether the verdict "deviates materially from what would be reasonable compensation") gives "less deference to the jury's award than the traditional common law standard of 'shocks the conscience.'" *Scoma v. Wal-Mart Stores, Inc.*, 205 F.3d 1323, 2000 WL 19104 at *1 (2d Cir. 2000) (table); *see also Leo v. Long Island R.R. Co.*, 307 F.R.D. 314, 322 (S.D.N.Y. 2015) (same).

refusal to agree to a reduction (remittitur)." *Id*.

The jury's award for P&S encompassed both physical injury and mental distress. In assessing whether a physical past P&S award[50] is excessive, factors include: pain endured; length of hospitalization; number of surgeries; and extent of physical therapy. *See House v. Kent Worldwide Machine Works, Inc.*, 2010 WL 11607350, at *5-6 (S.D.N.Y. 2010). In assessing a future physical P&S award, a court considers "the nature of the plaintiff's injuries and its future effect on [plaintiff's] life, as well as the life expectancy of the plaintiff." *Id.* at *6.

"Awards for mental and emotional distress are inherently speculative" because "[t]here is no objective way to assign any particular dollar value to distress." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 205 (2d Cir. 2014). Courts nonetheless must "'ensure that' awards for 'intangibles' such as emotional and mental distress are 'fair, reasonable, predictable, and proportionate.'" *Carroll v. Trump*, 151 F.4th 50, 80 (2d Cir. 2025).

**B. <u>Relevant Trial Evidence</u>**

Defendants do not dispute that Plaintiff suffered significant injuries, after which she was transported to Bellevue Hospital, where she remained for twenty-four days and underwent eight surgeries. (Tr. 1352, 1360). She also underwent skin

---

50 Past pain and suffering runs from "the date of the accident through trial." *House*, 2010 WL 11607350, at *5.

grafts. (Tr. 1353). After discharge, she returned to Brazil, where she attended outpatient rehabilitation "multiple days" per week. (Tr. 1366). Plaintiff had assistance from her mother to take her to and from school, where she continued her education. (Tr. 1368-69). Plaintiff continued to undergo debridements for a year. (Tr. 1377).

In 2021, Plaintiff underwent "revision surgery," which involved further skin grafts to her leg stump. (Tr. 1392, 1412). Plaintiff testified she still experiences pain every day and that her arm and leg prostheses are often uncomfortable. (*See* Tr. 1326, 1383). The only potential future surgery that Plaintiff may undergo is osteointegration (an anchored prosthesis) for her arm. (Tr. 681-82, 1123).

Plaintiff graduated from college in Brazil after the accident in March 2018. (Tr. 1327, 1376-81). She studied at CUNY from August 2018 through 2020, when she graduated with a master's degree in architecture. (*Id.*). Plaintiff began working for Code Consultants, Inc. (an engineering firm) in January 2021, where she assesses buildings for ADA compliance. (Tr. 1172, 1389-97). She has advanced from first associate consultant to regular consultant, and then to senior accessibility consultant. (Tr. 1391, 1453). She is not a licensed architect, but intends to take exams for the license. (Tr. 1461).

Plaintiff testified that she no longer goes to the beach, plays guitar or engages in arts and crafts. (Tr. 1373-74). She now requires assistance from her husband to

dress and for general hygiene. (Tr. 1266). Holding books and stapling are difficult. (Tr. 1392). At work, she cannot do site visits or attend surveys. (Tr. 1392-93).

Plaintiff was 31 years old at trial and the Parties stipulated that Plaintiff's life expectancy is 81.83. (Tr. 1326, 2299).

## C. The Jury's Award "Deviates Materially" from "Reasonable Compensation"

Plaintiff's period of past P&S is nine years from her accident (August 2016) until trial in October and November 2025. The jury's $20 million award of past P&S equates to about $2.2 million per year. The jury's $50 million future P&S award equates to $1 million per year for Plaintiff's 50-year remaining life expectancy.

Under New York law, the jury's $70 million verdict "deviates materially" from "reasonable compensation" under any measure. This is confirmed by a review of verdicts found "reasonable" in cases involving amputations and other catastrophic injuries, such as paraplegia, quadriplegia and traumatic brain injuries ("TBIs").

### *1. Verdicts Involving Amputations*

In *Nunez v. Levy*, 2008 N.Y. Slip Op. 51061(U), at *1 (Sup. Ct., NY Cty. 2008), the 29-year-old plaintiff's right leg was amputated after a bank vault pinned him to the ground for 30 to 60 minutes. The jury awarded $5 million for four years of past P&S and $5 million for 43 years of future P&S. *Id.* at *1, *12. The court reduced the verdict to $2.5 million for past P&S (or $625,000 per year) and $4 million for future P&S ($93,023 per year). *Id*. at *12.

In *Firmes v. Chase Manhattan Auto. Fin. Corp.*, 50 A.D.3d 18 (2d Dep't 2008), plaintiff suffered a leg amputation in an auto accident. He was in the hospital for 47 days and underwent 11 surgeries. *Id*. at 22. The Second Department reduced the jury's $2.2 million verdict for past P&S to $1.5 million and the $5.2 million verdict for future P&S over 50 years to $3.5 million (or $70,000 per year). *Id.* at 38.

In *Chung v. New York City Transit Auth.*, 183 A.D.2d 741 (2d Dep't 1992), the jury awarded $62,226,000 to a plaintiff whose legs were severed by a subway train. The trial court reduced the verdict to $5 million, $3,445,000 of which was for past and future P&S. *Id*. at 741-42. On appeal, the Second Department further reduced the verdict for P&S to $1.3 million. *Id*. at 742. On a retrial of past P&S, the jury awarded $1.5 million, which the Second Department again reduced to $600,000. *Chung v. New York City Transit Auth.*, 213 A.D.2d 619, 620-21 (2d Dep't 1995).

In *House*, 2010 WL 11607350, plaintiff's legs were nearly amputated when he was pulled into an industrial machine. *Id*. at *1. Plaintiff underwent 19 surgeries, before one leg was amputated. *Id*. at *5. At an inquest, the court awarded plaintiff $750,000 per year for 7.23 years of past P&S (or $5,422,500) and $93,000 per year for 45 years of his life expectancy for future P&S (or $4,185,000).

In *Norcia v. Dieber's Castle Tavern, Ltd.*, 980 F.Supp.2d 492, 497 (S.D.N.Y. 2013), plaintiff suffered catastrophic injuries to both arms when she was struck by a

boat. She suffered "so much nerve damage that her fingers didn't work" and had "a breakdown and pretty much wanted to kill [herself]." *Id*. at 498. Plaintiff ultimately recovered and was working as a flight attendant and bartender. *Id*. at 499. After an inquest, the Court awarded plaintiff $200,000 per year for past P&S (a total of $1,266,000) and $28,140 per year for future P&S (a total award of $1,435,140). *Id*. at 508.

These cases reveal ranges of $200,000 to $750,000 per year for past P&S - - which translates to approximately $1.8 million to $6.75 million for Plaintiff's nine years of past P&S. The ranges for future P&S are $28,140 to 93,000 per year - - or a range of $1.4 million to $4.65 million for Plaintiff's fifty years of future P&S.

This is consistent with verdicts found to be "reasonable compensation" in other amputation cases. *See, e.g., Bondi v. Bambrick*, 308 A.D.2d 330, 331 (1st Dep't 2003) ($9.75 million reasonable compensation for past and future P&S for 35-year old plaintiff whose leg was amputated); *Hoenig v. Shyed*, 284 A.D.2d 225 (1st Dep't 2001) ($5.6 million was reasonable compensation for past and future P&S where plaintiff's right leg was amputated after she was hit by a taxi cab).

***2. Verdicts Involving Paraplegia and Quadriplegia***

Plaintiff's injuries were significant. Plaintiffs who suffer paraplegia or quadriplegia, however, obviously have more extensive physical limitations. Yet, no New York case has concluded that a P&S verdict approaching $70 million is

"reasonable compensation" even for those gravely injured plaintiffs.

For example, in *Miraglia v. H&L Holding Corp.*, 36 A.D.3d 456, 456 (1st Dep't 2007), the jury awarded plaintiff, who was paralyzed in a construction accident, $5 million for past P&S and $10 million for future P&S. The First Department held: "the seriousness of the injuries notwithstanding," the award for future P&S should be reduced to $5 million.

In *Okraynets v. Metropolitan Transp. Auth.*, 555 F.Supp.2d 420 (S.D.N.Y. 2008), plaintiff was paralyzed when heavy forms at a construction site fell on him. The jury awarded $5 million for past P&S and $15 million for future P&S over 39 years. *Id*. at 425. The court reduced the past P&S award to $2.5 million and $8 million for future P&S (or $205,128 per year). *Id*. at 439-40; *see also Ruby v. Budget Rent A Car Corp.*, 23 A.D.3d 257, 257 (1st Dep't 2005) (where plaintiff's spine was severed, First Department reduced $3 million for past P&S to $2 million and $12 million for future P&S over 44.6 years to $8 million ($179,372 per year)); *Cruz v. Long Island R.R. Co.*, 22 A.D.3d 451, 453 (2d Dep't 2005) ($3,000,000 for past P&S and $9,000,000 for future P&S reasonable)

Quadriplegia cases further show the jury's $70 million award for Plaintiff is unreasonable. For example, in *Saldino v. Stewart & Stevenson Servs., Inc.*, 2011 WL 284476 (E.D.N.Y. 2011), the District Court described plaintiff as "essentially a prisoner in his own body" dependent on others "every moment of his day." *Id*. at *8.

The Court held: "New York Courts have sustained pain and suffering awards to paralysis victims of at least $10 million and up to $17.5 million." *Id*. at *6. The Court ultimately concluded that $15 million for past and future P&S was reasonable compensation. *Id*. at *7-8.

Similarly, in *McMillan v. City of New York*, 2008 WL 4287573, at *8-9 (E.D.N.Y. 2008), plaintiff suffered quadriplegia when he was injured in a ferry collision. The Court found that an award of $4.5 million and $7.5 million for past and future pain and suffering was reasonable. *Id*.[51]

These cases involving paraplegics and quadriplegics show that the jury's $70 million P&S award is patently unreasonable.

### *3. Verdicts Involving Traumatic Brain Injuries*

TBI cases involve incapacitating cognitive limitations, which invariably limit the plaintiff's ability to function physically. Verdicts found "reasonable" in such cases are far below the $70 million the jury awarded to Plaintiff.

In *Angamarca v. New York City Partnership Hous. Dev. Fund*, 87 A.D.3d 206 (1st Dep't 2011), plaintiff suffered a TBI and vertebral fractures in a fall at a

---

[51] Other cases have found even lower verdicts for quadriplegics to be reasonable compensation. *See Brown v. City of New York*, 275 A.D.2d 726 (2d Dep't. 2000) (reducing verdicts in favor of two quadriplegic brothers from $3 million for past P&S to $1 million and $7 million in future P&S to $3 million); *Driscoll v. New York City Transit Auth.*, 262 A.D.2d 271 (2d Dep't 1999) (reducing $10 million award for past and future P&S to $2 million).

construction site. He underwent surgery to remove part of his brain and a spinal fusion. *Id*. at 210. He suffered from serious cognitive impairments and would "always require some sort of supervision and assistance." *Id.* at 207. The First Department found that $1.5 million for past P&S and $3.5 million over 40 years of future P&S (or $87,500 per year) was reasonable. *Id.*

In *Redish v. Adler*, 65 Misc.3d 1227(a) (Sup. Ct., Bronx Cty. 2019), *aff'd as mod.*, 195 A.D.3d 452 (1st Dep't 2021), plaintiff suffered a traumatic brain injury (TBI) while undergoing treatment in the hospital. The jury awarded $60 million for past P&S and $30 million for future P&S (over 34.5 years). *Id.* The First Department reduced the award to $3 million for past P&S and $7 million for future P&S (or $202,898 per year).

In *Andino v. Mills*, 135 A.D.3d 407 (1st Dep't 2016), the First Department reduced a future P&S award of $23 million to a plaintiff who suffered TBI to $2.7 million over 37 years (or $72,972 per year).

In *Ramos v. New York City Transit Auth.*, 2014 WL 11512022, at *2 (Sup. Ct., New York Cty, 2014), *aff'd sub nom*, 139 A.D.3d 590 (1st Dep't 2016), the First Department affirmed a $3.9 million verdict for future P&S where an infant plaintiff suffered a TBI.

These cases all involve verdicts significantly below the $70 million the jury awarded to Plaintiff here.

#### *4. Application to the Jury's $70 Million Verdict*

Permitting the jury's $70 million P&S verdict to stand would be unprecedented in New York. Based on the cases involving verdicts in amputation cases, a reasonable verdict for Plaintiff's nine years of past P&S would be $1.8 million to $6.75 million. Likewise, a verdict for future P&S in the range of $1.4 million to $4.65 million would be reasonable.

The Court should reduce the verdict significantly based on several factors. Plaintiff undoubtedly suffered serious injuries, underwent several surgeries, and will be living with prostheses for the remainder of her life. However, before her accident, Plaintiff did not suffer any pre-accident terror. The Court should consider this in assessing a reasonable award for past P&S.

With respect to both her past and future P&S, the Court should consider the good recovery that Plaintiff has made in resuming her career as an architect. *See, e.g*, *Weiden v. Schwartz*, 193 A.D.2d 570, 571 (1st Dep't 1993) (considering "plaintiff's good recovery from this accident" in finding that verdict was excessive); *Seargent v. Berben*, 235 A.D.2d 1024, 1026 (3d Dep't 1997) (rejecting plaintiff's request to increase award for past P&S based on his "good recovery and his ability to work").

For these reasons, the Court should reduce the jury verdict for past and future P&S from $70 million to $7.5 million to $10 million or grant a new trial.

## CONCLUSION

For the reasons above, the Court should:

1. grant JMOL to Defendants; or, alternatively;

2. grant Defendants' application for a new trial; or, alternatively,

3. grant remittitur of the jury's verdict.

Dated: January 20, 2026
New York, NY

Respectfully submitted,

LANDMAN CORSI BALLAINE & FORD P.C.

By: /s/ Timothy J. Collazzi
Timothy J. Collazzi
Attorneys for Defendant
120 Broadway 13th Floor
New York, New York 10271
(212) 238-4800

## CERTIFICATION

TIMOTHY COLLAZZI, hereby declares under the penalty of perjury that the following is true and correct:

I am an attorney for Defendants herein. I hereby certify, pursuant to L. Civ. R. 7.1(c), that the document complies with the type-volume limit set by the Court in its Order dated January 7, 2026. The document contains 14,977 words, excluding the parts exempted by L. Civ. R. 7.1(c). The number of words has been determined using the word count function of Microsoft Word.

Dated: January 20, 2026
New York, NY

Respectfully submitted,

LANDMAN CORSI BALLAINE & FORD P.C.

By: /s/ Timothy J. Collazzi

Timothy J. Collazzi
Attorneys for Defendant
120 Broadway 13th Floor
New York, New York 10271
(212) 238-4800